UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Defendant Daniel E. Carpenter ("Carpenter"), through his undersigned counsel, respectfully submits this memorandum of law in support of his motion to dismiss the indictment pending against him in its entirety.

A grand jury returned the indictment ("Ind.") on February 4, 2004 charging Carpenter with 19 counts of mail and wire fraud pursuant to 18 U.S.C. §§ 1341 and 1343.[1] On February 24, 2004, Carpenter entered a plea of not guilty on all counts and was released on personal recognizance.

In the indictment, the government misapplies the law in an unavailing effort to transform into a federal crime a simple civil breach of a contract – entered into by sophisticated parties in their corporate capacities – which was the result of unanticipated stock market losses similar to those suffered by millions of investors in late 2000. The indictment suffers from three fatal defects: (1) it fails to allege and specifically identify the

---

[1] Counts One through Fourteen charge wire fraud and counts Fifteen through Nineteen charge mail fraud. The indictment also charges aiding and abetting mail and wire fraud pursuant to 18 U.S.C. § 2 and seeks forfeiture pursuant to 18 U.S.C. § 981 and 28 U.S.C. § 2461(c). Although not specified in the indictment, the defendant assumes for the purposes of this motion that the aiding and abetting allegations refer to the involvement in this matter of Martin L. Paley ("Paley"), the president of Benistar Property Exchange Trust Co., Inc. ("BPE"), the company at the center of this case (Ind. ¶ 11), who apparently has not been charged by the government.

necessary *actus reus* and *mens rea* to support a criminal charge; (2) it contains internally inconsistent allegations and theories of fraud which fail to allege a crime; and (3) it fails to allege "materiality" — an essential element of the mail and wire fraud statutes.

In other words, not only does the indictment fail to place the defendant on notice as to exactly *what* he is alleged to have done in violation of a federal criminal statute (as well as *when*), and not only does the indictment fail – as a matter of law – to allege a crime, the indictment also fails to allege an essential element of the offenses charged. Consequently, the appropriate remedy is dismissal of the indictment.

## FACTUAL BACKGROUND

The facts necessary to decide this motion are undisputed.

Several professional real estate investors and businessmen located in Massachusetts and one in New Hampshire (Ind. ¶¶ 59, 63, 70, 77, 83, 88 and 93) decided to take advantage of tax benefits available under Section 1031 of the Internal Revenue Code, 26 U.S.C. § 1031, by deferring capital gains taxes on the "like-kind" exchange of certain real estate properties acquired for investment. (Ind. ¶ 4.) In order to qualify for favorable tax treatment under § 1031, a party must sell investment property (the "relinquished property"), cause the proceeds from the sale to be conveyed to and held by a "qualified intermediary," and then purchase a "replacement property" with the sales proceeds of the relinquished property within 180 days.[2] (Ind. ¶¶ 4, 5.) The qualified intermediary for a tax-free exchange cannot, as a matter of law, have a client or fiduciary relationship with the exchangor. In other words, a qualified intermediary cannot be an exchangor's attorney,

---

[2] For a general background on § 1031 exchanges, see Comment, *Reverse Like-Kind Exchanges: Is the Safe Harbor Provided By Revenue Procedure 2000-37 Really Safe?*, 33 Ariz. St. L.J. 1243 (2001); see also 26 C.F.R. § 1.1031(k)-1 (2003) (regulations involving deferred like-kind exchanges).

accountant, broker, investment banker, etc. See 26 C.F.R. § 1.1031(k)-1(k)(2) (2003) (definition of a disqualified person). Therefore, classifying the exchangors as "clients" of BPE is incorrect as a matter of law. See Point II, infra.

To that end, these professional real estate investors ("exchangors") caused the proceeds of one or more sales of investment properties to be transferred to BPE, a qualified § 1031 intermediary, and executed various standardized agreements with BPE regarding these exchanges.[3] (Ind. ¶¶ 5, 6.) Under these various agreements, BPE agreed to invest these sales proceeds in accounts at the brokerage firms of Merrill Lynch and, later, PaineWebber. (Ind. ¶ 8.) BPE's agreements with the exchangors promised either a 3% or 6% annual return on the invested funds — depending upon the level of investment risk chosen by each exchangor — until such time as the exchangor directed BPE to return or release the funds in order to pay for the replacement properties. (Ind. ¶¶ 7-8.) BPE's agreements made it clear that all cash proceeds transferred to BPE were to be invested in accounts at Merrill Lynch or PaineWebber, id., and invested "in the discretion" of BPE. (See Exchange Fee Agreement referenced in Ind. ¶ 6(d), a specimen of which is annexed hereto as **Exhibit A**.)

