would have lost $9 million. Would the government have indicted Carpenter for causing BPE to make *bond* investments which lost money (as opposed to stock options)? What about purchasing annuities in an insurance company that later went into receivership? Or investing in certificates of deposit in excess of the $100,000 FDIC insurance limit in a bank that subsequently went bust? In sum, the government has reverse-engineered a fraud out of whole cloth from what is clearly just a breach of contract. However, a contract breach does not "itself constitute a scheme to defraud." McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir. 1990).

Likewise, if BPE had invested in more "secure" investments, but still lost money, would there have been a fraud? If so, then the allegations relating to the creation of the investment accounts and the allegations relating to the representations about the money being "safe" are irrelevant. Conversely, does it mean that if BPE had invested in options and made money, as in 1999, there would have been no fraud? What if BPE earned enough only to pay back the principal plus 3%, but not 6%? Or what if BPE could only pay back the principal? Would that still be a crime?

The indictment begs the critical questions: Would this be a fraud if BPE made money on the options investments and fully repaid the exchangors their principal plus 3% or 6% interest? Alternatively, would it be a fraud if the money was lost on the investments, but BPE somehow was able to repay the exchangors from another source (*i.e.*, loans)? Would it be a fraud if BPE made a lot of money, returned the principal and some interest, and then added additional funds to "sweeten the pot"? These questions are important because, if there can be no fraud if the investments were successful or if the exchangors were repaid, then the government's theory of fraud is not only unclear, it is

21

constitutionally infirm. For, surely, whether or not an individual engages in a federal crime cannot depend on whether or not his investments make money! There must be a material misrepresentation or omission and an intent to defraud. Ultimately, the gain or loss of the investment is irrelevant.

It is clear that the government has transformed this civil breach of contract dispute involving sophisticated parties acting in their corporate capacities into a federal criminal proceeding because of (a) the size of the loss; (b) the incessant demands of the exchangors to use the government as their collection agency; and perhaps (c) an institutional desire to be viewed as proactive in pursuit of "white-collar" crime in this post-Enron era of law enforcement.[8]

## II.    THE INDICTMENT'S INTERNAL INCONSISTENCIES MAKE IT IMPOSSIBLE TO DISCERN WHAT CRIMNAL CONDUCT IS ALLEGED

The indictment contains so many internally inconsistent factual allegations and theories of fraud that it is impossible to discern exactly what conduct the government contends is criminal.

For example, the indictment alleges that BPE was a wholly-owned subsidiary of Benistar (Ind. ¶ 2) and that Carpenter was chairman of both BPE and Benistar. (Ind. ¶ 3.) However, nowhere does the indictment allege that Carpenter acted outside the scope of his corporate authority or that he breached a fiduciary duty owed to either Benistar or BPE.

---

[8] The indictment was returned at 4:18 p.m. on February 4, 2004. (Ind. at 32.) However, at a meeting with Carpenter's attorneys *earlier that same day*, government attorneys stated that a decision whether to indict had not yet been made. The next day, the government issued an obviously hastily drafted press release (annexed hereto as **Exhibit B**) announcing the indictment and which erroneously implied that Carpenter had actually stolen or embezzled $9 million. The day after that, it was reported that on the same day the indictment was returned, government prosecutors had been publicly criticized for their perceived lack of focus on pursuing white-collar offenses. See *Federal Judge Accuses U.S. Attorney of Letting Corruption Slide*, The Boston Globe at B-1. (Feb. 6, 2004) (annexed hereto as **Exhibit C**).

22

Consequently, the indictment lacks the factual nexus to connect Carpenter to *any* activity that would be more properly identified as acts of BPE itself.

In other words, whenever the word "CARPENTER" appears in the indictment, the word "BPE" can easily be substituted for it and the theory of fraud does not change. This makes the indictment internally inconsistent because *all* of the acts that are alleged to have been committed by Carpenter could very easily have been alleged to have been committed by BPE. However, since it is not alleged that Carpenter overstepped his corporate authority with respect to BPE, the acts of Carpenter cannot be distinguished from those of BPE with sufficient particularity to put Carpenter on notice as to what it is *exactly* that he is alleged to have done in violation of a federal criminal statute.

