COURT
OF MASS.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2004 MAY 27  P  7: 08

UNITED STATES OF AMERICA )
)
v. )  CRIMINAL NO. 04-10029-GAO
)
DANIEL E. CARPENTER, )
)
Defendant. )
)

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

The United States opposes defendant Daniel E. Carpenter's ("Carpenter's") Motion to

Dismiss the Indictment. Contrary to the arguments advanced by Carpenter, the allegations of the

indictment – which must be taken as true for purposes of defendant's motion – adequately plead

the elements of the charged mail and wire fraud offenses and fully inform Carpenter of the

charges against which he must defend. Specifically, the indictment charges Carpenter with

having engaged in a fraudulent interstate scheme, using the wires and the mail, pursuant to which

clients were induced to entrust millions of dollars to Carpenter's company based on false

representations that the money would be held safely in escrow and returned to them in full. In

fact, Carpenter took the money and used it, without his clients' knowledge or authorization, to

finance aggressive, speculative trading in uncovered stock options, with the purpose of

generating substantial profits for himself. Carpenter's options trading failed, and he lost over $9

million of the client funds that he had misappropriated. (Indictment ¶¶ 25-29).

Defendant's motion to dismiss ignores the foregoing allegations and instead attempts to

characterize the funds as having been "unfortunately lost" due to a "perfect storm" of

unanticipated "adverse market conditions" – conduct that Carpenter asserts may have constituted

a breach of his contractual obligations to his clients but that he contends did not amount to a federal crime. (Def. Br. at 4-5, 17, 28-30). Carpenter is free to try to spin the facts this way if he wishes, but the proper time and place for him to do so is at trial, to a jury. His disagreements with the indictment's factual allegations are not the proper basis for a motion to dismiss.

The indictment fully and adequately pleads the crimes charged. Carpenter's motion to dismiss should be denied.

## THE INDICTMENT'S ALLEGATIONS

On February 4, 2004, the Grand Jury indicted Carpenter on fourteen counts of wire fraud (18 U.S.C. § 1343) and five counts of mail fraud (18 U.S.C. § 1341). The charges in the indictment revolve around false representations made to induce clients to retain and escrow funds with Carpenter's company, Benistar Property Exchange Trust Company, Inc. ("BPE").

As charged in the indictment, BPE was engaged in the business of serving as an intermediary in connection with property exchanges performed pursuant to Section 1031 of the Internal Revenue Code. (Indictment ¶ 4). Pursuant to such exchanges, owners who sell investment property can defer the capital gains tax that would otherwise be owed upon the sale by rolling the proceeds over into the purchase of replacement property within 180 days. Id. Because tax deferral is lost if the owner takes possession of the proceeds during the interim period between the sale of the initial property and the acquisition of the replacement property, a number of companies offer their services as short-term intermediaries to hold the proceeds in escrow until the owner is ready to close on the replacement property transaction. BPE held itself out as such an intermediary. (Indictment ¶ 5).

BPE gave written and oral assurances to its clients that BPE would hold their money safe

2

and return the principal to them, in full, for using in closing on the purchase of replacement property. That was the purpose of doing a section 1031 exchange – to park the proceeds from the initial sale in escrow with the intermediary until the money was disbursed to close on the purchase of replacement property. (Indictment ¶ 17).

The indictment sets forth in detail the specific assurances that were given to clients. (Indictment ¶¶ 18-24). They included representations that BPE was trustworthy, that the money would be held in escrow in the designated account into which the clients were instructed to transmit the funds, that BPE would not transfer the money out of the account without the client's written authorization, and that BPE would return the funds in full, either to be disbursed for the client's use in closing on the purchase of replacement property or to be returned to the client if no replacement property transaction was to occur. Id.

As Chairman of BPE, Carpenter was aware of the representations that were being made to induce clients to retain and escrow their funds with his company. (Indictment ¶¶ 28, 100). The indictment charges him with having reviewed and assisted in drafting the exchange documents and promotional materials that contained those representations. (Indictment ¶¶ 14, 18-21, 100).

