UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 04-10029-GAO |
| ) | |
| DANIEL E. CARPENTER, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF SUPPLEMENTAL MOTION TO DISMISS THE INDICTMENT FOR LACK OF VENUE

Defendant Daniel E. Carpenter ("Carpenter"), by his undersigned counsel, hereby submits this brief in support of his supplemental motion to dismiss the indictment for lack of venue. Specifically, Carpenter seeks dismissal of the indictment in its entirety because the underlying "crime" (if there was one) was allegedly committed in Connecticut or New York and, therefore, falls beyond the indictment power of a grand jury in Massachusetts.[1]

The mere fact that the exchangors whose funds were lost were located primarily in Massachusetts is irrelevant to a determination whether Carpenter can be prosecuted in Massachusetts. Furthermore, although Carpenter has been charged with aiding and abetting pursuant to 18 U.S.C. § 2, the indictment's allegations clearly charge Carpenter as a *principal* instead of as an accessory, thereby negating the application of Section 2's expansive venue provision. Consequently, for the reasons described below, it is clear that the indictment in this case should be dismissed in its entirety for lack of venue.

---

[1] Carpenter's initial motion to dismiss the indictment on substantive grounds (*i.e.*, for failure to allege a crime) has already been fully briefed by Carpenter and the government. Consequently, for purposes of this supplemental motion to dismiss for lack of venue, the Court is respectfully referred to the prior brief for the factual background of this case.

# ARGUMENT

## I. THE ENTIRE INDICTMENT SHOULD BE DISMISSED FOR LACK OF VENUE

### A. Introduction

The limits on where a criminal defendant can be brought to trial derive from two separate provisions of the Constitution and also from the Federal Rules of Criminal Procedure. "Aware of the unfairness and hardship to which trial in an environment alien to the accused exposes him, the Framers wrote into the Constitution that '[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed.'" United States v. Johnson, 323 U.S. 273, 275 (1944) (quoting U.S. CONST. Art. III, § 2, cl. 3). The Bill of Rights in the Sixth Amendment takes this requirement a step further by mandating that the trial take place in the same district as that in which the crime was allegedly committed. U.S. CONST. Amend. VI. ("In all criminal prosecutions, the accused shall enjoy the right to . . . trial, by an impartial jury of the State and district wherein the crime shall have been committed[.]").[2] Rule 18 of the Federal Rules of Criminal Procedure, providing that "prosecution shall be had in a district in which the offense was committed," codifies these Constitutional commands. The touchstone in each of these provisions is the place where the alleged criminal acts of the defendant were committed.

It is worth a few words of historical background to describe the genesis of these Constitutional provisions. Among the most prominent reasons for these provisions were actions taken by England that ignited the spark which became the American Revolution.

---

[2] Technically, the Sixth Amendment addresses only "vicinage" (*i.e.*, the place from which jurors are to be selected) rather than venue. See Charles Alan Wright, Federal Practice and Procedure: Criminal 3d § 301, at 293-94 (2000). However, "[t]his technical distinction has been of no importance whatsoever" because it is presumed that the jury will sit where it is chosen. Id. at 294.

Over the objection of those who said such a course would lead to war, in 1769 Parliament passed a resolution which called for transporting American Colonists who were accused of treason in Massachusetts Bay Colony against the Crown to England for trial.[3]

This aroused passionate objection in Massachusetts Bay and the other Colonies on behalf of those who were to be conveyed to a distant land to be tried before total strangers without having witnesses available to testify to their innocence. See generally William Wirt Blume, The Place of Trial of Criminal Cases: Constitutional Vicinage and Venue, 43 Mich. L. Rev. 59, 64 (1944). The feeling of outrage throughout the Colonies on this issue was so strong that "[t]ransporting us beyond the Seas to be tried for pretended offenses" is listed as one of the causes of the Revolution and is set forth in the Declaration of Independence. See THE DECLARATION OF INDEPENDENCE para. 21 (U.S. 1776).

