UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S REPLY BRIEF IN FURTHER SUPPORT OF SUPPLEMENTAL MOTION TO DISMISS THE INDICTMENT FOR LACK OF VENUE

Defendant Daniel E. Carpenter respectfully submits this reply brief in response to the government's opposition to Defendant's Supplemental Motion to Dismiss Indictment for Lack of Venue dated September 10, 2004. Not only does the government's opposition entirely miss the key points at issue, it also confirms Carpenter's prior protestations that the indictment fails to allege any criminal offense as a matter of law.

In its opposition, the government has finally (and only after full briefing on two separate motions to dismiss) better explained its theory of fraud in this case.[1] The government now contends, for the very first time, that "Carpenter's crime" (Gov. Br. 6) was causing the exchangors to send their funds to BPE based on allegedly false statements that the funds would be "returned to them in full, with interest," (Gov. Br. 4) but, instead, Carpenter "was taking" (Gov. Br. 4) and "misappropriated" (Gov. Br. 6) the funds by causing BPE to engage in "high risk, high stakes options trading" (Gov. Br. 4.) – even though in the indictment's 108 paragraphs there is not a single allegation that Carpenter actually "took," "misappropriated," "embezzled" or "stole" any of the funds.

---

[1] Defined terms used herein have the same meaning as in Carpenter's initial brief ("Def. Br.").

1

Yet, literally in the same breath, the government also admits for the first time that whether BPE's investments "subsequently resulted in gains or losses is irrelevant." (Gov. Br. 6.) While this admission is in direct conflict with the government's position taken two pages earlier on page 4 ("[a]nd he is the one who is charged with having gambled and lost – in unauthorized, speculative options trading – approximately $9 million in BPE client money"), this admission also proves what Carpenter and his counsel have long suspected, *i.e.*, that the government has indicted Carpenter **solely due to his choice of BPE's investments**. However, since merely incurring investment losses is neither a "scheme to defraud" nor a "crime," the indictment fails to allege a criminal act as a matter of law. Moreover, the law is clear that the mere fact that the exchangors "reside and do business in Massachusetts" and "[t]he false representations that were made to them . . . occurred in Massachusetts," (Gov. Br. 1) does not create venue in Massachusetts.

## ARGUMENT

### I. THE LACK OF CRIMINAL CONDUCT MAKES IT DIFFICULT FOR THE GOVERNMENT TO ESTABLISH VENUE IN A CRIMINAL PROSECUTION

The government is having substantial difficulty establishing venue in this case because no "crime" was alleged or committed. This explains why it is even more difficult for the government to allege the necessary predicates to establish venue in a criminal prosecution. In a criminal case, the issue of venue has not only practical implications, but involves substantial Constitutional rights as well. As the First Circuit recently instructed in United States v. Salinas, 373 F.3d 161, 162 (1st Cir. 2004), "[v]enue in a criminal case is not an arcane technicality. It involves matters that touch closely the

fair administration of criminal justice and public confidence in it." Id. (internal citations and quotations omitted).

"Over time, one of the primary concerns motivating the limitation of venue has been the danger of allowing the government to choose its forum free from any external constraints." Id. at 169 (citing Travis v. United States, 364 U.S. 631, 634 (1961) ("[V]enue provisions in Acts of Congress should not be so freely construed as to give the Government the choice of a tribunal favorable to it.")). This risk would become a reality if the indictment in this case, which fails to charge Carpenter with committing or causing any act in Massachusetts, is allowed to stand.

While concentrating on the origins of the charged mailings and wire communications in this case, the government has lost sight of any actual fraud. This explains why the government's arguments in its reply brief have been reduced to flawed, circular, illogical and, at times, even incoherent, reasoning. It also explains why Carpenter, his counsel, and this Court are left to speculate as to the actual nature of the crime or scheme to defraud being alleged. If the alleged criminal act cannot be identified, then neither can the proper venue for its prosecution.

