UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| v. | ) | VIOLATIONS: |
| | ) | 18 U.S.C. § 1341 (Mail Fraud) |
| DANIEL E. CARPENTER, | ) | 18 U.S.C. § 1343 (Wire Fraud) |
| | ) | 18 U.S.C. § 981 and |
| Defendant. | ) | 28 U.S.C. § 2461(c) (Forfeiture) |
| | ) | |

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

## I. BACKGROUND

At all times relevant to this Indictment:

### A. The Company

1.      Benistar Property Exchange Trust Company, Inc. ("BPE") was a Delaware corporation with its principal office located in Newton, Massachusetts.  BPE was engaged in the business of serving as an intermediary in property exchanges performed pursuant to Section 1031 of the Internal Revenue Code.

2.      BPE was a wholly owned subsidiary of Benistar, Ltd. ("Benistar"), a Delaware corporation headquartered in Simsbury, Connecticut.  Benistar and its subsidiaries marketed and administered tax deferral products and services, including welfare benefit plans, employee stock ownership plans, 401(k) plans and property exchanges.

### B. The Defendant

3.      Defendant DANIEL E. CARPENTER ("CARPENTER"), a resident of

Connecticut, was Chairman of Benistar and of BPE.  His office is located at Benistar's corporate

headquarters in Simsbury, Connecticut.

### C.  Mechanics of a Property Exchange

4.      Section 1031 of the Internal Revenue Code allows owners of investment property

to defer the capital gains tax that would otherwise be owed upon the sale of that property by

rolling the proceeds over into the purchase of replacement property.   The exchange – i.e., the

purchase of the replacement property – must take place within 180 days of the sale of the initial

property.

5.      Tax deferral is lost if the owner takes possession of the proceeds received from

the sale.  Consequently, a number of companies offer their services as section 1031

intermediaries to hold the proceeds in escrow until such time as the owner is ready to close on

the purchase of the replacement property.  BPE held itself out as such an intermediary.

6.      BPE followed a standardized set of exchange procedures with its clients.

Pursuant to those procedures, clients were asked to sign the following standardized documents:

(a) an Exchange Agreement; (b) an Escrow Agreement; (c) an Account Selection Form; and (d)

an Exchange Fee Agreement.

7.      The Exchange Agreement and the Escrow Agreement expressed the client's

intention to perform a property exchange using BPE as the intermediary.  The agreements

provided for the proceeds from the sale of the initial property to be transmitted by wire or check

directly from the closing to BPE, for BPE to hold those funds in escrow either in a 3% account or

in a 6% account (as specified by the client on an Account Selection Form), and for BPE to

release the funds from the escrow account only upon the written direction of the client, either to

2

be disbursed for the client's use in closing on the purchase of replacement property or to be returned to the client if no replacement property transaction was to occur.

8.      BPE provided Wire Transfer Instructions to its clients specifying the account into which clients were directed to transmit the funds that BPE would be holding in escrow. Up until October, 2000, the Wire Transfer Instructions directed that client funds be wired to Mellon Bank in Pittsburgh, PA for the benefit of Account No. 849-07B01 (the "B01 Account") held in the name of BPE at Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"). In October, 2000, BPE transferred its accounts to PaineWebber, Inc. ("PaineWebber") and instructed clients to wire their funds to the Bank of New York in New York City for the benefit of Account No. EX-15434 (the "34" account) held in the name of BPE at PaineWebber. For funds transmitted by check, BPE directed clients and closing counsel to send the checks via overnight mail to Benistar in Simsbury, CT for deposit into the B01 Account or, as of October, 2000, into the "34" account.

9.      Following Benistar's receipt of the funds, BPE sent out a confirmation letter to the client acknowledging the amount received and being held in escrow. The letter was accompanied by instructions for notifying BPE regarding the client's intended acquisition of replacement property. Upon the scheduling of the replacement property closing, BPE would disburse the client's escrowed funds from Merrill Lynch (later, PaineWebber) to the closing attorneys who were handling the purchase of the replacement property. Clients who selected the 3% account had the contractual right to receive disbursement of their funds on three days notice. Clients who selected the 6% account were required to give 30 days written notice.

