UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIMINAL NO. 04-10029-GAO |
| DANIEL E. CARPENTER | ) ) ) | |

# DEFENDANT'S VERIFIED REPLY BRIEF IN FURTHER SUPPORT OF EMERGENCY MOTION TO TRANSFER VENUE

Defendant Daniel E. Carpenter ("Carpenter") respectfully submits this reply brief in further support of his emergency motion to transfer venue dated May 5, 2005, and in response to the government's opposition brief dated May 6, 2005. The government begins its opposition by attacking the validity of the defendant's motion through a reference to the number of emergency motions recently filed by Mr. Carpenter. This irrelevant comment simply observes that Mr. Carpenter has been forced to file several "emergency" motions in the past week in light of the unique procedural posture of this case. However, the filing of other motions and the emergency nature of Mr. Carpenter's motion to transfer venue to the District of Connecticut pursuant to Fed. R. Crim. P. 21(b) do not make the transfer motion any less meritorious or compelling.

The government's opposition not only fails to address adequately the required factors enumerated in Platt v. Minnesota Mining & Mfg. Co., 376 U.S. 240 (1964), but also relies on two cases that are clearly distinguishable from the present case and whose analyses, when applied to the facts of this case, actually support transfer. The government – other than continuing to bemoan the age and infirmity of a couple of its witnesses (which is not one of the Platt factors) – can articulate **no** compelling reason why this case should

1

not be transferred immediately to the District of Connecticut. Rather, the government bases its argument on factors that might be relevant under 28 U.S.C. § 1404 if this were a civil litigation (*i.e.*, the convenience of the government's witnesses).

Furthermore, the government has already previously admitted that if Carpenter committed a crime at all, he did so in Connecticut. In its brief filed in opposition to Carpenter's motion to dismiss the indictment for lack of venue, the government stated that whether the stock options investments of Benistar Property Exchange Trust Co., Inc. ("BPE") "subsequently resulted in gains or losses is **irrelevant**." Gov. Br. 6 (Sep. 10, 2004) (Dkt. 29) (emphasis added). Consequently, since the loss of $9 million of exchangor funds is irrelevant, then not only is the fact that most of the exchangors reside in Massachusetts irrelevant, but the only act which could possibly constitute a crime was the actual investment of those funds in stock options – which even the government alleges was engaged in and directed by Carpenter *from Connecticut*.

In sum, this case should be transferred because the government's theory of fraud clearly shows that if any crime was committed by Mr. Carpenter, it was committed in Connecticut.

**ARGUMENT**

1. **The alleged criminal conduct occurred in Connecticut, not in Massachusetts**. The government claims that the criminal conduct alleged in the indictment "occurred substantially in Massachusetts." Gov. Br. 1. In making such a statement, the government must be referring to an indictment different from the superseding indictment ("SSI," Dkt. 34) filed in this case whose *entire* theory of fraud is that Carpenter caused BPE to invest in stock options. See, e.g., SSI ¶¶ 26, 58

2

("CARPENTER's primary object and purpose was to use BPE client funds to engage in aggressive, high risk trading in the options market, with the goal of leveraging the funds into a substantial profit for himself. . . . In total, more than $9 million in client funds were lost as a result of CARPENTER's options trading.").

In fact, a cursory review of the allegations in the SSI shows that all of Carpenter's alleged "acts" occurred, if at all, in Connecticut. See SSI ¶¶ 14, 15, 18, 28, 29. *All* of the acts that are alleged to constitute a crime (*i.e.*, Carpenter causing BPE to invest in stock options) occurred in and were directed from Connecticut. None of Carpenter's alleged acts occurred in or were directed from Massachusetts.

Carpenter is not even alleged to have made *any* of the representations to the exchangors that the government claims were false. All communications with the exchangors were handled by BPE's president Martin L. Paley ("Paley") and his administrative officer and first cousin Linda Jokinen ("Jokinen"). While a trial of Paley and/or Jokinen, both Massachusetts residents, could be conveniently held in Massachusetts, the SSI charges only Carpenter – who at all times lived and worked in Connecticut and whose investment of exchangor funds in stock options (the only act alleged to be criminal) occurred in and was directed from Connecticut.

As made clear in Carpenter's motion, the "nerve center" and "center of gravity" of the alleged criminal conduct in this case (investing in stock options) occurred *exclusively* in Connecticut.[1] Def. Br. 10-12. By seeking to call several New York-based employees of Merrill Lynch and PaineWebber to "testify concerning their knowledge of Carpenter's

---

[1] Although the Court denied Carpenter's motion to dismiss the *entire* indictment for lack of venue, Carpenter respectfully suggests that the Court overlooked the obvious venue problems inherent in Counts 3 and 4 of the SSI (involving the transmission of funds from New Hampshire to Pennsylvania).

