UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) ) | CRIMINAL NO. 04-10029-GAO |
| DANIEL E. CARPENTER | ) ) | |

**DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE ALL EVIDENCE
RELATING TO COUNTS 15 AND 19 FOR LACK OF
SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, TO DISMISS
(Defendant's Motion *In Limine* No. 11)**

Defendant Daniel E. Carpenter, through undersigned counsel, respectfully moves *in limine* to exclude **all** evidence relating to Counts 15 and 19 of the superseding indictment (Dkt. #34) for lack of subject matter jurisdiction. Specifically, these two mail fraud counts merely allege **internal mailings** relating to Benistar Property Exchange Trust Co., Inc. ("BPE"). Since BPE had already obtained the funds from the exchanges described in Counts 15 and 19, it did not matter in the least whether and how BPE sent and/or accounted for the funds internally. Consequently, the mailings charged in these counts were not in "furtherance" of the alleged fraudulent scheme and, therefore, fall outside of the federal mail fraud statute. See 18 U.S.C. § 1341. As a result, all evidence relating to Counts 15 and 19 should be excluded.

In the alternative, Counts 15 and 19 should be dismissed outright pursuant to Fed. R. Crim. P. 12(b)(3)(B), 12(d), and 17.1 for lack of subject matter jurisdiction.

**REQUEST FOR ORAL ARGUMENT**

Mr. Carpenter requests oral argument on the within motion at the final pre-trial conference scheduled for June 30, 2005.

1

**LOCAL RULE 7.1(A)(2) STATEMENT**

Mr. Carpenter's counsel has conferred with Michael J. Pineault, AUSA in a good faith, but unsuccessful, attempt to resolve or narrow the issue.

**MEMORANDUM OF LAW**

**I.   THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER COUNTS 15 AND 19**

**A.   Introduction.**

This case is simply an attempt by the government to transform into a complex federal crime a breach of contract dispute (governed by state law) between BPE, on the one hand, and a handful of sophisticated real estate developers and investors on the other hand. Not surprisingly, the result is a meandering indictment that fails to allege a specific theory of fraud. In fact, the government's theory of fraud in this case has been a moving target that has changed over time and from pleading to pleading. "At every stage in the ensuing criminal prosecution [Carpenter] was met with a different theory, or by no theory at all, as to what the [scheme] had been. Far from informing [Carpenter] of the nature of the accusation against him, the indictment instead left the prosecution free to roam at large—to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial." Russell v. United States, 369 U.S. 749, 768 (1962).

In the face of this uncertainty, Mr. Carpenter has attempted to glean, from statements contained in the government's various filings, what could possibly be the fraudulent scheme with which he has been charged in the superseding indictment ("SSI"). While this is a problem of Constitutional dimensions, described below as best as can be determined are the government's "Four Theories of Fraud." Mr. Carpenter allegedly:

1. Reviewed and edited BPE's promotional materials and agreements so that he supposedly knew of the representations made by BPE's president (Martin L. Paley) to the exchangors that their money would be "held safe" even though the funds were invested in stock options.  See SSI ¶¶ 14, 18, 20, 41.

2. Secretly opened a second account in the name of BPE at Merrill Lynch and PaineWebber as an investment account.  See SSI ¶¶ 31, 46.

3. Transferred funds from one BPE account to the other at both Merrill Lynch and PaineWebber.  See SSI ¶¶ 39, 49.

4. Caused BPE to invest in "high risk" stock options.[1]  See SSI ¶ 26.

None of these acts is illegal and the government has concocted a scheme to defraud out of thin air.  However, assuming that a scheme to defraud has been properly alleged, the SSI's fatal defect is that it charges the **wrong** mailings and wires in furtherance of that alleged scheme.

For example, if the fraudulent scheme was Mr. Carpenter reviewing and editing the promotional materials and agreements, then the charged wires should be the facsimiles or e-mails from Mr. Carpenter to Mr. Paley reflecting any such review or revisions (if they exist).

If the fraudulent scheme was Mr. Carpenter "secretly" opening a second account at both Merrill Lynch and PaineWebber, then the charged mailings should be the account opening documents for the second accounts sent by Mr. Carpenter to Merrill Lynch and PaineWebber.

If the fraudulent scheme was Mr. Carpenter transferring funds from one BPE account to another at both Merrill Lynch and PaineWebber, then the charged wires should be the

---

[1] It is disingenuous for the government to contend that this prosecution would exist if Mr. Carpenter's "high risk" stock option investments *had been profitable*.

