UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 04-10029-GAO |
| ) | |
| DANIEL E. CARPENTER, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**GOVERNMENT'S CONSOLIDATED OPPOSITION TO
DEFENDANT'S JUNE 23, 2005 MOTIONS IN LIMINE (DOCKETS 82-93)**

The United States submits this consolidated opposition to the twelve motions in limine filed by defendant Daniel E. Carpenter ("Carpenter") on June 23, 2005. Viewed collectively, the motions effectively seek to gut both the indictment and the evidence the jury would be permitted to hear and see at trial. A 19-count indictment charging Carpenter with having defrauded seven victims of $9 million would be reduced to four counts involving only $715,940. Moreover, the jury – pursuant to Carpenter's arguments – would be barred from hearing any evidence concerning the false representations made to the victims, what Carpenter did with their money, or even that they were "victims" at all.

Neither the facts nor the law support Carpenter's contentions. His motions should be denied.

SUMMARY OF CHARGES AND ANTICIPATED EVIDENCE

A.   <u>The Charges</u>

The superseding indictment charges Carpenter with having engaged in a fraudulent interstate scheme, using the wires and the mail, pursuant to which clients were induced to entrust millions of dollars to Carpenter's company, Benistar Property Exchange Trust Company, Inc.

("BPE"), based on false representations that the money would be held in escrow and returned to the clients in full within 180 days. In fact, Carpenter took the money and used it, without his clients' knowledge or authorization, to finance aggressive, speculative trading in uncovered stock options, with the purpose of generating substantial profits for himself. Carpenter's options trading failed, and he lost over $9 million of the client funds that he had misappropriated.

Carpenter does not dispute that the foregoing funds were transmitted to his company, that the money was under his control, that he traded it in options, and that he lost $9 million. Instead, his principal defense is that he lacked criminal intent – specifically, that he never intended to lose his clients' funds, that his current predicament is the unfortunate consequence of an unanticipated market downturn that affected millions of innocent investors, and that, at most, he breached a civil contract but certainly committed no federal crime.

B.  Anticipated Evidence

At trial, the principal witnesses will be: (a) BPE clients and/or their representatives, who will testify concerning the representations that they received and the funds that they sent; (b) former employees of Carpenter's company, who will explain the operations of BPE and Carpenter's role in the company; (c) Carpenter's stockbrokers (and their supervisors), who will testify regarding accounts that Carpenter opened at Merrill Lynch and Paine Webber and their dealings with him; and (d) two summary/expert witnesses, who will testify concerning the transfers of client funds into Carpenter's trading accounts, the nature of the trading in which Carpenter engaged in those accounts, and the timing and amounts of the losses that he incurred.

The government's exhibits will largely consist of: (a) promotional materials and literature that the victims received and on which they relied in entrusting their funds to Carpenter's

company; (b) the escrow and exchange agreements that the victims executed at the time they retained the company; (c) wire and deposit records documenting the victims' transmission of funds to Carpenter's company; (d) brokerage records and account records showing what Carpenter, in fact, did with the money; (e) internal corporate documents relating to the operation of Carpenter's company; and (f) various summary charts.

Carpenter's motions in limine seek to preclude much of the foregoing evidence from being shown to the jury. What follows is the government's response to each of his motions.

ARGUMENT

I.    <u>MOTION #1: EVIDENCE OF LOSS</u>

Carpenter contends that: (a) evidence of loss is irrelevant; (b) the government has already conceded its irrelevance; and (c) even if marginally relevant, the prejudice that would result from the introduction of such evidence outweighs its probative value. Each of these arguments is meritless.

<u>First</u>, evidence of loss is directly relevant to the issue of criminal intent. <u>E.g.</u>, <u>United States v. Copple</u>, 24 F.3d 535, 544-45 (3rd Cir. 1994) (evidence of loss is relevant in mail fraud case to show defendant's intent to defraud) (citing cases). One of Carpenter's core defenses is that he acted in good faith, that he didn't believe his options trading was risky, and that his loss of the victims' money was unanticipated and unintentional. The evidence will show, however, that:

- Carpenter's trading losses began in April, 2000, and increased as the year progressed;

- Notwithstanding these losses, BPE continued, with Carpenter's knowledge, to solicit and induce clients to entrust funds to the company based on representations that the money would be held in escrow, and

> Carpenter continued, contrary to those representations, to trade and lose client funds in the options market;
>
> - All of the $9 million lost by the seven clients referenced in the indictment consisted of funds that were entrusted to Carpenter's company during the period from August to December, 2000, well <u>after</u> Carpenter began sustaining heavy trading losses in April and May of that year;
>
> - Indeed, over 70% of the funds that the victims transmitted to Carpenter's company during the August-December time period was sent after Carpenter's trading privileges were terminated by Merrill Lynch in September due to excessive losses and excessive risk. Carpenter responded by opening new trading accounts at PaineWebber, where he lost even more.

