UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 04-10029-GAO |
| ) | |
| DANIEL E. CARPENTER ) | |

**DEFENDANT'S SUPPLEMENT MEMORANDUM IN SUPPORT OF
MOTION IN LIMINE (DKT. #125)
(Defendant's Trial Motion No. 1)**

**I.  INTRODUCTION**

A review of the indictment returned in this case clearly establishes that the government is attempting to constructively amend the fraud charged in this case. As the Court correctly observed, the indictment charges a "bright line" fraud. It charges that the "false written and oral assurances" were that the "money would be protected and held safe, that BPE would not transfer the funds without the client's written authorization, and that BPE would return the funds in full, either to be disbursed for the client's use in closing on the purchase of replacement property or to be returned to the client if no replacement property transactions was to occur." (Superseding Indictment at ¶27.) While the indictment mentions Mr. Carpenter's trading strategy, it is window-dressing and not related to the charged false statements.

In response to a defense that the written agreements provided the defendant with a good faith basis to believe he had the authority to invest the funds, the government is attempting to constructively amend the indictment to encapsulate the defense, *i.e.*, if the defendant had the authority to invest the money then he apparently had a duty to invest the money in whatever stocks or bonds or other investment vehicle the government, in its sole

discretion, decides is safer than stock options. This fallback theory is not charged in the indictment and the government should not be allowed to present any evidence regarding the allegedly aggressive or risky trading strategy he employed—he either had the discretion to invest the funds or not.

The defendant's investment strategy, and the government's opinion whether it was "prudent" or unduly risky, is not relevant to the fraud charged in the indictment. Moreover, Merrill Lynch and PaineWebber employees have not been noticed as experts and their opinions and conclusions are therefore excluded by Rules 701, 702, 703 and 704 of the Federal Rules of Evidence, as well as the government's violation of Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure.[1] Finally, even if somehow relevant to the fraud charged—and the defendant adamantly contends they are not—the broker employees' opinions are highly prejudicial and both firms have a vested interest in laying the blame on Mr. Carpenter.[2]

---

[1] Indeed, it appears the government now believes it is entitled to elicit from Mitchell Rock, a PaineWebber broker not noticed as an expert in this case, a quantitative analysis of how Mr. Carpenter would have done had PaineWebber not stopped his trading privileges. The defendant received a thirteen (13) page facsimile from the government last night at 7:12 p.m. indicating that Mr. Rock has conducted an "approximation" based on account statements and has concluded that Mr. Carpenter's account would have been "wiped out" by year end 2000. Clearly, any and all of this proposed testimony should be excluded pursuant to Fed. R. Evid. 701, 702, 703, 704, as well as the government's failure to notice Mr. Rock as an expert and provide discovery required for experts.

[2] PaineWebber has an $88 million arbitration pending against it, and Merrill Lynch is appealing the granting of a new trial against it in favor of the exchangors' multi-million dollar claims. Indeed, in an FBI 302 report the defendant just received yesterday in court, Lori Enright, a PaineWebber witness, admitted that she gave false testimony in her civil trial deposition, apparently in an effort to protect her colleague, Mitchell Rock, in the predecessor civil litigation. See FBI 302 dated July 5, 2005 ("At the beginning of the interview, ENRIGHT stated that during her deposition, she said that she did not recognize the handwriting on DANIEL CARPENTER's (CARPENTER) account opening form with PAINEWEBBER when she knew it to be the handwriting of MITCHEL [sic] ROCK and ROCK's Assistant, JENEANE KOESEL.").

## II. ARGUMENT

The fraud charged in the superseding indictment ("SSI") is contained in paragraph 27:

Clients were induced to wire funds to BPE based on material, false written and oral assurances that the money would be **protected and held safe, that BPE would not transfer the funds without the client's written authorization, and that BPE would return the funds in full, either to be disbursed for the client's use in closing on the purchase of replacement property or to be returned to the client if no replacement property transaction was to occur.**

See also SSI ¶ 17 ("BPE gave written and oral assurances to its clients that BPE would hold their money safe" and the purpose of doing the 1031 exchange was "to park the proceeds from the initial sale in escrow with the intermediary for up to 180 days until the money was disbursed…"); ¶ 18 ("representations concerning the security and safety of all funds"); ¶ 99 ("assurances that client funds would be held safe and secure"); ¶ 101 ("based on material, false written and oral assurances that the money would be protected and held safe."). Moroever, in the section of the SSI wherein the government dissects the fraud as it relates to the individual exchangors, see SSI at ¶¶59-98, the indictment refers back to paragraphs 22 and 23, which set forth the language of the marketing materials that ostensibly guaranty that the funds would be placed in escrow accounts and would be disbursed only for a subsequent closing or to return the funds to the original property owner. See SSI at ¶¶22-23. Clearly, the fraud charged in the SSI is that Mr. Carpenter committed mail and wire fraud because he removed the funds from the escrow accounts and invested the money—**not** the manner in which he invested the money.

