UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIMINAL NO. 04-10029-GAO |
| DANIEL E. CARPENTER | ) ) ) | |

## MOTION FOR MISTRIAL
### (Defendant's Trial Motion No. 2)

The jury has received a full day's testimony that certain employees of Merrill Lynch told Mr. Carpenter that they did not agree with his trading strategy, that Mr. Carpenter himself agreed that he was an aggressive investor and, basically, that Mr. Carpenter was employing what the Merrill Lynch witnesses believed was an unduly risky trading strategy. The evidence came in on the theory that it was relevant to Mr. Carpenter's state of mind.

However, all of the Merrill Lynch testimony was totally irrelevant to the charged offenses and was irreversibly prejudicial to Mr. Carpenter. The only facts established so far during this trial are that Benistar Property Exchange Trust Co., Inc. ("BPETCO") lost substantial sums of money and that Dan Carpenter was an "aggressive investor" in a volatile market. The charged fraud, however, is whether Mr. Carpenter made misrepresentations to the exchangors that their funds would be held in escrow and would not be moved unless for one of two purposes: purchasing the replacement property or returning the funds to the exchangor. Mr. Carpenter's investment strategy (and its success or failure) is simply not a relevant issue in this case. There is no charge in this case that Dan Carpenter represented to the exchangors that their funds would be invested prudently, conservatively, or otherwise; the charge is that he lied to the exchangors and told them it would not even be moved from the

escrow account. Either Mr. Carpenter had the authority to invest the funds, or he did not. If he did, he committed **no** crime, despite his "aggressive" or "risky" trading strategy.

On Thursday afternoon, July 14, 2005, during oral argument, the Court stated that it had the impression that the government's case was a "bright-line" case, "[t]hat is, that the misrepresentations that underlie the fraudulent scheme were that the money would be parked in particular places and nowhere else and so on . . . And that the fraudulent intent was having said those things, then going and using the money someplace else; but not that it mattered qualitatively how bad the other investments were as opposed to just being outside the scope of what had been represented." See Tr. 4-150.[1]

The Court's analysis was directly on point because that is exactly the fraud charged in the indictment and that is exactly the testimony the government has elicited from their exchangor witnesses during this trial. For example, the following exchange occurred during Eliot Snider's direct examination:

Q:   Did anyone tell you your money would go anywhere but in escrow?
A.   No.

---

[1] The following colloquy occurred by and between the parties:

MR. PINEAULT: . . . [Mr. Carpenter] had been explicitly told by Merrill Lynch that he was not trading prudently.

THE COURT: Why does prudence have anything to do with this?

MR. GOLDSTEIN: It doesn't, your Honor.

MR. PINEAULT: I'm sorry?

THE COURT: Why does prudence matter? See Tr. 4-144, 145.

THE COURT: I've been getting the impression that the government's case is a little bit more bright-line. That is, that the misrepresentations that underlie the fraudulent scheme were that the money would be parked in particular places and nowhere else and so on . . . And that the fraudulent intent was having said those things, then going and using the money someplace else; but not that it mattered qualitatively how bad the other investments were as opposed to just being outside the scope of what had been represented. See Tr. 4-150.

Q: In your experience, is an escrow used as a fund from which the holder of the escrow may invest in the stock market?
A. It specifically says that funds will only be disbursed for an exchanged property or to be returned to Massachusetts Lumber Company on written instructions.
Q. Hold on one second. I'm asking you about your experience with escrows. In your experience with escrows, is money typically -- **in the escrow is money typically used to invest in the stock market?**
A. **Never …**
Q. **Were you ever told that all of your money would be lost in investments or could be lost in investments?**
A. **No ….**

MR. GOLDSTEIN: I object, your Honor.
THE COURT: Well, rephrase the question. The second question instead of the first.
Q. **Were you ever told that all of your money could be lost in investments?**
A. **No.**
Q. **Would you have given your money if you had been told that?**
A. **No.**

See Tr. 2-79-80, 104.

Marjorie Adams (Iantosca's lawyer) testified to the following:

Q. Were you ever told by anyone from Benistar that money would be moved out of that -- the account indicated there?
A. **The only time money would be moved out would be if we requested it for replacement property or we didn't identify a replacement property and we wanted the money back**. "We" meaning Mr. Iantosca.

See Tr. 4-43.

David Eaton (Bellemore's advisor) testified:

Q: **Did Mr. Paley ever tell you the money was ever going to go anywhere but in escrow**?
A. **No**.

See Tr. 4-104.

The sole purpose of the redirect testimony of Albert Bellemore was to make the point that if he wanted to invest his funds he would have done it himself:

Q. As somebody who invests in the stock market, as you just testified, could you put the money from the sale of the Colby Court property into the stock market if you so choose?

3

A.    Sure, absolutely.

See Tr. 4-130.

These exchanges are illustrative, not exhaustive, as the government has pursued the same line of questioning with all of the exchangor related witnesses.

