UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
UNITED STATES OF AMERICA    )
                            )
    v.                      )    CRIMINAL NO. 04-10029-GAO
                            )
DANIEL E. CARPENTER,        )
                            )

### DEFENDANT'S MOTION TO DISMISS

Defendant Daniel E. Carpenter, by and through undersigned counsel, respectfully moves to dismiss the superseding indictment **with** prejudice given that the government has predicated its prosecution upon a false impression of a material fact (that Mr. Paley did not know that Mr. Carpenter was investing Mr. Paley's clients' principal in the stock market). Hamric v. Bailey, 386 F.2d 390, 394 (4th Cir.1967) (prosecutorial misconduct occurs "not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact."). Contrary to the presentation made to the grand jury, statements contained in FBI 302 reports, the accusations levied in the indictment returned in this case, and the presentation made by the government in its opening statement, Mr. Paley has now admitted under oath that the essence of his agreement with Mr. Carpenter was that Mr. Paley's clients' principal would be invested in the stock market, at Mr. Carpenter's unfettered discretion in terms of investment vehicles (including stock options). Given this incontrovertible and irrefutable testimony, the government's entire case is premised upon a false impression of material fact. Wherefore, the case must be dismissed.

Moreover, Mr. Paley's additional testimony yesterday that he conveyed this information to AUSA Pineault during his three interview/proffer sessions raises significant Brady and Napue concerns. See Brady v. Maryland, 373 U.S. 83 (1962); Napue v. Illinois, 360 U.S. 264 (1958). If

Mr. Paley (the cornerstone witness of the prosecution who alone made representations to each of the exchangors) in fact told AUSA Pineault that he knew as early as September 1998 that Mr. Carpenter was intending to invest the exchangors' principal at his discretion and that the funds, as any funds that are invested, were at risk, and that this constituted the essence of his agreement with Mr. Carpenter, the government has committed insurmountable Brady violations that require dismissal of this case:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones.

Berger v. United States, 295 U.S. 78, 88 (1934).

To the contrary, if AUSA Pineault contends that Paley's testimony in this regard was false, he has a constitutional obligation to correct what he believes to be perjured testimony. Napue v. Illinois, 360 U.S. 264 (1958). There exists no legally viable third option given the gravity of the conflict between the trial testimony and the pretrial discovery provided to the defendant of Paley's pretrial interviews (which aver that Paley never knew—until the end of December 2000—that Mr. Carpenter intended or ever invested the exchangors' principal), the grand jury presentation by the government, and the indictment returned in this case.

The Brady and Napue issues appear to be academic, however, because the government simply can not proceed with a prosecution built upon a false impression of material fact.

## FACTUAL BACKGROUND

After reviewing the preliminary transcript of Paley's July 20th trial testimony, it is clear that Paley has now testified under oath that he told AUSA Pineault certain information during his

interviews that has never been disclosed to the defense prior to yesterday's testimony and which is squarely at odds with the government's theory of prosecution in this case. Below are some of the relevant portions of the FBI 302 reports and Paley's testimony:

> <u>FBI 302 Report dated 12/19/01</u>: " (3) … Carpenter stated that he would trade in the market the spread between the three percent paid to their clients and his actual rate of return … It wasn't until the end of December 2000 that Paley first became aware that Carpenter had been trading with their client's [sic] principal (4)."

> <u>FBI 302 Report dated 2/28/02</u>: "Paley believed that Carpenter was just investing the spread. Paley did not know that Carpenter was trading or losing the principal." (2/28/02 at 1). "It was during this telephone call (end of December 2000) that Paley first became aware that Carpenter was investing their clients' principal in risky stock transactions." (2/28/02 at 2).

In contrast, Paley's July 20th trial testimony, in pertinent part, is as follows:

> **Q:    And you knew that he was investing the clients' principal in the stock market?**
>
> **A:    Yes.**

Tr. 8-59.

> **Q:    So when you sat down with Mr. Pineault in December of 2001, in February of 2002, and January of 2004, you told Mr. Pineault that you knew your clients' funds, the principal, was being invested in the stock market before December 2000?**
>
> **A:    Yes.**

Tr. 8-61.

