UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIMINAL NO. 04-10029-GAO |
| DANIEL E. CARPENTER | ) ) ) | |

**<u>DEFENDANT'S OMNIBUS MOTION FOR JUDGMENT OF ACQUITTAL<br>PURSUANT TO FED. R. CRIM. P. 29(a)</u>**<br>**<u>(Defendant's Rule 29 Motion No. 3)</u>**

Defendant Daniel E. Carpenter, by and through undersigned counsel, respectfully moves at the close of the government's evidence and at the close of all the evidence, pursuant to Fed. R. Crim. P. 29(a), for a judgment of acquittal on all counts of the superseding indictment ("indictment").

Prior to trial, the government represented to the Court that this was a "simple" case. However, well into the trial, the Court observed that the government's case had shifted from a "bright line" case (*i.e.*, whether Mr. Carpenter had the authority to invest the funds) to a case in which the "prudence" of Mr. Carpenter's investment strategy has been put on trial. Now that the case is at an end, the government has converted and enlarged a "simple" misrepresentation case into multiple crimes at least three of which have never been charged by the grand jury. Mr. Carpenter was never indicted for omissions, aggressive trading, or conspiring or aiding and abetting a *culpable* Paley.

The government's problems in this case are now compounded because Paley has testified that he knew from the very beginning in September 1998 that Mr. Carpenter "was investing the clients' principal in the stock market" (Tr. 8-59), and that the "clients' principal

would be invested at Mr. Carpenter's discretion in terms of investment vehicles" (Tr. 8-96), which included "stock options." (Tr. 8-102.)

Because, as described below, the sparse and contradictory evidence offered by the government is insufficient to sustain a conviction on <u>any</u> of the counts, the Court should enter a judgment of acquittal as to the entire indictment.

## **MEMORANDUM OF LAW**

### I. THE INDICTMENT HAS BEEN CONSTRUCTIVELY AMENDED

The Presentment Clause of the Fifth Amendment provides that "[n]o person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. Accordingly, "after an indictment has been returned[,] its charges may not be broadened through amendment except by the grand jury itself." <u>Stirone v. United States</u>, 361 U.S. 212, 215-16 (1960). <u>See also</u> <u>United States v. Miller</u>, 471 U.S. 130, 138 (1985) (constructive amendment occurs when trial evidence "broaden[s] the possible bases for conviction from that which appeared in the indictment.").

"An indictment has been constructively amended in violation of the Presentment Clause when the charging terms of the indictment are altered, **either literally or in effect**, by prosecution or court after the grand jury has last passed upon them." <u>United States v. Fornia-Castillo</u>, 408 F.3d 52, 66 (1st Cir. 2005) (emphasis added). "Constructive amendment is a *per se* violation of the Fifth Amendment." <u>United States v. Milstein</u>, 401 F.3d 53, 65 (2d Cir. 2005). "Any broadening of the possible bases for conviction from that which appeared in the indictment is fatal." <u>United States v. Leichtman</u>, 948 F.2d 370, 377 (7th Cir. 1991).

A constructive amendment occurs, as in this case, when the government presents evidence at trial that broadens the scope of the indictment beyond that returned by the grand

jury.  See Stirone, 361 U.S. at 217-19 (finding constructive amendment, and reversing conviction, when indictment charged interference with interstate shipments of sand, but government also offered evidence of interference with interstate shipments of steel); United States v. Zingaro, 858 F.2d 94, 103 (2d Cir. 1988) (finding constructive amendment, and reversing conviction, when government offered evidence of loan that fell outside scope of the charged scheme); United States v. Wozniak, 126 F.3d 105, 109-11 (2d Cir. 1997) (finding constructive amendment, and reversing conviction, when indictment charged defendant with conspiracy to distribute cocaine, but evidence was also offered regarding marijuana).[1]

The Second Circuit has warned that courts should be particularly vigilant in preventing deviations from the indictment in fraud cases because of the already broad nature of such prosecutions:

> In light of the current broad range of conduct covered by the federal fraud statutes, it is critical that courts vigilantly enforce the Fifth Amendment requirement **that a person be tried only on the charges contained in the indictment returned by the grand jury**.  In order to avoid amending an indictment in violation of the Fifth Amendment, the government in fraud cases should think through the nature of the crime it wishes to allege and then spell out the offense in a carefully drafted indictment, **instead of confronting the defendant with its theory of criminality for the first time at trial**.

