UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES OF AMERICA         )
                                )
        v.                       )          CRIMINAL NO. 04-10029-GAO
                                )
DANIEL E. CARPENTER              )
_____ )

### Defendant's Motion to Set Aside the Verdict and
### Grant a New Trial Pursuant to Fed.R.Crim.P. 33
### (Defendant's Post-Verdict Motion No.2)

Defendant Daniel E. Carpenter, by and through undersigned counsel, respectfully

moves this Honorable Court, pursuant to Fed. R. Crim. P. 33, to use its discretion in the

interest of justice, set aside the verdict, and grant Mr. Carpenter a new trial to rectify the

wholly unsupported jury verdict in this case. Mr. Carpenter respectfully submits that

numerous independent grounds alone warrant a new trial in this case, but certainly that in

combination the only proper remedy for the numerous errors is a new trial. Specifically, the

defendant contends the following errors warrant a new trial: (1) the issue of venue should

have been submitted to the jury, (2) the government knowingly and intentionally concealed

exculpatory evidence—i.e., that Paley lied to the government when he falsely denied

knowledge of Carpenter's investments—and the government wrongly argued to the Court that

it never adopted Paley as an innocent conduit of Carpenter's, all of which allowed the

government to create a false impression of material fact and to switch theories at the end of

the case and argue Paley was a co-conspirator, which eviscerated the foundational element of

the defense in this case (that Paley deceived the government too), (3) the prosecutors clearly

failed to fulfill their constitutional and ethical responsibilities in this case to correct known

perjurious testimony, (4) the government's closing and rebuttal arguments were improper and

prejudicial, and (5) the government constructively amended the indictment and/or created a material variance of proof by relying upon an "omissions" theory of proof when the indictment only charges a "misrepresentation" case.

The remedy of a new trial is warranted "where there would be a miscarriage of justice or where the evidence preponderates heavily against the verdict."  United States v. Andrade, 94 F.3d 9, 14 (1st Cir. 1996) (quotations omitted).  Here, both of the conditions for a new trial are easily satisfied with respect to any one of the above-referenced grounds.

**Request for Oral Argument**

Mr. Carpenter respectfully requests oral argument on the within motion.

**ARGUMENT**

**I.    Introduction.**

In the end, the government converted its so-called "simple" case into a complex prosecution focused principally upon the defendant's alleged risky and unreasonable investment strategy, after previously arguing to the Court that profits and losses were irrelevant to the government's theory of proof, and after providing the Court with the improper impression that the government's case was a "bright line" case where prudence of investments was irrelevant. To that end, the defendant was irreparably prejudiced by more than two days of irrelevant and prejudicial testimony from the Merrill Lynch and PaineWebber stock brokers. The government was able to argue an omission theory of liability in its closing and rebuttal arguments, despite the fact that an omission fraud is not charged in the indictment and the Court did not instruct the jury on an omission theory of liability. The government also violated numerous discovery obligations and, as direct result of those violations, convinced the defendant that it believed Paley was an innocent conduit in this case

and therefore convinced the defendant to pursue a defense strategy focused on Paley having deceived the government. In the end, the government was able to wrongfully convince the Court it never adopted Paley as a non-culpable party and was therefore permitted to wrongfully argue in closing and in rebuttal that all the defense proved in this case was that Paley was a co-conspirator, which did not excuse the defendant's guilt in this case. In effect, totally eviscerating the principal defense in this case. Moreover, because the government pursued theories of proof during trial that were at direct odds with their pretrial representations, the Court was unable to properly assess evidentiary objections and motions *in limine*, and the defendant was unable to prepare a defense designed to meet the government's shifting theories of proof.

Finally, government counsel engaged in highly improper and prejudicial closing and rebuttal arguments, arguing facts not admitted into evidence, arguing facts for purposes for which they were not admitted, inviting the jury to decide the case upon sympathy and compassion for the elderly, disabled, hard-working, and honest "victims", personally attacking the credibility of defense counsel and the defendant, and adopting new theories of proof in their final and rebuttal arguments.

As explained in detail *infra*, there has been pervasive prosecutorial misconduct in this case that warrants a new trial in the interests of justice. In short, faced with the real prospect of an acquittal in this case, it appears the government decided to secure a conviction at all costs, even at the expense of justice and fair play. In the end, though, the prosecutors' subjective motivations need not be resolved because there simply can be no reasonable dispute that the defendant's ability to defend the charges levied in this case were critically compromised by the government's improper actions in this case. As such, for all of the

reasons discussed *infra*, the defendant respectfully requests a new trial in this matter, such that the defendant can secure the fair trial guaranteed by the Fifth Amendment, one not infected with the prejudicial and improper government conduct that permeated this trial.

## II.    Applicable legal framework.

"Under Rule 33, a new trial in the 'interests of justice' may be granted liberally on a motion made 'within 7 days' after the verdict; but, thereafter, it can be granted solely for newly-discovered evidence (and then only on a motion made within three years)." United States v. Conley, 323 F.3d 7, 10 (1st Cir.2003), quoting Fed.R.Crim.P. 33.  Motions for a new trial are directed to the discretion of the trial court. United States v. Rothrock, 806 F.2d 318, 321 (1st Cir.1986). "In considering such a motion, the court has broad power to weigh the evidence and assess the credibility of ... the witnesses who testified at trial...." Rothrock, 806 F.2d at 321, citing United States v. Indelicato, 611 F.2d 376, 387 (1st Cir.1979) (district judge may weigh the evidence and evaluate the credibility of witnesses). The First Circuit "will not disturb the disposition of a new trial motion unless the court abused its discretion or misapplied the law." Rothrock, 806 F.2d at 321-322, quoting United States v. Rodriguez, 738 F.2d 13, 17 (1st Cir.1984); United States v. Thornley, 707 F.2d 622, 626 (1st Cir.1983). Finally, where an order for a new trial is predicated on the district court's concern about the effect of prejudicial acts that may have resulted in an unfair trial, as distinguished from an evaluation of the weight of the evidence, a less stringent standard of review is applied by the First Circuit. Rothrock, 806 F.2d at 322. In this case, because a combination of prejudicial acts by the government resulted in a manifestly unfair trial, the interests of justice demand a new trial in this case.

III. **The interests of justice warrant a new trial in this case.**

    A. **Because venue was "in issue," the jury should have decided whether the government sustained its burden of proving proper venue.**

In a memorandum dated July 27, 2005, after the close of all the evidence and after denying Mr. Carpenter's request that the jury be instructed on venue (Tr. Charging Conf. at 6), the Court ruled "that the question whether venue has been properly established for any of the counts in the indictment is a question to be determined by the court, not the jury." 7/27/05 Mem. at 1 (Dkt. #148). The Court then found that "venue is proper as to all counts." Id. On the facts of this case, the lack of a jury instruction on venue constitutes reversible error. Indeed, no Court of Appeals has upheld the denial of a jury instruction on venue when venue was placed "in issue", as it was in this case. That error can be easily remedied, however, by a new trial. See United States v. Miller, 111 F.3d 747, 753-54 (10th Cir. 1997) (reversing conviction and remanding for new trial based on failure to give specific venue instruction); United States v. Cryar, 232 F.3d 1318, 1323 (10th Cir. 2000), cert. denied, 532 U.S. 951 (2001) ("Venue is a fact question, normally decided by the jury.").

Because venue need only be proved by a preponderance of the evidence, there is some dispute as to whether it automatically presents a question for the jury. The weight of authority, on the facts of this case given Mr. Carpenter's strenuous objections to venue at all stages of the proceedings, is that an instruction was required.[1]

---

[1] Given that venue was actively litigated in this case, the jury instruction would have been *required* in all six of the Circuits which have addressed this issue (Third, Fifth, Seventh, Eighth, Tenth and District of Columbia). A commentator has determined that the First, Second, Fourth, Sixth, Ninth and Eleventh Circuits have not yet directly addressed the issue. See Lorraine Donnelly, Comment, *PROPER VENUE AS A JURY ISSUE IN FEDERAL CRIMINAL CASES: THE "IN ISSUE" APPROACH TO WHEN VENUE PRESENTS A FACT QUESTION FOR THE JURY AS OPPOSED TO A QUESTION OF LAW FOR THE COURT*, 76 Temple L. Rev. 883, 884 n.7 (2003) (hereinafter, "Comment").

A jury instruction must be given when venue has been placed "in issue" in the case (*i.e.*, actually litigated).  There are two approaches that courts have taken to make this determination.  The "narrow view" (which the Comment suggests is the majority and better approach) has been adopted by the Third, Fifth, Seventh and, very recently, the District of Columbia Circuits.  It asserts that venue is "in issue" when trial testimony or other evidence is proffered that creates a factual dispute with respect to the location of the crime, and requires more than a general objection to venue by the defendant or a request for a jury instruction. See Comment at 888; United States v. Perez, 280 F.3d 318 (3d Cir.), cert. denied, 537 U.S. 859 (2002) (collecting cases).

The "broad view," on the other hand, has been adopted by the Eighth and Tenth Circuits, and holds that failure to instruct on venue, when requested, is reversible error unless it is beyond a reasonable doubt that the jury's guilty verdict necessarily incorporates a finding of proper venue.  See Comment at 897; United States v. Miller, 111 F.3d 747 (10th Cir. 1997).  Given the procedural history of this case and the evidence adduced at trial, venue has clearly been placed "in issue" regardless of which approach is utilized.

