UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES OF AMERICA        )
                                )
      v.                        )        CRIMINAL NO. 04-10029-GAO
                                )
DANIEL E. CARPENTER             )
_____ )

### DEFENDANT'S MOTION FOR ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29(c)
### (Defendant's Post-Verdict Motion No. 1)

> The broad language of the mail and wire fraud statutes are both their blessing and their curse. They can address new forms of serious crime that fail to fall within more specific legislation . . . . On the other hand, they might be used to prosecute kinds of behavior that, albeit offensive to the morals or aesthetics of federal prosecutors, *cannot reasonably be expected by the instigators to form the basis of a federal felony*. The case at bar falls within the latter category.
>
> United States v. Czubinski, 106 F.3d 1069, 1079 (1st Cir. 1997) (emphasis added).

Defendant Daniel E. Carpenter, by and through undersigned counsel, respectfully moves this Honorable Court, pursuant to Fed. R. Crim. P. 29(c), to set aside the unsupported verdict in this case and enter an acquittal on all counts of the superseding indictment ("indictment").

There are three primary grounds upon which this Court should enter an acquittal. The first is that even though good faith is an **absolute defense** to mail and wire fraud, the government offered no evidence to *disprove* Mr. Carpenter's good faith belief that he had unfettered discretion to invest the funds in any investments he saw fit – including stock options. An acquittal is warranted because there is no evidence by which a reasonable and rational jury could find, beyond a reasonable doubt, that Mr. Carpenter did *not* act in good faith.[1]

---

[1] Mr. Carpenter's investment discretion was limited *only* by the available investments at Merrill Lynch or PaineWebber, not by the terms of any written contract between Benistar Property Exchange Trust Co., Inc. ("BPE") and the exchangors listed in the indictment (the "Exchangors").

The second ground for an acquittal is that the government constructively amended the indictment during trial in violation of the Presentment Clause of the Fifth Amendment. Instead of seeking to convict Mr. Carpenter for making *affirmative misrepresentations*, as charged in the indictment, the government sought to convict Mr. Carpenter based solely on *omissions – i.e.*, not informing the Exchangors that the funds would be invested in stock options. Additionally, the government offered no evidence that BPE or Mr. Carpenter had a *duty* to disclose how the funds were being invested. Absent a duty to disclose, there can be no liability for omissions.

The third ground for an acquittal is that there was insufficient evidence to prove beyond a reasonable doubt the necessary elements of mail and wire fraud as instructed by the Court.

Even "view[ing] the evidence and draw[ing] all inferences in the light most favorable to the verdict," United States v. McGauley, 279 F.3d 62, 66 (1st Cir. 2002), this verdict cannot stand. The jury was clearly blinded by the undisputed fact that $9 million was lost in stock option investments (which the government improperly referred to numerous times as "gambling") (see, e.g., Tr. 12:34), and was confused by the government's constantly-changing allegations of fraud as well as the government's reliance on mountains of prejudicial and irrelevant evidence regarding the characteristics of Mr. Carpenter's investment strategy. Aside from the fact that $9 million was lost (which the government admitted pre-trial was "irrelevant"), *there is insufficient evidence to support a conviction in this case*. Consequently, the Court should set aside the verdict and enter an acquittal as to the entire indictment.

## REQUEST FOR ORAL ARGUMENT

Mr. Carpenter respectfully requests oral argument on the within motion.

## LOCAL RULE 7.1(A)(2) STATEMENT

A good faith, but unsuccessful, attempt was made to narrow or resolve the issue with AUSA Mitchell.

# ARGUMENT

## I.     THE VERDICT SHOULD BE SET ASIDE AND AN ACQUITTAL ENTERED

### A.     Legal Standard

In considering a Rule 29 motion, the Court is to review "the totality of the evidence," "take a hard look at the record," and "reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." United States v. Czubinski, 106 F.3d 1069, 1073 (1st Cir. 1997) (reversing district court's denial of Rule 29 motion in wire fraud case). If the evidence, viewed in the light most favorable to the verdict, gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," the motion should be granted. United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995).

"The government must prove guilt beyond a reasonable doubt, reflecting the structuring of our criminal jurisprudence to avoid stigmatizing and taking away the liberty of an innocent person." United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986). The jury has convicted an innocent person of mail and wire fraud in this case on nothing more than the fact that $9 million was lost in stock option investments (which the government conceded was "irrelevant"). Thus, an innocent person has been convicted based on irrelevant evidence. See In re Winship, 397 U.S. 358, 363 (1970) (Harlan, J., concurring) ("it is far worse to convict an innocent man than to let a guilty man go free"). The Court can remedy this injustice by granting this Motion.

