UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 04-10029-GAO |
| ) | |
| DANIEL E. CARPENTER, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
TO SET ASIDE THE VERDICT AND GRANT A NEW TRIAL**

The United States opposes defendant Daniel E. Carpenter's ("Carpenter's") motion for a new trial. Each of the five arguments that Carpenter advances in support of his motion is without merit: (1) venue appropriately was decided by the Court, particularly since defendant's challenge to venue turned principally on questions of law not disputes over facts; (2) the government concealed no impeachment or exculpatory information relating to Martin Paley, as evidenced by defense counsel's exhaustive cross-examination of him, nor did it create a "false impression of material fact"; (3) to the extent Paley allegedly committed perjury on cross-examination, any untruthful testimony was fully exposed and "corrected"; (4) the government's closing and rebuttal fell within the bounds of appropriate argument; and (5) there was no constructive amendment to the indictment or prejudicial variance of proof. For all of these reasons, Carpenter's motion for a new trial should be denied.

ARGUMENT

I.   THE COURT APPROPRIATELY DECIDED VENUE

The First Circuit does not appear to have yet addressed when, if ever, a case might require that the issue of venue be submitted to the jury. Carpenter nonetheless asserts that this

Court erred in not, at a minimum, following the approach taken by the "majority" of circuit courts to consider the issue. Citing to United States v. Perez, 280 F.3d 318 (3rd Cir. 2002), which he characterizes as presenting the most "cogent" analysis of the majority view, Carpenter argues that venue in this case "clearly" had to be submitted to the jury. (Br. at 6-8). He is mistaken.

The Third Circuit stated explicitly in Perez that venue does not always present a question requiring determination by the jury. 280 F.3d at 330 ("venue does not automatically present a question for the jury"). It may instead present an issue appropriately decided by the court. The dispositive consideration is not, as Carpenter contends, whether the defendant has sought to place venue "in issue" (Br. at 6), but rather on whether resolution of the issue turns on questions of fact or questions of law. Under the holding of Perez, venue is not submitted to the jury unless the defendant establishes, inter alia, the existence of a genuine issue of material fact regarding venue. Absent such a disputed fact, venue is appropriately decided by the court. Perez, 280 F.3d at 330-35; see also United States v. Haire, 371 F.3d 833, 839-40 (D.C. Cir. 2004); United States v. Bascope-Zurita, 68 F.3d 1057, 1062 (8th Cir. 1995).

Here, Carpenter can point to no material, venue-related factual disputes. The evidence regarding the physical transmission of the wires and mailings charged in the indictment was uncontested. It consisted largely of testimony by third party witnesses from various banks and financial entities, who explained the circumstances of each wire transfer, including where and how each transfer was processed and transmitted. (Tr. 10:83 through 11:37). Other witnesses provided similar testimony concerning the charged mailings. (Tr. 3:10-12, 3:23-27, 7:14-15, 7:27-28, 7:131-34).

Carpenter mounted no fact-based challenge to the foregoing evidence. The wire and mail transmissions were clerical in nature, and the testimony pertaining to them was uncontested. Nor did Carpenter challenge the evidence concerning the locus of the other events alleged in the indictment. What happened, and where it happened, was never fundamentally in controversy. The heart of the case revolved around the presence (or absence) of criminal intent.

Consistent with the foregoing, Carpenter's challenge to venue was not premised on a dispute over facts. It was based on a disagreement over the governing legal standards – i.e., whether, given the uncontested facts concerning who did what and where, venue was proper in Massachusetts. For example, Carpenter asserted that, as a matter of law, venue over him could not lie in Massachusetts where his conduct consisted of trading in options and that trading took place in Connecticut and New York. See Defendant's Brief in Support of Supplemental Motion to Dismiss for Lack of Venue at 7-11 (Dkt. 28). This and other venue arguments made by Carpenter related to how broadly the Court should define venue, not to the accuracy of the underlying facts. As such, Carpenter's arguments raised questions of law, not fact, and the Court acted appropriately in deciding the matter itself. See Perez, 280 F.3d at 332 (court could rule as a matter of law on venue where "the necessary facts were established and only the legal question of how broadly we would define venue remained").

