UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIMINAL NO. 04-10029-GAO |
| DANIEL E. CARPENTER, | ) ) | |
| Defendant. | ) ) | |

**GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION FOR ACQUITTAL**

The United States opposes defendant Daniel E. Carpenter's ("Carpenter's") Motion for Acquittal on three principal grounds. <u>First</u>, contrary to the arguments advanced by Carpenter, there was no constructive amendment to the indictment. <u>Second</u>, viewed in the light most favorable to the government and the verdict, <u>United States v. Callipari</u>, 368 F.3d 22, 43 (1st Cir. 2004), sufficient evidence existed for a rational jury to find beyond a reasonable doubt each of the essential elements of wire and mail fraud. <u>Third</u>, sufficient evidence likewise existed to support the jury's rejection of Carpenter's claim that he acted in good faith. For these reasons, Carpenter's motion for acquittal should be denied.

ARGUMENT

I.   <u>THERE WAS NO CONSTRUCTIVE AMENDMENT TO THE INDICTMENT</u>[1]

A constructive amendment occurs when "the charging terms of the indictment are altered, either literally or in effect, by prosecution or Court after the grand jury has last passed upon

---
[1] Carpenter advanced a virtually identical argument in Defendant's Motion to Set Aside the Verdict and Grant a New Trial. This section of the government's brief accordingly tracks the corresponding section from the government's opposition to Carpenter's new trial motion.

them." United States v. Fisher, 3 F.3d 456, 462 (1st Cir. 1993) (internal quotations and citations omitted). No such amendment occurred here, for the following reasons.

First, the indictment's wire and mail fraud counts were framed in the language of the governing statutes and charged Carpenter with having devised a "scheme and artifice to defraud . . . by means of false and fraudulent pretenses, representations, and promises concerning material facts and matters . . . ." (Indictment ¶¶ 103, 105). Contrary to defendant's assertions, the statutory language is not limited to direct false statements – what Carpenter labels "affirmative misrepresentations." It also encompasses half-truths and the knowing concealment of material facts. E.g., United States v. Townley, 665 F.2d 579, 585 (5th Cir. 1982) (mail fraud statute is not limited to express misrepresentations; "it is just as unlawful to speak "half truths" or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading."); see also Pattern Criminal Jury Instructions for the District Courts of the First Circuit, Instruction No. 4.18.1341 (2003) (The term "false or fraudulent pretenses" includes "actual, direct false statements as well as half-truths and the knowing concealment of facts.").

Second, in addition to its recitation of the general statutory language, the indictment made clear, through detailed factual allegations, the full scope of the false and deceptive conduct with which Carpenter was charged. Among other things, the indictment alleged that the exchange documentation and promotional materials utilized by BPE contained material, false assurances and representations concerning the manner in which client funds would be treated and held. See Indictment ¶¶ 17 - 24, 27 - 28. The indictment further alleged that Carpenter failed to notify clients, or direct other BPE personnel to notify clients, that he was, in fact, using

their escrow funds to engage in high risk, speculative options trading, and sustaining heavy losses. See Indictment ¶ 41 (Carpenter "did not notify or direct BPE personnel to notify current or prospective clients that he was using client funds [to engage in high risk, speculative options trading]"); Indictment ¶¶ 31, 46 (failure to disclose existence of Merrill Lynch or PaineWebber trading accounts to clients); Indictment ¶ 49 (failure to disclose options trading or substantial losses to clients); Indictment ¶ 101 (same).

The foregoing allegations made plain that the fraudulent scheme charged in the indictment encompassed what the clients *were* told and also what they were *not* told regarding the manner in which their funds would be treated and held. These allegations were not amended or altered, by either the government or the Court, at trial. The government hewed to the allegations in its opening (Tr. 2:18-33) and in its closing. (Tr. 12:18-46). The Court's jury instructions tracked them as well. (Tr. 12:8-17).

Third, the evidence introduced at trial was fully consistent with these charges. The government introduced exhibits establishing each of the document-based representations and assurances charged in the indictment. See, e.g., Gov. Exs. 1, 2, 10-13. It also introduced testimony by clients concerning what they were not told about the handling of the BPE escrow funds (e.g., that Carpenter was trading and losing millions of dollars in high risk stock options). See Defendant's Motion at 7-8 (excerpting such testimony).

