## STATEWIDE GRIEVANCE COMMITTEE

Gail Cahaly, Complainant vs. Daniel E. Carpenter, Respondent

Grievance Complaint #02-0600

### DECISION

Pursuant to Practice Book §2-35, the undersigned, duly-appointed reviewing committee of the Statewide Grievance Committee, conducted a hearing at the Superior Court, One Court Street, Middletown, Connecticut on April 8, 2004. The hearing addressed the record of the complaint filed on December 18, 2002, and the probable cause determination filed by the Stamford/Norwalk Judicial District Grievance Panel on March 27, 2003, finding that there existed probable cause that the Respondent violated Rules 1.15(a) and (b) and 8.4(3) of the Rules of Professional Conduct.

A hearing was scheduled in this matter for July 10, 2003. Notice for that hearing was mailed to the Complainant and to the Respondent on May 29, 2003. The Complainant appeared at the hearing. The Respondent, represented by Attorneys Ralph Elliot and Richard S. Order, also appeared at the hearing. Counsel for the Respondent filed a Motion for Stay of Hearing dated June 27, 2003, based mainly on the fact that the Respondent would assert his fifth amendment privilege against self-incrimination given that a criminal investigation was ongoing. Argument was heard at the July 10, 2003 hearing, and the matter was taken under advisement. The reviewing committee of Carl Fortuna, Jr., Lorraine D. Eckert and Professor Paul Hawkshaw thereafter denied the motion by letter dated December 4, 2003.

Notice of the April 8, 2004 hearing was mailed to the Complainant and to the Respondent on January 20, 2004. The Complainant appeared at the hearing and gave testimony. The Respondent, represented by Attorneys Elliot and Order, appeared at the hearing. Attorney Elliot renewed the motion to stay the proceeding given his representation that the Respondent would assert his fifth amendment privilege against self-incrimination. The reviewing committee denied the request and the hearing went forward. The Respondent did not testify at the hearing. Ronald Cahaly testified on behalf of the Complainant. One exhibit was admitted into evidence.

The reviewing committee permitted the parties to file post-hearing briefs and set the following deadlines for the submission of such material: July 26, 2004 for briefs and August 9, 2004 for reply briefs. Counsel for the Respondent submitted a post-hearing brief on July 26, 2004. Although the Complainant did not submit a post-hearing brief, she did submit a reply brief on August 6, 2004. On August 12, 2004, a Motion for Leave to File Reply Brief was received from counsel for the Respondent, along with a reply brief dated August 12, 2004. On August 23, 2004, the reviewing committee granted the motion and considered the Respondent's reply brief.

This reviewing committee finds the following facts by clear and convincing evidence:

The Respondent was the chairman and secretary of Benistar Property Exchange Trust Company, Inc. (hereinafter Benistar). Martin Paley was the president of Benistar. Benistar acted as an intermediary for individuals and other entities purchasing replacement property to satisfy a "like-kind exchange" as regulated by 26 U.S.C. §1031 of the Internal Revenue Code, thereby taking advantage of tax benefits and deferring property tax obligations.

On November 8, 2000, the Complainant and Mr. Paley signed an Exchange Fee Agreement (hereinafter agreement), whereby the Complainant contracted with Benistar for it to hold funds on her behalf in relation to like-kind exchanges. According to the agreement, "Exchangor [the Complainant] and

Intermediary [Benistar] expressly agree that any cash proceeds received from the disposition of the relinquished property shall be held and invested at PaineWebber in the discretion and through financial institutions of Intermediary." However, the agreement also provided:

> Exchangor [the Complainant] and Intermediary [Benistar] expressly agree that any cash proceeds received from the disposition of the relinquished property shall be held and invested with PaineWebber in either a 3% per annum account or 6% per annum account. The 6% per annum account can not be liquidated without written thirty (30) days notice, whereas the 3% account can be liquidated by 72 hours written notice.

As an officer of Benistar, the Respondent managed the proceeds from the sale of properties that Benistar held until such time as its clients either directed the proceeds to be applied to the purchase of a new property or requested return of the proceeds. To accomplish this, the Respondent initially established several accounts with Merrill Lynch for Benistar, one was a money market account and the others were trading accounts. At some point, several of the Merrill Lynch accounts were transferred to PaineWebber, where a money market account and a trading account were opened for Benistar.

