UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
UNITED STATES OF AMERICA    )
                                                    )
          v.                                       )          CRIMINAL NO. 04-10029-GAO
                                                    )
DANIEL E. CARPENTER              )
_____)

**Defendant's Reply to Government's Opposition to Motion
to Set Aside the Verdict and Grant a New Trial Pursuant to Fed.R.Crim.P. 33**

**I.        Introduction.**

The defendant understands that our criminal justice system prefers finality over

renewed litigation, but there are rare circumstances where finality must succumb to

justice and fairness. Because this is such a case, and because it is necessary to set forth

the factual record in this case in some detail, Mr. Carpenter has sought leave of Court to

file this memorandum, which exceeds 20 pages. The defendant does not wish to unduly

burden the Court with lengthy pleadings, but given the gravity of this matter, given that

the defendant had only seven days to prepare his initial brief (as contrasted with the

government's six weeks), and given the defendant's understanding that his request

necessarily requires the Court to invalidate the jury's finding in this case, he has

endeavored to provide the Court with a detailed accounting of the trial proceedings

herein. In the end, Mr. Carpenter respectfully submits that serious errors occurred in this

matter and the interests of justice warrant a new trial.

**II.    A new trial is required because the government concedes that factual disputes regarding venue *must* be submitted to the jury and that an incorrect legal standard was applied.**

In its opposition, the government states that "venue is not submitted to the jury unless the defendant establishes, inter alia, the existence of a genuine issue of material fact regarding venue." (Government Opposition at 2). Since Mr. Carpenter disputed venue on several factual (as well as legal) grounds throughout this case, a new trial is required because, as the government now concedes, factual disputes regarding venue *must* be submitted to the jury. The existence of several factual disputes demonstrates the error, acquiesced to by the prosecution (see Tr. Charging Conf. 5-6), of the Court's not submitting the venue issue to the jury.[1]

Furthermore, based on United States v. Ramirez, 420 F.3d 134 (2d Cir. 2005), decided after this Court issued its Memorandum decision on venue dated July 27, 2005 (Dkt. 148) and after Mr. Carpenter filed his initial brief in support of a new trial, devising and/or participating in a scheme to defraud is not an essential *conduct* element for determining venue under the mail (and, by implication, wire) fraud statute. Thus, an incorrect legal standard was applied to determine venue – which also requires a new trial.

**A.    There were numerous factual disputes regarding venue.**

The government asserts that Mr. Carpenter "can point to no material, venue-related factual disputes." (Government Opposition at 2). This assertion, however, is clearly erroneous. Literally from the inception of this case, Mr. Carpenter has

---

[1] The government also requests that the Court issue a supplemental finding that venue for mail and wire fraud exists in the district through which a mailing or wire passes or from which it was orchestrated. See Government Opposition at 4-5 (citing United States v. Pace, 314 F.3d 344, 349-50 (9th Cir. 2002)). However, in its opposition to Mr. Carpenter's pre-trial motion to dismiss for lack of venue (Dkt. 29), the government expressly disclaimed any reliance on Pace. See Dkt. 29 at 2, n.1 ("This court need not address [Pace]. The government does not rely on it here.").

vigorously challenged venue from his pre-trial motion to dismiss for lack of venue (Dkt. 27), to his pre-trial motion to transfer venue to the District of Connecticut (Dkt. 66), to his motions *in limine* challenging venue on virtually all of the wire fraud counts (Dkt. 83, 84), to his pre-verdict Rule 29 motion based on venue (Dkt. 142), to his post-verdict motions for a new trial (Dkt. 158) and acquittal (Dkt. 160).  In fact, venue has been litigated in this case almost as much as the alleged underlying scheme to defraud.

For example, prior to trial, Mr. Carpenter moved *in limine* to exclude all evidence relating to virtually all of the wire fraud counts because the subject wire transfers were not sent from or received in Massachusetts.  (Dkt. 83, 84.)  At trial, in order to counter Mr. Carpenter's arguments on this issue, the government called as its first "venue" witness Mr. Ralph Ventresco, the wire transfer manager at the Federal Reserve Bank of Boston.[2]  (Tr. 10:83).  The government attempted to prove through Ventresco that virtually all of the wire transfers "cleared" through the Boston Fed.  (Tr. 10:94).  However, on cross-examination, Ventresco admitted that it was possible that the subject wire transfers did *not* clear through the Boston Fed.  (Tr. 10:97).  Obviously, whether or not the wire transfers cleared through the Boston Fed is "the existence of a genuine issue of material fact regarding venue," Government Opposition at 2, that should have been decided by the jury.

Another venue-related factual dispute involved counts 5 through 11 where, in an attempt to prove proper venue for those counts (wire transfers sent by Citizens Bank), the government called a Citizens employee to testify about the wire transfer process at

---

[2]  Further proof that venue was disputed on several factual grounds is that, in response to Mr. Carpenter's numerous attacks on venue, the government was forced to call a total of 11 "venue" witnesses – which exceeded the number of Exchangors (7) in this case.

Citizens in the year 2000, even though the witness did not begin working at Citizens until 2002. (Tr. 10:99). Defense counsel objected to the entire testimony on hearsay grounds, Tr. 10:98, but the objection was overruled. (Tr. 10:102). Had the jury been allowed to decide venue, a rational fact-finder could have rejected all such testimony and acquitted on those counts. Similarly, with respect to counts 1 and 2 (wire transfers sent by Fidelity), the government sought to convince the jury that venue was proper because the wire process "started" in Massachusetts, but defense counsel was able to elicit from the Fidelity witness that the wire transfers were actually sent from New York. (Tr. 10:140). Again, had the jury been allowed to decide venue, a rational fact-finder could very easily have determined that the wire transfers in counts 1 and 2 had no nexus with Massachusetts and acquitted on those counts.[3]

Factual disputes regarding the origin and locus of the charged wires, as well as whether they passed through Massachusetts, existed for virtually all of the wire fraud counts. The evidence showed that the bank wire rooms from which the subject wires originated were located in New York (Tr. 10:140), New Hampshire (Tr. 11:25), Rhode Island (Tr. 10:105), and Pennsylvania (Tr. 10:125, 131), and all the wire transfers were sent to Merrill Lynch or PaineWebber in New York. Had the jury been allowed to decide venue, a rational fact-finder could have easily found that venue in Massachusetts was improper and unproven with respect to virtually all of the wire fraud counts because the subject wires were not sent from, received in, or passed through, Massachusetts. Consequently, for the government to claim that Mr. Carpenter's venue challenges were "not premised on a dispute over facts," Government Opposition at 3, is clearly false.

---

[3] This is especially so regarding counts 1 and 2 because Ventresco testified that "[o]n those two wires, accounting entries would *only* take place in New York." (Tr. 10:95) (emphasis added).

As explained in Mr. Carpenter's Motion for Leave to File Supplemental Authority for his Rule 33 motion (Dkt. 173), the Fourth Circuit recently joined the six other circuits that have directly addressed this issue and held that "[s]ubmitting the venue question to the jury is an appropriate procedure for resolving a factual dispute relating to venue." United States v. Ebersole, 411 F.3d 517, 526 n.10 (4th Cir. 2005). Not one circuit has approved a trial court's usurpation of a venue fact issue from the jury. If venue was simply a matter of law, then the entire venue issue would have been resolved pre-trial and no venue witnesses would have been allowed to testify. Although requiring a lower standard of proof, venue fact issues have routinely been submitted to juries. The government has not challenged the contention of Mr. Carpenter that the Court's pre-empting of the venue fact issue is without precedent.

Factual disputes are created when a defendant tests the credibility or the basis of knowledge of a prosecution fact witness. Mr. Carpenter tested the credibility or basis of knowledge of *every* prosecution witness in this case – not just as to facts impacting venue but also facts going to the essential elements of mail and wire fraud. Even the testimony of the government's auditor – Thomas Zappala – was challenged by Mr. Carpenter. See Tr. 10:26-34. In fact, the entire issue of whether Mr. Carpenter "caused" any of the mailings and wires is an essentially factual issue that cannot be segregated from the venue issue. Furthermore, Mr. Carpenter did not stipulate to any "venue" facts in this case – although the government requested that he do so. Instead, the defense challenged all of the government's venue witnesses and contested whether the government carried its burden of proving venue as to each count.

While the First, Second, Sixth, Ninth and Eleventh Circuits have yet to address this issue directly, *every* Court of Appeals that has done so has ruled that factual disputes regarding venue *must* be submitted to the jury. Since the government now concedes this point, the clear existence of numerous material factual disputes regarding venue requires a new trial.[4]

**B.    An incorrect legal standard for determining venue was applied.**

Another reason for granting a new trial is that, in light of United States v. Ramirez, 420 F.3d 134 (2d Cir. 2005), an incorrect venue legal standard was applied in this case.

Based on its reading of United States v. Rodriguez-Moreno, 526 U.S. 275 (1999), and United States v. Scott, 270 F.3d 30 (1st Cir. 2001), cert. denied, 535 U.S. 1007 (2002), this Court in its Memorandum determined that venue was proper because "[a]n essential element of all the crimes alleged in the indictment is the defendant's knowing and willful participation in a scheme to defraud," Memorandum at 2, and that Massachusetts was the "locus" of such scheme. Id.

However, in Ramirez, decided on August 23, 2005, the Second Circuit – after engaging in a detailed analysis of Rodriguez-Moreno – reversed and vacated mail fraud convictions for lack of venue and in doing so held that "having devised or intending to devise a scheme or artifice to defraud, while an essential element, is not an essential *conduct* element for purposes of establishing venue." Id. at 145 (quotations omitted) (emphasis in original). Since devising and/or participating in a scheme to defraud is not

---

[4]  This is particularly true in this case, as the jury heard a day and a half of testimony on venue issues from 11 venue witnesses and then received no venue instruction. The jurors could obviously not help but wonder why so much time was "wasted" on an irrelevant (as to them) issue. There is a reasonable likelihood that this prejudiced Mr. Carpenter in the jury room.

an essential *conduct* element for determining venue under the mail and wire fraud statutes, and since Carpenter did not cause the wires or mailings that are the subject of this indictment, <u>see</u> Section I of Defendant's Reply Brief in Further Support of Motion for Acquittal, it would be in the interests of justice for there to be a new trial where the Court would have the opportunity to make determinations of sufficiency and instruct the jury on the factual issues surrounding venue.[5]

Had the jury been allowed to decide the venue issue, there is a substantial possibility that the jury would have acquitted Mr. Carpenter on all counts simply for lack of venue – even if they also believed that (somehow) he participated in a scheme to defraud. "The two inquiries are, on the facts of this case, entirely separate." <u>United States</u> v. <u>Perez</u>, 280 F.3d 318, 331 (3d Cir.), <u>cert. denied</u>, 537 U.S. 859 (2002).

