# MARTIN G. WEINBERG, P.C.
## ATTORNEY AT LAW

20 PARK PLAZA, SUITE 905
BOSTON, MASSACHUSETTS 02116

(617) 227-3700

FAX (617) 338-9538

NIGHT EMERGENCY
(617) 901-3472

EMAIL: owlmgw@worldnet.att.net

November 4, 2005

**BY HAND & CM/ECF**
Hon. George A. O'Toole, Jr.
United States District Judge
Suite 2300
One Courthouse Way
Boston, MA 02210

    Re:    United States v. Daniel E. Carpenter, No. 04-cr-10029-GAO

Dear Judge O'Toole:

The defendant feels obligated to respond briefly to the government's factually erroneous and legally unsupported assertions contained in its letter dated November 3, 2005.

### Concurrence of *Mens Rea* with *Actus Reus*

The government misconstrues the defendant's concurrence argument. The issue is whether the government introduced evidence from which a rational jury could find that there was a concurrence of Mr. Carpenter's *mens rea* with his *actus reus* in the August-December 2000 period charged in the indictment. First, the defendant does not concede—in fact, ardently rejects—the proposition that he ever participated in any scheme to defraud, in 1998 or 2000, as the government insinuates in its letter to the Court. (See Government Letter at p.1, ¶3). Nor does the defendant concede that he <u>ever</u> knew that the documents reviewed in 1998 contained "false and fraudulent representations." The defendant's November 2, 2005 letter to the Court assumed *arguendo* that even if such 1998 conduct was proven, it did not satisfy the requirements of an "act" as a predicate for causation in 2000, nor did it demonstrate the defendant's culpability, as charged, two years later.

As stated in his original letter, even if Mr. Carpenter *arguendo* knew in August-December 2000 that the exchange documents contained false and fraudulent representations, the government cannot point to any **act** by Mr. Carpenter in August-December 2000 (other than investing the funds) to which his alleged *mens rea* concurs. Since Mr. Carpenter was not charged with mail and wire fraud in connection with investing the funds, that conduct cannot – as a matter of law – provide the necessary *actus reus* to concur with his alleged *mens rea*. Consequently, an acquittal is warranted.

In an attempt to construct an argument against acquittal, the government now mischaracterizes the Indictment as charging a three year scheme to defraud that commenced in 1998. The Indictment simply does not charge such a scheme, but instead it charges a specific period of time—August to December 2000. Clearly, any references to conduct prior to that specified in paragraphs 103 and 105, the so-called charging paragraphs, was antecedent introductory history rather than a criminal allegation predicated on time and place as required by Rule 7 of the Federal Rules of Criminal Procedure. The indictment contains no allegation regarding any impropriety or false representations to attorney Patterson, no promise of holding his client's funds in a fixed interest escrow account, and no particularized allegations at all regarding the span of time ending in late 2000 when 119 exchange transactions were performed in full. (See Tr. 9:106-9) (Patterson, largely by adopting prior civil deposition answers, reluctantly conceded that, although safety was *his* concern, the BPE documents all indicated that the funds were going to be *invested* and the BPE documents did not particularize the nature of the investments nor preclude options investing or any other investment stratagem elected at the discretion of the intermediary).

The government argues on page two of its letter that Jackie Spielman testified that copies of the exchange documents were sent to Mr. Carpenter's Connecticut office and that Linda Jokinen testified that the documents were modified to reference PaineWebber in October 2000 and the revised documents were sent to Spielman in Connecticut. Putting aside the absence of any evidence that Mr. Carpenter actually saw and reviewed these documents, whether or not exchange documents were routinely sent by Paley or Jokinen to Spielman is immaterial to the causation issue since there is no evidence that they were received *before* the wires or mailings in question were transmitted, and further because passive receipt of the documents would not constitute an act which caused a wire or mailing as required by the Court's instructions. Importantly, although there is evidence that Jokinen sent documents to Connecticut, there is no evidence in the record that after October 1998 any of the transmitted exchange documents were in fact modified, edited, or even reviewed by the defendant.

With regard to the government's stream of commerce argument, absent proof of a legal or regulatory duty, Mr. Carpenter's failure to modify documents years later cannot be construed as an "act" that caused a mailing or wire. The Government has not provided to the Court a single legal precedent where an "act" done 22 months before the first of 19 charged mailings/wires and almost 2 years before the charged scheme to defraud satisfied the requirement of causation. The defendant's alleged acts in 1998 are simply too attenuated and not properly charged to be the lynchpin of causation for mailings and wires sent in August-December 2000.

