UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA    )
                                        )
        v.                              )        CRIMINAL NO. 04-10029-GAO
                                        )
DANIEL E. CARPENTER            )
_____)

**Defendant's Motion for New Trial Based on Newly Discovered Evidence
Pursuant to Fed.R.Crim.P. 33**

I.    Introduction

        Since the completion of trial in the above-captioned matter, the Defendant, Daniel

Carpenter ("Mr. Carpenter") has discovered that a primary cornerstone of the

prosecution's attack on the prudence of his investment strategy – a matter that the defense

contended was irrelevant, a matter as to which the Court excluded opinion testimony, yet

a matter that was the pejorative centerpiece of the prosecution summation which

condemned Mr. Carpenter as a riverboat gambler engaged in irrationally risky *naked*

stock option trading – was founded not on the hard reality of fact but instead on the soft

quicksand of fiction.  The entire foundation for the government's contention that Mr.

Carpenter should be convicted because he traded in the excessively speculative field of

uncovered or naked options is predicated on a false assumption – his trades were not

uncovered or naked, as the government contended throughout trial, but rather, to the

contrary, on average, a substantial majority of the options portfolio positions during the

relevant time period were covered or hedged.

        That is an opinion reached by Dr. Arthur Eubank, an expert retained by Mr.

Carpenter, as he recently testified before the National Association of Securities Dealers,

Inc., in an arbitration proceeding involving Benistar Property Exchange ("BPE") and

1

PaineWebber that took place in September and November 2005 in New York, New York (the "NASD Arbitration"), and as articulated in his affidavit attached hereto as Exhibit 1. Dr. Eubank testified in the NASD proceeding that Mr. Carpenter made "reasonable trades in reasonable positions." (NASD Tr. at 408). Dr. Eubank has examined BPE's trading accounts and has concluded that "on average, a substantial majority of the BPE options portfolio positions during the period August-December 2000 were 'covered' or 'hedged.'" (Exhibit 1). He has concluded that "BPE's options portfolio was not unreasonably risky or speculative for a 'bullish' portfolio", and has opined that "BPE's options portfolio was hedged against a drop in the stock market in a manner such that losses were expected to be significantly mitigated." (Exhibit 1).

Had the jury known that Mr. Carpenter's investment style was *not* to regularly take uncovered or naked positions, to not risk the exchangors money in the "riskiest" of trading positions, but instead was to hedge or cover his bullish positions, the prosecution would have been unable *factually* to make their persuasive plea to the jury, echoed over and over again, that the jury should convict Mr. Carpenter for the imprudence and the lack of safety of his investments – the *legality* of which was addressed in the previously filed motion for a new trial – and the outcome of the trial would have been different.

The government itself recognized that without inundating the jury in the irrelevant - whether Mr. Carpenter was or was not prudent - would result in acquittal given the reality that millions of investors like Mr. Carpenter, including the chief research analysts of both PaineWebber and Merrill Lynch, were bullish in the 2000 bear market, that hundreds of Wall Street's most respected firms invested pension funds in Enron and Worldcom and Lucent, so the government prosecuted Mr. Carpenter for the use of naked

options. It is almost axiomatic that had the options not been naked, had the broker witnesses' opinions that the government relied on been negated by a trustworthy expert analysis of whether the trades were or were not naked, the credibility of the prosecution broker witnesses - and even the prosecution itself - would be in shambles, and the outcome of the trial would have been different. Instead, because the government repeatedly mischaracterized this case as simple and straightforward, and ultimately persuaded the Court that a continuance of trial was not necessary, trial counsel was unable to provide the jury with the evidence now possessed by the defense. The prejudice caused by the government's mischaracterizations of this case as simple and straightforward, as contrasted with the representations made to the Court before trial by the defendant that complex factual and legal issues permeated the case, see Public Affidavit of Martin G. Weinberg  in Support of Motion for New Trial to November 2005 at ¶9, is inestimable, for the new evidence would have negated the allegations that Mr. Carpenter was a "riverboat gambler" recklessly gambling the exchangors' money. A new trial is warranted for this reason alone.

