UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States submits this memorandum in advance of the December 19, 2005 sentencing hearing in this case.

### Introduction

On July 27, 2005, following a thirteen-day trial, a jury convicted Daniel E. Carpenter ("Carpenter") of nineteen counts of wire and mail fraud, stemming from his misappropriation of client funds that had been entrusted to his company, Benistar Property Exchange Trust Company, Inc. ("BPE"). Contrary to representations that the funds would be held in fixed interest escrow accounts, Carpenter transferred the money to trading accounts, gambled it in speculative stock options, and lost approximately $9 million.

In anticipation of Carpenter's sentencing, the government submits this memorandum presenting: (i) a summary of relevant facts; (ii) the government's guidelines computations; (iii) the government's sentencing recommendation; and (iv) a response to certain departure and sentencing arguments that the defendant has made to the Probation Office.

### I.    Relevant Facts

The Probation Office's Presentence Report ("PSR") summarizes the principal evidence

that the government introduced at trial.  (PSR ¶¶ 8 - 57).  Rather than repeat that summary here,

the government highlights five principal factual points that it believes are material to the Court's

sentencing determination:[1]

    A.    Carpenter Is Fully Culpable for His Criminal Conduct.

Carpenter is fully culpable for his criminal conduct, which he undertook in an attempt to

enrich himself.

Carpenter knew that clients were entrusting their funds to BPE based on representations

that the money would be held in short term, fixed interest escrow accounts and returned to them

to complete their 1031 property exchanges.  Carpenter personally participated in BPE's first

exchange, was advised in writing by Attorney David Patterson during that exchange of the

importance of maintaining the funds' security, and signed an Exchange Agreement and an

Escrow Agreement containing such assurances.  (Gov. Exs. 138, 140, 142).

Contrary to these representations, Carpenter misappropriated the client escrow funds by

using them to trade in the options market.  He knew full well the associated risks.  Merrill Lynch

and PaineWebber warned him of those risks when he opened the trading accounts (Gov. Exs.

145-46, 166-67); he experienced the risks firsthand in the form of millions of dollars in trading

losses that he suffered beginning in April, 2000 (Gov. Exs. 196, 206); and yet from August

through December of the same year, he took millions more that the victims in this case entrusted

to BPE, and proceeded to trade and lose that money as well.  (Id.).  He did so despite the

repeated warnings of Merrill Lynch and PaineWebber and the enormous losses he had already

sustained.  (Gov. Exs. 152-53, 161-63, 172).

---

[1] The government refers the Court to the PSR for a broader discussion of the evidence.

Carpenter's conduct cannot be justified as "good faith" investments authorized by BPE's clients. The clients received documents and signed agreements stating that their funds would be held in escrow in fixed interest accounts. (Gov. Exs. 1-3, 10-13, 18). They were never told, nor did they authorize, the funds to be traded in high risk options. No reason existed for them ever to suspect that would happen. Sufficient yields were available from U.S. Treasury instruments, money market accounts, and similar vehicles to enable Carpenter to satisfy the rates of interest owed to clients consistent with the escrow representations that BPE had made to them, particularly since the majority of the funds were to be held at 3%. (Gov. Exs. 148D, 168, 208). However, as Carpenter stated in a memorandum dated October 30, 2000, putting BPE's client funds in such prudent holdings would not have yielded profits "worthy of [his] time." (Gov. Ex. 184). So, instead, Carpenter gambled the funds in speculative options trading. He did so for the purpose of enriching himself, by using the escrow money to finance aggressive trading that he hoped would generate substantial profits – profits which, after paying the 3% or 6% interest that BPE owed to clients, Carpenter could then pocket. Id.

That BPE did not collapse until January, 2001 is not a testament to either Carpenter's "good faith" or the "prudence" of his investments, as he now asserts. BPE's ability to continue to close replacement property transactions in the latter part of 2000 was attributable solely to the fact that enough new client money was coming in to pay off existing clients whose funds had (unbeknownst to them) been traded and lost in the market. In essence, Carpenter's conduct was analogous to a Ponzi scheme. As early as April, 2000, Carpenter's trading losses caused BPE to have far less escrow money in its accounts than what it owed to clients. (Gov. Ex. 207). However, Carpenter was able to cover up the sizeable shortfall, and hide what was in fact

happening to the money, because enough new clients were being lured in to cover the

redemptions owed to earlier clients who had requested their money back.

       B.    <u>Carpenter's Conduct Caused Substantial Harm.</u>

      When Carpenter's scheme finally imploded, his criminal conduct had caused seven

victims, collectively, to lose approximately $9 million – money that they (falsely) had been told

would be held in escrow but that, in truth, Carpenter misappropriated and traded.  (PSR ¶ 172;

Gov. Ex. 209).  The victim impact statements submitted to Probation describe the resulting harm

to these individuals.  In addition to the obvious financial impact, Carpenter's conduct has caused

substantial additional consequences.  Two of the victims are in their eighties; one is in his mid-

seventies.  These three have been forced to spend some of the final years of their lives dealing

with the worry and stress of having lost substantial amounts of their life savings.  The remaining

victims have experienced considerable harm as well, including one who had to struggle to find

financing to replace the lost funds at the same time that he was being treated for cancer and

dealing with the birth of a premature daughter.  All have suffered collateral financial

consequences, in the form of adverse tax penalties, increased financing costs, legal and

accounting expenses, and the like – consequences that were foreseeable to Carpenter and that

will not be covered by any order of restitution.

