UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA )
)
)
v. )    CRIMINAL NO. 04-10029-GAO
)
DANIEL E. CARPENTER )
_____)

---

## DAN CARPENTER'S SENTENCING MEMORANDUM

---

I.    **Introduction.**

While the defendant continues to maintain that his previously filed motions for acquittal and new trial warrant the relief requested therein, and continues to earnestly believe that a sentencing hearing will in the end not be necessary, the Court's procedural order requires the defendant to file his sentencing memorandum three days before the scheduled hearing. As such, the defendant hereby submits the instant sentencing memorandum, but in doing so does not in any respect want to intimate or suggest he does not continue to believe in the validity of his pending motions. Herein, the defendant does not reiterate the detailed legal arguments he has made regarding calculation of the sentencing guidelines, as detailed in his various submissions to Probation, but incorporates said arguments, which he will address at the sentencing hearing, if necessary.

Clearly, the defendant has great difficulty reconciling the jury's finding with what he knows existed in his mind and in reality, but he accepts and understands a verdict has been returned. At a sentencing hearing, the issue becomes what consequence should flow from the conviction: does Dan Carpenter, a man who, as documented by the PSR and the letters of support

submitted on his behalf, has devoted his life to bettering the lives of others, who has contributed

his time and energy to the causes of others, a man who has never before this episode in his life

harmed a soul, a man who never met with or intended to harm a single exchangor, a man who

did not profit from the charged crimes, does a man like Dan Carpenter need to be warehoused in

a federal prison facility to further the goals of punishment articulated in 18 U.S.C. S3553(a). For

all of the reasons outlined herein, the defendant respectfully contends that a sentence of

probation is the only reasonable sentence given the clear mandate of 18 U.S.C. §3553(a), which

obligates the Court to "impose a sentence sufficient, but not greater than necessary, to comply

with the purposes" set forth in statute.[1]

       Clearly, a sentence of incarceration is not necessary to protect the public from further

crimes of Mr. Carpenter, nor is it necessary to provide him with needed education or vocational

training. With respect to affording adequate deterrence and just punishment, Mr. Carpenter has

lived with the horror of this episode for five years now-- five years since the criminal

investigation and the parallel civil litigation began; two years since indictment and the $19

million civil judgment; and five months since conviction — it has been the subject of numerous

newspaper articles in his community newspaper, he has been forced to divorce himself from a

significant part of the operation of the business he built from the ground up after graduating law

school, and it has simply ravaged his life. With respect to the goal of general deterrence, the

government's prosecution of this case has certainly sent a resounding message to Mr.

Carpenter's community in particular and the overall community in general. Indeed, with the

advent of the internet (i.e., Google and other search engines) and the vitriol of Mr. Carpenter's

---

[1]. Post-Booker, sentencing courts are still required to "consider" the Guidelines, but they must also give "equal consideration" to the sentencing factors set forth in 18 U.S.C. § 3553(a); see also 18 U.S.C. §3661 clearly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.".

competitors, Mr. Carpenter's matter has been the subject of great attention in the relevant industries. Even the government concedes Mr. Carpenter did not set out to harm anyone, yet he faces a $19 million dollar judgment, he was subjected to a federal prosecution, he now stands a convicted felon, his licenses to practice law and engage in the insurance business are in peril, he will be sentenced by this Court, and, regardless of the type of sentence imposed, he will be under the supervision of the criminal justice system for a significant period of time hereafter. A sentence of five years probation meets the goals of general deterrence as well as any period of incarceration.

Most importantly, the conduct at the heart of this prosecution utterly betrays the remarkable life record of Dan Carpenter, whose tireless commitment to his community, employees and family is poignantly illustrated within the Presentence Report ("PSR"), as well as the many letters appended hereto in the Appendix. Dan has compiled a record of continuous and pre-offense commitment to social causes and service to his community, as well as a special commitment to his immediate family and the "Benistar family." Respectfully, the defendant contends herein that a sentence of probation is the only reasonable resolution of this case, given the defendant's extraordinary record of spectacular good works, his remarkable employment and educational record, his extraordinary family and community ties and responsibilities, the disparity of treatment between Mr. Carpenter and Martin Paley, the atypicality of the fraud charged, Mr. Carpenter's unusual family responsibilities, the harsh consequences already inflicted upon Mr. Carpenter, the third party harm that will be inflicted upon the innocent employees of Benistar by a sentence of imprisonment, the fact that the loss in this case overstates Mr. Carpenter's culpability and was caused by extraneous factors, as well as the government misconduct of mischaracterizing the true focus of their prosecution and their opinion of Mr.

Paley's conduct in this case. It is for these and other reasons that the Court should sentence Dan Carpenter to a term of probation, or a period of home confinement at most.

**II.     Argument**.

As noted, pursuant to 18 U.S.C. § 3661, "*no limitation* shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence," and this statutory language certainly overrides the (now-advisory) policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's educational and vocational skills, family ties and responsibilities, community ties, charitable or public service, employment-related contributions, and/or prior good works. *See* U.S.S.G. § 5H1.1-12. As such, the defendant argues herein that these considerations warrant a sentence of probation in this case. See United States v. Bradley, 2005 WL 2596197 (1st Cir.2005) ("Under mandatory guidelines, a district could well conclude that a group of discouraged factors did not quite justify a departure from the guidelines under the prevailing 'heartland' analysis but might justify a somewhat shorter sentence under a reasonableness standard."). Additionally, the defendant respectfully contends that he would qualify for a departure, pursuant to USSG Ch. 1, Pt. A**,** comment. (n.4(b)), given the unique factual aspects of the case, including the fact that it is conceded Mr. Carpenter did not misappropriate any of the lost funds for his own personal benefit or to his own personal accounts, as well as the fact that the losses suffered in this case were due in whole or part to the extraneous forces of one of the worst stock market collapses in our financial markets history. In the end, after reviewing all of the relevant considerations in this case, the defendant respectfully

contends that a sentence of probation constitutes a sentence "sufficient but not more than necessary" to meet the goals of sentencing, as set forth in 18 U.S.C. §3553.

        a.      *The defendant's extraordinary life accomplishments.*

As is readily apparent from a review of the letters authored by friends, family and co-workers (see Appendix, Tabs 1-43), Dan Carpenter is not the paradigm of a white-collar defendant convicted of mail and wire fraud.  Born and raised in a close, loving but financially challenged family, (PSR at 121), Dan Carpenter understands that family, community and friends are the pillars of "success," not financial milestones, and so at every step of his adult life has been committed—through devotion of personal time and energy, not simply writing a check—to giving back to his academic, work and residential communities with extraordinary and continuous acts of civic, philanthropic and personal contributions.  From running and coaching local soccer teams for more than 30 hours per week, to founding a "Big Buddy" program through which high school students tutor underprivileged elementary school children, to donating countless hours to help employees and friends in varied personal crises, to anonymously donating turkeys to the local food bank for Thanksgiving and toys at Christmas for struggling families in his community, Dan Carpenter's selfless nature has transformed him into the cornerstone of each community in which he has resided or worked.

  Dan was the product of a "great" childhood, neither he nor his siblings "ever went without the basic necessities" and he enjoyed a "fantastic" relationship with his parents and siblings. (PSR at ¶121). Mr. Carpenter's parents, Edgar (88 years old) and Constance (86), still reside in Canton, Connecticut, nearby to their eldest son, Dan. (PSR at ¶124-25). Dan remains very close with his three siblings, John (48, a professor at the University of London), Connie (45, a computer consultant in New York), and Jim (42, a manager of investment firm in Texas), who

remain steadfastly behind their older brother and are concerned for his well-being. (PSR at ¶126-29; Appendix at Tabs 7, 25, and 36).

