UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 04-10029-GAO

UNITED STATES OF AMERICA

vs.

DANIEL E. CARPENTER

MEMORANDUM AND ORDER
December 15, 2005

O'TOOLE, D.J.

Daniel E. Carpenter was tried on an indictment charging him with fourteen counts of wire fraud in violation of 18 U.S.C. § 1343 and five counts of mail fraud in violation of 18 U.S.C. § 1341. The jury returned a verdict finding Carpenter guilty under all counts.

Following the trial, Carpenter timely filed a renewed motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c) and an alternative motion for a new trial pursuant to Fed. R Crim. P. 33. This memorandum and order addresses both motions.

**I.  The Motion for Judgment of Acquittal**

Carpenter's original motion for entry of a judgment of acquittal asserted three reasons why he was entitled to that relief: (1) the government had failed to disprove his good faith; (2) the proof at trial amounted to a variance from or a constructive amendment of the indictment; and (3) the evidence was insufficient as a matter of law to sustain the guilty verdicts. In his reply brief to the government's opposition, he refined the last ground by arguing specifically that the evidence was insufficient to prove that he had "caused" the mailings or wire transmissions alleged in the indictment.

He also asserted in the reply that a judgment of acquittal is required because the evidence at trial did not support venue for the trial of the indictment in this District.

        A.  <u>Venue</u>

Carpenter has persistently maintained an objection to venue in this District.  In his Rule 29 motion, he repeats his previous substantive objection and adds a procedural one: the question should have been put to the jury.

As to the procedural point, there is no controlling law in this Circuit.  Carpenter points to decisions in other Circuits where various statements have been made about the necessity or propriety of submitting factual disputes about venue to the trial jury.  It has been said, for example, that venue is a question of fact which ordinarily must be submitted to the jury.  <u>See</u> <u>United States v. Miller</u>, 111 F.3d 747, 749 (10th Cir. 1997).

That statement, however, incorporates two distinct propositions: (1) that the determination of venue depends on the resolution of disputed facts, and (2) that resolution must be done by a jury, not a judge.  The first proposition, as stated, is undoubtedly overbroad, because not all venue determinations involve factual disputes; many require only a conclusion as to whether venue is proper, the facts being undisputed.  <u>See, e.g.</u>, <u>United States v. Palma-Ruedas</u>, 121 F.3d  841, 848 (3d Cir. 1997); <u>United States v. Baxter</u>, 884 F.2d 734, 736 (3d Cir. 1989); <u>see also</u> <u>United States v. Perez</u>, 280 F.3d 318, 322 (3d Cir. 2002) ("In Baxter and Palma-Ruedas, we could rule as a matter of law because the necessary facts were established and only the legal question of how broadly we would define venue remained.").  But more importantly for the present controversy, it is by no means clear that the second proposition must necessarily follow from the first, even where the underlying facts on which venue will be determined are vigorously disputed by the parties. In other words,

characterization of an issue as involving the determination of facts does not automatically mean it is a matter to be decided by a jury. Some factual disputes, such as disputes about the predicate for the admission of evidence, for example, are typically (with some exceptions) resolved by the judge. See Fed. R. Evid. 104(a). But see, id. 104(b). See also Blake v. Pellegrino, 329 F.3d 43, 47-48 (1st Cir. 2003) (judge resolves "foundational facts"). Moreover, as a practical matter, the judicial resolution of a factual dispute raised by a pretrial motion to dismiss or to suppress evidence often serves as the crucial turning point on the road to either conviction or acquittal.

If identifying a factual dispute about venue does not by itself compel the conclusion that the issue must be presented to a jury, what else might? Is the question required to go to a jury because proper venue is ultimately a constitutional right? See U.S. Const. art. III, § 2, cl. 3; id., amend. VI. Not necessarily. Fact disputes arising with respect to other fundamental constitutional rights – such as whether there has been an unreasonable search or seizure or whether the assistance of counsel has been effectively provided – are routinely resolved by judges, not juries. The constitutional character of the right therefore does not determine whether the decision-maker should be a judge or a jury.

Some cases from other Circuits suggest that venue is effectively an "element" of the offense and then apply the rule that the jury must resolve all factual disputes concerning elements of the offense. See United States v. Record, 873 F.2d 1363, 1366 (10th Cir. 1989) ("Venue in criminal cases is an element of the prosecution's case. . . . "); United States v. Winship, 724 F.2d 1116, 1124 (5th Cir. 1984) ( "Venue is an element of any offense."). In this Circuit, however, it has been plainly held that venue is *not* to be regarded as an element of the offense. See United States v. Georgacarakos, 988 F.2d 1289, 1293 (1st Cir. 1993) (citing United States v. Hall, 691 F.2d 48, 50 (1st Cir. 1982)). Even without this circuit precedent, the idea that venue is an element of an offense

3

is not compelling. There is no question that the burden rests with the prosecution to establish that venue for the trial is proper, and in this regard it may be correct to call proof of proper venue an element of the prosecution's *case*. See, e.g., Miller, 111 F.3d at 749-50 ("Venue in federal criminal cases is an element of the prosecution's case. . . .") (quoting Record, 873 F.2d at 1366). Strictly speaking, however, venue is not regarded, even in other circuits, as an element of the *crime*.

Cases that refer to venue as an "element" of the offense seem to recognize that it is actually more like an isotope; it is not exactly like the other real, or "substantive," elements. See United States v. Perez, 280 F.3d at 330 ("[T]he term 'element' lacks its usual force in the context of venue. . . . When courts describe venue as an element, they often distinguish it from 'substantive' or 'essential' elements.") (citing cases); Wilkett v. United States, 655 F.2d 1007, 1011 (10th Cir. 1981) ("Venue is, of course, unlike the substantive facts which bear on guilt or innocence in the case. Venue is wholly neutral; it is a question of procedure, more than anything else, and it does not either prove or disprove the guilt of the accused."). Unlike the rights to trial by jury, assistance of counsel, or confrontation of accusers, for example, the right to a trial in the proper venue can be waived – or more precisely, forfeited[1] – by the mere omission to claim it. See Miller, 111 F.3d at 750; Winship, 724 F.2d at 1124. Similarly, although it is ordinarily error for a court to omit to instruct the jury as to a substantive element of the offense even in the absence of a request for an instruction, the failure to request an instruction on venue ordinarily means that the issue is simply bypassed. See United States v. Haire, 371 F.3d 833, 839 (D.C. Cir. 2004). But perhaps the most striking difference between the venue "element" and the substantive "elements" is that venue may be proved by just a

---

[1] "A party waives a right when he intentionally relinquishes or abandons it. . . . This is to be distinguished from a situation in which a party fails to make a timely assertion of a right – what courts typically call a 'forfeiture.'" United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002).

