UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Eastern Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *v.* | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER | ) | |

**DEFENDANT'S VERIFIED MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT, GRAND JURY BIAS, AND AN UNCONSTITUTIONAL GRAND JURY**

Pursuant to 28 U.S.C § 1867(a) and Fed. R. Crim. P. 12(b)(3)(A), defendant Daniel E. Carpenter moves to dismiss the superseding indictment in this four-year old mail and wire fraud case, involving $9 million of investment losses at Benistar Property Exchange ("BPE"), for which PaineWebber has been found solely responsible and in which no crime was committed.[1]

Dismissal is required because: (i) the grand jury's deliberations were contaminated by three separate acts of prosecutorial misconduct involving a former AUSA; (ii) the grand jury is presumed to have been biased in favor of PaineWebber and against Mr. Carpenter by virtue of a manager in PaineWebber's law firm serving as Deputy Foreperson of the grand jury; and (iii) the one-year durational residence requirement for grand jurors found in 28 U.S.C. § 1865(b)(1) and

[1] All the indictment essentially alleges is that Mr. Carpenter caused BPE to invest in stock options, lost $9 million, and was unable to make good on the losses. Instead of stock options, perhaps the government would have preferred that Mr. Carpenter had invested the funds in something "safe" like mortgage-backed securities? The recent bailout of Bear Stearns, enabled by $30 billion in financing from the Federal Reserve (*i.e.*, the taxpayers), was necessary because Bear invested $16 billion in supposedly "safe" mortgage-backed securities that suddenly became worthless. The only difference between BPE and Bear is that BPE was not "too big to fail," and Mr. Carpenter could not call upon the taxpayers for a bailout. The indictment simply fails to allege a crime (there was no theft or embezzlement), and Mr. Carpenter plans to file a subsequent motion to dismiss on this basis (as well as for lack of subject matter jurisdiction and improper venue, among several other grounds for dismissal). *See generally*, P. Lattman & K. Dunham, *Tax Strategy For Real Estate Hits Rocky Turf*, WALL ST. J., May 26, 2007, at B1 ("Furthermore, a QI [qualified intermediary] can do virtually anything with the funds in its possession, subject to its agreement with the taxpayer. '**There isn't any kind of prohibition in the tax code that says where those dollars can be placed**' . . . QI businesses make money in several ways. Most charge transaction fees, **while others also earn the spread between interest they gain on 1031 investors' sale proceeds and the interest paid out to the investors** . . . An intermediary doesn't [even] need a license.") (emphasis added).

the Court's Jury Plan violates the right to travel contained in the Due Process Clause of the Fifth Amendment and, therefore, is unconstitutional *as applied to Mr. Carpenter*.

## I. FORMER AUSA'S PROSECUTORIAL MISCONDUCT REQUIRES DISMISSAL.

Of the two witnesses who appeared before the grand jury, the primary witness was an FBI agent referencing and reading FBI 302 reports of his interviews with BPE president Martin L. Paley ("Paley"), Merrill Lynch broker Gerald Levine ("Levine"), and others. It is now clear that Paley and Levine made material, false statements to the government (in violation of 18 U.S.C. § 1001) and committed perjury in their testimony in this case and in the civil case (in violation of 18 U.S.C. §§ 1621, 1623). *See, e.g.*, *United States v. Carpenter*, 405 F. Supp. 2d 85, 97 n.8 (D. Mass. 2005) ("Paley . . . gave inconsistent testimony."); *Cahaly v. Benistar Property Exchange*, 2004 WL 5031628 (Mass. Super. Sep. 24, 2004) ("Paley's testimony at the motion hearing [was] inconsistent and incredible."); Video Webcast of Oral Argument at 32:10, *Cahaly v. Benistar, Ltd.*, SJC No. 10041 (Jan. 7, 2008), *available at* http://www.suffolk.edu/sjc/archive/2008/SJC_10041.html (last visited Mar. 17, 2008) (former SJC justice and Exchangors' attorney Charles Fried noting Levine's "false, perjured testimony."). The sum and substance of such false and perjured testimony, which took the form of hearsay-upon-hearsay (*i.e.*, double hearsay) through the FBI agent's testimony, constituted virtually all of the grand jury "evidence."

