# ATTACHMENT B

Westlaw.

2007 WL 4892049 (Mass.)                                                    Page 1

For Opinion See <u>2008 WL 1960356</u>

Supreme Judicial Court of Massachusetts.
Gail A. CAHALY, Jeffrey M. Johnston; Bellemore Associates, LLC; Massachusetts Lumber
Company, Inc.; Joseph Iantosca, Individually and as Trustee of the Faxon Heights
Apartments Realty Trust and Fern Realty Trust; and Belridge Corporation,
Plaintiffs-Appellants,
v.
BENISTAR PROPERTY EXCHANGE TRUST CO., INC.; Benistar, Ltd.; Benistar Employer Services
Trust Corporation; Benistar Admin Services, Inc.; Carpenter Financial Group, LLC; Molly
Carpenter; Daniel Carpenter; Merrill Lynch Pierce Fenner & Smith, Inc.; and UBS Financial
Services Inc. f/k/a UBS Painewebber Inc., Painewebber, Inc., Defendants-Appellees and
cross-Appellants.
No. SJC-10041.
November 7, 2007.

On Further Appellate Review From The Appeals Court, No. 2005-P-1717

Brief and Supplemental Appendix of the Benistar Defendants-Appellees and
Cross-Appellants

<u>Brooks L. Glahn</u>, BBO #648308, Adler, Cohen, Harvey, Wakeman & Guekguezian LLP, 75 Federal
Street, Boston, Massachusetts 02110, (617) 423-6674.<u>Jack E. Robinson</u>, BBO #559683, 2187
Atlantic Street, Suite 905, Stamford, Connecticut 06902, (203) 425-4500.<u>Gary R.
Greenberg</u>, BBO #209420, Greenberg Traurig, LLP, One International Place, Boston,
Massachusetts 02110, (617)310-6000.<u>Arthur R. Miller</u>, BBO #554226, 1525 Massachusetts
Avenue, Cambridge, Massachusetts 02138, (617) 495-4111.

**\*i** TABLE OF CONTENTS

TABLE OF AUTHORITIES ... iii

ISSUES PRESENTED FOR REVIEW ... 1

STATEMENT OF THE CASE ... 2

A. Introduction ... 2

B. Nature of the Case ... 5

C. Relevant Proceedings and Disposition Below ... 8

D. Statement of Relevant Facts ... 14

 1. Transactional Facts ... 14

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2. Jurisdictional Facts ... 18

SUMMARY OF ARGUMENT ... 19

ARGUMENT ... 20

I. THERE IS NO PERSONAL JURISDICTION OVER THE BENISTAR DEFENDANTS ... 20

 A. Constitutional Limits ... 20

 B. Long-arm Statute ... 22

 C. Jurisdictional Standards ... 22

  1. No Jurisdiction Over Phase III Defendants ... 23

  2. No Jurisdiction Over The Carpenters ... 25

   a. Molly Carpenter ... 25

   b. Daniel Carpenter ... 29

    i. No "Transacting Business". ... 29

    ii. No "Causing Tortious Injury" ... 30

   2. The Doctrine Of Corporate Disregard Cannot Be Used To Establish Personal
Jurisdiction ... 33

*ii II. BENISTAR DEFENDANTS ARE ENTITLED TO A NEW TRIAL ... 36

 A. Paley's Newly Discovered Evidence Warrants A New Trial For The Benistar Defendants
... 36

 B. Possible Jury Misconduct Warrants A New Trial ... 44

III. BENISTAR DEFENDANTS ARE NOT LIABLE TO PLAINTIFFS ... 45

 A. No Contract Liability ... 45

 B. No Tort Liability ... 47

  1. Massachusetts Economic Loss Doctrine ... 47

  2. Wrong Law Applied on Corporate Disregard ... 48

CONCLUSION ... 49

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CERTIFICATION ... 51

*iii TABLE OF AUTHORITIES

Cases:

"Automatic" Sprinkler Corp. of America v. Seneca Foods Corp., 361 Mass. 441 (1972) ...
22

Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano County, 480 U.S. 102 (1987) ...
28

Bay State-Spray & Provincetown S.S., Inc. v. Caterpillar Tractor Co., 404 Mass. 103 (1989)
... 47-48

Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985) ... 21

Cahaly v. Benistar Property Exchange Trust Co., Inc., 68 Mass. App. Ct. 668 (2007) ...
13, 33, 48

Cahaly v. Benistar Property Exchange Trust Co., Inc., 268 Conn. 264, 842 A.2d 1113 (Conn.
2004) ... 9

Cahaly v. Benistar Property Exchange Trust Co., Inc., 449 Mass. 1107 (2007) ... 14

Cahaly v. Benistar Property Exchange Trust Co., Inc., No. 2005-P-1717, slip op. at 2
(Mass. App. Ct. May 15, 2007) ... 13

Cahaly v. Somers, 52 Mass. App. Ct. 1104 (2001) (Table) (unpublished), 2001 WL 766154
(Mass. App. Ct. Jul. 9, 2001), review denied, 435 Mass. 1108 (2002) ... 46

Chase Precast Corp. v. Paonessa Co., Inc., 409 Mass. 371 (1991) ... 45-46

Clark v. Rowe, 428 Mass. 339 (1998) ... 48

Colley v. Benson, Young & Downs Ins. Agency, Inc., 42 Mass. App. Ct. 527 (1997) ... 36

*iv Commonwealth v. Fidler, 377 Mass. 192 (1979) ... 44

Commonwealth v. Soils, 407 Mass. 398 (1990) ... 44

Cunningham v. Ardrox, Inc., 40 Mass. App. Ct. 279 (1996) ... 31

East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986) ... 47

FMR Corp. v. Boston Edison Co., 415 Mass. 393 (1993) ... 47

Gilmore v. Century Bank & Trust Co., 20 Mass. App. Ct. 49 (1985) ... 39

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Good Hope Indus., Inc. v. Ryder Scott Co.*, 378 Mass. 1 (1979) ... 22, 23

*Hanson v. Denckla*, 357 U.S. 235 (1958) ... 21

*In re UBS PaineWebber, Inc.*, Index No. 600156/06 (N.Y. Sup. Ct. Apr. 18, 2007) ... 4

*Intech, Inc. v. Triple "C" Marine Salvage, Inc.*, 444 Mass. 122 (2005) ... 22, 29-30

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ... 20, 22

*Johnson v. Witkowski*, 30 Mass. App. Ct. 697 (1991) ... 30

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ... 34

*Leavitt v. Mizner*, 404 Mass. 81 (1989) ... 37

*Lily Trans. Corp. v. Royal Institutional Serv., Inc.*, 64 Mass. App. Ct. 179, *review denied*, 445 Mass. 1105 (2005) ... 49

*Markee v. Biasetti,* 410 Mass. 78 (1991) ... 44

**v** *Mass. Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26 (1st Cir. 1998) ... 31

*Miller v. Miller*, 448 Mass. 320 (2007) ... 23

*Morris v. Unum Life Ins. Co. of America*, 66 Mass. App. Ct. 716 (2006), *review denied,* 447 Mass. 1109 (2006) ... 28, 33

*Ramsdell v. Doliber*, 59 Mass. App. Ct. 446 (2003) ... 37

*Realty Developing Co., Inc. v. Wakefield Ready-Mixed Concrete Co., Inc.*, 327 Mass. 535 (1951) ... 45

*Roberts v. Legendary Marine Sales*, 447 Mass. 860 (2006) ... 22

*Rush v. Savchuk*, 444 U.S. 320 (1980) ... 34, 35

*Stagecoach Transp., Inc. v. Shuttle, Inc.*, 50 Mass. App. Ct. 812 (2001) ... 44

*Tatro v. Manor Care, Inc.*, 416 Mass. 763 (1994) ... 24

*Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood,* 752 A.2d 1175 (Del. Ch. 1999) ... 49

*Wojcicki v. Cragher*, 447 Mass. 200 (2006) ... 38

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980) ... 21

Statutes and Other Authorities:

