("NASD").[6] Benistar alleged that UBS had acted improperly in halting option trading in the Benistar accounts—the theory being that they could have recouped their losses if they had been permitted to continue trading.

In November 2004, after judgment had been entered in Massachusetts in favor of Benistar's clients against Benistar, the Massachusetts court assigned the right to prosecute Benistar's arbitration claims against UBS to Benistar's clients. R. 451. As a result, Benistar's clients stepped into Benistar's shoes, and their lawyer from the Massachusetts Litigation became Benistar's counsel in the company's arbitration proceeding against UBS.

Once the clients' lawyer took over as Benistar's counsel, Benistar's theory of the arbitration claim changed radically. New counsel abandoned the claim that UBS had acted improperly in halting option trading in the Benistar accounts. Instead, in an Amended Statement of Claim, Benistar alleged that UBS had acted improperly in permitting Benistar to engage in such trading at all—specifically, that UBS was negligent in failing to discover that Benistar was opening its accounts with its clients' money, and in failing to block Benistar's fraudulent use of its clients' money to engage in options trading. R. 372-94. On

---

[6]    An affiliate, Benistar Employer Services Company, Inc. ("BESTCO"), joined Benistar in the claim, but the arbitration panel eventually ruled in UBS's favor on the claims brought by BESTCO, R. 72, and BESTCO has not challenged that ruling.

this basis, Benistar argued that UBS was liable to it for all the losses that occurred

in its trading accounts. *See id.*[7]

UBS repeatedly explained to the arbitration panel that this theory of

liability was baseless as a matter of law—that UBS could not be held liable to

Benistar for failing to detect its own fraud.  UBS made the point in writing, filing a

Motion for Summary Disposition on September 14, 2005.  R. 265-75.  The panel

did not rule on the Motion for Summary Disposition, so counsel for UBS

continued to make the point orally to the arbitrators during the arbitration hearing

itself. *See, e.g.*, R. 103 (Tr. 665-66), 182 (Tr. 2405-06).  A former judge was even

called to testify to the controlling legal principles.  R. 138 (Tr. 1697-98), 142-44

(Tr. 1714-21).

When UBS's counsel argued to the panel that the law does not allow

recovery by the wrongdoer for failure to detect his fraudulent scheme, the panel

members made clear that they were in no position to rule on such an argument:

> MR. GREEN: We can't make judgments on the technical
> issues that you are raising.  Those are legal
> considerations.  We are specifically not – all we are
> obliged to do is not to egregiously ignore existing law.
> That is our only obligation.

---

[7]    Over UBS's objection, the arbitration panel allowed the filing of the
Amended Statement of Claim less than three weeks before the arbitration was to
begin on September 19, 2005.

THE CHAIRPERSON: Manifest disregard of the law. That is a reason to – we don't want to do that.

MR. GREEN: We judge what happened and <u>we weigh the facts</u> and we are enforcing an NASD rule[8] and <u>not the law.</u>

THE CHAIRPERSON: You are telling us that this is the law, but that is your interpretation of the law. I am sure Mr. Zelle [Benistar's counsel] has a different interpretation, but it puts this panel between a rock and a hard place.

MR. GREEN: It will be fun.

MR. CRONAN: We have presented it, and, respectfully, we believe the Panel is called upon, at times, to make judgments that are about the law. . . .

. . .

THE CHAIRPERSON: <u>You are asking this panel to decide the legal issues, which I am not capable of doing.</u>

MR. GREEN: <u>I am not either.</u>

THE CHAIRPERSON: I am not an attorney. It is your interpretation versus Mr. Zelle's interpretation. <u>You are putting us on the spot of making a ruling on matters of law,</u> which is now – who do we – <u>we will have to decide whether Mr. Zelle is right or you are right. And if the wrong party loses, then they will go darting off to the nearest court looking to vacate the order.</u>

R. 104 (Tr. 668-69, 671) (emphases added).

In short, the panel made clear that it was not capable of ruling on the

legal issues that UBS had raised—issues that went to the heart of the claim—and

---

8       The "rule" referenced was NASD Rule 2310.

that it would not rule on those issues for fear that the losing party would seek to vacate the award on that basis. The effect of not ruling on the legal issues raised by UBS, of course, was to reject UBS's legal theories and defenses.

