(Benistar's clients) steps into the shoes of the assignor (Benistar), is limited to the assignor's claims, and is subject to all of the same defenses as the assignor. And second, even if Benistar's clients could assert their own claims against UBS, they had already asserted those claims in court in Massachusetts and lost! However one views the arbitration claim, therefore—as Benistar's claim or as the claim of its clients—it was doomed from the start.

### a. The New York Law of Assignment

The law regarding assignment of claims could not be more clear. It is established by statute, has been confirmed in repeated judicial decisions, and was clearly explained to the panel. An assignee stands in precisely the same position as his assignor—no better and no worse, limited to the same claims, and subject to the same defenses.

The pertinent New York statute states unequivocally: "Where a claim or demand can be transferred, the transfer thereof passes an interest, which the transferee may enforce . . . subject to any defense or counter-claim, existing against the transferrer . . . ." N.Y. Gen. Obl. Law § 13-105. "[T]ransfer" is expressly defined by the statute to include "assignment." *Id.* § 13-109. The plain text says it all: "any defense" is applicable.

This rule is repeated in numerous decisions of the courts of New York. As the Court of Appeals has stated: "It is elementary ancient law that an assignee

never stands in any better position than his assignor." *Int'l Ribbon Mills, Ltd. v.*

*Arjan Ribbons, Inc.*, 36 N.Y.2d 121, 126 (1975) (emphasis added). *See also, e.g.,*

*Trans-Resources, Inc. v. Nausch Hogan & Murray*, 298 A.D.2d 27, 30 (1st Dep't

2002) ("An assignee takes a cause of action subject to all the infirmities, equities

and defenses that could have been asserted against the assignor at the time of the

assignment . . . . The assignment only gives [the party] the right to bring this

action against defendant. It does not purport to insulate [the party] from any

defense that may be asserted against it . . . ."); *Crispino v. Greenpoint Mortg.*

*Corp.*, 304 A.D.2d 608, 609 (2d Dep't 2003); *Roslyn Assocs. v. Inc. Vill. of*

*Mineola*, 84 A.D.2d 581, 581 (2d Dep't 1981); *Robischon v. Genesee Valley Med.*

*Care, Inc.*, 92 Misc. 2d 854, 856 (N.Y. Sup. Ct., Monroe County 1977), *aff'd*, 65

A.D.2d 681 (4th Dep't 1978); 6 Am. Jur. 2d *Assignments* § 144 (2007) ("[T]he

assignee cannot recover more than the assignor could recover, and the assignee

never stands in a better position than the assignor." (footnote omitted)).

　　　　Lest the panel be under any misapprehension on the subject, UBS

provided expert testimony from former Judge J. Owen Todd, who explained to the

arbitrators: "After an assignment of a claim to prosecute takes place, it is just as if

the claim was being prosecuted by the original owner. . . . They [the assignees]

stand in the shoes of Benistar, and [are] subject to the same defenses including

unclean hands, wrongful conduct, whatever the defense is." R. 138 (Tr. 1697-98),

141 (Tr. 1709). No contrary testimony was offered, and no attempt was made to undermine this testimony on cross-examination. R. 145-46 (Tr. 1725-28). In fact, Benistar itself acknowledged in its Amended Statement of Claim that its clients "now stand in the shoes of Benistar Property." R. 374 (emphasis added).

In short, the governing law is clear and uncontroverted: Benistar's clients could not, by virtue of the assignment, have acquired any more legal rights than Benistar itself enjoyed. It makes no difference that the recovery would go to Benistar's customers: the law takes that as a given. The claim, however, remains that of Benistar, the assignor. And UBS owed no duty to Benistar to detect its fraud and prevent its losses.

