UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIMINAL NO. 04-10029-GAO |
| DANIEL E. CARPENTER, | ) ) | |
| Defendant. | ) ) ) | |

DEFENDANT DANIEL E. CARPENTER'S
MOTION *IN LIMINE* TO EXCLUDE ALL EVIDENCE RELATING TO ANY
TESTIMONY, OPINIONS OR DOCUMENTS AS TO
THE NATURE OR CHARACTER OF DEFENDANT'S
INVESTMENTS OR INVESTMENT STRATEGY, OR IN THE ALTERNATIVE,
TO EXCLUDE ALL SUCH NON-EXPERT EVIDENCE PERTAINING TO THIS
SUBJECT MATTER

## I.    INTRODUCTION

Defendant Daniel E. Carpenter ("Mr. Carpenter") respectfully moves *in limine* to preclude the Government from introducing at trial any testimony, opinions or documents as to the nature or character of Mr. Carpenter's investments or investment strategy or, in the alternative, to exclude all such non-expert evidence pertaining to this subject matter. In particular, Mr. Carpenter requests an order precluding the Government from introducing any testimony, opinions or documents describing Mr. Carpenter's investments or investment strategy as "risky" or similar terms, and barring any reference to any such testimony, opinions or documents at any time in the jury's presence, including but not limited to questions of witnesses, opening and closing statements, and arguments on objections or motions.

The grounds for this motion and requested order are that all such evidence should be precluded, in the first instance, under Federal Rules of Evidence 404(b) and 403.

The grounds for Mr. Carpenter's alternative request, *i.e.*, to preclude all non-expert testimony on this subject matter, are that such testimony calls for opinion for which expert testimony is required. *See* Fed. R. Evid. 702. Accordingly, any witness who has not been designated by the Government as an expert and qualified to provide expert testimony should be precluded from testifying as to any characterization of, or opinion as to, Mr. Carpenter's investment strategy.

By and through this motion Mr. Carpenter hereby requests that he immediately be provided by the government with notice of "the general nature of any such evidence it intends to introduce at trial." *See* Fed. R. Evid. 404(b).

## II.    PRIOR PROCEEDINGS

During the first trial, testimony and documents were admitted from certain employees of Merrill Lynch and PaineWebber[1] that: Mr. Carpenter had engaged in what was, in their opinion, a risky trading strategy involving stock options; they advised Mr. Carpenter on their preferred strategy of diversification and on the risks inherent in options trading; Carpenter acknowledged those risks, continued his aggressive trading strategy, and sustained heavy trading losses first at Merrill Lynch and then at PaineWebber, until PaineWebber suspended his trading privileges. *See United States v. Carpenter*, 494 F. 3d 13, 16 (1st Cir. 2007). One Merrill Lynch witness (Mr. Levine) read several paragraphs from Merrill Lynch materials, which had been sent to Mr. Carpenter, describing the "special risks associated with uncovered option writing which expose the investor to potentially significant losses." *See* Tr. 5: 63-64. ("The writer of an uncovered call is in an extremely risky position ..."; "the risk of writing uncovered put

---

[1] *See* Tr. 5: 12-144 (Merrill Lynch witnesses Gary Stern and Gerald Levine); Tr. 5: 118-144; Tr. 6: 13-152 (PaineWebber witnesses Mitchell Rock and Lori Enright).

options is substantial …"). *Id.* at 64.   Mr. Levine also testified at length concerning

margin calls in general. *Id.* at 81-83.  At the conclusion of the Merrill Lynch brokers'

testimony, Mr. Carpenter filed a motion for mistrial, arguing that he had been

"irretrievably prejudiced in front of the jury by the testimony of the Merrill Lynch

witnesses that he was an aggressive speculator[,] a riverboat gambler." *See Carpenter*,

494 F.3d at 19.  After the denial of this motion, the government presented two expert

witnesses who testified concerning Mr. Carpenter's investment strategy.  Mr. Allaire's

testimony showed, as previewed by the government, "the volatility of the trading

activity" and the details of all Mr. Carpenter's trades.  Tr. 10: 38-39 (AUSA Pinneault).

