UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIMINAL NO. 04-10029-GAO |
| DANIEL E. CARPENTER, | ) ) | |
| Defendant. | ) ) | |

# DEFENDANT DANIEL E. CARPENTER'S
# MOTION IN LIMINE TO PROHIBIT ADMISSION OF
# TESTIMONY OF DAVID PATTERSON

Defendant Daniel E. Carpenter ("Mr. Carpenter") respectfully moves *in limine* to preclude the admission of any testimony by David Patterson. The testimony which Patterson is expected to offer, based upon the first criminal trial of Mr. Carpenter before this Court, will relate to contacts with Mr. Carpenter which are not related to any of the transactions charged in the Indictment. In fact, these contacts occurred some two years prior to the first exchange alleged by the Government to have been a fraudulent act, and are factually distinct from the crimes Mr. Carpenter is charged with in the Indictment. Moreover, the testimony of Patterson is unfairly prejudicial to Mr. Carpenter, as it serves to mislead the jury, confuse the issues on trial, and as a result his testimony should be excluded pursuant to Fed. R. Evid. 403. This Court should preclude Patterson's testimony as to prior acts of Mr. Carpenter, as the Government has failed to meet its burden as to the admissibility of Patterson's testimony relating to Mr. Carpenter's prior acts under Fed. R. Evid. 404(b).

I.  **ARGUMENT**

   A.  **The Testimony of Patterson Should Be Barred As Inadmissible Evidence Of Other Acts Of The Defendant**

Rule 404(b) of the Federal Rules of Evidence bars admission of prior acts of a defendant if the evidence is used to prove the defendant's criminal character or propensity to commit crimes of the sort for which he is on trial. See United States v. Vardoudakis, 233 F.3d 113, 118 (1st Cir. 2000). In order to admit evidence of prior acts, the party seeking the admission of the evidence must satisfy two tests:

> First, the evidence must have "special relevance" to an issue in the case such as intent or knowledge, and must not include "bad character or propensity as a necessary link the inferential chain." United States v. Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996). Second, under Rule 403, evidence that is specially relevant may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

Id. In determining the probative value of prior act evidence, courts must consider "the remoteness in time of the other act and the degree of resemblance to the crime charged." Id. (citations omitted).

The Government's underlying purpose in introducing Patterson's testimony is clear from the closing argument by Assistant United States Attorney Jonathan Mitchell ("Mitchell") during the first trial. Mitchell referenced Patterson no less than four times, arguing, among other things:

> Remember David Patterson, the lawyer who . . . [r]epresented Jean Carey, Benistar's first client back in 1998, in October of 1998. Patterson testified among other things that he expressed his concern to Dan Carpenter . . . -- he wanted to know that the money would be safe with Benistar. . . . Per David Patterson's request, Dan Carpenter drafted the escrow agreement and sent it to him and they talked about it. The defendant knew from the start that the concept of an escrow would convey to prospective clients that their funds would be held securely and returned to them. <u>The defendant knew in his conversations with Patterson that the word "escrow" meant something very specific to real estates professionals,</u>

2

> including real estate attorneys like Patterson and the others you heard from . . . .
>
> (Tr. T 12-23:7 - 12-24:4) (emphasis added).
>
> . . . .
>
> David Patterson made clear his concern to Dan Carpenter that the funds be secure. . . . So there's no question that Dan Carpenter was aware from the very first client what the contents of the materials were and that the security of the funds was of paramount concern to the people who would be his clients.

(Tr. T 12-32:12 - 12-33:10) (emphasis added).

Clearly, based upon these statements, the Government sought to show, and in this trial will again seek to show, that Mr. Carpenter's approach, communications, and conduct with respect to Patterson, and his client Jean Carey, was the template which he followed with Gail Cahaly, Eliot Snider, Joseph Iantosca, Jeffrey Johnston, Byron Darling, Bellemore Associates, and Brian Fitzgerald (collectively, the "Exchangors"). More specifically, the Government sought, and will again seek, to impute the concerns and knowledge of Patterson, on behalf of Carey, to the Exchangors, a tactic that is inappropriate, misleading, and in violation of the principles of Fed. R. Evid. 404(b).

