UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,     )
                              )
          Plaintiff,          )
                              )   Criminal Action
v.                            )   No. 04-10029-GAO
                              )
DANIEL E. CARPENTER,          )
                              )
          Defendant.          )
                              )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

FINAL PRETRIAL CONFERENCE


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, May 22, 2008
2 p.m.


Marcia G. Patrisso, RPR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2
         OFFICE OF THE UNITED STATES ATTORNEY
 3       By: Jonathan F. Mitchell and
             Jack W. Pirozzolo, Assistant U.S. Attorneys
 4       John Joseph Moakley Federal Courthouse
         One Courthouse Way
 5       Boston, Massachusetts  02210
         On Behalf of the Government
 6
         GREENBERG TRAURIG, LLP
 7       By: A. John Pappalardo, Esq.
             Gary R. Greenberg, Esq.
 8           Evan Georgopoulos, Esq.
             Paula J. DeGiacomo, Esq.
 9       One International Place
         Boston, Massachusetts  02110
10       On Behalf of the Defendant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                  P R O C E E D I N G S

 2           THE CLERK:  All rise.  This is the United States

 3   District Court for the District of Massachusetts.  Court

 4   is now in session.  Please be seated.

 5           For a final pretrial conference in the case of

 6   United States of America versus Daniel Carpenter, Docket

 7   04-10029.

 8           Would counsel please identify yourselves for the

 9   record.

10           MR. MITCHELL:  Good afternoon, your Honor.

11   Jonathan Mitchell and Jack Pirozzolo on behalf of the

12   United States.

13           MR. PIROZZOLO:  Good afternoon, your Honor.

14           MR. PAPPALARDO:  Good afternoon, your Honor.

15   John Pappalardo and Gary Greenberg at counsel table,

16   Paula DeGiacomo and Evan Georgopoulos in the stands.

17           THE COURT:  Okay.  Well, I see there's some

18   motions that have come in, and some so recently that

19   it's not clear whether they're opposed or not because

20   there's no opposition.  Maybe you could give me an idea

21   on that.

22           MR. PAPPALARDO:  Yes, your Honor.  We, on behalf

23   of Mr. Carpenter, are in the process of formulating

24   positions which I will characterize to the Court as

25   oppositions to certain of those motions, and we will
</pre>

1  have those filed forthwith.  There's also a possibility

2  that we will be filing additional motions in limine at

3  the beginning of next week that would come to the

4  Court's attention.

5          THE COURT:  Okay.  Well, let me ask you -- let

6  me see which ones are not -- well, the government's

7  motion -- there's a government's motion with respect to

8  the arbitration award and a potential settlement, which

9  there's been no opposition to.  But you're going to file

10  with respect to that?

11          MR. PAPPALARDO:  Oh, yes, your Honor.  Yes, your

12  Honor.

13          THE COURT:  I guess we'll wait for that.

14          And then the defense has filed a number of

15  motions.  Will there be formal responses to those or do

16  you want to take them up now, I guess is the question I

17  really want to --

18          MR. MITCHELL:  Well, I think we can, your Honor.

19  The government opposes all of them, with one minor

20  exception, and I can explain that.  But these are all,

21  for the most part, objections to certain evidence that

22  the Court has already ruled on.  I understand the Court

23  ruled on it during the first trial.  It's not to suggest

24  that the Court can't revisit those items, but the

25  objections were argued thoroughly the first time around

PDF created with pdfFactory trial version www.pdffactory.com

1    and the Court made its decisions clear.

2         I can go through each one of them, your Honor,

3    and I think they are all low-hanging fruit that the

4    Court can address right now.  I don't know whether your

5    Honor has had an opportunity to review any of them, but

6    in no particular order, the first one is -- and these

7    all have long titles, but the first one pertains to the

8    oral representations of Marty Paley.  That was something

9    that was litigated at a couple of different points

10   during the first trial, and their argument essentially

11   is -- there are two arguments:  One is that what Paley

12   had to say was hearsay; and, secondly, even if his

13   representations come in for a non-hearsay purpose, that

14   that is -- those statements would be unduly prejudicial

15   and therefore should be excluded under 403.

16        The defendant's wrong on both counts, and these

17   issues have been litigated.  First of all, the

18   representations are not hearsay; they are admissions by

19   an agent of the defendant.  And the Court addressed

20   that, and addressed it specifically in the context of

21   Eliot Snider's testimony.  If you recall, Eliot Snider

22   was the first government witness in the last trial who

23   was one of the exchangors, and was asked by me, "What

24   did Marty Paley say to you?"  There was an objection,

25   and the Court essentially ruled at that point that the

PDF created with pdfFactory trial version www.pdffactory.com

1    statements would come in but that you would -- we'd have

2    to prove up a foundation as the trial went along, and we

3    did.

4            But more to the point, your Honor, the

5    statements come in because they are -- for non-hearsay

6    purposes; they come in for the fact that they are verbal

7    acts and representations made to the exchangors that

8    induced them to give their money to Benistar.  What's

9    particularly -- and so for that reason, they don't come

10   in for the truth of the matter asserted but the fact

11   that they were, in fact, asserted.

12           The defense has not pointed to a single

13   statement that any of the exchangors -- that Marty Paley

14   said to any of the exchangors that is somehow

15   prejudicial, and completely absent from their brief is

16   any mention of any statement that they suggest is

17   prejudicial.  And the reason for that is because every

18   one of the exchangors came in and said, "Marty Paley

19   didn't say anything materially different from what was

20   in the exchange documents."

21           So the question begs, "Why not keep that out

22   anyway?"  The reason for that is, it is highly relevant

23   that Marty Paley did not say anything different from

24   what was in the documents because otherwise, it would

25   leave open the suggestion that somehow he was acting

PDF created with pdfFactory trial version www.pdffactory.com

1    ultra vires in making all sorts of representations that

2    aren't before the jury that induced the exchangors to

3    give their money to Benistar.  It wasn't the evidence

4    the first time around.

5         Leaving out those statements would also lead the

6    jury to believe that Marty Paley met with these people

7    and didn't say a word; he just handed them documents and

8    they said, "Okay, we'll give you our money," which is,

9    again, all part of the story and necessarily should come

10   in.  It really is in the end -- the motion is an effort

11   to keep out the fact that Marty Paley didn't say

12   anything different from the exchange documents so that

13   they can stand up in closing and say, "You didn't hear

14   any evidence at all about what Marty Paley said.  Who

15   knows what that scoundrel said?  Who knows what he said

16   that would have induced the exchangors to give their

17   money to Benistar?" which would be a highly misleading

18   argument, but it's the only argument that's suggested by

19   this motion.

