UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Eastern Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
|     *v.*    ) | CRIMINAL NO. 04-10029-GAO |
| ) | |
| DANIEL E. CARPENTER  ) | |

## **DEFENDANT'S OMNIBUS MOTION TO DISMISS**

Pursuant to Fed. R. Crim. P. 12(b), defendant Daniel E. Carpenter respectfully moves to dismiss the superseding indictment. The indictment is a rambling hodge-podge of civil accusations more appropriately dealt with in a private breach of contract action than a federal mail and wire fraud case. After being under indictment for more than four years, and literally on the eve of trial, Mr. Carpenter still has no idea what acts of his are alleged to be criminal. Is it investing in stock options? Reviewing and editing documents? Causing someone (presumably Benistar Property Exchange ("BPE") president Martin L. Paley ("Paley") to make oral misrepresentations to the Exchangors? Losing $9 million? [Although PaineWebber has since been found liable for causing the losses and Mr. Carpenter has paid the Exchangors $12.7 million.] The indictment fails to allege specifically what is the crime.

All Mr. Carpenter is charged with doing in the indictment is reviewing, editing and assisting in the drafting of documents, and investing in stock options. Nor is it described what specific intent Mr. Carpenter had to deceive the Exchangors or deprive them of their funds. The indictment alleges that oral misrepresentations were made by someone (presumably Paley), but does not allege that Mr. Carpenter made them. Nor does the indictment contain a conspiracy or agency charge, so even if Paley did make misrepresentations to the Exchangors, Mr. Carpenter

1

cannot be held criminally liable for such misrepresentations (if they were made). And even if misrepresentations were made, they are immaterial as a matter of law.

In sum, the entire indictment is fatally flawed from start to finish. Counts 15 and 19 should be dismissed prior to trial for lack of subject matter jurisdiction, and Count 4 should be dismissed prior to trial for lack of venue.

**I.    ARGUMENT**

   **A.    Counts 15 & 19 Should be Dismissed for Lack of Subject Matter Jurisdiction.**

For subject matter jurisdiction to exist under the mail and wire fraud statutes, the charged mailing or wire transmission must be "for the purpose of executing" the charged scheme to defraud. See 18 U.S.C. §§ 1341, 1343; Kann v. United States, 323 U.S. 88, 94 (1944) (mailing must be "for the purpose of executing the scheme, as the statute requires."); Parr v. United States, 363 U.S. 370, 385 (1960) ("these were essentially state crimes and could become federal ones, under the mail fraud statute, only if the mails were used 'for the purpose of executing such scheme.'"); United States v. Maze, 414 U.S. 395, 399 (1974) (mailings not "sufficiently closely related to respondent's scheme to bring his conduct within the statute.").

In Schmuck v. United States, 489 U.S. 705 (1989), the Supreme Court held that a mailing satisfies the jurisdictional predicate of the mail fraud statute if it is "incident to an essential part of the scheme, or a step in [the] plot." Id. at 711. However, Schmuck also reinforced the concept that *post*-scheme mailings, such as those involving "post-fraud accounting," id. at 714, do not satisfy the mail fraud statute. "A mailing cannot be said to be in furtherance of a scheme to defraud when it occurs **after** the scheme has reached fruition." United States v. Altman, 48 F.3d 96, 103 (2d Cir. 1995) (emphasis added); see also United States v. Adkinson, 158 F.3d

2

1147, 1163 (11th Cir. 1998) ("We have not hesitated to reverse mail fraud convictions where the underlying scheme has reached fruition *prior* to the mailing.") (emphasis added).

Counts 15 and 19 should be dismissed because they charge mailings that occurred **after** the alleged scheme to defraud reached fruition. The indictment alleges that the Exchangors were lured into using BPE as their § 1031 qualified intermediary by misrepresentations regarding the "safety" and "security" of their funds. However, as the Court found, "[t]he scheme's object was achieved **when the money was obtained**, before it was invested." United States v. Carpenter, 405 F. Supp. 2d 85, 93 (D. Mass. 2005) (emphasis added). Counts 15 and 19 should be dismissed because they charge mailings that occurred **after** the money was obtained by BPE.

