UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT DANIEL E. CARPENTER'S MOTION
## FOR DECLARATION OF MISTRIAL

Defendant Daniel E. Carpenter ("Mr. Carpenter") respectfully moves this Court to Declare a Mistrial as a result of the Government's knowing failure to correct false evidence in violation of Mr. Carpenter's due process rights under the Fourteenth Amendment of the United States Constitution and in direct contravention of the Supreme Court's decision in Napue v. State of Illinois, 360 U.S. 264 (1959).

## FACTS

During Day Seven of this trial the Government called Gerald Levine ("Mr. Levine"), the former Merrill Lynch broker who worked under the direction of Gary Stern. Tr. at 8-58.[1] In relevant part, on cross examination Mr. Levine unequivocally testified that at no time did he ever have a conversation with David Patterson ("Mr. Patterson"), an attorney who represented a client who had successfully completed a § 1031 exchange:

> Q: **At that point in time, sir, isn't it true that you did have a telephone conversation with an attorney by the name of David Patterson?**
>
> A: **No.**
>
> Q: **You had no conversation with Mr. Patterson?**

---

[1] Pages of the trial transcript cited herein are attached hereto in chronological order as **Exhibit A**.

> A: No.
>
> Q: Are you saying that unequivocally or because you don't remember a conversation, sir?
>
> A: I'm saying that I had no conversation with David Patterson.
>
> Q: At any time?
>
> A: At any time."
>
>                                           ***
>
> Q: Do you remember a conference call in October of 1998 where Dan Carpenter called you with an individual who identified himself as David Patterson, an attorney representing a client? Do you remember a conference call?
>
> A: No.
>
> Q: Now, sir, if such a call occurred, that would be something you would remember, isn't it?
>
> A: Yes.

Tr. at 7 – 98 through 7-99; 7-102.[2]

On June 17, 2008, the Government called Mr. Patterson as a witness. During direct examination by the Government Mr. Patterson testified that he did have a phone conversation with Mr. Carpenter and Mr. Levine in which Mr. Patterson explained to Mr. Levine that he was representing a client in a § 1031 transaction; that his client's funds were being held in escrow; that his client's name could not be on the account; and that his client's funds would need to be returned to her within 180 days. Tr. at 12-37 through 12-38. Mr. Patterson further testified that Mr. Levine understood what Mr. Patterson was referring to when they discussed § 1031 exchanges. Tr. at 12-38.

---

[2] During direct examination by the Government Mr. Levine testified that he could not "recall" ever communicating with or receiving faxes from Mr. Patterson. Tr. at 7-75.

During cross examination, Mr. Patterson again testified that he had a three-way conversation with Mr. Carpenter and Mr. Levine on October 21, 1998 (Tr. at 12-56); that during this conversation he explained to Mr. Levine the mechanics of a § 1031 exchange (Tr. at 12-59); after that conversation he got Mr. Levine's private number at Merrill Lynch (Tr. at 12-61); that on October 22, 1998 he had a second call with Mr. Levine (Tr. at 12-63)[3]; that the call lasted approximately 10.5 minutes (Tr. at 12-64); that shortly after the call with Mr. Levine he received a fax from Mr. Levine which included account forms that Mr. Levine told Mr. Patterson he was going to use (Tr. at 12-65); and that on October 23, 1998 he sent to Mr. Levine (by fax and first class mail) the signed Escrow and Exchange agreements (Tr. at 12-68 through 12-70).

Mr. Patterson's testimony is consistent with the affidavit he signed on March 9, 2004 in connection with the civil matter <u>Cahaly, et al v. Benistar Property Exchange Trust, et al</u>, Suffolk Superior Court Civil Action No. 02-00116 (the "Civil Action") (specifically, paragraphs 10 through 14). Mr. Patterson's Affidavit is attached hereto as **Exhibit B**. It was introduced as Exhibit 30 at a May 18, 2004 evidentiary hearing in the Civil Action in which Mr. Levine also testified.[4] At that hearing Mr. Levine denied that he had the conversation with Mr. Patterson on October 21, 1998 which Mr. Patterson described in paragraphs 10 and 11 of his Affidavit. A copy of the relevant pages of Mr. Levine's testimony during the May 18, 2004 evidentiary hearing in the Civil Action is attached hereto as **Exhibit C** and was produced by the Government in this Action (labeled GOV 30524 – 30628).

