# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|                              |   |                    |
|------------------------------|---|--------------------|
| UNITED STATES OF AMERICA,    | ) |                    |
|                              | ) |                    |
|         Plaintiff,           | ) |                    |
|                              | ) | Criminal Action    |
| v.                           | ) | No. 04-10029-GAO   |
|                              | ) |                    |
| DANIEL E. CARPENTER,         | ) |                    |
|                              | ) |                    |
|         Defendant.           | ) |                    |
|                              | ) |                    |


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY SEVEN
JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, June 10, 2008
9 a.m.


Marcia G. Patrisso, RPR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    you didn't visit it?

2    A.    No.

3    Q.    Does it refresh your memory that you visited the

4    website with Mr. Tabbah?

5    A.    I just told you:  He put it on my computer, said,

6    "There's a website here; try to visit it sometime."  So

7    if you call that a visit, then that is definitely a

8    visit.

9    Q.    And did you go through the website with him present?

10   A.    No; just covered the front -- whatever the first

11   page of the website is.

12   Q.    Is there a reason why you didn't visit it?

13   A.    I was already losing confidence in the relationship

14   because Dan Carpenter was really not listening to my

15   advice on how to invest, and it wasn't a priority of

16   mine.

17   Q.    Well, Mr. Stern, when do you say that Mr. Tabbah

18   asked you to look at the website?  Wasn't that at the

19   beginning of the relationship with Mr. Carpenter?

20   A.    No, it was towards the end.

21   Q.    So your testimony today is that you never saw the

22   website?

23   A.    No, I didn't say that.  I said that I saw it on my

24   computer briefly, and I didn't go and visit the website

25   after that.

1    and speak into the mic, please.

2          THE WITNESS:  Gerald Levine, L-E-V-I-N-E.

3                    DIRECT EXAMINATION

4    BY MR. PIROZZOLO:

5    Q.   Good morning, Mr. Levine.

6    A.   Good morning.

7    Q.   Mr. Levine, where do you live?

8    A.   New York City.

9    Q.   How old are you?

10   A.   Seventy-one.

11   Q.   Where do you work now?

12   A.   Law Offices of John M. Paige.

13   Q.   And what's your job there?

14   A.   I am client manager.

15   Q.   And about how long have you worked there?

16   A.   Five and a half years.

17   Q.   Mr. Levine, what's your educational background?

18   A.   Brown University, bachelor's degree, 19 -- class of

19   1958; General Motors Institute of Technology, business

20   management, class of 1960.

21   Q.   Briefly, could you describe your working career up

22   until the time of the late 1990s?

23   A.   I started in the investment business in 1980 to 1983

24   with Oppenheimer & Company, I was the vice president;

25   from 1983 to 1989 I was managing director of 21st

1    Securities; from 1990 to 1993 I was the associate

2    national director of commerce and industry with DCI;

3    from '93 to '96 I was managing director of IAG Group;

4    and from '97 to 2003 I was a financial consultant with

5    Merrill Lynch.

6    Q.    When did you join Merrill Lynch?

7    A.    In December of 1997.

8    Q.    And where did you work?  What office?

9    A.    717 Fifth Avenue, New York City.

10   Q.    Who did you work with at Merrill Lynch?

11   A.    Gary Stern.

12   Q.    Did you work at his direction?

13   A.    Yes.

14   Q.    Could you describe briefly what the formal

15   relationship was between you and Mr. Stern.

16   A.    Gary was the primary broker in our group and oversaw

17   the management of the Stern-Levine team and its

18   associates.  And the type of business that Gary did was

19   the type of business that I did.

20   Q.    Do you know a man named Dan Carpenter?

21   A.    Yes.

22   Q.    How do you know him?  When did you meet?

23   A.    I met Dan at a luncheon at the University of

24   Pennsylvania Club in February of 1998.

25   Q.    Who were you with?

Page 75

1                 (After recess.)

