# EXHIBIT B

## AFFIDAVIT OF DAVID D. PATTERSON, ESQ.

I, David D. Patterson, hereby swear and depose under oath as follows:

1. I am an attorney admitted to practice in the Commonwealth of Massachusetts and maintain my office at 1087 Beacon Street in Newton, Massachusetts. I was admitted to practice in 1979 and have been in active practice full time since my admission.

2. In the fall of 1998, I represented Jane W. Carey in the sale of investment real estate in Boston. Ms. Carey's accountant had recommended that she sell the property as part of a "like-kind" property exchange in accordance with 26 U.S.C. section 1031 of the Internal Revenue Code, thereby deferring payment of capital gains on the sale. The closing was scheduled for October 22, 1998.

3. On or about October 9, 1998, I received a call from Paul Sapienza, Ms. Carey's accountant, in which he stated that he had set up a meeting with a Martin Paley of Nationwide which was a 1031 property exchange company. I stated to Mr. Sapienza that I would be interested in attending the meeting to obtain additional information about Mr. Paley's 1031 property exchange services.

4. On October 13, 1998, I attended the meeting with Mr. Paley and Mr. Sapienza held in Mr. Sapienza's office in Boston. Mr. Paley stated that he had recently switched 1031 exchange companies and that he was now working for a company called Benistar Property Exchange based in Connecticut. He produced various Benistar general promotional materials and stated that the fee would be $2,000 with a $500 retainer being due before he could commence any work.

5. On October 14, 1998, I called Mr. Paley and informed him that my client had decided to retain Benistar to act as the qualified 1031 exchange intermediary on her sale. In our conversations of either October 13 or October 14, Mr. Paley had stated that Benistar had never done a 1031 exchange before. He stated that Benistar was a large, Connecticut based, pension fund business. However I was concerned that Mr. Paley had never done a 1031 transaction for Benistar and Benistar had never done a 1031 exchange before. In my letter to Mr. Paley sent later on October 14, I stated: "I trust you can understand my concern as Ms. Carey's attorney as I have no personal knowledge of Benistar and we will be delivering approximately $500,000 to you in a transaction of first impression". I informed Mr. Paley that I wanted to review the Benistar 1031 exchange documents including specifically the Escrow Agreement which Benistar would be using for this transaction as well as documentation as to

Ex. 23

Benistar's legal status. A true and accurate copy of this letter (without the purchase and sale agreement enclosures) is attached as Exhibit A.

6. In response I received a fax from Mr. Paley on or about October 14 or 15 recommending that I speak directly with Benistar Chairman Daniel Carpenter in Connecticut to obtain the documentation I was seeking. The fax included a sample exchange agreement for Nationwide, Mr. Paley's prior company, but not Benistar. A true and accurate copy of this fax is attached as Exhibit B.

7. On Friday, October 16, 1998, I faxed another letter to Mr. Paley repeating my request for the Benistar exchange documentation since the closing was less than a week away. A true and accurate copy of my letter dated October 16, 1998 is attached as Exhibit C.

8. On or about October 20 or October 21, 1998, I received a letter from Benistar's Connecticut office which included most of the documentation I had requested. A true and accurate copy of this letter and attached documentation is attached as Exhibit D.

9. On October 21, 1998, I had a telephone conversation with Mr. Carpenter of Benistar. He informed me that Benistar would be setting up an account at Merrill Lynch in New York City to hold the funds from the Carey closing. I pressed Mr. Carpenter for more information about the Merrill Lynch account to ensure that the funds would be held in escrow in accordance with the terms of the Escrow and Exchange Agreements as well as the 1031 requirements. Mr. Carpenter stated to me that my client's escrow account at Merrill Lynch would be handled by Gerald Levine, a Merrill Lynch account executive. Mr. Carpenter said that he would put me in touch with Mr. Levine to explain to me the type of account at Merrill Lynch and to assure me that the funds would be held in an escrow account for my client which would comply with the 1031 requirements.

10. On October 21, 1998, Mr. Carpenter and I had a telephone conference call with Mr. Levine. I told Mr. Levine that I was the attorney representing Ms. Carey in connection with the sale of property as a part of the section 1031 property exchange which Benistar was handling. I told him that I wanted to be sure that the Merrill Lynch account would be appropriate for a 1031 exchange. I explained that to preserve the tax deferred status of the proceeds of the sale of my client's property, neither she nor I could have any control over the funds. I told Mr. Levine that the account had to be an escrow account for Ms. Carey's 1031 property exchange. I also told him that I could not be named on the account and that Benistar, as the intermediary, had to have exclusive control over the account.

11. Mr. Levine indicated to me in this conference call that the account he would be setting up would not violate the 1031 requirements and he offered to send me a copy of the Merrill Lynch account form. Mr. Levine also stated that he understood that this was to be an escrow account for Ms. Carey's funds and that she would be needing the funds to purchase the replacement property.

12. I received a fax from Mr. Levine on October 22, 1998 which attached a copy of the account form which he had said he would be using for the Carey escrow account. A true and accurate copy of this fax is attached as Exhibit E.

13. The closing on the sale of the property occurred on October 22, 1998 at the offices of the lender's counsel, Brody, Jacobs and Fitzgerald, in Boston. Upon information and belief, the Carey 1031 exchange funds from the closing were wired by lender's counsel to Merrill Lynch on the morning of October 23.

14. On October 23, 1998, I wrote to Mr. Levine to confirm that the closing had occurred and that Ms. Carey's funds were being wired to Merrill Lynch to be held pursuant to the Escrow Agreement. I enclosed with the letter copies of the Benistar <u>Escrow Agreement</u> and the <u>Exchange Agreement</u>, as executed by my client and Mr. Carpenter. I sent this letter and the enclosures to Mr. Levine by fax and by first class mail. A true and accurate copy of this letter and the documentation I sent to Mr. Levine is attached as Exhibit F.

15. In February of 2004, I read an article in the February 23, 2004 Massachusetts Lawyers Weekly relating to the collection of judgments. The article referred to the case against Benistar and Merrill Lynch. On February 27, 2004, I called attorney Anthony R. Zelle, who was listed as one of the attorneys for the plaintiffs in that case. I informed him of my communications with Mr. Levine about the Carey escrow account in October of 1998. Mr. Zelle asked me to provide an affidavit pertaining to my discussions and correspondence with Mr. Levine at Merrill Lynch. Prior to speaking with Mr. Zelle on February 27, 2004, I had not spoken with Mr. Zelle or any persons acting as counsel in this case about the communications I had with Mr. Levine or the documents I sent to Merrill Lynch.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 5th DAY OF MARCH, 2004.

_____
David D. Patterson

3