# EXHIBIT E

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

*Redacted*

Date of transcription    04/14/2004

DAVID D. PATTERSON, date of birth 10/4/46, Social Security Number ▮▮▮▮▮▮▮, was interviewed at his law firm, 1087 Beacon Street, Suite 201, Newton, Massachusetts, phone number (617)332-7045.  After being advised of the nature of the interview and the identity of the interviewing Agents, PATTERSON provided the following information:

In roughly October 1998, PAUL SAPIENZA recommended MARTIN PALEY as someone who could conduct a 1031 exchange for PATTERSON'S client, JANE CAREY.  PATTERSON was told that PALEY was with a company called NATIONWIDE. PATTERSON was not familiar with NATIONWIDE but it did not matter. SAPIENZA recommended PALEY and not NATIONWIDE.

At the first meeting, PATTERSON learned that PALEY was in the process of leaving NATIONWIDE for a company called BENISTAR. PALEY was heading up the Massachusetts Office of BENISTAR.  PATTERSON knew Connecticut was BENISTAR'S main office and knew PALEY was the only BENISTAR employee in Massachusetts. PATTERSON assumed PALEY'S office was a shoebox operation.

BENISTAR had not done 1031's before PALEY came on board. PATTERSON became concerned that his client was BENISTAR'S first 1031 exchange.

At the first meeting with PALEY, PATTERSON and his client were provided with promotional materials from BENISTAR. PALEY requested a $500 retainer at this meeting.

PATTERSON received a letter from PALEY, shortly after the meeting.  PATTERSON was not totally confident with giving $500,000 of his client's money to PALEY and was suspicious of everything surrounding PALEY and the 1031 exchange.

After PALEY informed PATTERSON that the funds were held at MERRILL LYNCH, PATTERSON felt a lot more comfortable. He felt that way because MERRILL LYNCH was a reputable firm.

After the first meeting, PATTERSON pressed PALEY for credentials and documents about BENISTAR to ensure it was registered in Massachusetts. PALEY called PATTERSON and told him the best way to do due diligence on BENISTAR was to call and

---

Investigation on    4/09/2004    at   Newton, MA

File #  318E-BS-88331  #36 *jo U*                              Date dictated  4/9/04
        SA John S. Caldwell
by      SA Marc E. Toulouse *MET*

**GOV 25837**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

318E-BS-88331

Continuation of FD-302 of ___DAVID D. PATTERSON_____ , On _4/09/2004___ , Page __2___

talk to DANIEL CARPENTER. PALEY also suggested PATTERSON deal primarily with CARPENTER because CARPENTER would be handling the documents.

PATTERSON had two principle ideas he wanted to ensure were understood by everyone concerning the 1031 exchange:

1.  The money was his client's money

2.  His client's name should not be on the account so as to preserve the tax advantages of the 1031 exchange.

CARPENTER and PATTERSON spoke on the telephone in an attempt by CARPENTER to make PATTERSON feel more comfortable about the transaction. CARPENTER did not seem to care or understand that CAREY'S name could not be on the escrow account. CARPENTER did not have a good understanding of how 1031 exchanges worked. To attempt to further allay PATTERSON'S fears, a conference call was set up with PATTERSON, CARPENTER, and GERALD LEVINE. LEVINE handled the escrow account at MERRILL LYNCH. Like CARPENTER, LEVINE didn't know much about 1031 exchanges.

PATTERSON was concerned with trying to find out what type of account the money would be in and who was the signatory on the account. He was concerned because the signatory would control the account.

PATTERSON was also concerned with ensuring the tax benefits of the 1031 exchange. He was not as concerned with the safety of the funds because the funds were in an escrow account with an escrow agreement and the funds were held at MERRILL LYNCH.

CARPENTER mailed an escrow agreement to PATTERSON. PATTERSON marked it up with some minor changes and sent it back to CARPENTER. One of the "mark ups" on the escrow agreement was in paragraph 5A. PATTERSON wanted "gross negligence" changed to "negligence." PATTERSON both faxed the documents to CARPENTER and spoke with CARPENTER on the phone about the changes. CARPENTER verbally agreed to these changes.

PATTERSON did not get a clean copy of the escrow agreement at the closing. His client signed the copy with the changes penciled in. PATTERSON faxed this escrow agreement to

GOV 25838

FD-302a (Rev. 10-6-95)

318E-BS-88331

Continuation of FD-302 of _____ DAVID D. PATTERSON _____ , On 4/09/2004 , Page 3

    CARPENTER after his client had signed it. CARPENTER signed it and faxed it back to PATTERSON.

    CAREY was offered two different types of accounts in which to place her money for the escrow account. One offered a three percent interest rate and the other six percent. Money could be taken out of the three account with a day's notice. At least thirty days notice was needed to take money out of the six percent account. CAREY chose the six percent account over the three percent account. Time was not an issue for her.

    PATTERSON sent a "critical" letter on October 23, 1998 to LEVINE reminding LEVINE that CAREY'S funds were to be held in an escrow account and the funds did not belong to BENISTAR.  As another reminder, PATTERSON had faxed and mailed the fully executed escrow agreement to LEVINE within hours of the closing.

    PATTERSON both talked to LEVINE and sent LEVINE the escrow paperwork in order to ensure that LEVINE knew CAREY was not a BENISTAR entity.  PATTERSON is sure LEVINE knew that the money was not BENISTAR'S.

    PATTERSON first discovered there may be a problem with BENISTAR'S 1031 business about a year ago after reading a Boston Globe article.

GOV 25839