UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 04-10029-GAO |
| ) | |
| DANIEL E. CARPENTER ) | |

## DEFENDANT'S SUPPLEMENTAL RULE 29(a) MOTION
## FOR PARTIAL JUDGMENT OF ACQUITTAL

Defendant Daniel E. Carpenter respectfully moves at the close of the government's evidence, after the close of all the evidence, and prior to jury deliberations, pursuant to Fed. R. Crim. P. 29(a), for a partial judgment of acquittal on all but four (4) counts of the superseding indictment ("indictment"). A judgment of acquittal must be entered as to the remaining 15 counts because the government has failed to prove the appropriate elements *beyond a reasonable doubt* as described in the following table:

\* \* \*

| Count | Lack of Subject Matter Jurisdiction | Improper Venue | No Fraudulent Inducement | Successful Exchange |
|---|---|---|---|---|
| 1 |  |  | X | X |
| 2 |  |  | X | X |
| 3 |  |  |  |  |
| 4 |  | X |  |  |
| 5 |  | X |  |  |
| 6 |  | X |  |  |
| 7 |  | X | X |  |
| 8 |  | X | X |  |
| 9 |  | X | X |  |
| 10 |  | X | X |  |
| 11 |  | X | X |  |
| 12 |  | X |  |  |
| 13 | X | X |  |  |
| 14 |  |  |  | X |
| 15 | X |  |  |  |
| 16 |  |  |  |  |
| 17 |  |  |  |  |
| 18 |  |  |  |  |
| 19 | X |  | X |  |

1

**I.      ARGUMENT.**

**A.      Subject Matter Jurisdiction Is Lacking as to Counts 13, 15 and 19.**

    **1.      No Interstate Wire in Count 13.**

Count 13 charges a wire transfer of $17,090 relating to a Fitzgerald exchange. While the indictment alleges that the wire transfer was sent "from Massachusetts to the Bank of New York in New York City," indictment ¶ 97, the record evidence admitted at trial shows that the wire transfer in Count 13 was actually sent from "FLEET NYC" (Fleet Bank in New York City) to "BK OF NYC" (Bank of New York in New York City). Ex. 214.

There was no testimony at trial to explain the details of this transfer, so Ex. 214 must speak for itself, and the document clearly shows that the wire transfer was from one New York bank to another New York bank. Because the wire fraud statute requires a wire transmission in *interstate* commerce, see 18 U.S.C. § 1343, a New York-to-New York wire does not qualify under the statute. See United States v. Phillips, 376 F. Supp. 2d 6, 9 (D. Mass. 2005), aff'd, 238 Fed. App'x 631 (1st Cir. 2007), cert. denied, 128 S. Ct. 1288 (2008) ("the government was required to prove beyond a reasonable doubt that the pertinent wire transmissions actually crossed state lines."). The ambiguous nature of Ex. 214 precludes the government from proving *beyond a reasonable doubt* that the wire in Count 13 crossed state lines. Consequently, a judgment of acquittal must enter on this Count.

    **2.      Mailings in Counts 15 and 19 Occurred *After* the Scheme Reached Fruition.**

Federal courts are courts of limited jurisdiction because "[t]hey possess only that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994). For subject matter jurisdiction to exist under the mail fraud statute, the charged mailing must be "for the purpose of executing" the charged scheme to defraud. See 18 U.S.C. § 1341;

Kann v. United States, 323 U.S. 88, 94 (1944) (mailing must be "for the purpose of executing the scheme, as the statute requires."); Parr v. United States, 363 U.S. 370, 385 (1960) ("these were essentially state crimes and could become federal ones, under the mail fraud statute, only if the mails were used 'for the purpose of executing such scheme.'"); United States v. Maze, 414 U.S. 395, 399 (1974) (mailings not "sufficiently closely related to respondent's scheme to bring his conduct within the statute.").

