UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                   )
UNITED STATES OF AMERICA,          )
                                   )
         Plaintiff,                )
                                   ) Criminal Action
v.                                 ) No. 04-10029-GAO
                                   )
DANIEL E. CARPENTER,               )
                                   )
         Defendant.                )
                                   )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY ONE
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, June 2, 2008
9:45 a.m.

Marcia G. Patrisso, RPR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: Jonathan F. Mitchell and Jack W. Pirozzolo,
3         Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         One Courthouse Way
          Boston, Massachusetts  02210
5         On Behalf of the Government

6         GREENBERG TRAURIG, LLP
          By: A. John Pappalardo, Esq. and
7             Gary R. Greenberg, Esq.
          One International Place
8         Boston, Massachusetts  02110
          On Behalf of the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open

2     court before the Honorable George A. O'Toole, Jr.,

3     United States District Judge, United States District

4     Court, District of Massachusetts, at the John J. Moakley

5     United States Courthouse, One Courthouse Way, Boston,

6     Massachusetts, on June 2, 2008.

7          The defendant, Daniel E. Carpenter, is present

8     with counsel.  Assistant U.S. Attorneys Jonathan F.

9     Mitchell and Jack W. Pirozzolo are present.)

10         THE CLERK:  All rise.  Please be seated.

11         THE COURT:  Good morning.

12         MR. MITCHELL:  There were a handful of issues to

13    take up before the trial, your Honor, but I think there

14    were two to tackle before we get the jury in here:  One

15    is the pending motion in limine concerning the loss, and

16    the other has to do with voir dire.

17         THE COURT:  I don't think we need to do the loss

18    one before we pick the jury.

19         MR. MITCHELL:  Probably not before we pick the

20    jury, but before we open.

21         THE COURT:  Certainly.  We're on a bit of a

22    schedule with the jury pool when people come so I would

23    rather get that done.  I agree that there's some issues

24    we have to deal with before the openings.  I don't

25    expect we're going to open until tomorrow anyway

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   unless --

 2         MR. MITCHELL:  That's what we did last time, it

 3   was on day 2.

 4         THE COURT:  That's typical on a case like this.

 5         MR. MITCHELL:  So I guess the only other issue

 6   to take up is the proposed voir dire, and I don't know

 7   how you want to do that.  The defendant has said that --

 8   I don't know if you have --

 9         THE COURT:  I've looked at both of them.  I can

10   tell you I'm going to do pretty much the same thing I

11   did last time.

12         MR. MITCHELL:  I guess I don't have anything to

13   add, then.

14         THE COURT:  All right.  Anything from the

15   defense?

16         MR. PAPPALARDO:  Well, we submitted our

17   questions, your Honor, and I think we'll have to wait to

18   see -- is it your practice, your Honor, to conduct the

19   voir dire individually or as a group and then deal with

20   respective jurors --

21         THE COURT:  I'll ask the questions to the group,

22   get affirmative and negative responses -- affirmative

23   responses and no response is negative, and follow up

24   after we ask the questions one by one on the side.  And

25   I generally do the questions unless I need a follow-up.
```

1        MR. PAPPALARDO:  Very good.

2        THE COURT:  But my philosophy on this is not to

3   be particularly probing, to touch the particular areas

4   that are common to most criminal cases and when there

5   are some things like in this case I'll ask about whether

6   people have been involved with either criminal or

7   non-criminal fraud claims, but other than that, we won't

8   get -- was that the jury?

9        THE CLERK:  Yes.  Two minutes.

10       THE COURT:  So the jurors will be here shortly

11  and we'll get going.  We'll have to arrange -- I think

12  we usually put the jurors in these sections here, so

13  people will need to rearrange themselves.

14       THE CLERK:  I'll take care of it, Judge.

15       THE COURT:  All right.

16       THE CLERK:  All rise.

17       (There is a recess in the proceedings at

18  9:45 a.m.)

19       THE CLERK:  All rise.  Hear ye, hear ye, hear

20  ye, all persons having business with the United States

21  District Court for the District of Massachusetts draw

22  near, give your attention and you shall be heard.  God

23  save these United States and this Honorable Court.  The

24  Honorable George A. O'Toole, Jr., presiding.

25       Please be seated.  For trial, the case of United

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   States of America versus Daniel Carpenter which is

 2   Docket 04-10029.

 3           THE COURT:  Good morning, everyone.

 4           THE JURORS:  Good morning.

 5           THE COURT:  Welcome to the United States

 6   District Court.  We're about to begin, with the help of

 7   some of you, the presentation of a prosecution by the

 8   United States against Mr. Daniel Carpenter.  This is a

 9   criminal case, and I'll tell you just in very general

10   terms what it's about so you have some idea.  If you're

11   selected to participate as one of the jurors, of course

12   you'll hear in great detail about the nature of the case

13   and what's involved.

14           But just to give you a general idea of what the

15   matter is, it arises under the laws of the United States

16   and, therefore, a criminal case is prosecuted by an

17   agency of the Department of Justice, the United States

18   Attorney's Office.  The case is framed by an indictment

19   which presents the charge.  And, in general terms, the

20   indictment charges the defendant, Mr. Carpenter, with a

21   number of individual counts of what is called, in

22   shorthand, wire fraud and mail fraud, crimes made -- or

23   activity made criminal by an act of Congress in the

24   United States Code.

25           In very brief terms, the indictment alleges that
```

1    the defendant engaged in conduct that constituted an

2    unlawful scheme to obtain money or property by means of

3    false or fraudulent pretenses; that he participated in

4    such a scheme with an intent to defraud; and that he

5    used both interstate wire and/or mail facilities to

6    commit the offense.  The defendant says he is not guilty

7    of the crimes that he's charged with, and his position

8    will be, as you will hear throughout the evidence, that

9    he was not engaged in any intentional fraud and was

10   engaged in legitimate business transactions.

11        A defendant -- this defendant -- is presumed to

12   be innocent of any charge that is made against him

13   unless and until the government proves he is guilty

14   beyond a reasonable doubt by the evidence, and that's

15   what the trial will be about.  We want to be sure that

16   we have a jury who will ultimately make the decision on

17   the evidence of the case, composed of people who are

18   completely fair-minded and impartial with respect to the

19   parties and the issues that will be the subject of the

20   case.

21        And so I'm going to have some questions that I

22   will put to all of you as a group to be sure that you

23   personally can be in that condition if you're called to

24   serve; that is, completely fair-minded and impartial as

25   regards to these parties and these issues.  The way

PDF created with pdfFactory trial version www.pdffactory.com

1    we'll do this is I will ask you a question.  If you
2    personally would answer the question "yes," just stand
3    up wherever you are for a minute.  And typically a
4    number of you will stand.  We'll go around and jot down
5    your names and note that you've answered that question
6    in the affirmative.  If you would answer the question
7    "no," make no signal, just sit there.  We'll assume by
8    your silence and your inaction that your answer to the
9    question is "no."  So if the answer is "yes," stand up;
10   if the answer is "no," make no gesture.
11        If you have any doubt about whether the answer
12   is yes or no, answer "yes," because after all the
13   questions -- I've gone through all the questions, then
14   one by one we'll invite those who have answered "yes" to
15   the side, and follow up to get the reasons why that was
16   your answer to the particular question.  So if you have
17   some doubt and you're not sure whether to answer "yes,"
18   err on the side of answering "yes" and we'll follow up.
19        This is an important part of the process, of
20   selecting a fair jury, and the law requires that your
21   answers now to me, both in general and at the side, be
22   made under oath.  So I'll ask the clerk now to
23   administer the oath to you.
24        THE CLERK:  Will the jurors in the jury box and
25   in the courtroom please rise and raise your right hand.

1          (Jury pool sworn.)

2          THE COURT:  The first several questions I'm

3   going to ask you relate to people who will be taking

4   part in one way or another in the trial.  And I'm

5   interested in whether you have any connection with any

6   of these people that might interfere with your ability

7   to be a fair and impartial juror.

8          Let's start with Mr. Daniel E. Carpenter who is

9   a defendant in the case himself.  Mr. Carpenter is a

10  resident of Simsbury, Connecticut.

11         Mr. Carpenter, if you would stand so people

12  could see who you are, and rotate a little bit, I guess.

13         Mr. Carpenter is the defendant.  You will also

14  hear that Mr. Carpenter is involved in some businesses

15  called -- some variations on the term Benistar,

16  B-E-N-I-S-T-A-R.  You'll hear about Benistar Property

17  Exchange Trust Company, Benistar Limited and perhaps

18  other variations.

19         So my first question is:  Are any of you related

20  to, do you have any connection -- business,

21  professional, social or otherwise -- with either Mr.

22  Carpenter himself personally or with any company such as

23  Benistar, Benistar Property Exchange Trust Company?  Any

24  relationship whatsoever?  No?  Okay.

25         The case for the prosecution will be presented

PDF created with pdfFactory trial version www.pdffactory.com

1    by Assistant United States Attorneys, employees of the

2    Department of Justice.  At this stage, in each district,

3    the District of Massachusetts, there is a United States

4    Attorney who is akin to the district attorney in the

5    state system, and he is assisted by a number of

6    assistant U.S. attorneys.

7         So Mr. Mitchell and Mr. Pirozzolo, if you would

8    introduce yourself to the jurors.

9         MR. MITCHELL:  Thank you, your Honor.

10        Good morning, ladies and gentlemen.  My name is

11   Jonathan Mitchell.  Jack Pirozzolo and I are assistant

12   United States attorneys, and we have the honor of

13   representing the United States in this case.

14        MR. PIROZZOLO:  Good morning.

15        THE COURT:  Mr. Pappalardo, will you do the

16   honors for the defense?

17        MR. PAPPALARDO:  Yes, your Honor.

18        Good morning, ladies and gentlemen.  My name is

19   John Pappalardo.  I'm with the law firm of Greenberg

20   Traurig.  With me is Gary Greenberg.  And we're pleased

21   to represent Mr. Dan Carpenter in this matter.

22        THE COURT:  Okay, jurors.  Are any of you

23   related to, do you have any connection -- business,

24   social, professional or otherwise -- with any of the

25   lawyers in the case, either the lawyers for the

PDF created with pdfFactory trial version www.pdffactory.com

1  government or the lawyers for the defendant?  And

2  included in that, Mr. Pappalardo mentioned the firm --

3  the law firm Greenberg Traurig, are the two lawyers for

4  the defense.

5          Any connection or relationship with the lawyers

6  in the case?

7          As I'm sure you realize, a good bit of evidence

8  in a case such as this will come from the testimony of

9  witnesses who will appear in the courtroom who give

10  answers to questions that the lawyers put to them.  I'm

11  going to read to you now a list of people who may appear

12  in the course of the case as a witness.  It's a fairly

13  lengthy list, so I would ask you to pay close attention

14  to it.  Not all of these people will necessarily appear,

15  but we want to make sure that if they do, that, again,

16  there's no problem with your personal participation in

17  the case because of some relationship with them.  So I

18  think I've got a couple of dozen names at least, perhaps

19  more, to read.  I'd like you to listen to the list very

20  carefully as I read it slowly, and then I'll ask a

21  question at the end which is similar to what I've asked:

22  whether you have any connection with any such people,

23  okay?

24          So here are people who may be witnesses for one

25  side or the other in the course of the case:  Marjorie

PDF created with pdfFactory trial version www.pdffactory.com

1    Adams of Rockland, Massachusetts; J. Marc Allaire,

2    spelled A-L-L-A-I-R-E, of Bloomington, Indiana; Robert

3    Barrett of Marshfield, Massachusetts; Chuck Bellemore of

4    Goffstown, New Hampshire; Michael Bergeron of

5    Portsmouth, New York; Claudia Breslin of Riverdale --

6    I'm sorry, Riverside, Rhode Island; Gail Cahaly, spelled

7    C-A-H-A-L-Y, and Ronald Cahaly, both of Westwood,

8    Massachusetts; Jo-Ann Chenail, spelled C-H-E-N-A-I-L, of

9    Worcester; David Commito of Boston; Byron Darling of

10   Truro, Massachusetts; Kevin Duffy of Stamford,

11   Connecticut; David Eaton of Manchester, New Hampshire;

12   William Ely, E-L-Y, of Boston; Lori Enright of Garden

13   City, New York; Linda Farris of Boston; Steven Feit,

14   spelled F-E-I-T, of Short Hills, New Jersey; Brian

15   Fitzgerald, Upton, Massachusetts; Helen Flanders of

16   Boston; Joseph Iantosca of Braintree; Jeffrey Johnston

17   of Boston; Linda Jokinen, spelled J-O-K-I-N-E-N, of

18   Norwood; Matthew Kameron, spelled with a K,

19   K-A-M-E-R-O-N, of Milton; Gerald Levine of New York;

20   Janet May of Enfield, Connecticut; Martin Paley of

21   Newton; David Patterson of Newton; Thomas Rasmussen of

22   Florham Park, New Jersey; Mitchell Rock of Woodcliff

23   Lake, New Jersey; Paul Sheehan of Boston; Eliot Snider

24   of Chestnut Hill; Jackie Spielman Mahannah, spelled

25   M-A-H-A-N-N-A-H, of Canton, Connecticut; Gary Stern of

PDF created with pdfFactory trial version www.pdffactory.com

1    Scarsdale, New York; Hassan Tabbah, spelled T-A-B-B-A-H,

2    of Greenwich, Connecticut; Ralph Ventresco of Boston;

3    Susan Walsh of Boston; Thomas Zappala, an employee of

4    the United States Attorney's Office; Anthony Zelle,

5    Z-E-L-L-E, of Boston; Melissa Zizza, Z-I-Z-Z-A, of

6    Boston; Richard Belding of Simsbury, Connecticut; Molly

7    Carpenter of Simsbury, Connecticut; James B. Carpenter

8    of Red Bank, New Jersey; Holly Fletcher of Sudbury;

9    Nancy Sawyer of Florham Park, New Jersey; Donald Trudeau

10    of Stamford, Connecticut; Donna Wayne of Simsbury,

11    Connecticut.

12          Now, in that long list, was there anybody that

13    you recognize as somebody you're related to, have any

14    friendship, social, professional, business or any other

15    kind of association or connection with?

16          Mr. Jankulla?

17          THE JUROR:  Michael Levesque.

18          THE COURT:  I'm sorry.  Levesque?  All right.

19    Okay.  Thank you.

20          THE JUROR:  Thomas Landon, your Honor.

21          THE COURT:  Twelve.  Okay.  Thank you.  You can

22    sit.  Anybody else?

23          The next group of questions I want to broaden it

24    from you personally as an individual to you and those

25    people who are in your life closest to you:  your

1    immediate family, members of your household, people who

2    are so close to you that what affects them affects you,

3    in a sense.  They're going to be similar kinds of

4    questions, but I wanted to broaden it to include that.

5           And first I want to ask about any existing or

6    prior employment.  As I've said, this is a prosecution

7    being presented by a federal law enforcement agency.  I

8    want to ask you whether any of you have -- in that

9    group, you personally and those other people close to

10   you, have ever been employed in any capacity with any

11   federal law enforcement agency, including prosecution

12   agencies such as the United States Attorney's Office,

13   but including the FBI, the Internal Revenue Service or

14   any other federal prosecuting agency.

15          Have any of you, or anybody close to you, ever

16   been employed by any state or local law enforcement

17   agency?  Now, that would include district attorneys'

18   offices, the attorney general of Massachusetts, for

19   example, or any other state; local police officers,

20   state police or any -- the broadest possible definition.

21   I just want to know if you've had any connection or

22   relationship with any law enforcement in any state.

23          THE JUROR:  Jennifer Bernard.

24          THE COURT:  Number 1.

25          THE JUROR:  Sean O'Connell.

1         THE COURT:  Three.

2         THE JUROR:  Michael Levesque.

3         THE COURT:  Six.  Thank you.

4         Starting in this section, ma'am.

5         THE JUROR:  Francesca Tramontozzi.

6         THE COURT:  Number 17.

7         THE JUROR:  Spencer Kalker.

8         THE COURT:  Twenty.

9         THE JUROR:  Joseph Capezzuto, your Honor.

10        THE CLERK:  Nineteen.

11        THE COURT:  In the back.

12        THE JUROR:  Ann Hanlon.

13        THE COURT:  Twenty-three.

14        THE JUROR:  Elaine Joyce.

15        THE COURT:  Twenty-nine.

16        THE JUROR:  Elaine Blais.

17        THE COURT:  Twenty-eight.

18        THE JUROR:  Arthur Oliveira.

19        THE COURT:  Thirty-nine.

20        THE JUROR:  Charles Kowalski.

21        THE COURT:  Forty.

22        THE JUROR:  Andrew White.

23        THE COURT:  Forty-two.

24        THE JUROR:  Charles Sorrentino.

25        THE COURT:  Fifty-nine.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1          THE JUROR:  Jovita Daley.

 2          THE CLERK:  Forty-three, Judge.

 3          THE JUROR:  Sue Jackson.

 4          THE COURT:  Forty-nine.

 5          THE JUROR:  Benjamin Waxman.

 6          THE CLERK:  Forty-eight, Judge.

 7          THE COURT:  Okay.

 8          THE JUROR:  Jon Vanrader.

 9          THE COURT:  Forty-seven.

10          THE JUROR:  Kristopher Doherty.

11          THE COURT:  Fifty-two.

12          THE JUROR:  Jamie Jeanson.

13          THE CLERK:  Number 4.

14          THE COURT:  Thank you.

15          Have you or has anyone in that group that is

16   closest to you ever been the victim of a crime?  Again,

17   if you have any doubt, answer "yes" and we'll follow up

18   on it.

19          Okay, sir.

20          THE JUROR:  Keith Cabral.

21          THE CLERK:  Ten.

22          THE JUROR:  Thomas Landon.

23          THE COURT:  Twelve.  Okay.

24          THE JUROR:  Joseph Capezzuto, your Honor.

25          THE COURT:  Nineteen.
```

```
 1            THE JUROR:  Margaret Wheeler.

 2            THE COURT:  Thirty-four.

 3            THE JUROR:  Maria Murphy.

 4            THE COURT:  Thirty-six.

 5            THE JUROR:  Andrew White.

 6            THE COURT:  Forty-two.

 7            THE JUROR:  Annie Bispham.

 8            THE COURT:  Fifty-seven.

 9            THE JUROR:  Johannes Bom.

10            THE COURT:  Fifty-six.

11            THE JUROR:  Christopher Davidson.

12            THE CLERK:  Fifty-five.

13            THE JUROR:  Sue Jackson.

14            THE CLERK:  Forty-nine, Judge.

15            THE JUROR:  John Vanrader.

16            THE COURT:  Forty-seven.

17            It may be redundant, but I want to focus on it

18     in particular because of the nature of the charge here.

19     I want to know whether you or anybody close to you has

20     ever felt that you were victimized in a fraudulent

21     scheme or in any fraud.  Now, by this I mean not just

22     something that might have been criminal, but something

23     you thought, perhaps, in a transaction was unfair or

24     fraudulent.  If you or anybody close to you ever felt

25     defrauded or victimized by a fraud.
```

| | |
|---|---|
| 1 | Ms. Bernard? |
| 2 | THE JUROR:  Yes. |
| 3 | THE COURT:  Mr. Levesque? |
| 4 | THE JUROR:  Mr. Williams. |
| 5 | THE COURT:  Lucas? |
| 6 | THE JUROR:  Yes. |
| 7 | THE COURT:  Number 8. |
| 8 | THE JUROR:  Spencer Kalker. |
| 9 | THE CLERK:  Number 20, Judge. |
| 10 | THE JUROR:  Sean O'Connell. |
| 11 | THE JUROR:  Eileen Polin. |
| 12 | THE COURT:  Twenty-five. |
| 13 | THE JUROR:  Susan Dempsey. |
| 14 | THE COURT:  Twenty-six. |
| 15 | THE JUROR:  John Doyle. |
| 16 | THE COURT:  Thirty-three. |
| 17 | THE JUROR:  Jovita Daley. |
| 18 | THE COURT:  Forty-three. |
| 19 | THE JUROR:  Andrew White. |
| 20 | THE JUROR:  Christopher Davidson. |
| 21 | THE JUROR:  Kristopher Doherty. |
| 22 | THE COURT:  I'm sorry? |
| 23 | THE JUROR:  Kristopher Doherty. |
| 24 | THE COURT:  Fifty-two.  Okay. |
| 25 | THE JUROR:  Karen Powers. |

```
 1            THE CLERK:  Forty-five.
 2            THE COURT:  Have you or has anybody particularly
 3    close to you ever been accused of committing a crime?
 4            THE JUROR:  Francesca Tramontozzi.
 5            THE COURT:  Seventeen.
 6            THE JUROR:  John Capezzuto.
 7            THE JUROR:  Rebecca Hodges.
 8            THE COURT:  Twenty-seven.
 9            THE JUROR:  Elaine Blais.
10            THE COURT:  Twenty-eight.
11            THE JUROR:  Margaret Wheeler.
12            THE COURT:  Thirty-four.
13            THE JUROR:  Jovita Daley.
14            THE CLERK:  Forty-three.
15            THE JUROR:  Karen Powell.
16            THE COURT:  Forty-five.  Sir?
17            THE JUROR:  John Vanrader.
18            THE COURT:  Forty-seven.
19            THE JUROR:  Kristopher Doherty.
20            THE CLERK:  Fifty-two.
21            THE JUROR:  Annie Bispham.
22            THE COURT:  Fifty-seven.
23            THE JUROR:  Johannes Bom.
24            THE COURT:  Fifty-six.
25            THE JUROR:  Thomas Landon, your Honor.
```

```
 1          THE COURT:  Okay.  Have you or has anybody close
 2    to you ever been the focus of a non-criminal accusation
 3    of fraud; that is, in a civil context?  Has anyone ever
 4    complained about you or anyone close to you as being the
 5    perpetrator of a fraud?  Not necessarily a crime, but in
 6    a civil -- a business context, that you're aware of?
 7          I've told you in very general terms about the
 8    nature of the case.  It involves allegations that Mr.
 9    Carpenter participated in a scheme to defraud people of
10    money and property by use of the mails or by wire which
11    involved interstate communications.  Having just that
12    general sense of the nature of the case, knowing nothing
13    more about it, have you had any personal experience or
14    do you have any beliefs or attitudes or potential biases
15    with respect to the subject matter of this case that
16    would interfere with your ability to be a fair and
17    impartial juror in this case?
18          Mr. Levesque?
19          THE JUROR:  Annie Bispham.
20          THE COURT:  Fifty-seven.
21          THE JUROR:  Charles Kowalski.
22          THE COURT:  Forty.
23          THE JUROR:  Roselmo Pessote.
24          THE CLERK:  Twenty-one, Judge.
25          THE COURT:  As I mentioned, in a criminal
```

1    prosecution each defendant is presumed to be innocent

2    unless and until the government proves to the contrary

3    that he's guilty by the evidence, and proves it beyond a

4    reasonable doubt.  Those concepts of the presumption of

5    innocence, of proof beyond a reasonable doubt are

6    fundamental ones in our law.

7            Does any of you have any difficulty accepting

8    and applying those principles if you were to be selected

9    as a juror?

10           Finally, let me say a word about the schedule we

11   will follow in the case.  Trials here in this session

12   are conducted on a daily basis, Monday through Friday,

13   between the hours of 9 a.m. and 1 p.m., roughly

14   speaking.  We do that because in the afternoons we then

15   are able to attend to other business.  As you can

16   imagine, we have a number of cases pending at any given

17   time, not just one, and so we can give attention to the

18   jury trial in the nine-to-one part of the day and then

19   tend to other business and keep other things going in

20   the afternoon.

21           That continues throughout the course of the case

22   until the jury begins deliberating.  And at that time,

23   since the deliberations are in the jury room and not in

24   the courtroom, we're able to do two things at once:  The

25   jury can be deliberating in the afternoons, if

PDF created with pdfFactory trial version www.pdffactory.com

 1  necessary, and we'll be conducting our other business in

 2  the courtroom.  So once deliberations begin, we would go

 3  to a full day from the nine-to-one to schedule.  But

 4  most of the presentation of the evidence will be on a

 5  nine-to-one basis.

 6          Now, on that schedule, based on what I

 7  understand from the parties about the evidence that will

 8  be presented and so on, my estimate is the case will

 9  take somewhere between two and three weeks to present,

10  so that beginning today, this week, next week and

11  probably something into the following week.  It's always

12  difficult to predict exactly how long a case will

13  present.  You can tell something from the number of

14  witnesses I read, but it's unlikely that all of those

15  people will testify.  In my experience, the number gets

16  narrowed down considerably.  But my best estimate is two

17  to three weeks.

18          Now, we understand and appreciate that every one

19  of you would be someplace else if you had not responded

20  to the summons to be a juror.  We know that having

21  jurors come in and perform the important service that

22  jury duty is we have to ask people to put aside

23  something else they would be doing.  It's one of the

24  costs of citizenship.  It's one of the costs of having a

25  system that allows citizens like yourself to make

PDF created with pdfFactory trial version www.pdffactory.com

1    decisions in important cases like this.  So we don't

2    minimize that.  We know there is inconvenience,

3    rearrangement and a little bit, perhaps, of annoyance.

4         Beyond that level which everybody would share no

5    matter what they would do, is there anything over the

6    next two to three weeks that presents a particular

7    obstacle for your service in the case?  Okay.

8         THE COURT:  Number 6, Number 12, Number 4.

9    Okay.

10         I'm going to learn your name soon.  That's

11    Ms. Tramontozzi?

12         THE JUROR:  Yes.

13         THE COURT:  Okay.  And Mr. Cabral.

14         THE JUROR:  Spencer Kalker.

15         THE CLERK:  That's 20.

16         THE COURT:  All right.

17         THE JUROR:  Ann Hanlon.

18         THE CLERK:  Twenty-three.

19         THE JUROR:  Christopher Ruigomez.

20         THE CLERK:  Twenty-four.

21         THE JUROR:  Eileen Polin.

22         THE COURT:  Number 25.

23         THE JUROR:  Susan Dempsey.

24         THE COURT:  Number 26.

25         THE JUROR:  Carol Cahill.

