UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 ) Criminal Action
v.                               ) No. 04-10029-GAO
                                 )
DANIEL E. CARPENTER,             )
                                 )
        Defendant.               )
                                 )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY TWO
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, June 3, 2008
9 a.m.

Marcia G. Patrisso, RPR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Jonathan F. Mitchell and Jack W. Pirozzolo,
 3         Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         One Courthouse Way
           Boston, Massachusetts  02210
 5         On Behalf of the Government

 6         GREENBERG TRAURIG, LLP
           By: A. John Pappalardo, Esq. and
 7             Gary R. Greenberg, Esq.
           One International Place
 8         Boston, Massachusetts  02110
           On Behalf of the Defendant

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              I N D E X

2                    Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3    GOVERNMENT:

4  ELIOT SNIDER

5      By Mr. Mitchell        108

6

7              E X H I B I T S

8

9  Exhibit No.        Identification        Marked    Received

10 Unnumbered        Sealed                  11

11
   Government's
12  Exhibit No.        Description           Marked    Received

13
   Nos. 1 - 6   Benistar documents to Mr. Snider          116
14
   No. 7        Benistar documents to Mr. Snider          119
15
   No. 9 - 13   Benistar documents to Mr. Snider          119
16

17

18

19

20

21

22

23

24

25

```
 1              (The following proceedings were held in open
 2    court before the Honorable George A. O'Toole, Jr.,
 3    United States District Judge, United States District
 4    Court, District of Massachusetts, at the John J. Moakley
 5    United States Courthouse, One Courthouse Way, Boston,
 6    Massachusetts, on June 3, 2008.
 7              The defendant, Daniel E. Carpenter, is present
 8    with counsel.  Assistant U.S. Attorneys Jonathan F.
 9    Mitchell and Jack W. Pirozzolo are present.)
10              THE CLERK:  All rise.
11              Please be seated.
12              THE COURT:  Good morning.
13              ATTORNEYS IN UNISON:  Good morning, your Honor.
14              THE COURT:  The matter of the jurors.
15              MR. MITCHELL:  Because it involves criminal
16    history, should we take it up at sidebar, your Honor?
17    Would that be more appropriate?
18              THE COURT:  Okay.
19              (Discussion at sidebar and out of the hearing of
20    the jury:)
21              MR. MITCHELL:  Did you get a copy of this, your
22    Honor?
23              THE COURT:  Yes.
24              MR. MITCHELL:  There are two points to be made.
25    As to one point, Mr. -- I'm sorry.  Mr. Vanrader wasn't
```

1  straight with the Court about his criminal history.  I

2  mean, if you were to look at this, I'd suggest he has a

3  far larger body of work than he indicated that includes

4  quashed and includes a conviction, includes time

5  committed.

6       What he said here, as I recall, was that he had

7  a couple of things that were dismissed and that he was

8  in the wrong place at the wrong time.  He's got a long

9  record here of possession of controlled substances,

10 assault, firearms, kidnapping in here.  You know, given

11 the record, that suggests that he was at least deflating

12 if not downright untruthful.

13      I think he should be struck for cause.

14      MR. GREENBERG:  Your Honor, let me just note

15 that this gentleman, I believe, is one of two

16 African-American jurors.  First of all, there's no

17 evidence whatsoever, in our view, that he was less than

18 candid.  The government had adequate opportunity to ask

19 any additional questions.  The juror indicated that he

20 was in the wrong place at a particular point in time,

21 and we have no reason to disbelieve any of that.  As a

22 matter of fact, many of these allegations happen to have

23 been dismissed.

24      We strongly want this juror to remain and oppose

25 the government's request.  Again, you had ample

1   opportunity -- the government did -- to inquire further

2   at that time.

3         MR. MITCHELL:  The point was, though, we did --

4   he told us -- he responded to the question.  The Court

5   later found out that there was more to it.  The Court

6   looked into it; we looked into it.  There is a lot more

7   to it.  I would ask that his record be made a part of

8   the trial record.

9         And I'd also note for the record that this is

10  the only African-American that the government has moved

11  to strike for cause or peremptorily, just to be clear

12  about that.

13        THE COURT:  There are really two issues, and

14  you've addressed the second one, I guess, in the way I

15  was looking it.  The first is whether he is statutorily

16  disqualified.  That does not appear to be the case, from

17  my review.  The most recent -- even if it continues

18  without a finding, serves as a conviction or a pending

19  charge, which some of you might think is sufficient, it

20  appears to be a misdemeanor.  Simple possession is what

21  he was continued on -- it does not appear to be a

22  felony -- because I thought yesterday it might have

23  been.  There was an older one where he was committed in

24  1999.  I think that may be the same thing.  But at any

25  rate, I think under Massachusetts law, his civil rights

PDF created with pdfFactory trial version www.pdffactory.com

1    would have been restored.

2         But the second issue, then, is whether the

3    information that has emerged since the selection process

4    was completed justifies a second look at the question of

5    whether he's an appropriate juror.  And that I do agree

6    with the government:  I don't think he was candid with

7    us.  We did explore it; he minimized it.

8         Now we could see how minimal his description

9    was -- minimizing his description was as compared to --

10   most of the record, candidly, is dismissals.  But it is

11   a long record of encounters that he didn't suggest was

12   the case when we asked him about it.  So I think that's

13   a ground for excusing him.

14        As to his race, I think it has nothing to do

15   with the matter.  I don't think race is an issue that is

16   even remotely, under the circumstances here -- it's not

17   a case that has any racial overtones of any sort, and I

18   think it's completely irrelevant.

19        MR. GREENBERG:  Your Honor, most of these --

20   many of these offenses go back, you know, ten or more

21   years.

22        THE COURT:  Right.

23        MR. GREENBERG:  As your Honor noted, there's a

24   great number of dismissals.

25        You know, again, the witness -- I'm sorry.  The

PDF created with pdfFactory trial version www.pdffactory.com

1  juror specifically disclosed the fact that he had

2  encounters with the law before.  And whether or not he

3  minimized it or not, in his own view, he portrayed the

4  facts.  And there was opportunity to inquire at that

5  point in time.

6         And the entire panel's been seated, the -- you

7  know, we're in a position now where, you know, the

8  defendant has been -- I think the defendant's prejudiced

9  if we were to remove a juror.  We're only investigating,

10 it sounds as though, one particular juror.

11        THE COURT:  Okay.  I understand your position

12 but I don't agree with it.

13        MR. MITCHELL:  I'm going to --

14        THE COURT:  So I will excuse the juror.

15        Now, I think in order to have 14, we will have

16 to pick another juror which means we'll have to go

17 through that process again.  We have a pool of people

18 who we can bring up here and repeat the process.

19        MR. PAPPALARDO:  Do you have a new list, your

20 Honor?

21        THE COURT:  We will.  I don't have it yet

22 myself.

23        Let me just add, it's not quite the same level

24 of problem, but one of the jurors who was seated has

25 been complaining to the clerk, both last evening and now

1   again this morning, that it's burdensome for him and so

2   on and so forth.  He is?

3         THE CLERK:  Mark Sullivan.

4         THE COURT:  When he was selected, he made no --

5   he made no protest at all during the process yesterday.

6         MR. GREENBERG:  Do you know where he's seated?

7         THE CLERK:  I don't know his seat number.

8         THE COURT:  And the list -- he was chosen

9   very -- he's 47.  He was chosen late.

10         THE CLERK:  He's Seat No. 4.

11         MR. MITCHELL:  He never spoke up.

12         THE COURT:  Number 41.  He was wearing a dark

13   T-shirt or something like that, a youngish-looking

14   fellow.  And I don't --

15         THE CLERK:  Basically, his complaint is that he

16   has three children, he has a wife, he has a mortgage; if

17   he doesn't work, he doesn't get paid.  He thinks that --

18   so I inquired of him as to, you know, he had opportunity

19   to mention it during the selection, why didn't he.

20   "Well, I'm not familiar with the process," blah, blah,

21   blah.  "Well, you just sat there.  You know, you had

22   ample time to."  And he's like, "Well, I can't do it."

23         It didn't seem like anything that would be any

24   more of a hardship than anyone else.  Everyone has a

25   mortgage, et cetera.  But that's it.

1          THE COURT:  I've seen the phenomena before.

2     People sit there -- are seated, watching the striking of

3     everyone around them -- and believe we'll strike them.

4     But they don't get struck and then they're distressed.

5          MR. PAPPALARDO:  Like investments, your Honor.

6          (Laughter.)

7          THE COURT:  I bring it up because if we're going

8     to go through a process, we could fill two as well as

9     one and solve a potential time bomb.

10         MR. PAPPALARDO:  Could I just consult with my

11    client, your Honor, because I have a position.

12         THE COURT:  Fine.

13         (Discussion off the record.)

14         MR. PAPPALARDO:  Your Honor, subject to the

15    government's view on this, I don't think it's in

16    anybody's interest to have a juror on this case that

17    isn't paying attention or is distracted.  Certainly, we

18    take the position that we'd rather have somebody's full

19    attention.

20         And I would have no objection if we re- -- if

21    we're going to re-impanel anyway, if we seat another

22    juror.

23         MR. MITCHELL:  It does seem like a common

24    excuse.

25         THE COURT:  It is.

1          MR. PAPPALARDO:  I mean, perhaps, your Honor --

2     perhaps you can inquire of him and then make a

3     determination at that point in time.

4          THE COURT:  I will.  I'll bring him out.  I may

5     bring him out now.

6          MR. MITCHELL:  That makes more sense.

7          MR. GREENBERG:  Your Honor, I want to go on the

8     record, number one, noting our objection to your Honor's

9     excusing of the Juror Vanrader, and also note that it's

10    our understanding that no other jurors' backgrounds were

11    checked, you know, subsequent to them, you know, being

12    seated.

13         THE COURT:  Right.  I asked the government to do

14    the check.  I had actually asked our probation office to

15    do one first before that.  So it wasn't the government

16    taking it upon themselves to check on a juror.

17         We should mark a copy of this --

18         MR. MITCHELL:  Should this be under seal?

19         THE COURT:  Yes, under seal.

20         -- as an exhibit for identification or something

21    like that, just so it's preserved.

22         (Sealed document marked for identification.)

23         (Mr. Sullivan appears before the Court.)

24         THE COURT:  Good morning.

25         THE JUROR:  I apologize for not speaking up

PDF created with pdfFactory trial version www.pdffactory.com

1    yesterday, but I guess I have an extreme situation.  I

2    got a wife and three kids.  If I don't make my mortgage,

3    then I'm in some serious trouble.

4         THE COURT:  You have a T-shirt that says "PJ

5    Kennedy."

6         THE JUROR:  I'm a plumber.

7         THE COURT:  And PJ Kennedy is a contractor?

8         THE JUROR:  They're a mechanical contractor,

9    yes.  We're working at the South Boston Police Station

10   down here.

11        THE COURT:  Is it a union position?

12        THE JUROR:  Yes.

13        THE COURT:  Is there any provision for paying

14   the wages of a juror?

15        THE JUROR:  I really doubt they'd pay me, just

16   from employees in the past, that it's not something that

17   they do.

18        THE COURT:  Anybody have any questions of

19   Mr. Sullivan?

20        MR. MITCHELL:  No, I don't, your Honor.  Thank

21   you.

22        THE COURT:  All right.  I think I will excuse

23   you.  You should have brought it up yesterday.  It's

24   caused a bit of problem.

25        THE JUROR:  I apologize.  I realize that now.  I

```
 1   made a mistake.
 2           THE COURT:  I'll excuse you.
 3           (The juror is excused.)
 4           THE COURT:  So we will get the panel.  I'm not
 5   sure even how many people are in it, but it should be
 6   sufficient to get two jurors.
 7           MR. MITCHELL:  As I recall, your Honor, the
 8   government has three remaining strikes, the defendant
 9   one, and it's the defendant's turn.
10           THE COURT:  Right.
11           MR. PAPPALARDO:  Your Honor, if I may, perhaps
12   the Court could instruct the clerk -- I mean, I don't
13   know how to do this, but if somebody was very vocal
14   about not wanting to appear, particularly where it
15   doesn't really fall within the strict parameters of a
16   hardship, you know, essentially communicating that to
17   the rest of the jury and they see him walking out, maybe
18   we want to cauterize the problem.
19           MR. MITCHELL:  People always complain.  You
20   know, I would complain.
21           MR. PAPPALARDO:  My point is:  When somebody
22   complained, they go, and we don't want that to happen
23   again.
24           THE COURT:  I agree with that.  And there was
25   actually another one that I don't think rises to it,
```

PDF created with pdfFactory trial version www.pdffactory.com

```
1    which is the fellow who said he had cleared the next two
2    weeks but the third week would be the problem.  He's the
3    designer sitting in the back.
4         Kalker, I believe his name was.
5         MR. PIROZZOLO:  I think that's right.
6         MR. MITCHELL:  Yeah, he's in the back.  I think
7    either Seat 8 or 9.
8         THE COURT:  Juror 20, I think, if I remember.
9    Yeah, Spencer Kalker, Juror 20, a consultant --
10   marketing consultant and so on.
11        Anyway, he made some protest, nothing to the
12   same degree as this.  But I appreciate the issue.
13        THE CLERK:  Mr. Kalker?
14        THE COURT:  Yes.
15        So what do you suggest?
16        MR. PAPPALARDO:  I don't know.  I mean, some
17   cautionary word to -- you know, once we begin today, we
18   should -- perhaps the clerk could say this is it, and we
19   made all the decisions we're going to make.
20        THE COURT:  We don't want the jurors to get the
21   idea "It worked for Sullivan; it will work for me."  So
22   I will say -- I don't know whether to bring it up or --
23        THE CLERK:  Well, I mean, they're going to want
24   to know because --
25        MR. PAPPALARDO:  I don't know how to handle it,
```

1    your Honor.  I just raise the issue.

2           MR. MITCHELL:  Just say it's a special

3    situation.

4           THE COURT:  I guess I'm concerned about

5    answering a question before it gets asked.  I think if a

6    question gets asked, the way to deal with it is to say

7    "For details you don't know about, his family

8    circumstances, it was a special case that doesn't apply

9    to anybody else."

10          I'm leery about raising it without anybody

11   asking about it.

12          MR. PAPPALARDO:  As long as we can be responsive

13   at the time to prevent additional attrition.

14          THE CLERK:  I mean, if we go and pick more

15   jurors -- this juror -- so if they ask, I just say it's

16   family circumstances?

17          THE COURT:  Unusual circumstances.

18          THE CLERK:  Unusual circumstances?

19          THE COURT:  Right.

20          MR. MITCHELL:  Your Honor, will the selection of

21   these two be in keeping with your rule that the last two

22   seated are the alternates?

23          THE COURT:  Yes.

24          MR. GREENBERG:  Your Honor, with respect to

25   challenges, you know, we would ask to have -- to have a

PDF created with pdfFactory trial version www.pdffactory.com

1   couple of additional challenges given, given the fact

2   that we relied upon the impanelment procedures yesterday

3   when exercising the challenges.

4           THE COURT:  No, I think it's just a continuation

5   of the process.  I think we'll leave it as it is.

6           MR. PAPPALARDO:  And how many do we have, your

7   Honor?

8           THE COURT:  One.

9           MR. PAPPALARDO:  And how many does the

10  government have?

11          THE COURT:  Three.

12          MR. MITCHELL:  We have three left.

13          MR. PAPPALARDO:  I would renew Mr. Greenberg's

14  request.  I don't think it's a continuation, your Honor.

15  We had a jury seated.  And, you know, if -- and it was

16  not foreseeable that we would be in this situation.

17          THE COURT:  Okay.  I'll give you one more, so

18  you have one for each of them.  So you'll have two and

19  that will give them four.  So I'll give you an extra

20  one.  I mean, by analogy, if we expanded from 14 to 16,

21  you'd have an extra one, so...

22          So I'll give you another one.  You'll have two

23  and they'll have four.

24          MR. PAPPALARDO:  We'll take it.

25          (Discussion off the record.)

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              (In open court:)
 2              THE CLERK:  All rise.
 3              The Court's going to take a short recess.
 4              (There is a recess in the proceedings at
 5         9:26 a.m.)
 6              THE CLERK:  All rise.
 7              Hear ye, hear ye, hear ye, all those having
 8    business before the United States District Court for the
 9    District of Massachusetts draw near, give your
10    attention, you shall be heard.  God save these United
11    States and this Honorable Court, the Honorable George A.
12    O'Toole presiding.  Please be seated.
13              For a trial, the case of United States of
14    America versus Daniel Carpenter, which is Docket
15    04-10029.
16              THE COURT:  Good morning, jurors.  Potential
17    jurors.
18              THE JURORS:  Good morning.
19              THE COURT:  As you heard, my name is Judge
20    O'Toole.  We're in the process of selecting a jury to
21    participate with us and to decide the issues presented
22    in the case that we're beginning.  We began the jury
23    selection process yesterday and haven't quite finished,
24    and we hope to finish this morning and select a couple
25    of you to join the already-partially-selected jury that
```

PDF created with pdfFactory trial version www.pdffactory.com

1    is waiting in the back room for us to finish this.

2         Let me tell you just generally, in a very

3    general way, the nature of the case because it may be

4    useful for you to know that as we go through the

5    selection process.  This is a criminal prosecution

6    brought by the United States against Mr. Daniel

7    Carpenter.  It is a prosecution that arises under

8    statutes of the United States.

9         The particular charges that are made in this

10   case involve offenses that are, in summary, or

11   colloquial terms, referred to as mail fraud and/or wire

12   fraud.  In brief, the statutes of the United States

13   declare it to be a crime to cause the use of the mails

14   or interstate facilities of communication in furtherance

15   of a scheme to defraud or to obtain property by false

16   pretenses.  Those charges are made in this case against

17   Mr. Carpenter, and that will be what the trial is about.

18        Mr. Carpenter says that he is not guilty of any

19   of the charges that are made against him, and as I say,

20   the trial will be to determine that.  The defendant, Mr.

21   Carpenter, is presumed to be innocent of any charge made

22   against him unless and until the government proves by

23   the evidence at trial the contrary, and proves it beyond

24   a reasonable doubt.

25        So that's an overview of the context in which we

1    are proceeding.

2            We want to be sure, of course, that we have a

3    panel of jurors to listen to the evidence in the case

4    and decide the case at the end who are completely

5    fair-minded and impartial as to the parties involved in

6    the case and as to the issues involved in the case.  And

7    that's part of what we do in the selection process, is

8    to make sure that we are selecting a panel of jurors who

9    are in that condition:  fair-minded and impartial.

10           As part of that, I am going to address some

11   questions to you all as a group.  I'd like you to listen

12   to the question, and if you personally would answer any

13   of the questions that I ask you now "yes," then just

14   stand up for a minute.  If there's a number of you,

15   we'll go around, just jot down your name and that you've

16   answered "yes" to that question.  If your answer to any

17   of my questions would be "no," then just sit there, make

18   no signal, and we'll assume by your inaction that your

19   answer to the question is "no."  So if "yes," stand up

20   briefly, we'll get your name and then you can sit down

21   again; if your answer is "no," make no signal, all

22   right?

23           This is an important part of the process and the

24   law requires that your answers to me, to my questions,

25   now be given under oath.  So if you would all please

PDF created with pdfFactory trial version www.pdffactory.com

1    stand, the clerk will administer the oath.

2              (Jury panel sworn.)

3              THE CLERK:  Please be seated.

4              THE COURT:  My first group of questions will

5    deal with whether you have any connection of any kind

6    with any of the people who may take part in the case.

7    So let's start, first of all, with Mr. Carpenter, who is

8    the defendant.

9              Daniel Carpenter of Sudbury, Connecticut.

10             THE DEFENDANT:  I'm Dan Carpenter.  Thank you

11   for your service.

12             THE COURT:  Mr. Carpenter is the defendant.  You

13   may hear about some businesses that Mr. Carpenter was

14   involved in:  Benistar, B-E-N-I-S-T-A-R, Property

15   Exchange Trust Company, Benistar Limited, and some other

16   companies that may have the name "Benistar" in them.  So

17   my first question is:  Are any of you related to, do you

18   have any business, professional, social or other

19   connection with either Mr. Carpenter or any of the

20   Benistar businesses?  Okay.

21             The case will be presented by -- for both sides

22   by attorneys.  Representing the government will be two

23   assistant U.S. Attorneys.  I'll ask them to introduce

24   themselves.

25             MR. MITCHELL:  Thank you, your Honor.

1              Good morning, ladies and gentlemen.  My name is
2     John Mitchell.  I'm an assistant United States Attorney,
3     along with Jack Pirozzolo.  And we have the honor of
4     representing the United States in this case.
5              MR. PIROZZOLO:  Good morning.
6              THE JURORS:  Good morning.
7              THE COURT:  And Mr. Carpenter is represented
8     by -- gentlemen?
9              MR. PAPPALARDO:  Good morning, ladies and
10    gentlemen.  My name is John Pappalardo, and with me is
11    Gary Greenberg.  We are with the law firm of Greenberg
12    and Traurig, and we have the privilege of representing
13    Mr. Carpenter in this action.
14             THE COURT:  All right, ladies and gentlemen.
15    Are any of you related to, do you have any business,
16    professional, social or any other kind of connection
17    with any of the lawyers individually here or, in the
18    case of the defense, with the law firm of Greenberg
19    Traurig?
20             Your name, sir?
21             THE JUROR:  Glenn Teman.
22             THE COURT:  Number 18.  Thank you.
23             I just want to know the "yes," that's all.
24    We'll follow up at the side why you're answering "yes."
25    We'll follow up at the side after I've asked some

PDF created with pdfFactory trial version www.pdffactory.com

1   general questions.  Anybody else?  Okay.

2          Now, as I'm sure you realize, in a trial such as

3   this, a good bit of the evidence that's produced comes

4   from witnesses who appear in the courtroom and testify.

5   I'm now going to read a list of people who may be

6   witnesses in the course of the case, and at the end I'll

7   ask you about these people whose names I'm about to

8   read, whether you have any connection, just as I've

9   asked about the lawyers.  It's a fairly lengthy list

10  because we want to be sure we've covered every

11  conceivable witness who might testify.  It's unlikely

12  that all of these people will turn out to be witnesses,

13  but we want to be on the side of caution, and so we will

14  read the full list.  So I'd ask you to bear with me.  As

15  I read it, listen carefully to it, because then I'll ask

16  at the end whether you have recognized anybody on the

17  list.

18          Marjorie Adams of Rockland, Massachusetts; J.

19  Mark Allaire, spelled A-L-L-A-I-R-E, of Bloomington,

20  Indiana; Robert Barrett of Marshfield, Massachusetts;

21  Chuck Bellemore of Goffstown, New Hampshire; Michael

22  Bergeron of Portsmouth, New York; Claude Breslin of

23  Riverside, Rhode Island; Gail Cahaly, spelled

24  C-A-H-A-L-Y, and Ronald Cahaly, of Westwood,

25  Massachusetts; Jo-Ann Chenail, spelled C-H-E-N-A-I-L, of

