UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    ) Criminal Action
v.                                  ) No. 04-10029-GAO
                                    )
DANIEL E. CARPENTER,                )
                                    )
        Defendant.                  )
                                    )



BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY THREE
JURY TRIAL



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, June 4, 2008
9 a.m.



Marcia G. Patrisso, RPR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1   APPEARANCES:

2       OFFICE OF THE UNITED STATES ATTORNEY
        By: Jonathan F. Mitchell and Jack W. Pirozzolo,
3       Assistant U.S. Attorneys
        John Joseph Moakley Federal Courthouse
4       One Courthouse Way
        Boston, Massachusetts  02210
5       On Behalf of the Government

6       GREENBERG TRAURIG, LLP
        By: A. John Pappalardo, Esq. and
7           Gary R. Greenberg, Esq.
        One International Place
8       Boston, Massachusetts  02110
        On Behalf of the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                        I N D E X

 2                      Direct   Cross   Redirect   Recross
     Witnesses For The
 3     Government:

 4   ELIOT SNIDER, resumed

 5       By Mr. Mitchell       16              94
         By Mr. Pappalardo          49
 6
     BYRON DARLING
 7
         By Mr. Pirozzolo      100
 8       By Mr. Pappalardo          123

 9                        E X H I B I T S

10
     Government's
11    Exhibit No.         Description        Marked   Received

12
     No. 18         Acknowledgment dated 9/21/00        45
13
     No. 51         Darling Escrow Agreement            110
14
     No. 52         Darling Exchange Agreement          112
15
     No. 53         Darling Interest Election form      114
16
     No. 58         Letter to Darling                   115
17

18

19

20

21

22

23

24

25
</pre>

```
 1            (The following proceedings were held in open

 2   court before the Honorable George A. O'Toole, Jr.,

 3   United States District Judge, United States District

 4   Court, District of Massachusetts, at the John J. Moakley

 5   United States Courthouse, One Courthouse Way, Boston,

 6   Massachusetts, on June 4, 2008.

 7            The defendant, Daniel E. Carpenter, is present

 8   with counsel.  Assistant U.S. Attorneys Jonathan F.

 9   Mitchell and Jack W. Pirozzolo are present.)

10            THE CLERK:  All rise.

11            Please be seated.

12            MR. MITCHELL:  Good morning, your Honor.

13            THE COURT:  Good morning.

14            Let me see counsel at the side.

15            (Discussion at sidebar and out of the hearing of

16   the jury:)

17            THE COURT:  We have a juror problem.  The last

18   one seated, Juror No. 4 of the second list, who was

19   seated -- was seated at Seat No. 4, came in today --

20   this is at the report of the court security officer who

21   is shepherding the jury -- and she asked if she could

22   speak to him.  And he said that she said she had been

23   driving home last night and it had suddenly dawned on

24   her that she and her husband had lost $10,000 in a real

25   estate scam -- I think she used the word, but it was the
```

PDF created with pdfFactory trial version www.pdffactory.com

1  equivalent if it wasn't the exact word -- about ten

2  years ago and had forgotten about it, and had now

3  remembered it.  And she made a disparaging comment about

4  Mr. Carpenter.

5          MR. PAPPALARDO:  To whom?

6          THE COURT:  To the officer.

7          MR. PAPPALARDO:  Oh, to the officer?

8          THE COURT:  I think it was something like, "And

9  I started thinking about the sleaze who was on trial."

10          I haven't inquired of her at this point; I

11  wanted to bring it to your attention.

12          MR. MITCHELL:  Well, I think it makes sense to

13  inquire.

14          MR. PAPPALARDO:  Well, I think it not only makes

15  sense to inquire, I think it makes sense to inquire of

16  the jury generally.

17          THE COURT:  We can learn from her whether she

18  said anything to the others.

19          MR. PAPPALARDO:  Exactly, your Honor.

20          And apropos the discussion that we had with the

21  government just before you came out, I think, your

22  Honor, I would ask the Court to consider instructing the

23  jury not to avail themselves of extraneous evidence; in

24  other words, decide the case on the evidence in the

25  courtroom.  My problem isn't so much that there will be

PDF created with pdfFactory trial version www.pdffactory.com

1    media attention here, the defendant residing in Sudbury,

2    Connecticut.  Having said that, you know, there's a lot

3    of stuff on the Internet which cuts both ways, and

4    there's a lot of lawsuits and a lot of recoveries.

5         And I think if they haven't already ruled -- you

6    know, usually -- and I'm concerned, your Honor, that the

7    focus is on the evidence in the courtroom.  And I know

8    the government agrees with that.

9         THE COURT:  Right.  Yes.  The only question is

10   when is the appropriate time to do that.  I think at the

11   end of the day when they go back home.

12        MR. PAPPALARDO:  Well, I'll leave it to the

13   Court.

14        THE COURT:  Yeah, but that's a fair comment.

15        MR. PAPPALARDO:  But you can couch it in terms

16   of media and, you know, Internet and whatever.

17        THE COURT:  Okay.  So I guess we should just --

18   I mean, we could do it either here or in the back.  I

19   think we should just do it here.

20        THE CLERK:  Just bring her up here?

21        THE COURT:  Yeah, I guess so.

22        (Pause.)

23        (Juror appears before the Court.)

24        THE COURT:  Good morning.

25        THE JUROR:  I'm sorry about this.  I should have

PDF created with pdfFactory trial version www.pdffactory.com

said this to you yesterday.  But I was driving home

yesterday, and it just kind of hit me -- because I was

feeling very agitated about all of this -- what the

situation is here.  And it kind of jarred my memory of a

situation I had been through about ten years ago.

My husband and I were involved in a real estate

situation.  We put down $10,000 in goodwill to purchase

a place and found out that we were being lied to -- not

only by the people who were selling it but by the

insurance company -- and people were not forthright with

the situation, that basically it was in a flood zone --

and not just a flood, but a velocity zone.

And when we finally found out, you know, it's

like, "I'm not going to buy a house that's in a velocity

zone."  So we contacted a lawyer because we didn't want

to go through with things, and he basically told us,

"Look, it's going to cost you more for lawyer fees on

this."  And we basically lost the $10,000.  And I'm

thinking:  I lost $10,000; these people lost millions of

dollars.

I thought it would be right just to tell you

where I come from on this.

THE COURT:  Well, is it your sense that this

would affect your -- potentially affect your judgment in

the case; that your personal experience would lead you

```
 1   to be, perhaps -- tend toward sympathy for the people
 2   who might have been in a position to lose money?
 3        THE JUROR:  Well, I can understand losing money.
 4   I mean, I've been there.  I want to be able to do my
 5   civic duty; it's the right thing to do.  I want to be
 6   able to do this.  It's a great group of people who are
 7   in there, and I'm like -- but I left, and I just felt
 8   like the guy's a sleazebag, is how I felt.  I drove
 9   home -- I've been up since four in the morning tossing
10   over this.
11        THE COURT:  Have you discussed this with any of
12   the other jurors?
13        THE JUROR:  No.
14        THE COURT:  So you talked to the CSO, the court
15   security officer?
16        THE JUROR:  Only.  Only.  Yes.  I didn't think
17   it would be right to say anything to anybody.  I don't
18   want to color anything for anybody.
19        THE COURT:  Well, it sounds like, from what you
20   just said, you may have already formed an impression
21   about the case or --
22        THE JUROR:  I'm trying not to, but it took me
23   years to stop being emotional and so angry about what
24   happened to me.  And I'm trying to be right about this.
25        THE COURT:  Okay.  Thanks.
```

1              Why don't you --

2              THE CLERK:  Have her go back in the back.

3              THE COURT:  Yeah, but stay outside the jury room

4    for the time being.

5              THE CLERK:  Okay.

6              (The juror is excused.)

7              MR. MITCHELL:  Yeah.

8              MR. PAPPALARDO:  Well, your Honor, I cannot

9    think that there is any issue about her; I think

10   obviously she has to be excused.  The question I have

11   is:  Based upon the fact that I can't think of a more

12   inflammatory comment than that, the only issue is

13   whether or not she had contact with other jurors, and in

14   that vein.  I know she said she didn't, but she also

15   said that she would base her opinions on the evidence in

16   the trial.  And she said, "I can't imagine" -- you know,

17   she said, "I can relate to losing money.  I lost

18   $10,000, and I can't imagine that these people lost

19   millions of dollars."

20             She doesn't know that.  She hasn't had --

21             THE COURT:  Well, she heard the openings.

22             MR. PAPPALARDO:  But, your Honor, you know, Mr.

23   Carpenter is on trial for a very serious offense, and my

24   only concern is whether or not these jurors have been

25   impacted at all.  And I would ask the Court to -- I

PDF created with pdfFactory trial version www.pdffactory.com

1    mean, I've had a lot of experience with respect to this

2    precise issue.  I mean, the *Coast of Maine Lobster* case

3    is a great example of that, where the government had

4    serious problems on this.

5         And the issue, your Honor, is whether or not she

6    has either intentionally -- perhaps not -- but

7    inadvertently impacted the collective thinking of the

8    jury.  And I would ask the Court to poll the jurors on

9    that point.

10        THE COURT:  Here's what I -- I don't think it's

11    necessary to do an individual polling because I think

12    her statement that she had not spoken to anybody was a

13    credible one.  I mean, she seemed to be very firm about

14    that.  But I can ask the jurors if they have abided by

15    my instruction when we adjourned last night to avoid any

16    discussion of the matters of the case, and so on, and

17    see whether anybody has done that.

18        But I think --

19        MR. PAPPALARDO:  Your Honor, I would ask that --

20        THE COURT:  I think it will make matters

21    worse -- or potentially make matters worse -- to suggest

22    that there's a problem to the jury by individually --

23    where we don't have any indication that it has happened.

24        MR. PAPPALARDO:  Well, again, your Honor, I'm

25    not asking for you to do this individually; you can ask

PDF created with pdfFactory trial version www.pdffactory.com

1    the question collectively.  Having said that, I think

2    there needs to be more than one question.  To ask

3    whether or not -- to ask the question you pose, I mean,

4    half the time jurors in a group -- we see this when we

5    impanel -- don't respond to the judge until the third or

6    fourth question.  And this is exactly what happened in

7    the *Coast of Maine Lobster* case.

8              THE COURT:  So what's the suggestion?

9              MR. PAPPALARDO:  The suggestion, your Honor, is

10   when the jury comes out, ask whether or not they've

11   formed any opinions about this case, whether or not

12   they've discussed it with other jurors, and in

13   particular, just, you know, ask that.  And basically, I

14   can't tell you the questions to ask because it really

15   depends on the response.

16             THE COURT:  Right.  Well, I don't know that --

17   that's what -- I think that's what I was suggesting:

18   I'll ask whether they've discussed it with anybody.

19             MR. PAPPALARDO:  Your Honor, we don't want to

20   try this case yet again.

21             THE COURT:  I agree.

22             So I'll ask them whether they've abided by my

23   instruction or whether they've discussed any of the

24   matters; can they assure me they have not discussed the

25   matter.

1          MR. MITCHELL:  Collectively, your Honor?

2          THE COURT:  Yeah, collectively.

3          MR. PAPPALARDO:  That's what I would propose.

4          THE COURT:  Anything else while we're assembled?

5          MR. MITCHELL:  I don't think so.

6          MR. PIROZZOLO:  Oh, just because I expect we're

7    going to get to it, on the Jokinen testimony, the

8    reading, I think -- I spoke to Mr. Greenberg just before

9    we came in here, and I think we agree that we'll just

10   start reading from the transcript.

11         Has the Judge made a separate ruling --

12         THE COURT:  I've looked at it.  Most of them --

13   most of the objections will be overruled.  There is an

14   objection with respect to some exhibits.  I've read the

15   transcript but I haven't had a chance to look at the

16   exhibits.  And those exhibits, from memory, are

17   PaineWebber statements from December 20th showing --

18   recapping the individual exchangor accounts and what was

19   there and what was not there.

20         And I wanted to look at those and see what was

21   up because it may be that they are sufficiently post the

22   relevant time periods; that they're not relevant.

