UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   ) Criminal Action
v.                                 ) No. 04-10029-GAO
                                   )
DANIEL E. CARPENTER,               )
                                   )
          Defendant.               )
                                   )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY FOUR
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, June 5, 2008
9 a.m.

Marcia G. Patrisso, RPR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: Jonathan F. Mitchell and Jack W. Pirozzolo,
3         Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         One Courthouse Way
          Boston, Massachusetts  02210
5         On Behalf of the Government

6         GREENBERG TRAURIG, LLP
          By: A. John Pappalardo, Esq. and
7             Gary R. Greenberg, Esq.
          One International Place
8         Boston, Massachusetts  02110
          On Behalf of the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
1                        I N D E X

2                 Direct   Cross   Redirect   Recross
   Witnesses For The
3    Government:

4  LINDA JOKINEN (through transcript)

5     By Mr. Pirozzolo        36

6  BRIAN FITZGERALD

7     By Mr. Pirozzolo        116

8                    E X H I B I T S

9  Government's
    Exhibit No.        Description         Marked    Received
10
   No. 15        Fax cover sheet                      83
11 No. 29        Fax cover sheet                      68
   No. 54        Fax cover sheet                      76
12 No. 59        PowerPoint presentation             121
   No. 60        The Benistar Difference             125
13 No. 61        Article by Martin Paley             129
   No. 62        1031 article                        130
14 No. 63        How to Identify Exchange Opportunity 131
   No. 66        Exchange Agreement                  143
15 No. 67        Escrow Agreement                    133
   No. 68        Fee Agreement                       148
16 No. 69        Account Selection form              147
   No. 70        Fitzgerald letter dated 11/16/00     66
17 No. 82        Faxing of Fidelity bond              57
   No. 83        Faxing of Fidelity bond              58
18 No. 110       Letter from Ms. Adams to Ms. Jokinen 79
   No. 111       Accounting to Ms. Spielman           81
19 No. 113       Fax to Mr. Iantosca from Ms. Jokinen 97
   No. 178       Memo regarding procedural issues     48
20 No. 179       Standard operating procedure memo    43
   No. 181       Revised exchange documents           61
21 No. 182A      Faxing of revised exchange documents 104
   No. 182B      Faxing of revised exchange documents 104
22 No. 186       Fax cover sheet and spreadsheet      98
   No. 187       Fax cover sheet and spreadsheet      98
23 No. 189B      Spielman e-mail dated 12/26/00       90
   No. 189C      Spreadsheet                          90
24 No. 189       Spreadsheets                         95
   No. 313       Exchange Agreement                  144
25 No. 314       Escrow Agreement                    135
</pre>

1          (The following proceedings were held in open

2     court before the Honorable George A. O'Toole, Jr.,

3     United States District Judge, United States District

4     Court, District of Massachusetts, at the John J. Moakley

5     United States Courthouse, One Courthouse Way, Boston,

6     Massachusetts, on June 5, 2008.

7          The defendant, Daniel E. Carpenter, is present

8     with counsel.  Assistant U.S. Attorneys Jonathan F.

9     Mitchell and Jack W. Pirozzolo are present.)

10          THE CLERK:  All rise.  Please be seated.

11          MR. GREENBERG:  Thank you, your Honor.  We just

12     wanted to go over a few general housekeeping matters to

13     hopefully minimize the interruptions.  I have, actually,

14     six things, your Honor.

15          First of all, I do want to apologize, on behalf

16     of Mr. Carpenter, to the Court and the government for

17     yesterday.  There was an outburst at sidebar.  While

18     it's our view the government made a statement which was

19     factually inaccurate, we apologize.  Clearly, Mr.

20     Carpenter does.  It was inappropriate.  And we apologize

21     to the Court and to the government.

22          Secondly, your Honor, I want to just address the

23     two depositions that I believe are going to be read in

24     today:  One is Mr. Iantosca and the other is Ms.

25     Jokinen.

1          Your Honor, we have some substantial concerns

2     given your Honor's prior order.  Mr. Iantosca's

3     deposition testimony in the first trial was replete with

4     testimony of loss that the Court has previously

5     excluded.  If you look at the trial transcript, both the

6     questions and the answers starting at transcript 4, page

7     88, "Did you get the money back -- that money back?  Did

8     you get all of that money back?"

9          "ANSWER:  Nothing."

10         MR. MITCHELL:  Where are you?

11         MR. GREENBERG:  Transcript 4-88, line 22.

12         "Did you get the money back -- that money back?

13    Did you get all of that money back?

14         "ANSWER:  Nothing.

15         "QUESTION:  When did you find out you weren't

16    going to get that money back?

17         "ANSWER:  Never got any money back."

18         Going down on page 89, "He lost" -- "When

19    did" -- "What did Dan Carpenter tell you about the money

20    at that meeting?"

21         "He lost all his money.  All his money, he

22    lost."  It keeps going on.

23         The next -- on page 90 he testifies, "After they

24    lost about 4 to $5 million, I'm going to give them more

25    money?"

PDF created with pdfFactory trial version www.pdffactory.com

1          The testimony, your Honor, is two things:

2    Number one, it's replete with testimony and questions

3    that relate to loss which your Honor had excluded;

4    secondly, your Honor, it also relates to a conversation

5    with Mr. Carpenter that took place in January of 2001.

6          Your Honor, we submit that the testimony is not

7    relevant to Mr. Carpenter's state of mind, if you look

8    at the responses as of November 30th, 2000.  And to

9    allow that testimony to come in would be, first of all,

10   contrary to your Honor's prior rulings; it would be

11   irrelevant; it would be -- I mean, unfairly prejudicial

12   to the defendants -- I mean, it would essentially

13   create -- I mean, given the outburst yesterday from Mr.

14   Snider and given this testimony which is highly

15   prejudicial and improper and inconsistent with your

16   Honor's prior rulings.

17          The same thing with Ms. Jokinen's.  If your

18   Honor looks at the government's -- and I just refer

19   to -- this is on transcript Volume 3, page 35.  And

20   there's a discussion at the first trial, your Honor,

21   about an exhibit.  And this is Exhibit -- I believe it's

22   189B.  It's a December 26, 2000, e-mail.

23          The government, in justifying --

24          THE COURT:  Let me just clarify, because the

25   transcript talks about some multiple of 189:  189B and

PDF created with pdfFactory trial version www.pdffactory.com

1    -C, I think, and so on.  The book I have has a single

2    Exhibit 189, I think, unless -A and -B are different

3    pages of the same document.

4         MR. PIROZZOLO:  They are, your Honor.

5         THE COURT:  The 189 that's in the book for this

6    trial looks like -- or matches -- the discussion in the

7    transcript seems to coordinate with what's 189; I just

8    didn't know.

9         MR. GREENBERG:  It is, your Honor.  Our copy --

10        THE COURT:  So we can disregard the B and C,

11   right?

12        MR. GREENBERG:  We have for our purposes, your

13   Honor.

14        MR. PIROZZOLO:  Your Honor, what happened is,

15   they were separately marked at the trial B and C.  So if

16   you look at the original exhibit there's one document,

17   but then there are blue sheets in between and then

18   there's one that's marked 189B and 189C.  I'm happy to

19   give the original exhibit to the Court.

20        THE COURT:  Maybe that would help.

21        MR. GREENBERG:  Your Honor, with respect to Ms.

22   Jokinen's testimony, the government in defending Exhibit

23   189 states that -- your Honor asked, you know, "What

24   does this document do?"  And they go on to say, well, it

25   will establish the money was traded and lost.  In other

1    words, they intended to use the document to demonstrate

2    that the money was lost.

3          If you continue on, in other parts of her

4    transcript starting at page 37, 38, going on, talks

5    about, you know, amounts of money, essentially, that are

6    owed; you know, losses -- spreadsheet showing losses;

7    monies not yet paid.  Again, your Honor, you know,

8    wholly inconsistent with your Honor's rulings that loss

9    is not an element of the crime as alleged in the

10   indictment; and secondly, your Honor, you know, it

11   relates to events after the alleged -- certainly after

12   November 30th, 2000, as --

13         I mean, there's questions that are unbelievable.

14   3-57 talks about "the money disappearing," "closing the

15   door."  These are -- this is testimony -- if you look at

16   the questioning -- this is at 3- -- page 37:  "What

17   happened that caused you to go out of business?"

18         "ANSWER:  The money disappeared.

19         "QUESTION:  Do you remember when Benistar

20   company closed its doors?

21         "ANSWER:  No.

22         "QUESTION:  At what point did you realize the

23   money had disappeared?"

24         That's the government's question.

25         "ANSWER:  I don't know the date."

1        Again, this is --

2        THE COURT:  I'm sorry.  What page are you on?

3        MR. GREENBERG:  Fifty-seven, line 8.

4        "What happened that caused it," meaning

5   Benistar, "to go out of business?"

6        "ANSWER:  The money disappeared.

7        "QUESTION:  Do you remember when Benistar closed

8   its doors?

9        "ANSWER:  I don't know the date."

10       Dropping down to line 18:  "And at what point

11  did you learn that the money had disappeared?"

12       "ANSWER:  I don't know the date."

13       Keep going on --

14       THE COURT:  Yeah.  Let me just -- it's my

15  intention to keep focused on the charges of the

16  indictment and the crimes that are charged in there, and

17  therefore, to minimize any attention to the consequences

18  of the trading, period, I guess -- having -- no,

19  comma -- having in mind that there are some potential

20  legitimate uses for such evidence as it bears on state

21  of mind, specific intent and perhaps other matters.

22       But I think as a practical matter, given the --

23  well, just given the available evidence, it will not be

24  possible to be absolutely -- for the record, to be

25  absolutely devoid of evidence about what happened in the

1    trading and the consequence for the availability of

2    funds to complete exchanges.  The defense has already,

3    in its opening statement, referred to that by, among

4    other things, the suggestion that if it hadn't been for

5    PaineWebber suspending the trading privileges, that Mr.

6    Carpenter would have ridden the market back up again and

7    the money would have been there.

8         So there's already been some discussion about

9    what happened in the trading account and what the

10   consequences were.  I think it's going to be inevitable

11   we're going to have some of that.  So I don't think it's

12   an achievable goal to have an absolute sanitization, if

13   you will, of the record in that respect.  So the most

14   practical thing is to keep focused on what the main

15   purpose of the evidence is to be directed to and

16   minimize, as I say, the extraneous.

17        So any ruling about any of these matters, I

18   think, has to be done with that in mind because I think

19   we're going to see things, as the case goes on, that are

20   going to make it understood to the jury that -- I mean,

21   I think they already know it from what they've heard --

22   that there were -- that the exchanges couldn't be

23   completed because the funds from the PaineWebber account

24   weren't available to do it.

25        MR. GREENBERG:  Your Honor, it's one thing to

1  say an exchange couldn't be completed at that time.

2  It's another thing --

3      THE COURT:  I understand.  That's going to be

4  your response.

5      MR. GREENBERG:  But, your Honor, to permit the

6  government to ask a question, or to elicit questions

7  about the money being gone, about it having disappeared,

8  first of all, is wholly inaccurate, and they know that.

9  They absolutely know what the state of the facts are.

10      THE COURT:  Well, let me just -- so I don't

11  disagree entirely.  What I'm trying to do is set the

12  stage for how we answer particular questions and

13  answers.  So I think one rule is we can't expect to

14  eliminate all references to those historical facts,

15  okay?  We can make sure that whatever references there

16  are, are no more than is necessary to achieve what is

17  the proper role of the evidence, okay?  And beyond that,

18  it's --

19      So now, if there's a particular answer --

20  question that is particularly -- you think particularly

21  offensive under Rule 403, I guess we'll rule with that

22  one by one.  But I just want to set the stage by saying

23  it's not going to be practical to keep everything,

24  possibly --

25      So let me just illustrate it:  You take

PDF created with pdfFactory trial version www.pdffactory.com

1  Iantosca's testimony.

2       MR. GREENBERG:  Yes, your Honor.

3       THE COURT:  One thought I had on the passage

4  you're referring to is to permit the question and answer

5  at lines 22 through 24 on page 88, but stop it there.

6  In other words, "Did you get the money back?  Did you

7  get all the money back?"  Answer:  "Nothing."  And then

8  just you don't need to elaborate on that; leave the rest

9  out.

10      MR. GREENBERG:  Leave the rest out, your Honor?

11      THE COURT:  Yeah.  We get the answer but we

12  don't go into the details of how many millions it was,

13  and so on and so forth.

14      MR. GREENBERG:  So the testimony would conclude

15  at line 21?

16      THE COURT:  No, at 24.

17      MR. GREENBERG:  "Did you get all of that money

18  back?"

19      THE COURT:  First question -- yeah, that's

20  right.  And he says, "Nothing."  And then we don't get

21  all the amplification.

22      MR. GREENBERG:  First of all, your Honor, the

23  government knows that's not accurate.  They know he's

24  been in a position -- he got money -- I believe this

25  is -- he got money in January, your Honor.  This is

PDF created with pdfFactory trial version www.pdffactory.com

 1    blatantly untrue, and they know that.  They know that

 2    Mr. Iantosca was paid money in January and -- I'm told,

 3    your Honor, it was $1.3 million, okay?

 4         And putting aside whatever subsequently may or

 5    may not have happened in the civil suit, to allow this

 6    testimony to go in is unfairly prejudicial and just

 7    taints the entire process.

 8         MR. MITCHELL:  As we sit here today, Mr.

 9    Iantosca is still out over $3 million.

10         THE COURT:  He said he didn't get anything back.

11         MR. MITCHELL:  He got back -- and counsel states

12    specifically for the record what he got back instead of

13    saying generally what he got back.  He got back a small

14    portion of it.

15         THE COURT:  But it was not nothing.

16         MR. MITCHELL:  It was not nothing, no.

17         THE COURT:  Well, I don't know whether the

18    government should be the sponsor of an answer that it

19    understands is incorrect.

20         MR. MITCHELL:  Well, we can put that up there.

21         THE COURT:  You can't use the question and

22    answer.  You can't elicit it as if he was here.  If you

23    knew that he was going to say "Nothing" if you asked him

24    on the stand, and you knew that was not true, that would

25    not be proper.

```
 1            MR. GREENBERG:  If your Honor stops --

 2            THE COURT:  That, as a matter of fact, if you go

 3    back in history, is in the Napue case.

 4            MR. MITCHELL:  We remember that, your Honor.

 5            THE COURT:  That's exactly that case.

 6            MR. MITCHELL:  I don't know off the top of my

 7    head.  My understanding is he got back some funds --

 8            THE COURT:  Well, that --

 9            MR. MITCHELL:  In any event, your Honor, there

10    are other reasons -- there are allegations with some

11    portion of what's in there.  So for instance, he has

12    this conversation -- for instance, in particular,

13    Iantosca had a conversation, as we mentioned before,

14    with Dan Carpenter in January, which Dan Carpenter

15    breaks the news, says some things, doesn't say other

16    things.  Among the things he did say, and which Iantosca

17    testifies to, is that Carpenter asked for a loan which

18    suggests that -- it's relevant to his state of mind; it

19    suggests a consciousness of guilt.

20            Not only did he ask for a loan, there's no

21    mention of options at that point, in which in

22    combination it suggests he's just covering his tracks.

23    This is what this whole thing has been about.  So it is

24    relevant to intent at the time these exchanges were

25    going on back in the fall.
```

```
 1              THE COURT:  The objection is sustained to the

 2    shaded area of the conclusion of the direct testimony.

 3              MR. GREENBERG:  Thank you, your Honor.

 4              THE COURT:  Now, that raises some questions

 5    about the shaded area that Mr. Goldstein's -- I'll leave

 6    that to you.

 7              MR. GREENBERG:  Well, your Honor, there's no

 8    issue about -- as far as we're concerned, and we don't

 9    need to read the --

10              THE COURT:  So just would be -- just so the

11    record is precise, let me just focus beginning on page

12    88 because there are other shaded areas that I'm not --

13    4-88, line 22, through 4-90, line 14, is excluded.

14    That's Iantosca.

15              MR. MITCHELL:  So basically we're reading

16    Iantosca, your Honor, right up to 4-88, line 21, is

17    that --

18              MR. GREENBERG:  Yeah.  And then there's a couple

19    of -- I think there's probably three or four lines.  I

20    think there's two lines on cross.

21              THE COURT:  I'm sorry?

22              MR. GREENBERG:  Two lines.  Just lines --

23    there's -- on cross it's just lines 21 and 22, and 7, 8

24    and 9.  We'll read nothing.  We'll read nothing.  We'll

25    read nothing, your Honor.  That will be it.
```

```
 1              THE COURT:  Okay.

 2              MR. MITCHELL:  Okay.  So no cross and we stop at

 3    line 21?

 4              THE COURT:  Okay.

 5              MR. GREENBERG:  That's fine.

 6              MR. MITCHELL:  Do you wish to hear from us on

 7    Jokinen, your Honor?

 8              MR. GREENBERG:  I would suggest the government,

 9    based on those rulings, take another look because Ms.

10    Jokinen's is a lengthy transcript that is -- contains a

11    number of exhibits that they ask extensive questions

12    about.  And the exhibits, you know, reference, both, the

13    loss.  I mean, it's just -- and that's why they're

14    putting it in: to show loss.  I mean --

15              MR. PIROZZOLO:  I'm responsible for the Jokinen

16    testimony, your Honor.

17              THE COURT:  Yeah.

18              MR. PIROZZOLO:  What is in the transcript, at

19    least as I read it, with respect to the reason it went

20    in, your Honor, is if you read from page 3-35, lines 11

21    through 15, Mr. Pineault said that it is relevant to

22    show that the money was sent, that it was received by

23    Benistar Property Exchange.  And through other witnesses

24    we'll establish that money among others was traded and

25    lost.  It's part of the chain of evidence showing the
```

PDF created with pdfFactory trial version www.pdffactory.com

1  money was, in fact, sent down to Connecticut.  Among the

2  elements that we need to establish in this case in the

3  wire and mail fraud counts is the fact that the money

4  was transferred across state lines and was received by

5  Benistar.

6           THE COURT:  So --

7           MR. PIROZZOLO:  That's an entirely proper use of

8  that document.

9           THE COURT:  On this point, what you're saying is

10  this is a business record of -- business accounting

11  record of Benistar which shows the receipt and

12  possession, I guess.

13           MR. PIROZZOLO:  The accounting of what was

14  received and what was owed to the exchangors during the

15  relevant period of time.  If you look at the document,

16  what they're --

17           THE COURT:  So I understand, the relevance of

18  showing that the money moved in interstate commerce.  Is

19  that the only purpose for it?

20           (Pause.)

21           THE COURT:  Let me finish and ask the second

22  part of the question, because if it is, if that's the

23  only purpose -- which I agree with you is a legitimate

24  purpose -- that's something you have to prove,

25  obviously.  The question is if that is the only purpose

PDF created with pdfFactory trial version www.pdffactory.com

1   of this evidence, is there other evidence of that, just

2   as serviceable, so that this might be viewed as

3   cumulative under Rule 403?

4           (Pause.)

5           MR. PIROZZOLO:  It is difficult for me to answer

6   that question with precision because I think that with

7   respect to certain of these transactions there would be

8   evidence of a mailing, for instance, to show that money

9   was sent to Connecticut, your Honor.  And so I can't

10  answer precisely whether or not it is an entirely

11  cumulative document or not.

12          THE COURT:  Let me go back to what the exhibit

13  is because I have -- in the book I have four pages that

14  have -- this is probably used with the bar code, for use

15  with the system, I guess.  00877 through 00880.  So

16  that's four pages?  Five pages?  Four pages.  That's

17  behind Tab 189.  The one you gave me is a much lengthier

18  document.  Actually, what's in the book is what is 189B.

19          MR. GREENBERG:  I also think 113, 186, 187 --

20          THE COURT:  Let's just deal with one at a time.

21          MR. GREENBERG:  Okay.

22          MR. PIROZZOLO:  Can you give me the Bates

23  numbers, your Honor, that's in the book so I can match

24  them up?

25          THE COURT:  I can't see the Bates numbers.

```
 1          MR. PIROZZOLO:  There's a number at the bottom.
 2          THE COURT:  I see a number at the bottom with
 3   the bar code which looks like it might be for the
 4   electronic system.
 5          MR. PIROZZOLO:  0081, is that --
 6          THE COURT:  Yeah.  I don't have that.  I have
 7   00877 through 00880.
 8          (Pause.)
 9          MR. PIROZZOLO:  00877?
10          THE COURT:  Right.
11          MR. PIROZZOLO:  All right.  There must have been
12   an error in copying.
13          THE COURT:  Those pages correspond with what --
14   in the paper folder you gave me -- is 189B.
15          MR. PIROZZOLO:  Yes.
16          THE COURT:  It is also 189B that the transcript
17   refers to.
18          MR. PIROZZOLO:  Yes.  That was, I think, what
19   was ended being projected up on the screen, is my
20   recollection.
21          THE COURT:  So my question is:  In this trial is
22   your intention to refer to only 189B, which is a portion
23   of the big paper file?
24          MR. PIROZZOLO:  We were only going to refer --
25   in the course of the trial we're only going to refer --
```

PDF created with pdfFactory trial version www.pdffactory.com

in the course of the testimony the only thing that I
think goes up on the screen is 189B, but I believe both
189 and 189C, I think, also went into evidence as well.
So presumably that would go into evidence.  Maybe not so
presumably based on this discussion.

THE COURT:  I don't know.  I'm just trying to
understand what your offer is.  And I guess I inferred
that your offer was what was in the book, and that is
limited to what we can call the former 189B.  I don't
know whether it's technically the same paper version.

So the consequence is, I've looked at that.  I
haven't looked at 189 which is -- it looks like it's 50
pages long.

MR. PIROZZOLO:  Right.  It's a cumulative
spreadsheet of what was going in and what was going out.

If I could just add an additional purpose for
this evidence, and this -- I don't think there's another
exhibit in evidence that establishes this fact.  One of
the things that was going on during the relevant period
of time, your Honor, is that Mr. Carpenter, during the
course of -- during the course of the scheme, is short
funds; he has obligations to exchangors that far exceed
the money that he has available in the Benistar
accounts.  He has more obligations than he can cover in
the Benistar accounts during the relevant period of

PDF created with pdfFactory trial version www.pdffactory.com

1    time.

2           THE COURT:  When you say "Benistar accounts,"

3    you're talking about PaineWebber?  First Merrill Lynch

4    and then PaineWebber?

5           MR. MITCHELL:  First Merrill Lynch.  He's short

6    in Merrill Lynch as well, your Honor, and then he

7    becomes even further behind.

8           THE COURT:  Your use of "Benistar accounts"

9    means the use of those two.

10           MR. PIROZZOLO:  At the two brokerage houses.

11           The fact that he is continuing to trade in the

12    investments during this period of time and is

13    compounding his losses relative to the obligation that

14    he has to the exchangors is relevant both to showing

15    that there were misrepresentations -- material

16    misrepresentations made to the -- to the exchangors who

17    turned over their money and to establish his state of

18    mind that he understood that he was misleading these

19    people.

