UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Criminal Action |
| v. | ) No. 04-10029-GAO |
|  | ) |
| DANIEL E. CARPENTER, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY FIVE
JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Friday, June 6, 2008
9 a.m.


Marcia G. Patrisso, RPR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

APPEARANCES:

    OFFICE OF THE UNITED STATES ATTORNEY
    By: Jonathan F. Mitchell and Jack W. Pirozzolo,
    Assistant U.S. Attorneys
    John Joseph Moakley Federal Courthouse
    One Courthouse Way
    Boston, Massachusetts  02210
    On Behalf of the Government

    GREENBERG TRAURIG, LLP
    By: A. John Pappalardo, Esq. and
        Gary R. Greenberg, Esq.
    One International Place
    Boston, Massachusetts  02110
    On Behalf of the Defendant

<u>I N D E X</u>

|  | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|

<u>Witnesses For The
 Government:</u>

BRIAN FITZGERALD, resumed

    By Mr. Pappalardo          4
    By Mr. Pirozzolo                    31

MARJORIE ADAMS

    By Mr. Mitchell    46           132
    By Mr. Greenberg         86

<u>E X H I B I T S</u>

| <u>Exhibit No.</u> | <u>Description</u> | <u>Marked</u> | <u>Received</u> |
|---|---|---|---|
| No. 64 | Follow-up letter from Mr. Paley to Mr. Fitzgerald | | 5 |
| Nos. 75-80 | Benistar folder with presentation documents | | 52 |
| No. 84A | Exchange Fee Agreement | | 60 |
| No. 84B | Escrow Agreement | | 60 |
| No. 84C | Account selection form | | 60 |
| No. 86 | Fax cover sheet | | 60 |
| No. 88 | Fax cover sheet | | 60 |
| No. 89 | Account Election Form 9/24/00 | | 110 |
| No. 90 | Exchange Fee Agreement | | 66 |
| No. 92 | Account Selection form | | 66 |
| No. 93 | Wiring instructions | | 71 |
| Nos. 95-98 | Exchange documents for 25 and 45 Morton Street, Quincy | | 74 |
| Nos. 100-103 | Exchange documents for 261-265 Haywood Street, Braintree | | 77 |
| Nos. 105-108 | Exchange documents for 135 Quincy Avenue, Quincy | | 78 |
| No. 230 | Ms. Adams' billing record 1/31/01 | | 137 |
| No. 252 | Exchange Fee Agreement | | 105 |

```
 1              (The following proceedings were held in open
 2      court before the Honorable George A. O'Toole, Jr.,
 3      United States District Judge, United States District
 4      Court, District of Massachusetts, at the John J. Moakley
 5      United States Courthouse, One Courthouse Way, Boston,
 6      Massachusetts, on June 6, 2008.
 7              The defendant, Daniel E. Carpenter, is present
 8      with counsel.  Assistant U.S. Attorneys Jonathan F.
 9      Mitchell and Jack W. Pirozzolo are present.)
10              THE CLERK:  All rise for the jury.
11              (Jury in at 9:14 a.m.)
12              THE CLERK:  Please be seated.
13              THE COURT:  Good morning, jurors.
14              THE JURORS:  Good morning.
15              THE COURT:  Counsel?
16              COUNSEL IN UNISON:  Good morning, your Honor.
17              MR. PAPPALARDO:  May I proceed, your Honor?
18              THE COURT:  Please.
19              MR. PAPPALARDO:  Thank you.
20                      BRIAN FITZGERALD, resumed
21                      CROSS-EXAMINATION
22      BY MR. PAPPALARDO:
23      Q.   Good morning, Mr. Fitzgerald.
24      A.   Good morning.
25      Q.   Sir, I remind you that from yesterday you're still
```

1    under oath.

2    A.    Yes.

3    Q.    Mr. Fitzgerald, we left off yesterday discussing the

4    status, in your mind, of Martin Paley.  You said you

5    thought he was the owner of Benistar Property Exchange?

6    A.    That is correct.

7    Q.    Do you recall now, sir, that he was the president?

8    A.    That's correct.  Yeah, I've seen that on some of the

9    documents.

10   Q.    Could you look at Exhibit 64, please?

11   A.    I have it.

12   Q.    Okay.  And do you recognize that document, sir?

13   A.    I do.  That's a follow-up letter from Martin Paley

14   to myself.

15   Q.    Okay.  And this letter was sent to you by Mr. Paley?

16   A.    Yes, it was.

17   Q.    And it references a meeting that you had?

18   A.    Yes, it does.

19        MR. PAPPALARDO:  I would offer it, your Honor.

20        MR. PIROZZOLO:  No objection.

21        THE COURT:  Okay.

22        MR. PAPPALARDO:  May it be published, your

23   Honor?

24        THE COURT:  Yes.

25        (Exhibit No. 64 received into evidence.)

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   BY MR. PAPPALARDO:

 2   Q.   Mr. Fitzgerald, basically what this letter says is

 3   it's a follow-up to the meeting that he had -- that

 4   Mr. Paley had with you and your CPA, Sharon Burke,

 5   inquiring about your future needs and that sort of

 6   thing, right?

 7   A.   That's correct.

 8   Q.   And it's signed by Mr. Paley.

 9        This is the meeting that you spoke about yesterday?

10   A.   That's correct.

11   Q.   And this was in March, again, of 2000?

12   A.   Yes, it is.

13   Q.   Your next contact with Mr. Paley was when?

14   A.   I believe that would have been probably September --

15   it was in the fall of 2000.

16   Q.   Okay.  And did you initiate that contact?

17   A.   I did.

18   Q.   And did that result in a meeting between you and

19   Mr. Paley?

20   A.   Yes, it did.

21   Q.   And was there anyone else at that meeting?

22   A.   Actually, if I could retract that.  I'm not sure if

23   we had a physical meeting or just a phone conversation

24   at that point.  I really don't recall if I went back in

25   to Newton to see him.  It might have been done via the
```

PDF created with pdfFactory trial version www.pdffactory.com

1    phone.

2    Q.   And was anyone else on the phone call with you, that

3    you recall?

4    A.   No; probably just myself.

5    Q.   And, sir, did that result in the generation of

6    Exhibit No. 68 -- could you look at that -- which is in

7    evidence?

8    A.   Yes, I did.

9    Q.   Okay.  And this is the Exchange Fee Agreement

10   between you and Benistar Property Exchange; isn't that

11   right?

12   A.   That's correct.

13            MR. PAPPALARDO:  Could you highlight the first

14   sentence of the second full paragraph, please?  Just the

15   first sentence.

16   BY MR. PAPPALARDO:

17   Q.   Do you see that on the screen, sir?

18   A.   I do.  It's a little blurred.

19   Q.   And it says that "The exchangor" -- which is you --

20   "and the intermediary expressly agree that any cash

21   proceeds received from the disposition of the

22   relinquished property" -- the property you're selling --

23   "shall be held and invested at Merrill Lynch at the

24   discretion and through the financial institutions of the

25   intermediary," right?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   That's correct.

2  Q.   Now, at this point in time, in your mind and as this

3  document indicates, as did the promotional materials,

4  you were still dealing with Merrill Lynch, right?

5  A.   True.   Again, as I noted yesterday, I wasn't so much

6  concerned what institution.   I realized it was going

7  into an escrow account.

8  Q.   Right.   And chronologically, March and September,

9  obviously, come before October.   But this document says

10 "Merrill Lynch"?

11 A.   That's correct.

12 Q.   But what I would like to focus your attention on,

13 sir, is that it says "held and invested at the

14 discretion and through the financial institutions of the

15 intermediary."   That's what it says, right?

16 A.   That is correct.

17 Q.   There's nothing in there that says anything else?

18 A.   No, not on this particular page.   No, sir.

19 Q.   Right.   Right.   And it also says, if you go to

20 the -- strike that.

21      So at this point in time in September you knew that

22 the monies that you gave to Benistar -- or that you gave

23 to them for the purposes of effectuating the 1031 tax

24 deferral -- would be held and invested by Benistar

25 through their financial institutions, but more

1    importantly, at their discretion, right?

2    A.   Well, yes, I guess that's fair to say.  But with the

3    assumption that --

4    Q.   Sir, we'll get to that.

5    A.   That's fine.

6    Q.   But that's what this says, right?

7    A.   That's exactly what that says.

8         MR. PAPPALARDO:  Now, if you would go to the

9    beginning of the fourth paragraph, please, and just

10   highlight that sentence.

11   BY MR. PAPPALARDO:

12   Q.   You also knew -- I'm sorry, sir.  Do you see that --

13   A.   I do.

14   Q.   -- the first sentence?

15        You also knew that at some point in time -- not

16   through this document but at some point in time -- in

17   the future you would have an election to make as between

18   a 3 percent account and a 6 percent account, right?

19   A.   That's correct.

20   Q.   And that's what this is highlighting, right?

21   A.   That's correct.

22   Q.   And you didn't elect at this point, did you?

23   A.   I'm not sure at what point I did, but I did elect

24   the 3 percent account.

25   Q.   You did.  And we'll get to that, sir.

1   A.   Sure.

2   Q.   Now, sir, this document, the Exchange Fee Agreement,

3   in the first paragraph provides that you would pay a fee

4   to Benistar of $2500, right?

5   A.   That is correct.

6   Q.   And that would take the form of a $500 initial

7   payment and $2,000 payable to Benistar, right?

8   A.   That's correct.

9   Q.   And that's what you did?

10  A.   Absolutely.

11  Q.   And did you send a check to Martin Paley?

12  A.   I did not.  The whole idea of the exchange is that

13  it doesn't pass through the exchangor; it basically went

14  from the other party, the party --

15  Q.   No, sir.  Sir, the fee.  The fee.  Let me clarify

16  the question so we're all on the same page.

17  A.   That's correct, the fee --

18  Q.   The fee that you sent, the $500 fee and the $2,000

19  balance, did that take the form of a check?

20  A.   I'm not sure.  That might have been taken out of the

21  proceeds, actually; in fact, I think it was taken out of

22  the proceeds.  I'd have to go back in my QuickBooks and

23  try to pull it out.  But I think it did come out of the

24  proceeds.

25  Q.   Proceeds of?

1  A.   Of the sale of the property.

2  Q.   And how did those proceeds get to Martin Paley?

3  A.   Martin Paley, or Benistar Property, actually, would

4  have received them directly from the purchasing party,

5  and he probably -- and, again, this is hypothetical; I'm

6  quite sure this is how it was structured -- that they

7  would take those fees right out of the proceeds

8  themselves.

9  Q.   Okay.  But it's not hypothetical, sir.  It's your

10  best memory of what you --

11  A.   My best memory.

12  Q.   -- remember, right?

13  A.   Sure.

14  Q.   Now, let's move on to -- let's move on to the

15  account selection form.  That is Exhibit 69.  Do you see

16  that, sir?

17  A.   Not yet but --

18  Q.   Sure.  Take your time.

19  A.   -- I'll recognize it.

20       Did you say 59, sir?

21  Q.   Sixty-nine.

22  A.   Sixty-nine?  There's a lot of papers up here.  I do

23  have it.

24       MR. PAPPALARDO:  Okay.  And may that be -- that

25  be highlighted, especially the 3 percent?

PDF created with pdfFactory trial version www.pdffactory.com

1          THE WITNESS:  I have that on my screen as well.

2  BY MR. PAPPALARDO:

3  Q.   Okay.  Now, this is -- at this point in time, as you

4  previously testified, you made an election to go with a

5  3 percent account, right?

6  A.   That's correct.

7  Q.   And that's what this form indicates?

8  A.   That's correct.

9  Q.   That's your signature at the bottom?

10 A.   Yes, it is.

11 Q.   And you've checked off the top with your initials?

12 A.   That is correct.

13 Q.   And, now, this document, sir, is dated on Halloween,

14 basically, right?

15 A.   That's correct.

16 Q.   It's dated in October.  And there's no mention of

17 which institution you're dealing with --

18 A.   That's correct.

19 Q.   -- but it doesn't say "Merrill Lynch," right?

20 A.   It does not.

21 Q.   Okay.  What it does say is that you've elected for a

22 3 percent per annum account, right?

23 A.   Correct.

24 Q.   It doesn't say "money market account," does it, sir?

25 A.   No, it does not.

```
 1   Q.   It doesn't say anything other than a 3 percent

 2   account?

 3   A.   That's absolutely correct.

 4   Q.   And you indicated, I believe on your direct

 5   testimony, that you selected the 3 percent because it

 6   had less of a lead time in terms of liquidation, right?

 7   A.   Correct again.

 8   Q.   Okay.  All right.  Let's turn now to Exhibit 66.

 9   A.   Did you say 66, sir?

10   Q.   Sixty-six; yes.

11   A.   I have that in front of me, the Exchange Agreement.

12   Q.   Okay.  And this is the document that -- one of the

13   documents -- but this is the Exchange Agreement; this is

14   the agreement between you and Benistar, right?

15   A.   That's correct.

16   Q.   Okay.  Now, sir, we had testimony yesterday that you

17   bifurcated your exchange; in other words, you had money

18   in property and money in equipment, right?

19   A.   It was a dual exchange.

20   Q.   Dual exchange.  And the rest of the exchange is

21   reflected in Exhibit 313, right?

22   A.   That's correct; 313.

23   Q.   And both of these documents were executed by you on

24   the same day?

25   A.   Yes, they were.
```

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   October 31st, 2000?

2  A.   That's correct.

3  Q.   And for reasons that we needn't get into, you did

4  choose to bifurcate this exchange, right?

5  A.   That's correct.

6  Q.   Now, these documents, with the exception of what

7  they refer to, are otherwise identical, are they not?

8  A.   I believe so.

9  Q.   To your knowledge the provisions of these documents

10 are identical?

11 A.   Without reading it letter for letter, that is

12 correct.

13 Q.   But that's your understanding as you sit here today,

14 sir?

15 A.   Absolutely.

16 Q.   And that was your understanding back on October 31,

17 2000?

18 A.   Absolutely.

19 Q.   Okay.  So let's deal with Exhibit 66 knowing it's

20 the fundamental equivalent and language of 1313, okay?

21 A.   There was a significant difference in the two

22 exchanges, though -- not the terminology -- as far as

23 the parties.

24 Q.   Right.  And, sir, again, what I'm talking about is

25 the operative thrust of the document; not the parties,

PDF created with pdfFactory trial version www.pdffactory.com

1    not what was being exchanged or anything like that.

2    A.   Okay.

3    Q.   And you would agree that they're otherwise identical?

4    A.   Yes.

5    Q.   So for simplicity, let's just turn to 66.

6         Now, let's look at --

7              MR. PAPPALARDO:   On the second page, if you

8    would highlight Section C.

9    BY MR. PAPPALARDO:

10   Q.   Do you see that, sir?

11   A.   I do.

12   Q.   And this says, "The exchangor agrees that the

13   intermediary shall hold the net proceeds from the

14   closing herein until such time as the exchangor has

15   located suitable like-kind property or properties in

16   which to exchange" -- correct?

17   A.   That's correct.

18   Q.   -- "and which shall be described as replacement

19   property."

20        And you knew, sir, in order to be eligible for this

21   tax deferral, that the money had to be in the hands of a

22   qualified intermediary?

23   A.   That's correct.

24   Q.   Okay.  Now, continuing on, "Thereafter, the

25   exchangor shall instruct the intermediary to acquire

PDF created with pdfFactory trial version www.pdffactory.com

1   replacement property on the terms and conditions

2   negotiated by the exchangor as evidenced by a written

3   agreement for the purchase thereof," right?

4   A.   That's correct.

5   Q.   And that is what you did with respect to the

6   property, right?

7   A.   Yes, it is.

8   Q.   And that's what that refers to?

9   A.   That's exactly what it refers to.

10  Q.   Okay.  Let's proceed, please, to Paragraph 10 of

11  this agreement on page 3.

12       MR. PAPPALARDO:  And if that may be highlighted.

13  BY MR. PAPPALARDO:

14  Q.   Take a moment and read that, sir.

15  A.   I'm very familiar with it.

16  Q.   Okay.  And this says that "The exchangor and the

17  intermediary expressly agree that any cash proceeds

18  received from the disposition of the relinquished

19  property shall be held and invested" -- and now we have

20  PaineWebber at a -- in this case it's a 3 percent

21  account, right?

22  A.   That's correct.

23  Q.   And again, sir, it says that the proceeds shall be

24  held and invested with PaineWebber, right?

25  A.   Correct.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   Let's look at Paragraph 20 of that document.   Are
 2   you familiar with this paragraph, sir?
 3   A.   Not right off the top of my head because...
 4   Q.   Take a moment to read it and see if that refreshes
 5   your recollection.
 6             (There is a pause.)
 7   A.   It looks like boilerplate legal jargon.   But, yes,
 8   I'm familiar with it.
 9   Q.   And you understand this to be what they call an
10   "integration clause," right?
11   A.   No, I'm not familiar with that term, but I recognize
12   generally what it's trying to pull together.
13   Q.   And what it's really saying is that other than this
14   document, there are no other representations that
15   control unless modified by a different document, right?
16   That with respect to this document --
17   A.   I'm not an attorney.   I'm not sure if I'm really
18   able to answer that factually, but I can speculate that,
19   sure, that to the best of my knowledge, that's --
20   Q.   Let's read it.   You're not an attorney, sir, but
21   let's read it.   "This agreement contains the entire
22   agreement of the parties hereto and supersedes" -- you
23   know what that means, sir, right?
24   A.   Yes, I do.
25   Q.   Okay.
```

1       -- "supersedes any prior written or oral agreement

2   between the parties" -- "between them," meaning the

3   parties -- "concerning the subject matter contained

4   herein?"

5       The subject matter is the exchange, right?

6   A.   That's correct.

7   Q.   "And there are no representations, agreements,

8   arrangements or understandings, oral or written, between

9   the parties hereto, relating to the subject matter

10  contained in this agreement which are not fully

11  expressed herein," right?  That's what it says?

12  A.   That's correct.

13  Q.   And listen to my question now, sir, because -- this

14  is not a trick.  Here's my question:  Do you understand

15  that this clause applies to anything that Martin Paley

16  told you back in March?

17  A.   Probably that's what they're trying to express out

18  of it, and certainly that would be fine because it seems

19  like there's enough other documentation that accompanies

20  it to make it a secure agreement.

21  Q.   And, sir, we'll get to that.  Just, please, take it

22  a step at a time.

23      My question to you, sir, is:  Do you understand that

24  this clause essentially supersedes whatever

25  representations Martin Paley may have made to you in

PDF created with pdfFactory trial version www.pdffactory.com

1    March?

2    A.    Sure.

3    Q.    Okay.  Because this is what controls, right?

4    A.    Correct.

5    Q.    Now let's look at Exhibit 67.  Do you have that,

6    sir?

7    A.    I do have it.

8         MR. PAPPALARDO:  And may that be put up on the

9    screen?  And in particular, the third paragraph.  Would

10   you highlight that?

11   BY MR. PAPPALARDO:

12   Q.    And before, sir, we get into a discussion of

13   these -- of this document, would you look at Exhibit

14   314?

15   A.    I have that as well.

16   Q.    Okay.  Now, Exhibit 67 and Exhibit 314 are Escrow

17   Agreements, right?

18   A.    That's correct.

19   Q.    And Exhibit 67 is the Escrow Agreement that applied

20   to the property, the real property; and Exhibit 314 is

21   the Escrow Agreement that applied to the fixtures, or

22   the equipment; isn't that fair to say?

