UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
                                ) Criminal Action
v.                              ) No. 04-10029-GAO
                                )
DANIEL E. CARPENTER,            )
                                )
        Defendant.              )
                                )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY SIX
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, June 9, 2008
9:20 a.m.

Debra M. Joyce, RMR, CRR
Marcia G. Patrisso, RPR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

1  APPEARANCES:

2      OFFICE OF THE UNITED STATES ATTORNEY
       By: Jonathan F. Mitchell and Jack W. Pirozzolo,
3      Assistant U.S. Attorneys
       John Joseph Moakley Federal Courthouse
4      One Courthouse Way
       Boston, Massachusetts  02210
5      On Behalf of the Government

6      GREENBERG TRAURIG, LLP
       By: A. John Pappalardo, Esq. and
7      Gary R. Greenberg, Esq.
       One International Place
8      Boston, Massachusetts  02110
       On Behalf of the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

<u>Direct</u>   <u>Cross</u>   <u>Redirect</u>   <u>Recross</u>

Witnesses For the
 Government:

JOSEPH IANTOSCA (Testimony read in p. 5)

DAVID EATON

    By Mr. Mitchell       12                    44
    By Mr. Greenberg              28                    45

ALBERT BELLEMORE

    By Mr. Mitchell       47                    67
    By Mr. Greenberg       57

GARY STERN
    By Mr. Pirozzolo      74
    By Mr. Pappalardo            108


<u>E X H I B I T S</u>


| Exhibit No. | Description | Marked | Received |
|---|---|---|---|
| No. 24-27 | Bellemore Exchange Documents | | 21 |
| No. 28 | Bond | | 36 |
| No. 30 | Wire Transfer | | 43 |
| No. 32 | Notification of Received Funds 8/8/00 | | 27 |
| No. 145 | Standard Option Agreement between Benistar and Merrill Lynch | | 89 |
| No. 146 | Special Statement For Uncovered Option Writers | | 92 |
| No. 151 | Letter to Mr. Stern from Mr. Rasmussen dated 1/14/00 | | 122 |
| No. 227 | Money Making Option Strategies | | 81 |
| No. 255 | Letter to Mr. Carpenter from Mr. Rasmussen | | 119 |
| No. 417 | Activity report | | 137 |

PDF created with pdfFactory trial version www.pdffactory.com

1              (The following proceedings were held in open

2    court before the Honorable George A. O'Toole, Jr.,

3    United States District Judge, United States District

4    Court, District of Massachusetts, at the John J. Moakley

5    United States Courthouse, One Courthouse Way, Boston,

6    Massachusetts, on June 9, 2008.

7              The defendant, Daniel E. Carpenter, is present

8    with counsel.  Assistant U.S. Attorneys Jonathan F.

9    Mitchell and Jack W. Pirozzolo are present.)

10             THE COURT:  Good morning, jurors.

11             Good morning, counsel.

12             MR. MITCHELL:  Good morning, your Honor.

13             Your Honor, the United States calls Joseph

14   Iantosca.  Mr. Iantosca's prior testimony will be read

15   by Mark Balthazard.

16             THE COURT:  This, ladies and gentlemen, is

17   another instance, in the absence of a live witness, an

18   opportunity to present recorded testimony that was taken

19   on an earlier occasion.  So we'll take the same format

20   we did earlier.

21             MR. MITCHELL:  Thank you, your Honor.

22             Just for the record, Mr. Iantosca during his

23   prior testimony was sworn.

24             May the record reflect?

25             THE COURT:  Yes.

```
 1              (Testimony of Joseph Iantosca read as follows:)
 2   Q.   Good morning, Mr. Iantosca.  Would you tell us where
 3   you live?
 4   A.   You've got to talk a little louder, because I can't
 5   hear you.
 6   Q.   I'm sorry.  I'll come a little closer to the
 7   microphone.
 8              Could you tell the jury where you live?
 9   A.   I live at 40 LB Drive in Braintree, Mass.
10   Q.   How long have you lived there?
11   A.   About five years.
12   Q.   Where did you live before that?
13   A.   I lived in Braintree, Eliot Road, Braintree.
14   Q.   For how long?
15   A.   About 20 years.
16   Q.   Are you married?
17   A.   No, I'm divorced.
18   Q.   Do you have any children?
19   A.   Two.
20   Q.   Do you have any grandchildren?
21   A.   Three.
22   Q.   How old are they?
23   A.   The grandchildren are seven, five, and two.
24   Q.   Where are you from originally?
25   A.   Originally from Italy.
```

```
1    Q.   When did you come to the United States?

2    A.   In 1950.

3    Q.   How old were you at that time?

4    A.   About 17 years old, turned 18 as a matter of fact.

5    Q.   Okay.  When you arrived in 1950, what did you do?

6    A.   1950?

7    Q.   Is that when you got here, 1950?

8    A.   Yes.

9    Q.   What did you do when you got here?

10   A.   I was working on -- for Michael Upholstery.  I

11   worked for the upholstery company.

12   Q.   How long did you work for the upholstery company?

13   A.   About a year, year and a half.

14   Q.   What did you do after that?

15   A.   I worked in construction.

16   Q.   Was that here in Boston?

17   A.   Yes, in South Boston, then in Braintree, Mass. and

18   Brockton and South Shore area.

19   Q.   What kinds of construction work did you do?

20   A.   I was working -- I do the form for the concrete

21   forms, then I worked for a company to build houses, and

22   then after about two to three years, in '54 I started my

23   own business.

24   Q.   What kind of business did you start in '54?

25   A.   I started building a house.
```

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   You started building houses?

2  A.   Yes.

3  Q.   Where did you build houses?

4  A.   I built houses, started with Braintree, Quincy,

5  Brockton, the South Shore area, Randolph, so forth.

6  Q.   Did you have people working for you?

7  A.   Yes.

8  Q.   Okay.  How long did you build houses for?  How long

9  did you build houses?

10 A.   About 15, 20 years.

11 Q.   Do you know how many houses you built?

12 A.   About 11, 1,200, 1,300 houses, something like that.

13 Q.   What did you do after you got done building houses?

14 A.   Repeat, please.

15 Q.   I'm sorry.  You said you built houses for about 15

16 to 20 years?

17 A.   Yes.

18 Q.   When did you stop building houses?

19 A.   Well, I really don't stop; I've been doing other

20 commercial stuff.

21 Q.   So are you still building houses?

22 A.   Some of it, yeah.

23 Q.   Do you own any real estate?  Do you own any

24 properties?

25 A.   Yes.

1    Q.    Okay.   And do you manage those properties?

2    A.    Yes.

3    Q.    Do you have people helping you manage those

4    properties?

5    A.    Yes.

6    Q.    Have you ever done business with a company called

7    Benistar Exchange Trust Company?

8    A.    Yes.

9    Q.    Do you call them Benistar?

10   A.    Excuse me a minute.   You have to up the voice,

11   because I can't hear good.

12   Q.    My apologies.

13          Did you do business with a company called

14   Benistar?

15   A.    Yes.

16   Q.    When was that?

17   A.    The Benistar Company?

18   Q.    Yes.

19   A.    I don't remember the name, but it was through one of

20   the fellows that come in, and he come in asking me if we

21   can do some business together.

22   Q.    Okay.   Do you remember that fellow's name?

23   A.    No, I don't remember.

24   Q.    Does the name Martin Paley ring a bell?

25   A.    Who?

```
 1    Q.    Martin Paley?

 2    A.    Yes.

 3    Q.    Did you meet Martin Paley?

 4    A.    Yes.

 5    Q.    When did you meet Martin Paley?

 6    A.    If you ask me the date, I don't know.

 7    Q.    Does the year 2000 sound correct?

 8    A.    About a few years back, I don't remember.

 9    Q.    Where did you meet him?

10    A.    He came into my office.

11    Q.    Was anyone else there?

12    A.    No, I think it was Mr. Paley.  He was the only guy

13    when I met him.

14    Q.    Was anybody else in the room during the meeting?

15    A.    Not that I remember, no.

16    Q.    In your discussion with Mr. Paley, did you get any

17    help from an attorney?

18    A.    Can you repeat, please?

19    Q.    Are you represented -- do you know who Marjorie

20    Adams is?

21    A.    Yes.

22    Q.    Who is Marjorie Adams?

23    A.    She's my -- does a lot of my work.

24    Q.    Was she there during the meeting with Mr. Paley?

25    A.    I don't remember that.  I don't remember that.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Okay.  Did you hire Mr. Paley's company to do

2    something for you?

3    A.    I hired Mr. Paley?

4    Q.    Why did you meet with Mr. Paley?

5    A.    Why -- why I met with Mr. Paley?

6    Q.    Yeah.  Why did you meet with him?

7    A.    He come into my office.

8    Q.    What did you talk to him about?

9    A.    I didn't talk.  He talked to me.  Then he said he

10   had somebody over here and got a -- give the money and

11   his people can double the money from whatever we have

12   done.  That's all.

13   Q.    He talked about a company holding the money for you?

14   A.    If you don't -- let me say this.  If you don't

15   higher the voice, I can't understand.

16   Q.    I apologize.  I will get really close to the

17   microphone and be as loud as I can.

18           Did Mr. Paley talk to you about his company

19   holding money for you?

20   A.    Yes, yeah, they hold it very -- yeah.

21   Q.    And did you give them some money to hold eventually?

22   A.    Yes.

23   Q.    Do you remember when that was?

24   A.    I don't remember the date, but it happened a few

25   years back, yeah.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Was that in the year 2000?

2  A.   I haven't got any papers with me here now.

3  Q.   Did you sign any agreements?  Did you sign anything?

4  A.   I don't remember.

5  Q.   Let me show you a document, Mr. Iantosca.  Hold on

6  one sec.

7        I'm showing you what has been marked -- or what

8  has been admitted as Government's Exhibit 90.  Do you

9  see the yellow sticker in the corner there?

10  A.   Mm-hmm.

11  Q.   Number 90?

12  A.   Yes.

13  Q.   Do you see at the top it says, "Exchange Agreement"?

14  A.   Yes.

15  Q.   And I'll have you turn to the last page.

16        Do you recognize this document?

17  A.   I don't remember.  Yes, that's my signature.

18  Q.   Is that your signature right there?

19  A.   Yes.

20  Q.   Do you remember signing the document -- a document

21  like that?

22  A.   This is -- yes, this is my signature right here.

23  Q.   All right.  Thank you.

24        Do you remember how much money you gave

25  Benistar?

```
 1   A.   The amount, I don't remember; it must have been in
 2   the millions of dollars.
 3   Q.   The millions of dollars?
 4   A.   Yes.
 5           MR. MITCHELL:  That's it.
 6           THE COURT:  Does that complete the transcript?
 7           MR. MITCHELL:  It does.
 8           THE COURT:  Okay.
 9           MR. MITCHELL:  The United States calls David
10   Eaton.
11           DAVID EATON, having been duly sworn by the
12   Clerk, was examined and testified as follows:
13           THE CLERK:  State your name, spell your last
14   name for the record, keep your voice up, and speak into
15   the mic so everyone can hear you.
16           THE WITNESS:  My name is David Eaton, E-a-t-o-n.
17                       DIRECT EXAMINATION
18   BY MR. MITCHELL:
19   Q.   Good morning, Mr. Eaton.
20   A.   Good morning.
21   Q.   Sir, where do you live?
22   A.   Manchester, New Hampshire.
23   Q.   How long have you lived in Manchester?
24   A.   About 55 years.
25   Q.   Are you married, sir?
```

1    A.    I am.

2    Q.    How long have you been married?

3    A.    Over 30 years.

4    Q.    Do you have any children?

5    A.    I have three children.

6    Q.    Do you have any grandchildren?

7    A.    Not yet, about a month.

8    Q.    Okay.  Sir, what is your educational background?

9    A.    High school, and I attended three years of college.

10   Q.    What do you do for a living?

11   A.    I'm in the real estate asset management business.

12   Q.    And do you work for yourself?

13   A.    I own a company with my brother Donald called Eaton

14   Partners.

15   Q.    I'm sorry, I cut you off.

16   A.    Called Eaton Partners.

17   Q.    How long have you been working at Eaton Partners?

18   A.    We formed the company in 1994.

19   Q.    And where is your office located?

20   A.    814 Elm Street in Manchester, New Hampshire.

21   Q.    What types of services does Eaton Partners perform?

22   A.    We perform real estate management services for

23   third-party property owners, we provide advisory

24   services for clients looking to acquire real estate

25   assets, and we provide financing services as a

PDF created with pdfFactory trial version www.pdffactory.com

1  third-party broker, securing financing for those

2  acquisitions.

3  Q.   You mentioned a second category of services,

4  advisory services.  Would you tell us what kind of

5  advisory services you offer?

6  A.   Clients that would be looking to invest capital into

7  real estate assets, typically investment real estate.

8  We would help them locate the asset that they might be

9  acquiring.

10  Q.   Okay.  In the course of your work at Eaton Partners,

11  have you ever dealt with a company called Benistar

12  Property Exchange Trust Company?

13  A.   Yes.

14  Q.   When was that?

15  A.   In 2000 and 2001.

16  Q.   What was the purpose of your dealing with Benistar?

17  A.   We had a client who was disposing of a property and

18  they were looking to defer the taxation by entering into

19  a 1031 exchange and we were seeking a third-party

20  intermediary to assist in that transaction.

21  Q.   Okay.  A number of follow-up questions.

22      Who was the client?

23  A.   Bellemore Associates, I believe.

24  Q.   Was Bellemore Associates part of a larger company?

25  A.   The three principals own multiple companies.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Okay.  And who are the principals?

2    A.    Raymond Bellemore, Albert Bellemore, and Robert

3    Bellemore.

4    Q.    And are those gentlemen brothers?

5    A.    They were.

6    Q.    And was there a point person with Bellemore

7    Associates you dealt with in this?

8    A.    Yes, Albert Bellemore, Chuck Bellemore.

9    Q.    He goes by Chuck?

10    A.    He does.

11    Q.    How long has Bellemore Associates or any of their

12    principals been a client of yours?

13    A.    Probably about 25 years.

14    Q.    What kind of business is Bellemore Associates in?

15    A.    They're investors in real estate.

16    Q.    In any particular kind?

17    A.    Income producing of -- currently their -- it's a

18    single-purpose entity in that I believe the only asset

19    they own currently in that entity is an industrial

20    facility in Goffstown, New Hampshire.

21    Q.    What sorts of assistance or advice have you provided

22    the Bellemores over the years?

23    A.    We've done some brokerage transactions for them,

24    we've managed a number of real estate assets for them,

25    we've financed a bunch of properties, and we provided

PDF created with pdfFactory trial version www.pdffactory.com

1    general advisory services.

2    Q.   You mentioned you engaged Benistar for the purposes

3    of doing a 1031 exchange.  Was there a sale of property

4    involved in that exchange?

5    A.   Yes, there was, property located in Bedford, New

6    Hampshire, it was a raw piece of land that was sold.

7    Q.   Okay.  Did that -- did you have a name for that

8    property?

9    A.   It's located on Colby Court behind what would be

10   known in the Bellemore real estate as the South River

11   Road property.  I think the address was 43.

12   Q.   Okay.  And in whose name was it?  Was it in

13   Bellemore Associates' name?

14   A.   Correct, it was.

15   Q.   What sorts of services were you providing in

16   connection with that property?

17   A.   I believe we brokered the sale of the land and

18   was -- were assisting them with the acquisition of the

19   replacement property.

20   Q.   Okay.  How did you find out about Benistar?

21   A.   From two sources:  one was a gentleman who used to

22   work with me by the name of Joel Kahn, who is a real

23   estate broker who had used Benistar in the past; and the

24   second was I had seen some articles written by Martin

25   Paley relative to 1031 exchanges.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Okay.  And did you reach out to Benistar?

2  A.   I did.  Joel actually referred Paley to me.

3  Q.   Did you meet with Paley?

4  A.   I did.

5  Q.   When did you meet with him?

6  A.   I believe it was June of 2000.

7  Q.   Where did you meet with him?

8  A.   At my office on Elm Street.

9  Q.   In Manchester?

10 A.   Yes.

11 Q.   Was anyone else there?

12 A.   I believe my brother was there.

13 Q.   Okay.  How long did the meeting last?

14 A.   Approximately an hour.

15 Q.   Did he bring any materials with him?

16 A.   He did, brought some promotional materials, made a

17 presentation using those materials.

18 Q.   Okay.  And what, in general, did you discuss?

19      MR. GREENBERG:  Objection.  Could I see your

20 Honor one moment at sidebar?

21      THE COURT:  All right.

22      (At sidebar on the record.)

23      MR. GREENBERG:  Two things, your Honor.  One is

24 it relates to hearsay.  Second is this witness has

25 already testified in the civil action that he was not

1    the agent for Bellemore Associates in connection with

2    the property exchange.  So it would be no different,

3    even if Martin Paley said something to a cab driver --

4    you know, he's testified under oath that he was not the

5    agent, and I'm willing to show back in 2001.

6          So I don't know how any statement that Mr. Paley

7    may have made to this witness is, you know, is

8    attributable to Mr. Carpenter or even gets to

9    Mr. Bellemore.

10         MR. MITCHELL:  This is precisely the same

11   hearsay objection the defense made in the last trial.

12         The reason the representations of Paley and the

13   promotional materials are coming in through David Eaton

14   is because he can testify that he conveyed them to Chuck

15   Bellemore, and Chuck Bellemore acted on what he -- what

16   Mr. Eaton relayed to him in terms of written material

17   and the oral representations, and that's what he relied

18   on when he executed the agreements.

19         MR. GREENBERG:  It's not the same hearsay

20   objection as the last trial.  Last trial, I don't

21   believe anyone ever raised the issue that Mr. Eaton had

22   testified that he was not an agent for Bellemore

23   Associates in connection with the property exchange.

24         It was no different than if Mr. Paley said

25   something to any third party and somehow how it found

PDF created with pdfFactory trial version www.pdffactory.com

1    its way to Mr. Bellemore.

2         THE COURT:  No, I don't think the agency status

3    of this witness matters at all, actually.  It's what

4    Mr. Paley said that the government says can be

5    attributed to Carpenter, and that will be an issue for

6    the jury to decide.

7         The objection is overruled.

8         MR. GREENBERG:  Thank you.

9         (End of discussion at sidebar.)

10   BY MR. MITCHELL:

11   Q.   Okay.  I think the question was what, in general,

12   did you discuss with Mr. Paley at the meeting?

13   A.   I'm sorry?

14   Q.   What, in general, did you discuss with Mr. Paley at

15   this meeting?

16   A.   What, in general?

17   Q.   Yes.

18   A.   The 1031 exchange and the process, mechanics of it,

19   fees.

20   Q.   And did he go through the materials he brought with

21   him?

22   A.   He did, using his Power presentation.

23   Q.   And for the purposes of advising Chuck Bellemore,

24   what features of the 1031 property exchange were

25   important to you?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. GREENBERG:  Objection, your Honor.
 2              THE COURT:  Overruled.
 3    A.   The fact that the company is experienced, they had
 4    executed 1031 exchanges before, that they were
 5    competitive in their fee structure, and that they had,
 6    to me, a reputation from someone that I knew.
 7    Q.   Okay.  And why was that representation -- why was
 8    that reputation important?
 9    A.   It was important so that we knew that the money was
10    going to a place where the exchange could be
11    effectuated.
12    Q.   Was the security of the funds an important feature
13    of the 1031 exchange?
14              MR. GREENBERG:  Objection.
15              THE COURT:  Sustained.  Sustained.
16    BY MR. MITCHELL:
17    Q.   I'm going to have you take a look at the documents
18    in front of you, Exhibits 24 through 27.
19              Would you take a look at those?
20    A.   Do you want me to look at all of them?
21    Q.   Briefly take a quick look at them, and then I'll ask
22    you whether you recognize them.
23              (Pause.)
24    Q.   Okay.  Do you recognize those documents, Mr. Eaton?
25    A.   I do.
```

1   Q.   One by one, what's Exhibit 24?

2   A.   24 is titled, "Identifying 1031 Exchange

3   Opportunity."

4   Q.   Okay.  --

5   A.   I'm sorry, that's 25.  I'll get 24.

6        24 is "1031 Property Exchange and Overview."

