UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
        Plaintiff,                 )
                                   )  Criminal Action
v.                                 )  No. 04-10029-GAO
                                   )
DANIEL E. CARPENTER,               )
                                   )
        Defendant.                 )
                                   )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY SEVEN
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, June 10, 2008
9 a.m.

Marcia G. Patrisso, RPR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Jonathan F. Mitchell and Jack W. Pirozzolo,
3        Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        One Courthouse Way
         Boston, Massachusetts  02210
5        On Behalf of the Government

6        GREENBERG TRAURIG, LLP
         By: A. John Pappalardo, Esq. and
7            Gary R. Greenberg, Esq.
         One International Place
8        Boston, Massachusetts  02110
         On Behalf of the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

<u>Direct</u>  <u>Cross</u>  <u>Redirect</u>  <u>Recross</u>

WITNESSES FOR THE
  <u>GOVERNMENT:</u>

GARY STERN

    By Mr. Pappalardo              4                      51
    By Mr. Pirozzolo                        40

GERALD LEVINE

    By Mr. Pirozzolo      57
    By Mr. Pappalardo            91

<u>E X H I B I T S</u>

| <u>Exhibit No.</u> | <u>Description</u> | <u>Marked</u> | <u>Received</u> |
|---|---|---|---|
| No. 144A | Client information in Merrill Lynch opening account booklet | | 60 |
| No. 144B | Client information in Merrill Lynch Opening account booklet | | 63 |
| No. 148D | Monthly Portfolio Summary 9/29/00 | | 89 |
| No. 149 | Fax cover sheet to Mr. Carpenter from Mr. Levine | | 66 |
| No. 150 | Money transfers | | 81 |
| No. 152 | Notification letter | | 46 |
| No. 254 | Working Capital Management Account Agreement and Program Description | | 37 |
| No. 293 | Iantosca wire transfer dated 8/1/00 | | 14 |
| No. 294 | Iantosca wire transfer dated 7/31/00 | | 14 |
| No. 295 | Darling wire transfer dated 2/9/00 | | 14 |
| No. 343 | Fax from Janet May | | 131 |
| No. 352 | Letters of authorization to wire transfers | | 17 |
| No. 403 | Benistar website page | | 134 |
| No. 408 | Memo to Mr. Patterson from Mr. Levine dated 10/22/98 | | 107 |
| No. 409 | Account No. 849-07B01 opening form | | 37 |
| No. 418 | Letter to Mr. Levine from Mr. Patterson dated 10/23/98 | | 112 |
| No. 423 | Merrill Lynch WCMA account paperwork | | 33 |

```
 1              (The following proceedings were held in open

 2     court before the Honorable George A. O'Toole, Jr.,

 3     United States District Judge, United States District

 4     Court, District of Massachusetts, at the John J. Moakley

 5     United States Courthouse, One Courthouse Way, Boston,

 6     Massachusetts, on June 10, 2008.

 7              The defendant, Daniel E. Carpenter, is present

 8     with counsel.  Assistant U.S. Attorneys Jonathan F.

 9     Mitchell and Jack W. Pirozzolo are present.)

10              THE CLERK:  All rise for the jury.

11              (Jury in at 9:08 a.m.)

12              THE CLERK:  Please be seated.

13              THE COURT:  Good morning, jurors.

14              THE JURORS:  Good morning.

15              THE COURT:  Mr. Pappalardo?

16              MR. PAPPALARDO:  Thank you, your Honor.

17                        CROSS-EXAMINATION

18     BY MR. PAPPALARDO:

19     Q.   Good morning, Mr. Stern.

20     A.   Good morning.

21     Q.   Now, I remind you, sir, you're still under oath from

22     yesterday.

23          Yesterday you testified that Mr. Carpenter was

24     engaging in the practice of option trading, in quotes,

25     right?
```

1   A.   Correct.

2   Q.   And that's what he did, right?

3   A.   Yes.

4   Q.   And you indicated at various times during your

5   direct testimony that if one engages in the type of

6   trading that Mr. Carpenter engaged in, there was an

7   element of risk, right?

8   A.   Correct.

9   Q.   And that was a risk that over time you became

10  concerned about?

11  A.   Yes.

12  Q.   Notwithstanding the fact that he was successful at

13  various times during the relationship with Merrill

14  Lynch?

15  A.   Right.

16  Q.   Okay.  I'd like you, sir, to look at Exhibit 227.

17  A.   Okay.

18  Q.   Do you see that?

19  A.   Yes.

20  Q.   And this is what we agreed yesterday were marketing

21  materials that you presented, or caused to be delivered,

22  to Mr. Carpenter with your name at the bottom,

23  essentially as an effort to induce him to deal with

24  options; is that fair to say?

25  A.   Yes.

1  Q.   Okay.  I'd ask you to look at this package.  And you

2  said you were either -- you either prepared this package

3  or caused it to be prepared and you signed it -- or your

4  name appears at the bottom, right?

5  A.   My name appears at the bottom, correct.

6  Q.   Right.  Let's look at the last page of this.  Do you

7  see that, where it says "off-putting"?

8  A.   Yes.

9       MR. PAPPALARDO:  And, your Honor, this is in

10  evidence.  May portions of this be highlighted?

11       THE COURT:  All right.

12       MR. PAPPALARDO:  Can we start with where it

13  says, "Clearly," the -- the fifth paragraph down?  If

14  that could be highlighted?

15  BY MR. PAPPALARDO:

16  Q.   Okay.  Do you see that, sir?

17  A.   I see it.

18  Q.   And it says, "Clearly, naked call writing is

19  extraordinarily risky.  There's unlimited potential

20  risk; in fact, if a stock's price goes to the moon, Ma

21  admits as much," right?

22  A.   That's what it says.

23  Q.   And naked call writing isn't what Mr. Carpenter was

24  doing, was it?

25  A.   I believe he had a few naked call trades in there,

1  yes.

2  Q.   A few?

3  A.   A very small percentage.

4  Q.   A very small percentage?

5  A.   Yes.

6  Q.   The bulk of what he was doing was naked put writing,

7  according to your testimony, right, or uncovered put

8  writing?

9  A.   Yes.

10  Q.   All right.  Let's continue on.  Next paragraph:

11  "Naked put writing, on the other hand, suffers from what

12  many see as an undeservedly dark reputation dating from

13  the crash of '87 when sellers of index option puts took

14  on leverage that far exceeded their ability to meet

15  margin calls.  When the wave broke, brokerage firms took

16  the blame for not adequately assessing their customers'

17  suitability and not requiring higher margins.  Needless

18  to say, requirements became tougher, and naked put

19  selling, not surprisingly, acquired an image problem."

20       Have I read that accurately?

21  A.   Yes, you have.

22  Q.   Okay.  Next paragraph.  And this is -- they're

23  talking about "Ma."  And that's Moses Ma who's a partner

24  at Mitchell Madison Group, right?

25  A.   I believe so, yes.

1    Q.   Yeah.   And if you look to the fourth -- the

2    beginning of the fourth paragraph of that article, it

3    identifies who he is?

4    A.   Yes; I see that.

5    Q.   Okay.   "Ma may be an extreme case, but there's a

6    host of reasonable people who believe naked put selling

7    gets short shrift, especially when compared with widely

8    sanctioned and socially acceptable covered call writing

9    in which you buy stock and sell calls on the position,"

10   right?

11   A.   That's what it says.

12        MR. PAPPALARDO:   And the next two paragraphs,

13   may they be highlighted?

14   BY MR. PAPPALARDO:

15   Q.   "Lawrence McMillan, author of 'Options As A

16   Strategic Investment' and president of McMillan

17   Analysis, says flatly if you're doing covered call

18   writing you should be selling naked puts."

19        "2:  Naked put selling tends to be more cost

20   efficient.   There's only one commission to pay as

21   opposed to the two transactions required in covered call

22   writing."

23        Now, sir, this was in your promotional materials,

24   right?

25   A.   Correct.

1  Q.   And it basically says that -- it drew a distinction
2  between naked call writing and naked put writing, right?
3  A.   It did.
4  Q.   And it said that naked put writing is something that
5  should not be overlooked but should be considered, and
6  that it's had a bad name due to events back in 1987.
7  Isn't that this author's opinion?
8  A.   Yes.
9  Q.   And you included that as part of these materials?
10 A.   Yes.
11 Q.   Now, sir, you visited at some point in time the
12 Benistar website; isn't that right?
13 A.   I did not; I was shown the Benistar website by one
14 of my managers.
15 Q.   And that's Hassan Tabbah?
16 A.   Yes.
17 Q.   He was your branch supervisor?
18 A.   Yes.
19 Q.   So you were shown the website?
20 A.   Yes.  Just by, "By the way, you should take a look
21 at" -- he put it on my computer and then said, "Try to
22 visit it sometime."
23 Q.   And did you visit it?
24 A.   Not after that, no.
25 Q.   Your supervisor tells you to look at the website and

PDF created with pdfFactory trial version www.pdffactory.com

1    you didn't visit it?

2    A.    No.

3    Q.    Does it refresh your memory that you visited the

4    website with Mr. Tabbah?

5    A.    I just told you:  He put it on my computer, said,

6    "There's a website here; try to visit it sometime."  So

7    if you call that a visit, then that is definitely a

8    visit.

9    Q.    And did you go through the website with him present?

10   A.    No; just covered the front -- whatever the first

11   page of the website is.

12   Q.    Is there a reason why you didn't visit it?

13   A.    I was already losing confidence in the relationship

14   because Dan Carpenter was really not listening to my

15   advice on how to invest, and it wasn't a priority of

16   mine.

17   Q.    Well, Mr. Stern, when do you say that Mr. Tabbah

18   asked you to look at the website?  Wasn't that at the

19   beginning of the relationship with Mr. Carpenter?

20   A.    No, it was towards the end.

21   Q.    So your testimony today is that you never saw the

22   website?

23   A.    No, I didn't say that.  I said that I saw it on my

24   computer briefly, and I didn't go and visit the website

25   after that.

1  Q.   Okay.  When you briefly saw it on your computer, did
2  you briefly look at the home page?
3  A.   A glance and not -- not -- other than to see that
4  "Benistar" was the heading -- whatever the name, what
5  the thing was.  I recognized that it was a Benistar
6  website -- but not beyond that.
7  Q.   And did you briefly glance at the fact that on the
8  home page, prominently displayed, was a section called
9  "1031 Exchanges"?
10       MR. PIROZZOLO:  Objection.  Personal knowledge.
11       THE COURT:  No; he may answer.
12       THE WITNESS:  No, I told you I just looked at
13  the heading.
14  BY MR. PAPPALARDO:
15  Q.   Just looked at which heading?
16  A.   At the top of the website.
17  Q.   Well, do you recall seeing "Property Exchanges'
18  Frequently Asked Questions"?
19  A.   No.  As I repeat:  I just saw the top of the
20  website.
21  Q.   Did you look at the reference to their accounts?
22       MR. PIROZZOLO:  Objection, your Honor.
23       THE COURT:  Sustained.
24  BY MR. PAPPALARDO:
25  Q.   Now, Mr. Stern, was there someone in your group that

PDF created with pdfFactory trial version www.pdffactory.com

1    took care of facilitating wire transfers when they came

2    in as requests from clients?

3    A.    There are a couple of people in my administrative

4    staff.

5    Q.    And they reported to you?

6    A.    They reported to Merrill Lynch and worked for me,

7    yes.

8    Q.    And could you walk us through what happens when a

9    wire request from a client was made to your group?

10   A.    Basically, it shows up on our fax machine -- not on

11   our fax machine -- our fax machine, yes.  It would come

12   in on the fax and one of the administrative people would

13   pick it up, and then they would go through whatever

14   procedures they needed to go through to facilitate that.

15   Q.    And could you describe those procedures?

16   A.    No, I can't.

17   Q.    You can't.

18        Well, do you recall seeing wire transfers in the

19   ordinary course of your duties?

20   A.    On occasion.  I wasn't really around the fax machine

21   very often.

22   Q.    Did you see requests from Dan Carpenter concerning

23   wire transfers?

24   A.    I'm sure that during the course I probably picked up

25   a couple of the wire transfers and placed it on a desk.

PDF created with pdfFactory trial version www.pdffactory.com

1              MR. PAPPALARDO:  May I approach the witness,

2     your Honor?

3              THE COURT:  All right.

4     BY MR. PAPPALARDO:

5     Q.   Let me put some documents in front of you, sir.  Do

6     you see what has been premarked as Exhibit 293?

7     A.   Yes.

8     Q.   What is that?

9     A.   It's wire transfer authorization.

10    Q.   And what's the date of it?

11    A.   8/1/2000.

12    Q.   And --

13             MR. PIROZZOLO:  Your Honor, we don't object to

14    the admission of any of these documents.

15             MR. PAPPALARDO:  Okay.  We'll accept that, your

16    Honor.  We'd offer --

17             THE COURT:  What does "any of these documents"

18    mean?

19             MR. PAPPALARDO:  Any of these documents --

20             THE COURT:  One at a time.

21             MR. PAPPALARDO:  Exhibit 293 is a wire transfer

22    from Carpenter dated August 1, 2000; Exhibit 294 is a

23    wire transfer from Carpenter dated July 31st, 2000; and

24    Exhibit 295 is a wire transfer from Carpenter dated July

25    31, 2000.

```
 1            THE COURT:  I have 295 listed as 2/9/00; that's
 2    the date.  I'm looking at your list, 295, Byron Darling?
 3            MR. PAPPALARDO:  It's a wire transfer from
 4    Carpenter dated July 31, 2000, regarding Byron Darling,
 5    in the amount of $250,908 --
 6            THE COURT:  Then the date on the list is wrong.
 7    The date on the list is February 9th.
 8            MR. PAPPALARDO:  I apologize for that, your
 9    Honor.
10            THE COURT:  Okay.  So there's no objection to
11    293, 294, 295.
12    BY MR. PAPPALARDO:
13    Q.   Okay, sir.  Could you --
14            THE COURT:  Wait a minute.  I'm just asking.
15            MR. PIROZZOLO:  No, your Honor.
16            THE COURT:  All right.  Those may be admitted,
17    then.
18            (Exhibit Nos. 293, 294 and 295 received into
19    evidence.)
20    BY MR. PAPPALARDO:
21    Q.   Could you just look briefly at each of those
22    documents?
23    A.   Okay.
24    Q.   And 293 --
25            MR. PAPPALARDO:  May that be published, please?
```

```
1   BY MR. PAPPALARDO:

2   Q.   Okay.  293 is a document dated August 1, 2000, with

3   the name "Iantosca" next to it, right?

4   A.   I see that.

5   Q.   And it says, "Wire to Union Bank escrow number."  Do

6   you see that?

7   A.   Yes.  It says "escrow number" at the bottom; yes.

8   Q.   Okay.  So you were being requested -- that is, you,

9   Merrill Lynch -- a request was put to Merrill Lynch to

10  wire this money to an escrow account, right?

11  A.   It looks that way.  We were wiring it to Union Bank,

12  and it looks like an escrow account.  Yes, it does.

13  Q.   And the same thing with Exhibit 294?

14  A.   Yes.

15  Q.   And look at 295.  On this occasion the request was

16  for Merrill Lynch to wire the money to a client fund

17  account; isn't that fair to say?

18  A.   We were wiring it to Cape Cod Bank & Trust Company.

19  The account -- you're asking me what the account name

20  was of this --

21  Q.   Nancy Correia Client Fund Account?

22  A.   Right.

23  Q.   So these three wires were to various escrow

24  accounts; isn't that fair to say?

25  A.   I didn't know the client fund was an escrow account
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    until he got into this whole thing.  I don't know if it
 2    is or not, to tell you the truth.  The other two look
 3    like they are.
 4    Q.   So at the time you didn't know a client fund account
 5    was an escrow account?
 6    A.   Right.
 7    Q.   Is it fair to say that an escrow account -- strike
 8    that.
 9         In any event, someone in your group prepared a form
10    to enable Merrill Lynch to wire money from Benistar
11    Property Exchange Trust Company to the escrow account
12    set forth in these requests; isn't that fair to say?
13    A.   I don't know if they prepared a form or they just
14    put it in the computer.  I'm not sure.
15    Q.   They effectuated the transfer to those accounts?
16    A.   Correct.
17         MR. PAPPALARDO:  May I approach, your Honor?
18         THE COURT:  All right.
19    BY MR. PAPPALARDO:
20    Q.   Do you see that document that has been marked 352?
21    A.   Yes; it looks like multiple documents.
22    Q.   And as the lead broker responsible for this account,
23    do you recognize these documents?
24         MR. PIROZZOLO:  Your Honor, the government does
25    not object to Exhibit 352 either.
```

1          MR. PAPPALARDO:  I would offer it, your Honor.

2          THE COURT:  Okay.  Admitted.

3          (Exhibit No. 352 received into evidence.)

4          THE WITNESS:  I don't recognize all these

5    documents, just occasional ones, the format of some of

6    the wire transfers we just went through that we put on

7    my assistant's desk.  But I don't recognize all these.

8    BY MR. PAPPALARDO:

9    Q.  Well, let's talk about what the documents are.  What

10   are they generically?

11   A.  I mean, each document is separate, it looks like.

12   So are we going to go through every one?

13   Q.  No, I'm just asking you what this package

14   represents; what are these documents?

15   A.  Some of them look like they're transfers from one

16   account to another within Merrill Lynch; some documents

17   look like they're wire transfers out; some documents

18   asked to transfer the profits of one account into

19   another account.  I mean, they're all different --

20   they're all different things, so I don't know whether

21   you want to go through each one or whether you want

22   to...

23   Q.  Is it fair to say that this package contains letters

24   of authorization for wire transfers?

25   A.  No, because when you're transferring from one

PDF created with pdfFactory trial version www.pdffactory.com

1   account to another account internally, it's not a wire

2   transfer, it's just -- it's basically an entry

3   internally.  So they're not all wire transfers.

4   Q.   Okay.  Let's look, then, sir, at -- do you see at

5   the top of each page there's a Bates stamp?

6   A.   Yes.  Yes, I see that.

7         MR. PAPPALARDO:  Okay.  Could we go to 7607?

8   BY MR. PAPPALARDO:

9   Q.   Okay.  Do you see that, sir?

10  A.   Yes.

11  Q.   7607 is a wire transfer, right?

12  A.   Yes.

13  Q.   And it's dated September 16, 1999?

14  A.   Yes.

15  Q.   And signed by Daniel Carpenter?

16  A.   It appears to be.

17  Q.   Right.  Do you see the bottom line right above

18  Daniel Carpenter's signature?

19  A.   Yes.

20  Q.   It says, "Account name:  "Robinson, Donovan,

21  Madden & Barry, PC, trustees for clients," right?

22  A.   Yes.

23  Q.   Did you think that that was for an escrow account or

24  a trustee account?

25  A.   Did I -- do I think reading it now?  I didn't think

PDF created with pdfFactory trial version www.pdffactory.com

1    anything because I never saw it before, but if you ask

2    me now, it seems to be so.

3    Q.    You never saw it before?

4    A.    No.  I don't recall seeing this particular document.

5    Q.    Okay.  Let's go to 7608, the next page.

6            MR. PAPPALARDO:  May that be published?

7            THE WITNESS:  Okay.

8    BY MR. PAPPALARDO:

9    Q.    Do you see right above the signature line it says

10    "Stephen S. Greenzang clients' fund account"?

11    A.    Yes.

12    Q.    And what does that mean to you, sir?

13    A.    I went through that before:  I didn't differentiate

14    clients' funds from anything.  And I really didn't look

15    into the wire transfers above the fact that if there was

16    a wire transfer, that was to be handed off to someone on

17    my team.  So I never really got into the body of these

18    documents.

19    Q.    Well, if it's an escrow account or a clients' fund

20    account or a real estate trust account or a client's

21    account or a client trust account, doesn't that indicate

22    it's somebody else's money?

