UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               ) Criminal Action
v.                             ) No. 04-10029-GAO
                               )
DANIEL E. CARPENTER,           )
                               )
          Defendant.           )
                               )



BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY EIGHT
JURY TRIAL



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, June 11, 2008
9:06 a.m.



Debra M. Joyce, RMR, CRR
Marcia G. Patrisso, RPR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Jonathan F. Mitchell and Jack W. Pirozzolo,
 3        Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        One Courthouse Way
          Boston, Massachusetts  02210
 5        On Behalf of the Government

 6        GREENBERG TRAURIG, LLP
          By: A. John Pappalardo, Esq. and
 7        Gary R. Greenberg, Esq.
          One International Place
 8        Boston, Massachusetts  02110
          On Behalf of the Defendant

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PDF created with pdfFactory trial version www.pdffactory.com

1                        I N D E X

2                    Direct   Cross   Redirect   Recross
  Witnesses For The
3   Government:

4  THOMAS RASMUSSEN

5      By Mr. Pirozzolo      4              84
       By Mr. Pappalardo          52              88
6

7  MITCHELL ROCK

8      By Mr. Mitchell      90

9                        E X H I B I T S

10

11  Exhibit No.        Description           Marked    Received

12  No. 147 A-D Documents for account No. 849-07B01    8
    No. 148 A-C Documents for account No. 849-07B10    9
13  No. 14       Screen Shot of account No. 849-07B01   10
    No. 31       Screen Shot of account No. 849-07B10   12
14  No. 55       Screen Shot of Account No. 849-07B10   13
    No. 56       Screen Shot of account No. 849-07B10   13
15  No. 85       Screen Shot of account No. 849-07B10   14
    No. 161      Active Action Personal Contact Sheet
16               4/16/99                               18
    No. 161 A    Letters between Mr. Rasmussen and
17               Mr. Carpenter 4/23/99, 4/30/99        25
    No. 162      Active Account Review 10/14/99        28
18  No. 162 A    Letter to Mr. Carpenter from
                 Mr. Rasmussen 10/25/99                33
19  No. 163      Active Account Review 5/15/00         34
    No. 157      Letter to Mr. Rasmussen from
20               Mr. Carpenter 9/22/00                 46
    No. 158      Screen Shot of account No. 849-07B10   84
21  No. 164      Welcome letter                        106
    No. 164A     Account application                   107
22  No. 164B     Account application                   107
    No. 165      Trading options form                  116
23  No. 166      Special statement for options trading 120
    No. 167      Characteristics and Risks of Trading
24               Options                               123
    No. 171A     Request to transfer money             144
25

PDF created with pdfFactory trial version www.pdffactory.com

1          (The following proceedings were held in open

2     court before the Honorable George A. O'Toole, Jr.,

3     United States District Judge, United States District

4     Court, District of Massachusetts, at the John J. Moakley

5     United States Courthouse, One Courthouse Way, Boston,

6     Massachusetts, on June 11, 2008.

7          The defendant, Daniel E. Carpenter, is present

8     with counsel.  Assistant U.S. Attorneys Jonathan F.

9     Mitchell and Jack W. Pirozzolo are present.)

10          THE COURT:  Good morning, jurors.

11          THE JURY:  Good morning.

12          THE COURT:  Mr. Pirozzolo.

13          MR. PIROZZOLO:  The United States calls Thomas

14     Rasmussen.

15          THOMAS RASMUSSEN, having been duly sworn by the

16     Clerk, was examined and testified as follows:

17          THE CLERK:  State your name, spell your last

18     name for the record, speak into the mic so everyone can

19     hear you.

20          THE WITNESS:  Tom Rasmussen, R-a-s-m-u-s-s-e-n.

21                    DIRECT EXAMINATION

22     BY MR. PIROZZOLO:

23     Q.  Good morning, Mr. Rasmussen.  Could you tell

24     everybody where you work?

25     A.   Merrill Lynch, and currently in Red Bank, New

1    Jersey.

2    Q.    How long have you worked for Merrill Lynch?

3    A.    Twenty-four years.

4    Q.    What's your current position at Merrill Lynch?

5    A.    I'm the region manager for the Mid-Atlantic coastal

6    region.

7    Q.    What does a region manager to?

8    A.    I'm responsible for all the business aspects of that

9    region.  I have four complexes that I'm in charge of:

10   Red Bank, Princeton, Del Mar, and South Jersey.

11   Q.    Mr. Rasmussen, I want you to focus on the time frame

12   of October 1998 through September of 2000.  At that

13   time, where were you working?

14   A.    I was in Fifth Avenue Financial Center, New York.

15   Q.    With Merrill Lynch?

16   A.    With Merrill Lynch, yes.

17   Q.    At that time, what was your position?

18   A.    I was the administrative manager.

19   Q.    What were your duties and responsibilities as the

20   administrative manager?

21   A.    I was in charge -- I was in a supervisory position

22   in charge of the FAs, the financial advisers, kind of

23   looking over their trading activity, correspondence, all

24   type of things like that.

25   Q.    Who did you report to?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Hassan Tabbah.

2    Q.    And what was his position?

3    A.    He was a resident vice president of that complex at

4    the time.

5    Q.    Now, at the time you were in the Fifth Avenue

6    branch, were there two financial advisers there working

7    there by the names of Gary Stern and Gerry Levine?

8    A.    Yes.

9    Q.    During the period of time that you were working at

10   the Fifth Avenue branch, did you become familiar with

11   accounts that were -- that Mr. Stern and Mr. Levine were

12   responsible for that related to a entity called Benistar

13   Property Exchange Trust Company?

14   A.    Yes.

15   Q.    Now, before you came here today, did you have an

16   opportunity to review certain documents that related to

17   the Benistar Property Exchange Trust Company, records of

18   Merrill Lynch?

19   A.    Yes.

20   Q.    And it's the case that Merrill Lynch maintained

21   records related to the Benistar Property Exchange Trust

22   Company during the period of time that we're talking

23   about, which is October 1998 through September 2000?

24   A.    Yes, it was.

25   Q.    Can you take a look at the documents that are in the

1    folder in front of you that are marked Exhibit 147?  And

2    within Exhibit 147, there are some subparts, Exhibits

3    147 A, B, C, and D.

4    A.   Okay.  I have them.

5    Q.   Before you took the stand here today, did you have

6    an opportunity to review Exhibits A -- Exhibits 147 A,

7    B, C, and D?

8    A.   I did.

9    Q.   What account do those records relate to?

10   A.   Let's see.  It is the Benistar Property Exchange

11   Trust Company.

12   Q.   And what account number do those records relate to?

13   A.   849-07B01.

14   Q.   Without going into detail as to the substance of

15   what's within each of those folders, can you describe

16   what's in each of the folders, A, B, C, and D?

17   A.   Sure.  In folder A is account statements for the

18   account just referenced, the 07B01 account.  In account

19   (sic) B, there are deposit slips, WCMA deposit slips for

20   the same account, the 07B01, as well as some checks and

21   some screen shots of deposits.

22        In folder C, there's some screen shots from the

23   firm, the account, the 07B01.

24        And in folder D, there are checks that were

25   checks drawn on Merrill Lynch Benistar Properties checks

1    that were written out by Mr. Carpenter.

2    Q.   For each of the documents in each of the four

3    folders you reviewed documents that were maintained and

4    kept in the ordinary course of business at Merrill

5    Lynch?

6    A.   Yes.

7         MR. PIROZZOLO:   The United States would offer

8    Exhibit 147 and subparts A, B, C, and D.

9         MR. PAPPALARDO:   No objection.

10         THE COURT:   All right.

11         (Exhibits 147 A, B, C, and D received into

12    evidence.)

13    BY MR. PIROZZOLO:

14    Q.   Would you look -- you can put those back in the

15    folder.

16         Could you look at the next folder in front of

17    you that's marked Exhibits 148, and I believe there are

18    subparts A, B, and C?  If you could take the contents

19    out of that folder.

20         (Pause.)

21    A.   Okay.  I have it.

22    Q.   Before you came here today, did you have an

23    opportunity to review the documents that were in that

24    folder and marked as subparts 148 A, B, and C?

25    A.   I did.

1   Q.   Can you describe generally, without getting into the

2   substance, what those records consist of?

3   A.   The A folder represents account statements for the

4   account that's titled Benistar Property Exchange Trust

5   Company, Inc.

6   Q.   Mr. Rasmussen, if you could keep your voice up?

7   A.   Sorry.  Folder A represents the account statements

8   for the Benistar Property Exchange Trust, Inc. -- excuse

9   me, Company, Inc. account, which is the 849-07B10

10  account.

11       Folder B has deposit slips and screen shots of

12  those deposits for account 849-07B10, the same account.

13       And folder C has screen shots from Merrill Lynch

14  for the same account, the 849-07B10.

15  Q.   Were each of those documents in those folders

16  maintained and kept in the ordinary course of business

17  at Merrill Lynch?

18  A.   Yes.

19       MR. PIROZZOLO:  The United States would offer

20  Exhibits 148 and subparts A, B, and C.

21       MR. PAPPALARDO:  No objection.

22       THE COURT:  All right.  Admitted.

23       (Exhibits 148 A, B, and C received into

24  evidence.)

25  BY MR. PIROZZOLO:

1    Q.   You could put that back in the folder and set those

2    aside, Mr. Rasmussen.

3         Now, Mr. Rasmussen, if you could take the

4    folders that are in front of you and pull out Exhibits

5    14, 31, 56, and 85, please.

6    A.   I have them.

7    Q.   Starting with Exhibit 14, could you describe what

8    that document is?  Again, not getting into the

9    substance, just describe what it is generally.

10   A.   This is a screen shot from one of the Merrill Lynch

11   screens referencing account 07 -- the 07B01 account with

12   credit, the account being credited.

13   Q.   Is that document a Merrill Lynch-generated document?

14   A.   It is.

15   Q.   And is it kept in the ordinary course of business at

16   Merrill Lynch?

17   A.   Yes.

18        MR. PIROZZOLO:  The United States would offer

19   Exhibit 14.

20        MR. PAPPALARDO:  No objection.

21        THE COURT:  All right.

22        (Exhibit 14 received into evidence.)

23        MR. PIROZZOLO:  May I publish that?

24        THE COURT:  Okay.

25   BY MR. PIROZZOLO:

1    Q.   I put up on the screen Exhibit 14, and,

2    Mr. Rasmussen, can you explain some of the information

3    that's on this document?

4    A.   Sure.  This is a screen shot from one of our screens

5    or computer screens at Merrill.  It is showing -- if you

6    look down at the second line in the middle, a Merrill

7    Lynch account number, which is the 849-07B10.  The name

8    on the account is the Benistar Property Exchange.  The

9    amount is a little bit below the account number there.

10   And then it's a credit, showing that a credit came into

11   this account.

12   Q.   And I'm going to highlight the amount there.  Do you

13   see that?

14   A.   Yes.

15   Q.   And the account number I've highlighted as well?

16   A.   Yes.

17   Q.   Can you look at Exhibit 31, which is the next

18   document in the folder?

19   A.   I have it.

20   Q.   What is that document?

21   A.   It is another one of our screen shots, again -- not

22   again, but referencing account number 849-07B01, the

23   Benistar Property account.  It's a credit and shows a

24   dollar amount --

25   Q.   Without getting into substance, is it a record

PDF created with pdfFactory trial version www.pdffactory.com

1  that's kept -- maintained and kept in the ordinary

2  course of business at Merrill Lynch?

3  A.   It is.

4        MR. PIROZZOLO:  The United States would offer

5  Exhibit 31.

6        THE COURT:  Okay.

7        (Exhibit 31 received into evidence.)

8  BY MR. PIROZZOLO:

9  Q.   I'm not going to put it up on the screen.  Is it

10 fair to say it's a similar format we just saw, Exhibit

11 14?

12 A.   Yes.

13 Q.   But it relates to a different transaction?

14 A.   Yes.

15 Q.   Could you look at Exhibit 55, please?

16 A.   I have it.

17 Q.   What is that document?

18 A.   A similar document, just a different dollar amount.

19 Q.   Is that a screen shot?

20 A.   Yes, screen shot from Merrill Lynch.

21 Q.   Similar to Exhibits 14 and 31, which have been

22 admitted?

23 A.   Correct.

24 Q.   And maintained in the ordinary course of business at

25 Merrill Lynch?

1    A.    Correct.

2            MR. PIROZZOLO:  The United States offers Exhibit

3    55.

4            THE COURT:  All right.

5            (Exhibit 55 received into evidence.)

6    BY MR. PIROZZOLO:

7    Q.    Could you look at Exhibit 56, please?

8    A.    I have it.

9    Q.    And what is that document?

10   A.    It's a screen shot from Merrill Lynch referencing

11   the same account number.

12   Q.    And is it similar to the same documents 14, 31, and

13   55, which have just been admitted?

14   A.    It is.

15   Q.    And is it maintained in the ordinary course of

16   business at Merrill Lynch?

17   A.    It is.

18           MR. PIROZZOLO:  The United States offers Exhibit

19   56.

20           MR. PAPPALARDO:  No objection.

21           THE COURT:  Okay.

22           (Exhibit 56 received into evidence.)

23   Q.    Could you look at Exhibit 85, please?

24   A.    I have it.

25   Q.    What is that?

1   A.   Screen shot by Merrill Lynch, similar to the

2   previous documents.

3   Q.   Similar to 14, 31, 55, and 56 that have just been

4   admitted?

5   A.   Yes.

6   Q.   It was maintained in the ordinary course of business

7   at Merrill Lynch?

8   A.   Yes.

9        MR. PIROZZOLO:   The United States would offer

10  Exhibit 85.

11       THE COURT:   Okay.

12       (Exhibit 85 received into evidence.)

13  BY MR. PIROZZOLO:

14  Q.   You could set those aside.

15       I want to focus your attention, Mr. Rasmussen,

16  on the B10 account --

17  A.   Okay.

18  Q.   -- which I believe is Exhibit 148.   That's the B10

19  account.   You don't need to pull that in front of you.

20  A.   Okay.

21  Q.   In your capacity as administrative manager in the

22  branch at Fifth Avenue, did you ever conduct something

23  called an active account review of the B10 account?

24  A.   Yes.

25  Q.   Approximately how many of those did you conduct?

1   A.   Probably seven or eight, maybe more.

2   Q.   What is an active account review?

3   A.   It's a review of the account.  Once a month the

4   actively traded accounts would pop up on our computer

5   screen for the managers to review.  So I would review it

6   for all different aspects of the trading aspect of the

7   account.

8   Q.   What's the purpose of conducting such a review?

9   A.   It's to just really kind of take a hard look at

10  what's going on in the account.

11  Q.   Did you conduct active account reviews of the B10

12  account where you spoke with Mr. Carpenter?

13  A.   Yes.

14  Q.   Did you meet with him in person or were there

15  conversations over the telephone?

16  A.   Over the phone.

17  Q.   Now, when you had the conversations over the

18  telephone with Mr. Carpenter, did you follow a set

19  script to -- where you asked certain questions of

20  Mr. Carpenter?

21  A.   Yes.

22  Q.   And is that script, that set script something that

23  is a form that is generated by Merrill Lynch?

24  A.   It's a form, yeah, that we used there.

25  Q.   What does it look like?

1  A.   It's a couple pages long, it's got -- on the first

2  page has really introducing myself, who I am, speaking

3  to the customer, and then going into some questions

4  about the account to confirm some of the information

5  that I picked up during the active account review.

6  Q.   And what use do you make of that script during the

7  course of the conversation?

8  A.   It just helps with the flow of the conversation to

9  hit all the topics that I'd like to make sure we discuss

10 during the call.

11 Q.   Do you write on that script as you proceed?

12 A.   I do.

13 Q.   And as you proceed through the conversation?

14 A.   Yeah, as I'm having the conversation, I write the

15 comments that are relayed back to me.

16 Q.   And do you write those comments at or near the time

17 you're actually -- you're actually hearing the

18 information during the conversation?

19 A.   Yes.

20 Q.   And what information -- what do you write when you

21 put that down?

22 A.   Well, some of it is -- I have a screen shot in front

23 of me of the active account review, so I'll write some

24 of the information as I'm discussing it with him to

25 confirm it, and then some of it is just conversation

PDF created with pdfFactory trial version www.pdffactory.com

1  flow between the client and myself.

2  Q.   Now, after you write on the form and end the

3  conversation, what do you do with the form?

4  A.   Keep it in a file for that account number.

5  Q.   And is it part of the regular course of business for

6  you to keep that document in a file, in the Merrill

7  Lynch file?

8  A.   Yes.

9  Q.   And are there certain procedures at Merrill Lynch

10 that require keeping of that document?

11 A.   Yes.

12 Q.   Can you take a look at the document that's in

13 file -- it's in a file marked Exhibit 161, please?

14 A.   I have it.

15 Q.   Without getting into the substance of what's in that

16 document, generally describe what that is.

17 A.   It's one of the account -- active account personal

18 contact sheets that I used.

19 Q.   And what account does it relate to?

20 A.   The 849-07B10 account, the B10.

21 Q.   Who conducted that review?

22 A.   I did.

23 Q.   When did you conduct that review?

24 A.   April 16, 1999.

25 Q.   Did you follow the standard procedure in conducting

1    that review?

2    A.    I did.

3    Q.    And is that reflected on the document?

4    A.    It is.

5          MR. PIROZZOLO:  The United States would offer

6    Exhibit 161.

7          MR. PAPPALARDO:  No objection.

8          THE COURT:  Okay.

9          (Exhibit 161 received into evidence.)

10          MR. PIROZZOLO:  May I publish?

11          THE COURT:  You may.

12   BY MR. PIROZZOLO:

13   Q.    Now, Mr. Rasmussen, I'm going to go through this

14   document with you, and I've magnified the top portion of

15   the first page.  Do you see that?

16   A.    I do.

17   Q.    What's the date of that active account review?

18   A.    April 16, '99.

19   Q.    And what account does that relate to?

20   A.    The 849-07B10.

21   Q.    And is a telephone number listed?  Do you see that?

22   A.    Yes.

23   Q.    What's the area code for that?

24   A.    860.

25   Q.    Do you know what area that relates to?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    It's --

2    Q.    Whose number is that?

3    A.    It's Mr. Carpenter's number, the number that was on

4    file that I called.

5    Q.    And in the first few lines after that, there's a

6    line that says, "Hi, Mr./Mrs. Dan Carpenter."  Do you

7    see that?

8    A.    I do.

9    Q.    Is this something that you read to him?

10   A.    Yes.  The first -- I don't know that I read it word

11   for word, but I kind of flowed through the conversation.

12   Q.    And you filled in the names of the financial

13   advisers there?

14   A.    Yes.

15   Q.    Further down on that document, there are some

16   numbered questions.  Do you see that?

17   A.    I do.

18   Q.    With check marks.  I'm not going to ask you to read

19   every word of that, but can you -- what is the first --

20   number 1, what does that relate to?

21   A.    Just confirm that he's receiving his confirmations

22   and statements.

23   Q.    And number 2, what does that refer to?

24   A.    Referencing what we currently have on file is his

25   risk tolerance of investment objective.

1   Q.   Is that a question you asked Mr. Carpenter?

2   A.   Yes.

3   Q.   There are two or three items that I'm going to

4   highlight here.

5        What does that say?  What does it say?

6   A.   "Great job," "aggressive," and "income."

7   Q.   Let's start with the word "aggressive."  Who

8   provided that information to you?

9   A.   Mr. Carpenter originally provided it as part of his

10  original new account opening profile.

11  Q.   And then there's an investment objective.  Do you

12  see that?

13  A.   I do.

14  Q.   And what does that say?

15  A.   It's short for income.

16  Q.   And then next to it there's something that says

17  "great job"?

18  A.   Correct.

19  Q.   What does that relate to?  Did you have a

20  conversation with him about that subject?

21  A.   Yeah, question number 2 with regard to financial

22  needs and goals are the recommendations by -- and I

23  might have said Gary and Gerry -- within your investment

24  objectives.  And his comment to me was they're doing a

25  great job.

1    Q.    Down here there's a handwritten notation.   Do you

2    see that?

3    A.    Yes.

4    Q.    And what does that relate to?

5    A.    It's just a note that I wrote that, you know, made

6    me reference that he was doing option trading.

7    Q.    And item 4, there's a question there.   What does

8    that relate to?

9    A.    Again, it was something I would have said, Are there

10   occasions where Gary or Gerry's suggestions don't match

11   these goals?   And the answer was no.

12   Q.    Will you look at the second page of that?   And I'm

13   going to magnify the bottom two-thirds of that document.

14   Do you see that?

15   A.    I do.

16   Q.    Next to item 7, there's a question:   "Does our

17   financial consultant call you with recommendations?"

18   A.    I see it, yes.

19   Q.    Okay.   There's a response.   What is that?

20   A.    "Total unsolicited."

21   Q.    What does that mean?

22   A.    It means that the trading that went on was

23   Mr. Carpenter's recommendations or calls.   He called

24   them in and said this is what I'd like do.   It wasn't a

25   recommendation made by the financial adviser.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   On the call, who provided that information?

2   A.   Mr. Carpenter.

3   Q.   Next to item 8, there's a question:  "Approximately

4   how often do you and your financial consultant speak?"

5   Do you see that?

6   A.   I do.

7   Q.   What is the response?

8   A.   "Daily, sometimes two to three times a day."

9   Q.   And that's a response that Mr. Carpenter gave you?

10  A.   Yes.

11  Q.   If you can look at the third page of that exhibit?

12         Questions 13 and 13 A.  Do you see that?

13  A.   I do.

14  Q.   Can you walk through that and explain what

15  information is in those sections there?

16  A.   As I'm having the conversation with Mr. Carpenter,

17  I'm talking to him about the commissions, about his

18  realized gains and profits, his unrealized gains or

19  profit -- excuse me, gains or losses.  And then

20  reflecting the date that I'm giving him this information

21  from.

22  Q.   And at that point in time, there was a realized

23  profit of how much?

24  A.   162,863.

25  Q.   And there was an unrealized loss?

1   A.   Of 153,394.

2   Q.   Further down, there's some handwritten notes.  Do

3   you see that?

4   A.   I do.

5   Q.   Looking at the first one.  What does that note say?

6   A.   It's cut off a little bit to the left, but it said

7   "He said only blame losses on the client, himself."

8   Q.   What does that mean?

9   A.   Again, the trades were unsolicited, so they were his

10  calls, the losses are his losses.

11  Q.   Is that what he said to you?

12  A.   Yes, absolutely.

13  Q.   Further down, the next item.  Do you see where it

14  starts FEs or FCs?

15  A.   Yes.

16  Q.   What does that note say?

17  A.   "FCs go out of their way to be ultra conservative,

18  they go the extra mile to pull him back."

19  Q.   On the call, who said that?

20  A.   Those are my notes from the conversation that we

21  had.  So Mr. Carpenter had made reference to those.

