UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    ) Criminal Action
v.                                  ) No. 04-10029-GAO
                                    )
DANIEL E. CARPENTER,                )
                                    )
          Defendant.                )
                                    )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


DAY NINE
JURY TRIAL



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, June 12, 2008
9 a.m.


Marcia G. Patrisso, RPR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728


Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Jonathan F. Mitchell and Jack W. Pirozzolo,
3        Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        One Courthouse Way
         Boston, Massachusetts  02210
5        On Behalf of the Government

6        GREENBERG TRAURIG, LLP
         By: A. John Pappalardo, Esq. and
7            Gary R. Greenberg, Esq.
         One International Place
8        Boston, Massachusetts  02110
         On Behalf of the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2                    Direct   Cross   Redirect   Recross
    WITNESSES FOR THE
3     GOVERNMENT:

4   MITCHELL ROCK

5       By Mr. Greenberg            14                115
        By Mr. Mitchell                      108
6
    JACKIE MAHANNAH
7
        By Mr. Pirozzolo      117
8       By Mr. Pappalardo             151

9                        E X H I B I T S

10

11   Exhibit No.        Description         Marked   Received

12   No. 16        Check dated 9/14/00              129
     No. 17        Check dated 9/20/00              129
13   No. 19        Check                            132
     No. 20        Check                            132
14   No. 21        Check                            132
     No. 111       Check                            148
15   No. 112       Check                            148
     No. 130       Check                            147
16   No. 131       Check                            147
     No. 168       Account records and monthly statements   7
17   No. 169A
     through
18   No. 169F      Account records and monthly statements   7
     No. 170       Account records and monthly statements   7
19   No. 256       Wire transfer instructions       40
     No. 362       E-mails from Mr. Rock to Mr. Carpenter   61
20   No. 433       Web page of PaineWebber account   92
     No. 434       Web page of Paine Webber account   105
21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1          (The following proceedings were held in open

2     court before the Honorable George A. O'Toole, Jr.,

3     United States District Judge, United States District

4     Court, District of Massachusetts, at the John J. Moakley

5     United States Courthouse, One Courthouse Way, Boston,

6     Massachusetts, on June 12, 2008.

7          The defendant, Daniel E. Carpenter, is present

8     with counsel.  Assistant U.S. Attorneys Jonathan F.

9     Mitchell and Jack W. Pirozzolo are present.)

10          THE CLERK:  All rise.  Please be seated.

11          THE COURT:  Good morning.

12          COUNSEL IN UNISON:  Good morning, your Honor.

13          MR. GREENBERG:  We just wanted to raise a

14     concern -- or alert the Court to a concern.  One of our

15     colleagues has noticed now on two occasions one of the

16     jurors in the second row, the one with the moustache,

17     when visuals are on, gesturing to the screen and sort of

18     nudging one of the jurors beside him.  You know, we're

19     concerned that, your Honor, if it's appropriate, but

20     certainly, please, at the very least, caution all the

21     jurors they shouldn't be talking about the case to

22     anyone including among themselves.

23          And our concern obviously is even gesturing is a

24     way of communication.  We just want to alert the Court

25     that it was observed by one of our colleagues now twice

1  and that's...

2        THE COURT:  Okay.

3        MR. MITCHELL:  No problem.

4        THE COURT:  I'll address it at the end of the

5  day unless you --

6        MR. MITCHELL:  That's fine.  One housekeeping

7  matter on our end, your Honor, if Mr. Greenberg is done,

8  but the exhibits for which I laid a foundation

9  yesterday, the PaineWebber statements -- account

10 statements -- 168, 169, 170, we have taken out from

11 those exhibits the statements for December of 2000,

12 January of 2001 and the year-end 2000 statements.  So we

13 have statements only up through November 30th.  As I

14 understand, that satisfies the objection articulated at

15 sidebar by the defendants.  So at this point I would

16 move that they be admitted.

17        MR. GREENBERG:  That did satisfy one of our

18 objections.  The other objection which we previously

19 raised was that the trading and the trading losses are

20 irrelevant or certainly to the extent they're marginally

21 relevant -- that they are relevant -- the harm to the

22 defendant outweighs any relevancy.  And we have objected

23 on those grounds previously and we renew that.

24        Secondly --

25        THE COURT:  Well, that objection goes to more

PDF created with pdfFactory trial version www.pdffactory.com

1  than these documents; that goes to others as well.

2          MR. GREENBERG:  That's correct.  I just didn't

3  want to waive that.

4          And also, as we said before, to the extent these

5  documents relate to -- refer to money market rates,

6  treasury rates in existence at the time, it's irrelevant

7  and prejudicial.

8          THE COURT:  All right.  Those objections have

9  been overruled.

10          MR. GREENBERG:  Thank you, your Honor.

11          THE COURT:  So precisely which exhibits are they

12  so we can note it?

13          MR. MITCHELL:  168, 169A through -F inclusive,

14  and 170.

15          THE COURT:  Okay.

16          MR. GREENBERG:  They have now been revised or

17  redacted, right?

18          MR. MITCHELL:  Yeah.  You saw them.

19          MR. GREENBERG:  I agree.  I've seen the

20  documents.

21          THE COURT:  As described by excluding anything

22  after November 30?

23          MR. GREENBERG:  Correct, your Honor.  Thank you.

24          THE COURT:  Did you get those, Paul?  Did you

25  get those, the exhibits being offered?  168, 169A

1    through -F, and 170.

2         THE CLERK:  I got those.

3         (Exhibit Nos. 168, 169A through 169F and 170,

4    received into evidence.)

5         THE COURT:  Now, with respect to -- I think the

6    question about -- Mr. Rock isn't present, is he?

7         MR. MITCHELL:  No.

8         THE COURT:  The question about the arbitration

9    evidence.  I think that the appropriate way to deal with

10   it is the way it's been dealt with with respect to the

11   Merrill Lynch people, and that's with respect to bias.

12   I think the information about the arbitration is

13   admissible as potential bias including the outcome,

14   because I think the outcome is an aspect of what could

15   be bias of a witness partisan to one of the --

16   particularly to the loser in the arbitration -- might

17   have feelings different from somebody who is, for

18   example, looking forward to testifying in a proceeding

19   not yet completed.  So I think that can be done.

20        So the outcome can be put in but only through

21   the testimony of a witness and not by putting in a

22   document.  I think that will accomplish the legitimate

23   purpose.

24        MR. MITCHELL:  Your Honor, I just want to be

25   clear before he takes the stand what questions they're

1   permitted to ask.  We know what the -- I think we can

2   all -- we all agree he'll answer the questions:  Yes,

3   there was a settlement; yes, there was -- PaineWebber

4   has to pay money -- or had to pay money; and in terms of

5   the partiality question he'll say no -- there's no

6   reason to believe he'll say anything but --

7        THE COURT:  He's familiar enough with the

8   arbitration and the outcome that it might affect his

9   impartiality and reliability as a witness.  That's

10  basically -- just as the Merrill Lynch witnesses were

11  asked whether their awareness that Merrill Lynch was a

12  party in an upcoming proceeding and they might be called

13  to testify could affect --

14       MR. MITCHELL:  I'm worried about the

15  characterization.  The Merrill Lynch matter was

16  characterized as a claim against Merrill Lynch when, in

17  fact, there were many claims --

18       THE COURT:  What are you particularly worried

19  about?  What would be a bad characterization?

20       MR. MITCHELL:  The bad characterization I'm

21  worried about are a couple:  One, suggesting there's one

22  claim in that litigation, so Claim 1 of the claims

23  instead of the claim, that's one thing; and secondly, if

24  there's any suggestion at all that PaineWebber was

25  exclusively at fault here, because that gets us into the

PDF created with pdfFactory trial version www.pdffactory.com

1    risk that the jury be confused and misled to believe

2    that Mr. Carpenter wasn't found at fault in the matter

3    when, in fact, he was, and that the entire -- the entire

4    basis of the claim against PaineWebber was the fact not

5    that they -- not that they somehow contributed but that

6    they didn't control him, they didn't know -- they didn't

7    do enough work to determine whom they were dealing with.

8         That's the basis ultimately of the claim.  To

9    the extent that the jury's misled to believe anything

10   beyond that, it shouldn't come in.

11        MR. GREENBERG:  Your Honor, again, the simple

12   fact is that this witness testified at arbitration; the

13   arbitration awarded -- there was a claim in the

14   arbitration; there was an award issue that he's aware

15   of; he knows what the amount of the award is.  He also

16   knows that PaineWebber is going to pay the amount of the

17   arbitration award.

18        And in terms of -- we've already conceded in the

19   opening statement that there was civil liability as it

20   related to Benistar; there's no secrets here with

21   respect to that.  These are simply operative facts

22   which, as your Honor indicated, go to his bias, the

23   existence of the award.

24        THE COURT:  I think the arbitration has to be

25   described in general terms.  I don't want to get into

PDF created with pdfFactory trial version www.pdffactory.com

1    trying to sort out here exactly what the issues were

2    because the principal point for the impeachment is his

3    side lost.

4            MR. GREENBERG:  That's correct.

5            THE COURT:  That's the -- and exactly what the

6    scope of the claims and who was vindicated or not

7    vindicated by the -- I don't want to get into it.  The

8    principal focus is what effect that event might have had

9    on his ability to be the kind of witness the jury should

10   trust.  That's the point.

11           MR. MITCHELL:  One further matter:  Introducing

12   the amount of the award will suggest exclusive

13   responsibility on the part of PaineWebber.  If the jury

14   is told that PaineWebber had to pay $12 million, that's

15   going to suggest to the jury that PaineWebber alone is

16   at fault.

17           THE COURT:  I think the amount of the award is

18   relevant to the bias issue.  An award of nominal damages

19   of one dollar is different from an award of $12 million

20   in terms of how it might affect a partisan witness.

21   It's not huge, but it's not excluded.

22           MR. PAPPALARDO:  Your Honor, I'm not going to

23   belabor this point at all now, but we filed a

24   supplemental memorandum last night with respect to what

25   Mr. Pirozzolo raised at the end of the trial day

PDF created with pdfFactory trial version www.pdffactory.com

 1  yesterday concerning independent grounds for

 2  admissibility of this based upon the fact that Mr.

 3  Carpenter's defense in this case is a lack of intent,

 4  and there's an abundance of cases that allow this to

 5  come in based upon a lack of intent.

 6        We distinguish -- we substantially distinguish

 7  the case that Mr. Pirozzolo raised from the Second

 8  Circuit yesterday.  The facts are completely different.

 9  The defense in that case was simply a repayment; there

10  was no intent.  Intent is the issue in this case, your

11  Honor, and more importantly, losses before the jury.

12        And it has come in and in -- you know, the only

13  thing, your Honor, that distinguishes the victims in

14  this case from any of the other exchangors is loss.  And

15  I would suggest to the Court that it has an independent

16  admissible ground.  And I just point out to the Court

17  that we submitted that brief last night.

18        THE COURT:  All right.

19        MR. MITCHELL:  One other thing, your Honor.  I

20  was just going to ask at the end of the case, as part of

21  the Court's instruction -- I think it probably would be

22  more appropriate now -- but the jury has to be made

23  clear they shouldn't be speculating about outcomes of

24  civil matters, they shouldn't be speculating about

25  findings or why parties settled a civil matter or what

PDF created with pdfFactory trial version www.pdffactory.com

1    some arbitration panel found in New York.  The issue of

2    the award is offered only -- is only relevant to this

3    witness's credibility and that's it.

4         And there shouldn't be any speculation about:

5    Okay, why was it PaineWebber was found -- was found

6    liable?  Or why Merrill Lynch is going to be involved in

7    further civil proceedings?  Because it really does make

8    the jury start to wonder, inappropriately, about

9    liability or the fault of others who are not on trial

10   here -- and that's a big problem -- and doing it just

11   based exclusively on what third parties -- the

12   Massachusetts state court and an arbitration panel in

13   New York concluded.

14         So it really is, to stem -- I think --

15         THE COURT:  Well, are you asking that there be

16   an instruction accompanying the evidence?  Is that what

17   you're saying?

18         MR. MITCHELL:  Yes.  As opposed to in the case.

19         THE COURT:  I doubt it.  I mean, I'll see how it

20   comes in.  But there's a lot of things you can say to

21   the jury in the course of the case as evidence comes in.

22   I doubt that this will require it.  I'll see when it's

23   been said what I think at that point.

24         MR. MITCHELL:  Okay.

25         MR. PAPPALARDO:  Your Honor, and again, we don't

1    need to belabor this point now -- we have a jury

2    waiting -- but I would argue that the appropriate

3    time -- which I suggest is not while this witness is on

4    the stand -- that there's an independent ground for

5    admissibility and I would be -- should be permitted to

6    argue that ground because it is the defendant's defense

7    in this case of lack of intent.  And the case law is

8    abundantly clear on that.

9            I mean, I understand the Court's ruling today

10   for purposes of this witness, but I think that what Mr.

11   Mitchell just raised deals with final argument, and we

12   can address it at a later point in time.  Thank you.

13           THE COURT:  Okay.  Let's get the jury and the

14   witness.

15           (Pause.)

16           THE COURT:  Now, is my recollection correct that

17   you completed your direct?

18           MR. MITCHELL:  I have.

19           THE COURT:  Now that the documents have been

20   offered?

21           MR. MITCHELL:  Yes.

22           THE COURT:  Yeah.

23           (Pause.)

24           THE CLERK:  All rise for the jury.

25           (Jury in at 9:22 a.m.)

PDF created with pdfFactory trial version www.pdffactory.com

1          THE CLERK:  Please be seated.

2          THE COURT:  Good morning, jurors.

3          THE JURORS:  Good morning, your Honor.

4          MR. GREENBERG:  May I proceed, your Honor?

5          THE COURT:  Please.

6          Mr. Rock, you may be seated.

7                    CROSS-EXAMINATION

8   BY MR. GREENBERG:

9   Q.   Good morning, Mr. Rock.  My name is Gary Greenberg,

10  and along with me is John Pappalardo.  We represent Mr.

11  Carpenter in this matter.

12       Mr. Rock, you joined PaineWebber approximately

13  August of 2000, a couple of months before Benistar

14  became a client; is that right?

15  A.   One month before, yes; that's correct.

16  Q.   One month before.  And at the time you joined

17  PaineWebber you received a bonus of approximately

18  $1,687,000?

19  A.   Approximately.

20  Q.   So just a month before, as part of PaineWebber's

21  efforts to get you to go to work for them, they agreed

22  and paid you a bonus of almost $1.7 million, right?

23  A.   That's correct.

24  Q.   Now, yesterday you were asked by the government a

25  series of questions about your initial conversation with

1   Mr. Sterns [sic], your friend from PaineWebber; do you

2   recall that?

3   A.   My friend from Merrill Lynch.

4   Q.   I'm sorry.   Your friend from Merrill Lynch.   That's

5   right.

6        And you discussed -- you testified as to your

7   conversations with Mr. Sterns in those first couple of

8   telephone conversations; is that right?

9   A.   That's correct.

10  Q.   You didn't tell the Court and this jury everything

11  that you and Mr. Sterns just discussed in those first

12  couple of conversations, did you?   Did you -- let me

13  rephrase it.

14       Did you intend to tell the jury everything that you

15  and Mr. Sterns discussed about Mr. Carpenter and

16  Mr. Benistar [sic] that occurred during those first

17  couple of conversations?

18  A.   Yes.   I didn't leave anything out; nothing that

19  comes to mind right now.

20  Q.   Let's just see if we can go over everything.

21  Mr. Sterns told you that Mr. Carpenter was a very

22  sophisticated person --

23  A.   Correct.

24  Q.   -- is that right?

25       He told you that Mr. Carpenter and Benistar managed

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   money; isn't that what he said?
 2   A.   He didn't say he managed money.  I know that he --
 3   he said something about he had a very exclusive
 4   clientele; he did tax consulting, pension consulting,
 5   benefits administration, real estate investor, radio
 6   stations; he mentioned the Yankees.  At one point he
 7   dropped the name.
 8   Q.   He managed money for a number of people?
 9   A.   I don't recall that.
10   Q.   He told you he's very knowledgeable about taxes?
11   A.   Yes.
12   Q.   Okay.  He told you that Mr. Carpenter focused on
13   option trading?
14   A.   Yes.
15   Q.   He told you that Mr. Carpenter had a brother who was
16   a stock analyst who Mr. Carpenter would consult with?
17   A.   He actually didn't tell me that but I found out
18   about that later from conversations with Dan.  He said
19   he had a brother at Datek.
20   Q.   And Mr. Stern told you that Mr. Carpenter was not
21   happy with Merrill Lynch?
22   A.   More like Merrill Lynch wasn't happy with him.
23   Q.   Well, didn't he tell you both, that Merrill Lynch
24   was less than thrilled with --
25   A.   Less than thrilled.
```

1  Q.    -- Mr. Carpenter and Mr. Carpenter was less than

2  thrilled with Merrill Lynch?

3  A.    Correct.  It was mutual.

4  Q.    So you understood there was at least some tension

5  that existed between Mr. Carpenter and Merrill Lynch?

6  A.    Yes, of course.

7  Q.    And he also told you Mr. Carpenter had been up $2

8  million in his trading and then had lost $2 million?

9  A.    Approximately, yes.

10  Q.    And he told you -- Mr. Sterns also told you that

11  Merrill Lynch was hoping to maintain some relationship

12  with Benistar?

13  A.    That's correct.

14  Q.    And that he viewed Mr. Carpenter as a good source of

15  referrals?

16  A.    That is correct.

17  Q.    And he told you that he was hoping that, in fact,

18  Mr. Carpenter would send him some more business?

19  A.    That's correct.

20  Q.    And he told you Mr. Carpenter was a very, very

21  successful person?

22  A.    That is correct.

23  Q.    And he told you that Benistar was a well-known

24  company?

25  A.    I don't recall that, but...

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    He told you that --

2           MR. GREENBERG:  Can I approach the witness, your

3    Honor?

4    BY MR. GREENBERG:

5    Q.    You recall testifying back in 2001 in connection

6    with a civil matter, sir?  April of 2001?

7    A.    That was a deposition.

8    Q.    In a civil case; is that right?

9    A.    Correct.

10   Q.    And the events were pretty -- the subject that

11   you're testifying about today relates to events that

12   took place in the fall of 2000, right?

13   A.    Correct.

14   Q.    And back in April -- would you agree that in April

15   of 2001 your memory was likely clearer; events were

16   fresher in your mind than they are today?

17   A.    That would be -- possibly, yes.

18   Q.    And let me just show you, if I can, page 101 of your

19   deposition on April 5th of 2001 -- page 101, line -- I'm

20   sorry.  Page 101, line 12 -- and just ask you -- refer

21   to whether or not Mr. Sterns told you -- do you see the

22   reference there, to a well-known company?

23   A.    Uh-huh.

24   Q.    That Dan -- "successful, well-known company."

25   "Very, very successful with a well-known company."

PDF created with pdfFactory trial version www.pdffactory.com

1    That's what Mr. Sterns told you, right?

2    A.    Okay.

3    Q.    And he also told you that Mr. Carpenter was an

4    expert in a lot of things?

5    A.    Yes.

6    Q.    And he told you that Mr. Carpenter was very sought

7    after for his tax advice?

8    A.    Yes, he did.

9    Q.    And he also told you that Mr. Carpenter is a good

10   investor, right?

11   A.    Yes.

12   Q.    And you asked him about the rate -- the commissions

13   that Mr. Sterns and PaineWebber were charging --

14   A.    Merrill Lynch was charging.

15   Q.    -- did you not?

16        I'm sorry.  That Merrill Lynch was charging.

17   A.    Correct.

18   Q.    Because you wanted to know what Merrill Lynch was

19   charging before you discussed what PaineWebber was going

20   to charge?

21   A.    Correct.

22   Q.    Okay.  And Mr. Sterns told you?

23   A.    Stern.

24   Q.    I'm sorry.  Mr. Stern told you that Merrill Lynch

25   had been charging Mr. Carpenter 10 cents a share?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   That's not correct.  I believe he said they were
 2   charging 6 cents a share.
 3   Q.   Well, okay.
 4   A.   But you check the transcript.  I don't recall.  But
 5   I think he said six and I decided we were going to
 6   charge ten.
 7   Q.   Let me just show you page 106 of your deposition,
 8   the same day.
 9   A.   Okay.
10   Q.   And did he tell you that they were charging 6 cents
11   a share on average?  Just if you could look at page 108.
12   A.   Yeah.
13   Q.   Yeah.  Thank you.
14        (Pause.)
15        THE WITNESS:  Okay.  Gary was charging ten.
16   BY MR. GREENBERG:
17   Q.   And I think you testified that after -- when you
18   discussed what PaineWebber was going to charge, that was
19   the charge that you and Benistar agreed on?
20   A.   That's correct.  We agreed to charge 10 cents per
21   share.
22   Q.   Okay.  Fair enough.
23        Now, when you -- after your discussions with
24   Mr. Stern you had some discussions with Mr. Carpenter,
25   correct?
```

1    A.    Correct.

2    Q.    And among the things Mr. Carpenter told you was that

3    he wanted you to be a sounding board for his strategy

4    from time to time.  Didn't he tell you that?

5    A.    I believe what he said was --

6    Q.    Just yes or no.  Did he tell you whether or not he

7    wanted you to be a sounding board on strategy from time

8    to time --

9    A.    On occasion --

10   Q.    Did he say that to you?

11   A.    Do you know what?  If you're reading a transcript

12   from years ago, I'd have to refresh my memory because it

13   was seven years ago.

14   Q.    Let me ask you a question:  Before you testified

15   yesterday did you read your transcript from seven years

16   ago on what you're testifying to here?

17   A.    Yes.

18   Q.    When did you read your transcript?

19   A.    Over the last couple of weeks I reviewed my

20   transcripts.

21   Q.    And you don't remember here today what you said in

22   your transcript; is that what you --

23   A.    You're talking about a specific paragraph, and

24   there's a lot of detail.

25   Q.    Let me show you page 112 of the same day --

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Okay.

2   Q.   -- and just ask you whether or not Mr. Carpenter, in

3   his discussions with you, told you he would want you to

4   be his sounding board for strategy from time to time,

5   among other things you and he discussed.

6   A.   May I read from the beginning of my answer?

7   Q.   No, I want you to answer the question.   Did Mr.

8   Carpenter say to you that one of the things he was

9   looking for was for you to be his sounding board from

10  time to time?

11  A.   I really would like to read my entire answer rather

12  than the last line of my answer.

13  Q.   If you want to read it to yourself, that's fine.

14  I'm just asking you the question:   Did he say that to

15  you?

16  A.   Dan wanted me to be familiar with the option

17  markets, and he told me straight out that I wasn't going

18  to be a source of ideas; I was going to guide -- I was

19  just going to guide him or give him quotes and be a

20  sounding board for strategy from time to time.   Yes.

