UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,      )
                              )
         Plaintiff,            )
                              ) Criminal Action
v.                            ) No. 04-10029-GAO
                              )
DANIEL E. CARPENTER,           )
                              )
         Defendant.           )
                              )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY TEN
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Friday, June 13, 2008
9 a.m.

Marcia G. Patrisso, RPR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

1   APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Jonathan F. Mitchell and Jack W. Pirozzolo,
3        Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        One Courthouse Way
         Boston, Massachusetts  02210
5        On Behalf of the Government

6        GREENBERG TRAURIG, LLP
         By: A. John Pappalardo, Esq. and
7            Gary R. Greenberg, Esq.
         One International Place
8        Boston, Massachusetts  02110
         On Behalf of the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

|                          | Direct | Cross | Redirect | Recross |
|--------------------------|--------|-------|----------|---------|
| WITNESSES FOR THE GOVERNMENT: |        |       |          |         |
|                          |        |       |          |         |
| THOMAS ZAPPALA           |        |       |          |         |
|                          |        |       |          |         |
| By Mr. Pirozzolo         | 4      |       | 70       |         |
| By Mr. Pappalardo        |        | 42    |          | 76      |
|                          |        |       |          |         |
| GAIL CAHALY              |        |       |          |         |
|                          |        |       |          |         |
| By Mr. Pirozzolo         | 89     |       |          |         |
| By Mr. Greenberg         |        | 101   |          |         |
|                          |        |       |          |         |
| MARTIN PALEY             |        |       |          |         |
|                          |        |       |          |         |
| By Mr. Mitchell          | 111    |       |          |         |

E X H I B I T S

| Exhibit No. | Description                          | Marked | Received |
|-------------|--------------------------------------|--------|----------|
| No. 37      | Cahaly property exchange document    |        | 94       |
| No. 40      | Exchange fee agreement 11/8/00       |        | 97       |
| No. 41      | Copy of check dated 11/7/00          |        | 99       |
| No. 185     | Page from Benistar website           |        | 138      |
| No. 214     | Bank of America/Fleet wire transfer  |        | 38       |
| No. 215     | Bay State Savings Bank wire transfer |        | 38       |
| No. 216     | Federal Reserve Bank wire transfer   |        | 38       |
| No. 217     | Fidelity Investments wire transfer   |        | 38       |
| No. 218     | Service Credit Union wire transfer   |        | 38       |
| No. 219     | Sovereign Bank transfer              |        | 38       |
| No. 221     | Bernkopf, Goodman wire transfer      |        | 38       |
| No. 222     | Barrett wire transfer                |        | 38       |
| No. 223     | Peabody & Arnold wire transfer       |        | 38       |
| No. 224     | Hoffman & Hoffman wire transfer      |        | 38       |
| No. 225     | 12 CFR Part 229, Appendix A          |        | 38       |
| No. 226     | Wire transfer chart                  |        | 38       |



PDF created with pdfFactory trial version www.pdffactory.com

1          (The following proceedings were held in open

2    court before the Honorable George A. O'Toole, Jr.,

3    United States District Judge, United States District

4    Court, District of Massachusetts, at the John J. Moakley

5    United States Courthouse, One Courthouse Way, Boston,

6    Massachusetts, on June 13, 2008.

7          The defendant, Daniel E. Carpenter, is present

8    with counsel.  Assistant U.S. Attorneys Jonathan F.

9    Mitchell and Jack W. Pirozzolo are present.)

10          THE CLERK:  All rise for the jury.

11          (Jury in at 9:05 a.m.)

12          THE CLERK:  Please be seated.

13          THE COURT:  Good morning, jurors.

14          THE JURORS:  Good morning.

15          MR. PIROZZOLO:  The United States calls Thomas

16    Zappala.

17                    THOMAS ZAPPALA, sworn

18          THE CLERK:  State your name, spell your last

19    name for the record, keep your voice up and speak into

20    the mic, please.

21          THE WITNESS:  My name is Thomas Zappala, and

22    that's spelled Z-A-P-P-A-L-A.

23                    DIRECT EXAMINATION

24    BY MR. PIROZZOLO:

25    Q.   Mr. Zappala, where do you work?

```
 1   A.   I work for the United States Attorney's Office here
 2   in the District of Massachusetts in the Economic Crimes
 3   Unit.
 4   Q.   What's your position?
 5   A.   I'm an auditor.
 6   Q.   Can you describe what an auditor does?  What do you,
 7   as an auditor, do?
 8   A.   Certainly.  I participate in the investigation of
 9   economic crimes generally, and my duties involve
10   reviewing financial statements, participating in
11   interviews of witnesses on occasion, summarizing records
12   and documents, and in some instances obtaining documents
13   and records, and at times like today, presenting
14   summaries at trial.
15   Q.   Let's talk a little bit about your background.
16   Where did you go to school?
17   A.   I went to Boston College where I received a degree
18   in economics, and I went to Babson College in evenings
19   where I received a master's in business administration.
20   Q.   Can you talk a little bit about your employment
21   background before you came to work for the U.S.
22   Attorney's Office?
23   A.   Yes.  I worked in banking for approximately ten
24   years at two institutions in the internal audit
25   department, initially, and then for some time at the end
```

1    I worked as the head of retail banking services at a

2    savings bank.

3    Q.   And in that capacity what were your duties and

4    responsibilities?

5    A.   Generally to conduct periodics of the books and

6    records of the banks that I was employed at.  In the

7    first instance -- institution I was staff auditor, and

8    in the second institution I established and staffed and

9    ran an internal auditing department for most of my

10   tenure.

11   Q.   Now, in connection with your duties and

12   responsibilities as an auditor with the U.S. Attorney's

13   Office, have you been assigned to a case involving

14   Daniel Carpenter?

15   A.   I have.

16   Q.   In that capacity have you reviewed certain documents

17   before you came here today?

18   A.   Yes.

19   Q.   Can you describe what those documents are?

20   A.   Certainly.  I reviewed first the indictment in the

21   case; I reviewed records of certain accounts of Merrill

22   Lynch and PaineWebber relating to Benistar Property

23   Exchange, also some records of a company called Benistar

24   Employer Services Trust; I reviewed the accounting

25   statements, certain wire transfer, checks and other

1    documents relating to those accounts; I reviewed certain

2    records relating to the customers of Benistar Property

3    Exchange including some rate selection forms and other

4    documents relating to exchanges; I listened to some of

5    the testimony here at trial; and I reviewed generally

6    some other documents in the course of the investigation.

7    Q.    Among the documents that you reviewed from the

8    Merrill Lynch and PaineWebber records, did that also

9    include wire transfer advices?

10   A.    Yes.

11   Q.    What's a wire transfer advice?

12   A.    A wire transfer advice is typically a record of a

13   transfer of funds between two institutions where one is

14   the sending institution, one's the receiving

15   institution.  And it's simply a record akin to a

16   cancelled check that we would ordinarily see with our

17   bank statements but it's a little more technical in

18   nature.

19   Q.    And, Mr. Zappala, have you prepared summaries of

20   those records you've reviewed?

21   A.    I have.

22   Q.    Can you take a look at the exhibit that's marked in

23   front of you as Exhibit 204C?

24   A.    I have it here.

25   Q.    What is it?

1    A.    This is a summary that I prepared of the month-end

2    asset account balances of the Merrill Lynch and

3    PaineWebber accounts of Benistar Property Exchange for

4    the period January 31st of the month of January, 2000,

5    through November 30th of 2000.

6    Q.    And was it based on records that were introduced

7    into evidence in this case?

8    A.    It was.  I simply took the asset balances from the

9    statements, recorded them in a column for each account,

10   and then I added the columns across to get a total asset

11   balance for the four accounts throughout the period.

12         MR. PIROZZOLO:  The government would offer

13   Exhibit 204C.

14         MR. PAPPALARDO:  Your Honor, is it being offered

15   as an exhibit or as a chalk?

16         MR. PIROZZOLO:  As an exhibit.

17         MR. PAPPALARDO:  Well, I would object.

18         THE COURT:  Let me see you at the side.

19         (Discussion at sidebar and out of the hearing of

20   the jury:)

21         MR. PAPPALARDO:  Your Honor, this is one of

22   them, but I think this last line --

23         THE COURT:  What's the difference between B and

24   C?

25         MR. PAPPALARDO:  The last line of B is out.

1          MR. PIROZZOLO:  We eliminated the records for

2     December.

3          MR. PAPPALARDO:  Your Honor, I don't want to

4     spend a lot of time on this but I would suggest these go

5     in as chalks and not exhibits.

6          THE COURT:  The significance of that being?

7          MR. PAPPALARDO:  The significance of that being

8     it doesn't go as an exhibit to the jury.

9          THE COURT:  He's right.

10          MR. PIROZZOLO:  It's a summary of an exhibit

11     which is appropriately admissible under Rule 1006.

12          THE COURT:  No, it's not, actually.  There are

13     two kinds of summaries:  One is the 1006 summary, which

14     is a summary of documents not in evidence that are

15     available but too voluminous and can be prepared in

16     advance; there is then, under the case law, a separate

17     group of summaries which are called pedagogical

18     summaries, which are summaries of things that are in

19     evidence.  Most people don't recognize the distinction

20     and it is usually ignored and these are typically

21     offered.  But the case law in the circuit is, on

22     objection, they can be excluded as pedagogical, it's not

23     1006.

24          MR. PIROZZOLO:  So they could be offered just as

25     chalks?

PDF created with pdfFactory trial version www.pdffactory.com

1        THE COURT:  So they could be used as chalks,

2   which means they could be used here in the courtroom but

3   they can't go to the jury.

4        MR. PAPPALARDO:  Absolutely.

5        MR. PIROZZOLO:  Thank you.

6        (In open court:)

7        MR. PIROZZOLO:  May I publish Exhibit 204C?

8        MR. PAPPALARDO:  As a chalk?

9        MR. PIROZZOLO:  As a chalk?

10        THE COURT:  Yes.  Yes.

11   BY MR. PIROZZOLO:

12   Q.   Mr. Zappala, I'm going to magnify the screen here, a

13   portion of Exhibit 204C.  If you could walk through the

14   various columns, identify what information is contained

15   in the columns, and then we'll proceed through --

16   chronologically through the exhibit.

17   A.   Certainly.  As I said before, what I did was simply

18   looked at the account statements for each of the four

19   accounts.  Now, across the top you'll see after the

20   first -- the column to the left I simply list the date

21   or the month-end for each period for which statements

22   were generated.  Then reading across to the right there

23   are -- from left to right there are two accounts for

24   Merrill Lynch.  One is the 849-07B01 account, the B01

25   account, and then the second column next to that is the

1    849-07B10, the B10 account.  Continuing across is the

2    PaineWebber 13 -- EX15433-MR account, and next to that

3    is the 34 account.

4        And then in the column to the right -- I simply

5    added up the four account balances.  And as is

6    illustrated here, in the first nine months of the year

7    the PaineWebber accounts are not active and, therefore,

8    they have zero balances and the assets are simply those

9    that are in the Merrill Lynch accounts.

10        Similarly, at the -- for October and November the

11   balances in the Merrill Lynch accounts are -- there are

12   some residual balances, but they're not of substance.

13   The significant balances that are in the PaineWebber

14   accounts.  These are typically the balances that are

15   reflected on the account statements.

16   Q.   And with respect to certain balances on July 31,

17   2000, do you see that?

18   A.   Yes, I do.

19   Q.   What were the balances in both accounts at that

20   time?

21   A.   The total was $790,331.30.

22   Q.   And then November 30, 2000.  Do you see that?

23   A.   I do.  The balance there was $5,148,647.13.

24   Q.   There's a note done at the bottom, Mr. Zappala?

25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   What does that reflect?

2  A.   In the course of my review I noted that there were

3  three other accounts in the name of Benistar Property

4  Exchange, and I looked at the month-end balances of

5  these accounts, there wasn't much activity in them;

6  however, the month-end balances were at no point greater

7  than $135.51.  So for that reason I didn't include them

8  in my analysis.

9  Q.   And "BPE" refers to what?

10  A.   Benistar Property Exchange Trust.

11  Q.   Can you take a look at Exhibit 208?

12  A.   I have it here.

13  Q.   What is that?

14  A.   This is a list of selected Benistar Property

15  Exchange deposits.  It lists the date of the deposit,

16  the exchangor, the account as is referenced in the

17  indictment, the account into which the deposit was made,

18  the amount of the deposit, and then the rate of interest

19  that the exchangor selected to receive when making their

20  deposit.

21  Q.   And that's a listing you prepared, Mr. Zappala?

22  A.   It is.

23  Q.   Based on evidence that's been presented in the case?

24  A.   Yes.

25          MR. PIROZZOLO:  May I approach, your Honor?

```
 1              THE COURT:  Okay.  As a chalk?
 2              MR. PIROZZOLO:  Yes.
 3              THE COURT:  Yes.
 4    BY MR. PIROZZOLO:
 5    Q.   If you could walk us through this exhibit.
 6    A.   Certainly.  The count is simply something as a
 7    reference to an indictment in this case, but the -- on
 8    September 8 of 2000 there was a deposit made to the
 9    Merrill Lynch B01 account in the amount of $294,290.35.
10    This account -- this credit shows up on the account
11    statement, and I know from the course of my review of
12    documents in this case that the source of the funds was
13    Byron Darling, an individual, and that he had selected a
14    rate of 6 percent to receive on his funds from Benistar
15    Property Exchange.
16    Q.   Further down through the document -- you mentioned
17    Byron Darling -- who else is listed?
18    A.    There are other -- Bellemore Associates, Jeffrey
19    Johnston, Mass. Lumber and Eliot Snider, Joseph
20    Iantosca, Brian Fitzgerald, Gail Cahaly, Jeffrey
21    Johnston.
22    Q.   And further down at the end, 12/14/00, do you see
23    that?
24    A.   Yes, Joseph Iantosca.
25    Q.   And just, I'm going to focus on a date for a second.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    12/14?

2    A.    Yes.

3    Q.    Is that the latest date specified as a count in the

4    indictment?

5    A.    It is.

6    Q.    And what is the total amount?

7    A.    $15,004,937.57 is the sum of these deposits.

8    Q.    If you could take a look, Mr. Zappala, at Exhibit

9    148D, please.  And that's in evidence.

10    A.    I have it here.

11    Q.    What is that document?

12    A.    This is the account statement for the Benistar

13    Property Exchange Trust Company account, the B10 account

14    at Merrill Lynch.

15    Q.    I want to focus on the lower right-hand corner of

16    the front page of that document.  Do you see that?  Do

17    you see that?

18    A.    Yes, I see it.

19    Q.    There's a financial market indicators portion of the

20    document?

21    A.    Yes, I see that.

22    Q.    And there's a notation with respect to three-month

23    Treasury bills.  Do you see that?

24    A.    I do.

25    Q.    What was the rate?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. PAPPALARDO:  I object, your Honor.

2          THE COURT:  It's in evidence.  Overruled.

3    BY MR. PIROZZOLO:

4    Q.   What's the rate as specified?

5    A.   The rate specified for the three-month Treasury

6    bills for this statement is 6.2 percent, and for the

7    last statement specified it's 6.3 percent.

8    Q.   And that's for a three-month Treasury bill?

9    A.   Yes.

10   Q.   What's a Treasury bill?

11   A.   A Treasury bill is a security issued by the United

12   States government.  It's an investment that's made to

13   the public but issued by the United States Treasury to

14   help fund the operations of the government.

15   Q.   Would you take a look at Exhibit 205, please?  205A.

16   Excuse me.

17   A.   Yes; I have it here.

18   Q.   What is that?

19   A.   This is a summary of transfers that I prepared

20   reflecting transfers into the B10 account at Merrill

21   Lynch of Benistar Property Exchange and then into the

22   433 account at PaineWebber, reflecting generally

23   transfers between, in the first instance, the B1 account

24   and to the B10 account, and in the second instance, from

25   the B1 and B10 accounts to the 33 account, as the

PDF created with pdfFactory trial version www.pdffactory.com

1    Merrill Lynch accounts were being closed out, and then

2    from the 34 account to the 33 account at PaineWebber.

3    In addition, there's one other transfer in there that I

4    had noted.

5    Q.    And that's a document that you prepared?

6    A.    It is.

7         MR. PIROZZOLO:    The government would like to

8    publish that document, Exhibit 205A.

9         THE COURT:    Okay.

10   BY MR. PIROZZOLO:

11   Q.    Let's focus on the top half of the document.

12   There's a title, "Summary of transfers."  Do you see

13   that?

14   A.    I do.

15   Q.    And there's a line, "Transfers to Merrill Lynch

16   Account Number 849-B10."  And can you explain each

17   column, and then we'll walk through chronologically.

18   A.    Certainly.  This section of the chart simply

19   reflects the transfers from the B1 account to the B10

20   account at Merrill Lynch.  For example, in the first

21   row, on February 1st, 2000 -- and these are for the year

22   2000 -- for the first row there, on February 1st there

23   was a $750,000 transfer from the B1 account to the B10

24   account; that is, the money was withdrawn from the B1

25   account and deposited into the B10 account.  And this

PDF created with pdfFactory trial version www.pdffactory.com

1    continues down until July 28th when there's actually a

2    transfer from the B10 account back to the B1 account.

3    Q.   Why is that included?

4    A.   What I was trying to show is the flow of funds from

5    the B1 account to the B10 account.  And as there was

6    money going both ways in these two instances, these two

7    transfers on 7/28 and 7/31, I thought it appropriate to

8    include them so as to fairly reflect the transfers from

9    the B1 account to the B10 account on a net basis.

10   Q.   What effect does it have to this bottom-line figure,

11   $4,570,000?  What effect does including those two

12   transfers have to that number?

13   A.   It reduces the amount by the amount of those two

14   transfers.

15   Q.   I'm going to scroll down a portion of the transfers

16   that refers to PaineWebber.  Do you see that?

17   A.   Yes.

18   Q.   Can you walk us through that document as well?

19   A.   Certainly.

20   Q.   That portion of the document, please.

21   A.   Certainly.  What I saw in reviewing the bank records

22   on October 12, I saw there was a transfer of funds from

23   the Merrill Lynch account, the B1 account, to the 433

24   account at PaineWebber in the amount of $200,000.  So I

25   recorded that.  Similarly, on 10/18 there was a transfer

PDF created with pdfFactory trial version www.pdffactory.com

1    from the B10 account to the 433 account at PaineWebber

2    in the amount of $870,690.

3    Q.    There's a transfer from a 35 account.  Do you see

4    that?

5    A.    Yes.

6    Q.    Can you explain what that transfer is?

7    A.    Yes.  That's a transfer from an account in the name

8    of Benistar Employer Services Trust Company, what I

9    believe to be a related company.  There was a $2 million

10   credit to the 433 account, and as I was looking at

11   transfers into this account I thought it appropriate to

12   include it.

13        Continuing down the chart, there were three other

14   transfers into the account of $1 million, $1,020,402,

15   and $929,156.  And on December 4th there was a transfer

16   back in the amount of $420,402, and so I just netted

17   that out.

18   Q.    The final date on the chart is December 14th, 2000.

19   Do you see that?

20   A.    I do.

21   Q.    Why is that the final date on the chart?

22   A.    That was a date I was asked -- the date of the last

23   transfer here and as of the date of the last count in

24   the indictment.  It was the date I was asked to prepare

25   it through.

1    Q.   Now, with respect to this transfer, when you

2    reviewed documents did you identify any other transfers

3    from BESTCO, the Benistar Employers Services Trust

4    Company?

5    A.   Not into the B10 or the 433 account, as I had set

6    out to do here.  But I did note in the course of my

7    review there was a $120,000 transfer from the BESTCO

8    account into the B01 account in July of 2000.

9    Q.   Did you identify any other transfers in July of 2000

10   into the B1 account?

11   A.   I did.

12   Q.   What did you identify?

13   A.   I saw there was a $400,000 transfer from an entity

14   noted as Carpenter Financial.

15   Q.   Did you note in your review of any documents any

16   transfers to an entity called Carpenter Financial?

17   A.   I did.  I noted one in September.  I believe on

18   September 18th.

19   Q.   For how much?

20   A.   That was in the amount of $412,000.

21   Q.   Did you identify any other transfers into the

22   accounts that you couldn't link to one of the

23   exchangors?

24   A.   There was one transfer in June that I'm just not

25   certain about -- it was in the amount of $400,000 -- and

PDF created with pdfFactory trial version www.pdffactory.com

1    I couldn't -- I could not link it to the -- to a

2    specific exchangor.  The wire transfer advice reflects

3    Mr. Carpenter's name, though I noted he's also named on

4    the recipient account because it's a transfer into the

5    B01 account.  But I did note that in my review.

6    Q.   Can you take a look at summary Exhibit 206B, please.

7    A.   Yes, I have it.

8    Q.   What's that?

9    A.   This is a chart that I prepared which is titled

10   "Summary of Trading Losses," and it reflects the losses

11   and gains reflected in trading activity in the B10

12   account and in the 433 account at PaineWebber.

13   Q.   And it's based on information that was -- has been

14   introduced into evidence at this trial?

15   A.   Yes.  It's information I took directly from the

16   account statements.

17          MR. PIROZZOLO:  May I publish?

18          THE COURT:  Okay.

19   BY MR. PIROZZOLO:

20   Q.   The title of this is what?

21   A.   "United States v. Carpenter - Summary of Trading

22   Losses."

23   Q.   Let's focus on the top half of this chart.  Can you

24   walk us through each of the columns, and then

25   chronologically the information on this?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   Certainly.  Well, the three columns simply are the

 2   month, and it reflects the month-end, the realized

 3   capital gains, and in parenthesis, losses for the month,

 4   and then the realized capital gains and losses year to

 5   date.  And in preparing this I simply looked at the

 6   account statements -- there is a section that's entitled

 7   "Realized Capital Gains and Losses" -- and then I simply

 8   took those figures off the account statements.

 9   Q.   And there's a column that refers to a monthly?

10   A.   Yes.

11   Q.   And a YTD.  Do you see that?

12   A.   Yes.  Year to date.

13   Q.   So can you explain what the number in the column

14   "year to date" reflects?

15   A.   It just represents the cumulative realized capital

16   gain or loss in the account.

17   Q.   And there are certain parenthesis around some of

18   these figures.  What do the parenthesis signify?

19   A.   It signifies a loss.

20   Q.   If you can look -- if we can go through portions of

21   these, there's a May 2000.  Do you see that?

22   A.   I do.

23   Q.   Incidentally, when you have 5/00, is that month end?

24   A.   It's for the month, but it's month end, and those

25   are reflected on the month-end statements.
```

