```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS




                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )
                                    ) Criminal Action
v.                                  ) No. 04-10029-GAO
                                    )
DANIEL E. CARPENTER,                )
                                    )
         Defendant.                 )
                                    )




            BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                   UNITED STATES DISTRICT JUDGE

                          DAY ELEVEN
                          JURY TRIAL




            John J. Moakley United States Courthouse
                       Courtroom No. 9
                       One Courthouse Way
                 Boston, Massachusetts  02210
                    Monday, June 16, 2008
                          9 a.m.



                   Marcia G. Patrisso, RPR, CRR
                    Debra M. Joyce, RMR, CRR
                     Official Court Reporter
                 John J. Moakley U.S. Courthouse
                       One Courthouse Way
                 Boston, Massachusetts  02210
                        (617) 737-8728

            Mechanical Steno - Computer-Aided Transcript
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Jonathan F. Mitchell and Jack W. Pirozzolo,
 3        Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        One Courthouse Way
          Boston, Massachusetts  02210
 5        On Behalf of the Government

 6        GREENBERG TRAURIG, LLP
          By: A. John Pappalardo, Esq. and
 7            Gary R. Greenberg, Esq.
          One International Place
 8        Boston, Massachusetts  02110
          On Behalf of the Defendant

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                          Direct   Cross   Redirect   Recross

   WITNESSES FOR THE
3    GOVERNMENT:

4  MARTIN PALEY, resumed

5      By Mr. Mitchell      4                116
       By Mr. Pappalardo           67
6

7                        E X H I B I T S

8

9

10  Exhibit No.          Description              Marked    Received

11
   No. 8          Letter to Mr. Carpenter from
12                Mr. Rowe dated 8/31/00                    10
   No. 183        Memo to Mr. Paley from Mr. Carpenter      45
13  No. 184A       Memo to Mr. Carpenter from Mr. Paley
                  dated 10/29/00                           56
14  No. 184        Memo to Mr. Paley from Mr. Carpenter
                  dated 10/30/00                           52
15  No. 390        Nationwide Exchange Agreement           108

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open

2     court before the Honorable George A. O'Toole, Jr.,

3     United States District Judge, United States District

4     Court, District of Massachusetts, at the John J. Moakley

5     United States Courthouse, One Courthouse Way, Boston,

6     Massachusetts, on June 16, 2008.

7          The defendant, Daniel E. Carpenter, is present

8     with counsel.  Assistant U.S. Attorneys Jonathan F.

9     Mitchell and Jack W. Pirozzolo are present.)

10          THE CLERK:  All rise for the jury.

11          (Jury in at 9:01 a.m.)

12          THE CLERK:  Please be seated.

13          THE COURT:  Good morning, jurors.

14          THE JURORS:  Good morning.

15          MR. MITCHELL:  Good morning, your Honor.  The

16     witness is right outside.

17          THE COURT:  Okay.

18          (Pause.)

19          MR. MITCHELL:  You may have a seat, Mr. Paley.

20                CONTINUED DIRECT EXAMINATION

21     BY MR. MITCHELL:

22     Q.   Mr. Paley, when we left off on Friday we were

23     discussing Benistar's website.  Do you remember that

24     testimony?

25     A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    I'm going to switch subjects now, Mr. Paley.

2        Mr. Paley, in addition to providing prospective

3    clients with promotional literature, did you make oral

4    representations to them?

5    A.    Sure, in the course of the discussions of whether

6    they were going to use me as an exchange -- yes.

7    Q.    Okay.  You spoke with these people?

8    A.    Of course, yes.

9    Q.    And did you also give presentations to groups or was

10   it just to individuals?

11   A.    I made presentations to groups, yes.

12   Q.    What kinds of groups did you make presentations to?

13   A.    I've made presentations to groups of attorneys,

14   groups of accountants, groups of financial

15   professionals, real estate brokers.

16   Q.    And did those presentations differ in substance from

17   the presentations you made to individuals?

18   A.    No.

19   Q.    Did your oral presentations differ in any way from

20   the material in the documents?

21   A.    No.

22   Q.    Did Mr. Carpenter ever attend any of your group

23   presentations?

24   A.    Yes.

25   Q.    How many times did he attend your group

1    presentations?

2    A.    One.

3    Q.    When was that?

4    A.    The summer of 2000.

5    Q.    Where was it?

6    A.    Cambridge, Massachusetts.

7    Q.    Was it a specific place in Cambridge?

8    A.    Yeah.  It was at the Hyatt Hotel.

9    Q.    Okay.  And what was the event?

10   A.    It was a presentation to a group of doctors on 1031

11   and 419.

12   Q.    And how many people were in the room, approximately?

13   A.    Fifty.

14   Q.    Okay.  And was Dan Carpenter there throughout your

15   presentation?

16   A.    Yes.

17   Q.    Did that presentation to those doctors differ in any

18   way from your usual presentation?

19   A.    No, it didn't.

20   Q.    And did you speak to Dan Carpenter about the

21   presentation afterward?

22   A.    Yes.

23   Q.    What did you say?

24   A.    Just debriefed.  I don't think it had any substance

25   of any sort; it was just general comments.

```
 1    Q.   Okay.  Did he voice any objection to what you told
 2    the doctors?
 3              MR. PAPPALARDO:  Objection, your Honor.  Can the
 4    witness testify?  He's been leading the witness all
 5    morning.
 6              THE COURT:  Overruled.
 7              You may answer that.
 8    BY MR. MITCHELL:
 9    Q.   Did Mr. Carpenter voice any objection to what you
10    told the group of doctors?
11    A.   No.
12    Q.   At some point, Mr. Paley, did the subject of a bond
13    come up with Mr. Carpenter?
14    A.   Yes.
15    Q.   Okay.  When did that come up?
16    A.   I don't recall.
17    Q.   Was it during -- was it after Benistar started?
18    A.   Yes.
19    Q.   After the property exchange business had started?
20    A.   Yes.
21    Q.   Did you have a discussion with Mr. Carpenter about
22    it?
23    A.   Yes.
24    Q.   Okay.  What did you say to him and what did he say
25    to you?
```

1    A.   That it would be a good idea to have a bond.   And he

2    said that he would take care of it.   And that was it --

3    that's how it happened.   He was in charge of getting one

4    and he got one.

5    Q.   When you said it would be a good idea to have a

6    bond, was that something you said to him?

7    A.   I don't recall who brought it up first.

8    Q.   Okay.   Was the reason it would be a good idea to

9    have a bond --

10            MR. PAPPALARDO:   Objection, your Honor.

11            THE COURT:   Sustained to that.

12   BY MR. MITCHELL:

13   Q.   Did you explain to him why you thought it would be a

14   good idea to have a bond?

15            MR. PAPPALARDO:   Objection.

16            THE COURT:   Sustained.

17   BY MR. MITCHELL:

18   Q.   What discussion, if any, did you have about a bond

19   on that occasion?

20   A.   Other than the bond?

21   Q.   About the bond.

22   A.   About the bond?

23   Q.   What else was discussed about the bond?

24   A.   That it would be an extra level of comfort for our

25   clients, to make them want to use us instead of somebody

PDF created with pdfFactory trial version www.pdffactory.com

1    else.

2    Q.    And is that something you said or something that he

3    said?

4    A.    I don't recall who said which.

5    Q.    Was there any disagreement in the discussion about

6    that point?

7    A.    No.

8    Q.    Did Mr. Carpenter obtain a bond?

9    A.    Yes.

10   Q.    Did you receive a copy of it?

11   A.    Yes.

12   Q.    I'll have you take a look at Government's Exhibit 7

13   that has been previously admitted.

14   A.    I see it.

15   Q.    Do you recognize that document?

16   A.    I do.

17   Q.    Tell us what it is.

18   A.    It's a Fidelity bond.

19   Q.    Is that the bond that Mr. Carpenter said he would

20   obtain?

21   A.    Yes.

22   Q.    Is that something you presented to prospective

23   clients?

24   A.    When asked, yes.

25   Q.    I'll have you turn to what's marked as Government's

PDF created with pdfFactory trial version www.pdffactory.com

1   Exhibit 8 which is not in evidence yet.  If you would

2   look at that.

3        Do you recognize that document?

4   A.   Yes.

5   Q.   Tell us what it is.

6   A.   It's a letter from Donald Rowe highlighting the

7   coverage of the bond.

8   Q.   Okay.  Could you tell us the date?

9   A.   August 31, 2000.

10  Q.   And is it addressed to somebody?

11  A.   To Daniel Carpenter.

12  Q.   Is this something Daniel Carpenter gave to you?

13  A.   Yes.

14       MR. MITCHELL:  At this time the government would

15  offer Government's Exhibit 8.

16       MR. PAPPALARDO:  I object, your Honor.

17       THE COURT:  No, it's admissible on notice

18  grounds.

19       Go ahead.  I'll admit it.

20       (Exhibit No. 8 received into evidence.)

21       MR. MITCHELL:  Thank you, your Honor.

22  BY MR. MITCHELL:

23  Q.   This is, again, addressed to Dan Carpenter?

24  A.   Yes.

25  Q.   And I'll just highlight for you -- this is from

1    Travelers Property Casualty?

2    A.    Yes.

3    Q.    And I'll just highlight for you the first sentence.

4    If you could just read that briefly to us?

5    A.    "This is a letter to highlight and comment on the

6    financial institution bond coverage program which

7    Travelers, a member of Citigroup, provides to Benistar."

8    Q.    Okay.  And I'll highlight the last sentence.

9    A.    "This insurance coverage commentary is intended to

10   be informative only.  The terms and provisions of the

11   contract and any riders attached thereto would govern

12   any question arising in connection with the coverage."

13   Q.    Okay.  Is this a document you gave to clients?

14   A.    When asked, yes.

15   Q.    Now, I'm going to show you another document.  Would

16   you take a look at Government's Exhibit 181.  I'd like

17   to ask you a general question, and that is, when an

18   exchangor -- prospective exchangor agreed to hire

19   Benistar, did the exchangor sign some documents?

20   A.    Yes.

21   Q.    And what sorts of documents were they?  Just listen

22   to the question.

23   A.    All right.

24   Q.    What sorts of documents did they sign?

25   A.    There's a Fee Agreement, an Exchange Agreement and

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   an Escrow Agreement.
 2   Q.   I'll have you take a look at 181.  Would you take a
 3   moment to do that?
 4        MR. MITCHELL:  And this is in evidence already,
 5   your Honor, so I'll put this up on the screen.
 6        THE COURT:  All right.
 7   BY MR. MITCHELL:
 8   Q.   Okay.  Have you had a moment to look at those
 9   documents?
10   A.   Yes.
11   Q.   What do you recognize them to be?
12   A.   Exchange documents for Massachusetts Lumber/Murray
13   on September 13th of 2000.
14   Q.   Okay.  And just briefly, the highlighted -- if you
15   look up at the screen, the highlighted portion there,
16   that passage, does that tell exchangors how to wire or
17   send in money to Benistar?
18   A.   Yes.
19   Q.   And let me turn your attention to the next page.
20   Tell us what this is, please.
21   A.   It's a checklist, if you will, of documents that I
22   believe are part of the agreement.
23   Q.   Is that a standard form that went out to all
24   clients?
25   A.   Yes.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Okay.  Do you see that up there, that document?

2    A.    Yes.

3    Q.    Is that the Exchange Agreement that you were

4    referring to?

5    A.    Yes.

6    Q.    Was this agreement substantially the same for all

7    Benistar clients?

8    A.    Yes.

9    Q.    Mr. Paley, do you know where the substance of this

10   document came from?

11   A.    I don't understand the question.

12   Q.    Did you use a similar document when you worked at

13   Nationwide?

14   A.    Similar.

15   Q.    Okay.  And when you came over to Benistar, was this

16   something that Mr. Carpenter reviewed?

17          MR. PAPPALARDO:  Objection, your Honor.

18          THE COURT:  Sustained.

19   BY MR. MITCHELL:

20   Q.    Okay.  Did Mr. Carpenter, to your knowledge, review

21   this document?

22          MR. PAPPALARDO:  Objection.

23          MR. MITCHELL:  The witness has already testified

24   that Mr. Carpenter reviewed certain documents.

25          THE COURT:  Some of the questions do have an

1   unnecessary leading approach to them.

2        You may have the question "Did Mr. Carpenter

3   review this?"

4   BY MR. MITCHELL:

5   Q.   Did Mr. Carpenter review this?

6   A.   This one or the documents in general?

7   Q.   Let's back up.  You testified yesterday that you

8   presented certain materials to Mr. Carpenter for his

9   review when the business started; do you recall that

10  testimony?

11  A.   Yes.  Yes, I do.

12  Q.   Was the Exchange Agreement one of those documents?

13  A.   Yes.

14  Q.   Did he make any revisions to the Exchange Agreement?

15  A.   Yes.

16  Q.   What did he revise?

17  A.   He added the Escrow Agreement.

18  Q.   I'm focusing on the Exchange Agreement.  What in the

19  Exchange Agreement, if any, did he revise?

20  A.   Well, the account-selection aspect in the back.

21  Q.   Which paragraph are you referring to, sir?

22  A.   Give me a moment.  Paragraph 10.

23  Q.   Okay.  What did Mr. Carpenter change in Paragraph

24  10?

25  A.   That was all written -- created by him.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    So he created the whole thing.

2    A.    Yeah.  Yes.

3    Q.    Do you recall whether he made any other revisions?

4    A.    I don't recall specifically, but there were other

5    changes.

6    Q.    Okay.  Did you discuss with Mr. Carpenter the

7    revisions or the addition of Paragraph 10?

8    A.    Yes.

9    Q.    Okay.  What did he say about it?

10   A.    That these were the types of -- this is the type of

11   language that should be put in.  That's it.

12   Q.    Okay.  Did he explain anything having to do with a

13   Merrill Lynch Ready Asset money market account?

14   A.    No.

15         MR. PAPPALARDO:  Objection.  Objection.

16         THE COURT:  Sustained.

17   BY MR. MITCHELL:

18   Q.    Okay.  Did he say anything else besides this is the

19   language that he prefers to have in the document?

20   A.    No.  That was about it.

21   Q.    And did you question him?

22   A.    No.

23   Q.    I'll have you turn to the Escrow Agreement.  Do you

24   see that?  Do you see that up there?

25   A.    Yes.

```
 1   Q.   Okay.  Did you use an Escrow Agreement when you
 2   worked at Nationwide?
 3   A.   No.
 4   Q.   Did you begin using one when you started working at
 5   Benistar Property Exchange Trust Company?
 6   A.   Yes.
 7   Q.   How did it come about that you started to use this
 8   document?
 9   A.   Dan Carpenter thought it was a good idea to include
10   them in the exchange documents.
11   Q.   Is that something he told you?
12   A.   Yes.
13   Q.   Do you know who wrote the document?
14        MR. PAPPALARDO:  Objection.
15        THE COURT:  No, you may answer whether you know.
16        THE WITNESS:  I'm sorry?
17        THE COURT:  You may answer whether you know.
18   That was the question, whether you know who wrote it.
19        THE WITNESS:  Do I know if he wrote it?  Do I
20   know if he wrote it?
21   BY MR. MITCHELL:
22   Q.   Do you know who wrote it?
23   A.   I believe it's Dan.
24   Q.   And why do you believe that?
25   A.   Because he didn't tell me anybody else wrote it,
```

1    so...

2    Q.   I'll have you turn to the next document, the account

3    selection form.  Do you see that up there?

4    A.    Yes.

5    Q.    Now, is this something that you used with

6    Nationwide?

7    A.    No.

8    Q.    Okay.  And is this something that you used with

9    Benistar?

10   A.    Yes.

11   Q.    Do you know how this document came about?

12   A.    Dan Carpenter created it.

13   Q.    And did he, in creating it, give you any

14   instructions on how to use it?

15   A.    I mean, other than what it says, no.

16   Q.    Did he give you any directions at all about its use?

17   A.    No.  Just that, you know, to get people to make a

18   decision on whether it's going to -- their funds would

19   be held at 3 percent or 6 percent, and that they needed

20   to know about the time constraints for each.

21   Q.    Is that something that he said to you?

22   A.    Yeah.  Yes.

23   Q.    Did you discuss the language that is used in this

24   document with him other than what you already testified?

25   Did you have any follow-up discussion?

1  A.   Not really, no.

2  Q.   Thank you.  Let me switch subjects.

3       When you first formed a relationship with Benistar,

4  was there -- and had discussions with Dan Carpenter, did

5  the subject of the handling of the clients' money come

6  up?

7  A.   Yes.

8  Q.   Okay.  What did you discuss?

9  A.   That Dan had lots of experience with --

10        MR. PAPPALARDO:  Objection, your Honor.

11  Objection.  What time?  With whom?  Who's present?

12  There's no foundation for that question.

13        THE COURT:  Sustained.

14        MR. MITCHELL:  I'm picking up on discussions he

15  already testified to on Friday, your Honor.  I mean,

16  I'll be happy to ask those questions.

17  BY MR. MITCHELL:

18  Q.   When did you have a discussion with Mr. Carpenter

19  about the handling of money?

20  A.   When we first met in September of '98.

21  Q.   Okay.  And what did Mr. Carpenter say about the

22  handling of funds?

23  A.   That he was good at it and that he had lots of

24  experience.

25  Q.   And when you were at Nationwide, what was the

PDF created with pdfFactory trial version www.pdffactory.com

1  arrangement as to who handled the funds?

2  A.   The funds were handled in California.

3  Q.   Did you handle the funds?

4  A.   No.

5  Q.   Did you arrive at a different understanding with Mr.

6  Carpenter?

7  A.   I'm sorry?

8  Q.   Did you arrive at a different understanding with Mr.

9  Carpenter?

10  A.   No, it would be similar.

11  Q.   Did you handle the funds at Benistar?

12  A.   No.

13  Q.   Did you have -- strike that.

14      Was an account opened to hold client funds?

15  A.   Yes.

16  Q.   Where?

17  A.   At Mellon Bank.

18  Q.   And at Mellon Bank --

19      MR. PAPPALARDO:  Your Honor, if we could get

20  which company he's with at this point in time.

21      MR. MITCHELL:  I'll be happy to direct the

22  examination at this point; Mr. Pappalardo will have his

23  chance in a moment.

24  BY MR. MITCHELL:

25  Q.   I'll have you take a look back at 181.  I'll refer

PDF created with pdfFactory trial version www.pdffactory.com

1   you to where it says "Merrill Lynch."

2   A.    Right.

3   Q.    Okay.  Was an account opened up at Merrill Lynch?

4   A.    Yes.

5   Q.    Okay.  Did you have any signatory authority on that

6   account?

7   A.    No.

8   Q.    Did you have any access to it?

9   A.    No.

10  Q.    Did you see the account-opening documentation?

11  A.    No.

12  Q.    Did you ever personally deposit money into it?

13  A.    No.

14  Q.    Did you ever take any money out?

15  A.    No.

16  Q.    Was anyone but Dan Carpenter, as far as you know,

17  authorized to manage the money in that account?

18  A.    No.

19  Q.    Did Benistar charge a fee for holding clients'

20  money?

21  A.    I don't know how to answer the question.  We

22  provided services for exchange -- we provided services,

23  professional services, yeah.

24  Q.    And did clients pay for those services?

25  A.    Yes.

1   Q.   In what form did that payment take?

2   A.   It was deducted at the closing.

3   Q.   Okay.  And was it a flat fee?

4   A.   Yes.

5   Q.   How much -- what would that fee be based on?

6   A.   It was based on the complexity of the transaction.

7   Q.   Okay.  Could you describe for us how generally those

8   fees worked?

9   A.   If there were several properties involved or if

10  there were lots of different partners in a transaction

11  the fees would be higher; if it was a simple

12  transaction, meaning the property was owned by, you

13  know, one person and there was going to be property

14  bought relatively quickly afterwards, then the fee would

15  be dramatically less.

16  Q.   Okay.  What was the range of fees?

17  A.   I don't recall exactly.  Roughly $1500 to -- I think

18  as high as 10- to 15-.  I don't recall exactly.

19  Q.   Okay.  And as between you and Mr. Carpenter, who got

20  those fees?

21  A.   Well, we had an arrangement of how the fees were

22  divided.

23  Q.   And what was that arrangement?

24  A.   There would be a $500 deduction from the fee for

25  marketing purposes that was kept by the Newton office,

1    and then that balance was split, 90 percent to go to the

2    Newton office and 10 percent to go to Connecticut.

3    Q.    Did the Simsbury office, the headquarters, receive

4    any additional compensation in the course of providing

5    services for prospective -- for clients?

6    A.    No.

7    Q.    Are you aware whether interest was generated on --

8    was there an understanding as to who would keep any

9    additional interest on clients' funds above 3 and 6

10   percent?

11   A.    Yes.

12   Q.    Okay.  What was that understanding?

13   A.    That that would be split evenly.

14   Q.    Evenly between whom?

15   A.    Between Connecticut and Newton.

16   Q.    Sir, are you familiar with the wire instructions

17   given to clients?

18   A.    Yes.

19   Q.    All right.  And the first document in Exhibit 181,

20   again, is that the one that describes how funds --

21   clients' funds would be sent to the account?

22   A.    Yes.

23   Q.    Were there different instructions about wiring

24   depending on whether someone selected 3 percent or 6

25   percent?

PDF created with pdfFactory trial version www.pdffactory.com

