UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                )
UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                ) Criminal Action
v.                              ) No. 04-10029-GAO
                                )
DANIEL E. CARPENTER,            )
                                )
          Defendant.            )
                                )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY 12
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, June 17, 2008
9:05 a.m.

Debra M. Joyce, RMR, CRR
Marcia G. Patrisso, RPR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

1   APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Jonathan F. Mitchell and Jack W. Pirozzolo,
3        Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        One Courthouse Way
         Boston, Massachusetts  02210
5        On Behalf of the Government

6        GREENBERG TRAURIG, LLP
         By: A. John Pappalardo, Esq. and
7        Gary R. Greenberg, Esq.
         One International Place
8        Boston, Massachusetts  02110
         On Behalf of the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

<pre>
1                         I N D E X

2                      Direct   Cross   Redirect   Recross
     Witnesses For The
3     Government:

4    DAVID PATTERSON

5        By Mr. Mitchell       13              84
         BY Mr. Pappalardo           49
6
     JEFFREY JOHNSTON
7
         By Mr. Mitchell       89             117
8        By Mr. Greenberg           106

9                      E X H I B I T S

10

11   Exhibit No.        Description        Marked   Received

12   Nos. 118
     through
13   No. 122  Benistar corporate package            97

14   Nos. 123
     through
15   No. 127  Exchange documents                    99

16   No. 133  Letter from Ms. Jokinen to Mr. Johnston
                 dated 11/24/00                     104
17
     No. 135   Promotional Material                  17
18
     No. 136  Letter to Mr. Paley from Mr.
19            Patterson 10/14/98                      20

20   No. 333  Fax to Mr. Patterson from Mr. Paley
                 10/14/98                             24
21
     No. 138  Letter from Mr. Patterson to Mr. Paley
22               10/16/98                             30

23   No. 139  Proposed documents for Jane Carey
                 transaction                          32
24
     No. 140  Fax Letter to Mr. Carpenter and
25            Mr. Paley from Mr. Patterson 10/22/98   40
</pre>

```
 1                    E X H I B I T S (cont'd)

 2
       Exhibit No.         Description          Marked     Received
 3
       No. 141 Letter to Mr. Carpenter and Mr. Paley
 4             10/23/98                                       42

 5     No. 142 Letter to Mr. Levine from Mr.
               Patterson 10/23/98                            44
 6
       No. 142A Original Exchange Agreement                  46
 7
       No. 142B Original document                            46
 8
       No. 143  Acknowledgement of proceeds                  49
 9
       No. 395C Arbitration award dated 12/15/05    121
10
       No. 402 Telephone records of Mr. Patterson
11             October, November 1998                        62

12     No. 415A Superior court order signed by     121
               Judge Fabricant with settlement and
13             release dated 6/5/08

14

15

16

17

18

19

20

21

22

23

24

25
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              (The following proceedings were held in open

 2   court before the Honorable George A. O'Toole, Jr.,

 3   United States District Judge, United States District

 4   Court, District of Massachusetts, at the John J. Moakley

 5   United States Courthouse, One Courthouse Way, Boston,

 6   Massachusetts, on June 17, 2008.

 7              The defendant, Daniel E. Carpenter, is present

 8   with counsel.  Assistant U.S. Attorneys Jonathan F.

 9   Mitchell and Jack W. Pirozzolo are present.)

10              THE COURT:  Good morning.  Somebody have

11   something?

12              MR. PAPPALARDO:  I did, your Honor, and I'll be

13   very brief with this.

14              Your Honor, this is a continuation of a

15   discussion we had at the end of yesterday's proceedings.

16   And I want to draw the Court's attention to what I

17   present is the controlling law in this circuit, it's

18   United States v. Ranney, and in that case, your Honor,

19   which, by the way, was a mail fraud and wire fraud case,

20   where a particular salesman was being charged with mail

21   fraud and wire fraud based upon oral representations

22   that he made in connection with the selling of various

23   items.

24              Your Honor, specifically in that case it says

25   that the defendants are correct that the prosecution
```

PDF created with pdfFactory trial version www.pdffactory.com

1   must show that the employer expressly or impliedly

2   authorized or ratified a salesman's statements before

3   those statements may be introduced as evidence against

4   the employer.

5           Now, your Honor, we heard -- the only evidence

6   in this case, the only evidence in this case with

7   respect to that issue came in yesterday, and it's very

8   brief.  It said -- this was with Mr. Paley.

9           "In fact, Dan Carpenter never authorized you to

10  say anything other than what was in the written

11  statements; isn't that fair to say?

12          "That's true.

13          "He never told you to say anything outside of

14  those documents, did he?

15          "No, he didn't.

16          "He never told you to say anything, did he?

17          "No.

18          "As a matter of fact, he didn't even have

19  anything to do with that, that was your job, right?

20          "That's true."

21          Your Honor, there is absolutely no evidence of

22  authorization.  And I appreciate, your Honor, reading

23  from your comments yesterday afternoon that in the

24  purely commercial context, you know, in the context of a

25  scheme to defraud alleged in the indictment.  What I

1  point out, your Honor, is that there are standards, and

2  those standards have not been met in this case.

3       This case doesn't even charge conspiracy, much

4  less does it prove conspiracy.  There's no evidence of a

5  conspiracy, your Honor, between Mr. Paley and

6  Mr. Carpenter.

7       But, your Honor, I suggest that you take into

8  consideration -- and I point this out, your Honor,

9  because we did not cite this in our brief before trial

10 in attempting to exclude these statements, but I would

11 submit to the Court that in the last trial, you

12 prohibited the government from arguing anything to do

13 with the oral conversations between Mr. Paley and the

14 investors.  And that was in your charging conference,

15 your Honor, on page 45 and 46.

16      In this case, your Honor, there is -- there's

17 not even a hint of evidence.  In that case there was --

18 I reviewed the transcript -- there was some evidence

19 back and forth; Paley was all over the place in that

20 case.

21      In this case, your Honor, there is absolutely no

22 evidence of any authorization, of any contact, of

23 anything.

24      Now, that leaves the documents, but I'm talking

25 specifically about the oral conversations between Paley

PDF created with pdfFactory trial version www.pdffactory.com

1    and -- I mean, your Honor, it couldn't be more clear.

2         And if I may, approach, your Honor, I would just

3    like to hand you the case, and then we can continue.

4         THE COURT:  All right.

5         MR. PAPPALARDO:  It's on -- it's footnote 7.

6    And I represent, again, your Honor, that we -- that

7    that's controlling law in this circuit.  And I just

8    offer it for your consideration.

9         THE COURT:  All right.  I'll read it.

10        MR. PAPPALARDO:  Thank you.

11        MR. MITCHELL:  Can I have the citation?

12        MR. PAPPALARDO:  You can have the case, we'll

13   give you the case.

14        MR. MITCHELL:  You're swell.

15        Your Honor, the -- I think there's ample

16   evidence to support the notion that whether you apply

17   the standard of -- in the wire and mail fraud statutes

18   where they have been read into the wire and mail fraud

19   statutes or in the commercial context that Paley was

20   acting as Carpenter's agent, whether defined as a

21   partner or as a subordinate.  However you define it, he

22   was authorized to make representations that were

23   consistent with the Exchange Agreements.  We know from

24   testimony or read in testimony of Linda Jokinen that the

25   defendant reviewed and approved all the materials.  We

1    know that -- we know the same from testimony of Jackie

2    Spielman Mahannah as well.  In addition, we know from

3    the testimony of all the exchangors that Paley --

4    Paley's representations to them were consistent with

5    these documents.  In other words, they fell within the

6    scope of the agency relationship.

7         I don't understand Mr. Pappalardo to be arguing

8    that Mr. Paley wasn't an agent in as far as he presented

9    documents to -- the documents that the defendant

10   approved to prospective exchangors.  By the same token,

11   he's making representations that are consistent, as we

12   all know he was at this point, with those documents that

13   he was making oral representations within that agency

14   relationship.

15        And so the government shouldn't be precluded

16   from contending that he was an agent and that the

17   evidence of his oral representations was properly

18   included.

19        Now, that's not even to address the issue of why

20   the statements were admitted in the first place.  I

21   mean, as we've argued time and again, they do come in

22   for non-hearsay purposes, the fact that they were

23   actually said.

24        But, in any event, the record is ample that he

25   was acting within the scope of this arrangement.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Well, we can resolve it at a later

2     time, particularly the evidentiary claim or the point

3     that defense says the case raises.  But I guess I'm just

4     wondering how much of a controversy this is.

5          MR. PAPPALARDO:  It is with respect to the

6     second witness today, your Honor.  That's why I wanted

7     to bring it before you.

8          THE COURT:  We haven't heard it yet.  Because

9     what I was going to say is at least this go-around, it

10    doesn't appear that the government is relying on oral

11    representations by Paley but rather on the documents.

12         MR. PAPPALARDO:  And, your Honor, that's fine,

13    we can address that at a later time.

14         But two things:  Number one, in a review of the

15    indictment, the indictment makes reference to these oral

16    representations, and I suggest that -- or I will suggest

17    later that's improper and the indictment should be

18    redacted.  More importantly, your Honor, I suspect with

19    regards to the second witness today --

20         THE COURT:  That being Mr. Patterson?

21         MR. PAPPALARDO:  No, Mr. Patterson is the first.

22    This is Mr. Johnston, I believe, your Honor.

23         THE COURT:  Okay, Mr. Johnston.

24         MR. PAPPALARDO:  He is an exchangor, an

25    investor, and there may be an effort by the government

PDF created with pdfFactory trial version www.pdffactory.com

1    to elicit conversations that he had with Paley.  And I

2    suggest to the Court, based upon the very, very clear

3    language of that case, that that is probably

4    inadmissible.  But that's why I wanted to flag it now,

5    your Honor, before this occurred.

6         MR. MITCHELL:  I guess it would be helpful if

7    Mr. Pappalardo flags what he's referring to.  I'm not

8    exactly sure what he's referring to.  We should probably

9    hash it out now before the witness takes the stand.

10         THE COURT:  Let me ask, does the government --

11    besides the documents, which we know about, that says

12    about what accounts would be used and so on so forth, is

13    the government relying on things that Paley said that

14    were different?

15         MR. MITCHELL:  With respect to that witness?

16         THE COURT:  Anybody in the case, to prove the

17    fraud or scheme to defraud?

18         MR. MITCHELL:  No, other than the fact that the

19    representations were consistent with the written

20    materials.

21         THE COURT:  That doesn't add anything to it,

22    does it?

23         MR. MITCHELL:  Well, no, except the fact that --

24         THE COURT:  I'm just wondering whether there is

25    any evidence that would be particularly significant that

PDF created with pdfFactory trial version www.pdffactory.com

1    would fall under the rule if the case says --

2         MR. MITCHELL:  I think the answer is no, but at

3    the same time, I need to be clear that Paley was echoing

4    what was in the documents, that has been consistent

5    throughout the case.  To suggest that the government

6    can't say that Paley was making oral representations

7    consistent with the documents is a different matter.  In

8    other words, we should be able to argue that, look,

9    you're getting it -- exchangors were getting the

10   following representations from the documents, they're

11   also hearing it from Paley.  That seems to me

12   appropriate and non-prejudicial.

13        I don't know -- with respect to Mr. Johnston, I

14   actually don't know which statement Mr. Pappalardo is

15   referring to.  I mean, we can deal with it now other

16   than taking up the jury's time at sidebar.  I mean --

17        THE COURT:  Is this something he said before, is

18   that it?

19        MR. PAPPALARDO:  No, your Honor, I think it's --

20   I don't have his testimony before me, but I understand

21   from his testimony, your Honor, he's an individual who,

22   not unlike other people, likes to go beyond the scope of

23   the question and refer to certain things, and I just

24   wanted to bring it to the Court's attention.  That's

25   all.

PDF created with pdfFactory trial version www.pdffactory.com

1          We -- with regard to what Mr. Mitchell just

2     said, your Honor, any oral representations by Paley

3     cannot under that case be admitted against

4     Mr. Carpenter.

5          The documents, your Honor, speak for themselves.

6          THE COURT:  Okay, I understand that part.

7          MR. MITCHELL:  That's a different issue, and

8     I've cautioned the witness about volunteering how much

9     money he lost and so on, which shouldn't be a problem.

10         THE COURT:  Okay.  Let's get the jury.

11         (Jury entered the courtroom.)

12         THE COURT:  Good morning, jurors.

13         MR. MITCHELL:  Good morning, again, your Honor.

14         The United States calls David Patterson.

15         DAVID PATTERSON, having been duly sworn by the

16    Clerk, was examined and testified as follows:

17         THE CLERK:  Please be seated.  State your name,

18    spell your last name for the record, keep your voice up,

19    and speak into the mic.

20         THE WITNESS:  David Patterson,

21    P-a-t-t-e-r-s-o-n.

22                    DIRECT EXAMINATION

23    BY MR. MITCHELL:

24    Q.   Good morning, Mr. Patterson.

25    A.   Good morning.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Sir, could you tell us where you live?

2   A.   In Newton.

3   Q.   And how long have you lived in Newton?

4   A.   Since 1982.

5   Q.   What do you do for a living, sir?

6   A.   I'm an attorney.

7   Q.   Where do you practice?

8   A.   I practice in Newton.

9   Q.   Are you married?

10  A.   I am.

11  Q.   Do you have any children?

12  A.   I do.

13  Q.   How many children do you have?

14  A.   One child, 12-year-old boy.

15  Q.   Okay.  Sir, could you tell us what your educational

16  background is?

17  A.   I graduated from high school, St. Paul's School in

18  1964; Harvard College 1969; Harvard Graduate School of

19  Education 1972, Master's in education; and I graduated

20  from Northeastern Law School in 1979.

21  Q.   Okay.  Sir, what kind of law do you practice?

22  A.   Civil, primarily real estate, residential real

23  estate now.

24  Q.   And when you say "residential real estate," what

25  kinds of transactions are you talking about?

1  A.   Fair amount of conveyancing, purchase and sale work,

2  single-family residence transactions.

3  Q.   So people buying and selling their homes?

4  A.   Correct.

5  Q.   In the course of your practice of real estate law,

6  have you ever represented a client in a transaction

7  involving Benistar Property Exchange Trust Company?

8  A.   I did.

9  Q.   When was that?

10  A.   1998, I believe.

11  Q.   Who was the client?

12  A.   The client was Jane Carey, C-a-r-e-y.

13  Q.   And did she hire Benistar to do something for her?

14  A.   She did hire Benistar to act as an intermediary in a

15  1031 transaction.

16  Q.   Okay.  Did that involve a piece of commercial

17  property that she owned?

18  A.   Yes, it was a three- or four-family residence on

19  Marlboro Street in Boston.

20  Q.   And how did, sir, did you find out about Benistar?

21  A.   I received -- I was -- I received a call from her

22  accountant indicating that he was suggesting that she do

23  a 1031 transaction, and he recommended an individual who

24  worked for Benistar to do the transaction.

25  Q.   And whom did he recommend?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Martin Paley.

2    Q.    Had you ever done a 1031 property exchange before?

3    A.    I am not sure.  It may have been my first or my

4    second.

5    Q.    Okay.  Had you done any research into 1031 exchanges

6    independently of your accountant's referral?

7    A.    I think I did some research at the time to the 1031

8    process.

9    Q.    Okay.  Did you meet with Mr. Paley?

10   A.    I did.

11   Q.    When did you meet with him?

12   A.    I believe it was October of 1998, October 13.

13   Q.    Okay.  Did you meet with him in person?

14   A.    I did.

15   Q.    Where was that?

16   A.    That was in Ms. Carey's accountant's office in

17   Boston.

18   Q.    Did Mr. Paley bring anything with him to that

19   meeting?

20   A.    He brought some promotional materials.

21   Q.    Did you go through those materials with Mr. Paley?

22   A.    Very briefly.

23   Q.    Sir, there's a stack of folders in front of you.

24   Could you take a look at the first folder, which is

25   marked Government's Exhibit 135.

PDF created with pdfFactory trial version www.pdffactory.com

1           (Pause.)

2    A.   This is a copy of the promotional materials that he

3    gave me.

4    Q.   Okay.

5           MR. MITCHELL:   At this time, your Honor, the

6    government would offer Exhibit 135.

7           THE COURT:   All right.   Is there any objection?

8           MR. PAPPALARDO:   One moment, your Honor.   Ms.

9    Carey.

10          (Pause.)

11          (Discussion off the record.)

12          MR. PAPPALARDO:   No objection.

13          THE COURT:   All right.

14          (Exhibit 135 received into evidence.)

15   Q.   Do you see Exhibit 135 up there on the screen?

16   A.   I do.

17   Q.   Just by way of summary, is this a slide show or a

18   Power Point?

19   A.   It appears to be something like that.

20   Q.   Something of that format, okay.

21          I'm just going to walk through it briefly with

22   you.  Tax-legislative history, tax-deferral advantage,

23   advantages to investors, benefits to attorneys, benefits

24   of using tax deferral, and so forth.

25          Did Mr. Paley go through this with you at the

PDF created with pdfFactory trial version www.pdffactory.com

1  time?

2  A.    He may have extremely briefly.

3  Q.    In his review of these materials with you, did he

4  say anything that was inconsistent with your

5  understanding of 1031 exchanges?

6  A.    No.

7  Q.    At the end of the meeting -- after the meeting, what

8  happened next?

9  A.    After the meeting, I spoke to my client and I told

10  her that I had a meeting with Paul Sapienza and Martin

11  Paley about the 1031 and that I did not see a problem

12  with using Martin Paley's outfit for the 1031

13  transaction.

14  Q.    Did she agree to go forward with it?

15  A.    And she indicated she wanted to go forward using

16  Benistar.

17  Q.    Okay.  Paul Sapienza, by the way, was her

18  accountant?

19  A.    That's Ms. Carey's accountant, yes.

20  Q.    By the way, did you seek any additional information

21  from Benistar?

22  A.    I wanted to see copies of the actual transaction

23  documents that they were going to use, the Escrow

24  Agreement in particular, and also the Exchange

25  Agreement, any other documents that they were going to

1    be submitting to her to sign as part of the 1031

2    transaction.

3    Q.   And in the course of your work in commercial and

4    residential real estate, have you been involved in

5    transactions in which an escrow was used?

6    A.   Very frequently.

7    Q.   Very frequently.  This is -- did you receive -- did

8    you ask somebody for the Escrow Agreement or other

9    documentation?

10   A.   Yes, I asked Martin Paley specifically for the

11   Escrow Agreement.

12   Q.   Can you take a look at Exhibit 136 in front of you?

13        (Pause.)

14   Q.   Do you recognize that document?

15   A.   Yes, it's a copy of a letter dated October 14th that

16   I sent to Martin Paley.

17   Q.   And you sent it to him for what purpose?

18   A.   Well, I was indicating, first, that my client was

19   prepared to go forward with Benistar on the 1031

20   transaction, that she was prepared to pay the $2,000

21   fee, and I had also -- I believe I guaranteed payment of

22   the $500 retainer.

23   Q.   Okay.  All right.

24        MR. MITCHELL:  At this time, your Honor, the

25   government would offer 136.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. PAPPALARDO:  No objection.

 2              THE COURT:  Okay.

 3              (Exhibit 136 received into evidence.)

 4    BY MR. MITCHELL:

 5    Q.   All right.  Do you see the letter up there --

 6    A.   Yes.

 7    Q.   -- on the screen?

 8              And again, this is to Martin Paley.  Just, by

 9    way, if you don't mind, a summary, the first two

10    paragraphs, this is what you were just describing, the

11    fees that you agreed to pay --

12    A.   Correct.

13    Q.   -- Benistar?

14              And then it you ask for certain documentation

15    here?

16    A.   Yes, I did.  I asked for the draft documentation --

17    a draft of all the documentation they were going to be

18    giving to her to sign with a specific interest in the

19    Escrow Agreement, as well as asking for documentation

20    confirming their corporate status, that they were

21    authorized to do business in Massachusetts.

22    Q.   Why did you ask for that?

23    A.   I'm sorry, why did I ask for that?

24    Q.   Yes, sir.

25    A.   As to all three of those?
```

1    Q.    No, I'm sorry, no, the third one.  Why did you ask

2    for documents reflecting the legal status of Benistar?

3    A.    Well, I understood that Benistar had been newly

4    organized and was just setting up in Massachusetts, and

5    I just wanted to make sure that they were authorized to

6    do business in Massachusetts.

7    Q.    Okay.  How did you know that Benistar was just

8    starting up?

9    A.    Martin Paley told me that at the meeting at Paul

10   Sapienza's office.

11   Q.    Okay.  And then I highlight for you the next

12   paragraph.

13          Could you read that to the jury?

14   A.    "I trust you can understand my concern as

15   Ms. Carey's attorney as I have no personal knowledge of

16   Benistar and we will be delivering approximately

17   $500,000 to you in a transaction of first impression."

18   Q.    What did you mean by a "transaction of first

19   impression"?

20   A.    Well, that it was -- I knew that it was Benistar's

21   first 1031 transaction in Massachusetts, and, quite

22   possibly, I think it was their first 1031 transaction

23   overall.

24   Q.    In representing Ms. Carey in this transaction, what,

25   if any, of the features of the transaction were

1    important to you?

2            MR. PAPPALARDO:  Objection.

3            THE COURT:  Sustained.

4            MR. MITCHELL:  I'll move on.

5    BY MR. MITCHELL:

6    Q.   Did you get a response to this letter from

7    Mr. Paley?

8    A.   I did.  I believe I got a fax later that evening or

9    early the next morning indicating that I should be in

10   contact with Daniel Carpenter at Benistar to see the

11   actual documentation, to review the documentation.

12   Q.   Okay.  Could you take a look at Exhibit 137?

13           (Pause.)

14   A.   This is the fax that I received from Martin Paley in

15   response to my October 14 letter.

16   Q.   And when is it dated?

17   A.   It's dated October 14, 9:19:50 p.m.  So it came in

18   that evening.

19   Q.   Okay.

20           MR. MITCHELL:  Your Honor, the government would

21   offer Government's Exhibit 137 .

22           MR. PAPPALARDO:  Your Honor, may we approach

23   quickly, your Honor?

24           (At sidebar on the record.)

25           MR. PAPPALARDO:  Your Honor, if I may, my -- I

```
 1   don't really have an objection to the document, except
 2   that it's not complete.  This is a complete document,
 3   your Honor.  It's a six-page document, and this one is
 4   four pages.  And, you know, I don't have an objection to
 5   this, but I would just like it to be a complete
 6   document.
 7        THE COURT:  I'm looking at one that has the
 8   original sticker on it, I guess.
 9        MR. PAPPALARDO:  It's the original sticker, but
10   it's four pages.
11        You end --
12        THE COURT:  I count six here.
13        MR. PAPPALARDO:  Oh, you do.
14        THE COURT:  The two -- it looks like duplicates
15   of the fax page, and then a four-page document.
16        MR. PAPPALARDO:  Okay.  The document, see how it
17   ends at 4 in the exhibit?  It goes on to 5 and it goes
18   on to 6.
19        MR. MITCHELL:  You've been hiding it from me.
20        MR. PAPPALARDO:  It's your witness.
21        MR. MITCHELL:  I'm kidding.
22        I'll be happy to substitute -- you marked that
23   as defense 333, I can put that in.  That's fine.
24        MR. PAPPALARDO:  With that, I have no objection.
25        THE COURT:  Okay, all right.
```