BPE invested the funds in stock options seeking to cover the promised return and earn a profit by making money on the invested funds. (Ind. ¶ 26.) Profits earned above the 3% or 6% level were to be split on a 50-50 basis between Benistar and Paley. (Ind. ¶ 16.) BPE also charged a fixed fee of $2,500 (see **Ex. A**) for handling each exchange, which was

---

[3] Carpenter, chairman of BPE, was also chairman of Benistar, Ltd. ("Benistar") and did work for BPE from Benistar's offices located in Simsbury, Connecticut. (Ind. ¶ 3.) Paley was BPE's president and worked in BPE's offices located in Newton, Massachusetts. (Ind. ¶ 11.)

split on a 90-10 basis in favor of Paley.[4]  (Ind. ¶ 16.)  This fee split represented the relative amount of work performed by Paley and Benistar in BPE's operations.  The indictment does not and cannot allege that any money was paid to Carpenter personally.

Although BPE successfully completed over $100 million in property exchanges for over 120 exchangors (including the exchanges at issue in the indictment as well as other exchanges involving some of these same exchangors) (Ind. ¶¶ 61, 68, 72, 87, 98), it is undisputed that BPE lost these seven particular exchangors' funds in stock option investments that went bad in the severe stock market downturn in late 2000.  (Ind. ¶ 34).  It is also undisputed that these exchangors' collective losses of $9 million (Ind. ¶ 58) substantially were incurred in late December 2000/early January 2001 when PaineWebber swept BPE's money market account to cover losses in its investment account.  (Ind. ¶¶ 52-53.)  The indictment does not allege that Carpenter moved the money to his personal account.  Rather, the funds always remained in a BPE investment or money market account.

Importantly, there is **no** allegation that Carpenter stole or embezzled **any** of the lost funds.  Instead, the funds remained in BPE's Merrill Lynch or PaineWebber accounts (as represented to the exchangors) (Ind. ¶ 8) and were simply lost due to adverse market conditions.  In other words, the indictment does not allege that Carpenter transferred any of the funds into his *personal* account and then engaged in stock options trading that went bad.  Instead, all of the funds remained in BPE's accounts *at all times*, BPE invested the funds in stock options (as permitted by the agreements between BPE and the exchangors),

---

[4] BPE's marketing strategy was to charge fees which were significantly *lower* than those prevailing in the market and pay rates of interest significantly *higher* than the market, and still make a profit.  The exchangors obviously had the option to choose to utilize the services of a different intermediary whose strategy differed.

and the funds were unfortunately lost due to a sudden market downturn (as opposed to any misappropriation, fraud, embezzlement or theft).

The word "misappropriate" is mentioned twice in the indictment. See Ind. ¶ 25 (alleging that Carpenter "engaged in a scheme to defraud that involved the misappropriation of millions of dollars of funds that BPE's clients had entrusted to the company."); Ind. ¶ 101 (alleging that Carpenter "willfully misappropriated – and lost in the market – millions of dollars of funds . . ."). However, the indictment does not tie the alleged "misappropriation" to any act of Carpenter's other than his causing BPE to invest in stock options, and the indictment certainly does not allege that any "misappropriation" redounded to Carpenter's personal benefit.

Moreover, it is undisputed that Paley was the person (a) who met with all the exchangors and persuaded them to utilize BPE's services (Ind. ¶¶ 11-12), (b) who drafted all the BPE agreements with the exchangors (Ind. ¶ 14), and (c) who made all the representations to the exchangors. (Ind. ¶¶ 17-18.) On the other hand, Carpenter (working from Benistar's office in Connecticut) *never* met with, spoke to, or communicated in writing with *any* of the exchangors.[5] (Ind. ¶¶ 12-13.) All marketing efforts were undertaken by Paley from BPE's offices in Massachusetts (Ind. ¶ 11), and all representations to the exchangors were made by Paley. (Ind. ¶¶ 17-18.)