A simple example of this is when the indictment alleges that Carpenter obtained a bond to "further reassure [the exchangors] that their money would be safe," (Ind. ¶ 21) presumably in furtherance of his alleged "scheme" to deceive the exchangers into using BPE's services. However, it was BPE that obtained the bond, not Carpenter, and obtaining corporate bonding is a normal, customary and *prudent* thing to do in the business world.

Similarly, the indictment alleges that Carpenter had the ultimate "goal of leveraging the funds into a substantial profit for *himself*." (Ind. ¶ 26) (emphasis added). However, this allegation is directly contradicted by paragraph 16 of the indictment which does not mention Carpenter at all and states that profits were to be split between Paley and *Benistar*. In other words, without alleging that Carpenter is the sole shareholder of Benistar, there is no basis in the indictment for alleging that Carpenter was to personally benefit from any profit split with Paley!

23

Another example relates to the theory that "unbeknownst" to the exchangors, Carpenter "opened up a second account at Merrill Lynch in the name of BPE." (Ind. ¶ 31.) This theory implies that the creation of BPE's investment account at Merrill Lynch (and later PaineWebber) was somehow fraudulent.

Yet this theory of fraud is directly contradicted by the factual averments contained in the indictment itself. The indictment alleges that one of the standardized forms the exchangors were required to sign was an "Account Selection Form" (Ind. ¶ 6) and that this form put the exchangors on notice that the 3% account allowed for disbursement of funds on only three days' notice, but disbursements from the 6% account required 30 days' notice for liquidation of the investment. (Ind. ¶ 9.) These facts make the "secretiveness" theory laughable, since the exchangors obviously knew there were separate accounts at Merrill Lynch and PaineWebber because they were forced to sign Account Selection Forms informing them of this fact. Consequently, it is impossible for Carpenter to have established the second account "unbeknownst" to the exchangors.

Another major inconsistency is that throughout the indictment the exchangors are constantly referred to as BPE's "clients," evidently as a tactic by the government to suggest the existence of some kind of fiduciary relationship between BPE and the exchangors akin to a brokerage, investment manager or other similar relationship. However, as described supra, the § 1031 intermediary cannot, *as a matter of law*, have a "client" or similar fiduciary relationship with the exchangor. In other words, a § 1031 intermediary cannot be an exchangor's attorney, accountant, broker, investment banker, or any other professional wherein a "client" relationship is assumed or intended. See 26 C.F.R. § 1.1031(k)-1(k)(2) (2003) (definition of a disqualified person). If a client

24

relationship is found to exist between the exchangor and the intermediary, the intermediary is disqualified from so acting and the § 1031 tax benefits will be lost.

Therefore, the continued use in the indictment of the word "client" to describe the exchangors is incorrect as a matter of law. Since the exchangors could not be "clients" of BPE, there could be no fraudulent scheme *as a matter of law* because BPE owed no duty (other than that arising from contract) to the exchangors to keep the funds "safe" or in any other state. See United States v. Autorino, 2003 WL 23315192 (D. Conn.) (dismissing wire fraud indictment because, as a matter of law, provisions of the Uniform Commercial Code prevented alleged fraudulent act from occurring).

### III. THE INDICTMENT IS DEFECTIVE BECAUSE IT FAILS TO ALLEGE MATERIALITY

Nowhere in the 32 pages and 108 paragraphs of the indictment is there a single allegation that Carpenter committed a misrepresentation or omission of a **material** fact. Since "materiality" is an essential element of the mail and wire fraud statutes, the indictment is defective on its face and must be dismissed.

Due to the substantial similarity of the operative language of the mail and wire fraud statutes, both statutes are analyzed together. See Carpenter v. United States, 484 U.S. at 25 n.6 ("The mail and wire fraud statutes share the same language in relevant part …"); United States v. Boots, 80 F.3d 580, 586 n.11 (1st Cir. 1996) ("The Court has analyzed mail and wire fraud offenses similarly, because they share the same relevant statutory language."). To prove mail and wire fraud, the government must allege and prove:

25

.
.
.

a scheme to defraud by means of false pretenses;

the defendant's knowing and willing participation in the scheme with the **intent to defraud**; and

the use of interstate wire or mail communications in furtherance of the scheme. See United States v. Montminy, 936 F.2d 626, 627 (1st Cir. 1991) (elements of mail fraud); United States v. Serrano, 870 F.2d 1, 6 (1st Cir. 1989) (elements of wire fraud) (emphasis added).