Contrary to the representations that were made to clients, however, Carpenter did not hold the escrow funds safe in the accounts into which they had been wired. Instead, without his clients' knowledge or authorization, Carpenter took the funds and used them to engage in aggressive, high stakes trading in the options market, transferring millions of dollars of BPE client money into trading accounts that he opened, first, at Merrill Lynch and, later, at PaineWebber. (Indictment ¶¶ 26-28). In essence, Carpenter was gambling in speculative investments with client escrow funds, hoping to win big on his options trading and thereby

leverage the funds into a substantial profit for himself.  (Indictment ¶¶ 30-33).

Carpenter's plans went awry, however.  Beginning no later than April, 2000, he began sustaining substantial trading losses – losses that he covered by systematically transferring additional BPE client funds into his trading account. (Indictment ¶¶ 34, 39).  In response, Merrill Lynch urged him to trade more prudently.  Carpenter disregarded Merrill Lynch's advice and its warnings, despite acknowledging to one of his brokers that he had the mentality of a "riverboat gambler" and was acting "very foolish." (Indictment ¶ 36).  Instead, BPE continued, with Carpenter's knowledge, to solicit and induce clients to entrust funds to the company based on false representations that the money would be held safely in escrow, and Carpenter continued, without his clients' knowledge or authorization, to take and to use those funds to finance his high risk trading "strategy."  (Indictment ¶ 41).

In September, 2000, after Carpenter had sustained approximately $4 million in losses, Merrill Lynch terminated Carpenter's trading privileges, because his strategy was "too risky." (Indictment ¶ 43).  Carpenter responded by transferring BPE client funds to PaineWebber and opening up a trading account there.

PaineWebber similarly cautioned Carpenter concerning the substantial risks and "very significant potential losses" posed by his options trading.  He disregarded those warnings as well, followed the same aggressive "strategy" that he had employed at Merrill Lynch, and sustained equally heavy losses.  (Indictment ¶¶ 47-51).  As he had at Merrill Lynch, Carpenter covered his losses, and also financed his ability to engage in additional trading, by transferring BPE client funds into his PaineWebber trading account.  (Indictment ¶ 49).

In December, 2000, PaineWebber terminated Carpenter's trading privileges.  By the time

Carpenter wound down his positions at PaineWebber, his total net losses exceeded $9 million. (Indictment ¶¶ 52-53).

The indictment details seven specific BPE clients who collectively lost just over $9 million in funds that Carpenter misappropriated, gambled and lost through the above-described options trading. (Indictment ¶ 58). All of the clients were induced to retain BPE and to entrust their money to the company based on explicit representations and assurances that they received concerning the safety of their funds and the manner in which the money would be held. (Indictment ¶¶ 59 - 95). None of the clients authorized Carpenter to use their funds for high risk options trading. None was told that Carpenter was engaged in such trading with BPE client money, that he was sustaining heavy losses in such trading, or that Merrill Lynch had terminated Carpenter's account privileges because of the excessive risk of his trading "strategy." Id. They were not told this even though:

- All of the $9 million lost by these seven clients consisted of funds that were entrusted to Carpenter's company during the period from August to December, 2000, well after Carpenter began sustaining heavy trading losses in April and May of that year; and

- Over 70% of the funds that the clients transmitted to BPE during the August-December time period was sent after Merrill Lynch had terminated Carpenter's trading privileges.

Rather, as charged in the indictment, Carpenter engaged in a scheme pursuant to which these and other clients were induced to entrust their funds to Carpenter's company (BPE) based on false representations that the funds would be held safely and securely in escrow; that the funds would not be transferred without the client's written authorization; and that the funds would be disbursed only for the purpose of closing on the purchase of replacement property or to be

5

returned directly to the client. (Indictment ¶ 99). Having obtained the funds through these false pretenses, Carpenter then proceeded – contrary to the representations given to clients – to misappropriate the funds by using them to engage in speculative options trading, ultimately losing over $9 million in client funds. (Indictment ¶¶ 25-28, 101).