Our Constitutional rule – based on its history – requires that venue be linked to the nature of the crime charged and where the acts constituting it allegedly took place, and that the accused not suffer the hardship of a trial in a district remote from where the crime was allegedly committed. Read as a whole, these provisions manifest a strong Constitutional policy disfavoring trials removed from the situs of the alleged criminal activity. "**The result is a safety net, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum solely at the prosecutor's whim.**" United States v. Salinas, 373 F.3d 161, 164 (1st Cir. 2004) (emphasis added).[4]

---

[3] This is the primary reason why, during the Battles of Lexington and Concord on April 18-19, 1775, Samuel Adams and John Hancock were forced to take drastic measures to evade capture by British troops, who were under direct orders from King George III to arrest and transport them to England to be tried for treason.

[4] Salinas and two companion cases were decided by the First Circuit on the same day. *All three cases resulted in dismissals of the indictments for lack of venue.* See United States v. Boham, 101 Fed. Appx. 361 (1st Cir. 2004); United States v. Arteaga, 2004 WL 1433433 (1st Cir. Jun. 28, 2004).

Such is the case here. Although Carpenter is not alleged to have committed **any** act (let alone crime) in Massachusetts, he is now facing criminal charges in Massachusetts. The proper venue for this case is the District of Connecticut, which is the only place in which even the government alleges Carpenter committed any acts, criminal or otherwise.[5] The District of Massachusetts, therefore, is clearly not the proper venue.

**B.     Standard**

"[W]hen a defendant is charged in more than one count, venue must be proper with respect to *each* count." United States v. Geibel, 369 F.3d 682, 696, 697 (2d Cir. 2004) (dismissing substantive insider trading counts regarding options investments for lack of venue because there was "no evidence showing that defendants directly contacted New York when they engaged in insider trading.") (emphasis added). Furthermore, "[t]he burden of showing proper venue is on the government, which must do so by a preponderance of the evidence." United States v. Scott, 270 F.3d 30, 34 (1st Cir. 2001); see also United States v. Haire, 371 F.3d 833, 837 (D.C. Cir. 2004) ("[T]he government bears the burden of establishing by a preponderance of the evidence that venue is proper with respect to each count charged against the defendant.") (internal citations omitted).

Venue is a Constitutional element of the offense and while virtually all the Circuits (including the First Circuit) have held that the applicable standard for the government to prove venue is by a preponderance of the evidence, the Supreme Court's recent decision in Blakely v. Washington, 124 S.Ct. 2351 (June 24, 2004), raises the issue of whether venue must now be proven beyond a reasonable doubt. This shall serve as

---

[5] Arguably, venue might also be proper in the Southern District of New York, which was the location of the Merrill Lynch and PaineWebber accounts through which all of the investments were made on behalf of Benistar Property Exchange Trust Co., Inc. ("BPE").

4

Carpenter's express objection to the government having to prove venue merely by a preponderance of the evidence.

However, as explained below, it is clear that the indictment's allegations fail to satisfy the government's burden of proof (even pursuant to the lesser civil standard) in this case.

The Supreme Court has formulated a set of guidelines for determining criminal venue. If the statute under which the defendant is charged contains a specific venue provision, that provision is to be honored (assuming, of course, that it satisfies the constitutional requirements). See Travis v. United States, 364 U.S. 631, 635 (1961) ("Where Congress is not explicit, the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it") (quoting United States v. Anderson, 328 U.S. 699, 703 (1946)). The *locus delicti* is defined as "[t]he place where an offense is committed; the place where the last event necessary to making the actor liable occurs." BLACK'S LAW DICTIONARY at 951-52 (7th ed. 1999).

Because the indictment necessarily alleges that the last event necessary to making Carpenter liable was the actual loss of the invested funds (in other words, clearly there would have been no indictment had BPE's investment strategy been *profitable*), venue is proper in the District of Connecticut since even the government acknowledges that all of the investment decisions made by Carpenter on behalf of BPE were made in Connecticut involving BPE's brokerage accounts in New York. See, e.g., Ind. ¶ 3.