In Salinas, the criminal act was the defendant's fraudulent procurement of a United States passport by using a "bogus" New Jersey birth certificate. In United States v. Pimental, 2004 WL 1921828 (1st Cir. Aug. 30, 2004) (discussed infra, Part II.B.), it was the defendant's commission of insurance fraud by lying to insurance carriers in order to pay lower workers' compensation insurance premiums. Yet, in this case, all that is really alleged is that Carpenter caused BPE to invest in stock options.

In <u>United States v. Cabrales</u>, 524 U.S. 1 (1998), the government prosecuted Cabrales in Missouri for money laundering in Florida. The district court dismissed the substantive counts in the indictment for lack of venue, and the Eighth Circuit affirmed. On the government's appeal, the Supreme Court affirmed the dismissals, ruling that venue in Missouri was improper despite the fact that Missouri was the exclusive source of the funds at issue, because the money laundering occurred entirely in Florida. In the present case, by substituting Carpenter for Cabrales, Massachusetts for Missouri, and Connecticut (or New York) for Florida, it becomes clear that the government cannot meet its burden of establishing venue in Massachusetts by a preponderance of the evidence without being "antithetic to the Supreme Court's venue jurisprudence." <u>Salinas</u>, 373 F.3d at 170.

The crux of the government's theory of a "crime" in this case appears to be that Carpenter indirectly "induced" (Gov. Br. 1) knowledgeable, sophisticated and experienced real estate investors and their attorneys to: (a) send their funds to BPE for the purpose of effectuating Section 1031 property exchanges just so that Carpenter could cause BPE to engage in the "illegal act" of investing those funds in stock options **<u>in BPE's accounts</u>** at two of the largest brokerage firms on Wall Street; and (b) consummate the very Section 1031 property exchanges that were contemplated, all to earn a "substantial profit" (Ind. ¶ 26) for BPE's shareholders. Not only does this theory fail to describe a "scheme to defraud," let alone a "crime," but nowhere in the indictment or in any of the government's submissions to date in this case has a single factual or legal averment been offered that supports this theory.

In its opposition, the government does not and cannot point to a single factual averment in the indictment relating to any specific deceptive conduct by Carpenter or to

4

any misrepresentation made by him. Not one. There is not a single criminal act, fraudulent act or misrepresentation that the government can point to because Carpenter did not commit any such act or make any such misrepresentation. And whatever Carpenter may have actually "done" in this case (which is still unclear from the indictment), the government concedes that he did it from his company's offices located in Simsbury, Connecticut (Ind. ¶ 2) and not Paley's offices located in Newton, Massachusetts. (Ind. ¶¶ 1, 11.)

Just three months from now, the civil case at the center of this alleged "crime" will begin its fifth year with no resolution in sight and no judgment having been entered against any party. Paley, who exclusively ran BPE's operations in Massachusetts, has recently testified that it was he who created all of the exchange documents and various promotional materials, and that he was the only one who met with the exchangors. (Def. Br. 8-9.)

Moreover, the attorney for BPE's very first exchangor (who successfully completed her property exchange in October 1998) recently testified that Carpenter was completely open, honest and above-board in allowing that exchangor's attorney to communicate <u>directly</u> with Merrill Lynch as to how BPE's funds would be held and invested. See *Memorandum and Order on Plaintiff's Motion to Reinstate Jury Verdict Against Defendant Merrill Lynch*, <u>Cahaly v. Benistar Property Exchange Trust Co., Inc.</u>, No. 01-0116-BLS2 (Suffolk Sup. Ct. Aug. 26, 2004) (Botsford, J.). For this reason alone, instead of opposing Carpenter's motions to dismiss, the government would be acting well within its sound discretion to further the public interest by doing the right and honorable thing and voluntarily dismissing the indictment pursuant to Rule 48(a).

5

II. **THE INDICTMENT NOT ONLY FAILS TO CHARGE CRIMINAL OFFENSES AS A MATTER OF LAW, BUT ALSO FAILS TO ESTABLISH THE NECESSARY CAUSATION FOR VENUE PURPOSES**

It is necessary to address the indictment's failure to allege a scheme to defraud before discussing causation with respect to venue because "a scheme to defraud must be established before courts can even turn to the issue of causation of mail and wire transmissions." United States v. Philip Morris USA, 316 F.Supp.2d 13, 18 (D.D.C. 2004). Additionally, the government raises this issue. (Gov. Br. 2-5.)