10.     ·The Exchange Fee Agreement specified the fee to be paid to BPE for providing the foregoing intermediary services. BPE typically collected its fee via separate checks paid by

3

the client. On occasion, and with written authorization from the client, BPE deducted its fee from the proceeds of the sale of the initial property.

### D. Division of Responsibilities Between
### Connecticut and Massachusetts

11.    Virtually all BPE business except the handling of clients funds was performed by employees who were based in BPE's office in Newton, Massachusetts ("BPE-Newton"). Those employees consisted of BPE's President, his assistant and, depending on the time period, one or two other employees.

12.    BPE-Newton gave marketing presentations to potential clients, prepared and transmitted exchange documents, and handled the client communications and logistical details associated with performing each exchange transaction.

13.    Benistar employees based in Simsbury, Connecticut ("Benistar-CT") handled matters involving the receipt, deposit and disbursement of client funds, including communications with Merrill Lynch (later, PaineWebber) concerning the receipt of incoming wires and checks, and communications concerning the outgoing disbursement of client funds in connection with closings on replacement property.

14.    CARPENTER directed the operations of Benistar-CT and co-directed, in consultation with BPE's President, the operations of BPE-Newton. CARPENTER reviewed the promotional materials that BPE's President drafted for soliciting clients. CARPENTER also reviewed and assisted in drafting the exchange documents that BPE utilized, including the Exchange Agreement and the Escrow Agreement.

15.    CARPENTER opened and controlled the BPE accounts at Merrill Lynch and at

4

PaineWebber that are referenced in paragraph 8, above. CARPENTER communicated directly with Merrill Lynch and PaineWebber concerning the accounts, including signing wire transfer and disbursement requests. CARPENTER also was advised on a regular basis of the account balances.

16.    BPE-Newton and Benistar split the fees generated by BPE's clients, with 90% going to BPE-Newton and 10% to Benistar. To the extent that Benistar received from Merrill Lynch (later, PaineWebber) a higher interest rate than the 3% or 6% that the company was obligated to pay to its clients, BPE-Newton and Benistar agreed to split the excess interest on a 50/50 basis.

E. Representations Made by BPE re: Handling of Client Funds

17.    BPE gave written and oral assurances to its clients that BPE would hold their money safe and return the principal to them, in full, for use in closing on the purchase of replacement property. That was the purpose of doing the § 1031 exchange – to park the proceeds from the initial sale in escrow with the intermediary for up to 180 days until the money was disbursed to close on the purchase of replacement property, thereby ensuring deferral of the capital gains tax.

18.    The promotional materials that BPE used to solicit clients contained representations concerning the security and safety of all funds transmitted to Benistar. BPE's President prepared a Powerpoint presentation, which was reviewed and edited by CARPENTER, that explained to potential clients the benefits of doing a § 1031 exchange and also explained why they should retain BPE as their intermediary. One of the slides in the presentation was titled *Choosing an Intermediary* and listed several factors that clients should consider in making that

5

choice. The third factor was labeled: "Security of Funds." The accompanying text stated: "Ask

about the security of your funds, and find out what guarantees are offered. The intermediary

should be bonded, and carry Errors & Omissions insurance coverage." The next slide in the

presentation stated: "Merrill Lynch Private Bank is used for all our escrow accounts. This

provides 3% - 6% interest on the escrow."

19.    BPE's President also drafted – and CARPENTER reviewed – a document titled

*Frequently Asked Questions About 1031 Property Exchange*, which was distributed to potential

clients. One of the listed questions was: "What will the intermediary do with my money?" The

answer stated:

> One important factor to consider in your selection of an
> intermediary is how they will handle your money. BENISTAR
> Property Exchange has a long-standing reputation for
> trustworthiness, and is part of BENISTAR, LTD, the largest 419
> trust plan administrator in the nation.
>
> Escrow accounts are restricted to paying out funds only for a
> subsequent closing, or to return funds to the original property
> owner. Written request is required for any disbursements.

20.    Similarly, Benistar's web site (*www.Benistar.com*) contained a "Frequently Asked

Questions" page that was drafted by BPE's President and reviewed by CARPENTER. One of

the listed questions was: "Can I Trust BENISTAR Property Exchange with My Money?" The

answer stated:

> BENISTAR Property Exchange Trust Company, Inc. is a part of
> BENISTAR, LTD., the largest 419 Trust Plan Administrator in the
> country, and we protect your assets:
>
> Our accounts are restricted to paying out funds only for a
> subsequent closing, or to return funds to the original property
> owner. We distribute funds only at your written request.