3

trading activity," Gov. Br. 2, the government necessarily concedes that it is Mr. Carpenter's *trading activity* that is alleged to be criminal – and all such trading activity occurred in or was directed *solely* from Connecticut.

The government also contends that the exchangors transmitted their funds from Massachusetts (even though funds were transmitted from New Hampshire to Pennsylvania in connection with Counts 3 and 4 of the SSI). Gov. Br. 1. However, not a single exchangor transmitted any funds whatsoever from Massachusetts or New Hampshire to BPE's accounts at Merrill Lynch or PaineWebber (all such funds, instead, were transmitted by the *purchasers* of the relinquished properties).

    **2.** **The majority of the evidence and witnesses are in Connecticut**. While perhaps the majority of the *government's* witnesses are located in Massachusetts (Gov. Br. 2), the majority of *all* the witnesses are located outside of Massachusetts (specifically Connecticut, New York and New Jersey). Def. Br. 3, n.2. Moreover, the government's sole immunized witness is also located in Connecticut.[2] Notwithstanding the government's irrational claim that a Boston trial would be more convenient for witnesses located in Connecticut, New York and New Jersey than a trial in Hartford (Gov. Br. 3, n.5), a trial in Connecticut would also be substantially more convenient for the several New York-based Merrill Lynch and PaineWebber employees whom the government intends to call as witnesses. The fact that the attorneys for these brokerage firm employees are located in Boston is totally irrelevant since it is the brokerage firm employees

---

[2] The government contends that the defendant mischaracterizes Ms. Jackie Spielman (the government's sole immunized witness who lives in Connecticut) as a "chief" government witness. Gov. Br. 2, n.3. However, the fact that Ms. Spielman was the *only* live fact witness to have testified before the grand jury and is the *only* witness to have been granted immunity in this case speaks volumes as to her importance as perceived by the government.

themselves – and not their attorneys – who will be testifying at trial and their attorneys will not even have a role to play in the trial. If the location of attorneys were truly at issue, such a factor would favor Mr. Carpenter, whose attorneys are located in Connecticut and New York.

In fact, any testimony from attorneys for the exchangors or the brokers (Gov. Br. 2) would be subject to exclusion as being irrelevant. The only person's state of mind that is relevant in this case is Mr. Carpenter's – *i.e.*, whether he had the required scienter to be culpable under the mail and wire fraud statutes. The documents about which any attorney might testify all speak for themselves. Consequently, the Massachusetts-based lawyers who appear on the government's witness list (Gov. Br. Ex. A) will very likely not be able to testify at all.

The government also makes the bald and unsupported statement that "[t]he bulk of the evidence is in Massachusetts, including all of the documents," Gov. Br. 2, but the defendant has made a verified statement that *all* of BPE's documents produced to the government are located in Connecticut. Def. Br. 12.

      3.      **<u>Considerations of burden, accessibility, and expense favor transfer</u>**.

Notwithstanding the age or infirmity of some of the government's witnesses, a trial in Hartford would not be too inconvenient for them. The government's paraplegic witness (Gov. Br. 2) – Mr. Brian Fitzgerald – lives near Worcester and is essentially equidistant from the Boston and Hartford federal courthouses. Def. Br. 18-19. Since the government's younger witness who is ill and resides in a nursing home (Jokinen) will have her videotaped Rule 15 testimony taken on May 10, 2005, it does not matter whether she attends the trial in person (and from the government's own dire predictions in connection

with the defendant's motion for a continuance, it appears she may not attend the trial even if it proceeded on July 11 in Boston). Similarly, the government's oldest witness (Mr. Byron Darling, almost 90) has already had his Rule 15 videotaped testimony taken on May 5, 2005 – so his appearance at the trial likewise is not required. And in any event, the testimony of Messrs. Fitzgerald and Darling will have minimal impact because they settled all of their claims against Mr. Carpenter prior to the civil trial. Furthermore, Mr. Carpenter has consented to taking the Rule 15 videotaped pretrial testimony of *any* witnesses whom the government requests.

The government began its investigation of this case in early 2001, *more than four years ago*. It then waited until February 2004 to return the original indictment against Mr. Carpenter and waited another *seven months* before returning the superseding indictment against Mr. Carpenter in September 2004. All throughout this delay, the government's elderly and infirm witnesses certainly were not getting any younger or healthier. The government has only its own laches to blame if the passage of time might now arguably negatively impact certain of the government's witnesses or the protection of Mr. Carpenter's constitutional rights. In any event, it has been less than a year since the superseding indictment was returned, so there has not been any undue delay in the progression of this case since its initiation.