3

various facsimile authorizations sent by Mr. Carpenter to the brokerage firms instructing them to perform the transfers.

And if the fraudulent scheme was Mr. Carpenter causing BPE to invest in "high risk" stock options, then the charged wires should be all of the telephone calls and facsimile orders sent to Merrill Lynch and PaineWebber through which the stock option trades were directed.

The government, however, fails to charge any of these mailings and wires. Instead, it charges the transmissions by which funds were sent to BPE – none of which have anything to do with the government's theory of fraud. Moreover, with respect to Counts 15 and 19, the government charges **internal mailings** – neither of which was in "furtherance" of the execution of the alleged fraudulent scheme.[2]

      **B.**      **The Mailings Charged in Counts 15 and 19 Have Nothing Whatsoever to Do With the Alleged Fraudulent Scheme.**

The government stated in its brief filed on September 10, 2004 (Dkt. #29), in opposition to Mr. Carpenter's motion to dismiss the original indictment for lack of venue, that "**[t]he gravamen of the offense was the scheme to obtain funds through fraudulent pretenses**." Gov. Br. at 6 (emphasis added). If so, then what BPE did with the funds once they were obtained (*i.e.*, sending them from "BPE-Newton" to "Benistar-CT" for internal accounting purposes) is irrelevant and could not possibly be part of the alleged "scheme" to fraudulently obtain the funds.

The Supreme Court has dealt with this precise issue in a long line of cases. See Kann v. United States, 323 U.S. 88 (1944); Parr v. United States, 363 U.S. 370 (1960); United States v. Maze, 414 U.S. 395 (1974); Schmuck v. United States, 489 U.S. 705 (1989). In Schmuck, the Supreme Court held:

---

[2]  Counts 15 and 19 both charge mailings from "BPE-Newton" to "Benistar-CT."

> The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails **is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law**.

Schmuck, 489 U.S. at 710 (emphasis added).

In Kann, corporate officers and directors were accused of establishing a dummy corporation through which they diverted profits of their own corporation to their own use. As a part of the scheme, the defendants were accused of having fraudulently obtained checks payable to themselves that were cashed or deposited at a bank and then mailed for collection to the drawee bank. In reversing the defendants' mail fraud convictions, the Supreme Court held that the fraud was completed at the point at which the defendants cashed the checks, not when the depository bank mailed the checks for collection:

> *The scheme in each case had reached fruition.* The persons intended to receive the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, *how* the bank which paid or credited the check would collect from the drawee bank.

Id. at 94 (emphasis added).

The same applies here. BPE's alleged scheme of fraudulently obtaining the funds had reached fruition once the funds were, in fact, obtained. It was immaterial to the exchangors listed in Counts 15 and 19, or to any consummation of the scheme, *how* the funds were accounted for internally. The funds could have just as easily been accounted for in the offices of "BPE-Newton" where the checks were received, without any use of the mails at all. The mailings charged in Counts 15 and 19 were "merely incidental and collateral to the scheme," id. at 95, because the "scheme" of obtaining the funds had already reached fruition.

In Parr v. United States, 363 U.S. 370 (1960), nine individuals and two banks were indicted and convicted on 19 counts of mail fraud and one count of conspiracy to commit mail fraud. However, after the convictions were affirmed by the Fifth Circuit, the Supreme Court

5

reversed all of the convictions on all of the counts, holding that the charged mailings were not "for the purpose of executing" the fraudulent scheme.

In Parr, the defendants were charged with, inter alia, having fraudulently obtained gasoline and a variety of other products and services through the unauthorized use of a credit card issued to the school district that employed them. The mailing element of the mail fraud charges was purportedly satisfied when the issuer of the credit card mailed invoices to the school district for payment and when the district mailed payment in the form of a check. Relying on Kann, the Supreme Court held that these mailings were not part of the execution of the scheme as required by the mail fraud statute because it was immaterial to the defendants *how* the credit card issuer went about collecting its payment. Parr, 363 U.S. at 393. Specifically:

> these were essentially state crimes and could become federal ones, under the mail fraud statute, **only if the mails were used for the purpose of executing such scheme**.

Id. at 385 (quotations omitted) (emphasis added). The same holds true here. The alleged fraudulent scheme of obtaining the funds did not rely at all on how (or whether) BPE accounted for the transactions after-the-fact. It was immaterial to the exchangors how BPE went about accounting for the transactions internally once the exchangors' funds had been obtained.