The above facts demonstrate the relevance of evidence concerning loss. Among other things, it relates directly to the question of Carpenter's intent, and to his defense of good faith. Given Carpenter's repeated insistence that he did not believe his options trading put clients' funds at risk, and his corollary insistence that he fully believed he would be able to return the funds as promised, it is highly relevant for the jury to hear that, in fact, Carpenter was losing enormous sums in the market at the same time that additional clients were being induced to entrust their funds to his company based on false promises that it would be held in escrow and returned in full.

<u>Second</u>, the government did not previously "admit" or "concede" that loss was irrelevant to the disputed issues in this case. Carpenter cites, out of context, to one passage from one brief, in which the government disputed Carpenter's attempt to characterize the indictment's criminal charges as resting solely on the fact that Carpenter had *lost* money trading.[1] Carpenter claimed that under the government's theory, there would have been no indictment had his trading been

---

[1] <u>See</u> Government's Opposition to Defendant's Supplemental Motion to Dismiss the Indictment for Lack of Venue (Docket 29), at 5-6.

profitable.² The government disagreed, noting that irrespective of whether Carpenter ultimately made money or lost money, it was fraudulent to induce clients to entrust funds to BPE based on representations that their money would be held in escrow when, in fact, Carpenter was gambling those funds in the options market.³ The government's assertion did not constitute an "admission" that loss was irrelevant to any and all issues in this case. To the contrary, as demonstrated above, loss is relevant on, inter alia, the issue of Carpenter's intent.

Third, prejudice does not outweigh probative value. For all of the reasons outlined above, the probative value of the loss evidence is, in fact, quite high.

II.     MOTION #2: COUNTS 3 AND 4 (VENUE)

Counts 3 and 4 both relate to victim Bellemore Associates, who entrusted (and lost) $444,659.65 to Carpenter's company. Carpenter seeks to bar evidence regarding Count 4, on the ground that no venue exists to charge that count in Massachusetts. He also seeks to bar evidence regarding Count 3, on the ground that it charges the same crime as Count 4 and hence is multiplicitous.

Although styled as a motion in limine, Carpenter's second motion is, in effect, a motion to dismiss. As such, the issue is whether the indictment on its face, taking its allegations as true, adequately pleads the required elements of the charged offense. Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 & n.16 (1952); Hamling v. United States, 418 U.S. 87, 117 (1974).

---

² See Defendant's Brief in Support of Supplemental Motion to Dismiss the Indictment for Lack of Venue (Docket 28) at 5.

³ See Government's Opposition to Defendant's Supplemental Motion to Dismiss the Indictment for Lack of Venue (Docket 29), at 4, 6.

Count 4 plainly does. It alleges that Carpenter, "in the District of Massachusetts and elsewhere", transmitted and caused to be transmitted the specified wire communication. (Indictment ¶ 103). To the extent Carpenter disputes the allegation, and intends to contend that the wire at issue did not have the requisite nexus to Massachusetts, that is an issue to be resolved at trial, based on the evidence ultimately introduced. The government expects that evidence will establish the required Massachusetts nexus, based, <u>inter</u> <u>alia</u>, on the fact that wire transfers from the financial institution specified in Count 4 (Service Credit Union) clear through the Federal Reserve Bank of Boston. <u>United States v. Goldberg</u>, 830 F.2d 459, 465 (3rd Cir. 1987) (venue proper where wire transfers passed through a Federal Reserve Bank in the district of prosecution). At this juncture, however, the sole issue is whether the indictment's *allegations* are sufficient on their face. They are.

Carpenter's multiplicity challenge to Count 3 also fails. Each mailing or wire transmitted in furtherance of a scheme to defraud is a separate offense. <u>E.g.</u>, <u>United States v. Pace</u>, 314 F.3d 344, 350 (9th Cir. 2002). Counts 3 and 4 relate to separate wires; hence, they are properly charged as separate counts. Moreover, if Count 4 were ultimately to be dismissed, as Carpenter urges, Count 3 clearly would not be multiplicitous of any remaining charge.