The government is attempting to amend the indictment to incorporate an alternative fraud, seeking to convict Mr. Carpenter solely because his investment strategy was "risky," "too aggressive," or was bullish "in the teeth of a bear market." In other words, the

3

government has charged Mr. Carpenter with a crime merely because he – like millions of other investors and even Federal Reserve Chairman Alan Greenspan – did not realize until it was too late that the country was in the "teeth of a bear market." The government simply can not constructively amend the indictment. Nor should it be allowed to improperly use the Merrill Lynch and PaineWebber witnesses (the "Broker Witnesses") to bolster its fallback theory by introducing their opinions regarding Mr. Carpenter's investment strategy.

The government also misconstrues Mr. Carpenter's "good faith" argument. First, Mr. Carpenter has not yet – and may never – put on a defense, so it is impossible for the government to know what that defense might entail.[3] Second, the issue of "good faith" has to do with Mr. Carpenter believing that he had the legal **authorization** to invest the funds in his discretion, **not** (as the government claims in its opposition) that he had a "good faith" belief that his investment strategy would be successful. That simply is not what is charged in the SSI. As the Court noted yesterday, had Mr. Carpenter caused BPE to purchase IBM stock and suffered losses, the government's theory would be that purchasing IBM stock in a market downturn was too risky or aggressive. Similarly, Mr. Carpenter could have had BPE invest in Polaroid and United Airlines bonds, or Superior Bank certificates of deposit, and the funds still would have been lost. The good faith goes to the legal authorization to invest, not to *how* the funds should be invested. Consequently, the Broker Witnesses should not be allowed to give their lay opinions regarding *how* the funds were invested.

The government's position begs the question that had Mr. Carpenter's investment strategy been profitable (*i.e.*, outperformed the market, avoided the downturn in IBM stock,

---

[3] The defendant's two statements of the case to which the government refers (Gov. Opp. at 1) addressed the issue of investing *only* to rebut the government's anticipated opening, and not because the issue was invited by the defendant.

4

and avoided the bankruptcies of Polaroid and UAL), would some other money manager be on trial for mail and wire fraud for adopting a "prudent" investment strategy like investing in Enron or WorldCom? Would the government accuse that person of a crime simply for being "bullish" when he should have been "bearish," and vice versa? Nor should the government be allowed to adopt a roving theory of prosecution. "[W]hen the grand jury indicts on one theory of the illegal conduct, but the government prosecutes the case on an entirely different theory . . . [such a] roaming theory of the prosecution can produce trial error of constitutional proportions." United States v. Chandler, 388 F.3d 796, 798 (11th Cir. 2004) (reversing convictions for conspiracy to commit mail fraud).

This is particularly true given that the government has already admitted in this case that whether Mr. Carpenter's investments resulted in gains or losses is "irrelevant" – which means that Mr. Carpenter could have been indicted in early 2000 for generating close to a $1 million investment profit for BPE by the end of 1999. The government's arguments on this issue are disengenuous at best and are sophistry at worst. Moreover, the government has already been allowed to admit evidence of loss. The government has questioned every exchangor whether he or she ever received his or her money back, the answer was "no," and so the government has offered and the jury has already received evidence that the funds were lost.

Finally, the defendant objects to the government's use of yet *another* theory of mail and wire fraud in this case – "fraudulent omissions." Gov. Opp. at 2 ("it is entirely appropriate to ask questions concerning what the victims (or their representatives) were (and were not) told."). **Nowhere does the SSI allege that "fraudulent omissions" were involved in the alleged scheme to defraud**. To the contrary, it is the alleged "representations

5

concerning the security and safety of all funds" (SSI ¶ 18) that constitute the alleged scheme to defraud – **not** any omissions. In fact, the word "omissions" (fraudulent or otherwise) is not contained anywhere in the SSI.

The government's attempt to constructively amend the indictment must be precluded. See Stirone v. United States, 361 U.S. 212, 217 (1960) ("a court cannot permit a defendant to be tried on charges that are not made in the indictment against him."). Evidence regarding Mr. Carpenter's investment strategy (including whether the investments were "prudent") is completely irrelevant because the SSI alleges that the scheme to defraud was inducing the exchangors to part with the funds "based on material, false written and oral assurances that the money would be protected and held safe." SSI ¶ 27.[4]

Based on the foregoing, the Broker Witnesses should be precluded from testifying regarding their opinions of Mr. Carpenter's investment strategy.

Dated: July 15, 2005

DANIEL E. CARPENTER,
By his attorney,

**/s/ Robert M. Goldstein**
Robert M. Goldstein, Esq.
(BBO #630584)
20 Park Plaza, Suite 903
Boston, MA 02108
(617) 742-9015
rmg@goldstein-lawfirm.com

---

[4] It is the failure to protect and hold the money safe – and not the manner of investing – that the SSI alleges is a crime. If Mr. Carpenter cashed the wires and the checks and left the cash just sitting on a table in his office, that would be a failure to keep the funds "safe" as alleged in the SSI. However, the manner in which the funds were invested is totally irrelevant to the inquiry of whether they were "held safe."

6