Given the indictment returned in this case and the testimony elicited by the government, the evidence of Mr. Carpenter's trading strategy is simply not a relevant consideration in this case. Yet, now, over Mr. Carpenter's repeated written and oral objections, the jury has received a full day's worth of testimony that the investment strategy employed by Mr. Carpenter was aggressive and the most risky available.  That Mr. Carpenter was told—or even if he believed—that his investment strategy was aggressive is not relevant to the charged fraud.  The charged fraud is whether Mr. Carpenter had the authority to invest the funds.  The charged fraud is **NOT** whether he exercised that authority in a prudent or sagacious manner.

Even a cursory review of the superseding indictment shows that there is not a single charged representation in the indictment that Mr. Carpenter fraudulently advised the exchangors their funds would be invested wisely, prudently, or conservatively.  The superseding indictment is the polar opposite: the fraudulent representations are supposedly that Mr. Carpenter told the exchangors their funds would be held in escrow—*i.e.*, would NOT be invested.

The prejudice suffered by Mr. Carpenter as a result of the Merrill Lynch testimony on July 15th, and the prejudice to be suffered by yet another full day of PaineWebber witnesses on Monday, July 18th, cannot be cured by any instruction to the jury.  The government has been able to characterize Mr. Carpenter as a bad person and a bad investor, for no relevant

4

purpose (after disclosing that it would not submit any evidence under Fed. R. Evid. 404(b)). The government has been able to characterize Mr. Carpenter as being cavalier about the losses, after eliciting testimony from the exchangors regarding the substantial impact of the losses on their lives. Indeed, Fitzgerald somehow related the losses to his own cancer and his daughter's stay in the hospital. The government is intent on drawing a picture for the jury that Mr. Carpenter is a bad person, cavalier about losing other people's (substantial) funds, with no remorse or regret. Indeed, Mr. Pineault purposefully utilized the phrase "riverboat gambler" in two to three follow up questions to Mr. Levine.[2]

      This is not a civil case. The parties are not here to prove that Mr. Carpenter was or was not a wise investor, a prudent investor, an aggressive investor, or a "riverboat gambler." The parties are here to determine whether Mr. Carpenter had the authority to invest the funds. That is the **only** issue in this case. Given the fraud charged in the superseding indictment, **if the jury concludes that Mr. Carpenter had a good faith belief that he had authority to invest the exchangors' funds, they must find him not guilty, EVEN IF they also believe he engaged in the most reckless and aggressive investment strategy known to mankind**.[3] This irrefutable legal truism compels a mistrial. Whether Mr. Carpenter believed or did not believe he was investing in a prudent manner—*i.e.*, his state of mind regarding the prudence or imprudence of his trading—does not bear any relation to the charged fraud of whether he had the authority to invest the funds.

---

[2]. It is impermissible bad character evidence (and, therefore, inadmissible under Fed. R. Evid. 404(b), it is not relevant (and, therefore, inadmissible under Fed. R. Evid. 402), and it is irreversibly and unduly prejudicial (and, therefore, inadmissible under Fed. R. Evid. 403).

[3] For example, numerous banks and insurance companies failed in 2000 due to having made bad investments (*i.e.*, General American, Reliance, Superior Bank). Had Mr. Carpenter invested the exchangors' funds in certificates of deposit issued by Superior Bank, or in annuities issued by General American or Reliance – as opposed to stock options – would the government have still brought the prosecution? Moreover, none of the chairmen of these companies, involving billions of dollars in losses, were charged with a crime for (as is essentially now alleged here) making bad investments.

Given the overwhelming volume of prejudicial Merrill Lynch testimony on Friday, July 15th, a mistrial is the only fair option. The government's case has migrated from a criminal mail and wire fraud trial to a trial over the wisdom of Mr. Carpenter's trading strategy. The relative success of Mr. Carpenter's trading strategy is simply not an issue in this case. The government has not identified, nor does the superseding indictment identify, any representations that the money would be invested prudently, cautiously, or conservatively. Rather, the superseding indictment charges that Mr. Carpenter represented that the money would NOT be invested.

As argued in Mr. Carpenter's first trial motion *in limine* and the supplemental memorandum in further support thereof, as well as by his oral arguments to the Court on July 14 and 15, 2005 and through objections made to the Merrill Lynch testimony, all of the July 15th Merrill Lynch testimony should have been excluded as irrelevant and unduly prejudicial pursuant to Fed. R. Evid. 401 and 403. There is simply no way to cure the prejudice already suffered by Mr. Carpenter and he therefore respectfully requests a mistrial.[4]

---

[4] Without waiving his right to a mistrial, at the very least all of the July 15th Merrill Lynch testimony regarding the sagacity of Mr. Carpenter's trading strategy should be stricken from the record, the jury should be strongly instructed it must find Mr. Carpenter not guilty if it concludes he possessed a good faith belief he had discretion to invest the funds even if the jury also believes his trading strategy was too aggressive, and the Court should clearly prohibit similar testimony from the PaineWebber witnesses and the additional Merrill Lynch witness scheduled for July 19th.

        DANIEL E. CARPENTER,
        By his attorney,

        **/s/ Robert M. Goldstein**
        Robert M. Goldstein, Esq.
        (BBO #630584)
        20 Park Plaza, Suite 903
        Boston, MA 02108
        (617) 742-9015
        rmg@goldstein-lawfirm.com

Dated: July 18, 2005