The <u>February 28, 2002 FBI 302</u> report states: "Paley was never informed as to the nature of Carpenter's investments, but never felt that his client's principal would be at risk."

Yet Paley's July 20th testimony states, in pertinent part:

> **Q:    Mr. Paley, my question is when you were asked questions about this specific document by Mr. Pineault, did you tell him that you knew, as you've testified today, as of September 9th, 1998 that your clients' funds could be lost to investment? Did you tell Mr. Pineault that when he asked you that question?**

3

      **A:**      **I did.**

Tr. 8-44.

      **Q:**      **So you knew in September of 1998 that your clients' principal would be invested at Mr. Carpenter's discretion in terms of investment vehicles?**

      **A:**      **Yes.**

Tr. 8-96.

      **Q:**      **So it's your testimony here today that in February of 2002 when you met with Mr. Pineault and government officials, you told them that as of September of 1998, that you knew that Mr. Carpenter had full discretion to invest your clients' principal funds in whatever investment vehicles he saw fit. That's what you told them?**

      **A:**      **That was what was implied . . . .**

Tr. 8-101.

      **Q:**      **In February of 2002 when you sat down with Mr. Pineault and government officials, you conveyed to them that you knew from September of 1998 that Mr. Carpenter had full investment discretion to invest your clients' principal in any investment vehicle?**

      **A:**      **Yes.**

      **Q:**      **And that would include, then, stock options, sir?**

      **A:**      **I would say yes.**

      **Q:**      **And when you met with them for a third time in January of 2004, you told Mr. Pineault and the other officials that were there from the U.S. Attorney's Office that you knew as of September of 1998 that Mr. Carpenter had full discretion to invest your clients' principal in any investment vehicle he chose. You told him that, sir?**

      **A:**      **Yes.**

Tr. 8-101-02.

      **Q:**      **Well, Mr. Paley, I know you want to keep talking about the surplus, but you just admitted, sir, that you knew as of September of 1998 that Mr. Carpenter was going to be investing all of the money, not just the surplus, correct?**

4

**A:** Yes.

Tr. 8-107.

This list is meant to be illustrative, not exhaustive.

Mr. Paley's assertions that the essence of the agreement he reached with Mr. Carpenter was that Mr. Carpenter had full and unlimited discretion to invest Mr. Paley's client's principal in whatever investment vehicle he chose (including stock options) exonerates Mr. Carpenter of the charged offense. Mr. Paley alone met with the exchangors, Mr. Carpenter never once met with any of the seven exchangors identified in the indictment, and Mr. Paley alone made oral representations to these individuals. If Mr. Paley agreed with Mr. Carpenter that the clients' principal or corpus would be invested at Mr. Carpenter's discretion, yet Mr. Paley alone concealed this information from his clients without Mr. Carpenter's knowledge, consent or authorization, Mr. Carpenter has committed no federal offense. If the government knew of this information, there has been an insurmountable Brady violation. Even if the government did not know of this information (i.e., if Paley did in fact lie to the government and conceal this critical information), the government now knows this information, it has no basis upon which to contest this information, and it must agree to dismiss this case pursuant to its proper function in the criminal justice system, to ensure that justice is served. See Berger v. United States, 295 U.S. 78, 88 (1934). There simply is no other principled alternative.

There are two other significant issues raised by some of Mr. Paley's testimony yesterday. Mr. Paley's testified that he told AUSA Pineault that he knew that Mr. Carpenter had full discretion to invest the clients' principal in any investment vehicle he chose (including stock options), that he told AUSA Pineault that he knew from September 1998 that Mr. Carpenter would be investing BPE's clients' principal in the stock market, and that he told AUSA Pineault

that he knew since September 1998 that his clients' principal could be lost as a result of Mr. Carpenter's investments. This information is totally at odds with the FBI 302 reports provided to the defense and relied upon by the defense in preparing this case for trial, it is inconsistent with the grand jury presentation in this case, and it is inconsistent with the indictment returned in this matter.