United States v. Mollica, 849 F.2d 723, 729 (2d Cir. 1988) (finding constructive amendment, and reversing conviction, when indictment charged conspiracy to impair IRS in collection of

---

[1] See also United States v. Narog, 372 F.3d 1243, 1248-49 (11th Cir. 2004) (finding constructive amendment, and reversing conviction, when indictment alleged that defendants knew a chemical would produce a certain controlled substance, but the court instructed jury that defendants could be convicted if the chemical was transformed into another controlled substance); United States v. Keller, 916 F.2d 628, 634-36 (11th Cir. 1990) (finding constructive amendment, and reversing conviction, when indictment alleged that defendant conspired with a certain person, but court instructed jury that defendant could be convicted if he conspired with other persons); United States v. Yeo, 739 F.2d 385, 387 (8th Cir. 1984) (finding constructive amendment, and reversing conviction, when indictment referred to extortion of a certain person, but government offered evidence of extortion of other persons); United States v. Cusmano, 659 F.2d 714, 715, 719 (6th Cir. 1981) (finding constructive amendment, and reversing conviction, when indictment charged extortion by means of threatened economic loss, but government introduced evidence of threatened physical violence).

taxes, but evidence permitted jury to convict defendant of conspiracy to commit any fraudulent act against the United States) (quotations omitted) (emphasis added).

Rather than heed the Second Circuit's admonition, the government in this case charged a misrepresentation case (*i.e.*, Mr. Carpenter caused misrepresentations to be made to the exchangors) and then confronted Mr. Carpenter with its true theory of criminality for the first time at trial (*i.e.*, Mr. Carpenter invested aggressively in stock options in a volatile market, as well as allegations of material *omissions*). Simply put, the crimes of mail and wire fraud charged in the indictment are not those that the government sought to prove at trial.

The indictment charges only a misrepresentation case:

> ¶ 17: BPE gave *written and oral assurances* to its clients that BPE would hold their money safe . . .
>
> ¶ 18: The promotional materials that BPE used to solicit clients contained *representations* concerning the security and safety of all funds transmitted to Benistar.
>
> ¶ 27: Clients were induced to wire funds to BPE based on material, *false written and oral assurances* that the money would be protected and held safe . . .
>
> ¶ 29: . . . entrust funds to BPE based on *material, false representations* regarding the manner in which the funds would be treated and held.
>
> ¶ 41: . . . entrust funds to BPE based on *material, false representations* that the money would be protected and held safe . . .
>
> ¶ 101: . . . based on *material, false written and oral assurances* that the money would be protected and held safe.

Indictment ¶¶ 17, 18, 27, 29, 41, 101 (emphasis added).

The government, however, has offered no evidence of false representations – not even from the person who is alleged to have made them. Paley testified as follows:

> Q:    Did your oral presentations to individuals or to groups differ in any significant way from what the written material said?

      A:    No.

(Tr. 7-122.) Nor are there any representations in **any** of the written materials sent from BPE to the exchangors that the funds would be "protected and held safe." See Gov. Exs. 1-6, 10-13 (Snider); 24-27, 29, 32 (Bellemore); 36-37, 40 (Cahaly); 51-53, 58 (Darling); 59-64, 66-69 (Fitzgerald); 75-83, 84, 86, 88, 90-92, 95-97, 100-02, 105-07, 113 (Iantosca); 118-26, 133 (Johnston). Instead, the government has spent the last two weeks seeking to prove material *omissions*, as well as the fact that Mr. Carpenter was an aggressive investor in stock options on NASDAQ technology stocks and was "bullish" throughout the year 2000 and eventually lost $9 million in the BPE portfolio in December 2000.