The most cogent analysis of this issue is contained in Perez, in which the Third Circuit adopted the "narrow view" while also requiring that additional procedural prerequisites be met before proper venue becomes a fact question for the jury.  The District of Columbia Circuit recently followed Perez in United States v. Haire, 371 F.3d 833, 840 (D.C. Cir. 2004) (Sentelle, J.).  The Third Circuit, after canvassing the case law in all of the Circuits that have addressed this issue, held that where the indictment alleges venue without a facially obvious defect, venue becomes a jury question if three requirements are met:

    (1) the defendant objects to venue prior to or at the close of the prosecution's case-in-chief;

(2) there is a genuine issue of material fact with regard to proper venue; and

(3) the defendant timely requests a venue jury instruction.

Perez, 280 F.3d at 334. See also id. at n.11 (suggesting that "the better practice is to give the instruction when requested").

Whether under the "narrow view" or the "broad view," venue was clearly placed "in issue" in this case. See Tr. 9:140 (THE COURT: "I recognize that venue remains an issue in the case."). Mr. Carpenter filed (i) a pretrial motion to dismiss the *entire* indictment for lack of venue – claiming that the acts he is alleged to have committed occurred, if at all, in Connecticut or New York (Dkt. #27); (ii) pre-trial motions *in limine* to exclude evidence (or dismiss) all but one of the 14 wire fraud counts for lack of venue (Dkt. ##83, 84); (iii) a trial motion *in limine* to preclude new government witnesses and exhibits called specifically to prove venue with respect to all 14 of the wire fraud counts (Dkt. # 130); and (iv) a pre-verdict Rule 29 motion at the close of the government's evidence (renewed at the close of all the evidence) seeking an acquittal on 12 of the 14 wire fraud counts for lack of venue. (Dkt. #142.) Mr. Carpenter also adduced substantial evidence during trial, through cross-examination of the government's numerous venue witnesses, raising a genuine issue of material fact as to venue. See Tr. 10:94–11:26. In light of his substantial and consistent challenges to venue at all stages of the proceedings, there can be no doubt that Mr. Carpenter placed venue "in issue" in this case.

Mr. Carpenter clearly met the test set forth in Perez, and recently confirmed in Haire, to have the jury instructed on venue. He objected to venue prior to and at the close of the prosecution's case-in-chief on numerous occasions (pre-trial, during trial, and post-trial); there is a genuine issue of material fact with regard to proper venue (because all of Mr. Carpenter's acts occurred in Connecticut and New York); and Mr. Carpenter timely requested

a venue jury instruction.  The defendant also objected when the Court notified him that it

would not instruct the jury on the issue of venue. <u>See</u> Tr. 11:4-5. Given all of the foregoing,

the Court should have instructed the jury on venue.  <u>See</u> <u>Miller</u>, 111 F.3d at 751 (holding that

when venue is "in issue," the trial court must instruct the jury on venue if requested).  <u>See also</u>

Scott Liljegren, Comment, *Criminal Procedure: Failure to Instruct the Jury on Venue, When*

*Requested, Constitutes Reversible Error, Notwithstanding Venue Subsumed by a Guilty*

*Verdict*, 37 Washburn L. J. 439, 457-58 (1998) (finding <u>Miller</u>'s reasoning "compelling" and

noting that it "charges trial judges to provide an instruction on any element of the crime, when

requested, if failure to do so will prospectively impact the verdict.").[2]

Although discussed in <u>Perez</u> and <u>Haire</u>, it is also arguable that Mr. Carpenter has a

Constitutional right under <u>United States v. Gaudin</u>, 515 U.S. 506, 522-23 (1995), to have the

jury determine *every* fact and element of the offense – including venue.  <u>See</u> <u>id.</u> ("[t]he

Constitution gives a criminal defendant the right to have a jury determine, beyond a

reasonable doubt, his guilt of every element of the crime with which he is charged."); <u>see also</u>

<u>United States v. Booker</u>, 125 S. Ct. 738, 748 (2005) (affirming that jury must find every fact

and element of a crime).  Since "[v]enue in a criminal case is not an arcane technicality,"

<u>United States v. Salinas</u>, 373 F.3d 161, 162 (1st Cir. 2004), at the very least Mr. Carpenter

was entitled to have the jury determine venue.

---

[2]  Given the substantial evidence at trial that Mr. Carpenter's *only* acts in this case were investing the
funds in New York from his office in Connecticut, had a jury instruction been given, there is a
substantial possibility that the jury would have acquitted Mr. Carpenter on venue grounds – even if
they also believed he participated in a scheme to defraud.  "The two inquiries are, on the facts of this
case, entirely separate."  <u>Perez</u>, 280 F.3d at 331.

B.    **The government concealed exculpatory evidence, violated constitutional discovery obligations, and violated discovery obligations of our Local Rules, all of which allowed the government to create a false impression of material fact that critically prejudiced the defendant's ability to formulate and prepare a defense in this case.**

During the charge conference in this case, which occurred after the government rested, the defendant learned for the first time that the government believed and understood that Paley was lying to them when (during his four proffer sessions with the government) he advised the government that he did not know until the end of December 2000 that BPE's clients' principal funds would be invested in the stock market or that clients' principal would be at risk of loss. During the charge conference of July 25, 2005, Mr. Pineault responded to the defendant's argument that the government had engaged in misconduct as follows:

> Your Honor, I don't find anything cute about this case, and I don't find anything cute about the government's behavior in this case or what it's trying to achieve in this case. Mr. Paley was put on the stand, and the last two documents I showed to him during his direct examination were two of the documents that Mr. Goldstein then promptly used to skewer him, which are two of the memos from Mr. Carpenter to him referencing the options trading and the amount of the losses. **I have an obligation not to elicit what I think might be perjurious testimony from a witness. So for me to have asked Mr. Paley what did you know, I know full well the answer he would have given, which is I didn't know that the clients' money was at risk. That is what he consistently told the government. There is certain ample reason for everyone in this courtroom to doubt the credibility of that testimony. So for me to have asked him that question I think would have run afoul of my obligations**.

(Tr. Day 11 at 10-11).

This incredible concession by the government constitutes irrefutable proof that the government violated the defendant's constitutional rights to pretrial discovery of this exculpatory evidence, irrefutable proof that the government violated multiple discovery obligations imposed upon the government by our Local Rules, and irrefutable proof that the government created a false impression of fact in this case that critically compromised and

prejudiced the defense strategy implemented in this case. Moreover, it has now become clear

that the government falsely argued to the Court that it never adopted Paley as an innocent

conduit, when in fact the government's non-disclosure pursuant to various provisions of our

Local Rules compels a conclusion that the government intentionally provided the defendant

with the false impression that Paley was an innocent conduit of Carpenter's. As such, and as

explained in detail below, the prejudice generated by this prosecutorial misconduct alone

compels a new trial, which is the only way to remedy the prejudice and provide the defendant

with his Fifth Amendment right to a fair trial.

1.    *The government violated discovery obligations imposed by the
constitution and our Local Rules.*

First, given that the government now admits that it concluded prior to trial that Paley

had lied to them during their proffer sessions, and further given the government's decision to

not charge Paley with violating 18 U.S.C. §1001 for each of the successive false statements, it

is axiomatic that the government was obliged, pursuant to Brady v. Maryland, 373 U.S. 83

(1962) and Giglio v. United States, 405 U.S. 150, 153-154, 92 S.Ct. 763, 31 L.Ed.2d 104

(1972) to advise the defendant of this reward and/or inducement for his cooperation with and

testimony for the government. The government was also obligated to advise the defendant of

the government's decision to not charge Paley with the wire and mail fraud that was the

subject matter of the instant case, which constitutes yet another promise and reward for

Paley's cooperation with the government in this case, given the government's belief that

Paley knew all along that Carpenter was investing clients' principal funds in the market.

"When the 'reliability of a given witness may well be determinative of guilt or innocence,'

nondisclosure of evidence affecting credibility falls within" the general rule that "suppression

of material evidence justifies a new trial 'irrespective of the good faith or bad faith of the

prosecution'." <u>Giglio v. United States</u>, 405 U.S. 150, 153-154, 92 S.Ct. 763, 31 L.Ed.2d 104

(1972); <u>Ouimette v. Moran</u>, 942 F.2d 1, 9 (1st Cir.1991) (holding that petitioner's due process

rights were violated by state prosecutor's failure at trial to disclose extensive criminal record

of state's chief witness and withholding from petitioner existence and nature of witness deals

with state in return for his inculpatory testimony), <u>citing</u> Note, *The Prosecutor's*

*Constitutional Duty to Reveal Evidence to the Defendant,*74 Yale L.J. 136, 138 (1964)

(discussing denial of due process under *Napue* even when no specific show of prejudice).