### B.     Mr. Carpenter's Good Faith Is An Absolute Defense

"[G]ood faith is an absolute defense to a charge of mail or wire fraud." United States v. Dockray, 943 F.2d 152, 155 (1st Cir. 1991). See also First Circuit Pattern Jury Instructions (Criminal Cases) at 87 (1998); United States v. Callipari, 368 F.3d 22, 33 (1st Cir. 2004) ("Good faith is a complete defense and it is the government's burden to disprove it beyond a reasonable

doubt."). Not only did the government fail to prove Mr. Carpenter's lack of good faith beyond a reasonable doubt, it offered no evidence at all regarding good faith.

Mr. Carpenter's primary defense was that he had a good faith belief that he had the legal, contractual, and regulatory authority to invest the funds in his unfettered discretion – including in stock options. Contrary to the government's contention, Mr. Carpenter's defense was *not* that he had a good faith belief his investments would ultimately be successful (although that was also the case). Rather, Mr. Carpenter's defense was predicated on the fact (of which this Court may take judicial notice ) that there is nothing in the statute governing § 1031 exchanges (26 U.S.C. § 1031) or the governing regulations (26 C.F.R. § 1.1031(k)-1) that limits how the qualified intermediary may invest the exchange proceeds. Any such limitations are left solely to the contract between the qualified intermediary and the exchangor, as the Court instructed the jury in this case.

The government offered no evidence to rebut Mr. Carpenter's defense of good faith with respect to his right to invest the funds as he saw fit. Not only is there no substantial evidence that the BPE exchange agreements and promotional materials provided to the  Exchangors (collectively, the "Written Materials") restrict Mr. Carpenter's investment discretion, but the language from the Nationwide documents in which the possible investments *were* limited (see, e.g., Ex. 390) was removed by BPE president Martin L. Paley ("Paley") and BPE-Newton employee Linda Jokinen ("Jokinen") when they created the BPE documents after their separation from Nationwide. See Tr. 3:69-70. In light of this evidence (or lack thereof), no reasonable and rational jury could have concluded that Mr. Carpenter did *not* act in good faith.

### C.  No Misrepresentations Contained in the Written Materials

The indictment charged that there were oral and written *affirmative misrepresentations* that the Exchangors' funds would be "safe." Indictment ¶¶ 17, 27, 41 and 101. At trial,

however, the government not only abandoned its allegation that *oral* misrepresentations were made, but the government also failed to prove that the Written Materials contained *any* affirmative misrepresentations that the funds would be "safe." Since no oral representations were relied on by the government at trial and since the Written Materials contain no representations that the funds would be "safe" (even Chuck Bellemore agreed that the word "safe" is nowhere to be found (Tr. 4:128)), there is no evidentiary basis upon which any reasonable and rational jury could have convicted Mr. Carpenter of these offenses.

As in Czubinski, the government pursued *at least* two allegations of fraud in this case: first, that Mr. Carpenter defrauded the Exchangors by inducing them "to wire funds to BPE based on material, false written and oral assurances that the money would be protected and held safe"; and second, "that BPE would not transfer the funds without the client's written authorization." Indictment ¶ 27. The evidence is insufficient to sustain a conviction under either allegation.

### 1.     "Safe"

At the charging conference, the government formally abandoned its theory that *oral* misrepresentations were made to induce the Exchangors to send funds to BPE. See Tr. Charging Conf. at 45-46. Without any oral misrepresentations, the government was limited to proving a scheme to defraud based *solely* on the Written Materials. However, *none* of the Written Materials contain *any* representations that the funds would be "safe." See Exs. 1-6, 10-13 (Snider); 24-27, 29 (Bellemore); 37, 40 (Cahaly); 51-53 (Darling); 59-63, 66-69 (Fitzgerald); 75-81, 84, 90-92, 95-97, 100-02, 105-07 (Iantosca); and 118-26 (Johnston). Furthermore, there is no credible evidence tying Mr. Carpenter to the Written Materials because Jokinen testified that the Written Materials "were modeled after the Nationwide documents" (Tr. 3:70), and were revised for BPE's use by herself and Paley. Id.

The only statement in any of the Written Materials regarding "safety" is contained in Paley's Powerpoint presentation, where it is **<u>suggested</u>** that potential clients "[a]sk about the security of your funds." <u>See</u> Exs. 1, 59, 75, 81, and 118 (all at slide #14). However, suggesting that potential clients *ask* about the "security" of their funds falls far short of *affirmatively representing* to them that the funds will be "safe." As a matter of law, such a suggestion is not a representation at all, let alone a misrepresentation. After alleging in the indictment that the Written Materials contain misrepresentations and after repeatedly going over the Written Materials in lengthy detail during the two-week trial, the government has utterly failed to show that the Written Materials contain *any* misrepresentations.