The Court rendered its venue decision orally from the bench and then memorialized it in a Memorandum dated July 27, 2005. (Dkt. 148). In its ruling, the Court determined that venue was appropriate in the District of Massachusetts pursuant to a standard that considered the nature of the crime alleged and the location of the acts and events relating to the fraudulent scheme. Applying this standard, the Court concluded that if the jury ultimately found Carpenter guilty –

3

i.e., if they determined that he had knowingly and willfully participated in the charged scheme – there was "no question" that Massachusetts was the locus of many of the events relating to that scheme.[1] (Memorandum at 2). In so ruling, the Court rejected Carpenter's argument that the venue standard should be restricted more narrowly to a "key verb" test that examined only whether the charged wire transmissions and mailings specifically originated or were received in the district of prosecution.

The First Circuit does not yet appear to have addressed the venue standard that the district court applied in the specific context of a mail/wire fraud prosecution, although, as this Court noted, the First Circuit "abjured reliance" on the 'key verb' test in United States v. Scott, 270 F.3d 30 (1st Cir. 2001). See also United States v. Salinas, 373 F.3d 161, 164 (1st Cir. 2004). In the event, however, that the court of appeals disagrees with the venue standard that the Court applied, the government requests that the Court issue a supplemental memorandum finding, in the alternative, that even under the narrower standard urged by Carpenter, venue was proper in Massachusetts based on the uncontested evidence regarding the transmission of the charged wires and mailings, which established that each wire and mailing originated in, passed through, or was received in this judicial district. See Tr. 10:83 through 11:37 (testimony regarding wire transfers charged in Counts 1-2 and 4-14); Tr. 3:10-12, 3:23-27, 7:14-15, 7:27-28, 7:131-34 (testimony regarding wire and mailings charged in Counts 3 and 15-19); United States v. Goldberg, 830 F.2d 459, 465 (3rd Cir. 1987) (when wire transfers pass through a Federal Reserve Bank in the district of prosecution, venue is proper in that district); United States v.

---

[1] This language appears consistent with the government's observation that Carpenter's venue challenge turned on disputes of law not of fact.

Pace, 314 F.3d 344, 349-50 (9th Cir. 2002) ("Venue is established in those locations where the wire transmission at issue originated, passed through, or was received, or from which it was 'orchestrated.'"); United States v. Kim, 246 F.3d 186 (2d Cir. 2001) (holding venue proper because payment-related wire communications were transmitted to and from a bank in the district of prosecution).

Because the facts pertaining to venue are not in dispute – only the breadth of the governing legal standard – such a decision may properly be rendered by the Court, for all of the reasons discussed above.

II. THE GOVERNMENT CONCEALED NO IMPEACHMENT OR EXCULPATORY EVIDENCE RELATING TO MARTIN PALEY

The United States fully produced to the defendant all discovery in its possession concerning Martin Paley, including all impeachment and exculpatory evidence. Carpenter advances no facts to support his argument to the contrary.

First, the government gave no promises, rewards, or inducements to Paley. (Tr. 9:57-58, 63-64). No assurances were made, no promises given, and no agreements entered. Id. To the extent Carpenter strives to contend that the absence of filed charges against an individual, standing alone and without any promise, assurance, or agreement, constitutes a "reward" within the meaning of the governing rules, he offers no support for that proposition. Moreover, even if that were true, the absence of such charges is a matter of public record and was known to defense counsel, who emphasized that fact in his cross-examination of Paley and in his closing argument. See, e.g., Tr. 9:55-56;12:85.

Second, all discovery materials relating to Paley, consisting primarily of documents, a computer hard drive, and prior statements by him, timely were produced to and/or made

available for inspection by the defendant. Defense counsel repeatedly has acknowledged that production. (Tr. 8:7, 24-25, 119).

Carpenter now contends that this was not enough. Specifically, he asserts that if the foregoing materials caused government counsel to formulate any opinions concerning Mr. Paley's credibility or veracity, the government was required to inform the defendant of those opinions in writing, either pursuant to Brady, Giglio, or the governing discovery rules. (Br. at 9-13).

No support exists for Carpenter's contentions. The government's discovery obligations extend to documents, objects, reports of examinations and tests, prior statements by witnesses, and related information/items in its possession. See Fed. R. Crim. P. 16(a); 18 U.S.C. § 3500; Local R. 116.1 and 116.2. No obligation exists for the government to disclose its counsels' mental impressions of those materials, including whether counsel thinks the materials might be used to call into question a witness's credibility.