In light of the foregoing, it is insupportable for Carpenter to assert that he had no notice he was being charged with a scheme to defraud that encompassed both express misrepresentations and the failure to provide complete, truthful information. There was no "shifting" of theories by the government during trial. The indictment expressly pled the full

scope of Carpenter's conduct (see above); the government's opening detailed the same allegations (Tr. 2:19-20); they have been part of the case since the beginning.

II.     SUFFICIENT EVIDENCE GROUNDED THE JURY'S FINDINGS OF GUILT

Viewed in the light most favorable to the government and the verdict, sufficient evidence existed for a rational jury to find beyond a reasonable doubt each of the essential elements of wire and mail fraud: (a) a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses; (b) Carpenter's knowing and willful participation in the scheme; and (c) the use of interstate wire communications or mailings in furtherance of the scheme. 18 U.S.C. §§ 1341, 1343.

Specifically, the government introduced evidence establishing that clients were induced to entrust substantial sums of money to BPE based on material, false representations that BPE was trustworthy, that the money would be held in escrow in the designated account into which the clients were instructed to transmit the funds, that BPE would not transfer the money out of the account without the client's written authorization, and that BPE would return the funds in full, either to be disbursed for the client's use in closing on the purchase of replacement property or to be returned to the client if no replacement property transaction was to occur. See, e.g., Gov. Exs. 1, 2, 10-13, 18 (BPE promotional materials and exchange documents); see also Tr. 2:65-98 (reviewing excerpts from the foregoing exhibits). Contrary to these representations, Carpenter misappropriated the money without his clients' knowledge or authorization;[2] used it to finance high risk options trading, the purpose of which was to achieve substantial financial gain

---

[2] All of the victims denied having been informed of, or having authorized, Carpenter's use of their funds to engage in options trading. See, e.g., Tr.11:64, 2:103, 3:107, 3:132, 4:52, 4:125, and 11:44.

4

for himself;[3] and, notwithstanding significant trading losses, continued to solicit, gamble with, and lose ever-increasing amounts of escrow funds – without disclosure to, knowledge of, or permission from BPE's clients -- until more than $9 million in escrow funds was gone.[4]  The evidence further established the use of both wire communications and mailings in connection with the scheme, specifically in regards to the transmission of client funds.[5]

      Carpenter's challenge to the sufficiency of the foregoing evidence is premised, at bottom, on a request that the Court discard the jury's verdict in favor of the defendant's competing view of events, and that it do so despite the existence of evidence that could – and did – lead a rational jury to come to a contrary conclusion.  For example, Carpenter denies there was evidence that he drafted any of the written materials that were provided to BPE's clients.  Both Linda Jokinen and Martin Paley testified, however, that the materials were transmitted to Carpenter for his review and comment.  See Tr. 2:134, 3:52, 7:115-19, 7:126-28.  David Patterson similarly testified that he received the exchange documents for his client's 1031 transaction, including the Escrow Agreement, from Janet May, Carpenter's administrative assistant, and that he subsequently discussed the documents with Carpenter, personally, on the telephone.  See Tr. 9:79-98.  Internal BPE documents further demonstrated the extent to which Carpenter exercised control over the

---

    [3] Carpenter's brokers at Merrill Lynch and PaineWebber, and government witness J. Marc Allaire, testified concerning defendant's options trading.  See, e.g., Tr. 5:22-31, 5:69-73, 6:26-30, 10:47-67.

    [4] Carpenter's trading losses were detailed in graphs and spreadsheets that the government introduced as exhibits at trial.  See, e.g., Gov. Exs. 196, 206, 209.

    [5]  See Tr. 10:83 through 11:37 (testimony regarding wire transfers charged in Counts 1-2 and 4-14); Tr. 3:10-12, 3:23-27, 7:14-15, 7:27-28, 7:131-34 (testimony regarding wire and mailings charged in Counts 3 and 15-19); Gov. Exs. 16-17, 29, 111,130, 226 (copies of mailings and chart itemizing wire transfers).

company's operations. See Gov. Ex. 179.

Carpenter likewise denies that his actions contravened any written representations or assurances that were made to BPE's clients. However, the evidence established that Carpenter took client escrow funds, transferred them into trading accounts without the clients' knowledge or authorization, and proceeded to lose millions of dollars in high risk options trading.[6] A rational jury could, and did, find such conduct to violate the representations and assurances that falsely induced BPE's clients to entrust their money to Carpenter's company, including written assurances that the money would be held in escrow in a designated short-term account, that BPE would not transfer the money without the client's written authorization, and that BPE would return the funds in full. This and other evidence furnished more than sufficient basis for the jury to conclude that Carpenter was not an "innocent" victim of a stock market downturn, or a businessman who had inadvertently breached a civil contract, but rather someone who had knowingly and willfully participated in a scheme to defraud.