In November of 2000, the Complainant transferred $2,412,230 to Benistar to be held in accordance with the agreement. The Respondent used the Complainant's funds, as well as funds from other Benistar clients, to transact business on the stock market by trading in options, which are high risk investments. The Respondent, however, did not represent the Complainant and did not provide her with any legal services or advice. At the Complainant's request, Benistar returned $500,000 in November of 2000 and $920,000 in January of 2001 to complete like-kind exchanges. However, Benistar could not return the balance of the Complainant's funds, totaling $992,230, given that the Respondent lost approximately $9 million of the clients' money in the stock market.

The Complainant and other Benistar clients were successful in receiving a $9 million jury verdict in Massachusetts against the Respondent and other defendants for breach of fiduciary duty, conversion and misrepresentation. In that matter, counsel for the Respondent filed a motion for a new trial, which was still pending at the time of the hearing in this matter. The Respondent subsequently was indicted in Massachusetts.

This reviewing committee also considered the following:

In her grievance complaint, the Complainant alleged that she delivered money to Benistar to be held in escrow. She maintained that the Respondent participated in a scheme to "swindle" real estate investors, including her, and to use their money without their knowledge to transact business on the stock market. In an additional submission, the Complainant alleged that the Respondent took the profits generated by the option trading for himself, and that he admitted to her husband that he used the investors' funds to invest in the stock market instead of holding them in escrow.

The Complainant admitted that she spoke with Mr. Paley before signing the Exchange Fee Agreement, not the Respondent. She testified that the Respondent did not represent her and her husband, Ronald Cahaly, in any legal capacity; rather, she claimed that the Respondent acted as their escrow agent. The Complainant maintained that she and her husband gave funds to the Respondent to be held in a money market account in relation to a real estate exchange and that he was to release the funds when they requested such in writing. She testified that the first disbursement check issued to her was from a money market account. In addressing the language from the agreement, the Complainant explained that a money market account was an investment account and that although she knew PaineWebber was a stock brokerage firm, she also knew that PaineWebber performed other financial services. Finally, the

Complainant stressed that she expected that Benistar would invest her money in a money market account at PaineWebber.

Mr. Cahaly testified that the Respondent did not act as an attorney for the benefit of his wife and himself. He explained that he and his wife felt that Benistar's duties and obligations were to hold their money for their benefit, and only for their benefit, until such time as they needed the funds to complete the real estate exchange. He further testified that their understanding was that their funds were going to be held in a money market account at PaineWebber and that it was not their intention that the Respondent would invest their funds in the stock market. Mr. Cahaly also explained that in January of 2001, the Respondent and Mr. Paley came to his office and that the Respondent explained that he invested the funds in the stock market, that the market sank, that the funds were gone and that PaineWebber had swept Benistar's accounts. Mr. Cahaly testified that that was the first time he had ever met the Respondent. Finally, Mr. Cahaly testified that the Respondent requested that Mr. Cahaly lend him money in an attempt to recover the lost funds.

At a deposition in connection with the Massachusetts civil litigation, Mitchell S. Rock, a broker at PaineWebber, testified that he spoke with the Respondent on January 3, 2001 and that the Respondent admitted that the funds in the Benistar accounts were his clients' funds. Mr. Rock further testified that the Respondent stated that he informed his clients that he lost their money and that he requested additional time to repay them. According to Mr. Rock, the Respondent explained that he attempted to do the "noble" thing, but that his clients were very upset and were being unreasonable. Finally, Mr. Rock testified that the Respondent stated that his clients could either work with him and give him more time to get their money back, or he would place Benistar in bankruptcy and they would never get their money back.