---

[5] The district court in <u>Ramirez</u> initially reserved, but then denied, the Rule 29 motion when it was renewed at the close of all the evidence, holding that "[v]iewed in the light most favorable to the government, a preponderance of the evidence clearly demonstrates that essential elements of the conduct constituting the charged offenses occurred in the Southern District of New York, notwithstanding the fact that some essential elements may also have occurred elsewhere." <u>Id.</u> at 138. The district court's venue ruling in <u>Ramirez</u> is virtually identical to this Court's Memorandum decision on venue.

**III.    The government committed multiple discovery violations that materially prejudiced the defense in this case and which alone warrant a new trial.**

---

**Local Rule 116.2**

**(B) Timing of Disclosure by the Government.** Unless the defendant has filed the Waiver or the government invokes the declination procedure under Rule 116.6, the government must produce to that defendant exculpatory information in accordance with the following schedule:

(2) Not later than twenty-one (21) days before the trial date established by the judge who will preside:

(e) A written description of any prosecutable federal offense known by the government to have been committed by any witness whom the government anticipates calling in its case-in-chief.

(f) A written description of any conduct that may be admissible under Fed.R.Evid. 608(b) known by the government to have been committed by a witness whom the government anticipates calling in its case-in-chief.

---

As noted above, Local Rule 116.2(B)(2) is clear, unequivocal, and without any ambiguity: not later than twenty-one days before trial, the government <u>must</u> produce to the defendant a <u>written description of any prosecutable offense</u> known by the government to have been committed by any witness whom the government anticipates calling in its case-in-chief. Government counsel has conceded, again without any ambiguity, that he believed Paley committed multiple violations of 18 U.S.C. §1001 during various proffer sessions with the government. During the charge conference, Assistant U.S. Attorney Michael Pineault ("AUSA Pineault") stated: "So for me to have asked Mr. Paley what did you know, I know full well the answer he would have given, which is I didn't know that the clients' money was at risk … [s]o for me to have asked him that question I think would have run afoul of my obligations" to not elicit perjurious testimony. (Tr. Charging Conf. at 12).[6] 18 United States Code §1001 proscribes false statements to government

---

[6]. <u>See</u> Tr. Charging Conf. at 62 ("Mr. Goldstein may not be aware of the case law, but it is crystal clear that I cannot as the prosecutor elicit information from Mr. Paley that I think may not be true.

agents during the course of an investigation. AUSA Pineault's concession that he believed Paley lied to him and various FBI agents during at least two proffer sessions in this case is a clear admission that the government knew of several prosecutable federal offenses to have been committed by a witness the government anticipated calling in its case-in-chief. In short, there is simply no quarreling with the conclusion that the government violated its discovery obligations by failing to provide written notice that Paley committed multiple §1001 offenses, as required by the Local Rule 116.2.

There are other clear, indisputable discovery violations by the government. First, given the government's belief that Paley lied to them during multiple proffer sessions, the government was obligated to provide the defendant with a written description of this 608(b) conduct, pursuant to 116.2(B)(2)(f). Second, and more fundamental, given AUSA Pineault's concession that the government believed Paley knew that Carpenter would be investing the Exchangors funds, the government axiomatically believed that Paley committed the offenses with which they have charged Dan Carpenter in this case. Indeed, it was Paley alone who met with the Exchangors, who alone made the sales presentations to the Exchangors, who alone drafted the exchange agreements, who alone made oral representations to the Exchangors, and who admittedly created the sales literature and PowerPoint presentations relied upon by the government to convict Mr. Carpenter. Hence, pursuant to Local Rule 116.2(B)(2)(e), the government was unconditionally required to provide written notice to the defendant of its belief that Paley committed the prosecutable offenses of mail and wire fraud.

---

And no matter how many times I asked Mr. Paley … what did you know, he very consistently … said 'I did not know the clients' principal was at risk.' So for me to ask him that question knowing that was the answer I was going to get would not, in my view, have been appropriate").

Indeed, the government's discovery failures are so self-evident, the failure to provide written notice pursuant to Local Rule 116.2 is not even addressed, much less logically justified, in the government's opposition pleading. Instead, while omitting any discussion of our Local Rules, the government mischaracterizes the defendant's argument as a complaint about a failure to provide notice of "mental impressions," and then argues that its discovery obligations "extend to documents, objects, reports of examinations and tests, prior statements by witnesses, and related information/items in its possession". (Government Opposition at 6). First, the government clearly is required to provide the defendant with so-called "mental impressions," i.e., when they have formed conclusions regarding known prosecutable offenses or 608(b) conduct, they are required to provide written notice. The government can not avoid disclosing <u>Brady</u> material or other discoverable information by simply failing to memorialize it on paper. <u>See United States v. Soto-Beniquez</u>, 356 F.3d 1, 40 (1st Cir.2004) ("The government's obligation to disclose impeachment evidence is not, as suggested by the prosecution, dependent on whether that evidence has been reduced to written form."). <u>Brady</u> and its progeny have distilled over decades of jurisprudence a clear principle: if government counsel <u>knows</u> of discoverable information, it must provide it. Our Local Rules require that this known information be reduced to writing, even if provided orally to the government. For example, when government counsel hears a witness make a statement, and thereafter formulates the conclusion that it is inconsistent with a prior statement made by any witness on the same subject matter, the prosecutor is obligated to disclose the inconsistent statements, whether received orally or in writing.  <u>See</u> L.R. 116.2(B)(2)(c). In short, government counsel's knowledge is not work product protected from disclosure – an

apparent new defense to non-production of exculpatory evidence—but, rather, is unconditionally an available source of discovery.

To the extent the government argues its obligations extend only to documents and objects and related information in its possession,  see Government Opposition at 6, these may in fact be some sources that the government is obliged to scour in discharging their discovery obligations, but these sources do not describe the panoply of discovery obligations imposed by our Local Rules, they are simply some (and not even all) of the places the government must look to discharge their discovery obligations.[7]

Enough has been said about the undeniable factual predicate that the government violated its discovery obligations. The only remaining issue is the appropriate remedy. In the context of a motion for new trial, the court possesses the discretion to grant a new trial if the interests of justice so warrant. Cf. United States v. Rosario-Peralta, 175 F.3d 48 (1st Cir.1999) (remanding for district court to hold hearing to determine whether logs should have been provided by government and, if so, ordering district court "to determine whether the government's failure to turn over that log materially prejudiced the defense"); United States v. Conley, 415 F.3d 183, 188-89 (1st Cir.2005) (observing that the "law makes it easier for [a defendant] to obtain a new trial where the government has engineered an unfair trial by withholding material exculpatory or impeachment evidence.").  During trial, when the defendant moved for a jury instruction on

---

[7]. To the extent the government argues it gave the defendant enough information in this case, or the defendant possessed it in other forms, the First Circuit has already denounced this argument. See United States v. Rosario-Peralta, 175 F.3d 48, 55 (1st Cir.1999) (government arguing that the defendants already possessed the suppressed relevant information in other forms, court noting that government cites no authority for the proposition that it may deny discovery of relevant evidence on the ground that defendants already have enough evidence on that issue; Rule 403 may preclude cumulative evidence but that is not basis to resist discovery disclosure).

government misconduct, the Court opined that a remedy for the misconduct would not come from the jury. (Tr. 11:63) (Court opining that "if a remedy is needed for anything, it's not for the jury to give it.").

Notwithstanding the government's empty rhetoric, the defense in this case was materially prejudiced by the government's discovery failures. The entire defense in this case was structured on the foundational principle that Paley deceived the government, as he had deceived the Exchangors' and Mr. Carpenter, and the government therefore believed Paley was an innocent conduit. The defendant's reliance on this foundation was reasonable, given the fact that no notice was provided pursuant to LR 116.2 of any §1001 offenses. This is not some convenient post-trial reconstruct of the record. In his opening, the defendant assumed the burden of proving that Paley deceived the government. "I will assume a burden in this case. I will prove to you that Marty Paley, far from the innocent he has portrayed himself to be to the government, has knowingly, unjustifiably placed the blame for his own misconduct upon the feet of Dan Carpenter." (Tr. 2:34). Defense counsel further stated:

> Mr. Paley has told the government, made representations to the government, that he didn't know that Dan Carpenter was going to invest the proceeds of these Exchangors. The evidence in this case will overwhelmingly establish beyond any doubt that Mr. Paley knew from day one that Mr. Carpenter would be investing the Exchangors' proceeds. That was the essence of his agreement with Mr. Carpenter … Mr. Paley has sold this story to the government. And they, as its foundational element in this case, will try and sell it to you. This house of cards with Mr. Paley as its foundational element is simply without any basis in reality … They have relied upon the uncorroborated word of Marty Paley, and they will try and sell that uncorroborated word to you, and the evidence will show [it is] a simply unsustainable position in this case.

(Tr.38-39).

When the defendant learned of the government's concession that it believed all along that Paley had lied to them, he immediately moved to dismiss the charges in this case, arguing that his defense was materially prejudiced because he had staked his entire defense on the theory that Paley had deceived the government. (See Defendant's Motion to Dismiss, Docket Entry 140). The first line of the defendant's motion argued that the indictment must be dismissed "given that the government has predicated its prosecution upon a false impression of a material fact (that Mr. Paley did not know that Mr. Carpenter was investing Mr. Paley's clients' principal in the stock market." See Hamric v. Bailey, 386 F.2d 390, 394 (4th Cir.1967) (prosecutorial misconduct occurs "not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact."). At the charge conference, the defendant moved *in limine* to prevent the government from arguing that Paley is a culpable party or arguing that Paley's criminal culpability does not excuse Mr. Carpenter's actions in this case. (Tr. Charging Conf. at 9). The defendant also requested jury instructions on government misconduct and willful blindness, again arguing the prejudice suffered as a result of the government "knowing before trial that Mr. Paley was lying to them and not having done anything about it." (Id. at 60-61).

The record of this case amply demonstrates that the defendant was totally unaware of the government's knowledge and belief that Paley was lying to them. Knowledge that the government believed Paley lied to them was critical information that would have substantially altered the defendant's trial strategy. First, the defendant would not have assumed the burden of proving that Paley deceived the government. Second,

more focus would have been placed upon the existence of some understanding or agreement between the government and Paley (see section IV *infra*).

Third, knowledge of the government's belief would have necessarily altered the defendant's and the Court's approach to evidentiary issues in this case. The defendant filed motions *in limine* to exclude oral statements made by Paley to Exchangors. The government opposed the defendant's motion, arguing that Paley's statements were admissible as statements by an agent or were admissions. There was no co-conspirator argument advanced by the government. The prejudice of the government's subterfuge is that it caused the Court to admit all of Paley's oral statements, as well as Paley's marketing materials, on the theory that Paley was the innocent conduit of Carpenter.