As to the fall of 1998, it was Paley and not Mr. Carpenter who conformed his old Nationwide documents to his new company with modifications that eliminated the limits on investment vehicles. After the October 1998 Patterson communications, Mr. Carpenter was never again shown to have reviewed and certainly not shown to have participated in modifying or editing documents. The documents at the heart of the 19 mailings and

wires were each modified by Paley and Jokinen, not even sent to Spielman until after they were signed and thus after the exchanges were completed. There simply is no evidence of any "act" by Mr. Carpenter in connection with the 19 exchanges in question until after the wires and mailings were sent, which is why the government cannot point the Court to any such "act."

### No Written Half-Truths

It is the government's burden to prove its case beyond a reasonable doubt and, likewise, it is the government's burden to cite case law that half-truths in a written contract can sustain a mail and wire fraud conviction. The Government has not been able to provide the Court with even a single legal precedent where the half-truth definition of false representations was applied to a legal contract that was reviewed by attorneys and that contained an integration clause. The government's failure to do so highlights the weakness of its argument. Indeed, even in the context of civil law, First Circuit case law clearly provides that "…there can be no actionable claim of fraud for failure to disclose in the absence of a duty to disclose." Royal Business Group, Inc. v. Realist, Inc., 933 F.2d 1056 (1st Cir.1991); Metropolitan Life Insurance Company v. Ditmore, 729 F.2d 1, 5 (1st Cir.1984).[1]

Moreover, as noted in the defendant's written pleadings and during oral argument, the "omissions" relied upon by the government in their closing arguments were not even remotely similar to the so-called "half-truths" cited by the government as being within the four corners of the indictment, but were radically different in both scope and substance.

### Venue

The government's contention that Mr. Carpenter failed to timely request a jury instruction on venue as required in the three-prong test enunciated in United States v. Perez, 280 F.3d 318, 335 (3d Cir.), cert. denied, 537 U.S. 859 (2002), is as fanciful – and blatantly wrong – as its argument that there were no material factual disputes regarding venue (such as whether the wires cleared through the Boston Fed (Tr. 10:97)). During the charge conference, Mr. Carpenter requested a jury instruction on venue that was denied. Tr. Charge Conf. at 4. It is of no moment that defense counsel did not initially cite to any of the numerous cases from the Second, Third, Fourth, Fifth, Seventh, Eighth, Tenth and District of Columbia Circuits that, with the benefit of further research, clearly

---

[1] Furthermore, the skeletal references in the indictment to the alleged concealment of facts and omissions contained in ¶ 31 ("[u]nbeknownst"), ¶ 41 ("did not notify"), ¶ 46 ("did not disclose"), ¶ 49 ("did not notify"), ¶ 55 ("[u]nbeknownst"), ¶ 99 ("neither requested nor received), and ¶ 101 ("did not notify"), fails miserably to satisfy the notice requirement of an omissions theory of liability as described in United States v. Yefsky, 994 F.2d 885, 893 (1st Cir. 1993) (indictment "must fairly inform[] the defendant of the charges against which he must defend.").

show that a venue instruction was required.[2] The defendant raised the venue issue at each stage in the proceedings, and affirmatively requested a jury instruction on the issue. Importantly, venue is part of the prosecution's burden. For the government to rely on this kind of argument clearly shows its desperation on this issue.

Additional evidence of the government's desperation to uphold this conviction at all costs is its argument that Mr. Carpenter failed to timely submit his requested jury instructions. Although the Court informed defense counsel that it preferred to receive proposed instructions on the "[f]irst day of trial," Tr. 9:147, the Court allowed defense counsel to submit the instructions the very next day, there was no objection by the Court and, most importantly, the government did not object. Tr. 9:147-49. Absent an objection, the government has waived any argument that the defendant failed adequately to preserve the issue of instructing the jury on venue.[3]

Finally, as in United States v. Miller, 111 F.3d 747, 748-49 (10th Cir. 1997), "[i]n the jury instruction conference, Mr. [Carpenter's] counsel objected to the failure to instruct the jury specifically on the element of venue. The trial court denied the objection." See also id. at 751 (finding that objecting during the charge conference resulted in "Mr. Miller preserv[ing] his objection below"). The government's argument on this issue necessarily rings hollow.

The government now realizes that the lack of a jury instruction on venue is fatal to the convictions in this case and requires a new trial. Yet, instead of voluntarily conceding this point to see "that justice shall be done" as a "servant of the law," Berger v. United States, 295 U.S. 78, 88 (1934), the government searches in desperation for *any* argument (no matter how implausible) that might salvage the convictions in this case. This is not the proper role of government prosecutors.