There are additional grounds, though, supporting the instant motion for new trial. First, the defendant has now located a witness—a former intern for Mr. Carpenter named David Vasecka—who can testify regarding the fact that Mr. Carpenter was considering and relying upon analysts' opinions in adjusting his trading strategy, the lynchpin evidence that was lacking at trial and which alone would have satisfied the Court's evidentiary rulings regarding the admission of evidence of experts' opinions that the declining market presented a buying opportunity—i.e., a nexus of proof of Carpenter's specific reliance on the experts. (Affidavit of David Vasecka attached hereto as Exhibit

2). Second, testimony evidence from the NASD arbitration matter has provided the defendant with additional evidence undermining the credibility of the broker witnesses who testified in this matter regarding their opinions of Mr. Carpenter's trading strategy (in the form of conversations with Mr. Carpenter). Finally, the defendant continues to review and analyze the thousands of emails that Paley attempted to delete from his multiple hard drives and seeks permission herein to supplement the instant pleading at such a time when new evidence is discovered during his examination of these hard drives.

Although the government will predictably contend that both Dr. Eubank and Mr. Vasecka could have been located and interviewed on these subjects before trial, such an argument collides with the reality that the government repeatedly mischaracterized this case before trial as being simple and straightforward, as merely a re-do of the civil trial, and a prosecution wherein the issue of loss was irrelevant. <u>See</u> Section II(B) infra. By so mischaracterizing the nature of this case, the government achieved what it sought—a denial of the defendant's motions to continue trial and a rejection of the defendant's pleas, submitted via motions and affidavits by undersigned counsel, that additional time was needed largely to master the complexities of the options market in general and Mr. Carpenter's trades in particular. Without such mastery, counsel could not react or respond to the government's transforming this case from a prosecution focused upon Paley's alleged representations to exchangors to an indictment of Mr. Carpenter's trading strategy in particular and the options market in general. The newly discovered evidence would have armed counsel with powerful exculpatory evidence, the essence of which would have eviscerated the pivotal foundation of the government's summations that Mr.

Carpenter should be convicted because he was supposedly recklessly gambling the exchangors' funds in "naked" options.

II.    <u>Argument</u>

"A defendant seeking a new trial based on newly discovered evidence must show that: '(1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant.'" <u>United States v. Vigneau</u>, 337 F.3d 62, 69 (1st Cir.2003), <u>quoting</u> <u>United States v. Wright</u>, 625 F.2d 1017, 1019 (1st Cir.1980); <u>see</u> also <u>United States v. Colon-Munoz</u>, 318 F.3d 348, 358 (1st Cir.2003).

    A.    <u>The defendant has now discovered material, new evidence that "will probably result" in the acquittal of the defendant upon retrial.</u>

The first piece of newly discovered evidence is the expert opinion of Dr. Eubank that an analysis of BPE's trading accounts indicate that "on average, a substantial majority of the BPE options portfolio positions during the period August-December 2000 were 'covered' or 'hedged.'" (Exhibit 1). He also opines that "BPE's options portfolio was not unreasonably risky or speculative for a 'bullish' portfolio", and that "BPE's options portfolio was hedged against a drop in the stock market in a manner such that losses were expected to be significantly mitigated." (Exhibit 1).

It can not seriously be argued that the government did not exploit the evidence admitted in this case to argue that Mr. Carpenter was "naked", "uncovered" and therefore recklessly "gambling" other persons' money. The evidence of such trading often came in indirectly, e.g. from the prosecution's reading of sections of the PaineWebber Options Manual or from Mr. Carpenter signing a form ostensibly evidencing his notice that such

trading was risky. It was not received into evidence, however, for the purpose of affirmatively establishing that Mr. Carpenter's trading was naked, speculative or unreasonably risky, but instead was admitted for limited purposes other than a witness' opinion (e.g., to show Mr. Carpenter's state of mind). In the end, though, the evidence was radically and unfairly exploited during each prosecutorial summation in which the government repeatedly and impermissibly condemned the defendant as a gambler, a trader in "naked" options, a person who invested with total disregard for the interests of the exchangors.