       C.    <u>Carpenter Has Displayed No Remorse or Acceptance of Responsibility.</u>

      Through it all, Carpenter had displayed no remorse.  He has hired teams of lawyers to

mount a bitter defense against parallel civil litigation that the victims filed against him, to wage

an equally vigorous defense in this criminal case, and to blame anyone and everyone else for

what has happened – from his brokers, who should have saved him from himself, to Martin

Paley, whom Carpenter characterizes as the "real" criminal, to government counsel, whose every action (according to Carpenter) has been tainted by misconduct.  Carpenter's transparent purpose, in every motion he has filed, every continuance he has sought, and every appeal he has pursued, has been to delay the ultimate day of reckoning for as long as possible, in the hope that he will outlive and/or outlast his victims.

> D.    Carpenter Has Withheld Financial Information from Probation.

Consistent with the foregoing strategy, Carpenter has not been forthcoming in providing financial information to Probation.  Based on the information contained in the PSR, Carpenter apparently claims liquid assets of less than $10,000, real estate assets of only $13,000 (held by his wife), no business assets of any kind, no personal income (although his wife apparently draws a salary from Benistar), three life insurance policies (characterized as assets of his wife), and an outstanding civil judgment against him, all of which yields an alleged net worth of *negative* $129,000.  (PSR ¶¶ 148, 150-55).

The PSR reflects no disclosures by Carpenter concerning relevant tax returns (individual or corporate), no disclosures concerning assets held in the name of his child (or other family member) or in trust for his child (or other family member), no disclosures concerning the value or the division of ownership interests in the numerous companies that he has established or with which he has been associated (a list of those entities is attached at Exhibit 1), virtually no disclosures concerning assets held in the name of his wife or for her present or future benefit, and no disclosures concerning the assets on which he and his family have been living, continue to live, or the sources of the money that he has been using to fund his civil and criminal defense.

According to letters that he has submitted to Probation, Carpenter distributes substantial

gifts to Benistar employees (many of whom have written letters on his behalf), makes sizeable contributions to the prep school that he attended as a boy (and certain other causes) (PSR ¶146A), drives a Cadillac Escalade (with lesser SUV's leased for his wife and daughter) (PSR ¶ 152), presumably has paid and continues to pay hundreds of thousands of dollars to his many lawyers, and yet purportedly has not a single dollar with which to pay restitution.

      E.      <u>Carpenter's Past History Reveals that His Conduct Here Is Not an Anomaly.</u>

In his submissions to Probation, Carpenter has urged full consideration of his life history. Towards that end, he has submitted approximately 40 supporting letters, which he characterizes as reflecting, <u>inter alia</u>, a life of "hard work," "charity," and "ethical and law-abiding behavior." (PSR at 73). It is difficult to evaluate such submissions. Over half are from employees of Carpenter's business(es), with most of the remainder from family and friends. They plainly are written to put the defendant in the best possible light. And yet they paint a picture materially at odds with the conduct that gave rise to the defendant's conviction.

In an effort to probe beyond the letters, the government has conducted some rudimentary public database searches. Those searches have revealed prior instances of sharp-elbowed conduct that are tellingly consistent with the behavior displayed by Carpenter in this case, and that offer insight into an aspect of his character not reflected in the letters he has submitted.

The longest running saga involves the case of <u>Israel v. Carpenter</u>, litigated primarily in the United States District Court for the Southern District of New York from 1995 to 2004, which arose out of an acrimonious parting of the ways between Carpenter and two former business partners. The partners accused Carpenter of reneging on an agreement to pay them the value of their ownership interests, and filed suit. <u>See</u> <u>Israel v. Carpenter</u>, 2000 WL 1376255 (S.D.N.Y.

(September 25, 2000). The court described a "long and rather tortured history" of litigation that, in the court's words, included conduct by Carpenter "toward the plaintiffs and others [that] has often been characterized by threats of retribution whenever someone takes a position that he perceives to be contrary to his interests." 2000 WL 1376255 at *7. The court then listed a series of examples of such "bullying" conduct by Carpenter, including threats of "Thermonuclear War" and "one last chance to get out before you and your family spend the next 7 years on the wrong side of a lawsuit." Id. Carpenter lost the case and, according to the factual summaries of various judicial decisions, apparently fought the nearly half-million dollar judgment (more, with interest) for years, through appeals, "frivolous" motions (see 2001 WL 1159631 (S.D.N.Y. October 1, 2001)), and questionable assertions concerning the nature and value of his assets. See 2002 WL 1424594 (S.D.N.Y. June 28, 2002). When in April, 2004, the plaintiffs finally located and obtained a writ of execution against property held by Carpenter in Florida, Carpenter promptly conveyed the land to his sister for $0, following which she proceeded to encumber it with mortgages held by various Carpenter-controlled businesses, presumably in an effort to so dissipate the value that the plaintiffs would effectively recover nothing. (See Property Transfer Records at Exhibit 2; PSR at 40).