While financially disadvantaged, Mr. Carpenter's hard work and good fortune produced an academic scholarship to Avon Old Farms in Avon, Connecticut, which produced an "incredible experience" for Dan. (PSR at ¶122). Grateful for the "opportunity to become someone," (PSR at ¶122), Dan devoted all of his energies to rewarding the Avon Old Farms institution for their largesse to him. (PSR at ¶`122) (noting Dan excelled academically and was often ranked first in his class each quarter). After graduating from Avon Old Farms, Dan matriculated at Bowdoin College, again on an academic scholarship, from where he graduated Magna Cum Laude with a B.A. dual degree in Government and History in May 1976. (PSR at ¶144). After Bowdoin, Dan studied in London and then attended and graduated from the University of Connecticut School of Law. (PSR at ¶144).

In 1982, Dan married Molly (nee Hohengarten) and their only child, Caroline, was born in 1986. (PSR at ¶130). As the PSR and the letters appended hereto poignantly demonstrate, Dan and Molly are a true team, personally, professionally and spiritually. Letter after letter attests to their devotion to each other, to those around them, and to the community in general. (See Letter of Molly Carpenter at Tab 5). Mary Bursey wrote that she "could not possibly list all the things that Dan and his wife Molly have done for me personally, as well as his other employees and so many others—strangers and friends alike—in our community." (Letter of Mary G. Bursey at Tab 1, at p.2). Donna Wayne writes that "[w]hat Dan has done for me personally goes beyond loyalty and friendship. He and his wife Molly have celebrated my joys and successes and comforted me in all ways possible in every time of grief or uncertainty." (Letter of Donna Wayne at Tab 2, at p.2).

Dan reported to Probation that their marriage is "great", Molly "has been a tremendous source of support for him since the inception of this case", "she has stood by his side through 'thick and thin'", and "this crisis has brought them closer together." (PSR at ¶130).   Caroline is now a student at Trinity College where, perhaps not surprisingly given Dan's and Molly's extraordinary commitment to their family and community, (e.g., PSR at ¶133-34), she is an excellent student, active in school affairs, and a member of the College's soccer team. Caroline, who was present throughout the trial, remains a steady and supportive pillar for Dan. (PSR at ¶131; Letter of Caroline Carpenter at Tab 6).

Mr. Carpenter has not forgotten what it means to the recipient of opportunities as a result of the kindness, attention and graciousness of others. As a result of his gratitude, he has relentlessly devoted his time, energy and financial wherewithal to better his community. For example, he started the TOPS program (The Outreach Program for Soccer for disabled children) and the SCORE (Stamford Coalition on Recreation and Education) program to help others gain valuable life lessons through soccer. The SCORE foundation, founded and funded by Dan in Stamford, Connecticut, helped inner city youngsters play sports for free, provided the funding for the acquisition of musical instruments for elementary schools, created scholarships for youngsters to attend dance schools, and donated dozens of computers to elementary schools at a time when computers in the classroom were unheard of (except for elite private schools). Mr. Carpenter advised Probation "that the reason for him starting these programs, particularly the SCORE program, was so that he could 'give back' to the community and give underprivileged children an opportunity to become 'somebody,' just as he was afforded an opportunity to become somebody with his scholarship to Avon Old Farms School." (PSR at ¶134; see  PSR at ¶¶136,

146A) (Mr. Carpenter's sister noting that Mr. Carpenter has started scholarships for inner city children to attend private schools).

Mr. Carpenter also established the "Big Buddy" program, a mentor program whereby older inner city high school students tutored younger inner city students to help both groups increase their self-esteem, to help the older students earn money and obtain extracurricular credits for their college applications, and to help the younger students commit themselves to education and overcome learning disabilities. He coached his daughter's soccer teams (and one year coached her team to a National Championship in the State Games of America), but is prouder still of coaching other people's children to local and State Division, League, and Tournament Championships, all of which required 30 or more hours each week.

As noted in the PSR, in addition to the SCORE and TOPS programs, Mr. Carpenter has made other "significant community contributions", including scholarships for Trinity Catholic, STEPS scholarships, Simsbury Youth Soccer and other soccer programs and events, being a Board Member at Avon Old Farms and other contributions to the Avon Old Farms community. (PSR at ¶146). Ms. Bursey details how lucky she felt "to accompany Dan to the Simsbury Town Hall to drop off gifts and food for a needy family that we had anonymously 'adopted' for Christmas." (Letter of Mary G. Bursey at 2). Probation has concluded **"that the defendant's contributions to his community are significant, genuine, and commendable."** (PSR at Addendum, p.61) (emphasis added).

Dan has created a truly unique business atmosphere—a family—at Benistar, a theme echoed over and over by each of the employees that have submitted letters on his behalf. Kathleen Kelly-Naylor describes a "pinky swear" Dan made to her that he would assist her with her kids' college tuition, which he did. (Letter of Kathleen Kelly-Naylor at Tab 8). "As [a]n

employee [Dan] treats you like family and every holiday the Carpenter family is so generous in both their time and money … Dan Carpenter is guilty of being a wonderful father, husband, friend, [and] employer". (Letter of Kathleen Kelly-Naylor at Tab 8). Sheila O'Grady wrote that, while her prior experience told her it was difficult to work in a family run business, "Dan and his wife Molly care as much about the welfare and camaraderie of their employees as much, if not more so at times, than the business itself. I have seen on many occasions where Dan has put an employee's issue first. However, that's not to say that Dan in any way neglects the business end. If anything, Dan has somehow figured out a way to balance all that needs to be done to run this business while making sure that everyone feels that they are a part of the day-to-day operations more to the tune of a co-worker than a boss." (Letter of Sheila O'Grady at Tab 9). Consider the letter of Mauricio Agudelo, while lengthy, it exposes the heart, soul and character of Dan Carpenter:

> I believe Dan's character is best revealed by the generosity he displayed toward my family nearly two years ago in the summer of 2003. I walked into Dan's office on a random Friday afternoon to make sure that all was taken care of before I left for the evening. He acknowledged that all was well and, as was customary, asked me if I had any specific plans for the weekend. I explained that I was treating my mom to dinner that evening and that I had no idea what I'd do the next day. He wished me well but asked me why it was that I mentioned doing things with my mom but rarely ever mentioned my dad. I told him that my father worked two full-time jobs for over twenty years and was therefore hardly ever available to do the things most of us take for granted, like going to dinner on Friday nights.
>
> Dan stopped his work and asked me to sit and talk about my father for a minute, and so I told him of my father's life since coming to America in 1983: with a child on the way and three others under the age of 10, he worked in the only industries available to non-English speaking immigrants. He washed floors and dishes and empties waste bins while my mother nursed her growing belly and cared for us at home, and while my brother and I delivered newspapers to help stretch ends that would never meet. My dad provided well for us; we never lacked the basics, but never had much more either. For a while, things got better for us, and then they got much worse; my dad fell ill with kidney stones and a gall bladder complication that nearly took his life. He survived the illness, but could not subdue his creditors, and so we lost our home and went back to renting an apartment in the low-income neighborhood we'd left only years before.

Dan listened as I explained how my father's illness led to bankruptcy, and bankruptcy to the resigned but certain idea that he would spend the rest of his years toiling for the elusive yet immortal dream of middle-class life. I was due to transfer offices at the time, and mentioned that before I left my parents home that I'd like to get my dad out of his '78 Ford Econoline van and into something safe that wouldn't leave him stranded on his way home form work at 2:30 in the morning. Dan had never met my father; he had never shaken his hand or heard his broken accent on the phone, but he respected him as only a man who has struggled in his own life can understand a disadvantaged man's strength, fidelity and industry. When I returned on Monday, Dan decided to help me buy my father's car and had even circled all the ads in the Sunday paper he thought might interest me.

When I told my mom the plans Dan and I had for my father, she broke down into tears and told me a story she'd held inside for many years. My father had never been a covetous man. Born into fantastic poverty, and raised among the penniless and pitiful in the ghettos of Columbia, he wanted little more from life than love and the opportunity to raise his children far from the nefarious playgrounds of his youth. When the occasion to move to the United States presented itself, he knew it meant abandoning his own ambitions for the opportunity to allow us to pursue our own. He did so willingly, yet kept one modest dream for himself: to experience the pleasure of owning a Mercedes Benz by his fiftieth birthday. He had the length of an entire life to achieve his dream, but the uncompromising ebb and flow of illness and misfortune colluded well and his fiftieth birthday was celebrated in great company but without having secured that temperate wish.