4

preponderance of the evidence, rather than by proof beyond a reasonable doubt. See United States v. Salinas, 373 F.3d 161, 163 (1st Cir. 2004). If the standard of proof for the venue "element" may be different from the standard of proof for the substantive elements of the offense, why may not the identity of the fact finder for that "element" be different as well?

It is undeniable that many cases can be found that seem to require the submission of the question of venue to the jury, at least in some circumstances. What is generally lacking is an explanation of *why* submission of the question is *required*, as distinguished from simply being permitted. Instead, the statements indicating that venue must be submitted to the jury seem often the product of reflex or habit, rather than decision. Here is an illustration. In United States v. Grammatikos, 633 F.2d 1013 (2d Cir. 1980), the Second Circuit stated flatly: "Where the defense[] of . . . improper venue [is] squarely interposed, [it] *must be* submitted to a properly instructed jury for adjudication." Id. at 1022 (emphasis added). The court cited its prior case of United States v. Rodriguez, 465 F.2d 5, 8-9 (2d Cir. 1972) as authority for the stated proposition. Rodriguez stands as an example of a case where the issue was in fact submitted to the jury, but it is not authority for the proposition that it *must be* so submitted. The trial court in Rodriguez had submitted the question of venue to the jury. The government argued two alternate theories in support of a finding that venue was proper. On appeal, the court concluded that one theory was proper but that the other – that the offense in question was a continuing offense within the meaning of 18 U.S.C. § 3237, making venue proper in more than one district – was unavailable as a matter of law. Because it could not be determined which venue theory had persuaded the jury, the verdict was set aside and the case remanded. Whether or why submission of venue issues to the jury was required was not addressed by the Rodriguez court. So far as it appears, it was simply assumed that the question should be

5

decided by the jury. From the fact that it *had been done* in <u>Rodriguez</u>, it appears that the

<u>Grammatikos</u> court jumped to the conclusion that it *had to be done* in general. This seems to be a

theme that runs through the cases.

None of this is to say that it is either wrong or inadvisable to submit contested venue

questions to the jury, but rather simply to respond to the defendant's argument that it is necessary to

do so. Indeed, asking the jury to decide contested venue questions in any given case may be

counseled by a prudent regard both for the competence and traditional stature of juries and for the

constitutional significance of the right to be tried only in a proper venue. <u>See</u> <u>United States v.</u>

<u>Johnson</u>, 323 U.S. 273, 275-76 (1944). To say that a particular approach might be prudent, however,

is not to say that it is mandated, and thus the question of whether a judge or a jury should resolve the

venue issue remains open, at least in this Circuit.

A practical rule of decision, even if it is not compelled, is suggested by the Third Circuit in

<u>Perez</u>, and it may be rephrased as follows: the venue question should be submitted to the jury when

(1) the defendant has timely objected that venue in the forum chosen by the government is improper,

(2) there is a genuine issue of material fact upon which the question of venue necessarily turns,

meaning that the venue question cannot legitimately be resolved without first resolving the underlying

factual dispute, and (3) the defendant has timely requested that the jury be instructed on the issue and

given the task of deciding it. <u>See</u> <u>Perez</u>, 280 F.3d at 327. <u>See also</u> <u>Haire</u>, 371 F.3d at 840 (adopting

the <u>Perez</u> test).

Here, the first and third parts of the test (which are closely related) have been met.[2] Resolution of the issue therefore hinges on the second criterion, whether there was, in the evidence, a genuine issue of material fact upon which the venue question turned. I adhere to my conclusion, expressed in summary terms at the conclusion of the evidence, that there was no genuinely disputable factual issue upon which the resolution of the venue issue depended.

For an offense that is a "continuing" one, venue is proper "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). By statutory definition, mail fraud is such a continuing offense and may be prosecuted "in any district from, through, or into which" the mailed matter has moved. Id. Although § 3237(a) does not specifically address the offense of wire fraud, it is clear that to the extent the wire communication is sent from one district to or through one or more others, it also should be considered a "continuing" offense, with venue proper in any district in which the offense was "begun, continued, or completed." "Begun" and "completed" are clear enough; the offense is continued if the wire transmission passes through facilities of interstate wire communication on its way from beginning to end. See United States v. Pace, 314 F.3d 344, 349 (9th Cir. 2002); United States v. Goldberg, 830 F.2d 459, 465 (3d Cir. 1987).

Each of the mailings that form the basis for the five mail fraud counts (counts 15 through 19) began in Massachusetts. The uncontested proof at trial conformed to the allegations of the indictment as to these counts. There is no question that venue was proper as to these counts.

---

[2] Although, as the government has pointed out, the defendant's compliance with the third part was a bit on the casual side, it was sufficient.