Although, as a general rule, hearsay may be presented to the grand jury, when double hearsay, based on perjury and false statements, is added to a former AUSA giving unsworn testimony regarding Mr. Carpenter's alleged fiduciary duty to the Exchangors, *see* 1/14/04 Grand Jury Tr. 54-56, and that same former AUSA misleading the grand jury as to whether a legal dispute existed between Mr. Carpenter and the brokers in response to a direct question from a grand juror, *see* 1/14/04 Grand Jury Tr. 51-52, the Court must conclude that the grand jury's

deliberations were so unfairly prejudiced and contaminated by these three acts of prosecutorial misconduct, that the indictment must be dismissed. In other words, the prosecutor's actions so influenced the decision to indict that the grand jury's independence was compromised. *See United States v. Williams*, 504 U.S. 36, 49 (1992) ("Recognizing [the] tradition of independence [of the grand jury], we have said that the Fifth Amendment's constitutional guarantee *presupposes* an investigative body acting independently of either prosecuting attorney or judge.") (emphasis in original) (internal quotations and citations omitted). In *Williams*, Justice Stevens discussed the prosecutor's serious responsibility and high duty when communicating with a grand jury:

> Like the Hydra slain by Hercules, prosecutorial misconduct has many heads . . . the prosecutor operates without the check of a judge or a trained legal adversary, and virtually immune from public scrutiny. The prosecutor's abuse of his special relationship to the grand jury poses an enormous risk to defendants as well. For while in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened.

*Id.* at 60, 62-63 (Stevens, J., dissenting) (internal citations and quotations omitted).

Dismissal is required if the grand jury was substantially influenced or if there is grave doubt that the decision to indict was not free from substantial influence. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988). Both problems exist here because (i) the prosecutor **knowingly allowed false, perjured testimony** to be presented to the grand jury; (ii) the prosecutor **provided unsworn testimony** that Mr. Carpenter owed the Exchangors a fiduciary duty where no such duty existed as a matter of law; and (iii) the **prosecutor misled the grand jury** into believing that no legal dispute existed between Mr. Carpenter and the brokers. These acts constitute prosecutorial misconduct because Paley's testimony that he did not know Mr.

Carpenter invested the funds in stock options was patently false and the prosecutor knew that it was patently false. Moreover, due to the very nature of property exchanges under 26 U.S.C. § 1031, **no fiduciary relationship existed between BPE (let alone Mr. Carpenter) and the Exchangors as a matter of law**. *See* 26 C.F.R. § 1.1031(k)-1(k)(2) (definition of disqualified person); *United States v. Sigma Int'l, Inc.*, 244 F.3d 841, 872 (11th Cir. 2001), *reh'g en banc granted and opinion vacated by*, 287 F.3d 1325 (11th Cir. 2002) ("An AUSA testifying informally and unsworn to a grand jury therefore has the potential of overbearing the grand jury."). Finally, the prosecutor misleading the grand jury that no dispute existed between Mr. Carpenter and the brokers necessarily gave the impression that Mr. Carpenter believed that he (Mr. Carpenter) was to blame for the losses.[2]

In *United States v. Cerullo,* 2007 WL 2683799 (S.D. Cal. Sep. 7, 2007), an indictment charging a minister with filing a false tax return was dismissed due to prosecutorial misconduct in the grand jury. The key issue as to whether probable cause existed that a crime was committed was differentiating between earned income and gifts, and the prosecutor misled the grand jury on this vital issue:

> The prosecutor's conduct before the grand jury . . . fell to a level that misled the grand jury on this most critical issue. During the prosecutor's presentation, the grand jury asked at least three times about how to differentiate between earned income and gifts. Each time the prosecutor answered without mentioning the most critical factor: the donor's intent.

---

[2] Nor, contrary to the allegations in the indictment, was there any escrow arrangement. Although the Exchangors and BPE executed "escrow agreements," as a matter of law there was no legally valid escrow arrangement because "[a]n escrow is created when one party to a transaction delivers a sum to a third party, the escrow agent, for him or her to hold until the performance of a condition and then to deliver to the other party to the transaction." *Schlecht v. Smith*, 1994 WL 621594, *6 (D. Mass. Nov. 7, 1994) (Ponsor, J.) (finding no escrow arrangement and no fiduciary duty). There was no third party acting as escrow agent because all of the agreements between the Exchangors and BPE were *two-party* agreements. Furthermore, merely because a document is entitled "escrow agreement" does not mean that a valid escrow was established. "Merely characterizing an account as an 'escrow account' does not render it so." *Mercurius Inv. Holding, Ltd. v. Aranha*, 247 F.3d 328, 333 n.3 (1st Cir. 2001). The lack of a legally valid escrow arrangement in this case is yet another fatal defect in the indictment, and one upon which Mr. Carpenter will rely in a subsequent motion to dismiss.

*Id.* at *2. "[T]he prosecutor and the revenue agent witnesses failed to tell the grand jury that the donor's intent is the most critical factor. Their failure misled the grand jury and amounts to prosecutorial error." *Id.* at *3.

The situation involving the Carpenter grand jury was far worse than in *Cerullo*. Not only did the prosecutor give unsworn testimony which misled the grand jury on a vital issue regarding Mr. Carpenter's "fiduciary duty" to the Exchangors (which did not exist as a matter of law); and not only did the prosecutor again mislead the grand jury when it asked specifically whether a legal dispute existed between Mr. Carpenter and the brokers (to determine whether Mr. Carpenter blamed the $9 million loss on the brokers); but the prosecutor committed a third act of prosecutorial misconduct when he knowingly allowing the FBI agent to recount Paley's false and perjured statements to the grand jury. The prosecutor's informal testimony that a "fiduciary relationship" existed misled the grand jury into thinking that Mr. Carpenter had somehow breached a fiduciary duty that, as a matter of law, did not exist. The prosecutor's failure to inform the grand jury that no "fiduciary relationship" existed as a matter of law, in addition to the other grounds, amounts to prosecutorial misconduct requiring dismissal of the indictment, just as was done in *Cerrullo*.