26 Code Fed. Regs. § 1.1031(k)-1 ... 3

26 Code Fed. Regs. § 1.1031(k)-1 (g) (4) ... 6

26 Code Fed. Regs. § 1.1031(k)-1(k) (2) ... 3, 7, 10

G. L. c. 93A ... 2, 11, 26, 27, 43

G. L. c. 223A ... 22

G. L. c. 223A, §3 ... 24

**\*vi** G. L. c. 223A, §3(a) ... 29, 33

G. L. c. 223A, §3(d) ... 29, 30, 33

I.R.C. § 1031 ... 3, 5, 15, 39, 41

I.R.C. § 1031(a) ... 3

Mass. R. A. P. 16(a) (6) ... 51

Mass. R. A. P. 16(e) ... 51

Mass. R. A. P. 16(f) ... 51

Mass. R. A. P. 16(h) ... 51

Mass. R. A. P. 16(i) ... 2

Mass. R. A. P. 16(k) ... 51

Mass. R. A. P. 18 ... 51

Mass. R. A. P. 20 ... 51

Mass. R. A. P. 27.1 ... 13

Mass. R. A. P. 27.1(f) ... 2

Mass. R. Civ. P. 64 (a) ... 13

L. Brilmayer & C. Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process,*
105 HARV. L. REV. 1217 (1992) ... 34

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

L. Hoffman, The *Case Against Vicarious Jurisdiction*, 152 U. PA. L. REV. 1023 (2004) ... 36

Stuart M. Riback, Note, The *Long Arm and Multiple Defendants: The Conspiracy Theory of In Personam Jurisdiction*, 84 COLUM. L. REV. 506 (1984) ... 35

TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, U.S. DEP'T OF TREASURY, PUBL'N NO. 2007-30-172, Like-Kind Exchanges Require Oversight to Ensure Taxpayer Compliance 7 (2007) ... 6

**ISSUES PRESENTED FOR REVIEW**

I. Did the trial court improperly exercise personal jurisdiction over the Benistar Defendants, all but one of whom are nonresidents that had no contacts with Massachusetts or the plaintiffs?[FN1]

> FN1. The "Benistar Defendants" are Benistar Property Exchange Trust Co., Inc. ("BPE"); Benistar Employer Services Trust Corp.; Benistar Admin Services, Inc.; Carpenter Financial Group, LLC; Benistar Ltd.; Daniel Carpenter; and Molly Carpenter. BPE is the only Benistar Defendant not seeking dismissal for lack of personal jurisdiction because BPE is the only Benistar Defendant that had contacts with Massachusetts or the plaintiffs. The other defendants-appellees are Merrill Lynch & Co., Inc. ("Merrill Lynch") and UBS PaineWebber, Inc. ("PaineWebber"). Plaintiffs- appellants are Gail A. Cahaly; Jeffrey M. Johnston; Bellemore Associates, LLC; Massachusetts Lumber Company, Inc.; Joseph Iantosca, individually and as Trustee of the Faxon Heights Apartments Realty Trust and the Fern Realty Trust; and Belridge Corporation.

II. Are the Benistar Defendants entitled to a new trial based on possible jury misconduct and newly discovered evidence that resulted in a new trial regarding Merrill Lynch?

III. Are the Benistar Defendants insulated from liability to the plaintiffs due to PaineWebber's proven supervening misconduct and the Massachusetts Economic Loss Doctrine?

**STATEMENT OF THE CASE**

**A. Introduction.**

The Benistar Defendants, defendants-appellees and cross-appellants, respectfully submit this opening brief pursuant to Mass. R. A. P. 16(i) and 27.1(f).[FN2]

> FN2. Plaintiffs have resubmitted all of their Appeals Court briefs in this Court. The Benistar Defendants' reply brief is due November 27, 2007.

Looking beyond plaintiffs' rhetoric, this case is simply a business dispute involving sophisticated parties seeking to assign blame for $8.6 million in investment losses arising from the stock market collapse in late 2000. JA.3139.[FN3] Unfortunately, the case mushroomed into a judgment for double damages, attorneys' fees and costs totaling $19 million (JA.3139; 3319-23) based on legally untenable findings of breach of contract, conversion, fraud, breach of fiduciary duty, and violations of G. L. c. 93A, all of which

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are predicated on a verdict rendered by a jury that invited plaintiffs' counsel out for "some beers" (SA.2) immediately after the trial.

> FN3. "JA." refers to the 20-volume Joint Appendix filed by the plaintiffs. The
> Appeals Court granted the Benistar Defendants permission to file a Supplemental
> Appendix ("SA."), which follows the Addendum herein.

Plaintiffs describe this case as involving a "Ponzi scheme" (Pl. Br. 1, 15, 19, 60), where BPE engaged in the "conversion of plaintiffs' funds" (Pl. Br. 24), by "illegally trading its clients' escrowed funds in high risk [stock] options." Pl. Br. 51. The reality, however, is very different. There was no Ponzi scheme.[FN4] BPE was a bona fide "qualified intermediary" conducting I.R.C. § 1031 Tax Deferred Exchanges that, from October 1998 through December 2000, successfully completed over $100 million in like-kind property exchanges for 119 out of 126 exchangors ("Exchangors"). JA.1495-98; 6912; 6979-7036; 7101-7526; 7533-91; 7602-79; 7823-7973; 8347-96; 8440-42; 10291-10605. Neither I.R.C. § 1031(a), the "safe harbor" provided by 26 Code Fed. Regs. § 1.1031(k)-1 nor, most importantly, BPE's written agreements with the Exchangors, prohibited BPE's investments in stock options. Furthermore, 26 Code Fed. Regs. § 1.1031(k)-1(k)(2) (definition of disqualified person) precluded BPE from being in a fiduciary relationship with the Exchangors.

> FN4. There was neither a finding by the trial court of a Ponzi scheme nor did the
> plaintiffs allege the existence of one in their pleadings.

As a result, there was nothing illegal or fraudulent about BPE's investments in stock options. Nor did the Benistar Defendants take, steal, misappropriate or embezzle any Exchangor funds. In fact, BPE chairman Daniel Carpenter ("Carpenter") invested and lost $2 million of his own company's money in BPE while trying to keep the business afloat. JA.8969. Furthermore, BPE has steadfastly maintained, and has since proven before a National Association of Securities Dealers, Inc. ("NASD") arbitration panel, that the $8.6 million in investment losses were caused by the stock market's collapse in late 2000 and PaineWebber's mishandling of BPE's accounts. In December 2005, the NASD awarded BPE $12.6 million against PaineWebber. SA.4-10. That arbitration award was upheld by a New York court, which issued a final judgment in favor of BPE against PaineWebber for $14.2 million. *In re UBS PaineWebber, Inc.*, Index No. 600156/06 (N.Y. Sup. Ct. Apr. 18, 2007).

Consequently, BPE is not liable to the plaintiffs for breach of contract because BPE's failure to perform its contractual obligations (i.e., complete the plaintiffs' exchanges) is legally excused by PaineWebber's supervening misconduct under the doctrine of frustration of purpose.[FN5] Nor is BPE liable to the plaintiffs in tort because all of the tort claims are entirely derivative of the contract claims (JA.638), and the Massachusetts Economic Loss Doctrine bars recovery in tort for purely economic losses. Lastly, the plaintiffs have failed to allege or prove that personal jurisdiction existed over the Benistar Defendants (excluding BPE).

> FN5. Although BPE's arbitration award against PaineWebber was not rendered until
> after the trial in this case, BPE raised the defenses of frustration of purpose
> and impossibility from the outset of this litigation. JA.637.

**B. Nature of the Case.**

The seeds of this multiparty litigation were planted in the historic stock market collapse of December 2000. PaineWebber mishandled BPE's accounts and, as a result, BPE suffered

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

losses of $8.6 million.

From 1998 until the end of 2000, BPE, of which Carpenter was chairman (JA.1620) and Martin
Paley ("Paley") was president (JA.1623), acted as a "qualified intermediary"
successfully completing over $100 million in I.R.C. § 1031 Tax Deferred Exchanges for
119 out of 126 Exchangors. See supra p. 3. "Given the lack of regulations, statutes,
and court cases providing a definitive answer on the subject of Like-Kind exchanges,"
TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, U.S. DEP'T OF TREASURY, PUBL'N NO.
2007- 30-172, Like-Kind Exchanges Require Oversight to Ensure Taxpayer Compliance 7
(2007) ("2007 Treasury Report"), BPE was not limited in its investments other than by
its written agreements with the Exchangors.[FN6]

> FN6. In the recent 2007 Treasury Report dealing with like-kind exchanges, it was
> concluded that " [v]arious IRS instructions need to provide additional guidance
> to taxpayers participating in like-kind exchanges," 2007 Treasury Report 4,
> because there are no explicit instructions how to report like-kind exchanges or,
> inter alia, invest the proceeds therefrom.