When counsel for UBS argued that the panel was "bound by the results in the Massachusetts litigation"—at least with respect to the determinations that Benistar had committed fraud, and that UBS owed no duty to Benistar's clients—the panel again refused to listen. R. 108 (Tr. 686). "I will guarantee you," one member of the panel emphasized, "that we will not get into that. . . . That is way over the line from where we are." *Id.* "This is a separate and distinct hearing," the panel's chairperson explained, "with no connection [to the Massachusetts Litigation], as far as we are concerned." R. 80 (Tr. 7). *See also* R. 81 (Tr. 13).

On December 15, 2005, the panel awarded Benistar more than $8.7 million in compensatory damages, $3.8 million in interest, and $125,000 in attorneys' fees. R. 71-77. The damages represented the total losses Benistar incurred as a result of its trading in its entirely non-discretionary accounts at UBS.

**D.    Petition to Vacate Award**

Faced with this remarkable result, UBS filed a Petition to Vacate the Arbitration Award in the IAS Court on January 16, 2006. R. 39. In a decision dated November 16, 2006, the IAS Court denied UBS's Petition in its entirety. R.

-16-

19. The IAS Court acknowledged that the arbitrators' stated reluctance to make

legal rulings "cast a shadow of doubt" on their competence. R. 24. It concluded,

however, that the "reluctance" of the panel was only "preliminary," and that the

panel ultimately "acted in the exact manner that it first stated it would not,"

"consider[ing] the legal issues" and making "legal conclusions necessary to foster

a rational decision." *Id.* Nowhere, however, did the IAS Court cite any legal

conclusions reached by the panel—because no conclusions were stated. And

nowhere did the Court itself explain how the arbitration's outcome could be

squared with the clearly applicable legal principles that were brought to the panel's

and the Court's attention. The only legal argument that the court noted the panel

might have accepted was Benistar's argument that Carpenter, not Benistar, was the

wrongdoer, and that he would not benefit because the claim had been assigned to

Benistar's customers—an argument that, as explained below, overlooked several

incontestable points of law: (a) that Benistar was also found liable for fraud; (b)

that the assignee merely stands in the shoes of the assignor; and (c) that the

assignees had already sued UBS and lost. R. 32.

On April 18, 2007, judgment was entered against UBS in the amount

of the arbitration award plus interest—a total of $14,181,144.45. R. 8-9. Notices

of Entry with respect to the judgment and the underlying IAS Court decision were

served on April 19, 2007, and May 21, 2007, respectively. R. 10, 35. Timely

-17-

Notices of Appeal from the judgment and underlying IAS Court decision were

filed on May 21, 2007.  R. 6, 17.  The appeals are consolidated herein.

## ARGUMENT

This is a classic case of an arbitration panel attempting to impose its "own brand of justice" without regard to the legal principles that control the case—indeed, without regard to prior judicial rulings in a case involving the same parties. Obviously moved by the desire to compensate the victims of Benistar's fraud, the panel ordered UBS to foot the bill. But that result flies in the face of well-established law and a binding judicial judgment. UBS had no legal duty to Benistar to detect and thwart Benistar's fraudulent scheme. And the Massachusetts court had ruled that UBS had no duty of due care to Benistar's clients.

Benistar's victims are entitled to recovery from Benistar, from Carpenter and, if the rulings of the Massachusetts Superior Court and Appeals Court are affirmed, perhaps from Merrill Lynch.[9] But there is no legal alchemy by which a claim can be created against UBS.