### b.   *Res Judicata*

Even if one ignores the law of assignment—and treats the claim here as that of Benistar's clients—the result is the same. The clients had already asserted their claims against UBS, and the Massachusetts court had ruled against them on the merits. Their claim of negligence—that UBS had failed to exercise due care to detect the fraud and prevent the trading from the start—was dismissed as a matter of law, on the ground that "a broker does not owe a duty of care to the customers of its customer." R. 370. The court then granted summary judgment to UBS on the remaining claims—aiding and abetting Benistar's wrongful conduct—on the ground that there was no evidence that UBS had "participated in,"

-35-

"substantially assisted" or "conceal[ed]" Benistar's wrongful acts. R. 251. The clients did not appeal the dismissal of their negligence claim, and the grant of summary judgment to UBS on the remaining claims was affirmed on appeal.

Benistar's clients are bound by the judgment against them in Massachusetts, and the arbitrators were not free to disregard it. Arbitrators may not ignore the principle of *res judicata. See, e.g., Fajemirokun v. Dresdner Kleinwort Wasserstein Ltd.*, 27 A.D.3d 320 (1st Dep't 2006) (*res judicata* barred relitigating claims in court proceeding that were already decided in NASD arbitration); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Benjamin*, 1 A.D.3d 39 (1st Dep't 2003) (claim raised in arbitration that could have been raised in an earlier divorce proceeding was barred by *res judicata*); *Aircraft Braking Sys. Corp. v. Local 856 Int'l Union*, 97 F.3d 155, 159 (6th Cir. 1996) (arbitrators "are not free to ignore" the doctrines of *res judicata* and collateral estoppel).

"Under the doctrine of res judicata, a party may not litigate a claim where a judgment on the merits exists from a prior action between the same parties involving the same subject matter." *In re Hunter*, 4 N.Y.3d 260, 269 (2005); *see also, e.g., In re Reilly v. Reid*, 45 N.Y.2d 24, 27 (1978) ("It is blackletter law that a valid final judgment bars future actions between the same parties on the 'same cause of action.'"); *Partlow v. Kolupa*, 122 A.D.2d 509, 510 (3d Dep't 1986)

("[T]he judgment in the former action is conclusive in the later." (quotation marks omitted)).

Echoing these doctrines, Judge Todd again spelled out the preclusive effects of the Massachusetts judgment for the arbitration panel. R. 142-44 (Tr. 1714-18, 1721). Counsel for UBS repeatedly reminded the panel that Benistar's clients had already lost their claims against UBS in the Massachusetts Litigation. *See, e.g.*, R. 100-01 (Tr. 654-56), 109 (Tr. 688). Indeed, counsel for Benistar himself explained the basis for the Massachusetts court's ruling on the clients' negligence claim: "PaineWebber [UBS] got out because third parties generally are not permitted to sue brokers. . . . Third parties aren't permitted to sue brokers, or at least recover against brokers, unless there is evidence of collusion that they were in it together." R. 94 (Tr. 630).

In short, Benistar's customers had litigated their claims against UBS and lost, leaving them with no viable claims to assert in an arbitration. The question that presents itself, then, is this: if Benistar's clients had no viable claims against UBS, and Benistar had no viable claims against UBS, then where did the claim that was sustained by the arbitration panel come from? The answer is apparent: it was created out of thin air, in the apparent belief that an assignment from one party to another somehow permits the arbitrators to overlook the flaws in both parties' claims. Arbitration, however, is not like multiplication: the

-37-

combination of two negatives does not produce a positive result. When no one has a claim against UBS for recovery of the losses at issue—neither Benistar nor its clients—no possible combination or substitution of lawyers and theories can give rise to a claim against UBS.

**B.    The Arbitrators Disregarded The Law**

The only way the arbitration panel could have rendered its award was to disregard the established law that was repeatedly brought to its attention. The arbitrators were told time and again, both orally and in writing, of the legal rules that barred Benistar's claims—that UBS had no duty to uncover Benistar's own fraud;[18] that the assignment of Benistar's claims to its customers did not alter available defenses;[19] and that under the principle of *res judicata* the Massachusetts judgment was entitled to preclusive effect.[20] These legal principles were brought to the panel's attention in ways that its members could not have missed, including through the testimony of a former judge.