Mr. Carpenter moved to exclude Mr. Allaire's testimony on the grounds that it was

"cumulative, unhelpful and a waste of time." *See Carpenter*, 494 F.3d at 19; Tr. 10: 35.

The Court precluded Mr. Allaire from offering an expert opinion "on the riskiness of

what [Mr. Carpenter] was doing" Tr. 10: 39.  Mr. Allaire did testify that Mr. Carpenter's

trading strategies were "bullish" for the year 2000, and that bullish was defined as "an

option position that makes you money if the stock goes up" that "the account was

positioned to make money in a rising market" Tr 10: 66-67, and the heavy losses which

were sustained. *See e.g.*, Tr. 10:53-54.

Most importantly, as stated by the First Circuit, this "extensive evidence

regarding Carpenter's investment behavior" "dominated three of the ten days of

Carpenter's trial." *Id.* at 17.

**III    ARGUMENT**

**A.    ALL EVIDENCE OF INVESTMENTS AND INVESTMENT
STRATEGY SHOULD BE PRECLUDED UNDER FEDERAL
RULES OF EVIDENCE 404(b) AND 403**

### 1.    Rule 404(b)[2]

At the first trial, this Court admitted the trading strategy evidence only for the "rather limited purpose" of proving specific intent to defraud *i.e.*, "that by mid-2000 Mr. Carpenter was experiencing heavy losses in the options trading which was relevant to the question," and tended to show that he knew that the contemporaneous representations to exchangors with respect to keeping their money safe, were false. *See United States v. Carpenter*, 405 F.Supp.2d 85, 102 (D. Mass. 2005); *Carpenter*, 494 F.3d at 17.

It is respectfully requested that in this re-trial, the Court examine the admissibility of this evidence under the principles governing Rules 404(b) and 403[3] and order that the evidence of trading strategy constitutes unduly prejudicial "other acts" evidence and exclude it in its entirety.[4] As stated recently by the First Circuit in *United States v. Varoudakis*, 233 F.3d 113, 118 (1st Cir. 2000), in which the Court reversed an arson conviction because the probative value of the prior bad act evidence concerning the defendant's involvement in a prior fire was substantially outweighed by danger of unfair prejudice,

---

[2] Rule 404 (b) provides:

**Other Crimes, Wrongs, or Acts.--**

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

[3] Present counsel has not been able to locate in the record a request that this Court do so in the first trial.

[4] Rule 404(b) is the appropriate vehicle to analyze whether the investment or investment strategy evidence should be admitted. The Rule's "terminology 'other crimes, wrongs or acts' includes conduct that is neither criminal nor unlawful … It does not matter whether the proffered act occurred before or after the charged crime or other conduct at issue." *See* 2 Weinstein's Federal Evidence, § 404.20[2][a] at 404-43 (2nd Ed. 2008); *see also United States v. Zapata*, 139 F.3d 1355, 1357 (11th Cir. 1998) (principles governing other crimes evidence are the same whether conduct occurs before or after offenses charged).

Rule 404(b) provides that evidence of a defendants [other acts] may not be admitted to prove his criminal character or propensity to commit crimes of the sort for which he is on trial. To admit evidence of [other acts], a trial court must first find that the evidence passes two tests. First, the evidence must have "special relevance" to an issue in the case such as intent or knowledge, and *must not include "bad character or propensity as a necessary link in the inferential chain."* *United States v. Frankenhauser*, 80 F.3d 641, 648 (1st Cir. 1996). Second, under Rule 403, evidence that is specially relevant may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

*Varoudakis*, 233 F.3d at 118. (emphasis added).