### 1. There Is No "Special Relevance" To Mr. Carpenter's Interactions With Patterson

In the first part of its 404(b) analysis, a Court must "consider whether the proffered evidence has some special relevance which enables it to shed light on a disputed issue in the case, rather than merely to show a defendant's deplorable character or propensity for wrongdoing." Udemba v. Nicoli, 237 F.3d 8, 15 (1st Cir. 2001). The Government's use of Patterson's testimony at the first trial was, and its likely approach in this trial will be, to demonstrate Mr. Carpenter's interactions with Patterson, who was acting on behalf of Carey and

3

then impermissibly extrapolate these interactions to the Exchangors' transactions. The Government's theory appears to be that Mr. Carpenter made false and fraudulent representations to the Exchangors, a position they attempted to support with Patterson's testimony. However, to the extent that this strategy by the Government implicitly suggests that Mr. Carpenter's oral and written communications with Patterson were fraudulent, then Patterson's testimony is offered purely to show Mr. Carpenter's allegedly "deplorable character" or his "propensity" for such allegedly fraudulent representations, and cannot be admitted.

> 2. **There Is Little, If Any, Probative Value To The Interactions Between Mr. Carpenter And Patterson.**
>
>> a. **There Are Significant Differences Between The Charged Conduct And The Interactions Between Mr. Carpenter And Patterson**

There are critical differences between Patterson's interactions with Mr. Carpenter and the crime with which Mr. Carpenter is charged, rendering Patterson's testimony inadmissible. During the first trial, Patterson testified as to direct oral and written communications with Mr. Carpenter. See Tr. T. 9-78:14 - 9:98. In stark contrast, no evidence was presented at the first trial, and there will be no evidence in this trial, that Mr. Carpenter had any direct oral or written communication with the individuals and entities who allegedly lost funds as a result of the charged scheme to defraud, prior to the wires and mailings referenced in the Indictment.

The testimony of Patterson invites the jury to impute the particularized understanding and concerns of an attorney representing the first ever client of Benistar Property Exchange Trust Company, Inc. ("BPE") (see Tr. T. 9-61:3-7), to the Exchangors some two years later, who dealt with a company in BPE that had, by that point, successfully completed dozens of 1031 exchanges, and had successfully and properly handled millions of dollars in the process of these exchanges. See Tr. T. 10-33:9-15 (on cross-examination, the Government's witness, Thomas

4

Zappala, acknowledged that millions of dollars flowed into the BPE accounts in 1998 and 1999). Based purely on the significant changes in circumstances with respect to BPE as a business, Mr. Carpenter's interactions with Patterson, as well as the specific concerns and questions of Patterson, are clearly distinguishable from Mr. Carpenter's conduct with respect to the Exchangors on one hand, and the Exchangors' own concerns and questions on the other hand.

Similarly telling as to the differences between Patterson's interactions with Mr. Carpenter and the charged conduct is the Government's failure to charge Mr. Carpenter in connection with Ms. Carey's exchange (or indeed any of the other intervening clients prior to the Exchangors). Viewed critically, the only distinction between Ms. Carey's transaction (and every other Section 1031 exchange clients of BPE) and the Exchangors' transactions is that the Exchangors allegedly lost their funds. See Tr. T. 8-10:18-23 (Mr. Paley, on cross-examination, confirmed that prior to January of 2001, all BPE clients had had successful Section 1031 exchanges). If Mr. Carpenter's acts with respect to Ms. Carey truly are similar to the conduct he is alleged to have engaged in with respect to the Exchangors, it is unclear why Mr. Carpenter was not charged with mail and wire fraud in connection with Ms. Carey's transaction. The Government's decision not to include this transaction as part of the alleged scheme to defraud undercuts any argument that Mr. Carpenter's interactions with Mr. Patterson are sufficiently similar to the conduct with which he is charged in the Indictment.

      **b.    The Interactions Between Mr. Carpenter And Patterson Are Temporally Distant From The Charged Conduct**

Additionally, the time elapsed between Mr. Carpenter's interactions with Patterson and the alleged wire and mail fraud is not insignificant. Patterson testified that he spoke with Mr. Carpenter on October 21 and 22, 1998 (see Tr. T. 9-78:18), between twenty-two and twenty-six months before the alleged incidents of mail and wire fraud described in the Indictment (alleged

5

to have occurred between August 8 and December 14, 2000). While some First Circuit cases have ruled that periods of time of up to seven years between prior acts and charged crimes were not too temporally distant, those cases involved incidents that were much more alike than the conduct the Government seeks to link in this case. For example, in Frankhauser, the Government sought to admit against Frankhauser -- who was on trial for corruptly persuading a witness to destroy or conceal objects with intent to impair their availability for use in an official proceeding, and endeavoring to obstruct a grand jury investigation -- evidence of his conviction in 1987 for conspiracy to obstruct justice. 80 F.3d at 644. In both the former case which resulted in conviction and the latter case, Frankhauser's conduct involved advising an individual to destroy potential evidence prior to the issuing of a subpoena from the government, and the First Circuit found the conduct to be "very similar." Id. at 645-49. In clear contrast, Mr. Carpenter's conduct with respect to Patterson -- that is, direct oral and written communications -- are not part of the Government's case against Mr. Carpenter with respect to the Exchangors. In view of the disparate nature of the alleged conduct and the prior act, as discussed above, the temporal distance of over two years in some cases should be considered significant.