20        So the bottom line is, your Honor, it's relevant

21   that Marty Paley -- that the exchangors can testify --

22   testimony that Marty Paley didn't say anything other

23   than what was in the exchange documents.  He made no

24   material deviation from that that is relevant to show

25   the nature of the scheme.  It is relevant to show what

PDF created with pdfFactory trial version www.pdffactory.com

1    induced the exchangors to give their money to Benistar,

2    and it shouldn't be excluded.

3            THE COURT:  Mr. Pappalardo?

4            MR. PAPPALARDO:  Your Honor, I'm not going to

5    repeat what's in the motion, but let me state that I

6    reviewed the trial transcript in this case and at no

7    time did I find -- which is the necessary

8    prerequisite -- that this Court found an agency

9    relationship.  And I would suggest to the Court -- at

10   least if the Court did, it wasn't on the record.

11           But I would suggest to the Court that there

12   wasn't an agency relationship.  The government never

13   established an agency relationship between Mr. Paley and

14   Mr. Carpenter; and furthermore, absent that foundation,

15   it's not clear to me that Paley was an agent of

16   Carpenter or that Carpenter was an agent of Paley.

17           As the Court recalls the evidence in this case,

18   Mr. Carpenter was an individual who had no familiarity

19   with 1031 exchanges; he knew nothing about them, whereas

20   Marty Paley for many years worked in that field with a

21   national company called Nationwide, had familiarity --

22   all of these documents, in fact, were his and were

23   tailored by him by simply putting "Benistar" instead of

24   "Nationwide."  He had them in his previous employment.

25   I'm not sure that establishes an agency relationship.

PDF created with pdfFactory trial version www.pdffactory.com

1          Furthermore, your Honor, without getting into a
2   lot of detail about what Marty Paley said, Marty Paley
3   said a lot of things, and among them were that he never
4   went outside of the documents when he spoke with the
5   potential exchangors.  He further testified that he was
6   never authorized by Dan Carpenter to do so, but yet --
7   but yet -- the government still wants to introduce these
8   statements.

9          The documents speak for themselves, your Honor.
10  They're an exclusion clause in the documents that say
11  that the document is, you know, the operative
12  interaction between the parties and no oral
13  representations can modify that in any event.

14         Your Honor, part of the problem here is that
15  this is a creation of the government.  The government is
16  trying to overcome a problem that they have invited, and
17  their problem is this:  They have charged in this case
18  fraud in the inducement.  Their theory of the case is
19  that this was a completed crime at the time that the
20  money was transferred to Benistar Property Exchange.
21  The difficulty with that, your Honor, is that there was
22  no interaction between Mr. Carpenter and any of the
23  exchangors.  In fact, as the Court recalls from the
24  testimony, most of the exchangors were personal friends
25  of Marty Paley who had engaged Marty Paley and

PDF created with pdfFactory trial version www.pdffactory.com

1    Nationwide in this property exchange area on previous

2    occasions.

3            There was no interaction by Dan Carpenter.  The

4    government could have solved this problem:  They could

5    have invited Marty Paley, they could have alleged a

6    conspiracy with unindicted coconspirators, but they

7    didn't.  I'll tell you what else they didn't do, your

8    Honor.  They didn't establish an agency relationship

9    which is sufficient to have statements by Marty Paley

10   apply to Dan Carpenter in a criminal case, particularly

11   statements that don't go beyond the documents.

12           And I would suggest, your Honor, that there's

13   nothing misleading about saying to Mr. Paley on the

14   stand, if he takes the stand, "Did you have a

15   conversation with the exchangor?"

16           "Yes," they had a conversation.

17           And was the conversation concerning these

18   documents and was there any conversation outside of

19   these documents?  That's sufficient to permit reasonable

20   inferences and proper argument, which I suggest may not

21   have been the case in the first trial.

22           There was nothing here, your Honor, that goes

23   beyond -- that makes this non-prejudicial.  This is an

24   invited problem by the government in the way they've

25   charged this case, and there's no foundation for

PDF created with pdfFactory trial version www.pdffactory.com

1   admitting these statements against Dan Carpenter.

2        MR. GEORGOPOULOS:  Your Honor, if I may be

3   permitted to add briefly to Mr. Pappalardo's points?

4        THE COURT:  Go ahead.

5        MR. GEORGOPOULOS:  Thank you.

6        Your Honor, first of all, we received yesterday

7   a transcript of the charging conference at which this

8   very issue was addressed and at which time your Honor

9   determined that the government had failed to show

10  sufficient agency between Carpenter and Paley beyond the

11  existence -- excuse me -- beyond the subject matter of

12  the documents; so therefore, the oral terms were not

13  supported, the oral representations that would have gone

14  beyond it.

15       I submit, your Honor, that the oral -- and

16  that's on page 45 running into 46 of the transcript of

17  the charging conference.

18       So I am not aware of the government's having

19  made any proffer that would change that analysis.  I

20  think that in view of that, it's clear that, if not in

21  their entirety, substantial portions of the testimony of

22  the exchangors that was permitted into evidence at the

23  first trial should be excluded from the retrial.  And,

24  you know, one, as has been outlined, I think there's the

25  prejudicial impact that they would have to the extent

PDF created with pdfFactory trial version www.pdffactory.com

1    they represent the individual perceptions of the

2    exchangors, or Paley, as to what the terms of those

3    documents meant.  To have those imputed on to Carpenter

4    would be inappropriate.

5         I guess what I'm saying, even with respect to

6    the documents, they speak for themselves.  Elaborations

7    from Mr. Paley is unnecessary, and I submit only likely

8    to lead to confusion.  Mr. Paley is in the best position

9    to recount what his statements were.  And I just wanted

10   to apologize to the Court for not having, at the time of

11   filing this, obtained a copy, and, therefore, presenting

12   more of an argument than would have been necessary had

13   we had this in time.