Count 15 relates to a property exchange performed by Gail Cahaly and charges the mailing of a $2.4 million check from BPE-Newton to Benistar-CT. See indictment ¶ 105. "The check was mailed from BPE's offices in Massachusetts to Simsbury, Connecticut via Airborne Express and deposited into BPE's "34" account at PaineWebber." Indictment ¶ 60. This mailing of the check, **after** it had already been obtained by BPE, is just like the post-fraud accounting mailings that were found insufficient in Kann, Parr, and Maze. Once Cahaly endorsed the check over to BPE, see indictment ¶ 60 ("Cahaly endorsed over to BPE a check in the amount of $2,412,230"), the alleged offense reached fruition—*i.e.*, BPE obtained the funds. What BPE did with the funds after obtaining them is, as the Court has already found, irrelevant. For example, instead of BPE-Newton mailing the check to Benistar in Connecticut via Airborne Express, Paley could have just as easily drove to Connecticut and hand–delivered the check to Benistar in Connecticut (perhaps because Paley did not want to risk Airborne Express losing a $2.4 million check). Or Paley could have taken the check in hand to PaineWebber's downtown Boston office and deposited it himself into BPE's "34" account at PaineWebber (to make sure that the money

went into the BPE account at PaineWebber without delay). If either of these post-scheme events had transpired, no mailing would have occurred at all, but BPE still would have obtained Cahaly's $2.4 million and the offense, as alleged in the indictment, still would have been completed. This shows why the charged mailing in Count 15 was not for the purpose of executing the scheme, because the scheme was complete once BPE obtained possession of the check. Whether BPE mailed the check after-the-fact to Benistar in Connecticut had no impact on executing the already completed scheme of obtaining Cahaly's funds.[1]

The same analysis also shows why Count 19 should be dismissed. Count 19 relates to an exchange involving Joseph Iantosca and charges the mailing of a $300,000 check "from BPE-Newton to Benistar-CT." Indictment ¶ 105. For the same reasons as relate to the mailing in Count 15, the mailing of this $300,000 check from BPE-Newton was **after** BPE had already obtained the funds, and is simply a post-scheme mailing as in Kann, Parr, and Maze. Again, once BPE obtained the check, the scheme was complete. Whether the check was thereafter mailed from BPE-Newton to Connecticut, hand-delivered to Connecticut by Paley, or hand-deposited by Paley directly into BPE's "34" account at PaineWebber in downtown Boston, has no effect on BPE's ability to obtain the check. The scheme was complete and had reached fruition once BPE obtained possession of the check, regardless of how (or whether) the check was mailed after-the-fact. Since the mailings in Counts 15 and 19 clearly were not for the purpose of executing the charged scheme to defraud, Counts 15 and 19 should be dismissed prior to trial for lack of subject matter jurisdiction.

---

[1] The undisputed evidence at trial will show that Cahaly *hand-delivered the check to Paley in person*, which means that this transaction falls completely outside of the mail fraud statute.

### B.  Count 4 Should be Dismissed for Lack of Venue.

"[W]hen a defendant is charged in more than one count, venue must be proper with respect to each count." United States v. Geibel, 369 F.3d 682, 696 (2d Cir. 2004). Count 4 charges a wire transfer "from Service Credit Union (Portsmouth, NH) to Merrill Lynch B01 Acct." Indictment ¶ 103. Specifically, the amount "was wired from New Hampshire to Mellon Bank in Pittsburgh, PA for the benefit of the Merrill Lynch B01 Account." Id. at ¶ 90. Because the wire transmission in Count 4 is alleged to have begun in New Hampshire and concluded in Pennsylvania, venue is obviously improper in Massachusetts.