---

[3] Mr. Patterson testified that the purpose of this call was to see the Merrill Lynch account forms that were to be used for his client's benefit. Tr. at 12-64.

[4] As the Court is aware, this was a civil lawsuit filed by the Exchangors against Mr. Carpenter, Benistar and, *inter alia*, Merrill Lynch and PaineWebber. Mr. Carpenter submits that Mr. Levine had a strong motive to falsely deny that he had engaged in any conversation with Mr. Patterson regarding Mr. Patterson's client's funds as such an admission could have substantially impaired Merrill Lynch's defense in that lawsuit – namely, that it was unaware that Mr. Carpenter was investing Exhangors' funds when he engaged in options trading.

Mr. Patterson's testimony is also consistent with the testimony he provided on May 19, 2004 in connection with the Civil Action, in which he testified that he had a conversation with Mr. Carpenter and Mr. Levine on October 21, 1998 and a subsequent conversation with just Mr. Levine on October 22, 1998.  Copies of the relevant pages from the May 19, 2004 evidentiary hearing in the Civil Action are attached hereto as **Exhibit D**.

Mr. Patterson's recent testimony is also consistent with the statements he provided to the Federal Bureau of Investigations ("FBI") in 2004: "[T]o attempt to further allay Patterson's fears, a conference call was set up with Patterson, Carpenter and Gerald Levine.  Levine handled the escrow account at Merrill Lynch;" and "Patterson both talked to Levine and sent Levine the escrow paperwork in order to ensure that Levine knew Carey [Patterson's client] was not a Benistar entity.  Patterson is sure Levine knew that the money was not Benistar's."  FD-302 (Rev. 10-6-95) ("Patterson FBI 302") (labeled GOV 25837 - 25839) (attached hereto as **Exhibit E**).

Moreover, additional documentary evidence undeniably corroborates Mr. Patterson's testimony and proves that Mr. Levine, also a Government witness, provided false evidence on cross-examination in this trial when he testified that he never had a conversation with Mr. Patterson.  Mr. Patterson's phone records (see Trial Exhibit 402, attached hereto as **Exhibit F**) reflect that on October 22, 1998 Mr. Patterson made a telephone call to (212) 415-7486, a number Mr. Levine admitted was his personal number (see Tr. at 7-103: "That's my number"), which call began at 10:22 a.m. and lasted ten and one half minutes.  At 10:47 a.m., less than fifteen minutes after the 10:22 a.m. call, Mr. Levine faxed to Mr. Patterson the Merrill Lynch authorization forms.  See Trial Exhibit 408, attached hereto as **Exhibit G**.  Notably, Mr. Levine signed the fax cover page, "Jerry."  Id.  Finally, on October 23, 1998 Mr. Patterson faxed to Mr.

Levine the Escrow Agreement, Exchange Agreement and Wiring Instructions.  See Trial Exhibit 142, attached hereto as **Exhibit H**.  Mr. Patterson's phone records corroborate that a call was made on October 23, 1998 at 2:47 p.m. to (212) 415-7934, a number which Mr. Levine testified he "believed" was his fax number.  See Tr. at 7-113.  In fact, the cover page of the fax that Mr. Levine sent to Mr. Patterson on October 22, 1998 identifies Mr. Levine's fax number as (212) 415-7934.[5]  See Trial Exhibit 408.  Mr. Patterson's testimony, and the unrebutted documentary evidence, prove that Mr. Levine testified falsely when he stated that he never had a conversation with Mr. Patterson.