2                 MR. MITCHELL:  May I begin?

3                 THE COURT:  Go ahead.

4    BY MR. PIROZZOLO:

5    Q.    Mr. Levine, during the course of your business

6    relationship with Mr. Carpenter, do you recall

7    communicating with a man named David Patterson?

8    A.    No.

9    Q.    Do you recall receiving any faxes or other

10   information from a Mr. David Patterson?

11   A.    No.

12   Q.    Focusing on 1999, the year 1999, how was

13   Mr. Carpenter's performance with his trading?

14   A.    Initially, I believe that his strategy was proving

15   successful.

16   Q.    Did you discuss his strategy and provide

17   recommendations to him during that period of time, 1999?

18   A.    Yes.

19   Q.    And what was -- what did he say to you about his

20   strategy or about your recommendations?

21   A.    He, again, declined going into a more conservative

22   cover call, writing strategy with greater

23   diversification into various market sectors.  He said he

24   was being successful and he was going to continue with

25   the strategy that he was implementing.

1    the forms for him for the master account and receive

2    those back by mail?

3    A.    He may have picked them up when he was at my office.

4    He asked me for several blank sets of documents, that he

5    wasn't sure which account names he wanted to put on

6    them.   So he may have gotten a complete package, several

7    packages of account opening documents from me in person,

8    or I could have sent them up by mail as well.  He did

9    request quite a few sets.

10   Q.    And my question, sir, is:  Did you receive them back

11   by mail?

12   A.    Again, my answer --

13   Q.    The B10 account?

14   A.    I can only assume that I did, but I'm not certain

15   that I did.  It may have been in person.

16   Q.    Now, let's move ahead to October 22nd of 1998, ten

17   days after Mr. Carpenter signed these forms.

18           At that point in time, sir, isn't it true that

19   you did have a telephone conversation with an attorney

20   by the name of David Patterson?

21   A.    No.

22   Q.    You had no conversation with Mr. Patterson?

23   A.    No.

24   Q.    Are you saying that unequivocally or because you

25   don't remember a conversation, sir?

1   A.   I'm saying I had no conversation with a David

2   Patterson.

3   Q.   At any time?

4   A.   At any time.

5   Q.   Okay.  Does it refresh your memory, sir, that

6   Mr. Patterson told you he represented a client in

7   connection with the sale of a 1031 property exchange

8   which Benistar was handling?

9   A.   No.

10  Q.   Does it refresh your memory at all that on the 22nd

11  of October he said to you that to preserve the

12  tax-deferred status with the proceeds of the sale,

13  neither he nor his client could have any control over

14  the funds?

15          MR. PIROZZOLO:  Objection just to the form, your

16  Honor.  I think if there's a document to show

17  Mr. Levine, he can read it and see if it refreshes his

18  recollection or not.

19          THE COURT:  All right.

20          MR. PAPPALARDO:  If I may approach, your Honor.

21          THE COURT:  You may.

22  BY MR. PAPPALARDO:

23  Q.   Sir, I show you Exhibit -- what has been marked as

24  342.  Do you see that?

25  A.   Yes.

Page 102

1    22nd of 1998, did David Patterson tell you by phone the

2    account had to be an escrow account?

3    A.    No.

4    Q.    Do you remember a conference call in October of 1998

5    where Dan Carpenter called you with an individual who

6    identified himself as David Patterson, an attorney

7    representing a client?  Do you remember a conference

8    call?

9    A.    No.

10    Q.    Now, sir, if such a call occurred, that would be

11    something you would remember, isn't it?

12    A.    Yes.

13              MR. PAPPALARDO:  May I approach, your Honor?

14              THE COURT:  You may.

15    BY MR. PAPPALARDO:

16    Q.    Sir, I put before you Exhibit 402.

17              Do you see that, sir?

18    A.    I have 402 in front of me.

19    Q.    Yes.  Do you know what that is?  Just yes or no.

20    A.    It looks like it says a summary of charges from

21    Sprint to David Patterson and Timothy Loff.

22    Q.    It's a -- is it fairly identified as a phone bill to

23    David Patterson from Sprint?

24    A.    It says it's a summary of charges.

25    Q.    Okay.  I'm going to direct your attention to the

1    last page of that document, and specifically to the date

2    of October 22nd at 10:22 a.m., which is number 1 on the

3    last page.  Do you see that, sir?