In Schmuck v. United States, 489 U.S. 705 (1989), the Supreme Court held that a mailing satisfies the jurisdictional predicate of the mail fraud statute if it is "incident to an essential part of the scheme, or a step in [the] plot." Id. at 711. See also Bridge v. Phoenix Bond & Indemnity Co., 2008 WL 2329761, *5 (U.S. June 9, 2008) ("any mailing that is incident to an essential part of the scheme satisfies the mailing element . . . even if the mailing itself contains no false information.") (citing Schmuck) (internal citations and quotations omitted).  However, Schmuck also reinforced the concept that *post*-scheme mailings, such as those involving "post-fraud accounting," Schmuck, 489 U.S. at 714, do not satisfy the mail fraud statute.  "A mailing cannot be said to be in furtherance of a scheme to defraud when it occurs *after* the scheme has reached fruition." United States v. Altman, 48 F.3d 96, 103 (2d Cir. 1995) (emphasis added); see also United States v. Adkinson, 158 F.3d 1147, 1163 (11th Cir. 1998) ("We have not hesitated to reverse mail fraud convictions where the underlying scheme has reached fruition *prior* to the mailing.") (emphasis added).

Judgment of acquittal must be entered as to Counts 15 and 19 because they charge mailings that occurred *after* the alleged scheme to defraud reached fruition.  The indictment alleges that the Exchangors were induced to use BPE as their § 1031 qualified intermediary by misrepresentations regarding the "safety" and "security" of their funds.  However, as the Court

3

has previously found, "[t]he scheme's object was achieved **when the money was obtained**, before it was invested."  United States v. Carpenter, 405 F. Supp. 2d 85, 93 (D. Mass. 2005) (emphasis added).  Counts 15 and 19 charge mailings that occurred *after* the money had already been obtained by BPE.

Count 15 relates to an exchange performed by Gail Cahaly and charges the mailing of a $2,412,230 check from BPE-Newton to Benistar-CT.  Indictment ¶ 105.  "The check was mailed from BPE's offices in Massachusetts to Simsbury, Connecticut via Airborne Express and deposited into BPE's "34" account at PaineWebber."  Indictment ¶ 60.  The check (Ex. 41) was made payable to Cahaly and she then endorsed it over to BPE.  However, Cahaly testified that instead of mailing the check to BPE-Newton, she handed it over to Paley in person:

> AUSA Mitchell:   Who did you provide this check?  Who did you give this check to?
> Cahaly:          Martin Paley.
> AUSA Mitchell:   How did you give it to him?
> Cahaly:          By hand.

Tr. 10:100 (Cahaly).  The delivery of the check to Paley, BPE's president and agent, concluded the alleged scheme of BPE obtaining Cahaly's funds as charged in the indictment.  Any mailing that occurred *after* BPE (through its agent Paley) had already obtained the funds clearly falls outside of the mail fraud statute.

The mailing of Cahaly's check from BPE-Newton to Benistar-CT, after it had already been obtained by BPE, is just like the post-fraud accounting mailings that were found wanting in Kann, Parr, and Maze.  Once Cahaly endorsed the check over to BPE, the alleged scheme reached fruition—*i.e.*, BPE obtained the funds.  What BPE did with the funds after obtaining them is, as the Court has already found, irrelevant.  For example, instead of BPE-Newton mailing the check to Benistar-CT, Paley could have just as easily driven to Connecticut and hand–delivered the check to Benistar-CT (perhaps because Paley did not want to risk Airborne

4

Express losing a $2.4 million check).  Or Paley could have taken the check in hand to PaineWebber's downtown Boston office and deposited it himself into BPE's "34" account at PaineWebber (to make sure that the money went into BPE's account at PaineWebber without delay).  If either of these post-scheme events had transpired, no mailing would have occurred at all, but BPE still would have obtained Cahaly's funds and the offense, as alleged in the indictment, would have been completed.  This shows why the mailing charged in Count 15 was not for the purpose of executing the scheme, because the scheme had already been completed once BPE (in the guise of its agent Paley) obtained possession of the check.  Whether BPE mailed the check after-the-fact to Benistar-CT had no impact on executing the already completed scheme of obtaining the check.