```
 1              THE CLERK:   Number 32.

 2              THE JUROR:   Margaret Wheeler.

 3              THE COURT:   Number 34.

 4              THE JUROR:   Maria Murphy.

 5              THE COURT:   Number 36.

 6              THE JUROR:   Carol Eldridge.

 7              THE COURT:   Number 38.

 8              THE JUROR:   Andrew White.

 9              THE COURT:   Number 42.  We'll deal with this

10      section -- no, I guess we'll keep going.

11              THE JUROR:   Annie Bispham.

12              THE COURT:   Number 57.

13              THE JUROR:   Christopher Davidson.

14              THE CLERK:   Fifty-five.

15              THE JUROR:   Charles Sorrentino.

16              THE COURT:   Fifty-nine.

17              THE JUROR:   Sue Jackson.

18              THE COURT:   Forty-nine.

19              THE JUROR:   Benjamin Waxman.

20              THE COURT:   Number 48.

21              THE JUROR:   Erin Donovan.

22              THE COURT:   Number 53.

23              Okay.  Those are my questions for you as a

24      group.  We're now going to, one by one, follow up on

25      this, so we ask for your patience.  This is going to
```

PDF created with pdfFactory trial version www.pdffactory.com

1    take a little while.  And we appreciate your patience as

2    we go through this.  We'll have each of you, as you've

3    answered, come up to the side, and we'll follow up on

4    the reasons for the answers you've given for the various

5    questions.

6              Counsel?

7              THE CLERK:  Jennifer Bernard.  Step up here,

8    please.

9              (Discussion at sidebar and out of the hearing of

10   the jury:)

11             THE COURT:  Hi.  You answered a couple of the

12   questions.  One was connection with state law

13   enforcement?

14             THE JUROR:  Corrections officer.

15             THE COURT:  You are yourself?

16             THE JUROR:  Massachusetts Department of

17   Corrections.

18             THE COURT:  And where are you stationed?

19             THE JUROR:  In Framingham now.  I worked at two

20   other facilities in the Bridgewater complex.

21             THE COURT:  And how long have you been doing it?

22             THE JUROR:  Two years.

23             THE COURT:  Two years?  Any other prior law

24   enforcement connection?

25             THE JUROR:  My in-laws work for the city.

```
 1            THE COURT:  The municipal police?

 2            THE JUROR:  Yes.

 3            THE COURT:  In what kinds of --

 4            THE JUROR:  He's a sergeant for the police

 5     department.

 6            THE COURT:  Okay.

 7            THE JUROR:  And my father is actually a retired

 8     captain from the Department of Corrections.

 9            THE COURT:  And where was he?

10            THE JUROR:  Bridgewater State Hospital.

11            THE COURT:  Do those connections give you any

12     concern about your ability to be impartial in a criminal

13     case?

14            THE JUROR:  (Nonverbal response.)

15            THE COURT:  I think you also said that you or

16     somebody close to you may have been the victim of a

17     fraud?

18            THE JUROR:  We were attempting to build a new

19     house; the contractor took the money and ran.

20            THE COURT:  Tell me a little bit more about it.

21            THE JUROR:  When my in-laws were building on

22     property and were putting an addition on the house for

23     us to live in with the children, and the company,

24     construction person, whoever it was, took about $12,000

25     that they just disappeared, never came back to the job,
```

PDF created with pdfFactory trial version www.pdffactory.com

1    never -- and he claimed bankruptcy right around that

2    time and nobody's heard or seen from him since.

3            THE COURT:  When was this?  When?

4            THE JUROR:  Four years ago.

5            THE COURT:  Four years ago?  And nothing's

6    happened?

7            THE JUROR:  No.  We can't find him.

8            THE COURT:  Yeah.  And in a case that contains

9    allegations of fraud, do you think that would have an

10   impact on your ability to remain impartial?

11           THE JUROR:  No.

12           THE COURT:  Do you think you would be able to

13   put your personal experience aside and judge the

14   evidence here?

15           THE JUROR:  Yes.  Yes.

16           THE COURT:  Okay.  Thank you.

17           (The juror is excused.)

18           (In open court:)

19           THE CLERK:  Sean O'Connell.  Just one second.

20           (Discussion at sidebar and out of the hearing of

21   the jury:)

22           THE COURT:  Let me just say to -- Mr. Mitchell

23   knows, but Mr. Pappalardo and Mr. Greenberg may not, I'm

24   going to go through and get a lot of answers and then

25   we'll go back, and if there are cause questions -- so

PDF created with pdfFactory trial version www.pdffactory.com

1   just reserve.  The fact that they go sit down doesn't

2   mean I've passed them, okay?

3           (In open court:)

4           THE CLERK:  Sean O'Connell.  Thank you.

5           (Discussion at sidebar and out of the hearing of

6   the jury:)

7           THE COURT:  Hi.

8           THE JUROR:  Good morning.

9           THE COURT:  I think you said somebody close to

10  you had a connection with law enforcement?

11          THE JUROR:  My uncle, Richie O'Connell, is

12  retired from the Massachusetts State Police; my wife's

13  cousin, Peter Burns, is currently a Mass. state police

14  officer.

15          THE COURT:  Okay.  Do those connections with law

16  enforcement people give you any concern about your

17  ability to be impartial in a case like this?

18          THE JUROR:  No.

19          THE COURT:  Can you wait until I finish the

20  question; she can only write one person at a time.

21          THE JUROR:  Sorry.

22          THE COURT:  I think you also said that somebody

23  close to you may have been the victim of a fraud?

24          THE JUROR:  Yeah.  For what it's worth, I pay

25  monthly for my two boys to play video games.  They were

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    given some free add-on thing which compromised the
 2    account information on my credit card.  My card was
 3    in -- nothing was on it, but we had my charge changed.
 4    That was the extent of it.
 5              THE COURT:  Was that recent?
 6              THE JUROR:  It was in the last year.
 7              THE COURT:  Did it involve -- I presume you
 8    talked to the credit card people?
 9              THE JUROR:  Yes.  Yes.
10              THE COURT:  Did you go beyond that?  Did you get
11    involved with any agency investigations or anything?
12              THE JUROR:  No.
13              THE COURT:  Does that leave you with any
14    feelings or inability to --
15              THE JUROR:  I was bitter.  I was bitter that was
16    allowed to happen.  I was told by people who I gave my
17    information to this couldn't happen, but it did.
18              THE COURT:  Would you be able to put that
19    experience aside and judge the evidence here?
20              THE JUROR:  I don't think so.  It was pretty
21    frustrating.
22              THE COURT:  Okay.  Thank you.
23              THE JUROR:  Thank you.
24              (The juror is excused.)
25              (In open court:)
```

```
 1              THE CLERK:  Jamie Jeanson.
 2              (Discussion at sidebar and out of the hearing of
 3     the jury:)
 4              THE COURT:  Connection with law enforcement of
 5     some kind, did you say?
 6              THE JUROR:  I work for the Lowell District
 7     Court.
 8              THE COURT:  It says you're a case specialist?
 9              THE JUROR:  Yes.
10              THE COURT:  What is that?
11              THE JUROR:  I enter all the data from all the
12     cases that come downstairs in the criminal department.
13              THE COURT:  On the criminal side?
14              THE JUROR:  Yeah.
15              THE COURT:  Would that have any effect on your
16     ability to be a fair-minded juror in a criminal case?
17              THE JUROR:  I would probably side with the
18     courts.
19              THE COURT:  Well, the Court's in the middle.
20              THE JUROR:  I know.  But I'm saying like -- I
21     don't know.  I mean, it probably wouldn't affect it that
22     much, but it depends.
23              THE COURT:  You also said you have some concern
24     about the schedule?
25              THE JUROR:  Yeah, I have a wedding to go to in
```

1    Nantucket, it's on a Friday; and then the rehearsal

2    dinner is on a Wednesday.

3              THE COURT:  When is that?

4              THE JUROR:  It is the 19th.  I wasn't sure if

5    that would --

6              THE COURT:  The 19th is?

7              THE JUROR:  Like the 18th and 19th.

8              THE COURT:  Two, nine, 16.  The end of the third

9    week.  So what would -- you'd have to be away --

10             THE JUROR:  From that Wednesday to Friday.

11             THE COURT:  -- from the Wednesday to Friday?

12             THE JUROR:  Uh-huh.

13             THE COURT:  Okay.  Thank you.

14             THE JUROR:  Okay.

15             (The juror is excused.)

16             (In open court:)

17             THE CLERK:  Michael Levesque.

18             (Discussion at sidebar and out of the hearing of

19    the jury:)

20             THE JUROR:  Hi.

21             THE COURT:  Do you recognize somebody on the

22    witness list?

23             THE JUROR:  Yeah.  Adams in Rockland and Joseph

24    Iantosca of Braintree.  I'm a UPS man.  I'm a cover

25    driver.  I know about 50-something routes.  I get out

1  and visit lots of people.

2          THE COURT:  And so those people are people

3  you've made deliveries to?

4          THE JUROR:  I've met Mr. Iantosca and I'm pretty

5  sure I've met Mrs. Adams in Rockland a few times.

6          THE COURT:  Would that affect your ability to be

7  an impartial juror in this case?

8          THE JUROR:  Not towards that, no.

9          THE COURT:  Okay.  Connection with state law

10 enforcement of some kind?

11         THE JUROR:  I know about 20 cops.  I have a

12 state trooper who lives down the street from me; my

13 next-door neighbor's a town cop; people behind me are an

14 FBI guy; my sister-in-law is a dispatcher for a police

15 department; some of my best friends are policemen.

16         THE COURT:  And would that affect your

17 impartiality in a case?  Would you tend to side with the

18 prosecution side of the case without hearing the

19 evidence or would you be able to hear the evidence

20 and --

21         THE JUROR:  I could weigh through it.

22         THE COURT:  So you don't think it would have any

23 effect?

24         THE JUROR:  I don't think it would.

25         THE COURT:  I think you also said you may

PDF created with pdfFactory trial version www.pdffactory.com

1    have -- somebody close to you may have been the victim

2    of a fraud?

3            THE JUROR:  I'm currently in the sub-prime

4    mortgage mess.  I have a really shitty mortgage.  And

5    I've been fighting it for almost two years now.  I'm

6    working as many hours as I can; I'm the sole provider in

7    my family.  And I don't have a lot of good things to say

8    about people who try to defraud other people who work

9    hard for a living and try to make ends meet and are

10   struggling each and every day to make ends meet.

11           THE COURT:  Okay.  And you also answered -- I

12   have a very general question about whether you had any

13   experience or attitudes or beliefs that would interfere

14   with your ability to be impartial.  Is that what you're

15   just talking about?

16           THE JUROR:  That has to go with that, yeah.

17           THE COURT:  And you also, then, said that you

18   were concerned about the schedule?

19           THE JUROR:  Next week -- I get three weeks a

20   year vacation.  And I'm supposed to see some family up

21   in Maine for a couple of days next week.  Just my

22   godparents.  I don't get up there often, but it's a

23   much-needed retreat.

24           THE COURT:  Okay.  Thank you.

25           THE JUROR:  Thank you.

1            (The juror is excused.)

2            (In open court:)

3            THE CLERK:  Edward Lucas.

4            (Discussion at sidebar and out of the hearing of

5    the jury:)

6            THE COURT:  Hi.

7            THE JUROR:  Hi.

8            THE COURT:  You said somebody close to you had

9    been victimized by fraud?

10           THE JUROR:  Yeah.  My fiancée was -- was the

11   victim of credit card fraud.

12           THE COURT:  Tell me about it.

13           THE JUROR:  Somebody took her card numbers and

14   used it to purchase gas in Connecticut, New Jersey, New

15   York.

16           THE COURT:  And what happened?  Did she report

17   it?

18           THE JUROR:  Yeah, she reported it.

19           THE COURT:  And what happened?

20           THE JUROR:  I think they're still going through

21   it.

22           THE COURT:  How much was involved?

23           THE JUROR:  $800.

24           THE COURT:  Would that have an effect on your

25   ability to be an impartial juror in a case like this?

```
 1          THE JUROR:  Yeah, it would, because we have a

 2   child, and that's like taking money out of my mouth and

 3   my child's.

 4          THE COURT:  I guess the question is:  Would you

 5   be able to put aside those personal feelings and judge

 6   the evidence here or would you be affected by that?

 7          THE JUROR:  Yeah, sure.  I can.  But that's the

 8   extent of it.

 9          THE COURT:  Okay.  Thank you.

10          THE JUROR:  Thank you.

11          (The juror is excused.)

12          (In open court:)

13          THE CLERK:  Keith Cabral.

14          (Discussion at sidebar and out of the hearing of

15   the jury:)

16          THE JUROR:  Good morning.

17          THE COURT:  Hi.  Someone close to you had been

18   the victim of a crime?

19          THE JUROR:  Myself.  My house was robbed and

20   ransacked.

21          THE COURT:  When was this?

22          THE JUROR:  Seven years ago.

23          THE COURT:  And was anyone prosecuted?

24          THE JUROR:  No, they never caught anybody.

25          THE COURT:  Does that affect your ability to be
```

1    an impartial juror in a criminal prosecution --

2            THE JUROR:  No, I don't think so.

3            THE COURT:  -- like this?

4            You're concerned about the schedule?

5            THE JUROR:  For two reasons:  I was just

6    discharged from the hospital about a week and a half

7    ago, and I have follow-up appointments in two weeks for

8    upper-GI and lower-GI exams.

9            THE COURT:  Do you know the exact date?

10           THE JUROR:  It's the week of -- the week of --

11   not next week, the week after.  So the first, second --

12           THE COURT:  The 16th?

13           THE JUROR:  The 16th.

14           THE COURT:  Do you know when it is that week?

15           THE JUROR:  The 18th.  Wednesday.

16           THE COURT:  Is it a morning, afternoon?

17           THE JUROR:  It's a morning appointment.

18           THE COURT:  And is it something that could be

19   moved?

20           THE JUROR:  I can check with the surgeon.

21           THE COURT:  It's a follow-up, you say?

22           THE JUROR:  Yeah.  I had an obstruction, and

23   they don't know what caused it.

24           And the other thing, from a financial

25   standpoint, unless my employer's willing to cover my

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    salary, it would be a very big financial burden for me.
 2    I'm in the process of walking away from a condo in
 3    Florida, so I'm trying to save money for attorneys'
 4    fees.
 5            THE COURT:  Okay.  Great.  Thanks.
 6            (The juror is excused.)
 7            (In open court:)
 8            THE CLERK:  Thomas Landon.
 9            (Discussion at sidebar and out of the hearing of
10    the jury:)
11            THE COURT:  Hi.  Do you recognize somebody on
12    the witness list?
13            THE JUROR:  I had a boss, William Ely, who lived
14    in Boston.  I don't know it's the same one or not:
15    sergeant, 107 fighter wing.
16            MR. PIROZZOLO:  I don't think it's this one.
17            THE JUROR:  I didn't catch the middle initial.
18            THE COURT:  You said you or somebody close to
19    you had been a victim of a crime?
20            THE JUROR:  Yeah, I had been sexually assaulted,
21    raped when I was eight years old by a YMCA camp
22    director.  He never did any jail time or paid any fines,
23    and paid me an insulting amount of money 25 years later
24    after I spent about 200 grand in therapy.
25            THE COURT:  There was a prosecution?
```

1          THE JUROR:  No.  Statute of limitations was

2     gone.  There was a civil trial.  The same guy who --

3     John Stobierski, who took down the diocese there in

4     Western Mass.

5          THE COURT:  Does that leave you with feelings

6     that would interfere with your ability to be a fair

7     juror in a case like this?  Would you be able to fairly

8     judge the evidence?

9          THE JUROR:  I don't think we have two U.S.

10    attorneys and all of these expensive people sitting here

11    because nobody did anything.  That's just the way I

12    think.  But I'm a military guy.  So does that make me

13    biased?  I don't know.  I know it's the country's burden

14    to prove it beyond a reasonable doubt, but we don't

15    usually end up in the Moakley court building because

16    nobody did anything.

17         THE COURT:  You said also that somebody close to

18    you had been accused of a crime?

19         THE JUROR:  I had a juvenile record of breaking

20    and entering, larcenies that were sealed, and at UMass I

21    had an alcohol-related incident, before I got sober,

22    that I got charged and got continued without a finding.

23    But I have a clean CORI, because I've worked in law

24    enforcement for the Air Force as well, so...  Just on

25    the 9 /11 activation and sporadically.

```
 1          THE COURT:  Uh-huh.  And finally, you said you
 2     had a concern about the schedule?
 3          THE JUROR:  Yeah.  I'm on military duty on
 4     Barnes where we move the planes to this Thursday and
 5     Friday.  It's an exercise that we do every two to three
 6     years for when we get deployed to war.  And I also am
 7     taking my kids on a veterans' fishing trip out of
 8     Peotone this Sunday for Iraqi and Afghanistan vets,
 9     which I served in Iraq in '04 and '05.  And I really
10     don't want to tell them I can't go because I'm here.
11          I have -- and the regular stuff is that I have
12     two-, four-, six-, ten- daughters and 15- and
13     17-year-old stepsons, and I run a landscaping company to
14     pay my $500,000 debt.  And I don't think we need to talk
15     about whether the grass is growing now in Maine, but I
16     only have one employee and me, when I'm not doing my
17     federal job, is Monday through Thursday, and my military
18     job is the weekends, or when we go to war, and then I
19     run that company.  And I rode my motorcycle in from
20     Wellfleet.  So I don't know if that falls under
21     hardship, but that's my life.
22          THE COURT:  All right.  Thank you.
23          THE JUROR:  Thank you, sir.
24          (The juror is excused.)
25          THE COURT:  I think we skip to 17?
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            THE CLERK:  Yeah.

 2            (In open court:)

 3            THE CLERK:  Francesca Tramontozzi.

 4            (Discussion at sidebar and out of the hearing of

 5     the jury:)

 6            THE COURT:  Good morning.

 7            THE JUROR:  Good morning.

 8            THE COURT:  You answered several questions.

 9     We'll start with the first one, was connection with

10     state law enforcement of some sort.

11            THE JUROR:  U.S. district attorney John

12     Tramontozzi, he's my husband's first cousin.

13            THE COURT:  And where is he?

14            THE JUROR:  Where is he?

15            THE COURT:  Where does he work?

16            THE JUROR:  Well, he's a U.S. attorney.  So I

17     wasn't sure if that had anything to do with --

18            THE COURT:  Boston?

19            THE JUROR:  I believe it's Boston.  I'm not

20     totally sure, but I believe it is.

21            THE COURT:  Okay.

22            THE JUROR:  He's from the Brighton area, so...

23            THE COURT:  Would that have any effect on your

24     ability to be an impartial juror?

25            THE JUROR:  I don't believe so, but I just
```

1    thought I'd offer it.

2        THE COURT:  Let me just ask:  We have some very

3    rudimentary information about jurors, and it says name

4    and address and so on.  So it usually gives us what your

5    occupation or employment is.  For you it says

6    "unemployed"?

7        THE JUROR:  Yes.  Yes, I'm home.

8        THE COURT:  Have you had previous employment,

9    and if so, what did you do?

10        THE JUROR:  With schools.  Yes, I worked with

11   private schools, private Christian schools, where my

12   children went, basically.  I basically was employed

13   there.  Right now I'm doing volunteer, though, at the

14   school where my child is right now.

15        THE COURT:  Okay.  And you said someone close to

16   you had been accused of a crime?

17        THE JUROR:  Yeah.  And committed and convicted.

18   My brother Joseph Lagotto (ph).

19        THE COURT:  And what was that?

20        THE JUROR:  Drugs.

21        THE COURT:  And when?  How long ago?

22        THE JUROR:  Oh, it could have even been within

23   the last three years, two years.

24        THE COURT:  Recent?

25        THE JUROR:  Yes, recent.  And many years prior.

1   Maybe up to ten, 20 years?  He's been -- you know, his

2   children were small -- buying and selling drugs.

3           THE COURT:  What's his situation right now?

4           THE JUROR:  Well, right now he's -- I don't know

5   if he's involved in anything.  It's always hard to tell.

6   But he's divorced.  He doesn't have his family.  He's

7   all alone, basically.

8           THE COURT:  Do you see him very much?

9           THE JUROR:  I do see him, yes.  He comes to the

10  house for a meal.

11          THE COURT:  Would that have any effect on your

12  ability to be a fair and impartial juror?

13          THE JUROR:  I don't believe so, but I thought it

14  was important to offer that information.

15          THE COURT:  You're absolutely right.

16          You also have a concern about the schedule?

17          THE JUROR:  Yeah, because for the family needs.

18  Basically my husband took the day off for me to come in

19  here because we have a daughter that has to be taken

20  care of.

21          THE COURT:  What does he do?

22          THE JUROR:  He works for Home Depot, and he also

23  works for a cleaning company.  He works in the customer

24  service department.

25          THE COURT:  You have a young child at home?

```
 1          THE JUROR:  I have an 11-year-old.  And so he
 2   has to take time off in order to take her to school and
 3   bring her home and all.  And he told me today really he
 4   can't really take any time off.
 5          THE COURT:  So if you were here on a nine-to-one
 6   schedule, would you be able to drop her off and pick her
 7   up in the afternoons?  What time does she --
 8          THE JUROR:  To get back to Arlington -- I'd need
 9   to be in Arlington by 2:40.
10          THE COURT:  And what time does she go to school
11   in the morning?
12          THE JUROR:  She's there by 7:55.
13          THE COURT:  Okay.  Thank you.
14          (The juror is excused.)
15          (In open court:)
16          THE CLERK:  Joseph Capezzuto.
17          (Discussion at sidebar and out of the hearing of
18   the jury:)
19          THE COURT:  Good morning.
20          THE JUROR:  Good morning.
21          THE COURT:  You answered a number of our
22   questions.  One is connection with law enforcement?
23          THE JUROR:  I have a maternal uncle who's a
24   retired state police officer; I have a cousin through
25   marriage who's a Boston police officer; I have an
```

PDF created with pdfFactory trial version www.pdffactory.com

1    acquaintance who is an assistant district attorney, I

2    believe in Suffolk County, District Attorney's Office.

3         THE COURT:  Would any of those relationships

4    interfere with your ability to be impartial?

5         THE JUROR:  I don't think so, no.

6         THE COURT:  Let me just ask you:  You're an

7    attorney?

8         THE JUROR:  Yes.

9         THE COURT:  At Camp, Dresser & McKee?

10        THE JUROR:  Yes.

11        THE COURT:  What do you do there?

12        THE JUROR:  In-house legal counsel.  We do

13   contract negotiations -- we do mostly civil matters.

14   Civil matters.  Anything that comes across our desk, we

15   handle.

16        THE COURT:  Have you ever been involved in

17   criminal prosecutions, defense?

18        THE JUROR:  No.

19        THE COURT:  I think you also told us that

20   somebody close to you had been a victim of a crime?

21        THE JUROR:  Yes.  My younger brother was a

22   victim of an assault and battery, and he was in a coma

23   for nearly a month.  He's also the same individual who

24   was accused of a crime.  And he had been arrested and

25   convicted and served time for a crime.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              THE COURT:  What crime?
 2              THE JUROR:  Drug possession, assault and battery
 3    himself.  And my mother was also mugged herself walking
 4    home from work.
 5              THE COURT:  And was anybody prosecuted in that?
 6              THE JUROR:  No, they never found out who did it.
 7              THE COURT:  Any of those family issues with the
 8    justice system have any impact on your impartiality as a
 9    juror?
10              THE JUROR:  I don't think so, no.
11              THE COURT:  What's your brother doing now?
12              THE JUROR:  He's dead.
13              THE COURT:  I'm sorry to hear that.
14              Okay.  Thank you.
15              THE JUROR:  Thank you.
16              (The juror is excused.)
17              (In open court:)
18              THE CLERK:  Spencer Kalker.
19              (Discussion at sidebar and out of the hearing of
20    the jury:)
21              THE COURT:  Hi.
22              THE JUROR:  Hi.
23              THE COURT:  Before I get to the questions you
24    answered, we have some basic information about people
25    which gives employment and so on.
```

1              THE JUROR:  Yes.

2              THE COURT:  It describes you, helpfully, as a

3       consultant.  That doesn't tell us much.

4              THE JUROR:  Basically I do showroom design.  And

5       I own my own business and travel around the country and

6       work with independent retailers in developing their

7       businesses.

8              THE COURT:  Doing in-store setups?

9              THE JUROR:  Yes, exactly.  And architectural

10      designs and things like that.

11             THE COURT:  You said you had a connection with

12      law enforcement?

13             THE JUROR:  Yes.  My niece is an officer in the

14      Countryside Police Department, just outside of Chicago.

15      She's actually in Iraq right now, but...  She's on leave

16      from there.

17             THE COURT:  All right.  And you also said that

18      somebody had been a victim of fraud?

19             THE JUROR:  Yeah, I actually made some

20      investments in Fans Rule, which is a case that went down

21      a while ago in Boston, I believe.  A company that was a

22      fan club.  And I had an investment in that.  And I

23      believe there was fraud in that.  And I lost my

24      investment in that.

25             THE COURT:  How much was that?

1            THE JUROR:  $25,000.

2            THE COURT:  And that was recent, you said?

3            THE JUROR:  Two years ago, three years ago.

4            THE COURT:  Was there any official investigation

5    done?

6            THE JUROR:  No, there was not.  I believe the

7    company went bankrupt, and basically the owners

8    absconded with the money.

9            THE COURT:  Would that experience interfere with

10   your impartiality in a case like this?