```
1   Worcester; David Commito of Boston; Byron Darling of
2   Truro, Massachusetts; Kevin Duffy of Stamford,
3   Connecticut; David Eaton of Manchester, New Hampshire;
4        William Ely, E-L-Y, of Boston; Lori Enright of
5   Garden City, New York; Linda Farris of Boston; Steven
6   Feit, spelled F-E-I-T, of Short Hills, New Jersey; Brian
7   Fitzgerald of Upton, Massachusetts; Helen Flanders of
8   Boston; Joseph Iantosca of Braintree; Jeffrey Johnston
9   of Boston; Linda Jokinen, spelled J-O-K-I-N-E-N, of
10  Norwood; Matthew Kameron, spelled with a K,
11  K-A-M-E-R-O-N, of Milton;
12       Gerald Levine of New York, New York; Janet May
13  of Enfield, Connecticut; Martin Paley of Newton; David
14  Patterson of Newton; Thomas Rasmussen of Florham Park,
15  New Jersey; Mitchell Rock of Woodcliff Lake, New Jersey;
16  Paul Sheehan of Boston; Eliot Snider of Chestnut Hill;
17  Jackie Spielman Mahannah, spelled M-A-H-A-N-N-A-H, of
18  Canton, Connecticut; Gary Stern of Scarsdale, New York;
19  Hassan Tabbah, spelled T-A-B-B-A-H, of Greenwich,
20  Connecticut; Ralph Ventresco of Boston; Susan Walsh of
21  Boston; Thomas Zappala of the United States Attorney's
22  Office here in Boston; Anthony Zelle, Z-E-L-L-E, of
23  Boston; Melissa Zizza, Z-I-Z-Z-A, of Boston;
24       Richard Belding of Simsbury, Connecticut; Molly
25  Carpenter of Simsbury, Connecticut; James Carpenter of
```

1    Red Bank, New Jersey; Molly Fletcher of Sudbury,

2    Massachusetts; Nancy Sawyer of Florham Park, New Jersey;

3    Donald Trudeau of Stamford, Connecticut; Donna Wayne of

4    Simsbury, Connecticut.

5              As to any of those people who I've just read to

6    you, are you related in any way, do you have any

7    business, professional, social or other connection or

8    relationship with any of those people?

9              Your name, sir?

10             THE JUROR:  Jerome MacDonald.

11             THE CLERK:  Jerome MacDonald, Number 11.

12             THE COURT:  All right.  Anyone else?

13             As I told you, this is a prosecution brought on

14   behalf of the United States government -- before I ask

15   that question, let me just say the next few questions, I

16   want you to think not only of you, yourself, personally

17   as an individual, but also those people that are closest

18   to you.  So I'm shifting the pronoun "you" from the

19   singular to the plural now.  And I want you to think of

20   those people who are in your immediate family, your

21   household, people who are the closest to you when I ask

22   you these questions about connections with other

23   agencies.

24             So to return to the question:  This is a federal

25   prosecution.  It involves federal law enforcement

```
 1   officials.  Are you or has any -- is anybody in that
 2   group that I've described for you, now or in the past --
 3   have you been an employee of any federal law enforcement
 4   agency, any agency of the Department of Justice such as
 5   the U.S. Attorney's Office, the FBI, the Internal
 6   Revenue Service or any agency charged with law
 7   enforcement?
 8           THE JUROR:  Kessler.
 9           THE CLERK:  Seven.
10           THE COURT:  Seven, yeah.
11           All right.  Anybody else?
12           Let me ask you about state law enforcement.  Any
13   connection, in that group that I referred to, employment
14   with any state law enforcement agency which could
15   include a prosecutor's office like a D.A.'s office, a
16   district attorney, could include the state attorney
17   general, but also would include police agencies such as
18   the state police, local police and so on.
19           THE JUROR:  MacDonald.
20           THE COURT:  Ma'am?
21           THE JUROR:  Eleanore Casey.
22           THE JUROR:  Tricia Lemieux.
23           THE CLERK:  Ma'am, please stand up again.
24           THE COURT:  I have two of you:  I've gotten
25   MacDonald and Casey.  All right.
```

```
 1            THE JUROR:  Correia.
 2            THE COURT:  Number 16.
 3       Okay.
 4            THE JUROR:  Lemieux.
 5            THE COURT:  Tricia, is that it?  I'm sorry, the
 6  last woman.
 7            THE JUROR:  Yes; Lemieux.
 8            THE COURT:  Your first name is Tricia?
 9            THE JUROR:  Yes; Patricia.
10            THE CLERK:  I've got it.
11            THE JUROR:  Bonnie Lewis-Gentry.
12            THE COURT:  Twenty.
13            THE CLERK:  Twenty.  I've got it.
14            THE COURT:  Have you or has anybody close to
15  you, as I've described it, ever been the victim of a
16  crime?
17       Ma'am?
18            THE JUROR:  Rogers.
19            THE CLERK:  Number 1, Judge.
20            THE COURT:  Yeah.
21       Anybody else?
22            THE JUROR:  Keith Champney.
23            THE COURT:  Twelve.
24            THE JUROR:  Christine Cleary.
25            THE COURT:  Twenty-one.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            THE CLERK:  Okay.
 2            THE COURT:  Okay.  Have you or has anyone
 3   particularly close to you, as I've defined the group,
 4   ever been the victim of what you have regarded as a
 5   fraud or a scheme to defraud?  And by this I mean, to
 6   distinguish it from the last question as the victim of a
 7   crime, do you think that you, or has anybody close to
 8   you, ever thought that they were the victim of a fraud,
 9   whether or not it was a crime?
10            THE JUROR:  Dennehy.
11            THE CLERK:  Number 9, Judge.
12            THE COURT:  If you have any doubt, answer "yes"
13   and we'll follow up at the side.
14            THE JUROR:  Fequiere, Frantz.
15            THE CLERK:  Number 2.
16            THE COURT:  Number 2.  Thank you.
17            Anybody else?
18            Have you or has anybody particularly close to
19   you ever been accused of a crime?
20            THE JUROR:  Jacobs.
21            THE JUROR:  Rogers.
22            THE COURT:  One.  Thank you.
23            THE JUROR:  Gould.
24            THE COURT:  Four.  Okay.
25            THE JUROR:  Casey.
```

1          THE COURT:  Casey is 8.

2          THE JUROR:  Salerno.

3          THE JUROR:  Iovanni.

4          THE COURT:  Thirteen.

5          THE JUROR:  Correia.

6          THE COURT:  Sixteen.

7          THE JUROR:  Cleary.

8          THE COURT:  Twenty-one.

9          THE JUROR:  Suzanne Pomerleau.

10          THE COURT:  Twenty-two.

11          And again, moving from the criminal

12    classification to perhaps a non-criminal, have you or

13    anybody close to you ever been accused of having

14    committed a fraud of any kind, whether or not it was a

15    crime; that is, even if it was a civil dispute over some

16    matter?  Have you or has anybody close to you been on

17    the receiving end of an accusation of defrauding anyone?

18          THE JUROR:  Jacobs.

19          THE COURT:  That's Number 6.  Okay.

20          Understanding in general terms what the nature

21    of the case is, it's a prosecution alleging the crimes

22    of wire fraud and/or mail fraud, have you had any

23    personal experience, do you have any personal beliefs,

24    attitudes, potential biases, that would interfere in

25    your judgment with your ability to be a fair-minded and

PDF created with pdfFactory trial version www.pdffactory.com

1    impartial juror in this case?

2         THE JUROR:  Jacobs.

3         THE COURT:  Six.

4         Anybody else?

5         As I mentioned a few moments ago, the defendant

6    in this case is presumed to be innocent unless and until

7    the government proves to the contrary, and proves it

8    beyond a reasonable doubt.  Those concepts of the

9    presumption of innocence and proof beyond a reasonable

10   doubt are fundamental ones in our law.

11        Do any of you have any reservations about your

12   ability to accept and apply those principles in this

13   case?

14        Finally, let me just say a word about the

15   schedule that we will follow in the case.  In this

16   session of the district court we conduct jury trials

17   such as the one we're about to begin, on a daily basis,

18   Monday through Friday, between the hours, generally, of

19   9 a.m. and 1 p.m.  So for jurors, that means that after

20   1 p.m. the day is yours again and you can return to

21   other matters.

22        That will continue throughout the presentation

23   of the case.  The reason we do that is it enables us to

24   keep up with our other work, other cases in the

25   afternoon.  So we have a two-track system:  trials in

PDF created with pdfFactory trial version www.pdffactory.com

1    the morning, other business in the afternoon.

2         When the jury begins deliberations at the end of

3    all the evidence, the jurors are doing that in another

4    room, the jury room, and so we can do things here in the

5    courtroom in the afternoon while the jury is

6    deliberating in the afternoon, as necessary, in the jury

7    room.  So once the case is presented to the jury for

8    decision, the day would go from a nine-to-one day to a

9    nine-to-five day, roughly, for however long that takes.

10        On that schedule, based on what I understand

11   from the parties in the case, the estimate is this case

12   will take probably between two and three weeks to

13   present.  We understand and appreciate that every one of

14   you would be someplace else if you had not responded to

15   the summons to be a juror.  We know that jury service

16   requires people to undergo some inconvenience, some

17   disruption of their routines and other expectations.  It

18   is a necessary byproduct of the jury system that we call

19   people from their busy lives to spend a little time here

20   on the work of listening to the evidence and deciding

21   cases.  We can't have a jury system unless we do that.

22   So we do appreciate the willingness and the good

23   citizenship of people who do it.

24        Apart from the general kind of inconvenience

25   that everybody has who is asked to serve as a juror, for

PDF created with pdfFactory trial version www.pdffactory.com

1    you personally is there anything over the next two to

2    three weeks which would present a serious obstacle or

3    hardship if you were asked to be a juror in this case?

4         THE JUROR:  Alice Wellington.

5         THE CLERK:  Number 19.

6         THE JUROR:  Dennehy.

7         THE COURT:  Number 9.

8         Okay.  All right.  Those are my questions for

9    you.  We're going to follow up one by one by calling you

10   up, if you've answered "yes" to any of the questions,

11   and get the rest of the story here at the sidebar.  We

12   do it in private so you don't have to tell everybody in

13   the world what your situation is.  So we ask for your

14   patience now as we call you up one by one to follow up

15   on these answers.

16        THE CLERK:  Denise Rogers, would you step up

17   here, ma'am?

18        (Discussion at sidebar and out of the hearing of

19   the jury:)

20        THE COURT:  Good morning.  You answered a couple

21   of the questions.  One was a victim of a crime?

22        THE JUROR:  My father was assaulted.

23        THE COURT:  When was that?

24        THE JUROR:  Quite a few years ago.

25        THE COURT:  Tell me a little bit about that.

1          THE JUROR:  He was a long-haul truck driver.  He
2     was robbed, assaulted, beat up and left for dead.  And
3     the people weren't ever caught.
4          THE COURT:  Okay.  Is that the --
5          THE JUROR:  Basically, that's it.
6          THE COURT:  You also said that somebody close to
7     you had been accused of a crime.
8          THE JUROR:  My son was arrested for DUI and
9     prosecuted for it.
10          THE COURT:  When was that?
11          THE JUROR:  That was about two years ago.
12          THE COURT:  And what was the outcome?
13          THE JUROR:  It was continued without a
14     finding -- or continued for a year.  And he had
15     probation and had to go to court, the classes and all
16     that stuff.
17          THE COURT:  How old is he?
18          THE JUROR:  He's now 35.
19          THE COURT:  Do either of those experiences in
20     your life leave you with any concern about your ability
21     to be a fair juror in a criminal case?
22          THE JUROR:  Not really, no.
23          I just had a couple of questions as far as wire
24     fraud.  I work in a bank.  I work with money wires all
25     the time.  I don't know if that is contingent on this

PDF created with pdfFactory trial version www.pdffactory.com

1  case or not, but one of the things that I do is I review

2  the list of names of people who have done crimes from

3  the FBI.

4          THE COURT:  Just like a PEP report?

5          THE JUROR:  I can't think of the name of it

6  right now.

7          MR. MITCHELL:  Suspicious Activity Report.

8          THE JUROR:  I don't recognize any of the names

9  on it from anything I've seen, but I do deal with that

10  through my employer.  Other than that, that's...

11          THE COURT:  Does it bring you into interaction

12  with the FBI directly?

13          THE JUROR:  Directly, no.

14          THE COURT:  Does anybody have any questions on

15  that topic?

16          MR. PAPPALARDO:  Could we inquire, your Honor --

17  would the Court consider inquiring precisely what it is

18  she does besides reading those documents.

19          THE COURT:  Could you give us a little more

20  detail on that?

21          THE JUROR:  I check basically to make sure -- I

22  work for a bank and make sure we don't have any of those

23  accounts that connect to any of those people.  And as

24  far as checking OFAC lists for wires that come in and

25  out -- we deal with wires, people transferring money --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    it's up to us to make sure none of those people are in

 2    any way concerned with the OFAC list.

 3             THE COURT:  Now, is that just a part of your

 4    duties?  Is that one aspect of what you do?

 5             THE JUROR:  Yes.

 6             THE COURT:  What are some of the other things

 7    you do?

 8             THE JUROR:  I work in the accounting office for

 9    a bank, and basically all the accounting functions.

10    There's a couple of us that do it.

11             MR. MITCHELL:  Can I ask which bank, your Honor?

12             THE JUROR:  Wakefield Cooperative Bank in

13    Wakefield.

14             THE COURT:  Okay.  Thank you.

15             MR. MITCHELL:  Thank you.

16             (The juror is excused.)

17             (In open court:)

18             THE CLERK:  Frantz Fequiere.

19             (Discussion at sidebar and out of the hearing of

20    the jury:)

21             THE COURT:  Good morning.

22             THE JUROR:  Good morning.

23             THE COURT:  Let me just ask before we get to the

24    question you answered, we have a little bit of

25    information about each juror which includes employment.
```

1    And I wondered, just yours said O-P-S, or Ops, Lead/TNT
2    USA.  Can you translate that for me?
3           THE JUROR:  I'm the operations supervisor for
4    TNT Express, which it's like DHL.  We do ship stuff
5    overseas.
6           THE COURT:  I see.  Okay.  And so you manage one
7    of the local points; is that it?
8           THE JUROR:  Yes; in Woburn.
9           THE COURT:  All right.  Now, the question you
10   answered, I guess, whether you thought you had been a
11   victim of fraud?
12          THE JUROR:  Yeah.  My stepson was involved in
13   illegal activities, and a couple of times he broke in my
14   house and stole my computer and my kids' Xbox 360s.  Two
15   of them.  So to protect my family against him -- I don't
16   know what he's capable of doing -- I had to take a
17   restraining order against him.
18          THE COURT:  I see.  Was this recently?
19          THE JUROR:  Yes; in February.
20          THE COURT:  Okay.  Does that leave you with any
21   concern about your ability to be a fair juror in a case
22   like this?
23          THE JUROR:  No.
24          THE COURT:  Okay.  Thanks.
25          THE JUROR:  You're welcome.

1           (The juror is excused.)

2           (In open court:)

3           THE CLERK:  Ronnie Gould.

4           (Discussion at sidebar and out of the hearing of

5     the jury:)

6           THE COURT:  Hi.  I think you said somebody close

7     to you had been accused of a crime?

8           THE JUROR:  Yeah; my husband.

9           THE COURT:  Tell me a little bit about it.

10          THE JUROR:  Probably about ten years ago.  It

11     was really weird.  It was, I guess, at a club, an older

12     boy was caught spitting on my son.  And things just got

13     out of hand.  And my husband got very heated over the

14     situation and confronted the older boy, and then the

15     older boy's father then went ahead and had a criminal

16     case against my husband.  But things were -- we had to

17     hire an attorney, but things were settled out of court.

18     That was the end of that.

19          THE COURT:  Okay.  So there was no -- actually,

20     it never got to the point of a trial or anything like

21     that?

22          THE JUROR:  No.  Yes.

23          THE COURT:  Does that leave you with any

24     feelings about the justice system or anything that would

25     affect your ability to be an impartial juror in a case

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    like this?