23         MR. GREENBERG:  There's about four or five other

24   questions, your Honor, that the forms of the question

25   are argumentative.

```
 1            THE COURT:  Most of those -- I looked at them

 2    and overruled, or would not allow.

 3            MR. GREENBERG:  If it's okay with your Honor, as

 4    they read those in, I wanted to highlight those.

 5            MR. PAPPALARDO:  They're not going to read them

 6    in.

 7            MR. GREENBERG:  I'm sorry?

 8            THE COURT:  No, the other way around.

 9            MR. GREENBERG:  Those are some of those

10    questions Mr. Pappalardo had highlighted.  But I won't

11    interrupt.  There's four or five of them.  I just want

12    to make sure your Honor has focused on them.

13            MR. PAPPALARDO:  Your Honor, one other thing, to

14    save another sidebar conference.  Assuming the Court is

15    content that the jury pool has not been adversely

16    impacted by this morning's events, with respect to how

17    you couch the -- this juror leaving the pool.  And I

18    would suggest that it be something mutual like there was

19    an issue that surfaced and you're not to speculate as to

20    what it may have been; it was an issue with the juror

21    and you considered it appropriate to excuse her.

22            Thank you.

23            THE COURT:  The only -- I have to think about it

24    a little.  The only problem is that they will speculate

25    from the two comments being made side by side, so
```

```
 1    there's that danger.  Okay.
 2            Will you get Paul?
 3            (Pause.)
 4            (In open court:)
 5            THE CLERK:  All rise for the jury.
 6            (Jury in at 9:42 a.m.)
 7            THE CLERK:  Please be seated.
 8            THE COURT:  Good morning, jurors.
 9            THE JURORS:  Good morning.
10            THE COURT:  Again, we appreciate your patience
11    while we resolve some questions.  One of the jurors had
12    a personal issue that we had to discuss with her, and as
13    a result, we've excused her.  So if you see the blank
14    chair, that's why.
15            We're about to resume with the evidence.  And
16    you'll recall when we left last evening I asked you to
17    avoid any discussion of the case or the evidence in the
18    case with anybody.
19            Have you all abided by that instruction?
20            THE JURORS:  Yes.
21            THE COURT:  Okay.  Let me just add -- because it
22    occurs to me, not because it's urgent -- we live in
23    times now where it is possible sometimes for jurors to
24    do some investigating on their own by Googling things
25    and so on.  And I ask you to avoid doing that.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Sometimes there are press reports; I'm not sure there

2    will be press reports about this case.

3          But it's part of your obligation to remain away

4    from any external influences.  As I said yesterday, we

5    want to make sure that everything that you've seen and

6    heard about the case is coming from here in the

7    courtroom where we all know what the same thing is

8    and -- rather than -- okay?  So as times advance, we

9    have to change our thinking about what might be -- what

10   might be possible.  And so there is a temptation

11   sometimes to hit the Internet and see what you can

12   learn.  No supplementing, I guess, is the way to leave

13   it.  This is the evidence that we'll be dealing with,

14   okay?

15          All right.  I think now we're ready to resume

16   with the examination of Mr. Snider.

17          MR. MITCHELL:  Mr. Snider is coming in, your

18   Honor.

19                   ELIOT SNIDER, resumed

20          THE COURT:  Good morning, Mr. Snider.  I remind

21   you, you remain under oath from yesterday.

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Okay, Mr. Mitchell.

24          MR. MITCHELL:  Thank you, your Honor.  Before we

25   begin, can I ask the Court to ask the jury to -- I want

1  to confirm that everybody has their notebooks.

2          THE COURT:  I think everybody has their

3  notebooks.  Those in the back may want to get their

4  monitors in place and ready so that...  There's no

5  evidence yet.

6          Okay.  Everybody all set?  This one, Paul, the

7  one we had trouble with, is not working.  We've had

8  trouble with that particular monitor before, so...

9  there's a loose wire.

10          Did you solve it before?

11          THE CLERK:  Just hit it once?

12          LAW CLERK:  Just hit it once.

13          THE COURT:  All set?  Go ahead, sir.

14          MR. MITCHELL:  Thank you, your Honor.

15                  CONTINUED DIRECT EXAMINATION

16  BY MR. MITCHELL:

17  Q.   Good morning, Mr. Snider.

18  A.   Good morning.

19  Q.   Mr. Snider, when we left off we were talking about

20  Exhibit 2.  Do you see that up on the screen in front of

21  you?

22  A.   Two?

23  Q.   Yeah.  If you could grab the folder.

24  A.   Okay.

25  Q.   All right.  And that's a one-page, two-sided

PDF created with pdfFactory trial version www.pdffactory.com

1  document, correct?

2  A.    Yes.

3  Q.    All right.  We'll have you focus back to page 2.

4  I'm reading the highlighted paragraph right there.

5  A.    "What will the intermediary do with my money?"

6  Q.    If I could just re-orient you, I'm going to focus

7  your attention on the second of those two paragraphs now

8  just so we could refresh ourselves as to where we were

9  at the end of the day yesterday.  Could you read the

10 second paragraph?

11 A.    "One important factor to consider in your selection

12 of an intermediary is how they'll handle your money.

13 Benistar Property Exchange has a longstanding reputation

14 for trustworthiness, and is part of Benistar, Limited,

15 the largest 419 trust plan administrator in the nation.

16     "Benistar has accounts with major banking and

17 investment firms, such as Merrill Lynch.  As required

18 under the Safe Harbor provisions for exchanges, these

19 accounts are under our sole control.  Escrow accounts

20 are restricted to paying out funds only for a subsequent

21 closing or to return funds to the original property

22 owner.  Written request is required for any

23 disbursements."

24 Q.    Mr. Snider, in the course of your work in real

25 estate, have you participated in transactions that have

PDF created with pdfFactory trial version www.pdffactory.com

1    involved escrows?

2    A.    Yes.

3    Q.    And based on your experience, how's an escrow

4    typically used?

5    A.    Typically, it is used --

6              MR. PAPPALARDO:  Objection.

7              THE COURT:  Overruled.

8              Go ahead.

9              THE WITNESS:  An escrow is to separate something

10   and hold it so it's used for its appropriate purpose.

11   BY MR. MITCHELL:

12   Q.    In your experience, is an escrow a fund from which

13   the holder uses the money in the stock market?

14             MR. PAPPALARDO:  Objection.  Leading.

15             THE COURT:  Sustained.  Sustained.

16   BY MR. MITCHELL:

17   Q.    I'm going to have you turn to the third exhibit.

18   A.    I didn't hear that.

19   Q.    I'm sorry.  I'll speak up.  Exhibit No. 3.  Would

20   you take a look at that?

21   A.    Okay.

22   Q.    Okay.  I'm going to have you read portions of this

23   document.  Let's start off with the introductory

24   section.  I'm going to highlight it up here.  Would you

25   read that to us?

1  A.    "Internal Revenue Code 1031 tax-deferred property

2  exchanges are a little-known device that allows the

3  owner of business or investment property to exchange

4  that property for another of equal or greater value.

5  The capital gain tax that would normally be generated by

6  the sale is deferred."

7  Q.    Okay.  And I'm going to highlight the section that

8  is titled, "Who needs 1031?"  Would you read that to us?

9  A.    "Who needs 1031?  Many property owners can profit

10 from a 1031 exchange:

11     "Sellers, who are facing a large capital gain tax

12 liability.

13     "People who want to exchange poor-performing

14 investment property for more lucrative property.

15     "Business owners who wish to expand into larger

16 facilities, diversify their business into more than one

17 location, or consolidate from many locations into a

18 single location."

19 Q.    Okay.  Thank you very much.  One more passage on

20 this page.  Could you read the first sentence of the

21 next section?

22 A.    "The benefits of 1031:  1031 tax-deferred property

23 exchange enables the owner of business or investment

24 property to retain 100 percent of the equity of the sold

25 property."  More?

1    Q.    No.   I have a follow-up question; that is, what
2    benefit were you seeking in doing your 1031?
3    A.    I can't hear you.
4    Q.    What benefit, if any, were you seeking in doing a
5    1031 exchange?
6    A.    Well, the company had a piece of property with a
7    large open space that called for development in a nice
8    area, and I was not in a position to do the development.
9    So I wanted to trade it for a place that was all built.
10   Q.    Okay.   Does that mean you were looking for another
11   property?
12   A.    Yes.
13   Q.    Okay.   I'm going to have you take a look at Exhibit
14   No. 4, Mr. Snider.   Okay.   What's that one titled?
15   A.    "1031 Property Exchange:   Legal Authority."
16   Q.    Okay.   Could you just read, for now, the first
17   sentence?
18   A.    "The following cases provide legal authority for
19   advisors who are investigating the liability of 1031
20   tax-deferred property exchanges for their clients."
21   Q.    Okay.   And just very quickly, there are a number of
22   court cases that are listed here with descriptions?
23   A.    Read the first?
24   Q.    I'm sorry.   I'll say that again.   On this document
25   there are a set of court cases that have descriptions

PDF created with pdfFactory trial version www.pdffactory.com

1   after them?

2   A.   Yeah.

3   Q.   I'll have you turn to the second page.  Do you see

4   that?

5   A.   Yes.

6   Q.   Okay.  Do you see down on the bottom it says "IRS

7   Code Sections"?

8   A.   Yes.

9   Q.   I know it's a lot to read, but if you wouldn't mind

10  reading that section?

11  A.   "IRS Code Sections.  Section 1031 provides an

12  exception from the general rule requiring the current

13  recognition of gain or loss realized upon the sale or

14  exchange of property.  See Section 1001(c).  Section

15  1031(a)(1) provides that no gain or loss shall be

16  recognized on the exchange of 'property held for

17  productive use in trade or business or for investment'

18  if such property is exchanged solely for property of a

19  'like kind' which is to be 'held either for productive

20  use in a trade or business or for investment.'

21       "Section 1.1002-1(d).  A transaction constitutes an

22  exchange if there is a reciprocal transfer of property

23  as distinguished from a transfer of property for money

24  consideration only.

25       "Section 1.1031(k)-1(f).  The IRS will argue that if

PDF created with pdffactory trial version www.pdffactory.com

1    a transferor actually or constructively receives full

2    consideration in cash for the property transferred

3    before the actual receipt of the like-kind exchange

4    property, the transaction is a sale and a reinvestment

5    rather than an exchange."

6    Q.   Okay.  Thank you very much.

7         Let's go to the next document you received from

8    Benistar.  It's Exhibit 5.  What's this one called?

9    A.   "Identifying a 1031 Exchange Opportunity."

10   Q.   And the subtitle?

11   A.   "Phrases to listen for."

12   Q.   Okay.  And are there a set of questions after that?

13   A.   Yeah; five of them.

14   Q.   All right.  If you could just --

15        MR. MITCHELL:  What I'll do, your Honor, is take

16   a moment so the jury has an opportunity to read it

17   rather than have Mr. Snider go through it one by one.

18        THE COURT:  All right.

19        (Pause.)

20        THE COURT:  Okay.  I think they've had enough

21   time to read it.

22   BY MR. MITCHELL:

23   Q.   Let's go to the next document you got from Benistar.

24   That's Exhibit 6.  Take a look at that.  Would you

25   remind us, Mr. Snider, what this document is?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   This is a series of articles that Martin Paley of

2  Benistar wrote for a local -- New England Real Estate

3  Journal on exchanges.

4  Q.   Okay.  Did you read through these articles?

5  A.   I certainly did.

6  Q.   And that's part 1 of 5, of five installments?

7  A.   Yes.

8  Q.   All right.  I'm going to have you turn specifically

9  to the last one.  I'll have you read a couple of

10  passages from the last article.

11      Okay.  I'm going to focus your attention on this

12  highlighted area, "Selecting an exchange facilitator."

13  Could you read that for the jury?

14  A.   "Selecting an exchange facilitator:  It should be

15  pointed out that there are no state or federal

16  regulations governing the function of qualified

17  intermediaries other than the fiduciary responsibilities

18  that govern the conduct of any entity holding or

19  handling other people's money.  For this reason, care in

20  selecting a qualified intermediary or facilitator is a

21  critical step.  Some basic advice includes the

22  following:

23      "Choose a facilitator as you would an attorney or a

24  physician - with personal care and attention."

25  Q.   Okay.  Thank you.  When you read this, did you note,

PDF created with pdfFactory trial version www.pdffactory.com

1    Mr. Snider, the term "fiduciary responsibility"?

2         MR. PAPPALARDO:  Objection, your Honor.

3         THE COURT:  Sustained.

4    BY MR. MITCHELL:

5    Q.   I'm going to have you read another section here.  Do

6    you see that?  Do you see where it says, "Ask about the

7    security of your funds"?  Would you read that to us,

8    please?

9    A.   "Ask about the security of your funds and what

10   assurance you will have to assure you that your funds

11   and your exchange status will be protected.

12        "Safeguarding your exchange should translate

13   directly to your personal peace of mind.  A good rule of

14   thumb is to evaluate an intermediary primarily based

15   upon their interest in your exchange - not your exchange

16   fee, your closing fee, or an associated title insurance

17   premium."

18   Q.   Okay.  Thank you, Mr. Snider.

19        Mr. Snider, you mentioned yesterday that you would

20   ask for a bond.  Why, again, did you ask for a bond?

21   A.   That was to assure me that they were established in

22   their business and were thought well enough of by the

23   bonding company to issue a bond.

24   Q.   And I'll have you turn to Exhibit 7.  Is that --

25   again, that's the bond that you received from Martin

PDF created with pdfFactory trial version www.pdffactory.com

1  Paley?

2  A.   Yes.

3  Q.   Okay.  Did you review that bond, or did you look

4  through it?

5  A.   I did.

6  Q.   And did that address your concern about whether

7  Benistar was established?

8  A.   Yes, it did.

9  Q.   Mr. Snider, did you shop any other intermediaries?

10 A.   Yes.

11 Q.   Okay.  What efforts did you undertake to shop other

12 intermediaries?

13 A.   I discussed it with another qualified intermediary

14 that was a law firm in Boston.

15 Q.   Okay.  And why did you go with Benistar in the end?

16 A.   Well, one, I knew the whole Paley family:

17 grandfather, father, aunt; and Martin, when he came in,

18 impressed me as being a pleasant, able young man.  And

19 he offered assistance in finding replacement real

20 estate, which nobody else did.

21 Q.   Did the things he present to you address your

22 concerns about security of the funds?

23         MR. PAPPALARDO:  Objection.

24         MR. MITCHELL:  He's testifying that security was

25 important to him.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. PAPPALARDO:  He's forming his conclusion.
 2              THE COURT:  You may have the question.
 3   BY MR. MITCHELL:
 4   Q.   Did the materials Mr. Paley presented to you address
 5   your concerns about the security of your funds?
 6   A.   Yes.
 7   Q.   Did you ever meet a man named Dan Carpenter?
 8   A.   No.
 9   Q.   Did anyone ever suggest to you that you meet with
10   Dan Carpenter?
11              MR. PAPPALARDO:  Objection.
12              I'll withdraw.
13              MR. MITCHELL:  It's a yes-or-no question.
14              MR. PAPPALARDO:  I'll withdraw it.
15              THE COURT:  Okay.  You may answer the question.
16              THE WITNESS:  Yes.  I had an appointment with
17   him one time which he didn't show up for.
18   BY MR. MITCHELL:
19   Q.   When was that?
20   A.   In January.
21   Q.   Okay.  And then who set up that meeting?
22   A.   I don't recall.
23   Q.   Did you speak to anybody else at Benistar about the
24   property exchange?
25   A.   Well, Stewart Winkler, who worked for him.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Okay.  What did you speak to Stewart Winkler about?

2    A.    Well, he was the one who was --

3          MR. PAPPALARDO:  Objection, your Honor.  Can he

4    clarify?  Worked for whom?

5    BY MR. MITCHELL:

6    Q.    What was your understanding as to whom Stewart

7    Winkler worked for?

8    A.    For Benistar Property Exchange.

9    Q.    Okay.  And what did you speak to Stewart Winkler

10   about?

11   A.    About my desire to find replacement properties.

12   Q.    Okay.  And did he provide you assistance along those

13   lines?

14   A.    Yes, he did.

15   Q.    What assistance did he provide you?

16   A.    What was that?

17   Q.    What assistance did he provide you?

18   A.    He made some suggestions and went out with me to

19   look at a couple of places.

20   Q.    Okay.  Did you ever speak to a woman named Linda

21   Jokinen?

22   A.    Yes, I did.

23   Q.    What did you speak to her about?

24   A.    She was in the office.  I don't recall.

25   Q.    Now, you identified certain exhibits yesterday as

PDF created with pdfFactory trial version www.pdffactory.com

1   agreements that you signed with Benistar.  Do you recall

2   your testimony?

3   A.   Yes.

4   Q.   I'll have you turn to Exhibit 10, if you could.  I'm

5   skipping over to 10.

6        Do you see Exhibit 10?

7   A.   I have it.

8   Q.   Okay.  What's the title of this document?

9   A.   "Exchange Agreement."

10  Q.   Okay.  And if you could just take a look at the back

11  page.  Is that your signature there?

12  A.   Yes, it is.

13  Q.   Okay.  Is it also signed by somebody else?

14  A.   Martin Paley.

15  Q.   Did you review this document before you signed it?

16  A.   Yes.

17  Q.   Did you have the assistance of an attorney?

18  A.   I don't recall whether I inquired or not.

19  Q.   Okay.  I'm going to have you walk through certain

20  provisions in this document.  This document is dated

21  when?

22  A.   September 14, 2000.

23  Q.   And Paragraph No. 1 is titled "Closing

24  Instructions"; is that correct?

25  A.   Yes.