20           There are two parts -- there are two pieces that

21    connect -- that offset and connect the losses:  There's

22    the options trading which is causing the deficiency, but

23    that has to be measured against the obligations that Mr.

24    Carpenter has at the time that he is incurring those

25    losses.

PDF created with pdfFactory trial version www.pdffactory.com

1        I believe this is the only document, 189, the

2    cumulative document along with the attachments that were

3    shown, that establishes the open obligations that he had

4    at the time that he was incurring the losses.  So it is

5    to show not only the fact that this money was sent and

6    received, but the amount of money that is sent and

7    received and owed during the relevant period of time.

8    And for that reason, it is not cumulative.

9        THE COURT:  Okay.  Just before I hear from Mr.

10   Greenberg, I hate to sound like an accountant, but I

11   want to make sure we get everything -- we know exactly

12   what we're talking about.

13       It looks to me like from the Jokinen transcript

14   that only 189B and 189C were admitted.

15       MR. PIROZZOLO:  I don't believe that's correct,

16   your Honor.  Page 42, your Honor, 3-42, line 3, Exhibit

17   189 was received in evidence.

18       THE COURT:  Wait a minute.  42?

19       MR. PIROZZOLO:  3-42:  "Government Exhibit 189

20   received in evidence."

21       THE COURT:  All right.  All right.  I see it.

22       MR. PIROZZOLO:  So it was admitted, your Honor.

23       THE COURT:  All right.

24       MR. PIROZZOLO:  And I apologize for the mis- --

25   the incorrect thing that you got in your binder, your

PDF created with pdfFactory trial version www.pdffactory.com

```
 1  Honor.
 2         THE COURT:  Let me just look at 189 because I
 3  haven't seen it -- I saw it at the last trial.
 4         (Pause.)
 5         MR. GREENBERG:  Your Honor, I just want to make
 6  sure we're -- because I'm concerned we're not all
 7  operating off the same document.  So if I understand,
 8  189B is as of December 27th?
 9         MR. PIROZZOLO:  189C, the last entry I see is
10  December 7, 2000.
11         MR. GREENBERG:  Your Honor, just a couple of
12  points in terms of this evidence being cumulative.  I
13  believe the government intends to call Mr. Paley and
14  Mr. Zappala and -- as well as, you know, all of the
15  exchangors that they've already called and intend to
16  call in terms of what was actually paid.  The issue
17  about what, you know, may or may not have been owed as
18  of a point in time is just not relevant.  Certainly it's
19  not relevant as it relates to after November 30th, which
20  is the date of the last contract.
21         So both this is cumulative, unnecessary.  I
22  mean, the government -- and certainly if these documents
23  were to come in -- and if you look at them in context
24  with other documents we've been talking to, which relate
25  to later in time, the amounts that are allegedly
```

1   outstanding or due should be redacted.  I mean, if the

2   purpose of this is specifically to show what was

3   received, and they can't get it in through Mr. Paley or

4   the exchangors or Mr. Zappala -- and I submit they can,

5   there's no question they can -- the only -- I mean, if

6   you really look behind it, the only purpose they're

7   putting in these documents is for them to be able to

8   argue to the jury that they got in the back door this is

9   the amount of money they lost, okay?  That's what Mr.

10  Snider blurted out yesterday; that's what they've

11  designated today.

12          If you look at the other exhibits in the first

13  trial, there's a description showing losses:  "Monies

14  not yet paid back."  I mean, that's the gist -- that's

15  why they're putting on -- a principal reason they're

16  trying to proffer Ms. Jokinen.  And as of January --

17  they have Exhibit 187:  "Monies not yet paid back as of

18  January 2001."  They're trying to backdoor your Honor's

19  prior orders.

20          187 is January 4, Linda Jokinen.  It's a

21  spreadsheet showing balances.  It's --

22          MR. PIROZZOLO:  Your Honor, I'm confused.  Which

23  exhibit are we talking about?

24          THE COURT:  I think we've slipped a little.  I

25  want to stay with 189 as well.

PDF created with pdfFactory trial version www.pdffactory.com

1          I understand they're -- I think that -- perhaps

2     both reasons, but I accept Mr. Pirozzolo's argument

3     about the more general relevance than the first, which

4     is just to the interstate commerce element.  The general

5     relevance of the history of the accounts which is set

6     forth in Exhibit 189 is sufficient to be admitted

7     notwithstanding the fact that it shows some things that

8     are not particularly relevant.

9          So I will -- the objection as to 189, 189B, 189C

10    is overruled; and therefore, to the extent that that's

11    an objection to related testimony, that's overruled as

12    well.

13         Now, if you want to address other exhibits --

14         MR. GREENBERG:  I would, your Honor.  I would

15    ask that we redact out of 189B and -C the portions that

16    are irrelevant.  I mean, and if they --

17         THE COURT:  I don't think it's necessary.

18         MR. GREENBERG:  Well, then the government ought

19    not be permitted to argue --

20         THE COURT:  They won't be permitted to argue --

21    well, I don't know.  I won't say they won't be permitted

22    to argue loss.  They have to focus on the offenses.  And

23    any argument that touches on the account balances has to

24    be related to the offenses and not to an appeal to

25    sympathy for loss.

 1           MR. GREENBERG:  Then I would ask, your Honor,

 2    because I anticipate they're going to highlight that

 3    exhibit and they're going to focus on balance columns

 4    suggesting amounts owed, that your Honor instruct the

 5    jury that that is not an element and that is not --

 6           THE COURT:  We'll do what we have to do to keep

 7    the jury focused.

 8           MR. GREENBERG:  Your Honor, if we go to 113 and

 9    186 referred to on page 43, 113 is a December 26 to Mr.

10    Iantosca.

11           THE COURT:  Yeah?

12           MR. GREENBERG:  After the fact, your Honor --

13           THE COURT:  Can we talk jointly about 113, 186

14    and 187?

15           MR. GREENBERG:  Yes, your Honor.

16           THE COURT:  Are those all the same?

17           MR. GREENBERG:  Well, they all suffer from the

18    same --

19           THE COURT:  No.  I mean, they're all similar

20    documents?  They're a listing of Mr. Iantosca's

21    accounts?

22           MR. GREENBERG:  Yes.  That's correct; yes.

23           THE COURT:  Okay.  Go ahead.

24           MR. GREENBERG:  Your Honor, they all relate to

25    issues of loss in terms of balances due.  They all

PDF created with pdfFactory trial version www.pdffactory.com

1    relate to periods of time that are after -- a month or

2    more after the contract and have no relevance to any

3    issue and are certainly duplicative of other testimony

4    and other documents.  And, again, it's simply intended

5    to introduce an element of loss that's not relevant.

6              THE COURT:  Okay.  Mr. Pirozzolo?

7              MR. PIROZZOLO:  Could I just have the page that

8    this was referred to, your Honor?  I just --

9              MR. PAPPALARDO:  Page 43 and 49.  And I think

10   you refer to it as monies not yet paid back as of

11   January 2000...  And the question was:  "That's

12   monies" -- this is at page 49, Volume 3, line 6.

13             This is the government's question:  "That's

14   monies received, not yet paid back, right?"

15             "ANSWER:  Right.

16             "QUESTION:  And that's as of January 4, 2001?

17             "ANSWER:  Right."

18             MR. PIROZZOLO:  I'm sorry.  Which page again?

19             MR. GREENBERG:  Page 49, Volume 3.

20             And again, that doesn't reflect the monies, that

21   over two -- I'm sorry.  It's $2.9 million, your Honor,

22   that was paid back.  Again, the government is proffering

23   testimony which is not only irrelevant but it's just --

24   you know, they're suggesting facts which they know are

25   no longer the case.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. PIROZZOLO:  Here's my response, your Honor,

2     to that:  With respect to the general admissibility of

3     those documents, those documents establish money

4     received by Benistar from Mr. Iantosca, and that's all.

5     If there's a particular objection to a question that was

6     asked about the document which is going beyond what its

7     scope is, then I think appropriately Mr. Greenberg can

8     object and you can sustain it and we can cross it out.

9     I think that's how we should handle all of these

10    documents, 113 through 186.

11         THE COURT:  I agree with that.  I think for the

12    same reasons as apply to 189, these exhibits are

13    admissible:  113, 186, 187.

14         MR. PIROZZOLO:  And 188.  I believe they were

15    all admitted together.

16         THE COURT:  188 is not just an Iantosca --

17         MR. GREENBERG:  Your Honor, if it is admitted we

18    ask that they be redacted again to eliminate the

19    references to, you know, balances owed.  If the only

20    purpose is to demonstrate that monies were paid, you

21    know, pursuant to an exchangor -- tendered to the

22    intermediary to hold, then there's no issue.  We

23    shouldn't get into issues about balances.

24         You know, your Honor, we can stipulate to monies

25    being received by Benistar at various dates by various

PDF created with pdfFactory trial version www.pdffactory.com

1    exchangors.

2         THE COURT:  I think the prejudice under 403 is

3    minimal, so I don't think at this stage we'll pause to

4    do all of that type of redacting, but I do want to

5    address 188 because I do think it's separate from 186

6    and 187.

7         And it's -- let me just suggest to the

8    government that it's -- at first impression, it strikes

9    me as redundant of what you already have through all the

10   other exhibits for the legitimate purposes that you have

11   in mind.

12        MR. PIROZZOLO:  I'm just flipping through the

13   testimony.  I don't believe it was specifically

14   discussed in the testimony.  I'm trying to find it.

15        THE COURT:  I don't think it was either.  I

16   don't think it was either.

17        MR. PIROZZOLO:  Since it was not, I think the

18   government would accept that this does not come into

19   evidence.

20        THE COURT:  All right.  188 is out.

21        And as for the -- I think at this point, so we

22   can get things moving, Mr. Pirozzolo's suggestion is a

23   practical one with respect to questions about these

24   exhibits.  If there are particular questions that go too

25   far, having in mind the questions about the exhibits are

1    proper as a general matter, if they're particularly

2    offensive -- and let me just say that I would suggest

3    that 3-49 -- I think Mr. Greenberg referred to these

4    questions -- 3-49, line 6 through 11, be deleted.

5    That's one example, at least, of an offensive and

6    unnecessary series of questions and answers.

7         MR. GREENBERG:  Your Honor, so the questions

8    that -- I take it the government will not be asking the

9    questions that, you know, we referenced before?

10        MR. PIROZZOLO:  I'll try -- I'll try not to.

11        There may be other places, your Honor, where

12   there may be an objection, and I'll --

13        THE COURT:  We've dealt with specific identified

14   testimony in Iantosca.  Now we've identified just a few

15   lines here that are also out, those five lines on

16   page -- six lines on page 49.  There may be others.  As

17   we go along, Mr. Greenberg, you can rise and object as

18   you would if the witness were here in person.

19        MR. GREENBERG:  I would, your Honor, although it

20   may be that if I believe a question is coming up that

21   is -- states something which is objectionable, I'll

22   object.

23        THE COURT:  Yeah.  Do it before the question

24   gets asked.  Fine.

25        MR. PIROZZOLO:  And I'll try to keep it in the

PDF created with pdfFactory trial version www.pdffactory.com

1   spirit of the order, your Honor.

2        MR. GREENBERG:  Just two other quick things,

3   your Honor.  We're going to ask before Ms. Adams

4   testifies today we have a short voir dire.  Her

5   testimony, as you may recall, relates to a purported

6   conversation which we deny occurred with Mr. Carpenter

7   in January of 2001.  Both it is irrelevant to show Mr.

8   Carpenter's state of mind, it relates to loss.  Also,

9   her comments at the first trial about what she

10  understood, what was in her mind are irrelevant,

11  unfairly prejudicial.

12       We'd just ask that -- there's two

13  conversations -- and that before she be allowed to

14  testify, your Honor gives the government guidance and

15  her as to what she'll be allowed to testify to.  Because

16  last time, you know, what she said, you know, was highly

17  inflammatory in terms of what Mr. Carpenter, according

18  to her, said, and what she said to him.

19       THE COURT:  All right.  Well, let's get through

20  the depositions and then -- is she the first live

21  witness after the deposition?

22       MR. MITCHELL:  She's the second.

23       MR. PIROZZOLO:  Second.

24       MR. PAPPALARDO:  Your Honor, can I -- not to

25  belabor this, your Honor, but can I address the first

PDF created with pdfFactory trial version www.pdffactory.com

1  live witness?  The first live witness today, as I

2  understand it, is Mr. Fitzgerald.  Two things, your

3  Honor:  As the Court knows, prior to the trial, we filed

4  a motion relating -- a motion in limine regarding

5  victims and evidence on victim impact.  As the Court did

6  at the last trial, the Court allowed that.  But I

7  specifically want to raise with respect to

8  Mr. Fitzgerald, as I did in the motion, your Honor, that

9  in the first trial he gets into a long discussion of --

10  you know, the question from the government was:  "What

11  was the impact of the loss?"  If we're not going to get

12  into loss, we shouldn't get into the impact of the loss.

13       MR. PIROZZOLO:  I don't even intend to get into

14  that, your Honor.

15       MR. PAPPALARDO:  And he gets into his daughter's

16  cancer and his hospital -- if I may, your Honor, I want

17  to point out to the Court this was a $500,000 exchange.

18  $400,000 was returned in the exchange and then he got

19  another $80,000 back.  So that's my first point.

20       Secondly, your Honor -- and I appreciate what

21  Mr. Pirozzolo says, but I have to raise it, your Honor.

22       THE COURT:  Okay.

23       MR. PAPPALARDO:  Secondly, your Honor, I believe

24  the books that are here should not be here --

25       THE COURT:  I agree with you.

1          MR. PAPPALARDO:  -- for this witness.

2          THE COURT:  I agree with you.

3          MR. PAPPALARDO:  Thank you.

4          THE COURT:  Those have to be collected.

5          (Pause.)

6          MR. MITCHELL:  Your Honor, at the end of the day

7    I'd like to raise a few more issues.  They don't have to

8    be raised now, but I would like to raise them at the end

9    of the day, if possible.

10          MR. PIROZZOLO:  Your Honor, I'm sorry.

11   Ms. Walters has made -- pointed out to me in your ruling

12   on the Jokinen testimony you excluded through line 11.

13   There's a question:  "Who prepared this?"  "I did."

14          THE COURT:  Yeah.  Okay.  Nine is more

15   appropriate, I think.

16          MR. PIROZZOLO:  Thank you, your Honor.

17          THE COURT:  Okay.  All right.

18          THE CLERK:  Very good.

19          (Pause.)

20          MR. PIROZZOLO:  Your Honor, is there going to be

21   some instruction we're reading Ms. Jokinen's testimony

22   now?

23          THE COURT:  I'm not going to say it was a trial;

24   I'm going to say it was a prior opportunity for her to

25   be examined under oath by two lawyers and that it's in

PDF created with pdfFactory trial version www.pdffactory.com

1    lieu of testimony permitted by the Rules of Evidence,

2    something like that.

3        MR. GREENBERG:  Your Honor, there's no need for

4    me to repeat our objections, for the purposes of the

5    presentation --

6        THE COURT:  Not for those that have been

7    definitively resolved.

8        THE CLERK:  All rise for the jury.

9        (Jury in at 9:44 a.m.)

10       THE CLERK:  Please be seated.

11       THE COURT:  Good morning, jurors.

12       THE JURORS:  Good morning.

13       THE COURT:  Again, we appreciate your patience.

14   In a trial like this there are always issues that the

15   lawyers and I have to resolve without you, and we've

16   been doing that.  We're ready to proceed.

17       The next testimony of the next two witnesses

18   will be presented in a way that's slightly different

19   from the way you've seen already from witnesses.

20   Sometimes at trials it's not always possible to have

21   people here, and there might be substitutes for their

22   personal appearance.  A common substitute is that there

23   was a prior occasion on which the parties had an

24   opportunity to conduct examination very similar to what

25   you see here, and it's been recorded and so on.  That's

PDF created with pdfFactory trial version www.pdffactory.com

1    what we have.  We have transcripts of examination and

2    cross-examinations of the next two witnesses that are

3    able to be presented because the witnesses are not able

4    to be here.

5           The way it will happen is that a person will

6    play the role of the witness but will simply be reading

7    from the transcript.  And you should treat the reader as

8    if it were the witness although you don't have the same

9    benefit of seeing the person.  But we'll follow the same

10   question-and-answer format, and the witness's answer

11   will be given by a reader.

12          All right.  Mr. Pirozzolo?

13          MR. PIROZZOLO:  Thank you, your Honor.

14          The government's next witness is Linda Jokinen.

15   And speaking on behalf of Ms. Jokinen is Sarah Walters.

16          THE COURT:  And I guess I should say for the

17   record that the transcript that we're using indicates

18   that the witness was sworn, as would have been done here

19   before the testimony was given.

20          MR. PIROZZOLO:  Is it necessary for the reader

21   to be sworn, your Honor?

22          THE COURT:  No, I don't think so.

23          MS. WALTERS:  I'll do my best.

24          (Testimony of Linda Jokinen read as follows:)

25   BY MR. PIROZZOLO:

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Good afternoon, Ms. Jokinen.  Will you tell us where

2    you live, please?

3    A.   In Norwood, Massachusetts.

4         THE COURT:  Excuse me.  Could you just adjust

5    the mic so you're speaking into it?  It's very

6    directional, and you have to be speaking right into it.

7    BY MR. PIROZZOLO:

8    Q.   And how long have you lived in Norwood?

9    A.   For 22 years.

10   Q.   Can you briefly summarize for us your educational

11   background?

12   A.   I went to Beaver Country Day School for prep school,

13   and I went to Bentley College where I get my B.S. in

14   accounting.

15   Q.   When was that?

16   A.   '75.

17   Q.   Did you work in the accounting field after you

18   graduated from Bentley?

19   A.   I did.

20   Q.   Can you summarize for us types of work that you did

21   after you graduated?

22   A.   I did some corporate work being the account manager

23   of different companies, and I also had my own small

24   accounting practice where I had private clients.

25   Q.   How long did you have your own accounting practice?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Approximately 20 years.

2    Q.    And did you work anywhere else?

3    A.    I worked at several different firms.

4    Q.    Was one of those firms H&R Block?

5    A.    Yes.

6    Q.    How long did you work at H&R Block?

7    A.    Eight years.

8    Q.    Did you also work, at some point in time, for a

9    company that performed 1031 property exchanges?

10   A.    I did.

11   Q.    What was the name of that company at the time you

12   started work there?

13   A.    Nationwide Property Exchange.

14   Q.    Can you tell us where physically you worked?

15   A.    In Martin Paley's office.

16   Q.    Where was that?

17   A.    In his home.

18   Q.    Which was in what town?

19   A.    In Newton.

20   Q.    And where was Nationwide itself based?

21   A.    In California.

22   Q.    How did you come to work with Martin Paley in

23   Newton?

24   A.    We just discussed it over time, and we finally --

25   and we finally came to pass that I had to leave my

PDF created with pdfFactory trial version www.pdffactory.com

1    full-time job in Boston due to illness, and shortly

2    after that I started working for Marty.

3    Q.    Are you and he related?

4    A.    Yes.

5    Q.    How are you related?

6    A.    We're first cousins.

7    Q.    Approximately when did you stop working in Boston

8    and join Nationwide?

9    A.    '97.

10   Q.    Can you tell us the principal business of that

11   company?

12   A.    1031 exchanges.

13   Q.    What were your job responsibilities when you first

14   started at Nationwide?

15   A.    I did the bookkeeping; I had client contacts; I

16   followed through on exchanges.

17   Q.    And at some point did the Newton office end its

18   affiliation with Nationwide?

19   A.    Yes.

20   Q.    Do you remember about when that happened?

21   A.    I don't.

22   Q.    Did the office become affiliated with some other

23   company?

24   A.    Yes.

25   Q.    What was the name of that new company?

```
 1   A.   Benistar.

 2   Q.   Where was Benistar based?

 3   A.   Also in Marty's home.

 4   Q.   Are you familiar with a company called Benistar,

 5   Ltd.?

 6   A.   Yes.

 7   Q.   Where was Benistar, Ltd., based?

 8   A.   In Connecticut.

 9   Q.   Who was the head of Benistar, Ltd.?

10   A.   Dan Carpenter.

11   Q.   Can you tell us the relationship, if any, that

12   existed between the Newton office and Benistar, Ltd.?

13   A.   Yes.

14         MR. PIROZZOLO:  Excuse me.  Let me ask the next

15   question.  Line 23.

16         (Testimony of Linda Jokinen continues to be read

17   as follows:)

18   BY MR. PIROZZOLO:

19   Q.   As a matter of corporate structure, Ms. Jokinen, are

20   you aware whether a relationship existed between the

21   Newton office and Benistar, Ltd.?

22   A.   Yes.

23   Q.   How did you know that?

24   A.   Because we had documents going back and forth and

25   contact between Benistar, Ltd., and Benistar Property
```

1    Exchange.

2    Q.   And based on the documents that you saw going back

3    and forth, what was the corporate relationship between

4    Benistar, Ltd., and Newton?

5    A.   Benistar was the parent company.

6    Q.   What was the name of the Newton office after it

7    became owned by Benistar, Ltd.?

8    A.   Benistar Property Exchange.

9    Q.   Did your office location change physically?

10   A.   No.

11   Q.   Did Benistar Property Exchange continue performing

12   1031 exchanges?

13   A.   Yes.

14   Q.   Did anyone work at the Newton office of Benistar

15   Property Exchange Trust Company besides you and Martin

16   Paley?

17   A.   Yes.

18   Q.   Who else worked there?

19   A.   Holly Fletcher.

20   Q.   I'm sorry.  What was her job?

21   A.   Marketing.

22   Q.   How long was Ms. Fletcher at Benistar Property?

23   A.   Not very long; a matter of months.

24   Q.   Did anyone else work there?

25   A.   Paul Ley.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   Would you spell the last name, please?

 2   A.   L-E-Y.

 3   Q.   What was Mr. Ley's job?

 4   A.   He was supposed to be maintaining the computers and

 5   searching out new products.

 6   Q.   How long was he at Benistar Property?

 7   A.   I'm not sure.  Again, a matter of months.

 8   Q.   Was anyone else there besides you and Mr. Paley?

 9   A.   At some point towards the end Susan Paley started

10   working there.