23   A.    That's correct.  Yes, it is.

24   Q.    And other than, perhaps, differences in the parties,

25   corporate structures or whatever, the operative language

PDF created with pdfFactory trial version www.pdffactory.com

1   of these two exhibits are identical, are they not?

2   A.   I would have to assume so.

3   Q.   Well, I don't want you to assume it.

4   A.   Well, I would have to read them letter-for-letter to

5   be able to say that.

6   Q.   Was it your understanding at the time, sir, that

7   these were identical?

8   A.   Sure.  But again, I don't know, because one is a

9   corporation, one is a personal party; one is equipment,

10  one is real estate.

11  Q.   And if you would just -- could we leave 67 on the

12  screen and leave 314 in front of you, okay?

13  A.   I have them both here.

14  Q.   Okay.  Good.  And these are -- we can all agree that

15  these are Escrow Agreements, right, sir?

16  A.   That's correct.

17  Q.   Let's look at the third paragraph.  And could you

18  highlight that, please?

19       By the way, sir, these were executed by you?

20  A.   Yes, they were.

21  Q.   Signed by you on --

22  A.   Yes, they were.

23  Q.   -- October 31st of 2000?

24  A.   Yes, they were.

25  Q.   Same day as the Exchange Agreement, same day as the

PDF created with pdfFactory trial version www.pdffactory.com

1    account selection form, right?

2    A.   That's correct.

3    Q.   Altogether they were signed --

4    A.   That's correct.

5    Q.   -- by you, to the extent that they obviously had to

6    be, but other agreements also by Martin Paley, right?

7    A.   That's correct.

8    Q.   Now let's look at the third paragraph.  And what

9    this says, sir, is, "Whereas the exchangor," meaning

10   you, "will be depositing with Benistar," meaning the

11   qualified intermediary, "an amount of funds to be

12   deposited in the Benistar accounts at PaineWebber,"

13   right?

14   A.   Yes, it does.

15   Q.   And do you see, sir, that it says "accounts"?

16   A.   I do.

17   Q.   Do you see that's the plural?

18   A.   I do.

19   Q.   And you see this says -- this is the Escrow

20   Agreement we're talking about here, right?

21   A.   I do.

22   Q.   Okay.  So this says "accounts"?

23   A.   That's correct.

24   Q.   Let's move now to the next "whereas" clause, and

25   under Point 1.

 1          MR. PAPPALARDO:   And can Point 1 be highlighted,

 2    please.

 3    BY MR. PAPPALARDO:

 4    Q.   Okay.  Now, sir, this says, "Benistar shall open an

 5    escrow custodial account under Benistar's name at

 6    PaineWebber for the exchangor's benefit," right?

 7    A.   That's correct.

 8    Q.   Okay.  And it says that Benistar shall open the

 9    escrow account, right?

10    A.   That's correct.

11    Q.   It says "under Benistar's name," right?

12    A.   That's correct.  It says "under Benistar's name at

13    PaineWebber for the exchangor's benefit."

14    Q.   Right.  And again, that's to effectuate the

15    eligibility for a 1031 under the law, right?

16    A.   That's correct.

17    Q.   Because they had to have control of the money?

18    A.   That's correct.

19    Q.   Okay.  But it says that the account shall be in

20    Benistar's name, right?

21    A.   That's correct; it cannot be in the exchangor's

22    name.

23    Q.   But it doesn't say that it's an isolated account,

24    does it, sir?

25    A.   No, it does not.  I'm not sure what that would mean,

PDF created with pdfFactory trial version www.pdffactory.com

1    but...

2    Q.   It would mean an account in Benistar's name with --

3    you know, designated for just you.

4    A.   No.  But it does say "the exchangor's benefit,"

5    which --

6    Q.   Of course.  And you would agree with me, sir, would

7    you not, that what that means is that the money would be

8    pooled?

9    A.   No, I wouldn't really assume that.  But if, in fact,

10   that's the case, an escrow account's an escrow account.

11   Q.   An escrow account is an escrow account, and that's

12   what we're talking about here sir.  But here's my

13   question:  When it says the escrow custodial account

14   would be in Benistar's name, okay, did you have any

15   issue with that?

16   A.   No, not at all.

17   Q.   Okay.  Let's look at Paragraph 2.

18          MR. PAPPALARDO:  May that be highlighted?

19   BY MR. PAPPALARDO:

20   Q.   And, sir, what this says is that "Benistar shall

21   have full control over the exchangor's funds to invest,

22   as the exchangor directs, in either the 3 percent or 6

23   percent account."  Again, for you it was 3, right?

24   A.   Absolutely.

25   Q.   So that you agreed when you signed this document

1  that Benistar shall have full control over the
2  exchangor's funds -- over your funds --
3  A.   That's correct.   Whether it's Benistar or whatever
4  the intermediary is, that they have to have absolute
5  control over it; otherwise, it defeats the whole idea of
6  the exchange.
7  Q.   We understand.  We understand.  But by this clause,
8  again, you're agreeing that you want to be a full
9  corporate 1031?
10 A.   Correct.
11 Q.   Now, let's continue.  "Benistar shall have full
12 control over the exchangor's funds to invest" -- do you
13 see that?  "Full control to invest"?
14 A.   That's correct.
15 Q.   So by this document you conferred them full control
16 to invest?
17 A.   That's correct.  In an escrow account to my benefit.
18 Q.   That's what it says.  It's an Escrow Agreement.
19 A.   Correct.
20 Q.   But there were no limitations on their investment,
21 was there, sir?  There's none provided by this document,
22 is there?
23 A.   I'm not an attorney and I can't speak to what their
24 limitations are.  I just know from my point of view.
25 Q.   I'm asking you.  I'm asking you.

1    A.    From my point of view as a layperson, apparently

2    not.    Apparently they do have control over where those

3    funds are invested.

4    Q.    Right.    And that's what it says.

5    A.    That's correct.

6    Q.    But --

7    A.    I think that's why I wasn't too upset with the

8    difference between PaineWebber and Merrill Lynch.    It

9    just didn't ring a bell.    They're both big institutions.

10   Q.    And this is a different point, sir.    This is a

11   different point.    My question to you is that there were

12   no restrictions on the nature of the investment provided

13   by this escrow account, were there?

14   A.    I don't know if I'm comfortable saying that because

15   I really -- I don't know throughout the whole document

16   what else is in this whole Exchange Agreement, you know,

17   word by word.    Again, I'm not an attorney.    I relied on

18   an attorney as well as general instincts.

19   Q.    Sir, can you please take a minute -- this is a very

20   short document.    It's two and a half pages.    This is

21   your Escrow Agreement, right?

22   A.    Correct.

23   Q.    Can you read this whole document to yourself?

24   A.    It's part and parcel with the larger agreement.

25   Q.    Okay.    Then I'll tell you what, sir.    First of all,

1   read this Escrow Agreement and tell me where there are

2   any limitations placed on the nature of the investment

3   by Benistar.   This is your Escrow Agreement.

4   A.   Without even looking at it, then, I guess I can make

5   a statement.   The limitations in my mind would be

6   limited to the exchangor's benefit, as simple as that.

7   Q.   And, sir -- sir -- sir, my question to you is not

8   what was in your mind.   My question to you was what the

9   document says.

10  A.   I'll go back to what you put on the screen.   "To the

11  exchangor's benefit."   That's the way that I interpreted

12  it and that's what it says.   To me that would be the

13  investment range was limited to the exchangor's benefit.

14  I don't know if I can make that any clearer.

15  Q.   No, sir.   Every investment is for your benefit, it

16  has to be under the 1031, right?

17  A.   That's what we would like to assume.

18  Q.   But the point is -- the point is:   Does this

19  document have any limitations -- do you provide or limit

20  the nature of the investment by Benistar in the Escrow

21  Agreement?

22        (Pause.)

23  A.   Well, the only thing, again, that I could respond to

24  would be it was limited to -- and it states it right

25  there -- the IRC Code 1031, Section 1031.   What that is,

PDF created with pdfFactory trial version www.pdffactory.com

1    I don't know.  I don't have that in front of me, exactly

2    what those are.  But I'm sure there's some type of

3    limitations to that as well.

4    Q.  You're sure there's some type of limitations to

5    that?

6    A.  I would assume so.  It's the United States

7    government code.  I'm sure there's some kind

8    of limitations --

9    Q.  Sir, if I suggested to you that under the United

10    States government code, under the federal tax laws under

11    1031 there is absolutely no limitation on the nature of

12    the investment --

13          MR. PIROZZOLO:  Objection.  It's his personal

14    knowledge.

15          THE COURT:  Sustained.

16    BY MR. PAPPALARDO:

17    Q.  But that's the only limitation you see in this

18    document?

19    A.  That I see; that's correct.

20    Q.  And that's in your mind?

21    A.  That's correct.

22    Q.  Right.  And other than that, there are no

23    documents -- excuse me -- there are no limitations

24    placed on this escrow account either?

25    A.  That's correct.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And in the exchange -- in fact, what it says is that

2    they should have full control to invest the funds,

3    right?

4    A.   That's correct.

5    Q.   Now, sir, you said many times you're not a lawyer,

6    right?

7    A.   That's correct.

8    Q.   And you aren't?

9    A.   That's correct.

10   Q.   But you did have a CPA, didn't you?

11   A.   I did.

12   Q.   And did your CPA review all of your documents?

13   A.   Yes, she did.

14   Q.   And did you rely on your CPA to do that?

15   A.   No, I didn't.  I had an attorney also --

16   Q.   We'll get to your attorney.

17   A.   Yeah.

18   Q.   Did she review the documents?

19   A.   Yes, she did.  I don't know to what extent she did,

20   but she was definitely partaking in it.

21   Q.   And did you have any conversations with her about

22   these documents?

23   A.   No --

24        THE WITNESS:  Shall I continue?

25        MR. PIROZZOLO:  My only objection is, I think

1  "yes" or "no" is okay, but into the privileged nature of

2  the conversation I think is off limits.

3        MR. PAPPALARDO:  With the CPA?

4        MR. PIROZZOLO:  I think the question related to

5  an attorney.

6        MR. PAPPALARDO:  It didn't, your Honor.

7        THE COURT:  Go ahead.

8        THE WITNESS:  No.  I think that if I go back --

9  I couldn't tell you verbatim what we discussed as far as

10 the Exchange Agreement outside it was pretty much a

11 boilerplate thing, these are done all the time, she

12 subsequently didn't have --

13 BY MR. PAPPALARDO:

14 Q.   Okay.  Now, you have an attorney, too?

15 A.   I do.

16 Q.   And your attorney reviewed each of these documents,

17 didn't he?

18 A.   I'm sure he did.

19 Q.   And did you have a conversation -- and did you have

20 a conversation -- yes or no -- with your attorney about

21 these documents?

22 A.   I'm sure we did.

23 Q.   And you signed these documents?

24 A.   That's correct.  They're both good friends of mine,

25 they're both very bright people, and they had no reason

PDF created with pdfFactory trial version www.pdffactory.com

1    to be suspect of anything as well.  We were quite

2    comfortable going forward with the exchange.

3    Q.    Sir, you would agree with me that there's nothing on

4    the face of these documents that prohibited Benistar

5    Property Exchange from having full control to invest

6    these monies as they see fit, would you?

7    A.    I would think not.

8    Q.    But there's no specific provision in any of these

9    documents that you could point to that would limit their

10   investment strategy, is there?

11   A.    That's correct.  This is a little difficult.  I'm

12   trying to compartmentalize things and keep it very

13   structured to the facts for you.  I would like to be

14   able to just speak to it, but I understand the procedure

15   of the Court and I'll just keep it addressed to that.

16   But bear with me because it is tough to keep it

17   segmented and compartmentalized without editorializing a

18   little bit.

19   Q.    Sir, you were asked a question yesterday by Mr.

20   Pirozzolo:  "Did you ever direct Benistar to invest in

21   an options trading account?"  Do you remember that

22   question?

23   A.    I certainly do.

24   Q.    And you answered no, you did not; isn't that fair to

25   say?

1    A.   That's correct.  That's very fair to say.

2    Q.   Isn't it also fair to say, sir, that you didn't

3    direct Benistar in any fashion or place any limitations

4    on their investment?

5    A.   That's correct.  Again, when I put my deposit in a

6    checking account, I don't ask where that's going; I'm

7    assuming it's being held in the bank or invested in

8    something.  It's a nonissue for me.  It was a nonissue.

9    It was pretty much a standard thing that was happening.

10           (Pause.)

11   Q.   Now, sir, at any point -- at any point in time

12   through and including the time that you signed these

13   agreements, did you even know that Dan Carpenter

14   existed?

15   A.   No; I wouldn't know anybody at Benistar.

16           MR. PAPPALARDO:  That's all, your Honor.

17           THE COURT:  Mr. Pirozzolo?

18           MR. PIROZZOLO:  Just a few questions on

19   redirect, your Honor.

20                    REDIRECT EXAMINATION

21   BY MR. PIROZZOLO:

22   Q.   Mr. Fitzgerald, a couple of moments ago you were

23   asked some questions about the Escrow Agreement, Exhibit

24   67, certain provisions in that agreement?

25   A.   That is correct.

1   Q.   And you were asked -- if you could just put that in

2   front of you, Exhibit 67 and --

3   A.   I have them both:  67 and 314.

4   Q.   And I will -- you were asked a question about one of

5   the paragraphs, Paragraph 1.  I'm not going to pull it

6   up on the screen, but I'll just read it.  It said,

7   "Benistar shall open an escrow custodial account under

8   Benistar's name at PaineWebber for the exchangor's

9   benefit."

10  A.   That's correct.

11  Q.   And you were asked a question a few minutes ago by

12  Mr. Pappalardo where he said, "It doesn't say it is an

13  isolated account"; do you remember that?

14  A.   I do.

15  Q.   It does not say that it was going into an options

16  trading account, correct?

17  A.   That's correct.

18  Q.   You were asked a question about the second paragraph

19  of the Escrow Agreement, the second numbered paragraph

20  of the agreement.  And again I'll just read that.

21  "Benistar shall have full control over the exchangor's

22  funds to invest as the exchangor directs in either the 3

23  percent or the 6 percent account."  Did I read that

24  correctly?

25  A.   Yes, you did.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And Mr. Pappalardo, a few minutes ago, read a
2    portion of that but he stopped.   He read:   "Benistar
3    shall have full control over the exchangor's funds to
4    invest."   He stopped at the "to invest"; do you remember
5    that?
6    A.   That's correct.
7    Q.   Do you remember that?
8    A.   I certainly do.
9    Q.   What he did not read, "as the exchangor directs in
10   either the 3 percent or the 6 percent account"?
11   A.   That's correct.
12   Q.   He did not read that to you.
13        And it does not say "as you direct in a 3 percent or
14   6 percent account for purposes of trading in options,"
15   correct?
16   A.   That's correct again.
17   Q.   You were asked some questions about an escrow -- an
18   Exchange Fee Agreement that's Exhibit 68.   And again,
19   I'm not going to put it up on the screen because I only
20   have a few questions about that agreement.
21        And that document refers to Merrill Lynch, correct?
22   A.   Correct.
23   Q.   And then you were asked a series of questions about
24   the Exchange Agreement which references PaineWebber,
25   correct?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Correct.

2   Q.   What, if anything, were you told as to why the

3   Exchange Fee Agreement, which referenced Merrill Lynch,

4   was changed in the later agreements to reference

5   PaineWebber?

6           MR. PAPPALARDO:  Objection.

7           THE COURT:  You may answer.

8           THE WITNESS:  I didn't inquire, actually.  I saw

9   no difference between the institutions; I just saw a

10  large banking institution, financial institution.

11  BY MR. PIROZZOLO:

12  Q.   My question is:  What, if anything, were you told as

13  to why?

14  A.   I was told nothing.

15          MR. PIROZZOLO:  I have no further questions,

16  your Honor.

17          THE COURT:  Anything else?

18          MR. PAPPALARDO:  No.

19          THE COURT:  All right.  Thank you, Mr.

20  Fitzgerald.  You may step down.

21          THE WITNESS:  Thank you very much.

22          THE COURT:  Thank you.

23          (The witness is excused.)

24          MR. MITCHELL:  Your Honor, may I just have a

25  moment to put the chair back up and gather up the

1   documents?

2           THE COURT:  Sure.

3           (Pause.)

4           THE COURT:  Is somebody being called?

5           MR. MITCHELL:  The United States calls Marjorie

6   Adams.

7           THE COURT:  Paul, would you hold on just a

8   minute?  I know that there's an issue before this

9   testimony that we have to resolve with the lawyers.

10  Let's just excuse the jurors for a moment, and the

11  witness.

12          THE CLERK:  Sure.

13          THE COURT:  Jurors, we'll just be a few minutes;

14  we need to deal with something important.

15          (Jury out at 9:54 a.m.)

16          THE COURT:  Okay.  I just thought it was easier

17  logistically than talking through the music.

18          I've gone through the Adams testimony from the

19  prior trial, and I thought one easy way to do it --

20  well, I sort of underlined what I thought was

21  admissible, and I thought if I just gave you that, you

22  could see what they are.  But let me just -- as to the

23  first conversation, I don't think there's any problem.

24  The government may have the first conversation in July.

25          It's the second conversation.  What was

1  addressed in the transcript as to the second

2  conversation included matters which are properly

3  admissible but also include some extraneous matters

4  including Ms. Adams' comments about her reactions and

5  her -- even some of the things she said which are not

6  necessary to an understanding of what Mr. Carpenter

7  said.  And Mr. Carpenter's statements are admissible

8  against him obviously under the Rules of Evidence as an

9  exception to the hearsay rule, but that doesn't

10 necessarily make any other statement in the conversation

11 admissible, and I think there were some that were not.

12         If you're looking -- if you have the transcript

13 there, this part of the conversation begins at page 50

14 at line 12, I think.  And the description of how the

15 call was made is proper; that is, she can testify.  I

16 assume she's not going to say exactly the same words

17 because she's not going to be reading from the

18 transcript as she answers questions, but she can

19 indicate that she was asked to get in touch with

20 Mr. Paley; that she called, and Mr. Paley handed the

21 phone to Mr. Carpenter and so on, she says.

22         And the answer that she gives at lines 3 through

23 12 of page 51 is essentially okay and admissible; the

24 answer at lines 14 through 21 I think include some of

25 her own reaction which should not properly be admitted.

And in particular, I think she can say "I inquired what

he meant by 'run on the bank,'" if she says that he had

said that.  And then the material at lines 15 through

the first part of line 18 I think is extraneous; that's

her reaction.  She should not testify to that.  She can

then go on to say what her response is to her question,

"What do you mean by 'a run on the bank'?" and the rest

of the answer.

          MR. MITCHELL:  I think she's going to -- 15

through 18, your Honor, my understanding is -- and it

wasn't clear -- it isn't clear from this transcript --

my understanding is that she will testify that she said

that to the defendant and will testify to what his

reaction was --

          THE COURT:  I think it's still unnecessary.  The

point is that she asked -- because it's his -- what's

admissible is his statements; her statements are

necessary only to -- so that we can understand why his

statements are given and so on.  So that she posed a

question is sufficient, I think, rather than

including -- even if she actually did it, it doesn't

matter.

          MR. MITCHELL:  Well, his silence is also an

admission, too.  If she put something to him that he

would, under the circumstances, be -- one would expect

PDF created with pdfFactory trial version www.pdffactory.com

 1    him to react to and explain what happened -- I mean,

 2    it's sort of the classic -- someone gets out of the

 3    car and says --

 4         THE COURT:  I think that's theoretically

 5    possible; I don't think it's sufficiently probative

 6    here.  So I think we have to -- this exactly, I think --

 7    what my concern is about Ms. Adams is -- I don't want to

 8    be unfair to her, but my impression from memory was that

 9    she was trying to get a couple of licks in last time,

10    and I think the transcript supports that.  That's what I

11    want to avoid.