7   Q.   Okay.  And 25 is "Identifying 1031 Exchange

8   Opportunity"?

9   A.   Correct.

10  Q.   26?

11  A.   "Frequently Asked Questions About 1031 Property

12  Exchange."

13  Q.   And 27.

14  A.   "These Are the ABCs of Tax-Deferred Exchanges."

15  Q.   Are these materials that Mr. Paley brought along

16  with him -- brought along with him at that meeting?

17  A.   That's correct.

18  Q.   And presented these to you?

19  A.   He did.

20       MR. MITCHELL:  At this time, your Honor, the

21  government would move to admit Government's 24 through

22  27.

23       THE COURT:  Okay.

24       (Exhibits 24 through 27 received in evidence.)

25  BY MR. MITCHELL:

 1  Q.   Let's take a quick look at these.

 2       Do you see Exhibit 24 up there on the screen?

 3  A.   Yes.

 4  Q.   Okay.  And did you go through this document with

 5  Mr. Paley?

 6  A.   I did.

 7  Q.   Moving right along.  25.

 8  A.   Yes.

 9  Q.   Did he go through that one with you?

10  A.   He did.

11  Q.   "Identifying a 1031 Exchange Opportunity"?

12  A.   It is.

13  Q.   Going to the next one.  "Frequently Asked Questions

14  About 1031 Property Exchange."   Did you go through that

15  one with him?

16  A.   I did.

17  Q.   Did he walk through these documents with you as he

18  was going -- as he had them in front of you?

19  A.   Yes, he did.

20  Q.   All right.  I'm going to have you take a look.  The

21  second page of that exhibit, "What will the intermediary

22  do with my money?"

23  A.   Yes, I see it.

24  Q.   Okay.  And as you were going through this, did you

25  note that it said, "escrow accounts are restricted to

PDF created with pdfFactory trial version www.pdffactory.com

1   paying out funds only for a subsequent closing or to

2   return funds to the original property owner"?

3   A.   I'm sure I read it.

4   Q.   In the course of your work in real estate, have you

5   been involved in transactions involving an escrow?

6           MR. GREENBERG:  Objection.

7           THE COURT:  Sustained.

8           MR. MITCHELL:  The question has been allowed

9   previously, your Honor.  It goes to materiality.

10          THE COURT:  No, sustained.

11          MR. MITCHELL:  All right.

12  BY MR. MITCHELL:

13  Q.   I'm going to direct your attention to Government's

14  27.  Is that something you went through with Martin

15  Paley?

16  A.   He used it as a reference document.

17  Q.   Okay.  At any point during the discussion, did

18  Martin Paley say your money could go anywhere else --

19          MR. GREENBERG:  Objection, your Honor.

20  BY MR. MITCHELL:

21  Q.   -- besides an escrow?

22          MR. GREENBERG:  Objection, your Honor.

23          THE COURT:  No, you may have that.

24  A.   I'm sorry, could you repeat that?

25  Q.   The question was:  At any point during the

| | |
|---|---|
| 1 | discussion, did Martin Paley tell you that your money |
| 2 | could go anywhere but in an escrow? |
| 3 | MR. GREENBERG:  Objection. |
| 4 | THE COURT:  Overruled. |
| 5 | A.    No. |
| 6 | Q.    Did Martin Paley tell you anything different from |
| 7 | what was set forth in these documents? |
| 8 | A.    Not that I recall. |
| 9 | Q.    Did you ever speak to somebody named Dan Carpenter? |
| 10 | A.    No. |
| 11 | Q.    Did you ever discuss a bond with Martin Paley? |
| 12 | A.    I'm sorry? |
| 13 | Q.    Did you discuss -- did the subject of whether |
| 14 | Benistar was bonded come up in the process? |
| 15 | A.    Yes, did. |
| 16 | Q.    What did Martin Paley tell you about that? |
| 17 | A.    Told us the company was bonded, I believe, in the |
| 18 | amount of $15 million. |
| 19 | Q.    Did you shop any other intermediaries? |
| 20 | A.    I did.  I contacted, I believe, two or possibly |
| 21 | three. |
| 22 | Q.    Okay.  And did Chuck Bellemore ultimately go with |
| 23 | Benistar? |
| 24 | A.    He did. |
| 25 | Q.    Did you convey what Marty Paley had presented to you |

PDF created with pdfFactory trial version www.pdffactory.com

1    to Chuck Bellemore?

2    A.    I discussed the information in the presentation with

3    Chuck.

4    Q.    And -- okay.

5          Was that before he decided to go with Benistar?

6    A.    Yes.

7    Q.    Okay.  Did you receive any other documents from

8    Benistar?

9    A.    There was a contract and a notification of receipt

10   of funds at the time that the funds were transferred

11   upon the sale of the Bedford property.

12   Q.    Did you receive any agreements at all, anything

13   called an Exchange Agreement or an Escrow Agreement?

14   A.    That's the contract I'm speaking of.

15   Q.    Okay.  Did you forward those on to Chuck?

16   A.    I received them and forwarded them on to his

17   attorney.  I'm not sure I copied him at that point, but

18   I could have.  They definitely went to his attorney.

19   Q.    After you forwarded those documents on, did you

20   continue to assist Chuck Bellemore in the transaction?

21   A.    I did.

22   Q.    What did you help him with?

23   A.    Well, the transaction involved the acquisition of

24   that industrial property that I spoke of and we

25   monitored that through the process of completing it.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   And at the point we knew that the transaction or the

 2   acquisition was going to go through, we started to

 3   contact Benistar to request the funds.

 4   Q.   Okay.  And are you aware of whether Benistar was

 5   notified of the identity of the replacement property?

 6   A.   I believe they were.

 7   Q.   Did the sale of the Colby Court property go through?

 8   A.   It did.

 9   Q.   And did Mr. Bellemore send money to Benistar?

10   A.   They did.

11   Q.   I'm sorry, the proceeds of that sale to Benistar?

12   A.   I'm sorry?

13   Q.   Did he send the proceeds of the sale of that

14   property to Benistar?

15        MR. GREENBERG:  Actually, objection to the form

16   of the question.

17        THE COURT:  Overruled.

18   A.   Yes, we sent the proceeds of the sale to Benistar.

19   Q.   How much did you send Benistar?

20   A.   I believe it was $450,000, thereabouts.

21   Q.   And do you recall by what means it was sent?

22   A.   I believe they were wired.

23   Q.   I'm going to have you turn to another exhibit in

24   front of you, Exhibit 32, if you will take a look at

25   that?
```

```
 1   A.   I don't have exhibit 32.

 2   Q.   Oh, you don't?

 3        MR. MITCHELL:  If I could have a moment, your

 4   Honor?

 5        (Pause.)

 6        MR. MITCHELL:  May I approach, your Honor?

 7        THE COURT:  You may.

 8   BY MR. MITCHELL:

 9   Q.   Do you recognize Exhibit 32?

10   A.   I do.

11   Q.   What is it?

12   A.   It's a notification from Benistar that they had

13   received the funds totalling $444,659.65.

14   Q.   Okay.  What's the date on it?

15   A.   August 18, 2000.

16   Q.   Okay.

17        MR. MITCHELL:  At this time, your Honor, the

18   government would offer Government's Exhibit 32.

19        THE COURT:  All right.

20        (Exhibit 32 received into evidence.)

21        MR. GREENBERG:  No objection.

22   BY MR. MITCHELL:

23   Q.   Do you see that up on the screen?

24   A.   I do.

25   Q.   Okay.  You mentioned there was an acknowledgment and
```

1  receipt.  Is that the acknowledgement right there and

2  magnified on the screen?

3  A.   Correct.

4  Q.   And the funds -- it says the funds are accruing at

5  six percent.  Are you aware of whether Mr. Bellemore

6  selected six percent as the account, the escrow account

7  into which his money would go?

8  A.   He did.

9  Q.   Mr. Eaton, if you were told that the money that

10  Eaton gave to Benistar would be traded in stock options,

11  would you have advised him --

12          MR. GREENBERG:  Objection.

13          THE COURT:  Sustained.

14          MR. MITCHELL:  Okay.  Your Honor, that's all I

15  have of this witness.

16                    CROSS-EXAMINATION

17  BY MR. GREENBERG:

18  Q.   Good morning, Mr. Eaton.  My name is Gary Greenberg.

19  I represent -- with Mr. Pappalardo, we represent

20  Mr. Carpenter.

21          I think you just testified, I want to be sure,

22  that you never met or spoke with Daniel Carpenter; is

23  that correct?

24  A.   I have never spoken to him or met him.

25  Q.   Okay.  And is it accurate that, therefore, that

PDF created with pdfFactory trial version www.pdffactory.com

1    nothing that Dan Carpenter ever said to you influenced

2    Mr. Bellemore's decision to use Benistar?

3    A.    We never spoke with him.

4    Q.    Okay.    Is it also accurate that you have no idea

5    what was in Dan Carpenter's mind at the time the

6    exchange documents were signed with the Bellemore

7    entity?

8          MR. MITCHELL:    Objection, he said he's never met

9    him.

10          THE COURT:    Sustained.

11   BY MR. GREENBERG:

12   Q.    Is it correct you never reached out to Mr. Carpenter

13   to ask him any information with respect to this

14   transaction or any of the documents?    Is that correct?

15   A.    I never reached out to Mr. Carpenter.

16   Q.    And to the best of your knowledge, is it also

17   correct that no one from Bellemore ever had any

18   communication with Dan Carpenter at any time through and

19   including the time that the agreements -- the exchange

20   agreements were signed?

21          MR. MITCHELL:    There's -- to the extent that he

22   knows.

23   BY MR. GREENBERG:

24   Q.    To the extent that you know, is it correct, sir,

25   that, to the best of your knowledge, Mr. Bellemore --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   none of the Bellemores ever reached -- ever spoke with
 2   Mr. Carpenter, either in writing or orally, up through
 3   the date in which the exchange documents were signed?
 4   A.   To the best of my knowledge, no.
 5   Q.   The exchange documents, I think you said, were
 6   signed by Mr. Bellemore in New Hampshire, is that right,
 7   in August of 2000?  In August of 2000; is that right?
 8   A.   I presume.  I wasn't there when he signed them.
 9   Q.   Is it your understanding that no one from Benistar
10   was present when Mr. Bellemore signed the documents?
11   A.   It is my understanding.
12   Q.   Okay.  And if we could -- can we just look -- if we
13   can pull up Exhibits 24 -- you see that's -- you see
14   Mr. Paley's --
15           MR. GREENBERG:  Your Honor, could your Honor
16   turn on --
17           Thank you.
18   Q.   That's Mr. Paley's contact information down at the
19   bottom, is that right, his address, his telephone
20   number, and his e-mail address?
21   A.   I don't know if it's Paley.  It's Benistar.  It
22   says, "Benistar Property Exchange Trust Company, Inc."
23   Q.   You see, Mr. M. Paley, is it, gis.net?
24   A.   It's a website and e-mail address, right.
25   Q.   Actually, you mentioned before that Joel Kahn
```

1    recommended Mr. Paley to you; is that right?

2    A.    That's correct.

3    Q.    And Mr. Kahn was a former employee of yours?

4    A.    He was.

5    Q.    And do you know whether Mr. Kahn had had dealings

6    with Mr. Paley when Mr. Paley was affiliated with a

7    company known as Nationwide?

8    A.    I do not know that.

9    Q.    Did Mr. Kahn tell you that he had engaged in

10   successful 1031 exchanges with Mr. Paley in the past?

11   A.    He had.

12   Q.    Did he indicate the magnitude -- the number of

13   exchanges that Mr. Paley had successfully completed in

14   the past?

15   A.    I would say it was more than one.

16   Q.    Did you get the sense, the impression, from what

17   Mr. Kahn told you that Mr. Paley was -- had significant

18   experience and expertise in 1031 exchanges?

19   A.    I don't know if he had significant experience, he

20   had successfully executed more than one exchange with

21   Mr. Kahn.

22   Q.    Now, if we can just go, actually, to the --

23            MR. GREENBERG:   Exhibits 24, 25, can we just put

24   on the screen, Gerard?

25   A.    25?

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Yes.  I just want to go through very quickly 24, 25,

2  26.

3         Those are documents Mr. Paley gave you at the

4  meeting, right?

5  A.   That's correct.

6  Q.   And again, would you agree that Mr. Carpenter's name

7  is nowhere on any of those documents?

8  A.   It's the same, Benistar Property Exchange Company,

9  same website, same address, same phone number, same

10  e-mail.

11  Q.   The article.

12         MR. GREENBERG:  Can you just put 27 on the

13  screen for a moment.

14  Q.   This article in the New England Real Estate Journal,

15  you said Mr. Paley gave you that.  Actually, it

16  identified him as the president of Benistar Properties

17  located in Newton, Massachusetts?  Do you see that in

18  the right-hand corner?

19  A.   Yes, I do.

20  Q.   Was that consistent with what Mr. Paley told you at

21  your meeting?

22  A.   It was.

23  Q.   Okay.  And can you just put back on the screen --

24  and it referred to -- this was New England's largest

25  publication of its kind in the nation?  Do you see that,

1    the tag line?

2    A.   It's not what it says.   It says, "Reprinted by New

3    England Real Estate."

4    Q.   I'm sorry.   Does it say, "The largest business

5    publication of its kind in the nation" in describing the

6    New England --

7    A.   Oh, I see it at the top.   Yes, it does say that.

8    Q.   So is it accurate to state that as a result of your

9    meeting with Mr. Paley and these articles and what

10   Mr. Kahn had told you, that you believed that Mr. Paley

11   had significant experience and expertise in 1031

12   exchanges?

13   A.   There was significant information relative to what

14   Mr. Paley left with me and by Mr. Kahn's recommendation

15   that Mr. Paley was in the business and had successfully

16   completed some exchanges.

17   Q.   Now, when you had this meeting with Mr. Paley, you

18   were not acting as Mr. Bellemore's agent, were you?

19   A.   No.

20   Q.   You weren't.

21        And you had this single meeting with Mr. Paley

22   at your office, one meeting.

23   A.   That's correct.   I may have met Mr. Paley prior to

24   that, but relative to this transaction, we only had one

25   meeting, that's correct.

```
 1    Q.   Do you have a recollection of having met Mr. Paley
 2    at some point prior to this transaction?
 3    A.   He had a membership in the New England Commercial
 4    Investment -- called CCIM Group.  I may have met him at
 5    a meeting.  I don't have a vivid recollection of it, by
 6    any means.
 7    Q.   What is the CCIM Group?
 8    A.   It's a group of real estate professionals that carry
 9    a national designation.
10    Q.   When you say, "carry a national designation," of
11    what?
12    A.   CCIM, Certified Commercial Investment Member.
13    Q.   And in order to carry that designation, is there
14    some process one has to go through?
15    A.   Yes.
16    Q.   What is the process?
17    A.   It's about 200 hours of education, followed by a
18    national exam, presentation of your knowledge in a
19    resumé.
20    Q.   And is it your understanding that Mr. Paley was a
21    member?
22    A.   He was a member of the organization.  He had not
23    received the designation at that time.
24    Q.   Didn't --
25    A.   He used it as a networking group.
```

1  Q.   Now, were you -- did you have some basic familiarity

2  with 1031 requirements at this time?

3  A.   Very basic.

4  Q.   Did you know -- at the time you met with Mr. Paley,

5  did you know that the Bellemores would need to transfer

6  the money, cause the money to be transferred to an

7  intermediary, in other words, Benistar?

8  A.   That was the purpose of hiring them.

9  Q.   And did you know at the time that the money needed

10  to be -- must be in the intermediary's name, in other

11  words, in Benistar's name?

12  A.   Correct.

13  Q.   And did you know under the -- that at the time that

14  under the Internal Revenue Service Code there were no

15  restrictions on how an intermediary, such as Benistar,

16  could hold or invest the money from an exchange?

17  A.   No, I did not.

18  Q.   You didn't know that at that time?

19  A.   I did not.

20  Q.   You mentioned before that Mr. Bellemore had counsel

21  that advised him in connection with this transaction?

22  A.   Legal counsel, yes.

23  Q.   And what was -- was it a woman, sir?

24  A.   It was.

25  Q.   Was it a New Hampshire attorney?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    It was.

2    Q.    And what was the attorney's name?

3    A.    Perrault, Laurie Perrault.

4    Q.    Do you know whether she was an experienced attorney?

5    A.    I presume so.

6    Q.    Had she represented Mr. Bellemore, to your

7    knowledge, in the past?

8    A.    Many years.

9    Q.    For many years?

10          And --

11          Were you aware, sir, that under the -- strike

12    that.

13          MR. GREENBERG:  Could you put up on the

14    screen -- actually, Exhibit 28, I don't know if it's

15    been introduced as a trial exhibit.

16          If it hasn't, we would ask that it be

17    introduced.  It's the bond.

18          MR. MITCHELL:  We have no objection.

19          THE COURT:  All right.  28 will be admitted.

20          (Exhibit 28 received into evidence.)

21          MR. GREENBERG:  Thank you.

22          Will you just put that on the screen?

23    BY MR. GREENBERG:

24    Q.   Now, you mentioned in direct examination that

25    Mr. Paley made reference to a bond that a bonding

PDF created with pdfFactory trial version www.pdffactory.com

1   company had issued on behalf of Benistar?

2   A.   I believe what happened was I inquired whether there

3   was a bond, and he answered in the affirmative.

4   Q.   And you were -- and either you or someone on behalf

5   of Mr. Bellemore was provided a copy of the bond?

6   A.   I don't believe I was ever provided a copy of the

7   bond.

8   Q.   Well, let me show you what the government had

9   identified as Exhibit 28 as part of the Bellemore

10  documents here.

11       Do you recognize this bond?

12  A.   No.

13  Q.   You haven't -- you have personally not seen this

14  bond?