23    A.    Apparently, after going through what we're going

24    through right now, I've come to that conclusion.  I

25    didn't go through the body to come to that conclusion

PDF created with pdfFactory trial version www.pdffactory.com

1    prior to this.

2    Q.   Well, on these wire transfers there's no suggestion

3    that they're hiding that this is someone else's money,

4    is there?

5          MR. PIROZZOLO:  Objection.  This is really

6    argumentative.

7          THE COURT:  Sustained.

8    BY MR. PAPPALARDO:

9    Q.   Let's look at -- just to yourself -- 7614, 7622,

10   7628, 7659.

11   A.   Whoa.

12   Q.   One at a time.  Here's my question, sir -- you look

13   at them yourself -- on 7608, we just went over, it says

14   "clients' fund account," right?

15   A.   Yes.

16   Q.   The same notation appears on 7614, doesn't it?

17   A.   Yes.

18   Q.   Go to 7622.

19   A.   Yes.

20   Q.   The same notation, right, "clients' fund account"?

21        7628?

22   A.   Yes.

23   Q.   7659:  "Clients' fund account," right?

24   A.   Yes.

25   Q.   7668:  "Clients' fund account"?

1    A.    Yes.

2    Q.    Okay.  Look at 7612.  Do you see that, sir?

3    A.    Yes.

4    Q.    That says "real estate trust account," doesn't it?

5    A.    No.

6    Q.    I'm sorry.  That says -- 7612 says "estate account,

7    IOLTA account," right?

8    A.    Yes.

9    Q.    It says "clients' fund real estate account," right?

10   A.    Yes.

11   Q.    What is a "clients' fund real estate account"?

12   A.    I have no idea.

13   Q.    Do you know what an IOLTA account is?

14   A.    No, I don't.

15   Q.    Would you accept, sir, this indicates that this is

16   third-party money?

17           MR. PIROZZOLO:  Objection.

18           THE COURT:  Sustained.

19   BY MR. PAPPALARDO:

20   Q.    Let's go to 7616:  "Clients' fund for real estate

21   account," right?

22   A.    Right.

23   Q.    7667:  "Client trust account," right?

24   A.    No.  It says "Perkins' real estate trust account."

25   Q.    Okay.  I'm sorry.  7667 is "real estate trust

1   account," right?

2   A.   That's what you said.

3   Q.   Okay.  And 7613 is the same thing?

4   A.   Yes.

5   Q.   Let's look at 7625.

6   A.   Okay.

7   Q.   Do you see that?  That says "clients' fund," right?

8   A.   Yes.

9   Q.   Look at 7628.  That says "clients' fund."

10  A.   Right.

11  Q.   How about 7619?

12  A.   Okay.  I see that.

13  Q.   That says "clients' account," right?

14  A.   Yeah.  You're talking about the end of each of these

15  things, of course.

16  Q.   Yes.  "Maurice Sullivan, attorney-at-law, clients'

17  account," right?

18  A.   Right.

19  Q.   7634?

20  A.   Okay.  Do you want me to read it as you ask me

21  these?

22  Q.   No.  Just is that what it says?

23  A.   It says "Alexander & Femino client account."

24  Q.   Right.  And 7627?

25  A.   "Liebman & Helwig Group client trust account."

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Client trust account, right?

2    A.    That's what I see.

3    Q.    And look at 7653.

4    A.    "Tom Bolten Associates, PC, escrow account."

5    Q.    This one says "escrow account," right?

6    A.    That's what I see, yes.

7    Q.    7655?

8    A.    Monteforte & McGrail IOLTA escrow account."

9    Q.    Okay.  Coming to the end.  7663?

10   A.    "Stephen P. Welch, Esquire, IOLTA escrow account."

11   Q.    Escrow account.

12         And lastly, 7670.  That says "real estate escrow

13   account," does it not?

14   A.    Yes.  It ends in "real estate escrow account."

15   Q.    Now, sir, is it fair to say that each and every one

16   of these documents that I've referenced is a request to

17   wire money to a certain account by Dan Carpenter?

18   A.    Yes.

19   Q.    And is it fair to say that each one of these

20   documents that I have referenced makes a reference to

21   different clients of Benistar Property Exchange Trust

22   Company?

23   A.    Yeah.  It makes a reference to wire to banks, and

24   then if you read further into it, it actually goes into

25   the actual client account, yea.

```
 1   Q.   So each one of these documents is a transaction

 2   relating to a different client or perhaps a separate

 3   transaction for the same client at a different time; is

 4   that fair to say?

 5   A.   I don't know that it represents a transaction; it

 6   represents a transfer.

 7   Q.   It represents a transfer, right?

 8   A.   Correct.

 9   Q.   A wire transfer?

10   A.   Right.

11   Q.   These wire authorizations weren't secret, were they?

12   A.   No.

13   Q.   Not at all.  You could have picked these up at any

14   time and looked at them, right?

15   A.   Yes.

16   Q.   But you didn't?

17   A.   Only when I had occasion to go by the machine to

18   drop it on one of my assistants' desks.

19   Q.   Do you know whether Mr. Levine saw these?

20   A.   I'm pretty sure he probably had the same scenario I

21   did where when he got them he would give them to an

22   assistant, but I'll let Mr. Levine answer for himself.

23   Q.   Isn't it a fact, sir, that you and Mr. Levine knew

24   full well Mr. Carpenter was trading with third-party

25   funds?
```

```
 1   A.   Definitely not.
 2   Q.   Is it true, sir, that if you had known about wire
 3   transfers coming in and going to lawyer trust accounts
 4   or lawyer escrow accounts, that might be something that
 5   you would be a little suspicious about?
 6   A.   Knowing what I know now, you know, I'm very
 7   suspicious about it.  And if I -- you know, basically
 8   there is definitely more suspicion that would be known
 9   by perusing through these in detail, which was never
10   done by myself.
11   Q.   But you say you never knew that?
12   A.   Never knew that.
13   Q.   But it was open to you to see, right?
14   A.   The wire transfers were sent to our office, yes.
15   Q.   The website was open for you to see?
16   A.   The website was available, as I said before, yeah.
17   Q.   But you didn't look at the website; you didn't go
18   into it?
19   A.   I didn't go into it.
20   Q.   Isn't it basic, sir, in the business that you're in
21   to know your client?
22   A.   Yes.  We try to know our client as best as possible.
23   Q.   And did you know your client?  Did you know Mr.
24   Carpenter?
25   A.   I knew him as best I thought I could know him.  I,
```

```
 1   you know, met him; got references -- we were introduced
 2   by a friend -- we had him fill out the basic information
 3   that we needed to get a new account going; and we had
 4   conversations with him on the telephone.
 5            MR. PAPPALARDO:  May I approach the witness,
 6   your Honor?
 7            THE COURT:  You may.
 8   BY MR. PAPPALARDO:
 9   Q.  Sir, I'm going to show you a document and ask you to
10   read that to yourself.
11            MR. PIROZZOLO:  Your Honor, the government has
12   no objection to having this document admitted.
13            THE COURT:  What is the number?
14            MR. PIROZZOLO:  157.
15            MR. PAPPALARDO:  I'm not offering it; I'm just
16   asking him to read it.
17            THE COURT:  Okay.
18            (Pause.)
19   BY MR. PAPPALARDO:
20   Q.   Now, sir, in this document I just want to direct
21   your attention to the second page at the end of the
22   second full paragraph.  Do you see that, sir, the
23   sentence beginning with "we"?
24   A.   The second paragraph?
25   Q.   Second full paragraph, the sentence beginning -- the
```

second sentence in the second full paragraph, the

sentence beginning with "we"?

A.    Yes.

Q.    Okay.  Do you see that?

A.    I see it.

Q.    First of all, have you seen this letter before?  Did

you see this letter at or about September 22nd, 2000?

A.    No.

Q.    Did you discuss that language that I just brought to

your attention contemporaneous with this letter being

written, that is, in September of 2000?

A.    I don't recall discussing that particular sentence

where -- you want me to go into the sentence or --

Q.    No.  I'm just asking you:  Did you discuss that?

A.    I don't recall discussing that particular sentence.

The gist of the letter was not that -- we were focused

on when one of my -- when Jerry Levine came to me to

summarize the letter.

Q.    Now, sir, doesn't this indicate that Mr. Carpenter

was dealing with client funds?  Yes or no?

A.    It's interpreted in many different ways because

we've discussed it since this letter's been admitted in

the course of other conversations after the fact.

Q.    My question to you, sir, is:  Doesn't this section I

asked you to read tell you that Mr. Carpenter was

PDF created with pdfFactory trial version www.pdffactory.com

1    dealing with client funds?

2         MR. PIROZZOLO:  Objection, your Honor.  Now Mr.

3    Pappalardo is testifying to the substance of the

4    document.

5         THE COURT:  Sustained.

6         MR. PIROZZOLO:  We have no objection to it being

7    admitted.

8         MR. PAPPALARDO:  I'm asking the witness, your

9    Honor --

10        THE COURT:  I know.  The document speaks for

11   itself.  If you want to have it in, you could have it

12   in, that's fine; but if not, it's not up to the witness

13   to tell us what it says.

14   BY MR. PAPPALARDO:

15   Q.   Mr. Stern, Mr. Carpenter opened up all of these

16   accounts at Merrill Lynch under his own name; isn't that

17   fair to say?

18   A.   No, he opened it up under a corporate name.

19   Q.   Using his name as a signatory?

20   A.   Yes.  The corporate name under his name as the

21   signatory.

22   Q.   And as far as you know, all of the account-opening

23   forms were signed by him?

24   A.   As far as I know they were signed by him, yes.

25   Q.   And you spoke with him basically every week, on

1  average; isn't that fair to say?

2  A.   On average.

3  Q.   And sometimes you would have numerous phone calls

4  with him during the week and other times you might have

5  none; isn't that fair to say?

6  A.   Yes.

7  Q.   You indicated your subordinate, Mr. Levine, was the

8  primary contact for this account, correct?

9  A.   Correct.

10 Q.   And Mr. Levine spoke with Mr. Carpenter, to your

11 knowledge, on an average of every day, about one to two

12 hours a day, about the investments he was making; isn't

13 that fair to say?

14 A.   Well, I'm sure not sure about every day.  There were

15 times when Dan Carpenter would go on vacation or

16 whatever.  There were times when there was no trading

17 done, so...  But very regularly.

18 Q.   On a normal day, assume -- not assuming vacations

19 or -- by Mr. Levine or Mr. Carpenter.  Is it fair to say

20 that it was a couple of hours a day between Mr. Levine

21 and Mr. Carpenter?

22 A.   On an normal day it could run up to a couple, two,

23 three hours in a day, and it could be a 10-, 15-minute

24 day.  So, yeah, there were some lengthy calls there.

25 Q.   As a matter of fact, he was taking up 50 percent of

PDF created with pdfFactory trial version www.pdffactory.com

1    Mr. Levine's time, right?

2    A.    A lot of time.

3    Q.    Now, when he called you, he always identified

4    himself as Dan Carpenter, right?

5    A.    Yes.

6    Q.    And you came to know his voice?

7    A.    Yes.

8    Q.    There was no element of secrecy in what he was doing

9    or what he was saying to you?

10   A.    No element of secrecy that I knew at the time.

11   Q.    He never told you not to tell anyone about the

12   investments that he was making on behalf of Benistar in

13   the trading account, did he?

14   A.    No.

15   Q.    He never told you that if anyone called to ask you

16   questions about Benistar, make sure you don't tell them

17   that Dan Carpenter is trading funds, did he?

18   A.    No.

19   Q.    As a matter of fact, if he wanted to, Mr. Carpenter,

20   like anyone, could have done his trading online,

21   couldn't he?

22   A.    Sure.

23   Q.    He could have opened up an E-trade account,

24   circumvented Merrill Lynch, done the same trades with

25   complete anonymity; no one would know what he was doing,

PDF created with pdfFactory trial version www.pdffactory.com

1    right?

2            MR. PIROZZOLO:  Objection, your Honor.

3            THE COURT:  Sustained.

4    BY MR. PAPPALARDO:

5    Q.   Mr. Stern, at no time did Mr. Carpenter ask you to

6    take any of the money from the Benistar Property

7    Exchange Trust Company and put it into any of his

8    personal financial accounts, did he?

9    A.   Not that I recall, but I wasn't involved in all the

10   transactions.

11   Q.   Well, you never saw any funds going to any personal

12   account or other account beside Benistar Property

13   Exchange Company's two accounts, right?

14   A.   I didn't see most of these that you're showing me,

15   sir.  No, I didn't see that either.

16           MR. PAPPALARDO:  May I approach the witness,

17   your Honor?

18           THE COURT:  All right.

19   BY MR. PAPPALARDO:

20   Q.   Mr. Stern, I put a document in front of you.  It's

21   423.

22   A.   I've got it.

23   Q.   You're familiar with the contents of that document,

24   right?

25   A.   I'm looking through it.  Yes.

1    Q.    Take your time.

2    A.    Yes.

3    Q.    And that is the WCMA account, is it not?

4    A.    There are a bunch of things here.

5    Q.    Okay.

6    A.    There's an options agreement form; there's a Merrill

7    Lynch online client order entry enrollment form; there

8    is a WCMA account-opening form; there is a W-9 taxpayer

9    ID form.  That's all I recognize within this batch of

10   documents.

11   Q.    Okay.  What is a WCMA account?

12   A.    Working Capital Management Account.  A corporate

13   account.

14   Q.    A corporate account.

15        And based upon your review of those documents, the

16   B10 account was the trading account, right?

17   A.    Yes.  I believe we had established that already.

18   Q.    And the B10 account was the WCMA master account, was

19   it not?

20   A.    I'm not -- I don't recollect whether it was the

21   master account or not at this point in time.

22   Q.    Okay.  Sir, I would ask you to look at Bates-stamp

23   9663.

24   A.    Okay.

25   Q.    And this is the B10 account, right?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   Yes.  That does say "master account" below that.

 2   Q.   And that's the trading account, right?

 3   A.   Yes.

 4   Q.   So that's the master account; you would agree with

 5   that?

 6   A.   Yes, it says that.  You referred me to that page.

 7   Thank you.

 8        MR. PIROZZOLO:  The government doesn't object to

 9   this document being offered either, your Honor.

10        MR. PAPPALARDO:  We offer it, your Honor.  We

11   offer this entire package.

12        THE COURT:  All right.  The number is?

13        MR. PAPPALARDO:  The number is 423.

14        (Exhibit No. 423 received into evidence.)

15        MR. PAPPALARDO:  And may we publish page --

16   Bates-stamp 9663.  And the top two lines where it says

17   "master account."

18   BY MR. PAPPALARDO:

19   Q.   And, sir, as you've testified, this refreshes your

20   memory that the trading account was the master account,

21   right?

22   A.   Yes.

23   Q.   Okay.  Look at 9685.

24   A.   Okay.

25   Q.   And this is a document you spoke about yesterday on
```

1   direct examination, is it not?

2   A.   Yes, it is.

3   Q.   And what is this document?

4   A.   It says "Standard Options Agreement for

5   Institutional Accounts."

6           MR. PAPPALARDO:  Okay.  May we highlight the

7   lower right-hand corner, last three lines?

8   BY MR. PAPPALARDO:

9   Q.   And this had to do with -- again, when the accounts

10  were opened in October of 1998.  This is the B10

11  account; the trading account, right?

12  A.   Correct.

13  Q.   And you see in the lower right-hand corner it says

14  "master"?

15  A.   I see that.

16  Q.   Okay.  So there's no question about this being a

17  master account, right?

18          MR. PIROZZOLO:  Objection.  The document speaks

19  for itself.

20          THE COURT:  All right.

21  BY MR. PAPPALARDO:

22  Q.   And if you'd just flip to the next page, sir.

23  A.   Okay.

24  Q.   The standard option agreement that you testified

25  about yesterday?

```
 1   A.   Yes.

 2   Q.   See the lower right-hand corner?

 3   A.   Yes.  It looks like a copy of the previous page.

 4   Q.   Now, most of the trading that was done by Benistar

 5   was done through the master account, B10, right?

 6   A.   Yes.

 7   Q.   The B1 account --

 8   A.   01?

 9   Q.   The B01 -- right?

10   A.   Okay.

11   Q.   -- was the subaccount, right?

12   A.   I believe so.

13   Q.   If you look at page 9669.

14   A.   Yes?

15   Q.   And this is the Master Financial Service WCMA

16   Subaccount Authorization form, right?

17   A.   Yes, it appears to be.

18   Q.   Now, in a -- to be eligible for a subaccount, the

19   subaccount must have the same tax identification number,

20   right?

21   A.   I believe so.  I'm not certain.  I'm not really

22   involved in the operations side of the business.

23   Q.   And in this case it did?

24   A.   I don't know.  Did we show the tax ID?  Let's see.

25   What -- do you have a document with the tax ID for 01?
```

PDF created with pdfFactory trial version www.pdffactory.com

1    And then I can tell you definitely.

2    Q.   9689?

3    A.   The 07B10 -- they're both 07B10.

4    Q.   9636?

5    A.   I don't have it on this exhibit.

6         MR. PAPPALARDO:  May I approach the witness,

7    your Honor?

8         THE COURT:  All right.

9         THE WITNESS:  9636 shows the 01 account has the

10   same tax ID number as the 10 account.

11   BY MR. PAPPALARDO:

12   Q.   The master accounts and the subaccounts are under

13   the same relationship, right, on a WCMA?

14   A.   Yes.

15   Q.   As a matter of fact, the master account and the

16   subaccounts are linked together, right?

17   A.   Yes.

18         MR. PAPPALARDO:  May I approach the witness,

19   your Honor?

20         THE COURT:  You may.

21   BY MR. PAPPALARDO:

22   Q.   Sir, I'm showing you two documents:  409 and 254.

23   Look at 409 again, please.

24   A.   Okay.

25   Q.   And this is the paperwork that created the

PDF created with pdfFactory trial version www.pdffactory.com

1    subaccount, the 01 account, right?

2    A.    Yes.

3            MR. PAPPALARDO:   And I offer this, your Honor.

4            MR. PIROZZOLO:   No objection.

5            THE COURT:   All right.   Admitted.

6            (Exhibit No. 409 received into evidence.)

7    BY MR. PAPPALARDO:

8    Q.    And I ask you, sir, to look at Exhibit 254.

9    A.    Okay.

10   Q.    And do you recognize that?

11   A.    Yes.

12   Q.    What is it?

13   A.    It describes the Working Capital Management Account.

14           MR. PAPPALARDO:   I would offer it, your Honor.

15           MR. PIROZZOLO:   No objection.

16           THE COURT:   Okay.

17           (Exhibit No. 254 received into evidence.)

18   BY MR. PAPPALARDO:

19   Q.    And in Paragraph 1 of that document --

20   A.    Okay.

21   Q.    Do you recognize that?

22           MR. PAPPALARDO:   May that be published?

23           THE COURT:   It may.

24           THE WITNESS:   Yes.

25   BY MR. PAPPALARDO:

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   This is a standard agreement for a WCMA account,

2  right?

3  A.   Yes.

4  Q.   Setting forth the terms and conditions which govern

5  this account?

6  A.   Yes.

7  Q.   And it's fair to say, sir, that this document

8  provides that "the WCMA service is an integrated

9  financial service linking three components:   a

10 securities account, a choice of several money accounts,

11 and a WCMA check card accounting," right?

12 A.   Yes.   You're talking about not that paragraph in

13 general, but the document you're talking about?

14 Q.   The document I'm talking about, yes.

15 A.   Yes.

16 Q.   It's in the document?

17 A.   Yes.

18 Q.   And "the WCMA master financial service consists of a

19 master WCMA account" -- that is the trading account,

20 right?

21 A.   In this case it is, yes.

22 Q.   -- "established with the full WCMA services

23 described above and one or more WCMA subaccounts,"

24 right?

25 A.   Right.