22  Q.   When you say "he made reference to those," that

23  statement is -- Mr. Carpenter said that to you?

24  A.   Yes.

25  Q.   And then further down, finally, there's a bullet.

PDF created with pdfFactory trial version www.pdffactory.com

1    Do you see that?

2    A.    I do.

3    Q.    And what is that?

4    A.    He referenced there that he would do a commercial

5    for Merrill Lynch because the information advisers --

6    financial consultants, that's what they were called at

7    the time -- do a great job for them.

8    Q.    Now, after you prepare this document, Mr. Rasmussen,

9    is the case that a letter can follow up from the

10   document?  Merrill Lynch will sent out a letter?

11   A.    Yes.

12   Q.    With respect to this account review, do you know

13   whether a letter was followed up?

14   A.    I would say yes.

15   Q.    Can you look at Exhibit 161 A, please?

16   A.    I have it.

17   Q.    Again, just generally describe what the documents

18   are within 161 A.

19   A.    It's a letter that I had sent out to Mr. Carpenter,

20   a letter back to me from Benistar Properties and a Janet

21   May wrote the letter and a copy of the envelope that

22   came back -- that that letter came back in.

23   Q.    What's the date of the letter?

24   A.    April 23, 1999.

25   Q.    And it has your signature on it?

PDF created with pdfFactory trial version www.pdffactory.com

```
1   A.    It does.

2   Q.    And at the bottom is there a signature that appears

3   to be from Mr. Carpenter?

4   A.    Yes.

5   Q.    And there's a date on that.  What's the date?

6   A.    April 30, 1999.

7   Q.    And with respect to the cover letter from Janet May,

8   what's the letterhead?

9   A.    Benistar Property Exchange Trust Company, Inc.

10  Q.    What's the date?

11  A.    April 30, 1999.

12        MR. PIROZZOLO:  The government would offer

13  Exhibit 161 A.

14        MR. PAPPALARDO:  Just one moment, your Honor.

15        (Pause.)

16        MR. PAPPALARDO:  No objection, your Honor.

17        THE COURT:  All right.

18        (Exhibit 161 A received into evidence.)

19        MR. PIROZZOLO:  May I publish?

20        THE COURT:  You may.

21  BY MR. PIROZZOLO:

22  Q.    Do you see that document?  I have put it up on the

23  screen.

24  A.    I do.

25  Q.    And on that document there's some handwritten
```

1  notations.  Do you see that?

2  A.   I see them.

3  Q.   And they exist elsewhere in the document.  Do you

4  see that?

5  A.   Yes.

6  Q.   What are those?

7  A.   When the letter came back to me, it was correcting

8  the way we spelled some things on the letter.

9  Q.   Flipping over to the cover page -- the cover letter

10  that came with it, if you could, I'm going to put that

11  up on the screen.  Do you see that?

12  A.   I do.

13  Q.   If you could take a look at the second paragraph of

14  that letter.  Do you see that?

15  A.   I do.

16  Q.   Could you read that out loud, please?

17  A.   It says, "Mr. Carpenter was particularly gratified

18  that a company such as Merrill Lynch could spell their

19  client's chairman's name incorrectly.  We thought only

20  we made those kinds of mistakes."

21  Q.   Now, back to the letter that you sent,

22  Mr. Rasmussen.

23       Second paragraph of that letter.  Do you see

24  that?

25  A.   I do.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And it refers to a discussion you had?

2    A.    It does.

3    Q.    Would you read the second sentence of that, please?

4    A.    "While between January and March 16, 1999 your

5    account had a realized profit of $62,063 and currently

6    reflects an unrealized loss of $103,443."

7    Q.    Further down in that document in that letter there's

8    a sentence in the fourth full paragraph.  Do you see

9    that?

10   A.    I see the fourth paragraph, yes.

11   Q.    And the first sentence, do you see that?

12   A.    Yes.

13   Q.    It says, "As we spoke about, active trading involves

14   special risks."

15   A.    Yes.

16   Q.    And the next sentence says what?

17   A.    "During our conversation, you assured me that you

18   are aware of, and are willing to assume" -- I'm sorry,

19   willing and able to assume the risks.

20   Q.    Would you take a look at Exhibit 162?

21         You can set that aside.  Exhibit 161 A, you can

22   set aside.  Take a look at Exhibit 162, please.

23   A.    I have it.

24   Q.    What is that document?

25   A.    It's an active account review that was done in

PDF created with pdfFactory trial version www.pdffactory.com

 1   October 1999.

 2   Q.   Who conducted it?

 3   A.   I did.

 4   Q.   Does it contain your handwriting?

 5   A.   It does.

 6   Q.   Was that a telephone conversation?

 7   A.   It was.

 8   Q.   With whom did you have the conversation?

 9   A.   Mr. Carpenter.

10   Q.   Did you follow the standard procedure for recording

11   the information on the form?

12   A.   I did.

13        MR. PIROZZOLO:  The United States would offer

14   Exhibit 162.

15        MR. PAPPALARDO:  No objection.

16        THE COURT:  All right.

17        (Exhibit 162 received into evidence.)

18   BY MR. PIROZZOLO:

19   Q.   I'm going to magnify the first third of that first

20   page of the document.  Do you see that?

21   A.   Yes.

22   Q.   And again, the date is what?

23   A.   October 14, 1999.

24   Q.   And what account does it relate to?

25   A.   The 07B10 account.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   And there's a handwritten note up here.  Do you see

2   that?

3   A.   Yes.

4   Q.   What is that?

5   A.   That I left a message at 10:00 a.m. on October 14th,

6   and then it says called back, and then it looks like

7   it's cut off, 10/1 and it looks like the rest of the

8   document is cut off to the right.

9   Q.   With respect to item 2, with regard to your

10  financial needs and goals, are the recommendations made

11  by, and there's blank, within your investment

12  objectives.  Do you see that?

13  A.   I do.

14  Q.   And what's the check mark show?

15  A.   The answer back to me was yes.

16  Q.   And then there's -- we show them as risk tolerance?

17  A.   Yes.

18  Q.   And the note is what?

19  A.   "Aggressive."

20  Q.   And investment objective, do you see that?

21  A.   Yes.

22  Q.   What does that say?

23  A.   "Income."

24  Q.   Who said that to you?

25  A.   Mr. Carpenter confirmed that back to me.

1    Q.   Can you look at the second page of that document?

2    And I'm going to magnify the first third of that.

3         Do you see that?

4    A.   I do.

5    Q.   Next, item 5, or under item 5, which says, "Is there

6    anything that I can do to assist you or that you would

7    like to comment on?"  Do you see that?

8    A.   I do.

9    Q.   What did Mr. Carpenter say to you?

10   A.   "Problem with naked limits due to the fact that the

11   system not picking up true spreads put into system as

12   separate orders."

13   Q.   What does the term "naked limits" refer to?

14   A.   Just options themselves.

15   Q.   And what does this relate to?  What does this --

16   A.   He had said at the time that he was -- when you put

17   an option order in, you can put a spread order in and

18   that order goes in at the same time, a buy and sell with

19   a spread on the options; but what he was doing was

20   putting the trades in at separate times.  So for margin

21   purposes and maintenance purposes, he didn't feel that

22   the firm was correctly calculating that and the amount

23   available to him to use in terms of cash.

24   Q.   What is margin, again?

25   A.   It's just, you know, basically borrowing on the --

PDF created with pdfFactory trial version www.pdffactory.com

1    excuse me, on the securities in the account.

2    Q.   I'm going to scroll down in that document.   Next

3    item, item 7, where it says, "Does our financial

4    consultant call you with recommendations?"   Do you see

5    that?

6    A.   I do.

7    Q.   What does it say?

8    A.   "All unsolicited."

9    Q.   Who told you that?

10   A.   Mr. Carpenter.

11   Q.   Item 8.   There's a note:   "Approximately how often

12   do you and your financial consultant speak?"   Do you see

13   that?

14   A.   Yes.

15   Q.   What was his answer?

16   A.   "Daily."

17   Q.   If you could look to the next page of the exhibit.

18   I'm going to magnify the middle third of that document,

19   again, item 13, 13 a, do you see that?

20   A.   I see it.

21   Q.   Again, can you walk through the information that

22   appears in that section of the document?

23   A.   Again, we were talking about the amount of

24   commissions that he paid, which was 124,034, between

25   January and August with a trailing 12 commissions of

1    150,000 -- I can't really read the rest of it there.

2    And then we talk about the -- at that time, between

3    January and October 14, 1999, his account had a 31,878

4    realized profit, and at the close of business on October

5    13th, reflected an unrealized loss of 124,658.

6    Q.    I'm going to scroll down to the bottom third of that

7    document.  Do you see that?

8    A.    I do.

9    Q.    There are additional comments concerning call.  Do

10   you see that?

11   A.    Yes.

12   Q.    First line says what?

13   A.    "Gerry and Gary doing a great job."

14   Q.    And then further down there's a notation there.

15   What does that say?

16   A.    It says, "Very happy with them, understand I am

17   doing a due diligence call, send him a letter."

18   Q.    And that's what he said to you?

19   A.    Yes.

20   Q.    Did you send him a letter?

21   A.    Yes.

22   Q.    Could you look at what's been marked as Exhibit 162

23   A?

24   A.    I have it.

25   Q.    What is that?

1  A.   It's a letter that was sent to Mr. Carpenter by me

2  on October 25, 1999.

3  Q.   Is that the letter that you sent after this account

4  review?

5  A.   Yes.

6  Q.   And --

7       MR. PIROZZOLO:  The United States would offer

8  Exhibit 162 A.

9       MR. PAPPALARDO:  No objection.

10       THE COURT:

11       (Exhibit 162 A received into evidence.)

12  BY MR. PIROZZOLO:

13  Q.   I'm going to publish that letter, Mr. Rasmussen.

14       Again, the date of that letter is what?

15  A.   October 25, 1999.

16  Q.   And it's sent to whom?

17  A.   Daniel Carpenter.

18  Q.   You spelled that with an "a"?

19  A.   I did.  Wrong again.

20  Q.   If you could look at the paragraph that starts, "As

21  we discussed."  Do you see that?

22  A.   I do.

23  Q.   Can you read the sentence that states -- starts,

24  "While between.  Do you see that?

25  A.   Yes.

1    Q.   Can you read that?

2    A.   "While between January and October 14, 1999 your

3    account has a realized profit of 31,078 and currently

4    reflects an unrealized loss of 119,950."

5    Q.   Can you look at the document that's marked as

6    Exhibit 163, please?

7    A.   I have it.

8    Q.   What is that?

9    A.   An active account review that was conducted on May

10   5, 2000 -- excuse me, May 15, 2000.

11   Q.   Who conducted it?

12   A.   I did.

13   Q.   Who did you speak to?

14   A.   Mr. Carpenter.

15   Q.   And is it your handwriting on the document?

16   A.   It is.

17   Q.   Did you follow the standard procedure for recording

18   the information?

19   A.   I did.

20        MR. PIROZZOLO:  The United States offers Exhibit

21   163.

22        MR. PAPPALARDO:  No objection.

23        THE COURT:  Okay.

24        (Exhibit 163 received into evidence.)

25   Q.   I'm going to magnify the top third of this document.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              Do you see that?
 2    A.   I do.
 3    Q.   And again, the date of this conversation?
 4    A.   May 15, 2000.
 5    Q.   And time?
 6    A.   2:10.
 7    Q.   And what account does it relate to?
 8    A.   The 07B10.
 9    Q.   Further down, with respect to answer to number 2.
10    Do you see that?
11    A.   I do.
12    Q.   And that says, "With regard to your financial needs
13    and goals are the recommendations made by Gary and Gerry
14    within your investment objectives?"  Do you see that?
15    A.   I do.
16    Q.   And his answer was?
17    A.   "Yes."
18    Q.   And then you address the risk tolerance.  And what
19    was his answer to you?
20    A.   "Aggressive."
21    Q.   And with respect to investment objective, what was
22    his answer to you?
23    A.   "Income."
24    Q.   The bottom of the document, there's some handwritten
25    notes.  Do you see that?
```

1    A.    I do.

2    Q.    And what does it say?

3    A.    "To put in margin line close of business April 2000

4    968,609 debt."

5    Q.    What does that mean?  What does that relate to?

6    A.    When we were going to type up the letter, my

7    assistant was going to type up the letter, I asked her

8    to put -- there's a standard margin line that we used to

9    highlight the fact that he's in a large margin debit.

10   Q.    And what relevance, if any, does a large margin

11   debit have?

12   A.    Again, he's borrowing against securities in the

13   account, so any -- he basically owes that money back to

14   us.

15   Q.    Can you look at the second page of that exhibit,

16   please?

17         Next to item 6, do you see that, where it says,

18   "Are there any concerns regarding the trading activity

19   in your account?"  Do you see that?

20   A.    I do.

21   Q.    And the notation -- the check mark is what?

22   A.    "No."

23   Q.    And that's what he said to you?

24   A.    Correct.

25   Q.    And there's a notation that starts, "Losses."  Do

PDF created with pdfFactory trial version www.pdffactory.com

1  you see that?

2  A.   I do.

3  Q.   What does it say?

4  A.   "Losses due to the NASDAQ."

5  Q.   Who said that?

6  A.   Mr. Carpenter.

7  Q.   What was that in reference to?

8  A.   It was referencing he was trading some of the NASD

9  stocks at the time.

10  Q.   Further down, there's a notation, "Approximately how

11  often do you and your financial consultant speak?"  Do

12  you see that?

13  A.   I do.

14  Q.   And what was his response?

15  A.   "Daily."

16  Q.   Can you look at the next page of that exhibit?

17       And I'm going to highlight, magnify items 13.

18  Do you see that?

19  A.   I do.

20  Q.   And can we walk -- can you walk us through the

21  information that appears in that?

22  A.   It references the commissions, again, the 158,233

23  between January and April of 2000.  It references that

24  between January and close of business May 12, 2000, your

25  account had a realized loss of -- excuse me, 1,168,782.

1    On the close of business on 5/12, your account reflects

2    an unrealized loss of 535,762.

3    Q.   Is that information that you provided to him on the

4    call?

5    A.   It was.

6    Q.   And I'm going to scroll down to some notations,

7    bullet 1, 2, 3, and 4.  Do you see that?

8    A.   I do.

9    Q.   Item 1.  What does that say?

10   A.   "Clocked cleaned."

11   Q.   Who said that?

12   A.   Mr. Carpenter.

13   Q.   What is that in reference to?

14   A.   He referenced that he got his clocked cleaned, he

15   lost a lot of money recently.

16   Q.   Item 2.  What does that say?

17   A.   "What's 1,500,000 amongst friend."

18   Q.   Who said that?

19   A.   Mr. Carpenter.

20   Q.   After you had this call, was there a letter

21   generated?

22   A.   There was.

23   Q.   Can you take a look at a document that's in folder

24   152, please?

25           MR. PIROZZOLO:  And I believe that's in

1    evidence, your Honor.

2    A.    I see it.

3    Q.    I'm going to put it up on the screen.

4         The date of that document?

5    A.    May 17, 2000.

6    Q.    And that's to whom?

7    A.    Daniel Carpenter.

8    Q.    And you have it with an "e" there?

9    A.    Yes.

10   Q.    And it's for what account?

11   A.    The 07B10.

12   Q.    And the first paragraph of that.  Is that in

13   reference to the call we just discussed in the active

14   account review?

15   A.    It is.

16   Q.    Can you read the second full paragraph of that

17   document, please?

18        And keep your voice up, please.

19   A.    I'm sorry.  "As you and Thomas discussed having

20   again reviewed your account, we wanted to call your

21   attention to the continued volume of trading.  Between

22   January and April 2000, a total of 890 transactions took

23   place generating $158,233 in commissions.  At the close

24   of business on May 12, 2000 your account had an

25   unrealized loss of $535,762, and in 2000 a realized loss

PDF created with pdfFactory trial version www.pdffactory.com

1  of $1,168,782."

2  Q.   And the next paragraph, it starts, "As of April 28,

3  2000."  Do you see that?

4  A.   I do.

5  Q.   Could you read that paragraph, please?

6  A.   "As of April 28, 2000, your account has a margin

7  debit balance of $968,609.  Please be reminded that such

8  a margin debit balance increases the potential for

9  losses, as well as gains, in your account.  As you may

10  be aware, with this degree of leverage, a market decline

11  may necessitate a deposit of additional funds to retain

12  your position."

13  Q.   The next paragraph, Mr. Rasmussen, that starts,

14  "Mr. Stern."  Can you read that?

15  A.   "Mr. Stern and Mr. Levine indicated and you

16  confirmed to Thomas that all transactions were executed

17  entirely at your direction.  Furthermore, all

18  transactions should be consistent with your investment

19  objectives and financial resources.  At this time, our

20  records indicate your investment objective is income and

21  your risk tolerance is aggressive."

22  Q.   Can you look at the second page of this letter?  Do

23  you see that?

24  A.   I do.

25  Q.   And that's signed by whom?

1    A.    Hassan Tabbah.

2    Q.    Did you participate in creating this letter,

3    Mr. Rasmussen?

4    A.    I did.

5    Q.    But you did not sign it; is that correct?

6    A.    I did not.

7    Q.    Why not?

8    A.    Each year the resident vice president is required to

9    do a certain amount of active account reviews.  At this

10   time, it was a rule within Merrill.  So I performed it,

11   sent the letter out, he signed off on it, and ultimately

12   followed that up with a phone call.

13   Q.    Mr. Rasmussen, did you send another letter after

14   this letter to Mr. Carpenter with respect to his trading

15   in the B10 account?

16   A.    I don't recall without seeing it.

17   Q.    Let's take a look at Exhibit 153.

18   A.    I did.

19   Q.    What's 153?

20   A.    It's an active account review done August 29th of

21   2000.

22   Q.    And is that a letter that you prepared?

23   A.    It is.

24   Q.    And that you signed?

25   A.    It is.

```
 1              MR. PIROZZOLO:  Your Honor, I believe this is
 2     already in evidence, so I'm going to project this.
 3              THE COURT:  All right.
 4     BY MR. PIROZZOLO:
 5     Q.   That's dated, again?
 6     A.   August 29, 2000.
 7     Q.   And this letter in the second full paragraph, what
 8     does it state?
 9     A.   "Between January and July 2000, a total of 1,680
10     transactions took place generating $253,554 in
11     commissions.  At the close of business on August 4,
12     2000, your account had an unrealized loss of $87,392,
13     and in 2000, a realized loss of $1,957,852."
14     Q.   Further down, there's a paragraph that states, "As
15     of August 28, 2000."  Do you see that?
16     A.   I do.
17     Q.   Can you read that, please?
18     A.   It says, "As of August 28, 2000, your account has a
19     margin debit balance of $1,078,415.39.  Please be
20     reminded that such a margin debit balance increases the
21     potential for losses, as well as gains, in your account.
22     As you may be aware, with this degree of leverage, a
23     market decline may necessitate a deposit of additional
24     funds to retain our position."
25     Q.   And then, finally, there's a paragraph that states,
```

```
 1    "We trust."  Do you see that?
 2    A.   Yes.
 3    Q.   What does that say?  If you could read that
 4    paragraph.
 5    A.   "We trust that Gary Stern has discussed all these
 6    transactions with you, and that you fully understand the
 7    associated risks.  Furthermore, all transactions should
 8    be consistent with your investment objectives and
 9    financial resources.  At this time, our records indicate
10    your investment objective is income and your risk
11    tolerance is aggressive."
12    Q.   And that's your signature below?
13    A.   It is.
14    Q.   Mr. Rasmussen, did there come a time when Merrill
15    Lynch made a decision to stop Mr. Carpenter from opening
16    any additional options trades?
17    A.   Yes.
18    Q.   Was it shortly after this August 29 letter, to your
19    recollection?
20    A.   I believe so, yes.
21    Q.   Did you speak to Mr. Carpenter about that decision?
22    A.   I did.
23    Q.   How many times?
24    A.   Twice, I believe.
25    Q.   Was it in person or on the telephone?
```

1    A.    Telephone.

2    Q.    Let's talk about the first telephone call with

3    Mr. Carpenter.  Who was on it?

4    A.    That call, I believe it was myself, Mr. Carpenter,

5    and Gerry Levine.

6    Q.    About how long did that conversation last?

7    A.    I'm not really sure.

8    Q.    What did you tell him?

9    A.    I reiterated --

10   Q.    By "him," I mean Mr. Carpenter.

11   A.    I'm sorry.  I reiterated the fact that, you know,

12   Merrill Lynch was not going to allow him to put any

13   further opening positions in his accounts.

14   Q.    And what was his response?

15   A.    He was upset by it.  He felt that, you know, we were

16   shutting him down.

17   Q.    Did he say anything else that you can recall on that

18   call?

19   A.    He just -- he just wanted to continue to trade the

20   accounts.

21   Q.    And what did you tell him on that call?

22   A.    A decision was already made that we were no longer

23   going to continue to allow him to trade.

24   Q.    Now, let's talk about the second call.  Was there a

25   second call?

PDF created with pdfFactory trial version www.pdffactory.com

Case 1:04-cr-10029-GAO     Document 295     Filed 06/20/2008     Page 45 of 175

45

```
 1   A.    There was.

 2   Q.    Who was on that call?

 3   A.    I believe myself, Mr. Carpenter, and Kevin Duffy,

 4   who was an attorney of Merrill Lynch.

 5   Q.    When was that?

 6   A.    A few days later.

 7   Q.    What was said on that call?

 8   A.    Same type of conversation.  He was trying to, you

 9   know, again, get us to change our minds and allow him to

10   trade there.  You know, it actually became kind of

11   heated, you know, during that call.

12   Q.    Heated on which end of the call?

13   A.    From Mr. Carpenter.  Again, he just wanted to trade

14   the account.  You know, as far as he was concerned, it

15   was his money, he could do what he wanted with it; he

16   could trade it; how come we were shutting him down?  We

17   were preventing him from getting into the market further

18   which would allow him to gain back some of the losses

19   that he already sustained.

20   Q.    And what was your response to him?

21   A.    The decision was made by, you know, option

22   compliance department, the office of general counsel,

23   everybody said that the account should be shut down, and

24   the office themselves.