21  Q.   Now, Mr. Carpenter also asked you if you were

22  familiar with covered call writing; isn't that correct?

23  A.   That's correct.

24  Q.   And he told you that he did not use a lot of naked

25  strategies; that he used a lot of covered options.

PDF created with pdfFactory trial version www.pdffactory.com

1  Isn't that what he told you?

2  A.   Do you know what?  The strategy --

3  Q.   Just, is that what he told you?

4  A.   Repeat the question, please?

5  Q.   Did Mr. Carpenter tell you in his initial

6  conversations with you that he did not engage in a lot

7  of naked strategies; that he was utilizing a lot of --

8  I'm sorry.  That he wanted to -- that he was not using a

9  lot of naked options -- naked strategies?

10  A.   That wouldn't be correct because if he did, we

11  wouldn't have sent in the form that he needed for naked

12  options.

13  Q.   Well, you sent him both forms, didn't you?

14  A.   At his request.  The only reason we sent that to him

15  was because he told me he wanted it because he traded

16  naked and uncovered options.

17  Q.   And he told you that he wasn't -- was not currently

18  engaged in -- not a lot of naked strategy?

19  A.   Dan told me that he was an aggressive options

20  investor and was doing naked as well as covered call

21  writing.  So he wanted the form for naked option trading

22  as well as covered option trading because the same

23  strategy employed both trades.

24  Q.   We will get to the actual trading in a little bit.

25  A.   Okay.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   But that's your testimony.

2         Did he also tell you that he was going to sue

3    Merrill Lynch?

4    A.   He wasn't happy with the way the relationship ended

5    because he thought they were making him close the

6    accounts at a bad time.

7    Q.   Did he tell you that he intended to sue Merrill

8    Lynch?

9    A.   He mentioned that, yes.

10   Q.   So if I understand, when you accepted Benistar as a

11   client, PaineWebber had told you -- Mr. Stern --

12   A.   Merrill Lynch.

13   Q.   I'm sorry.  Merrill Lynch.

14        -- that Merrill Lynch had told you that they were

15   less than thrilled with him as a client and Mr.

16   Carpenter -- and at the same time they told you that

17   they were hoping to get referrals from him, and Mr.

18   Carpenter had told you that Benistar intended to sue

19   Merrill Lynch; is that correct, sir?  Just yes or no?

20   A.   He did say that, yes.

21   Q.   And your testimony is that that didn't raise any red

22   flags or bells didn't go off as to "I'm taking on a

23   referral from my close friend at Merrill Lynch from

24   someone who's telling me they're planning on suing

25   Merrill Lynch"?  That didn't raise any red flags?

1  A.   At the time the way the conversation was relayed to

2  me and had -- there really wasn't any substance behind

3  it, and I would make -- it was only after the fact,

4  years later --

5  Q.   Is your answer no, that it didn't raise any red

6  flags?

7  A.   No.  I wasn't concerned because there wasn't any

8  real substance behind it.

9  Q.   Okay.  Isn't it, in fact, true that in October of

10  2000 when Benistar Properties became a client of

11  PaineWebber, that you were aware that Benistar

12  Properties engaged in 1031 exchanges as an intermediary?

13  A.   No.

14  Q.   And isn't it true that you knew that the monies that

15  were going to be going into the PaineWebber account

16  included monies from the 1031 exchange orders?

17  A.   Absolutely not.

18  Q.   What is the name -- the name of the client is

19  Benistar Property Exchange Trust Company; is that right?

20  A.   Inc.  Yes, that's correct.

21  Q.   And wouldn't you agree that a name of a company can

22  be a pretty good indicator of its business -- in other

23  words, Citizens Bank, a bank; Marriott hotels, a

24  hotel -- that a company that's known as "Benistar

25  Property Exchange Trust Company" is engaged in the

PDF created with pdfFactory trial version www.pdffactory.com

1   property exchange business?

2   A.    No.

3   Q.    No?

4   A.    No.

5   Q.    You knew the name of the company, right?  You knew

6   that in the name of your client it was going to have the

7   name "Property Exchange."

8   A.    I didn't know the name of the corporate accounts

9   that we were going to be opening up until I saw the

10  paperwork arrive from Merrill Lynch after we had already

11  agreed to open up three corporate accounts.

12  Q.    Sir, did you know the name of your client before

13  PaineWebber effectuated the first trade?

14  A.    Yes; that's correct.

15  Q.    Okay.  So before the first trade -- before you ever

16  took any of the money into the PaineWebber account, you

17  knew that the name of the client included the words

18  "property exchange" in the name?

19  A.    That's correct.

20  Q.    And your testimony is that that didn't raise any

21  suggestion in anyone at PaineWebber that maybe, maybe,

22  Benistar Property Exchange Trust Company, Inc., was

23  engaged in the property exchange business.  Is that your

24  testimony?

25  A.    If I may, up until --

1   Q.   No.  Is that correct?

2   A.   That's correct.  I didn't know what a property

3   exchange was until these proceedings started.

4   Q.   Is that your testimony, that no one at PaineWebber

5   knew what a property exchange company did?

6        MR. MITCHELL:  This goes beyond his personal

7   knowledge.

8        THE COURT:  Sustained.

9   BY MR. GREENBERG:

10  Q.   Well, before this account had to be opened, who had

11  to approve the opening of the Benistar Property Exchange

12  Trust Company account?

13  A.   The first step was my conversation with Dan, he

14  telling me that this was his money --

15  Q.   Just tell me who.

16  A.   I'm explaining.  I speak with a client, fill out

17  paperwork --

18  Q.   Mr. Rock, I understand.

19  A.   -- and then I hand it in to operations for approval,

20  and ultimately the manager signs the form.

21  Q.   Let's go through -- just tell the Court, if you

22  would, who has to approve it.  You have to approve it in

23  the first instance?

24  A.   Right.  I speak with the client.

25  Q.   And who's the next level of approval?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Then it goes to management for the sign-off.

2   Q.   Who is management; what's their position?

3   A.   Either the branch manager or the operations manager

4   signs off on the account.

5   Q.   So the branch manager and the operations manager?

6   A.   Either/or.

7   Q.   And what about for someone opening both an uncovered

8   and covered options account, doesn't that require

9   additional proof --

10  A.   There's a registered options principal and the

11  manager.  Sometimes it could be one and the same.  They

12  also sign off on it.

13  Q.   So that requires even additional approvals?

14  A.   Yes.

15  Q.   So would it be fair to say that at least two or

16  three approvals above you on the hierarchy were required

17  before the Benistar Property Exchange account was set

18  up?

19  A.   One person could have done all of the approving, but

20  definitely someone in addition to me.

21  Q.   Okay.  Now, you said yesterday that -- let me just,

22  so I don't -- the government asked you yesterday about

23  the Benistar Property -- the Benistar website.

24  A.   Correct.

25  Q.   Do you recall that testimony?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.    I do.

 2   Q.    And you said you were on the website probably 15

 3   seconds at most?

 4   A.    That's correct.

 5   Q.    And you said, "I visited the website just to confirm

 6   the address"?

 7   A.    That's correct.

 8   Q.    Okay.

 9         MR. GREENBERG:  Could we -- it's Exhibit --

10         A VOICE:  403.

11         MR. GREENBERG:  Thank you.  Could you put it up

12   on the monitor?  It's 403, the website.

13   BY MR. GREENBERG:

14   Q.    The website -- it's actually one page, but because

15   of the, I guess, restrictions of technology, we have a

16   two --

17         MR. GREENBERG:  Gerard, could you put the single

18   page -- the single-page home page?

19   BY MR. GREENBERG:

20   Q.    And you testified that you just looked at the home

21   page; is that right?  Is that right?  You were on it for

22   15 seconds at most.  Let's -- I don't know if I have a

23   clock.

24         MR. GREENBERG:  Gerard, can we just go through

25   this --
```

PDF created with pdfFactory trial version www.pdffactory.com

BY MR. GREENBERG:

Q.   First of all, we see it's Benistar's home page, and
we see there's a bunch of buttons.  I guess I'm not that
technologically savvy either, but you can scroll down
and hit certain subjects.  And if I see, the fifth
subject down says "1031 exchanges," and there's a
reference to Dan Carpenter, chairman.

     I'm just looking to see the -- could you just
find --

          MR. MITCHELL:  I don't know if there's a
question pending.

          THE WITNESS:  At the very top -- can I explain
why I went to the website?

          THE COURT:  No, hang on a minute.

          Mr. Greenberg, first of all, you have to do a
question rather than what -- a description of what the
exhibit is.

          MR. GREENBERG:  I'm sorry.

BY MR. GREENBERG:

Q.   Can you just show me the address?

A.   If you click the "Contact us" at the top and click
through the address -- the reason I went to the website,
Mr. Greenberg, was we had just transferred over --

Q.   Mr. Rock, I just asked you, could you just show
me --

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    "Contact us."

2    Q.    -- where the address was?

3    A.    Right at the top of the home page, click "Contact

4    us" and it brings you to the address.   And I noticed it

5    was a Connecticut firm and I left.

6    Q.    So you looked at more than just the home page?

7    A.    No.  Well, I --

8    Q.    My --

9    A.    My objective in going to the home page was not to

10   learn about Benistar, per se, but to confirm that I was

11   registered in the state that they do business in because

12   we just transferred all my licenses and registrations

13   over from Oppenheimer to PaineWebber, and if my

14   Connecticut license didn't apply, I wasn't sure it would

15   be --

16   Q.    Mr. Rock, did you look at more than just the home

17   page?

18   A.    Apparently I had to click through the "Contact us,"

19   but I'm not convinced sitting here today that back in

20   September of 2000 the web page looked like this, so I

21   can't say that.  I just know that I went to it for

22   purposes of finding out the address, I was satisfied

23   with my inquiry and I moved on.

24   Q.    Well, you have a recollection of clicking on at

25   least the "Contact us," right?  Is that your testimony,

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   you recall clicking --
 2   A.   As I see it today --
 3          THE REPORTER:  Wait.  I can only take one at a
 4   time.
 5          THE WITNESS:  The only thing that I --
 6          THE COURT:  Wait a minute.  Let's start again.
 7   BY MR. GREENBERG:
 8   Q.   Do you have a recollection, when you looked at the
 9   home page at the time Benistar Property Exchange became
10   a client, scrolling down and clicking onto additional
11   references on the home page?
12   A.   I don't recall how many times I clicked, but I do
13   recall typing in Benistar.com with the objective of
14   finding out where they were located, and then I left.  I
15   can't sit here today and tell you whether the address
16   was on the home page, if I clicked the "Contact us," but
17   I can tell you that the entire inquiry probably lasted
18   15 seconds, and that's a record that you can find
19   somewhere.
20          MR. GREENBERG:  Can we look at the home page --
21   BY MR. GREENBERG:
22   Q.   Actually, you saw the 1031 reference, right?
23   A.   I see it as you show it to me today.
24   Q.   And on the --
25          MR. GREENBERG:  If we could look, Gerard, at the
```

1    last paragraph of the first page of the home page.

2    BY MR. GREENBERG:

3    Q.   You see it says "Nationwide Property Exchange was

4    founded by Martin Paley and grew into the Boston area's

5    leading 1031 qualified intermediary"?

6    A.   I see that now but -- I didn't know what a property

7    exchange -- a 1031 exchange -- what any of this was, who

8    Martin Paley was -- until these proceedings started.  I

9    never heard of a property exchange until this started.

10   Q.   Okay.  But you do recall this being the home page --

11   A.   Yes.

12   Q.   Okay.

13        -- of the website.  Okay.

14        MR. MITCHELL:  Your Honor, I just want to object

15   because -- to the vagueness of that question.  There's a

16   date at the bottom of this exhibit.  It says January of

17   2001.  So he's referring to a website but he's referring

18   to -- you can read the exhibit.  When he's referring to

19   the site, he's talking about something different from

20   what the witness is talking about.

21        THE COURT:  Perhaps.  The exhibit is what it is.

22        MR. GREENBERG:  Thank you, your Honor.

23        Now, could we put up Exhibit 164?  164A, please.

24   BY MR. GREENBERG:

25   Q.   This was one of the documents yesterday that -- one

1    of the account-opening documents.  First of all, I want

2    to clear up a couple of things.  This is either all of

3    your -- except for the signature, this is either all of

4    your handwriting or the handwriting of your assistants;

5    is that right?

6    A.   That's correct.

7    Q.   So to the best of your knowledge, nothing on this

8    page is -- that's --

9         MR. GREENBERG:  Could you highlight the part

10   that's underscored, the top line?

11   BY MR. GREENBERG:

12   Q.   Can you read that?

13   A.   "For trust accounts only:  Is there more than one

14   trustee for this account?"

15   Q.   Okay.  So this is a form that is to be filled out

16   when the client, Merrill Lynch -- I'm sorry --

17   PaineWebber's client -- is a trust; isn't that right?

18   That's when that line is to be completed, if the client

19   is a trust, correct?

20   A.   That box was checked incorrectly.

21   Q.   Mr. Rock, could you just -- isn't it true that that

22   line is to be completed only when the Merrill Lynch --

23   I'm sorry -- the PaineWebber client is a trust

24   company -- or is a trust, right?

25   A.   That is correct.

```
 1   Q.   Okay.  And what -- whoever is filling it out is to

 2   indicate if there's more than one trustee.  And if

 3   there's more than one trustee, you're supposed to check

 4   "yes," and if there's only one trustee, you check "no,"

 5   right?  Is that right?

 6   A.   Well, that line doesn't really apply.  We were new

 7   to the firm -- we had only been to the firm a month at

 8   the time -- and she filled out the paperwork wrong.

 9   Q.   Mr. Rock, could you answer my question?  This line

10   is only to be completed --

11   A.   That line shouldn't have been completed.

12   Q.   That line --

13   A.   Yeah.

14   Q.   Mr. Rock, if a client is a trust company, it was

15   PaineWebber's procedure that you would then complete

16   that line.  You would check "yes" or "no" whether or not

17   there's one trustee or not; is that right?

18   A.   That's wrong.

19   Q.   Now, either you or your assistant checked that box,

20   right?

21   A.   Wrong.  Well, I don't know who checked that box, but

22   it shouldn't have been checked.

23   Q.   Well, are you suggesting that maybe Mr. Carpenter

24   checked that box to make sure that you knew it was a

25   trust company?
```

1   A.   No.  I think that my assistant, who was only at the

2   firm a month at the time, said this isn't a trust,

3   checked "no," and it was filled out too quickly.

4   Because if it was a trust there would have been a

5   trustee certification form, there would have been a

6   whole other set of documentation.  And all of the

7   paperwork -- there is corporate paperwork.

8   Q.   Mr. Rock, could we go to the next -- actually, 164B.

9   Mr. Rock, 164B.  Another document that you were asked

10   about yesterday in connection with the account which

11   you -- and if we could look again, this is a document

12   again -- could we agree that all of the writing on this

13   document, this account-opening form, is either in your

14   handwriting or the assistant -- your assistant's, except

15   for the signature line?

16   A.   That's correct.

17   Q.   And, again, it says "For trust accounts only," and

18   the same question, you know, "Is there more than one

19   trustee or not?"  And again, it's checked off "no"; is

20   that right?

21   A.   That's correct.

22   Q.   Okay.  And I just want to be sure.  These

23   documents -- because I do understand you were only there

24   for a month -- and let's assume that your assistant was

25   only there for a month -- but I think you talked about a

PDF created with pdfFactory trial version www.pdffactory.com

1    process that these accounts have to go through before

2    they're opened, right?

3    A.    Correct.

4    Q.    And you put together paperwork, or it gets inputted

5    into some computer, and somewhere along the line someone

6    other than you or your assistant either reviews this

7    application or the information that's in the

8    application, right?

9    A.    Correct.

10   Q.    Okay.  And the people before that, you said, you

11   know, that had to approve the account opening, you said

12   it was the manager.  Who's the manager at the office?

13   A.    The next step in the process, Mr. Greenberg, is we

14   take this form --

15   Q.    Yeah.  And you give it to who?

16   A.    -- along with the supporting documentation and bring

17   it to management.

18   Q.    And management looks at it?

19   A.    And part of their review process, when they look at

20   the document --

21   Q.    Just bear with me.  Try to answer your question.

22          MR. MITCHELL:  Your Honor, he's cutting off the

23   witness.

24          THE COURT:  I think the witness was straying

25   from the question.

PDF created with pdfFactory trial version www.pdffactory.com

1          Go ahead, direct him to another question.

2          THE WITNESS:  If you --

3     BY MR. GREENBERG:

4     Q.   No.  Could you just answer the questions?

5     A.   You asked the process; I was going to tell you.

6     Q.   Mr. Rock, just identify the position of the

7     person -- just the position of the person -- that gets

8     these documents as part of the approval process.

9     A.   Either the branch manager or the operations manager.

10    Q.   Okay.  And they -- that person then -- who was that

11    person at the time?

12    A.   Either Lori Enright or Steven Feit.

13    Q.   Had they been at PaineWebber for more than a month?

14    A.   Yes; that's correct.

15    Q.   And, again, the line in 164B about trust accounts,

16    that box is only to be checked if the PaineWebber client

17    is holding money in an account in trust for others; is

18    that right?  Just yes or no?

19    A.   That line did not apply --

20    Q.   Just yes or no:  Is it correct that that line is

21    only to be completed if the PaineWebber client is

22    holding money in trust for others?

23    A.   No.

24          THE WITNESS:  Now, could I answer the question I

25    wasn't able to answer before, your Honor?

```
 1              THE COURT:  No, wait for the next question.
 2              THE WITNESS:  Okay.
 3   BY MR. GREENBERG:
 4   Q.   Now, after the account was opened and there was
 5   money in the account, or assets in the account, in
 6   October, November and December there were disbursements,
 7   wires of money that came out of that account and went to
 8   third persons, right?
 9   A.   Yes.
10   Q.   Okay.  Now, I just want to -- before we look at the
11   wires I want to go through the process, and let me ask
12   you -- first of all, let me show you Exhibit 256.  I'm
13   not sure if it's in evidence, but let me show you
14   Exhibit 256.
15              MR. GREENBERG:  Can I approach the witness, your
16   Honor?
17              THE COURT:  You may.
18   BY MR. GREENBERG:
19   Q.   It's a two-page document.  And just tell me if you
20   could identify that, those two pages.  The first page --
21   A.   Yes.  This is our cover -- this is our fax cover
22   page.
23   Q.   Yup?
24   A.   And these are the wire transfer instructions that we
25   sent the client.
```

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   You sent the client?

2   A.   That we sent the client.

3        MR. GREENBERG:  All right.  I would ask that

4   this be introduced as the next exhibit as Defendant's

5   256.

6        MR. MITCHELL:  May I just have a second to look

7   at it, your Honor?

8        MR. GREENBERG:  Sure.

9        MR. MITCHELL:  No objection.

10       (Exhibit No. 256 received into evidence.)

11       MR. GREENBERG:  Okay.  Let's put it up on the

12  screen and just -- actually, you could put it up.  I

13  just want to --

14  BY MR. GREENBERG:

15  Q.   So the process is -- and this is something that you

16  sent to Jackie -- this is at Benistar -- Jackie

17  Spielman?

18  A.   Correct.

19  Q.   And you sent this on September -- I'm sorry.

20  October 17, 2000?

21  A.   Correct.  Correct.

22  Q.   And then the next page.  Okay.  Do you see these are

23  wire transfer instructions?  This is what you sent

24  Benistar, actually, before the first trade, right?

25  A.   Correct.

1  Q.   And this is the instructions, and it's to be

2  completed by Benistar and it's supposed to identify

3  something called "client" --

4       Do you see that?

5  A.   Correct.

6  Q.   -- on what you sent them.

7       And there's the amount of the wire; is that right?

8  A.   Correct.

9  Q.   And then they're supposed to do the account name?

10 A.   Correct.

11 Q.   That means -- that's Benistar's account -- Benistar

12 Property Exchange.  And this is the account number.

13      I just want to be -- let me clear up one thing:  You

14 mentioned there were two accounts?

15 A.   Correct.

16 Q.   But for PaineWebber -- I'm sorry.  For PaineWebber

17 purposes it was treated as one, right?

18 A.   Well, for margin purposes, cross-collateralization

19 purposes, the 33 account was the trading account and the

20 34 account was the cash account.

21 Q.   I don't want to belabor.  Is it just correct for

22 PaineWebber purposes they were treated as one account?

23 A.   For purposes of margin.  But they were two separate

24 account numbers, yes.  It's the same name.  One account

25 had -- one name had two accounts.

1    Q.    They were linked, right?

2    A.    We were authorized to move money back and forth

3    between them.

4    Q.    Okay.  I mean, let me just show you something that's

5    from back in 2001 and whether or not -- PaineWebber

6    considered these the same accounts because they had the

7    same title.  Isn't that what you said?

8    A.    Yes.

9    Q.    Okay.  Okay.  So let's look at the procedure -- I'm

10   sorry.  So this gets filled out, and they have to

11   identify the date; the client name; the amount of the

12   wire; where's the wire supposed to go to, in other

13   words, the bank; and who the receiving bank should

14   credit, right?

15   A.    Correct.

16   Q.    So in other words, if I'm wiring money to you I'm

17   going to identify, you know, your bank, and to credit it

18   to your account, right?

19   A.    Can I see the cover page to this for one second?

20   Q.    We'll keep going.  We've already identified it.

21   A.    Okay.

22   Q.    Let me just go through the process.

23         So you would get a fax from the client, right?  Is

24   that -- let's start with that.  You would get the fax

25   and then you'd give it to your assistant; is that right?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   The fax would go directly to her; I never saw them.

2   Q.   All right.  Well, let's see if I can't refresh your

3   recollection.  Isn't it correct that typically you would

4   take the fax, and you would give it to your assistant

5   after you got it?

6   A.   The fax machine was located right between us.  If I

7   had saw it, I would hand it to one of the people in my

8   group; if they got it, they would run with it.

9   Q.   Let me ask you:  You were deposed on multiple

10  occasions in 2001?

11  A.   Yeah.

12  Q.   And on April 6, 2001, you were -- on page 346 and

13  347 -- you were asked about the procedure for wire

14  transfers.  And isn't it correct that, you know,

15  typically you would take the fax and you would give it

16  to Janine, your assistant?  Isn't that what you did?

17  Typically, again.  I'm not saying all the time.  But

18  typically you would get the fax and you would give it to

19  your assistant?

20  A.   That's what I said.

21  Q.   Okay.  And then your assistant would -- thank you.

22       Your assistant would then complete the paperwork,

23  right?