1  Q.   And he had a monthly loss in May of 2000 of how

2  much?

3  A.   It was a loss that month of $1,156,618.48.  That's a

4  realized capital loss as reflected on the Merrill Lynch

5  account statement.

6  Q.   And he had a year-to-date loss as of May 2000 of

7  what?

8  A.   $2,453,828.42.

9  Q.   And his cumulative loss for the next month in June

10 is how much?

11 A.   $2,632,346.46.

12 Q.   For July 2000 there's a number there that does not

13 have parenthesis.  What does that reflect?

14 A.   That reflects a realized capital gain for the month

15 of $660,347.99.

16 Q.   And then the cumulative number for that month?

17 A.   Is $1,971,998.47.

18 Q.   And then the cumulative amount as of August 2000 is

19 how much?

20 A.   A realized capital loss of $2,229,310.63.

21 Q.   And then finally, for September, the cumulative loss

22 was?

23 A.   $4,000,283.69.

24 Q.   On the bottom half of this chart there's a listing

25 of PaineWebber accounts.  Do you see that?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    I do.

2    Q.    And which account does that relate to?

3    A.    That relates to the 433 account.

4    Q.    And was that the trading account?

5    A.    Yes.

6    Q.    And there's a change in value of investments.  Do

7    you see that?

8    A.    I do.

9    Q.    This appears to have different terminology than the

10   terminology above.  Why is that?  With respect to

11   Merrill Lynch, why is there that difference?

12   A.    They're really two different companies.  I just used

13   the terminology that's reflected on the account

14   statements.

15   Q.    And in October 2000, the monthly change in

16   investments with the PaineWebber accounts is how much?

17   A.    $508,433.09.

18   Q.    And that's the same as the cumulative?

19   A.    Yes.  That was the month that the account was opened

20   in.

21   Q.    And then there's a November account.  Do you see

22   that?

23   A.    Yes.  And the change in value was a negative

24   $2,860,897.

25   Q.    And the monthly loss there was how much?

1   A.   $2,352,463.91.

2   Q.   In one of the earlier charts we noted a date of

3   December 14, 2000.  Do you remember that just a few

4   moments ago?

5   A.   I do.

6   Q.   This table does not have months up until December

7   14, 2000.  Why is that?

8   A.   I was not able to calculate the gain or loss on --

9   in the interim period during the month, I simply took

10  the month-end balances, and for that reason I simply

11  reflected the last balance as November 30th, or the last

12  change in value.

13  Q.   Can you take a look at the chart in front of you

14  that's marked as Exhibit 212C, please?  Excuse me.

15  212D.

16  A.   Yes, I have it.

17  Q.   Can you describe what that is?

18  A.   This is a chart that I prepared which was simply

19  intending to show the flow -- the general flow of funds

20  from the customers into the accounts at Merrill Lynch

21  and PaineWebber into which the exchangors -- the changes

22  were deposited, and then reflecting the transfers to the

23  B10 account and the 433 account, what we refer to as the

24  "trading accounts."

25          MR. PIROZZOLO:  May that be shown, your Honor?

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Okay.

2          MR. PIROZZOLO:  Your Honor, I have a blowup of

3    this.  I would like the witness to come down.  Where

4    would you like the easel?  I could put it right in the

5    middle here, and I could put it up on the screen for the

6    Court and for the clerks, if you can't see it.

7          THE COURT:  Well, here is fine.  How long will

8    it be up? I guess is the question.  I don't want to

9    block lines of sight, is all.

10          MR. PIROZZOLO:  I'll make sure the defense can

11    see it.

12          THE COURT:  Okay.

13    BY MR. PIROZZOLO:

14    Q.   Mr. Zappala, would you step down?

15    A.   (Witness complies.)

16    Q.   So, Mr. Zappala, could you walk us through this

17    chart?

18    A.   Sure.  Again, really what I was trying to show was

19    the movement of funds generally.  And so what I have

20    here furthest to the left is the B01 account, which is

21    the Benistar Property Exchange account that operated

22    initially, and then the 434 account into which

23    customers' funds were transferred and from which they

24    were repaid from.

25          And so generally what we saw is that with the B1

1    account there were funds that were then transferred into

2    the trading account.  The numbers we just reviewed,

3    there was an exhibit that listed the transfers, and that

4    was the total on that exhibit.  So those funds were

5    transferred from the B1 account to the B10 account.

6        Further, what this summarizes is the funds that were

7    in this account.  There were losses sustained in this

8    account.  That's simply what this was intending to show.

9    As the Merrill Lynch accounts were closed out, based on

10   my review I noticed that funds were transferred from the

11   B1 account into the 434 account, and at the same time

12   there were some transferred into the 433 account in the

13   amount of 200,000.  There were also funds transferred

14   from the B10 account into the 433 account, simply to

15   fund these accounts.

16       Then as customer deposits were received here, there

17   were transfers from the 434 account into the 433

18   account.  And as we discussed, there was a significant

19   transfer in the amount of $2 million from Benistar

20   Employer Services that was transferred at the end of

21   October into the 433 account of Benistar Property

22   Exchange, and that's reflected there as well.  And

23   the -- as we did with Merrill Lynch, the change in value

24   is reflected down here on this chalk.

25   Q.   A couple of notes on the date.  At the top of the

1  chart you say "Through 12/14."  Do you see that?

2  A.   Yes.

3  Q.   But in terms of the PaineWebber change in value,

4  that ends at 11/30 on your chart?

5  A.   It does.  I'd actually note there's an error on my

6  chart, I'm sorry to say.  In one of the edits I simply

7  picked up the monthly loss for the amount of -- for the

8  November period and not the cumulative total.

9  Q.   And was the cumulative total higher or lower than

10 that number?

11 A.   It was higher by the amount of a loss in October,

12 some 500,000.

13 Q.   Now, on the table there's -- at the top left-hand

14 portion -- there's some arrows that relate to a $400,000

15 transfer.  Do you see that?

16 A.   Yes.  If I may?

17      Yes.  As I just testified, I saw $120,000 transfer

18 from Benistar Employer Services into the Benistar

19 Property Exchange account that was in July of 2000, and

20 similarly, I saw a transfer of $400,000 into that

21 account in July.  And in September I saw $412,000

22 returned.

23 Q.   Returned to what?

24 A.   To the entity known as Carpenter Financial.

25 Q.   I just want to point out, what is the relationship,

1    if any, between the change in value of investments of

2    the PaineWebber number, and the change in value of the

3    realized loss from the Merrill Lynch statements?

4    A.   Well, there's no real relationship except for

5    similar items.  I believe that while the Merrill Lynch

6    account was operating with $4 million in realized

7    losses, there were additional losses recognized in the

8    PaineWebber account.

9    Q.   Okay.  You can return to the stand, Mr. Zappala.

10   Thank you.

11       Can you now take a look at the chart that's marked

12   as Number 207A.

13   A.   Yes, I have it.

14   Q.   What is that?

15   A.   This is a chart that I prepared.  It lists -- it

16   compares the obligations of Benistar Property Exchange

17   as listed on current exchange reports that I reviewed.

18   It compares them to the account balances, or the asset

19   balances, of Benistar Property Exchange in the Merrill

20   Lynch and PaineWebber accounts as of specific dates.

21           MR. PIROZZOLO:  May I publish?

22           MR. PAPPALARDO:  I object, your Honor.

23           THE COURT:  Let me see you.

24           (Discussion at sidebar and out of the hearing of

25   the jury:)

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Is this it?  That's the only thing I

2    have.

3          MR. PIROZZOLO:  Yes, it is, although it's the

4    particular chalk as of 11/30.

5          MR. PAPPALARDO:  Your Honor, my objection is

6    relevance.  This has nothing to do with this case and

7    I'd suggest, therefore, it's misleading.  Who cares what

8    the variant summary is at the end of the month?  The

9    only thing that's important here is what the amounts of

10   the money were at the time contracts were entered into.

11   And this -- you know, it makes no difference what

12   happens at the end of the month.

13         It is Mr. Carpenter's state of mind at the time

14   the contract was entered into that is controlling here,

15   and what this shows is a bunch of big numbers; what this

16   doesn't show is that -- you know, you don't know --

17   while you may have certain obligations, they were

18   obligations that had nothing to do with that point in

19   time, and for that reason I would suggest this is

20   misleading.

21         I would suggest too if this chart -- this chart

22   could have been done differently to make it relevant,

23   but the way it stands now, it is completely irrelevant.

24   And I would object on that basis.

25         MR. PIROZZOLO:  One of the issues in this case

1    is the question of what were the open obligations to the

2    exchangors compared to the amount of money on hand to

3    meet the obligations of the exchangors.  Mr. Carpenter

4    continued to accept money from the exchangors at the

5    same time as suffering significant losses -- that made

6    it impossible for him to repay the exchangors if they

7    exercised what was their right in the contract, which

8    was to have the money returned -- as the comparison of

9    what were the obligations that he knew about -- this is

10   based on Exhibit 189 -- to what were his losses that he

11   actually had on hand in order to pay them, which comes

12   from the Merrill Lynch statements.

13          It's relevant to his intent, it's relevant to

14   material representations, and for that reason it is

15   relevant.  If there are defects in the chart, they can

16   be explored on cross-examination.

17          MR. PAPPALARDO:  Your Honor, if I may just

18   respond to that.  The issue isn't what the outstanding

19   number is; the issue is when the debts fall due.  The

20   obligation isn't due.

21          I would suggest to the Court this chart also

22   doesn't include -- and there's been testimony from this

23   witness already -- that there's been an influx of

24   capital from Benistar companies, on one occasion of $2

25   million, on another occasion of $400,000, on another

PDF created with pdfFactory trial version www.pdffactory.com

1    occasion of 128.  You remember at the sidebar yesterday

2    from Carpenter Financial there was 668 there; I can

3    offer proof there was much more.

4        This is a misleading chart, your Honor, so it's

5    irrelevant to this case.

6        THE COURT:  I think the problem I have with it

7    is that it presumes, or assumes, that this kind of

8    calculation was one that a person in Mr. Carpenter's

9    position -- or Mr. Carpenter himself -- would have done;

10   in other words, to affect his state of mind.  It would

11   have been the kind of thing he would have taken note of,

12   and I'm not sure it is, actually; it is a calculation.

13       Whether it is the kind of calculation that

14   someone in his position would typically have been doing

15   to make sure these accounts were -- certainly he knows

16   of the losses, certainly he knows that money is coming

17   in from exchangors.  You have all of that.  A sort of

18   precise calculation of a comparison between those

19   suggests that's a metric that somebody would resort to

20   and I'm not sure that's the case.  I'm not sure -- sort

21   of intuitively.  And I'm not sure it's not in the

22   evidence in the case, so...

23       It's too precise, in other words.

24       MR. PIROZZOLO:  We have an ongoing running

25   spreadsheet in evidence where they are, in fact,

PDF created with pdfFactory trial version www.pdffactory.com

1  calculating what they owe the exchangors.  That's

2  Exhibit 189, your Honor.  These are running spreadsheets

3  they're keeping.  This ties specifically to specific

4  spreadsheets that were printed out and created.

5          THE COURT:  Oh, there's --

6          MR. PIROZZOLO:  Absolutely.  These were specific

7  documents created by the defendant.

8          THE COURT:  Why aren't they in, then?

9          MR. PIROZZOLO:  This is a chalk to demonstrate,

10  as they are generated, this is what their losses are.

11  That's what this is.  So you're saying it's not precise

12  enough or it is too precise?

13          THE COURT:  It is overly precise in the sense it

14  suggests a method of analysis which may or may not have

15  existed.

16          Let me just take a look -- this is what you're

17  talking about?

18          MR. PIROZZOLO:  Yeah.  What you'll see is

19  there's a series of spreadsheets that have different

20  dates on them.

21          THE COURT:  These?

22          MR. PIROZZOLO:  Those.  Those.  And they collect

23  into different -- this is just one.  This is actually

24  outside the scope of the period, but if you look at 189,

25  the full exhibit, there are specific spreadsheets --

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  This is just the account of the

2    exchangor and what's been received, what's owed, what's

3    been paid.

4          MR. PIROZZOLO:  That is printed out and

5    distributed --

6          THE COURT:  So that tells -- this tells you what

7    you know you're going to have to pay to somebody, right?

8          MR. PIROZZOLO:  Yeah.  And this tells you what

9    happened.

10          THE COURT:  Well, okay.

11          MR. PAPPALARDO:  Your Honor, there's no evidence

12   in this case that Mr. Carpenter had seen those

13   spreadsheets.  The witness who testified yesterday

14   indicated as much.  He didn't even look at the daily

15   balances on the -- there is no evidence that this was

16   before Mr. Carpenter, your Honor.

17          MR. PIROZZOLO:  He is receiving -- I want to

18   argue -- this is really important, your Honor.  With all

19   due respect, you've cut back on our evidence

20   consistently throughout this trial.

21          THE COURT:  Right.  Intentionally.

22          MR. PIROZZOLO:  So -- but I think that -- I

23   think what we had yesterday was on a regular basis Mr.