```
1   A.    No.

2   Q.    Did some clients send in checks?

3   A.    Some, yes.

4   Q.    Okay.  And what happened when they sent in checks to

5   Newton?

6   A.    They were sent to Connecticut.

7   Q.    How were they sent?

8   A.    Courier, overnight service.

9   Q.    Okay.  And did you do that with all checks that came

10  in to Newton?

11  A.    Yes.

12  Q.    Let me have you take a look at Exhibit 41.  Could

13  you take a look at that?

14  A.    I see it.

15  Q.    Do you see it?

16  A.    Yes.

17        MR. MITCHELL:  This one's in evidence already,

18  your Honor.

19        THE COURT:  All right.

20  BY MR. MITCHELL:

21  Q.    What do you recognize this document to be?

22  A.    It's a check.

23  Q.    And a check from whom to whom?

24  A.    From Union Square Apartments, Limited, to Gail

25  Cahaly.
```

1   Q.   Okay.  And was this a check that Benistar received?

2   A.   Yes.

3   Q.   And was this one of the ones that was sent by

4   overnight delivery to Connecticut?

5   A.   Yes.

6   Q.   At some point, sir, was the account -- the Benistar

7   account moved from Merrill Lynch to PaineWebber?

8   A.   Yes.

9   Q.   When was that?

10  A.   I don't recall exactly.  The fall of 2000.

11  Q.   Did you discuss with Dan Carpenter why that account

12  was being moved?

13  A.   It was really more after the fact that it was, just

14  that he told me he did it.

15  Q.   He told you he did it after the fact?

16  A.   Yeah.

17  Q.   Did he explain to you why?

18  A.   He said he would get better service.

19  Q.   Did he say anything else?

20  A.   Not really.

21  Q.   After the accounts were moved from PaineWebber --

22  excuse me, from Merrill Lynch to PaineWebber, were

23  clients still given the choice between 3 percent and 6

24  percent?

25  A.   Yes.

1   Q.   And were they still -- all clients still directed to

2   wire the money to the same single account?

3   A.   Yes.

4        MR. MITCHELL:   May I just have one moment, your

5   Honor?

6        (Pause.)

7   BY MR. MITCHELL:

8   Q.   This one isn't in front of you but I'm going to have

9   you look at the screen.   This is Exhibit 13, which is

10  already in evidence.   Would you take a look at that?

11  A.   Uh-huh.

12  Q.   I'm going to blow up the "3 percent" language.   Do

13  you see that where it says "Merrill Lynch Ready Asset

14  money market account"?

15  A.   Yes.

16  Q.   After the move to PaineWebber, did any of that

17  language change?

18  A.   I'm unclear.   I don't remember.   I think so, but I

19  don't know.

20  Q.   Do you recall whether you spoke to Dan Carpenter

21  about changes in that language?

22  A.   Yeah, about changes that he said that should be in

23  the account, yes -- in the language.   Excuse me.

24  Q.   Okay.   Did you change the language?

25  A.   No, I did not.

1    Q.    Did Connecticut provide the Newton office with

2    information about the receipt of client funds?

3    A.    Yes.

4    Q.    And in what form did that take?

5    A.    They were by client, the amount of money that we

6    received, date of the transaction.

7    Q.    I'm going to have you take a look at another

8    document up there.  It's marked Government's Exhibit

9    189B.  Take a look at that.

10   A.    Yes.

11            MR. MITCHELL:    One moment, your Honor.

12            (Pause.)

13   BY MR. MITCHELL:

14   Q.    189B is what kind of document?

15   A.    It's a spreadsheet.

16   Q.    Okay.  And do you see -- I'm going to put it up on

17   the screen as it's already been admitted.

18        Is that what you're looking at right there?

19   A.    Yes.

20   Q.    Okay.  And what was the purpose of this document?

21   A.    So we could keep track of clients' funds and -- keep

22   track of clients' funds.

23   Q.    Was there somebody in Connecticut that you usually

24   received this from?

25   A.    Yes.

1   Q.   Who was that?

2   A.   Jackie Spielman.

3   Q.   Did you have discussions with her about the status

4   of client funds?

5   A.   Not generally.  It was something that was discussed

6   with Linda Jokinen, my assistant, and her.

7   Q.   Did you ever receive account statements from either

8   the Merrill Lynch or the PaineWebber accounts?

9   A.   No.

10  Q.   Did you discuss -- did you discuss with Dan

11  Carpenter when clients would need their money back?

12  A.   Rarely.

13  Q.   I'm sorry.  What was the answer?

14  A.   Rarely.

15  Q.   Rarely?  On those rare occasions -- well, rarely is

16  how many times, sir?

17  A.   Maybe once or twice.  That was not something that we

18  talked about a lot; it was mostly handled between Linda

19  Jokinen and Jackie Spielman.

20  Q.   Did you ever speak to anybody at Merrill Lynch?

21  A.   Yes.

22  Q.   Who did you speak to?

23  A.   Who or -- who?  Jerry Levine.

24  Q.   And what was your understanding as to who Jerry

25  Levine was?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   He was the account manager for the -- for Benistar's

2   clients' funds.

3   Q.   Okay.  And on how many occasions did you speak to

4   him?

5   A.   At least once.

6   Q.   Okay.  What did you talk to him about?

7   A.   I was explaining about exchanges to him.

8   Q.   Okay.  And what prompted you to have that discussion

9   with him?

10  A.   Dan Carpenter thought it was a good idea for me to

11  call him.  It was early on in our relationship, and he

12  thought it was a good idea for me to talk with Jerry and

13  inform him of what we were doing and that clients' money

14  would be coming in and out of the account.

15  Q.   Okay.  And did Jerry Levine appear to understand

16  what you were telling him?

17  A.   Not initially.

18  Q.   Okay.  Did you have a later conversation with him?

19  A.   I don't remember.

20  Q.   At the end of the one conversation you've been

21  describing, did it sound like he understood what you

22  were talking about?

23  A.   I think he had, you know, a rudimentary

24  understanding, yes.

25  Q.   Did you and Dan Carpenter have a discussion about

PDF created with pdfFactory trial version www.pdffactory.com

1  Jerry Levine at any point?

2  A.   Did we talk about Jerry Levine?  Yes.

3  Q.   Okay.  When did you talk about Jerry Levine?

4  A.   I don't recall.

5  Q.   Was it around the same period that you had a

6  discussion with Jerry Levine?

7  A.   Yes.

8  Q.   Okay.  Do you remember what you and Dan Carpenter

9  talked about in reference to Jerry Levine?

10 A.   Well, before I spoke to Jerry Levine it was what I

11 said earlier, that Dan thought it was a good idea for me

12 to talk to him.  And then after I had spoken to Jerry

13 Levine it was basically a conversation essentially, you

14 know, "How did it go?"  You know, "Do you think" -- Dan

15 was asking me, "Do you think Jerry got it?"  "Did he

16 understand what you were saying?"  And I said, "I think

17 so."

18     And I think I said something about "I don't think

19 he's 100 percent understanding of exchanges, but that

20 doesn't matter, just the rudimentary stuff I think he

21 understood."

22 Q.   Okay.  Did you have any other -- talk to Dan

23 Carpenter -- have any further discussion with Dan

24 Carpenter about Jerry Levine?

25 A.   I don't recall.

1    Q.   I'm going to show you a document --
2            MR. MITCHELL:  May I approach the witness?
3            THE COURT:  You may.
4    BY MR. MITCHELL:
5    Q.   I'm going to show you a document.  I'd like you to
6    read the part that I've marked to yourself, if you
7    would.
8            (There is a pause.)
9            THE WITNESS:  Okay.  I read it.
10   BY MR. MITCHELL:
11   Q.   Okay.  Having read that document, is your
12   recollection refreshed as to other things Dan Carpenter
13   spoke about in reference to Jerry Levine?
14   A.   Yes.
15   Q.   All right.  What else was it?
16   A.   It was something about MOMEC, which is a modified
17   endowment contract, and also that Jerry should know
18   about the account selection form that he had informed
19   him about, whether a client would have the option of
20   selecting the 3 or 6 percent.
21   Q.   Okay.  Anything else?
22   A.   No.
23   Q.   Okay.  At any point did Dan Carpenter have meetings
24   with exchangors?
25   A.   No.

1    Q.   At any point -- let me direct your attention to

2    January of 2001.   Did Dan Carpenter have meetings with

3    exchangors in January of 2001?

4              MR. PAPPALARDO:   Objection.

5              THE COURT:   Let me see you.

6              (Discussion at sidebar and out of the hearing of

7    the jury:)

8              MR. PAPPALARDO:   Yes, your Honor.   My objection

9    is that we are now into January of 2001.   Any of these

10   meetings, if they follow the previous transcript or

11   other transcripts in different matters, are going to

12   involve discussions about meetings that involve loss or

13   failed exchanges, and I would suggest to the Court that

14   it's not appropriate -- or that it's irrelevant to this

15   case, what happened in January of 2001.

16             The focus of this case, as the government has

17   indicted it, is that there was a crime -- or not a crime

18   as of the time of the date of the last contract that was

19   entered into by exchangors.   And I submit to the Court

20   that a meeting with an exchangor subsequent -- we're now

21   easily more than a month after that point in time -- has

22   no bearing on his state of mind back when, and I would

23   ask that it not be included.

24             The other thing, your Honor, is that again, as

25   the Court has indicated from its previous discussions,

PDF created with pdfFactory trial version www.pdffactory.com

the Court has attempted to strike a balance here with respect to loss versus repayment. And without having to rehash all of that, this is opening up, again, that particular subject. And more importantly, is very much going to involve a response by the defense. Mr. Carpenter here is on crime and we will respond to this if it comes in.

MR. MITCHELL: This, of course, has already been beaten several times over the course of the last several weeks, your Honor. You have let into evidence, among other things, a defense conversation with Marjorie Adams for the purpose of showing the defendant's intent at the time of doing an exchange, and you did so because it shows a consciousness of guilt, that what he was doing with the money was not something that he had communicated to the exchangors.

I'm referring to conversations -- comments like there had been a run on the bank, comments -- asking Joe Iantosca for a loan, a complete omission of his having traded options throughout the entire period. This was -- and there are -- there are essentially four conversations that he had between Joe Iantosca which --

THE COURT: Who's "he"?

MR. MITCHELL: Carpenter with Paley.

THE COURT: Focus in on what this witness will

PDF created with pdfFactory trial version www.pdffactory.com

1    say about it.

2              MR. MITCHELL:   This witness will say he

3    approached Joseph Iantosca that there was a run on the

4    bank -- Carpenter said there had been a run on the bank.

5              THE COURT:   Is Paley with him?

6              MR. MITCHELL:   Paley was always with him.

7              And Carpenter left him a voicemail, with

8    Iantosca's attorney, Matt Kameron, who will be the next

9    witness -- there was a phone call and a message, "Sorry,

10   there was a run on the bank; I don't have any funds

11   left."  And most importantly, he will say he said, "It's

12   not Martin Paley fault," which is why they want to keep

13   this conversation out.

14             The defense has built on two prongs, your Honor:

15   One that the exchangor -- that Merrill Lynch and

16   PaineWebber were brokers and somehow knew and somehow,

17   you know, blessed what Mr. Carpenter was doing with the

18   clients' money and this is somehow PaineWebber's fault.

19   And he's making that the focus of the cross-examination.

20   But the reality -- the reality -- the reality is he said

21   at the time it was not Marty Paley's fault.

22             THE COURT:   You're saying there are four

23   conversations?

24             MR. MITCHELL:   Yeah.   There was a voicemail with

25   Kameron, there is a conversation with --

PDF created with pdfFactory trial version www.pdffactory.com