```
 1            (End of discussion at sidebar.)
 2            MR. MITCHELL:  May I approach the witness, your
 3    Honor?
 4            THE COURT:  You may.
 5    BY MR. MITCHELL:
 6    Q.   Okay.  Showing you what has been marked as Defense
 7    Exhibit 333, could you take a look at that,
 8    Mr. Patterson?
 9            (Pause.)
10    A.   Yes.
11    Q.   Okay.  Is that the same document --
12    A.   That appears to be the same document.
13    Q.   Okay.
14            MR. MITCHELL:  At this time the government would
15    move into evidence Defense Exhibit 333.
16            MR. PAPPALARDO:  No objection, your Honor.
17            THE COURT:  Okay.
18            (Exhibit 333 received into evidence.)
19            THE COURT:  Can you display that from your --
20            MR. MITCHELL:  I can.
21            THE COURT:  I just wondered if I needed to do
22    the defense computer.
23            MR. MITCHELL:  I don't think so.
24    BY MR. MITCHELL:
25    Q.   Okay.  Do you see this document up on the screen?
```

1  A.    I do.

2  Q.    And is this a fax -- the fax you were describing

3  right here?

4  A.    It is.

5  Q.    All right.  And could you read the last paragraph

6  right there for us?

7  A.    "The fastest way to do due diligence on Benistar is

8  to speak with our chairman Dan Carpenter.  I have told

9  him you would be call.  He will make sure you are

10 comfortable dealing with our firm.  You may reach him at

11 800-969-6000 extension 227."

12 Q.    And is there a document attached?

13 A.    Yes, there is.

14 Q.    Okay.  The second page, by the way, is just another

15 copy of the same fax, right?

16 A.    Correct.

17 Q.    And then there's an Exchange Agreement right there?

18 A.    Correct.

19 Q.    And this says, "Nationwide Corporation"?

20 A.    As the intermediary, yes.

21 Q.    Okay.  Was that the company you were dealing with?

22 A.    No, it was not.

23 Q.    Did you -- what did you do to follow up -- if

24 anything, what did you do to follow up that fax from

25 Mr. Paley?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   I believe I called Mr. Paley and indicated that I

2    was interested in seeing the Exchange Agreement for the

3    transaction we were doing with Benistar, not an Exchange

4    Agreement with Nationwide, Nationwide being his prior

5    employer.

6    Q.   Okay.  And did you do that by letter or by phone?

7    A.   By phone.

8    Q.   Okay.  Did you also send a letter?

9    A.   I believe I did.

10   Q.   Let me ask you this:  Did you also call

11   Mr. Carpenter?

12   A.   Several days later.

13   Q.   Okay.  So the letter to Mr. Paley came next?

14   A.   Correct.

15   Q.   The following letter.

16        What did you say to Mr. Paley in the phone call?

17   A.   I indicated that I had received the document, that

18   it was not the document I was looking for, and that I

19   wanted to get the documentation that my client was going

20   to be expected to sign at the closing.

21   Q.   Okay.  And the letter you sent to Mr. Paley, was

22   that consistent with your phone call?

23   A.   Yes.

24   Q.   Okay.  And I'm going to have you take a look at

25   another exhibit, this is Government's 138, which should

PDF created with pdfFactory trial version www.pdffactory.com

1    be in front of you.

2    A.    It is.

3    Q.    Would you tell us what that is?

4          (Pause.)

5    A.    Yes.  My letter of October 16 is where I indicate

6    that I still need to get the documentation I had

7    requested in my letter of October 14.

8    Q.    Okay.  And this was to Martin Paley?

9    A.    It is.

10          MR. MITCHELL:  At this time, your Honor, the

11    government would offer Government's 138.

12          MR. PAPPALARDO:  May we approach, your Honor?

13          (At sidebar on the record.)

14          MR. PAPPALARDO:  Your Honor, for the same reason

15    that we objected to the conversations about what this

16    individual, this attorney, is representing Ms. Carey

17    said, we would object to this on the ground that it

18    contains his request that -- he says, "I trust this

19    escrow will give my client full protection."  What he

20    trusts is not at issue here, it's either his client or

21    any representations made by Carpenter to him.

22          I suggest it's improper to allow this to be

23    admitted against Mr. Carpenter.  I mean, this is a

24    letter to Martin Paley, who I strongly suggest to the

25    Court is not an agent of Mr. Carpenter.  But, more

1   importantly, his mental impressions, what he desires or

2   what he requests are not properly before this jury.  And

3   if he has a conversation with Mr. Carpenter, that's a

4   different story, but I don't think this is admissible.

5          MR. MITCHELL:  Well, this is -- two points.  One

6   is, there is an agency relationship, and I won't repeat

7   the arguments I made before the jury came in.

8          Secondly, this is in the course of dealing that

9   involved Mr. Paley, involved Mr. Carpenter, involved

10  Jerry Levin, involved David Patterson.  This is also a

11  string of communications that led right up to Paley's

12  bringing in Mr. Carpenter into the mix.  So for that

13  reason, it comes in for non-hearsay purpose of showing

14  action and conforming therewith.

15         MR. PAPPALARDO:  I point out to the Court that

16  you've excluded this with respect to other people, the

17  attorney for Mr. Iantosca.  I also point out, your

18  Honor, that this was, obviously, a successful exchange.

19  And again, any interaction that he had directly with

20  Mr. Carpenter I will not object to, but I think --

21         THE COURT:  I take it there's no evidence that

22  Mr. Carpenter saw this letter, right?

23         MR. MITCHELL:  No, I can't connect it up.

24         THE COURT:  Would you object if that sentence

25  were out?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            MR. PAPPALARDO:  If I may, your Honor.
 2            (Pause.)
 3            MR. PAPPALARDO:  I would not object, your Honor,
 4    if that --
 5            THE COURT:  The "I trust a written
 6    authorization" --
 7            MR. PAPPALARDO:  Yes, that's fine.  If that is
 8    redacted, then the rest of this is in evidence already.
 9    The content of the letter is in evidence.
10            MR. MITCHELL:  Well, how do you -- how should we
11    go about that?  I mean, in terms of on-the-spot
12    redaction.
13            THE COURT:  You may not be able to show it on
14    the screen.
15            MR. MITCHELL:  And then just redact later?
16            THE COURT:  I guess.  I mean, that's possible.
17            MR. MITCHELL:  Okay.
18            THE COURT:  I mean, otherwise I think it
19    should -- if you can't redact it, I think it would have
20    to be excluded.  So it's sort of get you something but
21    not that sentence.
22            MR. MITCHELL:  Which sentence specifically, just
23    so I'm clear?
24            THE COURT:  The sentence beginning "I trust."
25            MR. MITCHELL:  This one down here, "I trust"?
```

1            THE COURT:  Right here.

2            Which is stating basically the witness' mental

3      attitude.  It would be one thing if it could be shown

4      that Carpenter was directly given that impression by the

5      witness, but --

6            MR. MITCHELL:  Okay.

7            THE COURT:  -- without that, I don't think it's

8      admissible.

9            MR. MITCHELL:  All right.  So --

10           THE COURT:  You can have the letter without that

11     sentence.

12           MR. MITCHELL:  Okay.  Very good.

13           (End of discussion at sidebar.)

14           MR. MITCHELL:  Okay.  Is the document admitted

15     subject to the Court's ruling?

16           THE COURT:  Yes.

17           (Exhibit 138 received into evidence.)

18     BY MR. MITCHELL:

19     Q.   All right.  Mr. Patterson, is that the letter you

20     sent to Mr. Paley following up the fax that he sent you?

21     A.   Correct.

22     Q.   Okay.  And what documents do you ask for

23     specifically in this letter?

24     A.   I ask, again, for the Escrow Agreement and also --

25     actually, the exact same three items I request in my

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   letter of October 14, the final documentation package,
 2   the Escrow Agreement, and the documentation as to the
 3   Massachusetts legal status for Benistar.
 4   Q.   Okay.  Did you receive those documents?
 5   A.   Several days later, yes.
 6   Q.   In the meantime, did you have a telephone conference
 7   with Mr. Carpenter?
 8   A.   After I received those documents, yes.
 9   Q.   Okay.  All right.  I'm going to have you turn to
10   Exhibit 139.  Would you take a look at that?
11        (Pause.)
12   A.   Yes, these are the documents that I received from
13   Benistar.
14   Q.   And what are they?
15   A.   This is the proposed Exchange Agreement, Escrow
16   Agreement, resolution of the board of directors,
17   statement for services rendered, and Benistar's cover
18   letter.
19   Q.   Okay.
20        MR. MITCHELL:  At this time --
21   Q.   And did you receive this before or after speaking
22   with Mr. Carpenter?
23   A.   Before.
24   Q.   Before.
25        MR. MITCHELL:  At this time, your Honor, the
```

1    government would offer Exhibit 139.

2             MR. PAPPALARDO:  No objection.

3             THE COURT:  Okay.

4             (Exhibit 139 received into evidence.)

5    BY MR. MITCHELL:

6    Q.    Okay.  And is that -- the first page is the cover

7    letter, sir?

8    A.    Correct.

9    Q.    And this is the Exchange Agreement?

10   A.    Correct.

11   Q.    And between Jane Carey, your client -- and what's

12   Madeira Isle Real Estate Corp.?

13   A.    That was the purchaser of the property in our

14   closing.

15   Q.    And Benistar Property Exchange Trust Company?

16   A.    As the intermediary, correct.

17   Q.    Which one is this one?

18   A.    This is the resolution of the board of directors

19   authorizing the transaction.

20   Q.    And just blow it up a little bit.

21            "Nationwide" was crossed out.  "Benistar" is

22   crossed out, too.

23            Are the signatures for the board of directors of

24   Benistar?

25   A.    Yes.

1    Q.    And who are the two directors whose lines are here?

2    A.    Dan Carpenter, Esq., and Molly Carpenter.

3    Q.    The next page is what?

4    A.    The next page is a statement for services rendered.

5    This is the fee for -- the bulk of the transaction is a

6    fee of $1,500 that Benistar charged for doing the 1031

7    exchange.

8    Q.    And in this last document --

9    A.    Is the proposed Escrow Agreement.

10    Q.    All right.  And does the Escrow Agreement designate

11    where the funds, where Ms. Carey's funds would go?

12    A.    Yes, that they would be held at Merrill Lynch in an

13    account under Benistar's name.

14    Q.    Okay.  At some point, sir, did you have that

15    conversation with Dan Carpenter?

16    A.    I did.  Later, the same day that I received these

17    documents.

18    Q.    Okay.  And did you call the number that Martin Paley

19    had given you?

20    A.    Yes, I did.

21    Q.    All right.  And you got Dan Carpenter?

22    A.    I was put on to Dan Carpenter, yes.  Actually, I

23    take that back.  Dan Carpenter wasn't there, I left my

24    name and my phone number, and then he called me.

25    Q.    Okay.  And what did you say to him?

1   A.   Well, I wanted to go over the documentation.  I had

2   some changes for the documentation, and I also wanted to

3   go over with him, get information as to exactly where

4   the funds were going to be held and how the account

5   would be set up.  In other words, in whose name the

6   account was going to be set up, how the signatories

7   would work.

8   Q.   Okay.  And let me just walk through those items with

9   you.

10        What information did you tell him you wanted --

11  or what provisions in the agreements did you tell him

12  you wanted to change?

13  A.   There are a number of things that I made changes on,

14  and I sent him a draft of the -- I believe I faxed him a

15  draft of those -- I know that I had a document in front

16  of me where I had made changes, and I discussed those

17  with him on the phone.

18  Q.   Okay.  And did he make those changes to the

19  documents?

20  A.   I believe he made all of them, yes.

21  Q.   You said you discussed with him where your client's

22  funds would be held.  What did you -- as best you can

23  recall, what did you say to him about that?

24  A.   Well, I wanted to know where the funds were going to

25  be held.  He told me that they were going to be held at

PDF created with pdfFactory trial version www.pdffactory.com

1    Benistar's accounts at Merrill Lynch.  And I asked him

2    as to how the accounts -- who would be listed as the

3    signatories on the accounts, how the account cards would

4    work, how the signatory cards would work.

5    Q.   What do you mean by that?

6    A.   Well, usually when you take out an account, when you

7    have an account, you have signatory cards whereby the

8    person who has authority to withdraw funds signs on the

9    cards giving them authorization to withdraw funds from

10   the account.  And I wanted to make sure that neither my

11   name nor Ms. Carey's name was listed as a signatory on

12   the account.

13   Q.   Did you discuss with Dan Carpenter why that

14   mattered?

15   A.   Yes.  As part of a 1031 exchange transaction, the

16   exchangor, meaning the client, Ms. Carey, cannot have

17   control of those funds.  They have to be held under the

18   control of the third-party intermediary.

19   Q.   Did Dan Carpenter agree with that observation?

20   A.   Yes.

21   Q.   Did Dan Carpenter tell you whether he was an

22   attorney?

23   A.   I believe he did, yes.

24   Q.   Did he tell you what kind of law he practiced ?

25        MR. PAPPALARDO:  Objection, your Honor, form.

```
1            THE COURT:  Overruled.  You may have it.
2  BY MR. MITCHELL:
3  Q.   Did he tell you what kind of law he practiced?
4  A.   I'm not sure he told me that.  He told me that his
5  company, Benistar, did a lot of tax -- a lot of tax
6  work.
7  Q.   Okay.
8  A.   That they had pension fund investments and things
9  like that.
10 Q.   Did the -- your concern about your client's lack of
11 control of the funds end up in language in the
12 agreements?
13            MR. PAPPALARDO:  Objection.
14            THE COURT:  Sustained, I believe, to the form of
15 the question.
16 BY MR. MITCHELL:
17 Q.   Okay.  Did the agreements reflect what you and
18 Mr. Carpenter had agreed to was -- that your client
19 could not control the funds?
20 A.   Yes.
21 Q.   And where is that reflected in the agreements?
22            (Pause.)
23 A.   It states on paragraph number 1 in the Escrow
24 Agreement that Benistar will open an escrow custodial
25 account under Benistar's name at Merrill Lynch for the
```

PDF created with pdfFactory trial version www.pdffactory.com

exchangor's benefit, that Benistar shall have the full
control over the exchangor's funds, and will invest them
as the exchangor directs in either of two accounts.  And
then that only upon the exchangor, meaning Jane Carey's,
written direction and authorization shall the funds
leave the Benistar account.

      So I felt that that was -- and then there was
language saying that Benistar is only a custodian.  So I
felt that was consistent with the understanding and how
the 1031 transaction was going to work.

Q.   Okay.  Did you speak to anybody else besides
Mr. Carpenter in that call?

A.   Yes.

Q.   Who was that?

A.   Mr. Carpenter was not sure exactly how the account
cards were going to work, and he said that's really
something that the Merrill Lynch person would know.  So
he said let me get you Jerry Levine from Merrill Lynch,
and he can explain to you exactly how the account cards
work.

Q.   Okay.  Did he get Mr. Levine on the line?

A.   He did.  I don't remember whether or not he patched
him in to our conversation or whether he then called me
back with Jerry Levine on the line.  It was one or the
other.

1   Q.   Okay.  And did you speak to the two of them at once?

2   A.   Yes, I did.

3   Q.   What did you talk to them about?

4   A.   Well, since I had conversation with Daniel

5   Carpenter, my focus, once Jerry Levine got on the line

6   was, just to go over how the account cards worked.

7        I expressed to Jerry Levine -- I told him that

8   that was a 1031 transaction, made sure that he

9   understood that the funds were being held in escrow,

10  that the funds were for Jane Carey's benefit, but that

11  Jane Carey's name would not be on the account, Jane

12  Carey could not have the right to withdraw the funds,

13  that was to be exclusively in Benistar's control, but

14  that the funds were Jane Carey's funds, funds needed to

15  go back to Jane Carey within 180 days for the

16  replacement transaction, which is the second step of a

17  1031 exchange when she buys replacement property,

18  like-kind property.

19  Q.   Okay.  In your conversation with the two of them,

20  did it appear that Mr. Levine understood what you were

21  referring to?

22  A.   I believe he did.

23  Q.   Okay.  What about Mr. Carpenter?

24  A.   Yes.

25  Q.   Did you discuss with Mr. Carpenter the Escrow

PDF created with pdfFactory trial version www.pdffactory.com

1  Agreement specifically?

2  A.   I believe I did, yes.

3  Q.   Okay.  What did you discuss with him about the

4  Escrow Agreement?

5  A.   I might have had one or two changes in the terms of

6  the Escrow Agreement.  I don't remember.  I'd really

7  have to see the changes that I made in both agreements

8  to know whether or not I talked about a particular

9  provision of the Escrow Agreement with him or not.

10  Q.   Okay.  Well, in any case, did -- at any point during

11  this conversation, did either Mr. Carpenter or

12  Mr. Levine tell you that your client's money would be

13  invested in stock options?

14       MR. PAPPALARDO:  Objection, your Honor.

15       THE COURT:  Sustained.

16  BY MR. MITCHELL:

17  Q.   Is there any mention of stock options in the

18  conversation?

19       MR. PAPPALARDO:  Objection, your Honor.

20       THE COURT:  Sustained.

21  BY MR. MITCHELL:

22  Q.   What, if anything, what said about stock options in

23  that conversation?

24       MR. PAPPALARDO:  Objection.

25       THE COURT:  Sustained.

1    BY MR. MITCHELL:

2    Q.   Okay.  At some point, did you receive -- did you

3    follow up this phone call with any letters?

4    A.   I'm sorry, did I follow --

5    Q.   Let me show you a document.  Take a look at

6    Government's Exhibit 140 in front of you.

7         (Pause.)

8    A.   All right.

9    Q.   Do you recognize that document?

10   A.   Yes, it's a letter that I sent by fax on October 22

11   to Daniel Carpenter with a copy to Martin Paley sending

12   my revisions to the escrow and Exchange Agreements to

13   them.  And also asking them that they add additional

14   language so that the documents can be signed by fax.

15        MR. MITCHELL:  At this time the government moves

16   into evidence Government's 140.

17        MR. PAPPALARDO:  No objection.

18        THE COURT:  Okay.

19        (Exhibit 140 received into evidence.)

20   BY MR. MITCHELL:

21   Q.   Okay.  Do you see that document up there on the

22   screen, Mr. Patterson?

23   A.   I do.

24   Q.   All right.  And again, this is to Daniel Carpenter

25   from you.  Is that your letterhead at the top?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   It is.

2   Q.   I'm just going to highlight the body of the letter.

3        There is language in here that you propose to

4   add to the escrow and Exchange Agreement.  Would you

5   tell us what that language is?

6   A.   Some of that language is what the standard of care

7   is.  I believe I changed -- there was language in the

8   original draft saying that he would only be responsible

9   for gross negligence, and I said that it should be mere

10  negligence, regular negligence.  There were some typos,

11  there were some incorrect names, there were a number of

12  things that I changed.

13  Q.   Are these the things that you discussed with

14  Mr. Carpenter?

15  A.   And I discussed with Mr. Carpenter on the day

16  before, and he agreed to.

17  Q.   Okay.  And it says here, "A facsimile copy of this

18  document."  What is that about?

19  A.   That's because of the fact that my client would be

20  signing it and then I was going to get it to Benistar,

21  Daniel Carpenter, for him to sign, and I needed to have

22  the signed document back from Daniel Carpenter before I

23  authorized the release of the funds to be wired to

24  Merrill Lynch.  I needed to make sure that Daniel

25  Carpenter had signed it, and since he was going to be

PDF created with pdfFactory trial version www.pdffactory.com

1    signing by fax, I needed to put in the agreement that a

2    faxed signature was as acceptable as an original.

3    Q.    Okay.  Did Mr. Carpenter agree to that provision?

4    A.    Yes.

5    Q.    All right.  Did you continue to have letter

6    exchanges with Mr. Carpenter?

7    A.    Well, this was the morning of the closing and there

8    were -- the closing happened that afternoon and then

9    there was some correspondence after the closing over the

10   next week.

11   Q.    Okay.

12         I'm going to have you take a look at

13   Government's Exhibit 141.  Would you take a look at

14   that?

15         Do you recognize that document?

16   A.    I do.  That's the letter I sent the morning after

17   the closing, dated -- my letter to Daniel Carpenter

18   dated October 23rd with a copy to Martin Paley.

19         MR. MITCHELL:  At this time, your Honor, the

20   government would offer Government's Exhibit 141.

21         MR. PAPPALARDO:  No objection.

22         THE COURT:  Okay.

23         (Exhibit 141 received into evidence.)

24   BY MR. MITCHELL:

25   Q.    This is from you to Mr. Carpenter, correct?

1    A.    Correct.

2    Q.    And what were you asking for specifically in this

3    document?

4    A.    Well, I am sending him the signed documents, and I

5    am asking him to sign and date and return by fax as well

6    as send me the originals by mail the exchange and the

7    Escrow Agreements.

8    Q.    Okay.  And it says here, "Please sign and date in

9    blue ink both copies of the exchange -- both sets of the

10   Exchange Agreement and the Escrow Agreement."   What's

11   the purpose of signing in blue ink?

12   A.    Well, when you have documents that have been

13   transmitted by fax, obviously the signatures are all in

14   black, and if you have a signature in blue ink, then you

15   know that that is an original document, at least the

16   signature is an original signature.

17   Q.    Okay.

18         Now, did you send a copy of the agreements to

19   Jerry Levine as well?

20   A.    I did.

21   Q.    Could you take a look at Government Exhibit 142?

22   A.    Yes, that's my letter to Gerald Levine dated October

23   23rd in which I send to Mr. Levine the fully executed,

24   meaning signed by both Jane Carey and the buyer and Dan

25   Carpenter, copy of the Escrow Agreement and the Exchange

PDF created with pdfFactory trial version www.pdffactory.com

1    Agreement as well as the wiring instructions.

2    Q.   Okay.

3         MR. MITCHELL:  At this time the government would

4    offer 142.

5         MR. PAPPALARDO:  No objection, your Honor.

6         THE COURT:  Okay.

7         (Exhibit 142 received into evidence.)

8    BY MR. MITCHELL:

9    Q.   Do you see that up there?

10   A.   Yes.

11   Q.   This is your cover letter to Gerald Levine?

12   A.   It is.

13   Q.   And cc Daniel Carpenter and Martin Paley?

14   A.   Correct.

15   Q.   And does it say how much money Ms. Carey is sending

16   to Merrill Lynch?

17   A.   It does, $374,406.93.

18   Q.   And this is the Escrow Agreement?

19   A.   It is.

20   Q.   Is that the final agreement?

21   A.   It is.

22   Q.   It has the Exchange Agreement in there as well?

23   A.   I would certainly expect so.

24        (Pause.)

25   A.   Yes.

1   Q.   And do you see this form?

2   A.   I do.

3   Q.   Tell us what that is.

4   A.   That's the Account-Selection Form.

5   Q.   Okay.  Did your client select the Ready Asset money

6   market account at three percent or the six percent

7   investment account?

8   A.   She selected the six percent investment account.

9   Q.   Did you discuss with either Martin Paley or

10  Mr. Carpenter why that was, why she chose six?

11          MR. PAPPALARDO:  Objection, your Honor.

12          THE COURT:  Sustained.

13          MR. MITCHELL:  I asked whether he discussed it

14  with Mr. Carpenter or Mr. Paley.

15          MR. PAPPALARDO:  Still I object.

16          THE COURT:  Why she chose it -- well, at

17  least -- maybe it's the form only, but --

18          MR. MITCHELL:  Okay.

19  BY MR. MITCHELL:

20  Q.   When -- how many days between -- do you recall how

21  quickly Ms. Carey needed her money at closing?

22  A.   She would need it within 180 days.  She had a very

23  good idea of a replacement property, so she was planning

24  on going close to the full 180 days.

25  Q.   Okay.  And again, the wire instructions, these are

1   the wire instructions you were referring to?

2   A.   They are, yes.

3   Q.   Did you receive original signed copies back from

4   Mr. Carpenter?

5   A.   I did.

6   Q.   Okay.  I'm going to have you turn to two exhibits

7   that are not in folders, Exhibits 142 A and 142 B.

8   A.   Yes, these are the documents with the original

9   signature of Daniel Carpenter on them.

10  Q.   Okay.

11        MR. MITCHELL:  At this time, your Honor, we

12  would offer 142 A and 142 B.

13        MR. PAPPALARDO:  May I just ask a question?

14        (Discussion off the record.)

15        MR. PAPPALARDO:  No objection.

16        THE COURT:  Okay.

17        (Exhibit 142 A and 142 B received into

18  evidence.)

19  BY MR. MITCHELL:

20  Q.   Mr. Patterson, could you turn to the last page of

21  the Exchange Agreement?

22        Who are the signatures on that page?

23  A.   Jane W. Carey, my client, the buyer for Madeira --

24  for Madeira Isle Real Estate, the purchaser of the

25  property, and then Daniel E. Carpenter for intermediary

PDF created with pdfFactory trial version www.pdffactory.com

1    Benistar.

2    Q.   Okay.  Is Mr. Carpenter's signature in blue ink?

3    A.   It is.

4    Q.   Could you hold that up for the jury?

5         (Discussion off the record.)

6    Q.   142 B, could you look at 142 B?

7    A.   Yes.

8    Q.   Is that also signed by Mr. Carpenter in blue ink?

9    A.   It is.

10   Q.   All right, thank you.

11        Okay.  At some point, did Ms. Carey select a

12   replacement property?

13   A.   She did.

14   Q.   Okay.  And was that communicated to Benistar?

15   A.   It was.

16   Q.   I'm going to have you take a look at Government's

17   Exhibit 143.  Can you take a look at that?

18        Do you recognize that document?

19   A.   Yes, that's the copy of the document that I received

20   that was addressed to Jane Carey dated October 28, 1998

21   in which --

22   Q.   Okay.  And is this from Daniel E. Carpenter?

23   A.   Correct.

24        MR. MITCHELL:  At this time the government would

25   offer 143.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. PAPPALARDO:  No objection, your Honor.

2          THE COURT:  Okay.

3          (Exhibit 143 received into evidence.)

4   BY MR. MITCHELL:

5   Q.   Do you see 143 up there?

6   A.   Yes.

7   Q.   Okay.  And this document acknowledges the proceeds

8   received from the exchange, 374,000 and change.  Do you

9   see that at the top?

10  A.   I do.

11  Q.   And acknowledges that the money has been deposited

12  in Merrill Lynch Private Client Fund.  Do you see that?

13  A.   I do.

14  Q.   And does the document acknowledge a closing date?

15  A.   It does of October 22.

16  Q.   All right.  Would you read this, the last two

17  sentences?

18  A.   "This means that you will need to identify your

19  replacement property on or before December 5, 1998 (45

20  days from closing date).  We have enclosed a form and

21  instructions suitable for this purpose."

22  Q.   Okay.  And did Ms. Carey identify the replacement

23  property within the 45 days as directed by

24  Mr. Carpenter?

25  A.   She did.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. MITCHELL:  That's all I have for this
 2       witness.
 3                      CROSS-EXAMINATION
 4       BY MR. PAPPALARDO:
 5       Q.   Good morning, Mr. Patterson.
 6       A.   Good morning.
 7       Q.   Mr. Patterson, my name is John Pappalardo, and along
 8       with Mr. Greenberg here, we represent Mr. Carpenter in
 9       this matter.
10              Now, sir, you're an attorney, right?
11       A.   Yes.
12       Q.   You've been in practice since 1998?
13       A.   I've been in practice since 1979.
14       Q.   Oh, excuse me.
15              How long have you been in practice -- you had
16       been in practice approximately 20 years as of the time
17       that you were dealing with this exchange, right?
18       A.   Correct.
19       Q.   And at some time -- sometime in the fall of 1998,
20       you represented Jane Carey in connection with the 1031
21       exchange that you referred to on your direct
22       examination, right?
23       A.   Yes.
24       Q.   And it's fair to say that during the course of your
25       representation of Ms. Carey, you were referred to an
```