In early 2001, the handful of exchangors whose funds had been lost filed various lawsuits, which were consolidated in the Business Litigation Session of the Suffolk Superior Court, against BPE, Carpenter, Paley, Merrill Lynch, PaineWebber and others alleging, *inter alia*, breach of contract. The superior court granted PaineWebber's motion

---

[5] The sole exception is Carpenter's having met with two exchangors in early January 2001, *after* the funds had been lost, and only to inform them of the losses. (Ind. ¶ 56.)

for summary judgment prior to trial. Also prior to trial, the defendants settled with and received full releases from Byron Darling (see Ind. ¶¶ 83-87) and R&B Enterprises (see Ind. ¶¶ 93-98), leaving only five exchangors as plaintiffs. At the conclusion of the jury trial in December 2002, a jury returned a verdict in the amount of approximately $9 million against BPE, Carpenter, Paley, Merrill Lynch and others.[6] Soon thereafter, however, Merrill Lynch's motion for judgment notwithstanding the verdict was granted. The jury award was doubled pursuant to Mass. Gen. Laws ch. 93A and, with attorney's fees, the final judgment in favor of the exchangors who collectively lost almost $9 million is expected to total almost $20 million.

However, since the rendering of the jury verdict more than a year ago, a final judgment has *not* yet been entered in the civil case due to various post-trial motions.

Specifically, the exchangors recently filed a post-trial motion to reinstate the jury verdict against Merrill Lynch which the trial court has treated as a motion for new trial. In support of that motion, an affidavit was submitted by Paley, who had previously exercised his right under the Fifth Amendment not to testify at both his deposition and trial. In his affidavit, Paley stated that when BPE was opening for business Carpenter gave him the name and phone number of BPE's broker at Merrill Lynch (Gerald Levine), to whom Paley described the nature of BPE's business and to whom he explained that the funds in BPE's accounts were to be invested for the benefit of BPE's exchangors. Another affidavit in support of the motion was submitted by an attorney who was previously not involved in the civil trial, David Patterson, who represented BPE's *very first* exchangor. Patterson

---

[6] Defendants subsequently learned that, immediately after the jury rendered its verdict, a juror called and left two voicemails for the exchangors' attorneys inviting them to meet the *entire* jury at a bar in downtown Boston "for beers." This is but one of among several key matters that will be major issues on appeal of the civil case.

stated that since BPE was a new company at the time (late 1998), he asked Carpenter to put him in touch with somebody at Merrill Lynch so that Patterson could satisfy himself that BPE's investment arrangements at Merrill Lynch were proper and above board. Carpenter put Patterson in touch with Levine and came away from that discussion fully satisfied.

This new evidence destroys the government's theory that Carpenter kept BPE's investment arrangements at Merrill Lynch a secret from the exchangors. See Ind. ¶ 31. If Carpenter thought he was doing something illegal by investing BPE's funds in stock options, the absolutely last thing in the world he would have done would be to put an exchangor's attorney in *direct* contact with BPE's broker at Merrill Lynch.

The trial court has taken these matters under advisement and it is certainly possible that a new trial may be granted as to all defendants, including Carpenter. Additionally, the trial judge may make factual findings which further severely undercut the current indictment.

## ARGUMENT

## I.    THE INDICTMENT IS DEFECTIVE BECAUSE IT FAILS TO ALLEGE A CRIME

The indictment is defective because, after parsing its allegations, it is impossible to discern *exactly* what Carpenter is alleged to have done that violates a federal criminal statute. Moreover, it fails to allege a crime because there is no connection between the required specific intent to defraud and the required specific criminal act that is alleged to have occurred.

Instead, the indictment is nothing more than a rambling hodgepodge of factual allegations (most of which are irrelevant and many of which are incorrect) whose

underlying theories of fraud meander between alleging that investing in stock options is a crime *per se*, to alleging that acting as a § 1031 intermediary is a crime *per se*, to alleging that seeking to earn a "substantial profit" in business is a crime *per se*.

In fact, "the indictment here, after all has been said and done, pleads little more than the statutory language without any fair indication of the nature or character of the scheme or artifice relied upon, or the false pretenses, misrepresentations or promises forming a part of it." United States v. Curtis, 506 F.2d 985, 992 (10th Cir. 1974).