The Supreme Court has ruled, however, that the mail and wire fraud statutes incorporate the common law concept of "materiality," in the sense that both mail and wire fraud require that the defendant committed a misrepresentation or omission of *material* fact. See Neder v. United States, 527 U.S. 1, 25 (1999) ("we hold that materiality of falsehood is an [essential] element of the federal mail fraud, wire fraud, and bank fraud statutes"). Consequently, an indictment charging mail or wire fraud must contend that the alleged scheme or artifice to defraud "involved *material* falsehoods." United States v. Colon-Munoz, 192 F.3d 210, 221 (1st Cir. 1999) (emphasis added); see also United States v. Marino, 204 F. Supp.2d 476, 490 (E.D.N.Y. 2002) ("As to the element of a scheme to defraud, the government is required to prove . . . [*inter alia*] the materiality of the misrepresentations."). Here, the indictment does not even mention the word "material" or refer to the issue of "materiality" once, let alone allege that Carpenter engaged in any material falsehoods.

"Though there is no prescribed formula, it is generally sufficient that an indictment set forth the offense in the words of the statute itself, **as long as those words set forth all the elements of the offense without any uncertainty or ambiguity**." United States v. Brown, 295 F.3d 152, 154 (1st Cir. 2002) (internal quotations and citations omitted)

(emphasis added); see also Hamling v. United States, 418 U.S. 87, 117 (1974) ("[A]n indictment is sufficient if it, first, contains the elements of the offense charged . . . ."); United States v. Allen, 357 F.3d 745, 749 (8th Cir. 2004) ("To be sufficient, an indictment must contain the elements of the offense charged.") (internal quotations and citations omitted). Moreover, as the government clearly has done in this case, "simply parroting the language of the statute in the indictment is insufficient." United States v. Brandon, 298 F.3d 307, 310 (4th Cir. 2002). This Court is certainly not required to rubber-stamp every indictment that merely tracks the relevant statutory language.

"If the indictment is legally deficient, the proper result is dismissal of the indictment." United States v. Landham, 251 F.3d 1072, 1080 (6th Cir. 2001). Furthermore, the government's resort to a bill of particulars in this case would be unavailing. "A bill of particulars cannot cure a legal deficiency; rather the proper result is dismissal of the indictment." United States v. Superior Growers Supply, Inc., 982 F.2d 173, 177 (6th Cir. 1992). Since the indictment omits *any* allegations regarding materiality – an essential element of both mail and wire fraud – the indictment is legally deficient and must be dismissed. See United States v. Martinez, 268 F. Supp.2d 70 (D. Mass. 2003) (dismissing indictment for, *inter alia*, failing to allege all elements of the offense); United States v. Whiting, 771 F. Supp. 476, 477 (D. Mass. 1991) ("an indictment must clearly state *every element of the crime charged* and may not be amended or amplified by either the evidence adduced at trial or the judge's instructions to the jury") (emphasis added); United States v. Pickett, 353 F.3d 62, 68 (D.C. Cir. 2004) (reversing conviction and dismissing indictment because indictment "does not charge all the elements of the offense.").

27

## IV. THE COURT SHOULD NOT PERMIT THE GOVERNMENT TO CRIMINALIZE THIS CIVIL BUSINESS DISPUTE

The First Circuit has cautioned federal prosecutors:

> The broad language of the mail and wire fraud statutes are both their blessing and their curse. They can address new forms of serious crime that fail to fall within more specific legislation. On the other hand, they might be used to prosecute kinds of behavior that, albeit offensive to the morals or aesthetics of federal prosecutors, cannot reasonably be expected by the instigators to form the basis of a federal felony.

United States v. Czubinski, 106 F.3d 1069, 1079 (1st Cir. 1997) (internal citations omitted).

The case at bar clearly falls within the latter category. Investing in stock options is a normal, customary and established way to invest. For purposes of this motion, this Court may take judicial notice of the fact, see Fed. R. Evid. 201(f), that Merrill Lynch and PaineWebber both invest their own funds *and* their clients' funds in stock options on a daily basis. Carpenter could not have reasonably expected that causing BPE to invest the funds (to which it held legal title) in stock options would form the basis of a federal felony.