The foregoing summarizes the gravamen of the charges set forth in the indictment. As the discussion makes clear, and contrary to defendant's characterization in his motion to dismiss, Carpenter was <u>not</u> indicted for simply breaching a contract, for being a businessman trying to make a profit, or for suffering losses as an "innocent" victim of the downturn in the stock market that occurred in 2000. (Def. Br. at 28-30). Rather, Carpenter was indicted on fraud charges stemming from his intentional misappropriation of client funds that were entrusted to Carpenter's company based on false representations of safety and security

## ARGUMENT

I. THE INDICTMENT FULLY AND ADEQUATELY PLEADS THE ELEMENTS OF THE ALLEGED OFFENSES AND INFORMS CARPENTER OF THE CHARGES AGAINST WHICH HE MUST DEFEND.

In passing on the sufficiency of an indictment in connection with a motion to dismiss, the Court must take the indictment's allegations as true for purposes of the motion. <u>Boyce Motor Lines, Inc. v. United States</u>, 342 U.S. 337, 343 & n.16 (1952). Viewed through this lens, an indictment satisfies the requirements of the Fifth and Sixth Amendments if it contains the elements of the offense charged, fairly informs a defendant of the charge against which he must defend, and enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974).

The indictment at issue here satisfies these requirements. As demonstrated below, it

6

adequately pleads the elements of the charged wire and mail fraud offenses:

(1)     a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses;

(2)     the defendant's knowing and willful participation in the scheme with the intent to defraud or to obtain money or property by means of false or fraudulent pretenses; and

(3)     the use of interstate wire communications or mailings in furtherance of the scheme.

18 U.S.C. §§ 1341, 1343; see also Pattern Criminal Jury Instructions for the District Courts of the First Circuit, Instruction No. 4.18.1341 (2003).

The indictment also fairly informs the defendant of the charges against which he must defend and enables him to plead an acquittal or conviction in bar of future prosecutions for the same offenses.

A.     The Indictment Adequately Pleads the Existence of a Scheme to Defraud

The indictment contains detailed allegations concerning the charged scheme to defraud. Contrary to the defendant's protestations (Def. Br. at 7-8), these allegations fully inform Carpenter of the "what," "when," and "where" of his criminal conduct.

Paragraphs 25 through 29 of the indictment set forth a comprehensive overview of the scheme. They charge Carpenter with having engaged in a scheme pursuant to which: (a) clients were induced to entrust substantial sums of money to BPE based on false representations that their funds would be held safely in escrow; (b) contrary to those representations, Carpenter misappropriated (i.e., took) the money without his clients' knowledge or authorization and used it to finance high risk options trading, the purpose of which was to achieve substantial financial gain for himself; and (c) notwithstanding significant trading losses, Carpenter continued to

7

solicit, gamble with, and lose ever-increasing amounts of escrow funds that BPE had promised to hold safe, until more than $9 million in client monies was gone. (Indictment ¶¶ 25-29).

The indictment contains a thorough explication of each facet of the above-described scheme. It sets forth the process utilized by BPE in performing section 1031 property exchanges (Indictment ¶¶ 4-10); the division of responsibilities, including Carpenter's role, in that process (¶¶ 11-16); the specific (false) representations that were made to clients to induce them to entrust their funds to Carpenter's company (¶¶ 17-24); Carpenter's conduct in misappropriating the funds to engage in high risk options trading (¶¶ 30-53); and the substantial monies that Carpenter lost as a result (¶¶ 30-53, 58).

In addition, for each of the seven BPE clients whose funds constituted the bulk of the monies that Carpenter lost, the indictment sets forth detailed allegations concerning the clients' individual transactions, including the false representations that were made to them, the monies they transmitted in reliance on those representations, and the funds that Carpenter misappropriated and lost. (¶¶ 59-101).

In sum, the indictment contains a comprehensive presentment of the "what," "when," and "where" of the fraudulent scheme and the specific conduct committed by Carpenter in furtherance of that scheme. Defendant's contentions to the contrary are unavailing.

B.      The Indictment Adequately Pleads Criminal Intent

Defendant is likewise incorrect in asserting that the indictment fails adequately to plead criminal intent.

As a threshold matter, Carpenter errs in articulating what he claims to be the governing legal standard for establishing fraudulent intent. Citing two Second Circuit decisions, United

States v. D'Amato, 39 F.3d 1249 (2d Cir. 1994) and United States v. Starr, 816 F.2d 94 (2d Cir. 1987), Carpenter argues that the government must allege and prove that he specifically intended to harm BPE's clients. (Def. Br. at 14). That, however, is not the standard in the First Circuit.