Since the wire fraud statute (18 U.S.C. § 1343), unlike the mail fraud statute (18 U.S.C. § 1341), makes no reference to the venue of the offense, it can be argued that the narrower venue provision contained in the mail fraud statute governs the venue

5

determination regarding the mail fraud counts of the indictment (Counts 15 through 19), while the general (and broader) federal venue statute, 18 U.S.C. § 3237(a), governs the venue determination regarding the indictment's wire fraud counts (Counts 1 through 14).[6] See, e.g., United States v. Turley, 891 F.2d 57, 60 (3d Cir. 1989) (acknowledging and approving government concession that § 3237 "is not applicable to mail fraud"); United States Department of Justice, *Criminal Resource Manual* 966 (1997) ("section 3237 is inapplicable to mail fraud"); United States v. Brennan, 183 F.3d 139, 147 (2d Cir. 1999) (holding that § 3237 is inapplicable to mail fraud).[7]

However, this Court does not need to resolve the relationship between § 1341 and § 3237. Insofar as Carpenter contends that venue of the *entire* indictment is inappropriate in Massachusetts under the expansive version of venue (that is, § 3237), the more restrictive venue provision found in § 1341 would necessarily also preclude prosecution of Carpenter in Massachusetts.

As directed by the Supreme Court, in order to determine the proper venue for an offense (even under § 3237), **"a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts."** United States v. Rodriguez-Moreno, 526 U.S. 275, 279 (1999)

---

[6] 18 U.S.C. § 3237 provides, in pertinent part, as follows:

(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

[7] Carpenter's counsel successfully argued Brennan before the Second Circuit in which the mail fraud indictment was dismissed *without* prejudice for lack of venue. The Brennan court also noted that "in view of the possibility that a United States Attorney in a district where venue could properly be laid may consider undertaking a new prosecution, we observe that the case against defendants appears seriously problematic in several respects." Brennan, 183 F.3d at 149. Although such is the case here as well, we note that if the Court dismisses the indictment for failure to allege a crime (the basis for Carpenter's initial motion to dismiss), the indictment in this case would be dismissed *with* prejudice.

(emphasis added). Although the focus of this test is on the conduct comprising the offense, the Supreme Court has rejected the so-called "verb test" – the notion that action verbs reflected in the text of the statute should be "the sole consideration in identifying the conduct that constitutes an offense." Id. at 280. "Rather, an inquiring court should peer at the conduct elements comprising the crime through a wider-angled lens." Salinas, 373 F.3d at 164.

Following this road map, it becomes clear that, with respect to any prosecution of Carpenter, venue in the District of Massachusetts is improper.

### C. The Indictment Charges Carpenter With Committing Acts Only In Connecticut – *Not* Massachusetts

The Indictment alleges that Carpenter, "a resident of Connecticut" and BPE's chairman, only worked out of his office in Connecticut. (Ind. ¶¶ 3, 14.) All of BPE's business except investing the funds was performed by BPE's president (Martin L. Paley, "Paley") in Massachusetts. (Ind. ¶ 11.) Carpenter opened the Merrill Lynch and PaineWebber accounts (Ind. ¶ 15), both of which were in New York. (Ind. ¶ 8.)[8]

Carpenter communicated directly with Merrill Lynch and PaineWebber in New York (Ind. ¶ 15) only from his office in Connecticut, directed the handling of BPE's funds only in Connecticut and made all of BPE's investment decisions only in Connecticut. (Ind. ¶ 13.)

When Merrill Lynch or PaineWebber staff communicated with Carpenter (Ind. ¶ 51), they reached him only at his office in Connecticut. To the extent that Carpenter is alleged to have reviewed the various promotional materials that Paley drafted for soliciting the

---

[8] The Merrill Lynch account, although located in New York, utilized Mellon Bank in Pittsburgh, Pennsylvania, merely as a clearing agent for funds transfers. See Ind. ¶ 30.

exchangors to utilize BPE's Section 1031 services (Ind. ¶ 14), Carpenter did so only in Connecticut.

In recent post-trial proceedings in the parallel civil case, which is still ongoing even at this late date, Paley (who has recently waived his Fifth Amendment rights as part of a settlement with the exchangors whereby he has agreed to pay $150,000 to settle upwards of $20 million in claims) testified that he was the only person who prepared BPE's promotional materials:

> Q: Now, Benistar Property also had sales and promotional materials, correct?
> A: Yes.
> Q: And did you prepare those?
> A: Yes

See Deposition of Martin L. Paley, May 13, 2004 at 174, attached hereto at Tab 1.[9]

Moreover, to the extent that Carpenter is alleged to have reviewed and assisted in drafting BPE's various exchange documents (such as the exchange agreement and escrow agreement), he did so only in Connecticut. (Ind. ¶ 14.)