A. **The Indictment Is Fatally Flawed Because, Under Any Theory, It Fails To Allege A Scheme To Defraud**

The government now describes its theory of fraud in this case as being that Carpenter made (or "caused" to be made)[2] false statements to the exchangors regarding the "safety and security" of their funds (Ind. ¶¶ 17, 27-29) to induce them to send their funds to BPE. (Gov. Br. 1, 2, 4.) However, nowhere in the indictment or the government's various submissions in this case is there any allegation or contention that Carpenter, when allegedly causing these false statements to be made, **intended to harm or defraud the exchangors**. In fact, the indictment alleges exactly the opposite, that Carpenter intended to have BPE (including Paley, its Massachusetts principal) earn a "substantial profit" (Ind. ¶ 26) which could only occur **after** the exchangors had their funds "returned to them in full, with interest."[3] (Gov. Br. 4.) The government also ignores BPE's 120 successfully completed exchanges since 1998 and the $100 million in

---

[2] The issue of causation for venue purposes is described infra, Part II.B.3.

[3] The indictment does **not** allege that Carpenter never intended to provide the exchangors with the promised Section 1031 tax benefits or that BPE was not a *bona fide* Section 1031 qualified intermediary.

6

exchangors' funds successfully repaid "in full, with interest," all the while using the same "highly speculative options trading." (Gov. Br. 4.)

The indictment and the various explications of it offered by the government allege only the making of false statements, but false statements alone are not enough. United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994) ("Misrepresentations amounting only to a deceit are **insufficient** to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim.") (emphasis added). Absent an allegation that Carpenter intended to harm or defraud the exchangors, the indictment is fatally flawed and should be dismissed. See United States v. Callipari, 368 F.3d 22, 33 (1st Cir. 2004) ("To convict a defendant of wire fraud . . . **the government must prove beyond a reasonable doubt that he acted with intent to defraud the alleged victim.**") (emphasis added).

"Intent to defraud requires a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." United States v. Owens, 301 F.3d 521, 528 (7th Cir. 2002). However, the indictment does not allege that Carpenter intended to "deceive or cheat" the exchangors. While Carpenter obviously intended for BPE to earn a profit (as is the goal of any profit-making enterprise), BPE could only earn a profit **after** the exchangors had received the return of their principal plus interest. Only then could companies controlled by Carpenter and Paley split the profits "on a 50/50 basis." (Ind. ¶ 16.)[4]

---

[4] The government ignores corporate formalities by focusing on Carpenter *individually*. The indictment, by charging Carpenter as a principal, also ignores the fact that **it was Paley**, through BPE-Newton, (Ind. ¶ 11) **who received 90% of the fees**. (Ind. ¶ 16.)

7

Seeking to earn a profit **after** causing BPE to fulfill its contractual obligations to the exchangors does not and cannot form the basis of an intent to "deceive or cheat" under the mail and wire fraud statutes. See United States v. Pendergraft, 297 F.3d 1198, 1209 (11th Cir. 2002) (reversing mail fraud conviction because "[s]ince there was no intent to deceive, there was no scheme to defraud") (internal quotations omitted).

The government attempts to create a "scheme to defraud," basically out of thin air, by continually repeating the mantra that Carpenter, rather than BPE, "gambled and lost – in unauthorized, speculative options trading – approximately $9 million in BPE client money." (Gov. Br. 4.) However, it is not enough for the government to argue that Carpenter realized BPE's "speculative" investment strategy had the capacity to incur losses (as does every investment, whether "safe" or "speculative"). "Instead, the proof must demonstrate that **the defendant had a conscious knowing intent to defraud** . . . [and] that the defendant contemplated or intended some harm to the property rights of the victim." United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (internal citations and quotations omitted) (emphasis added).[5]