6

21.   Consistent with the advice given in the Powerpoint presentation, a number of

potential clients asked whether BPE was bonded.  CARPENTER obtained a bond from Travelers

Casualty and Surety Company so that BPE could provide a copy of the bond to any clients who

requested it, and thereby further reassure them that their money would be safe.

22.   The language of the standardized exchange documents used by BPE paralleled the

language of the promotional literature with respect to the handling of client funds.  Paragraph 1

of the Escrow Agreement stated:  "BENISTAR shall open an Escrow Custodial Account under

BENISTAR's name at Merrill Lynch [later, PaineWebber] for the Exchangor's benefit."

Paragraph 3 of the same Agreement provided:

> Only upon the Exchangor's written direction and authorization
> shall the funds leave the BENISTAR account.  Upon the written
> direction of the Exchangor shall the funds be released and then the
> funds shall be delivered to one of only two places at the
> Exchangor's written direction:
>
> 1.   Directly to the Exchangor's account; or
> 2.   Directly to the Escrow account for the closing on the
>      Replacement Property to be purchased pursuant to the
>      Exchange Agreement.

23.   The Exchange Agreement contained similar language, stating, in paragraph 2(c):

> Exchangor agrees that Intermediary shall hold the net proceeds
> from the closing herein until such time as Exchangor has located
> suitable like-kind property or properties in which to exchange,
> which shall be described as the "Replacement Property."

24.   The post-closing confirmation letter that BPE sent to clients made reference to

the funds being held in escrow, stating:

> We have received $_____ of sales proceeds, which we are
> holding for your benefit.  These funds are accruing interest at
> %____ [either 3 or 6%].  Remember that BENISTAR needs

7

written notice and a minimum of thirty calendar days to forward any escrow funds held at 6% (three business days for funds held at 3%).

## II. THE SCHEME TO DEFRAUD

### A. Overview

25.     At all times material to the indictment, CARPENTER engaged in a scheme to defraud that involved the misappropriation of millions of dollars of funds that BPE's clients had entrusted to the company.

26.     CARPENTER's primary object and purpose was to use BPE client funds to engage in aggressive, high risk trading in the options market, with the goal of leveraging the funds into a substantial profit for himself.

27.     Clients were induced to wire funds to BPE based on material, false written and oral assurances that the money would be protected and held safe, that BPE would not transfer the funds without the client's written authorization, and that BPE would return the funds in full, either to be disbursed for the client's use in closing on the purchase of replacement property or to be returned to the client if no replacement property transaction was to occur.

28.     CARPENTER knew the foregoing representations were being made to BPE's clients. Contrary to these representations, however, CARPENTER did not hold the funds safe in the accounts into which they had been wired. Instead, he used the funds to trade in the options market, transferring millions of dollars of BPE client money into trading accounts that he opened at Merrill Lynch and PaineWebber.

29.     During the period from April through December, 2000, CARPENTER sustained substantial losses from his options trading. Notwithstanding these losses, BPE continued, with

8

CARPENTER's knowledge, to solicit and induce clients to entrust funds to BPE based on

material, false representations regarding the manner in which the funds would be treated and

held. By the time BPE ceased operations, over $9 million in client funds had been lost as a result

of CARPENTER's trading.

B. <u>Carpenter's Trading Activity</u>

30.     As set forth in paragraph 8, above, up until October, 2000, BPE's Wire Transfer

Instructions directed clients to wire the proceeds from their property sale to Mellon Bank in

Pittsburgh, PA for the benefit of the Merrill Lynch B01 Account. That was the account into

which all BPE client funds were initially deposited, and out of which all client funds were

disbursed.

31.     Unbeknownst to BPE's clients, CARPENTER also opened up a second account at

Merrill Lynch in the name of BPE. The second account was Account No. 849-07B10 (the "B10

Account"). CARPENTER utilized the B10 account to engage in options trading.