While it is perhaps the case that a trial in Hartford would be slightly more inconvenient for "the Boston-based prosecutors and [FBI] case agents," Gov. Br. 2, this Court should give little, if any, "weight to whatever inconvenience th[ese] particular Assistant United States Attorney[s] may suffer for spending a few weeks in [Connecticut]." United States v. Coffee, 113 F. Supp. 2d 751, 758 (E.D. Pa. 2000).

6

"The United States of America has, for all practical purposes, unlimited financial resources to bring to bear. Unlike the [Carpenters], the Government can, and does, mint money." Id. at 757. Yet, the government now contends that "expense does not seem to be a pressing issue for [Mr. Carpenter]." Gov. Br. 3. Nothing could be further from the truth – especially since Mr. Carpenter was forced to step down from his former positions at the companies he founded once the indictment was returned in February 2004 in order to fight these baseless charges. And while it is true that Mr. Carpenter's former companies have been litigating the parallel civil action for the past four years in Suffolk Superior Court, Mr. Carpenter and those companies filed several motions to dismiss the complaint in that case for lack of personal jurisdiction (and the $20 million judgment entered against Mr. Carpenter and the corporate defendants could very well be reversed by the Massachusetts Appeals Court on that basis alone).

The government's opposition does not even mention the tremendous financial burden a trial in Boston will impose on Mr. Carpenter. Putting aside the fact that Mr. Carpenter will be deprived of the emotional support of his family and friends if the case is not transferred (Def. Br. 2-3, 7-8), Mr. Carpenter will be forced to house and otherwise accommodate not only himself but his entire defense team (attorneys – none of whom reside in Massachusetts, paralegals, IT and other support staff, etc.) in expensive downtown Boston hotels for at least a month, as well as cover their *per diem* and related expenses. Mr. Carpenter conservatively estimates that this alone will cost him in excess of $250,000.[3]

---

[3] This Court can take judicial notice of the fact that a hotel room in Hartford costs substantially less than a hotel room in Boston. Consequently, it will cost Mr. Carpenter much more to accommodate himself and his defense team in Boston for the four week trial than it will cost the government to accommodate its prosecution team in Hartford for the same period.

By contrast, if the trial were held in Hartford, travel and *per diem* expenses related to not only the Carpenters but also to Attorney Richard Order (who also lives in Simsbury, Connecticut and on whose experience in litigating the civil case the government places such emphasis) would be eliminated altogether. Furthermore, Mr. Carpenter could then retain local criminal counsel in Connecticut to try the case, thereby eliminating travel and related expenses on that score as well. In sum, a transfer of this case to Hartford would virtually eliminate at least $250,000 in expenses that Mr. Carpenter would otherwise have to incur if the trial is conducted in Boston. Conversely, the government – putting aside its limitless financial resources – will not have to incur anything close to this amount if the case is transferred.[4]

   **4.**    **Judicial efficiency and economy also favor Connecticut**. While it is true that this Court has some familiarity with the case, the Court's familiarity with the case is *not* one of the ten Platt factors enumerated by the Supreme Court.

Furthermore, if this case is transferred it would not necessarily be assigned "to a new judge." Gov. Br. 3. In fact, there is a substantial likelihood that the case would be assigned to Judge Thompson in Hartford, the same judge who recently transferred Mr. Carpenter's FOIA case from the District of Connecticut to the District of Massachusetts based *solely* on the pendency of the criminal case in Massachusetts. Def. Br. 15-16.

---

[4] The government also takes issue with the number and type of character witnesses Mr. Carpenter intends to call during the defense case-in-chief, if necessary. Gov. Br. 2, n.4. Mr. Carpenter's character witnesses all hail from Connecticut, Def. Br. 8-9, and their impact on a jury in Hartford would be substantially greater where they are known than in Boston where – in all likelihood – they are not known. For example, Mr. Carpenter is intimately involved in youth soccer (CJSA – Connecticut Junior Soccer Association) and secondary education in the greater Hartford area and plans to call as character witnesses, among others, the Headmasters of several well-known and highly regarded private preparatory schools in the Hartford area such as Westminster, Avon Old Farms (where Mr. Carpenter served as a member of the Board of Trustees before being forced to step down due to the indictment), Loomis-Chafee, Kingswood-Oxford, and Suffield Academy (the so-called "WALKS" prep schools). It is highly unlikely that these distinguished educators and administrators, or their schools, would be known by a Boston jury.