In United States v. Maze, 414 U.S. 395 (1974), the defendant was convicted on four counts of mail fraud. The Sixth Circuit reversed the convictions and the government appealed. The Supreme Court affirmed the decision of the Sixth Circuit, ruling that the charged mailings were not sufficiently closely related to the defendant's scheme.

In Maze, the defendant allegedly stole his roommate's credit card, headed south on a two-week transcontinental spending spree, and obtained food and lodging at motels along the

6

way by placing the charges on the stolen card. The government argued that the mailing element of the mail fraud charge was supplied by the fact that the defendant knew that each motel would mail an invoice to the bank that had issued the credit card, which in turn would mail a bill to the cardholder for payment. The Supreme Court found that these mailings could not support mail fraud charges because the defendant's scheme had reached fruition when he checked out of each motel "and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss." Id. at 402. The subsequent mailings were immaterial to the success of the fraudulent scheme. Id.

In this case, the mailings charged in Counts 15 and 19 were not sufficiently closely related to the alleged fraudulent "scheme" of BPE obtaining the funds, primarily because it did not matter in the least *how* the funds were accounted for internally once they were obtained. This is exactly like the motels in Maze sending the credit card invoices to the various banks after Maze had completed his fraud by checking out of each motel.

In United States v. Evans, 148 F.3d 477 (5th Cir. 1998), the defendant (a parole officer) submitted falsified travel vouchers to her supervisor to hide her crimes in connection with her treatment of a parolee. After the supervisor's review and approval of the vouchers, they were mailed to department headquarters for routine processing for reimbursement. The Fifth Circuit reversed the mail fraud convictions, holding that the mailing requirement had not been satisfied because the defendant had "cleared the final hurdle" in her scheme when the supervisor approved the travel vouchers. Id. at 483. The Fifth Circuit also noted that "if Evans's travel vouchers had been thrown away by her supervisor, the scheme would have continued just the same." Id.

7

BPE "cleared the final hurdle" in its alleged fraudulent scheme when it obtained the exchangors' funds. Mailing the checks internally *after* the alleged scheme had reached fruition is just like the supervisor in Evans mailing the vouchers to headquarters for routine processing after-the-fact.

In United States v. Strong, 371 F.3d 225 (5th Cir. 2004), the Fifth Circuit affirmed the district court's granting of a motion pursuant to Fed. R. Crim. P. 29 on a mail fraud indictment because the charged mailings were not sufficiently related to the success of the fraudulent scheme. In Strong, two brothers engaged in a scheme whereby they would purchase used cars at auction, pay for the cars with buyers' drafts that they never intended to honor, used forged signatures to apply for and obtain new titles from the local office of the state motor vehicles department (which then mailed such fraudulent applications to the department's headquarters), and then used those fraudulently obtained titles to sell the cars to innocent purchasers (without ever paying the auction houses who futilely attempted to reclaim the cars). The Strongs' scheme thus resulted in substantial losses to the auction houses, as well as clouding the titles of the bona fide purchasers.

The Strong brothers were indicted on eight counts of mail fraud. One brother pleaded guilty, but the other went to trial. The jury found the other Strong guilty of three counts of mail fraud. However, the district court granted Strong's Rule 29 motion, holding that the use of the mails (namely, the mailing of the title applications from the local motor vehicles office to headquarters) was not sufficiently related to the fraudulent scheme because each fraudulent act had already been completed when Strong obtained the titles from the local motor vehicles office *in person* and the mailings did not assist him in covering up the fraud.

On the government's appeal to the Fifth Circuit, the only issue was whether the in "furtherance" requirement of the mail fraud statute had been met. The Fifth Circuit, relying on the Kann, Parr and Maze line of cases and distinguishing Schmuck, found that the jurisdictional requirement was not met because the mailing of the title applications neither advanced the fraudulent scheme nor contributed to an effort to hide it, and that each fraudulent act was complete when the defendant received the titles *in person* from the local motor vehicles office. Strong, 371 F.3d at 230-31.

More importantly, for the first time since Schmuck, a Court of Appeals has clearly and cogently synthesized the singular key holding in the Kann-Schmuck line of cases:

> [I]t is clear that the Court's statement that a mailing need merely be "incident to an essential part of the scheme" to satisfy the mail fraud statute, . . . **is cabined by the materiality of the mailing, as well as its timing: A tangential mailing occurring <u>after</u> the success of a fraud scheme is complete would <u>never</u> qualify, even if the mailing is "incidental" to a part of the scheme**.