III.   <u>MOTION #3: COUNTS 1-2 AND 5-13 (VENUE)</u>

As with Count 4, Carpenter seeks to bar evidence regarding Counts 1-2 and 5-13 on the ground that venue is not proper for these counts in Massachusetts. Again, since Carpenter effectively seeks the dismissal of these counts, the sole issue is the adequacy of the indictment's allegations.

The charging language for these counts is the same as that of Count 4. The indictment

alleges that Carpenter, "in the District of Massachusetts and elsewhere", transmitted and caused to be transmitted the specified wire communications. (Indictment ¶ 103). The foregoing language charges a sufficient nexus to Massachusetts to support venue. On this ground alone, Carpenter's third motion should be denied.

If the Court chooses to address the substantive merits of Carpenter's arguments, his contentions are both legally and factually incorrect. Legally, Carpenter characterizes too narrowly the nexus that must be shown to establish venue in Massachusetts. In addition to proof that a wire originated from or was received in the district of prosecution, courts also have held that venue is proper in districts through which a wire passed, see Goldberg, 830 F.2d at 465 (examining whether wire began, ended, or passed through the district of prosecution), or from which a wire was orchestrated. United States v. Pace, 314 F.3d 344, 349-50 (9th Cir. 2002);[4] see also S. Hewens, Mail and Wire Fraud, 41 Am. Crim. L. Rev. 865, 884 (2004) (the "passing through" of a transmission is sufficient to establish venue for wire fraud).

Factually, Carpenter also defines the relevant events too narrowly. Each of the counts at issue involved the wire transfer of funds by Massachusetts-based account holders out of Massachusetts-based accounts. Each transfer commenced with a request that the funds be transmitted, and each was completed upon the electronic debiting of the requestor's account and the electronic crediting of the recipient's account. The government expects the evidence to demonstrate the required nexus to Massachusetts at one or more points of each transfer's electronic journey. Again, however, the sole issue at this procedural juncture is whether the

---

[4] The Seventh Circuit has declined to accept Pace's broader formulation. United States v. Pearson, 340 F.3d 459, 467 (7th Cir. 2003).

indictment's *allegations* are sufficient on their face. They are.

IV.    MOTION #4: USE OF THE WORD "VICTIM"

Carpenter asserts that the government should be precluded from using the word "victim" until such time as he is convicted.

There is nothing inflammatory about the word "victim" such as to warrant the requested ruling. Carpenter stands accused of multiple counts of fraud, as the result of which several victims lost large sums of money. It is entirely permissible for the government, in its opening and closing, to refer to the indictment's allegations, including by use of such general purpose descriptive words as "crime," "fraud," "false representations," "victims," and "losses." E.g., United States v. Rude, 88 F.3d 1538, 1547-48 (9th Cir. 1996) (prosecutor's use of words such as "victim," "deceit," "falsehoods" and even "charlatan" and "scam" were not inflammatory).

V.    MOTION #5: REFERENCES TO PARALLEL CIVIL ACTION

Carpenter contends that any reference to the substance or outcome of the parallel Massachusetts Superior Court civil action, in which several victims prevailed, inter alia, on claims of fraud, should be precluded as irrelevant and because its prejudice outweighs its probative value.

The government does not intend to mention in its opening either the substance or the outcome of the civil action. However, numerous arguments that Carpenter has made in his pleadings to date have brought into play both the allegations and the result of that case. If Carpenter similarly opens the door at trial, whether through his counsel's argument, through cross-examination, or through the subject matter of the testimony of any witnesses that he calls, the government reserves the right to seek leave to introduce such evidence. The government will

inform the Court before seeking to delve into such areas.

VI.     MOTION #6: TESTIMONY OF SUMMARY FACT WITNESS ZAPPALA

The government intends to call auditor Thomas Zappala to testify concerning his review of accounts opened by Carpenter in the name of BPE at Merrill Lynch and PaineWebber, including his review of Carpenter's trading accounts. Carpenter preemptively seeks to preclude Mr. Zappala from testifying concerning the defendant's investment trends, practices, strategies, or losses. Carpenter also seeks, in a separate motion, the same preclusion with respect to the government's expert witness, Marc Allaire. (See Motion #7, below.)