If AUSA Pineault contends that Mr. Paley did not tell him these things during the interviews, then AUSA Pineault has an obligation to correct what Mr. Pineault necessarily believes to be perjured testimony. If Paley did tell AUSA Pineault these things, AUSA Pineault had an obligation under <u>Brady</u> to provide this exculpatory evidence to Mr. Carpenter.

**I.    The government's entire case is premised upon a false impression of material fact and the matter must therefore be dismissed.**

Whether Mr. Paley told the government or not, he has now testified that the essence of his agreement with Mr. Carpenter was that Mr. Carpenter possessed unfettered discretion to invest Mr. Paley's clients' principal in whatever investment vehicle Mr. Carpenter chose, with no limitations (even stock options). The government might believe Mr. Paley lied during his testimony when he stated that he conveyed this information to the government, but the government has no information or basis to assert that Mr. Paley was lying when he testified that that was the essence of the agreement he reached with Mr. Carpenter. As such, considering that the entire premise of the government's case has been proven to be false—i.e., that Mr. Paley did not know that his clients' principal was being invested in the stock market or that his clients' principal was at risk of loss, this prosecution can not continue.

Prosecutorial misconduct occurs "not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact." <u>Hamric v. Bailey</u>, 386 F.2d 390, 394 (4th Cir.1967); <u>see</u> <u>United States v. Boyd</u>, 55

F.3d 239, 243 (7th Cir.1995); <u>United States v. Iverson</u>, 637 F.2d 799, 805 n.19 (D.C.Cir.1980); 5 Wayne R. LeFave, et al., Criminal Procedure 497 (1999). The government presented this case to the grand jury on the premise that Mr. Paley did not know that Mr. Carpenter was investing the clients' principal. In fact, a grand juror asked a question regarding Mr. Paley's state of knowledge and AUSA Pineault provided the grand jury with the unmistakable impression that Mr. Paley did not know that his clients' principal was being invested by Mr. Carpenter. (Grand Jury Transcripts at 72-73). The entire presentation of evidence to the grand jury on February 4, 2004 was predicated on the foundational element that Mr. Paley never agreed with Mr. Carpenter that his clients' principal funds would be invested in the stock market.

 Moreover, the government's opening argument to the jury was premised on the foundational element that Mr. Paley did not know that Mr. Carpenter was trading his clients' principal. For example, the government stated:

> During the course of this trial, you will hear from seven of the clients who trusted their money to Carpenter's company.  You will hear them tell you that none was told that he was taking their money and trading it in the options market for his own benefit.  None was told that some or all of their money might be lost.  None was told at the time they were sending their money in to be held in escrow that he had already lost millions of dollars of other clients' money, trading their funds.  The first time these clients heard their money was being traded by Mr. Carpenter was when they were told it was gone.  Based on that conduct, Carpenter has been charged with 19 counts of mail and wire fraud.  And over the course of this trial, the government will be presenting to you testimony and exhibits that prove the fraud he committed.

(Tr. Day 2 at 19-20). The remainder of the government's opening was premised on the fact that Mr. Carpenter had no authority to invest the clients' principal, that he concealed this fact from Mr. Paley, and so Mr. Paley unknowingly concealed this fact from the exchangors. In short, the government's entire case is premised upon "a false impression of a material fact." <u>Hamric v. Bailey</u>, 386 F.2d 390, 394 (4th Cir.1967); see <u>United States v. Boyd</u>, 55 F.3d 239, 243 (7th Cir.1995); <u>United States v. Iverson</u>, 637 F.2d 799, 805 n.19 (D.C.Cir.1980); 5 Wayne R. LeFave,

et al., Criminal Procedure 497 (1999). As such, there is simply no principled basis upon which this prosecution can continue.

## II.     IF PALEY'S TRIAL TESTIMONY IS TRUTHFUL, THE GOVERNMENT HAS VIOLATED ITS *BRADY* OBLIGATIONS

"There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Paley's testimony clearly qualifies as both exculpatory evidence and impeachment evidence. Paley's testimony that he told AUSA Pineault that he knew the clients' principal was being invested in the stock market (including stock options) at Mr. Carpenter's discretion and that was the essence of the agreement he reached with Mr. Carpenter is clearly both exculpatory and impeaching. If such information was omitted from the FBI 302 reports, the government has suppressed vitally important exonerating if not exculpatory evidence, and Mr. Carpenter has been prejudiced by this improper and unlawful suppression of crucial evidence from the most significant prosecution witness.