      Mr. Carpenter was charged by the grand jury with making "material, false representations that the money would be protected and held safe." Indictment ¶ 41. However, the government has substantially altered the charges by (i) relying upon a theory of proof of material *omissions*, given an absence of proof that *any* oral or written misrepresentations were made, and (ii) switching its theory of criminality to convict Mr. Carpenter simply because he was "trading on a bull strategy in the teeth of a bear market." (Tr. 4-145.) Clearly, the "charging terms of the indictment [have been] altered, either literally or in effect, by [the] prosecution . . . after the grand jury has last passed upon them." United States v. Fornia-Castillo, 408 F.3d 52, 66 (1st Cir. 2005).

      Mr. Carpenter was confronted for the first time at trial with new charges concerning the prudence of his investment strategy although he had been accused of making false representations. The Court, evidently concerned with the direction the government's case was taking, inquired of the government, "Why does prudence matter?" (Tr. 4-145.) Simply put,

5

prudence does **not** matter with respect to the charges contained in **this** indictment. While the government has gone to great lengths in its attempt to prove that Mr. Carpenter's investment strategy was bullish when it should have been bearish, the grand jury did not indict Mr. Carpenter under the mail and wire fraud statutes for material omissions or for making bad investments or for being bullish – but for making false representations.

The government presented a misrepresentation case to the grand jury and presented a "bullish investments" case and material omissions case to the petit jury. The result is a constructive amendment of the indictment in violation of the Fifth Amendment that is "fatal." United States v. Leichtman, 948 F.2d 370, 377 (7th Cir. 1991). The only appropriate remedy is entry of a judgment of acquittal as to all counts of the indictment.

**II.    THE GOVERNMENT HAS OFFERED EVIDENCE OF REPRESENTATIONS REGARDING "SAFETY" *ONLY* WITH RESPECT TO COUNTS 1 & 2**

As described above, there were no representations in **any** of the *written* materials presented by BPE to the exchangors that the funds would be "protected and held safe."

As for *oral* representations, the indictment alleges that the exchangors were similarly told that their funds "would be protected and held safe." Indictment ¶ 27. See also Indictment ¶ 59 ("provided assurances concerning the safety of their funds") (Cahaly); ¶ 63 ("provided assurances concerning the safety of his company's funds") (Snider); ¶ 70 ("provided assurances concerning the safety of Iantosca's funds) (Iantosca); ¶ 77 ("provided assurances concerning the safety of his funds") (Johnston); ¶ 84 ("provided assurances concerning the safety of his funds") (Darling); ¶ 89 ("provided assurances concerning the safety of its funds") (Bellemore); ¶ 93 ("provided assurances concerning the safety of his funds") (Fitzgerald). If any oral representations were made, they were made by Paley because Mr. Carpenter did not meet with any of the exchangors prior to January 2001.

Paley denied making any oral representations regarding "safety." See Tr. 7-122. Only one exchangor (Darling) contested Paley's testimony and stated that Paley did, in fact, make such a representation:

> Q: When you were speaking with Mr. Paley, did you speak with him concerning the safety of your money if you decided to hire Benistar?
>
> A: I didn't get that.
>
> Q: Sure. When you spoke with Mr. Paley, what did you talk with him about?
>
> A: Oh, I talked about the safety of my money, and he said that it was **perfectly safe**, that they were honorable people and that they were bonded.

(Tr. 3-98, 99) (emphasis added).