     In addition to the government's constitutional obligations, Local Rule 116.2(B)(2)(c)

demands that the government produce to the defendant "[a] statement whether any promise,

reward or inducement has been given to any witness whom the government anticipates calling

in its case-in-chief, identifying by name each such witness and each promise, reward, or

inducement, and a copy of any promise, reward or inducement reduced to writing." The rule

obviously covers promises, rewards and inducements in writing <u>or otherwise.</u> Here, even if

the promise and reward of no §1001 prosecution and no §§1341 and 1343 prosecution were

never formally reduced to writing, the government clearly rewarded and induced Paley's

cooperation by <u>not</u> prosecuting him for what they acknowledge were repeated and successive

§1001 violations, as well as the mail and wire fraud offenses. The defendant was entitled to

receive this information prior to trial and the government's intentional concealment of this

information undermines the integrity of the verdict in this case.[3]

     Second, pursuant to <u>Brady</u>, the government was obligated to disclose to the defendant

this exculpatory evidence—i.e., the government's belief that Paley lied to them on repeated

occasions during the four interview/proffer sessions. "Impeachment evidence as well as

exculpatory evidence falls within the <u>Brady</u> rule." <u>Ouimette</u>, 942 F.2d at 9; <u>see</u> <u>United States v. Drougas</u>, 748 F.2d 8, 23 (1st Cir.1984) ("Evidence relating to the impeachment of prosecution witnesses and immunity or other preferential treatment given to prosecution witnesses is deemed to be exculpatory within the meaning of the <u>Brady</u> rule."). The government's discovery obligations are not somehow absolved by merely providing the defendant with mountains of documents that contain isolated statements that undermine the credibility of the government's witness or casts doubt on the credibility of the witness and leaving it to the defendant to piece together what the prosecution already knows—i.e., pointing the defendant to the proverbial haystack and telling him to find the needle. <u>See United States v. Brotnovsky</u>, 820 F.2d 572, 575 (2d Cir.1988) ("[t]he government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged"); <u>United States v. Turkish</u>, 458 F.Supp. 874 (S.D.N.Y.1978), aff'd, 623 F.2d 769 (2d Cir.1980) (Rule 16 requires the government to allow defendants to inspect and copy all documents "which will be relied upon or referred to in any way by any witness called by the government during its case in chief"); <u>United States v. Poindexter</u>, 727 F.Supp. 1470 (D.D.C.1989); <u>United States v. Upton</u>, 856 F.Supp. 727 (E.D.N.Y.1994). The government has a constitutional obligation to provide the defendant with meaningful discovery, which at the very least encompasses an obligation to inform the defendant of its belief that one of its central witnesses has repeatedly lied to the prosecutor in charge of the investigation and prosecution. It is beyond reasonable dispute that this evidence

---

[3]. Obviously, the entire country was apprised of §1001 violations when Martha Stewart was indicted, prosecuted and convicted of lying to government agents. As such, Paley and the government clearly understood and appreciated Paley's successive and repeated §1001 violations.

was highly exculpatory and the government violated the defendant's constitutional rights to this exculpatory evidence by intentionally failing to produce this evidence.

Local Rule 116.2 defines exculpatory evidence as including "all information that is material and favorable to the accused because it tends to … cast doubt on the credibility or accuracy of any evidence that the government anticipates offering in its case-in-chief". See L.R.116.2(A).  Local Rule 116.2(B)(2)(a) specifically compels the government to provide the defendant with "[a]ny information that tends to cast doubt on the credibility or accuracy of any witness whom or evidence that the government anticipates calling or offering in its case-in-chief." Given the government's concession that it had concluded prior to trial that Paley lied to them on successive occasions, the government was obligated to provide the defendant with that information. Its failure to do so constitutes a blatant violation of the discovery obligations imposed upon the government by our constitution and our Local rules.

Third, and of particular import to the instant motion, the government's failure to notify the defendant of its belief that Paley lied to them on successive occasions also violated Local Rule 116.2(B)(2)(e), which demands that the government provide the defendant with "[a] written description of any prosecutable federal offense known by the government to have been committed by any witness whom the government anticipates calling in its case-in-chief." Obviously, Paley's repeated lies to the government constituted "prosecutable federal offenses" known by the government, and they should have been disclosed pursuant to Local Rule 116(B)(2)(e). Additionally, Local Rule 116.2(B)(2)(f) compels the government to provide a "written description of any conduct that may be admissible under Fed.R.Evid. 608(b) known by the government to have been committed by a witness whom the government anticipates calling in its case-in-chief." Once again, the government knowingly violated this

rule by intentionally concealing its knowledge that Paley lied to them during the successive

proffer sessions. Rule 608(b) clearly covers repeated instances wherein a government witness

has lied to the prosecutor and agents in charge of the pertinent investigation and prosecution.

> 2.    *The government's intentional violation of their discovery obligations allowed them to create a false impression that Paley was an innocent conduit of Carpenter's.*

The import of all of the foregoing is profound given the direct connection that exists

between the government's discovery violations in this case and its ability to create a false

impression of material fact that critically impaired the defendant's ability to present a cogent

and complete defense to the charges levied in this case. As argued to the Court in prior

pleadings, the government always provided the defendant with the impression that it believed

Paley to be an innocent conduit utilized by Carpenter to commit the charged offenses. For

example, the government's presentation to the grand jury rested on the premise that Paley was

not a culpable party in this case. A grand juror asked a specific question regarding Paley's

knowledge of the investment of clients' principal and AUSA Pineault intentionally provided

the grand jury with the impression that Paley did not have knowledge of the fact that the

defendant was investing the principal in the market. (Grand Jury Transcripts at 72-73).The

302 reports that detailed Paley's proffers made no mention of the government's belief that

Paley was lying to the government, but rather merely recounted Paley's denial of knowledge

until the end of December 2000. The government did not identify Paley as a co-conspirator

pursuant to Local Rule 116.1(C)(1)(e), which requires the government to identify the name of

any person asserted to be a known unindicted conspirator. The government never notified the

defendant or the Court that it intended to admit Paley's statements to third parties during trial

pursuant to Fed.R.Evid. 801(d)(2)(E). The government did not identify Paley as a criminally culpable party to the jury during its opening statement.

In addition to all of the foregoing, we now have the government's concession that it intentionally violated the discovery obligations imposed by L.R. 116.2(B)(2)(e) and (f), which allowed the government to further its goal of creating a false impression of fact in this case. Because the government never notified the defendant of its belief that Paley committed successive §1001 offenses, pursuant to L.R. 116.2(B)(2)(e), the defendant reasonably presumed that the government believed Paley when he denied knowledge of investments until the end of December 2000, and therefore reasonably formulated his defense strategy around the central tenet that Paley had deceived the government and the jury could therefore reasonably conclude that Paley deceived the defendant too. The defendant reasonably concluded that the government believed Paley in his denials to them—otherwise, the defendant would have received a written description of the §1001 offenses pursuant to L.R. 116.2(B)(2)(e). Likewise, the defendant was reasonably entitled to believe that the government believed Paley in his denials to them given that no notice of these lies (as 608(b) evidence) was provided to the defendant pursuant to L.R. 116.2(B)(2)(f).

The failure of the government to notice Paley's false statements pursuant to these local rules confirms the defendant's arguments throughout this trial that he was irreversibly prejudiced by the government's sudden and improper switching of theories at the end of the trial (arguing that Paley was simply a co-conspirator). It also definitively establishes that the government made specious arguments to this Court when it asserted that it never endorsed Paley as an innocent conduit of Carpenter's. Had the government not endorsed Paley as an innocent conduit, the government would have been required to provide the defendant with

notice of his lies to the government pursuant to both L.R. 116.2(B)(2)(e) and (f), as well as

disclose the promises and rewards of no §§1001, 1341 and 1343 prosecutions. The

government's failure to notice these lies pursuant to these discovery provisions expose as the

government's repeated arguments to this Court that they never endorsed Paley as an innocent

conduit as utterly disingenuous.

3. *The government's creation of a false impression of fact critically impaired the defendant's ability to defend the charges.*

Prosecutorial misconduct occurs "not only where the prosecution uses perjured

testimony to support its case, but also where it uses evidence which it knows creates a false

impression of a material fact." Hamric v. Bailey, 386 F.2d 390, 394 (4th Cir.1967); see United

States v. Boyd, 55 F.3d 239, 243 (7th Cir.1995); United States v. Iverson, 637 F.2d 799, 805

n.19 (D.C.Cir.1980); 5 Wayne R. LeFave, et al., Criminal Procedure 497 (1999). Here, to

simply provide the defendant with the 302 reports detailing Paley's denials to the government,

and never correcting or contesting those statements, and never notifying the defendant of its

belief that those denials were false, the government created a false impression that it believed

Paley's repeated and successive denials of his knowledge. The defendant reasonably and

justifiably relied upon this false impression in formulating his entire defense strategy in this

case. In his opening statement, the defendant promised the jury he would assume one

burden—prove that Paley deceived the government as he had deceived the defendant. Had the

defendant known the government believed that Paley lied to them on successive proffers, and

had the defendant known the government all along planned to argue that Paley was a culpable

party in this case, his defense strategy would have been radically altered.

First, the defendant would have notified the jury in his opening statement that the

government believed Paley committed the mail and wire fraud offenses charged in this case

but chose to provide him with a complete pass for this criminal conduct. Second, the defendant would have notified the jury in his opening statement that the government believed Paley committed at least four separate §1001 offenses but chose to provide him with a complete pass for that criminal conduct. Third, the defendant would have notified the jury that the government had denied in writing on several occasions any promises or rewards to Paley for his cooperation, yet promises and rewards in fact existed. Fourth, the defendant would not have assumed a burden of proving that Paley deceived the government too, given that the defendant and jury would have known that Paley did not deceive the government, but instead the government chose to ignore his multiple criminal offenses.

Most importantly, though, the defendant never would have staked his entire defense strategy on proving that the government had been deceived in this case when in fact they were not deceived by Paley. The defendant never would have implemented a defense strategy that revolved around Paley's credibility as a contested matter if the defendant knew what the government knew and believed—i.e., that Paley had lied to the government. In the end, the government was able to negate the entire defense in this case in literally a sentence or two of rebuttal argument, arguing to the jury that Paley was a culpable party too, thereby eviscerating the entire defense in this case in a dramatic and unfair change of direction. Given this misconduct, there is simply no principled basis upon which the verdict in this case should be allowed to stand.