## 2.    <u>Transferring Funds Between Accounts</u>

The only other possible misrepresentation charged in the indictment involves Mr. Carpenter having regularly transferred funds between BPE's two accounts first at Merrill Lynch and then at PaineWebber, that such transfers were somehow contrary to the Written Materials, and were accomplished without the knowledge of the Exchangors. <u>See</u> indictment ¶¶ 40-41.

The evidence simply does not support such allegations. Gary Stern of Merrill Lynch testified that the "B01" and the "B10" accounts at Merrill Lynch were "linked together." Tr. 5:37. Similarly, Mitchell Rock of PaineWebber testified that the "33" and "34" accounts at PaineWebber "were viewed as one." Tr. 6:25. <u>See also</u> Tr. 5:128 (same). Rock further explained that one account was "where money flowed into and out of" and the other was simply an investment or "trading account." Tr. 6:25. Moreover, the PaineWebber accounts were set up just like the accounts at Merrill Lynch. Tr. 5:128. "[F]or margin purposes [both accounts] were cross collateralized so one was supporting the other and back and forth." Tr. 6:25. Thus, a scheme to defraud cannot result simply by regularly transferring funds between two accounts that each of the brokerage firms viewed as a linked, single, integrated account.

Furthermore, there is nothing in the Written Materials that promises there would be no transfers *between* BPE accounts – just unauthorized transfers *from* the BPE accounts. The BPE escrow agreement (¶ 3) states that "[o]nly upon the Exchangor's written direction and authorization shall the funds leave the BENISTAR account." Exs. 11, 29, 51, 67, 84, 91, 96, 101, 106, and 124. There is not a scintilla of evidence that a single dime from the BPE accounts "[left] the BENISTAR account" (since the two accounts were "viewed as one") except as the Written Materials provided, *i.e.*, either for the purchase of the replacement property or returned to the Exchangor. Even David Patterson, the attorney for BPE's first client (Jane Carey), fully understood that the funds would be transferred *between* BPE accounts (*i.e.*, from a BPE "primary account" to a BPE investment account). Tr. 9:105.

Because there were no misrepresentations in any of the Written Materials, no reasonable and rational jury could have found otherwise.

### D. The Government Constructively Amended the Indictment

The government charged a "misrepresentation" case – *i.e.*, Mr. Carpenter caused affirmative misrepresentations to be made to the Exchangors (Indictment ¶¶ 103, 105) and then confronted Mr. Carpenter at trial with an "omissions" case – *i.e.*, the Exchangors were not advised that their funds would be invested in stock options. This constitutes an impermissible, and fatal, constructive amendment of the indictment in violation of the Fifth Amendment.

The government sought to prove its "omissions" allegation by asking every Exchangor at the end of direct examination substantially the same question as follows:

> Q: Did anyone at Benistar ever tell you that your money would be invested in stock options?
>
> A: No.

Tr. 11:64 (Johnston). See also Tr. 2:103 (Snider – "Were you ever told that you were going to be investing in stock options when you gave them the $3.2 million?"); Tr. 3:107 (Darling – "When

you hired Benistar and gave them your money, did anyone from the company tell you at any time

that they were going to use your money to trade in options?"); Tr. 3:132 (Fitzgerald – "And

would you have sent your money to Benistar Property if you had known it was going to be used

to trade in options?"); Tr. 4:52 (Adams (for Iantosca) – "At any point did Mr. Carpenter tell you

that he invested the escrow money in stock options?"); Tr. 4:125 (Bellemore – "Did you know

that you were investing in stock options when you hired Benistar?"); Tr. 11:44 (Cahaly –

"Would you have given your money to Benistar Property if you had known it was going to be

used to buy and sell options?").  Then, in rebuttal, AUSA Pineault asked the jury to consider

whether any of the Exchangors would have given their money to BPE had they known it would

be invested in stock options.  See Tr. 12:92 (AUSA Pineault: ". . . if he had told them . . . that he

was going to be trading in options, not a single one of them would have given him their

money.").

   While the government's focus at trial was to prove that Mr. Carpenter omitted telling the

exchangors that their funds would be invested in stock options, the indictment does not charge

Mr. Carpenter with omissions – but with affirmative misrepresentations.  See indictment ¶¶ 103,

105.  **It is also important to note that Mr. Carpenter never met with or spoke to any of the**

**Exchangors when they were induced to give their money to BPE and the government**

**concedes that no oral misrepresentations were made – even by Paley**.

   The Presentment Clause of the Fifth Amendment provides that "[n]o person shall be held

to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a

Grand Jury."  U.S. Const. amend. V.  "An indictment has been constructively amended in

violation of the Presentment Clause when the charging terms of the indictment are altered, **either**

**literally or in effect**, by prosecution or court after the grand jury has last passed upon them."

United States v. Fornia-Castillo, 408 F.3d 52, 66 (1st Cir. 2005) (emphasis added).