That, however, is precisely what Carpenter is contending. He does not dispute that full production was made to him of all discovery relating to Paley. Nor does he dispute that his counsel effectively utilized that discovery to conduct a comprehensive cross-examination challenging Paley's credibility at trial. Instead, Carpenter asserts that if government counsel had formulated an opinion in his own mind that the discovery materials cast doubt on Paley's credibility regarding certain topics, the government was required to reduce that opinion to writing and produce it to defense counsel in advance of trial.

As the Court appears previously to have perceived (Tr. 9:23), Carpenter's contentions amount to an argument that Brady and Giglio require prosecutors to produce not simply

discovery materials but also their mental impressions of such materials. Defendant has cited no law in support of such a proposition, and the government is aware of none. Neither Brady nor Giglio nor any applicable discovery rule extends so far. Indeed, the text of Fed. R. Crim. P. 16(a)(2), titled "Information Not Subject to Disclosure," excludes from discovery precisely the types of materials most likely to contain such mental impressions, including "reports, memoranda, or other internal government documents made by an attorney for the government." See also Williamson v. Moore, 221 F.3d 1177, 1182-83 (11th Cir. 2000) (prosecutor's failure to disclose written notations of his mental impressions did not constitute Brady violation); Longworth v. Ozmint, 377 F.3d 437, 447 (4th Cir. 2004) (deputy sheriff's mental impressions concerning his interview of defendant did not constitute Brady material).

     Finally, even if Carpenter's legal contentions were correct – and they are not – no prejudice resulted. Defense counsel challenged Paley's credibility from the start of the trial (Tr. 2:47-48) to its finish (Tr. 12:47, 12:84-87), and he did so having received in discovery everything relevant to mounting an effective assault on Paley's veracity. Nor were there any "false impressions of material fact" created. The government did not stake its case on either the credibility or the non-culpability of Martin Paley. To the contrary, it informed the jury in its opening that much would be heard about Paley, that "not all of it will be kind," and that the government was calling Paley as a witness, "not because he comes out of this smelling like a rose but because he was there and has knowledge of certain relevant events." (Tr. 2:32).

     In sum, Carpenter's current claim that he would have fundamentally altered his theory of defense or his conduct of the trial had he obtained discovery of government counsel's mental impressions regarding Paley is meritless. (Br. at 14-17). Absent a reasonable probability that

the result of the trial would have been different – and none exists here – Carpenter's <u>Brady</u> and <u>Giglio</u> claims do not support his request for a new trial. E.g., <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999); <u>Conley v. United States</u>, 415 F.3d 183, 188-89 (1st Cir. 2005); <u>United States v. Dumas</u>, 207 F.3d 11, 16 (1st Cir. 2000) (impeachment information that is cumulative of other information already disclosed cannot give rise to a <u>Brady</u> violation); <u>Haire</u>, 371 F.3d at 841 (no showing that the allegedly withheld evidence raised "a reasonable probability of a different result").

III.    NO *NAPUE* VIOLATION OCCURRED

Carpenter's arguments under <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), are similarly deficient. (Br. at 20-24).

As a threshold matter, defendant does not rest his contentions on any testimony that the government affirmatively elicited from Paley during his direct or re-direct examination. Thus, this is not a situation, as in <u>Napue</u>, where the government, itself, is accused of having presented false evidence to the jury.

Nor is this a situation where: (a) unsolicited false evidence was presented at trial; (b) knowledge of the falsity rested within the province of the government; and (c) the falsity lay uncorrected while counsel sat silently by.

The core "falsehood" on which Carpenter bases his <u>Napue</u> arguments involves Paley's testimony on cross-examination regarding what he did and did not say to government investigators when interviewed concerning his knowledge of Carpenter's trading and the risk of loss. When asked these questions at the outset of his cross-examination, Paley repeatedly testified that he had told the government he had not known Carpenter was trading BPE's clients'

8

principal or putting the principal at risk of loss. (Tr. 8:19-24, 40). That testimony was fully consistent with the FBI 302 memoranda summarizing the government's pre-trial interviews of Paley. When pressed (multiple times) by defense counsel on the subject, however, Paley's responses began to display inconsistencies. Compare Tr. 8:40 (told government that did not know) with 8:44 (told government that did know) with Tr. 8:49 (did not know) with Tr. 8:51 (doesn't recall what was said).

The instant that Paley began to waver, Carpenter alleged perjury and contended, citing Napue, that government counsel was required to stand before the jury and personally inform it that Paley was a perjurer. (Tr. 8:44-45). Defendant now advances the same argument in support of his new trial motion. (Br. at 20-24).