III.  SUFFICIENT EVIDENCE SUPPORTS THE JURY'S REJECTION OF CARPENTER'S "GOOD FAITH" DEFENSE

For largely the same reasons, sufficient evidence existed to support the jury's rejection of Carpenter's defense that he acted in "good faith."

Carpenter grounded his defense primarily on a professed "good faith" belief that he had possessed unfettered discretion to "invest" BPE's client funds however he wished, no matter how speculative or risky the "investment." Although the jury could, theoretically, have accepted Carpenter's contention, his argument was undercut by a substantial amount of evidence. See

---

[6] See the record citations provided in notes 2-5, *supra*.

notes 2-5, *supra*. Among other deficiencies, the argument flew squarely in the face of the core purpose of 1031 exchanges, as communicated to BPE's clients and as embodied in all of the documents they received, which was to place real estate funds in a secure, short term escrow account so that they could be returned, in full, to purchase replacement property.

Given this countervailing evidence, it was within the jury's province to reject Carpenter's protestations of "good faith" and conclude, instead, that he had intentionally engaged in a scheme to defraud. Carpenter's disagreement with the jury's decision to arrive at the latter determination does not make it irrational. Nor does it constitute grounds to vacate the verdict and enter a judgment of acquittal.

In that regard, the government notes that multiple fact finders have now had occasion to render determinations concerning Carpenter's handling of BPE's client escrow funds, in connection with civil litigation, bar grievance proceedings, and, in this case, criminal charges that have all arisen out of the same events. Although the nature of the proceedings and the forums have been different, the outcomes bear mention as they relate to Carpenter's insistence that no reasonable, rational fact finder could reach the conclusions embodied by the jury's verdict here. Without exception, every fact finder who, to the government's knowledge, has considered the matter has rejected Carpenter's proffered defense and concluded that he engaged in fraudulent and/or deceptive acts:

1. A jury in Suffolk County rendered a civil verdict finding, inter alia, that Carpenter, individually, and others were liable for intentional misrepresentations to BPE clients. See Gail A. Cahaly, et als. v. Benistar Property Exchange Trust Co., Inc., Suffolk Superior Court No. 01-0116BLS2.

2.  The Superior Court judge in the same action issued a post-verdict memorandum doubling the jury's damage award pursuant to Mass. Gen. L. ch. 93A, based on the court's agreement with and adoption of the jury's findings.  In ruling that Carpenter's conduct was unfair and deceptive, the court found that "the evidence was clear that while Benistar Property was authorized to receive and take possession of the plaintiffs' funds, insofar as the funds were used to enable [Carpenter] to engage in highly risky, uncovered option trading this went beyond any grant of authority provided by the plaintiffs."  See Memorandum of Decision and Order on Plaintiffs' Claims Under G.L. c. 93A. (attached at Exhibit 1).

3.  Finally, in response to a complaint filed by Gail Cahaly, a three-member Connecticut Grievance Committee concluded after hearing that Carpenter, a member of the Connecticut Bar:

> violated Rule 8.4(3) of the Rules of Professional Conduct by investing and losing the Complainant's funds in the stock market through trading in options, which was in violation of the agreement to hold the Complainant's funds in an account yielding a 3 or 6% return.  Such conduct clearly involves dishonesty, fraud, deceit and misrepresentation.

In so ruling, the Committee rejected Carpenter's argument that the exchange documents provided him with the discretion to invest the client's funds as he saw fit.  See Decision of Statewide Grievance Committee, No. 02-0600, at 3 (attached at Exhibit 2).

In short, notwithstanding Carpenter's challenge to the rationality of the jury in this case, he has been found to have engaged in fraud and deceit by every fact finder who, to the government's knowledge, has considered the events at issue.

The jury, here, reached the same conclusion.  Ample evidence supported its verdict.

8

## CONCLUSION

For the foregoing reasons, the United States requests that Carpenter's motion for acquittal be denied.

                Respectfully submitted,

                MICHAEL J. SULLIVAN
                United States Attorney

By:

                **/s/ Michael J. Pineault**
                Michael J. Pineault
                Assistant U.S. Attorney
                U.S. Courthouse, Suite 9200
                1 Courthouse Way
                Boston, MA 02210

Date: September 15, 2005