This reviewing committee finds the following violation of the Rules of Professional Conduct by clear and convincing evidence:

The Respondent violated Rule 8.4(3) of the Rules of Professional Conduct by investing and losing the Complainant's funds in the stock market through trading in options, which was in violation of the agreement to hold the Complainant's funds in an account yielding a 3 or 6% return. Such conduct clearly involves dishonesty, fraud, deceit and misrepresentation. Although the Respondent was not a signatory to the agreement and had no dealings with the Complainant before she signed the agreement, the Respondent was an officer of Benistar and was bound by the terms of the agreement when he acted in this capacity. Counsel for the Respondent made no claim that Mr. Paley was not authorized to execute the agreement on behalf of Benistar or that the Respondent repudiated the terms of the agreement. Therefore, we find that the Respondent ratified or adopted the terms of the agreement when he acted pursuant to that agreement as an officer of Benistar and undertook to manage the Complainant's funds. The Complainant clearly believed that her funds would be held in an account yielding a 3 to 6% return and, based on this belief, she transferred her funds to Benistar. Moreover, neither the Respondent nor the agreement disclosed to the Complainant the true extent of the risk involved with the Respondent's investment of the Complainant's funds to trade in the options market. We are unconvinced by the argument put forth by counsel on behalf of the Respondent that under the terms of the agreement, the Respondent had the discretion to invest the Complainant's funds as he saw fit. This argument is flawed as it completely ignores the express language in the agreement dictating that the Complainant's funds were to be held in an account yielding a 3 to 6% return. We find that the agreement clearly envisioned a low-risk investment for the Complainant's funds and not risky investments such as option trading. As such, the Respondent's investment of the Complainant's funds in such investments was clearly in violation of the agreement.

We also reject the argument by counsel for the Respondent that Rule 8.4 of the Rules of Professional

Conduct only applies to conduct related to the practice of law. Counsel for the Respondent presented no authority for this position and, in fact, case law dictates otherwise. See Statewide Grievance Committee v. Egbarin, Superior Court, judicial district of Hartford, Docket No. 585474 (June 22, 1999, *Berger, J.*) (finding a violation of Rule 8.4(3) of the Rules of Professional Conduct and suspending attorney for five years in relation to conduct outside of the practice of law), aff'd 61 Conn. App. 445, 767 A.2d 732, cert. denied, 255 Conn. 949, 769 A.2d 64 (2001). Moreover, the wording of Rule 8.4 provides for no such limitation – expressly or implicitly. In fact, the Commentary to Rule 8.4 of the Rules of Professional Conduct provides that "[a]lthough a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving . . . dishonesty [and] breach of trust . . . are in that category."

Although there is no dispute that there was no attorney-client relationship between the Respondent and the Complainant, this reviewing committee is not foreclosed from considering whether the Respondent's conduct violated Rule 1.15 of the Rules of Professional Conduct. We disagree with the argument presented by counsel for the Respondent that Rule 1.15 does not apply in situations where there is no attorney-client relationship. While we acknowledge that language in Rule 1.15 appears to limit its application in that manner, we note violations of Rule 1.15 have been found where there was no attorney-client relationship. See Statewide Grievance Committee v. Mozzillo, Superior Court, judicial district of Hartford, Docket No. 588198 (December 20, 1999, *Berger, J.*) (reprimanding attorney for violation of Rule 1.15(b) of the Rules of Professional Conduct in relation to conduct arising from investment transactions, not an attorney-client relationship). Moreover, we found no case expressly stating that a prerequisite to finding a violation of Rule 1.15 is the existence of an attorney-client relationship. In addition, we note that most courts do not limit the application of Rule 1.15 to attorney-client relationships, but rather apply the obligations of Rule 1.15 to attorneys involved in other fiduciary relationships, such as when an attorney acts as a trustee, guardian or corporate officer. ABA/BNA Lawyers' Manual on Professional Conduct (2000), §45, p. 45:105-106. Nevertheless, we were unable to conclude that the manner in which the Respondent was allowed to manage the Complainant's funds rose to the level of a violation of Rule 1.15 of the Rules of Professional Conduct. While we find that the agreement provided for low-risk investments on the Complainant's behalf, we note that the agreement did grant some level of discretion to Benistar and, in pragmatic terms, the agreement could not guarantee a certain return as there is always some level of risk by the very nature of making any investment.

We view the Respondent's conduct in this matter as a very serious breach of the Rules of Professional Conduct. As such, we order that the Respondent be presented to the Superior Court for the imposition of whatever discipline the Court may deem appropriate.

_____
Attorney Carl Fortuna, Jr.

_____
Attorney Lorraine D. Eckert

_____
Mr. George W. Sawyer