For example, Gail Cahaly testified that Paley orally assured her that her money would be safe and she relied on Paley's oral representations. (Tr. 11:42-43) ("I said, Marty, are you sure my money is going to be safe … he said, yes, it is and it would be in a separate money market account at PaineWebber"). Likewise, Darling testified that he "talked about the safety of my money" with Paley and "he said that it was perfectly safe, that they were honorable people, and that they were bonded." (Tr. 3:99). The defendant objected to all of Paley's hearsay statements, from the inception of the trial, but the government repeatedly represented that it would connect the defendant to his oral statements and the Court therefore allowed the prejudicial testimony to be admitted. By the time of the charge conference, the Court ruled insufficient evidence existed to connect Mr. Carpenter to any statement by Mr. Paley different from the language of the agreements, (Tr. Charging Conf. at 45-46), and the government ultimately abandoned any reliance on the oral representations. Yet, by that time the defendant had already been

significantly prejudiced by the admission of all of Paley's hearsay statements, such as Ms. Cahaly's and Mr. Darling's testimony noted above.

These evidentiary issues clearly would have altered the Court's and defendant's approach to the evidentiary issues presented by Paley's oral statements to the Exchangors if the government appropriately disclosed its belief that Paley bore criminal responsibility for the underlying fraud and that he lied on successive occasions about that criminal culpability to remove himself from the government's charging radar. Moreover, had the defendant had sufficient notice that the government would base their case on what the defendant did <u>not</u> disclose to the Exchangors, i.e., the omission theory, the defendant would have made focused pretrial objections that he had no opportunity to disclose the contested information to the Exchangors and/or he was not responsible for Paley's failures.

Additionally, while the government obviously believed before trial that Paley had lied to them, they never disclosed this information to the Court when the pretrial *limine*/evidentiary motions were being considered. Clearly, the government had ethical obligations to the Court (as well as to defense counsel) to responsibly respond to motions *in limine* such that the parties and Court could consider the evidentiary issues with an accurate factual predicate. <u>See</u> <u>Barton v United States District Court for the Central District of California,</u> 410 F.3d 1104, 1110-1 (9th Cir. 2005) (commenting on ethical responsibilities of attorneys and noting that concealment of relevant facts creates a risk to the honest and accurate resolution of the dispute). For example, with knowledge of the government's belief in Paley's criminality, the Court likely would have been more receptive to arguments that Paley's uncorroborated testimony that Mr. Carpenter had

reviewed or adopted certain marketing materials was not a sufficient basis to admit the marketing materials as evidence against Mr. Carpenter. The theory of "Paley the innocent conduit of Carpenter" presents different legal issues, in terms of admitting Paley's out-of-court statements, than a theory that Paley knew all along that Mr. Carpenter would invest the Exchangors' funds, especially when Paley admits that Mr. Carpenter never authorized him to say anything contrary to or inconsistent with the written agreements. The predicate of the government's argument to the Court was always that Mr. Carpenter concealed his trades from Paley, which allowed Paley to lie to the Exchangors.  In this sense, the defendant was denied the right to contest on a fair playing field that Paley was not an agent acting within the scope of his authority in making representations to Exchangors.

The Local Rules require production of not just promises and rewards—they require a written statement of all known prosecutable federal offenses. The prosecutors clearly believed that Paley committed multiple prosecutable federal offenses—government counsel has unconditionally admitted that much on the record in this case (on multiple occasions). Martha Stewart was indicted, convicted and jailed for a §1001 offense for less compelling evidence than existed against Paley; in this courthouse, former Quincy City Councilor Michael D'Amico was prosecuted and convicted for false statements made to government agents who surprised him in the driveway of his home. Here, the government believed that Paley lied to the prosecutors and investigating agents on multiple occasions, not after being surprised in the driveway of his home with insufficient time to reflect on his comments, but during formal proffer sessions for which he undoubtedly spent considerable time preparing and in which he was represented by counsel. The government did not fulfill its obligations under the local rules to disclose

this information. The defendant was significantly prejudiced as a result of the government's discovery failures and, as a result, was denied his constitutional right to a fair trial. On this basis alone, a new trial is warranted.

**IV.** **An evidentiary hearing is required to explore the government's assertion that it "gave no promises, rewards or inducements to Paley", and that "[n]o assurances were made, no promises given, and no agreements entered."**

During direct examination, AUSA Pineault affirmatively elicited that Paley had no agreement with the United States Attorney's Office that he would not be prosecuted. (Tr. 9:57) (AUSA Pineault asked Paley "No promise you wouldn't be prosecuted?" and Paley answered "No agreement.").   In their opposition papers, the government reiterates this position. (Government Opposition at 5) ("The government gave no promises, rewards, or inducements to Paley. No assurances were made, no promises given, and no agreements entered."). Given the government's recent revelations regarding their belief that Paley lied to them during multiple proffer sessions, and therein committed multiple violations of 18 U.S.C. §1001, and the corollary belief that Paley committed the charged wire and mail fraud offenses, the proposition that no agreements were reached by and between Paley and the government is simply implausible.

Prior to trial, the government's representation that it had made no agreement to not prosecute Paley made sense <u>only</u> because no notice was provided pursuant to L.R. 116.2(B)(e) and the defendant therefore reasonably believed the government in fact believed Paley's denials of knowledge. The government's apparent belief of Paley's denials was the necessary predicate to explain why the government did not charge Paley in this case, much less charge him for §1001 violations. Now, given the government's disclosure that it did not believe Paley's denials to them, but instead apparently believed

that Paley knew from the inception that the Exchangors' funds were at risk (as the objective evidence demonstrated), the government's insistence that no agreement exists with Paley defies logic, experience and common sense. The government would never forgo prosecution of a known criminal without a mutually beneficial agreement, especially given the number of known prosecutable offenses in this case.

Paley lied to the government during multiple proffer sessions, confessed on the witness stand to the crimes for which Dan Carpenter was convicted, all ostensibly without any agreement or promise not to prosecute. Moreover, Paley committed perjury during trial. Thomas Finneran stands indicted for alleged false testimony during a civil trial and former Boston Police Officer Kenneth Conley withstood years of litigation for supposed false testimony before the grand jury. With each passing day the plausibility of Paley not having an agreement evaporates with the government's failure to bring any charges against Paley. Paley admitted during trial—and the defendant has the documentation—that his counsel met government counsel in July 2001, after which Paley sent a facsimile to his attorney congratulating him on a job well done and asking how much of his time would be consumed dealing with this matter (i.e., for his apparent cooperation). The facsimile seemed to undermine the government's contention before and at trial that no agreement existed, but the defendant accepted the government's representations based on the absence of any L.R. 116.2 notice.

Now, however, the government's representations have become implausible. At the very least, an evidentiary hearing is warranted to determine whether any secret agreement exists, either between the government and Paley's counsel (without Paley's knowledge), or an agreement with Paley's knowledge. United States v. Panitz, 907 F2d

1267, 1273 (1st Cir.1990) ("The test for granting an evidentiary hearing in a criminal case should be substantive: did the defendant make a sufficient showing that material facts were in doubt or dispute?"): United States v. Staula, 80 F.3d 596, 603 (1st Cir.1996):

> A hearing is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record. Most importantly, the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief.

Secret, unwritten or assumed agreements are prohibited, see United States v. Soto-Beniquez, 356 F.3d 1, 40 (1st Cir.2004) ("The government's obligation to disclose impeachment evidence is not, as suggested by the prosecution, dependent on whether that evidence has been reduced to written form."), citing Giglio, 405 U.S. at 154-55, 92 S.Ct. 763 (reversing conviction where an oral agreement between a prosecutor and key witness was not disclosed to the defense). Also, agreements amongst counsel without the knowledge of the defendant are cause for reversal. See Hayes v Brown 399 F.3d 972 (9th Cir. 2005) (en banc) (court finds violation of due process clause where prosecutor and defense counsel reach agreement, without witness' knowledge, and witness unwittingly provides false testimony that no agreement exists; "Few things are more repugnant to the constitutional expectations of our criminal system than covert perjury ...." It is reprehensible for the State to seek refuge in the claim that a witness did not commit perjury, when the witness unknowingly presents false testimony at the behest of the State. "This saves [the witness] from perjury, but it does not make his testimony truthful." Willhoite v. Vasquez, 921 F.2d 247, 251 (9th Cir.1990) (Trott, J., concurring). The fact that the witness is not complicit in the falsehood is what gives the false testimony the ring of truth, and makes it all the more likely to affect the judgment of the jury. That the

witness is unaware of the falsehood of his testimony makes it more dangerous, not less so."). So are conditional deals. See Silva v Brown, 416 F.3d 980, 985-988 (9th Cir. 2005) (new trial granted where prosecutor conditions deal with witness on witness' promise not to participate in any psychiatric testing, court concluding that strategic secret decision of prosecutor was "material" since prosecution would not have insisted on the witness's foregoing of a psychiatric exam unless they felt it was important). Clearly, the government's asseveration that no agreement exists defies common sense, logic and experience. If an evidentiary hearing discloses any secret, unwritten or acknowledged understandings, even if not formal or expressed, the failure to disclose such an agreement, which obviated the need for Paley to invoke immunity protections, warrants a new trial in this matter.

**V.      Government counsel failed to fulfill their ethical and constitutional responsibilities to the Court.**

In its opposition, the government trivializes Paley's perjury as mere inconsistent statements, yet this position conflicts with their affirmative statement at the charge conference that they believed Paley was intending to commit perjury, which was why the government never asked him any questions regarding the state of his knowledge. Given that admission, when Paley initially denied on cross-examination that he knew that Mr. Carpenter would be investing Exchangors' funds, the government believed at that point that Paley was committing perjury and therefore had a constitutional obligation to correct what it believes to be false testimony. Napue v. Illinois, 360 U.S. 264 (1958). Yet, government counsel did nothing despite that belief. "In our justice system, the prosecuting attorney occupies a special position of public trust.  Courts, citizens and even criminal defendants must rely on these public servants to be honorable advocates both for

the community on whose behalf they litigate and for the justice system of which they are

an integral part.  When prosecutors betray their solemn obligations and abuse the

immense power they hold the fairness of our entire system of justice is called into doubt

and public confidence is undermined." <u>Silva v Brown,</u> 416 F3d 980, 991(9th Cir. 2005).

Even if the defendant was aware of the perjury, an explanation proffered by the

government, defense awareness of perjury does not eradicate the government's ethical

and constitutional duty to correct it. <u>See</u> <u>Belmontes v Brown,</u> 414 F.3d 1094, 1115-16 (9th

Cir. 2005).