### Clear Violation of Local Rule 116.2(B)(2)

The government clearly violated Rule 116.2(B). In one last attempt to excuse its violation, the government again tries to mischaracterize the defendant's argument and the government's discovery responsibilities. Mr. Carpenter does not "rest his contention on the argument that the government had in its possession evidence casting doubt on Martin Paley's credibility". (Government Letter at 3-4). This is not about the government's assessment of Paley's credibility. The government had in its possession voluminous

---

[2] See United States v. Grammatikos, 633 F.2d 1013, 1022 (2d Cir. 1980); Perez; United States v. Ebersole, 411 F.3d 517, 526 (4th Cir. 2005); United States v. Winship, 724 F.2d 1116, 1124-25 (5th Cir. 1984); United States v. Massa, 686 F.2d 526, 530 (7th Cir. 1982); United States v. Moeckley, 769 F.2d 453, 461 (8th Cir. 1985); United States v. Miller, 111 F.3d 747, 751 (10th Cir. 1997); United States v. Haire, 371 F.3d 833, 840 (D.C. Cir. 2004), cert. granted and judgment vacated on other grounds, 125 S. Ct. 1014 (2005) (Booker remand).

[3] Another basis for waiver is that the government did not raise this objection in any of its post-trial pleadings or even at the October 31, 2005 hearing. The government failed to preserve this objection and cannot, for the first time, raise it in a post-hearing letter submission.

4

documents—objective evidence—establishing that Paley committed the charged fraud, as well as multiple §1001 offenses. Notwithstanding the government's possession of this evidence, and their concession that they viewed the evidence as demonstrating Paley's criminality, the government did not provide written notice of these known prosecutable crimes. This is not about a government attorney's assessment of credibility, it is about objective evidence of criminality and the government's failure to provide a written description of that criminal conduct as required by our Local Rules.

For example, in a hypothetical fraud prosecution, if the government possesses a videotape of its witness robbing a bank, it would have to provide a copy of the videotape along with a written notice of the known prosecutable Hobbs Act violation. In this case, all of the documents in the government's possession amounted to a videotape of Paley committing the charged fraud in this case and various §1001 offenses. The government was required to provide written notice pursuant to L.R. 116.2(B), but it failed to do so. Nor is L.R. 116.2(B)(2)(a) of any help to the government because it simply creates additional responsibilities for the government. It does not lessen them.

The prejudice of the government's failures is exacerbated in this case because rather than providing notice of the known prosecutable offenses, the government instead provided the defendant with the 302 reports wherein Paley falsely denied committing the charged fraud. Because the government did not provide the written notice required by L.R. 116.2(B)(2)(e), the defendant was led to believe that the government believed Paley's false denials, and had therefore embraced Paley as the innocent conduit he portrayed himself to be, as detailed within the 302 reports provided to the defendant by the government. As a result, the government created the critical false impression of material fact—that it believed Paley's false denials. The defendant therefore built his entire defense around the government's apparent embracement of Paley as an innocent conduit.

Had the government provided the written description required by L.R. 116.2(B)(2)(e), the defendant would not have been misled into believing the government believed Paley. Moreover, the government's failures prevented the defendant from establishing Paley's justified bias in favor of the government (they inexplicably excused his criminal conduct without any prosecution) and Paley's interest in currying favor with the government (they could still prosecute him for his various crimes if the government was not satisfied with his testimony). It is beyond comprehension that the government can argue the defendant was not prejudiced by its failure to responsibly discharge its discovery obligations.

Finally, the government's discovery obligations are not somehow absolved by pointing the defendant to the proverbial haystack and telling him to find the needle. See United States v. Brotnovsky, 820 F.2d 572, 575 (2d Cir.1988) ("[t]he government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged"); United States v. Turkish, 458 F.Supp. 874 (S.D.N.Y.1978), aff'd, 623 F.2d 769 (2d Cir.1980) (Rule 16 requires the

government to allow defendants to inspect and copy all documents "which will be relied upon or referred to in any way by any witness called by the government during its case in chief"); United States v. Poindexter, 727 F.Supp. 1470 (D.D.C.1989); United States v. Upton, 856 F.Supp. 727 (E.D.N.Y.1994). The government has an obligation to provide the defendant with meaningful discovery and simply providing mountains of evidence does not satisfy this responsibility.

Respectfully,

Martin G. Weinberg, Esq.

cc: AUSA Michael J. Pineault (via ECF)