Consider the prejudicial testimony of Mitchell Rock, through whose testimony the government was able to elicit that Mr. Carpenter was "an aggressive investor", Tr. 5:122, that Mr. Carpenter told Rock "that he wanted to trade options…both covered and uncovered", Tr. 5:125, that Mr. Carpenter said "that he was interested in the most aggressive type of option trading …naked puts and calls", Tr. 5:125-6, that Mr. Carpenter "answered aggressive speculative" when asked for his risk profile on the account opening form, Tr. 5:132, and that Mr. Carpenter signed that he read the standardized options booklet (GX167), Tr. 5:136, which lead the government to insert, over the defendant's objection, its most inflammatory paragraphs such as "the writer of an uncovered call is in an extremely risky position and may incur large losses if the value of the [stock] increases above the exercise price.  The potential loss is unlimited for the writer of an uncovered call…As with writing uncovered calls, the risk of writing put options is substantial…if the value of the [stock] declines below the exercise price…the writer of a put bears the risk of a decline in the price…potentially to zero." Tr. 5:142. Through Mr. Rock, the government also read government exhibit 166, "Special Statement for

Uncovered Option Writers," indicating that when "the investor writes both a put and a call on the same underlying instrument the potential risk is unlimited." Tr. 6:14. Rock further testified that Mr. Carpenter bought on margin, Tr. 6:22, and while he purchased "puts at times []the reason was not to reduce his risk but was to reduce his margin costs without trading more." Tr. 6:28. Rock also testified that Mr. Carpenter's hedging was "mostly not for capital preservation but for margin reduction." Tr. 6:30. Rock further testified that Mr. Carpenter repeatedly rejected his suggestions to change trading strategy, instead saying "I'm going to make a fortune." Tr. 6:28-29.

Likewise, over the defendant's objection, the government elicited testimony from the Merrill Lynch witnesses regarding Mr. Carpenter's trading strategy. For example, Gary Stern testified that he told Mr. Carpenter that "he was taking a lot of risk with his strategies, he was not diversified enough, he was using a lot of leverage, and I thought that he should take less risk." Tr. 5:24. Stern also testified that Mr. Carpenter did not follow his recommendations. Tr. 5:46.  The government also introduced the Merrill Lynch Options Strategy pamphlet, (government exhibit 253, with attached articles). Again, the government elicited another set of opinions via the alleged communications to Mr. Carpenter that he should utilize a covered call strategy, and not just sell put options "which is what he primarily did." Tr. 5:27. The government elicited from Stern Mr. Carpenter's pejorative self-characterizations, such as his alleged response that Stern's proposed strategy was boring and like watching paint dry. Tr. 5:28.

The prejudicial impact of Stern's testimony was compounded when Merrill Lynch employee Gerald Levine testified that Mr. Carpenter preferred a strategy of selling puts above the market where there was more risk but greater premium and Mr. Carpenter felt

that a covered call strategy (where you buy underlying stock and then sell an option that

expires in 30 days against it) was like watching paint dry or grass grow, that Mr.

Carpenter "preferred the greater action," Tr. 5:70, and Mr. Carpenter's statement (offered

through Levine) that he should have listened to Levine but "I had the mentality of a river

boat gambler and I was just trying to double up on my losses and quickly recover," Tr.

5:73.[1]

       Through Allaire, the government proceeded to analyze every option trade that Mr.

Carpenter conducted in the Merrill Lynch B10 account and the PaineWebber 33 account

from January 2000 through December 2000. Tr. 10:47-48. For example, government

exhibit 194 was a chart depicting profits and losses for the 57 option trades closed in

August 2000. Tr. 10:49-50. Allaire testified that the chart "show[ed] the volatility of

options trading. It shows that you can get a gain one day and a loss the next day and a

loss the next day and a gain the other day. And you can see the fluctuations. And this

…graph also …quantifies the magnitude of the gains and losses." Tr. 10:50. Government

exhibit 195 depicted profits and losses for approximately 67 option trades closed in the

month of November 2000. Tr. 10:51. Government exhibit 196 was a summary of the

monthly gains and losses for the year 2000. Tr. 10:52-53. Government exhibit 199 was a

chart showing the size of the opening trades executed during the year 2000, with Mr.

Allaire testifying that there were "a little under 1300 opening trades executed in the year

2000." Tr. 10:54-56. Mr. Allaire then testified that the size of Mr. Carpenter's contracts

increased as the year progressed. Tr. 10:56-57. The government also admitted exhibits

_____

[1] Thomas Rasmussen, a third witness from Merrill Lynch witness, reiterated prejudicial but uncontested facts such as "aggressive" in trading style, Tr. 7:69, 86, that Merrill Lynch Financial Associates went "the extra mile to pull him back," Tr. 7:72, the extent of the losses, Tr. 7:80, and the extent of the margin debt, Tr. 7:78.

192 and 193 in an effort to demonstrate the period of time the defendant held his option

positions. Tr. 10:58-59. The government also admitted government exhibit 197 to

demonstrate the number of positions held by Mr. Carpenter that were "bullish" and those

that could be characterized as "bearish." Tr. 10:60-65.