Carpenter has employed similarly aggressive tactics in other disputes. E.g., Daniels v. Wayne Bursey, Daniel Carpenter, et al., 2004 WL 1144046, *1 (N.D. Ill. 2004) (deploring the parties' "level of invective," which the court described as having "far exceeded" virtually anything the judge had seen during years of practice or on the bench); Amresco v. John Olson, Daniel Carpenter, et al., 147 F.3d 179 (2d Cir. 1997) (detailing aggressive maneuvers employed by Carpenter in an attempt to evade claims (and dissolve an associated lien) filed against him).

Carpenter has exhibited similar behavior here, both in the greed and arrogance that motivated the conduct giving rise to his convictions, and the manner in which he has responded to the civil and criminal actions filed against him.  If past is prologue, the dearth of financial information provided by Carpenter to Probation likely presages the next phase of this case, which will consist of Carpenter's fierce resistance to paying restitution.

All of the foregoing is equally relevant to assessing Carpenter's "history and characteristics."  It indicates, unfortunately, that the conduct at issue in this case does not represent an anomalous occurrence.

## II.    Application of the Sentencing Guidelines

### A.    Statutory Maximums

The applicable statutory maximums on each of counts one through nineteen of the indictment are:

1.    No more than five years imprisonment;
2.    A fine of up to $250,000;
3.    Special assessment of $100;
4.    Three years supervised release; and
5.    Mandatory restitution to the victims.

(PSR ¶¶ 156-173).

### B.    Guidelines Computation

The applicable Guidelines Manual, which was the Manual in effect at the time of the offense, is the November, 2000 edition.  Application of this Manual yields the following Guidelines computations:

| | | |
|---|---|---|
| Base Offense Level | 6 | U.S.S.G. §2F1.1(a) |
| Increase for Loss of More than $5 million and less than $10 million | 14 | U.S.S.G. §2F1.1(b)(1)(O) |
| More than minimal planning | 2 | U.S.S.G. §2F1.1(b)(2) |
| Abuse of position of trust | 2 | U.S.S.G. §3B1.3 |
| **FINAL OFFENSE LEVEL** | **24** | |
| *Guidelines Sentencing Range* | *51-63 months* | |
| *Restitution* | $9,040,686.00 | U.S.S.G. §5E1.1 |
| *Applicable Fine* | $10,000 - $100,000 | U.S.S.G. §5E1.2 |

Probation concurs with the foregoing computations.  (PSR ¶¶ 101-113).

Carpenter disputes each of the enhancements as well as the restitution amount.  For the reasons discussed below, his arguments are without merit.

     1.    <u>Loss/Restitution</u>

Application Note 8 to U.S.S.G. §2F1.1 states that "loss is the value of the money, property, or services unlawfully taken."  Here, the indictment charged and the jury convicted Carpenter of having engaged in a fraudulent scheme pursuant to which victims were induced to entrust money to BPE based, <u>inter alia</u>, on false representations that the money would be held in short term, fixed interest escrow accounts and returned to them so that they could complete their 1031 exchanges.  The "value of the money . . . unlawfully taken" consists of the amount of the funds that the victims fraudulently were induced to entrust to Carpenter's company – funds that were never returned to them and that they never would have given BPE had they been told the money would be traded in options.  That sum, collectively, for the seven victims referenced in the indictment, totals $9,040,686.00.  (PSR ¶ 172; Gov. Ex. 209).

Carpenter strives to characterize the victims' $9 million loss as consequential damages flowing from extrinsic events for which he is not criminally culpable.  (PSR at 78-81, 84-86). This argument is unavailing.  There is nothing "consequential" or "extrinsic" about the $9 million amount.  That figure represents the <u>direct</u> sum that the victims were fraudulently induced to give Carpenter's company and that he knowingly took, gambled, and lost in high risk options trading, contrary to the representations that had been made to the victims.  Probation concurs in this assessment.  (PSR at 81-82, 87).

There are substantial additional damages that the victims suffered over and above their $9 million in direct losses, including tax penalties, replacement financing costs, foregone interest, and attorney's fees.  These additional damages, which are detailed in the victim impact statements, are not included in the government's loss or restitution computations.

Pursuant to 18 U.S.C. §§ 3663A and 3664(f)(1)(A), restitution is mandatory and shall be ordered in the full amount of each victim's loss.  The PSR sets forth those loss amounts in paragraph 172.[2]

2.     <u>More than Minimal Planning</u>

Application Note 1(f) to U.S.S.G. § 1B1.1 states, in relevant part, that "'More than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune.  Consequently, this adjustment will

---

[2] The government notes that civil litigation and arbitration proceedings remain pending between, <u>inter alia</u>, certain of the victims and Merrill Lynch and PaineWebber.  Pursuant to 18 U.S.C. § 3664(j)(1), if any of the victims ultimately receives compensation from any third party source, the court "shall order that restitution be paid to the person who provided . . . the compensation . . . provided that all restitution of victims . . . be paid . . . before any restitution is paid to such a provider of compensation."  The government requests that the Court incorporate by reference into its restitution order the requirements of § 3664(j)(1).

apply especially frequently in property offenses."