When Dan heard the story, he asked me to determine what kind of initial payment I would need in order to buy my dad his new Mercedes. At 23 years old, the thought of giving my dad his joy was foreign to me as wealth itself. I had read of such generosity in fiction, but had never experienced it in my life. The act was difficult to believe but it was real, and two weeks later Dan gave me an unsolicited bonus to cover the down payment on my fathers new Mercedes Benz, I have continued to make the monthly payments on the car, but I would never have been able to initiate the sale with out his help. Dan's bounty was not a disinterested gift of money; he took on my cause as thought it were his own and made real the impossible imagination of two men. In my adult life, I've seen my father cry only at the birth of his grandchildren, and on the day I gave him the keys to his new Mercedes Benz.

Dan is more than my employer; he is a mentor, teacher, and friend. Dan errs like other men, but gives unlike and I have ever met. I hope that in addition to my family's penitence and prayers that this expression of Dan's extraordinary will may successfully petition your forgiveness, and that you may remember the kindness in his heart when you look deep within your own for direction.

(Letter of Mauricio Agudelo at Tab 10). Joseph Castagno sums up the feeling of being a member of the Benistar family:

> When I first met Dan, he seemed like a very determined businessman. Once I got to know him though, not only did he confirm what I thought, but I also saw the dedication he had, and still has, to keeping a family of employees as exactly that: a Family. This is an uncommon characteristic amongst employers since nowadays everything is about cheaper labor and higher profits. He has put aside his personal time more than I can count just to help someone, including myself.

> Dan has been amazing these past few years. He's always looking out for me in every venture I make, and treats me like one of the family, and although that may not be important to others, it is to me. There's no better feeling someone can have than to know that they're loved. That's the feeling I get, and the type of man Dan is.

(Letter of Joseph Castagno at Tab 43).

Dan's commitment to his community is also illustrated by his contributions to several local establishments. Timothy Molinari wrote:

> One of my responsibilities for Dan is bookkeeping at several local businesses Dan has partial interest in. These include the Pettibone Tavern, a local landmark restaurant that has stood for over 200 years, and two local video stores. Profit is not Dan's interest in these places – in fact to keep them afloat Dan has put in significant amounts of his own money. He does this not hoping for an eventual windfall, but because these places are local landmarks, small town businesses that he does not want to see them disappear replaced by faceless super massive chain stores, which have no connection to our town and no roots here.

(Letter of Timothy Molinari at Tab 38). Matthew Tofil wrote:

> I grew up in West Hartford, Connecticut and have worked in many places throughout the United States. In October of 2002, I was contacted by a colleague about an opportunity to become Executive Chef at Pettibone Tavern. The chance to make it back home and be the Chef of one of my favorite places growing up was a dream come true. Finally I had a chance to show my own creativity and culinary style. This opportunity would not have been possible without the support and generosity of Dan. Mr. Carpenter has always been there when needed and always shows an interest in my culinary creations. His support and drive to be the best has been the catalyst of our great restaurant. My opportunity at Pettibone Tavern has enabled my wife and I to purchase our first home and live in a community we never thought possible. This was all possible because of Dan's support. It is a good thing he likes my cooking!

(Letter of Matthew Tofil at Tab 34).

There are more than 40 letters that echo the same themes—Dan Carpenter the gracious, kind, generous, caring, loving, thoughtful, devoted and truly extraordinary man. These letters— written by family, friends, employees and business associates—all attest to the fact that Dan Carpenter need not be imprisoned for the grave mistakes he made in connection with BPE, which is just one tiny sliver of the matrix of facts, circumstances, and history that embodies Dan Carpenter the person.

In examining the overall circumstances of this case and this individual defendant, the Court should consider the truly extraordinary charitable and civic contributions made by Dan Carpenter.  See United States v. Cooper, 394 F.3d 172, 177-78 (3d Cir. 2005) (affirming 4-level downward departure for securities fraud defendant's exceptional good works such as organizing and running a youth football team in a depressed area of Pittsburgh, mentoring young men on the football team, paying for several players to attend a suburban high school and one to attend college, and making "hands-on personal sacrifices which have had a dramatic and positive impact on the lives of others.").[2]

 "In short, [Carpenter] does not fit the paradigm that the First Circuit routinely discounts– the man or woman with the lavish lifestyle, who can well afford to endow the local museum or philharmonic hall", he instead has contributed to his community with his time, energy, and passion.  United States v. Mehta, 307 F. Supp.2d 270, 282 (D. Mass. 2004) (Judge Gertner granting 5-level downward departure to mail and wire fraud defendant based on civic and charitable works).  See also United States v. Serafini, 233 F.3d 758, 773 (3d Cir. 2000)

---

[2]  Compare United States v. Thurston, 358 F.3d 51, 78 (1st Cir. 2004) (reversing "good works" downward departure because corporate executive primarily made large charitable donations).

(upholding downward departure based in part on the defendant's help to three persons, one of whom he employed); United States v. Woods, 159 F.3d 1132,1136-37 (8th Cir. 1998) (downward departure for a defendant who brings two troubled women, one a relative, one a former employee who had stolen from her, into her home, who pays for their schooling and who helps an elderly friend who moved out of a nursing home with the defendant's assistance); United States v. Somerstein, 20 F. Supp. 2d 454 (E.D.N.Y. 1998) (granting downward departure for mail fraud defendant on grounds of donations of food and services to charitable organizations among other factors).

The contributions of Dan Carpenter to his community more than match those of the defendants in the cases identified above.

      b.    *Unduly harsh consequences have already been exacted*.

The day BPE failed, January 5, 2001, began a period of time in Dan Carpenter's life that has exacted an inestimable impact upon Dan, who characterized "his life since the inception of this case as being in a 'state of siege,' which has resulted in poor sleeping and eating habits, and the occurrence of several panic attacks." (PSR at ¶139). Those of us who appear in this courthouse as a livelihood inevitably numb, at least to some extent, to the pressure, stress and emotional damage inflicted by a federal prosecution. Mr. Carpenter has dealt with these external and internal forces for five years now and they have exacted a great toll on him. Dan described "the early days of this case in 2001 as 'the dark days'", where "his livelihood was attacked, whereby he was at risk of losing everything he had so tirelessly spent to achieve and build." (PSR at ¶139). It was so dark, in fact, that he penned a letter to his then attorney wherein he discussed suicidal intentions. (PSR at ¶139). More substantial than the lost business opportunities, the risk of loss of his professional licenses, the destruction of his reputation, Dan

has had to share and witness the anxiety inflicted upon his wife, daughter, extended family and

employees over the past five years—the holidays dampened, the birthdays clouded, and the

anniversaries tainted. Since January 2001, Dan Carpenter has been living constantly under the

cloud of civil litigation, criminal investigation, indictment and conviction.  Expectedly, "this

whole case has been a 'hellish' experience." (PSR at ¶132). "[A]s a result of the civil suits filed

by the victims in this case as well as his indictment in 2004, [Dan] has had to give up some of the

many of the great things that have become his identity," including control of the company he

began the year after he graduated law school, his soccer coaching positions because local parents

in his community did not want their kids to "see their coach carted off the field in handcuffs,"

and his position on the Avon Old Farms Board of Trustees. (PSR at ¶132-134;

http://www.avonoldfarms.com).   Clearly, Dan Carpenter has already suffered incredible

punishment. Indeed, Probation "does not dispute that the defendant's life has been forever

changed as a result of his involvement in" this case. (PSR at Addendum, p.65).

     Dan's reputation in the Simsbury, Connecticut, community has suffered correspondingly.

As made clear in a recent Wall Street Journal article on the chaos surrounding Refco, Inc., the

unraveling of that business in the wake of allegations surrounding its CEO "were a lesson in how

fast, in today's electronic and globalized financial markets, a securities firm that depends upon

client confidence and borrowed money to operate can face crisis." Wall Street Journal, October

15, 2005, at A1. The article noted that in today's times you "don't have time to work things out.