Similarly, all but two of the wire transmissions alleged to have been the instances of wire fraud were initiated in Massachusetts. (See counts 1-2 and 5-14.) Again, the uncontested proof at trial conformed to the allegations of the indictment. Counts 3 and 4, however, alleged wire transmissions originating in New Hampshire. For these, the "begun" part of the venue statute is inapposite. However, in the case of count 3, the uncontested evidence at trial was that the transmission – a fax – was "completed" in Massachusetts by its receipt at the offices of Benistar Property Exchange Trust Company in Newton. As to count 4, the evidence was that the wire from the bank in New Hampshire to a Merrill Lynch account at Mellon Bank in Pittsburg cleared through the Federal Reserve Bank in Boston. Although the defendant tried to challenge this evidence by suggestive cross-examination, in the end the evidence stood as uncontroverted.[3]

Thus, venue was proper in this district under § 3237(a) even under the former "key verb" standard. See United States v. Rodriguez-Moreno, 526 U.S. 275, 279-80 (1999) (rejecting "key verb" test as exclusive method of evaluating venue). Under the present test, which requires attention to all of the "conduct elements comprising the crime," see United States v. Salinas, 373 F.3d 161, 164 (1st Cir. 2004), the conclusion that venue is proper in this District is confirmed. The scheme to defraud that is the subject of the indictment was carried out through the Benistar Property Exchange Trust Company office in Newton, Massachusetts. For all the transactions alleged in the indictment, it was in Newton that the specific documents for each exchange transaction were prepared for delivery to the exchangors. Communications from the exchangors or their representatives were directed to Martin Paley and other workers in the Newton office. Apart from the distinct mailings

---

[3] To the extent there was a genuine issue of fact which, as the trial judge, I am authorized to decide, I am convinced by a preponderance of the evidence that the wire alleged in count 4 passed "through" this district.

or wire transmissions that are the specific conduct alleged to violate the respective statutes, the broader conduct was the promotion and administration of the exchanges centered in the actions of Paley and others in the Newton office.

Carpenter maintains that he did not commit acts within Massachusetts for which he can be held criminally liable. That is a separate matter, which is addressed later in this memorandum. The venue point is this: *if* Carpenter is properly held liable as a participant in the conduct of the scheme, many of the acts done in execution of that scheme occurred within Massachusetts, and venue is proper. This is one of those cases where the jury's guilty verdict necessarily implies a conclusion that venue for the trial of the charges against Carpenter was proper in Massachusetts. See, e.g., Miller, 111 F.3d at 751 (failure to instruct on venue when requested does not constitute reversible error where it is beyond a reasonable doubt that the jury's guilty verdict on the charged offense necessarily incorporates a finding of proper venue). If the acts constituting the conduct of the scheme were properly attributed to him, he acted within Massachusetts for venue purposes.

### B.  Variance / Constructive Amendment

Carpenter argues that the government's proof at trial focused on misrepresentation by *omission*, whereas (he says) the indictment charged only affirmative misrepresentations. He contends that the variance of the proof from the indictment amounts to an illegitimate constructive amendment of the indictment. The government insists that the proof at trial was consistent with the allegations of the indictment.

The indictment alleged that Carpenter made written and oral statements that were materially false. See, e.g., Superseding Indictment, ¶ 27. There was no evidence at trial that Carpenter personally made any oral misrepresentations, so the focus was on the written statements that the

9

indictment alleged were materially false. The government's theory, and its argument to the jury, was that certain statements in written materials provided by Benistar to the exchangors were either plainly false or were "half-truths" that required that fuller information or explanation be given to the exchangors if they were not to be considered materially misleading.[4] Put another way, the fraudulent scheme alleged in the indictment included the "omission" to clarify the half-truths that the defendant directed toward the exchangors. This theory is well within the scope of the indictment, and proof of such "omissions" was neither a variance nor a new theory. There was no constructive amendment of the indictment.

C.  Sufficiency of the Evidence

Carpenter argues that the evidence at trial was insufficient to prove him guilty of mail or wire fraud beyond a reasonable doubt. He focuses on two propositions: (1) the government's evidence failed to disprove his good faith; and (2) the government failed to prove that he had "caused" the mailings or wire transmissions that formed the basis for each of the counts in the indictment.

Carpenter's good faith argument misses the mark. The good faith he has in mind (as described in his motion for acquittal) was his belief that there were no restrictions on his ability to invest exchangor's funds in any manner he saw fit. However, this good faith belief on his part was not the relevant one.

---

[4] Carpenter's argument that there can be no written, as opposed to oral, half-truths is unconvincing.

The concept of good faith enters the prosecution of mail or wire fraud offenses in relation to the government's burden to prove that the defendant had a specific intent to defraud. See United States v. Dockray, 943 F.2d 152, 155 (1st Cir. 1991); New England Enterprises, Inc. v. United States, 400 F.2d 58, 71 (1st Cir. 1968). That is, good faith is essentially the opposite of an intent to defraud. Dockray, 943 F.2d at 156. Thus, when a defendant puts his good faith in issue, it becomes part of the government's burden to sustain its proposition that he acted with intent to defraud by negativing any inference that might be permissible on the evidence that the defendant had acted in good faith.

In this case, the government's theory was that Carpenter knew that the promotional materials and transactional documents used by Benistar contained assurances to exchangors that their funds once turned over to Benistar would be held safely in escrow accounts from which they would not move except to be reinvested in qualifying property or to be returned to the exchangors, and further that Carpenter knew that these assurances were either false or materially incomplete. More particularly, as the government's theory goes, Carpenter knew that the exchangors were not being advised that, contrary to the assurances in the documents, he intended to use their funds to invest in the options market. In other words, the scheme was to obtain the exchangors' money on the basis of assurances known by Carpenter to be fraudulent. The government's theory was supported by evidence at trial that would have permitted the jury to conclude that Carpenter knew what the documents that were used to induce the exchangors to entrust their money to Benistar did and did not say and, more specifically, that he knew that the material information that their funds would be used in options trading was withheld from the exchangors. Upon this evidence, the jury could find beyond a reasonable doubt that Carpenter had a specific intent to defraud, implying a rejection, by the requisite standard of proof, of a claim of good faith.

Whether Carpenter believed in good faith that he was free, under the terms of the transactions with the exchangors, to invest their funds as he saw fit – including by engaging in options trading – is not the point.  Such a good faith belief would not be inconsistent with proof of specific intent to defraud, as discussed above.  The object of the scheme to defraud was obtaining control of the exchangors' money by false pretenses; the fraud was not, as the defendant has himself repeatedly emphasized, the pursuit of an incautious investment strategy.  The scheme's object was achieved when the money was obtained, before it was invested.  Even if, as the defendant believes, there were no positive legal or contractual impediments to his investing the funds as he wished, that belief does not necessarily affect the existence of a prior intent to obtain control of the money by false pretenses.