"Those whose duty it is to enforce the law must obey the law themselves." *United States v. D'Angiolillo*, 340 F.2d 453, 456 (2d Cir. 1965). The presence of double hearsay based on false statements and perjury, together with affirmative acts by the prosecutor to mislead the grand jury regarding the cause of the losses, as well as the prosecutor giving unsworn, informal testimony that attempted to create an otherwise non-existent legal obligation by Mr. Carpenter, all require dismissal. "To let the [Carpenter] indictment stand under these circumstances would

make a mockery out of the entire grand jury process and would render the Grand Jury Clause a nullity." *United States v. Leeper*, 2006 WL 1455485, *5 (W.D.N.Y. May 22, 2006).[3]

## II. PRESUMED GRAND JURY BIAS REQUIRES DISMISSAL.

The Deputy Foreperson (Participant # 100398784) of the grand jury in this case was the manager of the Trust and Estate Planning Department in the Boston office of Goodwin Procter LLP, the same office of the same law firm that has represented PaineWebber in this and all other BPE-related matters since early 2001—including an NASD arbitration filed by BPE (at Mr. Carpenter's direction) against PaineWebber in December 2003. BPE prevailed in that arbitration and received what is now a $15 million judgment against PaineWebber that was entered in New York state court in April 2007. *See In re UBS PaineWebber, Inc.*, Index No. 600156/06 (N.Y. Commercial Div. Apr. 18, 2007). The Boston office of Goodwin Procter has been and remains actively involved in this and all other BPE-related proceedings on behalf of PaineWebber.[4]

The grand jury that returned both the original (Dkt. #1) and superseding (Dkt. #34) indictments in this case was impaneled in April 2003 and was dismissed in late 2004. It

---

3 The original indictment was returned by the grand jury and signed by the Deputy Foreperson and the former AUSA in the afternoon on February 4, 2004. The next day, the former AUSA issued a press release announcing the indictment and which erroneously and maliciously implied that Mr. Carpenter had stolen or embezzled $9 million. *See* Press Release, U.S. Dept. of Justice, *Former Chairman of Newton Corporation Charged With $9 Million Fraud* (Feb. 5, 2004) ("The Indictment charges CARPENTER with fraudulently misappropriating approximately $9 million in client funds that had been entrusted to Benistar Property to hold in escrow."). The following day, it was reported that *on the same day that the indictment was returned*, the U.S. Attorney for the District of Massachusetts had been publicly criticized for a perceived lack of focus on pursuing white-collar crimes. *See Federal Judge Accuses U.S. Attorney of Letting Corruption Slide*, THE BOSTON GLOBE, Feb. 6, 2004, at B-1 ("A federal judge criticized U.S. Attorney Michael J. Sullivan, saying he went after drug and gun cases that belonged in state court while overlooking public corruption and white-collar offenses that have a larger impact."). The timing of the indictment suggests that Mr. Carpenter was hastily charged, primarily in response to the harsh criticism leveled by Judge Wolf.

4 PaineWebber has appealed the judgment to the Appellate Division of the New York state court, and the Boston office of Goodwin Procter is co-counsel in that appeal. The Boston office of Goodwin Procter is also counsel for PaineWebber in the appeal of the ongoing state court civil litigation involving the Exchangors, BPE, Mr. Carpenter, Merrill Lynch and PaineWebber, which is currently pending in the Massachusetts Supreme Judicial Court. *See Cahaly v. Benistar, Ltd.*, 871 N.E.2d 491 (Mass. 2007).

consisted of 23 regular members and 10 alternates. The Deputy Foreperson held a leadership position in the grand jury. *See* Fed. R. Crim. P. 6(c) ("The court will appoint one juror as the foreperson and another as the deputy foreperson."). However, the Deputy Foreperson had a legal and financial conflict of interest in Mr. Carpenter's indictment because Mr. Carpenter has always maintained that PaineWebber caused the $9 million loss in this case, and the grand jury's indictment of Mr. Carpenter would deflect blame from PaineWebber. This conflict of interest is exacerbated by BPE's $15 million judgment against PaineWebber for causing the $9 million loss at the center of this case. The Deputy Foreperson's leadership role in the grand jury, including the fact that the Deputy Foreperson's signature appears on both the original and superseding indictments, taints the entire grand jury proceeding. Such a clear violation of Mr. Carpenter's right to an unbiased grand jury requires dismissal of the indictment.