An Exchangor normally employs the "safe harbor" provided by 26 Code Fed. Regs. § 1.1031
(k)-1(g)(4), by utilizing the services of a qualified intermediary (such as BPE) to invest
the cash from the sale of the relinquished property until the purchase of the replacement
property. However, "if taxpayers do not specifically follow the rules for like-kind
exchanges, they could be held liable for taxes, penalties, and interest on their
transactions." 2007 Treasury Report 1. One such rule is that the qualified intermediary
cannot be related to or be in a fiduciary relationship with the Exchangor. 26 Code Fed.
Regs. § 1.1031(k)-1(k) (2) (definition of disqualified person).

Plaintiffs (all of whom are sophisticated real estate developers and/or investors)
engaged in § 1031 Tax Deferred Exchanges on the sale of their various investment
properties (JA.626), and utilized BPE as their qualified intermediary. Id. Under written
agreements between BPE and the plaintiffs, BPE invested the funds at Merrill Lynch and
later at PaineWebber. JA.630. Each plaintiff had the option to choose between a 3% or
6% return on the invested funds depending on whether 3-day or 30-day notice was required
for the release of the funds. See JA.6287. In order to generate the promised 3% or 6%
return, Carpenter caused BPE to invest in exchange-listed stock options of highly-rated
technology companies and other investment-grade, publicly-traded securities offered
through Merrill Lynch and later PaineWebber. JA.1626. In December 2000, BPE's accounts
at PaineWebber sustained losses of $8.6 million of the funds of several Exchangors.
JA.3139. Those Exchangors blamed Carpenter's investment strategy for the losses, whereas
Carpenter attributed the losses to PaineWebber's mishandling of BPE's accounts.
Carpenter caused BPE to file the NASD arbitration claim against PaineWebber, which
resulted in BPE's $14.2 million judgment against PaineWebber.

Paley (working out of his office in Massachusetts (JA.1623)) was responsible for BPE's
marketing, had the exclusive interactions and communications with the Exchangors,
solicited the Exchangors, and executed all of the transaction documents. See JA.1623;
6198-99; 6202. Carpenter, who lived and worked in Connecticut (JA.1624), had no contact
with the Exchangors, and limited his role simply to investing the funds after they were
forwarded to BPE's brokerage accounts in New York. JA.1625. The $8.6 million was not
stolen, misappropriated or embezzled, just lost by virtue of the late 2000 stock market
crash and PaineWebber's malfeasance. SA.4-10.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**C. Relevant Proceedings and Disposition Below.**

Beginning in January 2001, plaintiffs filed separate actions against BPE, Daniel Carpenter, Molly Carpenter (his spouse), Paley, Merrill Lynch, PaineWebber, and other corporate Benistar Defendants with whom the plaintiffs later stipulated they had no dealings (SA.11-13), but alleged were corporate alter egos of BPE and therefore liable to the plaintiffs under a corporate disregard (veil piercing) theory.[FN7] All of the complaints alleged breach of contract, conversion, fraud, breach of fiduciary duty, and violations of various States' consumer protection statutes. See JA.445-60. Each cause of action derived solely from the $8.6 million in investment losses. All of the actions were transferred to the Suffolk Superior Court Business Litigation Session.[FN8]

> FN7. In January 2001, plaintiff Cahaly also filed suit against Carpenter in Connecticut seeking prejudgment remedies. However, Carpenter prevailed in that case. _Cahaly v. Benistar Property Exchange Trust Co., Inc.,_ 268 Conn. 264, 842 A.2d 1113 (Conn. 2004).

> FN8. The claims of two other Exchangors were settled before trial (JA.3480-81), and those Exchangors are not parties to this appeal.

In March 2002, the trial court (Botsford, J.) granted the plaintiffs' motion for partial summary judgment against BPE for breach of contract and conversion. JA.625-39. In July 2002, the trial court granted PaineWebber's motion for summary judgment as to all of plaintiffs' claims. JA.2879-80; 3075-99. In November 2002, the trial court issued a scheduling order dividing the trial into three phases (jury and non-jury). JA.2990-91. During Phase I (jury), the trial court directed a verdict in favor of Molly Carpenter on the fraud and conversion claims. JA.10017. The sole remaining claim against her, breach of fiduciary duty, was allowed to go to the jury (JA.10018), notwithstanding that no fiduciary relationship existed as a matter of federal law. See 26 Code Fed. Regs. § 1.1031(k)-1(k)(2). In December 2002, the jury returned a verdict against BPE, Daniel Carpenter, Molly Carpenter, Paley, and Merrill Lynch on all remaining claims in the amount of $8.6 million. JA. 3054-74.

Shortly after the jury was discharged, two jurors telephoned plaintiffs' counsel, informed counsel that the _entire_ jury was having "some beers" at a bar in downtown Boston, and invited _all_ of the plaintiffs' attorneys to join them. SA.2. Despite this development, the trial court denied the Benistar Defendants' motion to conduct an evidentiary hearing into possible jury misconduct (JA.5751), and also denied the Benistar Defendants' motion for a new trial. JA.3121-22. The trial court did, however, grant Merrill Lynch's motion for judgment notwithstanding the verdict. JA.3100-20.

In March 2003, plaintiffs stipulated that they had no dealings with most of the corporate Benistar Defendants (all of whom are nonresidents), and that none of the elements of the Massachusetts long-arm statute were satisfied as to such defendants. SA.11- 13. Notwithstanding this stipulation, the trial court failed to dismiss all claims against these Benistar Defendants for lack of personal jurisdiction. JA.5841.

In September 2003, at the conclusion of Phase II (non-jury), the trial court awarded plaintiffs double damages and attorneys' fees pursuant to G. L. c. 93A against BPE, Daniel Carpenter, and Paley (JA.3127-37), but found Molly Carpenter not liable under c. 93A because there was "no evidence that [Molly's] conduct occurred primarily or substantially in Massachusetts, ... and no evidence connected Molly with the plaintiffs or with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Massachusetts in any but the most desultory way." JA.3135. The trial court also found in Phase III in favor of the plaintiffs on the corporate disregard claims against the other corporate Benistar Defendants (JA.3138-56), all of whom are Delaware corporations, by improperly applying Massachusetts law to pierce the corporate veil, and without making a separate determination that the exercise of personal jurisdiction over them comported with the Massachusetts long-arm statute and Due Process.[FN9] JA.5841.

> FN9. Phase III was also beset by procedural missteps, including several plaintiffs
>      failing to file and serve complaints (JA.5835) and pay the required filing fees.
> In February 2004, plaintiffs moved to reinstate the jury verdict against Merrill Lynch
> (JA.3205) based on newly discovered evidence (JA.9797-9801) obtained from Paley pursuant
> to a settlement agreement, by which Paley agreed to pay the plaintiffs $150,000 and
> testify in exchange for being released from the $19 million judgment against him.
> JA.9865-75. Paley had previously invoked the Fifth Amendment and refused to testify at
> his deposition and at trial. J.A.9801. The trial court conducted an evidentiary hearing
> and, in October 2004, denied the plaintiffs' motion to reinstate the jury verdict against
> Merrill Lynch but granted the plaintiffs a new trial on all claims against Merrill Lynch.
> JA.3238-51. However, the trial court denied the Benistar Defendants' motion for a new
> trial based on the same newly discovered evidence (SA.14), even though by virtue of his
> prior invocation of the Fifth Amendment, Paley was just as unavailable at trial to the
> Benistar Defendants as he was to the plaintiffs. In November 2004, the trial court issued
> an amended report under Mass. R. Civ. P. 64(a) regarding its decision involving Merrill
> Lynch (JA.3324-26), and in December 2004 the trial court entered amended judgments
> against the Benistar Defendants. JA.47; 3319-23. Plaintiffs appealed and the Benistar
> Defendants cross-appealed.