The material facts here are not disputed: Benistar committed fraud against its clients by promising them safe money-market returns and instead using

---

[9]    The claims upon which Benistar's clients prevailed at trial against Merrill Lynch were for aiding and abetting a breach of fiduciary duty to Benistar's clients, aiding and abetting conversion, and deceptive trade practices—not negligence. After *jnov* was entered in favor of Merrill Lynch, a new trial was ordered based on newly discovered evidence that Merrill Lynch knew that the funds in its accounts belonged to Benistar's clients, not Benistar. As the Massachusetts court ruled, there is no evidence that UBS had such knowledge. *See Cahaly v. Benistar Prop. Exch. Trust Co.*, 864 N.E.2d 548, 560-61 (Mass. App. Ct. 2007).

-19-

their money to engage in high-risk options trading; Benistar lied to UBS as to the source and ownership of the funds in its accounts; and Benistar, not UBS, was responsible for all of the trading decisions that produced its losses.

The legal principles are also clear and well-established—and were repeatedly brought to the attention of the arbitrators: First, a brokerage firm (here, UBS) has no legal duty to its customer (Benistar) to detect and prevent its customer's own fraud. Second, the assignees of a claim (here, Benistar's clients) acquire no greater rights than those enjoyed by their assignor (Benistar)—in this case, none. And third, the principle of *res judicata* foreclosed recovery based on the rights or claims of Benistar's clients in any event, when they had already litigated their claims against UBS and lost.

The issue here is whether an award can be sustained that disregards these principles altogether. As explained below, it cannot. This award must be vacated on four recognized statutory and non-statutory grounds: (1) the arbitrators manifestly disregarded applicable law; (2) the award is irrational; (3) the arbitrators exceeded their authority; and (4) the arbitrators refused to consider evidence pertaining to the Massachusetts Litigation.[10]

---

[10]     There is no disagreement between UBS and Benistar that FAA standards for the vacatur of arbitration awards apply here, and that New York law controls on matters of substantive law. *See* R. 400.

## I.    THE ARBITRATORS MANIFESTLY DISREGARDED CLEARLY APPLICABLE LAW

"To modify or vacate an award on the ground of manifest disregard of the law, a court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471, 481 (2006) (internal quotation marks omitted). *See also, e.g., Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 202 (2d Cir. 1998) (vacating award); *Sawtelle v. Waddell & Reed, Inc.*, 304 A.D.2d 103, 108 (1st Dep't 2003) (vacating award); *In re Spear, Leeds & Kellogg v. Bullseye Sec., Inc.*, 291 A.D.2d 255, 256 (1st Dep't 2002) (granting vacatur due to manifest disregard of the principle that "individual claimants, as a matter of law, cannot assert a cause of action to recover for wrongdoing done to a corporation").

Both prongs of this test are easily met in this case. The only way the arbitrators could have rendered their award was by disregarding time-honored legal principles. Indeed, the arbitrators were explicit in acknowledging their intention to ignore the law.

### A.    The Applicable Law Is Clear and Well-Defined

The applicable rules of law here are fundamental:  First, UBS had no affirmative legal duty of care to Benistar to discover Benistar's own fraud. *See infra* Section I.A.1. Second, under New York statutory and case law, assignment of

-21-

a claim never expands the claim or alters available defenses. *See infra* Section
I.A.2.a. Third, elementary principles of *res judicata* prevent a party from
recovering on claims that were already adjudicated against it in an earlier court
proceeding. *See infra* Section I.A.2.b. All of this is, quite plainly, "well defined,
explicit, and clearly applicable" law. *See Wien & Malkin LLP, Inc.*, 6 N.Y.3d at
481 (quotation marks omitted).

### 1. UBS Had No Duty To Benistar To Uncover Its Own Conceded Fraud

It would be hard to imagine a tort concept more firmly rooted than
that one party does not owe an affirmative legal duty of care to another to seek out,
discover, and prevent the other's own wrongdoing. Thus, in this case, UBS did not
owe a duty to Benistar to uncover the misrepresentations Benistar made to UBS in
its account application, or to discover that Benistar was misusing its own clients'
funds. UBS, in short, did not owe a duty to Benistar to uncover and stop Benistar's
fraudulent scheme.