That the arbitrators' award cannot be reconciled with clearly established law that was brought to their attention is all that needs to be shown to establish manifest disregard of the law, and thus require vacatur. Manifest

---

[18]    *See, e.g.*, R. 103 (Tr. 665-66), 182 (Tr. 2405-06), 265-75.

[19]    *See, e.g.*, R. 138 (Tr. at 1697-98), 99-100 (Tr. 651-63).

[20]    *See, e.g.*, R. 142-43 (Tr. 1714-18), 144 (Tr. 1721), 99-100 (Tr. 651-63).

disregard can be shown "where the arbitrator ignored" governing law "after it was brought to the arbitrator's attention in a way that assures that the arbitrator knew its controlling nature." *Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2002). *See also Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003) (noting that "[i]n determining an arbitrator's awareness of the law," a court imputes "knowledge of governing law identified by the parties to the arbitration"). "The manifest disregard doctrine is <u>not</u> confined to that rare case in which the arbitrator provides us with explicit acknowledgment of wrongful conduct." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 218 (2d Cir. 2002) (emphasis added).

This is, however, among those "rare cases" in which the arbitrators' manifest disregard of the law was "explicit." *Id.* In this case, as in *In re UBS Warburg LLC v. Auerbach, Pollack & Richardson, Inc.*, 294 A.D.2d 245 (1st Dep't 2002), the arbitrators' own words bring into sharp relief how they "overtly disregarded the law." *Id.* at 246 (affirming vacatur of award, noting "one of the majority panelists' statement that she would not read the applicable cases and regulatory authorities"). The arbitrators here actually indicated <u>on the record</u> exactly what they were planning to do.

When counsel for UBS pointed out the fatal legal flaw in Benistar's case—that "[t]he law doesn't allow" a claim by Benistar that UBS was "negligent

for not having caught [it] committing . . . intentional fraud"—the arbitrators

responded that they "can't make judgments" on such "technical issues," because

they involved "legal considerations." R. 103-04 (Tr. 665-66, 668). The panel said

that its role was solely to "judge what happened," to "weigh the facts," and to

"enforce[e] an NASD rule and <u>not the law</u>." R. 104 (Tr. 668) (emphasis added).

When UBS's counsel insisted that "the Panel is called upon, at times, to make

judgments about the law," the panel's chairperson held firm: "<u>You are asking this</u>

<u>panel to decide the legal issues, which I am not capable of doing</u>." R. 104 (Tr. 671)

(emphasis added). A second panel member agreed: "I am not either." *Id.* The

chairperson was quite explicit that the panel did not want to be put "on the spot of

making a ruling on matters of law," out of fear that the losing party "will go darting

off to the nearest court looking to vacate the order." *Id.*

   In short, the panel was unwilling to rule on the legal issues because it

did not want to give the losing party an argument that it got the law wrong. But

that was an abdication of the panel's responsibility to decide all of the issues in the

case, including the legal ones. Under the manifest-disregard-of-the-law standard, a

mere error of law may not be a ground for vacating the award. But refusing to

consider the legal issues at all, as the panel did, is a classic example of manifest

disregard of the law.

The IAS Court acknowledged that the arbitrators' remarks "cast a shadow of doubt" on their competence. R. 24. It concluded, however, that "[t]he statements cited by UBS merely elude [sic] to the preliminary reluctance of the Panel and/or repugnance of the idea of making judicial-type legal rulings." *Id.* The IAS Court purported to find evidence elsewhere in the transcript that the panel ultimately "acted in the exact manner that it first stated it would not," "consider[ing] the legal issues" and making "legal conclusions necessary to foster a rational decision." *Id.* That evidence cited by the Court, however, is unpersuasive.