Here, in the first trial, the government sought to admit the trading strategy evidence to show intent to commit mail or wire fraud. As previously stated by this Court and the First Circuit, the intent requirement which the government must prove is the intent to defraud *at the time Mr. Carpenter obtained his clients' funds*. *Carpenter*, 494 F.3d at 23. (emphasis added). It is important to note that the charged fraud hinges on a determination as to whether Mr. Carpenter made misrepresentations to the exchangors that their funds would be held in escrow and would not be moved except for the purchase of replacement property or returning the funds to the exchangor. Mr. Carpenter's investment or investment strategy is extrinsic evidence which is easily segregable.

Even assuming, *arguendo*, the trading strategy has "special relevance" to intent, as the government alleges, it suffers from the flaw that it includes "bad character or propensity as a necessary link in the inferential chain." *Varoudakis*, 233 F.3d 113, 118. This Court specifically noted in its allowance of the motion for new trial (as did the First Circuit in affirming the district court's decision) the inherent characteristics of the trading strategy evidence and the danger of its improper use by the jury. For example, this Court deemed the government's closing argument " 'persistently pejorative' in nature [which had] a tendency to lead the jury away from the charges in the indictment by inviting them

to blame Carpenter because he was a gambler, or because he lost the exchangors' money, rather than because he had committed mail or wire fraud." *Carpenter*, 405 F. Supp. 2d at 102.

The same can be said of the three days of testimony on trading strategy from which the prosecutor derived much of its closing argument.[5] Even if the testimony itself was not as larded with the words and phrases used by the prosecutor which "referred to gambling in its morally freighted gaming sense with provocative references to 'cashing in chips' and 'doubling down' and 'riverboat gambler'", *Carpenter*, 494 F.3d at 23, the three days of testimony was itself just as provocative and had the same effect -- inexorably leading the jury toward considering bad character or propensity. By way of example only, the Merrill Lynch brokers and PaineWebber broker repeatedly testified that, in their opinion, Mr. Carpenter's trading strategy was risky and that they told him so in numerous conversations. Tr. 5: 24-27, 45-46 (Stern); Tr. 5:70-72, 80-81 (Levine); Tr. 6: 20-22, 26-29, 93 (Rock). They read significant portions from Merrill Lynch and PaineWebber materials which had been sent to Mr. Carpenter concerning the riskiness of options trading and explained the risks involved in option trading. Tr. 5: 23-24 (Stern); Tr. 5: 58-59, 64-65 (Levine); Tr. 5: 136, 140-143, Tr. 6: 13-15 (Rock). They also repeatedly testified that Mr. Carpenter was not following their advice to further diversify. Tr. 5: 24-25, 28-29, 45-46 (Stern); Tr. 5: 70-72, 80-81 (Levine); Tr. 6: 29-30, 93, 97 (Rock).[6] With respect to PaineWebber witness Lori Enright, who was the compliance manager the government attempted to illicit statements for the opinion or inference that

---

[5] *See Carpenter*, 494 F.3d at 24 ("[the court] had admitted the evidence from which the gambling metaphors were drawn for a limited purpose").

[6] On cross examination Mr. Levine conceded that, notwithstanding his advice which other of his Merrill Lynch clients followed, those clients too lost money in the stock market crash of 2000. Tr. 5: 96-97.

such investments are risky.  Tr. 6: 116 (Q:  … As part of your duties do you monitor

accounts to determine whether there is a level of risk in the trading that may exceed what

PaineWebber would like?).  While this was objected to and not answered when the court

sustained the objection, the government did elicit statements that: she "was the cop of the

office" at PaineWebber, *id.*, she and Mitchell Rock had a telephone call with Mr.

Carpenter on November 20, 2008 during which among other things, she verified "the

large losses in the account" (close to $3 million in three weeks of trading) and she asked

him "if he knew the risks and why he was trading in that manner."  Tr. 6:119.  She also

testified as to a number of statements Mr. Carpenter made in the November 20 telephone

call such as that the losses were "the market's fault" *id*, at 116, 119, 125, that he was

expecting a Thanksgiving rally and confident that this was going to happen , *id.* at 125.