      **B.**     **Patterson's Testimony Is Inadmissible Under Fed. R. Evid. 403 As Its Probative Value Is Substantially Outweighed By The Danger Of Unfair Prejudice**

Even if this Court determines that Patterson's testimony meets the "special relevance" prong of Fed. R. Evid. 404(b), it should still exclude the evidence as it fails to meet the standard of Fed. R. Evid. 403. See Varoudakis, 233 F.3d at 121 ("Prior bad act evidence that surmounts the bar of Rule 404(b) may still be inadmissible under Rule 403. . . . if its probative value is substantially outweighed by 'the danger of unfair prejudice.'").

6

1.  **The Introduction Of Patterson's Testimony Will Serve To Confuse The Issues And Mislead The Jury**

Fed. R. Evid. 403 excludes evidence if its probative value is substantially outweighed by, among other things "confusion of the issues, or misleading [of] the jury. . . ." As referenced above, the Government's closing argument in the first trial clearly demonstrates the tendency of this evidence confuse the issues and mislead the jury. Patterson's client, Carey, was not identified as an Exchangor who was allegedly defrauded by Mr. Carpenter, and Patterson's direct oral and written communication with Mr. Carpenter was not duplicated by any of Exchangors. The Government's contention that because Patterson attached particular meaning to the phrase "escrow agreements" the Exchangors and their representatives shared that understanding, and that because Patterson was concerned about the security of Carey's funds it necessary follows that every one of the Exchangors shared this precise concern is an impermissible conflation of the identities, interests, and experiences of Patterson and the Exchangors. This evidence mislead the jury and to encourage them to draw improper inferences, based upon propensity, which are clearly unfairly prejudicial to Mr. Carpenter. To the extent Patterson's testimony has any probative value, it is clearly substantially outweighed by such prejudice.

2.  **By The Government's Own Argument During The First Trial, Its Need For Patterson's Testimony Is Slight**

The First Circuit, in discussing the interplay between Fed. R. Evid. 403 and 404(b), has stated that, "[u]nder Rule 403 . . . [the] risk of an improper criminal propensity inference should be considered in light of the totality of the circumstances, including the government's need for the evidence given other available testimony, to prove the issue identified pursuant to the 404(b) special relevance analysis." Vardoudakis, 233 F.3d at 122 (quoting Old Chief v. United States, 519 U.S. 172, 184, 117 S.Ct. 644 (1997)). Moreover, "[d]oubts about the probative value of

7

prior bad acts evidence are . . . 'compounded' when prosecutors have other evidence available, 'rendering negligible their need to show intent by the prior bad acts." <u>Id.</u> (quoting <u>United States v. Lynn</u>, 856 F.2d 430, 435 (1st Cir. 1988)).

      The prosecution asserted, in the words of AUSA Mitchell during his closing argument, that during the first trial it presented "<u>overwhelming</u> evidence that Dan Carpenter engaged in a scheme to defraud and that he knew the clients were being lulled into believing that Benistar faithfully would return their money while he put the money at grave risk in the options market without their knowledge or their authorization." Tr. T. 12-19:10-15 (emphasis added). According to AUSA Mitchell's closing argument, this evidence included the testimony of the Exchangors as well as, in some instances, their attorneys or representatives, the exchange agreement, the escrow agreement, other "important" documents, such as the promotional materials. Tr. T. 12-19-21. Based upon the Government's confident self-assessment of its case, it is difficult to understand the need for Patterson's testimony, and thus any question as to the probative value of the evidence should be resolved in Mr. Carpenter's favor.

## CONCLUSION

WHEREFORE, defendant Daniel E. Carpenter respectfully requests this Court grant his Motion in Limine to prohibit the admission of any testimony by David Patterson pursuant to Fed. R. Evid. 404(b).

        **RESPECTFULLY SUBMITTED:**
        DANIEL E. CARPENTER, Defendant,
        By his attorney:

        /s/ A. John Pappalardo
        A. John Pappalardo (BBO # 338760)
        GREENBERG TRAURIG, LLP
        One International Place, 20th Floor
        Boston, MA 02110
        (617) 310-6000
        (617) 310-6001 (fax)

## Certificate of Service

I hereby certify that on this 21st day of May, 2008, I served on counsel of record in the foregoing matter Daniel E. Carpenter's Motion in Limine to Prohibit Admission of Testimony of David Patterson, by means of the ECF system.

        /s/ A. John Pappalardo
        A. John Pappalardo

*BOS 46,359,587v1 5-21-08*