14        THE COURT:  All right.  Let me say a couple of

15   things:  One is, questions of admissibility of evidence

16   will be determined on the evidence at this trial, not on

17   the last one, which I think is uncontroversial,

18   obviously.  Insofar as the motion asks for a categorical

19   exclusion of all statements, whatever they are, it's too

20   broad, obviously.  And so on that basis, if that's how

21   it's styled, it's denied.

22        We will take up any particular objection at

23   trial to any question that calls for a statement -- an

24   out-of-court statement by Mr. Paley as to what was said

25   out of court -- and decide then whether it is hearsay,

PDF created with pdfFactory trial version www.pdffactory.com

1    that is, offered for the truth, much of which would not

2    be, I would suspect.  And if it is within the range of

3    something that could be classified as hearsay, whether

4    any of the exceptions of Rule 801, or any other rule,

5    would apply.

6          So as a categorical matter, the motion would be

7    denied, and you may, as I say, preserve the opportunity

8    to make any particular objection on the record as it

9    appears at the time the objection is made.

10         MR. MITCHELL:  Thank you, your Honor.  There are

11   three other motions that I think the Court can dispense

12   with.  I'll try to be as brief as possible.  One is the

13   exclusion of government witness David Patterson.  You'll

14   recall, your Honor, that David Patterson was -- is and

15   was an attorney practicing in Newton.  He represented in

16   1998 an individual named Jean Carey who happened to be

17   Benistar's first exchangor.

18         His testimony, in pertinent part, established

19   that he had direct conversations, Patterson did, with

20   Dan Carpenter about the exchange agreements in which

21   he -- in which two things happened:  One, he expressed

22   concern about the security of Jean Carey's funds, as she

23   was engaged, as the others were, in a property exchange

24   and expected to have her money held safely and be made

25   available for her until the time came to purchase the

PDF created with pdfFactory trial version www.pdffactory.com

1  replacement property; and then secondly, that they went

2  over the exchange documents, in particular, and that

3  Mr. Carpenter produced for Mr. Patterson what became the

4  escrow agreement that the other exchangors received.

5       So it puts -- the testimony of David Patterson

6  puts knowledge of those documents directly into the

7  defendant's head, and it is relevant to intent for that

8  reason -- directly relevant -- highly probative of

9  intent; and, secondly, it also highlights for him --

10  puts him on notice that security of funds was important

11  to people engaging in 1031 exchanges.  The principal

12  reason is the first reason:  It establishes that the

13  defendant was well familiar with the exchange documents.

14       The defendant has moved to exclude that

15  testimony on the grounds that it -- two, really.  One,

16  on 404(b) grounds, which I guess I don't quite

17  understand.  The episode with David Patterson was

18  inextricably entwined with the course of Benistar's

19  business.  This was one of several exchangors who did

20  business with Benistar directly, and it didn't involve

21  some other conduct unrelated to this case; it's directly

22  related, part of the same pattern of business activity.

23       Putting the 404(b) issue aside, the defendant

24  also argues that the testimony was unfairly prejudicial

25  because it was remote in time and because it suggests a

PDF created with pdfFactory trial version www.pdffactory.com

1    propensity -- I guess I confess I don't really

2    understand the argument -- it suggests it's propensity

3    evidence.  I'm not sure what type of propensity evidence

4    it is, but if anything, if anything, because

5    Ms. Carey's -- Ms. Carey got her money back, it suggests

6    that it is highly prejudicial to the defendant.

7         But in the end, your Honor, for the reasons I

8    just highlighted, it's highly probative; it directly

9    connects the defendant with the exchange documents.

10   Those are the documents that induced people to give his

11   business money.  For that reason, David Patterson's

12   testimony should come in.

13        MR. PAPPALARDO:  Well, your Honor, the documents

14   come in through Marty Paley if Marty Paley testifies,

15   but just to clear up one point, the propensity argument,

16   your Honor, I think is very clear from the motion that

17   we filed.  What the government really wants

18   Mr. Patterson for is to extrapolate the interaction

19   between Patterson, who was the attorney representing the

20   first exchangor, and the subsequent exchangors; in fact,

21   the 115th through the 119th exchangor, and trying to

22   superimpose a state of mind at a point in time in 1998

23   through the end of 2000.

24        And there's no clearer evidence than that, than

25   in the government's final argument in this case, where

PDF created with pdfFactory trial version www.pdffactory.com

1    they say that there's no question that Dan Carpenter was

2    aware from the very first client what the contents of

3    the materials were and that the security of funds was of

4    paramount concern to the people who would be his

5    clients.  I submit to the Court, that's highly improper.

6    I think that that inference is not warranted from the

7    interaction with Patterson and it's not a deductive

8    conclusion that could be properly drawn.

9         You can't superimpose the state of mind of

10   Mr. Patterson on the state of mind of the attorneys who

11   were representing Investors 1,010.  Each of those people

12   have their own reasons for making exchanges.  Some

13   people make property exchanges and decide to withdraw

14   the money for tax reasons.

15        The whole point, your Honor, is, again, this is

16   another example where the government could have charged

17   this case differently.  They could have charged the

18   crime as being complete with Mr. Patterson because,

19   after all, if there was fraud in the inducement -- which

20   is really what they're alleging here, that these were

21   fraudulent documents, they were fraudulent documents

22   from day one, and they continue to be fraudulent

23   documents all the way through to the last investors who

24   did not receive compensation for their investment --

25   they could have charged it that way.  They didn't.

PDF created with pdfFactory trial version www.pdffactory.com

1      And I submit to the Court that it's improper to

2   draw an inference because Patterson thought this was

3   critical that it was the same for every other investor.

4   And certainly, your Honor, again, it highlights the idea

5   that this is the only time that Mr. Carpenter ever spoke

6   to anybody; ever spoke to an agent of an investor or an

7   investor prior to the time that an investment was made.

8      And this is a deficiency in the government's

9   case.  They're trying to bootstrap up now.  Why didn't

10  they charge -- why didn't they charge this crime back in

11  1998?  Why didn't they charge the other crimes?  Then

12  this would be an easy call.  I submit to the Court that

13  they went beyond what was permissible and proper in the

14  first case, and it should be excluded in this one.

15      THE COURT:  Well, again, to the extent that the

16  motion is to categorically exclude Mr. Patterson's

17  testimony in any respect, it would be denied.  As to the

18  substance of it, it may be evidence directly in support

19  of the indictment or it might be 404(b) evidence.  But

20  even if it's 404(b) evidence, some of it, anyway, is

21  likely admissible under the terms of 404(b) itself;

22  intent, planned, motive, so on and so forth.  Again,

23  that's something that we can judge at the time when it's

24  offered.