Wire fraud is a continuing offense and, therefore, venue for wire fraud offenses is governed by the general federal venue statute. See 18 U.S.C. § 3237(a). Venue for a wire fraud charge is proper in any district in which the wire communication began, continued, or concluded. Id. See also United States v. Kim, 246 F.3d 186, 191-92 (2d Cir. 2001) (same); United States v. Ebersole, 411 F.3d 517, 527 (4th Cir. 2005) (same). In Count 4, the wire transfer is alleged to have begun in New Hampshire and concluded in Pennsylvania. Because the indictment is totally silent as to where the wire transfer continued (*i.e.*, passed through), the indictment's allegations are plainly insufficient to sustain venue of Count 4 in this District.

Moreover, it is irrelevant for mail and wire fraud venue purposes that the scheme to defraud charged in the indictment was based in Massachusetts. See Kreuter v. United States, 218 F.2d 532, 534 (5th Cir. 1955) ("The place where the scheme is conceived or put in motion is immaterial, it is the place of mailing or delivery by mail."); United States v. Ramirez, 420 F.3d 134, 145 (2d Cir. 2005), cert. denied, 546 U.S. 1113 (2006) ("[a]lthough a fraudulent scheme may be an element of the crime of wire fraud, it is using wires and causing wires to be used in furtherance of the fraudulent scheme that constitutes the prohibited conduct.") (internal citations

and quotations omitted). The indictment's failure to allege that the wire transmission charged in Count 4 began, continued, or concluded in Massachusetts results in a fatal venue defect warranting dismissal of Count 4 prior to trial.

### C. The Indictment Fails to Provide Fair Notice.

To comply with the protections of the Fifth and Sixth Amendments, an indictment must contain sufficiently specific facts to to provide the defendant "with reasonable certainty, of the nature of the accusation against him" so that he knows "what he must be prepared to meet." Russell v. United States, 369 U.S. 749, 765-66 (1962) (internal quotations and citations omitted). In addition, the indictment must be framed to "ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." United States v. Pirro, 212 F.3d 86, 92 (2d Cir. 2000) (internal citations and quotations omitted).

Here, the indictment does not inform Mr. Carpenter clearly as to what acts of his constitute a crime. Was it investing in stock options or failing to inform the Exchangors that he was investing in stock options? Was it making or causing to be made oral and/or written misrepresentations? If the alleged misrepresentations are written, where are they? Since the Exchangors have all been made whole by Mr. Carpenter, what is the factual and legal premise for the indictment? Because "an indictment must do more than simply repeat the language of the criminal statute," Russell, 369 U.S. at 764, the indictment is deficient as a matter of law and should be dismissed.

### D. The Indictment is Fatally Flawed Because it Fails to Allege *Material* Misrepresentations.

In its attempt to save the original indictment (Dkt. #1) from dismissal, the government added the word "material" to seven paragraphs of the superseding indictment (Dkt. #34). See indictment ¶¶ 27, 29, 41, 49, 101, 103, 105. However, even with the insertion of the word

"material," the indictment remains deficient because the alleged misrepresentations that Benistar Property Exchange ("BPE") would hold the Exchangors' funds "safe" and "secure" are nothing more than common marketplace "puffery" or "seller's talk" that is deemed to be immaterial as a matter of law and, therefore, inactionable under the mail and wire fraud statutes. See Neder v. United States, 527 U.S. 1, 25 (1999) ("we hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.").

The alleged statements that the Exchangors' funds would be held "safe" and "secure," without being more specific, is mere puffery or sales talk "which is not actionable under the mail and wire fraud statutes." United States v. Zomber, 358 F. Supp.2d 442, 449 (E.D. Pa. 2005). See also United States v. Brown, 79 F.3d 1550, 1557 (11th Cir. 1996) (" 'puffing' or 'seller's talk' is still not actionable under the mail fraud statute."). "'Puffery' is an exaggeration or overstatement expressed in broad, vague, and commendatory language." Gillette Co. v. Norelco Consumer Prods. Co., 946 F. Supp. 115, 130 (D. Mass. 1996). A marketing and promotional statement that is mere puffery is not actionable as being misleading, fraudulent or materially deceptive because it is an "exaggerated, blustering, and boasting statement upon which no reasonable buyer would rely." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1145 (9th Cir. 1997). Professor Prosser colorfully describes the essence of puffing:

> Such sales talk, or puffing, as it is commonly called, is considered to be offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer . . . The "puffing" rule amounts to a seller's privilege to lie his head off, so long as he says nothing specific.