Further, the documents show that the Government was aware that Mr. Levine testified falsely when cross-examined about his conversations with Mr. Patterson.  For example, the Government was aware that in 2004 Mr. Levine, when questioned about Mr. Patterson's Affidavit at the evidentiary hearing in the Civil Action, denied that he had any conversation with Mr. Patterson on October 21, 1998: "Q: Do you deny that the conversation with Mr. Patterson that's referenced in paragraphs 10 and 11 took place? A: Yes."  See **Exhibit C**, GOV 30550.  Likewise, the Government was in possession of (1) Patterson's testimony at the evidentiary hearing on May 19, 2004, in which he testified consistently his affidavit, (2) the Patterson FBI 302, (3) Mr. Patterson's phone records, (4) Mr. Levine's October 22, 1998 fax to Mr. Patterson, (5) and Mr. Patterson's October 23, 1998 fax to Mr. Levine.  Despite this knowledge, the Government failed to correct his false testimony on cross-examination that he never had a conversation with Mr. Patterson.

---

[5] The fax number is written below Mr. Levine's other contact information and appears to be written by the same hand that wrote the message on the cover page, which is signed, "Jerry."  See Exhibit 408.

ARGUMENT

"It is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." Napue, 360 U.S. at 269. "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Id. Such convictions must be set aside where "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Augurs, 427 U.S. 97, 103 (1976). The Government's obligation to correct false evidence is no less necessary when the evidence is introduced during cross examination. See United States v. Mangual-Garcia, 505 F.3d 1, 10 (2007) (finding Napue violation when Government allowed false testimony to go in uncorrected during cross examination but finding claim waived where defendant failed to present the information regarding the falsity to the jury). One avenue by which the Government may attempt to correct false evidence is through the use of redirect examination of the witness. See United States v. Kattar, 840 F.2d 118, 128 (1988) (noting that the prosecutor "should have made an attempt to correct [the witness'] testimony…during subsequent redirect examination"). Alternatively, the Government may request a side bar and attempt to work out "how to inform the jury that the testimony is false." See United States v. LaPage, 231 F.3d 488, 492 (9th Cir. 2000).

There can be no doubt that Mr. Levine falsely testified that he never had any phone conversation with Mr. Patterson. The Government's own witness, Mr. Patterson – an individual who has no interest in the outcome of this trial and whose client successfully completed a § 1031 exchange with Benistar – flatly contradicted Mr. Levine, and Mr. Patterson's testimony is entirely consistent with (i) his (Mr. Patterson's) March 9, 2004 Affidavit, (ii) Mr. Patterson's testimony in the Civil Action on May 19, 2004, and (iii) the information Mr. Patterson provided

to the FBI as set forth in the Patterson FBI 302.  Moreover, additional unrebutted documentary evidence corroborates Mr. Patterson's testimony that he had a second phone conversation with Mr. Levine on October 22, 1998.  See Trial Exhibit 402.  Mr. Levine actually faxed Merrill Lynch account authorization forms to Mr. Patterson less than fifteen minutes after the 10:22 a.m. phone conversation concluded, and signed the fax "Jerry."  See Trial Exhibit 408.  Simply put, Mr. Levine unquestionably submitted false testimony when he testified that he "had no conversation with a David Patterson" (see Tr. at 7-99), and the Government did not correct it as it is obligated to do.

      Mr. Patterson's stark contradiction of Mr. Levine's testimony is more than a mere "conflict of testimony among witnesses."  See United States v. Doherty, 867 F.2d 47, 70 (1st Cir. 1989) (finding no Napue violation where there was only a mere conflict of testimony among witnesses, which testimony was not elicited from the Government, where there was no evidence that the Government knew which witness was lying and where appellants had not shown they were prejudiced by the witnesses' testimony).  Nor is this a case of "mere inconsistencies between two versions of a witness' testimony."  See United States v. Pagan-Santini, 451 F.3d 258, 265 (1st Cir. 2006) (no Napue violation where there was no evidence of knowing use by the Government of false testimony and where there were "mere inconsistencies" between two version's of a witness' testimony).  Here, the Government was aware that Mr. Levine was testifying falsely because the Government was undeniably aware, prior to Mr. Levine's testimony, of Mr. Patterson's 2004 testimony and Affidavit and the overwhelming documentary

evidence demonstrating that Mr. Patterson did, in fact, have a conversation with Mr. Levine on October 21 and 22, 1998. The Government knew this but failed to take any corrective action.[6]