4    A.   10:22 a.m., yes, I see it.

5    Q.   Okay.  And you see there -- you see the number

6    that's being called at 10:22 a.m.?

7    A.   Yes.

8    Q.   Is that your number?

9    A.   That is my number.

10    Q.   212-415-7486?

11    A.   That is correct.

12    Q.   And that's your personal telephone number, isn't it?

13    A.   Yes, it is.

14    Q.   And do these records indicate a call that lasted

15    ten-and-a-half minutes?

16    A.   Yes.

17         MR. PIROZZOLO:  Objection, your Honor.  This is

18    not in evidence.  Again --

19         MR. PAPPALARDO:  I would offer it, your Honor.

20         MR. PIROZZOLO:  The government would object with

21    respect to it coming into evidence through this witness,

22    your Honor.

23         MR. PAPPALARDO:  I offer it de bene, for the

24    next witness, your Honor.

25         MR. PIROZZOLO:  Can we be heard on this?

1    A.    It's a fax transmission of a letter.

2    Q.    Okay.  It's a facsimile transmission.  This

3    particular one is a facsimile transmission, but it's

4    also a letter, too, isn't it, sir?

5    A.    Yes.

6    Q.    So there's both a fax to you and the letter, right?

7    A.    This is the fax of a letter to me.

8    Q.    Right.  And you also -- there was also a letter to

9    you in the United States mails, right?

10   A.    No.

11   Q.    Okay.  Well, let's look at the fax transmission

12   first.

13           Your fax number, sir, at the time was

14   212-415-7934; isn't that right?

15   A.    I believe so.

16   Q.    Well, there's not any question about that, is there?

17   A.    It's been ten years; I don't remember my fax number.

18   I'll take that as a fact if you say it, but I don't

19   remember my fax number anymore.

20   Q.    Okay.  Let's look at this facsimile, sir.

21           This is a fax which contains a cover letter to

22   you talking about an escrow agreement, talking about an

23   exchange agreement, an account election form, and

24   Benistar's wiring instructions, right?

25   A.    That's what the letter purports to be.

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,            )
                                     )
          Plaintiff,                 )
                                     )
                                     ) Criminal Action
v.                                   ) No. 04-10029-GAO
                                     )
DANIEL E. CARPENTER,                 )
                                     )
          Defendant.                 )
                                     )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY 12
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, June 17, 2008
9:05 a.m.

Debra M. Joyce, RMR, CRR
Marcia G. Patrisso, RPR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1          We -- with regard to what Mr. Mitchell just

2    said, your Honor, any oral representations by Paley

3    cannot under that case be admitted against

4    Mr. Carpenter.

5          The documents, your Honor, speak for themselves.

6          THE COURT:  Okay, I understand that part.

7          MR. MITCHELL:  That's a different issue, and

8    I've cautioned the witness about volunteering how much

9    money he lost and so on, which shouldn't be a problem.

10         THE COURT:  Okay.  Let's get the jury.

11         (Jury entered the courtroom.)

12         THE COURT:  Good morning, jurors.

13         MR. MITCHELL:  Good morning, again, your Honor.

14         The United States calls David Patterson.

15         DAVID PATTERSON, having been duly sworn by the

16    Clerk, was examined and testified as follows:

17         THE CLERK:  Please be seated.  State your name,

18    spell your last name for the record, keep your voice up,

19    and speak into the mic.

20         THE WITNESS:  David Patterson,

21    P-a-t-t-e-r-s-o-n.

22                   DIRECT EXAMINATION

23    BY MR. MITCHELL:

24    Q.   Good morning, Mr. Patterson.

25    A.   Good morning.

1    exchangor's benefit, that Benistar shall have the full

2    control over the exchangor's funds, and will invest them

3    as the exchangor directs in either of two accounts.  And

4    then that only upon the exchangor, meaning Jane Carey's,

5    written direction and authorization shall the funds

6    leave the Benistar account.