The same analysis shows why the mailing charged in Count 19 also falls outside of the mail fraud statute.  Count 19 relates to an Iantosca exchange and charges the mailing of a $300,000 check "from BPE-Newton to Benistar-CT."  Indictment ¶ 105; Tr. 4:80-81 (Jokinen).  The mailing of this $300,000 check (Ex. 111) from BPE-Newton was **after** BPE had already obtained the funds, and is simply a post-scheme mailing as in Kann, Parr, and Maze.  Once BPE obtained the check, the scheme was complete.  Whether the check was thereafter mailed from BPE-Newton to Benistar-CT, hand-delivered to Connecticut by Paley, or hand-deposited by Paley directly into BPE's "34" account at PaineWebber in downtown Boston, has no effect on BPE's obtaining the check.  The scheme had reached fruition once BPE obtained possession of the check, regardless of how (or whether) the check was mailed after-the-fact.[1]

---

[1] The mailing that the government *should* have charged is the mailing of the check from Marjorie Adams (Iantosca's attorney) to BPE-Newton. Ex. 110; Tr. 4:78-79 (Jokinen).  That mailing clearly was in furtherance of the alleged scheme of BPE obtaining the check in the first instance.

5

In United States v. Redcorn, 2008 WL 2332005 (10th Cir. June 9, 2008), the defendants embezzled money and wired it first into their private bank accounts in Oklahoma, and from those accounts the money was then wired to the defendants' out-of-state brokerage accounts. Because wire fraud requires an *interstate* wire communication, see 18 U.S.C. § 1343, the government charged the wire transfers from the in-state banks to the out-of-state brokerage accounts as wire fraud counts. In entering a judgment of acquittal on these wire fraud counts, and after a lengthy discussion of Supreme Court precedent on this issue, the Tenth Circuit held that once the money was wired into the defendants' in-state bank accounts, the scheme of obtaining the money had reached fruition. "We think the 'scheme to defraud' ended at the earlier step, before the interstate wires were used. It was at that point that '[t]he persons intended to receive the money had received it irrevocably' and the scheme 'had reached fruition.'" Id. at *11 (citing Kann). Similarly, the charged scheme of obtaining the Exchangors' funds ended once the funds had been obtained by BPE. Mailing the checks after-the-fact from BPE-Newton to Benistar-CT is no different than the defendants in Redcorn wiring the funds from their in-state bank accounts to their out-of-state brokerage accounts **after** they had already obtained the funds.

Because the mailings in Counts 15 and 19 occurred after the alleged scheme reached fruition, they were not in furtherance of the charged scheme, subject matter jurisdiction is lacking as to those mailings, and a judgment of acquittal must be entered as to Counts 15 and 19.

**B.    There Can Be No Fraudulent Inducement When Several Exchangors Had Previously Completed Successful Exchanges With BPE.**

The indictment appears to assert one overarching claim—*i.e.*, the Exchangors were induced to execute contracts by which they gave money to BPE based on material false or fraudulent representations and, as a result, the mailings and wires charged in the 19 counts

6

occurred as a direct result of such fraudulent inducement.[2]  However, several of the 19 counts involving certain Exchangors did not occur as a result of any fraudulent inducement.  In fact, these Exchangors had previously contracted with BPE successfully *and did not receive any further marketing representations prior to executing their subsequent exchanges with BPE that are charged in the indictment*.  Consequently, it was an Exchangor's prior successful experience with BPE that necessarily caused an Exchangor to become a "repeat customer" and sign the agreements regarding the exchanges charged in the indictment, and not any alleged representations, because no other representations were made after the first successful exchange.  Thus, there could be no fraudulent inducement with respect to the failed exchanges charged in the indictment.