11           THE JUROR:  I would say no.  No.  I mean, it

12   happens.

13           THE COURT:  You also expressed concern about the

14   schedule.

15           THE JUROR:  Again, because of my -- I cleared my

16   next -- this week and next week, but I'm a little bit

17   concerned about it going longer than that because I

18   basically have no income if I'm not doing my job.  And

19   being in the morning, I can still work in the afternoons

20   and evenings, which isn't a problem.

21           THE COURT:  So basically you're a sole

22   practitioner.  Is that it?

23           THE JUROR:  I have a couple of people who work

24   for me as independent contractors, but I basically work

25   out of my house and travel.

```
 1          THE COURT:  Okay.  Thank you.

 2          THE JUROR:  Thank you.

 3          (The juror is excused.)

 4          (In open court:)

 5          THE CLERK:  Roselmo Pessote.

 6          (Discussion at sidebar and out of the hearing of

 7    the jury:)

 8          THE COURT:  Good morning.

 9          THE JUROR:  Good morning.

10          THE COURT:  Connection with state law

11    enforcement?

12          THE JUROR:  No.

13          THE COURT:  No?  I must have written that down

14    wrong.  You have a concern about the schedule?

15          THE JUROR:  Actually, my concern is about the

16    language.  Because I was born in Brazil, and I never got

17    an education here.  So I do speak English.  You know, I

18    can read but I cannot write, you know, not properly.

19          THE COURT:  You can read, you say?

20          THE JUROR:  I can.

21          THE COURT:  If you see it, you can translate it

22    or understand it?

23          THE JUROR:  Yes.  Yes.

24          THE COURT:  How have you done this morning as

25    we've been talking?  Have you been able to understand
```

```
 1  me?
 2          THE JUROR:  Sure, absolutely.  Yes.
 3          THE COURT:  A little personal history:  How long
 4  have you been in the U.S.?
 5          THE JUROR:  It's going to be 14 years in June.
 6  Yes.
 7          THE COURT:  And what kind of work do you do?
 8          THE JUROR:  Construction supervisor.
 9          THE COURT:  Okay.  Well, it sounds to me like
10  you're doing pretty well.  I mean, if you had some
11  concern --
12          THE JUROR:  No, just if I had to write.
13          THE COURT:  No, I appreciate it.
14          (The juror is excused.)
15          (In open court:)
16          THE CLERK:  Ann Hanlon.
17          (Discussion at sidebar and out of the hearing of
18  the jury:)
19          THE COURT:  Law enforcement?
20          THE JUROR:  My father-in-law, retired Boston
21  sergeant.  Police sergeant.
22          Why am I nervous?
23          THE COURT:  Retired how long?
24          THE JUROR:  At least 20 years now.
25          THE COURT:  Oh, okay.  Would that have any
```

1    effect on your --

2         THE JUROR:  No.  No.  But you asked, and I had

3    to say "yes."

4         THE COURT:  That's why we ask.

5         THE JUROR:  Hardship.

6         THE COURT:  Yeah.

7         THE JUROR:  I have a ten-year-old son and a

8    76-year-old blind mother that lives with me.  And I just

9    think that three weeks might be a little bit long for me

10   to be away.

11        THE COURT:  Your son is ten, you say?

12        THE JUROR:  Ten.

13        THE COURT:  He's in school?

14        THE JUROR:  Yeah, fourth grade.

15        THE COURT:  And what are his hours?

16        THE JUROR:  Nine to three.

17        THE COURT:  Okay.  And what does your mother do?

18   Does she have help besides you?

19        THE JUROR:  No.

20        THE COURT:  And she lives with you, is that what

21   you --

22        THE JUROR:  She lives with me.  I can leave for

23   a few hours; I just don't know if 15 days' worth of a

24   few hours would be good.  But I can always try to

25   squeeze together something if I had to.  But you asked,

PDF created with pdfFactory trial version www.pdffactory.com

1  again.

2          THE COURT:  Fine.  Thank you.

3          Medical technologist is -- any specialty?

4          THE JUROR:  Microbiology.  I work in a

5  laboratory.

6          THE COURT:  Okay.  Thanks.

7          THE JUROR:  Okay.  Thank you.

8          (The juror is excused.)

9          (In open court:)

10         THE CLERK:  Christopher Ruigomez.

11         (Discussion at sidebar and out of the hearing of

12  the jury:)

13         THE COURT:  Good morning.

14         THE JUROR:  Good morning, your Honor.

15         THE COURT:  You're concerned about the schedule?

16         THE JUROR:  Yes.  I have a seven-year-old son

17  who has autism.  I have a letter from his psychiatrist

18  about not being able to be in touch.  As well as he has

19  a very important school meeting on the 16th at 8 a.m.

20         THE COURT:  With respect to your son, I mean,

21  it's an availability issue, is that it?  You have to be

22  available?

23         THE JUROR:  It's availability -- I have

24  flexibility at work, but also there's an important

25  meeting where we have to decide --

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  I'm going to come back to the

2     meeting, but generally.

3          THE JUROR:  If there's a problem, generally the

4     schedule would be fine.  It's really the length.

5          THE COURT:  Now, about the particular meeting

6     is -- when is it?

7          THE JUROR:  June 16th at 8 a.m.  It's an

8     individualized education plan meeting to decide whether

9     we're going to continue --

10          THE COURT:  Where is that?

11          THE JUROR:  Keith School in Brookline.

12          THE COURT:  And how long do you think that

13     meeting will be?

14          THE JUROR:  That meeting will be an hour, hour

15     and a half at the very most.

16          THE COURT:  Okay.  Thanks.

17          THE JUROR:  Okay.  Thank you.

18          (The juror is excused.)

19          (In open court:)

20          THE CLERK:  Eileen Polin.

21          (Discussion at sidebar and out of the hearing of

22     the jury:)

23          THE COURT:  Good morning.

24          THE JUROR:  Good morning.

25          THE COURT:  You answered a couple of our

```
 1    questions.  Let me just find it here.

 2              THE CLERK:  She's Number 25.

 3              THE COURT:  I had it and lost it.  You were a

 4    victim of fraud?

 5              THE JUROR:  I have a few things.

 6              THE COURT:  Okay.

 7              THE JUROR:  Excuse me.  I get very emotional.  I

 8    don't mean to, but I have a habit of it.

 9              My mother was sent to a nursing home for

10    rehabilitation.  Boston Rehab, actually.  She went there

11    to get physical therapy so she could walk again.  She

12    came out of there bedridden.  And I had a lawyer who

13    supposedly was supposed to help me because there was

14    money owed on her stay there because her insurance

15    company wouldn't pay.  He did a lousy job.

16              Also, the lawyer to the Boston Rehab Center made

17    it possible that I could not countersue for what they

18    did to her.  And I found out she had a stroke there,

19    okay?  So it left me feeling very agitated, and I felt

20    that she was being taken advantage of.

21              I'm sorry, my throat's going on me.

22              And I had taken her case to another lawyer, and

23    instead of helping me, he called me back -- when I

24    called him -- he actually downgraded me and made me feel

25    like two cents.  So I don't have very much, I hate to
```

```
 1    say it, confidence in lawyers at all when it comes to

 2    certain things because of both instances.

 3              THE COURT:  Okay.

 4              THE JUROR:  Okay?

 5              THE COURT:  One of the other questions you

 6    answered was about the schedule in the case.

 7              THE JUROR:  The schedule.  I am very tight on

 8    money, okay?  I have a part-time job and I have just

 9    enough to barely pay my part of the rent and give my

10    daughter the rest for food and bills.

11              I'm also a diabetic and I'm supposed to have,

12    like, six meals a day, small ones.  So when I'm in

13    court, if I don't have it, I sometimes get light-headed

14    and dizzy.  The last time I was at court I actually

15    almost fainted and the guard had to bring me -- one of

16    the officers was nice enough to bring me some water

17    until I actually felt better.

18              THE COURT:  Okay.  Thank you very much.

19              THE JUROR:  You're welcome.

20              (The juror is excused.)

21              MR. MITCHELL:  Your Honor, there's one juror

22    who's raising her hand to get your attention.  Paul?

23              (There is an interruption in the proceedings.)

24              THE CLERK:  Judge, the CSO just mentioned that

25    the woman, Number 7, doesn't speak English, and she
```

```
 1   didn't understand that if she had problems she was to

 2   raise her hand.

 3            THE COURT:  Fine.  We'll come back to her.

 4            THE CLERK:  Do you want to keep going on?

 5            THE COURT:  Yes, let's keep going on.

 6            (In open court:)

 7            THE CLERK:  Susan Dempsey.

 8            (Discussion at sidebar and out of the hearing of

 9   the jury:)

10            THE COURT:  Let's see.  Hi.

11            THE JUROR:  Hi.

12            THE COURT:  Somebody close to you a victim of

13   fraud?

14            THE JUROR:  Yes, myself.

15            THE COURT:  Okay.  Tell us a little bit about

16   it.

17            THE JUROR:  I had some credit card fraud against

18   me, about $2,000, that I'm still fighting with the

19   credit card company about.

20            THE COURT:  This was done recently, I guess?

21            THE JUROR:  Yeah, over the last couple of

22   months.  It's ridiculous I've -- how much I have to

23   fight against this, but...  And I also have a cousin who

24   had some credit card fraud through eBay.

25            THE COURT:  This is people using your credit
```

1    card?

2            THE JUROR:  This was somebody using my credit

3    card.

4            THE COURT:  Stealing your credit card account

5    number?

6            THE JUROR:  Yeah.

7            THE COURT:  Would that affect your ability to be

8    an impartial juror in a case like this?

9            THE JUROR:  Yeah, because it's irritating how

10   much time I have to spend fighting for something that I

11   didn't even do.  So I mean, it's -- yeah, because I

12   didn't expect this, so...

13           THE COURT:  Okay.  You also said you have some

14   concern about the schedule?

15           THE JUROR:  I do.  I have -- right now I'm

16   self-employed, but I have a second interview with a

17   company out of Albany Thursday and Friday of this week.

18   I have a couple of interviews set up next week for a few

19   sales jobs that I'm looking into.  And I have a

20   scheduled vacation to Burlington, Vermont, the week of

21   June 21st.

22           THE COURT:  Okay.  Thank you.

23           THE JUROR:  Thank you.

24           (The juror is excused.)

25           (In open court:)

```
 1            THE CLERK:  Rebecca Hodges.
 2            (Discussion at sidebar and out of the hearing of
 3   the jury:)
 4            THE COURT:  Good morning.
 5            THE JUROR:  Hi.
 6            THE COURT:  Someone had been accused of a crime?
 7            THE JUROR:  My ex-boyfriend was charged with
 8   felonious sexual assault and he was on trial.  I
 9   testified and he was found innocent.
10            THE COURT:  When was this?
11            THE JUROR:  Two years ago.
12            THE COURT:  And where was the case?
13            THE JUROR:  In New Hampshire.
14            THE COURT:  New Hampshire?  Does this experience
15   leave you with any feelings about the system or anything
16   else that would affect your ability to be an impartial
17   juror in a case like this?
18            THE JUROR:  No.
19            THE COURT:  Okay.  Thank you.
20            (The juror is excused.)
21            (In open court:)
22            THE CLERK:  Elaine Blais.
23            (Discussion at sidebar and out of the hearing of
24   the jury:)
25            THE COURT:  Good morning.
```

```
 1          THE JUROR:  Good morning, your Honor.  How are
 2    you?
 3          THE COURT:  Good.  What kind of law do you
 4    practice?
 5          THE JUROR:  Patent litigation.
 6          THE COURT:  And your husband is an attorney?
 7          THE JUROR:  He is.
 8          THE COURT:  What does he do?
 9          THE JUROR:  He's in-house counsel at Lycos
10    Internet company.
11          THE COURT:  Also for intellectual property?
12          THE JUROR:  Some intellectual property.
13          THE COURT:  You answered a couple of questions.
14    I think one was about state law enforcement connections?
15          THE JUROR:  Yes.  My husband's cousin is a
16    police officer in Middleboro.
17          THE COURT:  Okay.  Somebody you see regularly
18    or --
19          THE JUROR:  Yes.
20          THE COURT:  Would that affect your ability to be
21    an impartial juror?
22          THE JUROR:  I don't think so.
23          THE COURT:  And the other was someone accused of
24    a crime?
25          THE JUROR:  Yeah.  My uncle's actually under
```

```
 1    investigation by the U.S. Attorney's office in the
 2    District of Maryland for criminal violation of the Lacey
 3    Act.  We expect him, essentially, to be indicted this
 4    summer.  And it's kind of a big issue in our family.  So
 5    I think I can be impartial but --
 6              THE COURT:  Have you been involved at all?  Have
 7    people been speaking --
 8              THE JUROR:  I have spoken with him and made sure
 9    he has a good attorney and that sort of thing, yeah.
10              THE COURT:  And that's at the grand jury stage,
11    is that it, at this point?
12              THE JUROR:  I'm not exactly sure.  I believe
13    that's right.
14              THE COURT:  He hasn't been charged yet but he
15    expects to be charged?
16              THE JUROR:  They've extended the statute through
17    July, so he can be indicted any time now.
18              THE COURT:  Would you be able to isolate this
19    case and judge this case on its merits?
20              THE JUROR:  I believe I could, yes.
21              THE COURT:  Okay.  Thanks.
22              THE JUROR:  Okay.  Thank you.
23              (The juror is excused.)
24              (In open court:)
25              THE CLERK:  Elaine Joyce.
```

```
 1            (Discussion at sidebar and out of the hearing of
 2      the jury:)
 3            THE JUROR:  Hello.
 4            THE COURT:  Good morning.  Connection with
 5      state -- I'm sorry.  I've got the -- yeah, state law
 6      enforcement.
 7            THE JUROR:  I worked for the Somerville Police
 8      Enforcement, 9-1-1 operator.  It was over ten years ago.
 9      I just thought I should tell you.
10            THE COURT:  Would that have any effect on your
11      impartiality as a juror?
12            THE JUROR:  No.
13            THE COURT:  Okay.  Thank you.
14            THE JUROR:  Thanks.
15            (The juror is excused.)
16            (In open court:)
17            THE CLERK:  Carol Cahill.
18            (Discussion at sidebar and out of the hearing of
19      the jury:)
20            THE JUROR:  Good morning.
21            THE COURT:  Good morning.  You're concerned
22      about the schedule?
23            THE JUROR:  Yes, the length of time, actually.
24      I work at a mental health clinic, services department of
25      mentally ill, chronic psychotic patients.  And three
```

```
 1   weeks is a long time to be away.  And, you know, we
 2   don't even take vacations, usually, for more than one
 3   week to ten days, and we have another psychiatrist going
 4   on vacation, you know, next week.
 5          I also have a brother starting chemotherapy
 6   again next week, so I'm pretty --
 7          THE COURT:  With respect to the work issue, does
 8   the nine-to-one sort of half-day schedule help at all?
 9          THE JUROR:  Not too much.  We see patients in
10   large clinics that we share.  So if more than one of us
11   is away at a time, it's burdensome because other people
12   have to see their patients plus mine.  I don't -- I
13   can't reschedule them; it's not like a private practice.
14          THE COURT:  Thanks.
15          (The juror is excused.)
16          (In open court:)
17          THE CLERK:  John Doyle.
18          (Discussion at sidebar and out of the hearing of
19   the jury:)
20          THE COURT:  Good morning.
21          THE JUROR:  Good morning.
22          THE COURT:  Victim of fraud.  Somebody close to
23   you?
24          THE JUROR:  I lost a beachfront property about
25   30 years ago.
```

 1          THE COURT:  Tell me a little bit about the

 2    circumstances.

 3          THE JUROR:  Friends of the family offered to

 4    sell it to me for about $48,000.  It was right on

 5    oceanfront in Onset.  Winokur & Winokur, the attorneys

 6    representing the bank -- because I needed to obtain half

 7    of the financing in a loan.  Winokur & Winokur did the

 8    title search.  The attorney for Winokur & Winokur told

 9    me that he would never be able to provide a clear title,

10    and clear title would be needed for the financing, so I

11    passed on the property.

12          Three months later the same attorney made an

13    offer to the people for half the money for the property

14    claiming he'd at least take a stab at it, and ended up

15    claiming the title three weeks later.  So I don't really

16    like attorneys.

17          THE COURT:  Did you take any action as a result

18    of that?

19          THE JUROR:  As Caesar said, "Who guards the

20    guards?"

21          THE COURT:  Would that affect your ability to be

22    impartial in a case like this?

23          THE JUROR:  Fraud?  Yeah.

24          THE COURT:  Okay.  Thank you.

25          (The juror is excused.)

PDF created with pdfFactory trial version www.pdffactory.com

1          (In open court:)

2          THE CLERK:  Margaret Wheeler.

3          (Discussion at sidebar and out of the hearing of

4    the jury:)

5          THE JUROR:  Good morning.

6          THE COURT:  Hi.  You answered a couple of

7    questions.  One was about somebody being the victim of a

8    crime?

9          THE JUROR:  Yes.  My parents' house was broken

10   into and extensive personal property was stolen.

11         THE COURT:  When was that?

12         THE JUROR:  That was in the mid '70s.

13         THE COURT:  And where?

14         THE JUROR:  In Armonk, New York.  In Westchester

15   County.

16         THE COURT:  Was there ever a prosecution of

17   anybody?

18         THE JUROR:  No, there was not.

19         THE COURT:  And was that the incident you had in

20   mind when I asked about that?

21         THE JUROR:  Yes.

22         THE COURT:  Also, someone accused of a crime?

23         THE JUROR:  Yes, my husband faced several motor

24   vehicle charges in the early '90s.

25         THE COURT:  What happened with those?

1          THE JUROR:  The charges were eventually

2   dismissed.

3          THE COURT:  And does that -- were you involved

4   at all?  Did you go to the court or --

5          THE JUROR:  No, I did not.

6          THE COURT:  Did that leave you with any feelings

7   that would interfere with your ability to be an

8   impartial juror?

9          THE JUROR:  No.

10          THE COURT:  I think, lastly, you were concerned

11   about the schedule?

12          THE JUROR:  Yes.  I am the healthcare proxy for

13   my 84-year-old mother who has multiple medical issues.

14   She's in the process of diagnostics for respiratory

15   illness.  The appointments began last week.  I go to all

16   medical appointments with her so that I can get

17   information for her and so that I'm informed to make

18   decisions should she not be able to.

19          THE COURT:  And she has appointments scheduled

20   in the near term?

21          THE JUROR:  If I wasn't here right now, I would

22   be following up on the CAT scan she had last week to

23   find out what the next step is.

24          THE COURT:  Okay.  Thank you.

25          THE JUROR:  Okay.  Thank you.

```
 1              (The juror is excused.)

 2              (In open court:)

 3              THE CLERK:  Maria Murphy.

 4              (Discussion at sidebar and out of the hearing of

 5      the jury:)

 6              THE JUROR:  Hi.

 7              THE COURT:  Good morning.

 8              THE JUROR:  Good morning.

 9              THE COURT:  You said that somebody close to you

10      had been a victim of a crime?

11              THE JUROR:  It was a friend of mine.  She got

12      murdered.  I wasn't too sure about if that's the

13      question.

14              THE COURT:  When was that?

15              THE JUROR:  I believe it was in 1995.

16              THE COURT:  Where?

17              THE JUROR:  Somerville.

18              THE COURT:  And was anyone arrested or

19      prosecuted for that?

20              THE JUROR:  Yes, there was.  It was a young boy.

21              THE COURT:  And what happened?

22              THE JUROR:  I think he strangled her.

23              THE COURT:  No.  But his case:  Was he

24      convicted?

25              THE JUROR:  Yeah, he was convicted.
```

 1              THE COURT:  Did you take part at all in the

 2    trial?

 3              THE JUROR:  No.  At the time I wasn't even

 4    living here; I was living in Brazil.  She was a friend

 5    of mine.

 6              THE COURT:  Does that leave you with any

 7    feelings that would interfere with your ability to be a

 8    fair juror?

 9              THE JUROR:  Probably, yes.

10              THE COURT:  How so?

11              THE JUROR:  Can you repeat the question?  I'm

12    sorry.  I'm a little bit nervous.

13              THE COURT:  That experience, having had someone

14    close to you in that situation, would that affect your

15    ability to be a fair juror in a case like this?

16              THE JUROR:  Maybe no.

17              THE COURT:  You said you were concerned about

18    the schedule?

19              THE JUROR:  Yes, because I have three young

20    children.  The ages are eight, ten and 11.  And my

21    husband works long hours so I'm the one who takes them

22    to school and, you know, drops them off and picks them

23    up.

24              THE COURT:  Do they go to the same school or

25    different schools?

1          THE JUROR:  One is in middle school.  So two of

2     them in the same school and one is in middle school.

3          THE COURT:  And if you were on a schedule here

4     of nine to one, would that leave you time to drop them

5     off in the morning?

6          THE JUROR:  The thing is, I'll probably be

7     taking the T, and the schedule is kind of -- it's not

8     going to give me enough time to...

9          THE COURT:  Okay.  Thank you.

10          (In open court:)

11          THE CLERK:  Carol Eldridge.

12          (Discussion at sidebar and out of the hearing of

13     the jury:)

14          THE COURT:  Good morning.

15          THE JUROR:  Good morning.

16          THE COURT:  You have concerns about the

17     schedule?

18          THE JUROR:  Yes.

19          THE COURT:  Tell me about it.

20          THE JUROR:  I'm a self-employed designer getting

21     ready for a big show in Atlanta in July.  So if I'm on a

22     three-week trial, I'm not doing my work.  It's just me.

23          THE COURT:  When is the -- when's the show?

24          THE JUROR:  I leave July 9th for Atlanta.

25          THE COURT:  And what -- tell me about the show.

1    You're exhibiting your own works, is that it?

2          THE JUROR:  It's the major gift show of the

3    country.  There's one in January; there's one in July.

4    And I will be there representing a company that I do

5    some work for, also, meeting with new companies and

6    trying to get new business.  So I need to do the design

7    work before I go.  So it would be -- it would be a

8    hardship for me to do this.  Not impossible, but --

9          THE COURT:  Okay.  All right.  Thank you.

10         THE JUROR:  Thank you.  I have one question:

11   Why is everyone wearing a red tie?

12         THE COURT:  It would be an artist that would

13   observe that, I guess.

14         (The juror is excused.)

15         (In open court:)

16         THE CLERK:  Arthur Oliveira.

17         (Discussion at sidebar and out of the hearing of

18   the jury:)

19         THE JUROR:  Good morning, your Honor.

20         THE COURT:  Good morning.  Connection with law

21   enforcement?

22         THE JUROR:  My dad is a retired police officer,

23   as my brother is --

24         THE COURT:  Where were they?

25         THE JUROR:  In New Bedford.

```
 1            THE COURT:  Okay.  Would those relationships
 2   interfere with your ability to be an impartial juror?
 3            THE JUROR:  No, it wouldn't.
 4            THE COURT:  Is that it?
 5            THE JUROR:  That's it.
 6            THE COURT:  That was it.  Thank you.
 7            (The juror is excused.)
 8            (In open court:)
 9            THE CLERK:  Charles Kowalski.
10            (Discussion at sidebar and out of the hearing of
11   the jury:)
12            THE JUROR:  Hi.
13            THE COURT:  Connection with state law
14   enforcement?
15            THE JUROR:  My father-in-law is retired from the
16   state police, recently deceased.  But I wanted to make
17   sure you knew that.
18            THE COURT:  Would that affect your ability to be
19   an impartial juror?
20            THE JUROR:  I don't believe so.
21            THE COURT:  You also said that you were
22   concerned that you maybe had some experiences or beliefs
23   that may interfere --
24            THE JUROR:  I've worked for the postal service
25   for 38 years.  I'm an account manager and I deal with
```

PDF created with pdfFactory trial version www.pdffactory.com

1    financial institutions and I deal with colleges and

2    universities, major accounts of the postal service, the

3    process of the mail.

4        THE COURT:  Okay.  Would that affect your

5    ability, in a particular case, to judge whether the

6    evidence supports the government's view or not?

7        THE JUROR:  No.

8        THE COURT:  You're familiar with --

9        THE JUROR:  I believe in the sanctity of the

10   mail.

11       THE COURT:  Right.  But the question is whether

12   there was an offense committed or not.

13       THE JUROR:  Right.  That's correct; yes.

14       THE COURT:  And so the question is:  Would you

15   be able to judge the evidence and make that

16   determination without preexisting disposition to one

17   side or another?

18       THE JUROR:  I would hope so.

19       THE COURT:  Have you been involved in mail fraud

20   prosecutions?

21       THE JUROR:  No, I have not.

22       THE COURT:  And by "involved," I mean even

23   people come to talk to you about it.  Not that you're

24   running it, but, you know, an investigator might come by

25   and say --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              THE JUROR:  Some of the colleges contact me

 2     regarding mail theft, usually internal, that type of

 3     thing.

 4              THE COURT:  Physical theft of mail?

 5              THE JUROR:  Yeah.

 6              THE COURT:  And where are you stationed?

 7              THE JUROR:  Right here in Boston.

 8              THE COURT:  Okay.  All right.

 9              THE JUROR:  I have one question.  One of the

10     names on the list was Zizza?

11              THE COURT:  Yes.

12              THE JUROR:  My sister's last name is Zizza, but

13     I don't know if there's any relationship.

14              THE COURT:  First name?

15              MR. MITCHELL:  Melissa.

16              THE COURT:  In town?

17              MR. MITCHELL:  Boston.  She works at Fidelity.

18              THE JUROR:  Okay.  I'm not familiar with it, but

19     I just -- it's my sister's married name.

20              THE COURT:  Thank you.

21              (The juror is excused.)