 2            THE JUROR:  No.

 3            THE COURT:  Okay.  Thanks.

 4            (The juror is excused.)

 5            (In open court:)

 6            THE CLERK:  Herbert Jacobs.

 7            (Discussion at sidebar and out of the hearing of

 8    the jury:)

 9            THE JUROR:  Good morning.

10            THE COURT:  Good morning, Mr. Jacobs.  You

11    answered a couple of questions.  Let me state the first:

12    You said somebody was accused of a crime?

13            THE JUROR:  I was accused of a crime.

14            THE COURT:  Tell me about it.

15            THE JUROR:  I was accused of conspiracy to

16    commit bank fraud in 1995.  I pled guilty; I was

17    sentenced in this court.

18            THE COURT:  Okay.  I think you also answered my

19    question about a non-criminal accusation of fraud.  Does

20    that relate to the same thing?

21            THE JUROR:  No.  I was a victim of fraud.

22    Somebody defrauded me from some money in a civil matter.

23            THE COURT:  Can you tell us a little bit about

24    that?

25            THE JUROR:  Somebody was holding some money and
```

1  they wouldn't -- they wouldn't turn the money over when

2  it was due to be given to me.

3        THE COURT:  Was there anything that happened as

4  a result?  Was there a lawsuit?

5        THE JUROR:  Unfortunately, the person committed

6  suicide.

7        THE COURT:  You also said -- I asked the general

8  question about whether there was anything in your

9  experience, beliefs, so on, that would interfere with

10 your ability to be an impartial juror in this case.

11       THE JUROR:  I think generally everything being

12 equal, I would be less likely to believe the government

13 as opposed to more likely to believe the defense, but

14 I'm not sure that I can quantify that.

15       THE COURT:  Okay.  Thank you.

16       THE JUROR:  Thank you.

17       (The juror is excused.)

18       (In open court:)

19       THE JUROR:  Jerry Kessler.

20       (Discussion at sidebar and out of the hearing of

21 the jury:)

22       THE COURT:  Hi.

23       THE JUROR:  Hi.

24       THE COURT:  You said somebody close to you may

25 have a connection with federal law enforcement?

1          THE JUROR:  Ten years ago I did a wire -- a mail
2     fraud case with an FBI agent.  I worked with him on it.
3          THE COURT:  In what way?
4          THE JUROR:  There was a mail fraud case, and I
5     helped him with it at the community college.
6          THE COURT:  I see.  Where you were working?
7          THE JUROR:  Yeah.  And I brought him in and we
8     worked together.  He's a friend of mine.  It was about
9     ten years ago.
10         THE COURT:  Can you tell us a little bit about
11    the circumstances?
12         THE JUROR:  Somebody was selling books to
13    students illegally through the mail.  And I documented
14    that.  My friend is an FBI agent, a sergeant.
15         THE COURT:  What's his name?
16         THE JUROR:  Robeson.  Fred Robeson.  He's a
17    sergeant.  In the past.  About ten years ago.
18         THE COURT:  You are a teacher at the Middlesex
19    Community College?
20         THE JUROR:  Yes.
21         THE COURT:  What do you teach?
22         THE JUROR:  Dental technology.  Nobody knows
23    what that is.  But essentially that's the person who
24    gets the impression, we make the teeth and send them
25    back.

1              THE COURT:  Would your experience with the FBI

2     investigation have any effect on your ability to be

3     impartial?

4              THE JUROR:  Yes.  Yes.  I would -- I would not

5     be very objective.

6              THE COURT:  Okay.  Thank you.

7              THE JUROR:  Thank you.

8              (The juror is excused.)

9              (In open court:)

10             THE CLERK:  Eleanor Casey.

11             (Discussion at sidebar and out of the hearing of

12     the jury:)

13             THE COURT:  Good morning.

14             THE JUROR:  Good morning.

15             THE COURT:  You answered a couple of my

16     questions.  I think one was a connection with state law

17     enforcement agency or --

18             THE JUROR:  My son is a Medford policeman and my

19     dad was an official with the Registry of Motor Vehicles.

20             THE COURT:  How long has your son been a police

21     officer?

22             THE JUROR:  Since 1998, I think.  About ten

23     years.  Maybe eight.

24             THE COURT:  Does he have any special assignments

25     or is he just sort of a regular municipal police

1  officer?

2          THE JUROR:  Yeah, as far as I know.  He wouldn't

3  tell me anyway.  He could arrest my next-door neighbor

4  and he wouldn't tell me.

5          THE COURT:  Before I go on, I see -- we have

6  some basic information about jurors which gives your

7  employment and your husband's employment.  It says your

8  husband's an attorney?

9          THE JUROR:  He's an attorney.

10          THE COURT:  What kind of practice does he have?

11          THE JUROR:  Right now he's semi-retired.  And he

12  doesn't do criminal.

13          THE COURT:  He does not do criminal?

14          THE JUROR:  A few years ago he did a few petty

15  criminals, but...

16          THE COURT:  His name is Casey, too?

17          THE JUROR:  Yes.

18          THE COURT:  And what's his first name?

19          THE JUROR:  William.

20          THE COURT:  The other question you answered,

21  somebody close to you had been accused of a crime?

22          THE JUROR:  Okay.  I don't know if this really

23  applies.  My husband and I were both accused by his

24  sister of forgery of a trust that he drew up for her

25  mother, and it was all part of selling a house once,

1  because I was the trustee of the trust.  It was all part
2  of selling a house, which hasn't been sold yet.  My
3  children are the beneficiaries.
4       The judge decided it was not -- there was no
5  forgery.
6       THE COURT:  When was this?
7       THE JUROR:  It started in 2002.  My
8  mother-in-law passed away in 2002.
9       THE COURT:  You made reference to a judge.  Was
10 this in the state probate court?
11      THE JUROR:  It was in Plymouth.
12      THE COURT:  Was there a full trial on the
13 matter?
14      THE JUROR:  No; just the judge.
15      THE COURT:  And that was resolved favorably to
16 you?
17      THE JUROR:  Uh-huh.
18      THE COURT:  Do either of those things -- the
19 fact that you have a son who's a police officer and your
20 experiences with the case involving claims against
21 you -- do either of those circumstances raise any
22 question in your mind about your ability to be an
23 impartial juror in a criminal case like this?
24      THE JUROR:  I don't think so.
25      THE COURT:  Okay.  Thank you.

PDF created with pdfFactory trial version www.pdffactory.com

```
1              THE JUROR:  Okay.

2              (The juror is excused.)

3              (In open court:)

4              THE CLERK:  Sean Dennehy.

5              (Discussion at sidebar and out of the hearing of

6    the jury:)

7              THE COURT:  Hi.

8              THE JUROR:  Hi.

9              THE COURT:  You answered a couple of questions.

10   The first one was about being a victim of fraud.

11             THE JUROR:  Someone -- my daughter had been.

12             THE COURT:  Tell me about that.

13             THE JUROR:  My daughter and her boyfriend gave

14   first and last month's deposit towards a residence to

15   rent through Craig's List.  And the person basically

16   took the money, didn't own the property, left town.  Now

17   she's out the money.

18             THE COURT:  And when was that?

19             THE JUROR:  That was probably last month.

20             THE COURT:  Last month?  You also said you had

21   some --

22             THE JUROR:  On the 18th I have vacation

23   scheduled.

24             THE COURT:  June 18th?

25             THE JUROR:  Yes.
```

```
1              THE COURT:  Just that one day, or that begins
2    it?
3              THE JUROR:  No, that begins it.
4              THE COURT:  Okay.  Thanks.
5              THE JUROR:  Thank you.
6              (The juror is excused.)
7              (In open court:)
8              THE CLERK:  Natalie Salerno.
9              (Discussion at sidebar and out of the hearing of
10   the jury:)
11             THE COURT:  Hi.
12             THE JUROR:  Good morning.
13             THE COURT:  I think you answered the question
14   about whether somebody close to you had been accused of
15   a crime.
16             THE JUROR:  My brother was, four years ago,
17   accused of drunk driving and arrested for driving with a
18   revoked license.
19             THE COURT:  And what happened?
20             THE JUROR:  He lost his license until he was 21.
21   But the driving with a revoked license, he was -- they
22   let it slide because he was driving while somebody else
23   was drunk, and he was the only one sober.  So it was the
24   wrong place -- doing the right thing at the wrong place.
25             THE COURT:  Did you have any involvement in that
```

1    whole thing with him?  Did you go to court with him or

2    anything like that?

3           THE JUROR:  No.  No.

4           THE COURT:  Does it leave with you any feelings

5    about the system that would interfere with your ability

6    to be a fair juror?

7           THE JUROR:  No.

8           THE COURT:  Okay.  Thank you.

9           (The juror is excused.)

10          (In open court:)

11          THE CLERK:  Jerome MacDonald.

12          (Discussion at sidebar and out of the hearing of

13   the jury:)

14          THE COURT:  Hi.

15          THE JUROR:  How are you doing?

16          THE COURT:  You answered a couple of questions:

17   One, you recognize somebody on the witness list?

18          THE JUROR:  Yeah, I'm a Marshfield resident, and

19   I'm familiar with the Barrett family.

20          THE COURT:  How familiar?

21          THE JUROR:  It's a small town.  Everybody knows

22   everybody.

23          THE COURT:  Other than that, knowing people

24   living in the same town, but do you have any connection?

25          THE JUROR:  No.

PDF created with pdfFactory trial version www.pdffactory.com

```
1              THE COURT:  I guess is it Robert Barrett is --
2              MR. MITCHELL:  I think it's Robert.
3              THE COURT:  Would you give his testimony any
4    different consideration than you'd give the testimony of
5    other witnesses you don't know?
6              THE JUROR:  I don't think so, no.
7              THE COURT:  If you thought he was not reliable
8    in his testimony, would you be able to form that
9    conclusion?
10             THE JUROR:  Yeah.
11             THE COURT:  Okay.  The other question was
12   connection with state law enforcement?
13             THE JUROR:  Yeah, my grandfather was captain of
14   detectives, state trooper.
15             THE COURT:  How long ago?
16             THE JUROR:  He's retired now.  He retired in the
17   early '90s, I believe.
18             THE COURT:  Would that have any effect on your
19   impartiality as a juror?  Would you have any tendency to
20   favor the law enforcement side or --
21             THE JUROR:  Somewhat, yes.
22             THE COURT:  Because of that?
23             THE JUROR:  Yeah.
24             THE COURT:  You say "somewhat."  Would you be
25   able to control that or would it take over?
```

```
 1            THE JUROR:  It would be dependent upon the
 2    evidence.
 3            THE COURT:  Okay.  Thanks.
 4            (The juror is excused.)
 5            (In open court:)
 6            THE CLERK:  Keith Champney.
 7            (Discussion at sidebar and out of the hearing of
 8    the jury:)
 9            THE COURT:  Good morning.
10            THE JUROR:  Good morning.
11            THE COURT:  I think you said somebody close to
12    you had been the victim of a crime?
13            THE JUROR:  Yes.  My wife was raped, and we had
14    our home broken into twice, burglarized twice.
15            THE COURT:  When were those events?
16            THE JUROR:  Both over 20 years ago.  All of them
17    were over 20 years ago.
18            THE COURT:  Were there prosecutions as a result?
19            THE JUROR:  No, there was never anyone found.
20            THE COURT:  For any of the crimes?
21            THE JUROR:  For any of the three, no.  They all
22    went unsolved.
23            THE COURT:  Does that leave you with any
24    feelings about the system or anything that would
25    interfere with your ability to be a fair-minded juror?
```

1          THE JUROR:  I don't think so.  The rape happened
2     in Bermuda.  And I don't have very great feelings about
3     Bermuda or about the legal system of Bermuda.
4          THE COURT:  But?
5          THE JUROR:  But I don't have the same feelings
6     about the United States.
7          THE COURT:  Have you had any other dealings with
8     the legal system other than --
9          THE JUROR:  Yeah.  Yeah.  I am a physician.  I
10    have been sued, and I've also served as an expert
11    witness.
12         THE COURT:  How recently were you a witness?
13         THE JUROR:  About 10, 12 years ago.
14         THE COURT:  And what kind of case was it?
15         THE JUROR:  It was a case of a gentleman who was
16    maintaining he was having headaches after he had been
17    dropped in the operating room having a hip procedure.
18    The man was my patient.  I was testifying for him,
19    though I don't think my testimony was very helpful.
20         THE COURT:  Okay.  That went through to a
21    conclusion in that case, did it?
22         THE JUROR:  Yes.
23         THE COURT:  A jury conclusion?
24         THE JUROR:  No, I'm sorry.  I don't know the
25    answer to that.  It was a deposition I did that, I

PDF created with pdfFactory trial version www.pdffactory.com

1  think, in the lawyer's office.

2      THE COURT:  Okay.  So you didn't testify

3  actually in the courtroom?

4      THE JUROR:  No, I don't think so.  Not that

5  time.

6      THE COURT:  I see.  Now, you also referred to a

7  case against you?  A malpractice suit?

8      THE JUROR:  Yeah.  Yeah.

9      THE COURT:  Was that tried or resolved before

10  trial?

11      THE JUROR:  Resolved before it was tried.

12      THE COURT:  Do any of your contacts with the

13  civil justice system leave you with any feelings that

14  would affect your judgment as a juror in this case?

15      THE JUROR:  No.

16      THE COURT:  Okay.  Thank you.

17      THE JUROR:  You're welcome.

18      (The juror is excused.)

19      THE COURT:  All right.  Let's do cause issues.

20  And we have enough to get through whatever peremptories

21  we have.

22      Number 1?

23      MR. MITCHELL:  No.

24      THE COURT:  Okay.  Number 2?

25      MR. MITCHELL:  No.

```
1              MR. PAPPALARDO:  I'm sorry.  Are we on Number 1?

2              THE COURT:   Number 2.

3              MR. PAPPALARDO:  No.

4              THE COURT:  Okay.  Number 4?

5              MR. PAPPALARDO:  Yes.  We would ask that he be

6    excused for cause.

7              THE COURT:  She.

8              MR. PAPPALARDO:  She?

9              THE COURT:  What's the reason?

10             MR. PAPPALARDO:  I'm sorry, your Honor.  Are we

11   on Juror No. 6?

12             THE COURT:  No; Number 4.

13             MR. PAPPALARDO:  I'm sorry.  I got screwed up.

14   We have no problem with her.

15             THE COURT:  Okay.  Number 6 is, I think, who you

16   were talking about before.  I would assume the

17   government has more problem with them.

18             MR. CARPENTER:  I like Number 6.

19             MR. PAPPALARDO:  You like Number 6?

20             MR. MITCHELL:  I think both six and seven should

21   be struck for cause.  They demonstrated biases.

22             THE COURT:  Eight?

23             MR. PAPPALARDO:  We would object.

24             THE COURT:  What's the basis?

25             MR. PAPPALARDO:  Her son's a police officer; her
```

1    father was a police officer; her husband dealt with

2    criminal cases at some point in time; she was accused by

3    her sister of forgery; was involved in a state issue;

4    and she -- yeah.  And she did equivocate when you asked

5    her if she could be impartial.

6           THE COURT:  Well, I don't think she equivocated.

7    She paused.  But anyway...

8           MR. MITCHELL:  She paused.  She did think about

9    her answer.  I mean, it's not equivocation.

10          I object because --

11          THE COURT:  Yeah, I don't think she was --

12   indicated any inability to be impartial.

13          Number 9?

14          MR. MITCHELL:  As for 9, your Honor, I think his

15   vacation lines up such that he might be okay.  I mean,

16   the 19th is, what, right at the end of the third week.

17          MR. PAPPALARDO:  He was a victim of fraud, your

18   Honor, with respect to his daughter.

19          THE COURT:  Yeah.  I think that I would excuse

20   him for cause.

21          Ten?

22          MR. PAPPALARDO:  No, that's fine.

23          THE COURT:  Eleven?

24          MR. PAPPALARDO:  We would object to 11, your

25   Honor.  Not only does he know one of the witnesses but

PDF created with pdfFactory trial version www.pdffactory.com

```
1   he --
2           THE COURT:  I'll excuse him.
3           And 12?
4           MR. PAPPALARDO:  No.
5           THE COURT:  Okay.  All right.  I think that
6   gives us enough.  So right now the two would fill the
7   seats -- would be Seat 4 and Seat 11.
8           THE CLERK:  Which one do you have?  I have Seat
9   4 and Seat --
10          THE COURT:  Seat 11.
11          THE CLERK:  That's it.
12          THE COURT:  So Juror No. 1 would go to Seat 4
13  and Juror No. 2 would go to Seat 11, okay?  So that's
14  where we are.
15          MR. MITCHELL:  You probably don't even need to
16  seat them.
17          THE COURT:  I don't think we do.  I don't think
18  we do.
19          Whose turn is it first?
20          MR. MITCHELL:  I believe it was theirs, your
21  Honor.
22          THE COURT:  I think it's your turn.
23          MR. PAPPALARDO:  We would strike Number 1,
24  Rogers.
25          MR. MITCHELL:  We're fine with Number 2.
```

```
 1            THE COURT:  Just Number 1?  Okay.  We don't even
 2    have to tell them.  We could just tell who the winners
 3    are.
 4            So that's Number 3.
 5            Actually, 11, I think, because we put Number 1
 6    in Seat 4 and Number 2 in Seat 11.  So we'll just keep
 7    the chart.  So now Seat 4 is empty and now Number 3 will
 8    go into Seat No. 4.
 9            MR. PAPPALARDO:  And they'll be designated as
10    alternates from those seats?
11            THE COURT:  They will be, because they're the
12    last two.
13            MR. PAPPALARDO:  Okay.
14            THE COURT:  So now...
15            (Pause.)
16            MR. MITCHELL:  Ready?  We pass.
17            (Pause.)
18            MR. GREENBERG:  Your Honor, I just wanted to ask
19    one question:  Was Juror No. 9 excused because of his
20    vacation?
21            THE CLERK:  For cause.
22            THE COURT:  No, he was accused because of fraud.
23            MR. GREENBERG:  Okay.
24            MR. PAPPALARDO:  We will exercise a peremptory
25    on Number 3, your Honor.
```