```
 1    Q.   Paragraph 2, do you see that?  That's titled
 2    "Exchange"?
 3    A.   Yes.
 4    Q.   I'm going to have you turn to the second page.  Do
 5    you see where Paragraph C is?
 6    A.   Yes.
 7    Q.   And I'm going to have you -- if you would read the
 8    first --
 9    A.   "Exchangor agrees that intermediary shall hold the
10    net proceeds from the closing herein until such time as
11    exchangor has located suitable like-kind property or
12    properties in which to exchange, which shall be
13    described as 'the replacement property.'  Thereafter,
14    exchangor will instruct intermediary to acquire said
15    replacement property on the terms and conditions
16    negotiated by exchangor as evidenced by a written
17    agreement for the purchase thereof.  Exchangor
18    relinquishes any and all rights to instruct intermediary
19    to tender the proceeds held by intermediary directly to
20    exchangor."
21    Q.   Okay.  Thank you.  Let's just look through the
22    titles of the next ones.  Paragraph 3 is titled
23    "Closing," Paragraph 4 is titled "Offer"; is that
24    correct?
25    A.   Where are you?
```

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   If you could do me a favor and just read the title

2   of the next set of provisions up to Number 9.  Title 3,

3   4, 5, et cetera?

4   A.   Three:  "Closing:"  "The closing herein shall occur

5   by closing" --

6   Q.   Hold on.  I just want you to read the title, not the

7   whole thing.

8   A.   Okay.  "Closing," "Offer," "Possession," "Deposits,"

9   "Prorations," "Costs," "Intermediary's Fees."

10   Q.   Let me stop you right there.  I have a couple of

11   questions about that paragraph.

12       Did Benistar charge you a fee for the property

13   exchange?

14   A.   Yes.

15   Q.   Do you recall how much that was?

16   A.   $4,000.

17   Q.   Did you pay it?

18   A.   Yes.

19   Q.   I'll have you -- for the moment we're going to flip

20   back to Exhibit 9.  If you'll just open that up briefly.

21   A.   Yes?

22   Q.   And you identified these as your checks yesterday;

23   is that correct?

24   A.   Yes.  These are two checks totaling $4,000.

25   Q.   And these are both checks that you -- both checks

PDF created with pdfFactory trial version www.pdffactory.com

1    you wrote to Benistar?

2    A.   Correct.

3    Q.   And the memo line says "Benistar fee for exchange"

4    and "Deposit on fee for exchange"?

5    A.   Yes.

6    Q.   And together they add up to $4,000?

7    A.   That's correct.

8    Q.   All right.  Let's go back to Exhibit 10, if you

9    would, Paragraph 9.  Actually, let's go to Paragraph 10.

10   This paragraph doesn't have a title?

11   A.   Yes.

12   Q.   All right.  Would you read for us the first sentence

13   of that paragraph?

14   A.   "Exchangor and intermediary expressly agree any cash

15   proceeds received from the disposition of the

16   relinquished property shall be held and invested with

17   Merrill Lynch Private Client Group in either 3 percent

18   per annum at a Merrill Lynch Ready Asset Money Market

19   account, or 6 percent per annum in a Merrill Lynch

20   investment account."

21   Q.   All right.  I'll have you read the last sentence of

22   the paragraph that begins with "By the terms hereof"?

23   A.   "By the terms hereof, intermediary shall only be

24   required to participate in the withdrawal of funds when

25   instructed by exchangor and only when the instruction

PDF created with pdfFactory trial version www.pdffactory.com

1    involves the acquisition of the replacement property of

2    the disposition of said proceeds by intermediary to

3    exchangor pursuant to the terms of Paragraph 2(c) above

4    or as otherwise provided in Paragraph 2(c) above."

5    Q.    Mr. Snider, at that point in the process of

6    exchanging properties, were you told that your money

7    could be withdrawn for any other purpose?

8              MR. PAPPALARDO:  Objection, your Honor.

9              THE COURT:  Sustained.

10             MR. MITCHELL:  Your Honor, I guess at this point

11   I would just ask that -- give the jury a moment to read

12   through the document as the jury sees fit.

13             THE COURT:  Well, I'm just concerned about the

14   time.  I mean, the document's in evidence and at some

15   point they'll be able to evaluate it all.  If there's

16   something you want to highlight, I think that's the best

17   way to do it rather than using trial time here reading

18   the whole page.

19             MR. MITCHELL:  That's fine, your Honor.  I was

20   only planning to do it with this one and the next one.

21   But that's fine; I'll move on.

22   BY MR. MITCHELL:

23   Q.   Okay.  I'll have you turn to Exhibit 11.  Would you

24   take a look at that?  Okay.  This one is titled "Escrow

25   Agreement"?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    Yes.

2  Q.    And I'm going to highlight for you -- this is the

3  only part I'm going to have you read:   Paragraphs 1

4  through 4.   Could you read that?

5  A.    "Now, therefore, the parties agree to the following:

6      "1.   Benistar shall open an Escrow Custodial Account

7  under Benistar's name at Merrill Lynch for the

8  exchangor's benefit.

9      "Benistar shall have full control over the

10  exchangor's funds to invest as the exchangor directs in

11  either the 3 percent Ready Asset Money Market fund or

12  the 6 percent investment account.

13      "Only upon the exchangor's written direction or

14  authorization shall the funds leave the Benistar

15  account.   Upon the written direction of the exchangor

16  shall the funds be released and then the funds shall be

17  delivered to one of only two places at the exchangor's

18  written direction:

19      "a.   Directly into the exchangor's account; or

20      "b.   Directly to the escrow account for the closing

21  on the replacement property to be purchased pursuant to

22  the exchange agreement.

23      "Upon distribution of the funds to the exchangor's

24  designated account, Benistar shall have no further

25  obligation to the exchangor."

1    Q.    Okay.  One follow-up question:  The two places where

2    the funds may be used, A and B in Paragraph 3, do you

3    see that?

4    A.    Yes.

5    Q.    Did you at any point direct Benistar to direct the

6    money to anyplace other than A or B?

7              MR. PAPPALARDO:  Objection.

8              THE COURT:  Overruled.

9              You may answer that.

10             THE WITNESS:  No.

11   BY MR. MITCHELL:

12   Q.    Okay.  Let's turn to the next one, which is Number

13   12.  Okay.  Do you see that up there?

14   A.    Yes.

15   Q.    And you signed this agreement?

16   A.    Yes.

17   Q.    The date you signed it?

18   A.    13th day of September, 2000.

19   Q.    And is this one also signed by Martin Paley?

20   A.    Yes.

21   Q.    Could you -- I'm going to focus your attention on

22   the first two sentences of the second paragraph.  Do you

23   see those?

24   A.    Yes.

25   Q.    Would you read those?

1  A.    "Exchangor and intermediary expressly agree that any

2  cash proceeds received from the disposition of the

3  relinquished property shall be held and invested at

4  Merrill Lynch at the discretion and through financial

5  institutions of intermediary.  Interest accruing in said

6  account will accrue to the benefit of exchangor."

7  Q.    Okay.  All right.  Let's go to the next one, Exhibit

8  13.  Okay.  What's this one titled?

9  A.    "Benistar Property Exchange Trust Company, Inc.,

10  Merrill Lynch Private Client Group Account Selection

11  Form."

12  Q.    Okay.  And this document gives you the choice of

13  selecting between two accounts?

14  A.    Yes.  Between the 3 percent account or the 6 percent

15  account.

16  Q.    Okay.  Could you read for the jury the first one?

17  A.    "(3 percent per annum) Merrill Lynch Ready Asset

18  Money Market Account:

19      "Notice:  The above account can be liquidated the

20  next business day following 48' hours written notice."

21  Q.    Okay.  And would you read 6 percent?  6 percent.

22  A.    "(6 percent per annum) Merrill Lynch Investment

23  Account:

24      "Notice:  Interest will accrue as of the third day

25  after receipt.  The above account cannot be liquidated

1    without 30' days written notice, at which time the

2    interest rate will change to 3 percent until the account

3    is liquidated.  If funds are requested to be released

4    with less than 30' days written notice, the interest

5    will drop to 2 percent for the entire period the funds

6    are held."

7    Q.   Okay.  And how much money did you deposit?

8    A.   $3,287,190.

9    Q.   And you've selected the 6 percent account.  Why did

10   you do that?

11   A.   Because it's more than 3 percent.

12   Q.   Did you need your money in a period shorter than 30

13   days or longer than 30 days?

14   A.   With a property to be bought, the purchase and sale

15   agreement usually will require more than 30 days, the

16   closing, so it was easy to give 30 days' notice.

17   Q.   Okay.  And after you sold the New Boston Road

18   property, did you actually direct those funds to

19   Benistar?

20   A.   Well, I identified three properties for sale:  one

21   of them went to a purchase and sale agreement.  Benistar

22   sent a check for $50,000 to deposit on that agreement.

23   Q.   No, I mean the sale of the original property, the

24   property you described yesterday as the one you were

25   selling.  You, in fact, directed those funds to

1    Benistar?

2    A.    Yes.

3    Q.    Did you receive confirmation that those funds were

4    received by Benistar?

5    A.    Yes.

6    Q.    Okay.  And I'll have you turn to an exhibit that's

7    not admitted and not in the notebooks but on your

8    screen.  Can you turn to Exhibit 18?

9          MR. PAPPALARDO:  Objection, your Honor.

10         THE COURT:  Related to the document?

11         MR. PAPPALARDO:  Yes.  May we approach at

12   sidebar?

13         THE COURT:  All right.

14         (Discussion at sidebar and out of the hearing of

15   the jury:)

16         MR. PAPPALARDO:  I'm sorry.  What is Exhibit 18?

17         (Pause.)

18         MR. PAPPALARDO:  I'm sorry.  This isn't what I

19   thought it was.

20         THE COURT:  Could you preview it in the future

21   so we don't have to come up here again?

22         MR. PAPPALARDO:  Absolutely, your Honor.

23         What I would like to preview is the letter that

24   was referred to in the government's opening yesterday

25   which was a letter that was sent to Mr. Snider by an

PDF created with pdfFactory trial version www.pdffactory.com

1    attorney for Benistar in January.  Now, since he opened

2    with that, I'm assuming it may -- he may try to put that

3    in through this witness.

4            THE COURT:  What exhibit number?

5            MR. MITCHELL:  Twenty-three.

6            (Pause.)

7            THE COURT:  Okay.

8            MR. PAPPALARDO:  Okay?  Your Honor, we have an

9    objection to this.  Number one, it is complete rank

10   hearsay.  There is no basis upon which this letter can

11   go in against Mr. Carpenter.  You know, it is a letter;

12   it's an out-of-court statement being offered for its

13   truth, and there is no exception to the hearsay rule

14   that would allow this to come in.

15           I can expand on that.

16           MR. MITCHELL:  Same objection that was made at

17   the last trial.  And the Court let it in on the grounds

18   it shows an event -- it shows actions that led to the

19   event -- what happened to the money.

20           MR. PAPPALARDO:  It's still hearsay.  Your

21   Honor, if I may --

22           THE COURT:  Well, yeah, I think -- I'm not sure

23   what -- you have to believe it in order to understand

24   what the event describes; in other words, they're saying

25   a statement of fact, which is, Benistar is in the

1  process of attempting to resolve issues, for instance.

2  That's a statement of fact.  So I assume it's not for

3  the truth to prove that they're in the process of

4  attempting to resolve things.

5        I mean, I guess I don't understand what the

6  event is unless it accepts the truth of the statements.

7        MR. PIROZZOLO:  Notification.

8        THE COURT:  If there was a check or something

9  like that, it could be evidence of delivery, perhaps,

10  but this seems to be --

11        MR. MITCHELL:  It's also --

12        THE COURT:  -- about what's going on.

13        It's also evidence about what's going on.

14        MR. MITCHELL:  It's also a verbal act since it

15  puts him on notice that the money is no longer there.

16        THE COURT:  But that's a statement of fact:  The

17  money's no longer there.

18        MR. MITCHELL:  Okay.  I'll just ask him what he

19  was told.  I mean, it's just --

20        MR. PAPPALARDO:  Your Honor, if he asks him what

21  he was told, that's hearsay unless there's an exception.

22        THE COURT:  Unless it's somebody who can -- but

23  from whom?

24        MR. MITCHELL:  Well, this purports to be an

25  agent of the defendant as well.

1          MR. PAPPALARDO:  Where does it say that, your

2    Honor?

3          THE COURT:  That's, I think, the crux of the

4    question here.  He purports, on its face, to be an agent

5    of Benistar.

6          MR. PAPPALARDO:  Your Honor, there is no agency

7    established by this letter, period.  He's counsel to

8    Benistar; he's not counsel to Dan Carpenter.

9          THE COURT:  I understand that.  So the question

10   is whether an agent for Benistar is equivalent to an

11   agent for evidentiary purposes for Mr. Carpenter.

12   That's the question.  If you can establish that, you can

13   have it; if you can't, you can't.  Mr. Benistar and Mr.

14   Carpenter are different.  The party here is Mr.

15   Carpenter.  So if they're equivalent, for evidentiary

16   reasons, you can get it in; but if they're not, you

17   can't.

18         MR. MITCHELL:  Well, then I'll be able to prove

19   that up later through the testimony of Martin Paley and

20   Linda Jokinen, and that Dan Carpenter was Benistar:  Dan

21   Carpenter was the owner, the chairman; he controlled it

22   in every respect.  I mean, we proved it before --

23         THE COURT:  I think I'll have to hear it before

24   we get there.

25         MR. PAPPALARDO:  Your Honor, let me just state a

PDF created with pdfFactory trial version www.pdffactory.com

1    response to what Mr. Mitchell just said.  It may very

2    well be reported that Mr. Shuster is an agent of

3    Benistar.  Benistar is a separate entity.  It's a

4    corporation; it's a separate entity under the eyes of

5    the law.

6         The fact that Mr. Shuster is an agent of

7    Benistar doesn't mean he's an agent of Carpenter.  The

8    fact that Martin Paley is an agent of Benistar doesn't

9    make him an agent of Carpenter.

10         THE COURT:  I understand that.  The converse is,

11   he couldn't be an agent.  We have to hear the evidence

12   before --

13         MR. MITCHELL:  He could be both.

14         Okay.  So I mean, I can ask him, "Well, what

15   happened to your money?  Did you get your money back?"

16         MR. PAPPALARDO:  Well, your Honor, that raises

17   another issue, since we're at sidebar.  I don't know.

18   The Court said it was going to make a ruling as the

19   trial proceeded with respect to the issue of loss.  And

20   our view is very plain:  If he starts getting into the

21   issue of loss, then we can examine and we can introduce

22   evidence on what that loss was.

23         And we take the position, to remind the Court,

24   that loss, number one, is not an element of this crime;

25   number two, that to the extent that the government seeks

PDF created with pdfFactory trial version www.pdffactory.com

1    to introduce loss on the issue of state of mind on Dan

2    Carpenter back in September of 2000, we should be

3    permitted under any rule that I can think of to explain

4    that and to show that, number one, today there won't be

5    a loss -- or there's anticipated that there won't be a

6    loss because there's been a judgment that will more than

7    satisfy this; and, number two, either it's -- you know,

8    either it is relevant to the issue of intent or it is

9    not.

10           I'm just going to ask the Court --

11           THE COURT:  I don't think it is at this point.

12           MR. PAPPALARDO:  Fine.

13           MR. MITCHELL:  It's relevant to what we're doing

14    here, your Honor.  The point is:  He did not complete

15    the exchange.  None of these people completed their

16    exchange.

17           THE COURT:  The offense that's alleged is the

18    obtaining of the exchange proceeds by false pretenses.

19    You put some of that evidence in this morning, I

20    presume, about what the evidence was regarding the

21    security of the funds.  If you can show that the

22    defendant specifically intended exchangors, like Mr.

23    Snider, to be fooled into giving money under false

24    statements about security, you have the offense.  But

25    that's the offense, the giving of the money.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. MITCHELL:  Right.  But what I'm saying is,

2    again, it's part of -- this is consistent with a number

3    of the Court's rulings at the first trial.  It's

4    relevant to show the elements of the offense.  If the

5    jury is led to believe that he completed his exchange,

6    your Honor, that begs the question of --

7          THE COURT:  More relevant would be if you wanted

8    to show that somebody else before -- if you tie the

9    representations to the defendant, before the

10   representations were made to Snider, the defendant

11   already knew that somebody else's had failed, and

12   therefore, when the renewed representations were made in

13   September 2000 to Snider, there was guilty knowledge on

14   the part of the defendant which could support an

15   inference of specific intent.

16         But his subsequent loss has nothing to do with

17   the crime.  The crime was completed when Snider

18   entrusted the money based on false representations and

19   used the mails.  That's when the crime was committed.

20         MR. MITCHELL:  I understand that.

21         THE COURT:  And so it doesn't affect, good or

22   bad -- Snider's experience works out or doesn't work

23   out -- doesn't affect whether at the time he paid the

24   money it was obtained by fraud.

25         MR. MITCHELL:  I don't see -- it's relevant,

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   again, to show events, but I made that statement.  The
 2   other part of this is there's no prejudice in asking
 3   him, "Did you complete your exchange?"  He didn't
 4   complete his exchange.  I mean, if he had completed his
 5   exchange, we wouldn't be here today.
 6            THE COURT:  That's interesting, but no.  The
 7   objection will be sustained.
 8            MR. PAPPALARDO:  Thank you.
 9            (In open court:)
10            MR. MITCHELL:  May I have a moment, your Honor?
11            (Pause.)
12   BY MR. MITCHELL:
13   Q.   Okay.  When we left off, you were looking at Exhibit
14   18.  Do you recognize Exhibit 18?
15   A.   Yes.
16   Q.   What do you recognize it to be?
17   A.   It's an acknowledgment of receiving the money on
18   deposit and reminding me what some of the rules were for
19   its use.
20   Q.   Okay.  And when is it dated?
21   A.   September 21, 2000.
22   Q.   September 21, 2000.  Who is it from?
23   A.   Linda Jokinen.
24   Q.   And are there any attachments to this letter?
25   A.   Yes.  There's one called "Replacement Property
```

```
 1  Identification," and then "Identification of Real
 2  Property."
 3           MR. MITCHELL:  At this time the government would
 4  offer Government's 18.
 5           MR. PAPPALARDO:  No objection, your Honor.
 6           THE COURT:  All right.  It will be admitted.
 7           (Government's Exhibit No. 18 received into
 8  evidence.)
 9  BY MR. MITCHELL:
10  Q.   Okay.  I'm going to have you read just a little bit
11  from that.
12  A.   From 18?
13  Q.   From 18, yeah.  And this one is not in the binders.
14  All right.  So this is to you, Eliot Snider, at
15  Massachusetts Lumber Company.  Do you see that?
16  A.   Yes.
17  Q.   And the first paragraph, it says, "Thank you for
18  choosing Benistar"; is that correct?
19  A.   Yes.
20  Q.   All right.  Let me direct your attention down to the
21  last paragraph on that page.  Do you see that there?
22  A.   Yes.
23  Q.   Would you read that for us?
24  A.   "We have received $3,287,190 of sales proceeds which
25  we are holding for your benefit.  These funds are
```

PDF created with pdfFactory trial version www.pdffactory.com

1    accruing interest at 6 percent.  Remember that Benistar
2    needs written notice at a minimum of 30 calendar days to
3    forward any escrow funds held at 6 percent, three
4    business days for funds held at 3 percent."
5    Q.   Okay.  And let's just -- page 2 is the end of the
6    letter?
7    A.   Yes.
8    Q.   All right.  Page 3 of that exhibit is titled
9    "Replacement Property Identification"; is that correct?
10   A.   Yes.
11   Q.   And page 4 is a form?
12   A.   Yes.
13   Q.   Okay.  What is that form specifically?
14   A.   Provides for a description of the relinquished
15   property and identified three prospective properties
16   that I'm interested in buying, or acquiring.
17   Q.   Okay.  And did you notify Benistar of replacement
18   properties you were interested in?
19   A.   Yes.
20   Q.   Do you recall when you did that?
21   A.   Well, shortly thereafter, but I don't know when.
22   Q.   Okay.
23   A.   By letter.
24   Q.   And as part of the purchase and sale of those two
25   properties, did you place a deposit down?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    And how much was that deposit?

3    A.    $50,000.

4    Q.    Did you get that from Benistar?

5    A.    Yes.

6    Q.    And put that $50,000 deposit down?

7    A.    Yes.  It was on a purchase of a property in New

8    Hampshire.

9    Q.    Okay.  And after that -- after that $50,000 deposit

10   was sent to you by Benistar, what was the balance of the

11   money you had at Benistar, roughly?

12   A.    $3,237,000.

13   Q.    All right.  Did you complete your property exchange?

14          MR. PAPPALARDO:  Objection.

15          THE COURT:  Sustained.

16   BY MR. MITCHELL:

17   Q.    Okay.  Mr. Snider, are you familiar with stock

18   options?

19   A.    Yes.

20          MR. PAPPALARDO:  Objection.

21          THE COURT:  Well, that answer may stand.  What's

22   the next question?

23          MR. MITCHELL:  The next question is:  "Have you

24   ever invested in stock options?"