11   Q.   Is that Martin Paley's wife?

12   A.   Yes.

13   Q.   And do you know the name Stewart Winkler?

14   A.   I do.

15   Q.   Did Mr. Winkler work at Benistar Property?

16   A.   Yes, he did.

17   Q.   What was his job?

18   A.   Supposed to be strategic sales.

19   Q.   How long was he there?

20   A.   Again, just a matter of months.

21   Q.   For the benefit of our court reporter, if you

22   could --

23             MR. PIROZZOLO:  Let me skip that one.

24             (Testimony of Linda Jokinen continues to be read

25   as follows:)
```

PDF created with pdfFactory trial version www.pdffactory.com

1    BY MR. PIROZZOLO:

2    Q.    At some point after Benistar, Ltd., acquired

3    Benistar Property Exchange, did you receive a memorandum

4    setting forth standard operating procedures for 1031

5    exchanges?

6    A.    I saw one.

7    Q.    Where did you see it?

8    A.    It came in an e-mail or a fax.

9    Q.    Let me show you what's been marked for

10   identification as Government Exhibit 179.  Would you

11   tell us if you recognize that document?

12   A.    I do.

13   Q.    Can you identify it for us, please?

14   A.    It's a letter that Dan sent to Marty.

15   Q.    When you say "Dan," you're referring to Dan

16   Carpenter?

17   A.    I am.

18   Q.    How many pages is this document?

19   A.    Two pages.

20   Q.    And the first page is the letter you just

21   referenced?

22   A.    Yes.

23   Q.    What is the date of the letter?

24   A.    June 17, 1999.

25   Q.    And can you identify briefly what the second page

PDF created with pdfFactory trial version www.pdffactory.com

1    is?

2    A.    Standard operating procedure from Dan to Marty.

3    Q.    Can you read the "to" line?

4    A.    "Linda or Holly faxes exchange information to

5    Janet."

6    Q.    Now, turn to page 2 of the exhibit of 179.

7    A.    Okay.

8    Q.    Who is the memo addressed to?

9    A.    It's addressed to all Benistar Property Exchange

10   Trust staff.

11   Q.    Were you one of those staff members?

12   A.    Yes.

13   Q.    What's the date of the memo?

14   A.    June 16, 1999.

15   Q.    Did you see this memorandum while you worked at

16   Benistar Property?

17   A.    I did.

18           MR. PIROZZOLO:  The government would move

19   Exhibit 179 into evidence.

20           THE COURT:  All right.

21           (Government Exhibit No. 179 received into

22   evidence.)

23           MR. PIROZZOLO:  May I project it?

24           THE COURT:  You may.

25           Get the monitors ready, jurors.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1          (Testimony of Linda Jokinen continues to be read
 2     as follows:)
 3     BY MR. PIROZZOLO:
 4     Q.   Ms. Jokinen, would you read, please, the letter from
 5     Mr. Carpenter to Mr. Paley?
 6     A.   "Dear Marty:  Enclosed please find a list of
 7     standard operating procedures for the Benistar Property
 8     Exchange.
 9          "I want to continue having everything come through
10     the Simsbury office.  If there ever is a problem and
11     someone tries to sue, it will be Benistar that will
12     probably be sued and not Newton; therefore, we want the
13     quality control to remain with us.
14          "Please feel free to give me a call with any
15     comments, additions or suggestions.
16          "With best regards, Daniel E. Carpenter, Esq."
17     Q.   Now, if you would turn, please, to the second page
18     of this exhibit.  And would you read, please, who the
19     memo's addressed to, who it's from, what it pertains to
20     and the date?
21     A.   It's to all Benistar Property Exchange Trust staff
22     from Daniel E. Carpenter, Esq., regarding standard
23     operating procedure, and the date is June 16, 1999.
24     Q.   Okay.  Now, did you read this memo when it came in?
25     A.   I did.
```

1  Q.   According to the operating procedures as specified,

2  how were exchanges supposed to be handled?

3        MR. GREENBERG:  Objection, your Honor.  This

4  question was excluded.

5        MR. PIROZZOLO:  Yes.  I apologize.

6        THE COURT:  Line 5.

7        MR. PIROZZOLO:  Yes.  Thank you, your Honor.

8        (Testimony of Linda Jokinen continues to be read

9  as follows:)

10  BY MR. PIROZZOLO:

11  Q.   Okay.  Then, Ms. Jokinen, why don't we just go

12  through the paragraphs in this memo.

13  A.   Okay.  Number 1:  "Marty Paley arranges exchange and

14  provides Linda or Holly with the information on the

15  upcoming transaction."

16  Q.   "Linda" is you?

17  A.   Me.

18  Q.   And who is "Holly"?

19  A.   Holly Fletcher.

20  Q.   Would you read the next paragraph?

21  A.   "Linda or Holly faxes exchange information to Janet

22  at (860)408-7015.  Janet verifies fax received by phone

23  or confirmation fax."

24  Q.   Who's "Janet"?

25  A.   Janet May.

1   Q.   Where was she based?

2   A.   In Connecticut.

3   Q.   Would you read Paragraph 3, please?

4   A.   "Janet calls closing attorney to verify information

5   and reminds closing attorney to send all signed

6   documents and correspondence directly to her at

7   Benistar, 507 Hopmeadow Street, Simsbury, Connecticut

8   06070.  Client does not start to accumulate interest

9   until Janet has confirmation from attorney of any

10   wires/checks and signed documents."

11   Q.   Paragraph 4?

12   A.   "Janet prepares all documents for closing (unless

13   out of the office on vacation, ill, et cetera).  Janet

14   or company representative will notify the Newton office

15   when she is unavailable.  She sets up a file, and

16   completed documents are faxed to Property Exchange in

17   Newton to verify that documents are correct.  They then

18   fax information to all property parties and send Janet

19   confirmation response."

20   Q.   Paragraph 5?

21   A.   "Following the closing, Janet receives signed

22   documents, wire confirmation, check for fees."

23   Q.   And if you could just continue with Paragraphs 6, 7

24   and 8?

25   A.   "Janet deposits checks, logs in wire and

PDF created with pdfFactory trial version www.pdffactory.com

1    confirmation wire with Merrill Lynch.  She then mails a

2    copy of signed documents and wire confirmation and any

3    fees owed (once check is cleared) to Property Exchange

4    in Newton."

5        Number 7:  "Linda or Holly prepare confirmation

6    letter to client and any additional follow-up

7    correspondence with clients."

8        Number 8:  "Janet faxes a report on Fridays of any

9    activity in and out for the week."

10   Q.   Okay.  If you could read the last three lines of

11   this page, the ones that I've highlighted in yellow?

12   A.   "At no time are any procedures to be changed by any

13   staff of the Benistar Property Exchange without the

14   prior approval of Daniel Carpenter."

15       MR. GREENBERG:  Your Honor, I would object to

16   the next two questions.

17       THE COURT:  Overruled.

18       (Testimony of Linda Jokinen continues to be read

19   as follows:)

20   BY MR. PIROZZOLO:

21   Q.   During the time that you worked at Benistar Property

22   Exchange, did Mr. Carpenter have final approval

23   authority over the operations at Benistar Property

24   Exchange?

25   A.   Yes.

1   Q.   Was his authority greater or less than that of Marty

2   Paley?

3   A.   Greater.

4   Q.   Were there other memos issued by Mr. Carpenter

5   regarding operating procedures?

6   A.   Yes.

7   Q.   Let me show you what's been marked as Government

8   Exhibit 178 for identification.   Do you recognize that

9   document, Ms. Jokinen?

10  A.   I do.

11  Q.   Would you tell us what it is?

12  A.   It's a memo regarding procedural issues.

13  Q.   From whom to whom?

14  A.   From Dan Carpenter to Martin Paley, Holly Fletcher,

15  Benistar Property Exchange.

16  Q.   What's the date of the memo?

17  A.   May 24, 1999.

18  Q.   And did you see this document when you worked at

19  Benistar Property?

20  A.   I did.

21          MR. PIROZZOLO:   The government would offer

22  Exhibit 178 into evidence.

23          THE COURT:   All right.   It's admitted.

24          (Government Exhibit No. 178 received into

25  evidence.)

PDF created with pdfFactory trial version www.pdffactory.com

1          (Testimony of Linda Jokinen continues to be read
2    as follows:)
3    BY MR. PIROZZOLO:
4    Q.   Ms. Jokinen, if we could look at the second page of
5    this exhibit -- actually, let's go back to the first
6    page for just a second.  Would you tell us what this
7    page is?
8    A.   It's the fax cover sheet from a letter.
9    Q.   From whom to whom?
10   A.   From Dan Carpenter to Marty Paley.
11   Q.   And then if we could turn to the second page, is
12   this the memo itself?
13   A.   Yes.
14   Q.   Did you work at Benistar Property Exchange at the
15   time this memo was dated?
16   A.   Yes, I did.
17   Q.   Would you read the first sentence of the memo?
18   A.   "In an effort to avoid future misunderstandings,
19   this is to let you know in writing how the money is
20   transferred for Benistar Property Exchange and to set
21   some procedures."
22   Q.   And then if you could just read the first sentence
23   in Paragraph No. 1?
24   A.   "All transactions from this office are handled by
25   Janet May and Janet May only."

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   If you would turn to the second page of this memo.

2    If you would look at Paragraph No. 3.  Would you read

3    the last sentence in that paragraph?

4    A.   "Remember, you get 90 percent of each transaction.

5    We only get 10 percent, yet Janet does a lot of the

6    work."

7    Q.   Did Benistar Property in Newton and Benistar in

8    Connecticut split the fees that were received?

9    A.   Yes.

10   Q.   What was the fee split?

11   A.   90/10.

12   Q.   Ninety percent going to whom?

13   A.   To Newton.

14   Q.   And 10 percent going where?

15   A.   To Connecticut.

16   Q.   Did that percentage remain the same during the

17   entire time you worked at Benistar Property?

18   A.   Yes.

19   Q.   Was there ever any change made to the operating

20   procedures outlined in Exhibits 178 and 179?

21   A.   Yes.

22   Q.   What was the change?

23   A.   Over time it evolved that I handled most of the

24   paperwork.

25   Q.   When you say "the paperwork," what do you mean?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    The exchange documents.

2    Q.    Did Benistar personnel in Connecticut continue to

3    have any responsibilities?

4    A.    They handled the cash.

5    Q.    The client money that came in?

6    A.    Right.

7    Q.    Did Benistar Property have marketing and promotional

8    materials that it sent clients?

9    A.    Yes.

10   Q.    Can you tell us what types of materials went out to

11   clients?

12   A.    There were PowerPoint presentations, pages

13   describing what a 1031 exchange was.  I'm sorry, could

14   you repeat the question?

15   Q.    Yes.  I asked you what types of materials went out

16   to clients by way of promotional materials.

17   A.    Okay.  Those are the main ones.

18   Q.    I'm going to show you what's been admitted into

19   evidence as Government's Exhibits 1 through 6.  If you

20   could look at Exhibit 1, please, and tell us if you

21   recognize that.

22   A.    I do.

23   Q.    What do you recognize it to be?

24   A.    It's a PowerPoint presentation used as a marketing

25   tool.  This particular one is directed to Eliot Snider.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Did you see -- well, let me ask you this:  Was this

2  PowerPoint presentation provided to any client other

3  than Eliot Snider?

4  A.   Yes.

5  Q.   Were any changes made to the presentation depending

6  on which client it was going to?

7  A.   Yes.

8  Q.   What types of changes were made?

9  A.   Typically, just the name, the company.

10  Q.   So on the first page, Slide 1 where it says

11  "Presentation to Eliot Snider, Massachusetts Lumber

12  Company," would you make a change to that?

13  A.   Yes.

14  Q.   What change would you make?

15  A.   We would put in the correct client name and the

16  correct client company.

17  Q.   Were any other changes made to this if you were

18  giving a presentation to a potential exchangor?

19  A.   It would still have a "presentation" line.

20  Q.   Did you play any personal role in the preparation of

21  this PowerPoint presentation?

22  A.   I did.

23  Q.   What was your role?

24  A.   I would print them for the client.  I would also do

25  some editing if there were changes to be made.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   So the changes you were just discussing where you

2  might change the name "Eliot Snider" to another name,

3  was that a change you would make?

4  A.   Yes.

5  Q.   And I think you also were explaining down below the

6  slide where it says -- and I'm going to highlight it

7  now -- where it says "Benistar presents 1031

8  tax-deferred property exchanges to Eliot Snider,

9  Massachusetts Lumber Company."  Was that another change

10  that you would make depending on the client?

11  A.   Yes.

12  Q.   Were there any other changes that you personally

13  made to the PowerPoint presentation to customize it for

14  one exchangor versus another?

15  A.   Sometimes there's another unusual type of exchange

16  and we wanted to make sure that that was covered, so we

17  might add a page.

18  Q.   Okay.  Other than when there was an unusual

19  exchange, did the rest of the PowerPoint basically stay

20  the same?

21  A.   It changed over time; there were some different

22  things done to it.

23  Q.   Okay.  Now, if you would look at the next exhibit,

24  Exhibit 2, which has the title "Frequently Asked

25  Questions About 1031 Property Exchange."

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Right.

2    Q.    Did you see this document when you worked at

3    Benistar Property?

4    A.    I did.

5    Q.    Was it sent -- did you send it to potential clients?

6    A.    Yes.

7    Q.    Now, if you would look at Exhibit 3, which is titled

8    "1031 Property Exchange and Overview," did you see that

9    document when you worked at Benistar?

10   A.    I did.

11   Q.    Did you send it to potential clients?

12   A.    I did.

13   Q.    Exhibit 4, titled "1031 Property Exchange Legal

14   Authority," did you see that when you worked at Benistar

15   Property?

16   A.    I did.

17   Q.    Did you send it to potential clients?

18   A.    I did.

19   Q.    And then Exhibit 5.  Did you see that document as

20   well?

21   A.    I did.

22   Q.    Did you send it to clients?

23   A.    I did.

24   Q.    And then Exhibit 6, which is the five-part series

25   titled "These are the ABC's of Tax-Deferred Exchanges,"

PDF created with pdfFactory trial version www.pdffactory.com

1    did you see this when you worked at Benistar Property?

2    A.    I did.

3    Q.    Did you send this to potential clients?

4    A.    I did.

5    Q.    Now, if you take Exhibits 1 through 6, the ones we

6    just reviewed, did you send these materials down to

7    Connecticut to be reviewed?

8    A.    Yes.

9    Q.    To be reviewed by whom?

10   A.    By Dan Carpenter.

11   Q.    What caused you to send the materials down to

12   Connecticut for review by Dan Carpenter?

13   A.    Because the procedure was that everything had to be

14   approved by him before going out of the office.

15   Q.    Was that true as to these promotional materials as

16   well?

17   A.    Yes.

18   Q.    Now, I didn't ask you this as to Exhibits 2 through

19   6 -- I did ask you as to Exhibit 1, but just focusing on

20   2 through 6 -- were these materials in this form, or

21   this basic form, sent to all potential clients or were

22   there customized differences depending on which client

23   was getting what?

24   A.    It may not have gone to every client, but there are

25   no customized differences on this.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Okay.  Now, in addition to the promotional materials

2    that we've just reviewed, did Benistar Property have an

3    insurance binder or bond that it sent to the clients as

4    well?

5    A.    We had one from Benistar.

6    Q.    And I'm going to put up on -- well, actually, let me

7    show it to you as well.  Do you have in front of you

8    Exhibit 7?  Do you have that in front of you?

9    A.    I do.

10   Q.    Okay.  Now, if you would turn to the second page of

11   Exhibit 7.  Do you recognize this document?

12   A.    I do.

13   Q.    And what do you recognize it to be?

14   A.    The insurance binder sent by Benistar, Ltd., to

15   Benistar-Newton to send out to clients or their

16   attorneys when asked.

17   Q.    And you anticipated my next question, which is:

18   When you sent this out to clients, where did you get it

19   from to be able to send it?

20   A.    Connecticut.

21   Q.    Now, Ms. Jokinen, I'd like to show you what's been

22   marked for identification as Government Exhibit No. 82,

23   and I'm going to show you what's been marked for

24   identification as Government Exhibit 83.

25        Let's start with Exhibit 82.  Would you look at

PDF created with pdfFactory trial version www.pdffactory.com

1    that, please.  Do you recognize that?

2    A.    I do.

3    Q.    Would you tell us what it is?

4    A.    It's my faxing of the Fidelity bond to Marjorie

5    Adams.

6    Q.    Who is Marjorie Adams?

7    A.    Joe Iantosca's attorney.

8    Q.    Who is Joe Iantosca?

9    A.    An exchange client.

10   Q.    What's the date of the fax?

11   A.    May 17, 2000.

12   Q.    Did you personally send this fax to Ms. Adams?

13   A.    Yes, I did.

14          MR. PIROZZOLO:  The government would offer

15   Exhibit 82 into evidence.

16          THE COURT:  Okay.

17          (Government Exhibit No. 82 received into

18   evidence.)

19          (Testimony of Linda Jokinen continues to be read

20   as follows:)

21   BY MR. PIROZZOLO:

22   Q.    Let me pull it up on the screen.  And I will turn,

23   if you would turn with me, to the second page.

24       Is this a copy of the insurance binder that you sent

25   to Ms. Adams?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes, it is.

2    Q.    Now, if you would turn, please, to Exhibit 83.  Do

3    you recognize that document?

4    A.    I do.

5    Q.    What is it?

6    A.    It's a bond that I sent to Matthew Kameron.

7    Q.    Who is Matthew Kameron?

8    A.    He's an attorney at Robinson & Cole.

9    Q.    Who did he represent?

10   A.    I don't recall.

11   Q.    And what were you sending him by way of this fax?

12   A.    The Fidelity bond.

13   Q.    Did you send this personally yourself?

14   A.    I did.

15         MR. PIROZZOLO:  The government would offer

16   Exhibit 83 into evidence.

17         THE COURT:  All right.

18         (Government Exhibit No. 83 received into

19   evidence.)

20         (Testimony of Linda Jokinen continues to be read

21   as follows:)

22   BY MR. PIROZZOLO:

23   Q.    Let me just pull it up on the screen.  What was the

24   date of this particular fax?

25   A.    November 29, 2000.

1    Q.   And if you would turn, please, to the second page.

2    Is that a copy of the bond that you sent to Mr. Kameron?

3    A.   It is.

4    Q.   And who is the underwriter for this particular bond?

5    A.   Donald Rowe.

6    Q.   Working for what company?

7    A.   Travelers Property Casualty [sic].

8    Q.   Now, if you would turn, please, to the third page of

9    this exhibit.  Was this also part of your fax to Mr.

10   Kameron?

11   A.   Yes.

12   Q.   Would you tell us what this document is, this page?

13   A.   This document just describes what the bond covers.

14   Q.   Okay.  And who's it from?

15   A.   It's from Donald Rowe.

16   Q.   Working at Travelers?

17   A.   Yes.

18   Q.   Who is it addressed to?

19   A.   Daniel Carpenter.

20   Q.   Did you send this bond out to clients or their

21   representatives other than Eliot Snider, Marjorie Adams

22   and Matthew Kameron?

23   A.   Yes.

24   Q.   Now, after a client decided to hire Benistar

25   Property to perform a property exchange, was there a set

1    of agreements or documents that you would prepare in

2    connection with the transaction?

3    A.    Yes.

4    Q.    Did you prepare similar agreements for each exchange?

5    A.    Yes.

6    Q.    Were there standard forms that you used to prepare

7    the documents?

8    A.    Yes.

9    Q.    Where did you get the forms?

10   A.    From Daniel Carpenter.

11   Q.    Let me show you what's been marked as Government

12   Exhibit 181 for identification.  Do you recognize that

13   document?

14   A.    I do.

15   Q.    Would you tell us what it is?

16   A.    It's a set of revised exchange documents.

17   Q.    Who is the sender?

18   A.    Myself.

19   Q.    What's the date on which you sent it?

20   A.    September 13, 2000.

21   Q.    And did you put together the documents that are

22   enclosed with this fax?

23   A.    Yes, I did.

24   Q.    Do you see on the "re" line where it says

25   "Massachusetts Lumber"?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yes.

2   Q.   Are you familiar with a company called Massachusetts

3   Lumber?

4   A.   I am.

5   Q.   Who are they?

6   A.   It's Eliot Snider's company.

7   Q.   Did you work on a 1031 transaction relating to

8   Massachusetts Lumber?

9   A.   I did.

10  Q.   And did you send this fax out in connection with

11  that transaction?

12  A.   I did.

13       MR. PIROZZOLO:  The government would offer 181

14  into evidence.

15       THE COURT:  Okay.

16       (Government Exhibit No. 181 received into

17  evidence.)

18       (Testimony of Linda Jokinen continues to be read

19  as follows:)

20  BY MR. PIROZZOLO:

21  Q.   I just brought up the first page of this exhibit on

22  the projector, Ms. Jokinen.  Do you see this there?

23  A.   I do.

24  Q.   And the top of the cover sheet just indicates who it

25  was being sent to, correct?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    Right.

2  Q.    And then if we look at the next two paragraphs, the

3  actual text of the cover sheet, would you read both of

4  those paragraphs, please?

5  A.    "Here are revised exchange documents to be executed

6  at the above-noted closing.  Please note the date must

7  be inserted onto the first line of the exchange

8  agreement.  Please have both the buyer and seller sign

9  wherever necessary and send the executed documents to

10  Benistar Property Exchange as noted on the attached

11  letter.

12       "All funds are to be sent, preferably by wire, to

13  Benistar Property Exchange.  If it is necessary to send

14  checks, they must all be made payable only to Benistar

15  Property Exchange and cannot be endorsed by any other

16  payee to Benistar.  Please send any proceeds checks by

17  overnight mail to:  Jackie Spielman, Benistar, Ltd., 507

18  Hopmeadow Street, Simsbury, Connecticut 06070, telephone

19  (860) 408-7000."

20  Q.    I believe we'd just begun reviewing together Exhibit

21  181.  Do you have that in front of you?

22  A.    I do.

23  Q.    If you would turn, Ms. Jokinen, to the second page

24  of Exhibit 181.  Do you see the list of disclosures in

25  the middle of that page?

1  A.    I do.

2  Q.    Would you read that list for us?

3  A.    "Exchange agreement; escrow agreement; fee invoice;

4  Merrill Lynch fund selection form; wire transfer

5  instructions."

6  Q.    Am I correct this is a letter that you prepared?

7  A.    Yes.

8  Q.    And who assembled the list of enclosures?

9  A.    It was a boilerplate document.

10 Q.    Was that something you had to put together, though?

11 A.    Probably.

12 Q.    Okay.  Are these the types of agreements that you

13 sent out to exchangors or their attorneys prior to the

14 first real estate transaction in a 1031 exchange?

15 A.    No.

16 Q.    Is there something different here that you typically

17 did not send out to a client?

18 A.    We did not send them out.  They were sent out by the

19 California office.

20 Q.    Okay.  Take a look, though, at the date in the top

21 left-hand corner of this exhibit.  Do you see that date,

22 September 13, 2000?

23 A.    I do.

24 Q.    As of September 2000 -- and actually, if you look at

25 the heading at the top of page 2, do you see where it

PDF created with pdfFactory trial version www.pdffactory.com

1    says "Benistar Property Exchange Trust Company"?

2    A.    Yes.

3    Q.    As of that point in time was the Newton office

4    affiliated with Nationwide in California anymore?

5    A.    I don't know.

6    Q.    Am I correct that after the affiliation with

7    Nationwide ended, that's when it started to become

8    called Benistar Property Exchange?