12         She -- from my memory, anyway -- she appeared as

13    though this was something that had upset her and she

14    wanted to make sure that that was conveyed, and I think

15    that that's improper; she is a vehicle for the testimony

16    about what Mr. Carpenter said, and that's appropriate.

17         MR. MITCHELL:  Sure.

18         THE COURT:  So let's go on to the next -- I

19    think it's on page 52.  I don't think that the lines 1

20    through 6 ought to be given for the same reason because

21    this is her comments.  So I think that the admissible

22    part would begin at line 7 and go down through either 17

23    or 19, or even 21, except for the "I wasn't getting

24    answers that made sense to me; it was a short

25    conversation."

PDF created with pdfFactory trial version www.pdffactory.com

1          The question at line 23 I think should be

2     excluded because it's just cumulative and not

3     particularly probative, her context.

4          MR. GREENBERG:  Do I understand, your Honor,

5     she's not to testify "I wasn't getting any answers that

6     made sense to me"?

7          THE COURT:  Right.

8          MR. GREENBERG:  That's out?

9          THE COURT:  That's out.  Actually, anything

10    after line 7 -- 19 is fine.  "Did you respond?"  "I

11    don't know if I responded."  Anything else in the direct

12    examination I think should not be.

13         So it's limited basically between, I guess, with

14    the omissions that I've mentioned -- the entire

15    conversation goes from page 50, line 12, through 53,

16    line 13.  And I think that the meat of it is really

17    between page 51, line 3, through 52, line 19.  That's

18    basically it.

19         MR. MITCHELL:  Obviously she's not going to be

20    reading this, so I'm obviously going to have to lead her

21    through it.

22         THE COURT:  I'm doing this so you understand

23    what the topics are that are being permitted and what's

24    not permitted.  Another question about whether she was

25    told about options trading, I think we've had enough of

PDF created with pdfFactory trial version www.pdffactory.com

1  that for the time being, at least from this kind of

2  witness who's not an exchangor, and it's after the fact.

3        MR. MITCHELL:  But again, though, the fact that

4  he explains -- he's trying to explain what happened to

5  the money -- and he said absolutely nothing about

6  options trading -- is probative of his state of mind.

7  I'd suggest that he knew he wasn't supposed to be doing

8  it.

9        THE COURT:  No, I don't think that is a

10 strong-enough inference in the context to warrant it.

11       MR. MITCHELL:  So all right.  So I take it that

12 I have to lead the witness so I don't step on these land

13 mines.

14       THE COURT:  Maybe you have to have a

15 conversation with her before she takes the stand.

16       MR. GREENBERG:  Yes.  Yes.

17       THE COURT:  That's one of the reasons I excused

18 the jury, so you'd have the opportunity to do that.

19       MR. MITCHELL:  Just so I'm clear, your Honor --

20       THE COURT:  Actually, if it's easier, I'll make

21 a photocopy of the page that I've underlined what I

22 think is admissible and you can use that as a guide.

23 I'll give you both a copy.

24       MR. GREENBERG:  Your Honor, just two points:

25 Number one, as we said before repeatedly, the defendant

PDF created with pdfFactory trial version www.pdffactory.com

1  denies that this conversation -- that --

2       THE COURT:  That's what evidence is about.

3       MR. GREENBERG:  The second thing is, what I'm

4  really concerned about is that she doesn't suggest, as

5  she did last time, that Mr. Carpenter intimated or said

6  to her he intended to use other people's money because,

7  as your Honor may recall, subsequently at page 72, line

8  9, she then said, "Mr. Carpenter never said he was going

9  to use other people's money; that was my" -- "that was

10  my guess as to why we would need to wait for other

11  closings to happen, because he was going to use their

12  money to make good."

13       So the suggestion -- the whole -- I just don't

14  want her, as she did last time, to put what was in her

15  head into Mr. Carpenter's mouth and then have to, on

16  cross-examination -- as they had to last time, after the

17  well was poisoned -- to go forward.  You know, it's

18  clear it was a short conversation, he made very specific

19  points, and she ought to be directed to just say

20  whatever she claims he said.

21       THE COURT:  Well, I agree with that in general.

22  Without being specific about that particular issue, her

23  testimony should be limited to what Mr. Carpenter said

24  and not her interpretation of it, or her reaction to it.

25  Some of her conversation has to be given in order to

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   give context to a two-party conversation, but when her
 2   conversation becomes an opportunity to present a point
 3   of view, it goes beyond what is necessary to understand
 4   the context.  That's all.
 5            MR. MITCHELL:  I agree with that.
 6            THE COURT:  So --
 7            MR. MITCHELL:  It would be my position that
 8   without her actually reading what you --
 9            THE COURT:  That's why I think if you take a
10   minute, we'll take a short break and you can review with
11   her what the limits are.
12            MR. MITCHELL:  Okay.  So you want me to make --
13            THE COURT:  I mean, she's a lawyer.  She'll
14   understand.
15            MR. MITCHELL:  Will the Court have somebody make
16   a copy of what -- oh, it's being done right now?
17            THE COURT:  So he'll be right back.  We'll take
18   a short break and he'll give you a copy.  I've
19   underlined the parts of the -- the controversial parts
20   that I think are admissible.
21            THE CLERK:  All rise.  The Court will take a
22   short recess.
23            (There is a recess in the proceedings at
24   10:04 a.m.)
25            THE CLERK:  All rise.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. GREENBERG:  Your Honor, I apologize, but I
 2    asked government's counsel, because I wanted to make
 3    sure that she was not going to testify, as she did at
 4    page 21, "And he just said there would be a number of
 5    closings where people were buying, and they were waiting
 6    for a closing where somebody would be selling so there
 7    would be sufficient funds," because as the government
 8    knows, on page 7 --
 9              THE COURT:  Where are you?
10              MR. GREENBERG:  Page -- on page 51, your Honor,
11    line 18, in her answer.
12              THE COURT:  Yeah.
13              MR. GREENBERG:  "He just said," meaning Mr.
14    Carpenter.
15              THE COURT:  No.
16              MR. GREENBERG:  So you've seen that?
17              THE COURT:  Yes.
18              MR. GREENBERG:  If your Honor goes to page 72,
19    and if you actually -- if you start on line 7 --
20    actually, if you start before, on page -- the question
21    it's asking about "Did Mr." -- about Mr. Carpenter
22    wanting to use other people's money to conduct these
23    closings.  And then if you go down, over to 72 and
24    starting with line 9, she says, "Mr. Carpenter never
25    said he was going to use other people's money.  That was
```

PDF created with pdfFactory trial version www.pdffactory.com

1    my guess as to why we would wait for other closings to

2    happen, because he was going to use their money to make

3    good."

4          MR. MITCHELL:  She's referring to two

5    different -- I'm sorry to cut off counsel.

6          THE COURT:  Let me hear the answer.  I don't

7    know what the truth is.  She should testify to the

8    truth.  If she said two different things, hopefully --

9    she could be asked about the subject and she should tell

10   us what is her truthful memory.  I can't tell you one's

11   better than the other one.

12         MR. GREENBERG:  Well, your Honor, what she said

13   was -- in effect, what she said was --

14         THE COURT:  I understand she said that.

15         MR. GREENBERG:  No, she said something

16   different.

17         THE COURT:  She might have said something

18   different.  Anyway, the topic is fair game, and you have

19   impeaching transcript if she said something different.

20         MR. MITCHELL:  What I've told the witness, your

21   Honor, is I showed this to her -- she had to run to the

22   bathroom.  I told her your two principal concerns, one

23   about her -- in general about testifying about her

24   reaction, and specifically which portions are

25   admissible.  If you would give her a minute to read it

PDF created with pdfFactory trial version www.pdffactory.com

1  because I was writing the questions down so I could --

2          MR. GREENBERG:  I would ask that the witness be

3  given the transcript and her reference because she's a

4  lawyer -- she said -- she corrects her prior testimony,

5  your Honor, and she makes it clear what she meant before

6  what was in her head, not what Mr. Carpenter said.  If

7  the government is going to proffer --

8          THE COURT:  No.

9          MR. MITCHELL:  You could show it to her on

10 cross; go ahead.

11         MR. GREENBERG:  Well, the damage is in the first

12 part; it would have been done, your Honor.  And the

13 government knows that she corrected her testimony

14 subsequent to her examination.  And to then allow this

15 witness to testify in a way knowing that she's already

16 corrected it is highly improper.

17         THE COURT:  Have you had an adequate opportunity

18 to talk to her?

19         MR. MITCHELL:  She had to run to the bathroom.

20         MR. PIROZZOLO:  She's outside, your Honor.

21 She's ready.  But there's argument ongoing so she's

22 waiting outside.

23         THE COURT:  I didn't know if Mr. Mitchell had

24 adequate opportunity to go over what he needed to with

25 her.  But in general, I want you to stay in control of

PDF created with pdfFactory trial version www.pdffactory.com

1   the examination.

2        MR. MITCHELL:  That's why I'm writing the

3   questions down.

4        THE COURT:  We'll give you another three.

5        MR. MITCHELL:  Thank you, your Honor.

6        THE CLERK:  All rise.

7        (There is a recess in the proceedings at

8   10:14 a.m.)

9        THE CLERK:  All rise for the jury.

10       (Jury in at 10:20 a.m.)

11       THE CLERK:  Please be seated.

12       MR. MITCHELL:  The United States calls Marjorie

13  Adams.

14                 MARJORIE ADAMS, sworn.

15       THE CLERK:  Please state your name, spell your

16  last name for the record, keep your voice up, and speak

17  into the mic so everyone can hear you.

18       THE WITNESS:  Marjorie Adams, A-D-A-M-S.

19                 DIRECT EXAMINATION

20  BY MR. MITCHELL:

21  Q.   Good morning.

22  A.   Good morning.

23  Q.   Ms. Adams, where do you live?

24  A.   Hanover, Massachusetts.

25  Q.   How long have you lived there?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Since 1993.

2    Q.    Are you married?

3    A.    Yes.

4    Q.    Do you have any children?

5    A.    Yes; I have two.

6    Q.    Two children.  And what do you do for a living?

7    A.    I'm a lawyer.

8    Q.    Where do you practice law?

9    A.    Currently in Rockland.

10   Q.    And are you with a law firm?

11   A.    Yes; a partnership with Adams & Sammon.

12   Q.    Okay.  And how long have you been practicing law?

13   A.    Since 1996.

14   Q.    What type of law do you practice?

15   A.    It's a general practice law firm.  We do some

16   conveyancing work; real estate closings; I do commercial

17   leasing; landlord-tenant; general litigation.  No

18   personal injury, no criminal work or divorce or anything

19   like that, though.

20   Q.    Okay.  Among the things you do is real estate work?

21   A.    Yes.

22   Q.    In the course of your career have you represented an

23   individual named Joseph Iantosca?

24   A.    Yes.

25   Q.    When did you represent him?

1    A.    I've represented Joseph Iantosca and entities he's

2    controlled since about 1997, 1998, maybe, through to the

3    present.  I still represent some of the entities that

4    he's involved with.

5    Q.    And what kinds of transactions have you represented

6    him in?

7    A.    I did a lot of landlord-tenant work.  He owned

8    residential apartment buildings, and I would do the

9    evictions of the tenants.  At some point he sold the

10   apartment buildings and purchased commercial property,

11   and I represented him as the seller on those

12   transactions.

13   Q.    And how many of those types of transactions were you

14   involved in?

15   A.    I believe he sold between eight and ten apartment

16   buildings, and he may have purchased four replacement

17   properties that were more commercial or office building

18   in nature.

19   Q.    Okay.  Have you ever represented Iantosca in a

20   transaction with a company called Benistar Property

21   Exchange Trust Company?

22   A.    Yes.

23   Q.    And when was that?

24   A.    In the year 2000.  Beginning about March 2000

25   through December 2000.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   And how many real estate transactions did you

2  represent him in in connection with Benistar?

3  A.   Well, a transaction, when it relates to Benistar,

4  was two halves of the transaction.  So I would represent

5  him on the sale portion of between eight and ten of

6  these apartment buildings.  I typically did not

7  represent him on the purchase end -- on one of them I

8  did represent him on the purchase end -- and I believe

9  there were four or five purchases.

10  Q.   Okay.  And did Joseph Iantosca hire Benistar?

11  A.   Yeah, he -- you know, I don't know if "hire" -- he

12  contracted with them.

13  Q.   Retained them?

14  A.   Yeah.

15  Q.   And what exactly did he hire them to do?

16       MR. GREENBERG:  Objection, your Honor.

17       THE COURT:  Overruled.

18       THE WITNESS:  Benistar was the qualified

19  intermediary for a 1031 tax exchange.

20  BY MR. MITCHELL:

21  Q.   Okay.  Did you perform any research on 1031

22  exchanges before you engaged in this transaction?

23  A.   I did some limited research.  I'm not a tax

24  attorney, so he had his accountants inform him about

25  the -- what the -- mathematically, financially what the

1    transaction would do.  I just did certain research on

2    the mechanics of the transaction to make sure that it

3    qualified as a 1031 tax exchange.

4    Q.   How did you find out about Benistar?

5    A.   A real estate broker named David Ross brought

6    Benistar to Joseph Iantosca, and I was contacted to come

7    to a meeting at Joseph Iantosca's office that David

8    Ross, Martin Paley from Benistar, myself and Joseph

9    Iantosca attended.

10   Q.   When was that?

11   A.   I believe it was late February 2000.  It could have

12   been early March 2000.

13   Q.   How long was that meeting?

14   A.   Maybe an hour, maybe a little more.

15   Q.   Okay.  And did Mr. Paley make a representation to

16   you at that meeting?

17   A.   He had a white folder that said "Benistar" on the

18   front, and inside were printouts -- paper printouts --

19   of what looked like a slide show presentation.  It even

20   said, you know, "Slide Number" this and "Slide Number"

21   that on them; there was like a legal opinion letter in

22   there.  And he kind of went through them as though it

23   was a presentation.  He had a folder for Joseph and a

24   separate one for me.

25   Q.   Okay.  And if you would take a look at a few of the

PDF created with pdfFactory trial version www.pdffactory.com

1    exhibits that you have in front of you, specifically,

2    Exhibit 75 through 80.  Would you take a moment to flip

3    through those?  They're right on the top.

4              (Pause.)

5    A.    Yes.

6    Q.    Okay.  Do you recognize Exhibit 75 through 80,

7    Ms. Adams?

8    A.    Yes, I do.

9    Q.    Can you tell us what they are?

10   A.    These are pieces of -- copies of some of the things

11   that were inside that folder.

12   Q.    And just for the record, can you tell us what each

13   one is by number, 75?

14   A.    Number 75 are the sheets that were identified as

15   "Benistar Presents 1031 Tax-Deferred Property

16   Exchanges," and they had Slides No. 1 through 18; Number

17   76 was a sheet called "Frequently Asked Questions About

18   1031 Property Exchange"; 77, "1031 Property Exchange

19   Legal Authority"; 78, "Identifying a 1031 Exchange

20   Opportunity"; 79, "1031 Property Exchange:  An

21   Overview"; and Exhibit 80 was a reprint of an article in

22   the New England Real Estate Journal by Martin Paley,

23   Benistar Property Exchange, called "These are the ABC's

24   of Tax-Deferred Exchanges."

25              MR. MITCHELL:  At this time, your Honor, the

1   government would move to admit Government's 75 through

2   80.

3           MR. GREENBERG:  No objection.

4           THE COURT:  All right.  Those may be admitted.

5           (Government Exhibit Nos. 75 through 80 received

6   into evidence.)

7   BY MR. MITCHELL:

8   Q.   All right.  We're going to flip through these

9   briefly.  And that's Exhibit 75.  This is -- and it

10  says, "Presentation of Marjorie Adams, Esq."  That's

11  you?

12  A.   That's me.

13  Q.   All right.  And did Martin Paley go through this

14  with you and Mr. Ross, Mr. Iantosca?

15  A.   Yes.  There were sections about other things, too,

16  in there, but the 1031, because that's what we were

17  doing, these ones he actually went through.

18  Q.   When you say "other things," what other things are

19  you referring to?

20  A.   I know one was called ESOP.  It was an Employee

21  Simplified -- some other ESOP; and then there was a 419

22  trust, which were other things that Benistar offered but

23  that we weren't taking advantage of.

24  Q.   Those things -- did those things have anything to do

25  with 1031 exchanges?

1    A.   Not to my knowledge.

2    Q.   They were other services that Benistar could

3    provide?

4    A.   Yeah, they were other services that Benistar

5    offered.

6    Q.   I'll have you take a look at this one, "Frequently

7    Asked Questions."  Do you see that?

8    A.   Yes.

9    Q.   Did you go through that with him?

10   A.   Yes.

11   Q.   I'll have you take a look at one item here.  I'll

12   highlight for you that paragraph.  Do you see that?

13   A.   Yes.

14   Q.   Did you go through that paragraph with -- did

15   Mr. Paley go through that paragraph with you?

16   A.   Yes.  Specifically he --

17        MR. GREENBERG:  Objection.  She's answered the

18   question, your Honor.

19        THE COURT:  Okay.  Next question.

20   BY MR. MITCHELL:

21   Q.   Okay.  He went through that paragraph with you?

22   A.   Yes.

23   Q.   Where it says "Escrow accounts are restricted to

24   paying out funds only for subsequent closing or return

25   funds to the property owner," did you read that at the

PDF created with pdfFactory trial version www.pdffactory.com

1  time?

2  A.  Yes.

3  Q.  Okay.  In the course of your work as a real estate

4  attorney, have you been involved in transactions

5  involving escrows?

6         MR. GREENBERG:  Objection.

7         THE COURT:  Sustained.

8  BY MR. MITCHELL:

9  Q.  Okay.  I'm going to show you the next document.

10  This one says "1031 Property Exchange Legal Authority"?

11  A.  Yes.

12  Q.  I show you the second page of that.  Did you see the

13  IRS code sections that are listed there at the bottom?

14  A.  Yes, I did.

15  Q.  Did you familiarize yourself with those?

16  A.  I did.

17  Q.  And this one identifying a 1031 property exchange,

18  is that another one that he went through with you?

19  A.  Yes.

20  Q.  Okay.  And I'll just go through the last two

21  briefly.  Again, "1031 Property Exchange:  An Overview."

22  Did you go through that one?

23  A.  Yes.

24  Q.  And then the last one here, what was this?

25  A.  That is a reprint of an article that was printed in

1   the New England Real Estate Journal.

2   Q.   And was that part of his presentation?

3   A.   That was in the package.  He didn't actually go

4   through the specifics that were in there; it was left

5   for me to read later.

6   Q.   Okay.  All right.  In your capacity as Mr.

7   Iantosca's advisor, what features of the 1031 exchange,

8   if any, were important to you?

9           MR. GREENBERG:  Objection.

10          MR. MITCHELL:  It's the same question, your

11   Honor, that the Court allowed with Mr. Snider, or that

12   we discussed.

13          THE COURT:  Yes.  I'll allow it.  I'll allow it.

14   Overruled.

15          THE WITNESS:  I was interested in how the money

16   was secured during the time period that Benistar was

17   going to be holding the money.

18   BY MR. MITCHELL:

19   Q.   Okay.  And did you have any other concerns -- or was

20   anything else important to you?

21   A.   I was concerned about what the mechanics were for a

22   1031 tax exchange to make sure that we received the

23   tax-deferred benefit and also where the money was going

24   to be and whether it was secured during the time period

25   that Benistar was going to hold it.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   Okay.  Going back to Exhibit 76, I have one other

 2   follow-up question.  No, do you know what?  I'll ask it

 3   later.

 4        Did Mr. Paley say anything during the course of his

 5   presentation that varied from these documents in

 6   substance?

 7   A.   No.

 8   Q.   And did you -- based on Mr. Paley's presentation,

 9   did you provide advice to Mr. Iantosca?

10            MR. GREENBERG:  Objection, your Honor.

11            THE COURT:  Overruled.

12   BY MR. MITCHELL:

13   Q.   Without saying what the advice was, did you provide

14   him advice?

15   A.   Yes.

16   Q.   Did he -- did you shop any other intermediaries?

17   A.   No.

18   Q.   Was there any discussion of a bond?

19   A.   I think at that point the only discussion was that

20   there was one; that Benistar was bonded and insured.

21   Q.   Can you take a look at Government's 82, which is in

22   front of you also.

23   A.   I don't think 82 is in front of me.

24   Q.   It isn't?  I'm sorry, it is up there.

25            MR. MITCHELL:  May I just -- it's already in
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   evidence, your Honor.
 2            THE COURT:  All right.
 3            MR. MITCHELL:   Thank you.
 4   BY MR. MITCHELL:
 5   Q.   The question is:  Do you recognize that document?
 6   A.   I do.
 7   Q.   Could you tell us what it is?
 8   A.   This is a fax cover sheet from Benistar Property
 9   Exchange and a copy of the insurance binder with
10   Travelers Casualty & Surety Company of America.
11   Q.   Is that something that you received from Benistar?
12   A.   Yes; this was faxed to my office on May 17, 2000.
13   Q.   Okay.
14            MR. MITCHELL:  At this time, your Honor, the
15   government would move to admit Government's Exhibit 82.
16            MR. GREENBERG:  No objection, your Honor.
17            MR. MITCHELL:  I'm sorry.  It's already in.  I
18   apologize.  I'm just being sure.
19   BY MR. MITCHELL:
20   Q.   And this is the bond you received?
21   A.   Yes.
22   Q.   And did your receipt of this bond satisfy your
23   concern about security of the money?
24   A.   Yes.
25   Q.   Did Mr. Iantosca sign agreements with Benistar for
```

1  the properties he was selling?