15  A.   I have not.

16  Q.   Okay.

17       MR. GREENBERG:  Could you take that off, then?

18       Could you put on the screen Exhibit 29, the

19  Exchange Agreement?

20       Could you go to the second page, please?

21       THE COURT:  I'm not sure this is in evidence,

22  either.

23       MR. MITCHELL:  It is in evidence, your Honor.

24       THE CLERK:  It is, through Linda Jokinen.

25       THE COURT:  Oh, okay.

PDF created with pdfFactory trial version www.pdffactory.com

1           MR. GREENBERG:   This is 29 A, B, and C.

2    BY MR. GREENBERG:

3    Q.   Mr. Eaton, this is the Exchange Agreement; is that

4    correct?

5    A.   That's what it's titled.

6    Q.   And this is the Exchange Agreement between Bellemore

7    and Benistar; is that right?

8    A.   Yes, that's correct.

9    Q.   Okay.  Can we first go to -- and you received a copy

10   of this from Benistar; is that right?

11   A.   Yes, I did.

12   Q.   And I think you testified you either -- and you

13   forwarded it on to Mr. Bellemore's attorney?

14   A.   That's correct.

15   Q.   And you're not sure, you may have also sent it to

16   Mr. Bellemore himself?

17   A.   I may have done it at the same time.

18   Q.   And did you -- was the reason you forwarded it to

19   Mr. Bellemore's attorney based on your expectation that

20   the attorney was going to review it and advise

21   Mr. Bellemore with respect to this transaction?

22   A.   It was my anticipation that she would review it as a

23   contract.

24   Q.   And can we just --

25           MR. GREENBERG:   If you could put up paragraph

1    number 10, Gerard.  That page and onto the next page.

2    Q.   And do you see in paragraph 10 there's a reference

3    to the proceeds of the exchange being held and invested

4    with Merrill Lynch?  Do you see that, sir?  Do you see

5    the word, "invested"?

6    A.   I do, held and invested, yeah.

7    Q.   And also it talks about it's going to be -- "said

8    investment account shall be in the name of the

9    intermediary."  Do you see that, in paragraph 10?

10   A.   I do.

11   Q.   And did you understand the intermediary, that meant

12   Benistar?

13   A.   Yes, I imagine it's defined in the contract.

14   Q.   Okay.  So that your understanding was that the

15   proceeds would be held and invested by -- in the name of

16   Benistar; is that right?  Just yes or no.

17   A.   No.

18   Q.   That's not your --

19   A.   That was not my --

20   Q.   That wasn't your understanding?

21   A.   Right.

22   Q.   Okay.  Well, was it your understanding that the

23   funds would be -- strike that.

24        That was not your understanding.  That's your

25   testimony -- I'll withdraw it.

PDF created with pdfFactory trial version www.pdffactory.com

1          Did you read this document before you sent it on

2    to Mr. Bellemore's attorney?

3    A.   I'm sure I did.

4    Q.   Did you read it closely or did you just skim through

5    it?

6    A.   I would think I skimmed through it.

7    Q.   Did you advise Mr. Bellemore as to whether or not he

8    should sign the agreement?

9    A.   I don't think I specifically advised him either way.

10   I think I stated that the merits of the transaction were

11   it was a competitive price in a known intermediary,

12   competitive fee.

13   Q.   So you told him he should proceed with the

14   transaction based upon the pricing?

15   A.   I told him that I had met with Mr. Paley, listened

16   to his representations, had checked him out with someone

17   who had completed a 1031 exchange -- one or more with

18   him, and that I had shopped his fee structure against

19   other intermediaries and that it was a

20   competitive-priced service.

21   Q.   Okay.  Could you go to paragraph 16?

22          When you -- this paragraph, where it cites that

23   the intermediary has advised exchangor to seek

24   independent tax and legal advice both as to the income

25   tax consequences of the exchange as contemplated by

1  exchangor and as to the legal effect of their agreement,
2  do you see that?
3  A.   I do.
4  Q.   Is it your understanding that Mr. Bellemore sought
5  advice from a lawyer as to the legal effect of this
6  agreement?
7  A.   I don't know what Mr. Bellemore did.  I know that I
8  forwarded the documents to his attorney, and I'm sure he
9  had conversations with his attorney.
10  Q.   Again, was the purpose of your forwarding the
11  document to Mr. Bellemore's attorney so that he could
12  get advice as to the legal effect of this agreement?
13  A.   The purpose was that it was a legal document and I
14  wanted an attorney to review a legal document before any
15  of my clients enter into -- sign them.
16       MR. GREENBERG:  Can we go -- put on the screen
17  Exhibit 29 B, the Escrow Agreement?
18       If you could highlight the second whereas
19  clause.
20  Q.   And do you see there, sir, that it indicates that
21  the exchangor will be depositing with Benistar an amount
22  to be deposited in Benistar's accounts at Merrill Lynch?
23  Do you see that?
24  A.   I do.
25  Q.   And you read that at the time you -- at or about the

PDF created with pdfFactory trial version www.pdffactory.com

1    time you forwarded the agreements to Mr. Bellemore's

2    attorney?

3    A.   I'm sure I did.

4    Q.   Is that right?

5    A.   Yes.

6    Q.   Okay.

7         MR. GREENBERG:  Could we go to paragraph 2,

8    Gerard, please?

9    Q.   And do you see in paragraph 2 it says, "Benistar

10   shall have full control over the exchangor's funds to

11   invest"?  Do you see that?

12   A.   I do.

13   Q.   And that's consistent with your understanding at the

14   time; is that correct, sir?

15   A.   I think my understanding --

16   Q.   Just yes or no.  Was that consistent with your

17   understanding, that Benistar shall have full control

18   over the funds?

19   A.   Yes.

20   Q.   Okay.

21        MR. GREENBERG:  If you could go to Exhibit

22   Number 30, the wire transfer.

23        I'm sorry, 30.  Is that 30?

24        MR. MITCHELL:  The government has no objection.

25   It's not in evidence, but the government has no

PDF created with pdfFactory trial version www.pdffactory.com

 1    objection.

 2            THE COURT:  Okay.

 3            MR. GREENBERG:  Thank you.

 4            (Exhibit 30 received into evidence.)

 5            MR. GREENBERG:  The second page.

 6            Gerard, can you do the second page?

 7            Thank you.

 8    Q.   Not a great copy.

 9            Does this appear to be, sir, evidence of the

10    wire transfer notice that was given to Mr. Bellemore?

11    A.   I'm sorry, I have no idea what this is.

12    Q.   Well, let me just ask you, the reference --

13    A.   First time I've ever seen it.

14    Q.   Do you see the word "beneficiary"?

15    A.   I see it a couple times, yes.

16    Q.   Sir, does this document identify specifically the

17    name of the account in which Benistar was holding the

18    money as well as the account number?

19    A.   I've never seen this document before.  I don't know

20    if this is an -- if this references this case or not.

21    I'm sorry, I just have never seen it before.

22    Q.   Well, when you said you never saw this, this is a

23    copy of a document that was sent to counsel in New

24    Hampshire, Mr. McKenney?

25            MR. MITCHELL:  Objection, your Honor.  The

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   witness has already established that he has no personal
 2   knowledge of this document.  If Mr. Greenberg would like
 3   him to read, he's proved that he's literate and can
 4   read, if that's what defense counsel would like to do.
 5          MR. GREENBERG:  You can take that off.
 6   BY MR. GREENBERG:
 7   Q.  You said before that you knew that Benistar would
 8   have full control over these funds during the period
 9   that they were holding them, correct?  Is that correct?
10   A.  Correct.
11   Q.  And you knew that that was the requirement under the
12   Internal Revenue Service Code?
13   A.  Correct.
14          MR. GREENBERG:  Thank you, Mr. Eaton.
15          MR. MITCHELL:  Just a quick follow-up, your
16   Honor.
17                 REDIRECT EXAMINATION
18   BY MR. MITCHELL:
19   Q.  Mr. Eaton, do you recall Mr. Greenberg's asking you
20   about your understanding, quote, your understanding was
21   that money would be held and invested in the name of
22   Benistar.  And your answer was no?
23          Mr. Eaton, what was your understanding as to
24   what Benistar would do with your client's escrow funds?
25          MR. GREENBERG:  Objection.
```

```
 1              THE COURT:  Overruled.
 2   A.   We thought they were being held in -- I thought they
 3   were being held in an escrow account for the benefit of
 4   the 1031 exchange transaction, and recognized that they
 5   had to be held by Benistar because they had to be out of
 6   the Bellemores' control.
 7              MR. MITCHELL:  That's all I have, your Honor.
 8              MR. GREENBERG:  Just a couple quick questions.
 9                   RECROSS-EXAMINATION
10   BY MR. GREENBERG:
11   Q.   You knew the money was going to be in an investment
12   account, right?
13   A.   I presumed it would be an investment account in
14   order to pay interest on it.
15   Q.   And you knew that the money, under the agreement,
16   under Exhibit 29 A and 29 B, it was going to be invested
17   by Benistar, the intermediary, right?
18   A.   I guess, yes.
19              MR. GREENBERG:  And if you could just pull up 29
20   A for one moment.  Just go to the integration clause,
21   which I think is paragraph 20.
22              Thanks, Gerard.
23   Q.   And you knew that there was a provision in this
24   agreement that indicated that this agreement contained
25   the entire agreement of the parties and superseded any
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    prior written or oral agreements concerning the subject
 2    matter?  You knew that was contained in the agreement?
 3    A.   Reading it now, I see that it is contained in the
 4    agreement, yes.
 5    Q.   And you see that it says there are no
 6    representations, agreements, arrangements or
 7    understandings, oral or written, between the parties --
 8            MR. GREENBERG:  Can you just go through the rest
 9    of that, Gerard?
10    Q.   -- that's relating to the subject matter contained
11    in this agreement, which are not fully expressed herein.
12    It's pretty clear, isn't it?
13            MR. MITCHELL:  That's argumentative and also
14    states a legal conclusion.
15            THE COURT:  Sustained as to the last part.
16            MR. GREENBERG:  I have nothing further.
17            THE COURT:  Thank you, Mr. Eaton.  You may step
18    down.
19            MR. MITCHELL:  Your Honor, the United States
20    calls Chuck Bellemore.
21            ALBERT BELLEMORE, having been duly sworn by the
22    Clerk, was examined and testified as follows:
23            THE CLERK:  Please be seated.  State your name
24    and spell your last name for the record.
25            THE WITNESS:  Albert Bellemore, last name is
```

1   B-e-l-l-e-m-o-r-e.

2                          DIRECT EXAMINATION

3   BY MR. MITCHELL:

4   Q.   Good morning, Mr. Bellemore.

5   A.   Good morning.

6   Q.   Sir, could you tell us where you live?

7   A.   I live at 57 Glenwood, Ave., Manchester, New

8   Hampshire.

9   Q.   And how long have you lived there?

10  A.   Since 1989.

11  Q.   And are you married, sir?

12  A.   I am.

13  Q.   How long have you been married?

14  A.   I've been married 25 years.

15  Q.   Do you have any children?

16  A.   I do.

17  Q.   How many children do you have?

18  A.   I have three.

19  Q.   And what are their ages?

20  A.   Twenty-three, 20, and 17.

21  Q.   Sir, what do you do for a living?

22  A.   I own a company called Bellemore Investment Group.

23  Q.   What kind of company is that?

24  A.   It's a real estate management company.

25  Q.   And what's sorts of properties does it manage?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    It manages office, industrial, residential.

2    Q.    Where are you based?

3    A.    Based in -- actually, my office is in Goffstown, New

4    Hampshire right now.

5    Q.    And where, in general, are the properties located?

6    A.    Generally, all the properties are located in New

7    Hampshire, in various towns.

8    Q.    Okay.  How long have you been in business?

9    A.    I've been in business with Bellemore Investment

10   Group since 1999.

11   Q.    Do you have partners?

12   A.    I do not.

13   Q.    So you own it by yourself?

14   A.    I own Bellemore Investment Group by myself, yes.

15   Q.    In the course of your work in the real estate

16   industry, have you dealt with a company called Benistar

17   Property Exchange Trust Company?

18   A.    I have.

19   Q.    When did you deal with Benistar?

20   A.    In the year 2000.

21   Q.    And did you hire Benistar to do something for you?

22   A.    Yes.

23   Q.    What was that?

24   A.    To act as a third-party intermediary for -- to

25   execute a 1031 exchange.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Okay.  And was that in connection with the sale of a

2  piece of property?

3  A.   Yes, it was.

4  Q.   And the purchase of another property?

5  A.   That's correct.

6  Q.   Where was the sale property located?

7  A.   Sale property was located on Colby Court in Bedford,

8  New Hampshire.

9  Q.   What kind of property was it?

10 A.   It was a piece of land.

11 Q.   Undeveloped land?

12 A.   That's correct.

13 Q.   How long had you owned it?

14 A.   It had been in the family for a number of years.  We

15 owned it, I think, since 1979 or '80, something like

16 that.

17 Q.   Do you remember how much you paid for it,

18 approximately?

19 A.   I do not recall.

20 Q.   Why were you selling it, sir?

21 A.   We were selling it because we secured a buyer to

22 build a -- build on it.  We were going to buy another

23 piece of property.

24 Q.   How big a piece of property was it?

25 A.   It was approximately -- approximately three acres.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   And how -- I'm sorry -- how much did you sell it
 2   for?
 3   A.   $490,000.
 4   Q.   Did you have anybody advising you in connection with
 5   1031 property exchange?
 6   A.   Yes.
 7   Q.   Who was that?
 8   A.   David Eaton.
 9   Q.   Had you worked with David Eaton before?
10   A.   I have.
11   Q.   In what capacity did you work with him, Dave?
12   A.   Dave has consulted with myself and my brothers on
13   buying and selling property, sort of helping us with
14   management, things like that.
15   Q.   Your brothers are also in the real estate business?
16   A.   My brothers and I are partners in a number of
17   different pieces of property.
18   Q.   Did you discuss with David Eaton the nature of a
19   1031 exchange?
20   A.   Yes.
21   Q.   How did you find out about Benistar?
22   A.   Benistar, actually, I found out through David Eaton.
23   We got a call, he had done some business with him.  My
24   accountant had recommended him because one of his
25   associates had called and had done some business with
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Benistar.

2    Q.    Okay.  Did you ever meet with anybody from Benistar?

3    A.    I did not.

4    Q.    Sir, what features of a 1031 property exchange, if

5    any, were important to you in connection with this

6    transaction?

7              MR. GREENBERG:  Objection.

8              THE COURT:  Overruled.

9    A.    The features are basically that it would help defer

10   taxes to help us purchase another piece of property,

11   that the agreements would basically allow us -- the

12   monies couldn't be transferred unless we have -- they

13   had written agreements from myself to allow them to do

14   that.

15   Q.    Okay.  Why was that last piece important to you?

16             MR. GREENBERG:  Objection, your Honor.

17             THE COURT:  Overruled.

18   A.    It's important because, you know, it was a lot of

19   money to us, and we wanted to make sure that the money

20   was put aside to execute the 1031 on a secondary piece

21   of property we were buying.

22   Q.    I'm going to have you look at a document in front of

23   you, you see it's the one in the folder.  It is marked

24   as Government's Exhibit 29, 29 A, 29 B, and 29 C, which

25   have already been admitted.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              Would you take a moment to look at those?
 2   A.   Okay.
 3            (Pause.)
 4   A.   Would you like me to look at all three at the same
 5   time?
 6   Q.   Yes, just take a moment to look through them.
 7            (Pause.)
 8   Q.   Okay.  Mr. Bellemore, do you recognize those
 9   documents?
10   A.   I do.
11   Q.   Can you briefly just tell us what they are, 29 A, B,
12   and C?
13   A.   The first one, 29, is basically a fax from my
14   attorney to Linda Jokinen from Benistar Property
15   Exchange, basically noting that the funds of
16   approximately $444,659.65 were wired into the account,
17   the net proceeds from the sale.
18   Q.   Okay.  The amount $444,659.65 is the amount that you
19   sent Benistar from the sale of the property?
20   A.   That's correct.
21   Q.   Just turn to the next document, Exchange Agreement.
22   A.   Okay.
23   Q.   Did you sign that agreement?
24   A.   I did.
25   Q.   Your signature is on the last page?
```

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    That's correct.

2    Q.    And did you have an attorney representing you in

3    connection with this?

4    A.    I did.

5    Q.    All right.  And what's her name?

6    A.    Laurie Perreault.

7    Q.    Did she provide you advice with respect to the

8    exchange?

9    A.    That's correct.

10   Q.    I'm going to go to the next one.  The next one is an

11   Escrow Agreement, correct?

12   A.    That's correct.

13   Q.    I'm going to magnify part of that for you.

14         If you take a look at paragraph 3.  Do you see

15   that right there?

16   A.    Yes.

17   Q.    Okay.  Does that paragraph discuss where the money

18   could be directed?

19   A.    It states that it could be directed into two areas.

20   Q.    Right.  Does it say, "directly into the exchangor's

21   account" -- you're the exchangor, correct?

22   A.    That's correct.

23   Q.    -- "or directly to the escrow account for the

24   closing on the replacement property to be purchased

25   pursuant to the Exchange Agreement."  Did I read that

PDF created with pdfFactory trial version www.pdffactory.com

1  correctly?

2  A.  Yes, you did, that's correct.

3  Q.  At any point did you direct Benistar to put your

4  money -- put your $444,000 and change to any other

5  place?

6          MR. GREENBERG:  Objection.

7          THE COURT:  Overruled.

8  A.  I did not.

9  Q.  Did you -- what was the replacement property?

10  A.  The replacement property was an industrial property

11  in Goffstown, New Hampshire, approximately about 90,000

12  square feet.

13  Q.  Okay.  And did you identify that property for

14  Benistar?

15  A.  Yes.

16  Q.  Did you -- you conveyed that directly to Benistar?

17  A.  I didn't directly, through David Eaton.

18  Q.  Okay.

19          I direct you to the final piece of this exhibit.

20          Do you recognize this document?

21  A.  I do.

22  Q.  Okay.  This is an account exchange form?

23  A.  That's correct.

24  Q.  Account Selection Form, excuse me.

25          You see I've magnified it on the screen?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Okay.

2    Q.    All right.  You selected the six percent Merrill

3    Lynch investment account instead of the Merrill Lynch

4    Ready Asset money market account.  Do you see that?

5    A.    I do.

6    Q.    Why would you choose the second of those two

7    accounts?

8    A.    Because the restriction on that account was 30 days,

9    and I knew that I could execute the exchange -- or live

10   within those terms.

11   Q.    Okay.  I'm just going to highlight one -- how far

12   out was your closing on the replacement property?

13   A.    From the time --

14   Q.    Approximately?

15   A.    It was approximately three months.

16   Q.    Okay.  Highlighting for you the statement right

17   below the check mark.  Can you read that to the jury?

18   A.    "The above account cannot be liquidated without 30

19   days' written notice, at which time the interest rate

20   will change to three percent until the account is

21   liquidated."