```
 1   Q.   And the subaccount in this case was the 01 account?
 2   A.   Yes.
 3   Q.   Now, you have before you the exhibits that opened
 4   both accounts.  And it's fair to say that Mr. Carpenter
 5   signed all of the account-opening forms as the chairman
 6   and secretary of Benistar for both the 01 account and
 7   the 10 account, right?
 8   A.   It appears so.
 9   Q.   Did Mr. Carpenter ask you to create a master
10   account, or was that your idea or someone else's at
11   Merrill Lynch?
12   A.   I think he just -- he didn't ask me to do anything,
13   so he had -- whatever conversations for account opening
14   was with my associate, Jerry.
15           MR. PAPPALARDO:  May I approach the witness,
16   your Honor?
17           THE COURT:  All right.
18   BY MR. PAPPALARDO:
19   Q.   Sir, do you remember testifying on October 17th of
20   2001 in a deposition?
21   A.   If that's the date.  I remember a lot of
22   depositions.
23   Q.   I direct your attention to page 111, the highlighted
24   area.
25   A.   Okay.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Did you read that, sir?

2    A.    I read it.

3    Q.    And does that refresh your memory as to whether or

4    not Mr. Carpenter asked you to create a master account,

5    or somebody at Merrill Lynch?

6    A.    Does it refresh my memory?

7    Q.    Yes.

8    A.    It refreshes my memory that he -- once again, like I

9    told you before, I don't think that he --

10   Q.    Whose idea was it, sir?  Can you testify to that

11   today?

12   A.    I think I just testified that Jerry Levine was

13   responsible for opening up the accounts.

14   Q.    Okay.  But do you know whose idea it was between Mr.

15   Carpenter or anybody else at Merrill Lynch?

16   A.    No.

17          MR. PAPPALARDO:  That's it, your Honor.

18          THE COURT:  Mr. Pirozzolo?

19          MR. PIROZZOLO:  Just a few questions on

20   redirect, your Honor.

21                    REDIRECT EXAMINATION

22   BY MR. PIROZZOLO:

23   Q.    Mr. Stern, yesterday on cross-examination you were

24   asked some questions about Exhibit 227, which is the

25   "Money-Making Option Strategies" document.  Do you

PDF created with pdfFactory trial version www.pdffactory.com

1   recall being asked some questions about that by Mr.

2   Pappalardo --

3   A.   Yes.

4   Q.   -- yesterday?

5        And Mr. Pappalardo asked you a question about the

6   first page of the packet with the typewritten

7   description of the option strategies.  Do you see that?

8   I have put it up on the screen.

9   A.   I see it.

10  Q.   And he asked you about the statement in the first

11  paragraph of that document.  It starts, "The option

12  strategy."  Do you see that?

13  A.   Yes.

14  Q.   And the sentence says, "The option strategy that I

15  find to be most effective is selling puts on stocks that

16  I think are going up but that I wouldn't mind owning at

17  cheaper prices if for some reason they end up going

18  down."  Did I read that correctly?

19  A.   You did.

20  Q.   Did Mr. Carpenter follow your strategy?

21  A.   No.

22  Q.   What did he do instead?

23  A.   Basically, he sold puts on -- he sold puts on just

24  technology stocks, not stocks that he would potentially

25  own because he never really did own most of those

PDF created with pdfFactory trial version www.pdffactory.com

1    stocks.  He would buy back the option positions at a

2    loss, typically, before he owned those underlying

3    stocks.

4    Q.   And the puts he bought were naked or uncovered puts,

5    right?

6    A.   Correct.

7    Q.   You were asked some questions about Exhibit 151.  If

8    you would put that in front of you?  And I'm going to

9    put that up on the screen.

10        That's an active account review from November '99.

11   Do you recall some questions about that document?

12   A.   Yes.

13   Q.   And you were asked some questions about certain

14   portions of the document; do you recall that?

15   A.   I recall that.

16   Q.   Do you see that there are certain bulleted

17   paragraphs on that document?

18   A.   Yes.

19   Q.   Do you see the third bulleted paragraph?

20   A.   Yes.

21   Q.   It starts, "Client, who is a licensed attorney."  Do

22   you see that?

23   A.   Yes.

24   Q.   Could you read that full paragraph, please?

25   A.   "Client, who is a licensed attorney, insurance and

PDF created with pdfFactory trial version www.pdffactory.com

1    real estate broker, is the chairman of several large
2    insurance brokerage companies, a welfare benefits
3    company, and heads a support staff of over 80 people
4    located in two sites in Connecticut.  Client also owns a
5    Caribbean wireless telephone company and reports his net
6    worth in excess of $30 million."
7    Q.    Who provided that information?
8    A.    Dan Carpenter.
9    Q.    Yesterday you were asked some questions about a
10   February 2000 letter -- it's marked as Exhibit 255 --
11   and I'm not going to put it up on the screen.  But if
12   you could put before you, there's a document that's
13   marked as Exhibit 152?
14        (Pause.)
15        MR. PIROZZOLO:  May I approach, your Honor?
16        THE COURT:  You may.
17        MR. PIROZZOLO:  My fault.
18   BY MR. PIROZZOLO:
19   Q.    Would you take a look at Exhibit 152, please?
20   A.    Okay.
21   Q.    Do you recognize what that is?
22   A.    Yes.
23   Q.    And what's the date of that document?
24   A.    May 17, 2000.
25   Q.    Now, switching back for a moment to Exhibit 255,

PDF created with pdfFactory trial version www.pdffactory.com

1    which is a February 2000 letter you were asked about

2    yesterday?

3    A.    Right.

4    Q.    And that was a notification letter that was provided

5    to Mr. Carpenter; do you recall that?

6    A.    Right.

7    Q.    Is this Exhibit 152 also a notification letter?

8    A.    Yes.

9    Q.    Could you look at the second page of the exhibit, at

10   the bottom, and there's a cc?

11   A.    Yes.

12   Q.    Who's the cc on the letter?

13   A.    Gary Stern and Jerry Levine.

14   Q.    And Gary Stern is you?

15   A.    Yes.

16        MR. PIROZZOLO:  The government would offer

17   Exhibit 152.

18        THE COURT:  Any objection?

19        MR. PAPPALARDO:  I object, your Honor.

20        THE COURT:  I'll see you briefly.

21        (Discussion at sidebar and out of the hearing of

22   the jury:)

23        MR. PAPPALARDO:  Your Honor, again, this is one

24   of a series of letters -- none of which have gone into

25   evidence -- certainly which state opinions by the

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    various brokers.  And I would suggest to the Court that

 2    a letter that's to a client, you know, by somebody from

 3    Merrill Lynch or any brokerage house, is obviously

 4    designed to posture things in a way to put the advice

 5    and put the information of the letter in the light most

 6    favorable to the company, in this case, Merrill Lynch.

 7         I would suggest to the Court that there's no

 8    basis to admit this because it does contain an opinion,

 9    and that opinion is something the Court has tried to

10    minimize, if not exclude.  These people are not experts

11    and they are -- they have the self-serving basis for

12    making whatever statements they make to Carpenter or to

13    anybody else.

14         MR. PIROZZOLO:  This is a notification letter to

15    Mr. Carpenter; it goes to the information that Merrill

16    Lynch communicated to him during the relevant period of

17    time.  It's very similar to the form that was used for

18    the February 2nd, 2000, document, which is in evidence.

19    It's also very similar to the form of the August 29,

20    2000, document, which Mr. Pappalardo put in evidence.

21         Not only is it relevant for purposes of

22    notification, but also under a doctrine of completeness

23    it should come in.

24         THE COURT:  All right.  The objection is

25    overruled.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              (In open court:)
 2              MR. PIROZZOLO:  The government offers Exhibit
 3     152.
 4              THE COURT:  All right.  It's admitted.
 5              (Exhibit No. 152 received into evidence.)
 6              MR. PIROZZOLO:  May I publish?
 7              THE COURT:  You may.
 8     BY MR. PIROZZOLO:
 9     Q.   Now, Mr. Stern, what's the date of that letter?
10     A.   May 17, 2000.
11     Q.   And that's sent to whom?
12     A.   Daniel Carpenter.
13     Q.   And that relates to which account?
14     A.   849-07B10.
15     Q.   The very first paragraph of that refers to a
16     conversation with a Mr. Thomas Rasmussen.  Do you see
17     that?
18     A.   Yes.
19     Q.   Looking at the second full paragraph, could you
20     please read that full paragraph?
21     A.   "As you and Thomas discussed, having again reviewed
22     your account, we wanted to call your attention to the
23     continued volume of trading.  Between January and April
24     2000 a total of 890 transactions took place generating
25     $158,233 in commissions.  At the close of business on
```

PDF created with pdfFactory trial version www.pdffactory.com

1    May 12, 2000, your account had an unrealized loss of

2    $535,762, and in 2000, a realized loss of $1,168,782."

3    Q.    Further down, the next paragraph, there's a

4    reference to a margin debit balance; do you see that?

5    A.    Yes.

6    Q.    What does that mean?

7    A.    That's how much money he was being lent by Merrill

8    Lynch to -- in his account.

9    Q.    Can you read the second two sentences of that

10   paragraph, please?  Mr. Stern, I know you're from New

11   York, but if you could slow down a little bit?

12         (Laughter.)

13         THE WITNESS:  Sorry.  You mean after the

14   968,000?

15   BY MR. PIROZZOLO:

16   Q.    Yes.

17   A.    "Please be reminded that such a margin debit balance

18   increases the potential for losses as well as gains in

19   your account.  As you may be aware, with this degree of

20   leverage, a market decline may necessitate a deposit of

21   additional funds to retain your position."

22   Q.    And then I'm going to highlight the fourth

23   paragraph.  If you could just read the first sentence of

24   that fourth paragraph, please.

25   A.    "Mr. Stern and Mr. Levine indicated, and you

PDF created with pdfFactory trial version www.pdffactory.com

1    confirmed to Thomas, that all transactions were executed

2    entirely at your direction."

3    Q.   Now, Mr. Stern, you were asked yesterday some

4    questions about market movement; the NASDAQ.  Do you

5    remember the series of questions about the NASDAQ that

6    Mr. Pappalardo asked you?

7    A.   Yes.

8    Q.   And there were some questions about where the NASDAQ

9    was in or around the spring of 2000.  Your testimony was

10   it was around 3200; do you recall that?

11   A.   I don't recall the exact number.

12   Q.   Do you recall the questions and answers yesterday

13   about that fact?

14   A.   Yes.  Yes.

15   Q.   And you also recall that there was a question and

16   answer about where the market was in September of that

17   year?

18   A.   Yes.

19   Q.   And the answer was approximately where?  Do you

20   recall there was a question about 4,000?

21   A.   Yes.

22   Q.   Was that about 4,000?

23   A.   Right.

24   Q.   Do you recall that?

25   A.   I recall that.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Take a look at Exhibit 153, which is in evidence.

2         MR. PIROZZOLO:  Your Honor, may I approach?

3         THE COURT:  All right.

4         MR. PIROZZOLO:  Actually, look at Exhibit 417.

5         (Pause.)

6         THE WITNESS:  That must be hiding with the other

7    one.

8         MR. PIROZZOLO:  May I approach, your Honor?

9         THE COURT:  All right.

10   BY MR. PIROZZOLO:

11   Q.   Mr. Stern, I'm putting before you a document that is

12   in Folder 153; do you see that?

13   A.   Yes.

14   Q.   And is that the August 29th letter that was

15   introduced into evidence yesterday?

16   A.   Yes.

17        MR. PIROZZOLO:  For these purposes I would offer

18   Exhibit 153 and project that.  It's the same document as

19   Exhibit 417 that was admitted yesterday.

20        THE COURT:  Okay.

21   BY MR. PIROZZOLO:

22   Q.   If you could take a look at that, and take a look at

23   the second paragraph?

24   A.   Okay.

25   Q.   Then can you read the paragraph that starts "Between

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    January"?
 2    A.    "Between January and July 2000, a total of 1,680
 3    transactions took place generating $253,554 in
 4    commissions.  At the close of business on August 4,
 5    2000, your account had an unrealized loss of $87,392,
 6    and in 2000, a realized loss of $1,957,852."
 7    Q.    Is that more or less -- is the loss more or less
 8    than what is -- what was reported in May on Exhibit 152?
 9    A.    More.
10    Q.    Now, you were asked a series of questions a few
11    moments ago about trades -- about transfers that appear
12    to be going to escrow funds or client funds.  Do you
13    recall that series of questions?
14    A.    Yes.
15    Q.    You were asked a question as to whether that was
16    suspicious; do you recall that?
17    A.    I recall that.
18    Q.    And was your answer, sir, that had you been aware
19    that this related to real estate transactions, that
20    would have been suspicious to you?
21    A.    Yeah.  After the fact, if I had actually really read
22    through those things, there could have been something
23    suspicious.
24    Q.    And why is that?  Why would that be?
25    A.    Well, I mean, it would warrant the question because
```

1    it's -- it has titles that represent other parties

2    that -- you know, as I read it after the fact, I now

3    know that these are escrow funds, but I didn't know

4    anything about any of that prior to that.

5    Q.   And you were asked some questions about whether Mr.

6    Carpenter told you to keep any of this information

7    secret.  Do you recall that series of questions a few

8    moments ago?

9    A.   Yes.

10   Q.   Had Mr. Carpenter come to you and said you need to

11   keep this secret, would that have been a red flag for

12   purposes of identifying what he was doing with the

13   money?

14   A.   Yes.

15          MR. PIROZZOLO:  That's all I have, your Honor.

16          MR. PAPPALARDO:  Briefly, your Honor?

17                    RECROSS-EXAMINATION

18   BY MR. PAPPALARDO:

19   Q.   Mr. Stern, let's go to the May 17, 2000, letter that

20   was just introduced.  Do you have that in front of you?

21   A.   Yes.

22   Q.   And this letter contains the usual form language

23   when a senior account review supervisor at Merrill Lynch

24   sends a letter to a client, does it not?

25   A.   I believe so.  I don't know how much they alter the

1  original form letter.

2  Q.   But it embodies the original language, the same

3  phrase as --

4  A.   I believe so.

5  Q.   Now, this talks about, in the second paragraph, "at

6  the close of business on May 12th, your account had an

7  unrealized loss of $535,000, and a realized loss of over

8  a million," right?

9  A.   Right.

10  Q.   And you knew, sir, because you were handling the

11  account, that in July the account was ahead, right?

12  A.   In July of what?

13  Q.   July 2000.

14  A.   Do I know that the account was ahead?

15  Q.   Yeah.  Did you know that in July of 2000 that those

16  losses were at risk?

17  A.   You'd have to refresh my memory.

18  Q.   Let's look at the next paragraph.  You're talking

19  here about -- or the letter says that you're copied

20  on it -- that in April of 2000 -- this is a letter to

21  Mr. Carpenter:  "Your account has a margin debt balance

22  of 968," right?

23      And if that amount gets so large, it puts the -- not

24  only the traders, but the supervisory people who are in

25  charge of monitoring this account, nervous, right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    And they have what is known as a margin call, right?

3    A.    Correct.

4    Q.    Was there ever a margin call at any time on any of

5    Dan Carpenter's accounts?

6    A.    Yes.

7    Q.    There was?

8    A.    Yes.

9    Q.    Did he ever fail to meet the margin call?

10   A.    Not that I recall.

11   Q.    Well, that's something you would recall, if it had

12   occurred, right?

13   A.    Right.  So I don't recall him not meeting a margin

14   call.

15   Q.    Now, sir, you said it would have been suspicious if

16   you'd realized back then that all of these wire

17   transfers were going out to third parties:  to escrow

18   accounts, to trust accounts, to client accounts, to real

19   estate accounts and that sort of thing, right?

20   A.    Suspicious enough to inquire about it.

21   Q.    And is there a reason why you didn't pay attention

22   to it back then?

23   A.    I think I already testified to it, that I didn't get

24   into the body of the letter.  It wasn't my job.  That's

25   one of the reasons I put together a team.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   And were you satisfied that Gerald Levine did his
2  job --
3  A.   Yes.
4  Q.   -- at the time?
5  A.   At the time.
6  Q.   And the reason why this is a problem to you, sir, is
7  because you can't let a company trade in other people's
8  money in such an account; isn't that true?
9  A.   I would -- yes, that would be a safe assumption.
10 Q.   In other words, if you knew that Dan Carpenter was
11 trading on Property Exchange money, you couldn't have
12 opened up the account -- when I say "you," I mean
13 Merrill Lynch -- in this fashion; isn't that right?
14 A.   That's correct.
15 Q.   And that's why it would have raised suspicion,
16 right?
17 A.   Correct.
18 Q.   And isn't it true, sir, that based upon
19 communications in September of 2000, there was no
20 question in your mind that these accounts were trading
21 in exchange money; other people's money?  Isn't that
22 true?
23 A.   No.
24 Q.   That's not true?
25 A.   No.

1    Q.   You didn't know by September of 2000?

2    A.   September of 2000 was when the accounts transferred

3    to PaineWebber.   Is that the time you're talking about?

4    Q.   Precisely.

5    A.   Right.   I didn't know that.

6    Q.   You didn't know that?

7    A.   No.

8    Q.   You weren't on notice in September -- your testimony

9    is that you weren't on notice in September of 2000

10   unequivocally that this was third-people money,

11   notwithstanding these faxes, notwithstanding the letters

12   that you've seen?

13   A.   Correct.   I did have no idea.

14   Q.   Notwithstanding discussions with Mr. Levine?

15   A.   No idea.

16   Q.   Notwithstanding discussions with Mr. Rasmussen who

17   received correspondence?

18   A.   Actually, Mr. Rasmussen, after the fact -- I know he

19   consulted with other people, and Dan Carpenter was asked

20   whether it was his money, and he said it was.

21   Q.   First of all, sir, that's not responsive to my

22   question.

23        MR. PAPPALARDO:   And I'd ask, your Honor, that

24   that be stricken.