25   Q.    Following that call or around the time of that call,
```

1   did you receive a letter?

2   A.   I did.

3   Q.   Can you look at what's been marked as Exhibit 157?

4   And it's in a folder in front of you.

5   A.   I have it.

6   Q.   Without going into the substance of that letter, who

7   is it addressed to?

8   A.   Me.

9   Q.   Who is it from?

10  A.   Daniel Carpenter.

11  Q.   What is the date?

12  A.   September 22, 2000.

13  Q.   On the re: line -- do you see the re: line?

14  A.   I do.

15  Q.   And what does it relate to?

16  A.   Benistar Property Exchange, the account number

17  849-07B10.

18          MR. PIROZZOLO:  The United States would offer

19  Exhibit 157.

20          THE COURT:  All right.

21          (Exhibit 157 received into evidence.)

22  BY MR. PIROZZOLO:

23  Q.   Again, the date, Mr. Rasmussen?

24  A.   September 22, 2000.

25  Q.   And the letterhead?

1   A.    Benistar Limited.

2   Q.    It relates to what?

3   A.    The Benistar Property Exchange, the 07B10.

4   Q.    It was sent by what method?

5   A.    It was sent by certified mail and by fax.

6   Q.    Is starts, "Dear Tom."   Do you see that?

7   A.    I do.

8   Q.    The first sentence says what?

9   A.    "You have been very helpful to us in the past, I

10  wanted to lodge an official complaint with you against

11  Merrill Lynch."

12  Q.    Do you see the first paragraph?

13  A.    I do.

14  Q.    Could you just read the first sentence of that

15  paragraph, please?

16  A.    "I am very upset and disappointed with Merrill

17  Lynch's option compliance department's decision to

18  prohibit Benistar Property Exchange Trust Company from

19  opening any new positions in our account (849-07B10, et

20  cetera)."

21  Q.    And the following sentence says what?

22  A.    "This decision is shortsighted at best and will

23  likely cause us to miss trading profits of $2 million or

24  more in the coming months."

25  Q.    There's a reference in the third full paragraph that

1    starts with "the extreme volatility."  Do you see that?

2    A.    I do.

3    Q.    What was the -- can you read the first sentence of

4    that, please?

5    A.    "With the extreme volatility of tech stocks, and

6    especially SDLI, I thought that closing out the position

7    was the prudent thing to do while I was travelling."

8    Q.    If you could look at the second page of that letter,

9    please.

10         Look at the first paragraph.  Do you see that?

11   A.    I do.

12   Q.    Could you read the first sentence of that, please?

13   A.    "This type of volatility is perfect for us to earn

14   back the losses we have suffered since April, which I

15   must say many of which were caused by maintenance calls

16   and trading blocks by Merrill.  Several times in the

17   past Merrill has blocked us from getting back our money

18   in profitable trades such as Rambus and Juniper, et

19   cetera."

20   Q.    What is he complaining about there?

21   A.    That we're stopping him from opening up any new

22   positions which, in his opinion, would allow him to gain

23   back some of the losses he already had.

24   Q.    The next paragraph down.  Do you see that?

25   A.    Where it starts, "Look"?

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    "Look at"?

2    A.    Yes.

3    Q.    There's a sentence that starts, "By preventing me."

4    Do you see that?

5    A.    I do.

6    Q.    Can you read that for us?

7    A.    "By preventing me from reselling the 170 contracts

8    of $420 puts, Merrill is costing us at least $1,700,000,

9    if not more."

10   Q.    And you see the next sentence, the first two -- "The

11   more."  Do you see that?

12   A.    Yes.

13   Q.    Can you just read that?

14   A.    "The 'more' comes from the volatility of SDLI which

15   has had daily point swings of more than 30 points almost

16   every other trading day for the last month" --

17   Q.    Sorry.

18   A.    It's okay.

19   Q.    There's a parens.  Do you see that?

20   A.    Yes.

21   Q.    And what does that say?

22   A.    "In fact, as I write this letter, SDLI had a 20

23   point swing just in one hour on 'Intel' Friday."

24   Q.    Can you take a look at the first sentence of the

25   next paragraph.  It starts, "Suffice to say."

1    A.    Yes.

2    Q.    What does that say, please?

3    A.    "Suffice to say, the frequent selling and buying of

4    puts at the 420 level of SDLI will provide a real cash

5    cow for us that would allow us to recover most if not

6    all of our past losses, much of which we feel is

7    directly attributable to Merrill Lynch's actions."

8    Q.    Can you please read the next sentence of that

9    letter, please?

10   A.    "We have chosen Merrill as our to depository for our

11   clients so we cannot move the funds elsewhere.  If we

12   cannot trade at Merrill, we cannot trade anywhere, and

13   you will have doomed us to our losses in a volatile

14   market that we were perfectly positioned to profit

15   from."

16   Q.    Mr. Rasmussen, there's a reference there to a

17   depository for our clients.  Do you see that?

18   A.    I do.

19   Q.    Did you discuss that issue with Mr. Carpenter?

20   A.    I did not.

21   Q.    What is that in reference to?

22   A.    As far as I was concerned, his Benistar

23   relationships.

24   Q.    Did Mr. Carpenter inform you on the telephone call,

25   the two telephone calls that we have just discussed or

PDF created with pdfFactory trial version www.pdffactory.com

1  on any of the active account reviews, whose money he was

2  trading?

3  A.   It was always -- he implied it was his money.

4        MR. PAPPALARDO:  Objection, your Honor.

5        THE COURT:  I'll strike it.

6  BY MR. PIROZZOLO:

7  Q.   Now, Mr. Rasmussen, after you received this letter,

8  did Merrill Lynch change its position as to whether or

9  not it would continue to allow Mr. Carpenter to open up

10  options positions?

11  A.   We did not.

12  Q.   What did Mr. Carpenter do after this?

13  A.   He ultimately transferred his relationship out of

14  Merrill Lynch.

15        MR. PIROZZOLO:  If I could have a moment, your

16  Honor.

17        (Discussion off the record.)

18  Q.   I just want you to take a look at the paragraph

19  that's below the one I just highlighted.  I will magnify

20  that.

21        Do you see that?

22  A.   I do.

23  Q.   Can you read the first sentence, please?

24  A.   "Let me conclude by saying that Merrill Lynch has no

25  bigger fan than Dan Carpenter and that Benistar has met

```
 1   each and every one of its maintenance or margin calls on
 2   a timely basis, no matter how painful."
 3   Q.   Did Mr. Carpenter on the phone call tell you how he
 4   was meeting his maintenance and margin calls?
 5   A.   He did not.  He was liquidating sometimes to meet
 6   the calls or delivering funds.
 7   Q.   And Merrill Lynch did not change its position with
 8   Mr. Carpenter?
 9   A.   We had not.
10        MR. PIROZZOLO:  I have nothing further, your
11   Honor.
12                    CROSS-EXAMINATION
13   BY MR. PAPPALARDO:
14   Q.   Good morning, Mr. Rasmussen.
15   A.   Good morning.
16   Q.   My name is John Pappalardo, and along with
17   Mr. Greenberg, seated right here, we represent
18   Mr. Carpenter.
19        Now, sir, I want to direct your attention to a
20   period of time 1999 and 2000, period of time you
21   focussed with specificity in terms of certain documents.
22   My question is a general one, sir.  During this time
23   period throughout 1999 and 2000, you would agree with me
24   that whether it was part of your professional duties or
25   personal interest, you regularly kept abreast of
```

PDF created with pdfFactory trial version www.pdffactory.com

1  financial market news and analysis, right?

2  A.   Somewhat, sure.

3  Q.   That was your job, right?

4  A.   Yes.

5  Q.   And in connection with that, you read the Wall

6  Street Journal on a daily basis?

7  A.   I did.

8  Q.   And you looked at Barron's as well?

9  A.   I looked at it once in a while, yes.

10  Q.   And you concluded that there were competing visions

11  about where the market was going in 2000, right?

12  A.   There's always competing visions.

13  Q.   But specifically then, right?

14  A.   Sure.

15  Q.   And there were some analysts and market watchers who

16  were very bullish on the market, others saw the market

17  as a great buying opportunity, right?

18  A.   Correct.

19  Q.   And others saw it as a down market and advocating a

20  conservative approach, right?

21  A.   Correct.

22  Q.   Do you know an individual by the name of Henry

23  Blodgett?

24  A.   I know the name, yes.

25  Q.   And who is he?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   He was an analyst at Merrill Lynch.

2    Q.   He was the chief investment strategist at Merrill

3    Lynch during 2000, right?

4    A.   Yes.

5    Q.   And you know that Merrill Lynch's chief investment

6    strategist, Mr. Blodgett, during the fall months of

7    2000, September, October, November, was often quoted in

8    the Wall Street Journal, wasn't he?

9    A.   He was.

10   Q.   And Merrill Lynch's own chief investment strategist

11   was publicly advocating technology stocks in the Wall

12   Street Journal and elsewhere, was he not?

13   A.   I'm sure he was; I don't recall honestly.

14   Q.   You don't recall?

15   A.   No.

16            MR. PAPPALARDO:  May I approach, your Honor?

17            THE COURT:  You may.

18            MR. PIROZZOLO:  Your Honor, may we approach

19   briefly?

20            (At sidebar on the record.)

21            MR. PIROZZOLO:  I just want to clarify the scope

22   of the Judge's -- the Court's prior rulings on this.

23            I believe that there is a prior ruling as to the

24   scope of expert opinion or lay opinion with respect to

25   Merrill Lynch witnesses and to Paine Webber witnesses.

1          To the extent this is starting to stray outside

2     the scope of what was provided to Mr. Carpenter or what

3     Mr. Rasmussen may have said to Mr. Carpenter, we're

4     starting to drift into opinion of Mr. Rasmussen, and I

5     just want to understand what the scope and dimensions of

6     the Judge's rulings are on that.

7          MR. PAPPALARDO:  Well, your Honor, we've just

8     listened to a direct this morning that introduced a

9     series of documents and letters that indicated -- and I

10    believe the import of them was to suggest that this was

11    a foolhardy strategy, one that was imprudent, improper,

12    and I believe, based upon my reading of the indictment,

13    criminal.  And I would just like to get out of this

14    witness what he said before in prior testimony regarding

15    his interactions with Carpenter and big-picture items.

16         I'm not going to get into the specifics, except

17    for the documents, the specifics of what he says on

18    this.

19         THE COURT:  I'm not sure whether this will help

20    or not.

21         MR. PIROZZOLO:  Okay, thank you.

22         THE COURT:  So far the questions about what

23    Mr. Blodgett may have said about the market and so on I

24    take as evidence of historical facts, that Blodgett

25    expressed opinions about things.  That's different from

1    a witness expressing an opinion here.

2          MR. PIROZZOLO:  Right, right.  That's true,

3    but --

4          THE COURT:  So I think that it is possible as a

5    historical matter to say that whoever it was who may

6    matter, Blodgett, for example --

7          MR. PAPPALARDO:  Your Honor, I'm not dwelling on

8    this, I just have --

9          THE COURT:  -- had an opinion and expressed it,

10    it's printed in the paper, and therefore, it's a fact.

11          MR. PIROZZOLO:  That's why I didn't object.  I

12    just want to make sure I understood the scope.

13    Historical fact or --

14          THE COURT:  I don't think there's going to be an

15    opinion solicited from this witness.

16          MR. PAPPALARDO:  Your Honor, this witness will

17    testify --

18          THE COURT:  Other than as a statement of what he

19    might have expressed historically.

20          MR. PIROZZOLO:  To Mr. Carpenter.

21          THE COURT:  Well, whatever, I don't know.

22    But -- in other words, recounting what happened in the

23    past, which might include an expression of an opinion,

24    because that's a fact which may or may not matter -- it

25    might not be irrelevant, we'll have to deal with that.

```
 1    Relevance is a separate question from whether it's

 2    admissible opinion evidence.

 3              MR. PIROZZOLO:  Yes, right.

 4              THE COURT:  Opinion evidence relates to an

 5    opinion given here in the courtroom by a witness now.

 6              MR. PIROZZOLO:  But as we go, there is going to

 7    be a relevance issue, obviously, the further out we go

 8    to what was going on and what may have been said in the

 9    Wall Street Journal.  But I understand the Court's --

10              THE COURT:  Depending on how far we go.

11              MR. PAPPALARDO:  As a matter of fact, we're not

12    going very far.  I'll tell you where we're going, if you

13    want.

14              (End of discussion at sidebar.)

15    BY MR. PAPPALARDO:

16    Q.  Sir, I put before you three folders that are

17    marked --

18              (Discussion off the record.)

19    Q.  Sir, if you would look at page 7102?

20    A.  Which folder?

21    Q.  Of the -- it should be the first folder.

22    A.  Okay, I have that.

23    Q.  Okay.  Sir, you recall testifying in July of 2005,

24    correct?

25    A.  I do.
```

1   Q.   Okay.  And I asked you -- did you read that, sir?

2   A.   I'm sorry?

3   Q.   Did you read page 7102?

4   A.   I didn't read the whole page, no.

5   Q.   If you read between 15 -- lines 15 and 22.

6   A.   Okay.

7           (Pause.)

8   A.   Okay.

9   Q.   And you would agree with me, sir, that Merrill

10  Lynch's own chief investment strategist was publicly

11  advocating technology stocks in the Wall Street Journal,

12  right?

13  A.   Yes.

14  Q.   Now, also, that 2000 was a very volatile year in --

15  for technology stocks in general, right?

16  A.   Correct.

17  Q.   Nevertheless, it was still being advocated?

18  A.   Correct.

19  Q.   Now, sir, you testified on direct examination that

20  you conducted a number of active account reviews; isn't

21  that right?

22  A.   Yes.

23  Q.   And by the way, you said seven or eight?

24  A.   I believe so, yes.

25  Q.   Isn't it closer to four or five?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   From the documentation I have here.

2   Q.   Look at your trial testimony on page 61, the same

3   document.

4   A.   Okay.

5   Q.   Did you testify -- does that refresh your memory

6   that it was closer to four or five?

7   A.   Which line?  I haven't read the whole document.

8   Q.   Okay.

9        (Pause.)

10  Q.   Line 18, 19, 20.

11  A.   Okay.  Page 61, correct?

12  Q.   Page 60, excuse me.  Page 60.

13  A.   Line 18.  Okay.  I see it says about four or five.

14  Q.   Okay.  That was your testimony in 2005?

15  A.   It was.

16  Q.   Is that accurate?

17  A.   I'm sure it was.

18  Q.   Now, on several of those occasions when you were

19  conducting these reviews, you actually spoke with

20  Mr. Carpenter, right?

21  A.   Correct.

22  Q.   And all of his telephone contact with you during

23  these reviews was pleasant, was it not?

24  A.   It was.

25  Q.   And on a couple of those occasions, on -- on several

PDF created with pdfFactory trial version www.pdffactory.com

1    of those occasions, you followed up your telephone

2    conversations with Mr. Carpenter via letter, right?

3    A.   Correct.

4    Q.   Now, focusing in on the telephone conversations

5    themselves, you would agree with me, wouldn't you, that

6    the purpose of the call was to make contact with the

7    client to make sure that he's aware of the activity

8    that's going on in his account?

9    A.   That's one of the purposes, and to confirm the

10   activity.

11   Q.   Right.   To make sure that the client had an

12   awareness of what was going on in the account, right?

13   A.   Correct.

14   Q.   This was what is often referred to as due diligence?

15   A.   Correct.

16   Q.   And it's also an opportunity for you to determine

17   whether or not people who work for you were being

18   responsive to the particular account holder, right?

19   A.   Correct.

20   Q.   Now, you testified that you used a script for the

21   questions that you would put to Mr. Carpenter?

22   A.   Correct.

23   Q.   And you used the same script every time?

24   A.   I did.

25   Q.   And that's a routine script?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes, it's a script that I use.

2    Q.    And Exhibit 161, which was put up on the screen

3    during your direct examination, is an example of that

4    script, right?

5    A.    Correct.

6    Q.    And that reflects your first conversation with Dan

7    Carpenter on April 16, 1999, right?

8    A.    Correct.

9         MR. PAPPALARDO:    May that be published again?

10   Q.    Now, the handwritten entries that appear on this

11   document, Exhibit 161, that's your handwriting, isn't

12   it?

13   A.    Yes.

14   Q.    And that's your handwriting at the bottom, where it

15   says, "option trades."    Is that right?

16   A.    Yes.

17   Q.    Because Dan Carpenter was doing a lot of option

18   trades at that point, right?

19   A.    Correct.

20   Q.    And that's one of the purposes of the call.    You

21   noted that, and you spoke to him about those option

22   trades?

23   A.    Correct.

24   Q.    Right?

25         Now, as a result of this conversation that you

PDF created with pdfFactory trial version www.pdffactory.com

1    had with Mr. Carpenter in April of 1999, you didn't have

2    any concerns about this account, did you, sir?

3    A.    I did not.

4    Q.    You had none.

5    A.    I did not.

6    Q.    Let's look at 162.

7          This document is another active account review

8    and personal contact form, right?

9    A.    It is.

10   Q.    And again, the document has your handwriting?

11   A.    It does.

12   Q.    And this relates to a telephone conversation that

13   you had with Mr. Carpenter on October 14th of 1999,

14   right?

15   A.    Correct.

16   Q.    And is it fair to say that in April and then in

17   October of 1999, that you and Mr. Carpenter had a

18   general conversation about his active option trading and

19   where he was going with his strategy?

20   A.    I'm not sure if we went into the details of his

21   strategy, but, yes, we talked about his option trading.

22   We really went through the numbers and really went over

23   the profile of his account.

24   Q.    And you talked about where he was going with it,

25   right?

1    A.    I'm not sure that I did.  I don't see reference to

2    it in there.

3    Q.    Would you look at, please -- look at volume I, and

4    specifically at page 120 and 121.

5            (Discussion off the record.)

6            MR. PAPPALARDO:  December 5th.

7    Q.    Specifically, the bottom of page 120, line 23, 24,

8    the top of page 121, through and including line 2.

9    A.    Yes, I see it.

10   Q.    Okay.

11           So you did discuss with Mr. Carpenter where he

12   was going with his strategy, right?

13   A.    Correct.

14   Q.    No question.  That refreshes your memory?

15   A.    It does.

16   Q.    Okay.  And that's what you testified to before?

17   A.    It does.

18   Q.    You spoke to Dan Carpenter again on May 15th of

19   2000, right?

20   A.    I believe so.

21   Q.    That's Exhibit 163.

22   A.    Okay.

23   Q.    Okay.

24           MR. PAPPALARDO:  Could we get that up, please?

25   Q.    And again, you filled this form out?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yes.

2   Q.   And this shows on page 3 that the Benistar account

3   experienced a realized loss for the period of about

4   $1,168,782, right?

5   A.   Yes.

6   Q.   And an unrealized loss of $535,762, correct?

7   A.   Correct.

8   Q.   In this May 2000 period, you saw losses of a similar

9   magnitude in the accounts of some other clients at

10  Merrill Lynch, didn't you?

11  A.   Correct.

12  Q.   Now, let's go back to page 1.  On the bottom of page

13  1 of Exhibit 163, you indicated that there is a $968,609

14  debit, right?

15  A.   Yes.

16  Q.   And that -- that pertains to the margin line that

17  Mr. Carpenter had, right?

18  A.   Correct.

19  Q.   And that means that Dan Carpenter was borrowing

20  money from Merrill Lynch for purposes of these trading

21  accounts, right?

22  A.   Correct.

23  Q.   And at that time he had borrowed $968,609, right?

24  A.   Correct.

25  Q.   And despite the losses in the account, Merrill Lynch

1    was still providing Dan Carpenter with a margin line,

2    right?

3    A.    Correct.

4    Q.    Prior to September of 2000, in all of the various

5    account reviews that you performed with respect to this

6    Benistar account, in all of your conversations with Dan

7    Carpenter, you came to a conclusion as to whether Dan

8    Carpenter's trading was rational or irrational, didn't

9    you, sir?

10   A.    Yes.

11   Q.    And you concluded that Dan Carpenter's trading was

12   rational; isn't that correct?

13   A.    Correct.

14   Q.    You didn't think it was irrational, did you?

15   A.    No.

16   Q.    And you didn't conclude Dan Carpenter's trading was

17   irrational, because he had a strategy; isn't that fair

18   to say?

19   A.    That's correct.

20   Q.    And, sir, at various points in time, Mr. Carpenter's

21   strategy had been profitable for him, had it not?

22   A.    It had.

23   Q.    And if you can from memory, sir, that included the

24   end of 1999, where he went from approximately a $400,000

25   deficit to a profit of over $600,000; isn't that fair to

PDF created with pdfFactory trial version www.pdffactory.com

1   say?

2   A.  I mean, honestly, I don't recall.  I mean, I recall

3   he had profits in his account, absolutely.  His trading

4   generated profits over time frames.

5   Q.  You don't recall those time frames?

6   A.  I don't recall them off the top of my head, but he

7   did have trading profits.

8   Q.  And when he was making profits in his trading

9   accounts, did you also do account reviews with him?

10   A.  I did, absolutely.

11   Q.  And do you have those?

12   A.  During that time period?

13   Q.  Yeah.

14   A.  They're not in front of me.  I don't know.

15   Q.  In fact, you discussed with Dan Carpenter on more

16   than one occasion that he had a strategy and how this

17   strategy made money in the past and how he, how Dan

18   Carpenter, believed it would make money in the future;

19   isn't that fair to say?

20   A.  That's fair to say.

21   Q.  Sir, if you'd look at the number 2 transcript, the

22   one that's marked number 2.  Do you see that?

23   A.  Yes.  Which page?

24   Q.  Could you look at page 107?

25   A.  Okay.  I'm here.  Read the page?

1  Q.   Read from line 5 to 11.

2       (Pause.)

3  Q.   Do you see that, sir?

4  A.   I do.

5  Q.   Now, is it fair to say that refreshes your memory

6  that at the end of '99, he went from being down about

7  $400,000 to being above by over $600?

8  A.   It does.

9  Q.   And that was after two of those account reviews that

10 you're talking about that are admitted into evidence,

11 right?

12 A.   Correct.

13 Q.   Also, we had display of an account review that took

14 place in May of 2000, right?

15 A.   Yes.

16 Q.   That was in March -- I'm sorry, in March of 2000,

17 the NASDAQ went way down, right?

18 A.   Correct.

19 Q.   It was up at about 5000 points, it went way down to

20 3200 points?

21 A.   Correct.

22 Q.   And that's a significant drop, right?

23 A.   Correct.

24 Q.   So that's consistent with one getting his clocked

25 cleaned if you're in NASDAQ stocks, right?

1  A.    Correct.

2  Q.    Now, after the account review that you described,

3  which --

4            MR. PAPPALARDO:   Could we get -- it's Exhibit

5  162.   Could you put that up on the screen, please?

6            No, it's not.

7            163.

8  Q.    This is the May 15th account review, May 15th of

9  2000, right?

10 A.    Correct.

11 Q.    After the March crash of the NASDAQ, right?

12 A.    Yes.

13 Q.    And it shows significant losses here, right?

14 A.    I can't tell from this screen, this page.

15 Q.    Let's go to the second page.

16 A.    The third.

17 Q.    The third.  You know these forms better than I do,

18 sir.

19            Significant losses, right?

20 A.    Correct.

21 Q.    Over a million dollars in losses?

22 A.    In realized, and another 500,000 in unrealized.

23 Q.    And unrealized loss is a loss that's yet to occur?

24 A.    Correct.

25 Q.    But, certainly, you've got over a million in

PDF created with pdfFactory trial version www.pdffactory.com

1   realized losses?

2   A.   Yes, sir.

3   Q.   And that was in May, right?

4   A.   Yup.

5   Q.   Isn't it a fact, sir, after your account review

6   that's described in this document and after the

7   subsequent letter that you sent out to Mr. Carpenter

8   evidencing the fact that you had the phone call with him

9   doing your due diligence, which is what you do in part,

10  isn't it a fact that in June and July Mr. Carpenter had

11  significant gains?  June and July of 2000?

12  A.   I don't know that.

13  Q.   Okay.  Look at the second -- number 2, I think it's

14  before you.

15  A.   Yup.

16  Q.   Look at 23.  Page 23, lines 13 and 14.

17  A.   Okay, I'm there.  I'm sorry, what lines?

18  Q.   Excuse me, let me see.

19  A.   I apologize.  You said page 23?

20  Q.   Yes, page 23, lines 9 through 15.

21  A.   Okay.

22       (Pause.)

23  Q.   Do you see that, sir?

24  A.   Yes.

25  Q.   Isn't it fair to say that in June and July of 2000,

1    this account was profitable?

2    A.   Yes.

3    Q.   Okay.  And that was your testimony in 2002, right?

4    A.   If that's the date of this document, yes.

5    Q.   But that's accurate, sir, that refreshes your

6    memory?

7    A.   It does.

8    Q.   After this account review in May, after you wrote

9    all those entries out, after you sent the letters, after

10   you had the phone call, Mr. Carpenter's strategy worked,

11   didn't it?

12   A.   It became profitable at the time, yeah.

13   Q.   At that time?

14   A.   Yes.

15   Q.   Now, sir, there came a time in September of 2000

16   where you were contacted by a Mr. Malia; isn't that

17   right?

18   A.   Correct.

19   Q.   And at that time, Mr. Malia headed the option

20   compliance at the firm, right?

21   A.   Correct.

22   Q.   At the time, he discussed with you, did he not,

23   trading strategy that was being employed by Dan

24   Carpenter?

25   A.   He did.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And at that time, he expressed concerns to you about

2    that strategy, right?

3    A.   Correct.

4    Q.   And the concerns he expressed to you, in essence,

5    were that while there was nothing wrong with Dan

6    Carpenter's strategy itself, it's just the times we're

7    in right now, it's not working.  Isn't that fair to say?

8    A.   I believe so, yes.

9    Q.   That's what he told you?

10   A.   Yes.

11   Q.   Now, sir, you did not, as the leader of Mr. Stern

12   and Mr. Levine, suggest that this account be closed, did

13   you, this Benistar account?

14   A.   Correct.

15   Q.   In fact, if compliance had not strongly suggested

16   it, you weren't planning to shut down the Benistar

17   account at this time, right?

18   A.   Correct.

19   Q.   That is in September of 2000?

20   A.   Correct.

21   Q.   And even with the losses that appeared, even with

22   the losses that were sustained as well as projected,

23   absent Mr. Malia's weighing in with you, you weren't

24   going to shut down that account?

25   A.   I would say correct.

1    Q.   That's what you said under oath on previous

2    occasions, too, right, sir?

3    A.   If you tell me I did.

4    Q.   No, no.  Is that your memory?  I don't want to

5    testify, sir.  Is that your memory?

6    A.   I had no plans on shutting the account down at that

7    time.

8    Q.   Okay.

9         Now, sir, you had the task of calling

10   Mr. Carpenter, did you not, after receiving the news

11   from Mr. Malia, that notwithstanding his -- that

12   Mr. Carpenter had a strategy, he wanted to close the

13   account, right?

14   A.   I spoke to Mr. Carpenter, yeah.  I don't know

15   whether I initiated the call or if it came into me --

16   Q.   Okay.

17   A.   -- through a conversation with his brokers, you

18   know.

19   Q.   But that was -- it was your job to contact

20   Mr. Carpenter, right?

21   A.   Correct.

22   Q.   It wasn't compliance's job, right?

23   A.   No.

24   Q.   Okay.

25        Now, isn't it true, sir, that in that phone call

PDF created with pdfFactory trial version www.pdffactory.com

1    that you testified about on direct examination, that in

2    addition to what you testified, Dan Carpenter told you

3    that he had made back -- he had made back his losses

4    before, he could do it again, and that Merrill Lynch was

5    costing him money because you would not allow him to

6    trade?  Isn't that fair to say?

7    A.   That's fair to say.

8    Q.   And you have a memory of that today, sir, right?

9    A.   Yes.

10   Q.   Okay.

11        Now, after that phone call, or during that phone

12   call, you testified Mr. Carpenter was somewhat upset?

13   A.   Correct.

14   Q.   And do you know when that phone call occurred?

15   A.   Date wise?

16   Q.   Yeah.

17   A.   Not exactly.

18   Q.   Would it refresh your memory if I suggested to

19   you -- but remember, it's your memory that controls,

20   sir -- that the account was closed on September 21st?

21   A.   Again, I don't recall the exact date.

22   Q.   Well, is it fair to say that you contacted

23   Mr. Carpenter as soon as you could with the news that

24   the account was going to be closed?

25   A.   Yes, that's fair to say.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Because you didn't want a lot of time to linger, you

2    didn't want a lot of uncertainty to prevail?

3    A.   Correct.

4    Q.   Once a decision had been made by compliance, you

5    needed to communicate that quickly?

6    A.   Correct.

7    Q.   And that's what you did, right?

8    A.   Correct.

9    Q.   And is it your memory that it occurred on the day

10   the trading account was closed?

11   A.   I would -- I can't guarantee it, but I would tell

12   you that I would try to make that call as quickly as

13   possible.  So there's a good chance that it was done on

14   the day that, ultimately, the decision was made.

15   Q.   Okay.  Let's look at Exhibit 157, which should be

16   before you, sir.

17            MR. PAPPALARDO:  May that be published?

18   Q.   Now, sir, this is the letter that was sent to you by

19   Mr. Carpenter.  You identified this as an exhibit in the

20   case here?

21   A.   Yes, sir.

22   Q.   Okay.  You're familiar with this?

23   A.   Yes.

24   Q.   Now, this letter is dated September 22, 2000, right?

25   A.   Correct.