24  A.   Correct.

25  Q.   And just so we all understand, what is the paperwork

PDF created with pdfFactory trial version www.pdffactory.com

1   after you've gotten these completed instructions from
2   the client?  What is the paperwork?
3   A.   I'm not familiar with the procedure as far as wiring
4   money, but she would fill out the internal paperwork and
5   send it to treasury operations, and we would wire out
6   the money.
7   Q.   Okay.  So you get it, you give it to your assistant,
8   she does some paperwork, and then you say it's taken to
9   operations.  What is operations?
10  A.   It goes to treasury operations.  It goes to the
11  corporate -- PaineWebber's bank sends it to our back
12  office, and it goes through a series of approval steps
13  and the money gets wired out.
14  Q.   When you say "approval steps," what does that
15  consist of?  Does someone look at these documents?
16  A.   Make sure the money is available to be sent.
17  Sometimes trades haven't settled; sometimes it's
18  invested, there's not available cash.  So the treasury
19  department's role is to make sure the money is available
20  and that -- and then they send it out.
21  Q.   So there's another review of these documents; is
22  that right?
23  A.   Other people see it, yes.
24  Q.   Okay.  And then if the wire's above a certain
25  amount, doesn't it require additional levels of

PDF created with pdfFactory trial version www.pdffactory.com

1    approval?

2    A.   I believe so, but I'm not familiar with the process.

3    I know that there was -- there was a threshold at which

4    we needed a letter in writing.  There was a threshold at

5    times where a call needed to be made just to verify that

6    the client, in fact, wanted the money sent out.

7    Q.   You would agree, though, that at least a couple --

8    multiple people at PaineWebber would have to review and

9    approve a wire instruction -- this request for a wire

10   before actually PaineWebber would wire out the money?

11   A.   Yes.

12   Q.   Okay.  Now, let's look at some of these wire

13   requests.  It's 250 -- I'm sorry.  169.  Government's

14   Exhibit 169.  Would you look at it on the screen?  I've

15   highlighted -- this is a wire request to someone

16   named -- do you see this is from Benistar?  Do you see

17   that, sir?

18   A.   Yes, I do.

19        MR. GREENBERG:  Actually, can we just -- Gerard,

20   I'm sorry.  Can we just blow up where it identifies the

21   date and the client?

22   BY MR. GREENBERG:

23   Q.   And this is back in October 25, 2000, do you see?

24   And that's identified a client by the name of Gelber?

25   A.   I see that.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.    Okay.  And it's in the amount of $10,000?

2   A.    Yes.

3   Q.    And it says it's from -- it says from Benistar

4   Property Exchange Trust, and the wire's to go to

5   Citizens Bank, and for further credit to Bernard

6   Gelber's account; do you see that?

7   A.    I do see that.

8         MR. GREENBERG:  Thank you, Gerard.

9   BY MR. GREENBERG:

10  Q.    And the handwritten portions -- other than Mr.

11  Carpenter's signature -- that's all your assistant's,

12  right?

13  A.    Correct.

14  Q.    So she looked at it sufficiently --

15        MR. GREENBERG:  Could you just put it back on?

16  BY MR. GREENBERG:

17  Q.    -- and she wrote, "Please waive fee," the wire

18  number.  That is all her handwriting; is that right?

19  A.    That's correct.

20  Q.    Okay.  Then let's go through these.  The next

21  page -- these are government exhibits -- what's the date

22  of this wire?

23        MR. GREENBERG:  Gerard, if you could.

24        THE WITNESS:  October 30th.

25  BY MR. GREENBERG:

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    The client is identified as who?

2    A.    It says Langley Union.

3    Q.    And this is a wire of how much money?  $795,977 and

4    some change?

5    A.    That's correct.

6    Q.    And this is to go to -- credit to First American

7    Title Company?

8    A.    Correct.

9    Q.    Okay.  And the handwriting, again, that's your

10   assistant's, right?

11   A.    Yes.

12   Q.    Okay.

13         MR. GREENBERG:  If we could go to the next one,

14   please.

15   BY MR. GREENBERG:

16   Q.   This is early November -- this is November what?  I

17   can't read my --

18   A.    November 1.

19   Q.    November 1st.  And this is -- again, Mr. Gelber is

20   identified as the client.  And would you just --

21         MR. GREENBERG:  If you could scroll down a bit,

22   Gerard.

23   BY MR. GREENBERG:

24   Q.   And that's for $35,000, and it's to credit to

25   Perkins Real Estate Trust Account?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   That's correct.

2  Q.   And the handwriting, "Please waive fee," that's your

3  assistant's, right?

4  A.   Yes, it is.

5       MR. GREENBERG:   Okay.   Could we go to the next

6  one, please?

7  BY MR. GREENBERG:

8  Q.   The date of that is November 8; is that right?

9  A.   Yes.

10  Q.   And the client is -- can you just read that for me,

11  please, the client that's identified in that?

12  A.   The client is Alexander Arigiros.

13  Q.   A-R-G-I- -- either A-R-I-G-R-I-R-O-S or

14  A-R-I-G-I-R-O-S.   And that's to go to Sovereign Bank and

15  for credit to an IOLTA account.   Is that an attorney

16  trust fund account?

17  A.   I don't know what an IOLTA account is.

18  Q.   Okay.   But it's identified as a company, and then it

19  says "IOLTA account."   And the handwriting on that page

20  is your assistant's; is that right?

21  A.   That's right.

22       MR. GREENBERG:   If you could go to the next one

23  chronologically.

24  BY MR. GREENBERG:

25  Q.   These are all wires that were processed by

PDF created with pdfFactory trial version www.pdffactory.com

1    PaineWebber?

2    A.    That's correct.

3    Q.    And the date on this wire transfer request is

4    November 15th.  And the client, Benistar's client, is

5    identified as who?

6    A.    It says Margaret Shapiro.

7    Q.    Okay.  And the wire's for how much money?

8    A.    $330,761.03.

9    Q.    And this is to credit -- what's the name of the

10   account that it's to be credited to?

11   A.    Michael Dym IOLA *[sic]* account.

12   Q.    And the handwriting, again, is your assistant's?

13   A.    Correct.

14           MR. GREENBERG:  Could we go to the next one,

15   please?

16   BY MR. GREENBERG:

17   Q.    And the date of this?

18   A.    November 17th.

19   Q.    And who is the client of Benistar's that's

20   identified on this document?

21   A.    Richard Schireurer.

22   Q.    And how much is the amount of the requested wire?

23   A.    40,720.09.

24   Q.    And who is this wire to be credited to?

25   A.    Alexander & Femino client's -- Alexander & Femino

PDF created with pdfFactory trial version www.pdffactory.com

1  client's account.

2  Q.   Thank you.  And the handwriting on this is -- that's

3  also your assistant's, is it?

4  A.   Yes, it is.

5  Q.   Excuse me.  Could you identify -- the date of this

6  wire request from Benistar is what?

7  A.   November 20th.

8  Q.   And who is the Benistar client identified on this

9  account?

10  A.   Johnson.

11  Q.   Johnson?  Would that be Jeffrey Johnson?  You don't

12  know?

13  A.   I don't know.

14  Q.   And let me -- is the wire -- the amount of wire

15  that's requested is how much?

16  A.   $216,345.54.

17  Q.   And who was the wire to be sent to, or credited to

18  what account?

19  A.   For further credit to Robert Flynn, attorney at law,

20  IOLTA account.

21  Q.   And the handwriting, is that -- do you know if that

22  handwriting was -- the "5912" is your assistant's?

23  A.   Yes, it is.

24  Q.   And the date of this wire was what, sir?  Wire

25  request?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    November 27th.

2    Q.    Okay.  And who is the Benistar client that's

3    identified on this account?

4    A.    It says Gelber 2.

5    Q.    And the amount of this wire is how much?

6    A.    7,500.

7    Q.    And who is it to be credited to?

8    A.    Bernard S. Gelber.

9    Q.    And the handwriting on this account -- on this

10   request, other than Mr. Carpenter's signature, is your

11   assistant's; is that right?

12   A.    That's correct.

13            MR. GREENBERG:  Can we go to the next one?

14   BY MR. GREENBERG:

15   Q.    The next date is -- what's the next date, sir?

16   A.    November 27th.

17   Q.    And this is also Gelber again?

18   A.    Yes; Gelber 2.

19   Q.    And the handwriting is your assistant's; is that

20   right?

21   A.    That's correct.

22            MR. GREENBERG:  Let's move on to the next one,

23   please.

24   BY MR. GREENBERG:

25   Q.    The date of this is December 1st -- is that right?

1    A.    That's correct.

2    Q.    -- 2000.

3          And Benistar's client on this request is who?

4    A.    Gangemi.

5    Q.    That's Benistar's client as identified --

6    A.    It says "Client:  Gangemi."

7    Q.    And the wire request is how much?

8    A.    $800,663.52.

9    Q.    And it was to go to who -- to credit to --

10   A.    To further credit Patricia Heelen, Specific Fidelity

11   account number.

12   Q.    And the handwriting, is that of your assistant's,

13   other than Mr. Carpenter's signature?

14   A.    Yes.

15         MR. GREENBERG:  Okay.  Could you move to the

16   next wire transfer for Benistar.

17   BY MR. GREENBERG:

18   Q.    The next one is December 6, 2000; is that right?

19   A.    That's correct.

20   Q.    And Benistar's client is identified as someone by

21   the name of Iantosca?

22   A.    Correct.

23   Q.    And the amount of wire requested is how much?

24   A.    564,361.05.

25   Q.    $564,000?

1    A.    Correct.

2    Q.    And it was to be credited to Robinson & Cole IOLTA

3    account?

4    A.    Correct.

5    Q.    And the handwriting on this request is -- other than

6    Mr. Carpenter's signature, is that of your assistant's?

7    A.    Yes, it is.

8            MR. GREENBERG:    We'll go to the next one,

9    please.

10   BY MR. GREENBERG:

11   Q.    The next one is also -- is dated December 6th, also.

12   The client is Iantosca, 261-265 Hayward.  Do you see

13   that?

14   A.    I do.

15   Q.    And the amount of the wire request is how much?

16   A.    564,785.95.

17   Q.    And who is the money to be credited to?

18   A.    Robinson & Cole IOLTA account.

19   Q.    And the handwriting on this request, other than Mr.

20   Carpenter's signature, is that of your assistant's; is

21   that right?

22   A.    Yes, it is.

23   Q.    Is that right?

24   A.    Yes, it is.

25   Q.    All right.  I'm sorry.

```
 1              MR. GREENBERG:  Could you move on, Gerard.
 2    BY MR. GREENBERG:
 3    Q.   The next one is also December 6, 2000, the request.
 4    And who's the Benistar client indicated?
 5    A.   It says Faxon Heights.
 6    Q.   And what is the amount of the wire requested?
 7    A.   $2 million.
 8    Q.   And who is the -- who is the wire to be credited to?
 9    A.   Robinson & Cole IOLTA account.
10    Q.   And whose handwriting is on that?
11    A.   My assistant's.
12    Q.   And the next date is also November -- I'm sorry,
13    December 6, 2000?
14    A.   Yes, it is.
15    Q.   And who is the client identified?
16    A.   It says "Firm:  25 Morton."
17    Q.   And the amount of the wire?
18    A.   1,175,638.95.
19    Q.   And who is it to be credited to?
20    A.   Robinson & Cole IOLTA account.
21    Q.   And the handwriting on this, other than Mr.
22    Carpenter's signature, is that of your assistant's?
23    A.   That's correct.
24              MR. GREENBERG:  Could we move on to the next
25    one.
```

```
1   BY MR. GREENBERG:

2   Q.   The date of the next wire transfer request is

3   December -- I'm sorry -- is that 7th, 2000?

4   A.   Yes.

5   Q.   And who is the client, the Benistar client,

6   evidenced on this document?

7   A.   It says Gelber 2.

8   Q.   And what's the amount of the requested wire?

9   A.   $10,000.

10  Q.   And who's it to be credited to?

11  A.   Bernard S. Gelber.

12  Q.   And is the handwriting on this request that of your

13  assistant's, other than Mr. Carpenter's signature?

14  A.   I can't see the bottom, but I would say yes.  Yeah.

15  Q.   Is it?

16  A.   Yes.

17  Q.   Thank you, sir.

18         MR. GREENBERG:   The next one, please.

19  BY MR. GREENBERG:

20  Q.   The next wire request is December 7, 2000; is that

21  right?

22  A.   That's correct.

23  Q.   And who is the Benistar client identified on this

24  request?

25  A.   It says "Client:  Stephen Brown."
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And what is the requested amount of the wire?

2    A.    $25,000.

3    Q.    And who is it to be credited to?

4    A.    Deborah A.S. Brown and Michael S. Brown.

5    Q.    And is the handwriting, other than Mr. Carpenter's

6    signature, that of your assistant's?

7    A.    That's correct.

8              MR. GREENBERG:    The next one, please.

9    BY MR. GREENBERG:

10   Q.    The next one is dated December 8, 2000; do you see

11   that?

12   A.    I do.

13   Q.    And who is the Benistar client identified on that

14   document?

15   A.    It says "Client:  Eliot Snider."

16   Q.    And what is the amount of the requested wire?

17   A.    $50,000.

18   Q.    And who is it to be credited to?

19   A.    Holland, Donovan, Beckett & Hermann client account.

20   Q.    And is the handwriting, other than Mr. Carpenter's

21   signature, that of your assistant's?

22   A.    Yes.

23             MR. GREENBERG:    The next one, please.

24   BY MR. GREENBERG:

25   Q.    January 5, 2001.  Who is the client identified?

1    A.    It says "Client:   Iantosca."

2    Q.    And what is the amount?

3    A.    $2,688,385.84.

4    Q.    And what is the credit -- who is it to be credited

5    to?

6    A.    It's to be credited to First American Title

7    Insurance escrow account, attention Karen Bullard

8    Ciacera.

9    Q.    Thank you.

10          MR. GREENBERG:   You can take that down.   Thank

11   you.

12   BY MR. GREENBERG:

13   Q.    Thank you, Mr. Rock.   Yesterday -- I want to move

14   on.

15       Yesterday you testified that when the account came

16   over from Merrill Lynch, they sent you, I think you

17   said, like 86 pages of client history?

18   A.    I don't think we talked about the quantity of pages,

19   but they said it was too many to fax, so they asked if

20   they could send it via overnight courier, so they did.

21          MR. GREENBERG:   Can I put up on the screen?   I

22   think it's Government Exhibit 148.   Would you put up the

23   first page of that?   It's 148A.   I'm sorry.

24          Gerard, could you...

25   BY MR. GREENBERG:

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Now, this is a government exhibit.  It's a Merrill

2  Lynch account statement as of -- actually, let -- as of

3  September 29, 2000; do you see that?

4  A.   I do.

5  Q.   Okay.  And do you see there's a line that says

6  "equities" -- I'm sorry.  This is the -- do you see the

7  line "equities"?  I circled it in my -- and there's also

8  a line for "options."  Do you see that?

9  A.   I do.

10  Q.   Okay.  And beside the word "equities," is the --

11  there's a valuation of equities as of August 31, 2000,

12  of $12,422,350, and the number to the right of it is

13  $11,935,000; do you see that?

14  A.   Correct.  I do.

15  Q.   And then underneath there's a reference to valuation

16  of options; do you see that?

17  A.   Yes, I do.

18           MR. GREENBERG:  Could we go to page -- actually,

19  scroll down, Gerard.  Just -- I want to make sure --

20  BY MR. GREENBERG:

21  Q.   And this is the right account.  This is the -- what

22  we're going to refer to as the B10 account at Merrill

23  Lynch.  That's the account number?

24  A.   That's what it says; that's correct.

25  Q.   And is that one of the accounts that was transferred

1  over?

2  A.  Yes.

3  Q.  Okay.  Sure.

4       MR. GREENBERG:  Can we just move to page 8 of

5  Government's Exhibit 148A?

6  BY MR. GREENBERG:

7  Q.  And this just -- this is a list -- do you see there

8  is a list of -- there's a list that says "quantity" -- a

9  list, I think a total of -- on this page -- of 46,000,

10  under "quantity," 46,000 shares; do you see that?

11  A.  I do.

12  Q.  And the name of the security, there's a company

13  known as Broadcom?

14  A.  Yes.

15  Q.  And then there's a column that says "Date acquired,"

16  and it looks like the dates are February 23rd, and then

17  it says, under this, June 19th; do you see that?

18  A.  Yes.  And the "N/A" stands for "not available."

19  Q.  And could you move -- okay.

20       Now, I think you said that -- you said that Mr.

21  Carpenter --

22       MR. GREENBERG:  That can go off the screen.

23  BY MR. GREENBERG:

24  Q.  Mr. Carpenter told you that he -- when the accounts

25  first came over -- that he planned to sue Merrill Lynch,

1    right?

2    A.   Yes.

3    Q.   Now, you testified about -- I think you testified

4    that during the period of time that Mr. Carpenter was

5    investing with PaineWebber he, on occasion, would ask

6    you for -- or run ideas by you; is that a fair

7    statement?

8    A.   There were two occasions, possibly three, where in

9    the middle of the day he asked me for some advice, and

10   he asked me for an opinion on some strategy he was

11   considering, and I told him I would look into it and let

12   him know what I thought.

13   Q.   Okay.  And, I mean, this related to strategies

14   that -- I mean, Mr. Carpenter had a consistent strategy

15   that he employed most of the time; is that right?

16   A.   No.

17   Q.   No?  Okay.  I thought -- sir, to the extent you

18   intended -- strike that.

19        Let me show you the Defendant's Exhibit --

20            MR. GREENBERG:  Actually, 362.  Thank you.

21            May I approach the witness, your Honor?

22            THE COURT:  You may.

23   BY MR. GREENBERG:

24   Q.   362 is a number of pages.  Can you just identify

25   what they are first, and then we'll try to go through

PDF created with pdfFactory trial version www.pdffactory.com

1    them?

2    A.   These are e-mails that I sent to Dan one evening.

3    Q.   I'm sorry?

4    A.   These were e-mails that I sent to Dan.

5    Q.   Okay.

6         MR. GREENBERG:  I would ask that they be

7    introduced as the next.

8         MR. MITCHELL:  No objection.

9         THE COURT:  Okay.  362.

10        (Exhibit No. 362 received into evidence.)

11        MR. GREENBERG:  Let's, if we could, put on the

12   screen 362.

13   BY MR. GREENBERG:

14   Q.   And this is an e-mail that you sent to Mr. Carpenter

15   on October 31st, is that right, 2000?

16   A.   That's right.

17   Q.   And you write, "This is the one I like the most.  We

18   are on the right track.  I would suggest the following."

19   Do you see that?

20   A.   Yes.

21   Q.   And then you give -- you make a suggestion.  And

22   then you say, "Position is free.  Max exposure to stock

23   is 20 points.  Worst case is you get" -- "put the stock

24   at 70 and begin to sell calls against it.  Best case is

25   stock gets called away in December at 95.  Profit is 30

1  points on no money down."

2      Can you just explain to a layperson what it is --

3  the strategy you and Mr. Carpenter are referring to in

4  this e-mail?

5  A.   Sure.  The name of the stock was Sycamore.  And Dan

6  had spoken with me in the middle of the day --

7  Q.   Just, what's the strategy?  I just want to know the

8  strategy.  What does this signify?

9  A.   This is consistent with the strategy -- one of the

10  strategies Dan was employing at the time --

11  Q.   Can you just --

12  A.   And he called me up in the afternoon and said, "I

13  want to sell puts."  "I want to use the proceeds to buy

14  calls."  "I'd like to do it without a capital outlay."

15  "These are the strike prices I'm considering, what do

16  you think?"  And because it was the middle of the day

17  and this required some thought I said to Dan, "Let me do

18  it after the close -- I'll run through the numbers --

19  tell me what you're considering again, and I'll let you

20  know what the upside, downside of what you're

21  considering is."

22      So based upon the closing prices that evening I

23  filled in the blanks on all the strategies we talked

24  about and relayed to him that if he was looking to not

25  put any money into the investment, this is the result

PDF created with pdfFactory trial version www.pdffactory.com

1   based upon the closing prices and what it would cost
2   him.  He also asked me to tell him what the maximum gain
3   could be and what the maximum exposure could be.
4   Q.   And this is -- what you set forth is a strategy that
5   to some degree captured gain and hedges your loss; is
6   that right?
7   A.   No.
8   Q.   No?
9   A.   No.
10  Q.   Okay.  You say here that "the maximum exposure to
11  the stock is 20 points under what you're proposing"; is
12  that right?
13  A.   Correct.  Correct.
14  Q.   And so -- again, I don't need to get into -- we
15  don't need to get into what you are proposing, but you
16  and he are proposing a strategy that -- the stock was
17  selling for how much?
18  A.   I don't recall where Sycamore was at the time, but I
19  would -- I can't make a guess.  I don't know.
20  Q.   Was it more than 20?
21  A.   Yeah.  I would -- I would probably say that it was
22  somewhere between 55 and 95 on this date.
23  Q.   55 to $95.
24       And your strategy under this -- what you were
25  discussing with Mr. Carpenter -- was a strategy where

PDF created with pdfFactory trial version www.pdffactory.com

1    the maximum loss would be $20, right?  Is that what you

2    mean, "maximum exposure to stock is 20 points"?

3    A.   Was Dan's strategy.  And this is my summary of his

4    proposal.

5    Q.   Okay.

6    A.   Yeah.

7    Q.   So I just want to be clear.  When you were talking

8    about strategies and if it were employed, if a stock was

9    selling -- you said Sycamore was somewhere between, I'm

10   sorry, 50 to 75, that this strategy, the maximum

11   exposure would be 20.  And what would the ultimate

12   upside be?  You said profit is -- "best case is stock

13   gets called away in December, profit is $30 per share on

14   no money down"?

15   A.   Thirty-five.  Right.  The maximum gain on this,

16   within lay terms, would be -- if you look at where it

17   says "on the calls," you're buying their right to buy

18   the stock at 60 and you're selling the right to someone

19   else to buy it at 95.  So the difference between 60 and

20   95 is profit on the trade, and that's the maximum.

21   Q.   So your upside is 35 and your downside is one?

22   A.   Correct.

23   Q.   Your downside isn't 60 or 95, it's --

24   A.   This particular trade is --

25   Q.   I appreciate that.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. GREENBERG:  Can we go to the next --

2    actually, another e-mail, same day, "To summarize our

3    position."

4    BY MR. GREENBERG:

5    Q.   Again, this is -- you're discussing with him another

6    strategy where you say "I would" -- you say "I would

7    sell 10 of the November 300 puts and sell 200 of the

8    November 340 calls at two and a half.  This position is

9    prime to make money all the way around between 300 and

10   350.  I would let it develop over the next two weeks."

11   That's what you wrote, right?

12   A.   This was -- this is --

13   Q.   Is that what you wrote?

14   A.   Yeah.  Yeah.

15   Q.   And you wrote this e-mail in response to -- I think

16   you said before you had a discussion with Mr. Carpenter

17   during the day; is that right?

18   A.   No.  What happened was, Dan had called me during the

19   day --

20   Q.   Fine.

21   A.   -- and he asked how many calls or puts he could

22   sell.  And my focus at that point, because of the --

23   Q.   I'm not asking you about your focus.  I'm asking you

24   what --

25   A.   I told him, in our conversation, that if he wanted

PDF created with pdfFactory trial version www.pdffactory.com

1   to still have directional exposure to the stock, but not

2   expose the accounts to the amount of principal risk that

3   he had been doing, I said, "You don't want to get out of

4   balance."  So he said to me, "Tally up the position and

5   let me know how many" --

6   Q.   And that's what you said in response?

7   A.   Right.  So this is my answer to his inquiry; yes.

8        MR. GREENBERG:  Could we go to the next --

9   BY MR. GREENBERG:

10  Q.   This is also the same day, you talk about -- you

11  suggest doing nothing, and yet the stock -- what stock

12  is this you're talking about, October 31, 7:22?

13  A.   That says Broadcom.

14  Q.   I'm sorry.  The next page.

15  A.   That's Juniper.  JNPR is the ticket symbol for

16  Juniper.

17  Q.   So on Juniper you were saying, "I would suggest

18  doing nothing until the stock retraces to 150"?

19  A.   Right.  He asked me A, B or C or nothing, and I said

20  neither.

21  Q.   Is that what you were saying, you would suggest

22  doing nothing until stock retraces?

23  A.   Right.

24  Q.   What does "retrace" mean?

25  A.   Go down.  It was my attempt to tell him not to do

1    what he was doing.

2    Q.   You were giving advice; you were trying to convey

3    your thoughts to him?

4    A.   He asked me A, B or C or nothing, and I was probably

5    concurring with the "nothing."

6    Q.   And did --

7         MR. GREENBERG:  If we could just go back one

8    page, the one on Broadcom.

9    BY MR. GREENBERG:

10   Q.   You said -- this was your idea on Broadcom, sell 80

11   of the November 240 puts for 27 and buy 80 of the

12   November 200 calls for 30?

13   A.   That was actually Dan's idea on Broadcom, and I

14   was --

15   Q.   This says, "I would sell 80 of the November 240 puts

16   for 27 and buy 80 of the November 200 calls for 30."

17   Isn't that what you wrote?

18   A.   Yes.

19   Q.   "If you get put the stock, you will sell calls

20   against it for a three investment."  What does that

21   mean, "three investment"?

22   A.   $3 investment.

23   Q.   "And you can make participate in all the upside

24   above 203 over the next two and a half weeks."  That's

25   what you wrote?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    A.    Correct.

 2          MR. GREENBERG:  If we could move ahead to the

 3    next one.  Thank you.

 4    BY MR. GREENBERG:

 5    Q.    This is also October 31st, and you're talking about

 6    two other companies, Rambus -- and what's the other one?

 7    A.    As I sit here today I don't remember what that was

 8    the symbol for.  I don't recall what that's a symbol for

 9    right now.

10    Q.    But you did suggest some strategy for some company?

11    A.    I suggested nothing.  I was telling him which of the

12    choices he proposed to me during the afternoon he should

13    do, if that's what -- if he was going to do anything.

14    Q.    Okay.  You wrote, "I would suggest the same strategy

15    as" -- you were referring to some other company here.

16    A.    Rambus.

17    Q.    Rambus?

18    A.    No, Sycamore.

19    Q.    Sycamore?

20    A.    Sycamore, yes.

21    Q.    And this is another strategy that would limit the

22    downside but -- and also cap the upside; is that right?

23    A.    One second.  Can I look for a moment?

24    Q.    Sure.  Absolutely.

25          (Pause.)
```