24   Carpenter was receiving profit-and-loss statements from

25   Ms. Spielman, and also regularly receiving and printing

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   out the amount of obligations that they owed to the
 2   exchangors.  This simply lays it out.
 3        THE COURT:  This chart suggests a particular
 4   comparison and suggests -- and the inference would be
 5   that from that comparison something could be deduced
 6   about Mr. Carpenter's state of mind.  That presumes he
 7   would have made this comparison, not others.  You have
 8   others that the evidence shows his familiarity.  He
 9   obviously was a hands-on person when it came to this and
10   he's got all kinds of stuff.
11        I'm directing only to this particular
12   comparison -- and it suggests that somebody would do
13   this -- and I just don't think that appears, and it's
14   not self-evident.  I think, therefore, it doesn't have a
15   proper use.
16        MR. PIROZZOLO:  Okay.  Thank you, your Honor.
17        (In open court:)
18   BY MR. PIROZZOLO:
19   Q.  Now, Mr. Zappala, I'm going to have you step down
20   again in just a moment.
21        MR. PIROZZOLO:  Your Honor, at this time there's
22   a stipulation on the record that relates to the wire
23   fraud counts, and at this time I think it's appropriate
24   for me to read the stipulation.
25        MR. PAPPALARDO:  No objection.
```

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  That's the one that was just filed

2    the other day?

3          MR. PIROZZOLO:  Yes.  There's a stipulation -- I

4    don't know if the Court needs to explain what a

5    stipulation is.

6          THE COURT:  Let me just see you at the side for

7    a minute.

8          (Discussion at sidebar and out of the hearing of

9    the jury:)

10          THE COURT:  Is this usual for the jury?  Didn't

11    I determine it wasn't?

12          MR. MITCHELL:  You did.  The government's

13    position on this, your Honor, is that -- you're correct,

14    it is an issue for the Court, but what we propose is

15    that it should also be submitted to the jury at the same

16    time.

17          THE COURT:  Belt and suspenders?

18          MR. MITCHELL:  Exactly.  Because there's no

19    controlling precedents in the circuit on this issue; it

20    seems to be split.  And most of the circuits are going

21    the other way, saying it's a jury issue.

22          MR. PIROZZOLO:  I know I'm violating the

23    one-lawyer rule here, but my understanding is that as of

24    now the defendant is contesting whether this goes to the

25    jury.

1          MR. PAPPALARDO:  Your Honor, let me tell you

2     what I told the government on more than one occasion:  I

3     am not going to mention wires.  I don't care about

4     wires; I'm not going to cross-examine on wires; I've

5     told them I'll stipulate to all of their witnesses; I'm

6     not going to mention it in final arguments.  I simply am

7     not going to do it.

8          What they're reacting to -- and I suggest it's

9     an overreaction, because I've never seen a case, your

10    Honor, in 35 years of practice, that had more

11    information about wires.  The issue here is a very

12    technical one, and in all of the wire fraud cases that

13    I've been involved in -- and there have been hundreds of

14    them -- this has never been an issue.

15         And, you know, the Court has already made a

16    ruling; I abide by that ruling.  I don't know why this

17    has to be, you know, highlighted.  The stipulation is in

18    there.  I don't know why it has to be read now, but it

19    is a stipulation.  And if the Court wants it read, fine.

20         THE COURT:  It's harmless to read it.  My

21    problem is, is it's going to confuse the jury.

22         MR. PIROZZOLO:  What I propose --

23         THE COURT:  If you want to submit it to --

24         MR. PIROZZOLO:  I'll just offer it into

25    evidence -- offer the documents that are related to this

PDF created with pdfFactory trial version www.pdffactory.com

1    into evidence -- I won't even read the stipulation --

2    and then I'm just going to have --

3              THE COURT:  You want to get these exhibits in?

4              MR. PIROZZOLO:  Yes.  There are exhibits that

5    need to go into evidence.

6              THE COURT:  There's only one count at issue

7    here, right, Count 4?  I mean, the best case, I mean,

8    that's the one that started in New Hampshire and ended

9    up in Pennsylvania or something like that; it passed

10   through the fed, right?  There's only one of those.

11   Everyone else has a better attachment to Massachusetts:

12   It began here or something else, right?  How much

13   worth --

14             MR. PIROZZOLO:  We just -- what you haven't

15   heard from Mr. Pappalardo is that he is not contesting

16   that and not contesting the wires.  If they're going to

17   waive venue, waive the argument -- there's a motion to

18   dismiss pending on venue.  We want to have a record on

19   this.

20             MR. MITCHELL:  Not only was there a motion --

21   Mr. Greenberg crossed Bellemore on where the wires went,

22   so they have put it in as an issue.

23             THE COURT:  I can understand your not wanting to

24   give it up; the case isn't over.  So, okay.  I just

25   don't want to get the jury off on something they're not

PDF created with pdfFactory trial version www.pdffactory.com

1    going to understand.

2           MR. PIROZZOLO:  Right.  So what I'll do is, I'll

3    just offer the exhibits and then we can have the

4    stipulation be part of the record or something.

5           THE COURT:  It's filed; it's in the case.

6           MR. PAPPALARDO:  Absolutely.

7           THE COURT:  Okay.

8           (In open court:)

9           MR. PIROZZOLO:  Your Honor, pursuant to the

10   stipulation that was just mentioned, the government

11   offers Exhibits 214 through 219, Exhibits 221 through

12   225, and Exhibit 226.

13          THE COURT:  Okay.

14          MR. PIROZZOLO:  Thank you, your Honor.

15          THE COURT:  They'll be admitted.

16          (Exhibit Nos. 214, 215, 216, 217, 218, 219, 221,

17   222, 223, 224, 225, 226 received into evidence.)

18   BY MR. PIROZZOLO:

19   Q.   Mr. Zappala, there's some exhibits in front of you,

20   214 through 219 -- before you get down from the stand --

21   and 221 through 225.  Can you just describe what those

22   documents are?

23   A.   Certainly.  Exhibit 2 -- I'm sorry?

24   Q.   If you could start with Exhibit 214?

25   A.   Yes.  Exhibit 214 is a funds transfer payment order

PDF created with pdfFactory trial version www.pdffactory.com

1    and agreement on Fleet Bank authorizing -- or ordering

2    the transfer of $17,090 to the 434 account of Benistar

3    Property Exchange.

4    Q.   Can you move to 215, please?

5    A.   Sure.  215 is a wire transfer authorization for the

6    Jennings Street Minute Carwash, authorizing the transfer

7    of $400,000 to the Benistar 434 account of PaineWebber.

8    Q.   What's Exhibit 216?

9    A.   216 is a series of wire transfer advices for a

10   number of transactions.

11   Q.   And what's Exhibit 217?

12   A.   217 is a one-time brokerage wire request for the

13   Truro Conservation Trust requesting the transfer of

14   $295,083.19 to Benistar Properties.

15   Q.   What's Exhibit 218?

16   A.   218 is a letter dated August 8 of 2000 from a law

17   firm describing net sale proceeds of $444,000 -- it

18   looks like -- 259.65.  There's a real estate HUD-1

19   settlement statement that's attached to it, wire

20   transfer instructions and a wire transfer advice

21   authorizing -- or documenting the transfer of

22   $444,659.65 from the Service Credit Union to the

23   Benistar Property Exchange Trust at Merrill Lynch for

24   Bellemore.

25   Q.   And Exhibit 219?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    219 is a facsimile cover sheet with a wire --
2    telephone and wire transfer agreement authorizing the
3    transfer of $72,535.62 to the Benistar Property Exchange
4    Trust Company 434 account at PaineWebber.
5    Q.    And Exhibit 221, please?
6    A.    221 are several wire transfer advices and a bank
7    statement for the Bernkopf, Goodman & Baseman clients
8    fund IOLTA account, as well as copies of several wire
9    transfer requests, or wire out requests.
10   Q.    222, please?
11   A.    Exhibit 222 is a copy of a wire transfer advice, a
12   copy of some wire transfer instructions and a copy of a
13   bank account statement for Robert J. Barrett, attorney
14   at law, conveyancing account.
15   Q.    224, please?  Or did I skip?  223.
16   A.    223 is a wire transfer advice reflecting a transfer
17   of $3 million to Benistar Property Exchange Trust, the
18   B01 account, regarding Mass. Lumber, and a copy of an
19   outgoing wire transfer form and wire transfer
20   instructions from Benistar Property Exchange Trust
21   Company.
22   Q.    And Exhibit 224?
23   A.    Exhibit 224 includes wire transfer instructions for
24   the transfer of funds to the 434 account at PaineWebber.
25   There's a wire transfer advice referencing the transfer

PDF created with pdfFactory trial version www.pdffactory.com

1    of $513,180.74 and a bank account reflecting that

2    transfer from the account of Hoffmann & Hoffmann IOLTA

3    account conveyance.

4    Q.    And Exhibit 225, please?

5    A.    Exhibit 225 is Appendix A to Regulation CC which

6    details -- which is a routing number guide to next-day

7    availability checks and local checks.

8    Q.    Now, Mr. Zappala, if you could now step down from

9    the stand and if you could put Exhibit 226 up on the

10   easel.  Now, what's that?

11   A.    This is a summary chart that I prepared entitled

12   "Wire Transfer Summary," and it simply lists the

13   accounts as noted in the indictment, the client and the

14   property for which exchange funds were furnished to

15   Benistar Property Exchange, the date of the wire

16   transfer, description of the wire, and the ABA number or

17   the bank routing number of the sending institution.

18   Q.    I'm not going to have you go through each one of

19   those on the chart.  I do have a couple of questions.

20   There's no route for Count 3.  Do you see that?

21   A.    I do.

22   Q.    And why is that?

23   A.    Because these wire transfers in Count 3 is a

24   different type of wire or fax transfer.

25   Q.    And let's take a look at Count No. 6, the Eliot

1   Snider wire transfer.  If you would just walk through

2   the information on that, as an example.

3   A.    Sure.  The chart simply lists the client and the

4   property, or the exchanger -- that's Eliot Snider -- who

5   worked at Mass. Lumber Company in Woburn.  There was a

6   transfer made on September 14th; that transfer is

7   reflected on the B01 account of Merrill Lynch.  I saw

8   the transfer there.  It was in the amount of $3 million.

9       The wire transfer advices show that it came from

10  Peabody & Arnold in Boston, Massachusetts, it was sent

11  to the B01 account, and it was sent from Citizens Bank.

12  And here on the right is the ABA number, or routing

13  number, for Citizens Bank.

14          MR. PIROZZOLO:  If I could just have a moment,

15  your Honor?

16          (Pause.)

17          MR. PIROZZOLO:  No further questions, your

18  Honor.

19          Mr. Zappala, you can take that down.

20                      CROSS-EXAMINATION

21  BY MR. PAPPALARDO:

22  Q.    Good morning, Mr. Zappala.

23  A.    Good morning, Mr. Pappalardo.

24  Q.    Now, sir, you testified on direct examination that

25  in your capacity as an auditor for the United States

1    Attorney's Office you had occasion to review documents

2    in relation to this case, right?

3    A.    Yes.

4    Q.    And those documents, as you've testified, included

5    financial statements, statements from brokerage houses,

6    PaineWebber, Merrill Lynch; they included wire

7    transfers; they included documents relating to exchanges

8    made by investors who were availing themselves of

9    Section 1031 of the code, right?

10   A.    Yes.

11   Q.    And they included documents that were provided to

12   the government by Benistar -- is that right?

13   A.    Yes.

14   Q.    -- pursuant to subpoena?

15   A.    Yes.

16   Q.    And in addition to that, you had occasion from time

17   to time -- not continuously, but from time to time -- to

18   listen to testimony in connection with this case and on

19   a previous occasion; is that fair to say?

20   A.    Yes.

21   Q.    Okay.  And specifically, you reviewed the documents

22   that were generated in connection with the 1031 exchange

23   for certainly the investors who are mentioned in these

24   charges, right?

25   A.    Yes.

1    Q.   As well as the indictment itself?

2    A.   Yes.

3         MR. PAPPALARDO:  Now, could we please turn to

4    Exhibit 205?  May that be brought up on the screen?

5    Thank you.

6    BY MR. PAPPALARDO:

7    Q.   Now, sir, this indicates -- this is a chart that you

8    prepared which indicates a summary of transfers into the

9    main Merrill Lynch accounts, between the accounts, and

10   also between the PaineWebber accounts, right?

11   A.   Yes.  Into these two accounts.

12   Q.   Into those accounts, right?

13   A.   Yes.

14   Q.   Exactly.  And as you testified, except for 7/28 and

15   7/31 of the year 2000, these show transfers from Account

16   B01 to B10, right?  B10?

17   A.   Yes.

18   Q.   And you were able to deduce this just by looking at

19   the account statements, right?

20   A.   I was.

21   Q.   That's what you did.  And the B1 statement showed

22   the amount of those being transferred to B10, and the

23   B10 statements showed the amount of transfer received

24   from B1, right?

25   A.   It did.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And similarly, with respect to the PaineWebber

2    accounts, the PaineWebber account transactions were

3    reflected in both accounts that were at PaineWebber,

4    right?

5    A.    That's correct.

6    Q.    And in your review of the materials of this case,

7    and your review of the statements provided by both of

8    these brokerage houses, you would say, sir, that these

9    were linked accounts; isn't that fair to say?

10   A.    Yes.

11   Q.    The Merrill Lynch accounts were linked together and

12   the PaineWebber accounts were linked together but not

13   with each other?

14   A.    Absolutely.

15   Q.    And the only time there was cross-fertilization

16   between those accounts, as you indicated on this chart,

17   was on October 12th and October 18th which reflect the

18   B1 account being transferred to -- from Merrill Lynch to

19   PaineWebber, and the B10 account being transferred from

20   Merrill Lynch to PaineWebber, right?

21   A.    Yes, sir.

22   Q.    Okay.  Could we now turn to Exhibit 208.

23         You have that in front of you, sir?

24   A.    I do.

25   Q.    Okay.  And again, these are one of the charts that

PDF created with pdfFactory trial version www.pdffactory.com

1    you prepared for today's testimony?

2    A.    It is.

3    Q.    Now, the column farthest to the right in this chart

4    shows the percent interest that the source -- that the

5    investor selected for that transaction, right?

6    A.    It does.

7    Q.    And "6 percent" meaning that the person elected 6

8    percent interest, right?

9    A.    Yes.

10   Q.    "3 percent" meaning they elected 3 percent interest,

11   correct?

12   A.    Yes.

13   Q.    Now, you have August 9th which is -- and by the way,

14   "count" refers to count of the indictment, right?

15   A.    It does.

16   Q.    August 9th, which is under Count 3 and 4, the third

17   line, is chronologically the first-listed transaction;

18   isn't that fair to say?

19   A.    It is.

20   Q.    Okay.  That was Bellemore Associates, right?

21   A.    Yes.

22   Q.    And from August 9th through the end of October there

23   were eight separate deposits by exchangors in the

24   Merrill Lynch 01 account, correct?

25   A.    I'm sorry.  Did you say through the end of November?

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    From August 9th through the end of October.

2    A.    I count seven.

3    Q.    You count seven?  Okay.  Well, I'm not going to

4    quarrel with -- you're the auditor, Mr. Zappala.

5        Okay.  Each of those transactions -- the point being

6    each of those transactions or deposits elected 6 percent

7    interest; is that right?

8    A.    That's correct.

9    Q.    Now, starting with August 9th and ending just before

10   November 8th, the Count 15 transaction, there weren't

11   any 3 percent transactions; isn't that right?

12   A.    That's correct.

13   Q.    And isn't it also true that the 3 percent

14   transactions that are in this -- that are counts in this

15   indictment -- that none of those investors elected the 3

16   percent Merrill Lynch Ready Asset market account,

17   correct?

18   A.    That's correct.

19   Q.    As a matter of fact, the only 3 percent elections by

20   any of the investors in this case were the 3 percent

21   PaineWebber investment account, correct?

22   A.    Yes.  Yes.

23   Q.    Okay.  So none of these -- none of these investors

24   elected a money market -- made a money market election,

25   right; is that fair to say?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   I'm sorry.  A Merrill Lynch money market election?

2  Q.   Any of the investors.  None of the investors in this

3  case elected a money market; they were all investment

4  elections, right, either -- mostly at 6 percent and one

5  at 3 percent, isn't that fair to say, from your review

6  of the documents, your understanding of the case?

7  A.   Yes.

8  Q.   Okay.  Now let's move to -- okay.  Let's -- I'm

9  sorry.  Let's go back to 205, if you would, sir.

10      Now, sir, I'd like you to focus on transfers to

11  PaineWebber; specifically, the entry for October 27th.

12  Do you see that?

13  A.   I do.

14  Q.   Okay.  And this shows $2 million going into the

15  PaineWebber account, the 33 account on that date, right?

16  A.   Yes.

17  Q.   And where did that come from?

18  A.   It came directly from the 435 account of Benistar

19  Employers Services Trust Company, or BESTCO, at

20  PaineWebber.

21  Q.   Okay.  And that was a separate account under the

22  Benistar umbrella; is that fair to say?

23  A.   It's fair to say.  It was a different company

24  basically --

25  Q.   Different company.  Right.

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    -- but I believe it was opened at the same time.

2    Q.    And none of that $2 million, based upon your

3    analysis of this case and your review of these documents

4    and your understanding, came from any exchangor, did it?

5    A.    Not to my knowledge.

6    Q.    It came from Benistar Employer Services, right?

7    A.    Yes.

8    Q.    And that was one of Mr. Carpenter's companies?

9    A.    Yes.  That's my understanding.

10   Q.    And what happened to the $2 million after it was put

11   into that account, PaineWebber 433?

12   A.    It was commingled with the other funds in that

13   account.

14   Q.    Okay.  It was never withdrawn, was it?

15   A.    No.

16   Q.    It stayed in the account?

17   A.    Or was either paid to exchangors or was invested or

18   traded.

19   Q.    Right.

20   A.    But stayed in the account; it was not removed.

21   Q.    What I'm asking, Mr. Zappala --

22   A.    It didn't go back.

23   Q.    Okay.  It didn't go back.  Thank you.  Thank you.

24       The $2 million essentially became part of the fund

25   that Mr. Carpenter bought and sold securities with in

1   that PaineWebber account, right?

2   A.   Yes.

3   Q.   Okay.

4        MR. PAPPALARDO:   Just one moment, your Honor.

5        (Pause.)

6   BY MR. PAPPALARDO:

7   Q.   Mr. Zappala, do you remember testifying on direct

8   examination -- your attention was being drawn to the

9   lower right-hand corner of an account -- and you

10  testified -- I believe it was 148D.

11       MR. PAPPALARDO:   Could that be brought up?   And

12  the lower right-hand corner of that, please.

13  BY MR. PAPPALARDO:

14  Q.   That's the section that you were asked questions

15  about on direct examination?

16  A.   Yes.

17  Q.   Right?   And specifically, your attention was drawn

18  to the three-month Treasury bills and the percentages

19  that were being displayed for that month; isn't that

20  right?

21  A.   Yes.

22  Q.   Okay.   And that shows, at that point in time,

23  anyway, that the three-month Treasury bill was 6.2, 6.3,

24  whatever?

25  A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Now, sir, you understand, of course, that a Treasury

2  bill couldn't have been purchased with respect to

3  anybody who was electing a 6 percent account in this

4  case, don't you, and meet the 6 percent?  Or meet the

5  terms of the contract?

6  A.   Not profitably.

7  Q.   Well, no.  It couldn't be done and meet the terms of

8  the contract, could it, whether or not it was

9  profitable?

10         MR. PIROZZOLO:  Objection.

11         THE COURT:  Overruled.

12  BY MR. PAPPALARDO:

13  Q.   Isn't that fair to say, sir?

14  A.   I'm not sure I quite follow the question.

15  Q.   Okay.  You reviewed the contracts in this case,

16  right?  You reviewed the exchangor documents; you

17  reviewed the Escrow Agreements; you reviewed the

18  Exchange Agreements, right?

19  A.   Yes.

20  Q.   You reviewed the election forms, right?

21  A.   Yes.

22  Q.   And isn't it true, sir, that if someone elects a 6

23  percent return, that they also agree to have -- they

24  have to give a 30-day notice for that?

25  A.   Yes.

1    Q.   Okay.  And if you have your money in a three-month

2    Treasury bill and someone gives you a 30-day notice on

3    the second day of that 90-day Treasury bill, you

4    couldn't meet your obligation, could you?

5    A.   There is an active secondary market for Treasury

6    bills.

7    Q.   And we'll get to that.  Answer my question, first.

8    If you bought a three-month Treasury bill, right, from

9    the U.S. Treasury --

10   A.   Yes.

11   Q.   -- in three months -- the term is three months,

12   right?

13   A.   If you didn't sell the bond, the fund would be tied

14   up, yes.

15   Q.   And if the funds were tied up to three months, that

16   wouldn't allow you to liquidate once you were given a

17   30-day notice during certain parts of that three months;

18   in fact, for the first two months of that, right?  Isn't

19   that fair to say?

20   A.   The funds would be locked in for the term of the

21   agreement.

22   Q.   Right.  Which is three months, okay?

23        Now, Mr. Zappala, you said there's a secondary

24   market, right?

25   A.   Yes.