```
1              THE COURT:  Let me just ask you about that.  You
2     want to ask Kameron, right?
3              MR. MITCHELL:  Yes.
4              THE COURT:  And you want to play the voice
5     recording?  So why do we need his testimony?
6              MR. MITCHELL:  Because they're going to try to
7     keep that out among -- for reasons that escape me,
8     but...
9              THE COURT:  But I mean, if they hear the actual
10    conversation, Paley's recollection of the conversation
11    isn't as important, is it?
12             MR. MITCHELL:  As to that one, no.
13             THE COURT:  Okay.
14             MR. MITCHELL:  Can I just -- can we just pause
15    on that conversation?  They have maintained throughout
16    that conversation that happened that because Matt
17    Kameron didn't recognize Martin Paley's voice, that
18    somehow is inadmissible, which is not dependent upon
19    104A, direct intention.
20             THE COURT:  All right.
21             MR. MITCHELL:  So there's that piece.  I'd be
22    happy to pick up on that.  There's a conversation with
23    Joseph Iantosca, there is a conversation with --
24             THE COURT:  In his office?
25             MR. MITCHELL:  In Iantosca's office; there was a
```

PDF created with pdfFactory trial version www.pdffactory.com

1    conversation with Marjorie Adams which Mr. --

2           THE COURT:  Which she's already testified about.

3           MR. MITCHELL:  She's testified about that.

4           And then there's a conversation with Ron Cahaly,

5    similar conversation, "run on the bank; not Martin

6    Paley's fault."  The defendant kept repeating "It is not

7    Martin Paley's fault" in each of these conversations.

8           THE COURT:  With respect to the Iantosca

9    meeting, what would be the evidence specifically there?

10           MR. MITCHELL:  Not Martin Paley's fault --

11           What will be the evidence?  That he was present

12    during the conversation.

13           THE COURT:  Right.  And what of interest to us

14    now that Mr. Carpenter said to Iantosca other than he

15    wasn't getting his money?

16           MR. MITCHELL:  There had been a run on the bank

17    and it wasn't Martin Paley's fault.  So those two

18    principal things.

19           MR. PAPPALARDO:  Your Honor, number one, with

20    respect to that conversation, what he said to Paley,

21    what they want this in for -- we're not going to argue

22    that Martin Paley invested money.  I think the evidence

23    is going to be very clear at the end of this trial that

24    Martin Paley had nothing to do with it.  I don't think

25    that's an issue here.  However, with respect to this

PDF created with pdfFactory trial version www.pdffactory.com

1   meeting, they want to introduce this meeting because

2   there was a request by Paley and by Carpenter to get

3   money from Iantosca.

4           Now, let me explain that, your Honor.  Their

5   characterization, you know, a loan from Iantosca.  The

6   reason they went that I would suspect, is that -- if

7   this conversation comes in, was not to borrow money from

8   Iantosca, but to have Iantosca put money back into his

9   account so the exchange could be completed so he could

10  save his 20 percent on the property exchange; it wasn't

11  to borrow money to invest or to put into the market or

12  anything like that.  That was the only purpose of that,

13  so he could receive the tax benefit of the exchange that

14  he had contemplated.

15          Your Honor, it gets into -- there's no question

16  that what this does is highlight the amount of loss.

17  With respect to the conversation with Kameron, Mr. Paley

18  needn't go into that.  You know, what he can say, if he

19  wants to set it up, is:  "Were you present when Kameron

20  made a call [sic]?" but not what it was.  The call

21  speaks for itself.  Whether we can successfully exclude

22  the call depends on other issues.  My sense is that, you

23  know --

24          THE COURT:  Well, maybe Paley can authenticate

25  it.  Maybe Kameron can't but Paley can.

1          MR. PAPPALARDO:  But without getting into the

2     substance of the call, your Honor, he could say, "I was

3     present during a conversation with..."

4          Your Honor, everything the government is

5     attempting to offer through this witness right now is

6     either already in the case -- this is cumulative at

7     best.  I would suggest to the Court that it's highly

8     prejudicial, it's unfairly prejudicial, and all it does

9     is focus attention on the issue of loss.  And, you know,

10    if we're going to be permitted to show a payment down

11    the road, then let it all come out and we'll go down

12    there.  I'm happy to do that.  But I would suggest to

13    the Court again that it is improper to let this stuff in

14    on the issue of loss.  In your articulated balancing

15    test, this unbalances it.

16         MR. MITCHELL:  This testimony corroborates

17    Marjorie Adams who Mr. Greenberg in his cross referred

18    to as having a purported conversation with the defendant

19    and it called into question whether the phone calls

20    actually happened.  And this -- what is cumulative to

21    one party is corroborative to another.  This is highly

22    relevant evidence, your Honor.  And that being said,

23    when Kameron explained to us what happened, he lied.  He

24    lied.

25         THE COURT:  What was the lie?

1      MR. MITCHELL:  The lie -- I mean, two things:
2  He lied about there being a run on the bank --
3      THE COURT:  I suppose it depends on whether you
4  believe that was a -- meant to be strictly factual or
5  whether it was meant to be metaphorical.
6      MR. MITCHELL:  Well, we can argue about that,
7  but that doesn't change the relevance.
8      THE COURT:  But assume it was meant strictly
9  factually.  I guess -- I guess there is a very small
10  value to any falsehood, as you say, consciousness of
11  guilt.  I mean, the only reason people tell falsehoods
12  is if they think they have to.
13      MR. MITCHELL:  And "it's not Martin Paley's
14  fault" is equally important for another reason.  It goes
15  to any defense that they have already advanced in this
16  case.
17      THE COURT:  It depends on what it is, I guess.
18  What isn't Martin Paley's fault?
19      MR. MITCHELL:  The fact that they're out all of
20  this money.
21      THE COURT:  Nobody is saying it is Martin
22  Paley's fault they're out of this money.
23      MR. PAPPALARDO:  I appreciate what the
24  government is telling me what my defense is, your Honor,
25  but it's not.  I mean, with all --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1          THE COURT:  What I understand the defense's view
 2   of Paley's role is in the initial transactions, not in
 3   the losing of money.
 4          MR. PAPPALARDO:  That's right.
 5          Your Honor, if I may, it's very clear not only
 6   was the statement "run on the bank" metaphorical, not
 7   only is it already in, but not only that, we heard
 8   substantial testimony from Mitch Rock about this; he
 9   talked about what happened when the account was closed.
10   It's very clear what happened, okay?  And a
11   characterization like "run on the bank" is a
12   colloquialism.
13          There's been a lot of phrases that have come
14   into this case that if you took them literally -- if you
15   took riverboat gambling literally --
16          MR. MITCHELL:  I confess.
17          MR. PAPPALARDO:  -- Carpenter couldn't be a
18   riverboat gambler because a riverboat gambler never
19   wins, and there's been evidence that Carpenter has won
20   on more than one occasion.
21          This is not being offered for anything else than
22   to highlight and refocus the jury's attention on loss.
23   This is cumulative at best; it's of limited value, if at
24   all; and any value it has is clearly eclipsed by the
25   prejudicial value.
```

1          And again, your Honor, it creates the misleading

2    impression about the idea that these people are out

3    money.  They're not out money.  And I would strongly

4    suggest -- and I made this offer, you know, five minutes

5    ago at the sidebar conference -- if the government wants

6    to get that all in, I'm okay with it, as long as we

7    could get in our -- I think that's -- we filed a motion

8    at the beginning of this case to exclude loss.

9          And I point something out, your Honor.  With

10   respect to the issue of loss, you know, the government

11   opened on the basis of that letter from Scott Schuster.

12   They read that letter.  That was at the beginning of

13   their opening statement.  And since then, on two prior

14   occasions after the letter was excluded from evidence by

15   the Court, they made reference to the letter.  As a

16   matter of fact, when Snider -- Mr. Snider also started

17   dealing with the letter from memory, "I regret," you

18   know?  And what is the purpose of doing that, your

19   Honor, if it isn't again to highlight the issue of loss

20   to the jury?

21          There is no basis to ask a question about a

22   letter that comes in in January if it isn't to highlight

23   the fact that the exchange didn't go through or that

24   there was a loss.  Your Honor, this is very far afield

25   from what this case is really about.

1          MR. MITCHELL:  Your Honor, you've made it

2    crystal clear, it seems to me, the issue that the case

3    cannot be sanitized of any mention of loss.  It can't.

4    It is a historical fact.  And that your issue with

5    introduction of loss wasn't that it was somehow

6    prejudicial at all; it was a matter of emphasis, that

7    there had been -- your issue with the opening and the

8    closings in the last trial, that there had been a shift

9    of emphasis.

10         And so what we've done, fastidiously, is tried

11   to refocus our evidence in compliance with the Court's

12   take on it.  But the reality is that these people are

13   out money, and you could hide that from the jury and

14   keep out all the relevant evidence -- like what the

15   defense does in its own voice when the time comes to

16   explain matters -- but it is highly prejudicial; it

17   skews the whole picture.

18         THE COURT:  The evidence of events including

19   statements by the defendant after mid December, at least

20   the evidence that's been described, is not directly

21   relevant to the issues that guide me.  As you say, some

22   of what we have heard is -- because it's hard to present

23   a coherent story to the jury about what events were

24   without some reference to what's happened.  But without

25   direct relevance, it seems to me that the evidence

```
1   you're looking for now, the two statements, "run on the
2   bank" and "it's not Martin Paley's fault," are of rather
3   limited probative value and I think they're probably
4   outweighed at this point by the prejudice.
5        So I think they ought to be excluded under 403,
6   the balance, that -- we have some of it.  And it really
7   is a question of how much is too much.  It doesn't
8   seek -- if the evidence were stronger, if it was some
9   other statement that was more inculpatory on its face,
10  which then if believed -- but I don't think either of
11  those two statements have enough probative force to
12  outweigh the prejudice.
13       MR. MITCHELL:  Well, before Matt Kameron takes
14  the stand I would like to -- I want to revisit that so
15  you have the transcript right in front of you so you can
16  read it specifically.
17       THE COURT:  Yeah.
18       MR. MITCHELL:  Then what I might do with this
19  witness, I might just have him identify the transcript
20  as being consistent with a phone call that Carpenter
21  had.
22       MR. PAPPALARDO:  Your Honor, if I may?
23       THE COURT:  Maybe you have to do it now.
24       MR. PAPPALARDO:  If the Court decides at the
25  time it comes in that Paley was there --
```

```
 1              THE COURT:  Would have testified that he heard
 2      it?
 3              MR. PAPPALARDO:  Right.  That he would have
 4      testified that he heard it, I don't think we need to --
 5              THE COURT:  So we could get by the foundation
 6      problem.
 7              MR. PAPPALARDO:  Okay.
 8              THE COURT:  Okay?  All right.
 9              MR. MITCHELL:  All right.
10              (In open court:)
11              MR. MITCHELL:  Your Honor, may I have a moment
12      to retool things?
13              THE COURT:  Uh-huh.
14              (Pause.)
15      BY MR. MITCHELL:
16      Q.  Mr. Paley, prior to December of 2000 had you
17      received any memos from Dan Carpenter regarding the
18      management of client escrow funds?
19      A.  Yes.
20      Q.  I'm going to have you take a look at Government's
21      Exhibit 183.
22              THE COURT:  This is not yet in evidence, right?
23              MR. MITCHELL:  This is not in evidence, your
24      Honor.
25      BY MR. MITCHELL:
```

```
 1   Q.   Do you see Exhibit 183 in front of you, sir?

 2   A.   No; I do not have it.

 3   Q.   You do not have it?

 4        MR. MITCHELL:  May I have a moment, your Honor?

 5        (Pause.)

 6        MR. MITCHELL:  That's because I still have it.

 7        May I approach the witness?

 8        THE COURT:  All right.

 9        MR. MITCHELL:  Sorry about that.

10   BY MR. MITCHELL:

11   Q.   Would you take a look at that?

12   A.   (Witness complies.)

13   Q.   Do you recognize that document, Mr. Paley?

14   A.   Yes.

15   Q.   Would you tell us what it is?

16   A.   It's a memo from Dan Carpenter to me.

17   Q.   Is it dated?

18   A.   No, it's not.

19   Q.   Do you recall when you received it?

20   A.   Yes.  It would be in May of 2000.

21   Q.   Okay.  And what does the memo concern --

22   A.   It's a --

23   Q.   -- just generally.

24   A.   It's calculations from Dan about how monies should

25   be distributed from the clients, 3 percent or 6 percent
```

PDF created with pdfFactory trial version www.pdffactory.com

1  selection.

2  Q.   Okay.

3        MR. MITCHELL:   At this time, your Honor, the

4  government would offer Government's Exhibit 183.

5        MR. PAPPALARDO:   No objection.

6        THE COURT:   Okay.

7        (Exhibit No. 183 received into evidence.)

8  BY MR. MITCHELL:

9  Q.   Do you see 183 up there on the screen?

10 A.   Yes, I do.

11 Q.   Okay.  And it says to Marty Paley, SMG Ventures,

12 LLC.  What's SMG Ventures, LLC?

13 A.   It was doing business as an entity that we formed

14 for the Boston office.

15 Q.   Who's "we"?

16 A.   Well, it's my wife's initials.

17 Q.   Who formed it?

18 A.   I did.

19 Q.   Okay.  And was that with Mr. Carpenter's assent?

20 A.   Yes.

21 Q.   And it says, "Pay out to SMG from Benistar Property

22 Exchange."  So what was this concerning?

23 A.   It was concerning how money would be distributed

24 once the clients' money had been held with Benistar

25 during their exchange.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Okay.  I'm going to have you take a look at the

2    first sentence.  Could you just read that to us?

3    A.    "After giving this a great deal of thought, I

4    believe that I have come up with a way to have a steady

5    payout come out to SMG that incentivizes you based on

6    bringing in money rather than hoping for a good

7    investment return on our part."

8    Q.    Okay.  Did you have an earlier discussion with him

9    about this?

10   A.    I don't recall.

11   Q.    Do you know what prompted this memo?

12   A.    I don't recall.

13   Q.    Where it says that -- "payout that incentivizes you

14   based on bringing in money rather than hoping for a good

15   investment return," what does that -- what was your

16   understanding of what that meant?

17   A.    That he wanted me to bring in more business.

18   Q.    Okay.  Let me have you look at this.  I'm not going

19   to have you read the whole thing.  Where it says, "The 3

20   percent payout means that we're effectively paying out

21   25 basis points per month," what does "basis points"

22   refer to?

23   A.    It's a financial term.

24   Q.    Meaning what?

25   A.    It's a quarter of a percent, is what 25 basis points

PDF created with pdfFactory trial version www.pdffactory.com

1    is.

2    Q.   Okay.  It says, "Since we earned 4.8 on money market

3    funds, we earn 40 BPs" -- is that basis points?

4    A.   Uh-huh.

5    Q.   -- "per month on 3 percent money"?

6    A.   Yes.

7    Q.   And then where it says, "We have a spread of 15

8    basis points, I propose that we pay SMG 10 basis points

9    of those 15" -- okay.  Can you explain to us what this

10    is dealing with?

11    A.   It's -- I'm not -- well, there's a spread of

12    between -- what he's saying is that there's 40 basis

13    points a month minus 25 basis points that he's

14    proposing, and that would leave 15 basis points left

15    over.

16    Q.   Okay.  And did you have discussions with him -- did

17    you have discussions with Dan Carpenter about the amount

18    of profit that was being made on the interest of client

19    funds?

20    A.   Did I have discussions?

21    Q.   Yes.

22    A.   Yes.

23    Q.   Okay.  And is that what this paragraph is

24    discussing?

25    A.   It is.

```
 1  Q.   And if you would turn to Paragraph 3.  This says
 2  "three ways:  20 percent" -- at the beginning -- "At the
 3  end of each quarter we'll divide the profits, if any,
 4  three ways:  20 percent to Benistar and then 40 percent
 5  to SMG" -- that's you?
 6  A.   Yes.
 7  Q.   -- "and 40 percent to CFG."  What is "CFG"?
 8  A.   Carpenter Financial Group.
 9  Q.   Was this proposal different from the arrangement you
10  had prior to it?
11  A.   Yes.
12  Q.   And would this have allowed you to take a larger or
13  smaller portion of the profit on the investment
14  interest?
15  A.   Smaller.
16  Q.   And then in closing, it just -- could you just read
17  the first paragraph -- excuse me.  The first sentence?
18  A.   "I believe this is the fairest way to get money to
19  you on a regular basis and to incentivize you to bring
20  in as much money as possible."
21  Q.   Did you go along with this proposal?
22  A.   No, we did not.
23  Q.   And why not?
24  A.   Because I said it was unfair.
25  Q.   Did you continue to go forward with the same
```

PDF created with pdfFactory trial version www.pdffactory.com

1  arrangement you had previously?

2  A.    Yes.

3  Q.    And that was to split the interest 50/50?

4  A.    Yes.

5  Q.    I'm going to show you what has been marked as

6  Government's 184A.  Take a look at that.

7  A.    I have it.

8  Q.    Okay.  During the course of your work at Benistar

9  did you perform any services in connection with 419

10 plans?

11 A.    Yes.

12 Q.    Okay.  Was a 419 plan a part of the larger Benistar

13 business?

14 A.    Yes.

15 Q.    What was your understanding with Mr. Carpenter as to

16 what your role was in that part of the business?

17 A.    That I would be presenting 419s to potential clients

18 in the Boston area.

19 Q.    And, again, what is a 419 plan?

20 A.    It's a welfare benefit plan.

21 Q.    All right.  And did you present proposals to

22 prospective clients in the Boston area as to 419 plans?

23 A.    Yes.

24 Q.    Did you prepare promotional materials for that

25 purpose?

1    A.    Yes.

2    Q.    Is that something that you shared with Mr.

3    Carpenter?

4    A.    No.

5    Q.    And did you have a discussion with Mr. Carpenter

6    about sharing in the 419 plans -- plan presentation?

7    A.    Yes, I did.

8    Q.    And when was that discussion?

9    A.    When was the discussion?

10   Q.    Yes, sir.

11   A.    October of 2000.

12   Q.    Okay.  What did you discuss with Mr. Carpenter

13   concerning your 419 plan presentation?

14   A.    That I didn't want to hand over the presentation to

15   him without being compensated for it.

16   Q.    And would you just look -- just put the document

17   aside for a minute, Mr. Paley.  You told him you wanted

18   to be compensated for the 419 presentation you put

19   together?

20   A.    Correct.

21   Q.    And what did Mr. Carpenter say in response, if

22   anything?

23   A.    "No."

24   Q.    Did you --

25   A.    Well, we had a discussion that went back and forth.

PDF created with pdfFactory trial version www.pdffactory.com

1    And I put a lot of time and effort into it; it was my

2    opinion it was very difficult to put together.  I had

3    hired somebody to help me create the presentation on my

4    end, from my funds, and I didn't think it was fair just

5    to hand over a presentation that cost me many dollars

6    and many hours to create without being paid for it.

7    Q.    Okay.  And did Mr. Carpenter explain his position?

8    A.    He explained it.

9    Q.    What did he say?

10   A.    He said that we were a team and that I should just

11   hand it over and be a member of the team.

12   Q.    Did you have follow-up correspondence with him

13   concerning this discussion?

14   A.    Yes.

15   Q.    Okay.  I'm showing you what has been marked as

16   Government's Exhibit 184A.  Would you take a look at

17   that?

18           THE COURT:  Is this the same memo?

19           MR. MITCHELL:  This is the same one.

20   BY MR. MITCHELL:

21   Q.    Do you recognize that document, sir?

22   A.    Yes.

23   Q.    Can you tell us what it is?

24   A.    It's a memo from me to Dan.

25   Q.    And is there a date on it?

1  A.   Yes.  October 29, 2000.

2  Q.   And what does the memo concern?

3  A.   Our phone call.  Our phone call that day.

4       MR. MITCHELL:  At this time the government would

5  offer 184A.

6       THE COURT:  I don't have an A and B designation

7  here.  I have two different memos under 184.

8       MR. MITCHELL:  It's the second of the two.  I'm

9  going in reverse order.

10       THE COURT:  Okay.  So A is the -- Mr. Paley just

11  said his memo?

12       MR. MITCHELL:  Yes.

13       MR. PAPPALARDO:  May we have a moment, your

14  Honor?

15       (Pause.)

16       MR. PAPPALARDO:  No objection, your Honor.

17       THE COURT:  Okay.

18       (Exhibit No. 184A received into evidence.)