PDF created with pdfFactory trial version www.pdffactory.com

1    individual by the name of Martin Paley by Ms. Carey's

2    accountant, right?

3    A.    Yes.

4    Q.    And that's Mr. Sapienza?

5    A.    Yes.

6    Q.    And as a result of that referral, you had occasion

7    to meet with both Mr. Sapienza and Mr. Paley sometime in

8    the fall of 1998, late September, early October?

9    A.    Correct.

10   Q.    Is that fair to say?

11   A.    Yes.

12   Q.    And you said that you had some -- you may have done

13   one prior exchange but Mr. Sapienza was the one who

14   recommended a property exchange; is that fair to say?

15   A.    Yes.

16   Q.    And do you know whether or not, sir, he had

17   experience with regard to these issues?

18   A.    I'm not sure.  I believe he did, but I'm not sure

19   how extensive it was.

20   Q.    Okay.  And at the time you met with Mr. Paley, had

21   you concluded -- and when I say "you," I mean the

22   collective you, you, Ms. Carey, and Mr. Sapienza, that

23   you were going to utilize the services of a qualified

24   intermediary?

25   A.    Yes.

1   Q.   In other words, you had already made the decision to

2   enter into a property exchange, right?

3   A.   Mr. Sapienza had recommended it to his client, my

4   client, and she wanted to do it, and it was a question

5   of finding a 1031 exchange company to do it.

6   Q.   Exactly.  The issue wasn't whether you were going to

7   do one, the question was with whom; is that fair to say?

8   A.   I think that's fair.

9   Q.   Okay.  So the promotional materials that you were

10   shown by the government a bit earlier, to the extent

11   that those related to the benefits of a 1031, this is

12   what you can do, you can defer your capital gains taxes,

13   you can save X amount of money using various models,

14   extolling the virtues of an exchange, really didn't

15   apply to you, did it?

16   A.   It was not critical to the decision.

17   Q.   And that's why you didn't spend much time in

18   reviewing it?

19   A.   Correct.

20   Q.   What was critical to you, Mr. Patterson, you know,

21   as Ms. Carey's lawyer, was finding an exchangor that was

22   suitable for her, right?

23   A.   That was suitable and safe, yes.

24   Q.   That was suitable.  And you wanted to satisfy

25   yourself that the exchangor was an appropriate one

PDF created with pdfFactory trial version www.pdffactory.com

1   for -- for your client, right?

2   A.   Suitable, suitable and safe, yes.

3   Q.   Okay.  Well, to illuminate any suspense,

4   Mr. Patterson, you completed this exchange successfully,

5   right?

6   A.   Yes.

7   Q.   And --

8   A.   My client did, yes.

9   Q.   Exactly.  And at the end of the day, your client

10  received the benefits of the over 20 percent tax

11  deferral, your client, at the end of the day, received

12  the benefits of her six percent election, she was able

13  to complete her property exchange on time and without

14  incident, right?

15  A.   Correct.

16  Q.   Okay.  But let's go back to October of 1998.  In

17  October of 1998 when you met with Mr. Paley, what had

18  you known about Mr. Paley before that meeting?

19  A.   I was told by Mr. Sapienza that he was recommended

20  as trustworthy, I believe.

21  Q.   Okay.  Were you also told that he was an individual

22  who had experience in 1031 property exchanges?

23  A.   Yes.

24  Q.   Okay.  And were you also told that he had been

25  affiliated or was affiliated with a company known as

PDF created with pdfFactory trial version www.pdffactory.com

1    Nationwide for a period of approximately three years and

2    they specialized in property exchanges?

3    A.    He didn't tell me the length of time, but he did say

4    that he worked for Nationwide.

5    Q.    And so when Mr. Paley identified himself as someone

6    working for Benistar, you had to resolve in your mind

7    what Benistar was, right?

8    A.    Correct.

9    Q.    And you learned in your conversation with Mr. Paley,

10   did you not, that Benistar was a new company?

11   A.    New to the 1031 business, yes.

12   Q.    Well -- okay, new to the 1031 business.   That

13   Benistar, not to be confused with Mr. Paley, had not

14   really done a property exchange before, right?

15   A.    Correct.

16   Q.    And so, therefore, you wanted to drill down a little

17   bit further to make sure your comfort level was

18   satisfied that this would be proper for your client with

19   this company, right?

20   A.    Correct.

21   Q.    Okay.   And as a result, you had a conversation with

22   Mr. Paley that you've described on or about October

23   13th, and Mr. Paley sent you documentation and said,

24   look it, if you have any questions, please contact

25   Mr. Carpenter.   And we saw that fax here, right?

1    A.    Correct.

2    Q.    And you called Mr. Carpenter, Mr. Carpenter wasn't

3    there, Mr. Carpenter calls you back?

4    A.    Correct.

5    Q.    Okay.  And prior -- prior to speaking with

6    Mr. Carpenter, you had an exchange of information with

7    Mr. Paley, right?

8    A.    Yes.

9    Q.    You wanted to see what kind of documents were being

10    offered to your client so that you could review those

11    documents, so that you could satisfy yourself,

12    particularly under the -- your new understanding that

13    Benistar had not completed a property exchange in

14    Massachusetts; is that fair to say?

15    A.    Yes.

16    Q.    Okay.  And so Mr. Paley sends you a document, right?

17    A.    Yes.

18    Q.    And that document was basically an Exchange

19    Agreement for Nationwide; is that fair to say?

20    A.    Yes.

21    Q.    And you reviewed that document, right?

22    A.    I did.  I might say not carefully.  As soon as I saw

23    "Nationwide," I didn't spend much time on it after that.

24    Q.    Of course not.  Fair enough.  You saw it said

25    "Nationwide," so you didn't really care what it said,

1   you weren't concerned with Nationwide; Mr. Paley was

2   representing Benistar at that point, right?

3   A.   Yes.

4   Q.   You wanted to see something with Benistar's name on

5   it, right, because that to would be the operative

6   document; is that fair to say?

7   A.   Yes.

8   Q.   Okay.  Now, sir, let's go to -- at some point in

9   time you received that document, didn't you?

10  A.   I did.

11  Q.   And you received an Exchange Agreement?

12  A.   Yes.

13  Q.   Proposed Exchange Agreement?

14  A.   Correct.

15  Q.   With Benistar's name on it?

16  A.   Correct.

17  Q.   You received a proposed Escrow Agreement with

18  Benistar's name on it?

19  A.   Yes.

20  Q.   You received a proposed selection form of three or

21  six percent with Benistar's name on it?

22  A.   Correct.

23  Q.   And that was given to you by Mr. Paley?

24  A.   No, that was given to me by Mr. Carpenter.

25  Q.   Okay.  Mailed to you?

1  A.   I believe it was Federal Expressed, yes.

2  Q.   Okay.  Now, those documents were sent to you prior

3  to the time that you had a conversation, the first

4  conversation, with Mr. Carpenter?

5  A.   Yes.

6  Q.   Okay.  And to be fair, you had two conversations

7  with him, right?

8  A.   I believe.

9  Q.   Okay.  Now, the first conversation with

10 Mr. Carpenter took place on October 21st of 1998; is

11 that right?

12 A.   Correct.

13 Q.   And that conversation, to the best of your memory,

14 lasted about an hour; is that fair to say?

15 A.   Yes.

16 Q.   And half of that time it was a three-way

17 conversation between you and Mr. Levine, right?

18 A.   And Mr. Carpenter, yes.

19 Q.   Exactly, you, Mr. Levine, and Mr. Carpenter.

20      So -- just so we can get the logistics of this,

21 you spoke with -- Mr. Carpenter called you back after

22 you placed a call to him, and you engaged in

23 conversation about items that we'll go into in a moment,

24 and somewhere in the middle of that conversation, he

25 either put Mr. Levine on the phone or he called you back

PDF created with pdfFactory trial version www.pdffactory.com

1    with Mr. Levine on the phone; is that fair to say?

2    A.    Correct.

3    Q.    And that's been your testimony?

4    A.    Yes.

5    Q.    Okay.

6          Okay.   Sir, you testified on direct examination

7    that in that conversation, the initial conversation with

8    Mr. Carpenter, you were concerned about two items,

9    right?

10   A.    I believe so.

11   Q.    Okay.   And those two items were you wanted to get

12   information as to where the funds would be held,

13   correct?

14   A.    Correct.

15   Q.    And specifically, you wanted to get information

16   about how the account would be set up?

17   A.    Correct.

18   Q.    Because, as a lawyer, you understood that in order

19   to be eligible for this tax-deferral status, the account

20   could not be in the name of your client or yourself, but

21   rather had to be in the name of a qualified

22   intermediary?

23   A.    Correct.

24   Q.    And during your conversation with Mr. Carpenter, did

25   you learn that he had never done a property exchange?

1    A.   I either learned it during the conversation or knew

2    it before.

3    Q.   Or knew it before.

4         So that, essentially, while he was a lawyer,

5    this was his -- this was his maiden voyage with respect

6    to 1031s, right?

7    A.   Yes.

8    Q.   And you knew that while you were speaking with him?

9    A.   Yes.

10   Q.   So that caused you to be doubly concerned that you

11   got the correct answers to your questions, right?

12   A.   Yes.

13   Q.   And as a result, Mr. Carpenter gets Mr. Levine on

14   the phone, right?

15   A.   Right.

16   Q.   Because you raise these issues with him, he said --

17   he said, I don't know what this is going to be, let me

18   put you in touch with the account representative at

19   Merrill Lynch, right?

20   A.   Basically to say he didn't know the exact mechanics.

21   He said let's get Jerry Levine on the line and he'll

22   explain it.

23   Q.   Right.  He didn't offer to explain it.  He said

24   let's get it straight from the horse's mouth, right?

25   A.   Right.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   So he puts Levine on the line, or he calls you back
2  with Levine on the line?
3  A.   Mm-hmm.
4  Q.   And then you have a conversation with Mr. Levine,
5  right?
6  A.   Right.
7  Q.   No question that conversation occurred, right?
8  A.   Right, no question.
9  Q.   And it was important to you, wasn't it, that you
10 explain to Mr. Levine the mechanics of a 1031 exchange?
11 A.   The major elements of it, yes.
12 Q.   That was important to you?
13 A.   Yes.
14 Q.   Because he was representing the company that was
15 actually holding the money, right?
16 A.   Correct.
17 Q.   And in your conversation, therefore, you gave
18 Mr. Levine a summary of a 1031 transaction, right?
19 A.   Generally, yes.
20 Q.   And you explained to him -- you made it very, very
21 clear to Mr. Levine that this money was your client's
22 money, right?
23 A.   Yes.
24 Q.   No question about that, right?
25 A.   No question.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.    You wanted him to know that this wasn't Benistar's

2   money, this was your client's money, right?

3   A.    Right.

4   Q.    And it's also fair to say, sir, that in that

5   conversation with Mr. Levine and Mr. Carpenter, you told

6   Mr. Levine that neither you nor your client's name could

7   appear anywhere on those accounts, right?

8   A.    Correct.

9   Q.    And there's no question about that, right?

10   A.    Right.

11   Q.    And you would agree with me, would you not, that by

12   the end of your conversation, Mr. Levine understood that

13   Benistar was holding money of your client, right?

14   A.    I believe so.

15   Q.    There isn't any issue in your mind about that,

16   right?  Mr. Levine knew that?

17   A.    I told him that on the phone, yes.

18   Q.    And again, your interaction with Mr. Levine

19   describing these issues, and Mr. Carpenter, was

20   approximately half of an hour, right?

21   A.    Approximately, yes.

22   Q.    Now, did you ask Mr. Levine about the various

23   accounts in that conversation?

24   A.    I'm not sure if I asked him about the accounts,

25   because I had known from Martin Paley that there were

1    two accounts, that there was a three percent account and

2    there was a six percent account --

3    Q.   Right.

4    A.   -- at Merrill Lynch.

5    Q.   And did you specifically address those issues with

6    Mr. Levine at that time; that is, on October 21st in

7    your three-way conversation?  Do you have a recollection

8    of it?

9    A.   I'm sure that it was discussed.  I don't remember

10   the -- how much detail.

11   Q.   Okay.

12   A.   I went into it, and he responded.

13   Q.   Now, sir, after that conversation with Mr. Levine,

14   you got his phone number?

15   A.   Yes.

16   Q.   And you got his private line at Merrill Lynch?

17   A.   I believe so.

18   Q.   And Mr. Carpenter encouraged you to do that, didn't

19   he?

20   A.   He certainly didn't discourage me.

21   Q.   Okay.  And because you wanted to be sure that you

22   had a contact at Merrill Lynch and the best contact was

23   the person who was setting up these accounts and

24   managing them for Benistar, right?

25   A.   Right.

1   Q.   Even though your name couldn't appear and your
2   client's claim couldn't appear, right?
3   A.   Right.  Also I got his -- he gave me his fax number
4   so I could send the documents to him.
5   Q.   And you got his secretary's name, Jeanine?
6   A.   Yes.
7   Q.   Is that fair to say?
8   A.   Yes.
9   Q.   Now, let's direct your attention, sir, to the
10  following day, October 22nd.  Okay?
11       MR. PAPPALARDO:  May I approach, your Honor?
12       THE COURT:  All right.
13  BY MR. PAPPALARDO:
14  Q.   Sir, I put a document in front of you.
15       (Discussion off the record.)
16  A.   This is a copy of my billing record -- of my
17  telephone records for November, October of 1998.
18  Q.   Right.
19       MR. MITCHELL:  Your Honor, we have no objection
20  to this document.
21       MR. PAPPALARDO:  These were previously admitted
22  de bene, your Honor.
23       THE COURT:  All right.
24       MR. PAPPALARDO:  We would offer them, your
25  Honor.

1          THE COURT:  Okay.

2          (Exhibit 402 received into evidence.)

3    BY MR. PAPPALARDO:

4    Q.   Specifically, Mr. Patterson, could I direct your

5    attention to page 4?

6          MR. PAPPALARDO:  Can you put up the last page of

7    the document?

8          And if you would, Gerald, please highlight entry

9    1.

10   Q.   Now, sir, on the 22nd of October, sometime at 10:22

11   in the morning, you had another call with Mr. Levine,

12   did you not?

13   A.   Or with his -- with his office, yes.

14   Q.   Well, you remember having another call with

15   Mr. Levine, the same person you spoke with the day

16   before, right?

17   A.   I believe I did.

18   Q.   And that call was, according to these records -- by

19   the way, do you have an independent memory of that

20   number being Mr. Levine's?

21   A.   I don't.

22   Q.   You don't.  You've testified about this before

23   though, haven't you?

24   A.   Yes, I have.

25   Q.   Okay.  And you recall previously testifying that

PDF created with pdfFactory trial version www.pdffactory.com

1  that was Mr. Levine's number?

2  A.   I have it written down, so --

3  Q.   And the call lasted 10.5 minutes?

4  A.   Correct, yes.

5  Q.   And you weren't on hold for 10.5 --

6  A.   I'm sorry?

7  Q.   You weren't on hold, were you, sir?

8  A.   No.

9  Q.   And the reason why you called the following day was

10  because you wanted to see the Merrill Lynch account

11  forms that were to be used for your client's benefit;

12  isn't that right?

13  A.   Correct.

14  Q.   And you made that request of Mr. Levine, didn't you?

15  A.   I did.

16  Q.   And what did he say to you?

17  A.   He said it would be their standard forms, but he

18  offered to send me a copy.  I asked for a copy of the

19  actual account signatory forms, signatory cards, and he

20  said he would fax it to me.

21  Q.   Okay.  And did you mention to him in that phone

22  call, did you reinforce the idea that these monies were

23  your client's monies?

24  A.   I don't know if I reinforced it again.

25  Q.   Okay.  And it's fair to say, sir, is it not, that

PDF created with pdfFactory trial version www.pdffactory.com

1    shortly after this phone call you received a fax?

2    A.    I did.

3    Q.    And that fax was from Mr. Levine, right?

4    A.    Yes.

5          MR. PAPPALARDO:  Could we publish Exhibit 408,

6    your Honor?  I believe it's in.

7          THE COURT:  Okay.

8    BY MR. PAPPALARDO:

9    Q.    Sir, you see that on the screen?

10   A.    I do.

11   Q.    And this is a fax from Gerald Levine to you on

12   October 22nd of 1998 at 10:47 a.m., right?

13   A.    Correct.

14   Q.    And --

15   A.    I don't have the time on this.

16   Q.    If you look at the upper left-hand corner, you see

17   the fax notation and the time?

18   A.    Yes.

19   Q.    Is that fair to say?

20         And he is sending you account forms, right?

21   A.    Correct.

22   Q.    And he asked you -- I'm sorry, he's sending you the

23   WCMA master financial service account and subaccount

24   forms, right?

25   A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   And you made it plain to him the day before, did you

2  not, that these -- this was something that was important

3  to you, right?

4  A.   I did.

5  Q.   And were these the forms you requested, sir?

6  A.   Well, they were the account forms that he said he

7  was going to use, so to the extent that I requested the

8  forms he was going to use, they were the forms I

9  requested.

10 Q.   Okay, fair enough.  Fair enough.

11          So he sends you this -- he sends you this

12 package, right?

13 A.   Correct.

14 Q.   And what, if anything, did he do with the package?

15 What do you do with this?

16 A.   With the fax that I received?

17 Q.   Right.

18 A.   I read it --

19 Q.   Yes.

20 A.   And then we had the closing that afternoon.

21 Q.   Right.  And the point, sir, is that -- at this point

22 in time, as a lawyer, as a real estate lawyer, you have

23 events going on, the world is still turning, right?

24 A.   Right.

25 Q.   And even though you're having conversations with

PDF created with pdfFactory trial version www.pdffactory.com

1    Gerald Levine, the closing is taking place, right?

2    A.    Correct.

3    Q.    And by "the closing," I mean the selling of the

4    property that would generate the proceeds that would be

5    in play for eligibility for 1031, right?

6    A.    That's right.

7    Q.    And so that was happening that afternoon?

8    A.    Correct.

9    Q.    Okay.  And it wasn't going to wait for you to, you

10   know, continue -- whether or not you continued faxing

11   back and forth to Mr. Levine or Mr. Carpenter, that sale

12   was going to occur, right?

13   A.    Yes.

14   Q.    And after receiving this, did you send something to

15   Mr. Levine?

16   A.    I'm not sure.  Before I left for the closing?

17   Q.    Okay.  You left for the closing.

18   A.    Right.  After the closing I sent him something, but

19   between receiving this and the closing, I don't know if

20   I sent him anything.

21   Q.    Exactly.  So you have the closing -- do you remember

22   when -- approximately when that was on the 23rd?

23   A.    2:00 or 3:00 in the afternoon.

24   Q.    And after the closing, sir, did you then send

25   something to Mr. Levine?

1    A.    Yes, I did.

2    Q.    And what did you send to him?

3    A.    I sent him the signed Escrow and Exchange

4    Agreements.

5    Q.    Okay.

6    A.    I believe I also faxed him a copy of the check.

7    Q.    Okay.  And when you say you sent it to him, how did

8    you send it to him?

9    A.    It would have been by fax.  I don't remember if I

10   also sent a copy by mail.

11         (Discussion off the record.)

12   Q.    Sir, could you look at Exhibit 142 that's in

13   evidence?

14         MR. PAPPALARDO:  May that be displayed, the

15   front page of that?

16   Q.    Do you see that, sir?

17   A.    I do.

18   Q.    This is what you testified about on direct

19   examination?

20   A.    Correct.

21   Q.    This is a fax transmission on October 23rd, right?

22   A.    Correct.

23   Q.    And you say, Enclosed please find one fully executed

24   copy of the Escrow Agreement under which the funds will

25   be held.  Also included are the Exchange Agreement and

PDF created with pdfFactory trial version www.pdffactory.com

1  the wiring instructions, right?

2  A.    Right.

3  Q.    That's what you faxed to Mr. Levine?

4  A.    Correct.

5  Q.    Right?

6         Sir, if you look at the last page of this

7  document -- do you see that?