### A.    The Indictment Fails to Identify What Ultimate Crime Was Intended

Mail fraud and wire fraud are facially inchoate crimes. Inchoate crimes prohibit an act performed in anticipation of committing *another* substantive criminal act. See Robbins, *Double Inchoate Crimes*, 26 Harv. J. on Legis. 1, 3 n.3 (1989) (inchoate crime is one in which some ultimate crime is intended by actor) ("Robbins"); *Black's Law Dictionary* 1108 (7th ed. 1999) (defining inchoate crime as "[a] step toward the commission of another crime"). Here, on the most basic level, is where the indictment's foundation totally collapses.

The indictment simply fails to identify the ultimate crime Carpenter allegedly intended to commit. Put another way, the indictment fails to describe the "target" crime that was the object of Carpenter's actions involving the alleged BPE fraud. Did Carpenter (through Paley) fraudulently induce the exchangors into using BPE's services with the intention of depriving them of their § 1031 benefits? Clearly not, since BPE did business with numerous other exchangors and successfully completed over $100 million in property exchanges — including successful exchanges involving most of the alleged "victims" here. (Ind. ¶¶ 61, 68, 72, 87, 98.) Was Carpenter's ultimate goal, once the exchangors' funds

were safely in BPE's accounts at Merrill Lynch and PaineWebber, to abscond with the funds? Not only is there no allegation in the indictment that Carpenter stole or embezzled a **single penny** from BPE, the exchangors whose $9 million was lost did not even proffer at the civil trial any evidence of such conduct. Was Carpenter's ultimate aim to lose the exchangors' funds in the stock market? Hardly, especially since from the time BPE began operations in 1998 until mid-2000, BPE's options investment strategy was actually *profitable* and even the government admits that the goal of BPE's investment strategy was to be successful and thereby earn a profit for BPE. (Ind. ¶ 16.)

The *only* allegation in the indictment regarding Carpenter's alleged ultimate criminal purpose is as follows:

> CARPENTER's primary object and purpose was to use BPE client funds to engage in aggressive, high risk trading in the options market, with the goal of leveraging the funds into a substantial profit for himself.

(Ind. ¶ 26.) Consequently, the indictment makes the ridiculous allegation that Carpenter had two target "crimes" in mind:

1.   to have BPE invest in stock options; and

2.   to earn a "substantial profit."

The indictment is clearly defective on its face because it is not a crime to invest in stock options or to earn a "substantial profit" in business. Given that these were Carpenter's alleged ultimate aims, there can be no "scheme to defraud" because the ultimate goal of the alleged fraud, by the government's own admission, was to invest BPE's funds in stock options and earn a substantial profit while doing so – neither of which constitutes fraud or a fraudulent scheme.

Moreover, pursuant to 26 U.S.C. § 1031, the qualified intermediary (BPE) is required to take *legal title* to the funds during the holding period in order for the favorable tax treatment under § 1031 to apply. See In re Exchanged Titles, Inc., 159 B.R. 303, 305-06 (Bankr. C.D. Cal. 1993) (regarding transfer of legal title to intermediary); 26 C.F.R. § 1.1031(k)-1(g)(4)(iv)(A) (2003) (requiring that legal title pass to the intermediary). Consequently, and as a matter of law, BPE was required to invest the funds in its sole discretion since any direct involvement in the choice of investment vehicle by the exchangors (other than choosing whether they sought a 3% or 6% return) would most likely run render the intended tax benefits null and void pursuant to 26 C.F.R. § 1.1031(k)-1(g)(3)(ii)(B) (2003) (requiring that exchangors have no right "to receive, pledge, borrow, *or otherwise obtain the benefits of the cash*" held by the intermediary) (emphasis added).

Furthermore, the exchangors — all of whom are professional real estate investors and/or sophisticated businessmen — knew (or reasonably should have known) that BPE was in business to earn a profit, that BPE had to invest the funds in order to earn the necessary 3% or 6% return plus earn a profit, that all investments carry risk, and that BPE could earn a profit *only* if the investment earned a return in excess of the exchangors' selected 3% or 6% return. In fact, the exchangor who lost the most money (Joseph Iantosca, see Ind. ¶¶ 70-75) testified during the civil trial that this clearly was his understanding.