While the government may take umbrage with BPE's investment strategy, criminalizing a simple breach of contract dispute involving sophisticated parties acting in their normal corporate capacities is akin to the horrific practice of Procrustes. See Morano, *The Mail Fraud Statute: A Procrustean Bed*, 14 J. Mar. L. Rev. 45, 47 n.3 (1980) (likening the unsettling malleability of mail fraud to the conduct of Procrustes, who in mythology forced his guests to lie on an iron bed and then either stretched out or lopped off their legs to make their bodies conform to the length of the bed).

Furthermore, this case is a misallocation of the Court's extremely limited resources (as well as those of the government). In bringing this proceeding, the government has

assumed the mantle of "collection agent" for a handful of sophisticated real estate investors and businessmen who are about to reap a windfall in the form of a $20 million civil judgment on account of a $9 million loss.

An oft-cited case is particularly applicable to the conduct at issue in the case at bar, given the backdrop of the recent technology bubble and the late 2000 stock market collapse. In United States v. Corliss, 7 F.2d 455 (8th Cir. 1925), two brothers were indicted for an alleged scheme to obtain money from purchasers of stock in their dairy business by means of fraudulent representations. The government alleged that the brothers had fraudulently represented that the company had paid, and would continue to pay, dividends on its stock at the rate of 11% per year and that the company would, on 30 days' notice, refund the purchase price of the stock to any dissatisfied purchaser. During World War I, the government encouraged dairy farmers to substantially expand their facilities. However, when the war ended, the government found itself with a massive oversupply of milk and, consequently, prices collapsed. As a result, the brothers were unable to pay stock purchasers the 11% dividend or, for that matter, redeem the shares. On appeal, the Eighth Circuit reversed the brothers' fraud convictions, stating:

> Some allowance ought to be made for the zeal and excitement which seized upon industries like the defendants' and other war industries to enlarge their business and to believe such increases would yield large profits. Errors committed in the atmosphere which reigned during the years 1917-1920 ought to be looked upon charitably . . . The record shows that the disaster which overtook the defendants' business was common throughout the entire industry. *A business failure induced by such causes does not convert the enterprise into a scheme to defraud.*

Id. at 457 (emphasis added).

Here too, "[s]ome allowance ought to be made for the zeal and excitement which seized upon industries like [BPE's] to enlarge their business and to believe such increases

29

would yield ["substantial"] profits. Errors committed in the atmosphere which reigned during the years [1999-2000] ought to be looked upon charitably . . . The record shows that the disaster which overtook [BPE] was common throughout the entire [investment] industry. *A business failure induced by such causes does not convert the enterprise into a scheme to defraud.*" Id. (emphasis added).

Although ultimately, and unfortunately, the exchangors lost money, there were no misrepresentations, there was no scheme to defraud, no one was deceived, no money was stolen or embezzled, no harm was intended and, consequently, no crime was committed.

## CONCLUSION

For all the foregoing reasons, and in the interests of justice, defendant Daniel E. Carpenter respectfully requests that this Honorable Court dismiss the indictment in its entirety.[9]

## REQUEST FOR ORAL ARGUMENT

Defendant respectfully requests oral argument on this motion.

Dated:  May 6, 2004

DANIEL E. CARPENTER,
By his attorneys,

A. John Pappalardo, Esq. (BBO # 338760)
Evan Georgopoulos, Esq. (BBO# 628480)
GREENBERG TRAURIG LLP
One International Place, 20th Floor
Boston, MA 02110
(617) 310-6000

---

[9] Since "a charge of aiding and abetting is implicit in indictments for substantive offenses," United States v. Keene, 341 F.3d 78, 84 (1st Cir. 2003), dismissal of the mail and wire fraud counts will likewise result in dismissal of the aiding and abetting allegations.

30

*Of Counsel*:

Alan M. Dershowitz, Esq.
1563 Massachusetts Avenue
Cambridge, MA 02138
(617) 496-2187

Edward A. McDonald, Esq.
Nelson A. Boxer, Esq.
Michael J. Gilbert, Esq.
DECHERT LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 698-3500

Richard S. Order, Esq.
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8100

## CERTIFICATE OF SERVICE

I, Evan Georgopoulos, hereby certify that a true and accurate copy of the foregoing was served on the government's attorney as appears below by hand delivery on this 6th day of May, 2004:

Michael J. Pineault
Assistant U.S. Attorney
Office of the U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210

Evan Georgopoulos, Esq.