In United States v. Kenrick, 221 F.3d 19 (1st Cir. 1999), the First Circuit, sitting *en banc*, exhaustively analyzed the common-law meaning of the term "fraud" as used in the mail fraud, wire fraud, and bank fraud statutes and concluded that it means an intent to deceive in order to obtain money or other property. Neither "intent to harm" nor even "intent to bring about financial gain to oneself" is required. The latter two purposes, although they ordinarily might accompany a scheme to defraud, are "not the essence of fraudulent intent." What counts is whether the defendant intended to deceive in order to obtain money or other property, "regardless of the ultimate purpose." Id. at 29.

Kenrick addressed the proper definition of fraudulent intent in the context of an appeal from convictions under the bank fraud statute, 18 U.S.C. § 1344. The Court noted, however, the nearly identical language of the mail fraud, wire fraud and bank fraud statutes, all three of which derive historically from the original 1872 enactment of the mail fraud statutes. Id. at 27 n.6. The Court based its reasoning on the common-law meaning of fraudulent intent and on its conclusion that "'Congress intended to incorporate the common-law meaning of the term 'fraud' in the mail fraud, wire fraud, and bank fraud statutes.'" Id. at 28, *quoting* Neder v. United States, 527 U.S. 1, 23 n.7 (1999).

Pursuant to this reasoning, the holding of Kenrick applies equally to the nature of the criminal intent that must be established under the mail and wire fraud statutes. "Intent to harm" is not the standard. The government simply must prove that the defendant intended to deceive in

9

order to obtain money or other property. Kenrick, 221 F.3d at 29; see also United States v. Welch, 327 F.3d 1081, 1105-06 (10th Cir. 2003) (the intent necessary to a mail or wire fraud conviction is not the intent to harm or even the intent to achieve personal gain, *citing* Kenrick); United States v. Fernandez, 282 F.3d 500 (7th Cir. 2002) (government need not establish a contemplated harm to the victim in order to prove a scheme to defraud under the mail fraud statute); United States v. Butler, 704 F. Supp. 1351, 1354 (E.D. Va. 1989) ("intent to harm" is a minority view adopted by the Second Circuit in Starr and "is in opposition to the rule in the majority of the Circuits").

Pursuant to the legal standards articulated in Kenrick, the indictment adequately pleads the element of fraudulent intent. The body of the wire and mail fraud counts tracks the language of the governing statutes and explicitly charges Carpenter with having engaged in a scheme to defraud for the purpose of "obtaining money and property by means of false and fraudulent pretenses, representations, and promises . . . ." (Indictment ¶¶ 103, 105).

Elsewhere, the indictment alleges that: (a) Carpenter personally participated in drafting and reviewing written assurances that induced clients to entrust millions of dollars to BPE based on (false) representations that their money would be protected and held safe (Indictment ¶¶ 100); (b) that knowing of these representations, Carpenter nonetheless "willfully misappropriated" such funds, without his clients' knowledge or authorization, to engage in speculative options trading (Indictment ¶¶ 101); (c) that Carpenter did so for the primary object and purpose of trying to leverage his clients' funds into a substantial profit for himself (Indictment ¶ 26); and (d) that with Carpenter's knowledge and notwithstanding his substantial trading losses, clients continued until December, 2000 to be given false representations concerning the safety of their funds, they

10

continued to be induced to entrust their money to Carpenter's company, and he continued to gamble and lose their money in the options market. (Indictment ¶¶ 29, 41, 49, 101).

The foregoing allegations clearly satisfy the intent standard articulated by the First Circuit in Kenrick. The allegations also satisfy the narrower standard articulated by the Second Circuit in D'Amato and Starr.

C.      The Indictment Adequately Pleads Materiality

Defendant's challenge to the sufficiency of the indictment's allegations regarding materiality are similarly deficient. (Def. Br. at 25-27).