Paley also recently testified that Carpenter had nothing to do with drafting BPE's exchange agreement:

> Q: So just so we're clear in terms of the history of how the exchange agreement that [BPE] was using, you took the one that you had used at Nationwide [Property Exchange] and you gave it to [BPE] to use, is that right?
> A: Yes.

See Testimony of Martin L. Paley at Post-Trial Evidentiary Hearing, June 2, 2004 at 34, attached hereto at Tab 2.

---

[9] Consideration of extrinsic material is appropriate in this motion to dismiss for lack of venue. See Artis v. Greenspan, 223 F.Supp.2d 149, 152 (D. D.C. 2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue . . . .").

8

Paley's assistant (Linda Jokinen) also testified that Carpenter had nothing to do with drafting BPE's escrow agreement:

> Q: [I]s your testimony the same with regard to the [BPE] escrow agreement, that it was forwarded by [Nationwide Property Exchange] that was modified to suit Benistar Property?
> A: Yes.

See Deposition of Linda F. Jokinen, March 30, 2001 at 155-56, attached hereto at Tab 3.

Nor does the indictment allege that Carpenter had *any* communications with the exchangors prior to the loss of the funds or made any representations to them in Massachusetts or anywhere else.[10]

---

[10] The only time Carpenter communicated with any of the exchangors was on January 3, 2001 (Ind. ¶ 56), *after* the funds had already been lost and only to inform two of the exchangors of the losses. Additionally, contrary to the indictment's allegations, Paley recently testified that even he did not make any representations to the exchangors that their funds would be held "safe" or "secure" (see Ind. ¶¶ 17, 27-28):

> Q: Did you ever have any discussions with any of the Plaintiffs in this case as to how their funds would be invested while they were held by Benistar Properties [sic]?
> A: They were informed on the forms that they had signed.
> Q: Did you have any discussions with them other than what was on the forms?
> A: The mechanics, no.
> Q: Or in what investment -- what types of investments their funds would be put? Did you have any discussion with any of the Plaintiffs about that?
> A: Not about the specifics, no.

See Deposition of Martin L. Paley, May 13, 2004 at 213-14, at Tab 1.

> Q: When speaking with the plaintiffs or their advisors, did you tell them in what fashion the monies would be invested?
> A: I don't -- I don't think so.
> Q: Okay. So you don't think so. Your recollection is you did not?
> A: That's my recollection.
>     *     *     *     *
> Q: Did you ever say to any of the plaintiffs or their advisors or any prospective client that your money is safe. Did you ever use that word, safe?
> A: I don't - - no.
> Q: Did you ever use the word secure to any prospective clients, that your money is secure?
> A: I don't believe so.

See Testimony of Martin L. Paley at Post-Trial Evidentiary Hearing, June 2, 2004 at 58-59, 67, attached hereto at Tab 2.

In light of this recantation by the government's key witness, the government has a duty to reconsider whether, in furtherance of the public interest, it should voluntarily dismiss the indictment pursuant to Fed. R. Crim. P. 48(a). See Fed. R. Crim. P. 48(a) ("The government may, with leave of court, dismiss an indictment"); United States v. Jacobo-Zavala, 241 F.3d 1009, 1013 (8th Cir. 2001) (Rule 48(a) dismissal proper unless contrary to the public interest).

9

In short, the indictment does not describe any act of Carpenter's which occurred or was committed in Massachusetts.

This case is virtually identical to United States v. Percuoco, 630 F. Supp. 784 (D. Mass. 1986) (Tauro, J.), aff'd sub nom. United States v. Griffin, 814 F.2d 806 (1st Cir. 1987) (Campbell, C.J.). In that case, the defendants, all Massachusetts accountants, attorneys and/or promoters, were indicted by a grand jury in the District of West Virginia for the establishment of fraudulent coal mining tax shelters in West Virginia and the subsequent use of those shelters to provide clients with illegal deductions on tax returns filed in Massachusetts. The indictment asserted that the various partnerships established by the defendants mined no coal, nor ever intended to – they purportedly existed solely to allow Massachusetts taxpayers to claim over $14 million in fraudulent tax deductible losses.[11]

After the case was transferred to the District of Massachusetts for the parties' convenience, the defendants moved to dismiss all of the substantive counts in the indictment, arguing that the return of those counts in West Virginia was improper because all of their alleged criminal conduct had taken place <u>exclusively</u> in Massachusetts. As in the present case, the indictment contained the same 18 U.S.C. § 2 "aiding and abetting" language even though all the defendants were alleged to have been principals.