There is no allegation anywhere in the indictment that Carpenter contemplated or intended harm to the exchangors. In fact, the indictment alleges exactly the opposite, *i.e.*, that Carpenter intended for BPE to earn a profit after satisfying its obligations to the

---

[5] The government claims that BPE's stock options investments were somehow "unauthorized," (Ind. ¶ 41) yet the indictment does not allege that the exchangors had the right to instruct BPE how to invest the funds (only whether they desired to receive 3% or 6% interest). In fact, under federal law, any such right or control given to the exchangors could have nullified the intended tax benefits. See 26 C.F.R. § 1.1031(k)-1(g)(6)(i) (agreement between BPE and exchangors must provide that "the [exchangor] has no rights . . . to receive, pledge, borrow, or otherwise obtain the benefits of money" held by BPE).

8

exchangors. Consequently, the indictment fails to allege an intent to defraud and should be dismissed on this basis.[6]

When stripped of all its technical ornamentation and legal embellishments, the government's theory of fraud in this case appears to be that "Carpenter's crime" was to allow the exchangors to be told that their funds would be "safe" and then cause BPE to invest those funds in "unsafe" stock options. This begs the ultimate question: would there have been an indictment if BPE had suffered its investment losses in Polaroid, US Airways, WorldCom or Enron bonds? Or is it just investing in stock options that the government seeks to criminalize?[7]

Furthermore, other than alleging that false statements were made, the indictment fails to describe with the requisite Constitutional specificity how Carpenter intended to defraud the exchangors because there is no allegation that Carpenter intended that BPE not perform its obligations under the exchange documents. See United States v. Santa-Manzano, 842 F.2d 1, 2 (1st Cir. 1988) (Breyer, J.) ("[T]he indictment must contain the elements of the offense charged and fairly inform a defendant of the charge against which he must defend.") (internal quotations and citations omitted).

For example, had BPE invested the funds in the "safest" investment possible – U.S. Treasury securities (whose values and interest rates fluctuate on a daily basis in the

---

[6] The indictment also fails to allege materiality – an essential element of both mail and wire fraud. See, e.g., United States v. Gee, 226 F.3d 885, 892 (7th Cir. 2002) (reversing mail and wire fraud convictions because indictment, just as in this case, not only lacks the word "material," but failed to allege that the defendant had made any **material** misrepresentations).

[7] Of course, other than the fact that the funds were ultimately lost in the stock market, the government does not describe how one can make "safe" and "legal" investments that are guaranteed to generate at least a 6% return. In fact, this Court can take judicial notice, pursuant to Fed. R. Evid. 201, that the NASDAQ Composite Index suffered a 45% decline from early September to mid-December 2000 (the time period alleged in the indictment). See www.nasdaq.com.

9

U.S. Government bond market) – but accepted the funds from the exchangors knowing that it never intended to perform the Section 1031 exchanges, an intent to defraud would have existed at the time BPE accepted the funds because it had already decided that it did not intend to effectuate the exchanges, regardless of what ultimately happened to the funds (*i.e.*, whether lost in the U.S. Government bond market or returned in full with interest).

This helps to explain why the indictment fails to allege a scheme to defraud as a matter of law, because – as the government now concedes – whether BPE's investments ultimately made or lost money is irrelevant. (Gov. Br. 6.) The issue is whether BPE (as opposed to Carpenter) intended to perform its obligations under the exchange documents, in consideration of which the exchangors transmitted their funds to BPE in the first place.

### B. The Government Misconstrues The Causation Requirement In Determining Venue

The government misconstrues Carpenter's venue argument. Obviously it is undisputed that virtually all of the charged mailings and wire communications originated in Massachusetts (although the government now concedes that venue is improper at least with respect to Count 4 (Gov. Br. 2)).[8] The issue is whether the indictment sufficiently alleges whether (a) Carpenter "caused" those mailings and wire communications and (b) they were "in furtherance of" the alleged scheme to defraud (which, as described in Parts I and II.A., supra, is not sufficiently alleged in any event).