32.     In conducting his options trading, CARPENTER used aggressive, high risk,

"bullish" strategies that were designed to try to earn profits in a rising stock market. For

example, one of CARPENTER's trading strategies consisted of selling "puts." Such "puts"

entitled the purchaser to "put" back to CARPENTER – i.e., compel CARPENTER to buy – a

specified number of shares in a specified company at a specified price (the "strike price") and a

specified time.

33.     If the strategy worked successfully, CARPENTER would sell the "put" – and

receive the corresponding premium – but never be forced to buy the underlying stock (i.e., the

shares specified in the option would never be "put" to him) because the actual price of the stock

9

would be equal to or have risen higher than the specified "strike" price, thus causing the option to expire unexercised. If the strategy was unsuccessful, CARPENTER risked substantial losses, particularly in a falling stock market.

34.    The latter scenario is what occurred to CARPENTER beginning in or about April, 2000. Stock prices fell and he began to lose increasing amounts of money.

35.    Merrill Lynch cautioned CARPENTER repeatedly about the risks of options trading. At the time he opened the B10 Account, CARPENTER was required to sign a Standard Option Agreement that advised him that "option transactions involve a high degree of risk."

36.    As CARPENTER's trading losses increased in the spring of 2000, Merrill Lynch warned him again concerning the risks of his trading strategy and the magnitude of the losses that he was sustaining. For example, an internal Merrill Lynch memo dated May 30, 2000 and authored by one of CARPENTER's brokers stated:

> Client has suffered very large losses in this particular trading account [the B10 Account]. He makes all his own decisions . . . .
>
> We have at times, reigned in his "irrational exuberance" when he was approaching his position limits . . . .
>
> Last week, May 22-23, he acknowledge [sic] to me that he was acting very foolish, and had the mentality of a "riverboat gambler", who was trying to make a huge killing to get even in just a few days.
>
> He was, once again, urged to reduce the number of different holdings, and trade more prudently.

37.    CARPENTER disregarded Merrill Lynch's warnings. His losses continued to increase. By the close of September, 2000, CARPENTER had lost approximately $4 million through his trading activity in the B10 Account.

38.    CARPENTER was fully aware of the magnitude of his losses. Each morning, Merrill Lynch faxed to him summary balance sheets reflecting his trading activity from the previous day.

39.    CARPENTER covered his trading losses and also financed his ability to engage in additional trading by systematically transferring BPE client funds from the B01 Account into the B10 Account. During the period from February, 2000 to September, 2000, CARPENTER made net transfers of approximately $4.5 million from the B01 Account into the B10 Account.

40.    Such transfers were contrary to the language of BPE's Escrow Agreement, which stated that: "BENISTAR shall open an Escrow Custodial Account under BENISTAR's name at Merrill Lynch for the Exchangor's benefit" and that "Only upon the Exchangor's written direction and authorization shall the funds leave the BENISTAR account."

41.    CARPENTER did not seek, nor did he receive, client authorization to transfer funds out of the B01 account or to use the funds to engage in high risk, speculative options trading. He did not notify or direct BPE personnel to notify current or prospective clients that he was using client funds in this fashion or that he was sustaining substantial losses in the market. Rather, BPE continued, with CARPENTER's knowledge, to solicit and induce clients to entrust funds to BPE based on material, false representations that the money would be protected and held safe, that BPE would not transfer the funds without the client's written authorization, and that BPE would return the funds in full, either to be disbursed for the client's use in closing on the purchase of replacement property or to be returned to the client if no replacement property transaction was to occur.

42.    When CARPENTER had bad days in the market, he instructed the Benistar

11

employee who assisted him with BPE matters not to let anyone know. CARPENTER also told the assistant that information concerning the property exchange business, especially the investment results, were to be kept between the two of them.

43.     In or about mid-September, 2000, Merrill Lynch informed CARPENTER that the firm was terminating his trading privileges. An internal Merrill Lynch account note states that the account was shut down "because the client's strategy was too risky."

44.     CARPENTER moved BPE's accounts to PaineWebber. On or about October 8, 2000, CARPENTER opened two accounts at PaineWebber in the name of BPE: Account Nos. EX-15433 and EX-15434 (hereafter, the "33" and "34" accounts, respectively).

45.     At or about the same time, BPE revised its Wire Transfer Instructions to direct clients to wire their funds into the "34" account at PaineWebber. Thereafter, all client funds were deposited into the "34" account and all client disbursements were made out of that account.