In fact, by immediately (i) transferring the criminal case to the District of Connecticut, (ii) *re-transferring* the FOIA case to the District of Connecticut pursuant to 28 U.S.C. § 1404, and (iii) marking both cases as "related," judicial efficiency and economy (regarding which the government proclaims concern) would be optimized because Judge Thompson would be able to deal with *all* issues relating to *both* cases and this Court would be able to clear both its civil and criminal docket of cases which, by all objective measures, deserve to be litigated in Connecticut. Furthermore, the fact that the District of Connecticut impanels *30% fewer* juries than the District of Massachusetts not only weighs in favor of transfer and judicial economy, but means that a speedy trial can be obtained. Def. Br. 14-15.

The government posits that delay "is the motivating force behind the defendant's motion." Gov. Br. 3. However, nothing could be further from the truth. Mr. Carpenter had resolved to file this motion once Judge Thompson entered his decision in the FOIA case on April 28, 2005. <u>See</u> Def. Br. Ex. 1. Furthermore, the timing of the motion belies the government's theory. The Court issued its decision denying the defendant's motion for a continuance on May 4, 2005, and the motion to transfer was filed less than 24 hours later on May 5th. If the government's supposition was true, it would be a great feat indeed for undersigned counsel to have researched, written and filed such a thorough and all-encompassing motion to transfer *in less than 24 hours*. The motion to transfer is a direct result of Judge Thompson's exhortation in his April 28th order. The timing of the filing, coming as it did less than 24 hours after the Court's denial of the defendant's motion for a continuance, was purely coincidental (and is a comment on the Court's alacrity rather than Mr. Carpenter's motives).

9

**5.    The analyses undertaken in the cases cited by the government support transfer in this case**. In United States v. Perry, 152 F.3d 900 (8th Cir. 1998), even though the Eighth Circuit affirmed the district court's denial of the defendant's Rule 21(b) motion to transfer the case from the District of Nebraska to the defendant's home district (Eastern District of Virginia), the analysis undertaken by the Eighth Circuit actually supports transfer of Mr. Carpenter's case.  Id. at 904.

In Perry, the government's chief witnesses and most of the victims resided in Nebraska.  In this case, while most of the alleged "victims" reside in Massachusetts, the government's chief witnesses (two of whom were former employees of Mr. Carpenter's company, including one who is the government's sole immunized witness, and several of whom are Merrill Lynch and PaineWebber personnel) reside in Connecticut, New York, or New Jersey.  Def. Br. 9.  In Perry, the bulk of the investigative work and most of the records used in the case were in Nebraska.  In this case, the bulk of the records are located in Connecticut (Def. Br. 12) and, although the investigative work might have been performed in Massachusetts, the investigation relates to acts of Mr. Carpenter that occurred *exclusively* in Connecticut.  In Perry, the trust through which the fraud was committed was administered in Nebraska.  In this case, all of the investments were directed by Mr. Carpenter from his office in Connecticut and were performed by Merrill Lynch and PaineWebber in New York.  In Perry, at the time the transfer motion was filed, Perry had a co-defendant who was a Nebraska resident.  In this case, Mr. Carpenter is the sole defendant and he resides in Connecticut.  Moreover, in Perry, the Eighth Circuit did not balance the ten Platt factors as required, so it is unclear whether a different result would have been reached had it done so.

In United States v. Peterson, 357 F. Supp. 2d 748 (S.D.N.Y. 2005), the court denied the defendant's Rule 21(b) motion to transfer the case from the Southern District of New York to Peterson's home district (Northern District of California). However, the analysis undertaken by the court supports transfer of Mr. Carpenter's case to Connecticut. Id. at 750-51. In Peterson, the government conceded that much of the alleged criminal activity occurred in California and Arizona. In this case, the government has conceded that since evidence of gains or losses is irrelevant, the alleged criminal conduct must necessarily be the act of investing in stock options – which occurred in or was directed from Connecticut. In Peterson, the court found a number of "significant" New York contacts, such as meetings in New York, Lloyd's of London employees based in New York, victims outside New York contacting New York-based companies, checks cleared through banks in New York, and the investigation having been conducted in New York. In this case, Mr. Carpenter is not alleged to have had any meetings with the exchangors prior to the funds having been lost – let alone any meetings in Massachusetts. All of the "New York-based brokers" (Gov. Br. 2) are, obviously, not based in Massachusetts. With respect to the exchange that originated outside Massachusetts (in this case New Hampshire), funds were sent from New Hampshire directly to Pennsylvania. Def. Br. 16-17. And all of the funds were invested in BPE's accounts at Merrill Lynch and PaineWebber in New York.