Strong, 371 F.3d at 229 (citations omitted) (emphasis added).

Applying the analysis in Strong to the present case, while remaining true to the holdings in the Kann-Schmuck line of cases, leads to the same result. The mailings of the checks from "BPE-Newton" to "Benistar-CT" were merely tangential mailings occurring after BPE had succeeded in its alleged scheme of obtaining the funds. Such mailings can "never" qualify to satisfy the "furtherance" requirement of the mail fraud statute – even if an argument could be made that such mailings were "incidental" to the scheme (which cannot be made in this case). See also United States v. Pacheco-Ortiz, 889 F.2d 301, 305 (1st Cir. 1989) ("[F]or the mailings to be considered in furtherance of the scheme, the scheme's completion or the prevention of its detection must have depended in some way on the mailings") (citations and quotations omitted); United States v. Greenleaf, 692 F.2d 182, 186 (1st Cir. 1982) ("The

9

government urges us to adopt a rule that at any time a defendant sets in motion a scheme that leads ineluctably to mailings, he can be guilty of mail fraud. Our reluctance to do so stems from the fact that under this test, the conviction in United States v. Maze, supra, would have been affirmed.").

Even though "[t]he courts have generously construed the 'furtherance' requirement," United States v. Cacho-Bonilla, 404 F.3d 84, 91 (1st Cir. 2005), "the mail fraud statute applies only to mailings that have to do with the fraud." United States v. Young, 955 F.2d 99, 108 (1st Cir. 1992). The charged mailings in Counts 15 and 19 clearly have absolutely nothing whatsoever to do with the "fraud" of obtaining the funds.

The Supreme Court's primary view regarding the mail fraud statute is that it does "not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, **leaving all other cases to be dealt with by appropriate state law**." Schmuck, 489 U.S. at 710 (quoting Kann, 323 U.S. at 95)) (emphasis added). Counts 15 and 19 – dealing solely with internal mailings – are clearly included in those cases that the Supreme Court has held should be left to the appropriate state law to determine whether any crime has been committed.

    **C.**    **Summary.**

When the allegations in this case are compared to the litany of Supreme Court and Circuit Court cases described in this brief, it becomes readily apparent that Mr. Carpenter is not a "con man," has committed no inherently fraudulent acts, and there is no obviously fraudulent scheme. By contrast, in all of these other cases the fraudulent scheme is readily apparent. Here, however, the government is simply attempting to criminalize normal business activities and a simple breach of contract. See, e.g., United States v. Corliss, 7 F.2d 455, 457

(8th Cir. 1925) ("A business failure induced by [market losses] does not convert the enterprise into a scheme to defraud.").

The government has caused the grand jury to indict Mr. Carpenter on one theory of fraud but has presented in its pleadings a handful of additional theories. And if this case goes to trial, numerous additional theories will undoubtedly emerge. "[W]hen the grand jury indicts on one theory of the illegal conduct, but the government prosecutes the case on an entirely different theory . . . . [such a] roaming theory of the prosecution can produce trial error of constitutional proportions." United States v. Chandler, 388 F.3d 796, 798 (11th Cir. 2004) (reversing convictions for conspiracy to commit mail fraud).

## CONCLUSION

Based on the foregoing, this Court should grant the motion *in limine* and exclude all evidence relating to Counts 15 and 19 for lack of subject matter jurisdiction.

In the alternative, pursuant to Fed. R. Crim. P. 12(b)(3)(B), 12(d) and 17.1, Counts 15 and 19 should be dismissed outright for the same reasons. See United States v. Coia, 719 F.2d 1120, 1123 (11th Cir. 1983), cert. denied, 466 U.S. 973 (1984) ("[Rule 12(d)] clearly indicates that findings of fact as well as of law are within the province of the district court to make in pretrial proceedings.").

DANIEL E. CARPENTER,
By his attorney,

**/s/ Robert M. Goldstein**
Robert M. Goldstein
Mass. Bar No. 630584
20 Park Plaza, Suite 903
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

Dated: June 23, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that true and accurate copy of the foregoing pleading has been served by electronic filing on this 23rd day of June, 2005, on Michael J. Pineault, Esq., Assistant U.S. Attorney, Office of the U.S. Attorney, 1 Courthouse Way, Suite 9200, Boston, MA 02210.

**/s/ Robert M. Goldstein**
Robert M. Goldstein