Put simply, Carpenter does not want mention made of what he did with the victims' money (i.e., that he traded it in high-risk options) or the end result (that he lost it). Such testimony and evidence, however, is directly relevant to show the falsity of the representations that were made to the victims – specifically, to demonstrate that Carpenter did not maintain BPE's client funds in escrow, as promised, but rather traded (and lost) them in the options market. The evidence also is relevant to the issue of Carpenter's criminal intent – to prove that contrary to his current claims of good faith, he intentionally engaged in speculative, leveraged options trading, and, in fact, continued such trading, with clients' escrow money, notwithstanding substantial losses that he began incurring as early as April, 2000. Further discussion of the latter point is contained in the government's opposition to Motion #1, above.

VII.   MOTION #7: EXPERT TESTIMONY AND TESTIMONY REGARDING EVENTS AFTER NOVEMBER 20, 2000

   A.   Expert Testimony

The government intends to call options expert Marc Allaire to testify concerning his review of Carpenter's trading activity, including the nature, frequency, and magnitude of the defendant's trading, the relative risks inherent in the trading, and the timing and magnitude of the profits/losses incurred by Carpenter.

Carpenter first claims that such testimony is irrelevant. This argument is plainly wrong, for the reasons set forth in the government's opposition to Motion #'s 1 and 6, above.

Carpenter next asserts that the testimony is unnecessary because the government intends to call as fact witnesses the brokers at Merrill Lynch and at PaineWebber through whom he conducted his trading. This contention also is incorrect. The Merrill Lynch and PaineWebber employees are being called as percipient fact witnesses. Mr. Allaire is being called to present the results of his expert review. The focus of the expected testimony is different. Further, the government anticipates that Carpenter will level accusations of prejudice and bias against the brokers. Similar accusations have no applicability to Mr. Allaire. For these reasons, among others, his testimony will have both independent relevance and probative value.

Finally, Carpenter argues that Mr. Allaire's testimony will violate Fed. R. Evid. 704(b) because it impermissibly will proffer a direct opinion concerning one of the ultimate issues in the case: Carpenter's criminal intent. Carpenter is wrong on this assertion as well. The government will not be asking Mr. Allaire to opine directly about Carpenter's criminal intent. Rather, Mr. Allaire is expected to testify concerning the nature of the defendant's options trading, the level of risk such trading entailed, and the losses that he incurred. Such testimony, although relevant to

the jury's assessment of Carpenter's intent, is wholly distinct from the expression by Mr. Allaire of a direct opinion on intent. The latter would be impermissible. United States v. Valle, 72 F.3d 210, 216 (1st Cir. 1995). The former is not. E.g., United States v. Schneiderhan, 404 F.3d 73, 81 (1st Cir. 2005) (bar against direct expert testimony concerning intent "does not, however, apply to 'predicate facts from which a jury might infer such intent.'") (citing Valle, 72 F.3d at 216).

      B.      Events after November 20, 2000

Carpenter claims that all events occurring after November 20, 2000 are irrelevant. He is wrong.

As a threshold matter, Joseph Iantosca, one of the seven victims referenced in the indictment, transmitted approximately $7 million in funds to BPE to hold in escrow after November 20. Iantosca's funds were transmitted by wire on December 1 and also by separate mailings that occurred on and before December 14. (Indictment ¶ 73, Counts 8-11 and 19). It is plainly relevant to the jury's assessment of the Iantosca transactions to know that Carpenter continued trading and losing substantial funds in the options market in November and December. Such evidence sheds light on Carpenter's intent at the time he received Iantosca's funds. It also sheds light on the material falsities and omissions in what Iantosca and his representatives were told in the time period leading up to their transmission of the funds.

Carpenter's post-November 20 trading also is relevant to the charges involving the other victims. It demonstrates what he did with their remaining funds – namely, that he traded them aggressively in the options market, contrary to the representations the clients received. It also sheds light on his state of mind, by demonstrating that he repeatedly and knowingly put the

client-victims' funds at risk, including well into the month of December, 2000, despite the significant losses he had sustained in earlier months.

VIII.    MOTION #8: GOVERNMENT EXHIBIT 189

Government Exhibit 189 consists of internal company-prepared spreadsheets documenting the client funds that BPE received. Carpenter contends that these spreadsheets should be excluded because: (a) they are irrelevant; and (b) they do not constitute business records. Both assertions are without merit.

The spreadsheets clearly are relevant. They constitute BPE's contemporaneous accounting of the receipt of client funds, as well as the amount of outstanding funds that BPE ostensibly was holding (and obligated to return to its clients) as of the date each spreadsheet was prepared.