The *only* connection between Mr. Carpenter and the representations alleged in the superseding indictment is Paley. However, the government (a) did not identify Paley as a co-conspirator in its discovery disclosures; (b) did not contend in its responses to motions *in limine* that Paley's out of court statements should be admitted under FRE 801(d)(2)(E) as co-conspirator statements; (c) did not charge or immunize Paley, leaving the defense – as well as the jury – with the conclusion that the government considered him to be a victim as opposed to a culpable party; and (d) FBI Special Agent Caldwell's grand jury testimony that Paley did not know the funds were being invested caused the grand jury to indict Mr. Carpenter based on

8

material and perjured testimony. If the government was told by Paley that he knew from September 1998 and agreed as of September 1998 that Mr. Carpenter was to invest clients' principal at his discretion in the stock market, then the prosecution concealed evidence that exculpates and exonerates Mr. Carpenter.

If the government possessed this information, Mr. Carpenter has been substantially and irrevocably prejudiced by the government's violation of its obligation to produce this Brady material. In fact, because Mr. Carpenter had never met with or spoken to any of the exchangors prior to the loss of the funds (and, therefore, had no idea what Paley was or was not telling the exchangors), Mr. Carpenter based his defense on what was contained in those FBI 302 reports. If those reports omitted such vital, exculpatory and impeaching evidence regarding the government's cornerstone witness, then Mr. Carpenter's rights under Brady have been egregiously violated and dismissal *with* prejudice is the appropriate sanction. See, e.g., Ferrara v. United States, 2005 WL 903196 (D. Mass. Apr. 12, 2005).

### III. IF PALEY'S TRIAL TESTIMONY IS FALSE, THE GOVERNMENT MUST DISCHARGE ITS *NAPUE* OBLIGATIONS

Conversely, if the government believes that Paley committed perjury during his trial testimony of July 20th (*i.e.*, falsely testifying that he told AUSA Pineault that he knew the clients' principal was being invested in the stock or stock options market but, in reality, did not tell that to AUSA Pineault), AUSA Pineault must correct this claimed perjury. The government has clear and unequivocal obligations to take all necessary steps to avoid use of or reliance on false evidence to obtain a conviction.

One of the bedrock principles of our democracy, "implicit in any concept of ordered liberty," is that the government may not use false evidence to obtain a criminal conviction. Napue v. Illinois, 360 U.S. 264, 269 (1958). The government violates a criminal defendant's

right to due process of law when, although not soliciting false evidence, it allows false evidence to go uncorrected when it appears. Id. "There is nothing redemptive about the sovereign's conspiring to deceive a judge and jury to obtain a tainted conviction . . . Napue forbids the knowing presentation of false evidence by the State in a criminal trial, whether through direct presentation or through covert subornation of perjury." Hayes v. Brown, 399 F.3d 972, 981 (9th Cir. 2005). See also Moreno-Morales v. United States, 334 F.3d 140, 148 (1st Cir. 2003) ("It is true that due process is offended when a prosecutor knowingly suborns perjury to obtain a conviction.").

If AUSA Pineault believes that Mr. Paley has committed perjury in stating that he provided the exculpatory evidence to the government, then AUSA Pineault has a Constitutional and moral obligation to correct what he believes to be Paley's perjured testimony. Otherwise, AUSA Pineault must be deemed to have adopted Paley's testimony (and therefore acquiesces to the commission of an insurmountable and egregious Brady violation). By failing to act, the prosecution is implicitly endorsing the veracity and completeness of Paley's testimony.

WHEREFORE, the defendant respectfully requests that the superseding indictment be dismissed with prejudice immediately.

> The Defendant,
> Daniel E. Carpenter,
> By his attorney,
>
> **/s/ Robert M. Goldstein**
> Robert M. Goldstein
> Mass. Bar No. 630584
> 20 Park Plaza, Suite 903
> Boston, MA 02116
> (617) 742-9015
> rmg@goldstein-lawfirm.com

Dated: July 21, 2005