The remainder of the exchangors focused **only** on the existence of the bond to determine the "safety" of their funds. See Tr. 2-80-83 (Snider); Tr. 3-112-113 (Fitzgerald); Tr. 4-22-23 (Iantosca (through Adams)); Tr. 4-102 (Bellemore (through Eaton)); Tr. Day 11 (Cahaly); Tr. Day 11 (Johnston). Consequently, the **only** alleged misrepresentation (written or oral) regarding "safety" was made to Darling that the funds would be "perfectly safe" (Tr. 3-99), because there is no dispute that BPE was, in fact, bonded. See, e.g., Gov. Exs. 7, 8.

Since the government has offered no evidence of written misrepresentations regarding safety, and conflicting evidence with respect to Darling (Counts 1 and 2) regarding oral representations, the government has failed to offer any evidence upon which a reasonable jury could find that misrepresentations regarding "safety" were made to any exchangor other than Darling. Consequently, the Court should enter judgments of acquittal on Counts 3-19 for the failure of the government to offer any evidence (let alone prove) that false representations were made to obtain money or property.[2] See Indictment ¶¶ 103, 105.

---

[2] Nor is there any evidence that Mr. Carpenter authorized Paley to promise safety or knew that Paley would do so.

### III. IN ANY EVENT, ANY REPRESENTATIONS THAT THE FUNDS WOULD BE "PERFECTLY SAFE" WERE PUFFERY AND ARE IMMATERIAL AS A MATTER OF LAW

The only proof offered by the government of misrepresentations regarding "safety" are oral representations to Darling that the funds would be "perfectly safe." (Tr. 3-99.) However, stating that something is "perfectly safe" is nothing more than common marketplace puffery or sales talk that is deemed to be immaterial as a matter of law and, therefore, inactionable under the mail and wire fraud statutes.

The Supreme Court has held that the mail and wire fraud statutes incorporate the common law concept of "materiality," meaning that the government is required to prove beyond a reasonable doubt that *material* misrepresentations were made in furtherance of the alleged fraudulent scheme. Neder v. United States, 527 U.S. 1, 25 (1999) ("[W]e hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."). The government has failed to prove materiality in this case because the sole representation to Darling (made by Paley) that the funds would be "perfectly safe" is mere puffery or sales talk "which is not actionable under the mail and wire fraud statutes." United States v. Zomber, 358 F. Supp.2d 442, 449 (E.D. Pa. 2005).

"'Puffery' is an exaggeration or overstatement expressed in broad, vague, and commendatory language." Gillette Co. v. Norelco Consumer Prods. Co., 946 F. Supp. 115, 130 (D. Mass. 1996); see also *Black's Law Dictionary* at 1269 (8th ed. 2004) ("The expression of an exaggerated opinion – as opposed to a factual misrepresentation – with the intent to sell a good or service.").[3] Marketing and promotional statements that are mere puffery are not actionable as being misleading, fraudulent or materially deceptive because

---

[3] The terms "puffery" and "puffing" are synonymous. Id.

8

such statements "cannot be proven either true or false." Lipton v. The Nature Co., 71 F.3d 464, 474 (2d Cir. 1995).

> Professor Prosser colorfully describes the essence of puffery and puffing:
>
> Such sales talk, or puffing, as it is commonly called, is considered to be offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer . . . The "puffing" rule amounts to a seller's privilege to lie his head off, so long as he says nothing specific.

W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 109, at 756-57 (5th ed. 1984). Puffery is also described as an "exaggerated, blustering, and boasting statement upon which no reasonable buyer would rely." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1145 (9th Cir. 1997).

> A practical definition of puffery is as follows:
>
> It is clear that the concept of "puffery" as a permitted form of advertising or sales technique has existed for many, many years. In its earlier history, it involved situations, or words of a superlative nature, the proof of which was virtually impossible, *i.e.*, better, best, brighter, brightest, etc.