    4.      *The government's misrepresentations regarding Paley's status significantly impaired the Court's ability to assess evidentiary objections and motions in limine.*

Surely, the Court would have assessed the admissibility of all of the prejudicial hearsay conversations by and between Paley and the exchangors in this case in a different

light had it known the government's true intention was to argue that Paley was a co-conspirator in this case. Prior to the government switching theories in this case, it asked each exchanger for his or her recollection regarding conversations with Paley. The defendant repeatedly objected to these conversations, the Court denied the objections and various motions *in limine* directed at these conversations, and instead provisionally allowed the conversations into evidence subject to the government later proving that they were authorized agent statements. In the end, however, Paley testified that Carpenter never authorized any statements inconsistent with the written agreements, the government argued that Paley was a co-conspirator, and the government abandoned any reliance on oral statements inconsistent with the written agreements. It was too late, however, as the jury already received the hearsay conversations.

Clearly, the government's failure to disclose to the Court that it believed Paley would commit perjury as a witness in this case and that he previously committed serial §1001 offenses undermined the Court's ability to properly assess the defendant's evidentiary objections, especially considering the Court's authority in this context to consider the declarant's reliability in admitting or excluding certain conversations. Indeed, it is simply outrageous that the government allowed the Court to address these evidentiary issues, which in part hinged on the Court's ability to assess the credibility of Paley, without disclosing the government's knowledge and belief that Paley committed the charged wire and mail fraud offenses and that Paley committed multiple §1001 offenses. In so doing, the government was able to have its cake and eat it too—it convinced the Court to provisionally admit the conversations based on (implit or explicit) representations that Paley was an innocent conduit in this case and later was able to argue to the jury that Paley was simply a co-conspirator.

The *only* connection between Mr. Carpenter and any oral representations made by Paley was Paley. Because the government created a false impression of fact that Paley was an innocent conduit, the Court was inhibited from properly evaluating the hearsay conversations proffered by the government as statements of Carpenter's agent or as Carpenter's adopted admissions. Surely the Court would have approached the evidentiary issues raised by the government's proffer of third party conversations by and between Paley and exchangors differently if the Court knew that the government believed that Paley lied to them on successive occasions and that Paley falsely denied knowledge that Mr. Carpenter was to invest clients' principal at his discretion in the stock market. This is yet another instance where prosecutorial misconduct in this case deprived the defendant of a fair trial.

Moreover, because of the specious arguments by the government that it never adopted Paley as an innocent conduit, the Court allowed the government to shift gears at the conclusion of the evidence and to argue for the first time that Paley was simply another culpable party that did not excuse the defendant's guilt. For example, AUSA Mitchell argued that "perhaps the government should have charged" Martin Paley, that if the jury believed that Martin Paley knew that Carpenter was investing "it puts him right in the soup with Dan Carpenter; it doesn't take Dan Carpenter out of the soup." Tr. 12:44-45. He further argued that "however wrong Marty Paley was, it doesn't make [Carpenter] any less culpable." Tr. 12:44-45. AUSA Pineault argued on rebuttal that "all that was established" by the defense in this case "was that Mr. Paley knew full well that these client monies were being invested … And so even if Mr. Paley bears some measure of responsibility for what happened here, so does Mr. Carpenter." Tr. 12:97. To provide the defendant with the false impression that the government believed Paley was an innocent, non-culpable party, and then to disingenuously

argue to the Court that it never took such a position in this case so that the government could

switch theories at the finish line of the trial, constitutes gross and inexcusable prosecutorial

misconduct.

> **C.    The government's failure to disclose Paley's perjury prior to trial, as well as the government's failure to voluntarily correct Paley's perjurious testimony, truly illustrate the improper government motive in this case— obtain conviction at all costs, even at the expense of justice and fair play.**

The foregoing section demonstrably illustrates that the prosecutors' conduct in this

case is severely problematic and troubling, but there are additional instances of government

misconduct in this case that provide relevant background and context to arguments made *infra*

regarding impermissible closing arguments by the government, as well as additional overall

support to the defendant's contention that the interests of justice warrant a new trial in this

case.

While the Court allowed the defendant to call the two FBI agents as witnesses (over

the government's objection), and therefore allowed the defendant to correct Paley's perjurious

testimony that he told the government that he knew as of September 1998 that Carpenter

would be investing BPE's clients' principal funds and therefore risking loss of those funds,

the government clearly failed to fulfill their constitutional and ethical responsibilities in this

case. First, given the government's belief that Paley's denial of knowledge of Carpenter's

investment of clients' principal until the end of December 2000 was false, the government had

an obligation to correct that perjury when Paley repeated that false denial in response to

defense counsel's initial questions on that subject matter. Once Paley perjured himself on the

witness stand by repeating these false denials, AUSA Pineault and AUSA Mitchell had an

affirmative constitutional and ethical obligation to correct the perjury, not wait to see whether

Paley would eventually correct his own perjury upon repeated questioning by defense counsel.

Likewise, when Paley committed perjury and testified that he told AUSA Pineault during his proffer sessions that he knew as of September 1998 that Carpenter would be investing clients' principal in the market, AUSA Pineault had a constitutional obligation to correct that perjury. See, e.g., Tr. 8:61 ("Q: So when you sat down with Mr. Pineault in December of 2001, in February of 2002, and January of 2004, you told Mr. Pineault that you knew your clients' funds, the principal, was being invested in the stock market before December 2000?  A: Yes."). While the Court ultimately allowed the defendant to correct Paley's perjury by allowing the defendant to call the two FBI agents as witnesses, over the government's incomprehensible objections, the prosecutors' conduct in these matters starkly illuminates the misguided goal in this case of winning at all costs, even at the expense of justice and fair play:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor—indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.

> Berger v. United States, 295 U.S. 78, 88 (1934).

The Ninth Circuit, in a recent decision, addressed a similar issue in Hayes v. Brown, 399 F.3d 972 (9th Cir. 2005) (en banc), granting habeas relief and holding that the prosecutor's knowing presentation of false evidence and failure to correct the record violated the defendant's due process rights.  In that case, which involved a defendant charged with first degree murder, the prosecutor reached an agreement before trial with a cooperating witness'

attorney to grant immunity to the witness ("James") for the killing and to dismiss other

pending unrelated felony charges in return for James's testimony against Hayes.  However,

the prosecutor wished to keep the promise to dismiss the felony charges away from the trial

judge and the jury.  Therefore, the prosecutor extracted a promise from James's attorney that

he would not tell James about the deal.  The idea was that James would be able to testify that

there was no deal in place, without perjuring himself, because James would not have personal

knowledge of the arrangement.

The Ninth Circuit found that: (1) before the Hayes trial, the State had made a deal with

James's attorney for the dismissal of the pending felony charges after his testimony; (2) the

State specifically represented to the trial judge that there was no such deal; (3) the State

elicited sworn testimony from James at trial that there was no such deal; and (4) the State

failed to correct the record at trial to reflect the truth.  As such, "[t]he State's actions violated

Hayes's constitutional rights first under [Napue v. Illinois, 360 U.S. 264 (1959)], by

presenting false evidence to the jury and, second, under [Alcorta v. Texas, 355 U.S. 28

(1957)] and [Pyle v. Kansas, 317 U.S. 213 (1942)], by failing to correct the record following

the presentation of false evidence."  Hayes, 399 F.3d at 980.

The State contended that there was no Napue violation because James did not commit

perjury (given that he was unaware of the deal).  The Ninth Circuit disagreed, noting that

Napue "addresses the presentation of false *evidence*, not just the subornation of perjury."  Id.

at 981 (emphasis in original).  The Court went on to hold that Alcorta and Pyle "create an

affirmative duty on the part of the prosecution to correct false testimony at trial, even when

the testimony is unsolicited."  Hayes, 399 F.3d at 981.  "Thus, the rule has been clear for

decades: a criminal defendant is denied due process of law when a prosecutor either

knowingly presents false evidence **or fails to correct the record to reflect the true facts when unsolicited false evidence is introduced at trial**." Id. at 984 (emphasis added).    In closing, the Ninth Circuit observed that "[o]ur criminal justice system depends on the integrity of the attorneys who present their cases to the jury.  When even a single conviction is obtained through perjurious or deceptive means, the entire foundation of our system of justice is weakened." Id. at 988.

While the facts of Hayes are different, the underlying legal principal applies equally to the case at bar. A criminal defendant is denied due process of law when a prosecutor "**fails to correct the record to reflect the true facts when unsolicited false evidence is introduced at trial**." Id. at 984 (emphasis added). Once Paley testified falsely—which he did when he initially denied on cross-examination knowledge that Carpenter would invest clients' principal in the market and later when he testified that he told AUSA Pineault that he knew as of September 1998 that Carpenter would be investing clients' principal in the market—AUSA Pineault and/or AUSA Mitchell had an affirmative duty to correct the record.  Their failure to do so not only violated Mr. Carpenter's due process rights, but it starkly illustrates the true goal of the prosecution in this case—obtain a "win" at all costs, even at the expense of justice and fair play.[4]

Additionally, it seems axiomatic that the government should never have proffered Paley as an impartial and competent witness given the government's belief that he lied to them on successive occasions, their belief that he falsely denied commission of the subject offenses, and the government's expectation that Paley would commit perjury (at the very

---

[4]. It is worth noting that Paley's attorney met with government prosecutors in July 2001 outside of Paley's presence, which prompted a facsimile from Paley to his attorney congratulating him on his success in that meeting. It is yet unknown what agreements, if any, were reached during that meeting by and between Paley's counsel and the government.

least) on cross-examination. Rule 3.3 of the Model Rules of Professional Conduct, which describes lawyers' responsibilities for candor toward the tribunal, specifically provides that a "lawyer shall not knowingly offer evidence that the lawyer knows to be false" and if a lawyer or a witness called by the lawyer "has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal." In this case, not only did AUSA Pineault present Paley as a witness in this case knowing and expecting that he would commit perjury, he fought defense counsel's efforts to expose Paley's perjury to the Court, when the government in fact believed his testimony was false and the government intentionally did not ask Paley certain questions because it believed it would receive false responses.