"Constructive amendment is a *per se* violation of the Fifth Amendment."  United States v. Milstein, 401 F.3d 53, 65 (2d Cir. 2005).  "Any broadening of the possible bases for conviction from that which appeared in the indictment is fatal."  United States v. Leichtman, 948 F.2d 370, 377 (7th Cir. 1991).

By charging that Mr. Carpenter made affirmative misrepresentations but then proffering evidence and arguing at trial that Mr. Carpenter is guilty simply because he did not inform the Exchangors that their funds would be invested in stock options, the government has both literally and in effect constructively amended the indictment.  Such an amendment is "fatal."  Id.

Not only did the government constructively amend the indictment at trial, the government offered no evidence whatsoever that there was a legal or contractual **duty** on the part of BPE (or Mr. Carpenter) to inform the exchangors *how* the funds would be invested in order to generate the 3% or 6% return.  **Absent a duty to disclose, there can be no liability for omissions**.  See United States v. Autuori, 212 F.3d 105, 119 (2d Cir. 2000) ("an omission can violate the fraud statute *only* in the context of a duty to disclose"); Kemp v. AT&T Corp., 393 F.3d 1354, 1359-60 (11th Cir. 2004) (omissions "constitute a violation of the mail and wire fraud statutes *where a defendant has a duty to disclose*") (mail and wire fraud in civil RICO case) (emphasis added).[2]

There is nothing in the Written Materials, or in the mandated arm's length and non-fiduciary relationship between a § 1031 qualified intermediary and an exchangor, that creates an obligation or duty on the part of BPE (or Mr. Carpenter) to disclose how it expects to earn the 3% or 6%.[3]  See United States v. Cassiere, 4 F.3d 1006, 1022 (1st Cir. 1993) (duty to disclose

---

[2]  No exchangor, including Marjorie Adams (one of Iantosca's attorneys), testified that he/she expected to be told *how* the funds would be invested in order to generate the 3% or 6% return.

[3]  A qualified intermediary expressly *cannot* be an exchangor's "agent . . . employee, attorney, accountant, investment banker or broker, or real estate agent or broker" (*i.e.*, anyone acting in a fiduciary capacity).  See 26 C.F.R. § 1.1031(k)-1(k).

exists if there is "a general professional or a specific contractual duty to make such a disclosure"). Absent such a duty, Mr. Carpenter cannot be convicted for omitting to inform the exchangors how he was investing the funds.

###   E.   There Was Insufficient Evidence for a Conviction

In light of the insufficient evidence regarding (i) the existence of a scheme to defraud (as opposed to a mere breach of contract between BPE and the Exchangors); (ii) Mr. Carpenter's scienter (specific intent to deceive or cheat the Exchangors); and (iii) alleged misrepresentations in the Written Materials that do not even exist; the jury's verdict must necessarily have been based on a legally impermissible theory – *i.e.*, one not charged in the indictment or instructed by the Court. "Where a jury returns a general verdict that is potentially based on a theory that was legally impermissible or unconstitutional, the conviction cannot be sustained because jurors, as non-lawyers, cannot be expected to eliminate the legally impermissible option." United States v. Naghani, 361 F.3d 1255, 1261 (9th Cir. 2004) (quotations omitted).

###   1.   Different Scheme Charged

The Court instructed the jury that the government must prove the existence of a scheme substantially similar to that alleged in the indictment. "**In other words, the government may not charge one scheme and then prove another**." Tr. 12:10 (emphasis added). The scheme charged in the indictment was making affirmative misrepresentations. However, the scheme sought to be proved at trial was for omissions.

Given that the misrepresentations in the Written Materials that were charged in the indictment simply do not exist, the only possible basis on which the jury could have convicted was on omissions regarding the types of investments used to generate the 3% or 6% return. However, since the government offered no evidence regarding a duty to disclose, and never secured an indictment based on omissions, a conviction based on omissions cannot stand.

2.      **Scheme to Defraud**

Not only do the Written Materials lack any of the alleged misrepresentations charged in the indictment, there is not a single piece of documentary evidence suggesting that Mr. Carpenter drafted any of the Written Materials or did so as part of a scheme to defraud.

The only evidence that connects Mr. Carpenter to any BPE agreement with an exchangor, other than Paley's uncorroborated assertions, is testimony from David Patterson (the attorney for BPE's first exchange client, Jane Carey). Patterson discussed a version of the escrow agreement and the exchange agreement for the Carey transaction with Mr. Carpenter in October 1998.[4] Tr. 9:79. Patterson testified that Mr. Carpenter did not state in their conversation who actually drafted the agreements. Tr. 9:85. Patterson suggested changes to the agreements that were merely cosmetic or unrelated to the security of the exchange funds, such as changing the "law governing" provision from Connecticut to Massachusetts.[5] Id.