Defendant's contention is deficient on at least two levels. First, any inconsistencies in Paley's responses regarding the subject of his interviews with government investigators did not rise to the level of "false evidence" within the meaning of Napue and its progeny, particularly given the consistency and truthfulness of the responses at the outset of Paley's cross-examination and the fact that the later inconsistencies arose only under the pressure of repeated questioning. A distinction exists between the typical impeachment of a witness through inconsistencies, on the one hand, and the existence of false evidence sufficient to trigger constitutional concerns on the other. Paley's testimony falls into the former category. To conclude otherwise risks creating a situation where defense counsel can seize upon every witness inconsistency as a predicate for triggering a Napue-based incident.

Second, even if Paley's later answers are construed as "false evidence" under Napue, they did not lie uncorrected. Defense counsel immediately (and exhaustively) exposed the

inconsistencies on cross-examination. In addition, the Court permitted Carpenter to introduce extrinsic evidence to clarify the record, in the form of two FBI agents whom the defense called as witnesses to testify concerning the government's interviews of Paley. (Tr. 11:84-97). Although the government expressed its view at trial that testimony by the FBI agents was unnecessary, the Court allowed it, thus further bolstering the record concerning what Paley had, in fact, told government investigators.

In light of the foregoing, Carpenter's attempt to analogize this case to Napue fails. No due process violation occurred, nor is a new trial warranted.

IV.   THE GOVERNMENT'S CLOSING AND REBUTTAL FELL WITHIN THE BOUNDS OF PROPER ARGUMENT

Carpenter's challenges to the government's closing and rebuttal fail as well.

As a threshold matter, the government notes that Carpenter's new trial motion seeks to challenge the government's closing and rebuttal on a host of grounds as to which he made no objection at trial. Carpenter asserted only a limited number of objections following the closings and rebuttal. (Tr. 12:114). He objected to any references to what he labeled the government's "omission theory of liability", he objected to statements regarding the riskiness of options trading, and he requested an additional jury instruction on "state of mind" because of references in the government's closing to testimony by certain real estate professionals. Id. That was all. Thus, it is incorrect for Carpenter to suggest in his brief that he requested curative instructions from the Court regarding each of the purported errors now raised in his post-trial memorandum, and that the Court declined to give "*any*." (Br. at 26) (emphasis in original). He did not. In view of Carpenter's failure to object to most of the "errors" that he now claims, he bears the burden of establishing plain error. Specifically, he must demonstrate that the alleged improprieties "so

10

poisoned the well that the trial's outcome was likely affected." United States v. Taylor, 54 F.3d 967, 977 (1st Cir. 1995) (internal quotations omitted). Carpenter has not met this burden with respect to any of the six categories of error that he alleges.

First, Carpenter's "Golden Rule" argument is inapposite. (Br. at 26-27). The "Golden Rule" precludes improper appeals to a jury's passions and prejudices. It is most frequently invoked in personal injury cases when plaintiff's counsel improperly urges the jurors to compute damages by putting themselves in the shoes of the plaintiff. E.g., Forrestal v. Magendantz, 848 F.2d 303, 309 (1st Cir. 1988). Courts have drawn a distinction, however, between improper appeals to a jury's emotions (which the Rule forbids) and appropriate requests that jurors put themselves in the position of a witness or defendant for the purpose of rationally assessing the evidence on a disputed issue (to which the Rule does not apply). United States v. Kornegay, 410 F.3d 89, 97 n.6 (1st Cir. 2005) (no error in prosecutor's suggestion that jury place itself in witness' shoes to evaluate the likelihood that witness had lied); United States v. Moreno, 947 F.2d 7, 8 (1st Cir. 1991) (prosecutor's suggestion to the jury "to put themselves in the place of the defendant" did not violate the "golden rule"); see also United States v. Kirvan, 997 F.2d 963, 964 (1st Cir. 1993) (suggestion that jury put itself in the place of an eyewitness did not violate the rule); McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1071 n.3 (11th Cir. 1996) (no "golden rule" violation); Pacheco v. Artuz, 2001 WL 1134864, at *11-12 (S.D.N.Y. 2001) (witness' "shoes": no error); Blount v. Keane, 1992 WL 210982, at *10 (E.D.N.Y. 1992) (defendant's "shoes": no error).