 While the Court allowed the defendant to call two FBI agents as witnesses (over

the government's objection), and therefore allowed the defendant to correct Paley's

perjurious testimony that he told the government that he knew as of September 1998 that

Mr. Carpenter would be investing BPE's clients' principal funds and therefore risking

loss of those funds, that does not excuse the government's failure to fulfill their

constitutional and ethical responsibilities in this case. First, given the government's belief

that Paley's denial of knowledge of Mr. Carpenter's investment of clients' principal until

the end of December 2000 was false, the government had an obligation to correct that

perjury when Paley repeated that false denial in response to defense counsel's initial

questions on that subject matter. Once Paley perjured himself on the witness stand by

repeating these false denials, government counsel had an affirmative constitutional and

ethical obligation to correct the perjury, not wait to see whether Paley would eventually

correct his own perjury upon repeated questioning by defense counsel. Likewise, when

Paley committed perjury and testified that he told AUSA Pineault during his proffer

sessions that he knew as of September 1998 that Mr. Carpenter would be investing

clients' principal in the market, AUSA Pineault had a constitutional obligation to correct

that perjury. See, e.g., Tr. 8:61 ("Q: So when you sat down with Mr. Pineault in

December of 2001, in February of 2002, and January of 2004, you told Mr. Pineault that

you knew your clients' funds, the principal, was being invested in the stock market before

December 2000?  A: Yes."). The government's incomprehensible objections to the

defendant's request to call the two FBI agents illustrates the misguided goal in this case

of winning at all costs:

> The United States Attorney is the representative not of an ordinary party to a
> controversy, but of a sovereignty whose obligation to govern impartially is as
> compelling as its obligation to govern at all; and whose interest, therefore, in a
> criminal prosecution is not that it shall win a case, but that justice shall be done.
> As such, he is in a peculiar and very definite sense the servant of the law, the
> twofold aim of which is that guilt shall not escape or innocence suffer.  He may
> prosecute with earnestness and vigor—indeed, he should do so.  But, while he
> may strike hard blows, he is not at liberty to strike foul ones.

Berger v. United States, 295 U.S. 78, 88 (1934).

As noted in the defendant's original brief, the Ninth Circuit has recently clarified

that Napue "addresses the presentation of false *evidence*, not just the subornation of

perjury." Hayes v. Brown, 399 F.3d 972 (9th Cir. 2005) (en banc). The Court went on to

hold that Alcorta and Pyle "create an affirmative duty on the part of the prosecution to

correct false testimony at trial, even when the testimony is unsolicited."  Hayes, 399 F.3d

at 981.  Stating that "the rule has been clear for decades," the Ninth Circuit observed that

a defendant is denied due process of law when a prosecutor "either knowingly presents

false evidence or fails to correct the record to reflect the true facts when unsolicited false

evidence is introduced at trial."  Id. at 984 (emphasis added).

Clearly, once Paley testified falsely—which he did when he initially denied on

cross-examination knowledge that Mr. Carpenter would invest clients' principal in the

market and later when he testified that he told AUSA Pineault that he knew as of

September 1998 that Carpenter would be investing clients' principal in the market—

government counsel had an affirmative duty to correct the record.  Their failure to do so

not only violated Mr. Carpenter's due process rights, but it starkly illustrates the true goal

of the prosecution in this case—obtain a "win" at all costs, even at the expense of justice

and fair play.

      Finally, it bears repeating that the government should never have proffered Paley

as an impartial and competent witness given the government's belief that he lied to them

on successive occasions, their belief that he falsely denied commission of the subject

offenses, and the government's expectation that Paley would commit perjury (at the very

least) on cross-examination. Rule 3.3 of the Model Rules of Professional Conduct, which

describes lawyers' responsibilities for candor toward the tribunal, specifically provides

that a "lawyer shall not knowingly offer evidence that the lawyer knows to be false" and

if a lawyer or a witness called by the lawyer "has offered material evidence and the

lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures,

including, if necessary, disclosure to the tribunal." In this case, not only did the

government present Paley as a witness in this case knowing and expecting that he would

commit perjury, it fought defense counsel's efforts to expose Paley's perjury to the Court,

when the government in fact believed his testimony was false and the government

intentionally did not ask Paley certain questions because it believed it would receive false

responses. Clearly, the government should have notified the Court (and counsel) prior to

trial of its belief that Paley had committed §1001 offenses prior to trial, that Paley had

committed the charged mail and wire fraud offenses, and that government counsel

expected Paley to repeat this perjury on the witness stand in this case. Having failed to do so, not only did the government inhibit the Court's ability to properly assess evidentiary objections and motions *in limine*, the government failed to fulfill its ethical mandate of candor to the tribunal. It seems patently unfair that the government waited to determine whether defense counsel was able to uncover Paley's perjury before disclosing the government's true belief in this case—that Paley had been lying to the government all along and the government expected him to commit perjury in this case. As the defendant observed in his original brief, the ethical duty of the prosecutor is an extraordinary obligation which is supposed to exceed that imposed upon defense counsel. As the court stated in United States v. Maccini:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done … It is as much his duty to refrain from improper methods calculated to produce a conviction as it is to use every legitimate means to bring about a just one.

**VI.    The omission theory of liability:  A 180 degree turn from the indictment and government's pretrial descriptions of charge resulting in a trial by surprise and instructions and proof that constituted a constructive amendment of the indictment.**

**A.  Introduction.**

Despite the objective evidence to the contrary, the government continues to press its position that the indictment in this case charged an omission theory of liability. First, a review of the indictment reveals inadequate notice of any intent to proceed on an omission theory of liability. Second, consistent with the indictment, the government throughout the course of this litigation uniformly described this case as an affirmative false representation case, to the exclusion of any meaningful descriptions of omissions.

Third, consistent with an indictment that did not identify or charge that the defendant possessed some legal duty of disclosure, the government never established or even argued during trial that a legal duty to disclose existed between Dan Carpenter and any of the charged Exchangors, and the Court never instructed the jury that it needed to find a legal duty to disclose existed. Fourth, even if *arguendo* some legal duty to disclose did exist, there simply was no opportunity for Mr. Carpenter to make such disclosures, given the undisputed evidence that he never met with or even spoke to any of the Exchangors prior to the transfer of any funds to BPE. No more than a lawyer has a duty to disclose past convictions, or a doctor past unsuccessful surgeries, Dan Carpenter had no legal duty to disclose investment failures to the Exchangors, especially considering the absence of any conversations with any Exchangor that would naturally call for such disclosures. In short, the omission theory of liability was a reverse course born of necessity, given the government's eventual understanding that the defendant would utilize the actual written agreements to demonstrate to the jury that the documents in fact disclosed that the funds would be invested at BPE's discretion. [8] In so doing, the government prejudicially varied facts of proof and constructively amended the indictment returned by the grand jury in this case.

### B.  Argument.

The government advances two main arguments in opposition to the defendant's constructive amendment argument, neither of which is compelling. First, the government

---

[8]. See, e.g. Tr.4:151 (in response to Court's inquiry that it believed case was more of a bright-line, government argues that "to the extent that some of the agreements do use the word 'invest', which Mr. Goldstein has emphasized in his cross, he is arguing through his questions, that the use of the word 'invest' in the agreements constituted authorization for the defendant to do whatever he wanted to do with the money so long as it fell within the broad penumbra of the word invest. And to the extent that's his argument, and it certainly is, then it becomes highly relevant to explain that there is, you know, there's a universe of investments out there.").

argues that the wire and mail fraud counts in the indictment were framed in the language of the governing statutes, those statutes proscribe "false and fraudulent pretenses", and the term "false and fraudulent pretenses" includes "half-truths" and "knowing concealment of facts." (Government Opposition at 17-18). Second, the government argues that language within five (5) paragraphs of the indictment provided constitutionally adequate notice that the government would proceed on an omissions theory of liability.

It is true that the general statutory term "false and fraudulent pretenses" can, in an appropriate case, encompass half-truths and knowing concealment of material facts, but, in order to provide the notice required by the Due Process Clause, the government must adequately plead and charge the "half-truths" and "knowing concealment of facts" within the indictment. See, e.g., United States v. Yefsky, 994 F.2d 885 (1st Cir.1993) (finding count of indictment charging defendant with conspiracy to commit engineering fraud by mails did not provide adequate notice and was therefore defective because it did not specify false pretenses used). In this case, practice simply does not meet theory. Not only does the indictment provide wholly inadequate notice of an omission theory of liability, the government's representations throughout the course of the litigation confirmed the defendant's belief that the government was proceeding on an affirmative false representation theory of proof, not omission liability.

First, the indictment. In an indictment that contains 108 paragraphs, the government can cite only five paragraphs that even remotely support their argument that the indictment limned an omission theory of liability. The imperceptible omission theory ostensibly outlined in these five paragraphs simply does not constitute constitutionally

adequate notice. See, e.g., Yefsky, 994 F.2d 885 (1st Cir.1993) (finding count of indictment charging defendant with conspiracy to commit engineering fraud by mails did not provide adequate notice and was therefore defective because it did not specify false pretenses used). Indeed, after four days of trial, and therefore well after the Court had studied the indictment in this case, even the Court did not discern an omission theory of liability in the indictment, but instead believed the government's case was more "bright-line" than the case being prosecuted by that stage of the litigation, questioning "why does prudence matter … I've been getting the impression that the government's case is a little bit more bright-line. That is, that the misrepresentations that underlie the fraudulent scheme were that the money would be parked in particular places and nowhere else and so on. You've been emphasizing the 'only returned to the Exchangor' language and so on and so forth. And that the fraudulent intent was having said those things, then going and using the money someplace else; but not that it mattered qualitatively how bad the other investments were as opposed to just being outside the scope of what had been represented." (Tr.4:145, 150).

Certainly, the Court, like the defendant, reached this understanding because, among other reasons, the indictment charged such a case. Indeed, a careful review of the paragraphs cited by the government undermines their position that adequate notice was provided in this case of an omission theory of proof. Paragraph 31 states that "[u]beknownst to BPE's clients, Carpenter also opened up a second account at Merrill Lynch in the name of BPE." (Indictment at ¶31). Paragraph 46 states that Carpenter "did not disclose the existence of the '33' account to BPE's clients." (Indictment at ¶46). These paragraphs do not describe an omission theory of proof or charge a duty or

opportunity to disclose. The three remaining paragraphs cited by the government---
paragraphs 41, 49 and 101—contain a single sentence, in the midst of larger paragraphs,
that Carpenter "did not notify or direct BPE personnel to notify current or prospective
clients that he was using client funds" to invest in options trading or that he was
sustaining substantial losses. (Indictment at ¶¶41, 49, 101). Again, there is no
corresponding charge of some legal duty to disclose or even an opportunity to disclose.