     In their closing arguments, the government converted the foregoing "state of

mind" and "factual" testimony into conclusive opinion testimony that Carpenter was

engaged in speculative and reckless gambling of third persons' money. The government

began their closing by arguing "What these people did not know was that Carpenter was

pouring his money, the escrowed funds, into naked stock options and volatile technology

companies, investments whose riskiness the defendant knew to be off the charts." Tr.

12:18. The government argued "There's no dispute here that the defendant rolled the dice

in the options market and lost it all." Tr. 12:19. Later, the government argued: "What

were they not told? That their money would be moved into a different account.  These

people didn't know that.  Dan Carpenter was shifting money around into accounts that

these people had no notice of whatsoever.  He never told them he'd be trading in

uncovered or naked stock options or stock options at all or anything else other than

having the money parked in one place." Tr. 12:26. The government argued that "Money

market means something very specific to people.  It means low risk.  It means stability.  It

doesn't mean stock options." Tr. 12:25. The government further argued: "He opens up the

options account at Merrill Lynch the same day.  This thing was rigged from the start.  He

never intended to put that money in a safe place." Tr. 12: 35-36. With regard to the

brokers' testimony, the government argued: "As if he had to have been warned at all, his

brokers harped on him on nearly a daily basis, you got to tone it down. These people in

Merrill Lynch and PaineWebber made their money off of his trading, and they're telling him you got to tone it down, this is too much." Tr. 12:34.

On rebuttal, the government argued that Mr. Carpenter put the money in "high-risk stock options knowing he had lost millions of dollars and knowing there was a substantial chance that he would lose millions more", Tr. 12:88, that Mr. Carpenter was "getting explicit disclaimers about the risks of options trading, about the dangers he ran of losing all of his funds and more … when he got---opened up his accounts at PaineWebber, again warning after warning from those companies advising him of the risks, telling him he could lose it all", Tr. 12:91-92. The government argued on rebuttal that there was nothing in the written agreements providing notice that the exchangors' money would be "at substantial risk of loss." Tr. 12:93. The government argued that Marjorie Adams was not told that Carpenter would "take that money and gamble it in the options market" and there was nothing in the agreements that "suggested he was going to take that money and gamble it to try to make money for himself." Tr. 12:94-95. The government argued that it was supposed to be a real estate transaction, not "an investment scheme, this wasn't let's give Mr. Carpenter my money so he can gamble it in the stock market, make a million for himself and I'll get some of it too." Tr. 12:95.  The government also argued on rebuttal that "What was established, if you so find, was that Mr. Paley knew full well that these client monies were being invested, they were being invested in risky options, millions of dollars were being lost.  That's what was established that Mr. Paley knew." Tr. 12:97. Likewise, the government argued that Mr. Carpenter was the "one who took the money, he was the one who bet it in the options market," Tr.

12:98, and he was the one who "took that money and he gambled it in the options market so that it would be worth his time," Tr. 12:99.

In essence, and contrary to their pretrial characterizations of this case as simple and straightforward, see infra section B, the government converted this case into a complex indictment of the options market in general and the defendant's trading strategy in particular. The defendant has now discovered, however, that the government's theory of proof at trial—that Mr. Carpenter was an out-of-control riverboat gambler engaged in naked and/or uncovered options trading—was simply not true. Dr. Eubank has examined BPE's trading accounts and has concluded that "on average, a substantial majority of the BPE options portfolio positions during the period August-December 2000 were 'covered' or 'hedged.'" He testified at the NASD proceeding that "by and large the positions" taken by Mr. Carpenter "were not uncovered, but the put positions were what I would call covered." (NASD Tr. at 405-407). Dr. Eubank testified that Mr. Carpenter made "reasonable trades in reasonable positions." (NASD Tr. at 408). He has concluded that "BPE's options portfolio was not unreasonably risky or speculative for a 'bullish' portfolio", and that "BPE's options portfolio was hedged against a drop in the stock market in a manner such that losses were expected to be significantly mitigated." (Exhibit 1). He has also testified that had PaineWebber not closed Mr. Carpenter's positions, but instead held them open until January 19, 2001, the losses in the trading accounts would have been reduced by $2,936,354.[2] (NASD Tr. at 408).