Here, Carpenter's fraudulent conduct commenced no later than October, 1998, when he directly participated in inducing BPE's first client to entrust her funds to Carpenter's company based on false representations that the money would be held in a short term, fixed interest escrow account. In fact, Carpenter simultaneously, and without disclosure to that client or any other client, was opening up a speculative options trading account at Merrill Lynch into which he transferred and traded client funds. (Gov. Ex. 144).

Thereafter, Carpenter's conduct continued through the end of 2000, including, most notably, the period from April through December, 2000, when Carpenter, on virtually a daily basis, made aggressive, speculative bets on high risk options trades and lost millions of dollars in client funds, despite the repeated warnings of Merrill Lynch and, later, PaineWebber. (Gov. Exs. 148, 168). Such repeated acts, over an extended period of time, pursuant to a long running scheme in which clients were fraudulently induced to entrust their funds to Carpenter's company, constitute the essence of "more than minimal planning." See PSR ¶ 107. E.g., United States v. Colon-Munoz, 318 F.3d 348, 362-363 (1st Cir. 2003); United States v. Chapman, 241 F.3d 57, 61-62 (1st Cir. 2001).

3.    Abuse of Position of Trust

Carpenter's conduct also falls squarely within the Guidelines enhancement applicable to offenses involving the abuse of a position of trust. The escrow relationship supposedly formed between BPE and its clients was, by definition, one of trust. Indeed, Benistar's web site included among its "Frequently Asked Questions" the following query: "Can I trust Benistar Property Exchange with my money?" (Gov. Ex. 185). The company's answer to that question was an

unequivocal "yes," backed by representations, assurances, and written commitments that client funds would be held in escrow in fixed interest accounts and then returned. Carpenter utilized his position as BPE Chairman, and the unfettered control that he exercised over BPE's accounts, to abuse that trust by misappropriating the money. His conduct was closely analogous to the example given in Application Note 1 to U.S.S.G. § 3B1.1, which states that the abuse of trust enhancement applies to situations such as the embezzlement of a client's funds by an attorney serving as a guardian.

Here, Carpenter, through his company, was serving as an escrow agent rather than as a guardian, but his conduct was the functional equivalent. He occupied a position of trust characterized by considerable unchecked authority over BPE's client funds, and he used that authority to facilitate his misappropriation of the monies that BPE had pledged to hold in escrow. The enhancement properly applies. See PSR ¶ 108.

## III.    The Government's Sentencing Recommendation

Pursuant to the foregoing guidelines computations, Carpenter's GSR is 51-63 months. The government recommends a sentence of 60 months, which falls in the upper quadrant of the applicable range, together with three years supervised release, a special assessment of $1,900, restitution in the amount of $9,040,686.00, and a fine of $75,000.

Without repeating the discussion set forth above, Carpenter's conduct was egregious; the harm inflicted was severe; and the defendant remains unrepentant, indeed, defiant in resisting all efforts to hold him accountable for his conduct and secure restitution for the victims.

IV.    **Other Sentencing Matters**

    A.    Oral Statements by Victims

The government is informed that at least three and perhaps five of the victims in this case

wish to make an oral statement at the sentencing hearing either personally or through a

representative, pursuant to their rights under the Justice for All Act of 2004.  See 18 U.S.C.

§§ 3771(a)(4) and 3771(d)(1).  The government expects the statements to be brief.

    B.    Downward Departures

Carpenter has not (yet) filed a motion for downward departure.  Based on defendant's

submissions to Probation, however (see PSR at 54-75), the government anticipates that

Carpenter will raise the following arguments.  In the event that Carpenter supplements the

arguments that he made to Probation with a formal departure motion, the government requests

the opportunity to file an opposition.

    1.    Carpenter's Offenses Do Not Fall Outside the "Heartland" (PSR at 54)

The Sentencing Commission has approved of "heartland" departures under limited

circumstances, stating that it "does not foreclose the possibility of an extraordinary case that,

because of a combination of . . . characteristics or circumstances [not ordinarily relevant to a

departure], differs significantly from the 'heartland' cases covered by the guidelines in a way

that is important to the statutory purposes of sentencing, even though none of the characteristics

or circumstances individually distinguishes the case."  U.S.S.G. § 5K2.0, commentary.  The

Sentencing Commission has emphasized, however, that cases where this kind of departure is

appropriate "will be extremely rare."  U.S.S.G. § 5K2.0, commentary.

This is not such a case.  The conduct for which Carpenter was charged and convicted – a

fraudulent scheme, which induced victims to entrust their funds to the defendant's control, followed by the defendant's misappropriation of those funds to engage in high risk, speculative trading – is not unique.  That Carpenter failed in his attempts to enrich himself by speculating with other people's funds, and that he lost all the money, is all too common as well.  No support exists for Carpenter's assertion that this case falls outside the "heartland."