People just hit the panic button," especially in "industries requiring trust."  Id.

     The professional ramifications of this prosecution have also been dramatic. The instant

convictions have also placed Dan in jeopardy of losing his insurance license and being disbarred

as an attorney.  Additionally, the Department of Labor has asserted in an action that Mr.

Carpenter is barred from acting in a fiduciary capacity or serving as a service provider to any

ERISA-covered plan for thirteen years because of his conviction in this matter. Moreover, in

addition to having to "divorce" himself from Benistar, and officially step down as President and

Chairman, (PSR at ¶132), many business competitors have used the civil suits, investigations and

federal prosecution as the fulcrum to ravage Benistar. (PSR at ¶132). The company Mr.

Carpenter built, and the atmosphere he has created through his leadership and example, is truly

unique. The letters submitted by many of the employees dramatically illustrate the profound

impact Dan has had on their lives. The fact that the courtroom was filled throughout trial by the

"Benistar family" is a vivid testimonial to Dan's character, personality, and his very being. Yet,

there is no question but that Dan Carpenter and Benistar (which has been tainted by this case

merely because BPE's name includes the word "Benistar" even though Benistar had absolutely

nothing whatsoever to do with the 1031 business), have suffered substantial costs as a result of

this prosecution. See Section "e" *infra*. Since his indictment in February 2004, Dan has been

prohibited from business and personal travel outside the United States.  Because Dan Carpenter

has traditionally served as Benistar's primary contact with overseas financial and insurance

contacts in Bermuda and in London, this restriction has had a substantial detrimental impact on

Benistar's ability to conduct its insurance business and to remain competitive in its industry in

recent years.

      Moreover, because Dan Carpenter's entire professional career revolves around trust, the

degradation of his reputation that has resulted from this prosecution and the government's

characterization of this case as involving "misappropriation" (read "embezzlement") has caused

him untold anguish.  See United States v. Buchanan, 987 F. Supp. 56, 59 (D. Mass. 1997) (Judge

Gertner finding that banker convicted of misapplying bank funds would likely have been

sentenced to probation under a non-mandatory guidelines regime based on his first-time offender status and "exemplary life," as well as that his business had been destroyed and he had to bear "the stigma of a felony criminal conviction"). <u>See also</u> <u>United States</u> v. <u>Morris</u>, 837 F. Supp. 726, 729 (E.D. Va. 1993) (attorney's conviction on narcotics-related charges and possible disbarment "tarnishe[d] and degrade[d]" the "good he [had] achieved," and the resulting "stigma" should be deemed "part of the retributive effect of the sentence").

Dan Carpenter is widely considered to be the nation's leading expert on multiple employer welfare benefit plans under Section 419A(f)(6) of the Internal Revenue Code ("419 Plans"). When the U.S. Treasury Department was promulgating new regulations regarding 419 Plans in 2003, it asked Dan Carpenter to submit a white paper and testify at public hearings held in November 2002. Both Dan Carpenter and Benistar have nationwide reputations in the insurance and welfare benefit plan industries. These reputations, however, have now been substantially harmed by virtue of the convictions in this case (which unfairly have also tarnished Benistar), even more so as a result of the government's characterization of this case in particular press releases as Dan having "misappropriated" (read "embezzled") $9 million from "clients." In the insurance and welfare benefit plan industries, such accusations can be the "kiss of death" to any person or company involved in those businesses. Dan Carpenter's work resides squarely within industries that rest upon client confidence and trust and his indictment and conviction have significantly damaged not only Dan Carpenter but Benistar. Indeed, Dan Carpenter took the extraordinary step of making a formal request to the U.S. Attorney's Office to remove the word "misappropriate" from their press release following conviction in this case because of the predictable impact it would have on Benistar. His request was rejected by the U.S. Attorney's Office and the financial impact has been substantial.

Where the collateral consequences resulting from convictions are extraordinarily severe, such consequences may justify substantial downward departures, especially where such collateral consequences almost fully address the needs for retribution, deterrence, incapacitation, and reformation.  See United States v. Gaind, 829 F. Supp. 669 (S.D.N.Y. 1993) (destruction of defendant's business by investigation and prosecution constituted a "source of both individual and general deterrence" justifying downward departure).

      c.      *Extraordinary family responsibilities*

Dan Carpenter has several dependents: (a) his 19 year-old daughter Caroline, who is a sophomore at Trinity College in Hartford, Connecticut; (b) his 88 year-old father, Edgar, who lives in Canton, Connecticut with Mr. Carpenter's mother and is suffering from advanced dementia and Alzheimer's Disease; and (c) his 86 year-old mother, Constance, who suffers from various ailments including Arthritis, Hypertension and poor hearing.  Due to the fact that out of his three other siblings, Dan Carpenter lives the closest to his elderly and infirm parents and is the only sibling who lives in Connecticut (only 10 minutes away in Simsbury, Connecticut), he is the "first responder" to anything that happens (or may happen) regarding his elderly parents in terms of medical and any other emergencies.  As noted by Probation, Dan and Molly are the primary care givers for Edgar and Constance, both of whom suffer from significant medical conditions. (PSR at Addendum, p.68).

Given the advanced age of his parents and their ill-health, Dan Carpenter must be able to respond to their needs at a moment's notice.  A good example of this recently occurred during the nine days of steady rain that hit New England this past Fall—it was Dan Carpenter who responded to his parents' needs as a result of the urgencies created by the rains.  During these emergency flood conditions, the basement of his parents' house was completely flooded.  It fell

to Dan Carpenter to address and stabilize the situation.  He was also able to confirm the medical

status of his parents and determine whether hospitalization was necessary.   Fortunately, his

parents were unharmed (other than emotionally).   However, Dan Carpenter's father had no

appreciation of the danger or the extent of the damage done.  Given their physical condition,

neither his father nor mother could help in fending off the problem or in the subsequent clean-up.

A sentence of probation is the only possible sentence that will allow Dan Carpenter to

address similar (and, given his parents' advanced age and physical infirmities, certain)

emergencies in the future. Whether extraordinary for purposes of §5H1.6 or not, in a post-

Booker sentencing world such family considerations are clearly part of the proper sentencing

analysis.

        d.     *Disparity Between Dan Carpenter and Paley.*

As departing to achieve uniformity in the sentencing of co-defendants (or cooperators) is

appropriate, see 18 U.S.C. §3553(a)(6), then clearly departing to reflect the gross disparity

between the treatment of Dan Carpenter and Paley in this case is not only reasonable, but

necessary.  See United States v. Thurston, Cr. No. 98-10026-MLW (D. Mass. 2005) (Judge Wolf

imposing sentence of three months where guideline range was 63-78 months, to avoid

unwarranted disparity with co-defendant and promote respect for law); United States v.

Wilkerson, 411 F.3d 1, 10 (1st Cir. 2005) (holding that advisory guidelines regime allows court

to take "disparate treatment" into account). Probation has noted "that the case law relied upon by

the defendant clearly supports the argument that a court, particularly in a post-Booker era, has

the authority to depart from the advisory guideline range to address disparity in the sentencing of

co-defendants," though Probation "believes that the authority for the Court to depart under the[]

circumstances [of disparate prosecutorial treatment of individuals related to the same case] exist

at U.S.S.G. §5K2.0." (PSR at ¶Addendum, p.67). "Therefore, the Probation Office maintains that if the Court finds that the disparity in the prosecutorial treatment of the defendant and Paley is a 'mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described,' the Court may impose a sentence outside the advisory guideline range." (PSR at Addendum, p.67).

In this case, justice, due process and the principles of fundamental fairness require that the Court consider the thoroughly disparate situations of Dan Carpenter and Paley.  The government decided not to charge Paley at all even though it was Paley who made all of the representations to the exchangors. During cross-examination, Paley admitted that he knew from the beginning that Dan Carpenter would be investing the clients' principal in stock options; indeed, he admitted that was the essence of their agreement reached at the October 1998 meeting.  It was Paley alone who met with each exchangor in this case, who alone drafted the marketing materials, who alone made representations to the exchangors.  It was Paley who was the self-professed 1031 expert, it was Paley who was the architect of the exchange agreements at the center of this prosecution and the 1031 business model, and it was Paley who received an equal distribution of any profits and a larger share of the exchange fee provided by the exchangors. The government has now admitted it believed all along that Paley knew that Dan Carpenter would be investing clients' funds in the stock market in general and stock options in particular.