Carpenter's other argument, that the evidence was insufficient to prove that he "caused" the alleged mailings and wire transmissions, is more substantial.  The respective mailings and wire transmissions, it bears emphasizing, were the "gist" of each of the charged offenses.  See United States v. Wood, 364 F.3d 704, 726 (6th Cir. 2004); United States v. Brooks, 748 F.2d 1199, 1202 (7th Cir. 1984).  The jury was instructed as follows:

> To cause an interstate wire transmission is to do an act with the knowledge that a reasonably foreseeable consequence of that act is that an interstate wire communication will be transmitted by someone.  Similarly, to cause the mails to be used is to do an act with the knowledge that it is reasonably foreseeable that the use of the mails will follow.

See First Circuit Pattern Criminal Jury Instructions §§ 4.12 and 4.13 (1998).

According to the evidence, any act done by Carpenter was, relative to other actors, somewhat remote from the actual mailings or transmissions specified in the indictment. All of the wire transmissions and three of the five mailings were most directly "caused" by the exchangors or their

agents, sending funds either to Benistar or directly to Merrill Lynch or PaineWebber. Two of the mailings (counts 15 and 19) were directly "caused" by someone at the Benistar Newton office, sending funds to Benistar's Connecticut office.

At the next remove was Paley, who solicited the exchangors and executed the transaction documents. It was certainly foreseeable to him that mail and/or wire transmissions would occur in consummating the transactions. He had to have been aware not just that sometime, somewhere, somebody would use the mails or interstate wire communications facilities; he had to have known who was likely to do so and when. He can plainly be said, under the applicable definition, to have "caused" the mailings or wire transmissions alleged in the indictment.

Carpenter stands farther back, both in time and in proximity, from the critical events that are the gist of the charged offenses. On the evidence, any acts by him that preceded any given mailing or wire transmission (and therefore could have caused the transmission) were confined to setting up of the Benistar Property Exchange Trust business with Paley. However, those acts were far from insignificant. The jury could have found on the evidence that Carpenter reviewed and approved the promotional materials and transaction documents that contained materially false statements or misleading half-truths. Put another way, the evidence permitted the jury to conclude that Carpenter agreed with Paley to form a company to engage in the business of serving as a qualified intermediary for Section 1031 property exchanges, that Carpenter and Paley jointly produced the documents with allegedly fraudulent content and agreed to their use in soliciting exchangors to entrust their funds to that company, that Carpenter expected and intended Paley to use the documents in the transactions

with the exchangors, and that Carpenter reasonably foresaw that the mails or interstate wire communications facilities would be used in the consummation of the transactions.[5]

Though Carpenter may not have acted as directly as Paley did to solicit exchangors or to execute the transaction documents with them, his participation in the creation of Benistar Property Exchange Trust Company was more than just an isolated historical event with no ongoing effect. To the contrary, having joined with Paley initially to devise the fraudulent scheme, Carpenter remained a participant in it. Paley's acts in furtherance of the scheme produced the funds which Carpenter used to conduct his trading.

Some courts have noted some similarity between a scheme to defraud in the context of the mail and wire fraud statutes and a criminal conspiracy. See, e.g., United States v. Cohen, 516 F.2d 1358, 1362 (8th Cir. 1975); United States v. Grow, 394 F.2d 182, 203 (4th Cir. 1968). It has been suggested that an "individual participant in a fraud scheme will be held liable for the acts of his agents and co-schemers that are within the general scope of the scheme . . . unless, as in a conspiracy, he undertakes some affirmative act of withdrawal." Cohen, 516 F.2d at 1364.

There are good reasons to be skeptical of an approach that would tend to treat mail or wire fraud substantive charges as implicitly charging a conspiracy. First of all, it is entirely unnecessary.

---

[5] "Causation" in mail fraud cases has been defined very broadly by the courts. See Pereira v. United States, 347 U.S. 1, 8-9 (1954) ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or that such use can reasonably be foreseen, . . . then he 'causes' the mails to be used."); United States v. Pimental, 380 F.3d 575 (1st Cir. 2004) (finding that the defendant had "caused" a mailing where he had misrepresented the nature of his business when applying for worker's compensation coverage and insurance company employee later sent a summary of his meeting with the defendant to the insurance company's headquarters); United States. v. Bortnovsky, 879 F.2d 30 (2d Cir. 1989) (defendant "caused" mailing where he filed false report with insurance company and that company, two years later, mailed the defendant a letter advising them of the need to promptly file suit in order to preserve rights under policy).

If the facts presented to the grand jury warrant it, an indictment for mail or wire fraud can easily include a conspiracy count as well. Moreover, the notion of "implicit" charging has little, if anything, to recommend it, for reasons both of simple clarity and substantial due process. Reflexively conflating a fraudulent "scheme" with a "conspiracy" is also likely to confuse the substantive law as to either: for example, proof of an agreement is not necessary for proof of a scheme, as it is for proof of a conspiracy.

Nonetheless, there is some value perhaps to the analogy, including the notion of affirmative withdrawal, in considering whether the evidence in this case was sufficient to permit a jury to conclude that Carpenter's "acts" in setting the scheme in motion may be considered still causally effective at later points in time when Paley acted in other ways to further the scheme. By continuing his relationship with Paley in the Benistar Property Exchange Trust Company, Carpenter was effectively ratifying and renewing the initial institution of the scheme they had jointly formed, namely the continued use of the misleading documents to solicit exchangors, whose funds Carpenter used to invest in the options market. A jury finding to that effect was warranted on the evidence, and such a finding would have further justified a conclusion that Carpenter committed the crimes alleged.[6]

For all the foregoing reasons, Carpenter's motion for judgment of acquittal is DENIED.