There can be little doubt that, since early 2001 (when the civil litigation began), if Mr. Carpenter had asked the Trust and Estate Planning Department of the Boston office of Goodwin Procter to draft his will, that after completing a conflicts check, the firm (perhaps even the Deputy Foreperson) would have quickly shown Mr. Carpenter the door. Such an obvious conflict of interest would not be excused in a disciplinary proceeding involving Goodwin Procter, *see* SJC Rule 3:07, Rule 1.7(a) ("A lawyer shall not represent a client if the representation of that client will be directly adverse to another client"), nor can it be excused where Goodwin Procter's manager occupies a leadership position in a grand jury that decides to indict a party against whom one of Goodwin Procter's largest clients is actively litigating at the time. *See* SJC Rule 3:07, Rule 1.10(a) (imputed disqualification for a law firm). The Deputy Foreperson clearly had an interest in the outcome of the grand jury proceedings (the indictment

of Mr. Carpenter), which would likely inure (directly or indirectly) to the Deputy Foreperson's professional and/or monetary benefit.

It also appears that attorneys in the Boston office of Goodwin Procter might have been tipped off in late January/early February 2004 that an indictment of Mr. Carpenter was imminent. BPE commenced the NASD arbitration proceeding against PaineWebber on December 10, 2003. PaineWebber's answer was filed on February 3, 2004—*the day before the grand jury returned the original indictment in this case*. *See* Dkt. #1. PaineWebber's answer asserted as a defense that BPE's claims "are barred by its intentional acts and *criminal misconduct*." PaineWebber's Answer to Statement of Claim at 21 (Feb. 3, 2004) (emphasis added). It is unethical for a lawyer, and simply unheard of for a law firm of Goodwin Procter's reputation, to impute criminality to an adversary in a civil proceeding in order to gain a tactical advantage. *See* SJC Rule 3:07, Rule 3.4(h) ("A lawyer shall not . . . present, participate in presenting, or threaten to present criminal or disciplinary charges solely to obtain an advantage in a private civil matter."). PaineWebber's assertion in an arbitration pleading that criminal misconduct occurred would constitute a clear violation of the Rules of Professional Conduct, unless an indictment had been issued or was imminent. The curious timing of these events begs the question: How would Goodwin Procter's Boston office obtain such knowledge just prior to the grand jury's return of Mr. Carpenter's indictment?

Even more troubling is the fact that although PaineWebber's answer was filed by Goodwin Procter on February 3, 2004, Goodwin Procter had requested a 10-day extension to February 13, 2004 in which to file an answer. The extension request was denied by the NASD, thereby forcing PaineWebber's answer to be filed by the original deadline of February 3, 2004. Although not clear at the time, it now appears that Goodwin Procter sought the extension

because it had been tipped off that Mr. Carpenter would be indicted sometime before February 13, which would have provided substantially more grist for PaineWebber's answer if it could have included an assertion that an indictment had, in fact, been returned against Mr. Carpenter. There is no other plausible explanation for "one of the nation's leading law firms, with a team of 850 attorneys," *Goodwin Procter Advertisement*, 36 M.L.W. 1553 (Mar. 17, 2008), to risk committing an ethical violation by alleging "criminal misconduct" in an arbitration pleading, unless the law firm had information on good authority that an indictment in the matter was imminent. Mr. Carpenter requests an opportunity to conduct discovery and to have an evidentiary hearing into this issue if the Court otherwise denies this Motion.

A fundamental guarantee of the Grand Jury Clause of the Fifth Amendment is that an indictment must be returned by an impartial grand jury. *See* U.S. Const. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."); *Lawn v. United States*, 355 U.S. 339, 349-50 (1958) (holding grand jury must be legally constituted and unbiased). An indictment can be dismissed for a constitutional violation that renders the grand jury proceedings so fundamentally unfair that prejudice must be presumed. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 256-57 (1988) (holding that prejudice is presumed where "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair.").

"[N]o man is permitted to try cases where he has an interest in the outcome." *In re Murchison*, 349 U.S. 133, 136 (1955). Jurors who have a relationship with a party are "automatically presumed bias[ed]." *United States v. Torres*, 128 F.3d 38, 45 (2d Cir. 1997) (quoting 3 William Blackstone, *Commentaries* *480-81 (stating that a juror has implied bias if he is a party's attorney or has an interest in the case)); *see also Caterpillar, Inc. v. Sturman Indus.*,

387 F.3d 1358, 1373 (Fed. Cir. 2004) (holding that juror was impliedly biased because her "financial well-being was to some extent dependent upon defendant's.") (internal quotations omitted).