In April 2007, the Appeals Court affirmed the trial court in all respects. *Cahaly v. Benistar Property Exchange Trust Co., Inc.*, 68 Mass. App. Ct. 668 (2007). The Benistar Defendants timely petitioned for rehearing and, in May 2007, the Appeals Court denied the petition, holding (without citing any authority): "The failure to observe requisite corporate formalities, amply demonstrated on the record, merges individual and corporate identity for jurisdictional analysis no less than for purposes of liability." *Cahaly v. Benistar Property Exchange Trust Co., Inc.*, No. 2005-P-1717, slip op. at 2 (Mass. App. Ct. May 15, 2007). In July 2007, this Court granted the separate applications of Merrill Lynch and the Benistar Defendants for leave to obtain further appellate review pursuant to Mass. R. App. P. 27.1. *Cahaly v. Benistar Property Exchange Trust Co., Inc.*, 449 Mass. 1107 (2007) (Table).

**D. Statement of Relevant Facts.**

**1. Transactional Facts.**

In contracting with BPE as their qualified intermediary, plaintiffs executed two agreements that provided, respectively, in pertinent part:[FN10]

> FN10. The trial court held that both agreements "were clearly part of [a] single
>      transaction, and should be read together." JA.635.
> Exchangor and Intermediary expressly agree that any cash proceeds received from the
> disposition of the relinquished property *shall be held and invested at PaineWebber* in
> the discretion and through financial institutions of Intermediary.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*[BPE] shall have full control over the Exchangor's funds to invest* as the Exchangor directs in either the 3% or the 6% account.

JA.6508; 6284 (emphasis added). As a result of these agreements, which were substantially the same for the Merrill Lynch and later the PaineWebber accounts, BPE had the contractual right to invest the sales proceeds in investment vehicles of BPE's choice including, but not limited to, stock options and other securities offered through Merrill Lynch and later PaineWebber. BPE invested the funds in order to generate the necessary 3% or 6% return as chosen by the Exchangors. Notably, however, BPE did not agree to invest in securities that *only* yielded 3% or 6%.

The trial court found that the plaintiffs knew their funds would be "used to purchase some form of securities" (JA.3083), so even under the trial court's analysis it should not have mattered whether BPE invested in stocks, bonds, stock options, or any other type of securities offered through Merrill Lynch and later PaineWebber. Indeed, that was the entire point of the Exchangors agreeing to place the funds in brokerage accounts rather than with a bank. Nothing in BPE's agreements with the Exchangors restricted the types of investments that BPE could make. Nothing in those agreements forbade investments in stock options or restricted BPE's investment discretion in any way. There was not even a general provision that the funds be "prudently," "reasonably," or "safely" invested. JA.627-31. In sum, nothing in the agreements, I.R.C. § 1031 or its cognate regulations prohibited "risky" investments in general, or stock option investments in particular.

Carpenter's role at BPE was confined to managing BPE's investments until the Exchangors "either directed such proceeds to be applied to the purchase of a new property or requested return of the proceeds." JA.1625. BPE chose to invest the funds in stock options and other securities in order to generate the necessary 3% or 6% return promised to the Exchangors. JA.1625-26. The plaintiffs were provided with the BPE account numbers at Merrill Lynch and later at PaineWebber. JA.6335; 6435. Although the plaintiffs or their advisors could have easily inquired as to the status of the investments at any time, none chose to do so until after the funds had been lost at PaineWebber. JA.7745.

Paley and his staff handled all of the other functions for BPE from Paley's offices located in Newton, Massachusetts. JA.1623. Paley and his staff directed and performed all of BPE's marketing activities, met and communicated with the plaintiffs and their advisors, prepared all the necessary paperwork for all the property exchanges, performed all of the necessary follow-up and client management, and maintained all of BPE's files. *Id.*

As a result of the stock market's collapse in December 2000, BPE's accounts at PaineWebber suffered substantial losses. JA.1627. PaineWebber responded by mishandling BPE's accounts.[FN11] *Id.* Once it became clear that BPE would be unable to complete the plaintiffs' remaining property exchanges in January 2001, BPE sent letters to the plaintiffs advising them that funds were not available to complete the planned exchanges and suggested that they obtain funds from elsewhere in order to preserve their tax benefits. *See* JA.6325.

> FN11. PaineWebber's Appeals Court brief states that "all trading in the accounts had been shut down and all open positions liquidated." PaineWebber Br. 6.

In early January 2001, Carpenter and Paley met with several Exchangors to advise them of the losses. JA.3821; 4082. At around the same time, one of the plaintiffs' attorneys wrote a demand letter to PaineWebber directly referencing the BPE account number and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that specific plaintiff's lost funds. JA.7745. Prior to the loss of the funds in January 2001, none of the plaintiffs had ever met with, spoken to, or communicated with Daniel Carpenter. JA.3761- 62; 3855; 3931; 4025-26; 4092. At no time have any of the plaintiffs met with, spoken to, or communicated with Molly Carpenter. JA.3762; 3931; 4026; 4092-93.

## 2. Jurisdictional Facts.

Daniel and Molly Carpenter reside in Connecticut. JA.8559; 8866. All of the corporate Benistar Defendants are organized under the laws of the State of Delaware and maintain their principal places of business in Connecticut. JA.1630; 1632; 3140-41; 3148. Excluding BPE, none of the Benistar Defendants were domiciled in Massachusetts, maintained offices in Massachusetts, transacted any business in Massachusetts, or otherwise engaged in any acts enumerated in the Massachusetts long-arm statute. SA.11-13; JA.5819. BPE maintained an office located in Paley's home in Newton, Massachusetts. JA.1622.

Notwithstanding these undisputed jurisdictional facts, the trial court found that personal jurisdiction existed over all of the Benistar Defendants, *without* making separate determinations that each Benistar Defendant's contacts satisfied the elements of the Massachusetts long-arm statute and comported with Due Process. JA.527-67; 640-42; 2949- 50; 3138-56; 5815-16; 5839-40.

## SUMMARY OF ARGUMENT

The plaintiffs failed to prove that personal jurisdiction over the Benistar Defendants (other than BPE) was authorized by the Massachusetts long-arm statute and Due Process. (pp. 20-36.) The plaintiffs executed a stipulation, which proved that none of the elements of the long-arm statute were satisfied as to the Phase III Benistar Defendants. (pp. 23-25.) The trial evidence and Paley's newly discovered evidence directly refuted the prior adverse inferences drawn by the trial court to support its denial of the Carpenters' motions to dismiss for lack of personal jurisdiction. (pp. 25-33.) The trial court improperly conflated the substantive liability test of corporate disregard with the two-pronged jurisdictional test. (pp. 33-36.)

The Benistar Defendants are entitled to a new trial. (pp. 36-44.) Paley's newly discovered evidence, which the trial court found warranted a new trial against Merrill Lynch, also supported a new trial for the Benistar Defendants. (pp. 37-42.) Paley's newly discovered evidence constituted important testimony likely to effect the outcome at trial because it directly contradicted, *inter alia,* (i) the trial court's and jury's findings and plaintiffs' testimony against the Benistar Defendants, and (ii) the adverse inferences drawn by the trial court against the Carpenters. (p. 43.) The Benistar Defendants are entitled to a new trial also as a result of the trial court's failure to investigate possible jury misconduct. (p. 44.)

The Benistar Defendants are not liable to the plaintiffs due to the doctrine of frustration of purpose and the "economic loss" doctrine (pp. 45-48), and the corporate Benistar Defendants are not liable to the plaintiffs for the additional reason that the trial court improperly applied Massachusetts law to pierce the veil of Delaware corporations. (pp. 48-49.)

ARGUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### I. THERE IS NO PERSONAL JURISDICTION OVER THE BENISTAR DEFENDANTS.

#### A. Constitutional Limits.

In 1945, the Supreme Court held that states' power to exercise personal jurisdiction over defendants consistent with the federal Constitution was not contingent on those defendants' physical presence within the states' borders. _International Shoe Co. v. Washington,_ 326 U.S. 310, 316 (1945). **\*21** Instead, in order to exercise personal jurisdiction over nonresident defendants, the Due Process Clause of the Fourteenth Amendment requires only that the defendants have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" _Id._ (citation omitted).