Unless UBS owed some such legal duty of care to Benistar, no finding
of negligence on UBS's part is possible. As the Court of Appeals has repeated time
and again, "[t]he threshold question in any negligence action is: does defendant
owe a legally recognized duty of care to plaintiff?" *Hamilton v. Beretta U.S.A.
Corp.*, 96 N.Y.2d 222, 232 (2001) (emphasis added). "If, in connection with the
acts complained of, the defendant owes no duty to the plaintiff, the action must

-22-

fail." *Darby v. Compagnie Nat'l Air France*, 96 N.Y.2d 343, 347 (2001).[11] Here
UBS clearly owed no duty to Benistar to thwart its own fraud. Benistar's claim,
therefore, had to fail.

Duties of due care do not exist in the abstract. "The law demands . . .
that the damaged plaintiff be able to point the finger of responsibility at a
defendant owing, not a general duty to society, but a specific duty to him."
*Johnson v. Jamaica Hosp.*, 62 N.Y.2d 523, 527 (1984) (emphasis added). *See also,
e.g., Hamilton*, 96 N.Y.2d at 232; *Lauer v. City of New York*, 95 N.Y.2d 95, 100
(2000). And the law imposes such a duty only when the relationship between the
parties requires it. As Justice Benjamin Cardozo wrote in one of the landmark
cases confirming this principle: "Negligence is not actionable unless it involves
the invasion of a legally protected interest, the violation of a right. Proof of
negligence in the air, so to speak, will not do." *Palsgraf v. Long Island R.R. Co.*,
248 N.Y. 339, 341 (1928) (internal quotation marks omitted).

---

[11]    *See also, e.g., Espinal v. Melville Snow Contrs., Inc.*, 98 N.Y.2d 136, 138
(2002) ("Because a finding of negligence must be based on the breach of a duty, a
threshold question in tort cases is whether the alleged tortfeasor owed a duty of
care to the injured party."); *Lauer v. City of New York*, 95 N.Y.2d 95, 100 (2000)
("Without a duty running directly to the injured person there can be no liability in
damages . . . ."); *Hamilton v. Beretta U.S.A. Corp.*, 264 F.3d 21, 30 (2d Cir. 2001)
("[I]t is black-letter law in New York that a plaintiff cannot recover on a negligence
claim absent some duty of care owed by defendant to the plaintiff.").

The threshold question in this case is whether UBS had any duty of due care <u>to Benistar</u> to discover the misrepresentations Benistar was making to UBS and then to prevent Benistar from carrying out the fraudulent scheme it was perpetrating on its own clients. That question answers itself. As the wrongdoer, Benistar obviously cannot claim that it was owed a duty by UBS to prevent its own wrongdoing. "[W]here a defendant's only sin is its failure to prevent transgressions by the plaintiff, no benefit flows to the public from rewarding the transgressor." *Miller v. N.Y. Produce Exch.*, 550 F.2d 762, 768 (2d Cir. 1977). The transgressor, in short, can claim no duty by another "to prevent [its] transgressions."

This basic principle has been applied in a variety of settings, and with various doctrinal labels, to prevent a party guilty of fraud from seeking to recover from others who are alleged to have assisted in the fraud or allowed it to take place. Thus, this Court long ago explained that a company engaged in a fraudulent investment scheme could not bring claims of aiding and abetting against stock exchange members, where the company itself was "responsible for the illegal transaction and [a party] to the fraud." *Barnes v. Schatzkin*, 215 A.D. 10, 13 (1st Dep't 1925), *aff'd*, 242 N.Y. 555 (1926). The same principle is often cited as the basis for barring claims against third parties (like UBS) by the bankruptcy trustees of companies that perpetrated fraudulent schemes (like Benistar). As the Second

-24-

Circuit has reiterated, a company has "no standing to assert aiding-and-abetting claims against third parties for cooperating in the very misconduct that it had initiated." *See In re Mediators, Inc.*, 105 F.3d 822, 826 (2d Cir. 1997) (citing *Barnes*). Thus, a "claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991) (citing *Barnes*) (emphasis added).[12]

Indeed, for well over a century, it has been settled New York law that "[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere been superseded by statutes." *Riggs v. Palmer*, 115 N.Y. 506, 511-12 (1889) (emphasis added).