The Court noted that after the chairperson remarked that they were being put "between a rock and a hard place" by being asked to rule on matters of law, another panel member noted, "It will be fun." R. 104 (Tr. 668) (quoted at p. 15, *supra*). The Court interpreted the second panel member's comment to reflect a determination to decide the legal issues after all. R. 31. But that same panel member stated again, three pages later in the transcript, that he was not capable of deciding the legal issues, R. 104 (Tr. 671), so his earlier remark "[i]t will be fun" can hardly be taken as an indication that he would in fact decide them.

The IAS Court also cited questions asked by the panelists, but no conclusions reached by them. R. 31. It cited arguments <u>by counsel</u>, but no ruling or even tentative statements <u>by any panelist</u> on the two critical legal contentions:

-41-

(1) that UBS had no duty to Benistar to detect and prevent Benistar's wrongdoing;

and (2) that the Massachusetts court had held that UBS had no duty to Benistar's

customers.

There is, in sum, ample direct evidence that the panel was

uninterested in grappling with the legal issues that UBS had raised.  But the case

ultimately does not turn on whether there is direct evidence that the arbitrators

disregarded the law.  As already noted, "[t]he manifest disregard doctrine is <u>not</u>

confined to that rare case in which the arbitrator provides us with explicit

acknowledgment of wrongful conduct." *Westerbeke Corp.*, 304 F.3d at 218

(emphasis added).  Manifest disregard of the law occurs when "the arbitrators

knew" of a "clearly applicable" legal principle and "refused to apply it." *Wien &*

*Malkin LLP*, 6 N.Y.3d at 481 (quotation marks omitted).  And "[i]n determining an

arbitrator's awareness of the law," a court imputes "knowledge of governing law

identified by the parties to the arbitration." *Duferco Int'l Steel Trading*, 333 F.3d

383 at 390.  There were "clearly applicable" legal principles here, which were

brought to the panel's attention and which it "refused to apply."  That is more than

enough to warrant vacating the award.

In an effort to defend the award, the IAS Court cited factual evidence

of what it regarded as UBS's failure to adhere to the "'know your customer' rules"

when UBS did not detect and prevent Benistar's fraud—evidence that Merrill

-42-

Lynch had ended its relationship with Benistar, that UBS did not conduct a "thorough investigation . . . into Benistar," and that it had "only briefly" visited the Benistar website that described its property exchange business.  R. 25-26.  But the Court, like the arbitration panel, failed altogether to address the central legal question:  whether, in the first place, UBS's general duty to know its customer included a duty to the customer to see through the customer's own lies and prevent the customer's fraud on third parties.  The answer to that question is clearly no. The purpose of a "know your customer rule" is "to protect customers from risk, not identify them as potential perpetrators of fraudulent activity." *Weber v. E.D.& F. Man Int'l, Inc.*, No. 97 C 7518, 1999 WL 258496, at *3 (N.D. Ill. Apr. 9, 1999). Moreover, there is no private cause of action under either of the "rules" alluded to by the Court—NASD Rule 2310 or New York Stock Exchange Rule 405.  *See, e.g., Tucker v. Janney Montgomery Scott, Inc.*, No. 96 CIV 1923(LLS), 1997 WL 151509, at *3 (S.D.N.Y. Apr. 1, 1997); *Jaksich v. Thomson McKinnon Sec., Inc.*, 582 F. Supp. 485, 501 (S.D.N.Y. 1984).

Finally, the IAS Court noted that the arbitration panel was "evidently persuaded" by the argument "that Carpenter committed an ultra vires act of fraud, and due to an assignment of claims from Benistar to its customers, unclean hands does not apply because Carpenter (the wrongdoer) will not benefit from the award."  R. 32.  To the extent, however, that the Court meant that Benistar was not

-43-

itself guilty of fraud, that disregarded the judgment in Massachusetts that Benistar

had engaged in fraud, R. 300-27, as well as Benistar's counsel's concession that

Benistar itself had engaged in fraud, R. 146 (Tr. 1729), 131 (Tr. 1546-47), 550.