She also testified that Mr. Carpenter said that "if there was no Thanksgiving rally he was

going to change his strategy and not trade as aggressive" but in fact he did not do so.  *Id.*

at 129.  He also said he had "[n]o one to blame but himself.  *Id.* at 127.

In sum, the three days of testimony by the brokers and the experts was, just as the

closing argument was, an effort to "[c]ondemn[] Carpenter for gambling … an appeal to

instincts of moral disapprobation about recklessness, waste and perhaps even theft."

*Carpenter*, 494 F. 3d. at 13 *quoting Carpenter*, 405 F. Supp. at 102.

Limiting instructions prior to or during the admission of the testimony or prior to

deliberations will not be sufficient to cleanse this evidence of what it truly is -- forbidden

bad character or propensity evidence as a necessary link in the inferential chain -- or

prevent the jury from using it for an improper purpose.  "No reasonable juror, even with

the most forceful instructions could avoid the temptation" to conclude that if Mr.

Carpenter was persistently engaging in risky trading strategy then he might be "the sort of person" who would also engage in mail fraud. *See United States v. Gilbert*, 229 F.3d 15, 24 (1st Cir. 2000)[7] (evidence of defendant's attempted murder of her husband by a method similar to that employed on the victims sought to be admitted under Rule 404(b) properly excluded).[8]

## 2.    Rule 403[9]

Even if this court determines that the evidence is "specially relevant" under Rule 404(b), its admission should be precluded under Rule 403, which requires the court to exclude the evidence if its probative value is substantially outweighed by "the danger of unfair prejudice." *See* Fed. R. Evid. 403. As the First Circuit has made clear, satisfying Rule 404(b) is only the first hurdle and "[o]therwise relevant evidence may also be

---

[7] In *Gilbert*, 229 F.3d 15 the defendant who was a nurse was charged with the murder and attempted murder of seven patients. The First Circuit affirmed the district court's exclusion of evidence which the government sought to admit under Rule 404(b) pertaining to: (1) the attempted murder of defendant's husband by means of a method similar to that used on the victims; (2) the defendant's anonymous bomb threat; and (3) the perceptions of the nurses in the ward in which the defendant committed the murders that, during the same period as the crimes, there was a marked increase in the number of cardiac emergencies while the defendant was on duty. *Id. passim.* In excluding this evidence, the Court rejected the government's arguments, *inter alia*, that the evidence tended to show that the defendant acted intentionally, had the knowledge necessary to commit the crimes and to refute her defense that the deaths and near deaths of patients were the result of natural causes of physician negligence. *Id.* at 21.

[8] The instant case is not like *United States v. Epstein*, 426 F.3d 431, 438-39 (1st Cir. 2005) in which the First Circuit held that the trial court had not abused its discretion when it admitted into evidence in a mail and wire fraud case in connection timeshare owners, the defendant's tax return in which the proceeds of the fraud were not declared. In *Epstein*, the trial court found that the tax return was "part and parcel of the crime" and not governed by Rule 404(b). It also found that the defendant's his failure to include all of his income suggested that he had knowledge of the fraudulent scheme. Here, unlike the filing a false tax return which is itself a federal crime, in the first instance the trading strategy evidence sought to be admitted is not illegal. Nor is it part and parcel of the crime charged -- it is extrinsic propensity evidence which is a necessary link in the inferential chain -- leading the jury to conclude that if Mr. Carpenter was engaging in risky trading strategy then the inference exists that he might be the sort of person to engage in the intentional deceit and fraud necessary for mail fraud.