25      MR. PAPPALARDO:  Your Honor, I would just say --

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  One other thing.

2          MR. PAPPALARDO:  Sure.

3          THE COURT:  To the extent that what you -- your

4    argument just now suggested that there would be some

5    testimony permitted by Mr. Patterson as to what he

6    thought, or his assessment.  That would likely be

7    excluded as improper lay opinion or something like that,

8    I guess, incompetent.  It's not within his personal

9    knowledge.  There may be some basis for it.

10         I don't recall that that's what he testified

11   last time or whether it was an issue at all.  But if it

12   goes to the transaction and what was said during the

13   transaction and what drafts were exchanged and so on and

14   so forth, insofar as the objective facts rather than

15   somebody's interpretation of them, it might aid the jury

16   in resolving a question such as intent, knowledge,

17   motive, preparation, so on.  All of those four would be

18   categories that would likely be admissible; but his, you

19   know, personal assessment of what he thought was going

20   on would likely not be.  But, again, we'll know exactly

21   what the state of the evidence is when we get to that

22   point.

23         MR. MITCHELL:  Just so we're clear, your Honor,

24   we plan to go about it -- about his testimony the same

25   way.  If you recall last time, we asked him what

PDF created with pdfFactory trial version www.pdffactory.com

1    statements he made to Dan Carpenter and what statements

2    Dan Carpenter made in response.  And to the extent that

3    those statements reflected concerns on Mr. Patterson's

4    part, that was admissible and we were not going to offer

5    testimony about Mr. Patterson's own private musings

6    about what he was concerned about.

7            Secondly, for the record, if the Court believes

8    that this is 404, the evidence, I just want to put on

9    the record the government is giving the defendant notice

10   of its intent to offer.

11           THE COURT:  You're welcome.

12           MR. MITCHELL:  What?

13           THE COURT:  I said, "You're welcome."

14           MR. MITCHELL:  There are two other motions.  One

15   has to do with victim impact, and there are two motions

16   in limine built in there.  One has to do with a motion

17   that the defendant filed before the last time, and that

18   is to preclude the government from using the word

19   "victim" at trial and the -- we're not going to oppose

20   that.  We won't -- as we refrained from using that term

21   last time, we'll do so again this time around.

22           THE COURT:  That's Number 262, the motion?

23           MR. MITCHELL:  I think it was, yes.  That is

24   Number 262; yes.

25           THE COURT:  Okay.  That will be granted by

PDF created with pdfFactory trial version www.pdffactory.com

1    agreement.

2          MR. MITCHELL:  Okay.  And then secondly, your

3    Honor, it was -- the other relief that the defendant

4    seeks in that motion that we oppose, and that is that

5    there cannot be any testimony about victim impact.  This

6    issue was litigated in the context of Brian Fitzgerald's

7    testimony.  Brian Fitzgerald, if you'll recall, was a

8    middle-aged gentleman in a wheelchair who talked about

9    selling his carwash and trying to parlay that money into

10   another part of the business.

11         And he was asked by Mr. Pinault a series of

12   questions about how it affected him.  There was an

13   objection; in fact, Mr. Goldstein moved for a mistrial

14   on that issue.  As I understand the Court's ruling, the

15   Court agreed that testimony about the impact it had on

16   Mr. Fitzgerald's life, the financial problems that

17   arose, was admissible on really three grounds:  One, as

18   the Court put it, its relevance is materiality, for one

19   thing, materiality of representations; secondly, it's

20   relevant to the structure, as you put it, your Honor, of

21   the scheme to defraud; it's also relevant on another

22   ground that was argued by Mr. Pinault which the Court

23   didn't address specifically, and that is, in the

24   defendant's opening, the defendant put in issue the

25   sophistication of the exchangors, contending that these

1  were sophisticated people who knew what they were

2  getting into, understood the risks of doing business

3  with Benistar, and went forward nonetheless.

4      The testimony about the impact of this affair on

5  the likes of Mr. Fitzgerald, and perhaps one or two

6  other of the exchangors, was relevant to show that, no,

7  these weren't all sophisticated people.  Some were

8  not -- like Mr. Fitzgerald, were not sophisticated at

9  all.  They saved up money, they put it into a business,

10  and as a result of the defendant's actions, they lost

11  their money and it had an impact on their lives.

12      So for all those reasons, your Honor, for all

13  the same reasons that were articulated and discussed at

14  sidebar during Brian Fitzgerald's testimony, this type

15  of evidence should be allowed.

16      MR. PAPPALARDO:  Well, your Honor, in response,

17  I would simply state that I would contest the relevance.

18  But not to belabor the point, it seems to me that

19  testimony which is allowed in from an exchangor which

20  has to do with his own cancer and his daughter's

21  hospitalization is something that even, if admissible,

22  is certainly unfairly prejudicial, particularly at a

23  point in time, again, your Honor, by the government's

24  own charging instrument, the crime was complete.

25      I'd suggest to the Court that that is in there

PDF created with pdfFactory trial version www.pdffactory.com

1    simply for the purpose of evoking sympathy from a jury

2    for this exchangor; it has no purpose in this case and

3    it's not probative on the issue of whether or not Dan

4    Carpenter committed a crime prior to the conditions of

5    this particular investor.  I can't think of anything

6    that would be more prejudicial under 403 than those

7    statements.

8         THE COURT:  I'll reserve on this.  I want to

9    look at the transcript and see what happened in the last

10   trial, so we'll reserve that aspect of 262.

11        MR. MITCHELL:  All right, your Honor.  The next

12   one, your Honor, and the last of the defendant's pending

13   motions is Government's 263, evidence concerning the

14   defendant's trading strategy.  What the motion seeks to

15   exclude really is evidence at the heart of this case.  I

16   mean, the heart of the fraud here, your Honor, at least

17   part of it, is that the defendant knew that certain

18   representations were being made to the exchangors.  He

19   knew specifically that they were told that their money

20   would be put in escrow, that it would be secure in

21   accounts that either yielded a 3 percent rate of

22   interest or a 6 percent rate of interest, and that the

23   whole nature of a 1031 exchange was to exchange

24   properties, commercial real estate properties.  And

25   unbeknownst to those individuals, he did something

PDF created with pdfFactory trial version www.pdffactory.com

1    completely contrary with the money, and that is, he put

2    it in high-risk, uncovered call options in a sector at a

3    time when that sector was extraordinarily volatile.