W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 109, at 756-57 (5th ed. 1984).

A vague statement that the funds would be "safe" and "secure," assuming such a statement was made, was mere seller's talk, similar to a well-known insurance company proclaiming that those who buy its insurance products are "in good hands." See Bologna v.

7

Allstate Insurance Co., 138 F. Supp. 2d 310, 323 (E.D.N.Y. 2001) (famous Allstate slogan "is mere puffery that is not actionable"). It is also similar to a used car salesman claiming that a sleek convertible is the "fastest" car on the lot, or an investment firm saying that its investment products will earn the "highest" rate of return. See Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co., 941 F.2d 561, 570 (7th Cir. 1991) ("[s]tatements that a certain investment will earn the 'highest' rate of return are puffery.").

In Baron v. Smith, 285 F. Supp.2d 96 (D. Mass. 2003), aff'd, 380 F.3d 49 (1st Cir. 2004), a private securities fraud action against certain officers and directors of a company, the shareholders claimed they were misled in a company press release to believe that the company would use the bankruptcy process to reorganize successfully. The press release at issue stated, in pertinent part:

> Through the Chapter 11 process, the Company *expects* to be able to terminate unprofitable leases, reduce the Company's operating expenses and make necessary improvements to the business to create a *strong competitive future* . . .

Baron, 285 F. Supp. 2d at 100 (emphasis added). In dismissing the action with prejudice, this Court held that the information contained in the press release "concerned what the Company *hoped* would be the outcome of the bankruptcy. These statements about what the Company's management *expected to be able to achieve* in the bankruptcy were clearly forward-looking statements, . . . *the kinds of optimistic statements that the market would easily recognize as nothing more than a kind of self-directed corporate puffery*." Id. at 106 (citations and quotations omitted) (emphasis added).

The optimistic statements that the Exchangors' funds would be "safe" and "secure" is no different from the optimistic statements made in the press release in Baron. The indictment does not allege that BPE (let alone Mr. Carpenter) did *not* intend to repay the Exchangors, or that Mr.

8

Carpenter intended to lose money in the investments. In fact, just the opposite is alleged—that after repaying the Exchangors their principal plus their selected 3% or 6% interest, the remaining "profit" would be split between Mr. Carpenter and BPE president Martin L. Paley ("Paley"). See indictment ¶ 16. The statement about "safe" is precisely the kind of optimistic statement that BPE's financially sophisticated customers "would easily recognize as nothing more than a kind of self-directed corporate puffery." Baron, 285 F. Supp.2d at 106. Because the statements alleged in the indictment are mere puffing or seller's talk, they are immaterial as a matter of law.

Aside from puffery, the alleged misrepresentations are immaterial because they would have made no difference to an Exchangor's decision whether or not to utilize BPE as their qualified intermediary. The Exchangors obviously knew their funds were being invested, otherwise they would not have been able to receive 3% or 6% interest. Neither Merrill Lynch nor PaineWebber are known as "banks," but rather big brokerage firms. Because it was obvious the funds were being invested in securities at Merrill Lynch and PaineWebber, it was also obvious that some measure of risk was involved—as with any investment. Frankly, at this late date in 2008, when it is apparent that "safe" investments in bonds backed by home mortgages could bring down venerable investment firms like Bear Stearns, it is amazing that the government thinks any investment is "safe." Because the indictment does not allege that specific representations were made as to the type of investment being made (*i.e.*, stocks vs. bonds), the indictment fails to allege materiality sufficient to charge mail and wire fraud. While the question of materiality "should normally be left to a jury rather than resolved by the court on a motion to dismiss," In re Cabletron Systems, Inc., 311 F.3d 11, 34 (1st Cir. 2002), here the alleged misrepresentations are deemed to be immaterial as a matter of law. Consequently, there is nothing for a jury to consider.