Further, there is certainly a "reasonable likelihood" that Mr. Levine's false testimony could affect the judgment of the jury. See, e.g., Augurs, 427 U.S. at 103; Mangual-Garcia, 505 F.3d at 10 (citing Giglio v. United States, 405 U.S. 150, 154 (1972)). A critical aspect of Mr. Carpenter's defense is his good faith belief that he was under no restrictions as to how the Exchangors' funds were to be invested; that he had unfettered discretion to invest the Exchangor's funds; that he made no representations to the Exchangors nor did he cause any representations to be made to the Exchangors other than those in the Exchange Agreements, and consequently no Exchangor was mislead by Mr. Carpenter into believing that the funds would be "safe"; that he had successfully utilized his options trading in the past to the benefit of other clients and that he would continue to successfully utilize this strategy; and that he never attempted to hide the fact that he was trading in options. Whether Mr. Carpenter put Mr. Patterson, who represented the first Exchangor, in direct contact with Mr. Levine, who managed the Exchangors' funds at Merrill Lynch, and whether the detailed conversation between the two took place regarding the fact that these were third party funds which needed to be held in escrow as a result of a § 1031 exchange are critical facts. As Mr. Levine was fully aware that Mr. Carpenter was trading options he could easily have disclosed such to Mr. Patterson or any of the Exchangors or their representatives, but did not. Also, it demonstrates that Mr. Levine, although

---

[6] The Government had at least two options in response to Mr. Levine's false testimony. First, at the moment in which Mr. Levine testified that he absolutely denied having any conversation with Mr. Patterson, the Government could have requested a bench conference to work out "how to inform the jury that the testimony is false." See LaPage, 231 F.3d at 492. Or, the Government could have attempted to correct the false testimony during its redirect of Mr. Levine. Kattar, 840 F.2d at 128 (noting that the prosecutor "should have made an attempt to correct [the witness'] testimony…during subsequent redirect examination"). The Government did neither (see Tr. at 7-151: "No questions").

knowing that these were third party funds, never informed Mr. Carpenter that he could not trade in options with those funds. Had Mr. Levine told the truth, it would have significantly aided in Mr. Carpenter's defense as it reflects Mr. Carpenter's good faith in being open and obvious with the only agent of an Exchangor with whom he had contact; conduct which is not that of man who is allegedly trying to hide his options trading.

Additionally, Mr. Levine testified that Mr. Carpenter ignored his investment advice. Tr. at 7-10. Knowledge that Mr. Levine had falsely testified concerning his communications with Mr. Patterson is more than reasonably likely to influence a jury when it weighs Mr. Levine's credibility with respect to his alleged interactions with Mr. Carpenter. Mr. Carpenter respectfully submits that there is more than a reasonable likelihood that Mr. Levine's testimony could affect the judgment of the jury.

## CONCLUSION

For the foregoing reasons, Mr. Carpenter respectfully submits that the only remedy for the Government's violation of his Fourteenth Amendment rights is to declare a mistrial.

**RESPECTFULLY SUBMITTED:**
DANIEL E. CARPENTER, Defendant,
By his attorney:

/s/ A. John Pappalardo
A. John Pappalardo (BBO # 338760)
GREENBERG TAURIG, LLP
One International Place, 20th Floor
Boston, MA 02110
(617) 310-6000
(617) 310-6001 (fax)

## Certificate of Service

      I hereby certify that on this 17th day of June, 2008, I served on counsel of record in the foregoing matter Daniel E. Carpenter's Motion for Declaration of Mistrial, by means of the ECF system.

                                                /s/ A. John Pappalardo
                                                A. John Pappalardo