7            So I felt that that was -- and then there was

8    language saying that Benistar is only a custodian.  So I

9    felt that was consistent with the understanding and how

10   the 1031 transaction was going to work.

11   Q.   Okay.  Did you speak to anybody else besides

12   Mr. Carpenter in that call?

13   A.   Yes.

14   Q.   Who was that?

15   A.   Mr. Carpenter was not sure exactly how the account

16   cards were going to work, and he said that's really

17   something that the Merrill Lynch person would know.  So

18   he said let me get you Jerry Levine from Merrill Lynch,

19   and he can explain to you exactly how the account cards

20   work.

21   Q.   Okay.  Did he get Mr. Levine on the line?

22   A.   He did.  I don't remember whether or not he patched

23   him in to our conversation or whether he then called me

24   back with Jerry Levine on the line.  It was one or the

25   other.

Page 38

1    Q.   Okay.  And did you speak to the two of them at once?

2    A.   Yes, I did.

3    Q.   What did you talk to them about?

4    A.   Well, since I had conversation with Daniel

5    Carpenter, my focus, once Jerry Levine got on the line

6    was, just to go over how the account cards worked.

7         I expressed to Jerry Levine -- I told him that

8    that was a 1031 transaction, made sure that he

9    understood that the funds were being held in escrow,

10   that the funds were for Jane Carey's benefit, but that

11   Jane Carey's name would not be on the account, Jane

12   Carey could not have the right to withdraw the funds,

13   that was to be exclusively in Benistar's control, but

14   that the funds were Jane Carey's funds, funds needed to

15   go back to Jane Carey within 180 days for the

16   replacement transaction, which is the second step of a

17   1031 exchange when she buys replacement property,

18   like-kind property.

19   Q.   Okay.  In your conversation with the two of them,

20   did it appear that Mr. Levine understood what you were

21   referring to?

22   A.   I believe he did.

23   Q.   Okay.  What about Mr. Carpenter?

24   A.   Yes.

25   Q.   Did you discuss with Mr. Carpenter the Escrow

Page 56

1  A.   I believe it was Federal Expressed, yes.

2  Q.   Okay.  Now, those documents were sent to you prior

3  to the time that you had a conversation, the first

4  conversation, with Mr. Carpenter?

5  A.   Yes.

6  Q.   Okay.  And to be fair, you had two conversations

7  with him, right?

8  A.   I believe.

9  Q.   Okay.  Now, the first conversation with

10  Mr. Carpenter took place on October 21st of 1998; is

11  that right?

12  A.   Correct.

13  Q.   And that conversation, to the best of your memory,

14  lasted about an hour; is that fair to say?

15  A.   Yes.

16  Q.   And half of that time it was a three-way

17  conversation between you and Mr. Levine, right?

18  A.   And Mr. Carpenter, yes.

19  Q.   Exactly, you, Mr. Levine, and Mr. Carpenter.

20       So -- just so we can get the logistics of this,

21  you spoke with -- Mr. Carpenter called you back after

22  you placed a call to him, and you engaged in

23  conversation about items that we'll go into in a moment,

24  and somewhere in the middle of that conversation, he

25  either put Mr. Levine on the phone or he called you back

Page 59

1    Q.    So he puts Levine on the line, or he calls you back

2    with Levine on the line?

3    A.    Mm-hmm.

4    Q.    And then you have a conversation with Mr. Levine,

5    right?

6    A.    Right.

7    Q.    No question that conversation occurred, right?

8    A.    Right, no question.

9    Q.    And it was important to you, wasn't it, that you

10   explain to Mr. Levine the mechanics of a 1031 exchange?

11   A.    The major elements of it, yes.

12   Q.    That was important to you?

13   A.    Yes.

14   Q.    Because he was representing the company that was

15   actually holding the money, right?