### 1. **Judgment of Acquittal Must Be Entered on All of the Iantosca Exchanges (Counts 7-11 and 19).**

Joseph Iantosca signed his first agreement with BPE on February 29, 2000.  Ex. 252.  Marjorie Adams, Iantosca's attorney, was not aware that Iantosca had executed an agreement with BPE prior to her first meeting with Paley.  Tr. 5:104 (Adams).  Thus, any inducement that caused Iantosca to contract with BPE occurred on or prior to February 29, 2000, which was clearly before Adams, Iantosca and Paley met at Iantosca's office in March 2000, where Paley gave his marketing presentation, Tr. 5:50 (Adams), and long before Iantosca signed the first agreement involving an unsuccessful exchange on August 10, 2000.  Ex. 84A.  Moreover, Iantosca contracted with BPE to handle nine (9) separate property exchanges and "four of the nine exchanges were successfully completed."  Indictment ¶ 72; Tr. 5:111 (Adams: "Iantosca had successful 1031 exchanges using Benistar.").  One of these successful exchanges involved

---

[2]  For purposes of this analysis, the specific content of the alleged misrepresentations is irrelevant.

the Sports Authority, which occurred prior to the first unsuccessful exchange charged in the indictment. Tr. 5:116-17 (Adams).

Iantosca contracted with BPE before any representations charged in the indictment could have been made, and there is no evidence regarding representations or meetings Paley might have had with Iantosca prior to February 29, 2000. As a result, *Iantosca could not have been induced to contract with BPE by any post-February 29, 2000 representations (written or oral).*[3] A judgment of acquittal must therefore be entered on all of the Iantosca transactions charged in the indictment (Counts 7, 8, 9, 10, 11 and 19) because it was legally impossible for Iantosca to have been induced to contract with BPE regarding those transactions when he had already been induced to sign a contract with BPE no later than February 29, 2000, and had completed at least one successful exchange (Sports Authority) with BPE prior to the time he executed the agreement on August 10, 2000 (involving the first of his unsuccessful exchanges).

### 2. Judgment of Acquittal Must Be Entered on Both of the Darling Exchanges (Counts 1 and 2).

Byron Darling testified that after he had a telephone conversation with Jokinen and Paley in December 1999, he agreed to use BPE for an exchange involving two vacant lots in Truro and that exchange was successfully completed. Tr. 3:105 (Darling); Tr. 3:106 (Darling: first exchange was "a satisfactorily arranged exchange."). Darling also testified that he did not have any more conversations with Paley after December 1999. Tr. 3:126-28 (Darling).

Darling executed the agreement for his second (unsuccessful) exchange on August 28, 2000. Ex. 52. However, prior to executing that agreement, he did not have any further contact with BPE. Thus, it is legally impossible for Darling to have been induced to sign the agreement

---

[3] Jokinen sent the Travelers bond to Adams on May 17, 2000 (Ex. 82), after Iantosca had already executed his first agreement with BPE.

8

regarding the second exchange with BPE based on anything other than the fact that the first exchange had been successful. A judgment of acquittal must therefore be entered on both of the counts relating to the second Darling exchange (Counts 1 and 2), because Darling could not have been induced to contract with BPE for the second exchange when he had already signed a contract with BPE and completed a successful exchange prior to August 28, 2000, and did not speak to or communicate with BPE after the first exchange.

    **3.**    **Judgment of Acquittal Must Be Entered on Fitzgerald's Successful Exchange (Count 14).**

Brian Fitzgerald testified that he engaged in a "dual exchange," Tr. 5:13 (Fitzgerald), where "one was for $400,000 for the real estate and one for $100,000 for the equipment." Tr. 4:150 (Fitzgerald). With respect to the $400,000 exchange for the real property, "that money was returned." Tr. 4:151 (Fitzgerald). Since only unsuccessful exchanges are deemed by the government to be fraudulent, see Tr. 3:44 (AUSA Mitchell: "I mean, if he had completed his exchange, we wouldn't be here today."), the record evidence dictates that a judgment of acquittal must be entered as to the successful exchange charged in Count 14.