22              (In open court:)

23              THE CLERK:  Andrew White.

24              (Discussion at sidebar and out of the hearing of

25     the jury:)
```

```
 1              THE COURT:  Hi.
 2              THE JUROR:  Hi.
 3              THE COURT:  You answered a number of our
 4    questions.  I think the first was connection with law
 5    enforcement?
 6              THE JUROR:  Yes.  My sister's husband, his two
 7    brothers are police officers.  Two very good friends of
 8    mine are police officers, and we work for them quite
 9    often.
10              THE COURT:  When you say "you work for them,"
11    your business?
12              THE JUROR:  Small business; yes.
13              THE COURT:  You're a contractor?
14              THE JUROR:  Remodeling; yes.
15              And the judge is a good friend of mine.
16              THE COURT:  Would the relationship with law
17    enforcement people influence you one way or another in
18    hearing a case?
19              THE JUROR:  Honestly, it could.  I think it
20    could.  Along with the other one, that I was a victim of
21    identity theft.
22              THE COURT:  I was just going to get to that.
23    You answered both victim of crime and victim of fraud.
24    They may be related.
25              THE JUROR:  Correct.
```

```
 1              THE COURT:  Tell us about that.
 2              THE JUROR:  That was probably about five or six
 3    year ago, and it took me about three years to get
 4    through it, to get everything cleared, which I still
 5    have to deal with now and then.
 6              THE COURT:  Were there any --
 7              THE JUROR:  There was no formal investigation
 8    that I know of other than I had to attach mailboxes and
 9    find out where things were going, which happened to be
10    around Boston.
11              THE COURT:  You also had some concern about the
12    schedule?
13              THE JUROR:  Just other than -- mainly with the
14    fact of the small business which -- a remodeling company
15    which has been really very slow in the winter and we're
16    finally starting to pick up, which isn't an issue for
17    you guys, but it is very important to myself and my
18    wife.
19              THE COURT:  Does the nine-to-one schedule help
20    you at all?
21              THE JUROR:  No.
22              THE COURT:  Do you have a crew in the field and
23    you can deal with them in the afternoons?
24              THE JUROR:  We have -- actually, I have three,
25    four guys that work for me all the time.  And I don't
```

PDF created with pdfFactory trial version www.pdffactory.com

1  have a foreman.  It's very hard to find.  So it's --

2  pretty much a lot of it depends on me.

3           THE COURT:  Okay.  Thanks.

4           THE JUROR:  Thank you.

5           (The juror is excused.)

6           (In open court:)

7           THE CLERK:  Jovita Daley.

8           THE COURT:  Good morning.

9           THE JUROR:  Good morning.

10          THE COURT:  You said you had some connection

11  with state law enforcement?

12          THE JUROR:  My father.  My father is Joseph

13  Cessa, and he works for the Milford Police Department,

14  and he's closely --

15          THE COURT:  Milford?

16          THE JUROR:  Has close connections with all of

17  the police officers through friendships and close

18  acquaintances and yadee, yadee, yadee.  And he works

19  there in the evening.  He's retired; he just works

20  because he wants to keep busy.  And he always is closely

21  related to cases and stuff because he hears everything.

22  And he's a janitor there, so he cleans it all up.  And

23  he knows too much.

24          And in a way that was kind of comfortable to me

25  because when my husband was picked up coming home from

PDF created with pdfFactory trial version  www.pdffactory.com

```
 1    work -- he was a software engineer.  You probably see
 2    this on my list.  And he was actually arrested in
 3    Foxboro, Massachusetts, for drunk and operating under
 4    the influence, and he was booked.  And he had nothing in
 5    his system; he was clean.  He was just overtired; he was
 6    trying to get home.
 7           And I went through -- this happened November
 8    1st.  I got called down to the police station, and
 9    $5,000 later -- because it got through booking, we had
10    to go through the court system -- $5,000 later to clear
11    his name, and he was innocent from the beginning.  So it
12    did not make me happy.
13           THE COURT:  Did either of those circumstances,
14    your father's connection with the police or your
15    personal experience -- do either of those have -- either
16    cause you to have some concern about your ability to be
17    impartial?
18           THE JUROR:  I'm trying to be impartial because,
19    yes, my husband's name did get cleared because he should
20    have been cleared, but it shouldn't have even gotten
21    that far.  It was a rookie cop; didn't really have
22    his -- and that's how it happened.
23           THE COURT:  I understand you have some strong
24    feelings about it.
25           THE JUROR:  So I'm trying to be impartial
```

1    understanding how it's not -- everybody's got a learning

2    curve.

3         THE COURT:  Would you be able to put aside those

4    feelings and judge the evidence?

5         THE JUROR:  I think I would, but my concern is

6    the fraud part.  In 1993 I tried to buy my house with my

7    husband.  I was born Deborah Ann Cessna.  I got married

8    in 1985 to a Daley, D-A-L-E-Y.  Now, you combine

9    commonality of Deborah Ann Daley in the forum of

10   databases today, and somebody had attached Deborah Ann

11   Daley -- attached herself to my credit report.

12        I almost did not get an opportunity to buy my

13   home.  And in 2000 -- it got progressively worse.  The

14   lawyer we had, the real estate lawyer was very good and

15   he cleared it up enough to get us the mortgage.  But

16   then the databases for medical and library system bit

17   me.  And when that happened in 2000 I had to go back to

18   my mother and father and ask them to change my first

19   name, because my husband would not let me change my last

20   name back to my maiden name.  So they gave me my

21   great-grandmother's name.  So I had that fiasco.

22        But three years before that my husband had a

23   credit card used by two people to take a flight to

24   California, so that was a scary situation because his

25   credit card was being used fraudulently.  So we've had a

PDF created with pdfFactory trial version www.pdffactory.com

1    little bit of it.

2         But I think, as an educated woman, that I feel

3    that I can be fair.  And I don't like to pass judgment

4    on people, but I will tell you honestly when that

5    happened November 1st of 2007 and we're still dealing

6    with it in 2008, early, within the first couple of

7    months, it threw me for a loop.  It really did.  So

8    my -- you know, like I said, I mean, it is -- he did get

9    his name cleared, but not without a struggle and not

10   without a loss of money.  And civilly, if we wanted to,

11   we could turn the tables on Foxboro.  But I mean, I've

12   been in the court system for years, and I don't know if

13   I want to deal with it.

14        THE COURT:  Another question:  We have some

15   basic information about people which usually gives

16   employment.  For you it says "unemployed"; is that

17   correct?

18        THE JUROR:  Yes.

19        THE COURT:  Have you recently been employed?

20        THE JUROR:  I was laid off in 1999, and I've

21   been trying to go back for degrees.

22        THE COURT:  What kind of work?

23        THE JUROR:  I was an accountant.  Yup.

24        THE COURT:  Okay.  Thank you.

25        THE JUROR:  Thank you.

```
 1            (The juror is excused.)

 2            (In open court:)

 3            THE CLERK:  Karen Powers.

 4            (Discussion at sidebar and out of the hearing of

 5   the jury:)

 6            THE COURT:  Good morning.

 7            THE JUROR:  Good morning.

 8            THE COURT:  You said you had been a victim of

 9   fraud?

10            THE JUROR:  Yeah.  TJ Maxx fraud.  And somebody

11   stole my credit card one time.

12            THE COURT:  Now, when you say the "TJ Maxx

13   fraud," are you referring to the computer data that was

14   stolen?  Is that what you mean?

15            THE JUROR:  I think that's it.  I had to do my

16   license over again because of it.

17            THE COURT:  And that was fairly recently?

18            THE JUROR:  Yeah.

19            THE COURT:  And some credit card -- is that what

20   you said?

21            THE JUROR:  Yeah, that was a credit card.

22            THE COURT:  When was that?

23            THE JUROR:  That was maybe three years ago.

24   Over three years ago somebody stole my credit card.

25            THE COURT:  And used it?
```

1          THE JUROR:  And used it.

2          THE COURT:  And did that cost you out of pocket

3    any money?

4          THE JUROR:  The insurance covered that; yeah.

5          THE COURT:  Does that leave you with any

6    feelings that would affect your ability to be an

7    impartial juror in a case like this one?

8          THE JUROR:  It could, because it happened to me

9    and it was a terrible feeling.  I was very angry after

10   it happened, you know.  I still am.

11         THE COURT:  You also said that somebody close to

12   you had been accused of a crime?

13         THE JUROR:  Yeah.

14         THE COURT:  Tell me about that.

15         THE JUROR:  Yeah.  My boyfriend is in Norfolk on

16   an assault-and-battery charge.

17         THE COURT:  He's currently incarcerated; is that

18   what you said?

19         THE JUROR:  Yeah.

20         THE COURT:  For what term?  Do you know how

21   long?

22         THE JUROR:  He's got 14 more months.

23         THE COURT:  And he's at Norfolk House of

24   Corrections?

25         THE JUROR:  Yes.

1          THE JUROR:  He's in recovery now, in AA, doing

2     well.

3          THE COURT:  Okay.  We have some basic

4     information about jurors, including some employment

5     information.  This says you're retired?

6          THE JUROR:  Yes, from United Airlines.  Yeah.

7     Well, they pushed me out.  You know, they put the $8

8     people in there.  They got rid of me.

9          THE COURT:  What did you do for American

10    Airlines?

11         THE JUROR:  Cleaning the cabins.

12         THE COURT:  At Logan?

13         THE JUROR:  Yeah.

14         THE COURT:  Okay.  Thank you.

15         THE JUROR:  Thank you.

16         (The juror is excused.)

17         (In open court:)

18         THE CLERK:  Jon Vanrader.

19         (Discussion at sidebar and out of the hearing of

20    the jury:)

21         THE JUROR:  Good morning.

22         THE COURT:  Good morning.  You answered several

23    of our questions.

24         THE JUROR:  I did.

25         THE COURT:  One is connection with state law

PDF created with pdfFactory trial version www.pdffactory.com

1   enforcement?

2          THE JUROR:  Yeah.  I might have gotten it a

3   little bit wrong.  I have a couple of relatives that are

4   corrections officers.  One is in New York State and one

5   is retired from Massachusetts.

6          THE COURT:  Okay.  I'm sorry.  You said

7   relatives?  Is that what you said?

8          THE JUROR:  Yeah.

9          THE COURT:  How close?  Cousins or --

10         THE JUROR:  Yeah, that's exactly what they are.

11  You said the broadest --

12         THE COURT:  No, that's right.  Would that have

13  any effect on your ability to be an impartial juror in a

14  case like this?

15         THE JUROR:  No.

16         THE COURT:  I think you said you or somebody

17  close to you had been the victim of a crime?

18         THE JUROR:  Correct.

19         THE COURT:  Tell us about that.

20         THE JUROR:  Home invasion not very long ago.

21         THE COURT:  Yeah.  Is that you personally?

22         THE JUROR:  Me personally, yeah.

23         THE COURT:  Anybody apprehended or prosecuted?

24         THE JUROR:  They're looking for them still.

25         THE COURT:  How long ago was that?

```
 1            THE JUROR:  December, I believe.

 2            THE COURT:  December of '07?

 3            THE JUROR:  Yes.

 4            THE COURT:  This past December?

 5            THE JUROR:  Yes.

 6            THE COURT:  And -- okay.  I think you also said

 7    somebody close to you had been accused of a crime?

 8            THE JUROR:  Myself.

 9            THE COURT:  Tell me about that.

10            THE JUROR:  I was just -- drugs.

11            THE COURT:  How long ago?

12            THE JUROR:  One was ten years ago and one was a

13    year ago.  And they just got rid of it and they dropped

14    any drug-selling charges or anything.

15            THE COURT:  In both cases?

16            THE JUROR:  Yes.

17            THE COURT:  Both the ten-year-old one and the --

18            THE JUROR:  Yes.

19            THE COURT:  And what was the drug?

20            THE JUROR:  Cocaine.

21            THE COURT:  When you say "they dropped it" --

22            THE JUROR:  The state.

23            THE COURT:  Was it municipal police or state

24    police?  What was the police agency?

25            THE JUROR:  The judge.
```

```
 1              THE COURT:  Before that.  How did -- who was the
 2    arresting agency, if you were arrested or charged?
 3              THE JUROR:  Local and state police officers.
 4              THE COURT:  The ten-year-old one, which was
 5    that?
 6              THE JUROR:  The same.
 7              THE COURT:  No, but what local police?
 8              THE JUROR:  Oh, Brockton.
 9              THE COURT:  And the state police, too?
10              THE JUROR:  Correct.
11              THE COURT:  And the recent one was also Brockton
12    and state?
13              THE JUROR:  Correct.  Wrong place at the wrong
14    time.
15              THE COURT:  Does any of that leave you with the
16    feeling you would have a difficult time being an
17    impartial juror or do you think that you would be able
18    to be a fair and impartial juror despite any connections
19    with the system?
20              THE JUROR:  Fair and impartial despite.
21              THE COURT:  Okay.  All right.  Thank you.
22              (The juror is excused.)
23              (In open court:)
24              THE CLERK:  Benjamin Waxman.
25              (Discussion at sidebar and out of the hearing of
```

```
 1   the jury:)
 2           THE JUROR:  Good morning.
 3           THE COURT:  Good morning.  You answered a couple
 4   of our questions.  One is connection with state law
 5   enforcement?
 6           THE JUROR:  My brother-in-law is on the Hill for
 7   the City of Salem.  Tenuous, but he's had -- you know,
 8   if we're in doubt --
 9           THE COURT:  Yeah.
10           THE JUROR:  -- stand up.
11           THE COURT:  Your wife is an attorney?
12           THE JUROR:  Yes.
13           THE COURT:  What kind of practice does she have?
14           THE JUROR:  Nonprofit law.
15           THE COURT:  And for yourself, we have that
16   you're a marketing consultant?
17           THE JUROR:  Yes.
18           THE COURT:  Can you --
19           THE JUROR:  Self-employed.  Been on my own for
20   about 15 years consulting to mostly
21   business-to-business.  A lot of fund-raising.
22           THE COURT:  Any particular kinds of businesses?
23           THE JUROR:  High-tech, healthcare and finance
24   mostly.  But for 15 years I've consulted with a lot of
25   different organizations, a lot of colleges and nonprofit
```

```
 1    institutions.  I'd be happy to give you more detail if
 2    you want.
 3           THE COURT:  Well, I guess the only thing I'm
 4    interested in is:  Any real estate companies?
 5           THE JUROR:  No.
 6           THE COURT:  You also expressed some concern
 7    about the schedule?
 8           THE JUROR:  Yeah.  Tomorrow and Wednesday --
 9    tomorrow is Tuesday?  Tomorrow and Wednesday I have a
10    trip scheduled to D.C.  There's a conference, and I'm
11    leading a meeting that I set up.  If I have to,
12    obviously, I could cancel that, but it's something
13    that's been in the works for quite some time.  It's an
14    annual meeting, not something that I have --
15           THE COURT:  What kind of meeting is it?  Is it a
16    client meeting or is it a professional meeting of some
17    sort?
18           THE JUROR:  The conference is a -- the Mental
19    Health Association, and my wife and I run a nonprofit
20    that raises funds for mental health charities.  And so
21    there are ten to twelve mental health charities coming,
22    and I'm presenting to them and talking to them about our
23    plans from last year and plans for next year.  And I
24    invited them, so it's something -- you know, the
25    conference I have no control over; this meeting,
```

1   obviously, I would have to cancel and reschedule the

2   trip.  And then I have some other client meetings after

3   that.

4           THE COURT:  Okay.  Thanks.

5           THE JUROR:  Thank you.

6           (The juror is excused.)

7           (In open court:)

8           THE CLERK:  Sue Jackson.

9           (Discussion at sidebar and out of the hearing of

10  the jury:)

11          THE JUROR:  Good morning.

12          THE COURT:  Connection with law enforcement, I

13  think you said somebody?

14          THE JUROR:  Yes.  My husband's uncle and two

15  cousins.

16          THE COURT:  Okay.  Were what?

17          THE JUROR:  Police officers.

18          THE COURT:  Where?

19          THE JUROR:  In Wareham, Massachusetts.

20          THE COURT:  All in Wareham?

21          THE JUROR:  Yes.  Yes.

22          THE COURT:  Were or are?

23          THE JUROR:  Are.

24          THE COURT:  Okay.  I used the "were."

25          THE JUROR:  Were, are.

1          THE COURT:  So some still are?

2          THE JUROR:  Yes.

3          THE COURT:  Would that give you any concern

4     about your ability to be impartial in a criminal

5     prosecution?

6          THE JUROR:  We're a close-knit family.  You

7     know, sometimes you hear things.  And it's hard to say

8     "yes" or "no" on that one.

9          THE COURT:  You also said that somebody close to

10    you had been the victim of a crime?

11         THE JUROR:  Yes.  The -- I'm a registered nurse,

12    and the Board of Registration and Licensure last year

13    accidentally gave out several hundred social security

14    numbers by accident; mine happened to be one of them.

15    And I had to apply for fraud protection so that our --

16    all of our credit rating would not be destroyed.  And

17    I'm under that protection now for three years.

18         THE COURT:  Okay.  And you also had some concern

19    about the schedule?

20         THE JUROR:  Yes.  I work four days a week and my

21    daughter works three.  And I take care of her children:

22    Two are under school age, a-four-year-old and a

23    16-month-old.  She has no other person to take care of

24    them except I.  And then I take care of the 12-year-old

25    that comes home after school.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              THE COURT:  Okay.  Thank you.

 2              THE JUROR:  Thank you.

 3              (The juror is excused.)

 4              (In open court:)

 5              THE CLERK:  Kristopher Doherty.

 6              (Discussion at sidebar and out of the hearing of

 7      the jury:)

 8              THE JUROR:  How are you doing?

 9              THE COURT:  Hi.  Good morning.

10              THE JUROR:  Good morning.

11              THE COURT:  I guess it's "good morning,"

12      although just barely.

13              You answered several questions.  One was

14      connection with state law enforcement?

15              THE JUROR:  Yeah.  One of my good friends is a

16      state trooper and another one of my friends is an

17      assistant D.A. in Brockton.

18              THE COURT:  Would those connections have any

19      effect on your ability to be an impartial juror?

20              THE JUROR:  Probably not.

21              THE COURT:  And I think you said that someone

22      close to you had been the victim of fraud?

23              THE JUROR:  Yes, my girlfriend.  She had her

24      identity stolen.

25              THE COURT:  Is that recently?
```

1          THE JUROR:  Within the past year.

2          THE COURT:  And what's happened on that?

3          THE JUROR:  It's pretty much all cleared up now.

4    Her credit kind of got wrecked on it, but the fallout

5    isn't that bad anymore.

6          THE COURT:  Would that have any effect on your

7    ability to be a fair and impartial juror?

8          THE JUROR:  It might.  I have to deal with a lot

9    of it, and I still do.  Whenever we're planning anything

10   with vacations or the house, it has to go under my name.

11         THE COURT:  We have some basic information about

12   jurors which gives us employment information.  It says

13   IT support for Fidelity?

14         THE JUROR:  Yeah.

15         THE COURT:  Would you give us a better idea of

16   what you do?

17         THE JUROR:  I do PC, laptop, data, software,

18   phone lines and landline, all support for all of that.

19         THE COURT:  Making sure they run?

20         THE JUROR:  Yeah, pretty much.

21         THE COURT:  Good.  Okay.  Thanks.

22         THE JUROR:  Thank you.

23         (The juror is excused.)

24         (In open court:)

25         THE CLERK:  Erin Donovan.

```
 1            (Discussion at sidebar and out of the hearing of
 2     the jury:)
 3            THE COURT:  Good morning.  I think you answered
 4     a couple of questions.  One was about somebody being
 5     accused of a crime?
 6            THE JUROR:  I just did the personal hardship.
 7            THE COURT:  Just the hardship?  Okay.  I can't
 8     read my own writing.
 9            THE JUROR:  Yeah.  I'm just going out of town on
10     June 11th.  On Wednesday I'm going to Europe, so...
11            THE COURT:  That's next Wednesday?
12            THE JUROR:  Yes, the 11th.
13            THE COURT:  Okay.  Thank you.
14            THE JUROR:  Okay.  Thank you.
15            (The juror is excused.)
16            (In open court:)
17            THE CLERK:  Christopher Davidson.
18            (Discussion at sidebar and out of the hearing of
19     the jury:)
20            THE COURT:  Hi.  Someone close to you had been
21     the victim of fraud?
22            THE JUROR:  I was, yes.
23            THE COURT:  Tell me about that.
24            THE JUROR:  It was my cell phone provider.
25     Somebody got my account information and bought a bunch
```

PDF created with pdfFactory trial version www.pdffactory.com

 1    of phones and activated them on my account.

 2          THE COURT:  You also answered about being the

 3    victim of a crime.  Was it the same thing or --

 4          THE JUROR:  No, I had a different one in mind.

 5    I was mugged and beaten up.

 6          THE COURT:  When was that?

 7          THE JUROR:  That was '95 or '96.

 8          THE COURT:  Does either of those things -- in

 9    particular, the first one, the cell phone, does that

10    leave you with any concern about your ability to be an

11    impartial juror in a case like this?

12          THE JUROR:  Yeah; it doesn't bother me.

13          THE COURT:  The basic information we have says

14    you're an accountant at State Street Bank?

15          THE JUROR:  Yes.

16          THE COURT:  Can you give us a little bit more

17    particular idea of what that entails.

18          THE JUROR:  I check out the prices that we send

19    out every day; I verify them for accuracy.

20          THE COURT:  Prices of what?

21          THE JUROR:  The mutual funds.

22          THE COURT:  And what does it -- what does it

23    mean to say you check the accuracy of the prices?

24          THE JUROR:  I tolerate them against the market

25    movement and make sure everything's moving the same way.

1          THE COURT:  Okay.

2          THE JUROR:  You know, they all invest in

3   different kinds of securities, so I just make sure that

4   they're not moving.  You know, if they're --

5          THE COURT:  What if they are moving?

6          THE JUROR:  Then I have to find out why.

7          THE COURT:  Okay.  And have you been involved in

8   any investigations as to why there might be funny

9   movement of some kind?

10         THE JUROR:  No.  No.

11         THE COURT:  How long have you been there?

12         THE JUROR:  Eight years.

13         THE COURT:  You also said you're concerned about

14   the schedule?

15         THE JUROR:  Yeah.  I'm applying for another job,

16   and I could potentially get an interview in the next

17   week or two, I'm hoping, and I just don't want to pass

18   up the opportunity.

19         THE COURT:  Okay.  If it happened in the next

20   week or two, would you be able to schedule it for an

21   afternoon rather than a morning?

22         THE JUROR:  I could try.  I don't know.  I don't

23   know anything about the other -- the company policy.

24         THE COURT:  Okay.  Thanks.

25         THE JUROR:  Thank you.

```
 1              (The juror is excused.)

 2              (In open court:)

 3              THE CLERK:  Johannes Bom.

 4              (Discussion at sidebar and out of the hearing of

 5     the jury:)

 6              THE COURT:  Hi.

 7              THE JUROR:  Hi.

 8              THE COURT:  Before I get to the questions you

 9     answered, for most jurors we have a bit of information

10     about employment, and yours is blank, so...

11              THE JUROR:  I'm unemployed currently.

12              THE COURT:  What have you done in the past?

13              THE JUROR:  Customer service management.

14              THE COURT:  And it says your spouse is a

15     professor?

16              THE JUROR:  Correct.

17              THE COURT:  Of what subject?

18              THE JUROR:  Business school, operations

19     management.

20              THE COURT:  And where?

21              THE JUROR:  UMass Dartmouth.

22              THE COURT:  Okay.  Now, I think you said that

23     you or someone close to you had been the victim of a

24     crime?

25              THE JUROR:  Right.
```

1          And the second question, the answer will be the

2   same.

3          THE COURT:  Accused?

4          THE JUROR:  Yes.  My older sister's 23-year-old

5   son was convicted recently of sexual assault against my

6   younger sister's three-year-old daughter.

7          THE COURT:  Okay.  Was convicted, you say?

8          THE JUROR:  Just recently, yes.

9          THE COURT:  So there were court proceedings and

10  so on?

11         THE JUROR:  Correct.

12         THE COURT:  Were you involved in that?

13         THE JUROR:  No, this all took place in

14  California.

15         THE COURT:  Would that have any effect on your

16  impartiality as a juror?

17         THE JUROR:  I don't believe so.

18         THE COURT:  Thank you.

19         THE JUROR:  Thank you.

20         (The juror is excused.)

21         (In open court:)

22         THE CLERK:  Annie Bispham.

23         (Discussion at sidebar and out of the hearing of

24  the jury:)

25         THE COURT:  Hi.  You answered several of the

         1    questions.  One was about somebody close to you being a
         2    victim of a crime?
         3         THE JUROR:  I was the victim of a crime.
         4         THE COURT:  You were?  Tell me about that.
         5         THE JUROR:  I was mugged.
         6         THE COURT:  When was that?
         7         THE JUROR:  About seven, eight years ago.
         8         THE COURT:  Anybody apprehended or prosecuted?
         9         THE JUROR:  No.  I reported it but they never
        10    caught the young kid who did it.
        11         THE COURT:  Was that in Boston?
        12         THE JUROR:  Yeah.
        13         THE COURT:  And I think you said somebody close
        14    to you had been accused?
        15         THE JUROR:  Yeah, my husband's grandson is sort
        16    of like in and out with drugs, you know, and things like
        17    that.  So he was in and out of the court system.
        18         THE COURT:  How recently?
        19         THE JUROR:  I would say as recently as four
        20    years ago.  He's not -- fortunately, he's not now, but,
        21    I mean, he started at a young age, so...  And he was
        22    convicted.  One time he was dealing around schools.  So
        23    he's been -- but I think he's --
        24         THE COURT:  When that was happening, did you
        25    have any involvement in his cases or anything?

```
 1                THE JUROR:  No.  No.  Just my husband sort of

 2      had to support him as far as going to court and stuff

 3      like that, yeah.

 4                THE COURT:  Did you ever go with them to court

 5      or anything like that?

 6                THE JUROR:  No.

 7                THE COURT:  Did either of those things, you

 8      know, your own having been a victim and then your

 9      husband's grandson, give you any concern about your

10      ability to be an impartial juror in a criminal case?

11                THE JUROR:  Not really.  I guess -- maybe not,

12      no.

13                THE COURT:  Let me just ask you, the employment

14      information we have about you says you're a teacher in

15      the Boston School System?  What school do you teach in,

16      and can you tell me the subject matter?

17                THE JUROR:  Yes, at Madison Park.  I teach

18      health, the vocational aspect of it.  And this time of

19      year, finals and, you know...

20                THE COURT:  This is getting into your earlier

21      answer which is --

22                THE JUROR:  Oh, yeah.  Oh, yeah.

23                THE COURT:  -- your concern about the

24      scheduling.  Tell me about your concern.

25                THE JUROR:  It's the timing because school is
```

PDF created with pdfFactory trial version www.pdffactory.com

1    going to be out in about three weeks, I think, and

2    finals and getting the grades in and things like that.