```
1              THE COURT:  Okay.  That's it?
2              MR. PAPPALARDO:  That's it for us.
3              THE COURT:  So that puts Number 4 --
4              THE CLERK:  In Seat 4.
5              THE COURT:  -- in Seat 4.  It comes full circle.
6              MR. MITCHELL:  And we're fine with Number 4.
7              THE COURT:  Okay.  Then we're done.  So we will
8    call those two in, Number 2 and -- we're going to have
9    them actually just take the seats ceremoniously now, and
10   then we'll excuse the rest.  You may have to direct them
11   to their seat.
12             (In open court:)
13             THE CLERK:  Ronnie Gould, you can sit up here,
14   the fourth seat; and Mr. Fequiere, you'll be sitting in
15   Seat 11, which is right over here.  It's the fourth seat
16   in.  This is where you're going to be in the jury.
17             THE COURT:  Okay.  This completes our
18   impanelment, ladies and gentlemen.  The rest of you are
19   excused.  The clerk will give you your cards and you may
20   return back to the jury pool.
21             Thank you for your willingness to participate.
22             (Discussion at sidebar and out of the hearing of
23   the jury:)
24             THE COURT:  Can I just mention while it occurs
25   to me -- it's not urgent -- I believe tomorrow is a
```

1  visiting judge from Argentina who is coming to see some

2  proceedings, and I've invited him to see some of this.

3  I'd like him to sit on the bench with me unless there's

4  any objection.  I just want to clear it with counsel.

5          MR. PAPPALARDO:  We have no objection.

6          THE COURT:  I don't know whether he will want

7  to; I haven't talked to him about it yet.  I just

8  mention it to you out of courtesy.  And I don't expect

9  he'll want to stay for the whole morning.

10          MR. PAPPALARDO:  Can we argue to him, your

11  Honor?

12          (Laughter.)

13          MR. MITCHELL:  Do you plan to introduce him to

14  the jury?

15          THE COURT:  Yes, I'll do that.  Right.  Right.

16  Plans always change with visitors like this.  But I

17  think it will be first thing.  So my thought is if he

18  wants to do it, you know, it will be until the morning

19  recess.  He can stay as long as he wants.  He may prefer

20  to sit in the audience so he can leave.  I haven't

21  discussed it with him.  But if he's willing to do it,

22  I'll invite him to join me.

23          MR. MITCHELL:  I want to put one thing on the

24  record because it was raised earlier:  Juror No. 2 who

25  is now in seat 11, Mr. Fequiere, is an African-American;

1    the government did not move to strike him.

2            THE COURT:  Very good.  All right.  We'll just

3    take a recess and get organized and go forward.

4            Oh, let me --

5            THE CLERK:  Should I send them back here?

6            THE COURT:  Yeah, this will just take a second.

7            Okay.  I guess we have some pending opening

8    matters to know about, and one is the testimony -- the

9    testimony of Jokinen and Iantosca.

10            I don't see any reason to exclude any of the

11    particular questions on Jokinen.  I mean -- so I think

12    that whatever is necessary to show personal knowledge,

13    the foundation has been sufficiently established.

14            As to Iantosca, I think the appropriate

15    resolution is -- I won't foreclose his testimony, but it

16    can be impeached by the kinds of documents that the

17    defense has presented.  I don't think that's a reason

18    for disqualifying his testifying.  It may present an

19    issue which could be presented to the jury and argued

20    about, but that can be done through the impeachment.  I

21    think that was it.

22            The only other issue was whether there could be

23    reference to the Adams and Kameron identification or --

24    or testimony about conversations.  Those witnesses, I

25    understand, will be here, and so that the foundation --

PDF created with pdfFactory trial version www.pdffactory.com

1   unlike perhaps with Iantosca and Jokinen, the foundation

2   isn't frozen; a new foundation can be laid.

3        So I think this puts us in the case where we

4   would be in any trial, where if there's a proffer of --

5   reasonable proffer of evidence that would qualify as a

6   foundation -- an adequate foundation, then it could be

7   referred to in the opening.  I mean, sometimes things

8   don't work out as people hope, but we usually allow it

9   unless we think for some reason it won't get in for

10  sure.

11       So I guess I would ask the government for a

12  proffer for the foundation of those two conversations

13  that would be sufficient to let it go.

14       MR. MITCHELL:  I can do that.  I think we went

15  through it yesterday.  I mean, the foundation comes in

16  from a number of places -- from a number of witnesses:

17  the testimony of Marjorie Adams that she received a call

18  from Joseph Iantosca's office that Joe was angry that

19  Dan Carpenter had been there.  She called Dan Carpenter

20  and said, "What's going on?"

21       She called the number that she had for him.  He

22  picked up the phone and he spoke to her for some period

23  of time and they discussed, among other things, whether

24  the money was available.  He identified himself as Dan

25  Carpenter on the phone; he talked about his discussion

PDF created with pdfFactory trial version www.pdffactory.com

1    with Joe Iantosca and his position on the funds that had

2    been entrusted to Benistar.

3            THE COURT:  Why don't you take the jurors out.

4            MR. MITCHELL:  And among other things, said

5    there had been a run on the bank; he admitted that

6    Carpenter had asked Iantosca for a loan.

7            And she asked him about, you know, "Is the money

8    supposed to be there?" et cetera, and there was an

9    argument with him about that.

10            Similar comments were made by Carpenter in a

11    phone call that Matthew Kameron identified, and will

12    identify, as the call he received from someone saying he

13    was Dan Carpenter.  The voicemail includes statements

14    that, again, there had been a run on the bank, that

15    there had been -- that he would get -- would try to get

16    the money back to them, that it wasn't Martin Paley's

17    fault.

18            All of these -- I can go on, your Honor, but all

19    of these facts suggest that the person who had those

20    conversations with Marjorie Adams and Matthew Kameron's

21    voicemail was indeed Dan Carpenter, and the dovetail

22    were the circumstances of the case with Benistar, and

23    Property Exchanges, in a property exchange with a guy

24    named Iantosca.

25            So for all of those reasons, there is a firm

PDF created with pdfFactory trial version www.pdffactory.com

1    foundation for these conversations.

2          MR. GREENBERG:  Your Honor, with respect to

3    Ms. Adams' purported call, it's the defense's position

4    that call never took place, number one.  We've

5    requested, and we've never received, including at the

6    first trial, copies of the phone records evidencing that

7    she, in fact, made the call, which is the claim.

8          Number two, Ms. Adams can't identify Mr.

9    Carpenter's voice.  And she didn't purport to identify

10   his voice during the first trial, and there's no basis

11   to suggest that she could identify his voice.

12         Number three, her testimony isn't that she

13   called the directory and asked for a specific number for

14   Dan Carpenter and relied upon the directory; her

15   testimony at the first trial was that she was simply

16   given a number and called that number and someone

17   purported to give the phone to Dan Carpenter.  And

18   that's insufficient foundation with relation to that

19   foundation with respect to the phone message.

20         Again, Mr. Kameron can't identify Mr.

21   Carpenter's voice.  The testimony is simply that he

22   received a voicemail and the message, in itself, simply

23   purports to be Dan Carpenter.

24         Similarly, as it relates to Mr. Kameron's

25   purported phone conversation with Mr. Carpenter, and I

PDF created with pdfFactory trial version www.pdffactory.com

1    believe it's under Rule 901 in terms of authenticated

2    telephone calls, is deficient.

3           THE COURT:  Okay.  I think the proffer is

4    sufficient, so both can be referred to.

5           MR. MITCHELL:  The schedule for the remainder of

6    the day, your Honor, is --

7           THE COURT:  I'll give some preliminary

8    instructions and we'll break for ten minutes or so, 15,

9    and start openings and see where we are.  If we have

10   witnesses, let's go.

11          MR. MITCHELL:  We have Mr. Snider outside.

12          MR. PAPPALARDO:  Your Honor, the only other

13   thing we want to take up now is we've agreed to a

14   sequestration order which includes, obviously, witnesses

15   not being present for the openings.  Having said that,

16   after discussion with the government, Mr. Mitchell has

17   agreed that Molly Carpenter, who is Mr. Carpenter's

18   wife, is permitted to stay in the courtroom.

19           And we appreciate that.  She is on the witness

20   list.  And I've represented to the government that she

21   would only be put on to authenticate certain things if

22   we can't find somebody else.

23          THE COURT:  So --

24          MR. PAPPALARDO:  And also, obviously,

25   Mr. Zappala can stay in, too.  He's a witness.  He's a

1    government witness.  He works for the U.S. Attorney.

2            THE COURT:  Fine.  I have no problem with that.

3    The arrangement with Mrs. Carpenter is throughout the

4    trial or just the opening?

5            MR. PAPPALARDO:  I would like to have her

6    present throughout the trial.

7            MR. MITCHELL:  We don't have a problem with that

8    based on the representation that all she would be doing

9    is authenticating documents.

10            THE COURT:  All right.  I just wanted it to be

11    clear.

12            I look to the parties to police this because I

13    don't know who the witnesses are when they show up in

14    the back of the room.  So you should be diligent about

15    that, and I would expect you to talk to them about it.

16            So I think we'll begin about 11.

17            MR. MITCHELL:  Thank you, your Honor.

18            MR. PAPPALARDO:  Thank you, your Honor.

19            MR. GREENBERG:  Thank you.

20            MR. PIROZZOLO:  Thank you, your Honor.

21            (In open court:)

22            THE CLERK:  All rise.

23            The Court will take a recess.

24            (There is a recess in the proceedings at

25    10:46 a.m.)

PDF created with pdfFactory trial version www.pdffactory.com

1          (After recess.)

2          (Jury sworn in by the clerk.)

3          THE CLERK:  Please be seated.

4          THE COURT:  Jurors, thank you for your patience.

5    We appreciate your standing by while we completed the

6    process of selecting a jury, and we're happy that's now

7    done and we're ready to begin.

8          Actually, the administration of the oath of

9    office, as has just been done to you as jurors, marks

10   the formal beginning of the trial.  We are now formally

11   under way.  And I just want to say a few things before

12   we actually begin the presentation of the case to you,

13   sort of remind you of, I think, some of the things you

14   saw in your orientation about how we're going to

15   proceed.

16         As I'm sure you can appreciate, this is a very

17   serious and important case for the parties in the case

18   on both sides.  This is their day in court, as it were,

19   and we know that you'll give it that serious level of

20   attention that it merits and deserves.

21         A trial is a formal proceeding.  We proceed in

22   accordance with some rules that have been set for these

23   kind of things based largely on experience and mindful

24   of the important work that a trial involves.  Some of

25   the rules are perhaps of relatively recent origin, some

PDF created with pdfFactory trial version www.pdffactory.com

1    of them are perhaps centuries old.  We follow the forms

2    and rules not just because that's what lawyers do, but

3    that's a way of ensuring a fair presentation to both

4    sides in a case.  If we establish the rules and then

5    live by them, everybody knows what's coming and can

6    adjust accordingly and make their presentations that

7    way.  The consequence is that sometimes it might seem a

8    little stiff or inefficient.  We will try to be as

9    efficient as we possibly can, but that is a secondary

10   goal to making sure we have a fair presentation of the

11   evidence, so that in the end justice may be done.

12          So we ask you to be patient, as you already have

13   been, as we've worked out some of the things that may

14   arise during the course of the case.

15          Part of the formality of the trial is that we

16   proceed in a set way, and in just a minute we'll begin

17   with the first stage of the case, which is the

18   opportunity for the lawyers to make what we call their

19   opening statements.  An opening statement is an

20   opportunity for each side to sort of get you ready to

21   hear the evidence.  In other words, they prepare you for

22   what's coming by giving you an overview of what they

23   expect the evidence will be.  Their statements are not

24   part of the evidence.  If we stopped at the end of the

25   opening statements, you'd have nothing to decide on

PDF created with pdfFactory trial version www.pdffactory.com

1    because you'd have no evidence.  You'd have a preview,

2    and it was helpful because it -- you'll hear the

3    evidence piece by piece, witness by witness, question by

4    question, exhibit by exhibit.  It perhaps will make a

5    little bit more sense to you to listen to that as it

6    comes in if you've had an overview and have some sense

7    of what the case is about from the perspective of the

8    lawyers.  So they each have a chance do that and to

9    prepare you for the evidence.

10          Then we'll begin the evidence, and the evidence

11   will come largely through the testimony of witnesses who

12   sit in the witness box right across from you, swear to

13   tell the truth, and then answer questions that are put

14   to them by the lawyers, each side having an opportunity

15   to question each witness.  That question and answer

16   format is an instance of the formality of the trial.  We

17   don't simply have people come in and get up and tell you

18   what's on their mind about the case or talk to you in a

19   narrative form; rather, their evidence is directed by

20   the questions that the lawyers put to them.  And there

21   are a number of reasons for that, one is efficiency, in

22   fact, because the lawyers have an understanding of

23   what's important to be brought out and they can focus on

24   that by putting questions that way, rather than perhaps

25   have witnesses ramble on, giving you information that

PDF created with pdfFactory trial version www.pdffactory.com

1    isn't important.  Another reason is that, in addition to

2    being guided by rules about procedure, we have a body of

3    rules which we call the rules of evidence, which are

4    basically an expression of judgments that the law has

5    made over time about the quality of information that is

6    properly presented to a jury, such as yourselves, and

7    should be the basis for your judgment.

8            The law makes some categorical judgments, but

9    some kinds of evidence are reliable enough to be

10   presented in a case like this and some other kinds might

11   be, as a general matter, not reliable enough so that

12   they should not be used as a basis.  You don't have to

13   worry about it; it's part of my job to see that the

14   rules of evidence are properly applied, with the help of

15   the lawyers, who will bring to my attention any problem

16   that may arise under it, but I mention it because you

17   will see it happen.

18           Let me give you an illustration about what kind

19   of rules there are; again, you don't have to worry about

20   the substance of it, it's an example.  The law generally

21   prefers firsthand information to secondhand information

22   as the basis for judgment.  So witnesses are ordinarily

23   confined to testifying about things they have -- the

24   phrase is "personal knowledge," something they have

25   directly perceived, done, participated in, heard, seen,

PDF created with pdfFactory trial version www.pdffactory.com

1    and so on, rather than secondhand information, something

2    somebody else has told them about something.

3          So that's a broad judgment.  Generally,

4    firsthand information is better than secondhand

5    information.  That's the kind of judgment that the rules

6    of evidence make.  Again, you don't have to worry about

7    it, but you will see it happening, because if a lawyer

8    thinks that a question calls for evidence from a witness

9    that would be improper under the rules, the lawyer will

10   make an objection.  I'm sure you've seen that on TV or

11   in the movies.  A couple of things to understand about

12   that.  First of all, that is not an interference or an

13   obstruction of the process.  The lawyer isn't trying to

14   keep you from knowing something you otherwise should

15   know.  It's exactly the opposite.  It's an assist to the

16   process, because it keeps us on track with the kind of

17   information that is properly admitted and seeks to keep

18   out that which the rules of evidence would call for

19   being excluded.

20         Now, obviously, commonly, the parties will

21   disagree about that sometimes, and that's when I'll make

22   the judgment about whether the evidence ought to be

23   given or not.

24         So on an objection, I may sustain the objection,

25   say I agree that question calls for evidence that

PDF created with pdfFactory trial version www.pdffactory.com

1    shouldn't be given.  In that case, the witness won't

2    answer the question.  If that should be the case, put

3    the question out of your mind.  Don't try to answer it

4    yourselves, don't try to guess at what the answer might

5    have been if the answer had been given.  Just take it,

6    for whatever reason, there will be no answer to the

7    question, wait for the next question and the answer to

8    that question.

9         It is the witness' answers that produce

10   evidence, not the questions.  Sometimes questions may be

11   suggestive of a fact, sometimes a question may ask a

12   witness to agree that something is true or not.  Unless

13   the witness adopts the answer, it's not evidence, even

14   though it might be suggestive in the question.

15        Now, on the other hand, I might overrule the

16   objection, disagree with the person making the objection

17   and say, no, go ahead, you can answer that.  That answer

18   is given, and it becomes part of the evidence, just like

19   all the other answers that are given without objections.

20   An answer that is given after an objection is not a

21   special answer.  The objection is not a clue or a hint

22   that this must be important because they wouldn't be

23   objecting to it.  It's just to be taken with all the

24   other answers and thought about at the end of the case.

25   And the reason it's not a clue or a hint is because the

PDF created with pdfFactory trial version www.pdffactory.com

1  principles that underlie the rules of evidence have

2  nothing to do with the merits of the case.  They're just

3  completely different considerations.  So there's no

4  connection, logical or otherwise, between an objection

5  and the merits of the case.  So don't look for any,

6  because there isn't any there.

7       Sometimes we'll have the lawyers come over to

8  the side, as you saw us do when we were doing the

9  selection process.  That's usually to discuss a point of

10 evidence, and we do it because if the evidence should be

11 excluded, we don't want to be talking about it first,

12 because you will have heard it and then be told that you

13 should disregard it.  So we try to do it over at the

14 side, out of your hearing.  Because the acoustics are so

15 good, we will usually mask the sidebar conference by

16 playing some music.  So one of my other roles, I get to

17 be the disc jockey here.  So don't be surprised if you

18 hear a little music when we go over to the side.  It's

19 not really for your entertainment -- you're free to

20 enjoy it, I guess -- it's really to keep you from

21 hearing what we're saying.

22       When all the evidence has been presented to you,

23 the lawyers have another chance to sum up for you what

24 they think you should remember about the evidence, think

25 about concerning the evidence, what we call their

PDF created with pdfFactory trial version www.pdffactory.com

1   closing statements, sometimes referred to as their final

2   arguments, and they'll ask you to evaluate the evidence

3   that favors their point of the view, obviously.  I'll

4   have some instructions for you then about the rules of

5   law that apply and how you ought to resolve the issues

6   that are presented to you, and then you'll conduct your

7   deliberations.

8           Now, in terms of time, the presentation of the

9   evidence is the longest part of the case, that's what

10  we'll spend most of our time doing.  While we do that,

11  we're going to permit you to have notebooks and to take

12  notes during the evidence.  We don't allow it during my

13  instructions or during the lawyers' statements, but

14  during the evidence, we will.  And so we'll hand out

15  some notebooks, and you'll have them throughout the

16  trial to use as you think is helpful.  They will be

17  collected every night and kept in a secure place, so you

18  don't have to worry about them for the next day.

19          Now, everybody is probably different from

20  everybody else in terms of note-taking, and it's been my

21  observation over time some jurors do it quite a bit,

22  some jurors do it practically not at all.  I've seen

23  some just fold up the notebook and put it away.  Do

24  whatever you think might help you; don't do whatever you

25  think you're supposed to do because your neighbor is

PDF created with pdfFactory trial version www.pdffactory.com

1    doing it.  It's really just an assist to you in a case

2    that may go on for a number of days to be able to bring

3    some things back when it's time to make some judgments.

4    So it's entirely up to you personally how much or how

5    little you want to take notes.

6              There's going to be some documents, some

7    exhibits that you will have, some will be exhibited

8    through the system, some may be in paper.  You'll have

9    all the exhibits with you in the jury room at the end of

10   the case anyway, so you don't have to be too concerned

11   about capturing what an exhibit may have said.  You'll

12   have that later on.

13             Now, I mentioned the system.  We do have some

14   electronics that we use to bring documents and other

15   things to your attention.  Those of you in the front

16   rows, you can see them in position.  Those of you in the

17   back row, between every other seat there is a console,

18   if you take the top -- lift the top up, it's sort of

19   like those trays in the airplane in between the seats,

20   the monitor will pivot up, and you can put it in place.

21   They're turned on by a little button that should turn

22   green at the lower right-hand corner.  So at the

23   appropriate time we'll ask you to get those going.  That

24   will be one of the ways we'll present some of the

25   evidence to you.

PDF created with pdfFactory trial version www.pdffactory.com

1          Now, I'm not going to read the indictment to

2    you, but I will tell you that the offenses charged arise

3    under two particular statutes of the United States, and

4    I will read for you the formal language of the statutes,

5    which is very formal, and one is commonly referred to as

6    the mail fraud statute, and the other is commonly

7    referred to as the wire fraud statute.  These are

8    enacted by the Congress, federal statutes, so they're

9    federal offenses.  Federal offenses deal with matters

10   that are of concern to the national government as

11   opposed to state or local governments.  And you'll hear,

12   as I read this, that one, in particular, focus of these

13   statutes is interstate means of communications, whether

14   by the use of the United States Postal Service or by

15   wire, radio, television, other kinds of electronic

16   communication in interstate commerce, because the

17   national government has an interest in interstate

18   commerce, state and local governments do not.

19          So the offenses that are charged are under these

20   following two statutes, the relevant language of which I

21   will read, and this is Title 18 of the United States

22   Code section 1341, and reads in part, Whoever, having

23   devised or intending to devise any scheme or artifice to

24   defraud or for obtaining money or property by means of

25   false or fraudulent pretenses, representations, or

PDF created with pdfFactory trial version www.pdffactory.com

1    promises for the purpose of executing such scheme or

2    artifice or attempting so to do, places in any post

3    office or authorized depository for mail matter, any

4    matter or thing whatever to be delivered or sent by the

5    Postal Service, or deposits or causes to be deposited

6    any matter or thing whatever to be sent or delivered by

7    any private or commercial interstate carrier, or takes

8    or receives therefrom, any such matter or thing, or

9    knowingly causes to be delivered by mail or such carrier

10   according to the direction thereon, or at the place at

11   which it is directed to be delivered by the person to

12   whom it is addressed, any such matter or thing, commits

13   the offense of mail fraud.

14           Section 1343 of the same title of the United

15   States Code, referring to wire fraud, reads:  Whoever,

16   having devised or intending to devise any scheme or

17   artifice to defraud, or for obtaining money or property

18   by means of false or fraudulent pretenses,

19   representations, or promises, transmits or causes to be

20   transmitted by means of wire, radio, or television

21   communication in interstate or foreign commerce, any

22   writings, signs, pictures, signals, or sounds for the

23   purpose of executing such scheme or artifice, shall be

24   guilty of the offense.

25           I'll have some detailed instructions to you at

1    the end of the case about how to construct and apply

2    those terms, but those are the offenses that are charged

3    here.  And they essentially involve proof of a -- of the

4    defendant's knowing and willing participation in a

5    scheme or artifice, to defraud or obtain property by

6    false or fraudulent pretenses, and the use of, in the

7    case of the mail fraud statute, the mails or similar

8    private carrier, such as FedEx or something like that;

9    and in the case of the wire fraud, use of the interstate

10   communication facilities of an electronic nature.  And

11   that's what the presentation will be focused on by the

12   evidence.

13            Now, as I said, the defendant says that he is

14   not guilty of any of the charges made against him, and

15   he's entitled to the presumption that he is not guilty

16   unless and until the government proves otherwise by the

17   evidence and proves it to you beyond a reasonable doubt.

18            With that, I will ask Mr. Mitchell, on behalf of

19   the government, to make the government's opening

20   statement.

21            MR. MITCHELL:  Thank you, your Honor.

22            Ladies and gentlemen, this man, Daniel

23   Carpenter, seated directly behind his attorneys, ran a

24   business that offered real estate investors a safe place

25   to hold their money while they waited to purchase