25          MR. PAPPALARDO:  Objection.

```
 1            THE COURT:  Sustained.
 2   BY MR. MITCHELL:
 3   Q.   Now, the exhibits in front of you, Mr. Snider,
 4   Exhibits 1 through 13, the ones we went through over the
 5   last day, would you show us in there where there is any
 6   mention of stock options?
 7            MR. PAPPALARDO:  Objection.  The documents speak
 8   for themselves.
 9            THE COURT:  The documents speak for themselves.
10   BY MR. MITCHELL:
11   Q.   Anybody say anything to you about stock options?
12            MR. PAPPALARDO:  Objection, your Honor.
13            THE COURT:  Sustained.
14   BY MR. MITCHELL:
15   Q.   Were you told that your money would be placed in
16   anything other than escrow?
17            MR. PAPPALARDO:  Objection.
18            THE COURT:  Sustained.
19   BY MR. MITCHELL:
20   Q.   Mr. Snider, how old are you?
21   A.   Eighty-seven.
22            MR. MITCHELL:  That's all I have.
23            MR. PAPPALARDO:  If I may inquire, your Honor?
24            THE COURT:  You may.
25            Are you going to be using -- this is the
```

1    defense's PC; is that what it's called?

2            MR. PAPPALARDO:  Quite possibly.

3                        CROSS-EXAMINATION

4    BY MR. PAPPALARDO:

5    Q.   Good morning, Mr. Snider.

6    A.   Good morning.

7    Q.   Sir, permit me to introduce myself.  My name is John

8    Pappalardo, and I am counsel to Mr. Carpenter.

9        Now, sir, you graduated from Harvard College; isn't

10   that correct?

11   A.   Yes.

12   Q.   And Harvard Business School?

13   A.   Yes.

14   Q.   And your MBA from Harvard is in business

15   administration; isn't that fair?

16   A.   Yes.

17   Q.   It's also fair to say that you're the sole owner of

18   Massachusetts Lumber Company?

19   A.   That's true.

20   Q.   And you have been in senior management there running

21   back to the 1950s, right?

22   A.   Correct.

23   Q.   And in addition to Mass. Lumber, you have

24   considerable other business experience.  Isn't that also

25   true?

1    A.    No.

2    Q.    No?  Have you served as president and owner of

3    Eastern Terminals, Inc.?

4    A.    Yes.

5    Q.    And you were also the director and officer of

6    Eastern Terminals, Inc., were you not?

7    A.    Yes.

8    Q.    And didn't you also serve as president and owner of

9    Richardson Dana & Company?

10   A.    That was a subsidiary; yes.

11   Q.    You wouldn't quarrel that you're an experienced

12   businessman, would you, sir?

13   A.    No.

14   Q.    Also, you were on the board of directors of Beth

15   Israel Hospital for 25 years; isn't that true?

16   A.    Approximately.

17   Q.    Now, sir, let's go to that book you have in front of

18   you.  Let's look at Exhibit 1.

19       I'm sorry.  Prior to doing that, you know Mr. Martin

20   Paley?

21   A.    Well, yes, I met him in connection with this

22   transaction.

23   Q.    Right.  And that was sometime in August/September of

24   2000?

25   A.    July and August, yes.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   July and August of 2000?   That was your first

2   contact with Mr. Paley?

3   A.   Yes.

4   Q.   And had Mr. Paley been recommended to you by

5   someone?

6   A.   Yes.

7   Q.   And that was your initial contact with Martin Paley,

8   right?

9   A.   Yes.

10   Q.   But you were very familiar with his family, weren't

11   you?

12   A.   Yes.

13   Q.   You certainly knew a member of his family -- a

14   number of his family, including his grandfather?

15   A.   Yes.

16   Q.   His father?

17   A.   Yes.

18   Q.   And his uncle?

19   A.   Yes.

20   Q.   In fact, Mr. Paley's grandfather you had done

21   business with; isn't that right?

22   A.   Correct.

23   Q.   And you also knew Martin Paley's father who you did

24   business with?

25   A.   Right.

```
 1   Q.   And you knew Martin Paley's uncle from sitting on
 2   the board of trustees at Beth Israel Hospital; isn't
 3   that correct?
 4   A.   Yes.
 5   Q.   And you knew all that before you met Martin Paley,
 6   right?
 7   A.   Correct.
 8   Q.   So after you received a recommendation to talk to
 9   Martin Paley about a 1031 exchange, you called and made
10   an arrangement to meet him; isn't that right?
11   A.   Right.
12   Q.   And that meeting took place in your office?
13   A.   Yes.
14   Q.   And at that time, the time of your initial meeting,
15   did he have materials for you?
16   A.   Yes.
17   Q.   And could you describe just generically those
18   materials?
19   A.   They're what's in this collection.
20   Q.   Okay.  Part of what was in that book?
21   A.   Yes.
22   Q.   Including Exhibit 1?
23   A.   Yes.
24   Q.   That's the -- it says on the first page of that that
25   "Benistar presents:  1031 tax-deferred property
```

PDF created with pdfFactory trial version www.pdffactory.com

1  exchanges to Eliot Snider," right?

2  A.   Correct.

3  Q.   And so certainly -- and you have a recollection of

4  receiving this material in your first meeting?

5  A.   Yes.

6  Q.   And this was how, sir, in a booklet or in a slide

7  show or a PowerPoint or what?

8  A.   It was on paper.

9  Q.   It was on paper?  Okay.  And that's paper that you

10 retained, of course, after the meeting?  He left that

11 with you?

12 A.   Of course.

13 Q.   And in your initial meeting Mr. Paley -- how long

14 after you called him did he show up at your office?

15 A.   I don't know.  A few days.

16 Q.   A few days.  And in your initial meeting he

17 explained to you that he was the president of Benistar

18 Property Exchange, right?

19 A.   Yes.

20 Q.   And he explained to you that he had a tremendous

21 amount of experience in the business of property

22 exchanges, did he not?

23 A.   Yes.

24 Q.   And he talked a little bit about Benistar, the

25 company, and extolled the virtues of the company, did he

1  not?

2  A.   Yes.

3  Q.   And he said he was extremely well qualified in the

4  business of being an intermediary, or words to that

5  effect; isn't that fair to say?

6  A.   He delivered that impression.

7  Q.   Certainly.   Certainly.

8       Now, in terms of the -- in terms of Exhibit 1, if

9  you look through this Exhibit 1, the first page --

10 second page -- the second page talks about what 1031 is,

11 right?

12 A.   Yup.

13 Q.   Is that fair to say?   At Slide 2?

14 A.   Yup.

15 Q.   And Slide 3 talks about, again, what a 1031 is and

16 the advantages of a 1031, right?

17 A.   Yes.

18 Q.   And Slide 4 talks about what property is eligible.

19 You would agree with that, sir?

20      And similarly -- would you not agree with that?

21 A.   Yes.

22 Q.   And Slide 5, "Types Of Exchanges"; Slide 6, "How

23 Does 1031 Work," the advantages to the investor; in

24 Slide 7, the "Advisor's Advantages" -- by the way, you

25 weren't interested in what an advisor's advantage was,

PDF created with pdfFactory trial version www.pdffactory.com

1    were you, at that time?

2    A.   I can't remember.

3    Q.   Well, let me put it this way, sir:  You weren't a

4    lawyer or an accountant who had clients who might be

5    interested in a 1031 exchange; you were interested in

6    the exchange; isn't that fair to say?

7    A.   After these last seven years, I feel like a lawyer

8    or an accountant.

9    Q.   Okay.  Now, sir, I can understand, and I would ask

10   you to answer my question.  At the time that you met

11   with Martin Paley in the summer of 2000, isn't it fair

12   to say that you were interested in the exchange and not

13   on behalf of someone else?

14   A.   Yes.

15   Q.   Okay.  And the next several slides talk about the

16   advantages, again, and they cite examples and, using

17   amounts, talk about qualified intermediaries, talk about

18   choosing an intermediary, right?

19   A.   Yup.

20   Q.   Okay.  Up until Slide 13 was there anything in this

21   packet that you learned for the first time?

22   A.   Probably.

23   Q.   And what might that be, sir?

24   A.   I don't know.

25   Q.   Okay.  Well, let's approach it this way:  At the

PDF created with pdfFactory trial version www.pdffactory.com

1    time you met with Martin Paley sometime in the summer of

2    2000, you were very familiar with 1031 exchanges, were

3    you not?

4    A.    No.   I had read about them.

5    Q.    You had read about them?

6    A.    Yes.

7    Q.    That's all?

8    A.    Yes.

9    Q.    Okay.   Up until that time, sir, prior to the time

10   you had met Martin Paley, had you ever engaged in a 1031

11   property exchange?

12   A.    No.

13   Q.    Okay.   On Slide 14 you highlighted during your

14   direct testimony that the intermediary should be bonded;

15   isn't that right?   Or at least the slide highlights

16   that.

17   A.    Well, I asked about bonding.

18   Q.    You asked about it?

19   A.    Yes.

20   Q.    And it's in this material, right?

21   A.    Yes.

22   Q.    Okay.   And let's look at Slide 15.   It talks about

23   over $100 million in property exchanges successfully

24   completed since 1995, right?

25   A.    That's what it says.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Right.  And did you learn, sir, that Benistar

2   Property Exchange Company started in October of 1998?

3   A.   Well, he brought up at some point that he had worked

4   for a different corporation.

5   Q.   Right.  Right.  Martin Paley had worked for

6   Nationwide Property Exchange prior to starting Benistar

7   Property Exchange, right?

8   A.   I think so.

9   Q.   And he's incorporating his past experience into

10   this -- these marketing materials, is he not?

11   A.   I know that now, yes.

12   Q.   He is.  Did you know it at the time, do you think?

13   A.   I'm not sure I did.

14   Q.   Okay.  But in any event, you knew that in 1998,

15   that's when Benistar started?

16   A.   No, I didn't.

17   Q.   Okay.  If you look at Slide 16 in the fourth section

18   there, does that refresh your memory that you probably

19   learned that from Mr. Paley?  "Recent acquisition in

20   1998 by Benistar, Limited"?

21   A.   That didn't say Benistar started then; that says he

22   added something else.

23   Q.   That's how you interpreted that, sir?

24   A.   Yes.

25   Q.   Okay.  Now, sir, with respect to that document,

1   Number 1 --

2   A.   Are you going back to Number 1?

3   Q.   No.   This is all Number 1, sir.   Exhibit 1, I should

4   say --

5   A.   Okay.

6   Q.   -- to be clear.   I'm sorry.

7        With respect to Exhibit No. 1, this is material that

8   was presented to you by Martin Paley, right?

9   A.   Yes.

10  Q.   When he presented that material to you, you reviewed

11  it; isn't that fair to say?

12  A.   I looked it over.

13  Q.   You asked questions pursuant to what was contained

14  in there?

15  A.   Probably.

16  Q.   And you viewed these -- this exhibit as essentially

17  marketing materials, right?

18  A.   Yes.

19  Q.   He was trying to sell you on Benistar Property

20  Exchange?

21  A.   He was offering me his service, yes.

22  Q.   Right.   Right.   Did you tell him you were consulting

23  with a potential competitor?

24  A.   Yes.

25  Q.   And so he was trying to explain to you why Benistar

PDF created with pdfFactory trial version www.pdffactory.com

1    would be a better value to you than a different firm?

2          MR. MITCHELL:  Objection as to what he knew

3    about what Mr. Paley was thinking.

4          THE COURT:  Well, sustained, that question.

5    BY MR. PAPPALARDO:

6    Q.   Sir, these are marketing materials, right?  Exhibit

7    1 is marketing materials?

8    A.   If you say so.

9    Q.   No, I'm asking you.  In your mind these are

10   marketing materials, sir?

11   A.   They're information.

12   Q.   Right.  It's not a contract, is it?

13   A.   No.

14   Q.   Okay.  They're basically information to enable you

15   to make an informed decision as to what it is that you

16   want to do in terms of the selection of a property

17   exchange company; isn't that fair to say, sir?

18   A.   Yes.

19   Q.   Okay.  Thank you.

20         Let's look at Exhibit 2.  This is the "Frequently

21   Asked Questions About 1031 Property Exchanges"?  You'd

22   view this to be in the same vein, would you not,

23   marketing materials, promotional documents?

24   A.   I suppose so.

25   Q.   Well, in any event, it's not a contract, is it, sir?

```
1   A.    No.

2   Q.    Same thing with Exhibit 3?   It's informational

3   marketing materials, not a contract?

4   A.    Yes.

5   Q.    Same thing with Exhibit 4?

6   A.    Yup.

7   Q.    Same thing with Exhibit 5?

8   A.    Well, this is true until you get to the ones with

9   signatures on them.

10  Q.    Okay.   And lastly, the same thing with Exhibit 6.

11  That's the series of articles -- or the one article in

12  the series of six parts written by Martin Paley, right?

13  A.    Five articles.

14  Q.    Or five articles.   I stand corrected, sir.   You're

15  right.   Five of five.

16  A.    Yes.

17  Q.    And that last piece extolls the virtues of Mr. Paley

18  as an experienced 1031 individual, right?

19  A.    Yes.

20  Q.    And you knew Mr. Paley wasn't a lawyer, didn't you?

21  A.    I never asked.

22  Q.    Well, did he hold himself out to be an attorney?

23  A.    No.

24  Q.    But you read these materials?

25  A.    I looked at them.
```

1  Q.   Okay.  You looked at them.  And based upon these

2  materials, in part, you formed an impression that you

3  wanted to go with Benistar; is that fair to say?

4  A.   Yes.

5  Q.   And you did that in conjunction with the meeting you

6  had with Mr. Paley; isn't that fair to say?

7  A.   Well, partially as a result of.

8  Q.   Okay.  What other components entered your mind other

9  than the meeting and these materials?

10  A.   Well, I had discussed it with another company; I

11  discussed it with Paley, the real estate service he

12  proposed to offer.  There were discussions.

13  Q.   And based upon that, you went with Benistar --

14  A.   Yes.

15  Q.   -- as you testified?

16  A.   Right.

17  Q.   Now, in any of these materials -- in any of these

18  promotional materials -- does Dan Carpenter's name

19  appear?

20  A.   Not that I know of.

21  Q.   During the presentation that was made by Martin

22  Paley with respect to these promotional materials during

23  that meeting that you had, did he mention Dan Carpenter?

24  A.   I can't remember when he mentioned him.  It might

25  have been then; it may have been later.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   It might have been then, might have been later?

 2   A.   Yeah.

 3   Q.   Is that your testimony, sir?

 4   A.   Yes.

 5   Q.   Okay.  Let me ask you this:  Do you have a specific

 6   recollection of him mentioning Dan Carpenter at all

 7   during that first meeting?

 8   A.   No.

 9   Q.   Isn't it fair to say that he didn't mention Dan

10   Carpenter at that meeting?

11   A.   I don't know.

12   Q.   Well --

13   A.   It is seven and a half years ago.

14   Q.   Yes, it is, sir.  Yes, it is.

15        Sir, do you remember testifying at a previous trial?

16   A.   Yes.

17          MR. PAPPALARDO:  May I approach the witness,

18   your Honor?

19          THE COURT:  All right.

20          (Pause.)

21   BY MR. PAPPALARDO:

22   Q.   Sir, I just want to show you something and ask you

23   to read it to yourself, please.  I'd ask you to read

24   that portion.