9    A.    Where.

10   Q.    Now, if you'd look at the list of enclosures again,

11   do you see where it says "exchange agreement"?

12   A.    Yes.

13   Q.    Are you familiar with that document?

14   A.    Yes, I am.

15   Q.    Is that a document that was used for all of the 1031

16   exchanges you worked on?

17   A.    With some minor adjustments; yes.

18   Q.    And how about the escrow agreement, was that a

19   standard form document?

20   A.    Yes.

21   Q.    At the bottom of the letter here -- and I'm going to

22   magnify it for everyone's benefit -- can you read the

23   last two lines of the letter?

24   A.    "After the closing, please return the original

25   signed documents to our Newton office along with a

1    confirmation for funds wired or check mailed."

2    Q.   Was that same instruction to return the original

3    signed documents to Newton -- was that same instruction

4    given to all of Benistar's exchangors?

5    A.   Many.

6    Q.   And when the documents came back to the Newton

7    office after they had been signed, did they come to you?

8    A.   Yes.

9    Q.   I'd like to show you what's been marked for

10   identification as Government Exhibit 70.  At the same

11   time, I'll bring you what's been marked as Government

12   Exhibit 79.  But if you could look, first, please, at

13   Government Exhibit 70 and just read it to yourself, if

14   you would, please.

15       I want to direct your attention in particular to the

16   "re" line.  Do you see where -- there the name "Brian G.

17   Fitzgerald"?

18   A.   I do.

19   Q.   Do you recognize that name?

20   A.   I do.

21   Q.   Who was Brian Fitzgerald?

22   A.   He was an exchange client.

23   Q.   Did you work on his 1031 exchange?

24   A.   I did.

25   Q.   And am I correct Exhibit 70 is a letter?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    Yes.

2  Q.    Who is it addressed to?

3  A.    It's addressed to Benistar Property Exchange Trust.

4  Q.    And to the attention of whom?

5  A.    Myself, Linda Jokinen.

6  Q.    Date of the letter, please?

7  A.    November 16, 2000.

8  Q.    And am I correct that this letter refers to

9  Mr. Fitzgerald's exchange?

10 A.    Yes.

11        MR. PIROZZOLO:  Your Honor, the government would

12 move that Exhibit 70 be admitted.

13        THE COURT:  Okay, it's admitted.

14        (Government Exhibit No. 70 received into

15 evidence.)

16        (Testimony of Linda Jokinen continues to be read

17 as follows:)

18 BY MR. PIROZZOLO:

19 Q.   I'm now going to project the first page of this

20 exhibit.  And, Ms. Jokinen --

21        MR. PIROZZOLO:  Your Honor, a witness has just

22 entered the courtroom.

23        THE COURT:  I think they're aware of that, yeah.

24        (There is an interruption in the proceedings.)

25        THE COURT:  Thank you.

PDF created with pdfFactory trial version www.pdffactory.com

1    (Testimony of Linda Jokinen continues to be read
2    as follows:)
3    BY MR. PIROZZOLO:
4    Q.   And, Ms. Jokinen, if you would just read the first
5    sentence of the letter right after the introduction, the
6    "Dear Linda."
7    A.   "In connection with the above-captioned matter and
8    our recent telephone conversations concerning the same,
9    please find enclosed herewith the following documents."
10   Q.   And do you see the list set forth below?
11   A.   I do.
12   Q.   Is this an example of an attorney sending you back
13   the fully signed exchange documents?
14   A.   Yes.
15   Q.   Now, if you would put before you, please, Exhibit
16   29, and just look for a moment at the first two pages.
17   Would you tell us what the first page is?
18   A.   It's a fax cover sheet.
19   Q.   Addressed to whom?
20   A.   To myself.
21   Q.   What's the date, please?
22   A.   August 8, 2000.
23   Q.   And then if you would turn to the second page of
24   Exhibit 29, would you tell us what that is?
25   A.   That's a letter to me.

1    Q.    Dated what?

2    A.    August 8, 2000.

3    Q.    And do you see the "re" line?

4    A.    I do.

5    Q.    Where it says "Bellemore Associates," do you see

6    that?

7    A.    I do.

8    Q.    Do you recognize the name "Bellemore Associates"?

9    A.    I do.

10   Q.    What do you recognize it to be?

11   A.    An exchange client.

12          MR. PIROZZOLO:  At this point the government

13   would move Exhibit 29 into evidence.

14          THE COURT:  Okay.

15          (Government Exhibit No. 29 received into

16   evidence.)

17          (Testimony of Linda Jokinen continues to be read

18   as follows:)

19   BY MR. PIROZZOLO:

20   Q.    I'm now going to project, Ms. Jokinen, the second

21   page of Exhibit 29.  You've already mentioned it was

22   dated August 8th, 2000; is that correct?

23   A.    Yes.

24   Q.    Now, would you read the line starting "Via

25   facsimile," please?

1  A.   "Via facsimile transmission and by overnight

2  delivery."

3  Q.   And we covered the fact that the "re" line says

4  "Bellemore Associates."  Now, would you just read where

5  it says "Dear Ms. Jokinen," the first sentence after

6  that?

7  A.   "Enclosed herein please find an original executed

8  exchange agreement and escrow agreement regarding the

9  above-referenced matter and forward us a copy of the

10 final settlement statement in this regard."

11 Q.   And then if you'd see the third sentence, I'm going

12 to try to highlight it as best I can.  "Please note that

13 I anticipate funds."  Do you see that?

14 A.   I do.

15 Q.   Would you read that, please?

16 A.   "Please note that I anticipate funds in the amount

17 of $444,659.65 being wired into your account as

18 Bellemore Associates, LLC's, net proceeds."

19 Q.   Thank you.  Now, when clients or their attorneys

20 send into the Newton office their fully signed exchange

21 documents, what did you do with them after you received

22 them?

23 A.   I gave them to Marty to sign.

24 Q.   And after they were signed, what did you do with

25 them?

PDF created with pdfFactory trial version www.pdffactory.com

```
1   A.   I kept an original and sent a copy back to the
2   client.
3   Q.   And did you send copies anywhere else besides the
4   client?
5   A.   Occasionally I would send a set down to Connecticut.
6   Q.   To anyone particular in Connecticut?
7   A.   At first Jackie Spielman.  Excuse me, at first
8   Jackie May, and then Jackie Spielman.
9   Q.   Now, if you would pull back out and put in front of
10  you Exhibit 181, and I'm going to project the first page
11  of that exhibit and magnify the second paragraph.
12       When you were sending out the exchange documents to
13  be signed, was it your practice to provide instructions
14  to the attorneys concerning what should be done with the
15  money when the first transaction took place; in other
16  words, when the first piece of property was sold?
17  A.   Yes.
18  Q.   Does this letter contain such instructions?
19  A.   The highlighted area.
20  Q.   Would you read that, please?
21  A.   "All funds are to be sent preferably by wire to
22  Benistar Property Exchange.  If it is necessary to send
23  checks, they must all be made payable only to Benistar
24  Property Exchange and cannot be endorsed by any other
25  payee to Benistar.  Please send any proceeds checks by
```

1    overnight mail to:  Jackie Spielman, Benistar, Ltd., 507

2    Hopmeadow Street, Simsbury, Connecticut 06070, telephone

3    (860)408-7000."

4    Q.   Thank you.  Now, we had already reviewed the list of

5    enclosures, but I would like to turn a bit deeper into

6    Exhibit 181 and find, if you would, the first enclosure

7    which is entitled "Exchange Agreement."  Do you have it?

8    A.   I do.

9    Q.   Did you prepare exchange agreements for most, if not

10   all, of the 1031 exchanges on which you worked?

11   A.   Yes.

12   Q.   Now, if you would turn and find the next enclosure

13   which is titled "Escrow Agreement."  Do you have that?

14   A.   I do.

15   Q.   Did you also prepare escrow agreements for most, if

16   not all, of the exchanges on which you worked?

17   A.   I did.

18   Q.   If you would find the next enclosure, please, which

19   is the fee invoice.  I'm going to project that as well.

20   Do you have it?

21   A.   I do.

22   Q.   Would you read the dollar amount for this particular

23   invoice?

24   A.   The exchange fee was 4,000; the retainer received

25   was 500; the balance due was 3500.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   What was the range of fees that Benistar Property

2    charged on the exchanges that you worked on?

3    A.   1500 was the typical, but it could be as high as

4    10,000.

5    Q.   Was that fee split in any way?

6    A.   Yes, it was.

7    Q.   Between whom and whom?

8    A.   Between Benistar-Connecticut and Benistar-Boston.

9    Q.   And what was that split?

10   A.   90/10.

11   Q.   And I may have asked you this -- if I did, I

12   apologize -- who received the 90 and who received the 10?

13   A.   Benistar-Boston received the 90; Benistar, Ltd., in

14   Connecticut received the 10.

15   Q.   Now, if you would turn to the next enclosure which

16   is the accounts selection form.

17   A.   Yes.

18   Q.   Did the clients -- did clients receive interest on

19   their funds while the money was being held in escrow?

20   A.   Yes, they did.

21   Q.   What was the interest rate?

22   A.   Three percent or 6 percent.

23   Q.   Was that a choice the clients could make between 3

24   percent and 6 percent?

25   A.   Yes.

1    Q.    How did they indicate their choice?

2    A.    By checking off the "3 percent" or "6 percent" line.

3    Q.    On the account selection form we're all looking at

4    now?

5    A.    Correct.

6    Q.    Would you read the title at the top?

7    A.    "Merrill Lynch Private Group Account Selection

8    Form."

9    Q.    And if you look at the remainder of the form, do you

10   see below where it says "3 percent per annum"?  And I'll

11   highlight it in yellow.  Do you see where I've just

12   highlighted?

13   A.    I do.

14   Q.    Would you read it, please?

15   A.    "3 percent per annum.  Merrill Lynch Ready Asset

16   Money Market account.  Notice:  The above account can be

17   liquidated the next business day following 48 hours'

18   written notice."

19   Q.    And was there a different notice required for 6

20   percent money?

21   A.    Yes, there was.

22   Q.    And I'm going to highlight that language.  What was

23   the written notice requirement for 6 percent money?

24   A.    Thirty days.

25   Q.    Now, if you would turn with me, please, to the final

PDF created with pdfFactory trial version www.pdffactory.com

1    enclosure of the exhibit, which are the wire transfer

2    instructions.  Do you see those?

3    A.    I do.

4    Q.    I'm going to magnify the middle third of that page.

5    Would you read the title?

6    A.    "Wire Transfer Instructions."

7    Q.    And on the first line of the instructions, which

8    bank was the money to be wired to?

9    A.    Mellon Bank.

10   Q.    And again I'll highlight in yellow, do you see where

11   after the Mellon Bank information there's a line that

12   says "For credit to"?

13   A.    Yes.

14   Q.    Which account was being credited in the first

15   instance?

16   A.    Merrill Lynch Account No. 1011730.

17   Q.    And I'm going to highlight where it says "further

18   credit to."  Do you see that?

19   A.    I do.

20   Q.    Where was the wire ultimately being credited to on

21   that line?

22   A.    Benistar Property Exchange Trust Company, Inc.,

23   Account No. 849-07B01.

24   Q.    Did all clients receive wire transfer instructions?

25   A.    I believe so.

1  Q.   Was there any difference between the instructions

2  given to clients who chose the 6 percent line versus the

3  clients who chose the 3 percent line?

4  A.   Not originally.

5  Q.   Okay.  Did that change at some point?

6  A.   It did.

7  Q.   How did it change?

8  A.   The accounts were split up on the wire transfer

9  instructions.

10  Q.   Okay.  Now, did you ever provide assistance when

11  there were logistical difficulties involving the wire?

12  A.   Very rarely.

13  Q.   I'm going to show you what's been marked for

14  identification as Government Exhibit 54.  And if we

15  could just start with the first page of Exhibit 54.

16      Am I correct this is a fax cover sheet?

17  A.   Excuse me?

18  Q.   Am I correct this is a fax cover sheet?

19  A.   Yes, that is.

20  Q.   Addressed to whom?

21  A.   To Jackie Spielman.

22  Q.   And sent by whom?

23  A.   By myself.

24  Q.   What's the date?

25  A.   September 7, 2000.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Do you see the "re" line?

2    A.    I do.

3    Q.    What's the name listed there?

4    A.    Byron Darling.

5    Q.    Do you recognize the name of Byron Darling?

6    A.    I do.

7    Q.    Who is he?

8    A.    He's an exchange client.

9    Q.    Am I correct this is a fax that you put together and

10   sent?

11   A.    Yes.

12         MR. PIROZZOLO:  Your Honor, the government would

13   move Exhibit 54 into evidence.

14         THE COURT:  All right.

15         (Government Exhibit No. 54 received into

16   evidence.)

17         (Testimony of Linda Jokinen continues to be read

18   as follows:)

19   BY MR. PIROZZOLO:

20   Q.    Ms. Jokinen, I'm going to project the first page of

21   Exhibit 54.  Do you see that?

22   A.    I do.

23   Q.    As we were just discussing, this is a fax that you

24   sent to Jackie Spielman in the Connecticut office; is

25   that right?

1  A.   Yes.

2  Q.   Would you read the text of the fax cover sheet which

3  I'm now highlighting?

4  A.   "Here is wire info for Byron Darling.  Please try to

5  track down this money.  According to his attorney, the

6  wire was sent last Monday.  Thanks."

7  Q.   And if you turn to the second -- and then I guess

8  I'm going to ask you about the third page of this

9  document, and I'll now project that.  Am I correct that

10  this is a Fidelity Investment bank wire request form?

11  A.   Yes.

12  Q.   And was this part of the materials that you sent

13  down to Connecticut?

14  A.   Yes.

15  Q.   Now, a few minutes ago we were reviewing Exhibit

16  181.  Do you recall -- there's no reason for you to pull

17  it back out, but do you recall the section of the first

18  page where you said the clients were instructed either

19  to wire their money, or if they sent checks to send the

20  checks to Connecticut?

21  A.   Yes.

22  Q.   When clients sent checks instead of wires, were

23  there ever times when the checks were brought or sent to

24  the Newton office rather than sent directly to

25  Connecticut?

1    A.    Occasionally.

2    Q.    What would you do in those situations?

3    A.    Send it back overnight mail to Connecticut.

4    Q.    Okay.  And to whom in Connecticut would you send it?

5    A.    Originally Janet May and then to Jackie Spielman.

6    Q.    I would like to show you what's been marked for

7    identification as Government Exhibit 110.  And I'm also

8    going to show you Government Exhibit 111.  And if you

9    would look first, please, at 110.  Do you have it in

10   front of you?

11   A.    I do.

12   Q.    Would you tell us what the first page of Exhibit 110

13   is?

14   A.    It's a letter from Marjorie Adams to myself or

15   Marty.

16   Q.    Okay.  So the letter is addressed to Marty for

17   Linda?

18   A.    Yes.

19   Q.    Do you see the "re" line where it says "Iantosca"?

20   A.    I do.

21   Q.    Are you familiar with the name "Iantosca"?

22   A.    I am.

23   Q.    Who is Mr. Iantosca?

24   A.    An exchange client.

25          MR. PIROZZOLO:  Your Honor, the government would

PDF created with pdfFactory trial version www.pdffactory.com

1    move Exhibit 110 into evidence.

2            THE COURT:  All right.

3            (Government Exhibit No. 110 received into

4    evidence.)

5            (Testimony of Linda Jokinen continues to be read

6    as follows:)

7    BY MR. PIROZZOLO:

8    Q.   Let me project the first page.  And if you would

9    please read the body of the letter, Ms. Jokinen?

10   A.   "Please find enclosed the final $300,000 for the

11   closing that took place on November 30, 2000.  This

12   amount appeared on the HUD settlement statements as the

13   deposits and should therefore be allocated to the

14   properties in the same manner.

15       "If you have any questions, please feel free to call

16   me.

17       "Very truly yours, Marjorie A. Adams."

18   Q.   Who is Marjorie Adams?

19   A.   Joe Iantosca's attorney.

20   Q.   And if you could turn now to the second page of

21   Exhibit 110 and tell us what that is.

22   A.   That's a check from Adams & Sammon to Benistar for

23   $300,000.

24   Q.   And can you see the memo line?

25   A.   Yes.

1    Q.    Can you make out what it says there?

2    A.    Iantosca, Fern/Faxon.

3    Q.    What does "Fern" and "Faxon" refer to?

4    A.    Two different properties.

5    Q.    And that Mr. Iantosca owned?

6    A.    Right.

7    Q.    Am I correct that Exhibit 110 is an example of an

8    instance where a client's attorney sent the check to you

9    rather than the Newton -- to the Newton office rather

10   than to Connecticut?

11   A.    Yes.

12   Q.    And if you would turn now to Exhibit 111 for

13   identification.  Do you have that in front of you?

14   A.    I do.

15   Q.    Would you tell us what the first page of that

16   exhibit is?

17   A.    It's an accounting of the $300,000 that is being

18   sent to Jackie Spielman.

19   Q.    Who wrote the letter?

20   A.    I did.

21   Q.    What is the date of it?

22   A.    December 14, 2000.

23          MR. PIROZZOLO:  Your Honor, the government would

24   move Exhibit 111 into evidence.

25          THE COURT:  Okay.

```
 1          (Government Exhibit No. 111 received into
 2    evidence.)
 3          (Testimony of Linda Jokinen continues to be read
 4    as follows:)
 5    BY MR. PIROZZOLO:
 6    Q.   Let me project the first page.  And if you could
 7    just read the first line of the letter, please.
 8    A.   "Enclosed is a check from Adams & Sammon for
 9    $300,000 to be deposited into Joseph Iantosca's escrow
10    accounts, as soon as possible, as follows."
11    Q.   Do you see following that sentence a list of
12    properties?
13    A.   Yes.
14    Q.   Are those different real estate -- parcels of real
15    estate Mr. Iantosca was selling?
16    A.   Yes, with separate ownership.
17    Q.   Now, if you would turn to the next page of this
18    exhibit.  Is this the enclosure that you sent to
19    Ms. Spielman with the letter?
20    A.   Yes, it is.
21    Q.   Would you tell us what it is?
22    A.   It's the $300,000 check that was sent to Benistar in
23    Boston.
24    Q.   And then, finally, the last page of Exhibit 111.
25    Would you tell us what that is?
```

1    A.    That's the receipt for the Airborne Express shipment

2    of the check and the letter.

3    Q.    When you received checks at the Newton office and

4    sent them on to Connecticut, was it your practice to

5    send them by Airborne Express?

6    A.    Yes.

7    Q.    Now, when clients wired their money straight into

8    the account, or when they mailed checks directly to

9    Connecticut, were you informed when the money had been

10    received?

11    A.    I would typically have to ask, but I was ultimately

12    informed.

13    Q.    Who would you ask?

14    A.    Janet or Jackie.

15    Q.    Did any of the attorneys for the exchangors ever

16    send or copy you on letters notifying you that the funds

17    had been wired in the first instance?

18    A.    Yes.

19    Q.    Let me show you what's been marked for

20    identification as Government Exhibit 15.  If you would,

21    just take a look at that for a minute.  Do you have that

22    in front of you?

23    A.    I do.

24    Q.    The first page of this, what is it?

25    A.    It's the fax cover sheet from Christopher Dole.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Addressed to whom?

2    A.    Addressed to me from Christopher Dole.

3    Q.    And would you tell us the date of this fax?

4    A.    September 14, 2000.

5    Q.    And is this a fax that you received in connection

6    with your work on a particular 1031 exchange?

7    A.    Yes.

8    Q.    In fact, if you turn to the second page of this

9    exhibit and look at the "re" line, do you see where it

10   says "Massachusetts Lumber"?

11   A.    I do.

12   Q.    Which 1031 exchange client did that refer to?

13   A.    Eliot Snider.

14        MR. PIROZZOLO:  Your Honor, the government would

15   move Exhibit 15 into evidence.

16        THE COURT:  All right.

17        (Government Exhibit No. 15 received into

18   evidence.)

19        (Testimony of Linda Jokinen continues to be read

20   as follows:)

21   BY MR. PIROZZOLO:

22   Q.    Ms. Jokinen, I'm going to project now the first page

23   of Exhibit 15.  Was Christopher Dole one of the

24   attorneys working on the Eliot Snider transaction?

25   A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And do you see the comment line which I'm about to

2    highlight in yellow?  Would you read that, please?

3    A.   "FYI:  $3 million is coming by wire."

4    Q.   Thank you.  And then if you would turn, please, to

5    the next page of this exhibit, the enclosures to the fax

6    that you received.  And I'm just going to highlight --

7    actually, I'm going to magnify the body of the letter.

8    Would you read what I've just magnified?

9    A.   "In connection with the above-captioned matter,

10   enclosed are two checks, one in the amount of $62,190,

11   and the other one in the amount of $225,000.  Please

12   call with any questions or comments.  Sincerely."

13   Q.   Did it sometimes happen, Ms. Jokinen, that there was

14   an initial wire of the bulk of the escrow funds and then

15   follow-on checks that were sent a little bit later?

16   A.   Yes.

17   Q.   And is this what we see happening here?

18   A.   I can't tell.

19   Q.   Okay.  But if you turn to the next two pages of this

20   exhibit, am I correct that the next page after the one

21   we were just reviewing is a copy of the $225,000 check?

22   A.   Yes.

23   Q.   And then the page after that, can you tell us the

24   amount of that check?

25   A.   $62,190.

1    Q.    Now, after Benistar Property had received the escrow

2    monies from its clients or from their attorneys, did you

3    send any written notification or acknowledgment

4    confirming receipt of the money?

5    A.    Yes.

6    Q.    I'd like to show you what was admitted into evidence

7    yesterday as Government Exhibit 18.    Let me project that

8    for everyone's benefit.

9         Do you recognize that document?

10   A.    I do.

11   Q.    Would you tell us what it is?

12   A.    It's a follow-up letter upon the successful

13   completion of the first stage of an exchange.

14   Q.    Who prepared the letter?

15   A.    I did.

16   Q.    And is that your signature on the second page?

17   A.    It is.

18   Q.    To whom is this particular letter addressed?

19   A.    Eliot Snider.

20   Q.    And if you would look with me at the fourth

21   paragraph which I have just magnified, would you read

22   what it says?

23   A.    "We have received $3,287,190 of sales proceeds,

24   which we are holding for your benefit.    These funds are

25   accruing interest at 6 percent.    Remember that Benistar

PDF created with pdfFactory trial version www.pdffactory.com

1    needs written notice and a minimum of 30 calendar days

2    to forward any escrow funds held at 6 percent (three

3    business days for funds held at 3 percent.)"

4    Q.   Are there other instructions set forth in this

5    letter?

6    A.   Yes.

7    Q.   Involving the identification of replacement

8    property; is that right?

9    A.   Yes.

10   Q.   And then am I correct there are a couple of

11   replacement property identification documents at the

12   back of the letter?  In fact, if you look at the screen,

13   can you see I just projected the document titled

14   "Replacement Property Identification"?