2  A.  Yes.

3  Q.  Okay.  I'm going to have you take a look at

4  Government's Exhibit 84A.  It's actually not in a

5  folder; I think you have it.

6      Okay.  Do you know what?  I'm going to have you

7  look, while we're at it, at 84A through -C.  Look at all

8  of those.  I think they're all in that stack.

9  A.  Okay.  84A, -B and -C.

10 Q.  Okay.  And then also take a look -- this is part of

11 the same transaction -- at 86, 88 and 89.

12 A.  I see -A and -B but I don't actually see -C.

13      MR. MITCHELL:  Can I have a moment, your Honor?

14      THE WITNESS:  Wait.  It's stuck to it.  Okay.

15      And then 86?

16 BY MR. MITCHELL:

17 Q.  Yeah, 86.  Do you see that?

18 A.  Yes.

19 Q.  And 88?

20 A.  Yes.

21 Q.  Okay.  All right.  Can you tell us what those

22 documents are, in order?

23 A.  84A is entitled "Exchange Agreement."  This is the

24 agreement that involves the buyer, the seller and

25 Benistar.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   For which property are we talking about?

2   A.   What I always called the Plymouth land, but it's

3   really Lots 11-26, 11-27, 28, 29, 30 and 31 Chilton

4   Park, Plymouth, Massachusetts.

5   Q.   Okay.

6   A.   The purchaser was Robert Gosselin and Gosselin

7   Group, Inc.

8   Q.   All right.  And 84B?

9   A.   84B is the Escrow Agreement between Belridge

10  Corporation, which is an entity controlled by Joseph

11  Iantosca, and Benistar Property Exchange.

12  Q.   For the same property?

13  A.   For the same transaction; yes.

14  Q.   84C?

15  A.   And 84C was the account selection form.  It

16  doesn't -- actually, it is entitled that.

17  Q.   Okay.  Same property?

18  A.   Yes.

19  Q.   And then 86 and 88?

20  A.   Eighty-six is a fax cover sheet from Benistar

21  Property Exchange and a letter to Joseph Iantosca, care

22  of my office, and then a replacement property

23  identification page explaining the rules of the

24  replacement property identification, and then a form to

25  complete for the identification of real property.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   Okay.  And that relates to the same --
 2   A.   That was also the same transaction, yes.
 3   Q.   -- property?
 4        Okay.  And that's dated when?
 5   A.   This is dated August 17, 2000.
 6   Q.   Okay.  And who's it from?
 7   A.   Linda Jokinen.
 8   Q.   And then 88?
 9   A.   Eighty-eight is a fax cover sheet dated September
10   20, 2000, also from Linda Jokinen, and it says, "Here's
11   another set of property identification forms," and
12   it's -- although it's now dated September 20, 2000, it
13   appears to be on the same transaction.
14   Q.   Is it?
15   A.   It says 45 days from the August 10, 2000, closing.
16   Q.   Okay.  And what did that 45 --
17        MR. MITCHELL:  At this time, your Honor, the
18   government would move the admission of 84A, -B and -C,
19   86 and 88.
20        MR. GREENBERG:  No objection, your Honor.
21        THE COURT:  All right.  Those exhibits may be
22   admitted.
23        (Government Exhibit Nos. 84A, 84B, 84C, 86 and
24   88, received into evidence.)
25   BY MR. MITCHELL:
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   All right.  Let's go through those briefly.  84A:
 2   Would you put that in front of you?  Okay.  And that's
 3   the Exchange Agreement?
 4   A.   Yes.
 5   Q.   Okay.  And it identifies exchangor, Belridge, and a
 6   copy to Marjorie Adams.  That's you, correct?
 7   A.   Yes.
 8   Q.   And the intermediary is Benistar Property Exchange
 9   Trust Company, right?
10   A.   Yes.
11   Q.   And by the way, the purchaser is identified on this
12   document as well, right?
13   A.   Yes.  That's Robert Gosselin of Gosselin Group, Inc.
14   Q.   And is this signed by Joseph Iantosca?
15   A.   Yes.
16   Q.   And it's signed by whom from Benistar?
17   A.   Martin Paley.
18   Q.   I'll have you turn to the Escrow Agreement; okay?
19   And is this -- was this also signed by Mr. Iantosca?
20   A.   Yes.
21   Q.   Thank you.  And do you see -- I'll just flip it back
22   up -- I'm highlighting something on the first page for
23   you.  Could you just read that briefly to us, please,
24   that one sentence?
25   A.   "Benistar shall have full control over the
```

PDF created with pdfFactory trial version www.pdffactory.com

1    exchangor's funds to invest as the exchangor directs in

2    either the 3 percent Ready Asset Money Market Fund or

3    the 6 percent investment account."

4    Q.   Okay.  And backing up, does it say where that

5    account would be held?  Where the account would be held?

6    A.   Yes.  Paragraph 1 says, "Benistar shall open an

7    escrow custodial account under Benistar's name at

8    Merrill Lynch for the exchangor's benefit."

9    Q.   Okay.  And again, this is -- did Mr. Iantosca select

10   one of these two accounts, either the 3 percent Ready

11   Asset Money Market Fund or the 6 percent investment

12   account?

13   A.   Yes.  He selected the 3 percent Merrill Lynch Ready

14   Asset Money Market account.

15   Q.   And that's Government 84C?

16   A.   Yes.

17   Q.   And that's right there.  That check indicates his

18   selection of the 3 percent Ready Asset Money Market

19   account at Merrill Lynch, correct?

20   A.   Yes.

21   Q.   And how much money did he give Benistar?

22   A.   I don't recall the net amount; the gross amount is

23   listed here.  The total purchase price of that property

24   was $510,000.  There was no mortgage on it, but there

25   would have been certain costs that the seller had

PDF created with pdfFactory trial version www.pdffactory.com

1   deducted from his proceeds before we got the net.  And

2   it doesn't look like I ever filled in on this sheet --

3   the what the net amount that was actually sent was.

4   Q.   What's deducted out as transactional fees?

5   A.   Yeah.  The broker's fee, the tax stamps.  If there

6   was a real estate tax adjustment, if there were taxes

7   outstanding at the time of the -- at the time of the

8   sale.

9   Q.   Okay.  All right.  I'm going to show you

10  Government's Exhibit 88.  Is that a fax cover page right

11  there?

12  A.   Yes.

13  Q.   The first page, this is a letter to Joseph Iantosca.

14  And you said you got a copy of this by fax?

15  A.   Yes.  This was actually faxed to me even though it's

16  addressed to him.

17  Q.   Okay.  Right here where it says "45 days to closing

18  on the original property"?

19  A.   Yes.

20  Q.   Okay.  Forty-five days, does that refer to something

21  in the contracts?

22  A.   When he sold the property he had 45 days to identify

23  what he was going to purchase and use the funds from the

24  sale for.

25  Q.   And this is about replacing property, the

```
 1   replacement property identification; is that correct?
 2   A.   Yes.  This explained how he could choose -- you
 3   know, there were three different mechanisms for figuring
 4   out what was the replacement property.
 5   Q.   Okay.  And this was the form that goes along with
 6   it?
 7   A.   And that page is the actual form.  When he chose
 8   what he was going to purchase, he filled that form out
 9   and put down the identity of the new property that he
10   was going to purchase.
11   Q.   And was that property identification submitted to
12   Benistar?
13   A.   Yes.  It had to be within the 45 days.
14   Q.   Okay.  All right.  I'm going to have you -- were
15   there other properties that Mr. Iantosca completed a
16   similar set of forms for?
17   A.   Yes.  Each time he sold a property there would be
18   this complete set.
19   Q.   All right.  I'm going to have you take a look at
20   Government's Exhibit 90 through 92.  Could you take a
21   look at that?
22   A.   Okay.
23   Q.   Do you recognize those documents?
24   A.   Yes.
25   Q.   What are they?
```

1  A.   Ninety is the Exchange Agreement for the sale of --

2  let me see what he called the property -- the entity

3  that Joe controlled was Fern Realty Trust and the

4  purchaser was Tinson Suomi Limited Partnership.  I think

5  the property address is listed here.

6        MR. GREENBERG:  If I can speed this up, we'll

7  stipulate to those exhibits, 90, 91 and 92, if that's

8  helpful.

9        MR. MITCHELL:  That's fine, your Honor, but she

10 still has to identify them.

11       THE WITNESS:  It's right here.  8 Tinson Road,

12 Quincy, was the identity of the property.

13 BY MR. MITCHELL:

14 Q.   Okay.  Tinson Road, Quincy?

15 A.   Yes.

16 Q.   And that's an exchange -- that's the Exchange

17 Agreement?

18 A.   The first one is the Exchange Agreement.

19 Q.   Okay.  And 91, is that the Escrow Agreement for that

20 property?

21 A.   And my copy actually has the Escrow Agreement

22 attached to 90, but then it's also here as 91.

23 Q.   Okay.  And 92 is the account selection form for that

24 property?

25 A.   Yes.

1    Q.    Okay.

2         MR. MITCHELL:  At this time, pursuant to the

3    stipulation and the foundation, the government would

4    offer 90 through 92.

5         THE COURT:  Okay.  Those are admitted.

6         (Government Exhibit Nos. 90 and 92 received into

7    evidence.)

8    BY MR. MITCHELL:

9    Q.    Okay.  That's the Exchange Agreement right there for

10   Tinson Road?

11   A.    Yes.

12   Q.    That's signed by Mr. Iantosca?

13   A.    Yes.

14   Q.    Okay.  What's the date on this one?

15   A.    November 30, 2000.

16   Q.    And that is, if I could just -- and Mr. Iantosca

17   signed this one, correct?

18   A.    Yes.

19   Q.    Let me have you turn to the third page.  Okay.  Do

20   you see that there?

21   A.    The page that is up there?

22   Q.    Yeah.  Do you see it up on the screen?

23   A.    Yes.

24   Q.    It starts with Paragraph 10?

25   A.    Yes.

1    Q.    Okay.  And I'll just magnify a portion of that for

2    you.

3          MR. MITCHELL:  May I have a moment, your Honor?

4    I need some remedial training.

5          (Pause.)

6    BY MR. MITCHELL:

7    Q.    I guess I can't make it that big.  So Paragraph 10?

8    A.    Yes.

9    Q.    Can you -- actually, we'll do it this way:  All

10   right.  Do you see that up there?

11   A.    Yes.

12   Q.    All right.  Can you read just the first sentence,

13   please?

14   A.    "Exchangor and intermediary expressly agree that any

15   cash proceeds received from the disposition of the

16   relinquished property shall be held and invested with

17   PaineWebber at either 3 percent per annum or 6 percent

18   per annum in a PaineWebber account."

19   Q.    Okay.  And did you read that paragraph when you

20   executed this form?

21   A.    Yes.

22   Q.    And that's the same document over there, right?

23   A.    Yes.

24   Q.    Let me have you flip back to Government's 84A.  Do

25   you see that up there?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yes.

2   Q.   All right.  You've identified this as the Exchange

3   Agreement for the first property, correct?

4   A.   For the Plymouth land property, yes.

5   Q.   I focus your attention on the same paragraph, 10, in

6   that document.

7   A.   Yes.

8   Q.   Can you read, although it's cut off -- I'll go to

9   the next page.  Can you read the first sentence of that

10  paragraph 10?

11  A.   "Exchangor and intermediary expressly agree that any

12  cash proceeds received from the disposition of the

13  relinquished property shall be held and invested with

14  Merrill Lynch Private Client Group in either 3 percent

15  per annum in a Merrill Lynch Ready Asset Money account

16  or 6 percent per annum in a Merrill Lynch investment

17  account."

18  Q.   Okay.  And just so we're clear, that's the

19  continuation on the next page, right?

20  A.   Yes.

21  Q.   Okay.  Let me just flip back.  What's the -- the

22  document on the left is dated what?  If you would just

23  look at the last page.

24  A.   It was signed August 10, 2000.

25  Q.   Okay.  And the second document, when was that dated?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    November 30, 2000.

2  Q.    So about three months apart, roughly?

3  A.    (Nonverbal response.)

4  Q.    Does the second paragraph, 10, state that Merrill

5  Lynch would be holding the account?

6  A.    The --

7  Q.    In other words, let's focus on the first two

8  sentences in Paragraph 10.

9  A.    Okay.

10         MR. GREENBERG:  Excuse me.

11         THE WITNESS:  In August it was Merrill Lynch and

12  in November it was PaineWebber.

13  BY MR. MITCHELL:

14  Q.    Okay.  Did anybody discuss with you why it was

15  different?

16  A.    No.

17  Q.    Okay.  Could you look again at the first one.  Do

18  you see where it says "money market" -- excuse me.  Let

19  me just go to -- okay.  Do you see where the sentence

20  continues on the second page where it says right at the

21  very top "Ready Asset Money Market Account"?

22  A.    Yes.

23  Q.    Do you see that there?  Okay.  Does that appear in

24  the November document?

25  A.    No.

1    Q.    Okay.  Did anybody discuss with you why those

2    provisions -- that part of the provision didn't appear?

3    A.    No.

4    Q.    Okay.  Let's go back to the second transaction now.

5    Just take a quick look at -- so you could see it -- this

6    is the Escrow Agreement in the second transaction?

7    A.    Okay.

8    Q.    And the PaineWebber account -- again, this also says

9    "PaineWebber"?

10   A.    Yes.  "Benistar shall open an escrow custodial

11   account under Benistar's name at PaineWebber for the

12   exchangor's benefit."

13   Q.    Okay.  Thank you.  And then finally, did Mr.

14   Iantosca, for this property, make a selection of

15   accounts?

16   A.    Yes.

17   Q.    And is that reflected on Government's Exhibit 92?

18   A.    Yes.

19   Q.    Would you just -- and that indicates it right there

20   what you see on the screen?

21   A.    He selected the 3-percent-per-annum account.

22   Q.    Okay.  In the course of your advising Mr. Iantosca,

23   are you aware of why he selected 3 percent as opposed to

24   6 percent?

25            MR. GREENBERG:  Objection.