22   Q.    Did you receive confirmation -- strike that.

23         I show you one more exhibit.

24         MR. MITCHELL:  May I approach the witness?

25         THE COURT:  You may.

1   BY MR. MITCHELL:

2

3   Q.   Have you take a look at Government's Exhibit 35.

4   Do you recognize Government's Exhibit 35?

5        MR. GREENBERG:  Objection, your Honor.

6        THE COURT:  Well, he may answer that.

7   BY MR. MITCHELL:

8   Q.   Do you recognize Government's Exhibit 35?

9   A.   I do.

10  Q.   Is it a letter?

11  A.   Yes, it is.

12  Q.   And is that a letter you received?

13  A.   It is.

14  Q.   And the date, sir?

15  A.   January 17, 2001.

16  Q.   Okay.

17       MR. MITCHELL:  That's all I have on that

18  document.

19  Q.   Sir, do you know what stock options are?

20  A.   A have an idea.

21  Q.   Have you ever invested in stock options?

22       MR. GREENBERG:  Objection, objection.

23       THE COURT:  Overruled.

24  BY MR. MITCHELL:

25  Q.   Have you ever invested in stock options?

1    A.   I have not.

2         MR. MITCHELL:   In light of the Court's prior

3    ruling, that's all the questions I have.

4         (Discussion off the record.)

5                    CROSS-EXAMINATION

6    BY MR. GREENBERG:

7    Q.   Good morning, Mr. Bellemore.   My name is Gary

8    Greenberg, with Mr. Pappalardo, we represent

9    Mr. Carpenter in this matter.

10   A.   Good morning.

11   Q.   Good morning, sir.

12        Again, I just want to be certain that we all

13   understand.   You never spoke or met with Dan Carpenter

14   at any time prior to your signing the exchange

15   documents; is that right?

16   A.   That's correct.

17   Q.   And is it correct, sir, that, as far as you know,

18   nothing that Dan Carpenter ever did influenced your

19   decision to sign those documents?

20        MR. MITCHELL:   That's a vague question, your

21   Honor.   I'm not sure --

22        THE COURT:   Sustained to the form of the

23   question.

24   BY MR. GREENBERG:

25   Q.   Is it correct, sir, that you never reached out to

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Dan Carpenter at any point in time prior to signing the
 2   exchange documents?
 3   A.   That's correct.
 4   Q.   And you never asked Mr. Carpenter or anyone at
 5   Benistar to explain to you any of the language in any of
 6   the documents; is that right?
 7   A.   That's correct.
 8   Q.   And you have no idea what was in Dan Carpenter --
 9   how Mr. Carpenter or anyone from Benistar understood
10   what the language in those agreements meant, do you?
11           MR. MITCHELL:  Objection.
12           THE COURT:  Sustained.
13   BY MR. GREENBERG:
14   Q.   I think you said you never even spoke -- I'm sorry,
15   sir.  You never spoke with Martin Paley?
16   A.   I did not.
17   Q.   And you never spoke with anyone from Benistar; is
18   that correct?
19   A.   That's correct.
20   Q.   Now, sir, you signed the agreements in New
21   Hampshire; is that right, sir?
22   A.   Yes.
23   Q.   And no one from Benistar was present when you signed
24   the agreements, correct?
25   A.   That's correct.
```

1    Q.    And the monies that were referred to on direct

2    examination, those monies were sent by you from New

3    Hampshire to a Merrill Lynch account in Pennsylvania; is

4    that right?

5    A.    That's correct.

6    Q.    And, sir, to the best of your knowledge, is it

7    correct that Dan Carpenter's name is nowhere in any of

8    the promotional material or the agreements that you

9    signed?

10    A.    I don't recall seeing Dan Carpenter's name.

11    Q.    Prior to signing the exchange agreements, did you

12    have some basic familiarity with 1031 exchanges?

13    A.    That was the first 1031 exchange I had done, so I

14    didn't have -- earlier I didn't have a lot of knowledge.

15    However, I did -- through my accountant and through my

16    attorney got -- got to be updated a little bit on it.

17    Q.    So I just want to be sure I understand correctly,

18    sir.

19        You were advised by not only Mr. Eaton, but by

20    an attorney and an accountant before you signed the

21    exchange documents; is that correct, sir?

22    A.    That's correct.

23    Q.    And I think we got the name of your attorney, but

24    who was your accountant that advised you?

25    A.    Joseph Ciccarello from Gray, Gray & Gray.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.    How long had he represented you in an accounting

 2   capacity at that time?

 3   A.    Oh, since, I believe, 1988, '89 possibly.

 4   Q.    Was he a Certified Public Accountant?

 5   A.    Yes.

 6   Q.    Now, at the time you signed the Exchange Agreements,

 7   did you understand that you needed to transfer the money

 8   to an intermediary, such as Benistar?

 9   A.    Yes.

10   Q.    And did you also understand at that time that the

11   money needed to be in the intermediary, in Benistar's

12   name?

13   A.    Yes.

14   Q.    Okay.  And did you also understand that the

15   intermediary needed to have control over the funds?

16   A.    Yes.

17   Q.    Did you understand, sir, that for purposes of the

18   Internal Revenue Code, the IRS Code, that there was no

19   restrictions on how an intermediary, such as Benistar,

20   could hold or invest the funds?  In other words, that

21   the IRS had no limitations on investment vehicles during

22   the period that -- during the period the money was held

23   by the intermediary?

24          MR. MITCHELL:  He's asking the witness for a

25   legal opinion.  Objection on that grounds.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              THE COURT:  The objection is sustained.
 2    BY MR. GREENBERG:
 3    Q.   Exhibits 24, 25, 26, 27, that's the 1031 overview,
 4    the identifying a 1031 opportunity, the frequently --
 5    did you see any of that material, that promotional
 6    material?
 7    A.   I don't recall offhand at this point.
 8    Q.   Ever seeing it?
 9    A.   I don't recall.
10    Q.   How about Exhibit 28?
11              MR. GREENBERG:  Would you put that on the
12    screen?
13    Q.   Were you ever given a copy of this bond?
14    A.   It's hard to read, it's blurry.
15    Q.   Let me ask you this way.  Do you have a recollection
16    of ever having received a bond, a copy of a bond, or
17    binder evidencing a binder before you signed the
18    exchange documents?
19    A.   From Benistar?
20    Q.   Yeah -- from anyone -- from Benistar or someone who
21    gave you a copy of Benistar's bond?
22    A.   I believe David Eaton received a bond.
23    Q.   Okay.  And as far as you know, there's absolutely
24    nothing inaccurate about this bond, is there?  It's a
25    genuine --
```

1    A.    As far as I know.

2            MR. MITCHELL:  Objection.

3            THE COURT:  You may have that.

4            MR. GREENBERG:  If you could put 29 A on the

5    screen, the Exchange Agreement.

6    Q.    Again, before you signed this document, you had been

7    advised by a lawyer and accountant that it was okay to

8    sign, right?

9    A.    Yes.

10   Q.    In fact, you recall -- if you could look at

11   paragraph 16 -- that the agreement specifically stated

12   that the intermediary, Benistar, had advised you to seek

13   independent tax and legal advice both as to the income

14   tax consequences of the exchange as contemplated by

15   exchangor and as to the legal effect of this agreement.

16   Do you recall seeing that in the agreement?

17   A.    Yes.

18   Q.    And did you seek legal advice for purposes of

19   understanding the legal effect of this agreement?

20   A.    Yes.

21   Q.    And did you seek advice from your CPA so you could

22   understand the tax consequences?

23   A.    Yes.

24   Q.    Okay.  Thank you.

25           MR. GREENBERG:  Could we go back to paragraph

1    number 10 on this?  If you could just highlight that and

2    the next page.

3    Q.   Sir, when you signed the Exchange Agreement, you see

4    in paragraph 10 it makes a reference that the

5    relinquished property shall be held and invested with

6    Merrill Lynch?  Do you see that?

7    A.   Yes, I do.

8    Q.   And it talks about either a three percent Ready

9    Asset money market or a six percent Merrill Lynch

10   investment account.  And you chose the investment

11   account, right?

12   A.   Yes, I did.

13   Q.   And you also see that the investment account shall

14   be in the name of the intermediary and shall require the

15   signature of an authorized officer of the intermediary

16   to permit the withdrawal.  Do you see that?

17   A.   I do.

18   Q.   And is that consistent with your understanding that

19   the money was going to be held by Benistar in its name

20   and invested by Benistar in a Merrill Lynch investment

21   account?

22   A.   It was my understanding that it was going to be in a

23   Merrill Lynch six percent --

24   Q.   Investment account?

25   A.   Investment account.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   Okay, sure.

 2          MR. GREENBERG:  And if you could go to Exhibit

 3   29 B, that's the Escrow Agreement.

 4          And do you see just in the second "whereas,"

 5   there's a reference that the exchangor will be -- that's

 6   you, correct, you're the exchangor.

 7   A.   Right.

 8   Q.   -- will be depositing with Benistar an amount to be

 9   deposited in the Benistar accounts at Merrill Lynch.  Do

10   you see that?

11   A.   I do.

12   Q.   All right.  And you know that there were -- based on

13   this, you knew that there were multiple accounts at

14   Merrill Lynch, is that right, that Benistar had more

15   than one account?

16   A.   I'm not aware of that.

17   Q.   Okay.

18          MR. GREENBERG:  If you could go to paragraph 2.

19   Q.   And do you see where it says that "Benistar shall

20   have full control over the exchangor's funds to invest"?

21   Do you see that?

22   A.   I do.

23   Q.   And you read that at that time, sir?

24   A.   I did.

25   Q.   And as far as you know, your lawyers and your
```

1    accountant read that, right?

2    A.    Correct.

3    Q.    And you understood that Benistar would have full

4    control over the funds?

5    A.    There was some restrictions to the control.

6    Q.    Okay.

7         MR. GREENBERG:  If you could go to -- actually,

8    29 C, the Account Selection Form.

9    Q.    This is the account you selected; is that right?

10   A.    Yes, it is.

11   Q.    And you selected the Merrill Lynch investment

12   account?

13   A.    I -- that's correct.

14   Q.    And --

15        MR. GREENBERG:  You can take that off.

16   Q.    Mr. Bellemore, is it fair to say that Martin Paley

17   never made any promises or representations to you?

18        MR. MITCHELL:  Objection.  He already testified

19   he never met anybody from Benistar or spoke to them.

20        THE COURT:  The objection is sustained.

21   BY MR. GREENBERG:

22   Q.    And you knew, sir, the six percent investment

23   account, you knew, sir, that that was something other

24   than a money market account; is that right?  Is that

25   right, sir?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    And is it correct, sir, that you understood that you

3    would receive six percent from whatever it was that

4    Benistar was investing the money in; is that correct?

5    A.    Correct.

6    Q.    Sir, is it also correct that you never -- sir, in

7    all of the documents that you signed that you never read

8    anywhere any restrictions that were placed on Benistar's

9    money about what it could buy in this investment

10   account?

11   A.    The --

12   Q.    Is that correct, sir?

13   A.    Would you repeat the question, please?

14   Q.    Yeah, let me just get your prior --

15          Sir, did you ever read anywhere of any

16   restrictions that were placed on Benistar property about

17   what it could buy in this investment account?

18   A.    I'm not sure I understand the question, but --

19   Q.    If you don't understand, let me show you then --

20   A.    All right.

21   Q.    You were deposed -- you were involved in civil

22   litigation in which your deposition was taken?

23   A.    That's correct.

24   Q.    And that was taken back in October of 2001?

25   A.    Okay.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Is that right?  That's roughly -- a very short time

2  after this -- these events?

3  A.   Right.

4  Q.   And --

5       MR. GREENBERG:  Could I approach the witness?

6       THE COURT:  You may.

7  BY MR. GREENBERG:

8  Q.   This is a deposition on October 10, 2001, sir, at

9  page 172.  And starting at line 1, could you just -- if

10 you could just read the question and your answer, just

11 the question and answer, starting --

12 A.   Yes.

13       "Did you ever read anywhere of any restrictions

14 that were placed on Benistar about what it could buy in

15 this investment account?"

16 Q.   What was your answer?

17 A.   My answer was:  "No, I did not."

18 Q.   Thank you, sir.

19       MR. GREENBERG:  Thank you.  Thank you very much,

20 sir.

21       THE COURT:  Mr. Mitchell?

22       MR. MITCHELL:  Just a few follow-ups.

23                    REDIRECT EXAMINATION

24 BY MR. MITCHELL:

25 Q.   Mr. Greenberg asked you a moment ago, quote, you

1    knew that the six percent account was something other

2    than a money market account, close quote.

3         Did you know that money in that account would be

4    traded in stock options?

5         MR. GREENBERG:  Objection, your Honor.

6         THE COURT:  No, he may answer it.

7    A.   No.

8    Q.   Mr. Greenberg asked you a number of questions about

9    your team of advisers:  accountant, lawyer, and

10   Mr. Eaton, and whether they had reviewed, gone over the

11   documents with you.

12        Did any of these people tell you that this

13   wasn't a good idea?

14        MR. GREENBERG:  Objection.

15        THE COURT:  Sustained.

16   BY MR. MITCHELL:

17   Q.   Did any of these people advise against going

18   forward?

19        MR. GREENBERG:  Objection.

20        THE COURT:  Sustained.

21   BY MR. MITCHELL:

22   Q.   Mr. Greenberg asked you about your understanding of

23   certain provisions in the documents.  Mr. Bellemore,

24   what was your understanding as to what Benistar would do

25   with your escrowed funds?

1          MR. GREENBERG:  Objection.

2          THE COURT:  Overruled.

3   A.   It was my understanding it would be in a six percent

4   account and it would be there until we find another

5   piece of property to do the exchange with and that the

6   money could not be transferred unless I -- they had

7   written authorization from me or two places that the

8   money can go to would be either into my account or into

9   the -- or into the -- following through with the 1031

10  exchange to buy the piece of property.

11         MR. MITCHELL:  Okay.  That's all I have.

12         (Discussion off the record.)

13         MR. GREENBERG:  Sir, thank you very much.

14         THE COURT:  All right.  Mr. Bellemore, thank

15  you, you can step down.

16         MR. PIROZZOLO:  The government calls Gary Stern.

17  And if I may have a moment to see if he's here.

18         (Pause.)

19         GARY STERN, having been duly sworn by the Clerk,

20  was examined and testified as follows:

21         THE CLERK:  Please be seated.

22         State your name, spell your last name for the

23  record, speak into the microphone.

24         THE WITNESS:  Gary Stern, S-t-e-r-n.

25         MR. PAPPALARDO:  Your Honor, may we approach

PDF created with pdfFactory trial version www.pdffactory.com

1    briefly?

2            THE COURT:  All right.

3            (At sidebar on the record.)

4            THE COURT:  Is this a Merrill Lynch guy?

5            MR. MITCHELL:  It is.

6            MR. PAPPALARDO:  Your Honor, my reason for

7    asking for this sidebar is that, based upon the

8    testimony to date in this trial, we would be objecting,

9    as we filed in our motion in limine, to any opinion

10   testimony of this witness or any of the other Paine

11   Webber witnesses or Merrill Lynch witnesses with regard

12   to trading strategy.  I believe this is inappropriate.

13   These people are not experts, and I also point out that

14   this was your prior ruling in the first trial.  And we

15   just take exception to any of this sort of evidence

16   coming in.  It's not --

17           THE COURT:  You say, "any of this sort of

18   evidence," you mean any Rule 702 evidence?

19           MR. PAPPALARDO:  Yes, exactly.

20           THE COURT:  Is that what you intend?

21           MR. PIROZZOLO:  Well, I intended to have the

22   examination proceed roughly along the lines of the

23   Court's ruling from the last trial, meaning that we

24   aren't going to have Mr. Stern or any of the Merrill

25   Lynch witnesses testify as experts, giving expert

PDF created with pdfFactory trial version www.pdffactory.com

1    opinion as to the riskiness of the trading.

2         However, there were communications to

3    Mr. Carpenter from the Merrill Lynch people, including

4    Mr. Stern, telling him about the riskiness of his

5    strategy, and it's those communications that are

6    relevant to his intent at the time of the offense, and

7    therefore, that's appropriate.

8         MR. PAPPALARDO:  And I would say, your Honor,

9    either they're experts or they're not.  Either their

10   opinions are admissible or they're not.  Whether or not

11   they communicated anything directly to Mr. Carpenter

12   doesn't make them an expert, and whether or not they

13   communicated orally or in writing does not make it

14   admissible.  Either they're experts or they're not.  The

15   fact that there's a letter doesn't do it.

16        THE COURT:  I think -- no, I agree with that, I

17   don't think it's a difference between that.  But it

18   bears on his state of mind, at least for the subsequent

19   transactions, of which there were some, right?

20        MR. MITCHELL:  Yes.

21        MR. PIROZZOLO:  Yes.

22        MR. PAPPALARDO:  Your Honor, then that means we

23   get into the whole area of, you know, what they

24   communicated to Mr. Carpenter and that necessarily, by

25   definition, requires solicitation of opinion testimony.

 1          THE COURT:  Well, I don't know.  We'll see how

 2     that goes, but I don't think it's necessary.  The fact

 3     of what was said to him may be relevant to the

 4     consideration of what his specific intent was or wasn't

 5     in continuing the transactions.

 6          MR. PAPPALARDO:  Well, your Honor, just as a

 7     preview of coming attractions, I think that if that is

 8     going to be the Court's ruling, we'll get into the fact

 9     that, you know, two of the Merrill Lynch individuals

10     offered their views one way and two offered them a

11     different way, and they're not in agreement --

12          THE COURT:  When you say "offered," you mean

13     expressed to Mr. Carpenter?

14          MR. PAPPALARDO:  Yes.

15          THE COURT:  Fine.

16          MR. MITCHELL:  Before we leave, your Honor,

17     there's a scheduling matter.

18          Mr. Levine or -- Mr. Stern is first of five

19     people we have flying in from New York.  Because we've

20     gone a lot slower than we anticipated, we've had to

21     cancel flights for all of them three times in the last

22     week because the schedule has been slipping -- nobody's

23     fault -- but where that's left us is he's all we have in

24     the on-deck circle right now, and he's not going to fill

25     the balance of the day.