25        THE COURT:   I'll strike it.

```
 1   BY MR. PAPPALARDO:
 2   Q.   Second of all, Mr. Stern, my question to you is
 3   this:  Isn't it true that you knew in September of 2000,
 4   based upon letters that went to Merrill Lynch by Dan
 5   Carpenter, that he was -- that Benistar Property
 6   Exchange Trust Company was dealing in 1031 exchanges;
 7   and, therefore, other people's money, and isn't that why
 8   you transferred the account to your friend Mitch Rock?
 9   A.   Definitely not.
10           MR. PAPPALARDO:  Thank you.
11           THE COURT:  All right.
12           Thank you, Mr. Stern.  You may step down.
13           THE WITNESS:  Thank you.
14           (The witness is excused.)
15           MR. PIROZZOLO:  The government calls Gerald
16   Levine.
17           Your Honor, if I could just have a moment to
18   tidy up?
19           THE COURT:  Sure.
20           (Pause.)
21           THE CLERK:  If you could step up to the box,
22   please?  Up here.  Raise your right hand.
23                   GERALD LEVINE, sworn
24           THE CLERK:  Please be seated.  State your name,
25   spell your last name for the record, keep your voice up
```

```
 1   and speak into the mic, please.
 2           THE WITNESS:  Gerald Levine, L-E-V-I-N-E.
 3                     DIRECT EXAMINATION
 4   BY MR. PIROZZOLO:
 5   Q.   Good morning, Mr. Levine.
 6   A.   Good morning.
 7   Q.   Mr. Levine, where do you live?
 8   A.   New York City.
 9   Q.   How old are you?
10   A.   Seventy-one.
11   Q.   Where do you work now?
12   A.   Law Offices of John M. Paige.
13   Q.   And what's your job there?
14   A.   I am client manager.
15   Q.   And about how long have you worked there?
16   A.   Five and a half years.
17   Q.   Mr. Levine, what's your educational background?
18   A.   Brown University, bachelor's degree, 19 -- class of
19   1958; General Motors Institute of Technology, business
20   management, class of 1960.
21   Q.   Briefly, could you describe your working career up
22   until the time of the late 1990s?
23   A.   I started in the investment business in 1980 to 1983
24   with Oppenheimer & Company, I was the vice president;
25   from 1983 to 1989 I was managing director of 21st
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Securities; from 1990 to 1993 I was the associate

2    national director of commerce and industry with DCI;

3    from '93 to '96 I was managing director of IAG Group;

4    and from '97 to 2003 I was a financial consultant with

5    Merrill Lynch.

6    Q.    When did you join Merrill Lynch?

7    A.    In December of 1997.

8    Q.    And where did you work?  What office?

9    A.    717 Fifth Avenue, New York City.

10   Q.    Who did you work with at Merrill Lynch?

11   A.    Gary Stern.

12   Q.    Did you work at his direction?

13   A.    Yes.

14   Q.    Could you describe briefly what the formal

15   relationship was between you and Mr. Stern.

16   A.    Gary was the primary broker in our group and oversaw

17   the management of the Stern-Levine team and its

18   associates.  And the type of business that Gary did was

19   the type of business that I did.

20   Q.    Do you know a man named Dan Carpenter?

21   A.    Yes.

22   Q.    How do you know him?  When did you meet?

23   A.    I met Dan at a luncheon at the University of

24   Pennsylvania Club in February of 1998.

25   Q.    Who were you with?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Gary Stern and I were there with a friend by the

2    name of Walter Zweifler who introduced us to Dan

3    Carpenter.

4    Q.    What, if anything, at that meeting did you discuss

5    about stock options?

6    A.    Very, very little.

7    Q.    Did there come a time when Mr. Carpenter, either on

8    his own behalf or on behalf of a company he controlled,

9    opened accounts with you at Merrill Lynch?

10   A.    Yes.

11   Q.    When was that, approximately?

12   A.    Mid 1998.  The June-July period, I seem to

13   recollect.

14   Q.    What role, if any, did you have in opening the

15   accounts?

16   A.    I prepared the opening-account forms by asking Dan

17   certain specific questions as to the type of accounts he

18   wanted to open.

19   Q.    And were the accounts in his name or in the name of

20   some other entity?

21   A.    Another entity.

22   Q.    Do you recall what entity that was?

23   A.    Benistar Property Exchange Trust was one of the many

24   entities that Benistar opened with me.

25   Q.    Focusing on the accounts that related to Benistar

PDF created with pdfFactory trial version www.pdffactory.com

1    Property Exchange Trust Company, who was the person who

2    acted on behalf of that company?

3    A.    Daniel Carpenter.

4    Q.    Can you take a look at -- there are two exhibits in

5    folders -- Exhibit 144A and 144B?

6              (Pause.)

7              THE WITNESS:    I'm sorry, but I don't see those

8    exhibits here.    I see 144 and 145.

9    BY MR. PIROZZOLO:

10   Q.    Actually, if you could open up what's in 144.    And

11   is there a sticker on that?

12   A.    Yes; it says "144A."

13   Q.    Okay.    What is that document?

14   A.    That is the page in an opening-account booklet that

15   describes who the customer would be and where the

16   business is located, the type of business and the

17   corporate name.

18   Q.    Did you participate in creating the document?

19   A.    Yes, I did.

20            MR. PIROZZOLO:    The government offers Exhibit

21   144A.

22            MR. PAPPALARDO:    No objection.

23            THE COURT:    Okay.

24            (Exhibit No. 144A received into evidence.)

25   BY MR. PIROZZOLO:

1   Q.   I'm going to project up on the screen portions of

2   that document, Mr. Levine.  There's handwriting on the

3   document, Mr. Levine; do you see that?

4   A.   Yes.

5   Q.   Whose handwriting is on the document?

6   A.   The printed handwriting in heavy print is mine; the

7   account number and the name of the corporation is not

8   mine.

9   Q.   Can you describe how this document was created?

10  A.   I took --

11  Q.   What was the process, if you will?

12  A.   I would take a -- I would ask Dan Carpenter what

13  sort of business account he wanted to open; take the

14  appropriate account-opening information form, ask him

15  the relevant questions that were on the face of the

16  form; and then I mailed the documents to him for his

17  deciding what name to put the document in, his signature

18  and corporate seals.

19  Q.   I've highlighted on the screen here a portion that

20  says "Customer's Principal Activity"; do see that?

21  A.   Yes.

22  Q.   There's a check mark; do you see that?

23  A.   Yes.

24  Q.   And what's the check mark state?

25  A.   "Operating business."

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And it states further below, "Describe business or

2    activity conducted"; do you see that?

3    A.   Yes.

4    Q.   What's it say?

5    A.   "Real estate."

6    Q.   And on top there's an account number listed.  Do you

7    see that?

8    A.   Yes.

9    Q.   Do you recognize that account number?

10   A.   Yes, I do.

11   Q.   And if I refer to that as the "B1 account," would

12   you understand that it relates to this particular

13   account?

14   A.   Yes.

15   Q.   Can you turn to Exhibit 145?  Folder 145?  Oh,

16   excuse me.  Within 144.  Within 144 there should be a

17   second document.

18   A.   There are several pages in 144A in front of me.

19       MR. PIROZZOLO:  May I approach, your Honor?

20       THE COURT:  Yes.

21       THE WITNESS:  And then there's 144B.

22   BY MR. PIROZZOLO:

23   Q.   If you would look at 144B; do you see that?

24   A.   Yes.

25   Q.   And what is 144B?

1   A.   It is similar in form to 144 -- to the previous form

2   that was designated the B1 with similar questions, and

3   it had a different -- it has a different account number

4   on it.

5   Q.   And what's the name of the customer?

6   A.   Benistar Property Exchange Trust Company, Inc.

7   Q.   And did you participate in creating this document as

8   well?

9   A.   No, I didn't.

10  Q.   Do you recognize what this document is?

11  A.   Yes.

12          MR. PIROZZOLO:   The government would offer

13  Exhibit 144B.

14          THE COURT:   Okay.

15          (Exhibit No. 144B received into evidence.)

16  BY MR. PIROZZOLO:

17  Q.   Mr. Levine, I projected the first page of Exhibit

18  144B; do you see that?

19  A.   Yes.

20  Q.   And on that page I've highlighted the top right-hand

21  corner; do you see that?

22  A.   Yes.

23  Q.   And what account does that relate to?

24  A.   That relates to the 849-07B10 account.

25  Q.   What was the difference between the B01 and the B10

PDF created with pdfFactory trial version www.pdffactory.com

1   account, to your recollection?

2   A.   I believe that Mr. Carpenter used the first account,

3   the B01, as an operating account primarily, and that he

4   used this account, the B10, as primarily his trading

5   account.

6   Q.   If you could look further on in that document

7   there's a "customer's principal activity" line.  Do you

8   see that?

9   A.   Yes.

10   Q.   And what's checked there?

11   A.   "Investments."

12   Q.   Now, in opening the accounts, Mr. Levine, did you

13   review any other -- or provide any other paperwork for

14   Mr. Carpenter to sign on behalf of Benistar Property

15   Exchange Trust Company?

16   A.   Yes.

17   Q.   And was that in connection -- did you do that in

18   connection with the B10 account?

19   A.   Yes.

20   Q.   Could you look at Exhibit 145 now?

21        MR. PIROZZOLO:  And, your Honor, that is in

22   evidence.

23        THE COURT:  Okay.

24   BY MR. PIROZZOLO:

25   Q.   Do you have that in front of you?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   Yes.
 2   Q.   And that is a "Standard Option Agreement -
 3   Institutional Accounts Only"; do you see that?
 4   A.   Yes.
 5   Q.   And if you could look at Paragraph 4 -- well, before
 6   we talk about Paragraph 4, what is this document?
 7   A.   When a corporate account wishes to trade options,
 8   the account has to be made aware of the risks of --
 9   involved in trading options, and this must be signed by
10   the account owner in order to start to engage in trading
11   options.
12   Q.   Could you read Paragraph 4?  The first line of
13   Paragraph 4, and Subparagraph A?  Just read it out loud.
14   A.    "As options transactions involve a high degree of
15   risk, we understand that:  A, we should not purchase an
16   option unless we are able to sustain a total loss of the
17   premium and the transaction costs, and we should not
18   write a call option unless we either own the underlying
19   security or a security convertible, exchangeable or
20   exercisable, into such underlying security or are able
21   to sustain financial losses, and that we should not
22   write a put option unless we are able to sustain
23   substantial financial losses."
24   Q.   Now, Mr. Levine, was there an additional document or
25   documents that you provided to Mr. Carpenter relating to
```

1    options?

2    A.    Yes.

3    Q.    Can you look at Exhibit 149.  Do you have that in

4    front of you?

5    A.    Yes, I do.

6    Q.    Do you recognize that document?

7    A.    Yes.

8    Q.    Without getting into the substance of the document,

9    generally what is that document?

10   A.    It is a fax cover sheet.

11   Q.    Who was it sent to?

12   A.    Dan Carpenter.

13   Q.    Who is it sent from?

14   A.    From me.

15   Q.    And does it relate to a particular account?

16   A.    Yes.

17   Q.    Which account?

18   A.    The B10 account.

19          MR. PIROZZOLO:  The government offers Exhibit

20   149.

21          MR. PAPPALARDO:  I have no objection, your

22   Honor.

23          THE COURT:  All right.  Admitted.

24          (Exhibit No. 149 received into evidence.)

25   BY MR. PIROZZOLO:

1    Q.    I'm just publishing the first page of this,

2    Mr. Levine; do you see this?

3    A.    Yes.

4    Q.    The second part of that refers to a document; do you

5    see that?

6    A.    Yes.

7    Q.    Just read that out loud, please.

8    A.    "Please sign and mail back as soon as possible this

9    special statement for uncovered option writers."

10   Q.    Now, there's an attachment to that document?

11   A.    Yes.

12   Q.    And the second page, which I will now project, do

13   you see that?

14   A.    Yes.

15   Q.    And that -- the title of that document is what?

16   A.    "Special Statement for Uncovered Option Writers."

17   Q.    And there's a date on that; do you see that?

18   A.    Yes.

19   Q.    Is that your handwriting?

20   A.    Yes.

21   Q.    It is not signed; is that correct?

22   A.    Correct.

23   Q.    Can you look at Exhibit 146, please?

24        MR. PIROZZOLO:    And, your Honor, that is in

25   evidence as well.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            THE WITNESS:  I'm sorry.  I don't see 146 in

 2    this pile.

 3            MR. PIROZZOLO:  May I approach, your Honor?

 4            THE COURT:  You may.

 5            (Pause.)

 6            THE WITNESS:  Thank you.

 7    BY MR. PIROZZOLO:

 8    Q.   Do you see that document?

 9    A.   Yes.

10    Q.   And do you recognize what that document is?

11    A.   Yes.

12    Q.   Is that a document that you received?

13    A.   Yes.

14    Q.   What types of options does this document relate to?

15    A.   Uncovered options.

16    Q.   What are uncovered options?

17    A.   If you do not own the underlying stock and you wish

18    to do transactions involving options, this is what --

19    this would allow you to do an option trade, a put or a

20    call, without owning the underlying security.

21    Q.   There's a reference in the very first part of the

22    document that says "There are special risks associated

23    with uncovered option writing."  Do you see that?

24    A.   Yes, I see it.

25    Q.   What are the special risks?  What are the special
```

1  risks?

2  A.    Do you want me to read them?

3  Q.    Are the special risks set forth in this document?

4  A.    Yes, they are.

5  Q.    Let's focus on Paragraph 2.

6  A.    Okay.

7  Q.    I'm not going to ask you to read the entire

8  document -- the jurors have already seen this -- but

9  what is this referring to; what types of options?

10  A.    Uncovered put options.

11  Q.    Now, after the accounts were opened, Mr. Levine,

12  what was your role in handling the account?

13  A.    In executing the orders that were unsolicited that

14  were placed by Dan Carpenter.

15  Q.    Can you describe examples of what your day-to-day

16  responsibilities were?

17  A.    On a typical day I would get a phone call from Dan

18  Carpenter saying that he had identified a target list of

19  volatile high-tech stocks that he might be interested in

20  trading, some of them, during that day when the market

21  opened.  He would then ask me once the market opened

22  what the stocks were trading at; he then would ask me

23  what the option pricing would be, typically a month or

24  two months out at a certain strike price.  And we would

25  go through -- I'd have to research it on my screen, get

1    him quotes, give them to him.  Then we would move on to

2    another stock, another stock, another stock, and maybe

3    20 stocks in all.

4        At the end of that identification process, he would

5    typically whittle down the list from about 20 stocks to

6    about ten stocks.  This could have taken half an hour.

7    He then would ask me to go through the same processes

8    again and identify where the stocks were trading as of

9    that point in time, again, what the option pricing would

10   yield to him if he executed some trades.  And then he

11   might whittle it down further or he might tell me to go

12   ahead and execute certain trades if the pricing was what

13   he had felt was an acceptable trade.

14   Q.   What was Mr. Carpenter's predominant strategy,

15   trading strategy, in the B10 account?

16   A.   To sell uncovered puts, take in as much premium as

17   he could, and hope that the underlying stocks would go

18   up.

19   Q.   What is a "put"?

20   A.   A put gives the right to someone to force the seller

21   of a put to take the stock at a certain price.

22   Q.   What is an "uncovered put"?

23   A.   Is where you do not own any of the stock that you

24   are selling a put on.

25   Q.   During the course of your relationship with Mr.

PDF created with pdfFactory trial version www.pdffactory.com

1     Carpenter, did you make any recommendations to him about
2     his trading strategy?
3     A.    Yes.
4     Q.    What were the recommendations that you made to him?
5     A.    From the very beginning of our relationship I
6     recommended to Mr. Carpenter to do an entirely different
7     type of trading strategy, one called "covered call
8     writing," in which he would purchase the underlying
9     stock, he would then sell a call against it.  And if
10    the -- the call is usually sold at a price higher than
11    the price you purchased the stock for -- and the call is
12    usually written about a month out -- and you would
13    receive a premium.
14        If the stock went to the call price or beyond it,
15    the stock would be called away from you at a higher
16    price, you would have participated in the increase of
17    the price and you also received a premium.
18        It was a way of enhancing portfolio yield.  And I
19    also recommended that this strategy should be
20    diversified amongst several different sectors of the
21    marketplace.
22    Q.    What was Mr. Carpenter's response to you?
23    A.    His direct response to me was that doing the
24    strategy like that was watching paint dry or watching
25    grass grow and he had a completely different sense of

PDF created with pdfFactory trial version www.pdffactory.com

1    how he wanted to trade options.

2    Q.   When you say "he had a completely different sense,"

3    was that something he expressed to you?

4    A.   Absolutely.

5    Q.   Mr. Levine, if you could look at Exhibit 151, which

6    is in evidence.

7             MR. PIROZZOLO:  May I approach, your Honor?

8             THE COURT:  All right.

9    BY MR. PIROZZOLO:

10   Q.   Do you have that in front of you?

11   A.   Yes, I do.

12   Q.   I've put it up on the screen here.  Do you recognize

13   that document?

14   A.   Yes, I do.

15   Q.   Did you participate in creating that document?

16   A.   Yes.

17   Q.   And what prompted you to create that document -- or

18   to participate in creating that document, I should say?

19   A.   Gary had received a request from our compliance

20   department -- Thomas Rasmussen was the originator of the

21   request -- to have an active account review of this

22   particular trading account.  And this is the B10

23   account.  And he wanted us to specifically discuss the

24   month of November of 1999 where he realized losses of

25   $100,104, and he had unrealized losses of $273,932.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Now, Mr. Levine, I'm going to magnify the screen

2    here, the first bullet of that document.  Do you see it?

3    A.    Yes.

4    Q.    And can you read the -- just the first sentence of

5    that document -- of that bullet?  Excuse me.

6    A.    "Client is very active and aggressive investor who

7    makes 99 percent of his own unsolicited decisions."

8    Q.    There's a term there, "unsolicited"; do you see

9    that?

10   A.    Yes.

11   Q.    What is "unsolicited"?

12   A.    Unsolicited are transactions that are initiated

13   exclusively by the purchaser and have no recommendation

14   at all from a broker in making these trades.

15   Q.    Further down there's a bullet, a fourth -- excuse

16   me -- a third bulleted paragraph; do you see that?

17   A.    Yes.

18   Q.    And it starts, "Client, who is a licensed attorney";

19   do you see that?

20   A.    Yes.

21   Q.    Who provided that information that appears in that

22   bullet?

23   A.    Dan Carpenter provided the facts and I memorialized

24   them in this memo.

25   Q.    Now, during the course of your relationship,

1    Mr. Levine, with Mr. Carpenter, did you provide

2    profit-and-loss information to Mr. Carpenter?

3    A.    Yes.

4    Q.    Can you please describe what you provided to him and

5    how often?

6    A.    The firm provides us a monthly statement.  In

7    addition to that, whenever Dan executed trades, the

8    following morning, before the stock market opened, I

9    would open up his account screen and I would make a copy

10   of all executed trades that day and fax them to him.

11   Q.    What was on the faxes; what information?

12   A.    The specific options that he had traded in; the

13   amount of the number of contracts that he had executed,

14   sold; the price that he received in premium for those

15   contracts; the total value of the trades; and the total

16   cash position at the end of the trading day.

17          MR. PIROZZOLO:  Your Honor, I'm about to move to

18   a different subject.  I notice it's almost eleven.

19          THE COURT:  All right.  We'll take the morning

20   recess.

21          THE CLERK:  All rise.  The Court will take the

22   morning recess.

23          (Jury out and recess in the proceedings at

24   11:00 a.m.)

25                              - - -