```
 1   Q.   And if the account was closed on September 21st,
 2   this is the next day?
 3   A.   Correct.
 4   Q.   And it's fair to say that this letter was written
 5   after your first conversation with Mr. Carpenter, right?
 6   A.   Correct.
 7   Q.   Now, in this letter, Mr. Carpenter outlines his
 8   discontent; isn't that right?
 9   A.   Yes.
10   Q.   Can we go to the second full paragraph, please, and
11   highlight that?
12        He's explaining to you here that, in his view,
13   it there was extreme volatility in the tech stocks,
14   right?
15   A.   Correct.
16   Q.   And the same tech stocks that were being advocated
17   by your chief trader at the time, right?
18   A.   I don't know that he was advocating these particular
19   tech stocks, but, in general, yes.
20   Q.   Okay.  And he takes -- he takes issue with closing
21   out his positions, because, he says, that he is
22   essentially perfectly positioned to recapture this on a
23   rebound, right?
24   A.   He does.
25   Q.   That's the import of what he's saying here --
```

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   He does, yes.

2  Q.   -- is that fair to say?  And you understood that to

3  be the case at the time?

4  A.   When he wrote the letter, yes.

5  Q.   And isn't that also what he said to you over the

6  phone in the conversation that took place prior to this

7  letter being sent to you?

8  A.   Yes.

9  Q.   And he goes into a little bit of detail on that in

10  paragraph 2, right?

11  A.   The detail toward the end, yes, particularly at

12  issue.

13  Q.   And as a matter of fact, if you turn to the top of

14  page -- top of the second page of the document --

15  highlight that -- he suggests to you in the letter that

16  this type of volatility is perfect for us to earn back

17  the losses, right?

18  A.   Correct.

19  Q.   And isn't that the same thing that occurred at the

20  end of 1999, when he had a million-dollar gain

21  offsetting a $400,000 loss?

22  A.   He came back with profits, yes.  I don't know if

23  it's the same thing.

24  Q.   And isn't it fair to say that is essentially the

25  same thing that happened in the wake of the collapse of

PDF created with pdfFactory trial version www.pdffactory.com

1    the NASDAQ in March of 2000, he came back in June and
2    July for profitable sessions?
3    A.   He did, he had profitable months.
4    Q.   In fact, he -- if you go to the next paragraph and
5    highlight that, please.
6         He suggests to you by this action is placing him
7    in a position where he can't recapture, you know, some
8    amount of money as a result of what he considered to be
9    a perfectly positioned situation.  Right?
10   A.   That was his opinion, yes.
11   Q.   Correct.  That was -- clearly that's his opinion.
12        And it's fair to say he believed in that
13   opinion, right?
14   A.   Correct.
15   Q.   Something he had said to you all during your account
16   reviews, he believed in his strategy --
17   A.   His strategy, yes.
18   Q.   Now, sir, if you would look at the next full
19   paragraph.
20        MR. PAPPALARDO:  If that may be highlighted,
21   please, in particular, the last sentence.
22   Q.   He says here that "We have chosen Merrill as our
23   depository for our clients so we cannot move the funds
24   elsewhere."
25        I'm sorry, it would be the third sentence,

PDF created with pdfFactory trial version www.pdffactory.com

1    sentence right before that.

2           Did I read that correctly, sir?

3    A.   Yes.

4    Q.   And he tells you in this sentence that he chose

5    Merrill and it's a depository for our clients.  Right?

6    A.   That's what he states in the letter, yes.

7    Q.   That's what he states in the letter.  That's not

8    ambiguous, is it?

9    A.   No, not in the letter.

10   Q.   This line is not ambiguous, is it?

11   A.   No.

12   Q.   And he says, "We can't move the funds elsewhere."

13   Right?

14   A.   Correct.

15   Q.   And he goes on to say -- he goes on to say that

16   you're going to cost us more money, and much of the same

17   in the next paragraph, right?

18   A.   I don't see it on the screen, but if you tell me

19   that --

20   Q.   Okay.  Well, you have the exhibit in front of you.

21   A.   Yup, yup --

22   Q.   It mentions people by name, that sort of thing?

23   A.   Yes.

24   Q.   Now, let's return to the first paragraph -- second

25   paragraph.

1          MR. PAPPALARDO:  And highlight the second

2    sentence.  Beginning with, "This decision."

3    A.   I'm sorry, read it?

4          MR. PAPPALARDO:  I'm sorry, go back to the first

5    page.  The second sentence second and third sentences of

6    the second paragraph.

7    Q.   Do you see that, sir?

8    A.   Yes.

9    Q.   What he says there is he strongly disagrees with the

10   decision.  He says it's shortsighted, and he also says

11   that he intends -- or we intend to hold Merrill legally

12   responsible for lost profits as the compliance

13   department's action came without warning, right?

14   A.   He does.

15   Q.   It continues.

16          So he puts you on notice that he's contemplating

17   a lawsuit?

18   A.   He does.

19   Q.   Is that how you understood that?

20   A.   It is.

21   Q.   And as a result of that, sir, after receiving this

22   letter, you had another phone call with Mr. Carpenter,

23   right?

24   A.   I did.

25   Q.   And at that time, who else participated in that

PDF created with pdfFactory trial version www.pdffactory.com

1    phone call?

2    A.    Kevin Duffy.

3    Q.    And who is Kevin Duffy?

4    A.    He's was an attorney with our office general

5    counsel.

6    Q.    He's with OGC?

7    A.    He is.

8    Q.    And he's an in-house Merrill lawyer?

9    A.    He is.

10   Q.    And you wanted him on that phone call because you

11   knew that Dan Carpenter was contemplating a legal

12   action, right?

13   A.    Correct.

14   Q.    And that's perfectly fine, right?

15          Now, let's go to Exhibit 162.

16          And if we could -- sir, you previously

17   identified Exhibit 162 as the active account review on

18   October of 1999, right?

19   A.    Correct.

20          MR. PAPPALARDO:  Okay.  Let's go to the second

21   page of that, please.

22          And may paragraph 5 be highlighted?

23   Q.    Do you see that, sir?

24   A.    I do.

25   Q.    This is something you testified about on direct

PDF created with pdfFactory trial version www.pdffactory.com

1   examination?

2   A.   Correct.

3   Q.   Okay.  What is this?

4   A.   It was a conversation that I had with Mr. Carpenter.

5   He said to me that there was a problem with the naked

6   limits due to the fact that the system wasn't picking up

7   true spreads put into the system as separate orders.

8   Q.   And isn't it true, sir, that what Mr. Carpenter was

9   saying to you was that he would sell a put, for

10  instance, at 25, as an example, and he would buy another

11  one at 20, and the difference between 25 and 20 is the

12  spread, right?

13  A.   Correct.

14  Q.   And so that would limit his exposure on these

15  so-called naked puts, right?

16  A.   Correct.

17  Q.   Because it would only be a five-point spread, not a

18  25-point spread, right?

19  A.   Correct.

20  Q.   And he did that in all of his trading, didn't he?

21  A.   I can't -- I don't recall that he did it on every

22  trade, but the majority -- that was his strategy.

23  Q.   Is it fair to say that was his predominant strategy,

24  that he did it in the majority of his trades?

25  A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   So when he would put in -- when he would buy a put,

2  he would hedge his bets and limit the potential loss,

3  isn't that right, by the spread?

4  A.   Correct, if he created a spread.

5  Q.   Right.  And isn't that what he was talking about

6  here?

7  A.   What he was referring to here were the -- we had

8  limits on naked contracts, what he could put on, and

9  ultimately, because he didn't do them as one

10 transaction, he did them as two, it limited him to the

11 amount of positions he could put on.

12 Q.   Right.  And what you're saying, sir, is that he

13 would buy -- he would have a put issued at 25, and in a

14 different transaction sell the put at 20, right --

15 A.   Mm-hmm.

16 Q.   -- but that wouldn't be reflected as one

17 transaction, but two, even though it created the spread,

18 and even though it limited the exposure?

19 A.   Correct.  But what it was doing was creating it as a

20 straight naked position --

21 Q.   Right.

22 A.   -- from the system, and we had limits on what he

23 could do naked-wise.

24 Q.   Right.  And what he was arguing to you was it's not

25 really naked because they're covered by the lower --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   they're covered by the spread, right?
 2   A.   That's correct, but he wouldn't put the trades on at
 3   the same time, so there was a period of time where he
 4   was truly naked and had unlimited exposure.
 5   Q.   Right.  I understand that.
 6   A.   Okay.
 7   Q.   What he was saying to you was unfair was because
 8   after that second trade, the first put wasn't really
 9   naked, right?
10   A.   Correct.
11   Q.   Because it had a spread?
12   A.   Correct.
13   Q.   And it limited liability, or limited exposure?
14   A.   It did, once he put the second trade on.
15   Q.   Okay.  So that's what that was about?
16   A.   Correct.
17        MR. PAPPALARDO:  One moment, your Honor.
18        (Discussion off the record.)
19   Q.   Now, sir, you still work for Merrill Lynch?
20   A.   I do.
21   Q.   And you're aware that there is an outstanding
22   lawsuit involving the facts and circumstances of these
23   events?
24   A.   I understand that, yes.
25   Q.   And that it is likely that you will be called to
```

1    testify yet again?

2    A.    Yes.

3    Q.    And that lawsuit is one where there's a claim that

4    Merrill Lynch engaged in improper conduct?

5    A.    Yes.

6    Q.    And Merrill Lynch's lawyer is here?

7    A.    Correct.

8            MR. PAPPALARDO:   Thank you.

9            MR. PIROZZOLO:   Just a couple of follow-ups,

10   your Honor.

11           May I approach, your Honor?

12           THE COURT:   You may.

13                       REDIRECT EXAMINATION

14   BY MR. PIROZZOLO:

15   Q.    Mr. Rasmussen, during Mr. Pappalardo's examination

16   of you, you were asked a question as to how many active

17   account reviews that you did for Mr. Carpenter with

18   respect to the Benistar accounts.  Do you remember that?

19   A.    Yes.

20   Q.    Can you take a look at the exhibit in front of you

21   that's marked as Exhibit 158?

22           What is that?

23   A.    It's the screen shot on the active account system.

24   Q.    And what -- is that a document that is kept in the

25   ordinary course of business at Merrill?

1    A.    It is.

2          MR. PIROZZOLO:  The government would offer

3    Exhibit 158.

4          THE COURT:  Okay.

5          (Exhibit 158 received into evidence.)

6    BY MR. PIROZZOLO:

7    Q.    What is it?

8    A.    The --

9    Q.    Just describe what it is.

10   A.    It's a screen shot showing that the account in

11   question, the 07B10 account came up for active account

12   review basically, you know, every month here from

13   January all the way through July of 2000.  And I'm not

14   sure that captures them all, because you don't see on

15   the right-hand side is there's kind of a scroll button

16   that would show more of them down.

17   Q.    So there were at least this many; is that correct?

18   A.    Correct.

19   Q.    And that's the record of how many times there were

20   these reviews; is that correct?

21   A.    Correct.

22   Q.    You were asked a question about -- there was a swing

23   to profits at some point in time in July -- June or July

24   of 2000?

25   A.    Yes.

1    Q.    Do you remember that testimony?

2    A.    I do.

3    Q.    Now, with respect to the swing to profits, was that

4    on a monthly basis or was that overall on a year-to-date

5    basis?

6    A.    On a monthly basis.

7    Q.    With respect to the year-to-date basis what was

8    Mr. Carpenter's position?

9    A.    I'd have to look at the statement at that point.

10   You mean through --

11   Q.    Why don't you pull out the July 2000 statement.

12   It's in front of you in Exhibit 148.

13   A.    The July 2000, correct?

14   Q.    Correct.

15          (Pause.)

16   A.    Okay.

17   Q.    What's the year-to-date position?

18   A.    I'm sorry, I'm not sure -- the value of the account

19   or --

20   Q.    Year-to-date realized loss.

21          If you turn to the second page.

22   A.    Is 1,971,998.

23   Q.    And we've already seen a letter in August --

24   A.    We did.

25   Q.    -- that records losses as well?

1    A.    We did.

2    Q.    That was approximately $1.9 million as well?

3    A.    Correct.

4    Q.    Now, you were asked some questions about whether or

5    not Mr. Carpenter's trading was rational or not.  Do you

6    remember that line of --

7    A.    I do.

8    Q.    -- inquiry?

9          Was the issue that Merrill was addressing,

10   whether or not they were competing views as to which

11   direction the would go, was the issue the risk that

12   Mr. Carpenter was taking?

13   A.    Correct.

14   Q.    And you were asked some questions about Exhibit 157,

15   which is a letter that Mr. Carpenter sent to you after

16   the first conversation where you told him you were

17   shutting him down?

18   A.    Yes.

19   Q.    And there was a statement in that letter that was

20   read to the effect that Mr. Carpenter said he can't move

21   the funds elsewhere.  He can't move the client funds

22   elsewhere.

23   A.    He wrote that in the letter, yes.

24   Q.    But he did, didn't he?

25   A.    He could move it, yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And he, in fact, did move it.

2    A.   He did move it, yes.

3    Q.   And whatever your view was as to rationality of

4    Mr. Carpenter's trading, a decision was made to shut him

5    down, correct?

6    A.   Correct.  The ultimate decision by the firm was to

7    shut him down.

8             MR. PIROZZOLO:  I have nothing further, your

9    Honor.

10            THE COURT:  Anything else, Mr. Pappalardo?

11            MR. PAPPALARDO:  Just one question, your Honor.

12                     RECROSS-EXAMINATION

13   BY MR. PAPPALARDO:

14   Q.   Very briefly, Mr. Rasmussen --

15            MR. PAPPALARDO:  Could we have Exhibit 158

16   displayed here?

17   Q.   Do you have that document in front of you, sir?

18   A.   I do, sir.

19   Q.   Okay.  This, as you've just testified on redirect,

20   is an active review account -- active account review

21   checklist, right?

22   A.   It's a screen shot that comes up on the monthly

23   report.

24   Q.   Right.  So am I interpreting this correctly that on

25   7/2000, a review was required and it occurred, correct?

1   A.   That is correct.

2   Q.   But on 6/2000, none was required, right, and didn't

3   occur?

4   A.   Yeah, I mean -- if I can explain the doc, I'll

5   explain how it works.

6   Q.   I'm just curious.

7   A.   Yeah.  Essentially, the review pops up on the screen

8   from an automatic system, review required is something I

9   make a decision whether or not I want to take it any

10  further or not.

11  Q.   Okay.

12  A.   And obviously, if the answer is yes, you'll get a

13  request date, then the next line there, the financial

14  consultant would make some comments, and then,

15  ultimately, after they made the comments, the manager

16  would review it again, myself, the date reviewed, and

17  then the decision of whether to send a letter, make a

18  phone call, whatever it might be, if you follow it

19  across.  So every month it appeared, then there was a

20  decision whether or not -- how far do we go?

21  Q.   Okay.  Thanks.

22          MR. PAPPALARDO:  That's it, your Honor.

23          THE COURT:  That's it.

24          All right.  Mr. Rasmussen, you may step down.

25  We'll take the morning recess.

```
 1              (Recess taken.)

 2              THE CLERK:  All rise for the jury.

 3              (Jury in at 11:26 a.m.)

 4              THE CLERK:  Please be seated.

 5              THE COURT:  Mr. Mitchell?

 6              MR. MITCHELL:  Thank you, your Honor.

 7         The government calls Mitchell Rock.

 8                    MITCHELL ROCK, sworn

 9         THE CLERK:  State your name, spell your last

10    name for the record, keep your voice up and speak into

11    the mic.

12              THE WITNESS:  Mitchell Rock, R-O-C-K.

13                    DIRECT EXAMINATION

14    BY MR. MITCHELL:

15    Q.   Good morning, Mr. Rock.

16    A.   Good morning.

17    Q.   Mr. Rock, where do you live?

18    A.   Woodcliff Lake, New Jersey.

19    Q.   How long have you lived there?

20    A.   Three years.

21    Q.   And are you married, sir?

22    A.   Yes, I am.

23    Q.   And do you have any children?

24    A.   Yes, one eight-year-old son.

25    Q.   Sir, can you tell us what your educational
```

PDF created with pdfFactory trial version www.pdffactory.com

1    background is?

2    A.    I have an undergraduate degree in accounting from

3    George Washington University and an MBA in finance from

4    New York University.

5    Q.    And, sir, what do you do for a living?

6    A.    I run a wealth management group at UBS.

7    Q.    And where is that located?

8    A.    New York City.

9    Q.    And UBS, was that formerly PaineWebber?

10   A.    Yes, it was.

11   Q.    And if we refer to that company as "PaineWebber" in

12   your testimony, we'll be talking about the same company?

13   A.    That's correct.

14   Q.    How long have you worked in the financial services

15   industry?