1            THE WITNESS:  Correct.  Yes, you would have

2    limited downside on this.

3    BY MR. GREENBERG:

4    Q.   I'm sorry?

5    A.   Yes, that's correct.  What you said is correct.

6    Q.   Okay.  I'm only going to do a few more of these.

7         If we could turn to the next page, November 7th.

8    This is another e-mail that you forwarded to Mr.

9    Carpenter?

10   A.   Correct.

11   Q.   And it says, "As you requested, the following

12   strategy could be implemented on Rambus."  And, again,

13   is this another strategy that limits the downside and at

14   the same time it caps the upside, to some degree?

15   A.   Yes, that's what this strategy does.

16   Q.   Okay.

17           MR. GREENBERG:  Can we go to the next?

18   BY MR. GREENBERG:

19   Q.   November 19, 2000:  This is another e-mail from you

20   to Dan Carpenter?

21   A.   Yes.

22   Q.   And, again, is this another strategy that is an

23   effort by you to -- you say "possible action."  You're

24   suggesting some type of possible action that he may wish

25   to consider?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    No.   The actual -- the question that was proposed --

2    that precipitated -- that caused me to write this e-mail

3    was to summarize my position, let me know if I'm in or

4    out of balance, meaning an equal number of puts at

5    various strike prices, and if I can sell more puts to

6    bring it back into balance, how many puts I can sell.

7    So I was able to summarize the position for him in this

8    e-mail.

9    Q.   And can we move on to -- the next e-mail is November

10   19th.   Is this again a recap and suggestions of what he

11   may want to consider?

12   A.   It's also a recap and confirmation of one of the

13   choices that he proposed to me.

14   Q.   And you also talk about he may want to consider

15   selling 90 calls and using the proceeds to buy calls at

16   a strike price of 250?

17   A.   Correct.   Correct.

18   Q.   Again, these are all consistent with your

19   discussions with Mr. Carpenter throughout the month of

20   October and November, right?

21   A.   Not really.   Not really.

22   Q.   All right.   Well, let's go to November 19th.

23   Sunday, November 19th, you sent him another e-mail

24   talking about different options that he may want to

25   consider, closing out certain positions, right here,

1  buying other calls and things that you were suggesting

2  he consider?

3  A.   Once again, I wasn't -- I never suggested he

4  consider anything.

5  Q.   Did you write that "You may want to consider" -- is

6  that your words or did I -- do I read this correctly,

7  "You may want to consider selling"?  Did you write that?

8  A.   Yup.

9  Q.   Okay.  Let's move on to November 19th, the next one.

10 And I only have three more I'm going to deal with with

11 you at this time.

12     Again, another e-mail dealing with another position,

13 confirming to him his positions are in balance?

14 A.   Correct.

15 Q.   When you say "balance," what did you mean by that?

16 A.   That the strikes on the puts -- the quantities were

17 the same, meaning a long 60 with a strike of 120 and

18 also short 60 and average strike of 163.

19 Q.   In other words, you hedged your loss, right?

20 A.   Yes; these particular trades.

21 Q.   So the loss is not unlimited; it's been -- there's a

22 finite loss?

23 A.   On these particular trades.

24 Q.   Right.  Fine.

25 A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1           MR. GREENBERG:   If we could then go...

2    BY MR. GREENBERG:

3    Q.   Another e-mail on November 19th about some other

4    transaction.  You're suggesting "You may want to sell an

5    additional" -- do you see that down here?

6    A.   Yes.

7    Q.   And, again, you're updating his position, which,

8    again, is a position that has a hedge against the

9    downside?

10   A.   You know, I hesitate to say a blanket "yes" because

11   there were so many unhedged positions in this --

12   Q.   Mr. Rock, this e-mail reflects a holding that

13   Benistar had that had a hedge against the downside,

14   right?

15   A.   Not at the moment, but if he did what I -- if he

16   ultimately did this trade it would be hedged, yes.  But

17   many of the trades in the portfolio were not hedged.

18           MR. GREENBERG:   I move to strike the last

19   answer.

20           THE COURT:   It will be stricken.

21           The jury will disregard it.

22   BY MR. GREENBERG:

23   Q.   Now, in the -- you spoke with Mr. Carpenter

24   regularly?

25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   And in the October-November time period you

2   discussed with him the impact of the -- well, the

3   market -- the stock market was in a unique situation,

4   would you agree, in October-November of 2000?

5   A.   I don't know what you mean by "unique."

6   Q.   I guess I would ask you.  There was an arbitration

7   proceeding -- besides the civil action -- that you also

8   testified in, an arbitration proceeding in New York

9   before the National Association of Securities Dealers,

10  did you not?

11  A.   That's correct.

12  Q.   And you actually testified on more than one day,

13  right?

14  A.   Correct.

15  Q.   Didn't you -- isn't it true that you testified that

16  in October and November the stock markets were in a

17  somewhat unique position then?  Just yes or no?

18  A.   I guess you could argue the market's always in a

19  unique position.

20  Q.   Did you testify in the arbitration proceeding that

21  in the October-November 2000 time frame, that the stock

22  market was in a somewhat unique position at that time?

23  A.   I don't --

24  Q.   Just yes or no?

25  A.   I don't recall.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. GREENBERG:  May I approach the witness?

2          THE COURT:  You may.

3          MR. GREENBERG:  Thank you, your Honor.

4    BY MR. GREENBERG:

5    Q.    Could I ask you to look at --

6    A.    Sure.

7    Q.    This is your testimony on September 19, 2005, before

8    the National Association of Securities Dealers in an

9    arbitration, page 213.  And I'd just ask you if you

10   would start looking at your testimony on line 14, and

11   whether or not that -- whether or not you testified that

12   the market back then was in a somewhat unique position?

13   A.    Yes, that's what I said.

14   Q.    Okay.  And you discussed with Mr. Carpenter, and he

15   discussed with you, that the failure of the Federal

16   Reserve Bank to lower interest rates had had a negative

17   effect on the market, the stock market, because the

18   stock market and investors had anticipated that the

19   Federal Reserve Bank was going to lower interest rates.

20   Isn't that something that you and he discussed?

21   A.    Dan told me that his expectation was that the fed

22   would lower rates, the election would go the way he

23   expected, and the sector of the market that he was

24   focused on would turn around and go back to the highs

25   that they were at six months prior.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   So is it fair to say that you and he discussed the
 2   impact that the failure or the delay in the Federal
 3   Reserve lowering interest rates was having on the
 4   market?
 5   A.   I wouldn't say "on the market."  I would say
 6   specifically his stocks, because during that period of
 7   time many stocks were going up, but Dan's stocks were
 8   going down.
 9   Q.   Okay.  They only went up after you -- we'll get to
10   that.
11       And there was a -- do you recall back in 2000 that
12   there was an election held before the former President
13   Bush and -- actually, between President Bush and the
14   then-Vice President Gore?
15   A.   I do.
16   Q.   And there was -- we had a -- there was a deadlock
17   and the election wasn't resolved until, I think, the end
18   of December?
19   A.   I do remember that.
20   Q.   Yeah.  And do you recall that back in November
21   everybody, mostly the investment community, thought that
22   this election issue was going to get resolved, you know,
23   in the next day?
24   A.   Every day.  Every day.
25   Q.   Every day, yeah.  And every day turned into a week
```

PDF created with pdfFactory trial version www.pdffactory.com

1    and a week turned into a month and a month turned into

2    almost two months?

3    A.    Correct.

4    Q.    And back then it was a pretty unique situation in

5    the market, the stock market?

6    A.    Yes.

7    Q.    You had the interest rate issue and you had this --

8    the election issue that were really hanging over the

9    market, right?

10   A.    People were focused on the outcome of the election,

11   yes.

12   Q.    And when you used the word "unique" in your

13   arbitration testimony, was that one of the things you

14   were thinking about, was the election?  The dispute over

15   the election was --

16   A.    There's always a certain degree of uncertainty in

17   the marketplace.  I mean, at the time there was a lot of

18   volatility in the markets:  There were a lot of stocks

19   going up; there were a lot of stocks going down.

20   Q.    Isn't it true that Mr. Carpenter told you that he

21   believed that the Benistar investments were positioned

22   to do well once the election was resolved?  Didn't he

23   tell you that?

24   A.    Yes.

25   Q.    And he told you he believed -- you had no doubt that

PDF created with pdfFactory trial version www.pdffactory.com

1  that's what he believed, that he believed that his

2  holdings, Benistar's investments, were poised to do well

3  as soon as the election was resolved?

4  A.   He used the word "capitulation" a lot.  He was

5  hoping that his stocks would go higher, sure.  But every

6  investor feels that way, too.  Everyone who buys a stock

7  hopes that it goes higher.

8  Q.   And it's true -- you testified yesterday -- is there

9  a difference in your mind between technology stocks and

10 Internet stocks?

11 A.   Yes, but they're close.

12 Q.   Well, because yesterday you testified that Mr.

13 Carpenter's holdings were primarily in Internet stocks.

14 Do you remember saying that yesterday?  If you don't, I

15 can --

16 A.   The whole genre of Internet-related companies.

17 Q.   That's not my question.  Do you remember saying to

18 this Court yesterday, and the jury -- let me just get

19 it -- you were asked by counsel for the government, "And

20 he was trading in a particular industry sector?"  And

21 your answer was, "Yes."  And the question was, "What was

22 that?"  And your answer was, "Internet stocks."

23      Do you remember testifying to that?

24 A.   Correct.  Yes.  Yes.

25 Q.   I think you just said in your own mind there's a

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    difference.  In fact, you testified at the arbitration
 2    that Benistar was primarily trading in technology stocks
 3    on the NASDAQ exchange; isn't that what you testified
 4    to?
 5    A.   Yes.  There's a --
 6    Q.   Sir, is that what you testified to?
 7    A.   Yes.  Yes.
 8    Q.   So when you testified yesterday that Mr. Carpenter
 9    was primarily trading in Internet stocks, you didn't
10    tend -- strike that.
11         And it's true that technology stocks had been a
12    great performer in the 1990s?
13    A.   That's correct.
14    Q.   And it's true that in October and November there was
15    a belief by many leading investment strategists that the
16    market was undervalued?
17    A.   Some people thought that.
18    Q.   Well, in fact, you're familiar with a gentleman
19    named Edward Kerschner?  He was at the time
20    PaineWebber's chief investment strategist.  Are you
21    familiar with -- you were aware of that, right?
22    A.   Only as a result of prior proceedings.
23    Q.   Well, he also was the strategist of -- he was named
24    the -- I think it's the "Strategist of the Year," was he
25    not?
```

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    I don't recall.

2  Q.    And chief investment strategist, that's the --

3  what -- so we all understand, what is an investment

4  strategist?  What do they do?  They give advice?

5  A.    In theory, the investment strategist accompanies the

6  person who evaluates the market and makes a judgment

7  call as to whether or not it's going to go up or down,

8  what -- globally -- the U.S. market is undervalued, the

9  Japanese market is overvalued, and basically will print

10 a very broad-brush report of where people should invest

11 their money.

12 Q.    And Mr. Kerschner was the chief investment

13 strategist at PaineWebber at this time; is that right?

14 A.    Yes.

15 Q.    So -- and he was speaking in -- was quoted in

16 newspapers, magazines, on the telephone -- I'm sorry,

17 television programs in terms of what he, as

18 PaineWebber's chief strategist, was predicting in terms

19 of the market, correct?

20         MR. MITCHELL:  Your Honor, I just want to

21 interject an objection here about whether it's his

22 knowledge now or at the time.  If he learned something

23 through proceedings --

24         THE COURT:  Well, he may have familiarity of

25 what people were saying that was publicized, in the

PDF created with pdfFactory trial version www.pdffactory.com

1    press and so on, as a distinction that Mr. Greenberg is

2    making.

3    BY MR. GREENBERG:

4    Q.   Is it correct, sir, that Mr. Kerschner, the chief

5    PaineWebber investment strategist, was making statements

6    throughout October, November and December that in his

7    view the stock market was undervalued?

8    A.   I only know that today.  At the time I never -- I

9    did not know that at the time.

10   Q.   Well, let's go through -- let me show you -- have

11   you ever also heard of someone named Abby Joseph Cohen?

12   A.   Yes.

13   Q.   And she was the Goldman Sachs --

14   A.   She was the chief investment strategist at Goldman

15   Sachs.

16   Q.   And Goldman Sachs:  Who are they?

17   A.   Goldman Sachs is an investment firm, brokerage firm.

18   Q.   Is it one of the most respected in the world, sir?

19   A.   Different people like different companies.  They're

20   another brokerage company.

21   Q.   Okay.  A competitor of yours?

22   A.   Yes.

23   Q.   Let me show you an article from October 15th, first

24   of all, from the Los Angeles Times.  And isn't it

25   correct, sir, that Mr. Kerschner, as PaineWebber's

PDF created with pdfFactory trial version www.pdffactory.com

 1  strategist, was reporting in publications in the middle

 2  of October?

 3           MR. MITCHELL:  I'd make the same objection, your

 4  Honor.  No foundation.

 5           THE COURT:  No.  Overruled.  It's not hearsay.

 6           MR. MITCHELL:  It's also irrelevant, too.

 7           THE COURT:  No.  Overruled.

 8  BY MR. GREENBERG:

 9  Q.  If you could turn to page 3 of this copy of the Los

10  Angeles Times article entitled "Your Money."  It says,

11  "Edward Kerschner" --

12           MR. GREENBERG:  Could we actually put that on

13  the screen, if you would?

14  BY MR. GREENBERG:

15  Q.  Actually -- I'm sorry, no.

16       Isn't it true that Mr. Kerschner was telling

17  clients, as reported in the Los Angeles Times, that

18  "Today's valuation suggests the most attractive buying

19  opportunity since 1998"?  Isn't that what he's quoted as

20  saying?

21  A.  I only know that today.

22  Q.  Isn't that what was reported on October 15th, 2000?

23  A.  I only found out about anything that Kerschner said

24  when these proceedings started years later.  At the time

25  I was employed, during the fourth quarter of 2000, I had

PDF created with pdfFactory trial version www.pdffactory.com

1  no idea who Kerschner was.

2  Q.   You were a stockbroker that had just been paid

3  almost $1.7 million working for PaineWebber, and your

4  testimony is that you didn't know that the chief

5  investment strategist of PaineWebber was Mr. Kerschner?

6  A.   Absolutely 100 percent true.  And I don't know who

7  the strategist is today, and I've been there eight

8  years.  No idea.

9  Q.   Let me show you a series of other articles.

10      Actually, backing up to the article -- you said

11  before you were aware of Abby Joseph Cohen, and that was

12  someone you knew about in October of 2000; you heard of

13  her name?

14  A.   I heard of her name, yeah.

15  Q.   She spoke almost regularly on CNN and a variety of

16  business outlets, did she not?

17  A.   Yes.

18  Q.   And according to this article, October 15th, "Abby

19  Joseph Cohen, Goldman Sachs investment strategist and

20  perhaps the world's most respected bull, told clients

21  Friday that the S&P 500 stocks were about 15 percent

22  undervalued based on closing prices"?

23          MR. MITCHELL:  Objection.

24          THE COURT:  Yeah, sustained.

25  BY MR. GREENBERG:

1   Q.   Let me show you another article dated -- this is

2   from Business Week dated November 6, 2000, making

3   reference again to Mr. Kerschner.  And if you could look

4   at the second page, the first full paragraph?

5   A.   Uh-huh.

6   Q.   In the fourth line it refers -- isn't it true

7   Mr. Kerschner was reported as maintaining that the S&P

8   500 is undervalued by 12 percent?

9   A.   I have to say that I truly had no idea of what he

10  was saying then or ever.

11  Q.   Well, this is what -- this was reported in the

12  Business Week?

13  A.   And I see that you're showing me this today.  But

14  this is the first time -- when these proceedings started

15  was the first time that I'm seeing any of this.  And

16  even as I sit here today I have no clue what any

17  strategist from any brokerage firm is saying about the

18  direction of the market.

19  Q.   Isn't it true that Mr. Kerschner was reported in

20  publications in the middle of November as saying "the

21  investment market environment remains perfect"; isn't

22  that what he was reported as saying?

23          MR. MITCHELL:  Objection.

24          THE COURT:  Let me see you at the side, please.

25          (Discussion at sidebar and out of the hearing of

PDF created with pdfFactory trial version www.pdffactory.com

1   the jury:)

2        MR. MITCHELL:  I object on a number of grounds:

3   One, it's hearsay; two, it's not an impeachment area;

4   three, not connected up with anything with Mr. Carpenter

5   and it's irrelevant.  I mean, why doesn't he just open

6   up the Internet -- the Wall Street Journal website and

7   read from that?

8        MR. GREENBERG:  It goes to his good-faith

9   belief, in terms of his investment strategy, the market

10  was going to go up.

11       THE COURT:  It might be relevant but the

12  question is:  Is it admissible?  I let the first one in

13  because I thought you were going to ask the witness

14  about -- and get the witness's testimony, so we got past

15  it.

16       I do agree that it's hearsay.  There are two

17  levels of hearsay:  One is possibly what he -- what

18  Kerschner actually said, which is probably not hearsay

19  because it's opinion, and so on and so forth, a

20  statement of fact; the newspaper writer's statement that

21  Kerschner said it is hearsay, okay?

22       MR. GREENBERG:  But, your Honor, it's been

23  offered that it was reported; it's a historical fact.

24       THE COURT:  No.  That's one problem with it.

25  The article that says that "Kerschner said yesterday,"

PDF created with pdfFactory trial version www.pdffactory.com

1    that's a statement of fact, that is hearsay; it's an

2    exception.  I thought you were going to get to what the

3    witness would remember about those things, but it

4    doesn't look like that's happening.

5         Beyond that, while it might be relevant to Mr.

6    Carpenter's state of mind, if he knew these things, the

7    fact that it was in Business Week doesn't eschew by

8    itself that he knew these things, okay?  If there's

9    something that would connect what's reported in Business

10   Week to Mr. Carpenter, maybe you can have it, but you

11   still have the problem...

12        MR. GREENBERG:  Your Honor, I believe there's

13   going to be other witnesses who are going to testify

14   that Mr. Carpenter --

15        THE COURT:  Then maybe we have to leave it to

16   the other witnesses.

17        MR. GREENBERG:  No, your Honor.  This is

18   PaineWebber's chief investment --

19        THE COURT:  It's not his --

20        MR. GREENBERG:  Your Honor, I mean --

21        THE COURT:  He's not giving you the foundation

22   for his own --

23        MR. GREENBERG:  Right.  I think it also goes to

24   his credibility, for him to say repeatedly he didn't

25   know who the chief investment strategist was.

1              THE COURT:  Well, he said that and you have

2      that.

3              MR. GREENBERG:  Your Honor, we are going to

4      connect it up with respect to other witnesses, as it

5      relates to Mr. Carpenter, you know, that he regularly

6      read these articles --

7              THE COURT:  If they could do the connecting,

8      they could probably do the foundation for the admitting.

9              MR. PAPPALARDO:  Since I know about that

10     witness, may I be permitted, your Honor?