```
 1   Q.   Okay.  But the secondary market has a lower interest
 2   rate, doesn't it, sir, from your personal knowledge?
 3   A.   From my personal knowledge, if you buy Treasury
 4   bills, the -- or any investment, issued by the United
 5   States government, you can sell the bond but you may be
 6   subject to the risk that interest rates go up or down,
 7   in which case the value of the underlying asset, the
 8   bond, would go up or down during that process.  It's
 9   somewhat akin to why people like to get low-rate 30-year
10   mortgages, because they work to their benefit if
11   interest rates rise.  But in a shorter time there's less
12   interest rate risk; over longer terms there's higher
13   interest rate risks.
14   Q.   Right.  We can certainly agree on that.  But there's
15   still a possibility, and indeed in certain instances a
16   substantial likelihood, that you wouldn't be able to
17   meet that obligation; isn't that fair to say?
18   A.   Well, I believe that the Treasury bills -- actually,
19   they're liquid, so it's a question of what price you'd
20   get them for.
21   Q.   Right.  And the price isn't always the interest
22   price, right?
23   A.   No, it's subject to going up or down a little bit
24   depending on where interest rates go.
25   Q.   And the secondary market in Treasury bills has a
```

PDF created with pdfFactory trial version www.pdffactory.com

1   lower interest rate, doesn't it, sir?  A secondary

2   market in Treasury bills?

3   A.   I don't know that.  I think they're issued at a

4   certain rate, and then depending on where the market

5   rate is, then the rates for the secondary market reflect

6   that.

7   Q.   Depending on whether they fluctuate?

8   A.   Yes.

9   Q.   But the point is, you couldn't be guaranteed that

10  that would be the case, right?  You couldn't predict?

11  A.   The only way you could guarantee the rate would be

12  to buy it and hold it.

13  Q.   Which would have been -- okay.  We spent enough time

14  on that.

15       Okay, sir.  Let's turn to Exhibit 206.  And, again,

16  sir, this is a chart that you prepared, right?  And this

17  is what you've characterized as the summary of trading

18  losses, right?

19  A.   Yes, I believe we looked at 206B when I was

20  testifying on direct.

21          MR. PAPPALARDO:  Excuse me, your Honor.

22          (Pause.)

23  BY MR. PAPPALARDO:

24  Q.   206B, right.  And you see where in the right-hand

25  column under "PaineWebber" you have listed "Realized

```
 1   Capital Gains and Losses," right?
 2   A.   I've actually listed "Change in Value of Investments
 3   Cumulative" for PaineWebber down at the bottom.
 4   Q.   Okay.  I'm sorry.  In Merrill Lynch.
 5   A.   Thank you.
 6   Q.   Merrill Lynch.
 7   A.   Thank you.
 8   Q.   My mistake, sir.
 9   A.   It's okay.
10   Q.   At Merrill Lynch at the top in the right-hand column
11   it's "Realized Capital Gains and Losses," right?
12   A.   Yes.
13   Q.   And as you noted under PaineWebber what you have is
14   "Change in Value of Investments," then "cumulative,"
15   right?
16   A.   Yes.
17   Q.   What's the difference?
18   A.   First of all, it's the terminology as it appears on
19   the account statements.  That's what I used.  And I just
20   pulled the numbers right off the account statements.  I
21   believe, based on my general knowledge, that the
22   realized capital gains and losses in the Merrill Lynch
23   account are actual gains and losses where securities
24   have been purchased and sold and closed out, and those
25   are actual losses that occurred.  And, in fact, there
```

PDF created with pdfFactory trial version www.pdffactory.com

1    may be other gains or losses in the account from

2    securities that have not been closed out yet.  I believe

3    in the PaineWebber account, based on my review, that the

4    change in value of investments -- I believe that the

5    investments are valued at the end of the period and they

6    reflect where they are at that particular juncture.

7    That's my understanding.

8    Q.   And --

9    A.   That is to say, as if they were closed out on that

10   particular day, that's where they would be.

11        MR. PAPPALARDO:  May I approach the witness,

12   your Honor?

13        THE COURT:  All right.

14   BY MR. PAPPALARDO:

15   Q.   Sir, I'm going to put Exhibit 168 in front of you.

16   That's the October and November PaineWebber statements.

17   Okay, sir, do you have those?

18   A.   I do.

19   Q.   I direct your attention to the first page.  Let's go

20   to -- for the month of November, okay?  The first page

21   of the month of November.

22   A.   Yes.

23   Q.   Okay.  Under the "Portfolio Summary" on the left.

24   Do you see that?

25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. PAPPALARDO:  And may that be published, 168?

2    Highlight the "Portfolio Summary" in the middle.  Yes.

3    Thank you.

4    BY MR. PAPPALARDO:

5    Q.   Okay.  Now, those are the numbers that correspond,

6    do they not, to your Exhibit 206, right, in November?

7    A.   That's correct.

8    Q.   So you have in November under "Change in Value of

9    Investments" minus $2,860,897, right?

10   A.   Yes; the cumulative.

11   Q.   Right.  And that is reflected under "Change in Value

12   of Investments," right?  That's where you got that

13   number?

14   A.   Yes.

15   Q.   Okay.  So for year to date you're using the

16   $2,680,000 figure, right?

17        Is it your testimony, sir, that that is the same as

18   realized gains and losses?

19   A.   No.  I think I just testified that it's different in

20   that it's the -- I believe that my understanding of how

21   the PaineWebber accounts work is that they value the

22   assets as of a certain point in time -- here:  November

23   30th -- and they calculate the change in value which is

24   different than the realized capital gains and losses

25   which I think are reflected on the Merrill Lynch

1    statements.

2    Q.   And isn't it part of their calculation at

3    PaineWebber, sir, that they include in that figure

4    unrealized losses?

5    A.   Yes.

6    Q.   So you're comparing apples to oranges here?

7    A.   What I was trying to do was to show -- what I was

8    trying to do -- to demonstrate was the asset balances

9    that were at PaineWebber and how they were affected by

10   the funds that were put into the account and then

11   what -- the performance in the assets that were

12   invested.  That's all.

13   Q.   Okay.  I appreciate that.  All -- and my point to

14   you, sir, is this:  The PaineWebber -- the PaineWebber

15   column, "Change in Value of Investments," includes, does

16   it not, unrealized losses?

17   A.   It does.  That's my understanding.

18   Q.   And that figure in the PaineWebber sheets is

19   different from the corresponding figure in the Merrill

20   sheets which only show realized losses?

21   A.   That's correct.

22   Q.   And if you go through Exhibit 168, what would be

23   the -- if you backed out the unrealized losses from that

24   figure, do you know what it would be?

25   A.   I do not, no.

1    Q.    Okay.  Could you look at the Bates stamp in the

2    lower left-hand corner of PaineWebber 49?

3    A.    Yes, sir.

4    Q.    And what would that figure be?

5    A.    I believe that's a table that continues through to

6    Bates No. 53.

7    Q.    Yeah.  Look at 53 at the bottom.

8    A.    It says "Year-to-date realized capital losses,

9    $2,223,331.17."

10   Q.    Okay.  So if this -- if this were a comparison of

11   just realized losses, it wouldn't be two-million-eight;

12   it would be 2,223,000, right?

13   A.    Yes.

14   Q.    Okay.  And similarly for October?

15   A.    For October the year-to-date realized capital losses

16   reflect $155,921.26.

17   Q.    Okay.  As opposed to 508?

18   A.    Yes.

19   Q.    And unrealized losses are losses that haven't

20   occurred, right?

21   A.    Yes.

22   Q.    Okay.  Let's look at 206 again.  206 whatever it is,

23   C?

24   A.    B.

25   Q.    B.  All right.

1       Do you see the item in August of 2000?

2    A.   I do.

3    Q.   Okay.  And that shows a monthly loss of $257,000,

4    right?

5    A.   Yes.

6    Q.   And you got that directly from the Merrill

7    statement, right?

8    A.   Yes.

9    Q.   Do you have that statement in front of you -- I

10   believe it's Government 148 -- for August of 2000?  Do

11   you have that, sir?

12   A.   I do.  I have part of it, anyways.  Excuse me.  I

13   have it for September, not August.

14        MR. PAPPALARDO:  If I may approach, your Honor?

15        THE COURT:  Okay.

16   BY MR. PAPPALARDO:

17   Q.   Do you have that now, sir?

18   A.   I do.

19   Q.   Okay.  Turn to page 2.

20        MR. PAPPALARDO:  May that be published?  It's

21   148, page -- the second page.  I think the Bates stamp

22   is 3791.

23   BY MR. PAPPALARDO:

24   Q.   Okay.  On the second page, that shows the loss of

25   $257,312, right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    It does.

2    Q.    And how much of that loss, Mr. Zappala, is

3    attributable to trading options?

4    A.    That I'm not certain.

5    Q.    Okay.  Would you be surprised to learn -- why don't

6    you go to pages 3 and 4 of that statement.  Do you see

7    page 3?

8    A.    I see it.

9    Q.    Okay.  That's options trading, right, calls and

10   puts?

11   A.    It is.

12   Q.    Go to page 4.

13   A.    I see.

14   Q.    Three-quarters of the way down the page.  Just

15   before where it says "SDL, Inc."

16   A.    Yes.

17   Q.    And those two pages reflect, don't they, the

18   realized gains and losses for option trades?

19   A.    They do.

20   Q.    Okay.  Is there any other place on -- in this bank

21   statement for the month of August that shows any other

22   option trades or gains or losses from options trading?

23   A.    I think there are certainly other places in this

24   document that show option trades, but I believe this to

25   be a summary of the realized monthly capital gains and

1    losses from option trading.

2    Q.    Okay.  So if you added up the sections that you just

3    looked up on page 3 through page 4 where it begins

4    "SDL," would you -- if you could add that up quickly,

5    would you agree that that is a net loss of $82,000 --

6    $82,700?  Does that look right to you, sir?

7                (Pause.)

8                THE WITNESS:  I can't say that as I sit here.

9    I'd be happy to take a minute and add them.

10   BY MR. PAPPALARDO:

11   Q.    Can you ballpark it, Mr. Zappala?

12   A.    Certainly.  Just give me a moment.

13                (Pause.)

14   BY MR. PAPPALARDO:

15   Q.    Mr. Zappala, to save some time -- go ahead.  Is it

16   less than a hundred thousand dollars, sir?

17   A.    It appears to be less than a hundred thousand

18   dollars as I add up those two -- the losses and gains on

19   those two pages.

20   Q.    And if I were to suggest to you that it was really

21   $82,700, is that consistent with what you're seeing

22   there?

23   A.    Not that I've had the benefit of doing it in

24   detail --

25   Q.    Right.  Without doing --

1    A.    -- it seems like it would be reasonable.

2    Q.    So, sir, out of that $257,000 loss, only --

3    certainly much less than a hundred thousand dollars was

4    attributable to options, right?

5    A.    Less than a hundred thousand, yes.

6    Q.    The rest was lost on traditional stocks, right?

7    A.    Yes.

8    Q.    Okay.  Now, let me just ask you this question, sir:

9    You show a loss in Government 206 in November of

10   $2,300,000 -- 352,463, right?  Do you have any idea what

11   percentage of that $2,352,463 was an option loss or

12   traditional stocks?

13   A.    I do not know.

14   Q.    You didn't do that calculation?

15   A.    I did not.

16   Q.    If you go to page 27 to 31 on 148.

17   A.    I'm sorry.  And which month is that?

18   Q.    148, page 27 to 31.

19   A.    I'm sorry.  Could I have that reference once again?

20   Q.    Sure.  The option trades are on page 27 and 31,

21   right, for -- I'm sorry.  For November of 2000.  That is

22   before you?  Excuse me.  168.  My apologies.

23   A.    Okay.  I have the page here.

24   Q.    Okay.  Do you see the amount of losses there?

25   A.    Looking at their realized gains and losses on page

1   31?

2   Q.   Yes.

3   A.   I see realized losses of $2,981,829.29 on page 31.

4   Q.   Okay.

5   A.   I'm sorry.  That's -- those are the aggregate of the

6   losses; there are some gains.  And the net loss is

7   $2,379,252.43, if I can read that properly.

8   Q.   And what page are you on, sir?

9   A.   On page 31.

10  Q.   Did you ever calculate what percentage of that was

11  due to option trading?

12  A.   I did not, no.

13  Q.   Without adding it up, sir, let me just ask you this

14  question:  Would it surprise you that the figure would

15  be $900,000 less than what it is on your table?

16        MR. PIROZZOLO:  Objection just to form.

17        THE COURT:  Sustained.

18  BY MR. PAPPALARDO:

19  Q.   Sir, you were never asked to differentiate between

20  losses due to option trading or losses due to

21  traditional stock investments, were you?

22  A.   I was not.

23  Q.   And you listened to the testimony in this case?

24  A.   I've listened to some of the testimony.

25  Q.   And you've listened to the focus on options?

1   A.   I know there's been some discussion about options,

2   yes.

3         MR. PAPPALARDO:   Just one moment, your Honor.

4         (Pause.)

5   BY MR. PAPPALARDO:

6   Q.   Now, sir, when you were compiling your charts that

7   you showed to the jury before, you never included in

8   your charts -- because they were restricted just to

9   monies coming in from investors, for the most part, and

10  the exception to that I'll get to in just a moment --

11  you never included influx of capital, or potential

12  influx of capital, from Benistar, did you?

13  A.   Well, I included the $2 million that was transferred

14  from Benistar Employer Services Trust.  And as I said, I

15  discussed there was $400,000 that came in from Carpenter

16  Financial, and then there was 120,000 that came in.  I

17  really looked at the activity for the year 2000.

18  Q.   Right.  And your activity in the year 2000, you

19  never footnoted, or never took into account, the

20  possibility that cash could be infused into those

21  amounts, particularly on -- you know, when you did that

22  loss comparison chart?  You didn't include that, did

23  you, in that chart?

24  A.   I tried to account for funds coming in from outside.

25  Q.   Actual funds coming in, right?

1    A.   Well, and transfers from other entities.  To the

2    extent I could identify them, I included them.

3    Q.   But the chart itself did not contemplate the

4    possibility that monies could come from another account

5    from Benistar, right?  The potential for that?

6         MR. PIROZZOLO:  Objection.  Just the form of the

7    question:  "potential of additional funds"?

8         THE COURT:  Why don't you re-ask the question.

9    BY MR. PAPPALARDO:

10   Q.   You know that Mr. Carpenter had other companies?

11   A.   Yes.

12   Q.   As a matter of fact, you saw an influx of $2 million

13   that hit the PaineWebber accounts on October 27th of

14   2000, right?

15   A.   Yes.

16   Q.   It didn't come from investors, did it?

17   A.   No.

18   Q.   You saw $400,000 coming in on that nice chart that

19   you had for the jury, right, 400,000?

20   A.   Yes.

21   Q.   And saw 128,000 coming in on that very same chart,

22   didn't you?

23   A.   A hundred twenty.

24   Q.   I'm sorry.  A hundred twenty?

25   A.   I did.

```
 1   Q.   And so you knew there was certainly the potential

 2   for money coming in from other sources, right?

 3   A.   Yes.

 4   Q.   And you didn't footnote that on any one of your

 5   charts, right?  I'm talking about --

 6           MR. PIROZZOLO:  Objection, your Honor.  Is he

 7   asking him to speculate whether there was additional

 8   money out there?  This is calling for speculation.

 9           THE COURT:  No, overruled.

10           Go ahead.

11           THE WITNESS:  To the extent I was aware of other

12   money coming in, I identified it.

13   BY MR. PAPPALARDO:

14   Q.   Right.  Okay.  With respect to that $400,000,

15   okay -- and it's not necessary to go out there with that

16   chart again, just from memory -- that indicated the

17   $400,000 went in from a Carpenter company into which

18   account, sir?

19   A.   That went into the B01 account.

20   Q.   The B01 account at Merrill Lynch.  Do you recall

21   when it was?