19  BY MR. MITCHELL:

20  Q.   Okay.  Do you see it up on the screen?

21  A.   Yes.

22  Q.   All right.  And this is dated October 29, 2000?

23  A.   Yes.

24  Q.   Okay.  And does this memo explain your position

25  concerning 419 plans?

1   A.   Yes.

2   Q.   Okay.  I'd like you to read the blown-up portion, if

3   you would.

4   A.   "Our telephone call did not end well.  We are

5   obviously misunderstanding our relationship.  This brief

6   note is intended to continue our partnership.  Please

7   understand that I have put forth much time and money for

8   the marketing of this business.  The sales presentations

9   I use are well written and well received.  While the

10  1031 side is going well, my 419 efforts have been

11  disappointing.  The deals I have completed have been

12  most difficult and time-consuming.  I continue to have

13  confidence in the product but I am frustrated in my

14  ability to sell it."

15  Q.   Thank you.  Is there a second page?

16  A.   Yes.

17  Q.   I'm going to highlight for you this paragraph.

18  Would you read us that paragraph?

19  A.   "You know that I pay all of my own expenses.  You

20  know that I have been contributing to the Benistar

21  family with 1031 fee income with minimal work from

22  Benistar Property Exchange-Connecticut and a small

23  amount of 419 income.  You know that I have supplied

24  numerous referrals for new business.  You know that you

25  have yet to make even one introduction for Benistar

PDF created with pdfFactory trial version www.pdffactory.com

1    Property Exchange-Massachusetts in two years.

2    Q.    Okay.  Is this something that you discussed with Mr.

3    Carpenter on the phone conversation the day before?

4    A.    Yes.

5    Q.    And it says you've been contributing to the Benistar

6    family with 1031 fee income with minimal work from

7    Benistar Property Exchange-Connecticut.  What were you

8    referring to?

9    A.    Meaning I'm doing the marketing, you know,

10    administrating the transactions, dealing with clients,

11    dealing with their professionals, all of that, and that

12    Benistar Property Exchange-Connecticut has done very

13    little during that same time.

14    Q.    I'm going to highlight for you this third paragraph.

15    Would you read that to us?

16    A.    "You know that you have not held up your end of our

17    partnership by incurring heavy losses on the funds

18    invested.  You know that the account was up $150,000

19    earlier this year.  I asked you to sell and would have

20    been overjoyed with receiving $75,000.  You chose not to

21    sell and lost all of the profit.  You have repeatedly

22    said that you are sorry for this and I accept your

23    apology.  I did not run from you even though that would

24    have been good reason to do so.  I chose to stay with

25    you because I see this as a temporary situation that can

PDF created with pdfFactory trial version www.pdffactory.com

1    be solved.  I believe our future together is brighter
2    than one costly mistake."
3    Q.    Did you discuss with Mr. Carpenter in a phone
4    conversation a loss of $150,000 earlier in the year?
5    A.    Yes.
6    Q.    Okay.  What did he say?
7    A.    He was sorry.  He regretted it.
8    Q.    Okay.  Where it says tell him to sell, sell what?
9    A.    Whatever he was investing the money in.
10   Q.    Well, what did he tell you he had his money in at
11   that point?
12   A.    He wasn't specific.
13   Q.    And would you read the conclusion of your memo?
14   A.    "Dan, I think we have a bright future together.  It
15   is important to realize that we both have skills that
16   can make our partnership lots of money.  Let us see how
17   we can work together to make this happen."
18   Q.    All right.  Did you get a response from Mr.
19   Carpenter?
20   A.    Yes.
21   Q.    All right.  Would you turn to the 184?
22   A.    I have it.
23   Q.    Okay.  Tell us what it is, please.
24   A.    It's a memo -- memorandum from Dan Carpenter to me.
25   Q.    What is it dated?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   October 30, 2000.

2   Q.   And what does it concern?

3   A.   Our phone call of the day before.

4   Q.   Is this the response to the memo that I just had you

5   read from?

6   A.   Yes.

7        MR. MITCHELL:  At this time the government would

8   offer 184.

9        MR. PAPPALARDO:  No objection.

10       THE COURT:  All right.

11       (Exhibit No. 184 received into evidence.)

12  BY MR. MITCHELL:

13  Q.   Okay.  I'll just walk through this with you.  This

14  is from Dan to you marked "personal and confidential,"

15  correct?

16  A.   Yes.

17  Q.   All right.  I'm going to have you read -- please

18  read for us the first paragraph, Mr. Paley.

19  A.   "About the only thing I can agree with you on in

20  your memo is that our phone call did not go well.  The

21  rest of your memo shows how self-interested and

22  self-absorbed you are.  The primary directive at

23  Benistar is loyalty to the team.  As is often said by

24  coaches, 'There is no "I" in team.'  But there are a

25  lots of 'I's' in your memo.  Just reread it after

PDF created with pdfFactory trial version www.pdffactory.com

1    reading this and you will see why we should consider
2    restructuring our business relationship."
3    Q.   In the phone call you had with Mr. Carpenter, did
4    you discuss the restructuring of your business
5    relationship?
6    A.   I don't recall.
7    Q.   Do you see it's referred to here in this memo?
8    A.   I do.
9    Q.   Okay.  I'm going to have you turn to the second
10   paragraph.
11   A.   Uh-huh.
12   Q.   Would you read that to us?
13   A.   "First, I never said I was going to give your
14   presentation to other salespeople.  I said, 'Why do you
15   ask?'  You went on about all the time and money you put
16   into the presentation.  What about the two to three
17   hours I put in educating you every Sunday for the past
18   year?  Who really taught you about 419s in the first
19   place?  Asset accumulation?  Remember that I refused to
20   be even associated with your first 419 PowerPoint
21   presentations.  Also, Ken Palmer and I have been asking
22   for over a month to review your presentation, and for
23   the past several Sundays you were supposed to be working
24   with me on a new 419 PowerPoint presentation that would
25   be the 419 equivalent of the 412(i) presentation that I

1    sent to you by e-mail.  Thus far you have been less than

2    no help."

3    Q.   A couple of follow-up questions.  Do you know what a

4    412(i) presentation is?

5    A.   I have no idea, no.

6    Q.   And Ken Palmer, who is that?

7    A.   He worked at Benistar.

8    Q.   What was his role?

9    A.   Salesman.

10   Q.   Did he work in Connecticut or --

11   A.   Yeah, in Connecticut.  He worked in Simsbury.

12   Q.   Where it says "educating you every Sunday for the

13   past year," did you have meetings with Mr. Carpenter on

14   Sundays?

15   A.   By phone, yes.

16   Q.   And what were those meetings by phone about?

17   A.   Questions about business strategies.  That's it.

18   Q.   All right.  I'm going to have you do a fair amount

19   of reading on this document, Mr. Paley.  Paragraph 3,

20   Mr. Paley.  Would you read that to us?

21   A.   "As for the property exchange partnership, you see

22   everything you do as vital and what everyone else does

23   as trivial.  Because of that you see the 90/10 split as

24   fair.  Benistar receives an average about $200 per

25   transaction.  What is a good year in 1031 exchanges, 50

1   or 100 cases?  That means net fees to Benistar of

2   $10,000 or $20,000 per year.  You and Property Exchange

3   are contributing virtually nothing to Benistar's bottom

4   line.  As far as leads, what leads?  Why should we give

5   you leads to 419 plan candidates when in your own memo

6   you acknowledge your abject failure to close a deal, yet

7   you can get rave reviews on your PowerPoint

8   presentations?  This business is a distraction that most

9   people here feel is taking my eye off the Benistar

10  ball."

11  Q.   Referring to this business taking his eye off the

12  Benistar ball, is that something you discussed with Mr.

13  Carpenter?

14  A.   "This business"?

15  Q.   Yes.  Where it says, "This business is a distraction

16  that most people here feel is taking my eye off the

17  Benistar ball," is that something you discussed with

18  him?

19  A.   Yes.

20  Q.   Okay.  And when did you discuss that with him?

21  A.   Well, leading up to this memo.  So it would be in

22  October.

23  Q.   Okay.  Could you tell us what he said?

24  A.   He said that he was busy with projects that were

25  bigger than what Benistar Property Exchange was

1    contributing to the overall company.

2    Q.   And did he discuss why that was a problem for him?

3    A.   I don't think I understand the question.

4    Q.   He's expressing here that the business you're

5    involved in is a distraction.  Did he discuss why that

6    was a problem for what he did?

7    A.   I can't speculate.

8    Q.   I'm not asking you to.  I'm asking you:  Did he say

9    anything about that?

10   A.   Yeah, he mentioned it.  He was saying that he had

11   better things to do with his time.

12   Q.   I'm going to have you turn to the second page.

13   Would you read the fourth paragraph to us?

14   A.   "And believe me, no one is more sorry that I did not

15   totally get out of the market in March than me.  I saw

16   the April 10-15 percent downturn as a great buying

17   opportunity, even though we sold options.  Little did I

18   know this was simply a trap for the unweary leading to

19   the greatest market decline of all time.  I take little

20   comfort that some of the greatest money managers of our

21   time got washed out or had to be carried out or, worse,

22   driven to the asylum.  We are still standing, though

23   somewhat awkwardly, and on one leg.  As for your

24   decision to stay, is that loyalty or more the fear of

25   embarrassment that bankruptcy would bring?"

1    Q.    Okay.  Did you discuss bankruptcy with him?

2    A.    No.

3    Q.    Would you read the next paragraph, Mr. Paley?

4    A.    "Which leads me to how we came to be in this

5    predicament in the first place.  If we assume that we

6    have an average monthly balance of about $5 million in

7    the BPETCO fund and everyone is at 3 percent, the best

8    we can do is earn $100,000 a year in interest.  Split

9    two ways, that is $50,000 for each of our companies.

10   Unfortunately, the majority of the money was invested

11   with us at 6 percent, and at 4-5 percent we would

12   actually lose $50,000 to $100,000 a year by keeping the

13   money in money market funds.  The option strategy was

14   necessary to make us money and yet keep the funds

15   relatively liquid.  Had we been successful, we could

16   have earned 2 to 3 percent per month, which means we

17   could have split over a million dollars in profits.

18   Obviously, that has not happened.  And while I am

19   committed to getting us back in the black, I do not

20   think it is prudent to invest the 6 percent money in

21   anything other than GNMAs and corporate bonds which

22   would earn $50,000 to $100,000 in excess interest that

23   we split.  This is not a profitable growth business

24   worthy of my time."

25   Q.    What is a GNMA, sir?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Government National Mortgage Account.

2    Q.    Is that referring to government bonds?

3    A.    Yes.

4    Q.    And when it says "50- to $100,000 in excess interest

5    that we split," is that referring to what the profit

6    would be in Ginnie Mae or corporate bonds?

7    A.    That's what it says.

8    Q.    Did you discuss that with him?

9    A.    No.

10   Q.    Did you discuss what kind of business would be

11   worthy of Mr. Carpenter's time?

12   A.    No.

13   Q.    Mr. Paley, do you know what stock options are?

14   A.    Yes.

15   Q.    Okay.  Did you discuss the trading of stock options

16   with Mr. Carpenter?

17   A.    No.

18   Q.    Do you see right here, sir, "The option strategy"?

19   A.    Uh-huh.

20   Q.    I just highlighted it on the screen.  Do you see

21   that?

22   A.    Yes.

23   Q.    And that says "The option strategy."  Did he refer

24   to that in the phone call?

25   A.    He referred to an option strategy, yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    In the phone call?

2    A.    Right.

3    Q.    And what did he say to you about the option

4    strategy?

5    A.    That there was one.

6    Q.    Okay.  Were you aware that he was trading options?

7              MR. PAPPALARDO:  At what time?

8    BY MR. MITCHELL:

9    Q.    Were you aware at that time, at the time you got

10   this memo, that he was trading in options?

11   A.    I was -- it didn't occur to me.

12   Q.    Does it say "option strategy" right there,

13   Mr. Paley?

14   A.    It does.  It does.

15   Q.    It does.  Did this document tell you that he was

16   trading in stock options?

17   A.    It says it here.

18   Q.    Yeah.  You knew what stock options are, correct?

19   A.    Yeah.

20   Q.    Sir, you've been in different components of the

21   finance business for how many years, sir?

22   A.    Many.

23   Q.    Many years.  Did you have any misunderstanding as to

24   what option strategy was here, sir?

25   A.    No.

1  Q.   You knew he was trading in stock options as of this

2  memo, correct?

3  A.   I knew there was an options strategy.

4  Q.   Okay.  Did any of the materials that you gave to the

5  prospective exchangors say anything about stock options?

6  A.   No.

7  Q.   Did you tell any of the exchangors what your boss

8  was doing with the money, sir?

9  A.   No.

10 Q.   Did you tell Gail Cahaly or Ron Cahaly about stock

11 options?

12 A.   No.

13 Q.   Did you tell Joe Iantosca about stock options?

14 A.   No.

15 Q.   How about Eliot Snider?

16 A.   No.

17 Q.   How about Byron Darling?

18 A.   No.

19 Q.   What about Brian Fitzgerald, did you tell him?

20 A.   No.

21 Q.   Did you make any -- after this memo, Mr. Paley, did

22 you make -- did anybody make any change to the exchange

23 documents at all?

24 A.   I don't recall.

25 Q.   Did you continue to hand out the same exchange

PDF created with pdfFactory trial version www.pdffactory.com

1    documents to people after you learned that your boss was

2    trading in stock options?

3         MR. PAPPALARDO:  Objection.  Objection to the

4    question.

5         THE COURT:  Overruled.

6         MR. PAPPALARDO:  "Boss," your Honor?

7         THE WITNESS:  Repeat the question, please.

8    BY MR. MITCHELL:

9    Q.   The question is this:  Did Benistar make any changes

10   at all to exchange documents, in the promotional

11   materials or the contracts, after you learned that your

12   boss was trading in stock options?

13   A.   Yes, there were, because we changed banks.

14   Q.   Did anything in those documents say anything about

15   stock options?

16   A.   No, they did not.

17   Q.   So did these people have any idea that their money

18   would be put in stock options?

19        MR. PAPPALARDO:  Objection.  Objection.  He

20   can't testify to --

21        THE COURT:  Sustained.  Sustained.

22   BY MR. MITCHELL:

23   Q.   Mr. Paley, isn't that fraud?

24        MR. PAPPALARDO:  Objection, your Honor.

25        THE COURT:  Sustained.

1              MR. PAPPALARDO:  Your Honor...

2    BY MR. MITCHELL:

3    Q.   Mr. Paley, were you hoping that this option strategy

4    paid off for you?

5    A.   Yes.

6    Q.   Sir, are you testifying today under a grant of

7    immunity?

8    A.   No, I'm not.

9    Q.   Have any promises been made to you by the United

10   States Attorney's Office --

11   A.   No.

12   Q.   -- about whether you will be prosecuted?

13   A.   No.

14             MR. MITCHELL:  That's all I have for this

15   witness.

16             MR. PAPPALARDO:  Can we approach, your Honor,

17   very briefly?

18             (Discussion at sidebar and out of the hearing of

19   the jury:)

20             MR. PAPPALARDO:  Your Honor, a question that

21   goes to what he would know -- particularly a lay witness

22   who is not an expert who's asked to testify to the

23   ultimate issue of the trier of fact in this case -- or

24   what the trier of fact in this case has to determine --

25   is absolutely unequivocally improper and the government

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   knows that.  How can he testify to whether or not this

 2   was fraud?

 3        And, I mean, your Honor, I'm just -- I'm just

 4   voicing in frustration, your Honor.  I don't know what I

 5   would ask you to do about it.

 6        MR. MITCHELL:  I can impeach my own witness.

 7        THE COURT:  That was improper.

 8        MR. PAPPALARDO:  Not that way, you can't.

 9        THE COURT:  At any rate, we've passed it.

10        MR. PAPPALARDO:  Okay.  Okay.

11        (In open court:)

12        MR. PAPPALARDO:  I just need a minute to get

13   organized.

14        (Pause.)

15                    CROSS-EXAMINATION

16   BY MR. PAPPALARDO:

17   Q.   Good morning, Mr. Paley.

18   A.   Good morning.

19   Q.   Mr. Paley, my name is John Pappalardo, and together

20   with Gary Greenberg we represent Mr. Carpenter in this

21   case.

22        Now, sir, you indicated on your direct examination

23   that you initially met Mr. Carpenter sometime in 1998;

24   is that fair to say?