8  A.    It's my fax cover sheet.

9  Q.    Right.  And this is a fax cover sheet dated October

10 23rd, right?

11 A.    Correct.

12 Q.    To Jerry Levine?

13 A.    Correct.

14 Q.    And you also sent this same package by first class

15 mail, right?

16 A.    I did.

17 Q.    And that's clear from the check mark?

18 A.    Correct.

19 Q.    And that would be your usual practice anyway in

20 matters such as this, right, send by fax and by first

21 class mail?

22 A.    Usually, but there may be sometimes that I might

23 send just by fax, but if I -- most of the time I would

24 want to send it by first class mail.

25 Q.    Okay.  But in this case, you did both?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   I did.
 2   Q.   And if we could, sir, let's go back to Exhibit 402.
 3            MR. PAPPALARDO:  Can we display that?
 4            Again, the last page.  Could you highlight item
 5   22?
 6   Q.   Do you see that, sir?
 7   A.   I do.
 8   Q.   And is it fair to say that, given the originating
 9   number and given the location, this is evidence of the
10   fax that went to Mr. Levine on the 23rd of October of
11   1998?
12   A.   It is.
13   Q.   Okay.
14            Now, sir, let's go back to -- let's go back to
15   142.
16            The first page of the exhibit, on the face of it
17   you say, after Mr. Levine, re: exchangor, Jane Carey,
18   your client, right?
19   A.   Yes.
20   Q.   And you had previously said to Mr. Levine, certainly
21   on October 21st, when you had the three-way
22   conversation, that that was the name of your client,
23   right?
24   A.   Yes.
25   Q.   And you have it here on the fax on the 23rd, right?
```

1    A.    Yes.

2    Q.    And let's look at the second to last page of this

3    package of documents that you faxed and sent by first

4    class mail to Mr. Levine.

5              This is the wire transfer instruction.  Do you

6    see that?

7    A.    I do.

8    Q.    And you're indicating that this is where, once a

9    request was made by you, the wiring -- the monies would

10   be wired to the Mellon Bank, right?

11   A.    Correct.

12   Q.    And it's clear that at the bottom here you have

13   again, the exchangor's name, Jane W. Carey, right?

14   A.    Correct.

15   Q.    And the case number Benistar Property Exchange case

16   number, right?

17   A.    Right.

18   Q.    No secret in your mind that you are representing

19   Ms. Carey, that these are client funds and you were

20   being open with that respect to Mr. Levine, right?

21   A.    Right.

22   Q.    And that was important to you, wasn't it?

23   A.    It was.

24   Q.    Okay.  Sir, did you have any further contact with

25   Mr. Levine?

1    A.    I'm not sure that I did.

2    Q.    Based upon the exchange of faxes, based upon the --

3    between you and Mr. Levine, based upon the two phone

4    conversations, you were satisfied that your questions

5    were answered, being direct contact with the -- with

6    Merrill Lynch, right?

7    A.    Correct.

8    Q.    Okay.

9    A.    I felt my client was protected.

10   Q.    You felt your client was protected.   Okay.

11          Now, sir, let's go to Exhibit 408.   We looked at

12   that a bit earlier.

13          These were the forms that -- these were the

14   forms that Mr. Levine sent you, right?

15   A.    Yes.

16   Q.    Okay.

17          At the bottom of the form on the last two lines,

18   do you see those?

19   A.    Yes.

20   Q.    "Investor credit line service, check here."   Do you

21   see that?

22   A.    Yes.

23   Q.    Do you see, "if the customer agrees to establish a

24   WCMA subaccount," right?

25   A.    Yes.

1    Q.   You had -- you were sent these documents by
2    Mr. Levine, right?
3    A.   Correct.
4    Q.   Do you see where it says that this subaccount might
5    have something to do with margin credit?
6    A.   I see that, yes.
7    Q.   And did that concern you when you received this
8    document?
9    A.   When I saw the document, I felt that it was not
10   particularly responsive to my request, it looked like a
11   standard broker's account form.
12   Q.   Mm-hmm.
13          Well, did you ever -- did you ever ask
14   Mr. Levine about what that meant, margin credit?
15   A.   No.
16   Q.   Did you ever ask Mr. Carpenter what that meant?
17   A.   No.
18   Q.   What does it mean?
19   A.   I'm sorry?
20   Q.   Do you know what it means?
21   A.   Yes, funds are borrowed on credit.
22   Q.   Right.  Margin accounts, options, right?
23   A.   Right.
24   Q.   Now, let's look at 402.  I'm sorry.
25          (Discussion off the record.)

1    Q.   Let's look back at 408, that's the package of the

2    four documents.

3            (Discussion off the record.)

4    Q.   Sir, I'll tell you what, let's go back to 142.  This

5    is your fax to Mr. Levine.  Okay?

6    A.   Yes.

7    Q.   And we'll go from there.

8            MR. PAPPALARDO:  If this could be published on

9    the --

10   Q.   The first document in here is the Escrow Agreement,

11   sir?

12   A.   It is.

13   Q.   Okay.  And if you look at -- if you look at the

14   third paragraph down, which begins with "Whereas"?

15   A.   Yes.

16   Q.   This was the agreement that was signed by

17   Mr. Carpenter and by your client, right?

18   A.   Correct.

19   Q.   This is a document that you reviewed?

20   A.   Correct.

21   Q.   Okay.  This is a document that Ms. Carey's

22   accountant reviewed?

23   A.   Probably not.

24   Q.   Okay.  This is the Escrow Agreement, right?

25   A.   Yes.

1    Q.   You see where it says, in the third paragraph, that

2    "Whereas exchangor will be depositing with Benistar an

3    amount of funds to be deposited in the Benistar accounts

4    at Merrill Lynch."  Correct?

5    A.   It's numbered three?

6         Yes.

7    Q.   Accounts in the plural?

8    A.   Yes.

9    Q.   In your discussions with Mr. Levine, either with

10   Mr. Carpenter on the phone or with Mr. Levine by

11   yourself, did you ever determine that the main account

12   was the investor trading account and the other account

13   was the subaccount?

14   A.   No.

15   Q.   You didn't.  Okay.

16        Let's go down to paragraph 2 -- I'm sorry, point

17   number 2, "Benistar shall have full control."  Do you

18   see that?

19   A.   Correct.

20   Q.   What that says is that Benistar shall have full

21   control over the exchangor's funds to invest as the

22   exchangor directs in either the three percent account or

23   the six percent Merrill Lynch investment account, right?

24   A.   Yes.

25   Q.   And by signing this document, you gave Benistar full

PDF created with pdfFactory trial version www.pdffactory.com

```
1    control to invest in the six percent -- in a six percent
2    investment account, right?
3    A.   In the six percent Merrill Lynch investment account,
4    yes.
5    Q.   Right.   Right.
6         What you were looking for was a return of six
7    percent, right?  That was your election form, right?
8    A.   Yes, I was looking for the funds to be held safely
9    in the Merrill Lynch investment account that paid six
10   percent.
11   Q.   Well, was there a Merrill -- I mean, did you ask
12   Mr. Levine about a Merrill Lynch investment account that
13   paid six percent?
14   A.   I believe I had conversations at some point either
15   with Martin Paley or with Gerald Levine, and they led me
16   to believe that there was a specific account at Merrill
17   Lynch that paid six percent.  That there were two
18   accounts, one paid three percent -- that these were
19   specific accounts that paid either three percent or six
20   percent.
21   Q.   Now, sir, isn't it true that you were told by
22   Mr. Levine that there was a three percent Ready Asset
23   money market account, right?
24   A.   That was the name of the account, yes.
25   Q.   And that was a specifically named account, right,
```

1    for three percent, right?

2    A.    Yes.

3    Q.    Okay.

4    A.    As was --

5    Q.    And this says an investment account which yields six

6    percent.  It doesn't specify a particular account, dos

7    it, sir?

8    A.    It does not.

9    Q.    Okay.

10        Let's move on, sir -- let's move on to the

11   Exchange Agreement, which is in this package.

12        You see paragraph 10?

13   A.    Yes.

14   Q.    Okay.  And what that says is that the exchangor and

15   the intermediary expressly agree that any cash proceeds

16   received from the disposition of the relinquished

17   property shall be held and invested with Merrill Lynch

18   Private Client Group in either three percent annum in a

19   Merrill Lynch Ready Asset money market account, right?

20   A.    Yes.

21   Q.    Or a six percent annum in a Merrill Lynch investment

22   account, right?

23   A.    Yes.

24   Q.    It doesn't designate what kind of investment

25   account, dos it?

1  A.   My understanding was there was a three percent

2  account, it was an account called the Merrill Lynch

3  Ready Asset Money Market Account.

4  Q.   Right.

5  A.   That paid three percent.

6  Q.   Right.

7  A.   That there was a similar account, one specific

8  account called the Merrill Lynch Investment Account.  I

9  know those are general terms, but that was my

10  understanding, was that there was -- it was a specific

11  account.

12  Q.   Sir, put aside your understanding for a second, what

13  does this say?  Does this say a specific account?

14  A.   It says in a Merrill Lynch investment account.

15  Q.   Right.  In a Merrill Lynch investment account,

16  right?

17  A.   Right.

18  Q.   Sir, let's go back -- let's go back to the document

19  that you received from Mr. Paley at Nationwide when he

20  was with Nationwide.  Do you remember that, the one that

21  you just glanced at and rejected?

22  A.   Yes.

23  Q.   Okay.  I believe --

24        (Discussion off the record.)

25  Q.   Let's look at Exhibit 333.

PDF created with pdfFactory trial version www.pdffactory.com

1          And on this document, sir, I direct your

2     attention to paragraph 9.

3          Sir, you will agree, as you've testified, that

4     this is what Mr. Paley initially sent to you that you

5     basically just glanced over because it didn't say

6     "Benistar," it says "Nationwide," right?

7     A.   Correct.

8     Q.   And you would also agree with me, as a lawyer, that

9     paragraph 9 in this document is the functional

10    equivalent of paragraph 10 in the document that you --

11    your client ultimately signed, right?

12    A.   I'd have to read it, read them both carefully.

13    Q.   Well, let's -- this deals with an election of

14    various accounts, right?

15         Let me direct your attention to where it says --

16    under paragraph 9 -- if this could be highlighted -- the

17    second sentence -- excuse me, the third sentence.

18    Beginning with "exchangor."

19         Okay.  Do you see that, sir?

20    A.   I do.

21    Q.   Now, what this document said, which isn't the

22    document you signed, what this document says is that

23    "The exchangor and the intermediary expressly agree that

24    any cash proceeds received from the disposition of the

25    relinquished property shall be held and invested in

PDF created with pdfFactory trial version www.pdffactory.com

1    certificates of deposit, cash management, working

2    capital or money market accounts, bankers acceptance or

3    U.S. obligations in the discretion and through the

4    financial institutions of the intermediary."    Right?

5    A.    That's what it says.

6    Q.    Those are specifically designated types of

7    investments, right?

8    A.    Some of them are, working capital, cash

9    management -- no, I guess they're specific accounts.

10    Q.    Right.    Working capital or money market accounts,

11    right?

12    A.    Yes.

13    Q.    Okay.    And this wasn't the agreement that you

14    signed.    You said -- the agreement that was signed by

15    you said that Benistar shall be have the full authority

16    to invest as long as they return six percent to you, and

17    that's what happened, right?    You received your --

18    excuse me, your client received her six percent?

19    A.    They had full signatory power.    They didn't have

20    full authority to invest however they wanted to invest.

21    Q.    Well -- well, I'll ask you, sir, to look at the

22    investment document and tell me what limits their

23    authority.

24    A.    Are you talking the Escrow Agreement, Exchange

25    Agreement --

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Whatever agreement you'd like, pick one out.

2    A.    The Account-Selection Form.

3    Q.    Right.

4    A.    Referred specifically to two Merrill Lynch accounts,

5    one was the three percent Merrill Lynch Ready Asset

6    money market account, and then the other was the Merrill

7    Lynch investment account.

8    Q.    A Merrill Lynch -- the Merrill Lynch investment

9    account?

10   A.    Yes.

11   Q.    Does it say what account it was?

12   A.    No, it says it's an account that pays six percent.

13   Q.    Right.  And there are many ways to invest the money

14   at Merrill Lynch and get a six percent return, isn't

15   there?

16   A.    There may be ways to do it.  My understanding was

17   there was one particular account that they would

18   guarantee that they would pay six percent.

19   Q.    And, sir, did you ever raise that understanding with

20   Mr. Carpenter?

21   A.    I didn't go into those details with him, no.

22   Q.    And did you ever raise that understanding with

23   Mr. Levine, who works at Merrill Lynch?

24   A.    No, I didn't feel I needed to because I knew that it

25   was my client's funds that were needed to go back to my

PDF created with pdfFactory trial version www.pdffactory.com

1    client in 180 days.

2    Q.    Right.   Right.   But is this -- so --

3    A.    It's not there for Benistar to invest as they saw

4    fit.

5    Q.    Right.   Well, doesn't it say --

6    A.    It's to be put into a Merrill Lynch account and it

7    was to be parked there, it was going to pay six percent,

8    and it was going to be paid back to Ms. Carey after 180

9    days.

10   Q.    Sir --

11   A.    And the percent --

12   Q.    Sir, do you remember I just showed you the account

13   opening forms --

14   A.    Yes.

15   Q.    -- at Merrill Lynch?  And you would agree, sir, that

16   the account opening forms say on their face that it

17   includes margins?

18   A.    Right, it does.

19   Q.    It does.  And there's nothing in those documents

20   that would prevent anybody from engaging in margins.  It

21   says -- it says, does it not, that Benistar will have

22   the full control to invest at their discretion, doesn't

23   it?

24   A.    That's what those forms say.

25   Q.    That's what those forms say.  That's the document

PDF created with pdfFactory trial version    www.pdffactory.com

1    that was signed, isn't it?

2    A.    I don't know that that account form was signed.

3    That was what -- that was what Mr. Levine sent me three

4    hours before the closing.  That's why I sent him and

5    made perfectly clear to him that these were escrow funds

6    that belonged to Jane Carey, not to Benistar to invest

7    as they saw fit.

8    Q.    Right.

9    A.    Now, he sent me forms that were their standard

10   forms, but that's why it was important that he see the

11   actual Exchange Agreement and he see the actual Escrow

12   Agreement and that he understand fully the funds belong

13   to my client.

14   Q.    Sir, we read the operative language of the Escrow

15   Agreement that says Benistar can invest as -- has the

16   full authority to invest, right?

17   A.    In two specific accounts as directed by the client.

18   Q.    Sir, the six percent account doesn't say a specific

19   account, it says a six percent investment account?

20   A.    It says the six percent Merrill Lynch investment

21   account.

22   Q.    Sir, did you see the Escrow Agreement that said

23   Benistar shall have the full authority to invest?

24   A.    In those two accounts, yes.

25   Q.    And is there anything --

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. PAPPALARDO:  That's enough.  Thank you.

2          THE COURT:  Redirect?

3          MR. MITCHELL:  Yes.  Very briefly, your Honor.

4                    REDIRECT EXAMINATION

5    BY MR. MITCHELL:

6    Q.  Mr. Patterson, Mr. Pappalardo asked you a series of

7    questions about Defense Exhibit 408 where there's an

8    open check.

9          MR. MITCHELL:  Gerard, is it possible to put

10   that up on the screen?  I don't have access to defense

11   exhibits.  It's 408.

12         Just turn to the second page.

13   Q.  Okay.  You see the language down at the bottom that

14   Mr. Carpenter was directing you, if the customer -- it

15   says?  Check here if the customer agrees to establish

16   the WCMA subaccount with the investor credit line

17   services (margin)."  Do you see that?

18   A.  I do.

19   Q.  That's where it says the word "margin"?

20   A.  Yes.

21   Q.  Was that checked when you got it?

22   A.  No.

23   Q.  Did anybody discuss checking it?

24   A.  No.

25   Q.  Mr. Pappalardo asked you what that margin, reference

PDF created with pdfFactory trial version www.pdffactory.com

1  to margin meant options.  Do you remember that question?

2  A.   Yes.

3  Q.   Did anybody, Jerry Levine, Daniel Carpenter,

4  anybody, tell you that your client's money would be

5  invested in stock options?

6        MR. PAPPALARDO:  Objection.

7  A.   Absolutely not.

8        THE COURT:  Overruled.

9  BY MR. MITCHELL:

10 Q.   If you had been told -- Mr. Pappalardo asked Cod you

11 did that concern you, referring to that margin credit

12 reference, did that concern you when you received it?

13 Do you remember when he asked you that?

14 A.   Yes.

15 Q.   If you had been told that your client's money would

16 have been invested in stock options, would you have

17 advised her to go forward with this deal?

18        MR. PAPPALARDO:  Objection to that.

19        MR. MITCHELL:  The door is open to this, your

20 Honor.

21        THE COURT:  I'll allow it.

22 A.   I would have strongly advised her not to.

23        MR. MITCHELL:  Thank you.  That's all.

24        THE COURT:  All right.  Mr. Patterson, I think

25 that completes your testimony.  Thank you.  You may be

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    excused.  We'll take the morning recess.

 2              (Recess taken.)

 3              THE CLERK:  All rise.

 4              Please be seated.

 5              MR. PAPPALARDO:  Your Honor, I believe under the

 6    case law -- I believe I should raise this at this

 7    time -- but we would be moving for a mistrial based upon

 8    previous witnesses' testimony under a First Circuit case

 9    in 2007, U.S. versus Mangual/Garcia.  Specifically, your

10    Honor, the government may not knowingly use false

11    evidence, including false testimony, to obtain a

12    conviction regardless of whether the prosecutor solicits

13    the false evidence or allows false evidence to go

14    uncorrected when it appears.  Obviously, this violates

15    the defendant's right to due process.  And the standard,

16    your Honor, is if the false testimony could in any

17    reasonable likelihood have affected the judgment of the

18    jury.

19              I would submit to the Court that at the

20    beginning of this trial the government put on a witness

21    by the name of Gerald Levine.  And Mr. Levine testified

22    to a lot of things.  One of the things he testified to

23    was that he never had -- not that he didn't remember,

24    but that he never had a conversation with Martin Paley;

25    another thing that he said on direct examination and
```

PDF created with pdfFactory trial version www.pdffactory.com

1    cross-examination was that he never had a conversation

2    with David Patterson, an attorney in Boston.

3         I submit to the Court that all three were

4    government witnesses.  Mr. Levine not only denied the

5    existence of the conversation, which in itself is a

6    serious problem, but not only that, denied obviously the

7    content of any of the conversations.  And we

8    specifically asked him each and every question including

9    what was the elicited today from Mr. Patterson, that he

10   knew that they were clients' funds, that he knew these

11   were property exchanges, that he knew that it was

12   important to various individuals, that he knew anything

13   about 1031 exchanges.

14        The government can't have it both ways, your

15   Honor.  When the government puts on Mr. Levine and

16   testifies to that, the government either has to withdraw

17   Mr. Levine or correct the testimony.  It's not simply a

18   case where there are differing recollections of events.

19   I would submit to the Court that Mr. Levine's testimony

20   goes to the heart of this case, particularly in terms of

21   his interactions with Mr. Carpenter, particularly into

22   the state of mind of Merrill Lynch at the time he was

23   the representative of Merrill Lynch.  He set up these

24   accounts.

25        And I submit to the Court -- I mean, the

1    government has made a big deal throughout this case Mr.

2    Carpenter moved money around between Merrill Lynch

3    accounts, and he can't do that without permission.

4    Putting aside whether I think he could do that or the

5    documents permit him to do that, that's their argument,

6    your Honor, and this comes in through Levine.

7         I would suggest, your Honor, that it is

8    improper, it is prejudicial and it is grossly

9    inappropriate for the government to attempt to let this

10   case go to the jury with the testimony of David

11   Patterson, which, by the way, I point out, they knew in

12   advance of this trial; which, by the way, is backed up

13   by independent corroborating documentation, including

14   phone books -- excuse me, phone records, including

15   billing records, including faxes, including letters

16   which clearly show that these events occurred.

17        Your Honor, Mr. Paley is simply a matter of

18   memory.  There's nothing going back and forth except

19   Mr. Paley's memory, although he was unequivocal about

20   this, too.  I submit to the Court what has occurred here

21   is grossly improper, and for that reason I would ask for

22   a mistrial.

23        THE COURT:  All right.  To the extent the

24   timeliness of the objection is --

25        MR. PAPPALARDO:  That's my point, your Honor.

1          THE COURT:  -- required, you have made the

2     timely objection and we'll reserve further discussion on

3     it, including what the government has to say about it,

4     until an opportune time.  I would like to finish with

5     the witness.

6          And your rights in that respect are saved.

7          MR. PAPPALARDO:  Thank you, your Honor.

8          THE COURT:  All right.  So are we ready for

9     Mr. Johnston?

10         MR. MITCHELL:  We are.

11         (Pause.)

12         THE CLERK:  All rise for the jury.

13         (Jury in at 11:29 a.m.)

14         THE CLERK:  Please be seated.

15         MR. MITCHELL:  Thank you, your Honor.

16         The United States calls Jeffrey Johnston.

17         (The witness is sworn.)

18         THE CLERK:  Please be seated.  State your name,

19     spell your last name for the record, keep your voice up

20     and speak into the mic.

21         THE WITNESS:  Jeffrey Johnston, J-O-H-N-S-T-O-N.

22                    DIRECT EXAMINATION

23     BY MR. MITCHELL:

24     Q.  Good morning, Mr. Johnston.  Sir, can you tell us

25     where you live?

```
 1    A.    41 Phillips Street, Boston, Massachusetts.

 2    Q.    How long have you lived in Boston?

 3    A.    Twelve years.

 4    Q.    And are you married, sir?

 5    A.    I am.

 6    Q.    Do you have any children?

 7    A.    Two.

 8    Q.    What do you do for a living?

 9    A.    Real estate investment and development.

10    Q.    And is that for a particular company?

11    A.    Cathartes Investment.

12    Q.    Where is Cathartes Investments located?

13    A.    85 Devonshire Street in Boston.

14    Q.    Sir, what is your educational background?

15    A.    University of New Hampshire undergrad; Northeastern

16    MBA; and MIT graduate -- graduate school.

17    Q.    Okay.  How long have you been in the real estate

18    business?

19    A.    Twenty years, twenty-two years.

20    Q.    Where did you start out?

21    A.    I started out with a company called the Flatly

22    Company.

23    Q.    What does the Flatly Company do?

24    A.    They're a regional real estate development company.

25    Q.    How long did you stay there?
```

```
1    A.    Four years.
2    Q.    What did you do there?
3    A.    I was a leasing agent.
4    Q.    What does a leasing agent do?
5    A.    Leases office space.
6    Q.    And after you left the Flatly Company, where did you
7    go?
8    A.    Graduate school.
9    Q.    Was at MIT?
10   A.    Correct.
11   Q.    And what was your degree there?
12   A.    Real estate -- it was a graduate degree in real
13   estate finance and development.
14   Q.    After you graduated, where did you go to work?
15   A.    It was a company called Tellerus (ph).
16   Q.    Where was that located?
17   A.    In New York City.
18   Q.    How long did you stay with Tellerus?
19   A.    One year.
20   Q.    What kind of company was that?
21   A.    It was a real estate technology start-up.
22   Q.    And what, in general, did it do?
23   A.    Collected real estate information.
24   Q.    And from Tellerus, where did you go?
25   A.    To Cathartes Investments.
```

1   Q.   What was your first position at Cathartes
2   Investments?
3   A.   I was an acquisition analyst.
4   Q.   What did you do in that position?
5   A.   I underwrote potential properties that the company
6   would buy.
7   Q.   How long did you remain an analyst?
8   A.   Approximately two or three years.
9   Q.   And after that?
10  A.   I kind of worked up the ranks into partnership role,
11  so I was -- I just took on more responsibilities.
12  Q.   Are you a partner there now?
13  A.   I am.
14  Q.   Can you describe for the jury what generally your
15  job entails as partner at Cathartes?
16  A.   Continue the acquisition transactions, some
17  development management, and work -- I have some
18  corporate things that I need to take care of as well.
19  Q.   And what kinds of transactions are involved in the
20  regular course of business?
21  A.   Buying and selling properties.
22  Q.   What kinds of properties?
23  A.   They range -- in developing companies, they range
24  the gamut.  They could be office buildings, industrial
25  buildings, hotels.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Is that in the Boston area or beyond?