### B. There is No Allegation of the Coupling of a Culpable Act (*Actus Reus*) With a Culpable Mind (*Mens Rea*)

"The *actus reus* element of a crime is the wrongful deed that comprises the physical components of a crime and that generally must be coupled with *mens rea* to establish criminal liability." United States v. Gumbs, 283 F.3d 128, 132 (3rd Cir. 2002)

(quoting *Black's Law Dictionary* 37 (7th ed. 1999)). "It is fundamental that a person is not criminally responsible unless criminal intent accompanies the wrongful act." Gasho v. United States, 39 F.3d 1420, 1429 (9th Cir. 1994), cert. denied sub nom. Ball v. Gasho, 515 U.S. 1144 (1995); see also Morissette v. United States, 342 U.S. 246, 251 (1952) (stating that a crime is the "concurrence of an evil-meaning mind with an evil-doing hand"); United States v. Bates, 96 F.3d 964, 967 (7th Cir. 1996), aff'd sub nom. Bates v. United States, 522 U.S. 23 (1997) ("A basic tenet of criminal law provides that *actus non facit reum nisi mens sit rea*, meaning an act does not make one guilty unless his mind is guilty."). In fact, the Supreme Court has constitutionalized this principle. See Powell v. Texas, 392 U.S. 514, 533 (1967) (The Eighth Amendment's Cruel and Unusual Punishment Clause requires that "criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some *actus reus*.").

A district court has summarized this concept for practical application. "A crime generally consists of two components, both of which must be proved to sustain a conviction: (a) a criminal act (*actus reus*) (b) done with the necessary criminal intent (*mens rea*) . . . a judge should dismiss a [criminal] charge when the [government] has not presented sufficient evidence to prove both the necessary *actus reus* and *mens rea*." Nesbitt v. Hopkins, 907 F. Supp. 1317, 1324 (D. Neb. 1995), aff'd, 86 F.3d 118 (8th Cir.), cert. denied, 519 U.S. 1016 (1996) (emphasis in original). Consequently, the law requires that an actor's "bad act" accompany a "bad state of mind," and the two must occur contemporaneously. In this case, the indictment fails to allege *either* the "bad act" *or* the

"bad state of mind," much less join them together. For this reason alone, the indictment must be dismissed.

The *mens rea* required in an inchoate crime is a specific intent to effect the harm that is proscribed by an object crime. See Robbins, supra. Thus, specific intent is the intention to commit a particular *target* crime; it is a special mental element *in addition to* the intent to commit the act element of the inchoate offense itself. Consequently, the mail or wire fraud defendant must specifically **intend to defraud**, and not merely intend to effect a mailing or wiring or engage in a misrepresentation. See, e.g., United States v. Sawyer, 239 F.3d 31, 40 (1st Cir. 2001) (citing United States v. Woodward, 149 F.3d 46, 51-54 (1st Cir. 1998)) (requiring specific intent to defraud); Carpenter v. United States, 484 U.S. 19, 28 (1987) (noting lower court finding of specific intent); United States v. LaMacchia, 871 F. Supp. 535, 541 (D. Mass. 1994) (dismissing wire fraud indictment because "[a] scheme to defraud is the defining concept of the mail and wire fraud statutes … [which] forbid a state of mind").

As discussed above, the only target "crimes" alleged against Carpenter in the indictment were to cause BPE to invest in stock options and earn a "substantial profit." Assuming that these were Carpenter's aims, there is clearly no crime and no intent to defraud the exchangors since neither investing in stock options nor earning a substantial profit constitutes fraud or harm to the exchangors. The total lack of allegations regarding a "bad state of mind" to harm the exchangors, combined with the government's abject failure to allege a contemporaneous "bad act," renders the indictment invalid on its face.

Moreover, the indictment fails to specify exactly *when* Carpenter engaged in the alleged fraud. Did the fraudulent act take place when the funds were transferred into the

investment accounts – the Merrill Lynch B10 account or the PaineWebber 33 account (Ind.

¶ 46) – regardless of what type of investments were made?  Or is the government claiming

that the fraud took place when the option investments were made; or when the money was

lost; or when BPE failed to pay back the money?  Throughout the indictment, the

government's underlying theory of fraud zig-zags from one point to the next without

presenting any definitive conclusion.  Nowhere in the indictment does the government

allege "where" and "when" the alleged crime was committed.

This is essential because the *actus reus* must be done with the requisite *mens rea*.

A subsequent event that is beyond the control of the defendant – such as a stock market

downturn – cannot constitute the requisite elements that turn an act, *innocent when done*,

into a crime.