The government acknowledges that it must prove that the false representations encompassed by Carpenter's scheme involved falsehoods as to *material* facts. Neder v. United States, 527 U.S. 1, 25 (1999). Defendant is wrong, however, in contending that a mail/wire fraud indictment is fatally deficient and must be dismissed unless it expressly uses the word "material" in the text of the indictment.

Several courts have addressed this issue in the wake of Neder. The government has not found, and defendant has not cited, a single decision dismissing a mail or wire fraud indictment because of the absence of the word "material." To the contrary, courts consistently have rejected the argument, on two principal grounds.

First, a mail/wire fraud indictment that sets forth the offense in the words of the governing statutes, including the requisite "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses", adequately pleads materiality because: (a) the latter concept is a component part of the common-law meaning of "fraud;" and (b) an indictment that charges a legal term of art, such as fraud, "sufficiently charges the component

11

parts of the term." United States v. Stewart, 151 F.Supp.2d 572, 583-84 (E.D. Pa. 2001).  The

First Circuit's pattern jury instruction on mail fraud employs similar reasoning to explain why the

pattern instruction does not list materiality as a separate element of the offense, "because it seems

most logical to treat it [materiality] as part of the definition of "defraud" or "false or fraudulent

pretenses." See Comment No. 9, Pattern Criminal Jury Instructions for the District Courts of the

First Circuit, Instruction No. 4.18.1341 (2003).[1]

     Second, courts have ruled that "'the law does not compel a ritual of words' when

determining if an indictment is sufficient." Stewart, 151 F.Supp.2d at 583-84, *quoting* United

States v. Wilson, 884 F.2d 174, 179 (5th Cir. 1989).  What matters is the substance of the

indictment's allegations.  Thus, if an indictment alleges misrepresentations that can only be

characterized as material, the indictment is sufficient irrespective of whether the word "material"

is explicitly used. Id. at 584; see also United States v. Caldwell, 302 F.3d 399, 409 (5th Cir.

2002) ("[I]f the facts alleged in the indictment warrant an inference of materiality, the indictment

is not fatally insufficient for its failure to allege materiality *in haec verba*.") (internal citations

omitted); Fernandez, 282 F.2d at 508-09 (indictment's allegations adequately encompassed the

concept of materiality); United States v. Richards, 204 F.3d 177, 191-93 (5th Cir. 2000) (same)

(*citing* United States v. McGough, 510 F.2d 598, 601-03 (5th Cir. 1975)); United States v.

Noorlun, 2001 WL 1789408, at *1 (D.N.D. 2001).[2]

---

    [1] In making this observation, Comment No. 9 noted that an argument could be made that
it is nonetheless "safer" to separate out materiality as a distinct numbered element in the jury
charge. "Safer," however, does not mean "required."

    [2] Applying similar reasoning, the First Circuit has several times deemed as "harmless
error" a district court's failure to explicitly instruct a jury on materiality, on the ground that upon
review of the evidence, no jury could reasonably have found that the false representations made

The indictment at issue here passes muster under both of these principles. The text of the wire and mail fraud counts sets forth the offenses in the words of the governing statutes, thereby encompassing the notion of materiality, which is a subsidiary component of the term "fraud." (Indictment ¶¶ 103, 105).

In addition, the allegations of the indictment make clear the materiality of the false representations that were made. The indictment specifically charges that clients were induced to retain BPE and wire millions of dollars to the company based on repeated false written and oral assurances that their money would be protected and held safely in escrow, that BPE would not transfer the funds without the client's written authorization, and that BPE would return the funds in full, either to be disbursed for the client's use in closing on the purchase of replacement property or to be returned to the client if no replacement property transaction was to occur. (Indictment ¶¶ 27, 41, 99, 101). Since the whole purpose of performing a section 1031 exchange was to promptly roll over the full proceeds into the purchase of replacement property, the materiality to BPE's clients of the assurances that they received regarding the safety of their funds is self-evident. Indeed, the indictment alleges that BPE expressly counseled prospective clients that one of the paramount factors they should consider in choosing an intermediary was the security of their funds and how the intermediary would handle their money – precisely the representations that Carpenter violated. (Indictment ¶¶ 18-20).

In light of these allegations, the indictment plainly charges misrepresentations that can only be characterized as material. Defendant's contentions to the contrary are insupportable.