Judge Tauro granted the motion to dismiss the indictment because "[i]t is undisputed that everything that [the defendants] are accused of doing took place in

---

[11] By contrast, BPE was a *bona fide* Section 1031 tax deferral program which successfully completed over $100 million in property exchanges saving almost $40 million in taxes for over 120 exchangors (including other exchanges involving some of the same exchangors listed as "victims" in the indictment, see Ind. ¶¶ 61, 68, 72, 87, 98). This explains why the government does not allege in the indictment that BPE never intended to deliver its promised tax benefits.

Massachusetts." Percuoco, 630 F. Supp. at 785. Therefore, "[a]n indictment, returned in a district other than where the crime was committed, **must** be dismissed." Id. at 786 (emphasis added). In affirming Judge Tauro's dismissal of the indictment, Chief Judge Campbell stated for a unanimous First Circuit panel that "[b]ecause [the defendant] acted only in Massachusetts, his violation of [the relevant statute], if any, did not occur in West Virginia." Griffin, 814 F.2d at 811.

Likewise, even the government admits that everything Carpenter is accused of doing took place **exclusively** in Connecticut. Clearly, as in Griffin, Carpenter's violation of the mail and wire fraud statutes, if any, did not occur in Massachusetts. See also Salinas, 373 F.3d at 169 ("a criminal defendant's *own* actions will determine where venue can be laid.") (emphasis added). Just as in Percuoco (which was unanimously affirmed by the First Circuit), the indictment returned against Carpenter in Massachusetts is invalid and should be dismissed.

### D. Any Acts That Did Occur In Massachusetts Were Committed By Paley And Cannot Be Attributed To Carpenter

Although the government's theory of what acts constituted the alleged "crime" in this case is far from clear, it appears from the face of the indictment that venue in this case is premised entirely on the allegation that virtually all of the wire transfers of funds and mailings of checks by which the exchangors sent their funds to BPE originated in Massachusetts.[12] While this allegation may provide the necessary venue in Massachusetts for a prosecution of *Paley*, it fails with respect to a prosecution of Carpenter.

---

[12] The sole exceptions are: (a) Count 3 which alleges a facsimile transmission regarding a forthcoming wire transfer in the amount of $444,659.65 sent from New Hampshire to Massachusetts; and (b) Count 4 which alleges the actual wire transfer in the amount of $444,659.65 sent from New Hampshire to New York. See Ind. ¶ 103. Since Counts 3 and 4 relate to the same transaction (*i.e.*, a wire transfer in the amount of $444,659.65 sent from New Hampshire to New York), clearly there can be no dispute that venue in Massachusetts is improper with respect to these counts.

11

This is so because the indictment fails to connect the sending of money to BPE by the exchangors with any act of Carpenter's. In fact, it is clear from the indictment's allegations that the exchangors did not even know who Carpenter was at the time they sent their funds to BPE.[13] The exchangors dealt with Paley and only Paley, and they dealt with Paley in Massachusetts.

Consequently, if the government seeks to charge someone in Massachusetts for representations allegedly made to the exchangors in Massachusetts, such an indictment can only be brought in Massachusetts *against Paley* – whom the indictment alleges made all of the representations to the exchangors in Massachusetts. Since there is no allegation that Carpenter engaged in **any** act in Massachusetts, there can be no prosecution of Carpenter in Massachusetts without violating the Constitution.

This point is underscored when the analysis mandated by the Supreme Court in Rodriguez-Moreno is conducted (*i.e.*, identifying the conduct constituting the nature of the crime and then determining the location of the criminal acts). See United States v. Lanoue, 137 F.3d 656, 661 (1st Cir. 1998) ("We must look to the statute defining the crime to determine the location of the crime for the purpose of venue.").

"[V]enue under the mail and wire fraud statutes lies at the place where an individual **causes** a mailing or wire communication to be sent or received." United States v. Donato, 866 F. Supp. 288, 292 (W.D. Va. 1994) (dismissing mail and wire fraud

---

[13] For example, Joseph Iantosca – the exchangor who lost the most money (see Ind. ¶ 58) – did not know that Carpenter even existed prior to the loss of the funds:

Q:   By whom were you informed of all of this?
A:   Martin Paley. I don't know ... Daniel Carpenter. The only person I met, until the last day, I met Martin Paley and that's the only person I did business with.