---

[8] The government is also incorrect when it attempts to distinguish United States v. Percuoco, 630 F. Supp. 784 (D. Mass. 1986), aff'd sub nom. United States v. Griffin, 814 F.2d 806 (1st Cir. 1987), on the basis that it "involved a different statute." (Gov. Br. 5, n. 2.) Setting aside the fact that Percuoco is directly applicable on the issue of venue, the defendants in that case, like Carpenter, were charged with aiding and abetting pursuant to 18 U.S.C. § 2 even though the factual averments of the indictment clearly charged the defendants (just like Carpenter) as principals instead of as accessories.

A careful analysis of the First Circuit's recent decision in United States v. Pimental, 2004 WL 1921828 (1st Cir. Aug. 30, 2004), shows that the indictment in this case lacks the requisite causal factors linking Carpenter to <u>any</u> of the charged mailings or wire communications.

In Pimental, a husband-and-wife team which owned a small construction company were charged with mail fraud for misrepresenting to their workers' compensation insurance carrier the kind of work their employees performed in order to pay lower premiums for workers' compensation insurance coverage. After a jury trial, the wife was acquitted on all counts and the husband was acquitted on all but two counts of mail fraud. The district court then granted the husband's Rule 29 motion for judgment of acquittal on the remaining two mail fraud counts, which centered on mailings from independent loss control inspectors, because those mailings "had nothing to do with the determination of premiums and played no role in perpetuating the charged scheme to defraud." United States v. Pimental, 236 F.Supp.2d 99, 101 (D. Mass. 2002) (Gertner, J.).

On appeal, the First Circuit reversed the district court's grant of the husband's Rule 29 motion, reinstated the husband's convictions on the two mail fraud counts, and remanded for sentencing. United States v. Pimental, 2004 WL 1921828, *19 (1st Cir. Aug. 30, 2004). However, in so doing, the First Circuit provided an analytical road map for this Court to follow in evaluating Carpenter's venue arguments.

In an initial holding that is fatal to the indictment in this case, (see Part II.A., supra) the First Circuit reiterated that mail fraud requires "**the specific intent to defraud**." Id. at *6 (internal citations and quotations omitted) (emphasis added). The First Circuit then went on to address three issues which Carpenter has raised here: (a) the

11

existence (or lack thereof) of a scheme to defraud; (b) the "in furtherance of" requirement; and (c) whether the mailings were reasonably foreseeable. However, unlike in Pimental, BPE was not engaged in any illegal activity.

### 1. The Lack Of A Scheme To Defraud

Upon application of the First Circuit's analysis in Pimental, it is easy to see how the indictment here fails to allege a scheme to defraud. "In order to find a scheme to defraud, the jury simply had to determine that Pimental was attempting to wrong one in his property rights by dishonest methods or schemes." Id. at *7 (internal citations and quotations omitted). While "there was more than sufficient evidence for the jury to conclude that Pimental lied about the nature of his company's work in order to pay cheaper premiums on his workers' compensation insurance," id., there is no allegation in the indictment that Carpenter lied about the nature of BPE's work, BPE's intention to complete the exchanges, or even the specific manner in which the funds would be invested (for example, none of BPE's agreements or promotional materials identified the kinds of securities in which BPE would invest the funds in order to generate the required rate of return (Ind. ¶¶ 6, 7)). All the indictment charges is that Carpenter merely allowed allegedly false statements to be made to the exchangors regarding the "safety" of the funds, but at no time does the indictment connect such allegedly false statements to any intention of Carpenter to wrong, harm or defraud the exchangors.

The First Circuit in Pimental then reiterated that success in a fraudulent scheme is not required to support a mail fraud conviction. Pimental, 2004 WL 1921828, *7. On this point, however, the government in its brief seems to imply that the alleged "fraudulent scheme" was BPE in and of itself, and not the manner in which the funds were invested,

12

because the government contends that "[w]hether Carpenter's fraudulent scheme (and his speculative options trading) subsequently resulted in gains or losses is irrelevant." (Gov. Br. 6.) This implies, again for the first time, that the alleged "fraudulent scheme" is something separate and distinct from the act of investing BPE's funds in stock options.