46.     CARPENTER did not disclose the existence of the "33" account to BPE's clients. Instead, CARPENTER utilized the PaineWebber "33" account for the same purpose that he had used the Merrill Lynch B10 Account – to engage in uncovered options trading.

47.     PaineWebber warned CARPENTER at the time he opened the account concerning the substantial risks posed by options trading. CARPENTER was required to sign a "Special Statement for Uncovered Option Writers" cautioning him concerning the "potentially significant loss" that could be suffered by engaging in such trading. CARPENTER also was given a booklet titled "Characteristics and Risks of Standardized Options", for which he signed an acknowledgment of receipt, informing him that options trading exposed him to "very significant potential losses."

12

48.    Notwithstanding his receipt of these warnings, CARPENTER followed the same active and aggressive options trading strategy at PaineWebber that he had followed at Merrill Lynch. That strategy included CARPENTER's sale of "puts."

49.    Immediately upon his commencement of options trading at PaineWebber, CARPENTER began to sustain substantial losses. As had occurred at Merrill Lynch, the losses were covered, and CARPENTER's ability to continue to trade was financed, through the transfer of BPE client funds from the "34" account into the "33" account. As stated in paragraph 40, above, such transfers were contrary to the language of BPE's Escrow Agreement and the Exchange Agreement. CARPENTER never sought, nor did he ever receive, client authorization to transfer funds out of the "34" account or to use the funds to engage in high risk options trading. He did not notify or direct BPE personnel to notify current or prospective clients that he was using client funds in this fashion or that he was sustaining substantial losses in the market. Rather, just as had occurred during CARPENTER's trading losses at Merrill Lynch, BPE continued, with CARPENTER's knowledge, to solicit and induce clients to entrust funds to BPE based on material, false representations concerning the manner in which their money would be held and treated.

50.    By the end of November, 2000, CARPENTER's net trading losses in the "33" account exceeded $2.8 million. As of that same time, more than $2 million in BPE client funds had been transferred from the "34" account into the "33" account.

51.    Internal PaineWebber notes dated November 20, 2000 document a telephone call made by a PaineWebber manager to CARPENTER to speak with him about his losses. The notes state that CARPENTER was "aware of losses"; that he had "no one to blame but himself"

13

but that his situation was nothing a "good old fashioned rally wouldn't solve." The notes further record CARPENTER's reaction as "not happy but that's investing."

52.    By December 18, 2000, CARPENTER's losses in the "33" account exceeded $5.5 million. On December 19, PaineWebber advised CARPENTER that they were terminating his trading privileges and would only permit him to close his open positions.

53.    Additional losses occurred during the period between December 19, 2000 and the date when BPE's PaineWebber accounts ultimately were wound down and closed. The total net losses sustained in the "33" trading account exceeded $9 million.

## III. DISCOVERY OF THE FRAUD

54.    At or about the time that PaineWebber was notifying CARPENTER of its decision to terminate his trading privileges, BPE-Newton informed Benistar-CT of several clients who were scheduled to close on their acquisition of replacement property beginning in January, 2001 and who were requesting the disbursement of their funds.

55.    Unbeknownst to the clients, millions of dollars in BPE client funds had been lost as a result of CARPENTER's trading losses, and the funds that remained at PaineWebber were insufficient to cover the scheduled closings.

56.    In or about late December, 2000, CARPENTER informed BPE's President that there was insufficient money to cover the upcoming closings. On or about January 3, 2001, CARPENTER and BPE's President informed two of BPE's clients of this fact and that funds had been lost in the stock market. On the same date, CARPENTER left a telephone message for one of the client's attorneys stating that "we really had [been] killed in the market in December," that he, CARPENTER, had made what he thought "were prudent investments at the time," but that it

14

"didn't turn out that way" and the funds were not presently available.

57.     The foregoing news spread to other BPE clients, who began attempting to contact

BPE regarding the status of their own funds.  In response, counsel retained by BPE sent out

letters in or about mid-January, 2001 informing BPE's clients that the company was "in the

process of attempting to resolve certain issues relating to client funds" and that BPE was "not

able to return the funds to you at this time."  BPE went out of business shortly thereafter.