While the government's investigation was conducted in Massachusetts (which is not even one of the Platt factors), the investigation and the indictment are focused on Mr. Carpenter's acts committed *exclusively in Connecticut*. In light of that fact, the U.S. Attorney for the District of Massachusetts should have referred the investigation of Mr. Carpenter to the U.S. Attorney for the District of Connecticut. His failure to do so cannot

now be used by the government as a reason to deny Mr. Carpenter's motion to transfer.

The government's opposition does not even attempt to analyze all of the necessary Platt factors. This is reason enough to grant Mr. Carpenter's motion. However, the cases cited by the government favor transfer to Connecticut.

**6.    Similar situation as in Walter Forbes case**. Mr. Carpenter's request in this case is similar to the case of United States v. Forbes. Walter A. Forbes, a Connecticut resident, was the former CEO of Cendant Corporation, a New Jersey-based Fortune 500 company. Forbes was indicted in the District of New Jersey in 2002 for allegedly masterminding a $9 billion fraud. The government indicted Forbes in New Jersey because all of the related securities fraud and class action suits involving Cendant (numbering more than 50) were pending in the District of New Jersey, the judge to whom the case was assigned was handling all of those related civil actions as well as criminal cases of other Cendant defendants, and the U.S. Attorney for the District of New Jersey was responsible for investigating and prosecuting all of the Cendant criminal actions.

Forbes moved pursuant to Rule 21(b) to transfer the case to his home district in the District of Connecticut and the government vehemently opposed the motion, raising many of the same arguments regarding judicial economy, familiarity with the case, location of witnesses, location of documents, etc., that the government has raised here. Nonetheless, the New Jersey district court transferred the case to Hartford – agreeing with Forbes that, as a Connecticut resident, his interests in being tried in his home district and to receive the support of his family outweighed the interest and convenience arguments put forward by the government. The district court so found even though the government offered evidence

that Forbes' home in New Canaan, Connecticut, was actually *closer* to the federal courthouse in Newark than to the Hartford courthouse – although Forbes countered that the rush-hour trip to Newark was substantially longer given traffic patterns in the New York metropolitan area (just as the rush-hour trip to Boston results in a three-hour commute *each way* from Hartford (Def. Br. 2)).  The government went so far as to seek a *writ of mandamus* from the Third Circuit to order the district judge to vacate his transfer order, but the Third Circuit declined the government's invitation to do so.  See In re United States, No. 02-2180 (3d Cir. Aug. 23, 2002).

       Interestingly, upon transfer to the District of Connecticut, Forbes' case was assigned to Judge Thompson in Hartford, the same judge who recently transferred Mr. Carpenter's FOIA case to this Court and, in doing so, made reference to Mr. Carpenter's rights under Rule 21.  After a four month jury trial in which there was a hung jury as to Forbes but Forbes' co-defendant (Cendant's former CFO) was convicted, the government moved to *re-transfer* the case back to New Jersey for the retrial of Forbes in September 2005.  Judge Thompson recently denied that motion.  See United States v. Forbes, No. 02-cr-00264 (D. Conn. Mar. 8, 2005) (oral order denying motion to re-transfer).

       If the Forbes case could be transferred from the District of New Jersey to the District of Connecticut, where fewer of the Platt factors favored transfer than in Mr. Carpenter's case, then certainly this Court would be acting well within its sound discretion to transfer Mr. Carpenter's criminal case (and re-transfer the FOIA case) to the District of Connecticut.

**CONCLUSION**

Because this case deserves to be tried in Connecticut and the ten <u>Platt</u> factors (Def. Br. 5-19) weigh heavily in favor of transfer, the Court should grant the motion to transfer and, at the same time, re-transfer the FOIA case to the District of Connecticut.[5]

DANIEL E. CARPENTER,
By his attorney,

**/s/  Jack E. Robinson**
Jack E. Robinson, Esq. (BBO #559683)
2187 Atlantic Street
Stamford, CT 06902
Tel:  (203) 425-4500
Fax:  (203) 425-4555
E-mail:  Robinsonesq@aol.com

Dated:  May 9, 2005

**VERIFICATION**

I hereby certify under penalty of perjury, pursuant to 28 U.S.C. § 1746(2), that the factual statements contained herein are true and correct.

**/s/ Daniel E. Carpenter**

---

[5]  Mr. Carpenter also requests that, as part of its transfer order, the Court dismiss Counts 3 and 4 of the SSI for lack of venue.