For the same reason, the government expects the testimony at trial to establish that the spreadsheets constitute business records, within the meaning of Fed. R. Evid. 803(6). Among other things, the spreadsheets were prepared, updated, and maintained by Benistar employees in the normal course of their duties, as part of the regular activities and practices of the business.

IX.    MOTION #9: TESTIMONY REGARDING ORAL/WRITTEN REPRESENTATIONS, AND THE MEANING OF EXCHANGE DOCUMENTS

A.    Oral/Written Representations

Carpenter seeks to preclude all evidence of the false oral and written representations that induced the victims to entrust their funds to his company. As grounds, he contends that each victim signed contract documents containing a merger/integration clause, and that this provision bars any evidence of representations made prior to the execution of the agreements.

Merger/integration clauses might have a bearing on the categories of evidence that can

permissibly be introduced in certain types of contract actions between private litigants. Carpenter's arguments have no applicability, however, to the trial of criminal fraud charges brought by the United States.[5]  Put differently, merger/integration clauses in private contracts do not serve to bar the admission of evidence of fraud in federal criminal cases.  <u>Shale v. United States</u>, 388 F.2d 616, 619 (5th Cir. 1968) (parol evidence rule does not apply in a criminal prosecution); <u>United States v. Martel</u>, 792 F.2d 630, 635 (7th Cir. 1986) ("The restrictions embodied in the parol evidence rule simply are not applicable" in the criminal context); <u>United States v. National Marketing, Inc.</u>, 306 F. Supp. 1238, 1240-1241 (D. Minn. 1969) (same, and citing cases).  The false oral and written representations made to the victims (and their representatives) in this case to induce them to entrust their funds to Carpenter's company are a material component of the fraudulent scheme charged in the indictment.  Evidence of these representations is thus relevant and admissible.

      B.    <u>The Meaning of Exchange Documents</u>

Carpenter argues that no victim (or victim representative) should be permitted to testify concerning their understanding of any of the representations or documents that they received.  Again, defendant's arguments are misplaced.  Such testimony is relevant, <u>inter</u> <u>alia</u>, to establishing the materiality of the representations and their deceptive nature.  <u>E.g.</u>, <u>Shale</u>, 388 F.2d at 618 ("Testimony concerning the reasons why a witness was mislead and what he thought the written instrument meant is proper evidence in a prosecution for mail fraud.").

---

[5] Even in the context of private actions, parol evidence is not categorically prohibited.  It is admissible, for instance, in civil actions alleging fraud in the inducement.  <u>E.g.</u>, <u>Kenda Corp. v. Pot O'Gold Money Leagues, Inc.</u>, 329 F.3d 216, 226 (1st Cir. 2003) (under Massachusetts law, a contracting party cannot rely upon an integration clause as protection against claims based upon fraud or deceit) (citing cases).

X.	MOTION #10: REPRESENTATIONS BY PALEY

Carpenter seeks to preclude all evidence of oral and written representations made or disseminated by Martin Paley, on the ground that he has not been charged (or named) as a co-conspirator and, accordingly, any representations made by him constitute inadmissible hearsay.

Carpenter's arguments are without merit. The admissibility of representations made or disseminated by Paley does not hinge on the co-conspirator exception to the rule against hearsay. Several other bases support the admission of such evidence. Certain of the documents encompassed by Carpenter's motion qualify under Fed. R. Evid. 801(d)(2)(A) as Carpenter's own statements, including, for example, materials that he drafted, reviewed, and/or approved. Others are admissible under Fed. R. Evid. 801(d)(2)(C) and (D) as authorized statements and/or statements by an agent or servant, in light of Carpenter's status and role as owner and chairman of Benistar and BPE, and Paley's status as BPE's president. Still others are not being admitted for the truth of the matter asserted and thus do not fall under the hearsay rules at all. E.g., United States v. Krohn, 573 F.2d 1382, 1386 (10th Cir. 1978) (statements and representations by salesmen were admissible against defendants even though salesmen were not alleged to be parties to the fraudulent scheme); United States v. AMREP Corp., 560 F.2d 539, 545-46 (2d Cir. 1977) (same); United States v. Shelton, 669 F.2d 446, 456-57 (7th Cir. 1982).

Particular pieces of evidence undoubtedly will need to be addressed as they arise at trial. Carpenter's request for a categorical rule of exclusion, however, should be denied.[6]

---

[6] Carpenter's Confrontation Clause arguments do not, at present, warrant discussion. The government's current intention is to call Paley as a witness at trial.