U-Haul Int'l, Inc. v. Jartran, Inc., 522 F. Supp. 1238, 1244 (D. Ariz. 1981), aff'd, 681 F.2d 1159 (9th Cir. 1982). Clearly, a broad and vague statement that the funds would be "perfectly safe" was mere sales puffery. Claiming that a laundry detergent is "bright," "brighter," or "brightest" is no different from claiming that the funds would be "safe," "safer," or "safest." This is underscored by the fact that nothing specific is alleged to have been communicated, either orally or in writing, regarding the *kind* of investments that BPE would make (*i.e.*, stocks, bonds, CDs, options, futures, T-Bills, etc.).

Furthermore, the generalized statement that the funds would be "perfectly safe" is deemed to be *immaterial as a matter of law* in private securities fraud actions brought under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), pursuant to the

"safe harbor" for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. §§ 78u-4, 5 (1995).  Consequently, the government should not be allowed to criminalize statements that Congress has already ordained are immaterial as a matter of law in private civil proceedings.

A statement that the funds would be "perfectly safe" is similar to an optimistic forward-looking statement regarding future financial performance that can only be deemed true or false based on future events.  See Smith v. Circuit City Stores, Inc., 286 F. Supp.2d 707, 722 (E.D. Va. 2003) ("A statement . . . whose truth or falsity is discernible only after it is made is necessarily forward-looking.").  If the indictment in this case were a complaint in a private securities fraud action instead of a criminal pleading issued by the government, the indictment would have to be dismissed with prejudice for alleging fraud regarding statements that Congress has deemed are, as a matter of law, immaterial.

"The PSLRA deems generalized expressions of corporate optimism immaterial as a matter of law and therefore insufficient as the basis for an action alleging securities fraud."  In Re QLT Inc. Sec. Lit., 312 F. Supp.2d 526, 532 (S.D.N.Y. 2004).  "[E]xaggerated, vague, or loosely optimistic statements about a company are not actionable."  In re Boston Tech., Inc. Sec. Lit., 8 F. Supp.2d 43, 54 (D. Mass. 1998).  See also In re Focus Enhancements, Inc. Sec. Lit., 309 F. Supp.2d 134, 153 (D. Mass. 2001) (statements "were at most unduly optimistic"); Van Ormer v. Aspen Technology, Inc., 145 F. Supp.2d 101, 106-07 (D. Mass. 2000) (statements "nothing more than corporate puffery"); Fitzer v. Security Dynamics Techs., Inc., 119 F. Supp.2d 12, 22 (D. Mass. 2000) ("[t]he corporate puffery rule applies to loose optimism about both a company's current state of affairs and its future prospects" such as statements that company is "well positioned").

Any statement that the funds would be "perfectly safe" is a typically vague and loosely optimistic statement about future performance that would apply to any company in the § 1031 business (or any other business in which customer funds are held pending the completion of a transaction). If BPE were a publicly-traded company, any statements that the funds were "perfectly safe" would be inactionable for fraud. The fact that BPE was privately-held does not transform the legal characteristics of the statement.

A particularly relevant case is Baron v. Smith, 285 F. Supp.2d 96 (D. Mass. 2003) (O'Toole, J.), aff'd, 380 F.3d 49 (1st Cir. 2004). In Baron, shareholders sued certain of the officers and directors alleging securities fraud. The shareholders claimed they were misled by the officers and directors to believe, based on statements contained in a company press release, that the company would use the bankruptcy process to reorganize successfully. The press release at issue stated, in pertinent part, as follows:

> Through the Chapter 11 process, the Company expects to be able to terminate unprofitable leases, reduce the Company's operating expenses and make necessary improvements to the business to create a strong competitive future . . . .

Baron, 285 F. Supp. 2d at 100. In dismissing the action with prejudice, this Court held that the information contained in the press release "concerned what the Company *hoped* would be the outcome of the bankruptcy. These statements about what the Company's management *expected to be able to achieve* in the bankruptcy were clearly forward-looking statements, . . . *the kinds of optimistic statements that the market would easily recognize as nothing more than a kind of self-directed corporate puffery*." Id. at 106 (citations and quotations omitted) (emphasis added).