Clearly, the government should have notified the Court prior to trial of its belief that Paley had committed §1001 offenses prior to trial, that Paley had committed the charged mail and wire fraud offenses, and that government counsel expected Paley to repeat this perjury on the witness stand in this case. Having failed to do so, not only did the government inhibit the Court's ability to properly assess evidentiary objections and motions in limine, the government failed to fulfill its ethical mandate of candor to the tribunal. Trials are not games. It seems unconscionable that the government waited to determine whether defense counsel was able to uncover Paley's perjury before disclosing the government's true belief in this case—that Paley had been lying to the government all along and the government expected him to commit perjury in this case.[5] The ethical duty of the prosecutor is an extraordinary

---

[5]. It should also be noted that the government apparently engaged in serious misconduct before the grand jury, deliberately leading the grand jury to believe that Paley was an innocent conduit when the government in fact knew and/or believed that he was a culpable party. There were additional grand jury abuses that were the subject of the defendant's pretrial motions to dismiss. The defendant respectfully contends that the Court should consider these abuses in determining whether the interests of justice require a new trial in this case.

obligation which is supposed to exceed that imposed upon defense counsel. As the court

stated in United States v. Maccini:

> The United States Attorney is the representative not of an ordinary party to a
> controversy, but of a sovereignty whose obligation to govern impartially is as
> compelling as its obligation to govern at all; and whose interest, therefore, in a
> criminal prosecution is not that it shall win a case, but that justice shall be done … It is
> as much his duty to refrain from improper methods calculated to produce a conviction
> as it is to use every legitimate means to bring about a just one.

**D**.      **Government's closing and rebuttal arguments were improper and
prejudicial and alone warrant a new trial.**

In its closing and rebuttal arguments, the government engaged in prosecutorial

misconduct by violating the "Golden Rule" (by asking the jurors to place themselves in the

position of the exchangors), by arguing an "omission" theory of criminality (essentially for

the first time on rebuttal) not charged in the indictment, by personally attacking the credibility

of defense counsel, by denigrating Mr. Carpenter in a highly prejudicial manner, by inciting

the jury to decide the case on improper bases, and by arguing facts not admitted as evidence

and/or arguing evidence for purposes other than which it was admitted. The cumulative effect

of all of these abuses were highly prejudicial to Mr. Carpenter and deprived him of his Fifth

Amendment right to a fair trial, especially in light of the overall weakness of the

government's case.  See Donnelly v. DeChristoforo, 416 U.S. 637, 645 (1974) (improper

argument by prosecutor violates the Constitution if it renders a trial "so fundamentally unfair

as to deny [defendant] due process.").  Consequently, the Court should grant a new trial.

Improper prosecutorial remarks during closing argument and in rebuttal are grounds

for reversal "if they 'so poisoned the well' as to have likely affected the trial's outcome."

United States v. Mooney, 315 F.3d 54, 60 (1st Cir. 2002) (armed robbery). The First Circuit

has fashioned a three-prong test in making that determination.  "(1) whether the prosecutor's

conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit

cautionary instruction; and (3) whether it is likely that any prejudice surviving the judge's

instruction could have affected the outcome of the case."  United States v. Joyner, 191 F.3d

47, 54 (1st Cir. 1999) (cocaine distribution ring). The Court did not give *any* curative

instruction, although one was requested by defense counsel at sidebar after the government's

rebuttal.  Tr. 12:114-15.  See United States v. Johnson, 968 F.2d 768, 772 (8th Cir. 1992) ("In

light of the tenuous nature of the evidence and the lack of a curative instruction, . . . we cannot

declare that the error was harmless beyond a reasonable doubt") (reversing conviction and

remanding for new trial in drug distribution case due to improper prosecution remarks during

closing). As such, the remaining issues are whether the prosecutors' conduct was isolated

and/or deliberate, and whether the prejudicial arguments could have affected the outcome of

the trial.

First, a review of the arguments made by the government in this case compels the

conclusion that the prosecutors' conduct was not at all isolated, but deliberate and intentional.

In fact, the entire closing and rebuttal arguments are laced with the prosecutors' offending

statements.

First, in his rebuttal argument, AUSA Pineault violated the "Golden Rule" by asking

the jurors point-blank to put themselves "in the shoes" of the exchangors:

> Put yourself in the shoes of Byron Darling, in the shoes of Brian Fitzgerald, in the
> shoes of the other clients in this case.  Pretend you had been the person to receive
> those documents and ask yourself is there anything in here that would have put me on
> notice that my money could be taken by Mr. Carpenter and put in the options market
> and traded? Is there anything in here that would put me on notice that he'd been doing
> this for months, that he had lost millions of dollars? That my money would be at
> substantial risk of loss? Do you see anything in there that would have put you on
> notice? And I suggest to you the answer is going to be no. Unequivocally no.

Tr. 12:93.

Prosecutors are strictly forbidden from invoking the "Golden Rule," which seeks to place jurors in the shoes of the alleged victim.  "We have held that the 'golden rule' argument improperly encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence."  United States v. Moreno, 947 F.2d 7, 8 (1st Cir. 1991) (cocaine conspiracy).  See also United States v. Kirvan, 997 F.2d 963, 964 (1st Cir. 1993) (defendant "relies primarily on cases that forbid so-called 'golden rule' arguments in which plaintiffs or prosecutors ask the jury to put itself in the place of the victim.") (armed bank robbery).

Second, in rebuttal, AUSA Pineault repeatedly and improperly attacked the credibility of defense counsel. For example, AUSA Pineault argued that Carpenter's reliance on the word "invest" in the various exchange agreements was "an argument by a lawyer on behalf of a lawyer," clearly suggesting it was a contrived argument. Tr. 12:94. AUSA Pineault attacked defense counsel in arguing that the "core argument Mr. Goldstein would have you accept" and then attacking the argument, thereby attacking the credibility of defense counsel and asking the jury to personally disbelieve "Mr. Goldstein." Tr. 12:88.  Likewise, AUSA Pineault argued on rebuttal that "I disagree with Mr. Goldstein on the significance of [Mr. Carpenter's] communications with Mr. Patterson", he argued that "when Mr. Goldstein stands up and says disbelieve Linda Jokinen when she says I sent those to Mr. Carpenter because he needed to review and approve anything" that it is Mr. Goldstein who should be disbelieved, Tr. 12:90, he argued that "Mr. Goldstein says Mr. Carpenter was totally above board in all of that. He didn't try to hide anything" and then advised the jury that the evidence does not support defense counsel's position, Tr. 12:91, he argued "Mr. Goldstein points to the language in the exchange agreements, and he points to language in the escrow agreements. I ask that you take

a look at those. I ask that you read them in their entirety … What you'll see is these foam boards right here, they only partially excerpt the language. One of the conspicuous omissions is the language from the escrow," (in essence arguing that defense counsel was trying to trick the jurors), Tr. 12:92, and he argued that "Mr. Goldstein pressed [Marjorie Adams] pretty hard about the use of the word invest" and asked the jury to "recall the impassioned response that Marjorie Adams gave when she was grilled by Mr. Goldstein on that word", arguing in essence that Mr. Goldstein was a mean-spirited person who "grilled" and "pressed" the "impassioned" Marjorie Adams, Tr. 12:94.

In short, a large majority of AUSA Pineault's rebuttal argument was directed towards personally attacking the credibility of defense counsel. These types of *ad hominem* attacks on defense counsel are clearly impermissible and they seriously distort the trial process. Most importantly, they denied Mr. Carpenter a fair trial because they insinuate that Mr. Carpenter and his attorney essentially fabricated a defense theory and then tried to trick the jurors into focusing on irrelevant matters and empty rhetoric.  See United States v. Rodrigues, 159 F.3d 439, 449 (9th Cir. 1998), opinion amended on denial of reh'g, 170 F.3d 881 (9th Cir. 1999) (reversing bribery conviction where prosecutor argued in closing that defense counsel "has tried to deceive you"); United States v. Carter, 236 F.3d 777, 782 (6th Cir. 2001) (reversing armed bank robbery conviction and remanding for new trial because prosecutor argued during closing that defense counsel told "one tremendous colossal lie" and insinuated that counsel was "trying to sneak one over on the jury").

In United States v. Holmes, 413 F.3d 770, 775 (8th Cir.2005), the Eighth Circuit recently concluded that "various comments referring personally to [defense counsel] and the necessity for [defense counsel] to 'get his stories straight,' taken as a whole and in the context

of the rebuttal argument, show that the government attorney was accusing counsel of

conspiring with the defendant to fabricate testimony." The court noted that "[t]hese types of

statements are highly improper because they improperly encourage the jury to focus on the

conduct and role of [defense counsel] rather than on the evidence of [the defendant's] guilt."