In the only discussion Patterson had with Mr. Carpenter regarding investing the funds, Mr. Carpenter only confirmed the client could choose 3% or 6%. Tr. 9:92. Mr. Carpenter did not tell Patterson anything inconsistent with what was in the agreements. Tr. 9:94. Because his client (Jane Carey) chose 6%, Patterson understood that the funds would have to be invested in order to generate such a return. Tr. 9:104. Patterson also understood that the "money would be deposited in one account at Merrill Lynch and then be moved to another account" to be invested. Tr. 9:104-05.

---

[4]  The agreements utilized in the Carey transaction in 1998 contain several differences from those subsequently used in 2000 with respect to the transactions involving the Exchangors. For example, one such difference is that Mr. Carpenter was a signatory to the Carey documents (see Ex. 142), but Paley was the signatory to all of the documents involving the Exchangors.

[5]  No reasonable and rational jury could infer that Mr. Carpenter, who according to Patterson "did not have a good understanding of how 1031 exchanges worked" (Tr. 9:101), would be responsible for drafting the documents at the core of the business.

Not only is there no evidence of a scheme to defraud, but the exact opposite must be concluded. Mr. Carpenter's dealings from the very beginning of BPE's existence with the attorney for BPE's first exchangor clearly show that there was no scheme to defraud. Patterson knew and understood that the funds would be moved between accounts and invested, and Mr. Carpenter said nothing that was inconsistent with what was contained in the agreements. That Mr. Carpenter successfully invested the funds in stock options in 1999 rather than losing money in other types of investments deemed "safe" by federal prosecutors seems to elude the government in its contentions. Perhaps that is because Mr. Carpenter was indicted for investing in stock options rather than investments the government deems to be more "prudent." As the Court observed, however, it "wouldn't make a difference" had Mr. Carpenter invested and lost all the funds in IBM stock (Tr. 4:150), Polaroid bonds or any other investment vehicle not "offensive to the morals or aesthetics of federal prosecutors," Czubinski, 106 F.3d at 1079, so long as Mr. Carpenter had the good faith belief that he had the legal, contractual, and regulatory authority to invest the funds at his discretion.

There is no evidence that Mr. Carpenter did or said anything that was contrary to the Written Materials. He did not misappropriate, embezzle or siphon off any funds – not one dime. To the contrary, in October 2000, Mr. Carpenter injected $2 million of his other company's money into BPE to try and replenish BPE's losses and stave off the failure of the business. Tr. 10:32. Jackie Spielman (Mr. Carpenter's former secretary) testified that, after BPE's collapse, Mr. Carpenter desired to pay back the other exchangors that BPE and Mr. Carpenter could afford to repay (Tr. 7:39), and Jokinen testified that Mr. Carpenter ultimately did so. Tr. 3:86. There is no evidence whatsoever that Mr. Carpenter intended to deceive or cheat anyone. No reasonable

and rational jury could find on the evidence in this case that Mr. Carpenter's actions, however

unsuccessful in terms of investing, rose to the level of a scheme to defraud.[6]

At bottom, there was no scheme to defraud here.  BPE was a real business that processed

119 successful exchanges in 1998, 1999 and through December 2000.  Tr. 10:33-34.  Over $100

million was invested and returned to successful exchangors with interest.  There was almost $40

million in taxes saved by the successful exchangors – including some of the Exchangors in this

case.  None of this was taken into account by the government in its investigation, presentation to

the grand jury, trial tactics, or closing and rebuttal arguments.  This case is merely an attempt by

the government to criminalize investment losses that resulted from standard (and legal) operating

business practices.  However, the Supreme Court takes an exceedingly dim view of such

governmental tactics.  See Arthur Andersen LLP v. United States, 125 S. Ct. 2129, 2136 (2005)

("We have traditionally exercised restraint in assessing the reach of a federal criminal statute,

both out of deference to the prerogatives of Congress, and out of concern that a fair warning

should be given to the world in language that the common world will understand, of what the law

intends to do if a certain line is passed") (quotations and citations omitted).

### 3.    Materiality

The Court instructed the jury that "**[a] statement or representation is 'material' if it is

one that has a natural tendency to influence or is capable of influencing a decision of the

person to whom it is addressed**."  Tr. 12:10 (emphasis added).  However, the government

offered no evidence that BPE had a duty to disclose how it would invest the money in order to

earn the 3% or the 6%, or that there were any discussions or writings about investments.  All of

---

[6]  Nor was there any evidence that Mr. Carpenter "devised" or "intended to devise" a scheme to defraud
from BPE's inception – as argued by AUSA Mitchell.  See Tr. 12:36 ("[BPE] was rigged from the
start.").  Paley's own notes from his first meeting with Mr. Carpenter in September 1998 clearly state that
Mr. Carpenter wanted "no involvement with 1031" (Ex. 300), and that all Mr. Carpenter wanted to do
was "handle the money from [his] office."  Id.

the Written Materials discuss the benefits of a 1031 property exchange, not how the funds were to be invested.