The latter situation is what occurred here. Per the Court's instructions, the jury was required to determine, among other things, whether the evidence established the existence of a

11

scheme to defraud or to obtain money or property by means of false or fraudulent pretenses. (Tr. 12:9). The jury was instructed that such a scheme could encompass direct false statements or statements of half-truths that are misleading because of what they omit; that they were required to determine whether any such statements were "material"; and that a statement is "material" if it is one that "has a natural tendency to influence or is capable of influencing a decision of the person to whom it is addressed." (Tr. 12:10). To make the foregoing determinations, it was appropriate for the jury to consider the circumstances of the BPE clients who received the representations and the nature of what they were and were not told – in short, to put themselves in the shoes of BPE's clients and apply their common sense.

      That was all that the government, in its rebuttal, asked the jury to do. The government specifically requested the jury to review, for itself, the language of the exchange documents because of defense counsel's focus on those documents in his own closing. Among other things, Mr. Goldstein emphasized the use of the words "held" and "invested" in the Exchange Agreement and the Escrow Agreement and argued that these terms demonstrated that the "actual agreement" between the parties was not a traditional escrow agreement, but rather one that contemplated and permitted the "investments" that Carpenter had made. (Tr. 12:67-69) ("Held and invested." . . . "Every written agreement talks about money being held and invested."). Mr. Goldstein sounded similar themes in his opening. (Tr. 2:42). Further, he characterized BPE's clients, the victims of the charged fraud, as "sophisticated business people" who knew "where their money is going" and "understood [it] would be invested." (Tr. 2:43, 46-47).

      In response to these arguments, the government asked the jury to review the exchange agreements and the escrow agreements and ask themselves whether they saw anything in either

document that provided notice that Carpenter could take the money and trade it in the options market. (Tr. 12:93).

Nothing about this request implicated or violated the "Golden Rule." Carpenter's arguments sought to persuade the jury that it should find no fraud because, among other reasons, the exchange documents adequately disclosed that clients funds were going to be "invested." The government's response, which requested that the jurors put themselves in the shoes of BPE's clients and read the documents for themselves, was not an appeal to the jury's sympathy but rather a suggestion that they apply their common sense in evaluating the evidence before them, including their determination of whether the statements in the documents constituted misrepresentations or half-truths that had a "natural tendency to influence or [were] capable of influencing a decision of the person to whom [they were] addressed." (Tr. 12:10).

To the extent Carpenter now argues that the government's comments were improper, he failed to object to them. In any event, the Court on its own initiative, as part of general instructions that it delivered immediately after the rebuttal, directed the jury that it must be "completely fair and impartial, swayed neither by prejudice nor sympathy, by any personal likes or dislikes toward any of the people involved in the case." (Tr. 12:101). If any curative instruction was needed, the Court effectively gave it. Forrestal, 848 F.2d at 309-10.

Second, contrary to Carpenter's contentions, the government's rebuttal contained no personal "attacks" on defense counsel. A rebuttal, by its nature, responds to arguments made by opposing counsel in his/her closing. The government did so here by referencing specific assertions and statements that Mr. Goldstein had made, and then summarizing the evidence that rebutted those assertions. Carpenter attempts, through a string of carefully crafted excerpts and

alleged paraphrases, to suggest that inappropriate argument occurred. (Br. at 27-28). Review of the actual transcript, however, makes clear the absence of any "attack" on defense counsel. (Tr. 12:87-100). Rather, the government attempted to marshal and present evidence that rebutted the principal assertions that defendant had made. If fault is to be found, it is in defense counsel's closing, which employed barbed rhetoric that unfortunately has only escalated in his current written submissions to the Court. See, e.g., Tr. 12:53 (government "falsely charged" the defendant); 63-64 (government's "attempt to manipulate" certain evidence was "utterly disingenuous" and "specious"); 68 ("government wants to lull you into this false premise"); 78 ("desperateness to convict"); 86 ("don't fall victim to the government's transparent argument"). The government refrained then, and continues to refrain now, from responding in kind.

    Third, it was wholly consistent with the indictment's charges and the evidence for the government to argue in rebuttal that the jury should consider not only what BPE's clients *were* told but also what they were *not* told. As discussed in more detail in Part V of this memorandum, *infra*, the indictment expressly alleged not only express false assurances and representations concerning the manner in which client funds would be treated and held (Indictment ¶¶ 17 - 24, 27 - 28)[2] but also that Carpenter failed to notify clients, or direct other BPE personnel to notify clients, that he was in fact using their escrow funds to engage in high risk, speculative options trading. (Indictment ¶ 41, 46, 49, 101). The government introduced evidence at trial establishing the full spectrum of this misconduct, including what clients were told and what they were not told about Carpenter's handling of their escrow funds. It was therefore appropriate for the government to reference these issues in its closing and its rebuttal.