At its essence, the government argues that one or two sentences in a 108
paragraph indictment, spanning more than 31 pages, provided the defendant with notice
that, at the end of the case, the government would rely virtually exclusively on an
omission theory of liability. "Rule 7(c)(1) of the Federal Rules of Criminal Procedure
requires an indictment to provide 'a plain, concise and definite written statement of the
essential facts constituting the offense charged.'" Yefsky, 994 F.2d at 893. One or two
sentences sprinkled over a 31 page indictment does not constitute a plain, concise and
definite statement. "Where guilt depends so crucially upon such *a specific identification
of fact*, our cases have uniformly held that an indictment must do more than simply repeat
the language of the criminal statute." Yefsky, 994 F.2d at 893. In Yefsky, the count at
issue did not provide any description of the scheme. In this case, the indictment contained
an unduly verbose description of a scheme spanning 31 pages that provided wholly
inadequate notice of an omission theory of liability. See United States v. Russell, 369
U.S. 749, S.Ct. 1038, 8 L.Ed.2d 2408 (1962) ("A cryptic form of indictment in cases of
this kind requires the defendant to go to trial with the chief issue undefined.  It enables
his conviction to rest on one point and the affirmance of the conviction to rest on another.
It gives the prosecution free hand on appeal to fill in the gaps of proof by surmise or

conjecture"). Under these circumstances, the defendant was unable to prepare a proper defense to the theory of proof ultimately pursued by the government. See Russell, 369 U.S. at 767 ("An indictment's primary purpose is to inform the defendant of the nature of the accusation against him."). In United States v. Tomassetta, 429 F.2d 978 (1st Cir. 1970), the First Circuit, in finding an indictment failed to state an offense, explained the relevant principles at stake:

> A vital function of an indictment is to provide 'such description of the particular act alleged to have been committed by the accused as will enable him properly to defend against the accusation. This principle is derived directly from the Sixth Amendment's guarantee of the right of an accused 'to be informed of the nature and cause of the accusation' and is basic to the proper functioning of our adversary system of justice. Without sufficient information to identify that conduct which the grand jury has deemed adequate to support an indictment, an accused is at a material disadvantage in meeting the charge against him.

Tomassetta, 429 F.2d at 979. At the very least, in this case, rather than simply repeating the language of the criminal statute in the charging paragraphs, the government was obligated to notify the defendant therein that it intended to rely on so-called "half-truths" and/or "concealment of material facts." (Indictment at ¶¶103, 105).

In actuality, the omission theory of liability was developed by the government post-indictment in response to the defense strategy of demonstrating that the written agreements disclosed risk and provided Dan Carpenter with the discretion to invest the funds. Indeed, nothing demonstrates the fact that it was an afterthought (i.e., after indictment) more starkly than a review of the government's pretrial pleadings. For example, in the government's opposition to the defendant's motion to dismiss, filed by the government in May 2004, in arguing that the allegations of the indictment "fully inform Carpenter of the charges against which he must defend," the government does not rely upon or articulate any omission theory of liability, nor does it cite the five foregoing

paragraphs in support of an argument that the government was pursuing an omission theory of proof. (<u>See</u> Government's Opposition to Defendant's Motion to Dismiss the Indictment, Docket Entry 18, at 1). Under a section entitled "The Indictment's Allegations", the government sets forth a bright-line indictment that "revolve[s] around false representations made to induce clients to retain and escrow funds with Carpenter's company" pursuant to "written and oral assurances [] that BPE would hold their money safe and return the principle to them, in full, for using in closing on the purchase of replacement property." (Government's Opposition to Defendant's Motion to Dismiss the Indictment at 2-3). The unequivocal thrust of the government's description of the offense is affirmative false representations:

- "The indictment sets forth in detail the specific assurances that were given to clients. They included <u>representations</u> that BPE was trustworthy, that the money would be held in escrow in the designated account into which the clients were instructed to transmit the funds, that BPE would not transfer the money out of the account without the client's written authorization, and that BPE would return the funds in full…" (Government's Opposition to Defendant's Motion to Dismiss at 3).
- "As Chairman of BPE, Carpenter was aware of the <u>representations</u> that were being made to induce clients…".  (Government's Opposition to Defendant's Motion to Dismiss at 3).
- "Contrary to the <u>representations</u> that were made to clients, however, Carpenter did not hold the escrow funds safe in accounts into which they had been wired. Instead, without his clients' knowledge or authorization, Carpenter took the funds and used them to engage in aggressive, high stakes trading in the options market…" (Government's Opposition to Defendant's Motion to Dismiss at 3).
- Carpenter's plans went awry, he began sustaining substantial losses, he ignored warnings from brokers and "[i]nstead, BPE continued, with Carpenter's knowledge, to solicit and induce clients to entrust funds to the company based on <u>false representations</u> that the money would be held safely in escrow, and Carpenter continued, without his clients' knowledge or authorization, to take and to use those funds to finance his high risk trading 'strategy.'" (Government's Opposition to Defendant's Motion to Dismiss at 4).
- "All of the clients were induced to retain BPE and to entrust their money to the company based on <u>explicit representations and assurances</u> that they received concerning the safety of their funds and the manner in which the money would

be held. (Indictment 59-95). None of the clients authorized Carpenter to use their funds for high risk options trading. *None was told that Carpenter was engaged in such trading with BPE client money, that he was sustaining heavy losses in such trading, or that Merrill Lynch had terminated Carpenter's account privileges because of the excessive risk of his trading 'strategy.' Id. They were not told this even though" the $9 million lost was transferred from August to December 2000, after heavy losses were already sustained and after termination by Merrill Lynch.* (Government's Opposition to Defendant's Motion to Dismiss at 5).

- Carpenter engaged in a scheme "pursuant to which these and other clients were induced to entrust their funds to Carpenter's company (BPE) based on <u>false representations</u> that the funds would be held safely and securely in escrow; that the funds would not be transferred without the client's written authorization; and that the funds would be disbursed only for the purpose of closing on the purchase of replacement property or to be returned directly to the client." (Government's Opposition to Defendant's Motion to Dismiss at 5-6).

- "Having obtained the funds through these false pretenses, Carpenter then proceeded—<u>contrary to the representations given to the clients</u>—to misappropriate the funds by using them to engage in speculative options trading, ultimately losing over $9 million in client funds." (Government's Opposition to Defendant's Motion to Dismiss at 6).

- "The foregoing summarizes the gravamen of the charges set forth in the indictment. As the discussion makes clear, and contrary to defendant's characterizations in his motion to dismiss, Carpenter was not indicted for simply breaching a contract, for being a businessman trying to make a profit, or for suffering losses as an 'innocent' victim of the downturn in the stock market that occurred in 2000. <u>Rather, Carpenter was indicted on fraud charges stemming from his intentional misappropriation of client funds that were entrusted to Carpenter's company based on false representations of safety and security.</u>" (Government's Opposition to Defendant's Motion to Dismiss at 6).

Most telling is the government's argument in their opposition to the motion to dismiss that the indictment adequately plead the existence of a scheme to defraud. There is no mention in that section of any duty or failure to disclose facts, no reference to half-truths, and no mention of concealment of facts. Rather, it is focused entirely on false, affirmative representations. The government's argument is worth repeating in its entirety:

> The indictment contains detailed allegations concerning the charged scheme to defraud. Contrary to the defendant's protestations (Def. Br. at 7-8), these allegations fully inform Carpenter of the "what," "when," and "where" of his criminal conduct.

Paragraphs 25 through 29 of the indictment set forth a comprehensive overview of the scheme. They charge Carpenter with having engaged in a scheme pursuant to which: (a) clients were induced to entrust substantial sums of money to BPE based on false representations that their funds would be held safely in escrow; (b) contrary to those representations, Carpenter misappropriated (i.e., took) the money without his clients' knowledge or authorization and used it to finance high risk options trading, the purpose of which was to achieve substantial financial gain for himself; and (c) notwithstanding significant trading losses, Carpenter continued to solicit, gamble with, and lose ever-increasing amounts of escrow funds that BPE had promised to hold safe, until more than $9 million in client monies was gone (Indictment ¶¶ 25-29).

The indictment contains a thorough explication of each facet of the above-described scheme. It sets forth the process utilized by BPE in performing section 1031 property exchanges (Indictment ¶¶ 4-10); the division of responsibilities, including Carpenter's role, in that process (¶¶11-16); the specific (false) representations that were made to clients to induce them to entrust their funds to Carpenter's company (¶¶ 17-24 0; Carpenter's conduct in misappropriating the funds to engage in high risk options trading (¶¶ 30-53); and the substantial monies that Carpenter lost as a result (¶¶ 30-53, 58).

In addition, for each of the seven BPE clients whose funds constituted the bulk of the monies that Carpenter lost, the indictment sets forth detailed allegations concerning the clients' individual transactions, including the false representations that were made to them, the monies they transmitted in reliance on those representations, and the funds that Carpenter misappropriated and lost. (¶¶ 59-101).

In sum, the indictment contains a comprehensive presentment of the "what," "when," and "where" of the fraudulent scheme and the specific conduct committed by Carpenter in furtherance of that scheme. Defendant's contentions to the contrary are unavailing.

(Government's Opposition to Defendant's Motion to Dismiss at 7-8). In this description

of the "what", "when" and "where" of Mr. Carpenter's alleged scheme to defraud, there

is not a single asseveration that paragraphs 31, 41, 46, 49 or 101 charge an omission

theory of liability, there is not a single mention of a failure to disclose certain

information, there is no mention of the word "half-truths", and there is no allegation of

"concealment of material facts." Instead, it refers to "specific (false) representations that were made to clients to induce them to entrust their funds to Carpenter's company." (Government's Opposition to Defendant's Motion to Dismiss at 8). Further, in arguing that the indictment adequately plead the "materiality" element, the government focused singularly on the false representations of safety and the purpose of a section 1031 exchange being the prompt roll over of the funds. (Government's Opposition to Defendant's Motion to Dismiss at 13). The government concluded its opposition:

> "The indictment alleges a scheme pursuant to which Carpenter willfully misappropriated funds <u>obtained through false representations and promises</u>, gambled those funds in the options market, and lost $9 million of the money. Accepting these allegations as true, as must be done in ruling on a motion to dismiss, the indictment adequately pleads the offenses that are charged."

(Government's Opposition to Defendant's Motion to Dismiss at 14) (emphasis added).

The government's omission theory of liability was virtually invisible (in one instance it was a rhetorical afterthought) to their repeated characterizations of their charges and their proof as being based on the premise that all the clients were induced to retain BPE and entrust their money based on "false representations" regarding the safety of their funds and the fact that they would be held in escrow and returned. [9]

The same theory of proof permeates all of the government's pretrial pleadings— i.e., a prosecution based on specific false representations and promises of safety, followed by investments in the options market. <u>See</u>, <u>e.g.</u>, Opposition to Continuance Motion at 1-2 ("straightforward fraud case" … a simple case based on 7 victims, $9 million dollars lost,

---

[9]. As noted *supra*, in the government's opposition to the motion to dismiss, there is a singular reference to the fact that clients were not told of the trading or losses, but that was not repeated in the body of the government's argument that the indictment adequately plead the existence of a scheme to defraud. Indeed, it is simply a lonely afterthought in a record replete with summaries of both charges and proof as an false representation case - both written and oral. It certainly does not constitute adequate notice of an omission theory of proof in this case.

based on "representations that the funds would be held in escrow and returned to them");
Government Opposition to Transfer Case to District of Connecticut 1, ¶1 ("false
representations" made to Massachusetts individuals); Government Opposition to Motion
to Dismiss for Venue at 1, 4 (indictment summarized as being based on false
representations and assurances funds will be held in escrow and returned).