In addition to Dr. Eubank' newly discovered opinions, the defendant has located a witness who can testify that Dan Carpenter was actively reading the Wall Street Journal,

---

[2] Indeed, it appears that PaineWebber sold 90% of Mr. Carpenter's positions on December 20, 2000, a day on which the market dropped precipitously, apparently in response to Steven Feit's vacation schedule, as contrasted with decisions correlated to wisdom or assessment of market conditions.

<u>Investor's Business Daily</u>, <u>Barron's</u>, and other financial literature during the relevant time period and discussing and relying upon the so-called "experts" in formulating his trading strategy. David Vasecka interned with Dan Carpenter during the summer of 2000, between his junior and senior years at the University of Massachusetts at Amherst, beginning in or about May 2000 and going back to school in or about early September 2000. (Affidavit of David Vasecka, attached hereto as Exhibit 2, at ¶¶1, 7). Mr. Vasecka's "primary function was to compile any and all information possible regarding analysts assessments of the markets so that Mr. Carpenter could process this information and adjust his trading strategy accordingly." (Vasecka Affidavit at ¶2). Each morning, Mr. Vasecka would compile all nightly analyst reports and would research and accumulate analysts' opinions from approximately 20 different websites and various newspapers (such as the <u>Wall Street Journal</u>, <u>Investors Business Daily</u>, and <u>Barron's</u>) and provide them to Mr. Carpenter. (Vasecka Affidavit at ¶3). Mr. Vasecka recalls discussing various analysts' predictions regarding the market at that time and he avers that, on a daily basis, and throughout the course of the day, he would discuss various experts' opinions with Mr. Carpenter, as articulated in the various newspaper and website articles collected for Mr. Carpenter. (Vasecka Affidavit at ¶¶4-5). Finally, Mr. Vasecka recalls there was a two drawer file cabinet in Mr. Carpenter's office that contained many of the articles they had clipped and/or printed. (Vasecka Affidavit at ¶6).

At trial, the defendant tried unsuccessfully to admit into evidence newspaper articles discussing the bullish recommendations of various analysts during the relevant time period. Tr. 11:78-80. The Court ruled that without any witness who could testify that Mr. Carpenter had read the articles they would not be admitted into evidence. Tr. 11:78-

80. At a retrial, the defendant would be able to present the testimony of Mr. Vasecka, who would clearly provide the lynchpin factual predicate required by the Court in terms of Mr. Carpenter's assiduously working to compile and analyze various experts' opinions and formulate his strategy accordingly. This evidence would also substantially rebut the government's arguments that Mr. Carpenter was some out-of-control gambler, as contrasted with a studious individual devoting many hours to formulate a particular trading strategy.

In addition to the foregoing, testimony from the NASD proceeding provides new evidence that undermines the testimony of various broker witnesses in this case. PaineWebber employees Lori Enright and Mitchell Rock recently testified at the NASD arbitration proceeding, as did Merrill Lynch employees Gerald Levine and Gary Stern. There were significant contradictions between the brokerage witnesses testimony, both at trial in within the NASD proceeding. For example, Stern testified during the NASD arbitration matter that he told Rock when he (first) spoke to him regarding Mr. Carpenter that "Merrill Lynch was closing positions only and he could not initiate any new positions here," (NASD Tr. at 1004), thus contradicting Rock's and other PaineWebber witnesses' position that they were unaware of Merrill Lynch having closed Mr. Carpenter down. In preparing for the NASD matter the defendant located evidence that Rock clearly knew Ed Kirschner,  PaineWebber's chief investment strategist at the time who was advocating a buy strategy during the relevant time. Moreover, the arbitration testimony established that PaineWebber should have actively provided management oversight to Mr. Carpenter's trading. (NASD Tr. at 1092). While the foregoing alone may not warrant a new trial, it would have provided the defendant with the ability to damage the

credibility of these brokerage witnesses, whose testimony was severely prejudicial to the

defendant, given the government's ability to extract from these witnesses their opinions

regarding Mr. Carpenter's alleged imprudence and that his trades were naked, all in the

form of conversations with Mr. Carpenter, and then convert those opinions into facts in

their closing arguments that Dan Carpenter was an out-of-control gambler. The NASD

testimony provides the defendant with the ability to fully expose their self-interests and

establish the incredibility of their contradictory positions.[3]

      B.      <u>The foregoing is indeed newly discovered evidence</u>.

Given the pretrial defense disclosure to the government identifying Dr. Eubank as

a potential defense witness, the prosecution, predictably, will contend his testimony does

not constitute newly discovered or newly available evidence. This case is different.