    2.    <u>The Loss Amount Does Not Overstate the Seriousness of the Offense</u> (PSR at 56)

Carpenter advances two "loss overstates" arguments.  Neither fits within the type of fact pattern that the Sentencing Commission or the First Circuit has recognized as potentially justifying a "loss overstates seriousness" departure.

<u>First</u>, the sentencing guidelines provide that, "*in a few instances*, the loss determined under subsection (b)(1) [the loss table] may overstate the seriousness of the offense."  U.S.S.G. §2F1.1, app. note 11 (emphasis supplied).  By way of example, the Sentencing Commission points to a situation such as an attempted scheme to defraud that was "so obviously fraudulent" that it never could have worked.  In such circumstances, a Court may consider whether the loss overstates the seriousness of the offense.  <u>Id.</u>

Here, of course, the loss numbers are not based on a mere attempt but rather on actual losses.  Moreover, the losses resulted from Carpenter's intentional conduct in using client escrow funds to engage in speculative options trading whose substantial risks were repeatedly disclosed to him in warnings issued by Merrill Lynch and PaineWebber.  Notwithstanding those warnings, notwithstanding the millions of dollars in trading losses that he suffered beginning in April, 2000, notwithstanding Merrill Lynch's termination of his trading privileges, and notwithstanding the enormous losses he thereafter continued to suffer at PaineWebber, Carpenter knowingly and

willfully persisted in gambling and losing client escrow monies in high risk options trades.  By the fall of 2000, when virtually all of the victim funds at issue in this case were transmitted, misappropriated, traded, and lost, Carpenter cannot credibly claim ignorance, and he cannot credibly claim good faith – a defense on which the jury was instructed and which, through its verdict, it plainly rejected.  Rather, the evidence established that Carpenter chose to increase the magnitude of his bets in the options market because, as he stated in his October 30, 2000 memorandum to Martin Paley (Gov. Ex. 184), handling the money prudently would not have yielded profits "worthy of [his] time."  In no way do the losses overstate Carpenter's culpability in this case.  His actions were knowing, they spanned a lengthy period of time, they were egregious, and they caused enormous harm.

Second, Carpenter's "multiple causation" argument is similarly without merit.[3] Carpenter cannot evade culpability for the victims' losses in this case by striving to blame them on "economic and political forces beyond [his] control."  (PSR at 58).  It was within Carpenter's control not to breach the representations made to BPE's clients that their funds would be held in escrow in fixed interest accounts; it was within his control not to misappropriate the monies, in an attempt to enrich himself, by gambling them in high risk stock options; and it was within his control to wake up to the enormous losses he suffered beginning in April, 2000, heed his brokers' repeated warnings, and put the remaining money (and all new money that subsequently came in) into the escrow accounts in which it should have been maintained from the outset.  In

---

[3]  The First Circuit has recognized that a downward departure may be warranted under U.S.S.G. § 2F1.1 where a fraudulent misrepresentation is "not the sole cause of the loss."  United States v. Rostoff, 53 F.3d 398, 405 (1st Cir. 1995); see also United States v. Bennett, 60 F.3d 902, 905 (1st Cir. 1995).

sum, as the Probation Office observes, "the overwhelming contributing factor for the loss in this case was not the significant decline in the stock market, but rather the placement of BPE client funds in the speculative options market, a market in which the placement of client funds was neither intended nor authorized by BPE clients." (PSR at 60). Put succinctly, it is Carpenter's criminal conduct that caused the losses, and he bears full culpability for the entire amount.[4]

      3.    <u>Carpenter's Civic Contributions Do Not Warrant a Departure</u> (PSR at 60)

Charitable work and community service are discouraged factors under the Sentencing Guidelines. U.S.S.G. § 5H1.11; <u>United States v. DeMasi</u>, 40 F.3d 1306, 1324 (1st Cir. 1994). Accordingly, such activities can serve as the basis for a downward departure only where the defendant's charitable deeds are truly extraordinary in nature. <u>E.g.</u>, <u>Koon v. United States</u>, 518 U.S. 81, 92 (1996); <u>United States v. Rivera</u>, 994 F.2d 942, 948 (1st Cir. 1993). Carpenter fails to clear this threshold. The community contributions that he lists, which consist principally of various soccer and sports programs and donations to the prep school that he attended as a boy (<u>see</u> PSR ¶ 146A), are not "exceptional" for local businessmen, particularly one of Carpenter's wealth. As such, they do not justify a downward departure. <u>E.g.</u>, <u>United States v. Thurston</u>, 358 F.3d 51, 79-81 (1st Cir. 2004) ("Those who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot."), <u>remanded for further consideration</u> in light of <u>U.S. v. Booker</u>, 125 S. Ct. 984 (2005); <u>United States v. Morken</u>, 133 F.3d 628, 630 (8th Cir. 1998) (defendant's community activities, which included service on