Yet, notwithstanding his admission of knowledge of investing and the independent actions he took in this case, Paley stands uncharged with any criminal offense.  Nor has Paley been charged with any 18 U.S.C. § 1001 offenses, despite his admission to these violations

during cross-examination and the government's admission that it always believed Paley had lied to them in violation of § 1001.  Clearly, the Court possesses the authority to depart from whatever Guideline range it determines applies in this case to reflect this unfair and unjust disparity in treatment.[3]

One of the chief purposes of sentencing and the Guidelines is the avoidance of unwanted disparities in sentencing.  The government seeks to imprison Dan Carpenter for 51-63 months primarily based upon the fact that there was a $9 million investment loss. However, it is worth noting that in other cases the government has treated far more leniently white collar defendants who have engaged in far more malevolent criminal misconduct. For example, the government recently wrapped up a seven-year investigation into the West Lynn Creamery "Rebate Program" wherein certain Dunkin Donuts franchisees who purchased dairy products from West Lynn Creamery were able to obtain rebate income and evade paying taxes.  While the two senior West Lynn Creamery executives who were allegedly at the heart of the conspiracy were acquitted, see United States v. Pappathanasi, 383 F. Supp.2d 289 (D. Mass. 2005) (Judge Wolf granting judgments of acquittal to Messrs. Pappathanasi and Scangas at the close of the government's case), all of the Dunkin Donuts franchisees who were charged pled guilty to various offenses. However, these defendants – all of whom admitted their guilt to, inter alia, defrauding the United States – nevertheless received probation, small fines, and/or no more than 5 months in a half-way house.[4]

---

[3] Paley has also committed perjury in the related civil case regarding alleged conversations with Merrill Lynch solely to obtain a full release from a $19 million civil judgment, and has committed perjury before this Court on multiple occasions.

[4] See United States v. Ted Foundas, Cr. No. 02-10116-GAO (D. Mass. 2005) (3 years probation); United States v. Debra Foundas, Cr. No. 02-10116-GAO (D. Mass. 2002) (3 years probation); United States v. Paul Govostes, Cr. No. 02-10116-GAO (D. Mass. 2005) (2 years probation); United States v. Gavriel, Cr. No. 98-10282-RCL (D. Mass. 1999) (2 years probation); United States v. Manuel Sardinha, Cr. No. 02-10117-NG (D. Mass. 2002) (5 months half-way house); United States v. Serpa, Cr. No. 02-10118-WGY

While the defendant in no way questions the propriety of the sentences imposed in those matters, and he understands individuals are entitled to credit when they cooperate with the government, witness cooperation is not the sole basis, particularly in the post-<u>Booker</u> sentencing world, for individualized and compassionate sentences. Nowhere is it mandated that a cooperator should receive more credit off his or her sentence than another defendant who qualifies for adjustments for other reasons, i.e., living an exemplary life, extraordinary commitment to one's community and family, charitable contributions, disparity of treatment amongst similarly situated individuals, atypicality of the offense, or any other valid sentencing factor.

Clearly, if incarceration of individuals such as Ted Foundas and Paul Govostes is not necessary to further the sentencing goals of §3553(a), then it is not necessary in this case. Judge Wolf specifically found that Ted Foundas – the government witness at the <u>Pappathanasi</u> trial – had committed perjury:

> The court had the opportunity to observe Foundas. His demeanor did not suggest that he was a credible person, and his testimony did not suggest that he was a credible person . . . *The court finds that Foundas was not truthful*, that he was inventing facts he did not recall in an effort to assist the government and try to help himself in connection with his sentencing.

<u>Pappathanasi</u>, 383 F. Supp.2d at 299-300 (emphasis added). As for Govostes, in addition to admitting to years of tax evasion, he breached his pre-trial release conditions by smoking crack cocaine and admitted to years of bribing local politicians to effectuate his business needs.

In the instant case – where Dan Carpenter has never before been charged with or convicted of any crime (and certainly not one involving violence or drugs), and where he has such a demonstrated record of charitable and civic contributions, the government seeks upwards

---

(D. Mass. 2003) (4 months half-way house); <u>United States</u> v. <u>Jose Sardinha</u>, Cr. No. 02-10119-PBS (D. Mass. 2002) (4 months half-way house); <u>United States</u> v. <u>Furtado</u>, Cr. No. 02-10120-RGS (D. Mass. 2003) (4 months half-way house).

of five years in prison.  It simply is not warranted or necessary to further the goals of

sentencing.[5]

     e.    <u>*Third party harm: The harsh effects of imprisonment on innocent Benistar*</u>
          <u>*employees and the Simsbury community*</u>*.*

Where imprisonment of corporate executives may result in job loss and other

extraordinary harsh consequences to innocent employees, a substantial downward departure may

be justified.  <u>See</u> <u>United States</u> v. <u>Olbres</u>, 99 F.3d 28, 36 (1st Cir. 1996) ("job loss to innocent

employees resulting from incarceration of a defendant may not be categorically excluded from

consideration"); <u>United States</u> v. <u>Milikowsky</u>, 65 F.3d 4 (2d Cir. 1995) (recognizing that

downward departure was warranted where imprisonment of company's officers would have

severe economic impact on its employees and the surrounding community).

Dan Carpenter founded Benistar in 1995 and its predecessor Benefit Concepts in 1978,

and built them both up from scratch.  As Chairman, he had day-to-day management

responsibilities.  His managerial, administrative, financial, networking, technical, and marketing

skills in the welfare benefit plan and insurance industries have been essential ingredients to

Benistar's success.  His impact upon the company and the essence of his contributions to the

organization's success is vividly portrayed in the letters of support submitted by the Benistar

employees. Over and over again, they describe Dan Carpenter as the backbone of the company's

spiritual and financial operation. Even though Dan Carpenter was forced to resign from Benistar

in February 2004 after the indictment was returned, his imprisonment would pose a serious threat

---

[5]  As an example of how unreasonable the government's sentencing recommendation is in this case, Scott
Sullivan (the former CFO of WorldCom who testified at the trial of Bernard Ebbers) received a 5-year
sentence after pleading guilty to WorldCom's **$12 billion** fraud.  <u>See</u> <u>United States</u> v. <u>Sullivan</u>, Cr. No.
02-1144 (S.D.N.Y. 2005).  Similarly, on December 9, 2005, William T. Owens (a former CFO of
HealthSouth who testified at the trial of Richard Scrushy) also received a 5-year sentence after pleading
guilty to HealthSouth's **$2.7 billion** fraud.  <u>See</u> <u>United States</u> v. <u>Owens</u>, Cr. No. 03-00131 (N.D. Ala.
2005).

to Benistar's continuing viability (particularly as clients and potential clients transfer their

benefits and insurance business to competitors because Benistar's founder "went to prison for

stealing $9 million of client funds").