## II. **The Motion for a New Trial**

---

[6] It should be emphasized that this analysis is directed toward Carpenter's culpability as a principal, for having himself used the mails and interstate wire communication facilities to execute a scheme to obtain money or property by false or fraudulent pretenses. He was not (although he might have been) charged as a co-conspirator with Paley, and although the indictment contains a reference to 18 U.S.C. § 2, during trial the government disavowed a theory of Carpenter's culpability based on his having aided or abetted Paley. His conviction rests on his own acts, not on Paley's attributed to him.

Carpenter asserts several reasons why a new trial should be ordered. Two of his arguments – that venue was improper and that the indictment was constructively amended – have been addressed in connection with his motion for a judgment of acquittal. Essentially for the same reasons, no new trial is warranted.

His other arguments for vacating the verdict and granting him a new trial fall under two general claims. First, he says the government violated its disclosure obligations in certain respects that prejudiced him. Second, he contends that the government's arguments to the jury were improper.

A. Disclosure

Carpenter contends that the government failed to disclose information it knew about Martin Paley that had potential exculpatory value. While the background to this argument is the case law emanating from Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972), Carpenter's argument is more particularly based in this Court's Local Rules. Local Rule 116.2 (captioned "Disclosure of Exculpatory Evidence") establishes a timetable for the disclosure by the government of potentially exculpatory material. It begins with a definition of exculpatory information:

> **(A) Definition.** Exculpatory information includes, but may not be limited to, all information that is material and favorable to the accused because it tends to:
>
> > (1) Cast doubt on defendant's guilt as to any essential element in any count in the indictment or information;
> >
> > (2) Cast doubt on the admissibility of evidence that the government anticipates offering in its case-in-chief, that might be subject to a motion to suppress or exclude, which would, if allowed, be appealable pursuant to 18 U.S.C. § 3731;
> >
> > (3) Cast doubt on the credibility or accuracy of any

> evidence that the government anticipates offering in its
> case-in-chief; or
>
> (4) Diminish the degree of the defendant's culpability
> or the defendant's Offense Level under the United
> States Sentencing Guidelines.

L.R. 116.2(A).

Two preliminary observations about this definition are in order. First, the categories of information listed in the Local Rule as potentially exculpatory are consistent with the applicable case law, covering matters that may be directly exculpatory in that they tend to negative an inference of the defendant's guilt, as well as matters that are indirectly exculpatory in that they impeach or call into question some of the government's inculpatory evidence. Second, it is worth noting the important qualification in the Rule's preamble, as in the case law: to be exculpatory, information must be both "material" and "favorable to the accused."

Assessing the materiality of potentially exculpatory information is guided by the principles outlined by the Supreme Court in <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995) and <u>United States v. Bagley</u>, 473 U.S. 667 (1985). Materiality is not judged simply by asking whether the information might be favorable to the defendant in some degree. Put the other way around, not all information favorable to the defendant is necessarily material. <u>Kyles</u>, 514 U.S. at 437; <u>Bagley</u>, 473 U.S. at 675 & n.7. The touchstone of materiality is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable

probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434. The materiality of the undisclosed information is to be assessed not in isolation, but in the context of the entire record at the trial. See United States v. Agurs, 427 U.S. 97, 112 (1976).

Carpenter's argument that the government withheld exculpatory information from him focuses on Local Rule 116.2(B)(2)(e) and (f),[7] which provide:

> (e) A written description of any prosecutable federal offense known by the government to have been committed by any witness whom the government anticipates calling in its case-in-chief.
>
> (f) A written description of any conduct that may be admissible under Fed. R. Evid. 608(b) known by the government to have been committed by a witness whom the government anticipates calling in its case-in-chief.

Relying on these provisions, he asserts the government improperly failed to disclose to him its belief that Paley had lied to government investigators when he told them in interview sessions that he had not known until December 2000 that Carpenter was investing exchangors' funds in the options market. Paley had been telling the government all along that he himself had no part in or knowledge

---

[7] Carpenter also makes two more general and perfunctory arguments, based on Local Rule 116.2(B)(2)(a) and (B)(2)(c), that the government was required to provide "information that tends to cast doubt on the credibility of [Paley]" and, similarly, that it was required to provide "[a]ny inconsistent statement . . . made orally or in writing by [Paley]." As explained in greater depth in the discussion of the government's obligations under Local Rule 116.2 (B)(2)(e) and (f), see text pp. 18-23, the government did provide Carpenter with all material information it was required to produce under Rule 116.2. The government's failure to disclose its own subjective evaluations of that information does not constitute a violation of the Local Rules.

18

of the risky investment strategy being pursued by Carpenter, the intended inference being that he had

not intentionally misled the exchangors by withholding that information, because he himself had been

duped by Carpenter. At trial, the government pointedly refrained from asking Paley whether he knew

how the funds were being invested by Carpenter, because the government believed his answer might

be false. [8]

  The government had provided the defense with FBI 302 reports summarizing what Paley had

told government agents, as well as copies of documents that Paley had furnished to the government

from his own or Benistar's files. In other words, the government disclosed what Paley had said to

them. What was not disclosed, but which Carpenter asserts should have been, was the government's

belief that Paley was not being truthful in his statements to agents and to the prosecutors. Carpenter

reasons that if the prosecutors believed Paley was lying to them and the agents, then they must also

have realized that Paley was prosecutable under 18 U.S.C. § 1001 (punishing materially false

statements), and this should have been disclosed under Local Rule 116.2(B)(2)(e). In addition, such

instances of deceptive conduct might be admissible under Fed. R. Evid. 608(b) in the course of

Carpenter's cross-examination of Paley, requiring disclosure under Local Rule 116.2(B)(2)(f).

Moreover, Carpenter adds, if Paley's denials that he knew how Carpenter was investing the funds

were false, then under the government's theory of this case, he also would have been culpable (and

---

 [8] Paley was extensively cross-examined by the defense about his knowledge of the options trading, and he gave inconsistent testimony. At different points, he both admitted and denied that he knew as early as September 1998 how the funds would be invested by Carpenter. See Appendix A.

therefore prosecutable) in the scheme to defraud, and that should have been disclosed pursuant to Local Rules 116.2 (B)(2)(e) and (f) as well.[9]

Carpenter's argument is unpersuasive. The government had disclosed the factual information it had about what Paley told government agents. Paley's statements as recorded in the 302s and his own personal notes and records were available to be used, and in fact were used, in cross-examination by the defense to attack his credibility. The defense position at trial was that Paley's statements, whether in trial testimony or in interviews with government agents, were not to be believed. The information provided by the government in pretrial discovery was utilized to attack his credibility, precisely the purpose intended to be facilitated by the discovery rules.