In early 2001, the original judge assigned to preside over the related state court civil proceedings, the Hon. Allan van Gestel (ret.), was forced to recuse himself because he had previously worked at the Boston office of Goodwin Procter and PaineWebber was a party to the action being represented by Goodwin Procter's Boston office. If Judge van Gestel was required to recuse himself from a *civil* case on account of the relationship between PaineWebber and Goodwin Procter's Boston office, then certainly the Deputy Foreperson's recusal was required in a *criminal* case involving the exact same parties and subject matter—especially where the Deputy Foreperson held a leadership role in the grand jury in charge of the investigation. "The concept of implied bias is well-established in the law . . . a court must excuse a juror for cause if the juror is related to one of the parties in the case, or if the juror has even a tiny financial interest in the case." *United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000) (finding implied bias where juror was an employee of U.S. Attorney's office).

Grand jury bias (whether actual or presumed) infects the entire grand jury process. Given the unique facts and circumstances of this case, the risk is simply too great that the Deputy Foreperson (who might have tipped off her employer that an indictment of Mr. Carpenter was imminent) contaminated the grand jury's deliberations by steering the other members of the grand jury away from blaming PaineWebber for the $9 million loss and instead blaming (and indicting) Mr. Carpenter. Because the Deputy Foreperson was in the unique leadership position to "shift blame" from PaineWebber to Mr. Carpenter, bias must be presumed as a matter of law and, as a result, Mr. Carpenter's indictment must be dismissed.

## III. THE DURATIONAL RESIDENCE REQUIREMENT IS UNCONSTITUTIONAL.

Section 10(a)(3) of the Court's Plan For Random Selection of Jurors ("Jury Plan") provides that a grand or petit juror is *automatically disqualified* from serving if "he or she . . . has not resided within the judicial district for a period of one year or more." Jury Plan § 10(a)(3) (Nov. 2000).[5] This one-year durational residence requirement most likely originates from the 1968 amendment to the Jury Selection and Service Act, 28 U.S.C. § 1865(b), which disqualifies someone from serving on a federal grand or petit jury "unless he . . . has resided for a period of one year within the judicial district." 28 U.S.C. § 1865(b)(1) (the "Statute").[6] Both the Statute and the Jury Plan are unconstitutional *as applied to Mr. Carpenter* because the durational residence requirement imposed on all federal grand and petit jurors in this case violates the constitutional right to travel and the guarantees of equal protection of the laws embedded in the Due Process Clause of the Fifth Amendment. *See* U.S. Const. amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law."); *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954) (equal protection guarantees extend to the federal government's actions via the Due Process Clause of the Fifth Amendment).

Mr. Carpenter makes an *as applied* challenge to the durational residence requirement in the Statute and the Jury Plan because the residence requirement guaranteed that a "Connecticut Yankee" like Mr. Carpenter would be investigated and indicted by a grand jury comprised solely of long-time Massachusetts residents, who naturally would be expected to harbor sympathies for Massachusetts "victims," and instead would prefer to blame the $9 million loss on someone from

---

[5] The Jury Plan in place when the grand jury was impaneled was the November 2000 version. The Jury Plan was substantially amended in March 2007, but the provision at issue here remains unchanged. *Compare* Jury Plan § 10(a)(3) (Nov. 2000), *with* Jury Plan § 9(a)(iii) (Mar. 2007).

[6] The original version of the Statute, enacted in 1948, did **not** contain a durational residence requirement. *See* 62 Stat. 951, c. 646, 80th Cong., 2d Sess. (June 25, 1948) ("Any citizen of the United States who has attained the age of 21 years and *resides* within the judicial district, is competent to serve as a grand or petit juror.") (emphasis added).

Connecticut who had no connection whatsoever to Massachusetts (rather than a Massachusetts citizen (Paley) who ran the entire BPE operation from the Boston area). In other words, the durational residence requirement subjected Mr. Carpenter "to the verdict of mere strangers, who may feel no common sympathy, or who may even cherish animosities or prejudices against him." 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 925 (Boston, Hilliard, Gray & Co. 1833). The likelihood of local grand jury bias against Mr. Carpenter is heightened in this case because, when given the opportunity to indict a Connecticut resident (Mr. Carpenter) and/or a Massachusetts resident (Paley), the grand jury chose to indict *only* the Connecticut resident.[7]

The durational residence requirement violates the right to travel in this case because it acts as a "penalty" imposed on newly-arrived Massachusetts citizens, who are prevented from participating "in civic life," *Powers v. Ohio*, 499 U.S. 400, 409 (1991), due solely to their length of residency. Such a restriction is subject to strict scrutiny, *i.e.*, whether it is narrowly tailored to further a compelling governmental interest. Because no such interest exists, the durational residence requirement is clearly unconstitutional *as applied to Mr. Carpenter*.[8]

### A. <u>Mr. Carpenter Has Standing</u>.

A citizen's right not to suffer discrimination in grand jury selection and a defendant's right to a fair and impartial grand jury are bedrock constitutional principles. *See Strauder v. West Virginia*, 100 U.S. 303, 309 (1879) (overturning state law limiting grand and petit jury

---

7 Mr. Carpenter does not make a facial challenge to the durational residence requirement because such a challenge would not make sense if made, for example, by a resident of South Boston (who lives only a mile from the Boston Federal Courthouse) who is indicted by a grand jury made up entirely of residents of Eastern Massachusetts (or perhaps even Suffolk County).