A state court deciding whether it has jurisdiction over a nonresident defendant under the Due Process Clause must evaluate the "quality and nature," _Burger King Corp. v. Rudzewicz,_ 471 U.S. 462, 475 (1985), of the defendant's contacts with the forum state under a totality of the circumstances test. _Id._ at 485-86. The crucial question is whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," _id._ at 475 (quoting _Hanson v. Denckla,_ 357 U.S. 235, 253 (1958)) (internal quotations omitted), "such that the defendant] should reasonably anticipate being haled into court there," _Id._ at 474 (quoting _World-Wide Volkswagen Corp. v. Woodson,_ 444 U.S. 286, 297 (1980)) (internal quotations omitted).

#### *22 B. Long-arm Statute.

Relying on _International Shoe,_ state legislatures enacted laws, known as "long-arm" statutes, prescribing the terms under which courts could exercise personal jurisdiction over nonresidents. The Massachusetts long-arm statute, G. L. c. 223A, was enacted in 1968. St. 1968, c. 760. As in Massachusetts, most of these long-arm statutes provide that jurisdiction will be permitted to the full extent allowed by the federal Constitution. _See "Automatic" Sprinkler Corp. of America v. Seneca Foods Corp.,_ 361 Mass. 441, 443 (1972).

#### C. Jurisdictional Standards.

This Court has often set forth "the well-settled principles governing the determination of personal jurisdiction." _Roberts v. Legendary Marine Sales,_ 447 Mass. 860, 862 (2006). "A Massachusetts court may acquire personal jurisdiction over a nonresident 'when some basis for jurisdiction enumerated in the [long-arm] statute has been established.'" _Intech, Inc. v. Triple "C" Marine Salvage, Inc.,_ 444 Mass. 122, 125 (2005) (quoting _Good Hope Indus., Inc. v. Ryder Scott Co.,_ 378 Mass. 1, 6 (1979)).

**\*23** However, "[o]nce the statute has been satisfied, the constitutional requirements of due process also must be met." _Miller v. Miller,_ 448 Mass. 320, 328 (2007). Jurisdiction is permissible only when both elements are satisfied. _Good Hope Indus., Inc.,_ 378 Mass. at 6. Here, instead of satisfying both elements of the jurisdictional test, plaintiffs have satisfied neither element. Consequently, all claims against the Benistar Defendants (excluding BPE) must be dismissed for lack of personal jurisdiction as a matter of law.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### 1. No Jurisdiction Over Phase III Defendants.

During Phase III, the plaintiffs executed a stipulation (SA.11-13), subsequently admitted into evidence (JA.6019), which proves that none of the elements of the long-arm statute are satisfied as to the Phase III Benistar Defendants.[FN12] The stipulation provides as follows:

> FN12. The Phase III Benistar Defendants are Benistar Admin Services, Inc., Benistar Employer Services Trust Corp., and Carpenter Financial Group, LLC (collectively, with Benistar Ltd., the "Phase III Defendants").

• Plaintiffs offered no evidence where the Phase III Defendants are domiciled;
• Phase III Defendants are not organized under the laws of Massachusetts nor do they maintain a principal place of business in Massachusetts;
*24 • *None of the plaintiffs transacted any business with the Phase III Defendants;*
• *Plaintiffs offered no evidence relative to the Phase III Defendants' contacts with and/or acts or omissions in Massachusetts;* and
• Plaintiffs offered no evidence that the Phase III Defendants:
1) regularly do or solicit business in Massachusetts;
2) contract to supply services or things in Massachusetts;
3) engage in any other persistent course of conduct in Massachusetts; or
4) derive substantial revenue from goods used or consumed or services rendered in Massachusetts.

SA.11-13 (emphasis added).

"A plaintiff has the burden of establishing facts to show that the ground relied on under [the long-arm statute] is present." *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767 (1994). The stipulation shows that the plaintiffs failed to carry their evidentiary burden with respect to the Phase III Defendants by confirming that the conduct necessary to satisfy the requirements in G. L. c. 223A, §3, was lacking. Thus, personal *25 jurisdiction did not exist over the Phase III Defendants.[FN13]

> FN13. Because personal jurisdiction is lacking under the long-arm statute, no Due Process analysis is required.

### 2. No Jurisdiction Over The Carpenters.

#### a. Molly Carpenter.

At her deposition, Molly Carpenter ("Molly") did not testify due to the Massachusetts spousal disqualification rule. JA.534-35. In denying Molly's motion to dismiss for lack of personal jurisdiction (JA.527-67), the trial court found personal jurisdiction by drawing adverse inferences from Molly's refusal to testify. JA.561-62. The trial court drew adverse inferences that Molly, *inter alia,* (i) made fraudulent representations to the plaintiffs, and (ii) traveled to Massachusetts. JA.562. However, the evidence at the subsequent trial directly refuted these adverse inferences.[FN14] In the face of the actual trial testimony, the adverse inferences drawn by the trial court to support personal jurisdiction over Molly are no longer reasonable, reliable, or fair. *26 Consequently, the trial court's finding of personal jurisdiction over Molly cannot be upheld.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN14. The trial court sustained Molly's objection to the introduction of her
> deposition into evidence. JA.4533.

At trial, the plaintiffs admitted that they had never met with, spoken to, or communicated
with Molly. JA.3762; 3931; 4026; 4092-93. Plaintiffs offered no evidence that Molly had
any contact with any of them. Nor was there any evidence that Molly made any
representations to any plaintiff. In the face of the actual trial testimony, the adverse
inferences drawn by the trial court to deny Molly's motion to dismiss for lack of personal
jurisdiction are no longer reasonable, reliable or fair. The actual trial testimony,
as noted above, contradicted the prior adverse inferences drawn by the trial court to
support its finding that personal jurisdiction existed over Molly.

Furthermore, the trial court's subsequent decision in Phase II that G. L. c. 93A was
inapplicable to Molly further confirms that the trial court erred in finding personal
jurisdiction over her. In its ruling that c. 93A was inapplicable, the trial court found
that no evidence connected Molly with the plaintiffs or with Massachusetts "in any but
the most desultory way" (JA.3135) and that there was "no viable *27 claim" that Molly
participated in statements made to plaintiffs by (as it turns out) Paley. JA.3136. The
trial court's c.93A finding thereby confirms that the court erred in the adverse
inferences it drew against Molly when denying her motion to dismiss for lack of personal
jurisdiction.

The plaintiffs fell woefully short of meeting their burden of establishing personal
jurisdiction over Molly. There is no evidence of a single in-forum contact by Molly,
not a single visit, meeting, telephone call or letter. Molly lived and worked in
Connecticut and the brokerage offices used to conduct BPE's investments were located
in New York. As the trial court held in its c. 93A finding, there is simply no evidence
that connected Molly with the plaintiffs or Massachusetts.

The *only* evidence alluded to by the plaintiffs that Molly had any connection to this
case at all was the appearance of her name, as an officer of BPE, on the Merrill Lynch
and PaineWebber account opening documents. JA.6787; 6790; 7721. However, the mere
appearance of Molly's name on BPE account opening forms that were executed in Connecticut
and mailed to *28 New York (JA.3131) is insufficient to create personal jurisdiction
over Molly in Massachusetts.

"Jurisdiction is proper ... where the contacts proximately result from actions by the
defendant *himself* that create a substantial connection with the forum State." *Asahi Metal*
*Indus. Co. v. Super. Ct. of Cal., Solano County,* 480 U.S. 102, 109 (1987) (internal
citations and quotations omitted) (emphasis in original). Thus, merely being a
nonresident officer of a company that transacts business in a state does not create
personal jurisdiction over the corporate officer in that state. "[J]urisdiction over
a corporation does not automatically secure jurisdiction over its officers." *Morris v.*
*Unum Life Ins. Co. of America,* 66 Mass. App. Ct. 716, 720 (2006), *review denied,* 447
Mass. 1109 (2006) (Table) (internal quotations omitted). "Rather, the question of
personal jurisdiction over [Molly] is to be decided on the basis of the nature and extent
of [her] individual contacts with Massachusetts." *Id.* at 721.

Because it is indisputable that Molly had *no* contacts (personal or corporate) with
Massachusetts or the plaintiffs, personal jurisdiction over her is lacking. Plaintiffs

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are compelled to agree, because **29** their only basis for asserting personal jurisdiction over Molly is "based on documents showing she was an officer of [BPE] and on the adverse inferences drawn from her refusal to testify." Pl. Reply Br. 31.