New York courts have reaffirmed this common-sense principle in more recent times, applying it in a variety of circumstances to bar recovery by wrongdoers. In *Stuart v. Tomasino*, 148 A.D.2d 370, 373-74 (1st Dep't 1989), for

---

[12]    *See also, e.g., In re Bennett Funding Group, Inc.*, 336 F.3d 94, 96, 102 (2d Cir. 2003) (barring claim by bankruptcy trustee against "the company's lawyers and an accounting firm on the theory that they should have detected the fraud"); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir. 1995) (barring claims by bankruptcy trustee for company implicated in fraudulent scheme alleging professional malpractice against the company's accountants and lawyers).

example, this Court found that summary judgment should be denied to plaintiffs—even where the defendants failed to submit any evidence—because fact issues existed as to whether the plaintiffs were knowing participants in the fraudulent scheme that led to the losses for which they were seeking recovery. "If the latter is established," this Court held, "then those plaintiffs would be barred from recovering since one may not profit from his own wrongdoing." *Id.* at 374.[13]

In this case, it is undeniable that Benistar was guilty of wrongful conduct—and it is inconceivable that UBS owed any duty <u>to Benistar</u> to detect and prevent its wrongful conduct. Benistar misappropriated money from its clients, lied to UBS to open an account, and took a joyride with the stolen money through speculative trades of its own choosing. If those trades had turned a profit, Benistar would have kept the gains, over and above what it promised its clients. Having suffered losses instead, it asked the arbitrators to make someone else, UBS, pay the price. In this multi-million-dollar version of the playground principle "heads I win, tails you lose," Benistar enjoyed the potential for substantial gain if its bets

---

[13]    Citing the same age-old principles, the Court of Appeals has barred tort recovery to a 15-year-old plaintiff whose injuries resulted from his construction of a "pipe bomb," *Barker v. Kallash*, 63 N.Y.2d 19 (1984), and a plaintiff whose injuries stemmed from joyriding with a high-school friend, *Manning v. Brown*, 91 N.Y.2d 116 (1997). *See also, e.g., Reno v. D'Javid*, 42 N.Y.2d 1040 (1977); *Carr v. Hoy*, 2 N.Y.2d 185 (1957); *Countrywide Home Loans, Inc. v. Lafonte*, No. 14265/01, 2003 WL 1389089 (N.Y. Sup. Ct., Nassau County Feb. 13, 2003).

had turned our right, and was able to place the losses on UBS's shoulders when its bets turned out wrong.[14]

The law, of course, imposes different rules than the ones that prevail on the playground. During the arbitration, UBS repeatedly brought the applicable legal principles to the panel's attention, highlighting two aspects of Benistar's wrongdoing: (1) its fraudulent misuse of its clients' funds for speculative option trading; and (2) the misrepresentations Benistar made to UBS in furtherance of the overall fraudulent scheme. *See, e.g.*, R. 103 (Tr. 665-66); *see also* R. 143 (Tr. 1718) (testimony of former judge noting that the law in New York is that "wrongdoers cannot profit by their own wrongdoing").

Benistar made no attempt to deny the fraudulent scheme that formed the basis of UBS's defense. Nor, indeed, could it have done so, as the Massachusetts court had found that Benistar had defrauded its customers by its unauthorized use of their funds to trade options in its Merrill Lynch and UBS accounts. Thus, Benistar's counsel freely admitted in the course of the arbitration that Benistar had defrauded its customers: "there is, as a matter of fact, <u>an admission on my part that, yes, indeed Benistar Property did perpetrate a fraud</u> on

_____

[14]    To put the claim here in even starker terms, it is as if a criminal sued the police for failing to arrest him before he could commit additional crimes. *See Farley v. Town of Hamburg*, 34 A.D.3d 1294 (4th Dep't 2006) (concluding that the police "owed no duty to [a suspect] to accomplish his arrest").