And to the extent that the Court meant that the assignment of the claim to

Benistar's clients justified the result, that disregarded not only the law of

assignment, but also the judgment that UBS owed nothing to Benistar's clients.

In short, it was only by disregarding the applicable legal principles

that this award could have been rendered or sustained. It must, therefore, be

vacated.

## II.    THE MULTI-MILLION-DOLLAR AWARD TO BENISTAR IS WHOLLY "IRRATIONAL"

In addition to manifest disregard, this Court has recognized that

irrationality is an independent, non-statutory ground for vacatur of an arbitration

award under the FAA. *See, e.g., Uram v. Garfinkel*, 16 A.D.3d 347, 348 (1st Dep't

2005) (explaining that "a court may vacate an arbitration award either on a ground

set forth in section 10(a) of the FAA or on one of several nonstatutory grounds,

such as manifest disregard of the law or irrationality"); *In re Spear, Leeds &

Kellogg*, 291 A.D. 2d at 256 (vacating portion of NASD award as "irrational");

*Sawtelle*, 304 A.D.2d at 108 (recognizing the "'nonstatutory'" ground of

"irrationality" and vacating award on that basis).

-44-

In *Sawtelle*, for example, this Court was faced with an arbitration award containing punitive damages that could not be squared with the Supreme Court's established Due Process Clause standards for punitive awards. This Court found that a "grossly excessive award that is arbitrary and irrational under" the Supreme Court precedent "should be equally arbitrary and irrational under the FAA." 304 A.D.2d at 109. In turn, this Court vacated the award, holding that an award so out of line with the law "cannot stand." *Id.* at 113.

Like the punitive damage award in *Sawtelle*, the award here cannot be reconciled with well-established legal principles. The arbitrators here fashioned a claim where none existed under the law. For the reasons explained in Section I.A.1, *supra*, UBS owed no duty to Benistar to seek out and discover its fraudulent scheme. And, as already decided in the Massachusetts Litigation, UBS owed no duty to the third-party clients of Benistar. Presented with these circumstances, it was irrational for the arbitration panel to render an award for more than $12 million against UBS. *See In re State Office of Mental Health v. N.Y. State Corr. Officers & Police Benevolent Ass'n*, 46 A.D.3d 1269, 848 N.Y.S.2d 444, 446 (3d Dept. 2007) (holding that "the failure to recognize and accept judgments of conviction and give them preclusive effect in subsequent proceedings is irrational," requiring vacatur of the arbitration award).

-45-

Stated simply, if neither Benistar nor its client had a valid claim against UBS, there is no rational basis upon which an award can be based. Once again, the IAS Court completely ignored this problem, as did the arbitration panel itself. The Court noted, and the panel evidently concluded, simply that UBS failed to conduct an investigation of its client sufficient to discover that, contrary to Benistar's representation, the funds it was investing belonged to someone else. But that does not make it rational to render an award <u>to Benistar</u>. The theory of the claim was not that Benistar was not sufficiently sophisticated to be permitted to engage in option trading; the theory was that UBS should have discovered that Benistar had misappropriated its customers' money and was violating duties it owed to them. It is completely irrational to say that UBS breached a duty to Benistar by believing Benistar's representations that the money consisted of its own corporate funds. And it is equally irrational to say that recovery should be awarded on the theory that UBS violated a duty to Benistar's clients, when a court had already determined that there was no such duty. Such an irrational award "cannot stand." *Sawtelle*, 304 A.D.2d at 113.