[9] Rule 403 provides:

**Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time**
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

excluded if its probative value is substantially outweighed by "confusion of the issues, or

misleading [of] the jury, or by considerations of undue delay, waste of time or needless

presentation of cumulative evidence." *Varoudakis*, 233 F.3d at 121; *see Old Chief v.*

*United States*, 519 U.S. 172, 117 S. Ct. 644, 650 (1997) (unfair prejudice 'refers to the

tendency of certain evidence to provoke an emotional response in the jury or otherwise to

suggest a decision on an improper basis"). In *Varoudakis*, 233 F.3d at 122, after

balancing the need for the evidence, the strength of the evidence in proving the issue (its

probative value) against the risk that the jury would infer criminal propensity, the Court

found that the prejudice resulting from admission of the prior bad act evidence of the car

fire outweighed its probative value. *Varoudakis*, 233 F.3d at 122 ("The prejudice to an

opponent can be said to be 'unfair' when the proponent of the evidence could be proved

by other, non-prejudicial evidence") *quoting* 22 Charles A. Wright & Kenneth A.

Graham, Jr., *Federal Practice and Procedure*, § 5214 (1978).

     Here, the government should be required in the first instance to state precisely

what its need for this evidence is. However, that purported need should be weighed

against the government's prior assertions regarding the strength of its evidence. For

example, in its closing argument in the first trial the government forcefully argued that

the jury had "heard *overwhelming evidence* that Dan Carpenter engaged in a scheme to

defraud." Tr. 12: 19. The government relied upon, *inter alia*, testimony of the

exchangors and their attorneys, the documents such as the escrow agreements which were

signed by the exchangors, the testimony of Attorney Patterson who represented an

exchangor whose transaction was not part of the indictment and who had spoken with

Mr. Carpenter, substantial testimony of the government's cooperator Martin Paley and

finally, the testimony of other employees at Benistar who worked with Mr. Carpenter. "Doubts about the probative value of [other acts] evidence are thus 'compounded' when prosecutors have other evidence available , 'rendering negligible their need to show intent by [other acts] evidence. *Varoudakis*, 233 F.3d at 122. [citation omitted].

Here, as in *Varoudakis* , 233 F.3d at 123 and *United States v. Gilbert*, 229 F.3d 15, 24 (1st Cir. 2000) a jury will not be able to "regard the [other acts] evidence as specially relevant without drawing a forbidden inference of criminal propensity ... ." Therefore, this court should exclude such evidence it its entirety.

**B.    ALTERNATIVELY, THIS COURT SHOULD EXCLUDE ALL NON-EXPERT EVIDENCE RELATING TO ANY TESTIMONY, OPINIONS OR DOCUMENTS AS TO THE NATURE OR CHARACTER OF DEFENDANT'S INVESTMENTS OR INVESTMENT STRATEGY**

This Court ruled in the first trial that witnesses not identified as expert witnesses under Fed. R. Evid. 702 are not permitted to give opinion testimony. *See* Tr. at 5: 5-6 (ruling in connection with Merrill Lynch witnesses); *see also* Tr. at 6: 19 (ruling PaineWebber employee witness barred from commenting on investment strategy, because it "is in the realm of analysis, which would be 702 testimony"). The Government repeatedly elicited, or attempted to elicit, statements from witnesses relating to the character of stock options, all for the directly stated opinion or inference that such investments are risky. *See, e.g.*, Tr. at 2: 103-104 (direct of Mr. Snider re: stock options: "They're risky."); Tr. 4: 52-53 (leading direct of Ms. Adams: "Q: At any point did Mr. Carpenter tell you that he invested the escrow money in stock options?" "A: No." "Q: At any point did [Mr. Carpenter] say that Mr. Iantosca knew that he was making a risky investment?" "A: No."); Tr. 6: 116 (direct of Ms. Enright: "Q: Okay. As part of your

duties, do your monitor accounts to determine whether there is a level of risk in the trading that may exceed what PaineWebber would like?").