4         To the extent that the defendant seeks now to

5    exclude that court testimony, the testimony and

6    documents that show the very nature of the fraud, it is,

7    frankly, your Honor, akin to arguing in a

8    felon-in-possession case that the gun shouldn't come in.

9    It is at the heart of the case itself.  What the

10   defendant is trying to do with this motion is have the

11   Court revisit the line the Court drew, as you just

12   articulated a moment ago, between lay testimony about --

13   in this context about trading strategy and what the

14   defendant was specifically told.  What he was put on

15   notice of.

16        There was, as the Court will recall, testimony

17   in a variety of forms and documents -- and several

18   documents that show -- that put the defendant on notice

19   of the risks of options trading, particularly uncovered

20   options trading, and despite those risks he proceeded

21   knowing, on the other hand, the representations that

22   were being made to get him the money in the first

23   instance.

24        And so in that way, your Honor, what's being

25   asked to be excluded is extraordinarily probative

PDF created with pdfFactory trial version www.pdffactory.com

1    evidence.  I mean, it is the heart of the case.  And --

2         THE COURT:  What's the evidence you're referring

3    to when you say evidence to put the defendant on notice

4    as to the riskiness?

5         MR. MITCHELL:  The evidence that the defendant

6    cites are the applications he completed with PaineWebber

7    that contain warnings about the risks of trading in

8    options.  I think there was some other materials that he

9    reviewed.  I think there are only a couple of examples,

10   frankly, in the defendant's motion.  Those are the two

11   that leap out at me, but they all sort of fall in the

12   same category of evidence; that is, evidence that the

13   defendant was aware of the riskiness of his trading

14   strategy.

15        And for the reasons that the Court made very

16   clear during the last trial, that evidence was probative

17   of the defendant's intent at the time that the scheme

18   was in place.  For that reason, all of this should come

19   in just as it did in the last trial.

20        MS. DEGIACOMO:  Good afternoon, your Honor.

21   Paula DeGiacomo for the defendant, this motion, in

22   particular.  Your Honor, in the first place, I couldn't

23   find in the transcript, but we're asking the Court to

24   consider this on 404(b) and 403 grounds, which I don't

25   think it was -- I don't think anyone requested the Court

PDF created with pdfFactory trial version www.pdffactory.com

1    consider it on those bases in the first trial.  As the

2    Court -- and I know this was a subject matter of a lot

3    of testimony at trial and a lot of objections and

4    rulings by the Court, but as the First Circuit said,

5    there was extensive evidence admitted on this -- on the

6    investment trading strategy, and it dominated three of

7    the ten days of trial in the matter.

8         The Court noted -- this Court noted during the

9    course of the trial that it had limited relevance and it

10   also had a limited purpose.  And one point that the

11   trial court ruled that its limited purpose was that, by

12   inference -- after Mr. Carpenter became aware of the

13   magnitude of the losses, that by inference he had to

14   have intended the fraud.

15        Now, again, there was a lot of discussion that

16   the intent that the government must prove is intent at

17   the time the client obtained the funds.  And under Rule

18   404(b), first of all, we'd request notice with respect

19   to the nature of the evidence the government intends to

20   offer at this trial if it's any different than evidence

21   that was offered at the first trial, but under the

22   traditional 404 analysis we're relying on *Varoudakis* and

23   *Gilbert*.  And *Varoudakis*, not only must the evidence be

24   relevant to intent or knowledge or opportunity to plan,

25   the litany goes on, but it also may not include bad

PDF created with pdfFactory trial version www.pdffactory.com

1    character or propensity as a necessary link in the

2    inferential chain.  And what we're arguing here, your

3    Honor, that as the Court stated, the inferential chain

4    here is that after he became aware of the magnitude of

5    the loss, the inference was that he must have intended

6    the prior misrepresentations.

7         While this Court, in its ruling on the motion

8    for a new trial, and the First Circuit opinion is based

9    on the closing argument, we would argue, your Honor,

10   that the closing argument was simply based on the

11   evidence derived at trial.  And so the conclusions that

12   were made by this Court and the First Circuit reiterates

13   this Court's conclusions that all of this evidence and

14   perhaps the dominant nature of it had a tendency to lead

15   the jury away from the critical issue of intent to

16   defraud by inviting them to blame the defendant, because

17   he was a gambler or because he lost the exchangors'

18   money, rather than committing the wire fraud.

19        And we are arguing that this is, in fact, the

20   prohibited propensity evidence that 404(b) would exclude

21   even if it's relevant.  In other words, as this Court

22   said, it leads a jury to conclude that he should be

23   found guilty on the grounds of moral disapprobation,

24   about recklessness and waste as opposed to the specific

25   intent here.

PDF created with pdfFactory trial version www.pdffactory.com

1          And, in fact, what we also argue, your Honor, is

2     that limiting instructions won't cure this because, in

3     fact, the Court did give an instruction on good faith

4     and, in fact, the Court did give an instruction on the

5     risky trading, and as we saw, the jury came back guilty.

6          And also, we would request a ruling on Rule 403,

7     your Honor, a balancing of the unfair prejudice versus

8     the probative nature of this, and sort of dependent on

9     *Old Chief*, a U.S. Supreme Court case, and *Varoudakis*

10    that "unfair" means a tendency to evoke an emotional

11    response in a jury or otherwise suggests a decision

12    based on an improper basis.

13         In addition, "unfair" can mean, you know, can

14    the government prove it in another not-so-prejudicial

15    manner?  And in this case, your Honor -- and again, this

16    is going to depend on how the evidence comes in at this

17    trial, but at the government's closing they said that

18    their evidence was overwhelming in this case, that

19    Mr. Carpenter committed -- and did so -- an intent to

20    engage in a fraudulent scheme.

21         They relied on the exchangors and the attorneys,

22    the documents.  They relied heavily on Attorney

23    Patterson; they relied heavily on the government's

24    cooperator, Marty Paley; they relied on the testimony of

25    the employees at Benistar who knew Mr. Carpenter and

PDF created with pdfFactory trial version www.pdffactory.com

1   worked with Mr. Carpenter.  And essentially, your Honor,

2   we'd argue that it's necessary to exclude the evidence

3   because there's such a danger -- the rule said "a danger

4   of unfair prejudice":  it doesn't say "proven unfair

5   prejudice" -- that the jury simply won't be able to

6   focus its attention on the intent to commit the crime

7   when the funds were obtained and the representations

8   made at that point, and they won't be able to do that

9   without drawing the forbidden inference that's forbidden

10  by Rule 404(b).