### E. The Indictment is Fatally Flawed Because it Fails to Allege Specific Intent.

The First Circuit has held that intent to defraud, at least in the bank fraud context, means "an intent to deceive the bank in order to obtain from it money or other property." United States v. Kenrick, 221 F.3d 19, 29 (1st Cir. 2000) (en banc). Assuming the same standard is applied to mail and wire fraud cases, the indictment fails to allege that Mr. Carpenter intended to *deceive* the Exchangors in order to obtain their money.

Nowhere does the indictment allege that Mr. Carpenter intended to deprive the Exchangors of their money through deception. Put another way, had Mr. Carpenter's investments with respect to the seven (7) Exchangors charged in the indictment been profitable, the Exchangors would have received their principal plus either 3% or 6% and, presumably, the government would not allege that a crime had been committed.[2] Thus, whether or not Mr. Carpenter committed a crime according to the government turns entirely on whether his investments were profitable. Had the Market not gone down, or had Mr. Carpenter sold calls and purchased puts, instead of the other way around, Mr. Carpenter's investments would have generated millions of dollars in profit. Had that been the case, would a crime have been charged? Nowhere in the indictment does the government even suggest that Mr. Carpenter intended to lose the money. See United States v. Yefsky, 994 F.2d 885, 893-94 (1st Cir. 1993) (indictment repeating just statutory language insufficient because failed to allege specific intent as required by case law); United States v. Carll, 105 U.S. 611, 612 (1881) (finding indictment deficient for failure to allege defendant specifically intended to violate the law). Criminality cannot turn on luck, it must turn on intent—and the indictment fails to allege the requisite intent under the mail and wire fraud statutes. It is insufficient merely to plead the statutory language

---

[2] The government failed to charge the other 119 exchanges that were successfully consummated by BPE. Furthermore, the seven Exchangors whose funds were originally lost have since been made whole, so the factual and legal predicate for alleging a crime even as to them no longer exists.

10

(*i.e.*, "intending to devise a scheme").  See indictment ¶¶ 103, 105; United States v. Daily, 921 F.2d 994, 1000 (10th Cir. 1990) ("it is not sufficient in this regard to merely plead the statutory language.").

### F. The Indictment is Fatally Flawed Because it Alleges Only a Civil Breach of Contract.

Notably, the indictment does not allege anywhere that Mr. Carpenter stole, embezzled, or misappropriated the Exchangors' funds *for his own benefit*.  The indictment merely alleges that the funds were invested in stock options, were lost, and BPE was unable to repay the Exchangors their principal plus 3% or 6% interest as agreed.  See indictment ¶¶ 56-58.  The indictment alleges only a breach of contract, which does not constitute mail or wire fraud.

"A breach of contract does not amount to mail fraud.  Failure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract.  To infer fraudulent intent from mere nonperformance, therefore, would eviscerate the distinction between a breach of contract and fraud."  United States v. D'Amato, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994); see also United States v. Kreimer, 609 F.2d 126, 128 (5th Cir. 1980) ("[T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract.").  The indictment alleges only that BPE failed to perform its contractual obligations to the Exchangors by failing to return the principal plus the 3% or 6% interest.  Notably, Mr. Carpenter was neither a party nor a signatory to any of the agreements.  The indictment fails to allege that BPE (let alone Mr. Carpenter) did not intend to fulfill its contractual obligations to the Exchangors.  BPE's mere nonperformance of its agreements (caused by PaineWebber's adjudged malfeasance), without more, cannot constitute mail or wire fraud.  "Nor does a breach of contract in itself constitute a scheme to defraud." McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir. 1990).

## CONCLUSION

For all of the foregoing reasons, Counts 15 and 19 should be dismissed for lack of subject matter jurisdiction and Count 4 should be dismissed for lack of venue. Alternatively, the entire indictment should be dismissed.

DANIEL E. CARPENTER,
By his attorney,

*/s/ Jack E. Robinson*
Jack E. Robinson
(BBO #559683)
2187 Atlantic Street, Suite 905
Stamford, CT 06902
(203) 425-4500

Dated: June 1, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on the date hereof this document was filed through the Court's CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).

*/s/ Jack E. Robinson*
Jack E. Robinson