16   A.    Correct.

17   Q.    And in your conversation, therefore, you gave

18   Mr. Levine a summary of a 1031 transaction, right?

19   A.    Generally, yes.

20   Q.    And you explained to him -- you made it very, very

21   clear to Mr. Levine that this money was your client's

22   money, right?

23   A.    Yes.

24   Q.    No question about that, right?

25   A.    No question.

1    two accounts, that there was a three percent account and

2    there was a six percent account --

3    Q.    Right.

4    A.    -- at Merrill Lynch.

5    Q.    And did you specifically address those issues with

6    Mr. Levine at that time; that is, on October 21st in

7    your three-way conversation?  Do you have a recollection

8    of it?

9    A.    I'm sure that it was discussed.  I don't remember

10   the -- how much detail.

11   Q.    Okay.

12   A.    I went into it, and he responded.

13   Q.    Now, sir, after that conversation with Mr. Levine,

14   you got his phone number?

15   A.    Yes.

16   Q.    And you got his private line at Merrill Lynch?

17   A.    I believe so.

18   Q.    And Mr. Carpenter encouraged you to do that, didn't

19   he?

20   A.    He certainly didn't discourage me.

21   Q.    Okay.  And because you wanted to be sure that you

22   had a contact at Merrill Lynch and the best contact was

23   the person who was setting up these accounts and

24   managing them for Benistar, right?

25   A.    Right.

1              THE COURT:  Okay.

2              (Exhibit 402 received into evidence.)

3    BY MR. PAPPALARDO:

4    Q.   Specifically, Mr. Patterson, could I direct your

5    attention to page 4?

6              MR. PAPPALARDO:  Can you put up the last page of

7    the document?

8              And if you would, Gerald, please highlight entry

9    1.

10   Q.   Now, sir, on the 22nd of October, sometime at 10:22

11   in the morning, you had another call with Mr. Levine,

12   did you not?

13   A.   Or with his -- with his office, yes.

14   Q.   Well, you remember having another call with

15   Mr. Levine, the same person you spoke with the day

16   before, right?

17   A.   I believe I did.

18   Q.   And that call was, according to these records -- by

19   the way, do you have an independent memory of that

20   number being Mr. Levine's?

21   A.   I don't.

22   Q.   You don't.  You've testified about this before

23   though, haven't you?

24   A.   Yes, I have.

25   Q.   Okay.  And you recall previously testifying that

1    that was Mr. Levine's number?

2    A.    I have it written down, so --

3    Q.    And the call lasted 10.5 minutes?

4    A.    Correct, yes.

5    Q.    And you weren't on hold for 10.5 --

6    A.    I'm sorry?

7    Q.    You weren't on hold, were you, sir?

8    A.    No.

9    Q.    And the reason why you called the following day was

10   because you wanted to see the Merrill Lynch account

11   forms that were to be used for your client's benefit;

12   isn't that right?

13   A.    Correct.

14   Q.    And you made that request of Mr. Levine, didn't you?

15   A.    I did.

16   Q.    And what did he say to you?

17   A.    He said it would be their standard forms, but he

18   offered to send me a copy.  I asked for a copy of the

19   actual account signatory forms, signatory cards, and he

20   said he would fax it to me.

21   Q.    Okay.  And did you mention to him in that phone

22   call, did you reinforce the idea that these monies were

23   your client's monies?

24   A.    I don't know if I reinforced it again.

25   Q.    Okay.  And it's fair to say, sir, is it not, that

Page 65

1    shortly after this phone call you received a fax?

2    A.    I did.

3    Q.    And that fax was from Mr. Levine, right?

4    A.    Yes.

5              MR. PAPPALARDO:  Could we publish Exhibit 408,

6    your Honor?  I believe it's in.

7              THE COURT:  Okay.

8    BY MR. PAPPALARDO:

9    Q.    Sir, you see that on the screen?

10   A.    I do.

11   Q.    And this is a fax from Gerald Levine to you on

12   October 22nd of 1998 at 10:47 a.m., right?

13   A.    Correct.

14   Q.    And --

15   A.    I don't have the time on this.

16   Q.    If you look at the upper left-hand corner, you see

17   the fax notation and the time?