**C.**    **Venue is Improper as to Counts 1-2 and 4-13.**

"[W]hen a defendant is charged in more than one count, venue must be proper with respect to each count." United States v. Geibel, 369 F.3d 682, 696 (2d Cir. 2004). Wire fraud is a continuing offense and, therefore, venue for wire fraud offenses is governed by 18 U.S.C. § 3237(a). Venue for a wire fraud charge is proper in any district in which the actual wire transmission itself (rather than any preparatory act) began, continued, or concluded. Id. See also United States v. Kim, 246 F.3d 186, 191-92 (2d Cir. 2001) (same); United States v. Ebersole, 411 F.3d 517, 527 (4th Cir. 2005) (same).

It is irrelevant for mail and wire fraud venue purposes that the scheme to defraud charged in the indictment was based in Massachusetts.  See Kreuter v. United States, 218 F.2d 532, 534 (5th Cir. 1955) ("The place where the scheme is conceived or put in motion is immaterial, it is the place of mailing or delivery by mail."); United States v. Ramirez, 420 F.3d 134, 145 (2d Cir. 2005), cert. denied, 546 U.S. 1113 (2006) ("[a]lthough a fraudulent scheme may be an element of the crime of wire fraud, it is using wires and causing wires to be used in furtherance of the fraudulent scheme that constitutes the prohibited conduct.") (internal citations and quotations omitted).  Furthermore, "actions that are merely preparatory are not probative in determining the nature of the crime."  United States v. Muhammad, 502 F.3d 646, 653 (7th Cir. 2007), cert. denied, 128 S. Ct. 1104 (2008); see also United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1190 (2d Cir. 1989) ("venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not a part of the offense.").

Pursuant to the venue stipulation (Dkt. #280) and exhibits admitted into evidence (Exs. 214-19; 221-26), venue is improper in the District of Massachusetts with respect to Counts 1, 2, and 4-13 because:

- "(Counts 1, 2, 4-13) involve wire transmissions from bank wire rooms located outside of Massachusetts to either Pennsylvania (Merrill Lynch) or New York (PaineWebber)."  Dkt. #280, ¶ 2.

- The wire transfers in Counts 1 and 2 were sent from J.P. Morgan Chase Bank in New York to Mellon Bank in Pittsburgh.  Ex. 217.  While the wires were "initiated" in Massachusetts (Dkt. #280, ¶ 2), these preparatory acts are not probative of venue because the actual wire transfers themselves, while "initiated"

>   in Massachusetts (*i.e.*, by a Massachusetts-based bank customer) were actually sent from New York to Pennsylvania.

- The wire transfers in Counts 4-13 were all sent from banks located outside of Massachusetts (Ex. 216) to banks in either Pennsylvania or New York. Dkt. # 280, ¶ 4. Although these wire transfers "cleared" through the Federal Reserve Bank of Boston (Dkt. #280, ¶ 3), the mere fact that accounting entries were made on the books of the Boston Fed (i.e., clearing) is not probative of whether the actual wire transfers themselves physically "passed through" Massachusetts. At the very least, the record evidence is sufficiently ambiguous that the government has failed to carry its burden of proof.

Because the government has failed to prove by a preponderance of the evidence that the actual wire transfers themselves (as opposed to preparatory acts) charged in Counts 1-2 and 4-13 began, continued, or were completed in Massachusetts, a judgment of acquittal for lack of venue must be entered as to those counts. See United States v. Strain, 396 F.3d 689 (5th Cir. 2005), reh'g denied, 407 F.3d 379, 380 (5th Cir. 2005) (remanding for entry of judgment of acquittal due to the government's failure to prove venue).

## II.     CONCLUSION.

In light of the foregoing, and according to the table on the first page, only Counts 3 and 16-18 should be submitted to the jury.

        RESPECTFULLY SUBMITTED,
        DANIEL E. CARPENTER,
        By his attorney,


        */s/ Jack E. Robinson*
        Jack E. Robinson
        (BBO #559683)
        2187 Atlantic Street, Suite 905
        Stamford, CT 06902
        (203) 425-4500

Dated: June 18, 2008

### **CERTIFICATE OF SERVICE**

    I hereby certify that on the date hereof this document was filed through the Court's CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).

        */s/ Jack E. Robinson*
        Jack E. Robinson