3    It's not the fact that I'm a teacher or anything; it's

4    just the timing that's so important, I guess.  And my

5    mind, thinking about all of those things.

6            THE COURT:  And I asked a very general question

7    about whether you had any experience or attitude or so

8    on that might affect your impartiality.  Is that what

9    you had in mind or did you have something else in mind?

10            THE JUROR:  No, I had something else in mind.

11            THE COURT:  Tell me about that.

12            THE JUROR:  I guess some years back, not too

13    long ago, I used to get these things in the mail, I

14    guess, telling you you won, like, $40,000, you know, and

15    you get the car and you get this and that.  And I think

16    my husband and I -- well, we kind of acted on one.  It

17    was just, like, we knew we weren't going to win all of

18    that, but it was just take the trip and all of this

19    stuff.  And it was sort of misleading, you know?  They

20    just wanted to get you there and get the timeshare and

21    stuff like that.  So it kind of left a bitter taste in

22    my mind *[sic]* about stuff like that.

23            THE COURT:  Okay.  Thanks.

24            (The juror is excused.)

25            (In open court:)

```
 1              THE CLERK:  Charles Sorrentino.
 2              (Discussion at sidebar and out of the hearing of
 3    the jury:)
 4              THE COURT:  Good morning.
 5              THE JUROR:  Good afternoon, your Honor.
 6              THE COURT:  It is afternoon.  You're right.
 7         Connection with law enforcement?
 8              THE JUROR:  My son was just hired by the
 9    Department of Homeland Security; his best friend's
10    mother's an assistant D.A.; and I work as part of my job
11    with the Salem District Attorney's Office in juvenile
12    diversion.
13              THE COURT:  Okay.  According to the -- what we
14    have here, you're a clinical psychologist?
15              THE JUROR:  Yes, your Honor.
16              THE COURT:  Can you tell us a little bit about
17    the kind of work you do with the D.A.?
18              THE JUROR:  Kids, usually adolescents, are given
19    a choice between going through a trial process or doing
20    community service and seeing a therapist.  And I'm one
21    of the therapists that are often seen.
22              THE COURT:  Is the choice given to them before
23    you see them or are you part of the choice-giving?
24              THE JUROR:  I'm not part of the choice-giving.
25              THE COURT:  Okay.  Do the other connections --
```

1    either that connection or the others have any effect on

2    your ability to be an impartial juror?

3         THE JUROR:  None that I can think of, sir.

4         THE COURT:  Do you ever get involved in

5    presenting evidence to the juvenile court about one of

6    the kids that's going through?

7         THE JUROR:  Not formally thus far, although it

8    could happen at any point.

9         THE COURT:  Okay.  It's not a customary or usual

10   practice?

11        THE JUROR:  Generally it's through an officer of

12   the court that I will talk to verbally over the phone or

13   send a report at the end of the process to.

14        THE COURT:  A prosecutor, perhaps, or a

15   probation officer?

16        THE JUROR:  A probation officer.

17        THE COURT:  You also expressed concern about the

18   schedule?

19        THE JUROR:  Yeah.  I'm seeing currently about 50

20   clients in my private practice -- I'm in practice

21   alone -- and the majority of them are children,

22   adolescents, and at this point I've got between five and

23   seven kids or teenagers who are either suicidal or in

24   acute crises; as a matter of fact, this is the first

25   time in years that I've been out of touch with my

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   office.

 2          THE COURT:  Okay.  Thank you.

 3          THE JUROR:  Thank you.

 4          (The juror is excused.)

 5          MR. MITCHELL:  Your Honor, if we could go with

 6   one follow-up with Juror No. 7.

 7          THE COURT:  That's right.

 8          (In open court:)

 9          THE CLERK:  Ma'am.

10          (Discussion at sidebar and out of the hearing of

11   the jury:)

12          THE COURT:  Hi.

13          THE JUROR:  I don't think my English is good

14   enough to be on the jury.

15          THE COURT:  Have you had some difficulty this

16   morning?

17          THE JUROR:  I understand.  I can talk but I

18   feel --

19          THE COURT:  Say that again?  I'm sorry.

20          THE JUROR:  I understand about 85 percent.

21          THE COURT:  Are you able to read English?

22          THE JUROR:  Yeah; but write, no.

23          THE COURT:  To write, no?

24          THE JUROR:  I can, but...

25          THE COURT:  Your original language is?
```

```
 1              THE JUROR:  Albanian.

 2              THE COURT:  Albanian?  Okay.  Thanks.

 3              (The juror is excused.)

 4              THE COURT:  Can we have them back if -- I'm

 5      wondering if we could give them a break while we do

 6      this, but I'm concerned about getting them back.

 7              THE CLERK:  We've already gone through the whole

 8      list, so it would just be -- Judge, we have a juror

 9      coming up here.

10              THE COURT:  The power of suggestion.

11              THE CLERK:  We have somebody else.  She was

12      sitting toward that way.  Maritza.

13              THE COURT:  What's her name?

14              THE CLERK:  I can't understand her.  Maritza

15      something.

16              THE COURT:  Just have her come up.

17              (In open court:)

18              THE CLERK:  Ma'am?

19              (Discussion at sidebar and out of the hearing of

20      the jury:)

21              THE COURT:  Hi.

22              THE JUROR:  Hi.

23              THE COURT:  What is your name?

24              THE JUROR:  Maritza Depilier.

25              THE COURT:  Fifty-one.  Juror No. 51.
```

1          And you have some concern about the language?

2          THE JUROR:  Yes.  The language is very

3     difficult, for me to understand everything in English.

4          THE COURT:  Have you been having trouble when I

5     was talking to the group?

6          THE JUROR:  Certain times, yeah.

7          THE COURT:  What is your original language?

8          THE JUROR:  Spanish.

9          THE COURT:  And how long have you been speaking

10    English to any degree?

11         THE JUROR:  I'd say five years.

12         THE COURT:  Okay.

13         THE JUROR:  More than five years.  But I'm

14    trying to learn more and more.

15         THE COURT:  Are you able to read English?

16         THE JUROR:  Just I read but no -- I don't

17    understand everything.

18         THE COURT:  Okay.  Okay.  Thank you.

19         THE JUROR:  Okay.

20         (The juror is excused.)

21         THE COURT:  Let's go ahead.  All right.  So

22    let's just go down the page starting with the first one,

23    and if anybody has an issue with respect to anybody,

24    just raise it and we'll deal with it.

25         So Juror No. 1.

1          MR. MITCHELL:  Strikes for cause at this point?

2          THE COURT:  This is just cause.  Just cause.

3    Only cause.

4          MR. PAPPALARDO:  I would request the Court

5    consider Juror No. 1 be excused for cause.  Do you want

6    to hear the reasons?  She indicated, your Honor, she

7    would say -- she indicated she was a corrections

8    officer; she has police affiliations in Fall River,

9    including her father.  When asked by the Court if that

10   would cause her not be impartial, she indicated no.

11         Also, given the nature of this case, your Honor,

12   she indicated that a contractor took money from her in

13   connection with a home repair that was not done.  Making

14   it worse, it was four years ago and it's unsolved and

15   nothing happened.

16         I would suggest to the Court that that would

17   leave her, in the context of this case, somewhat

18   disillusioned by the facts of this case, and I would

19   suggest to the Court on both grounds -- but certainly on

20   each ground -- she should be excused for cause, but

21   certainly together I would question her impartiality.

22         MR. MITCHELL:  I didn't see any equivocation at

23   all -- from her at all, your Honor.  I mean, she has

24   relatives in law enforcement and she is in a

25   law-enforcement-type position.  But when you asked her

PDF created with pdfFactory trial version www.pdffactory.com

1    specifically whether she could be impartial, she didn't

2    bat an eye.  Not that I saw.

3         Obviously, it's the Court's impression that

4    controls, but I didn't see it.  I'll also add that if,

5    frankly, there's a motion to strike as to Juror No. 1,

6    we're going to be here for a while, and whether you give

7    a break or not --

8         MR. PAPPALARDO:  Well, she's a victim of fraud.

9         THE COURT:  That's the problem for me.  It's the

10   out-of-pocket cost.  But I think if she's out $12,000,

11   that's something that's going to be a problem.  So we'll

12   excuse her for cause.

13        Okay.  Number 3?

14        MR. PAPPALARDO:  Yes, your Honor.  I believe

15   Number 3 indicated that -- Number 3 indicated that

16   she --

17        MR. MITCHELL:  We won't object to Number 3.  I

18   know he's saying that he can't put his --

19        MR. PAPPALARDO:  He can't be impartial.

20        MR. MITCHELL:  He said he can't put his

21   experience aside.  That's fine.

22        THE COURT:  Number 4?

23        MR. PAPPALARDO:  Your Honor, in response to the

24   Court's inquiry as to whether this person could be

25   impartial, they indicated that they would have a

PDF created with pdfFactory trial version www.pdffactory.com

1    tendency to side with the courts, as a court worker.  I

2    would ask, your Honor, to inquire of this individual

3    precisely what it is that she does in court.  She -- the

4    Court did not get into that.

5         And it may mean that she's performing some

6    ministerial function, but if she's dealing with criminal

7    cases a lot and interacts with law enforcement people,

8    then there may be a basis, particularly given her

9    response where she didn't want to tell you she couldn't

10   be impartial.  She said, "Well, I have a tendency to

11   side with the courts."  I interpreted that to mean, you

12   know, that she would be pro-government.

13        MR. MITCHELL:  We wouldn't object to further

14   inquiry.

15        THE COURT:  No, I think I'm going to excuse her.

16        MR. MITCHELL:  The wedding?

17        THE COURT:  Well, I just -- it was her response

18   that I saw that I think she thinks of the courts as the

19   moving force, which is really the law enforcement people

20   around the courts.

21        MR. PAPPALARDO:  The Court's response was great,

22   however, I think.

23        THE COURT:  Okay.  So I think I'll excuse her.

24        Number 6?

25        MR. PAPPALARDO:  Well, your Honor, we're getting

1  a cluster of these in the beginning.  Number 6, I would

2  submit to the Court, should be dismissed for cause,

3  one --

4         MR. MITCHELL:  No objection.

5         THE COURT:  No objection?  Okay.

6         Number 7 I think I will excuse.  And if we will

7  get to her, the one we just talked to, as well as 51.

8         THE CLERK:  For cause?

9         THE COURT:  Six is excused.

10        Because I have in mind that there are documents

11  here -- it's not just an ability to listen to the oral

12  testimony -- and so there's going to have to be some

13  reading of evidence.

14        Okay.  That brings us to Number 8.

15        MR. PAPPALARDO:  Number 8, your Honor, the juror

16  indicated that because his fiancée was the victim of a

17  stolen credit card scam, which is still under

18  investigation that's pending, he said it would affect

19  his impartiality.  And then when pressed, the Court got

20  him to say he thought he could put it aside.  I would

21  suggest that he should be removed for cause.

22        I'm troubled, your Honor, by the number of

23  jurors who have themselves been victims of fraud or the

24  perception of fraud, particularly in ongoing matters

25  that have not been resolved, and this was one of them.

1          MR. MITCHELL:  The record was pretty clear, your

2     Honor, it seemed to me, that you asked him whether it

3     would affect his ability to be impartial and he said no,

4     it's $800.  Unlike Juror No. 1 who lost thousands of

5     dollars, this person lost $800 which is not a terrific

6     amount of money.  That's the level of people here.  It's

7     unfortunate that identity fraud is very common these

8     days and one of the resources that's getting all of the

9     interest.  That said, I didn't see any equivocation by

10    this person that made this person seem anything but

11    impartial.

12         MR. PAPPALARDO:  If I'm not mistaken, your

13    Honor, this was the juror who said he's dealt with a

14    house problem because of this -- had to put it in his

15    name as opposed to his wife's name.

16         THE COURT:  No, that was later on.

17         MR. PIROZZOLO:  No, it wasn't.

18         MR. MITCHELL:  No, it wasn't.

19         MR. PAPPALARDO:  This one clearly wavered on

20    impartiality.

21         THE COURT:  Well, I think -- I did follow up

22    with him, and he said he could put it aside.

23         MR. PAPPALARDO:  Right.

24         THE COURT:  I think there may be a difference

25    between the identity-theft credit-card-fraud people and

PDF created with pdfFactory trial version www.pdffactory.com

1  somebody who has dealt with a contractor who took their

2  deposit and so on.  I think I will not discharge Number

3  8 for cause.

4       MR. PAPPALARDO:  Well, your Honor, Number 10 I

5  think is a fairly clear case of someone who should be

6  discharged for cause.

7       MR. MITCHELL:  No objection.

8       THE COURT:  Number 12.

9       MR. PAPPALARDO:  Oh.

10       MR. PIROZZOLO:  No objection.

11       THE COURT:  Juror No. 17?  Okay?

12       MR. PAPPALARDO:  Yes; she's fine.

13       THE COURT:  Okay.  Number 19?

14       MR. PIROZZOLO:  Nothing from the government.

15       THE COURT:  Okay.  Number 20?

16       MR. MITCHELL:  Not for the government.

17       MR. PAPPALARDO:  One second, your Honor.

18       (Discussion off the record.)

19       MR. PAPPALARDO:  We have no objection to Number

20  20.

21       THE COURT:  No objection?  Okay.  He passes?

22  Number 21?

23       MR. PAPPALARDO:  Didn't speak English,

24  construction supervisor from Brazil.

25       MR. MITCHELL:  Moving to strike?  Moving to --

```
 1   if you're moving to strike, we don't object.
 2           THE COURT:  I thought he did all right.
 3           MR. PIROZZOLO:  Yeah, I thought he did.
 4           MR. PAPPALARDO:  He's the one who said he could
 5   speak 85 percent.  I believe he had issues with
 6   documents, of reading.
 7           THE COURT:  I suppose we ought to apply the same
 8   rule to everybody, perhaps, since there are three in the
 9   category who have difficulty with English, particularly
10   in reading.  All right, we'll strike him.
11           Twenty-three?
12           MR. PAPPALARDO:  We have no problem.
13           THE COURT:  She has the blind mother.
14           MR. PAPPALARDO:  Right.
15           MR. PIROZZOLO:  She has a serious scheduling
16   issue; it's not just her mother, right?
17           MR. PAPPALARDO:  We have no objection.
18           THE COURT:  I think I'll excuse her for her
19   personal hardship.
20           MR. PAPPALARDO:  Excuse her?
21           MR. PIROZZOLO:  Number 24 has a personal
22   hardship.
23           MR. MITCHELL:  This is the one with the letter?
24           THE COURT:  I'll excuse him.
25           Number 25?
```

1            MR. PAPPALARDO:  This is the one, your Honor,

2    who --

3            MR. MITCHELL:  No objection.

4            THE COURT:  There's no objection to 25.

5            MR. PAPPALARDO:  This one, 26, for being a

6    victim of credit card fraud, which she's still fighting,

7    "will affect my ability to be impartial."  She also has

8    job interviews this week and next week.

9            MR. MITCHELL:  No objection.

10            THE COURT:  I'll excuse her.

11            THE COURT:  Twenty-seven?

12            MR. PAPPALARDO:  Twenty-seven we have no issue

13    with.

14            THE COURT:  Twenty-eight?

15            MR. MITCHELL:  Twenty-eight, I think she said --

16    she equivocated on the impartiality question.  She's the

17    one the uncle is under investigation down in Maryland.

18    The other thing is, she works at Goodwin Procter.  And

19    there's going to be some issue about a dismissal of the

20    indictment because there was a grand juror who worked at

21    Goodwin Procter.  So I think it makes a clean record.

22            THE COURT:  I think that's a reasonable offer.

23            MR. PAPPALARDO:  We have no objection.

24            THE COURT:  Number 29.

25            MR. PAPPALARDO:  Our only issue is she was a

PDF created with pdfFactory trial version www.pdffactory.com

1   former 9-1-1 operator ten years ago.  We have no problem

2   with her.

3           THE COURT:  Thirty-two?

4           MR. PAPPALARDO:  This was the mental health

5   clinic person.

6           THE COURT:  I would be inclined to excuse him

7   for work reasons.

8           MR. PAPPALARDO:  I would move that 33 be excused

9   for cause.

10          THE COURT:  I think he was the belligerent one.

11          MR. PAPPALARDO:  He was the one -- he was the

12  one who lost the beachfront property and doesn't believe

13  in lawyers.

14          THE COURT:  Number 34:  I think she said that if

15  she weren't here, she would be taking her mother to the

16  hospital.

17          MR. PAPPALARDO:  She's the healthcare proxy.

18          MR. MITCHELL:  Right.  She had a hardship too.

19          THE COURT:  So I think I will excuse her.

20          Thirty-six?

21          MR. PAPPALARDO:  That's a hardship issue, your

22  Honor.

23          She did say that her friend being hurt probably

24  would affect her ability to be fair.

25          MR. MITCHELL:  She said "maybe no."  She said

PDF created with pdfFactory trial version www.pdffactory.com

1    "maybe no."

2          THE COURT:  I had the impression she didn't

3    quite understand the question, which puts her in the

4    other category, her English was not --

5          MR. MITCHELL:  Yeah.  No objection.

6          MR. PAPPALARDO:  Thirty-eight is a hardship

7    issue.

8          MR. MITCHELL:  Yeah, but she liked your tie.

9    She liked all of our ties.

10          THE CLERK:  At least she liked mine the best.

11          THE COURT:  All right.  We'll excuse her.

12          MR. PAPPALARDO:  Thirty-nine we have no issue

13    with, your Honor.

14          THE COURT:  Okay.  Forty?  The postal service

15    guy?

16          MR. PAPPALARDO:  Your Honor, with respect to

17    him, he had some interesting comments about how he

18    believes in the sanctity of the mail.  And with the

19    Court's probing about whether or not he could be

20    impartial, I think he clearly equivocated at the end

21    of -- I think his final answer was, "I would hope so."

22    And I'm not sure that's a resounding yes.

23          MR. MITCHELL:  We won't object.

24          THE COURT:  Okay.  Forty-two?

25          MR. PAPPALARDO:  When asked whether she could be

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   impartial --

 2          MR. MITCHELL:  Forty-two?

 3          THE CLERK:  Forty-two is Andrew White.

 4          MR. PAPPALARDO:  Putting aside the police

 5   department connections, which I don't think are

 6   significant, when asked whether he could be impartial he

 7   said, honestly, it could make a difference, and that

 8   was -- that was just on the PD.  Then he went into the

 9   being the victim of ID theft and his small business and

10   the seasonal -- my question with him, your Honor, is

11   given the --

12          MR. MITCHELL:  No objection.  I also think I

13   know the guy.  I think I played pickup basketball with

14   him as a youth.  I didn't make much of an impression

15   because he didn't recognize me.

16          THE COURT:  The years have gone by you so fast.

17   Okay.  Fine.  I think I would also excuse him for a

18   small business, you know, necessity, but anyway.  Okay.

19          Anyway, forty-three?

20          MR. PAPPALARDO:  Forty-three, your Honor, I

21   think should be excused for cause.

22          MR. PIROZZOLO:  No objection.

23          THE COURT:  Okay.  Excuse forty-three.

24          Forty-five?

25          MR. MITCHELL:  No objection.  I assume you're
```

1  moving?

2          MR. PAPPALARDO:  Yeah.  Yeah.  I believe, your

3  Honor --

4          THE COURT:  All right.  No objection.

5          Forty-seven?

6          MR. PAPPALARDO:  I don't have any issue with the

7  relatives being correction officers.

8          THE COURT:  Any problem?

9          MR. MITCHELL:  No, I think he said he's

10  impartial.

11          THE COURT:  Forty-eight.  The guy with the DC

12  trip.

13          MR. PAPPALARDO:  It's a hardship issue.

14          THE COURT:  I think so.  It's not just him, it's

15  other people, so...

16          All right.  Forty-nine?

17          MR. PAPPALARDO:  My notes indicate when asked

18  whether he could be impartial, the juror said, "It's

19  hard to say yes or no."

20          THE COURT:  This juror, I think, I would excuse

21  for family circumstances unless there's some objection.

22          MR. MITCHELL:  Yeah.

23          THE COURT:  She takes care of her daughter's

24  children.

25          Number 51 we're going to excuse for language

PDF created with pdfFactory trial version www.pdffactory.com

1    issues.

2            That brings us to 52.  And I think there's a --

3            MR. MITCHELL:  Right.  No objection, 52.

4            MR. PAPPALARDO:  Fifty-three is hardship, if the

5    Court finds --

6            MR. MITCHELL:  No objection.

7            THE COURT:  All right.  Fifty-five?

8            MR. PAPPALARDO:  Your Honor, 55, my notes do not

9    reflect after the juror indicated that he was a cell

10   phone victim of fraud, anything about the status of that

11   case, whether -- he said that it was recent.  I don't

12   know if it's in court, whether it's under investigation,

13   which agency it's with, if he is with one, and I would

14   ask for some clarification with respect to 55.

15           MR. MITCHELL:  If he wants clarification, that's

16   fine.  We don't object to clarifying.  We don't think

17   this juror should be struck based on the record right

18   now.

19           THE COURT:  I don't think it's necessary.  I

20   think it's sufficiently different -- I mean, it may be

21   generally broadly fraud of some kind but it's not

22   related really to the allegations in this case.  So if

23   that's the objection, I would deny that one.

24           Number 56?  57?

25           MR. PAPPALARDO:  That's the teacher.

1          MR. PIROZZOLO:  She had a hardship issue.

2          MR. MITCHELL:  Yeah, the last three weeks of the

3    school year.

4          THE COURT:  Yeah, it's not so much her hardship

5    as it is the kids'.  I think we'd better excuse her.

6          MR. PAPPALARDO:  Fifty-nine, we don't have any

7    issue, but I think there's a hardship issue here.

8          THE COURT:  Yeah, I think so, too.

9          Have we gone through all of those?  What we will

10   do is, the next step would be peremptories.  So

11   whoever's in the box will go out, fill them with the

12   next ones in order, and then we'll begin the first

13   peremptories.  We'll do a narrowing round in the first

14   round.  The government would give me peremptories and

15   you would give me any peremptories, I would excuse

16   those; those replacements would be the subject of the

17   next round.  And in the second round you go first and

18   the government second, and we keep switching back and

19   forth until we're finished.

20          The last two jurors seated will be the

21   alternates.  So you can always tell because they're the

22   highest numbers.

23          MR. PAPPALARDO:  Okay.  Can you back-strike?

24          THE COURT:  No.  Once they've passed, they've

25   passed.

```
 1          MR. PAPPALARDO:  We have 11 challenges?

 2          THE COURT:  You have 11 and you have seven.

 3          (In open court:)

 4          THE CLERK:  In the jury box the following will

 5     be excused:  Jennifer Bernard, Sean O'Connell, Jamie

 6     Jeanson, Michael Levesque, Vasilika Jankulla, Pete

 7     Cabral and Thomas Landon.  You'll all be excused.  Go

 8     back to the jury room, please.

 9          Juror No. 1 will now be Elaine Owens.  Elaine

10     Owens, would you take the first seat in the first row,

11     ma'am.  Juror No. 3 is now Jessica Trovato.  Would you

12     take the first seat in the first row, ma'am.  And Juror

13     No. 4 is now Francesca Tramontozzi.  Would you take the

14     next empty seat in the first row, ma'am.  Juror No. 6 is

15     now Catherine Hosein.  Would you take the next empty

16     seat in the first row, please.  Juror No. 7 is now

17     Joseph Capezzuto.  Would you take the next empty seat in

18     the first row, sir.  Juror No. 10 is now Spencer Kalker.

19     Would you take the empty seat in the second row.  Third

20     one in.

21          Roselmo Pessote, you'll be excused.  Go back to

22     the jury room, please.  Follow Mr. McAlear.

23          Juror No. 12 is now Patricia Toomey,

24     T-O-O-M-E-Y.  Would you take the next empty seat in the

25     second row, please, ma'am.  All right.
```

PDF created with pdfFactory trial version www.pdffactory.com

1           (Pause.)

2           THE COURT:  All right, counsel?

3           MR. PAPPALARDO:  We'll need a minute, your

4    Honor.

5           THE COURT:  All right.

6           (Pause.)

7           THE COURT:  All right, counsel.

8           (Discussion at sidebar and out of the hearing of

9    the jury:)

10          THE COURT:  Okay.

11          MR. MITCHELL:  We have two strikes, your Honor:

12    17 and 19.

13          THE CLERK:  The numbers 17 and 19?

14          MR. MITCHELL:  Seventeen and 19.

15          MR. GREENBERG:  Your Honor, Seat 2, Juror No. 2,

16    and Seat 11.