```
 1   property.  This business told these people that their
 2   money would be secure and kept in escrow accounts
 3   earning either three percent or six percent interest.
 4   Unbeknownst to them, however, the defendant took the
 5   money and traded it in the high-flying stock options
 6   market, putting it all at grave risk.  If his ploy had
 7   paid off, it would have made him a fortune, while still
 8   paying the people whose money he was trading only three
 9   percent or six percent.  But his ploy didn't pay off.
10   As he was losing thousands of dollars a day in the
11   options market, he kept taking in more and more money
12   from people whose -- who had been assured by his company
13   that their money would be safe.
14        His downward spiral in the stock options market
15   lasted until the last group of people who entrusted
16   their money to him, all $9 million of it, got a letter
17   that said to them, bluntly, Please be advised that we
18   are not able to return your funds to you at this time.
19        For this, ladies and gentlemen, Dan Carpenter
20   stands before you today accused of mail and wire fraud.
21        Once again, my name is Jon Mitchell and, along
22   with Jack Pirozzolo, we have the honor of representing
23   the United States in this case.  It is our job to
24   present to you the evidence that will show beyond a
25   reasonable doubt that Dan Carpenter engaged in a scheme
```

1   to defraud.

2           Now, as Judge O'Toole noted, the evidence in the

3   case is going to come in in bits and pieces, and that's

4   because each witness can only testify to those things

5   that he or she saw or heard.  So I'm going to take about

6   the next 20 minutes to sum up for you what the evidence

7   is going to look like when you put it all together.

8           To appreciate the evidence, you have to

9   understand something about the defendant's business.

10  The defendant's business, his company, was called

11  Benistar Property Exchange Trust Company.  Sometimes

12  we'll refer to it as Benistar.  In fact, most of the

13  time we will refer to it as Benistar.  It was

14  headquartered in Simsbury, Connecticut, where the

15  defendant was located, and it had a satellite office in

16  Newton, Massachusetts.

17          Benistar was in the property exchange business.

18  What's a property exchange?  Well, it has to do with the

19  way the government taxes commercial real estate.  Now,

20  as we all know, the federal tax system is very

21  complicated, but this case is quite simple.  If you are

22  the owner of a piece of commercial property, let's say a

23  convenience store or even an apartment that you rent

24  out, if you sell the property, you have to pay capital

25  gains taxes on the sale if you make money on the sale;

1    that is to say, if you sell it for more than you bought

2    it.  But let's say you're not interested in pocketing

3    the proceeds of the sale.  Let's say, instead, that you

4    want to roll it into another property.  Well, the IRS

5    has a rule, which we'll refer to by its name, section

6    1031, or just 1031, that allows people to swap

7    properties without paying a capital gains tax.  This is

8    sometimes called a like-kind exchange.

9            To properly complete one of these property

10   swaps, you have to follow two principal rules.  The

11   first rule is that you have to complete the whole thing

12   in 180 days, no longer.  If you don't complete in 180

13   days, you have to pay capital gains taxes on the sale of

14   the property.  The other big rule is you can't hold the

15   money yourself, you have to give it to a third party

16   called a qualified intermediary, which holds the

17   property until you find a replacement property and are

18   ready to buy it.  There are companies out there that do

19   this sort of thing for a fee, and the defendant's

20   company, Benistar, was one of these companies.

21           I mentioned to you this last group of people who

22   found out that their money wasn't there.  Over the

23   course of the trial, you will hear from all seven of

24   these people, who in the year 2000 approached Benistar

25   so that they could do one of these property swaps.  At

PDF created with pdfFactory trial version www.pdffactory.com

1    one point or another in their lives, they had invested

2    in property.  Every one of them was a real estate

3    investor who was doing a property swap for the specific

4    purpose of staying in real estate.

5            They will tell you, each one of them, that they

6    met a person named Martin Paley, who ran the defendant's

7    Newton office.  They will tell you that they received

8    from Martin Paley certain promotional materials and

9    certain contracts.  You'll get a chance to see all of

10   this stuff.  You'll see the promotional materials and

11   how they described the money would be placed in escrow

12   where it would be secure.  These materials emphasized

13   that Benistar was an established and trustworthy

14   company.  You will also see those contractual documents.

15   They include promises that the money would be held in

16   escrow.  In fact, one of these documents is called The

17   Escrow Agreement.  The escrow contracts gave the

18   property owners a choice between a three percent and six

19   percent account, as I mentioned earlier.  The

20   difference, as described in the documents, between these

21   two accounts was that with the three percent account,

22   you could get your money back in one day.  If you put

23   your money in the six percent account, it took 30 days

24   to get it back.

25           None of these documents say anything, anything

PDF created with pdfFactory trial version www.pdffactory.com

1    about stock options.  None of them mention risk.

2    Instead, they emphasize that the money will be placed in

3    escrow.  They emphasize that the funds may not be

4    withdrawn without the authorization of the property

5    owner himself or herself.  They say that the money will

6    be returned to the property owner so they can complete

7    the rollover, the property swap, and if they don't, as I

8    mentioned before, these documents said that if you don't

9    do it within 180 days, a short period of time, the money

10   will return to the property owner.

11        The defendant well knew what his business was

12   about.  He well understood property exchanges.  He was a

13   tax attorney who understood the rules, the rules of the

14   road and understood specifically what the materials

15   said.  You will hear evidence that he -- that he

16   personally approved each one of these documents before

17   they were allowed to go out to the exchangors.  Indeed,

18   you will learn that Dan Carpenter micromanaged the

19   affairs down to the last detail at Benistar.  He

20   mandated that nothing of substance left the office.  If

21   it happened at Benistar, Dan Carpenter knew about it.

22        In fact, you will hear in -- in addition, you

23   will hear a witness.  An attorney named David Patterson

24   will tell you that he went through the documents,

25   through the contractual documents point by point with

```
1    him before he would -- before David Patterson would
2    allow his client to sign the agreement.
3            While these materials were being handed out to
4    the property exchangors up here in Massachusetts, the
5    defendant was back in Connecticut handling all the
6    money.  He set up an escrow account at Merrill Lynch,
7    and the property exchangor was directed to send their
8    money either by mail or wire to that Merrill Lynch
9    account, hence, the charges of mail, wire fraud in this
10   case.
11           The defendant exercised exclusive control of
12   these accounts.  He managed the money.  Despite the
13   promises that were being made to the exchangors, the
14   defendant was doing something entirely different with
15   the money.  At the same time he opened the escrow
16   account, he opened up a side account, which he didn't
17   tell the clients about, and transferred their money into
18   it, and that's where he did his options trading.  His
19   Merrill Lynch brokers told him -- you'll hear from his
20   Merrill Lynch brokers, they'll describe the nature and
21   the magnitude of his trading.
22           Just to be clear, ladies and gentlemen, when I
23   talk about stock options, when you hear stock options,
24   these aren't the same kinds of stock options that people
25   have in their retirement accounts or they may receive
```

1    from their employers.  These are entirely different

2    beasts.  These stock options that we're talking about

3    are contracts in which people agree to buy or sell

4    blocks of 100 shares -- 100 shares of stock based on

5    guesses as to which way the market is going.  The kind

6    of stuff that he was doing are called naked puts and

7    naked calls.

8         The defendant was aware, as you will hear, that

9    this type of trading was extraordinarily risky.  He was

10   a sophisticated investor, a tax attorney.  If he had any

11   doubt about the riskiness of his trading, his Merrill

12   Lynch broker made it crystal clear to him.  He warned

13   him time and time again, You've got to tone down the

14   risk.  And he just responded, "I know what I'm doing."

15        At first he guessed the right way.  In 1999, as

16   the stock market was going up, the defendant's high-risk

17   strategy was yielding positive returns.  If it had kept

18   up, he would have made a fortune while still paying the

19   people who entrusted their money to him three percent or

20   six percent.  But pretty soon, his high-flying strategy

21   caught up with him.  When the market stopped soaring in

22   the year 2000, his losses mounted, first in the

23   thousands, and then in the millions.  His Merrill Lynch

24   brokers spoke to him again and again, repeatedly, and in

25   writing.  They sent him letters and told him to rein it

PDF created with pdfFactory trial version www.pdffactory.com

1  in.

2       In September of 2000, Merrill Lynch actually cut

3  him off.  They were actually making money -- making

4  commissions off his trades, but they told him that they

5  were concerned about his trading.  Despite the soaring

6  losses and the increasing risk, the defendant responded

7  not by ceasing his trading, but by moving it to another

8  broker, Paine Webber.  There he did the same thing.  He

9  set up an escrow account and he set up a side account to

10 do options trading.  You'll hear from his broker.  His

11 Paine Webber broker told him in their first meeting, If

12 you're coming here, you've got to tone down the risk.

13 The defendant said, Okay, I will.  But he didn't.

14 Instead, he resumed trading in the same way he traded at

15 Merrill Lynch, naked puts and naked calls, all the while

16 he kept up the charade that everything was fine.

17       Meanwhile, new clients were giving -- were being

18 led to believe that his company was a safe place to keep

19 their money.  And he continued to take their money and

20 trade it in the options market.  In fact, the seven

21 property exchangors that you will hear from in this case

22 gave their money to Benistar after the defendant's

23 losses were $2 million and counting.  As the defendant

24 well knew, they were being presented with promotional

25 materials and contractual documents that told them that

PDF created with pdfFactory trial version www.pdffactory.com

1    their money would be placed in an escrow and held in

2    low-yield accounts.  He knew that they were real estate

3    investors who were involved in property exchanges

4    because they wanted to keep their money in real estate.

5        By the end of 2000, less than two months after

6    he moved his money over to Paine Webber, Paine Webber,

7    too, cut off his trading privileges.

8        When the exchangors called Benistar for the

9    return of their money so that they could complete their

10   property exchange, because they needed their money to

11   complete these exchanges, Carpenter could no longer hide

12   the fact that the money, which was supposed to be parked

13   in a safe place, wasn't there.

14       None of this happened by accident.  As a tax

15   attorney, again, he understood property exchanges and

16   understood why people did them.  He knew exactly what

17   the documents said.

18       The documents you'll see refer to the three and

19   six percent accounts as investment accounts.  But you'll

20   see, ladies and gentlemen, that there is nothing in

21   these documents, nothing that says anything about stock

22   options.  There is nothing in there.  There's nothing in

23   there about risk.  This was all meant by the defendant

24   to lull potential clients to believe that his company

25   was a safe place for their money while he went ahead and

1    traded it in the options market.

2        Now, the documents will explain why he did all

3    of this.  Benistar's fees were modest, and they were

4    split between the Newton office and the Simsbury office,

5    with the Newton office getting most of the fees.  The

6    defendant even said that these fees weren't even worth

7    his time.  What he was after was an opportunity to

8    strike it rich in the options market without any risk to

9    his own personal funds and while paying the people whose

10   money he was trading a measly three or six percent.  On

11   the other hand, the property exchangors, without knowing

12   it, had taken on all the risk without any potential

13   gain.

14       So what does Carpenter say to these people about

15   what happened to their money?  Does he tell them he used

16   the escrow funds in the options market?  No.  He

17   actually tells them they put their money into prudent

18   investments.  He actually says that.  He tries to gloss

19   over the fact that the money -- that he traded the funds

20   in stock options by saying there was a run on the bank.

21   He actually says that, too, "a run on the bank."  And

22   then he actually asks one of the exchangors for a loan.

23       The evidence will show in this case, ladies and

24   gentlemen, that there was no run on the bank.  A run on

25   the bank happens when a bank has money tied up in

PDF created with pdfFactory trial version www.pdffactory.com

1  investments and it can't get at that money right away.

2  The money wasn't tied up here; it wasn't there anymore.

3  The fact is, Carpenter had taken the money and used it

4  all up in the options market.

5       Now, did Carpenter act on this, act by himself

6  all through this?  No.  He was in charge of many people,

7  and he micromanaged all of these people down to the last

8  detail, as I said.  He also had a front man, a person

9  named Martin Paley, who I mentioned earlier, who ran the

10  Newton office.

11       Martin Paley dealt directly with the exchangors

12  while the defendant was back in Connecticut handling the

13  dough.  You won't hear in this trial a lot of kind

14  things about Martin Paley.  As a result of his

15  interaction with the defendant, he was in a position to

16  know that the defendant was committing fraud, and he

17  continued on with business as usual.  You'll have an

18  opportunity to see Martin Paley and see what he has to

19  say for himself.  But whatever Martin Paley's failings,

20  the evidence will show that at all times Dan Carpenter

21  was in charge.  Dan Carpenter knew that the property

22  exchangors -- property exchangors expected to have their

23  money back to complete their property exchanges.  Dan

24  Carpenter knew what the documents they had been

25  presented said, and Dan Carpenter alone poured their

PDF created with pdfFactory trial version www.pdffactory.com

1    money into the options market.

2            And based on this evidence, ladies and

3    gentlemen, at the end of this case, we will return to

4    you and ask that you return verdicts of guilty on each

5    and every count.

6            Thank you.

7            MR. PAPPALARDO:  May it please the Court, ladies

8    and gentlemen of the jury.  As you know, my name is John

9    Pappalardo.  Together with my partner, Gary Greenberg,

10   we are privileged to represent Mr. Dan Carpenter.

11           This case is about the contracts that a company,

12   Benistar Property Exchange, made with dozens of

13   investors to allow those investors to defer the payment

14   of capital gains, taxes, from the sale of commercial

15   real estate.

16           As you've heard, when an investor sells property

17   and immediately transfers the funds toward the purchase

18   of another property, there is no need for an

19   intermediary.  In this case, all of the investors sold

20   property but did not have another purchase lined up,

21   which required them to engage a qualified intermediary

22   to hold the proceeds and apply them to the purchase of

23   another property within 180 days in order to be eligible

24   for this tax deferral.

25           Further, under federal tax law, the investor was

PDF created with pdfFactory trial version www.pdffactory.com

1    required to relinquish total control of the proceeds

2    during that time in order to gain that tax advantage.

3         All of the investors in this case contracted

4    with Benistar to be their qualified intermediary and

5    enable them to take advantage of this tax deferral

6    strategy.  But more than deferring capital gains, taxes

7    on their money, the evidence here will show that each

8    investor also chose to earn interest on those proceeds.

9    So each of these investors in their contracts with

10   Benistar expressly granted the company the right to

11   invest the proceeds of the real estate sales in order to

12   provide a return to the investor.

13        You will be presented with evidence that the

14   company invested these sums as it was lawfully able to

15   do under the contracts with the investors, indeed, as

16   the company was obligated to do under those contracts to

17   generate a three- or a six-percent return for the

18   investors.

19        The evidence will show that from October of 1998

20   through December of 2000, Benistar successfully

21   completed approximately 100 contractual agreements.  The

22   investors received back the sums they invested, along

23   with the promise of three percent or six percent, used

24   the monies for their real estate acquisitions, and saved

25   themselves about 20 percent on the sale proceeds by

PDF created with pdfFactory trial version www.pdffactory.com

1    deferring capital gains taxes.

2           But there was a problem in the fall of 2000.

3    The evidence will show that the market took a huge

4    downturn, and substantial losses were incurred across a

5    wide spectrum of investments and spectrums.  You will

6    hear how this was compounded at that time by the

7    uncertainty and the volatility in the markets during the

8    2000 U.S. presidential election controversy.  Usually,

9    the president is elected on the first Tuesday of

10   November.  In the year 2000, as a result of a series of

11   court proceedings, the president wasn't elected and

12   seated until mid-December.

13          The evidence will reveal that despite the ups

14   and downs in Dan Carpenter's investments in this time

15   period, he did not sustain the bulk of the investment

16   losses until the last two weeks of December.  In

17   December of 2000, Benistar Property, without warning and

18   without ever having missed a margin call, was ultimately

19   forced by Paine Webber to liquidate and withdraw its

20   investments while the market was still down, preventing

21   the company from benefitting from the January 2001

22   market rally.  You will see evidence that at the very

23   same time that Paine Webber forced Benistar's

24   liquidation of those stock options, it was telling

25   investors that it was the best time in 20 years to be

1    holding stock.

2         Further, the evidence will show you that had Dan

3    Carpenter been able to continue with his investment

4    strategy, had he not been forced to liquidate his

5    investment positions, he would have benefited from that

6    January 2001 market rally and the interest rate cuts

7    that occurred in the beginning of January, and as a

8    result, Benistar would have been in a materially

9    superior position financially and better situated to

10   meet all of its contractual obligations.

11        The evidence will also show that as a result of

12   all of this, seven investors did not in January of 2001

13   have their money returned as they had contracted for so

14   they could not complete their real estate exchanges and

15   enjoy the tax benefits.

16        Benistar breached its contract to these seven

17   investors, there's no question whatsoever about that.

18   Did these investors pursue civil claims against the

19   company, its officers, and others for this?  Absolutely.

20   Moreover, as the person designated to invest the money,

21   Dan Carpenter was responsible, albeit unintentionally,

22   for this contractual breach, and we don't contest that.

23        But we're not here today to represent Dan

24   Carpenter in a civil case.  We are defending

25   Mr. Carpenter in a federal criminal case for mail and

1    wire fraud charges.  Dan Carpenter, a reputable,

2    respected businessman, a family man, is on trial before

3    you with his liberty at stake, his life with his family

4    on the line.  This case is not merely about money, it's

5    about freedom; and based upon the evidence in this case,

6    you will decide whether the government has met its

7    burden of proof beyond a reasonable doubt.

8         Now, I ask each and every one of you to pay very

9    close attention to the evidence in this case.  Listen

10   closely to what the witnesses say, and also note what

11   they don't say.  Ask yourself:  What does the witness

12   have to gain or lose by their testimony?  Also pay

13   careful attention to the documents that are admitted

14   into evidence.  What do the documents actually say as

15   opposed to what the witnesses thought they said?

16        As you begin your careful assessment of this

17   evidence, I want you also to look closely at the

18   government's theory of this case.  In a nutshell,

19   Mr. Carpenter is charged with making misrepresentations

20   to investors which caused them to select Benistar and

21   then investing that money contrary to the contract.

22   Supposedly his goal was to make a substantial profit for

23   himself by using the funds of others.  These charges

24   require that the government prove that Mr. Carpenter had

25   a specific intent to defraud the investors at the time

PDF created with pdfFactory trial version www.pdffactory.com

1    that the contracts were entered into, and that period,

2    ladies and gentlemen, as the evidence will show, is

3    between August of 2000 and at the end of November of

4    2000, November 30th.

5          Mr. Carpenter's state of mind at that precise

6    time is the most crucial issue in this case.

7          We submit that these allegations are not

8    supported by the evidence, but rather the evidence will

9    show that Mr. Carpenter acted in good faith at all

10   times:  Good faith at the time each contract was entered

11   into, good faith at the time that he invested these

12   funds.

13         How is it possible that Mr. Carpenter acted in

14   good faith?  Here is what the evidence will show you and

15   what the government didn't tell you:  Dan Carpenter had

16   absolutely no contact with the investors or their

17   representatives at the crucial time in this case, the

18   time they entered into the contracts with Benistar.  No

19   investor prior to contracting with Benistar had ever

20   spoken a word with Dan Carpenter, not a word.  The

21   investors will tell you that prior to contracting with

22   the company, they never met or spoke with Dan Carpenter,

23   they never received any correspondence from Dan

24   Carpenter, they never sent any correspondence to Dan

25   Carpenter, they never tried to call Dan Carpenter, they

PDF created with pdfFactory trial version www.pdffactory.com

1    didn't even know that Dan Carpenter existed.  Further,

2    Mr. Carpenter didn't sign those contractual documents,

3    which, by the way, is not suggesting that Benistar

4    wasn't responsible.  We've agreed to that.

5         With one exception -- and which I'll get to --

6    the evidence will show that the only communications

7    which any of the investors or their representatives had

8    with Benistar through December of 2000 was either with

9    Martin Paley, the president of Benistar Property

10   Exchange, or his employee, assistant, and cousin, Linda

11   Jokinen.

12        Now, Martin Paley will testify, and he will say

13   that he exclusively solicited investors for Benistar.

14   He will say in that process he never said anything to

15   the investors that was untruthful or that was contrary

16   to what was contained in the contract documents.  He

17   will testify that all the contracts provided for

18   investing the proceeds, and that is what was done.

19        Moreover, you will hear that Paley was the only

20   one with any experience in property exchanges.  He was

21   the expert.  He was the one who held himself out as the

22   expert.  Paley was the only one who sold the services of

23   Benistar.

24        The evidence will show that there was one

25   instance in which Mr. Carpenter was in contact with an

PDF created with pdfFactory trial version www.pdffactory.com

1    investor's agent prior to the investor's contracting

2    with Benistar.  Mr. Patterson, referred to in the

3    government's opening, was an attorney for the very first

4    investor that Benistar had.  He spoke with Mr. Carpenter

5    prior to the -- his client's contact with Benistar way

6    back in 1998.  He had questions about two things:  One,

7    Benistar was a brand new company, and he wanted to know

8    what their track record was in this area of property

9    exchanges; and two, he also wanted to know about the

10   account in which his client's proceeds were to be held

11   and invested at Merrill Lynch.

12        So what did Dan Carpenter do?  In a phone call

13   with Mr. Patterson, he picks up the phone and

14   conferences in a fellow by the name of Mr. Levine, who

15   was Benistar's primary contact at Merrill Lynch.  He was

16   the one who controlled the funds.  He gets him on the

17   phone so that the three could talk about the -- how the

18   money would be invested and address Mr. Patterson's

19   concerns.  This is good faith.  He didn't make

20   representations.  He put him right in touch with Merrill

21   Lynch.

22        You will learn also in this case that the law

23   which governs property exchanges, section 1031 of the

24   tax code, permits any form of investment, including

25   risky ones.  Therefore, you must turn to the contracts