25   A.   "Correct" --
```

1    Q.    No, to yourself, sir.  To yourself.

2    A.    (Witness complies.)  Okay.

3    Q.    Now, sir, does that refresh your memory?

4    A.    It says I didn't mention Dan Carpenter.

5    Q.    It says you didn't even know Dan Carpenter existed;

6    isn't that fair to say?

7    A.    That's what it says.

8    Q.    And that was on July 12th of 2005, right?  I'm

9    sorry.  Let me --

10   A.    That was the trial -- yes; that's correct.

11   Q.    Is that fair?  July 12, 2005?

12   A.    Yeah.

13   Q.    And it's fair to say, sir, your memory was a little

14   bit better then than it is now?

15   A.    No.

16   Q.    Going back, sir, to the documents...

17            (Pause.)

18   BY MR. PAPPALARDO:

19   Q.    Let me ask you, sir, to direct your attention to

20   Exhibit 9.  Those are the two checks.

21   A.    Yes.

22   Q.    Now, you've testified that this -- these were two

23   checks that you caused to be issued to engage the

24   services of Benistar Property Exchange; isn't that

25   right?

1   A.   Yes.

2   Q.   And did you cause these checks to be delivered to

3   Martin Paley?

4   A.   I don't remember which way, but yes.

5   Q.   Okay.

6   A.   He acknowledged receiving them.

7   Q.   Yes, exactly.  But you delivered them to him, right?

8        And on -- and continuation on Exhibit 9, they were

9   deposited in a bank account in Newton Center,

10  Massachusetts; isn't that right?

11  A.   That's what it says.

12  Q.   Okay.  And we have no reason to disbelieve that,

13  right?

14  A.   (Nonverbal response.)

15  Q.   Sir, you were asked on direct examination about the

16  term "Safe Harbor" as it relates to 1031s.  Do you

17  recall that?

18  A.   No.

19  Q.   Let's turn to Exhibit 10.  This is the exchange

20  agreement?

21  A.   Yes.

22  Q.   And you've read through that for purposes of your

23  testimony today, and testified about that on direct

24  examination, right?

25  A.   Yes.

1    Q.   Let's move to Part C on page 2.  That would be under

2    2(c)?

3    A.   Yes.

4    Q.   You were asked questions about that.  And what --

5    this particular provision says that intermediary shall

6    hold the net proceeds of the property, right?

7    A.   Yes.

8    Q.   And thereafter, the exchangor shall instruct the

9    intermediary to acquire said replacement property on the

10   terms and conditions -- and that's what you did when you

11   received your $50,000 check, is it not?

12   A.   Yes.

13   Q.   And you were operating pursuant to the provisions of

14   that section?

15   A.   Yes.

16   Q.   Now, the $4,000 that is embodied in those two

17   checks, that was the fee for -- that you paid Benistar,

18   was it not?

19   A.   Yes.

20   Q.   And that was the entire fee arrangement that you had

21   with them, was it not?

22   A.   Yes.

23   Q.   And in exchange for that you deposited well over $3

24   million based upon the proceeds of your -- the sale of

25   your first property?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    Isn't that fair to say?

3    A.    Yes.

4    Q.    And you were to receive, according to the contracts,

5    a 6 percent interest -- a 6 percent return on your

6    proceeds, isn't that right, while the property was in

7    the control of Benistar?

8    A.    Yes.

9    Q.    That's what the contract provided for?

10   A.    Yes.

11   Q.    But there were no other fees as such that you

12   expected to pay Benistar out of your pocket, was there?

13   A.    Yes.

14   Q.    There was?

15   A.    No; you're right.

16   Q.    Okay.  Let's look at the Exchange Fee Agreement.

17   That would be Exhibit 12.

18   A.    Yes.

19   Q.    Okay.  You have that in front of you?  This recites

20   the $4,000 in the fee that you paid, in the first

21   paragraph, right?

22   A.    Right.

23   Q.    Okay.  Let's direct your attention to the second

24   full paragraph of that document.  And it says,

25   "Exchangor and intermediary expressly agree that any

PDF created with pdfFactory trial version www.pdffactory.com

1    cash proceeds received from the disposition of the

2    relinquished property" -- that's the property you sold,

3    right?

4    A.   Yes.

5    Q.   -- "shall be held and invested at Merrill Lynch" --

6    correct?

7    A.   Yes.

8    Q.   -- "at the discretion and through financial

9    institutions of intermediary."

10        Am I reading that correctly?

11   A.   Yes.

12   Q.   So you understood that to mean that these funds were

13   going to be invested at their discretion, did you not?

14   A.   I understood that they would be in an escrow account

15   at the Merrill Lynch private bank, from the other

16   papers --

17   Q.   Okay.

18   A.   -- at 6 percent.

19   Q.   Okay.  But -- and we'll get to that, sir.  We'll get

20   to that, sir.

21        But did you understand from this document that you

22   were -- because you signed this document and testified

23   to that, right?

24   A.   Yes.

25   Q.   And Mr. Paley signed on behalf of Benistar?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yes.

2   Q.   You understood that the funds would be held and

3   invested at Merrill Lynch, right?

4   A.   Yes.

5   Q.   At the discretion and through the financial

6   institutions of the intermediary?

7   A.   As an escrow account; yes.

8   Q.   Well, again, that's what this says, right?

9   A.   That's what it says.

10  Q.   So you knew it was going to be invested?  You knew

11  it was going to be invested and you knew that the

12  discretion for that investment was with the

13  intermediary; isn't that fair to say, sir?

14  A.   Yes; had to be.

15  Q.   And it further says, "Said investment accounts shall

16  be in the name of the intermediary and shall require the

17  signature of an authorized officer to permit the

18  withdrawal of any portion thereof"; isn't that fair to

19  say?

20  A.   That's what it says.

21  Q.   And that means the investment account shall be in

22  the name of Benistar, right?

23  A.   Had to be; yes.

24  Q.   And would require the signature of an authorized

25  officer of Benistar to permit the withdrawal of any

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   portion thereof.  Isn't that what it says?

 2   A.   That's what it says.

 3   Q.   So we could agree on that?

 4   A.   You're reading correctly.

 5   Q.   Thank you.

 6        Now, you signed this on the 13th of September of

 7   2000?

 8   A.   Yes.

 9   Q.   It appears to be signed by Mr. Paley on the -- on

10   August 10th?

11   A.   Yes.

12   Q.   Do you think that's just a misprint by Paley?

13   A.   I don't know.

14   Q.   But in any event, your memory was that it was around

15   September, because that's around the time of the checks,

16   right?

17   A.   Yes.

18        THE COURT:  Mr. Pappalardo, if you're finished

19   with that document --

20        MR. PAPPALARDO:  I am, your Honor.

21        THE COURT:  -- we'll take our morning recess.

22        THE CLERK:  All rise.  The Court will take the

23   morning recess.

24        (Jury out and recess in the proceedings at

25   11:06 a.m.)
```

```
 1              (After recess.)

 2              THE COURT:  Go ahead.

 3              MR. PAPPALARDO:  Thank you, your Honor.  Just

 4      one moment.

 5              (Discussion off the record.)

 6      BY MR. PAPPALARDO:

 7      Q.   Mr. Snider --

 8      A.   Yes.

 9      Q.   -- sir, I asked you a few moments ago whether you

10      understood the benefits of a 1031 exchange before

11      meeting with Martin Paley in 2000.  Do you recall that?

12      A.   Yes.

13      Q.   I asked you whether you had ever completed an

14      exchange before that?

15      A.   Yes.

16      Q.   Your answer was no?

17      A.   Under 1031, you said.  1031 was only about ten years

18      old then.

19      Q.   I said a property exchange, sir.

20      A.   You said under 1031, I thought.  I had completed a

21      property exchange earlier.

22      Q.   You had.  Okay.

23              And how much earlier.

24      A.   How what?

25      Q.   How -- sir, when did you complete your first
```

1   property exchange?

2   A.    Maybe 15 years before.

3   Q.    Before the meeting with Martin Paley?

4   A.    Yes.

5   Q.    And in fact, it had to do with the very same

6   property that was the subject matter of this exchange;

7   isn't that fair to say?

8   A.    That's true.

9   Q.    So you were very familiar with the benefits of a

10  property exchange?

11  A.    At different rules, yes.

12  Q.    Okay.  But the basic rules that if you were selling

13  a property and you didn't have another one to buy, you

14  had to give the money to a qualified intermediary until

15  one was selected and leave them with the discretion to

16  control those funds; isn't that fair to say?

17  A.    Not at the previous time.  No intermediary was used.

18  Q.    Okay.  And the benefit was to accept the -- to have

19  the benefit of the capital gains; isn't that right?

20  A.    Would you explain that?

21  Q.    The benefit of a property exchange is to save

22  approximately 20 percent?

23  A.    No, it's to defer it.

24  Q.    Right.  So you knew about the benefits of

25  deferring -- to obtain a tax deferral on land prior to

PDF created with pdfFactory trial version www.pdffactory.com

1  meeting with Martin Paley; isn't that fair to say?

2  A.   That's correct.

3  Q.   Okay.  And so all of that business in the first 13

4  slides of his presentation to you, you were familiar

5  with; isn't that fair to say?

6  A.   No, that's an exaggeration.

7  Q.   That's an exaggeration?

8  A.   Yeah.

9  Q.   Isn't it -- why did you select Benistar?

10 A.   I needed an intermediary.  I was very favorably

11 disposed, because of my familiarity with the other parts

12 of the family, Martin Paley was a nice, young guy who

13 came in and said he had good experience in this field,

14 and he offered me extra service of real estate location,

15 which was important to me.

16 Q.   And there wasn't anything in particular that Martin

17 Paley said to you that made you decide to go with

18 Benistar, was there?

19 A.   Nothing in particular, just everything in general.

20 Q.   And after meeting with Mr. Martin Paley and

21 reviewing his marketing materials, which suggested that

22 anybody engaging or contemplating these transactions

23 should consult with counsel, did you do that?

24 A.   I don't think so, and I don't think that's what it

25 said.

```
 1   Q.   Did you consult with counsel in connection with this

 2   transaction?

 3   A.   Not to my recollection.

 4   Q.   Does it refresh your memory that you consulted with

 5   the law firm of Testa Hurwitz & Thibault?

 6   A.   I had a lot of business with Testa Hurwitz back

 7   then, yes.

 8   Q.   In connection with this particular exchange?

 9   A.   I can't remember that.

10   Q.   Was there -- did you take Mr. Paley at face value?

11   A.   Whatever that is, yes.

12   Q.   You were impressed with his materials?

13   A.   I liked him.

14   Q.   You liked him.  And in part, you liked him because

15   you knew his family?

16   A.   Yes.

17   Q.   Let's turn, sir, to Exhibit 13, which is the account

18   selection form.

19        Do you have that in front of you, sir?

20   A.   Yes.

21   Q.   Okay.  And this was signed by you on the 14th of

22   September of 2000, right?

23   A.   Yes.

24   Q.   And you elected the six percent choice, right?

25   A.   Right.
```

```
 1   Q.   And -- if you could put that on the screen, please.

 2         (Discussion off the record.)

 3   Q.   Okay.  With respect to this document, Exhibit 13,

 4   you know that the six percent investment account is not

 5   a money market account, don't you?

 6   A.   Yes.

 7   Q.   It says that, right?

 8   A.   If you say so.

 9   Q.   Sir, what I say is really of no relevance here, it's

10   what you say that counts.

11   A.   It doesn't say it's a money market account or not

12   one.

13   Q.   No, but the three percent does say that, right?

14   A.   Right.

15   Q.   This particular document says that you've elected

16   for six percent, and when you make this election, it

17   notifies you that this account cannot be liquidated

18   without 30 days' written notice; isn't that fair to say?

19   A.   Yes.

20   Q.   And that's consistent with it being an investment

21   account, the securities account, is it not?

22   A.   Yeah, like in bank CDs or something like that.

23   Q.   And my question is:  Not liquidating it within 30

24   days is consistent with it being an investment account

25   in a securities account, is it not?
```

1  A.    No, it's not.  It's consistent with its being an

2  investment in an account suitable for an escrow account

3  that has a maximum life of six months.

4  Q.   Are you saying this language is not consistent with

5  an investment account?

6  A.    It depends on your definition of an investment

7  account.

8  Q.    Sir, my definition of an investment account was what

9  we covered before the break, which was contained in your

10  agreement.  If you could just, again, sir, turn to

11  Exhibit 10, paragraph 10.

12        Do you see that, sir?

13  A.    Yes.

14  Q.    Okay.  This is the agreement that you signed?

15  A.    Yes.

16  Q.    And it says, "The funds, the disposition of the

17  relinquished property shall be held and invested with

18  Merrill Lynch Private Client Group."  Right?

19  A.    Right.

20  Q.    "In either an asset money market account, or a six

21  percent per annum in a Merrill Lynch investment

22  account."  Correct?

23  A.    That's what it says.

24  Q.    And this is the document you signed?

25  A.    Yes.

1   Q.   Okay.  Let's go back, again, to -- let's go back to

2   Exhibit 13.

3        My question to you, sir, again, is:  Your

4   election of six percent has a provision that there's a

5   30-day notice for liquidation, right?

6   A.   Yes.

7   Q.   And that is consistent with this being an investment

8   account, is it not?

9   A.   Well, that part's consistent, but this is an

10  investment account of an escrow account --

11  Q.   And we will get to that.

12  A.   -- with a short life.

13  Q.   Sir, please, just answer my questions and we will

14  get to this.

15  A.   I said yes.

16  Q.   So -- and the reason for that is because an

17  investment account requires time and notice in order to

18  liquidate, unlike a money market account; isn't that

19  fair to say?

20  A.   No, not necessarily at all.  If it were in stocks,

21  it could be sold the next day.

22  Q.   They could be, but not necessarily, right?  That's

23  why -- I mean, you would agree with me, sir, that the

24  issue is liquidity, right?

25       MR. MITCHELL:  I would object to that question.

PDF created with pdfFactory trial version www.pdffactory.com

1    I don't know what issue he's talking about.

2          THE COURT:  Sustained to the form of that.

3          MR. PAPPALARDO:  Okay.

4    BY MR. PAPPALARDO:

5    Q.   If it were a bank account, sir, you could liquidate

6    it in a minute, right?

7    A.   If it's a deposit account, yes.

8    Q.   Right.  And if it were -- if it were a money market

9    account, you could liquidate it almost instantaneously;

10   isn't that fair to say?

11   A.   Yes.

12   Q.   And that's reflected in this document.  It says the

13   next business day, right?

14   A.   Yes.

15   Q.   Okay.  And again, if it were an investment account,

16   investments take time, in some cases, to liquidate, and

17   that's why there's a 30-day notice provision, isn't

18   there?

19         MR. MITCHELL:  Objection as to what -- why

20   certain provisions are in the document.

21         THE COURT:  Sustained.

22   BY MR. PAPPALARDO:

23   Q.   You knew this was an investment account, sir, right?

24   A.   Yes.

25   Q.   Okay.

1              (Pause.)

2    Q.   And by electing the six percent, you were

3    contracting to get a six percent return on the

4    investment that was held; isn't that fair to say?

5    A.   That's what it says.

6    Q.   And let's look again at Exhibit 10, paragraph 10.

7    By electing the six percent per annum, you understand

8    that that six percent per annum is going to be in a

9    Merrill Lynch investment account, right?

10   A.   That's what it says.   It doesn't define investment

11   account, though.

12   Q.   It doesn't, you're right.   But it says "investment

13   account."

14          And also, by the way, on this document, Exhibit

15   10, the Exchange Agreement, I want to direct your

16   attention to paragraph 20.

17          Could we highlight that, please?

18          This, sir, is an integration clause.   You're

19   familiar with those, are you not?

20   A.   No.

21   Q.   You're not.   Okay, well, let's read it.

22          It says that this is the entire agreement,

23   right?   That's what it says.

24   A.   That's what it says.

25   Q.   This is the contract you signed, right?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Right.

2   Q.   "This agreement contains the entire agreement of the

3   parties hereto, and supersedes any prior written or oral

4   agreement between them" -- meaning the parties --

5   "concerning the subject matter contained herein.  There

6   are no representations, agreements, arrangements or

7   understandings, oral or written, between the parties

8   hereto relating to the subject matter contained in this

9   agreement which are not fully expressed herein."

10          Do you understand that, sir?

11  A.   That's what it says.

12  Q.   That's what it says.

13          Do you understand that, sir?

14  A.   Yes.

15  Q.   And did you understand that at the time you signed

16  this document?

17  A.   That's a standard clause.  Yes.

18  Q.   It is a standard clause?

19  A.   Yeah.

20  Q.   And what it means is that anything said to you is

21  outside of this contract?

22          MR. MITCHELL:  Objection.

23  BY MR. PAPPALARDO:

24  Q.   If it's not contained in this contract; isn't that

25  fair to say?

```
 1            THE COURT:  You may answer it.

 2            You may answer.

 3   A.   Yes.

 4   Q.   And this is what you agreed to?

 5   A.   Yes, without a definition of investment account.

 6   Q.   Okay.  Well, sir, an investment account in this

 7   document, if you go back to -- if you go back to

 8   paragraph 10, is something that is designed to give you

 9   six percent return on your money; isn't that right?

10   A.   Yes.

11   Q.   It doesn't specify what kind of investment, does it?

12   A.   Does not.

13   Q.   It does not.

14            It doesn't specify the nature of the investment,

15   does it?

16   A.   Correct.

17   Q.   Now, sir, you're a sophisticated businessman with a

18   Harvard MBA; isn't that fair to say?

19   A.   So far.

20   Q.   You are, sir, trust me on that.

21            The point is, the point is, investment accounts

22   include accounts that have a degree of risk attached to

23   them, do they not.

24   A.   Not necessarily.

25   Q.   Please listen to my question.
```

```
 1          Investment accounts include such accounts that
 2     have a degree of risk.  Not all investment accounts have
 3     the same degree of risk, but investment accounts have
 4     risk, don't they?
 5     A.   No investment account I've ever heard of
 6     contemplates losing $3 million in 90 days on puts,
 7     calls, and options.  This is not --
 8          MR. PAPPALARDO:  Your Honor, I object, and I
 9     move to strike.
10          THE COURT:  I'll strike the answer.  Put the
11     question.
12     A.   All right.  My feeling is this is not an investment
13     account as operated.
14          THE COURT:  Mr. Snider, you just have to respond
15     to the questions that are asked.
16          MR. PAPPALARDO:  Can we have the question read
17     back, your Honor?
18          THE COURT:  All right.  Can you read the
19     question back, line 5?
20          (Record read.)
21     A.   Yes.
22     Q.   They do.
23          And you knew investment accounts had risk when
24     you signed onto this contract, didn't you.
25     A.   Yes.
```

1    Q.    Let's look at the Escrow Agreement.

2    A.    What number is that?

3    Q.    That, sir, is Exhibit 11.

4          Do you have that before you, sir?

5    A.    Yes.

6    Q.    I want to direct your attention to the third

7    paragraph of this agreement.