15   A.   Right.

16   Q.   Is there something you sent to clients -- is this

17   something you send to clients with your confirmation

18   letter?

19   A.   Yes, it is.

20   Q.   And then the following page is a document titled

21   "Identification of Real Property."  Do you see that?

22   A.   I do.

23   Q.   Was that something you also sent?

24   A.   Yes.

25   Q.   And when clients completed the Identification of

PDF created with pdfFactory trial version www.pdffactory.com

1    Real Property Form, did it come back to you?

2    A.    Typically.

3    Q.    Did you play any role, logistical or otherwise, in

4    connection with making the arrangements to have funds

5    returned back to clients for them to be able to buy

6    their replacement property?

7    A.    Yes.

8    Q.    What did you do?

9    A.    I would speak to one of the people in Connecticut.

10   Q.    Would that be Jackie -- would that be Janet or

11   Jackie?

12   A.    Yes.

13   Q.    And if that replacement transaction was completed

14   successfully and the money was, in fact, returned, was

15   that particular 1031 exchange completed as of that

16   moment in time?

17   A.    Yes.

18   Q.    Did you receive any reports or documents from

19   Benistar personnel in Connecticut regarding the escrow

20   monies that they had received?

21   A.    Yes.

22   Q.    What form did those reports take?

23   A.    A spreadsheet.

24   Q.    Who sent those spreadsheets to you?

25   A.    Janet May originally and then Jackie Spielman.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   And under the operating procedures that you were

2  explaining to us yesterday, whose responsibility was it

3  to prepare those reports?

4  A.   Either Janet or Jackie.

5  Q.   How frequently were the spreadsheets updated and

6  sent to you?

7  A.   Anywhere from one week to two weeks.

8  Q.   So every week or two you'd receive them?

9  A.   Right.

10  Q.   When they were sent up to you, how were they sent?

11  A.   Originally by fax, and then by e-mail.

12  Q.   And would you describe for us the type of

13  information that was contained in those spreadsheets

14  when you received them?

15  A.   The client's name, the date of the exchange, the

16  amount of the deposit, the accrued interest.

17  Q.   And what did you do with the spreadsheets when you

18  received them?

19  A.   I would try to confirm them against my records.

20  Q.   And what records did you have against which you were

21  confirming them?

22  A.   The exchange documents.

23  Q.   Did you file the spreadsheets after you got them?

24  A.   Yes.

25  Q.   Let me show you what's been marked for

PDF created with pdfFactory trial version www.pdffactory.com

1    identification as Government Exhibits 189B and -C.  And

2    if you would look first, please, at 189B, would you tell

3    us what the first page of that exhibit is?

4           MR. PIROZZOLO:  Your Honor, may I just approach

5    with respect to this particular exhibit?

6           THE COURT:  Okay.

7           MR. PIROZZOLO:  Thank you.

8           (Pause.)

9           MR. PIROZZOLO:  Thank you, your Honor.

10          (Testimony of Linda Jokinen continues to be read

11   as follows:)

12   BY MR. PIROZZOLO:

13   Q.   Would you look first, please, at Exhibit 189B, and

14   would you tell us what the first page of that exhibit

15   is?

16   A.   It's an e-mail from Jackie Spielman to myself.

17   Q.   What's the date of it?

18   A.   December 26, 2000.

19   Q.   And is that an e-mail that you received while

20   working at Benistar Property?

21   A.   Yes, it is.

22   Q.   What is the attachment to the e-mail, if you could

23   just describe it?

24   A.   It's the spreadsheet regarding the current exchange

25   escrow account.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Did you receive and review these in the normal

2   course of your job duties?

3   A.   Yes.

4        MR. PIROZZOLO:  Your Honor, the government would

5   move Exhibit 189B into evidence.

6        THE COURT:  All right.

7        (Government Exhibit No. 189B received into

8   evidence.)

9        MR. PIROZZOLO:  The government would also move

10  Exhibit 189C into evidence.

11       THE COURT:  All right.  Also admitted.

12       (Government Exhibit No. 189C received into

13  evidence.)

14       (Testimony of Linda Jokinen continues to be read

15  as follows:)

16  BY MR. PIROZZOLO:

17  Q.   Now, Ms. Jokinen, if you would look at Exhibit 189B,

18  which I've just projected.  You testified earlier this

19  was an e-mail sent by Jackie Spielman to you?

20  A.   Yes.

21  Q.   Can you read the subject line on the e-mail?

22  A.   "Current account balances."

23  Q.   Now, if you would turn, please, to the second page

24  of this exhibit.  And if you could just walk us

25  through -- let me start with a threshold question.  What

1  are we looking at right now on the second page of 189B?

2  A.   You're looking at the spreadsheet of the current

3  exchange escrow accounts prepared by Jackie Spielman and

4  e-mailed to myself.

5  Q.   All right.  And let us actually turn to the second

6  page of the spreadsheet, which is the third page of the

7  exhibit.  And I'm going to magnify the top few lines

8  which didn't get a whole lot -- which didn't get a whole

9  lot bigger when I did it.

10      Let me try again.  Let's start with the first few

11 columns, okay?  And can you walk us, left to right,

12 across these columns and tell us the information

13 contained here?

14 A.   Certainly.  The case name is the name of the

15 exchange client; the date received is the date that the

16 money was received; the amount received was the amount

17 of escrow funds received; the fee withdrawn would be any

18 monies that were withheld after the money came in that

19 was supposed to be withheld for fees; the date paid is

20 the date the money was disbursed; the debit would be the

21 amount that was disbursed.

22      MR. PIROZZOLO:  Let's stop right there because

23 that's all we magnified.

24      (Testimony of Linda Jokinen continues to be read

25 as follows:)

PDF created with pdfFactory trial version www.pdffactory.com

1    BY MR. PIROZZOLO:

2    Q.   Let's focus on the second client, Mass. Lumber.  You

3    said that was Eliot Snider; is that right?

4    A.   Yes.

5    Q.   So this would indicate $3 million was received on

6    September 14, 2000?

7    A.   Yes.

8    Q.   And then there was subsequent amounts, 62,000 and

9    225,000, received on the 15th and the 21st of the same

10   month, right?  In the same month?

11   A.   Right.

12   Q.   And, in fact, are those the wires and checks we were

13   just looking at a few minutes ago?

14   A.   Yes.

15   Q.   And if you move right on that same client line, we

16   see a debit of $50,000, correct?

17   A.   Right.

18   Q.   So is that $50,000 that was released from escrow and

19   returned to Mr. Snider?

20   A.   I don't know that it was returned to Mr. Snider, but

21   it was released from escrow.

22   Q.   Understood.  It might have been sent directly to

23   whoever he was buying his replacement property from?

24   A.   Exactly.

25            MR. GREENBERG:  Your Honor, we would ask for an

1    instruction at this point in terms of what is relevant

2    and what is not relevant.

3            THE COURT:  No; I don't think it's necessary.

4            (Testimony of Linda Jokinen continues to be read

5    as follows:)

6    BY MR. PIROZZOLO:

7    Q.  And finally, Ms. Jokinen, let's look at the last two

8    columns -- or three columns, actually.  Well, just

9    explain those, please:  debit date, interest and

10   balance.

11   A.   The debit date is the date that disbursement would

12   have been made; the interest would be the interest

13   accrued through the date of the spreadsheet; and the

14   balance is the balance which would include the amount

15   received less any fees withdrawn less any monies

16   advanced on behalf of or to the exchangor plus the

17   interest.

18   Q.   Okay.  So again focusing on the second dollar amount

19   relating to Mass. Lumber, you testified that the date of

20   this particular e-mail was December 26, 2000; is that

21   right?

22   A.   I'd have to look at it again.

23           MR. GREENBERG:  Your Honor, we object to the

24   next two questions.

25           THE COURT:  Yes.  Sustained.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. GREENBERG:  Thank you.

2          MR. PIROZZOLO:  The next two questions?

3          THE COURT:  Yes.  So skip to line -- I guess

4    it's 17.

5          (Testimony of Linda Jokinen continues to be read

6    as follows:)

7    BY MR. PIROZZOLO:

8    Q.   Now, very quickly, if you would look at Exhibit

9    189C.  And I'll project -- I'll magnify the first page

10   of that exhibit.  Is this an updated account balance

11   spreadsheet that Ms. Spielman sent to you?

12   A.   Yes.

13   Q.   And I'm going to highlight it in yellow, but can you

14   tell us the date when this was transmitted to you?

15   A.   December 27, 2000.

16   Q.   I believe you testified a few minutes ago that you

17   received these account spreadsheets from either Jackie

18   Spielman or Jackie May every week or two; is that right?

19   A.   That would be the typical timing.

20   Q.   Did you compile a fair collection of these

21   spreadsheets over the period of time you worked as

22   Benistar Property?

23   A.   Yes, I did.

24   Q.   I'd like to show you now what's been marked for

25   identification as Government Exhibit 189.  Would you

PDF created with pdfFactory trial version www.pdffactory.com

1    take a minute to look -- would you take a look at that

2    for a minute, please?

3        Ms. Jokinen, if you would -- I'm not asking at this

4    point -- I'm not asking you to look at every single

5    page, but would you flip through enough pages to

6    familiarize yourself with the types of documents

7    contained in this exhibit?  Are these examples of other

8    spreadsheets that you received from Connecticut

9    personnel?

10   A.   Yes.

11   Q.   And that would be Janet May or Jackie Spielman?

12   A.   Right.

13   Q.   And are most of them similar in format to the

14   spreadsheets we were just looking at on the screen?

15   A.   Yes.

16       MR. PIROZZOLO:  Your Honor, the government would

17   move Exhibit 189 into evidence.

18       THE COURT:  All right.

19       (Government Exhibit No. 189 received into

20   evidence.)

21       (Testimony of Linda Jokinen continues to be read

22   as follows:)

23   BY MR. PIROZZOLO:

24   Q.   Ms. Jokinen, did you ever prepare your own

25   spreadsheets?

1  A.   Yes, I did.

2  Q.   What information did you use when you did that?

3  A.   I would typically take one of Jackie's spreadsheets

4  and edit it to be numbers that I thought to be more

5  correct.

6  Q.   What information -- what did you review when you

7  were making those corrections?

8  A.   Everything:  All monies that came in, monies that

9  went out and any interest that accrued thereon.

10 Q.   And did you prepare your own spreadsheets?  Were

11 they Excel spreadsheets?

12 A.   Yes.

13 Q.   Did you prepare those as part of your job duties?

14 A.   Yes.

15 Q.   What did you do with the spreadsheets after you had

16 prepared them?

17 A.   I showed them to Marty.

18 Q.   And after you had done that, did you file them

19 anywhere?

20 A.   I did.

21 Q.   And if I could show you now what's been marked for

22 identification as Government Exhibits 113, and also 186

23 through 187.  And if you would start, please, with

24 Exhibit 113.  And let's look for a moment at just the

25 first page.  Would you tell me what the first page is?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   It's a fax cover sheet.

2   Q.   From whom to whom?

3   A.   From myself to Joe Iantosca.

4   Q.   What's the date of it?

5   A.   December 26, 2000.

6   Q.   Is there an attachment to the fax?

7   A.   Yes.

8   Q.   Would you tell us just in general terms what it is?

9   A.   It's his escrow funds list.

10  Q.   Is it a spreadsheet?

11  A.   Yes, it is.

12  Q.   Who prepared it?

13  A.   I did.

14  Q.   And did you prepare that as part of your job duties

15  at Benistar?

16  A.   I did.

17  Q.   At or about the time you sent the fax?

18  A.   Yes.

19  Q.   And, again, what's the date of the fax?

20  A.   December 26, 2000.

21       MR. PIROZZOLO:  The government would move

22  Exhibit 113 into evidence, your Honor.

23       THE COURT:  Okay.  It's admitted.

24       (Government Exhibit No. 113 received into

25  evidence.)

1          MR. PIROZZOLO:  The government would also move

2     into evidence Exhibit 186 and 187.

3          THE COURT:  Also admitted.

4          (Government Exhibit Nos. 186 and 187 received

5     into evidence.)

6          (Testimony of Linda Jokinen continues to be read

7     as follows:)

8     BY MR. PIROZZOLO:

9     Q.   I'm now going to project the first page of Exhibit

10    113 and magnify the body of the fax cover sheet.  Again,

11    this was a fax that you sent to Joseph Iantosca; is that

12    correct?

13    A.   Yes.

14    Q.   Would you read the text of the fax cover sheet, the

15    message you put on it?

16    A.   "Here is a current accounting of your escrow funds.

17    Please let me know if you have any questions or need any

18    additional information."

19    Q.   Now, if you return to the second page of Exhibit

20    113, would you tell us the information -- well, first

21    off, tell us what this is.

22    A.   It's a spreadsheet and property address of Joseph

23    Iantosca's escrow funds.

24    Q.   Prepared by you; is that right?

25    A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

```
1          MR. GREENBERG:  Your Honor, I object to the next

2   question and answer.

3          THE COURT:  I'm sorry.  Line 7?

4          MR. GREENBERG:  Line 7, the answer.

5          THE COURT:  Overruled.

6          MR. GREENBERG:  Okay.

7          (Testimony of Linda Jokinen continues to be read

8   as follows:)

9   BY MR. PIROZZOLO:

10  Q.   Can you tell us the nature of the information

11  contained here?

12  A.   The escrow funds received, the interest accrued, the

13  money that was disbursed and the balance.

14  Q.   Okay.  So if we actually focus on the second line

15  which has the name Fern/148 Newbury Street, do you see

16  that?

17  A.   Right.

18  Q.   Would you read how much had been received?

19  A.   555,166.55.

20  Q.   How much interest had been earned on that?

21  A.   $9,194.50.

22  Q.   How much was disbursed?

23  A.   554,361.05.

24  Q.   So the remaining balance was?

25  A.   Zero.
```

1    Q.   So is that a particular transaction that Mr.

2    Iantosca, in fact, received back all of his escrow funds

3    plus interest?

4    A.   Right.

5         MR. GREENBERG:  I object to the next question,

6    your Honor, and answer.

7         THE COURT:  Sustained.

8         Proceed to line 4 on --

9         MR. PIROZZOLO:  Thank you, your Honor.

10        (Testimony of Linda Jokinen continues to be read

11   as follows:)

12   BY MR. PIROZZOLO:

13   Q.   Now, if you could look at Exhibit 186 and 187.  And

14   beginning with 186, would you tell us what this is?

15   A.   It's a fax cover sheet from myself to Jackie

16   Spielman regarding Joe Iantosca.

17   Q.   And if we turn to the second page, is this another

18   updated Iantosca spreadsheet that you prepared?

19   A.   Yes.  This is what I used to calculate the interest.

20   Q.   Now, if you turn to Exhibit 187 -- and I'm going to

21   magnify the address information on the fax cover

22   sheet -- is that another fax you sent?

23   A.   Yes.

24   Q.   To whom did you send this particular fax?

25   A.   To Daniel Carpenter.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    What's the date of it?

2    A.    January 4, 2001.

3    Q.    And then moving down to the body of the message,

4    would you read what it says there?

5    A.    "Here is the latest update on the escrow accounts."

6    Q.    Actually, that's fine.  I don't need you to read any

7    more than that.  But do you see the handwriting right

8    below?

9    A.    Yes.

10    Q.    Whose handwriting is that?

11    A.    Mine.

12         MR. GREENBERG:  Your Honor, we object to the

13    next two questions.

14         THE COURT:  Well, not -- overruled as to line 2

15    through 5, but sustained beginning with line 6.

16         MR. GREENBERG:  Thank you, your Honor.

17         (Testimony of Linda Jokinen continues to be read

18    as follows:)

19    BY MR. PIROZZOLO:

20    Q.    And if you would turn to the second page of Exhibit

21    187.  Would you tell us what that is?

22    A.    That's a spreadsheet showing the balance of all the

23    exchanges of clients.

24    Q.    Who prepared this?

25    A.    I did.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   And you sent it to Dan Carpenter; is that right?

2   A.   Yes.

3   Q.   And so let's pick out a name that we discussed

4   before.  If you look at the last line of the

5   spreadsheet -- let me just magnify the first few

6   columns -- this pertains to Mass. Lumber; is that

7   correct?

8   A.   Right.

9   Q.   That's Mr. Snider; is that right?

10  A.   Right.

11        MR. GREENBERG:  Your Honor, I object -- we

12  object, your Honor, to the next question and response.

13        THE COURT:  Sustained.

14        MR. GREENBERG:  Thank you, your Honor.

15        (Testimony of Linda Jokinen continues to be read

16  as follows:)

17  BY MR. PIROZZOLO:

18  Q.   I showed you earlier today, and I believe it was

19  contained in Exhibit 181, the wire transfer instructions

20  that had gone out to exchangors or their attorneys.  Do

21  you recall seeing those?

22  A.   I do.

23  Q.   And the particular wire transfer instruction we had

24  reviewed together had directed that the funds be wired

25  for the benefit of an account up at Merrill Lynch; is

1  that correct?

2  A.   Yes.

3  Q.   At some point in time did Benistar Property no

4  longer instruct its clients to wire funds into a Merrill

5  Lynch account?

6  A.   Yes.

7  Q.   Where were they instructed to wire the money after?

8  A.   PaineWebber.

9  Q.   Were the exchange documents that you sent out to

10  clients and their lawyers revised to reflect the change

11  from Merrill Lynch to PaineWebber?

12  A.   Yes.

13  Q.   Did you play a role in making those revisions?

14  A.   I made the revisions.

15  Q.   Let me show you what's been marked for

16  identification as Government Exhibit 182A and -B.   And

17  if you would look first at Exhibit 182A.   And the first

18  page, in particular, would you tell us what that page

19  is, please?

20  A.   It's a fax to Jackie Spielman with revised exchange

21  documents on them.

22  Q.   Who's the sender of this particular fax?

23  A.   I am.

24  Q.   If you'd look at the attachments to the fax, are

25  these the revised exchange documents referenced on the

PDF created with pdfFactory trial version www.pdffactory.com

1    cover sheet?

2    A.   Yes.

3    Q.   Who prepared them?

4    A.   I edited the "Merrill Lynch" to reflect

5    "PaineWebber."

6              MR. PIROZZOLO:  Your Honor, the government would

7    move in Exhibit 182A, and also at this time Exhibit 182B.

8              THE COURT:  Okay.

9              (Government Exhibit Nos. 182A and 182B received

10   into evidence.)

11             (Testimony of Linda Jokinen continues to be read

12   as follows:)

13   BY MR. PIROZZOLO:

14   Q.   So let me project, if I could, the first page of

15   182A.  Again, this is a fax from you to Jackie Spielman?

16   A.   Yes.

17   Q.   And I'm going to highlight the actual body of the

18   message you put on the fax cover sheet.  Would you read

19   that language, please?

20   A.   "Here are the exchange documents changed to

21   PaineWebber.  Please have Dan review and advise ASAP.

22   We have an exchange for which I must prepare paperwork

23   tomorrow."

24   Q.   And the "Dan" where it says "Please have Dan review

25   and advise ASAP," is that Dan Carpenter?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    What caused you to send these revised exchange

3    documents to Connecticut for Dan Carpenter's review?

4    A.    Because Daniel had to have final word on all the

5    documents.

6    Q.    Now, I had asked you yesterday about the origin, if

7    you will, of the standard form exchange documents that

8    Benistar Property used with its clients.

9    A.    Right.

10    Q.    Am I correct you testified you prepared the

11    customized exchange documents for any particular

12    transaction by using standard form documents and editing

13    them as necessary?

14    A.    Right.

15    Q.    Do you know where the standard form documents came

16    from that you used to customize?

17    A.    Originally, for the most part, from Nationwide

18    Property Exchange.

19    Q.    Did all of the standard form documents that you used

20    come from Nationwide?

21    A.    Mostly.

22    Q.    Are there some that you're not certain of?

23    A.    Right.

24    Q.    Now, other than changing the exchange documents to

25    reflect the move to PaineWebber from Merrill Lynch, were

1  all clients instructed still to wire their money to a

2  particular account but now at PaineWebber?

3  A.   Can you repeat the question?

4  Q.   Sure.  Previously clients had been instructed to

5  wire the money to Merrill Lynch, right?

6  A.   Correct.

7  Q.   After these changes, were they now supposed to be

8  wiring their money to the benefit of a PaineWebber

9  account?

10  A.   Yes.

11  Q.   Did you ever receive --

12       MR. GREENBERG:  Your Honor, I object to the next

13  three questions.  Actually, the next four.

14       THE COURT:  Overruled.

15       (Testimony of Linda Jokinen continues to be read

16  as follows:)

17  BY MR. PIROZZOLO:

18  Q.   Did you ever receive, while you were working in the

19  Newton office, account statements relating to the

20  accounts either when they were maintained at Merrill

21  Lynch or when they started to be maintained at

22  PaineWebber?  Did you ever see -- I'll start with the

23  first question.  Did you ever receive account statements

24  from either Merrill Lynch or PaineWebber?

25  A.   No.

1  Q.   Did you ever see any account statements related to
2  Merrill Lynch or PaineWebber?
3  A.   No.
4  Q.   Did you ever receive documents from the Benistar
5  office in Connecticut that showed what was happening to
6  the monies that had been sent into the Merrill Lynch or
7  PaineWebber accounts?
8  A.   No.
9  Q.   Did you ever receive anything or see anything that
10 showed the activity in the Merrill Lynch or PaineWebber
11 accounts?
12 A.   Every so often.
13 Q.   Okay.  And when you say "every so often," how often
14 was that?
15 A.   Maybe two or three times, all told.
16 Q.   And what is it that you recall seeing?
17 A.   A confirmation of a wire that was sent.
18 Q.   Okay.  From whom to whom?
19 A.   From either PaineWebber or Merrill Lynch to the
20 attorney, the closing attorney.
21 Q.   Continue.
22 A.   Or the client.
23 Q.   And was that a wire reflecting the return of money
24 to buy replacement property?
25 A.   Yes.

1  Q.   Other than those wire confirmations, did you ever

2  see or receive anything else showing the account

3  activity?

4  A.   No.

5  Q.   Did you have any responsibility for overseeing or

6  maintaining the accounts, the escrow accounts, into

7  which the client monies were sent?

8  A.   No.

9  Q.   Now, you explained earlier that there was a split, a

10  90/10 split, in fees between Newton and Connecticut; is

11  that right?

12  A.   Right.

13  Q.   Did Connecticut ever --

14       MR. GREENBERG:  I object, your Honor.

15       THE COURT:  No, overruled.

16       (Testimony of Linda Jokinen continues to be read

17  as follows:)

18  BY MR. PIROZZOLO:

19  Q.   Did Connecticut ever send money to Newton above and

20  beyond Newton's share of the fee split?

21  A.   Yes.

22  Q.   Did you see that information coming up on

23  Connecticut?

24  A.   I did.

25  Q.   Who in Connecticut was sending the information to

1    Newton?

2    A.    They would send us a check.

3    Q.    Who is "they"?

4    A.    The Connecticut office.    Typically it would come

5    from Jackie in the mail signed by Dan.