```
 1              THE COURT:  Sustained.
 2    BY MR. MITCHELL:
 3    Q.   Would you take a look at Government's Exhibit 93.
 4    All right.  Do you recognize that?
 5    A.   Yes.
 6    Q.   What do you recognize that to be?
 7    A.   That was the wiring instructions provided by
 8    Benistar for me to give to the closing attorney so they
 9    knew where to send Mr. Iantosca's funds.
10    Q.   Okay.
11              MR. MITCHELL:  At this time, your Honor, the
12    government would move in Government's Exhibit 93.
13              MR. GREENBERG:  No objection.
14              THE COURT:  Okay.
15              (Government Exhibit No. 93 received into
16    evidence.)
17    BY MR. MITCHELL:
18    Q.   Do you see that up there on the screen?
19    A.   Yes.
20    Q.   Okay.  And just by way of summary, this is titled
21    "Wire Transfer Instructions"?
22    A.   Yes.
23    Q.   And the destination of the wire is --
24    A.   Bank of New York, 1285 Avenue of the Americas, New
25    York, New York 10019; ABA Routing Number 021000018; for
```

PDF created with pdfFactory trial version www.pdffactory.com

1  additional -- I forget what "FAO" stands for.

2  Q.   That's okay.

3  A.   PaineWebber Account No. 8900114096.

4  Q.   Okay.  And then it says, "For further credit to

5  Benistar Property Exchange Trust Company"?

6  A.   Yes.

7  Q.   And there's an account number below that?

8  A.   Yes.

9  Q.   The exchangor's name is identified as --

10 A.   Fern Realty Trust was the entity that sold the

11 property that -- Joseph Iantosca's property.

12 Q.   Okay.  Very good.

13     All right.  Let's try to go --

14         THE COURT:  Well, actually, Mr. Mitchell, if

15 you're going to move to another transaction, it's eleven

16 o'clock.

17         We'll take the morning recess.

18         THE CLERK:  All rise.

19         The Court will take the morning recess.

20         (There is a recess in the proceedings at

21 11:01 a.m.)

22                              *  *  *

23

24

25

1              (After recess.)

2              MR. MITCHELL:  Thank you, your Honor.

3    BY MR. MITCHELL:

4    Q.   Ms. Adams, when we left off, we were about to turn

5    to another transaction.  Do you recall a transaction

6    involving 25 and 45 Tinson Road?

7    A.   Yes.

8    Q.   Could I have you take a look at Exhibits 95 through

9    98?  If you have a moment to look at them, the question

10   is:  Do you recognize them?

11   A.   Yes, I recognize those documents.

12   Q.   And just for the record, could you tell us, in

13   order, what they are?

14   A.   Number 95 is the Exchange Agreement for the sale of

15   25, 40 Morton Street, 96 is the Escrow Agreement, 97 is

16   the account selection form, and 98 is the wire

17   instructions.

18   Q.   And do these -- are these exchange documents that

19   pertain to 25 and 45 Tinson Road?

20   A.   I believe they all do.

21   Q.   Actually, would you take a look at the address?  I

22   might have it wrong here.

23   A.   Well, certainly the Exchange Agreement was for 25

24   and 45 Morton Street in Quincy.

25   Q.   Morton Street, I'm sorry.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. MITCHELL:  At this time, your Honor, the

2     government would move in 95 through 98.

3          MR. GREENBERG:  No objection.

4          THE COURT:  Okay, admitted.

5          (Exhibits 95 through 98 received into evidence.)

6     BY MR. MITCHELL:

7     Q.   Just quickly so you can see them, 95 is the Exchange

8     Agreement, correct?

9     A.   Yes.

10    Q.   And 96 is the Escrow Agreement for this property?

11    A.   Yes.

12    Q.   Do you know, by the way, what kind of property this

13    was?  What was on the property?

14    A.   These are apartment complexes.

15    Q.   Do all the transactions involve apartment complexes?

16    A.   Except for the Plymouth land, that was vacant land.

17    Q.   Okay.

18          And 96 is the Escrow Agreement, correct?

19    A.   96 is the Escrow Agreement.

20    Q.   And the Escrow and Exchange Agreements are

21    substantially the same as those in the last transaction

22    we talked about?

23    A.   Yes.

24    Q.   And with this transaction, Morton Street

25    transaction, did Mr. Iantosca make an account selection?

PDF created with pdfFactory trial version www.pdffactory.com

1 A. Yes.

2 Q. And what was his escrow account selection?

3 A. The three percent per annum account.

4 Q. Right there?

5 A. Yes.

6 Q. And for this transaction, did he notify Benistar

7 about the replacement property?

8 A. I don't have a document here that says that.

9 Q. What's your recollection?

10 A. My recollection was, each time -- he didn't always

11 do it immediately because he had the 45 days, but he

12 always did it within the 45 days.

13 Q. Okay.  And Exhibit 98, take a look at that.

14 A. Yes.

15 Q. Again, these are the wire instructions for that

16 account?

17 A. Yes.

18 Q. Did Mr. Iantosca send money from the sale of Morton

19 Street in connection with this transaction?

20 A. Well, the money was actually sent from Alan Grace at

21 Bernkopf Goodman & Baseman, the closing attorney,

22 because the -- you know, the purchaser deposits their

23 money with the closing attorney, and then the closing

24 attorney wires it out, as directed by the seller, and

25 Joe would have provided the wire transfer instructions

PDF created with pdfFactory trial version www.pdffactory.com

1    to Bernkopf Baseman to have them send the money on his

2    behalf to Benistar.

3    Q.   Okay.  And do you recall how much money that was?

4    A.   No.

5    Q.   Okay.  Next transaction.  Take a look at

6    Government's Exhibits 105 through 108.

7         Actually, I skipped one, I'm sorry.

8         100 through 103.

9    A.   100 is the Exchange Agreement for 261-265 Haywood

10   Street in Braintree.

11   Q.   Okay.

12   A.   101 is the Escrow Agreement, 102 is the account

13   selection form, and 103 is the wiring instructions.

14   Q.   Okay, thank you.

15        Mr. Iantosca executed all these agreements, all

16   the agreements --

17   A.   The agreements, yes.

18   Q.   And the wire -- the wire instruction page pertains

19   to the same transaction?

20   A.   To the Haywood Street transaction?

21   Q.   Yes.

22   A.   Yes.

23        MR. MITCHELL:  At this time the government would

24   move to admit Government's 100 through 103.

25        MR. GREENBERG:  No objection, your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            THE COURT:  Okay.
 2            (Exhibits 100 through 103 received into
 3    evidence.)
 4    BY MR. MITCHELL:
 5    Q.   Quickly, this is the Exchange Agreement?
 6    A.   Yes.
 7    Q.   Okay.  And the next one is the Escrow Agreement?
 8    A.   Yes.
 9    Q.   Are those substantially the same as the last
10    agreement that we went through?
11    A.   Yes.
12    Q.   And which account did he select this time?
13    A.   The three percent per annum account.
14    Q.   Okay.  Did Mr. Iantosca pay the fee for this
15    transaction with Benistar?
16    A.   Yes.
17    Q.   Did he pay for each of the transactions?
18    A.   Yes.
19    Q.   Okay.  The next transaction is government's 105
20    through 108.  Would you take a look at that?
21    A.   Those are the agreements related to 135 Quincy
22    Avenue.
23    Q.   Okay.  Again, just by -- so the record would show,
24    which ones are which?
25    A.   The number 105 is the Exchange Agreement, 106 is the
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Escrow Agreement, 107 is the account selection form, and

2    108 is the wiring instructions.

3    Q.    Okay.  And which property do they pertain to?

4    A.    135 Quincy Avenue in Quincy.

5    Q.    And was that also an apartment building?

6    A.    Yes, called Faxon Heights.

7            MR. MITCHELL:  Your Honor, at this time the

8    government would move for admission of 105 through 108.

9            MR. GREENBERG:  No objection, your Honor.

10           THE COURT:  Okay.

11           (Exhibits 105 through 108 received into

12   evidence.)

13   BY MR. MITCHELL:

14   Q.   All right.  Is that the Exchange Agreement for this

15   one?

16   A.    Yes.

17   Q.   I'm going to have you take a look at a specific

18   page.

19           MR. MITCHELL:  I'm sorry, if I could just have

20   one minute, your Honor?

21           (Pause.)

22           (Discussion off the record.)

23           MR. MITCHELL:  I'm sorry for the delay.

24   Q.   Again, just going through this, 106 is the Escrow

25   Agreement for this transaction?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yes.

2   Q.   And which escrow account did Mr. Iantosca select for

3   this transaction?

4   A.   The three percent per annum account.

5   Q.   At any point in the process, did -- actually, let me

6   ask you this:  Were the funds wired to Benistar for this

7   transaction?

8   A.   Yes.

9   Q.   At any point in any of these transactions, as far as

10  you're aware, did Mr. Iantosca direct funds to go

11  anywhere but in escrow?

12        MR. GREENBERG:  Objection.

13        THE COURT:  Overruled.  You may answer that.

14  A.   Did he direct the money to go anywhere but in

15  escrow?  No.

16  Q.   Okay.  In the course of your dealings with Benistar,

17  did you ever speak to a gentleman named Dan Carpenter?

18  A.   Yes.

19  Q.   Okay.  Did you speak to him in person or on the

20  phone?

21  A.   On the telephone.

22  Q.   How many times did you speak with him?

23  A.   At least two.

24  Q.   When was the first time?

25  A.   I believe it was July 2000.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And what prompted your conversation with him?

2    A.    There was a potential that one of the closings was

3    going to be -- one of the sale end of the transaction

4    was going to be delayed, but the purchase end couldn't

5    be delayed, so I contacted him to discuss the mechanics

6    of a reverse exchange, which is when you purchase the

7    new property first, then sell the old -- the

8    relinquished property.

9    Q.    And how did you know to call him?

10   A.    I talked to Martin Paley, who suggested I contact

11   Dan Carpenter, because he was the tax attorney and he

12   could explain the process better.

13   Q.    Okay.  Did Martin Paley give you Dan Carpenter's

14   number?

15   A.    Yes.

16   Q.    And did you talk to Dan Carpenter?

17   A.    I did.

18   Q.    Okay.  What did you talk to him about?

19   A.    About the mechanics of a reverse exchange.

20   Q.    And did he explain that to you?

21   A.    Yes.

22   Q.    How did he identify himself?

23   A.    I --

24   Q.    That's not a clear question.

25         Did he -- you said that you believed he was an

PDF created with pdfFactory trial version www.pdffactory.com

1    attorney.  Did he tell you he was an attorney?

2    A.   He did not say that he was an attorney.  My belief

3    that he was an attorney came from both Martin Paley and

4    the promotional material I had received originally from

5    Benistar.  In there was an opinion letter from another

6    attorney written to Daniel Carpenter, Esquire.  So those

7    two things together, but I don't know that Dan Carpenter

8    ever said, "I am an attorney."

9    Q.   In your conversation with Mr. Carpenter, did he say

10   anything about where Joseph Iantosca's money would be

11   put?

12          MR. GREENBERG:  Objection.

13          THE COURT:  Sustained.

14   BY MR. MITCHELL:

15   Q.   What, if anything, did he say about where

16   Mr. Iantosca's money would be put?

17          MR. GREENBERG:  Objection.

18          THE COURT:  Sustained.

19   BY MR. MITCHELL:

20   Q.   At any point in the conversation with Mr. Carpenter,

21   did -- actually, let me back up.

22          Did -- in your discussion with him, lawyer to

23   lawyer, did Mr. Carpenter appear to be familiar with

24   1031 exchanges?

25          MR. GREENBERG:  Objection.