```
 1              THE COURT:  So what else --
 2              MR. MITCHELL:  That might dictate when you take
 3    breaks or so forth.
 4              THE COURT:  How long do you think you'll be?
 5              MR. PIROZZOLO:  I expect on direct 45 minutes,
 6    something like that.
 7              THE COURT:  Well, why don't we take -- as long
 8    as we've interrupted anyway, maybe we should take a
 9    break now and pick up, just go through, finish up -- we
10    will finish him?
11              MR. MITCHELL:  I think so.
12              MR. PAPPALARDO:  Your Honor, I don't know what
13    he's going to say.  I assume if he's testifying in
14    accordance to what he said before, there's a substantial
15    likelihood we finish him by 1:00, but I can't be sure.
16    I don't know how combative he is.
17              MR. PIROZZOLO:  Okay.
18              THE COURT:  Or how -- never mind.
19              MR. PAPPALARDO:  Compliant.
20              THE COURT:  All right, okay.
21              (End of discussion at sidebar.)
22              THE COURT:  We'll take the morning recess at
23    this point.
24              (Recess taken.)
25              (After recess.)
```

1          THE CLERK:  All rise for the jury.

2          (Jury in at 11:23 a.m.)

3          THE CLERK:  Please be seated.

4          THE COURT:  Go ahead.

5                  DIRECT EXAMINATION

6    BY MR. PIROZZOLO:

7    Q.   Good morning.  Mr. Stern, could you just say your

8    full name again?

9    A.   Gary Stern.

10   Q.   Where do you live?

11   A.   In Scarsdale, New York.

12   Q.   Where do you work?

13   A.   In New York City, New York.

14   Q.   And for whom do you work?

15   A.   Merrill Lynch.

16   Q.   How long have you worked at Merrill Lynch?

17   A.   Twenty-three and a half years.

18   Q.   What have you -- what position have you held at

19   Merrill Lynch?

20   A.    I was financial adviser from the very beginning, and

21   now I'm a first vice president, senior financial

22   adviser.

23   Q.   Can you describe what a financial adviser does?

24   A.    It -- we basically advise people to achieve goals

25   based on their risk and their needs using investments

PDF created with pdfFactory trial version www.pdffactory.com

1    and other vehicles that are available to use.

2    Q.   As a vice president are there any additional or

3    different responsibilities that you have as compared to

4    being a financial adviser?

5    A.   No.

6    Q.   How long have you been vice president?

7    A.   I believe close -- there was vice president and then

8    there was first vice president.   I believe I first got

9    the vice president title roughly ten years ago.

10   Q.   Now, at Merrill Lynch, do you manage other brokers?

11   A.   Yes; I did at the time.   Right now I currently am

12   managing one other broker as well.

13   Q.   When you say you did at the time, are you referring

14   to the time frame of October 1998 through approximately

15   September of 2000?

16   A.   Yes.

17   Q.   Can you describe generally how your team is staffed

18   currently, and then we'll discuss how it was staffed at

19   the time.   How is your team staffed currently?

20   A.   Currently -- it is currently staffed where I have

21   one junior broker that is in, like, a trainee

22   position -- he's a qualified broker just starting out in

23   the business and I'm sort of his, quote/unquote,

24   mentor -- and then I have a sales assistant that

25   basically does all of the administrative stuff; and I

PDF created with pdfFactory trial version www.pdffactory.com

1   have another sales assistant that does some of the

2   administrative stuff as well as some of the trading for

3   some of my clients; and then I have an intern as well.

4   Q.   Now, let's focus on the time frame of November 1998

5   through September 2000.  How was your team staffed at

6   that time?

7   A.   It was staffed pretty similarly.  It was staffed --

8   I had two sales assistants that did most of the

9   administrative work.  Once again, one of them would also

10  do trading as well.  And then I had another individual

11  that was a junior partner/broker, and I had another

12  person that was a partner/broker with my firm -- with my

13  team.

14  Q.   Now, as a financial adviser as a vice president, are

15  you licensed to buy and sell stocks and bonds and other

16  types of financial instruments?

17  A.   Yes.

18  Q.   Can you describe generally the types of things that

19  you're licensed to buy and sell on behalf of your

20  clients?

21  A.   Basically almost anything on the financial side:

22  You have options; you have stocks; you have bonds; CDs;

23  money markets; insurance; partnerships.  Everything.

24  Q.   And do you place trades on behalf of clients that

25  you service?  Is that what you do?  You buy and sell on

1   behalf of clients?

2   A.   Yes.

3   Q.   Are you familiar with a man named Dan Carpenter?

4   A.   Yes.

5   Q.   Do you see him here today?

6   A.   Yes.

7   Q.   Could you point him out and describe an article of

8   clothing he's wearing?

9   A.   It looks like a gray suit.

10        MR. PIROZZOLO:   Let the record reflect that

11  Mr. Stern identified Mr. Carpenter.

12        THE COURT:   Okay.

13  BY MR. PIROZZOLO:

14  Q.   When did you first meet Mr. Carpenter?

15  A.   1998.

16  Q.   Where were you?

17  A.   We were at a lunch meeting.

18  Q.   What did you discuss at the lunch meeting?

19  A.   Originally -- the lunch meeting was basically there

20  to have him introduced to us -- Dan Carpenter introduced

21  to us by a friend of my associate, Jerry Levine.  And

22  basically he was going to explain to us some trusts that

23  would benefit our clients that we could potentially

24  recommend to them in the future.

25  Q.   Who's Jerry Levine?

1    A.   Jerry Levine is the broker that worked under my

2    supervision in 1998.

3    Q.   Who set up the meeting or the lunch?

4    A.   Jerry Levine set it up with a friend of a friend of

5    his named Walter Zweifler.

6    Q.   What else did you talk about at the lunch?

7    A.   We talked about trust strategies.  And then at the

8    end of the lunch, I believe it was, that Dan Carpenter

9    asked us pretty much what we kind of did for our

10   clients.  And then the topic of options trading came up

11   as one of my favorite things to do along with a lot of

12   other things that I did.

13   Q.   What did he say to you at that time about options?

14   A.   He said he was involved in options and he was

15   excited about getting to know how we would go about the

16   process of dealing with trading options and getting

17   together and talk about it further.

18   Q.   Did you get together and talk about it further with

19   Mr. Carpenter?

20   A.   Eventually we did.

21   Q.   After the lunch, did Mr. Carpenter later open up

22   accounts at Merrill Lynch?

23   A.   Yes.

24   Q.   Did you have any responsibility for those accounts?

25   A.   Yes.

1    Q.    What was your responsibility?

2    A.    I'm the lead broker since I had the team that we

3    just talked about.  So I am the lead broker responsible

4    for signing on the documents and making sure everything

5    was done properly when you opened up the accounts.

6    Q.    Now, were any of the accounts that Mr. Carpenter

7    opened, opened in the name of an entity called Benistar

8    Property Exchange Trust Company?

9    A.    Yes.

10    Q.    And do you recall -- if you recall, were there one

11    or two accounts?

12    A.    There were two.

13    Q.    Can you describe each account?

14    A.    The only thing I can recall is that one of the

15    accounts ended in 10 and one of the accounts ended in

16    01, and one of those accounts was more of an active

17    trading account as opposed to the other one not being

18    active trading.

19    Q.    Now, you mentioned Mr. Levine previously?  You just

20    mentioned Mr. Levine?

21    A.    Correct.

22    Q.    At the time, were there any other people on your

23    team who worked on the Benistar case?

24    A.    Yes, everyone on my team would have some sort of

25    responsibility with every account.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   What role did Mr. Levine play?

2  A.   He was the primary contact for the Benistar account

3  and responsible for opening it and maintaining a

4  relationship.

5  Q.   Now, at the time -- do you recall approximately when

6  it was that Mr. Carpenter opened up the Benistar

7  Property Exchange Trust accounts?

8  A.   I'm not sure -- I'm not sure exactly, but sometime

9  in 1998.

10  Q.   Around the time that you opened up the accounts for

11  Mr. Carpenter, the Benistar Property Exchange Trust

12  accounts, did you provide Mr. Carpenter with any written

13  materials about options trading?

14  A.   Yes.

15  Q.   Could you take a look -- in front of you there's

16  some documents, Mr. Stern.  Could you take a look at the

17  document that's in Folder No. 227.

18  A.   I've got to put my glasses on.  Okay.

19  Q.   Do you recognize that?

20  A.   Yes.

21  Q.   What is it?

22  A.   This is the book that we prepared for Dan Carpenter.

23  Q.   What's the title of it?

24  A.   "Money Making Option Strategies."

25          MR. PIROZZOLO:  The government would offer

1    Exhibit 227, your Honor.

2            MR. PAPPALARDO:  If I may have one moment, your

3    Honor?

4            (Pause.)

5            MR. PAPPALARDO:  No objection, your Honor.

6            THE COURT:  No objection?  All right, admitted.

7            (Exhibit No. 227 received into evidence.)

8            MR. PIROZZOLO:  It's been admitted, your Honor?

9            THE COURT:  Yes.

10           MR. PIROZZOLO:  All right.  May I publish?

11           THE COURT:  You may.

12   BY MR. PIROZZOLO:

13   Q.   I put up on the screen here, Mr. Stern, the first

14   page of that exhibit, correct?

15   A.   Correct.

16   Q.   Now, I'm going to want you to flip through this

17   document.  And is it fair to say there are different

18   parts of this document, this collection?

19   A.   Yes.

20   Q.   Why don't you just describe what it is generally,

21   and then we'll go through some of the more specific

22   parts.

23   A.   Okay.  The first page is like a cover page; and then

24   there are two pages where we typed up basically our team

25   strategy of using options; then the fourth page is

1    basically the beginning of a whole book that Merrill

2    Lynch puts out on options trading and all the different

3    risks and types of options that you can trade; and then

4    at the end of this exhibit are a couple of articles that

5    we found interesting that we attached to the back.

6    Q.    Can you turn to the second page of that exhibit?

7    And I will put it up on the screen here.   At the very

8    top there's a title.   Do you see what it says there?

9    A.    Yes.

10   Q.    And what is that?

11   A.    "Option Review."

12   Q.    Below it there are two bullet points.   Do you see

13   that?

14   A.    Yes.

15   Q.    What does the first bullet point say?

16   A.    "A call is an option to buy a stock at a set price

17   within a set time period."

18   Q.    And below that there's another bullet.   What does

19   that say?

20   A.    "A put is an option to sell a stock at a set price

21   within a set time period."

22   Q.    Now, in the first two pages of that document, so

23   page 1 -- excuse me.   In pages 2 and 3 of that

24   document there's a description of a strategy; is that

25   fair to say?

1    A.    Yes.

2    Q.    Okay.  Can you describe -- I'm not going to have you

3    read the entire document, but could you describe what

4    the strategy expressed here says?

5              MR. PAPPALARDO:  I object to that, your Honor.

6              THE COURT:  No; if he could give a fair summary,

7    that's all right.  Overruled.

8              THE WITNESS:  Basically, the strategy is:  I

9    would sell puts on stocks that I would not mind owning,

10   and then if the stocks were put to us, I would end up

11   owning those underlying stocks.  So then I would have a

12   portfolio of underlying stocks in which I would then

13   sell cover calls, or the right to lose those stocks, on

14   that portfolio.

15   BY MR. PIROZZOLO:

16   Q.    Can you just describe mechanically how a put works?

17   How does a put work?

18   A.    As it says in the definition, a put is an option to

19   sell a stock.  So basically if you're buying a put,

20   you're buying the right to sell a stock.  So if the

21   stock is trading at 25 and you buy a put at, say, 20,

22   you're basically -- you're basically either protecting

23   yourself from having your underlying stock go down below

24   20 or you're speculating -- if you think the stock is

25   going to go down a lot, and you buy the put at 20 --

PDF created with pdfFactory trial version www.pdffactory.com

1    that you think a stock is going to go down below 20.

2    And you can actually put up a very little amount of

3    money and actually make a lot of money from that if it

4    were to go down a lot if you were a put buyer.

5        And then there's a seller.

6    Q.   Let's talk about that.  Your example just now spoke

7    about put buying, correct?

8    A.   Correct.

9    Q.   What is put selling or put writing?

10   A.   Put selling or put writing is if you sell someone

11   else the right to sell you a stock.  So if you sold a

12   put at $25 and the stock were to go down to $20, you

13   would have sold that person a right to put that stock to

14   you at $25 even if the stock is lower.  So you would

15   actually be kind of stuck holding the stock at a higher

16   price, at 25, when actually the market price is below

17   that, at 20.

18   Q.   Let's turn to the next section of that exhibit.  It

19   starts off with "Introduction."  Do you see that?

20   A.   Yes.

21   Q.   Can you flip to the next page of that exhibit?  And

22   I'm going to magnify on the screen a portion that says,

23   "What Are Stock Options?"  Do you see that?

24   A.   Yes.

25   Q.   And if you could just read the first paragraph of

1    that magnified portion.

2    A.   "Options have been in existence in various forms for

3    hundreds of years, but they have achieved their current

4    popularity only since the introduction of trading in

5    listed options in 1973.  An option gives the buyer the

6    right to buy or the right to sell an asset at a

7    predetermined price for a predetermined period of time.

8    An option to buy is termed a 'call.'  An option to sell

9    is termed a 'put.'  Each listed option contract traded

10   normally covers 100 shares of common stock, and the

11   predetermined price and date are set by the exchanges on

12   which that particular option is listed."

13   Q.   And when it refers to "common stock," can you give

14   an example of a common stock?  A "common stock," what is

15   that referring to?

16   A.   A common stock is stock traded on the stock

17   exchange.  Like IBM, for example.

18   Q.   If you look at the third paragraph where it says

19   "What Are Stock Options?"  Could you just read the first

20   sentence?

21   A.   Of the second paragraph?

22   Q.   Of the third paragraph.

23   A.   Of the third paragraph?  "In the parlance of the

24   trade, selling options is termed 'writing options.'"

25   Q.   So does selling and writing mean the same thing?

1    A.    Yes, it does.

2    Q.    In this context?

3    A.    Yes.

4    Q.    Could you now turn to -- it's page 8 of that

5    section.    And I'll put it up on the screen:    "What The

6    Put Buyer Wants."    Do you see that?

7    A.    Yes.

8    Q.    And just read the very first -- the first two

9    sentences of that.

10   A.    "A 'put' is an option that allows the buyer to sell

11   100 shares of stock at a predetermined price for a

12   predetermined period of time.    For this right, the buyer

13   pays the put writer a dollar premium."

14   Q.    What is a dollar premium; what does that mean?

15   A.    It's for every -- since every option represents a

16   hundred shares, a dollar would represent a hundred

17   dollars.    So it's -- a premium is the amount of money

18   you have to -- if you're a put buyer, the amount of

19   money you would have to pay for that particular option.

20   Q.    Can you turn to the next page of that exhibit.

21   There's a section that says "What the Put Writer Wants."

22   Do you see that?

23   A.    Yes.

24   Q.    If you could read the first paragraph of that

25   magnified section?

1   A.   "You may wonder, why obligate myself to buy stock

2   from someone who thinks that stock is going down?  Well,

3   there are several possible reasons.  In the simplest

4   case, you may feel that the put buyer is wrong in his

5   assessment of the prospects of the underlying stock; you

6   may think that it will not go down.  If you are correct,

7   the put you write will not be exercised, you will not

8   have to buy any stock, and you will get to keep the

9   premium the buyer pays you."

10  Q.   Can you take a look at page 12 of that exhibit -- of

11  that section?  Excuse me.  And I'm going to put this up

12  on the screen as well.  There's a bullet, "Writing calls

13  when you don't own the underlying stock."  Do you see

14  that?

15  A.   Yes.

16  Q.   Could you read the first paragraph, please, of that

17  section?

18  A.   "Perhaps the most aggressive method of writing

19  options and the one that carries the greatest potential

20  risk is commonly referred to as 'writing uncovered' or

21  'naked call options.'  This simply means selling call

22  options when you do not own the underlying stock."

23  Q.   Is it possible also to write puts without owning the

24  underlying stock?

25  A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Can you give an example of an uncovered put which is

2  written?  Writing an uncovered put?  Could you give me

3  an example?

4  A.   Sure.  You're selling someone else the right to give

5  you stock at a certain price at a certain period of

6  time.  It's kind of like I use -- in my philosophy I use

7  it as basically selling someone the right to give you

8  stock that you wouldn't mind owning at a lower price.

9  That's typically what the put seller would want.

10 Q.   What is an "uncovered put"?

11 A.   It means that there's not necessarily 100 percent

12 collateral to cover that.

13 Q.   What do you mean by that, "100 percent collateral"?

14 A.   It means that you don't have to have all the money

15 to buy that particular amount of stock that will be put

16 to you.

17 Q.   Can you look at the document that's in the folder

18 marked Exhibit 146?  Excuse me, Exhibit 145.

19 A.   Yes.

20 Q.   Do you have that in front of you?

21 A.   I do.

22 Q.   Do you recognize that document?

23 A.   Yes.

24 Q.   What's the date of that document, or the date of

25 the -- at the bottom of the document?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   November 3, 1998.

2   Q.   And without reading the contents of the document,

3   what is the title of the document?

4   A.   "Standard Option Agreement, Institutional Accounts

5   Only."

6   Q.   And at the bottom of the document, who is the

7   agreement with?

8   A.   The agreement is with Dan Carpenter for Benistar

9   Property Exchange Trust Company, Inc.

10        MR. PIROZZOLO:   The government would offer

11   Exhibit 145.

12        MR. PAPPALARDO:   No objection.

13        THE COURT:   Okay.

14        (Exhibit No. 145 received into evidence.)

15        MR. PIROZZOLO:   May I publish?

16        THE COURT:   You may.

17   BY MR. PIROZZOLO:

18   Q.   I think I'm going to have to magnify this a little

19   bit, so we'll start at the top.  What's the standard

20   option agreement?  What's the purpose of this agreement?

21   A.   The purpose of the agreement is basically to make

22   sure that the client knows most -- all the risks

23   associated with doing option writing, or in this case

24   the institution knows all the risks associated with

25   doing options.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And this document was provided to Mr. Carpenter?

2    A.   Yes, it was.

3    Q.   Focusing on the very bottom of the document, there

4    are some signatures there.  Do you see those?

5    A.   Yes.

6    Q.   And one of them appears to be for, it says,

7    signature and title of authorized individual.  Do you

8    see that?

9    A.   Yes.

10    Q.   Who does it appear to be signed by?

11    A.   It appears to be signed Daniel Carpenter.

12    Q.   And then it states for what entity?

13    A.   Benistar Property Exchange Trust Company, Inc.

14    Q.   And down below there's a number.  Do you see where

15    it says 849-07B10?

16    A.   Yes.

17    Q.   What is that?

18    A.   That's the account number we used to identify, in

19    the office, the particular account.

20    Q.   Now, is this the particular account that you

21    referred to earlier as the trading account?

22    A.   Yes.

23    Q.   In the middle of that -- towards the top third, I

24    guess, of that document -- and I'm going to try to blow

25    it up -- there's a Paragraph 4.  Do you see that?

1    A.    Yes.

2    Q.    Can you read that paragraph?

3    A.    Sure.   It's not really centered on the monitor.

4    Q.    I'll move it along on the monitor as we go.

5    A.    "As option transactions involve a high degree of

6    risk, we understand that:   A, we should not purchase an

7    option unless we are able to sustain a total loss of the

8    premium and transaction costs, and we should not write a

9    call" -- can I try to read off of this document?

10   Q.    Sorry.   Sorry.

11   A.    "We should" -- "A, we should not purchase an option

12   unless we are able to sustain a total loss of the

13   premium and transaction cost, and we should not write a

14   call option unless we either own the underlying security

15   or security is convertible, exchangeable or exercisable

16   into such underlying security, or able to sustain

17   substantial financial losses, and that we should not

18   write a put option unless we are able to sustain

19   substantial financial losses; B, we might not be able to

20   close a position in the event that a secondary market in

21   the option ceases to exist or the list of exchangors fix

22   or suspend trading in the options."

23   Q.    On the side of the agreement there's some

24   handwriting.   What does that signify?

25   A.    It looks like it was an approval for buying calls

1    and puts, selling calls and puts.

2    Q.   Would you take a look at an exhibit that is in the

3    folder, 146?

4    A.   I've got that.

5    Q.   Do you recognize that document?

6    A.   Yes.

7    Q.   What is that?

8    A.   It's an additional document that clients are

9    required to sign because if they're doing --

10   Q.   Let's not get into the substance just yet.  What's

11   the title of the document?

12   A.   Oh, sorry.  "Special Statement For Uncovered Option

13   Writers."

14   Q.   Is there a signature on the document?

15   A.   It appears to be Daniel Carpenter.

16   Q.   And what's the date?

17   A.   11/3/98.

18   Q.   And there's an account number referenced.  What is

19   that?

20   A.   849-07B10.

21          MR. PIROZZOLO:  The government offers Exhibit

22   146.

23          THE COURT:  Okay.

24          MR. PAPPALARDO:  No objection.

25          (Exhibit No. 146 received into evidence.)