```
 1              (After recess.)
 2              MR. MITCHELL:  May I begin?
 3              THE COURT:  Go ahead.
 4    BY MR. PIROZZOLO:
 5    Q.   Mr. Levine, during the course of your business
 6    relationship with Mr. Carpenter, do you recall
 7    communicating with a man named David Patterson?
 8    A.   No.
 9    Q.   Do you recall receiving any faxes or other
10    information from a Mr. David Patterson?
11    A.   No.
12    Q.   Focusing on 1999, the year 1999, how was
13    Mr. Carpenter's performance with his trading?
14    A.   Initially, I believe that his strategy was proving
15    successful.
16    Q.   Did you discuss his strategy and provide
17    recommendations to him during that period of time, 1999?
18    A.   Yes.
19    Q.   And what was -- what did he say to you about his
20    strategy or about your recommendations?
21    A.   He, again, declined going into a more conservative
22    cover call, writing strategy with greater
23    diversification into various market sectors.  He said he
24    was being successful and he was going to continue with
25    the strategy that he was implementing.
```

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   And how was Mr. Carpenter's performance in the year

2  2000?

3  A.   Time frame?

4  Q.   Yes, let's focus in the first four, five months in

5  2000.

6  A.   I believe that at the beginning of 2000 and for the

7  first month or two, he was up about $200,000, and then,

8  as the technology market rapidly turned, he experienced

9  a loss, a net position loss of over a million dollars.

10 Q.   During the period of time that the technology market

11 turned in 2000, did you speak with Mr. Carpenter about

12 his losses?

13 A.   Yes.

14 Q.   What did you say to him and what did he say to you?

15 A.   I had told him that I didn't feel that his strategy

16 was the proper strategy to employ with the market

17 changing.  He felt the market was just going through a

18 temporary hiccup.  He was sure that he could recover his

19 losses.

20       I said to him that he was getting more and more

21 frequent margin calls in his account, and I even advised

22 him at one point that he could put on no additional

23 trades unless he were to wire in a million dollars to

24 wipe out a negative margin debt.

25 Q.   Focusing on the time frame May 2000, did you and

1    Mr. Carpenter have a -- withdrawn.

2         Focusing on the time frame of May 2000, did

3    Mr. Carpenter suffer losses that you and he discussed?

4    A.   Yes.

5    Q.   What prompted the conversation?

6    A.   The amount of losses he was experiencing, the amount

7    of margin calls, the frequency of his having negative

8    balances in his account.  This was ongoing, the market

9    was eroding rapidly, and he had not adjusted his

10   strategy accordingly, despite our recommendations to

11   change.

12   Q.   What did he say to you?

13   A.   He said that he had the mentality of a riverboat

14   gambler in doing some of the trades, in trying to

15   quickly recoup by going larger and larger contracts and

16   positions to recoup the losses that he was sustaining.

17   Q.   Now, you mentioned a margin call, a specific margin

18   call, you mentioned a million dollars?

19   A.   Yes.

20   Q.   Can you describe what is a margin call?

21   A.   If you are borrowing money from a broker's firm, in

22   this case it was Merrill Lynch, you're using the firm's

23   money to do transactions based on the overall value of

24   your portfolio.  If the value of the portfolio is

25   declining because of the underlying stocks dropping

PDF created with pdfFactory trial version www.pdffactory.com

1    rapidly, the supporting stocks are no longer as valuable

2    and cannot give you as much margin; therefore, you have

3    to come up with additional cash to come up to a certain

4    minimum amount.

5    Q.    Typically, what did Mr. Carpenter do to meet margin

6    calls?

7    A.    He would typically transfer funds from his operating

8    B01 account into his B10 account if he wanted to do

9    trading that day.

10   Q.    Mr. Levine, can you look at Exhibit -- the document

11   that's in the folder marked Exhibit 150?

12   A.    It's in front of me.

13   Q.    Do you see that?

14   A.    Yes.

15   Q.    Do you recognize what that is?

16   A.    Yes.

17   Q.    Without getting into the substance of the document,

18   just generally describe what it is.

19   A.    It is a fax from Daniel Carpenter to me authorizing

20   the transfer of one million dollar --

21   Q.    Don't get into the substance just yet.

22   A.    I'm sorry.  It's a fax from Daniel Carpenter to me.

23   Q.    And the date, please?

24   A.    May 30, 2000.

25   Q.    If you can look, there are additional pages behind

1    Exhibit 150, if you can flip through this.

2            Generally, what are they?

3    A.   The same sort of instructions, transferring money

4    from an operating account to a trading account.

5            MR. PIROZZOLO:  The government would offer

6    Exhibit 150.

7            MR. PAPPALARDO:  If I may have a moment, your

8    Honor.

9            (Pause.)

10            MR. PAPPALARDO:  May we approach, your Honor?

11            (At sidebar on the record.)

12            MR. PAPPALARDO:  Your Honor, my inquiry here has

13    to do with the relevance of this.  This is dated May

14    30th of 2000, which shows a transfer from one account to

15    another.  And given the fact that the time frame in this

16    case and, indeed, Mr. Carpenter's state of mind is

17    within the critical period of August through November of

18    2000, I'm not sure what this shows, where it's clear

19    that he's transferred money back and forth; it's clear

20    that they lost money in March; it's clear that they were

21    over the top in July of the same year.  And I mean, I

22    don't understand why -- you know, what's the relevance

23    of this?  Clearly they transferred money back and forth,

24    that's in the case already.  I don't know what this is.

25            MR. PIROZZOLO:  This establishes a series of

1    transfers to meet the margin calls.  There's already

2    been testimony regarding the margin calls that were

3    made.  The relevant period of time includes May 30 and

4    following.  We've already had a series of notices that

5    were given to Mr. Carpenter that date at least from --

6    at least from February of 2000.  It's within the

7    relevant period of time and it goes to -- it goes to

8    both his intent and the management of the funds.

9         This came from the B10 account, which is the

10   client funds account, and he is using it to meet a

11   margin call for his trading.  It's -- it's relevant,

12   your Honor.

13        MR. PAPPALARDO:  And I would ask, your Honor, if

14   there's going to be testimony eliciting this being a

15   margin call, where's the margin call?  Where's the

16   backup documentation to this?

17        Quite frankly, for there to be an assertion,

18   particularly outside of the period of time, that this is

19   a margin call out of a subaccount to the operating --

20   the master account, we're certainly going to need some

21   backup, if that's what he's going to elicit.

22        THE COURT:  Okay.  I think it's relevant,

23   whether or not it's to a margin call.

24        MR. PAPPALARDO:  My question is:  What's coming

25   up?

```
 1              THE COURT:  We'll hear what we hear.  The
 2    objection is overruled.
 3              (End of discussion at sidebar.)
 4              MR. PIROZZOLO:  The government moves to admit
 5    Exhibit 150.
 6              THE COURT:  Okay.  Admitted.
 7              (Exhibit 150 received into evidence.)
 8              MR. PIROZZOLO:  May I publish it?
 9              THE COURT:  You may.
10    BY MR. PIROZZOLO:
11    Q.  Let's look at the very first page of Exhibit 150,
12    which I've projected the on screen, Mr. Levine.  Do you
13    see that?
14    A.  Yes.
15    Q.  And you see it's to you?
16    A.  Yes.
17    Q.  From?
18    A.  Daniel Carpenter.
19    Q.  And there's a signature at the bottom.  Do you see
20    that?
21    A.  Yes.
22    Q.  And what does it appear to say?
23    A.  Daniel E. Carpenter, Esquire.
24    Q.  And there's a reference line, re: line, do you see
25    that, where it says, "Benistar Property Exchange Trust"?
```

1  A.   Yes, right.

2  Q.   And then there's -- there is a sentence that starts,

3  "please transfer."   Can you just read that, please?

4  A.   "Please transfer $1 million from account 849-07B01

5  to account 84907 B10."

6  Q.   You were referencing a margin call of a million

7  dollars a few moments ago?

8  A.   Yes.

9  Q.   How, if at all, does this relate to that testimony?

10        MR. PAPPALARDO:   Objection, your Honor.

11        THE COURT:   Overruled.

12  A.   This wire satisfied the margin call that was due

13  that day.

14  Q.   How often did Mr. Carpenter face margin calls?

15  A.   Frequently, as the year progressed.

16  Q.   Can you turn to the second page of Exhibit 150,

17  which I'll publish?

18        And what's the date of that?

19  A.   August 8, 2000.

20  Q.   And that relates to a transfer.  Do you see that?

21  A.   Yes.

22  Q.   And how much is it for?

23  A.   $400,000.

24  Q.   What account is it going from?

25  A.   From the 849-07B01 to --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   What account is it going to?

 2   A.   849-07B10.

 3   Q.   And whose signature is at the bottom of that?

 4   A.   Daniel Carpenter.

 5   Q.   Can you look at the next page?

 6        What's the date of that document?

 7   A.   August 18, 2000.

 8   Q.   And that relates to a transfer.  Do you see that?

 9   A.   Yes.

10   Q.   How much is being transferred?

11   A.   $300,000.

12   Q.   From what account?

13   A.   The B01 account.

14   Q.   To what account?

15   A.   The B10 -- excuse me, I misstated.  To the -- it's

16   going from the B01 to the B10 account.

17   Q.   Thank you, Mr. Levine.

18        Can you turn to the next page of that?

19        That relates to a transfer, correct?

20   A.   Yes.

21   Q.   How much?

22   A.   $200,000.

23   Q.   From which account?

24   A.   B01 to B10, September 7th.

25   Q.   Can you look at the next page of that document?
```

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    What's the date of that document?

3    A.    September 19, 2000.

4    Q.    And for -- how much is being transferred?

5    A.    $500,000.

6    Q.    From what account and to what account?

7    A.    The B01 account was the transferring account, the

8    B10 was the receiving account.

9    Q.    Whose signature is on that?

10    A.    Daniel E. Carpenter.

11    Q.    Then the last page of the exhibit --

12    A.    Yes.

13    Q.    -- what does that show?

14    A.    A wire transfer of $70,000.

15    Q.    From which account?

16    A.    B01 to B10.

17    Q.    And who signed that?

18    A.    Daniel Carpenter.

19    Q.    After the May 2000 conversation that you testified

20    to a few moments ago, through the summer and into

21    September of 2000, did you observe any changes in

22    Mr. Carpenter's trading strategy or patterns?

23    A.    I believe that earlier in the year he had finally

24    agreed to go to a more conservative strategy, and he

25    initially opened up three accounts to do the

1    conservative cover-call writing or to do buying

2    preferred utility stocks and holding them to get

3    dividends.  He briefly funded the accounts that were

4    going to do the option -- the cover-call option writing,

5    but he had margin calls, and he withdrew those funds

6    before we ever got started.  Again, during the course of

7    this period that you just identified, he was losing more

8    and more money and still sticking, stubbornly, to his

9    strategy.

10   Q.   The accounts you just referenced, are those accounts

11   different than the two accounts that we've been speaking

12   about here, the B01 and B10 accounts?

13   A.   Yes, they are.

14   Q.   And are the accounts different from the Benistar

15   Property Exchange Trust Company accounts?

16   A.   Yes, they were.

17   Q.   Now, at some point in time did Merrill Lynch decide

18   not to allow Mr. Carpenter to continue options trading?

19   A.   There came a time where they prohibited him from

20   putting on new positions in options trading, but did

21   allow him to complete option trades he already had on

22   the books.

23   Q.   Did you communicate this decision to Mr. Carpenter?

24   A.   Yes, I did.

25   Q.   What did you say to him and what did he say to you

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    when you communicated this decision to Mr. Carpenter?

 2    A.    To the best of my recollection, I spoke to him

 3    mid-morning after I had been informed by senior

 4    management that he would no longer be allowed to do --

 5    put on any --

 6              MR. PAPPALARDO:  Objection, your Honor.  It's

 7    not responsive to the question.

 8              THE COURT:  I agree.

 9              Try again.

10    BY MR. PIROZZOLO:

11    Q.   Let's focus on what you said to him and what he said

12    to you.

13    A.    I told Mr. Carpenter that he would no longer be

14    allowed to put on any new positions.  He could close out

15    his existing positions.  He was very, very unhappy about

16    the decision --

17              MR. PAPPALARDO:  Objection, your Honor.  What he

18    was or wasn't isn't responsive.

19              THE COURT:  The question is what he said.

20    A.    He said to me he was very unhappy about that

21    decision.  He asked me if there was any chance that it

22    was temporary and that he could continue the trading.  I

23    told him it was a final decision, but he could take his

24    trading and do it at any other broker's firm that he so

25    desired.
```

1   Q.   Did he say anything on that call that you can

2   recall -- or in that conversation that you can recall?

3   A.   I believe he wanted to talk after the market closed

4   to Tom Rasmussen, the compliance manager, and plead his

5   case.

6   Q.   What, if anything, did you talk to Mr. Carpenter

7   about in addition to what you've just testified about

8   switching brokers?

9   A.   That he could go to anybody that he wanted to.

10  Q.   Did he eventually switch?

11  A.   Yes, he did.

12  Q.   Where did he go?

13  A.   He asked me if I knew of any brokers who specialized

14  in the type of option trading that he did.  I said I

15  didn't know of anybody, but possibly he could talk to

16  Gary Stern, who might know of some names.

17  Q.   Mr. Levine, during the period of time that you were

18  working on Mr. Carpenter's accounts, the Benistar

19  Property Exchange Trust accounts, did you have access to

20  account statements?

21  A.   Yes.

22  Q.   Would you take a look at Exhibit 148D, which is in

23  front of you?

24  A.   I have it.

25  Q.   Do you recognize what that is?

```
 1    A.    Yes.

 2    Q.    What is it?

 3    A.    It is a monthly account statement for the B10

 4    account that is produced each month and sent out to

 5    clients.

 6    Q.    For which month does this apply?

 7    A.    This particular one is for the end of the month of

 8    September of 2000.

 9    Q.    Is that a record that's kept in the ordinary course

10    of business at Merrill Lynch?

11    A.    Yes.

12           MR. PIROZZOLO:  The government would offer

13    Exhibit 148D.

14           MR. PAPPALARDO:  Objection, your Honor.

15           THE COURT:  Overruled.

16           MR. PAPPALARDO:  Can we see you at sidebar?

17           THE COURT:  All right, I'll see you.

18           (At sidebar on the record.)

19           MR. PAPPALARDO:  Your Honor, I have no objection

20    to portions of this document coming in; however, what

21    I'm objecting to are these references down here that

22    talk about, you know, treasury bills, treasury bonds and

23    Dow Jones Industrial Average and that sort of thing,

24    which have no bearing in this case.  I would suggest to

25    the Court that they're misleading and confusing.  They
```

1  have no relevance to this case.  I have no problem if

2  the exhibit goes in with that redacted.

3         MR. PIROZZOLO:  Your Honor, it's a business

4  record; it comes on in.  The issue as to the interest

5  rates, first of all, it shows notices -- it is relevant,

6  actually, because it provides notice as to what the

7  operating interest rate was at the time of the events

8  here.  It shows that they could have obtained an

9  interest rate and paid out the three and six percent

10 easily based on prevailing market rates.  It's relevant,

11 and it's a business record.

12        THE COURT:  Yes, I think it falls within the

13 hearsay exception, and I don't think 403 calls for its

14 exclusion, so I'll put it in as is.

15        MR. PAPPALARDO:  We object, your Honor.

16        MR. PIROZZOLO:  Thank you, your Honor.

17        (End of discussion at sidebar.)

18        MR. PIROZZOLO:  The government offers Exhibit

19 148D.

20        THE COURT:  All right.

21        (Exhibit 148D received into evidence.)

22        MR. PIROZZOLO:  May I publish?

23        THE COURT:  You may.

24 BY MR. PIROZZOLO:

25 Q.  Now, Mr. Levine, I'm going to magnify certain

1    portions of this document.

2          What's it relate to?  Who's the client?

3    A.   Benistar Property Exchange Trust Company, Inc.

4    Q.   And what is this document called?

5    A.   The Monthly Portfolio Summary.

6    Q.   What's the date that this applies to?

7    A.   As of October -- as of September 29th, year 2000.

8    Q.   What's the balance in the account at this point in

9    time?

10   A.   $790,089.32.

11   Q.   What account does this apply to?

12   A.   The B10 account.

13   Q.   Down below, there's a page listing, it says 1 of 86,

14   I believe?

15   A.   Yes.

16   Q.   Now, Exhibit 148D isn't all 86 pages, is it?

17   A.   No, it's abbreviated.

18   Q.   What's the statement period?

19   A.   September 1 of 2000 to September 29, 2000.

20   Q.   If you could turn to the second page of that

21   document, Mr. Levine?

22          Do you see that?  Do you have it in front of

23   you?

24   A.   Yes, I do.

25   Q.   Now, in the middle part of the document there's a

PDF created with pdfFactory trial version www.pdffactory.com

1    realized capital gain and loss summary.  Do you see

2    that?

3    A.   Yes.

4    Q.   Can you read out the line that says, "short term"?

5    A.   "This month short-term capital loss" -- because it's

6    in parenthesis -- "of $1,770,973.06."

7    Q.   And there's a year-to-date number.  Do you see that?

8    A.   Yes.

9    Q.   What's the year-to-date number?

10   A.   That's a loss figure, because of parenthesis, of

11   $4,000,283.69.

12          MR. PIROZZOLO:  I have nothing further, your

13   Honor.

14          MR. PAPPALARDO:  May I proceed, your Honor?

15          THE COURT:  Yes.

16                      CROSS-EXAMINATION

17   BY MR. PAPPALARDO:

18   Q.   Mr. Levine, my name is John Pappalardo, and,

19   together with Mr. Greenberg, we represent Mr. Daniel

20   Carpenter.

21          Now, Mr. Levine, based upon your interactions

22   with Mr. Carpenter, you would say that he was a fellow

23   who was very knowledgeable in securities, wouldn't you?

24   A.   He characterized himself that way.

25   Q.   And I'm asking you what you would say, sir.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   Would you repeat the question, please?

 2   Q.   Was he knowledgeable in securities?

 3   A.   He seemed to be.

 4   Q.   Was he knowledgeable in options?

 5   A.   He seemed to be.

 6   Q.   You knew that his brother was an investment adviser,

 7   did you not?

 8   A.   I thought his brother was an analyst.

 9   Q.   Worked with investments?

10   A.   That's what he told me.

11   Q.   Well, that's what you told your bosses, too, right?

12   A.   I repeated what he told me to my bosses, yes.

13   Q.   Mm-hmm.  And let me show you, sir --

14        (Pause.)

15        MR. PAPPALARDO:  May I approach, your Honor?

16        THE COURT:  Yes.

17   BY MR. PAPPALARDO:

18   Q.   Sir, I direct your attention to Exhibit 409, which

19   is in evidence.  Do you see that document?

20   A.   Yes.

21   Q.   Now, do you recognize that document?

22   A.   Yes.

23   Q.   That's a document you testified about on direct

24   under a different exhibit number, right?

25   A.   Yes.
```

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Okay.  And you recognize this as the WCMA account

2   opening form on the front page?

3   A.   For a particular account, yes.

4   Q.   For account number 849-07B01, right?

5   A.   Correct.

6   Q.   And that is the subaccount of the two accounts that

7   Benistar Property Exchange Trust Company had with

8   Merrill Lynch, is it not?

9   A.   That was the account he so designated.

10  Q.   It was an account he designated?

11  A.   Yes.

12  Q.   That was the subaccount, wasn't it?

13  A.   There were two accounts with the name Benistar.

14  Q.   Right.

15  A.   One account he wanted to have as a master account,

16  and the other account he designated as the subaccount.

17  Q.   Now, and the account he designated as the master

18  account was the B10 account, right?

19  A.   Yes.

20  Q.   And are you saying that was his designation and not

21  yours?

22  A.   Yes.

23  Q.   Okay.  Now, the top of this account opening form, it

24  says, "Benistar Property Exchange Trust Company,"

25  right?

 1   A.   It says, "Inc." after that.

 2   Q.   Right.  It says, "Trust Company," right?

 3   A.   Yes.

 4   Q.   Did you discuss with Mr. Carpenter the business of

 5   Benistar Property Exchange Trust Company?

 6   A.   Yes.

 7   Q.   And did he tell you it was in the business of

 8   property exchanges for clients?

 9   A.   No.

10   Q.   Okay.  Now, let's move on, Mr. Levine.

11        He signed the form, the IRS form W-9, for --

12   with a taxpayer identification number, right?

13        And he signed it on October 12; is that correct?

14   A.   I don't know.  Where is that?

15   Q.   You see in the upper left corner, sir, of this

16   package of documents, you see the number there, there's

17   a Bates stamp number?

18   A.   9364.

19   Q.   Right.  Would you go, please, to 9366?

20   A.   I have it.

21   Q.   Do you see that?

22   A.   Yes.

23   Q.   And this document was signed on October 12, 1998,

24   was it not, sir?

25   A.   So indicated.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And you have no reason to question that date, do

2    you?

3    A.    No.

4    Q.    And if you go to 9640 --

5    A.    I have it in front of me.

6    Q.    -- Mr. Carpenter signs as chairman and secretary of

7    Benistar Property Exchange Trust Company, right?

8    A.    Inc.

9    Q.    Inc.  Sorry about that.  Inc., right?

10   A.    Yes.

11   Q.    And this document was packaged with the others, so

12   it was signed on October 12th of 1998, right?

13   A.    That's an assumption you're asking me to make.

14   Q.    I'm asking from your memory, sir, did this package

15   of documents come to you together?

16   A.    To the best of my recollection, it did.

17   Q.    Okay.  And you have no reason to disbelieve that

18   this was done on or about October 12, 1998, right?