16   A.    Twenty-one years.

17   Q.    And could you just give the jury a brief outline of

18   your employment history in the industry.

19   A.    When I graduated from NYU I worked as what became to

20   be the director of research for a hedge fund; I was

21   there from 1985 through 1991.  I worked briefly at

22   Merrill Lynch; then I was an executive director at what

23   came to be CIBC Oppenheimer & Company.  I was at

24   Oppenheimer for seven years.  And in August of 2000 we

25   moved our group from CIBC Oppenheimer to what was just

PDF created with pdfFactory trial version www.pdffactory.com

1    then PaineWebber.

2    Q.   Okay.  So you moved to PaineWebber in August of

3    2000?

4    A.   That's correct.

5    Q.   All right.  So in August of 2000 when you started at

6    PaineWebber, what was your position?

7    A.   I was a senior vice president in the private client

8    group responsible for working with individual investors.

9    Q.   And just again by way of background, how does your

10   current position in wealth management differ, if at all,

11   from your position in August of 2000 --

12   A.   Exactly the same.  I'm still the senior vice

13   president at UBS.

14   Q.   Okay.  And did you work in a particular branch

15   office of PaineWebber in August of 2000?

16   A.   Yes.

17   Q.   Where was that?

18   A.   1285 Sixth Avenue.

19   Q.   That's in Manhattan?

20   A.   Yes.

21   Q.   And could you tell us how you were compensated,

22   based on what?  Was it salary or something else?

23   A.   No salary; it's commission-based.

24   Q.   And commissions based on what?

25   A.   We share in the management fees and the commissions

1   that are generated in our client accounts.  There's no

2   base salary.

3   Q.   Okay.  Commissions on trades?

4   A.   Correct.

5   Q.   Can you tell us generally how a broker such as

6   yourself back in August of 2000 obtained clients?

7   A.   You know, back then most of our clients came through

8   referrals.

9   Q.   Okay.  At some point did you have a client named

10  Daniel Carpenter?

11  A.   Yes.

12  Q.   When did you first meet Mr. Carpenter?

13  A.   Dan Carpenter was introduced to me in September of

14  2000 from a friend of mine named Gary Stern who at the

15  time, and still is, a broker at Merrill Lynch.

16  Q.   Okay.  And was this someone Mr. Stern spoke to you

17  about before you met him?  Before you met Dan Carpenter.

18  A.   Yes.

19  Q.   Okay.  And could you tell us -- could you tell us

20  the circumstances surrounding his telling you that?

21  A.   Gary called me up in the middle of September of 2000

22  and said he had a client who was interested in working

23  at a full-service brokerage firm, would I be interested

24  in -- would I be interested.

25       He told me a little bit about the client, said he

PDF created with pdfFactory trial version www.pdffactory.com

1   was an aggressive options trader, wanted to work at a

2   full-service firm to have the continuity of working with

3   the same person on every phone call.  And I said I would

4   be interested in talking to him to find out more.

5   Q.   Okay.  And did you have a conversation with Mr.

6   Carpenter?

7   A.   Yes.

8   Q.   Okay.  And when was your first conversation with

9   him?

10  A.   I was introduced to him either one or two days later

11  through a conference call that Gary's office set up.

12  Q.   And who was on that call?

13  A.   I believe at the time it was Gary Stern, Dan

14  Carpenter, and there was a man by the name of Jerry

15  Levine in Gary's office who I think was on that call as

16  well, the introductory phone call.

17  Q.   And what did you talk to Dan Carpenter about?

18  A.   Well, Dan asked me my background:  where I went to

19  school; how long had I been doing this; what our group

20  did; would I be interested in working with him.  And

21  after speaking for a while we determined that it could

22  be a good fit.

23  Q.   Okay.  And did he explain to you what he was looking

24  for in a broker?

25  A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    What did he say?

2    A.    Said that he was very familiar with the sector of

3    the market that he was investing in, really was looking

4    for someone just to execute transactions, be a familiar

5    voice on the phone; wanted an office that had the right

6    amount of support so he can call and execute

7    transactions.

8    Q.    Okay.  And did he at some point in the conversation

9    describe his style of investing or strategy of

10   investing?

11   A.    He did.  And that's why it was important to him to

12   work with someone who had a familiarity with the options

13   markets, so that they would understand the language of

14   what he was doing.

15   Q.    Okay.  And what did he say about his options

16   strategy?

17   A.    That he was an aggressive options trader, was doing

18   a lot of naked options selling and buying and spreads.

19   And he just wanted someone who was familiar with his

20   style that would understand the language.

21   Q.    Did you tell him -- did you sketch out for him your

22   familiarity with options trading?

23   A.    I did.  I mean, at that point in time we were doing

24   a lot -- we were creating a lot of hedging transactions

25   for people that had concentrated equity positions and

1    using options as hedging vehicles, both long and short.

2    So it was a nice -- I thought it was a very nice fit.

3    Q.   Before we get into some of that -- that went way

4    over my head -- could you -- what is your background in

5    options trading?

6    A.   I had been trading options on behalf of clients for

7    a number of years prior to that.  A lot of clients were

8    using options to hedge equity positions, and we were

9    establishing many strategies for them.

10   Q.   And did he talk to you about what kind of advice, if

11   any, he was looking to you for -- would be looking to

12   you for?

13   A.   He wasn't looking for advice.  He made it very clear

14   that the decisions were going to be his.  He was going

15   to be calling up and saying, "I want you to do A, B, C,"

16   report back to him at the end of the day.  And it was

17   because of my familiarity with options that I was able

18   to understand what he was doing.  But he wasn't looking

19   for advice.

20   Q.   Did he describe his business to you?

21   A.   Yes.

22   Q.   What did he say?

23   A.   He said that he had a lot of business interests.  He

24   was -- he had a tax consulting firm -- he did tax

25   consulting, benefits administration, pension consulting,

PDF created with pdfFactory trial version www.pdffactory.com

1    owned radio stations, and had a very successful real
2    estate investment business.
3    Q.    Okay.  And did he describe the real estate
4    investment business?
5    A.    No.  No, he just -- no.  No, he did not.
6    Q.    Did he describe any companies or businesses that he
7    worked with directly?
8    A.    No.  It was -- the way it was presented to me was he
9    was a significant client at Merrill Lynch and there were
10   a lot of different accounts.  And it really wasn't up
11   until we were opening the accounts that we even knew the
12   names of the accounts we would be getting because I
13   didn't know which accounts from Merrill he was going to
14   be transferring over.
15   Q.    Okay.  Did he ultimately transfer all of the
16   accounts over or --
17   A.    No, just some of the accounts.
18   Q.    Did you happen to have a subsequent call with Mr.
19   Carpenter after this -- after this first conference
20   call?
21   A.    Yes.  Yes.
22   Q.    How long afterward was that?
23   A.    Shortly thereafter we had a call where we had the
24   more formal account-opening call:  know your customer;
25   establish net worth parameters; establish trading

PDF created with pdfFactory trial version www.pdffactory.com

1    objectives, investment objectives; formally discuss the

2    compensation arrangement around the accounts; and when

3    we were going to start working together.

4    Q.   Okay.  You mentioned "investment objectives."  What

5    did he say, that being?

6    A.   Dan made it very clear his objective was to make a

7    lot of money and that he was an aggressive investor in

8    what then was the dot-com space, and that he was

9    going -- he wanted to make a lot of money by trading

10   options.

11   Q.   Well, do you have clients who tell you anything

12   different from than they want to make a lot of money?

13          MR. GREENBERG:  Objection.

14          THE COURT:  Overruled.

15   BY MR. MITCHELL:

16   Q.   What do other people tell you?

17   A.   After doing this for a very long time -- as

18   investors' lives transition -- or an individual's life

19   transitions from wealth accumulation to preservation,

20   and then later your distribution of your wealth, most of

21   our clients have already created a lot of money for them

22   already, and they come to us to preserve their capital

23   and get ready for distribution.  Most people don't come

24   to us with the goal of making a lot of money,

25   quote/unquote.

1   Q.   Okay.  And did he -- during that call did he go into

2   any more detail about the nature of his business?

3   A.   No.

4   Q.   During that call did he talk about strategy as

5   opposed to objective?  Strategy to obtain the objective

6   of making money?

7   A.   Yes.  Yes.

8   Q.   Can you tell us what that was?

9   A.   Not to be technical, but he said basically what I

10  was going to be doing was selling puts and buying calls.

11  Q.   And just as a brief reminder, a "put" is what?

12  A.   A "put" is the right to sell -- technically

13  speaking, a "put" is a right to sell 100 shares of stock

14  at a specified price on a specified date.

15  Q.   And a "call"?

16  A.   A "call" is the right to buy 100 shares of stock at

17  a specified price on a specified date.

18  Q.   Okay.  And during the call did he say anything about

19  his relationship with Merrill Lynch?

20  A.   Yes.

21  Q.   And what was that?

22  A.   Well, because Dan was a very aggressive investor,

23  the way the account was introduced to me was that he was

24  taking up so much time and his trading was so aggressive

25  that Merrill didn't want to work with him anymore.  And

PDF created with pdfFactory trial version www.pdffactory.com

1    I mentioned to Dan that the only way we would work with

2    him is if the volume of the calls was reduced because we

3    didn't have the capacity to have five, six, eight calls

4    a day --

5    Q.   When you say "calls," you're talking about telephone

6    calls?

7    A.   Telephone calls.

8         That the quantity of calls into the office had to be

9    more limited than they were at Merrill Lynch because I

10   believe at Merrill there was one person who was

11   dedicated to working with him exclusively who he would

12   call up and speak to for many times throughout the day.

13   And I didn't have a dedicated person for him.

14        And the objective was -- I was happy to work with

15   him, I was happy to execute orders on his behalf, but we

16   didn't have anybody who was going to be assigned to him

17   to work with him.

18   Q.   Were there any other conditions of his going to

19   PaineWebber that you discussed with him in that phone

20   call?

21   A.   Yes.  I wanted him to moderate the risk in the

22   portfolio.  And because we were using options as hedging

23   vehicles on behalf of our clients and were familiar with

24   strategies utilizing options, the hope was that we would

25   be able to come up with alternative ways for Dan to

PDF created with pdfFactory trial version www.pdffactory.com

1    participate in the stocks he wanted to without exposing

2    himself to the same amount of risk.

3    Q.   Did you tell him this?

4    A.   Yes, of course.

5    Q.   Okay.  "Using options as hedging vehicles," what

6    does that mean?

7    A.   Typically -- if someone sold their company to

8    another company and now they have a lot of low-basis

9    stock -- say, for example, someone's company went public

10   and now they have 300,000 shares of stock at a cost

11   basis of a dime, and it's now trading at 20.  If you're

12   the owner of a company, now you have most of your wealth

13   sitting in this particular stock.  If you sell it you're

14   going to have a very large tax liability.

15        So when you utilize options as a hedging vehicle,

16   you're basically creating a band around the stock so

17   that if the stock should decline in value, you don't

18   lose money, but you're also sacrificing the upside.  But

19   since you have so much money -- so much of your net

20   worth tied up in this one stock, if you use options as a

21   hedging vehicle, you defer the taxes and you reduce your

22   risk and you can continue to own the position.

23        And that's fine provided you have a position in the

24   underlying common stock.  Where things get riskier is if

25   you don't own that stock, and that's what Dan was doing.

1    Q.    When you don't own the underlying stock, is there a

2    term for the option?

3    A.    Naked or uncovered.   Synonymous.

4    Q.    "Uncovered" and "naked" are synonymous in their

5    role?

6    A.    Yes.

7    Q.    And just by way of clarity, when you use options as

8    hedging vehicles, it lowers the risk to the investor?

9    A.    Significantly.

10   Q.    And in this initial conversation did Dan Carpenter

11   agree to your two conditions:   to tone down the risk by

12   using hedging vehicles and not to spend all day on the

13   phone with you?

14   A.    Yes.

15   Q.    Did you look into Dan Carpenter's background at all?

16   A.    I'd say no because if he had walked in off the

17   street and knocked on our door and said he wanted to

18   open up an account, I probably would have inquired

19   further, but because the account was introduced to us by

20   someone at Merrill Lynch who I had known at that point

21   for 15 years, and since he was a client of Merrill Lynch

22   in good standing for so long, I felt comfortable that he

23   was who he said he was and relied on his statements as

24   facts.

25   Q.    Were you aware whether his company had a website?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Yes.

2  Q.   Did you ever visit that website?

3  A.   Yes.   Before we opened up the account I visited the

4  website just to confirm the address, find out what state

5  the company was in.

6  Q.   On the website, did you look beyond the address of

7  the company?

8  A.   No.   I was on the website probably 15 seconds at

9  most.

10 Q.   You mentioned that you discussed with Mr. Carpenter

11 a compensation arrangement.   Can you tell us what your

12 compensation was, what you agreed to?

13 A.   We agreed that our fee per trade -- for trading

14 options was going to be 10 cents per share.

15 Q.   Ten cents per share?

16 A.   Right.   Ten cents per underlying share.   So if you

17 trade one option, the commission would be a dollar -- or

18 $10.   I'm sorry.

19 Q.   Did PaineWebber ultimately accept Dan Carpenter as a

20 client?

21 A.   Yes.

22 Q.   Did you set up accounts for Mr. Carpenter?

23 A.   Yes, we did.

24 Q.   Okay.   And how did you go about doing that?

25 A.   We spoke with Dan.   He said that he was going to be

PDF created with pdfFactory trial version www.pdffactory.com

1    opening up three accounts and told us that he would

2    authorize Merrill Lynch to send us copies of the recent

3    statements, and we were going to open up the accounts

4    exactly as they were at Merrill Lynch.

5    Q.   Okay.  Did you discuss with him why he needed three

6    accounts?

7    A.   Not originally, but when the account statements were

8    received -- in fact, the statements were so large they

9    weren't faxed over; they were sent via overnight

10   courier.  When the accounts came in I noticed that the

11   same name account was split -- there was a duplicate:

12   There was one company name that had two accounts.

13        So I said, "Why don't we just have one account and

14   then we could open up" -- "save the paperwork?"  And I

15   thought it would make life easier -- I thought it was

16   duplicate accounts, so I suggested merging them.

17   Q.   Okay.  What did he say?

18   A.   He said he likes to have the accounts split in two

19   parts so that the trading and the cash flows were

20   separate.

21   Q.   I'm going to have you turn to an exhibit.  Would you

22   take a look at that?  It's in the folder marked 164.

23   A.   Yes.

24   Q.   Did Dan Carpenter fill out any applications for

25   accounts?  Account-opening applications?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   He signed the account-opening application.  We
2  completed the documentation and sent them to Dan for his
3  signature.
4  Q.   Okay.  Would you take a look at -- there are three
5  exhibits here:  164, 164A and 164C?
6  A.   Yes.
7  Q.   Do you see those in front of you?  Do you recognize
8  164?
9  A.   164 is the welcome letter that our group sent to Dan
10 the day we opened up the accounts, letting him know what
11 the account numbers were, wiring instructions that he
12 could forward to Merrill Lynch, or really to anybody,
13 any time he wanted to have money wired into his
14 accounts.
15 Q.   Okay.  And the date of this letter?
16 A.   October 6th, 2000.
17 Q.   And it's signed by whom?
18 A.   It's my signature.  My secretary signed my name and
19 initialed it because I was traveling that day.
20 Q.   And is this on your PaineWebber letterhead?
21 A.   Yes.  I wrote the letter.
22      MR. MITCHELL:  At this time, your Honor, the
23 government moves to admit Exhibit 164.
24      MR. GREENBERG:  No objection, your Honor.
25      THE COURT:  Okay.

```
 1                (Exhibit No. 164 received into evidence.)
 2      BY MR. MITCHELL:
 3      Q.   Do you see that up there?
 4      A.   Yes.
 5      Q.   And are these the three accounts that he opened up?
 6      A.   That's correct.
 7      Q.   Do you refer to these by the last two digits and the
 8      account number?
 9      A.   Yes.
10      Q.   And those are right over here on the right?
11      A.   Correct.
12      Q.   There's 33, 34 and 35?
13      A.   That's correct.
14      Q.   All right.  The 33 account, what was that used for?
15      A.   The 33 account was what we referred to as the
16      trading account and the 34 account was the cash account,
17      the same account but -- yes.
18      Q.   Okay.  And the 35 account?
19      A.   The 35 account we never did any trading in.  The
20      position was there, some money was there, but it was,
21      I'm going to say, inactive.  But in the three months it
22      was with us it probably -- there was never any trading
23      in that account; it just, I think, had some money in the
24      account.
25      Q.   Okay.  Would you take a look at Government's Exhibit
```

PDF created with pdfFactory trial version www.pdffactory.com

1    164A and 164B.  Would you tell us what those are?

2    A.   These are the actual account applications that we

3    completed when we opened up the account.

4    Q.   Okay.  Now, are they signed by somebody?

5    A.   Yes, they are.

6    Q.   And who's that?

7    A.   They're signed by Dan Carpenter.

8    Q.   These were opened in the name of what?

9    A.   Benistar Property Exchange Trust Company, Inc.

10            MR. MITCHELL:  At this time the government moves

11   to admit Exhibit 164A and 164B.

12            MR. GREENBERG:  No objection, your Honor.

13            THE COURT:  All right.

14            (Exhibit Nos. 164A and 164B received into

15   evidence.)

16   BY MR. MITCHELL:

17   Q.   Okay.  Do you see 164A on the screen?

18   A.   Yes.

19   Q.   Okay.  And this is the account-opening application

20   for which account?

21   A.   That is the Benistar Property Exchange Company,

22   Inc., what we referred to as the trading account.

23   Q.   Okay.  And earlier you mentioned that you went over

24   the application with Mr. Carpenter over the phone.  Is

25   this one of the applications you're referring to?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.    Correct.
 2   Q.    And so did you fill in the information as he was --
 3   based on what he told you over the phone?
 4   A.    Yes.
 5   Q.    Let's take this from the top.
 6         Okay.  Do you see the top heading here?
 7   A.    I do.
 8   Q.    All right.  We're going to walk through this
 9   document, Mr. Rock.  Do you see where it says "The owner
10   of this account is"?
11   A.    Yes.
12   Q.    Okay.  And what did Mr. Carpenter respond?
13   A.    That it was going to be a corporate account.
14   Q.    Okay.  And organization/business is incorporated; do
15   you see that?
16   A.    Yes.  Yes.
17   Q.    And then it describes the organization/business is a
18   blank; do you see that?
19   A.    Yes.
20   Q.    Okay.  Is anything checked there?
21   A.    "Incorporated."
22   Q.    No.  I mean in the second --
23   A.    Oh, no.  No.
24   Q.    Right.  Is there an entry for escrow agent and
25   escrow bank?
```

1    A.    There is an entry, yes.

2    Q.    Okay.  Is that checked?

3    A.    No, because they didn't apply.

4    Q.    It didn't apply.  And why didn't it apply?

5          MR. GREENBERG:  Objection, your Honor.

6          THE COURT:  Sustained.

7    BY MR. MITCHELL:

8    Q.    Did you discuss that with Mr. Carpenter?

9    A.    Yes.  Dan requested that we send him the paperwork

10   to open up three corporate accounts and be sure to

11   include option -- both covered and naked option --

12   paperwork along with corporate resolutions, anything

13   that would be needed for a corporate account.  And

14   that's what we sent him.  So when we completed the

15   documentation, it was all about this was going to be a

16   business account.

17   Q.    Okay.  And right there:  "For trustee accounts only

18   if there is more than one trustee for this account"?

19   The answer is no?

20   A.    Correct.

21   Q.    I'll highlight the next section.  Do you see that?

22   A.    Yes.

23   Q.    So the name, Benistar Property account, right there

24   in the left-hand corner, correct?

25   A.    Yes.

1    Q.    And the address information is there as well?

2    A.    Correct.

3    Q.    Is there a description for the nature of the

4    business?

5    A.    Yes.  "Nature of the business."  He wrote

6    "insurance/real estate," and then right above that --

7    it's a little messy -- it's the date of incorporation.

8    Q.    Okay.  And is there any indication as to the

9    principal of the organization?

10   A.    Yes.

11   Q.    And is that indicated in the highlighted area?

12   A.    Yes.

13   Q.    All right.  What's that?

14   A.    Dan Carpenter.

15   Q.    The next sections have to do with -- I'll highlight

16   for you -- it says "Business services account via safe

17   features."  Do you see that?

18   A.    Yes.

19   Q.    And what's indicated there?

20   A.    That the uninvested cash balance was going to be

21   rolled into the money market fund as opposed to a

22   tax-free money market fund.  That's where we select the

23   cash investment option on all accounts.

24            MR. MITCHELL:  One second, your Honor.

25            (Pause.)

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   BY MR. MITCHELL:
 2   Q.   Moving down the page, there's a section that has
 3   information about accountholder's financial background?
 4   A.   Yes, I see that.
 5   Q.   Did you go through this with Mr. Carpenter?
 6   A.   Yes, we did.
 7   Q.   All right.  Did you ask Mr. Carpenter what his net
 8   worth was?
 9   A.   Yes.  Dan told us his net worth was in the 40 to $50
10   million range, but for privacy concerns he wanted us to
11   keep the number low, and we agreed that 10 million plus
12   would be the number we used.
13   Q.   He agreed to 10 million plus?
14   A.   Yes.
15   Q.   Liquid assets?
16   A.   Same.
17   Q.   Same thing?  And his annual income?  Did he say
18   anything specifically about his annual income?
19   A.   Well, he did say it fluctuates, as all investors
20   realize that it's a function of liquidity.  If you sold
21   a building, income could be in that year and you may not
22   sell a building the next year.  But it fluctuated and
23   there was going to be -- we agreed that a million plus
24   would be the right number.
25   Q.   Okay.  And is there an entry for investment
```

1    experience?

2    A.   Yes.

3    Q.   Did you go through that with him?

4    A.   Yes, we did.

5    Q.   And what does that reflect?

6    A.   That says that he's been trading equities for 15

7    years, bonds for 15 years, futures for three years and

8    options for ten years.

9    Q.   And just moving right along, the entry about

10   objectives.  Did you go through that with him?

11   A.   Yes, we did.

12   Q.   What did he tell you about that?

13   A.   Capital appreciation.

14   Q.   And then the last entry, the last item, what is

15   that?

16   A.   That Dan would categorize himself as an

17   aggressive/speculative investor.

18   Q.   Did he say anything specifically about that other

19   than checking that block?

20   A.   Well, as an aggressive investor, as any investor

21   trading in options, especially naked or uncovered

22   options, you wouldn't --

23           MR. GREENBERG:  Your Honor, I would object.  The

24   question was what he said.

25           THE WITNESS:  He said based upon his style of

1    trading, he suggested that "aggressive/speculative"

2    would be how you would label his style of investing.