11             It's my understanding based upon the testimony

12     of the prior criminal trial of this case that one of the

13     witnesses that the government expects to call today is

14     going to testify that he read these articles, and I

15     believe, your Honor --

16             THE COURT:  Who's that?

17             MR. PAPPALARDO:  Jackie Spielman.

18             MR. MITCHELL:  That's not what she said.  She

19     said he read the newspaper.

20             MR. PAPPALARDO:  I think if you read the

21     testimony.

22             And not only did he read articles on these -- in

23     these areas, but that he cut them out, put them all over

24     his office and --

25             THE COURT:  Well, that may be, but that's not

1    helping you with this witness.

2        MR. GREENBERG:  Can I just ask this witness as

3    to whether or not he's aware that PaineWebber -- whether

4    it was the chief investment -- that PaineWebber was

5    stating to the public that this was the perfect

6    environment for investments, that they were making those

7    statements -- that he was making those statements?

8        In fact, your Honor, and it's a document --

9    there were two -- their document this January, which I

10   understand is not in evidence because it's irrelevant,

11   but PaineWebber's statement to Mr. Carpenter said it was

12   the best time in 20 years to invest in the stock market,

13   and that was a document that was obtained -- given

14   directly to Mr. Carpenter.

15       THE COURT:  I don't see it.  At least with this

16   witness.

17       MR. MITCHELL:  Your Honor, we're coming up on

18   the break, your Honor.

19       THE COURT:  We should break right now.

20       MR. MITCHELL:  Can I ask Mr. Greenberg how much

21   longer he has?

22       MR. GREENBERG:  I have a while.  I have a while.

23       MR. MITCHELL:  A while?

24       MR. GREENBERG:  Yes.

25       MR. PIROZZOLO:  If I may, your Honor, I know it

1    violates the one-lawyer rule.

2        THE COURT:  I'll allow it.

3        MR. PIROZZOLO:  The next witness is Jackie

4    Mahannah.  The last time she testified it was Jackie

5    Spielman.  She has a baby she needs to get home to.

6        THE COURT:  Where does she live?

7        MR. PIROZZOLO:  She lives in Connecticut.  We

8    understood before this cross-examination that Mr.

9    Greenberg would be half an hour, approximately.  We're

10   now working on two hours, and he says he has longer to

11   go.  And I'm very concerned that we will not finish with

12   him.

13       THE COURT:  How long is her testimony?

14       MR. PIROZZOLO:  Her direct is probably about 25

15   minutes, something like that.  And with the cross -- I

16   guess Mr. Pappalardo will have to answer that.

17       MR. PAPPALARDO:  It depends on what she says.

18   If she testifies the same way, your Honor, I don't

19   expect to be that long with her.  She's not a critical

20   witness.

21       MR. PIROZZOLO:  My request would be, if we look

22   like we're going to finish her today and go over one

23   o'clock --

24       MR. GREENBERG:  Do you want to interrupt this

25   witness and go --

PDF created with pdfFactory trial version www.pdffactory.com

1            THE COURT:  No.

2            MR. GREENBERG:  No.

3            MR. PAPPALARDO:  We could put the foundation in.

4            THE COURT:  I don't think you can.  I don't

5    think you can.

6            But anyway, we'll take the break now and then

7    we'll resume.

8            MR. PAPPALARDO:  Okay.

9            (In open court:)

10           THE COURT:  We'll take the morning recess.

11           THE CLERK:  All rise for the jury.

12           The Court will take the morning recess.

13           (Jury out and recess in the proceedings at

14   10:57 a.m.)

15                           ---------

16

17

18

19

20

21

22

23

24

25

```
 1              (After recess.)

 2              MR. GREENBERG:  May I continue?

 3              THE COURT:  Go ahead.

 4              MR. GREENBERG:  Thank you, your Honor.

 5              May I approach the witness?

 6              THE COURT:  You may.

 7     BY MR. GREENBERG:

 8     Q.   Mr. Rock, let me just show you a document.  I'd ask

 9     you if you can identify it?

10              (Pause.)

11     A.   I'm seeing this for the first time.  This appears to

12     be a snapshot of a home page from the Paine Webber

13     online service.

14     Q.   Well, it has your name on it, does it not, your

15     financial adviser --

16     A.   Yes, yes.

17     Q.   It says Mitchell Rock?

18     A.   Yes.

19     Q.   And it indicates that -- isn't this the format of

20     the document that was sent every day to -- the date of

21     this is what?

22     A.   I've never seen this before.

23     Q.   Is this dated October 23, 2000?

24     A.   I see at the bottom it was printed out on October

25     24, 2000.
```

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   In the left -- summary of account values as of the

2  close -- as of market close October 3, 2000?

3  A.   Yes, I see.

4  Q.   23?

5  A.   Yes, I see that.

6  Q.   It has a total -- these are Benistar's accounts, the

7  three accounts at Paine Webber?

8  A.   Yes, they are.

9  Q.   It has your financial adviser, Mitchell S. Rock?

10  A.   That's correct.

11  Q.   1285 Avenue of the Americas?

12  A.   That's correct.

13  Q.   And this is something -- every day to Mr. Carpenter

14  at Benistar you'd send him a summary of account values,

15  right?

16  A.   No, that's not correct.  I've never sent him this

17  before.  This is what he -- this is what a client would

18  access.

19  Q.   Oh, okay.

20  A.    If they went to painewebber.com and typed in their

21  password, they would access their accounts, and this is

22  their welcome page.

23  Q.   So this shows -- this is what Mr. Carpenter would --

24  or whoever at Benistar would access on October 3,

25  2000 -- 23, 2000; is that right?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. MITCHELL:  Object to personal knowledge.

2    Objection.

3          THE COURT:  Overruled.

4    A.   I have never seen this before, I have never been to

5    the client website before, but this is what a client who

6    logged into their account -- this is the format of the

7    way the account balances are delivered to them.

8    Q.   And this represents what -- if Benistar had accessed

9    their account on October 23, 2000, this is what would

10   have come up, correct?  Is that right?

11   A.   Correct.  At the end -- this reflects the value of

12   the accounts at the close of business on October 23,

13   2000, that's correct.

14   Q.   And these are the Benistar accounts?

15         MR. MITCHELL:  I don't have an objection --

16   we're reading from the document.  I don't care if this

17   comes in.

18         MR. GREENBERG:  Fine, let's -- I offer this as

19   the defendant's exhibit.

20         THE COURT:  Number?

21         MR. GREENBERG:  It's not numbered, your Honor.

22         THE COURT:  What's the next number?

23         MR. GREENBERG:  433, your Honor.

24         (Exhibit 433 received into evidence.)

25         MR. GREENBERG:  I also need some help, Gerard, I

1    just want to put this on -- we don't have this

2    electronically.

3    BY MR. GREENBERG:

4    Q.   Okay.  So -- so Mr. Rock, this is October 23, 2000.

5    This is the Benistar account, and this shows the

6    valuation of $5.4 million, and you see your name as the

7    financial adviser, you see that?

8    A.   Yes, I do.

9    Q.   And you also see the Paine Webber spotlight.  You

10   see it says, "Institutional Investor just ranked PW's Ed

11   Kerschner Wall Street number one strategist October

12   2000.  Watch Kerschner discuss the U.S. financial market

13   environment volatile and core investment themes."  Do

14   you see that here?

15   A.   I do see that.

16   Q.   Your testimony, then, is in October of 2000, you

17   didn't know who Ed Kershner was?

18   A.   Absolutely, that's correct.

19   Q.   Okay.

20         Now, I'd like to -- I'd like to turn to the time

21   in December when the Benistar accounts were shut down by

22   Paine Webber, so if you could just move into that time

23   period.

24         Isn't it correct that sometime prior to December

25   19, 2000, Paine Webber decided that they didn't want the

1   relationship with Benistar any longer?

2   A.   That is correct.

3   Q.   Okay.  And just in terms of background, at that

4   point you knew that Mr. Carpenter had told you he

5   intended to sue Merrill Lynch, right?

6   A.   Somewhat figuratively.  There was no substance

7   behind it, but he did say that, yes.

8   Q.   I didn't -- he told you he planned to sue Merrill

9   Lynch, and as a result of that there was some concern at

10  Paine Webber about what Mr. Carpenter's and Benistar's

11  reaction might be to the decision to shut down the

12  accounts, right?  Is that an accurate statement?

13  A.   That is correct, absolutely.

14  Q.   So as a result of that, Paine Webber consulted with

15  its lawyers, right?

16  A.   No.

17  Q.   No?

18  A.   No.

19  Q.   Okay.  You had decided -- Paine Webber had decided,

20  as you said, that they didn't want the account, right,

21  didn't want the Benistar account any longer?

22  A.   That's correct, we didn't want to work with Dan any

23  longer, that's correct.

24  Q.   You didn't want him.  And it was sensitive because

25  he told you he was going to sue Merrill Lynch, right?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Once again, in a figurative kind of a way.

2  Q.   Well, he told you he would have made a significant

3  amount of money had Merrill Lynch not acted the way they

4  did.  That's what he told you, right?

5  A.   Dan --

6  Q.   Is that what he told you, sir?  Is that what he told

7  you?

8  A.   Yes, that's correct.

9  Q.   And so with that in mind, the phone call was made to

10  Mr. Carpenter on the 19th of December, right?

11  A.   That's correct.

12  Q.   Okay.  But before you called Mr. Carpenter, Paine

13  Webber actually called Merrill Lynch first, right?

14  A.   That's correct.

15  Q.   Okay.  And when the call was placed to

16  Mr. Carpenter, Paine Webber was concerned about possible

17  civil liability?

18  A.   No.

19  Q.   Okay, no.

20       Now, at this time -- I think we went through a

21  bunch of wire transfers.  Sitting here today, you're

22  aware Benistar was doing it's 1031 exchanges right up --

23  right up until December 19, 2000, right?

24       MR. MITCHELL:  I object to that.  It's not

25  established he had personal knowledge of that.  He said

1   he didn't even know what a property exchange was.

2        THE COURT:  You can reask the question.

3   A.   Can you repeat the question?

4   Q.   Yes.  Sitting here today, you're aware of the fact

5   that up until the time of your phone call, Benistar

6   Property Exchange Trust was continuing to successfully

7   complete 1031 exchanges?

8        MR. MITCHELL:  In that form, it's a hearsay

9   objection.

10        THE COURT:  Overruled.  You may answer.

11   A.   I never knew what they were doing.  The way it was

12   positioned to me, these were real estate investment --

13   Q.   Is the answer no to the question, that you didn't

14   know --

15   A.   I don't know when they stopped doing what they

16   purported to be doing.

17   Q.   Okay.  Well, did you know as of December 19, 2000,

18   Benistar had completed over 100 successful 1031

19   exchanges?

20        MR. MITCHELL:  Same objection, your Honor,

21   personal knowledge objection.

22        THE COURT:  Well, he can say that.

23   A.   No, no, I didn't.

24   Q.   Do I understand correctly that as of December 19,

25   2000, Benistar had met every margin call that Paine

1    Webber had asked them to meet?

2    A.   Yes, he did.

3    Q.   And do I also understand correctly that there is not

4    a single letter ever sent up to this time by Paine

5    Webber to either Mr. Carpenter or Benistar raising some

6    objection or some objection to their trading strategies

7    or any objection?

8    A.   A number of --

9    Q.   Just yes or no.

10   A.   I wouldn't know.

11   Q.   Had you ever seen a letter from the start -- the

12   time -- the start -- the trading started up through

13   December 19th to Mr. Carpenter or anyone at Benistar

14   raising concerns or objections or criticisms, anything?

15   Any written letter?  Just yes or no.

16   A.   No.

17   Q.   Now, prior to the call, Paine Webber had already

18   made up its mind to shut down the Benistar account,

19   right?

20   A.   We had made up our mind that we no longer wanted to

21   work with Dan and that --

22   Q.   Sir, had you made up your mind to shut down the

23   account?

24   A.   No.

25   Q.   To have Benistar leave?

```
 1   A.   We had made up our minds that we no longer --
 2   Q.   Just yes or no.
 3   A.   I'll say it again.  We had made up our minds that we
 4   did not want to work with Dan any longer because he
 5   failed to --
 6   Q.   That's --
 7   A.   -- risk of the account in his trading, but we
 8   didn't -- the decision to formally shut down the account
 9   was Dan's.
10   Q.   It was Dan's?
11   A.   Dan agreed to stop trading based on the presentation
12   of the facts.
13   Q.   Sir, you decided to shut down the account before you
14   made the call?
15   A.   No.
16   Q.   No?
17   A.   We knew we didn't want to work with him, and the
18   objective of the call was to convince Dan to close the
19   account.
20   Q.   You told him on the call that you weren't going to
21   work with him any longer, right?  Is that right?
22   A.   I don't recall saying that.
23   Q.   Sir, did you -- who was your immediate supervisor?
24   A.   Steve Feit.
25   Q.   And you told Mr. Feit before the call that you
```

PDF created with pdfFactory trial version www.pdffactory.com

1  wanted Mr. Carpenter closed down?

2  A.    Yes.

3  Q.    Okay.  And before the call -- I mean, you said you

4  wanted Benistar to leave Paine Webber as a customer,

5  right?

6  A.    That's correct.

7  Q.    Now, if -- and on -- Dan Carpenter told you on

8  December 19th that he was in a position to recoup

9  millions of dollars in losses when the market rallied.

10  Isn't that what he said to you?

11  A.    He --

12  Q.    Yes or no.

13  A.    Yes, he said that every day, actually.

14  Q.    Sir, on December 19, 2000, the time you called --

15  Paine Webber called Mr. Carpenter, did Mr. Carpenter say

16  to you and the others on the phone that Benistar was in

17  a position to recoup millions of dollars of losses when

18  the market rallied?

19  A.    Yes, he did.

20  Q.    Okay.  And if I understand correctly, that Paine

21  Webber refused to allow Benistar to open up any new

22  positions; is that right?  Is that right?

23  A.    Can I --

24  Q.    No, no, is that right or wrong?

25  A.    That's correct.

1    Q.   All right.  And in fact, on December -- just let me

2    back up a bit.  We'll do a little primmer on option

3    trading.

4         The day before the call, isn't it correct that

5    Benistar had opened up positions on a number of new

6    trades?

7    A.   Correct.

8    Q.   And those positions remained open until -- is it the

9    third Saturday in January?

10   A.   It's actually the Saturday after the third Friday.

11   Q.   Fine.  And so if nothing were to happen, if those

12   positions simply stayed the same, one would see when --

13   I'm sorry, the third Saturday -- I'm sorry.  You said

14   the third Saturday --

15   A.   It's the Saturday after the third Friday.

16   Q.   The Saturday after the third Friday.

17        Now, the positions would either expire or you'd

18   see if you made money or you lost money, unless you did

19   something in the interim?

20   A.   I'm going to say no because -- if I may --

21   Q.   Sure.

22   A.   -- options on margin need to technically be paid for

23   every day.

24   Q.   Okay.

25   A.   And it's a function of the market value of the

PDF created with pdfFactory trial version www.pdffactory.com

1    underlying stock.  So the only reason you are a margin

2    call is if the value of the stock goes in an opposite --

3    in a direction opposite what you expect, you need to

4    come up with more money; otherwise, the position needs

5    to be closed.  So assuming the margin call would have

6    been able to be met along the way, those positions would

7    have been able to be maintained until the third Friday

8    in January, that's correct.

9    Q.   That's fine.  And up to that point, Benistar had

10   never missed a margin call?

11   A.   That's correct.

12   Q.   Okay.  So is it fair to say that at the point in

13   time when Paine Webber made this call on December 19th,

14   that Benistar had a number of open positions that were

15   scheduled to remain open until the third Saturday -- the

16   middle of January?

17   A.   That's fine.  Yes, that's correct.

18   Q.   Okay.  And -- but if I understand correctly, isn't

19   it true that 85 to 90 percent of Benistar's positions

20   were closed by Paine Webber on December 20th? Isn't that

21   correct?

22   A.   I don't think so, we basically shut down -- we

23   closed down the positions that -- Dan's authorization

24   slowly between the 19th and the last day of the year.

25           MR. GREENBERG:  Well, let me approach the

1    witness, if I may, your Honor.

2    Q.   Again, I hate to -- but let me ask you -- again,

3    April 6, 2001, which is a few months after these events

4    took place, if we can look at page 424, and just -- you

5    testified -- let me just ask you, isn't it true that you

6    testified that 85 to 90 percent of the positions were

7    closed on --

8    A.   Yes.

9    Q.   -- December 20th?

10   A.   Yes, that's right, that's what --

11   Q.   That's what happened, right?

12   A.   Yeah.

13   Q.   So -- you know, the other 15 to 20 percent of

14   positions were closed out before the end of the year,

15   right?  Is that right?

16   A.   That's correct, and all those trades were executed

17   by Dan.

18   Q.   Fine.

19        And it's correct that on February 3rd --

20   A.   January 3rd.

21   Q.   I'm sorry, January 3rd, 2001, after everything had

22   been shut down, the Federal Reserve lowered the interest

23   rate in the middle of the morning?

24   A.   By mid-morning there was a surprise 50 basis point

25   cut.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   And it was a huge day for the stock market, correct?

2   A.   That's correct.

3   Q.   And if Paine Webber had not shut down Benistar's

4   accounts and if there had been any margin calls,

5   Benistar would have been able to meet them?  Isn't it

6   true that as a result of that huge day in the market,

7   Benistar's holdings on that day would have been up

8   several million dollars?  Isn't that right?

9   A.   No.

10  Q.   No?

11  A.   No.

12  Q.   It was a huge day in the stock market, right?

13  A.   He would have never seen that day.

14  Q.   It was a huge day in the stock market?

15  A.   That's correct, that's correct.

16  Q.   It was -- you described it yourself as a huge day?

17  A.   The market was big that day, absolutely.

18  Q.   And the investments that -- several of the stocks,

19  the companies in which Mr. Carpenter had invested in

20  went up substantially that day, right?  Just yes or no.

21  A.   That's correct, yes.

22  Q.   Okay.  And the rally that Mr. Carpenter and other

23  leading investment strategists had been predicting came

24  in January, the stock market rally; isn't that right?

25  A.   The market went up January 3rd, that's correct.

1    Q.   And -- but Benistar was not able to benefit from

2    that rally because Paine Webber had shut down its

3    accounts and closed out all of its positions in

4    December; isn't that correct?   Just yes or no.

5    A.   No.

6    Q.   Okay.   And isn't it true that it was Paine Webber's

7    shutting down of their positions that kept Benistar

8    from -- its investments from growing several million

9    dollars in January?

10   A.   No.

11   Q.   And isn't it true that before January of 2001,

12   Benistar had never missed completing a successful

13   exchange, 1031 exchange?

14           MR. MITCHELL:   Same objection.

15           THE COURT:   Sustained.

16   BY MR. GREENBERG:

17   Q.   There was -- we referred to before that you -- let

18   me show you --

19           (Pause.)

20           (Discussion off the record.)

21   BY MR. GREENBERG:

22   Q.   Can you identify -- certainly that document -- is

23   this also, as with the Exhibit, is it, 433, is this a

24   page from -- that Benistar would have accessed or could

25   have accessed on December 27, 2000 showing the status of

1   their account?

2   A.   Correct.

3   Q.   And it has the account numbers?

4   A.   Correct.  Yes, that's correct.

5        MR. GREENBERG:  Your Honor, I would offer this

6   as the next exhibit.

7        MR. MITCHELL:  No objection.

8        THE COURT:  All right.  That will be 434, I

9   presume.

10        (Exhibit 434 received into evidence.)

11        MR. GREENBERG:  Could we publicize this, please?

12   BY MR. GREENBERG:

13   Q.   And this is December 27, 2000.

14        Do you see, it has your name on it?

15   A.   Yes, I do.

16   Q.   Okay.  And again, you didn't know who Edward

17   Kerschner was at this time?

18   A.   That's correct.

19   Q.   You see where it says "Outlook 2001"?

20        MR. GREENBERG:  Could you just highlight this?

21   A.   Yes, I do.

22   Q.   "Read why chief global strategist Ed Kerschner calls

23   2001 'one of the most attractive opportunities in the

24   past 20 years.'"

25   A.   I see that.

1  Q.   So if I read this correctly, at the same time or in

2  the same month that Paine Webber was shutting down

3  Mr. Carpenter's account, its chief investment strategist

4  was publicly pronouncing on statements that were

5  available to Benistar that it was one of the five most

6  attractive opportunities in the past 20 years?

7  A.   Correct, that's what -- I see that today, yes.

8  Q.   At some point --

9       MR. GREENBERG:  That can go off.

10  BY MR. GREENBERG:

11  Q.   Sir, at some point there was an arbitration

12  proceeding that was commenced by Benistar properties; is

13  that right?

14  A.   That's correct.

15  Q.   Okay.  And it was -- it was filed against Paine

16  Webber?

17  A.   Yes.

18  Q.   Is that right?  And you testified at that

19  proceeding?

20  A.   Yes, I did.

21  Q.   And other people from Paine Webber testified?

22  A.   Yes.

23  Q.   And is it -- and then that occurred in New York,

24  right?

25  A.   Yes.

```
 1   Q.   And there was an arbitration -- a decision by the
 2   arbitrators, three arbitrators decided against Paine
 3   Webber in that matter; is that right?
 4   A.   Yes, I believe there was an unfavorable decision.
 5   Q.   Well, there was a decision by the three arbitrators
 6   against Paine Webber; is that right?
 7   A.   That's correct.
 8   Q.   In favor of the claimants, the claimants in that; is
 9   that right?
10   A.   Yes, that's correct.
11   Q.   Again, the arbitration was commenced by Benistar
12   Properties?  Is the name of the arbitration Benistar
13   Properties Services Trust and Benistar Property Exchange
14   Trust, Inc. versus the Paine Webber entity?
15   A.   Yes.
16   Q.   Okay.  And the arbitration award with the interest,
17   you know, the principal award and the interest award, do
18   you recall how much it was?
19   A.   It's my understanding that nothing's been paid at
20   this time; it's still pending.
21   Q.   How much was the award for?
22   A.   I have no idea.
23   Q.   How much was the award for?  If I suggest to you the
24   interest and -- principal and interest was over $12
25   million, does that refresh your recollection?  I can
```

PDF created with pdfFactory trial version www.pdffactory.com

1  show you some documents if you'd like to refresh your
2  recollection.
3  A.   Okay.
4  Q.   Would you like to see some documents?
5  A.   It sounds about right.
6  Q.   I don't want to put words in your mouth.
7       Is it -- as a result of the arbitration in which
8  you and others testified, was there an award against
9  Paine Webber, principal and interest, which exceeded $12
10  million.
11  A.   It sounds correct, somewhere there.
12       MR. GREENBERG:  Mr. Rock, I thank you.
13       THE WITNESS:  Thank you.
14       THE COURT:  Mr. Mitchell.
15       MR. MITCHELL:  I have just a couple.
16       THE COURT:  Okay.
17                    REDIRECT EXAMINATION
18  BY MR. MITCHELL:
19  Q.   Mr. Rock, you remember Mr. Greenberg's asking you a
20  series of questions about certain e-mails that you sent
21  to Dan Carpenter?
22  A.   Yes.
23  Q.   What was the purpose of those e-mails?
24  A.   Dan called me up during the day and proposed a
25  series of transactions, and based upon closing prices,

1    asked which ones would satisfy his requirements for that

2    transaction.