22   A.   It was in July.

23   Q.   July of 2000?

24   A.   It was July 2000.

25   Q.   And you testified that there was $412,000 coming out
```

PDF created with pdfFactory trial version www.pdffactory.com

1   in, when, September?

2   A.   Yes.

3   Q.   And in your experience and based upon your review of

4   financial documents for so many years, sir, would you

5   look at that and say that that transaction was

6   consistent with a loan?

7   A.   I would say it was.

8   Q.   And the $12,000 delta being the interest on the

9   loan, right?

10  A.   It certainly occurred to me, yes.

11  Q.   Okay.  And in --

12  A.   I don't know what the details of the transaction

13  were; I only looked at the bank records.  But the money

14  came from Carpenter Financial and it went back to

15  Carpenter Financial.  Just based on the entity

16  identified in the wire transfer advices.  But yes.

17  Q.   And the other $120,000 that went in the B01 account,

18  that was never repaid or went back to a Carpenter

19  company, did it?

20  A.   Not that I saw.

21  Q.   Not that you saw.

22       And the other $400,000 that you testified about --

23  that you couldn't assign it to being something that came

24  from an investor, okay -- that money didn't go back out

25  either, did it?

1    A.    Not that I saw, no.

2    Q.    When did that money go in, sir?

3    A.    In June.

4    Q.    Okay.  June of 2000?

5    A.    Yes.

6    Q.    And based on your familiarity with this case you

7    saw it again, if I may, when you prepared your chart

8    showing the losses?

9    A.    Yes.

10   Q.    Based upon your familiarity with this case and your

11   knowledge of the underlying documents, despite all those

12   losses through the time period of your charts there was

13   never an unsuccessful exchange, was there?

14   A.    Through the period through December 14th?  No.

15   Q.    And --

16            MR. PAPPALARDO:  Just one moment, your Honor.

17            (Pause.)

18   BY MR. PAPPALARDO:

19   Q.    And, sir, none of your charts that were generated in

20   connection with the request made to you to prepare for

21   this case included other available assets of Benistar,

22   did it?

23   A.    No.  As I -- no.

24            MR. PAPPALARDO:  Thank you.

25            MR. PIROZZOLO:  Just a few questions on

```
 1   redirect, your Honor.
 2                        REDIRECT EXAMINATION
 3   BY MR. PIROZZOLO:
 4   Q.   You were asked some questions about the exhibit that
 5   set forth the money paid in by certain of the
 6   exchangors, and that is Exhibit 208?
 7   A.   Yes.
 8   Q.   You were asked some questions about what was 3
 9   percent and what was 6 percent money?
10   A.   Yes.
11   Q.   How much of the money was 3 percent money?
12   A.   About two-thirds.
13   Q.   You were asked a question about -- I believe a
14   question that said the only 3 percent money was for Mr.
15   Iantosca?
16           MR. PAPPALARDO:  Objection.  That wasn't asked.
17           THE COURT:  Overruled.
18           The witness may answer.
19   BY MR. PIROZZOLO:
20   Q.   I'm going to just put up on the screen here a
21   document that has been marked into evidence -- I'm going
22   to put up on the screen Exhibit 69 -- and that's an
23   election as of October 31, 2000, from which exchanger,
24   if you look on the screen?
25   A.   That's from Brian Fitzgerald.
```

1   Q.   And what did he elect?

2   A.   3 percent.

3   Q.   And you were asked a question about whether there

4   was an election for only the PaineWebber accounts being

5   3 percent, not the Merrill Lynch accounts.  Do you

6   recall that line of questioning of Mr. Pappalardo?

7   A.   Yes.

8   Q.   I'm going to put up on the screen Exhibit 68, which

9   is in evidence.  And this is a Exchange Fee Agreement.

10  Do you see that?

11  A.   Yes.

12  Q.   And at the top line, who's that for?

13  A.   Brian Fitzgerald.

14  Q.   And in reference to the account, is for what

15  account, which firm?

16  A.   Merrill Lynch.

17  Q.   And the date of that is which?

18  A.   September 13th of 2000.

19  Q.   You were asked some questions about realized versus

20  unrealized losses.  Do you remember that line of

21  questioning?

22  A.   I do.

23  Q.   And you were shown your summary chart that has the

24  trading losses which is Exhibit 206B.  Do you remember

25  that?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   I do.

2    Q.   And the realized loss for Merrill Lynch was how

3    much?

4    A.   $4,000,283.69.

5    Q.   And you were shown a document that showed a realized

6    loss as of November from PaineWebber of approximately

7    $2.3 million?

8    A.   Yes.

9    Q.   If you add those together, what's the total realized

10   loss?

11   A.   That would be approximately $6.3 million.

12   Q.   As of that date?

13   A.   Through November 2000.  For the year.

14   Q.   You were asked some questions about a $400,000

15   payment by Carpenter Financial into the Benistar 01

16   account.  Do you remember that line of questioning?

17   A.   Yes.

18   Q.   And there was a return of $412,000?  Do you recall

19   that?

20   A.   I do.

21   Q.   And you were asked a question whether that was

22   consistent with a loan.  Do you recall that?

23   A.   I recall that.

24   Q.   What is the interest rate, if you calculate $400,000

25   in and $412,000 out?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Well, the $12,000 increment is 3 percent of the

2   $400,000.   On an annual basis that would be

3   approximately 20 percent.

4   Q.   You were asked a question about exchanges and

5   whether or not you reviewed documents that showed that

6   there were unsuccessful exchanges as of 12/14, as of

7   December 14th.   Do you remember that question by Mr.

8   Pappalardo?

9   A.   Yes.

10  Q.   Were there unsuccessful exchanges after December

11  14th?

12          MR. PAPPALARDO:   Objection, your Honor.

13          THE COURT:   Sustained.

14          MR. PIROZZOLO:   Withdrawn.

15          No further questions.

16          THE COURT:   Anything else?

17          MR. PAPPALARDO:   May we approach, your Honor?

18          (Discussion at sidebar and out of the hearing of

19  the jury:)

20          MR. PAPPALARDO:   Your Honor, the government just

21  showed this witness an exhibit involving a 3 percent

22  election by Mr. Fitzgerald.   If I'm not mistaken, that

23  referred to -- if you remember, he had a bifurcated

24  exchange with property as well as equipment -- and the

25  property exchange was successful and the equipment

1    exchange wasn't -- and I believe that had to do with the

2    property exchange.

3          And I don't want to get into a long discussion

4    with -- certainly on recross with this witness, but

5    that's my understanding.  And if I'm wrong, I'd like to

6    be corrected.

7          THE COURT:  I don't know.

8          MR. PIROZZOLO:  I don't even understand the

9    objection, your Honor, but I'll do my best.

10         THE COURT:  I think he's asking you -- apart

11   from the merits of the objection -- the factual

12   question, whether there was a bifurcated --

13         MR. PIROZZOLO:  There were two contracts; he

14   signed one form for 3 percent.  So with respect to the

15   form that was provided in September --

16         THE COURT:  Well, what I noticed quickly just

17   looking at the screen was, one was the agreement,

18   whatever, the extended text Merrill Lynch has in it, was

19   dated September --

20         MR. PIROZZOLO:  Correct.

21         THE COURT:  -- and the other was dated the end

22   of October.

23         MR. PIROZZOLO:  Correct.  They switched the form

24   on him, your Honor.

25         MR. PAPPALARDO:  Oh, please.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  I don't follow.  Didn't they make

2     the election usually when they signed the agreement?

3          MR. PIROZZOLO:  In the case with Mr. Fitzgerald,

4     he was presented first with an Exchange Fee Agreement,

5     which he signed, and he agreed to pay the fee.

6          THE COURT:  Did it go to an election then in

7     September when he signed the agreement, to one of the

8     election forms?

9          MR. PIROZZOLO:  No, he did not.  That comes in

10    10/31/2000.

11         THE COURT:  That's the first election form he

12    does.

13         MR. PIROZZOLO:  Yes.  But the issue is, he's led

14    to believe this is going to a Merrill Lynch account.

15         THE COURT:  That may be.  I just want to get the

16    facts.

17         What's the problem?

18         MR. PAPPALARDO:  The problem is, he's trying

19    to -- the election form that was in play was signed by

20    the investor was not at Merrill Lynch; it was at

21    PaineWebber.

22         THE COURT:  Yeah?  So?  I don't --

23         MR. PIROZZOLO:  Right.

24         MR. PAPPALARDO:  Well, no, it is right.  Because

25    here's the problem:  Because when the original -- on the

PDF created with pdfFactory trial version www.pdffactory.com

1     original election form, when you were dealing with

2     PaineWebber it said 3 percent Ready Asset market

3     account, and 6 percent investment account, okay?  With

4     respect to --

5          THE COURT:  With Merrill Lynch.  You just said

6     "PaineWebber."

7          MR. PAPPALARDO:  I'm sorry.  I'm sorry.  With

8     Merrill Lynch.

9          With PaineWebber it was 3 percent and 6 percent.

10          THE COURT:  I get that.  But the documents are

11     there.  I mean, I don't -- I'm not sure the history --

12     how it transpired.

13          Actually, obviously, I think we all know there

14     was no Merrill Lynch account in October.

15          MR. PIROZZOLO:  Correct.

16          THE COURT:  I'm just not getting the controversy

17     here.

18          MR. PAPPALARDO:  The point, your Honor, is he

19     didn't -- he didn't elect for a money market account; he

20     elected for an investment account.

21          Let me deal with it on cross-examination.

22          THE COURT:  That can be a question of

23     interpretation for the jury; the evidence is there.

24          (In open court:)

25                    RECROSS-EXAMINATION

1    BY MR. PAPPALARDO:

2    Q.   Mr. Zappala, you were asked on redirect by the

3    government about Mr. Fitzgerald, right?

4    A.   Yes.

5    Q.   And do you have an independent memory of Mr.

6    Fitzgerald's interaction with Benistar Property Exchange

7    Trust Company?

8    A.   I don't.

9    Q.   You don't?  Okay.  Isn't it true, sir, that Mr.

10   Fitzgerald, in connection with his property exchange

11   with Benistar, made an election of 3 percent at

12   PaineWebber, which is a 3 percent investment account?

13   Isn't that true?  Do you know, sir?  Do you know that of

14   your own memory in the --

15   A.   I don't know it as memory.

16         MR. PAPPALARDO:  May I approach the witness,

17   your Honor?

18   BY MR. PAPPALARDO:

19   Q.   I show you -- I believe it's Exhibit 69 in evidence.

20   A.   Okay.  And this reflects a 3 percent investment.

21         MR. PAPPALARDO:  May this be published, your

22   Honor?

23         THE COURT:  Sure.  It's in evidence.

24   BY MR. PAPPALARDO:

25   Q.   And, Mr. Zappala, at the top of this document, this

1    is the Benistar Property Exchange Account Selection

2    Form, right?

3    A.    Yes.

4    Q.    And there are two possible selections, a 3 percent

5    account and a 6 percent account, right?

6    A.    That's correct.

7    Q.    And at the time, sir, this was signed by Mr.

8    Fitzgerald and dated on 10/31 of 2000, right?

9    A.    Yes.

10   Q.    Now, on 10/31 of 2000 PaineWebber was the brokerage

11   house, it wasn't Merrill Lynch; isn't that true, sir?

12   A.    That's fair to say.

13   Q.    Merrill Lynch was historical at that point, right?

14   A.    Yes.

15   Q.    And this document does not say a 3 percent Ready

16   Asset market account at Merrill Lynch, does it?

17   A.    It does not.

18   Q.    And this is what was signed by Mr. Fitzgerald,

19   right?

20   A.    Yes.

21   Q.    And it doesn't have any money market accounts, does

22   it?

23   A.    This form does not.

24         MR. PAPPALARDO:  Thanks.

25         THE COURT:  Is that it?

PDF created with pdfFactory trial version www.pdffactory.com

1           MR. PAPPALARDO:  That's it.

2           THE COURT:  We'll take the morning recess.

3    Thank you, Mr. Zappala.

4           THE CLERK:  All rise.

5           The Court will take the morning recess.

6           (There is a recess in the proceedings at

7    11:14 a.m.)

8           (After recess.)

9           MR. GREENBERG:  Your Honor, I would like to

10   address the Court.

11          The government has now on multiple occasions

12   asked questions which they know are clearly improper.

13   The last question about failed exchanges after December

14   14th, they've asked similar questions previously, all in

15   an attempt -- an obvious attempt to poison or -- the

16   minds of the jury into believing that a relevant portion

17   of this case is suggesting that these exchanges had

18   failed exchanges, that they suffered economic losses as

19   a result of these failed exchanges.  Highly

20   inappropriate.  It has unfairly prejudiced the

21   defendant, we intend to make reference to the transcript

22   and file an appropriate motion.

23          Given that, and given how they -- I mean,

24   it's -- it's obvious what they're trying to do.

25          Again, we have an order from the state court in

PDF created with pdfFactory trial version www.pdffactory.com

1    which Judge Botsford -- I'm sorry, Judge Fabricant, it's

2    Exhibit 415 A, entered June 2, 2008, that we had

3    stipulated to an entry of the order, directing that the

4    proceeds -- the money that Paine Webber would otherwise

5    have been paying over to Benistar would be directly

6    distributed to the exchangors.  I also gave to the

7    government yesterday the settlement agreement between

8    the exchangors and Paine Webber so that they get their

9    money.

10            As I referenced before, under this agreement,

11    they're going to get their money within 21 days, I

12    believe from when it's all signed.

13            We want to introduce this to demonstrate and to

14    make our efforts to try to unpoison what the government

15    has suggested by making it clear that all of these

16    exchangors will have, as a result of an arbitration that

17    Mr. Carpenter, on behalf of Benistar Properties,

18    initiated before there was any indictment and that was

19    prosecuted, that as a result of that action, a recovery

20    in favor of Benistar that we agreed that the money --

21    and the money is going directly to all these exchangors.

22    It goes not only to offset what the government has

23    attempted to do, and I think successfully, by suggesting

24    there's an economic loss and that is somehow relevant,

25    but also it goes to Mr. Carpenter's state of mind, which

PDF created with pdfFactory trial version www.pdffactory.com

1  is directly relevant to an essential element of the

2  offense.

3           (Discussion off the record.)

4           MR. GREENBERG:  As Mr. Pappalardo said, it is

5  the offense, there was never any intent to deceive or

6  defraud anyone.

7           THE COURT:  I understand.

8           Mr. Pirozzolo.

9           MR. PIROZZOLO:  The last question and exchange,

10  the question that was asked was whether there were in --

11  whether there were any unsuccessful exchanges before

12  December 14, 2000.  My question to Mr. Zappala was:

13  Where there any such successful exchanges --

14  unsuccessful exchanges after December 14th.

15           Mr. Pappalardo asked the question opening the

16  door to permit a question -- it was a suggestive

17  cross-examination which left open the door to us asking

18  whether or not there were unsuccessful exchanges after

19  December 14th.

20           Actually, on prior occasions, you did permit

21  such questions and responses from certain of the

22  exchangors in this case with respect to that -- with

23  respect to whether the exchanges were successful or

24  unsuccessful.  And we know that the exchanges were

25  unsuccessful.

1          So it was an appropriate question to ask under

2     the circumstances.  It is relevant and entirely

3     appropriate and has a good faith basis because, in fact,

4     there were unsuccessful exchanges after December 14th on

5     that issue.

6          The issue of the settlement agreement, the issue

7     whether or not there's been a settlement with Paine

8     Webber eight years after the operative events has no

9     bearing on Mr. Carpenter's intent.  It doesn't address

10    the issue of whether there were or were not unsuccessful

11    exchanges.  The settlement doesn't bear on that issue.

12         That's the government's position on this.

13         We really have been over and over and over the

14    settlement agreement, your Honor.

15         While we're at it, I believe it's the

16    defendant's consistent position and it is still their

17    position that they want the arbitration award,

18    settlement agreement to come in substantively, not just

19    for purposes of bias and impeachment.  I think the

20    Court's ruling to date has been bias and impeachment,

21    but it's still their position that it comes in

22    substantively, which is inappropriate.

23         Some of the questioning yesterday by

24    Mr. Greenberg of Mr. Rock which left off on the

25    cross-examination he never tied up that information to

PDF created with pdfFactory trial version www.pdffactory.com

1  the issue of bias.  He didn't until recross he asked a

2  question about bias.

3         What went on yesterday was Mr. Greenberg using

4  the issue of the arbitration as if it would be

5  substantive evidence of -- in defense of Mr. Carpenter's

6  intent, et cetera.

7         So starting with the question and answer at the

8  end of the last examination, it's appropriate, the door

9  had been opened.  There has been consistent testimony in

10  the defense side of this case as to what happened after

11  December 14th from Mitchell Rock, et cetera, and having

12  opened the door, it's appropriate to ask the question

13  what actually happened in December of '00.

14         That's where we are.

15         MR. GREENBERG:  Can I just say, the government

16  has conceded the reason they're asking these questions.

17  This isn't a game.  Mr. Carpenter, as the Court is

18  aware -- it isn't tit for tat.  They are conceding that

19  they're asking inappropriate questions for the purpose

20  of suggesting to the jury that there were unsuccessful

21  exchanges, knowing that that's -- that the issue of

22  unsuccessful exchanges has been excluded.

23         THE COURT:  No, it hasn't been excluded, it's in

24  the evidence.

25         The question is, as it has been throughout, a

PDF created with pdfFactory trial version www.pdffactory.com

1    question of emphasis and proportion with the evidence.

2    And so it is there.  We don't need anymore of it.  The

3    drift recently has been to be very careful about that

4    line because it's there and we don't need anymore of it,

5    and so that's where we are.

6            The inquiry was not permitted, I think that's as

7    far as we need to go with that.

8            With respect to the settlement --

9            MR. GREENBERG:  It's a payment on an award, it's

10   not a settlement.  It's a payment on an award.

11           THE COURT:  Whatever.  I can think of two

12   arguments for its admissibility:  One is, is that it's

13   somehow eligible as substantive evidence, and therefore,

14   ought to be admitted, and I reject that, I don't think

15   it is.  The other is that somehow under Rule 403 it's

16   remedial because of other, perhaps unfavorably,

17   prejudicial matters that the jury has heard about.  That

18   is perhaps a closer question, but I don't think that the

19   state of the balance of prejudice is such that it ought

20   to be admitted.  And one consideration I have in

21   striking that balance is that it would simply -- sort of

22   like mutually assure -- simply invite retaliation,

23   perhaps legitimate claim under 403 for more remedial,

24   and we just keep remediating and keep getting further

25   away from the main event.

1          So the balance where we are is as good as we're

2     going to get.  It's not going to get any better, and so

3     both the settlement ant arbitration award are excluded.

4          MR. GREENBERG:  Your Honor -- I just want to

5     state for the record -- I mean, we would offer Exhibit

6     415 A, which is the signed order of June 2, 2008.  We

7     would also offer the settlement agreement and ask that

8     it be marked, both of these be marked for

9     identification.

10          THE COURT:  Fine.

11          MR. GREENBERG:  Dated June 15, 2008.

12          And we'll -- thank you.

13          THE COURT:  Okay.

14          MR. PIROZZOLO:  Your Honor, just so we don't --

15     I think it's appropriate that we don't get into a tit

16     for tat.  Is it possible to set some ground rules for

17     examination with respect to questions about what did or

18     didn't happen or might have happened after December 14,

19     2000?

20          THE COURT:  I thought we made progress on that,

21     actually, with the amendment of some of the exhibits to

22     take off the December and January lines.  That's the

23     spirit that I'd like to press forward in, and I think we

24     got a little bit off with the last exchange.  We'll

25     leave that, but I want to get back on the general

PDF created with pdfFactory trial version www.pdffactory.com

1   understanding that the most relevant date in terms of

2   state of mind is the date of the last transaction is

3   12/14, and things after that are, at best, marginal --

4          MR. PIROZZOLO:  I understand, I completely

5   understand what the Court is telling me, at least.  But

6   I just would say that there are -- there's tendency for

7   very suggestive questioning in the cross-examination

8   that calls for the jury to start to speculate as to what

9   may have happened afterwards, and I may be objecting to

10  those, and I just -- I don't want to stand up and keep

11  objecting if the Court says okay, that's appropriate.

12         THE COURT:  Well, it's hard to predict in

13  advance, so depending on what the direct testimony is

14  and what that permits and so on.

15         MR. GREENBERG:  Your Honor, the next witness --

16         THE COURT:  Who is the next witness?

17         MR. GREENBERG:  Mrs. Cahaly, and she had a

18  successful exchange in January, which I intend to raise.

19         THE COURT:  No.

20         MR. GREENBERG:  Your Honor, let me just state --

21  they have just -- they have suggested to the jurors that

22  there were no un -- I'm sorry.  They've clearly

23  suggested that the -- in January there were no

24  successful exchanges by that last question.

25         THE COURT:  Well, I don't think so.  But anyway,

PDF created with pdfFactory trial version www.pdffactory.com

1    no, the answer is no.

2        MR. GREENBERG:  And they will not be allowed to

3    suggest there were unsuccessful exchanges with respect

4    to this witness at all.

5        MR. PIROZZOLO:  I am not asking at all what the

6    consequences were of the exchange transaction.  I am

7    stopping -- my intent is to stop when she turns over the

8    check.

9        MR. GREENBERG:  This witness, as did Mr. Snider,

10    this witness during the last trial gratuitously made a

11    number of comments that were highly prejudicial.

12        MR. PIROZZOLO:  Can I caution the witness, your

13    Honor?

14        THE COURT:  Yes.

15        Is she somebody we'll finish today?

16        MR. PIROZZOLO:  My examination of her is about

17    15 minutes.

18        THE COURT:  Okay.

19        MR. MITCHELL:  Your Honor, one thing, if we're

20    still on the record, very briefly.  The two pending

21    motions to dismiss.  I am taking at heart defense

22    counsel's representation that they don't plan to argue

23    these things and so, therefore, we're not preparing a

24    written response.

25        THE COURT:  I think I've indicated that to you

PDF created with pdfFactory trial version www.pdffactory.com

1    before, that it was not necessary to file a response

2    unless I change indication.

3            MR. MITCHELL:  Okay, thank you.

4            GAIL CAHALY, having been duly sworn by the

5    Clerk, was examined and testified as follows:

6            THE CLERK:  State your name, spell your last

7    name for the record, keep up your voice and speak into

8    the mic so everyone can hear you.

9            THE WITNESS:  Gail Cahaly, C-a-h-a-l-y.

10                      DIRECT EXAMINATION

11   BY MR. PIROZZOLO:

12   Q.   Mrs. Cahaly, where do you live?

13   A.   151 Philips Brooks Road in Westwood, Massachusetts.

14   Q.   How long have you lived there?

15   A.   About 30 years.

16   Q.   How long have you lived in Massachusetts?

17   A.   About 40 years.

18   Q.   Where did you go to school?

19   A.   In Rhode Island.

20   Q.   And what level of education did you have?

21   A.   I was a hairdresser.

22   Q.   Did you go to high school?

23   A.   Yes.

24   Q.   Now, where do you work now?

25   A.   Aaron realty company.

1    Q.   And focusing on -- focusing on the time period of

2    the year 2000, where were you working?

3    A.   Yes.

4    Q.   Is that where you were working?

5    A.   Yes.

6    Q.   What's the business of Aaron Realty?

7    A.   Property management and development.

8    Q.   Who else works with you?

9    A.   My husband and my son.

10   Q.   What's your husband's name?

11   A.   Ronald.

12   Q.   And your son's name?

13   A.   Ronald Jr.

14   Q.   How long have been in business with Aaron Realty?

15   A.   About 30 years now.

16   Q.   Can you describe your duties and responsibilities at

17   Aaron Realty?

18   A.   I do the daily work in the office, make sure the

19   maintenance is done, rents are collected, pay the bills,

20   do payroll?

21   Q.   What kind of buildings does Aaron Realty manage?

22   A.   We have retail and commercial now.

23   Q.   Do you own --

24   A.   Yes.

25   Q.   -- own the building?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yes, we do.

2   Q.   Focusing on the year 2000, what kinds of buildings

3   did Aaron Realty own?

4   A.   In 2000 we also had residential apartments.

5   Q.   And where were they located?

6   A.   Mostly Allston and Brighton.

7   Q.   In Massachusetts?

8   A.   Yes.

9   Q.   Now, at some point in time, did you become familiar

10  with a company called Benistar?

11  A.   Yes, we did.

12  Q.   Can you tell us how you became familiar with a

13  company called Benistar?

14  A.   We were doing a 1031 property exchange and Martin

15  Paley came to our office and we decided do business with

16  him and Mr. Carpenter.

17  Q.   How often did Mr. Paley come by the office?

18  A.   In the past years, many times.  He always just came

19  by to try and solicit business.

20  Q.   Solicit what kind of business?

21  A.   I don't know exactly.

22  Q.   Let's focus on the time frame of October 2000.

23  A.   Okay.

24  Q.   Did you hire Benistar to engage in a property

25  exchange transaction?

1   A.   Yes, we did.

2   Q.   Can you describe what piece of property was being

3   sold?

4   A.   We were selling a piece of property that had 175

5   apartments and retail at 15 North Beacon Street in

6   Allston, Massachusetts.

7   Q.   Now, did you your, yourself, receive any of the

8   proceeds of the sale?

9   A.   Yes, my portion -- I did receive a portion of the

10  proceeds.

11  Q.   And how much was that?

12  A.   $2.4 million, a little over.

13  Q.   Now, why did you hire Benistar?

14  A.   Because we wanted to do a property exchange on three

15  other properties we were buying, and we needed an

16  intermediary to give the money to, to hold the money.

17  Q.   Now, did you meet with Mr. Paley?

18  A.   Yes, we did.

19  Q.   Can you describe your meeting with Mr. Paley before

20  you engaged in any 1031 exchange?

21           MR. GREENBERG:   Objection.

22           THE COURT:   Overruled.

23  BY MR. PIROZZOLO:

24  Q.   Let me rephrase the question.

25           Focusing on the October 2000 period, did there

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   come a time when Mr. Paley met with you about a possible
 2   1031 exchange transaction?
 3   A.   He came in and met with my husband.  I wasn't in the
 4   office with them.
 5   Q.   Did you receive any documents?
 6   A.   Yes.
 7   Q.   From whom --
 8        THE COURT:  Well, I don't know if this is what
 9   Mr. Greenberg had in mind, again, do we have some
10   ambiguity with the use of the pronoun "you,"
11   particularly if this is Mr. Cahaly jointly operating?
12        MR. PIROZZOLO:  Yes.
13   BY MR. PIROZZOLO:
14   Q.   Did you personally receive some documents?
15   A.   Yes.
16        MR. PIROZZOLO:  Can you take a look --
17        MR. GREENBERG:  Can we just establish who
18   physically gave her the documents?
19        MR. PIROZZOLO:  Sure.
20   BY MR. PIROZZOLO:
21   Q.   Who physically gave you the documents?
22   A.   Mr. Paley.
23   Q.   Can you take a look at Exhibit 37, which is in the
24   folder in front of you?
25   A.   Yes.
```