25   A.   Yes.
```

1    Q.   And that was in connection with an ad that was

2    placed concerning 419 business?

3    A.   Yes.

4    Q.   And you learned from that interchange at that point

5    in time that Mr. Carpenter had the largest 419 business

6    in the country, right?

7    A.   Yes.

8    Q.   And that was based in part of the Benistar companies

9    in Simsbury, Connecticut?

10   A.   Yes.

11   Q.   And your initial interaction with Mr. Carpenter had

12   to do with you becoming acquainted with that business

13   and hopefully providing leads and becoming part of the

14   419 area; isn't that fair to say?

15   A.   Yes.

16   Q.   And at a later point in time you had a discussion

17   with Mr. Carpenter concerning essentially property

18   exchanges, right?

19   A.   I don't recall which happened first.  I'm sorry.

20   Q.   Okay.  But you -- the ad had to do with 419s?

21   A.   It did.  It did.

22   Q.   And that would have been sometime in January or

23   February of 1998.  Does that refresh your memory?

24   A.   It doesn't.

25   Q.   Okay.  But later on after you became involved with a

PDF created with pdfFactory trial version www.pdffactory.com

1   discussion of 419s, the subject matter of property

2   exchanges came up?

3   A.   Yes, it did.  Yes, it did.

4   Q.   Right?  And we've been able to establish from your

5   direct testimony that that occurred sometime in

6   September --

7   A.   Yes.

8   Q.   -- of 1998, right?

9   A.   Yes.

10  Q.   And you were familiar with property exchanges

11  because, as you testified, you worked with a company

12  called Nationwide since 1995, right?

13  A.   Yes.

14  Q.   And in connection with your efforts on behalf of

15  Nationwide, you assembled materials in an effort to

16  market the idea of 1031 property exchanges to those

17  people or to those groups that you think may have some

18  promise and some potential need for those services,

19  right?

20  A.   Yes.

21  Q.   And the materials that you had generated you

22  perfected over the period of time that you were with

23  Nationwide, right?

24  A.   Yes.

25  Q.   Okay.  Now, I'd like to --

1          MR. PAPPALARDO:  In fact, could we get Exhibit 6

2    displayed, please?

3    BY MR. PAPPALARDO:

4    Q.   Now, sir, I just direct your attention to that

5    document.  You're obviously familiar with that?  Oh, you

6    could look at it on the screen or if it's --

7    A.   No, I can see it.

8    Q.   Do you see that?

9    A.   Yes, I do.

10   Q.   And you're familiar with Exhibit 6, right?

11   A.   I've seen it before, yes.

12   Q.   Well, this is a five-part series that you actually

13   wrote, sir, to be published in the New England Real

14   Estate Journal?

15   A.   Yes.  Yes.

16   Q.   Now, this is something that you had published while

17   you were at Nationwide, right?

18   A.   I don't recall --

19   Q.   Okay.  Let's see if this refreshes your --

20   A.   -- the chronology.

21   Q.   -- memory if you discussed Benistar Property

22   Exchange in September.

23        Look at the date of this, sir.  It's in July, is it

24   not?

25   A.   Okay.

1   Q.  And does that refresh your memory as to whether or

2   not this was originally published under Nationwide and

3   you got it reprinted with Benistar?

4   A.  Oh, I do -- yes, I do remember, yeah.

5   Q.  Okay.  And of course everything you say in this

6   particular piece was accurate, to the best of your

7   knowledge, at the time you wrote it, right?

8   A.  Correct.

9   Q.  Okay.  And basically what this does is it goes over

10  the benefits of a 1031 exchange, what -- say, a quick

11  course on the legalities of a 1031 exchange and that

12  sort of thing.  And you wanted to basically cast a net

13  to hopefully get some business as it relates to these

14  property exchanges, right?

15  A.  Yes.

16  Q.  Okay.  Now, with respect to this and the other

17  marketing materials, Exhibit 1 through 6, these were all

18  materials that you had when you were with Nationwide,

19  right?  If you can just glance at 1 through 6 -- or

20  actually, 1 through 5.  We just looked at 6.

21  A.  I don't have 1 through 5 here.  I don't have 1

22  through 5 here.

23  Q.  Let's do it this way, sir:  Let's look at Exhibit 1.

24       MR. PAPPALARDO:  Could we get that up on the

25  screen, please?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   BY MR. PAPPALARDO:

 2   Q.   Okay, sir.  Do you see that?

 3   A.   Yes.

 4   Q.   And you're familiar with that, right?  That's the

 5   slide show that you basically prepared involving

 6   property exchanges?

 7   A.   Yes.  Yes, sir.

 8   Q.   And is it fair to say, sir, that all of these

 9   materials that you prepared, which I will call marketing

10   or promotional materials, you prepared these materials

11   for two purposes, did you not?  Isn't it fair to say

12   that the first purpose was to acquaint the prospective

13   individual or person that might be heading a group of

14   individuals, acquaint them with the idea of a 1031

15   exchange; and secondly, some of these materials are

16   intended by you to cause that individual, once they

17   become familiar with a 1031, to choose Benistar over

18   another competing exchange or qualified exchange

19   company; is that fair to say?

20   A.   Yes.

21   Q.   So it basically was a twofold mental calculation

22   that you went through when you were dealing with these

23   documents, right?

24   A.   Yes.

25   Q.   Okay.  Now, let's look at Slide 14 of Exhibit 1.
```

PDF created with pdfFactory trial version www.pdffactory.com

1          Okay.  Do you see that, sir?

2     A.    Yes, I did.

3     Q.    Do you see where it talks about security of funds?

4     A.    Yes.

5     Q.    Did you ever make any representations to any

6     individuals that you were soliciting that their funds

7     would be secure?

8     A.    It says there that they should be secure.

9     Q.    And my question is:  Other than what it says here,

10    did you ever make any representations to individuals

11    that their funds would be secure?

12    A.    Yes.

13    Q.    And did you talk about guarantees?

14    A.    I don't recall whether I used the word "guarantee."

15    Q.    Isn't it fair to say the only discussion that you

16    had with respect to security with any of the proposed

17    investors had to do with a bond?

18    A.    No.

19    Q.    What were other discussions?

20    A.    That we had accounts that were at major banking

21    institutions.

22    Q.    Uh-huh.  And that plus the bond, right?

23    A.    Plus the -- well, the bond came later, so...

24    Q.    Let's look at Slide No. 15.  Do you see that?

25    A.    Uh-huh.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Do you see the fourth bullet point down?

2   A.   Yes.

3   Q.   And this says "Merrill Lynch's private bank is used

4   for all our escrow accounts," right?

5   A.   Yes.

6   Q.   And this was in the professional materials certainly

7   at the time Merrill Lynch was the brokerage house,

8   right?

9   A.   Yes.

10  Q.   Okay.  Now, you testified on direct examination

11  about a conversation that you had with Mr. Levine; do

12  you recall that?

13  A.   Yes.

14  Q.   Now, isn't it fair to say that it was -- that that

15  conversation took place at or about the time that the

16  accounts were being formed at Merrill Lynch?

17  A.   Yes.

18  Q.   And that would have been September, perhaps early

19  October of 1998?

20  A.   Yes.

21  Q.   At any rate, that would have been contemporaneous,

22  at the same time as the first exchange, or before that,

23  right?

24  A.   Yes.

25  Q.   And it was Dan Carpenter who told you about

1   Mr. Levine and that he was the contact person who was

2   setting up those accounts at Merrill Lynch, right?

3   A.   Yes.

4   Q.   In fact, he's the one who gave you his phone number,

5   right?

6   A.   Yes.

7   Q.   And he urged you to call him?

8   A.   Dan Carpenter asked me to call Jerry, yes.

9   Q.   And you wanted to call him, in any event, didn't

10  you?

11  A.   Yes.

12  Q.   Because you wanted to speak directly to Levine to

13  ensure that Levine understood the business of Benistar

14  Property Exchange, right?

15  A.   Yes.

16  Q.   And isn't it fair to say, sir, that after several

17  attempts to reach Levine by yourself on the phone, you

18  were ultimately successful and you had a lengthy

19  conversation?

20  A.   Yes.

21  Q.   And in that conversation you told Mr. Levine, first

22  of all, that you were the president of Benistar Property

23  Exchange Trust Company, right?

24  A.   Yes.

25  Q.   And in that conversation you described the business

PDF created with pdfFactory trial version www.pdffactory.com

1  of Benistar Property Exchange Trust Company, right?

2  A.   Yes.

3  Q.   And you told him that Benistar serves as a qualified

4  intermediary for individuals, right?

5  A.   Yes.

6  Q.   And you told him that Benistar was holding funds in

7  escrow on behalf of clients pending the purchase of

8  suitable property, right?

9  A.   Yes.

10 Q.   And isn't it also true, sir, that you told him that

11 clients' money would be wired to Merrill Lynch with

12 their name and other information on the wire?

13 A.   I don't recall that.

14 Q.   Okay.  Isn't it true that you told Mr. Levine that

15 when clients needed their money, that Benistar would

16 send to Merrill Lynch an authorization form to wire

17 money up?

18 A.   Yes.

19 Q.   And that you stressed to him at that point that the

20 money could not be held up after such a request, right?

21 A.   Correct.

22 Q.   Because it was important that the money be moved

23 quickly, right?

24 A.   Yes.

25          MR. PAPPALARDO:  May I approach, your Honor?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              THE COURT:  You may.
 2    BY MR. PAPPALARDO:
 3    Q.   Sir, I'm going to direct your attention to this
 4    document, if I may, and specifically to what is
 5    underlined.  Do you see that, sir?
 6    A.   Yes.
 7    Q.   And does that refresh your memory as to whether or
 8    not you told Mr. Levine that clients' money would be
 9    wired to Merrill Lynch with their name and other
10    information on it?
11    A.   Yes, it does.
12    Q.   And is that what you told him?
13    A.   Yes.
14    Q.   Now, Levine told you in that conversation that he
15    had some knowledge about property exchange; in fact, he
16    called them something like a swap, right?
17    A.   Yes.
18    Q.   And you corrected him, correct?
19    A.   I did.
20    Q.   And in that conversation you told him that, "No,
21    it's not a swap," and you went on to explain,
22    essentially, the bullet points of Section 1031 of the
23    Internal Revenue Service code which covers property
24    exchanges, right?
25    A.   I did.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And you went into that with some level of detail so

2    that he would understand, right?

3    A.   Yes.

4    Q.   You also told him in that conversation, did you not,

5    that you'd had prior experience with property exchanges

6    before Benistar?

7    A.   Yes.

8    Q.   And you told him that you were with a company called

9    Nationwide, and that you were with that company for

10   several years; and, in fact, you told him that

11   Nationwide used Merrill Lynch as their repository in San

12   Jose, didn't you?

13   A.   Yes.

14   Q.   In fact, didn't you tell Mr. Levine that it would be

15   a good idea that he contact Sean Worthen at Merrill

16   Lynch in San Jose to get the benefit of his experience

17   about how these accounts should be set up?

18   A.   Yes.

19   Q.   And didn't you also tell Mr. Levine that it was

20   possible that he would receive calls directly from

21   clients or their representatives and that it was

22   important for him to be able to respond to those

23   inquiries?

24   A.   Yes.

25   Q.   And as part of that phone call, Mr. Paley, isn't it

PDF created with pdfFactory trial version www.pdffactory.com

1    also true that you told Mr. Levine that you would

2    provide copies of the standard agreements that were

3    being utilized by Benistar?

4    A.   I don't recall that.

5         MR. PAPPALARDO:  If I may approach, your Honor?

6         THE COURT:  You may.

7    BY MR. PAPPALARDO:

8    Q.   Sir, if I can just direct your attention to this

9    document, and specifically to what is underlined.

10   A.   Okay.

11   Q.   Sir, does that refresh your memory as to whether or

12   not you told Mr. Levine that you would send him copies

13   of the standard Benistar Property Exchange Agreements?

14   A.   Yes, it does.

15   Q.   And is that what you said to him?

16   A.   Yes.

17   Q.   Now, as the phone call was concluding you even asked

18   him for his assistant's name, right?

19   A.   I don't recall that.

20   Q.   Did he say to you that he understood the nature of

21   the business, of Benistar's business, when he came to

22   the phone call?

23   A.   Yes.  Yes, he did.

24   Q.   And is it fair to say after the phone call you

25   provided or caused to be provided the standard Fee

1    Agreement to be sent to Mr. Levine?

2    A.    I don't recall.

3             MR. PAPPALARDO:    If I may approach, your Honor.

4    BY MR. PAPPALARDO:

5    Q.    First read this and then that.    Just read that to

6    yourself, sir.

7             (Pause.)

8             THE WITNESS:    Okay.

9    BY MR. PAPPALARDO:

10   Q.    Thank you.    And, sir, does this refresh your memory

11   that you did ask Mr. Levine for his assistant's name in

12   case you weren't able to reach him?

13   A.    Yes.

14   Q.    And you gave Mr. Levine your telephone number?

15   A.    Yes.

16   Q.    And also, does it refresh your memory with respect

17   to -- that after the conversation, you caused to be

18   provided to Mr. Levine a copy of the standard fee

19   agreement with the clients?

20   A.    Yes.

21   Q.    And that lists the 3 and 6 percent account options,

22   right?

23   A.    Yes.

24   Q.    Now, sir, isn't it also true that you gave

25   Mr. Levine's name and phone number to clients when they

PDF created with pdfFactory trial version www.pdffactory.com

1    asked?

2    A.    I don't recall.

3          MR. PAPPALARDO:  If I may, your Honor?

4          THE COURT:  You may.

5    BY MR. PAPPALARDO:

6    Q.    The same document, Paragraph 17.

7          (Pause.)

8    BY MR. PAPPALARDO:

9    Q.    Now, sir, I ask you again:  Isn't it also accurate

10   to say that you provided to exchangors Mr. Levine's name

11   and telephone number, to them, when they asked for a

12   Merrill Lynch contact person?

13   A.    Yes.

14   Q.    And lastly, sir, you have had occasion to provide

15   information on several times before today, right?

16   A.    Yes.

17   Q.    And you provided that information under oath?

18   A.    I did.

19   Q.    And the document that I'm showing you was dated in

20   2004; isn't that fair to say?

21   A.    Yes.

22   Q.    Okay.  And was your memory of the events in 2004 a

23   little bit better than it might be in 2008?

24   A.    I would say.

25   Q.    So that when -- again, we have --

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. PAPPALARDO:  If we could have Exhibit -- I

2    guess it's Exhibit 1, Slide 15, bullet point 4.

3    BY MR. PAPPALARDO:

4    Q.   So, sir, when you provided potential investors with

5    your slide show, and in particular, with respect to the

6    fourth bullet point down which is highlighted on your

7    screen, this is what you meant, right?

8    A.   Yes.

9    Q.   And you took steps yourself directly to deal with

10   Merrill Lynch to make sure that they understood what the

11   import of these monies were or what the property

12   exchange business was all about and that they were

13   holding this money in escrow, right?

14   A.   Yes.

15   Q.   To the best of your ability, right?

16   A.   Yes.

17   Q.   By the way, sir, there's no doubt you spoke to

18   Mr. Levine, is there?

19   A.   No.

20   Q.   Sir, if you could --

21          MR. PAPPALARDO:  Could we get Exhibit 2 on the

22   screen, please?  And could we go to the second page of

23   Exhibit 2, to the second bullet point on the second

24   paragraph?  Could that be highlighted, please?  Thank

25   you.

1    BY MR. PAPPALARDO:

2    Q.    Okay, sir, do you see that in Exhibit 2?

3    A.    Yes.

4    Q.    And just for reference, Mr. Paley, this comes out of

5    your "Frequently Asked Questions About 1031 Property

6    Exchanges."  You're familiar with this document?

7    A.    Yes.

8    Q.    Now, you see the section in there under "What will

9    the intermediary do with my money?"

10    A.    Yes.

11    Q.    And that makes a reference to Benistar having

12    accounts with major banking and investment firms such as

13    Merrill Lynch, right?

14    A.    Yes.

15    Q.    And it says, "As required under the Safe Harbor

16    provisions for exchanges, these accounts are under our

17    sole control."  You're familiar with the Safe Harbor

18    provisions, sir --

19    A.    Yes.

20    Q.    -- of 1031?

21        And the Safe Harbor provisions of 1031 pertain to

22    whether or not a person is going to be eligible for a

23    1031 exchange; isn't that fair to say?

24        MR. MITCHELL:  I object.  This asks for a legal

25    opinion.

```
 1              THE COURT:  Overruled.
 2              You may answer.
 3              THE WITNESS:  Repeat the question, please.
 4              MR. PAPPALARDO:  May the question be read back.
 5              (The reporter reads the pending question.)
 6              THE WITNESS:  I'm familiar, yes.
 7    BY MR. PAPPALARDO:
 8    Q.   And don't the Safe Harbor provisions -- doesn't that
 9    clause provide for the eligibility of an individual
10    based upon the money being held by a qualified
11    intermediary for the 180 days or thereabouts?
12    A.   That's what I recall.
13    Q.   It has nothing to do with the safety of the funds,
14    right?
15    A.   I don't know.
16              THE COURT:  If you're about to change to a
17    different topic, it's eleven o'clock.  We'll take a
18    recess.
19              Let's take the morning recess.
20              THE CLERK:  All rise.
21              The Court will take the morning recess.
22              (Jury out at 11:00 a.m.)
23              (There is a recess in the proceedings at
24    11:00 a.m.)
25
```

1          (After recess.)

2          MR. PAPPALARDO:  May we approach, your Honor?

3          (At sidebar on the record.)

4          MR. PAPPALARDO:  Your Honor, I just sent people

5     out to find Mr. Carpenter.  I didn't speak to him during

6     the break, and I don't know where he is.  I'm sure that

7     he's here or in the men's room or something, and I would

8     not be inclined to continue in his absence, given the --

9     let me just leave it at that.  I would not be inclined

10    to continue with the witness.

11         THE COURT:  I expect your surmise is correct,

12    that he's somewhere like the men's room and he'll join

13    us shortly, but I don't see any reason to wait for him.

14         MR. PAPPALARDO:  You don't, okay.  Then we'll

15    continue.

16         THE COURT:  Okay.

17         (End of discussion at sidebar.)

18         MR. PAPPALARDO:  May we proceed, your Honor?

19         THE COURT:  Please.

20    BY MR. PAPPALARDO:

21    Q.   Now, Mr. Paley, sir, I just remind you you're still

22    under oath.

23         Mr. Paley, is there anything based upon my

24    cross-examination so far that you would like to change

25    in your testimony?

1    A.    What are you referring to?

2    Q.    Anything?

3    A.    Unless there's something specific --

4          MR. MITCHELL:  Your Honor, could I just ask that

5    the record reflect that the defendant did arrive for the

6    first question?

7          THE COURT:  All right.

8          MR. PAPPALARDO:  And may I approach the witness,

9    your Honor?

10          THE COURT:  You may.

11   BY MR. PAPPALARDO:

12   Q.    I just want you to read this to yourself.

13          (Pause.)

14   A.    Okay.

15   Q.    Do you see that?

16   A.    Yes, I do.

17   Q.    Now, sir, I asked you the question, by reading this,

18   did you refresh your memory?

19   A.    Yes.

20   Q.    And did you ever say to any of the investors, any of

21   the exchangors or their representatives that their money

22   would be safe?