2    A.    Yeah.  We like to call it New England Center.  It's

3    basically New England.

4    Q.    Have you ever engaged the services of a company

5    called Benistar Exchange Property Trust Company *[sic]*?

6    A.    I have.

7    Q.    Okay.  And when was that, sir?

8    A.    Who is that?

9    Q.    Benistar Property Exchange Trust Company, did you

10   ever use them for something?

11   A.    I did.

12   Q.    Okay.  When was that?

13   A.    When was that?  I didn't hear you.  Sorry.

14   Q.    Sorry.

15   A.    That was fall of 2000.

16   Q.    All right.  And why did you engage Benistar Property

17   Exchange Trust Company?

18   A.    As an intermediary to do a 1031 exchange.

19   Q.    Okay.  Was that for a specific piece of property?

20   A.    It was.  It was a condominium unit at a property

21   called Fort Point Place which is at 21 Wormwood Street.

22   Q.    Okay.  Is that south Boston?

23   A.    It's in south Boston, yeah.

24   Q.    And can you just describe the property a little bit

25   more?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yeah.  It was a loft renovation of 117 units.  It
2   was a residential condominium project.
3   Q.   Was that something you personally owned or was that
4   owned through Cathartes?
5   A.   It was a personal investment.  Cathartes was the
6   manager on it but I was buying it on my own account.  It
7   was a personal investment.
8   Q.   And when did you purchase the property itself?
9   A.   I think the closing was in November of 2000.
10  Q.   And could you just describe the nature of the
11  transaction?
12       Actually, let me back up a second.  Was the property
13  already built when you first sought to purchase it?
14  A.   It was a renovation or a rehab or renovation that we
15  were doing on behalf of a company called Beacon Capital,
16  so it was under construction during the, you know, late
17  1999-2000 time frame.
18  Q.   Okay.  And did you ever occupy this property?
19  A.   I did not.
20  Q.   Okay.  What were you attempting to do with it?
21  A.   I was going to sell it.  I was -- I just bought
22  it -- put it under contract early in the renovation, and
23  then I was hoping that the market would go up during
24  that time frame, which it did.
25  Q.   And when did you have it under agreement?

1    A.    It was, you know, early that fall, late the summer.

2    I think it was the fall, actually -- fall of 2000 --

3    just before the closing.

4    Q.    Okay.  And did the property go up in value between

5    the time you had purchased it and then sold it?

6    A.    From the time I had it under contract and the time I

7    closed on it, it had gone up in value.

8    Q.    Okay.  Did you meet somebody -- with somebody from

9    Benistar, sir?

10   A.    I did.

11   Q.    Who was that?

12   A.    Martin Paley.

13   Q.    Did you meet with him face to face?

14   A.    I did, at his office in Needham.

15   Q.    All right.  Was there anyone else there?

16   A.    No.

17   Q.    How long did that meeting last?

18   A.    An hour or so.

19   Q.    Okay.  And what was the purpose of the meeting?

20   A.    I was just conducting due diligence on the company

21   and a chance to understand -- I had never done a 1031

22   exchange before, so it was a chance to kind of learn

23   more about the business.

24   Q.    All right.  Did Mr. Paley present you with any

25   materials at this meeting?

1  A.   Yeah.  He went through a slide show on his laptop as

2  well as he gave me a copy of the slide, you know,

3  Benistar corporate folder.

4  Q.   I'm going to have you take a look at some documents

5  in front of you.  Would you take a look at Exhibits 118

6  through 121?  I show you 118 through 122.

7  A.   Okay.

8  Q.   Do you see those?

9  A.   Yup.  Yes.

10 Q.   Could you tell us what those are, if you recognize

11 them?

12 A.   Yeah.  These are all copies of the slides that were

13 provided to me at the meeting.

14 Q.   Which exhibit are you referring to, sir?

15 A.   It's 118.

16 Q.   All right.  And what about 119?

17 A.   These are just -- I don't know what you want to call

18 it -- corporate information, corporate -- it was part of

19 the corporate package he gave me.

20 Q.   Were these documents all part of the package he gave

21 you?

22 A.   Correct.

23       MR. MITCHELL:  At this time, your Honor, the

24 government would offer Government's 118 through 122.

25       MR. GREENBERG:  No objection, your Honor.

```
 1              THE COURT:  Okay.
 2              (Exhibit Nos. 118 through 122 received into
 3      evidence.)
 4      BY MR. MITCHELL:
 5      Q.   Is that 118 up there on the screen, Mr. Johnston?
 6      Do you see the screen in front of you?
 7      A.   I do now, yeah.
 8      Q.   Is that -- is that the slide show that we see there
 9      on the screen?
10      A.   Yes.
11      Q.   Did Mr. Paley go through that with you?
12      A.   Yes.
13      Q.   And the other exhibits are "Frequently Asked
14      Questions."  Do you see that up there?
15      A.   I do.
16      Q.   All right.  Did he go through that with you?
17      A.   He did.
18      Q.   And Exhibit 120?
19      A.   He went through that with me as well.
20      Q.   All right.  How about 121, did he go through that
21      with you?
22      A.   He went through that with me as well.
23      Q.   And the last one, "Legal Authority."  Do you see
24      that?
25      A.   Yeah.
```

```
 1   Q.   In the course of this transaction did you shop any
 2   other intermediaries?
 3   A.   I did.
 4   Q.   Okay.  What did you do?
 5   A.   I went online, I reviewed -- there was a group
 6   called Apex that had done some work -- had been a tax
 7   exchange agent in the area that I had looked at.
 8   Q.   Any others?
 9   A.   Not that I could remember.
10   Q.   All right.  As you were looking at doing a 1031
11   exchange, what aspects of the exchange, if any, were
12   important to you?
13           MR. GREENBERG:  Objection.
14           THE COURT:  Sustained.
15   BY MR. MITCHELL:
16   Q.   Did you ultimately go with Benistar?
17   A.   I did.
18   Q.   And were you sent certain contracts?
19   A.   I was.
20   Q.   I'll have you take a look at Government's Exhibits
21   123 to 127.
22   A.   Okay.
23   Q.   Do you see those?
24   A.   I do.
25   Q.   Okay.  Could you tell us what those are, by order?
```

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   By order?  In order?

2    Q.   Yeah.  Just 120 -- what's --

3    A.   123 is a copy of the Exchange Agreement.

4    Q.   Yup?

5    A.   '24 is a copy of the Escrow Agreement.

6    Q.   Yeah?

7    A.   '25 is the Exchange Fee Agreement; '26 is the

8    Account-Selection Form; '27 is the wire transfer

9    instructions.

10   Q.   Okay.  And these are all documents that were given

11   to you or that you completed in the course of conducting

12   your property exchange with Benistar?

13   A.   They were.

14        MR. MITCHELL:  Your Honor, at this time the

15   government would offer 123 through 127.

16        MR. GREENBERG:  No objection, your Honor.

17        THE COURT:  Okay.

18        (Exhibit Nos. 123 through 127 received into

19   evidence.)

20   BY MR. MITCHELL:

21   Q.   Okay.  Is that the Exchange Agreement up there?

22   A.   It is.

23   Q.   And does it identify you as being the exchangor?

24   A.   It does.

25   Q.   And the person, Liavin Mullen, as the purchaser of

1    the property?

2    A.    It does.

3    Q.    Do you see the Escrow Agreement there?

4    A.    I do.

5    Q.    Now, in your experience in the real estate industry,

6    are you familiar with the term "escrow"?

7    A.    I am.

8    Q.    All right.  Have you been involved in transactions

9    in which an escrow was used?

10          MR. GREENBERG:  Objection.

11          THE COURT:  Sustained.

12   BY MR. MITCHELL:

13   Q.    Exhibit 125:  Will you take a look at that?  Is that

14   the Exchange Fee Agreement?

15   A.    Yes.

16   Q.    And did you complete that?

17   A.    I did.

18   Q.    All right.  And the day you completed it was

19   November 15th of 2000?

20   A.    Yes.

21   Q.    I'll have you turn to Exhibit 126.  Do you see that

22   there?

23   A.    I do.

24   Q.    It says "Account-Selection Form"?

25   A.    Yeah.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Did you complete that?

2   A.   I did.

3   Q.   Did that give you a choice between accounts?

4   A.   It did.

5   Q.   In 3 percent or 6 percent accounts?

6   A.   Correct.

7   Q.   And you selected 6?

8   A.   I did.

9   Q.   Why did you select 6?

10          MR. GREENBERG:  Objection.

11          THE COURT:  Sustained.

12          MR. MITCHELL:  May I just have one moment here,

13  your Honor?

14          (Pause.)

15  BY MR. MITCHELL:

16  Q.   I'm going to ask you to flip back here to 119 and

17  ask you a question first:  Did anything that Martin

18  Paley tell you in the meeting differ from what you were

19  presented in the documents?

20          MR. GREENBERG:  Objection.

21          THE COURT:  You may answer that.  Yes or no?

22          THE WITNESS:  No.

23  BY MR. MITCHELL:

24  Q.   I'm going to direct your attention to -- do you see

25  119 up there?  Do you see page 2, what I'm highlighting

PDF created with pdfFactory trial version www.pdffactory.com

1    up there on the screen?

2    A.    Yes.

3    Q.    Where it says Merrill Lynch [sic] has accounts with

4    major banking and investment firms such as Merrill

5    Lynch?  I'll have you flip forward to the Escrow

6    Agreement -- actually, the Exchange Agreement.

7         Do you see Paragraph 10 of the Exchange Agreement?

8    A.    Yes.

9    Q.    Is there a financial institution named in that

10   provision?

11   A.    PaineWebber.

12   Q.    Okay.  Is that a different financial institution

13   from the one that's named in the Frequently Asked

14   Questions document that I just had you read from?

15   A.    It is.

16   Q.    Okay.  Did anybody explain to you why that was

17   different?

18   A.    No.

19   Q.    Mr. Johnston, in the course of your property

20   exchange, were you -- did you have the assistance of

21   counsel?

22   A.    I did.

23   Q.    And what was your attorney's name?

24   A.    Craig Gilmartin; Gilmartin, Magence & Ross.

25   Q.    And after you signed these agreements, did you have

PDF created with pdfFactory trial version www.pdffactory.com

1    any further communication with Benistar?

2    A.   I did.

3    Q.   And who did you speak to next at Benistar?

4    A.   There was a woman, Linda Jokinen, that kind of

5    handled the transaction after I met with Paley.

6    Q.   What did you speak to her about?

7         MR. GREENBERG:  Objection.

8         THE COURT:  Sustained.

9    BY MR. MITCHELL:

10   Q.   Did you receive any -- did you receive anything in

11   the mail from Benistar?

12   A.   Yes.

13   Q.   Okay.  If I could have you take a look at Exhibit

14   133 up there.

15   A.   Okay.

16   Q.   Do you recognize that document?

17   A.   I do.  It's a confirmation of funds from the closing

18   that had been put in the escrow.

19   Q.   Okay.  Is it a letter?

20   A.   It is a letter.

21   Q.   Yeah.  And who's it from?

22   A.   Linda Jokinen.

23   Q.   All right.  And it's to you?

24   A.   Correct.

25   Q.   Would you just tell us the date?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   November 24, 2000.

 2   Q.   Okay.  And are there documents attached to this?

 3   A.   Yes.  There's an identification of real property and

 4   it looks like just a fax confirmation that the fax went

 5   out.

 6   Q.   Okay.

 7        MR. MITCHELL:  At this time, your Honor, the

 8   government would offer Exhibit 133.

 9        MR. GREENBERG:  No objection.

10        THE COURT:  Okay.

11        (Exhibit No. 133 received into evidence.)

12   BY MR. MITCHELL:

13   Q.   Okay.  Do you see Exhibit 133 up there in front of

14   you, Mr. Johnston?

15   A.   I do.

16   Q.   Okay.  And you said that this confirms that they

17   had -- Benistar had received your money?

18   A.   Yes.

19   Q.   And does it indicate how much money you sent them?

20   A.   It does.

21   Q.   And can you tell us what that is?

22   A.   $541,930.74.

23   Q.   Okay.  And it says here that this money is accruing

24   interest at 3 percent.  Was that what you had selected?

25   A.   No, I selected 6 percent.
```

```
1    Q.    Okay.  At some point did you correct that?

2    A.    I did.  That was one of the reasons I called Linda

3    Jokinen.

4    Q.    Okay.  And what did you tell her?

5              MR. GREENBERG:  Objection.  To the extent it's

6    anything other than the correction.

7              THE COURT:  We don't know.

8              MR. GREENBERG:  I mean, then I object, your

9    Honor.

10             THE COURT:  Overruled.

11             You may answer.

12             THE WITNESS:  I think the question was why I

13   called her.  It was to correct that I had checked 6

14   percent, and I think it came back in a letter that it

15   was a 3 percent interest on the funds.

16   BY MR. MITCHELL:

17   Q.    Okay.  All right.  And if you could turn to -- back

18   to that page.  Does it say here how long you had to

19   identify a replacement property?

20   A.    It does.  Forty-five days.

21   Q.    That's right there in the paragraph I just blew up

22   right at the bottom?

23   A.    Yes.

24   Q.    All right.  Forty-five days from 11/21/00, correct?

25   A.    Correct.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And did you identify a replacement property for

2    Benistar?

3    A.   I did.

4    Q.   And --

5    A.   I identified three.  I think the form shows that you

6    have to send three properties.

7    Q.   Okay.  And are you referring to the three-property

8    rule on the form?

9    A.   Correct.

10   Q.   And, again, this states that it has to be within 45

11   days of the close of the relinquished property?

12   A.   Yes.

13   Q.   Okay.  And what was the property that you had

14   selected?  What were the -- do you remember what the

15   three were?

16   A.   One of them was on Washington -- it was an address

17   on Washington Street in Boston, I think there was a New

18   Hampshire property, and I can't remember the third.

19   Q.   Were these the three properties that you told

20   Benistar that you wanted your money to go to one of

21   them?

22   A.   Yeah.  I was negotiating on three of them and one of

23   them would be the replacement property from the sale.

24        MR. MITCHELL:  That's all I have, your Honor.

25             CROSS-EXAMINATION

1  BY MR. GREENBERG:

2  Q.   Good morning, Mr. Johnston.  My name is Gary

3  Greenberg, and I and John Pappalardo represent Mr.

4  Carpenter in this matter.

5       I just want to clear up a few things.  Is it correct

6  that in calendar 2000 [sic] that you never spoke with

7  Dan Carpenter?  That's correct, right?

8  A.   That's correct.

9  Q.   And your exchange, I think you just testified, took

10 place in November of 2000, correct?

11 A.   That's correct.

12 Q.   And is it also correct because you had no contact

13 with Mr. Carpenter, you have no idea what Mr. Carpenter

14 understood Benistar's rights were under the Exchange

15 Agreements?

16      MR. MITCHELL:   Objection.  He's asking the

17 witness what was going on in Mr. Carpenter's head.

18      THE COURT:   No, overruled.

19      You may have it.

20      THE WITNESS:   Can you ask that again, please?

21 BY MR. GREENBERG:

22 Q.   Yeah.  I mean, you have no idea what Mr. Carpenter

23 understood Benistar's rights were under the Exchange

24 Agreements, do you?  Isn't that correct, sir?

25 A.   No.  I mean --

1   Q.   You have no idea?

2   A.   No.

3   Q.   The government showed you some promotional material

4   that Mr. Paley, you said, gave you; is that correct?

5   A.   Correct.

6   Q.   I don't want to belabor the point, but would you

7   agree with me that Mr. Carpenter's name is nowhere

8   mentioned in any of those several exhibits?

9   A.   No.  It was mentioned during the interview but it's

10  not in --

11  Q.   It's not in any of the documents.  But again, your

12  attorney -- you said it was -- let me back up for a

13  second.

14       Is it a fair statement that Mr. Gilmartin had

15  recommended Martin Paley and Benistar as the

16  intermediary?

17  A.   He did.

18  Q.   And Mr. Gilmartin told you that he had done several

19  exchanges with Benistar and that they were a reputable

20  firm; is that right?

21  A.   Yeah, he --

22  Q.   Just yes or no.  Is that right?

23  A.   Yes.

24  Q.   And you mentioned before that you were represented

25  by an attorney in connection with this 1031 exchange.

PDF created with pdfFactory trial version www.pdffactory.com

1    Was it -- and you mentioned it was Mr. Gilmartin.  But

2    was it, in fact, an attorney at his office named Joanne

3    Leu?

4    A.   That's correct.  That's the correct firm, but Joanne

5    Leu did the closing.

6    Q.   And I know it's been eight years, but one thing you

7    do recall is that in connection with this 1031 exchange,

8    you did have the advice of counsel, right?

9    A.   I did.

10   Q.   I'm sorry.  You did?

11   A.   I did.

12   Q.   Yeah.  And that was an attorney Joanne Leu?

13   A.   It was.

14   Q.   Okay.  And is it fair to say that you understood

15   based on what Mr. Gilmartin told you that Mr. Paley was

16   an expert in 1031 transactions?

17   A.   He referred them.  I mean, "expert" -- the words

18   that you're using, it was a referral by Craig for

19   Benistar.

20   Q.   Okay.  But he told you he had successfully dealt

21   with Mr. Paley and Benistar in the past, right?

22   A.   Yes.

23   Q.   Okay.  Could we just -- the various documents -- you

24   and your attorneys read the exchange -- the Exchange

25   Agreement, the Exchange Fee Agreement, the Escrow

PDF created with pdfFactory trial version www.pdffactory.com

1    Agreement and the Account-Selection Form before you

2    signed it, sir?

3    A.   I read them, and I'm assuming Joanne did as well.

4    Q.   Fair enough.  Could we just look at -- first of all,

5    let's -- let's look at the Exchange Fee Agreement,

6    Exhibit 125 for one moment.

7         MR. GREENBERG:  Gerard, if you could put that on

8    the screen.

9    BY MR. GREENBERG:

10   Q.   That's your signature, right?

11   A.   It is.

12   Q.   And you read this before you signed it?

13   A.   I did.

14   Q.   Okay.

15        MR. GREENBERG:  Gerard, can you just blow up the

16   second paragraph so I can...

17   BY MR. GREENBERG:

18   Q.   And I'll try to move quickly.  It indicates in the

19   second line that the proceeds are going to be held and

20   invested at PaineWebber at the discretion and through

21   the financial institutions of the intermediary.  Do you

22   see that?

23   A.   I do.

24   Q.   And then the sentence that starts, "Said investment

25   account will be in the name of the intermediary and

PDF created with pdfFactory trial version www.pdffactory.com

1    shall require the signature of an authorized officer of

2    the intermediary."  Do you see that?

3    A.   I do.

4         MR. GREENBERG:  Okay.  And can you just drop

5    down to the next paragraph?

6    BY MR. GREENBERG:

7    Q.   And it indicates that the exchangor has had an

8    opportunity to review the transaction contemplated with

9    counsel prior to the execution of this document.  Do you

10   see that?

11   A.   I do.

12        MR. GREENBERG:  And the third paragraph, if you

13   would, Gerard.  Thank you.

14   BY MR. GREENBERG:

15   Q.   And there's another reference, you see, in the

16   second line, to it being held and invested with

17   PaineWebber in either a 3 percent or 6 percent account.

18   Do you see that?

19   A.   I do.

20   Q.   And it just refers to 3 percent account or 6 percent

21   account.  It's generic; is that right?

22   A.   It's 3 percent or 6 percent.

23   Q.   Account.  Yeah.

24        MR. GREENBERG:  If we could move on, please, to

25   124, please.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   BY MR. GREENBERG:
 2   Q.   And just very quickly, sir, the second "whereas."
 3   Again, you read this document, too?
 4   A.   I did.
 5   Q.   And your assumption is that -- you believe your
 6   attorney read it, too, before you signed it?
 7   A.   Correct.
 8   Q.   And it makes a reference to the fact that you're
 9   going to be -- the proceeds are going to be deposited in
10   the Benistar accounts at PaineWebber.  You saw that --
11   or you see that, sir?
12   A.   I see that.
13        MR. GREENBERG:  Could we move on to paragraph
14   No. 2.
15   BY MR. GREENBERG:
16   Q.   And you see, sir, that Benistar shall have full
17   control over the exchangor's funds to invest.  Do you
18   see that?
19   A.   I see that.
20        MR. GREENBERG:  Okay.  And again if we could
21   just go to the last page.
22   BY MR. GREENBERG:
23   Q.   And that's your signature?
24   A.   It is.
25   Q.   And I know this isn't signed by Mr. Paley, but it's
```

1    your understanding Mr. Paley signed this?

2    A.    It's my understanding.

3            MR. GREENBERG:  If we could move on to the next

4    exhibit, the Exchange Agreement.  I'm sorry.  Thank you,

5    Gerard.

6            Could you move to Paragraph 10, please.  And

7    also the next page, too.

8    BY MR. GREENBERG:

9    Q.    Do you see in Paragraph 10 there's a reference,

10   again, to the proceeds of the exchange being held and

11   invested with PaineWebber?

12   A.    Correct.

13   Q.    And there's also a reference in that paragraph to

14   the investment accounts shall be in the name of the

15   intermediary?  That's the name of Benistar, right?

16   A.    Yes.

17   Q.    And will require the -- the signature is going to be

18   an authorized officer of Benistar.  Do you see that?

19   A.    I do.

20   Q.    Okay.

21           MR. GREENBERG:  And again, could you go to

22   Paragraph 16?

23   BY MR. GREENBERG:

24   Q.    This document, also Paragraph 16, stated you'd been

25   advised that -- you had been advised to seek independent

PDF created with pdfFactory trial version www.pdffactory.com

1    tax and legal advice both as to the income tax

2    consequence of the exchange as contemplated by you and

3    as to the legal effect of this agreement; is that right?

4    A.   Yes.

5    Q.   And you did seek legal advice, right?

6    A.   Yes, I had legal advice.

7         MR. GREENBERG:  And if we could just do

8    Paragraph 20.

9    BY MR. GREENBERG:

10   Q.   And this document -- this refers to the fact that

11   there are no representations, arrangements, agreements

12   or understanding, written or oral, that aren't expressed

13   in the document.  Do you see that?

14   A.   I see that language.

15   Q.   And you're familiar with that from other contracts

16   that you've dealt with in your capacity as a real estate

17   professional; is that right or not?  Have you seen

18   similar --

19   A.   I have seen similar language, yes.

20        MR. GREENBERG:  Let me just go to the

21   Account-Selection Form, 126.  Thank you.

22   BY MR. GREENBERG:

23   Q.   Do you see you selected the 6 percent account?

24   A.   I did.

25   Q.   The generic reference to a 6 percent account, right?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Yeah, it's referenced -- yeah.

2  Q.   It just says "6 percent account," it doesn't --

3  A.   It's supposed to be a 6 percent return on the

4  escrow --

5  Q.   Six percent.

6       And let me see if we can't agree on a couple of

7  things, sir.  Now, you understood that the proceeds of

8  your 1031 exchange were being invested by Benistar in

9  securities of some type; isn't that right?  Just yes or

10 no.

11 A.   Yes.

12 Q.   And you understood that the word "discretion" that

13 we -- I referenced before -- you remember seeing the

14 word "discretion"?

15 A.   I do.

16 Q.   And you understood that the word "discretion" in the

17 Exchange Agreements meant that as long as you earned

18 your 6 percent, Benistar could choose the investment

19 vehicle for the funds, correct?

20 A.   Risk-free investment.

21 Q.   Sir, isn't that correct -- isn't that correct?  And

22 we'll get to that -- that you understood that the word

23 "discretion" in the Exchange Agreements meant that as

24 long as you earned your 6 percent, Benistar could choose

25 the investment vehicle?