This fundamental flaw renders the indictment unconstitutionally vague because it

allows the government to change its theory of the case in order to fit the evidence

ultimately adduced at trial.  The Second Circuit, having confronted this tactic, cautioned

courts to be especially alert to subtle attempts by the government to broaden the already

pervasive and wide sweeping nets of the mail and wire fraud statutes:

> In light of the current broad range of conduct covered by the federal fraud statutes,
> it is critical that courts vigilantly enforce the Fifth Amendment requirement that a
> person be tried only on the charges contained in the indictment returned by the
> grand jury . . .  In order to avoid amending an indictment in violation of the Fifth
> Amendment, *the government in fraud cases should think through the nature of the
> crime it wishes to allege and then spell out the offense in a carefully drafted
> indictment*, instead of confronting the defendant with its theory of criminality for
> the first time at trial.

United States v. Mollica, 849 F.2d 723, 729 (2d Cir. 1988) (internal citations and

quotations omitted) (emphasis added).  It is patently clear in this case that the government

has failed to follow this wise advice. Dismissal of the indictment, therefore, is the appropriate remedy.

The government's only other allegation in the indictment even remotely touching upon the issue of the "when" or "what" is that BPE (through Paley, since Carpenter had no direct contact with the exchangors) deceived the exchangors by misrepresenting to them that BPE "would hold their money safe" (Ind. ¶ 17) and gave "assurances that the money would be protected and held safe," (Ind. ¶ 27) and yet invested the money in stock options which turned out not to be "safe." The use of the vague term "safe" also renders the indictment unconstitutionally vague, since "safe" is a matter of degree and it was clearly contemplated that a 3% or 6% return could not be achieved without some level of risk-taking in the investments. If the exchangors wanted a completely risk-free strategy, they could have contracted with BPE to place the funds in an FDIC-insured savings account *or agreed not to receive any interest at all* (as is the case with many § 1031 intermediaries). In addition, the indictment is legally deficient because **"[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a <u>contemplated harm to the victim</u>."** <u>United States v. D'Amato</u>, 39 F.3d 1249, 1257 (2d Cir. 1994) (emphasis added) (quoting <u>United States v. Starr</u>, 816 F.2d 94, 98 (2d Cir. 1987) ("[o]nly a showing of <u>intended</u> harm will satisfy the requirement of fraudulent intent") (emphasis added)).

Furthermore, even according to the ill-defined theories underlying the indictment in this case, there is no allegation that Carpenter **intended to harm the exchangors** (*i.e.*, that he intended not to effectuate the § 1031 exchanges or that he intended to lose or steal the money). Quite to the contrary, even the government alleges that Carpenter's aim was to

earn a return sufficient to pay the 3% or 6% and to earn a profit for BPE – which could
occur only if the exchangors received their principal *plus* 3% or 6%.

The indictment is premised on the theory that the exchangors based their decision
to use BPE's services on Paley's representations that the funds would be "kept safe."
However, exactly what does it mean to keep the funds "safe"? The term "safe" is always a
matter of degree, and criminality cannot turn on unspecified matters of degree about which
reasonable people can differ. Is it the government's position that exchangors were
"guaranteed" that the funds would be kept in an account that did nothing but earn minimal
or zero interest? If so, that is inconsistent with the underlying documents which reflect an
understanding that the funds would be *invested in something* in order to secure a 3% or 6%
rate of return. See **Ex. A**. While 3% or 6% were not (unlike today) considered exorbitant
rates of return in mid-2000, no investment seeking those rates of return is 100% "safe." In
fact, there is no such thing as a "risk-free" investment. When interest rates rise, even U.S.
Government securities lose value. Thus, there is an inherent inconsistency between any
alleged representation about keeping the funds "safe" (*i.e.*, guaranteeing no interest at all)
and the language of the various agreements.

Alternatively, the government could be claiming that Paley "guaranteed" that the
proceeds would be returned in full, no matter what happened to the "interest." But if that
were the case, then the exchangors should not have expected *any* return on the funds
(either 3% or 6%) because, by definition, any large investment yielding *any* rate of interest
entails *some* risk to the principal. Again, there is an inherent and insurmountable conflict
between the government's theory of fraud and the underlying agreements, particularly
where (as here) the exchangors necessarily focused on risk or they would not have had a

choice between earning 3% and 6% on the funds. Moreover, it cannot be a crime to have

insufficient money to satisfy a "guaranteed" return. Many companies have lost money on

a particular investment and have had to satisfy guarantees with other assets. If the

government's theory is based on BPE having made "guarantees," certainly no crime can

occur simply because BPE lacked sufficient assets to make good on its guarantees.