---

were not material. E.g., United States v. Blastos, 258 F.3d 25, 29 (1st Cir. 2001); United States v. Benjamin, 252 F.3d 1, 9-10 (1st Cir. 2001); United States v. Colon-Munoz, 192 F.3d 210, 221-22 (1st Cir. 1999).

D.    The Indictment Adequately Pleads Use of the Wires and Mail

The final element of the charged offenses is that the defendant used or caused to be used the mails and the wires in furtherance of his scheme. Carpenter does not challenge the sufficiency of the indictment's allegations on this element. The indictment explicitly sets forth by count, client, transaction, date and description each charged wire and mailing. (Indictment, Counts 1 through 19).

II.    THE INDICTMENT ALLEGES CRIMINAL FRAUD, NOT A CIVIL BUSINESS
       DISPUTE

Defendant ends his brief with a recap of the theme that permeates each of the arguments in his motion to dismiss – that he never intended to lose his clients' money, that his current predicament is the unfortunate consequence of a market downturn that affected millions of investors, and that, at most, he breached a civil contract but certainly committed no federal crime. (Def. Br. at 28-30). In support of this theme, Carpenter laces his brief with a series of unsupported factual assertions that he claims demonstrate his innocence – assertions regarding what he contends to be the true extent of his involvement, the true state of his clients' knowledge, and the like.

The foregoing may well constitute a preview of the defense that Carpenter intends to present to the jury. It is not, however, what the indictment alleges. The indictment alleges a scheme pursuant to which Carpenter willfully misappropriated funds obtained through false representations and promises, gambled those funds in the options market, and lost $9 million of the money. Accepting these allegations as true, as must be done in ruling on a motion to dismiss, the indictment adequately pleads the offenses that are charged.

Carpenter's insistence that he intended to repay the funds – an oft-heard assertion from white collar defendants – is likewise no defense. "[A] bank teller who plays the horses with the bank's money has embezzled it, even if he wins and replenishes the till, . . . with interest." United States v. Young, 955 F.2d 99, 104 (1st Cir. 1992); see also United States v. Ross, 206 F.3d 896, 898-99 (9th Cir. 2000) (intent to repay is not a defense, citing mail fraud, bank fraud, misappropriation and embezzlement cases).

Playing the horses with his clients' money is, in essence, what Carpenter is charged with having done, except that instead of betting the money at the racetrack, he bet it on the options market. Whether Carpenter won (which he didn't) or lost big (which he did), the crime had already been consummated. It was consummated by Carpenter's intentional scheme to obtain money or property by means of false or fraudulent pretenses and his use of the wires and the mail in furtherance of that scheme.

Notably, the First Circuit rejected in United States v. Young arguments almost identical to the ones advanced by Carpenter here. In Young, the defendant was charged with having intentionally misappropriated funds that had been entrusted to him to hold safe and secure, by taking those funds and putting them, without authorization, in high risk investments (racehorses) for his own benefit. Young, 955 F.2d at 104. Like Carpenter, Young claimed that he had never intended to lose the money, that he did not think his investments would fail, and that, at worst, he had committed a civil, not a criminal, wrong. Id. The First Circuit rejected each of these arguments, holding that the defendant's misappropriation of the funds constituted the crime, irrespective of whether he intended to replace the money later.

Young involved a different statute, governing the misappropriation of funds administered

15

by the Veterans' Administration, but the Court's reasoning applies equally here. The indictment adequately pleads the mail and wire fraud offenses with which Carpenter is charged. Carpenter's protestations of innocence – and his repeated attempts to characterize the facts his way – are arguments for him to make to the jury. They provide no basis for dismissing the indictment.

CONCLUSION

For the foregoing reasons, the United States requests that defendant's motion to dismiss be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:

Michael J. Pineault
Assistant U.S. Attorney
U.S. Courthouse, Suite 9200
1 Courthouse Way
Boston, MA 02210

Date: May 27, 2004

CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the persons listed below a copy of the foregoing document by fax and first class mail:

John Pappalardo, Esq.
Evan Georgopoulos, Esq.
Greenberg Traurig, LLP
One International Place
Boston, MA 02110

This 27th day of May, 2004

Michael J. Pineault