See Deposition of Joseph Iantosca, October 1, 2001 at 166-67, attached hereto at Tab 4.

12

indictment for lack of venue) (emphasis added). As discussed above, the indictment does not allege that Carpenter "caused" any mailings of checks or wire transfers of funds to BPE, because the indictment does not allege that Carpenter communicated with any of the exchangors to induce them to send money to BPE. Thus, by definition, Carpenter could not have "caused" any of the mailings or wire transfers. See United States v. Pace, 314 F.3d 344, 350 (9th Cir. 2002) (reversing wire fraud convictions for lack of venue because defendant did not "cause" the wire transfers in the district); United States v. Mikell, 163 F. Supp.2d 720 (E.D. Mich. 2001) (issuing post-trial judgment of acquittal on mail and wire fraud indictment for lack of venue and because alleged victim "was not deprived of anything in which it had a property right").[14]

It is important to note that Carpenter is *not just* arguing that his lack of presence in Massachusetts necessarily means that venue in Massachusetts is improper. Rather, Carpenter's argument is that the indictment fails to allege that he "caused" the mailings and wire transfers that were sent from Massachusetts. Compare United States v. Kim, 246 F.3d 186, 192 (2d Cir. 2001) (upholding mail fraud conviction because defendant "caused" the in-district mailings even though he was not physically present in the district).[15]

---

[14] In Carpenter's brief in support of his initial motion to dismiss, it was argued that federal law regarding Section 1031 exchanges requires that the exchangors have no property rights in the funds while they are held by BPE as the qualified intermediary. See 26 C.F.R. § 1.1031(k)-1(g)(3)(ii)(B) (section 1031 exchange agreement must limit "the taxpayer's rights to receive, pledge, borrow, or otherwise obtain the benefits of the cash" being held).

[15] The indictment alleges simply that Carpenter "did transmit and cause to be transmitted" (Ind. ¶ 103) certain wire transfers and "did cause persons to place in post offices" (Ind. ¶ 105) certain mailings. However, the indictment alleges no facts whatsoever to support such conclusory allegations and, in any event, "simply parroting the language of the statute in the indictment is insufficient." United States v. Brandon, 298 F.3d 307, 310 (4th Cir. 2002).

What the government is seeking to do in this case is bring a prosecution against Carpenter in Massachusetts based solely on *Paley's* conduct in Massachusetts. However, since the indictment does not allege a conspiracy between Carpenter and Paley, the Constitution forbids the government's tactics in this regard. See United States v. Scott, 270 F.3d 30, 36-37 (1st Cir. 2001), cert. denied, 535 U.S. 1007 (2002) (criticizing "government forum shopping or of [using] a venue with the barest connection to the defendant").

### E. The Indictment's Aiding And Abetting Allegations Are Insufficient To Establish Venue Over Carpenter In Massachusetts

Although the indictment alleges, in the most summary fashion, that Carpenter violated the aiding and abetting statute, 18 U.S.C. § 2 (see Ind. ¶¶ 103, 105), the indictment is completely silent with respect to any facts to support such allegations or even to identify the "principal" to whom Carpenter was allegedly the "accessory."

In fact, the indictment's allegations make it abundantly clear that the government is charging Carpenter as a *principal*, yet he is being prosecuted for "aiding and abetting." Not only does this make no sense from a substantive standpoint, but it utterly destroys the government's feeble attempt to establish venue in Massachusetts with respect to Carpenter (and invites the obvious inquiry as to whether Carpenter was charged with aiding and abetting merely in an attempt to create venue in Massachusetts where none otherwise existed).

In aiding and abetting prosecutions under 18 U.S.C. § 2, "[v]enue is proper where the defendant's accessorial acts were committed *or* where the underlying crime occurred." United States v. Smith, 198 F.3d 377, 383 (2d Cir. 1999) (emphasis in original). There is no dispute that all of Carpenter's acts (accessorial or otherwise) were committed in

14

Connecticut. Consequently, the only basis for establishing venue over Carpenter in Massachusetts as an aider and abettor under Section 2 is if the underlying "crime" is alleged to have occurred in Massachusetts.