However, the indictment does not allege that BPE itself was a fraudulent enterprise or that BPE never intended to deliver the promised tax benefits. Consequently, the government's description of the alleged "fraudulent scheme" in its brief is completely at variance with the allegations contained in the indictment. See United States v. Santa-Manzano, 842 F.2d 1, 3 (1st Cir. 1988) (Breyer, J.) (reversing wire fraud conviction because "the government did not prove the scheme it charged, and it did not charge the scheme it proved") Moreover, the Constitution's notice requirement exists specifically so that neither Carpenter nor this Court have to engage in this kind of "guessing game" to determine exactly which "fraudulent scheme" the indictment seeks to charge. As it stands now, there is no "fraudulent scheme" alleged other than that BPE accepted funds to consummate Section 1031 property exchanges and invested those funds in stock options, neither of which is a crime.

### 2. The "In Furtherance Of" Requirement

The First Circuit in Pimental then held, relying on Schmuck v. United States, 489 U.S. 705 (1989), that the mailing "need not be an essential element of the scheme; it can be merely incident to an essential part of the scheme, or a step in [the] plot." Pimental, 2004 WL 1921828, * 8 (internal citations and quotations omitted).

Here, however, the mailings and wire communications that the exchangors sent to BPE were not "in furtherance of" the alleged scheme to defraud because whether or not

the particular exchangors identified in the indictment sent their funds to BPE had no impact whatsoever on BPE continuing to invest *other* exchangors' funds in stock options (as it had been doing, quite successfully, since 1998). In fact, these particular exchangors' funds were not even incident to an essential step in the so-called "plot" because these were not the only exchangors with whom BPE conducted business.[9] In other words, whether or not the seven exchangors identified in the indictment (out of 120) sent their funds to BPE had no impact whatsoever on Carpenter's decision to continue investing BPE's funds in stock options, as he had been doing successfully on BPE's behalf since 1998.

Furthermore, unlike in Pimental, the indictment here does not allege any mailings or wire communications after the funds were sent to BPE which could be seen as contributing to the prevention of the alleged scheme's detection (*i.e.*, "lulling the victim into a false sense of security"). Id. at *10. There are no allegations of mailings or wire communications after these exchangors sent their funds to BPE saying, in effect, "everything is okay, our investments are doing fine, your funds will be available when needed." In fact, just the opposite occurred, as Carpenter informed two exchangors and one of their attorneys on January 3, 2001, soon after the funds had been lost, that "the funds were not presently available." (Ind. ¶ 56.)

Moreover, unlike in Pimental, Carpenter's alleged "scheme" did not depend in any way on the exchangors sending their funds to BPE because, as stated earlier, the exchangors identified in the indictment were not the only exchangors for whom BPE

---

[9] As stated in Carpenter's brief in support of his initial motion to dismiss the indictment on substantive grounds, BPE successfully completed over $100 million in property exchanges for over 120 different exchangors.

14

acted as a Section 1031 qualified intermediary. In fact, the seven exchangors identified in the indictment represented fewer than 6% of BPE's total exchangors. So, whether or not these particular exchangors sent their funds to BPE had no effect whatsoever on BPE's investment strategy. BPE would have continued to operate (and invest in stock options) without the funds from these seven exchangors, as it had successfully operated since 1998 before any of these exchangors had arrived on the scene.

Consequently, the government's contention in its brief that "[a]bsent the Massachusetts wires and mailings charged in the indictment, Carpenter would not have received" (Gov. Br. 6) the funds misses the point. Whether or not these seven exchangors did business with BPE had absolutely no effect whatsoever on BPE's long-held strategy of investing the funds in stock options.

### 3.   Causation: The Charged Mailings And Wires Fail To Meet The "Reasonably Foreseeable" Test

The First Circuit in Pimental also confirmed that "it is simply the 'use of the mails' in the course of the scheme rather than the particular mailing at issue that must be reasonably foreseeable for the causation element of a mail fraud offense to be satisfied." Id. at *12. In other words, the use of the mails (or wire facilities), as a general matter, must be a reasonably foreseeable component of the scheme to defraud. Id. However, what must be factored into the "reasonably foreseeable" analysis is whether the "mailings were sufficiently closely related to [defendant's] scheme to bring his conduct within the [mail fraud] statute." United States v. Maze, 414 U.S. 395, 399 (1973) (Rehnquist, J.).