IV.  SPECIFIC CLIENT LOSSES

58.     In total, more than $9 million in client funds were lost as a result of

CARPENTER's options trading.  The clients who lost money include the seven individuals and

entities listed in the following table:

| Client | Address | Approximate Loss |
|--------|---------|------------------|
| Gail A. Cahaly | Westwood, MA | $984,730.00 |
| Eliot Snider<br>Massachusetts Lumber Co. | Brookline, MA | $3,237,190.00 |
| Joseph Iantosca | Braintree, MA | $3,428,141.00 |
| Jeffrey M. Johnston | Boston, MA | $541,931.00 |
| Byron Darling | Truro, MA | $306,665.00 |
| Bellemore Associates | Bedford, NH | $444,660.00 |
| Brian Fitzgerald<br>R&B Enterprises | Upton, MA | $97,369.00 |
| **TOTAL** | | **$9,040,686.00** |

A. Gail A. Cahaly

59.     At all times material to this Indictment, Gail A. Cahaly ("Cahaly") was a resident

of Westwood, Massachusetts. She and her husband, Ronald Cahaly, retained BPE in or about

November, 2000 to perform a § 1031 property exchange. They were provided assurances

concerning the safety of their funds, including Powerpoint slides and a document titled *IRC*

*§1031 Property Exchanges: Frequently Asked Questions* stating that they could trust BPE with

their money, that their funds would be held in a segregated account and would be paid out only

for a subsequent closing or to be returned to them, and that no BPE personnel would have access

to their account to withdraw money. They also requested and were provided a copy of a bond

issued to Benistar by Travelers Casualty and Surety Company (the "Travelers bond") as further

reassurance that their funds would be safe.

60.     On or about November 8, 2000, Cahaly endorsed over to BPE a check in the

amount of $2,412,230, which represented her interest in the proceeds of the sale of certain

property located in Allston, Massachusetts. The check was mailed from BPE's offices in

Massachusetts to Simsbury, Connecticut via Airborne Express and deposited into BPE's "34"

account at PaineWebber, to be held by BPE as intermediary pending Cahaly's closing on the

acquisition of replacement property, with interest to accrue at three percent.

61.     Cahaly received two partial disbursements from her escrowed funds. Following

those disbursements, approximately $984,730 in outstanding funds remained owed to her.

62.     On or about January 3, 2001, CARPENTER met with Ronald Cahaly and

informed him that he, CARPENTER, had lost substantial sums trading in the stock market and

that BPE was not able to return all of the Cahaly funds at that time. The approximate principal amount of the Cahaly funds that were lost and not returned by CARPENTER and BPE is $984,730.

### B. Eliot Snider

63.    At all times material to this Indictment, Eliot Snider was a resident of Brookline, Massachusetts and the President of Massachusetts Lumber Company ("Mass. Lumber"), based in Cambridge, Massachusetts. In or about September, 2000, Snider retained BPE to serve as intermediary in connection with a § 1031 exchange involving property owned by Mass. Lumber in Woburn, Massachusetts. Snider was provided assurances concerning the safety of his company's funds, including Powerpoint slides and a document titled *Frequently Asked Questions About 1031 Property Exchange* stating that BPE had a long-standing reputation for trustworthiness and that his funds would be held in an escrow account and would be paid out only for a subsequent closing or to be returned to the company. Snider also requested and was provided a copy of the Travelers bond.

64.    On or about September 14, 2000, Snider executed an Escrow Agreement and an Exchange Agreement with BPE containing the representations set forth in paragraphs 22 and 23, above, concerning the manner in which his company's funds would be held by BPE. Pursuant to an Account Selection Form completed by Snider at or about the same time, the funds were to accrue interest at six percent.

65.    On or about September 14, 2000, $3,000,000 in proceeds from the sale of the Mass. Lumber property was wired from Boston to Mellon Bank in Pittsburgh, PA for the benefit

17

of the Merrill Lynch B01 Account.

66.     On or about September 14 and September 20, 2000, two checks in the respective amounts of $62,190 and $225,000, representing additional proceeds, were sent via overnight mail from Boston to Benistar in Simsbury, Connecticut and deposited into the B01 Account.