XI.  MOTION #11: COUNTS 15 AND 19 (MAILINGS OF CHECKS BETWEEN BPE-NEWTON AND BENISTAR-CONNECTICUT)

Carpenter moves to exclude all evidence concerning, or alternatively to dismiss, Counts 15 and 19. Both counts relate to the mailing of checks representing client-victim funds from BPE's office in Newton to Benistar's office in Connecticut. As grounds, Carpenter asserts that neither mailing was "in furtherance of" the fraudulent scheme charged in the indictment. He is wrong.

As a preliminary matter, the indictment adequately and sufficiently alleges that both mailings were made in furtherance of Carpenter's scheme to defraud. (Indictment ¶ 105). At this procedural juncture, the Court's analysis should begin and end there, and Carpenter's motion should be denied.

If the Court elects to address the substantive merits of Carpenter's contentions, the government expects that the evidence at trial will establish that Carpenter controlled all of the BPE client monies. Clients were instructed to wire their funds to accounts that Carpenter had opened in New York. Alternatively, if they were transmitting the funds by check, they were instructed to mail the checks directly to Connecticut, where Carpenter maintained his office, following which Carpenter had the checks deposited into the New York accounts. As discussed above, after the funds were received and deposited into accounts under Carpenter's control, he proceeded to trade and lose millions of dollars of client money in the options market.

Paley and his assistant, Linda Jokinen, worked out of BPE's office in Newton, Massachusetts. On those occasions when client checks mistakenly were sent to Newton, Paley and/or Jokinen forwarded them by Airborne Express to Connecticut. Counts 15 and 19 charge two such Airborne Express mailings, involving checks that came into Newton and then were

mailed down to Connecticut.

Both mailings plainly were "in furtherance of" Carpenter's scheme. They constituted the direct mechanism by which those particular client funds were delivered to Carpenter's control. Carpenter's argument to the contrary misconstrues the "in furtherance" element of the mail and wire fraud statutes, and should be rejected. E.g., United States v. Pimental, 380 F.3d 575, 586 (1st Cir. 2004) (explaining "in furtherance" element).

XII.   MOTION #12: MERRILL LYNCH AND PAINEWEBBER DOCUMENTS AND TESTIMONY

Finally, Carpenter moves to preclude introduction of any Merrill Lynch or PaineWebber document that memorializes or reflects any statements that Carpenter made during conversations that he had with employees at those firms. As grounds, Carpenter contends that any document memorializing such statements does not qualify as a business record, and also cannot qualify as a prior consistent statement of any witness who might be testifying to the conversation.

Carpenter is wrong on both points. Internal corporate records memorializing statements made by third parties can qualify as business records if they satisfy the applicable business records requirements. E.g., United States v. Goodchild, 25 F.3d 55, 62 (1st Cir. 1994) (telephone call memos were admissible as business records); Zeneca, Inc. v. Eli Lilly & Co., 1999 WL 509471, *2 (S.D.N.Y. 1999) (call notes admissible as business records); Wolff v. Brown, 128 F.3d 682, 685 & n.2 (8th Cir. 1997) (reports of contact, memorializing statements made by party-opponent, admissible as business records); In re Blech Securities Litigation, 2003 WL 1610775, *6 (S.D.N.Y. 2003) (handwritten notes of compliance officer admissible as business records). Since the analysis necessarily must be conducted on a document-by-document basis, the government respectfully suggests that it would be more appropriate to

address each of the contested exhibits at trial, as they arise.  In brief, though, to the extent the government seeks to introduce such exhibits at trial, the government expects the evidence to establish, inter alia, that the documents were created in the ordinary course of business pursuant to the regular practices and procedures of the company.  Moreover, Carpenter's statements, as reflected in the records, constitute admissions of a party opponent, and are admissible as such.

In addition, the government also expects the documents to qualify as prior consistent statements pursuant to Fed. R. Evid. 801(d)(1)(B).  As the evidence will demonstrate, the records were created contemporaneously with the events that they memorialize, and before any legal action (civil or criminal) was threatened or filed.

## CONCLUSION

For all of the foregoing reasons, the United States requests that each of Carpenter's twelve motions in limine, filed June 23, 2005, be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  **/s/ Michael J. Pineault**
Michael J. Pineault
Jonathan Mitchell
Assistant U.S. Attorneys
U.S. Courthouse, Suite 9200
1 Courthouse Way
Boston, MA 02210

Dated: June 29, 2005