The optimistic statement that the funds would be "perfectly safe" is no different from the optimistic statements made in the press release in Baron. Just as in Baron, BPE expected

11

that the funds would be returned to the exchangors based on BPE's successful investments in stock options in the past (such as 1999). After all, BPE had by the Fall of 2000 successfully completed over 115 other property exchanges (Tr. 10-34) and even Gerald Levine of Merrill Lynch agreed that Mr. Carpenter did not intend to *lose* the funds. See Tr. 5-104. Additionally, BPE "expected to be able to achieve" positive investment returns as had been achieved in the past. There is no doubt that the statement about "perfectly safe" is *exactly* the kind of optimistic forward-looking statement that BPE's sophisticated customers "would easily recognize as nothing more than a kind of self-directed corporate puffery." Baron, 285 F. Supp.2d at 106. See also Frazier v. Vitalworks, Inc., 341 F. Supp.2d 142, 153 (D. Conn. 2004) ("Saying that a product is 'significant,' 'attractive,' or 'great' is merely 'puffery,' not actionable securities fraud.").

The only alleged misrepresentation presented at trial was Paley's oral statement to Darling that the funds would be "perfectly safe," although Paley denied making any such statement. However, if Paley made that statement, this was merely sales puffery on Paley's part that is deemed to be immaterial as a matter of law. Consequently, judgments of acquittal should enter on all counts in the indictment.

IV. **NO SCHEME TO DEFRAUD HAS BEEN PROVEN**

Even after the end of the trial, the precise scheme to defraud that the government alleges is a crime remains unclear.

One possible scheme to defraud is that misrepresentations were made regarding the safety of the funds. However, the evidence proffered at trial is that no *written* misrepresentations were made and that the only *oral* representation in this regard was made to one exchangor by Paley. Moreover, any statement by Paley that the funds would be

12

"perfectly safe," if actually made, is nothing but sales puffery that is immaterial as a matter of law and, therefore, inactionable under the mail and wire fraud statutes.

Another possible scheme to defraud is that Mr. Carpenter was an aggressive investor who was bullish during the year 2000 when, in retrospect, he should have been bearish. However, it is not a crime to be "bullish" in America, and if it is, then this entire Court's docket could easily be filled with criminal cases against Boston-based money managers who were bullish during the year 2000 and lost **trillions** of their clients' hard-earned savings contained in mutual funds, pension funds, 401ks, etc. Instead, Mr. Carpenter may very well be the only person in America who has been indicted for being bullish at that time.

The only other possible scheme to defraud that can be gleaned from the indictment and the evidence elicited at trial is that Mr. Carpenter's trading strategy, for better or worse, resulted in $9 million in losses (which is really what this case is all about). However, the government has failed to prove a scheme to defraud because there is no evidence that Mr. Carpenter had the scienter, or specific intent, to lose the funds, harm the exchangors, or deprive them of their funds. This entire prosecution is merely the government's effort to brand Mr. Carpenter a criminal because it disagrees with his trading strategy. That simply is not the purpose of the criminal law. The government should not attempt to criminalize business contractual disputes – even if they involve millions of dollars.

This case is very similar to United States v. Brown, 79 F.3d 1550 (11th Cir. 1996). One of Florida's largest real estate development companies (General Development Corporation ("GDC")) sold homes to prospective purchasers (mostly from the Northeast) by telling them that the homes were "safe investments" and that "rental income would exceed mortgage payments." Id. at 1554. As it turned out, however, the homes were sold for more

13

than what they were actually worth and customers discovered that rental income, if any, was less than what GDC had promised. Based in large part on customer losses, GDC subsequently filed for bankruptcy, pled guilty to fraud and established a $169 million fund to pay customers. The government, however, indicted GDC's senior management for multiple counts of mail fraud and other offenses and, after a nine-month trial, secured convictions.

The Eleventh Circuit, in reversing all of the convictions and remanding for a dismissal of the indictment with prejudice, embarked upon a blistering critique of the government's attempt to criminalize what was in essence a civil breach of contract dispute – just as the government has attempted to accomplish in the present case.