Holmes, 413 F.3d at 775. The court ultimately reversed the convictions and remanded for a

new trial, noting that the government's case was not strong, witnesses offered by the

defendant were improperly excluded, the prosecutor's improper comments occurred during

rebuttal argument, and the comments were of a highly prejudicial nature. Holmes, 413 F.3d at

776-77.

Similar to Holmes, AUSA Pineault's improper and highly prejudicial attack on

defense counsel occurred during rebuttal argument, which the Eighth Circuit found

"particularly disturbing" because defense counsel is without opportunity to rebut the

allegations and the jury heard the remarks immediately before deliberating. Holmes, 413 F.3d

at 776. "Such personal, unsubstantiated attacks on the character and ethics of opposing

counsel have no place in the trial of any criminal or civil case", Holmes, 413 F.3d at 776, and

this improper and prejudicial argument alone warrants a new trial.

Additionally, though, in their closing argument and rebuttal argument, the government

improperly argued that the jury should convict based upon an omission theory of criminal

liability. For example, AUSA Pineault argued that the contracts provided no information from

which any exchangor or any juror could have concluded that his or her money would be

traded in the options market, Tr. 12:93, that none of the Merrill Lynch or PaineWebber

warnings were contained in the documents or disclosed to the exchangors, Tr. 12:94, that

there was nothing in the agreements "that says that these wild profits might be made on top

and we're going to pay you 3 percent and pocket the rest," Tr. 12:95, and that if Mr.

Carpenter had disclosed that he was trading in the options market "not a single one of [the

exchangors] would have given him their money", Tr.12:92.

By arguing vehemently in closing and on rebuttal that the jury should convict the

defendant based on an omission theory of liability, the government once again engaged in

improper argument. The Court instructed the jury only regarding the "use of half-truths or

incomplete statements that omitted material information necessary to keep what was stated

from being misleading". Tr. 12:11. Yet, the government argued that Mr. Carpenter should be

convicted because of blatant omissions, which simply is not a theory of criminality charged in

the indictment, as the defendant has previously argued and does so again in section "E" *infra*.

The government also improperly denigrated Mr. Carpenter in their closing argument.

For example, in his closing argument, AUSA Mitchell – while pointing directly at Mr.

Carpenter – argued that BPE "was rigged from the start." Tr. 12:36.  This highly prejudicial

and inflammatory accusation is based neither on facts in evidence nor even on allegations

contained in the indictment.  It also ignores the 119 successful exchanges and the tens of

millions of dollars repaid (with interest and tax benefits) to successful exchangors. It is

tantamount to calling Mr. Carpenter a "liar" or a "con man." Such insulting and abusive

rhetoric, engaged in solely to denigrate Mr. Carpenter in the eyes of the jury, also suggests

habitual criminal behavior of which there is no evidence.  Such base appeals to the jury's

passion and prejudice are widely disfavored – and with good reason.  See United States v.

Francis, 170 F.3d 546, 552 (6th Cir. 1999) (reversing father-son drug and money laundering

convictions and remanding for new trial where the "prosecutor called [father] a liar and con

man in her closing argument but without a reference to the evidence produced during the

trial"); United States v. Cannon, 88 F.3d 1495, 1502 (8th Cir. 1996) (reversing drug and firearms convictions and remanding for new trial because the prosecutor during rebuttal twice referred to defendants as "bad people").  "It is easier for a prosecutor, when giving a closing argument, to call the defendant  names and misstate the evidence than to come to grips with the real evidence and carefully rebut the defenses that have been presented.  But the latter is the job of an Assistant United States Attorney."  United States v. Brodie, 268 F. Supp.2d 420, 435 (E.D. Pa. 2003) (district court granting new trial motion after convictions for Cuban trading violations based on improper remarks by prosecutors during closing and rebuttal). "[T]he prosecutor's role as representative of the United States (the named plaintiff in every federal criminal prosecution) demands the exercise of far better restraint and better judgment than was exhibited here."  United States v. Weatherspoon, 406 F.3d 636, 643 (9th Cir. 2005) (reversing firearms conviction on plain error review and remanding for new trial due to prosecutor's improper vouching for witnesses and pleas to alleviate societal problems during closing and rebuttal).

The government also incited the jury to decide this case on improper bases, such as sympathy and compassion for the exchangors. For example, AUSA Mitchell gratuitously noted that Eliot Snider had "been in his family's lumber business for 50 years when he sought Benistar's help with the Massachusetts Lumber's largest property in Woburn (a fact not in evidence), Tr. at 12:20-21, that Joe Iantosca was "someone who earned every nickel since he arrived on these shores as a teenager from Italy, Joe Iantosca made his way through hard work and by valuing the promises of other people (facts not in evidence), Tr. 12:21, he asked the jury to "[r]emember Brian Fitzgerald, the gentleman in the wheelchair who testified about the sale of his family's car wash business (there was no evidence that the business was a "family"

business), Tr. 12:22, and he told the jury they should "remember Byron Darling, the elderly

gentleman from the Cape" and asked whether Benistar gave him any reason to think that he

might lose the proceeds of the sale of property "that had been in his family for decades"

(again, not in evidence), Tr. 12:27.  AUSA Mitchell then closed his argument by appealing to

the jurors' natural desire for somebody to repay the exchangors, which of course is an

improper and irrelevant issue in this case:

> And when it came to a crashing halt, the seven people you heard from were out nine
> million bucks . . . Ladies and gentlemen, <u>today is the day that Dan Carpenter pays up</u>.

Tr. 12:46 (emphasis added).

A prosecutor's closing argument should not be used to incite in jurors feelings of

anger or a desire to seek revenge, or to decide a case on passion or sympathy for the alleged

"victims".  Such appeals are condemned because they introduce into the decision-making

process irrelevant and irrational elements that prevent calm and dispassionate consideration of

the evidence.  <u>See</u> <u>Lesko v. Lehman</u>, 925 F.2d 1527, 1545 (3d Cir. 1979) (overturning death

penalty where prosecutor suggested that the jury "had a duty to even the score"); <u>Arrieta-</u>

<u>Agressot v. United States</u>, 3 F.3d 525, 527 (1st Cir. 1993) (reversing drug convictions because

prosecutor's remarks urged jury to view case "as a battle in the war on drugs, and the

defendants as enemy soldiers"); <u>United States v. Manning</u>, 23 F.3d 570, 572, 573 (1st Cir.

1994) (reversing drug trafficking convictions because prosecutor in closing argued "[t]ake

responsibility for your community" and "[c]onvict the Defendant because justice compels

conviction.").

Additionally, in their closing and rebuttal arguments, the government argued several

key facts that simply were not in evidence (in addition to those previously cited).  For

example, AUSA Mitchell argued that Dan Carpenter deceived Merrill Lynch and

PaineWebber by failing to disclose to them that the funds belonged to third parties:

> "Same deal with the brokers. He doesn't tell the brokers where the money's coming
> from. He tells them he's a high net worth individual who can afford to sustain the
> losses, that's it… No word that they---no word from him that he's trading other
> people's money."

Tr. 12:37. The Court specifically excluded from evidence any assertions or allegations that

Carpenter concealed the source of the funds from Merrill Lynch or PaineWebber, ruling that

Carpenter was not charged with deceiving either institution. Yet, AUSA Mitchell ignored the

Court's ruling and argued the concealment in any event, in an obvious effort to blunt the

defendant's compelling argument that he was open and transparent in his dealings with the

brokers.[6]

AUSA Mitchell also argued that the term "escrow" account "meant something very

specific" to the real estate professionals in this case, that they all "arrived at the same

conclusion" after reading the same documents, that they would get the money back and it was

not even "an after thought for them." Tr. 12:28. During the charge conference on the

afternoon before closing arguments, the defendant specifically objected to the government

arguing that the real estate professionals in this case all read the documents to prohibit

investing, thereby arguing that in those individuals collective experience and expertise the

contracts did not support the defense proffered in this case.  Tr. 11:53-54.[7] After extensive

argument, the Court deferred ruling upon the issue, though it noted that it did not appear

---

[6]. Indeed, the defendant could have conclusively proved that all brokers knew the source of the funds, if that was
an issue in this case. Lori Enright's personal notes of her conversation with Gary Stern confirm that they all
knew the source of the funds were third-party clients and that the defendant was an intermediary for real estate
transactions.

[7]. It is worth noting that at the charge conference AUSA Pineault actually argued that he "highly doubt[ed]" that
AUSA Mitchell would argue that Marjorie Adams opined on this escrow agreement and you ought to accept her
opinion", Tr. 11:59, but of course that is the exact argument Mr. Pineault made himself to the jury in his rebuttal
argument, as detailed *supra*.

relevant given that Mr. Carpenter did not have face to face meetings with the exchangors. Tr. 11: 57, 59. AUSA Mitchell then proceeded to make the objectionable argument without any prior notice to the Court or the defendant, despite the fact that the government knew the defendant objected to this argument and the Court had not yet ruled upon its legitimacy. Clearly, AUSA Mitchell should not have made this impermissible argument to the jury, especially without prior approval of the Court.

AUSA Mitchell also argued that "[d]uring the trial we highlighted the relevant passages of those promotional materials . . . Benistar says you must go with . . . someone who will take your money and hold it safely . . ." and that "[a]ll these materials as we've discussed emphasize stability, emphasize safety, the money will be returned." Tr. 12:22, 36. However, nowhere in any of the BPE promotional materials or written agreements do the words "safety" or "stability" appear.