This fatal flaw goes directly to the government's charging a "misrepresentation" scheme but then seeking to prove an "omissions" scheme. Mr. Carpenter was likely found guilty simply because, as the government argued, he did not inform the Exchangors that the funds would be invested in stock options. However, unless Mr. Carpenter had a legal, contractual or regulatory *duty* to inform the Exchangors that he was investing in stock options, the verdict cannot stand.

The government will likely argue in response that the totality of the alleged affirmative representations are half-truths or incomplete statements used to mask the truth of how the funds would, in fact, be invested. However, half-truths and incomplete statements derive from *affirmative representations*, not omissions (which derive from silence). See *Black's Law Dictionary* at 1121 (8th ed. 1999) (defining "omission" as "[t]he act of leaving something out."). Nobody (other than Paley) discussed with Mr. Carpenter how the funds would be invested in order to generate the 3% or 6% return – not even Patterson. Thus, no reasonable and rational jury could have convicted Mr. Carpenter for remaining silent in response to questions that were never posed.

### 4.    Scienter

The Court instructed the jury that "**the government must prove that the defendant acted with the specific intent to defraud. This means the government must prove that the defendant acted with the specific intent to deceive or cheat for the purpose of obtaining money or property**." Tr. 12:11 (emphasis added). However, there was no evidence, not even from Patterson, that Mr. Carpenter said or did anything that was deceptive, false, fraudulent, or in contravention of the Written Materials. Even Paley testified that Mr. Carpenter did not

authorize Paley to tell the Exchangors anything contrary to what was contained in the Written

Materials:

> Q:    Dan Carpenter never authorized you to say anything other than what was in the
> written agreements, correct?

> A:    That's true.

Tr. 8:9.

The only plausible explanation for the jury to have found that Mr. Carpenter had the

requisite scienter to deceive or cheat was that, due to the government's shifting allegations of

fraud, it was unclear to which scheme Mr. Carpenter's scienter was supposed to relate.  If the

scheme was failing to tell the Exchangors that the funds would be invested in stock options (and

even at this late date Mr. Carpenter still lacks specific notice of the fraudulent scheme the jury

somehow found that he devised and in which he participated), then Mr. Carpenter's silence on

that issue might be relevant.  **However, that was not the scheme charged in the indictment**.

Rather, Mr. Carpenter was charged with making *affirmative misrepresentations*.  Thus, his

"silence" about options investments necessarily proves his innocence (because he made neither

representations nor misrepresentations and, in fact, did not communicate with any of the

Exchangors or their advisors) and no reasonable and rational jury could have found otherwise.

> **5.    Loss of Money**

The Court instructed the jury that "**simply proving that the exchangors lost money as a

consequence of the defendant's trading is not equivalent to proving that the defendant

committed the mail and wire fraud offenses alleged in the indictment**."  Tr. 12:14 (emphasis

added).  The thrust and focus of the government's entire case was that $9 million was lost as a

result of Mr. Carpenter's investment strategy.  The bulk of the government's witnesses,

testimony, exhibits and argument centered on the simple (and undisputed) fact that $9 million

was lost.

However, the government admitted pre-trial that whether Mr. Carpenter's investment strategy "subsequently resulted in gains or losses is irrelevant." See Gov. Br. dated Sep. 10, 2004 at 6 (Dkt. #29). See also United States v. Kattar, 840 F.2d 118, 130 (1st Cir. 1988) ("the federal government is a party-opponent of the defendant in criminal cases" and, therefore, is bound by admissions made in its pleadings pursuant to Fed. R. Evid. 801(d)(2)). The government's focus on the irrelevant evidence that $9 million was lost compellingly demonstrates the utter void of probative evidence regarding the charged scheme to defraud.

Losing the money through stock options investments may lead to an inability to repay the principal plus the 3% or 6% and, therefore, constitute a breach of contract by BPE, but losing the money in and of itself "will not sustain a finding of participation in a felonious criminal scheme to deprive the [Exchangors] of [their] property." Czubinski, 106 F.3d at 1076.