---

[2] Citations are to the Superseding Indictment.

Fourth, the government engaged in no "improper denigration" of the defendant. (Br. at 30-31). Carpenter cites in support only a single sentence from the entire closing, in which the government characterized the BPE escrow accounts as having been "rigged from the start." (Tr. 12:36). The evidence introduced at trial supported this characterization. It established that Carpenter set up his first undisclosed options trading account at Merrill Lynch at the very beginning of BPE's existence. (Tr. 5:14-96, Gov. Exs. 144-48). Even absent such evidence, the single, isolated comment was de minimis in nature and insufficient to warrant a new trial.

Fifth, the government did not "incite" the jury to decide the case on improper bases. (Br. at 31). Again, Carpenter cites to only a handful of lines from the closing, most of which consist of short references by government counsel to the backgrounds of various BPE clients who testified. Id. Those backgrounds were relevant to the jury's assessment of certain disputed issues, including whether to accept Carpenter's contention that BPE's clients were "sophisticated business people" who gave their money knowing exactly what would happen to it. (Tr. 2:43, 46-47). No error occurred, much less any that would warrant a new trial.

Sixth, the government did not argue "key facts" that were unsupported by the evidence. Carpenter purports to set forth a list of such facts. (Br. at 31-37). Most do not qualify as "key." Moreover, substantially all of the challenged statements were, in fact, supported by record evidence, including the following items from Carpenter's list (as to which the government has furnished supporting transcript citations):

- Facts regarding Eliot Snider's company. (Tr. 2:54-55, 102-03) (50-year business, Woburn property was largest in terms of value.)

- Joe Iantosca's background. (Tr. 4:82-83) (emigrated from Italy at age 17; worked in various manual labor jobs until started own construction business)

15

- Brian Fitzgerald's family car wash business. (Tr. 3:110-11) ("with the help of my father, we bought [the Worcester car wash] and started working that")

- Carpenter's statements to brokers. (Tr. 5:123-24; 5:130-32; 6:29; Gov. Exs. 144A, 144B, 164A, 164B) ($10 million net worth; able to afford the loss; escrow box unchecked on account application forms)

- Assurances contained in BPE promotional materials re: security of funds. (Gov. Exs. 1, 2, 185) ("[BPE] has a long-standing reputation for trustworthiness."; "Escrow accounts are restricted to paying out funds only for a subsequent closing, or to return funds to the original property owner."; "[W]e protect your assets.")

- David Patterson's communications with Carpenter expressing concern for safety of funds. (Gov. Ex. 140) ("I fully expect to work out some acceptable arrangements to meet my client's concerns as to security of the escrowed funds as expressed in my letters of October 14 and 16 [Ex. 138] to Marty Paley (enclosed).")

- Substantial amount of escrow funds were designated to be held at 3%, not 6%. (Gov. Ex. 208) (itemizing 3% funds versus 6% funds)

Carpenter's remaining assertions are equally deficient. (Br. at 36). Substantial evidence demonstrated the speculative, high risk nature of defendant's options trading. Carpenter's brokers testified concerning repeated conversations in which they counseled him to moderate his aggressive trading strategies. (Tr. 5:22-31; 5:69-73; 6:26-30). Merrill Lynch broker Gerald Levine recounted one discussion in which Carpenter acknowledged that he had the mentality of a river boat gambler. (Tr. 5:72-73). The government introduced charts depicting the frequency, magnitude, and volatility of Carpenter's trading, and the substantial overall losses that he suffered. (Gov. Exs. 192-97). All of this evidence supported the assertion that Carpenter's trading was highly risky and speculative. It was directly relevant to Carpenter's state of mind, including his protestations that he had acted in "good faith." And the gambling metaphor originated with Carpenter himself.

For all of these reasons, Carpenter's assertions of error with respect to the government's

closing and rebuttal are unavailing. Evidentiary support existed for each of the government's principal arguments. To the extent inadvertent variances existed between the evidence and any government statements, they were immaterial and "benign." Taylor, 54 F.3d at 977.