Clearly, then, a careful review of the indictment and the government's pleadings
in this case amply demonstrates there was inadequate notice that the government intended
to proceed on an omission theory of liability. There are additional legal barriers, though,
to a conviction in this case based on omissions. An omission theory of liability must be
affirmatively plead and proven, and it requires the legal predicate of a duty to disclose
(or, at the very least, an opportunity for disclosure). For example, in United States v.
Cassiere, 4 F.3d 1006, 1022 (1st Cir.1993), the court quoted Judge Young's instruction in
a case predicated on a failure to disclose material facts:

> A failure to disclose a material fact may also constitute a false or
> fraudulent misrepresentation if, one, the person was under a general
> professional or a specific contractual duty to make such a disclosure; and,
> two, the person actually knew such disclosure ought to be made; and three,
> the person failed to make such disclosure with the specific intent to
> defraud.

Here, even if the five paragraphs relied upon by the government provided adequate notice
that the government would argue omissions, there was no charge or evidence offered in
this case that (a) Mr. Carpenter had a duty to disclose or (b) he knew he had a duty to
disclose. These elements were simply never the subject of evidence, argument or dispute.
Indeed, the Court never instructed the jury they needed to find these legal predicates to a
conviction on an omission theory of liability.

The lack of focus on these elements illuminates part of the prejudice suffered by the defendant as a result of the government's 180 degree change of course. The defense never focused on disproving a duty to disclose or knowledge of any arguable duty to disclose. For example, if the defendant had notice of the government's intention to argue an omission theory of liability, the defendant would have vigorously contested that Mr. Carpenter possessed a legal duty to disclose or knowledge of a duty to disclose. For example, section 1031 specifically prohibits the intermediary from being a fiduciary of the Exchangors. The defendant would have sought expert testimony that no duty to disclose exists within the unique (anti) relationship between intermediary/exchanger. The defendant would have affirmatively argued that if there was *arguendo* a duty to disclose it was not known to Mr. Carpenter, which again is an essential element under Chief Judge Young's instructions in <u>Cassiere.</u>

Requirements imposed on prosecutions under 18 USC §1001 are instructive here. Section 1001 offenses can be proved by either omissions or affirmative false statements, but they are separate offenses. <u>See</u> <u>United States v Anzalone</u> 766 F.2d 676, 682-3 (1st Cir. 1985) (requiring that government prove a legal duty to disclose the material facts at the time the defendant was alleged to have concealed them). Although obviously a different statute, §1001 case law indicates that the making of a false statement (the *sine qua non* of <u>this</u> wire and mail fraud charge) and the making of a material omission/concealment are separate theories of liability or even offenses. <u>See</u> <u>United States v Diogo</u> 320 F.3d 902 (2d Cir. 1963)("it is well established that [§1001] encompasses within its proscription two distinct offenses, concealment of a material fact and false representations"); <u>see also</u> <u>United States v Uram</u> 148 F.2d 187, 190 (2d Cir. 1945)(distinguishes between the

obtaining of a loan based on an affirmative misrepresentation and the concealment of the fact that a prior loan was unpaid); <u>United States v Tobon-Builes</u>, 706 F.2d 1092, 1096 (11th Cir. 1983). Even if not separate and distinct offenses under the mail and wire fraud statutes, at a bare minimum, an omission theory of liability under these statutes requires adequate notice (not three to five paragraphs in a 108 paragraph indictment that are substantively ignored by the government in pretrial pleadings and litigation), and it requires the pleading and proof of a duty to disclose. In short, an omission is not material absent a duty to disclose and *mens rea* is not present without the defendant's knowledge of such a duty.

Moreover, even if *arguendo* the Court concludes the indictment provided adequate notice that the government would rely on certain omissions and that the government plead and proved a duty to disclose, a fatal factual disconnect exists in this case that renders an omission theory of liability *non sequitur*. Omissions can only be a basis of liability if the defendant, factually, had an opportunity to make the disclosure at issue. Here, it is acknowledged by all parties that Mr. Carpenter never once met with or spoke to any of the Exchangors prior to their decision to transfer funds to BPE. Given this undisputed factual predicate, there simply can be no liability for a failure to disclose. If Mr. Carpenter had been asked direct questions and provided a "half-truth" in response, or concealed a material fact during a conversation with an Exchangor prior to the transfer of funds, then perhaps liability on an omission theory of liability would be logically comprehensible. Where there were no discussions or conversations with Mr. Carpenter, however, there is simply a factual void that is insurmountable.

With Mr. Carpenter having no opportunity to make an oral disclosure, the omission theory could rest only upon a duty to incorporate into the written agreements the specific nature of the investments or a prior track record of investments, but this again is a completely uncharged theory of fraud. Moreover, all of the Exchangors conceded that the written exchange agreements did not preclude investment of their funds. For example, during cross-examination, Mr. Patterson, largely by adopting prior civil deposition answers, reluctantly conceded that, although safety was *his* concern, the BPE documents all indicated that the funds were going to be *invested*. Moreover, Mr. Patterson conceded that the BPE documents did not particularize the nature of the investments nor preclude options investing or any other investment stratagem elected at the discretion of the intermediary. (Tr. 9:106-9).[10] The paradigm established by the Patterson cross-examination reflects a basic lack of meeting of minds despite the integration clause of the written exchange agreement. Patterson strains to say "to my way of thinking" paragraph ten of the exchange agreement limited investments to some 6% specific Merrill Lynch account, but he agrees that the written agreements do not limit investments to CD's or Money Market or cash management accounts.  (See Tr. 9:109).[11]

The prejudice suffered by the defendant by the government's sudden reversal is immeasurable and unmistakable. One need look no further than the government's closing arguments in this case and the evidence (or lack thereof) admitted during trial in support

[10]. Of course, all of the lawyers are reluctant to concede the obvious—that the documents did not limit investment discretion—because their lack of due diligence, their lack of understanding what the written escrow and exchange agreements do and do not guarantee subjects them, as Adams so testified, to liability risks and, as to Patterson, embarrassment.

[11]. Parenthetically, Patterson illustrates the irrationality of the government theory that movement of client funds out of original incoming ML account was in violation of non-transfer paragraphs of the exchange agreements: Patterson testified that he knew that the money would be deposited into one account at ML and then there was the possibility that it would be moved into a second account for investment.  (Tr. 9:105).

of those arguments. For example, on direct examination, Exchangors were repeatedly asked whether anyone told them of a risk of loss of their funds, and of discretion to invest their funds in the option market. Paley and Jokinen were the only representatives of BPE with whom any Exchangor conversed regarding the exchange process. Mr. Carpenter never even had the opportunity to orally disclose any risks and/or discretion. The evidence at trial established that Paley knew from the inception of BPE (September 1998) that the company's objective was in fact to invest the clients' principal in options. There was no conspiracy charge indicating Mr. Carpenter and Paley agreed to not disclose this objective to Exchangors. There was no evidence Mr. Carpenter ever instructed Paley to not disclose this objective to investors. Indeed, the evidence established that Mr. Carpenter facilitated communication between Gerald Levine at Merrill Lynch and the only attorney for an Exchangor (Patterson for Carey) with whom he spoke, and there was absolutely no evidence indicating that Mr. Carpenter in any manner whatsoever instructed Levine to *not* disclose the options objective to Patterson.

Given all of the foregoing, in a non-conspiracy prosecution involving only Mr. Carpenter, there was simply no basis for the government to ask questions of its witnesses regarding what they were not told during conversations with Paley and/or Jokinen. All of the government's carefully crafted questions, at the conclusions of their direct and re-direct examinations, regarding what the Exchangors were <u>not</u> told – largely by Paley – not only constituted an improper constructive amendment of the indictment, but were improper given the evidentiary record established in this case and the void of any evidence that such omissions could plausibly or rationally be connected to Mr. Carpenter.

The government's summations stressed the omissions. AUSA Mitchell argued: "What's also important here, and as you've been instructed by Judge O'Toole, is what wasn't <u>said</u>. Judge O'Toole has instructed you that fraud also includes not only what was said but the concealment of material facts. What wasn't <u>said</u> to these people was critically important…never told them he'd be trading in uncovered or naked stock options…he never told them there was a risk that they might lose all their money. Would these things have been useful for these people to have known? Absolutely." (Tr. 12:26).[12] AUSA Mitchell later argued that "[o]ne would have also expected Mr. Carpenter…to have <u>told</u> his clients a little bit more about what he was doing. There's no mention … at all of any risk of loss in any of the materials you've seen." (Tr. 12:36). Again, given there were no communications between Mr. Carpenter and the Exchangors, and that no conspiracy was charged in this case whereby Paley agreed to not disclose any risks, the predicate for this argument is missing.

In his rebuttal argument, AUSA Pineault focused extensively on the government's "omission" theory of proof. For example, he argued that there was "Nothing in documents about options trading, about risks in turning over money to Benistar." He also argued that there was nothing in the escrow and exchange agreement given to Patterson "that says anything about options trading…would have given Mr. Patterson the first clue as to the risk he was running in giving the funds over to Benistar property. Nothing." (Tr. 12:91).

Additionally, to the extent the indictment *arguendo* provided notice of "omissions," the government argued "omissions" not even arguably referenced in the five paragraphs

---

[12]. As discussed above, Mr. Carpenter never even communicated with the Exchangors. As such, the entire predicate for this argument is missing.

relied upon by the government. For example, the government argued that there was nothing in the escrow agreement or exchange agreement telling clients what Mr. Carpenter was told by PaineWebber and/or Merrill Lynch. (Tr. 12:92). This was not an "omission" detailed in the five paragraphs relied upon by the government, which, if anything, referenced a failure to disclose a second account and a failure to notify clients of options trading and losses. The government argued that "conspicuous omissions is the language from the escrow agreement that specifically say to the clients your money will not be moved without your authorization…" (Tr. 12:92). Again, this was not listed in the indictment as a failure to notify. The government argued: "put yourself in the shoes of Bryon Darling…pretend you had been the person to receive those documents…ask yourself is there anything in here that would have put me on notice that my money could be taken by Mr. Carpenter and put in the options market and traded…that my money would be at substantial risk of loss…none of the disclaimers from Merrill Lynch, none of the warnings from PaineWebber. (Tr. 12:93-94). Again, this exceeded even the limited language in the five paragraphs relied upon by the government. The government argued omissions in what Marjorie Adams was told (Tr. 12:94) and omissions in documents regarding potential profits to BPE (Tr. 12:95), neither of which was detailed in the indictment as "omissions." Clearly, the government even exceeded the two to three omissions they contend were limned in the indictment.[13]

### C. Conclusion.

The indictment did not provide adequate notice of an omission theory of liability. The indictment did not charge, the government did not argue, and the evidence did not

---

[13]. The government also argued omissions to brokers regarding the sources of the funds being invested. (Tr. 12:37). This was not charged in the indictment as an omission (not to mention it was excluded as relevant evidence in this case by the Court).

establish a legal duty to disclose. Even if such a duty *arguendo* existed, the government offered no evidence that Mr. Carpenter knew of such a duty to disclose or even had an opportunity to disclose. Notwithstanding the foregoing, the government relied extensively on proof of omissions during trial and during summation. Indeed, by the end of the trial the government's case had boiled down to (a) Mr. Carpenter failed to disclose he was engaged in options trading and (b) he failed to disclose that the options trading was losing a lot of money. Based on the government's inaccurate representations that it adequately plead and provided constitutionally sufficient notice of an omission theory of proof, the Court improperly instructed the jury that it could convict on the basis of omissions. (Tr. 12:10-11) (court instructing the jury that guilt could rest on statements that are false in their entirety, "as well as statements of half-truths that are misleading because of what they omit, though what is actually said may be literally true"). The government's eliciting of omission evidence and summation constituted a full-scale constructive amendment. As such, a new trial is warranted.