Before trial, in their effort to persuade the Court that a continuance of trial was not

necessary, the government repeatedly characterized this case as simple and

straightforward, arguing that it was simply a re-do of the civil trial. The defendant, on the

other hand, repeatedly tried to convince the Court that the case was complex and

additional time was necessary to master the options market and the defendant's trading

strategy. For example, in his publicly filed affidavit in support of the defendant's motion

to continue trial from July 11, 2005 to November 2005, Attorney Martin G. Weinberg

asserted the following need for a continuance:

          Various expert witnesses have been disclosed by both the prosecution and
          defense.  These witnesses, if permitted to testify, address a range of complex

---

[3] Moreover, the defendant continues to review thousands of emails that had been deleted from Paley's multiple hard-drives. As the Court may recall, in the defendant's motion to continue trial to August 2005, he delineated the thousands of emails that had been recovered from Paley's hard drive, which somebody had apparently tried to delete from his system. The defendant continues to analyze these emails and seeks leave to supplement the instant motion with this additional newly discovered evidence.

> subjects including but not limited to options investing – its risks and its
> benefits – and the defendant's particular options investment strategy. Trial
> counsel needs to fully immerse himself in this subject in order to properly
> present defense testimony and in order to properly cross-examine the
> government's testifying expert – Marc Allaire ("Allaire").

(Public Affidavit at ¶7(K)). Attorney Weinberg likewise averred that he did "not believe

this case to be simple or straightforward", but instead insisted that complex factual and

legal issues permeated the case. (Public Affidavit at 9). Additionally, in a sealed affidavit,

the defendant asserted through counsel that there was an important need for counsel to

understand the practices and policies of the brokerage houses to effectively cross the

broker witnesses marked by government in their pretrial witness list.

On May 3, 2005, the government filed its opposition to the defendant's motion to

continue, arguing that the defendant's motion "significantly overstate[d] the size and

complexity of this case", and asserting that the "case is not particularly large or

complex." (Government's Opposition to Defendant's Emergency Motion for Further

Trial Continuance to November 2005, Docket Entry 62-1, at p.1). The government

argued *that it "is unclear how the defendant has transmogrified a straightforward

fraud case involving approximately 2000 pages of relevant documents into one that

allegedly requires six months to prepare for trial because of an asserted need to review

tens of thousands of pages of records."* <u>Id.</u> at p. 2 (emphasis added). The government

argued that the "fact that Carpenter has tried the case once, civilly, and has the benefit of

having on his criminal defense team the attorney who conducted that trial provides him

with a significant advantage." <u>Id</u>. at 4. "In short, contrary to the impression given by

defendant's motion, counsel is not walking into an enormous warehouse of documents

that he must painstakingly piece together by himself. He is inheriting a finite case that has

been tried once, effectively teed-up for trial again, and comes with an attorney on the defense team who knows the facts as well as, if not better than, anyone."

On or about June 28, 2005, having retained Attorney Robert M. Goldstein as lead defense counsel, the defendant again moved for a continuance of trial, this time from July 11, 2005 to August 8, 2005. In his motion, which incorporated Attorney Weinberg's prior affidavits to demonstrate the complexity of the case and the tasks that needed to be performed prior to trial, the defendant once again took issue with the government's assertion that this case was simple. (Motion to Continue Trial to August 8, 2005 at ¶¶7-8). After noting that two Assistants had been assigned to try this case for the government, the defendant focused on the need to master the complex subject matter of options investing, noting, *inter alia*, that counsel could consume an entire month studying the subject matter:

> The government has disclosed more than 200 trial exhibits. The government expects to call 27 witnesses, one of whom, J. Marc Allaire ("Mr. Allaire") is an expert in the area of options investing. The government has advised that it intends to call Mr. Allaire to testify regarding his analysis of the defendant's trading activity, to testify regarding "the nature, frequency, and magnitude of the defendant's trading activity, the relative risks posed by that activity, and the extent (if any) to which the defendant's trading activity changed over time", and to testify that the defendant's trading strategy was mostly "bullish" and that the "resulting risk level was materially higher than the stock market's overall risk." (Government Discovery Letter, February 3, 2005, attached hereto as Exhibit 1). The government has also advised that Mr. Allaire "will present historical data comparing the magnitude of the losses incurred by the defendant with the performance of certain market indices over the same period, including (a) three month U.S. Treasury obligations, (b) the S&P 500 Index, and (c) the NASDAQ 100 index." (Exhibit 1).
>
> Literally, there are volumes of books written on these complex topics with terminology unique to this investment vehicle (indeed, the government intends to offer a Glossary of Terms during Mr. Allaire's testimony, see Exhibit 2). With the luxury to do so, counsel could probably consume an entire month preparing for this single aspect of the case. To illustrate the