---

    [4] The government also notes that the $9 million loss amount is close to the upper end of the applicable guidelines range. The Court would need to find the loss to be "overstated" by approximately 44%, from $9 million down to below $5 million, to drop to the next lower offense level. The facts do not support such a finding.

his church council and raising money for charity, although laudable, were neither exceptional

nor out of the ordinary for someone of the defendant's income and preeminence in his town);

United States v. Crouse, 145 F.3d 786, 792 (6th Cir. 1998) (similar); United States v. Kohlbach,

38 F.3d 832, 838 (6th Cir. 1994) (deeming it "usual and ordinary" in white-collar crimes

involving executives to find that a defendant was involved as a leader in community charities,

civic organizations, and church efforts); United States v. Haversat, 22 F.3d 790, 796 (8th Cir.

1994) (similar).

    4.    No Departure Is Warranted Based on Harm to Third Parties (PSR at 61)

In United States v. Olbres, 99 F.3d 28 (1st Cir. 1996), the First Circuit held that a

sentencing court is permitted to consider "whether a case is so unusual as to warrant a downward

departure based on the loss of jobs to innocent employees occasioned by the imprisonment of the

defendant owner of a small business." Id. at 29; see also United States v. Milikowsky, 65 F.3d 4,

9 (2d Cir. 1995) ("departure may be warranted where . . . imprisonment would impose

extraordinary hardship on employees").  Although acknowledging the possibility of such a

departure, the First Circuit observed that:

> It is a rare case which does fall outside.  As courts have
> recognized, incarceration of a defendant inevitably means that the
> defendant will no longer be employed in his previous position and
> that fact inevitably will have consequences . . . The mere fact that
> innocent others will themselves be disadvantaged by the
> defendants' imprisonment is not alone enough to take a case out of
> the heartland.  These issues are matters of degree, involving
> qualitative and quantitative judgments.

Id. at 36.  Other courts have similarly observed that such "business failure" departures should

rarely be granted.  See United States v. Sharapan, 13 F.3d 781, 785 (3d Cir. 1994) (there is

"nothing extraordinary" about the claim that defendant's imprisonment "may cause harm to the

17

business and its employees; the same is presumably true in a great many cases in which the principal of a small business is jailed"); United States v. Rutana, 932 F.2d 1155, 1158 (6th Cir. 1991) (there is "nothing special" about an industrial polluter who happens to be an employer because the "very nature of the crime dictates that many defendants will likely be employers, whose imprisonment may potentially impose hardship upon their employees").  In short, ownership of a small business does not entitle one to an automatic get out of jail free card.  A defendant must demonstrate the existence of facts that take his case outside the heartland of typical white collar defendants.

Carpenter has failed to do so here.  The situation that he faces is the same as that posed in any other case where the principal of a small business is facing incarceration.

The government also notes the material inconsistency that exists between the assertions that Carpenter makes in support of his departure argument – that he is indispensable to Benistar's continued existence – and the representations that he has made in other contexts for other purposes.  Carpenter has stated to Probation that he has removed himself from Benistar's daily operations (PSR ¶¶ 147-48).  He states that his wife has had to convince clients that he is no longer affiliated with the company in order to secure the clients' business.  (PSR ¶ 132).  He lists no controlling or ownership interest in the business among his assets.  (PSR ¶¶ 150-53).

Having made these representations, Carpenter cannot now assert that he is so integrally involved in the running of Benistar that the company will fail lest he receive a departure.

5.     The Purposes of Sentencing Have Not Been Satisfied. (PSR at 64)

Carpenter has not served a day in prison.  He has not paid a dime towards the $9 million in restitution that he owes.  He exhibits no remorse, no repentance, and has accepted no

responsibility for the offenses for which he has been convicted.  There seems little doubt that should he receive a departure of any kind, he will trumpet that as vindication for his insistence that he did nothing wrong.  The purposes of sentencing have emphatically not been satisfied – not punishment, not deterrence, and not respect for the law.

6.     Carpenter Cannot Use Paley To Justify a Downward Departure (PSR at 66)

Carpenter's attempt to invoke Martin Paley as justification for a downward departure is factually and legally deficient.

As a factual matter, Carpenter and Paley are not similarly situated.  Carpenter, not Paley, was responsible for handling the client escrow funds.  Carpenter is the one who set up the undisclosed Merrill Lynch and PaineWebber trading accounts to engage in speculative/aggressive options trading.  (Gov. Exs. 144-46, 164-66).  He is the one who transferred client funds into those accounts and thereafter conducted the trading.  (Gov. Exs. 150, 171).  He received the warnings concerning the risks.  (Gov. Exs. 145-46, 165-66).  He received the account statements showing the magnitude of the losses.  (Gov. Exs. 148, 168).  He is the one who continued to trade notwithstanding the warnings and the losses.