     While Probation has questioned the propriety of this basis for a compassionate sentence

because Mr. Carpenter has advised that the outward appearance of his association with Benistar

is detrimental to the company, see PSR at Addendum, pp.63-64, Mr. Carpenter's value to the

company is in the form of relationships with clients and the legal and insurance wisdom he

brings to bear. It is Dan that is the creative architect of insurance and benefit strategies to meet

changing rules and regulations, and his absence to date has already resulted in dramatic drop in

revenue to Benistar related companies.[6] Dan's value to the fabric of the Benistar family has been

poignantly illustrated in all of the letters appended hereto. For example, consider the following

excerpt from Guy Neumann's letter:

> *While most of my friends were learning how to file and cold call during their internships, I had the honor and fortune to have the Chairman of Benistar, Dan Carpenter, taking me under his wing. Dan sat me right outside his office and took the time to teach me things about the world of business my professors never did he included me in most of his affairs and then he would have me write term papers about the information I just learned. Dan became my mentor and I his honored protégé. I finished school at the top of my class and Dan hired me on a full time basis. I was fresh out of school with an executive type position. Dan opened doors for me that would have taken me twenty years, if ever, to open otherwise.*

(Letter of Guy Neumann at Tab 40). Mr. Nuemann also wrote:

> *My mother has seen and accomplished a lot in her life; she used to run companies in Israel; she is a published author in Israel; she has interviewed and sat next to some of Israel's most prominent figures like Izhak Rabin's and Shimon Peres. But in this country, besides Dan, no one has ever given my mom a chance. When I told her about her new job opportunity she could not stop crying for a week and she still cries while telling this story. My mom started working at Benistar and quickly became a part of the Benistar "family." Today my mom walks on two new hips and has been able to receive a slew of other medical attention she neglected to receive due to the lack of insurance she had the past fifteen years. Dan made that happen, and he did it because he is just that kind of*

---

[6]. Proof of the dramatic reduction in revenue will be filed under seal with the Court under separate cover.

*man; a loving, supporting, and caring man.  The things Dan has done for the good of other people are extraordinary.*

(Letter of Guy Neumann at Tab 40). Another employee, Shawndrika Stevens-Gardner wrote:

*In my closing, I would like to say that I appreciate Dan and his family and I want to thank them for all that they have done for me.  He is a very hard working man with a loving spirit.  Next to his wife and daughter losing him I feel like I am losing a close family member.  Family is what hold a company together and Dan is what holds us together as a company.*

(Letter of Shawndrika Stevens-Gardner at Tab 20). Jenny Valedasarra wrote:

*I came to Benistar at the age of 20 with only one year of College under my belt.  When I came in for my interview with Dan & Molly they saw the potential I had and gave me the opportunity to learn about the insurance business.  They were always so polite and helpful with any questions I had.  I had always talked about going back to school but never could because of my financial situation but I knew if I corked hard and saved money that I'd be able to start taking at least two or three classes, but that meant taking time off.  I went to Dan and Molly to ask them about picking up some hours on the weekend because I need some time off during the week so I could go back to school.  Dan suggested that I come in for a couple of Saturday's to work on a project and he'd take care of school tuition.  I was ecstatic!*

(Letter of Jenny Valedasarra at Tab 19). Donna Dawson related a story about a difficult time in her life:

*Over the years I have had my ups and downs, but he and his wife, Molly, have always come through when you need them.  Dan and his wife have welcomed me into their home on more than one occasion.  When he found out that me, my husband and my three boys were living in a two bedroom one back condo, he didn't hesitate to extend a hand without any expectations and has never once asked me to do anything other than my job.  He set me up with his realtor and the rest is history.  He also helped to provide two of my sons with bedroom furniture.  You tell me where you would find such genero[s]ity.*

(Letter of Donna Dawson at Tab 22). Again, these are but a sampling of the letters written by the Benistar family, but they clearly illustrate Dan's irreplaceable status within the Benistar companies.

      f.      *The loss was caused by extraneous factors and it overstates culpability*.

The fact that the seven exchangors lost over $9 million clearly overstates Dan Carpenter's culpability in this case.  The Guidelines, even pre-<u>Booker</u>, require a downward departure when conduct that is the basis of the conviction fails to match the heartland model for the fraud guideline. "The notion in the fraud guideline that the loss table may under- or overstate the seriousness of the offense is little more than another way of saying that departure from the loss table may be warranted *for good cause*" <u>United States</u> v. <u>Brennick</u>, 134 F.3d 10, 15 (1st Cir.1998) (court remands for findings but adopts general principle that a defendant who never intended to permanently steal the government's money can be sentenced differently than someone who did in a tax fraud case).  <u>See also</u> <u>United States</u> v. <u>Monaco</u>, 23 F.3d 793 (3d Cir. 1994) (explaining that loss overstates seriousness where defendant had no intent to steal).[7]

Moreover, in this case, it can't seriously be argued that the loss was caused by extraneous forces. Dan Carpenter's investments in stock options generated sufficient funds to repay 119 of 126 exchangors *all* of their principal *and* either 3% or 6% interest.  After more than one year of operation, BPE's investments generated a net profit of over $600,000, which remained in the corporate accounts, as opposed to merely being taken by Mr. Carpenter as profit.  Clearly, the losses of 2000 resulted from a combination of economic and political forces far beyond Dan Carpenter's control – and in fact beyond the predictions or forseeability of most of the financial world's most prominent and respected experts and advisors.  <u>See</u> <u>United States</u> v. <u>Gregorio</u>, 956 F.2d 341 (1st Cir. 1992) (holding that downward departure is appropriate where degree of loss was caused by downturn in economy).

---

[7]  In light of <u>Booker</u>, "a district court judge could say, 'I think the whole idea of basing white collar crime sentencing on the dollar amount of the loss was a bad policy choice, and I am not going to do that.'" Correy E. Stephenson, *Sentencing in the Post-'Booker' World*, <u>Lawyers Weekly USA</u> at 25 (Nov. 7, 2005).

It's worth noting that there is no statute, regulation, case law or contractual provision that precluded BPE from investing exchangor funds in stock options.  Clearly, Dan Carpenter had good reason to believe that his conduct was not only legal, but in full compliance with BPE's agreements, as Mr. Paley, the avowed § 1031 expert, never suggested to Dan Carpenter that investing the funds in stock options was illegal or improper; indeed, Paley endorsed the business concept even though it is now clear that Paley knew from the beginning about the investment in stock options and the possibility of losses.

Recently, in response to a favorable settlement of investor lawsuits against Merrill Lynch, a Merrill Lynch executive was quoted in the Wall Street Journal as saying that investor losses in 2000 were caused by the worst bear market in two generations, not poor research. The fallout from the stock market calamity of 2000 is still reverberating.  See United States v. Maldonado-Montalvo, 356 F.3d 65, 69 (1st Cir. 2003) (Guidelines "permit a downward departure where the total loss calculation overstates the seriousness of the offense", and "such a loss overstatement may occur where, inter alia, 'any portion of the total loss sustained by the victim is a consequence of factors extraneous to the defendant's criminal conduct'") (emphasis added); United States v. Rostoff, 53 F.3d 398, 405 (1st Cir. 1995) (Judge Zobel departed in part because "economic forces not under the control of, or precipitated by, the defendants, especially the sudden, unforeseen collapse of the New England real estate market – a collapse that decimated the demand for residential condominiums – increased the magnitude of the losses."). Only seven exchangors out of 126 failed to successfully complete their § 1031 exchanges due to the largest NASDAQ market decline in history.  Consequently, the harm caused to the exchangors was the product of the market as much as if not more than any acts by Mr. Carpenter. See United States v. White Buffalo, 10 F.3d 575 (8th Cir. 1993) (discussing §5K2.11 and the "lesser harm"

doctrine, resulting in a sentence of three years probation rather than guidelines sentence of 18-24 months).

In <u>United States</u> v. <u>Olis</u>, 2005 WL 2842077 (5th Cir. Oct. 31, 2005), the defendant, an accountant and tax attorney at Dynegy Corporation, was convicted of conspiracy, securities fraud, mail fraud and wire fraud, for his role in "Project Alpha," a plan for a Dynegy affiliate to borrow $300 million and book it as cash flow from operations rather than debt as required by generally accepted accounting principles. When Dynegy's financial statements were later restated at the behest of the SEC to eliminate the effect of Project Alpha on Dynegy's operating cash flow, Dynegy's stock value dropped precipitously because Dynegy was now seen to be borrowing rather than earning money from Project Alpha.  The district court sentenced Olis to nearly 25 years in prison, based primarily on the court's finding that the fraudulent scheme "caused" a loss of $105 million to the University of California pension plan.  In vacating the sentence based on incorrect loss calculations, the Fifth Circuit held:

> Thus, there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines. **<u>Where the value of a security declines for other reasons, however, such decline, or component of the decline, is not a "loss" attributable to the misrepresentation</u>**.