---

[9] Carpenter also argues that Paley's alleged culpability for these crimes makes it "simply implausible" that no agreement or understanding was reached with the government to protect him from prosecution, and that the government's assertions to the contrary "def[y] logic, experience and common sense." Def.'s Reply to Government's Opp'n to Mot. to Set Aside the Verdict and Grant a New Trial, at 17-18. In his Rule 33 motion, he implies that such an agreement must exist and argues that the government must therefore have run afoul of Local Rule 116.2 (B)(2)(c), which requires production of a "statement whether any promise, reward or inducement has been given to any witness whom the government anticipates calling in its case in chief." The only support Carpenter offers for this contention (in addition to his generalized suspicions) is that Paley's counsel met with the government in July of 2001, after which Paley sent him a fax congratulating him on a job well done and asking how much of his time would be taken up, presumably by issues related to Paley's testimony.

At trial, however, Paley explicitly denied that there was any such agreement. Trial Trranscript, Day 9, page 57, lines 3-10 ( Q: "Mr. Paley . . . do you have any agreement whatsoever with the U.S. Attorney's Office?" A: "No, I do not." Q: "No immunity agreement?" A: "No." Q: "No promise you wouldn't be prosecuted?" A: "No agreement."). In its opposition to the Rule 33 motion, the government reiterated this position. Government's Opp'n, at 5 ("The government gave no promises, rewards or inducements to Paley. No assurances were made, no promises given, and no agreements entered.").

I have seen no evidence that leads me to believe that the government violated Local Rule 116.2 (B)(2)(c), or that a further hearing on this issue is warranted.

Carpenter's position amounts to an argument that the government must not only disclose exculpatory *evidence* or *information* in its possession about one of its witnesses, but also provide an *opinion* about the reliability of that information. After the government says to the defendant, "Here are all the statements made to us by the witness," Carpenter's claim is that it is then required to add the gloss, "But we don't believe him."

The government's evaluation of its own evidence would not be admissible or otherwise useable by the defense at trial. While the parties may argue that a particular witness should be believed or disbelieved, the witness's credibility is ultimately a matter for the jury to decide. The parties' own judgments are not relevant or even proper.[10] The discovery rules are designed to give a defendant the tools with which to discredit a government witness by disclosing the objective facts about what the witness has said or done in the past. The rules do not require the government to disclose subjective evaluations of the witness's statements or deeds.

Apart from being outside the scope of what might be defined as exculpatory evidence, such evaluative opinions are also not "material" in the necessary sense. Not being admissible or useable at trial, they cannot lead to a reasonable probability that the outcome of the trial would have been altered by their disclosure, which is necessary to a finding of materiality.

The defendant here argues that he could have used the information in a different way. Assuming that the government's view of Paley's credibility could not be made known to the jury, Carpenter argues that if he had known that the government thought Paley was lying when he said he

---

[10]    Plainly the government cannot vouch that a witness's testimony is credible. See United States v. Torres-Galindo, 206 F.3d 136, 142 (1st Cir. 2000). The defendant proposes a kind of "vouching for incredibility" – that the government should be *required* to say when it does not believe one of its witnesses.

21

lacked guilty knowledge of Carpenter's investment strategy, he would have formed a different trial strategy. In substance, rather than contending that Paley was a liar who had duped the government just as he had duped everyone else, he would have argued that everyone, including the government, agreed that Paley was a liar. He would have added that the government, notwithstanding its view that Paley was guilty, chose not to prosecute him but rather picked on the person Paley was attempting to frame, a fact that should lead the jurors to reject the attempt by finding Carpenter not guilty.

Two answers can be made to this argument. First, to accept it would be to expand the government's discovery obligations well beyond the bounds that have been set, either by precedent or by the Local Rules. What Carpenter proposes is not irrational. An "open file" regime of discovery could be imposed on the government in a criminal case, and could include a requirement that the government disclose not only hard information but also its evaluations, assessments, and even trial strategies. It is sufficient to say that such is not the state of the law concerning criminal discovery, which attempts to accommodate the defendant's right to a fair trial within the context of the traditional adversary process. See Bagley, 473 U.S. at 675. If there is to be an expansion of the government's obligations to include disclosure of subjective assessments of evidence, it will have to come from those who wield the precedential gavel.

Second, this argument also fails the materiality test. If Carpenter had known what the government thought about Paley's truthfulness, he would have made his argument that Paley was a liar in a different way. He still made a forceful argument that Paley was a liar, backed up by a cross-examination of Paley that exposed the witness's many inconsistencies and prevarications. He may even have succeeded in convincing the jury of that fact. It is conceivable on the evidence that the jury could have thought that Paley was a liar but still have concluded that Carpenter was guilty. That

seems to have been the government's view up to a point, and there is nothing inherently contradictory about it. Under these circumstances, Carpenter has not shown that the undisclosed information about the government's view of Paley's credibility – and thus his potential "prosecutability" – was material in the necessary sense. There is not a reasonable probability that Carpenter was denied a fair trial because the government did not identify Paley as a potential defendant in a false statements prosecution.

Carpenter also renews an argument made and rejected at trial. As noted above, Paley consistently told the government that he did not know until December 2000 how Carpenter was investing exchangor funds. Apparently, the government did not believe that was true; the statement appeared to be contradicted, or at least seriously qualified, by some of the documents Paley had produced. Consequently, in Paley's direct examination, the prosecutor deliberately avoided asking Paley when he learned that Carpenter was investing the funds in the options market because such a question might have elicited what the government regarded as false testimony. Paley was asked on cross-examination when he first knew about Carpenter's investment use of exchangors' funds, however, and his answers could easily have been understood as contradicting what the FBI 302s reported he had said to the government.[11]

Carpenter pointed out that the FBI 302s showed that Paley had *not* told the government that he knew prior to December 2000 how Carpenter was investing the exchangors' funds. Consequently, Carpenter argued, the government had to realize that Paley's testimony on cross-examination, that he *had* told investigators that he knew of Carpenter's investing prior to

---

[11] The confusing and contradictory nature of Paley's testimony on cross-examination is evident from the Trial Transcript, excerpts of which are attached hereto as Appendix A.