8 Undersigned counsel was one of five commenters who submitted suggestions to the Court's Jury Plan Committee prior to last year's adoption of the new Jury Plan. Counsel's suggestions, which mirror the arguments raised in this motion, "were more far-reaching than the changes the Committee proposed [and] remain under study by the Committee." Notes of the Jury Plan Committee at 8 (Mar. 2007).

service to white males); *Tennessee v. Lane*, 541 U.S. 509, 524-25 n.9 & n.14 (2004) (suggesting that jury service is a fundamental right). Although a criminal defendant has no right to a grand jury composed in whole or in part of the defendant's own race, sex, or national origin, "he or she does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria." *Powers*, 499 U.S. at 404.[9]

Even though Mr. Carpenter is not a newly-arrived Massachusetts citizen, he clearly has standing to raise the equal protection claims of persons—in this case newly-arrived Massachusetts citizens—who have been disqualified from grand jury service due solely to their length of residency. *See id.* at 415 ("We conclude that a defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the [government] because of their [newly-arrived status]."); *Campbell v. Louisiana*, 523 U.S. 392 (1998) (holding white defendant has standing to raise an equal protection challenge to discrimination against black persons in the selection of his grand jury).

More importantly, Mr. Carpenter, as a Connecticut defendant in a Massachusetts federal criminal proceeding (*i.e.*, a "Connecticut Yankee" hauled before a Boston-based grand jury), clearly has standing to challenge the make-up of the grand jury on which newly-arrived Massachusetts citizens were automatically disqualified from serving. Included in that clearly identifiable and suspect class, obviously, are people who moved into Massachusetts from Connecticut (or elsewhere) during the year preceding the formation of the grand jury. The exclusion of newly-arrived Massachusetts citizens from Connecticut and elsewhere not only caused substantial harm to Mr. Carpenter because it deprived him of the right to a fair and impartial grand jury, *i.e.*, one less susceptible to prejudice against out-of-state residents (like Mr.

---

[9] The basic principles prohibiting exclusion of persons from jury service "are essentially the same for grand juries and for petit juries." *Alexander v. Louisiana*, 405 U.S. 625, 626 n.3 (1972).

Carpenter, who was indicted) and local bias in favor of Massachusetts residents (like Paley, who was not indicted), but also guaranteed that only those persons with Massachusetts-centric proclivities would comprise his grand jury.[10] *See Peters v. Kiff*, 407 U.S. 493, 498 (1972) ("The exclusion of [newly-arrived residents] from jury service, like the arbitrary exclusion of any other well-defined class of citizens, offends a number of related constitutional values."). Mr. Carpenter has standing to challenge the make-up of his grand jury because he has suffered direct and identifiable harm (being indicted) caused by an unconstitutional grand jury.

**B. <u>The Durational Residence Requirement Violates The Right To Travel</u>.**

In *United States v. Arnett*, 342 F. Supp. 1255 (D. Mass. 1970), the constitutionality of the durational residence requirement found in the Statute was upheld in a two-sentence ruling that merely recited the legislative history of the Statute and in which no constitutional analysis was undertaken. *See id.* at 1261 ("The residential requirement 'assures some substantial nexus between a juror and the community whose sense of justice the jury as a whole is expected to reflect.'") (quoting S.Rep. No. 891, 90th Cong., 1st Sess.; H.Rep. No. 1076, 90th. Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 1792, 1796).[11]

*Arnett* and similar cases from other circuits upholding the durational residence requirement (i) predate the maturation of the right to travel as delineated by the Supreme Court; (ii) contain outdated, overly simplistic or clearly erroneous reasoning in light of the Supreme Court's recent cases on the subject; and/or (ii) fail to apply strict scrutiny analysis. *See, e.g.*,

---

[10] Paley ran BPE's operations from the basement of his home in Newton, Massachusetts.

[11] The purpose of the durational residence requirement, as explained in the legislative history, runs afoul of the underlying rationale supporting the federal judiciary as being less susceptible to local bias. *See, e.g.*, 28 U.S.C. § 1441 *et seq.* (providing out-of-state civil defendants the means to avoid local bias by removing cases from state court to federal court). Denying newly-arrived Massachusetts citizens the right to sit on grand and petit juries thereby prejudices out-of-state civil and criminal defendants (like Mr. Carpenter), because out-of-state defendants are judged by people who presumably have more of a local bias by virtue of their longer residence in (and connection to) Massachusetts.