### b. Daniel Carpenter.

The plaintiffs also failed to satisfy their burden of proving that the trial court had personal jurisdiction over Daniel Carpenter ("Daniel"). Prior to trial, the trial court found that the exercise of personal jurisdiction over Daniel was authorized by G. L. c. 223A, §§ 3(a) and (d) (transacting business in the commonwealth and causing tortious injury in the commonwealth). JA.548-56. This finding, however, was clearly erroneous. Further, the plaintiffs admitted that, prior to the alleged causes of action arising from the loss of the funds in January 2001, none of them had ever met with, spoken to, or communicated with Daniel. JA.3761-62; 3855; 3931; 4025-26; 4092.

### i. No "Transacting Business."

"For jurisdiction to exist under § 3(a), the facts must satisfy two requirements - the defendant must have transacted business in Massachusetts, and the plaintiff's claim must have arisen from the transaction of business by the defendant." *30*Intech, Inc., 444 Mass. at 126 (quotations omitted). See also Johnson v. Witkowski, 30 Mass. App. Ct. 697, 713 (1991) (there must be "a rational nexus between the cause of action and the transaction of business in Massachusetts.").

All of the plaintiffs' causes of action against the Benistar Defendants are based on their execution of agreements with BPE (signed by Paley) in and prior to December 2000 (JA.6193; 6284; 6311; 6484; 6508), and their dealings with Paley. Daniel transacted no business in Massachusetts from which the plaintiffs' alleged claims arose, because the plaintiffs had never communicated with Daniel prior to or at the time the alleged claims arose.

### ii. No "Causing Tortious Injury."

Even though the plaintiffs may have experienced the effects and consequences of an out-of-state injury (i.e., the loss of the funds) in Massachusetts, plaintiffs have not satisfied the "injury in this commonwealth" requirement of § 3(d) because the injury itself (i.e., the allegedly wrongful act of investing in stock options) did not occur in Massachusetts.

"While manifestations, effects, and consequences of an out-of-State injury may be experienced in **31** Massachusetts, they do not constitute 'injury in this commonwealth' within the meaning of § 3(d)." Cunningham v. Ardrox, Inc., 40 Mass. App. Ct. 279, 282 (1996).[FN15] Because plaintiffs' funds were invested by BPE from Connecticut with Merrill Lynch and later PaineWebber in New York, any injury suffered by the plaintiffs on account of the investment losses occurred in Connecticut or New York and not in Massachusetts. See Mass. Sch. of Law at Andover, Inc. v. American Bar Ass'n, 142 F.3d 26, 36 (1st Cir. 1998) ("We have wrestled before with this issue of whether the in-forum effects of extra-forum activities suffice to constitute minimum contacts and have found in the negative.").

    FN15. One of the plaintiffs, Bellemore Associates, LLC, is located in New Hampshire

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(JA.6314), so it did not even feel the effects of the losses in Massachusetts.

Nor have plaintiffs offered any evidence that Daniel regularly does or solicits business in Massachusetts, engages in a "persistent course of conduct" in Massachusetts or "derives substantial revenue" from goods that are used or consumed in Massachusetts or services rendered in Massachusetts. It is undisputed that Paley was the person at BPE who **32** handled all of the marketing, business solicitation, and communications with the plaintiffs in Massachusetts. JA.1623-24.

Daniel did not author the BPE marketing materials or agreements used in Massachusetts, which Paley testified were prepared by himself. JA.9465; 9469. There is no evidence that Daniel ever sent anything into Massachusetts. Daniel lived and worked in Connecticut and, as noted above, the brokerage offices used to conduct BPE's investments were located in New York. Daniel's activities with respect to these accounts all occurred outside of Massachusetts. Indeed, it was Paley, and not Daniel, who was responsible for causing the plaintiffs to have funds wired into BPE's New York-based brokerage accounts. JA.9542-43. All of Daniel's activities from which the plaintiffs' causes of action are alleged to have arisen occurred in Connecticut and New York. The only contact Daniel had with any of the plaintiffs was a single visit that occurred after the causes of action allegedly arose. JA.3821; 4082.

Accordingly, the trial court erred in finding that personal jurisdiction existed over Daniel because there was no evidence that Daniel had any in-forum handled all of the marketing, business solicitation, and communications with the plaintiffs in Massachusetts. JA.1623-24.

Daniel did not author the BPE marketing materials or agreements used in Massachusetts, which Paley testified were prepared by himself. JA.9465; 9469. There is no evidence that Daniel ever sent anything into Massachusetts. Daniel lived and worked in Connecticut and, as noted above, the brokerage offices used to conduct BPE's investments were located in New York. Daniel's activities with respect to these accounts all occurred outside of Massachusetts. Indeed, it was Paley, and not Daniel, who was responsible for causing the plaintiffs to have funds wired into BPE's New York-based brokerage accounts. JA.9542-43. All of Daniels' activities from which the plaintiffs' causes of action are alleged to have arisen occurred in Connecticut and New York. The only contact Daniel had with any of the plaintiffs was a single visit that occurred after the causes of action allegedly arose. JA.3821; 4082.

Accordingly, the trial court erred in finding that personal jurisdiction existed over Daniel because there was no evidence that Daniel had any in-forum **33** contacts from which the plaintiffs' causes of action arose. "[Plaintiffs'] failure to establish a predicate for the assertion of jurisdiction under G. L. c. 223A, § 3(a) or (d), is fatal to [their] appeal and makes it unnecessary for us to consider any due process issues." _Morris, 66 Mass. App. Ct. at 722._ [FN16]

    FN16. Although adverse inferences were drawn to find that Daniel "solicited business in this forum," and "personally gave promotional material to all plaintiffs" (JA.555), Paley later testified that he (Paley) was "the only person at [BPE] ... that had any contact with the plaintiffs." JA.9470-71.

**3. The Doctrine Of Corporate Disregard Cannot Be Used To Establish Personal Jurisdiction.**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Appeals Court found that "[t]he plaintiffs' theory of personal jurisdiction was necessarily intertwined with the merits of their claim that corporate disregard was appropriate in this case." _Cahaly_, 68 Mass. App. Ct. at 677. The trial court erroneously conflated the substantive liability doctrine of corporate disregard with the constitutional requirement regarding "minimum contacts," and thoroughly ignored the twofold jurisdictional inquiry. JA.3140; 3138-56; 5815-16; 5839-41. This jurisdictional theory, applied by the trial court and apparently adopted by the Appeals **\*34** Court, has never been sanctioned by the United States Supreme Court or this Court.

In fact, the Supreme Court has had occasion to consider a similar theory of jurisdiction and has rejected it. In _Rush v. Savchuk_, 444 U.S. 320 (1980), the Supreme Court ruled that "[t]he requirements of _International Shoe_ ... _must be met as to each defendant_ over whom a state court exercises jurisdiction." Id. at 332 (emphasis added). _See also_ L. Brilmayer & C. Norchi, _Federal Extraterritoriality and Fifth Amendment Due Process,_ 105 HARV. L. REV. 1217, 1259 n.253 (1992) ("In the ... context of personal jurisdiction, the Supreme Court has been loathe to permit states to attribute the contacts of one defendant to another.").

The Supreme Court has also had occasion to address this issue directly with respect to parent and subsidiary corporations.[FN17] In doing so, it held that jurisdiction over a parent corporation does not automatically establish jurisdiction over a wholly-owned subsidiary. _Keeton v. Hustler Magazine, Inc.,_ 465 U.S. 770, 781 n.13 (1984) . "_Each defendant's_ **\*35** _contacts with the forum State must be assessed individually." Id._ (emphasis added). Because the "minimum contacts" analysis of _International Shoe_ must be undertaken separately as to each defendant, the trial court's failure to do so with respect to the Benistar Defendants violates the Due Process Clause. _See_ _Rush,_ 444 U.S. at 332-33 ("Here, however, the defendant has no contacts with the forum, and the Due Process Clause does not contemplate that a state may make binding a judgment against an individual or corporate defendant with which the state has no contacts, ties, or relations.") (emphasis in original) (quotations omitted).

    FN17. At all relevant times, Benistar Ltd. was the parent of BPE. JA.1621-22.