[its customers]." R. 146 (Tr. 1729) (emphasis added).  *See also* R. 131 (Tr. 1546-
47) ("I can tell you that I will stipulate that Benistar Property Exchange was found
liable on counts of conversion, fraud, [and] breach of fiduciary duty . . . .").

       Benistar's fraud, as found by the Massachusetts court and conceded
by Benistar's counsel, was also carried out in part through affirmative
misrepresentations to <u>UBS itself</u>. As UBS's counsel explained to the panel,
Benistar "lied to [UBS], in the same way, unfortunately," that it had lied to
Benistar's clients. R. 103 (Tr. 666). The most significant of the lies to UBS were
(1) the representation that the funds were Benistar corporate assets, and not
escrowed client funds, *see, e.g.*, R. 156 (Tr. 1884) (testimony of UBS witness that
"the actual sources of the funds was clearly a lie, he told us that it was all
Benistar's money"); and (2) the representation that Benistar and Carpenter had the
right to trade the funds (supposedly Benistar's own) in uncovered options, R. 202-
05, 210-13, 84 (Tr. 169), 122-23 (Tr. 1075-76), 154-56 (Tr. 1876, 1881-84). Again,
Benistar did not dispute that these misrepresentations occurred.[15]

---

[15]    During the hearing, there was no suggestion that the misrepresentations had
not occurred; instead, Benistar (and the arbitrators, as evidenced by their questions
and comments, *see, e.g.*, R. 175 (Tr. 2377), 190 (Tr. 2436-37)) advanced a theory
that UBS had missed "red flags" that would have allowed it to ferret out the lies
and wrongdoing at an earlier stage—precisely the theory that Benistar, as the
wrongdoer, should have been foreclosed from advancing.

The patent absurdity of holding that UBS had a legal duty <u>to Benistar</u> to discover and prevent Benistar's conceded fraud, and ultimately to prevent its own trading losses, is compounded here by two additional considerations:

- First, even aside from the fraud by Benistar, courts have repeatedly recognized the highly circumscribed scope of any duty owed by a broker to a customer holding a nondiscretionary investment account. As UBS pointed out to the panel (with no disagreement from Benistar), it is clearly established that a broker owes only the most limited duty to the holder of a nondiscretionary account, who "by definition keeps control over the account and has full responsibility for trading decisions." *De Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002); *see also* R.172-73 (Tr. 2364-69). As the Second Circuit explained in the cited decision (whose text was quoted to the arbitration panel, *see* R. 173 (Tr. 2368)): "We are aware of no authority for the view that, in the ordinary case, a broker may be held to an open-ended duty of reasonable care, to a nondiscretionary client, that would encompass anything more than limited transaction-by-transaction duties." 306 F.3d at 1306.[16]

_____

[16]    *See also, e.g., Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998) ("[W]here the customer maintains a nondiscretionary account, the broker's duties are quite limited."); *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999); *Sands Bros. & Co. v. Alba Perez TTee Catalina Garcia Revocable Trust*, No. 04 Civ. 0005(JFK), 2004 WL 2186574 (S.D.N.Y. Sept. 28, 2004); *Fesseha v. TD Waterhouse Investor Servs., Inc.*, 305 A.D.2d 268, 268-69 (1st Dept. 2003) ("The claim for breach of fiduciary

-29-

- Second, it was Benistar's own, voluntary decisions that led to the trades resulting in its losses. Benistar's chairman, Carpenter, expressly acknowledged to UBS that Benistar was wholly responsible for all trading losses in its nondiscretionary accounts. R. 88-89 (Tr. 199-200, 381), 117 (Tr. 957), 162 (Tr. 1987). Therefore, not only was there no duty here on the part of UBS; there was no proximate cause between UBS's actions (or inactions) and Benistar's own trading losses. *See, e.g., Bennett v. U.S. Trust Co.*, 770 F.2d 308, 313-14 (2d Cir. 1985) (no proximate cause because "[t]he loss at issue was caused by [plaintiff's] own unwise investment decisions"); *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. LLC*, No. 00 Civ. 9214 (RWS), 2007 WL 2948115, at *21 (S.D.N.Y. Oct. 3, 2007); *Nat'l Commercial Bank v. Morgan Stanley Asset Mgmt., Inc.*, No. 94 Civ. 3167(DC), 1997 WL 634292, at *7 (S.D.N.Y. Oct. 15, 1997); *see also* R. 172 (Tr. 2364-65).