## III.   THE PANEL EXCEEDED ITS AUTHORITY

An arbitration award must be vacated if the arbitrators "exceeded their powers." *See* 9 U.S.C. § 10(a)(4). In applying that provision of the FAA, the court must consider "'whether the arbitrator[s] acted within the scope of [their]

authority,' or whether the arbitral award is merely the 'arbitrator[s'] own brand of justice.'" *See Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 262 (2d Cir. 2003) (alterations in original) (quoting *Local 1199 v. Brooks Drug Co.*, 956 F.2d 22, 25 (2d Cir. 1992)). Here it is clear that the arbitrators administered their "own brand of justice"—by deciding the case without regard to the law that was supposed to guide and limit them in the exercise of their powers.

The panel here believed that they had such "wide latitude" that "[w]e can read these things and take our own interpretation with . . . no punishment attached to it." R. 144 (Tr. 1723) (emphasis added). They thought they were to simply "judge what happened and weigh the facts," but "not the law." R. 104 (Tr. 668). But it is the "law," established over time by others, that ensures that arbitrators are not dispensing their "own brand of justice."

Arbitrators exceed their powers "when they fail to meet their obligations, as specified in a given contract, to the parties." *W. Employers Ins. Co. v. Jefferies & Co.*, 958 F.2d 258, 262 (9th Cir. 1992) (emphasis omitted). The obligation of the arbitrators here was to apply New York law to the facts. The arbitration agreement states unambiguously that "the relationship between the Client [Benistar] and the firm [UBS] shall be governed by the laws of the state of New York." R. 400 (emphasis added). The panel thought otherwise. In direct opposition to the governing contract, the panel made no bones about its view that

-47-

"this panel" was "not capable" of "decid[ing] the legal issues." R. 104 (Tr. 671).

Once they determined that they were "not capable" of "decid[ing] the legal issues,"

*id.*—once they declined to "make judgments" on the "legal considerations" raised

by UBS, R. 104 (Tr. 668)—they "fail[ed] to meet their obligations" under the

contract.

       The arbitrators here also exceeded their authority in a second, distinct

respect.  Arbitrators exceed their powers when they decide an issue that is not

before them—an issue that they did not have the "power . . . to reach." *See Banco*

*de Seguros del Estado*, 344 F.3d at 262 (quotation marks omitted); *Hoeft v. MVL*

*Group, Inc.*, 343 F.3d 57, 71 (2d Cir. 2003).  The conclusion is inescapable—and

indeed, Benistar's counsel conceded as much[21]—that the arbitrators here decided

whether <u>Benistar's clients</u> deserved compensation.  But that was not the question

they were authorized to decide.  Indeed, as explained above, the question that the

arbitrators evidently decided had already been answered in the Massachusetts

Litigation, where the clients' claims were dismissed.  The arbitrators were asked to

decide whether <u>Benistar</u> was entitled to compensation from UBS under New York

law, and the clear answer to that question is no.  That was the only claim asserted

in the arbitration, and it was the only claim asserted in Benistar's Amended

Statement of Claim.  *See R.* 372-94.

---

[21]  R. 727 (quoted at p. 32, *supra*).

Arbitrators do not have the power to grant relief on claims not asserted in the arbitration. *See In re Spear, Leeds & Kellogg*, 291 A.D.2d at 256 (holding that "the panel exceeded its authority by granting relief on claims not asserted in the amended statement of claim"). Furthermore, arbitration panels lack the authority to relitigate claims that have already been decided. *Motor Vehicle Accident Indemnification Corp. v. Travelers Ins. Co.*, 246 A.D.2d 420, 422 (1st Dep't 1998) ("Based on the principle of res judicata, an arbitrator exceeds his power by conducting a hearing and making an award premised on the same claim as a prior award . . . ."); *Casey v. Country-Wide Ins. Co.*, 240 A.D.2d 232 (1st Dep't 1997) (same); *see also In re State Office of Mental Health*, 46 A.D.3d 1269, 848 N.Y.S.2d at 446.

In sum, the arbitrators exceeded their powers by looking to the interests of parties who were not before them, by applying their own sense of justice to resolve the dispute that was actually before them, and by ignoring the legal principles that they were told to apply to that dispute. For these reasons as well, the award should be vacated.