Defendant seeks by the relief requested herein to extend this limitation to encompass documents and testimony admitted by the Court in the first trial, including, without limitation, the first trial's Government's Exhibit 149, Merrill Lynch's "Special Statement for Uncovered Option Writers." See Tr. 5: 63-67. This document, and others like it[10], operates to introduce Rule 702 opinion testimony, without the benefit of any of the assurances the rule requires in probing as to the bases for the opinion, the credentials of its proponent, or validity of its methodology. The allowance of documents of this type into evidence elevates what in fact is the investment company's self-serving, protective disclosure boilerplate into an unfairly prejudicial opinion testimony not subject to challenge. By way of example, the first paragraph of this document -- as read into evidence by the Government's witness -- states: "There are special risks associated with uncovered option writing which expose the investor to potentially significant losses. Therefore, this type of strategy may not be suitable for all customers approved for options transactions. One, the potential loss of uncovered call option writing is unlimited. The writer of an uncovered call is in an extremely risky position and must understand that he or she can incur large losses if the value of the underlying instruments increases above the exercise price." Tr. 5: 64.

The unfairly prejudicial nature of this material is manifest. Even if the Court were to find some potential relevance to this lay opinion testimony, its minimal probative

---

[10] Such documents include, without limitation: Gov.'s Ex. 146 (a copy of Gov.'s Ex. 149 signed by Defendant); Gov.'s Ex. 166 (PaineWebber iteration of similar document); Gov.'s Ex. 161 (Merrill Lynch's Active Account Review and Personal Contact).

value is substantially outweighed by the danger of severe and unfair prejudice to Mr. Carpenter, and so warrants exclusion under Fed. R. Evid. 403.

As stated above, this Court made plain that evidence of Mr. Carpenter's investment activity was introduced at the prior trial, and so here as well, for the "rather limited purpose" of proving specific intent to defraud: "that by mid-2000 Carpenter was experiencing heavy losses in the options trading was relevant to the question," and that this tended to show that he knew that the contemporaneous representations to exchangors vis-à-vis keeping their money safe, and so forth, were false. *See Carpenter*, 405 F.Supp.2d at 102. This underscores that it is Mr. Carpenter's own subjective perception of the relative safety or risk of the investments, and no one else's, that is of concern. While the Court may be willing to entertain some leeway for the Government's qualified and well-founded expert opinion (if any) on the relative safety or risk of investments, it cannot emerge from any of the non-expert fact witnesses, nor the proxy of documents, such as, for example, Gov.'s Ex. 149, which operate to the same end and present parallel evils. They are probative of nothing, and highly and unfairly prejudicial.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that an order issue precluding the Government from introducing at trial any testimony, opinions or documents as to the nature or character of Mr. Carpenter's investments or investment strategy or, in the alternative, to exclude all such non-expert evidence pertaining to this subject matter. In particular, Mr. Carpenter requests an order precluding the Government from introducing any testimony, opinions or documents describing Mr. Carpenter's investments or investment strategy as "risky" or similar terms, and barring any reference

to any such testimony, opinions or documents at any time in the jury's presence,

including but limited to questions of witnesses, opening and closing statements, and

arguments on objections or motions.


**RESPECTFULLY SUBMITTED:**
DANIEL E. CARPENTER,
Defendant,
By his attorney:

/s/ A. John Pappalardo
A. John Pappalardo (BBO # 338760)
GREENBERG TRAURIG, LLP
One International Place, 20th Floor
Boston, MA 02110
(617) 310-6000
(617) 310-6001 (fax)

**<u>Certificate of Service</u>**

       I hereby certify that on this 20th day of May, 2008, I served on counsel of record in the foregoing matter Daniel E. Carpenter's Motion In Limine to Exclude All Evidence Relating to Any Testimony or Opinion as to the Nature or Character of Defendant's Investments or Investment Strategy, Or, in the Alternative, to Exclude all Such Non-Expert Evidence Pertaining to this Subject Matter, by means of the ECF system.

<u>/s/  A. John Pappalardo</u>
A. John Pappalardo