11       And the second -- in the alternative, your

12  Honor, we are asking that any of this evidence, if it's

13  admitted, only come in through the expert.  I read the

14  testimony of Mr. Rock and Mr. Levine.  And what we have,

15  notwithstanding the Court's attempts to cauterize their

16  testimony, their opinion that his trading strategy was

17  risky and whatnot, and essentially, that this was too

18  dominant a part of the government's case and carried

19  with it the -- as the Court said, the moral freight

20  attendant with it that made it impossible for the jury

21  to engage in the mental gymnastics of separating out

22  that conduct from the conduct that occurred at the time

23  of the crime.

24       Thank you, your Honor.

25       THE COURT:  Okay.  As you all know, we spent a

PDF created with pdfFactory trial version www.pdffactory.com

1   great deal of attention on this the first time.  So it's

2   something that we're very familiar with.  I will say, as

3   a general matter -- we may have some small exceptions as

4   the need arises -- I expect to adhere to the same views

5   that I took the first time through, not because I took

6   them the first time through, but because I think they're

7   the correct way of doing it.  So I expect that that

8   template will largely be replicated.

9        I don't think this is propensity evidence if

10  propensity evidence is understood as propensity to

11  commit the crime that is charged in the indictment.  So

12  the propensity to commit fraud is the propensity of a

13  risk-taker in the market.  I don't think those are the

14  same things.

15       But at any rate, I think this is probably not

16  404(b) as the first characterization, but direct

17  evidence of an element of the offense.  If it is 404(b),

18  like the other evidence we're talking about -- and for

19  substantially the reason you're familiar with from the

20  first trial, I don't think 403 calls for its exclusion.

21  So generally the topic will be permitted.

22       Now, the technique by which the evidence comes

23  in might be open to some debate, and I think it may well

24  be that there was some leakage of lay opinion either

25  unexpected or unpoliced.  And we can keep a sharper eye

PDF created with pdfFactory trial version www.pdffactory.com

1    on that, I suppose.  What investors themselves thought,

2    for example, might be unbalanced under the opinion

3    rules.  But that's something we'll wait and see how this

4    develops in the testimony.  Okay --

5           MR. MITCHELL:  Your Honor, a couple of other

6    motions --

7           THE COURT:  So that motion is denied as a

8    general matter.

9           MR. MITCHELL:  I don't want to convert this into

10   a lengthy status hearing, but there are a couple of

11   other issues that I think are important to pick up right

12   now.  One of them is, your Honor, before I -- before I

13   stand up and give my opening, I want to make sure that I

14   have a good sense of the contours of the Court's new

15   trial order and what I can say and what I can't say.  I

16   don't want to step over the line.

17          As I understand the Court's new trial order, the

18   issue -- the problem that the Court had with the

19   closings was really two:  There was undue emphasis on

20   the losses and the trading activity as things got later

21   on in the life of Benistar Property Exchange and the

22   defendant's investment decisions as those losses were

23   mounting; and then secondly, the use of the term

24   "gamble" and analogous terms that liken the activity to

25   casino gambling, or gambling in general.

PDF created with pdfFactory trial version www.pdffactory.com

1          So as I understand it, for the government to

2    cure that problem in this whole thing and its closings,

3    we need to de-emphasize loss -- not emphasize losses as

4    much, and to refrain from the use of gambling-type

5    terms.

6          I mean, is that a fair characterization?  I'm

7    not trying to put words in the Court's mouth, but I'm

8    just trying to -- I don't want to -- I don't want to

9    cross the line.

10          THE COURT:  I think that my opinion and order

11   granting the new trial fully sets forth my view on the

12   matter, and I don't want to simplify it by a shorter

13   exposition, but I would -- that said, that caveat having

14   been put out, I think my general concern was that the

15   jury could have been distracted from the elements of the

16   offense and could have convicted on their -- their

17   having been satisfied there was conduct that they could

18   have found from the evidence, but was not necessarily an

19   element of the offense, and that we could not be sure

20   that they had adequately -- if that were the case, that

21   they had adequately found the elements of the offense

22   beyond a reasonable doubt.  So I guess, although this

23   may sound a little obscure, I think that the effort

24   should be to keep the jury focused on the crimes charged

25   in the indictment and the elements of the offense.

1         Now, the evidence we're talking about, as we've

2    just also discussed, has some relevance and bearing on

3    how they assess the evidence with regards to the

4    elements of the offense.  It's really a question of

5    emphasis.  It's not an in-or-out kind of thing; it's

6    taken as a whole:  Where is the center of gravity of the

7    argument?  And Mr. Pappalardo, I think, referred to it

8    earlier, the offense is obtaining of money or property

9    by a scheme or artifice to defraud, using that language.

10   So the key word there is the "obtaining."  And to the

11   extent the emphasis gets shifted to the losing, and

12   permits a conviction on losing rather than on the

13   pertaining, I think there's a problem.

14        MR. MITCHELL:  Okay.  I appreciate that.  Your

15   Honor, one other matter was the government's motion in

16   limine to permit the reading of the trial transcripts of

17   Joseph Iantosca and Linda Jokinen, and it has been

18   opposed by the defendant.  Do you want to --

19        MR. PIROZZOLO:  We would just request the

20   reading because Ms. Jokinen died, and at the prior trial

21   she was examined and there was an adequate opportunity

22   and motive to cross-examine her, particularly on the

23   issues and facts that she testified to at the first

24   trial.  And Mr. Iantosca has a mental medical issue that

25   makes him unavailable for trial this time around.  And

PDF created with pdfFactory trial version www.pdffactory.com

1    for the same reasons as Ms. Jokinen, there was adequate

2    motive and opportunity to cross-examine Mr. Iantosca at

3    the last trial.

4         And so on that basis, the government is moving

5    to have the testimony that was given prior by each of

6    them read into evidence along with -- shaped, of course,

7    by the rulings of the Court at that first trial.