18   A.    Yes.

19   Q.    Is that fair to say?

20              And he is sending you account forms, right?

21   A.    Correct.

22   Q.    And he asked you -- I'm sorry, he's sending you the

23   WCMA master financial service account and subaccount

24   forms, right?

25   A.    Yes.

Page 68

1   A.    Yes, I did.

2   Q.    And what did you send to him?

3   A.    I sent him the signed Escrow and Exchange

4   Agreements.

5   Q.    Okay.

6   A.    I believe I also faxed him a copy of the check.

7   Q.    Okay.  And when you say you sent it to him, how did

8   you send it to him?

9   A.    It would have been by fax.  I don't remember if I

10  also sent a copy by mail.

11        (Discussion off the record.)

12  Q.    Sir, could you look at Exhibit 142 that's in

13  evidence?

14        MR. PAPPALARDO:  May that be displayed, the

15  front page of that?

16  Q.    Do you see that, sir?

17  A.    I do.

18  Q.    This is what you testified about on direct

19  examination?

20  A.    Correct.

21  Q.    This is a fax transmission on October 23rd, right?

22  A.    Correct.

23  Q.    And you say, Enclosed please find one fully executed

24  copy of the Escrow Agreement under which the funds will

25  be held.  Also included are the Exchange Agreement and

1    the wiring instructions, right?

2    A.    Right.

3    Q.    That's what you faxed to Mr. Levine?

4    A.    Correct.

5    Q.    Right?

6          Sir, if you look at the last page of this

7    document -- do you see that?

8    A.    It's my fax cover sheet.

9    Q.    Right.  And this is a fax cover sheet dated October

10   23rd, right?

11   A.    Correct.

12   Q.    To Jerry Levine?

13   A.    Correct.

14   Q.    And you also sent this same package by first class

15   mail, right?

16   A.    I did.

17   Q.    And that's clear from the check mark?

18   A.    Correct.

19   Q.    And that would be your usual practice anyway in

20   matters such as this, right, send by fax and by first

21   class mail?

22   A.    Usually, but there may be sometimes that I might

23   send just by fax, but if I -- most of the time I would

24   want to send it by first class mail.

25   Q.    Okay.  But in this case, you did both?

Page 70

1   A.    I did.

2   Q.    And if we could, sir, let's go back to Exhibit 402.

3           MR. PAPPALARDO:  Can we display that?

4           Again, the last page.  Could you highlight item

5   22?

6   Q.    Do you see that, sir?

7   A.    I do.

8   Q.    And is it fair to say that, given the originating

9   number and given the location, this is evidence of the

10  fax that went to Mr. Levine on the 23rd of October of

11  1998?

12  A.    It is.

13  Q.    Okay.

14          Now, sir, let's go back to -- let's go back to

15  142.

16          The first page of the exhibit, on the face of it

17  you say, after Mr. Levine, re: exchangor, Jane Carey,

18  your client, right?

19  A.    Yes.

20  Q.    And you had previously said to Mr. Levine, certainly

21  on October 21st, when you had the three-way

22  conversation, that that was the name of your client,

23  right?

24  A.    Yes.

25  Q.    And you have it here on the fax on the 23rd, right?

1    isn't he?

2    A.    Yes.

3              MR. PAPPALARDO:  Just one moment, your Honor.

4              (Discussion off the record.)

5              MR. PAPPALARDO:  No further questions, your

6    Honor.

7              MR. PIROZZOLO:  No questions.

8              THE COURT:  No redirect?

9              Mr. Levine, you may be excused.

10             Jurors, thank you for your indulgence.

11             Let me just remind you, and it's probably

12   redundant, no extraneous information from the trial.

13   There's been a couple of mentions of websites during the

14   case.  That's not for you to do during the course of the

15   trial.  Just a reminder.  Enjoy the rest of the day.

16             THE CLERK:  All rise.  Court is in recess.

17             (Court adjourned at 1:30 p.m.)

18                  - - - - - - - - - - - -

19

20

21

22

23

24

25