17          THE CLERK:  And Seat 11?  Margaret Pelser?

18          MR. GREENBERG:  Two and 22.  Juror No. 2, Juror

19    No. 11, Juror No. 22.

20          (In open court:)

21          THE CLERK:  Francesca Tramontozzi, Joseph

22    Capezzuto, Karen Pisiewski, Margaret Pelser, Patricia

23    Toomey, you're all excused.  Report back to the jury

24    room, please.

25          (Pause.)

1          THE CLERK:  Ann Hanlon, Christopher Ruigomez,

2    Eileen Polin and Susan Dempsey, you're excused.  Return

3    to the jury room.

4          Juror No. 2 is now Rebecca Hodges.  Take the

5    second seat in the first row, ma'am.  Okay, she's 27; 28

6    is gone.

7          Elaine Blais, you'll be excused.  Return to the

8    jury room.  Thanks.

9          Juror No. 4 is now Elaine Joyce.  Take the

10   fourth seat, ma'am, in the first row.  Juror No. 7 is

11   now John Carroll.  Take the last seat in the first row,

12   sir.  Juror No. 11 is now Thomas Hiscock, Jr.,

13   H-I-S-C-O-C-K.  Take the next empty seat in the second

14   row, please.

15         Carol Cahill, John Doyle, and Margaret Wheeler,

16   go back to the jury room, please.  Thank you.

17         And Juror No. 12 is now Linda Brennan,

18   B-R-E-N-N-A N.  You could take the next empty seat in

19   the second row, ma'am.

20         (Discussion at sidebar and out of the hearing of

21   the jury:)

22         MR. MITCHELL:  Your Honor, one question.

23         Hey, John.  John.

24         Juror 31 mentions -- notes they're disabled.  I

25   want to make sure it's not a hearing difficulty that

PDF created with pdfFactory trial version www.pdffactory.com

1    would prevent him from hearing the proceedings.

2           THE CLERK:  Earlier this morning the CSO came up

3    to me.  And he gets heart palpitations so he can't -- I

4    mean, he's fine, but he can't sit for long periods of

5    time; he has to move around.  And when he gets

6    excited --

7           THE COURT:  Bring him up.

8           THE CLERK:  Okay.  Thomas Hiscock, could you

9    step up here for a minute, sir.

10          (Discussion at sidebar and out of the hearing of

11   the jury:)

12          THE COURT:  Hi.

13          THE JUROR:  How are you doing?

14          THE COURT:  We have some sort of basic

15   information about people, usually it includes employment

16   information.  For you it says "disabled," and we want to

17   know whether there's something about your disability

18   that would interfere with your ability to be a juror in

19   the case.

20          THE JUROR:  I have five stents in my heart.

21   Frequently I get palpitations.  And I also have the acid

22   reflux.  And it comes on sometimes, an acid reflux

23   attack, which causes an angina attack.

24          THE COURT:  And what do you do when that

25   happens?

1          THE JUROR:  If I get an angina attack, I've got
2     to spray the nitro under my tongue.
3          THE COURT:  Do you carry that with you?
4          THE JUROR:  Yes.  And I usually lay down for an
5     hour.  And I take the metoprolol, and it makes me very
6     drowsy.
7          THE COURT:  Uh-huh.  How have you done this
8     morning?
9          THE JUROR:  So-so.
10         THE COURT:  Okay.  Over the last month or so,
11    how many times have you had to use the nitro?
12         THE JUROR:  Five or six times.
13         THE COURT:  Okay.  But in terms of are you able
14    to be attentive and follow what's going on?  Is there
15    any particular difficulty -- would it bring on an acute
16    attack?
17         THE JUROR:  It depends, because the medication,
18    as I say, leaves me very, very drowsy.  And it's almost
19    like I'm under pentothal, if I try to fight it at times.
20         THE COURT:  What's the medication again?
21         THE JUROR:  It's Metoprolol XL.  And I take 100
22    milligrams of that three times a day, and that will
23    knock you for a loop.
24         THE COURT:  Is it the kind of thing you can't
25    drive?

1          THE JUROR:  If it's like that, they don't really

2    want me behind the wheel because of the drowsy feeling.

3          THE COURT:  As a general matter, I mean, do you

4    do it?  Do you drive?

5          THE JUROR:  No, I don't drive a car.

6          THE COURT:  Okay.  Thanks.

7          (The juror is excused.)

8          MR. MITCHELL:  I don't think he can go forward

9    with a three-week trial.

10          MR. PAPPALARDO:  Yeah.  We want someone to be

11    attentive.  We can't have someone who loses interest.

12          THE COURT:  Okay.  We'll excuse him.

13          (In open court:)

14          THE CLERK:  Mr. Hiscock, you'll be excused,

15    Maria Murphy, you'll be excused.  Return to the jury

16    room, please.

17          And Juror No. 11 is now Janet Wasserman,

18    W-A-S-S-E-R-M-A-N.  Take that empty seat in the second

19    row, ma'am.

20          (Pause.)

21          (Discussion at sidebar and out of the hearing of

22    the jury:)

23          MR. GREENBERG:  Seats 4, 1 and 12 we'll

24    challenge.

25          MR. MITCHELL:  Twenty-seven in Seat 2.

```
 1          THE CLERK:  Is that it?

 2          MR. MITCHELL:  Yes.

 3          (In open court:)

 4          THE CLERK:  Elaine Joyce, you'll be excused;

 5   Janet Wasserman, you'll be excused also; Linda Brennan,

 6   and Rebecca Hodges, you'll be excused; Carol Eldridge,

 7   you'll be excused.

 8          Juror No. 2 is now Arthur Oliveira,

 9   O-L-I-V-E-I-R-A.  If you would take the second seat,

10   first row, sir.

11          Charles Kowalski, Andrew White, and Jovita

12   Daley, you'll be excused.  Return to the jury room.

13   Thank you.

14          Juror No. 4 is now Mark Sullivan,

15   S-U-L-L-I-V-A-N; Juror No. 11 is now Jeannie Brown,

16   B-R-O-W-N.

17          Karen Powers, you'll be excused.  Return to the

18   jury room, please.

19          THE JUROR:  Thank you.

20          THE CLERK:  Thank you.

21          And Juror No. 12 is now Carmen Thompson,

22   T-H-O-M-P-S-O-N.

23          (Pause.)

24          (Discussion at sidebar and out of the hearing of

25   the jury:)
```

1          THE COURT:  You're up first.

2          MR. MITCHELL:  The government has no strikes.

3          MR. GREENBERG:  Eleven and 12.

4          MR. PIROZZOLO:  Which seats?  I couldn't hear

5     that.

6          MR. MITCHELL:  Eleven and 12.

7          (In open court:)

8          THE CLERK:  Jeannie Brown and Carmen Thompson,

9     you're excused.  Return to the jury room, please.

10         Juror No. 11 is now Jon Vanrader.

11         Benjamin Waxman and Sue Jackson, you will both

12    be excused.  Return to the jury room, please.  Thank

13    you.

14         (Pause.)

15         THE CLERK:  Juror No. 12 is now Thomas DaSilva,

16    D-A-S-I-L-V-A.

17         (Pause.)

18         (Discussion at sidebar and out of the hearing of

19    the jury:)

20         MR. GREENBERG:  Defense is content.

21         MR. MITCHELL:  One moment, your Honor.

22         (Pause.)

23         MR. MITCHELL:  Quick question:  Juror No. 50 did

24    not indicate spouse's occupation.  Can we ask?

25         THE COURT:  Would you have Mr. DaSilva come up.

1          THE CLERK:  Thomas DaSilva, can you come up here

2     one moment, sir.

3          (Discussion at sidebar and out of the hearing of

4     the jury:)

5          THE COURT:  Hi.  We have some very basic

6     information about each juror which includes employment

7     and spouse's employment, and there's no entry under

8     spouse's employment for you.

9          THE JUROR:  I don't have a spouse.

10          THE COURT:  That is a good-enough answer.  No

11     spouse?

12          THE JUROR:  Right.  That's it?

13          THE COURT:  Yes.

14          (The juror is excused.)

15          MR. MITCHELL:  Strike 50.  Strike Mr. DaSilva,

16     the guy who just walked up here.

17          THE CLERK:  You are striking him?  Okay.

18          (In open court:)

19          THE CLERK:  Thomas DaSilva, you'll be excused.

20     Thank you, sir.

21          (Discussion at sidebar and out of the hearing of

22     the jury:)

23          MR. MITCHELL:  We have a similar issue with 54.

24          THE COURT:  All right.  When you call 54, have

25     him come up, please.

1           (In open court:)

2           THE CLERK:  Robert Curran, could you step right

3    up here, if you would, please?

4           Maritza Depilier, you'll be excused; Kristopher

5    Doherty, you'll be excused; and Karen Donovan, you'll be

6    excused.

7           (Discussion at sidebar and out of the hearing of

8    the jury:)

9           THE COURT:  We have some basic information about

10   people which includes their own employment and spouse's

11   employment.

12          THE JUROR:  I have to get close to you because I

13   have a hearing aid.

14          THE COURT:  And we don't have an entry for

15   spouse's employment for you.  Are you married, do you

16   have --

17          THE JUROR:  Am I married?  Yeah.

18          THE COURT:  Does your wife have employment?

19          THE JUROR:  No, she stays home.

20          THE COURT:  Let me just ask you:  Have you had

21   any trouble hearing the proceedings when we've been --

22   when we haven't been whispering?

23          THE JUROR:  I was way in the back.  I heard this

24   fellow talking, but when you were talking it was hard.

25          THE COURT:  Do you think during the course of

PDF created with pdfFactory trial version www.pdffactory.com

1    the case you would have trouble -- we do use

2    microphones, so I don't know what level of --

3           THE JUROR:  Probably -- in all fairness to the

4    defendant, I probably have a hard time grasping

5    everything that's said.  You know, I don't want to be

6    unfair to him.

7           THE COURT:  You know, you can let us know.  In

8    the course of the case if you're not hearing things, put

9    your hand up.

10          THE JUROR:  If people pick their tone up a

11   little bit higher, I could hear everything.

12          THE COURT:  It says you're a maintenance worker.

13          THE JUROR:  What's that?

14          THE COURT:  Maintenance.

15          THE JUROR:  Yeah, maintenance, custodian.  The

16   Town of Lincoln.

17          THE COURT:  General town offices?

18          THE JUROR:  I work on the military base, on

19   Hanscom.

20          THE COURT:  Okay.  All right.  Thanks.

21          THE CLERK:  Sir, just have a seat right up

22   there.

23          (The juror is excused.)

24          MR. MITCHELL:  If he's having a tough time

25   hearing --

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Counsel.

2          MR. MITCHELL:  If he's having a tough time

3     hearing you...

4          THE COURT:  We do have lowered voices, but we're

5     also standing three feet away from each other.

6          MR. GREENBERG:  That's fine.

7          THE COURT:  It makes me a little concerned,

8     although we do have the compensating things.  I mean,

9     jurors have, in the past, raised their hands, and we try

10    to adjust.  We do have a sound system which we try to

11    make people use, so...

12         MR. GREENBERG:  Your Honor, I take no position

13    on it.  I'll leave it up to the Court and the Court's

14    wisdom.

15         MR. MITCHELL:  He didn't raise his hand at all

16    when you asked him any questions about whether he had

17    anything that might affect his ability to understand the

18    proceedings.

19         THE COURT:  I guess I'm concerned that two or

20    three times in our brief colloquy he didn't hear what we

21    said.  I think I'll excuse him.

22         (In open court:)

23         THE CLERK:  Robert Curran, you'll be excused.

24         Juror No. 12 is now Christopher Davidson.

25         (Pause.)

```
 1              (Discussion at sidebar and out of the hearing of
 2    the jury:)
 3           THE COURT:  I think it's the defense's turn.
 4           MR. PAPPALARDO:  I don't think so, your Honor.
 5           MR. MITCHELL:  I think it's the government's
 6    turn.  One second.  Yeah, we're fine.
 7           MR. GREENBERG:  We're going to challenge Juror
 8    55 in seat 12.
 9           (In open court:)
10           THE CLERK:  Christopher Davidson, you'll be
11    excused.
12           Juror No. 12 is now Johannes Bom.
13           (Pause.)
14           (Discussion at sidebar and out of the hearing of
15    the jury:)
16           MR. MITCHELL:  Can I just confirm the number
17    stricken?  I want to make sure I'm counting right.  The
18    government has exercised four and the defense has
19    exercised nine; is that correct?
20           MR. CARPENTER:  I thought we were at eight.
21           MR. GREENBERG:  We challenged Seat 12.
22           THE CLERK:  Seat No. 12?  Okay.  That makes
23    sense.
24           MR. MITCHELL:  So that makes ten.
25           MR. PIROZZOLO:  So they're at ten.  They have
```

1    one left.

2         (In open court:)

3         THE CLERK:  Mr. Bom, you're excused.  You may

4    return to the jury room.

5         Annie Bispham, you're excused.

6         Juror No. 12 is now Mark Cahoon, C-A-H-O-O-N.

7         (Discussion at sidebar and out of the hearing of

8    the jury:)

9         MR. MITCHELL:  We're content.

10        MR. PAPPALARDO:  We're fine.

11        THE COURT:  Both sides are content?  Okay.  We

12   have a jury.

13        THE CLERK:  Let me just excuse these last two,

14   if I could.

15        THE COURT:  Yup.

16        (In open court:)

17        THE CLERK:  Charles Sorrentino and Donald

18   Lampron, you'll both be excused.  You may return to the

19   jury room.  Thank you.

20        (Discussion at sidebar and out of the hearing of

21   the jury:)