```
 1   to determine what was permitted in this specific case

 2   with the seven investors in question.

 3        You will see evidence that the investors in

 4   their contracts with Benistar gave the company full

 5   discretion to invest the exchange proceeds, and that Dan

 6   Carpenter, in good faith, invested pursuant to and in

 7   keeping with that contractual agreement.

 8        The evidence will show that the exchange

 9   agreements required Benistar to invest the funds in, at

10   different times, Merrill Lynch or Paine Webber accounts.

11   These contracts did not restrict the form of investment,

12   and provided that Benistar -- that Benistar determine

13   the investment vehicle.  They only provided for a three-

14   or six-percent return to the investor.

15        The evidence will show in this case that the

16   investors each signed separate documents, not all of

17   which were identical, as some investors had different or

18   fewer contract documents.  That said, these agreements

19   will be in evidence, and I'd like to highlight some of

20   the language that is relevant.

21        The Exchange Fee Agreement, which could not be

22   more clear:  "Exchangor and intermediary expressly agree

23   that any cash proceeds from the disposition of the

24   relinquished property shall be held and invested at

25   Paine Webber at the discretion of and through financial
```

1    institutions of the intermediary.  Interest accruing in
2    said account will accrue to the benefit of the
3    exchangor."  It goes on.  "Said investment account shall
4    be in the name of the intermediary and shall require the
5    signature of an authorized officer of the intermediary
6    to permit the withdrawal of any portion thereof."  So
7    here, Benistar agrees that to earn its fee, it has an
8    obligation to invest the funds at its discretion.
9         The Escrow Agreement in its third clause,
10    whereas clause, states, and I quote, Whereas the
11    exchangor will be depositing with Benistar an amount of
12    funds to be deposited in Benistar accounts, the plural,
13    at Paine Webber.  Then in section two of the agreement,
14    it spells out what Benistar is to do once the money is
15    in:  "Benistar shall have full control over the
16    exchangor's funds to invest as the exchangor directs in
17    either the three-percent or the six-percent account."
18    So this agreement, with the name Escrow, states that
19    Benistar shall have full control to invest.
20         Lastly, the Exchange Agreement at paragraph 10,
21    which states:  "The exchangor and the intermediary
22    expressly agree that any cash proceeds from the
23    disposition of the relinquished property shall be held
24    and invested with Paine Webber at either three percent
25    per annum or six percent per annum."  Once again, held

PDF created with pdfFactory trial version www.pdffactory.com

1    and invested.

2         Ladies and gentlemen, these are contracts.  They

3    create obligations.  The investors agreed that Benistar

4    would have full control to invest.  The investors agreed

5    that Benistar would take control over the funds, invest

6    them, and return the principle.  The agreements did not

7    say how Benistar must invest.  The agreements did not

8    say that Benistar must put the money into a CD or to

9    treasury bills.  The agreements gave Benistar, and

10   therefore, gave Dan Carpenter, complete discretion.

11        The evidence will show that Dan Carpenter wasn't

12   just playing with other people's money, as the

13   government suggested in their opening, but that he put

14   millions of dollars of his own money into the investment

15   strategy he employed for Benistar's investments.  In

16   fact, he put several million dollars of his own money

17   into the very same investment account, because he

18   believed in what he was doing.  And the evidence will

19   show that Dan Carpenter believed in his investment in

20   good faith.  Why?  Because you will hear that using the

21   same investment strategy the previous year, he turned

22   from a loss position and ended up making $600,000 in

23   profits.

24        The evidence will show that in October 2000

25   through December 2000, and in fact, from the start of

PDF created with pdfFactory trial version www.pdffactory.com

1  the company to that time, that Benistar had never failed

2  to meet its contractual obligations in providing an

3  investor the exchange funds plus the promised return,

4  not once.  At the crucial time in this case, August of

5  2000 through the end of November of 2000, when Benistar

6  contracted with the seven investors in this case, Dan

7  Carpenter believed in the same investment strategy, that

8  it had never once let an investor down.  Dan Carpenter

9  believed in good faith that he would end the year ahead,

10 just like he had the previous year.

11       The evidence will also show that none, none of

12 the investors -- excuse me -- the investor (sic.) will

13 show you that none, not a dime of the investors' money

14 went into Dan Carpenter's pocket.  That is evidence of

15 good faith.  That is evidence of lack of criminal

16 intent.

17       Despite his good faith belief in his investment

18 approach, you will see that, in the end, Mr. Carpenter

19 failed in his efforts.  The company breached the

20 contracts, and its officers, including Dan Carpenter,

21 have been found civilly responsible.  But Dan Carpenter

22 's good faith failure is not a crime.  Dan Carpenter's

23 good faith pursuit of an investment strategy, one that

24 worked for him for two years, is not a crime.  A breach

25 of contract is not a crime.

1          The evidence in this case when analyzed

2   carefully and without emotion leads to only one

3   conclusion, and that is that Dan Carpenter is not

4   guilty.

5          Thank you.

6          MR. PIROZZOLO:  Your Honor, may we be heard very

7   briefly at sidebar?

8          (At sidebar on the record.)

9          MR. MITCHELL:  We have some serious objections

10  to that opening, for what they're worth.  Apart from

11  being over-the-top argumentative, Mr. Pappalardo

12  violated your ruling yesterday about mentioning civil

13  result, in spades, made -- not only did he mention that

14  there was a civil case, but he also -- he said to them

15  what the result was.  I mean, this is -- it's totally

16  prejudicial and totally violates the order.  It forces

17  us to stand up and object when we're reluctant to do

18  that at all because, out of courtesy, we'd like to allow

19  counsel to give their openings.  This is ridiculous,

20  totally objectionable, violated the Court's order

21  yesterday.

22          MR. PAPPALARDO:  Your Honor, I disagree with

23  that.  I reviewed the transcript in the first case which

24  the government -- I'm sorry, which the Court said it was

25  going to be bound by.  In that case -- there is going to

PDF created with pdfFactory trial version www.pdffactory.com

```
1    be evidence on this case of the civil matter.  It's in

2    for the impeachment of Paine Webber, it's in for the

3    impeachment of Merrill Lynch --

4         MR. MITCHELL:  No, it's not.

5         MR. PAPPALARDO:  -- and I would submit to the

6    Court there's going to be no secret at the end of this

7    case that there was a civil matter.  And there isn't any

8    secret.  There is going to be testimony in connection

9    with this case where these witnesses have testified

10   pursuant to the civil case will be used on

11   cross-examination.  There will be no mystery that there

12   was a civil case in this matter.

13        And furthermore, your Honor, with regard -- I

14   didn't get into the fact that the investors got their

15   money back, which is what I understood the Court's

16   ruling to be.  The issue was one of loss, and we didn't

17   touch the issue of loss.

18        The existence of a civil case is not what the

19   Court was talking about yesterday, in my view.

20        MR. PIROZZOLO:  Just so the record is crystal

21   clear on this, the investors have not gotten their money

22   back, just so there's no question about it.

23        THE COURT:  Okay.  I don't think the opening

24   contravened my order of yesterday.  I think it was -- I

25   will just leave it at that, I guess.
```

```
 1              MR. GREENBERG:  Could I just state for the
 2    record certain objections to the government's opening?
 3              On multiple occasions the government referenced
 4    naked puts or calls or naked.  I don't think they're
 5    going to be able to support that position, and it was
 6    highly prejudicial.
 7              Also, the reference to extraordinary risky
 8    trading, highly prejudicial.
 9              They also made the statement that without any
10    risk to his personal funds, knowing full well, despite
11    having made that statement in the opening argument, that
12    Mr. Carpenter had put in millions of dollars of his own
13    personal funds.
14              And the run on the bank, suggesting that
15    Mr. Carpenter had taken -- basically took the money,
16    took other people's money and ran with it.
17              THE COURT:  All right.  You've both done it, so
18    I'll use this occasion, now:  From here on, there's a
19    one-lawyer rule, all right?
20              MR. MITCHELL:  Okay.
21              (End of discussion at sidebar.)
22              THE COURT:  All right.
23              MR. MITCHELL:  Thank you, your Honor.  The
24    United States calls Eliot Snider.
25              THE COURT:  Wait a minute, we have to give the
```

PDF created with pdfFactory trial version www.pdffactory.com

1   notebooks out.

2           Paul.

3           (Pause.)

4           MR. PAPPALARDO:  Your Honor, may we approach?

5           THE COURT:  Okay.

6           (At sidebar on the record.)

7           MR. PAPPALARDO:  Your Honor, it's my

8    understanding, having been informed by the government,

9    that they intend to call Mr. Snider.  We object to any

10   testimony that involves -- first of all, we object to

11   the admission of certain documents, which include the

12   promotional materials where, based upon the first trial,

13   we will suggest to you there was not a foundation laid.

14   He said he saw some materials, he can't even identify

15   these materials.  And there were several incarnations of

16   them.

17           But secondly, and most importantly, we are

18   objecting to any conversations that he had with Martin

19   Paley on the basis -- in fact, to any of the documents,

20   on the basis that there is absolutely no nexus at this

21   point in time that they are connected to Mr. Carpenter.

22   The only thing the government -- the only thing the

23   government has done is make an opening statement.  There

24   is no basis, there is no foundation, there is no nexus

25   to Mr. Carpenter.  And on that basis, they can't be

1   admitted.

2         They can make a proffer if the Court wants to

3   make a limiting instruction, I would submit to the

4   Court, but at this point in time, there is absolutely no

5   connection to Carpenter.

6         Furthermore, your Honor, this is one of the

7   difficulties that occurred in the first trial, the Court

8   let in -- and I have the transcript -- the Court let in

9   evidence from this witness concerning conversations that

10  he had with Mr. Paley before the jury which the Court

11  later indicated perhaps was not a good idea.  And I

12  refer specifically to the fact that there is no agency

13  agreement, and Mr. Paley testified at the first trial

14  that he was not authorized by Dan Carpenter to go

15  outside the contracts, he was not authorized to make any

16  representations outside the contracts, and that he

17  didn't.  And I would submit to the Court, as we have in

18  the papers, that if there was any agency relationship at

19  all, Paley was an agent of Benistar and so was

20  Carpenter, but that doesn't make them agents of each

21  other.

22        Lastly, your Honor, it is totally prejudicial,

23  and in fact, the Court agreed with this, in their

24  conference that -- in the Court's conference, in the

25  first trial, to let in any testimony of conversations

PDF created with pdfFactory trial version www.pdffactory.com

1    where an investor spoke with Paley about the documents

2    themselves that were outside of the -- I'm sorry,

3    about -- conversations about the documents that weren't

4    contained in the documents.

5         You limited anything -- you limited the

6    discussion strictly to the documents themselves.  The

7    documents speak for themselves, they have an integration

8    clause.  Paley is not an agent, and any surmised

9    speculation, conjecture of the state of mind of any of

10   these investors is not before -- properly before this

11   Court or certainly this jury.

12        MR. MITCHELL:  That's essentially the same

13   objection that was lodged before Mr. Snider took the

14   stand in the last trial, and my response is the same now

15   as it was then; that is, we'll prove up the connection.

16   I mean, the issue is that ultimately is Mr. Carpenter

17   was aware of representations in form written and/or oral

18   representations made to the exchangors.  As it came in

19   the last trial, the oral representations came in,

20   according to the exchangors and Paley, stayed within the

21   four corners of the documents, materially were in the

22   four corners of the documents.

23        So I would urge the Court, and I can add more to

24   this, but, essentially, we will prove up over the course

25   of the trial that Dan Carpenter, through what was being

PDF created with pdfFactory trial version www.pdffactory.com

1    presented to them, and through a number of -- through a

2    number of witnesses.

3         Secondly, with respect to foundation, you know,

4    Mr. Snider will testify, I expect, that he recognizes

5    documents and the documents that Martin Paley gave him

6    in connection with doing a property exchange.

7         THE COURT:  Well, I think it's essentially an

8    argument about order of proof.  So I think government

9    can go ahead; whether they succeed or fail is something

10   we'll find out later.

11        MR. PAPPALARDO:  But, your Honor -- excuse me, I

12   didn't --

13        THE COURT:  But it's often necessary to put in

14   pieces together that will prove something in a way that,

15   well, that gives some leeway to the connecting up later.

16        MR. PAPPALARDO:  And, your Honor, I understand

17   the Court's ruling; obviously, our position is on the

18   record.

19        And a second point, however, is the following:

20   That notwithstanding the order of proof, you found in

21   the first trial that it was impermissible to allow

22   investors to talk about conversations with Paley that

23   supposedly related to the investment.  And I can read,

24   your Honor, from page 38 of the transcript.  This is at

25   the end of the trial.  You say, "I don't think I'd --

PDF created with pdfFactory trial version www.pdffactory.com

but I do not think that there's enough -- even the
evidence of general supervision or decision making is
enough to connect any statement by Mr. Paley that is
different from what has -- from what language it could
be concluded it had proved connect any statement with
Mr. Carpenter."  As a matter of fact, the stipulation
that you referred to at the bottom that says don't vary
from these procedures I think suggests to the government
you have to do something more to show that the agent
went off and added things, that it was not authorized.

THE COURT:  I'm not sure exactly what portion of
the transcript you're referring to --

MR. PAPPALARDO:  I can identify it --

THE COURT:  -- but I gather it's a retrospective
look at the evidence that was produced in that trial,
which is different from what you're asking now, which is
a prospective limitation.

Like I said, it may be the government is unable
to prove the things it has and we'll at some point have
a retrospective order.  The fact that I said that
doesn't mean -- I don't think that is a ruling on the
admissibility prospectively in letting them have their
chance --

MR. PAPPALARDO:  Your Honor, here's my point:
If you allow this investor to get into conversations

1    that he purportedly had with Mr. Paley and do what you

2    did at the last trial and say that, no, I shouldn't have

3    done that, the jury has already been poisoned with that

4    evidence.

5         THE COURT:  I don't think I said I shouldn't

6    have done it.  I think I said the government's evidence

7    isn't sufficient to get to a certain benchmark.  So

8    anyway --

9         MR. PAPPALARDO:  Can I just -- once it's in,

10   your Honor --

11        THE COURT:  I guess you can raise the objection.

12        MR. MITCHELL:  I just lay down one mark.  This

13   discussion happened last week at the status conference.

14   You know, again, going back to the Court's words,

15   "events can be shown."  I mean, if you were to rule in

16   that direction, say, hypothetically, truly left the

17   impression Martin Paley signed these documents, which is

18   ridiculous --

19        THE COURT:  I think they're two different

20   things.  One is an evaluation of the evidence at the

21   conclusion of the case, which we'll do again; another is

22   a question -- an objection to the government having the

23   opportunity to try to get to its benchmark.  We'll see

24   where it goes.

25        MR. PAPPALARDO:  Your Honor, I just want the

PDF created with pdfFactory trial version www.pdffactory.com

1    Court to understand that I am going to object to any

2    hearsay which is clear hearsay and for which no

3    exception applies that relates to conversations between

4    Marty Paley and this or any other investor.  There's

5    been no additional foundation proffered.  I've read this

6    transcript.  There was no foundation entered at that

7    time, and I object to it, your Honor.  It's prejudicial.

8    It's unfairly prejudicial, because this investor is

9    testifying to conversations that he had with Marty Paley

10   that Paley says, if they are proved, were unauthorized.

11   And by the way, Paley doesn't say they occurred, he says

12   they don't occur, and the government can't get that in.

13   That's what the rules of evidence are about, and I

14   object.

15           MR. MITCHELL:  I mean, it's going back over the

16   issue.  What I expect the evidence to be, as it was last

17   trial --

18           THE COURT:  Let me just frame the question as I

19   understand it.

20           MR. MITCHELL:  Okay.

21           THE COURT:  The question is:  Why are statements

22   attributed to Paley attributable to the defendant?

23           MR. MITCHELL:  He was acting as an agent, for

24   one thing.

25           THE COURT:  What will the evidence of that be?

1          MR. MITCHELL:  He worked for Benistar, he

2     answered directly to Dan Carpenter in conducting a 1031

3     property exchange business, and so, I mean -- that alone

4     establishes that he was -- he was an agent of Dan

5     Carpenter.  It is that simple.

6          Linda Jokinen will establish -- the reading of

7     her testimony will establish the same thing.

8          Secondly, the point is, the main point here,

9     your Honor, is that these people are going to say what

10    they said last time; that is, I talked to Marty Paley.

11    I'll ask them:  Did he say anything that wasn't in the

12    documents?  Or words to that effect.  They'll say, No.

13    I mean, I guess --

14          THE COURT:  We'll hear what the evidence is --

15          MR. MITCHELL:  -- what the prejudice is is if he

16    didn't say anything that wasn't in the document.  They

17    need to know they had conversation --

18          THE COURT:  We'll see how the evidence comes.

19    You'll raise the objection, and we'll see how it goes.

20          (End of discussion at sidebar.)

21          MR. MITCHELL:  The United States calls Eliot

22    Snider.

23          ELIOT SNIDER having been duly sworn by the

24    Clerk, was examined and testified as follows:

25          THE CLERK:  State your name for the record, keep

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   your voice up, and speak into the microphone.
 2          THE WITNESS:  My name is Eliot Snider,
 3   S-n-i-d-e-r.
 4                   DIRECT EXAMINATION
 5   BY MR. MITCHELL:
 6   Q.   Good afternoon, Mr. Snider.  Could you tell us where
 7   you live, sir?
 8   A.   In Chestnut Hill, Mass. part time and in Palm Beach
 9   part time.
10   Q.   And for how long have you lived in Chestnut Hill?
11   A.   Thirty-nine years.
12   Q.   And you spend time in Palm Beach, you said?
13   A.   Yes.
14   Q.   And how much time do you spend down there?
15   A.   Six months a year.
16   Q.   Are you married?
17   A.   Yes.
18   Q.   How long have you been married?
19   A.   Sixty-two years.
20   Q.   Do you have any children?
21   A.   Three.
22   Q.   And grandchildren?
23   A.   Four.
24   Q.   Sir, where did you go to school?
25   A.   Boston Latin, Harvard College, and Harvard Business
```