8          May that be highlighted, please?

9          In this agreement, it states, "whereas the

10   exchangor" -- that would be you, sir?

11   A.    Yes.

12   Q.    -- "will be depositing with Benistar an amount of

13   funds to be deposited in the Benistar accounts" -- in

14   the plural, right?

15   A.    Yes.

16   Q.    -- at Merrill Lynch Private Client Group, Fifth

17   Avenue, New York."

18         So you understood at that time, the time you

19   signed this agreement, that it would be in the Benistar

20   accounts; isn't that fair to say?

21   A.    Yes, as an escrow.

22   Q.    Okay.  We're getting to that.

23   A.    Okay.

24         Look at point number two.  It says, "Benistar

25   shall have full control over the exchangor's funds to

1    invest as the exchangor directs in either the three

2    percent Ready Asset Money Market Fund or the six percent

3    investment account;" is that fair to say, sir?

4    A.    That's what it says.

5    Q.    Right.  And it says -- when you signed this

6    document, you conferred to Benistar full control over

7    your funds?

8    A.    That's required by 1031.

9    Q.    Absolutely.  No, you're absolutely right, sir.  In

10   order to avail yourself of the tax deferral advantage,

11   you had do that.  We understand that.  But the point is,

12   you did do it?

13   A.    As an Escrow Agreement.

14   Q.    Yes.  And it says, "Benistar shall have full control

15   to invest the funds as the exchangor directs," and what

16   that refers to is either the three percent or the six

17   percent, right?

18   A.    Yes.

19   Q.    And you elected the six percent investment account?

20   A.    Yes.

21   Q.    So you directed them, that is, Benistar, to invest

22   your money into a six percent investment account --

23   A.    Yes.

24   Q.    -- knowing that that account had risk?

25   A.    That's your definition.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Didn't you say a moment ago --

2  A.   An escrow account does not have much risk.

3  Q.   Oh, sir, let's take -- okay.

4       What is your understanding of escrow, sir?

5  A.   My understanding of escrow is safekeeping during a

6  limited period of time for a specific purpose.

7  Q.   Is that your understanding?

8  A.   Yes.

9  Q.   Isn't your understanding something in suspense,

10 apart from everything else, separated, a holding place

11 for money?  Isn't that your understanding, sir?

12 A.   I don't understand what you just said.

13 Q.   Isn't your understanding, sir, an escrow account is

14 a deposit account that's waiting, somebody taking care

15 of the money for somebody else?

16 A.   Yes.

17 Q.   Okay.  And would you agree with me, sir, that there

18 are different types of escrow accounts?

19 A.   Probably.

20 Q.   And there are some escrow accounts where money is

21 kept in a bank in a deposit account, right?

22 A.   Okay.

23 Q.   You would agree with that?

24 A.   Yes.

25 Q.   There are some escrow accounts where money is put

PDF created with pdfFactory trial version www.pdffactory.com

1   into a CD for a period of time?

2   A.   Yes.

3   Q.   There are some escrow accounts that money is put

4   into a different vehicle pursuant to the Escrow

5   Agreement?

6   A.   If you say so.

7   Q.   No, sir --

8   A.   You asked me if I know.

9   Q.   If you know?

10  A.   No.

11  Q.   You don't?

12  A.   No.

13  Q.   Well, this escrow account (sic.), sir, the one that

14  you signed, said that the money would be in an

15  investment account; isn't that fair to say?

16  A.   Yes.

17  Q.   And that's not a money market account.  In fact, you

18  specifically didn't take the money market account?

19  A.   No, but at that time, money market accounts were

20  yielding five-and-a-half, so six was not very far off.

21  Q.   Sir, the point is --

22  A.   I'm explaining my thinking.

23  Q.   And my question is this:  You elected to put your

24  money and contracted to put your money into an

25  investment account; isn't that fair to say?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    And you elected to grant to Benistar the complete

3    discretion to invest those funds, did you not?

4    A.    As required, I did.

5    Q.    Well, you could have specified, could you not -- you

6    could agree to anything, and you could specify that I

7    want my money in a savings account.  You could have

8    specified that, couldn't you?

9    A.    I don't know.

10   Q.    Of course you could.

11   A.    Well, if you say so.

12          MR. MITCHELL:  This is getting argumentative.

13          THE COURT:  Yes, it is getting argumentative.

14   BY MR. PAPPALARDO:

15   Q.    Sir, you knew it was an investment account, you knew

16   an investment account had risk?

17          MR. MITCHELL:  It's a compound question.

18          THE COURT:  I think we've been over it.

19          MR. PAPPALARDO:  We have, your Honor.  Thank

20   you.

21   BY MR. PAPPALARDO:

22   Q.    Sir, were the terms of these documents at all

23   ambiguous to you when you signed them?

24   A.    Not that I recall.

25   Q.    So you knew what you were doing?

1  A.   I hope so.

2  Q.   Did you do anything to check out Mr. Paley's

3  background?

4  A.   I can't recall.  I thought I asked somebody about

5  him, but I don't recall the conversation.

6  Q.   Did you do anything to check out Benistar?

7  A.   No, I accepted these documents.

8  Q.   And you accepted what Marty Paley told you?

9  A.   Yes.

10  Q.   Did you provide these documents to Testa Hurwitz and

11  say, Please review them and advise me?

12         MR. MITCHELL:   Objection.

13         THE COURT:  You may answer.

14         MR. MITCHELL:  It may be privileged.

15         MR. PAPPALARDO:  It's yes or no, your Honor.

16         THE COURT:  Just whether or not he did.  It may

17  be answered.

18         THE WITNESS:  I couldn't hear that.

19         THE COURT:  You may answer whether or not you

20  did present the documents --

21  A.   Not that I recall.

22  Q.   Did you seek any professional advice from any third

23  person, accountant, attorney, or anyone with respect to

24  the language of these documents, sir?

25  A.   I don't recall any.

1    Q.    Sir, you said you were concerned about the security

2    of your money, right?

3    A.    Yes.

4    Q.    And you testified on direct examination that you

5    asked Marty Paley to provide to you a bond?

6    A.    Yes.

7    Q.    In fact, that's an exhibit in this case, right?

8    A.    Yes.

9    Q.    And he sent it to you?

10   A.    Yes.

11   Q.    And did you feel secure?

12   A.    It helped.

13            (Discussion off the record.)

14   Q.    Sir, could you please look at Exhibit 7?

15   A.    Yes.

16   Q.    And when you received that from Mr. Paley, you read

17   it?

18   A.    Yes.

19   Q.    And you wanted to make sure that if there was some

20   occurrence here, that you had a measure of protection;

21   isn't that right?

22   A.    Yes.

23   Q.    Okay.  I want to direct your attention, sir, to item

24   4 in Exhibit 7.

25            If you could highlight that.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              It's on the first page, item 4.
 2    A.   Yes.
 3    Q.   Do you see where it says, "securities"?
 4    A.   Under item 4?
 5    Q.   Yes.
 6              (Pause.)
 7    A.   No.
 8    Q.   On the first page, sir -- not on the cover sheet,
 9    not on the fax cover sheet, on the first page of the
10    document.
11    A.   Yes.
12    Q.   Maybe it's on the screen.  Does that help you?
13    A.   It's the same paragraph.
14              I don't see anything about securities.
15    Q.   Okay.  Do you see where it says, "Subject to
16    sections 4 and 11 hereof" -- in the middle of that box
17    it says, "the amount is applicable" -- "amount" meaning
18    the loss liability, single loss deductible -- "the
19    amount is applicable to, D, forgery or alteration; E,
20    securities."  Do you see that?
21    A.   No.
22              MR. PAPPALARDO:  If I may approach, your Honor.
23              THE COURT:  All right.
24    A.   Yes, I do see it.
25    Q.   Okay.  You see that?
```

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    Yes.

2  Q.    Under "securities," it says that this bond is not

3  covered, right?

4  A.    Right.

5  Q.    Did you know that then, sir?  Did you read this when

6  you got it?

7  A.    I assume I saw it if it was there.  But I didn't

8  anticipate this would be in securities.

9  Q.    Well, sir, you gave Benistar complete and full

10  discretion to invest your proceeds in whatever they saw

11  fit?

12        MR. MITCHELL:   It's been asked and answered

13  several times at this point.

14        THE COURT:   Yes, sustained.

15  BY MR. PAPPALARDO:

16  Q.    And you didn't anticipate that would be securities?

17  A.    No.

18  Q.    Well, you would agree with me, sir, that securities

19  are investments?

20  A.    Yes.

21  Q.    So it's a subset of the word "investment"?

22  A.    Okay.

23  Q.    Now, in all these marketing materials, they all had

24  Mr. Paley's name on them, right?

25  A.    Yes.

1  Q.  They all have Mr. Paley's address on them, right?

2  A.  They have the address of Benistar in Newton, yeah.

3  Q.  Right.  And that's Mr. Paley's address, Benistar in

4  Newton?

5  A.  Yes.

6  Q.  They have his e-mail?

7  A.  I didn't use it, but okay.

8  Q.  But it's on every page, right?

9  A.  I guess.

10  Q.  Look at it.  I don't want you to guess, sir.

11  A.  Say yes; it doesn't matter to me.

12  Q.  But it matters to us, sir.

13  A.  Okay.

14  Q.  If you look at the bottom of page -- look at Exhibit

15  1, the bottom.

16  A.  Okay, it's there.

17  Q.  Right.  And it has his address in Newton, has his

18  phone number, it has the Benistar website?

19  A.  That's the Benistar Property Exchange Trust Company

20  address, not Mr. Paley's.

21  Q.  Sir, did you meet -- did you understand Mr. Paley to

22  have his office address at 233 --

23  A.  I did.

24  Q.  -- Needham Street in Newton?

25  A.  Yes.

1    Q.   So Mr. Paley was the president of Benistar Property

2    Exchange, was he not?

3    A.   Yes.

4    Q.   And that's where his office was?

5    A.   Yes.

6    Q.   And this is his e-mail?

7    A.   Okay.

8    Q.   Okay.  And nowhere in these materials does it say

9    Dan Carpenter; isn't that fair to say?

10   A.   Yes.

11   Q.   And nowhere in the documents that are applicable to

12   this case --

13          MR. PAPPALARDO:  Strike that, your Honor, strike

14   it.

15   BY MR. PAPPALARDO:

16   Q.   Nowhere in the contracts, sir, nowhere in the

17   contracts does Dan Carpenter's name come in?

18   A.   That seems to be correct.

19   Q.   And you didn't meet with Dan Carpenter at any point

20   in time prior to engaging Benistar Property Exchange,

21   did you, sir?

22   A.   No.

23   Q.   You didn't even know he existed; isn't that fair to

24   say?

25   A.   I can't remember when I first became aware of his

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   existence.
 2   Q.   But it certainly wasn't at the time you engaged in
 3   these contracts, was it, sir?
 4   A.   At the time they were discussed, I don't think so.
 5            MR. PAPPALARDO:  One moment, your Honor.
 6            (Pause.)
 7   BY MR. PAPPALARDO:
 8   Q.   Sir, are you familiar with linked accounts?
 9   A.   No.
10   Q.   You don't know what that means?
11   A.   No.
12   Q.   Okay.  Did you provide any of these materials,
13   whether they be the marketing, promotional materials or
14   these contract documents, to any professional before
15   they were signed by you?
16   A.   I don't think so.
17            (Pause.)
18   Q.   By the way, the Mr. Winkler you spoke to, he worked
19   at the same address as Mr. Paley, right?
20   A.   Yes.
21   Q.   In Newton?
22            Ms. Jokinen, she worked there, too?
23   A.   Yes.
24            MR. PAPPALARDO:  Can we have one moment, your
25   Honor?
```

PDF created with pdfFactory trial version www.pdffactory.com

1          (Discussion off the record.)

2          MR. PAPPALARDO:  That's all, your Honor.

3          THE COURT:  Mr. Mitchell.

4          MR. MITCHELL:  Very briefly, your Honor, I just

5     have a quick handful of follow-up questions.

6                    REDIRECT EXAMINATION

7     BY MR. MITCHELL:

8     Q.   Mr. Snider, do you remember on direct Mr. Pappalardo

9     was asking you a series of questions about your

10    interaction with Mr. Paley and your decision ultimately

11    to go with him?

12    A.   Yes.

13    Q.   Do you remember that Mr. Pappalardo asked you,

14    quote, what other components entered your mind?  Do you

15    remember that question?

16    A.   No.

17    Q.   Do you remember Mr. Pappalardo asking you what else

18    influenced your thinking?

19    A.   In making the decision?

20    Q.   Yes.

21    A.   Yeah.

22    Q.   Okay.  Did it enter your mind that your money would

23    be traded in stock options?

24          MR. PAPPALARDO:  Objection, your Honor.

25          THE COURT:  Overruled.  He may answer that.

```
 1              MR. PAPPALARDO:  May we be heard on that, your
 2    Honor?
 3              THE COURT:  No.
 4              Answer that question.
 5    BY MR. MITCHELL:
 6    Q.   Did it enter your mind, Mr. Snider, that your money
 7    would be taken by Benistar and traded in stock options?
 8    A.   That would be about the furthest thing from my mind
 9    that I can think of.
10    Q.   Do you remember Mr. Pappalardo asked you about
11    Exhibit 12?
12              Just take a quick look at that, if you would.
13              (Pause.)
14    A.   Yes.
15    Q.   Do you remember he asked you about your
16    understanding of Exhibit 12?
17    A.   Yes.
18    Q.   Did your understanding of the word "investment"
19    include stock options?
20    A.   Never.
21              MR. PAPPALARDO:  Objection, your Honor.
22              THE COURT:  Overruled.
23    BY MR. MITCHELL:
24    Q.   I'm going to have you look at Exhibit 23, if you
25    could.  It's the last one.
```

1  A.   Yes.

2  Q.   Do you recognize Exhibit 23?

3  A.   Yes.  It was a letter I received --

4  Q.   Without telling us what it is, do you recognize

5  Exhibit 23?

6  A.   Yes.

7  Q.   Without telling us what it says, is that a letter

8  you received?

9  A.   It says, "We regret" --

10          MR. PAPPALARDO:  Objection.

11  BY MR. MITCHELL:

12  Q.   Hold on.  The question is:  Is that a letter you

13  received?

14  A.   Yes.

15  Q.   Okay.  And what's the date of the letter?

16  A.   January 17, 2001.

17  Q.   Okay.  And you received the letter?

18  A.   Yes.

19          MR. MITCHELL:  All right.  That's all I have,

20  your Honor.

21          MR. PAPPALARDO:  Brief.

22          (Discussion off the record.)

23                    RECROSS-EXAMINATION

24  BY MR. PAPPALARDO:

25  Q.   Mr. Snider, in your experience, some Escrow

PDF created with pdfFactory trial version www.pdffactory.com

1    Agreements have no return in the agreement; isn't that

2    fair to say?  In other words, the money is parked and

3    there's no return?

4    A.   Probably.

5         MR. PAPPALARDO:  Thank you.

6         THE COURT:  All right.  Mr. Snider, thank you.

7    You're done, you may be excused.

8         MR. PIROZZOLO:  The United States calls Byron

9    Darling.

10        MR. PAPPALARDO:  Your Honor, may we approach on

11   this witness?

12        (At sidebar on the record.)

13        MR. PAPPALARDO:  Your Honor, I'm going to object

14   to this witness being called, and the basis for my

15   objection is his testimony in the first trial.

16        This witness will testify that in connection

17   with the exchange that is the subject matter of this

18   indictment -- first of all, take it a step back.

19        He never met with anybody from Benistar, Martin

20   Paley or anybody else.  He never received any

21   promotional materials.  He had a phone call with Martin

22   Paley several years before, which resulted in a

23   successful property exchange, and it was based on the

24   phone call -- he didn't receive marketing materials, he

25   didn't receive anything else.

PDF created with pdfFactory trial version www.pdffactory.com

1          With the exchange that's the subject matter of

2     this case, there was no contact.  He signed a document.

3     And I would suggest to you, given the nature of these

4     charges, that there was no inducement, there was no

5     contact, certainly at any point by Mr. Carpenter.

6          THE COURT:  Let me ask the government what it

7     expects to show through the witness.

8          MR. PIROZZOLO:  We're going to show through the

9     witness that he engaged Benistar Property.  First, he

10    spoke with Mr. Paley.  He did engage in a successful

11    property exchange.  It was not several years before, as

12    Mr. Pappalardo represents, it was in 1999.  And then he

13    had a second property exchange where he received the

14    same form agreements that are at issue, clearly at issue

15    with respect to the representations that are made in

16    those agreements as to how the money would be held and

17    kept.  He executed the agreements, he went through with

18    the property exchange.