6    Q.    And to whom was the check made payable to?

7    A.    Benistar Property Exchange.

8    Q.    And how often did they -- did that happen?

9    A.    Every few months.

10   Q.    And can you tell us the range of the amounts on

11   these checks?

12   A.    Ten to 15.

13   Q.    Thousand dollars?

14   A.    Yes.

15   Q.    And do you have any ballpark estimate of the number

16   of these checks that came up?

17   A.    No, but I know the total.

18   Q.    What was the total?

19   A.    75,000.

20   Q.    And did you see any documents indicating what the

21   purpose was for this money, what it related to?

22   A.    Yes.

23   Q.    Can you tell us what you saw?

24   A.    It was a release.

25   Q.    Okay.    That accompanied the checks?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Yes.

2  Q.   And was the release supposed to be signed by anyone

3  in particular?

4  A.   Marty.

5       MR. GREENBERG:  Your Honor, I object to the next

6  question and answer, your Honor.

7       THE COURT:  No, overruled.

8       MR. PIROZZOLO:  Line 20, your Honor?  Is that

9  where we are?

10      THE COURT:  Yes.

11      (Testimony of Linda Jokinen continues to be read

12  as follows:)

13 BY MR. PIROZZOLO:

14 Q.   Separate and apart from the release, I'm focusing

15 now on the purpose, what the money pertained to.  Did

16 you see any documents showing why this money was being

17 sent up to Benistar?

18 A.   It was being sent up as Benistar's share of the

19 business profits, the excess interest on.

20 Q.   Above and beyond the 3 percent or the 6 percent?

21 A.   Right.

22 Q.   You said the total for all the checks that you saw

23 was approximately 75,000?

24 A.   Right.

25      MR. GREENBERG:  Your Honor, the balance of the

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   direct examination is subject to our objection.
 2           THE COURT:  No, the objection is overruled.
 3           (Testimony of Linda Jokinen continues to be read
 4   as follows:)
 5   BY MR. PIROZZOLO:
 6   Q.  At some point did Benistar Property Exchange go out
 7   of business?
 8   A.   Yes.
 9           MR. GREENBERG:  Your Honor --
10   BY MR. PIROZZOLO:
11   Q.  Do you remember when Benistar Property Exchange
12   closed its door?
13           THE COURT:  Let me see you briefly.
14           MR. GREENBERG:  Thank you, your Honor.
15           (Discussion at sidebar and out of the hearing of
16   the jury:)
17           MR. GREENBERG:  Your Honor, I thought that you
18   ruled this was out:  "The company went out of business,"
19   "The money disappeared."  The next question is:  "What
20   caused it to go out of business?"  "The money
21   disappeared."
22           THE COURT:  Did I?
23           MR. GREENBERG:  Yes.
24           MR. PIROZZOLO:  Your Honor, I actually skipped
25   it.  I skipped -- what I did was, "going out of
```

1   business," and then I skipped, "What happened that

2   caused it to go out of business?"  "The money

3   disappeared."

4        MR. GREENBERG:  You just had the jury hear that

5   they went out of business.

6        THE COURT:  Yeah, but they know that.

7        MR. GREENBERG:  Your Honor, it was excluded, and

8   the government read in something that was just excluded.

9        MR. PIROZZOLO:  No, it was not excluded, your

10  Honor.  What you had said was --

11       THE COURT:  I guess I could go back and look.  I

12  know we discussed it.  I didn't know that I made a

13  definitive ruling.

14       MR. PIROZZOLO:  I guess that was my memory too,

15  your Honor.

16       MR. GREENBERG:  Your Honor, the rest of this

17  colloquy is about money disappearing.  It's hard to

18  conceive of anything more prejudicial to the defendant

19  than closing the doors, money disappearing.  Again:

20  After the operative date, this is January, talking about

21  setting up a new company.  The rest of this -- the rest

22  of -- the balance has nothing to do with the charges.

23       MR. PIROZZOLO:  Your Honor, I think that the

24  issue that we discussed was the money disappearing; the

25  loss of the funds.  And I actually skipped questions at

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    lines 8 and 9, and I intended to skip this question

 2    18 -- at line 18, really, all the way through until line

 3    6.  That is how I was going to cover it.  And the issue

 4    of whether they went out of business is not an issue --

 5              THE COURT:  Okay.  That's fine.

 6              MR. GREENBERG:  What is the next question that

 7    the government intends to ask?

 8              MR. PIROZZOLO:  "Do you remember when Benistar

 9    Property closed its doors?"

10              MR. GREENBERG:  Your Honor, we object.

11              MR. PIROZZOLO:  Okay.  Then I --

12              THE COURT:  You don't need that.

13              MR. PIROZZOLO:  I don't.

14              MR. GREENBERG:  So what is the next question?

15              MR. PIROZZOLO:  The next question is at line 7.

16              MR. GREENBERG:  Your Honor, these last two

17    questions we object to.  With letters going out to

18    clients advising them that the money was going to be

19    traded in the options market, notification of funds

20    might be lost in the market.  I mean, this is -- this is

21    back -- putting aside the fact that the government is

22    testifying, it's outrageously leading.  They're getting

23    in through the back door this whole idea about the

24    monies having been lost.

25              This argument has no relevance whatsoever, and
```

1    it's under 403 grounds.

2         MR. PIROZZOLO:  If I could just parse this?  I

3    think that the -- Mr. Greenberg's objection is well

4    taken as to lines 12 through 16, which does refer to the

5    loss on the market, so the government would withdraw

6    reading that.  But I think the issue of where the money

7    went with respect to options I think is fair game and is

8    appropriate, and it goes to notice.

9         THE COURT:  Right.

10        MR. GREENBERG:  Your Honor, I don't believe

11   options -- other than Mr. Snider's gratuitous statement,

12   you know, blurting that out to the jury -- this case

13   isn't about --

14        THE COURT:  There's going to be evidence of how

15   the trading was done.

16        MR. GREENBERG:  Your Honor, this question is

17   testimony by the government.  It's highly objectionable.

18   If they're going to get it in, they get it in through a

19   proper foundation through another witness.

20        THE COURT:  I think they can have it because it

21   does go to whether the information was available to

22   exchangors before they entered into the transactions.

23   This is from a record-keeper of events who had

24   familiarity of what was sent out and what wasn't sent

25   out.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. GREENBERG:  Let them ask it of Paley.

2          THE COURT:  They could ask it of him too.

3          MR. PIROZZOLO:  So we're clear, line 7 through

4     11?

5          THE COURT:  And that's all that's left.  Is that

6     the rest of the testimony from Jokinen?

7          MR. GREENBERG:  I don't know if we're going to

8     designate anything, your Honor.  If we have a break --

9          THE COURT:  That's why I was going to try to

10    finish with this, if -- well, all right.  We'll take the

11    break after this and then --

12         MR. PIROZZOLO:  Okay.

13         (In open court:)

14         THE COURT:  Would you let Ms. Walters know where

15    you are?

16         MR. PIROZZOLO:  Yes, thank you.

17         (Testimony of Linda Jokinen continues to be read

18    as follows:)

19    BY MR. PIROZZOLO:

20    Q.  At any point when you worked at Benistar Property

21    Exchange, did you ever see any notification or letter or

22    warning going out to clients informing them that their

23    money was going to be traded in the options market?

24    A.  No.

25         MR. PIROZZOLO:  I have nothing further.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Okay.  That's the direct

2    examination.  We'll take the morning recess at this

3    point.

4          THE CLERK:  All rise.  The Court will take the

5    morning recess.

6          (Jury out and recess in the proceedings at

7    11:26 a.m.)

8                                    * * *

9          (After recess.)

10         MR. GREENBERG:  Your Honor, we're not going to

11   read anything.

12         THE COURT:  Okay.  I see Ms. Walters has left,

13   so I gathered that was the end of the testimony of Linda

14   Jokinen.

15         MR. PIROZZOLO:  The United States calls Brian

16   Fitzgerald.

17         BRIAN FITZGERALD having been duly sworn by the

18   Clerk, was examined and testified as follows:

19         THE CLERK:  Please state your name, spell your

20   last name for the record, speak into the mic so we can

21   hear you.

22         THE WITNESS:  Brian Fitzgerald,

23   F-i-t-z-g-e-r-a-l-d.

24                         DIRECT EXAMINATION

25   BY MR. PIROZZOLO:

1    Q.   Good morning, Mr. Fitzgerald.

2    A.   Good morning.

3    Q.   Can you tell us where you live?

4    A.   68 Grafton Road in Upton, Mass.

5    Q.   Are you married?

6    A.   Yes.

7    Q.   Any kids?

8    A.   One.

9    Q.   How old?

10   A.   A six-year-old.

11   Q.   Mr. Fitzgerald, where did you grow up?

12   A.   In Natick, Mass.

13   Q.   And what's your education?

14   A.   High school.

15   Q.   Where?

16   A.   Natick High School.

17   Q.   When did you graduate from Natick High School?

18   A.   Graduated in 1976.

19   Q.   What do you do for work, Mr. Fitzgerald?

20   A.   I'm in the car wash industry.

21   Q.   How long have you been in the car wash business?

22   A.   Since 1978.

23   Q.   How did you get into that business?

24   A.   I initially worked for ScrubaDub car wash when they

25   first opened up their chains, and a gentleman that my

PDF created with pdfFactory trial version www.pdffactory.com

1    dad had known had a small operation in Worcester.  It

2    was out of business at that time, and he made an offer

3    to us.  With the help of my folks, I was able to get

4    into a small pod, hand-washing cars.  It was a little

5    single-bay operation.

6    Q.    Do you currently own more than one car wash?

7    A.    I do.

8    Q.    How many?

9    A.    Two car washes.

10   Q.    Where are they?

11   A.    One is in Norton, Mass.; the other is over in

12   Grafton, Mass.

13   Q.    Mr. Fitzgerald, have you ever had any dealings with

14   a company called Benistar Property Exchange Trust

15   Company?

16   A.    Yes, I have.

17   Q.    Approximately when did you first come into contact

18   with Benistar Property Exchange Trust Company?

19   A.    That was in, I believe, March of 2000.

20   Q.    What caused you to get in touch with Benistar

21   Property Exchange Trust?

22   A.    I was looking at the location over in Grafton, a

23   piece of property over there, and I had contacted my

24   attorney.  I was going to be doing a 1031 exchange with

25   the parcel I had over in Worcester that I started out

PDF created with pdfFactory trial version www.pdffactory.com

 1    with.

 2    Q.   So the property you were proposing to sell was which

 3    property?

 4    A.   11 Jennies, J-e-n-n-i-e-s.

 5         THE COURT:  Mr. Fitzgerald, could you just keep

 6    your voice up a little bit more?  I want to make sure

 7    everybody can hear exactly what you're saying.

 8    BY MR. PIROZZOLO:

 9    Q.   And how did you learn about Benistar Trust?

10    A.   My accountant informed me of them.  She had an

11    acquaintance that I believe was somehow associated with

12    Benistar Trust.

13    Q.   And can you tell us how you yourself got in touch

14    with Benistar, whether you called them, how did you

15    communicate with them?

16    A.   She had arranged a meeting.  That was in March of

17    2000, and I drove to Newton to meet a Marty Paley that

18    was representing Benistar Property Exchange at the time.

19    Q.   Was that an in-person meeting?

20    A.   Somewhat, it was still formal.  He did a Power Point

21    presentation and took me through the whole procedural

22    aspect of the exchange.

23    Q.   Can you describe what that first meeting consisted

24    of?

25    A.   Laptop, did a Power Point presentation, you know,

PDF created with pdfFactory trial version www.pdffactory.com

1    some informal things initially just to introduce

2    himself, explaining what the, you know, benefits of the

3    1031 exchange, really just a Power Point presentation

4    that he took me through.

5    Q.   Now, at that meeting did Mr. Paley provide you with

6    any promotional materials?

7    A.   He did.

8    Q.   Did he show you the Power Point presentation?

9    A.   He did.  It was done on a laptop.

10   Q.   And were there subsequent materials that he

11   provided, documents?

12   A.   There was.  I believe I left with some type of

13   package from him, but he subsequently, within a matter

14   of days, had followed up with a package, it might have

15   been FedExed or in the mail or something, that contained

16   some other literature, newspaper article, and

17   essentially the same Power Point presentation he had

18   sent me, he had sent that along as well in print form.

19   Q.   During the meeting with Mr. Paley, what, if

20   anything, did you discuss at that meeting about the

21   safety of your money?

22        MR. PAPPALARDO:  Objection, your Honor.

23        THE COURT:  Overruled.

24   A.   Just, obviously, I inquired -- to be honest with

25   you, I really didn't think much of it, just assuming

1    that everything was in a safe held thing, that there was

2    various types of escrow accounts it could be put into as

3    far as interest rate.  That was pretty much it.

4    Q.   Now, Mr. Fitzgerald, there are some documents in

5    front of you at the table.  Can you look at Exhibit 59?

6            (Pause.)

7    A.   I see it.

8    Q.   Do you recognize what that is?

9    A.   I do.

10   Q.   What is that?

11   A.   It is part of the exchange, some of the information

12   they had sent along.

13   Q.   Is that a document you received?

14   A.   It is.

15   Q.   Is that something that you reviewed and discussed

16   with Mr. Paley?

17   A.   It is.

18           MR. PIROZZOLO:  The United States offers Exhibit

19   59.

20           MR. PAPPALARDO:  No objection, your Honor.

21           THE COURT:  Okay.

22           (Exhibit 59 received into evidence.)

23           MR. PIROZZOLO:  May I publish, your Honor?

24   BY MR. PIROZZOLO:

25   Q.   Looking at the first page of Exhibit 59, do you see

1    that up on the screen?

2    A.    I do.

3    Q.    I'm going to magnify the top portion.  Do you see

4    that now?

5    A.    I do.

6    Q.    Who is that addressed to?

7    A.    That was addressed to myself.

8    Q.    Now, at the meeting, did Mr. Paley go through the

9    various slides that are set forth in this package with

10    you?

11    A.    He did; essentially this is it.

12    Q.    I'm going to ask you to turn to slide 21 of the

13    presentation.  Do you have that in front of you,

14    Mr. Fitzgerald?

15    A.    I do.

16    Q.    I'm going to ask you to look at the first bullet

17    point on that page.  Do you see that?

18    A.    I do, yeah.

19    Q.    And if you could just, please, read that out loud?

20    A.    "Your selected qualified intermediary should have a

21    lot of experience with exchanges.  They should have an

22    exemplary reputation among real estate and legal

23    professionals.  Examine their track record and be sure

24    to check references."

25    Q.    Is that something Mr. Paley went through with you in

PDF created with pdfFactory trial version www.pdffactory.com

1    your meeting when he went through this presentation?

2    A.    I'm sure he probably did.  I do recall reading that

3    portion of it.

4    Q.    That is something you read yourself?

5    A.    Mm-hmm.

6    Q.    Can you look at the last two bullets of slide 21?

7    Do you see that?

8    A.    I do.

9    Q.    Can you read the first sentence of the first bullet

10   that I've highlighted there?

11   A.    "Ask about the security of your funds, and find out

12   what guarantees are offered."

13   Q.    If you could look at the last bullet.  Do you see

14   that?

15   A.    I do.

16   Q.    And if you could read that as well.

17   A.    "This is a place where quality is imperative!  Do

18   not select an intermediary on the basis of price alone."

19   Q.    Did you review this with Mr. Paley as well?

20   A.    I'm sure we did.  I don't exactly recall, but we did

21   go through this whole slide projection in this.

22   Q.    Can you look at slide 22, Mr. Fitzgerald?

23   A.    I have it.

24   Q.    And I put that up on the screen.  And I'm going to

25   highlight just the slide portion.

PDF created with pdfFactory trial version www.pdffactory.com

1          Do you see what the title is?

2   A.   I do.

3   Q.   And it says what Benistar provides?

4   A.   I do.

5   Q.   And there's a fourth bullet there.  Do you see that?

6   A.   I do.

7   Q.   And what does that say?

8   A.   "Merrill Lynch escrow relationship."

9   Q.   And did you review that slide as well with Mr. Paley

10  during the presentation?

11  A.   I did.

12  Q.   Further down on slide 22, there's a bullet that

13  starts, "Merrill Lynch."  Do you see that?

14  A.   I do.

15  Q.   I'm not going to have you read it in its entirety,

16  but is it fair to say that refers to Merrill Lynch

17  Private Bank being used for the escrow accounts?

18  A.   It does.

19  Q.   Now, were you ever told that any of your money would

20  be going to an account other than an escrow account?

21  A.   No.

22  Q.   And were you ever told that your money that you

23  would provide as part of an exchange would not be

24  secure?

25  A.   No.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Can you look at Exhibit 60, which is in one of the

2  folders in front of you?

3        Do you have that in front of you,

4  Mr. Fitzgerald?

5  A.   I do.

6  Q.   What is that?

7  A.   This is -- I believe this was a newspaper article or

8  something that he sent me.  Let me just look at it.

9        No, it was just part of the same presentation.

10  Q.   Is that a document that you received as part of the

11  presentation?

12  A.   Yes, it is.

13        MR. PIROZZOLO:  The government would offer

14  Exhibit 60.

15        MR. PAPPALARDO:  No objection.

16        THE COURT:  Okay.

17        (Exhibit 60 received into evidence.)

18        MR. PIROZZOLO:  May I publish?

19        THE COURT:  Yes.

20  BY MR. PIROZZOLO:

21  Q.   Now, title of this document is what, Mr. Fitzgerald?

22  A.   "The Benistar difference."

23  Q.   Within this document, there's a sentence that starts

24  "Originally."  Do you see that?

25  A.   Yes, I do.

1    Q.   And what does that say?  Could you please read that?

2    A.   "Originally founded as Nationwide Property Exchange

3    in 1993, Benistar Property Exchange is expert at

4    developing tax avoidance strategies for property and

5    business owners."

6    Q.   Were you ever told by Mr. Paley or anyone at

7    Benistar that Benistar was in the business of options

8    trading?

9         MR. PAPPALARDO:  Objection, your Honor, form and

10   content.

11        THE COURT:  Sustained.

12   BY MR. PIROZZOLO:

13   Q.   If you could look at the second page of that

14   exhibit.

15        There's a section of the document titled "1031

16   property exchange."  Do you see that?

17   A.   I do.

18   Q.   If you could look at the last paragraph of that

19   section.  Do you see that I've highlighted it on the

20   screen?

21   A.   I do.

22   Q.   Could you please read that out loud, as well?

23   A.   "Benistar has the expertise required to successfully

24   complete complex exchanges of every kind, and is ready

25   to serve as your qualified intermediary.  We go above

1    and beyond the requirements to ensure that your exchange

2    is a success."

3              MR. PIROZZOLO:  May I approach, your Honor?

4    There's a document I need to get.

5              (Pause.)

6    Q.   Mr. Fitzgerald, I'm putting before you a document

7    that's in evidence as Exhibit Number 2.  Could you take

8    a look at that?

9    A.   I have it.

10   Q.   What is it?

11   A.   Just information piece about frequently asked

12   questions about 1031 exchanges.

13   Q.   Did you receive this document, as well?

14   A.   I did.

15   Q.   I put up here the first page of the -- of the

16   document, and it's titled "frequently asked questions

17   about 1031 property exchange"; is that correct?

18   A.   That's correct.

19   Q.   I'm going to move to the second page of the

20   document.  And on the screen you will see there's a

21   highlighted portion.  Do you see that?

22   A.   I do.

23   Q.   I'm not going to ask you to read the entire

24   document, Mr. Fitzgerald, but is this a document among

25   the materials that you received before you made a

PDF created with pdfFactory trial version www.pdffactory.com

1    decision to proceed further with Benistar?

2    A.    Yes, it is.

3    Q.    And that portion of the document that I've

4    highlighted states, "What will the intermediary do with

5    my money?"  Do you see that?

6    A.    I do.

7    Q.    And there's a portion of the highlighted section --

8    there's a sentence that I will highlight on the screen

9    here.  It starts, "escrow accounts."   Do you see that?

10   A.    I do.

11   Q.    Again, I'm not going to ask you to read that

12   sentence, but it's fair to say that relates to escrow

13   accounts being restricted to pay out funds only for a

14   subsequent closing or to return to the original property

15   owner?

16   A.    That is correct.

17   Q.    Were you ever told that your funds might be used for

18   some other purpose?

19   A.    No.

20          MR. PAPPALARDO:  Objection, your Honor.

21          THE COURT:  No, overruled.  The answer may

22   stand.

23   BY MR. PIROZZOLO:

24   Q.    And can you also look at Exhibits 61, 62, and 63?

25   A.    I have 61.  Should I open them all up or --

1  Q.   Let's start with 61.  Do you recognize what that is?

2  A.   I do, indeed.

3  Q.   Is that a document that you received?

4  A.   It is.  This was not at the Power Point

5  presentation, this is something that came separately

6  right afterwards, and I think it was a newspaper

7  article, basically.

8  Q.   Without getting into the substance of the document,

9  Mr. Fitzgerald, generally describe what it is.

10  A.   It was a part of the New England Business Journal,

11  article about the ABCs of an exchange, and Marty Paley's

12  picture was on it.

13  Q.   And that's something you received?

14  A.   It is.

15  Q.   And you received after the presentation?

16  A.   I did.

17        MR. PIROZZOLO:  The government would offer

18  Exhibit 61.

19        MR. PAPPALARDO:  No objection, your Honor.

20        THE COURT:  Okay.

21        (Exhibit 61 received into evidence.)

22  BY MR. PIROZZOLO:

23  Q.   Can you look at Exhibit 62?

24        And while you're doing that, I'm going to

25  briefly publish Exhibit 61.

PDF created with pdfFactory trial version www.pdffactory.com

1          Mr. Fitzgerald, have you had a chance to look at

2    Exhibit 62?

3    A.   I have.

4    Q.   Do you recognize what that is?

5    A.   I do.

6    Q.   What is that?

7    A.   It's a little article, I believe, explaining the

8    legalities of the 1031.

9    Q.   Is that a document you received?

10   A.   It is.

11         MR. PIROZZOLO:  The government would offer

12   Exhibit 62.

13         MR. PAPPALARDO:  No objection.

14         THE COURT:  Okay.

15         (Exhibit 62 received into evidence.)

16         MR. PIROZZOLO:  And I'm going to briefly publish

17   that, as well, your Honor.

18   BY MR. PIROZZOLO:

19   Q.   Now, Mr. Fitzgerald, could you look at Exhibit 63?

20   A.   I don't think I have 63.  I have 66, 67, 68.

21   Q.   I apologize.

22   A.   69.

23         MR. PIROZZOLO:  May I approach?

24         THE COURT:  You may.

25   BY MR. PIROZZOLO:

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Do you recognize what that is?

2    A.   I do.

3    Q.   What is that?

4    A.   It's a -- how to identify an exchange opportunity.

5    Q.   Is that a document that you received?

6    A.   It is.

7         MR. PIROZZOLO:  The government would offer

8    Exhibit 63.

9         THE COURT:  Okay.

10        (Exhibit 63 received into evidence.)