```
 1          THE COURT:  No, you may answer that.
 2   A.   Yes.  I mean -- not only did he appear to be --
 3          MR. GREENBERG:  Your Honor, she's answered the
 4   question.
 5          THE COURT:  No.
 6          Go ahead.
 7   A.   -- he specifically stated that Benistar Property
 8   Exchange had done numerous reverse exchanges, and you
 9   know, he discussed the process very confidently.
10   Q.   And did you rely on the representations he made to
11   you in advising Mr. Iantosca?
12   A.   Yes.
13   Q.   You said you had a second conversation with him.
14   When was that?
15   A.   The beginning of January 2001.
16   Q.   Okay.  What prompted your call to -- did you call
17   him or did he call you?
18          MR. GREENBERG:  Objection, your Honor.
19          THE COURT:  Overruled.
20   A.   I called Martin Paley, who was physically with
21   Mr. Carpenter, and Martin Paley handed the phone to
22   Mr. Carpenter.
23   Q.   What prompted your call to Mr. Paley?
24   A.   I received a call from a staff member at the office
25   of Joseph Iantosca, who told me that Dan Carpenter and
```

PDF created with pdfFactory trial version www.pdffactory.com

1  Martin Paley had just left Joseph Iantosca's office, and
2  the meeting -- there had been some yelling and screaming
3  in the meeting and Joseph was very upset and they called
4  me to find out what was going on.
5  Q.   Okay.  And is that why you called Mr. Paley?
6  A.   Yes.  First I called Benistar and Linda Jokinen gave
7  me Martin Paley's cell phone number, and I called him to
8  find out what had just gone on in this meeting.
9  Q.   Okay.  And he handed you the phone -- he handed the
10 phone to Mr. Carpenter?
11 A.   Yes.
12 Q.   Okay.  And did you ask Mr. Carpenter what happened
13 in the meeting?
14        MR. GREENBERG:  Objection, your Honor.
15        THE COURT:  Overruled.
16 A.   Yes.
17 Q.   Okay.  What did he tell you?
18        MR. GREENBERG:  Objection.
19        THE COURT:  Overruled.
20 A.   Mr. Carpenter told me that he had just met with
21 Joe -- that everything was okay, that he just met with
22 Joe because he wanted to ask Mr. Iantosca to delay some
23 upcoming purchases because they had a run on the bank
24 and they had had numerous sale portions of closings and
25 not purchases, but they had some purchases coming up so

PDF created with pdfFactory trial version www.pdffactory.com

1    if Joe just delayed his closing a few days, the money

2    would be there for Joe's closing.

3    Q.    Did he say -- so did he say that the money wasn't

4    there at that point?

5    A.    Yes.

6           MR. GREENBERG:   Objection, your Honor.

7           THE COURT:   Overruled.

8    A.    Yes, the money was not available for Joe to do his

9    purchase, but it would be if Joe just waited a few days

10   because he had some upcoming closings.

11          MR. GREENBERG:   Objection, your Honor, move to

12   strike.

13          THE COURT:   No, overruled.

14   BY MR. MITCHELL:

15   Q.    I didn't ask -- I'm sorry, you were cut off.  What

16   was the last part of your answer?

17   A.    I said he said the money was not there then, but it

18   would be in a few days if Joe delayed his closings a few

19   days because he had some upcoming closings when money

20   would be coming in.

21   Q.    Okay.  I didn't ask you what the date of that

22   conversation was; could you tell us that?

23   A.    It was the beginning of January 2001.  It was either

24   January 3rd or January 4th.

25   Q.    Okay.  And did Mr. Iantosca have closings coming

1   up -- a closing or closings coming up?

2   A.    There was a closing coming up soon.    That's what he

3   was asking him to delay.

4   Q.    You said that Mr. Carpenter claimed that there was a

5   run on the bank.    Were those his words?

6   A.    Those are his words.

7   Q.    Did he explain to you what he meant by a run on the

8   bank?

9   A.    That several people had requested their money back

10  to make purchases, and so there wasn't any money left.

11  Q.    Okay.    Did he say anything to you about whose fault

12  it was?

13  A.    He specifically said that it wasn't Martin Paley's

14  fault.

15  Q.    Did he say whose fault it was?

16  A.    He did not.

17  Q.    Did he say anything about asking Joseph Iantosca for

18  a loan?

19  A.    Yes, he did.

20  Q.    And what did he tell you about that?

21  A.    I asked him if he had asked Joseph Iantosca for a

22  loan, and he admitted that he had asked him for some

23  money just for a few days to get through some upcoming

24  closings.

25              MR. MITCHELL:    Your Honor, that's all I have.

PDF created with pdfFactory trial version www.pdffactory.com

1              MR. GREENBERG:  Ms. Adams, my name is Gary

2     Greenberg.  I'm going to put before you some documents.

3                          CROSS-EXAMINATION

4     BY MR. GREENBERG:

5     Q.   Ms. Adams, did you just mean to suggest to the

6     members of the jury that Mr. Carpenter told you in this

7     conversation that he intended to use other people's

8     money to give back to Mr. Iantosca?  Is that your

9     testimony?

10    A.   It's my testimony --

11    Q.   Just yes or no.  Is that your testimony, that

12    Mr. Carpenter told you he was going to use other

13    people's money to give back to Mr. Iantosca?  Is that

14    what you're swearing to under oath today?

15    A.   He did not say those words.

16    Q.   He did not.

17              So to the extent you intended -- did you intend

18    to suggest to this Court and this jury that

19    Mr. Carpenter was suggesting to you that he was going to

20    use other people's -- was telling you he was going to

21    use other people's money to pay Mr. Iantosca?

22    A.   My intention in testifying was to repeat the

23    conversation as I remembered it and not to state what my

24    belief as to what he meant by what he said or what my

25    impression of what he was saying was.

1    Q.    Now, Ms. Adams, let's see if we can't agree on a few

2    things.

3          Starting at the beginning, you met with

4    Mr. Paley.  Would you agree that Mr. Carpenter was not

5    present when you met with Mr. Paley?

6    A.    Yes.

7    Q.    Okay.  Would you agree that during the entire

8    calendar 2000 that you never discussed with

9    Mr. Carpenter the exchange documents that Mr. Iantosca

10   signed?

11   A.    No.

12   Q.    You won't.

13   A.    We discussed --

14   Q.    When do you claim you spoke with Mr. Carpenter about

15   the exchange documents that Mr. Iantosca signed?

16   A.    When we discussed the reverse exchange in July of

17   2000, we discussed what would be different, and the

18   exchange agreements would be slightly different.

19   Q.    Did you discuss the documents, any of the terms --

20   I'm sorry.

21          Did you discuss any of the language in the

22   documents.

23   A.    No.

24   Q.    Did you ever discuss with Mr. Carpenter the

25   promotional material that you state that Mr. Paley gave

PDF created with pdfFactory trial version www.pdffactory.com

1    you?

2    A.    I don't know.

3    Q.    Did you ever communicate in calendar 2000 with

4    Mr. Carpenter in writing?

5    A.    No.

6    Q.    Did you ever ask Mr. Carpenter in calendar 2000 if

7    the money was going to be invested?

8    A.    No.

9    Q.    Okay.  Just so I'm clear -- and we'll go through the

10   documents -- virtually every one -- let me back up.

11        You were Mr. Iantosca's lawyer for all of these

12   transactions that the government just asked you about;

13   is that correct?

14   A.    Yes.

15   Q.    Okay.  And he also had another set of lawyers that

16   represented him in connection with those transactions,

17   too; is that right?

18   A.    No.  The transactions I was asked about was

19   basically a half transaction for the 1031, and I

20   represented him on the sale portion.  So the documents,

21   although eventually were also tied to a purchase, these

22   were all just signed at the sale.

23   Q.    Do you know whether or not the same documents that

24   the government just showed you were also available for

25   Mr. Iantosca's other set of lawyers to look at?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   I'm -- some portion of them would have been.  I

2    don't know if all of them were.

3    Q.   Okay.  You would agree -- I think we would all

4    agree -- that the word "invested" is -- it's in many

5    places in all those documents, right, that word,

6    "invested" or "invest" "investment account" or "invest"?

7    Do you recall the government showing you --

8    A.   The word "invest"?

9    Q.   Yeah, the word "invest" --

10   A.   There was one section they had me read when it was

11   talking about what kind of an account, the word "invest"

12   before the money market account.  Held and invested in

13   Paine Webber at either three percent or -- yeah, the

14   word "invest" was there.

15   Q.   Did you ever ask Mr. Carpenter during -- at any

16   point in time during 2000 if the money was going to be

17   invested?

18   A.   If the money was going be put in an account?

19   Q.   Did you ever ask Mr. Carpenter in 2000 whether the

20   money was going to be invested?

21   A.   No.

22   Q.   Okay.  Did you ever discuss with Mr. Carpenter what

23   he understood the word "invest "or "investment" in that

24   agreement meant?  Did you ever discuss that with him?

25   A.   No.

1  Q.   Isn't it correct that you have no idea what was in

2  Dan Carpenter's mind at the time these various Exchange

3  Agreements were signed? Isn't that correct?

4  A.   That's correct.

5  Q.   And you have no idea what Dan Carpenter understood

6  what Benistar's rights were under the Exchange

7  Agreements; isn't that correct?

8  A.   That I have no idea what he thought his --

9  Q.   That's right, yes.

10  A.   That's correct.

11  Q.   And isn't it also correct that every one of these

12  agreements that the government showed you either all

13  were signed by Mr. Paley on behalf of Benistar or were

14  supposed to be signed by Mr. Paley?

15  A.   You mean that there's a signature line for his

16  signature?

17  Q.   Yeah.

18  A.   Yes.

19  Q.   In fact, some of the documents the government showed

20  you had no signature from Mr. Paley, but his name was

21  indicated there; is that right?

22  A.   Right.  These documents were sent to us from

23  Benistar first, and then after we signed them, we sent

24  them.  So depending on where these came from, if they

25  came from my file, they might have been before Mr. Paley

1    signed them.

2    Q.   All right.   Thank you, Ms. Adams.

3           You also agree Mr. Carpenter, to the best of

4    your knowledge, signed no agreements whatsoever with

5    Mr. Iantosca?

6    A.   Did Mr. Carpenter actually sign them?

7    Q.   Sign anything, as far as you know?

8    A.   As far as I know, he never signed anything.

9    Q.   Okay.   And you'd also agree with me that nowhere in

10   the contract or the promotional material is

11   Mr. Carpenter's name ever mentioned?

12   A.   That's not true.   His name was specifically on the

13   opinion letter from Edwards & Angell that was in the

14   promotional material.

15   Q.   Was that a document that the government showed you?

16   A.   No, it wasn't.

17   Q.   Oh, okay.   So that's not a document -- do you have a

18   recollection -- could you just describe what that

19   document was?

20   A.   In the white folder that I was asked about, in

21   addition to those slide show presentations, there was an

22   opinion letter drafted from Edwards & Angell, a law

23   firm, addressed to Daniel Carpenter, Esquire at Benistar

24   about -- I think it was the 419 trusts.

25   Q.   It had nothing to do with 1031?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    I don't believe it did, but it was in the
2    promotional material.
3    Q.    Okay.  But it had nothing to do -- it has nothing to
4    do with 1031 exchanges?
5    A.    I believe your question was that his name wasn't in
6    anything.  Yes, his name was in something.
7    Q.    Was that promotional material in connection with the
8    1031 exchange?
9    A.    The whole package was handed to me at once.
10   Q.    Fair enough.
11         Let me, then, ask you about Exhibit 75.  That is
12   the promotional material that the government introduced.
13         Would you agree with me that the name, the
14   address, the fax, the e-mail address, all -- can we put
15   it on the screen, Exhibit 75?
16         Down at the bottom, you see down at the bottom
17   where it says "Benistar Properties"?
18   A.    Yes.
19   Q.    An address --
20         MR. GREENBERG:  And I'm sorry, your Honor --
21   could your Honor change it?
22         THE COURT:  I'm sorry.  I shut it down in the
23   transition.
24         MR. GREENBERG:  Thank you very much, your Honor.
25   BY MR. GREENBERG:

1    Q.   You see down -- it all relates to Mr. Paley's office

2    in Newton, his local telephone number, his fax number,

3    his --

4    A.   The Newton address of Benistar was on these

5    documents, yes.

6    Q.   And that's his -- to the best of your knowledge,

7    that's his e-mail address, that's his office --

8    A.   I never communicated with him by e-mail, but I

9    believe that is the mailing address we used, the

10   telephone number, and the fax number when I was

11   communicating with the Massachusetts office.

12   Q.   Where was your meeting with Mr. Paley?

13   A.   In Weymouth.

14   Q.   Okay.  Did you know he operated out of his home?

15   A.   I did not.

16   Q.   Oh.

17        And if you could please look through the next

18   couple of pages, that's on every page, his

19   identification, right?

20   A.   The Newton address, yeah.

21   Q.   His address, yeah.

22        Let me, if I can -- if you go to Exhibit 82, the

23   bond.  There was some testimony you -- the government

24   asked you about this bond that you asked for.  Mr. Paley

25   told you that Benistar was bonded; is that right?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.    He told me, and it was in the promotional material.

2   Q.    Okay.  I mean, just -- Ms. Adams, you saw the bond,

3   right?

4   A.    I saw the bond.

5   Q.    And there's no dispute that that was a true and

6   accurate copy of the bond, right?  As far as you know,

7   that's a true and accurate bond?

8   A.    I have no idea.

9   Q.    You don't have any --

10  A.    This is what I was shown.

11  Q.    But you didn't mean to suggest to this Court or the

12  jury that that bond somehow was not a true and accurate

13  bond, did you?

14  A.    My intention was just to identify the document as

15  something I had seen before.  I wasn't trying to suggest

16  anything about the document.

17  Q.    And sitting here today, as far as you know, that was

18  a true and accurate bond that was issued by the bonding

19  company, correct?

20  A.    I have no further information about that document.

21  Q.    Did you ever on behalf of Mr. Iantosca investigate

22  as to whether or not that bond was true and accurate?

23  A.    I did not.

24  Q.    And that bond, you looked at it, you're a lawyer,

25  you knew what it covered and you knew what it didn't

1  cover, right?

2  A.   I looked at it.  I did not know what it covered and

3  what it didn't cover other than what's on the face of

4  it.

5  Q.   You said before on direct examination that you did

6  some research concerning 1031 exchanges?

7  A.   Yes.

8  Q.   You became familiar with the underlying principles

9  of 1031 exchanges; is that right?

10  A.   The basic principles of it, yes.

11  Q.   And you also said that Mr. Iantosca was -- beside --

12  your law firm and another -- what was the other law firm

13  that represented him?

14  A.   You mean on the purchase end?

15  Q.   Yeah, on the purchase end.

16  A.   He was represented by Robinson & Cole for the

17  purchase of Wood Road.  I don't know if he was

18  represented by somebody else for any of the other

19  purchases.

20  Q.   Was Robinson & Cole -- to the best of your

21  knowledge, did they represent him generally -- on a

22  number of transactions over the years?

23  A.   I know that they did more than one real estate

24  transaction.  I don't know what else they did for him.

25  Q.   Now, you also said that -- I think you said that

PDF created with pdfFactory trial version www.pdffactory.com

1    Mr. Iantosca -- you had an accountant that was consulted

2    with in connection with these exchanges?

3    A.   Yes.

4    Q.   And I just want to see if you agree with this:  That

5    when Benistar was retained -- first of all, you were the

6    lawyer for Mr. Iantosca, and you were giving him legal

7    advice in connection with the exchange, right?

8    A.   Yes.

9    Q.   All right.  You looked at the documents, you

10   analyzed them, and you advised Mr. Iantosca in your role

11   as his lawyer, correct?

12   A.   Yes.

13   Q.   And is it correct that you knew, Ms. Adams, that the

14   Internal Revenue Service required that Mr. Iantosca

15   needed to transfer the money to an intermediary in order

16   to obtain the tax-deferral benefit under a 1031

17   exchange?

18   A.   Yes.

19   Q.   Okay.  And just so we're clear, when I say "tax

20   deferral," if Mr. Iantosca were to otherwise have a gain

21   of, say, a million dollars, he would have to pay capital

22   gain tax; is that correct, at that time?

23   A.   Well, he's going to have to pay; it's tax deferred.

24   It just means because he's still a property owner, he's

25   just pushing off the day he's going to have to pay the

PDF created with pdfFactory trial version www.pdffactory.com

1    capital gains.

2    Q.   Actually, Ms. Adams, there are ways in which you can

3    ultimately never pay the taxes by leaving it through

4    your estate, so actually --

5    A.   As I stated before, I'm not a tax attorney.  My only

6    role in this was to review the mechanics of this type of

7    transaction.  And a 1031 tax transaction doesn't say

8    anything about never paying the taxes.  It talks about

9    if you have real estate and you change it to like-kind

10   real estate, that you can defer the capital gains to

11   when you eventually sell and do not replace the

12   property.

13   Q.   And what's the amount of taxes at that point in time

14   that was deferrable?  Was it in the 20-percent range?

15   A.   I don't know.

16   Q.   Just by way of background, Mr. Iantosca -- back in

17   2000, you mentioned that he sold a number of -- I think

18   you called them apartment complexes?

19   A.   Yes.

20   Q.   Just about how many apartments did Mr. Iantosca own

21   back in 2000?

22   A.   I'd have to say between 500 and a thousand.  I don't

23   really remember.

24   Q.   Apartments?

25   A.   Apartment buildings or apartments .

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    He owned 500 to a thousand apartments?

2    A.    I mean, some would have 20 units -- actually, you

3    know what, I think that's high, because I don't think

4    any of them had a hundred in them.

5    Q.    So at least several hundred?

6    A.    You're asking about something a long time ago.  My

7    estimate could be way off.

8    Q.    Well, it is a long time ago, as --

9    A.    Each building certainly had a minimum of ten, so

10   with eight buildings, you know -- I think it was more

11   than 80.

12   Q.    And beside residential property, he owned commercial

13   property?

14   A.    He didn't -- well, I shouldn't say that.  He did, he

15   owned Matheson Drive in Weymouth before this, but then

16   each time he sold an apartment complex, he bought more

17   commercial property.

18   Q.    Did you find Mr. Iantosca to be a pretty savvy

19   businessperson?

20          MR. MITCHELL:  Objection.

21          THE COURT:  Overruled.

22   A.    Savvy's not the word I would use.

23   Q.    Experienced?

24   A.    I can't use one word.  If you want me to describe --

25   Q.    Would you describe him as a tough negotiator?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Mr. Iantosca is an eccentric person.  He understood

2    numbers and he had been successful in purchasing

3    property many years ago and sitting on top of that

4    property.  The way he ran his business, I would

5    certainly not call him savvy.  When you say

6    "experienced," as in he's been doing it for a long time,

7    yes, but he did not run his company the way the average

8    person who owns that kind of property might.

9    Q.    Okay.  At the time you were advising Mr. Iantosca in

10   connection with these transactions -- let me just go

11   back.

12          You knew that the Internal Revenue Service

13   required that he transfer the money -- I'm sorry, that

14   the proceeds from whatever property he was going to be

15   selling needed to go directly from the buyer to the

16   intermediary, in other words, Benistar, is that right,

17   in order to qualify for a 1031?

18   A.    Yes.

19   Q.    And you also knew that in order to qualify for a

20   1031 exchange, that the money that went from the

21   purchaser of the property to the intermediary had to be

22   held by the intermediary, Benistar, in their own name,

23   right?

24   A.    Yes.

25   Q.    And you also knew at that time that under the laws

PDF created with pdfFactory trial version www.pdffactory.com

1    of the United States tax code, for purposes of the

2    United States tax code, there were no requirements,

3    there were no restrictions as to how the intermediary,

4    in other words, Benistar, had to hold or invest that

5    money that they received from that exchange; isn't that

6    right?

7    A.   I don't know that.

8    Q.   You don't know that?

9    A.   I didn't review enough of the code to know that.  I

10   know that --

11   Q.   I'm sorry.  Is it your testimony --

12            MR. MITCHELL:  He just cut the witness' answer

13   off, your Honor.

14   BY MR. GREENBERG:

15   Q.   The answer is yes or no, did you not know --

16   A.   I did not know the IRS permitted him to do certain

17   things with the funds, no.

18   Q.   So your testimony here is that when you were

19   advising Mr. Iantosca to sign these documents that have

20   the word "invest," "investment" all over it, you did not

21   know that under the laws of the United States that there

22   were no restrictions on how an intermediary, such as

23   Benistar, had to hold the funds?  Is that your

24   testimony?

25   A.   First, I don't think I've testified that the word

PDF created with pdfFactory trial version www.pdffactory.com

1    "invest" is all over the documents.

2    Q.   I'm sorry.

3    A.   But next, my testimony is that I did not know that

4    the IRS had no regulations as to what he could do with

5    the money.

6    Q.   Well, sitting here today, it's been seven years,

7    seven-plus years, have you investigated whether or

8    not -- at the time you were advising Mr. Iantosca,

9    whether or not the law of the United States was that

10   there was no restrictions under the Internal Revenue

11   Service Code as to how Benistar or any other

12   intermediary had to hold the funds?

13   A.   No, I limited my investigation to what Benistar

14   agreed to do, not what the law -- I don't do criminal

15   law, I don't do tax law, so I did not investigate

16   whether he broke any laws.

17   Q.   Well, didn't you tell -- didn't you tell

18   Mr. Iantosca in 2001 that if he thought you did

19   something wrong, he could contact your malpractice

20   carrier?

21   A.   Yes, but that --

22   Q.   Just yes or no.  Did you tell him that?

23   A.   Yes, yes.

24   Q.   So it's your testimony that in calendar 2000, when

25   you were advising Mr. Iantosca, that you were unaware

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   that the law under the Internal Revenue Code was that

 2   there was no limitation on the proceeds -- I'm sorry, on

 3   what an intermediary -- I'm sorry, as to how an

 4   intermediary, such as Benistar, had to hold money?

 5          MR. MITCHELL:  Objection.  Asked and answered

 6   several times at this point.

 7          THE COURT:  Well, you can have this answer, but

 8   that will be it.

 9          You may answer.

10   A.   I'm not sure how you phrased the question.  But my

11   testimony is that I did not know whether or not there

12   was a law telling Benistar where they could put the

13   money or what they could do with it.

14   Q.   And you read the agreements and advised Mr. Iantosca

15   to sign them, correct, all of these agreements?

16   A.   Yes.

17   Q.   Okay.  Now, you testified that the first time you --

18   well, let me ask you:  When do you say the first time

19   you met with Mr. Paley --

20   A.   Either the very end of February 2000 or the

21   beginning of March 2000.

22   Q.   Okay.  If -- let me just -- I put in front of you --

23   there's a transcript of a prior proceeding on February

24   29, 2000, do you see that?

25          I'm sorry, the transcript, it's the Suffolk
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Superior Court transcript.  If you can turn to page 205.

2         You recall testifying in 2002 in the Suffolk

3    Superior Court?  Do you, Ms. Adams?  Do you remember

4    testifying in a civil proceeding in Suffolk Superior --

5    A.   I know that I did.

6    Q.   Well, that -- I'm going to show you -- I'm hoping

7    that will be helpful.  If you look at page 205, lines 2

8    to 6, does that refresh -- isn't it correct that your

9    first meeting, at least back when you testified in 2002,

10   was that you met with him, Mr. Paley, sometime after

11   February 29th of 2000?

12   A.   Actually, the question was:  Did you meet with him

13   before February 29, 2000.  So I may have met with him on

14   February --

15   Q.   What was your answer?

16   A.   I said I don't believe so.  I think it may have been

17   on the 29th of February of 2000.

18   Q.   Okay.  In fact, isn't it true that Mr. Iantosca had

19   already signed an agreement with Benistar before you

20   even met with Mr. Paley?

21   A.   I have no knowledge of that.

22        MR. GREENBERG:  If I could approach the witness,

23   your Honor?

24        THE COURT:  All right.

25        (Discussion off the record.)

PDF created with pdfFactory trial version www.pdffactory.com

1    BY MR. GREENBERG:

2    Q.    Do you recognize that document?

3    A.    No.

4    Q.    Do you recognize the signatures?

5    A.    I do recognize the signature of Joseph Iantosca.

6    Q.    Well, wasn't that document presented to you in prior

7    proceedings, Ms. Adams?

8    A.    It may have been.

9    Q.    Okay.  That's Mr. Iantosca --

10    A.    It definitely wasn't in 2000.  I mean, I recognize

11    they misspelled Bellridge, which I would have corrected,

12    so I was not --

13    Q.    That's Mr. Iantosca's signature, correct?

14    A.    That is Mr. Iantosca's signature.

15    Q.    And what's that document entitled?

16    A.    "Benistar Property Exchange Trust Exchange Fee

17    Agreement."

18    Q.    And were you aware that Mr. Iantosca had already

19    signed an Exchange Fee Agreement with Benistar before

20    you even had your meeting with Mr. Paley?

21    A.    I was not.

22          MR. GREENBERG:  Your Honor, I will offer this

23    as --

24          MR. MITCHELL:  No objection, your Honor.

25          THE COURT:  Okay.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              Paul, it's 252 on the defendant's list.

 2              (Exhibit 252 received into evidence.)

 3              MR. GREENBERG:  Can we put, please, Exhibit 252

 4     on the screen?

 5     BY MR. GREENBERG:

 6     Q.   Now, let me start off by setting -- asking you,

 7     Ms. Adams, did you know in the past had Mr. Iantosca

 8     signed contracts with parties without seeking your

 9     advice?

10     A.   Yes.

11     Q.   Okay.  And you said -- if you could just -- you said

12     that -- the Bellridge -- the exchangor here is

13     identified as Bellridge.  You said it's spelled wrong?

14     A.   Yes.

15     Q.   And you know -- you weren't consulted with respect

16     to this document?

17     A.   That's correct.

18     Q.   And in fact, you didn't even know this document

19     existed when you met with Mr. Paley and you didn't know

20     it existed when you had these alleged conversations with

21     Mr. Carpenter; is that correct?

22     A.   That's correct.

23     Q.   And if we could just highlight the second paragraph,

24     pull it up.

25              And you see where it talks about, again, the
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   language we've heard over and over again, "held and
 2   invested at Merrill Lynch cash management account in the
 3   discretion and through financial institutions of
 4   intermediary."  Same language as you saw in documents
 5   the government showed you, right?
 6   A.   Yes.
 7   Q.   And then it talks about the invest -- "said
 8   investment account shall be in the name of the
 9   intermediary."   Again, you never asked anyone -- I'm
10   sorry, you never asked Mr. Carpenter what the word
11   "investment account" meant, did you?
12   A.   I've already testified I didn't talk to
13   Mr. Carpenter until July.
14   Q.   Well, you never asked --
15   A.   And even then, that's correct, I did not ask him
16   about what type of account this was going to be held in.
17   Q.   Okay.
18           We'll take that down.  Thanks.
19           Now, the government asked you -- talked about a
20   transaction, Exhibits 84, 84 A, B, and C.
21           And actually, if you can put up Exhibit 84.
22           This was in August of 2000.  Paragraph 10.  This
23   is the Exchange Agreement.
24           And if we could highlight paragraph 10 -- thank
25   you.
```

1          Then, this is one of the agreements that you

2     advised Mr. Iantosca on, right, in August of 2000?

3     A.   Yes.

4     Q.   Okay.  And you read this and you told him it was

5     okay to sign it, correct?

6     A.   Yes.

7     Q.   Okay.  And again, the same words, "held and

8     invested," the investment account is going to be in the

9     name of the intermediary -- and you knew that, you knew

10    that the signature -- that the account was going to

11    require the signature from someone at Benistar, right?

12    A.   Yes.

13    Q.   You knew all that?

14    A.   Yes.

15    Q.   Okay.

16          Can you go to 16, paragraph 16, please?

17          And one of the paragraphs that the government

18    didn't -- if you can just pull it up.

19          Every one of these agreements, Benistar

20    specifically told each exchangor to "seek the

21    independent tax and legal advice, both as to the income

22    tax consequences of the exchange as contemplated by

23    exchangor and as to the legal effect of this agreement."

24    Did you see that?

25    A.   I see that.

1  Q.   It wasn't any attempt by Benistar to -- strike that.

2       Each one of these agreements advised every

3  investor, every exchangor, to go talk to your

4  accountant, go talk to your lawyer before you sign this

5  document, correct?

6  A.   This paragraph, number 16, that you have

7  highlighted, is in this document.

8  Q.   Okay.  And Mr. Iantosca consulted with you, right?

9  A.   Yes.

10  Q.   And did he also consult with his accountant for

11  advice on this transaction?

12  A.   Yes.

13  Q.   And do you know what his accountant advised him?

14  A.   I do not.

15  Q.   Was his accountant knowledgeable about 1031

16  exchanges?

17  A.   I don't know.

18  Q.   Could we go to -- and again, this agreement is all

19  of them, they're all -- Mr. Carpenter's name is nowhere

20  on these, didn't sign any of these?

21  A.   Not on these documents.

22  Q.   The government --

23       MR. GREENBERG: Jump to 84 C, please.  I'm sorry.

24  84 C.  The election.  I think it's the election, the

25  election form, Gerard.

PDF created with pdfFactory trial version www.pdffactory.com

1           Thank you.  Yeah, if you could just pull that

2    up.

3    Q.   You know, there was some testimony on direct

4    examination about Mr. Iantosca selecting this three

5    percent ready access money market account.  Do you see

6    that?

7    A.   Yes.

8    Q.   Okay.  I was actually surprised -- you went from

9    Exhibit 88 to 90, and we didn't look at 89.

10          This is August 10th, so -- 2000.

11          MR. MITCHELL:  I'm not sure there's a question

12   there, your Honor, but if counsel wants to offer 89, the

13   government has absolutely no objection to it.

14          MR. GREENBERG:  I will get to it, thank you.

15   BY MR. GREENBERG:

16   Q.   On August 10, 2000, Mr. Iantosca elected a three

17   percent Merrill Lynch ready asset money market account,

18   right?

19   A.   Yes.

20   Q.   Okay.  Now, you didn't mean to suggest to this Court

21   and this jury that that was the election that

22   Mr. Iantosca kept throughout the rest of the year, did

23   you?

24   A.   I didn't mean to suggest anything.  I testified that

25   on this document he selected the three percent per

1   annum.

2   Q.   Because you know that about a month later he changed

3   his election to a six percent investment account, right?

4   Isn't that right?

5   A.   Do I know now or did I know then, I guess is the

6   question.