```
 1              MR. PIROZZOLO:  May I publish?
 2              THE COURT:  You may.
 3   BY MR. PIROZZOLO:
 4   Q.   And what's this agreement?
 5   A.   That's an agreement that we give and make clients
 6   sign that basically is the understanding that uncovered
 7   option writing has some extra risks associated with just
 8   the general options market.
 9   Q.   What are the extra risks with uncovered option
10   writing?
11   A.   Uncovered option writing is basically you can lose
12   more than you actually have by writing uncovered options
13   as opposed to not having uncovered options.
14   Q.   Why is that?
15              MR. PAPPALARDO:  Objection.
16              THE COURT:  Overruled.
17   BY MR. PIROZZOLO:
18   Q.   Can you explain why that is?
19   A.   Well, uncovered options, you just have to maintain
20   what's called a marginal requirement so that they use
21   what's called leverage.
22   Q.   What is margin and leverage?  What is that?
23   A.   Well, leverage -- it's easy to describe leverage.
24   Basically, I guess most of America these days has seen
25   leverage when they buy a house.  If you put 30 percent
```

PDF created with pdfFactory trial version www.pdffactory.com

1    down on your house -- let's say you're buying a $200,000

2    house and you put $60,000 on it.  If the house were to

3    depreciate by 30 percent, you basically lost all of your

4    equity.  And you can do the same thing in the stock

5    market.  You can put roughly 30 percent down and

6    actually potentially own $200,000 -- $100,000 worth of

7    stock.

8    Q.   Can you read Paragraph 2 of that agreement?

9    A.   "As with writing uncovered calls, the risk of

10   writing uncovered put options is substantial.  The

11   writer of an uncovered put option bears a risk of loss

12   if the value of the underlying instrument declines below

13   the exercised price.  Such loss could be substantial if

14   there is a significant decline in the value of the

15   underlying instrument."

16   Q.   Paragraph 3 refers to uncovered option writing.  Do

17   you see that language?

18   A.   Yes.

19   Q.   Can you also read that language?

20   A.   "Uncovered option writing is thus suitable only for

21   the knowledgeable investor who understands the risk, has

22   a financial capacity and willingness to incur

23   potentially large losses, and has sufficient liquid

24   assets to meet applicable margin requirements.  In this

25   regard, if the value of the underlying instrument moves

PDF created with pdfFactory trial version www.pdffactory.com

1    against the uncovered writer's option position, the

2    investor's broker may request significant additional

3    margin payments.  If the investor does not make" -- I

4    can't read what that word is, but "suc *[sic]* margin

5    payments, the broker may liquidate stock or options

6    positions in the investor's account with little or no

7    prior notice in accordance with the investor's market

8    agreement."

9    Q.    Further down, that document is signed by whom?

10   A.    It appears to be Daniel Carpenter.

11   Q.    Now, within this document there's a reference.  Do

12   you see where it says "note"?

13   A.    Yes.

14   Q.    And it references a booklet.  Do you see that?

15   A.    Yes.

16   Q.    What is that booklet?  What's the title of the

17   booklet?

18   A.    "Characteristics and Risks of Standardized Options."

19   Q.    Can you look at Exhibit -- it's in the Folder 228,

20   please?

21   A.    I've got it.

22   Q.    And what is that?

23   A.    This is a booklet that goes into even more detail on

24   the risks associated with options as well as the

25   characteristics.

1   Q.   Let's not describe it.  Just what's the title of the

2   document?

3   A.   "Characteristics and Risks of Standardized Options."

4   Q.   Do you recognize that to be the booklet that's

5   referenced in the agreement?

6   A.   Yes, I do.

7   Q.   Is it?

8   A.   Yes.

9        MR. PIROZZOLO:  The government would offer

10  Exhibit 228.

11       MR. PAPPALARDO:  I object and would like to

12  approach, your Honor.

13       (Discussion at sidebar and out of the hearing of

14  the jury:)

15       MR. PAPPALARDO:  This is the document the

16  government seeks to introduce.  We would object.  First

17  of all, this is a 100-page document which goes into some

18  detail in terms of a discussion of option trading, but

19  more importantly, a discussion of risk.  I would suggest

20  to the Court that it's both confusing, and like many

21  documents put into evidence so far in this case on the

22  subject matter, it really doesn't say anything.  It says

23  one -- it takes one position, then it takes another

24  position for a brokerage house in order to hedge their

25  bets and to confuse the issue.

PDF created with pdfFactory trial version www.pdffactory.com

1          In the light most favorable to the government,

2     your Honor, this is cumulative of what we've just gone

3     into with respect to this witness's testimony.  The

4     reason I did not object to that document going in is

5     because Mr. Stern's name appears on the bottom of that.

6     I would suggest to the Court to -- I mean, I would

7     consider that document to be collateral to the issues in

8     this case.  Having said that, this particular document,

9     your Honor, at best is cumulative.  We've just had a

10    tutorial on option puts and calls and everything else.

11    This goes into more detail and it has no place in this

12    trial.

13          We're getting farther and farther away from

14    issues that are critical to this jury's consideration.

15    And I point out, your Honor, that the previous document,

16    the one entered into evidence, had Mr. Stern's name on

17    it, and I will examine him about that document.  But

18    this is a -- this is a generic document printed in 1994

19    that I would suggest to the Court if it has any

20    relevance at all, it is outweighed by its prejudicial

21    and cumulative value.

22          MR. PIROZZOLO:  This is one of the specific

23    documents that's referenced in the two agreements that

24    relate to options.  It doesn't -- it appears not only in

25    the option agreement that I just referenced but also to

PDF created with pdfFactory trial version www.pdffactory.com

1  the prior exhibit, Exhibit 145.  It is specifically

2  mentioned in the contract.  It was sent to Mr.

3  Carpenter.  It is notice.  And I don't intend to spend a

4  lots of time on it, but there is a specific reference in

5  here to "put in writing" which I do intend to just

6  highlight.

7          THE COURT:  I don't imagine there will be any

8  evidence that that particular section was ever

9  specifically noted by Mr. Carpenter?  I mean, except

10  that it could have been -- the thing was given to him?

11          MR. PIROZZOLO:  He received it.  And I believe

12  by signing the document, it says he received it and read

13  it.  I think that the prior agreement makes it -- I

14  don't want to overstate this, but I think it says

15  something like I, at least, received it, but it

16  acknowledges it.

17          THE COURT:  Yeah.  But given the nature of the

18  document, which is so long -- I mean, I guess I'm

19  concerned that there should be some specific indication

20  that -- if there's a particular discrete piece of advice

21  that is contained in it that somehow is actual as

22  opposed to might have been what was the brought to his

23  attention.

24          MR. PIROZZOLO:  I can't represent that.  I can't

25  say --

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  So then the question is:  If it's

2    only a "might have been," does that make it probative

3    enough?

4          MR. PIROZZOLO:  Well, this is really an issue

5    that has to be weighed as to its admissibility.  The

6    point I wanted to make with this document is there is

7    specific reference to "put write."  The prior document,

8    you may recall, the issue of risk of uncovered option

9    writing was focused on uncovered calls, and in this

10   particular case most of the trading was uncovered put

11   writing.

12         And so this is the document that discusses the

13   risks related to uncovered puts.  I don't intend to

14   spend more than a minute or two on this, but it is

15   something that he received.

16         MR. PAPPALARDO:  Your Honor, it is not

17   something -- the government has no evidence that he

18   received this.  The only thing the government has is a

19   signature that he signed which says in the document

20   there is suggestion -- "We suggest that you review

21   this."  There's no evidence that the government will

22   offer that Mr. Stern gave him this document; there's no

23   evidence that he was there when these documents were

24   signed; there's no evidence that Mr. Carpenter ever saw

25   this.

1      THE COURT:  Yeah.  I think I'll exclude it.  It

2  would be different if the witness said, "We sat down and

3  turned to page 87 and looked at the language."  But

4  without that, I think I'll exclude it.

5      MR. PIROZZOLO:  Thank you, your Honor.

6      (In open court:)

7  BY MR. PIROZZOLO:

8  Q.   Mr. Stern, after Exhibits 145 and 146, the two

9  options writing contracts, were executed, did Mr.

10  Carpenter proceed to have you execute trades in the

11  Benistar Property Exchange Trust Company accounts?

12  A.   Yes.

13  Q.   Did you personally speak with Mr. Carpenter about

14  the trading that he was doing in the trust -- the

15  Benistar Property Exchange Trust Company accounts?

16  A.   Yes.  Jerry Levine was the primary person, but I did

17  speak with Dan as well.

18  Q.   You've mentioned two separate accounts just a few

19  moments ago that were opened?

20  A.   Yes.

21  Q.   One was the trading account?

22  A.   Yes.

23  Q.   And what was the other account referred to as?

24  A.   "Less active account."

25  Q.   Now, during the course of your relationship with Mr.

PDF created with pdfFactory trial version www.pdffactory.com

1    Carpenter, did you speak with him about his trading?

2    A.    Yes.

3    Q.    And which account did it most often relate to?

4    A.    The active account, which was the 10, I guess,

5    looking at the documentation we just went through.

6    Q.    How often would you speak to Mr. Carpenter about his

7    trading in the 10 account?

8    A.    I probably spoke to him almost on a weekly basis,

9    maybe a couple of times in one week and nothing for a

10   week and so on.

11   Q.    And generally what were the matters that you

12   discussed with Mr. Carpenter?

13   A.    Generally towards the beginning of the relationship,

14   towards the middle or towards the end?

15   Q.    Let's talk -- well, first, what kind of trades was

16   he making?  What kind of securities or investments was

17   he engaged in?

18   A.    Mostly options.

19   Q.    What kind of options?

20   A.    Uncovered puts, put selling.

21   Q.    Now, did you review records showing that the

22   activity in the Merrill Lynch -- what the activity in

23   the accounts was?  Did you review the accounts from time

24   to time?

25   A.    From time to time I did review them.

1    Q.   During the course of your relationship with Mr.

2    Carpenter, was he making money or losing money?

3    A.   In the beginning of the relationship he actually

4    made a lot of money, and then towards the end of the

5    relationship, in 2000 or so, he started to lose a lot of

6    money.

7    Q.   You mentioned he was writing puts; is that correct?

8    A.   Correct.

9    Q.   And they were uncovered?

10   A.   Correct.

11   Q.   Let's talk about the beginning of the relationship.

12   What were the things that you spoke to Mr. Carpenter

13   about regarding his trading?

14   A.   In the beginning of the relationship he was writing

15   uncovered puts on, you know, a lot of stocks that were

16   more volatile and basically one-dimensional in terms of

17   mostly technology stocks he favored as opposed to

18   diversifying and doing lots of different categories like

19   retail, financial, things like that.

20        MR. PAPPALARDO:  Objection, your Honor.  May

21   that be stricken?  It wasn't responsive to the question.

22        THE COURT:  Overruled.

23   BY MR. PIROZZOLO:

24   Q.   What did you talk about with respect to

25   diversification?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   With respect to diversification, is something that I

2    believe in, part of my strategy, it actually lessens the

3    risk of the portfolio because you're not concentrating

4    on just one sector.

5    Q.   Did you express that to Mr. Carpenter?

6    A.   Yes.

7    Q.   What, if anything, did you discuss about leverage or

8    margin with Mr. Carpenter?

9    A.   Basically that it was dangerous.  The discussions

10   weren't as frequent about leverage and margin in the

11   beginning of the relationship as they were when he

12   leveraged himself more towards the end of the

13   relationship.

14   Q.   All right.  Let's talk about the middle of the

15   relationship.  Did you speak to Mr. Carpenter about his

16   trading patterns during the middle of the relationship?

17   And let's focus on the end of 1999, beginning of 2000.

18   A.   Yes.

19   Q.   What did you talk to him about?

20   A.   I basically talked to him about a few things:  A, he

21   was not diversifying; B, he was using an extreme amount

22   of leverage; and he was also doing something that I

23   don't do as much, which was writing options closer to or

24   in the money, than I usually write options out of the

25   money.  So -- do you want me to explain that?

 1          MR. PAPPALARDO:  Objection.  What he does is

 2  not --

 3          THE COURT:  Correct.  The object is about the

 4  conversation.

 5  BY MR. PIROZZOLO:

 6  Q.  Right.  Let's rephrase it.  What I want you to focus

 7  on is what you told Mr. Carpenter, okay?  So what did

 8  you tell Mr. Carpenter about writing options close to

 9  the money or closer to in the money?

10  A.  Closer and in-the-money options were much more

11  volatile than writing out-of-the-money options.

12  Q.  Can you describe what "in the money" versus "out of

13  the money" means?

14  A.  Sure.  If you have the stock trading at about $25 a

15  share, let's say, if you were writing out of the money,

16  you would be writing a $20 put which meant before you

17  actually lost money, the stock would have to fall down

18  below 20.  If you were writing a $25 option -- if you

19  were writing a $20 option and the stock was at $25, Dan

20  Carpenter would typically write an option at 25, or at

21  right about the price of the stock, so there wasn't that

22  margin of error where it had to go down five points.

23      And in some instances as the relationship or as the

24  time frame got towards the end of the relationship, then

25  what we had was Dan Carpenter was writing more

1    in-the-money options where he was actually selling

2    someone the right to give him stock at a price above the

3    price of stock, so actually, at $30 a share as opposed

4    to $25 a share.

5    Q.   What, if any, recommendations did you make about the

6    strategies that he was following?

7    A.   It was a pretty consistent recommendation that I

8    made throughout most of the relationship.  It was that

9    he should diversify, take less leverage, and not be as

10   aggressive as -- writing deep in the money as he was.

11   Q.   At any point in time did you make any observations

12   as to whether Mr. Carpenter followed your

13   recommendations?

14   A.   Yeah, he did not follow my recommendations.

15   Q.   At any point in time did you have a conversation

16   with him about your recommendations and whether he

17   followed your recommendations?

18   A.   Say that again?

19   Q.   At any point in time did you talk to Mr. Carpenter

20   about your recommendations?  Did he say anything to you

21   about your recommendations?

22   A.   Yeah.  I mean, he basically -- I shouldn't say --

23   going back to the previous question, he followed -- you

24   know, 10 percent of my recommendations he would follow;

25   90 percent of the recommendations would basically be his

PDF created with pdfFactory trial version www.pdffactory.com

1  own.  He would cherry-pick some of the ideas that

2  Merrill Lynch had on their books, and basically he would

3  cherry-pick the ones that were more volatile and tended

4  to be technology stocks.

5      Now, repeat the second part again.

6  Q.   What, if anything, did he say to you about the

7  strategy you were recommending?

8  A.   Oh, the strategy I was recommending -- he actually

9  started to do the strategy I was recommending which was

10 in the first couple of pages after that cover page of

11 that handout I had read before where my strategy was

12 selling puts and eventually owning the underlying stock,

13 and then selling covered calls against those particular

14 stocks.  And he kind of was not as fond of that as he

15 used the terminology "it was like watching paint dry."

16 Q.   Now, later on in the relationship -- and let's focus

17 on the time frame of approximately spring of 2000

18 through September of 2000, that time frame -- did you

19 make any observations about Mr. Carpenter's trading

20 strategy after that point in time?

21 A.   After what point in time?

22 Q.   April or May of 2000.

23 A.   Yes.

24 Q.   Later on in the relationship.

25 A.   Yes.  I reiterated even more he was being too

PDF created with pdfFactory trial version www.pdffactory.com

1    aggressive and taking on too much leverage and lack of

2    diversification.

3    Q.   What did he do differently than he had done earlier

4    in the relationship?

5    A.   Potentially he was -- he was basically even more in

6    technology stocks and writing options even deeper in the

7    money and going to the very limits of the amount of

8    money he could put on -- he could borrow or go on

9    margin.

10   Q.   What effect, if any, did that have to the risks he

11   was running at that period of time?

12   A.   The risk being --

13           MR. PAPPALARDO:   Objection, your Honor.

14           THE COURT:   Sustained.

15   BY MR. PIROZZOLO:

16   Q.   Did you make any observations at that period of time

17   as to how successful Mr. Carpenter's strategy was

18   towards the end of the relationship?

19   A.   The strategy seemed to be less successful; in fact,

20   not very successful at all towards the end of the

21   relationship.

22   Q.   Now, at some point did Merrill Lynch make a decision

23   not to let Mr. Carpenter open up any more options

24   positions?

25   A.   Yes; correct.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And when I use the term "not opening up any more

2    options positions," can you describe what that means?

3    What does that mean?

4    A.   That means he couldn't -- he couldn't put on any

5    more positions but he could close the ones that he

6    currently had.  So we still let him maintain whatever

7    positions he had at the time he made that decision.

8    Q.   When was that decision made?

9    A.   Somewhere in the mid-2000 time, beginning May of

10   2000.

11   Q.   At some point in time did Mr. Carpenter leave

12   Merrill Lynch?

13   A.   Yes, he did.

14   Q.   And approximately when was that?

15   A.   At the same time.

16        MR. PIROZZOLO:  If I could have a moment, your

17   Honor.

18        (Pause.)

19        MR. PIROZZOLO:  I have nothing further, your

20   Honor.

21                        CROSS-EXAMINATION

22   BY MR. PAPPALARDO:

23   Q.   Mr. Stern, my name is John Pappalardo, and I

24   represent, along with Mr. Greenberg, Dan Carpenter.

25        I'd like you to turn to what has been marked and

1    admitted as Exhibit 146.  Do you see that, sir?

2    A.    Yes, I have it.

3    Q.    Do you recall being asked on direct examination to

4    read portions of Paragraph 3 of that document?

5    A.    Yes.

6            MR. PAPPALARDO:  Okay.  May that be highlighted,

7    please, the first line?  The first line of Paragraph 3.

8    BY MR. PAPPALARDO:

9    Q.    And that says "Uncovered option writing is thus

10   suitable only for the knowledgeable investor who

11   understands the risks"; is that right?

12   A.    That's correct.

13   Q.    And that's a statement you would agree with, right?

14   A.    Yes.

15   Q.    No question about it?

16   A.    No question about it.

17   Q.    Now, Mr. Carpenter was very knowledgeable in

18   securities, wasn't he?

19   A.    He seemed to be.

20   Q.    Well, he was, right, when you met him?

21   A.    Yes.

22   Q.    He knew the terminology inside and out, didn't he?

23   A.    He did.

24   Q.    He was extremely knowledgeable about options, wasn't

25   he?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Yes.

2  Q.   And you knew that he worked with his brother who was

3  an investment adviser, didn't you?

4  A.   Yes.

5  Q.   And he told you that?

6  A.   Yes.

7  Q.   And he was very forthcoming with his knowledge about

8  options, wasn't he?

9  A.   Yes.

10  Q.   And, in fact, he impressed you regarding his grasp

11  of the options market, didn't he?

12  A.   Yes.

13  Q.   And so would you consider him a knowledgeable

14  investor who understands the risks?

15  A.   Yes.

16  Q.   And you considered him to be that at the time this

17  document was signed in 1998, right?

18  A.   Yes.

19  Q.   And in 1999?

20  A.   Did I consider him to be knowledge --

21  Q.   A knowledgeable investor who understood the risks.

22  A.   Yes.

23  Q.   And in 2000?

24  A.   Yes.

25  Q.   You, sir, yourself, you're not an expert in options,

1  are you?

2  A.    No.

3  Q.    Now, this document that -- excuse me.  Please turn

4  to Exhibit 227.

5  A.    Okay.  I've got it.

6  Q.    Okay.  That's a document you're familiar with,

7  right?

8  A.    Yes.

9  Q.    It's a document that's got your name at the bottom,

10  right?

11  A.    Yes.

12  Q.    Is it something you wrote?

13  A.    It's something that I directed a person on my team

14  to write, yes.

15  Q.    Okay.  Somebody wrote this on your behalf, and your

16  name appears at the bottom as that person's supervisor?

17  A.    Yes.

18  Q.    And you had input into this document?

19  A.    Yes.

20  Q.    You're familiar with the contents of this document?

21  A.    Yes.

22  Q.    The document's entitled "Money Making Options

23  Strategies," right?

24  A.    Yes.

25  Q.    And this is -- this document was provided to Mr.

1  Carpenter?

2  A.   Yes.

3  Q.   By whom?

4  A.   I believe Jerry Levine.

5  Q.   Do you know him?

6  A.   I can't tell you whether it was provided to him by

7  Jerry Levine or my assistant, Janine DelGrosso, or Lucy

8  or someone on my team provided it to him, but it was

9  provided to him.

10 Q.   How do you know that?

11 A.   Because -- I mean, we delivered it to him.  I don't

12 know whether he read the document or not.

13 Q.   You testified on direct examination that Mr.

14 Carpenter was selling puts during much of the time he

15 was trading at Merrill Lynch, right?

16 A.   Yes.

17 Q.   Let's direct your attention to the first line of the

18 first paragraph.

19 A.   Okay.

20 Q.   Do you see that?

21 A.   Yes.

22 Q.   And it says, "An option strategy that I find to be

23 most effective is selling puts on stocks that I think

24 are going up that I wouldn't mind owning at cheaper

25 prices if for some reason they ended up going down,"

PDF created with pdfFactory trial version www.pdffactory.com

1  right?

2  A.   Correct.

3  Q.   So right out of the box in this document you are

4  suggesting to the reader that this is -- this is a

5  strategy that is most effective?

6  A.   If you don't mind owning the underlying stock,

7  correct.

8  Q.   Right?

9  A.   Correct.

10  Q.   That's right.  No question about that, right?

11  A.   Right.

12  Q.   Is it fair to say that this particular document that

13  you're familiar with that was prepared by you or for you

14  or in some combination thereof is a document that is a

15  marketing booklet which encourages clients of Merrill

16  Lynch to use options trading to make money?  Is that

17  fair to say?

18  A.   To make money or improve the portfolio performance,

19  yes.

20  Q.   Right.  This is a marketing document that you

21  provide to investors to get them to consider options

22  trading, is it not?

23  A.   Yes.

24  Q.   It advocates the benefits and the flexibility of

25  options trading, right?

1    A.    If used appropriately, yes.

2    Q.    If used appropriately?

3    A.    Correct.

4    Q.    Okay.  We'll get to that.

5    A.    Okay.

6    Q.    If you look at the introduction, which I believe is

7    on the fourth page of this document.  Do you see that?

8    A.    I do.

9    Q.    At the end of the first paragraph --

10         MR. PAPPALARDO:  May that be highlighted,

11   please?

12         (Pause.)

13         MR. PAPPALARDO:  You don't have 227?  That's

14   fine.

15   BY MR. PAPPALARDO:

16   Q.    Do you have it in front of you, sir?

17   A.    Yes, I do.

18   Q.    Okay.  Let's look at the last sentence of the first

19   paragraph under "Introduction," the fourth page in.  Do

20   you see that, sir?

21   A.    The one that starts with "In short"?

22   Q.    Yes.

23   A.    Yes.

24   Q.    And that says, "In short, options offer a multitude

25   of strategies to those investors who are willing to

1  explore new avenues," right?

2  A.   Yes.

3  Q.   And look at the last -- look at the last line of

4  that page.  That says, "The important point we'd like to

5  make is that writing options can afford you, the

6  investor, an added degree of flexibility," right?

7  A.   Yes.

8  Q.   Look at page 19.

9  A.   Yes.

10  Q.   Do you see that, sir, under the general heading,

11  "Are You Ready to Write Options"?

12  A.   Yes.

13  Q.   All right.  Look at the second paragraph under that

14  heading, and the fourth sentence in starting with "The

15  holder."

16  A.   Okay.

17  Q.   That says, "The holder of a portfolio securities

18  doesn't have to be limited only to dividend income nor

19  must you accept market fluctuations without any means of

20  moderating," right?

21  A.   Yes.

22  Q.   Now, Mr. Carpenter's investment strategy while he

23  was at Merrill Lynch was focused, as you've said on

24  direct examination, in tech stocks, right?

25  A.   Yes.

1    Q.    Focused primarily in tech stocks?

2    A.    Correct.

3    Q.    And that's something that you say you said to him

4    was a mistake because he should be more diversified?

5    A.    Yes.

6    Q.    Did you say that to him in 1999?

7    A.    I've always said that you should be diversified, to

8    Dan Carpenter and every client.

9    Q.    And my question is, sir:  Do you recall having a

10   specific conversation with Dan Carpenter on that subject

11   in 1999?

12   A.    Do I recall the exact conversation?

13   Q.    No.  Do you recall having a specific conversation

14   with Dan Carpenter about diversification in 1999?

15   A.    Yes.

16   Q.    And did you tell him that he should not have the

17   bulk of his -- of the trading in tech stocks?

18   A.    Yes.

19   Q.    Okay.  In fact -- and did he follow your advice?

20   A.    Not 100 percent.  He would put less in tech stocks,

21   but he still put a majority of the portfolio in tech

22   stocks.

23   Q.    Okay.  So in your view he didn't follow the advice

24   you were providing to him?

25   A.    Correct.

1   Q.   In fact, in the calendar year 1999 he realized a

2   gain of $608,408 as a result of his trading activity,

3   didn't he?

4   A.   Something like that, yes.

5         MR. PAPPALARDO:  If I may approach the witness,

6   your Honor?

7         THE COURT:  All right.

8   BY MR. PAPPALARDO:

9   Q.   Sir, let me put this in front of you.

10   A.   Should I put this away?

11   Q.   Focus your attention on that for a moment.

12   A.   Okay.

13         MR. PAPPALARDO:  Actually, your Honor, if I may

14   give him the potential exhibit as opposed to something

15   that's marked.

16   BY MR. PAPPALARDO:

17   Q.   Do you see that, sir?

18   A.   Yes.

19   Q.   And this is a letter you're familiar with?

20   A.   Yes.

21   Q.   It's a letter February 2nd of 2000 where -- to Dan

22   Carpenter from Thomas P. Rasmussen, right?

23   A.   Yes.

24   Q.   And who's Thomas P. Rasmussen?

25   A.   He's the administrative manager of our office.

1   Q.   And was he somebody above you on the totem pole?

2   A.   Yes.

3   Q.   Okay.  Is he someone who was familiar with Dan

4   Carpenter's account?

5   A.   Yes.

6   Q.   Is he somebody that you interacted with during the

7   period of time that Dan Carpenter traded in -- with

8   Merrill Lynch?

9   A.   Yes.

10  Q.   Along with Jerry Levine?

11  A.   Yes.

12  Q.   Jerry Levine's also copied on this letter too,

13  right?

14  A.   Yes.

15  Q.   Now, isn't it fair to say that at the close of

16  business on December 31st, 1999, Mr. Carpenter had a

17  gain of over $608,000, right?

18  A.   Yes.

19  Q.   And that was not following your trading advice,

20  right?

21  A.   Not totally.

22  Q.   Right.  Because you say he was too heavily weighted

23  in technology stocks, right?

24  A.   Right.  He was following part of it, not all of it.

25  Q.   Well, sir, do you know -- you're familiar with these

1  accounts, right?  You paid attention to these accounts?

2  A.   Yes.

3  Q.   And so you would get updates of the trading

4  balances, right?

5  A.   Yes.

6  Q.   And they would be periodic and regular?

7  A.   Correct.

8  Q.   And do you recall that in November -- in December of

9  1999 Mr. Carpenter made approximately $1 million

10  following his own strategy, heavily weighted into

11  technology stocks?

12  A.   Yes.

13  Q.   And he realized a net gain of over $600,000, because

14  he was down $400,000 in December, was he not?

15  A.   I don't know.  You'd have to refresh me with

16  something if you'd like me to answer that.

17        MR. PAPPALARDO:  If I may approach, your Honor?

18        THE COURT:  You may.

19        MR. PAPPALARDO:  Well, prior to that I would

20  offer Defendant's 255.

21        MR. PIROZZOLO:  No objection.

22        THE COURT:  Okay.

23        (Exhibit No. 255 received into evidence.)

24        MR. PAPPALARDO:  May that be published, your

25  Honor?

1         THE COURT:  You'll have to erase the scribbling

2     on the screen.

3         MR. PAPPALARDO:  I shouldn't be using the screen

4     as a...

5         And could you highlight the end of the second

6     paragraph, please?  The last sentence, second paragraph.

7     BY MR. PAPPALARDO:

8     Q.  And, sir, this indicates "At the close of business

9     on December 31, 1999, your account had an unrealized

10    gain of $608,408," right?

11    A.  An unrealized gain of $6,479 and a realized gain of

12    $608,408, yes.

13    Q.  Okay.  Thank you.  I stand corrected.

14        And, sir, this indicates that yourself and Jerry

15    Levine, who you testified had the primary account

16    responsibility with Mr. Carpenter, had discussed all the

17    transactions with you -- this is from Rasmussen to

18    Carpenter -- "and that you fully understand the

19    associated risks.  Furthermore, all transactions should

20    be consistent with your investment objectives and

21    financial resources," right?

22    A.  Yes.

23    Q.  "At this time our records indicate your investment

24    objective is income and your risk tolerance is

25    aggressive respectively," right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Right.

2    Q.    And that reflects the reality.  You did have

3    conversations with Mr. Carpenter, right?

4    A.    Well, we had to have a conversation with him to take

5    the order.

6    Q.    Right.

7    A.    Correct.

8    Q.    And when I say "you," I meant the plural "you."

9    Yourself and Mr. Levine had conversations, right?

10   A.    Or anyone on our staff.  It could be Bert Fisher who

11   was the other broker on the team at the time as well.

12   Q.    But you know of your own personal knowledge, sir,

13   that Mr. Levine had many conversations with Mr.

14   Carpenter; isn't that fair to say?

15   A.    That's very fair to say.

16   Q.    And for long periods of time?

17   A.    Yes.

18   Q.    Sir, my question was in November of '99 Mr.

19   Carpenter was down approximately $400,000.  You said to

20   show you a document to refresh your memory?

21   A.    That would be nice, thanks.

22         MR. PAPPALARDO:  If I may approach, your Honor?

23         THE COURT:  All right.

24   BY MR. PAPPALARDO:

25   Q.    Sir, are you familiar with this document?