19   A.    I can only assume that it was done around that time.

20   Q.    Okay.  And if you look at 9641.

21   A.    I have it.

22   Q.    There's a corporate seal there?

23   A.    Yes, there is.

24   Q.    And there's a signature of Daniel Carpenter, Daniel

25   E. Carpenter, and that's also October 12, 1998, right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    It so appears.

2    Q.    Now, let's go to the Standard Option Agreement,

3    which is 9655, that you testified about on direct

4    examination.

5          That indicates that it was signed, also, in the

6    lower left-hand corner by Daniel E. Carpenter on October

7    12th of 1998, right?

8    A.    Yes.

9    Q.    And he signs that -- on 9596 he signs it as Daniel

10   E. Carpenter, 9/12/98, as chairman, right?

11   A.    Yes.

12   Q.    And this relates to the subaccount, the 01 account,

13   right?

14   A.    Yes.

15   Q.    In your discussions with Mr. Carpenter as you opened

16   this account with him, he told you he was the only

17   chairman and secretary of the corporation, right?

18   A.    Yes.

19   Q.    There was no other chairman, no other secretary, no

20   other officers that he mentioned to you, right?

21   A.    None.

22   Q.    And he also specifically told you that there were no

23   other officers -- if there were no other officers, he

24   would sign in both spots, right, if necessary?

25   A.    Yes.

```
 1   Q.   Now, after you sent out all of the forms associated
 2   with the opening of this account to Mr. Carpenter, you
 3   received them back fully signed by him in the mail,
 4   right?
 5   A.   I believe so.
 6   Q.   That's how you got them, right?  He didn't -- you
 7   didn't have a meeting in person?
 8   A.   He did come into the city several times.  I do not
 9   specifically recall whether this particular document
10   came to me via mail or whether he came in and delivered
11   them in my office.  I cannot testify which way I
12   received them.
13   Q.   Well, do you have a recollection of a meeting, sir,
14   where you're across the table from him going over these
15   documents?
16   A.   At some times, yes.
17   Q.   The account opening documents?
18   A.   I believe that most of this was done via mail, but
19   he did come into the office on some occasions and go --
20   went over some of these documents with me.
21   Q.   But is it your testimony, sir, that you received
22   these by mail?
23   A.   It's my testimony I received them.  I don't recall
24   specifically how I received them.
25   Q.   And what about the account B10?  Did you send out
```

PDF created with pdfFactory trial version www.pdffactory.com

1    the forms for him for the master account and receive

2    those back by mail?

3    A.   He may have picked them up when he was at my office.

4    He asked me for several blank sets of documents, that he

5    wasn't sure which account names he wanted to put on

6    them.  So he may have gotten a complete package, several

7    packages of account opening documents from me in person,

8    or I could have sent them up by mail as well.  He did

9    request quite a few sets.

10   Q.   And my question, sir, is:  Did you receive them back

11   by mail?

12   A.   Again, my answer --

13   Q.   The B10 account?

14   A.   I can only assume that I did, but I'm not certain

15   that I did.  It may have been in person.

16   Q.   Now, let's move ahead to October 22nd of 1998, ten

17   days after Mr. Carpenter signed these forms.

18         At that point in time, sir, isn't it true that

19   you did have a telephone conversation with an attorney

20   by the name of David Patterson?

21   A.   No.

22   Q.   You had no conversation with Mr. Patterson?

23   A.   No.

24   Q.   Are you saying that unequivocally or because you

25   don't remember a conversation, sir?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   I'm saying I had no conversation with a David
 2   Patterson.
 3   Q.   At any time?
 4   A.   At any time.
 5   Q.   Okay.  Does it refresh your memory, sir, that
 6   Mr. Patterson told you he represented a client in
 7   connection with the sale of a 1031 property exchange
 8   which Benistar was handling?
 9   A.   No.
10   Q.   Does it refresh your memory at all that on the 22nd
11   of October he said to you that to preserve the
12   tax-deferred status with the proceeds of the sale,
13   neither he nor his client could have any control over
14   the funds?
15        MR. PIROZZOLO:  Objection just to the form, your
16   Honor.  I think if there's a document to show
17   Mr. Levine, he can read it and see if it refreshes his
18   recollection or not.
19        THE COURT:  All right.
20        MR. PAPPALARDO:  If I may approach, your Honor.
21        THE COURT:  You may.
22   BY MR. PAPPALARDO:
23   Q.   Sir, I show you Exhibit -- what has been marked as
24   342.  Do you see that?
25   A.   Yes.
```

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   I direct your attention to the first page of that.

2        Actually, if you just read that to yourself,

3   sir.

4        (Pause.)

5   Q.   Sir, to speed things up, I want to direct your

6   attention specifically to paragraphs 10, 11, and 12.

7   I'll first ask you questions about 10.

8   A.   I haven't finished reading the first page.  Do you

9   want me to continue to get to that point, or do you want

10  me to skip to that point?

11  Q.   I would skip to 10, paragraph 10.

12  A.   Okay.

13        (Pause.)

14  A.   All right.  I've read the paragraph.

15  Q.   And, sir, does that refresh your memory that you had

16  a conversation with Mr. Patterson where he told you that

17  he represented a client in connection with the sale of a

18  1031 property exchange?

19        MR. PIROZZOLO:  Objection, your Honor.  This is

20  now hearsay.

21        THE COURT:  No, overruled.  You may have it.

22  BY MR. PAPPALARDO:

23  Q.   That he represented a client in connection with a

24  1031 property exchange which Benistar was handling?

25  A.   No.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Does that refresh your memory at all?

2    A.    No.

3    Q.    Reading, again, paragraph 10, does it refresh your

4    memory that Mr. Patterson told you on the 22nd of

5    October of 1998 that to preserve the tax-deferred status

6    of the proceeds of the sale, neither he nor his client

7    could have any control over the funds?

8            MR. PIROZZOLO:  Objection, your Honor.  This is

9    reading from a document, it's hearsay.

10           THE COURT:  Overruled.

11   A.    I believe you said October 22nd.  The paragraph 10

12   says October 21st.  Am I in error, or did you misstate?

13   Q.    On October 21st or October 22nd.  You're right, the

14   paragraph says October 21st.  At any time in October?

15   A.    The question?

16   Q.    The question was:  At any time in October, did you

17   have a conversation with an attorney by the name of

18   David Patterson --

19   A.    No.

20   Q.    -- where he said to you that to preserve the

21   tax-deferred status of the proceeds of sale, that

22   neither he nor his client could have any control over

23   the funds.  Does that refresh your memory, sir?

24   A.    No.

25   Q.    At any point in time, either October 21st or October

1    22nd of 1998, did David Patterson tell you by phone the

2    account had to be an escrow account?

3    A.    No.

4    Q.    Do you remember a conference call in October of 1998

5    where Dan Carpenter called you with an individual who

6    identified himself as David Patterson, an attorney

7    representing a client?  Do you remember a conference

8    call?

9    A.    No.

10    Q.    Now, sir, if such a call occurred, that would be

11    something you would remember, isn't it?

12    A.    Yes.

13          MR. PAPPALARDO:  May I approach, your Honor?

14          THE COURT:  You may.

15    BY MR. PAPPALARDO:

16    Q.    Sir, I put before you Exhibit 402.

17          Do you see that, sir?

18    A.    I have 402 in front of me.

19    Q.    Yes.  Do you know what that is?  Just yes or no.

20    A.    It looks like it says a summary of charges from

21    Sprint to David Patterson and Timothy Loff.

22    Q.    It's a -- is it fairly identified as a phone bill to

23    David Patterson from Sprint?

24    A.    It says it's a summary of charges.

25    Q.    Okay.  I'm going to direct your attention to the

1    last page of that document, and specifically to the date

2    of October 22nd at 10:22 a.m., which is number 1 on the

3    last page.  Do you see that, sir?

4    A.    10:22 a.m., yes, I see it.

5    Q.    Okay.  And you see there -- you see the number

6    that's being called at 10:22 a.m.?

7    A.    Yes.

8    Q.    Is that your number?

9    A.    That is my number.

10   Q.    212-415-7486?

11   A.    That is correct.

12   Q.    And that's your personal telephone number, isn't it?

13   A.    Yes, it is.

14   Q.    And do these records indicate a call that lasted

15   ten-and-a-half minutes?

16   A.    Yes.

17            MR. PIROZZOLO:  Objection, your Honor.  This is

18   not in evidence.  Again --

19            MR. PAPPALARDO:  I would offer it, your Honor.

20            MR. PIROZZOLO:  The government would object with

21   respect to it coming into evidence through this witness,

22   your Honor.

23            MR. PAPPALARDO:  I offer it de bene, for the

24   next witness, your Honor.

25            MR. PIROZZOLO:  Can we be heard on this?

1          THE COURT:  All right.

2          (At sidebar on the record.)

3          THE COURT:  What do you mean, the next witness,

4    Patterson?

5          MR. PAPPALARDO:  It will be Patterson.  I don't

6    mean the next one.  It will be going in through

7    Patterson, and I would ask to put it in now, your Honor,

8    because -- rather than recall this witness, I ask that

9    this go in through Patterson.

10         And I would represent to the Court there's -- I

11   have a reasonable basis for putting this in through

12   Patterson.

13         THE COURT:  What's the objection to the

14   document?  It's authentication?

15         MR. PIROZZOLO:  Yes.  It's not a document this

16   witness has ever seen before, it's nothing he knows

17   about, it's not appropriately offered through him,

18   there's no foundation for it for purposes of this

19   witness.

20         I don't even know if Mr. Patterson can put this

21   in.  Maybe he can, maybe he can't, I don't know.

22         MR. PAPPALARDO:  Your Honor, it's in his

23   affidavit.

24         THE COURT:  I would assume that Patterson can

25   probably lay a foundation for it.

1          MR. PAPPALARDO:  I would represent to the Court

2      that I have a good-faith basis for expecting

3      Mr. Patterson to identify this document, and it's being

4      offered now de bene subject to being tied in by

5      Mr. Patterson.

6          THE COURT:  Yes, I'll admit it.

7          Well, I won't admit it, but I'll allow you to

8      use it, I guess.

9          MR. PIROZZOLO:  Will we have a limiting

10     instruction, your Honor, as to what de bene means?

11         THE COURT:  I don't think it's necessary.  I

12     think it would be confusing.

13         (End of discussion at sidebar.)

14         MR. PAPPALARDO:  I would offer it, your Honor.

15         THE COURT:  I thought the resolution -- you may

16     use it without offering it.

17         MR. PIROZZOLO:  Your Honor, we object, then.

18         MR. PAPPALARDO:  Well, your Honor -- I will use

19     it, your Honor, and tie it up later.

20         THE COURT:  You may use it; it may be formally

21     offered later.

22         MR. PIROZZOLO:  Thank you.

23     BY MR. PAPPALARDO:

24     Q.  Now, sir, this indicates there was a telephone

25     conversation by somebody in the Patterson law firm at

PDF created with pdfFactory trial version www.pdffactory.com

1  10:22 a.m. in New York at your phone number,

2  212-415-7486, for 10.5 minutes.  In fact, it was charged

3  $2.21 for that phone call on the 22nd of October of

4  1998; isn't that fair to say?

5  A.    No.

6  Q.    What part of that is not fair to say?

7  A.    You said there was a phone conversation.  That could

8  very well have been that he was on hold, waiting for me

9  to pick up the phone, or it doesn't indicate who he was

10 talking to, if he did have a phone call.  I have

11 multiple phone lines on my desk.  I use some for

12 outgoing calls, I use some for incoming calls.  I never

13 had a conversation with Mr. Patterson on that date.

14 Q.    Okay.  But you would agree that there's a bill for a

15 10.5-minute phone call on that date, right?

16 A.    Yes.

17 Q.    Okay.

18        MR. PAPPALARDO:  May I approach the witness,

19 your Honor?

20        THE COURT:  All right.

21 BY MR. PAPPALARDO:

22 Q.    Sir, I ask you to look at Exhibit 408.

23 A.    I have it in front of me.

24 Q.    Can you identify that document?

25 A.    This is a memo that I sent to a David Patterson in

1    response to a note that I received on my desk that he

2    required some documentation.

3    Q.   This is a fax -- this is a facsimile that you sent

4    to a David Patterson, right?

5    A.   Yes.

6    Q.   And the facsimile was sent on October 22, 1998;

7    isn't that fair to say?

8    A.   Yes.

9    Q.   It's in your writing, isn't it?

10   A.   Yes.

11   Q.   It's signed by you, isn't it?

12   A.   Yes.

13   Q.   It indicates your phone number on the face of it?

14   A.   Yes.

15   Q.   It indicates your fax number on the face of it,

16   right?

17   A.   Yes.

18            MR. PAPPALARDO:  I offer it, your Honor.

19            MR. PIROZZOLO:  No objection.

20            THE COURT:  Okay.

21            (Exhibit 408 received into evidence.)

22            MR. PAPPALARDO:  May it be published?

23   BY MR. PAPPALARDO:

24   Q.   Now, sir, if you look at the upper left-hand corner

25   of that facsimile, it says, "10/22/1998 10:47," right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    And you would agree that's approximately ten minutes

3    after the entry on the phone bill stopped, right?  If

4    you look back at the phone bill.

5    A.    It looks like 15 minutes.

6    Q.    Okay.  Fifteen minutes.  Fifteen minutes after

7    the -- whatever this was, this phone call concluded,

8    right?

9    A.    Right.

10   Q.    On the same day.  And it's sent to Attorney

11   Patterson.  Who's Attorney Patterson?

12   A.    I have no idea.  I received a note on my desk to

13   send out faxes about the Benistar opening account forms

14   to this individual.  I sent out a fax.  I don't know who

15   he was.

16   Q.    And do you have that note?

17   A.    No, I don't have that note.

18   Q.    And up until this point in time, the only person

19   that you knew to be affiliated with Benistar was Mr. Dan

20   Carpenter, as chairman and secretary, right?

21   A.    Yes.

22   Q.    Why would you send out forms to a different

23   individual?

24   A.    The note on my desk said please send copies of the

25   Benistar opening accounts.

1   Q.   Now, these were the opening accounts for their --

2   for the 01 and 10 accounts, right?

3   A.   I believe they were blank forms that I sent out.  No

4   designation as to the account number.  This was,

5   apparently, opening up either another account or to see

6   what type of documents we used to open up this account,

7   these accounts.

8   Q.   Did you assign Mr. Patterson to be anybody

9   affiliated with Benistar?

10  A.   In my comments, I said, "If you want to designate

11  someone to sign as a Benistar Property Exchange officer,

12  have them sign on the left side of the page.  Dan will

13  sign as secretary.  If not, Dan will sign in both

14  places.  It's your call."

15  Q.   And did you call Dan Carpenter and ask who this

16  Mr. Patterson was?

17  A.   No.

18  Q.   Did you have a conversation with Dan Carpenter about

19  Mr. Patterson?

20  A.   No.

21  Q.   Isn't it true, sir, that you were on a phone call

22  with Dan Carpenter and David Patterson?

23  A.   No.

24  Q.   It's not true?

25  A.   It's not true.

1    Q.   So you're saying not that you don't remember, but
2    that the call never happened; is that your testimony?
3    A.   Yes.
4    Q.   Now, what you sent him were the opening of account
5    forms, right?
6    A.   Yes.
7    Q.   Blank sheets?
8    A.   Yes.
9    Q.   Isn't it fair to say that you would have only sent
10   out the subaccount authorization form to Patterson after
11   you either spoke to Patterson or Carpenter?
12   A.   No.
13   Q.   Mr. Carpenter had not designated anyone else and
14   never told that you Attorney Patterson was involved in
15   Benistar, right?
16   A.   I never heard the name Patterson.
17        I didn't even address this to an attorney; I
18   addressed this to a specific name.
19   Q.   So your testimony, sir, today is that you sent this
20   fax with a WCMA subaccount authorization form asking
21   someone who you never spoke with or spoke to Dan
22   Carpenter about to sign as a Benistar Property Exchange
23   officer?  That's your testimony?
24   A.   It speaks for itself.  If you want to designate
25   someone to sign as a Benistar Property Exchange officer.

1  Q.  Sir, I know what the fax says.  I'm asking about

2  your testimony today.  Is that your testimony?

3  A.   Would you repeat your question, please?

4  Q.   Yes.  Is it your testimony under oath today that you

5  sent this fax with a WCMA subaccount authorization form

6  asking someone you never spoke with or spoke to Dan

7  Carpenter about to sign as a Benistar Property Exchange

8  officer?

9  A.   I did send this fax.

10       MR. PAPPALARDO:  Okay.  If I may approach, your

11  Honor.

12       THE COURT:  All right.

13  BY MR. PAPPALARDO:

14  Q.  Sir, I'd like you to look at that document, it's

15  Exhibit 418.

16       MR. PAPPALARDO:  Your Honor, while he's looking

17  at that, I would ask that the previous exhibit be

18  admitted, that's the fax from Mr. Levine to

19  Mr. Patterson.

20       MR. PIROZZOLO:  I think it's already in

21  evidence, your Honor.

22       THE COURT:  Previously or --

23       MR. PIROZZOLO:  I think he offered it and we had

24  no objection.

25       THE COURT:  All right, fine.