3    BY MR. MITCHELL:

4    Q.    And did you get back this document from him?

5    A.    Yes, I did.

6    Q.    And was it signed?

7    A.    Yes, it was.

8    Q.    And is that the signature right there?

9    A.    Yes, it is.

10   Q.    Now, just so we're clear, the application for the

11   other account, is that --

12   A.    Exactly the same.

13   Q.    -- the same information?

14   A.    Exactly the same.

15   Q.    And that's Exhibit 164B?

16   A.    Correct.

17   Q.    Did Dan Carpenter say where the funds to be

18   deposited into these accounts were coming from?

19   A.    Initially the accounts were funded by a transfer

20   from Merrill Lynch.

21   Q.    Okay.  And you discussed -- you mentioned earlier

22   the transition.  Did it come from somewhere else after

23   they were set up?

24   A.    Based upon capital transactions.  I mean, there was

25   money flowing into and out of the accounts.  Since we

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   viewed this as a working capital account, it's --
 2           MR. GREENBERG:  Your Honor, I would object.  The
 3   question was what was said to him.
 4           THE COURT:  Right.
 5           THE WITNESS:  He said that money --
 6           MR. GREENBERG:  If he could answer the question,
 7   please.
 8           THE WITNESS:  He told us specifically that money
 9   would be coming into this account from monetization of
10   investments.  Or if someone owed him money they would be
11   wiring into this account, and if he had to pay bills he
12   would wire money out of this account.
13   BY MR. MITCHELL:
14   Q.   By the way, are you -- are you familiar with online
15   trading?
16   A.   Yes.
17   Q.   Now, the kinds of trades Mr. Carpenter ultimately
18   did in these accounts, could those have been done on an
19   online trading service, like an E*Trade or something?
20   A.   They could have been.
21   Q.   Is there any added value to having someone such as
22   yourself as opposed to -- doing the trades -- as opposed
23   to doing them online?
24   A.   I like to think so.  In theory --
25   Q.   What is it?
```

1   A.   In theory, the advantage of working with someone at

2   a full-service brokerage firm is familiarity.  You

3   didn't have to say a password if you wanted to trade, or

4   you didn't have to waste time giving your social

5   security number.  You could basically -- as opposed to

6   calling someone at a discount brokerage firm -- call us

7   and get down to executing transactions.  If he was to

8   trade online, he could have gone direct.  In theory, he

9   would have been able to do what we were doing.

10  Q.   Okay.  Now, were there other forms that Mr.

11  Carpenter had to fill out before he started trading?

12  A.   Yes.

13  Q.   I'm going to have you take a look at Exhibits 165,

14  166 and 167.  Would you take a look at those?

15  A.   Okay.

16  Q.   Could you just for the record identify each one of

17  these by number?

18  A.   165 is the form that clients fill out when they want

19  to trade options in an account.

20  Q.   Okay.  And what's 166?

21  A.   166 is the special statement for option trading that

22  people fill out when they want to do uncovered or naked

23  option trading.

24  Q.   Okay.  And 167?

25  A.   And 167 is the booklet that all clients receive

1  which is basically a primer on the characteristics and

2  risks of trading options.

3  Q.   Okay.  Let's start off with 165.  Could you focus on

4  that one?

5  A.   Okay.

6  Q.   Now, is there an account -- is there an account name

7  designated at the top?

8  A.   Yes.  This is -- yes.

9  Q.   What's that?

10  A.   This is the option paperwork for the Benistar

11  Property Exchange Trust Company 33 account.

12  Q.   Okay.  And this was an options trading account?

13  This was an options trading account?

14  A.   Correct.

15  Q.   And is it signed by the client down at the bottom?

16  A.   Yes, it is.

17  Q.   And who's that?  Is that Dan Carpenter?

18  A.   Yes.

19  Q.   And date?

20  A.   It was signed on October 7th, 2000.

21        MR. MITCHELL:  At this time, your Honor, the

22  government would move to admit Exhibit 165.

23        MR. GREENBERG:  No objection.

24        THE COURT:  Okay.

25        (Exhibit No. 165 received into evidence.)

PDF created with pdfFactory trial version www.pdffactory.com

BY MR. MITCHELL:

Q.   Let's walk through this one.  So this is an
application for people who want to invest in options or
index warrant.  What's an index warrant, by the way?

A.   There's options on stock and options on indexes,
like the S&P or the Dow Jones Financial or the NASDAQ.
So this warrant form covers people that want to trade
equity options as well as index options.  And a warrant
is nothing more than a long-term option.  So if someone
trades a warrant, it's typically a maturity of one year
or more.

Q.   Is that something Mr. Carpenter ended up doing in
this case?

A.   No.

Q.   So it's just options?

A.   Correct.

Q.   Okay.  Again, could you just walk through the
information?  And this identifies Benistar as the
account name?

A.   Yes.

Q.   And is there an indication as to the -- who the
point person is?

A.   Yes.  There is.

Q.   And is that Daniel Carpenter, chairman and
secretary?

1    A.    Correct.

2    Q.    All right.  And then the accountholder's financial

3    investment information, is this the same information we

4    went through before?

5    A.    Yes, it is.

6    Q.    The net worth and income and so forth?

7    A.    Yes.

8    Q.    This -- by the way, was this a document that you

9    sent to Mr. Carpenter for his signature?

10   A.    This was sent along with the account application

11   agreement that we spoke about earlier.

12   Q.    Okay.

13   A.    All in the same envelope.

14   Q.    Okay.  And did you get them all back at the same

15   time?

16   A.    Yes, we did.

17   Q.    I highlight for you down here the agreement, okay?

18   And I'm going to highlight something I'd like you to

19   read.  These are items -- this acknowledgment right

20   here, it says, "By signing below, I acknowledge and

21   agree"; do you see that?

22   A.    Yes, I do.

23   Q.    And the first one deals with "PaineWebber does not

24   provide legal advice"; do you see that?

25   A.    Yes, I do.

1    Q.    And then skip down to Number 3.

2    A.    Okay.

3    Q.    I'm just going to highlight it.  All right.  Do you

4    see Number 3?

5    A.    Yes.

6    Q.    What does that acknowledge?

7    A.    "That I have received, read and understand the

8    'Characteristics and Risks of Standardized Options

9    Booklet' and the provisions of this agreement contained

10   on the reverse side of this page."

11   Q.    Okay.  And the "Characteristics and Risks of

12   Standardized Options Booklet," was that something you

13   sent to Mr. Carpenter?

14   A.    Yes, we did.

15   Q.    And did you send it with this form for him to sign?

16   A.    Yes.  Yes, we did.

17   Q.    And is that what you noted as being Exhibit 167?

18   A.    Yes; that's correct.

19   Q.    I'll get to that in a moment.  Then it says Number

20   4.  Would you read that to us?

21   A.    "I have supplied all of the information contained in

22   this qualification form and I declare it as true and

23   accurate and further agree to notify PaineWebber in

24   writing of any material changes including those in my

25   financial situation or investment objectives."

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Okay.  Now, you said that there was a special

2   statement for uncovered option writers that was on 166?

3   A.   Yes.

4   Q.   Okay.  Could you take a look at that one?

5   A.   Okay.

6   Q.   What's the purpose of -- actually, let me ask you a

7   different question.  So you sent this along with the

8   other documents to Mr. Carpenter?

9   A.   Yes.

10  Q.   And did he sign it?

11  A.   Yes, he did.  On the same day.

12  Q.   And was that returned with the others to you?

13  A.   Yes, it was.

14          MR. MITCHELL:  All right.  At this time the

15  government would offer Exhibit 166.

16          MR. GREENBERG:  No objection.

17          THE COURT:  Okay.

18          (Exhibit No. 166 received into evidence.)

19  BY MR. MITCHELL:

20  Q.   Mr. Rock, what's the purpose of this form?

21  A.   Because the risks of trading uncovered or naked

22  options are so much more significant than purchasing

23  covered options or just buying options, the firm wants

24  clients to have a totally separate statement clearly

25  outlining the risks as opposed to having it incorporated

PDF created with pdfFactory trial version www.pdffactory.com

1    in the same document where the disclosure could

2    potentially be lost.

3    Q.    Okay.  And are those risks set forth in the

4    document?

5    A.    Yes, they are.

6    Q.    I'm going to have you take a look at the first

7    couple of paragraphs.  And if you could just read the

8    highlighted portions as we go along, if I could get the

9    highlighter right?  Okay.  Try that.

10   A.    "There are special risks associated with uncovered

11   option writing which expose the investor to potentially

12   significant loss."

13   Q.    Okay.  And Number 1, could you read that to us?

14   A.    "The potential loss of uncovered call writing is

15   unlimited.  The writer of an uncovered call is in an

16   extremely risky position and may incur large losses if

17   the value of the underlying instrument increases above

18   the exercise price."

19   Q.    All right.  And number -- the first sentence, Number

20   2.  Actually, let me -- at the risk of dragging this out

21   a little bit, could you just read off Number 2,

22   Paragraph 2?

23   A.    "As with writing uncovered calls, the risk of

24   writing uncovered put options is substantial.  The

25   writer of an uncovered put option bears a risk of loss

PDF created with pdfFactory trial version www.pdffactory.com

1    if the value of the underlying instrument declines below

2    the exercise price.  Such loss could be substantial if

3    there is a significant decline in the value of the

4    underlying instrument."

5    Q.   Okay.  Let's scroll down to the bottom.  Do you see

6    a note above the signature?

7    A.   Yes.

8    Q.   Okay.  Could you read that note?

9    A.   "It is expected that you will read the booklet

10   entitled 'Characteristics and Risks of Standardized

11   Options' which you have received through your financial

12   adviser.  In particular, your attention is directed to

13   the chapter entitled 'Risks of Buying and Writing

14   Options.'  This statement is not intended to enumerate

15   all of the risks entailed in writing uncovered options."

16   Q.   Okay.  This "Characteristics and Risks of

17   Standardized Options" is the same booklet that's

18   referred to in the previous application?

19   A.   That's correct.

20   Q.   All right.  And that's -- is that Exhibit 167?

21   A.   Yes, it is.

22   Q.   Okay.  And if you could turn to that?

23   A.   Okay.

24   Q.   Is that something you also sent to Mr. Carpenter

25   with these materials?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   Yes.

2    Q.   All right.

3         MR. MITCHELL:   At this time the government would

4    offer Exhibit 167.

5         MR. GREENBERG:   Objection, your Honor.

6         THE COURT:   Overruled.

7         (Exhibit No. 167 received into evidence.)

8    BY MR. MITCHELL:

9    Q.   Okay.  Could you open that up?

10   A.   Yes.

11   Q.   And is that -- what we're looking at on the screen,

12   is that the first page of Exhibit 167?

13   A.   Yes, it is.

14   Q.   And if I could, I'll just have you turn to the next

15   page.  Do you see in there the chapter that the previous

16   exhibit directed the signer to; in other words, the

17   chapter entitled "Risks of Buying and Writing Options"?

18   A.   Yes, I do.

19   Q.   Which chapter is that?

20   A.   That would be Chapter X, Roman numeral.

21   Q.   It's this chapter here, Chapter X?

22   A.   Yes.

23   Q.   I'm going to ask you to take a look at certain of

24   the -- I'll highlight certain passages of this chapter

25   and I'll just ask you to take a look.  Go ahead and read

PDF created with pdfFactory trial version www.pdffactory.com

1    some of it.  Just bear with me one second.

2        Okay.  Do you see Chapter X right there?

3    A.   Yes, I do.

4    Q.   Okay.  And I'm going to magnify that paragraph.

5    Would you mind reading us that paragraph?

6    A.   "Readers should also be aware that not all options

7    strategies will necessarily be suitable for them and

8    that certain strategies may expose them to very

9    significant potential losses.  For example, the risks

10   associated with the writing of puts or uncovered calls

11   expose investors to such potential losses, and this type

12   of strategy is therefore not suitable for all

13   investors."

14   Q.   Okay.  Just so we can all see it, the next

15   subheading discusses the risks generally of option

16   holders; is that correct?

17   A.   Yes, it does.

18   Q.   And just continuing on:  "Risks of Option Writers."

19   Do you see that right there at the top of the page?

20   A.   Yes, I see it.  Page 62.

21   Q.   Yes.  Let me highlight a couple of passages for you

22   here.  Do you see Item No. 3, there's an example --

23   A.   Yes, I do.

24   Q.   And do you see it's underscored?  Do you see that

25   it's underscored or underlined?

1    A.   Yes.

2    Q.   I'll magnify the underlined portion of that.  Why

3    don't you go ahead and read the underlined passage?

4    A.   "The writer of an uncovered call" --

5            MR. GREENBERG:  Your Honor, could I just object?

6    This is --

7            THE COURT:  It's cumulative.

8            MR. GREENBERG:  -- just irrelevant.

9            There's no suggestion --

10           THE COURT:  You only need one ground for the

11   objection to be sustained, and it's cumulative.

12           MR. MITCHELL:  Okay.

13   BY MR. MITCHELL:

14   Q.   Well, let me ask you this one last question about

15   this document.  It's in evidence.  Does it go on to

16   explain the risks of uncovered options trading?

17   A.   Yes --

18           MR. GREENBERG:  Objection, your Honor.

19           THE COURT:  Yeah.  It's in evidence.  He's

20   right.

21   BY MR. MITCHELL:

22   Q.   Okay.  I'm doing the same thing Mr. Pappalardo was

23   doing, leaving arrows on the monitor.  I'm sorry.

24       Going back to Number 166, at any time from the time

25   you sent this out to Mr. Carpenter until you -- he

1    received it, or you received it back from him, did he

2    ask you any questions about the meaning of this

3    document?

4    A.    No.

5    Q.    At any point in dealing with him, did he say

6    anything that suggested he didn't understand the risks

7    of uncovered options trading?

8            MR. GREENBERG:  Objection, your Honor.

9            THE COURT:  No.  Overruled.

10           You may answer that.

11           THE WITNESS:  No.  In fact, he many, many

12   times --

13           MR. GREENBERG:  Your Honor.  Your Honor.

14           THE COURT:  No, that goes beyond the question.

15           THE WITNESS:  No.  No.

16   BY MR. MITCHELL:

17   Q.    Did you have discussions with him about the risks of

18   uncovered options trading?

19   A.    Yes.

20   Q.    Okay.  What did you discuss with him?

21           MR. GREENBERG:  Objection, your Honor.  We've

22   been over and over this and this is not --

23           THE COURT:  Overruled.

24           You may have it.

25           THE WITNESS:  From the very first conversation

PDF created with pdfFactory trial version www.pdffactory.com

1    to the last, Dan made it very clear that he was an

2    experienced option investor and he was very comfortable

3    with the risks associated with his trading and that the

4    potential for loss never bothered him.

5        MR. GREENBERG:  Your Honor, I move to strike

6    that last comment.

7        THE COURT:  No; it may stand.

8    BY MR. MITCHELL:

9    Q.   You stated earlier that you told Mr. Carpenter at

10   the beginning that he should use options as a hedging

11   vehicle?

12   A.   Yes, I did.

13   Q.   Did he -- as he began trading, did he use options as

14   a hedging vehicle?

15   A.   No.

16   Q.   Okay.  How did he -- how did he -- what was the

17   nature of his trades?

18   A.   In any kind of investing there's a risk return

19   tradeoff:  The higher the risk, the higher the expected

20   rate of return.  And Dan made it clear his objective was

21   to maximize the rate of returns --

22        MR. GREENBERG:  Your Honor, if he could just

23   answer the questions.

24        THE WITNESS:  His objective was to maximize --

25        MR. GREENBERG:  The question had to do with the

1   trades, your Honor.

2        THE COURT:  What was the nature of his trades,

3   was the question.

4        THE WITNESS:  To position the portfolio for

5   maximum returns.

6        MR. MITCHELL:  Your Honor, can I have a sidebar?

7   I just want to...

8        (Discussion at sidebar and out of the hearing of

9   the jury:)

10        MR. MITCHELL:  This is sort of an unusual

11   sidebar in that I'm appearing principally to advocate

12   getting something in evidence but I'm -- I'm sensing

13   some discomfort on your part, your Honor, with this

14   evidence.  And I want to make sure, given the history of

15   this case, that we're not pushing things too far.

16        THE COURT:  I just think it's cumulative.

17   There's no doubt that he knew that this was a risky --

18   riskier than other types of strategies in the relative

19   scope of what strategies you can -- I don't think

20   there's much contest --

21        MR. GREENBERG:  Your Honor --

22        THE COURT:  And you're entitled to put it in, I

23   mean, because you think you can make something out of

24   it, the fact that he knew it was risky.  But we've heard

25   it so many times that I don't think that there's any

1    contest that he knew this was high-end trading.  He

2    describes himself as aggressive repeatedly.  That's

3    there.  I don't know what more we need to --

4          MR. GREENBERG:  Also, let me just note, this

5    repeated reference to uncovered positions, that's not

6    the facts, that's not the evidence, and it's highly

7    misleading.  The government knows full well, as Merrill

8    Lynch has testified to, there were no uncovered calls.

9          THE COURT:  At any rate, I --

10          MR. MITCHELL:  I don't want to --

11          THE COURT:  I mean, it's not a point in contest,

12    I don't think.  So I mean, the reason I let the booklet

13    in was because there's a signature saying "I received

14    it."  I thought it made it a point, to do that.

15          MR. MITCHELL:  I understand.  Look, I'm -- as I

16    said, I just don't want to --

17          THE COURT:  But it's not even a contested issue,

18    I don't think.

19          MR. MITCHELL:  Okay.  While we're up here, to

20    save time, two other issues:  One is in the last trial

21    you did not allow in a conversation on December 19th

22    between Mr. Rock and two of his colleagues and Mr.

23    Carpenter.  We had a long voir dire about it.  One of

24    the things that they talk about in the call, among

25    others, they put an end to his trading; told him don't

1   up any new option positions.  But he also says in the

2   call that PaineWebber is doing a great job,

3   PaineWebber -- he's pleased with the service he's

4   getting.  Mr. Pappalardo, in his opening, as you noted

5   last week, your Honor, made a point of saying that

6   PaineWebber was at fault for closing things down

7   prematurely and preventing, it's the argument, Dan

8   Carpenter from recouping his losses.

9        So I am suggesting that to the extent Mr.

10  Carpenter said in the December 19th call that

11  PaineWebber's not at fault is directly relevant to the

12  fact of the issue that we have now, and I would like to

13  get into that.  And if it's a matter of leading the

14  witness to that point so we keep out other parts of the

15  call, I'm fine with that.

16       MR. GREENBERG:  Well, let me just respond

17  twofold:  Number one, your Honor, your Honor ruled last

18  time that the December 19th call did not -- was not

19  probative of Mr. Carpenter's state of mind, recognizing

20  that the last date -- the last transaction of the

21  contract was November 30th and I believe the last wire

22  was December 14th.  So this is after that, you know.

23       But, you know, it is -- and that was your

24  Honor's ruling, but it is our position that PaineWebber

25  wrongfully, you know, shut him down and created a

PDF created with pdfFactory trial version www.pdffactory.com

1    situation which resulted in millions of dollars of

2    losses resulting in unsuccessful exchanges.  And so --

3            THE COURT:  This wasn't necessarily the position

4    taken last time.

5            MR. MITCHELL:  Right.

6            THE COURT:  So I think the circumstances may

7    have changed.

8            MR. GREENBERG:  I mean, to the extent that he

9    simply wanted to take the position -- but there are

10   other aspects of that:  his state of mind and --

11           THE COURT:  I don't remember the evidence about

12   the calls.

13           MR. MITCHELL:  He started to talk about saying

14   the potential for a Santa Claus rally, and that's the

15   one that I --

16           MR. GREENBERG:  Then that's fine.  If you simply

17   want to introduce testimony that Mr. Carpenter was, you

18   know, talking to PaineWebber about maintaining the

19   account and keeping it open, that he believed there was

20   going to be a rally and it was shut down nonetheless,

21   then --

22           MR. MITCHELL:  Well --

23           MR. GREENBERG:  I mean, to the extent that the

24   conversation is -- if that's the -- I don't want to go

25   through another voir dire, but if that's simply -- the

1   simple point is if that's all you're trying to elicit --

2        THE COURT:  Well, it sounds like there may not

3   be an objection to what Mr. Carpenter said in the

4   conversation.

5        MR. MITCHELL:  If that's the case --

6        THE COURT:  But if the focus will be on what he

7   said, that's what's admissible, his admissions under the

8   rule.

9        Let me ask you:  Are we going to finish with him

10  by one o'clock?

11       MR. GREENBERG:  I don't think so.

12       But it depends on whether you get done with him

13  in the next ten minutes.  We may have a shot.

14       THE COURT:  Let's take a shot.

15       MR. MITCHELL:  Along those lines, one other

16  issue I want to be clear about -- this has to do with

17  cross-examination.  As I understood the Court's ruling

18  on the government's motion in limine to keep out the

19  outcome of the civil arbitration proceeding, this is

20  something that you're not going to go into on cross.

21       MR. GREENBERG:  No, we intend to because the

22  judgment is -- this witness testified in an arbitration

23  proceeding which was brought by Benistar, the Property

24  Exchange --

25       THE COURT:  But that's over, isn't it?

1          MR. GREENBERG:  And they won.  Benistar

2    prevailed and a judgment was obtained.  PaineWebber

3    has --

4          THE COURT:  No.

5          MR. GREENBERG:  PaineWebber has had to pay over

6    $4 million to these very same exchangors.  This is

7    outrageous for the government to be able to suggest that

8    the reason his exchanges didn't take place was because

9    of something that Dan Carpenter and Benistar did when,

10   in fact, it's now been conclusively determined by a

11   court -- the arbitration award by the state court in New

12   York.

13          There's a judgment -- we have it ready to

14   introduce -- we have the arbitration award.  This

15   witness testified and all of PaineWebber's people

16   testified.  It goes not only to the motivation and their

17   credibility -- and certainly this is payback time for

18   Mr. Carpenter.  This is their opportunity to pay him

19   back.  They have this award for almost $15 million, they

20   have signed an agreement --

21          THE COURT:  Do you have the --

22          MR. GREENBERG:  I have the --

23          THE COURT:  When I looked for it last time -- I

24   forget, what was it, attached to a motion?

25          MR. GREENBERG:  There's an order issued by the

1    state --

2          THE COURT:  I have the summary order which

3    affirms the award, but I didn't have the body of the

4    award, or that is, the reasoning or the text.

5          MR. GREENBERG:  It's an oral arbitration award,

6    your Honor, which is a three-page document, and then

7    there's a court order affirming the --

8          THE COURT:  How do I get the findings?

9          MR. GREENBERG:  All you have is the arbitration

10   award.  That's exactly what it is, your Honor.  That's

11   exactly what it is.  And it's in favor of Benistar.

12         THE COURT:  How do you understand what that is

13   in the context of what the conversation is?  It says:

14   You win.  And how do you know what --

15         MR. GREENBERG:  The controversy was that

16   PaineWebber was accused of engaging in improprieties as

17   it related to Benistar, and that's what happened.  And

18   there was -- there was an adjudication.

19         THE COURT:  But I don't know that without a

20   document that frames the issue.

21         MR. GREENBERG:  Your Honor, this goes directly

22   to this witness's credibility.  As a result of their

23   misconduct Benistar has been awarded almost $15 million.

24   To keep that away from the jury, you know, given these

25   witnesses -- I mean, this goes directly to motivation.

1    Directly to motivation.  For them to just think that

2    there's some claim out there -- there's a judgment that

3    they had to pay.  I got a settlement document the other

4    day, and it's been represented to me it's been signed.

5    PaineWebber has agreed to pay within 21 days of whenever

6    the last signature.

7         These are the same exchangers that are in this

8    case, the five of them.  The other two, as your Honor

9    knows, Darling and Fitzgerald, settled years ago.  The

10   five exchangors.

11              THE COURT:  We're going into another track.

12              MR. GREENBERG:  I'm sorry.  The five exchangors,

13   your Honor, they received through their counsel $14

14   million -- almost $15 million that these people are

15   going to have to pay.

16              MR. MITCHELL:  This was argued before the trial

17   even began.

18              MR. GREENBERG:  And they don't have to put this

19   on?

20              THE COURT:  Okay.  Well, I'm not sure I can

21   resolve it without looking at some of the documents, but

22   I don't think that what I saw was sufficient to be

23   meaningful to the jury.  But it looks like we're not

24   going to be able to finish him anyway so we may have

25   some time to resolve that.