3    Q.    Okay.  And you remember the -- Mr. Greenberg asked

4    you whether those e-mails were meant to suggest ways in

5    which Mr. Carpenter might reduce the risk of his

6    positions?

7    A.    Yes.

8    Q.    Okay.  And were these some of many conversations you

9    had with him about the risk in his positions?

10   A.    During the course of our working together, my

11   objective was to limit the risk on the portfolio,

12   because there was exposure to -- so much exposure that

13   the slightest move against him would wipe the account

14   out.

15   Q.    Okay.  Did Mr. Carpenter follow your advice?

16   A.    Most of the time, no.

17   Q.    When you shut down the account -- when Paine Webber

18   shut down the account in December of 2000, as of

19   December 19th do you recall the amount of money that had

20   been lost by then?

21   A.    That $7 million.

22   Q.    Okay.  And by the time the -- the end of the year,

23   how much money was lost in his accounts?

24          MR. GREENBERG:  Objection.

25          THE COURT:  Sustained.

PDF created with pdfFactory trial version www.pdffactory.com

         1            MR. MITCHELL:  The door is pretty wide open at

         2     this point.

         3            THE COURT:  No, sustained.

         4            MR. MITCHELL:  Can I have a sidebar?

         5            THE COURT:  All right.

         6            (At sidebar on the record.)

         7            MR. MITCHELL:  The door as to what -- how much

         8     was lost by the end of the year is wide open.

         9     Mr. Greenberg asked a series of questions that not only

        10     elicited, you know, how much money was in the account as

        11     of December 27, 2000, but also went into questions and

        12     suggested -- designed to elicit from the witness what

        13     would have happened to the positions in January had they

        14     not been closed.  Somehow the market supposedly

        15     rebounded in the first week of January, and that would

        16     have restored Mr. Carpenter to whole or regained all of

        17     the losses.

        18            This witness will testify that he's actually

        19     taken a look at -- he's actually calculated what the

        20     losses would have been through the end of the year.  He

        21     will testify that if Mr. -- had they had not been closed

        22     out in December, December 19th did, or if he had been

        23     allowed to trade, that the entire account would have

        24     been wiped out by the end of the calendar year.

        25            So it's enormously misleading for him to go on

PDF created with pdfFactory trial version www.pdffactory.com

1    to say, well, if he had all this money in the market in

2    January, it would have recouped the losses.  It's not

3    the case at all, and that's what the witness was trying

4    to project, wasn't allowed to.

5         But -- I know you want to cabin the issue of

6    loss, your Honor, but Mr. Greenberg by filing all these

7    motions in limine, we're right back into it for his own

8    purposes.

9         All I'm trying to do is give the jury the other

10   side of the story.

11        MR. GREENBERG:  First of all, the losses in

12   December are not voluntary actions, they're a result of

13   the closing.  He made it very clear.  They closed out

14   positions.  So it has no relevance whatsoever in the

15   case.

16        (Discussion off the record.)

17        MR. GREENBERG:  As your Honor knows, and we've

18   said this before, that the fundamentals is

19   Mr. Carpenter's state of mind as of November 30th as to

20   when the last contract was signed.  Certainly -- I mean

21   the losses the last two weeks in December are not a

22   result of any voluntary action that Mr. Carpenter or

23   Benistar took.  So it's -- it's totally irrelevant.

24        THE COURT:  I don't see its useful purpose, and

25   I see it's pulling us further away from the main issues.

1          MR. MITCHELL:  That was Mr. Greenberg's doing.

2     I mean, we were abiding by the Court's order.  He went

3     into it, despite filing the motion in limine on that

4     very ground to keep all that stuff out, he goes into

5     what would happen in January.  That's -- I mean, end of

6     December.  I mean, you've kept that out and he's

7     introducing documents for it.

8          MR. GREENBERG:  Not for that purpose.

9          THE COURT:  What would the witness say?

10          MR. MITCHELL:  The witness is going to say if

11     they hadn't closed the positions down, the account would

12     have been wiped out.

13          THE COURT:  What does "wiped out" mean?

14          MR. MITCHELL:  It would have gone down to zero.

15          If they hadn't stopped him on December 19th,

16     hadn't pulled the plug, if he had kept going, kept

17     those -- not closed those positions down, it would have

18     been reduced -- they actually saved him $3 million.

19          THE COURT:  The passage of time and the activity

20     or the particular stocks in question in terms of their

21     trading, by itself, with no other factors affecting,

22     would have reduced the value of the account; is that --

23     that's what I don't quite understand.

24          MR. MITCHELL:  They told him to shut down his

25     positions.  And what he will say is if he hadn't shut

PDF created with pdfFactory trial version www.pdffactory.com

1    those positions down, the account would have been

2    reduced to nothing.

3          THE COURT:  By the passage of time and the

4    operation of the market?

5          MR. MITCHELL:  Operation of the market.  It's

6    not a Santa Claus rally.  That if he had kept the

7    positions -- and we can -- we could do it briefly here.

8    I don't want to burn anymore daylight.

9          THE COURT:  It's just not worth it.  It's not

10   pertinent enough, probative enough to warrant it.

11         If it were to be done, there would be two ways

12   of doing it:  One would be a very high level of

13   generality, which might not be very useful, and another

14   would be an appropriate particularity, that may be the

15   way.

16         MR. MITCHELL:  That may be the simplest way, to

17   back into Exhibits 169, 170 that have been redacted,

18   they're going to bring us to the period that

19   Mr. Greenberg has been providing motions in limine on.

20         THE COURT:  The focus is to provide some

21   response to the cross-examination.  It's just diverting

22   it from the main issues.  We've already diverted too

23   much from the main issues.

24         (End of discussion at sidebar.)

25   BY MR. MITCHELL:

1    Q.   Okay.  Mr. Rock, when we left off, so in December

2    19, 2000, Paine Webber shut down Mr. Carpenter's

3    accounts, or told him that they would not be doing

4    business with him anymore, correct?

5    A.   Correct.

6    Q.   And that was because he wasn't listening to your

7    advice --

8            MR. GREENBERG:  Objection, your Honor.

9            THE COURT:  Sustained to the form of the

10   question.

11   BY MR. MITCHELL:

12   Q.   Why was he told --

13   A.   When we had the call with Dan on the 19th, one of

14   the things that we were surprised to find out was that

15   this was all of the money that was in the account.

16           MR. GREENBERG:  Objection, your Honor --

17           THE WITNESS:  If I may.

18           THE COURT:  No, wait a minute.  You may have the

19   conversation.

20   BY MR. MITCHELL:

21   Q.   What did Dan --

22           THE COURT:  You may complete -- in other words,

23   there was examination about the conversation, you may

24   complete --

25   A.   Dan said on the call that this was all of the money

PDF created with pdfFactory trial version www.pdffactory.com

1    that he had, and he had told us when we opened up the

2    account that there was a net worth of $40 to $50

3    million, and money was always coming in to cover margin

4    calls from outside sources.

5         On that call, Dan asked us what his exposure to

6    the underlying stocks were, and we did the math and we

7    told him that he had exposure to $13 to $14 million

8    worth of stock.  And when we pointed out to him that the

9    slightest little down draft in the market would wipe him

10   out, he paused, we firmed up our numbers, and it was at

11   that point that Dan said, "I've got to close this

12   account because I'm going to go negative."

13        So we said to him that it would be best to do it

14   in an orderly fashion.  Or objective was that at the end

15   of the year the account be flat, but every single trade

16   was decided, the timing, by Dan's communication to me.

17   And it was at his suggestion that every transaction was

18   closed out on December 19th.  And on that date, the

19   value of the portfolio was --

20        MR. GREENBERG:  Objection, your Honor.

21        THE COURT:  Sustained, sustained, sustained.

22        MR. MITCHELL:  That's all I have, your Honor.

23                    RECROSS-EXAMINATION

24   BY MR. GREENBERG:

25   Q.   Just --

```
 1              (Discussion off the record.)
 2   Q.   Did the fact that after having testified in
 3   arbitration proceedings --
 4              MR. MITCHELL:   This is beyond the scope of
 5   redirect.
 6              THE COURT:   I don't know, I haven't heard the
 7   question.
 8   BY MR. GREENBERG:
 9   Q.   That an award entered after you testified and
10   others, that an award entered, together with interest
11   against Paine Webber, for in excess of $12 million, did
12   that fact impact your testimony today?
13   A.   Not at all.
14              MR. GREENBERG:   I have nothing further.
15              THE COURT:   All right, Mr. Rock, thank you.
16   You're excused.
17              MR. PIROZZOLO:   The United States calls Jackie
18   Mahannah.
19              If I could just have a moment to collect some
20   documents, your Honor.
21              JACKIE MAHANNAH, having been duly sworn by the
22   Clerk, was examined and testified as follows:
23              THE CLERK:   State your name, spell your last
24   name for the record, keep your voice up, and speak into
25   the mic.
```

```
 1           THE WITNESS:  Jackie Mahannah, M-a-h-a-n-n-a-h.
 2           MR. PIROZZOLO:  If I could just have a moment,
 3   your Honor, to collect some papers?
 4           THE COURT:  All right.
 5           MR. PIROZZOLO:  May I approach, your Honor?
 6           THE COURT:  Sure.
 7                      DIRECT EXAMINATION
 8   BY MR. PIROZZOLO:
 9   Q.   Good morning.
10   A.   Good morning.
11   Q.   It's still morning.
12           Ms. Mahannah, where do you live?
13   A.   Connecticut.
14   Q.   How old are you?
15   A.   Thirty.
16   Q.   Are you married?
17   A.   Yup.
18   Q.   Any kids?
19   A.   Yes.
20   Q.   How old?
21   A.   Two.
22   Q.   And how many?
23   A.   What's that?
24   Q.   How many kids?
25   A.   Just one.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    Q.   Where did you go to school?

 2    A.   Canton High School.

 3    Q.   Do you have any college education?

 4    A.   I never finished.

 5    Q.   Where have you worked since you got out of high

 6    school?

 7    A.   Various companies.  Do you want the names?

 8    Q.   Just generally, types of work you've done?

 9    A.   Different office jobs I've had.

10    Q.   Did there come a time when you went to work for a

11    company called Benistar?

12    A.   Yes.

13    Q.   When did you go to work for that company?

14    A.   '98 or '99, not really sure.

15    Q.   What position did you take when you went to work for

16    that company?

17    A.   Just general office help.

18    Q.   Can you describe some of your duties and

19    responsibilities when you went to work for Benistar?

20    A.    I did some accounts payables and receivables and

21    filing and, you know, typing.

22    Q.   Who hired you?

23    A.   Molly.

24    Q.   Who's Molly?

25    A.   Molly Carpenter.
```

1   Q.   What relationship, if any, does she have to

2   Mr. Carpenter?

3   A.   His wife.

4   Q.   At some point in time when you were at Benistar,

5   were you assigned to work on 1031 property exchange

6   business that Benistar had?

7   A.   Yes.

8   Q.   About when did that happen?

9   A.   Maybe like six months after I started.

10  Q.   After you started working on that business, about

11  how much of your time was spent working on the 1031

12  exchange part of Benistar's business?

13  A.   Maybe an hour or so a day.

14  Q.   For that business, who did you report to?

15  A.   Dan.

16  Q.   Who else at that time was working in the 1031

17  business?

18  A.   In our office?

19  Q.   Yeah -- well, let me actually back up.

20       What office did you work at, physically?

21  A.   Simsbury.

22  Q.   And that's in Connecticut?

23  A.   Yes.

24  Q.   Now, in the Simsbury, Connecticut office, who else

25  worked on the 1031 exchange business while you were

PDF created with pdfFactory trial version www.pdffactory.com

1    working on them?

2    A.    Just Dan and I.

3    Q.    Can you describe what your responsibilities were for

4    the 1031 exchange business?

5    A.    I would prepare wire transfers.  I would deposit

6    clients' money if it came in by check and keep track of

7    whose money we had.

8    Q.    Did you have responsibility for keeping files?

9    A.    Yes.

10   Q.    For the 1031 exchange business?

11   A.    Yes.

12   Q.    Can you describe -- how were the files kept?

13   A.    They were kept by client name in a filing cabinet.

14   Q.    Where was the filing cabinet located?

15   A.    Behind my desk.

16   Q.    What typically was kept in the filing cabinets?

17   A.    Just --

18   Q.    Let me withdraw the question.

19         What typically was kept in the 1031 exchange

20   files?

21   A.    The agreements, the exchange agreements, the account

22   selection forms, anything that I got from the lawyers or

23   from the Newton office that related to that client.

24         MR. PIROZZOLO:  May I approach, your Honor?

25   There's an exhibit I need to get.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Ms. Mahannah, I just put if front of you a folder

2    with Exhibits 84 A, B, and C.  Do you have that in front

3    of you?

4    A.   Yes.

5    Q.   And that's in evidence, so I'm just going to put

6    that up on the screen.

7         That's a package of documents that were sent to

8    you?

9    A.   Yes.

10   Q.   And this package of documents relates to -- or came

11   from an attorney, a Robert Barrett; is that right?

12   A.   Yes.

13   Q.   Typically, how did you get agreements such as this,

14   the various agreements?

15   A.   Via mail.

16   Q.   Where would they come from?  What sources?

17   A.   Sometimes the attorney's office, sometimes the

18   Newton office.

19   Q.   Now, within this package -- this cover letter says,

20   "Enclosed herewith please find the necessary papers for

21   the above-referenced exchange."  Do you see that?

22   A.   Yes.

23   Q.   If you look at the second page of the document

24   there, it says, "Exchange Agreement"?

25   A.   Yes.

1    Q.    Further into the package there's a document marked

2    84 B, it's titled "Escrow Agreement."    Do you see that?

3    A.    Yes.

4    Q.    And then further on into the agreement there's an 84

5    C, and that's marked as "Account Selection Form."    Do

6    you see that?

7    A.    Yes.

8    Q.    In terms of the packages that were usually kept in

9    the files at Benistar, does this reflect generally what

10   was kept in the files?

11   A.    Yes.

12   Q.    Across other exchanges, not just this one?

13   A.    Right.

14   Q.    What was the procedure at Benistar when you received

15   such materials, the Exchange Agreement, Escrow Agreement

16   and Account Selection Form.    Was there some sort of

17   procedure?

18   A.    I would have just set up an account and let Dan know

19   that we received the documents and if there was checks

20   or if we were going to be receiving a wire.

21   Q.    Did you notify Mr. Carpenter when such packages came

22   in?

23   A.    Yes.

24   Q.    Why did you do that?

25   A.    So he would know to be expecting the money.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Did you receive any instruction from anybody that

2    you were supposed to notify Mr. Carpenter?

3    A.    I think when I first started, he just told me to let

4    him know when we received documents or money.

5    Q.    Now, when you received money, did you keep track of

6    that at Benistar yourself?

7    A.    Yes.

8    Q.    Can you describe the process or procedure that was

9    in place at Benistar to keep track of money that was

10   received from the people who were engaging in the 1031

11   exchanges?

12   A.    We had a spreadsheet that had the clients' name on

13   it and the amount of money that they sent in to us.

14   Q.    I'm going to put up on the screen in front of you a

15   document that also is already in evidence that's been

16   marked as Exhibit 184 B.

17        Do you recognize that document?

18        And I'll try to magnify the first page.

19        Do you see that?

20   A.    Yes.

21   Q.    Can you read it?  Do you recognize that document?

22   A.    Yes.

23   Q.    And what is it?

24   A.    It's an e-mail from me to Linda.

25   Q.    Was it the case that you would communicate with --

PDF created with pdfFactory trial version www.pdffactory.com

1    who's Linda?

2    A.    She worked in the Newton office.

3    Q.    Linda Jokinen?

4    A.    Yes.

5    Q.    And was it the case -- was there some procedure or

6    practice where you would communicate this information

7    between -- by this information, the information on the

8    spreadsheet -- between Newton and Connecticut?

9    A.    I didn't send it that often.  If they requested it,

10   I would.

11   Q.    Attached to this document is a spreadsheet, correct?

12   A.    Yes.

13   Q.    I'm going to turn to the second page of that

14   document, which I'll put up on the screen.  And,

15   Ms. Mahannah, if you could -- if we could go through

16   each of the columns, and if you could explain what each

17   of these columns and titles relate to, what type of

18   information?

19         So the first column says, "case name."  Do you

20   see that?

21   A.    Yes.

22   Q.    What does that refer to?

23   A.    That's the client.

24   Q.    Then there's a "date received."  Do you see that?

25   A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And what does that refer to?

2    A.    The date we received the money.

3    Q.    And there's an "amount received."  Do you see that?

4    A.    Yes.

5    Q.    And what does that refer to?

6    A.    The amount that we received from them.

7    Q.    And then there's a "fee withdrawn."  What does that

8    represent?

9    A.    I don't know.

10   Q.    Then there's a "date paid."  Do you see that?

11   A.    Yes.

12   Q.    What does that relate to?

13   A.    If the client wanted money, when we paid it to them.

14   Q.    Then there's a "debit" column.  What is that?

15   A.    How much we paid to them.

16   Q.    There's a "debit date."  What does that relate to?

17   A.    I'm assuming it would be the same as the date paid.

18   Q.    And then there's an "interest" column.  What's that?

19   A.    Whether they were three percent or six percent

20   interest.

21   Q.    And there's a "balance ." Do you see that?

22   A.    Yes.

23   Q.    What's that?

24   A.    The balance that they had in the account.

25   Q.    And in terms of the balance, what they have in the

PDF created with pdfFactory trial version www.pdffactory.com

1    account, that's the balance that still remains to be

2    paid back to them by Benistar?

3    A.    Yes.

4    Q.    About how frequently did you update the spreadsheet?

5    A.    Usually if I got new money in or we paid out money.

6    Q.    And this a spreadsheet that you kept --

7    A.    Yes.

8    Q.    -- and maintained?

9    A.    Yes.

10   Q.    The information that's set forth in the spreadsheet,

11   who do you provide the information to?

12   A.    If Dan asked for it, I'd give it to him, or if Linda

13   in Newton asked for it, I'd give it to her.

14   Q.    Were there times when Mr. Carpenter did ask for the

15   information?

16   A.    Occasionally.

17   Q.    Now, you said you provided this to Newton from time

18   to time?

19   A.    Yes.

20   Q.    Did you have to receive permission to send it to

21   Newton before you sent it to Newton?

22   A.    Yeah, I would usually ask.

23   Q.    Who would you ask?

24   A.    Dan.

25   Q.    Why would you ask Dan?

1    A.   Because he told me to ask him before I sent anything

2    up to them.

3    Q.   Now, aside from this spreadsheet, was there any

4    other spreadsheet that you kept at the offices in

5    Connecticut that related to the 1031 exchange business?

6    A.   There was one other spreadsheet that was similar to

7    this.

8    Q.   Can you describe how it was different, if at all?

9    A.   I believe it calculated the interest, the amount of

10   days that the money was in the account.

11   Q.   And was that sent to Newton?

12   A.   No.

13   Q.   Why not?

14   A.   Because we would send them this one.  I was told not

15   to send it.

16   Q.   Who told you not to send it?

17   A.   Dan.

18   Q.   Now, how would you learn when money came in to the

19   accounts?

20   A.   Either the Newton office would call and let me know

21   that I'd be expecting money, or I would see the change

22   in the account balance from the previous day.

23   Q.   When the money came in, who did you inform that

24   money was received?

25   A.   Dan.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Now, what form did -- when the money came in to

2  Benistar, what form did it take, checks, wires, or some

3  combination?

4  A.   Both checks and wires.

5  Q.   What responsibility did you have to deposit the

6  funds that came in?

7  A.   I would make out a deposit slip and send it to

8  Merrill Lynch or Paine Webber.

9  Q.   When clients mailed in a check, to whose attention

10  would it come within Benistar?

11  A.   Mine.

12  Q.   And once you received the check, what did you do

13  with it physically?

14  A.   I would let Dan know it was there, then I would

15  write "for deposit only" and make out a deposit slip and

16  mail it out to Merrill or Paine Webber.

17  Q.   Can you look at Exhibits 16 and 17 that are in front

18  of you?

19       Do you recognize what those are?

20  A.   Yes.

21  Q.   Let's start with 16.  Is that a document that you

22  received?

23  A.   Yes.

24  Q.   What's the date of the document?

25  A.   September 14, 2000.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And there's a re: line.  Do you see that?  It

2    says -- what does it say next to the re: line?

3    A.   "Massachusetts Lumber/Murray, 170 New Boston Street,

4    your file number 000913."

5         MR. PIROZZOLO:  The government would offer

6    Exhibit 16.

7         MR. PAPPALARDO:  No objection.

8         THE COURT:  Okay.

9         (Exhibit 16 received into evidence.)

10   BY MR. PIROZZOLO:

11   Q.   Can you also take a look at Exhibit 17?

12        What is that?

13   A.   Same type of document, sending in a check from a

14   client.

15   Q.   And that's a document you received?

16   A.   Yes.

17        MR. PIROZZOLO:  The government would offer

18   Exhibit 17.

19        THE COURT:  Okay.

20        (Exhibit 17 received into evidence.)

21   Q.   I'm going to publish Exhibit 16, briefly.  The date

22   of that document, again, is what?

23   A.   September 14, 2000.

24   Q.   And it says above your name, it says something.

25   What does it say?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   "Via overnight mail."

2   Q.   And it references two checks?

3   A.   Yes.

4   Q.   Do you see that?

5   A.   Yes.

6   Q.   And it relates to which client?

7   A.   Massachusetts Lumber.

8   Q.   And attached to that document is a second page that

9   I'll put up on the screen.  What's that?

10  A.   A copy of the check.

11  Q.   How much money?

12  A.   $225,000.

13  Q.   And then the third document in that package, which I

14  will project, what is that?

15  A.   Another check.

16  Q.   For how much?

17  A.   $62,190.

18  Q.   And I'm going to project, briefly, Exhibit 17.

19  What's the date of that document?

20  A.   September 20, 2000.

21  Q.   And how was it received?

22  A.   Via overnight mail.

23  Q.   And it came to your attention?

24  A.   Yes.

25  Q.   And it references an enclosure.  Do you see that?

1  A.  Yes.

2  Q.  What is it enclosing?

3  A.  Photocopy of a check.

4  Q.  And attached to this is what?

5  A.  Copy of the check.

6  Q.  For how much?

7  A.  $225,000.

8  Q.  Can you take a look at Exhibits 19 through 21 that

9  are in front of you?