1   Q.    What is that?  Do you recognize it?

2   A.    Yes, it's the property exchange document that

3   Mr. Paley gave me.

4   Q.    What's the title of the document?

5   A.    Benistar Property Exchange.

6   Q.    And that's a document that you received?

7   A.    Yes.

8   Q.    And that's a document that you read?

9   A.    Yes, I did.

10         MR. PIROZZOLO:  The government would offer

11  Exhibit 37.

12         MR. GREENBERG:  No objection.

13         THE COURT:  Okay.

14         (Exhibit 37 received into evidence.)

15  BY MR. PIROZZOLO:

16  Q.    I put up it on the screen this document.  What is

17  this document?

18  A.    Benistar Property Exchange.  It says "ICR 1031

19  property exchanges:  Frequently asked questions."

20  Q.    I want to focus on paragraph 3.  Do you see that?

21  A.    Yes.

22  Q.    And what's the question that's posed there?

23  A.    "Can I trust Benistar Property Exchange with my

24  money?"

25  Q.    And could you read the first sentence of the -- of

1    that paragraph in response?

2    A.   "First, understand that Benistar Property Exchange

3    is a part of Benistar, Limited, the largest 419 welfare

4    benefit plan administrator in the country.  Next, take a

5    look at the steps we take."

6    Q.   There are three bullet points there?

7    A.   Yes.

8    Q.   Could you read each of those bullet points?

9    A.   "We have set up accounts with major banking and

10   investment firms -- accounts under our sole control, as

11   required for these exchanges.  (We must take possession

12   of the sale proceeds to satisfy the 'safe harbor' rules

13   outlined in 1031.)"

14   Q.   Second bullet?

15   A.   "Our accounts are restricted to paying out funds

16   only for a subsequent closing, or to return funds to the

17   original property owner."

18   Q.   And then the third bullet?

19   A.   "None of our personnel have access to your account

20   to withdraw the money."

21   Q.   Now, did you decide to proceed with an exchange with

22   Benistar?

23   A.   Yes, I did.

24   Q.   Did you rely on that document in proceeding with the

25   exchange?

```
 1          MR. GREENBERG:  Objection, your Honor.
 2   Objection.
 3          THE COURT:  Overruled.
 4   A.   Yes, I did rely on it, because it said --
 5          MR. GREENBERG:  Your Honor --
 6          THE COURT:  The answer is yes.  Next question.
 7   A.   Yes.
 8          MR. PIROZZOLO:
 9   Q.   Why did you rely on it?
10          MR. GREENBERG:  Objection.
11          THE COURT:  Sustained.
12   BY MR. PIROZZOLO:
13   Q.   Did you eventually sign any -- well, can you take
14   the exhibit that's in the folder marked 40, please?
15   A.   Yes.
16   Q.   What is that document?
17   A.   Benistar Property Exchange Fee Agreement.
18   Q.   And is that a document you signed?
19   A.   Yes, I did.
20   Q.   And what's the date of the document?
21   A.   November 8, 2000.
22   Q.   Who gave you the document?
23   A.   Martin Paley.
24          MR. PIROZZOLO:  The government would offer
25   Exhibit 40.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1          MR. GREENBERG:  No objection.

 2          THE COURT:  Okay.

 3          (Exhibit 40 received into evidence.)

 4  BY MR. PIROZZOLO:

 5  Q.   This document is titled what, Mrs. Cahaly?

 6  A.   "Benistar Property Exchange Trust Exchange Fee

 7  Agreement."

 8  Q.   And is that your name?

 9  A.   Yes, it is.

10  Q.   There's some language that relates to a fee.  Do you

11  see that?

12  A.   Yes.

13  Q.   There's -- there's some handwritten notations there?

14  A.   Yes.

15  Q.   What does that say?  What is that notation?

16  A.   I think what is "removed 7,500 fee within five

17  months."  He did take the $7,500.

18          MR. GREENBERG:  Objection, your Honor.  She's

19  answered the question.

20  BY MR. PIROZZOLO:

21  Q.   Let me just ask it this way -- what does that relate

22  to?

23  A.   The $7,500 fee that was taken for the exchange.

24  Q.   At the bottom of the document, there's a signature.

25  Do you see that?
```

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    Is that your signature?

3    A.    Yes, it is.

4    Q.    Further down, there's a signature.  Do you see whose

5    signature that is?

6    A.    Martin Paley's.

7    Q.    Now, there's a handwritten notation on the corner

8    that appears to be "GC."  What's that?

9    A.    That's my initials.

10    Q.    And then there's a cross-out.  Do you see that?

11    A.    Yes.

12    Q.    Why was that crossed out?

13             MR. GREENBERG:  Objection.

14             THE COURT:  No, overruled.  You may answer it.

15    A.    I'm not quite sure now.  I knew the money wasn't --

16    we were going to use the money soon, so I don't know why

17    that was crossed out.  I can't remember.

18    Q.    And there's a paragraph that's "exchangor and

19    intermediary expressly agree."  Do you see that?

20    A.    Yes.

21    Q.    And it goes on to state that the funds, the cash

22    proceeds shall be held and invested at Paine Webber in

23    the discretion and through financial institutions of

24    intermediary.  Do you see that?

25    A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Did you sign any additional agreements with Benistar
2  other than this one that you can recall?
3  A.   No.
4  Q.   After you signed this agreement, did you turn any
5  money over to Mr. Paley?
6  A.   Yes, I did.
7  Q.   How much?
8  A.   A little over $2.4 million.
9  Q.   Can you take a look at the document that is marked
10 as Exhibit 41?
11 A.   Yes.
12 Q.   And do you recognize what that is?
13 A.   Yes, that's the check that I signed over to
14 Mr. Paley.
15         MR. PIROZZOLO:   The government would offer
16 Exhibit 41.
17         MR. GREENBERG:   No objection.
18         THE COURT:   Okay.
19         (Exhibit 41 received into evidence.)
20 Q.   I'm going to focus first on the check, Mrs. Cahaly.
21 Do you see that?
22 A.   I'm sorry?
23 Q.   I'm going to focus first on the check.  Do you see
24 how I've magnified that?
25 A.   Mm-hmm.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   The amount of the check is what?

2  A.   $2,412,230.

3  Q.   And the date of that check?

4  A.   November 7, 2000.

5  Q.   And there's a Union Square Apartments Limited

6  Partnership.  What is that?

7  A.   Those are the people that bought the building from

8  us.

9  Q.   On the top of that exhibit --

10  A.   Yes.

11  Q.   -- do you see that?  It's a little bit sideways?

12  A.   That's all right.  We signed the check over to

13  Benistar Property Exchange Trust Company, Inc.

14  Q.   And that's your signature?

15  A.   Yes, it is.

16  Q.   Who did you provide this check?  Who did you give

17  this check to?

18  A.   Martin Paley.

19  Q.   How did you give it to him?

20  A.   By hand.

21  Q.   When you provided the check to Mr. Paley, did you

22  speak to him?

23  A.   Yes, I did.

24  Q.   What did you say to him and what did he say to you?

25       MR. GREENBERG:  Objection.

1            THE COURT:  Overruled.

2   A.   I made a copy of the check and then I handed it to

3   Martin, and I said, kiddingly, "Martin, I hope my

4   money's going to be safe."

5            MR. PIROZZOLO:  That's all I have, your Honor.

6                    CROSS-EXAMINATION

7   BY MR. GREENBERG:

8   Q.   Ms. Cahaly, good afternoon.  My name is Gary

9   Greenberg, and with me is John Pappalardo.  We represent

10  Mr. Carpenter in this matter.

11  A.   Good afternoon.

12  Q.   Ms. Cahaly, I just want to be sure of a few things.

13  Mr. Carpenter was not present at this meeting you had

14  with Mr. Paley; is that right?

15  A.   That's right.

16  Q.   Okay.  And during calendar 2000, you had no

17  discussions with Mr. Carpenter, did you?

18  A.   I myself, no.

19  Q.   Okay.  I mean, you didn't discuss the Exchange

20  Agreement or the document Frequently Asked Questions,

21  you didn't discuss that with Mr. Carpenter, did you?

22  A.   No.

23  Q.   You mentioned your husband.  Your husband's an

24  attorney; isn't that right?

25  A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And I think it's fair -- so Mr. Paley was the only

2    one that signed the agreement, and you; is that right?

3    A.    Yes, he was.

4    Q.    Now, Mr. -- you had done prior 1031 exchanges,

5    hadn't you?

6    A.    Yes.

7    Q.    So you were familiar -- you had some basic

8    familiarity with section 1031 of the Internal Revenue

9    Service Code?

10   A.    Well, I know our other exchanges worked out fine.  I

11   don't understand --

12   Q.    No, no.  How many other -- before this exchange --

13   A.    I think two.

14   Q.    -- you had done two others?

15   A.    I think so.

16   Q.    And you had an accountant at the time?

17   A.    I'm sorry?

18   Q.    You and your husband, you had an accountant?

19   A.    Yes, we do.

20   Q.    I mean at the time back in 2000?

21   A.    I don't know what you mean by an accountant.

22   Q.    Well, didn't -- let me just go back a little bit?

23         Isn't it true that your accountant had

24   recommended Mr. Paley to you?

25   A.    Oh, yes, he did.

1    Q.    Okay.

2    A.    We knew him, too, also.

3    Q.    I -- I -- but in terms of the historical --

4    A.    I'm sorry, I didn't know what you meant.  Yes.

5    Q.    And just historically, Mr. Paley was someone that

6    your husband had known for four or five years before

7    this transaction; isn't that right?

8    A.    I don't know how long.

9    Q.    Would you agree that he had known him for at least a

10   couple of years?

11   A.    Oh, more than that, yes.

12   Q.    Okay.  And Mr. Paley, I think you said Mr. Paley --

13   your accountant referred Mr. Paley to you, or you to

14   Mr. Paley in connection with 1031 exchanges?

15   A.    He may have, yes.

16   Q.    And you also knew other people that had done -- who

17   had used Benistar successfully in doing 1031 exchanges;

18   isn't that right?

19   A.    I don't know anyone else who did.  I don't remember.

20   Q.    Well, okay.

21          (Pause.)

22   Q.    Do you recall testifying in a civil action that you

23   brought against a variety of companies, including -- do

24   you recall testifying in a civil proceeding back in 2002

25   involving civil action?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Against who?

2    Q.    Well -- did you bring civil proceedings against

3    Merrill Lynch and Paine Webber?

4    A.    Yes.

5    Q.    Okay.  Let me just -- do you recall --

6           MR. GREENBERG:  May I approach the witness, your

7    Honor?

8           THE COURT:  Go ahead.

9    BY MR. GREENBERG:

10   Q.    Pages 108 to 109.  If you can just look, starting at

11   page 108, line 20, this is your testimony, and then your

12   answer.

13          And my question is:  Does that refresh your

14   recollection as to whether or not in civil

15   proceedings -- whether or not you had -- before you did

16   this exchange, you were aware that Benistar had had

17   successful exchanges with other exchangors?

18   A.    No, I don't remember that, though, right now.

19   That's a long time ago.

20          If I turn the page, I said, "Yes, James Sherman,

21   someone we knew."  But I didn't remember when you asked

22   me, it's a long time.