23   A.    No, I did not.

24   Q.    And did you ever say to them that their money would

25   be secure?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    No, I did not.

2    Q.    Did you ever tell them that there would be no risk

3    of loss?

4    A.    No.

5    Q.    Now, sir, you testified, I believe it was yesterday,

6    on direct -- I'm sorry, excuse me, Friday on direct

7    examination that you had occasion to prepare a website

8    for Benistar Property Exchange Trust Company?

9    A.    Technically -- I didn't prepare the website, I

10   supplied the material for the website, but I didn't

11   supply -- I didn't do the website.

12   Q.    Okay.  You supplied the content?

13   A.    Yes.

14          (Discussion off the record.)

15   Q.    On the website, sir, there was a section relating to

16   safe harbor.  Do you recall that?

17   A.    I don't recall that, no.

18   Q.    Could --

19          (Discussion off the record.)

20          MR. PAPPALARDO:  I believe it's 185.

21   Exhibit 185, top of the second page.

22   Q.    Do you see that, sir?

23   A.    I see that.

24   Q.    Okay.  And this is, essentially, verbatim from the

25   handout, the other promotional materials, right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    Okay.  And again, it mentions, "Benistar must take

3    possession of the sale proceeds to satisfy the 'Safe

4    Harbor' rules outlined in 1031 property exchanges."

5    Right?

6    A.    Yes.

7    Q.    And isn't it true, sir, that what that means, is in

8    order to be eligible for tax deferral of the proceeds of

9    the sale of a property when you don't buy another

10   property immediately, you have to be within the

11   provisions of the safe harbor, which means that a

12   qualified intermediary must gain custody of the funds in

13   the interim?  Isn't that what that means?

14   A.    Yes.

15   Q.    It has nothing to do with safety of funds; isn't

16   that fair to say?

17   A.    That's true.

18   Q.    Now, sir, I want to direct your attention to a line

19   of questioning that the government inquired of today.

20   It's true, is it not, that Mr. Carpenter had no contact

21   whatsoever with any of the exchangors, any of the

22   investors any time in 2000, the calendar year 2000;

23   isn't that fair to say?

24   A.    That's correct.

25   Q.    Were you aware, sir, just parenthetically, that

PDF created with pdfFactory trial version www.pdffactory.com

1   there was contact by Mr. Carpenter in early 1998 with

2   one exchangor's representative?

3   A.   Yes.

4   Q.   And was that Mr. Patterson?

5   A.   Yes.

6   Q.   Okay.  But other than that in 1998 -- I'm sorry,

7   that would have been in October of 1998 --

8   A.   Yes.

9   Q.   -- when Benistar first --

10  A.   Yes.

11  Q.   -- began.  In fact, that was the first exchangor,

12  wasn't it?

13  A.   Yes.

14  Q.   Ms. Carey.

15  A.   Yes.

16  Q.   Other than that, through and including the year

17  2000, Mr. Carpenter had no contact with the exchangors?

18  A.   That's correct.

19  Q.   He had no personal meetings with them, right?

20  A.   No, he did not.

21  Q.   He had no telephone calls with them; is that true?

22  A.   That's true.

23  Q.   He never met with, spoke with, or had any kind of

24  contact with the individuals' advisers, either, did he?

25  A.   No.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   And -- so, the best of your knowledge, you were the

2  only person at Benistar other than people that worked

3  under you at your office in Newton, that had any contact

4  with the investors or their advisers; isn't that fair to

5  say?

6  A.   That's true.  That's true.

7  Q.   In fact, that's in keeping with the division of

8  labor that you structured with Mr. Carpenter when the

9  Benistar Property Exchange Trust Company was formed,

10  right?

11  A.   Yes.

12  Q.   You would have contact and -- with prospective

13  individuals, you would market the idea of property

14  exchanges, you would attempt to induce individuals, once

15  they were sold on a property exchange, to go to Benistar

16  as opposed to another, and once you were successful in

17  landing a client, then the monies would be transferred

18  over to Mr. Carpenter and he would have exclusive

19  control from that point forward; isn't that fair to say?

20  A.   Yes.

21  Q.   In other words, he would deal with the investment

22  side, you would deal with the marketing and solicitation

23  side?

24  A.   Yes.

25  Q.   Okay.  And there was a bright line between those

PDF created with pdfFactory trial version www.pdffactory.com

1    two; isn't that fair to say?

2    A.   Yes.

3    Q.   You mentioned on direct examination a discussion

4    early on where there was a -- where it might be

5    contemplated by you and Mr. Carpenter that he would try

6    to get people in Connecticut to do property exchanges.

7    Do you recall that?  That occurred Friday afternoon.

8    A.   Yes.

9    Q.   That never happened, did it?

10   A.   No, it didn't.

11   Q.   He never got a single client for Benistar Property

12   Exchange Trust Company?

13   A.   No, he did not.

14   Q.   And so, sir, you were the only person who presented

15   any of the potential investors with the marketing

16   materials and later the exchange documents, right?

17   A.   Yes.

18   Q.   And it's true, is it not, that you explained the

19   exchange documents to clients or their advisers?

20   A.   I did.

21   Q.   And once you reached an agreement with a prospective

22   investor, and they decided to select Benistar as the

23   qualified intermediary, you personally signed the

24   exchange documents that were referred to on Friday

25   afternoon and again this morning; isn't that fair to

1    say?

2    A.    Yes.

3    Q.    On behalf of Benistar as president of Benistar

4    Property Exchange Company, because that was your job,

5    right?

6    A.    Yes.

7    Q.    Mr. Carpenter didn't sign those, did he?

8    A.    No, he did not.

9    Q.    And isn't it also fair to say, sir, that several of

10   the exchangors, several of the investors who are

11   involved in this case, were known to you directly or

12   indirectly prior to the time they became clients of

13   Benistar?

14   A.    I don't think I understand the question.  I'm sorry.

15   Q.    Okay.  Mr. Snider, do you recall him?

16   A.    Yes.

17   Q.    Isn't it fair to say that he knew your father, your

18   bother, your uncle?

19   A.    Yes, yes.

20   Q.    He didn't know Mr. Carpenter?

21   A.    No, he did not.

22   Q.    How about Ms. Cahaly, she had prior dealings or her

23   husband had prior dealings with you, right?

24   A.    We had met, I don't think we had any dealings.

25   Q.    You met, what, socially?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    I believe so.  I think it was a business context,

2    but, yes.

3    Q.    Okay.  You also recall that an individual named

4    Mr. Fitzgerald was represented by an accountant who knew

5    your wife?

6    A.    I don't recall.

7    Q.    You don't recall that?  Do you remember meeting with

8    Mr. Fitzgerald and his accountant?

9    A.    I don't recall.

10   Q.    That's okay.  That's all right.

11   A.    I don't recall.

12   Q.    Now, sir, going back to your interaction, your

13   exclusive interaction, you and the people who worked

14   with you at Benistar in Newton, with potential investors

15   and actual clients of Benistar, you testified about

16   presentations that you made to individuals and groups

17   regarding 1031 exchanges.  Do you recall that?

18   A.    Yes.

19   Q.    And you made presentations to -- in some cases you

20   would tailor the materials to an individual, like what

21   we saw with Mr. Snider, right?

22   A.    Yes.

23   Q.    But the thrust of your marketing materials in large

24   part was geared to groups, like you'd go to law firms,

25   you'd go to the real estate arm of the law firm and say

PDF created with pdfFactory trial version www.pdffactory.com

1   if you have clients that are dealing with selling

2   property, don't have another property to buy, you ought

3   to consider this tax-deferral service.  Do you recall

4   that?

5   A.   Yes.

6   Q.   And you'd approach groups, like accountants, who

7   similarly who would have clients who might possibly

8   avail themselves of your services, that is, Benistar's

9   services?

10   A.   Yes.

11   Q.   Okay.  And you also would selectively target

12   individuals who were either brought to you or by word of

13   mouth who you knew they were going to potentially be

14   eligible to benefit from a 1031 exchange?

15   A.   Yes, I did.

16   Q.   And the whole thrust of a 1031 exchange, by the way,

17   is tax deferral, right?

18   A.   That's true.

19   Q.   That's what it's about?

20   A.   Yes.

21   Q.   Now, it's correct, sir, is it not, that when you met

22   with potential exchange clients, you did not make any

23   oral representations that were inconsistent with the

24   written agreements; isn't that fair to say?

25   A.   That's fair to say.

1  Q.   And in fact, Dan Carpenter never told you to say

2  anything other than what was in the written agreements;

3  isn't that fair to say?

4  A.   That's true.

5  Q.   Now, when you were successful in landing a client

6  and hopefully providing a service that would allow them

7  to be on the receiving end of that tax deferral, isn't

8  it true that you were never asked by any of the

9  exchangors specifically how their funds were going to be

10  invested?

11  A.   That's true.

12  Q.   And isn't it also true, sir, that you never provided

13  any of those exchangors with any details as to the

14  vehicles their funds would be invested in?

15  A.   That's true.

16  Q.   And again, sir, you never told them that their funds

17  would be safe or secure; isn't that fair to say?

18  A.   That's true.

19  Q.   Now, Mr. Paley, on some occasions you did have

20  conversations with various clients to tell them that

21  their monies would be pooled; isn't that fair to say?

22  A.   Yes.

23  Q.   In other words, that their monies would be

24  co-mingled with other monies from other people who were

25  utilizing the services of Benistar Property Exchange

PDF created with pdfFactory trial version www.pdffactory.com

1    Trust Company as a qualified intermediary?

2    A.   Yes.

3    Q.   So that the money would be in the same account for

4    investment purposes?

5    A.   Yes.

6    Q.   And you said that to them when they asked?

7    A.   Yes.

8    Q.   In fact, you said to them when -- on one occasion

9    that there was no distinction between client A's money

10   and client B's money in those accounts?

11   A.   That's true.

12   Q.   And isn't it true, sir, that there's no legal

13   requirement under section 1031 that the exchangor's

14   money be segregated?

15          MR. MITCHELL:  Objection.  Legal opinion.

16          THE COURT:  Overruled.

17   A.   I don't know about legal -- legal.

18          MR. PAPPALARDO:  May I approach, your Honor?

19          THE COURT:  You may.

20   BY MR. PAPPALARDO:

21   Q.   Let me just direct your attention -- ask you to read

22   from here to here.

23          (Pause.)

24   A.   Just here?

25   Q.   Keep going.

1              (Pause.)

2    A.    Okay.

3    Q.    Thank you.

4              (Discussion off the record.)

5    Q.    Now, sir, that's your sworn testimony from 2004,

6    right?

7    A.    Yes.

8    Q.    And does that refresh your memory as to whether or

9    not there is a legal requirement that plaintiffs' --

10   excuse me, that exchangors' money must be segregated

11   under 1031?

12   A.    Yes.

13   Q.    And isn't it true that they need not be segregated

14   under the --

15   A.    That's correct.

16   Q.    -- rules?

17             Now, Mr. Paley, as you sit here today under

18   oath, isn't it true that you cannot, to the best of your

19   knowledge, think of anything you said to any of these

20   investors, any of these exchangors in your presentations

21   or in your dealings with them that was not true?

22   A.    It's an awful long question.

23   Q.    Think about it.

24   A.    Okay.  Could you repeat it or break it into pieces?

25   Q.    Sure.

```
 1          Is there anything that you ever said to an
 2  investor that was not true?
 3  A.   No.
 4  Q.   And isn't that something you would remember if you
 5  had said it?
 6  A.   Yes.
 7  Q.   And that's consistent with your previous testimony;
 8  isn't it, sir?
 9  A.   Yes.
10  Q.   In fact, Dan Carpenter never authorized you to say
11  anything other than what was in the written agreements;
12  isn't that fair to say?
13  A.   That's true.
14  Q.   He never told you to say anything outside of those
15  documents, did he?
16  A.   No, he didn't.
17  Q.   He never told you to say anything, did he?
18  A.   No.
19  Q.   As a matter of fact, he didn't have anything to do
20  with that, that was your job, right?
21  A.   That's true.
22  Q.   You're the one who was dealing with prospective
23  clients and prospective investors, right?
24  A.   Yes.
25  Q.   He provided no direction to you in connection with
```

PDF created with pdfFactory trial version www.pdffactory.com

1  that?

2  A.    No.

3  Q.    Now, isn't it also fair to say, sir, that the

4  presentations that you gave to individuals and/or to

5  groups focused essentially on the tax savings benefits

6  of section 1031 exchanges rather than the rates of

7  return on investments?

8  A.    Yes.

9         MR. PAPPALARDO:    Could we have Exhibit 7

10  illuminated, please?

11         (Discussion off the record.)

12  Q.    Now, sir -- could we go to the second page of that?

13         Okay.   You're on it.   Thank you.

14  Q.    Mr. Paley, you recognize this as the bond that

15  you've testified about?

16  A.    Yes.

17  Q.    Is that fair to say?

18  A.    Yes.

19  Q.    And this is a bond that, if asked, you would provide

20  to prospective investors; isn't that fair to say?

21  A.    Yes.

22  Q.    And this is in all respects a true and accurate

23  document, correct?

24  A.    Yes.

25  Q.    Okay.   And I -- when you had a conversation with

PDF created with pdfFactory trial version www.pdffactory.com

1    Mr. Carpenter about this, he said, Sure, we can get a

2    bond, and please provide it, right?

3    A.    Yes.

4    Q.    There was no hesitation on his part?

5    A.    No.

6    Q.    And this was the bond?

7    A.    Yes.

8            (Discussion off the record.)

9    Q.    Now, Mr. Paley, on behalf of Benistar, you

10   facilitated over a hundred 1031 exchanges during your

11   time working with Mr. Carpenter; isn't that fair to say?

12   A.    Yes.

13   Q.    And before you joined Benistar, you were with

14   Nationwide for, certainly, over two years, from '95

15   through the fall of '98?

16   A.    Yes.

17   Q.    Is that fair to say?  And you facilitated many other

18   exchanges with them, right?

19   A.    Yes.

20   Q.    And during that period of time, from 1995 through

21   and including 2000, you became very familiar with the

22   workings of section 1031 of the tax code, correct?

23   A.    Yes.

24   Q.    And you understand that there are absolutely no

25   standards of investment for 1031, right?

1  A.    True, yes.

2  Q.    What that means is the money can be invested in

3  anything; isn't that true?

4  A.    Yes.

5  Q.    There are no prohibitions with respect to investment

6  of exchangors' money, is there, at least with respect to

7  1031?

8  A.    Yes.

9  Q.    That may ultimately be modified by documents, but as

10  far as the 1031 goes, there are no exclusions, no

11  prohibitions, right?

12  A.    Yes.

13  Q.    Let's look at those documents, sir.

14        MR. PAPPALARDO:  If we could go to Exhibit 10,

15  please.

16        And let's move right to paragraph 10.

17  Q.    Sir, do you have Exhibit 10 in front of you?

18  A.    On the screen, yes.  It's not here.

19  Q.    Do you recognize this as paragraph 10 of the

20  Exchange Agreement that was utilized by Benistar in

21  connection with the contracts with its clients?

22  A.    Can I see the other pages just to say they're in

23  context?

24  Q.    Sure.  One second, sir.

25        MR. PAPPALARDO:  If I may approach.

```
 1            THE COURT:  You may.
 2   BY MR. PAPPALARDO:
 3   Q.   This is the whole document, sir.
 4   A.   Okay, thanks.
 5   Q.   Just take a second.
 6   A.   Okay.  I see it.
 7   Q.   Okay.  I'd like you to look at paragraph 10.
 8   A.   I see it.
 9   Q.   And, sir, this says that "the exchangor and the
10   intermediary expressly agree that any cash proceeds
11   received from the disposition of the relinquished
12   property shall be held and invested with Merrill Lynch
13   Private Client Group" -- right?
14   A.   Yes.
15   Q.   -- "in either a three percent or six percent per
16   annum investment account."  Right?
17   A.   Yes.
18   Q.   "Held and invested," right?
19   A.   Yes.
20   Q.   And there's nothing in this that limits the nature
21   of the investment, is there?
22   A.   No.
23   Q.   Okay.  Let's turn to paragraph 20.
24         MR. PAPPALARDO:  Could that be highlighted?
25   Q.   Do you see that, sir?
```

1    A.    Yes.

2    Q.    That is what is known as an integration clause?

3    You're familiar with those from your days in business,

4    sir, right?

5    A.    Vaguely.

6    Q.    Okay.  But you see that?

7    A.    Yes.

8    Q.    You're familiar with that being an operative part of

9    this document?

10   A.    Yes.

11   Q.    Okay.  And what that says is this agreement --

12   within the four corners of this agreement contains the

13   entire agreement of the parties?

14   A.    Yes.

15   Q.    Excluding any kind of oral representations or things

16   of that nature, right?

17   A.    Yes.

18   Q.    And look at paragraph 16.  Do you see that, sir?

19   A.    Yes.

20   Q.    And this provision was in all of the contracts,

21   right, with each investor?

22   A.    I believe so.

23   Q.    Okay.  It says that the intermediary has advised the

24   exchangor to seek independent tax and legal advice, both

25   as to income tax consequences of the exchange as

1    contemplated by the exchangor and as to the legal effect

2    of this agreement, right?

3    A.   Yes.

4    Q.   And you encouraged clients to seek legal advice or

5    tax advice, did you not?

6    A.   Yes, I did.

7    Q.   And as a matter of fact, most of the clients that

8    you had were represented by counsel, CPAs, and things of

9    that nature; isn't that fair to say?

10   A.   Yes.

11   Q.   And just -- sir, if you'd just turn to the last page

12   of this document.

13   A.   Mm-hmm.

14   Q.   This is Exhibit 10.  That's your signature, right?

15   A.   Yes.

16   Q.   Let's look at Exhibit 11.

17          MR. PAPPALARDO:  And may that be published?

18          And, your Honor, may I approach and provide the

19   witness with a full copy?