```
 1   A.   "Discretion" meant --
 2   Q.   Just yes or no.  Just yes or no.  Is that your
 3   understanding or not?
 4   A.   Can you ask the question again?
 5   Q.   Yeah.  Isn't it correct, sir, that you understood
 6   that the word "discretion" in the Exchange Agreements
 7   meant that as long as you earned 6 percent, that
 8   Benistar could choose the investment vehicle for the
 9   funds; isn't that correct?
10   A.   Yes.
11   Q.   And isn't it also correct, sir, that none of the
12   agreements that you signed after being -- that none of
13   the agreements you signed stated that the monies would
14   be invested in a risk-free investment.  Just yes or no?
15   A.   It was assumed --
16   Q.   Sir, just yes or no?  Isn't that correct, that none
17   of the agreements that you read and were advised by
18   counsel -- that none of those agreements stated that the
19   monies to be invested would be invested in a risk-free
20   investment; isn't that right?
21   A.   I didn't read "risk-free" in those documents, no.
22   Q.   So is my statement correct, sir, that that is
23   correct?
24   A.   I didn't read "risk-free" in any of those documents.
25        MR. GREENBERG:  Thank you very much.  I have
```

PDF created with pdfFactory trial version www.pdffactory.com

1   nothing further.

2          THE COURT:  Okay.

3          MR. MITCHELL:  Okay.  Very briefly, your Honor.

4                    REDIRECT EXAMINATION

5   BY MR. MITCHELL:

6   Q.   A moment ago Mr. Greenberg was asking you about the

7   integration clause of the exchange document, the one

8   that says "this document supersedes other

9   representations."  Do you remember he asked you that?

10  A.   Yeah.

11  Q.   Do you remember he asked you whether in your

12  experience in real estate you had seen other contracts

13  with such clauses?

14  A.   Similar, yeah.

15  Q.   Have you had -- you've been involved in agreements

16  in which escrows have been used?

17         MR. GREENBERG:  Objection, your Honor.

18         THE COURT:  Sustained.  Sustained.

19         MR. MITCHELL:  It's the same --

20         THE COURT:  It's not the same.

21         MR. MITCHELL:  All right.

22  BY MR. MITCHELL:

23  Q.   Well, do you remember when Mr. Greenberg asked you

24  whether you understood that money would be invested in

25  securities of some type, what your understanding was?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   I remember the question, yeah.

2   Q.   Did you understand that your escrowed money would be

3   traded in stock options?

4           MR. GREENBERG:  Objection, your Honor.

5           THE COURT:  Sustained.

6           MR. MITCHELL:  That's all I have for this

7   witness, your Honor.

8           MR. GREENBERG:  Thank you.  I have nothing

9   further.

10          THE COURT:  Thank you, Mr. Johnston.

11          Let me see counsel briefly.

12          (The witness is excused.)

13          (Discussion at sidebar and out of the hearing of

14  the jury:)

15          MR. MITCHELL:  I know I'm beating a dead horse,

16  but there was an open door there, your Honor.

17          THE COURT:  I don't think so.

18          MR. MITCHELL:  "You understood?"  "Whether you

19  understood?"

20          All right.  I'm not trying to be a wiseguy, I'll

21  listen to your ruling on objections, but I mean, that's

22  what I had in mind.

23          THE COURT:  Okay.  So I just -- I think that's

24  the evidence?  That's why I brought you over here.

25          MR. MITCHELL:  Yeah.

1          THE COURT:  That completes the evidence?  I want

2     to preserve your rights.  The government has rested, I

3     understand.  I'll let them rest in front of the jury,

4     too.

5          MR. GREENBERG:  Your Honor, we would offer the

6     arbitration award that -- I think it's marked Exhibit --

7     I think it's for identification A and B, the order -- we

8     would offer the following:  One is, we would offer the

9     arbitration award; number two, we would offer the

10    court's order in state court which directed that the

11    proceeds from the PaineWebber and the arbitration award

12    go directly to the exchangors and their attorneys; and

13    three, we would offer the settlement agreement where

14    PaineWebber has agreed to pay those funds.

15         I believe the order from the Superior Court is

16    identification A, and I think the document entitled

17    "Settlement Agreement" is B; and the arbitration award

18    which we would have marked for identification, it's one

19    of our proposed exhibits but I don't think it's marked

20    yet, it has to be marked, but I understand from your

21    prior rulings that...

22         THE COURT:  Those are excluded.

23         MR. GREENBERG:  Those are excluded?  Okay.

24    Motion?

25         MR. PAPPALARDO:  Based upon their resting, we'll

PDF created with pdfFactory trial version www.pdffactory.com

1    be advancing the Rule 29 motion.

2         THE COURT:  And then?

3         MR. PAPPALARDO:  And then?

4         THE COURT:  Assuming it's denied, would you have

5    any other witnesses?

6         MR. PAPPALARDO:  Assuming it's denied, we'll

7    take it under advisement.  I guess we have a charging

8    conference.

9         THE COURT:  I just want to be able to announce

10   to the jury the evidence is closed.

11        MR. PAPPALARDO:  No, we have no further --

12        THE COURT:  So we'll excuse them.

13        MR. PAPPALARDO:  The only thing I would say,

14   your Honor, with respect to a Rule 29, if I had five

15   more minutes, or let's say a break of ten minutes, it

16   would make it a lot easier.

17        THE COURT:  We could take a break.  I want to be

18   able to say with authority --

19        MR. PAPPALARDO:  You could say with authority.

20        THE COURT:  -- that the evidence is closed.

21        MR. PAPPALARDO:  I hereby represent, your Honor,

22   we have no further evidence.

23        (In open court:)

24        THE COURT:  Jurors, as we thought yesterday,

25   that completes the evidence that will be presented for

PDF created with pdfFactory trial version www.pdffactory.com

1  the case.  And as I said yesterday, that means that the

2  next stage we'll proceed to, which we'll do tomorrow

3  morning, will be my instructions, the closing arguments,

4  and then you'll begin actually your work on the case,

5  your -- actually, you've been working on the case by

6  paying attention, but you'll get a little more active

7  and there will be discussion.

8          So we're going to excuse you now until tomorrow

9  morning, and when we come in, we'll be able to go to

10  those stages of the case.  So again let me just -- at

11  this critical stage when the evidence is now completed,

12  don't form any conclusions about it yourselves

13  individually, don't talk about it with anybody.  The

14  time is coming very soon when you'll be able to talk

15  about it with each other and begin deliberating, all

16  right?

17          So enjoy the rest of the day and we'll see you

18  tomorrow morning.

19          THE CLERK:  All rise for the jury.

20          (Jury out at 12:11 p.m.)

21          THE COURT:  We'll take a short recess.

22          THE CLERK:  The Court will take a short recess.

23          (Exhibit Nos. 395C and 415A marked for

24  identification.)

25          (There is a recess in the proceedings at

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    12:11 p.m.)

 2            THE CLERK:  All rise.

 3            Please be seated.

 4            MR. GREENBERG:  Your Honor, can I just ask a

 5    point of clarification in connection with the closings

 6    tomorrow?  It would be our expectation that we would put

 7    on the screen certain testimony, trial testimony from

 8    certain of the witnesses, and I want to make certain

 9    that -- advise the Court that --

10            THE COURT:  Do you have certified transcripts?

11            MR. GREENBERG:  We have the transcript, the

12    certified --

13            THE COURT:  I think if they're certified

14    transcripts, it's all right.

15            MR. GREENBERG:  Thank you, your Honor.

16            THE COURT:  I don't know.  Is there any problem

17    with that?  I mean, I wouldn't want to use an unofficial

18    transcript, but it's an official transcript.

19            MR. MITCHELL:  Yeah.  Well, it's a little

20    unusual, your Honor, insofar as it may --

21            THE COURT:  Well, let me just ask:  How

22    extensive would this be?  Among other things, I don't

23    want to slow things down.

24            MR. GREENBERG:  No.  I think it would be to

25    highlight certain testimony; it wouldn't be very
```

1    extensive.  But certainly as we're discussing the

2    evidence and we're commenting -- Mr. Pappalardo was

3    going to do the closing -- we'll be commenting on

4    testimony.  I mean, we think it's critical to our

5    ability to highlight certain aspects of the testimony.

6            MR. MITCHELL:  The problem I see, your Honor --

7            MR. GREENBERG:  There's nothing inaccurate.  As

8    a matter of fact, it confirms that the testimony is as

9    we're stating.

10           MR. MITCHELL:  The problem I see with that, your

11   Honor, in the standard part of your instructions and

12   every other judge's instructions, you charge the jury to

13   rely on their own recollection as to what the testimony

14   was, and so far as their putting it up there in print

15   and to certify it's a transcript might lead the jury to

16   believe that that somehow trumps their own recollection

17   of the testimony.

18           So I think in that respect it may be somewhat

19   misleading if you're selectively pulling out passages

20   from two weeks of testimony.

21           THE COURT:  Well, I don't know.  If it misled

22   them, it wouldn't mislead them to an inaccurate

23   transcript.  Do you know what I mean?  It could mislead

24   them away from an incorrect recollection into an

25   accurate transcript.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. GREENBERG:  How can the government object to

2     accurate testimony being put in front of the jury?

3          THE COURT:  The isolation point is a little more

4     serious, I think.  But I guess I don't see anything

5     fundamentally objectionable to it, as long as it's an

6     official transcript.

7          MR. GREENBERG:  It will be.

8          THE COURT:  I mean, it is a little bit more -- I

9     don't know how to say it -- forceful, perhaps, but it is

10    in the same category as, "You will recall, ladies and

11    gentlemen, that Mr. Levine said the following," you

12    know?  And they will recall that.  And so -- that's an

13    isolation problem, too, it's just not quite as dramatic.

14         MR. PIROZZOLO:  If that's the case, your Honor,

15    I would ask the Court prohibit counsel from referring to

16    the transcript as the official transcript because that

17    is not in evidence before the jury and that might

18    suggest that somehow what's up there is more important

19    than their own recollection of the testimony.

20         THE COURT:  Well, I don't -- fine.  I don't

21    think it's necessary to refer to it as the official

22    transcript.

23         MR. MITCHELL:  Okay.

24         THE COURT:  "You remember the witness said the

25    following."

```
 1          MR. MITCHELL:  And that should be good enough.
 2          THE COURT:  I guess it's -- you know, technology
 3    has now advanced to the point we're able to do it; we
 4    were never able to do it because we couldn't do it.  But
 5    I don't think there's any reason to distinguish that
 6    from an exhibit where you clip out a portion of the
 7    exhibit.
 8          Okay.  What I would like to do is reserve
 9    further on the mistrial motion, if we can call it that,
10    with respect to the leading testimony in part, or maybe
11    even principally, because I want to review Mr. Levine's
12    testimony before I hear argument on it.
13          So I think we could proceed to the Rule 29
14    motion.
15          MR. PAPPALARDO:  Thank you, your Honor.
16          Your Honor, we will be presenting this motion in
17    writing, but for purposes of this afternoon the grounds
18    of our motion under Rule 29 are twofold:  The first is
19    that the government has failed to disprove beyond a
20    reasonable doubt that Mr. Carpenter acted in good faith;
21    that is, that he in good faith believed that Escrow
22    Agreements, Exchange Agreements, Exchange Fee
23    Agreements, Account Selection Forms, which I will refer
24    to collectively as Exchange Agreements, place no
25    restrictions on how the funds would be managed in order
```

PDF created with pdfFactory trial version www.pdffactory.com

1    to produce the 3 or 6 percent return selected by the

2    investors;

3           Secondly, he made no representations to the

4    exchangors, nor did he cause any representations other

5    than those in the Exchange Agreements to occur, and

6    consequently, the exchangors were never misled by Mr.

7    Carpenter or caused to be misled by him into believing

8    their funds would be safe;

9           Three, that he had a good-faith belief -- and

10   the government hasn't disproved this -- that he had an

11   unfettered discretion to invest the exchangors' funds;

12          Four, that his trading strategy, which he had

13   successfully utilized in the past on many prior

14   occasions, was rational, supported by market analysis,

15   and would continue to succeed and result in successful

16   completion of outstanding exchanges.

17          The second ground, your Honor, for the motion is

18   that the government has presented insufficient evidence

19   to prove beyond a reasonable doubt the elements of mail

20   and wire fraud -- we know the standards, your Honor --

21   that after reviewing the evidence in the light most

22   favorable to the prosecution, that any rational trier of

23   fact could have found the essential elements of the

24   crime beyond a reasonable doubt.

25          I just point out that a motion for judgment of

PDF created with pdfFactory trial version www.pdffactory.com

1    acquittal must be granted on grounds of insufficiency

2    where an equal or nearly equal theory of guilt and a

3    theory of innocence is supported by the evidence viewed

4    in the light most favorable to the burden.

5         Your Honor, we contend that the government has

6    failed to prove beyond a reasonable doubt that the

7    defendant did not act in good faith.  The government,

8    under 1341 and 1343 must prove, first of all, that there

9    was a scheme or artifice to defraud, or obtain money or

10   property by materially false and fraudulent pretenses,

11   representations and promises and that the defendant

12   knowingly and willfully participated in the scheme.  Not

13   only that, had specific intent to defraud with a

14   specific intent to deceive at that time.  It's not

15   enough to participate in a scheme, you have to have that

16   specific intent.  And lastly, of course, in the

17   execution of that scheme, the mail or wires were used.

18        Mr. Carpenter in this case was charged with

19   having devised a scheme to defraud exchangors by

20   representing that their money would be invested

21   prudently while he intended to pursue an investment

22   strategy at odds with such representations.  The

23   government's theory was that Mr. Carpenter knew the

24   promotional materials and Exchange Agreements used by

25   Benistar contained representations to the exchangors

1    that their funds would be held safely in escrow accounts

2    from which they would not move except to be reinvested

3    in qualifying property or returned to the exchangor.

4         More particularly, your Honor, the government

5    theorized that Mr. Carpenter knew that the exchangors

6    were not being advised, contrary to the assurances in

7    the documents, that he intended to use their funds to

8    invest in the options market.

9         The government attempted to prove intent to

10   defraud and deceive based upon the same theory in this

11   trial as they did in the last.  They presented the

12   Exchange Agreements, the exchangors and the promotional

13   materials and the testimony of Martin Paley.  In

14   addition, it focused on the supposed incongruity between

15   the nature of a 1031 Property Exchange, a transaction

16   structured to avoid capital gains while allowing

17   investors to use the proceeds of one property sale to

18   purchase a replacement property within a short period of

19   time and the aggressive nature of Carpenter's investment

20   behavior.  It contended -- the government contends that

21   this incongruity demonstrates Carpenter's intent to

22   mislead the exchangors into depositing their money with

23   a supposedly safe intermediary so he could leverage the

24   funds and turn those funds into substantial profits for

25   himself.

PDF created with pdfFactory trial version www.pdffactory.com

1           Again in this trial, as it did in the first

2    trial, the government has to prove this part of their

3    agenda -- that the government sought to introduce

4    extensive evidence regarding Carpenter's investment

5    behavior.  As explained by the government, during the

6    course of the scheme he is short of funds, has

7    obligations to exchangors that far exceed the money that

8    he had available.  The fact that he's continuing to

9    trade in investments and his compounding his losses is

10   relevant, so says the government, to both showing that

11   they were material representations made to the

12   exchangors and to establish his state of mind when he

13   was misleading these people.

14          However, your Honor, as in the first trial, this

15   Court is only allowed trading strategy in order that the

16   brokers could testify as to factual matters allowing the

17   jury to consider the historical fact of this kind of

18   trading that was done and to permit the jury to decide

19   whether Carpenter had the requisite criminal state of

20   mind.

21          Your Honor, this Court instructed at the first

22   trial that good faith is an absolute defense to the

23   charge of wire fraud and mail fraud because it negates

24   the specific intent to defraud.  That is clearly

25   accurate.  Good faith on the part of the defendant is a

complete defense because if a defendant acted in good
faith, he necessarily lacked the specific intent to
defraud.  A person acts in good faith if the person acts
on the basis of a belief or opinion honestly held,
though the belief or opinion may turn out to have been,
in fact, wrong.  An honest belief and the truth of
statements or representations is inconsistent with the
specific intent to defraud.

Moreover, your Honor, it's well established that
under the mail and wire fraud statutes, even false
representations or statements or omissions of material
facts do not amount to fraud unless done with fraudulent
intent.  However misleading or deceptive a plan may be,
it's not fraudulent if it was devised or carried out in
good faith.  And I'd submit, your Honor, that an honest
belief -- and the truth of the representations made by
defendant -- were caused to be made by the defendant --
is a good and proper defense however inaccurate the
statement may turn out to be.  I'd suggest to the Court
that is the law.

Your Honor, there is substantial, if not
overwhelming, evidence of Carpenter's good faith which
wholly negates any specific intent to defraud and
deceive.  Your Honor, as I've just said, the government
must prove a specific intent to defraud and a specific

PDF created with pdfFactory trial version www.pdffactory.com

1   intent to deceive.  Mr. Carpenter, I suggest, believed

2   in good faith that he was free, under the terms of the

3   Exchange Agreements, that he had unfettered discretion

4   to invest the funds as he saw fit including engaging in

5   options trading.  Mr. Carpenter's good-faith belief in

6   this respect is relevant both because he had that

7   good-faith belief at the time the funds were obtained

8   from the exchangors and because the government seeks to

9   prove intent, or fraudulent intent, by and through his

10  very trading strategy.

11          Second, your Honor, Carpenter believed in good

12  faith that he had made no misrepresentations to the

13  exchangors nor did he cause any representations other

14  than those in the agreements to be made with the

15  exchangors; third, he therefore had a good-faith belief

16  that the exchangors never were misled by him or caused

17  to be misled by him into believing their funds would be

18  safe; fourth, he had a good-faith belief that his

19  trading strategy, which he had successfully utilized in

20  the past on many prior occasions, was rational,

21  supported by market analysts; fifth, your Honor, as the

22  Court may recall, there's over $2.5 million of money

23  that was put there, that wasn't exchangors' money, that

24  came from Benistar.

25          Your Honor, the Exchange Agreements place no

1    restrictions on how the funds would be managed in order
2    to produce the 3 or 6 percent return selected by the
3    exchangors in the Account-Selection Form.  They all
4    state that Benistar shall have full control over the
5    funds and that there is full discretion to invest the
6    funds.  In addition, each of the exchangors testified
7    that they were all represented by attorneys and
8    accountants who reviewed the Exchange Agreements and had
9    no contact with nor ever met Mr. Carpenter.  Similarly,
10   none of the exchangors had -- that are involved in this
11   case -- had any contact with or met or spoke or directly
12   or indirectly met Mr. Carpenter.  The exchangors
13   generally understood that Benistar was investing the
14   money but never asked in what.  They understood there
15   was no limitation on investments so long as they got
16   their 3 or 6 percent.
17          Let's look at the documents themselves, your
18   Honor.  The very language of these documents entered
19   into between the exchangors and Benistar make clear
20   Carpenter's full disclosure of material facts in his --
21   more importantly, his good faith with respect to his
22   conduct with the exchangors.  The Exchange Agreements
23   themselves, your Honor, recommend that the exchangors
24   consult with tax professionals and legal counsel.  They
25   make clear that any prior written or oral

PDF created with pdfFactory trial version www.pdffactory.com

1    representations made to the exchangors are superseded by

2    the documents.

3            In the Merrill Lynch Exchange Agreement -- and I

4    have to take them separately because we have a

5    bifurcated case with PaineWebber.  In the Merrill Lynch

6    Exchange Agreement, the agreement provides that the

7    exchangor and intermediary expressly agree that any cash

8    proceeds received from the disposition of relinquished

9    property shall be held and invested with Merrill Lynch

10   Private Client Group at either 3 percent, and in a

11   Merrill Lynch Ready Asset money market account, for 6

12   percent per annum in a Merrill Lynch investment account.

13   Said investment account shall be in the name of the

14   intermediary and require the authorized signature of an

15   officer of the intermediary to permit the withdrawal.

16           Your Honor, as noted by the government's

17   witness, Mr. Zappala, who works for the U.S. Attorney's

18   Office, none of the exchangors involved in this

19   indictment selected a 3 percent Merrill Lynch Ready

20   Asset money account, so that particular reference is not

21   important in this case.

22           When Benistar did begin to work with

23   PaineWebber, Paragraph 10 of the Exchange Agreement was

24   slightly revised to reflect the fact that PaineWebber

25   was in the picture.  And it reads:  "The exchange and

1  intermediary" -- "exchangor and the intermediary

2  expressly agree that any cash proceeds received from the

3  disposition of the relinquished property shall be held

4  and invested with PaineWebber at either 3 percent per

5  annum or 6 percent per annum in a PaineWebber account.

6  Said investment account shall be in the name of the

7  intermediary and shall require a signature."

8       This language put the exchangors on clear

9  notice, your Honor, as many of them testified, that

10  their funds would be invested.  And there is no evidence

11  whatsoever in these documents that would negate Mr.

12  Carpenter's good faith in investing the exchangors'

13  funds pursuant to these documents.

14       Similarly, your Honor, the Escrow Agreement:

15  The Escrow Agreement says -- during the Merrill Lynch

16  era it's stated, "Benistar shall have full control over

17  the exchangor's funds to invest as the exchangor directs

18  in either the 3 percent Ready Asset money market fund or

19  the 6 percent investment account."  In the PaineWebber

20  era the relevant language was revised to provide that

21  Benistar shall have full control over the exchangor's

22  funds to invest as the exchangor directs in either the 3

23  percent or 6 percent account.

24       Finally, your Honor, the Exchange Fee Agreement

25  signed by each of these exchangors further evidences the

PDF created with pdfFactory trial version www.pdffactory.com

1    fact that Benistar would invest the exchangors' funds in

2    its discretion.  The operative language is that "The

3    exchangor and the intermediary expressly agree that any

4    cash proceeds received from the disposition of the

5    relinquished property shall be held and invested at

6    Merrill Lynch at the discretion and through financial

7    institutions of the intermediary."

8         Your Honor, I submit to you that that is total

9    evidence of good faith on Mr. Carpenter's behalf; the

10   plain reading of those documents provides good faith.

11   But let's look at the exchangors' testimony, the first

12   body of witnesses that were before this Court.

13        The exchangors testified as follows:  Eliot

14   Snider testified -- he's a sophisticated and an

15   experienced businessman.  He said a lot of things, but

16   he also said that in deciding to retain Benistar, who

17   did he deal with?  Mr. Paley.  He knew Mr. Paley as a

18   result of family connections.  He agreed that Mr.

19   Carpenter's name does not appear in any of the

20   promotional materials and, like others, he testified

21   that he not only never met with Mr. Carpenter in 2000,

22   he didn't even know Mr. Carpenter existed.

23        He also claimed that there was nothing in

24   particular that Marty Paley said to him that made him

25   select Benistar; just everything in general.  Mr. Snider

testified that he understood his funds would be held and
invested at Merrill Lynch and that Benistar had the
discretion to invest those funds.  He further knew that
the 6 percent account he elected was an investment
account.  Snider acknowledged that the Exchange
Agreement he signed does not specify the kind or nature
of the investment Benistar would engage in to give him
the 6 percent return.  He knew the investment accounts
had risks.