In fact, the government's entire "safeness" theory also conflicts with the very

nature of § 1031 exchanges. There is nothing in the § 1031 regulations which prohibits an

exchangor from using a bank as a "qualified intermediary." See 26 C.F.R. § 1.1031(k)-1

(2003). In fact, BPE's competitors offered little or no interest on the funds during the

replacement period. The exchangors here could have just as easily chosen a bank, or other

totally "safe" repository, for their funds. Instead, they voluntarily chose BPE, in part

because of Paley's expertise (see Ind. ¶ 12), but also — in all likelihood — because they

relished the opportunity (as would any sophisticated real estate investor) to earn money on

their money during the six month replacement period and pay a low fee. In short, the

exchangors deliberately chose to assume investment risk in order to earn a "profit" (the 3%

or 6%) during the replacement period. They could just as easily have chosen a large

FDIC-insured bank to serve as the qualified intermediary.

Furthermore, the harm contemplated to the victim must go to the very nature of the

bargain itself. See United States v. Regent Office Supply Co., 421 F.2d 1174, 1182 (2d

Cir. 1970) (no fraud when misrepresentations did not affect "the customer's understanding

of the bargain nor . . . influenc[e] his assessment of the value of the bargain to him"). The

nature of the bargain between the exchangors and BPE was to complete § 1031 exchanges,

earning interest on the funds during the replacement period was merely the "icing on the

cake." Since there is no allegation in the indictment that Carpenter did not intend to complete the exchanges, the indictment fails to allege the necessary scheme to defraud.

When all is said and done, the "scheme" charged by the government, if it succeeded, would have resulted in (1) the exchangors receiving back their principal *plus* 3% or 6%, (2) the exchangors deferring millions of dollars in capital gains taxes due to the successful completion of their § 1031 exchanges, (3) BPE earning a profit ("substantial" or otherwise), and (4) Paley and Benistar evenly splitting that profit. Certainly this intended outcome, conceded by the government in the indictment, does not form the basis of an intent to defraud the exchangors. See United States v. Pimental, 236 F. Supp.2d 99, 107 (D. Mass. 2002) ("the required proof is of an *intent* to defraud") (emphasis added); United States v. Powers, 168 F.3d 741, 746 (5th Cir. 1999) (defendants must "intend some harm to result from the fraud"). Had the plan worked, there surely would be no crime, only satisfied exchangors. Failure of the plan due to a "perfect storm" of unanticipated market reversals cannot transform it into a crime.

At most, the indictment can be read to allege that *Paley and only Paley* deceived the exchangors by misrepresenting to them the form of investments to be made with their funds (to which Carpenter acceded) with a view to enticing them to utilize BPE's services as a qualified intermediary, thereby allowing BPE to successfully complete the exchanges, return the exchangors' principal, pay the exchangors 3% or 6%, earn a substantial profit for BPE, and evenly split that profit between Paley and Benistar. However, nowhere does the indictment allege that Carpenter **intended to harm the exchangors** (*i.e.*, either by intending not to effectuate their exchanges or by intending to lose or steal their funds). Nor did Carpenter misrepresent the location of the funds – even the government concedes

that the funds never left BPE's accounts at Merrill Lynch and PaineWebber until authorized by the exchangors to complete the exchanges. (Ind. ¶¶ 8-9.) Consequently, the indictment fails to allege "a fraudulent intent as required by the mail fraud statute." Starr, 816 F.2d at 98.

Because the indictment fails to allege the concurrence of a specific act with a specific intent to defraud, the indictment fails – as a matter of law – to support the crimes charged. When stripped of its surplusage, the indictment condemns Carpenter merely for seeking to operate BPE profitably. However, BPE could only earn a profit if the exchangors received back their principal *plus* the 3% or 6%. Likewise, if the exchangors lost money, BPE lost money. So, the government's theory in this case — taken to its logical conclusion — is that Carpenter intended to defraud himself, because any harm to the exchangors necessarily would have resulted in harm to Carpenter! Put another way, BPE could have earned only 1% on its investments, repaid the principal, and still would have lost money and breached its agreements with the exchangors. However, running a money-losing company is not a crime.