Exactly what the government alleges in the indictment to be the underlying "crime" is very difficult to determine. However, after parsing all of the indictment's allegations and reading the indictment as a whole, it appears to allege (after forcing the reader to engage in much supposition) that BPE's investment in stock options and subsequent loss of its funds was somehow a "criminal" act. See Ind. ¶¶ 26 ("engage in aggressive, high risk trading in the options market"), 28 ("used the funds to trade in the options market"), 29 ("sustained substantial losses from his options trading"), 33 ("strategy was an aggressive, high risk method"), 37 ("losses continued to increase"), 38 ("fully aware of the magnitude of his losses"), 48 ("followed the same active and aggressive options trading strategy at PaineWebber that he had followed at Merrill Lynch").

However, if the underlying "crime" in this case were BPE's "high risk" options investment strategy, then the underlying "crime" necessarily was committed in Connecticut, since even the government admits that Connecticut is where all of BPE's investment decisions were made. In fact, based on the indictment's allegations, the mailings and wire transfers which form the basis of the underlying "crime" were **not** those in which the exchangors sent their funds to BPE (which constitute all of the counts in the indictment), but, instead, were those from BPE to Merrill Lynch and PaineWebber, since it is by and through such communications that all of BPE's investment decisions were made and carried out.

Since the underlying "crime" alleged in the indictment appears to be the manner of investing the funds (which is not a crime at all), the mailings and wire transfers from the exchangors to BPE were not part of the underlying "crime" but, instead, were merely prior and preparatory to that "crime." However, "[a]ctions which are merely preparatory or prior to the crime are not probative in determining venue." United States v. Georgacarakos, 988 F.2d 1289, 1293 (1st Cir. 1993). In other words, it was the communications **from BPE to the brokerage firms** used to make BPE's investments that were actually part of the underlying "crime" of investing and losing BPE's funds in stock options, and not the exchangors merely sending their funds to BPE.

Because it is undisputed that all of the communications between BPE and the two brokerage firms occurred between Connecticut and New York, with no transit through or connection to Massachusetts whatsoever, venue of any prosecution of Carpenter cannot be proper in Massachusetts – even under the government's flimsy "aiding and abetting" theory. See United States v. Santiago, 83 F.3d 20, 24 (1st Cir. 1996) ("The venue requirement is designed to prevent a criminal defendant from having to defend himself in a place that has no meaningful connection to the offense with which he is charged.").

Reference to Percuoco and Griffin is relevant on this issue as well, because Judge Tauro dismissed the indictment in Percuoco based also on the fact that while the indictment charged the defendants with aiding and abetting, the substance of the indictment really charged them as principals. "With respect to their alleged [statutory] violations, defendants . . . must be considered principals. As such, they should have been indicted in the district where they committed the alleged offense." Percuoco, 630 F. Supp. at 786-87; see also Griffin, 814 F.2d at 811 ("We are unable to see how West

Virginia qualifies as the place where the *principal* crime was committed, or as the place where 'the principals' as distinct from 'the accessories' acted.") (emphasis in original).

The same analysis applies in the present case. No rational person reading the indictment in this case can draw any conclusion other than that Carpenter is being charged as the only "principal." In fact, Carpenter's name appears in the indictment 86 times (appearing in all capitalized letters as "CARPENTER"). By comparison, the name of Carpenter's alleged "principal" in all of these matters (*i.e.*, Paley) **is not mentioned even once in the indictment**. Clearly, there can be no doubt whatsoever as to the identity of the alleged "principal" in this case. See United States v. Lam Kwong-Wah, 924 F.2d 298, 302 (D.C. Cir. 1991) (reversing conviction because "the government . . . failed to specify, either in the indictment or at trial, that it was prosecuting [the defendant] on the theory that he was an aider and abettor as opposed to a principal.").

Even under the government's fanciful aiding and abetting theory, venue clearly does not exist against Carpenter in Massachusetts. "The government cannot alter this by pointing to [18 U.S.C.] section 2(a) or the steps [Paley] took in [Massachusetts]." Griffin, 814 F.2d at 811.