Undertaking this analysis in the present case is problematic due to the indictment's abject failure to be absolutely (and Constitutionally) clear in describing the alleged scheme to defraud. Without such exactitude, it is virtually impossible to determine **when**

15

the alleged scheme reached fruition – which is the *sine qua non* of determining causation in mail and wire fraud. See id. at 402 (defendant's "scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss"); United States v. Woodward, 149 F.3d 46, 65 (1st Cir. 1998) (noting that Schmuck limited Maze to cases in which the fraudulent scheme has come to fruition).

Unless the charged "scheme to defraud" can be identified, there obviously is no way to determine when it has come to fruition. Moreover, as stated in Pimental, a specific intent to defraud is required. The indictment does not make clear the required specific intent or exactly what was the "scheme to defraud." However, several guesses as to the alleged "scheme" charged in the indictment can be ventured for the purpose of this analysis. But see Russell v. United States, 369 U.S. 749, 770 (1962) ("To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant" of his Constitutional rights).

One guess is that the "scheme" was the actual loss of the funds. See, e.g., Ind. ¶ 29 ("CARPENTER sustained substantial losses from his options trading"), Ind. ¶ 55 ("millions of dollars in BPE client funds had been lost as a result of CARPENTER's trading losses"); Gov. Br. 6 ("traded and lost in the options market"). If the act of simply incurring losses while investing in stock options is the "scheme," then it necessarily came to fruition in April 2000, which is when the indictment alleges BPE's stock option investments began to lose money. See Ind. ¶ 34 (BPE incurred investment losses "beginning in or about April, 2000."). However, since the earliest mailing or wire

16

communication charged in the indictment occurred on August 8, 2000 (Ind. ¶ 103, Count 3), this was obviously after the "scheme" of losing money on stock options came to fruition.

Another guess is that the "scheme" consisted of transmitting to the exchangors the allegedly false and misleading representations and promotional materials describing that the funds would be kept "safe." See, e.g., Ind. ¶ 17 ("BPE gave written and oral assurances to its clients that BPE would hold their money safe"), Ind. ¶ 18 ("The promotional materials that BPE used to solicit clients contained representations concerning the security and safety of all funds"); Gov. Br. 1 ("based on false representations that the funds would be held safely"). If so, then the "scheme" necessarily came to fruition upon the transmission of the representations and promotional materials to the exchangors, which obviously occurred <u>before</u> the exchangors sent their funds to BPE in response to such marketing solicitations.[10]

Yet another guess, which seems the most plausible based on the government's reply brief filed on September 10, 2004, is that the charged "scheme" was simply Carpenter's causing BPE to invest in stock options in the first place. See, e.g., Ind. ¶ 26 ("engage in aggressive, high risk trading in the options market"), Ind. ¶ 28 ("used the funds to trade in the options market"); Gov. Br. 4 ("losing millions of dollars in high risk, high stakes options trading"). If so, then the "scheme" necessarily came to fruition in October 1998 when BPE first began doing business with its property exchange customers and invested (successfully) their funds in stock options. Consequently, the acts of the

---

[10] The indictment is silent as to *when* the exchangors received these various representations and promotional materials. However, it is clear that any promotional materials or representations were transmitted to the exchangors by Paley and not by Carpenter.

17

seven exchangors listed in the indictment sending their funds to BPE in late 2000 (*i.e.*, the charged mailings and wire communications) occurred long after the "scheme" came to fruition.[11]

Regardless of which formulation of the alleged scheme to defraud is chosen, it is clear that all of the charged mailings and wire communications occurred **after** the alleged "scheme" came to fruition. Consequently, these mailings and wire communications cannot supply the mailing or wiring element of the charges in the indictment because "**[t]he defendant's fraudulent scheme had [already] reached fruition**." Schmuck, 489 U.S. at 713 (emphasis added).