67.     On or about September 21, 2000, BPE transmitted a letter to Snider confirming the receipt of $3,287,190 of sales proceeds, "which we are holding for your benefit" and which "are accruing interest at 6%." The foregoing proceeds were to be held by BPE as intermediary pending Mass. Lumber's closing on the acquisition of replacement property.

68.     Snider received a partial disbursement of approximately $50,000 from the escrowed funds. He did not receive any additional disbursements. Following that disbursement, approximately $3,237,190 in outstanding funds remained owed to him.

69.     On or about January 17, 2001, counsel for BPE transmitted a letter to Snider stating that BPE was "in the process of attempting to resolve certain issues relating to client funds" and that BPE was "not able to return the funds to you at this time." The approximate principal amount of the Mass. Lumber funds that were lost and not returned by CARPENTER and BPE is $3,237,190.

## C. Joseph Iantosca

70.     At all times material to this Indictment, Joseph Iantosca was a resident of Braintree, Massachusetts. During the period from May to December, 2000, Iantosca retained BPE to serve as intermediary in connection with a series of § 1031 exchanges involving several commercial properties owned by Iantosca in Massachusetts. Iantosca and his real estate counsel

18

were provided assurances concerning the safety of Iantosca's funds, including Powerpoint slides

and a document titled *Frequently Asked Questions About 1031 Property Exchange* stating that

BPE had a long-standing reputation for trustworthiness and that his funds would be held in an

escrow account and would be paid out only for a subsequent closing or to be returned to the

company. Iantosca and his counsel also requested and were provided a copy of the Travelers

bond.

71.    During the period from May through November, 2000, Iantosca executed Escrow

Agreements and Exchange Agreements with BPE for nine separate property exchanges. These

agreements contained the representations set forth in paragraphs 22 and 23, above, concerning

the manner in which Iantosca's funds would be held by BPE.

72.    Four of the nine exchanges were successfully completed, with Iantosca receiving

back all of the proceeds for each of these four transactions.

73.    Iantosca did not receive back the full amount of his funds on the remaining five

exchanges. The amount of the proceeds that he transmitted to BPE in connection with these five

transactions was as follows:

a.    On or about August 16, 2000, $506,562.40 in proceeds from the sale of Iantosca
      property located at Chilton Park in Plymouth, Massachusetts was wired from
      Massachusetts to Mellon Bank in Pittsburgh, PA for the benefit of the Merrill
      Lynch B01 Account, to accrue interest at six percent.

b.    On or about December 1, 2000, the proceeds from the sale of four additional
      Iantosca properties were wired from Massachusetts to the Bank of New York in
      New York City for the benefit of the PaineWebber "34" Account, to accrue
      interest at three percent. A separate wire was sent for each property. The
      amounts of each wire and the addresses of the corresponding properties are as
      follows:

19

      (i)    $774,563.54 (8 Tinson Road, Quincy);

      (ii)   $1,875,323.43 (25 & 45 Morton Street, Quincy);

      (iii)  $1,615,902.33 (261-265 Hayward Street, Braintree); and

      (iv)  $2,434,659.51 (135 Quincy Avenue, Quincy).

c.    On or about December 14, 2000, a check in the amount of $300,000, representing additional proceeds from Iantosca's December 1 transactions, was mailed via Airborne Express from Massachusetts to Benistar in Simsbury, Connecticut and deposited in the PaineWebber "34" account.

74.    All of the foregoing proceeds were to be held by BPE as intermediary pending Iantosca's closing on the acquisition of replacement properties.

75.    Iantosca received partial disbursements from the escrowed funds listed in paragraph 73, above. Following those disbursements, approximately $3,428,141 in outstanding funds remained owed to him.

76.    On or about January 3, 2001, CARPENTER met with Iantosca and informed him that he, CARPENTER, had lost substantial sums trading in the stock market and that BPE was not able to return all of Iantosca's outstandings funds at that time. The approximate principal amount of the Iantosca funds that were lost and not returned by CARPENTER and BPE is $3,428,141.

### D. Jeffrey Johnston

77.    At all times material to this Indictment, Jeffrey Johnston was a resident of Boston, Massachusetts. In or about November, 2000, Johnston retained BPE to serve as intermediary in connection with a § 1031 exchange involving property located in Boston. Johnston was provided assurances concerning the safety of his funds, including Powerpoint slides and a document titled