The Eleventh Circuit first assumed that the defendants, through their failure to discipline salespeople or otherwise, acted to authorize misrepresentations by salespeople to customers about safety and value – although the salespeople who testified for the government uniformly denied that defendants expressly encouraged them to lie and "no one suggests that defendants ever, personally, lied to customers." Id. at 1555, n.9.[4]

After noting that the federal fraud statutes are so broad as to "encompass almost any situation," id. at 1556, the Eleventh Circuit applied the Rule of Lenity to avoid "[a] limitless reading of the mail fraud statute" resulting in "a kind of federal criminal common law, that is, a situation where a person could be convicted of a crime against the United States despite the

---

[4] Similarly, there is no evidence that Mr. Carpenter encouraged Paley to lie or that Mr. Carpenter "ever, personally, lied to customers." Id. In fact, Paley testified that Mr. Carpenter specifically did **not** authorize him to lie:

Q: Dan Carpenter never authorized you to say anything other than what was in the written agreements, correct?

A: That's true.

(Tr. 8-9.)

14

conduct not violating an express statutory provision." Id. at 1556-57.[5]  The Court also reiterated that "'puffing' or 'seller's talk' is still not actionable under the mail fraud statute." Id. at 1557 (citing United States v. Pearlstein, 576 F.2d 531, 540 n.3 (3d Cir. 1978) (statements that company "nationally known" and that product "among the finest . . . in the world" are "not cognizable under the federal mail fraud statute.")).

The Eleventh Circuit then determined that "reasonable jurors could not find that a person of ordinary prudence, about to enter into an agreement to purchase a GDC home in Florida, would rely on . . . the seller's own affirmative representations about the value or rental income of the GDC homes." Id. at 1559.  This holding was based on the finding that:

> A "scheme to defraud" under the pertinent criminal statutes has not been proved where a reasonable juror would have to conclude that the representation is about something which the customer should, and could, easily confirm—if they wished to do
>
> so—from readily available external sources . . . the relevant market prices are not difficult to investigate.  The essential pricing information can be obtained by nonexperts readily, for example, by a telephone call or a visit to a GDC competitor or by a look at newspaper classified ads.

Id.

Showing grave concern about the government attempting to "make up" the law in a criminal prosecution on the fly, the Eleventh Circuit issued this admonition:

> The law is a causeway upon which, so long as he keeps to it, a citizen may walk safely.  To be free of tyranny in a free country, the causeway's edges must be clearly marked.  The exercise of federal government power to criminalize conduct and thereby to coerce and to deprive persons, by government action, of their liberty, reputation and property must be watched carefully in a country that values the liberties
>
> of its private citizens.  **Never can we allow federal prosecutors to make up the law as they go along**.

---

[5]  This Court may take judicial notice of the fact that the laws and regulations governing 1031 exchanges do **not** preclude BPE from investing the funds during the holding period, nor do they specify the types of investments.  See 26 U.S.C. § 1031; 26 C.F.R. § 1.1031(k)-1.

Id. at 1562.  See also Arthur Andersen LLP v. United States, 125 S.Ct. 2129, 2135 (2005) ("We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress, and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.") (internal quotations omitted).

In the present case, the government is attempting to make up the law as it goes along and create a crime where none previously existed.  The 1031 exchange business is unregulated.  The governing statute and regulations do not prohibit the investment of exchangor funds in stock options.  There is no evidence that Mr. Carpenter made any representations to any of the exchangors (false or otherwise).  Even Paley himself admits that Mr. Carpenter did not authorize Paley to lie.  Mr. Carpenter invested the funds in his discretion as the agreements provided.  Of the 126 or so exchangors who utilized BPE's services, only seven failed to get their money back – and such failure was not due to any willful act or omission by Mr. Carpenter (since he did not intend to lose the funds).