AUSA Mitchell argued that "Patterson testified among other things that he expressed his concern to Dan Carpenter, that money -- that he was worried that the money would -- he wanted to know that the money would be safe with Benistar." Tr. 12:23. However, Patterson testified that his discussions with Mr. Carpenter concerned only the "gross negligence" and "law governing" provisions of the escrow agreement – safety was never mentioned.  Tr. 9:84-85. AUSA Mitchell argued that "most of the money, as you know, in this case went into the 3 percent column", Tr. 12:25, and that "most of the money was three percent money," Tr. 12:39. However, only two out of the seven exchangors listed in the indictment had funds earmarked for 3% and none were in the 3% Merrill Lynch "Ready Asset Money Market Account."  See Exs. 13, 29, 40, 53, 69, 89, 92, 97, 102, 107 and 126.

Only space limitations preclude further examples of the government's references in their closing and rebuttal arguments to key facts not in evidence. By referring to facts not in evidence, the prosecutors effectively assumed the role of an unsworn witness, lending the dignity and prestige of his office to the government's case. The natural result is that the evidence was misstated and the jury was misled. The Supreme Court has held it error for a prosecutor, during closing argument, to "indulge[] in an appeal wholly irrelevant to any facts or issues in the case." Viereck v. United States, 318 U.S. 236, 247 (1943) (reversing conviction of German agent's failure to register as an agent of foreign principals during WWII because the prosecutor argued: "This is war, harsh, cruel, murderous war.").

By going outside the evidence, the government "violated a fundamental rule, known to every lawyer, that argument is limited to the facts in evidence." United States ex rel. Shaw v. De Roberts, 755 F.2d 1279, 1281 (7th Cir. 1985) (affirming district court's granting of habeas petition in murder case). See also United States v. Wilson, 135 F.3d 291, 298 (4th Cir.), cert. denied, 523 U.S. 1143 (1998) (reversing drug trafficking conviction and remanding for new trial because "prosecutor asserted something as fact that had not been proved, and that was clearly improper"); United States v. Watson, 171 F.3d 695, 698 (D.C. Cir. 1999) (reversing cocaine distribution conviction and remanding for new trial because "[d]uring closing argument to the jury the prosecutor misstated a defense witness' testimony on a critical point"); United States v. Earle, 375 F.3d 1159, 1160 (D.C. Cir. 2004) (reversing drug and firearms conviction and remanding for new trial because "the prosecutor's remarks were based upon information he knew conflicted with the record.").

3.     _Improper gambling analogies and metaphors._

Both prosecutors repeatedly, in fact incessantly, employed improper, prejudicial and inflammatory gambling analogies and metaphors, employing terms such as "cash in chips", "double down", gambling with other people's money, etc. These analogies and metaphors are not only inflammatory, they are factually incorrect. Investing in the options market is not akin to gambling in a casino. The evidence admitted at trial established that the defendant spent hours per day on the phone with his broker carefully reviewing various potential stock positions, eventually winnowing 20 or so potential positions to approximately ten positions. There was no evidence that Mr. Carpenter was wildly and recklessly "gambling."

Moreover, the government never secured any opinion testimony that investing in options is _per se_ unreasonably risky or speculative, or that Mr. Carpenter's actual trades were unreasonably risky or speculative. Indeed, all of the brokers have previously testified that Mr. Carpenter's investment strategy was not irrational. These opinions were not solicited by the defendant because the Court excluded the opinions of the stock broker witnesses. Yet, of course, the government argued to the jury that Mr. Carpenter's trading strategy was in fact reckless and speculative, despite the fact that the Court excluded Mr. Allaire's expert opinions regarding stock options and the Merrill Lynch and PaineWebber brokers' statements regarding risk and volatility were received in evidence only for the limited purpose of their affect on the defendant's state of mind, not as facts or opinions. Clearly, the government employed these tactics to create an atmosphere that the defendant was knowingly reckless with other people's money and thereby provoke anger in the jury against the defendant. The prosecutors incessant employment of gambling metaphors and analogies was improper and prejudicial, their argument to the jury that the defendant's strategy was in fact risky and/or

speculative directly contravened the limited purpose for which the evidence was received, and these improper actions provide further support for the defendant's argument that a new trial is warranted in this case. As argued throughout this trial, it simply is not a crime to be "bullish" in America.

    4.    *Cumulative effect of improper arguments*.

The challenged statements by the prosecutors in closing and rebuttal, in light of the marginal evidence of Mr. Carpenter's guilt and the trial taken as a whole, clearly "could have" affected the outcome of the case, especially given the absence of any curative instruction in this case. A prosecutor's comment "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." United States v. Young, 470 U.S. 1, 18-19 (1985) (scheme to defraud oil refinery). "A prosecutor should not portray as fact matters that are not in evidence, he should not misstate the facts or the law, and he is not to express his personal belief that the defendant is guilty . . . And a prosecutor is not entitled to express his personal belief in the credibility of his witnesses." Id. at 418 (citations omitted). The failure of the prosecutors in this case to take heed to these guiding principles was highly prejudicial to Mr. Carpenter and deprived him of his Fifth Amendment right to a fair trial – especially given the weakness of the government's case and the lack of a curative instruction. Compare United States v. Kornegay, 410 F.3d 89, 97 (1st Cir. 2005) (finding no prejudice in prosecutor's closing given "the strong case presented by the government, the limited nature of the infraction, [and] the court's detailed curative instruction").[8]

---

[8]. It should also be noted that the government specifically advised that it wanted to admit the Merrill Lynch and PaineWebber account statements solely to show the money that was received and lost. In fact, when the government was seeking defense counsel's stipulation to these documents, defense counsel specifically noted that the government always has some underlying purpose when admitting stacks of documents and government

**E.    The Government Constructively Amended the Indictment or, Alternatively, Engaged in a Prejudicial Variance**

The government charged a "misrepresentation" case – *i.e.*, Mr. Carpenter caused affirmative misrepresentations to be made to the exchangors (indictment ¶¶ 103, 105) and then confronted Mr. Carpenter at trial (primarily in its rebuttal argument) with an "omissions" case – *i.e.*, the exchangors were not told that their funds would be invested in stock options. See, e.g., Tr. 12:92-93.  This constitutes a constructive amendment of the indictment at trial in violation of the Presentment Clause of the Fifth Amendment or, at the very least, is a prejudicial and material variance between the indictment and the proof at trial.  If the former, an acquittal should be entered.  If the latter, a new trial should be granted.

The indictment alleges that oral and written affirmative misrepresentations were made to the exchangors that the funds would be "safe."  Indictment ¶¶ 17, 27, 41, 101.  At trial, the government abandoned its claim that any *oral* statements inconsistent with the written agreements were made. (Tr. Charging Conf. at 45-46). Moreover, it became obvious early on that no affirmative misrepresentations were contained in the written materials provided by BPE to the exchangors, but they rather invited questions regarding security of the funds.  See, e.g., Exs. 1-6, 10-13.

In light of these failures of proof, the government shifted its focus to prove that Mr. Carpenter was responsible for material omissions of facts. The government sought to prove its "omissions" allegation by asking every exchangor at the end of direct examination substantially the same question as follows:

---

counsel advised it would never engage in such behavior. Then, of course, the government proceeded to use the account statements to argue during closing that 90 day treasury obligations noted in the account forms provided a return over 6%, directly contradicting the stated purpose of admitting the documents. The defendant would have cross-examined various witnesses differently had he known the true purpose of admitting the documents, including the fact that the 90 day treasury obligations did not provide the liquidity required of the 1031 exchange transactions.

> Q:    Did anyone at Benistar ever tell you that your money would be invested in stock options?
>
> A:    No.

Tr. 11:64 (Johnston).  See also Tr. 2:103 (Snider – "Were you ever told that you were going to be investing in stock options when you gave them the $3.2 million?"); Tr. 3:107 (Darling – "When you hired Benistar and gave them your money, did anyone from the company tell you at any time that they were going to use your money to trade in options?"); Tr. 3:132 (Fitzgerald – "And would you have sent your money to Benistar Property if you had known it was going to be used to trade in options?"); Tr. 4:52 (Adams (for Iantosca) – "At any point did Mr. Carpenter tell you that he invested the escrow money in stock options?"); Tr. 4:125 (Bellemore – "Did you know that you were investing in stock options when you hired Benistar?"); Tr. 11:44 (Cahaly – "Would you have given your money to Benistar Property if you had known it was going to be used to buy and sell options?").  Then, in rebuttal, AUSA Pineault asked the jury to consider whether any of the Exchangors would have given their money to BPE had they known it would be invested in stock options.  See Tr. 12:92 (AUSA Pineault: ". . . if he had told them . . . that he was going to be trading in options, not a single one of them would have given him their money.").