### 6. No § 1031 Investment Restrictions

The Court instructed the jury that "**for purposes of the tax code, there is no limitation on how the proceeds may be invested while they are held by the intermediary . . . . More generally, in the absence of a promise not to invest the proceeds in a certain way, no general statutory authority imposes limits on how they may be invested**." Tr. 12:15 (emphasis added). It is undisputed that there is no contractual provision in the Written Materials that limits (or even addresses) *how* the funds will be invested – other than to generate the 3% or 6%. Compare Ex. 390 (investment restrictions in the Nationwide agreements).[7]

---

[7] There were always two payout rates and two accounts, a deposit/transfer and an investment account. Although the Merrill Lynch Account Selection Form refers to a "(3% per Annum) Merrill Lynch Ready Asset Money Market Account," see Ex. 13, **none of the funds lost by the Exchangors were earmarked for 3% at Merrill Lynch**. See Ex. 13 (Snider/Mass Lumber, 6% at Merrill Lynch); Ex. 29 (Bellemore, 6% at Merrill Lynch); Ex. 40 (Cahaly at PaineWebber); Ex. 53 (Darling, 6% at Merrill Lynch); Ex. 69 (Fitzgerald/R&B Enterprises, 3% at PaineWebber); Ex. 89 (Iantosca, 6% at Merrill Lynch); Exs. 92, 97, 102 and 107 (Iantosca, 3% at PaineWebber); and Ex. 126 (Johnston, 6% at PaineWebber). **Thus, the government did not prove that the Exchangors were promised a 3% "money market account."** Also, only one-third of the lost funds ($3 million out of $9 million) was designated for a 3% return – contrary to AUSA Mitchell's closing argument that "[m]ost of the money went into 3 percent." Tr. 12:28.

Pursuant to Fed. R. Evid. 201, this Court may take judicial notice of the fact that neither the statute governing 1031 exchanges (26 U.S.C. § 1031) nor the governing regulations (26 C.F.R. § 1.1031(k)-1) impose any limits on how BPE could invest the funds. Moreover, there is nothing in the Written Materials imposing such restrictions. No reasonable and rational jury, in the face of this undisputed evidence, could have returned a guilty verdict.

### 7.     Breach of Contract Not Equivalent to Fraud

The Court instructed the jury that "**[a] breach of contract is not a crime. Nor is the failure to fulfill a contractual promise, without more, equivalent to fraud**." Tr. 12:16 (emphasis added). The only evidence that a reasonable and rational jury could have found in this case is that BPE lost $9 million by virtue of Mr. Carpenter's investment of the funds in stock options and, as a result, BPE breached its contracts with the Exchangors. However, as the *Second* Circuit has noted and as this Court instructed:

> A breach of contract does not amount to mail fraud. Failure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract. To infer fraudulent intent from mere nonperformance, therefore, would eviscerate the distinction between a breach of contract and fraud.

United States v. D'Amato, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994). See also United States v. Kreimer, 609 F.2d 126, 128 (5th Cir. 1980) ("**[T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract**") (emphasis added); Tr. 12:16.

No reasonable and rational jury could have found that a simple breach of contract by BPE was equivalent to the commission of mail and wire fraud by Mr. Carpenter.

### 8.     Imprudent or Risky Investment Strategy

The Court instructed the jury that **"it does not matter that - - or if having obtained custody of the exchangors' funds without fraud, the defendant pursued an imprudent, risky, or even reckless investment strategy**." Tr. 12:17 (emphasis added). Yet, all the jury

heard for two weeks was the government's continued drumbeat of evidence regarding how "risky" and "imprudent" Mr. Carpenter's investment strategy was in the year 2000; or that Mr. Carpenter was reckless enough to be "bullish" as the market was falling precipitously in late 2000 when the chief investment strategist at Merrill Lynch himself was bullish during the same period (see Tr: 7:101); or that Mr. Carpenter is guilty simply because the prosecutor said he was "trading on a bull strategy in the teeth of a bear market." Tr. 4:145.

While there was ample evidence from which the jury could find that Mr. Carpenter's investment strategy was aggressive in a volatile market, the characteristics of his investment strategy are irrelevant so long as the funds were not originally obtained by fraud. Since the government has failed to offer any evidence that the funds were, in fact, obtained pursuant to a fraudulent scheme with the requisite scienter, no reasonable and rational jury would have convicted but for its reliance on the mountain of irrelevant, inflammatory, and prejudicial evidence proffered by the government regarding Mr. Carpenter's investment strategy. There was no crime here, so it is legally impossible for a jury to find a crime where none exists.[8]

### F.     Summary

This verdict is seriously against the weight of the evidence, against the Court's instructions, and against the law. No reasonable and rational jury, on the evidence in this case, could have found the essential elements of mail and wire fraud beyond a reasonable doubt. Nor did the government disprove beyond a reasonable doubt Mr. Carpenter's good faith belief that he

---

[8]   Alliance Capital Management lost $300 million of Florida state employee pension fund money by buying Enron stock *after* the bad news about Enron broke in the Fall of 2001. The State sued Alliance for breach of contract and fraud. In April 2005, a Florida jury exonerated Alliance for its bad investment strategy. See N. Skene, *Politics and the Pension Fund: So Why, Again, Did the State Sue Alliance Capital?*, Florida Trend, June 2005. The chairman of Alliance was not charged with a crime, and certainly public pension fund assets are entitled to more "safety" than § 1031 property exchange funds.

had the legal, regulatory, and contractual authority to invest the funds at his discretion, which constitutes an absolute defense to mail and wire fraud.