V.    THERE WAS NO CONSTRUCTIVE AMENDMENT OR VARIANCE IN PROOF

Finally, no support exists for Carpenter's contentions that the indictment was constructively amended at trial or that a prejudicial variance in proof occurred. (Br. at 38-43).

A constructive amendment occurs when "the charging terms of the indictment are altered, either literally or in effect, by prosecution or Court after the grand jury has last passed upon them." United States v. Fisher, 3 F.3d 456, 462 (1st Cir. 1993) (internal quotations and citations omitted). A variance occurs when "the charging terms remain unchanged but when the facts proved at trial are different from those alleged in the indictment." Id. Neither happened here.

First, there was no constructive amendment to the indictment. The wire and mail fraud counts were framed in the language of the governing statutes and charged Carpenter with having devised a "scheme and artifice to defraud . . . by means of false and fraudulent pretenses, representations, and promises concerning material facts and matters . . . ." (Indictment ¶¶ 103, 105). Contrary to defendant's assertions, the statutory language is not limited to direct false statements – what Carpenter labels "affirmative misrepresentations." It also encompasses half-truths and the knowing concealment of material facts. E.g., United States v. Townley, 665 F.2d 579, 585 (5th Cir. 1982) (mail fraud statute is not limited to express misrepresentations; "it is just as unlawful to speak "half truths" or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading."); see also Pattern Criminal Jury Instructions for the District Courts of the First Circuit, Instruction No.

4.18.1341 (2003) (The term "false or fraudulent pretenses" includes "actual, direct false statements as well as half-truths and the knowing concealment of facts.").

In addition to its recitation of the general statutory language, the indictment made clear, through detailed factual allegations, the full scope of the false and deceptive conduct with which Carpenter was charged. Among other things, the indictment alleged that the exchange documentation and promotional materials utilized by BPE contained material, false assurances and representations concerning the manner in which client funds would be treated and held. See Indictment ¶¶ 17 - 24, 27 - 28. The indictment further alleged that Carpenter failed to notify clients, or direct other BPE personnel to notify clients, that he was, in fact, using their escrow funds to engage in high risk, speculative options trading, and sustaining heavy losses. See Indictment ¶ 41 (Carpenter "did not notify or direct BPE personnel to notify current or prospective clients that he was using client funds [to engage in high risk, speculative options trading]"); Indictment ¶¶ 31, 46 (failure to disclose existence of Merrill Lynch or PaineWebber trading accounts to clients); Indictment ¶ 49 (failure to disclose options trading or substantial losses to clients); Indictment ¶ 101 (same).

The foregoing allegations made plain that the fraudulent scheme charged in the indictment encompassed what the clients *were* told and also what they were *not* told regarding the manner in which their funds would be treated and held. These allegations were not amended or altered, by either the government or the Court, at trial. The government hewed to the allegations in its opening (Tr. 2:18-33) and in its closing. (Tr. 12:18-46). The Court's jury instructions tracked them as well. (Tr. 12:8-17).

Second, no prejudicial variance occurred between the indictment's allegations and the

proof that the government introduced at trial. The government introduced exhibits establishing each of the document-based representations and assurances charged in the indictment. See, e.g., Gov. Exs. 1, 2, 10-13. It also introduced testimony by clients concerning what they were not told about the handling of the BPE escrow funds (e.g., that Carpenter was trading and losing millions of dollars in high risk stock options). See Defendant's Brief at 39 (excerpting such testimony).

In light of the foregoing, it is insupportable for Carpenter to assert that he had no notice he was being charged with a scheme to defraud that encompassed both express misrepresentations and the failure to provide complete, truthful information. There was no "shifting" of theories by the government during trial. The indictment expressly pled the full scope of Carpenter's conduct (see above); the government's opening detailed the same allegations (Tr. 2:19-20); they have been part of the case since the beginning. No variance, much less any prejudicial variance, occurred.

## CONCLUSION

For all of the foregoing reasons, the United States requests that Carpenter's motion for a new trial be denied.

                        Respectfully submitted,

                        MICHAEL J. SULLIVAN
                        United States Attorney

By:

                        **  /s/ Michael J. Pineault**
                        Michael J. Pineault
                        Jonathan Mitchell
                        Assistant U.S. Attorneys
                        U.S. Courthouse, Suite 9200
                        1 Courthouse Way
                        Boston, MA 02210

Date: September 15, 2005