**VII.    The defendant was unfairly prejudiced by the government's ability to change its theory of liability at the end of the case.**

The defendant was severely prejudiced by the government's ability to change theories at the conclusion of this case. As defense counsel argued during the charge conference, wherein he moved *in limine* to prevent the government from arguing that Paley's culpability does not excuse Mr. Carpenter's alleged culpability, it was catastrophic to the defense strategy in this case to allow the prosecutors to simply exploit the defendant's cross-examination of Paley by simply transitioning into a new theory of criminality, the very evil which the United States Supreme Court warned against in United States v. Russell, 369 U.S. 749, 767, S.Ct. 1038, 8 L.Ed.2d 2408 (1962) ("A

cryptic form of indictment in cases of this kind requires the defendant to go to trial with

the chief issue undefined.  It enables his conviction to rest on one point and the

affirmance of the conviction to rest on another.  It gives the prosecution free hand on

appeal to fill in the gaps of proof by surmise or conjecture"). Clearly, if the government is

prohibited from arguing inconsistent theories of factual guilt in successive prosecutions,

they are unequivocally barred from arguing inconsistent theories of factual guilt in the

same prosecution. Yet, in this case, the government responded to the vicissitudes in proof

by changing from a theory that Mr. Carpenter caused an unwitting Paley to act as his

non-culpable agent (relying upon 18 USC §2(b)) to Mr. Carpenter aiding and assisting, or

simply conspiring with, a culpable principal, Paley, (ostensibly pursuant to 18 USC

§2(a)).  The gravity of this impropriety was so stark that the government withdrew its

request for any aiding and abetting instruction.


**VIII.   The improper and prejudicial prosecution summations deprived the
defendant of a fair trial.**

   **A.    Plain error is an appellate standard of review that simply is not
applicable to a motion for new trial, which is governed by the
"interests of justice."**

   As an initial proposition, the government argues that objections were not made to

some of the government's improper arguments and therefore the defendant bears the

burden of establishing "plain error." (Government Opposition at 10).  "Plain error" is an

appellate standard of review and is not relevant to a motion for new trial made within

seven days of the verdict pursuant to Rule 33, which "may be granted liberally" if "in the

interests of justice." United States v. Conley, 323 F.3d 7, 10 (1st Cir.2003) (emphasis

added). There is no authority cited by the government that "plain error" ever applies to a

motion for new trial pursuant to Rule 33. The only case cited by the government, United States v. Taylor, 54 F.3d 967, 977 (1st Cir.1995), predictably discusses a standard of review ("so poisoned the well that the trial's outcome was likely affected") in the context of an appeal. Stated simply, the defendant need not establish "plain error" at this stage of the litigation.[14]

It is worth noting, however, that the government's "plain error" argument is telling for two reasons. One, it again demonstrates that the government's interest in this case is securing a conviction, rather than justice, at all costs. Rather than simply admit its errors, the government seeks to invoke a higher standard of review to insulate its errors. Two, should the Court deny the defendant's motion for new trial, the government will surely advocate for the "plain error" standard of review to insulate its errors on appeal. This only exacerbates and illuminates the prejudice to the defendant of the government's improper argument, as the government will have gained an unfair advantage at trial of improper arguments to the jury yet will seek the protective cover of a heightened standard of review on appeal. The defendant respectfully contends that the Court should consider such an unjust result in deciding the defendant's motion for new trial, given the existence of numerous improper arguments by the government during summations.[15]

---

[14]. Moreover, for the record, the defendant does not concede that the errors were not preserved. There were several motions in limine made to the Court, orally and in writing, before and during trial that raised some or all of the issues identified by the defendant in his opening brief. As the government notes, several errors were fully preserved at the conclusion of the government's argument. (Tr. 12:114-115). In any event, as noted, the issue of preservation of errors is for the First Circuit to determine, if necessary.

[15]. It should also be noted that the defendant did not suggest in his brief that he requested curative instructions on all points and the Court thereafter declined to give them. (Government Opposition at 10). Rather, after highlighting the three prong test employed in the First Circuit, one of which is whether the Court gave any curative instructions, the defendant noted that the Court did not give any in this case. (Defendant's Brief at 25).

**B.**     **The government simply can not answer the impropriety of their "professionals" argument.**

In the government's opposition, there simply is no meaningful response for the government's improper argument that the defendant must have lacked good faith because all of the real estate professionals and sophisticated Exchangors "arrived at the same conclusion" after reading the escrow agreement and other written documents—i.e., that their money would not be invested--it was not even "an after thought for them." Tr. 12:28. For example, AUSA Mitchell argued: "That's the message the other real estate professionals you heard from …Remember Jeff Johnston…Gail Cahaly…she heard escrow.  That meant something to her too…then there's Chuck Bellemore…escrow agreement meant something very specific to him…it meant it was a place where one could place one's property or one's money for a short period while the transaction was completed." (Tr. 12:24). AUSA Mitchell also argued: "What about the real estate professionals? Again, escrow meant something very specific to them…all these people read the same documents, they all came to the same conclusion.  No problem, we'll get the money back." (Tr. 12:28). Despite the defendant's motion in limine to preclude this precise argument, made during the charge conference, and despite the Court's indicating that the argument did not appear relevant given that Mr. Carpenter did not have face-to-face meetings with the Exchangors, Tr. 11:57, 59, AUSA Mitchell made this argument without first securing approval from the Court or previewing the issue to the defendant prior to argument. Clearly, AUSA Mitchell should not have made this impermissible argument to the jury, especially without prior approval of the Court. [16]

---

[16]. The defendant moved *in limine* to prevent this specific argument by the government. AUSA Pineault advised the Court that he did not believe Mr. Mitchell would make such an argument, yet it was clearly the government's intention all along to make such an argument, given the questions

Equally egregious, these arguments simply are not supported by the evidence admitted during trial in this case. Johnston testified that he used escrow agreements 50 times, but no testimony was elicited about his opinions of their meaning or their limits. (Tr. 11:58). Moreover, he testified he never used an escrow agreement in a 1031 exchange prior to the transaction at issue and had never seen the "invest" language within the BPE escrow agreement in other escrow agreements. With regard to Ms. Cahaly, she never even signed an escrow agreement and could recall signing only a fee agreement. (Tr. 11:43). Likewise, Bellemore testified that he had done 5-6 escrow agreements in real estate deals, but never in a §1031 exchange and, again, no opinion was elicited regarding what they connoted to him.  (Tr. 4:101). He further testified that he signed an escrow agreement with Paley and there was no guarantee of safety contained within its terms. (Tr. 4:128).

The government also inappropriately transferred the professionals' alleged "knowledge" regarding escrows to the defendant, who they referred to as the "tax lawyer." During his final argument, AUSA Mitchell argued: "What did Mr. Carpenter do?  Per David Patterson's request Mr. Carpenter drafted the escrow agreement and sent it to him…the defendant <u>knew</u> from the start that the concept of an escrow would convey to the prospective clients that their funds would be held securely and returned to them. The defendant <u>knew</u> in his conversation with Patterson that the word 'escrow' means something very specific to real estate professions, including real estate attorneys like Patterson…that an escrow was a parking space for money not a fast lane." (Tr. 12:23-24) (emphasis added).

---

asked of these witnesses, which precipitated defense counsel's motion *in limine* regarding this argument.  (Tr. Charging Conf. at 46-49)

There was simply no evidentiary support for the argument that Mr. Carpenter "knew" these things, or even that Patterson told Mr. Carpenter that his meaning of escrow was "something very specific to real estate professional … that an escrow was a parking space for money, not a fast lane." There was no conversation with Mr. Carpenter wherein Mr. Patterson articulated that proposition or wherein he questioned or told Mr. Carpenter that the escrow agreement meant that the money would not be moved. To the contrary, Patterson conceded during cross-examination that he understood the money could be moved from the incoming account to generate the promised return. (Tr.9:105-106) (adopting deposition testimony that he understood funds could be moved into a separate account for investment for purpose of earning 6 percent).

In short, not only were the so-called real estate professionals' opinions and interpretations for the agreements irrelevant (given that Mr. Carpenter's state of mind controls), but their testimony in this case does not even provide the predicate for the summation, either factually or in terms of the prejudicial inference that any professional with experience with escrows axiomatically believed they guaranteed no investment risk. By going outside the evidence, the government "violated a fundamental rule, known to every lawyer, that argument is limited to the facts in evidence." United States ex rel. Shaw v. De Roberts, 755 F.2d 1279, 1281 (7th Cir. 1985) (affirming district court's granting of habeas petition in murder case). See also United States v. Wilson, 135 F.3d 291, 298 (4th Cir.), cert. denied, 523 U.S. 1143 (1998) (reversing drug trafficking conviction and remanding for new trial because "prosecutor asserted something as fact that had not been proved, and that was clearly improper"); United States v. Watson, 171 F.3d 695, 698 (D.C. Cir. 1999) (reversing cocaine distribution conviction and remanding

for new trial because "[d]uring closing argument to the jury the prosecutor misstated a defense witness' testimony on a critical point"); United States v. Earle, 375 F.3d 1159, 1160 (D.C. Cir. 2004) (reversing drug and firearms conviction and remanding for new trial because "the prosecutor's remarks were based upon information he knew conflicted with the record.").

     **C.**      **Miscellaneous errors of government's summations.**

The government asserts it "did not argue 'key facts' that were unsupported by the evidence," yet concedes in the next sentence that at least some of their argument was not supported by the record. (Government Opposition at 15) ("substantially all of the challenged statements were, in fact, supported by record evidence"). Moreover, the government simply ignores many of the improper aspects of its summations. For example, there is no response or justification for AUSA Mitchell's argument that Dan Carpenter deceived Merrill Lynch and PaineWebber by failing to disclose to them that the funds belonged to third parties. (Tr. 12:37). This argument relied on evidence specifically excluded by the Court and thus not admitted into evidence. Likewise, the government offers no meaningful evidentiary support for its argument that "[a]ll these [written] materials as we've discussed emphasize stability, emphasize safety, the money will be returned." (Tr. 12:22, 36). Predictably, in its response, the government can cite no example of any agreement wherein the words "safety" or "stability" appear.