depth and complexity of the expected testimony, the defendant has attached hereto as Exhibit 3 some of the exhibits identified by the government that will be utilized during Mr. Allaire's testimony. Additional time is necessary such that counsel can study these complex topics and be prepared to competently and effectively examine the government's expert witness. (Curriculum Vitae of J. Marc Allaire attached hereto as Exhibit 4).

Motion to Continue Trial to August 8, 2005 at ¶¶8-9 (footnotes omitted). The government opposed the defendant's motion, once again arguing that preparation for the case did not require additional time past July 11, 2005, despite the fact that Mr. Carpenter's prior counsel, Greenberg Traurig, was discharged on March 31, 2005 due to an irretrievable breakdown in the attorney-client relationship given prior counsel's overwhelming commitment to another case outside of the country, see March 31, 2005 Tr. at 8-10, and notwithstanding all that needed to be done, including reviewing 20 plus boxes of Paley's documents and approximately 27 boxes of materials forwarded by Greenberg Traurig, examining Paley's hard-drives that contained approximately 264 Act databases (each of which contained thousands of pages alone) and thousands of pages of emails and files, interviewing more than a hundred successful exchangors, conducting an investigation of Paley and Mr. Carpenter's history and background, and preparing to master the complex area of the options market in general and Mr. Carpenter's trading practice in particular.

Having secured what it sought—a denial of the defendant's motions to continue— the government proceeded on a theory of proof radically different than a "straightforward fraud case." Before trial it seemingly did not matter whether Mr. Carpenter was trading in "naked" or "covered" options, because the case was represented to be a straightforward fraud case. In the end, the government implored the jury to convict Mr. Carpenter, not because of some straightforward fraud, but because he supposedly recklessly gambled the

exchangors' funds in the riskiest aspect of the stock market--"naked" and "uncovered"
options. The radical shift in emphasis of theory of proof robbed Mr. Carpenter of a fair
trial and irreparably prejudiced his ability to prepare for trial. In the end, it was the
government who "transmogrified a straightforward fraud case" into an indictment of the
complicated options industry in general and Mr. Carpenter's trading strategy in
particular, forcefully arguing that Mr. Carpenter should be convicted simply because he
employed an "extraordinarily risky trading strategy," Tr. 10:40, and was a "bull in the
teeth of a bear market," Tr. 4:145.

Critically, because the government stressed before trial that this case was not
complex, that it was simple and straightforward, it was essentially a retrial of the civil
case, the defendant did not have Dr. Eubank analyze all of his trades to assess whether
they were naked or covered because the defendant believed such issues were irrelevant.
Given the time limitations imposed upon defense counsel as a result of the government's
insistence that a continuance was not necessary to prepare to meet its simple and
straightforward case, it was simply impossible for new counsel to master every
conceivable theory of proof in this case, or to evaluate every trade from the perspective of
rebutting what appeared to be a marginal if not irrelevant issue—the defendant's trading
strategy.[4] As such, the defendant focused upon what appeared to be the heartland of the
government's case—the written agreements precluded any investments, Paley did not
know there would be any investments, and that Mr. Carpenter made false statements
and/or caused false statements to be made by his "innocent conduit", Martin Paley.

---

[4] See Government's opposition to defendant's motion to dismiss for lack of venue, at page 6 (Dkt. #29)
("whether Carpenter's fraudulent scheme (and his speculative options trading) subsequently resulted in
gains or losses is irrelevant. The gravaman of the offense was the scheme to obtain funds through
fraudulent pretenses.").