Paley, by contrast, had no authority over the accounts and no involvement in the trading.  His responsibilities involved the property exchange side of BPE's business, not the financial side.  For the most part, clients wired their escrow monies directly into the Carpenter-controlled accounts.  Paley left that money entirely in the hands of Carpenter and his company – precisely the same arrangement that Paley had used, without incident, with Nationwide Property

Exchange, the company with which he had been affiliated prior to Benistar. (Tr. 7:108).[5]

Consistent with the foregoing, Carpenter acknowledged in early January, 2001, during the throes of BPE's demise, that "It's definitely not Marty Paley's fault." (Gov. Ex. 114 and 114A). Upon the commencement of this case, however, Carpenter reversed course. Suddenly, Paley became the sole culpable party, and the focus of Carpenter's defense became breaking Paley down on cross-examination.

Many witnesses would not hold up well under such circumstances, and Paley did not. That Paley crumpled under a relentless cross-examination, however, does not render him the criminal conspirator that Carpenter seeks to portray. The two men's demeanor in the courtroom made plain who has the commanding personality and was in charge, and who was not. The evidence introduced at trial – which established that Carpenter's approval was required on all material matters and that he had final authority – corroborated that fact. (Gov. Ex. 179; Tr. 2:134, 3:52, 7:115-19, 7:126-28). Paley may have been – to use the vernacular – a dupe and perhaps even a dope, too quick to defer to an overbearing figure such as Carpenter and without the backbone to ask the questions he should have asked. That is not reason to charge him, however, much less treat him and Carpenter as similarly situated. They are not.

Carpenter's arguments also suffer from multiple legal deficiencies. As a matter of Guidelines law, the First Circuit has made clear that even if Carpenter and Paley were similarly

---

[5] Paley subsequently stated that he thought the clients' principal was safe – that he believed any trading in which Carpenter was engaged involved only the "spread" – i.e., the surplus interest resulting from the difference between the rate that Merrill Lynch and Paine Webber paid on the accounts, and the 3% or 6% that BPE was obligated to pay its clients. (Tr. 8:22-23.

situated co-defendants – which they are not – a departure is not warranted to equalize their two outcomes. E.g., United States v. Wogan, 938 F.2d 1446, 1448-49 (1st Cir. 1991); see also Thurston, 358 F.3d at 78. Whatever the law might be elsewhere, including in the Sixth and Ninth Circuits (to which Carpenter heavily cites), the First Circuit has held that Congress' objective in enacting the Sentencing Guidelines was to eliminate "*nationwide* disparity among equivalent offenders." Id. at 1449 (emphasis in original). Contrary to this objective, reducing a defendant's sentence below the GSR to equalize it with that of a co-defendant "promotes, rather than reduces nationwide disparities" by creating a new disparity between the defendant's sentence and "'that of all similarly situated defendants throughout the country.'" Id. (quoting United States v. Joyner, 924 F.2d 454, 459-61 (2d Cir. 1991)). Congress' "chief concern," the First Circuit concluded, "was to safeguard the macrocosm of the sentencing universe from differential treatment, even if, occasionally, that valued prophylaxis might be attained at the expense of some disparity within a particular microcosm of the sentencing universe." Id.

Post-Booker, the same reasoning applies with equal strength to 18 U.S.C. § 3553(a)(6), which instructs courts to consider, in imposing sentence, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The government submits that section 3553(a)(6) is most properly viewed as safeguarding against disparities, per Wogan's language, across the "macrocosm of the sentencing universe."

Finally, the government notes certain separation of powers concerns that are implicated by Carpenter's arguments. Carpenter's contentions, as applied to this case, go beyond the issue addressed in Wogan, which is whether one convicted defendant should receive a below-

Guidelines sentence because another convicted defendant benefitted from one.  Rather,

Carpenter effectively asks the Court to second-guess the government's charging decision and

deem it an injustice – to be rectified by a departure – that Paley was not charged at all.

Carpenter's request, which asks the Court to alter its sentence based on an assessment of a

charging decision to which it was not privy, is unwarranted.  Carpenter should be sentenced, as

he was tried and convicted, on the basis of the conduct for which he is individually culpable.

       7.     <u>No Support Exists for a Family Circumstances Departure</u> (PSR at 67)

Carpenter also seeks a departure for "extraordinary family responsibilities," asserting that

he has both a college-aged daughter and elderly parents to whom he provides assistance.  This

argument also is unavailing.

In <u>United States v. Pereira</u>, 272 F.3d 76 (1st Cir. 2001), the First Circuit made clear that

family hardship is neither atypical nor unusual when a family member is incarcerated.  For this

reason, such hardships – without more – cannot justify a departure under U.S.S.G. § 5H1.6.

<u>Pereira</u>, 272 F.3d at 80-83.