<u>Olis</u> at *5 (emphasis added).

In this case, the losses were caused by reasons other than Mr. Carpenter's actions—i.e., the stock market collapse of 2000. Clearly, Mr. Carpenter pursued investment strategies geared towards making money, not losing money. Moreover, as articulated in his motion for new trial based on newly discovered evidence, $2,900,000.00 of the loss suffered in this case was attributable to trading decisions by PaineWebber after they terminated Mr. Carpenter's trading privileges, as they closed out his positions. Certainly, comparing the $9,000,000.00 market loss with an investor doing everything in his power to make money is not equitable to the paradigm

of a $9,000,000.00 loss where a malevolent defrauder simply converts investor funds to his own

pocket or his own personal benefit, yet the Guidelines make no distinction between the two.

      g.     *Government misconduct*

The Court should also consider the government's misconduct in this case in fashioning a

sentence. When government misconduct that falls short of mandating an outright dismissal of an

indictment pursuant to the Fifth Amendment's Due Process Clause, the sentencing court still

retains the authority to depart downward based upon that misconduct. *See United States v.*

*Montoya*, 62 F.3d 1, 3 (1st Cir.1995) (First Circuit acknowledging that its "own cases have

concluded that where government agents have *improperly* enlarged the scope or scale of the

crime, the sentencing court 'has ample power to deal with the situation either by excluding the

tainted transaction from the computation of relevant conduct or by departing from the guideline

sentencing range'") (emphasis in original); *United States v. Rowe*, 202 F.3d 37, 40-41 (1st

Cir.2000) ("we have recognized that other kinds of governmental misconduct [other than false

testimony of a government agent] could be the basis for a downward departure at sentencing"),

*citing Montoya*, 62 F.3d 1 (1st Cir.1995); *United States v. Gibbens,* 25 F.3d 28, 30-32 (1st

Cir.1994); *United States v. Brewster,* 1 F.3d 51, 55 (1st Cir.1993). Likewise, a district court

retains the authority to depart downward in a case of government misconduct not amounting to

entrapment. *See United States v. Osborne*, 935 F.2d 32, 35 n.3 (4th Cir.1991) (acknowledging

district court's authority to depart downward in case of outrageous government conduct not

amounting to entrapment).

Paley – during three separate proffer sessions with the government over a 4-year period –

consistently stated that he never knew until the very end that Dan Carpenter was investing

exchangor funds in the stock market.  It was this assertion that seemingly drove the

government's investigation and indictment – that Dan Carpenter had secretly decided, unbeknownst even to Paley, to invest the funds in stock options. It was this premise upon which Mr. Carpenter built his defense in this case. Yet, we now know that Paley knew about the options investments from the very beginning, and the government believed he was lying from the beginning as well. At trial, Paley kept going back and forth on the state of his knowledge regarding the investment of the exchangors' funds in the stock market. At times he was ambiguous, simply recanted earlier testimony, contradicted his own statements and – finally – committed outright perjury during trial. As the Court itself noted, Paley "said diametrically opposite things on the stand." Tr. 9:19. The Court also found that Paley was "a highly unreliable witness." Tr. 9:20.

In this case, the government violated the discovery obligations imposed by the Local Rules by failing to identify known crimes by Paley, it opposed the defense efforts to correct his false testimony to the jury, and it "tricked" the defense into basing their defense upon a false premise while at all times believing that Paley had lied to the government as well. Being cognizant of these acts of misconduct, the Court itself noted – in denying the defendant's motion for an instruction on government misconduct – "[i]f there is a remedy that is needed for anything, it's not for the jury to give it." Tr. Charging Conf. at 63. In light of the government's misconduct in this case, the Court's has the discretion and authority to reflect that misconduct in the sentence imposed. See United States v. Montoya, 62 F.3d 1, 3 (1st Cir.1995) ("[our] cases have concluded that where government agents have *improperly* enlarged the scope or scale of the crime, the sentencing court 'has ample power to deal with the situation either by excluding the tainted transaction from the computation of relevant conduct or by departing from the guideline sentencing range'") (emphasis in original).

h.    *Atypicality of the offense.*

Equally significant to the ultimate sentencing decision in this case are the unusual and truly atypical circumstances of the offense and conviction.  In contrast to the norm in mail and wire fraud cases, the government – despite an investigation of more than four years – did not present *any* evidence that Dan Carpenter took or received any profit from the over $100 million in exchangor funds successfully held and invested by BPE.  Indeed, it is undisputed that Dan Carpenter did not steal, embezzle or misappropriate *any* of the funds for his own personal benefit.  Compare United States v. Bleidt, Cr. No. 05-10144-WGY (D. Mass. Dec. 5, 2005) (investment adviser who pled guilty to 115 counts of mail fraud for stealing $27 million of clients' funds for personal use sentenced by Chief Judge Young to 135 months); United States v. Goodman, Cr. No. 05-10038-DPW (D. Mass. Dec. 5, 2005) (investment adviser who pled guilty to wire fraud for misappropriating for personal use $800,000 of client funds sentenced by Judge Woodlock to 24 months).  Government auditor Thomas Zappala testified that Dan Carpenter actually *injected* $2 million from another of his companies (Tr. 10:32) into BPE's accounts in an effort to protect BPE's clients from what he believed to be a transitory depression in the stock market.

If Dan Carpenter's motivation was to personally profit from BPE even at the expense of the exchangors, he could have easily "misappropriated" some or all of the over $100 million that flowed through BPE's coffers during the more than two years of its existence.  He also could have easily opened his own *personal* trading accounts at Merrill Lynch and PaineWebber, transferred BPE funds into those accounts, and then traded in stock options.  See United States v. Emmenegger, 329 F. Supp.2d 416 (S.D.N.Y. 2004) (investment firm employee pled guilty to wire fraud for trading stock options between firm's account and *personal accounts*); United

States v. Findley, Cr. No. 03-10276-MEL (D. Mass. 2004) (freight company CEO pled guilty to mail and wire fraud for stealing $1.9 million from customer escrow account for day trading in the stock market *in his personal account*).  Instead, Dan Carpenter did not steal or misappropriate any money, did not open any personal trading accounts, and did not transfer BPE funds to his own accounts.  What Dan Carpenter did do, however, was to fulfill his commitments to each and every client of BPE—all 119 of them—until the unforeseen and historic stock market collapse of late 2000 prevented BPE from fulfilling its obligations to the final seven exchangors charged in the indictment.

In contrast to a Ponzi scheme, or to a company created with fraudulent intent, BPE met its obligations to 119 of its 126 clients over a two year period.  Unlike so many frauds where there is a built-in conflict between the interests of the schemer and the unsuspecting client, here Dan Carpenter has not been accused of intending to harm his clients.  Moreover, rather than fleeing after the losses were incurred, Dan Carpenter took it upon himself to meet personally with two of the seven exchangors and explained that the losses resulted from the chaos in the stock market and not from any malfeasance on his or BPE's part, clearly accepting responsibility in a voicemail message left for a person he had never before met in life.

Emblematic of his good faith belief that he possessed the lawful discretion to invest the exchangors' funds, rather than conducting his investment trades behind the anonymity of an internet trading firm, Dan Carpenter's investment decisions were all made through Wall Street titans Merrill Lynch or PaineWebber, in the open, without guile or deceit, with total transparency, and without any conflict between his own interests and those of the exchangors. Investors lost trillions of dollars when the financial markets went into a tailspin in late 2000, yet Dan Carpenter was indicted simply because he lost funds while investing in the options market,

which the government contended exposed the exchangors' funds to excessive risk.[8]  The ultimate irony is that had Dan Carpenter invested in securities considered "safe" at the time such as IBM stock or WorldCom, Lucent, Enron, and Polaroid bonds, he would have suffered similar investment losses, but would have been insulated from prosecution claims, echoed and re-echoed throughout this case, that he recklessly "gambled" with the exchangors' funds.