December 2000, amounted to perjury. That realization, Carpenter asserts, imposed on the government the obligation to correct the perjury by stating in open court that it disbelieved Paley in this respect. Carpenter's argument was based principally on Napue v. Illinois, 360 U.S. 264 (1959).[12]

I reject the argument now for the same reasons I did so at trial. There are two important differences between Napue and this case. First, in Napue, the prosecutor's own question elicited the false testimony, making the prosecutor effectively the sponsor of the falsity unless he took steps to repudiate it. Here, the false testimony[13] by Paley that Carpenter points to was not elicited by the prosecutor, and the prosecutor therefore is not implicitly the sponsor of the specific answers said to be false. It is not an uncommon thing for criminal prosecutions to depend on testimony from persons who are less than fully honest truth-tellers. It is one thing to hold the prosecution to an obligation to correct testimony it knows to be false when elicited as part of its own examination of its own witness, as in Napue. It is quite another to require the government to follow any cross-examination of its witness with a disquisition for the benefit of the jury evaluating how truthful (in the government's opinion) the witness was in answering defense counsel's questions.

Second, and more significantly, in Napue the falsity of the witness's answer was known only to the prosecutor. No other method of correction was available than to require the prosecutor to do it. In this case, the defense was well aware of the inconsistencies between what the FBI 302s recorded that Paley had said in the interviews and what Paley's contrary testimony was. Defense

---

[12] In Napue, the prosecution asked a witness whether he had been promised leniency in exchange for his testimony. The witness replied that he had not. The prosecutor knew that this answer was false but did not correct it. The Supreme Court held that the prosecutor had an obligation not to let the false answer stand without correction.

[13] For purposes of evaluating Carpenter's argument, I assume that the testimony was false.

counsel was prepared to expose the inconsistencies to the jury and did so with some emphasis. Counsel was permitted to review the agents' raw notes from which the 302s were prepared and was further permitted to call the agents as witnesses to contradict Paley's testimony. The jury was given the tools to judge how false the testimony was and to decide what effect that might have on its evaluation of the issues presented.

There was no ethical breach by the government, and there was no need for any further remedy in light of the ample opportunity given to demonstrate Paley's putative perjury through the evidence.

## B. Prejudicial Inflammatory Argument

In the government's closing argument, both in the chief argument and in the rebuttal, the prosecutors seized upon a remark attributed to Carpenter by a witness to build an extended metaphor likening his investments of exchangor funds in the options market to "gambling." This included not only repeated uses of some form of the verb "gamble," but also other gambling references, such as betting, cashing in chips, and doubling down.[14] On more than one occasion, the prosecutors referred to Carpenter's "gambling with other peoples' money" to make money for himself – at one point it was said that he was gambling the exchangors' money so that he could "make a million for himself." Trial Transcript, Day Twelve, at page 95, line 19.

---

[14]  Carpenter's reply brief cites fourteen occasions in the government's closings where gambling references were pointedly made. See Def.'s Reply to Government's Opp'n to Mot. to Set Aside the Verdict and Grant a New Trial, at 49-50. According to the e-transcript concordance available to me, the word "gamble" was used eight times, "gambled" once, "gambler" twice, and "gambling" seven times.

Carpenter objects that these repeated references to gambling were intended to, and did, inflame the jury's passions against the defendant, and consequently he urges that the verdict from the thus-incited jury must be set aside.[15]  I agree.

The gambling characterizations were not, as a matter of the narrative of the government's case, wholly inapt.  Carpenter's persistence in an investment strategy that was high-risk to begin with and was proving through most of 2000 to be dramatically unsuccessful could very plausibly be characterized as gambling.  But the aptness of the metaphor to the behavior is not the only consideration.  See United States v. Felton, 417 F.3d 97, 103 (1st Cir. 2005) ("Technical accuracy is perhaps not conclusive.  One can imagine situations in which an epithet carries connotations well beyond the crime charged (*e.g.*, 'murderer' in a case of negligent homicide), or cases in which the description is gratuitously inflammatory, serving no reasonable purpose in summarizing the government's position.").  The real problem is that the references, in addition to being persistently pejorative, had the tendency to lead the jury away from the charges in the indictment by inviting them to blame Carpenter because he was a gambler, or because he lost the exchangors' money, rather than because he had committed mail or wire fraud.

According to the indictment, the scheme to defraud that Carpenter used the wires and mails to execute entailed making false representations or half-truths to induce the exchangors to entrust their property, that is, the proceeds of the sale of real estate, to Benistar Property Exchange Trust

---

[15]  He also advances other grounds for his argument that prosecutorial misconduct requires a new trial, such as violation of the "golden rule" that the jurors should not be asked to put themselves in the position of the exchangors.  In light of the disposition of the "gambling" issue, it is unnecessary to address these other grounds in detail.  It is enough to say that I would not find those other grounds, either separately or in the aggregate, to require a new trial.

Company.   The deception succeeded when an exchangor gave the funds to Benistar.  The specific mailings and wire transmissions alleged in each of the counts in the indictment all involved the sending to Benistar (or directly to an investment firm) of either transaction documents or the funds themselves.  In each case, the crime was completed when the mailing or wire transmission occurred, before Carpenter had invested, or "gambled," any of the money.  The "gambling" of the money was not part of the offense.