*United States v. Perry*, 480 F.2d 147 (5th Cir. 1973); *United States v. Duncan*, 456 F.2d 1401 (9th Cir. 1972); *United States v. Ross*, 468 F.2d 1213 (9th Cir. 1972); *United States v. Gast*, 457 F.2d 141 (7th Cir. 1972); *United States v. Blair*, 493 F. Supp. 398 (D. Md. 1980); *United States v. Rosenthal*, 482 F. Supp. 867 (M.D. Ga. 1979); *United States v. Armsbury*, 408 F. Supp. 1130 (D. Or. 1976); *Wilkins v. Maryland*, 402 F. Supp. 76 (D. Md. 1975); *United States v. Huber*, 457 F. Supp. 1221 (S.D.N.Y. 1978); *United States v. Grey*, 355 F. Supp. 529 (W.D. Okl. 1973). All of these cases have been effectively overruled by the Supreme Court's durational residence cases, which began with *Shapiro v. Thompson*, 394 U.S. 618 (1969) (welfare benefits).

In *Dunn v. Blumstein*, 405 U.S. 330 (1972), a newly-arrived Tennessee resident (who happened to be a law professor) attempted to register to vote in the upcoming state election but was rebuffed because Tennessee had a one-year durational residence requirement in order to be eligible to vote in state elections. A three-judge federal court found the requirement unconstitutional because it created a "suspect" classification penalizing some Tennessee residents because of recent interstate movement. The Supreme Court agreed:

> Durational residence laws penalize those persons who have traveled from one place to another to establish a new residence during the qualifying period. Such laws divide residents into two classes, old residents and new residents, and discriminate against the latter to the extent of totally denying them the opportunity to vote.

*Id.* at 334-35. Reiterating that durational residence requirements are to be analyzed under strict scrutiny, *id.* at 335, the Supreme Court struck down the requirement because "Tennessee's durational residence laws classify bona fide residents on the basis of recent travel, penalizing those persons, and only those persons, who have gone from one jurisdiction to another during the qualifying period." *Id.* at 338.

The Supreme Court focused on the right to travel. "Travel is permitted, but only at a price; voting is prohibited." *Id.* at 341. "Durational residence laws impermissibly condition and

penalize the right to travel by imposing their prohibitions on only those persons who have recently exercised that right." *Id.* at 342. "In sum, durational residence laws must be measured by a strict equal protection test: **they are unconstitutional unless the State can demonstrate that such laws are necessary to promote a compelling governmental interest**." *Id.* at 342 (quotation omitted) (emphasis added). The durational residence requirement as applied to this case is unconstitutional because there is no "compelling governmental interest" that can be shown in discriminating against new residents and thereby guaranteeing that Mr. Carpenter would have a grand jury pool inclined to be biased against him as a nonresident.

In *Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974), Arizona imposed a one-year durational residence requirement for the receipt of free non-emergency medical care. Applying strict scrutiny, the Supreme Court struck down the requirement:

> Not unlike the admonition of the Bible that, 'Ye shall have one manner of law, as well for the stranger, as for one of your own country,' **the right of interstate travel must be seen as ensuring new residents the same right to vital government benefits and privileges in the States to which they migrate as are enjoyed by other residents**.

*Id.* at 261 (quoting Leviticus 24:22 (King James Version)) (emphasis added).

In *Zobel v. Williams*, 457 U.S. 55 (1982), Alaska issued its annual natural resources dividend to adult residents based on the length of each citizen's residence. Unlike the durational residence cases described above, however, the Alaska program did not impose any threshold waiting period on those seeking dividend payments. Even those who had lived in Alaska less than one year were eligible. Nevertheless, the statute created fixed, permanent distinctions among Alaska citizens based on how long they had lived in the State and paid higher dividends correlated to longer residencies. The Supreme Court applied equal protection analysis and, for the first time, admitted openly what had been previously inferred, *i.e.*, that analyses under the

right to travel and the right to equal protection are effectively the same. *See id.* at 61 ("In reality, the right to travel analysis refers to little more than a particular application of equal protection analysis."). After finding that the Alaska statute created "distinctions between residents based on when they arrived in the State," *id.* at 60, n.6, the Supreme Court struck down the Alaska statute. "Alaska's reasoning could open the door to state apportionment of other rights, benefits, and services according to length of residency. It would permit the States to divide citizens into expanding numbers of permanent classes. **Such a result would be clearly impermissible**." *Id.* at 64 (emphasis added).

In *Hooper v. Bernalillo County Assessor*, 472 U.S. 612 (1985), New Mexico granted a property tax exemption limited to those Vietnam veterans who resided in the State before May 8, 1976. Citing *Zobel*, the Supreme Court struck down the New Mexico statute:

> The State may not favor established residents over new residents based on the view that the State may take care of 'its own,' if such is defined by prior residence. **Newcomers, by establishing bona fide residence in the State, become the State's 'own' and may not be discriminated against solely on the basis of their arrival in the State after May 8, 1976**.

*Id.* at 623 (emphasis added).