The conflation of the concepts of corporate disregard and personal jurisdiction has also been soundly criticized by legal scholars:
One major flaw in the [corporate disregard] theory of jurisdiction is that by using a substantive law concept - [corporate disregard] - as a framework for analysis, _courts are often led to conflate the question of contact with that of liability_ ... This intermingling of jurisdictional with substantive law can, in a number of distinct ways, lead to a confused and often unconstitutional result.

Stuart M. Riback, Note, _The Long Arm and Multiple Defendants: The Conspiracy Theory of In Personam Jurisdiction,_ 84 COLUM. L. REV. 506, 527 (1984) **\*36** (emphasis added). _See also,_ L. Hoffman, _The Case Against Vicarious Jurisdiction,_ 152 U. PA. L. REV. 1023, 1032 (2004) ("[T]he use of veil piercing for jurisdictional purposes is unwarranted as a matter of precedent and unwise as a matter of policy.").

"A judgment is void if the court from which it issues lacked jurisdiction over the parties." _Colley v. Benson, Young & Downs Ins. Agency, Inc.,_ 42 Mass. App. Ct. 527, 532 (1997). Accordingly, it was reversible error for the trial court to apply the doctrine of corporate disregard as a substitute for the "well-settled" twofold jurisdictional

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

inquiry.

## II. BENISTAR DEFENDANTS ARE ENTITLED TO A NEW TRIAL.

The Benistar Defendants are entitled to a new trial due to (1) Paley's newly-discovered evidence, and (2) possible jury misconduct.

### A. Paley's Newly Discovered Evidence Warrants A New Trial For The Benistar Defendants.

The same newly discovered evidence from Paley, on which the trial court based its decision to grant the plaintiffs a new trial against Merrill Lynch, also supports a new trial for the Benistar Defendants. Contrary to plaintiffs' assertions, Paley's evidence **\*37** is beneficial to the Benistar Defendants and is far from being "merely cumulative." Pl. Reply Br. 29.

A new trial may be granted on the basis of newly discovered evidence if that evidence "probably would be a real factor with a jury in reaching a decision" on retrial. _Leavitt v. Mizner_, 404 Mass. 81, 89 (1989). A new trial must be granted if, as here, "the failure to do so appears inconsistent with substantial justice and affects the substantial rights of the parties." _Ramsdell v. Doliber_, 59 Mass. App. Ct. 446, 450 (2003) . During his deposition and at trial, Paley invoked the Fifth Amendment and did not testify. JA.9801. As part of his post-verdict settlement agreement with the plaintiffs, Paley agreed to waive his Fifth Amendment rights (JA.9867) and provided an affidavit (JA.9797-9801) and testimony (JA.9331-9547) during the post-trial proceedings in which the plaintiffs sought to reinstate the jury verdict against Merrill Lynch.

Paley's newly discovered evidence directly refuted the plaintiffs' trial testimony, contradicted the trial court's prior findings and adverse inferences, and refuted the plaintiffs' closing argument. Accordingly, Paley's newly discovered **\*38** evidence was important evidence of the nature likely to effect the prior results in the action. _See Wojcicki v. Cragher_, 447 Mass. 200, 215 (2006) (newly discovered evidence warrants new trial if it is "important evidence that would have genuine effect on the jury.").

In granting the plaintiffs partial summary judgment against BPE for breach of contract and conversion (JA.625-39), the trial court held that the relevant contract language did not "suggest the plaintiffs bore any risk of loss" while BPE invested the funds.[FN18] JA.636. The meaning of the contractual provisions and whether the plaintiffs "bore any risk of loss," however, cannot be determined without reference to the newly available testimony of Paley, who had all of the communications with the plaintiffs (JA.9470-71) and signed all of BPE's agreements with them. JA.9472. "[E]xtrinsic evidence bearing on the background and purpose of the parties, as well as their understanding of the meaning of particular **\*39** language used in the contract, may be considered both in the construction of ambiguous contract language and in resolving uncertainties in applying the terms of the written contract to the subject matter." _Gilmore v. Century Bank & Trust Co._, 20 Mass. App. Ct. 49, 55 (1985).

> FN18. The trial court treated the conversion claims against BPE as entirely derivative of the breach of contract claims. JA.638. Thus, the interpretation of the true meaning of the agreements is the fundamental issue in resolving all claims against the Benistar Defendants.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Paley's statements to the plaintiffs prior to their execution of the BPE agreements support an interpretation of those agreements that gives investment discretion to BPE, a natural consequence of which is that plaintiffs' funds were subject to the volatility and vicissitudes of the stock market (especially since BPE had to invest the funds in order to generate the necessary 3% or 6% return). If the plaintiffs really sought total "safety" of their funds (as they testified at trial), they could have utilized the services of numerous other § 1031 intermediaries that invested in Treasuries or bank certificates of deposit (and, obviously, would have paid lower interest than BPE).[FN19] Paley's testimony, which was unavailable to all parties at trial, creates a genuine **40 issue of material fact concerning BPE's obligations under its agreements with the plaintiffs, and directly contradicts the plaintiffs' trial testimony on several vital points.

> FN19. Even though BPE invested Exchangors' funds in the stock market, it also obtained a $5 million fidelity bond from Travelers. JA.7757-58.

For example, based on the newly discovered Paley evidence, Paley (who was the only defendant that had pre-contract discussions with the plaintiffs (JA.9470-71)), testified that he never provided plaintiffs with any specifics as to *how* their funds would be invested and that none of the plaintiffs ever asked that question. JA.9489-91; 9507-08. Paley also testified that he never told the plaintiffs that there was "no risk of loss," or that their funds would be "safe" or "secure." JA.9496-97. Paley also testified that he "didn't see anything inappropriate" about BPE's investment activities. JA.9505. Nor could Paley think of anything he said to the plaintiffs that was not true. JA.9544. All of this is in stark contrast to plaintiff Cahaly's testimony that "I asked him [Paley] about my money being safe," and Paley allegedly "assured me that my money would be safe." JA.3820.

The plaintiffs also testified that Paley told them that their funds would be held in separate or **41 segregated accounts. JA.3728-29; 3877; 4020; 4077; 4131. Specifically, plaintiff Cahaly testified that she understood her funds would be held in " [a] separate account ... with my name." JA.3877. However, Paley testified that not only did he know that the Exchangors' funds would not be segregated (JA.9511), but that he informed the plaintiffs (including Cahaly) that BPE "pooled clients' money together," that "there is no distinction between Client A and Client B's money in an account," that "it wasn't a secret" that BPE did not provide segregated accounts, and that, in any event, segregated accounts were not required under § 1031. JA.9511-13.

Paley's new evidence would also have had a substantial impact on the jury's decision regarding the tort claims against the Benistar Defendants. The trial court informed the jury several times that BPE had already been found liable to the plaintiffs for breach of contract and conversion (JA.3570; 10208; 10214; 10227), thereby merging the concepts of contract and tort liability as far as the jury was concerned. For example, the jury found that Carpenter "knowingly ma[de] a false representation of fact to one or more of the plaintiffs." JA.3065. However, **42 Paley testified that he, and not Carpenter, was responsible for authoring the BPE promotional materials and agreements (JA.9464-65), prepared the BPE sales and promotional literature used to solicit the plaintiffs (JA.9469), and had the exclusive dealings and communications with the plaintiffs. JA.9470-71. In other words, because Paley testified that Carpenter made *no* statements (written or oral) to the plaintiffs, a second jury would have ample evidence to find that Carpenter did not commit fraud.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Far from being "merely cumulative," Pl. Reply Br. 29, Paley's testimony on what he did and did not say to the plaintiffs, and the contradictory testimony of the plaintiffs on these key issues, is highly probative of the underlying causes of action and would clearly be a significant factor for a second jury. At the very least, Paley's testimony would preclude partial summary judgment against BPE for breach of contract and conversion. The scope of BPE's contractual authority, and whether the elements for the tort causes of action were satisfied, can only be determined in the context of Paley's new testimony, which demonstrates that BPE acted consistently with its contractual authority. To ensure that a judgment *43 has not been entered against the Benistar Defendants based upon inferences and findings that Paley's new evidence has now directly refuted, a second jury must be allowed to assess Paley's new evidence.