---

duty was properly dismissed since plaintiff opened a nondiscretionary trading account, and the relationship between plaintiff and defendant was merely that of broker and customer . . . ."); *In re Dean Witter Managed Futures Ltd. P'ship Litig.*, 282 A.D.2d 271, 271 (1st Dept. 2001) (dismissing fiduciary duty claim where "plaintiffs have not alleged that they had anything more than ordinary broker-client relationships with their . . . brokers"); *Liberman v. Worden*, 268 A.D.2d 337, 339 (1st Dept. 2000) (affirming dismissal of fiduciary duty based on a nondiscretionary account); *Fekety v. Gruntal & Co.*, 191 A.D.2d 370, 371 (1st Dept. 1993) ("[A] broker does not, in the ordinary course of business, owe a fiduciary duty to a purchaser of securities."); *Perl v. Smith Barney Inc.*, 230 A.D.2d 664, 666 (1st Dept. 1996) (same).

In fact, the account agreement between UBS and Benistar confirmed that lack of proximate causation: "Client [Benistar] agrees that <u>Client will be liable for any losses from any and all account transactions</u> effected by any person authorized to effect such transactions in Client's account(s) . . . ." R. 400 (emphasis added); *see also* R. 89 (Tr. 380-81) (testimony regarding this provision during arbitration proceedings). The arbitration award inverted this rule— awarding Benistar damages for the losses resulting from its own trading decisions.

For all of these reasons, the award is legally baseless. A finding that UBS owed and breached a duty to Benistar to discover Benistar's own fraud, and to prevent Benistar's own trading losses, simply cannot be reconciled with the clearly established rules of law that were brought to the panel's attention.

### 2.    UBS Had No Duty to Benistar's Clients

Neither Benistar's counsel nor the arbitration panel made any attempt to address the basic flaw in the claim that was advanced to it—that UBS had no legal duty to Benistar to detect Benistar's own fraud. Indeed, Benistar's initial counsel knew better than to advance such a theory: their claim was not that UBS should have detected the fraud and prevented the trades that resulted in the losses, but rather that UBS should have allowed the trading to continue so that Benistar could have turned its fortunes around. Only when Benistar's claim was assigned to Benistar's clients—and counsel for the clients took over prosecution of Benistar's

claim—was the theory advanced that UBS had been negligent in failing to detect

the fraud when it opened the accounts in the first place. According to Benistar's

new counsel, the mere assignment of the claims changed everything, allowing

Benistar suddenly to avoid the barriers that would have previously prevented it

from recovering. Because any recovery from UBS in the arbitration proceeding

would ultimately go to Benistar's customers, not to Benistar, those barriers, in the

view of Benistar's new arbitration counsel, disappeared. The arbitrators evidently

agreed.

   As Benistar's arbitration counsel (the clients' counsel in the

Massachusetts Litigation) subsequently explained to the Massachusetts court:

> The [arbitration] panel . . . viewed this as a case where there
> would be no benefit to that party with the unclean hands
> [Benistar]. To the contrary, because the funds would ultimately
> go to the real parties [in] interest[] in that proceeding, . . . the
> consolidated plaintiffs here [Benistar's clients], they rejected
> that defense and <u>awarded the funds to Benistar Property
> Exchange solely based on the understanding and belief and
> determination that the funds would go to the consolidated
> plaintiffs [Benistar's clients].</u>

R. 727 (emphasis added).[17]

   The problem with that justification for the award is twofold: First,

under New York's long-standing law of assignment, the assignee of a claim

---

[17]  Counsel made the quoted statement to the Massachusetts Superior Court in
a successful effort to persuade the court that he, not Benistar's original counsel,
should be permitted to defend the arbitration award in these vacatur proceedings.