## IV.    THE ARBITRATORS REFUSED TO CONSIDER MATERIAL EVIDENCE—NAMELY, THE MASSACHUSETTS JUDGMENT

Finally, vacatur is required because the arbitrators "refuse[ed] to hear evidence pertinent and material to the controversy," 9 U.S.C. § 10(a)(3)—in particular, the critical rulings from the Massachusetts Litigation. This FAA

provision is implicated not only where arbitrators refuse to <u>admit</u> evidence
altogether, but also where they admit evidence but refuse to <u>consider</u> it. *See
Hoteles Condado Beach v. Union de Tronquistas Local 901*, 763 F.2d 34, 40 (1st
Cir. 1985). In *Hoteles*, which concerned an arbitration over the dismissal of an
employee, the arbitrator "accepted into evidence" the trial transcript of criminal
proceedings concerning the event the company relied upon in justification of the
employee's dismissal. *Id.* "After accepting the transcript into evidence, however,
the arbitrator refused to give any weight to this evidence." *Id.* The court found
that this resulted in "effectively exclud[ing]" the evidence. *Id.* Because the
evidence was "both central and decisive to the Company's position," the
"arbitrator's refusal to consider this evidence" was "so destructive of [the
Company's] right to present [its] case, that it warrants the setting aside of the
arbitration award." *Id.* (alterations in original) (internal quotation marks omitted).

Similarly, the panel here made it abundantly clear that it would not
even consider evidence related to the Massachusetts Litigation, notwithstanding
principles of *res judicata* and collateral estoppel that UBS had called to the panel's
attention throughout the arbitration. *See, e.g.*, R. 142-43 (Tr. 1714-1718). The
panel stated at the outset of proceedings: "This is a separate and distinct hearing,
with no connection [to the Massachusetts Litigation], as far as we are concerned."
R. 80 (Tr. 7). The panel then reiterated this stance throughout the arbitration. "I

-50-

will guarantee you," one member of the panel emphasized, "that we will not get into that [the Massachusetts Litigation]." R. 108 (Tr. 686). *See also* R. 81 (Tr. 13).

The IAS Court noted that evidence of one Massachusetts ruling was ultimately admitted into evidence, and that another order was "technically part of the record and needed not to be formally introduced into evidence." R. 28. But those observations missed the point: that regardless of whether certain evidence of the Massachusetts judgment was ultimately admitted, it was not considered by the panel.

Of course, it would not have been necessary to "get into" the Massachusetts case at all if the panel had not been told, in response to its questioning, *see, e.g.*, R. 94-95 (Tr. 631-32), that Benistar's clients would be the beneficiary of an award. Once Benistar's clients entered the stage, however, evidence of the Massachusetts judgment against them became critical. And the arbitrators' failure to consider that evidence itself requires that the award be vacated.

## CONCLUSION

For the foregoing reasons, the judgment of the IAS Court should be reversed and the arbitration award in Benistar's favor vacated.

-51-

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____

       Kevin T. Baine
       Stephen J. Fuzesi

       725 Twelfth Street, N.W.
       Washington, D.C. 20005
       (202) 434-5000 (main)
       (202) 434-5029 (fax)
       e-mail: kbaine@wc.com

FLEMMING ZULACK WILLIAMSON
       ZAUDERER LLP

       Mark C. Zauderer
       Jonathan D. Lupkin

       One Liberty Plaza, 35th Floor
       New York, New York  10006
       (212) 412-9500 (main)
       (212) 964-9200 (fax)

GOODWIN PROCTER LLP

       R. Todd Cronan, P.C.

       Exchange Place
       Boston, Massachusetts  02109-2881
       (617) 570-1000 (main)
       (617) 523-1231 (fax)

*Attorneys for Petitioner UBS Financial
Services Inc.*

Dated:  February 19, 2008