8         MR. PAPPALARDO:  Your Honor, we oppose that, as

9    indicated in our motion, because of the changed

10   circumstances in this case.  This is several years after

11   the first trial.  There have been intervening events

12   which bear upon the testimony of both of these

13   witnesses.  And those events are material and

14   significant in terms of not only the thrust of their

15   testimony but also the questions that were posed to

16   them, and they're now unable to be cross-examined on

17   those events.  And I would suggest to the Court that it

18   would be very prejudicial, and the denial of

19   Mr. Carpenter's 16th Amendment rights of confrontation

20   to allow that testimony in.

21        Your Honor, that's not just a blanket sort of,

22   you know, knee-jerk reaction.  We went through -- and I

23   just took four examples, for instance, of Ms. Jokinen's

24   testimony during the first trial from.  And if I could

25   beg the Court's indulgence, I'll just go over a couple

PDF created with pdfFactory trial version www.pdffactory.com

1  of these things.

2      "QUESTION:  During the time you worked at

3  Benistar Property Exchange, did Mr. Carpenter have final

4  approval authority over the operations of Benistar

5  Property Exchange?

6      "ANSWER:  Yes.

7      "QUESTION:  Was his authority greater or less

8  than that of Marty Paley?

9      "ANSWER:  Greater."

10     There was absolutely no foundation for that,

11  your Honor, at the time that she made that statement,

12  either through her or any other previous witness.  She

13  was not competent to answer that question as per her

14  role at Benistar.  How could she be in a position to

15  even come close to determining between Carpenter and

16  Paley who had greater authority?  And furthermore, your

17  Honor, the question calls for a conclusion for which

18  there is no adequate foundation.

19     "QUESTION:  What caused you to send these

20  revised exchange documents to Connecticut for Dan

21  Carpenter to review?

22     "ANSWER:  Because Dan had to have final word on

23  all documents."

24     Again, her answer is conclusory; she's

25  incompetent to give an answer; there's no foundation for

PDF created with pdfFactory trial version www.pdffactory.com

1    that in her previous testimony.

2         "At some point in time" --

3         "QUESTION:  At some point in time did Benistar

4    Property Exchange go out of business?

5         "ANSWER:  Yes.

6         "QUESTION:  What happened that caused it to go

7    out of business?

8         "ANSWER:  The money disappeared."

9         Your Honor, I suggest to you, again, she's not

10   competent to testify to that.  The question further

11   calls again for a conclusion, and the characterization

12   of the money disappearing is prejudicial and probably

13   not accurate.

14        "QUESTION:  At any point in time when you worked

15   at Benistar Exchange, did you ever see any notification

16   or letter or warning going out to clients informing them

17   that their money was going to be traded in the options

18   market?

19        "ANSWER:  No.

20        "QUESTION:  At any point when you worked at

21   Benistar Property Exchange did you ever see any

22   notification or letter going out to clients informing

23   them that there was a risk of some of their funds being

24   lost in the market?

25        "ANSWER:  No."

1          Your Honor, these questions in and of

2    themselves -- forget about the responses -- are very

3    argumentative, they're very leading, and I would suggest

4    to you they're improper.

5          THE COURT:  Okay.

6          MR. PAPPALARDO:  This entire transcript is

7    replete with that.

8          THE COURT:  Well, it may be.  I understood the

9    opposition to the motion to be an 804(b)(1) inadequate

10   opportunity under the Rules of Evidence and/or a

11   confrontation-clause proffer-type argument.  This is

12   different -- a slightly different argument.  This is an

13   argument apart from whether there was adequate

14   cross-examination, there are other objections like

15   competency, and so on and so forth, that could be made

16   that weren't made then.

17         My inclination -- I'll hear further from you

18   about it -- would be if the transcripts were to be

19   permitted as a general matter, that the testimony

20   contained in the transcripts would still be newly

21   offered in this trial, and any given question could be

22   objected to on any applicable basis; that is, the

23   substitution is a transcript for the live witness, but I

24   don't think that that means that because an objection on

25   competency grounds, for example, was not made the last

PDF created with pdfFactory trial version www.pdffactory.com

1  time, that it's waived for the reading of the

2  transcript.

3          Now, that's --

4          MR. PAPPALARDO:  Your Honor, we raised

5  competency with respect to Mr. Iantosca in our

6  opposition to the government's motion.

7          THE COURT:  Okay.  And maybe you did, but that

8  would be a question-by-question matter.

9          MR. PAPPALARDO:  Okay.

10         THE COURT:  Okay?  There's an overarching

11  question which is whether the transcript, or any part of

12  it, qualifies under 804(b)(1) or under proffer and the

13  confrontation clause.  That's sort of an overarching

14  question.

15         The other one is, I think we can -- and here's,

16  I guess, one other thing:  I'm not prepared to make a

17  ruling on it now because I want to look at the

18  transcripts, which I haven't done, or read them.  But it

19  is possible that I will say that the -- that I won't bar

20  the use of the prior recorded testimony categorically,

21  but that I would permit any objection on any valid

22  evidentiary-rule basis to any particular question and

23  answer.  And if that were the case, then I would expect

24  to do what I would do in civil cases if somebody wants

25  to testify by deposition:  I would expect the parties to

1    give me a written, marked-up transcript as to what their

2    objections are to particular questions, and I would rule

3    on that.  And then if there are some that are --

4    objections that are sustained, we'll excise that from

5    the transcript, and the transcript -- the remaining

6    transcript can be used.

7         So that's my hunch as to what the outcome would

8    be, but...

9         MR. PAPPALARDO:  And we will prepare it in that

10   fashion, your Honor, obviously prior to the time that

11   the government seeks to introduce the testimony.  But,

12   again, your Honor, I stress that the main thrust of the

13   motion has to do -- excuse me; I'm losing my voice --

14   with the changed circumstances that I suggest to the

15   Court are directly relevant to anyone's ability to

16   cross-examine that didn't exist at the time of their

17   testimony.

18        THE COURT:  I understand that, and I'll have

19   that in mind as I review the transcript.

20        MR. PAPPALARDO:  Thank you, your Honor.

21        MR. PIROZZOLO:  Your Honor, may I just -- the

22   changed circumstances they specify -- if I may be heard

23   on this for a moment -- is on page 6 of the opposition.