22        THE COURT:  Mr. Pappalardo, I just want to --

23   obviously we're going to let them go and swear them in

24   in the morning.  We'll go through the routine.  We'll

25   just let them go.  So be ready to start.  You may need a

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   little time in the morning before the --
 2          MR. PAPPALARDO:  We have some motion issues,
 3   your Honor.
 4          MR. MITCHELL:  Do we want to take up the cross
 5   issue today?
 6          THE COURT:  Actually, we could do it this
 7   afternoon, if you want.  We have some time to do it this
 8   afternoon.
 9          MR. PAPPALARDO:  What time, your Honor?
10          THE COURT:  Three?
11          MR. PAPPALARDO:  Sure.
12          THE COURT:  Spend a half-hour, and then we could
13   save the time.  Why don't we do that.
14          MR. MITCHELL:  Thank you.
15          (In open court:)
16          THE COURT:  All right, jurors.  I can now call
17   you that.  We've completed the selection process.  We
18   appreciate your patience.  You've seen, rather
19   dramatically, what a select group you are.
20          This is as far as we'll go today.  We're going
21   to adjourn now and just have you stay a little bit while
22   Paul, the clerk, will show you the ropes in the back
23   there.  He'll show you the jury room, which will be your
24   staging area for the next few days as we go through the
25   case, and he'll kind of give you the ropes of how to
```

PDF created with pdfFactory trial version www.pdffactory.com

1    arrive in the morning and come here and so on and so

2    forth.  And then we'll start tomorrow at nine.  I expect

3    you'll be here and ready to go, and we'll start the

4    presentation of the case tomorrow morning.

5             Enjoy the rest of the day and we'll see you

6    tomorrow morning.  The hearing will be in recess.

7             THE CLERK:  All rise.  Court will be in recess.

8             (Jury out and the proceedings adjourned at

9    1:22 p.m.)

10            (After recess.)

11            THE COURT:  Before we get to the matter we

12   expected to be here for, I had an issue with one of the

13   jurors that I want to bring to your attention, which we

14   haven't resolved yet.

15            You will recall that -- I don't have his number

16   here, I left my list upstairs, but Mr. Vanrader, who

17   said he had some drug arrests, mentioned something to

18   the clerk as he was leaving which suggested that maybe

19   he had more than arrests, that he had convictions, which

20   is something he sort of led us away from at the sidebar.

21   I think he said they were dismissed.  So because he had

22   reported that, I asked for his hand-filled-out

23   questionnaire and also asked the probation office to do

24   a quick record check on him.

25            And I have not finished evaluating it myself,

PDF created with pdfFactory trial version www.pdffactory.com

1    but he may be right, although he has quite -- he's

2    fairly well-known to the board.  Apparently most of his

3    cases were dismissed.

4         Two that are most pertinent is a -- and he

5    indicated there was a recent one -- a possession of

6    class B, arraignment date of 8/27/07.  In January --

7    well, no, I'm not clear, actually.  I think maybe,

8    actually, in May, May 1, '08, continued without a

9    finding until October 30, '09, class B.

10         And I'm not sure whether that counts as a felony

11    conviction under the federal jury statute or not.

12         The other relevant one is he indicated about ten

13    years ago there is a possession of class B, disposed of,

14    apparently, in September '99, guilty, one-year

15    committed.  And again -- so those seem to be the two

16    relevant ones.

17         I wanted to bring it to your attention, though,

18    because -- I don't ask for an answer right now -- but we

19    may have to deal with that in the morning, unless you

20    want to resolve it right now.  And I'm sure the

21    government can get access to the probation records,

22    share it with the defendant.

23         It may be that he is not disqualified under the

24    statute.  The statute, if I recall, talks about felony

25    convictions as to which civil rights have not been

PDF created with pdfFactory trial version www.pdffactory.com

1   restored, and it may be that his civil rights from the

2   1999 conviction have been restored in Massachusetts.  So

3   there may not be a problem, in which case, fine.

4         The jury clerk advises us that if we let him

5   know soon, he can have a standby panel available in the

6   morning, which I think would be an advisable thing to

7   do, in case we have to resort to it.  If we don't,

8   that's even better.  So I propose to do that.  We'll

9   pick up with the status of peremptories wherever we left

10  off, whoever has that many, and deal with that.

11        So --

12        MR. MITCHELL:  I think that makes sense, just in

13  case, your Honor.

14        MR. PAPPALARDO:  Your Honor, with respect to the

15  pending matter that the Court indicated is being

16  continued without a finding through and including

17  October of '09, can you indicate to us which court that

18  is from?

19        THE COURT:  Brockton District.

20        MR. PAPPALARDO:  District court.

21        THE COURT:  But I don't know what you had in

22  mind.  What matters is the penalty available under the

23  statute.

24        MR. PAPPALARDO:  Right.

25        THE COURT:  Whether it's actually imposed.

 1   Unless what you're thinking is a misdemeanor.  I think

 2   it's a concurrent felony.  I'm not sure that matters.  I

 3   think the absence of an actual guilty finding may be

 4   what's the difference, and I just don't know the answer

 5   to that.  I know it would count for sentencing purpose;

 6   I don't know if it counts for jury disqualification.

 7           Okay.  That was the new matter.

 8           Now, with respect to openings, what is it that

 9   we need to solve before openings?  I guess it's

10   generally about what can be said about losses by either

11   side.

12           MR. PIROZZOLO:  That's correct, your Honor.

13   That's -- there are two motions pending, one the

14   government filed with respect to issues relating to an

15   arbitration and possible settlement in a collateral

16   civil matter between Paine Webber and some of the

17   exchangors, and then more recently was a motion filed to

18   prohibit reference to loss filed by the defendants, and

19   also in opposition to the motion in limine to exclude

20   the arbitration award.

21           The government's position with respect to loss

22   generally is that the loss that was -- that

23   Mr. Carpenter was causing during the course of the

24   scheme is and remains relevant to the issue of intent

25   for the very same reasons that the Court articulated in

1    its order on the new trial.

2            The relevance of that evidence doesn't change in

3    any way because some third party has agreed in a

4    collateral matter to make a payment to certain of the

5    exchangors that were involved in the transactions here.

6            There were, so far -- as I counted, there are

7    four reasons proffered by Mr. Carpenter as to why now

8    these new events change -- change the circumstances that

9    would suggest that the Court should rule differently

10   than it did the first time around.

11           The first he's articulated in one of the earlier

12   briefs that was filed on Jokinen and Joseph Iantosca's

13   testimony; and that is, somehow it's relevant to show

14   Paine Webber's culpability in this case.  And as we've

15   articulated in the brief, the issue of Paine Webber's

16   culpability, first, isn't an issue in this case, number

17   one.

18           Number two, the circumstances of the arbitration

19   award don't address -- don't address what's relevant in

20   this case, which is Mr. Carpenter's culpability for his

21   conduct in engaging in the trading.

22           The second proffer issued is this idea is the

23   exchangors suffered no loss.  They suffered no loss,

24   therefore, they should be able to show that they

25   suffered no loss.

PDF created with pdfFactory trial version www.pdffactory.com

1          The issue as to whether the exchangors

2    ultimately received recovery in separate settlements is

3    not relevant to the offense proof at trial here.

4          And courts have held, very clearly, that the

5    issue of loss, whether or not a victim ultimately lost

6    money, is not relevant to the questions posed in the

7    mail and wire fraud context, and Mr. Carpenter, through

8    his attorneys, has suggested that there's this

9    additional element that's relevant, which is -- which is

10   that there was some form of repayment here, and that

11   repayment can be relevant to the issue of intent.

12         So loss is not relevant.  I'm not sure there's

13   any serious dispute.  The issue of loss as to whether

14   there's an ultimate loss to a victim, I don't know if

15   there's serious dispute as to the case law of that.  But

16   there is no additional argument that it's relevant to

17   his state of mind in the sense that they assert -- and

18   this is in their most recent filing -- they assert that

19   he's made efforts to repay.

20         Under the relevant case law, the question of

21   repayment, at least under these circumstances, is not

22   relevant to a defendant's state of mind, at least in

23   particular where the efforts of repayment come -- even

24   assuming they are -- and I'm going to get to that -- but

25   even assuming there are efforts at repayment, where they

PDF created with pdfFactory trial version www.pdffactory.com

1  come so long after the scheme to defraud terminates, if

2  you will, or is discovered, and so where it's so much

3  later in time, the -- the courts that have looked at

4  this have said it's simply not probative of intent, and

5  it will lead the Court into a substantial amount of

6  additional litigation over what is ultimately a

7  collateral issue.

8      I just point out the Sindona case, which is

9  cited in the government's brief, which, although

10 Mr. Carpenter has made great efforts to distinguish all

11 of the other cases -- or many of the other cases that

12 the government cited, absolutely no effort was made to

13 distinguish that case, and for good reason.  It is very,

14 very close to the facts that we have here.  It involved

15 a much later third-party settlement of collateral

16 litigation that the defendant claimed should be

17 probative -- would be probative both of the absence of

18 loss and of intent.  And that was -- that argument was

19 rejected on two grounds in the Sindona case, number one,

20 because it was deemed not relevant; and number two, even

21 if it was relevant, it was going to be unduly

22 prejudicial and would cause delay and confusion on a

23 collateral issue and was excluded under Rule 403.

24      On the facts of what actually happened -- and

25 now I'm bleeding a little bit into this arbitration

PDF created with pdfFactory trial version www.pdffactory.com

1   issue and settlement issue -- what actually happened

2   here is not in any meaningful sense a demonstration of

3   Mr. Carpenter's efforts to repay anyway.  There was an

4   arbitration filed.  The plaintiffs, who are the

5   exchangors in this case, as I understand it, over

6   Mr. Carpenter's objections, were assigned the right to

7   pursue the case in arbitration.  They changed the --

8   there was a completely separate theory than what had

9   been advanced by Mr. Carpenter when the case had been

10  initially filed.  A critical issue in the arbitration

11  was whether or not -- was not whether or not

12  Mr. Carpenter did or didn't commit fraud, but rather

13  what was the legal relevance of the fraud that was

14  committed that would bar the plaintiffs from getting any

15  relief against Paine Webber.  So it does not by any

16  stretch of the imagination show that Mr. Carpenter made

17  any efforts to repay anyway.

18       Also, if the issue is efforts to repay, the

19  arbitration award, the potential settlement, those are

20  outcomes.  Those are outcomes that show what a panel of

21  arbitrators found and what Paine Webber, for its

22  reasons, decided.  It is not in any way -- neither the

23  arbitration award nor the settlement is not in any way

24  probative of Mr. Carpenter's intent, which is now the

25  principal reason Mr. Carpenter is proffering for why

PDF created with pdfFactory trial version www.pdffactory.com

1    it's relevant to this case.

2        He wants to put on evidence of all the efforts

3    of repayment; assuming the Court concludes it is somehow

4    relevant, the arbitration award and settlement do not

5    bear on that issue.

6        There is an additional reason proffered as to

7    why the -- as to why the evidence should be admitted of

8    the arbitration and the settlement, and that goes to

9    issues of management, and that's articulated in the

10   brief.

11       First of all, the issue of an arbitration award

12   or a settlement with a third party is not impeaching in

13   any way any of the exchangors.  There is an assertion

14   made it impeaches the exchangors.  It does not.  It does

15   not.  The fact that there is some collateral settlement

16   they have doesn't impeach them, doesn't show that there

17   are any credibility issues with respect to their

18   testimony, it has no bearing on that.

19       The only possible issue is whether or not a

20   Paine Webber witness can be asked questions about that,

21   and again, at the earlier trial in this matter, the

22   Court addressed an issue about the pending arbitration,

23   and in that context, at least as I understand the

24   transcript, the Court found that there might be some

25   kind of issue of bias with respect to -- permitted some

PDF created with pdfFactory trial version www.pdffactory.com

1    questioning of the Paine Webber witness, one in

2    particular, Mitchell Rock.

3           That was in the context of a pending arbitration

4    with potential testimony upcoming.  And the government

5    has two points about that.  The first is, to the extent

6    there's some resolved matter, there isn't any longer any

7    pending potential testimony that would have a bearing or

8    permit the inference that Mitchell Rock might be shading

9    his testimony for that purpose, and therefore, the

10   arbitration proceeding ceases to have whatever marginal

11   relevance it might have for purposes of impeachment that

12   it did have at the last trial.

13          Second -- well -- second, again, this goes back

14   to my prior point, the issue of the award and the

15   settlement has -- themselves have no bearing on whatever

16   Mitchell Rock's intent or bias may be.  The fact of an

17   award, the fact of a settlement, again, doesn't have

18   much bearing.

19          The settlement itself or the potential

20   settlement, I don't know as I stand here today whether,

21   in fact, the settlement is final, but let's assume for

22   the purposes of this argument that there is a

23   settlement, it's also prohibited under Rule 408.  It's

24   not relevant, and it also should not be permitted under

25   Rule 403.

1          The final reason proffered in the papers

2     appears, again, in opposition to having Ms. Jokinen and

3     Mr. Iantosca's testimony read in is that it's a civil

4     dispute only.

5          As we've said in our papers, the argument, this

6     is just a civil dispute, is simply for jury

7     nullification.  It's not an appropriate basis for

8     admission of the evidence.

9          While it's on my mind, to the extent there's any

10    possible suggestion in the opening made by the defendant

11    that this is just a civil dispute, if there is any

12    argument or suggestion of that, the government will be

13    objecting to that as improper and will be asking for an

14    instruction that is not a proper basis to open or it's

15    not a proper basis to present to the jury, the issue

16    that this is just a civil dispute.

17         Those are principally the reasons that the

18    government has for permitting the issue of loss on the

19    same basis that it came in, in the last trial, and

20    excluding the issue of an arbitration award and a

21    possible settlement between the exchangors and Paine

22    Webber.

23         THE COURT:  Can the issue of loss to any

24    particular exchangor be separated from the issue of loss

25    within the trading accounts?

1          MR. PIROZZOLO:  Yes, absolutely it can be.

2          THE COURT:  Should it be?

3          MR. PIROZZOLO:  Yes.  It depends on what you

4    mean by loss here.

5          THE COURT:  Right.

6          MR. PIROZZOLO:  That's the question:  What do

7    you mean by loss?  I think that -- I think that for

8    purposes of the exchangors, I think the -- a question

9    and answer which would go the exchangor:  Did you -- was

10   the money available for your purchase or exchange at the

11   conclusion of it?  Did you receive some notification?

12   And I believe most of these exchangors received a

13   notification that said Benistar is not in a position to

14   proceed with the exchange.

15          And we don't necessarily need to get into

16   anything that ultimately happened as to whether they got

17   their money back; for instance, there are two exchangors

18   who didn't get their money back, but for purposes of the

19   fact that Benistar couldn't perform and didn't perform

20   as it had promised, I think, is sufficient to have that

21   testimony.

22          The issue of loss of the brokers by the issue of

23   the testimony by the brokers as to loss, is they

24   testified, and are going to be testifying, that the

25   accounts were incurring substantial loss positions

PDF created with pdfFactory trial version www.pdffactory.com

1    during a period of time when Mr. Carpenter was on notice

2    of the loss, was aware of the obligations that Benistar

3    had to the exchangors, and was also aware that Benistar

4    was continuing to receive funds from exchangors based on

5    the same statements and partial statements, if you will,

6    that had existed throughout the relationship.

7          Those losses, the trading losses, are highly

8    probative of intent, and you don't need to get into

9    whether there was ultimately a loss to the exchangors.

10   They are separate in that sense.  Separate relevances,

11   if you will.

12         THE COURT:  Does that mean that the government

13   is not interested in presenting evidence of loss to

14   individual exchangors?

15         MR. PIROZZOLO:  What do you mean by loss?  So --

16   the exchangors are going to testify --

17         THE COURT:  By way of saying was it available?

18   I guess that's what you said, right?

19         MR. PIROZZOLO:  Well, the exchangor is going to

20   say we didn't get our money, we didn't get -- I got a

21   notice that said they didn't have the money for my

22   exchange.  My exchange didn't close because there wasn't

23   the money.  That's entirely fair game, and that doesn't

24   bear on whether or not they ultimately, eight years

25   later, received a settlement from a third party.  They

1    should be entitled to testify to that.

2         THE COURT:  Okay.

3         MR. PAPPALARDO:  Good afternoon, your Honor.  I

4    find this argument by the government quite intriguing.

5         First of all, as I think the Court has pointed

6    out, loss is not an element of this -- of either of

7    these crimes, and if the Court looks at our motion, this

8    is a motion in limine to prevent any mention of loss.

9    However, in the first trial, the government took the

10   position, as I just heard the government taking the

11   position now, that loss is relevant with respect to the

12   issue of intent; because it shows state of mind,

13   purportedly, of Mr. Carpenter, it can be considered on

14   that issue of intent.  Intent, by the way, which is the

15   only thing that distinguishes this between a civil case

16   and a criminal case.  The government can't have it both

17   ways, your Honor.

18        They say that this is a third-party collateral

19   matter; that is, the fact that the exchangors now are

20   receiving this money.  It's not a third-party collateral

21   matter at all.  It's interesting that the third party is

22   one of their witnesses in this case, Paine Webber,

23   number one.  Number two, Mr. Carpenter himself commenced

24   this suit before he was indicted as evidence of his good

25   faith, as evidence of his efforts to try to get back

PDF created with pdfFactory trial version www.pdffactory.com

1    money for the investors, for the exchangors.

2         Prior to the time he was indicted, he commenced

3    a suit.  Yes, it's true, it's absolutely true, that the

4    suit was taken over for the benefit of the investors by

5    investors' counsel.  Having said that, that only serves

6    to explain why the outcome was what it was in terms of

7    its findings, not in terms of the amount.  Why?  Because

8    Mr. Carpenter didn't testify in that case.  Mr. Paley

9    didn't testify in that case.  So the exchangors were

10   able to shape the case in a way that they thought would

11   get them the money, and it did.

12        What's more interesting, your Honor, is that

13   when the arbitration award came down in an amount in

14   excess of the supposed loss to the investors, as argued

15   by the government, it was greatly in excess of that.

16   And in this case, the award goes to Benistar.  When that

17   award came down, immediately Mr. Carpenter, on behalf of

18   Benistar, signed it over so that Paine Webber could make

19   direct payment to the investors.

20        Now, your Honor, Mr. Carpenter isn't responsible

21   for how long it took Paine Webber to realize that there

22   was an arbitration award and they would settle it for

23   $12.4 million.  He didn't have any control, he did not

24   have any input at that time.  What he did do was he

25   started it off at a point in time before he was

PDF created with pdfFactory trial version www.pdffactory.com

1    indicted, and I submit to the Court that is -- if

2    anything is evidence of good faith, that is, as well as

3    his ability now to sign it directly over to each of the

4    investors to make sure that they do get compensated.

5         It's also interesting, your Honor -- and your

6    Honor has heard this case -- it's also interesting as

7    you look at the theory of this case that the government

8    has proposed.  According to the government,

9    Mr. Carpenter, through his misrepresentations, induced

10   investors to part with money to allow Mr. Carpenter to

11   play in the stock market and hopefully enrich himself.

12   Okay?  That's the government's theory of the case.  But

13   there were 114 or so exchangors.  The only thing that

14   distinguishes those that find their way into a

15   superseding indictment and those that didn't was loss.

16   Not an element of the crime.

17        So they try to have it both ways, your Honor.

18   Either it is germane to the issue of intent or not.

19        THE COURT:  Well, let me just ask you that.

20        Would it be to the defendant's advantage to

21   demonstrate that context; that is, to show that there

22   are a hundred and something as to which the same

23   representations were made and there was no loss?  So

24   wouldn't you seek to affirmatively use no loss to

25   balance the claim of loss?  So why doesn't that just put

everything -- I mean, they can show the loss, you can
show why that makes no sense because of context.

MR. PAPPALARDO:  Your Honor, our motion says we
don't want loss to come in.  However, if it does, then
it all comes in.  We have no problem with that.  It's in
the alternative.  That's what the motion says, that's
what we argue, that's what we cite ample case law on.

And the government says that -- okay, the
arbitration -- the arbitration takes a form that was
different from the way it started.  Of course it did,
because they didn't have control; I mentioned that
point.

What they want, your Honor, is to say that loss
is relevant to the issue of intent, but only for the
government to show that Mr. Carpenter had the intent,
and it's not relevant for the issue of Mr. Carpenter's
efforts to pay back the investors for the scheme.

Remember, your Honor, the evidence came in in
the first trial by way of documents, if nothing else,
that Mr. Carpenter was angry with Paine Webber.  Why?
Because they pulled the plug on his trading.  That's why
he sued them.  Had he been able to -- had he been able
to be -- keep his positions into January, there was a
market upswing, and they pulled the plug in the middle
of December.

PDF created with pdfFactory trial version www.pdffactory.com

1          He was angry with Paine Webber, that's what

2   caused him to sue them, that's what caused him in

3   part -- and I'm not blaming Paine Webber, I'm saying

4   they have a degree of culpability, but that was

5   Mr. Carpenter's theory.  And what could be more relevant

6   to good faith than adhering to a theory where you

7   believe in what you are doing?  Even -- even if certain

8   people are telling you that it's risky or certain people

9   are telling you it's the wrong position to take, if he

10  has a good faith belief in what he's doing, including

11  flying in the face of that, then that negates any

12  criminal intent.  That's a complete trump of criminal

13  intent.

14          And I appreciate Mr. Pirozzolo telling me that I

15  can't argue that this is a civil case.  I submit to the

16  Court I can, and I would suggest to the Court that the

17  one distinguishing factor in this case is whether or not

18  there is intent.  And loss, if it comes in for the

19  government to show that Mr. Carpenter had criminal

20  intent, should come in -- the repayment of that should

21  come in for Mr. Carpenter to show that he didn't have

22  that criminal intent.

23          Further, your Honor, this isn't a happenstance

24  thing.  There will be evidence in this trial during the

25  relevant periods of time that Mr. Carpenter, out of his

PDF created with pdfFactory trial version www.pdffactory.com

1    own funds, traded in these accounts.  There will be

2    evidence in this trial after the plug was pulled by

3    Paine Webber, notwithstanding how mad he was at Paine

4    Webber, that he went into his own pocket and completed

5    quite a few exchanges, albeit for smaller amounts, but

6    completed quite a few exchanges, which, again, shows a

7    lack of criminal intent.

8         And I would submit to the Court that this was a

9    course of conduct that has taken place from the

10   beginning in this case, not, you know, on May 28th of

11   2008.

12        And for the Court to allow the government, which

13   is what they did in the first trial, to mention loss, to

14   mention gambling, which is another collateral matter, 35

15   times between their opening statement and their closing

16   argument, including their rebuttal, and not let

17   Mr. Carpenter put into evidence the fact that these

18   investigators are paid back, I suggest to the Court is

19   not only fundamentally unfair, it's improper.

20        If -- either loss comes in and it all comes in,

21   or it doesn't.

22        THE COURT:  Well, again, it depends on what

23   we're talking about and at what point in time

24   significantly with respect to loss.

25        The issue, as to which all of this is being

PDF created with pdfFactory trial version www.pdffactory.com

1    directed, is specific intent to defraud.

2            MR. PAPPALARDO:  Exactly.

3            THE COURT:  All right.  There can be evidence

4    that we could call evidence of loss that is in a

5    temporal connection with the events that are said to be

6    the defrauding events that give that evidence of loss

7    some relevance.  There could be other evidence of loss

8    that is temporally and otherwise remote from the events

9    of the fraud which would not have the connection in

10   either direction, for either the government or the

11   defendant.

12           So when you talk about repayment, even that, I

13   guess, you have to be careful as to whether you're

14   talking about something that might be unfolding in the

15   ordinary course of the 1031 exchange transaction, or

16   something that might happen after the fact when the

17   cards have all fallen down.  And I think there are

18   different outcomes for those two different things.

19           So I think the way to be focusing on this is

20   what evidence, pro or con, relates to the question of

21   the specific intent of the defendant at a -- at the time

22   of the transactions, not thereafter, even if it's before

23   indictment or not thereafter when there's an arbitration

24   and so on, so forth.  I think this is more a temporal

25   problem than it is a topical problem, in one sense.

1          MR. PAPPALARDO:  Except, your Honor, in the last

2     trial, the government argued that the failure of the

3     investigators to have received their money at the time

4     of that trial was relevant to Carpenter's intent --

5          THE COURT:  I'm not sure what the argument was.

6          MR. PAPPALARDO:  That's exactly what they

7     argued.

8          THE COURT:  All right.  Let's not go to the

9     past, let's set the rules for this trial.

10          MR. PAPPALARDO:  Okay.

11          THE COURT:  So whether they did or didn't

12     before, let's talk about what they should or should not

13     do now.

14          And I'm suggesting that the time line is

15     certainly a significant determining factor as to what's

16     admissible or not admissible for either side.

17          MR. PAPPALARDO:  And if I could just comment

18     again on that, your Honor.  If there is going to be

19     evidence that shows that Mr. Carpenter was putting money

20     into this account during the exact relevant periods of

21     time that the government is saying that the investors

22     were being defrauded and was paying off investors in

23     January of 2001 and this pattern of conduct continues

24     through and including today, I would submit to the Court

25     that that's relevant on -- on the issue of whether

1    Mr. Carpenter ever had the intent to commit these crimes

2    when the government says they committed them, which, by

3    the way, was when the money went over from the

4    investors.  And this pattern of conduct will be

5    established.  It's not -- you know, again --

6            THE COURT:  Let me just get the government's

7    reaction to that.

8            I know we haven't finished with your points,

9    but --

10           MR. PIROZZOLO:  I think the time line is clearly

11   relevant and ought to be a controlling factor here.

12           I think -- I'm not sure I understood the

13   question that you just posed to Mr. Pappalardo.  Is the

14   question would they put in evidence -- would they be

15   able to put in evidence of Mr. Carpenter making

16   repayments during the course of this scheme and whether

17   we would object to that?  If he's making repayments

18   during the course of the scheme, I believe that evidence

19   is out there and it did come in in the last trial.

20           THE COURT:  I'm not sure --

21           MR. PIROZZOLO:  I'm not sure --

22           THE COURT:  I'm not sure what "repayment" means.

23   We're parsing here.

24           MR. PIROZZOLO:  You're right.

25           THE COURT:  If "repayment" means returning the

1    parked funds to the exchangor in accordance with the

2    exchange contract, then I think that's obviously

3    relevant; if it means sometime later making good on

4    defaults, then that means something else.

5         MR. PIROZZOLO:  As to the latter, that should

6    not be admissible, as to the latter.  The later

7    repayment to make good defaults is -- should not be

8    admissible, it's not relevant, it's not probative of his

9    intent at the time of the offense.

10        There are conversations --

11        THE COURT:  But more or less contemporaneous

12   return or making funds available is.

13        MR. PIROZZOLO:  It's potentially probative of

14   that.  However, I think there's a competing inference of

15   what's going on with that.  But, yes, I accept that.

16        THE COURT:  Some of this is going to be for the

17   jury to make sense of.

18        MR. PIROZZOLO:  Exactly.  Yes, that's right.

19        So I think that certainly statements that are

20   made when there's discovery that Benistar can't make its

21   obligations, it cannot make the repayments in the sense

22   of providing the funds to the exchangors, those

23   statements, things like that, up through January of 2001

24   are highly relevant intent.  So the time line would end

25   up through that period of time, which is approximately

1  January of 2001.

2          So unless you have other specific questions, I

3  think that's basically where we're --

4          THE COURT:  No, I think that's how we're going

5  to resolve it.

6          I don't know how you addressed the arbitration

7  award itself, if you have anything more to say about

8  that.  I'm not sure how it fits into your --

9          MR. PAPPALARDO:  The arbitration award, your

10  Honor, again, fits into the argument because it reflects

11  a continuous pattern of conduct by Mr. Carpenter in an

12  effort to repay the investors, which included putting

13  money in at the time of the supposed losses or when the

14  losses were being incurred, putting money in to allow

15  exchangors to complete their exchanges so that they

16  didn't lose money and their exchanges were complete and

17  they received the tax benefits from those exchanges

18  through and including filing an arbitration against

19  Paine Webber.

20          I should also point out, your Honor, that, as I

21  think the brief does, that there's still an outstanding

22  matter against Merrill Lynch in this case that is

23  ongoing and set for trial surrounding the exact same

24  issues.

25          I just suggest to the Court, and I can't argue

PDF created with pdfFactory trial version www.pdffactory.com

1    this more strongly, that it is fundamentally unfair for

2    the government now to be able to introduce evidence that

3    investors lost money today when they haven't lost money.

4    You can't have it both ways.  Either loss, which is not

5    an element of the crime, comes in on the issue of

6    intent, or it doesn't.  And I -- your Honor, it can't be

7    relevant for the government's intent and not relevant

8    for Mr. Carpenter's intent.

9            THE COURT:  Okay.

10           (Pause.)

11           THE COURT:  Well, I think maybe we'll have a

12   provisional resolution for the opening statements at

13   least, and then we'll see how that holds up as the case

14   proceeds.

15           The evidence that we're talking about is

16   admissible as potentially affecting an assessment as a

17   factual matter by the jury of whether one of the

18   elements, at least one of the elements of the offense

19   has been established by the government; that is, whether

20   the defendant had the specific intent to defraud.  For

21   each -- without the indictment in front of me, I'm

22   hesitating a little bit here -- but for each -- well,

23   let me say it this way:  For each separate transaction

24   with an exchangor, and therefore, for the specific

25   individual crimes that are alleged in the indictment,

PDF created with pdfFactory trial version www.pdffactory.com

1    that is, a particular use of the mail or a particular

2    wire transfer, that is the time when the specific intent

3    must exist or not.  Each indictment has its own temporal

4    focal point, then, because the allegation is that on

5    September 28, 1999 because a use of the mails, which was

6    in furtherance of a scheme to defraud having a specific

7    intent to defraud, that's the time when it matters for

8    that count whether there was a specific intent to

9    defraud.  It's not sort of a fog of intent; it might be

10   true in the narrative sense, but for the legal analysis,

11   it's a pointed period in time.  And it's very possible

12   that a specific intent to defraud could exist as to one

13   count and not to another.

14          So I think if we keep focused on the allegations

15   of the indictment, including the particular elements of

16   the crimes of wire fraud and mail fraud and the

17   particular requirements of a particular allegation with

18   respect to when the intent has to occur, evidence of the

19   trading environment known to Mr. Carpenter will be

20   relevant.  That could mean evidence that his trading

21   strategy was becoming so risky, as the government's view

22   would have it, that no one could in good faith believe

23   that this was a transaction that would honestly be

24   concluded.  Or, on the other hand, the trading

25   environment was such that a person could in good faith

PDF created with pdfFactory trial version www.pdffactory.com

1    believe that representations made to an exchangor to

2    induce the transaction were honest and expected to be

3    fulfilled.  I mean, that's basically the context.  I

4    don't know, there were 14 counts or something like that,

5    there could be 14 different analyses, but any evidence

6    has to go to one of them, it seems to me.

7            When we get past the commission of the crimes

8    into subsequent repairs of various things like that, I'm

9    not so sure.  So I think for the openings, we'll focus

10   on the elements of the offense and what might have been

11   known at that time or could have been believed in good

12   faith.  I think that's the best way to handle it, and

13   we'll see where that leads.

14           I mean, that's -- go ahead.

15           MR. PIROZZOLO:  Your Honor, I just have two

16   questions, two points of clarification of the Court's

17   ruling.  The first is you said the evidence that we're

18   talking about.  It wasn't clear to me, you're talking