PDF created with pdfFactory trial version www.pdffactory.com

1    School.

2    Q.   What did you do after you got out of college?

3    A.   I was in the Navy for three years.

4    Q.   What was the highest rank you achieved in the Navy?

5    A.   Lieutenant.

6    Q.   Which years were you in the Navy?

7    A.   '43 to '46.

8    Q.   What did you do after your discharge from the Navy?

9    A.   I went to work at the George McQuesten Lumber

10   Company.

11   Q.   What kind of company was that?  Was it a lumber

12   company, as the name implies?

13   A.   It inventoried and distributed and did things to

14   wood products, supplied them to local dealers.

15   Q.   What was your job?

16   A.   I started out as a shipper, or assistant shipper.

17   Over a period of time I became the company president.

18   Q.   When did you become the president?

19   A.   About late 1950s.

20   Q.   Was this a family business?

21   A.   Yes.

22   Q.   Okay.  And which members of your family were

23   involved in that business?

24   A.   My father.

25   Q.   And does George McQuesten still exist -- George

PDF created with pdfFactory trial version www.pdffactory.com

1    McQuesten Lumber Company still exist?

2    A.   Well, we started it in 1832, so he wasn't around.

3    Q.   I mean, does the company still exist now, McQuesten?

4    A.   No.  Some years ago when I sold the operating

5    business, the buyer took the name with it and the name

6    was changed to Massachusetts Lumber Company.

7    Q.   And do you have a position in Massachusetts Lumber

8    right now?

9    A.   Yes, I'm the president.

10   Q.   Does it still operate as a lumber company?

11   A.   No, it doesn't operate.

12   Q.   What does it do?

13   A.   It owns three pieces of real estate.

14   Q.   Okay.  Where are those pieces of real estate?

15   A.   One is in Vermont, one is in Maine, and one is in

16   Massachusetts.

17   Q.   Where is the one in Massachusetts?

18   A.   North Billerica.

19   Q.   Mr. Snider, during your time at Massachusetts Lumber

20   Company, did you ever do business with a company called

21   Benistar Property Exchange Trust Company?

22   A.   Yes.

23   Q.   When was that?

24   A.   2000.

25   Q.   What did you hire Benistar to do?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   To be the qualified intermediary to do a real estate

2  exchange.

3  Q.   And was that for a specific piece of property?

4  A.   Yes.

5  Q.   Where was that property located?

6  A.   It was a piece of property in Woburn, Massachusetts

7  which the company sold.

8  Q.   And what was on the property?

9  A.   It was a six-acre property and had one building on

10  it, which was leased to others.

11  Q.   And that was a commercial piece of property?

12  A.   Yes.

13  Q.   And why were you selling it?

14  A.   I didn't get that.

15  Q.   I'm sorry.  Why were you selling it?

16  A.   Well, it had a large piece of open space which

17  needed to be developed, and I wasn't in a position to do

18  the developing, so it was time to sell it and do

19  something else.

20  Q.   How much did you sell it for?

21  A.   $3.2 million.

22  Q.   Okay.  How did you first learn about qualified

23  intermediaries and property exchanges?

24  A.   By reading reports like The Research Institute and

25  so on that talked about how to do a property exchange.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Okay.  And how did you find out about Benistar, in

2    particular?

3    A.    Well, I asked around, and somebody, I don't know

4    who, I think in the bank, recommended that they were in

5    that business.

6    Q.    Did you speak to anyone at Benistar before you

7    retained them?

8    A.    Yes.

9    Q.    Who was that?

10   A.    Martin Paley.

11   Q.    When did you speak to Martin Paley?  When did you

12   first speak to Martin Paley?

13   A.    During the summer of the year 2000.

14   Q.    Okay.  Was that by phone or in person?

15   A.    First by phone, then in person.

16   Q.    All right.  How many meetings did you have with him?

17   A.    Two or three.

18   Q.    And where was the first meeting?

19   A.    At my office in Cambridge.

20   Q.    And how long was that meeting?

21   A.    Half an hour to an hour.

22   Q.    Was anyone else there at the time?

23   A.    I don't think so.

24   Q.    What was the purpose of that meeting?

25   A.    To find out about the services his company offered

PDF created with pdfFactory trial version www.pdffactory.com

1   acting as a qualified intermediary.

2   Q.   And did Mr. Paley make a presentation to you at that

3   meeting?

4   A.   Yes, he did.

5   Q.   Did that presentation include any materials?

6   A.   Yes, it did.

7   Q.   I'm going to have you take a moment to look at the

8   folders in front of you, Exhibits 1 through 6.   Would

9   you take a look at those?

10          (Pause.)

11  A.   They're familiar.

12  Q.   Okay.   You've looked at the first one.   Can you look

13  at the -- Exhibits 1 through 6?

14          (Pause.)

15  A.   Okay.

16  Q.   Okay.   Do you recognize those exhibits?

17  A.   Yes, I do.

18  Q.   Okay.   What do you -- let's take them one by one.

19  What do you recognize Exhibit Number 1 to be?

20          MR. PAPPALARDO:   Objection.

21          THE COURT:   Overruled.

22  A.   What was the question?

23  Q.   What do you recognize that to be?

24  A.   Well, it's a -- presents to Eliot Snider,

25  Massachusetts Lumber Company, the role of Benistar

1   Property Exchange Trust Company.

2   Q.   Is that a Power Point presentation?

3   A.   It looks like it.

4   Q.   Well, let me ask you, is that -- did Martin Paley

5   give that to you the day -- was that one of the

6   materials that Martin Paley gave you the day he met with

7   you?

8   A.   Yes.

9        MR. PAPPALARDO:   Objection, your Honor.

10       THE COURT:   Overruled.

11  BY MR. MITCHELL:

12  Q.   Okay.  Can you turn to Exhibit Number 2?

13       What do you recognize that document to be,

14  Mr. Snider?

15  A.   Well, it's says it's frequently asked questions

16  about 1031 property exchange.

17  Q.   Was that a document Mr. Paley gave to you in that

18  first meeting?

19  A.   Yes.

20  Q.   Okay.  Let me have you look at number 3.

21  A.   Property exchange, an overview.

22  Q.   Was that -- was that also a document that Mr. Paley

23  gave to you in that first meeting?

24  A.   Yes.

25  Q.   Could you look at Exhibit Number 4?

PDF created with pdfFactory trial version www.pdffactory.com

1          Same question.  What do you recognize that

2    document to be, Mr. Snider?

3    A.    Yes, it's an explanation of the legal side of the

4    transaction.

5    Q.    Okay.  Was that something Mr. Paley gave to you the

6    same day?

7    A.    Yes.

8    Q.    Next one is number 5.  What do you recognize that

9    document to be?

10   A.    Yes.

11   Q.    What do you recognize it to be?

12   A.    Well, it says, "identifying a 1031 exchange

13   opportunity," describes the circumstances.

14   Q.    Is that one of the documents that Mr. Paley gave you

15   at that --

16   A.    Yes.

17   Q.    Okay.  And the last one, number 6.  Same question,

18   do you recognize that?

19          You said you recognized that document.  Is that

20   one of the documents that Mr. Paley gave you at this

21   meeting?

22   A.    Yes.  This is a couple of articles he wrote, and he

23   gave me copies of them.

24   Q.    Okay.  And you discussed all these documents with

25   Mr. Paley during the meeting?

1    A.    Yes.

2          MR. MITCHELL:  At this time, your Honor, the

3    government would offer Government's Exhibits 1 through

4    6.

5          MR. PAPPALARDO:  Objection for the reasons at

6    sidebar, your Honor.

7          THE COURT:  Overruled.  They may be admitted.

8          (Exhibits 1 through 6 received into evidence.)

9          MR. MITCHELL:  At this time I'd like to pass out

10   the notebooks that we discussed yesterday.

11         THE COURT:  All right.

12         Well, let me ask you, do they contain only the

13   six documents --

14         MR. MITCHELL:  Just so I'm clear, they contain 1

15   through 6 and 8 through 13, so perhaps we should

16   admonish the jurors --

17         THE COURT:  No, I think we shouldn't give them 8

18   through 13 until they're in evidence.

19         MR. MITCHELL:  Why don't I do it that way, then.

20   BY MR. MITCHELL:

21   Q.   Mr. Snider, could you take a look at government's --

22   excuse me, right in front of you there's government's 8

23   through 13.  Do you see those?

24   A.   I'm having trouble hearing you.

25   Q.   I will speak up.  The folders in front of you, do

PDF created with pdfFactory trial version www.pdffactory.com

1    you see Exhibits 8 through 13?

2    A.   7 through 13.

3    Q.   I'm sorry, 7 through 13.  And without 8.

4    A.   Yes.

5    Q.   And could you take a moment and look through those

6    documents?

7          (Pause.)

8    Q.   Okay.  Do you recognize those documents, Mr. Snider?

9    A.   Yes, I do.

10   Q.   Let's take each one one by one.

11         Take a look at the first one.  That's Exhibit 7?

12   A.   Yes.

13   Q.   What do you recognize that document to be?

14   A.   It's a copy of the fidelity bond which I had

15   requested from Paley so I would know something about his

16   company.

17   Q.   Okay.  Let me have you turn to Exhibit 8, which is

18   the next folder.  Excuse me, 9.

19   A.   Yes.

20   Q.   Do you recognize that one?

21   A.   Yes, they're two checks from me.

22   Q.   From you to whom?

23   A.   To Benistar Property Exchange.

24   Q.   And what were those checks for?

25   A.   It was the fee for their service in handling the

1    exchange.

2    Q.   Okay.  The next one is Exhibit 10.  Would you take a

3    look at that?

4    A.   Yes.

5    Q.   Do you recognize Exhibit 10?

6    A.   Yes.

7    Q.   What do you recognize it to be?

8    A.   It's the Exchange Agreement signed by me and by

9    Martin Paley for what he was going to do.

10   Q.   Okay.  Exhibit 11, could you take a look at that?

11   A.   Yeah, this is the Escrow Agreement.

12   Q.   Okay.  And is that something Martin Paley gave you?

13   A.   Yes, and it's signed by me and him.

14   Q.   Okay.  The next exhibit is Exhibit 12.  Could you

15   take a look at that?

16   A.   Yes.  This was the Exchange Fee Agreement.

17   Q.   Is that something you received from Martin Paley?

18   A.   Yes.  Signed by me and him.

19   Q.   Okay.  And then the last one is Exhibit 13?

20   A.   Yes.

21   Q.   What is that one?

22   A.   This one is my choice of putting the escrowed funds

23   in a six percent Merrill Lynch investment account.

24   Q.   And that's something you also received from Martin

25   Paley?

1  A.   Yes.

2       MR. MITCHELL:  All right.  At this time the

3  government would move in Exhibit 7 and 9 through 13,

4  your Honor.

5       MR. PAPPALARDO:  Same objection, your Honor.

6       THE COURT:  Okay.  Admitted.

7       (Exhibits 7 and 9 through 13 received into

8  evidence.)

9       MR. MITCHELL:  At this time can I pass out the

10 binders?

11      THE COURT:  You skipped Exhibit 8?

12      MR. MITCHELL:  We did skip it, and Exhibit 8 is

13 not in there.

14      THE COURT:  Fine.

15      (Pause.)

16      MR. MITCHELL: Okay.  I'll start off with Exhibit

17 1, your Honor.  I'll also put it up on the screen.

18      THE COURT:  Jurors, you may want to get your

19 monitors ready now, because these documents are being

20 displayed on the screens as well as your books.

21      Do you see the image?  Does everybody have the

22 image?

23      Yes.  Okay?

24      All right.

25      MR. MITCHELL:  Okay, thank you, your Honor.

1          Your Honor, if you don't mind, what I'll do is

2     I'll highlight portions I'd like Mr. Snider to read, and

3     go through it.

4     BY MR. MITCHELL:

5     Q.   Okay.  Mr. Snider, do you see -- can you open up

6     Exhibit 1?

7          Okay.  I'm going to have you read each of these

8     pages, the summary box in the top left corner, if you

9     would, and I'll highlight that.

10    A.   "1031 tax-deferred property exchange, presentation

11    to Eliot Snider, Massachusetts Lumber Company.  Benistar

12    Property Exchange Trust Company."

13    Q.   Okay.  Slide 2, can you read that black box, black

14    summary box?

15    A.   "Benistar.  What is 1031?  Internal Revenue Code

16    section 1031 allows investment property owners to delay

17    paying capital gain tax by exchanging a property being

18    sold for another investment property."

19    Q.   Thank you.

20         And by the way, as Mr. Paley was presenting

21    these to you, did he go through these slides with you

22    one by one?

23    A.   Yes.

24    Q.   Can you read slide number 3, the summary box?

25    A.   "Benistar.  Advantages of 1031:  Immediate tax

1    savings, preserve equity, improve property portfolio,

2    grows estate without untaxed gain."

3    Q.    Can you read the next line?

4    A.    "Benistar.  What property is eligible?  Trade or

5    business property, investment property, income property,

6    unimproved property held for investment purposes."

7    Q.    Your property that you had sold was -- was one of

8    these types of properties or one or more of one of these

9    types of properties?

10    A.    Yes.

11    Q.    It was an investment property?

12    A.    Yes.

13    Q.    Okay.  Let's read the summary box on slide 5.

14    A.    "Benistar.  Types of exchanges:  Simultaneous

15    exchange, delayed exchange, reverse exchange,

16    improvement, construction exchange."

17    Q.    Okay.  And do you know what kind of exchange that

18    you were doing?

19    A.    Delayed exchange.

20    Q.    Okay.  Would you read the summary box from slide 6?

21    A.    "Benistar.  How does 1031 work?  Up to 21 percent

22    capital gain tax can be deferred.  The Benistar formula:

23    Wealth equals property exchange plus asset leverage.

24    Qualified intermediary prevents constructive receipt of

25    the funds by the seller."

1  Q.   Okay.  I'm going to have you go to -- do the same

2  thing on slide 7.

3  A.   "Benistar.  The investor's advantage:  Relocate

4  holdings nationwide, trade up to better performing

5  investments, a simple way to dump poor performing

6  assets, combine multiple assets into one."

7  Q.   Just so we're clear, Mr. Snider, these black boxes

8  summarize the rest of the slide; is that fair to say?

9  A.   That's correct.

10  Q.   And I show you the next one, slide 8.

11  A.   "The adviser's advantage:  Preserve or increase

12  client assets, manage tax regulation compliance issues,

13  participation in new property acquisition, value-added

14  service."

15  Q.   Which, if any, of these purposes were you interested

16  in when you did your property exchange?

17  A.   I was especially interested in his participation in

18  new property acquisition.

19  Q.   And were you also interested in the other purposes

20  that are listed here?

21  A.   Yes.

22  Q.   Okay.  Slide 9.

23  A.   "Benistar, the attorney's advantage:  Two property

24  closings instead of just one, additional document

25  reviews required, participation in new property

1    acquisition, value-added service."

2    Q.   Okay.  Let's go to slide 10.

3    A.   "Benistar.  The broker's advantage:  Two commissions

4    instead of just one, participation in new property

5    acquisition, value-added service."

6    Q.   This had to do with -- broker's advantage has to do

7    with the real estate brokers who are involved in these

8    property exchanges?

9    A.   In the buying and selling, yes.

10   Q.   Take a look at slide 11.  Slide 11 is a chart.

11   Could you tell us what that --

12   A.   "Benistar, the exchange difference."  It's hard to

13   tell here, but it seems to show that you're much better

14   off with the exchange than without it.

15   Q.   Okay.  Is there a chart below that shows -- depicts

16   savings?

17   A.   Yes, details.

18   Q.   I'm going to have you do the same thing on page 12.

19   Could you read us the summary box?

20   A.   "Benistar.  In a down market property sells for $9

21   million instead of $10 million, seller realizes a loss

22   of $210,000.  Without exchange, taxes must be paid

23   out-of-pocket."  That relates to the example on the

24   previous one.