19         The timing of the exchange is within the time

20    frame that the Court is focused.  It's in -- it's in the

21    late summer, early fall of 2000.

22         THE COURT:  So whatever misleading occurred,

23    occurred because of language in the documents that he

24    signed; is that what you're saying?

25         MR. PIROZZOLO:  Yes, it gets --

1          THE COURT:  That's your position?

2          MR. PIROZZOLO:  That's our position.

3          THE COURT:  Because Mr. Pappalardo said there

4    were no promotional materials.

5          MR. PIROZZOLO:  With this witness, there were no

6    promotional documents that were provided to this

7    witness.

8          THE COURT:  And no oral contact with Paley.

9          MR. PIROZZOLO:  With Paley, not with Carpenter.

10   Specifically he asked Mr. Paley would his money be safe,

11   and Mr. Paley represented to him that it would be, that

12   they were honorable people.

13         MR. PAPPALARDO:  And I just point out to the

14   Court, your Honor, that whatever contact occurred had to

15   do with the first exchange, not the second.  And I also

16   point out to the Court, again, with respect to the

17   honorable people and all of this stuff, your Honor,

18   Mr. Paley's representations, even if you assume, even

19   if -- even if you assume agency, which we vehemently

20   contest --

21         THE COURT:  I understand.

22         MR. PAPPALARDO:  Okay, his representations,

23   outside the scope of the documents is something that we

24   submit to you is not permitted because Paley will

25   testify that he was not authorized to say anything

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   beyond that.  So even if you assume an agency, it's

 2   beyond the scope of the agency.  And we suggest clearly

 3   there's no agency -- your Honor, the man is 92, I

 4   mean --

 5           THE COURT:  If it's a motion to exclude him,

 6   it's denied.  We'll take it to see how the evidence goes

 7   as it gets in.

 8           (End of discussion at the sidebar.)

 9           BYRON DARLING having been duly sworn by the

10   Clerk, was examined and testified as follows:

11           THE CLERK:  State your name, spell your last

12   name for the record, keep your voice up and speak into

13   the mic so everyone can hear you.

14           THE WITNESS:  Okay.  My name is Byron Darling,

15   B-y-r-o-n, D-a-r-l-i-n-g.

16           MR. PIROZZOLO:  Your Honor, may I approach?

17           THE COURT:  All right.

18                       DIRECT EXAMINATION

19   BY MR. PIROZZOLO:

20   Q.   Mr. Darling, here are some documents that we'll be

21   referring to during the examination.  Can you keep those

22   in front of you as we go along, please?

23   A.   Yes.

24   Q.   Mr. Darling, where do you live?

25           Where do you live?
```

1    A.    I live in Truro on Cape Cod.

2    Q.    For how long have you lived there?

3    A.    Probably 28 years.

4    Q.    In your own home?

5    A.    Yes.

6    Q.    How old are you, sir?

7          How old are you, Mr. Darling?

8    A.    I'm 92 years old.

9    Q.    Were you married?

10   A.    I'm a widower.

11   Q.    Are you retired?

12   A.    Yes.

13   Q.    How long have you been retired?

14   A.    Probably 35 years.

15   Q.    Before you retired, what did you do for work?

16   A.    Well, after the war, that's the Second World War, I

17   was a builder and did land subdivision, real estate

18   work.

19   Q.    Where did you serve in the war, sir?

20          Where did you serve in the war?

21   A.    Where?  Where did I serve?

22   Q.    Yes, sir.

23   A.    I served in -- you know, in the United States and in

24   England, France, Germany, Belgium.

25   Q.    Now, after the war, Mr. Darling, you said you became

1    a builder; is that correct?

2    A.    Yes, yes.

3    Q.    Can you describe what it was that you did as a

4    builder, Mr. Darling?

5    A.    Where did I build?

6    Q.    Yes, sir.

7    A.    In Stanford, Connecticut.

8    Q.    Now, Mr. Darling, at some point did you become

9    familiar with a company called Benistar Property

10    Exchange Trust Company?

11    A.    Yes, I did.

12    Q.    About when did you become familiar with that

13    company?

14    A.    I think it was probably in about '99, 1999.

15    Q.    What -- why did you become familiar with Benistar

16    Property?

17    A.    I was trying to find a method to make a tax-free

18    exchange on a property that I was selling, and my

19    attorney in Provincetown, Nancy Correia, I asked her if

20    she knew any such entity, and she said, I know the name

21    of one, but that's all I know about it.  And she gave me

22    the name of Benistar.

23    Q.    After you got the name Benistar from Ms. Correia,

24    what did you do next?

25    A.    Well, I got in touch with Benistar's

PDF created with pdfFactory trial version www.pdffactory.com

1    representatives.  I've forgotten where their office was,

2    but I got in touch with -- I spoke with a Linda Jokinen

3    and a Mr. Paley.

4    Q.   When you say you spoke with them, was that in person

5    or over the telephone?

6    A.   It was on the telephone.

7    Q.   When you -- on the telephone, when you spoke --

8    please describe what you discussed during the telephone

9    conversation.

10        MR. PAPPALARDO:  I have to object.

11        THE COURT:  Sustained.

12        MR. PIROZZOLO:  I'll withdraw it.

13   BY MR. PIROZZOLO:

14   Q.   When you spoke on the telephone, who did you speak

15   to first?

16   A.   I first spoke to Linda Jokinen, and then I spoke to

17   a Mr. Paley.

18   Q.   When you spoke to Mr. Paley, what did you say to him

19   and what did he say to you?

20        MR. PAPPALARDO:  I have to object, your Honor.

21        THE COURT:  Overruled.

22   A.   What did --

23   Q.   I'll rephrase the question.

24        When you spoke to Mr. Paley, what did you and he

25   speak about?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.    When did I receive --

 2   Q.    What did you and Mr. Paley discuss on the telephone?

 3   A.    Oh, we discussed the possibility of the tax-free

 4   exchange, and I asked questions about how safe the --

 5   the money would be that I turned over to Benistar.

 6   Q.    What did he say in response?

 7         MR. PAPPALARDO:  Objection, your Honor.

 8         THE COURT:  Overruled.

 9   BY MR. PIROZZOLO:

10   Q.    What did Mr. Paley tell you about that?

11   A.    He told me that -- I was particularly concerned

12   about the safety, of course, of the money, and he told

13   me that they were honorable people, he repeated that

14   several times, and the money would be perfectly safe.

15   Q.    Do you recall anything else about that conversation?

16   A.    Not really, only the concept of it being invested

17   and being secure.  Oh, he also, I believe, told me that

18   they were bonded.

19   Q.    After your conversation with Mr. Paley, did you

20   proceed -- did you hire Benistar?

21   A.    Did I perceive --

22   Q.    After you spoke with Mr. Paley, what did you do next

23   with Benistar?

24   A.    Well, I sent the money up.  I've forgotten whether I

25   sent it or whether it was sent by Nancy Correia, but I
```

PDF created with pdfFactory trial version www.pdffactory.com

1   sent the money out to Benistar.

2   Q.   Did that money relate to a property exchange?

3   A.   Did it remain --

4   Q.   Did the money relate to a property exchange?

5   A.   I'm sorry.

6   Q.   Why did you send the money to Benistar?

7   A.   Well, because I wanted to accomplish that tax-free

8   exchange, and I was satisfied that my money would be

9   secure.

10  Q.   Can you describe what the property was that related

11  to the exchange?

12  A.   The property was two vacant lots in Truro on --

13  along -- no, on the Tom's Hill Road Extension, and

14  they're about an acre-and-a-half, two acres altogether.

15  Q.   When was that property exchanged with Benistar?

16  A.   I believe it was in the beginning of 2000, the year.

17  Q.   Did you send money for the exchange to Benistar for

18  that exchange?

19  A.   Did I send money to Benistar?

20  Q.   Yes.

21  A.   Yes, yes.

22  Q.   And were you able to buy another property for that

23  exchange?

24  A.   Yes.  Later I bought a house on Long Nook Road in

25  Truro.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   And did you receive the money for that exchange?

2   A.   Yes.

3   Q.   From Benistar?

4   A.   Yes, yes, it was a satisfactorily arranged exchange.

5   Q.   Mr. Darling, did you proceed to do a second exchange

6   with Benistar?

7   A.   I'm sorry?

8   Q.   Mr. Darling, did you do another exchange?

9   A.   Yes, yes, I did.

10  Q.   Can you please describe the other exchange?

11  A.   The other property was in what is called downtown

12  Truro and it was vacant land with a commercial zoning

13  and the Truro conservation people approached me because

14  they wanted to buy it and I gave them a -- I gave them

15  an option for a year to buy for $325,000.

16  Q.   And did they come to you to exercise -- to buy the

17  property?

18  A.   Did --

19  Q.   Did the conservation trust come to buy the property.

20       Withdrawn, withdrawn.   Let me --

21  A.   I'm sorry.

22  Q.   Did you hire Benistar to do that exchange?

23  A.   Yes.

24  Q.   When?

25  A.   It was late 2000.

1    Q.    Who did you speak to at Benistar about that

2    exchange?

3    A.    I spoke first not about it, but Linda Jokinen

4    answered the phone and put me on with Mr. Paley.

5    Q.    What did you and Mr. Paley discuss on that occasion?

6             MR. PAPPALARDO:  Objection, your Honor.

7             THE COURT:  Overruled.

8    A.    When did we what?

9    Q.    What did you and Mr. Paley talk about on this second

10   exchange?

11   A.    We talked about it when I reached Mr. Paley through

12   Linda Jokinen, and he reiterated that they were -- in

13   fact, several times -- that they were honorable people

14   and that the money would be perfectly safe, and I guess

15   that's about it.

16   Q.    Did you sign any forms?

17   A.    Well, I'm sure I signed forms.  The -- you know,

18   they were sent to me, and I signed them.

19   Q.    Mr. Darling, could you open the folder and look at

20   the document that's marked number 51?  Do you see that?

21   A.    51, the Escrow Agreement.

22   Q.    Do you have that in front of you?

23   A.    Yes.

24   Q.    Can you look at the last page, the last page of that

25   document?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   Yes, yes.

 2   Q.   Is that your signature on the document?

 3   A.   Yes, it is.

 4   Q.   And the date of the signature?

 5   A.   The date?

 6   Q.   Yes, what is the date there?

 7   A.   The date is 8/28/2000.

 8        MR. PIROZZOLO:  The government would offer

 9   Exhibit 51, your Honor.

10        MR. PAPPALARDO:  One moment, your Honor.

11        (Pause.)

12        MR. PAPPALARDO:  If I may, your Honor.

13        (Discussion off the record.)

14        MR. PAPPALARDO:  Your Honor, may we approach?

15        THE COURT:  You may.

16        (At sidebar on the record.)

17        MR. PAPPALARDO:  Your Honor, there are a series

18   of documents that the government seeks to introduce

19   through this witness.  I would submit to you that, you

20   know, I don't have a problem with them leading him, I

21   don't have a problem, and we understand all of that.

22   The difficulty is this:  This document and subsequent

23   documents are not signed by Benistar.  They're -- they

24   may be signed by Mr. Darling -- I'm not sure whether he

25   can or can't identify it -- but the point is, there's no
```

1    connection to Benistar in terms of an executed document.

2    There's no connection to Mr. Carpenter, and you know,

3    your Honor, with all due respect, there was no phone

4    call for the second.  So I mean, we had testimony on

5    this before, but I have a real problem with the idea

6    that documents can come into evidence against

7    Mr. Carpenter when they're not even executed by

8    Benistar.

9         MR. PIROZZOLO:  This is the document that was

10   executed by the exchangor.  On both the representations

11   and what's set forth in the document, Mr. Darling sent

12   $322,000 to Benistar.  If there's some question as to

13   the authenticity as to whether this is actually the

14   agreement, the Court should take this de bene and we'll

15   be able to prove up the fact that the money was

16   transferred into the account and the authenticity of

17   this document will be satisfied.

18        Their objection, I think, goes to the weight of

19   the admissibility.

20        MR. PAPPALARDO:  Absolutely not, your Honor.  My

21   objection goes to the nexus of this defendant.  It's bad

22   enough that conversations have come in which are outside

23   the scope of any conceivable agency, which I submit to

24   the Court doesn't exist in the first place.  Having said

25   that, we're now -- the government seeks to introduce

PDF created with pdfFactory trial version www.pdffactory.com

1  documents that on their face have no connection to

2  Benistar.

3          THE COURT:  No, I don't think that's right; on

4  their face, they do.

5          MR. PAPPALARDO:  Okay, but they're not executed,

6  your Honor.

7          THE COURT:  That's right.

8          MR. PAPPALARDO:  That is not weight, with all

9  due respect to the Court.

10          THE COURT:  Well, the objection is overruled.  I

11  don't think they have -- if it were a contract case

12  here, they'd have to be bound by it.  This is not a

13  contract case.  This an event in the course -- the

14  government claims is in the course of a fraudulent

15  inducement.  Whether the case is made out that's

16  sufficiently tied to Benistar both from its face and

17  from the testimony -- at this point that is admissible.

18          MR. PIROZZOLO:  Thank you, your Honor.

19          (End of discussion at the sidebar.)

20          MR. PIROZZOLO:  Your Honor, the government

21  offers 51.

22          THE COURT:  All right.  51 is admitted.

23          (Exhibit 51 received in evidence.)

24          MR. PIROZZOLO:  May I publish?

25          THE COURT:  You may.

1   BY MR. PIROZZOLO:

2   Q.   Mr. Darling, do you have the document in front of

3   you?  Do you have Exhibit 51?  If you could put that in

4   front of you.

5          Actually, Mr. Darling, look at the document --

6          MR. PIROZZOLO:  May I approach, your Honor?

7          THE COURT:  Go ahead.

8   A.   Look at this?

9          Oh, okay.  Thank you.  Thank you.

10  Q.   Mr. Darling, that's the Escrow Agreement that you

11  signed, correct?

12  A.   Yes.

13  Q.   Could you look at the next document, number 52?

14         Do you have that in front of you, Mr. Darling?

15  A.   Yes, I do.

16  Q.   What are the top two words of that document?  Do you

17  see the top two words?  What are those?

18  A.   What is --

19  Q.   What does the top two words say of that document?

20  A.   It says, "Exchange Agreement."

21  Q.   Can you look at the last page of the document?

22  A.   Yes.

23         (Pause.)

24  Q.   Is that your signature on the document, Mr. Darling?

25  A.   Yes, it is.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   Can you look at the first page of the document,

 2   again?

 3            Can you look at the first, top line of the

 4   document, below the title?

 5   A.   Yes.

 6   Q.   Do you see the date?

 7   A.   August 28, 2000.

 8            MR. PIROZZOLO:  The government offers this

 9   exhibit, Exhibit 52.

10            MR. PAPPALARDO:  Same objection as sidebar.

11            THE COURT:  Okay.  The objection is noted but

12   overruled, and the document is admitted.

13            (Exhibit 52 received into evidence.)

14            MR. PIROZZOLO:  Your Honor, may I publish?

15            THE COURT:  You may.

16   BY MR. PIROZZOLO:

17   Q.   And Mr. Darling, is that the Exchange Agreement that

18   you signed for this second exchange --

19   A.   The second --

20   Q.   -- with Benistar?

21   A.   -- exchange, yes.

22   Q.   And can you turn back to Exhibit 51?  51.  The

23   Escrow Agreement.

24            Is that the Escrow Agreement that you signed in

25   connection with the second exchange?
```

1   A.   I'm sorry, I don't --

2   Q.   Is the Escrow Agreement the one you signed for the

3   second exchange?

4   A.   Escrow Agreement.

5   Q.   Is it for the second exchange?

6   A.   It's Exchange Agreement.

7   Q.   Right.  Is the Escrow Agreement for the second

8   exchange you did with Benistar?

9   A.   The Escrow Agreement, I believe it's for the first

10  exchange.  I'm not --

11          (Pause.)

12  A.   I --

13          (Pause.)

14  A.   Well, it must be for the second exchange.

15  Q.   Can you look at the next exhibit, number 53,

16  Mr. Darling?  53.

17  A.   53?

18  Q.   Yes, could you look at that, please?

19  A.   Yes.

20  Q.   Do you recognize what that document is?

21  A.   Yes.  It's a choice of interest rate return on the

22  money that Benistar would be holding.

23  Q.   Mr. Darling, is that your signature on the document?

24  A.   Yes.

25  Q.   And what's the date?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   The date is 8/22/2000.

 2        MR. PIROZZOLO:  The government offers Exhibit

 3   53.

 4        MR. PAPPALARDO:  Same objection.

 5        THE COURT:  Okay.  Overruled and admitted.

 6        (Exhibit 53 received into evidence.)

 7        MR. PIROZZOLO:  May I publish, your Honor?

 8        THE COURT:  Yes.

 9   BY MR. PIROZZOLO:

10   Q.   Mr. Darling, on that form, what did you elect for a

11   return?