11        MR. PIROZZOLO:  And I will briefly publish this

12   one, as well.

13   BY MR. PIROZZOLO:

14   Q.   Now, after your meeting with Mr. Paley, and after

15   you received these materials, did you make a decision to

16   proceed with a property exchange using Benistar Property

17   Exchange Trust Company?

18   A.   At a point in time I did.  I was quite comfortable

19   with the presentation.  Marty Paley did some of the

20   things that he identified as far as managing all the

21   419s, I felt like it was quite a big institution, felt

22   very comfortable with it.

23   Q.   And when you made the decision to proceed, was it

24   based in reliance on the materials that you had been

25   given?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes, I did.

2    Q.    And statements that had been made to you in that

3    presentation?

4    A.    Yes, I did.

5    Q.    Now, again, can you remind us what property it was

6    that you were exchanging?

7    A.    This was a piece of property that I originally

8    started my business on in '78, the car wash over in

9    Worcester on the lot there.  And at the time I met Marty

10   Paley, I was exploring the thought, I had been looking

11   at another location.  It hadn't been concrete, so this

12   initially was just an exploration with my accountant.

13   It wasn't that I was set to sell and buy something else.

14   It was after that I realized the benefit of the gain,

15   that I'd be able to roll those funds in, that I'd

16   decided I'd be a little more serious and shop.

17   Q.    All right.  Now, when you got serious about

18   proceeding with the transaction, did you subsequently

19   sign any forms or agreements with Benistar related to

20   the exchange?

21   A.    I did.

22   Q.    Can you put in front of you Exhibits 67 and Exhibit

23   314?

24          (Pause.)

25   A.    I have what you have labeled Exhibit 67.  I'm not

1    sure what 314 is.

2    Q.   If you look at some papers underneath, there's a tab

3    that's labeled, I think, 314.

4    A.   Okay.  I have them.

5    Q.   If you can just put those side by side.

6            Let's start with Exhibit 67.

7    A.   Okay.

8    Q.   Do you recognize what 67 is?

9    A.   I do.

10   Q.   What is it?

11   A.   That's the Escrow Agreement itself.

12   Q.   And does it bear your signature?

13   A.   It does.  I'm sure of it.  Let me find it.

14           (Pause.)

15   A.   It does.

16   Q.   What's the date?

17   A.   10/31 of 2000.

18           MR. PIROZZOLO:  The government offers Exhibit

19   67.

20           THE COURT:  All right.

21           (Exhibit 67 received into evidence.)

22   BY MR. PIROZZOLO:

23   Q.   Can you look at Exhibit 314, please?

24   A.   I have that.

25   Q.   And while you're doing that, I'm going to publish

PDF created with pdfFactory trial version www.pdffactory.com

1     Exhibit 67.

2          What is Exhibit 314?

3     A.   That's the actual legal exchange document.

4          MR. PIROZZOLO:  May I approach, your Honor?

5          THE COURT:  Yes.

6          (Discussion off the record.)

7     A.   Gotcha.

8     Q.   If you look at that document that I just put in

9     front of you, at the bottom is there a sticker on it?

10    A.   There is.

11    Q.   And what number --

12    A.   314.

13    Q.   And the one you were just referring to is what

14    number?

15    A.   313.

16    Q.   So let's focus on 314.

17    A.   Sure.

18    Q.   And put 314 side by side with Exhibit 67, please.

19          Do you recognize what Exhibit 314 is?

20    A.   I do, as well.

21    Q.   What is it?

22    A.   That is the Escrow Agreement.

23    Q.   And does it bear your signature?

24    A.   I believe it does, if there's three pages.  The two

25    didn't have anything, but this third page does.  I think

1    that's part of the Escrow Agreement.  It is part of the

2    Escrow Agreement and it does bear my signature.

3          MR. PIROZZOLO:  The government would offer

4    Exhibit 314.

5          MR. PAPPALARDO:  No objection.

6          THE COURT:  Okay.

7          (Exhibit 314 received into evidence.)

8          MR. PIROZZOLO:  And I'm going to publish that

9    one, as well; they'll beside by side.

10   BY MR. PIROZZOLO:

11   Q.   First, I'm going to look at the Escrow Agreement

12   that is Exhibit 67, which is on the left-hand portion of

13   the screen.  Do you see that?

14   A.   I do.

15   Q.   I will try to magnify it, if I can.

16          If you can read -- why don't you explain.  These

17   are two separate Escrow Agreements.  Do you see that?

18   A.   I do.

19   Q.   Why are there two Escrow Agreements?

20   A.   I can speculate, but let me just confirm it.

21          (Pause.)

22   A.   I believe they're two separate ones because there

23   was two exchanges done simultaneously.

24   Q.   Can you describe that?

25   A.   Sure.  One of them was for the actual real estate

PDF created with pdfFactory trial version www.pdffactory.com

1    that was sold; the other one -- which is done by me

2    personally, Brian Fitzgerald -- the other was actually

3    for the equipment that was owned by my corporation,

4    which is R&B Enterprises.

5    Q.    If you look at the Escrow Agreement on the left-hand

6    side -- if you look at Exhibit 67, which on the screen

7    is on the left-hand side, that's an agreement between

8    whom?

9    A.    Between Brian Fitzgerald and Benistar Property.

10    Q.    And if you look at Exhibit 34, that's an agreement

11    between who?

12    A.    R&B Enterprises and Benistar Property.

13    Q.    Now, I'm going to focus on Exhibit 67.

14         The title of that agreement is -- do you see

15    that, Mr. Fitzgerald?

16    A.    I do.

17    Q.    And what is it?

18    A.    "Escrow Agreement."

19    Q.    And paragraph 1 of that agreement states?

20    A.    It says that "Benistar shall open an escrow

21    custodial account under Benistar's name at Paine Webber

22    for the exchangor's benefit."

23    Q.    Paragraph two states?

24    A.    "Benistar shall have full control over the

25    exchangor's funds to invest as the exchangor directs in

PDF created with pdfFactory trial version www.pdffactory.com

1    either the three percent or six percent account."

2    Q.    Mr. Fitzgerald, did you ever direct Benistar to

3    invest in an options trading account?

4    A.    No, I did not.

5         MR. PAPPALARDO:  Objection, your Honor.

6         THE COURT:  Overruled.

7    BY MR. PIROZZOLO:

8    Q.    If you look at paragraph 3, the first sentence, do

9    you see that?

10   A.    I do.

11   Q.    And that states, "Only upon the exchangor's written

12   direction and authorization shall the funds leave the

13   Benistar account."  Do you see that?

14   A.    I do.

15        MR. PAPPALARDO:  Objection, your Honor.  May we

16   approach?

17        THE COURT:  All right.

18        MR. PAPPALARDO:  Thank you.

19        (At sidebar on the record.)

20        MR. PAPPALARDO:  Your Honor, I object to this

21   question, as I tried to object yesterday on the same

22   line of questioning.

23        The funds -- and the government knows this --

24   never left the escrow account.  And they're leaving the

25   impression as though it did and there was no written

PDF created with pdfFactory trial version www.pdffactory.com

1    permission.

2          The accounts -- the accounts that these monies

3    went into were all escrow accounts.  They were linked

4    accounts and it had designations of -- and as the Court

5    may recall from the first trial, from Paley, this was

6    all pooled money, and as a matter of fact, in -- I

7    believe, in some of Jokinen's -- I don't think in Linda

8    Jokinen's spreadsheets there's a reflection of that, I'm

9    not sure whether it was what you excluded or didn't

10   exclude.

11         But, your Honor, it's fundamentally unfair and

12   unduly prejudicial for the government to keep asking

13   witnesses about whether or not you authorized money to

14   leave an escrow that had always been in the escrow

15   account.

16         Now, your Honor, I had tell you, obviously, that

17   was a trading account.  There were several -- but they

18   always were in this -- and it's exactly, by the way,

19   your Honor, what the documents read.  The documents say

20   an escrow, an investment account which will -- I'm

21   sorry, an escrow account which will be invested.

22         And to leave this impression, I suggest to the

23   Court, is improper and unfair.

24         MR. PIROZZOLO:  I expect that this witness is

25   going to be testifying shortly that he put his money and

directed that the money be placed into the three percent

account, and the three percent account was supposedly

the money market account.  He never directed that the

money be sent to any other account at all.  And it

relates directly to the representations in that Escrow

Agreement that misled him into believing that it would

be kept in that three percent account.  And therefore,

it is relevant to the issue of fraud.

MR. PAPPALARDO:  Can I respond to that, your

Honor?  Because this is, again, a fundamental problem

with the evidence.

These accounts were at Paine Webber.  If you

look at the election sheet that Paine Webber -- it does

not say money market account, and the government knows

this, they put them into evidence --

THE COURT:  Let me just ask an information

question first.

I remember from the last trial there was a

reference to the BO1 and the B10, those were Merrill

Lynch accounts.

MR. PAPPALARDO:  Those were Merrill Lynch, and

those were linked, too.

Your Honor, I can get the exhibit that the

government is about ready to introduce.  In the election

form, it does not say money market, it says three

1  percent or six percent; the other documents say

2  investment account.

3          I, again, suggest to the Court --

4          THE COURT:  Quiet things down over there.

5          MR. PAPPALARDO:  Was I talking too loud?

6          THE COURT:  No, I think the jury was talking too

7  loud.

8          MR. PAPPALARDO:  Your Honor, to leave an

9  insinuation that the money didn't go into this account

10  and to get from the witnesses that they didn't give

11  permission to do that is improper.

12          THE COURT:  The problem is you both have in mind

13  a characterization of the term "escrow account" as it

14  appears in the documents.  It is not well-defined, and

15  there is room for each side to have its spin, if I may

16  call it that.

17          For that reason, I think we have to stick to the

18  facts and not the characterization.

19          I don't think it's right to talk about it as

20  "the escrow account" as if it were clear what that

21  meant.

22          In the government's favor is the proposition

23  that the language is strongly suggestive of an isolated

24  account which would be restricted.  But the language on

25  its face doesn't necessarily do that.

1        MR. PAPPALARDO:  Your Honor, may I point out one

2  other thing?

3        THE COURT:  So that's why I think -- you can

4  have your theory, but I think to treat it as the only --

5  as a fact as opposed to an interpretation of the facts,

6  I think goes a little bit too far.

7        So what I prefer to do -- you can have all the

8  subsidiary actual facts, but where we're having the

9  trouble is the characterization.  You say escrow account

10  means one thing; you say it means another thing.

11        MR. PAPPALARDO:  Your Honor, in each of these

12  exchanges -- and I pointed this out yesterday -- on

13  documents they signed "accounts" is in the plural.  It's

14  not one account.

15        THE COURT:  Right.  And those are the kind of

16  subsidiary facts that I'm talking about.  There will be

17  debate at the end about what they mean or don't mean.

18  Let's stick to what is said in terms.  As soon as we get

19  into characterization, which we will at argument time --

20  we're going a little bit beyond what we can do in the

21  evidence.

22        MR. PIROZZOLO:  Okay.

23        (End of discussion at sidebar.)

24  BY MR. PIROZZOLO:

25  Q.   Can you look, Mr. Fitzgerald, further in that

1    paragraph to the sentence that starts, "Upon the written

2    direction."  Do you see that?

3    A.    I do.

4    Q.    And can you read that sentence, Mr. Fitzgerald?  And

5    try to keep your voice up, if you would.

6    A.    Sure.  "Upon the written direction of the exchangor

7    shall the funds be released and then the funds shall be

8    delivered to one of only two places, at the exchangor's

9    written direction."

10   Q.    And further down, below that paragraph, there are

11   subparagraphs a and b.  Do you see that?

12   A.    I do.

13   Q.    Can you read the first one?

14   A.    "Directly to the exchangor's account; or, b,

15   directly to the escrow account for the closing on the

16   replacement property to be purchased pursuant to the

17   Exchange Agreement."

18   Q.    Now, if you could turn briefly to Exhibit 314, which

19   I will put up on the screen.  And I'm going to highlight

20   or magnify paragraphs 1 through 4.

21         Again, I'm not going to ask you to read the

22   entire thing, but is it fair to say that similar

23   provisions appear in that contract --

24   A.    Yes.

25   Q.    -- when compared to Exhibit 67?

PDF created with pdfFactory trial version www.pdffactory.com

```
1    A.    Yes, it is.

2    Q.    Can you look at Exhibit 66, Mr. Fitzgerald?  And

3    also if you could put in front of you at the same time

4    Exhibit 313?

5    A.    Sure.

6    Q.    Do you have Exhibit 66 in front of you?

7    A.    I do.

8    Q.    And what is that?

9    A.    That's an Exchange Agreement.

10   Q.    Does it bear your signature?

11   A.    It does.

12   Q.    And what's the date?

13         If you look at the first page of the exhibit,

14   very first line.

15   A.    I'm sorry, October 31, 2000.

16         MR. PIROZZOLO:  The government offers Exhibit

17   66.

18         THE COURT:  Okay.

19         (Exhibit 66 received into evidence.)

20   BY MR. PIROZZOLO:

21   Q.    Can you also look, Mr. Fitzgerald, at Exhibit 314?

22   A.    I have it.

23   Q.    What is that?

24   A.    That's an Exchange Agreement, also.

25   Q.    Does it have your signature?
```

1   A.    It does.

2   Q.    And what's the date?

3   A.    October 31, 2000, also.

4         MR. PIROZZOLO:  The government would offer

5   Exhibit 313.

6         MR. PAPPALARDO:  No objection, your Honor.

7         THE COURT:  Okay.

8         (Exhibit 313 received into evidence.)

9   BY MR. PIROZZOLO:

10  Q.    There are two -- those are Exchange Agreements; is

11  that right?

12  A.    They are.

13  Q.    I'm going to put Exhibit 66 up on the screen.

14        Can you, again, describe why there are two

15  Exchange Agreements?

16  A.    Again, one represented the property, the other

17  represented the corporation, which would be the

18  equipment that went along with it, the general car wash

19  equipment, vacuums, and whatnot.

20  Q.    Could you look at page 2 of Exhibit 66, which I'm

21  going to put up on the screen here?

22        And there's a paragraph c.  Do you see that?

23  A.    I do.

24  Q.    And that relates to holding of net proceeds?  Is

25  that what it relates to?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    It does.

2    Q.    Could you read the first -- just the first sentence

3    of that paragraph?

4    A.    "Exchangor agrees that the intermediary shall hold

5    the net proceeds from the closing herein until such time

6    as the exchangor has located suitable like-kind property

7    or properties in which to exchange, which shall be

8    described as the 'replacement property.'"

9    Q.    Can you look at paragraph 10 of the agreement, which

10   is on page -- the next page of the exhibit?  And it

11   actually goes over to the following page of the exhibit

12   as well, but right at the bottom, do you see that?

13   A.    I do.

14   Q.    Can you just, please, read the first sentence of

15   that paragraph?

16   A.    "Exchangor and intermediary expressly agree that any

17   cash proceeds received from the disposition of the

18   relinquished property shall be held and invested with

19   Paine Webber at either three per annum or six per annum

20   in a Paine Webber" -- let me get to the second page --

21   "account."

22   Q.    Mr. Fitzgerald, can you look at the document that

23   has been marked as Exhibit 313?

24           I'll put that one up on the screen.  Do you see

25   that?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   I do.

2    Q.   And turning to the second page of that document,

3    does that document also have a similar paragraph c to

4    the one we just discussed connected to Exhibit 66?

5    A.   It does.

6    Q.   And if you could flip forward in that document to

7    paragraph 10.

8         Do you see that?  Do you have paragraph 10 in

9    front of you?

10   A.   I do.

11   Q.   Is it fair to say that also has similar language to

12   the language you read --

13   A.   It is.

14   Q.   -- in connection with Exhibit 66, correct?

15   A.   Yes, it is.

16   Q.   Can you put in front of you Exhibit 69,

17   Mr. Fitzgerald?

18        Do you have that in front of you?

19   A.   I do.

20   Q.   What is it?

21   A.   That's the account selection form.

22   Q.   And what is it dated?

23   A.   That was dated on 10/31/2000.

24   Q.   And does it bear your signature?

25   A.   It does.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. PIROZZOLO:  The government offers Exhibit

2    69.

3          MR. PAPPALARDO:  No objection.

4          THE COURT:  Okay.

5          (Exhibit 69 received into evidence.)

6          MR. PIROZZOLO:  May I publish?

7          THE COURT:  You may.

8    BY MR. PIROZZOLO:

9    Q.   Mr. Fitzgerald, I tried to magnify the document a

10   little bit.  On the document you see there are two

11   selections?

12   A.   I do.

13   Q.   What selection did you make?

14   A.   The three percent account.

15   Q.   Why did you do that?

16   A.   I wanted to be able to ensure a quick return of the

17   money when needed.

18   Q.   Can you take a look and put in front of you Exhibit

19   68?

20          Do you have that in front of you?

21   A.   I do.

22   Q.   What is that?

23   A.   That's the fee agreement for the exchange.

24   Q.   What's it dated?

25   A.   It's dated 13th of September 2000.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And does it bear your signature?

2    A.    It does again.

3          MR. PIROZZOLO:    The government would offer

4    Exhibit 68.

5          THE COURT:    Okay.

6          (Exhibit 68 received into evidence.)

7          MR. PIROZZOLO:    And I'm going to publish that

8    next to the account selection form.    Actually, it's not

9    big enough, so I'm just going to publish it by itself.

10   BY MR. PIROZZOLO:

11   Q.    Do you see that?

12   A.    I do.

13   Q.    What's it called?

14   A.    "Benistar Property Exchange Trust Co. Inc. Exchange

15   Fee Agreement."

16   Q.    What's the date of that agreement?

17   A.    September 13, 2000.

18   Q.    I'm not going to put it up on the screen, but can

19   you flip to Exhibit 69, the account selection form?

20   A.    Okay.

21   Q.    Do you have that?

22   A.    I do.

23   Q.    What's the date of that selection form?

24   A.    That is October 31st of 2000.

25   Q.    If you look back on the screen to Exhibit 68, do you

PDF created with pdfFactory trial version www.pdffactory.com

1    see the first -- the fourth paragraph of that agreement,

2    it starts, "Exchangor and intermediary"?

3    A.   I do.

4    Q.   Can you read just the first sentence of that,

5    please?

6    A.   "Exchangor and intermediary expressly agree that any

7    cash proceeds received from the disposition of the

8    relinquished property shall be held and invested with

9    Merrill Lynch Private Client Group in either a three

10   percent annum account or six percent annum account, with

11   interest accruing as of the third day after receipt."

12   Q.   Mr. Fitzgerald, if you would flip back to Exhibit

13   69?

14   A.   I have it.

15   Q.   Actually, to Exhibit 67.  I had the wrong number.

16   A.   Okay.

17   Q.   It's the Escrow Agreement.

18   A.   Getting a little tricky flipping around here, but I

19   got it.

20   Q.   Sorry.

21   A.   No, that's -- I've got it.

22   Q.   Take a look at bullet 1.  Do you see that?

23   A.   I do.

24   Q.   Do you see where there's a reference to Paine

25   Webber?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.    Yes, I do.

2   Q.    Were you ever told why the accounts changed from

3   Merrill Lynch when you signed the agreement in

4   September, to Paine Webber when you signed the agreement

5   in October?

6          MR. PAPPALARDO:   Object.

7          THE COURT:   Sustained.

8   BY MR. PIROZZOLO:

9   Q.    Did you go forward with the transaction with

10  Benistar?

11  A.    I did.

12  Q.    Did you send money to Benistar?

13  A.    I did.

14  Q.    About how much?

15  A.    In the two exchanges, there was one for $400,000 for

16  the real estate and one for $100,000 for the equipment.

17  Q.    At some point in time did you ask for your money to

18  be returned?

19  A.    I did.

20         MR. PAPPALARDO:   Object, your Honor.

21         THE COURT:   No, overruled.

22         MR. PAPPALARDO:   Okay, can we -- could we have

23  him clarify the question?  There were two exchanges

24  here, your Honor, one for 400 and one for 100.

25         THE COURT:   Fair enough, yes.

 1          MR. PAPPALARDO:  Thank you.

 2          MR. PIROZZOLO:  I'll clarify.

 3    BY MR. PIROZZOLO:

 4    Q.   For the exchange in the amount of $400,000, was that

 5    money returned?

 6    A.   Yes, it was.

 7    Q.   For the exchange for the $100,000 -- you wanted to

 8    clarify?

 9    A.   I did.  It's not returned; if I can liken it to

10    trading in a car, it's the same thing.  It doesn't pass

11    through my hands.  It went to basically the other party

12    that was selling the second piece of real estate to me.

13    So in the sense -- I guess you could say it's returned,

14    but not directly to me; just passing on is what it is.

15    Q.   Did the $100,000 get transferred to the third party?

16    A.   No, that did not.

17    Q.   Focusing on when you turned your money over to

18    Benistar pursuant to the two agreements that we've

19    discussed -- actually, there are four agreements, two

20    Escrow and two Exchange Agreements -- were you told that

21    your money was going to be used to buy and sell options?

22          MR. PAPPALARDO:  Objection, your Honor.

23          THE COURT:  Sustained.

24          MR. PIROZZOLO:  If I could just have a minute,

25    your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

1          (Pause.)

2          (Discussion off the record.)

3          MR. PIROZZOLO:  I have no further questions.

4          MR. PAPPALARDO:  May we approach, your Honor?

5          (At sidebar on the record.)

6          MR. PAPPALARDO:  Your Honor, this is what I

7     highlighted to the Court this morning.

8          Mr. Pirozzolo asked whether that money was

9     returned, and what I indicated to the Court this morning

10    was that he received $80,000 pursuant to a civil

11    settlement on that $100,000, and because he said that,

12    he's leaving -- and he knows this, by the way, your

13    Honor, this is the second time this has occurred.  I

14    would suggest to the Court that I have the ability to go

15    into that payment of $80,000 in satisfaction of that

16    $100,000 --

17          THE COURT:  From where was it received?

18          MR. PAPPALARDO:  From Molly Carpenter.

19          MR. PIROZZOLO:  No, that is a misrepresentation.

20          MR. PAPPALARDO:  Benistar Employee Trust

21    Corporation, 15th day -- I mean, is that a

22    misrepresentation, your Honor?  Dan Carpenter, Carpenter

23    Financial Group, your Honor, is Dan Carpenter.

24          (Discussion off the record.)

25          MR. PAPPALARDO:  They're trying to leave an

1    impression with this jury that he is out $100,000, and I

2    suggest to the Court that's both improper, prejudicial

3    and, more importantly, unfairly prejudicial, your Honor,

4    particularly in a case where loss isn't an issue.  And

5    they knew this.

6          MR. PIROZZOLO:  That settlement agreement was an

7    agreement that was paid for by Merrill Lynch.  It was

8    not a payment by Mr. Carpenter, as far as I can tell.