7   Q.   Well, you testified this morning, didn't you?

8   A.   When I testified this morning in 2008, yes, I did.

9   Q.   Because you testified before about knowing about

10  that six percent account?

11  A.   And that's when I learned of it.

12  Q.   That's right.  Because you didn't even know at the

13  time that Mr. Iantosca, who had signed agreements before

14  you ever met with Mr. Paley after the first -- after he

15  did his first election, changes the election, you just

16  didn't know?

17  A.   That's correct.

18          MR. GREENBERG:  Can we put -- you've stipulated,

19  89, we'd offer it, your Honor.

20          THE COURT:  All right.

21          (Exhibit 89 received into evidence.)

22          MR. GREENBERG:  If you would put that on the

23  screen, please.

24  BY MR. GREENBERG:

25  Q.   Do you see, is that Mr. Iantosca's signature?

1    A.   It is.

2    Q.   He changes his election on September 24th to the

3    Merrill Lynch six percent Merrill Lynch investment

4    account, right?

5    A.   Yes.

6    Q.   Unknown to you at that time or at any time in 2000

7    right up through your purported conversation with

8    Mr. Carpenter in January?

9    A.   That's correct.

10   Q.   Okay.

11        Now, Mr. Iantosca had successful 1031 exchanges

12   using Benistar; isn't that right?

13   A.   Yes.

14   Q.   Okay.  In fact, he had his first successful -- did

15   he have a successful exchange using Benistar prior to

16   August?

17   A.   I don't know the exact dates.

18   Q.   Well, he had one in August, correct?

19   A.   He sold the Plymouth land August 10, 2000.

20   Q.   And he had a successful exchange in August, did he

21   not?

22   A.   I don't know when the purchase took place.  To be a

23   successful exchange, he would have had to have both

24   sold, parked his money with Benistar and received it

25   back for the purchase.  So again, we're talking about

PDF created with pdfFactory trial version www.pdffactory.com

1    something that happened eight years ago, so I don't

2    remember the order of -- and the dates of when he

3    purchased.

4            (Discussion off the record.)

5            MR. GREENBERG:  I'll find it.

6    BY MR. GREENBERG:

7    Q.   While we're looking for your reference in your prior

8    testimony, let me go to the Escrow Agreement.

9            MR. GREENBERG: Gerard, if we can -- let's call

10   up 84 B.

11           Thanks -- I'm sorry, 84 B, it's the escrow --

12   thank you very much.

13           Gerard, if you don't mind, can we just pull up

14   the second -- the whereas that's highlighted?

15   Q.   Do you see the reference, "deposited in Benistar's

16   accounts at Merrill Lynch"?

17   A.   Yes.

18   Q.   And you see the plural, as Mr. Pappalardo has

19   pointed out previously.  You knew that Benistar had

20   multiple accounts at Merrill Lynch, right?

21   A.   I did not know how many accounts they had at Merrill

22   Lynch.

23   Q.   My question is:  You knew they had more than one?

24   A.   I did not know that.  I didn't know they didn't have

25   more than one.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.    Doesn't it say deposited in Benistar's accounts at

2   Merrill Lynch?

3   A.    That doesn't tell me they actually have multiple

4   accounts.   Certainly it would lead me to believe they

5   had more than one account.

6   Q.    Okay, fair enough.

7          Could you go to full paragraph number two?  You

8   see where it says, "Benistar shall have full control

9   over the exchangor's funds to invest"?

10  A.    Yes.

11  Q.    You saw that?

12  A.    Yes.

13  Q.    Okay.  And it talks about the six percent investment

14  account.   That's what Mr. Iantosca selected in

15  September, right?

16  A.    That is what I have been told, that he switched from

17  the three percent to the six percent from August to

18  September.

19  Q.    Now, isn't it true that Mr. Iantosca -- that you and

20  Mr. Iantosca knew exactly the name and the account

21  number that Benistar was holding Mr. Iantosca's money?

22  A.    We knew based on the wiring instructions where the

23  money went from the closing.

24  Q.    You knew exactly, you knew it was going into a

25  Benistar -- why don't we pull it up on the screen.  If

1    we can pull up -- we'll take one, Exhibit 94.

2            I'm sorry.

3            THE COURT:  94 is not in evidence.

4            MR. GREENBERG:  I'm sorry.  I apologize, your

5    Honor.

6            Is 98 in, your Honor?

7            THE COURT:  98 is.

8            MR. GREENBERG:  We'll just pull up 98.

9    BY MR. GREENBERG:

10   Q.   Do you see on -- just so we're all clear, this is a

11   document that Mr. Iantosca and you were given before he

12   sent -- would send any -- would cause to be sent any

13   money to Benistar; is that right?

14   A.   This is the document we were given for the November

15   30, 2000 closings to give to the closing attorney to

16   wire the money from the November 30, 2000 closings.

17   Q.   Okay.  And I'm going to -- there's multiple -- there

18   is multiple exchanges that were started on November

19   30th; is that right?

20   A.   That's correct.

21   Q.   And each one of these exchanges, part of the

22   documentation, beside the Exchange Agreement, the Escrow

23   Agreement, the Fee Selection Agreement, all had a wire

24   transfer instructions?

25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Okay.  And that was given to -- there was no

2    secrets, it was given to Mr. Iantosca and his

3    representatives, right?

4    A.    That's correct.

5    Q.    Okay.  And that disclosed to everyone that the

6    money -- the account was going to be an account that was

7    named Benistar Property Exchange Trust Company, Inc.,

8    account number, and there was a specific account number,

9    EX-15434-MR?

10    A.    Yes.

11    Q.    My first point is:  You knew that the money was

12    going to be held in an account at Paine Webber, and the

13    name of the account was going to be Benistar Property

14    Exchange Trust Company, Inc., correct?

15    A.    Yes.

16    Q.    I asked you before -- as I understand your testimony

17    on direct examination, you were talking about exchange

18    documents that were signed in August and then several

19    Exchange Agreements that were signed November 30th, is

20    that right, all in 2000?

21    A.    They were all done in 2000.  I remember the August

22    was the Plymouth land, and the November ones were

23    Macozzi ones, but I don't remember -- there might have

24    been some other dates.

25    Q.    And were there other agreements that Mr. Iantosca

PDF created with pdfFactory trial version www.pdffactory.com

1    signed with Benistar that related to other exchanges?

2    A.    I don't know if I've been shown all of them or not.

3    Q.    Okay.

4         Can you look at your prior testimony at -- on

5    July 14, 2005 that's in this court at -- it's 4-26, if

6    you could look at specifically lines 10 through 15?

7         And my question to you is:  Isn't it true that

8    Mr. Iantosca did an exchange with Benistar where he sold

9    some property in May 2000 and then he purchased some

10   other property in August?

11   A.    You're -- I guess you're asking me two questions:

12   Is it true, or is this what I testified?  I don't know

13   if my memory was better then.  You want to do dates, I

14   need to look at documents.  May, August -- they're all

15   2000; that's eight years ago.  I know there are

16   documents that would refresh my memory as to the exact

17   timing of these closings, and certainly in 2005 I would

18   assume my memory was better than it is right now, but I

19   would not feel comfortable telling you the months that

20   each of these transactions happened without looking at a

21   document.

22   Q.    Well, isn't it correct, then, that in 2005 you

23   testified that Mr. Iantosca sold some property in May of

24   2000 and then he did an exchange for something you

25   called the Sports Authority in August?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   I said I think those were the ones sold in May, and

2   then he purchased in August the Sports Authority.

3   Q.   And that was a successful exchange, right?

4   A.   The Sports Authority?

5   Q.   Yeah?

6   A.   That was purchased then --

7   Q.   What was -- can you just describe for all of us what

8   the Sports Authority was?

9   A.   The Sports Authority is a commercial condominium.

10  As you're driving up 93, you see what used to be the

11  Grossman's -- I think it's called Grossman's

12  Marketplace, where KMart and Babies R Us is; there's a

13  Sports Authority store, which is, actually, a separately

14  owned condominium.  Each of those stores -- the plaza is

15  not owned by one owner, each of those stores is

16  separately owned, and Mr. Iantosca, under one of his

17  entities, owns the actual physical unit occupied by the

18  business called Sports Authority.

19  Q.   Okay.  Did he acquire that property in more than one

20  stage?

21  A.   No, he acquired it in one stage.

22  Q.   All at once, thank you.

23        MR. GREENBERG:  Gerard, if you could put up,

24  please, 92, back up.

25  Q.   And that's the account selection form.  This is --

1  and just so it's clear, he selected something -- the

2  three percent account, right?

3  A.   On this document you're showing me?

4  Q.   Yes.

5  A.   November 30, 2000, yes, he selected the three

6  percent per annum account on that one.

7  Q.   There's no mention as to what the account type was

8  at all, it simply says three percent per annum account,

9  correct?

10 A.   That's correct.

11 Q.   And if we look at the other account selection

12 forms -- I just want to make sure we all agree --

13 Exhibit 97, again, it's the three percent account, no

14 mention of the type of account, it's just --

15 A.   It says, "three percent per annum account."

16 Q.   And then if we can look at 102.

17        Again, three percent account, no mention of the

18 account, just it's an account that's going to -- it's a

19 three percent annum account?

20 A.   It's an account that's going to earn three percent,

21 yes, a three percent per annum account.

22 Q.   Thank you.

23        And let's do 107.

24        Again, same three percent account?

25 A.   Yes.

1  Q.   Okay.  No mention of the account.  The only

2  requirement is that you give 48 hours' notice.

3  A.   That's all that's stated there.

4  Q.   That's right, yeah.

5       Okay.  Thank you.  And can we just -- now, you

6  were aware that Benistar was no longer using Merrill

7  Lynch when the November transactions took place, right?

8  A.   I was aware in November 2000 that Joseph Iantosca's

9  funds would go into a Paine Webber account.  I did not

10 know that they no longer used Merrill Lynch in October.

11 Q.   Well --

12 A.   Just that my transactions would now go into a Paine

13 Webber account.

14 Q.   The government asked you -- I think asked you

15 whether or not Benistar ever told you they were going to

16 use Paine Webber versus Merrill Lynch?  I mean, you knew

17 they were using Paine Webber, right?

18 A.   It was in the documents.

19 Q.   Did you ask --

20 A.   I did not.

21 Q.   Why not?

22 A.   Why would I ask them why they changed banks?

23 Q.   Well, brokerage houses, I mean, really, Paine Webber

24 is not a bank, it's a brokerage house, right?

25 A.   I considered the money to be held in a bank.

1    Q.   Would you answer my question?  Is Paine Webber a
2    bank?
3    A.   I have no idea.
4    Q.   I'm sorry, your testimony is you don't know
5    whether --
6    A.   That is my testimony.
7    Q.   I withdraw the question.
8         Did you ask -- Ms. Adams, did you ask anyone
9    from Benistar why they were using Paine Webber as
10   opposed to Merrill Lynch?
11   A.   I did not.
12   Q.   Did you think it significant that they were using
13   Paine Webber as opposed to Merrill Lynch?
14   A.   No.
15   Q.   It was no secret that they were using -- I withdraw
16   the question.
17   A.   They didn't draw my attention to it, but in the
18   documents --
19   Q.   It was only in every piece of paper your client saw.
20   A.   Right.  They didn't call me up and say, Hey, we're
21   not using Merrill Lynch anymore.  It was in the
22   documents, yes, but there was no grand announcement of
23   it.
24   Q.   You would agree -- let me ask -- just focus your
25   mind on November 30, 2000.  Okay.  Isn't it correct that

PDF created with pdfFactory trial version www.pdffactory.com

1    as of that date in time, Mr. Iantosca had had successful

2    prior 1031 exchanges with Benistar?  In other words,

3    where he sold property, the money went to Benistar, he

4    purchased replacement property, and it was paid for

5    through those funds; isn't that right?

6    A.    That is correct.

7    Q.    Okay.  And how many of those successful prior

8    exchanges had Mr. Iantosca had using Benistar as of

9    November 30, 2000?

10   A.    I don't know.

11   Q.    Was it several?

12   A.    Was it more than one?

13        MR. MITCHELL:  She said she didn't know.

14   BY MR. GREENBERG:

15   Q.    More than one?

16   A.    I know that he purchased the Sports Authority before

17   November 2000.  I don't know about any of the other

18   purchases.  That's the only purchase that I represented

19   him on, so I don't know the timing of the other ones.

20   Q.    And what was the price for the Sports Authority that

21   he paid?

22   A.    I don't know.

23   Q.    Approximately?

24   A.    He assumed a mortgage, so I actually -- I mean --

25   I'd be guessing.  Between one and ten million dollars.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Fair enough, between one and ten.

2          Let's now focus on after November 30.  Isn't it

3    correct, Ms. Adams, that in December of 2000,

4    Mr. Iantosca acquired several pieces of property through

5    Benistar through successful exchanges?

6    A.    I don't know.

7    Q.    You don't know?

8    A.    I don't know.

9    Q.    Okay.

10   A.    But I'd be happy to look at documents if you want to

11   refresh my recollection.

12   Q.    Absolutely, sure.

13         (Discussion off the record.)

14         MR. GREENBERG:  I'm sorry, your Honor.

15         (Discussion off the record.)

16         MR. GREENBERG:  I'm sorry, your Honor.

17         (Discussion off the record.)

18   Q.    Well, are you familiar with one of the -- something

19   called -- did he sell property -- is it Fern/25 Morton,

20   is that a --

21   A.    Fern Realty would be the owner.  Fern Realty Trust

22   would be the owner of the property, and 25/45 Morton

23   Street would be the address of the property.

24   Q.    The new property?

25   A.    No, that's the property he sold.  Nina Macozzi and

1    an entity controlled by him purchased Morton Street.

2            (Discussion off the record.)

3            MR. GREENBERG:  Your Honor, I believe -- I think

4    186 is in.

5            MR. PIROZZOLO:  It's in.

6            MR. GREENBERG:  Let's put it on the screen, if

7    you could, Gerard.  Go to 186.  Go to the fourth page

8    of -- page four of 186.

9    BY MR. GREENBERG:

10   Q.   If you could -- do you see it says "Fern Tinson"?

11   Do you see that?

12   A.   Yes.

13   Q.   Okay.  And it talks about --

14           MR. GREENBERG:  I'm sorry, it's the next page.

15   Sorry, Gerard.  This is the 25 Morton.

16   Q.   Do you see on December 6th there was a disbursement

17   to Mr. Iantosca for almost a million -- 1,175,638?

18   A.   I see where it says, "disbursed December 6, 2000."

19   Q.   That was to buy property?

20           Mr. Iantosca was doing an exchange in December,

21   right?

22   A.   I don't know.  You'll have to show me something

23   else, because this is not a document I'm familiar with,

24   and it doesn't have an address of what he purchased.  I

25   mean -- I'm not trying to be difficult.  I would guess

PDF created with pdfFactory trial version www.pdffactory.com

1    it might be North Attleboro, if you have those

2    documents, but I --

3    Q.    Just so we understand, what did Mr. Iantosca

4    purchase in December of 2000?

5    A.    I don't know.

6    Q.    What is North Attleboro?  You just mentioned that.

7    A.    North Attleboro was a shopping plaza, but I didn't

8    handle the purchase of it and I don't remember the

9    dates, but that may have been what he purchased.  But 25

10   Morton Street was something he sold.

11   Q.    What was the size of this shopping plaza?

12   A.    In North Attleboro?

13   Q.    Yeah.

14   A.    I -- I didn't represent him on the purchase, so I --

15   I mean, it was -- you know, it had anchor stores, it

16   was -- it wasn't like a mall, like the South Shore

17   Plaza, it was more like a strip of -- I don't know, five

18   or six stores with -- I kind of remember one of them --

19   one of them may have been a Sears Home Life, because I

20   think later he had a problem with them.

21   Q.    Well, according to this document, it's part of a

22   1031 -- according to this document, disbursed on behalf

23   of Mr. Iantosca or his entity on December 6th was almost

24   1.2 million.  Do you see that?

25   A.    I see -- I don't recognize this document.  I see the

PDF created with pdfFactory trial version www.pdffactory.com

1    words "disbursed December 6, 2000, $1,175,638.95."  I

2    see the words "Fern/25 Morton."

3    Q.   Why don't we go to the first page of this document.

4    This is a government exhibit.  And just -- you see the

5    date of it, December 27, 2000?

6    A.   Yes.

7    Q.   From Linda Jokinen re: Iantosca?

8    A.   Yes.

9    Q.   Can we go to page 5, please?

10           And do you see there's another disbursement on

11   the same day of one -- another $1,175,638.95.

12   A.   That's the same figure that I just read off, and the

13   same date.  It's not another disbursement, that's the

14   same disbursement.

15   Q.   I'm sorry.  I'm sorry -- you're right.  You're

16   right.

17           I'm sorry.  The next page.  Sorry.

18           Here's a disbursement, same day, December 6,

19   $564,000.

20   A.   Yes.

21   Q.   A few days -- I'm sorry, $110,000 on the 19th?

22   A.   I see those.

23   Q.   Okay.  And can you -- this is all to the best -- all

24   in connection with 1031 exchanges, right?

25   A.   I'm not trying to be difficult, but I'm telling you

1    that I have never seen this document and --

2    Q.   You didn't represent him in connection with any of

3    his acquisitions in December.  In fact, you didn't

4    represent him in any acquisition except for one?

5    A.   That's correct.

6    Q.   So whenever he bought property, he used some other

7    lawyer except for you, other than the one time he used

8    you?

9    A.   When he bought property during this time period that

10   required a commercial mortgage, he used another law

11   firm.

12   Q.   Okay.

13   A.   I have represented him on smaller purchases at other

14   times not related to Benistar, and I did represent him

15   on the purchase of the Sports Authority that had a

16   mortgage in place that he was assuming.

17        MR. GREENBERG:  And then if you would go to the

18   next page, Gerard.

19   Q.   Sorry, this is -- you see $2 million on December 6,

20   2000.  $2 million was disbursed to Mr. Iantosca in

21   connection with his 1031 documentation?

22   A.   It says here, "disbursed December 6, 2000, $2

23   million."  The reference that leads me to Joseph

24   Iantosca is the Faxon Heights Quincy Avenue, which is

25   the property he sold.  I would be guessing if I told you

1    that he must have bought something on December 6, 2000.

2    I don't think you want me to do that.

3    Q.   Besides these transactions in December 2000, in

4    January 2001 Mr. Iantosca or one of his entities

5    received over -- from Benistar's accounts over $2

6    million?

7    A.   In January 2001?

8    Q.   Yes, yes.  In January 2001.

9    A.   I have no knowledge of him getting any of his money

10   after January 2001.

11   Q.   You have no knowledge of his getting his over $2

12   million in early 2002 -- 2001?

13   A.   My memory --

14   Q.   Just yes or no?

15   A.   No.

16   Q.   Now -- we can shut that.

17        You acknowledge that you read all of these

18   agreements, the documents that Mr. Iantosca signed,

19   right?

20   A.   I read the documents that I have identified here

21   today.

22   Q.   Every document the government presented to you that

23   Mr. Iantosca signed, you read them before he signed

24   them?

25   A.   That is correct.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   And is it fair, Ms. Adams, that you told him that it

2  was okay to sign them?  You advised him to sign the

3  documents?

4  A.   Yes.

5  Q.   And that at some point -- you told him at some point

6  in 2001 that he -- he could contact your professional

7  liability carrier if he thought you gave him bad advice?

8  A.   Yes.

9  Q.   And isn't it true that there was nothing in any of

10  the exchange agreements that limited the investments to

11  money market accounts as long as Mr. Iantosca got his

12  three percent or six percent?  There's nothing in the

13  agreements?