```
 1   A.   Yes.
 2   Q.   Okay.  And this is a document that you generated to
 3   Thomas Rasmussen; isn't that correct?
 4   A.   Yes.
 5   Q.   And it's dated November '99?  It's an account -- an
 6   active account review of Mr. Carpenter, is it not?
 7   A.   It's dated January 14, 2000, but it was as of '99.
 8   Q.   What, this has to do with the active account review
 9   in November of '99, right?
10   A.   Correct.  But dated January 14th.
11   Q.   Right.  The date of the document is January 14th but
12   the content of this relates to November of 1999; is that
13   fair to say?
14   A.   Yeah, that's correct.  You just started out with
15   "dated."
16        MR. PAPPALARDO:  May this be admitted, your
17   Honor, Exhibit 151?
18        MR. PIROZZOLO:  No objection.
19        THE COURT:  Okay.
20        (Exhibit No. 151 received into evidence.)
21   BY MR. PAPPALARDO:
22   Q.   And is it fair to say, sir, that this document
23   reflects a memo to you from Thomas Rasmussen which
24   indicates that in November of 1999 this account was down
25   approximately -- just under $400,000?
```

1   A.   Yes.

2       MR. PAPPALARDO:   And may the second paragraph of

3   this -- the first bullet point, if you will, be

4   highlighted?

5   BY MR. PAPPALARDO:

6   Q.   And in this memorandum, sir, you indicate to Mr.

7   Rasmussen that Jerry Levine or yourself "are in frequent

8   daily contact to discuss his selected positions and

9   analyze the various strike options that he hopes will

10  produce his desired results.  These calls can and do

11  last for over an hour at a time and occur two or three

12  times a day," right?

13  A.   Yes.

14  Q.   This also indicates in the next bullet point that

15  the client's brother is an analyst who gives him stock

16  recommendations?

17  A.   Yes.

18  Q.   And the last bullet point is, you're telling your

19  boss, Mr. Rasmussen, that the client has referred

20  several other clients to us and indicates a high level

21  of satisfaction with our servicing of this account in

22  discussions with administrative manager, Tom Rasmussen,

23  right?

24  A.   Yes.

25  Q.   Now, we've, from previous exhibits, determined that

PDF created with pdfFactory trial version www.pdffactory.com

1  he closed the year over $600,000 ahead, right?

2  A.    Yes.

3  Q.    And that $600,000 is net of all of the monies that

4  were paid to Merrill Lynch by way of commissions, right?

5  A.    Yes.

6  Q.    Now, let's direct your attention, if you will, to

7  the beginning of calendar year 2000.  Mr. Carpenter made

8  a good deal of money, almost to the tune of $800,000,

9  through the beginning of 2000, right?

10  A.    Say that again?

11  Q.    Mr. Carpenter made a good deal of money at almost to

12  the tune of $800,000 through the beginning of 2000?

13  A.    I believe that to be true.

14  Q.    Now, in March of 2000 that was a turning point, was

15  it not?

16  A.    Yes.

17  Q.    And markets became very volatile in March of 2000;

18  isn't that correct?

19  A.    Yes.

20  Q.    And that being the end of the first quarter of 2000,

21  markets started to change dramatically; isn't that

22  right?

23  A.    Yes.

24  Q.    And there were a lot of people who lost an awful lot

25  of money at that point in time, were there not?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. PIROZZOLO:  Objection, your Honor.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes.

4    BY MR. PAPPALARDO:

5    Q.   In fact, some of the biggest investors in the

6    country lost millions and millions of dollars in that

7    market in March of 2000; isn't that right?

8          MR. PIROZZOLO:  Objection.

9          THE COURT:  Overruled.

10         THE WITNESS:  Yes.

11   BY MR. PAPPALARDO:

12   Q.   Now, sir, are you aware that in the beginning of

13   March -- the beginning of March of 2000 -- the NASDAQ

14   had reached the level of 5,000 points?

15   A.   Yes, I'm aware of that.

16   Q.   And that was the highest point total ever, wasn't

17   it?

18   A.   For the NASDAQ, yes.

19   Q.   For the NASDAQ, right.  And what is the NASDAQ?

20   A.   It's the over-the-counter market.

21   Q.   I'm sorry?

22   A.   It's the over-the-counter market in the stock

23   exchange.

24   Q.   Okay.  And do you know what it stands for?

25   A.   National Association of Dealers -- no, not 100

PDF created with pdfFactory trial version www.pdffactory.com

1    percent.

2    Q.    Whatever.   NASDAQ is where -- is predominantly tech

3    stocks, is it not?

4    A.    It is -- yeah, a large portion of it is tech stocks.

5    Q.    Now, from a high in -- in March 11th of 2000 of over

6    $5,000 *[sic],* you're familiar, sir, that on April 17th

7    the market was at 3200?

8    A.    I know it declined precipitously.   And the exact

9    number I'm not sure of, but that sounds about right.

10           MR. PAPPALARDO:   May I approach the witness,

11    your Honor?

12    BY MR. PAPPALARDO:

13    Q.    Sir, if I could direct your attention to page 43,

14    those lines that are highlighted.   Just read that to

15    yourself.

16           (There is a pause.)

17           THE WITNESS:   Okay.

18    BY MR. PAPPALARDO:

19    Q.    So is it fair to say, sir, that by April 17th the

20    market was down to approximately 3200?

21    A.    Based on previous stuff that you just showed me, the

22    answer was yes.   And I said "approximately yes," so yes,

23    I guess the answer is yes.

24    Q.    And in September of 2000 the market was back up to

25    over 4,000; isn't that fair to say?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Yes.

2  Q.   And is it also fair to say, sir, that in round

3  figures, that from September through January -- as of

4  January of 2000 the NASDAQ was way below -- or was below

5  2000 at that particular time?

6  A.   Say the date again?

7  Q.   January of 2001, the NASDAQ was below 2,000 at that

8  point in time?

9  A.   I believe that's correct.

10  Q.   So that in the period from September of 2,000 to

11  January of 2001, it had lost half its value?

12  A.   Yes.

13  Q.   Approximately.

14      Now, prior to March of 2000 the technology sector

15  was the most-volatile and the best-performing sector of

16  the market; isn't that fair to say?

17  A.   During what time frame?

18  Q.   Prior to March of 2000.

19  A.   I would have to go back into history.  You're

20  talking about every year prior to 2000 or 1998 to 2000?

21  Q.   Generally speaking, sir, prior to 2000 is it fair to

22  say that the technology sector was the most-volatile and

23  the best-performing sector of the market?

24  A.   I don't know if you're talking prior to the '90s,

25  whether that would be accurate.  I would have to go back

1    into records and look at that.  But definitely -- in the

2    '90s, late '90s, that is the case.

3    Q.    Through March of 2000?

4    A.    Yes.

5    Q.    So you'd agree with that statement?

6    A.    Yes.  Through March of 2000 and during the '90s.

7    Q.    Yeah.  Prior to March of 2000.

8    A.    When you say "prior to March of 2000," you could go

9    back to 1940.

10   Q.    Did the NASDAQ exist in 1940, sir?

11   A.    No, but it existed before 2000, and it existed

12   before the '90s.

13   Q.    All right.  I'll tell you what:  Why don't we say

14   from October of 1998 through and including March of 2000

15   is it fair to say that the NASDAQ -- I'm sorry -- the

16   technology sector was the most-volatile and the

17   best-performing sector of the market?

18   A.    I believe that would be accurate.

19   Q.    Is it fair to say that Mr. Carpenter, who was

20   knowledgeable in the market and knowledgeable in

21   options, had a very bullish or an optimist strategy?

22   A.    A bullish strategy, yes.

23   Q.    And optimist strategy?

24   A.    Well, bullish would be optimistic, yes.

25   Q.    It wasn't an irrational strategy, was it?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   He proved that he was able to make money in some

2  years, and so, therefore, it was not irrational.

3  Q.   It was aggressive?

4  A.   Yes.

5  Q.   Now, you testified that around September of 2000, is

6  it fair to say, Merrill Lynch made a decision not to let

7  Mr. Carpenter open up any more option positions?

8  A.   It was somewhere in mid 2000, so September actually

9  makes sense, yes.

10  Q.   Do you have a specific memory that it was at a

11  specific point in time?

12  A.   Say again?

13  Q.   Do you have a specific memory of when?  Is September

14  fair?

15  A.   September sounds accurate now that you mentioned it.

16  Q.   Okay.  Okay.  And did you participate in that

17  decision?

18  A.   I participated in that decision, yes.

19  Q.   And was it -- did you have input into that decision

20  that resulted in Merrill deciding not to let Mr.

21  Carpenter open up any more option positions?  Did you

22  have input into that decision?

23  A.   I had some input.

24  Q.   And what was your input?

25  A.   My input was I agreed he was taking a lot of risks

PDF created with pdfFactory trial version www.pdffactory.com

1  and that it would not be a bad decision to stop him from

2  putting on new positions at that time.

3  Q.   And that's what Merrill did, right?

4  A.   That's what he did.

5  Q.   Who else had input into that decision?

6  A.   Thomas Rasmussen, who is my manager that we were

7  talking about, and I believe, but not 100 percent

8  positive, Hassan Tabbah, who was his manager.  And I

9  don't know if anybody else in the back office,

10  compliance legal area, had input into that as well.

11  Q.   Where did Mr. Carpenter go?

12  A.   He went to PaineWebber.

13  Q.   And how did he get to PaineWebber?

14  A.   He asked me for -- whether I knew anyone that was

15  able to facilitate options trading for him.

16  Q.   And isn't it a fact, sir, that you recommended to

17  him -- that is, Mr. Carpenter, to one of your very good

18  friends, a fellow by the name of Mitchell Rock, at

19  PaineWebber to take over this account?

20  A.   Yes.

21  Q.   And you put Mr. Carpenter in contact with Mr. Rock,

22  did you not?

23  A.   Yes.

24  Q.   You did not think -- strike that.

25       So the Benistar accounts were transferred to your

PDF created with pdfFactory trial version www.pdffactory.com

1   friend Mitchell Rock at PaineWebber, right?

2   A.   Right.

3   Q.   Do you know when that was?

4   A.   It was approximately around the time we were putting

5   him in closing positions only, which was probably that

6   September 2000 time frame.

7   Q.   Now, at the time these accounts were transferred,

8   there were two accounts, right?

9   A.   I believe so.

10  Q.   A B1 account?

11  A.   B10.

12  Q.   B01 and B10?

13  A.   Yes.

14  Q.   Is that fair to say?

15  A.   That's fair.

16  Q.   And that when they were transferred -- all of the

17  assets in those accounts and all of those positions in

18  those accounts, cash and pending option positions, were

19  transferred intact to PaineWebber, right?

20  A.   I believe so.  I think we still had a small

21  position.  I'm not sure whether -- what account that was

22  in.  But we had a small lingering position in one of the

23  accounts for an extenuating -- for a longer time after

24  that transfer.  I don't know whether it was one of those

25  two accounts or another account.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   My question, sir, is that is it fair to say that all

2   of the positions in the trading account, as well as the

3   other account, were transferred intact, as they were, to

4   PaineWebber?

5   A.   Yes.  The positions that were invested were

6   transferred intact, yes.

7   Q.   All right.  So if there was an option at

8   PaineWebber, that was transferred into an option -- I'm

9   sorry.  If there was an option at Merrill Lynch, that

10  was transferred as an option to PaineWebber?

11  A.   Yes.

12  Q.   And there was basically a mirror accounting of what

13  was in one account put into another account?

14  A.   Correct.

15  Q.   Only Merrill Lynch to PaineWebber, right?

16  A.   Yes.

17  Q.   Now, sir, in 1999 and 2000 was there a difference of

18  opinion among Merrill Lynch market analysts to how the

19  market would perform?

20  A.   There's always a difference of opinion.

21  Q.   And that included 1999 and 2000, right?

22  A.   Yes.

23  Q.   In fact, there were significantly competing views by

24  market analysts in 1999 and 2000 whether that market,

25  though volatile, represented a good buying opportunity;

PDF created with pdfFactory trial version www.pdffactory.com

1  isn't that fair to say?

2  A.   That's fair to say.

3  Q.   In fact, some at Merrill Lynch predicted the market

4  would rebound and others predicted it would not; isn't

5  that fair to say?

6  A.   Yes.

7  Q.   In fact, there was a divergence of opinion on that

8  particular subject between the individuals who were

9  assigned to monitor Mr. Carpenter's account at Merrill

10 Lynch; isn't that fair to say?

11 A.   Can you repeat that?

12 Q.   Yes.  The disparity in views concerning whether or

13 not the market would rebound included different views

14 within the people who were assigned to monitor Mr.

15 Carpenter's account; isn't that fair to say?

16 A.   I don't really know if they used the perception of

17 what direction they thought the market was going to go

18 when they decided to close Dan Carpenter's account.

19 Q.   Well, was there a difference of opinion, by the way,

20 amongst the people you've mentioned here-:  Mr.

21 Rasmussen, Mr. Levine, yourself -- is it Mr. Hassan?

22 A.   Hassan Tabbah.

23 Q.   Tabbah?  Okay.

24       MR. PIROZZOLO:  Objection, your Honor.

25 BY MR. PAPPALARDO:

1    Q.   -- as to whether or not the account should even be

2    closed?

3         MR. PIROZZOLO:  Objection.  Relevance.

4         THE COURT:  Overruled.

5         THE WITNESS:  I think we were all in agreement

6    that the account was taking on too much risk.

7    BY MR. PAPPALARDO:

8    Q.   But you were all in agreement?

9    A.   The account was taking on too much risk, not the

10   direction of the market.

11   Q.   Right.  And therefore, the accounts should be

12   closed?

13   A.   Should go to closing positions only, correct.

14   Q.   And your testimony is that's what everybody said in

15   that group that you just mentioned?

16   A.   Everybody seemed to be in agreement that it was

17   taking on too much risk, yes.

18   Q.   Was there any discussion within your group, sir --

19   that is, the group that was monitoring what Mr.

20   Carpenter was doing -- was there any discussion within

21   your group about whether or not the market would rebound

22   and -- proving Mr. Carpenter right in the, say from --

23   between March and September of 2000?

24   A.   We had daily if not hourly discussions on what

25   direction we thought the market would go, but obviously

PDF created with pdfFactory trial version www.pdffactory.com

1   nobody really knew what direction that would take place.

2   Q.   Nobody really knew, right?

3   A.   Nobody knew.

4   Q.   And there were some people who were more optimistic

5   within your group that the market would get back to

6   where it was in March and there were some people that

7   were less optimistic, right?

8   A.   I'm sure everyone has different degrees of optimism.

9   That would be normal human nature, yes.

10  Q.   Sir, my question to you is not everyone; my question

11  to you was all those people who are interacting with Dan

12  Carpenter:  yourself, Mr. Levine, Mr. Rasmussen.  Was

13  there a divergence of views within that group?

14  A.   There was a divergence of views on a day-to-day

15  basis within the group as within the firm.

16  Q.   And is it fair to say that there were those within

17  that group who were far more aligned with Mr.

18  Carpenter's position than you?

19  A.   I wouldn't go to the extreme of saying "far more."

20  Maybe slightly more in favor of that.  There wasn't very

21  much discrepancy between the viewpoints.

22  Q.   And it's your testimony, sir, that all of them

23  expressed an opinion that the accounts should be

24  terminated?

25  A.   All of them expressed that the account should be

PDF created with pdfFactory trial version www.pdffactory.com

1  terminated because of the risk, yes.

2  Q.   Okay.  Could you look back at Exhibit 255.

3  A.   If I find it.

4  Q.   Sir, that was one of the documents I brought up to

5  you.  It's probably not in a folder.

6  A.   Not in the folder?

7  Q.   Right.  It was a freestanding document.  It's a

8  letter to Mr. Carpenter --

9  A.   I've got it.

10 Q.   Okay.  See that, sir?

11 A.   Yes.

12 Q.   Okay.  Do you see the second paragraph of that

13 letter?

14 A.   Yes.

15 Q.   And that says, does it not, that between January and

16 December of 1999 a total of 1,736 transactions took

17 place generating $266,525 in commissions, right?

18 A.   Right.

19 Q.   And that was the trading commissions that Merrill

20 Lynch received for calendar year 1999, right?  Is that

21 fair to say?

22 A.   Yes.

23       MR. PAPPALARDO:  May I approach the witness,

24 your Honor?

25       THE COURT:  All right.

1    BY MR. PAPPALARDO:

2    Q.   I show you what's been premarked as Exhibit 417 for

3    identification.  Do you recognize that document, sir?

4    A.   Yes.

5    Q.   What do you recognize it to be?

6    A.   An activity review that is written by my manager,

7    Tom Rasmussen.

8    Q.   And who does it go to?

9    A.   It went to Dan Carpenter.

10   Q.   Have you seen that before?

11   A.   Yes.

12        MR. PAPPALARDO:  I offer it, your Honor.

13        MR. PIROZZOLO:  No objection.

14        THE COURT:  All right.

15        (Exhibit No. 417 received into evidence.)

16        MR. PAPPALARDO:  May that be published?

17        THE COURT:  Okay.

18        MR. PAPPALARDO:  The second paragraph.

19   BY MR. PAPPALARDO:

20   Q.   Now, sir, this indicates between January and July of

21   2000 a total of 1,680 transactions took place generating

22   $253,554 in commissions; is that fair to say?

23   A.   Yes.

24   Q.   And that, again, recognizes the commissions that

25   went to Merrill Lynch based upon those trading

PDF created with pdfFactory trial version www.pdffactory.com

1  transactions within that time frame?

2  A.    Correct.

3  Q.    So Merrill Lynch made a total of about $545,000 in

4  commissions on trading in these accounts; isn't that

5  fair to say?

6  A.    Yes.

7  Q.    What percentage of those commissions did your group

8  get?

9  A.    About 10 to 15 percent of that.

10 Q.    What percentage did you get?

11 A.    After taxes?

12 Q.    No, before.

13 A.    Probably about two-thirds to half of that.

14 Two-thirds, so that's 68 percent.

15 Q.    About $75,000?

16 A.    Somewhere between 50- and 75,000.

17 Q.    Does it refresh your memory that you said $75,000

18 the last time you were asked that question under oath?

19 A.    Yeah, that refreshes my memory.

20 Q.    Now, what percentage -- what percentage of your

21 annual commissions was Benistar in 1999 or 2000?

22 A.    On a net basis or a gross basis?

23 Q.    Gross.

24 A.    Probably about 10 percent.

25 Q.    And most of your money was made in commissions,

PDF created with pdfFactory trial version www.pdffactory.com

1    right?

2    A.    Yes.

3    Q.    Your base salary wasn't very much?

4    A.    No.  My base salary is what's called a draw against

5    commissions, so commissions makes up my salary.

6    Q.    Now, sir, in December of 2002 you testified in a

7    civil trial in Massachusetts state court concerning

8    these events; isn't that fair to say?

9    A.    I testified in a civil trial?  Yes.

10    Q.    And in that civil trial the exchangors were

11    plaintiffs and Merrill Lynch was one of the defendants;

12    isn't that fair to say?

13        MR. PIROZZOLO:  Objection.

14        THE COURT:  Sustained.

15        MR. PAPPALARDO:  May we approach, your Honor?

16        THE COURT:  Yup.

17        (Discussion at sidebar and out of the hearing of

18    the jury:)

19        MR. PAPPALARDO:  Your Honor, I'm about to get

20    into the fact, merely, that there is an ongoing civil

21    case in this matter and that his testimony in this case

22    bears upon that civil case.  That case is not over; in

23    fact, the case was just regenerated.  And I suggest,

24    your Honor, that it goes directly to the bias of this

25    witness's testimony on several of the points, many of

1    which were brought up on direct.  And I say it's proper

2    cross-examination to show bias.

3            MR. PIROZZOLO:  Biased in what sense?  I mean,

4    Mr. Carpenter's no longer a part of that litigation, as

5    I understand it, and he's been adjudicated to be at

6    fault in that litigation.  It doesn't go to bias against

7    Mr. Carpenter.  I don't understand any conceivable basis

8    that there would be bias.

9            THE COURT:  I suppose there would be bias in

10   favor of Merrill Lynch, but how does that mean that

11   that's bias against Mr. Carpenter?

12           MR. PAPPALARDO:  Because, your Honor, taking

13   certain positions in this case, he has something to gain

14   or lose in the civil case, and it goes to his

15   credibility.

16           THE COURT:  What's he said that might be

17   affected by his partiality to the Merrill Lynch position

18   in the civil case?

19           MR. PAPPALARDO:  The whole --

20           THE COURT:  Today here.

21           MR. PAPPALARDO:  Today?  Yes, your Honor.  I

22   would submit to the Court that the whole line of

23   questioning that dealt with the issue of his advice to

24   Mr. Carpenter about the positions he was taking, the

25   inherent risks in those positions.