```
 1          MR. PIROZZOLO:  We also have no objection to
 2   this one either, Exhibit 418.
 3          THE COURT:  418?
 4          MR. PAPPALARDO:  We'll offer it, then.
 5          THE COURT:  Okay.
 6          (Exhibit 418 received into evidence.)
 7          (Pause.)
 8   BY MR. PAPPALARDO:
 9   Q.   Sir, do you see this document?
10   A.   Yes.
11   Q.   It's a letter that was written or that is dated
12   October 23, 1998 to you, right?
13   A.   Yes.
14   Q.   From a David Patterson?
15   A.   Yes.
16   Q.   Right?
17          MR. PAPPALARDO:  May this be published, your
18   Honor?
19          THE COURT:  Okay.
20          (Discussion off the record.)
21   BY MR. PAPPALARDO:
22   Q.   So, sir, this is a letter from Mr. Patterson to you
23   that sends a fully executed copy of an escrow agreement,
24   an exchange agreement and wiring instructions; isn't
25   that fair to say?
```

1    A.   It's a fax transmission of a letter.

2    Q.   Okay.  It's a facsimile transmission.  This

3    particular one is a facsimile transmission, but it's

4    also a letter, too, isn't it, sir?

5    A.   Yes.

6    Q.   So there's both a fax to you and the letter, right?

7    A.   This is the fax of a letter to me.

8    Q.   Right.  And you also -- there was also a letter to

9    you in the United States mails, right?

10   A.   No.

11   Q.   Okay.  Well, let's look at the fax transmission

12   first.

13         Your fax number, sir, at the time was

14   212-415-7934; isn't that right?

15   A.   I believe so.

16   Q.   Well, there's not any question about that, is there?

17   A.   It's been ten years; I don't remember my fax number.

18   I'll take that as a fact if you say it, but I don't

19   remember my fax number anymore.

20   Q.   Okay.  Let's look at this facsimile, sir.

21         This is a fax which contains a cover letter to

22   you talking about an escrow agreement, talking about an

23   exchange agreement, an account election form, and

24   Benistar's wiring instructions, right?

25   A.   That's what the letter purports to be.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.  Well, that's what the facsimile says, right?  That's
2  what the exhibit says, right?
3  A.  That's what it says.
4  Q.  If you look at the top, after your address -- by the
5  way, that was your address, right?
6  A.  Yes.
7  Q.  That's a correct address; even ten years later, you
8  recall that?
9  A.  Yes, I do.
10 Q.  Now, you see where it says, "Exchangor Jane W.
11 Carey"?
12 A.  Yes.
13 Q.  And do you see Mr. Patterson's letterhead --
14 A.  Yes.
15 Q.  -- at the top?  He's identified as an attorney at
16 law, right?
17 A.  Yes.
18 Q.  No affiliation to Benistar, right, apparent from
19 this, anyway?
20 A.  As far as I can see, there's no connection.
21 Q.  And this facsimile tells you that approximately
22 $375,000 will be wired out by the closing attorney's
23 office to Merrill Lynch pursuant to the terms of the
24 wiring instructions, right?
25 A.  That's what the letter says.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   And for your information, the funds will be held in

2  a Merrill Lynch account pursuant to the Escrow Agreement

3  with Benistar's officer Daniel E. Carpenter being the

4  single signatory on the account, right?

5  A.   That's what the last paragraph says.

6  Q.   Signed by David Patterson, copied to Dan Carpenter,

7  right, Daniel E. Carpenter, chairman, Benistar Property

8  Exchange Trust?

9  A.   Among others, yes.

10 Q.   Copied to Martin Paley, president, Benistar Property

11 Exchange Trust.

12       Now, sir, I'd ask you to look at the billing

13 records to Mr. Patterson, the Sprint billing record, and

14 specifically to the 23rd of October of 1998 at 2:47 p.m.

15 Do you see that entry, it's number 22 on the last page?

16 A.   Yes, I see it.

17 Q.   Okay.  And that indicates a 6.4-minute transaction

18 to 212-415-7934; is that right?

19 A.   That is correct.

20 Q.   And you previously identified that as being your fax

21 number, to the best of your memory?

22 A.   I will amend that statement and say that is a group

23 fax number; it's not my personal fax number.

24 Q.   Is that a Merrill Lynch fax number, sir?

25 A.   Yes, it is.

1    Q.    Wasn't this fax machine right behind your desk at

2    Merrill Lynch, within arm's reach?

3    A.    At times it was, at times it was on a different

4    desk.

5    Q.    That's not what you said on May 18, 2004, is it,

6    sir?

7    A.    I'm not sure.  What did I say on May 18, 2004,

8    please?

9         MR. PAPPALARDO:  Give me a minute, your Honor.

10        (Pause.)

11        MR. PAPPALARDO:  May I approach the witness,

12   your Honor?

13        THE COURT:  You may.

14   BY MR. PAPPALARDO:

15   Q.    Sir, do you remember testifying on November 13, 2002

16   in a different proceeding?

17   A.    Yes.

18   Q.    Okay.  Let me show you this transcript.  Direct your

19   attention to page 47 and 48, highlighted in yellow.

20        (Pause.)

21   Q.    Did you read that, sir?

22   A.    Yes, I did.

23   Q.    And isn't it true that the fax machine was located

24   right behind your desk, within arm's length, you could

25   reach back and take a fax?

1    A.   At that particular time, it may have.  Merrill Lynch

2    went through a complete reconstruction and my address

3    changed from the sixth to the eighth floor.  And I

4    noticed the Patterson letter was addressed to me on the

5    sixth floor.  I believe that that's when there were

6    changes and that's when the fax machine was moved

7    around.  But at one time it definitely was located

8    directly behind me.  And then in the course of

9    reconstruction and refiguring and moving, the fax

10   machine got moved for a while, too.  I don't remember

11   the dates.

12   Q.   Sir, this October period of time is at the very

13   beginning of your relationship with Benistar, is it not?

14   A.   That's correct.

15   Q.   If you look at the cover sheet of this facsimile, it

16   indicates that the original of the transmitted document

17   will be sent not only by fax, but by first class mail;

18   isn't that right?

19   A.   On the first page?  I don't see what you're

20   referring to.

21   Q.   On the cover sheet, the fax cover sheet.

22        (Discussion off the record.)

23   Q.   Look to the last page, it may be on the last page of

24   that document.

25   A.   Last page, yes.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Okay.   That's the fax cover sheet to the fax of

2   October 23, 1998?

3   A.   Yes.

4   Q.   To you, to that fax number?

5        And that indicates, sir, does it not, that the

6   original of the transmitted document will be sent via

7   first class mail in addition to the fax

8   A.   That's what it indicates.

9   Q.   Now, sir, it's fair to say that this package of

10  documents came to you by facsimile, isn't it?  You

11  received this fax, sir, did you not?

12  A.   No.

13  Q.   You didn't?

14  A.   No.

15  Q.   You didn't receive this fax?  You didn't receive the

16  cover sheet?

17  A.   No.

18  Q.   You didn't receive the contracts that Mr. Patterson

19  sent by fax?

20  A.   No.

21  Q.   You didn't receive the exchangor agreement?  You

22  received nothing that was contained in that cover

23  letter?

24  A.   Nothing.

25  Q.   That's your testimony?

1   A.   That's my testimony.

2   Q.   And you didn't receive it by fax, sir, did you, sir?

3   That's what you're saying here?

4   A.   That's what I'm saying.

5   Q.   And, sir, did you receive it by U.S. mail?

6   A.   No.

7   Q.   You never received it?

8   A.   No.

9   Q.   So Mr. Patterson sends it by fax and by U.S. mail

10  and you don't receive it?

11  A.   If he sent it by U.S. mail, which was indicated, he

12  sent it to the sixth floor.  I believe my offices had

13  been moved, and then I never received it by mail, and

14  this fax never came across my desk.  There's an

15  incorrect address for me.

16  Q.   That's an incorrect address for you?

17  A.   It says, "sixth floor."  I was, at that time, I

18  believe, on the eighth floor.

19  Q.   Your testimony is that in October of 1998, you were

20  on the eighth floor?

21  A.   I believe I was.

22  Q.   And it wasn't a mystery where you moved, was it,

23  within Merrill Lynch?

24  A.   No.

25  Q.   People knew that you were moving to the eighth

PDF created with pdfFactory trial version www.pdffactory.com

1  floor, right?

2  A.   Yes.

3  Q.   And it was important that you would get mail, right?

4  In order for you to transact your business, right?

5  A.   That's right.

6  Q.   It's important for you to get faxes in order to

7  conduct your business?

8  A.   Yes.

9  Q.   In fact, you depend on communicating with clients,

10 don't you, sir?

11 A.   Primarily by phone, but, of course, communicating

12 with clients.

13 Q.   Well, you accept mail and you have a fax machine,

14 right?

15 A.   Yes.

16 Q.   And it's your testimony that you never received

17 either of these documents?

18 A.   Correct.

19 Q.   It's also your testimony, sir -- and you're just as

20 sure -- that you never had a conversation with

21 Mr. Patterson?

22 A.   Yes.

23 Q.   Isn't it true -- sir, isn't it true, that you knew

24 from October of 1998 that Dan Carpenter was engaged in a

25 property exchange business?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   No.

2   Q.   Where he was using clients' funds and investing

3   clients' funds?

4   A.   No.

5   Q.   Now, do you remember testifying on direct

6   examination here today, you talked about Exhibit 144 A

7   and B, the account opening materials that you received?

8   A.   Yes.

9   Q.   You said those came in the mail, didn't you?

10  A.   Or he brought them in.  I wasn't quite sure.

11  Q.   You testified that you mailed them to Mr. Carpenter

12  and he mailed them back to you, did you not?

13  A.   I believe I said I was not sure how I received them.

14  He may have brought them in, in one of several meetings

15  we had.

16       MR. PAPPALARDO:   Can I have a moment, your

17  Honor, please?

18       (Pause.)

19  Q.   Mr. Levine, do you know an individual by the name of

20  Martin Paley?

21  A.   No, I never heard of Martin Paley until this trial.

22  Q.   Until this trial?

23  A.   Until this case started.

24  Q.   Isn't it true, sir, that you spoke with Martin Paley

25  in October of 1998?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   No.

 2            (Pause.)

 3            (Discussion off the record.)

 4            MR. PAPPALARDO:  May I approach, your Honor?

 5            THE COURT:  You may.

 6   BY MR. PAPPALARDO:

 7   Q.   Sir, I'd like you to have a look at that.

 8            (Pause.)

 9            (Discussion off the record.)

10   Q.   Can we turn back, sir, to Exhibit 408?

11   A.   Yeah, I have it.

12   Q.   You have it?  And this is the fax that you sent to

13   David Patterson on October 22, 1998; is that right?

14   A.   That is correct.

15   Q.   And if you look at the address under "Merrill

16   Lynch," do you see that?

17            MR. PAPPALARDO:  Could that be highlighted,

18   please, Exhibit 408?

19   Q.   Do you see that?

20   A.   Yes.

21   Q.   That says the sixth floor, doesn't it?

22   A.   Right.  It's an old address.

23            (Discussion off the record.)

24   Q.   So at the time you sent that fax out, you were on

25   the sixth floor, right?
```

1    A.   I believe that I was using old fax cover sheets.  I

2    think that we were on the eighth floor at that time.

3    Q.   Well, if you were using old fax cover sheets,

4    wouldn't it be important for you to communicate with

5    people, wouldn't you handwrite in "eighth floor"?

6    A.   It would have been more helpful, certainly.

7    Q.   And this fax is in your handwriting, right?

8    A.   Yes.

9    Q.   Sir, the document I just put in front of you, I want

10   to direct your attention to paragraphs 11, 12, 13, 14,

11   15, 16, and 17.

12           (Discussion off the record.)

13           MR. PIROZZOLO:  Your Honor, may I be heard

14   briefly at sidebar?

15           (At sidebar on the record.)

16           MR. PIROZZOLO:  I just want to raise the issue

17   that came up with the last affidavit that was put in

18   front of this witness.

19           Mr. Pappalardo is asking questions, testing the

20   witness' memory, and the witness says either I do

21   remember or I don't remember, it did happen or it didn't

22   happen, and he shows him the document and says does this

23   refresh your recollection?  However, he reads the

24   contents of the document.  The documents that are being

25   put in front of him, both the first one and this one, I

1    assume -- I don't actually have a copy of it -- is an

2    affidavit of a third party, not Mr. Levine's affidavit.

3    It's an affidavit of Mr. Paley, in this case, and

4    Mr. Patterson in the prior case.

5         My objection isn't to whether it does or doesn't

6    refresh his recollection, they can prove it up by asking

7    Mr. Paley, by asking Mr. Patterson at a later time.

8    It's the reading in of the affidavit in the form of the

9    question that's my objection.

10        MR. PAPPALARDO:  Your Honor, let me take

11   exception to what Mr. Pirozzolo just said.  This is not

12   being offered to refresh his memory.  He testified that

13   he never had a conversation with Mr. Patterson, and that

14   he never had a conversation -- this is to impeach him.

15        THE COURT:  Right.  That's enough.  That's

16   right, correct.

17        MR. PIROZZOLO:  But he's impeaching him --

18        THE COURT:  It's a difference between refreshing

19   and impeaching.  He can impeach him -- he doesn't have

20   to stay at a level -- at a general level to impeach,

21   which is why I permitted it with Patterson.

22        If there are particular things that may be

23   important to bring out, he can ask particularly whether

24   that was true or not, where the witness has previously

25   denied it.

PDF created with pdfFactory trial version www.pdffactory.com

1           MR. PIROZZOLO:  With a -- well, if I could just

2    make my record on this.  This is a third-party's

3    statement.  This not his statement, this is not

4    impeachment by prior statement.

5           THE COURT:  It's impeachment by extrinsic

6    evidence, and the proffer, I presume, is that the

7    evidence will be forthcoming.

8           MR. PAPPALARDO:  Well, your Honor, just for the

9    record, to make the record complete, this is an

10   affidavit of Martin Paley, who I expect the government

11   is going to call as a witness.

12          THE COURT:  Right.

13          MR. PAPPALARDO:  And I fully expect he's going

14   to testify in accordance with his affidavit.

15          THE COURT:  And I expect the same is true with

16   Patterson.

17          MR. PAPPALARDO:  Right.

18          MR. PIROZZOLO:  Thank you, your Honor.

19          (End of discussion at sidebar.)

20          MR. PAPPALARDO:  Your Honor, if I may just have

21   a moment?  I'm searching for an additional copy of this.

22          MR. PAPPALARDO:  If I may proceed, your Honor.

23          THE COURT:  Go ahead.

24   BY MR. PAPPALARDO:

25   Q.   Now, sir, have you had enough time to read those

1   paragraphs, 12 through 17, of this document?

2   A.   Yes.

3   Q.   Sir, isn't it true that Mr. Paley called you in

4   October of 1998?

5   A.   No.

6   Q.   Isn't it true that he told you who he was and that

7   Mr. Carpenter had given him your name?

8   A.   No.

9   Q.   Sir, isn't it true that he told you that

10  Mr. Carpenter and he were in the business of doing

11  tax-deferred property exchanges for clients and would be

12  holding clients' money?

13  A.   No.

14  Q.   Isn't it true, sir, that Paley asked you if you knew

15  about exchanges, and you made a vague reference to

16  swaps?  And Paley corrected you and told you that he and

17  Mr. Carpenter would be holding clients' money subject to

18  section 1031 of the Internal Revenue Code and returning

19  their money to them when the request -- when they asked

20  for it and up to 180 days; isn't that true?

21  A.   No.

22  Q.   Isn't it true, sir, that Mr. Paley told you the

23  money had to be held in escrow in October of 1998?

24  A.   No.

25  Q.   Isn't it true that he told you that Benistar

1    Properties served as an intermediary and that it had to

2    be held in an escrow account to make sure the money was

3    available for clients when they needed it within 48

4    hours in some cases?

5    A.   No.

6    Q.   Didn't you say to Mr. Paley in that conversation

7    that you had some knowledge of property exchanges but

8    referred to them as a swap?

9    A.   No, there never was a conversation.

10   Q.   Mr. Levine, isn't it true that Paley told you that

11   clients' money would be wired into the Benistar accounts

12   at Merrill Lynch with the client's name and other

13   information?

14   A.   No.

15   Q.   And Mr. Paley told you when the clients of Benistar

16   needed the money to complete an exchange, Benistar would

17   send Merrill Lynch the information needed to wire the

18   funds out?

19   A.   No.

20   Q.   Did he tell you -- isn't it true that he told you

21   that Benistar only acted as an escrow agent with respect

22   to the clients' funds?

23   A.   No.

24   Q.   Mr. Levine, isn't it accurate that Paley told you

25   his former company, Nationwide, used Merrill Lynch for

PDF created with pdfFactory trial version www.pdffactory.com

1    its escrow account and Paley gave you the name of the

2    Merrill Lynch broker, Sean Worthen, in San Jose, who

3    dealt with Nationwide's clients and suggested that you

4    contact him to gain an understanding of how the account

5    should be set up?

6    A.    No.

7    Q.    Isn't it true, Mr. Levine, that Mr. Paley told you

8    that you may receive calls from Benistar clients and

9    that it was important for him to be able to respond to

10   the clients -- important for you to be able to respond

11   to the clients' questions or concerns relative to those

12   accounts?

13   A.    No.

14   Q.    And didn't -- isn't it true that he, Mr. Paley, told

15   you that he would cause copies of standard Benistar

16   Property Exchange agreements to be sent to you?

17   A.    No.

18   Q.    Well, sir, it is true, isn't it, that you were

19   provided with a copy of the standard fee agreement with

20   Benistar clients, which lists the three and six percent

21   account options; a copy of the cover sheet that may have

22   been transmitted in the agreement is attached ? Isn't

23   that true, you received that?

24   A.    No, never received it.

25           MR. PAPPALARDO:   May I approach, your Honor?

PDF created with pdfFactory trial version www.pdffactory.com

1         THE COURT:  All right.

2    Q.   I show you 343, ask you to read that.

3         (Pause.)

4    A.   I read it.

5    Q.   Okay.  That's a copy of a fax to you, is it not?

6    A.   Yes, it is.

7    Q.   And did you receive that fax?

8    A.   Yes, I did.

9    Q.   And that's from Janet May, right?

10   A.   That's right.

11   Q.   And in that fax, she's sending you the account

12   selection for a 1030 closing, right?

13   A.   That's what she said.

14   Q.   And that money should have been wired Friday

15   afternoon, right?

16   A.   Correct.

17   Q.   "Please let me know when funds have arrived, as I

18   have to wire back $50,000 for deposit on new property.

19   Thanks."  That's what it says, right?

20   A.   Correct.

21   Q.   Did you receive that fax?

22   A.   I just testified I did.

23   Q.   And did you receive the account document?

24   A.   I believe that she was referring to stock

25   selections.  I think that she misstated.  If I can

PDF created with pdfFactory trial version www.pdffactory.com

 1  recall this, to the best of my memory.

 2  Q.   She was referring to stock selections?

 3  A.   I believe so.

 4  Q.   She was referring to an Account Selection Form of

 5  either three percent or six percent, wasn't she?  Isn't

 6  that what it says, an Account Selection Form?

 7  A.   No, it doesn't say that.  Where do you see that?

 8  Q.   "Account selection for a 1030 closing."  Isn't that

 9  what the fax says?

10  A.   That's what the fax says, yes.  It says nothing

11  about three or six percent.

12  Q.   And the account selection was an election of three

13  or six percent, wasn't it?

14  A.   I have no idea.  I think she's talking about which

15  account she wants to have the money wired into, the B01

16  and B10.  She may have been talking about stocks.

17  There's nothing here at all about three or six percent

18  that would lead me to come to that conclusion.

19  Q.   Now, sir, I'm not saying it says that on that

20  document, what I'm asking:  It says an Account Selection

21  Form, right?

22  A.   It says, "account selection."

23  Q.   Account selection?

24  A.   Right, not form.  And Carpenter had several

25  accounts.  She was wiring money into one of his

1    accounts, wanted to know when it hit.

2    Q.   And that's your take on that document?

3    A.   Absolutely.

4        MR. PIROZZOLO:  Your Honor, we have no objection

5    to this document coming into evidence, Exhibit 343.

6        MR. PAPPALARDO:  We'll admit it, your Honor.  We

7    offer it, your Honor.

8        THE COURT:  Okay.  I just note that the list

9    that I have does not -- unless it's attached to

10   something else, does not look like the description is

11   accurate here.  So I just call that to your attention.

12   I'll accept that this is 343, but then the list --

13       MR. PAPPALARDO:  Your Honor, if we could clean

14   that up overnight, we could perhaps deal with that

15   tomorrow morning.

16       THE COURT:  All right.  343 is in evidence.  As

17   the witness has it, it will be admitted.

18       (Exhibit 343 received into evidence.)

19   BY MR. GREENBERG:

20   Q.   Mr. Levine, you visited the Benistar website, did

21   you not?

22   A.   Yes, I did.

23       MR. PAPPALARDO:  May I approach, your Honor?

24       THE COURT:  May I see counsel, please?

25       (At sidebar on the record.)

1          THE COURT:  I'm just concerned about the time.

2    Is there any chance that we'll finish with this witness

3    if we went over?

4          MR. PAPPALARDO:  I don't think so, your Honor.

5    I would like to say yes, but I don't think so.

6          MR. PIROZZOLO:  I'd like to a proffer, and

7    here's why:  Mr. Levine's wife is ill.  He's been called

8    by a doctor to go back to New York, preferably tonight,

9    to deal with some medical issues that his wife is

10   having.

11         If it's possible that Mr. Pappalardo can be

12   finished in half an hour, I have no redirect at this

13   point, I expect we could finish and allow him to go back

14   and be with his wife.

15         MR. PAPPALARDO:  Your Honor, I'm prepared to

16   continue.  I'd like to think I can finish in half an

17   hour.  It depends on the answers we get.  But it's up to

18   the Court.

19         THE COURT:  Let's try it.

20         MR. PAPPALARDO:  Fine.

21         MR. PIROZZOLO:  Thank you, your Honor.

22         (End of discussion at sidebar.)

23         THE COURT:  Jurors, I've just consulted with the

24   lawyers.  We've reached 1:00.  We're going to go a

25   little bit over to see if we can finish with this

PDF created with pdfFactory trial version www.pdffactory.com

 1   witness today.