```
 1            Just out of curiosity, who's after this guy,
 2   even if he goes into tomorrow?
 3            MR. MITCHELL:  Gail Cahaly.
 4            THE COURT:  And then?
 5            MR. MITCHELL:  Jackie Spielman.
 6            THE COURT:  She was short, if I remember last
 7   time.
 8            MR. MITCHELL:  Her testimony was brief.  I don't
 9   know that she was short.  Sorry.
10            THE COURT:  And then?
11            MR. MITCHELL:  And then Thomas Zappala will be
12   the next witness.
13            THE COURT:  Okay.  And then?
14            MR. MITCHELL:  And then Mr. Martin Paley.
15            THE COURT:  Friday?
16            MR. MITCHELL:  At this rate, your Honor, it's
17   anybody's guess.
18            THE COURT:  Those won't take that long.  Maybe
19   we'll be able to get through them tomorrow.  Cahaly
20   wasn't that long last time and Spielman wasn't that
21   long.
22            MR. MITCHELL:  I hope -- I hope, your Honor,
23   just to give you a little bit of comfort, we're trying
24   to work out a stipulation that would obviate the need to
25   call the 11 venue witnesses.  We are not going to call
```

1    the expert we called last time.  He's out.

2         THE COURT:  You're not going to, so he's out?

3         MR. GREENBERG:  Allaire?

4         MR. MITCHELL:  Allaire.  So you don't have to

5    work all weekend, Gary.

6         THE COURT:  So then Monday it looks like you'll

7    be finished with the government's case?

8         MR. MITCHELL:  I hope so.

9         THE COURT:  I'm concerned about the jury.  What

10   do you anticipate?

11        MR. PAPPALARDO:  Your Honor, as I -- if I may

12   talk?

13        THE COURT:  We changed paragraphs.

14        MR. PAPPALARDO:  Right.  As I represented to the

15   government yesterday, I anticipate it's possible that we

16   would call Janet May and/or Donna Wayne.  It will depend

17   upon the cross-examination of Spielman.  We're going to

18   attempt to introduce documents.  If they don't come in

19   through her, they'll come in through others.

20        THE COURT:  But we're more or less on track for

21   the two- to three-week --

22        MR. MITCHELL:  If we can kick out the venue.

23        MR. PAPPALARDO:  And I think we'll reach a

24   stipulation today.  But if we don't, I would like to be

25   heard on the venue witnesses because I think it can be

PDF created with pdfFactory trial version www.pdffactory.com

1    worked out that no one is called.  It's also been

2    represented to us that I think there's a short witness,

3    Kameron.

4         And are you calling the other -- what's her

5    name?

6         THE COURT:  Johnston?

7         MR. PAPPALARDO:  Johnston, Cahaly.

8         Are you calling Enright, the other

9    PaineWebber --

10        MR. MITCHELL:  Yeah.

11        MR. PAPPALARDO:  -- person?

12        And she's relatively quick?

13        MR. MITCHELL:  I think so, but that's entirely

14   up to you.

15        THE COURT:  Who's she?  I don't remember her.

16        MR. MITCHELL:  She used to work at PaineWebber.

17   She was a compliance person in the branch.

18        THE COURT:  All right.

19        MR. PAPPALARDO:  So to answer the Court's

20   question, as I understood it, I think this case could

21   easily wrap up -- if Paley stops on Friday, this case

22   could easily wrap up on Monday.  That's my sense of it.

23        THE COURT:  Okay.  I want to give the jury some

24   general --

25        MR. PAPPALARDO:  Certainly by the middle of next

1    week.

2            THE COURT:  So they're not looking at July here.

3    That's what I want to --

4            MR. PAPPALARDO:  Give me that assurance.

5            MR. MITCHELL:  Can I make a suggestion about

6    managing their expectations?  I mean, I think in the

7    beginning you said two to three weeks.  I think it's

8    worth saying -- appropriate to say we're still on a

9    three-week schedule, so if we can --

10           THE COURT:  I don't know.

11           MR. MITCHELL:  We're trying our best, your

12   Honor, to move this along.

13           THE COURT:  Okay.

14           (In open court:)

15           MR. MITCHELL:  May I resume, your Honor?

16           THE COURT:  Please.

17   BY MR. MITCHELL:

18   Q.   Mr. Rock, I think when we left off we were just

19   talking about the nature of Mr. Carpenter's trades.  How

20   long -- let's put a time frame on this.  For how long

21   did he trade with PaineWebber?  When did he -- when was

22   the first day, when was the last?

23   A.   I believe the first day of trading was October 19th

24   and the last position was put on on December 18th, and

25   by the end of December the account was flat.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.    So about --
 2   A.    Two months.
 3   Q.    -- two months?
 4         Okay.  During that two-month period what kind of
 5   options did he trade?
 6   A.    Puts and calls.  Dan primarily was selling puts and
 7   buying calls.
 8   Q.    Okay.  And was there a -- to put a finer point on
 9   it, were these uncovered puts or calls?
10   A.    Well, the puts were uncovered, so he was selling
11   puts without an offsetting position in the underlying
12   stock, and the calls were long because he was purchasing
13   them.
14   Q.    They were long?
15   A.    Yeah.  He was buying calls.
16   Q.    And did you discuss this strategy with him?
17   A.    Yes.
18   Q.    Okay.  How frequently did you discuss his strategy
19   with him?
20   A.    Well, we spoke several times per day.  But actual
21   strategy conversations to find out what he wanted to do?
22   Periodically.
23   Q.    Okay.  "Periodically" as in more than once a week or
24   less than once a week?
25   A.    The big-picture strategy was established at the
```

PDF created with pdfFactory trial version www.pdffactory.com

1    outset; it was the execution and implementation of that

2    strategy that was changing from moment to moment.

3    Q.   Okay.  And how did it change?

4    A.   The agreement at the outset was that the account

5    would come over if the risk was going to be tempered.

6    And when we started trading in the middle of October,

7    Dan was convinced that the outcome of the election was

8    going to be very favorable to his style of investing,

9    and that his expectation was that these stocks were

10   going to go much, much higher.

11        So the original positions that were put on were

12   aggressive in an effort to maximize the rate of return

13   in the account and make a lot of money.  When we saw,

14   after ten days of trading, that we had an extremely

15   aggressive portfolio, we made several attempts to try to

16   temper the risk in the account.  So that would happen

17   once every few days.  And the response was:  "As soon as

18   the election's over, let's make a lot of money and then

19   maybe we'll do something different."

20   Q.   What did you say to him in an effort to temper --

21   A.   There are ways to participate in the direction of

22   the stock without exposing yourself to both the upside

23   and downside risk.  So what Dan was doing was making a

24   bilateral directional bet.

25   Q.   I want you to focus on what you were saying to Dan

PDF created with pdfFactory trial version www.pdffactory.com

1    Carpenter.

2    A.    We told Dan that he can purchase a call, which gave

3    him the potential to upside -- the potential to profit

4    from an upside move on a stock without selling a put.

5    It's a much less-riskier way to invest but it also

6    limits the rate of return.    So by making a bilevel

7    directional move, not only betting that the stock will

8    go up but also betting that the stock won't go down, now

9    you're making two different bets.    And if you're right

10   you make money on both sides, but if you're wrong you

11   lose money on both sides.    And in order to maximize the

12   rate of return on the account, Dan wanted to sell puts

13   and buy calls.

14   Q.    And was he trading in a particular industry sector?

15   A.    Yes.

16   Q.    And what was that?

17   A.    Internet stocks.

18   Q.    All right.    Did Dan Carpenter follow your advice?

19   A.    No.

20   Q.    Are you familiar with the terms "unsolicited trades"

21   and "solicited trades"?

22   A.    Yes.

23   Q.    Could you briefly tell us what those are?

24   A.    A solicited trade is a transaction where the broker

25   calls the client, makes a suggestion and the broker

1   takes that -- then the client does that.  Typically, the

2   idea germinates from the broker -- on the broker's side.

3   Q.   Okay.  And were Mr. Carpenter's trades solicited or

4   unsolicited?

5   A.   No, they were all unsolicited.  All of the ideas

6   that we did were generated from Dan.  Sometimes we

7   replied to his inquiry.  If he said, "Do you like A, B,

8   or C; which do you like better?" we may come back and

9   say, "I like B" or "I like C," but the root of all of

10  the ideas were his.

11  Q.   And in October when he first started trading -- the

12  balance of that month, was he gaining or losing money in

13  the account?

14  A.   The account would fluctuate significantly from day

15  to day, but the overall -- he lost money every week --

16  every month that we traded.

17  Q.   And in the -- I'm going to have you look at a couple

18  of documents.  Would you turn to 171A and 171B?

19  A.   171?  171?  I have 170, I have 168 and 169.

20       MR. MITCHELL:  May we have a moment, your Honor?

21  May I have a moment to look up here and over here?

22       THE COURT:  Yes.

23       (Pause.)

24       THE WITNESS:  Oh, here it is.

25  BY MR. MITCHELL:

1    Q.    Did you find it?

2    A.    Yes.

3    Q.    Okay.  I knew it was there.

4          Okay.  Do you recognize Government's Exhibit 171A?

5    A.    Yes, I do.

6    Q.    All right.  Tell us what it is.

7    A.    This is a request to transfer money from the cash

8    account to the trading account.

9    Q.    Okay.  And is there -- are there more than one?

10   A.    Yes, there are many.

11   Q.    Did Mr. Carpenter transfer money from the savings --

12   excuse me -- from the 34 account to the 33 account to

13   cover losses?

14   A.    Yes.

15   Q.    And are these transfers reflected in Government's

16   Exhibit 171A?

17   A.    Yes, they are.

18   Q.    All right.  The dates on these, just for the record?

19   A.    November 9th, November 17th, November 27th.

20         MR. MITCHELL:  Your Honor, the government would

21   offer Government's Exhibit 171A.

22         MR. GREENBERG:  No objection.

23         THE COURT:  All right.  171A.

24         (Exhibit No. 171A received into evidence.)

25   BY MR. MITCHELL:

1    Q.    Okay.  Do you see it up there?

2    A.    Yes, I do.

3    Q.    Okay.  And very briefly, these are letters to you

4    from him?

5    A.    Correct.

6    Q.    That request transfers from the money market account

7    to the trading account?

8    A.    That's correct.

9    Q.    Same thing with the next one?

10   A.    Yes.

11   Q.    And this one is -- the first one is dated November

12   9th; this one is dated November 17th?

13   A.    Correct.

14   Q.    And the third one, same thing?

15   A.    Yes; that's correct.

16   Q.    That's dated November 27th?

17   A.    Yes.

18   Q.    Now, there's a few documents I would like you to

19   identify, and we'll go through them quickly.  Do you see

20   before you Government's Exhibits 168, 169 and 170?

21   A.    Yes, I do.

22   Q.    Would you take a moment to look through those?

23          (Pause.)

24          THE WITNESS:  Okay.

25   BY MR. MITCHELL:

1    Q.    Now, 168 is in subparts; do you see that?

2    A.    Yes.

3    Q.    All right.  And the first one is 168?

4    A.    Yes.

5    Q.    Would you tell us what that is?

6    A.    168 is the monthly statement that was generated.

7    This is the December year-end statement that was

8    generated on the trading account.

9    Q.    Okay.  And 168A?

10   A.    Same thing:  monthly statement.

11   Q.    And 168B?

12   A.    168B is a fax that we sent Dan at the end of the day

13   summarizing that day's transactions.

14   Q.    Okay.  And these all pertain to Benistar's accounts,

15   correct?

16   A.    Correct.

17          MR. MITCHELL:  At this time, your Honor, the

18   government would move admission of 168, 168A and 168B.

19          MR. GREENBERG:  Objection.

20          THE COURT:  All right.  Let me see you.

21          (Discussion at sidebar and out of the hearing of

22   the jury:)

23          THE COURT:  I can't tell from my binder.

24          MR. GREENBERG:  First of all, I'm not sure I

25   have the right one, but the year-end statement -- I

PDF created with pdfFactory trial version www.pdffactory.com

1    mean, to the extent that any of these statements relate

2    to periods after -- certainly December 14th, or December

3    19th, whatever date, they're irrelevant and highly

4    prejudicial; unfairly prejudicial.

5            THE COURT:  Is there a difference between

6    December 14th on and prior to December 14th --

7            MR. GREENBERG:  The losses -- I mean, the losses

8    because of what PaineWebber did.  Because of them

9    shutting him down and stopping his trading, the losses

10   became millions and millions of dollars more.  That's

11   the whole point, is what they did.  And what was found

12   in the arbitration -- I would respectfully submit if you

13   look at the transcript -- what PaineWebber did in terms

14   of shutting down the account on December 19th and

15   closing out the positions resulted in millions of

16   dollars of unnecessary losses.

17           And I believe I'll demonstrate on

18   cross-examination that option positions were taken by

19   Mr. Carpenter the day before on December 18th.  Those

20   positions were opened until they shut him down; closed

21   down his position.  He was shut down when the market

22   rebounded in January, when the feds lowered their

23   interest rate, when the election was over.  And this

24   is --

25           THE COURT:  Okay.  This seems to be organized by

1    companies, I guess, alphabetically, I think.  No, it's

2    hard to tell.  I can't tell.  Do you know how it's

3    organized?  Is it by date or --

4         MR. MITCHELL:  I'm actually not going to spend

5    any time on it but the -- the follow-up questions are to

6    identify the document.

7         THE COURT:  What do you need it for?

8         MR. MITCHELL:  For summary.  The reality is,

9    there isn't any statement that ends on December 14th.  I

10   mean, the monthly statement issued by the financial

11   institution.  So, I mean, again, does it go into

12   activity after the last wire transmission?  Yes.  But,

13   again, these are -- I mean, as you noted earlier, you

14   can only sanitize this stuff so much.

15        THE COURT:  Would it enable somebody to look at

16   it and say what the condition of the account was on

17   December 14th?

18        MR. MITCHELL:  I don't think so.  I mean -- I

19   don't think so if the activity goes --

20        THE COURT:  Is that a problem?

21        MR. MITCHELL:  From December 1st to December

22   14th.

23        THE COURT:  No, that's what I'm saying.  As of

24   the 14th.

25        MR. MITCHELL:  As of specifically the 14th?

1          THE COURT:  Would somebody be able to look at
2     this and -- maybe not from the bottom line, but from
3     reconstructing the data from it, be able to say what the
4     condition of the account was on December 14th?
5          MR. GREENBERG:  No.
6          MR. MITCHELL:  Can I take a brief look at it,
7     your Honor?
8          MR. GREENBERG:  No.  No.
9          (Pause.)
10          MR. MITCHELL:  Here's an idea:  Why don't we --
11     I wasn't going to ask any follow-up questions on this
12     169, which is the account statement; 170, which is more
13     account statements.  Why don't we just reserve on that
14     and if there's a way of redacting, we can do it.  Our
15     witness is going to base a summary on what's here, and
16     if there's some way to distill out what's -- what
17     happened before the 14th, we can do that, so...
18          THE COURT:  All right.
19          MR. MITCHELL:  So I'm not going to --
20          THE COURT:  So we'll withdraw the offer at this
21     point, is that it?  Or is that reserving your right to
22     reoffer it if we can explain it?
23          MR. MITCHELL:  Yeah.  I'll have him go through
24     these and identify them for the record so a foundation
25     is laid but not offer them.

 1            THE COURT:  And what's this one?  Are you

 2    offering this B?

 3            MR. MITCHELL:  Yeah.

 4            THE COURT:  That seems to be a summary of trades

 5    on November 13th.

 6            MR. GREENBERG:  I don't think -- that's not an

 7    issue.  What I was -- this is not an issue, if it's just

 8    the trades that day.

 9            THE COURT:  That's what it looks like.

10            MR. GREENBERG:  But I just want to be clear, the

11    year-end statements, there's a December statement here,

12    there's a January statement.  You know, those are all --

13            THE COURT:  I've seen them.

14            MR. GREENBERG:  And there's also references to

15    money market rates, and that -- and we believe -- and

16    these statements also.

17            THE COURT:  All right.  Well, let's resume the

18    examination.  You can identify them and then we'll --

19    we're obviously not going to finish him up today.

20            (In open court:)

21    BY MR. MITCHELL:

22    Q.   Mr. Rock, may I have you turn to Government's

23    Exhibit 169, a set of exhibits marked 169A through 169F?

24    Would you take a look at those?  Do you have those in

25    front of you?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1  A.   I'm looking.  I'm looking.  This is -- the 169
 2  exhibit folder is empty.
 3  Q.   It's actually in one of the bigger folders?
 4  A.   I've got it.  Yes, I have it.
 5  Q.   Okay.  Do you see the first document in there?
 6  A.   Yes, I do.
 7  Q.   All right.  That's marked 169?
 8  A.   Correct.
 9  Q.   Would you tell us what that is?
10  A.   That is the October 2000 statement that was
11  generated on the cash account.
12  Q.   For the cash account?
13  A.   Yes.
14  Q.   The 34 account?
15  A.   Yes.
16  Q.   Okay.  And 169A?
17  A.   That's also a monthly statement.
18  Q.   Which month?
19  A.   October 2000.
20  Q.   Okay.  And 169B?
21  A.   169B are deposit tickets.
22  Q.   Okay.  Same account?
23  A.   Yes.
24  Q.   169C?
25  A.   169C is "Fed Funds Transfer System Incoming Wire
```

1    Summary."

2    Q.   Okay.  And 169D?

3    A.   169D appears to be stubs from a checkbook detailing

4    payments.

5    Q.   169E?

6    A.   169E are requests from Dan to us to wire money.

7    Q.   And 169F?

8    A.   169F is a summary of outgoing wires from

9    PaineWebber.

10   Q.   Okay.  I'll have you put those aside.  Put those

11   back in the folder and turn to 170.

12   A.   Okay.  Okay.

13   Q.   Would you tell us what that is?

14   A.   170 is the monthly statements from the Benistar

15   Property Exchange corporation account with PaineWebber.

16   Q.   Let me ask you a question generally about 168, 169

17   and 170, all those exhibits.  Are these generally all

18   documents that PaineWebber keeps in the normal course of

19   business?

20   A.   Yes.

21   Q.   All right.  Put those aside.  I'm actually not going

22   to ask you any follow-up questions about them.

23        Okay.  Did you speak to him, Mr. Carpenter, about

24   the losses in his account?

25   A.   Yes, often.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   What did you say to him?

2         MR. GREENBERG:  Objection.  Can we have a time

3    period, your Honor?

4         THE COURT:  Yes.  If there are multiple

5    conversations, let's identify what you said when.

6    BY MR. MITCHELL:

7    Q.   When was the first time?

8    A.   The day after the first trade.  Every single day was

9    kind of a wrap-up of open positions, prior day's

10   gain/loss.  So often; many times.

11   Q.   Okay.  And how did he respond?

12   A.   "We'll get them another time."

13   Q.   Are you aware of whether others at PaineWebber spoke

14   to him about his trading losses?

15   A.   Yes.

16   Q.   And who are you aware of?

17        MR. GREENBERG:  Objection, your Honor.

18        THE COURT:  Yes.  Sustained.

19   BY MR. MITCHELL:

20   Q.   Did Mr. Carpenter indicate to you that he spoke to

21   others at PaineWebber about his trading losses?

22   A.   Yes.

23   Q.   And whom did he indicate?

24        MR. GREENBERG:  Objection.

25        THE COURT:  Overruled.

```
 1          THE WITNESS:  I believe -- I don't know the

 2    exact date, but the first week in November this account

 3    came up on compliance's radar screen, so to speak, and

 4    management needed -- wanted to have a call with Dan just

 5    to establish --

 6          MR. GREENBERG:  Your Honor, can he just --

 7          THE COURT:  No.  It's nonresponsive.  Strike the

 8    answer.

 9          THE WITNESS:  -- compliance.

10    BY MR. MITCHELL:

11    Q.   I'm asking you what Mr. Carpenter said about

12    conversations he had with others.

13    A.   Yes.  He had a conversation with the compliance

14    manager.

15    Q.   Did you discuss that conversation with Mr.

16    Carpenter?

17    A.   Yes.

18    Q.   And what did he say about that?

19    A.   He said that -- he said great things:  We're doing a

20    great job; his losing money was Alan Greenspan's fault;

21    but we're doing what he wants us to be doing so let's

22    come back and get them another day.