10          (Pause.)

11 Q.  Starting with 19, do you recognize what that is?

12 A.  Yes.

13 Q.  What is it?

14 A.  It's a check.

15 Q.  And attached to it there's a deposit slip.  Do you

16 see that?

17 A.  Yes.

18 Q.  Does it have your handwriting on it?

19 A.  The back of the check does.

20 Q.  If you could look at the second page, there's a

21 reference that has your handwriting on it?

22 A.  Yes.

23          MR. PIROZZOLO:  The government would offer

24 Exhibit 19.

25          MR. PAPPALARDO:  No objection.

```
 1              THE COURT:  Okay.
 2              (Exhibit 19 received into evidence.)
 3    BY MR. PIROZZOLO:
 4    Q.   Can you look at Exhibit 20?  Do you recognize that
 5    document?
 6    A.   Yes.
 7    Q.   What is it?
 8    A.   A check.
 9    Q.   If you could turn to the second page.  What is that?
10    A.   Copy of the back of the check, "for deposit only."
11    Q.   With your handwriting?
12    A.   Yes.
13              MR. PIROZZOLO:  The government would offer
14    Exhibit 20.
15              MR. PAPPALARDO:  No objection, or to 21.
16              MR. PIROZZOLO:  The government would offer
17    Exhibit 21.
18              THE COURT:  Okay.
19              (Exhibits 20 and 21 received into evidence.)
20    BY MR. PIROZZOLO:
21    Q.   I'm going to project Exhibit 19 on the screen for
22    you.  And that's -- which check is that?
23    A.   A check from Robert Murray.
24    Q.   For how much?
25    A.   $62,190.
```

1    Q.   And looking at the second page of the exhibit --

2    I've magnified a portion of it -- what is that?

3    A.   The back of the check, "for deposit only."

4    Q.   And which account does it go into?

5    A.   849-07B01.

6    Q.   Can you look at Exhibit 20, which I'll project on

7    the screen as well?  And that's a check, correct?

8    A.   Yes.

9    Q.   And for how much?

10   A.   $225,000.

11   Q.   And looking at the back -- excuse me, the second

12   page, do you see that?

13   A.   Yes.

14   Q.   And there's some handwriting.  What is that?

15   A.   "For deposit only."

16   Q.   And into which account?

17   A.   849-07B01.

18   Q.   And then, finally, Exhibit 21.  What's that?

19   A.   A deposit slip.

20   Q.   And it's for how much?

21   A.   $225,000.

22   Q.   And it references a working capital management

23   account.  Do you see that?

24        I'll magnify it on the screen.  Do you see that?

25   A.   Yes.

1  Q.   And there's an account number reference.  Do you see

2  that?

3  A.   Yes.

4  Q.   And which account is that?

5  A.   849-07B01.

6  Q.   Was the practice at Benistar when client funds came

7  in that deposits would be made into the B01 account?

8  A.   Yes.

9  Q.   Aside from the B01 account, were there other

10  accounts at or around -- withdrawn, let me rephrase.

11       During the period of time that you were working

12  at Benistar, were there certain accounts opened for the

13  1031 exchange business?

14  A.   Yes.

15  Q.   Which accounts were they?

16  A.   There was the account that the money I deposit into,

17  the client money, and then there was a trading account.

18  Q.   And how were the -- how did you refer to the

19  accounts, the two accounts that were opened for the 1031

20  exchange business?

21  A.   The client account and the trading account.

22  Q.   And who used those terms?

23  A.   Dan.

24  Q.   Now, are you aware that clients were allowed to

25  select a three percent or a six percent return --

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    -- when they deposited funds?

3    A.    Yes.

4    Q.    How did you keep track of that?

5    A.    There was an Account Selection Form that was kept in

6    their file, and also on the spreadsheet.

7    Q.    Is it the case that you would reflect the selection

8    by inputting that information onto the spreadsheet?

9    A.    Yes.

10   Q.    Now, where did you sit physically in relation to

11   Mr. Carpenter's office?

12   A.    His office was behind mine.

13   Q.    About how far?

14   A.    Maybe from me to you.

15   Q.    Now, while you were at Benistar, did you see

16   Mr. Carpenter trading?  Did you observe him trading,

17   engaged in trading of some --

18         MR. PAPPALARDO:  Objection to form.

19         MR. PIROZZOLO:  Withdrawn.  I'll try it again.

20   BY MR. PIROZZOLO:

21   Q.    During the period of time when you were at Benistar,

22   did you observe Mr. Carpenter -- what did you observe

23   Mr. Carpenter doing with respect to trading stocks or

24   options?

25         MR. PAPPALARDO:  Objection, form and foundation,

PDF created with pdfFactory trial version www.pdffactory.com

1    your Honor.

2          THE COURT:  Sustained.

3    BY MR. PIROZZOLO:

4    Q.  Were you in a position to observe Mr. Carpenter

5    engage in any trading?

6          MR. PAPPALARDO:  Objection.

7          THE COURT:  Sustained.

8    BY MR. PIROZZOLO:

9    Q.  Did you see Mr. Carpenter during the workday?

10   A.  Yes.

11   Q.  What did you see during the workday?

12   A.  Normal work activity, him on his computer, phone.

13   Q.  You reference a computer.  Did Mr. Carpenter use

14   more than one computer?

15   A.  Yes.

16   Q.  Can you describe each of the computers that he used?

17   A.  He had one in his office and then one in a little

18   area that was in between the two of our offices.

19   Q.  The computer that was in between the area between

20   the two offices, what was that computer?

21   A.  He used that -- he watched the stocks on that.

22   Q.  And how often did you observe him watching the

23   stocks on that computer?

24   A.  Daily.

25   Q.  And during the course of the day, about how many

```
 1   hours would he be watching the stocks on that computer?
 2   A.   Probably most of the day.
 3   Q.   Now, during the course of your duties at Benistar,
 4   would you receive information from either Merrill Lynch
 5   or Paine Webber related to the trading account?
 6            MR. PAPPALARDO:  Objection.
 7            THE COURT:  To form?
 8            MR. PIROZZOLO:  It's foundation, your Honor.
 9            MR. PAPPALARDO:  Form, for starters.
10            THE COURT:  I think the form is --
11            MR. PIROZZOLO:  I'll rephrase, but I think
12   there's a foundation for that.
13            THE COURT:  The "you" is ambiguous.
14   BY MR. PIROZZOLO:
15   Q.   Ms. Spielman, did you communicate with Merrill Lynch
16   or Paine Webber?
17   A.   Yes.
18   Q.   How did you communicate with them?
19   A.   On the phone.
20   Q.   What information, if any -- let's start with Merrill
21   Lynch -- did Merrill Lynch provide that you saw?
22   A.   Account balances.
23   Q.   How was that transmitted to you?
24   A.   Via fax.
25   Q.   Can you please describe what you received via fax?
```

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   The account balances from the previous day.

2   Q.   How often were those communicated to you?

3   A.   Daily.

4   Q.   What would you do with that information?

5   A.   I would calculate the gains or losses from the

6   previous day.

7   Q.   What then would you do with the information?

8   A.   I would file it in a binder.

9   Q.   When you referred to the "binder," what binder are

10  you talking about?

11  A.   It's just a binder that I put together that had all

12  the account balances in it from each day.

13  Q.   Where was that kept?

14  A.   On top of the filing cabinet behind my desk.

15  Q.   Would you provide any of that information to

16  Mr. Carpenter?

17  A.   If he asked for it.

18  Q.   Were there times that he asked for it?

19  A.   Yes.

20  Q.   While you were observing the information that came

21  over the fax from Merrill -- let's talk about Merrill

22  for now -- did you observe whether Mr. Carpenter was

23  making or losing money?

24       MR. PAPPALARDO:  Objection, your Honor.

25       THE COURT:  Sustained.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   BY MR. PIROZZOLO:
 2   Q.   What did you observe as to whether or not he was
 3   making or losing money?
 4            MR. PAPPALARDO:  Objection, your Honor.
 5            THE COURT:  Sustained.
 6   BY MR. PIROZZOLO:
 7   Q.   What, if anything, did you observe about the profit
 8   and loss during the period --
 9            MR. PAPPALARDO:  Objection, your Honor.
10            THE COURT:  I'll see you.
11            (At sidebar on the record.)
12            MR. PAPPALARDO:  Your Honor, to begin with, the
13   question is vague:  What did you observe about him
14   making or losing money?  We have no indication whether
15   she saw one account or five accounts.  There has been
16   testimony about five accounts relating to Benistar.  We
17   have no indication what she's getting from Merrill
18   Lynch.  We have no indication -- I mean, this woman
19   worked there from 1999 through the end of -- through the
20   beginning of 2001.  It's not said in terms of time, in
21   terms of place.  I mean, the question is patently vague,
22   and it's also leading.
23            MR. PIROZZOLO:  It's not leading, your Honor.
24            THE COURT:  What do you expect her answer to be?
25            MR. PIROZZOLO:  All right.  Based on her
```

 1    observation of the Merrill Lynch statements, she

 2    observed that he was making money for a period of time

 3    and then he was losing money.  She then, I believe, will

 4    testify she had a conversation with him about that

 5    and --

 6            THE COURT:  Well, okay, the conversation might

 7    be interesting, the other is hardly a surprise to the

 8    jury at this point.

 9            MR. PIROZZOLO:  I was trying to lay the

10    foundation for the question, your Honor.  I don't mean

11    to be glib --

12            THE COURT:  No, let's get to the conversation.

13    Because when was the conversation and what was it?

14            MR. PIROZZOLO:  When he was losing money, she

15    had a conversation with him where --

16            THE COURT:  Can you locate it -- does she locate

17    it in time?

18            MR. PIROZZOLO:  Yeah, in 2000, in 2000.  When

19    he's losing money, we know that to be March through

20    sometime --

21            THE COURT:  That's the best she can do, though?

22            MR. PIROZZOLO:  I can't represent --

23            THE COURT:  Maybe the time doesn't matter.  All

24    right.

25            MR. PIROZZOLO:  So then he told her not to tell

PDF created with pdfFactory trial version www.pdffactory.com

1    anybody about it.

2            THE COURT:  Okay.  You can have that.  But --

3    this has got to be --

4            MR. PIROZZOLO:  I can go right to the

5    conversation.  Your Honor, I'll do it -- I don't --

6            MR. PAPPALARDO:  Your Honor, again, without any

7    specifics -- you know, when he was losing money, he told

8    her not to tell anybody.  Losing money in connection

9    with what?  In connection with what account?  In

10   connection with what time?  I mean --

11           THE COURT:  I agree it's weak, but I think it's

12   admissible.

13           MR. PIROZZOLO:  Okay.  Thank you, your Honor.

14           (End of discussion at sidebar.)

15   BY MR. PIROZZOLO:

16   Q.   The information that was sent to you from Merrill --

17   let's start with Merrill -- what account did that relate

18   to?

19   A.   Both accounts.

20   Q.   By "both accounts," the Benistar Property Exchange

21   Trust accounts?

22   A.   Yes.

23   Q.   Did you have a conversation with Mr. Carpenter about

24   his losing money in those accounts?

25   A.   There was -- yeah, I did.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Can you -- what was the conversation?  What was

2    said?

3    A.    Towards at the end of the -- I'm not sure --

4    Q.    Let me fix it in time.  When the accounts --

5    information was coming in from Merrill, was it the case

6    that at least at a certain point in time Mr. Carpenter

7    was losing money; is that fair to say?

8    A.    Yes.

9    Q.    About when was that?

10   A.    Like the end of 2000, 2001.

11   Q.    During the course of that period of time, setting

12   aside the end of the time, did you speak with

13   Mr. Carpenter about the performance in the accounts?

14   A.    I know we had a conversation, I don't remember

15   exactly how it was.

16   Q.    What was the conversation?

17        MR. PAPPALARDO:  Objection, your Honor.  May I

18   be heard on this?

19        THE COURT:  All right.

20        (At sidebar on the record.)

21        MR. PAPPALARDO:  This witness just testified

22   from the stand that the conversation took place -- and

23   the question put to her by Mr. Pirozzolo that when you

24   read the account -- when you were losing money, when you

25   watched the Merrill forms, the date was set -- she said

PDF created with pdfFactory trial version www.pdffactory.com

1    at the end of 2000, beginning of 2001.  Merrill was out

2    of the picture in September.

3              THE COURT:  Right.

4              MR. PAPPALARDO:  I suggest to the Court, number

5    one, that time the frame is outside the scope of what is

6    relevant in this case.  And from this witness --

7              THE COURT:  Which time frame?

8              MR. PAPPALARDO:  The end of 2000, beginning of

9    2001 with respect to Mr. Carpenter's state of mind.

10             THE COURT:  It depends on whether that's one

11   time frame or two.

12             MR. PAPPALARDO:  But, your Honor, you see my

13   point.

14             THE COURT:  I do, but I leave it to cross.

15             MR. PAPPALARDO:  Okay.

16             (End of discussion at sidebar.)

17   BY MR. PIROZZOLO:

18   Q.   Focusing on the period of time that you were dealing

19   with Merrill, was there a time when you also dealt with

20   Paine Webber?

21   A.   Yes.

22   Q.   Let's focus on the time you were dealing with

23   Merrill, Merrill Lynch.

24   A.   Okay.

25   Q.   During that period of time when the Merrill Lynch

PDF created with pdfFactory trial version www.pdffactory.com

1  statements you were receiving, did you speak with

2  Mr. Carpenter about those statements?

3  A.   Occasionally.

4  Q.   Okay.  What do you recall you and he speaking about

5  with respect to those statements?

6  A.   There was one comment I made to him one day, I said,

7  "You made some money, why don't you get out now?"  And I

8  think we had another conversation -- I can't remember

9  the time frame.

10  Q.   Well, with respect to the time frame, what --

11  A.   I might have the conversations mixed up.

12  Q.   What's the first conversation you remember?  And

13  then we'll talk about the second conversation you

14  recall.

15       What's the first conversation you recall?

16  A.   He had told me not to say anything to anybody about

17  the losses because he didn't want to upset anybody.

18  Q.   What did you send to the Newton office with respect

19  to the -- to the Merrill accounts?

20  A.   Nothing.

21  Q.   Let's talk about Paine Webber.  What did you send to

22  the Newton office with respect to the Paine Webber

23  accounts?

24  A.   Nothing.

25  Q.   Did you participate in preparing paperwork that

PDF created with pdfFactory trial version www.pdffactory.com

1    related to the transfer of funds among either the

2    Merrill accounts or the Paine Webber accounts?

3    A.   Yes.

4         MR. PIROZZOLO:  Your Honor, may I approach?

5    There's a document I need.

6    Q.   Can you take a look at the document that's in the

7    folder marked 150?

8         MR. PIROZZOLO:  And that's in evidence, your

9    Honor.

10         THE COURT:  It is.

11   BY MR. PIROZZOLO:

12   Q.   What are these forms?

13   A.   Memo transfers.

14   Q.   And let's just look at the first page of that

15   document.

16         Who created the forms?

17   A.   I did.

18   Q.   Who signed the forms?

19   A.   Dan.

20   Q.   And once you created the forms and they were signed,

21   what did you do with the forms?

22   A.   I would fax them to Merrill Lynch or Paine Webber.

23   Q.   And if you could look at this sentence here, "Please

24   transfer $1,000,000 from account 849-07B01 to account

25   849-07B10."  Do you see that?

1   A.   Yes.

2   Q.   Generally, in which direction were the funds

3   transferred?

4   A.   From the 01 to the 10.

5   Q.   Now, at some point in time, did the company close

6   out the Merrill accounts and move to Paine Webber?

7   A.   Yes.

8   Q.   When the company closed the Merrill accounts, did

9   you speak to Mr. Carpenter about that?

10  A.   Yes.

11  Q.   What did he tell you?

12  A.   He just said that Merrill stopped him from trading.

13  Q.   When he opened -- after Merrill stopped the trading,

14  were accounts transferred to Paine Webber?

15  A.   Yes.

16  Q.   With respect to the 1031 property exchange business,

17  how many accounts were opened?

18  A.   Two.

19  Q.   How were they referred to?

20  A.   Client money and trading.

21  Q.   And how were they referred to by Mr. Carpenter?

22  A.   The same.

23  Q.   What role did you have in depositing funds in those

24  accounts?

25  A.   The same as before, making deposits.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Can you take a look at Exhibits 130 and 131, which

2   are in front of you.  Do you have those in front of you?

3   A.   Yes.

4   Q.   Do you recognize those?

5   A.   Yes.

6   Q.   What are they?

7   A.   Money from clients.

8   Q.   They're -- Exhibit 130, let's start with, you

9   received that document?

10  A.   Yes.

11  Q.   And attached to it is what?

12  A.   A copy of the check.

13        MR. PIROZZOLO:  The government would offer

14  Exhibit 130.

15        MR. PAPPALARDO:  No objection.

16        THE COURT:  Okay.

17        (Exhibit 130 received in evidence.)

18        MR. PIROZZOLO:  The government would offer

19  Exhibit 131.

20        MR. PAPPALARDO:  No objection.

21        (Exhibit 131 received in evidence.)

22        MR. PIROZZOLO:  The government would offer

23  Exhibits 111 and 112.

24  BY MR. PIROZZOLO:

25  Q.   Ms. Mahannah, if you could look at Exhibits 111 and

PDF created with pdfFactory trial version www.pdffactory.com

1    112, which are in front of you.

2    A.    I don't have 111.

3              MR. PIROZZOLO:  It's already in.

4              MR. PAPPALARDO:  No objection to 111 or 112.

5              THE COURT:  Okay.

6              (Exhibits 111 and 112 received into evidence.)

7    BY MR. PIROZZOLO:

8    Q.    Ms. Spielman, if we could start with Exhibit 130,

9    and I'll put that up on the screen.  Again, what is that

10   document?  The first page of the document, what is that?

11   A.    A letter from the attorney's office.

12   Q.    And it's enclosing what?

13   A.    A check.

14   Q.    Attached to the document is a check.  Do you see

15   that?

16   A.    Yes.

17   Q.    And there is a reference, I believe, here for -- you

18   see that?

19   A.    Yes.

20   Q.    I'm sorry, it's sideways.  Was there a particular

21   account into which the funds were deposited at Paine

22   Webber?

23   A.    Yes.

24   Q.    Which account was it?

25   A.    EX-15434-M12.  Yeah.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Again, I'm going to put up Exhibit 131.  Are those
2    checks as well?
3    A.   Yes.
4    Q.   There's a deposit slip as well?
5    A.   Yes.
6    Q.   And looking at Exhibit 111, do you see that?
7    A.   Yes.
8    Q.   And those are checks, as well, enclosed?
9    A.   Yes.
10   Q.   And then, finally, Exhibit 112, what is that?
11   A.   Copy of a check and a deposit slip.
12   Q.   Now, after the Paine Webber accounts are opened,
13   Ms. Mahannah, did you also observe Mr. Carpenter at the
14   computer next to your -- next to your -- or near your
15   own desk?
16   A.   Yes.
17   Q.   And what was he doing?
18   A.   Watching the stocks.
19   Q.   Did you receive any records from Paine Webber
20   about -- regarding trading?
21   A.   Yes.
22   Q.   What did you receive?
23   A.   The same as from Merrill, the account balances from
24   the previous day.
25   Q.   And did you send that information to Newton?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   No.

2  Q.   What did you do with that information?

3  A.   The same as before, I would calculate the gains or

4  losses from the previous day and file it.

5  Q.   With respect to the Paine Webber accounts, were

6  there transfers between those accounts?

7  A.   Yes.

8  Q.   And if we could look at -- if you could look at

9  Exhibit 171 in the folder there -- and I believe that's

10  in evidence.

11  A.   I don't think I have that.

12       THE CLERK:  Yes, it is.

13  A.   I have it.

14  Q.   And I'm just going to project the first page of

15  that.  Do you see that?

16  A.   Yes.

17  Q.   And what is it?

18  A.   A transfer memo.

19  Q.   And it shows a transfer from which account to which

20  account?

21  A.   From the EX-15434-MR to account EX-15433-MR.

22  Q.   What did you observe happening to the Paine Webber

23  balances during the period of time they were in?

24       MR. PAPPALARDO:  Objection, your Honor.

25  Objection.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  No, you may have it.

2          MR. PAPPALARDO:  The documents are in evidence,

3  your Honor.

4          MR. PIROZZOLO:  May I ask it again?

5  BY MR. PIROZZOLO:

6  Q.  What did you observe?

7  A.  That they were losing money.

8  Q.  Did you provide that information to Mr. Carpenter?

9  A.  If he asked.

10  Q.  Were there times that he asked?

11  A.  Yes.

12          MR. PIROZZOLO:  I have no other questions, your

13  Honor.

14                    CROSS-EXAMINATION

15  BY MR. PAPPALARDO:

16  Q.  Ms. Mahannah --

17  A.  Yes.

18  Q.  -- my name is John Pappalardo, and along with

19  Mr. Greenberg, we represent Dan Carpenter.

20          You used to be, before you were married, Jackie

21  Speilman, right?

22  A.  Yes.

23  Q.  You began work at Benistar when you were 22 years

24  old?

25  A.  Thereabouts.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And that was in 1999; is that fair to say?

2    A.    Yes.

3    Q.    And prior to beginning work at Benistar, you had a

4    high school education, right?

5    A.    Right.

6    Q.    No college at that point?

7    A.    No.

8    Q.    You were interviewed by the FBI in July of 2002;

9    isn't that fair to say?

10   A.    I don't know the time frame, but I was interviewed,

11   yes.

12   Q.    Okay.  Actually, you were interviewed a couple of

13   times, right?  Three times?

14   A.    I don't remember, but I was interviewed.

15   Q.    July 2002, February 2004, again in February of 2004;

16   is that --

17   A.    Yes.

18   Q.    More than once you were interviewed?

19   A.    Yes.

20   Q.    Okay.  And you testified, also, in a previous

21   proceeding; isn't that correct?

22   A.    Yes.

23   Q.    And your duties when you were hired at Benistar in

24   1999 were to be -- they were generally secretarial;

25   isn't that fair to say?

1   A.   Yes.

2   Q.   And how many people were at Benistar at that time?

3   A.   Maybe 20 or 30.

4   Q.   Okay.  And you were positioned in relatively close

5   proximity to Mr. Carpenter's office, right?

6   A.   Yes.

7   Q.   And you became an individual who became at least

8   somewhat familiar with the property exchange arm of

9   Benistar; is that fair to say?

10  A.   Yes.

11  Q.   And that familiarity included receiving

12  communications from -- from Newton; is that right?

13  A.   Yes.

14  Q.   And who was at Newton?

15  A.   Linda and Marty.

16  Q.   Linda and Marty.  And Marty is Martin Paley?

17  A.   Yes.

18  Q.   And he ran the operation in Newton, right?

19  A.   Yes.

20  Q.   And Linda was a counterpart, essentially, of yours?

21  A.   Yes.

22  Q.   And you would communicate with Linda on the phone,

23  would you?

24  A.   Yes.

25  Q.   Communicate by way of e-mail, by way of fax, by way

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   of mail, and basically processed papers that would go

 2   between Newton and Simsbury, Connecticut, right?

 3   A.   Yes.

 4   Q.   And you would prepare spreadsheets, as you testified

 5   to on direct examination, based upon information that

 6   would come to you; is that right?

 7   A.   Yes.

 8   Q.   Were you asked to prepare these spreadsheets?

 9   A.   Yes.

10   Q.   By whom?

11   A.   Dan.

12   Q.   And these spreadsheets that you prepared indicated

13   who the exchangor was, as you've testified; that was

14   accurate, right?

15   A.   Yes.

16   Q.   Now, you testified that you spoke with Dan Carpenter

17   and he said to go ahead and send spreadsheets to Linda

18   Jokinen; is that right?

19   A.   Sometimes, yes.

20   Q.   Sometimes.  Were there times when he said not to?

21   A.   I don't recall, but they weren't sent often.

22   Q.   Well, were there requests by Linda Jokinen for the

23   spreadsheets?

24   A.   Yes.

25   Q.   And would you tell Dan Carpenter about those
```

1    requests?