23   Q.    Does that refresh your recollection?

24   A.    Yes.

25   Q.    Now, isn't it true -- I'm sorry, we can take this --

PDF created with pdfFactory trial version www.pdffactory.com

1          Your entire discussion with Mr. Paley was less

2     than ten minutes; isn't that right?

3     A.   It was a little more than ten minutes.  We went --

4     Q.   Well, do you recall testifying that your

5     conversation with Mr. Paley was, at most, ten minutes?

6     A.   No.  You don't have to bring that.  I don't

7     remember.  That was eight years ago.  If I said it then,

8     then I guess it was.

9     Q.   Well, I don't want you to -- let me just show you,

10    if I can, page 146.

11          And I just ask you whether that refreshes your

12    recollection that your entire interaction with Mr. Paley

13    was at most ten minutes?

14    A.   That's what I said.

15    Q.   Back in 2002?

16    A.   Yup -- yes.

17    Q.   Okay.  So the conversation that you were testifying

18    to on direct examination about going over the frequently

19    asked questions, going over the document, that all

20    took -- you only met with Mr. Paley once; is that right?

21    Once with respect to --

22    A.   That's what I said.  But you have to remember that

23    was first time I was in court and very nervous over what

24    had happened.  I did go over the documents.

25    Q.   I'm sorry.  Mrs. Cahaly, did you meet with Mr. Paley

PDF created with pdfFactory trial version www.pdffactory.com

```
 1  more than once prior to the time you signed the
 2  agreement, the Fee Exchange Agreement?
 3  A.   No.
 4  Q.   And the one time you met him was the time you signed
 5  the document and gave him the check?
 6  A.   Yes.
 7  Q.   Is that right?
 8  A.   Yes.
 9  Q.   And in that entire process of going over everything,
10  it took, at most, ten minutes?
11  A.   That's what I had said.
12  Q.   I'll take that back.   Thank you.
13         Did you understand that Mr. Paley was a -- had a
14  lot of experience in 1031 exchanges?
15  A.   Yes.
16  Q.   Did you understand that he had published articles in
17  connection with 1031 exchanges?
18  A.   I don't remember that.
19  Q.   You knew he was the president of Benistar?
20  A.   No, I thought Mr. Carpenter was.
21  Q.   Okay.   Well, you never heard Mr. Carpenter's name
22  prior to -- even --
23  A.   Not at that time, no.
24  Q.   No.   So -- okay.   So when you said on direct
25  examination that you did an exchange -- I think you sort
```

1   of suggested you did an exchange with Mr. Paley and

2   Mr. Carpenter.  At the time you met with Mr. Paley, you

3   know, when you gave him the check and signed the

4   document, you never heard the name Dan Carpenter, did

5   you?

6   A.   Only that --

7   Q.   Is that right?  Only answer that, just yes or no.

8   A.   Yes, I did hear the name.

9   Q.   You said before you that were familiar with 1031

10   exchanges?

11   A.   We had done two before.

12   Q.   Okay.  And did you -- can we put on the screen

13   Exhibit 40?

14        Thank you.

15   Q.   And this is the document you signed?

16   A.   Yes, it is.

17   Q.   And you read it before you signed it?

18   A.   Yes, I did.

19   Q.   Okay.  And there's -- if we could just highlight the

20   second paragraph.

21        And do you see where it says that the proceeds

22   from the exchange are going to be held and invested at

23   Paine Webber at the discretion and through the financial

24   institution of the intermediary?  Do you see that?

25   A.   Yes.

1    Q.   It also says that the investment account shall be in

2    the name of the intermediary.  Do you see that?

3    A.   Yes.

4    Q.   Okay.  And you knew, did you not, that under the

5    Internal Revenue Service Code, that the proceeds of the

6    exchange had to be held in the name of the intermediary,

7    in the name of Benistar?

8    A.   Yes.

9    Q.   Did you know that?

10        Okay.  And you also knew that -- you knew that

11   your money -- the monies from the proceeds were going to

12   be invested at Paine Webber in the discretion of and

13   through the financial institutions of Benistar

14   properties?  You knew that?  Just yes or no.

15   A.   It can't be a yes or no.

16   Q.   Well, let me just -- you can't answer yes or no?

17        Let me -- you were deposed previously,

18   Mrs. Cahaly?  As opposed to being in Court, you were --

19   A.   Yes.

20   Q.   And you testified -- this -- I'm going to refer you

21   to a deposition, page 179.  You testified under oath.

22        MR. GREENBERG:  May I approach, your Honor?

23        THE COURT:  You may.

24   BY MR. GREENBERG:

25   Q.   Okay.  If you look at page 179, and if you could

1  just read line 20 --

2  A.   So you knew your money was going to be invested in

3  Paine Webber in the discretion and through financial

4  institutions of Benistar."

5          I said, "Yes."

6  Q.   Okay, thank you.

7          You also now that anything that that money

8  earned above the interest rate that you were selecting,

9  was going to be retained by Benistar, right?  Is that

10  right?

11  A.   I'm not sure.

12  Q.   Well, you were asked "were you entitled to retain --

13  I'm sorry, "were you entitled to anything above interest

14  for your funds?  And your answer was:  "I don't think

15  so."  Isn't that right?

16  A.   If I said that, I don't think so.

17          (Discussion off the record.)

18          MR. GREENBERG:  Just give me one moment, your

19  Honor.

20  Q.   Is Mr. Carpenter's name in any of the documents that

21  the government showed you today?

22  A.   I'm sorry, I can't --

23  Q.   Was Mr. Carpenter's name in any of the documents

24  that the government showed you?

25  A.   No.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1          MR. GREENBERG:  I think -- just one moment, your

 2    Honor.

 3          (Discussion off the record.)

 4          MR. GREENBERG:  Thank you very much,

 5    Mrs. Cahaly.

 6          THE WITNESS:  Thank you.

 7          MR. PIROZZOLO:  May I be heard very briefly at

 8    sidebar, your Honor?

 9          THE COURT:  All right.

10          (At sidebar on the record.)

11          MR. PIROZZOLO:  I just want to note that on the

12    cross-examination when Mr. Greenberg refers to the civil

13    matter that he was referring to, he only said against

14    Paine Webber and Merrill Lynch and left out the fact

15    that it includes Benistar Property Exchange Trust and

16    Mr. Carpenter.

17          I just object to the characterization of the

18    civil lawsuit in the course of the cross-examination.

19    I'm going to leave it at that.  I'm raising my

20    objection.

21          THE COURT:  Okay.

22          Do you have examination for her?

23          MR. PIROZZOLO:  No.  So she's finished.

24          THE COURT:  Are we going to proceed to the next

25    witness?
```

```
 1              MR. PIROZZOLO:  Yes, I believe so.

 2              THE COURT:  Mr. Paley?

 3              MR. PIROZZOLO:  Mr. Paley.

 4              (End of discussion at sidebar.)

 5              MR. PIROZZOLO:  No questions, your Honor.

 6              THE COURT:  All right.  Mrs. Cahaly, you may be

 7    excused.

 8              MR. MITCHELL:  Your Honor, the next witness is

 9    Martin Paley.  If I may just have a minute to gather up

10    some exhibits.

11              (Pause.)

12              MR. MITCHELL:  The United States calls Martin

13    Paley.

14              MARTIN PALEY, having been duly sworn by the

15    Clerk, was examined and testified as follows:

16              THE CLERK:  State your name, spell your last

17    name for the record, keep up your voice, and speak into

18    the mic, please.

19              THE WITNESS:  Martin Paley, P-a-l-e-y.

20                        DIRECT EXAMINATION

21    BY MR. MITCHELL:

22    Q.   Good afternoon, Mr. Paley.

23              Mr. Paley, where do you live?

24    A.   Newton, Massachusetts.

25    Q.   How long have you lived in Newton?
```

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Well, 32 years.

2   Q.   Sir, how old are you?

3   A.   I'm 55.

4   Q.   And what is your educational background?

5   A.   I have a bachelor's degree.

6   Q.   From where, sir?

7   A.   Oh, Tulane University, in New Orleans.

8   Q.   And in what?

9   A.   In philosophy.

10  Q.   Are you married, sir?

11  A.   Yes.

12  Q.   Do you have any children?

13  A.   I do.

14  Q.   How old are your children?

15  A.   I have a 20-year-old daughter and a 13-year-old

16  daughter.

17  Q.   Sir, what do you do for a living?

18  A.   I'm a senior mortgage banker.

19  Q.   And where are you a senior mortgage banker?

20  A.   American Trust Mortgage in Swampscott,

21  Massachusetts.

22  Q.   And how long have you been employed there?

23  A.   Fifteen months.

24  Q.   Okay.  At some point back in the 1990s, did you

25  begin -- were you working at a company called Nationwide

```
 1   Property Exchange?

 2   A.   Yes.

 3   Q.   What kind --

 4   A.   Yes.

 5   Q.   What kind of company was Nationwide Property

 6   Exchange?

 7   A.   They did tax-deferred property exchanges.

 8   Q.   And where was it located?

 9   A.   In Newton.

10   Q.   When you say tax-deferred property exchanges, are

11   you talking about 1031 property exchanges?

12   A.   Yes.

13   Q.   How did you could to start up that business?

14   A.   I had seen an ad in the Wall Street Journal and

15   answered the ad.

16   Q.   Who was the ad posted by?

17   A.   A man named Tom Bottenberg.

18   Q.   And who was Tom Bottenberg?

19   A.   The owner of Nationwide.

20   Q.   And was this a property exchange business that was

21   located in other parts of the country?