20          THE COURT:  Fine.

21   BY MR. PAPPALARDO:

22   Q.   Sir, this is Exhibit 11.  Just take a minute --

23          (Pause.)

24          (Discussion off the record.)

25   Q.   You see that, sir?

1   A.   Yes, I do.

2   Q.   Okay.  Now, this is the Escrow Agreement, is it not?

3   A.   Yes, it is.

4   Q.   And can you look at paragraph 3 of that Escrow

5   Agreement?

6   A.   Yes.

7   Q.   And do you see where it says --

8        MR. PAPPALARDO:  Okay.  I'm sorry, the second --

9   the second "whereas" clause.  It's the third

10  paragraph -- yes.

11  Q.   Do you see that, sir?

12  A.   Yes.

13  Q.   Okay.  You see where it says, "Whereas the exchangor

14  will be depositing with Benistar an amount of funds to

15  be deposited in the Benistar accounts at Merrill Lynch"?

16  A.   Yes.

17  Q.   Accounts in the plural?

18  A.   I see that.

19  Q.   Okay.  Let's go down to section 2.

20  A.   Okay.

21  Q.   Number 2.  Do you see that?

22  A.   Yes.

23  Q.   Okay.  That says in the Escrow Agreement that

24  "Benistar shall have full control over the exchangor's

25  funds to invest as the exchangor directs in either the

1   three percent Ready Asset money market fund or the six

2   percent invest the account."  Right?

3   A.   Yes.

4   Q.   And if you look at the last page, this is something

5   you signed, right?

6   A.   Yes, I did.

7   Q.   Okay.

8        This says that Benistar shall have full control

9   to invest, right?

10  A.   Yes.

11  Q.   This provides no limitations with respect to the

12  nature or the vehicle of that investment, does it?

13  A.   No.

14  Q.   Now, let's look at Exhibit 12.

15       MR. PAPPALARDO:  If I may, your Honor.

16  Q.   And you recognize this document, do you not, as the

17  Exchange Fee Agreement?

18  A.   Yes.

19  Q.   And this is also something that you would typically

20  sign, and this particular document, Exhibit 12, you did

21  sign, right?

22  A.   Yes.

23  Q.   In fact, you signed all of these documents?

24  A.   I did.

25  Q.   If you go to the top of the second paragraph of the

1    Exchange Fee Agreement, Mr. Paley, you see the first
2    line?
3    A.   Yes.
4    Q.   It says, "Exchangor and the intermediary expressly
5    agree that any cash proceeds received from the
6    disposition of the relinquished property shall be held
7    and invested at Merrill Lynch at the discretion and
8    through financial institutions of the intermediary."
9    Right?
10   A.   Yes.
11   Q.   No limitations with respect to the nature of the
12   investment provided by the Exchange Fee Agreement, is
13   there?
14   A.   No.
15            (Discussion off the record.)
16            MR. PAPPALARDO:  May I approach, your Honor?
17            THE COURT:  All right.
18   BY MR. PAPPALARDO:
19   Q.   Now, sir, I'm going to put before you a document
20   marked as Exhibit -- what for identification is 390.
21            (Discussion off the record.)
22   Q.   Do you see that, sir?
23   A.   Yes.
24   Q.   And do you recognize what that document is?
25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   What is it?

2   A.   It's a Nationwide Property Exchange fee agreement.

3   Q.   Okay.  This is Nationwide's Exchange Fee Agreement,

4   right?

5   A.   Yes.

6   Q.   And this is a document you're familiar with?

7   A.   I haven't seen it in many years.

8   Q.   But it's a document you used when you were with

9   Nationwide?

10   A.   Yes.

11   Q.   And this particular document is unexecuted, right?

12   A.   Yes.

13          MR. PAPPALARDO:  I offer it, your Honor.

14          MR. MITCHELL:  No objection.

15          THE COURT:  Okay.  390, you said?

16          MR. PAPPALARDO:  390.

17          (Exhibit 390 received into evidence.)

18          MR. PAPPALARDO:  Gerard, would it be possible to

19   put this up side by side with the last exhibit?

20   BY MR. PAPPALARDO:

21   Q.   Okay.  Sir, I direct your attention to -- it looks

22   like the second sentence of this document which starts

23   with the word "exchangor."

24          MR. PAPPALARDO:  Could that be highlighted?

25          The part that starts exchangor and intermediary.

1          GERARD:  This part here?

2          MR. PAPPALARDO:  No, it's in the middle of the

3     document.  "Exchangor and intermediary expressly agree."

4          Right there.

5     Q.   Okay.  Sir, do you see this?

6     A.   I do.

7     Q.   This was the document that was used by Nationwide,

8     and in this Exchange Fee Agreement it says, "Exchangor

9     and intermediary expressly agree that any cash proceeds

10    received from the disposition of the relinquished

11    property shall be held and invested in certificates of

12    deposit, cash management, working capital or money

13    market accounts, bankers acceptance or U.S. obligations

14    in the discretion and through the financial institutions

15    of intermediary, in this case, Merrill Lynch."   Right?

16    A.   Yes.

17    Q.   So it's fair to say, sir, that this particular

18    document does restrict the investment vehicle that the

19    qualified intermediary can utilize in connection with

20    these particular investments; isn't that true?

21    A.   Yes.

22    Q.   It's got to be one of those, right?

23    A.   Yes.

24    Q.   And so, this is not what you had with Benistar, was

25    it?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    No.

2    Q.    Okay.

3          MR. PAPPALARDO:  One moment, your Honor.

4          (Discussion off the record.)

5    Q.    Sir, do you have Exhibit 184 A in front of you?

6    A.    Yes.

7    Q.    Okay.  And you recognize that, sir, to be the

8    document that you generated and sent -- or I should say

9    faxed to Dan Carpenter on the 29th of October of 2000,

10   right?

11   A.    Yes.

12   Q.    And this is what you testified about on your direct

13   examination?

14   A.    Yes.

15         MR. PAPPALARDO:  And may that be put up on the

16   screen?

17   Q.    Now, sir, this occurred after -- when I say "this,"

18   this was generated after a telephone call you had the

19   same day with Mr. Carpenter, right?

20   A.    Yes.

21   Q.    And you wanted to send him a communication

22   clarifying or restating your views concerning some of

23   the content of that conversation, right?

24   A.    Yes.

25   Q.    And you say in here on the second page that --

```
 1              MR. PAPPALARDO:  In the third paragraph, if we
 2     could focus on that, just expand that.  Blow it up.
 3              Thank you.
 4     Q.   You say to Mr. Carpenter, "You know that you have
 5     not held up your end of our partnership by incurring
 6     heavy losses on the funds invested.  You know that the
 7     account was up $150,000 earlier this year.  I asked you
 8     to sell and would have been overjoyed with receiving
 9     $75,000.  You chose not to sell and lost all of the
10     profit.  You have repeatedly said that you are sorry for
11     this, and I accept your apology."  And you say to him,
12     "I didn't run from you, even though that would have been
13     good reason to."  Do you see that?
14     A.   Yes.
15     Q.   That's all true, right?
16     A.   Yes.
17     Q.   And what you're referring to was a loss that was
18     incurred earlier in 2000, was it around the time of
19     March of 2000 or the tech wreck?
20     A.   Yes.
21     Q.   Is that what you intended this to be referring to?
22     A.   Referring to?
23     Q.   Yes.
24     A.   Yes.
25     Q.   Okay.  And at that time you were up and after that,
```

1    like other investors, Benistar lost money, right?

2    A.   Yes.

3    Q.   Now, you say in the last line of that paragraph, "I

4    chose to stay with you because I see this as a temporary

5    situation that can be solved.  I believe our future

6    together is brighter than one costly mistake."   Did you

7    mean that, sir?

8    A.   Yes.

9    Q.   Okay.  Do you see the last paragraph?

10        MR. PAPPALARDO:  Could that be expanded, please?

11   Q.   You say here, "Dan, I think we have a bright future

12   together.  It is important to realize that we both have

13   skills that can make our partnership lots of money.  Let

14   us see how we can work together to make this happen."

15        Now, you meant that, sir, right?

16   A.   Yes.

17   Q.   And what you're referring to here is that you have

18   skills in terms of interacting with people and selling

19   them a product, right?

20   A.   Yes.

21   Q.   And Dan Carpenter had skills in terms of his

22   investments, isn't that fair to say, his investment

23   pursuits, his investment strategies?

24   A.   Yes.

25   Q.   That's what you meant by this, right?

1    A.    Yes.

2    Q.    And in fact, you knew that at the close of 1999, the

3    accounts were down some $400,000, and that by -- by the

4    close of the year, you had more than a million-dollar

5    profit so that the accounts were up over $600,000,

6    right?

7    A.    Yes.

8    Q.    And you had seen the investment strategy be

9    successful in the past; isn't that fair to say?

10   A.    No, I had not seen it.

11   Q.    Well, you had --

12   A.    I'm aware of it --

13   Q.    Right.  When I say "seen," I don't mean that you

14   looked at the documents, but you had witnessed, in your

15   capacity as president of --

16   A.    Yes, I was aware.

17   Q.    -- of Benistar --

18   A.    I was aware, yes.

19   Q.    You were aware of that, and you expected that that

20   would continue; isn't that fair to say?

21   A.    Yes.

22   Q.    And that's why you wrote this; isn't that fair to

23   say?

24          (Discussion off the record.)

25   Q.    And without putting it up on the screen,

PDF created with pdfFactory trial version www.pdffactory.com

1    Mr. Carpenter wrote you back the follow day.  You recall

2    testifying about that?

3    A.   Yes, I do.

4    Q.   And Mr. Carpenter sent you a letter, and in that

5    letter he, once again, apologizes for what had happened

6    earlier in the year, right?

7    A.   Yes.

8    Q.   And is it fair to say that that letter also included

9    Mr. Carpenter projecting a belief in his investment

10   strategy?

11   A.   Yes, it said that.

12   Q.   And he invited you to respond to that letter to him,

13   the last line -- do we have the letter?

14        MR. PAPPALARDO:   Could I have Exhibit 184?

15        Just put 184 on the screen, please.  Last line

16   of the two-page document.

17   Q.   Okay.  You see that, sir?

18   A.   Yes.

19   Q.   And he says, Mr. Carpenter to you, "Suffice to say

20   we need to restructure the company and our relationship

21   together going forward into the future.  Your thoughts

22   would be very much appreciated."   Do you see that?

23   A.   I do.

24   Q.   You never got back to him on that, did you?

25   A.   I don't recall.

1    Q.   The company wasn't restructured, was it?

2    A.   No.

3    Q.   Okay.

4         Now, Mr. Paley, do you recall being asked on

5    direct examination that you don't have any kind of deal

6    with the government?

7    A.   I remember that, yes.

8    Q.   You don't have immunity?

9    A.   I do not.

10   Q.   You don't have a non-prosecution agreement?

11   A.   I do not.

12   Q.   You don't have anything.  You're testifying here as

13   a witness, right?

14   A.   I am.

15   Q.   Okay.  You didn't do anything wrong, Mr. Paley, did

16   you?

17        MR. MITCHELL:  Same objection that was lodged

18   when I was up on direct, your Honor.

19        THE COURT:  Overruled.

20   BY MR. PAPPALARDO:

21   Q.   Mr. Paley, did you do anything wrong?

22   A.   In what regard?

23   Q.   In connection with your dealings with the investors?

24   A.   No.

25        MR. PAPPALARDO:  One moment, your Honor.

```
 1              (Discussion off the record.)

 2              MR. PAPPALARDO:  Nothing further at this time,

 3      your Honor.

 4              MR. MITCHELL:  Okay.  I have a handful of

 5      questions, your Honor.

 6                      REDIRECT EXAMINATION

 7      BY MR. MITCHELL:

 8      Q.   Mr. Paley, you see Exhibit 184 up there in front of

 9      you, on the screen?  It's up on the screen, Mr. Paley.

10      A.   Yes.

11      Q.   Do you see that?

12      A.   Yes.

13      Q.   You were just asked if you had done anything wrong?

14      A.   Yes.

15      Q.   Mr. Paley, was it wrong not to tell Gail Cahaly that

16      your boss was trading in stock options?

17              MR. PAPPALARDO:  Objection.

18              THE COURT:  Sustained.

19              MR. MITCHELL:  The door is opened to that, your

20      Honor.

21              Can I be heard at sidebar on this?

22              THE COURT:  Yes, I'll hear you.

23              (At sidebar on the record.)

24              MR. MITCHELL:  It seems to me that this is

25      legitimate redirect.  He closes by asking:  Did you do
```

1    anything wrong?  What I'm doing is bringing him back to

2    the document, asking him was it in any way wrong not to

3    tell Gail Cahaly, which he's already testified about his

4    interaction with her, that his boss was trading in

5    options?

6         I don't know if the objection is to the form of

7    the question or relevance, but it seems to me that it's

8    obviously relevant to something they've put in

9    initially, his opinion, his take on what he was doing,

10   his role in all of this was wrong.

11        MR. PAPPALARDO:  My response, your Honor, is he

12   was asked questions on direct examination about whether

13   he had a deal.  The government has had eight years to

14   decide whether he's done something wrong.  This witness

15   has testified he believes he didn't do anything wrong.

16   If they thought differently, they could have indicted

17   him.

18        With all due respect, your Honor, the

19   conversations that he had or didn't have with Gail

20   Cahaly have been vetted already in this case, and I

21   suggest to the Court that a discussion about whether he

22   should have told Gail Cahaly that they were involved in

23   options -- I didn't even mention the word "options" in

24   my cross-examination, not once.

25        THE COURT:  Well, the reason I permitted the

1    last question from the cross was because it was in the

2    area of potential bias or impartiality by the witness,

3    whether he's influenced by any deals.

4         I think these questions go beyond that question

5    to suggest that there were substantive untruths that he

6    might have said or not said.  So, therefore, I think it

7    goes too far.  I don't think the question on cross

8    should be seen as opening up that opportunity.

9         MR. MITCHELL:  While we're up here, just in

10   interest of saving time, the next witness is

11   Mr. Kameron.  As I've understood it, we weren't going to

12   get -- we were going to run through the balance of the

13   day such that it makes sense to bring him here, given

14   that we're also going to be arguing about whether he was

15   going to take the stand, so he is not here.  So it may

16   be that, you know, we're left with 15 minutes left in

17   the day or so.

18        THE COURT:  Well, does he have anything besides

19   the conversation?

20        MR. MITCHELL:  He does, but nothing that's worth

21   calling him exclusively for.

22        MR. GREENBERG:  We did think that we would

23   address the issue as to whether the conversation comes

24   in when the jury is gone for the day.  And to the extent

25   we can address it --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              THE COURT:  Paley is not going to be much
 2    longer.
 3              MR. MITCHELL:  That's what I'm saying.
 4              MR. GREENBERG:  That's what I'm saying.  They
 5    don't have Kameron available today.
 6              THE COURT:  Do you have anybody else?
 7              MR. MITCHELL:  I can have the agent call him,
 8    he'll be down here in ten minutes.  I can do that.  What
 9    I'm saying, though, as I understand, we were going to
10    have argument on whether he could testify, he could
11    authenticate, and you would allow in the taped
12    conversation.  And it seemed to me that would consume
13    some time, perhaps right through the end of the day, my
14    guess is.  I don't know.
15              THE COURT:  I'm not so sure.
16              MR. PAPPALARDO:  Your Honor, if I may, in
17    fairness to the government, we've been going back and
18    forth today on the issue of how long Mr. Paley was going
19    to be on cross-examination.
20              THE COURT:  I understand.
21              MR. PAPPALARDO:  And I gave them -- I didn't
22    expect to see what I saw.
23              THE COURT:  Didn't expect him to be as
24    cooperative.
25              MR. PAPPALARDO:  I read the prior transcript.
```