The next witness, your Honor -- Byron Darling,
the next investor -- said he only spoke on the telephone
to Linda Jokinen and Martin Paley; he never spoke with,
met or had any contact with Mr. Carpenter.  And the only
thing, your Honor, in his testimony was despite his
claim that Mr. Paley told him that his money would be
perfectly safe, Mr. Paley testified on cross-examination
that he never represented to anyone that their money
would be safe.

Mr. Fitzgerald testified that at the time he
entered into the Exchange Agreement he didn't even know
Mr. Carpenter existed.  He had an accountant and an
attorney to review his documents.  He understood that
the integration clause superseded any representations
made to him; that he knew that Benistar had full control
to invest his funds.  He knew he selected a 3 percent

account, referring merely to "the 3 percent account,"
not a money market account.

He also testified that the only restriction in
his mind as to the nature of Benistar's investment of
the funds was Section 1031 of the tax code and that he
did not place any limitation on Benistar's investment.
That is that section of the tax code, your Honor.

Joseph Iantosca's testimony was read to the
Court, and there's almost no evidence whatsoever
concerning the elements of the crime that Mr. Carpenter
is accused of.  He said he signed an Exchange Agreement.

Marjorie Adams, on the other hand, who
represented Mr. Iantosca, testified.  She testified
about her concerns regarding the security of Mr.
Iantosca's money, being satisfied by Mr. Paley sending
her a copy of the bond for Benistar.  The bond, your
Honor, is in evidence.  The bond speaks for itself.  The
bond says that securities are specifically excluded from
that.

She acknowledged -- that is, Ms. Adams -- that
she never asked Mr. Carpenter in 2000 if Mr. Iantosca's
funds were going to be invested; she has no idea what
was in Mr. Carpenter's mind at the time the Exchange
Agreements were signed, and that she had no idea what
Mr. Carpenter understood Benistar's rights to be under

PDF created with pdfFactory trial version www.pdffactory.com

1    the Exchange Agreement.

2         She acknowledged the Exchange Agreements did not

3    define the phrase "investment account."  There is no

4    limitation as to how it's going to be invested other

5    than the fact that Mr. Iantosca is scheduled to get

6    either a 3 or a 6 percent return depending on the rate

7    he chose.  That was her testimony.

8         Mr. Bellemore, your Honor, testified that he

9    never spoke or met with even Mr. Paley.  He certainly

10   didn't speak with Mr. Carpenter or anyone from Benistar

11   prior to entering into the agreement.  Instead, he --

12   Mr. Eaton testified on his behalf that he never spoke to

13   Mr. Carpenter.  Mr. Eaton testified that Mr. Paley never

14   told him anything different from that which was set

15   forth in the promotional materials.  Mr. Bellemore was

16   also advised by an attorney.

17        Mr. Bellemore testified that he never asked

18   anyone at Benistar to explain any of the language in any

19   of the exchange documents that -- and both Bellemore and

20   Eaton testified it was their understanding that Benistar

21   would have full control over Mr. Bellemore's funds.  Mr.

22   Eaton knew that Mr. Bellemore's money would be in an

23   investment account and the money would be invested by

24   Benistar.

25        There is absolutely no evidence, your Honor,

PDF created with pdfFactory trial version www.pdffactory.com

1    that Gail Cahaly received even promotional materials

2    other than Exhibit 37, which made no representations of

3    safety of funds but rather made a reference to the Safe

4    Harbor, which has nothing to do with safety but rather

5    eligibility for 1031s.

6         Ms. Cahaly had no discussions with Mr. Carpenter

7    in the year 2000.  She answers "yes" to the question:

8    "So you knew your money was going to be invested in

9    PaineWebber" -- "at the discretion and through the

10   financial institutions of Benistar?"

11        I submit, your Honor, there is absolutely no

12   evidence of fraudulent inducement with respect to any of

13   these individuals.

14        You heard Mr. Johnston testify this afternoon.

15   I don't have to go over that, your Honor.

16        Furthermore, as the Court knows, there are no

17   restrictions placed on any investments pursuant to 28

18   U.S.C. 1031.

19        Let's focus, your Honor, on Mr. Carpenter's good

20   faith because I believe, your Honor, this is what the

21   thrust of our argument is.  There is conclusive evidence

22   that Mr. Carpenter had a good-faith belief in his

23   trading strategy which he successfully utilized for two

24   years and which resulted in many successful prior

25   exchanges; that his good faith and his strategy was both

PDF created with pdfFactory trial version www.pdffactory.com

1    rational and supported by market analysts and that it

2    would continue to succeed and result in a successful

3    completion of outstanding exchanges.

4         Mr. Stern from Merrill Lynch testified that Mr.

5    Carpenter was very knowledgeable in securities and, in

6    particular, extremely knowledgeable about options, and

7    he understood the risks.  In addition to working with

8    Merrill Lynch brokers, Mr. Carpenter's brother was an

9    investment advisor and an analyst.

10        Mr. Rasmussen, Mr. Stern's boss, testified that

11   he and Mr. Carpenter discussed on more than one occasion

12   that his trading strategy had made money and generated

13   profits over certain timeframes and that Mr. Carpenter

14   had a complete belief in his strategy and that it would

15   continue to make money in the future.  He was aware of

16   the reversal at the end of 1999 when Mr. Carpenter's

17   strategy resulted in over a million dollars of profits

18   as well as the trends in 2000.

19        Furthermore, your Honor, this is Rasmussen's

20   testimony:  He said that Mr. Carpenter's trading

21   strategy was rational because he, in fact, had a

22   strategy.  But not just a strategy, one that had

23   previously been profitable at various times in the

24   relationship.  Similarly, Stern testified that Mr.

25   Carpenter 's trading strategy was bullish, optimistic,

PDF created with pdfFactory trial version www.pdffactory.com

1    aggressive, and that it proved that he was able to make

2    money in some years; it was not irrational.

3         Merrill Lynch's chief investment analyst, Henry

4    Blodget, was advocating exactly what Mr. Carpenter was

5    doing.  There were lots of differences of opinions

6    within Merrill Lynch at the time, your Honor, but the

7    point is that Mr. Carpenter's good-faith belief in his

8    trading strategy was reflected by their testimony.

9         Also, your Honor, it's clear that Mr. Carpenter

10   never failed to meet a margin call at either PaineWebber

11   or Merrill Lynch, and there was a difference of opinion

12   about how or whether Mr. Carpenter's account should be

13   closed at Merrill Lynch.

14        Your Honor, contrary to the representations of

15   the government in the indictment and in the opening

16   statement -- Mr. Carpenter's trading strategy was

17   characterized as risky, but the evidence revealed in

18   this case was that it did not involve totally uncovered

19   call-writing, rather, the predominant strategy used in

20   the majority of Mr. Carpenter's trades actually limited

21   liability or exposure.  The exposure was limited on

22   naked calls by the hedging that came out from Mr.

23   Rasmussen's testimony.  If a put was in at 25, there was

24   also one at 20 limiting only a 5 percent risk -- I'm

25   sorry -- five-point risk.

PDF created with pdfFactory trial version www.pdffactory.com

1          Moreover, your Honor, as the Court recalls from

2    Mr. Stern's testimony, early in the relationship he

3    provided Mr. Carpenter with marketing materials

4    including a book "Money Making Options"; marketing

5    materials that advocated naked put writing; marketing

6    materials that said that naked put writing wasn't the

7    same as naked call writing; that naked put writing had a

8    bad name.  More importantly, Mr. Rasmussen said that it

9    wasn't really even naked.

10          Stern recommended when he left -- when he, Mr.

11   Carpenter left Merrill Lynch -- he recommended this

12   account to his good friend, Mitchell Rock at

13   PaineWebber.  And what's interesting, your Honor, is

14   that Mr. Carpenter's belief -- his belief, the best

15   evidence of his belief -- on September 22nd of 2000 is

16   the letter that he wrote to Mr. Rasmussen.  It says in

17   that letter that -- by Mr. Carpenter -- that he was

18   perfectly positioned to recapture his losses on the

19   rebound of the market and specifically cited "as he had

20   in November and December of 1999."

21          Your Honor, Mr. Rock testified about the open

22   and obvious manner in which Mr. Carpenter conducted

23   himself in his interactions with PaineWebber.  He talked

24   about the fact that it was very clear that if Mr.

25   Carpenter wanted to trade, he could have traded on eBay

1   [sic] with total anonymity.  And I suggest to the Court

2   that if you're engaged in a fraud, if you're engaged in

3   fervent activity, that you don't do something in an open

4   and transparent sort of way; you take steps to conceal

5   what it is that you're doing.

6        The fact that Mr. Carpenter acted openly and in

7   good faith is also very much evidenced, your Honor, by

8   how he dealt with both of these account houses.  As the

9   Court recalls, the wires that were sent in clearly

10  stated the clients' names on them and clients' accounts.

11  All of the people in both brokerage houses had access to

12  this.  There was no attempt to disguise it; there was no

13  attempt to in any fashion limit the knowledge that these

14  were clients' funds.  And I'd suggest to you, your

15  Honor, that operating in that sort of a transparent

16  manner is clear indication of a very strong and

17  good-faith belief in what he was doing.

18       Your Honor also recalls the testimony of Mr.

19  Rock who, on direct examination, talked about the

20  trading relationship that he had with Mr. Carpenter.

21  And specifically what Mr. Rock said was that Mr.

22  Carpenter was convinced that the outcome of the

23  presidential election was going to be very favorable to

24  his style of investing and that his expectation was that

25  the stocks were going to go much, much higher.  Again,

PDF created with pdfFactory trial version www.pdffactory.com

1    your Honor, it isn't whether Mr. Carpenter was right; it

2    was whether he had a good-faith belief.

3         And I direct the Court's attention to the

4    evidence which shows that Mr. Carpenter conducted

5    himself from the very beginning of this relationship in

6    an open and obvious manner.  Your Honor, you can have

7    nothing more probative than the testimony of

8    Mr. Patterson today.  Mr. Patterson, who was skeptical

9    whether or not Benistar would be the proper place for

10   his client to hold money had a lot of questions about

11   how that was going to happen and what was going to

12   occur.  So what does Mr. Carpenter do?  He gets Levine

13   on the phone; he puts Patterson directly in touch with

14   Mr. Levine.  I'd suggest to the Court that that is

15   bountiful evidence of Mr. Carpenter's good faith.  Mr.

16   Carpenter could have made misrepresentations if he was

17   inclined to engage in fraudulent conduct.  He didn't do

18   so.  He said, "You have questions?  We'll put you in

19   touch with Merrill Lynch."

20         And more importantly, during the communications

21   with Merrill Lynch, Mr. Carpenter was aware that

22   Mr. Patterson provided not only an analysis of 1031 law,

23   but provided in the most clear terms that these were

24   clients' monies.  I'd submit to the Court that Mr.

25   Carpenter, who was present for that conversation, could

PDF created with pdfFactory trial version www.pdffactory.com

1    have relied on the idea that Merrill Lynch knew that

2    these were client monies; and specifically, that not

3    only that they were clients' monies, but that they were

4    properly exchange monies.  I think Mr. Patterson's

5    testimony on that point, your Honor, speaks for itself,

6    and that Mr. Carpenter in good faith could rely on the

7    fact that this is something that Merrill Lynch knew

8    which, by the way, your Honor, is evidenced in a later

9    letter of September 22nd to Merrill Lynch where he does

10   reference, you know, client accounts and client money,

11   not to be confused with all of the intermediate steps

12   where he's sending wires to Merrill Lynch with clients'

13   names on it and with client accounts on it.

14        Your Honor, furthermore, I would submit to the

15   Court that Attorney Patterson's testimony establishes

16   that Mr. Carpenter acted in good faith by demonstrating

17   from the very outset that he was open -- completely open

18   with investors or their representatives who made inquiry

19   of him, and he was forthcoming with Merrill Lynch about

20   the nature of the relationship; he was completely

21   transparent in his dealings.  And this is the best thing

22   we can look to because it's the only time that he ever

23   had any contact with either an investor or their

24   representative other than one occasion, your Honor,

25   which doesn't really apply to this case, a reverse

PDF created with pdfFactory trial version www.pdffactory.com

1    exchange in the middle of 2000.  He was -- as I said

2    before, your Honor, all of the wire transfers show the

3    source of the funds were third-party or clients' funds,

4    clients' accounts, clients' funds, clients' fund

5    accounts and so on.

6              Your Honor, to the extent that the government

7    claims -- to the extent that the government claims there

8    were transfers between the Merrill Lynch master account,

9    the B10 trading account and the subaccount B01, we

10   submit that the evidence is very clear that the master

11   and the subaccount were under the same relationship.

12   Even to be eligible for a subaccount you have to have

13   the same taxpayer identification number.  And again, the

14   documents say "accounts" in the plural.  The Working

15   Capital Management Account at PaineWebber, the main

16   feature of that account is that the accounts were

17   linked.  That's the testimony of Mr. Stern.

18             Your Honor, going to the heart of the case and

19   why the government hasn't proven that Mr. Carpenter

20   lacks good faith, the government failed to present any

21   evidence at all that Mr. Carpenter knew that outstanding

22   exchangor investments exceeded the liquidation value of

23   the brokerage accounts at the time of any of the

24   investments in this case.  As the government said in its

25   opening statement, that Carpenter was short of funds, he

1    has obligations to the exchangors that far exceed the

2    money he had available, that hasn't been shown, your

3    Honor.  There's no evidence of that.

4         Mr. Carpenter, the government continues,

5    continued to accept money from the exchangors at the

6    same time as suffering significant losses that made it

7    impossible for him to repay the exchangors if they

8    exercised what was their right in the contract, which

9    was to have their money returned.

10        Your Honor, notwithstanding these accusations,

11   there is absolutely no evidence in this case that

12   Carpenter had any knowledge of any shortfall between the

13   exchange investment amounts and the exchange account

14   values at the time -- of any of the seven exchangors who

15   invested funds with Benistar and are named in this

16   indictment; the government has presented no evidence

17   that at the time of the investment, Benistar's aggregate

18   and undistributed attained investments exceeded the net

19   value of its exchange dedicated account.

20        Particularly, your Honor -- I mean, that's a

21   true statement.  The government has not even taken into

22   account monies that Mr. Carpenter put into the accounts

23   outside of that of the exchangors.  What the government

24   did do, your Honor, is they tried to show that at the

25   last day of each month there were various balances.

1    Mr. Zappala, who testified for the government, said

2    specifically he was not able to calculate the gain or

3    loss -- a gain or loss on -- in the interim period

4    during the month.

5        Your Honor, I would submit to the Court that

6    absent any proof of the account values at the time of

7    any of the exchangors who committed and signed documents

8    and invested their 1031 funds with Benistar, the

9    government cannot prove at all, much less prove beyond

10   any reasonable doubt, that Benistar's outstanding

11   exchange fund liabilities exceeded the total liquid

12   value of the accounts at those times.

13       Your Honor, more importantly, the government has

14   presented no evidence that Carpenter knew that any

15   shortfall at the time of the investments would -- and

16   that Benistar would be unable to meet its obligations.

17   The government's case is profoundly flawed in its

18   failure to present evidence that Carpenter knew that any

19   exchangors had -- or were about to invest at a time when

20   the outstanding exchange fund liabilities exceeded the

21   total liquid value of the accounts.

22       Your Honor, there's not even a conversation;

23   there's not even an inference that Mr. Carpenter knew

24   who Mr. Paley was talking to.  There is no connection

25   between what Mr. Paley was doing and what Mr. Carpenter

PDF created with pdfFactory trial version www.pdffactory.com

1    was doing.  And I'd suggest, your Honor, absent the

2    demonstrable proof, absent any proof, this case cannot

3    be presented to a jury.  The government presented no

4    evidence from which the jury could infer beyond a

5    reasonable doubt that Carpenter knew that any exchangors

6    decided to invest at a time when any circumstances

7    existed that were at odds or inconsistent with any

8    statements made to them.

9         Your Honor, the only potential evidence of

10   relevant dates of liabilities is reflected in Exhibit

11   189 which were the last days of August and November of

12   2000.  The government put on no evidence at all that

13   Carpenter had ever seen any of these records or knew the

14   amounts of the liabilities on or about those dates.

15   Finally, your Honor, on this point, the government

16   presented no evidence that Carpenter knew when any of

17   the exchangors invested that Benistar did not intend to

18   or would not be able to discharge its obligations to the

19   exchangors when they fell due.

20        Your Honor, the government has also failed to

21   prove the material fraud arriving from risky options

22   trading.  The government contends that the scheme to

23   defraud in this case consisted of representations to

24   potential exchangors that their 1031 funds would be safe

25   while, in fact, Carpenter engaged in aggressive,

1    high-risk trading in the options market, and that

2    contrary to those representations Carpenter did not hold

3    the funds safe in the accounts into which they had been

4    wired but instead used the funds for trading in the

5    options market.

6        Thus, the essence of the government's case is

7    that the statements made to potential investors to

8    induce them to turn over their money were fraudulent

9    because Carpenter engaged in risky options trading;

10   however, your Honor, the evidence doesn't establish that

11   at all.  The evidence fails to establish as to any count

12   that the 1031 funds were, in fact, used to trade in

13   options, or if they had been used to trade in options,

14   that Carpenter used those funds in any material amount

15   to trade in options.

16       The account statements show on their face a

17   substantial portion of the total value of the accounts

18   were traded in traditional equities, fixed income

19   securities and in covered short sales of equities.

20   Further, your Honor, Mr. Zappala admitted at trial that

21   there was no effort made by the government in compiling

22   trading losses alleged by the government to distinguish

23   those losses arising from options trading and losses

24   arising from accruing trades in non-options securities.

25       Most revealing, your Honor, on this motion is

PDF created with pdfFactory trial version www.pdffactory.com

1    the testimony of Mr. Carpenter's supposed fraudulent

2    inducement to the exchangors.  The government's central

3    witness in this case testified repeatedly as to Mr.

4    Carpenter's good faith and his conduct with respect to

5    the exchangors.  And again, the focus here must be on

6    the relevant time period of when the exchangors entered

7    into their agreements and the representations made to

8    those exchangors prior to that time.

9         Mr. Paley testified that there was a bright line

10   division of labor at Benistar between himself and Mr.

11   Carpenter; Mr. Carpenter handled the investments,

12   Mr. Paley handled the marketing and solicitation.

13   Mr. Paley acknowledged that it was he who explained the

14   exchange documents to the exchangors and he who signed

15   those agreements.  And at most, your Honor, any

16   allegation of fraudulent inducement must -- appears to

17   relate to Mr. Paley and what he did, but not what Mr.

18   Carpenter did.

19        I understand that the government's theory, which

20   we believe is absolutely not supported by the evidence,

21   is that Mr. Paley was Mr. Carpenter's agent.  Mr. Paley

22   was an agent of Benistar, Mr. Carpenter was an agent of

23   Benistar.  That does not make them agents of each other.

24   But, your Honor, that's a moot point.  It's a moot point

25   because Mr. Paley, who doesn't have a deal with the

PDF created with pdfFactory trial version www.pdffactory.com

1    government, testified that he never said anything to an

2    exchangor that wasn't true.  Mr. Paley testified that he

3    did not make oral representations that were inconsistent

4    with any of the written agreements nor was he ever told

5    by Carpenter to do so.  Mr. Paley testified that Mr.

6    Carpenter never told Mr. Paley to say anything.

7    Mr. Paley never said to any of the exchangors or their

8    representatives that their money would be safe or secure

9    and that there would be no risk of loss.

10          Moreover, your Honor, Mr. Paley testified that

11    he was never asked, nor did he ever provide, any details

12    as to how the exchangors' funds would be invested.  He

13    further testified that there was no legal requirement to

14    segregate exchangors' funds.  He acknowledged there was

15    no limitation to the nature of investment as he read

16    Paragraph 10 of the Exchange Agreement; similarly, no

17    limitation as he read the Escrow Agreement; similarly,

18    there was no limitation in terms of his interpretation

19    as to the nature of the investment vehicle Benistar

20    could use which was provided for by the Exchange Fee

21    Agreement.  And he pointed out the distinctions that

22    existed, your Honor, between Benistar and Nationwide,

23    and specific distinctions that existed in the Exchange

24    Fee Agreement.

25          He also testified, which I suggest is probative

1    of Mr. Carpenter's good faith, that Mr. Carpenter

2    requested that he, Mr. Paley, speak directly with Jerry

3    Levine at Merrill Lynch.  And we know what his testimony

4    was.  He said Benistar was a qualified investor.  He

5    said that investors' money would be wired to Merrill

6    Lynch, and it was.  He also testified, your Honor, as to

7    Mr. Carpenter's trading strategy and how it had been

8    successful in the past.

9            Your Honor, I submit based upon the law, based

10   upon the evidence before you, that there is insufficient

11   evidence in the light most favorable to the government

12   clearly that would allow a jury to conclude that Mr.

13   Carpenter -- or that the government has shown beyond a

14   reasonable doubt that Mr. Carpenter was not engaged in

15   good faith, because that's the government's burden here.

16           With all of this testimony, your Honor, with all

17   of the disconnect, with all of what the government has

18   failed to do according to the terms of their own

19   charging instrument, I submit to the Court that it's not

20   only flawed but they're very deficient.

21           THE COURT:  Mr. Mitchell?

22           MR. MITCHELL:  I don't know whether you want me

23   to address all of that, your Honor, or are concerned

24   about a particular area.  I would be happy to do either.

25           THE COURT:  It's up to you.  I think the thrust

PDF created with pdfFactory trial version www.pdffactory.com

1   was the focus on the absence of good faith; the presence

2   of specific intent.   Two sides of the same coin.

3           MR. MITCHELL:   It is, your Honor.   And there

4   is -- again, to quote the Rule 29 standard -- there

5   is -- viewed in the light most favorable to the

6   government there is abundant evidence for a rational

7   jury to conclude that Mr. Carpenter -- conclude beyond a

8   reasonable doubt that Mr. Carpenter did not act in good

9   faith.   And on that ground your direct response to the

10  motion -- the motion should be denied.

11          The place to start, your Honor, is with the

12  nature of the transaction itself, the 1031 Property

13  Exchange.   The name "loan" suggests what it was about;

14  it was about a swapping, as we said in the opening --

15  swapping of two properties, it was a like-kind

16  exchange -- the very nature of which creating an

17  expectation on the part of everyone involved, the

18  exchangor and qualified intermediary alike, that there

19  would be a sale of one property and a purchase of

20  another piece of property.   And property -- real

21  estate is a particular kind of investment.   This is a

22  like-kind of real estate -- not real estate for stock

23  options for any other investment of equal value, but

24  real estate for real estate -- and that the whole thing

25  had to be accomplished within a very short window, 180

PDF created with pdfFactory trial version www.pdffactory.com

1    days tops, and that even within a shorter one, 45 days,

2    the replacement property had to be identified.

3         So we start with that template and build upon

4    that template all the representations that were made,

5    both oral and written.  And I'll focus on the written

6    one because, as we've discussed, the oral presentation

7    was inconsistent with the written.

8         The written materials, the promotional

9    agreements and the agreements, Exchange Agreements,

10   Escrow Agreements and so forth convey, above all, a core

11   representation that is consistent with the nature of a

12   1031 exchange, and that is that the money would be

13   parked and returned in time so that the exchangor could

14   complete the exchange and enjoy the tax benefit.

15        The promotional materials and the agreements

16   alike make clear that the money would be put in escrow,

17   a word that has a common meaning that is consistent with

18   the nature of the transaction, and that is, a parking

19   place, not a place for someone to exchange in

20   investments; that the money would be held for the

21   benefit of the exchangor, that there would be no

22   transfer of the funds anywhere but as the exchangor

23   directs, either back to the exchangor or to the seller

24   of the replacement property.