## C.    The Indictment Alleges Only A Breach of Contract — Which Does Not Amount to Mail or Wire Fraud

In the civil trial, which as of this date is still ongoing, BPE did not vigorously contest the breach of contract claim because it did (unfortunately) lose during a two-week period in poorly performing stock market investments at PaineWebber approximately $9 million of the exchangors' funds that BPE had agreed to make available for the purchase of the replacement properties. (Ind. ¶ 7.) However, BPE did vigorously contest the claim for

conversion because, as described supra, BPE was *required* to become the legal owner of the funds.[7]

The government has made the same mistake in the indictment as did the trial court in the civil case by losing sight of the key distinction between a breach of contract and fraud. "A breach of contract does not amount to mail fraud. Failure to comply with a contractual obligation is only fraudulent when the **promisor never intended to honor the contract**." D'Amato, 39 F.3d at 1261, n.8 (emphasis added); see also Soper v. Simmons Int'l, Ltd., 632 F. Supp. 244, 249 (S.D.N.Y. 1986) ("mere failure of promised performance has never permitted a factual finding that defendants never intended to perform."). Nowhere does the indictment allege that Carpenter did not intend for BPE to perform the agreed-upon exchange services or to return the exchangors' principal plus 3% or 6%.

Consequently, the mere failure of performance (*i.e.*, BPE's loss of the $9 million and the inability to complete the exchanges) cannot be used to infer, or even allege, fraudulent intent. As the Second Circuit put it in D'Amato, 39 F.3d at 1249 n.8 (reversing mail fraud conviction of Senator D'Amato's brother for insufficient evidence of criminal intent):

---

[7] "One who intentionally or wrongfully exercises acts of ownership, control or dominion over personal property *to which he has no right of possession at the time* is liable for conversion." Abington Nat'l Bank v. Ashwood Homes, Inc., 19 Mass. App. Ct. 503, 507 (1985) (emphasis added). Since federal law mandated that BPE become the legal owner of the invested funds, BPE's exercise of ownership over the funds was not "wrongful" within the meaning of the intentional tort of conversion. Rather, all the agreements between BPE and the exchangors necessarily endowed BPE with absolute control over the funds. Furthermore, the trial court found that "there appears to be no dispute that the plaintiffs knew their cash would be used to purchase some form of securities . . . ." See Cahaly v. Benistar Property Exchange Trust Co., Inc., No. 01-0116-BLS, *Memorandum and Order on Motion for Summary Judgment of Defendant UBS PaineWebber, Inc.*, at 9 (Jan. 13, 2003) (Botsford, J.) (emphasis added). Consequently, BPE's failure to return the funds may have constituted breach of contract, but not conversion and certainly not fraud. See 1 Dobbs, *The Law of Torts* § 63 at 133 (2001) ("**conversion does not lie for failure to pay a debt**.") (emphasis added).

> A breach of contract does not amount to mail fraud. Failure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract. To infer fraudulent intent from mere nonperformance, therefore, would eviscerate the distinction between a breach of contract and fraud.

Id. (internal citations omitted); see also United States v. Kreimer, 609 F.2d 126, 128 (5th Cir. 1980) ("[T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract."); Soper, 632 F. Supp. at 249 ("proof of [fraudulent] intention must be based on more than a mere showing of nonperformance"). In contrast, BPE successfully completed over 100 transactions, and failed only in a handful.

At bottom, the indictment's theoretical underpinnings are based on the dubious proposition that whether mail and wire fraud were committed depends *solely* on the success of BPE's investment strategy. In other words, had BPE's investment strategy been *profitable* in late 2000 (as it was from 1998 through mid-2000) and none of the exchangors' funds had been lost, would a crime have been committed? More specifically, had BPE invested "short" (*i.e.*, selling "calls" instead of selling "puts") (see Ind. ¶¶ 33-34) in the falling stock market of late 2000 instead of investing "long" (*i.e.*, expecting a rising market), it is likely that BPE would have *earned* money, all of the exchanges would have been successfully completed, BPE would have earned a "substantial profit," and there would have been no civil suit. Would a crime have been committed under those circumstances?

In the same vein, what if BPE, instead of investing in "risky" stock options, had invested in bonds of companies that were considered "safe" investments in mid-2000 (such as WorldCom, Enron, Polaroid and United Airlines – all of which have, since then, gone bankrupt and all of whose bonds have become virtually worthless)? The exchangors still