## CONCLUSION

The mere fact that the exchangors whose funds were lost were located primarily in Massachusetts is completely irrelevant to the issue of whether venue in Massachusetts is proper with respect to the criminal prosecution of a defendant whom all agree acted **exclusively** in Connecticut. In fact, under the government's theory of venue, Carpenter could also be prosecuted in the Western District of Pennsylvania (*i.e.*, Pittsburgh), since

all of the funds that went into BPE's Merrill Lynch account were processed in Pittsburgh by Mellon Bank. See Ind. ¶ 30.[16]

Although it appears that the investigation which led to this indictment was instigated by complaints registered by the exchangors with the United States Attorney's Office in order to gain a tactical advantage in the civil litigation, "[t]he Constitution, not public policy, dictates venue in federal criminal prosecutions." United States v. Cofield, 11 F.3d 413, 426 (4th Cir. 2002) (Luttig, J., dissenting).[17] In other words, when the United States Attorney's Office in Massachusetts decided only to charge Carpenter, it should have recognized that any prosecution of Carpenter could only be brought in the District of Connecticut and should have referred the case at that time to the United States Attorney for the District of Connecticut. Its failure to do so places the indictment at odds with the Constitution.

The upshot is that Carpenter, who has a Constitutional right to be tried in the State and district where his alleged crime was "committed," U.S. CONST., Art. III, § 2, cl. 3; Amdt. 6, is being prosecuted for committing mail and wire fraud in a State and a district in which all agree he never committed any act. "If to state this case is not to decide it, the law has departed further from the meaning of language than is appropriate for a government that is supposed to rule (and to be restrained) through the written word." Rodriguez-Moreno, 526 U.S. at 285 (Scalia, J., dissenting).

---

[16] The government's theory of venue is so broad that Carpenter could also be tried in Florida, where several of the exchangors maintain winter residences, or New Hampshire, where two of the exchangors reside.

[17] Public policy considerations with respect to venue counsel that a trial should never be held simply where the victims are located, since the jury pool may be skewed against the defendant, but where the alleged criminal acts and transactions occurred -- in this case, Connecticut.

18

For all of the foregoing reasons, defendant Daniel E. Carpenter respectfully requests that this Honorable Court dismiss the indictment in its entirety (or at the very least Counts 3 and 4) for lack of venue. "Any other result seems inconsistent with the Supreme Court's directive that criminal statutes must be construed, and venue determinations made, in light of the safeguards that the Constitution imposes," Salinas, 373 F.3d at 165, and "would be antithetic to the Supreme Court's venue jurisprudence." Id. at 170.[18]

Dated: August 20, 2004

                                           DANIEL E. CARPENTER,
                                           By his attorneys,

                                           _____
                                           A. John Pappalardo, Esq. (BBO # 338760)
                                           Evan Georgopoulos, Esq. (BBO# 628480)
                                           GREENBERG TRAURIG LLP
                                           One International Place, 20th Floor
                                           Boston, MA 02110
                                           (617) 310-6000

*Of Counsel*:

Alan M. Dershowitz, Esq.
1563 Massachusetts Avenue
Cambridge, MA 02138
(617) 496-2187

---

[18] Carpenter does *not* seek oral argument on this supplemental motion to dismiss for lack of venue. Instead, oral argument is sought only with respect to his initial motion to dismiss the indictment on substantive grounds (*i.e.*, for failing to allege that Carpenter intended to **defraud** the exchangors). See, e.g., United States v. Patel, 370 F.3d 108, 116 n. 6 (1st Cir. 2004) ("[M]ail fraud requires the use of the mails to **defraud**."); United States v. Callipari, 368 F.3d 22, 33 (1st Cir. 2004) ("To convict a defendant of wire fraud . . ., the government must prove beyond a reasonable doubt that he acted with intent to **defraud** the alleged victim.") (emphasis added).

Edward A. McDonald, Esq.
Nelson A. Boxer, Esq.
Michael J. Gilbert, Esq.
DECHERT LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 698-3500

Richard S. Order, Esq.
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8100

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1

I hereby certify that a good faith attempt to resolve or narrow the issues raised in the above motion, pursuant to L.R. 7.1, was made with AUSA Michael J. Pineault, but was unsuccessful.

_____
Evan Georgopoulos

## CERTIFICATE OF SERVICE

I, Evan Georgopoulos, hereby certify that a true and accurate copy of the foregoing was served on the government's attorney as appears below by hand delivery on this 20th day of August, 2004:

Michael J. Pineault, Esq.
Assistant U.S. Attorney
Office of the U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210

_____
Evan Georgopoulos, Esq.