Because Carpenter's alleged "scheme" had already reached fruition by the time these seven exchangors sent their funds to BPE, none of the nineteen charged mailings or wire communications were relevant to the "scheme" or related to a core transaction of Carpenter's so-called "plot." At most, they were "peripheric." See United States v. Fermin Castillo, 829 F.2d 1194, 1199 (1st Cir. 1987) ("It is not enough, however, that the challenged use of the mails or wires was reasonably foreseeable. The communications must also have been more than peripheric; they must have touched one or more of the core transactions of the plot.").

---

[11] Because of the indictment's overall vagueness, it was not until the government filed its reply brief on September 10, 2004 that Carpenter was finally able to determine better what the government alleges to be the charged "scheme to defraud" – which appears to be merely the act of causing BPE to invest in stock options. If so, then the "scheme" came to fruition and the "offense" occurred in October 1998 when BPE first invested its exchangors funds in stock options. Consequently, Carpenter is now able to contend that, since the indictment was returned on February 4, 2004, the indictment is time-barred and should be dismissed with prejudice on that basis. See 18 U.S.C. § 3282 (providing a five-year limitations period for mail and wire fraud prosecutions). Carpenter expressly reserves his objection to the indictment on this basis and, if the Court so desires, will submit further briefing on this issue.

Absent a showing that Carpenter "caused" any of the charged mailings or wire communications or that they were "in furtherance of" the alleged scheme to defraud, it is completely irrelevant that they originated or terminated in Massachusetts. Consequently, not only is venue improper in Massachusetts, but the indictment fails to allege criminal offenses as a matter of law.

## CONCLUSION

"This case simply represents an instance of an over-zealous prosecution and the misuse of the criminal laws where at most a civil remedy would have been appropriate." United States v. Hodge, 150 F.3d 1148, 1151 (9th Cir. 1998) (Reinhardt, J., concurring).[12] And as for the indictment itself, "[s]imply put, there is no there there." United States v. Hanson, 41 F.3d 580, 582, 584 (10th Cir. 1994) (reversing mail and wire fraud conviction because "[b]usiness failure may not automatically be equated with a [scheme] to defraud") (internal quotations and citations omitted).

That is all we have here – an inadvertent and (given Carpenter's alleged profit motive) unintentional business failure by BPE to return these seven exchangors' funds. Nothing more, nothing less. And the indictment fails to allege anything different.

For all of the foregoing reasons, Carpenter respectfully requests that both of his motions to dismiss the indictment be granted (i.e., based on a failure to allege criminal offenses and for improper venue), and further moves for dismissal of the indictment as being time-barred. See n. 11, supra.

Dated: September 16, 2004

---

[12] In the ongoing civil case involving these exchangors, the trial judge recently granted the exchangors a new trial against defendant Merrill Lynch whereby they can seek to make Merrill Lynch liable for $20 million in damages and, thus, avail themselves of the civil remedy that is more appropriate in this matter. Moreover, no judgment has been entered against any party in the civil case as of this date.

DANIEL E. CARPENTER,
By his attorneys,

/s/

A. John Pappalardo, Esq. (BBO # 338760)
Evan Georgopoulos, Esq. (BBO# 628480)
GREENBERG TRAURIG LLP
One International Place, 20th Floor
Boston, MA 02110
(617) 310-6000

*Of Counsel*:

Alan M. Dershowitz, Esq.
1563 Massachusetts Avenue
Cambridge, MA 02138
(617) 496-2187

Edward A. McDonald, Esq.
Nelson A. Boxer, Esq.
Michael J. Gilbert, Esq.
DECHERT LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 698-3500

Richard S. Order, Esq.
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8100

## CERTIFICATE OF SERVICE

I, Evan Georgopoulos, hereby certify that a true and accurate copy of the foregoing was served on the government's attorney as appears below by hand delivery on this 16th day of September, 2004:

Michael J. Pineault, Esq.
Assistant U.S. Attorney
Office of the U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210

/s/
Evan Georgopoulos, Esq.