The government has charged Mr. Carpenter with mail and wire fraud simply because a contractual obligation between BPE and these seven exchangors was not met resulting in a $9 million loss.  Had Mr. Carpenter been "bearish" in the latter part of 2000 and paid back the seven exchangors their principal plus interest, obviously this prosecution would never have been brought.  This fact alone warrants the entry of a judgment of acquittal.  As the Eleventh Circuit noted in Brown, "the fraud statutes do not cover all behavior which strays from the ideal."  Id. at 1562.  "The implications of allowing the federal fraud statutes to be treated by federal prosecutors as a largely unlimited device to attack wrongdoing whenever prosecutors

feel wrongdoing exists are extremely worrisome to us." Id. at 1562, n.9. They should also be extremely worrisome to this Court.

V. **BASED ON THE EVIDENCE AT TRIAL, THIS PROSECUTION IS TIME-BARRED**

One result of the government's ever-shifting theory of criminality is that the government has offered evidence at trial suggesting that the scheme to defraud was committed in October 1998 when Mr. Carpenter first opened the Merrill Lynch accounts and first spoke to David Patterson, Esq., the lawyer for BPE's very first exchangor (Jane Carey). If so, then the original indictment returned in this case in February 2004 was time-barred when issued and a judgment of acquittal as to the entire superseding indictment should be entered forthwith.

Because the original indictment was returned on February 4, 2004, it must have charged an offense occurring *after* February 4, 1999 in order to be timely. See 18 U.S.C. § 3282 (providing a five-year limitations period for mail and wire fraud). However, the government's presentation of its evidence at trial strongly suggests that the scheme to defraud was BPE deciding to be "aggressive" and investing in stock options from its inception – *i.e.*, October/November 1998.

Gerald Levine of Merrill Lynch testified that Mr. Carpenter opened the trading account, the "B10" account, in November 1998 and that Mr. Carpenter understood the risks of options investments when they discussed the topic at that time. (Tr. 5-65-66.) Thus, Mr. Carpenter had decided to (and did) invest the funds in stock options from the beginning of BPE's relationship with Merrill Lynch in October/November 1998.

In sum, the government has attempted to show the jury that from BPE's inception Mr. Carpenter was "aggressive," opened the trading account at Merrill Lynch, and invested in stock options. However, all of this occurred in October/November 1998 and could not possibly have any relevance to mailings and wires sent in the year 2000. The only purpose for introducing this evidence was to show the jury that Mr. Carpenter had a certain state of mind (scienter) in the Fall of 1998. If so, then the scheme to defraud must necessarily have occurred in the Fall of 1998.

"For purposes of mail fraud and wire fraud, the five-year statute of limitations begins to run from the date of mailing of the fraudulent information." United States v. Tadros, 310 F.3d 999, 1006 (7th Cir. 2002). If the scheme to defraud involved opening the trading account at Merrill Lynch and deciding to invest in stock options, that all occurred in October/November 1998. Once BPE began investing in stock options in October/November 1998, BPE "did not need to engage in any additional conduct to realize the ultimate goal of [its] scheme—the [investment in stock options]." United States v. Reitmeyer, 356 F.3d 1313, 1318 (10th Cir. 2004) (dismissing indictment as untimely because scheme was "executed" outside of limitations period).

Consequently, any indictment in this case – given the government's proffered evidence at trial – should have been returned by the grand jury no later than November 2003 in order to be timely. The return of the original indictment in February 2004 was untimely.

WHEREFORE, based on the foregoing (including Defendant's Rule 29 Motions Nos. 1 and 2 which are expressly incorporated herein), the defendant respectfully requests that the Court enter a judgment of acquittal on all counts of the superseding indictment.

                                                The Defendant,
                                                Daniel E. Carpenter,
                                                By his attorney,

**/s/ Robert M. Goldstein**
Robert M. Goldstein
Mass. Bar No. 630584
20 Park Plaza, Suite 903
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

Dated: July 25, 2005