While the government's focus at trial was to prove that Mr. Carpenter omitted telling the exchangors that their funds would be invested in stock options, the indictment does not charge Mr. Carpenter with omissions – but with affirmative misrepresentations.  See indictment ¶¶ 103, 105.  In fact, the word "omissions" does not appear anywhere within the indictment as it relates to the wire and mail fraud offenses. The government has tried to cure the prejudicial defect in its prosecution by arguing that the indictment charges a failure to notify. This "failure to notify" language relied upon by the government, which appears in only

two paragraphs (¶¶41 and 49), does not magically convert a misrepresentation case into an omissions fraud. To charge an omissions fraud, at the very least, the charging paragraphs need to specifically allege a fraud based upon "material omissions." Moreover, to proceed on an omission theory of criminality, the government must first present evidence that there was a legal or contractual **duty** on the part of BPE (or Mr. Carpenter) to inform the exchangors *how* the funds would be invested in order to generate the 3% or 6% return. **Absent a duty to disclose, there can be no liability for omissions**. See United States v. Autuori, 212 F.3d 105, 119 (2d Cir. 2000) ("an omission can violate the fraud statute *only* in the context of a duty to disclose"); Kemp v. AT&T Corp., 393 F.3d 1354, 1359-60 (11th Cir. 2004) (omissions "constitute a violation of the mail and wire fraud statutes *where a defendant has a duty to disclose*") (mail and wire fraud in civil RICO case) (emphasis added).[9]

There is nothing in the Written Materials, or in the mandated arms'-length and non-fiduciary relationship between a § 1031 qualified intermediary and an exchangor, that creates an obligation or duty on the part of BPE (or Mr. Carpenter) to disclose how it expects to earn the 3% or 6%.[10] See United States v. Cassiere, 4 F.3d 1006, 1022 (1st Cir. 1993) (duty to disclose exists if there is "a general professional or a specific contractual duty to make such a disclosure"). Absent such a duty, the government can not proceed an omission theory of criminality and Mr. Carpenter certainly should not be convicted for omitting to inform the exchangors how he was investing the funds.

---

[9] No exchangor, including Marjorie Adams (one of Iantosca's attorneys), testified that he/she expected to be told *how* the funds would be invested in order to generate the 3% or 6% return.

[10] A qualified intermediary expressly *cannot* be an exchangor's "agent . . . employee, attorney, accountant, investment banker or broker, or real estate agent or broker" (*i.e.*, anyone acting in a fiduciary capacity). See 26 C.F.R. § 1.1031(k)-1(k).

The Presentment Clause provides that "[n]o person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. "An indictment has been constructively amended in violation of the Presentment Clause when the charging terms of the indictment are altered, **either literally or in effect**, by prosecution or court after the grand jury has last passed upon them." United States v. Fornia-Castillo, 408 F.3d 52, 66 (1st Cir. 2005) (emphasis added). "Constructive amendment is a *per se* violation of the Fifth Amendment." United States v. Milstein, 401 F.3d 53, 65 (2d Cir. 2005). "Any broadening of the possible bases for conviction from that which appeared in the indictment is fatal." United States v. Leichtman, 948 F.2d 370, 377 (7th Cir. 1991).

By charging that Mr. Carpenter made affirmative misrepresentations but then proffering evidence and arguing at trial that Mr. Carpenter is guilty simply because he did not inform the exchangors that their funds would be invested in stock options, the government has both literally and in effect constructively amended the indictment. Such an amendment is "fatal." Id.

If there has been no constructive amendment, there certainly has been a fatal variance of proof in this case. The difference between a constructive amendment and a prejudicial variance was explained by the First Circuit as follows:

> A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them. A variance occurs when the charging terms remain unchanged but when the facts proved at trial are different from those alleged in the indictment. Convictions may be reversed based on variance only upon a showing of prejudice to the defendant's substantial rights–that is, when lack of notice regarding the charges deprives the defendant of his ability to prepare an effective defense and to avoid surprise at trial.

United States v. Soto-Beniquez, 356 F.3d 1, 27 (1st Cir. 2003), cert. denied, 541 U.S. 1074 (2004). Here, the government's shifting facts and allegations at trial qualify under either standard. Mr. Carpenter had no notice until late in the trial that he was being charged with omissions. The government was able to surprise and "sandbag" the defense with this strategy, because all of Mr. Carpenter's defense tactics at trial were centered on challenging the alleged misrepresentations – not any possible omissions. Whether deemed a constructive amendment or a prejudicial variance, the government's shifting its facts and allegations from a "misrepresentation" case to an "omissions" case (primarily in its rebuttal argument) clearly prejudiced Mr. Carpenter's substantial rights to a fair trial.

"It is true that if an indictment makes a fact or manner of committing an offense material to that offense, **that** fact or manner must be proven, not a substantially different one." United States v. Baker, 227 F.3d 955, 961 (7th Cir. 2000), cert. denied, 531 U.S. 1151 (2001). See also United States v. Hartec Enterprises, Inc., 967 F.2d 130, 134 (5th Cir. 1992) (reversing conviction on one count of theft of government property, after district court entered judgment of acquittal on all remaining counts at close of government's case, because government "failed to introduce proof supporting a [specific] theory, and has thus waived this possible theory of liability.").[11]

An "omissions" theory of liability under the mail and wire fraud statutes necessarily incorporates a substantially different scenario than a "misrepresentations" theory, primarily because liability for "omissions" requires a duty to disclose. See United States v. Cianci, 378 F.3d 71, 94 (1st Cir. 2004) ("A variance arises when the proof at trial depicts a scenario that differs materially from the scenario limned in the indictment.") (citation omitted). Mr.

---

[11] The Fifth Circuit also agreed with the district court that "this is not the kind of case that ought to have been tried." Id.

Carpenter may not have told the exchangors many things, but so long as he was not *required* to tell them those things, he cannot be held liable under an "omissions" theory of mail and wire fraud. Conversely, regardless of whether or not Mr. Carpenter had a duty to disclose certain things, if he made affirmative misrepresentations to the exchangors, that creates an independent basis for liability.

Mr. Carpenter's entire defense was based on challenging the indictment's allegations that he made affirmative misrepresentations to the exchangors. The government should not have been allowed to shift theories of criminality during the trial, without the grand jury having passed upon an "omissions" theory of liability. As such, this Court should grant Mr. Carpenter a new trial.

**IV**.    **Conclusion**.

The government misrepresented to the Court this was a simple prosecution in an effort to convince the Court to deny the defendant's motion for a continuance of trial. As a result, the defendant did not have sufficient time to review all of the documents provided during the discovery phase of this case, he did not have sufficient time to review all of the computer files recovered by the defendant's computer expert that had been deleted by Paley, and defense counsel did not have sufficient time to master the intricacies of options market or read the texts written by the government's expert in this case. Indeed, to this day, the defendant does not yet know what additional exculpatory evidence is contained within these files.

In the end, the government converted its so-called "simple" case into a complex prosecution focused principally upon the defendant's alleged risky and unreasonable investment strategy, after previously arguing to the Court that profits and losses were irrelevant to the government's theory of proof. Indeed, the government's shifting theory

caused the Court to comment that it believed the government's case was more of a bright-line one and to inquire regarding the relevance of investment prudence. In the end, the defendant was irreparably prejudiced by more than two days of irrelevant and prejudicial testimony from the stock brokers that should have consumed no more than 30 minutes of the Court's time in this case. The government was able to argue an omission theory of liability in its closing and rebuttal arguments, despite the fact that an omission fraud is not charged in the indictment and the Court did not instruct the jury on an omission theory of liability. The government also intentionally violated numerous discovery obligations and, as direct result of those violations, convinced the defendant that it believed Paley was an innocent conduit in this case and therefore convinced the defendant to pursue a defense strategy focused on Paley having deceived the government. In the end, the government was able to wrongfully convince the Court it never adopted Paley as a non-culpable party and was therefore permitted to wrongfully argue in closing and in rebuttal that all the defense proved in this case was that Paley was a co-conspirator, which did not excuse the defendant's guilt in this case. In effect, totally eviscerating the principal defense in this case.

Finally, faced with the real prospect of an acquittal in this case, government counsel engaged in highly improper and prejudicial closing and rebuttal arguments, arguing facts not admitted into evidence, arguing facts for purposes for which they were not admitted, inviting the jury to decide the case upon sympathy and compassion for the elderly, disabled, hard-working, and honest "victims", personally attacking the credibility of defense counsel and the defendant, and adopting new theories of proof in their final and rebuttal arguments. As the First Circuit stated in United States v. Maccini:

> That despite our consistent warnings to the Government we should still be called upon to admonish against such conduct is reprehensible per se because it

constitutes a disregard to our directives. But additionally, it is particularly pernicious because it results in an unnecessary waste of judicial resources, both at the trial and appellate level, by diversion and attention to review of what by now should be understood to be totally unacceptable conduct by those who lay claim to representing the Government of the United States.

In short, the government has improperly and unfairly secured a guilty verdict in this case where a rational evaluation of the relevant evidence compelled an acquittal. Whatever the prosecutors' subjective motivation, the improper actions combined to severely and critically prejudice the defense in this case and, ultimately, to deny the defendant of his Fifth Amendment right to a fair trial. Colloquially speaking, the government engaged in repeated misconduct in a desperate attempt "to snatch victory from the jaws of defeat." There is simply no way to remedy the prejudice of this government misconduct but with a new trial, at which time the Court will be in a better position to assess the various evidentiary issues raised by this case. As the Court may recall, when the defendant objected to the prosecutorial misconduct in this case, the Court opined that "if a remedy is needed for anything, it's not for the jury to give it." Tr. 11:63. The defendant respectfully contends that a remedy is needed, it is for the Court to provide it, and the form of the remedy is a new trial.

WHEREFORE, for all of the foregoing reasons, Mr. Carpenter respectfully requests that this Honorable Court set aside the verdict and grant a new trial pursuant to Rule 33.

Respectfully submitted,

DANIEL E. CARPENTER,
By his attorneys,

**/s/ Robert M. Goldstein**
Robert M. Goldstein, Esq.
(BBO #630584)
20 Park Plaza, Suite 903
Boston, MA 02108
(617) 742-9015
rmg@goldstein-lawfirm.com

**/s/ Jack E. Robinson**
Jack E. Robinson
(BBO#559683)
2187 Atlantic Street
Stamford, CT 06902
(203) 425-4500
Robinsonesq@aol.com

Dated:  August 5, 2005