The government's shifting allegations of fraud, whereby it charged a "misrepresentation" case and sought to prove an "omissions" case, constructively amended the indictment in violation of the Fifth Amendment. That the jury reached a unanimous verdict on 19 counts in a two-week trial on the same day that it began deliberations further supports the contention that the jury was hopelessly confused as a result of the government's shifting allegations of fraud and its introduction of mountains of cumulative, prejudicial and irrelevant evidence.

> The law is a causeway upon which, so long as he keeps to it, a citizen may walk safely. To be free of tyranny in a free country, the causeway's edges must be clearly marked. The exercise of federal government power to criminalize conduct and thereby to coerce and to deprive persons, by government action, of their liberty, reputation and property must be watched carefully in a country that values the liberties of its private citizens. *Never can we allow federal prosecutors to make up the law as they go along*.
>
> United States v. Brown, 79 F.3d 1550, 1562 (11th Cir. 1996) (emphasis added).

Here, the causeway's edges were not clearly marked. Nothing in the 1031 laws prohibited BPE from investing in stock options. Nothing in the Written Materials limited BPE's (or Mr. Carpenter's) investment discretion. Mr. Carpenter made no attempt to prevent an Exchangor from directly contacting Merrill Lynch or PaineWebber about the accounts. No Exchangor ever asked BPE or Mr. Carpenter *how* the funds were going to be invested. When the funds were lost, Mr. Carpenter called someone whom he had never met before (Mathew Kameron, another Iantosca attorney) and left a voicemail message informing him of, apologizing for, and accepting responsibility for the investment losses (which someone acting with criminal intent would *never* have done), and even expressed his concern that Iantosca not destroy his exchange due to being upset about the investment losses. See Ex. 114.

"Looking at the evidence in this case, our worry is that the criminal fraud statutes were used to convict [Mr. Carpenter] simply for [investing in stock options]."  <u>Brown</u>, 79 F.3d at 1562.  In retrospect, perhaps Mr. Carpenter should have been "bearish" in 2000 rather than "bullish," or should have invested the funds in U.S. Treasury obligations rather than in stock options (even though he would not have earned the requisite 6% because for most of the period 1998-2000, 90-day Treasuries were earning less than 6% and, in any event, would not have provided the necessary 3-day or 30-day liquidity mandated by the BPE agreements).  However, "the fraud statutes do not cover all behavior which strays from the ideal."  <u>Id.</u>

More importantly, had Mr. Carpenter been told at the September 11, 1998 meeting with Paley, when he told Paley about his lack of interest in the details of the 1031 business (Ex. 300), that being involved in the investing of 1031 exchange funds might lead to prison time, he would never have gotten involved with Paley in the first place, and he certainly would never have accepted the responsibility of investing the funds.

At the hearing on Mr. Carpenter's motion to dismiss the indictment held on September 21, 2004, the Court inquired of Professor Dershowitz "the time will come for a Rule 29 motion . . . Why isn't that a reason for deferring the final assessment of the viability of the government's theory until that time?"  9/21/04 Hrg. Tr. at 13.  Mr. Carpenter submits that the government's theory still is not viable and, in the interests of justice, beseeches this Honorable Court to put an end to his Kafkaesque nightmare, set aside the verdict, enter an acquittal on the entire indictment, and conditionally grant a new trial should the acquittal (for some unforeseen reason) be reversed on appeal.[9]

---

[9]  Mr. Carpenter has also filed on this date a timeous Rule 33 motion for a new trial.  Mr. Carpenter expressly incorporates herein by reference his three pre-verdict motions for acquittal pursuant to Rule 29 (Dkt. ##142, 143 and 146), his two pre-trial motions to dismiss the indictment (Dkt. ##13, 27), his trial motion to dismiss the indictment (Dkt. # 140), and his motion for mistrial (Dkt. #129).

Dated:  August 5, 2005

Respectfully submitted,

DANIEL E. CARPENTER,
By his attorneys,


**/s/ Robert M. Goldstein**
Robert M. Goldstein, Esq.
(BBO #630584)
20 Park Plaza, Suite 903
Boston, MA 02108
(617) 742-9015
rmg@goldstein-lawfirm.com


**/s/ Jack E. Robinson**
Jack E. Robinson
(BBO#559683)
2187 Atlantic Street
Stamford, CT 06902
(203) 425-4500
Robinsonesq@aol.com