With regard to the seemingly incontrovertible violation of the "Golden Rule," the government argues that its request for the jurors to put themselves in the shoes of the clients "was not an appeal to the jury's sympathy but rather a suggestion that they apply their common sense in evaluating the evidence before them." (Government's Opposition

at 13). Of course, if the government simply wanted to have the jurors apply their common sense, that is what they should have argued, not telling the juror's to put themselves in the shoes of Byron Darling, who AUSA Mitchell described in his closing as "the elderly gentleman from the Cape", Tr.12:27, or the shoes of Brian Fitzgerald, who AUSA Mitchell described "as the gentleman in the wheelchair who testified about the sale of his family's car wash business," Tr. 12:22.

The government also argues that its rebuttal contained no personal attacks on defense counsel, suggesting that the defendant has created that appearance by "a string of carefully crafted excerpts and alleged paraphrases." (Government Opposition at 13). There are no "alleged paraphrases" in the defendant's opening brief. Consider the following argument in rebuttal: "This focus on the word 'invest,' it's an argument by a lawyer on behalf of a lawyer." (Tr.12:94). The government has no response or explanation for this transparent attempt to convince the jury that two conniving lawyers have joined forces to deceive the jury.

> **D.**     **The government's summations were so infected with inflammatory and prejudicial gambling metaphors that a new trial is warranted on this basis alone.**

In response to the defendant's argument that the government improperly inflamed the jury with irrelevant and excessive gambling metaphors, the government's only response is that the "gambling metaphor originated with Carpenter himself." (Government Opposition at 16). Apparently, because a Merrill Lynch broker recalled Mr. Carpenter allegedly making a singular comment in a conversation in April 2000, the government believed it was at liberty to structure both closing arguments around the inflammatory predicate that Dan Carpenter was an out of control, reckless gambler intent

on losing other persons' money. The pervasiveness of the "reckless gambler" metaphor

can not be reasonably disputed:

- Any reasonable person…would have said its time to cash in my chips…Not Mr. Carpenter.  He kept on playing. (Tr. 12:34);
- His brokers harped on him on nearly a daily basis, you got to tone it down…he keeps going.  The self-professed river boat gambler pushes on … (Tr. 12:34);
- The compliance people at both of these places, Mr. Rasmussen from Merrill Lynch and Lori Enright from PaineWebber, who get on the phone…yeah I know I'm losing…its Alan Greenspan's fault, I'm looking for a Santa Claus rally, the market going to turn…all these excuses, all these excuses.  The kinds of excuses a person doesn't make if he's spending his own money.  He's free about it because he's gambling other people's money…" (Tr. 12:34);
- Speilman asked him "why don't you stop?  What does he do.  He laughs…knowing that he's using money that he got from people who believed that they were going to get it right back…cavalier attitude he had…because he knew he was spending other people's money." (Tr. 12:35);
- He was gambling the money … as we all know as markets go up, they also go down…. (Tr. 12:36);
- Mr. Carpenter is down $2 million, "What does he do…he keeps doubling down and doubling down and inevitably until the whole thing crashes.  How could anyone in good conscience do that?" (Tr. 12:39);
- Noting that T-bill rates were paying 6%, "He continued to gamble because it was easy. It was other people's money. The old saying that its easy to spend other people's money, it just as easy to gamble it as well." (Tr. 12:39);
- Arguing that Mr. Carpenter knew bonds were more stable, "He knows this the whole time, and yet he presses forward, he continues to double down. Nobody forced him to do that, and in the end it was easy, again, to continue to gamble other people's money. That's what he was doing there." (Tr. 12:40);
- Despite knowing promises were being made, "he chose, ladies and gentlemen, to invest their hard-earned money in what he knew to be the riskiest of investments, putting their money at grave risk …his unbridled greed pushed him to gamble more long after the point where he could have paid that money back." (Tr. 12:46).

AUSA Pineault reiterated the theme in his rebuttal argument:

- Adams not told Mr. Carpenter would "gamble it to try to make money for himself." (Tr. 12:94-95);
- Escrow not an investment scheme to give Mr. Carpenter money "so he can gamble it in stock market, make a million for himself." (Tr. 12:95);
- Arguing that the brokers told Mr. Carpenter to tone it down, that his strategy was not working. "And what did he say? Well, I know I'm acting a little bit

like a river boat gambler, but I know what I'm doing. What's $1,500,000 amongst friends." (Tr. 12:96).

- Mr. Carpenter is the one who "bet it in the options market…he didn't tell them, he didn't warn them…" (Tr. 12:98);

- He took other people's money, knowing that they had trusted it to the company based on expectations regarding it being held in escrow … He took that money and he gambled it in the options market so that it would be worth his time." (Tr. 12:99).

There simply can be no reasonable dispute that the government littered both summations with the improper, inflammatory gambling metaphor. That the defendant was investing other persons' money in options was not even an issue in dispute in this case—the defendant made this point absolutely clear throughout trial. (Tr. 7:66) (counsel again noting "[t]here's no factual disputes in this case that Mr. Carpenter was trading in options, that there were losses, that he was aggressive, that it was a risky strategy. It's not an issue."). As such, there simply was no reason to continually refer to this fact other than to inflame and incite the jury to decide this case on an improper basis. As much as the Court attempted to reign in the government's presentation of evidence, by limiting Allaire's testimony and excluding some of the brokers' testimony, the government inflammatory summation eclipsed all of these efforts, given its primary focus was to highlight the objectionable aspects of these persons' testimony. Even worse, there was no factual predicate for many of the arguments, such as the repeated references to "doubling down", the repeated assertions that Mr. Carpenter knew that he could not pay the money back at the time BPE accepted new clients, or the assertions that option investing was the riskiest of investment (the brokers' testimony was not received for the truth of their opinions and Allaire was not allowed to give his opinions). If at all appropriate—and the defendant strongly disputes its propriety—the government clearly overplayed the gambling metaphor in this case.

In a recent decision, United States v. Sanchez-Barrios, No. 03-2333, 2005 WL 2277629 (1ˢᵗ Cir. Sept. 20, 2005), the First Circuit emphasized that "[m]ischaracterization or overuse of a potentially inflammatory phrase may in some exaggerated circumstances be deemed prejudicial."  After noting that references to "corrupt officers" was a "marginally closer call" in terms of improper prosecutor conduct, the First Circuit found that "the manner and frequency of the prosecutor's usage of [the objected to phrase "corrupt officers"] was not excessive." Here, the prosecutors used the inflammatory gambling metaphor with such frequency, and in such a prejudicial manner, a new trial is warranted on the basis of this improper conduct alone.

Most critically, though, the prejudice of the gambling metaphors was exacerbated by the fact that the entire argument was constructed upon evidence that should not have been admitted in the first place, i.e., the brokers' testimony regarding their communications with Mr. Carpenter, The defendant presented a bright-line defense—he either had the discretion to invest the funds or he did not. Yet the government was permitted to elicit the brokers' communications with Mr. Carpenter, which amounted to no more than thinly veiled opinions that Mr. Carpenter was recklessly gambling other persons' money. The government then exploited this evidence to construct an argument depicting Mr. Carpenter as an out of control gambler recklessly spending other people's money. Indeed, only a small portion of either government closing argument was focused on the true issue in this case—the nature of the written representations. Instead, the overwhelming nature of the government's argument was focused on the $9 million loss and the wildly speculative nature of the options market. Yet, the losses and the defendant's investment strategy were not relevant, or marginally relevant at best. The

defendant clearly articulated a straight line defense:  he believed in good faith that he had

authority to engage in discretionary investments under the terms of the written

agreements (Tr. 7:66).  The Court understood the nature of the defense and repeatedly

inquired as to the admissibility of the evolving, cumulative and prejudicial evidence

being offered regarding the defendant's trading practices. (See Tr. 10:41) ("my concern is

making sure that the jury at the appropriate time is focused on the elements of the offense

and what needs to be proved. And I agree that to some degree this is all relevant as to

state of mind, but I'm concerned that the more the wisdom of the trading strategy gets

debated, the more the jury will think that has greater significance than maybe it does in

their deliberations… I want to keep this focused on whether there was an intent to

deceive or specific intent to defraud"); Tr. 12:17 (Court instructing the jury that for "the

purposes of this case, it does not matter that—if having obtained custody of the

Exchangors' funds without fraud, the defendant pursued an imprudent, risky, or even

reckless investment strategy"). Certainly, by the time Allaire was called by the

government, the defense had made crystal clear through counsel argument and the nature

of the limited cross-examination of the preceding witnesses that the defense was not to

endorse Mr. Carpenter's trading sagacity or conservatism, but instead to argue that it did

not matter given Mr. Carpenter's good faith belief—founded in the written agreements—

that he had discretion to invest the funds as he saw fit. Thus, almost every word from

Allaire was unrelated to the issues in dispute and arguably unrelated to the charges, and

so there was no principled basis for the government to elicit all of the testimony from

Allaire regarding the volatility, bullishness, and magnitude of trades and losses by Mr.

Carpenter. Clearly, a new trial would be fairer to Mr. Carpenter, it would be shorter, and

it would have the advantage of the Court making evidentiary rulings from the perspective of knowing pretrial (not post-trial) that Paley was not an innocent conduit as depicted in the government opposition to motions in limine and mostly to know how the government would ultimately argue the stock brokers/Allaire issues to the jury.

Given the bright-line defense in this case, all of the evidence regarding the brokers' communications to the defendant regarding the imprudent nature of his trading should have been excluded under Rule 403 and/or 701. It was admitted for limited purposes, but the government then exploited the evidence during closing argument as the predicate for an improper and inflammatory closing argument that characterized the defendant as an out of control riverboat gambler freely jeopardizing other persons' money. The volume of the investment evidence and the inflammatory nature of the government's summations simply eclipsed the jury's capacity to focus on the real issues in this case, which was the precise concern raised by the Court on Day 10 of trial (See Tr.10:41) (expressing concern jury will think trading sagacity has "greater significance than maybe it does in their deliberations"). The argument was simply not fair, it pervaded both closing arguments, and a new trial is therefore warranted. Certainly, the Court now knows the issues, the inherent risk of admitting the marginally relevant evidence, and will be able to reduce if not totally eliminate the prejudicial testimony during a retrial of this case.

## IX.     Conclusion.

Wherefore, for all of the foregoing reasons, as well as those articulated in his original brief, the defendant respectfully requests that his motion for a new trial be granted.

Respectfully submitted,
DANIEL E. CARPENTER,
By his attorneys,

**/s/ Robert M. Goldstein**
Robert M. Goldstein, Esq.
(BBO #630584)
20 Park Plaza, Suite 903
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com


**/s/ Jack E. Robinson**
Jack E. Robinson
(BBO#559683)
2187 Atlantic Street
Stamford, CT 06902
(203) 425-4500
Robinsonesq@aol.com

Dated:  September 26, 2005