The irony is that had Mr. Carpenter simply acted irresponsibly and proceeded *pro se*, he would likely be entitled to a new trial, at least according to a recent Third Circuit case styled <u>Pazden v. Maurer</u>, 424 F.3d 303 (3d Cir.2005). Pazden was convicted in state court on a 119 count indictment involving "white-collar fraud" stemming from the sale of condominiums in Clifton, New Jersey, and argued in his habeas appeal that the trial court violated his Sixth Amendment right to counsel when the court denied defense counsel's request for a continuance and Pazden proceeded to trial *pro se.* <u>Pazden</u>, 424 F.3d at 306. In that case, the defendant was indicted on December 3, 1993, the court appointed counsel, on October 3, 1995 the court appointed new counsel, who thereafter moved to continue the February 1996 trial date based on the need to interview more than 500 witnesses and claimed late discovery by the government. <u>Pazden</u>, 424 F.3d at 307-08. "Since the court would not delay the trial, and believing that he was then more familiar with the case than his attorney, given the witnesses and materials his attorney had not had an opportunity to explore, Pazden informed the court that he believed he had no alternative but to represent himself." <u>Pazden</u>, 424 F.3d at 308. Noting that "a reviewing court must be 'confident the defendant is not forced to make a choice between incompetent counsel or appearing *pro se*'", and that a "court [must] decide whether the defendant was bowing to the inevitable or voluntarily and affirmatively waiving his right to counsel," the court held that "Pazden was not exercising his free will, but was instead compelled to proceed *pro se* only because his attorney had not been given enough time to familiarize herself with the relevant background of his case." <u>Pazden</u>, 424 F.3d at 316. The court ruled that the trial "court's denial of Ms. Bartos's request for a three-month adjournment forced [Pazden] to choose between the 'lesser of two evils,' effectively

leaving him with 'no choice in th[e] matter' at all", which, the court held, was not a voluntary choice to waive one's Sixth Amendment right to counsel. <u>Pazden</u>, 424 F.3d at 317. Indeed, the court so held despite observing that the record suggested "that Pazden's request for a continuance was manipulative". <u>Pazden</u>, 424 F.3d at 314. The court also cautioned that "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." <u>Pazden</u>, 424 F.3d at 314.

That Mr. Carpenter chose to proceed with counsel even though he knew that counsel could not possibly master the complicated subject of options investing, and thereby chose what he believed to be the responsible and respectful course of action, does not dampen the prejudice suffered by the government's decision to convert a supposed straightforward fraud case into a complicated prosecution of the options market. In fact, the government's mischaracterization of this case as straightforward and simple exacerbates the prejudice suffered by Mr. Carpenter in the sense that counsel spent the limited time available to mastering the other aspects of the case highlighted by the government and that were expected to be the heartland of the government's prosecution.

In the end, it was the government's mischaracterization of this case as straightforward and simple that fatally compromised Mr. Carpenter's right to present a complete and meaningful defense. <u>See</u> <u>California v. Trombetta</u>, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, <u>Chambers v. Mississippi</u>, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, <u>Washington v. Texas</u>, 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18

L.Ed.2d 1019 (1967); <u>Davis v. Alaska</u>, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347

(1974), the Constitution guarantees criminal defendants a meaningful opportunity to

present a complete defense"). The defendant simply did not possess or have available to

him evidence to counter the government's decision to convert what had previously been

an irrelevant issue before trial and at the most a perimeter issue at the beginning of trial

into the heartland of the government's prosecution, and his defense was critically

damaged as a result thereof. Dr. Eubank's newly discovered opinions would have

critically undermined the government's "naked options" theory of proof, and it is

certainly material.

III.     <u>Conclusion</u>.

      The trial in this case was radically altered by impermissible attention to trading,

risk, and loss, which the government exploited on summation.  Before trial, the

government mischaracterized the case as a simple and straightforward case, a description

that caused the defendant, in the limited time allotted, to prepare a defense on the issues

he believed were relevant and in dispute. The government converted the case into a

prosecution of the defendant's trading strategy, incessantly characterizing Mr.

Carpenter's trades as naked and uncovered. In fact, however, on average, a substantial

majority of the BPE options portfolio positions during the relevant time period were

covered or hedged. Dr. Eubank's newly discovered opinions alone warrant a new trial in

this case. Certainly, when combined with the additional newly discovered evidence

outlined herein, a new trial is warranted. Wherefore, the defendant respectfully requests

that his motion for a new trial be granted.

Respectfully Submitted,
Daniel E. Carpenter,
The Defendant,


**/s/ Robert M. Goldstein**
Robert M. Goldstein
20 Park Plaza, Suite 903
Boston, Massachusetts 02116
(617) 742-9015
Mass. Bar No. 630584


**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 905
Boston, MA  02116
(617) 227-3700
Mass. Bar No. 519480