By way of illustration, the First Circuit cited in <u>Pereira</u> to a series of appellate cases in

which considerable family hardships – both financial and emotional – had been deemed

insufficient to take defendants out of the "heartland."  The cases included situations such as:

(1) the imprisonment of both the mother and father of a four-year old child, <u>United States v.</u>

<u>Carr</u>, 932 F.2d 67 (1st Cir. 1991) (not extraordinary; vacating departure); (2) a defendant with a

neurologically impaired nine-year old son and a wife with fragile mental health, <u>United States v.</u>

<u>Rybicki</u>, 96 F.3d 754 (4th Cir. 1996) (not extraordinary; vacating departure); (3) a defendant

who was a single mother and the sole provider for five children, one of whom had a substantial

neurological impairment, <u>United States v. Sweeting</u>, 213 F.3d 95 (3d Cir. 2000) (not extraordinary; no departure); (4) a defendant who supported three children and had a wife with depressive disorder and panic attacks, <u>United States v. Goff</u>, 20 F.3d 918, 921 (8th Cir. 1994) (no departure warranted); and (5) a defendant who was a single mother with three children under the age of four, where incarceration would require placing the children in foster care, <u>United States v. Dyce</u>, 91 F.3d 1462 (D.C. Cir. 1996) (not extraordinary; vacating departure).

As the First Circuit held in <u>Pereira</u>, in view of the significant hardships that courts have deemed to lie within the "heartland," Carpenter cannot supportably contend that his situation should for some reason be found extraordinary. It is not. He has one child, who is in college. And he has two siblings in the United States, including a sister in New York, who can assist in taking care of his elderly parents. (PSR at 68).

8.    <u>No Basis Exists for Carpenter's Claim of Government Misconduct</u> (PSR at 68)

The United States previously has addressed, at length, Carpenter's unsupported claims of government misconduct. There were no discovery violations, no <u>Napue</u> violation, and no shifting of prosecution theories mid-trial, to the purported detriment of Carpenter's theory of defense. <u>See</u> Government's Opposition to Defendant's Motion to Set Aside the Verdict and Grant a New Trial, at 5-10.

9.    <u>No Departure is Warranted Based on the Totality of Circumstances</u> (PSR at 69)

Carpenter's request for a "combination" departure based on the "totality of the circumstances" is equally unsupported.

The sentencing commission has approved of "combination" departures under limited circumstances, stating that it "does not foreclose the possibility of an extraordinary case that,

because of a combination of . . . characteristics or circumstances [not ordinarily relevant to a departure], differs significantly from the 'heartland' cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case."  U.S.S.G. § 5K2.0, commentary.  The sentencing commission has emphasized, however, that cases where this kind of departure is appropriate "will be extremely rare."  U.S.S.G. § 5K2.0, commentary.

This is not such a case.  Carpenter was convicted in connection with a fraudulent scheme pursuant to which he misappropriated and traded client escrow funds in the options market in an effort to enrich himself.  By all accounts, at the time of the offense, he ran a profitable business with ties to the local community.  His apparent motive was to add to his wealth.  Such facts are not unique, whether viewed in isolation or in combination.  No downward departure is warranted.  E.g., United States v. Rushby, 936 F.2d 41, 43 (1st Cir. 1991) (defendant's solid employment history and family responsibilities, "whether taken separately or together", did not justify a departure); see also United States v. DeBeir, 186 F.3d 561, 573-74 (4th Cir. 1999) (departure based on variety of factors, including defendant's education, strong employment history, efforts at rehabilitation and remorse, was abuse of discretion); United States v. Winters, 174 F.3d 478, 485 (5th Cir. 1999) (sentencing judge abused discretion by departing based on combination of factors, including defendant's 15-year employment history and family ties); United States v. Weise, 128 F.3d 672, 674-75 (8th Cir. 1997) (departure based on defendant's four and one half year employment record and fact that he supported four children was abuse of discretion).

C.    <u>Section 3553(a) Factors</u>

Carpenter's final sentencing arguments invoke the factors set forth in 18 U.S.C. § 3553(a) to contend that the Court should impose a sentence of probation, rather than the 51-63 months of imprisonment called for by the applicable Guidelines Sentencing Range.  (PSR at 70-74).

In support of this contention, Carpenter harkens back to virtually every theory of defense that he advanced at trial and virtually every departure argument that he made to Probation.  All of it can be distilled into three basic assertions: (1) he committed no crime; (2) it's all Paley's fault; and (3) he has suffered enough.

To these assertions, the government offers three responses: (1) Carpenter defrauded seven individuals of $9 million in a scheme whose sole purpose was to enrich himself by putting other people's money at risk; (2) the jury rejected every one of his defenses and convicted him on all counts after a full trial; and (3) Carpenter has served no jail time, returned none of the $9 million, and given every indication that he will exhaust every civil and criminal avenue available to him, hide every asset, and remain defiant and unrepentant to the end.

Carpenter has advanced no justification, either under a departure analysis or under section 3553(a), for imposing a sentence below the applicable GSR.  To the contrary, Carpenter's conduct warrants a sentence in the upper quadrant of the range.

## **Conclusion**

For the foregoing reasons, the United States requests that the Court impose a sentence of 60 months imprisonment, three years supervised release, a special assessment of $1,900, restitution in the amount of $9,040,686.00, and a fine of $75,000.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:

  **/s/ Michael J. Pineault**
Michael J. Pineault
Jonathan Mitchell
Assistant U.S. Attorneys
U.S. Courthouse, Suite 9200
1 Courthouse Way
Boston, MA 02210

Date: December 14, 2005