The "fraud" in this case is atypical for another reason.  Although Dan Carpenter was charged with a mail and wire fraud scheme based on affirmative misrepresentations, some in writing, but mostly oral by the uncharged BPE president Paley – who alone met with the seven exchangors who were not repaid and who alone had the opportunity to make disclosures to them – by the time the case reached its conclusion the government's theory of criminality had undergone a 180 degree turn from Paley's misrepresentations (which were originally argued to be attributable to Dan Carpenter) to an omissions theory where Dan Carpenter, so it was argued, had a duty to disclose the precise nature of the investments he intended, though he never met with, spoke to, or had the opportunity to promise anything to any of the seven exchangors.

      i.    *Combination of factors*.

Even if none of the characteristics or circumstances individually distinguishes a case from a typical "heartland" case, where "a combination of . . . characteristics or circumstances" does distinguish it, sentencing courts should consider a downward departure.  See USSG §5K2, Commentary (added by Nov. 1, 1994 amendments).  While Dan Carpenter contends that each of the factors enumerated above is sufficient in and of themselves to warrant a sentence of probation, the combination of these numerous factors clearly warrant such a sentence.

---

[8] It is undeniable that the criminal case against Dan Carpenter is posited solely on investment losses because the government has not alleged that the 119 clients who *successfully* consummated their 1031 exchanges were defrauded even though they, like the seven who did not, executed the same written agreements, relied on the same representations, and had their funds invested in the same manner.

Dan Carpenter has already suffered extraordinary harm. Dan Carpenter's professional life revolves around trust: his other uncharged companies (see http://www.benistar.com) are at the vanguard of businesses whose goal is to offer employees of small companies the "benefit-related" advantages (*i.e.*, health care and life insurance) available to employees of Fortune 500 companies. He is both a licensed attorney and insurance professional. His life and licenses in both fields are in jeopardy as a result of his tragic detour into the 1031 property exchange business at the fateful October 1998 luncheon meeting with Paley. His reputation – or what remains of it after the indictment and conviction in this case – is in peril. His business competitors have broadly disseminated the characterization of this case as a "misappropriation" (read "embezzlement") case.

Dan Carpenter is the founder and the former Chairman of the Benistar companies. He was forced to resign his position once the indictment in this case was returned in February 2004. However, Benistar's employees continue to rely on his leadership as the letters appended hereto so eloquently attest. Benistar's clients continue to rely on his genius and support. Significant third party harm will be generated by a sentence of imprisonment.

There are a broad number of bases for imposing a probationary sentence. Individualized sentencing is now the *sine qua non* of the post-Booker seismic change in the jurisprudence of sentencing. Come January 2006, Dan Carpenter will have already endured five years of investigation, litigation, attachment, banishment, indictment, prosecution and, finally, conviction – all due to his fateful October 1998 luncheon meeting with Paley before which Dan Carpenter had never even heard of a 1031 exchange. In short, Dan Carpenter is entitled to a compassionate sentence based on his entire life history of charity, selflessness, and civic dedication, rather than

an aberration of misguided judgment – based on his belief in Paley – that has already inflicted immeasurable and irreparable damage, harm and punishment.

Courts have recognized a sentencing court's unfettered ability to depart down on the basis of a "unique combination of factors." United States v. Rioux, 97 F.3d 648 (2d Cir. 1996) (noting that the district court may downwardly depart when a number of factors combine to create a situation that "differs significantly from the 'heartland' cases covered by the Guidelines"); United States v. Buoderson, 67 F.3d 452, 458-59 (2d Cir. 1995) (where there are multiple factors militating in favor of departure, the court may permissibly find that "th[e] confluence of circumstances was not taken into account by the Guidelines.").

Section 3553(a) provides that a court shall impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Those purposes that are relevant here are the need for the sentence imposed (1) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," § 3553(a)(2); (2) "to afford adequate deterrence to criminal conduct," id. at (a)(2)(B); and (3) "to protect the public from further crimes of the defendant," id. at (a)(2)(C).[9] Here, each of these considerations weigh heavily in favor of sentencing Dan Carpenter to a term of probation rather than imprisonment, given all of the circumstances outlined in this sentencing memorandum. As detailed *supra*, Dan Carpenter has already suffered from this prosecution in ways that are sufficient to meet the goals of punishment. Indeed, not only did he endure the publicity and ignominy of a public indictment and trial, which was detrimental to his family and his business, but he watched and supported his wife, who works for Benistar, as she endured a similar ordeal

---

[9]  Section 3553(a)(2)(D) requires courts to consider a defendant's need for education, training, treatment or medical care. These considerations are not relevant in this case as Dan Carpenter has a secure position of employment as a consultant by virtue of his being the nation's leading expert on 419 plans, is already highly educated, and suffers from no medical or psychological illnesses (other than the stress and anguish caused by these convictions).

as a defendant in the civil trial. Given these unusual facts, a sentence of probation is sufficiently "just" punishment.

Second, a sentence of probation will afford "adequate deterrence to criminal conduct." As a threshold matter, Dan Carpenter obviously is not at risk for recidivism. He has no criminal history and has never been on probation, let alone incarcerated. Moreover, he has every incentive to continue lawfully managing his business so that he can support his family. A term of incarceration, therefore, is unnecessary to deter Dan Carpenter from future criminal behavior. If the government can seriously argue for probation in favor of admitted criminals like Foundas and Govostes – who had prior criminal records and/or committed crimes during their pre-trial release – then it is axiomatic that Dan Carpenter, a model citizen and pre-trial releasee, should receive probation. Clearly, a sentence greater than probation is not necessary to "protect the public from further crimes of the defendant."

As far as "general deterrence" is concerned, it is safe to assume that the mere fact of prosecution and conviction, both of which have been well publicized by the local newspapers, the government and Mr. Carpenter's business competitors, will deter other potential wrongdoers from investing § 1031 exchange funds in stock options, irrespective of whether a term of imprisonment is imposed.

After considering each of the purposes of sentencing enumerated under § 3553(a)(2), the defendant respectfully contends that the factors outlined in this memorandum, certainly when considered in combination with each other, warrant a sentence of probation, which is a sufficient, and reasonable, and "not greater than necessary", sentence.[10]

---

[10]   As stated in the Introduction, supra, while the defendant does not reiterate herein his arguments on the amount of the "loss" for guidelines purposes, it should be noted that under the November 2000 guidelines (which all parties agree is the applicable version), the $9 million of investment losses are "consequential" and, therefore, cannot be considered the amount of the loss directly caused by the defendant. For sentencing purposes, the amount of the loss

III.    **Conclusion.**

Whether under the now advisory Guidelines or the more expansive criteria contained within § 3553, Dan Carpenter's life history and the other pertinent factors cited herein merit a probationary sentence. See United States v. Pimental, 367 F. Supp.2d 143, 157 (D. Mass. 2005) (Judge Gertner finding that "[a] sentence of probation is entirely appropriate here under 18 U.S.C. § 3553(a)" for mail fraud defendant with a total offense level of 18 (27-33 months)).


                               Respectfully submitted,
                               DANIEL E. CARPENTER
                               By his attorneys,


                               */s/ Martin G. Weinberg*
                               Martin G. Weinberg, Esq. (BBO #519480)
                               **MARTIN G. WEINBERG, P.C.**
                               20 Park Plaza, Suite 905
                               Boston, MA 02116
                               (617) 227-3700
                               owlmgw@worldnet.att.net


                               /s/ Robert M. Goldstein
                               Robert M. Goldstein, Esq. (BBO #630584)
                               20 Park Plaza, Suite 903
                               Boston, MA 02116
                               (617) 742-9015
                               rmg@goldstein-lawfirm.com


                               /s/ Jack E. Robinson
                               Jack E. Robinson, Esq. (BBO #559683)
                               2187 Atlantic Street
                               Stamford, CT 06902
                               (203) 425-4500
                               Robinsonesq@aol.com


Dated:  December 14, 2005

---

is only $1,925.  Such a finding results in a guidelines sentence of 0-6 months (Zone A) – which also suggests a probationary sentence.