Evidence of Carpenter's investment activity was admitted not because that activity was the focus of the criminal charges – it was not –  but because evidence that by mid-2000 Carpenter was experiencing heavy losses in the options trading was relevant to the question of whether he acted with the specific intent to defraud necessary to support a conviction.  The government's theory was that his knowledge of the losses he was sustaining in the trading tended to prove that he knew that representations he thereafter made to the exchangors that their money would be kept safe, would not be moved from an escrow account, etc., were false.  In other words, even assuming, *arguendo*, he did not believe such representations to be false or misleading during the time when he was making profits on the investment of the funds and so was able to return to the exchangors all the money they had entrusted to Benistar, the jury could conclude that the misleading tendency of the representations had to have been known to him – and by inference had to have been intended by him – after he became aware of the magnitude of the losses he was suffering.

This was a rather limited purpose. Nonetheless, considerable evidence about the trading losses was introduced by the government.  The figures and charts demonstrating the extent and persistence of the trading losses were dramatic.  Moreover, this evidence was introduced in the latter

stages of the government's case, close in time to the closing arguments. As the arguments were made, this evidence likely remained vivid in the jurors' memories.

Condemning Carpenter for "gambling," as the prosecutors persisted in doing, was an appeal to instincts of moral disapprobation about recklessness, waste, and perhaps even theft. The prosecutors' inflammatory argument repeatedly emphasizing the "gambling" metaphor, coming as it did after the dramatic evidence of losses, may have diverted the jury from its consideration of the crimes charged and may thus have induced a verdict based on the jury's disapproval of the "gambling," rather than because the jury was satisfied beyond a reasonable doubt that the elements of the offenses charged had been proven.

A key consideration in evaluating a motion for a new trial because of inflammatory argument is the overall strength of the government's case. See United States v. Manning, 23 F.3d 570, 574 (1st Cir. 1994); United States v. Mandelbaum, 803 F.2d 42, 45 (1st Cir. 1986). Here, though sufficient to withstand a motion for judgment of acquittal, the case was not so strong that it can confidently be said that the repeated "gambling" references had no illegitimate effect on the jury's assessment of the evidence. On what was perhaps the crucial issue, the jury would certainly have been warranted in concluding beyond a reasonable doubt that Carpenter acted with intent to defraud, but a contrary conclusion also would have been rationally possible on the evidence.

Because it cannot be said with confidence that the government's improper closing arguments did not taint the verdict, the verdict cannot be allowed to stand. Accordingly, the motion for a new trial is granted, and the verdict of conviction is set aside.

**III.  <u>Conclusion</u>**

For the foregoing reasons, the defendant's motion for judgment of acquittal (dkt. no.160) is

DENIED.  His motion to set aside the verdict and for a new trial (dkt. no. 158) is GRANTED.

It is SO ORDERED.


December 15, 2005                          \s\ George A. O'Toole, Jr.
DATE                                        DISTRICT JUDGE

**Appendix A**

Here is some of Paley's testimony regarding his knowledge of Mr. Carpenter's investment strategy, as given on cross-examination by defense counsel:

> Q.    So as of September of 1998, you understood, Mr. Paley, there could be losses in the funds holding the clients', the exchangors' funds, correct?
>
> A.    That's true.

Trial Transcript, Day Eight, page 39, lines 20-23.

> Q.    Did you tell [the prosecutor] when you sat down across the table from him trying to convince him not to seek an indictment of you, Mr. Paley, that you knew from day one, September 1998, your clients' funds could potentially be lost to investment?
>
> A.    No.
>
> Q.    You didn't tell him that, did you, sir?
>
> A.    No.
>
> Q.    You knew if you told [the prosecutor] that, you knew if you acknowledged that you knew your clients' funds could be lost due to investments, that wasn't going to prevent you, Mr. Paley, from being blamed, right?
>
> A.    That's true.

Id., at page 40, lines 7-18.

> Q.    You've testified on direct examination three or four times that you told [the prosecutor] that you didn't know your clients' funds were at risk of loss. You've said that three or four times?
>
> A.    I did not know that they were at risk of being lost.

Id., at page 41, lines 6-10.

> Q.    Mr. Paley, did you sit down with [the prosecutor] trying to convince him not to seek an indictment against you, and you told him that you didn't know until the end of December 2000 that your clients' funds were at risk?
>
> A.    That's true.

Id., at page 42, lines 13-17.

30

Q.     Well, how could you have told [the prosecutor] on three occasions that you never knew your clients' principal was at risk when you've testified here in court that as of day one, September of '98, you did know that your clients' principal was at risk?

A.     The reason is because that (sic) I had not held signatory on accounts or managed the money.

Q.     I didn't ask what your responsibilities were.  I asked you what your knowledge was.

A.     There were monies that were invested.   Clients' monies were invested, yes.

Q.     Mr. Paley, my question is when you were asked questions about this specific document by [the prosecutor], did you tell him that you knew, as you've testified today, as of September 9th, 1998, that your clients' funds could be lost to investment?  Did you tell [the prosecutor] that when he asked you that question?

A.     I did.

Q.     You told [the prosecutor] that you knew that your clients' funds could be lost to investment?

A.     That's a possibility, yes.

Id., at page 44, lines 5-24.


Q.     You told [the prosecutor] when you sat down with him you were unaware that Mr. Carpenter had been trading the corpus, the principal, in the stock market until the end of 2000, correct?

A.     That's true.

Q.     That's not true, though, is it, sir?

A.     That's true.

Q.     You did know prior to December 2000 that Mr. Carpenter was investing your clients' funds in the stock market, didn't you?

A.     He was investing clients' money in investment vehicles, yes.

Q.     The stock market, sir?

A.     Yes.

Q.     And you knew that he was investing the clients' principal in the stock market?

A.     Yes.

Id., at page 59, lines 6-24.

31

Q.      . . . But, you sat down with [the prosecutor] and told him that you didn't know that, sir, until the end of 2000.

A.      No, sir.

Q.      You didn't tell [the prosecutor] that?

A.      No, sir.

Q.      So when you sat down with [the prosecutor] in December of 2001, in February of 2002, in January of 2004, you told [the prosecutor] that you knew your clients' funds, the principal, was being invested in the stock market before December 2000?

A.      Yes.

Id., at page 61, lines 1-10.