In *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898 (1986), New York State provided civil service benefits to veterans who joined the armed forces at the time they were citizens of New York. Veterans who were New York residents, but who were not residents at the time they joined the armed forces, claimed the distinction was unconstitutional. The Supreme Court, applying strict scrutiny, agreed. "Because the creation of different classes of residents raises equal protection concerns, we have also relied upon the Equal Protection Clause in these [durational residence] cases. Whenever a state law infringes a constitutionally protected right, we undertake intensified equal protection scrutiny of that law." *Id.* at 904. "**[T]he right to**

**migrate protects residents of a State from being disadvantaged, or from being treated differently, simply because of the timing of their migration, from other similarly situated residents**." *Id.* (emphasis added). "For as long as New York chooses to offer its resident veterans a civil service employment preference, the Constitution requires that it do so without regard to residence at the time of entry into the services." *Id.* at 911-12.

Most recently, in *Saenz v. Roe*, 526 U.S. 489 (1999), California limited the maximum welfare benefits available to residents who had lived in the State for less than one year. In affirming the invalidation of the law, the Supreme Court focused on the right to travel:

> The 'right to travel' discussed in our cases embraces at least three different components. It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, **for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State**.

*Id.* at 500 (emphasis added).

The clear weight of these modern Supreme Court precedents shows that the durational residence requirement found in the Statute and the Jury Plan (i) imposes an impermissible "penalty" on the right to travel because those U.S. citizens who move into Massachusetts are prevented from participating "in civic life," *Powers*, 499 U.S. at 409, for an entire year; and (ii) creates an impermissible classification between "new" and "old" citizens. Not only is this classification not narrowly tailored to further a compelling governmental interest, it is totally irrational—especially given the immense difficulty court clerks currently have in filling the "qualified jury wheel" with qualified jurors. *See In re United States*, 426 F.3d 1, 3 (1st Cir. 2005).

Furthermore, there can be no basis to defend the durational residence requirement as applied to this case because, until 1968, the requirement did not exist. Although the legislative

history is sparse, given the tumultuous tenor of the times that existed in March 1968 when the amendment to the Statute was adopted, it could be argued that the real purpose behind the amendment was to preclude certain newly-arrived minorities (racial and otherwise) from serving on juries in previously segregated communities. In fact, in the Voting Rights Act Amendments of 1970, Congress prohibited the application of durational residence requirements in Presidential elections. *See* 42 U.S.C. § 1973aa-1(c) ("[n]o citizen of the United States who is otherwise qualified to vote in any election for President and Vice President shall be denied the right to vote . . . because of the failure of such citizen to comply with any durational residency requirement."). Given that Congress outlawed durational residence requirements in Presidential elections two years after amending the Statute, there is a very strong case to be made that the durational residence requirement is not only completely irrational and unconstitutional, but was erected upon a less-than-noble foundation.

In sum, if a person is a U.S. citizen over 18 years of age and is otherwise qualified to serve on a federal grand or petit jury, that person does not automatically lose the capacity to serve simply because of recently migrating into the forum state.[12] Because the durational residence requirement found in the Statute and the Jury Plan, *as applied to Mr. Carpenter*, renders both the Statute and the Jury Plan unconstitutional, Mr. Carpenter's indictment must be dismissed.

## **CONCLUSION**

For all of the foregoing reasons, the indictment in this case must be dismissed.

[12] For example, a resident of Enfield, Connecticut, who recently moved just over the border into Longmeadow, Massachusetts, is now disqualified from serving as a grand or petit juror in the District of Massachusetts (Western Division in Springfield) for an entire year solely because of that person's recent decision to move one town over the border into Massachusetts. Moreover, because of its geographic location, Enfield has the same community of interest with Springfield as with Hartford—so even the avowed legislative purpose for the durational residence requirement is not furthered in this example.

Respectfully submitted,
DANIEL E. CARPENTER,
By his attorneys,

*/s/ Jack E. Robinson*
Jack E. Robinson
(BBO #559683)
2187 Atlantic Street, Suite 905
Stamford, CT 06902
(203) 425-4500

Dated: March 25, 2008

**VERIFICATION**

Pursuant to 28 U.S.C. §§ 1746(2) and 1867(d), I hereby verify under penalty of perjury that the following factual statements, *i.e.*, that (i) the Statute and the Jury Plan contain a one-year durational residence requirement, (ii) Mr. Carpenter was a resident of Simsbury, Connecticut at the time of the indictment and remains so today, and (iii) Paley was a resident of Newton, Massachusetts at the time of the indictment, are true and correct. Executed on March 25, 2008.

*/s/ Jack E. Robinson*
Jack E. Robinson

**LOCAL RULE 7.1(A)(2) STATEMENT**

Mr. Carpenter's counsel has conferred with Jonathan F. Mitchell and Jack W. Pirozzolo, AUSAs, in a good faith but unsuccessful attempt to resolve or narrow the issue.

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system on the date hereof will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Jack E. Robinson*
Jack E. Robinson