Paley's newly discovered testimony also contradicted the trial court's prior findings and adverse inferences. For example, a pivotal issue upon which the trial court relied in its c. 93A finding against Daniel was the trial court's adverse inference that Daniel prepared the BPE promotional materials and agreements (JA.3129-30), which Paley's testimony now proves was not the case. JA.9464-65. The trial court's adverse inference is no longer reasonable, reliable or fair now that Paley's newly discovered testimony has directly refuted that inference.

Paley's newly discovered testimony also directly refutes a basic premise of plaintiffs' closing argument. Plaintiffs' counsel argued during closing that the Benistar Defendants committed fraud "[b]y lying." JA.10130. However, because Paley testified that he was the only person who communicated with the plaintiffs (verbally or in writing), the Benistar Defendants did not even have the opportunity to engage in "lying."

### *44 B. Possible Jury Misconduct Warrants A New Trial.

In light of the news article (SA.1) describing the jury's post-trial invitation to plaintiffs' counsel for "some beers" (SA.2), the trial court's failure to investigate possible jury misconduct and/or bias by holding an evidentiary hearing is an abuse of discretion that warrants a new trial.

When there is a question of possible jury bias against a party, an investigation is required. *Commonwealth v. Fidler,* 377 Mass. 192, 198 (1979) ( "Where overt factors are present by which the verdict's validity can be objectively assessed, the law's commitment to a just result warrants receiving evidence as to the alleged acts of misconduct"); *Markee v. Biasetti,* 410 Mass. 78, 88-89 (1991) (no reason to depart from *Fidler's* reasoning in civil cases). "[J]udges should be receptive to conducting an inquiry, once the defendant demonstrates a basis for suspicion." *Commonwealth v. Solis,* 407 Mass. 398, 404 (1990). The trial court abused its discretion by refusing to conduct the "requisite hearing" into the incident. JA.5750-51. *See Stagecoach Transp., Inc. v. Shuttle, Inc.,* 50 Mass. App. Ct. 812, 820 (2001) ("[t]he trial judge held the requisite hearing.").

### *45 III. BENISTAR DEFENDANTS ARE NOT LIABLE TO PLAINTIFFS.

### A. No Contract Liability.

BPE is not liable to the plaintiffs for breach of contract because BPE's failure to perform its contractual obligations (i.e., complete the plaintiffs' exchanges) is legally

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

excused by PaineWebber's supervening misconduct pursuant to the doctrine of frustration of purpose. The NASD finding that PaineWebber's mishandling of BPE's accounts caused the losses (SA.4-10) establishes that PaineWebber's supervening misconduct excused BPE's failure to perform. "A breach of contract is a failure to perform for which legal excuse is lacking." *Realty Developing Co., Inc. v. Wakefield Ready-Mixed Concrete Co., Inc.,* 327 Mass. 535, 537-38 (1951).

In light of PaineWebber's malfeasance, and because BPE's investments at PaineWebber were not wrongful, there was no breach of contract by BPE as a matter of law. "[W]hen an event neither anticipated nor caused by either party, the risk of which was not allocated by the contract, destroys the object or purpose of the contract, thus destroying the value of performance, the parties are excused from further performance." *46Chase Precast Corp. v. Paonessa Co., Inc.,* 409 Mass. 371, 374 (1991). "Under [the doctrine of] frustration, [p]erformance remains possible but the expected value of performance to the party seeking to be excused has been destroyed by [the] fortuitous event." *Id.* (internal quotations and citations omitted).

PaineWebber's supervening misconduct destroyed the expected value of performance, thereby frustrating the purpose of BPE's agreements with the plaintiffs. The doctrine of frustration of purpose applies because "an unanticipated circumstance, the risk of which should not fairly be thrown on the promisor, has made performance vitally different from what was reasonably to be expected." *Id.* Because BPE has a viable defense to the plaintiffs' breach of contract claims, it was clearly erroneous for the trial court to have granted the plaintiffs' motion for partial summary judgment on those claims. JA.633-37. BPE is entitled to present its breach of contract defense to a jury.[FN20]

> FN20. In *Cahaly v. Somers,* 52 Mass. App. Ct. 1104 (2001) (Table) (unpublished), 2001 WL 766154 (Mass. App. Ct. Jul. 9, 2001), *review denied,* 435 Mass. 1108 (2002) (Table), involving the same property subsequently used by plaintiff Cahaly in her exchange with BPE (JA.6508- 09), plaintiff successfully asserted this defense to avoid liability on failing to return $74,000 in security deposits to a relative.
> **\*47 B. No Tort Liability.**

### 1. Massachusetts Economic Loss Doctrine.

The Benistar Defendants have no tort liability to the plaintiffs because plaintiffs' tort claims are entirely derivative of their breach of contract claims (JA.638), and the Massachusetts Economic Loss Doctrine bars tort recovery for purely economic losses.

This doctrine provides that purely economic losses are not recoverable in tort actions in the absence of personal injury or damage to property other than the product or transaction itself. *FMR Corp. v. Boston Edison Co.,* 415 Mass. 393, 395 (1993). The rationale underlying the doctrine is that when a commercial transaction or product fails without harming persons or other property, "the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain - traditionally the core concern of contract law." *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 870 (1986). When the product or transaction injures only itself, "[t]he commercial user can protect himself by seeking express contractual assurances ... or by obtaining insurance against losses." *48Bay State-Spray & Provincetown S.S., Inc. v. Caterpillar Tractor Co.,* 404 Mass. 103, 109-10 (1989)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Purely economic losses attributed to the final product or transaction bargained for in a contract cannot be recovered in tort. BPE and the plaintiffs bargained freely in their agreements concerning the allocation of risk and there was no fiduciary relationship as a matter of federal law.[FN21] *See Clark v. Rowe*, 428 Mass. 339, 342 (1998) ("When the economic loss rule has been applied, the parties usually were in a position to bargain freely concerning the allocation of risk, and, more importantly, there was no fiduciary relationship."). Because the $8.6 million in losses caused by PaineWebber are purely economic losses, the Benistar Defendants have no tort liability to the plaintiffs and were not fiduciaries as a matter of federal law.

FN21. Some plaintiffs made hand-written changes to their contracts with BPE. JA.6508; 6315.

### 2. Wrong Law Applied on Corporate Disregard.

The trial court applied Massachusetts law to pierce the veil of Delaware corporations. *Cahaly*, 68 Mass. App. Ct. at 677, n.16. This ruling was erroneous because "[t]he matter is governed by the *49 [Benistar Defendants'] place of incorporation." *Lily Trans. Corp. v. Royal Institutional Serv., Inc.*, 64 Mass. App. Ct. 179, 188 n.15, *review denied*, 445 Mass. 1105 (2005)

"Persuading a Delaware court to disregard the corporate entity is a difficult task." *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) (citation omitted). To pierce a corporate veil under Delaware law, "the corporation must be a sham and exist for no other purpose than as a vehicle for Fraud." *Id.* at 1184 (citation omitted). Not only did the trial court make no such finding, but it held that "some of the Phase III defendants appear to perform independent corporate services and functions unrelated to [BPE]." JA.3154. Consequently, it was improper to pierce the veil of the corporate Benistar Defendants.

CONCLUSION

For the foregoing reasons, this Court should:
1) reverse and vacate the Judgment of the Appeals Court, and dismiss all claims against all of the Benistar Defendants;
2) reverse and vacate the Judgment of the Appeals Court, dismiss all claims against the Benistar Defendants (excluding BPE) for lack of personal jurisdiction, and remand for a new trial only as to BPE; or
*50 3) reverse and vacate the Judgment of the Appeals Court, and grant all of the Benistar Defendants a new trial as to all claims.

Gail A. CAHALY, Jeffrey M. Johnston; Bellemore Associates, LLC; Massachusetts Lumber Company, Inc.; Joseph Iantosca, Individually and as Trustee of the Faxon Heights Apartments Realty Trust and Fern Realty Trust; and Belridge Corporation, Plaintiffs-Appellants, v. BENISTAR PROPERTY EXCHANGE TRUST CO., INC.; Benistar, Ltd.; Benistar Employer Services Trust Corporation; Benistar Admin Services, Inc.; Carpenter Financial Group, LLC; Molly Carpenter;
2007 WL 4892049 (Mass.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.