24   It relates to a settlement between -- a potential

25   settlement between PaineWebber and ultimately the

```
 1  plaintiffs.

 2          THE COURT:  Right.

 3          MR. PIROZZOLO:  And an arbitration ruling

 4  against PaineWebber.

 5          I would just like to say right now, if you look

 6  at the three reasons that are given, not one of them is

 7  a changed circumstance that has any bearing on the

 8  testimony that Linda Jokinen gave or Mr. Iantosca gave

 9  at the time of the first trial.  They're just not

10  relevant.

11          THE COURT:  Okay.

12          MR. PAPPALARDO:  Well, your Honor, we'll take it

13  up.

14          THE COURT:  Right.  I gathered that would be the

15  government's view.

16          Okay.  What else?  Could you give me a trial

17  time estimate?

18          MR. MITCHELL:  I suspect it will be about as

19  long as the last one because we've ironed out some of

20  the -- having matured and having ironed out some of the

21  objections, it may be a little bit shorter.

22          THE COURT:  About two weeks.  Would that be

23  fair?

24          MR. MITCHELL:  About two weeks.  It might spill

25  into the third week.  If I remember last time, it was 13
```

1    days or something like that?

2            THE COURT:  Right.  Okay.

3            MR. MITCHELL:  There may be -- the parties are

4    discussing whether it will be necessary to -- for the

5    government to put on a long parade of so-called venue

6    witnesses.  If you remember last time, your Honor, we

7    had 11 witnesses from banks and law firms and so forth,

8    and there may or may not be a need for that this time

9    around.  That would obviously shorten the trial.

10           MR. PAPPALARDO:  Could I ask by how much, your

11   Honor?

12           THE COURT:  A day or two --

13           MR. MITCHELL:  That's about right.

14           THE COURT:  -- from recollection?

15           MR. PAPPALARDO:  And I take it your Honor's

16   practice is to go from nine to one?

17           THE COURT:  Yes.  Yeah.  I don't know how many

18   jurors we had last time, 14 or 16?

19           MR. MITCHELL:  I think 14, but I'm not sure.

20           THE COURT:  I usually do 14 unless it's going to

21   be really long.  Anyone think 14 won't be enough?

22           MR. MITCHELL:  That should be enough.

23           MR. PAPPALARDO:  Your Honor, we have a question

24   with respect to the Court's practice in terms of voir

25   dire of the jurors.  Would you like questions in

PDF created with pdfFactory trial version www.pdffactory.com

1  advance?

2        THE COURT:  If you'd like, I'll entertain them.

3        MR. PAPPALARDO:  Thank you.

4        THE COURT:  I ask the questions.

5        What else?  Any other mechanics of the trial?

6  Questions?

7        MS. DEGIACOMO:  Your Honor, there's just one

8  other item that I spoke to Mr. Lyness about.  We have a

9  system called Trial Director that I think can use all

10  the mechanics here.  We're going to be in touch with

11  your IT folks and try to come in next Thursday at ten

12  o'clock, I think, to see whether it all works.

13        THE COURT:  Try it all out.  Good.  Okay.

14  Anything unusual?

15        MS. DEGIACOMO:  Not that I know of, your Honor.

16  It's not my forte.

17        MR. MITCHELL:  We plan to proceed as we did last

18  time, your Honor, just using the Sanction II software

19  that you're familiar with.  And there's got to be some

20  way to reconcile the two, I suspect.

21        THE COURT:  They don't even have to -- well, I'm

22  not going to weigh into technical issues, but you could

23  each use your own PC, just separate connections.

24        MR. MITCHELL:  The only other thing I would

25  mention, your Honor, is two things:  The government

PDF created with pdfFactory trial version www.pdffactory.com

1    submitted a witness list, which is essentially the same

2    as the last one, and the government also submitted a

3    proposed jury instruction in addition to the ones that

4    we submitted last time.  What are the Court's deadlines

5    in terms of reciprocal filings from the defendant?

6             THE COURT:  Well, as to jury instructions, I'd

7    like any that are easily foreseeable the first day of

8    trial that can be supplemented by events that occur

9    during trial.  As to under the local rule, the

10   identification of witnesses and exhibits I think would

11   be due -- well, the government's a little early.

12   Usually it's seven days before the beginning of trial,

13   so the government's would be next -- it would Monday,

14   which is a holiday, and then the defense would be the

15   following Thursday.  So I guess we can stick with

16   Thursday since the government has been early on the

17   Monday.

18             So the defendant's witness list and exhibit list

19   by Thursday.

20             MR. PIROZZOLO:  Your Honor, just for

21   housekeeping purposes, do you want the government to

22   resubmit the same set of jury instructions that it

23   submitted last time?  The government did file a day or

24   so ago an additional instruction regarding the fiduciary

25   duty issue.  Do you want a full set of proposed

PDF created with pdfFactory trial version www.pdffactory.com

```
 1  instructions or not?  Which we could do --

 2       THE COURT:  I suppose these days it doesn't take

 3  much just to reproduce it.

 4       MR. PIROZZOLO:  It doesn't.

 5       THE COURT:  The principal -- this is more for

 6  the defendant, I guess, than for the government.  The

 7  principal question, I guess, is whether you satisfied

 8  any appellate court that you asked for something.  I

 9  guess that's the main thing.  You know, subject to some

10  adjustments to the evidence and so on, I don't think the

11  substantive instructions are going to change much.  I

12  wouldn't suspect so.  It's the same case, so...

13       But it's sort of what do you have to do to be on

14  record, I guess is the question, and that concerns me

15  less than it concerns other people.

16       MR. PIROZZOLO:  Okay.

17       THE COURT:  Okay.  Anything else?  All right.

18  We'll be in recess.

19       MR. PAPPALARDO:  Thank you, your Honor.

20       THE CLERK:  All rise.  The Court will take a

21  short recess.

22       (The proceedings adjourned at 3:01 p.m.)

23

24

25
```

1                        C E R T I F I C A T E

2

3           I, Marcia G. Patrisso, RPR, CRR, Official

4    Reporter of the United States District Court, do hereby

5    certify that the foregoing transcript constitutes, to

6    the best of my skill and ability, a true and accurate

7    transcription of my stenotype notes taken in the matter

8    of Criminal Action No. 04-10029-GAO, United States v.

9    Daniel E. Carpenter.

10

11

12                         /s/ Marcia G. Patrisso
                           MARCIA G. PATRISSO, RPR, CRR
13                         Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25