19   about the trading losses, the Merrill Lynch, Paine

20   Webber trading losses?

21           THE COURT:  Yes.

22           MR. MITCHELL:  And something else?

23           THE COURT:  Well, I don't -- you know, I don't

24   know everything you have in mind.  I mean, but it could

25   be that the failure to -- and I don't remember from the

1    evidence whether this is available or not -- but just

2    hypothetically it could be that an experience of being

3    unable to return funds when due in October because of

4    trading losses would illuminate something that happened

5    in November, because it's a past experience by that

6    time.  So trading losses, no, but perhaps also other

7    experiences.

8              MR. PIROZZOLO:  Okay.  That's helpful, your

9    Honor.

10             And there are certain statements that were made

11   by Mr. Carpenter in January.  I think the last count is

12   December of 2000.  With respect to the Court's ruling,

13   statements made after the fact are highly probative of

14   intent at the time the crime -- the crimes were

15   committed.  Is it outside the scope -- is the Court

16   saying that you cannot refer to those statements in the

17   opening?  The government cannot?

18             THE COURT:  Remind me of an example.

19             MR. MITCHELL:  I could do that.  These are --

20   there were a handful of statements that were made in the

21   first week of January, your Honor.

22             THE COURT:  I remember vaguely about it.  I

23   remember that Mr. Carpenter had gotten in touch with

24   several people and broke the bad news to them, but I

25   don't remember the specific statements.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. MITCHELL:  Right, broke the bad news.  Among

2     the statements were his claim that there had been a run

3     on the bank when, in fact, that there been no run on the

4     bank.  Secondly, that he said he had made prudent

5     investments.  These are all backward-looking statements,

6     which is significant, I think, in terms of their

7     relevance.  He said that -- he also asked for a loan so

8     that he could repay, he could make the money back and

9     could repay the exchangors.  These are all relevant to

10    show state of mind, they're all relevant to show

11    consciousness of guilt and intent, consciousness of

12    guilt at the time of taking their money.  There hadn't

13    been a run on the bank.  These are all backward-looking

14    statements that the Court read in.  That's essentially

15    what it is.

16         MR. PAPPALARDO:  Well, two things, your Honor.

17    First of all, we have outstanding objections to those in

18    the form of motions that relate to conversations with

19    Mr. Iantosca, which Mr. Greenberg will argue in terms of

20    the admissibility of his transcript.

21         You know, the government can take the position

22    that statements in January, when the accounts were

23    closed on December 14th, are evidence of consciousness

24    of guilt.  I suggest they're not.  First of all, I

25    question whether they're admissible.  Second of all --

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  That's really the only question.

2    But you seek to use them the other way around.  You say

3    they're evidence of good faith, I presume.

4          MR. PAPPALARDO:  No, your Honor.  No, your

5    Honor.  I suggest to you that, first of all, they're not

6    admissible.  And I also suggest to you that what the

7    government just characterized is not going to be the

8    state of the evidence.  They just said that, you know,

9    when Carpenter said that he was asking for money from

10   Iantosca so he could pay the investors back.  That's not

11   the evidence at all.  And quite frankly --

12         THE COURT:  Why are the statements of the

13   defendant inadmissible?  Normally, except for

14   irrelevance, they're not --

15         MR. PAPPALARDO:  I couldn't agree with you more,

16   your Honor, except that if you're drawing a bright line

17   test for purposes of the opening statement with respect

18   to admissibility of collateral issues that relate to the

19   state of mind at the time the crimes were committed back

20   in, supposedly, September, October, and November --

21         THE COURT:  But a defendant's statement about

22   what he thought back in September would relate to that.

23   Doesn't that --

24         MR. PAPPALARDO:  Your Honor --

25         THE COURT:  The historical statement may still

PDF created with pdfFactory trial version www.pdffactory.com

1    relate to the crimes, as I've defined it, even though

2    it's made later.

3         MR. PAPPALARDO:  And what the statement has to

4    do with, your Honor, even on the government's best

5    evidence, is that Paine Webber closed us down, a run on

6    the bank, and therefore, we can't complete this

7    exchange; it is not, you know, that at the time you put

8    in your money, this was risky.

9         What it is is an argument that but for the bank

10   being closed, but for the account being closed by Paine

11   Webber, we would not be in this position.  As a matter

12   of fact, as of the time that Iantosca was visited by

13   Mr. Paley and Mr. Carpenter, the stock market had gone

14   way up, but at that point in time the position was

15   closed, so the Benistar fund could not reflect the

16   upturn in the market.  That's what the statement was.

17   And I suggest to you that that statement does not

18   reflect the point in time that supposedly the government

19   contends the crime was committed, which was months

20   before, which was months before the run on the bank or

21   when Paine Webber closed it on December 14th.

22        And if you're to allow that in again for

23   purposes of the opening, then I'm not sure I understand

24   your ruling.

25        THE COURT:  Well, I think it is admissible for

PDF created with pdfFactory trial version www.pdffactory.com

1    the reason I stated.  I think it refers back to the

2    state of mind at the time of the various offenses as

3    charged.

4         So --

5         MR. MITCHELL:  One thing I'd like to clarify,

6    because I'm giving the opening tomorrow, I just want to

7    make sure I characterize loss, loosely speaking, the

8    financial loss in his trading activity is correct, or

9    doesn't run afoul of the Court's order.

10        I'm going to say words to the effect that the

11   exchangors learned that their money was gone, which is

12   an objectively true statement, their money was gone, it

13   was no longer with Benistar.  And secondly, I will refer

14   to those events as -- in the following way, or something

15   like it, that Carpenter had lost the money in the

16   options market; again, objectively true.

17        These statements concerning the disposition of

18   the funds not only -- I think, to use the Court's words

19   from the last trial, are relevant to show events.  In

20   other words, if the jury weren't to hear that the money

21   was gone, the jury might start to wonder, okay, what are

22   we doing here after all?

23        So it seems to me that, at least to conclude the

24   story, to show at least the structure of the scheme and

25   the whole narrative, the government has to be able to

PDF created with pdfFactory trial version www.pdffactory.com

1  say the money was gone, and was; that Carpenter lost the

2  money in the options market, and he did it; and it seems

3  to me that's a fair, non-prejudicial characterization of

4  what happened and what brings us here today.

5        MR. PAPPALARDO:  Well, your Honor, it's not only

6  not accurate, it is unfair.  That's not exactly what

7  happened.  What happened was Paine Webber closed his

8  position.  He didn't lose the money in the options

9  market, Paine Webber closed his position.  You know, the

10  government --

11        THE COURT:  But wait a minute.  They closed the

12  position with a huge deficit in the account.

13        MR. PAPPALARDO:  Sure, there was a huge deficit

14  in the account, your Honor, but what is also true is

15  that at no point in time with all of those supposed huge

16  deficits the -- did Mr. Carpenter ever fail to meet a

17  margin call.  This was a Paine Webber action.  This

18  wasn't a loss by Carpenter.  And but for that occurring,

19  those funds would have been replenished in significant

20  amounts at the beginning of January.  And keep in mind,

21  too, your Honor, that the exchangors' trades were

22  scheduled for February for the most part.

23        And I think it's fundamentally unfair for this

24  Court to allow testimony or even in an opening statement

25  to say that money was lost and not put that in context.

1    Because Carpenter didn't lose the money.  That's not

2    what happened.  Carpenter was prevented from trading by

3    a -- as the government says -- a collateral third party,

4    which was the fundamental basis of Mr. Carpenter's

5    problem.  He didn't lose the money.  It's not like he

6    bet on a stock, the stock went down and, you know, the

7    company liquidated.  That would be a problem.  That's

8    not what happened here.

9         And to leave the impression that Carpenter lost

10   the money, I say to the Court, is fundamentally unfair.

11   And again, it highlights precisely what this motion is

12   about.  Either a loss is relevant for intent for the

13   government, or it's not.  But it's got to be the same

14   intent, the same loss or the same explanation -- you

15   can't leave it with the jury that the money was lost,

16   because it wasn't, and certainly not the way the

17   government just characterized it.

18        THE COURT:  I do think that characterizing it as

19   a loss or the exchangors learned that their money had

20   been lost adds a commentary to facts.  I think the raw

21   facts are where we should stay.  Events, dollar amounts

22   in actual measurement in the account, dates at which

23   things occurred or didn't occur, notification by

24   Mr. Carpenter to people of what happened and so on

25   without characterization I think is the best way to do

PDF created with pdfFactory trial version www.pdffactory.com

1    it; otherwise, I'm going to get to the problem that has

2    us here.

3           MR. GREENBERG:  Your Honor, we have a couple of

4    issues involving trial testimony of Iantosca.

5           THE COURT:  Yes.  Let me just say that came up

6    last week, and I said I would read the transcripts, and

7    I have done that, yes.

8           MR. GREENBERG:  Your Honor, we have our

9    objections annotated, and we also have a motion we filed

10   this afternoon raising an issue as to Mr. Iantosca's --

11   his competency, based on records we've obtained,

12   certified copies, including a police report that took

13   place seven months after he testified at the first

14   trial.  Based on these -- based on these records, as

15   well as based upon -- if you look at his responses, it

16   raises significant issues as to whether or not

17   Mr. Iantosca was competent at the time.

18          Also, your Honor, since we -- since he's not

19   available to testify and we have these records, we're

20   now prevented from cross-examining him in terms of his

21   recollection and the accuracy of his testimony based on

22   these records.  We would ask -- and we filed it, we're

23   going to give it to the government -- that your Honor

24   consider our request that he be precluded from

25   testifying.  And secondly, to the extent your Honor

PDF created with pdfFactory trial version www.pdffactory.com

1    allows him to testify, you take a hard look at the

2    testimony and the objections we've raised.

3        I have -- this is the transcripts with our

4    objections as well as --

5        THE COURT:  Okay.

6        MR. GREENBERG:  If I can turn them over to the

7    Court.

8        THE COURT:  Fine.

9        THE COURT:  Mr. Mitchell, is it your intention

10    to address Mr. Iantosca's testimony in the opening?

11        MR. MITCHELL:  I'm not going to name him, no.

12        THE COURT:  Well --

13        MR. GREENBERG:  In fact --

14        THE COURT:  -- would there be evidence but for

15    his testimony would not be in the case?

16        MR. MITCHELL:  No.  I'm going to refer to the

17    exchangors generally, so it shouldn't be an issue.

18        MR. GREENBERG:  Well, I thought they just said

19    they were going to refer to a conversation in January

20    that Mr. Carpenter purportedly had with one of the

21    exchangors.  That's -- that's Mr. Iantosca.

22        MR. MITCHELL:  It's not just Mr. Iantosca.

23        MR. GREENBERG:  Well --

24        MR. MITCHELL:  All right.  The Court will -- if

25    you're asking me the question, your Honor, it will come

PDF created with pdfFactory trial version www.pdffactory.com

1    in through a voicemail that Mr. Carpenter left on --

2    with Matt Kameron, who was one of Iantosca's attorneys,

3    which said there was a run on the bank.  It will come in

4    through Marjorie Adams, another one of Mr. Iantosca's

5    attorneys, who asked in a conversation with

6    Mr. Carpenter in which Mr. Carpenter said -- admitted

7    that he had asked for a loan, and to whom he, Mr.

8    Carpenter, also said there had been a run on the bank.

9           So the statement, the characterization, it

10   doesn't rely on anything that's in Mr. Iantosca's

11   transcript.

12          MR. GREENBERG:  With all due respect to the

13   government, we don't believe they can authenticate that

14   phone message.  We don't believe they can authenticate

15   that telephone call, and I'm prepared to address it

16   right now, your Honor.

17          There's no evidence that suggests that

18   Mr. Kameron could recognize Mr. Carpenter's voice on the

19   phone message, and with respect to the return call,

20   there's -- the government, at least in the first trial,

21   lacked the sufficient foundation in order to tie that

22   conversation to Mr. Carpenter.

23          So we don't believe they can get -- from

24   admissibility grounds they can introduce that testimony.

25          THE COURT:  All right.  That's a different

PDF created with pdfFactory trial version www.pdffactory.com

1  ground than Iantosca's testimony.  Let's take them one

2  at a time.

3        I think I'm hearing that whatever Mr. Mitchell

4  wants to say in the opening, he is not making direct

5  reference to Mr. Iantosca's testimony.  There may be

6  additional problems, but -- is that correct?

7        MR. MITCHELL:  That is correct.

8        THE COURT:  So all that means is timing from my

9  point of view.  I'll try to look at it, but it isn't

10 necessarily absolute that we resolve it before the

11 opening.  We'll resolve it at some point.

12        As to the other, if you think there's going to

13 be reference to other matters in which you think it's

14 not likely the government will have evidentiary support,

15 that's something --

16        MR. GREENBERG:  It's my understanding in the

17 first trial they referred to three conversations, one

18 was with Mr. Iantosca, the second was with Mr. Kameron

19 which they report is on behalf of Mr. Carpenter.

20 Mr. Kameron is unable to identify Mr. Carpenter's voice

21 to tie it to him.  And secondly, a conversation that

22 Mr. Kameron supposedly had with Mr. Carpenter, and the

23 same thing with Marjorie Adams.  These are both, I

24 believe, in January.  Both of those witnesses are unable

25 to identify Mr. Carpenter's voice, at least based upon

PDF created with pdfFactory trial version www.pdffactory.com

1    our reading of the trial transcript the first time

2    around.

3          And I realize, your Honor -- and I appreciate

4    the fact that we're trying this case afresh.  I realize

5    many pieces of evidence at the first trial went in

6    unobjected to, but these -- both these -- all three of

7    these conversations, we believe, are inadmissible, given

8    the foundation that the government didn't lay.

9          THE COURT:  Will you be able to proffer a

10   foundation so they can use it in the opening?

11         MR. MITCHELL:  Yes.  It's the same thing that --

12   same foundation we laid last time with those two

13   witnesses.  And with respect to Adams' call with Dan

14   Carpenter, the person she'll testify that the person she

15   spoke with identified himself as Dan Carpenter and said

16   a number of things in the conversation that would link

17   up to Dan Carpenter; that is to say, that Joe Iantosca

18   had been a client, that Joe Iantosca -- he had visited

19   Joe Iantosca, he had visited Benistar, all those things,

20   given the circumstances by a preponderance of the

21   evidence, would establish that he is -- he was, in fact,

22   Dan Carpenter.

23         With respect to Mr. Kameron, again, the

24   controlling rule is Rule 104(a).  Mr. Kameron got on the

25   stand and said, yeah, that's the voicemail I got from

1    someone, identified himself as Dan Carpenter and was

2    calling Mr. Kameron as Mr. Iantosca's attorney and said

3    I just visited Mr. Iantosca, that he was quite mad.

4    Again, it all ties up both with Iantosca's and Adams'

5    testimony.  So again, by a preponderance of the

6    evidence, both conversations come in.  So I mean,

7    there's -- I'm not sure --

8         THE COURT:  Well, the question is enough for

9    opening.  If your objection --

10        MR. GREENBERG:  I don't believe under the cases,

11   your Honor, that's a sufficient basis, and we'll

12   bring -- if they want to make the statement, it's going

13   to irreparably, you know, poison the mind of the jurors.

14        THE COURT:  If the government's position is that

15   the trial transcript of the first trial evinces a

16   foundation that is adequate, I'll look at that

17   transcript and see whether that's enough for an opening.

18   If it's necessary past the point to have a voir dire

19   when the witnesses are here to actually do the evidence,

20   we can do that.

21        MR. PAPPALARDO:  We object, your Honor, to any

22   statement by the government in their opening.

23        THE COURT:  Okay.

24        MR. PIROZZOLO:  One other transcript that seems

25   to have not been discussed is Linda Jokinen's

PDF created with pdfFactory trial version www.pdffactory.com

1    transcript, your Honor, and briefly --

2            MR. PAPPALARDO:  I gave the Court --

3            MR. PIROZZOLO:  The government's position, if

4    you look at the objections that are raised throughout

5    Ms. Jokinen's transcript, the government had very few

6    comments, and there were very few places of agreement.

7            It's the government's position that

8    Ms. Jokinen's testimony comes in, for the most part, as

9    it came in the first time around.

10           The objections that are raised almost uniformly

11   are an objection -- it's a global objection, it's then

12   repeated throughout that there is -- that  Ms. Jokinen

13   lacked personal knowledge for various things that she

14   had testified to.  And there's some objection to

15   relevance.  Ms. Jokinen is a bookkeeper, as someone who

16   was in the office at Benistar in Newton clearly has

17   relevant evidence.  Her testimony clearly is relevant.

18           The issue of personal knowledge, I just want to

19   point out a couple of things, your Honor.  Personal

20   knowledge can be inferred from the circumstances and

21   from all of the evidence that's in the record.  And

22   based on her position, many of the objections that are

23   raised here are objections to personal knowledge, but

24   it's proper to infer from the circumstances that she did

25   have personal knowledge, such as, for example, sending

1    the -- she testified that certain packages were sent

2    down to Mr. Carpenter.  She testifies to the procedures

3    that Mr. Carpenter set forth.  There's an objection she

4    didn't have personal knowledge, Mr. Carpenter did that.

5         Those objections are really objections to the

6    weight, not the admissibility of that testimony.  And

7    there's two cases I just want to bring to the attention

8    of the Court as it goes through Ms. Jokinen's testimony,

9    that's United States v. Doe, Judge Breyer's decision,

10   960 F.2d 221, which talks about the standards for

11   personal knowledge.  Evidence proving personal knowledge

12   may consist of the witness' own testimony, and that

13   knowledge includes inferences and opinions as long as

14   they are grounded in observation, experience, which is

15   clearly the case with Ms. Jokinen.

16        There are a series of objections that she's

17   proffering an expert opinion when she refers to things

18   that are in escrow.  Your Honor, she's not proffering an

19   expert opinion or a lay expert opinion.  Among other

20   things, the documents said they were escrow agreements,

21   entirely appropriate for her to use that nomenclature

22   during the course of the testimony.

23        The other thing I would point out, Judge, with

24   respect to revisiting an entire transcript, you had made

25   the point last week that in civil depositions you

1   have -- you often will go through and rule on

2   objections.  This is a little bit different.  Ordinarily

3   in that case, your Honor, civil deposition context,

4   there's been a reservation of rights on the objections;

5   and with respect to forms of questions, the objections

6   are supposed to be raised at the time the questions are

7   made so that they can be corrected at the time the

8   transcript is being created.  Here, there are many

9   objections that go to form, et cetera, that they can't

10  be corrected because Ms. Jokinen is now dead.  With

11  respect to those types of objections, it is the

12  government's position that it is not appropriate to

13  revisit the admissibility of those questions under these

14  circumstances.  That's just sort of generally in terms

15  of going through the transcript.

16      THE COURT:  Okay.

17      MR. GREENBERG:  I'm a little confused, because

18  the government at the first trial asked each of the

19  witnesses whether or not as of that moment in time they

20  had received repayment, and now it sounds like, you

21  know, they've abandoned that theory and they're going to

22  a different theory.

23      If we're going to have a retrial on a clean

24  slate, then, you know, each of the questions have to be

25  independently proper.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  I don't disagree with that.

2          MR. GREENBERG:  So, your Honor, we have taken

3    considerable time to try to go through them and to where

4    we thought there were objections, set forth the

5    objections.

6          THE COURT:  Let me just ask about the format.

7    You have gray shaded --

8          MR. GREENBERG:  Gray is what we have objected

9    to.

10         THE COURT:  Obviously, I haven't had a response

11   by the government, so I don't imagine there are

12   objections by the government here.  Are there any

13   objections like cross-examination that are included

14   here?

15         MR. GREENBERG:  No.

16         MR. PIROZZOLO:  No.  Only to the extent that

17   there were objections that were raised in the prior --

18   there were some objections that were sustained both

19   ways, and it's the government's position that the ruling

20   should remain the same.  That's all.

21         THE COURT:  Okay.  But as I look at this, when I

22   look at something that's marked up, because it's in

23   gray, that's because the defendants object to it.

24         MR. PIROZZOLO:  That's exactly correct.

25         MR. GREENBERG:  Yes, your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

 1          MR. MITCHELL:  Your Honor, I find one point of

 2    Iantosca's questions we're going to be talking about

 3    form of question.  I just remind the Court when Iantosca

 4    took the stand, when Iantosca testified, it was clear he

 5    had a difficult time with the English language, and so

 6    the Court, in the absence of an objection, allowed me to

 7    lead him a little bit, and you'll see in the marked up

 8    transcript that there are objections to form of the

 9    question being leading, and I just wanted to put that in

10    context, because it might not be abundantly clear from

11    the Court record.

12          THE COURT:  Okay.

13          MR. MITCHELL:  By the way, to the extent that

14    there's a suggestion at the time he was testifying that

15    Joe Iantosca was incompetent, I guess I haven't seen

16    medical records to that effect.  All I'm aware of at

17    this point is the Court order.  I think that's something

18    Mr. Greenberg raised.  I haven't received documents from

19    them --

20          MR. GREENBERG:  You'll see -- attached to the

21    motions, you'll see an episode of the trial testimony.

22    Also, the Court indicates at least he was diagnosed, you

23    know, within -- in 2007 as having a -- meaningful

24    dementia, which is something that takes a while.

25          If you look at the medical records, and if you

1 look at his -- some of his incomprehensible responses,

2 it raises a significant issue as to his competency.  But

3 two things:  Number one, since we're not able to

4 question his ability to recollect because he's not here,

5 and the government gets simply to read in that

6 testimony, we're at a tremendous disadvantage.

7   THE COURT:  Well, you can impeach by extrinsic

8 evidence, couldn't you?  Couldn't you put in the record

9 you're -- I haven't even looked at them.

10   MR. GREENBERG:  The government has introduced no

11 one -- I mean, they filed a document saying he's not

12 competent without bringing in the physician, who might,

13 in fact, testify that, based upon his opinion, this

14 onset was several years ago.  You know, before one would

15 even consider reading in the transcript, it would be

16 useful to have an opinion from the physician as to

17 whether or not this condition has existed for many

18 years, especially if you look at the incident that took

19 place seven months after he testified, it jumps out at

20 you that this is someone who has significant,

21 significant mental health problems.

22   THE COURT:  With respect to the transcripts, to

23 the extent they are used, do you have any particular

24 requests as to what the jury hears about the occasion

25 under which these people were answering questions under

PDF created with pdfFactory trial version www.pdffactory.com

1  oath put by lawyers?

2          MR. MITCHELL:  There is in the Pattern

3  instructions an instruction that addresses mention of

4  prior proceedings, prior trials.  That's the appropriate

5  place to start.  So that the jury is not begging the

6  question, that might be the right way to address it,

7  your Honor.

8          THE COURT:  Mr. Greenberg, Mr. Pappalardo?

9          MR. PAPPALARDO:  Your Honor, I think simply to

10  say that they're unavailable and go by the Pattern

11  instructions is adequate.

12          THE COURT:  All right.

13          Now, on a different topic, electronics,

14  everybody square on electronics?

15          MR. MITCHELL:  I think so, your Honor.  We're

16  going to proceed the same way we did last time, using

17  Sanction.  There is one wrinkle to that, your Honor, and

18  we've raised this with defense counsel at the end of the

19  last week.  I'd like to supplement with the first

20  exchange the electronic exhibits with a binder,

21  old-fashioned binder of the first 13 exhibits.  I've

22  found in using Sanction -- I don't think I'm alone in

23  this -- that the jurors can become somewhat desensitized

24  to having one image after another flashed up in front of

25  them.  I think it may be useful to assist their

PDF created with pdfFactory trial version www.pdffactory.com

1  understanding to use binders of the exchange documents,

2  at least for the first exchange, so they can touch and

3  feel the documents.

4          THE COURT:  No problem.

5          MR. PAPPALARDO:  Well, could I be heard on that,

6  your Honor?

7          THE COURT:  Okay.

8          MR. PAPPALARDO:  I have a problem with it.  My

9  problem has to do -- let me state for the record that

10  Mr. Mitchell did raise this with me last week, and I

11  said I would consider it.

12          My problem with it is that the first witness,

13  I'm told by the government, is Mr. Snider.  One of the

14  difficulties, I think, at the last trial was testimony

15  from one witness was argued by the government to be, you

16  know, imputed to all of the witnesses.  I'm talking

17  strictly about the exchangors now.  And the book leads

18  off with the slide shows, with Power Points that were

19  generated by Martin Paley, which the government seeks to

20  introduce into evidence against Dan Carpenter simply

21  because Dan Carpenter saw them, putting aside whether

22  that's sufficient in terms of their admissibility at

23  this point in time.  I would suggest to you that

24  Mr. Snider is the only investor, with the possible

25  exception of Mr. Cahaly, that looked at any of these

PDF created with pdfFactory trial version www.pdffactory.com

1    slide shows.  And I think it's prejudicial for the

2    government to have it not only on the screen with

3    highlights and everything else but in their book.

4         I do -- I do not have an objection if they want

5    to use a book and not a screen.  I don't have a problem

6    with that, and I don't have a problem -- and I'll state

7    this:  I certainly don't have a problem with the

8    exchange documents themselves, which are common to each

9    investor, although they slightly change over time.  But

10   with respect to things like Power Point presentations,

11   where the only -- where there's only one or possibly two

12   witnesses that will testify they have any recollection

13   of seeing them, particularly a Power Point like these --

14   and we'll get into that when Mr. Snider testifies -- I

15   do have a problem with it being a double-barrelled

16   effort, and this particular, I highlight now what

17   occurred at the first trial, which is that all of this

18   was glossed over as being applicable to each and every

19   investor.  And that's my objection.

20        THE COURT:  Okay.  I don't see any problem using

21   both.  If your concern is that they keep the binder

22   after Snider's left the stand and use it with other

23   witnesses, we'll collect the binders for that, but if

24   it's just using of two different media while Snyder is

25   testifying, I don't think there's any problem.

1            Okay.

2            MR. MITCHELL:  I don't know how much time the

3     Court has.  There are a couple of other issues that I

4     think are worth raising, but they're not urgent.

5            One is, this weekend the defense filed two

6     motions to dismiss, which I think are essentially

7     redressed motions, to the extent they're even ripe right

8     now, of previous motions.  The government's prepared

9     to --

10           THE COURT:  Okay.  I haven't read them yet.

11           MR. MITCHELL:  Okay.  We'll be prepared to

12    respond in time under the rules, but I'm not sure they

13    even require a response.

14           THE COURT:  Let me look at them.

15           MR. MITCHELL:  And then there's one other --

16    there are, actually, a couple of other issues, one has

17    to do with venue.  I think at the status conference,

18    your Honor raised the possibility that an understanding

19    between the parties might obviate the need for the

20    government to put on its parade of venue witnesses, bank

21    employees, law firm employees, to talk about how wires

22    come in, so forth.  In discussion with defense counsel

23    last week, it was represented to us that the defense

24    would not contest venue and that they would put it on

25    the record.

PDF created with pdfFactory trial version www.pdffactory.com

1          The filings this weekend belie that

2    representation.  I'm not casting aspersions by raising

3    this, but I'm looking for some clarity, among other

4    reasons, to schedule witnesses.  Eleven witnesses were

5    going to be coming in here.

6          THE COURT:  I haven't looked at the -- well, let

7    me just say this -- I haven't looked at the recently

8    filed motions.  I'm sort of aware they came in over the

9    weekend, I haven't looked at them.

10          I dealt with the issue fairly extensively in the

11    order on the new trial and motion for judgment of

12    acquittal, which I -- I guess I ask whether that isn't

13    still effective, that resolution, and put the issue

14    aside?  Haven't I already resolved the venue issue in

15    that motion?

16          MR. PAPPALARDO:  Your Honor, I have indicated to

17    the government, and it's still my position, that it's

18    not necessary to bring in those witnesses.  We are not

19    making an issue at this time about venue.  Venue is

20    something that is -- either it's in the case or it is

21    not.

22          It's my understanding that this issue is now

23    raised because of the omnibus motion.  And my position

24    with respect to that is we are not arguing that motion.

25    That's filed to protect the record.

1          Having said that, in each and every case the

2     government is required to, you know, establish venue,

3     establish jurisdiction to the Court's satisfaction.  The

4     issue, as I understand it -- and I appreciate the

5     Court's ruling in the first trial, and I'm not saying I

6     disagree with it -- the issue as I understand it is that

7     in this circuit, at least with respect to wire fraud,

8     it's not clear whether that's a jury decision or whether

9     it's a judge decision.  To the extent that that motion

10    is filed, it is on the record, and I am not asking the

11    government to do anything else.  We are not arguing it.

12    The Court will make a decision as to whether or not

13    venue exists, and we will go from there.

14          THE COURT:  As I say, I think I may already have

15    done that in the prior order.  I'll look at the new

16    motion to see whether that changes that view.

17          MR. MITCHELL:  A couple of other miscellaneous

18    issues I think should be pretty quick, your Honor.

19          I've discussed this matter with defense counsel

20    earlier today, it shouldn't be an issue, I just want to

21    make a record of it; that is, during Eliot -- in

22    connection with Eliot Snider's exchange, he was

23    represented by an attorney named Chris Dole who worked

24    at Testa Hurwitz.  Chris Dole now works at Greenberg

25    Traurig.  I don't see any conflict here, but I just want

PDF created with pdfFactory trial version www.pdffactory.com

1  to make sure, I may be wrong, that there isn't conflict,

2  and I just want to make sure to the extent there may be

3  one, that the defendant understands it, is prepared to

4  go forward nevertheless.

5        MR. PAPPALARDO:  Your Honor, we've discussed

6  that with Mr. Carpenter.  First of all, we've advised

7  him that we don't see that as an issue, and he agrees.

8        THE COURT:  Okay.

9        MR. MITCHELL:  I think that's it, your Honor.

10        THE COURT:  Okay.

11        Mr. Pappalardo.

12        MR. PAPPALARDO:  Your Honor, unless I didn't

13  make it plain in the -- in my response to the

14  government, I do intend to make reference in the opening

15  tomorrow to this being a civil case.

16        MR. PIROZZOLO:  Your Honor, the government

17  objects to that.

18        THE COURT:  It's not -- well, let me -- I may be

19  in between the two of you on that.  The problem I see

20  with it is that it is argument rather than proper

21  opening.  You might be able to say that in your closing.

22        MR. PAPPALARDO:  Well, except, your Honor,

23  that --

24        THE COURT:  It's characterizing the strength of

25  the government's case or the appropriateness of it.

1    That's not true openings material.

2          MR. PAPPALARDO:  It's a characterization of the

3    evidence of the case, your Honor, which is what will be

4    the basis for statements.

5          THE COURT:  No, I think it's -- I don't think

6    it's proper opening material.  I'll reserve whether it's

7    proper closing.  I think it probably is proper closing

8    material.  I think it's fair for the defendant in

9    closing, in argument, to denigrate by characterization

10   the government's case, but I don't think that's part of

11   a proper opening.

12         I guess that's that.  So who's opening -- you're

13   opening for the prosecution?

14         MR. MITCHELL:  I am.

15         THE COURT:  Who's opening -- you're opening for

16   the defendant?

17         MR. PAPPALARDO:  Yes, your Honor.

18         THE COURT:  And then we'll get in -- and I

19   gather Mr. Snider is the first witness?

20         MR. MITCHELL:  I'm sorry, your Honor?

21         THE COURT:  Mr. Snyder is the first witness?

22         MR. MITCHELL:  Yes.

23         THE COURT:  Will he take the rest of the day?

24         MR. MITCHELL:  I don't think so.  I mean, unless

25   the cross is much different from what it was last time.

1          THE COURT:  Who else might we have?

2          MR. MITCHELL:  Byron Darling will be the second

3     witness.

4          MR. PIROZZOLO:  Actually, your Honor,

5     Mr. Darling is quite elderly.  We're hopeful we can

6     actually get him on and off tomorrow.  That's our goal,

7     at least.

8          THE COURT:  Okay.  All right.  See you in the

9     morning.

10          MR. MITCHELL:  Thank you.

11          (Court adjourned at 4:28 p.m.)

12

13               - - - - - - - - - - - -

14                    CERTIFICATION

15          We certify that the foregoing is a correct

16     transcript of the record of proceedings in the

17     above-entitled matter to the best of our skill and

18     ability.

19

20

21     /s/Debra M. Joyce                    _____
       Debra M. Joyce, RMR, CRR            Date
22     Official Court Reporter

23

24     /s/Marcia G. Patrisso               _____
       Marcia G. Patrisso, RPR, CRR        Date
25     Official Court Reporter