25   Q.   Slide 13, read the box there, qualified

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   intermediary?
 2   A.    "Benistar.    Qualified intermediary required by code
 3   for any exchange, other than simultaneous, should not be
 4   the attorney or CPA, wealth of knowledge required to do
 5   it right."
 6   Q.    And does this say somewhere that an attorney or CPA
 7   can't serve in the capacity as a qualified intermediary?
 8   A.    Yeah, it says it should not be the attorney or the
 9   CPA.
10   Q.    And it says it below, as well?
11   A.    Down below.   "In normal circumstances the
12   exchangor's attorney or CPA cannot serve in this
13   capacity."
14   Q.    Okay.   Let's go to the next slide.   Can you read the
15   summary box?
16   A.    "Choosing an intermediary"?
17   Q.    "Choosing an intermediary," yes.
18   A.    "Experience is the key, familiarity with entire
19   process, handles reverse exchanges, security of funds."
20   Q.    Were you interested in the security of your funds?
21   A.    Yeah, that was very important.
22   Q.    Slide 15.
23   A.    "What Benistar provides.   Benistar has the
24   experience, start to finish, exchange management,
25   reverse exchange experience, Merrill Lynch escrow
```

PDF created with pdfFactory trial version www.pdffactory.com

1   relationship and there's more."

2   Q.   Was it important to you that Merrill Lynch was

3   involved in this?

4        MR. PAPPALARDO:   Objection, your Honor, form of

5   the question.

6        THE COURT:   Sustained.

7   BY MR. MITCHELL:

8   Q.   Did you note on here that Merrill Lynch was

9   mentioned?

10       MR. PAPPALARDO:   Objection.

11       THE COURT:   No, you may answer that.

12  BY MR. MITCHELL:

13  Q.   Did you note that Merrill Lynch was mentioned in

14  these documents?

15  A.   Yes, and it refers on one of these to Merrill Lynch

16  Private Bank.

17  Q.   Was it important to you that Merrill Lynch retain

18  the money?

19       MR. PAPPALARDO:   Objection, your Honor.  May we

20  approach?

21       THE COURT:   All right.

22       (At sidebar on the record.)

23       MR. PAPPALARDO:   Your Honor, I would like to

24  raise -- at this point we are taking a position that

25  this witness or any investor's state of mind is not

1  relevant to these charges, particularly in conversation

2  with Mr. Paley or in a meeting with Mr. Paley.  There is

3  no -- there is no way that this witness' state of

4  mind -- particularly where we have never had any

5  contact, he doesn't even know that Carpenter exists --

6  can be admitted against Mr. Carpenter.  There's simply

7  no way that that can happen.  It's not relevant to this

8  case, it's not relevant to these charges.  His state of

9  mind is simply not properly before this jury.

10          MR. MITCHELL:  Materiality is properly before

11  this jury, and the question goes directly to

12  materiality.  The representation that Merrill Lynch

13  would hold the money, Merrill Lynch was someone that he

14  and probably all the jurors and all of us recognize as a

15  blue chip financial institution, suggested security of

16  the funds.  That is material, that's why that is

17  appropriate.

18          MR. PAPPALARDO:  He's now embarking now on

19  precisely the perilous grounds that we started to talk

20  about earlier, and I submit to the Court as clear as I

21  possibly can that this witness' state of mind is not

22  relevant to these charges.

23          THE COURT:  But address Mr. Mitchell's point,

24  materiality --

25          MR. PAPPALARDO:  How is that material?  How is

1    that material, your Honor --

2         THE COURT:  No, it's not whether his state of

3    mind is material, but whether a fraudulent

4    representation is material as part of the establishment

5    of the scheme of the fraud.  I guess that's the

6    argument.

7         MR. MITCHELL:  Yes.

8         THE COURT:  So therefore, to show that it

9    mattered to somebody is part of the proof of the scheme

10   to defraud.

11        MR. PAPPALARDO:  Your Honor, either there's a

12   scheme to defraud or there's not.  I don't think there's

13   any issue of materiality here.  Nobody wants their money

14   taken.  Nobody wants to be defrauded.  But to -- it

15   is -- it is inflammatory and prejudicial and, I submit

16   to the Court, totally improper to get into any questions

17   of -- that elicit or seek to elicit the state of mind of

18   an investor, particularly in a presence, in a meeting or

19   in a conversation with Mr. Paley.  This a trial of Dan

20   Carpenter.

21        THE COURT:  Right.  Well, I think it is -- I

22   think it is admissible as it goes to the existence of a

23   fraud; that is, it's not fraud unless it's material.

24   Okay?  That may not be a controverted fact, I don't

25   know.  Maybe you can stipulate that representations were

PDF created with pdfFactory trial version www.pdffactory.com

1   material for purposes of establishing a scheme to

2   defraud, but it's not his scheme.  I'm not sure, but --

3          MR. PAPPALARDO:  Your Honor --

4          THE COURT:  -- if the contest is there's no

5   fraud because no one was -- there's no tendency to

6   mislead, then I think the government is entitled to show

7   there was tendency to mislead because these were

8   important things that mattered to people.

9          MR. PAPPALARDO:  Your Honor, again, I say to you

10  that this witness' state of mind does not establish

11  materiality at all.

12         What this witness is going to testify to in

13  these and subsequent questions are his conversations

14  with Marty Paley.

15         THE COURT:  Right.

16         MR. PAPPALARDO:  His mental perceptions.  And I

17  suggest to you, your Honor, that the documents speak for

18  themselves.  They have to be viewed against the

19  objective backdrop.  It makes no difference what this

20  witness thought.  It makes no difference how he

21  interpreted what Marty Paley said.  It makes no

22  difference --

23         THE COURT:  Well, I think that your point seems

24  to be that materiality is not an element of establishing

25  the fraud or not part of the government 's case in

1    establishing the scheme and fraud.  Is that what you're

2    arguing?

3            MR. PAPPALARDO:  Your Honor --

4            THE COURT:  I can't tell whether you're saying

5    it's not part of the case or --

6            MR. PAPPALARDO:  I am saying it can't be

7    established through the testimony of this witness for

8    two reasons:  One, this witness' state of mind is not

9    relevant to the fraud.  This witness' state of mind and

10   his perceptions is not germane to the fraud.

11           THE COURT:  Why not?

12           MR. PAPPALARDO:  It can't be.  The documents,

13   your Honor, speak for themselves.  And more importantly,

14   the case law suggests, very clearly, that any of these

15   documents -- any of the documents have to be viewed

16   against the backdrop of an objective reality, not a

17   subjectively reality, which is what he's testifying --

18   about to testify to.  And the issue here, your Honor,

19   isn't his state of mind.  The issue is Mr. Carpenter's

20   state of mind, and we haven't heard Mr. Carpenter's name

21   yet.

22           THE COURT:  Well, Mr. Carpenter's state of mind,

23   is, of course, relevant to another part of the case.

24           Anyway, the objection is overruled.  You may

25   have it.

```
 1              (End of discussion at sidebar.)
 2    BY MR. MITCHELL:
 3    Q.   I don't know whether the question was answered, but
 4    where it says, "Merrill Lynch escrow relationship," was
 5    it important to you, Mr. Snider, that Merrill Lynch
 6    would be holding your money?
 7    A.   Yes.
 8    Q.   I'm actually going to go back a slide to slide 14,
 9    if you would flip back to slide 14.
10    A.   Yes.
11    Q.   Could you read for the jury -- and I'll highlight it
12    on the screen -- the first bullet point?
13    A.   "Your selected qualified intermediary should have a
14    lot of experience with exchanges.  They should have an
15    exemplary reputation among real estate and legal
16    professionals.  Examine their track record, and be sure
17    to check references."
18    Q.   Was it important to you that your intermediary have
19    experience?
20    A.   Yes.
21    Q.   I'm going to highlight for you the second to last
22    bullet point.  Would you read that for us?
23    A.   "Ask about the security of your funds, and find out
24    what guarantees are offered.  The intermediary should be
25    bonded, and carry errors and omissions insurance
```

1  coverage."

2  Q.   And was the security of your funds important to you?

3  A.   Yes.

4  Q.   And was the intermediary's being bonded important to

5  you?

6  A.   Yeah, that was significant, because he qualified for

7  the insurance company to give him a bond.

8          MR. PAPPALARDO:  Objection.

9          THE COURT:  No, that may stand.  Overruled.

10  BY MR. MITCHELL:

11  Q.   Let me highlight the last bullet point, Mr. Snider.

12  Could you read that for us?

13  A.   "This is a place where quality is imperative.  Do

14  not select an intermediary on the basis of price alone."

15  Q.   Okay.  Let me go back to slide 15.  Let's take a

16  look at that first bullet point.  I'm going to highlight

17  that.  Would you read that for us?

18  A.   "With more than $100 million in exchanges

19  successfully completed since 1995, Benistar has the

20  experience you need in a qualified intermediary."

21  Q.   All right.  I'm going to highlight the fourth bullet

22  point.  Could you read that for us?

23  A.   "Merrill Lynch Private Bank is used for all our

24  escrow accounts.  This provides three percent to six

25  percent interest on the escrow.  Funds transfer is

PDF created with pdfFactory trial version www.pdffactory.com

1    accomplished in a state-of-the-art environment utilizing

2    electronic wire transfers for security and timeliness."

3    Q.    Was it important to you that the money would be in

4    an escrow account?

5    A.    Yes.

6    Q.    And let me have you read -- let's read the next one,

7    too.

8    A.    "If the exchange is audited by the IRS for any

9    reason, Benistar will stand behind its work."

10   Q.    Okay.  Thank you.  And let's just finish the last

11   couple of pages in this exhibit.

12         Slide 16, could you just read the summary box at

13   the top?

14   A.    "Who is Benistar?  Founded in 1995 as Nationwide

15   Property Exchange, experts in little-known tax deferral

16   strategies such as 1031, in metro Boston alone, saved

17   clients over $15 million since 1995.  Recent acquisition

18   by Benistar added multiple capabilities."

19   Q.    Okay.  And the last bullet point on that page, could

20   you refer to that?

21   A.    "Recent acquisition in 1998 by Benistar Limited

22   added multiple capabilities:  419 welfare benefit trust

23   plans, ESOPs" -- that's an employee stock ownership

24   plan -- "CRTs, charitable remainder trusts."

25   Q.    All right.  And the next and final slide, would you

PDF created with pdfFactory trial version www.pdffactory.com

1    read the summary?  Slide 17.

2    A.   "Other Benistar services:  419 trusts, corporate

3    deduction reduces taxable income, benefit for selected

4    participants, ESOPs, tax from liquidation of estate, and

5    for business or real property."

6    Q.   Okay.  I am going, at this time, to have you turn to

7    Exhibit 2.  And again, what's this one called?

8    A.   "Frequently asked questions about 1031 property

9    exchange."

10   Q.   Okay.  And there are a list of headings with

11   explanations, questions, questions that people might

12   ask.  Is that -- do you see that on the document?

13   A.   Yes, there's six questions.

14   Q.   I'm going to have you turn to the back page.  This

15   is a two-sided document, correct?

16   A.   Yes.

17   Q.   Do you see the question:  "What will the

18   intermediary do with my money?"

19   A.   Yes.

20   Q.   Was that question important to you?

21   A.   Very.

22   Q.   Can you read that to us?

23   A.   "What will the intermediary do with my money?  One

24   important factor to consider in your selection of an

25   intermediary is how they will handle your money?

1    Benistar Property Exchange has a longstanding

2    representation for trustworthiness and is part of

3    Benistar Limited, the largest 419 trust plan

4    administrator in the nation.  Benistar has accounts with

5    major banking and investment firms such as Merrill

6    Lynch.  As required under the safe harbor provisions for

7    exchanges, these accounts are under our sole control.

8    Escrow accounts are restricted to paying out funds only

9    for a subsequent closing or to return funds to the

10   original property owner.  Written request is required

11   for any disbursements."

12   Q.   Okay.  Was it important to you that Benistar was

13   part -- Benistar Property Exchange was part of a larger

14   company that purported to be the largest 419 trust

15   plan administrator in the nation?

16        MR. PAPPALARDO:  Objection, form.

17        THE COURT:  Sustained to the form of the

18   question.

19   BY MR. MITCHELL:

20   Q.   Okay.  Was it important to you that Benistar

21   Property Exchange was part of a larger company?

22        MR. PAPPALARDO:  Objection, form.

23        THE COURT:  Sustained.

24   BY MR. MITCHELL:

25   Q.   The statement in the first paragraph, do you see

PDF created with pdfFactory trial version www.pdffactory.com

1   that, where it says, "Benistar Property Exchange has a

2   longstanding reputation?"  On page 2.

3   A.   The back page?

4   Q.   The back page, yes.  Do you see the second sentence

5   that begins, "Benistar Property Exchange has a

6   longstanding reputation of trustworthiness"?

7   A.   Yes.

8   Q.   Was it important to you that Benistar Property

9   Exchange is part of Benistar Limited?

10        MR. PAPPALARDO:  Objection, your Honor, form.

11        THE COURT:  Sustained.

12  BY MR. MITCHELL:

13   Q.   Was that statement important to you?

14        MR. PAPPALARDO:  Objection.

15        THE COURT:  Sustained.

16  BY MR. MITCHELL:

17   Q.   Do you see in the second paragraph, was it important

18   to you that the escrow accounts would be restricted to

19   paying out funds only for a subsequent closing?

20        MR. PAPPALARDO:  Objection.

21        THE COURT:  Sustained.

22        MR. PAPPALARDO:  Your Honor, can I have a

23   sidebar on this?  I don't want to take up a lot of the

24   Court's time.

25        THE COURT:  It's just about 1:00.  I think what

PDF created with pdfFactory trial version www.pdffactory.com

1    we'll do is we'll suspend for the day and resume --

2    we've started anyway, we'll make, I think, better

3    progress tomorrow.  A little slow getting going.

4         So jurors, as we take this first overnight

5    break, once the evidence has begun, let me give you a

6    couple of cautions.

7         First of all, please don't discuss the evidence

8    in the case, either among yourselves or with anybody

9    else; people at home, for example.  I know there will be

10   a temptation to tell people what's going on, but keep it

11   to the mechanics of the process rather than the

12   substance of the evidence.

13        It's important that at the end of the case you

14   can be confident that everything you have in your mind

15   about the case has come from the courtroom and the

16   evidence here, and not, for example, something somebody

17   said at the dinner table while the case is going on.  So

18   keep yourself immune in that sense to that.

19        And the other thing is, as we go along, the

20   evidence is going to come in over a period of time.

21   Please don't try to make any judgments as we go along.

22   Obviously, today you haven't heard enough to do that,

23   but you will be getting more and more evidence.  Keep

24   your judgments suspended, not just because you should

25   hear all the evidence of the case before you decide to

PDF created with pdfFactory trial version www.pdffactory.com

1    make any judgment, but also because, ultimately, you're

2    going to be talking to each other about it and sharing

3    the judgment, and it's not an individual judgment that

4    you will make.

5           So with those cautions, we'll recess for the day

6    and see you tomorrow.  Enjoy the rest of the day.  We'll

7    begin at 9:00 in the morning.

8           THE CLERK:  All rise for the jury.

9           (Jury left the courtroom.)

10          MR. MITCHELL:  Your Honor, do you want to excuse

11   Mr. Snider while we talk about --

12          THE COURT:  Okay, thank you, Mr. Snider.  We'll

13   see you in the morning.

14          (Discussion off the record.)

15          THE COURT:  Questions are leading.

16          MR. MITCHELL:  They are -- well, to the extent

17   that leading objections are in the eye of the beholder,

18   if the question -- the question -- I could also ask the

19   question:  What importance was it to you that blank?

20          THE COURT:  No, you can ask him to tell us what

21   features he found important, if any.

22          MR. MITCHELL:  Okay.

23          THE COURT:  That would be a direct question.

24          MR. GREENBERG:  Your Honor, a couple of points.

25   And I understand your Honor had issued an order with

PDF created with pdfFactory trial version www.pdffactory.com

1   respect to Ms. Jokinen's transcript.  You know, is that

2   the -- was that in as far as the opening went?  Because

3   we have --

4           THE COURT:  Not really.

5           MR. GREENBERG:  Well --

6           THE COURT:  Well, let me say this:  I went

7   through it, and I didn't see much difference among the

8   shaded areas.  I thought it seemed all to be sort of a

9   thorough going objection to her competence to testify

10  about those matters.

11          MR. GREENBERG:  Actually, your Honor, with

12  respect -- that was an issue.  As your Honor may have

13  noted, as the questioning proceeded, there's a number of

14  specific objections as it relates to, certainly, the

15  form of the question.  You know, there's countless

16  questions in which the government is basically doing the

17  testifying in terms of the leading nature.  There are

18  answers that are far beyond the scope of the question,

19  there's opinion testimony.

20          THE COURT:  Okay.

21          MR. GREENBERG:  My only point, your Honor, is

22  that we would ask that we treat these questions, you

23  know, question by question as it relates to --

24          THE COURT:  Yes, that's fine.  I will relook at

25  the transcript with that in mind.

1          MR. GREENBERG:  Okay.

2          THE COURT:  Perhaps I didn't notice some things

3     that I should have noticed on that.

4          MR. GREENBERG:  Thank you, your Honor.

5          THE COURT:  But I would like it resolved before

6     we read the transcript.

7          How are we going to do that?  What are the

8     mechanics --

9          MR. MITCHELL:  We're planning to have for

10    Jokinen and Iantosca Assistant United States Attorneys

11    serve as readers.

12         THE COURT:  Somebody other than you.

13         MR. MITCHELL:  Right.

14         THE COURT:  Sometimes when there's two lawyers,

15    one gets on the stand -- I was just curious.

16         MR. MITCHELL:  No, we're not planning on a duet

17    like that.

18         THE COURT:  When do you think you would offer

19    those transcripts?

20         MR. MITCHELL:  After Snider is done, we have

21    Byron Darling.  After Darling, we would go with Jokinen.

22         THE COURT:  So tomorrow.

23         MR. MITCHELL:  Yes.

24         Just one point about the leading questions.

25    Unlike the exercise we just did here with Eliot Snider,

1    with Linda Jokinen we don't have the opportunity to

2    rephrase the questions in a non-leading way, so the

3    analysis isn't --

4         THE COURT:  That's one of the consequences of

5    recorded testimony.  You can't change it.  It's all in

6    or all out, one or the other.

7         MR. MITCHELL:  Well, I mean --

8         MR. GREENBERG:  Your Honor --

9         THE COURT:  I understand -- I guess it's a plea

10   for leniency, but I'll entertain that in the context of

11   the transcript itself.

12        MR. MITCHELL:  I mean, I guess the point is,

13   leading and non-leading is something that's well within

14   the Court's discretion.

15        THE COURT:  Right.  I agree.

16        MR. GREENBERG:  Well, your Honor -- the final

17   point, your Honor, as it relates to the sequestration

18   order.  We just want to be certain that the government

19   does not discuss with Mr. Snider, you know, any subjects

20   concerning -- now that he's on the stand -- you know,

21   it's one thing to tell him when to be here tomorrow, but

22   beyond that, we would expect the government have no

23   further --

24        MR. MITCHELL:  We don't do that, your Honor.

25        MR. GREENBERG:  Just want to be sure.

```
 1          THE COURT:  We'll stand in recess.  We'll see

 2   you in the morning.

 3          (Court adjourned at 1:05 p.m.)

 4              - - - - - - - - - - - -

 5                  CERTIFICATION

 6        We certify that the foregoing is a correct

 7   transcript of the record of proceedings in the

 8   above-entitled matter to the best of our skill and

 9   ability.

10

11

12   /s/Debra M. Joyce                    _____
     Debra M. Joyce, RMR, CRR            Date
13   Official Court Reporter

14

15

16

17   /s/Marcia G. Patrisso               _____
     Marcia G. Patrisso, RPR, CRR        Date
18   Official Court Reporter

19

20

21

22

23

24

25
```

PDF created with pdfFactory trial version www.pdffactory.com