12   A.   I checked six percent per annum.

13   Q.   Why did you do that?

14   A.   Because I didn't feel that I would need the money

15   in, you know, any great hurry, I guess.  There was no

16   urgency in the matter.

17   Q.   Mr. Darling, can you look at the next document in

18   the folder, Exhibit 58, please?

19        (Pause.)

20   A.   Yes.  Benistar Property Exchange Trust, a letter to

21   me.

22   Q.   That's a letter that you received?

23   A.   Yes.

24        MR. PIROZZOLO:  The government offers Exhibit

25   58, your Honor.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. PAPPALARDO:  No objection to that.

 2              THE COURT:  Okay.

 3              (Exhibit 58 received into evidence.)

 4              MR. PIROZZOLO:  May I publish?

 5              THE COURT:  You may.

 6     BY MR. PIROZZOLO:

 7     Q.   Mr. Darling, what is the date of the letter?

 8     A.   The date?

 9     Q.   Yes.

10     A.   September 21, 2000.

11     Q.   Can you look at the first paragraph of that letter?

12     Do you see that?

13     A.   Yes.

14     Q.   Can you read out loud, Mr. Darling, the first two

15     sentences of the letter, please?

16     A.   "Thank you very much for using Benistar Property

17     Exchange as your qualified intermediary.  We hope that

18     your transaction went smoothly.  You may call us at any

19     time whether you have another exchange or if you just

20     want more information about tax-deferred real estate

21     exchanges and their tax implications."

22     Q.   Can you look at the second paragraph of that letter?

23     Please look at the second paragraph of the letter.

24     A.   Yes.

25     Q.   And could you please read the first sentence of that
```

1  paragraph?

2  A.   "Please be aware that you have until 10/8/00 (45

3  days from 8/25/00 closing on the original property) to

4  identify a replacement property for the exchange."

5  Q.   Can you look at the very last paragraph of that

6  document?

7  A.   Yes.  Read it?

8  Q.   And read -- and read the paragraph, please?

9  A.   "We have received $322,290.35 of sales proceeds,

10 which we are holding for your benefit.  These funds are

11 accruing interest at six percent.  Remember that

12 Benistar needs written notice and a minimum of 30

13 calendar days to forward any escrow funds held at six

14 percent (three business days for funds held at three

15 percent)."

16 Q.   Mr. Darling, did you identify another property for

17 exchange?

18 A.   Identify --

19 Q.   Did you make an exchange?

20 A.   Yes -- oh, no, no, no.

21       MR. PIROZZOLO:  Your Honor, may I approach?  May

22 I approach sidebar, please?

23       THE COURT:  Okay.

24       (At sidebar on the record.)

25       MR. PIROZZOLO:  I just don't want to violate the

1    Court's ruling on this.  I was going to ask him why he

2    didn't go through with the exchange, and I just want to

3    make sure that that's going to be an acceptable

4    question.

5        THE COURT:  What will he say?

6        MR. PIROZZOLO:  He's going to say, first, that

7    the deal fell through; and then he's going to say that

8    he received a notice that he was not getting his money

9    back.

10        MR. PAPPALARDO:  And I would object, your Honor,

11    on the basis of relevance, it's not an element of the

12    crime; and on the basis of prejudice.  This has no --

13        I'm concerned about this witness, your Honor, in

14    terms of what he may say, given the Court's prior

15    position on this subject.

16        MR. PIROZZOLO:  What if I ask him did the deal

17    go through, and just leave it at that?

18        MR. PAPPALARDO:  It's irrelevant, your Honor,

19    whether the deal went through.  He --

20        THE COURT:  Well, it --

21        MR. PIROZZOLO:  I just don't want to --

22        THE COURT:  Well, why don't you answer that

23    objection.  What is your response to the objection that

24    it's not relevant?

25        MR. PIROZZOLO:  Whether or not there was money

1    to return to him is not relevant?  Why isn't that

2    relevant, the fact that there's not money to be returned

3    to him?

4           THE COURT:  Well, that's my question to you.

5    Why is it relevant to the offense?  Not to -- obviously

6    relevant to Mr. Darling, but the offense --

7           MR. PIROZZOLO:  The fact that Benistar was not

8    in a position to refund the money, to provide the money

9    for the exchanges, and it is the case, and it will be

10   shown, that Benistar was not in a position -- was in a

11   deficit position throughout this period of time --

12          THE DEFENDANT:  That's bullshit.

13          THE COURT:  Mr. Carpenter, if you can't control

14   yourself, I'll excuse you from these conferences.

15          MR. PIROZZOLO:  It's relevant to the state of

16   mind of the defendant at the time he was accepting the

17   funds.  If Benistar is not in a position -- is not in a

18   position to make payment, repayment to the exchangors

19   during the time he's accepting the money --

20          THE COURT:  Well, that was August, right?

21          MR. PIROZZOLO:  Correct.

22          MR. PAPPALARDO:  And that's not --

23          THE COURT:  If you can show that you knew that

24   he was not in a position to return the money in August

25   when he received it, I'd admit that.

PDF created with pdfFactory trial version www.pdffactory.com

1       MR. PIROZZOLO:  But the fact that he didn't

2  return the money in January is probative of the fact

3  that he was not in that position at the time.

4       THE COURT:  How?

5       MR. PIROZZOLO:  It tends to show he was not in

6  that position.

7       THE COURT:  Doesn't necessarily.

8       MR. PIROZZOLO:  Doesn't necessarily, but it does

9  tend to show that.

10      THE COURT:  No, it doesn't; it's speculative.

11 It might be -- I mean, you could have other evidence,

12 like investment account statements, which would tend to

13 show that there was some continuity, but why you

14 couldn't be solvent in August and not solvent in January

15 does not -- just proving they're not solvent in January

16 doesn't prove they're not solvent in August.

17      MR. MITCHELL:  Your Honor, can I -- at the risk

18 of running afoul of your two-lawyer rule.  One of the

19 things to consider is what was said by Mr. Pappalardo

20 during opening about how Paine Webber cut off his

21 trading privileges at a point where he supposedly was in

22 a position to back up the funds, opened up the fact that

23 there weren't funds in the account in December when all

24 of these people were preparing to get their money back.

25 It opened up on that issue.  They've put it in issue.

1          THE COURT:  Well, I don't know whether it did,

2     that doesn't respond to the immediate question, which

3     is, whether the evidence is admissible.  So without an

4     adequate proffer, I'll exclude it.

5          MR. PIROZZOLO:  Okay.  Thank you.

6          MR. MITCHELL:  By the way, your Honor, just in

7     terms of time, I hope to get him off the stand.

8          MR. PAPPALARDO:  Oh, your Honor, you think I'm

9     going to cross-examine him for a long time?

10          MR. MITCHELL:  Please do so.

11          (End of discussion at sidebar.)

12     BY MR. PIROZZOLO:

13     Q.   Mr. Darling, can you look at Exhibit 53, please?

14     Exhibit 53.

15     A.   Yes.  Yes.

16     Q.   And I will put that up on the screen here.

17          Do you see in the document there's a reference

18     to a Merrill Lynch investment account?

19     A.   Yes.

20     Q.   Mr. Darling, were you ever told by anyone at

21     Benistar that your money was being transferred out of

22     the Merrill Lynch account?

23          MR. PAPPALARDO:  Objection, your Honor.

24          THE COURT:  Sustained.

25          Excuse me, Mr. Darling.  Mr. Darling, just wait.

PDF created with pdfFactory trial version www.pdffactory.com

1    The objection is sustained.

2         You may have to rephrase it.

3    BY MR. PIROZZOLO:

4    Q.  What, if anything, were you told about money being

5    transferred out of the Merrill Lynch account?

6         MR. PAPPALARDO:  Objection, your Honor, and I'd

7    like to be heard.

8         THE COURT:  Well, the question is not clear.

9    A.  Well, that --

10        THE COURT:  Mr. Darling, wait for the next

11   question, please.

12   A.  It would be --

13   Q.  Mr. Darling, Mr. Darling, let me ask a question.

14        What were you told about money being transferred

15   out of the Merrill Lynch account?

16        MR. PAPPALARDO:  Objection, your Honor.

17        THE COURT:  Sustained.

18   A.  I wasn't --

19   Q.  Let me ask another question.

20        When you hired Benistar for the second exchange,

21   Mr. Darling --

22   A.  Yes.

23   Q.  -- were you told that the money you transferred to

24   Benistar would be used to trade stock options?

25        MR. PAPPALARDO:  Objection, form and content.

PDF created with pdfFactory trial version www.pdffactory.com

1           THE COURT:  The objection is sustained to the

2      form.

3      BY MR. PIROZZOLO:

4      Q.   What were you told about whether your money would be

5      traded in stock options?

6           MR. PAPPALARDO:  Objection, your Honor.

7           THE COURT:  Overruled.  You may answer that.

8           MR. PAPPALARDO:  May we ask by whom?  I mean,

9      there's no foundation for the question.

10          THE COURT:  You may answer.

11     BY MR. PIROZZOLO:

12     Q.   What were you told about whether your money would be

13     used to trade stock options at the time you gave your

14     money to Benistar for the second exchange?

15     A.   I was never told that it would be used to trade

16     stock options, because I -- I would never --

17          MR. PAPPALARDO:  Your Honor, he answered --

18          THE COURT:  His answer has been given.  I think

19     the question was responded to.

20     BY MR. PIROZZOLO:

21     Q.   Would you have given your money to Benistar had you

22     known the money would be traded in stock options?

23          MR. PAPPALARDO:  I object, your Honor.

24          THE COURT:  Overruled.  You may answer.

25     A.   Absolutely not.  I considered stock options a very

PDF created with pdfFactory trial version www.pdffactory.com

1    risky --
2          MR. PAPPALARDO:  Objection, your Honor.
3          THE COURT:  I think the negative answer was
4    sufficient.
5    A.   -- concept.
6          MR. PIROZZOLO:  Just a moment, your Honor.
7          (Discussion off the record.)
8          MR. PIROZZOLO:  No further questions.
9                    CROSS-EXAMINATION
10   BY MR. PAPPALARDO:
11   Q.   Good afternoon, Mr. Darling.
12   A.   Good afternoon.
13   Q.   Now, sir, you were asked by the government about a
14   conversation with Mr. Paley as it related to the second
15   of the two exchanges.  Do you recall that, sir?
16   A.   I'm sorry, I don't get --
17   Q.   Okay.  Let me rephrase it.  You had two interactions
18   with Benistar; isn't that right, sir?
19   A.   I sent what?
20   Q.   You had two sets of contracts with Benistar --
21   A.   Yes.
22   Q.   -- isn't that fair to say, sir?
23   A.   Yes.
24   Q.   And in connection with the second of the two
25   contracts --

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    -- in August, September of 2000, do you recall any

3    conversation at all with Mr. Paley or anyone else from

4    Benistar?

5    A.    For the second transaction?

6    Q.    For the second transaction.

7    A.    Yes, I did.  I spoke to Mr. Paley again, and he

8    assured me my money would be safe and that they were

9    honorable men.  He kept repeating that.  And I said,

10   Well, I consider myself an honorable man.

11   Q.    And you are, sir.  But was that the first or the

12   second transaction?

13   A.    Well, I think it -- well, in both -- in each

14   transaction Mr. Paley spoke about honorable men.

15   Q.    Okay.  Sir, do you remember testifying in a

16   proceeding in 2001?  Just yes or no.

17   A.    Do I remember testifying in 2001?

18   Q.    Yes.

19   A.    Well, not -- probably not a great deal.

20        MR. PAPPALARDO:  May I approach?

21        THE COURT:  You may.

22        (Discussion off the record.)

23   BY MR. PAPPALARDO:

24   Q.    Sir, I just want to show you a document, Tuesday,

25   October 2, 2001.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. PIROZZOLO:  May I just have the page?

 2              MR. PAPPALARDO:  Of course.  It's page 33.

 3              MR. PIROZZOLO:  Thank you.

 4    BY MR. PAPPALARDO:

 5    Q.   And, sir, I would like you just to read this

 6    section, just this section, to yourself.

 7    A.   Okay.

 8    Q.   Take your time.

 9              (Pause.)

10    Q.   Have you read it, sir?

11    A.   Pardon?

12    Q.   Have you read it?

13    A.   Yes.

14    Q.   Let me ask a question about it.  Do you need it in

15    front of you?

16    A.   Yeah.

17    Q.   Okay.

18              (Discussion off the record.)

19    Q.   Sir, you've finished reading just that section?

20    A.   Will I read it?

21    Q.   No.  Have you finished reading it to yourself --

22    A.   Yes.

23    Q.   -- isn't that fair to say?

24              My question is this:  Does that refresh your

25    memory with regard to not having a conversation with Mr.
```

1    Paley after 1999?  Does that refresh your memory?  Just

2    yes or no.

3    A.   Well, as I read this, it implies that another

4    telephone conversation after the first one I had with

5    him in regard to -- I don't remember -- well, I -- I

6    believe that I -- I believe it was still 1999 when --

7    when they said my money wasn't available.

8         MR. PAPPALARDO:  Objection, your Honor.  May

9    that be stricken?

10        The question is whether that refreshes his

11   memory.

12        THE COURT:  I won't strike it, but you can ask

13   the question again.

14   BY MR. PAPPALARDO:

15   Q.   Sir, the only question before you is:  By reading

16   that passage, does that refresh your memory that there

17   was no conversation with Mr. Paley after 1999?

18   A.   Yes.

19   Q.   It does?

20   A.   Yes.

21   Q.   And isn't that the truth, sir?

22   A.   It's true that I spoke with Mr. Paley, I believe I

23   did, after 1999 when my funds --

24        MR. PAPPALARDO:  Okay, that's enough, sir.

25   That's enough.

1          Your Honor, may I read that?  May I publish the

2    transcript?

3          (Discussion off the record.)

4    BY MR. PAPPALARDO:

5    Q.   Sir, the passage you just read was taken from a

6    transcript, October 2, 2001?

7          Question to you:  "Do you recall Mr. Paley

8    saying anything else to you about the nature of property

9    exchanges at any point after that initial telephone

10   conversation that you had with him in December of 1999?"

11   A.   I don't -- I don't follow you.

12   Q.   No, I'm reading this.

13         "A.   I don't remember any."

14         Mr. Paley -- excuse me -- Mr. Darling, I just

15   have one question for you, sir.

16   A.   Maybe if you come up here and ask me what -- I don't

17   understand what you're saying.

18         MR. PAPPALARDO:  If I may approach, your Honor?

19         THE COURT:  Go ahead.

20   BY MR. PAPPALARDO:

21   Q.   Again, sir, and I will repeat this and you tell me

22   if this is what it says, if I'm reading it accurately,

23   okay?

24   A.   Okay.

25   Q.      "Q.  Do you recall Mr. Paley saying anything

PDF created with pdfFactory trial version www.pdffactory.com

1  else to you about the nature of property exchanges at

2  any point after that initial telephone conversation that

3  you had with him in December of 1999?

4          "A. I don't remember any."

5          Did I read that accurately, sir?

6  A.  It's -- my response is probably accurate, but it

7  alludes to another situation as far as I'm concerned,

8  and what I --

9  Q.  Sir, the only question is:  Did I read it correctly?

10 A.  Yes.

11 Q.  Okay, thank you.

12          And, sir, I have only one more question.  Did

13 you ever meet with or speak with or have any contact

14 with Mr. Carpenter at any point in time prior to you

15 signing the documents that are in front of you?

16 A.  Did I ever speak with -- have any contact with

17 Mr. Carpenter?

18 Q.  Yes, prior to your signing those documents that are

19 admitted into evidence?

20 A.  I'm sorry to be so --

21 Q.  Don't be, sir.

22          At any time, at any time prior to August or even

23 September of 2000, did you ever meet or speak or have

24 any contact with Mr. Carpenter?

25 A.  Speak with whom?

```
 1   Q.   Mr. Carpenter.

 2   A.   Carpenter?

 3   Q.   Yes.

 4   A.   Never.

 5           MR. PAPPALARDO:  That's it, your Honor.

 6           MR. PIROZZOLO:  No redirect, your Honor.

 7           THE COURT:  Nothing else?

 8           All right.  Mr. Darling, you may be excused.

 9           We will break at this point until tomorrow.

10           I remind you of the caution I gave you yesterday

11   about avoiding any discussion of any extraneous

12   information, and we'll see you tomorrow when we resume

13   at 9:00.

14           THE CLERK:  All rise, Court is in recess.

15           (Court adjourned at 1:04 p.m.)

16               - - - - - - - - - - - -

17                     CERTIFICATION

18           We certify that the foregoing is a correct

19   transcript of the record of proceedings in the

20   above-entitled matter to the best of our skill and

21   ability.

22   /s/Debra M. Joyce
     Debra M. Joyce, RMR, CRR            Date
23   Official Court Reporter

24   /s/Marcia G. Patrisso
     Marcia G. Patrisso, RPR, CRR        Date
25   Official Court Reporter
```