9    It's a settlement agreement of a civil matter.

10         Mr. Fitzgerald, I believe, will testify that it

11   was pursuant to -- I think it was a settlement

12   discussion with Merrill Lynch regarding the broker's

13   conduct.  And he was required to release Mr. Carpenter

14   in order to obtain the funds in return -- whatever funds

15   were being provided to him pursuant to this agreement.

16         THE COURT:  Well, anyway, I'm not going to

17   permit it because I think it --

18         MR. PIROZZOLO:  Can I say something else, your

19   Honor?

20         THE COURT:  The evidence of the incomplete

21   exchange transactions is part of the -- sort of the

22   unfolding of events.  It's not admitted because the

23   amounts matter at all.  It is a part of the big picture

24   of the government's prosecution that in December certain

25   events occurred and certain obligations weren't able to

PDF created with pdfFactory trial version www.pdffactory.com

1  be met and so on.  But it's not because there were

2  financial losses, really, it's because things were

3  incomplete.

4       MR. PIROZZOLO:  And, your Honor, may I just -- I

5  apologize.  My question was:  Did it go to the third

6  party?  Not whether it was returned.  That was my

7  question.

8       THE COURT:  That doesn't make any difference,

9  it's the same thing.

10       MR. PIROZZOLO:  And it was after Mr. Pappalardo

11  stood up and said we want to have the two

12  transactions -- under the doctrine of completeness, it

13  was entirely appropriate for me to ask a question about

14  the second exchange.  He asked for clarification.

15       THE COURT:  Before he asked for clarification,

16  it appeared worse for the defendant, so --

17       MR. PAPPALARDO:  Your Honor, I suggest to the

18  Court that by allowing this evidence in, the jury is

19  unduly prejudiced into thinking and concluding, because

20  there is nothing else before them, that this man, as he

21  sits here today, is out $100,000.  And I suggest to the

22  Court that is completely and unfairly prejudicial, and I

23  take very strong objection to that.

24       THE COURT:  Okay.  Noted.

25            (End of discussion at sidebar.)

 1          MR. PAPPALARDO:  May I have one moment, your

 2    Honor?

 3          (Discussion off the record.)

 4          THE COURT:  Are you going to be using your

 5    documents?

 6          MR. PAPPALARDO:  I think we probably can get to

 7    that.

 8          THE COURT:  I just want to change the setting.

 9          MR. PAPPALARDO:  I appreciate that, your Honor,

10    thank you.

11          MR. PAPPALARDO: May I proceed, your Honor?

12          THE COURT:  Yes.

13          MR. PAPPALARDO:  Thank you.

14                      CROSS-EXAMINATION

15    BY MR. PAPPALARDO:

16    Q.  Mr. Fitzgerald, my name is John Pappalardo, and I am

17    counsel to Mr. Carpenter.

18          Now, sir, you indicated that you had an initial

19    meeting with Mr. Martin Paley, Marty Paley?

20    A.  Yes, that is correct.

21    Q.  And isn't it fair to say that meeting was in

22    approximately March of 2000?

23    A.  That's correct.

24    Q.  And isn't it also fair to say that you indicated

25    that you learned about Mr. Paley from someone?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   That's correct.

2  Q.   And isn't it true, sir, that that someone was your

3  accountant, Sharon Burke?

4  A.   That's correct.

5  Q.   And wasn't the connection there that Sharon Burke,

6  your accountant, was friendly with Martin Paley's wife?

7  A.   That's correct.  She had met her at a -- some type

8  of a breakfast, power brunch thing, one of those deals.

9  I don't think they were friends, per se, but I think

10 they just met at this meeting, that's how --

11 Q.   And that's fair, sir, but that was the connection?

12 A.   That's correct.

13 Q.   And isn't it also true, sir, that in the meeting

14 that you described going over these promotional or

15 marketing materials, that you were accompanied by your

16 accountant, Sharon Burke?

17 A.   That's correct.

18 Q.   And she was present for the entire presentation by

19 Mr. Paley?

20 A.   Yes, she was.

21 Q.   Now, you received what has been marked as Exhibit 59

22 either -- certainly -- this is the slide show you were

23 shown that on that day, whatever that was, in March; is

24 that fair to say?

25 A.   69?

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   59, Exhibit 59.

2   A.   Could you just tell me what it was?  I don't have

3   anything on my Teleprompter there, so --

4        MR. PAPPALARDO:  If I may approach, your Honor?

5        THE COURT:  Yes.

6   A.   59, I've got it.  Sorry about that.

7   Q.   Okay, sir.  You have that in front of you now?

8   A.   I do.

9   Q.   Okay.  And this is the slide show that was presented

10  to you and to your accountant by Mr. Paley; isn't that

11  fair to say?

12  A.   That's correct.

13  Q.   And this was among the promotional or marketing

14  materials that you ultimately received from Mr. Paley

15  that day?

16  A.   That's correct.

17  Q.   And again, that was approximately March of 2000?

18  A.   I believe so.

19  Q.   Okay.  Let's go through some of this.

20       You went through this at the time, and you

21  listened carefully to these particular representations

22  by Mr. Paley, right?

23  A.   As careful as I could.  You know, some of it gets a

24  little mundane, but it was -- the whole general

25  atmosphere, the presentation, I was impressed by a

PDF created with pdfFactory trial version www.pdffactory.com

1    couple of things, mainly talked about the 419s and how

2    much of a structure there was.

3    Q.    And you were impressed with Mr. Paley, too?

4    A.    I was, mm-hmm.

5    Q.    And this was important to you, Mr. Fitzgerald,

6    because at the time you went in, you had really no

7    working familiarity with property exchanges, right?

8    A.    Not really.  I had been familiar somewhat because of

9    a piece of property a friend of mine -- someone I know

10   had done; I wasn't actually part of it.

11   Q.    But these were the materials that caused you to

12   focus on what you would do in your own situation, right?

13   A.    That's correct.

14   Q.    Now, as you go through these materials, sir, all of

15   these materials -- by the way, was anybody else present

16   at the meeting between you --

17   A.    Just Martin Paley, myself, and Sharon.

18   Q.    And that was it?

19   A.    Mm-hmm.

20   Q.    Okay.  As you go through these materials, you --

21   they make reference, do they not, to Merrill Lynch?

22   A.    They do.

23   Q.    And you -- that's something you were impressed with,

24   right?

25   A.    Yeah, just lent itself to the whole atmosphere,

PDF created with pdfFactory trial version www.pdffactory.com

1    professional operation.

2    Q.    Okay.  And again, in March of 2000, were you shown

3    any other documents beside the promotional materials,

4    which are Exhibit 59 and Exhibit 60, Exhibit 2, Exhibit

5    61, Exhibit 62?  Was there anything else you were shown

6    other than those exhibits, sir?

7    A.    I think that's pretty much the gist of it.  If

8    there's anything else -- this was by far the general

9    package that was presented.

10   Q.    Okay.  And that's what you've testified to, right?

11   A.    That's correct.

12   Q.    Now, in any of these marketing materials, that is,

13   on the exhibits I just mentioned, 2, 62, 60, 59, was Dan

14   Carpenter's name in there?

15   A.    Not that I'm aware of.

16   Q.    Did Dan Carpenter's name come up at all during that

17   meeting?

18   A.    Nope, I don't believe it did.

19   Q.    You indicated that you were provided these materials

20   and you were at least urged by the materials to check

21   references, right?

22   A.    That's -- I did see that statement there,

23   absolutely.

24   Q.    And did you check references?

25   A.    No, I really didn't.  You know, when I saw things

PDF created with pdfFactory trial version www.pdffactory.com

1    like Paine Webber and the whole presentation, it's like

2    when you're trading your car in, I wouldn't follow up

3    with the dealership to see if it was going to -- you

4    know, I should be credited back on my sales tax.  Very

5    similar with like-kind exchange of properties is trading

6    in a car for another car.

7    Q.   And just to be clear, sir, at least in the

8    promotional materials, again, in March of 2000, Paine

9    Webber wasn't in there, Merrill Lynch was, right?

10    A.   I believe that's correct.

11    Q.   Okay.

12    A.   Paine Webber, Merrill Lynch kind of --

13    Q.   And you thought Paine Webber and Merrill Lynch were

14    fungible, right?  They were the same --

15    A.   I know they're different institutions but of the

16    same thing.  The whole idea is it's being held in an

17    escrow account by large outfits --

18    Q.   Precisely.  It gave you the same comfort level.

19    A.   That's correct.

20    Q.   There was no functional distinction between Paine

21    Webber or Merrill Lynch?

22    A.   That's correct.

23    Q.   Now, in any of these materials -- all of these

24    materials, by the way, had to do with Mr. Paley, right?

25    A.   They had to do with Benistar Property Exchange.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Right.  And they showcased Mr. Paley, did they not?

2    A.   Just that one article, I believe, Mr. Paley -- if it

3    was Mr. Paley in a little office on the corner or

4    something, I may have a little more to ask, but because

5    of Benistar and the information, the dates that were

6    printed, how long they've been doing the 419s and the

7    power of the corporation, I think I felt a little more

8    secure knowing that it was a large institution.  That

9    was the impression I had at the time.

10   Q.   Right, right.  But these materials all refer --

11   the -- let's just look at them.  Let's look at 59, the

12   thick package again.

13   A.   Mm-hmm.

14   Q.   In 59, Mr. Paley's name is on this, right?  You look

15   at the bottom of the page, each page, Benistar Property

16   Exchange Trust Company, Needham Street in Newton, phone

17   number for there, fax for there, Benistar e-mail, Martin

18   Paley?

19   A.   I don't have his name on there, but it does have

20   the --

21   Q.   You see the e-mail, sir?

22   A.   -- street address.

23        Yeah, I do see that.

24   Q.   And that's on every page, right?

25   A.   Yes, it is.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And nobody else's name appears?

2    A.   No.  Again, sir, I'm looking at the much bigger

3    heading of Benistar Property Exchange, and not the very

4    small line there.  I didn't have to pay particular

5    notice to that.

6    Q.   Well, that at no time -- you thought when you went

7    in there Mr. Paley was the owner of Benistar, didn't

8    you?

9    A.   I did.  I didn't know the exact capacity of what it

10   was, but I knew he was -- similar to a franchise maybe.

11   I was under that impression that he had a satellite

12   office of this larger thing.

13   Q.   Right.

14        Now -- and by the way, sir, look at slide 22

15   on -- slide 22 on Exhibit 59.  That's the reference to

16   Merrill Lynch, right?  Fourth bullet point down.

17   A.   Yes, it is.

18   Q.   Okay.  Now, let's look at Exhibit 60 for a second

19   again.

20        Do you have that in front of you, sir?

21   A.   Not yet, but I'm working on it.

22   Q.   Take your time.

23   A.   This could be a little tricky.

24        I do have 60.

25   Q.   Okay.  Now, look at the first paragraph, if you

PDF created with pdfFactory trial version www.pdffactory.com

 1   will.

 2          Could you get that up on the screen, please,

 3   starting with "originally," the second part of the first

 4   paragraph?  And highlight from "originally" through the

 5   end of the first paragraph, please.

 6          MR. PAPPALARDO:  Your Honor, if I may --

 7          (Discussion off the record.)

 8   BY MR. PAPPALARDO:

 9   Q.   Okay.  You see that part in yellow?

10   A.   I do.

11   Q.   It says, "Originally founded as Nationwide Property

12   Exchange in 1993, Benistar Property Exchange is expert

13   at developing tax avoidance strategies for property and

14   business owners."   Right?

15   A.   That's correct.

16   Q.   And this is something that impressed you, did it

17   not?

18   A.   Yes, it did.

19   Q.   And you know, a long history in this business was

20   important to you?

21   A.   That's correct.

22   Q.   And did you discuss with Mr. Paley his relationship

23   with Nationwide?

24   A.   No, I did not.

25   Q.   Did Mr. Paley tell you that he was with Nationwide

PDF created with pdfFactory trial version www.pdffactory.com

1    in 1993?

2    A.    No, I don't believe he did.

3    Q.    Okay.  Did he tell you Benistar Property Exchange

4    Trust Company began in October of 1998?

5    A.    No, he did not.

6    Q.    And --

7    A.    If he did, it was in passing and wouldn't have made

8    any difference to me.

9    Q.    And it wouldn't have made any difference to you

10   because it was still Mr. Paley, right?

11   A.    No, because it was Benistar.  I was thinking of

12   Benistar, the big picture.  I just didn't put the whole

13   thing together; neither did my accountant, who is very

14   bright; neither did my attorney, apparently.

15   Q.    We will get to that.

16   A.    Sure.

17   Q.    Thanks.

18         Sir, if you look at 61, Exhibit 61.

19   A.    I have it.

20   Q.    Okay.  This was a series or five-part article of --

21   that showcased the knowledge of Mr. Paley, right?

22   A.    I'm not sure of that.  I think it was more in

23   regards -- this is what he sent me as a newspaper

24   article, I believe, after.  This wasn't at the Power

25   Point.  This was something that came along afterwards,

PDF created with pdfFactory trial version www.pdffactory.com

1   and it was just an article about exchanges, and it was

2   either written by him or featured him in it.

3   Q.   Right.  But, I mean, when I say "showcased him," it

4   had his picture, it was written by him, it was, again,

5   promotional or marketing materials designed to get

6   someone to consider Mr. Paley and his company; isn't

7   that fair to say?

8   A.   Yes, I believe it is.

9   Q.   Okay.  Is anybody else mentioned in here?

10  A.   I'd have to read the whole thing, to tell you the

11  truth, but -- and I only have page one --

12  Q.   Then that's okay, sir.  We can leave it at that.

13         My question is:  Did you ask Mr. Paley who else

14  was going to handle your matter beside himself?

15  A.   No.  It was all on the assumption that Benistar

16  was --

17  Q.   Yeah, beyond Mr. Paley, who was Benistar to you?

18  A.   Benistar was this large corporation that I was

19  presented with thinking that -- if I could take it to a

20  real level, it's like I wouldn't go into a bank and ask

21  as I'm making a deposit who is going to be handling my

22  cash up here.  I mean, there's stock in the

23  corporation --

24  Q.   And you relied on Mr. Paley as being not only the

25  contact to you but the only person you knew to be the

1    face of that corporation, right?

2    A.    The face of it, I realize, obviously, he's not

3    handling all of this stuff.  He presented it as a pretty

4    large picture, a large organization, and he was part of

5    it.  Again, whether it was -- you know, I don't want to

6    say a franchise, but I kind of interpreted as he was

7    operating a satellite portion of whatever this big

8    conglomerate was.

9    Q.    Right.  And that satellite portion and the part that

10   he played was president of the Benistar Property

11   Exchange Trust Company, right?

12   A.    I don't know if he represented himself as president;

13   he very well could have.

14          THE COURT:  Mr. Pappalardo, it's a little after

15   1:00.

16          MR. PAPPALARDO:  I'll be a little bit longer,

17   your Honor.  Perhaps we should recess until tomorrow.

18          THE COURT:  Okay, we'll do that.

19          We'll resume tomorrow, jurors, at 9:00.  We

20   continue making progress.

21          THE CLERK:  All rise for the jury.

22          (Jury left the courtroom.)

23          MR. PIROZZOLO:  Should we excuse the witness?

24          THE COURT:  The witness can be excused.

25          MR. PIROZZOLO:  Thank you.

1           (Witness left the stand.)

2           THE COURT:  Okay.

3           MR. MITCHELL:  I had mentioned on Monday or I

4   had asked the Court whether the Court had an opportunity

5   to take a look at the two motions to dismiss that the

6   defendant filed, and so I'm just renewing my question, I

7   guess, and whether --

8           THE COURT:  The answer is no, I haven't yet.

9           MR. MITCHELL:  Okay.  That's easy enough.

10          All I can submit, your Honor, is I think these

11  are disposable in open court.  If there's something

12  particular that the Court wants us to address in

13  writing, we'd be happy to do that.

14          THE COURT:  Fair enough.

15          MR. MITCHELL:  Maybe I'll ask in a couple more

16  days.

17          The only other thing, just in the interest of

18  time, your Honor, if there were any -- if there's

19  anything that we can sort of knock out right now as

20  opposed to, you know, at 9:00 tomorrow morning, so that

21  we don't delay things further.

22          THE COURT:  Let's get just a preview of what's

23  coming.  We'll finish Mr. Fitzgerald.  Then we have, I

24  guess, the Iantosca deposition, which shouldn't take too

25  long.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. MITCHELL:  No, we have Marjorie Adams,
2     first.
3          THE COURT:  Right.
4          MR. MITCHELL:  And then Iantosca's.
5          THE COURT:  Fine.
6          MR. GREENBERG:  And we do have an issue with
7     respect to Ms. Adams.
8          THE COURT:  What is it?
9          MR. GREENBERG:  If your Honor reads her trial
10    transcript, she talks of two conversations with
11    Mr. Carpenter.
12         THE COURT:  Right.
13         MR. GREENBERG:  One is -- you know, involves
14    reverse exchanges, which is irrelevant.  But the second
15    has to do with one that she claims took place in
16    January.
17         THE COURT:  Right.
18         MR. GREENBERG:  And it bears nothing to the
19    state of mind.  It is a variety of statements that are,
20    as I said, irrelevant and unfairly prejudicial.
21         She makes comments about what she -- what she
22    said to him, which has no relevance whatsoever.  It --
23    you know, I also -- you know, suggestive of the whole
24    issue of loss.
25         THE COURT:  I've looked at that, and I looked

PDF created with pdfFactory trial version www.pdffactory.com

1   during the recess, I read that quickly.

2          First of all, of course, unlike the witnesses

3   Jokinen and Iantosca, she'll be asked questions anew, so

4   the testimony may or may not be exactly the same as

5   appears in the transcript.  So what really -- I guess

6   rather than focus too much on the transcript, the

7   question is:  What does the government intend to elicit?

8   Whether it might be -- well, I guess that's the

9   question.

10          So if there's a concern about that conversation

11   in January, the first question is:  Does the government

12   intend to elicit evidence about that conversation?

13          MR. MITCHELL:  Yes.  And this is actually the

14   third time that defense counsel has prompted me to make

15   a proffer on this conversation.  Two days ago it was

16   that it never happened; now it's -- they apparently

17   agree it actually happened, now their objection is one

18   of relevance.

19          THE COURT:  Well, what do you want to elicit

20   about the conversation?  And then we'll see whether

21   there's an objection to that.

22          MR. MITCHELL:  What I'm going to elicit is the

23   following points.  It's largely the same thing that was

24   in the transcript last time, but essentially that she

25   had a conversation with Dan Carpenter, asked him, What's

1   the status of Joe Iantosca's funds?  He said that the

2   funds could not be disbursed to Iantosca.  Carpenter

3   told her that there had been a run on the bank, which is

4   highly probative of consciousness of guilt.  There had

5   not been a run on the bank in any conceivable way.

6            He further said that he had asked Iantosca for a

7   loan.

8            And there's one other point.  If I just can have

9   a minute to dig up the transcript, there's one other key

10  point.  I'm sorry.

11           Just bear with me one second, your Honor.

12           THE COURT:  If you're looking for the

13  conversation in the trial transcript  --

14           MR. MITCHELL:  I have the transcript.

15           THE COURT:  -- it's the fourth day at page 50.

16           MR. MITCHELL:  Okay.

17           He explains that we're waiting for other

18  exchanges to come in, another thing he says to her.  She

19  says the money is supposed to be there, which goes right

20  to his understanding.  I mean, he claims -- he's

21  glossing over, your Honor -- no mention of options,

22  doesn't say at any point that he had been trading stock

23  options.  Again, in a glaring omission, that is

24  probative of consciousness of guilt during the time when

25  he's taking in money, throughout the whole period.

PDF created with pdfFactory trial version www.pdffactory.com

1        In that to the extent that he says also that

2   he's waiting for other exchangors' money to come in to

3   take care of Iantosca suggests also his understanding of

4   investments.  He's using money from certain exchangors

5   to cover other exchangors' shortfalls.  That is not an

6   investment in any construction of the term, and it goes

7   right to the defendant's state of mind about what

8   investment meant to him.

9        So for all those reasons, it's probative, her

10  statements are probative of intent, his intent

11  throughout the entire course of his operation.

12       He also -- Mr. Greenberg also mentioned a July

13  call.  The July call was prompted by Marty Paley.

14  Ms. Adams had a question for Paley about reverse

15  exchanges.  He said, Well, why don't you -- why don't

16  you talk to Dan Carpenter?  She called Dan Carpenter,

17  put the questions.  Dan Carpenter went into detail about

18  reverse exchanges.  And the point of that, your Honor,

19  is it showed that the defendant well knew exactly how

20  this whole thing worked, how reverse exchanges worked.

21  He wasn't just somebody sitting back in a chair in

22  Connecticut not knowing what's going on out in the

23  hinterland.  He was involved in the business, was

24  involved in what was going on, understood it; therefore,

25  for both those bases, it's irrelevant.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. GREENBERG:  First of all, reverse exchanges

2     are not any part of any of this case, nor is any

3     suggestion about March of 2000.  There's no question, I

4     mean, Mr. Carpenter was involved in the business.  This

5     is -- it has no relevance whatsoever to any issue in

6     this case.

7          With respect to the second conversation, first

8     of all, as I've noted, Mr. Carpenter denies such

9     conversation took place.  But, more importantly, the

10    testimony here has nothing to do with his state of mind.

11    Again, the operative date -- the latest date is November

12    30th of 2000.  Mr. Carpenter's statements about, you

13    know, what may happen in the future, which is what

14    he's -- which she purports he made in early January, is

15    to Mr. Iantosca waiting a couple of weeks.  It has

16    nothing to do with his state of mind in January at all.

17    Again, this is just a backdoor effort to get in evidence

18    of loss.

19          Her statements here -- I mean, she testified at

20    the last trial, you know, what she purports to have told

21    him about other people's money and not supposed to be

22    using someone else's money to purchase this property.

23    Nothing could be more highly inflammatory, unfairly

24    prejudicial, and irrelevant as to this witness saying

25    something as to what she claims she told Mr. Carpenter.

PDF created with pdfFactory trial version www.pdffactory.com

1    It's not -- it's just not germane to this case.

2            THE COURT:  Okay.  I want to read a little more

3    carefully myself.  I'll take it under advisement

4    overnight.  I'll tell you first thing in the morning or

5    before she testifies.

6            MR. GREENBERG:  Thank you, your Honor.

7            THE COURT:  All right.

8            THE CLERK:  All rise, Court is in recess.

9            (Court adjourned at 1:12 p.m.)

10                  - - - - - - - - - - - -

11

12                        CERTIFICATION

13        We certify that the foregoing is a correct

14    transcript of the record of proceedings in the

15    above-entitled matter to the best of our skill and

16    ability.

17

18

19    /s/Debra M. Joyce
      Debra M. Joyce, RMR, CRR          Date
20    Official Court Reporter

21

22

23

24    /s/Marcia G. Patrisso
      Marcia G. Patrisso, RPR, CRR      Date
25    Official Court Reporter