14  A.   Could you repeat that question?

15  Q.   Yeah.

16        (Discussion off the record.)

17  Q.   There's nothing in any of the agreements that

18  Mr. Iantosca -- that you advised him to sign and that he

19  signed that in any way limits what Benistar can invest

20  in?

21  A.   I disagree with that statement.

22  Q.   You disagree, okay.

23        Well, could you turn to your testimony,

24  Ms. Adams, at the -- back in 2005, page 4-67?

25  A.   57 or 67?

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    67.    4-67.

2        And let me just start at line 13.  And you were

3    asked a question -- you were under oath, right?

4    A.    Yes.

5    Q.    And you were asked -- you see, starting -- "There's

6    no limitation to how it's going to be invested, other

7    than the fact Mr. Iantosca is scheduled to get either

8    three or six depending on the rate he chose, correct?"

9        And what was your answer under oath?

10   A.    "Correct."

11   Q.    Mr. Carpenter never spoke a single -- strike that.

12       I just want to see if we can agree on a few

13   points before we conclude -- that the agreements that

14   you told him he could sign do not define the phrase

15   "investment account."   Do you agree with that?

16   A.    I agree with that.

17   Q.    And do you agree that the documents that

18   Mr. Iantosca signed don't specify what kind of

19   investing?

20   A.    Do not specify --

21   Q.    Do not specify?

22   A.    I mean, it has to be an account.  I mean, your prior

23   question about investing, I mean, Benistar can't go, you

24   know, buy an office building and say, Joe's going to get

25   three percent.  It has to be in an account.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   You have to invest.  It has to be in an account, and

2    you have to be investing from out of that account,

3    right?

4    A.   It can never leave that account.

5    Q.   It's invested in that account?

6    A.   In that account, yes.

7    Q.   Okay, fine.  And you -- there are a variety of

8    different ways you invest, right?

9    A.   Yes.

10    Q.   Stocks -- I mean, stocks, securities, those are

11    types of investments?

12    A.   But those aren't types of accounts.

13    Q.   I'm just talking --

14    A.   Real estate is a type of investment, yes, and that's

15    what my client was investing in, real estate.  I mean,

16    when you say "invest," I don't -- your question that was

17    different from this question, you asked me to say invest

18    any way they want.  No, they can't.

19    Q.   Ms. Adams, I want to make sure you aren't changing

20    your testimony.

21         Is it correct -- is it your testimony that there

22    is no limitation under these documents, that there's no

23    limitation to how the money is going to be invested,

24    other than the fact that Mr. Iantosca is scheduled to

25    get either three percent or six percent depending upon

1    the rate he chose; isn't that right?

2    A.   I disagree with that statement.  I know I --

3    Q.   I'm sorry, you disagree with what you said under

4    oath in this Court in 2005?

5    A.   It was --

6    Q.   Is that your answer?

7    A.   You're asking one question out of context, and now

8    you want to say --

9    Q.   Ms. Adams, could you -- I don't want to trick you, I

10   really don't.  Can you just read to the jury the

11   question and your answer starting at line 13 on July 14,

12   2005 in this courthouse?

13   A.   And what was the page again?

14   Q.   4-67.  Just read the question starting on line 13

15   and your answer on line 16, please.

16   A.   The question presented me was:  "There is no

17   limitation to how it's going to be invested other than

18   the fact Mr. Iantosca is scheduled to get either three

19   or six percent depending upon the rate that he chose,

20   correct?"

21        And my response was:  "Correct."

22        MR. GREENBERG:  Can I have one moment?

23        (Discussion off the record.)

24        MR. GREENBERG:  Ms. Adams, I thank you.

25        Nothing further, your Honor.

1          THE COURT:  Mr. Mitchell.

2          MR. MITCHELL:  I have some follow-up.

3                    REDIRECT EXAMINATION

4     BY MR. MITCHELL:

5     Q.   Ms. Adams, you recall Mr. Greenberg's asking you

6     questions about your January 2001 conversation with Dan

7     Carpenter?

8          MR. GREENBERG:  Objection, your Honor.

9          MR. MITCHELL:  That's Mr. Greenberg.

10    A.   That was my -- yes.

11         MR. MITCHELL:  What's the basis?

12         THE COURT:  Can I see you?

13         (At sidebar on the record.)

14         MR. GREENBERG:  My only question -- it just has

15    to go to scope.  I asked a very limited question on

16    that.  I just didn't want him to go beyond -- there's

17    one subject.

18         MR. MITCHELL:  I'm not, actually.  He referred

19    to the conversation as a purported conversation.

20         MR. GREENBERG:  Okay.

21         MR. MITCHELL:  Earlier, this weekend she

22    produced the billing record that shows it's not a

23    purported conversation.  She said "telephone comments

24    with Dan Carpenter."  We're going to offer that.

25         THE COURT:  It sounded like -- that was my

PDF created with pdfFactory trial version www.pdffactory.com

1    concern.   It sounded like it was broader than actually

2    had been inquired.   That's fine, you can do that.

3         (End of discussion at sidebar.)

4         MR. MITCHELL:   Can I just have a moment?   I just

5    need an exhibit sticker, your Honor.

6         (Pause.)

7    MR. MITCHELL:

8    Q.   In your practice of law, Ms. Adams, do you keep

9    billing records?

10   A.   Do I keep billing records, yes.

11   Q.   Did you keep billing records of your work for

12   Mr. Iantosca?

13   A.   Yes.

14   Q.   And during the period that we've been discussing?

15   A.   Yes.

16   Q.   Were those records subpoenaed by defense counsel

17   this week?

18   A.   Yes.

19   Q.   And did you produce them?

20   A.   Yes, I did.

21        MR. MITCHELL:   May I approach the witness?

22        THE COURT:   You may.

23   BY MR. MITCHELL:

24   Q.   Ms. Adams, I'm showing you what has been marked as

25   Government's Exhibit 230.   Would you take a look at

1    that?

2    A.    Yes.

3    Q.    Do you recognize that document?

4    A.    I do.

5    Q.    What is that document?

6    A.    That's the bill I sent to my client, Fern Realty, on

7    January 31, 2001 for the period January 1, 2001 through

8    January 31, 2001.

9    Q.    Did you produce that document pursuant to the

10   subpoena you received from the defense team in this

11   case?

12   A.    I did.

13   Q.    Okay.  And is that a document that you generate --

14   this type of document a type of document you generate in

15   the normal course of your practice of law?

16   A.    Yes, it is.

17   Q.    Is it your practice -- is it a document that you

18   maintain and keep in the normal practice of law?

19   A.    It is.

20   Q.    And just so we can have a date, it's dated January

21   31, 2001?

22   A.    Yes, it is.

23   Q.    And it relates to entries -- work done for

24   Mr. Iantosca?

25   A.    Yes.

1          MR. MITCHELL:  At this time, your Honor, the

2     government would offer Government's Exhibit 230.

3          MR. PAPPALARDO:  Objection, your Honor.  Can I

4     just look at it?

5          MR. MITCHELL:  The one I just gave you.

6          MR. GREENBERG:  Could I see your Honor at

7     sidebar, as it relates to a variety --

8          THE COURT:  Okay.

9          (At sidebar on the record.)

10          MR. GREENBERG:  I just want to -- if this

11     document goes in, I intend to ask her about status of

12     lawsuits.  It talks about -- if -- they've gotten in the

13     fact that she has some conversation -- a record that

14     reflects a phone conversation.  If she wants to produce

15     this document, give me all of it.

16          MR. MITCHELL:  I won't publish it.  If you want

17     to redact --

18          MR. GREENBERG:  They want to go into this, let

19     her billing record come in, fine.  If the government

20     wants to open up the door, I -- we know what happened,

21     and the government does, too.

22          MR. MITCHELL:  I'm not sure what counsel is

23     referring to.

24          MR. GREENBERG:  In terms of civil litigation,

25     positions that were --

1          MR. MITCHELL:  If there is something that is

2     beyond what the Court has said is out of bounds, I'd be

3     happy to redact.  I won't publish it, I'm just going to

4     ask her what it says.  I'll direct her to a line.  It

5     reflects the fact that the conversation happened.

6          MR. GREENBERG:  They opened up the door, your

7     Honor.

8          THE COURT:  Yeah, but it's only admitted for the

9     purpose -- the evidentiary point of showing the record

10    of the conversation.

11         MR. MITCHELL:  That it happened.

12         THE COURT:  So I think only that portion should

13    be admitted.

14         MR. MITCHELL:  And I can --

15         MR. GREENBERG:  It talks about possible theft of

16    money.

17         THE COURT:  Yes.  Just telephone conference with

18    Daniel Carpenter.  I can redact the rest of it.

19         THE COURT:  Take everything else out.  It will

20    be telephone conference with Dan Carpenter, period.

21         MR. MITCHELL:  Okay.  And -- may I lead the

22    witness just so that we don't get out of bounds here?

23         THE COURT:  What do you want to ask her?

24         MR. MITCHELL:  Just ask her:  Does it say

25    telephone conference with Dan Carpenter?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1          MR. GREENBERG:  I prefer you not --

 2          MR. MITCHELL:  I just don't want to run afoul --

 3          THE COURT:  Yes, yes, yes.

 4          As long as you're here --

 5          MR. MITCHELL:  It's almost 1:00.

 6          THE COURT:  Is she just about finished?

 7          MR. MITCHELL:  We'll get her done by 1:00.  I

 8   mean, I have three witnesses outside.

 9          THE COURT:  When are you doing the Iantosca

10   deposition?

11          MR. MITCHELL:  We were going to do that next.

12   It's an AUSA reading it, so that can be bumped out to

13   Monday.

14          THE COURT:  How long will it take?

15          MR. GREENBERG:  Five minutes.

16          THE COURT:  It's like six pages.

17          Can we get that done, get her done and that

18   done?

19          MR. GREENBERG:  That would be great.

20          MR. MITCHELL:  Yeah.

21          (End of discussion at sidebar.)

22          MR. MITCHELL:  Your Honor, is Government's 230

23   admitted?

24          THE COURT:  Yes, subject to the discussion, yes.

25          (Exhibit 230 received into evidence.)
```

1          MR. MITCHELL:   Thank you.

2    BY MR. MITCHELL:

3    Q.   I'm not going to project it up there, just ask you

4    about a particular entry here, Ms. Adams.

5          Is there an entry on this document for the

6    purported conversation, as Mr. Greenberg described it,

7    with Dan Carpenter here?

8    A.   Yes.

9    Q.   Okay.  Does it say, "telephone conference with Dan

10   Carpenter"?

11   A.   It says, "Daniel Carpenter," but, yes.

12   Q.   And the date of that conversation?

13   A.   January 4, 2001.

14   Q.   Okay.  And that was an entry of the phone call you

15   had with Dan Carpenter you testified to earlier,

16   correct?

17   A.   Yes.

18   Q.   Do you remember -- do you remember when

19   Mr. Greenberg asked you whether Mr. Iantosca was a savvy

20   investor?

21   A.   Yes.

22   Q.   Is -- you've had -- how long have you known

23   Mr. Iantosca?

24   A.   I started representing him in maybe 1997 or so, but

25   I probably knew of him for a year or so more than that,

1    so maybe 1996.

2    Q.   You've had -- you testified earlier you've had

3    numerous conversations with him and worked with him on a

4    number of matters, correct?

5    A.   Yes.

6    Q.   Is English Mr. Iantosca's first language?

7    A.   No.

8    Q.   What is?

9    A.   Mr. Iantosca grew up in Italy.  Although he --

10         MR. GREENBERG:  Your Honor, could she just

11   answer the question, please?

12   BY MR. MITCHELL:

13   Q.   Is Italian --

14   A.   Italian is his first language.

15   Q.   When did Mr. Iantosca come to the United States?

16   A.   He came as a teenager.

17   Q.   Okay.  And did -- do you know Mr. Iantosca's

18   educational level?

19   A.   I know he did not graduate from high school.  I'm

20   not sure he finished junior high.

21   Q.   And Mr. Iantosca over time has made a lot of money;

22   is that correct?

23   A.   Mr. Iantosca has made a lot of money?  Yes.

24   Q.   And how, generally, has he made his money?

25   A.   The majority of his money would be in appreciation

PDF created with pdfFactory trial version www.pdffactory.com

1 of real estate, because he would buy it, you know, and

2 then sit on it -- the apartment complexes, some of them

3 he built, bought in the '70s, and then, you know, just

4 over time they appreciated in value.

5 Q. Okay.  And Mr. Greenberg asked you a couple of

6 questions about your offering your malpractice insurance

7 policy to Mr. Iantosca.

8 A. Yes.

9 Q. Could you tell us what prompted you to do that?

10   MR. GREENBERG:  Your Honor, I object.

11   THE COURT:  No, I think you opened it.

12 A. So am I to answer the question?

13 Q. Yes.

14 A. I don't really know exactly what prompted it.  I

15 wanted to do anything I could to help resolve the

16 situation, and I wanted Mr. Iantosca to know that if he

17 thought I did something wrong, that I had no objection,

18 we didn't have to get into a war about it.  If he wanted

19 to call my malpractice insurance company, if he wanted

20 to file a claim against me -- I did not believe that I

21 did anything wrong, but I certainly didn't want him to

22 think I was stopping him from pursuing a claim if he

23 thought he had one.

24 Q. Okay.  You didn't think you had done anything wrong?

25 A. I did not think I had done anything wrong.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Did he file any suit against you?

2    A.    He did not.

3    Q.    Mr. Greenberg asked you about your awareness of a

4    change Mr. Iantosca made from the three percent to the

5    six percent account in the first transaction.  Do you

6    remember those questions?

7    A.    I remember the questions, yes.

8    Q.    And how many transactions were involved that we went

9    over on direct?  Five or six, is that --

10   A.    Yeah, I think we went over about five or six of

11   them.

12   Q.    Okay.  Did he change his three percent selection to

13   six percent on any of the other accounts?

14   A.    I have no knowledge of him changing his selection on

15   anything except for that one that was brought to my

16   attention very late.

17           MR. MITCHELL:  If I can just have a moment to

18   look at a couple of documents, your Honor, try to make

19   it snappy.

20           (Discussion off the record.)

21   Q.    All right.  I'm going to project on the screen

22   Government's Exhibit 93.  Do you remember that document?

23   A.    Yes.

24   Q.    All right.  And that's the wire transfer form?

25   A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    All right.    Do you remember Mr. Greenberg's asking

2    you about the account number on those forms?

3    A.    Yes.

4    Q.    Okay.    And there were several of those forms that he

5    showed you?

6    A.    Yes.

7    Q.    Did any of those forms have more than one account

8    listed?

9    A.    No.

10   Q.    Do you remember Government's Exhibit 186?    Do you

11   remember that document, with the disbursements?

12   A.    This is one of those documents that I was told was

13   an exhibit, but I don't recall it, no.

14   Q.    Do you remember Mr. Greenberg asking you about

15   disbursements made to Mr. Iantosca from Benistar?

16   A.    Yes.    I remember there was December 6, 2000 that

17   said disbursed and there was money and he wanted me to

18   say that money had been disbursed to my client and all I

19   could really do is read the form.

20   Q.    Was all of Mr. Iantosca's money disbursed back to

21   him?

22          MR. GREENBERG:    Objection.

23          THE COURT:    Sustained.

24          MR. MITCHELL:    Can we do a really quick sidebar

25   on this, your Honor?    There is a basis.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              (At sidebar on the record.)

 2              MR. MITCHELL:  I'm sorry to grind this thing

 3    down so slowly, but Mr. Greenberg went through that

 4    document in detail, asking her a number of questions.

 5    She had never seen the document, but asking her a number

 6    of questions to show that disbursements had been made

 7    back to Mr. Iantosca, that millions of dollars had been

 8    sent back to him.  To me, that opens the door of the

 9    question --

10              THE COURT:  We already have it, is the short

11    answer.  We already have it to the extent that we need

12    it, and anymore gives it undue weight.

13              MR. MITCHELL:  All right, fair enough.  I'll

14    move on.

15              (End of discussion at sidebar.)

16              MR. MITCHELL:  Sorry for the delay, your Honor.

17    BY MR. MITCHELL:

18    Q.   I'm going to have you turn to Government's Exhibit

19    84.  84 A and B.

20    A.   Okay.

21    Q.   I'm going to actually skip that question.  I'm going

22    to ask you two general follow-up questions.

23              Do you remember questions about -- questions

24    about your knowledge of 1031 property exchanges?

25    A.   Yes.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   Could you tell us your understanding of -- based on
 2   what you know, what Mr. Greenberg inquired about --
 3   where the money is supposed to be returned to?
 4           MR. GREENBERG:  Objection.
 5           THE COURT:  Sustained.
 6           MR. MITCHELL:   Okay.
 7   BY MR. MITCHELL:
 8   Q.   Would you tell us what your understanding of how --
 9   what your understanding is as to how it's supposed to
10   work?
11           MR. GREENBERG:  Objection.
12           THE COURT:  Sustained.
13   BY MR. MITCHELL:
14   Q.   What is your understanding of how a 1031 exchange is
15   supposed to work?
16           MR. GREENBERG:  Objection.
17           THE COURT:  Sustained.
18   BY MR. MITCHELL:
19   Q.   Do you remember on cross-examination Mr. Greenberg
20   asked you:  Did you ask anybody whether -- why Paine
21   Webber was substituted for Merrill Lynch?  Do you
22   remember those questions?
23   A.   Yes.
24   Q.   And do you remember answering no?
25   A.   Yes.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And do you remember his asking you why not?

2    A.    Yes.

3    Q.    Why not?

4    A.    Why didn't I ask?

5    Q.    Why didn't you ask -- why didn't you ask anybody at

6    Benistar why Merrill Lynch -- why Paine Webber was

7    substituted for Merrill Lynch?

8              MR. GREENBERG:  Objection.

9              MR. MITCHELL:  Defendant's question, precisely.

10             THE COURT:  But I think it was answered.

11             MR. MITCHELL:  No, he cut off the witness.

12             THE COURT:  All right, go ahead.

13   A.    My statement at that time was, Why they change

14   banks?  So I did not think that it was a substantial

15   change that they had switched banks.  I mean, these are

16   months and months apart, businesses change who they do

17   their banking with.

18             MR. MITCHELL:  Okay.

19             That's all I have, your Honor.

20             MR. GREENBERG:  Thank you very much.

21             THE COURT:  Nothing?  All right.

22             Thank you, Ms. Adams, you can step down.

23             That brings us to 1:00, I think that's all we

24   can do today.  We made some progress.

25             Jurors, I hope you have a good weekend.  It's

PDF created with pdfFactory trial version www.pdffactory.com

1    going to be warm, I understand.

2        Turn off the switch as far as this case goes,

3    think of other things.  We'll flip the switch back on

4    Monday morning.  So give it no consideration over the

5    weekend whatsoever.  Please enjoy yourselves, and we'll

6    see you Monday.

7        We're in recess.

8        (Court adjourned at 1:00 p.m.)

9            - - - - - - - - - - - -

10                    CERTIFICATION

11        We certify that the foregoing is a correct

12    transcript of the record of proceedings in the

13    above-entitled matter to the best of our skill and

14    ability.

15

16

17    /s/Debra M. Joyce                    _____
      Debra M. Joyce, RMR, CRR            Date
18    Official Court Reporter

19

20

21

22    /s/Marcia G. Patrisso               _____
      Marcia G. Patrisso, RPR, CRR        Date
23    Official Court Reporter

24

25

PDF created with pdfFactory trial version www.pdffactory.com