```
 1              THE COURT:  All right.  You can have that limit.
 2              While you're here, how are we doing here?  I
 3   would like to finish him so he could go back to New
 4   York.  Can we do that?
 5              MR. PIROZZOLO:  I do have some brief redirect.
 6              MR. PAPPALARDO:  I have some more, your Honor.
 7              THE COURT:  How much?
 8              MR. PAPPALARDO:  I can -- I'm on page 9 of 19.
 9              THE COURT:  Really?  We're not going to finish
10   him.
11              MR. PIROZZOLO:  Okay.
12              THE COURT:  We'll -- I guess we might as well
13   finish this one little line, which is the bias, and then
14   we'll stop.
15              MR. PIROZZOLO:  If I could ask what's the
16   question that's coming as to bias?
17              THE COURT:  Okay.
18              MR. PAPPALARDO:  Merely, your Honor, that --
19   that he's aware that other people have testified
20   concerning the subject matter, the money that they had
21   given to Benistar; that he's aware that a new trial has
22   been ordered by --
23              THE COURT:  No, I don't want to get into
24   details.  If you want to get that he had -- that
25   something along the lines of he's a loyal Merrill Lynch
```

PDF created with pdfFactory trial version www.pdffactory.com

1    guy and wants to favor their position in the case or

2    something, I don't know how you do it, but I don't want

3    details.

4          MR. PAPPALARDO:  I don't want to get into

5    details, your Honor.  I want to show the bias.  What I'm

6    going to ask is if he's aware of the claims in the case

7    against Merrill Lynch, including a claim made that

8    Merrill Lynch has to pay out what they converted for

9    their own use, the monies of these exchangors.

10         MR. PIROZZOLO:  I object to that, your Honor.

11         THE COURT:  No, that's too detailed.

12         MR. PAPPALARDO:  I'm not sure, your Honor, how

13   you would like it framed.

14         THE COURT:  Maybe you could say something like

15   include claims that Merrill Lynch permitted Mr.

16   Carpenter to trade when the trading was aggressive or

17   something like that and -- I don't know, so it's in his

18   interest to minimize the support that Merrill Lynch had

19   given Carpenter while trading or something along those

20   lines.

21         MR. PAPPALARDO:  Okay, your Honor.  So I don't

22   run afoul of the Court, what is that again?

23         THE COURT:  I don't want to dictate the

24   question.

25         MR. PAPPALARDO:  I understand.  Give me the

PDF created with pdfFactory trial version www.pdffactory.com

1   general area and I'll do my best.  Your Honor, can I

2   bring out --

3          THE COURT:  He is partial to Merrill Lynch, that

4   Merrill Lynch is -- one of the claims that may be made

5   is that Merrill Lynch acted improperly and not -- I

6   don't know, I'm --

7          MR. PAPPALARDO:  Acted improperly, period.

8          THE COURT:  All right.  Fine.  I was going to

9   say "in not shutting him down sooner" or something like

10  that.  And so whatever.

11         MR. PAPPALARDO:  And that he knows he has to

12  testify because he testified before.  He knows --

13         THE COURT:  All right.  Fine.

14         MR. PIROZZOLO:  Thank you.

15         (In open court:)

16  BY MR. PAPPALARDO:

17  Q.   Mr. Stern, you are aware, are you not, sir, that

18  there are pending civil matters brought by the

19  exchangors against Merrill Lynch?

20  A.   Yes.

21  Q.   And in that case you are partial to Merrill Lynch,

22  are you not, sir?

23  A.   I'm employed by Merrill Lynch, so yes.

24  Q.   And you know you'll be testifying in that case;

25  isn't that fair to say?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    And that case involves the same subject matter as

3    this trial; is that not fair to say?

4              MR. PIROZZOLO:  Objection.

5              THE COURT:  Overruled.

6              THE WITNESS:  Yes.

7    BY MR. PAPPALARDO:

8    Q.    And the claim there is that Merrill Lynch acted

9    improperly; isn't that fair to say?

10   A.    That's the claim.

11             THE COURT:  All right.  All right.  We're not

12   going to finish the witness's testimony today, so we'll

13   break here.

14             Again, we'll resume tomorrow.  So enjoy the rest

15   of the day, and we'll see you at nine in the morning.

16             THE CLERK:  All rise for the jury.

17             (Jury out and proceedings adjourned at 1:05

18   p.m.)

19                      CERTIFICATION

20        We certify that the foregoing is a correct

21   transcript of the record of proceedings in the

22   above-entitled matter to the best of our skill and

23   ability.

24   /s/Debra M. Joyce            /s/ Marcia G. Patrisso
     Debra M. Joyce, RMR, CRR     Marcia G. Patrisso, RPR, CRR

25