 2          MR. PAPPALARDO:  May I approach, your Honor?

 3   BY MR. PAPPALARDO:

 4   Q.   Sir, would you look at the Exhibit 403, please?

 5   A.   I have it in front of me.

 6   Q.   Do you recognize that?

 7   A.   I believe this is a home page of benistar.com.

 8   Q.   Do you recognize that as the various pages from the

 9   Benistar website as it appeared in October of 1998?

10   A.   I don't know.  I was directed to this site to look

11   at tax strategies.  I don't recall -- I looked at it

12   once, I don't recall having looked after that one thing,

13   after what it said about tax strategies.  That was the

14   thrust of our original meetings with Carpenter.

15          Carpenter was at our luncheon, describing his

16   tax strategies, and I believe he directed me to this

17   site to refer to his tax strategies.  And then I never

18   looked at it again.  So I'm not sure if the date that

19   you're alluding to, but --

20   Q.   Sometime -- the date that I'm referring to, sir, is

21   sometime in the fall of 1998, probably around October?

22   A.   I don't know if this is what the page looked like

23   then.  I remember probably looking at it when we had our

24   initial meetings back in February or March at the Penn

25   Club, and he told me about his tax strategies that he

PDF created with pdfFactory trial version www.pdffactory.com

1  wanted us to get involved in.

2  Q.   And do you recognize that as being the website?

3  A.   I would assume that that was the page I had looked

4  at.

5         MR. PIROZZOLO:  Your Honor, the government has

6  no objection to the admission of this exhibit.

7         MR. PAPPALARDO:  We would offer it, your Honor.

8         THE COURT:  All right.

9         (Exhibit 403 received into evidence.)

10        MR. PAPPALARDO:  May the first page of that be

11  published, please?

12  BY MR. PAPPALARDO:

13  Q.   On the first page of that website on the fourth or

14  fifth item down, that says "1031 exchanges," right?

15  A.   That's right.

16  Q.   Did you know what a 1031 exchange was?

17  A.   No, I did not.

18  Q.   Were you curious about what it might be?

19  A.   No.  I was directed to look at the item directly

20  above it, tax strategies.  He wanted to sell our

21  clients, to get involved in tax strategies.  That was my

22  entire reason for going to that page.

23  Q.   Look at page 2, sir.

24        Do you see there's a discussion there about

25  Nationwide Property Exchange which grew into Boston's

1    area's leading section 1031 qualified intermediaries?

2    A.   Yes, I see that.

3    Q.   And wasn't it important for you, sir, to know what

4    the business of Benistar Property Exchange Trust Company

5    was?

6    A.   At the time I was directed to that page, we had not

7    even started a relationship.  Carpenter was telling me

8    about tax strategies that my clients could use at year

9    end, and my only interest was on tax strategies.  I

10   never looked at any of these other hyperlinks.  I never

11   even looked beyond page 1.

12   Q.   Isn't it the code for any investment house to know

13   their customer, sir?

14   A.   Carpenter was not a customer at this time.

15   Q.   Okay.  When he became a customer -- you would agree

16   with me he became one in October of 1998, right?

17   A.   Yes.

18   Q.   Okay.  So at that time, it was important to you to

19   know what Benistar Property Exchange Trust Company was,

20   right?

21   A.   Carpenter told me what the business was when I asked

22   him in opening up new account forms.  He never

23   redirected me to this page.

24   Q.   Did you do any due diligence on Mr. Carpenter at

25   that time?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes, I did.

2    Q.    And did you learn that Benistar Property Exchange

3    Trust Company was engaging in 1031s?

4    A.    He never told me that.

5    Q.    What about your independent due diligence?

6    A.    My due diligence was filling out a Merrill Lynch

7    questionnaire asking him specifically as to what the

8    nature of the business was.  He told me it was real

9    estate transactions.  He also told me who his bank was.

10   He gave me the name of a bank attorney.  He told me his

11   approximate bank balances.  He told me what other

12   businesses that he was associated with.  I filled out

13   the form that Merrill required me to fill out.

14   Q.    And wasn't it important to you, sir, to know what

15   the business of Benistar Property Exchange Trust Company

16   was?

17   A.    The name hadn't even been picked out yet when I sent

18   the forms to Carpenter.

19   Q.    They were picked out when he sent the forms back,

20   weren't they?

21   A.    He told me what the nature of the business was.  He

22   said he was in the business of buying and selling real

23   estate.

24   Q.    And did you make any attempt to independently

25   corroborate what the business was?  Did you Google the

1   business?

2   A.   No, I did not.

3   Q.   Sir, let's look at Exhibits 293, 294, and 295.

4        Do you see those?

5   A.   I'm working there.  293, I see 295.  You said 294?

6   Q.   Yes.

7   A.   Got it.

8   Q.   Could you just look at those?

9   A.   Just a moment.

10       (Pause.)

11  A.   I have them.

12  Q.   Okay.  And what are those documents?

13  A.   Wire transfers on 293.  Wire transfer instructions

14  on 294.  Wire transfer instructions on 295.

15  Q.   Okay.  And those documents evidence the transfer of

16  monies out of the accounts that Benistar had to the

17  various individuals, right?

18  A.   It looks to me like they are transferring money for

19  properties purchased to attorneys for property that he

20  was getting involved in.

21  Q.   Do you see the names Darling, Iantosca, and Iantosca

22  on those?

23  A.   Yes.

24  Q.   And did it occur to you that those were clients of

25  Benistar Property Exchange Trust Company, sir?

1   A.   No.

2   Q.   Not at all?

3   A.   Not at all.

4   Q.   Was there someone in the -- in your group who took

5   care of facilitating wire transfer requests from

6   clients?

7   A.   Yes.

8   Q.   Who was that?

9   A.   Could have been one of several people.  It could

10   have been a Janine Delgrasso, it could have been a Lucy

11   Vraba, it could have been a James somebody; the

12   administrative staff that took care of all of this.

13   Q.   Do you see on Exhibit 293, the last line where it

14   says, "escrow"?

15   A.   Yes.

16   Q.   Did that have any significance to you?

17   A.   It looked like that was the -- where Carpenter was

18   wiring money to that bank and they were putting it in an

19   escrow account.

20   Q.   And that's your testimony?

21   A.   Yes.

22   Q.   You see the top where it says, "client"?

23   A.   Yes.

24   Q.   It says, "Iantosca," right?

25   A.   Right.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Did you ever associate the escrow account to that of
2    the client?
3    A.   If I ever thought about it, I would have assumed
4    that was the person he was purchasing the property from.
5    Q.   Let's look at 294, same thing, "Iantosca escrow
6    account" at the bottom, right?
7    A.   Right.
8    Q.   295, Brian Darling -- I'm sorry, Byron Darling.  And
9    this a client fund account; is that fair to say?
10   A.   That's what it says, yes.
11   Q.   You saw all of these?
12   A.   No, I didn't see these.
13   Q.   You didn't.  You didn't see these?
14   A.   No.  These go directly to the administrative staff
15   for wiring out.
16   Q.   Look at Exhibit 352, please.
17   A.   What number, please?
18   Q.   352, please.
19   A.   Got it.
20   Q.   You see the Bates stamp --
21   A.   Just a moment, please.
22        Okay.  I don't see a Bates stamp on this.
23   Q.   Okay.  If you -- you see on the first page 7592 at
24   the top?
25   A.   No.

```
 1              (Discussion off the record.)

 2              MR. PAPPALARDO:  If I may approach, your Honor?

 3    Q.   Okay, sir.  Now that you have the correct document

 4    in front of you, do you see the Bates stamp at the top,

 5    7592?

 6    A.   Yes, I do.

 7    Q.   Okay.  Now, sir --

 8              MR. PAPPALARDO:  Can we show on the screen 7607?

 9    Q.   Do you have that in front of you, sir?

10    A.   I'm turning to it.

11              I have it.

12    Q.   Okay.  This is a wire transfer requested by

13    Mr. Carpenter on the 16th of September of 1999 to wire

14    money into an account of Robinson, Donovan & Barry PC,

15    trustees for clients.  Do you see that?

16    A.   Yes.

17    Q.   Is that an indication that Benistar was dealing with

18    clients?

19    A.   No.

20    Q.   No?

21    A.   It's an indication to me that he is purchasing

22    property and he is wiring it to the bank for that

23    client.

24    Q.   And that's your testimony?

25    A.   Yes.
```

1   Q.   Let's look at -- let's look at 7608.

2   A.   Right.

3   Q.   And this is September 16th of 1999.  Do you see the

4   top, it says, "client, Tischler"?

5   A.   Yes.

6   Q.   And the money is being wired into a client's fund

7   account?

8   A.   That's what it says, right.

9   Q.   And did you see this, too?

10  A.   No, I've never seen these wires.

11  Q.   What is this an indication of as you read this

12  today, Mr. Levine?

13  A.   That Benistar is buying Tischler property and he's

14  wiring it to Greenzang account.

15  Q.   It's not an indication that he's wiring money to a

16  client at the direction of a client?

17  A.   I wouldn't interpret it that way at all.

18  Q.   No?  Look at 7612.

19       MR. PAPPALARDO:  Could we put that up, please?

20  Q.   You see at the top, "client Xypteras"?

21  A.   Yes.

22  Q.   I'm sorry if I mispronounce the name.

23       The bottom, "clients' fund real estate account."

24  A.   Yes.

25  Q.   Is that an indication there's a client involved,

PDF created with pdfFactory trial version www.pdffactory.com

1   sir?

2   A.    It would appear to me that it is still that he's

3   purchasing property and he's wiring deposits on the

4   property.

5   Q.    Well, who was the client at the top?

6   A.    He's identified by the name Xypteras.  I'm assuming

7   he's buying property from Xypteras.

8   Q.    And similarly, on 7613.

9        MR. PAPPALARDO:  Could we view that, please?

10       MR. PIROZZOLO:  I just want to raise an

11  objection, your Honor.  I think the witness hasn't seen

12  these documents; just personal knowledge.  He's just

13  reading the documents.  I don't know if the witness can

14  do more than that.  So my objection is as to personal

15  knowledge.

16       THE COURT:  The objection is sustained.

17  BY MR. PAPPALARDO:

18  Q.    Did you see these documents, sir?

19  A.    Yes.

20  Q.    Did you see these documents, sir, on a

21  contemporaneous basis?

22  A.    Oh, no, I've never seen these documents.

23  Q.    Never seen these documents?

24  A.    These documents would be pulled off the fax machine

25  and the administrative staff would immediately act on

PDF created with pdfFactory trial version www.pdffactory.com

1   them.  They don't come across my desk.

2   Q.   Did anybody ever tell you that there were a host of

3   documents here that had clients' names and clients' fund

4   real estate accounts or clients' fund accounts or

5   clients' fund or trustees for clients or real estate

6   trust account or clients' account or escrow account?

7   Did anybody ever tell you that?

8   A.   Nobody ever pointed that out, no.

9   Q.   Isn't that something that would have been important

10  for you to know, sir?

11  A.   It was a client instruction to send out his funds,

12  seemed to be what he was doing in the course of his

13  business, seemed perfectly routine the way he was

14  running his business.

15  Q.   And you thought he was purchasing all this property?

16  A.   That's what he was telling me.

17  Q.   Oh, he told you he was purchasing all this property?

18  A.   He told me that he was in the business of real

19  estate transactions, of buying and selling real estate.

20  That was his initial statements to me.  He never said

21  anything else about that.  He always maintained when we

22  were talking about strategy that --

23  Q.   Sir, the answer yes or no.

24  A.   Sorry, what is your question?

25  Q.   The question was:  He told you that he was

PDF created with pdfFactory trial version www.pdffactory.com

1   purchasing property, that's your testimony?

2   A.   Yes.

3   Q.   Yes.   Thank you.

4        Sir, can you look at Exhibit 255?

5        (Discussion off the record.)

6   A.   255?

7   Q.   Strike that, sir, we're going to skip that.

8        Now, sir, I want to direct your attention to

9   calendar year 1999 as it relates to the Benistar

10  account, okay?   You have an independent memory of those

11  events?

12  A.   Somewhat now, yeah.

13  Q.   And in December '99 or shortly before the close of

14  the year in November of 1999, Mr. Carpenter was down

15  approximately $400,000; isn't that fair to say?

16  A.   I don't remember exactly, but I believe there was a

17  memo to that effect that I testified previously to, if

18  I'm in the right ballpark that he was down around

19  $200,000.   I could be wrong as to the amount, but, yes,

20  I did receive a memo.

21  Q.   And if I suggested to you it was closer to $375,000,

22  would you quarrel with that?

23  A.   If you have the data in front of you, I'll accept

24  that, sure.

25  Q.   And isn't it also fair to say, sir, that he closed

PDF created with pdfFactory trial version www.pdffactory.com

1    out the year with an over $600,000 profit?

2    A.    I believe so, yes.

3    Q.    So that he made up whatever deficit it was, from my

4    question was 375, so that he closed over $600,000 in

5    profit, right?

6    A.    I believe so, yes.

7    Q.    Employing the same trading that he employed

8    throughout, right?

9    A.    Yes.

10   Q.    Sir, the two accounts that were opened by Benistar

11   Property Trust, Inc., Property Management Trust, Inc.,

12   those two accounts were linked, right?

13   A.    Yes.

14   Q.    In fact, one was a master account, that being the

15   trading account; the 01 account was a subaccount, right?

16   A.    Yes.

17   Q.    Now, sir, when you -- you were asked a question

18   about margin calls on direct examination.  Do you

19   remember those series of questions?

20   A.    I believe so.

21   Q.    And you indicated that there were a series of margin

22   calls that occurred in this account and that on some

23   occasions they were evidenced by wire transfers?

24   A.    Yes.

25   Q.    I'm sorry, by transfers within accounts, right?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Yes.

2  Q.   On all of those occasions, was -- were there

3  transfers internally between accounts?

4  A.   From all the documents that I reviewed and testified

5  to, yes.

6  Q.   And do you have an independent memory that on

7  several occasions there were monies that were put in

8  from outside of any linked Benistar account?

9  A.   I would find out the next morning when I would

10 review his account.  I would never see any monies coming

11 in at all, but I would when I would review his accounts

12 the following morning notice if he had additional funds

13 put into the account.  I would never see the transfers

14 in, ever, until I've looked on the screen.

15 Q.   And could you tell on the screen if the money came

16 in from a linked Benistar account or from another

17 source?

18 A.   If it came from another source, it just showed funds

19 in, it didn't indicate the other source.  If it was a

20 linked account, it would probably show the linked

21 account.

22 Q.   And my question, sir, is:  Do you have today, as you

23 sit here, an independent memory of occasions where money

24 went into the account that didn't come from a linked

25 account into the trading account?

1    A.   If I would see it on the screen the next day, but --

2    you know, these are things -- this is ongoing daily

3    transactions.

4    Q.   And I appreciate that.  Let me see if I can

5    short-circuit this.

6         Do you have today, as you sit here, a

7    recollection that sometime in August of 2000 that

8    approximately $2 million went into the B10 account, the

9    trading account, that didn't come from the B01 account?

10   A.   I have no recollection today, without any sort of

11   backup, to verify your statement.

12   Q.   Okay.  You said that there were -- that some of

13   these exhibits that you were shown by Mr. Pirozzolo

14   indicated that there were margin calls, right?

15   A.   Yes.

16   Q.   Did all of them indicate margin calls?

17   A.   To the best of my recollection they were all to

18   satisfy margin calls.

19   Q.   So those were margin calls; that's your testimony?

20   A.   To the best of my recollection, yes.

21   Q.   And to the best of your recollection, Mr. Levine,

22   was a margin call ever missed by Mr. Carpenter?  Did he

23   ever fail to make a margin call?

24   A.   No, I don't believe so.  I think he made all of

25   them.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Do you remember being asked on direct examination

2    about the conversation you had with Mr. Carpenter at or

3    about the time that he was leaving Merrill Lynch?  Do

4    you remember that?

5    A.   Yes.

6    Q.   And could you just recap that conversation for us,

7    please?

8    A.   I instructed him that he could put on no new

9    positions.  He could only close out existing positions.

10   He was very unhappy.  He said to me something about had

11   he been aware of this decision, he would have done -- he

12   wouldn't have closed out positions beforehand because he

13   was going away for the weekend.  He wanted to know if it

14   was a reversible decision, and if it wasn't, what could

15   he do?  And I told him that he could transfer all of the

16   assets to any other brokerage firm of his calling.  And

17   then I believe he said he wanted to talk to Tom

18   Rasmussen at the end of the day.  That's the best of my

19   recollection.

20   Q.   That's the best of your recollection.

21        MR. PAPPALARDO:  May I approach, your Honor?

22        (Discussion off the record.)

23   Q.   Sir, do you remember testifying on July 15, 2005?

24   A.   I know I've been in this court testifying before.  I

25   can't remember the specific date.

PDF created with pdfFactory trial version www.pdffactory.com

1              Let me direct your attention, sir, to that

2    section.

3              (Pause.)

4    A.   Okay.

5    Q.   Do you see that?

6    A.   Mm-hmm.

7    Q.   Does that refresh your memory as to what

8    Mr. Carpenter said?

9    A.   Yes.

10   Q.   What did he also tell you?

11   A.   According to my previous testimony, he said that he

12   felt that he was perfectly positioned to take advantage

13   of market fluctuations.

14   Q.   He told you that he was perfectly positioned to take

15   advantage of a positive movement in the market to make a

16   lot of money, didn't he?

17   A.   That's what he said.

18   Q.   And he had a belief in his strategy, did he not?

19   A.   He absolutely --

20              MR. PIROZZOLO:  Withdrawn, your Honor.

21   Withdrawn.

22   A.   He did.

23              (Discussion off the record.)

24   Q.   Now, sir --

25              MR. PAPPALARDO:  Last line, your Honor, just

1    bear with me.

2    Q.    Mr. Levine --

3    A.    Yes, sir.

4    Q.    -- you are aware, sir, are you not, that there are

5    pending civil matters brought by the exchangors against

6    Merrill Lynch?

7    A.    Yes.

8    Q.    And in that case, you're partial to Merrill Lynch,

9    are you not?

10   A.    No.

11   Q.    No?  You were employed by Merrill Lynch, weren't

12   you?

13   A.    I was.

14   Q.    And you know you'll be testifying in that case;

15   isn't that fair to say?

16   A.    Yes.

17   Q.    And it involves the same subject matter as this

18   case; isn't that fair to say?

19   A.    Yes.

20   Q.    And the claim that exists is against Merrill Lynch,

21   that it acted improperly; isn't that fair to say?

22   A.    I'm not sure of the phraseology of the civil

23   charges, but you're characterizing it that way seems to

24   be -- I think that is what the charges are.

25   Q.    And Merrill Lynch's attorney is in the courtroom,

PDF created with pdfFactory trial version www.pdffactory.com

1  isn't he?

2  A.   Yes.

3        MR. PAPPALARDO:  Just one moment, your Honor.

4        (Discussion off the record.)

5        MR. PAPPALARDO:  No further questions, your

6  Honor.

7        MR. PIROZZOLO:  No questions.

8        THE COURT:  No redirect?

9        Mr. Levine, you may be excused.

10       Jurors, thank you for your indulgence.

11       Let me just remind you, and it's probably

12  redundant, no extraneous information from the trial.

13  There's been a couple of mentions of websites during the

14  case.  That's not for you to do during the course of the

15  trial.  Just a reminder.  Enjoy the rest of the day.

16        THE CLERK:  All rise.  Court is in recess.

17        (Court adjourned at 1:30 p.m.)

18               - - - - - - - - - - -

19

20

21

22

23

24

25

1                        CERTIFICATION

2           We certify that the foregoing is a correct

3      transcript of the record of proceedings in the

4      above-entitled matter to the best of our skill and

5      ability.

6

7      /s/Debra M. Joyce                    _____
       Debra M. Joyce, RMR, CRR            Date
8      Official Court Reporter

9

10     /s/Marcia G. Patrisso               _____
       Marcia G. Patrisso, RPR, CRR        Date
11     Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25