23    Q.   Okay.  Who was your compliance manager at the time?

24    A.   Lori Enright.

25    Q.   Who else besides Alan Greenspan did Mr. Carpenter
```

PDF created with pdfFactory trial version www.pdffactory.com

1   blame for his losses?

2           MR. GREENBERG:  Objection, your Honor.  Could

3   the witness testify as opposed -- the form of the

4   question is --

5           THE COURT:  Overruled.

6           You may answer.

7           THE WITNESS:  Alan Greenspan, who was the

8   chairman of the Federal Reserve at the time; the overall

9   market in general.  It was everybody else's fault.

10  BY MR. MITCHELL:

11  Q.   Did Mr. Carpenter trade on margin?

12  A.   Yes.

13  Q.   Okay.  And just a quick reminder:  What is margin

14  trading?

15  A.   Margin is when you borrow money from the brokerage

16  firm to support the positions you have in place.

17  Q.   And margin calls.  What's a margin call?

18  A.   A margin call is when you need to deposit more money

19  in the account to maintain the positions that you have.

20  Q.   Okay.  And were there margin calls made to Mr.

21  Carpenter?

22  A.   Yes.

23  Q.   Did he make those calls?

24  A.   He satisfied the requirements of those calls, yes.

25  Q.   Okay.  Are you aware of where the money came from to

PDF created with pdfFactory trial version www.pdffactory.com

1  satisfy those calls?

2  A.    Yes.   It was either transferred from the cash

3  account or wired in from an outside source.

4  Q.    At some point did PaineWebber bring an end to Mr.

5  Carpenter's trading?

6  A.    Yes.

7  Q.    When was that?

8  A.    December -- the middle of December.   December 19th,

9  I believe.

10  Q.    Okay.   And how was that communicated to him?

11  A.    Through a phone call.

12  Q.    Okay.   Who was on that phone call?

13  A.    Lori Enright, the compliance manager; Steve Feit,

14  the branch manager; and myself.

15  Q.    How long did that call last?

16  A.    It lasted about an hour.

17  Q.    And what did Mr. Carpenter say in that call?

18  A.    It was a long call.   During the call or the end of

19  the call?

20  Q.    Well, did you tell Mr. Carpenter what the call was

21  about at the beginning?

22  A.    Yes.

23  Q.    What was said to him?

24  A.    The call started out by summarizing the losses in

25  the account and the exposure that he currently had to

1    the markets at the time.  When we told Dan that the

2    losses were $5 million through that morning, he was

3    somewhat surprised.  He thought it was a little lower.

4    He asked us to summarize the P&L for him later that day.

5    And when we told him that his underlying exposure to

6    stocks was in the 12 to 14 million range, and that if

7    the market was to continue declining as it was then, the

8    account would be wiped out.

9        And Steve asked for more money --

10            MR. GREENBERG:  Your Honor, I'm going to object

11   to this.  I thought the question was what did Mr.

12   Carpenter say --

13            THE COURT:  Correct.  Let's stick with the --

14            MR. MITCHELL:  This is a follow-up.

15            THE COURT:  Sorry?

16            MR. GREENBERG:  Your Honor, I'd ask to strike

17   the entire answer.  It's unresponsive, what Mr.

18   Carpenter said to --

19            THE COURT:  Well, he can provide some context

20   for what he said.  But the main point of the question

21   was what did Mr. Carpenter say, not what did others say.

22   So why don't you re-ask -- let's refocus the question,

23   Mr. Mitchell.

24   BY MR. MITCHELL:

25   Q.   Okay.  Focus on what Mr. Carpenter said, Mr. Rock.

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Okay.  At the beginning of the call Dan was very

2    complimentary.  We did a great job, the execution was

3    great, the service was great.

4    Q.    Who's "we"?

5    A.    PaineWebber at the time, and everyone in our office

6    who serviced the account he was very happy with.  He was

7    very disappointed with the losses in the account and

8    said that he was -- the expectation was he was going to

9    make a lot of money.  When we pointed out the exposure

10   and the potential for loss and requested that he

11   transfer in more money, he told us that this was all the

12   money that there was.  And when we said to him, "You do

13   realize that another bad week or two and this account's

14   going to be wiped out," he then quickly transitioned

15   from the aggressive "Money's no object; I'm going to

16   make a fortune" type of trader to, "Yeah, I guess you

17   guys are right."

18            MR. GREENBERG:  Your Honor, I --

19            THE WITNESS:  I mean --

20            THE COURT:  No.  I thought you were just about

21   to say something Mr. Carpenter said, so let's hear that.

22            THE WITNESS:  At the end of the call Dan agreed

23   that the risks in the account were significant, and

24   since there was no more money to support the trade --

25            MR. GREENBERG:  Your Honor, can he just --

1              THE WITNESS:  -- he would close positions.

2              MR. GREENBERG:  Your Honor, objection.  If he

3    could restrict his answers to what Mr. Carpenter said.

4              THE COURT:  I believe that's what he was saying.

5              Was that what you were saying?

6              THE WITNESS:  Dan said that, "Wow, I didn't

7    realize that I've lost so much money.  I didn't realize

8    that if there's another bad week I could be wiped out.

9    And because I have no more money to send in, I probably

10   should start to wind down the positions," because at

11   that point we told him that we were not comfortable with

12   the risk in the account.  That's what Dan said.

13   BY MR. MITCHELL:

14   Q.   Okay.  Did he blame anyone for his losses?

15   A.   Well, Alan Greenspan.  It was the feds not having a

16   comfortable interest rate stand.

17   Q.   Did he blame --

18   A.   Dan was expecting a rate cut; Dan was expecting a

19   post-election rally; and Dan was expecting a year-end

20   rally.

21   Q.   These are things he said to you?

22   A.   Yes.

23   Q.   Did he blame PaineWebber?

24   A.   No, not at all.  As a matter of fact, he was very

25   complimentary.  He said, "You guys were great.  You guys

PDF created with pdfFactory trial version www.pdffactory.com

1    did everything I expected, you know?  I enjoyed working

2    with you."  And we were encouraging him to work

3    somewhere else.

4    Q.   And based on the representations, did you begin the

5    process of shutting down his account?

6    A.   Yes, we did.

7              MR. MITCHELL:  That's all I have, your Honor.

8              THE COURT:  All right.  Well, I think it's one

9    o'clock.  We'll break at this time.

10             Jurors, we're making progress.  I think we're

11   still within the time frame that I estimated at the

12   beginning of the case.  I can't be more precise than

13   that.  But we're moving along; I just want to reassure

14   you on that.

15             So we'll recess now and I'll see you tomorrow.

16             THE CLERK:  All rise.

17             The Court is in recess.

18             (Jury out at 1:01 p.m.)

19             THE COURT:  We'll stay.  Mr. Greenberg has

20   something he wants to say.

21             You may step down, Mr. Rock.

22             (The witness is excused.)

23             THE COURT:  Mr. Greenberg, you had --

24             MR. GREENBERG:  Yeah, your Honor, I do want to

25   address the arbitration.  As your Honor may recall, at

PDF created with pdfFactory trial version www.pdffactory.com

1    the time of the last trial there was a question about

2    the arbitration as it related to motivation and

3    credibility your Honor allowed.  At that time the

4    arbitration was pending and that's as far as the

5    questioning could then go.

6            The government's -- this witness just claimed

7    that, you know, Dan Carpenter didn't blame Merrill Lynch

8    *[sic]*.  I mean, certainly -- the arbitration -- the

9    proceeding -- the judgment directly refutes this

10   witness's, you know, testimony, because, in fact,

11   Benistar did initiate arbitration proceedings; they

12   pursued them and they prevailed.  As I said before,

13   number one, it goes directly to the motivation of the

14   PaineWebber witnesses.

15           The other thing is, your Honor may remember the

16   other day the government made a comment at sidebar,

17   something to the effect that it sort of took all of

18   us -- that if these exchanges had been successful, we

19   wouldn't be here, suggesting something other than what's

20   in the indictment.  And that's -- you know, there's been

21   lots of testimony here blaming Dan Carpenter for the

22   losses -- that's clearly the inference they want to

23   draw -- blaming Dan Carpenter for losses, blaming Dan

24   Carpenter for failed exchanges when, in fact, the

25   arbitration award and the judgment -- the New York State

1    judgment -- against PaineWebber means one of two things:

2    It either means that PaineWebber, you know, clearly

3    wrongfully stopped Benistar from trading or caused

4    Benistar's harm to the tune at that time with

5    interest -- I believe it was almost $15 million. Just a

6    little under $15 million. But the principal amount was

7    just a shade under $9 million.

8            So in effect, I mean, the arbitration award --

9    the only way one can include -- is that Benistar would

10   have had $9 million more, roughly, in their accounts but

11   for the conduct of PaineWebber. If they had that $9

12   million, if you take the government's position, then we

13   wouldn't be here. We wouldn't be here.

14           You know, this entire trial -- I mean, what

15   they're putting on trial is they keep saying risky

16   positions and risky trading strategy, that's what caused

17   these losses. That's what they're trying to -- you

18   know, to present to the jury. The arbitration award:

19   Nothing could make it clearer than the fact that the

20   inability to consummate these exchanges was because of

21   what PaineWebber did.

22           And as I said before, we were delivered the

23   other day -- I think it was yesterday -- the settlement

24   agreement. And I say "settlement agreement." There's

25   an award; there's a New York judgment. And the

PDF created with pdfFactory trial version www.pdffactory.com

1    settlement is simply -- it's a payment on the judgment.

2    And there's a slight reduction, but it's a payment of,

3    roughly, I think $14,487,000 approximately, in that

4    range, which goes to five of the exchangors in this

5    case: Johnston, Snider, Joseph Iantosca, Bellemore and

6    Cahaly. The other two -- there's only seven exchangors.

7    The other two exchangors are Fitzgerald and Darling,

8    both of whom signed releases in settlement agreements

9    with Benistar and with Merrill Lynch several years ago.

10         I think for a variety of reasons the existence

11   of the arbitration, the existence of the award, the

12   existence of the judgment and the fact that PaineWebber

13   has agreed to pay, you know, momentarily these people,

14   is just -- is relevant. It's certainly based upon the

15   way the government's presenting the case.

16         THE COURT: Well, as I mentioned at sidebar, one

17   of the concerns I have is the inability for the jury to

18   understand the significance of a judgment without

19   understanding what the issues were that led to the

20   judgment in a bottom line the-claimant-shall-recover

21   statement, without indicating why the claimant shall

22   recover and what factual controversies were resolved by

23   the arbitration. I'm not sure it can be put to --

24         MR. GREENBERG: If your Honor looks at the

25   award which is --

```
 1              THE COURT:  Use.
 2              MR. GREENBERG:  If your Honor looks at the award
 3    at 395, it summarizes, it states --
 4              THE COURT:  I'll find it because I've seen it
 5    before someplace.  I don't have it here right in front
 6    of me.
 7              MR. GREENBERG:  And again, the government has as
 8    one of their witnesses the attorney -- one of the
 9    attorneys --
10              MR. MITCHELL:  He's not being called.
11              MR. GREENBERG:  Well, then if he --
12              THE COURT:  At any rate, that's one problem.
13    And I'll look at the award and I'll hear from the
14    government obviously too on any question.
15              Let me get to another point, Mr. Greenberg.  I
16    mean, I think I'm hearing two separate arguments:  One
17    is that the loss of the arbitration by PaineWebber
18    infects the witnesses from PaineWebber with a bias which
19    the jury should be aware of?
20              MR. GREENBERG:  Correct, your Honor.
21              THE COURT:  That's one argument.
22              The other argument is that -- this is where I'm
23    not sure -- is that the outcome of the arbitration
24    establishes, sort of preclusively, a fact or set of
25    facts which the jury should take as established.
```

PDF created with pdfFactory trial version www.pdffactory.com

1        MR. GREENBERG:  No, your Honor.  It's evidence

2    that -- it's evidence to disprove the statement -- the

3    contention of the government that it was just because of

4    Dan Carpenter that these trading losses occurred.

5        THE COURT:  Well, okay.  It's because they could

6    believe -- it's because they can take the outcome of the

7    arbitration as an established -- as a fact.  We'll

8    strike "established."

9        MR. GREENBERG:  It's a consideration.  One, they

10    can consider it to the extent --

11        THE COURT:  What is that, somebody thought

12    something else?

13        MR. GREENBERG:  The pre --

14        THE COURT:  In other words, I guess I don't see

15    the distance between legally preclusive effect, a

16    binding adjudication which produces an answer which

17    cannot be revisited -- we sometimes have things like

18    that at trials -- and somebody else's view of what the

19    facts were.

20        MR. GREENBERG:  Except that --

21        THE COURT:  I can see how under some

22    circumstances the former might be admitted, but I don't

23    know how you get -- if it's not the former, how you get

24    somebody else's view admitted if it's not conclusive.

25        MR. GREENBERG:  Well, your Honor, it is

PDF created with pdfFactory trial version www.pdffactory.com

1    probative of the fact.  I think it's inclusive that

2    Benistar would have had approximately $9 million more

3    available to complete exchanges.  That's the award.

4    It's an award in favor of Benistar.  The government

5    is -- whether or not -- under whatever theory they

6    prevailed, $9 million was owed to Benistar.

7          And to the extent the government has talked

8    about losses, losses, losses, negatives in the accounts

9    or monies, well, the simple fact is that this award

10   shows $9 million would have been available.  And it has

11   nothing to do with the trading.  I mean, it's just that

12   would have been --

13         MR. PIROZZOLO:  Just a couple of points:  I

14   think what I would direct the Court to on the issue of

15   the arbitration is the government's motion in limine

16   that was filed.  Attached to that motion are a series of

17   documents.  And it includes the arbitration awards; it

18   includes the memoranda and opinion of the New York

19   Supreme Court, the order affirming the arbitration which

20   discusses and provides some context as to what the

21   arbitration is.  There's an awful lot flying around in

22   Mr. Greenberg's argument.  I'm going to do the best I

23   can to address them one by one.

24         First, his representation as to what happened in

25   that arbitration is factually incorrect.  That

1    arbitration was filed in 2003 by Benistar Property

2    Exchange against PaineWebber.  Later, in 2004, that

3    claim was assigned to the plaintiffs as a consequence of

4    the civil litigation.  The plaintiffs then amended the

5    claim and changed the theory.

6         The original theory that had been presented in

7    that arbitration -- there were two entities that sued:

8    There was Benistar Property Exchange Trust Company,

9    Inc., and an affiliate -- a Carpenter affiliate called

10   BESTCO, Benistar Employee Services Trust, or something

11   Company, whatever.  BESTCO.  And the original theory had

12   been just what Mr. Greenberg has asserted, that but for

13   PaineWebber's wrongful conduct, that they would have --

14   that they would have made substantial amounts of money.

15   I think the numbers that were thrown around were in the

16   40 to $50 million range.

17        After the plaintiffs were assigned the claim the

18   complaint was amended and the plaintiffs then changed

19   the theory of the case.  And if you look there's an

20   attachment to the memorandum that we submitted.  It's a

21   brief of PaineWebber on the appeal that explains kind of

22   a procedural background in this.  And they asserted a

23   know-your-customer-rule theory and asserted that

24   PaineWebber had failed to know the customer properly and

25   had improperly permitted Carpenter, who was acting

PDF created with pdfFactory trial version www.pdffactory.com

1    fraudulently and ultra vires, as against Benistar

2    Property Exchange Trust Company, and that PaineWebber

3    couldn't assert the wrongful conduct of Mr. Carpenter as

4    a defense because the assignment of the claim was not

5    going -- he was not going to benefit by virtue of the

6    assignment of the claim that was going to go to the

7    plaintiff.  So the equitable defense of ultra vires was

8    not going to be available to PaineWebber.  And if you

9    look at the discussion in the order you'll see lots and

10   lots of discussion inside of our motion.

11        And then if you look at what actually the order

12   provides -- if you look at the arbitration award there

13   are two components to it -- and you will see that

14   there's an $8.7 million judgment.  That is based upon

15   the losses.  It is not based on the fact that they

16   wrongfully shut them down when they would have made

17   substantial money.  It was for losses that the

18   plaintiffs suffered -- the ultimate plaintiffs here --

19   suffered as a consequence of Mr. Carpenter's wrongful

20   trading that PaineWebber should have stopped.

21        The claim by BESTCO that PaineWebber shut him

22   down improperly was rejected, and you will see in the

23   arbitration award there are two pieces to it:  One is

24   the award against Benistar Property Exchange and the

25   other says to the extent any other claims were asserted

PDF created with pdfFactory trial version www.pdffactory.com

1  here, including the claims of BESTCO, they are rejected.

2       So Mr. Greenberg's representation as to what

3  that arbitration award means and says, included, is

4  factually incorrect.  And if necessary we will have

5  attorney Tony Zelle come in and testify as to what that

6  arbitration award was about.  We put him on the list in

7  case the Court were inclined to introduce this evidence,

8  and then we would have some collateral proceeding as to

9  what the arbitration award actually means, okay?

10      So with respect to the representations as to

11 what's going on with the award, now, if it's Mr.

12 Greenberg's position separately that it's PaineWebber's

13 fault, the award need not come in, whatever settlement

14 PaineWebber may have reached with the plaintiffs as a

15 consequence of that underlying arbitration, those are

16 outcomes; they do not bear on the issue that Mr.

17 Greenberg apparently wants to raise as to whether or not

18 PaineWebber, in fact, was at fault during this period of

19 time.

20      They can put on evidence.  They can ask Mr.

21 Rock, or they can put on an expert, presumably, and say

22 this had nothing to do with Mr. Carpenter and the losses

23 were, in fact, caused by PaineWebber.  Adding the

24 potential settlement and adding the arbitration award,

25 your Honor, adds nothing to that inquiry.

PDF created with pdfFactory trial version www.pdffactory.com

1          Let me address the issue of loss generally.  And

2    there's a collateral -- the fact that there is a

3    collateral settlement.  We cited some cases in our

4    motions, and particularly the *Sindona* case which is out

5    of the Second Circuit where there was -- it's a criminal

6    case in which -- in which the defendant was involved

7    with -- it was a bank fraud scheme.  But there was a

8    separate settlement by a third party that occurred after

9    the operative events, and he wanted to put that into

10   evidence on two grounds:  The first was to show there

11   wasn't a loss to the victim, the ultimate victim in the

12   case; and the second was to show his intent, that he

13   intended to repay.

14         In the *Sindona* case they rejected that on the

15   question of ultimate return of the funds is not

16   probative -- is not relevant.  It explicitly said it's

17   not relevant to the issues in the case and on the issue

18   of intent, a later -- far later conduct, a far later

19   event isn't probative of the intent at the time the

20   offense was occurring.  And it also went on to say that

21   under the Rule 403 balancing factors, the opportunity

22   for confusion, delay, et cetera, far outweigh any

23   probative value that it would have.

24         On the issue of bias:  The arbitration is over

25   as to PaineWebber, and so it's not clear to me --

PDF created with pdfFactory trial version www.pdffactory.com

1    there's no evidence -- it doesn't appear that Mr. Rock

2    is going to be testifying at some future proceeding

3    unlike the Merrill Lynch witnesses which we just had.

4    So there isn't any kind of issue of bias as to whether

5    he would be shading his testimony one way or another

6    based on some future proceeding because apparently it's

7    over.

8              And I think also as to this issue of the

9    settlement, I have not been presented with anything that

10   says that there actually is a settlement in the case and

11   there's been payment made.  I'll operate on that

12   assumption based on this argument.  For purposes of this

13   argument, though, I'll operate under that assumption.

14   But my understanding is that there's some thesis that

15   the Benistar people are requesting before they are going

16   to permit the plaintiffs to retreat their funds -- to

17   have the funds from PaineWebber paid.

18             So those are basically the reasons why it's not

19   an appropriate basis for --

20             THE COURT:  Let me -- you mention "bias."  You

21   say you understand because the proceeding's over.  Why

22   not the sort of sore loser theory?  In other words, do

23   you think that Red Sox fans are still not biased against

24   Bucky Dent just because the game is over?  I mean, I

25   guess there's some value.  Maybe it's not enough.  But

PDF created with pdfFactory trial version www.pdffactory.com

1    isn't somebody who just lost a multimillion-dollar award

2    likely to possibly, in the view of the jury, have some

3    hard feelings that might shade his testimony?

4            MR. PIROZZOLO:  Shade his testimony --

5            THE COURT:  There's no future events that

6    affects bias, is there?

7            MR. PIROZZOLO:  The fact that there was an award

8    against PaineWebber based on this theory that they

9    should have stopped Mr. Carpenter from committing fraud

10   and they didn't --

11           THE COURT:  It doesn't matter what the basis

12   was.  The fact that PaineWebber has been caught up in

13   the scenario which has led them to lose a big case.

14           MR. PIROZZOLO:  And it's bias as against Mr.

15   Carpenter?  It wouldn't affect -- how is it going to

16   affect --

17           THE COURT:  No, not bias in the fact that it

18   affects the credibility of the witnesses.  Might it be

19   something that the jury would find --

20           MR. GREENBERG:  He brought the case, your Honor.

21           THE COURT:  -- relevant in considering whether

22   and how much credit to give to Mr. Rock's testimony

23   about anything?  I mean...

24           MR. PIROZZOLO:  The fact that there's some --

25           THE COURT:  The fact that he might be -- have

1    some feelings as a result of the loss of the arbitration
2    that would affect his reliability as a witness here in
3    the case, that's the --
4         MR. PIROZZOLO:  Well, to the extent there is
5    that possible issue, that he bears some ill will, some
6    hard feelings, that he's been unfairly accused of --
7         THE COURT:  He or people he's loyal to,
8    whatever.
9         MR. PIROZZOLO:  I really have two points on
10   that.  The first is:  That's not enough to show that
11   with respect to the percipient events that occurred here
12   in the month of October, November and December, that he
13   would be testifying any differently; and, second, to the
14   extent there is some basis upon which to -- upon which
15   to infer bias, that can easily be done by simply asking
16   the question, "Isn't it" -- similar to what we did with
17   the Merrill Lynch witnesses which is, "Isn't it the case
18   that there was some other proceeding?  Isn't it the case
19   that PaineWebber has been found liable in some other
20   proceeding?" and then a similar mechanism by which you
21   proceeded with respect to Merrill Lynch.  Putting in
22   every gory detail of the arbitration and settlement
23   award doesn't add to that at all.
24        THE COURT:  Okay.  All right.
25        MR. PAPPALARDO:  Your Honor --

1           THE COURT:  Very briefly.

2           MR. PAPPALARDO:  Extremely briefly.

3           THE COURT:  Yeah.

4           MR. PAPPALARDO:  Your Honor, Mr. Pirozzolo made

5    reference to the Second Circuit case.  As you probably

6    recall from what we filed before the trial, there's a

7    whole brief that we submitted to you.  I would suggest

8    to the Court that there is ample authority to allow this

9    evidence in even independent of bias, and it's cited in

10   the brief.  There are many circuits that allow this

11   evidence in.  And it makes no difference who pays the

12   money back as long as it's related.  And that's in the

13   brief.  I just wanted to point that out.

14          THE COURT:  I will look at the briefs and, if

15   necessary, we'll have further conversation in the

16   morning about it.  All right.

17          THE CLERK:  All rise.  Court is in recess.

18          (The proceedings adjourned at 1:20 p.m.)

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1                        CERTIFICATION

2

3          We certify that the foregoing is a correct

4     transcript of the record of proceedings in the

5     above-entitled matter to the best of our skill and

6     ability.

7

8

9     /s/Debra M. Joyce
      Debra M. Joyce, RMR, CRR          Date
10    Official Court Reporter

11

12

13

14    /s/Marcia G. Patrisso
      Marcia G. Patrisso, RPR, CRR      Date
15    Official Court Reporter

16

17

18

19

20

21

22

23

24

25