2    A.    Yes.

3    Q.    And what would Dan Carpenter say?

4    A.    Usually to send it.

5    Q.    And you indicated there was at least one occasion

6    when he said not to send the spreadsheets which

7    indicated the interest rates, the interest calculation?

8    A.    Yes.

9    Q.    Now, the difference between the two spreadsheets

10   you're talking about is merely a calculation based upon

11   the amount of money plus either three or six percent

12   interest, right?

13   A.    Yes.

14   Q.    So that if Linda Jokinen wanted to, because she

15   sends you the documents from the investor, she knows how

16   much money they're investing, right?

17   A.    Yes.

18   Q.    So all she had to do, if she wanted to figure out

19   what the interest rate was, was multiply it by three or

20   six percent, right?

21   A.    Yes.

22   Q.    There wasn't a lot of mental gymnastics involved in

23   your second spreadsheet, was there?

24   A.    No.

25   Q.    In fact, it was easily determined what that figure

PDF created with pdfFactory trial version www.pdffactory.com

1   is?

2   A.   Yes.

3   Q.   Now, you said you saw Dan Carpenter at a computer

4   for large blocks of time, right?

5   A.   Yes.

6   Q.   And that computer was located near you?

7   A.   Yes.

8   Q.   And were you watching what he was doing on the

9   computer?

10  A.   I'd see him if I went to talk to him or, you know,

11  it was close enough where I could see.

12  Q.   And what did you observe Mr. Carpenter doing?

13  A.   Watching stocks.

14  Q.   Watching stocks.  Just watching?

15  A.   Well, he was on the phone watching them.

16  Q.   All right.  When you were at Benistar, you didn't

17  have a stock portfolio, did you?

18  A.   No.

19  Q.   You didn't own any stock?

20  A.   No.

21  Q.   You didn't know anything about trading stock?

22  A.   No.

23  Q.   You saw Dan Carpenter on a computer, right?

24  A.   Yup.

25  Q.   You -- other than that, you don't know very much

PDF created with pdfFactory trial version www.pdffactory.com

1    about what he was doing, do you?

2    A.   You could see the stocks -- I knew enough to know

3    that they were stocks.

4    Q.   You could see a computer screen that represented

5    stocks, right?

6    A.   Right.

7    Q.   You don't know if that was a stock that

8    Mr. Carpenter held, controlled, had an option on, or had

9    a put on, do you?

10   A.   No.

11   Q.   You don't know whether or not those stocks had any

12   bearing to anything that you ever saw in any account

13   that came in from either Paine Webber or Merrill Lynch,

14   do you?

15   A.   No.

16   Q.   You have no idea about what his trades were, do you?

17   Did you?

18   A.   No.

19   Q.   As a matter of fact, the list that came to you at

20   the end of the day that you testified about on direct

21   examination from Paine -- excuse me, from Merrill Lynch

22   initially, that just had a number on it, right?

23   A.   Had the accounts and a balance.

24   Q.   Right.  It had an account and it had a number,

25   right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    It didn't say what stocks were in those accounts,

3    did it?

4    A.    No.

5    Q.    It didn't say anything about specific trading

6    activities, did it?

7    A.    No.

8    Q.    Just had a number?

9    A.    Right.

10   Q.    And you'd record that number, and you'd put it in a

11   file?

12   A.    Yes.

13   Q.    Okay.

14         So it's fair to say, then, isn't it, that you

15   didn't know what he was doing in the stock market?

16   A.    Correct.

17   Q.    You didn't know what trades he was engaged in, if

18   any?

19   A.    Correct.

20   Q.    You didn't know the nature of those trades, right?

21   A.    Right.

22   Q.    You didn't know any information relating to his

23   trading practices, right?

24   A.    No, I did not.

25   Q.    In fact, you don't really know whether he was

1    trading at all, do you?

2    A.    I heard him on the phone.

3    Q.    Okay.  Now, on direct examination, you were asked

4    about conversations with Mr. Carpenter.

5    A.    Yes.

6    Q.    And you initially indicated that the first

7    conversation that you had was at the end of 2000 or the

8    beginning of 2001; is that fair to say?

9    A.    I don't know which conversation you're talking

10   about, we've had a couple, and the time being when it

11   happened is -- it was a long time ago.

12   Q.    Let's go to the first of the two that you talked

13   about on direct, okay?  And that was the one where you

14   said -- where you said to Dan Carpenter, "You made some

15   money today, why don't you get out now?"

16   A.    Right.

17   Q.    That's the conversation I'm referring to.

18          Now, you said that to Mr. Carpenter, right?

19   A.    Yes.

20   Q.    And can you give us an approximation, your best

21   estimate of when that conversation took place, when you

22   made that statement to Mr. Carpenter?

23   A.    I actually have no idea.  I don't know.

24   Q.    Was it at the beginning of your time at Benistar?

25   Was it toward the end?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    I believe it was while I was still at Merrill Lynch.

2    Q.    Okay.  So that would have been sometime before

3    September of 2000, right?

4    A.    I believe so.

5    Q.    And you said that to him, was it the beginning of

6    the day, the end of the day?

7    A.    It must have been the morning because I -- that's

8    when I did the calculation.

9    Q.    From the previous day's account values?

10   A.    Yes.

11   Q.    And you said that -- you just made that statement to

12   Dan, offering him that observation in an unsolicited

13   way, correct?

14   A.    Yes.

15   Q.    Okay.  Let's go to the other conversation.  You

16   testified on direct examination that you had a different

17   conversation with Mr. Carpenter, where he told you not

18   to say anything because he did not want to upset

19   anybody.  Is that what you said?

20   A.    Yes.

21   Q.    Okay.  Let's talk about that conversation.  When in

22   point of time can you assign that conversation to have

23   taken place in what's your best estimate?

24   A.    It was when he started to lose money more, so it

25   was, you know, more towards the end.  Like I said, it

PDF created with pdfFactory trial version www.pdffactory.com

1    was so long ago, I don't --

2    Q.    Okay.  And we appreciate it was at least eight years

3    ago.

4    A.    Yeah.

5    Q.    We understand.  But was it toward the end -- was it

6    in 1999 or 2000?

7    A.    The accounts were still at Merrill.

8    Q.    Okay.  The accounts were still at Merrill, you're

9    sure about that?

10   A.    Yes.

11   Q.    So it had to be before -- before September of 2000,

12   September of 2000 or before?

13   A.    Right.

14   Q.    Now, are you sure that's what Dan Carpenter said to

15   you?

16   A.    Yes.

17   Q.    You're positive?

18   A.    Yes.

19   Q.    He said to you, "Don't say anything because he did

20   not want to upset anybody"?

21   A.    He didn't say in those exact words.  He said, "Don't

22   go talking about this, I don't want to upset anybody."

23          MR. PAPPALARDO:  May I approach, your Honor?

24          (Discussion off the record.)

25   BY MR. PAPPALARDO:

1   Q.   Do you recall testifying under oath on February 4,
2   2004?
3   A.   Yes.
4   Q.   Okay.  Let me just ask you to read from line 22, 1
5   through 4 on the next page.  Can you read that, please,
6   to yourself?
7        (Discussion off the record.)
8   Q.   Do you see that?
9   A.   Yes.
10  Q.   Thank you.
11       (Discussion off the record.)
12  Q.   In point of fact, Ms. Mahannah, that was testimony
13  before a federal grand jury, right?
14  A.   I believe so, yes.
15  Q.   Under oath?
16  A.   Yes.
17  Q.   And at that point in time, you were asked the
18  question:  "Did he tell you why you shouldn't tell
19  anybody?"  Right?
20  A.   Yes.
21  Q.   You were asked that question?
22  A.   Yes.
23  Q.   And you said:  "No"?
24  A.   Right.
25  Q.   Right?  So is it still accurate to say, as you said

PDF created with pdfFactory trial version www.pdffactory.com

1    this morning or this afternoon, that he did not want

2    anybody to know?  Did he say that to you?

3    A.   I think that was a separate conversation, it wasn't

4    that same one.

5    Q.   It's a third conversation?

6    A.   It was when they were losing money.  It was just a

7    "I don't want to upset anybody."

8    Q.   So you had -- now you say you had more than one

9    conversation --

10   A.   I've had many conversations with him.  I mean --

11           (Pause.)

12   Q.   Is it fair to say -- is it fair to say Dan is a

13   fairly proud guy?

14   A.   Yes.

15   Q.   And isn't it fair to say that on a day that he may

16   have incurred a loss or the day after that, he probably

17   would be a little bit embarrassed or upset about that?

18   A.   Yes.

19   Q.   Now, in your vantage point at Benistar when you were

20   working there, you indicated you could see into Dan's

21   office?

22   A.   Behind -- well, there was the desk that was to the

23   left of me and one behind me.

24   Q.   And did you make observations of the interior of his

25   office?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    Okay.  And did you watch Dan Carpenter read various

3    magazines and articles about investing?

4    A.    I don't know what he was reading, but, yes, he

5    was -- there was stuff all over the place.

6    Q.    You don't know what he was reading.  Did you see him

7    read the Wall Street Journal?

8    A.    Well, yeah.

9    Q.    Okay.  Did you see him read Barron's?

10    A.    I don't -- I don't remember.

11    Q.    How about the Investor's Business Journal?

12    A.    I don't know.

13    Q.    Excuse me?

14    A.    I don't know.  I mean, there was different magazines

15    and stuff all over.  I never really picked it up and

16    looked to see what he was reading.

17    Q.    Would Dan cut out articles?

18    A.    Yes.

19    Q.    And leave them all around his office?

20    A.    Yes.

21    Q.    And were those articles about investing?

22    A.    I never read them.

23    Q.    Well, did you see the headlines to them?

24    A.    Not really, never paid attention.

25    Q.    This activity where he would cut out articles and

PDF created with pdfFactory trial version www.pdffactory.com

1    read various things, that was the same period of time
2    that you describe in 2000; isn't that right?
3    A.    He had done that since the day I started.
4    Q.    Right.  But it included that period of time?
5    A.    Yes.
6    Q.    Now, you testified on direct examination that you
7    were familiar with the Merrill accounts, right?
8    A.    Yes.
9    Q.    Two accounts at Merrill?
10   A.    Yes.
11   Q.    And they were the 01 account?
12   A.    Yes.
13   Q.    Right, the in-and-out account?
14   A.    I don't remember which was which.
15   Q.    Okay.  One was a trading account?
16   A.    Right.
17   Q.    Right?  And didn't you testify that the trading
18   account was the 10 account?
19   A.    I may have back before, but I don't to this day
20   remember exactly which account was which.
21   Q.    I'm sorry, let me ask the question this way:  Didn't
22   you testify on direct examination that the 01 account
23   was the in-and-out account and the 10 account was the
24   trading account?
25   A.    I said that the money went into the 01 account, so,

PDF created with pdfFactory trial version www.pdffactory.com

1    yes.

2    Q.   And so the other one was the 10 account?

3    A.   Would be the trading account, yes.

4    Q.   And you recognize that number?

5    A.   Yes.

6    Q.   And you're sure that was a trading account?

7    A.   I can't tell you to this day, like I remember that

8    like it was yesterday, but because of the memorandums,

9    yes.

10   Q.   And you would receive -- you would receive

11   information from Merrill about those accounts, right?

12   A.   Yes.

13   Q.   What about the 00 account?

14   A.   I don't recall.  I don't know.

15   Q.   You have no memory of an 00 --

16   A.   It sounds familiar to me, but I can't tell you

17   anything about it.  I don't remember.

18   Q.   Do you remember telling the FBI that the 00 account

19   was a trading account?

20   A.   I do not, no.

21            (Discussion off the record.)

22            MR. PAPPALARDO:  If I may approach.

23   Q.   Can you just read to yourself this section?

24            (Discussion off the record.)

25   Q.   Does that refresh your memory?

1    A.    I don't remember -- I mean, I know I said this, but

2    I don't remember the account 00.  I remember from

3    looking at this, but I don't -- I can't remember it.

4    Q.    And it's fair to say that was in July of '02?

5    A.    Yes.

6             (Discussion off the record.)

7    Q.    In August of 2000, you were employed in the capacity

8    that you've previously described, right?

9    A.    Yes.

10   Q.    Do you recall in August of 2000 $2 million going

11   into the 10 account?

12   A.    Off the top of my head, no, I don't remember that

13   specific day.

14   Q.    Well, let me ask you this:  It would have been in

15   the beginning of August, oh, say around August 3rd,

16   where the money didn't come out of the 01 account, it

17   came out of a different account.  Does that refresh your

18   memory, $2 million?

19   A.    I'm sorry, no.

20   Q.    Okay.

21            (Discussion off the record.)

22            MR. PAPPALARDO:  May we approach, your Honor?

23            (At sidebar on the record.)

24            MR. PIROZZOLO:  Your Honor, just hopefully to

25   speed things along, Mr. Pappalardo is going to be

PDF created with pdfFactory trial version www.pdffactory.com

1  putting in this document and a series of documents that
2  relate to transfers of funds back to exchangors in
3  January of 2001 when things fell apart.  Mr. Carpenter
4  made some payments to some of the exchangors.  And
5  there's notation that she made that list --

6          THE COURT:  Is that all her handwriting?

7          MR. PAPPALARDO:  It's her handwriting.

8          MR. PIROZZOLO:  It's been authenticated.

9          Your Honor, this is something she definitely --
10  our position, only to the extent that this goes in, that
11  the information about the money he didn't pay back also
12  goes in.  So they can have all of it or none it.

13          MR. PAPPALARDO:  Your Honor, I'm specifically
14  offering this on one point, and one point only.

15          The previous witness, Mitchell Rock, testified
16  that there was a conversation he had with Dan Carpenter
17  when the account was closed where he says that Dan
18  Carpenter said that he was out of money.  And I suggest
19  to the Court that what this will show -- this is being
20  offered for the exclusive purpose of rebuttal witness to
21  what Rock said.

22          This is all Dan Carpenter's money in January.
23  He couldn't have been out of money at the time he had
24  the conversation with Mitchell Rock where he was talking
25  about, well, gee, I have to close this position because

1    I'm out of money.

2        He put over a million dollars, your Honor, in

3    January out of his own pocket to complete exchanges, and

4    he couldn't have been out of money.  That conversation

5    never took place, and that's the only reason why I'm

6    offering this.

7        MR. PIROZZOLO:  Well, I don't know that -- I've

8    seen evidence of a million dollars going into the

9    account in December.  To the extent they want to put in

10   the December statement, that would show whatever money

11   was transferred into that account and the source.

12        MR. PAPPALARDO:  This is January.

13        MR. PIROZZOLO:  So to the extent they want to

14   also put the January statement, they can do that as

15   well.

16        THE COURT:  Well, let me -- what about the

17   all-or-nothing proposition?

18        MR. PAPPALARDO:  Your Honor --

19        THE COURT:  Why should it be something other

20   than all or nothing?

21        MR. PAPPALARDO:  For two reasons, for two

22   reasons:  The first is, the purpose I'm just offering

23   this, I just told the Court, was on the basis of the

24   redirect examination of Mitch Rock --

25        THE COURT:  Right.

PDF created with pdfFactory trial version www.pdffactory.com

1            MR. PAPPALARDO:  -- who said in his conversation

2      that Carpenter said that he had no money in December,

3      which we vehemently dispute, and this shows it.

4            Secondly, your Honor, we take the position, as

5      we have from the beginning -- we didn't want to get into

6      trading, we did not want to get into loss, this is

7      offered for a specific purpose, and I'd be happy to

8      accept a limine instruction.  But I believe this is

9      probative from the witness, who is the person who had

10     the accounts, who is the person who wrote a lot of these

11     checks, and is the only person who can testify to the

12     fact that this money went in from outside of the

13     accounts to these investors to complete the exchange.

14            This shows -- this -- just this -- and, your

15     Honor, we've redacted the ones -- we've redacted the

16     ones that aren't clearly --

17            MR. PIROZZOLO:  So this is a redacted document?

18     It doesn't indicate on its face it is.

19            MR. PAPPALARDO:  No, no, we have redacted --

20     this is -- just let me finish.  We've redacted the ones

21     that this witness can't testify to.  This was a document

22     prepared by her.  There are other -- he spent over a

23     million dollars in January; this was the only thing this

24     witness can testify to.

25            THE COURT:  If it were the all, as opposed to

PDF created with pdfFactory trial version www.pdffactory.com

1   the nothing, what would your evidence be, in particular?

2   In other words, what numbers would we have?

3        MR. PIROZZOLO:  Well, it would be the Iantosca

4   numbers, the Snider numbers --

5        THE COURT:  What form would it take?

6        MR. PIROZZOLO:  We could put it in two forms:

7   We have a summary exhibit that lists where everything

8   was paid pack to all the exchangors -- it's one of the

9   exhibits, I could show it to you if you wanted to see

10  it -- and it lists both money in, money paid back,

11  balance remaining.  So that would be one thing we would

12  put in.

13       I really think the account statements are the

14  ones that are most probative of this, shows what was in

15  the accounts --

16       THE COURT:  The one that shows original, paid

17  back, balance, so on, is that one prepared by Benistar?

18       MR. PIROZZOLO:  No, it is a summary chart based

19  on the -- based on the Benistar records.

20       THE COURT:  Didn't we see some that had --

21       MR. PAPPALARDO:  They're redacted, your Honor.

22       THE COURT:  -- that had some -- I remember

23  some --

24       MR. MITCHELL:  Talking about the Paine Webber

25  accounts?

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  No, no, somebody made them.  They
2     look handmade.
3          MR. PIROZZOLO:  Handmade?
4          THE COURT:  Not hand -- they weren't
5     regularly -- they look like they were on a cruder or
6     old-fashioned kind of spreadsheet thing rather than --
7          MR. GREENBERG:  They're in evidence, your Honor.
8          THE COURT:  Are they in evidence?  I don't think
9     so.
10          MR. GREENBERG:  I thought they were.  I thought
11     they were.
12          THE COURT:  But, anyway --
13          MR. PIROZZOLO:  We should be entitled, your
14     Honor, to show the letters to show that people are not
15     getting their money back.
16          THE COURT:  What letters?
17          MR. PIROZZOLO:  The letters that went to the
18     series of exchangors.
19          MR. PAPPALARDO:  Your Honor, again, I'm offering
20     this for a limited purpose.  If the Court says no, then
21     we're not going to offer it.
22          THE COURT:  I think it's best not to get into
23     that.
24          MR. PAPPALARDO:  Fine.
25          THE COURT:  Mr. Pappalardo, how are we doing?

PDF created with pdfFactory trial version www.pdffactory.com

1    Are we going to finish?

2            MR. PAPPALARDO:  I think we can definitely

3    finish.  If I could just have one minute, I have to

4    regroup a bit.

5            (End of discussion at sidebar.)

6            (Discussion off the record.)

7    BY MR. PAPPALARDO:

8    Q.   Ms. Mahannah, as the person who was receiving the

9    value of the accounts on a daily basis, did there come a

10   point in time -- and witnessing the transfers between

11   the accounts, did there come a point in time any time in

12   the period of time you worked with Mr. Carpenter

13   directly and specifically to while you were at Merrill

14   that you understood that Dan Carpenter put in $2 million

15   of his own money into the 10 account?

16   A.   I know there was money put in; I don't know where

17   the money came from.

18   Q.   And does $2 million ring a bell to you?

19   A.   I can't say.  I don't remember.

20           MR. PAPPALARDO:  Okay.  Fine.

21           Nothing further, your Honor.

22           MR. PIROZZOLO:  No redirect, your Honor.

23           THE COURT:  All right, Ms. Mahannah, thank you.

24   You may step down.  You're excused.

25           THE COURT:  Thank you, jurors.  Given the fact

PDF created with pdfFactory trial version www.pdffactory.com

1    she was from Connecticut, we wanted to finish her today.

2         We're going to recess and resume tomorrow.

3         Let me just say -- I haven't reminded you for a

4    while, it's time to do it, I guess -- the more

5    information we have as we progress through the evidence,

6    maybe the greater the temptation to begin the process to

7    talk about it.  Please avoid that.  It's easy to do.

8    It's very sketchy.  As the pictures begin to fill out,

9    maybe there's more temptation.  Please avoid any

10   discussion among yourselves or otherwise about any of

11   the evidence.

12        Enjoy the rest of the day.  We'll see you

13   tomorrow.

14        (Jury left the courtroom.)

15        THE COURT:  I just want a preview.  What's up

16   for tomorrow?

17        MR. MITCHELL:  Tomorrow Ms. Cahaly is taking the

18   stand, and Mr. Zappala, and whether we get far enough

19   along, Mr. Paley.

20        MR. GREENBERG:  And then --

21        MR. PIROZZOLO:  We're not going to get beyond

22   Mr. Paley.

23        MR. GREENBERG:  Who is next?

24        MR. MITCHELL:  It's left to be decided.  I can

25   tell you what we're doing tomorrow.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Okay, thanks.

2          (Court adjourned at 1:15 p.m.)

3

4          - - - - - - - - - - - -

5               CERTIFICATION

6      We certify that the foregoing is a correct

7  transcript of the record of proceedings in the

8  above-entitled matter to the best of our skill and

9  ability.

10

11

12  /s/Debra M. Joyce
     Debra M. Joyce, RMR, CRR      Date
13  Official Court Reporter

14

15

16

17  /s/Marcia G. Patrisso
     Marcia G. Patrisso, RPR, CRR   Date
18  Official Court Reporter

19

20

21

22

23

24

25