22   A.   Well, in San Jose, California, for sure.

23   Q.   Okay.  Is that where it was based?

24   A.   Yes.

25   Q.   And Mr. Bottenberg ultimately hired you?
```

PDF created with pdfFactory trial version www.pdffactory.com

A.   We had a contractual relationship, so it was -- I

wasn't an employee, I was, I think, a licensee, I

believe, is how we termed it.

Q.   A licensee.

     Okay.  When did you become a licensee of

Nationwide?

A.   1995.

Q.   '95.  And as a licensee for Nationwide, did you

share responsibilities with Mr. Bottenberg?

A.   Yes.

Q.   Okay.  Could you describe the division of

responsibilities between you and him?

A.   Yes.  He had the expertise in doing exchanges, and I

was to promote exchanges in the Boston area.

Q.   Okay.  What did you do to promote exchanges in the

Boston area, Mr. Paley?

A.   I met with professionals that are in the real estate

business, real estate brokers, attorneys that have

clients that do real estate transactions, CPAs, and

educated them about exchanges and the benefits of doing

an exchange through me.

Q.   Okay.  And what was Mr. Bottenberg's

responsibilities?

A.   He was to provide the paperwork, do the

administrative part, and to hold the funds from the

PDF created with pdfFactory trial version www.pdffactory.com

1    exchange.

2    Q.   Okay.  Did you -- what role, if any, did you play in

3    holding the funds?

4    A.   I played no role in holding the funds.

5    Q.   At some point did that relationship with Nationwide

6    end?

7    A.   Yes.

8    Q.   When was that, sir?

9    A.   1998.

10   Q.   Did you subsequently form another business

11   relationship with another property exchange company?

12   A.   Yes.

13   Q.   And what company was that?

14   A.   Benistar.

15   Q.   When did you form a business relationship with

16   Benistar?

17   A.   The fall of '98.  I don't know exactly the date.

18   Q.   Okay.  Who was in charge of Benistar?

19   A.   I was the president, and Dan Carpenter was the

20   chairman.

21   Q.   All right.  And do you see Dan Carpenter in the

22   courtroom today, sir?

23   A.   I do.

24   Q.   Okay.  Could you identify him for the record?

25   A.   He's standing over there -- sitting over there.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            MR. MITCHELL:  May the record reflect the
 2   witness has correctly identified the defendant?
 3            THE COURT:  All right.
 4   BY MR. MITCHELL:
 5   Q.   Where was Benistar based?
 6   A.   In Simsbury, Connecticut.
 7   Q.   How did you first meet Dan Carpenter?
 8   A.   He had answered an ad that I had put in the Lawyers
 9   Weekly.
10   Q.   He answered -- what was the ad?
11   A.   I was looking for people that are -- professionals
12   that were familiar with 419 welfare benefit plans.
13   Q.   What's a 419 welfare benefit plan?
14   A.   It's -- it's very complicated.  It -- a long time
15   ago.
16   Q.   Just in general.
17   A.   It's a way that a corporation could buy life
18   insurance as a corporate benefit.
19   Q.   And you were interested in doing 419 work, is
20   that -- is that why you placed the ad?
21   A.   Yes.
22   Q.   All right.  Did you -- after he answered the ad, did
23   he answer the ad by calling you?  Is that how you
24   first --
25   A.   I believe so.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   -- made contact?
 2        Okay.  Did you have a meeting after that?
 3   A.   Yes.
 4   Q.   Where was the meeting?
 5   A.   In Simsbury.
 6   Q.   And did you meet at his office?
 7   A.   Yes.
 8   Q.   Who else was at the meeting?
 9   A.   I don't remember who else was at the meeting besides
10   him and me.
11   Q.   Was there anyone else at the meeting besides you and
12   he?
13   A.   I don't remember.
14   Q.   What were the -- as best you can recall, what were
15   the principal issues that the two of you discussed at
16   this meeting?
17   A.   That he was telling me about his expertise in doing
18   419 plans, and that he was very large organization that
19   had been doing them.
20   Q.   Okay.  Did you discuss anything else?
21        MR. PAPPALARDO:  Your Honor, could we get a
22   date, please?
23   BY MR. MITCHELL:
24   Q.   When was this meeting, as best you can recall?
25   A.   We talked about his expertise in 419 --
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   When was the meeting, as best you can recall,

2    Mr. Paley?

3    A.   The fall of 1998.

4    Q.   Besides 419 plans, what, if anything, did you

5    discuss with him during that meeting?

6    A.   Well, I told him that I was doing exchanges, and

7    that he was interested in hearing about them.

8    Q.   Okay.  Do you remember -- as best you recall, what

9    did he say along those lines?

10   A.   That he was interested in doing -- working together,

11   that I would -- he was interested in working on

12   exchanges, and I was interested in working with him on

13   419s.

14   Q.   Okay.  Did he tell you why he was interested in 1031

15   property exchanges?

16   A.   Just saw it as a business opportunity is all I

17   recall.

18   Q.   Okay.  Did you and he ultimately decide to enter

19   into a business relationship?

20   A.   Yes.

21   Q.   And did that relationship come in the form of a

22   business with a name?

23   A.   Yes.

24   Q.   What was the name?

25   A.   Benistar Property Exchange Trust Company.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   All right.  Do you know who incorporated the

2  company?

3  A.   Dan Carpenter.

4  Q.   All right.  Did he discuss his professional

5  background with you during that first meeting, by the

6  way?

7  A.   Yes.

8  Q.   What did he tell you?

9  A.   That he was an attorney, that he had lots of

10  experience in insurance and tax, estate planning for

11  high net worth individuals.

12  Q.   Now, Benistar Property Exchange Trust Company, the

13  company you formed, what did that company do?

14  A.   1031 tax-deferred property exchanges.

15  Q.   Okay.  Was there anything else?

16  A.   No, I don't believe so.

17  Q.   All right.  Did you continue to have an office in

18  Newton?

19  A.   Yes.

20  Q.   Were any of the 1031 duties also performed by people

21  in Simsbury?

22  A.   Yes.

23  Q.   All right.  Could you describe for us in general

24  what the division of responsibility was?

25  A.   That Simsbury was responsible for the holding of

1   funds for the beginning of the transaction through to

2   the end, and I was the -- responsible for the marketing

3   of the program.

4   Q.   Okay.  And let me direct you to an exhibit,

5   Mr. Paley.

6        Could you take a look at Government's Exhibit

7   179, which is already admitted into evidence?  It should

8   be right in front of you, sir.

9        (Pause.)

10  Q.   Take a moment to look at that, Mr. Paley.

11       (Pause.)

12  A.   I've read it.

13  Q.   Have you seep this document before, sir?

14  A.   Yes.

15  Q.   Can you tell us what it is?

16  A.   It's a letter from Dan to me about the operating

17  procedures of Benistar Property Exchange.

18       (Discussion off the record.)

19  Q.   Okay.  Do you see it up there on the screen,

20  Mr. Paley?

21  A.   Yes, I do.

22  Q.   You said this is a letter from Dan Carpenter to you?

23  A.   Yes.

24  Q.   And dated the 17th of June 1999; is that right?

25  A.   Yes.

1  Q.   Okay, sir, I'm going to highlight -- I'm going to

2  blow up the body of this document.

3          Could you read that to us?

4  A.   "Enclosed please find a list of standard operating

5  procedures for the Benistar Property Exchange.  I want

6  to continue having everything come through the Simsbury

7  office.  If there ever is a problem and someone tries to

8  sue, it will be Benistar that will probably be sued and

9  not Newton.  Therefore, we want the 'quality control' to

10 remain with us."

11 Q.   Okay.  From that point forward to the end of your

12 time at Benistar, did everything continue to go through

13 the Simsbury office?

14 A.   Yes.

15 Q.   Is there a memo attached to this document, standard

16 operated procedures, that are referenced in the letter?

17 A.   Yes.

18 Q.   Is that it right there?

19 A.   Yes.

20 Q.   Again, I'm going to highlight portions of that.

21 This is from Dan Carpenter, Esquire?

22 A.   Mm-hmm.

23 Q.   Did everybody, to your knowledge, receive this

24 document -- everybody at Benistar?

25 A.   Well, Newton, in Newton they did.

1   Q.   And are the procedures set forth bullet by bullet

2   down the page right here, Mr. Paley?

3   A.   Yes.

4   Q.   Okay.  I want to go through this somewhat quickly,

5   but number 1, it designates you as the person who

6   arranges exchanges and provides Linda or Holly with the

7   information on the upcoming transaction.  Is that what

8   it says?

9   A.   Yes.

10   Q.   Linda is who?

11   A.   Linda Jokinen.

12   Q.   And who is Holly?

13   A.   Holly Fletcher.

14   Q.   Did they work in the Newton office?

15   A.   Yes.

16   Q.   And then as you go down the page, phone numbers, and

17   then it says, Janet calls closing attorney to verify

18   information and remind closing attorney to send all

19   signed documents and correspondence to Benistar in

20   Simsbury.

21        Do you recall who Janet was, sir?

22   A.   Janet May.

23   Q.   Okay.  And what do you understand her position to be

24   at Benistar?

25   A.   She was administrating the documents of an exchange.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Okay.

2         And did you interact with her during the regular

3    course of your work at Benistar?

4    A.    Yes.

5    Q.    As we go down the page to the last point, you see

6    where it's highlighted at the bottom?

7    A.    Yes.

8    Q.    Would you read that?

9    A.    "At no time are any procedures to be changed by any

10   staff of the Benistar Property Exchange without the

11   prior approval of Daniel Carpenter."

12   Q.    Okay.  Did this decree remain in effect during your

13   time at Benistar?

14   A.    The procedures were modified, some of the procedures

15   were done by -- by Dan and some by me.

16   Q.    Okay.  But were the approval of any changes -- did

17   the approval of any changes have to go through Dan

18   Carpenter from this point forward?

19   A.    Yes.

20   Q.    Okay.

21        I'm going to show you another exhibit, 178.

22   Take a look at that.  This also is in evidence.

23        Do you see that up there on the screen?

24   A.    I do.

25   Q.    Okay.  Tell us what this is.

1              (Pause.)

2    A.   I've read it.

3    Q.   Okay.  Is this another memo that sets forth

4    procedures from Dan Carpenter?

5    A.   Yes.

6    Q.   And I'm just going to highlight a couple of

7    passages.

8              Can you read the first two sentences of the

9    first paragraph?

10   A.   "All transactions from this office are handled by

11   Janet May and Janet May only.  If she is out of the

12   office for any reason, she will let you know who to

13   contact."

14   Q.   Okay.  And "this office" refers to which office?

15   A.   Simsbury.

16   Q.   Is that where Dan Carpenter was?

17   A.   Yes.

18   Q.   And then down the bottom.

19   A.   Do you want me to read that?

20   Q.   I'm not going to have you read the whole thing,

21   Mr. Paley.

22             Can you read the first sentence?

23   A.   "You will not be able to get confirms on wire

24   transactions until after 3:00 p.m."

25   Q.   Okay.  And what does that mean?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   That only after 3:00, would there be the ability to

2    confirm that money was wired into the account or out of

3    the account.

4    Q.   Okay.  And just the last two sentences at the

5    bottom, having a number is helpful.  Can you read from

6    that?

7    A.   "Having a number is helpful but certainly not

8    mandatory.  BankBoston and First Union have told us the

9    same thing.  If Holly knows a better way, maybe she

10   should start her own bank and stop bothering us."

11   Q.   And again, this is a memo from Dan Carpenter?

12   A.   Yes.

13   Q.   At any point, did Dan Carpenter relinquish control

14   of the funds coming into the business?

15   A.   No.

16   Q.   I'm going to have you flip back, briefly, to 179,

17   the memo.

18        Do you see paragraph 4, sir that discusses Janet

19   May's preparing the exchange documents?

20   A.   Yes.

21   Q.   Did a point come when she was no longer responsible

22   for that part of the business?

23   A.   Yes.

24   Q.   Okay.  And did someone else take over

25   responsibility?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    And who was that?

3    A.    Jackie Spielman.

4    Q.    Okay.  And did Newton -- okay.

5          Who's Jackie Spielman?

6    A.    She worked for Dan Carpenter, or for Benistar.

7    Q.    And what was her role?

8    A.    An administrator in the office.

9    Q.    And did -- was it -- where were the documents

10   disseminated from Newton -- disseminated to exchangors,

11   from Newton or from Simsbury?

12   A.    They came from Newton.

13   Q.    Okay.  Let me have you take a look at Government's

14   Exhibits 1 through 6.  You can put 178, 179 aside.

15   A.    Okay.

16   Q.    Okay.

17         Have you had a chance to look at those?

18   A.    No.

19   Q.    Why don't you take a second to look at those.

20   A.    All of them?

21   Q.    Please.

22         (Pause.)

23   Q.    Why don't you do this:  Mr. Paley, if you could, I'm

24   only going to ask you a couple of specific questions

25   about those documents.  If you could just take a couple

PDF created with pdfFactory trial version www.pdffactory.com

1  of minutes and just flip through, peruse the other ones.

2  A.    Okay.

3         (Pause.)

4  A.    To 6, did you say?

5  Q.    Yes, please.

6  A.    Okay.

7  Q.    Okay.  Let me ask you a general question, Mr. Paley.

8         In the course of your duties at Benistar, did

9  you give prospective clients certain promotional

10  materials?

11  A.    Yes.

12  Q.    Okay.  And the exhibits that you were just

13  reviewing, are those some of the promotional materials?

14  A.    Yes.

15  Q.    All right.  We're going to flash some up on the

16  screen.

17         Do you see the first one up there?

18  A.    Yes, I do.

19  Q.    That's number 1, correct?

20  A.    Yes.

21  Q.    All right.  And what was this?

22  A.    This is a presentation to Eliot Snider of

23  Massachusetts Lumber Company.

24  Q.    And there were others -- a complete set of

25  promotional materials along with that, numbers 1 through

1    6.   Is that the standard package you gave to clients?

2    A.   I don't remember.

3    Q.   Okay.  Why don't you do this:  Take a look at number

4    two.

5         What is that?

6    A.   Frequently asked questions.

7    Q.   Okay.  Is that something you gave clients?

8    A.   Yes.

9    Q.   All right.  Number 3?

10   A.   Yes, I've given this out.

11   Q.   What is that?

12   A.   Yes, I have.

13   Q.   What is that?

14   A.   This is an overview of 1031 property exchanges.

15   Q.   Okay.  Number 4?

16   A.   This is a legal authority of 1031 property

17   exchanges.

18   Q.   Is that something you gave to clients?

19   A.   Yes.

20   Q.   Number 5?

21   A.   Yes, I've given this, yes.

22   Q.   All right.  And same for 6, Mr. Paley?

23   A.   Yes.

24   Q.   Gave it to clients, right?

25   A.   Mm-hmm.

1   Q.   All right.   Who prepared these promotional materials

2   in the first instance, Mr. Paley?

3   A.   I did.

4   Q.   When did you do that?

5   A.   Over a period of several years that they evolved,

6   since -- from '95.

7   Q.   All right.   So were these materials -- did you use

8   precursors of these materials when you were at

9   Nationwide?

10  A.   Yes.

11  Q.   Okay.   Did you send these materials to Dan Carpenter

12  for his review?

13  A.   Yes.

14  Q.   When did you do that?

15  A.   Fall of '98.

16  Q.   All right.   And why did you do that?

17  A.   So he could become familiar with exchanges.

18  Q.   Okay.   And did you discuss them with him?

19  A.   Yes.

20  Q.   And what was the thrust of the discussion?

21       MR. PAPPALARDO:   Objection.

22       THE COURT:   Overruled.

23       MR. PAPPALARDO:   "The thrust," your Honor?

24       THE COURT:   Well, all right.   I took that to be

25  a question for the content.

1          MR. PAPPALARDO:  I have no objection to what he

2    said and what Mr. Carpenter --

3          THE COURT:  The content.

4    BY MR. MITCHELL:

5    Q.   Okay.  What was the content of the discussion,

6    Mr. Paley?

7    A.   Repeat the question, please.

8    Q.   What was the content of your discussion with Dan

9    Carpenter about those promotional materials after you

10   had sent them down to him for his review?

11   A.   Oh, so he would understand what a 1031 was and how

12   we were explaining them to clients.

13   Q.   That's not the question.

14          The question is:  What did you talk about and

15   what was said in the conversation?

16   A.   That I was using these to talk with clients and

17   their advisers.

18   Q.   Okay.

19   A.   As promotional material.

20   Q.   Okay.  What did Mr. Carpenter say in response?

21   A.   Basically that he approved of them, said it looked

22   good, that he would also see if he could get people to

23   do exchanges from his contacts in Connecticut.

24   Q.   Okay.  And just briefly, among the materials you

25   sent him, did it include this slide?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            If you turn to page 14 of Exhibit 1.
 2    A.   Yes, I have it.
 3    Q.   Okay.
 4            This page it says, "Choosing an intermediary,
 5    experience is the key, familiarity with the entire
 6    process, handles reverse exchanges, security of funds."
 7    Was that given to Mr. Carpenter.
 8    A.   Yes.
 9    Q.   What about this one, was this given to
10    Mr. Carpenter, one that says what Benistar provides?
11    A.   Yes.
12    Q.   And Merrill Lynch Private Bank used for all escrow
13    accounts?
14    A.   Yes.
15    Q.   Was this given to Mr. Carpenter?
16    A.   Yes.
17    Q.   In this conversation you had with him, did
18    Mr. Carpenter express any disapproval of these
19    documents?
20    A.   No.
21    Q.   Did Benistar have a website, to your knowledge?
22    A.   Yes.
23    Q.   Did you familiarize yourself with it?
24    A.   Yes.
25    Q.   I'm going to have you turn to Exhibit 185.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    I have it.

2    Q.    Do you recognize that?

3    A.    Yes.

4    Q.    What is it?

5    A.    It's a page from benistar.com that says, "Frequently

6    Asked Questions."

7    Q.    Okay.

8            MR. MITCHELL:    At this time, your Honor, the

9    government would offer Government's Exhibit 185.

10            MR. PAPPALARDO:    Objection, your Honor.

11            THE COURT:    Let me see it.

12            (At sidebar on the record.)

13            MR. PAPPALARDO:    Your Honor, basically, I just

14    wanted a sidebar because after review of the transcript

15    in the first trial, this document was used in an effort

16    to deal with the issue of safety, how do we protect the

17    money.    And what it really is, is a discussion of the

18    safe harbor, which has nothing to do with protecting

19    money, it has to do with whether or not an intermediary

20    is a free-standing third person.    That's the safe harbor

21    that makes the exchange possible for the tax-deferred

22    status.

23            And I didn't know if he was going into that at

24    this point in time.

25            I can represent to the Court that based upon the

PDF created with pdfFactory trial version www.pdffactory.com

1    testimony before, it was not only inaccurate, it was

2    untrue.  And if the government can give me an offer of

3    proof of what it's going to have to say, I don't have to

4    object and it comes --

5            THE COURT:  Can I ask, first, before we get to

6    that.  This looks like -- the paper version of this, is

7    this any different from the text of frequently asked

8    questions --

9            MR. MITCHELL:  I think it's a little bit

10   different.  This is the one I want to highlight, "Can I

11   trust Benistar Trust Exchange with my money?"

12           THE COURT:  We saw that someplace else.

13           I guess part of the question is:  What does it

14   add if you have the paper version which was given to

15   people?  People have testified, Snider in particular.  I

16   just --

17           MR. MITCHELL:  It's a -- yeah, I mean, this is

18   because --

19           THE COURT:  Why use the internet rather than the

20   paper one with him.  I mean, if they're the same, that's

21   all.

22           MR. MITCHELL:  It further shows how Benistar was

23   holding itself out to the world by saying there's a

24   website that says, in fact, you can trust us with your

25   money.  Again, it goes to all the issue --

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. PAPPALARDO:  That's wonderful, your Honor,

2    except that there's no evidence that Dan Carpenter

3    looked at the website.

4          MR. MITCHELL:  Doesn't matter.

5          THE COURT:  I don't think that matters.

6          MR. MITCHELL:  I'm not going to spend a lot of

7    time on it, your Honor, I just want to highlight that

8    they're making consistent representations about safety

9    and security to not just these people, not just the

10   people we've heard from on the witness stand, but

11   holding it out to the world.  And that way, it's

12   directly relevant.  I'm just going to go over that small

13   portion.

14         THE COURT:  This date on the bottom, it looks

15   like January 10, '01.

16         MR. PAPPALARDO:  Which is what they objected to

17   before.

18         MR. MITCHELL:  I did -- well, two responses.

19   The website -- the web page that they introduced was

20   dated after events as well.  I can tie it up anyway.  I

21   can ask him was this website as it appeared --

22         THE COURT:  If he can tell you that.

23         MR. PAPPALARDO:  Your Honor, this the basis of

24   my coming up here, when they talk about sale proceeds to

25   satisfy the safe harbor --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              THE COURT:  I've already had that in other
 2    documents, this same -- it's a paper version of this
 3    document.
 4              MR. PAPPALARDO:  Your Honor, I don't have an
 5    objection with that document.
 6              THE COURT:  He's testifying about it.
 7              MR. PAPPALARDO:  I object to the testimony about
 8    this means safety when it's not.  And I'm trying to
 9    avoid the prejudice now.  It's very clear --
10              MR. MITCHELL:  It says, "Can I trust Benistar
11    with my money?"
12              THE COURT:  But that's going to depend on how
13    the witness responds to questions.  I mean, you want to
14    kind of --
15              MR. PAPPALARDO:  Your Honor, if I may.  In the
16    first trial, you gave, as part of your charge, an
17    analysis of 1031.  Among other things, you said that
18    there is no --
19              THE COURT:  Right.
20              MR. PAPPALARDO:  You also talked about -- this
21    is in the law.
22              THE COURT:  Right.
23              MR. PAPPALARDO:  I'm asking the Court to take
24    judicial notice, this has nothing to do with safety, it
25    has to do with safe harbor and being eligible.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            THE COURT:  I understand.  It's not an objection

 2      to the document, I guess, is my point.

 3            MR. PAPPALARDO:  No, no, that's what I started

 4      with, your Honor.  I'm looking to avoid the prejudice,

 5      if you would.

 6            MR. MITCHELL:  Well, it's also what the

 7      defendant's company was representing, whether it's true

 8      or not.  I mean, this is -- I understand.

 9            THE COURT:  The safe harbor clearly is intended

10      to refer to the non-taxable event.

11            MR. MITCHELL:  Right.

12            THE COURT:  But at any time --

13            MR. MITCHELL:  We're at 1:00.

14            THE COURT:  I'll let you introduce the document,

15      we're not going to go very far with it because of time.

16            MR. MITCHELL:  I probably have a couple of

17      minutes.

18            THE COURT:  As long as we're here, obviously, we

19      have started with Paley.  What's after him?  He'll take

20      a good bit of Monday, if not all of it.

21            MR. PAPPALARDO:  Fair to say, your Honor.

22            MR. MITCHELL:  The next one we have lined up,

23      Lori Enright, Paine Webber.

24            THE COURT:  She's Paine Webber, she's the

25      Rasmussen of Paine Webber.
```

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. MITCHELL:  She's the Rasmussen of Paine

2     Webber.

3          MR. GREENBERG:  And then --

4          MR. MITCHELL:  We're probably not going to get

5     to her Monday.

6          How long is your cross is going to be?

7          MR. PAPPALARDO:  Depends on what his direct is

8     and what he says.

9          MR. MITCHELL:  What if he says what he said last

10    time?

11         MR. GREENBERG:  He won't.

12         THE COURT:  We'll be here until Wednesday.

13         I just want to get -- after Enright -- I'm not

14    sure I'm going to say anything to them now, I don't know

15    if I want to get their hopes up.

16         MR. MITCHELL:  I have Kameron, who is --

17         THE COURT:  He's short, brief.

18         MR. GREENBERG:  That's January, your Honor,

19    January of 2001.

20         THE COURT:  He represented an exchangor in the

21    beginning.

22         MR. GREENBERG:  The reason they put him on --

23         MR. MITCHELL:  We've been through this.

24         THE COURT:  I don't want the solve the issues --

25         MR. GREENBERG:  Okay.

1              MR. MITCHELL:  Mr. Patterson, the attorney for

2      the first exchangor, Jeff Johnson.

3              THE COURT:  Okay.

4              MR. MITCHELL:  So a little ways to go.

5              THE COURT:  Okay.  All right.  So you can --

6              MR. MITCHELL:  Thank you.

7              (End of discussion at sidebar.)

8              THE COURT:  I'm not sure where we left off.  I

9      think the government was offering the exhibit, and

10     that's when we went to sidebar.

11             Pursuant to the discussion, the exhibit may be

12     admitted.

13             MR. MITCHELL:  Thank you.

14             (Exhibit 185 received into evidence.)

15     BY MR. MITCHELL:

16     Q.   I guess I just have a couple more questions.

17             Do you see Exhibit 185 up on the screen,

18     Mr. Paley?

19     A.   Yes, I do.

20     Q.   This is the website you were describing?

21     A.   Yes.

22     Q.   Do you see the material here about 1031 exchanges,

23     "Can I do this myself?  How is Benistar Property

24     Exchange different from a title company?  Can I trust

25     Benistar with my money?"

PDF created with pdfFactory trial version www.pdffactory.com

1           Is this material that you prepared?

2   A.    Yes.

3   Q.    Okay.  And did you send this to Dan Carpenter for

4   his approval?

5   A.    Yes.

6   Q.    I'm going to highlight one passage here for you.

7          Okay.  Do you see that?

8   A.    Yes, I do.

9   Q.    I'm going to have you read this, and then the

10  continuation on the next page.  Can you go ahead and

11  read that?

12  A.    "Can I trust Benistar Property Exchange with my

13  money?  Benistar Property Exchange Trust Company is a

14  part of Benistar Limited, the largest 419 trust plan

15  administrator in the country, and we protect your

16  assets."

17  Q.    Thank you.  Does it continue onto the next page?

18  A.    Yes.

19  Q.    Can you read that to us?

20  A.    Yes.  "We have accounts with major banking and

21  investment firms -- accounts under our sole control, as

22  required for these exchanges.  (Benistar must take

23  possession of the sale proceeds to satisfy the 'safe

24  harbor' rules outlined in 1031 property exchanges.)  Our

25  accounts are restricted to paying out funds only for a

PDF created with pdfFactory trial version www.pdffactory.com

1    subsequent closing, or to return funds to the original

2    property owner.  We distribute funds only at your

3    written request."

4    Q.   Okay.  Did Dan Carpenter approve this language?

5    A.   Yes.

6          MR. MITCHELL:  Your Honor, this is a good

7    stopping point.

8          THE COURT:  Okay.

9          We'll pause here for the weekend, resume on

10   Monday.  We're making progress.  And let me just remind

11   you, again, you have other pleasant things to think

12   about this weekend than the case, turn your minds to

13   those things, and Monday morning we'll resume our

14   acquaintance with the evidence here.

15         Enjoy the rest of the weekend, and we'll see you

16   on Monday.

17         (Court adjourned at 1:06 p.m.)

18

19                - - - - - - - - - - -

20

21

22

23

24

25

1                        CERTIFICATION

2           We certify that the foregoing is a correct

3       transcript of the record of proceedings in the

4       above-entitled matter to the best of our skill and

5       ability.

6

7

8       /s/Debra M. Joyce
        Debra M. Joyce, RMR, CRR                Date
9       Official Court Reporter

10

11

12

13      /s/Marcia G. Patrisso
        Marcia G. Patrisso, RPR, CRR            Date
14      Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com