```
 1              THE COURT:  Anyway, who do we have after
 2    Kameron?  Whom do we have after Kameron?
 3              MR. MITCHELL:  Patterson and --
 4              MR. GREENBERG:  Johnson.
 5              MR. MITCHELL:  Johnson.
 6              THE COURT:  And that's it.
 7              MR. MITCHELL:  That's it.
 8              THE COURT:  So we'll finish tomorrow.
 9              MR. MITCHELL:  Yes.
10              MR. PAPPALARDO:  Oh, yes.
11              THE COURT:  So I think what we ought to do --
12    well, I guess it depends on how long they are.  Will
13    they be half the morning?
14              MR. PAPPALARDO:  Patterson I can't imagine will
15    be long, your Honor.  I have no --
16              THE COURT:  I don't know if we can go
17    directly -- I guess I'm thinking of arguments and charge
18    on Wednesday.
19              MR. GREENBERG:  Yes.
20              THE COURT:  That will give us a little time to
21    work things out.
22              MR. MITCHELL:  And then close on Thursday, is
23    that what you're -- I guess it depends --
24              THE COURT:  No, no, arguments and charge on
25    Wednesday.
```

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. MITCHELL:  Arguments and charge on

2    Wednesday.

3          THE COURT:  As it turns out, we don't have

4    anything scheduled in the afternoon on Wednesday, so we

5    can go all day with getting the case to the jury if it

6    took that long.  I don't think it will, if we have a

7    good part of tomorrow to talk about instructions.

8          MR. MITCHELL:  One thing we haven't considered

9    is the defendant's case.

10          MR. PAPPALARDO:  Your Honor, I had witnesses

11    lined up depending on what Mr. Paley said, but -- I

12    don't know what the rest of his cross-examination is

13    going to be -- excuse me, redirect is going to be, but

14    if it's consistent with what's gone on so far, we'll

15    have no witnesses.

16          THE COURT:  Okay.  So let's finish with him, and

17    if it means we'll stop early, we'll do that.

18          MR. MITCHELL:  All right, thanks.

19          (End of discussion at sidebar.)

20    BY MR. MITCHELL:

21    Q.   Mr. Paley, do you remember you were asked on cross

22    whether -- you were asked about the kinds of groups that

23    you made presentations to?

24    A.   Yes.

25    Q.   Mr. Pappalardo asked you about law firms, real

1    estate groups to which you made your presentation?

2    A.   Yes.

3    Q.   Did you ever make any presentations to groups that

4    invest in stock options?

5         MR. PAPPALARDO:  Objection, your Honor.

6         THE COURT:  Overruled.

7    A.   I don't recall.

8    Q.   You have no recollection whether you made a

9    presentation to a group that specializes in stock

10   options?

11   A.   I don't recall making the presentation to a group

12   that specialized in stock options.

13   Q.   You were asked about conversations on cross with

14   Gerry Levin.  Do you remember those questions?

15   A.   Yes.

16   Q.   Do you recall specifically the questions that

17   Mr. Pappalardo asked you about what you should tell

18   Mr. Levine?

19        MR. PAPPALARDO:  Objection.

20        THE COURT:  Sustained.

21   BY MR. MITCHELL:

22   Q.   Did Mr. Carpenter give you instructions as to the

23   kind of details that should be given to Mr. Levine?

24   A.   I don't understand this question.  I'm sorry.

25   Q.   Did Mr. Carpenter direct you to say certain things

PDF created with pdfFactory trial version www.pdffactory.com

1    to Mr. Levine?

2    A.    No.

3    Q.    Do you recall -- do you recall, Mr. Paley -- do you

4    recall instructions about the level of detail to give

5    Mr. Levine?

6    A.    Yes, I do.

7    Q.    Okay.  What level of detail were you supposed to

8    give Mr. Levine?

9    A.    He was saying to keep it broad.

10   Q.    Okay.

11   A.    Not get too specific.

12   Q.    Okay.  And why -- did he explain why that was?

13   A.    Mr. Carpenter didn't think that Mr. Levine would

14   understand it all.

15          (Pause.)

16   Q.    Do you remember questions on cross-examination about

17   your tailoring the promotional materials and the

18   exchange documents, depending upon the person you were

19   dealing with?

20   A.    The exchange documents or the promotion --

21   Q.    Either one?

22   A.    I don't understand the word "tailor," what do you

23   mean by "tailor"?

24   Q.    Do you remember Mr. Pappalardo used the word

25   "tailor," tailor the promotional materials to specific

PDF created with pdfFactory trial version www.pdffactory.com

1    exchangors?

2    A.    Yes.

3    Q.    Okay.  I have a few follow-up questions.

4          If you would take a look at Exhibit Number 1,

5    which I will flash up on the screen, you can look at it

6    on the screen, Mr. Paley.

7          You see where it says, "what is 1031" with an

8    explanation after that?

9    A.    Yes.

10   Q.    Did you ever tailor that out of promotional

11   materials?

12   A.    No.

13   Q.    I'm going to show you this page.  Do you see the

14   highlighted sections right there?

15   A.    Yes.

16   Q.    The first bullet point, "Your selected qualified

17   intermediary should have a lot of experience with

18   exchangors.  They should have an exemplary reputation

19   among real estate and legal professionals.  Examine

20   their track record and be sure to check references."

21   Did you ever tailor that out of a presentation?

22   A.    No.

23   Q.    How about, "Ask about the security of your funds,

24   and find out what guarantees are offered."  Did you

25   ever tailor that out of your presentation?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    No.

2    Q.    How about, "This is a place where quality is

3    imperative.    Do not select an intermediary on the basis

4    of price alone."    Did you ever tailor that out of your

5    presentations, Mr. Paley?

6    A.    No.    No, I did not.

7    Q.    Go to Exhibit Number 2, second page, it says escrow

8    accounts restricted to paying out funds of only

9    subsequent closing or to return funds to the original

10   property owner."    Did you ever tailor that out of your

11   presentation, Mr. Paley?

12   A.    No.

13   Q.    Mr. Paley, did you tailor out anything material from

14   any of your presentations from -- that differ from the

15   documents that Dan Carpenter saw and approved?

16   A.    No.

17           MR. MITCHELL:    That's all I have.

18           (Discussion off the record.)

19           MR. PAPPALARDO:    No.

20           THE COURT:    All right.    Mr. Paley, thank you.

21   You may step down.

22           Okay.    Pursuant to our discussion, the lawyers

23   and I have something we have to discuss further.    It may

24   take a while, there's really no point in keeping you

25   here while we do it.    But I can tell you this:    We

1    expect probably to finish the witnesses tomorrow and be

2    ready to have the case presented to you in the final

3    arguments and charge and so on, on Wednesday.  So if you

4    would been effective Wednesday to expand your notion of

5    the trial day to now a full day rather than just a 9:00

6    to 1:00 day.  Tomorrow we'll probably be -- I won't say

7    probably, it may be less than 9:00 to 1:00, but

8    Wednesday we'll begin the full 9:00 to 5:00 schedule.

9            Okay.  So enjoy the rest of today, and we'll see

10   you tomorrow morning.

11           We'll stay in session with the lawyers.

12           (Jury left the courtroom.)

13           MR. MITCHELL:  Okay.  Why don't I do this, your

14   Honor:  If I just flash the transcript up on the screen,

15   that may be the easiest way --

16           THE COURT:  I have it.  It's 114.

17           MR. MITCHELL:  It's 114 A, yes.

18           THE COURT:  You can put it on the screen, too,

19   but I have the paper copy.

20           (Pause.)

21           THE COURT:  Well, I guess it's the defendant's

22   objection, if I'm correct --

23           MR. GREENBERG:  Yes, your Honor.

24           THE COURT:  -- to the transcripts.

25           MR. GREENBERG:  In addition with Mr. Carpenter,

PDF created with pdfFactory trial version www.pdffactory.com

1    just remind the Court that, again, this is not probative

2    of Mr. Carpenter's state of mind.  The last transaction

3    being as of November 30th is when he signed the

4    documents.  This is a conversation which is alleged to

5    have occurred on January 3rd.

6            Significantly, it opens up the whole issue of

7    loss again.

8            You will see it talks about payback.  In the

9    fifth line, pay back four and a half million dollars,

10   makes a reference about getting money to them in the

11   future.

12           Your Honor, to the extent that your Honor has

13   allowed consistent -- the continued references to loss,

14   it's patently, you know, unfair to the defendants not to

15   be able to show the -- substantively the payment by

16   Paine Webber under the agreement, the arbitration award.

17           The jury has been poisoned with the implication

18   by the government, starting with the opening, that these

19   particular investors, which are subject to this --

20   subject matter of the indictment, that they have lost

21   money, when, in fact, the government knows that, by

22   virtue of an arbitration award, the money either has

23   been or is about to be paid back to them through an

24   agreement.

25           So -- and that also that the Merrill Lynch

PDF created with pdfFactory trial version www.pdffactory.com

1    litigation is till going.

2         So that there's no question that none of these

3    exchangors, you know, are to suffer loss.  In fact, they

4    will have recouped everything and then some.

5         And also, I would point out to -- the Court may

6    be aware or not that Mr. Kameron's law firm represented

7    the exchangors in connection with the litigation, civil

8    litigation, also participated in the arbitration

9    proceeding, again, representing the interests of

10   Benistar.  Under the state court's order, the

11   exchangors' attorneys, which included Robinson & Cole,

12   were allowed to stand in the shoes of Benistar and raise

13   claims on behalf of Benistar Properties.

14        So to the extent that Mr. Kameron testifies, it

15   would be our intention to raise with him, again, the

16   arbitration award, again, his law firm's involvement in

17   representing Benistar Properties in the arbitration

18   award, the success of the arbitration award on behalf of

19   Benistar Properties, and also his law firm's involvement

20   in Paine Webber's willingness to honor the obligations

21   under that award by making a payment that Benistar

22   Properties has agreed can flow directly to the benefit

23   of the exchangors.

24        Again, just for the record, this is an

25   arbitration proceeding that Mr. Carpenter initiated on

1    behalf of Benistar Properties, and his action took place

2    before there was any indictment.

3          So we object to the phone conversation, your

4    Honor, because it reopens the issue of loss.  If it goes

5    in -- and we would ask if it goes in, that certainly the

6    certainly the reference be redacted, the four and a half

7    million dollars.

8          The other point, your Honor, is the government

9    knows Mr. Iantosca was paid back money in January.  So

10   this is misleading.  It's patently unfair when he was

11   paid back money by Benistar in January after this phone

12   call.  I believe the testimony is somewhere in the two

13   and a half million dollar range.

14         So it's for those reasons we would ask the

15   conversation be excluded; alternatively, it be redacted

16   to eliminate any reference to loss; and finally, if it

17   be allowed in any fashion, that we be allowed to

18   interrogate the witness in terms, again, of the

19   arbitration award, his law firm's involvement in that

20   proceeding and the law firm's involvement in the payment

21   by Paine Webber.

22         MR. MITCHELL:  Thank you, your Honor.

23         Your Honor, this is -- this should come in

24   because it is statements directly from the defendant.

25   They go directly to the defendant's state of mind not

```
 1   just at the time he utters the words, but also harkening
 2   back to the time when he was trading funds and taking in
 3   new exchangor money based on assurances that the money
 4   would be held and returned.
 5        He says, first of all, that there was a run on
 6   the bank.  And although the Court noted that that term
 7   may be open to interpretation, it may be a metaphor for
 8   lots of activity at the bank that would somehow have
 9   prevented him from recouping the funds, the government's
10   position, I think it's supported in the language, bears
11   the argument that run on the bank was not what happened
12   here.  There weren't somehow investments that were tied
13   up in the bank and couldn't get to them in sort of the
14   classic sense, but, in fact, the money which should have
15   been there wasn't there because he was off trading it in
16   the options market.
17        And so in that way, the fact that he -- a
18   conversation that purports to be a complete explanation
19   of what happened, he says that there was a run on the
20   bank, when there wasn't; and perhaps, just as
21   importantly, is what he omits, and that is -- he says
22   nothing in here at all about trading in stock options.
23   It's not mentioned at all.  And in conversation that is
24   supposed to have -- from the start to the finish
25   purports to be an explanation to an attorney for an
```

PDF created with pdfFactory trial version www.pdffactory.com

1   exchangor of what's going on, there's no mention of it

2   at all.  So in that way, again, we are offering and the

3   conversation is probative of the defendant's

4   consciousness of guilt in as far as it reflects that his

5   attitude, his take on the nature of his trades,

6   vis-a-vis the representations that are made.

7        Secondly, this is just sort of an ancillary

8   point, further supporting is misleading description of

9   what he was doing.  He said he put the money in prudent

10  investments when, in fact, if one is losing millions of

11  dollars over many months could not -- no reasonable

12  person could conceivably characterize what he was doing

13  as prudent.

14       Again, this is a no stretch to call it a

15  cover-up, because that's what it was.

16       So for all those reasons, it is probative of the

17  defendant's state of mind at the time that it matters,

18  and conversely, your Honor, there is -- although it

19  certainly introduces the notion of loss to the case,

20  that notion has already been introduced to the jury at a

21  number of points in time, and for good reason, because

22  it is -- the legality of what happened, as the Court

23  noted, you can't sanitize the transcript entirely, the

24  record entirely of references to loss.  I mean, it is

25  real, it is what happened at the end of the day here.

PDF created with pdfFactory trial version www.pdffactory.com

1   The government has shifted its emphasize away because

2   the Court has directed us to do that, the Court has

3   excluded evidence to keep the emphasis away from loss.

4   And so in that way, it is not prejudicial.

5        If the Court has questions -- unless the Court

6   has questions, I can go into this issue about

7   cross-examination of the witness.  But to sum up the

8   point about the tape itself, probative of intent at the

9   time that it matters, and not prejudicial in as far as

10  there is mention of loss because it's already in front

11  of the jury as it is.

12       MR. GREENBERG:  Two very brief points.  How can

13  it be -- I think they said the legality of what happened

14  and at the end of the day is that there's a loss.

15       The one thing we should be able in all good

16  conscience to admit is that at the end of the day and

17  that the reality that there is no economic loss.

18       Again, every day, every witness, the implication

19  is what they just said, that at the end of the day, the

20  reality is there was an economic loss.  There was not.

21  This is not what the crime is all about, but this is

22  what they're trying to prove.

23       The other factor is, and if we need to get into

24  it, that this was a phone call following what

25  Mr. Carpenter and Mr. -- perceived as threats.  And the

PDF created with pdfFactory trial version www.pdffactory.com

1    Court has in terms of the police reports that haven't

2    been marked into evidence, in terms of Mr. Iantosca, and

3    their concerns, that they were concerned that following

4    their meeting with him that they were in some state of

5    danger.

6         But if we need to go into all of that, I guess

7    we'll have to go into all of that.  But again, our

8    fundamental concern is that this doesn't add anything to

9    what the issues in the indictment are all about.  And

10   it's a continued effort, again, to put loss in front of

11   the jury and to mislead them as to what really happened

12   at the end of the day.

13        THE COURT:  All right.  I'm going to exclude it

14   for the same reason I excluded Paley's testimony.  I

15   don't think it's particularly probative of the issues as

16   to the exchangors -- as to state of mind at that point.

17        To the extent it reflects any kind of

18   consciousness of guilt, it's guilt of losing the money

19   rather than guilt of inducing the transactions, and I

20   think that highlights the divide we're trying to police

21   here.

22        I don't see anything that reflects on guilt

23   about representations that may have been made to induce

24   the transactions.  I mean, the subject matter is the

25   inability to make a payment timely when called for.

PDF created with pdfFactory trial version www.pdffactory.com

1          At any rate -- so I think for the reasons I said

2    at sidebar with respect to Paley's testimony with regard

3    to the same subjects, whatever probative value the

4    evidence would have on the government's side is very

5    low, is outweighed by prejudice of getting into areas

6    that are not the main event here.

7          So I will exclude the conversation.

8          You said that Kameron could add something else.

9    I guess you're free to call him for something else,

10   about transactions that he can testify to.  But it's

11   after-the-fact kind of things I'm not so sure.

12         MR. MITCHELL:  No, last time he did discuss

13   before-the-fact matters, but I think it's highly

14   unlikely that in light of the Court's decision, that

15   we'll call him.

16         THE COURT:  Okay.

17         MR. GREENBERG:  Your Honor, we have one other

18   issue, and I don't know if this is the appropriate time.

19   But your Honor had allowed in de bene, I think your

20   Honor had allowed in subject to revisiting statements

21   that exchangors and various representatives made in

22   terms of what Mr. Paley told them.  In terms of what the

23   state of the evidence was -- and you may recall that we

24   stated that Mr. Paley could not be deemed

25   Mr. Carpenter's agent at best, or it's probably

1    reasonable that he was a corporate agent, that he was

2    president.  That the state of the evidence to this

3    point, we believe, does not warrant any -- submit any

4    finding by the jury that Mr. Paley was Mr. Carpenter's

5    agent, and we would ask your Honor to strike all of the

6    testimony by all of the exchangors and the exchangors'

7    representatives as far as what Mr. Paley said to them to

8    the extent that it is intended to be the statements of

9    an agent attributable to Mr. Carpenter.

10        THE COURT:  No, just to save time, without

11    hearing the government's say, I disagree.  I think it be

12    permitted.

13        What may be appropriate is an instruction to the

14    jury on how to use such evidence; that is, they should

15    use it only if they believe that Mr. Paley was

16    authorized to bind Mr. Carpenter.

17        I will just add the observation that this isn't

18    necessarily principal and agency law.  In the purely

19    commercial context, this is in the context of a scheme

20    to defraud, as alleged in the indictment, if that's what

21    the jurors find, they might find co-participants in a

22    scheme, if they find one, to be acting with

23    authorization on each other's behalf.

24        Anyway, it seems to me for the point you're

25    concerned about, and not illegitimate, it's cured by an

```
 1   instruction to the jury and the appropriate time being
 2   instructions to the jury.
 3            MR. GREENBERG:  So we only have two witnesses
 4   left, then?
 5            THE COURT:  I guess.  Again, Johnson who did an
 6   exchange, right?
 7            MR. MITCHELL:  Yes, and David Patterson.
 8            THE COURT:  Patterson.
 9            MR. MITCHELL:  And so we'll rest tomorrow and so
10   that raises the issue of what evidence, again, the
11   defendant will be putting on.  I think --
12            THE COURT:  You heard what I heard.
13            MR. MITCHELL:  That there's none.
14            THE COURT:  At this point, they don't, I think,
15   have one.
16            MR. PAPPALARDO:  We will have a motion, your
17   Honor.
18            THE COURT:  I'm sure.
19            So we'll finish with them, we'll let the jurors
20   go, and we'll have some business, perhaps argument on
21   the motion and I guess we'll talk about the charge and
22   then we'll come in and plan to start first thing on
23   Wednesday.
24            MR. PAPPALARDO:  If the motion is not allowed,
25   your Honor.
```

1          THE COURT:  Yes, of course.

2          We'll start with arguments and charge on

3    Wednesday morning.

4          MR. MITCHELL:  Okay.

5          THE COURT:  So they should have it by noontime,

6    I would think.

7          MR. MITCHELL:  All right.  Sounds good, your

8    Honor.  Thank you.

9          (Court adjourned at 12:42 p.m.)

10

11              - - - - - - - - - - -

12                  CERTIFICATION

13      We certify that the foregoing is a correct

14   transcript of the record of proceedings in the

15   above-entitled matter to the best of our skill and

16   ability.

17

18

19   /s/Debra M. Joyce
     Debra M. Joyce, RMR, CRR          Date
20   Official Court Reporter

21

22

23

24   /s/Marcia G. Patrisso
     Marcia G. Patrisso, RPR, CRR      Date
25   Official Court Reporter

PDF created with pdfFactory trial version www.pdffactory.com