25        The idea -- consistent with the idea of an

1    escrow selection of the two -- the choice between two

2    low-yield accounts, a 3 percent account or 6 percent

3    account, the 3 percent account smacks of a passbook

4    traditional savings account in a bank; 6 percent smacks

5    of a low-yield T-bill.  We have evidence in this case of

6    what T-bills were going for at the relevant time period,

7    approximately the same, right around 6 percent.

8    Everything suggests the money would be put in a safe

9    place so that as contemplated by anyone who's reasonably

10   looking at this from the outside, the money would be

11   returned and put into replacement property.

12          The defendant knew this.  There is no

13   question -- I think the Court acknowledged at one

14   sidebar that the defendant is a hands-on manager,

15   someone who -- from the testimony of at least five

16   witnesses -- was aware of what the representations were

17   in these documents.  We have the testimony of Linda

18   Jokinen, of Martin Paley, of David Patterson, of Jackie

19   Spielman Mahannah, all of whom had said the defendant

20   had reviewed at one time or another all of the

21   agreements and the professional materials, for that

22   matter.  At least Mr. Paley said as much.  And that he

23   reflected, according to the testimony of Marjorie Adams,

24   a command and understanding of those materials insofar

25   as she sought him out for assistance in dealing with the

PDF created with pdfFactory trial version www.pdffactory.com

1    next level of sophistication in terms of these types of

2    transactions or reverse exchange.

3           The guy knew what was going on, he knew what he

4    was doing -- he's a tax attorney, a sophisticated

5    investor -- and he knew by virtue of some of these

6    over-the-top memos that he distributed to people who

7    worked for him that they weren't allowed to do anything

8    without his approval.  And that was consistent -- you

9    have that consistent testimony of Paley, Spielman,

10   Jokinen's testimony, but also in the writing itself, in

11   bold print on an exhibit, on the bottom of Exhibit 143,

12   whichever it was, your Honor.

13          He knew -- there is absolutely no question in

14   this case that he knew what representations were being

15   made to the exchangors.  He set this in motion.  He

16   incorporated Benistar, he ran it, he approved of these

17   materials going out.  He was the boss, by all accounts.

18   He caused these things to happen and he knew what was

19   going on, what was inducing these people to give their

20   money to Benistar.

21          While all of this is happening he's doing

22   something entirely different with the money.  He is,

23   despite assurances of security -- and the word

24   "security" is used in the promotional material,

25   assurances that the money would be in escrow, in a

PDF created with pdfFactory trial version www.pdffactory.com

1   low-yield account.  Despite all that, despite knowing

2   the nature of a 1031 transaction the defendant is

3   investing in what he knew to be extraordinarily risky

4   investments.  He knows that because, again, he is by all

5   accounts a sophisticated investor, according to the

6   broker.  They all said he knew what he was doing, we all

7   know that he was warned eight ways from Sunday, in

8   writing, in the applications he filled out at Merrill

9   Lynch, warning him that options investing could result

10  in large, catastrophic loss; that he was warned

11  repeatedly by his brokers at Merrill Lynch along the

12  same lines time and time again, and he continued to

13  invest.

14          He knew by -- he should have known that the

15  investment -- trading was risky; the only reason he was

16  losing money hand over fist.  All of the exchangors in

17  this case gave their money to Benistar after he already

18  lost $2 million in trading.  Every single one of them.

19  That's why the chronology in the case is important.

20  Every single one of them came in after he was already in

21  the hole $2 million.  And then he's kicked out of

22  Merrill Lynch.  If he hadn't known by then, if someone

23  hadn't hit him over the head, he certainly knew then

24  after being kicked out by Merrill Lynch.  Seventy

25  percent of the money in this case came after he was

PDF created with pdfFactory trial version www.pdffactory.com

1  kicked out by Merrill Lynch.

2       He goes to PaineWebber and he's told that the

3  condition was that he's going to -- by going to

4  PaineWebber that he would have to tone down the risk.

5  That's Mitchell Rock's testimony.  And yet what does he

6  do?  He continues to trade in the same fashion at the

7  same time the same representations that he knew were

8  being made to exchangors that their money would be safe,

9  losing millions of dollars a month at that point.

10      All of this suggests that there was -- that he

11  wasn't operating in good faith at all, your Honor, that

12  he may have had some hope that it was all going to work

13  out, that somehow he was going to make a fortune, pay

14  the exchangors their money back plus 3 or 6 percent and

15  nobody would ever notice.

16      Two points as to that, your Honor:  One, it

17  doesn't matter.  Under First Circuit law and as the

18  Court instructed the jury during the last trial, having

19  some hope that everything is going to work out is not

20  good faith.  Again, go back -- I guess this is the

21  second point:  Go back to, dare I say, the gambling

22  analogy, your Honor?  It is like -- and the government's

23  made this argument before in a similar context -- the

24  bank teller leaving the bank with money at the end of

25  the day, going to the casino with all the hope that he

PDF created with pdfFactory trial version www.pdffactory.com

1    or she would make the money back and keep some for him

2    or herself but -- and converting the money in that way.

3    That's fraud, too.  That's a species of fraud.  But the

4    fact that the person somehow naively hoped it would all

5    work out and it would pay off is not part of the

6    equation here.

7         So I mean, I'd be happy to go on, your Honor.  I

8    don't know at what point you want me to stop on this.

9    But I'm not going to go on for as long as Mr.

10   Pappalardo.

11        All of this suggests, your Honor, that the

12   defendant knew what he was doing; he knew that he was

13   making representations that were completely contrary to

14   what he was doing with the money.  The fact that others

15   knew, others who were not before this jury may have some

16   inkling about what he was doing with the money on the

17   one hand and representations being made on the other

18   does not suggest good faith for two reasons:  One,

19   neither of those people are on trial.  I guess I'm

20   referring to Martin Paley and to Mr. Levine.

21        But secondly, your Honor, two things:  He was

22   kicked out of Merrill Lynch, Mr. Levine's employer.  But

23   the third point is:  He never told the exchangors, any

24   of these people, that he was trading in options.  I

25   mean, there isn't full disclosure here.  None of these

PDF created with pdfFactory trial version www.pdffactory.com

people were told at all.  And the fact that somehow the
Exchange Agreements use the word "discretion" makes no
difference.  The word "discretion" had to be in there
because under 1031 these people could not have qualified
for the tax benefit if they had any control over their
funds.  So they had to accede discretion entirely in
order to complete this transaction.

Secondly, that the word "invest" was used?
There was a whole range of investments.  And the word
"invest" only means as much as it does in context like
any other word.  So, for instance, as Marjorie Adams
pointed out during her cross-examination, an apartment
building may be an investment for some people; it's a
piece of real estate.  It certainly didn't give Dan
Carpenter -- the contract certainly didn't give Dan
Carpenter the discretion to invest in real estate to go
ahead and buy an apartment building or some other piece
of property, so obviously "invest" can't mean anything
under the sun.

And again, that's where we run into -- we go
back to the bigger picture; and that is, we're dealing
here, again, as an exchange of real estate, people who
expect to have their money back at the end of the day
and representations that are entirely consistent with
that concept.  And for that -- and the defendant by all

1    accounts here, your Honor, knew all of this.  For this

2    reason the motion should be denied because any rational

3    jury would see that's the case.

4           THE COURT:  All right.  The motion is denied.

5           We've spent a lot of time on that so we don't

6    have as much time to do other things right now.  Let me

7    just -- with respect to instructions, you've both -- you

8    haven't both submitted.  The defendant has submitted

9    some principal ones and the government has submitted

10   some supplemental ones, and I gather made a reference

11   back to a previously filed set of instructions.

12          I can tell you that I intend to charge the jury

13   substantially along the lines that I charged them last

14   time, and I think you all have that.  So I don't know if

15   there are any particular questions you're concerned

16   about that isn't answered by saying I'll follow pretty

17   much the same instructions that I gave last time.

18          MR. MITCHELL:  Do you want to take that up now,

19   your Honor?

20          THE COURT:  If we could do it briefly.  I want

21   to know if there are any issues in particular that you

22   think --

23          MR. MITCHELL:  Well, there are --

24          THE COURT:  Let me raise one, which is not

25   exactly what I had in mind about the merits of the main

1    event, but I think it was in the government's earlier

2    set that I saw this.  I could be wrong.  But there are

3    some venue requests.  I don't -- I'm not sure that I am

4    clear on where the parties are on the submission of

5    venue to the jury.  I'm inclined not to do it, as I

6    think you know, because I don't think it's necessary in

7    the case.

8         Is there anybody asking for that?

9         MR. MITCHELL:  This may sound a little

10   mealymouthed, your Honor, but the government's position

11   is this:  The government's position is that it believes

12   the Court is correct in concluding that venue is an

13   issue for the Court and that the Court correctly decided

14   the venue issue back in 2005.  That said, there is no --

15   we have no direct guidance on the issue from the First

16   Circuit.  There are other circuits that go the other way

17   because it is a matter that is not -- is not

18   controverted.

19        I'd suggest as a belt and suspenders, as you put

20   it, measure, to submit it to the jury for the very

21   reason that we don't have a reversal on grounds, that

22   the problem solved, is not all that controverted; and

23   secondly, it's not likely to confuse the jury because it

24   is not all that controverted.  So that is the

25   government's position.

1          THE COURT:  Does the defendant have --

2          MR. MITCHELL:  That being said, your Honor, the

3    venue instructions as proposed by the defendant might

4    need some tweaking, so if you're inclined to give that,

5    I would like to address that.

6          THE COURT:  I'm not inclined to give it, I

7    guess, so I understand the conservative approach that

8    the government's taking, but I think it's unnecessary as

9    a matter of law, and I think in light of that, it would

10   be not particularly prudent to put things to the jury

11   that they don't have to be worried about.

12         Let me just mention a couple of other things.  I

13   noticed -- and I went through this quickly.  And I want

14   to do this very quickly, actually.  If we need more

15   time, we can set some time, but I'm not sure we do -- I

16   think last time the government asked for a willful

17   blindness instruction, and I believe from recollection

18   that I declined.  That would be -- I would continue that

19   view.

20         MR. MITCHELL:  Okay.

21         THE COURT:  I don't think there's a -- it's

22   appropriate under the evidence even looking at the

23   evidence of this trial as opposed to the last one.

24         The government's supplemental asks for -- one

25   supplemental asks for a fiduciary duty instruction, and

1    I think that's inappropriate as well.  In brief, if

2    there was a fiduciary duty, it arose after the crimes

3    occurred, in a sense; in other words, the use of the

4    mails and the formation of the exchange, if it did lead

5    to one -- I'm not sure what the law is on that -- but

6    there was not a fiduciary duty in the transactions that

7    led to the formation of the Exchange Agreements.

8         So if -- there's a temporal problem.  In other

9    words, if the formation -- there could be a fiduciary

10   duty with respect to other things that are not in issue

11   here, like care and custody of the funds, for example,

12   but the claim here is that the obtaining of the funds

13   was accomplished by deceit and defraud executed through

14   the mail and wires, and I don't think fiduciary duty

15   fits that, so I don't intend to give that.

16        The government this morning submitted an

17   instruction about other proceedings which I haven't

18   really absorbed, so I'm not sure what my view is on

19   that.

20        MR. MITCHELL:  Well, this is -- we had --

21        THE COURT:  I'm going to tell them -- I'm going

22   to say something to them about keeping focused on what

23   we're here about and not on other things, I just don't

24   know how I'm going to say it.  If that's what you're

25   covering --

1          MR. MITCHELL:  I suggest this is a good way to

2     say it.

3          THE COURT:  As I say, I haven't absorbed it yet.

4          MR. MITCHELL:  Here's my point:  During the

5     testimony -- during the cross-examination of Mitchell

6     Rock the Court, of course, allowed in questions on a

7     bias theory about the arbitration proceeding and the

8     outcome, and allowed inquiry essentially on the ground

9     that potentially Mitchell Rock may have sour grapes

10    toward Dan Carpenter because of that outcome.  And I

11    asked the Court to instruct the jury at that time that

12    they're not to -- that they can only consider that issue

13    for purposes of the witness's credibility and not

14    substantively, and that's what this does here.

15         The arbitration award -- the introduction of an

16    arbitration award in this case, your Honor, frankly was

17    a bombshell, your Honor, and the jury is left wondering

18    what's all this stuff about, focusing on Dan Carpenter.

19    And all we've heard about civil proceedings is that

20    PaineWebber and Merrill Lynch are liable -- there's no

21    mention of Dan Carpenter -- when the reality is, you

22    know, they were only found potentially culpable because

23    of Dan Carpenter.  And so --

24         THE COURT:  Well, as I say, keeping the jury

25    focused -- very focused on the indictment is one of my

PDF created with pdfFactory trial version www.pdffactory.com

1  objectives, and so I will have something to say about

2  that, I'm just not sure -- and I'll show you before I

3  say it in the morning.

4       MR. MITCHELL:  Yeah.  What this does, your

5  Honor, is it acknowledges the purpose for which the

6  Court allowed the questions but it also directs the jury

7  not to speculate about what the civil proceedings were

8  about.

9       THE COURT:  Okay.  The last time we sent a

10 redacted copy of the indictment to the jury.  It's

11 usually my practice to send the copy of the indictment.

12 This is a very long indictment and it includes a lot of

13 stuff -- I think we'd have to re- redact it.  I'm not

14 sure the redactions last time fits the evidence this

15 time.

16      One thought I had was a rather -- just to

17 provide the guidance as to what -- what's charged is

18 almost to give them practically nothing but the list of

19 accounts which begins at Paragraph 102 and maybe some

20 introductory language, maybe not, just so they could be

21 guided through on that.

22      Does anybody have any views on that?

23      MR. PAPPALARDO:  That's fine with us, your

24 Honor.

25      MR. MITCHELL:  Yeah.  I think that's fine, your

1    Honor, although, you know, I hadn't looked at it.  I

2    would assume you're going to send back the same redacted

3    version you had last time?

4         THE COURT:  No, because of differences in the

5    evidence and things like that, I don't think it fits.  I

6    don't know what it would look like when we finished with

7    it, but it would be different.  So we couldn't just

8    automatically do the same thing.

9         MR. MITCHELL:  Can I take 30 seconds just to

10   take a quick look at the indictment and see if there's

11   anything retrievable?

12        THE COURT:  Why don't you do it overnight and we

13   could deal with it in the morning.  But my suggestion

14   would be basically, Count 1 -- I mean, Paragraph 102

15   through Paragraph 105, I guess it is, which sets out the

16   19 counts respectively and stops at the forfeiture

17   count.

18        MR. PAPPALARDO:  Your Honor, with respect to

19   this -- I know the Court is going to reserve on the

20   government's request on Instruction 30.  You may want to

21   consider, if you're going to give something to that, to

22   delete the last two sentences and delete, "unrelated"

23   and/or -- and "some of," and then you've got that, your

24   Honor.

25        The one thing that I would want to raise, your

```
 1   Honor, for your consideration now is on Defense
 2   Instruction No. 15.  We would be strongly requesting
 3   that the Court include the language that's contained in
 4   Paragraph 3 because that is First Circuit law, and --
 5            THE COURT:  Beginning with the mail and wire
 6   fraud?
 7            MR. PAPPALARDO:  Yes, exactly.
 8            THE COURT:  Didn't I say that last time?
 9            MR. MITCHELL:  You did.
10            MR. PAPPALARDO:  I believe, your Honor, you did
11   not as --
12            THE COURT:  Okay.  I think it's an accurate
13   statement of the law.
14            MR. PAPPALARDO:  Thank you, your Honor.
15            MR. MITCHELL:  You're talking about the whole
16   paragraph, your Honor, or --
17            MR. PAPPALARDO:  Yes.  That's the First Circuit
18   law.
19            MR. MITCHELL:  You instruct -- the government's
20   position is your instruction last time on good faith
21   accurately reflected --
22            THE COURT:  I know I touched on the subject.
23   I'll look at the language.  I think that's accurate, I
24   would say that.  Whether an alternate formulation of it
25   would also be accurate...
```

1           MR. PAPPALARDO:  We'll go over this very

2    quickly, your Honor, in the morning, last minute --

3           THE COURT:  I hope I have something I could give

4    you, and you could look at it and read it.

5           MR. PAPPALARDO:  Thank you.

6           MR. MITCHELL:  Your Honor, as we look at the

7    indictment, is there anything in particular --

8           THE COURT:  There's a lot of loss information.

9           MR. MITCHELL:  So cut out the loss information?

10          THE COURT:  Yeah.

11          MR. MITCHELL:  It may not be retrievable --

12          THE COURT:  I guess I'm just concerned --

13   there's been a lot of evidence.  I want to keep them

14   focused on the evidence and not be looking at the

15   indictment for evidence, frankly.  The reason I give

16   them the indictment is so they can understand what's

17   charged and therefore respond to the charge, that's the

18   principal reason, you know, rather than to give them a

19   government brief, frankly.

20          MR. MITCHELL:  Yeah.  Can I address one thing,

21   your Honor?  The other supplemental -- proposed

22   Instruction No. 29?

23          THE COURT:  Yeah.

24          MR. MITCHELL:  Let me explain what the idea is

25   there.  On the cross of several government witnesses

1    defense counsel asked them to read the integration

2    clause, and certain questions were asked of the witness,

3    whether the witness understood all of the

4    representations that came beforehand were addressed --

5    and I'm paraphrasing now -- addressed in the integration

6    clause.  Now, the curious thing was that none of the

7    attorney witnesses were asked about the integration

8    clause because the attorney witnesses would have known

9    in a fraud case the integration clause matters not at

10    all.

11          So what I tried to do here, your Honor, is

12    capture that.  There is a risk -- there is a risk in

13    this case that the jury may focus on the integration

14    clause and say, "Jeez, you know, I think what came

15    before in those promotional materials may have been

16    misleading but it says right here that all

17    representations are superseded, so, and they signed the

18    contract, so this must mean that I can't consider what

19    was said is in the promotional materials."  And so in

20    that way there is a risk that the jury will give

21    integration clause legal effect and not just consider it

22    as an additional representation.

23          So what I've tried to do in the proposed

24    instruction is address both:  acknowledge that the jury

25    can't consider it but at the same time note that it

PDF created with pdfFactory trial version www.pdffactory.com

1   doesn't have legal effect and it doesn't somehow, as a

2   legal matter, insulate the defendant from liability just

3   because it's in there.

4        MR. PAPPALARDO:  Your Honor, very briefly in

5   response to that.  With respect to 29, we would strongly

6   object to that.  Number one, there's nothing that we

7   would say is outside of -- there are no statements.  But

8   more importantly, your Honor, if you look at these

9   cases, these are all civil cases.  And reading them,

10  they deal with contracts entered into by

11  misrepresentation.  This has no application in the

12  criminal case, your Honor, when we're dealing with guilt

13  beyond a reasonable doubt.  And I'd suggest --

14       THE COURT:  Okay.  I'll let you know in the

15  morning.

16       MR. GREENBERG:  Just one last thing very

17  quickly?  Based on what the government said before, it

18  would appear that they intend to argue during their

19  closing arguments expectations, understandings.  At

20  least that's what they were referring to in opposing the

21  motion.  We just want to make it clear that the

22  government not be permitted to argue the expectation,

23  the mental understandings or impressions that exchangors

24  or their attorneys had.  That's clearly an improper

25  argument.

PDF created with pdfFactory trial version www.pdffactory.com

1          As your Honor mentioned throughout the trial,

2    you know, unstated expectations or understandings that

3    were, in fact, never communicated to Mr. Carpenter has

4    no relevance whatsoever.  We would be, you know,

5    severely prejudiced if the government were to argue

6    during closing arguments to rely on the understanding or

7    expectations of any of these exchangors.

8          THE COURT:  All right.  The length of argument?

9          MR. MITCHELL:  Closing will be up to, what, 45

10    minutes?

11          MR. PIROZZOLO:  I'm doing the closing, your

12    Honor.  I think 40, 45 minutes, and maybe some

13    additional time for rebuttal.

14          THE COURT:  Is that -- who's arguing for the

15    defendant?

16          MR. PAPPALARDO:  I am, your Honor.  I would like

17    to think I could keep it to about 45 minutes.

18          THE COURT:  Well, yeah.  Okay.

19          MR. PAPPALARDO:  Or whatever time they --

20          THE COURT:  I don't run a stopwatch on it, but

21    it's got to be roughly the same, is my rule.

22          MR. PAPPALARDO:  Right.

23          THE COURT:  You know that -- of course I know

24    Mr. Mitchell knows -- that I instruct on the elements of

25    the offense before you argue; I bifurcate my -- I think

1    you know that from the transcript.

2         MR. PAPPALARDO:  Does that mean, your Honor, if

3    I have 30 minutes, that the government only has 30 for

4    both their closing and rebuttal?

5         THE COURT:  In theory, but you can't control it

6    that way.

7         MR. PAPPALARDO:  But you see my point, your

8    Honor.  Can I effectively preclude their rebuttal?

9         THE COURT:  No.

10        MR. MITCHELL:  One last point.  I'm glad Mr.

11   Greenberg reminded me of this.  I just want to make

12   clear that -- if it hasn't been made clear already --

13   that the government's position, and we so move, that

14   there shouldn't be reference to outcomes of civil

15   proceedings or references to civil proceedings in the

16   closings at all.  And when I say "at all," not just in

17   the context of "don't believe this individual because

18   his testimony is tainted by other civil proceedings."

19   In reality, each witness said, "No, it doesn't affect

20   me."

21        There were a couple of witnesses for whom the

22   defense counsel forgot to ask that type of question;

23   that is, you know, would the civil matter -- pending

24   civil matters or the arbitration color your testimony.

25   There is no evidence in the record that civil matters

PDF created with pdfFactory trial version www.pdffactory.com

1  affected their testimony at all so they shouldn't be --
2  there should not be any reference to them whatsoever.
3         I just wanted to make that -- I wanted to make
4  sure that that was the case, that we wouldn't find any
5  leakage.
6         THE COURT:  I don't know that there's any issue
7  other than with the PaineWebber and Merrill Lynch
8  people, was there?
9         MR. MITCHELL:  Right.  And they were all
10 asked --
11        THE COURT:  No.  The jury can make their own
12 judgment about that.
13        MR. PAPPALARDO:  Right.
14        THE COURT:  The views with those, not with the
15 exchangors, because I don't think there was evidence
16 about that.
17        MR. PAPPALARDO:  We will keep the evidence in
18 the case, your Honor, and the purpose for which it
19 was --
20        THE COURT:  The jurors can be asked to evaluate
21 Mr. Rock's testimony, for example, by the impeaching
22 evidence that was admitted.  So the evidence is -- if
23 it's in evidence, it's arguable.
24        MR. MITCHELL:  And --
25        MR. PAPPALARDO:  I understand.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            MR. MITCHELL:  And by the same token, there

 2    shouldn't be any reference to repayment by anybody in

 3    closing.  I mean, it's irrelevant.  The Court has

 4    established that it's irrelevant, there shouldn't be any

 5    reference to it.  It's a nullification argument.

 6            THE COURT:  Yeah.  No, that's out.

 7            MR. PAPPALARDO:  Or loss.

 8            MR. GREENBERG:  Or loss.

 9            MR. MITCHELL:  Or loss.

10            THE COURT:  Okay.

11            THE CLERK:  All rise.  Court is in recess.

12            (The proceedings adjourned at 1:49 p.m.)

13

14                      CERTIFICATION

15

16       We certify that the foregoing is a correct

17    transcript of the record of proceedings in the

18    above-entitled matter to the best of our skill and

19    ability.

20

21    /s/Debra M. Joyce
      Debra M. Joyce, RMR, CRR          Date
22    Official Court Reporter

23

24    /s/Marcia G. Patrisso
      Marcia G. Patrisso, RPR, CRR      Date
25    Official Court Reporter
```