UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                                )
UNITED STATES OF AMERICA,        )
                                )
          Plaintiff,             )
                                ) Criminal Action
v.                               ) No. 04-10029-GAO
                                )
DANIEL E. CARPENTER,             )
                                )
          Defendant.             )
                                )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY 13
JURY TRIAL



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, June 18, 2008
9:30 a.m.



Marcia G. Patrisso, RPR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Jonathan F. Mitchell and Jack W. Pirozzolo,
 3        Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        One Courthouse Way
          Boston, Massachusetts  02210
 5        On Behalf of the Government

 6        GREENBERG TRAURIG, LLP
          By: A. John Pappalardo, Esq. and
 7           Gary R. Greenberg, Esq.
          One International Place
 8        Boston, Massachusetts  02110
          On Behalf of the Defendant

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PDF created with pdfFactory trial version www.pdffactory.com

I N D E X

Closing Statement                                          Page

     By Mr. Pirozzolo                                     41
     By Mr. Pappalardo                                    74
     Rebuttal by Mr. Mitchell                            106


Court's charge to the jury:                          26/121

1          (The following proceedings were held in open

2     court before the Honorable George A. O'Toole, Jr.,

3     United States District Judge, United States District

4     Court, District of Massachusetts, at the John J. Moakley

5     United States Courthouse, One Courthouse Way, Boston,

6     Massachusetts, on June 18, 2008.

7          The defendant, Daniel E. Carpenter, is present

8     with counsel.  Assistant U.S. Attorneys Jonathan F.

9     Mitchell and Jack W. Pirozzolo are present.)

10          THE CLERK:  All rise.

11          Please be seated.

12          THE COURT:  We have a number of matters to deal

13     with.  I would like to first deal with the question of

14     the redaction of the indictment.  We spoke about just

15     sending the list of Counts 1 through 19 that appears, I

16     believe, at the beginning of Paragraph 102.  We talked

17     about that yesterday.

18          MR. MITCHELL:  Yeah.  I think that's fine, your

19     Honor.

20          THE COURT:  Well, it may be.  Still, I just want

21     to raise for you that one of the instructions is that

22     the government has an obligation to prove the scheme as

23     alleged in the indictment and not some other scheme.  If

24     they don't have a description of the scheme, that is a

25     little bit --

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. PAPPALARDO:  Your Honor, it was my

2   understanding that you were going to substitute that

3   with a description -- that you were going to augment

4   that charge with a description.  Is that not accurate?

5          THE COURT:  You mean of my own?

6          MR. PAPPALARDO:  Yeah.  A description of the

7   charge in the case.

8          Or you can just delete that part --

9          THE COURT:  No.

10          MR. PAPPALARDO:  -- of the instruction.

11          THE COURT:  I could do that.

12          MR. PAPPALARDO:  I think that would make sense.

13          MR. MITCHELL:  That's fine.

14          THE COURT:  That's usually an instruction for

15   the benefit of the defendant, but if the defendant

16   doesn't object to deleting that, I'm not sure -- let me

17   just find it.

18          MR. PAPPALARDO:  Would you direct our attention

19   to the specific...

20          THE COURT:  Yeah.

21          (Pause.)

22          THE COURT:  It's at the bottom of page 4, the

23   next-to-last paragraph.  "Let me address the element."

24          MR. PAPPALARDO:  Your Honor, I would not suggest

25   deleting that.  I would suggest a description of the

 1  charge.

 2          THE COURT:  I'm sorry?

 3          MR. PAPPALARDO:  I would suggest some

 4  description of the charge that we could agree on because

 5  I think that's important.

 6          MR. MITCHELL:  You can't have it both ways.  I'd

 7  be happy to go upstairs right after the closings and

 8  strip out the loss part of the indictment.  If he wants

 9  to keep the instruction, fine, but...

10          THE COURT:  Here's my proposal:  I don't know if

11  you have a copy of the indictment there.

12          MR. PAPPALARDO:  I'm sure we could get one, your

13  Honor.

14          THE COURT:  I think that the scheme is

15  substantially alleged -- I'm looking at the --

16          MR. MITCHELL:  Superseding indictment.

17          THE COURT:  -- superseding indictment, but the

18  redacted version that was submitted last night, which is

19  Docket No. 155.  And I say that because there are -- in

20  the paragraphs I'm going to refer to there are some

21  deletions.  Because I'm looking at the redacted version,

22  I'm not sure exactly what they are.

23          But anyway, looking at that, the scheme is

24  alleged, it seems to me, up through approximately

25  Paragraphs -- well, Paragraph 53, but there may be a

PDF created with pdfFactory trial version www.pdffactory.com

1    couple of things in the immediately preceding paragraphs

2    which are not in evidence and might be redacted.  And

3    then I would propose to skip from Paragraph 53 -- or,

4    that is, from 54 -- through to 102, it would begin.

5            In other words, it would delete the January

6    events and it would delete the specifics of each

7    exchangor's circumstances, and then go right to 102.

8            MR. PAPPALARDO:  Your Honor, if I may?

9            THE COURT:  Yeah.

10           (Pause.)

11           MR. PAPPALARDO:  Your Honor, I think it's going

12   to take some time to go through this.  Just looking at

13   some of the paragraphs in here, you excluded a lot.  In

14   the interest of expediency, I would suggest to the Court

15   that we go with the charge and you just deal with the

16   elements of the crime as we originally thought.

17           THE COURT:  Of course the instructions do that.

18           MR. PAPPALARDO:  Right.

19           THE COURT:  They don't describe -- they don't

20   describe what the indictment alleges as opposed to what

21   the proof may or may not be.  That's what this

22   instruction goes to, a variance between the indictment

23   and the proof.  I'm not suggesting there is one, but I

24   just -- it's hard to tell them to pay attention to what

25   the indictment alleges and not let them see the

PDF created with pdfFactory trial version www.pdffactory.com

1   indictment to see what it alleges.

2        MR. PAPPALARDO:  Again, your Honor, I'd suggest

3   that we delete that portion of the charge and just

4   address the elements but for the charge.

5        THE COURT:  We could do that, which is delete

6   the next-to-the-last paragraph on page 4 of the

7   instructions as you have them, beginning "Let me address

8   the first element" and ending with "failed to prove the

9   offense"; delete that entire paragraph?

10       MR. MITCHELL:  Yeah.  I think that works.  I

11  mean, if that's what they're agreeing to, sure.

12       THE COURT:  If that's the case, we won't have

13  the anomaly and we could simply put in Paragraph 102.

14       MR. PAPPALARDO:  Yes, your Honor.  Why don't we

15  do that.  Because it will take a long time -- I mean,

16  you've excluded a lot of evidence in the first 90

17  paragraphs of that indictment.

18       THE COURT:  I agree with that.  On the other

19  hand, it is always true that assertions in -- not nearly

20  always true -- I should say nearly always true that

21  assertions in the indictment always be fully supported

22  by the evidence.  And in any case, when we send the

23  indictment, there's probably some conflict between what

24  is alleged as a fact and what is ultimately in evidence.

25  So the fact that there is some of that, with the proper

PDF created with pdfFactory trial version www.pdffactory.com

1    instruction for the jury to handle it, I don't think is

2    a problem.

3         I would agree that there is -- there may be

4    still some particularly sensitive pieces that would have

5    to be scrutinized and, so -- which we can do even after

6    the jury retires.  I mean, we could take some time to do

7    that.  They'd have to wait a little bit to get the

8    actual indictment.  But, I mean, that's an option.  But

9    I'll do either course.  I'll delete that paragraph and

10   simply go to 102 or make a copy of 102 and following, or

11   we could keep the paragraph in and we could take a

12   little time after the jury has withdrawn to consider

13   what specifically ought to be taken out of the first 50

14   or so paragraphs.

15        MR. PAPPALARDO:  Your Honor, why don't we just

16   deal with 102; delete that paragraph.

17        THE COURT:  Okay.  Okay.  We'll prepare that,

18   then.

19        I think you have each received a copy of the

20   instructions?

21        MR. PAPPALARDO:  We have, your Honor.  If I

22   could just comment.  We would again request the Court

23   charge under the Sand jury instructions which we

24   submitted on Jury Instruction 15, Paragraph 2.  Again, I

25   submit to the Court that that is the appropriate law,

PDF created with pdfFactory trial version www.pdffactory.com

1  and I think it's very relevant to the facts of this

2  case.  And I did not see that included in your --

3        THE COURT:  Well, let me direct you to page 8.

4  The bottom of page 7 and the top of page 8.  If you read

5  the paragraph beginning "Second," I think I address it

6  in there.

7        MR. PAPPALARDO:  If I may, your Honor?

8        THE COURT:  Yeah.

9        (Pause.)

10        MR. PAPPALARDO:  You've covered it, your Honor.

11  Thank you.

12        MR. MITCHELL:  The only issue we have with the

13  instructions, your Honor, is the omission of the

14  instruction we proposed cautioning the jury about

15  speculating about civil proceedings.  We are concerned

16  that that is somehow going to become an enormous

17  distraction for the jury and --

18        THE COURT:  I think that's also in here, not in

19  the way you propose it, but I have an appropriate

20  caution.

21        MR. MITCHELL:  It doesn't address civil

22  proceedings, though.

23        THE COURT:  It doesn't use those words, I agree,

24  but I think it gives them the necessary caution to be

25  focused on this event.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. MITCHELL:  All right, your Honor.  Again, I

2    would -- just so we're clear, because I don't want to

3    object unnecessarily in front of the jury during the

4    defense's closing, but, again, my understanding is that

5    they're not going to use the fact of the civil

6    proceeding or the outcome of a civil proceeding as

7    substantive evidence in the closing, and they shouldn't.

8          THE COURT:  Certainly there is no evidence of

9    outcome, I think, so that would be obviously beyond the

10   evidence.  The limited reference is to potential bias of

11   the witnesses, and that's proper; that's in the

12   evidence.

13         MR. PAPPALARDO:  Your Honor, if I may, there is

14   evidence in this case with respect to the issue of bias

15   as follows:  Number one, there was a proceeding -- an

16   arbitration proceeding that was commenced by Benistar.

17   This came through -- the government allowed this -- with

18   respect to the bias of Mr. Rock.

19         THE COURT:  Right.

20         MR. PAPPALARDO:  Number one, that there was an

21   arbitration proceeding that was commenced by Benistar

22   against PaineWebber concerning the events of this case

23   that resulted in an award of over $12 million.  That's

24   what's in evidence.

25         THE COURT:  Right.  And it can be used in

PDF created with pdfFactory trial version www.pdffactory.com

1   connection with Mr. Rock's potential bias as a witness.

2       MR. PAPPALARDO:  Exactly.  And that's what we

3   would intend to do.

4       THE COURT:  That's fine.

5       MR. MITCHELL:  Okay.

6       THE COURT:  Okay.  I want to address the

7   defendant's motion for a mistrial which was orally made

8   yesterday and then a written motion was admitted.  And I

9   would like to have a response from the government to

10  that because I want to consider whether anything needs

11  to be done before the jury -- or as the jury is

12  instructed or closing statements begin.

13      MR. MITCHELL:  You want a response from the

14  government?  Well, the government -- we haven't read the

15  thing, your Honor.  It was filed late last night.  And

16  if you want to give us a couple of minutes.  They just

17  handed it to us this morning, so...

18      THE COURT:  Why don't we do that, then?  Why

19  don't we just take a pause and have you consider it,

20  because I would like to have the government's position

21  on it.

22      So we'll take a short recess.

23      THE CLERK:  All rise.

24      The Court will take a recess.

25      (There is a recess in the proceedings at

PDF created with pdfFactory trial version www.pdffactory.com

1   9:59 a.m.)

2          THE CLERK:  All rise.

3          Please be seated.

4          MR. PIROZZOLO:  Your Honor, the government's

5   response to the motion for a mistrial comes essentially

6   in three parts:  The case cited, the *Mangual-Garcia*,

7   involves situations in which there is information that

8   is within the possession of the government but not the

9   defendant, number one.  It also applies to situations

10  where the evidence is left uncorrected.

11         In this case all of the information that was set

12  forth in spades on cross-examination not only was

13  provided by the government and in the possession of the

14  defendant, but much of it was also on the government's

15  own exhibit list.  So whatever testimony that Mr. Levine

16  gave on cross-examination that appeared to be false was

17  corrected by the subsequent cross-examination by Mr.

18  Pappalardo.  There was nothing further for the

19  government to do at that point.

20         And second, the government then elicited on

21  direct examination of Mr. Patterson the corrected

22  information that at least put into play, if not

23  establishing, Mr. Levine's lack of credibility on the

24  issue of whether or not he ever spoke to Mr. Patterson.

25  So it was corrected; it applies only to information that

PDF created with pdfFactory trial version www.pdffactory.com

1    is not within the possession of the defendant -- that

2    doesn't apply here.

3         And finally, the third point is that there's no

4    prejudice of any kind here, none, because Mr. Pappalardo

5    was able to argue in spades here to the jury about

6    Mr. Levine's credibility, and he has a great deal to

7    work with to establish that he has issues with his

8    credibility.

9         THE COURT:  What does the government intend to

10   say to the jury about Mr. Levine's testimony?

11        MR. PIROZZOLO:  We were going to say nothing

12   about the riverboat gambler comment.  We do not intend

13   to address that in closing.

14        Second, our intention with respect to Mr. Levine

15   in the closing is as follows:  We're going to focus on

16   the fact that Merrill Lynch and PaineWebber may have

17   played a role in this, generally, not distinguishing

18   between Mr. Levine, Mr. Stern, Mr. Rasmussen, Mr. Rock.

19   And then I intend to say whatever role Mr. Levine may

20   have known about what Mr. Carpenter was up to is not

21   relevant to what Mr. Carpenter did after Merrill Lynch

22   threw him out and he went to PaineWebber.  That is the

23   extent of the closing argument insofar as it treats

24   Mr. Levine by name.

25        Now, there were two other brokers that testified

1  for Merrill Lynch, and there's testimony from them that

2  I do intend to address in the closing.  But their

3  testimony is not at issue by this motion or affected by

4  Mr. Levine's testimony.

5       THE COURT:  Does the government intend to ask

6  the jury to credit Mr. Levine's testimony?

7       MR. PIROZZOLO:  No.

8       THE COURT:  Does the government believe

9  Mr. Levine's testimony?

10      MR. PIROZZOLO:  As to the issue of whether or

11  not he received that call?  The most charitable way I

12  can put it is that he has a failure of recollection so

13  complete that he believes, but I do not think that his

14  testimony is credible, your Honor, as to that point.

15      THE COURT:  Mr. Pappalardo?

16      MR. PAPPALARDO:  Well, your Honor, I guess I'm a

17  little bit perplexed.  The government says that this

18  case is different because it draws a distinction between

19  whether or not the defendant has the information in its

20  possession at the time a statement is made.  That's

21  totally and unequivocally irrelevant to the issue.

22      The issue here, your Honor, is the government's

23  duty.  And let me point out that the government had this

24  information in various forms dating back to 2004; this

25  isn't something that just was sprung on them at this

PDF created with pdfFactory trial version www.pdffactory.com

1   trial.  They had an affidavit from Mr. Patterson; they

2   had used Mr. Levine's testimony on a prior occasion.  He

3   had testified in a civil proceeding.

4        The reason why they wanted Levine, your Honor,

5   was to shoehorn in that comment about riverboat gambler;

6   otherwise, essentially what he said was cumulative.

7   Cumulative with Stern, perhaps cumulative with

8   Rasmussen.  But they still wanted -- and what they

9   wanted was their cake and to eat it too, because they

10  also want Patterson.  And, your Honor, for this

11  government to stand up here at this trial at this point

12  in time and say that there was no prejudice of any kind

13  is absolutely amazing to me.

14       If your Honor please, the reason why they wanted

15  Patterson, as I understand it, is because Patterson --

16  they want to be able to argue, okay, that Patterson

17  wanted the secure funds and they wanted to show Dan

18  Carpenter's involvement because they sure as hell

19  don't -- excuse me -- they sure don't have it with the

20  investors that are within the confines of this case but

21  they do have it with Patterson.  And they want to show

22  that Carpenter was aware, they want to show Carpenter

23  was active, did things and didn't do certain things.

24  And we'll deal with that, too.

25       But they wanted Patterson.  And what they did,

PDF created with pdfFactory trial version www.pdffactory.com

1    your Honor, was they put on Mr. Levine to gild the lily,

2    and they got caught.  But what is amazing about it to me

3    is that they knew what Levine was going to say.

4         In direct examination Mr. Pirozzolo asked him --

5    and it was very interesting what he asked him.  He asked

6    him, "Do you recall a conversation?"  And he said, "No."

7    He asked him that twice on direct.

8         What we said on cross, your Honor, is at the

9    beginning of the motion.  It is unequivocal.  This

10   witness testified on that stand that absolutely no

11   conversation took place at any time.

12        And by the way, your Honor, it's not just

13   Mr. Patterson that disagrees with Mr. Levine; it's

14   Mr. Paley.  We chose to insert Mr. Patterson.  Why?

15   Because as the government had in their possession for

16   four years, there is independent corroborating evidence

17   of the fact that that conversation took place.  They

18   sent each other faxes back and forth; there are billing

19   records of Mr. Patterson in the government's possession;

20   there are phone statements from Mr. Patterson in the

21   government's possession.  They know this occurred and

22   yet they put Levine on that stand at a critical juncture

23   of this trial to tell this jury that.

24        Your Honor, there is nothing more crucial in

25   this case -- and I would suggest to the Court that Mr.

PDF created with pdfFactory trial version www.pdffactory.com

1   Carpenter's state of mind is really what's at issue

2   here.  And Levine's testimony goes to the heart of that,

3   as does Patterson's, and they wanted both.  They wanted

4   to put before this jury what Mr. Levine said, ignoring

5   the fact that what he said, particularly on

6   cross-examination, was not only a lie but it was no

7   surprise to the government.

8        It doesn't cure, your Honor.  It doesn't make it

9   all better that I can cross-examine Levine and make him

10  look like he's a liar because the damage is done with

11  the jury.  The jury hears the evidence.  And I submit to

12  the Court that at the point in time, certainly on

13  cross-examination -- at that point in time the

14  government by all of this case law has an affirmative

15  duty to correct that, and the government did not.

16       That is why we filed this motion for a mistrial,

17  your Honor.  The harm is obvious; the harm is palpable.

18  And the government knew it, the government invited it,

19  the government orchestrated it.  And that's why this

20  motion for a mistrial should be allowed.

21       THE COURT:  Well, correction could still be

22  possible.

23       MR. PAPPALARDO:  Your Honor, I totally disagree.

24  You cannot cure what is before this jury now.  If you

25  redacted Levine's testimony -- if you redacted Levine's

PDF created with pdfFactory trial version www.pdffactory.com

1    testimony, if the judge instructed the jury not to

2    listen to Levine or that you can't consider anything he

3    said, I would still suggest to you, your Honor, the harm

4    was done.

5         And the point here, your Honor, is this:  The

6    point is, again, this was all invited by the government.

7    The government knew this in advance; they had this for

8    years and they tried to skate around it, and then they

9    ignored it when it happened.

10        Your Honor, this is serious because it goes

11   precisely to the issue of the defendant's state of mind.

12   That's what Levine does; that's what Patterson does.

13   What could be more crucial, your Honor -- just let me

14   spin this out a bit.  What could be more crucial than

15   Mr. Carpenter's state of mind when the initial

16   engagement with Merrill Lynch started?  What could be

17   more crucial than October of 1998 when this account

18   relationship began and Mr. Carpenter is dealing with

19   Mr. Levine and Mr. Carpenter takes steps to ensure that

20   Mr. Levine, one, knows that they're dealing in clients'

21   funds; two, knows what a property exchange is all about,

22   knows that, you know, money has to come back and forth

23   because of that property exchange?  This is Mr.

24   Carpenter's state of mind at that time, and Mr. Levine

25   denied it.  He said, "No, that conversation never took

PDF created with pdfFactory trial version www.pdffactory.com

1   place."  Similarly, he denied it with Mr. Paley.

2        I submit to the Court there is nothing more

3   crucial in this case than what Mr. Carpenter could

4   reasonably be expected to rely upon in October of 1998

5   when he was setting up these accounts.  It's the only

6   time, your Honor -- it's the only time that he ever had

7   any contact with an investor or an investor's

8   representative.  That's what happened and that's why

9   this is so crucial.  And the government in a cavalier

10  fashion throws that testimony on knowing it's untrue and

11  does not follow the case law.

12        And I suggest, your Honor, there is no way that

13  you can at this point in time cure that testimony before

14  this jury.

15        THE COURT:  In the case you cite in the brief,

16  the *Mangual-Garcia* case, that's exactly what the Court

17  did, though, was instruct the jury --

18        MR. PAPPALARDO:  Your Honor, this is the

19  essential issue in this case.  The reason why I don't

20  care whether the indictment goes to the jury is that

21  this case reduces itself to one simple proposition:

22  What was Mr. Carpenter's state of mind?  And Levine's

23  testimony and Patterson's testimony and Paley's

24  testimony goes to the very heart of that:  What could

25  Mr. Carpenter -- what was in his mind at the time?  What

PDF created with pdfFactory trial version www.pdffactory.com

1  he did -- what he did, what he didn't do.

2       And for this jury to hear from Mr. Levine who

3  said, "Oh, no, I never heard from Mr. Paley; he never

4  told me about 1031 exchanges; he never told me that

5  exchangors were going to call; he never explained the

6  law to me," and to say the same thing with Patterson in

7  the face of faxes going back and forth, in the face of

8  letters going back and forth, in the face of telephone

9  records and billing records, your Honor, this is a -- I

10 can't overemphasize how important this is to the defense

11 of this case and how it can't be cured at this point in

12 time.  This jury has been poisoned by what Mr. Levine

13 said.

14       THE COURT:  Okay.

15       MR. PAPPALARDO:  Mr. Stern didn't say that, your

16 Honor.  Mr. Stern wasn't the account manager; Levine

17 was.  He was the one who set up this account.

18       THE COURT:  Okay.  I understand the argument.

19       Anything else?

20       MR. PIROZZOLO:  Unless you have any specific

21 questions, your Honor, no.

22       THE COURT:  Okay.  Well, I'm going to reserve on

23 the motion, and we'll proceed with the arguments and

24 charge.

25       MR. GREENBERG:  Your Honor, there's one issue on

1    a chalk that the government intends to use.  Your Honor,

2    the government has advised us they intend to use, as

3    part of their closing, 204C, which was a chalk used, you

4    know, during the trial.

5          We have an objection because we believe the

6    government is going to be attempting to use that to

7    mislead the jury.  Your Honor may recall that had

8    balances as of the end of certain months in the various

9    accounts.

10         And to the extent that the government intends to

11   suggest to the Court -- again, the operative dates are

12   not the end of the months; the operative dates are the

13   times of the very specific transactions.  And our

14   concern is that the government not be permitted to argue

15   based upon those month-ending balances to suggest that

16   those were the balances at the time of any particular

17   transactions which are the subject of the indictment.

18         THE COURT:  Well, we'll see what the argument

19   is.  The chalk may be used.  If it was used in

20   connection with the testimony, there's no reason to

21   preclude it from being used.  If we kept it out of

22   evidence --

23         MR. GREENBERG:  That's right.  But the issue has

24   to do with the use of the chalk.

25         THE COURT:  All right.  Well, we'll see what the

PDF created with pdfFactory trial version www.pdffactory.com

1  use is.

2         MR. PIROZZOLO:  I can tell you what it's going

3  to be.  Mr. Carpenter writes a memorandum to Mr. Paley

4  that mentions the possibility of bankruptcy.  It's in,

5  basically, 184.  He knows at that point in time he does

6  not have enough money on hand to meet the obligations of

7  the exchangors.  That's August of 2000.

8         What we intended to do was demonstrate that that

9  statement was not just ruminating; it had grounds.

10  There are the actual numbers that were both being kept

11  by Benistar and that were on the account statements of

12  Merrill Lynch.  It's an entirely fair argument.

13         MR. GREENBERG:  Your Honor, the bankruptcy

14  reference there, if I recall correctly, had nothing to

15  do with Mr. Carpenter, and it -- to the extent that is a

16  gross misrepresentation of the document --

17         THE COURT:  I don't know what that is.

18         MR. PIROZZOLO:  Your Honor, there is one thing

19  in my closing, because I'm not sure you were clear

20  yesterday as to your position on this.  I do intend in

21  my closing to refer to the testimony that is in evidence

22  from Mr. Snider that trading in options was the furthest

23  thing from his mind.  That's in evidence.  I believe

24  that's a fair comment for purposes of closing.

25         But I know that there was an objection raised

PDF created with pdfFactory trial version www.pdffactory.com

1    today -- yesterday, and I wasn't sure what the Court's

2    ruling was on that.

3         THE COURT:  What use, in your view, should the

4    jury make of that fact?  In other words, why should it

5    be presented?  What would you ask them to conclude based

6    upon that piece of testimony?

7         MR. PIROZZOLO:  It helps them understand the

8    nature of the transaction that the exchangors were

9    engaged in.  It's important for them to understand and

10   to put into context the issue of what the background

11   business situation was that generated the marketing

12   materials and the contracts that these people signed.

13   And it also goes to the materiality of the omissions and

14   the representations that were made.

15        MR. PAPPALARDO:  Your Honor, as we indicated

16   throughout this trial, what was in anybody's mind, and

17   especially in an investor's mind, that wasn't

18   communicated directly to Mr. Carpenter is not at issue

19   in this case.  I suggest to the Court that it's both

20   irrelevant and immaterial, but certainly improper.

21        (Pause.)

22        THE COURT:  Yeah, I think it unduly

23   subjectivizes the standard, even as to materiality.

24   Materiality is an objective standard.  So to emphasize

25   that a particular person had a subjective view I think

1  leads in the wrong direction with respect to the

2  materiality.

3         MR. PIROZZOLO:  Note my objection to that

4  ruling, your Honor.

5         THE COURT:  Okay.

6         All right.  I guess we're ready for the jury.

7         While he's doing that, you've seen a copy of the

8  redacted superseding indictment?  So you'll know the

9  difference, because the jury instruction packages look

10 the same, largely we've added the date to the current

11 version on the cover page.  We did that just as a

12 marker, so the one with the date is the current one.

13        MR. PIROZZOLO:  The current jury instructions?

14        THE COURT:  Yes.  The one we gave you earlier in

15 the morning had no date.  If you keep those together,

16 that will be the one that's operative.

17        Is anyone using equipment?

18        MR. PIROZZOLO:  Yes, your Honor.  We intend to

19 put up the exhibit we just spoke about, 204C, on the

20 computer.  But that is --

21        THE COURT:  Okay.  I just want to know whether

22 to give you the feed, that's all.

23        MR. PIROZZOLO:  I think we will.

24        MR. PAPPALARDO:  Your Honor, we will also use

25 selected portions of testimony and one exhibit.

PDF created with pdfFactory trial version www.pdffactory.com

```
1              THE COURT:  Okay.  So I'll switch them on.

2              THE CLERK:  All rise for the jury.

3              (Jury in at 10:47 a.m.)

4              THE CLERK:  Please be seated.

5              THE COURT:  Good morning, jurors.

6              THE JURORS:  Good morning, your Honor.

7              THE COURT:  Again, we appreciate your patience.

8    There are always last-minute things to take care of, and

9    we've been doing that and we're ready to proceed now.

10              In presiding over a trial like this I have two

11   major areas of responsibility:  The first is to make

12   sure that the Rules of Evidence and procedure are

13   properly applied in the course of the case as it's being

14   presented to you; and the second important

15   responsibility I have is to give you instructions about

16   the principles of law that pertain to the matters you've

17   heard about and about which you will have to make some

18   judgments.  So I am now going to give you these

19   instructions in the law, and you can think of this sort

20   of as a short course in all the law you will need to

21   know in order to decide the issues in this case.

22              You should take it that what I'm about to tell

23   you is a complete and accurate statement of the

24   principles of law that pertain to these matters.  I have

25   the responsibility to set forth these principles fully
```

and accurately without regard to any private or personal
views I might have about the prudence or wisdom of any
of these rules, whether there might be different or
additional ones that could be applied in these
situations, but to tell you what the law is with respect
to these matters.

        And you have a similar duty in receiving the
principles of law:  to listen to them and apply them
without regard to any private or personal views you
might have about whether there could be additional rules
or different ones that could be applied in these
circumstances.  Consider the instructions as a whole and
apply them sensibly and faithfully in your
deliberations.

        I'm going to talk about two general areas, and
I'm going to divide my time in doing it.  In just a
minute I'm going to set forth for you the principles
that pertain to the particular offenses that the
government charges the defendant with in the indictment
in this case.  That is, I will tell you what is
necessary for the government to prove by the evidence in
order to convict him of the charges made against him.
After I've done that the lawyers will have an
opportunity to present their closing statements.  I
think it will be helpful to you in listening to the

PDF created with pdfFactory trial version www.pdffactory.com

1    lawyers' arguments to have been instructed about the law

2    to pertain to the offenses charged.

3          After the closing statements I'll have some more

4    to say to you about how you should go about your

5    deliberations and what kinds of considerations you may

6    have as you evaluate the evidence and discharge your

7    responsibility as jurors.  So let me now turn to the

8    offenses that are charged against the defendant, Daniel

9    Carpenter, in the indictment that is before the Court.

10         The indictment presents a series of individual

11   counts.  Each count alleges a separate criminal offense,

12   that is, the violation of a particular identified

13   federal statute.  I will define for you what each of the

14   offenses at issue in the case consists of under the law.

15         It is essential that you pay close attention to

16   the elements of the offenses with which the defendant is

17   charged because your task is to determine whether on the

18   evidence given to you in the course of this trial the

19   government has proved those necessary elements beyond a

20   reasonable doubt.

21         Before I define the elements of the charge of

22   the offenses let me make two preliminary comments:

23   First, as I'm sure you all understand, our nation is a

24   federal republic, and both the states and the national

25   government have in their respective spheres the

PDF created with pdfFactory trial version www.pdffactory.com

1    authority to enact laws including laws prohibiting and

2    punishing certain conduct as criminal.  Federal criminal

3    law consists of laws enacted by Congress that define

4    certain acts as criminal.  In enacting a criminal

5    statute, Congress specifies what the necessary elements

6    of the particular crime are.

7         Where all the defined and necessary elements of

8    the crime have occurred, in fact, the crime has been

9    committed.  Where all the defined necessary elements

10   have not, in fact, occurred, the crime has not been

11   committed.  The task of a jury in a case such as this is

12   to determine whether on the evidence the government has

13   proved as to any given count in the indictment that all

14   the defined and necessary elements have been proved

15   beyond a reasonable doubt.  Your focus should be on that

16   question.

17        Second, it is not unusual for a body of evidence

18   in a case like this to suggest that there might be other

19   issues or inquiries that could be pursued such as what

20   rights or obligations various persons might have under

21   non-criminal rules of law governing commercial

22   relations, contract rights and the like.  Questions such

23   as those are not for you to resolve, nor are you to

24   wonder or speculate how such questions might be or might

25   have been resolved.  Your responsibility is to remain

PDF created with pdfFactory trial version www.pdffactory.com

1    focused on the particular issues presented to you for

2    resolution whether, as to the several counts in the

3    indictment, the government on the evidence has proved

4    the specific charges made against the defendant or not.

5    Your task is neither broader nor narrower than that, and

6    that must remain a focus.

7          Counts 1 through 4 in the indictment alleges the

8    offense of wire fraud established by Title 18 of the

9    United States Code Section 1343.  That statute provides

10   in relevant part whoever having devised or intending to

11   devise any scheme to defraud or for obtaining money or

12   property by means of false or fraudulent pretenses,

13   representations or promises, transmits or causes to be

14   transmitted by means of wire, radio or television

15   communication in interstate or foreign commerce any

16   writing, sign, signals, pictures or sounds for the

17   purpose of executing such scheme, commits an offense.

18   Whoever does that commits an offense.  That's Congress

19   prescribing what the acts are necessary in order to

20   constitute the offense.

21          Counts 15 through 19 of the indictment alleges

22   the count of mail fraud established by Title 18 of the

23   United States Code Section 1341, and that statute

24   provides in relevant part as follows:  Whoever having

25   devised or intending to devise any scheme to defraud or

PDF created with pdfFactory trial version www.pdffactory.com

1  for obtaining money or property by means of false or

2  fraudulent pretenses, representations or promises for

3  the purpose of executing such scheme or attempting to do

4  so, places in any post office or authorized depository

5  for mail matter -- any matter or thing, whatever, to be

6  sent or delivered by the postal service, or deposits or

7  causes to be deposited any matter or thing, whatever, to

8  be sent or delivered by any private or commercial

9  interstate carrier, or takes or receives therefrom any

10  such matter or thing, or knowingly causes to be

11  delivered by mail or such carrier according to the

12  direction thereon any such matter or thing, also commits

13  an offense.  Again, Congress defines what the offense

14  is.

15          So you can see the offenses involved here, the

16  two, wire fraud and mail fraud, are similar, and that

17  they differ essentially only in the means or the

18  instrumentality of communication that is involved:  wire

19  transmissions or mail deliveries, whether by public or

20  private delivery service.

21          To convict a person of wire or mail fraud the

22  government must prove beyond a reasonable doubt, one,

23  the defendant's knowing and willful participation in a

24  scheme to defraud or to obtain money or property by

25  means of false or fraudulent pretenses, representations

PDF created with pdfFactory trial version www.pdffactory.com

1    or promises, as to a material matter or matters with the

2    specific intent to defraud; and, two, the use of the

3    mails or of interstate wire communications, as the case

4    may be, in furtherance of such scheme.

5         Let me address the first of these elements.  The

6    word "scheme" is to be broadly understood.  It includes

7    any plan, pattern or course of action.  The term

8    "defraud" means to deprive another of something of value

9    by means of deception or cheating.  A scheme to defraud

10   is ordinarily accompanied by a desire or a purpose to

11   bring about some gain or benefit to oneself or some

12   other person or by a desire or purpose to cause some

13   loss to some person.  The term "false or fraudulent

14   pretenses, representations or promises" means any false

15   statements or assertions that concern a material aspect

16   of the transaction at issue.

17        So this term may encompass direct statements

18   that are false in their entirety as well as statements

19   of half-truths that are misleading because of what they

20   omit, though what is said may be literally true.  A

21   statement or representation is material if it is one

22   that has a natural tendency to influence or is capable

23   of influencing a decision of the person to whom it is

24   addressed.

25        A person acts knowingly if he acts voluntarily

PDF created with pdfFactory trial version www.pdffactory.com

1    and purposefully with awareness of the pertinent actual

2    facts and does not act out of ignorance of the facts or

3    by mistake or accident.  An act is willful if it is done

4    voluntarily and intentionally with the specific intent

5    to do something that the law forbids; that is, with a

6    specific intent to disobey or disregard the law.

7            To prove the offenses alleged in the indictment,

8    the government must prove that the defendant acted with

9    the specific intent to defraud.  This means that the

10   government must prove that the defendant acted with the

11   specific intent to deceive or cheat for the purpose of

12   obtaining money or property.  To the extent the

13   government asserts that the defendant intended to

14   deceive by the use of half-truths or incomplete

15   statements that omitted material information necessary

16   to keep what was stated from being misleading, the

17   government must prove that the defendant specifically

18   intended those statements to be misleading or deceptive

19   by reason of what they omitted.

20           Good faith on the part of the defendant is a

21   complete defense to a charge of wire fraud or mail fraud

22   because if a defendant acted in good faith, he

23   necessarily lacked the specific intent to defraud that

24   must be proved in order to convict.  A person acts in

25   good faith if the person acts on the basis of a belief

or opinion honestly held, though the belief or opinion may turn out to have been, in fact, wrong.  An honest belief in the truth of statements or representations is inconsistent with an intent to defraud.

Although good faith is said to be a defense to the charge, it is not up to the defendant to prove his good faith.  Because the government alone bears the burden of proof in a criminal case, it is the responsibility of the government to prove beyond a reasonable doubt that the defendant did not act in good faith.

What a person knows or intends is a matter of what is in the person's mind.  Obviously, there is no way of looking directly into a person's mind to see what is known or intended as one might look at a person to see what he is wearing.  Proof of knowledge or intent is therefore often a matter of inference from the way the person behaves or acts through a course of events as well as from any other pertinent circumstances as you may find them to be from the evidence.  You may consider and you may infer, though you are not required to do so, that a person intends the natural and probable consequences of his acts.

Now let me turn to the second proposition the government must prove as to each count, and that is that

PDF created with pdfFactory trial version www.pdffactory.com

the defendant caused or caused others to use the mails

or, as the case may be, interstate wire communications

in furtherance of a scheme to defraud.

Use of the mails is pretty much

self-explanatory.  Keep in mind that includes not only

mail delivered by the United States Postal Service but

also mail delivered by private delivery companies.

Interstate wire communications include telephone

communications including telephone calls and fax

transmissions from one state to another; it also

includes wire transfers of funds between one financial

institution and another.

To cause an interstate wire transmission is to

do an act with the knowledge that a reasonably

foreseeable consequence of that act is that an

interstate wire communication will be transmitted by

someone.  Similarly, to cause the mails to be used is to

do an act with the knowledge that it is reasonably

foreseeable that the use of the mails will follow.

These principles apply to all 19 counts of the

indictment.

Let me add just a few more considerations for

you to bear in mind in deciding whether as to any

particular count that the government has proved the

necessary elements of the offenses beyond a reasonable

PDF created with pdfFactory trial version www.pdffactory.com

1   doubt.

2        First, keep in mind that the various counts, as

3   you will see them, allege specific events occurring on

4   different dates.  Your evaluation of each count should

5   focus on the elements of the offense as I've outlined

6   them as they apply to specific allegations of the

7   particular count you're considering; for example, what a

8   person knew or intended may or may not vary at different

9   points in time.  So focus individually on each count.

10        Second, as I have said, the government must

11  prove the defendant specifically intended to deceive by

12  knowingly participating in a scheme to defraud to obtain

13  money or property by false or fraudulent pretenses.

14  Accordingly, the government must prove that the

15  defendant had the specific intent to deceive exchangors

16  in order to induce them to enter into the exchange

17  transactions with the Benistar Property Exchange Trust

18  Company.

19        Note that the government must prove both that

20  the defendant was responsible for making false,

21  fraudulent or misleading statements as to material

22  matters to obtain money or property, and that he

23  specifically intended such statements to be false,

24  fraudulent and misleading.  If the defendant made a

25  false or misleading statement as a result of

PDF created with pdfFactory trial version www.pdffactory.com

1    carelessness or ambiguity of expression but did not

2    specifically intend the statements to mislead, then the

3    necessary element of specific intent to defraud has not

4    been proved.

5           However, it is not necessary for the government

6    to prove that the defendant had the specific intent to

7    cause injury or financial loss to the exchangors.  If it

8    is proved that he intended to deceive them for the

9    purpose of inducing or persuading them to enter the

10   transaction, the absence of specific intention to cause

11   the loss is of no consequence.

12          The statute that the defendant is charged -- the

13   statutes the defendant is charged under are directed at

14   preventing facilities of interstate commerce,

15   communication, whether the mails or telecommunications,

16   from being the tools by which fraud is accomplished.

17   Statutes under which the present charges are brought do

18   not directly regulate investment decisions or forbid

19   particular kinds of business or financial activities;

20   they forbid using the mail or wire communication

21   facilities in intentional furtherance of a fraudulent

22   scheme.

23          The question presented to you is whether the

24   defendant committed the mail and wire fraud offenses

25   that are alleged in the indictment.  Whether and to what

PDF created with pdfFactory trial version www.pdffactory.com

1    extent any exchangor may have suffered a loss is not

2    something for you to try to decide.  Indeed, by reason

3    of my rules on evidence you do not have the evidence

4    necessary to decide that question because that question

5    is not pertinent to your task.

6              As you've heard, Section 1031 of the Internal

7    Revenue Code permits an investor in real property to

8    defer otherwise applicable capital gains taxes on the

9    sale of investment property by promptly reinvesting the

10   proceeds with replacement property.  To obtain the

11   benefit that Section 1031 offers, the investor may not

12   take possession of the proceeds, either actually or

13   constructively; instead, the proceeds must be held by

14   what the tax code terms a qualified intermediary.

15             The tax code provisions themselves contain no

16   requirement or restriction as to how the intermediary is

17   to hold the proceeds.  Specifically, for the purposes of

18   the tax code, there is no limitation on how the proceeds

19   may be invested while they're held by the intermediary.

20   Insofar as the tax code is concerned, an intermediary

21   may invest the proceeds or not in ways it may see fit.

22             Moreover, in the absence of a promise not to

23   invest the proceeds in a certain way, no general

24   statutory authority imposes limits on how they might be

25   invested.  However, one way a limitation on how proceeds

PDF created with pdfFactory trial version www.pdffactory.com

may be invested, may arise, would be of such a limit or part of what the parties agreed to in their contracts or agreements.

You have evidence of formal agreements or contracts that the exchangors entered into with Benistar Property Exchange Trust Company. A breach of contract exists where one party fails to fulfill a binding promise made by that party to others -- to the other in the contract. A breach of contract is not a crime, nor is the failure to fulfill a contractual promise, without more, equivalent to fraud. Specifically, the mail or wire fraud statutes do not reject all business practices that do not fulfill expectations nor do they taint every breach or business contract. Rather, the scheme must be intended to deceive another by false or fraudulent pretenses, representations or promises or other deceptive conduct.

So if a person makes a promise in a contract intending, when the promise was made, to keep it and live up to it, but then later fails or even refuses to do so, there may be a breach of contract but not a fraud; on the other hand, if the person -- if a person promises something in a contract but makes that promise intending never to fulfill it, but rather makes the promise only to persuade the other party to part with

PDF created with pdfFactory trial version www.pdffactory.com

1  money or property, then that would amount to deception

2  sufficient to support a conclusion of fraud.

3       So I remind you that the indictment charges the

4  defendant knowingly and willfully participated in a

5  scheme to defraud or to obtain the exchangors' money or

6  property by false or fraudulent pretenses,

7  misrepresentations or promises.  The focus is, thus,

8  primarily on the transactions in which the exchangors

9  agreed to use the Benistar Property Exchange Trust

10  Company as the intermediary.  If the government has not

11  proved that the defendant intended to induce the

12  exchangors to enter into such transactions by fraud

13  or -- false or fraudulent pretenses, then he is not

14  guilty of the crimes he's charged with.

15       For this purpose it does not matter if having

16  obtained -- properly obtained custody of the exchangors'

17  funds without fraud, the defendant then pursued an

18  imprudent, risky or even reckless investment strategy.

19  What the government has charged and what it must prove

20  is the intentional use by the defendant of the mails

21  and/or interstate wire communications facilities in

22  furtherance of a scheme to defraud as specified in each

23  count.

24       Finally, your focus should be on the defendant

25  before the Court, Mr. Carpenter, and whether he is

1    guilty or not as an individual of the crimes charged.

2    You may not convict him unless you are convinced that he

3    himself committed those crimes according to the

4    instructions I have given you.  You may not convict him

5    simply because he held an office in a company, although

6    his holding that office and how he conducted himself in

7    that office are obviously considerations you may take

8    account of in deciding whether he committed the offenses

9    charged.  But the charges are not made against the

10   corporation or any other person but against Mr.

11   Carpenter, and your consideration of the evidence and

12   your verdict must be similarly focused.

13           I'm going to pause now and ask the lawyers to

14   present their closing statements.

15           MR. PIROZZOLO:  Thank you.

16           THE COURT:  Let me just set the stage.  The

17   order of argument is the government goes first, followed

18   by the defendant, and the government then, if it wishes,

19   has an opportunity to give a very brief rebuttal.

20           Mr. Pirozzolo?

21           MR. PIROZZOLO:  Thank you, your Honor.

22           Good morning.

23           THE JURORS:  Good morning.

24           MR. PIROZZOLO:  There is a basic core complicity

25   to this case:  Mr. Carpenter took in millions of dollars

PDF created with pdfFactory trial version www.pdffactory.com

1    in real estate exchangors' money based on false and

2    fraudulent pretenses that Benistar would protect the

3    security and safety of the exchangors' money and that

4    the money would be held for the exchangors' benefit to

5    buy replacement property.

6         In truth, Mr. Carpenter was using the

7    exchangors' money for his own benefit to try to strike

8    it rich in the options market.  Why?  Why did he do

9    this?  Well, in his own words -- his own words --

10   because putting the exchangors' money in prudent

11   investments was, quote, not a profitable growth business

12   worthy of my time.

13        Mr. Carpenter put the exchangors' money into

14   options knowing full well that not a single exchangor

15   agreed, or was even told, that Mr. Carpenter would be

16   risking their money for that purpose.  He did this

17   knowing full well -- knowing full well -- that not a

18   single document anywhere warned the exchangors that he

19   would be taking such risks with their money; he did this

20   knowing full well that none of the exchangors would ever

21   have turned over their money had they known the whole

22   truth about how he intended to use their money.  By

23   doing this Mr. Carpenter, that man, committed fraud.

24        Now, one of the features of this case is that

25   most of the evidence of what actually happened here is

1    not seriously in dispute.  The amount of money that the

2    exchangors turned over -- that you heard -- the

3    exchangors that you heard from turned over,

4    approximately $15 million, is a matter of record.  There

5    is no serious dispute over what the various marketing

6    materials the exchangors received or the agreements

7    said; those are all a matter of record.  There is no

8    serious dispute as to what Mr. Carpenter actually did

9    with the money; it appears in the Merrill Lynch and

10   PaineWebber account statements.

11       Mr. Carpenter's ever-escalating losses during

12   2000 are also a matter of record; and that Merrill Lynch

13   and PaineWebber shut down his trading is also not

14   seriously in dispute.  But what is in dispute here is

15   how this evidence fits into what you must decide, into

16   the decision you must make, which is whether Mr.

17   Carpenter committed mail and wire fraud by his conduct.

18       He did, and here's why:  You just heard from the

19   Court that it is a violation of the mail and wire fraud

20   statutes if the evidence establishes two things:  first,

21   that there was a fraud; specifically, that Mr. Carpenter

22   knowingly and willfully obtained money or property by

23   means of false or fraudulent pretenses, representations

24   or promises as to a material matter with the specific

25   intent to defraud; and, second, that the mails and

PDF created with pdfFactory trial version www.pdffactory.com

1    interstate wires were used in furtherance of the scheme.

2         I'm going to discuss the first element, the

3    first thing that needs to be shown, the issue of fraud.

4    Understand that when Mr. Carpenter accepted funds from

5    the exchangors, in this case in August, in September, in

6    October, in November and in December of 2000, he knew

7    that the exchangors had come to Benistar for one reason:

8    to engage in a property exchange, not to engage in

9    options trading.  This was not some speculative get-rich

10   scheme -- get-rich-quick scheme that they came to him

11   for.  None of that.  They came to exchange property.

12        In fact, it was more specific than that.  They

13   came to Benistar because the IRS code required them to

14   give up control of their funds in order to qualify for

15   the like-kind real estate exchange.  Benistar was

16   supposed to be -- at all times supposed to be a

17   temporary parking place for their money until they

18   identified a replacement property for purchase.

19        Each and every exchangor you heard from was in

20   the real estate business; each and every exchangor you

21   heard from intended to use the money within six months

22   to buy a replacement property:  Eliot Snider was buying

23   a replacement for his land in Waltham; Brian Fitzgerald

24   was buying his first car wash; Byron Darling was getting

25   a replacement for land he sold for conservation -- into

PDF created with pdfFactory trial version www.pdffactory.com

1    conservation; Mr. Iantosca was exchanging apartments, as

2    was Ms. Cahaly and Mr. Johnston.  Every last one of

3    them, as Carpenter well knew, needed to identify an

4    exchange property within 45 days and could park the

5    money at Benistar for no more -- under no circumstances,

6    more than 180 days.

7         Risking all of the funds to be held short term

8    for real estate purposes is simply inconsistent with the

9    business Carpenter represented Benistar Property

10   Exchange Trust Company to be.  Mr. Carpenter also

11   knew -- he knew -- that when the exchangors were given

12   the sales pitch to choose Benistar over some other

13   competitor, that they were led to believe that Benistar

14   would act in a way that was consistent with the

15   overriding purpose of the exchange, a secure and safe

16   place to park the money until the exchange was

17   completed.

18        The marketing documents which you saw throughout

19   this trial emphasized the safety and security of the

20   money.  Exhibit 1, the PowerPoint presentation, Slide

21   14, says explicitly, "Ask about the security of your

22   funds and find out what guaranties are offered."

23   Exhibit 2, the "Frequently Asked Questions" document

24   says, "What will the intermediary do with my money?  One

25   important factor to consider in your selection of an

PDF created with pdfFactory trial version www.pdffactory.com

1    intermediary is how they will handle your money."  The

2    documents emphasized Benistar's reputation for

3    trustworthiness.

4          Take a look again at Exhibit 2.  It says

5    explicitly, "Benistar Property Exchange has a

6    longstanding reputation for trustworthiness."

7    Trustworthiness.  Take a look at Exhibit 6.  This is the

8    article -- series of articles that Mr. Paley sent to the

9    exchangors.  If you take a look at Part 5 of 5 you'll

10   see that Mr. Paley, who was Mr. Carpenter's mouthpiece

11   throughout this, tells people what they should expect

12   from the property exchange business that they're

13   choosing.  He says, "It should be pointed out that there

14   are no state or federal regulations governing the

15   function of qualified intermediaries other than the

16   fiduciary responsibilities that govern the conduct of

17   any entity holding or handling other people's money."

18   And he goes on, "For this reason, care in selecting a

19   qualified intermediary or facilitator is a critical

20   step."  And he gives advice:  "Choose a facilitator as

21   you would an attorney or a physician."  And he says

22   right there:  "Ask about the security of your funds and

23   what assurances you will have to assure that your funds

24   and your exchange status will be protected."

25          There are a series of other documents,

PDF created with pdfFactory trial version www.pdffactory.com

1    exhibits -- not only Exhibit 2, but Exhibits 3 and 4,

2    that describe Benistar as a specialist in property

3    exchanges.  Property exchanges.  And the documents also

4    emphasize that the funds would be held and restricted --

5    restricted -- for a very limited purpose.  Again, if you

6    look at Exhibit 2, it states explicitly here the escrow

7    accounts are restricted to paying out funds only for a

8    subsequent closing or to return funds to the original

9    property owner.  "Written request is required for any

10   disbursements."  That's what this says.

11         Even the interest rate options.  Consider the

12   interest rate options that these people were given --

13   the exchangors were given.  Those options were 3 percent

14   or 6 percent which at the time, as Mr. Carpenter well

15   knew, reflected very low-risk investments.  He knew --

16   and if you look at Exhibit 183, he knew that money

17   markets were paying 4.8 percent.  So the people

18   selecting 3 percent -- and most of the money in this

19   case -- most of the money you heard about from the

20   exchangors was selected at 3 percent, not 6 percent --

21   he knew that they were getting two points less than a

22   money market, and he also knew that for those people who

23   picked 6 percent -- and if you look at Exhibit 148D,

24   which is the Merrill Lynch statement which Mr. Carpenter

25   received -- that 6 percent was about what a Treasury

PDF created with pdfFactory trial version www.pdffactory.com

1   bill was paying, a government bond which was actually

2   6.2 percent, if you look at Exhibit 148D.

3        The purpose of including those rates was to lead

4   these people into believing that this was a

5   conservative, safe place to park their money.  And Mr.

6   Carpenter was well aware -- well aware of what these

7   people were being told.

8        As Linda Jokinen's testimony, which was read in

9   this case, established, he reviewed and approved every

10  single one of these documents -- every one -- that went

11  to the exchangors.  Mr. Paley also testified that Mr.

12  Carpenter reviewed and approved every one of these

13  documents.

14       And as if there were any doubt about that, just

15  take a look at Exhibit 179 in which Mr. Carpenter -- Mr.

16  Carpenter -- says, "Enclosed please find a list of

17  standard operating procedures" -- this is in June of

18  1999 -- "for Benistar Property Exchange.  I want to

19  continue having everything come through the Simsbury

20  office.  If there ever is a problem and someone tries to

21  sue, it will be Benistar that will probably be sued and

22  not Newton; therefore, we want the quality control" --

23  quality control -- "to remain with us."

24       If you look at that memo, at the bottom in big

25  bold letters:  "At no time are any procedures to be

1  changed by any staff of the Benistar Property Exchange

2  without the prior approval of Daniel Carpenter."  "Prior

3  approval" isn't only in bold and in caps, it's

4  underlined.

5       You heard from Jackie Mahannah how all the

6  agreements went to Simsbury.  Mr. Carpenter was aware of

7  the agreements; in fact, he signed the agreement that

8  Mr. Patterson -- that you heard from yesterday --

9  provided to him, signed it in blue ink.  He knew what

10  those agreements were about; he knew the business

11  context that applies to those agreements.  And those

12  agreements -- the Exchange Agreement, the Escrow

13  Agreement, the Account Selection Form -- were all

14  entirely consistent to anyone reading them, with the

15  marketing materials and the business transactions to

16  which they applied.

17       You have seen them multiple times throughout

18  this trial, but if you look at them you will see they

19  set out two accounts:  They set out a 3 percent or a 6

20  percent.  They set out, and specifically state, "The

21  funds will be held for the exchangors' benefit."  They

22  limit -- also, the Escrow Agreement in particular limits

23  where the funds can go.  Everything about those

24  documents -- everything about those documents -- said

25  that they were a temporary parking place for the money

PDF created with pdfFactory trial version www.pdffactory.com

 1    just as the exchangors had been told.

 2         You heard some testimony about an integration

 3    clause.  Mr. Fitzgerald, who runs a car wash, is asked

 4    several questions about an integration clause in a

 5    bifurcated agreement.  The integration clause is

 6    irrelevant if these people were misled into signing

 7    these agreements.  And, by the way, there is no

 8    integration clause in the Escrow Agreement.  And the

 9    Escrow Agreement is the agreement that Benistar took the

10    money; that's how they took the money, pursuant to the

11    Escrow Agreement.

12         Mr. Carpenter knew full well that those

13    documents were misleading, the agreements were

14    misleading, the marketing materials were misleading,

15    because they did not give the slightest warning -- the

16    slightest warning -- that the funds would go into

17    options and would be at serious risk of loss while

18    Benistar held them.

19         Now, how did Mr. Carpenter know that?  Contrast

20    the agreements that the exchangors signed.  Contrast,

21    for example, the Escrow Agreement -- this one happens to

22    be for Mr. Johnston -- with what the agreements that Mr.

23    Carpenter signed with Merrill Lynch and then later with

24    PaineWebber.  When Mr. Carpenter wanted to go trade

25    options, he had to sign agreements that contained

PDF created with pdfFactory trial version www.pdffactory.com

1  disclosures that said he had to specifically agree and

2  understand -- understand -- and this is Exhibit 145,

3  which is the Merrill Lynch option agreement that he

4  signed in 1998, a few days after he had the

5  conversations with Mr. Patterson.

6           Paragraph 4:  "An option transaction involves a

7  high degree of risk.  We understand" -- "we," the person

8  signing this document, Mr. Carpenter -- "that we should

9  not purchase an option unless we are able to sustain a

10 total loss of the premium and transaction costs, and we

11 should not write a call option unless we either own the

12 underlying security or a security convertible,

13 exchangeable or exercisable into such underlying

14 security, or are able to, unless we either own the

15 underlying security or unless we are able to sustain

16 substantial financial losses, and that we should not

17 write a put option" -- "we should not write a put

18 option" -- "unless we are able to sustain substantial

19 financial losses."  That's what he signed.

20          But that wasn't enough for what he was doing.

21 There was another agreement that he signed, the Special

22 Statement for Uncovered Option Writers.  And this one

23 says, "There are special risks associated with uncovered

24 option writing which expose the investor to potentially

25 significant losses; therefore, this type of strategy may

PDF created with pdfFactory trial version www.pdffactory.com

1    not be suitable for all customers approved for options

2    transactions."  And it goes on with a number of warnings

3    as to what Mr. Carpenter was getting into.  He knew

4    these were the warnings that he received when he was

5    trading in options.  He didn't put any of those warnings

6    into the Escrow Agreement.

7         He didn't just sign the Merrill Lynch accounts

8    either.  Understand that when Merrill Lynch kicked him

9    out in September 2000 he went to PaineWebber.  And at

10   PaineWebber he had to sign another document.  He --

11   again, October 7, 2000.  October 7, 2000.  The issue in

12   this case is Mr. Carpenter's intent at the time that he

13   was taking these people's money.  And October 7, 2000,

14   he signs another -- and this is Exhibit 166 -- he signs

15   another Special Statement for Uncovered Option Writers

16   that again says, "As with writing uncovered calls, the

17   risks of writing uncovered put options is substantial.

18   The writer of an uncovered put option bears a risk of

19   loss if the value of the underlying instrument declines

20   below the exercise price.  Such loss could be

21   substantial if there is a significant decline in the

22   value of the underlying instrument."

23        This is October 7th.  Mr. Johnston's agreement

24   is November 20th.  And a month and a half after he signs

25   this document he has Mr. Johnston sign a document which

1    has a slight change from the original documents that

2    applied to Merrill Lynch.  All he says in this is now

3    it's going to be directed into either the 3 percent or

4    the 6 percent account.  He knew -- he knew that that

5    language in the Escrow Agreement was misleading because

6    he knew what the actual risks were that he had to agree

7    to and was running with the exchangors' money.  And he

8    deliberately did not put those warnings into the

9    Exchange Agreements when he changed them -- and when he

10   changed them for the people whose money was going over

11   to PaineWebber.

12          In addition to the warnings in the documents

13   that Mr. Carpenter didn't see fit to put in the Escrow

14   or Exchange Agreements, he's given marketing packages

15   from Mr. Stern.  Exhibit 227, this document, back in

16   1998, describes all about options and all the risks he's

17   running.  He knows about this.  And he's given this in

18   October by PaineWebber, "Characteristics and Risks of

19   Standardized Options."  It's Exhibit 167.  It goes on

20   for pages.  He intentionally didn't put those warnings

21   in any of the agreements that he had the exchangors

22   sign.

23          But now he says, "Ah-ha, gotcha.  The contract

24   says," through counsel, "I have discretion to invest.

25   Naked puts and calls are investing under some

1    definitions, and, therefore, no fraud."  Sure enough,

2    the agreements do say "invest at discretion."  To this

3    the United States has two responses:  First, that view

4    of the contracts is a contrivity.  It totally removes

5    the language of the agreement from the context of the

6    document and the business transaction to which it

7    applies.

8         You heard Mr. Patterson yesterday.  Nothing in

9    those agreements authorized Benistar to do whatever it

10   wanted with the money.  The question of discretion was a

11   requirement of the IRS code to qualify so his clients,

12   so the exchangors, could qualify for the exchange.  The

13   money Benistar held, however, was still very much their

14   money, as Mr. Patterson explained, and it was being held

15   for their benefit.

16        The discretion language didn't authorize

17   Benistar to do whatever it wanted with the money so long

18   as it could conceivably be characterized as an

19   investment.  As Marjorie Adams testified -- you may

20   recall that she said that Benistar couldn't take the

21   money and go buy a building with it.  A building is an

22   investment, but they couldn't go do that.

23        Second, and more importantly for purposes of

24   this case, this argument about "invest at discretion"

25   ignores the law.  You just heard the Court tell you that

1   false and fraudulent pretenses encompasses not only

2   direct statements that are false in their entirety but

3   also statements of half-truths that are misleading

4   because of what they omit, though what they state may

5   be, literally, true.

6           Under these circumstances, in this context the

7   term "invest" in the various documents was misleading

8   because it omitted the highly material information as to

9   how that money was going to be invested; it was

10  misleading in the context of this agreement to tell the

11  exchangors that the funds would be invested in a money

12  market at times, and at other times in a 3 percent or 6

13  percent account without telling the exchangors the funds

14  were going into stock.  And worse, if Carpenter at the

15  time intended to point to that term "invest," if he

16  intended -- an attorney, as he was -- intended to point

17  to that term "invest" to claim it now entitled him to

18  trade in naked puts and calls, then his use of that term

19  under those circumstances was specifically intended to

20  deceive the people signing that document and those

21  documents.

22          You need to understand also that Mr. Carpenter's

23  fraud here is not limited -- is not limited only to the

24  way in which the exchangors were misled as to the true

25  risks Carpenter was taking with their funds.  There are

PDF created with pdfFactory trial version www.pdffactory.com

1    at least three other aspects of this fraud.  First, Mr.

2    Carpenter was secretly using the funds to enrich himself

3    and Mr. Paley.  Recall the agreements, recall the

4    marketing materials.  The agreements say explicitly "the

5    funds will be held for the exchangors' benefit."  "For

6    the exchangors' benefit."  What those agreements didn't

7    say and what no one was ever told was what Mr. Paley and

8    Mr. Carpenter discussed in October of 2000 in a

9    memorandum that Mr. Carpenter prepared marked "personal

10   and confidential," Exhibit 184.

11        And in that Mr. Carpenter explains what they

12   were up to.  He talks about the options strategy.  And

13   he says, "The options strategy was necessary to make us

14   money" -- he's talking to Mr. Paley -- "yet to keep the

15   funds relatively liquid.  Had we been successful, we

16   could have earned 2 to 3 percent per month, which means

17   we could have split over a million dollars in profits."

18        Mr. Carpenter, while he was paying the

19   exchangors a flat, capped rate of 3 percent or 6

20   percent, was actually using their money, and intended to

21   use their money, to enrich himself and Mr. Paley.  This

22   is something that the exchangors were never told, this

23   is something that is not disclosed in the agreements,

24   and the agreements explicitly state that the funds were

25   being held for the exchangors' benefit.  That makes

1    those statements in those agreements actually false.

2    And if they're not literally false, they are certainly

3    misleading.

4        The second thing that Mr. Carpenter did that was

5    fraudulent in addition to the two that I've already

6    talked about -- the third thing he did in addition to

7    the two I already talked about is that when he was

8    kicked out of Merrill Lynch in September of 2000, he

9    didn't tell any of the exchangors why that had happened.

10   He knew that being kicked out of Merrill Lynch was

11   material, and was material to the exchangors' money.  He

12   says so in a letter that he sent to Merrill Lynch.  It's

13   Exhibit 157.  He goes on and on about how Merrill

14   Lynch's decision to kick him out is going to cost him

15   money.  And he also says something else in the letter.

16   In the middle of the second page he says, "We have

17   chosen Merrill as a depository for our clients, so we

18   cannot move the funds elsewhere.  If we cannot trade at

19   Merrill, we cannot trade anywhere and you will have

20   doomed us to our losses in a volatile market that we

21   were perfectly positioned to profit from."

22       He knows it's material that Merrill is kicking

23   him out because it's now, according to his view of the

24   world, going to cause losses to the exchangors' money.

25   There's another point in here, though.  He says that the

PDF created with pdfFactory trial version www.pdffactory.com

1    money -- "We have chosen Merrill as our depository for

2    our clients so we cannot move the funds elsewhere."  Do

3    you remember the agreements?  Do you remember the

4    marketing materials that say that the funds can only be

5    moved for limited purposes, either back to the

6    exchangor, directly to the exchangors' account, or

7    directly to the escrow account for the closing on the

8    replacement property to be purchased pursuant to the

9    Exchange Agreement?  That's what the agreement says.  He

10   knows their money can't get moved.  And what does he do?

11   He moves it to PaineWebber.  He doesn't tell them why;

12   he just does it.

13         The next thing that Mr. Carpenter did that was

14   fraudulent comes in August, September, October, November

15   and December; and that is, during that period of time he

16   knew Benistar Property Exchange Trust Company did not

17   have enough money to meet its obligations to the

18   exchangors.  Again, I refer back to Exhibit 184.  And on

19   184, which is an October 30, 2000, memo, Mr. Carpenter

20   says -- this is Mr. Carpenter talking -- "and believe

21   me, no one is more sorry that I did not totally get out

22   of the market in March than me.  I saw the April 10 to

23   15 percent downturn as a great buying opportunity even

24   though we sold options.  Little did I know this was

25   simply a track for the unweary leading to the greatest

1    market decline of all time.  I take little comfort that

2    some of the greatest money managers of our time got

3    washed out or had to be carried out, or worse, driven to

4    the asylum."  And then he says, "We are still standing,

5    though somewhat awkwardly, on one leg.  As for your

6    decision to stay" -- he's talking to Mr. Paley -- "is

7    that loyalty or more the fear of embarrassment that

8    bankruptcy would bring?"

9         Mr. Carpenter knows in October of 2000 that

10   Benistar Property Exchange Trust Company is in a very

11   precarious position.  He not only says it in that

12   document, but if you look at Exhibit 189 -- Exhibit 189

13   is a series of spreadsheets that both Jackie Mahannah

14   and Linda Jokinen testified to were created and kept at

15   Benistar to keep track of what money was owed to the

16   exchangors, money coming in and how much was owed.

17        Jackie Mahannah testified that Mr. Carpenter was

18   aware of this spreadsheet, she provided it to him when

19   he asked for it, and this spreadsheet was communicated

20   between Newton and Simsbury, Connecticut.

21        If you take a look --

22        THE COURT:  The jurors in the back may want to

23   get your monitors ready.

24        MR. PIROZZOLO:  If you take a look inside that

25   document -- and I'm not putting anything up yet on the

PDF created with pdfFactory trial version www.pdffactory.com

1   screen:  I will in just a minute -- but you will find a

2   series of pages that are marked BEN 4803 through 4805.

3   Those appear to be 8/30/00, current escrow accounts with

4   a balance.  This is in August.  You will see on page

5   4805 that there's a balance owed to the exchangors --

6   this is August of 2000, of $4,223,669.57, about $4.2

7   million.  If you look at the chalk that Mr. Zappala

8   provided, which was marked as Exhibit 204C -- and this

9   will go up on the monitor -- this document shows the

10  account balances in the Benistar accounts.

11      If you take a look at the August 31, 2000,

12  account balance and work your way across, you will see

13  that the total account balance is, as of August 31,

14  2000, 2,328,941.69.  As of August 2000 Benistar Property

15  Exchange has $2 million less in its account than it owes

16  to the exchangors.

17      Mr. Carpenter's memo to Mr. Paley in October of

18  2000 refers to this issue of bankruptcy.  This isn't a

19  sudden issue; this is an issue that was ongoing

20  throughout each and every month that is alleged in the

21  indictment.

22      If we fast-forward to November of 2000 you will

23  see that through November of 2000 -- if you look at

24  Exhibit 189 you will see documents -- a spreadsheet with

25  the number at the bottom, 4797 through 4799.  And this

PDF created with pdfFactory trial version www.pdffactory.com

1  shows exchange obligations through November 22nd of

2  2000.

3          As of November 22nd of 2000 Benistar Property

4  Exchange Trust had outstanding obligations to exchangors

5  of $10,074,503.56.  If you look back at your screens

6  now, take a look at the account balances as of 11/30/00

7  on Exhibit 204C.  You will see that the total balance --

8  the total amount of money in the PaineWebber account was

9  $5,148,647.13.

10         Benistar was facing a hole of $5 million.  Mr.

11  Carpenter knew that.  Actually knew that.  And this is

12  at the time he was taking money from exchangors like

13  Ms. Cahaly, which is November of 2000; Mr. Johnston, who

14  is also November of 2000; Mr. Iantosca, late

15  November-early December of 2000; Mr. Fitzgerald,

16  Halloween of 2000.  He is aware that he doesn't have

17  enough money to meet the obligations.  The

18  representations that the money is going to be held for

19  the exchangors' benefit and that it will be held safe

20  and secure is false because he can't meet the

21  obligations that he owes to other exchangors.  That is

22  why the $2 million --

23         Do you recall a $2 million payment was made from

24  BESTCO into the PaineWebber accounts?  What that was

25  about on this evidence was that Mr. Carpenter knew of

PDF created with pdfFactory trial version www.pdffactory.com

1  the precarious financial position he was in and he

2  wanted to buy some time, put some additional money in

3  there to get out of the hole.  And that isn't

4  necessarily -- that isn't just -- that isn't just an

5  inference from -- just a mere inference from the

6  evidence; Mr. Carpenter says in October of 2000 that he

7  intends -- that he is "committed to getting us back in

8  the black."

9        What he is doing is taking new exchangors' money

10  to cure the problem that he created with the other

11  exchangors' money.  Under no conceivable construction of

12  the term "invest" or "discretion" is it fair to say that

13  the exchange -- that he was entitled to use exchangors'

14  money to get out of this hole.

15        Under these circumstances, Mr. Carpenter was not

16  acting at all in good faith by taking in the money from

17  Mr. Snider, Mr. Fitzgerald, Mr. Iantosca, Mr. Darling,

18  Mrs. Cahaly, Mr. Bellemore or Mr. Johnston without

19  telling them what he was actually doing with the money

20  and what they were exposed to.

21        Now, at times the defense has suggested through

22  its questioning -- expressed a theme that Mr. Carpenter

23  believed things would turn around and that showed his

24  good faith.  The problem with this argument is that it

25  ignores the law.  The Court has just told you it is not

PDF created with pdfFactory trial version www.pdffactory.com

1   necessary for the government to prove that the defendant

2   had a specific intent to cause injury or financial loss

3   to the exchangors if it is proved that he intended to

4   deceive them for purposes of encouraging them or

5   persuading them to enter the transaction.  The absence

6   of intention to cause them loss is of no consequence; it

7   is simply not a defense.  He was deceiving these people

8   during the period of time he was accepting this money

9   and trading in the options market, exposing it to huge

10  risks where he was also significantly underwater and

11  self-dealing to boot.

12          There is, however, a great deal more that tells

13  you what actually was going through Mr. Carpenter's mind

14  as to whether or not he was actually acting in good

15  faith.  Here is a man who tells Merrill Lynch that he's

16  worth $30 million, he then tells PaineWebber that he's

17  worth 40 or $50 million, yet he tells them he's going to

18  get rich in the options market?  How?  He's going to

19  trade other people's money, exchangors' money, to get

20  rich.  Is that good faith?  Is it good faith for him to

21  do that so he could split the money with Martin Paley?

22  Is he acting in good faith when he rejects the

23  suggestions of Gary Stern that he would reduce the risk

24  that he was exposing to the portfolio at Merrill Lynch

25  in 2000 saying, "No" -- you're not saying, "Your

PDF created with pdfFactory trial version www.pdffactory.com

1  strategy doesn't work for me, Mr. Stern."  No, what he

2  actually says is that that strategy is like watching

3  paint dry.

4        Is that the statement of a man who was acting in

5  good faith with the exchangors' money?  Does it sound

6  like good faith for Mr. Carpenter to say to Mr.

7  Rasmussen, when he loses over a million dollars in May

8  of 2000, what's one and a half million dollars amongst

9  friends?  And that's Exhibit 163, if you want to read

10 it.

11       Is that a man seriously taking -- taking

12 seriously his responsibilities to the exchangors, the

13 other people's money that they have entrusted to him?

14 Is that good faith?  Is it good faith to tell -- is it

15 good faith to tell Jackie Spielman Mahannah not to tell

16 anyone about his losses?

17       Now, you may recall Mr. Pappalardo asking her

18 questions about her education and whether she really

19 could know what Mr. Carpenter was doing next to the

20 computer.  And you heard her say she could both see and

21 hear what he was doing.

22       Is it good faith for Mr. Carpenter, after

23 Merrill Lynch shuts him down, to go right over to

24 PaineWebber and lose another $2.3 million by the end of

25 November, two months?  In fact, he knows it's not good

1  faith because he says it in his own words.

2        Again, take a look at Exhibit 184.  He tells

3  Mr. Paley in October of 2000 when he's at PaineWebber

4  incurring additional $2.3 million in losses, after he

5  says they could have split over a million dollars in

6  profits, if things had worked out, obviously -- this is

7  what he says:  "Obviously that has not happened, and

8  while I am committed to getting us back in the black, I

9  do not think it is prudent to invest 6 percent money in

10  anything other than GNMAs and corporate bonds which

11  would earn 50- to $100,000 in excess interest that we

12  split."  That's what he says in October.  What does he

13  do in November?  He continues to trade in options.  He

14  knows he's not supposed to do it and he does it anyway.

15        Everybody wants to make money; nobody

16  deliberately wants to lose money.  But the facts here

17  show that Mr. Carpenter was losing money hand over fist,

18  and he kept bringing in money based on the same promises

19  and assurances that he directed Martin Paley to give to

20  these people for -- since 1998, and contrasts what he

21  was doing with the exchangors' money behind the scenes

22  with what the exchangors were told.  That is not, by any

23  stretch, good faith.

24        Now, there's one piece of evidence that

25  crystalizes Mr. Carpenter's true intent here, and that

PDF created with pdfFactory trial version www.pdffactory.com

1  came in the form of Mr. Zappala's testimony.  You may

2  recall that Mr. Zappala identified a $400,000 payment

3  that Mr. Carpenter made into the Benistar accounts in

4  July 2000.  He also identified, though, that Mr.

5  Carpenter on September 18th took out $412,000.  By the

6  way, that happened four days after Mr. Snider deposited

7  the $3 million for his exchange.  Does he pay himself

8  with that $412,000 a 3 or 6 percent return as he was

9  giving the exchangors?  No, he pays himself 3 percent

10 for two months which works out to a 20 percent

11 annualized rate of return.  No doubt, because in his

12 mind, based on that conduct, a 3 or 6 percent return is

13 not worthy of his time.

14         I'm going to address now the second part of the

15 offense, the mailings and the wires.  There are 19

16 counts in this indictment.  The first 14, Counts 1

17 through 14, apply to the wire fraud counts.  And

18 received in evidence is this exhibit, which is Exhibit

19 226.  This applies to all of the wire fraud counts

20 except one.  And there are additional exhibits that are

21 in evidence that document the interstate wire

22 transmissions that occurred either from or through

23 Massachusetts to other states such as Pennsylvania or

24 New York.  And those are Exhibits 216 and Exhibits 217

25 through 219 and 221 through 225.  And you can see for

PDF created with pdfFactory trial version www.pdffactory.com

1    each one of them a wire transfer from various accounts,

2    either into the Merrill Lynch account or the PaineWebber

3    account.

4         There's one count, wire fraud count, Count No.

5    3, which is different than the transmission of wired

6    funds; it's a facsimile which is a wire transmission

7    between telephones.  And that is Exhibit 29.  It's an

8    August 8, 2000, fax that relates to the Bellemore

9    transaction, Exhibit 29.

10        Now, the mailings, there are five.  Count 15 is

11   Exhibit 41.  That's a November 2000 check that was

12   mailed by overnight that related to Mrs. Cahaly's

13   transaction.  Count 16 is Exhibit 130; that is a letter

14   that relates to Mr. Johnston's purchase from Hoffmann &

15   Hoffmann to Jackie Spielman Mahannah and mails a check.

16   Count 17 is Exhibit 16, which is a letter sent to

17   Benistar regarding Mr. Eliot Snider's exchange.  Count

18   18 is Exhibit 17, and which is a September 20th letter

19   to Benistar transmitting a check relating to Mr.

20   Snider's exchange.  And finally, Count 19 is Exhibit

21   111, and that's the December 14th letter from

22   Benistar-Newton to Benistar-Connecticut transmitting

23   $300,000 relating to Mr. Iantosca.

24        Now, before I end, I want to speak briefly about

25   some of the others who played some role in the events

 1    that you've listened to over the course of the last two

 2    and a half weeks.  First, I want to talk about

 3    Mr. Paley.  Mr. Paley played a direct role in this case

 4    as the evidence shows.  As he testified, he was Mr.

 5    Carpenter's mouthpiece for -- to the exchangors; he is

 6    the one who -- he is the one who spoke to the exchangors

 7    on Mr. Carpenter's behalf.  As he testified, Mr. Paley

 8    told the investors what Mr. Carpenter approved and

 9    directed him to say; he provided them the materials that

10    Mr. Carpenter approved and directed him to provide; he

11    went on and took these people's money telling them the

12    same things Mr. Carpenter authorized him to say without

13    telling them what was actually going on.

14            Perhaps he was a loyal servant or a partner,

15    perhaps he was trying to get rich along with Mr.

16    Carpenter.  Just take a look at Exhibit 184.  Shame on

17    him for having the audacity to sit here and say he

18    didn't do anything wrong.  But the fact that Mr. Paley

19    did what he was authorized to do and the fact that he

20    had a side deal with Mr. Carpenter to use the

21    exchangors' money to make a million dollars a year that

22    they could split doesn't in any way -- in any way --

23    absolve Mr. Carpenter of his responsibility for his

24    role.  And remember also, it was Mr. Carpenter who was

25    in control of the money throughout, and it was Mr.

PDF created with pdfFactory trial version www.pdffactory.com

1    Carpenter who at all times was calling the shots.

2        You also heard testimony from brokers who were

3    at Merrill Lynch and PaineWebber.  And whatever their

4    role in this episode, three things remain very true:

5    First, Merrill Lynch and PaineWebber are not on trial

6    here; Mr. Carpenter, and Mr. Carpenter alone, is, and

7    nothing they did or failed to do diminishes in any way

8    Mr. Carpenter's responsibility and culpability for his

9    own actions.

10       Second, Merrill Lynch and PaineWebber shut him

11   down.  These people were making hundreds of thousands of

12   dollars from Mr. Carpenter, as the evidence showed, yet

13   they shut him down.  And in the case of Merrill --

14   Merrill Lynch, they shut him down in September.  And

15   Carpenter -- Mr. Carpenter took in two-thirds of the

16   exchangors' money that you heard about here after

17   Merrill Lynch washed their hands of him.  And whatever

18   Mr. Levine may have known about what Mr. Carpenter was

19   up to, it is irrelevant to what Mr. Carpenter did after

20   he left Merrill Lynch and went to PaineWebber.

21       And finally, third, none of the exchangors who

22   turned their money over in August, September, October,

23   November and December 2000 were ever told what was

24   actually going on with Merrill Lynch and PaineWebber.

25   The issue here, in this case, is whether they were

PDF created with pdfFactory trial version www.pdffactory.com

1  misled, and whether they were intentionally misled by

2  Mr. Carpenter.  Whatever responsibility others may have

3  for not stopping Mr. Carpenter sooner, the fact remains

4  that the person at the center of this was Daniel

5  Carpenter:  It was he who made the decision as to how to

6  trade the money; it was he who knew what the exchangors

7  had come to Benistar to do; it was he who knew what they

8  had been told; it was he who decided to take the

9  exchangors' money and give them a measly 3 or 6 percent

10 while using that money to speculate, to make a killing

11 for himself in the options market.  That was Mr.

12 Carpenter's doing.

13         For these reasons, on the evidence and under the

14 law, Mr. Carpenter is guilty beyond any reasonable doubt

15 of each and every count of this indictment.

16         Thank you.

17         MR. GREENBERG:  Can we have a sidebar, your

18 Honor?

19         THE COURT:  All right.

20         (Discussion at sidebar and out of the hearing of

21 the jury:)

22         MR. GREENBERG:  Your Honor, on behalf of the

23 defendants we want to strenuously object to the

24 government's argument.  And I'd like to say a few

25 things.  I think, once again, the well has been so

PDF created with pdfFactory trial version www.pdffactory.com

1    poisoned as to what is in this trial.  The government --

2    I lost track of the number of times the government used

3    the word "loss" in their closing.  It was just

4    incredible.

5          The clear intent to suggest to this jury that

6    these exchangors lost significant amounts of money, that

7    coupled with what was a clear personal misstatement of

8    the evidence, a suggestion of some kind of Ponzi scheme

9    by using other people's money, is unfairly prejudicial

10    to the defendant.

11          We were denied the opportunity, your Honor, to

12    show payment -- payment of our own funds in January of

13    2001; we were denied the opportunity to show payment in

14    late December; we've been denied the opportunity to show

15    the arbitration award that we agreed the proceeds would

16    go to these exchangors.

17          For the government to suggest -- there is no way

18    one cannot read that transcript or listen to what the

19    government said and not conclude that these exchangors

20    lost funds, and lost millions and millions of dollars

21    when, in fact, we've been denied the opportunity.  The

22    number was actually $15 million.  I don't know where the

23    government got that number from, but I think you didn't

24    even give credit, which further compounds it, that there

25    was an effort to offset the arbitration award with $12

PDF created with pdfFactory trial version www.pdffactory.com

1    million.  They know full well of all of these payments.

2         Another statement:  With respect to the interest

3    rate, the comment about money markets and Treasury

4    bills.  The government has suggested that that was the

5    interest rate that was in effect during the entire time.

6    That was on one document that related to one period of

7    time; the government's argument included the implication

8    it was during the entire period of time this was the

9    interest rate.  Highly inflammatory, prejudicial, did

10   not reflect the evidence one bit.

11        The whole bit about option trading, the crime --

12   if you listen to the government, besides

13   mischaracterizing the evidence as naked options, naked

14   puts, naked calls -- I don't know how many times the

15   government made that statement -- first of all, it's

16   factually inaccurate, and the government knows that it

17   is factually inaccurate.  Again, an attempt to

18   mischaracterize the evidence, and again, focusing in on

19   options rather than what's the element of the crime as

20   your Honor has directed, the evidence.

21        The government made reference to the

22   understanding of the parties talking about Mr. Patterson

23   and Mrs. Marjorie Adams' understanding, knowing that's

24   not relevant; it's not the understanding or the

25   intention of the exchangors, is not a relevant

PDF created with pdfFactory trial version www.pdffactory.com

1    consideration, again, intending to poison the well.  The

2    whole reference about the account balances and the

3    amount outstanding was a show game because the

4    government knows it's different dates.  We objected to

5    that chalk initially, and your Honor understood that

6    that chalk relates to month-ending balances.  The issue

7    is what was Mr. Carpenter's state of mind during the

8    various points in time when these transactions were

9    engaged in.

10           To suggest -- to say the balance was one thing

11   at one point in time and he had accounts at some other

12   date -- they used the dates -- I know it was November

13   22nd for one and then November 13th.  They don't give

14   Mr. Carpenter credit for whatever may have transpired

15   within those eight days for payments, and also not

16   giving them an accurate statement as to what the

17   outstanding balance was as of November 30th -- November

18   22nd.

19           Again, it's just an attempt to engage in -- to

20   suggest to the jury -- I mean, clearly it was to suggest

21   a Ponzi scheme.  I'm just going through my notes.

22           Mr. Paley was --

23           THE COURT:  Okay.  I think you made a sufficient

24   record.  I note the objection, and I don't think any

25   corrective instruction is necessary.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. PIROZZOLO:  Thank you, your Honor.

2          (In open court:)

3          MR. PAPPALARDO:  May I proceed, your Honor?

4          THE COURT:  Yes.

5          MR. PAPPALARDO:  Thank you.

6          Ladies and gentlemen of the jury, on behalf of

7     Mr. Carpenter and his family, Gary Greenberg and I would

8     like to thank you for the patience and attention you've

9     devoted to this trial.  We realize it's taken time from

10    your schedules, but your service is very important to

11    us.

12          This case is not about whether you like or

13    dislike Dan Carpenter; this case is not whether you

14    think Dan Carpenter is a micro-manager or whether he's

15    stubborn or whether he's blunt; it's not whether you

16    like or feel sympathy for exchangors.  In fact, as the

17    Judge has told you, this case is expressly not about

18    perceived loss.  It's not about whether you think

19    options trading is good or it's bad or whether any

20    investment strategy employed by Dan Carpenter was always

21    successful.  The only issue in this case is whether the

22    government has proven beyond a reasonable doubt that Dan

23    Carpenter specifically intended to defraud and deceive

24    the investing exchangors.  Based on the evidence, and

25    viewed impartially, you must decide whether the

PDF created with pdfFactory trial version www.pdffactory.com

1   government has met its burden.  We respectfully submit

2   it has not.

3         As Judge O'Toole has instructed you, good faith

4   on the part of the defendant is an absolute defense to a

5   charge of wire fraud or mail fraud because if a

6   defendant acted in good faith, he necessarily lacked the

7   specific intent to defraud that must be proven in order

8   to convict.  A person acts in good faith if a person

9   acts on the basis of a belief or an opinion honestly

10  held even though the belief or the opinion may turn out

11  to have been, in fact, wrong.

12        While good faith is a complete defense to this

13  charge, or these charges, it is not up to the defendant

14  to prove he has good faith; rather, it's the

15  government's burden to prove beyond a reasonable doubt

16  that Dan Carpenter intended to criminally defraud the

17  investor exchangors.  The government must prove beyond a

18  reasonable doubt that Mr. Carpenter lacked good faith.

19  The government in this case has failed by a wide margin

20  to satisfy this burden.

21        Now, Dan Carpenter has absolutely no obligation

22  to put on any evidence here; the law presumes that he's

23  innocent.  However, while the defense does not have to

24  prove anything, during the course of this trial we did.

25  And I submit to you, based upon the evidence presented

PDF created with pdfFactory trial version www.pdffactory.com

1    to you, the government has not come close to satisfying

2    its burden to show beyond a reasonable doubt that Dan

3    Carpenter criminally intended to deceive exchangors.

4          As I indicated to you before the evidence began,

5    Mr. Carpenter's good faith is clearly evidenced by five

6    major points, and I'll go over them.  Number one, the

7    terms of the promotional materials:  the Escrow

8    Agreements, the Exchange Agreements, the Exchange Fee

9    Agreements and the Account-Selection Forms which placed

10   no restrictions on how the funds could be managed in

11   order to produce the 3 or 6 percent return selected by

12   the exchangors;

13         Two, the fact that Mr. Carpenter had made -- had

14   made no representations to the exchangors, nor did he

15   cause any representations other than those in the

16   Exchange Agreements; and consequently, the exchangors

17   were never misled by Mr. Carpenter or caused to be

18   misled by Mr. Carpenter into believing their funds would

19   be safe;

20         Three, by applicable law, Mr. Carpenter had

21   unfettered discretion to invest the exchangors' funds;

22         Four, his trading strategy which he had

23   successfully utilized in the past was rational and

24   supported by market analysts;

25         And, five, Mr. Carpenter put in well over $2

PDF created with pdfFactory trial version www.pdffactory.com

1    million of his own company's money into those trading

2    accounts.

3         The government has repeatedly said to you during

4    this case that the promotional materials told the

5    investing exchangors that their funds were safe or

6    guaranteed.  The documents don't say that.  Read them.

7    Look at Slide 14.  Slide 14 of the PowerPoint says -- it

8    states, and I quote, "Ask about the security of your

9    funds and find out what guaranties are offered."

10        The evidence showed in this case that those

11   individuals who did ask about security of funds asked

12   specifically about one thing:  whether or not Benistar

13   was bonded.  That was it.  They were provided upon

14   request with a copy of Benistar's bond, and there has

15   been no evidence to even suggest that this bond was not

16   true or accurate.

17        As you'll hear again later, Mr. Paley testified

18   that he never told any of the exchangors that their

19   funds were secure, and there is absolutely no evidence

20   of any guaranties being made to any of the exchangors or

21   their advisors by anyone at Benistar.

22        You've seen a lot about the language in the

23   Exchange Agreements, and I submit to you that that

24   language clearly supports a good-faith belief by Dan

25   Carpenter in his ability to invest monies exactly the

PDF created with pdfFactory trial version www.pdffactory.com

1    way Benistar did.

2          The Exchange Agreement said that cash proceeds

3    shall be held and invested.  This is the Exchange

4    Agreement itself:  "Shall be held and invested with

5    Merrill Lynch Private Client Group in either a 3 percent

6    per annum Merrill Lynch Ready Asset money market

7    account," which doesn't apply in this case, "or a 6

8    percent per annum in a Merrill Lynch investment account.

9    Said investment account shall be in the name of the

10   intermediary and shall require the signature of an

11   authorized officer or intermediary to permit the

12   withdrawal of any portion thereof."

13         There's been some discussion in this case about

14   money being withdrawn.  Let me suggest to you that there

15   was no money withdrawn from these accounts.  Money was

16   never withdrawn; it was transferred between linked

17   accounts to the main account from the subaccount to earn

18   interest as required by the contracts.

19         As you heard from Mr. Zappala, the government's

20   own witness, no exchangor identified in the indictment

21   selected the 3 percent Ready Asset money market account,

22   which was the only designated account in any of these

23   paperwork, a specific account designated by the

24   paperwork.  The same thing is true with PaineWebber:

25   The property -- "The money shall be held and invested

1    with PaineWebber at either 3 percent per annum or 6

2    percent per annum in a PaineWebber account."

3         It says in the Escrow Agreement, which talks

4    about accounts in the plural, that Benistar shall have

5    full control over the exchangors' funds to invest.  Full

6    control.  In both Escrow Agreements.  It says in the

7    Exchange Fee Agreement that "the exchangor and

8    intermediary expressly agree that any cash proceeds

9    received from the disposition of the relinquished

10   property shall be held and invested at Merrill Lynch or

11   PaineWebber at the discretion and through the financial

12   institutions of the intermediary."

13        Ladies and gentlemen, this language is clear.

14   It's plain, it's clear and it's unambiguous.  There is

15   no specific account mentioned in any of the exchange

16   documents in this case.  Don't you recall, in fact, from

17   yesterday, when Marty Paley was with Nationwide they had

18   specific enumerated accounts?  None of that is present

19   in this case.  It's not present because it's not in

20   those contracts.  It could have been in those contracts

21   if they were negotiated that way, but these are the

22   contracts and they're plain and they're clear.

23        How can it be that Dan Carpenter intended to

24   defraud investors when right in the Exchange Agreement

25   itself the potential exchangors, those people signing

PDF created with pdfFactory trial version www.pdffactory.com

1    those documents, are directed to seek independent legal

2    and tax advice?  He invites the review of professionals

3    to review those documents before they're signed.  He

4    doesn't hide it.  He doesn't say, "Oh, boy, you know,

5    it's great to see that these documents are signed, now I

6    can invest the money."  It's right in Paragraph 16 of

7    the Exchange Agreement.  That's good faith.

8            In listening to the government's closing

9    argument, I would think I heard a different case, but

10   this is the evidence in this case:  Except for a single

11   conversation with Marjorie Adams, which has nothing to

12   do with any of the charges before you, Dan Carpenter had

13   absolutely no contact with any exchangor or their

14   advisor referenced in this indictment, period.

15           How can he have attempted to deceive anyone?

16   The exchangors didn't even know that Dan Carpenter

17   existed at the time the contracts were entered into.

18   Conversely, there is no evidence before you that Dan

19   Carpenter knew about the exchangors before they signed

20   the contract.  How could he possibly have induced

21   somebody into signing a contract that he had never met?

22           Most importantly, Dan Carpenter never told

23   Mr. Paley to say anything to an exchangor.  This

24   evidence is clear; it's uncontradicted:  Mr. Carpenter

25   had no contact with the investors; it wasn't his job.

PDF created with pdfFactory trial version www.pdffactory.com

1          The government's own witnesses, the exchangors

2     and their advisors, testified that the language in the

3     Exchange Agreements permitted Benistar to invest without

4     limitation.   There were no restrictions or limitations

5     acknowledged by the exchangors.

6          Eliot Snider --

7          May this go up, your Honor?

8          THE COURT:  All right.

9          MR. PAPPALARDO:  Eliot Snider:  "So you knew it

10    was going to be invested?  You knew it was going to be

11    invested and you knew that the discretion for that

12    investment was with the intermediary; isn't that fair to

13    say, sir?"

14          "Yes, it had to be."

15          "And you knew investment accounts had risks when

16    you signed on to this contract, didn't you?"

17          "Yes."

18          Brian Fitzgerald.  Knowledge continued:

19    "'Benistar shall have full control over the exchangors'

20    funds to invest.'  Do you see that?  'Full control to

21    invest'?"

22          "ANSWER:  That's correct."

23          "QUESTION:  So by this document you conferred

24    them full control to invest?"

25          "ANSWER:  That's correct.  In an escrow account

PDF created with pdfFactory trial version www.pdffactory.com

1  to my benefit."

2       Marjorie Adams:  "And you were asked, you see

3  starting, "There's no limitation to how it's going to be

4  invested other than the fact that Mr. Iantosca is

5  scheduled to get either 3 or 6 depending on the rate he

6  chose,' correct?  And what was your answer under oath?"

7       "ANSWER:  'Correct.'"

8       David Eaton.  You remember him as an advisor to

9  Mr. Bellemore.  "You knew the money was going to be in

10  an investment account, right?"

11       "I presumed it would be in an investment account

12  in order to pay interest on it."

13       Mr. Bellemore:  "And it is correct, sir, that

14  you would receive 6 percent from whatever it was that

15  Benistar was investing the money in; is that correct?"

16       "ANSWER:  Correct."

17       Gail Cahaly:  "Okay.  If you look at page 179,

18  if you'd just read line 20, 'So you knew your money was

19  going to be invested in PaineWebber in the discretion

20  and through financial institutions of Benistar?'"

21       "ANSWER:  I said 'yes.'"

22       Jeffrey Johnston:  "Six percent.  Let me see if

23  we can agree on a couple of things, sir.  Not only you

24  understood that the proceeds of your 1031 exchange were

25  being invested by Benistar in securities of some type --

PDF created with pdfFactory trial version www.pdffactory.com

1    isn't that right?  Just yes-or-no."

2        "Yes."

3        "Isn't it correct, sir, that you understood that

4    the word 'discretion' in the Exchange Agreements meant

5    that as long as you earned 6 percent, that Benistar

6    could choose the investment vehicle for the funds; isn't

7    that correct?"

8        "ANSWER:  Yes."

9        Ladies and gentlemen, the exchangors knew, the

10   exchangors agreed.  There isn't a single exchangor or

11   their representative -- and they were all represented by

12   accountants and lawyers -- that asked for clarification

13   of these terms or requested modifications of these

14   terms.  This is what they agreed to.  Hindsight is

15   different.  This is what they agreed to at the time.

16   And at the time is when it's crucial for you to

17   determine what Mr. Carpenter's state of mind was, not

18   events that take place after.  His state of mind at the

19   time each of these investors entered into the contract

20   is what is before you in this case.

21       You've heard the judge.  Under the relevant tax

22   provision Mr. Carpenter had unfettered discretion to

23   invest; for purposes of the IRS code there are no

24   restrictions on how the proceeds of a 1031 exchange may

25   be invested while they're held by the intermediary.

1    There is no evidence -- no evidence at all -- that Dan

2    Carpenter thought he was doing anything prohibited by

3    either these contracts or the IRS code.  And there's not

4    a single statement by any investing exchangor or their

5    representative that Dan Carpenter did not have the right

6    to invest as he did.

7         Let's go to his trading strategy.  Much time was

8    spent before you in a discussion of his trading

9    strategy.  Collateral point:  On direct examination of

10   Merrill Lynch employees, you learned that naked options

11   are very risky.  You learned from Mr. Stern and

12   Mr. Levine that Mr. Carpenter was repeatedly told he

13   should diversify:  "Mr. Carpenter had way too much of

14   his portfolio in tech stocks"; "Mr. Carpenter wasn't

15   following our advice all the time."

16        What did you learn on cross-examination?  Here's

17   what you learned on cross-examination:  You learned for

18   the first time that both Mr. Stern and Mr. Levine said

19   that Carpenter was very knowledgeable about the stock

20   market; that he was an expert in options; he was

21   knowledgeable about securities.  What do you next learn?

22   You next learn that naked calls have very high risk

23   while naked puts have an undeserved bad reputation.

24        Well, guess what, ladies and gentlemen?  Not to

25   be confused with what you heard up here by Mr.

PDF created with pdfFactory trial version www.pdffactory.com

1   Pirozzolo, there are no naked calls in this case.  There

2   are no naked calls in this case.  That came out in

3   testimony by PaineWebber and by Merrill Lynch.  However,

4   with respect to naked puts, you heard testimony there's

5   naked puts in this case.

6        But what did you learn from Thomas Rasmussen?

7   Do you remember him from PaineWebber?  You learned that

8   for the most part the puts really weren't naked; you

9   learned that there was a hedge.  Do you remember the 20

10  and 25?  It couldn't go down to nothing.  In fact, Dan

11  Carpenter complained to Mr. Rasmussen in one of those

12  activity reports, "How come you're not including this

13  and why are you saying these are naked when they're

14  not?"  He testified to that.

15       What else did you learn from Mr. Rasmussen?  You

16  learned from Mr. Rasmussen that the chief investment

17  strategist of Merrill Lynch at the time of this trading

18  advocated more than once holding tech stocks; exactly

19  what Mr. Carpenter was doing.  Carpenter's -- you heard

20  from Mr. Rasmussen something else:  You heard at the

21  time this was happening that he considered Carpenter's

22  trading to be rational.  Why?  Because Mr. Carpenter had

23  a strategy, and that strategy had proven to be

24  successful.

25       Mr. Rasmussen also testified that he disagreed

PDF created with pdfFactory trial version www.pdffactory.com

1    with those who wanted to close down the Benistar

2    Property accounts.  By the way, Mr. Carpenter wasn't

3    shut down, as the government just said, from Merrill

4    Lynch at all.  Didn't you remember the testimony?  He

5    kept accounts there in his own name.  The account that

6    was transferred was Benistar Property Exchange Trust

7    Company.  Why?  We'll get to that.

8         The point is that Mr. Rasmussen testified that

9    Dan Carpenter had a belief in a rational strategy and it

10   had been successful in the past.  He also testified that

11   Mr. Carpenter never missed a margin call.

12        Look at the September 27th, 2000, letter to

13   Merrill Lynch after they decided that the Benistar

14   Property Exchange Trust Company account would leave

15   Merrill Lynch.  Carpenter states in that letter to

16   Rasmussen that he was perfectly positioned to recapture

17   losses on a rebound of the market like he had in

18   November and December of 1999.

19        And, ladies and gentlemen, it's not just a

20   good-faith belief because he did it before.  In that

21   time frame, actually, and we'll get to this in October,

22   Mr. Carpenter not only had a good-faith belief in what

23   he was doing, he acted on that belief.  How did he act

24   on that belief?  He put over $2 million of his own money

25   into those trading accounts.  He wasn't trading other

PDF created with pdfFactory trial version www.pdffactory.com

1    people's money; he wasn't playing with other people's

2    money.  He put his own money in those accounts.  Is that

3    evidence of good faith in a trading strategy?  I submit

4    to you it is.

5         Getting back to Mr. Rasmussen.  Did you

6    notice -- did you notice Mr. Rasmussen when he testified

7    was basically the same person on both direct and

8    cross-examination?  Compare that to Jerry Levine;

9    compare that to Gary Stern.  There is no question in

10   this case, I submit to you, that Merrill Lynch knew that

11   Benistar was trading in these accounts with exchangors'

12   funds.  You saw all of the wire transfers with clients'

13   names on them, with attorneys' names on them.  It's a

14   property exchange trust account.  Mr. Carpenter invited

15   them to review the websites which made it plain exactly

16   what they were doing.

17        Dan Carpenter told both of the Merrill Lynch

18   representatives, Stern and Levine, that they look at the

19   website.  And I again suggest to you this is evidence of

20   good faith.  He wasn't trying to hide anything.  Merrill

21   Lynch's Jerry Levine was told of Benistar's 1031

22   business and provided the exact agreements that were in

23   play at the time when the accounts were opened.  And

24   we'll get to him a little bit later, too.

25        Okay.  Moving ahead.  Let's go to PaineWebber.

1    Similar to his counterparts at Merrill Lynch, Mitch Rock

2    from PaineWebber gave testimony regarding Mr.

3    Carpenter's belief in his investing style, and what he

4    said was he thought that Carpenter believed in what he

5    was doing; he thought that the stocks he owned would go

6    much higher, particularly following the presidential

7    election.

8           Now, do you recall Mr. Rock's testimony?  Do you

9    recall that he testified that when Mr. Carpenter opened

10   up the accounts at PaineWebber, he sent him blank forms

11   that were signed -- just signed by Mr. Carpenter and

12   then sent back, and then he filled out the forms as to

13   what it was?  He said that either he filled them out or

14   his assistant filled them out.

15          And remember those boxes at the top of each of

16   the forms in those two accounts that checked "trusts"?

17   He said, "Oh, that was a mistake."  Do you remember him

18   saying that?  I suggest to you, ladies and gentlemen,

19   that Mr. Rock is lying.  Why would he lie?  As you

20   recall, PaineWebber had to pay over $12 million in an

21   arbitration award from an arbitration initiated by

22   Benistar against PaineWebber on the subject of these

23   exchangors before you.

24          Mr. Rock, the same man who despite getting paid

25   $1.7 million to join -- simply join PaineWebber proudly

PDF created with pdfFactory trial version www.pdffactory.com

1    testified he did not know who the chief strategist of
2    PaineWebber was in 2000, and he still doesn't.  I
3    suggest to you, ladies and gentlemen, that Mr. Rock has
4    about 12-1/2 million reasons to lie to you and say
5    filling out those forms stating "trust" was a mistake.
6    Why did he deny knowing the chief strategist at
7    PaineWebber?  Why?  Because the chief strategist at
8    PaineWebber at this very time -- and this evidence is
9    before you, was advocating the positions taken by Dan
10   Carpenter in tech stocks.  That's why he denied it.
11        In the same way I suggest you can consider the
12   credibility of Mr. Levine, the credibility of Mr. Stern,
13   because they testified that they were aware that Merrill
14   Lynch has an outstanding civil action against it still
15   pending relating to the facts of this case.  And I
16   submit to you that's a motive to lie; that's a motive to
17   shade; that's a motive to try to inculpate Mr. Carpenter
18   on what he did and didn't do.
19        Ladies and gentlemen, if a person is engaged in
20   fraud, if a person is fraudulent by nature, if he's
21   involved in a fraudulent scheme, you would expect that
22   scheme to be punctuated by secrecy, you would expect it
23   to be punctuated by concealing; however, Mr. Carpenter's
24   trading activities were open; they were obvious.  Had he
25   truly intended to conceal what he was doing, if he was

1    doing something wrong, he could have traded on the

2    Internet, he could have day-traded, he could have opened

3    up an eBay [sic] account.  He wouldn't have had to pay

4    over a million dollars in commissions to brokerage firms

5    to do that.  He didn't do that.  Why?  Because he was

6    getting advice from PaineWebber, he was getting advice

7    from Mitchell Rock.  You saw the e-mails.  He was

8    getting advice from Gary Stern, he was getting advice

9    from Jerry Levine, and all of a sudden they decided,

10   "Guess what?  We're trading in other people's money and

11   we knew it from the beginning.  This has to go."

12        For the same reasons that Merrill Lynch knew

13   Benistar was trading clients' funds as part of the 1031

14   exchanges, the wire forms, the website, the name of the

15   company and more, PaineWebber was aware of the nature of

16   Benistar's business and the funds they were trading

17   with.

18        Do you remember how they got to PaineWebber?

19   Gary Stern is a good friend of Mitchell Rock.  Gary

20   Stern is the one who called Mitchell Rock and said,

21   "Hey, we got this guy.  Can you take him over?"  Do you

22   think -- certainly at the time -- you've got the

23   documents.  Look at Mr. Carpenter's letter -- look at

24   Mr. Carpenter's letter to Mr. Rasmussen where he talks

25   about "my clients can't get service here" when they were

closing their positions at Merrill Lynch which forced

him to go to PaineWebber.  Do you think at that time

with the documentary evidence they knew that they were

engaged in trading other people's money?  And don't you

think -- don't you think that Gary Stern might have had

occasion to tell Mitchell Rock about it when he was

transferring the accounts to himself?

Before we leave our discussion of brokerage

houses, I just want to give you a quick, final word on

Jerry Levine.  Do you remember him?  Jerry Levine was

the one from PaineWebber who said he never spoke to

Martin Paley, or he never spoke to David Patterson, both

of whom, they testified they spoke to him.  And by the

way, guess what?  All of these people were called by the

government; every one of them was a government witness.

Levine didn't testify that he didn't recall

speaking; he testified that there was no conversation

between him and Martin Paley or him and David Patterson.

Look at the case of Mr. Patterson's conversation with

Mr. Levine.  Not only did he testify to it, this

conversation is independently corroborated by letters,

by faxes back and forth with Jerry Levine's name on it

between Patterson and Levine, by telephone records.

Ladies and gentlemen, it's very clear that from

the beginning -- because that's when Mr. Patterson had

1    the conversations, that's when Mr. Paley had the

2    conversations with Mr. Levine, when they were opening

3    the accounts, both of them.  From the beginning it's

4    very clear that Merrill Lynch was on notice that

5    Benistar was dealing with client funds and Benistar's

6    business was property exchanges and the money was not

7    Benistar's.

8         But look at what happened at that point in time.

9    Look at what happened in October of 1998.  Analyze what

10   Mr. Carpenter did and didn't do against the backdrop of

11   fraud, against the backdrop of specific intent.  What

12   did Dan Carpenter do?  He's on the phone -- he's on the

13   phone with David Patterson, a lawyer who calls him at

14   Marty Paley's suggestion.

15        Now, keep in mind at this point in time, unlike

16   Marty Paley who had done hundreds of property exchanges,

17   Mr. Carpenter wasn't familiar with property exchanges.

18   But he had to talk to the lawyer because the lawyer was

19   concerned about the accounts.  Where was the money going

20   to be held?  Remember, Benistar had never done a

21   property exchange.  And he was properly doing his due

22   diligence.

23        So he's on the phone with Carpenter.  What does

24   Carpenter tell him?  He's on the phone with him for half

25   an hour and he says, "I'm not sure.  I don't know."  He

PDF created with pdfFactory trial version www.pdffactory.com

1    doesn't try to fudge it; he doesn't try to tell him

2    something that's a misrepresentation, that's a

3    falsehood, that's an inducement.  He said, "I'll tell

4    you what.  Let me put you in touch directly with the

5    only person who knows, the account manager at Merrill

6    Lynch.  His name is Jerry Levine."  And not only does he

7    do that, he does it in the same phone call.  He's on the

8    phone with them for half an hour.  Is that concealment

9    or is that good faith?  Dan Carpenter wasn't hiding

10   anything.

11       What else happened?  The contact with Patterson

12   resulted in all of the exchange documents being sent to

13   Merrill Lynch.  Exchange Fee Agreements, the escrow

14   forms, the Account Selection Forms, all of the documents

15   that were attendant to a particular exchange, that

16   particular exchange, were mailed to Jerry Levine.

17       I suggest to you, ladies and gentlemen, that

18   it's very, very revealing in this case that the only

19   time -- the only time that Mr. Carpenter was contacted

20   by an exchangor or an exchangor's representative, he

21   acted in an open and honest manner and put that person

22   directly in communication with the Merrill Lynch

23   investment advisor who would be investing the funds.

24   This is evidence of good faith.

25       What else did he do at that time when they were

1    starting up?  Carpenter told Marty Paley to contact

2    Jerry Levine and explain to Merrill Lynch Benistar's

3    1031 business activities.  Paley testified he followed

4    Carpenter's instructions and that he had an extensive

5    discussion with Jerry Levine.

6         What else did Mr. Carpenter do?  Carpenter

7    further told Mr. Paley to provide any exchangor who

8    requested with Mr. Levine's name and telephone number in

9    order that that exchangor could directly communicate to

10   Merrill Lynch.  Is that fraud or is that being open?  Is

11   that being honest?

12        Ladies and gentlemen, these are not the actions

13   of a person who intends to deceive or defraud.  That

14   conduct, and that conduct alone, totally undermines the

15   government's suggestion that he engaged in criminal

16   deception.

17        Let's move to -- let's move to the testimony of

18   Mr. Zappala.  Do you remember him?  He works for the

19   United States Attorney's Office.  He's the one who

20   prepared these charts here that you heard about.  And

21   here's what he testified to:  He testified that in

22   October of 2000, specifically, on October 27th, that $2

23   million from a Carpenter-controlled Benistar fund,

24   BESTCO, went into these trading accounts.  The very same

25   trading accounts.  It was money that he never took back.

PDF created with pdfFactory trial version www.pdffactory.com

1    It's money that was intended to benefit exchangors.

2         In addition, he testified that another $400,000

3    went into those accounts; in fact, that another

4    $400,000, for a total of eight, plus another 120,000.

5    And it's true -- Mr. Pirozzolo is absolutely right --

6    $400,000 plus $12,000 went back to Carpenter Financial.

7    There's no question about it.  It's right on the chart,

8    and that happened.  But $2 million plus $400,000 plus

9    $120,000 plus another $400,000 with 412 going back?  I

10   submit to you, ladies and gentlemen, that Carpenter put

11   in his own money into these trading accounts is direct

12   evidence of his good-faith belief in his trading

13   strategy as well as general good faith.

14        Let's examine a little bit of the government's

15   deficiencies in this case.  The government has failed to

16   prove beyond a reasonable doubt, as it must, that

17   Carpenter had any knowledge of any shortfall between his

18   investment accounts and exchange account failures at the

19   precise time the exchangors invested money with

20   Benistar.  There is no evidence before you on that.

21   What they came up here with is a chart, the end of the

22   month.  Do you remember what the judge said in his

23   charge to you?  That's not what he said.  He said "pay

24   attention to specific events, pay attention to specific

25   dates."  The end of the month doesn't count.  It's when

PDF created with pdfFactory trial version www.pdffactory.com

1    the contracts were signed.

2          And I submit to you that there is absolutely no

3    evidence before you that on any of the dates that the

4    contracts were signed that there was a deficiency with

5    respect to the monies owed versus the monies in the

6    account.  And more importantly, most importantly, I

7    submit to you, that any of those account numbers or any

8    of those reconciliations were not known to Mr.

9    Carpenter.  He didn't even know who Martin Paley was

10   talking to.  Do you remember Paley's testimony?  He had

11   no idea who Paley was talking to or when.  He doesn't

12   know when these contracts are signed.  He's not on the

13   phone saying, "Hey, Marty, let's get me another 15 or 20

14   investors so we could have fun with this."

15         The government has to show you beyond a

16   reasonable doubt what was in Mr. Carpenter's mind at

17   that precise point in time, and they haven't done so.

18   There's no evidence before you.  As a matter of fact,

19   Mr. Zappala said he couldn't do it.  He also testified

20   he was never asked to do it.  Do you remember that?

21         In addition, ladies and gentlemen, when you're

22   going through these calculations and you're looking at

23   these fancy charts, what else doesn't the government

24   take into consideration?  They don't take into

25   consideration the fact that Carpenter has the ability to

1    put money into these accounts independent of investors,

2    best evidenced by the monies that we talked about a

3    moment ago.

4         Ladies and gentlemen, without this evidence, and

5    without this precise evidence, the government cannot

6    claim that it has proven that Carpenter knew the

7    accounts were less than what was owed the exchangors.

8    They want you to guess.  They want you to guess because

9    they have no evidence.

10        By the way, you know, there was a big thing made

11   about options again by the government.  When you're

12   deliberating, pick up the Merrill Lynch forms, okay,

13   Exhibit 148A.  Look at the front of the forms.  I just

14   have one of them here in front of me.  As of 9/29/2000

15   the total amount of the accounts in equities, that's

16   stock, is 74 percent; the total value of the accounts in

17   cash or money markets is 21 percent.  That is

18   approximately 94, 95 percent; total value of options, 6

19   percent.

20        Just like when I asked Zappala on

21   cross-examination, how much loss was attributable to

22   options?  He said, "I don't know."  So I had him add it

23   up.  On that particular month there was $82,000 lost in

24   options, there was $200 -- I'm sorry, there was $257,000

25   total loss; 82 in options, the rest in traditional

PDF created with pdfFactory trial version www.pdffactory.com

1    stocks.

2         Ladies and gentlemen, this is smoke and mirrors,

3    this isn't options, and it's not about options; this is

4    not about advice by PaineWebber, it's not about advice.

5    This is about Mr. Carpenter's state of mind as of the

6    time, the critical period, when these contracts were

7    signed.

8         Now, keep in mind one other thing, okay?  You

9    heard the judge's charge.  Schemes to defraud have a

10   purpose to them.  Schemes to defraud are designed to put

11   money in the pocket of the person who is engaged in the

12   scheme to defraud.  Where's the money in Carpenter's

13   pocket?  And you say, well, wait a second.  He was

14   losing money.  Yeah, but where's the evidence from

15   Mr. Zappala that, hey, you know, he was taking money

16   out, he was buying a car here, going on a vacation

17   there?  Where's the evidence that he took any of this

18   money and used it personally?  That's indicia of fraud.

19   He didn't.  He put his own money in his own belief that

20   his own trading strategy was accurate and successful.

21        Ladies and gentlemen, I have to give you some

22   discussion -- some discussion of the government's key

23   witness in this case, Mr. Paley.  Now, he's been

24   characterized here today as a mouthpiece for Mr.

25   Carpenter.  Ladies and gentlemen, think about this for a

PDF created with pdfFactory trial version www.pdffactory.com

1  second.  You heard the evidence.  How can Mr. Paley be a

2  mouthpiece for Mr. Carpenter?  At the time this began

3  Paley had worked for Nationwide Property Exchange.  That

4  was his business.  He worked from 1995 till 1998.  He

5  was Mr. Property Exchange.

6      Do you remember those wonderful little articles

7  that he wrote all about himself that the government

8  mentioned in their closing argument?  Those were written

9  when he was with Nationwide.  He testified to that.

10  Those weren't generated with Carpenter.  The point is,

11  he was the expert.  He was the expert in property

12  exchanges; he was the one with the experience; he was

13  the one with the contacts.

14      Don't you remember all the people that went to

15  Martin Paley?  They didn't go to Benistar; they went to

16  Paley because they knew Paley, they knew his family.  An

17  accountant knew Paley.  They knew him from before.  This

18  had nothing to do with Mr. Carpenter.  It's absurd --

19  it's absurd to suggest that Mr. Paley was getting

20  direction from Dan Carpenter.  They had a bright line

21  here; the division of labor was very clear.

22      By the way, do you remember that wonderful

23  little micromanaging memo that they were talking about

24  on closing argument?  Look at that.  I urge you to read

25  that while deliberating and ask yourself what it doesn't

1    say.  What that memo has to do with is once an investor

2    has signed up and signed those agreements, that's what

3    it has to do with, okay?  There's nothing in there about

4    the critical issue in this case which is what happened

5    in an effort to induce an investor to go with Benistar.

6         There's no memo in there that Dan Carpenter

7    says, "Hey, by the way, Marty, tell me about these

8    people that you're talking to; I want to weigh in on

9    this," or "We need five more investors here, I want to

10   know who it is you're talking to.  I want to know what

11   groups you're talking to."  No, there was no

12   conversation.  Dan Carpenter didn't know who Marty Paley

13   was talking to.  Dan Carpenter knew when an investor was

14   onboard when he got a check.  How can he induce people

15   he's never even seen or even know that they exist or

16   they him?

17        The evidence is clear, ladies and gentlemen, and

18   the government knows that Marty Paley, its key witness,

19   not Dan Carpenter, interacted with and solicited clients

20   for Benistar.  Paley testified, by the way, that he was

21   aware of Carpenter's investing in options.

22        May this go up, your Honor?

23        THE COURT:  It's up.

24        MR. PAPPALARDO:  Thank you.

25        You knew he was trading in stock options as of

this memo, that's the October 30th memo, ladies and
gentlemen, in response to Paley's memo the day before to
him.  "I knew there was an option strategy."  Mr. Paley
provided Jerry Levine's name and contact information to
exchangors when asked.  That's good faith, isn't it?

       "Now, sir, I ask you again, isn't it also
accurate to say that you provided exchangors
Mr. Levine's name and telephone number to them when they
asked for a Merrill Lynch contact person?"

       "ANSWER:  Yes."

       Paley testified that the agreements and the IRS
code permitted the types of investments that occurred
here.

       Ladies and gentlemen, Dan Carpenter had a
good-faith belief that he did not make any
representations or cause any misrepresentations to be
made.  Paley testified -- Mr. Paley, the one who created
the marketing materials, who used the marketing
materials years before he came to Benistar -- Paley
testified that he never said anything wrong or
misleading to any investor in this case.

       "Mr. Paley, did you do anything wrong?"

       "In what regard?"

       "In connection with your dealings with
investors?"

1           "No."

2           Paley testified he did not mislead investors.

3    Moreover, he testified that Dan Carpenter never told him

4    to say anything but refer to the precise terms of the

5    agreements.

6           "In fact, Mr. Carpenter never authorized you to

7    say anything other than what was in the written

8    agreements; isn't that fair to say?"

9           "That's true."

10          "He never told you to say anything outside of

11   those documents, did he?"

12          "No, he didn't."

13          "He never told you to say anything, did he?"

14          "No."

15          "As a matter of fact, he didn't have anything to

16   do with that; that was your job, right?"

17          "That's true."

18          Ladies and gentlemen, that's inducement.  That

19   is inducement, or I should say, in Mr. Carpenter's case,

20   a lack of inducement.

21          Mr. Paley also testified that he never said to

22   any exchangor or representative that their funds were

23   safe or secure or that there was no risk of loss.

24          "Did you ever say to any of the investors, any

25   of the exchangors or their representatives, that their

PDF created with pdfFactory trial version www.pdffactory.com

1   money would not be safe?"

2          "No, I did not."

3          "Did you ever say to them that their money would

4   be secure?"

5          "No, I did not."

6          "Did you ever tell them there would be no risk

7   of loss?"

8          As importantly -- ladies and gentlemen, as

9   importantly -- he was never asked by the exchangors or

10  their representatives as to how their funds would be

11  invested.  He did tell them that their money would be

12  pooled or commingled, and he testified before you that

13  there was no limitation on the investment vehicles

14  available to Benistar provided by these documents.

15         "Held and invested, right?"

16         "Yes."

17         "And there's nothing in this that limits the

18  nature of the investment, is there?"

19         "No."

20         Mr. Property Exchange.  How is it possible --

21  ask yourself this:  How is it possible that the only

22  person who spoke with the exchangors and their advisors,

23  the only person who signed any of these documents --

24  remember, the first document with respect to

25  Mr. Patterson was the only one that Mr. Carpenter

1    signed, and that's not in this case -- how is it

2    possible that the only person who spoke with the

3    exchangors and their advisors, who signed all the

4    documents in this case and authored the promotional

5    materials and the contracts was never charged with a

6    crime, but Dan Carpenter was?  Paley testified he has no

7    agreement with the government to immunity.  The

8    government never suggests he did anything illegal.

9         Ladies and gentlemen, you've heard the evidence

10   in this case, and I suggest that when you deliberate,

11   you review some of these documents and you ask

12   yourselves a lot of things.  But one thing I'd like you

13   to do:  Look at the evidence from the perspective of Mr.

14   Carpenter; look at Mr. Carpenter's state of mind.  By

15   standing in his shoes, examine what he did and what he

16   didn't do.  He forms a company with Martin Paley, an

17   expert on property exchanges.  There's a very strict

18   division of labor:  Paley gets the clients, Carpenter

19   invests the money to the selected return rate.

20        On the very first exchange -- on the very first

21   exchange -- he interacts with a lawyer -- he,

22   Carpenter -- putting him directly in touch with Merrill

23   Lynch to ensure there's no misunderstanding with either

24   the lawyer or Merrill Lynch.  Did he have a good-faith

25   basis to reasonably believe and rely that Merrill Lynch

PDF created with pdfFactory trial version www.pdffactory.com

1    knew everything about the nature of his business?  Of

2    course he did.  Did he act in an open fashion with

3    Merrill Lynch going forward?  Yes, he did.

4         Fast-forward this analysis to the real critical

5    time in this case, the time in this case that you have

6    to decide which is approximately two years later, from

7    August to November of 2000.  By that time Benistar

8    Property Exchange had completed over 100 successful

9    property exchanges; by that time a trading strategy was

10   in place that was proven to be successful.  By the way,

11   by that time there was still no interaction by Carpenter

12   with any investor.

13        Also at that time there were conflicting

14   viewpoints on how to invest within the very companies

15   that were being used by Benistar.  There was also one

16   other thing:  There was a unique and unprecedented stock

17   market that was left in limbo by a presidential election

18   that was not over in one day but lasted until mid

19   December.

20        Ultimately, Dan Carpenter's confidence in that

21   market would turn and was proven to be well founded, but

22   at that point in time it was too late, because it was

23   the beginning of January.  Why was it too late?  Because

24   PaineWebber closed those positions before that.

25        Ladies and gentlemen, you heard the judge say

PDF created with pdfFactory trial version www.pdffactory.com

1    this:  A breach of contract is not a crime.  Let me

2    leave you with one other thought:  What others thought

3    about any of this is not important.  You have one

4    decision to make.  All that is important is what Dan

5    Carpenter thought.  He is not a mind-reader.  What did

6    Dan Carpenter think?  What was communicated to him, what

7    could he reasonably rely on and what could he reasonably

8    believe in?  And remember, ladies and gentlemen, to have

9    good faith, you don't have to be right.  You don't have

10   to be right.

11          Lastly, ladies and gentlemen, as the judge said,

12   even false representations or statements or omissions of

13   material facts do not amount to fraud unless it was done

14   with a fraudulent intent.  However misleading or

15   deceptive a plan may be, it is still not fraudulent if

16   it was devised or carried out in good faith.  An honest

17   belief in the truth and representations made by a

18   defendant or caused to be made by a defendant is a good

19   defense, however inaccurate a statement may turn out to

20   be.

21          Thank you very much.

22          THE COURT:  The government has an opportunity

23   for a brief rebuttal.

24          MR. MITCHELL:  Good afternoon.  I know you've

25   been sitting here for a while, and I'll just take a few

PDF created with pdfFactory trial version www.pdffactory.com

1  minutes to address some of the points that Mr.

2  Pappalardo brought up.

3       Mr. Pappalardo and I agree on one point, and

4  that is, what's at issue here is what was going on in

5  Dan Carpenter's head; what his state of mind was.

6       His entire closing argument boils down to the

7  contention that Dan Carpenter believed in good faith

8  that what the exchangors were being told about what

9  would happen with their money was entirely consistent

10  with the risks that he was undertaking in the options

11  market.  And as you deliberate today, ask yourself,

12  based on what you've learned over the last couple of

13  weeks, does this make sense?  And as you do that, take a

14  step back and look at the big picture; refocus on the

15  basic transaction that we've been talking about for the

16  last two weeks, the property exchange.

17       As you know now, property exchange entails what

18  its name implies, the exchange of one piece of real

19  estate for another.  The whole thing is designed to

20  allow the property owner to keep that person's money in

21  real estate.  The defendant was aware that if a property

22  owner wanted to put the proceeds, the sale of real

23  estate, into something other than real estate, they're

24  free to do that.  They're free to do whatever they

25  wanted to do with it.  They could put it into stock

PDF created with pdfFactory trial version www.pdffactory.com

1  options if they wanted to.  But if they showed up on
2  Benistar's door, it meant by definition that they wanted
3  to keep it in real estate.  No other reason:  It would
4  stay in real estate.

5       He was the boss of this business, ladies and
6  gentlemen.  This man is no moron; he knew precisely what
7  his business was about.  He also knew that in any case
8  the money would be held for only a short period of time,
9  180 days tops.  He knew because people were giving him
10 notice of their replacement properties; within 45 days
11 of giving him their money that they had to commit to
12 another piece of property.  They had closings they had
13 to do.  They had commitments.  He knew that those
14 commitments would be pending.  This is what he knew
15 while he was trading their money in a way that hadn't
16 been disclosed to them.

17      The promotional materials and the exchange
18 documents these people received were entirely consistent
19 with this concept.  They spoke about escrows; they spoke
20 about low-yield accounts; they spoke about holding money
21 for the benefit of the exchangor.  The two principal
22 documents, look at the titles at the top.  We're all
23 familiar with these by this time:  "Exchange Agreement,"
24 exchange; "Escrow Agreement" suggests that the money
25 would be in escrow.

PDF created with pdfFactory trial version www.pdffactory.com

1          These people, remember, were paying $2,000,

2     roughly, give or take a little bit depending on the size

3     of the transaction -- roughly $2,000 apiece so that

4     Benistar could hold their money, and then they would get

5     what they thought was 3 percent or 6 percent as the

6     defendant knew and represented to them.  They had no

7     idea that they're paying $2,000 to take on this enormous

8     risk that he had accepted in the options market and yet

9     still be paid only 3 or 6 percent.  Nobody in their

10    right mind, as he well knew, would accept such a deal.

11    Certainly not people, the kind that he was aware of;

12    people, the kind of clients he knew were coming to him;

13    people who were in the real estate business seeking to

14    stay in the real estate business.  There was no question

15    he knew all of this.

16          We know from the testimony of Jackie Mahannah,

17    from the read-in testimony of Linda Jokinen, from the

18    testimony of David Patterson, from the testimony of

19    Martin Paley this guy read all the documents.  He read

20    the exchange documents; he carefully reviewed them.  He

21    was a tax attorney; he was a sophisticated guy by every

22    account.  He knew what was going on.  And, yes, he

23    micromanaged, as I've said in the opening and as you saw

24    in the memo.  He knew what was happening.  There's no

25    question at all that he was fully aware of what was

PDF created with pdfFactory trial version www.pdffactory.com

1    being told to these exchangors.

2            Now, the defense has suggested that somehow he

3    had unfettered discretion to do, nevertheless, what he

4    wanted with the money.  But somehow, because the word

5    "invest" was in there, that he could put the money into

6    any kind of vehicle.  Now, "invest," as we know, can

7    range from anything from a money market account, a

8    government bond, and even as Marjorie Adams pointed out,

9    an apartment building.  It could mean any of those

10   things.  But like any other word, the word "invest" is

11   shaped -- the meaning of the word "invest" is shaped by

12   the context in which it's used.

13           Think about the context as I just described it.

14   Again, we're dealing with a property exchange over a

15   short period of time.  The money is expected -- he knew

16   it would come right back out and go into real estate.

17   It was entirely inconsistent with putting the money into

18   the options market with all the risks that that entails.

19           Most of the money -- most of the money, as Tom

20   Zappala testified, was in 3 percent.  Think, based on

21   your own experience, what 3 percent means to somebody.

22   That's -- look at it objectively:  What does 3 percent

23   mean?  Three percent is low-yield; 3 percent does not

24   suggest high risk; 3 percent does not suggest

25   high-flying options.

PDF created with pdfFactory trial version www.pdffactory.com

1          Mr. Pirozzolo noted in this way the word

2    "invest" is a half-truth, and it is a half-truth because

3    what is omitted from the description is significant.

4    And it would be significant, objectively speaking, as

5    the defendant knew to anybody who would do business with

6    Benistar, and he -- this was by design.

7          If you recall those Nationwide agreements, you

8    remember what was stripped out of them so that people

9    wouldn't see:  "Government bond," "money market" and so

10   forth.  He deleted them.  He got rid of those portions

11   of the agreements.  So all a person would be left with

12   was "invest" and not think twice about it.  That's

13   fraud.

14         Mr. Pappalardo said, well, it was plain and

15   clear, his words, that the -- that Mr. Carpenter could

16   use the money however he chose.  He said -- Mr.

17   Pappalardo's words were:  "The exchangors knew."  That's

18   what Mr. Pappalardo said.  This suggestion -- this

19   suggests that really -- really you should be focusing on

20   the exchangors, that the likes of Gail Cahaly and Brian

21   Fitzgerald and Eliot Snider and the others and all their

22   advisors and their attorneys and so forth missed it;

23   that they were too careless to notice.

24         That's not what happened, ladies and gentlemen.

25   The defendant gave them no reason to believe that there

PDF created with pdfFactory trial version www.pdffactory.com

1    was anything else afoot.  There was no description, no

2    notice at all that he was about to -- that he was using

3    exchangor money in the options market.

4          Now, you've heard reference to these civil

5    proceedings involving PaineWebber and Merrill Lynch, and

6    what counsel would like you to do is to speculate what

7    that's all about.  You've been instructed by Judge

8    O'Toole not to speculate about what other -- and I'll

9    read right from his instructions, what other

10   non-criminal laws might govern commercial relations and

11   contract rights.  It has nothing to do with the case.

12   As the judge instructed you, you should focus on the

13   evidence that is before you.

14         The evidence -- not only the evidence that is

15   before you, but also the defendant, the one person who

16   is on trial here, and that's Dan Carpenter.  Merrill

17   Lynch -- neither Merrill Lynch nor PaineWebber are on

18   trial in this matter.  So as much as Mr. Pappalardo

19   seeks to deflect your focus onto those two entities,

20   neither one of them is here before you.

21         Now, let me deal for a moment with the notion

22   that somehow Mr. Carpenter, because he didn't deal

23   directly with the exchangors, didn't cause these

24   misrepresentations to happen because he used a

25   go-between by the name of Martin Paley and that somehow

PDF created with pdfFactory trial version www.pdffactory.com

1    he didn't cause these things to happen.

2          Ladies and gentlemen, again, is there any doubt

3    that he knew what was being said to these people?  He

4    had someone doing it on his own behalf.  He was the

5    boss.  He's created the company.  He supervised Martin

6    Paley and everybody else there.  He certainly caused

7    this business to run, and in the normal course of the

8    business these misrepresentations, these documents were

9    presented to the likes of the people that you've met.

10          Let me address the notion that somehow Mr.

11    Carpenter managed this business in an open way.  And the

12    emphasis here is, ladies and gentlemen, Mr. Carpenter

13    wants -- Mr. Pappalardo wants you to focus on the fact

14    that Jerry Levine was sent letters; that Jerry Levine

15    was put in a position to know what was going on.  Does

16    that mean he was operating this in an open way?  No, it

17    doesn't.

18          Who didn't know?  Who didn't know about the

19    options strategy?  All the people you heard from who

20    signed these contracts, the furthest thing from their

21    mind, as the defendant well knew, was that he was

22    trading the money in the options market.  He told

23    nobody.  There was not any indication whatsoever, not a

24    whiff of "options" in any of those documents.  That's

25    not open -- that is not open, that is -- that's not full

1  disclosure in the slightest way.

2       Nor is the fact that he put some of his own

3  money into it.  As Mr. Pirozzolo demonstrated to you,

4  Mr. Carpenter was putting in his own money so the thing

5  wouldn't fall apart.  He was in a big hole.  And I

6  encourage you to look at the documents, 189, which

7  you'll have back with you in the jury room.  As Mr.

8  Pirozzolo went through with you, Mr. Carpenter was in a

9  shortfall.  In Exhibit 184 he notes the risk of

10  bankruptcy; that the hole was growing larger and larger

11  and it may not be something he was able to make up.  He

12  was putting his own funds into the account for the very

13  purpose of keeping it afloat.  This wasn't something --

14  this wasn't his embracing some sort of trading strategy.

15  This was him just putting money in to survive.  None of

16  this was told to the exchangors, of course.  None.  Not

17  a whiff of this.

18       Secondly, the fact that -- the notion that he

19  believed in his trading strategy, as you were

20  instructed, is neither here nor there.  Of course he

21  believed in the trading strategy.  Of course he thought

22  he was going to make money.  But as Judge O'Toole

23  instructed, it is not necessary for the government to

24  prove that the defendant had specific intent to cause

25  injury or financial loss to the exchangors; it's not

PDF created with pdfFactory trial version www.pdffactory.com

1    relevant.

2         We can assume that he did.  We can assume that

3    he hoped it would all work out.  But it doesn't matter.

4    He was using the money in a way that he had not

5    disclosed to the exchangors, and he had lulled them into

6    a different kind of belief than what he would actually

7    do with the money.  That's your job to focus on that,

8    the difference between what was being represented and

9    what he was really doing.

10        In the final analysis, Exhibit 184, which we've

11   talked about a fair amount, reflects what Mr. Carpenter

12   had in mind at the relevant time period when we're

13   talking about the fall of the year 2000.  You'll see in

14   that document the defendant's own words.  If he had done

15   as he acknowledged in that memo what the promotional

16   materials and the exchange documents suggested he would

17   do with the money, that is, to put them in low-yield

18   bonds, it wouldn't have made him more than, as he said,

19   between 50- to $100,000.

20        As he said in that memo, this wasn't worth his

21   time.  He was after something else.  As Mitchell Rock

22   testified, he was trying to make a fortune and he did

23   it -- he executed this effort by lulling people to

24   believe that their money would be parked safely in

25   escrow accounts so that they could take it out later,

1    put it in properties that they were seeking to buy,

2    telling them that their money would be held in low-yield

3    accounts while he was, unbeknownst to them, not any

4    disclosure whatsoever, trading the money in the options

5    market.

6         This is fraud, ladies and gentlemen, and this is

7    why you should find him guilty on each and every count.

8         Thank you.

9         MR. GREENBERG:  Sidebar?

10        MR. PAPPALARDO:  May we be seen briefly, your

11   Honor?

12        THE COURT:  Okay.

13        (Discussion at sidebar and out of the hearing of

14   the jury:)

15        MR. PAPPALARDO:  Your Honor, I'll keep this

16   brief.  I'd submit to the Court what Mr. Mitchell just

17   said, almost in its entirety, was not rebuttal to what

18   Mr. Pirozzolo was saying before.  But I want to draw the

19   Court's attention to two things:  He said that he,

20   Carpenter, got rid of them, meaning the entries in the

21   report -- I'm sorry, in the Exchange Agreement from

22   Nationwide.  He said he got rid of them.  He, Carpenter

23   got rid of them, and that's fraud.  Your Honor, I submit

24   to the Court there is absolutely no evidence in this

25   case that that is true.

1          Secondly, your Honor, it was mentioned

2     Mr. Levine and with this motion pending before the

3     Court, I would suggest this is not representative --

4     when you asked about how they were going to deal with

5     Levine, he talked about Levine being sent letters.  And

6     that wasn't highlighted, your Honor, when they responded

7     to you.  But I'd suggest to the Court any mention of

8     Levine, given what is in play at the moment, is

9     inappropriate.

10         Your Honor, there's a lot of things that are

11    replete.  The furthest thing from the state of mind --

12    the exchangors' mind was trading options.  That's not

13    appropriate in this case.

14         Your Honor, I'm concerned about this statement.

15         THE COURT:  About the change in the agreement?

16    I don't think it's in evidence.

17         MR. PAPPALARDO:  It is not.

18         MR. MITCHELL:  There is a bare inference.

19         THE COURT:  No, there isn't.  We have evidence

20    that there was a change in the document; we don't know

21    who made it.  We have evidence that Carpenter -- we

22    don't know if he received a draft that omitted that

23    information or not; we don't know whether Paley edited

24    it and the other one was approved by Carpenter.  And you

25    suggested that Carpenter took it out, and I think that's

PDF created with pdfFactory trial version www.pdffactory.com

1    overstating the evidence.

2         MR. PAPPALARDO:  He stated it; he didn't suggest

3    it.  He said "he got rid of it," and that's fraud.

4         MR. MITCHELL:  I disagree.  I think it's a fair

5    inference.  And it doesn't sound like you're buying it,

6    your Honor.

7         THE COURT:  There are two people who could

8    have -- at least two people, I guess -- at least two

9    people who could have done it.  We don't have an

10   indication of who did it of the two.

11        MR. MITCHELL:  The tax attorney boss who

12   reviewed the documents and made revisions to it.

13        THE COURT:  I think it would be a guess.  I

14   think it was overstating the evidence.

15        So what --

16        MR. MITCHELL:  What would you have me do, stand

17   back up there and say "your recollection controls"?

18        THE COURT:  Yeah.  Or I could say it.

19        MR. PAPPALARDO:  You're looking to me, your

20   Honor?

21        THE COURT:  Yeah.  What do you want? I guess is

22   the question.

23        MR. PAPPALARDO:  Your Honor, I would like you to

24   state that that is -- that statement is not accurate and

25   it's not supported by the evidence in this case and you

1   can't consider that.

2        THE COURT:  Well, another alternative -- I can

3   say something like that.  I'm not sure I would say

4   exactly that.  But I could also give you the opportunity

5   to say it.  I can add to --

6        MR. PAPPALARDO:  Then --

7        THE COURT:  I could offer you a surrebuttal

8   opportunity.

9        MR. PAPPALARDO:  If your Honor please, all that

10  does is put the issue in play.  It's better coming from

11  you.  I mean, the fact is that it's not there.

12       THE COURT:  All right.

13       MR. MITCHELL:  We wouldn't object to a

14  surrebuttal at this point if he wanted to do that.

15       MR. PAPPALARDO:  Does he want to give me a

16  surrebuttal anyway?

17       THE COURT:  I'll do it.

18       And as to the second point about Levine, that is

19  under reservation; I don't think it changes the mix at

20  all.

21       Now, let me just -- I will say something:  I was

22  hoping to push this all the way through, but everybody

23  is getting tired, including poor Marcia.  And so I'm

24  going to take a break before I do the rest.  I think my

25  second half is about 20 minutes or so.  But that's just

PDF created with pdfFactory trial version www.pdffactory.com

1    going to take us too long.

2          There is a lunch waiting for them.  So I propose

3    to let them go, and we'll come back at two and give them

4    a strong instruction about not discussing the evidence

5    until then, okay?

6          (In open court:)

7          THE COURT:  Jurors, let me just address one

8    comment that was made by Mr. Mitchell in rebuttal.  He

9    made reference to -- he was trying to make a point that

10   there was a difference between provisions in the

11   Nationwide form of the agreement and a subsequent

12   Benistar, and it made reference to the fact that Mr.

13   Carpenter had been responsible for changing that

14   language.

15         There is no evidence that Mr. Carpenter was

16   responsible for changing the agreement.  You have

17   evidence of two different agreements, but there's no

18   evidence as to how they came to be different, and so

19   that would not be an appropriate thing for you to take

20   into consideration.

21         So I was hoping we would get this all wrapped

22   up -- I have a little more to say to you -- but we've

23   been in session for quite a while.  And I think we're

24   going to take a break, and then I'll come back and

25   finish my instructions, which won't take too long after

PDF created with pdfFactory trial version www.pdffactory.com

1    the break.

2         We have ordered a lunch for you which should be

3    there, so I invite you to go in and have some lunch.

4    We'll come back at two o'clock and then I'll finish, and

5    then we'll ask you to begin your deliberations.

6         Please, no discussion of the substance or merits

7    of the case during lunch, all right?  Until -- we're

8    still not quite ready to do that.  Maybe you could find

9    something else to talk about like, say, basketball or

10   something.

11        So we'll take a short recess and we'll see you

12   about two.

13        THE CLERK:  All rise.  The Court will take a

14   recess.

15        (Jury out and recess in the proceedings at

16   1:24 p.m.)

17                          - - -

18        (After recess.)

19        THE COURT:  Okay.  Jurors, we very much

20   appreciate your attentiveness throughout the morning.  I

21   have a good vantage point, and I see how you paid close

22   attention to everything that was presented to you this

23   morning and this afternoon.

24        I'm going to take just a few more minutes of

25   your time now to give you some instructions about how

PDF created with pdfFactory trial version www.pdffactory.com

1    you ought to go about performing your very important

2    responsibility about delivering upon the evidence in the

3    case and reaching a verdict with respect to the

4    indictment.

5         Your function is really a twofold function.  It

6    involves, first of all, resolving pertinent factual

7    disputes, determining the facts of the case; and once

8    you've done that, once you've decided what the evidence

9    indicates is true or not, or proven or not, then you

10   must apply the principles of law pertaining to the

11   offenses as I've already described them, and see

12   whether, on the evidence, the government has proved the

13   defendant guilty of the crimes he is charged with or

14   not.

15        With respect to your fact-finding function, let

16   me spend a few minutes talking to you about how you go

17   about resolving factual issues in the case.  It's often

18   said that jurors, such as yourselves, are the sole and

19   exclusive judges of the facts.  You determine the

20   weight, the value, the affect of the evidence that has

21   been presented to you in the course of the trial.  Where

22   there are disputes about factual matters about what

23   actually happened, it is up to you to resolve those

24   disputes on the evidence and tell us what the truth is.

25        You must determine the facts without fear or

PDF created with pdfFactory trial version www.pdffactory.com

1  favor based solely on a fair consideration of the

2  evidence.  That means two important things:  First of

3  all, it means, of course, that you are to be completely

4  fair and impartial, swayed neither by prejudice nor

5  sympathy, nor by any personal likes or dislikes toward

6  any of the participants or people involved in the case.

7  Your responsibility is to judge the true meaning of the

8  evidence fairly and impartially.

9       The second important point, of course, is that

10  your judgment must be based on the evidence presented to

11  you during the course of the case.  You may not go

12  beyond the evidence by speculating or guessing what

13  other evidence there might have been or what other

14  things might also have been shown or proven.  Your

15  responsibility is to resolve the issues presented to you

16  by your thoughtful consideration of the evidence.

17       Your conclusions should be those that the

18  evidence directs you to.  If there are questions that

19  you are unable to answer or issues you are unable to

20  resolve from the reliable evidence, then you must leave

21  those questions unanswered.  You may not answer them by

22  guessing or filling in any gaps in the evidence, if you

23  think there are any, by resorting to supposition or

24  speculation.

25       We ask you to think about the evidence, to

PDF created with pdfFactory trial version www.pdffactory.com

1  evaluate it carefully and cautiously, and to decide what

2  value it has.  And as I say, when you've done that, when

3  you have evaluated all the evidence, you may draw those

4  conclusions that the evidence leads your minds to draw.

5       I'm going to talk a little bit more about the

6  evidence and how to work with it, but first let me say a

7  word about what is not evidence.  I told you at the

8  beginning of the case, and I think, perhaps, counsel

9  have also reminded you, that their summary of the

10 evidence, both in their opening statements before they

11 presented the evidence in their case, and then in the

12 closing statements, are not part of the evidence.  The

13 summaries, the statements, refer to evidence, they talk

14 about it, they try to summarize it for you, highlight it

15 for you, but a lawyer's opening or closing statement is

16 no substitute for your collective appreciation,

17 understanding, recollection of what the witnesses have

18 said or the evidence is.

19      So the lawyers' arguments do not supply anything

20 additional or different from what you have heard in the

21 courtroom in the course of the presentation of the case.

22      I also told you at the beginning of the trial

23 that I would be supervising the presentation of the

24 evidence in accordance with the rules of evidence.

25 You've seen that happen.  I've made a number of rulings

1    on evidence in the course of the case.  I remind you

2    that evidence that is admitted after an objection should

3    be given no different consideration from evidence

4    admitted without objection.  The fact that evidence is

5    admitted after objection means nothing in terms of how

6    you ought to evaluate it.  By the same token, questions

7    that are not answered because an objection was sustained

8    produced no evidence, even though the question itself

9    might be suggestive of some evidence.  Unless an answer

10   is given properly in response to a question, there is no

11   evidence from that question.  And there is no

12   significance for your purposes about any of the

13   evidentiary rulings I've made.  There is no meaning to

14   be attached, no clues or hints to be discerned in one

15   direction or the other because of any rulings on

16   evidence.

17          Now, there are some different categories of

18   evidence that you have before you.  You have a number of

19   exhibits.  You will have the paper copies of all the

20   exhibits that have been introduced in evidence with you

21   in the jury room.  Many of the documents have been shown

22   to you in the course of the presentation of the

23   evidence, while, perhaps, some others have not or have

24   only been partially shown.  And, as I say, you will have

25   all the exhibits entered into evidence, both those that

PDF created with pdfFactory trial version www.pdffactory.com

1    have been discussed and displayed and those that have

2    not but have been admitted into evidence.  You may give

3    the exhibits, consider the exhibits and give them

4    whatever value and significance in your deliberation you

5    think is appropriate.

6          In addition to the exhibits, you have testimony

7    that witnesses have given here in the courtroom in

8    answer to the questions the lawyers have put to them.

9    Again, you ought to give the testimony of each witness

10   whatever weight, whatever value in your judgment it is

11   fairly entitled to receive.  With respect to each

12   witness, you should think carefully about the testimony

13   and decide how much value it ought to have to

14   fair-minded people, like yourselves, who are looking for

15   the truth.

16         As you think about the evidence from a

17   particular witness, you may find credible, reliable, and

18   meaningful just about everything that that witness has

19   said, perhaps just about nothing that that witness has

20   said, or perhaps something in between.  With respect to

21   any given witness, you may find that there are some

22   things that sound credible, reliable, worthwhile, and

23   other things the very same person has said that you may

24   find less credible, less reliable, less worthy of your

25   judgment.  It's not necessarily an all-or-nothing

1    proposition which makes the testimony of witnesses.

2           Now, as you think about the particular evidence

3    from each witness, there are some things you may do

4    legitimately in evaluating the evidence from that

5    witness.  I've mentioned some of them, not to tell you

6    you have to do these things, but to illustrate the kinds

7    of things that you may do.  First of all, think about

8    the evidence itself, the content of what the witness has

9    said.  Is it plausible or implausible on its face?  Is

10   it the kind of thing that has the ring of truth or not?

11   Is it the kind of thing that makes sense in your

12   experience?  Is it coherent, consistent, and so on?

13          You've also had the opportunity as to most of

14   the witnesses not only to hear the evidence but to see

15   the witnesses as they have been testifying.  Perhaps

16   there's been something in the way the witness answered

17   questions that says something to you about how reliable

18   or trustworthy the evidence is, and in your ordinary

19   daily affairs, when you're listening to somebody

20   describing something to you or telling you something

21   that's happened, you pay attention to what the person

22   says, but you also make other observations about the

23   person who is talking to you, perhaps not even being

24   aware that you're doing it, and you take those

25   observations into account in deciding how much of that

PDF created with pdfFactory trial version www.pdffactory.com

1  person's, quotes, evidence, you would accept.  And so in

2  your deliberations, you may ask yourselves the same kind

3  of questions that you ask, perhaps, as I say,

4  subconsciously in your daily life:  Is the person

5  straightforward, candid, accurate in remembering and

6  recounting things?  Is the person's evidence of the

7  quality that inspires confidence in a listener?  Or, on

8  the other hand, are there signals about uncertainty or

9  inconsistency, perhaps evasiveness or vagueness that

10  leads you to have some concern about how much value you

11  should place on them?

12       You may also take into account any impartiality

13  or bias that a witness might have toward one side or the

14  other.  Does the witness have any reason, any motive,

15  any interest in the outcome of the case that would lead

16  the witness to favor one side in his or her testimony?

17       Now, a tendency to favor one side might be

18  deliberate, intentional to favor one side, or it might

19  be unconscious, arising simply out of some affiliation

20  or affinity with one side or the other.  Such tendencies

21  could affect the reliability of the testimony, and you

22  ought to consider whether there has been any such affect

23  with respect to any of the witnesses you've heard.

24       Again, keep in mind, of course, that there are

25  always people in every case that always have some

PDF created with pdfFactory trial version www.pdffactory.com

1    connection with one side or the other, and that fact

2    alone does not mean that the person is automatically to

3    be disbelieved or distrusted, but potential bias or

4    partiality by a witness is something you can consider in

5    evaluating.

6         With respect to the testimony of all the

7    witnesses, you ought to consider the testimony or the

8    evidence of each witness not only by itself, but in

9    relation to all the other evidence in the case.

10   Consider the evidence as a whole.  Don't isolate pieces

11   of evidence and make judgments about the evidence as if

12   a particular witness, for example, were the only person

13   who testified.  Rather, evaluate the evidence in

14   context.

15        You may find, for example, that evidence that

16   sounds pretty good by itself may not sound so convincing

17   when compared with other evidence, or, perhaps it sounds

18   more convincing.

19        So what other evidence there is on the point may

20   cause you to change an assessment you might initially

21   make about any particular piece viewed in isolation.

22   The point is that you should see the evidence in the big

23   picture, don't break it down into such small parts that

24   you're not thinking sensibly about it.

25        We don't ask you to think about the evidence in

1    any technical way or to try to approach it as you might

2    think that hypothetical, quotes, jurors should approach

3    the problem, as if that was something different from the

4    way good, intelligent, conscientious citizens would

5    approach a serious matter.  We ask you to approach these

6    problems the way you approach any serious problem in

7    your lives.  Use the same good sense, good judgment,

8    calling upon your general experience in life.

9         You have an instinct for knowing what is true

10   and what is not true.  You know what is reliable and not

11   reliable.  We make those judgments every day, and we

12   don't ask you to behave any differently in this case

13   than you would with respect to important matters in your

14   own life as you evaluate what has the ring of truth.

15   What should you be confident of?  What should you be

16   suspicious of?  So we ask you to use that collective

17   common sense to resolve the issues in the case.

18        As I say, we ask you to reason the evidence, ask

19   what it means.  Reasoning is sometimes -- sometimes may

20   mean simply making an assessment about the quality of a

21   particular piece of evidence.  It may also mean trying

22   to decide what conclusions ought to be drawn from one

23   piece of evidence or from a number of pieces of evidence

24   put together.

25        You may reason by making inferences from the

PDF created with pdfFactory trial version www.pdffactory.com

1    evidence.  An inference is simply a little step in
2    reasoning, it's a way of thinking about something.  You
3    observe a series of events, a series of data, facts, you
4    draw conclusions from them.
5         We say generally in trials like this that facts
6    can be proved in either of two ways: by direct evidence
7    or by circumstantial evidence.  Direct evidence of a
8    fact exists when there is a piece of evidence which, if
9    accepted itself, would directly establish the fact is
10   true.  And in use of direct evidence, the key questions
11   are whether to accept the evidence as reliable, and if
12   it's accepted, how much weight or meaning it ought to
13   have.  Direct evidence could be, for example, a simple
14   assertion by a witness.  It's raining outside is a
15   statement of fact.  If you thought the person who said
16   it was truthful, had a sufficient basis for knowing what
17   the weather was like outside, so on, you could accept
18   the statement as evidence tending to prove the fact that
19   it was raining outside; and if you accepted it, you
20   could conclude that that was true.  Of course, if you
21   doubted the statement's reliability, you could reject it
22   as worthwhile evidence.
23        Suppose, instead, that someone -- instead of
24   having somebody report, make a statement about what the
25   weather conditions are, somebody came in the courtroom

PDF created with pdfFactory trial version www.pdffactory.com

1    now from outside wearing a wet raincoat, folding up an

2    umbrella that they were shaking water off.  Without any

3    words being spoken, without any assertion being made

4    that is, an observer might conclude it was raining

5    outside.  The observer would have some direct evidence

6    to consider, the observations of the wet raincoat and

7    the wet umbrella, and thinking about those pieces of

8    direct evidence might lead the observer to draw a

9    conclusion or an inference about an unobserved and

10   unstated fact, and that is, that it was raining outside.

11        So an inference is a conclusion that one may

12   draw from available facts.  The process of drawing

13   inferences or conclusions from available facts is what

14   we mean by proof by circumstantial evidence.

15   Circumstances that are observed add up to a conclusion

16   that lead you to think that, in addition to the observed

17   facts, an additional fact is also true.

18        And so I point that out, because sometimes

19   you'll hear people say, well, that's just circumstantial

20   evidence, that doesn't prove anything.  Well, that

21   statement goes too far, because circumstantial evidence

22   does prove things.  I think if you reflect on it for a

23   moment, you'll realize you probably rely heavily on

24   circumstantial evidence to get through the day.  You

25   walk into the kitchen and see steam coming out of the

PDF created with pdfFactory trial version www.pdffactory.com

1   kettle on the stove.  You draw a conclusion about how

2   hot the burner is without having to put your finger on

3   it and actually directly perceiving it.  You have based

4   an inference on circumstantial evidence.

5          On the other hand, in thinking about

6   circumstantial proof in a case such as this, you should

7   take care that the available evidence really does

8   support the inference that you would draw, and you

9   should not draw an inference that is not supported by

10  the evidence.

11         If the evidence points equally to different or

12  alternate inferences that might be drawn, you can't just

13  pick one to believe and reject the other equally likely

14  one without some basis for deciding between them.

15  Unless the evidence points to one rather than the other,

16  you may have insufficient evidence to choose which one

17  might be the proper one to draw.

18         Now, I told you at the very outset of the case,

19  I repeat now because it is very important, that the fact

20  that a person is charged with a crime is not evidence

21  that the person has committed the crime charged.  The

22  fact that an indictment is returned tends not at all to

23  prove that the person has done what the indictment

24  alleges.  It is a means of presenting the charge so the

25  matter can be tried in a full trial such as we have had.

1    So you should give no weight or consideration to the

2    fact that the charge is made.

3        Your judgment about whether the defendant is

4    guilty or not of the crimes charged must be based on the

5    evidence in the case and only on the evidence in the

6    case.

7        You should form your judgment as to whether the

8    defendant is guilty or not on the basis of the evidence

9    presented and must not consider either the fact or

10   cross-effect or extent of any potential punishment in

11   coming to that judgment.  Under the law, punishment is a

12   matter for the Court to decide if and when it should be

13   necessary to do so.

14       Now, every defendant, and this defendant,

15   Mr. Carpenter, is presumed to be innocent of the crimes

16   he is charged with.  Unless and until the government has

17   proved by the evidence that he is guilty beyond a

18   reasonable doubt, the burden of proof rests with the

19   government.  The defendant assumes no burden to prove

20   that he is innocent.  The question is never which side

21   has convinced me, but rather, has the government

22   convinced me beyond a reasonable doubt that the

23   defendant is guilty?  If the answer to that question is

24   yes, the government is entitled to your verdict of

25   conviction.  If the answer is no, the defendant is

PDF created with pdfFactory trial version www.pdffactory.com

1    entitled to be and must be acquitted.

2         The burden placed upon the government to prove a

3    defendant's guilt beyond a reasonable doubt is a strict

4    and heavy burden, but it not an impossible one.  It does

5    not require the government to prove a defendant's guilt

6    beyond all possible hypothetical or speculative doubt.

7    There are probably very few, if any, things in human

8    affairs that could be proved to absolute certainty, and

9    the law does not require that.  But the evidence must

10   exclude in your minds any reasonable doubt about the

11   defendant's guilt of the crimes he is accused of.  A

12   reasonable doubt may arise from the evidence produced or

13   from a lack of evidence.

14        If you conclude that the evidence may reasonably

15   permit either of two conclusions, one that the defendant

16   is guilty as charged and the other that the defendant is

17   not guilty, then you must find the defendant not guilty.

18        Reasonable doubt exists when, after you've

19   compared, considered, and weighed all the evidence,

20   using your reason and common sense, you cannot say that

21   you have a settled conviction of the truth of the

22   charge.  Conversely, we say that a fact is proven beyond

23   a reasonable doubt if, after consideration of all the

24   evidence, you are left with a settled conviction that

25   the fact is true.

PDF created with pdfFactory trial version www.pdffactory.com

1          A reasonable doubt is not speculation,

2    supposition, or suspicion; it is not an excuse to avoid

3    the performance of an unpleasant duty; and it is not

4    sympathy.

5          While the law does not require proof that

6    overcomes every hypothetical, conceivable, or possible

7    doubt, it is not enough for the government to show that

8    the defendant's guilt is probable or likely, even if it

9    seems a strong probability.  The government must

10    establish each element of an offense charged by proof

11    that convinces you and leaves you with no reasonable

12    doubt, thus, satisfies that you can, consistent with

13    your oath as jurors, base your verdict on it.  As I say,

14    if you are so convinced as to any count, then it is your

15    duty to return a verdict of guilty as to that count.

16          On the other hand, if you have any doubt about

17    whether the defendant is guilty of the crime charged in

18    any count, then you must give the defendant the benefit

19    of that doubt and find him not guilty.

20          A defendant in a criminal case has a right

21    guaranteed by the Bill of Rights in our Constitution to

22    choose not to testify in his case.  There may be many

23    reasons why a defendant would choose to invoke and

24    exercise that right.  You may not under any

25    circumstances draw any inference or presumption against

PDF created with pdfFactory trial version www.pdffactory.com

1  a defendant from his decision not to testify in

2  accordance with his right.  You should not even discuss

3  the matter.  You are to decide the issues presented

4  solely from your consideration of the evidence as it has

5  been given in the case.

6       Now, I remind you of, but will not now repeat,

7  the instructions I gave you before the arguments about

8  the elements of the offense, offenses charged.  Keep in

9  mind those instructions.  As I told you, for the

10  government to prevail on any of the counts, it must

11  prove beyond a reasonable doubt that each of the

12  essential elements required with respect to that count

13  has been established to your satisfaction.

14       There are 19 counts.  You are to give separate

15  attention to each count.  It may be in the end that your

16  judgment will be the same on all 19 counts.  There is no

17  necessary reason why that must be the case.  You may

18  have different verdicts on different counts, all

19  depending on your assessment and evaluation of the

20  evidence.

21       Your verdict must be a unanimous one, whether it

22  is guilty or not guilty.  That is, you must deliberate

23  with respect to each count until you have reached a

24  unanimous verdict with respect to that count.

25       Now, I cannot tell you exactly how to go about

1    your deliberations.  To some extent you will have to

2    resolve the etiquette and procedure of the jury room

3    yourselves, but let me make a couple of respectful

4    suggestions.  One of the first things I suggest you do

5    when you begin your deliberations is to elect one of

6    your number to be the foreman of the jury.  That person

7    will have the responsibility to communicate with us when

8    you have a verdict and, if necessary, if there are any

9    questions that arise in the course of your

10   deliberations, the foreman will let us know about the

11   question.

12       Let me just say on the matter of questions, if

13   you have any question about the law or about my

14   instructions to you about the law that you are unable to

15   resolve after talking among yourselves about it, then

16   you may send us a note and ask us the question.  We'd

17   rather have you ask a question and get the correct

18   answer about the law than to have you guess about it or

19   be unsure as to what principle of law to apply.

20       We cannot answer questions about the evidence or

21   about its meaning or about factual issues.  Jurors

22   sometimes ask about the evidence, they sometimes seem to

23   want a little help in resolving the issues, but we

24   cannot give you that help.  Neither I nor anyone else

25   may assist you in your assessment of the evidence in the

PDF created with pdfFactory trial version www.pdffactory.com

1   case.  That is exclusively your responsibility.

2        My other suggestion to you is that you should

3   not in the beginning start out by taking a vote or a

4   straw poll to see where people stand or what they think

5   as a whole.  Rather, start talking about the evidence

6   and see where it leads you.  Remember that the point is

7   not to take a position then look in the evidence for

8   support for that position, but the opposite:  Consider

9   the evidence with open minds and see what conclusions

10  the evidence leads you to draw.

11       It is important you deliberate with due regard

12  to the opinions of your fellow jurors, not only their

13  opinions in the sense of what the final verdict might

14  be, but also about their opinions about the evidence and

15  the pieces of evidence and their judgment about the

16  quality of the evidence as you talk about it.  I think

17  you will find that it will affect your own assessment of

18  the evidence as you listen to each other and honestly

19  work together to come up with a unanimous verdict that

20  represents your collective assessment of the evidence.

21       Each juror is entitled to his or her own

22  opinion, and each should render in the end a verdict

23  which represents that juror's conscientious view of the

24  evidence.  That doesn't mean you don't listen to each

25  other and deliberate together, present your own views,

PDF created with pdfFactory trial version www.pdffactory.com

1    consult with one another, and see whether you can,

2    without violence to your individual conscientious

3    judgment, come to a unanimous verdict.

4         Counsel, I'll see you briefly.

5         (At sidebar on the record.)

6         MR. PAPPALARDO:  Your Honor, I'm content with

7    the charge.

8         MR. MITCHELL:  As is the government.

9         THE COURT:  I just wanted to give you the

10   opportunity.

11        MR. PAPPALARDO:  The only question I have is,

12   does this go to the jury room?

13        THE COURT:  I was just saying to Paul, I found a

14   bunch of typos.

15        MR. PAPPALARDO:  As long as it gets there at

16   some point.

17        THE COURT:  I'll correct it and send it in.

18   I'll give you a corrected version of it.

19        MR. MITCHELL:  Thank you.

20        (End of discussion at sidebar.)

21        THE COURT:  There are just one or two things we

22   have to do before you actually withdraw.  The first, as

23   you may know, you probably know, a deliberating jury

24   consists of 12 jurors.  We started with 14, we now have

25   13.  We do that so we're sure we have 12 at the end of

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   the case.  We lost one, fortunately, we didn't lose
 2   anybody else, but we now must separate an alternate
 3   juror from the other 12, and that person will have to
 4   remain available, because sometimes it even happens in
 5   the course of deliberations that we lose a juror and
 6   then the alternate can come off the bench, as it were,
 7   and pinch in.
 8            Under the rules, the alternate juror is the last
 9   juror seated, and that is Mr. Fequiere in seat number
10   11.  So Mr. Fequiere, if you'd step down now and we'll
11   find a place other than the jury room for you.
12            The other jurors now will conduct the
13   deliberations.
14            You will have a verdict slip and the foreman's
15   job will be to fill out the verdict slip.  It is
16   completely self-explanatory, but it asks for a verdict
17   as to each count.  We will also give you an excerpt from
18   the indictment which enumerates the 19 counts that are
19   charged, you will see that, and that will be a guide.  I
20   remind you that guide is not evidence of anything,
21   simply a guide.
22            With that, we will eventually send in -- I have
23   a couple of typographical errors to correct in the
24   instructions I've given you, but we will send in a copy
25   of the instructions, as that may help you as well.  That
```

1  will be coming.

2         So with that now, jurors, we ask you to

3  withdraw, deliberate upon the evidence, and return with

4  your verdict.

5         THE CLERK:  All rise for the jury.

6         (Jury left the courtroom at 2:35 p.m.)

7                         - - -

8         THE CLERK:  All rise for the jury.

9         (Jury in at 4:41 p.m.)

10        THE CLERK:  Will the jurors remain standing,

11 will Mr. Carpenter remain standing, will everyone else

12 be seated.

13        Has the jury agreed upon a verdict?

14        THE JURORS:  Yes.

15        THE CLERK:  Could I have the form, please?

16        Thank you.

17        THE COURT:  You may announce the verdict.

18        THE CLERK:  Yes, sir.

19        In Criminal Action 04-10029, in the case of

20 United States of America versus Daniel Carpenter, jury

21 verdict form:  As to Count 1 of the indictment charging

22 the defendant Daniel Carpenter with wire fraud in

23 violation of 18 U.S.C. Section 1343, we, the jury, find

24 the defendant guilty.

25        As to Count 2 of the indictment charging the

1    defendant Daniel Carpenter with wire fraud in violation

2    of 18 U.S.C. Section 1343, we, the jury, find the

3    defendant guilty.

4        As to Count 3 of the indictment charging the

5    defendant Daniel Carpenter with wire fraud in violation

6    of 18 U.S.C. Section 1343, we, the jury, find the

7    defendant guilty.

8        As to Count 4 of the indictment charging the

9    defendant Daniel Carpenter with wire fraud in violation

10   of 18 U.S.C. Section 1343, we, the jury, find the

11   defendant guilty.

12       As to Count 5 of the indictment charging the

13   defendant Daniel Carpenter with wire fraud in violation

14   of 18 U.S.C. Section 1343, we, the jury, find the

15   defendant guilty.

16       As to Count 6 of the indictment charging the

17   defendant Daniel Carpenter with wire fraud in violation

18   of 18 U.S.C. Section 1343, we, the jury, find the

19   defendant guilty.

20       As to Count 7 of the indictment charging the

21   defendant Daniel Carpenter with wire fraud in violation

22   of 18 U.S.C. Section 1343, we, the jury, find the

23   defendant guilty.

24       As to Count 8 of the indictment charging the

25   defendant Daniel Carpenter with wire fraud in violation

PDF created with pdfFactory trial version www.pdffactory.com

1  of 18 U.S.C. Section 1343, we, the jury, find the
2  defendant guilty.
3       As to Count 9 of the indictment charging the
4  defendant Daniel Carpenter with wire fraud in violation
5  of 18 U.S.C. Section 1343, we, the jury, find the
6  defendant guilty.
7       As to Count 10 of the indictment charging the
8  defendant Daniel Carpenter with wire fraud in violation
9  of 18 U.S.C. Section 1343, we, the jury, find the
10 defendant guilty.
11      As to Count 11 of the indictment charging the
12 defendant Daniel Carpenter with wire fraud in violation
13 of 18 U.S.C. Section 1343, we, the jury, find the
14 defendant guilty.
15      As to Count 12 of the indictment charging the
16 defendant Daniel Carpenter with wire fraud in violation
17 of 18 U.S.C. Section 1343, we, the jury, find the
18 defendant guilty.
19      As to Count 13 of the indictment charging the
20 defendant Daniel Carpenter with wire fraud in violation
21 of 18 U.S.C. Section 1343, we, the jury, find the
22 defendant guilty.
23      As to Count 14 of the indictment charging the
24 defendant Daniel Carpenter with wire fraud in violation
25 of 18 U.S.C. Section 1343, we, the jury, find the

PDF created with pdfFactory trial version www.pdffactory.com

1  defendant guilty.

2          As to Count 15 of the indictment charging the

3  defendant Daniel Carpenter with mail fraud in violation

4  of 18 U.S.C. Section 1341, we, the jury, find the

5  defendant guilty.

6          As to Count 16 of the indictment charging the

7  defendant Daniel Carpenter with mail fraud in violation

8  of 18 U.S.C. Section 1341, we, the jury, find the

9  defendant guilty.

10         As to Count 17 of the indictment charging the

11 defendant Daniel Carpenter with mail fraud in violation

12 of 18 U.S.C. Section 1341, we, the jury, find the

13 defendant guilty.

14         As to Count 18 of the indictment charging the

15 defendant Daniel Carpenter with mail fraud in violation

16 of 18 U.S.C. Section 1341, we, the jury, find the

17 defendant guilty.

18         As to Count 19 of the indictment charging the

19 defendant Daniel Carpenter with mail fraud in violation

20 of 18 U.S.C. Section 1341, we, the jury, find the

21 defendant guilty.

22         Mr. Foreperson, is that your verdict?

23         THE FOREPERSON:  Yes, it is.

24         THE CLERK:  And so say you all?

25         THE JURORS:  Yes.

1          THE COURT:  Jurors, with your verdict now, your

2     service in the case as jurors is at an end and you are

3     discharged.

4          MR. GREENBERG:  Can we see your Honor at

5     sidebar?

6          THE COURT:  All right.

7          (Discussion at sidebar and out of the hearing of

8     the jury:)

9          MR. GREENBERG:  Your Honor, we would just ask

10    that you poll the jurors.  You don't have to do it as to

11    all 19 counts, but just poll the jurors that that

12    represents their verdict.

13         THE COURT:  But you say collectively?

14         MR. GREENBERG:  No.  No.

15         THE COURT:  That is to say, collectively as to

16    the counts?

17         MR. GREENBERG:  Yes.  Yes.

18         THE COURT:  Okay.

19         (In open court:)

20         THE COURT:  Jurors, upon request by the party,

21    the practice is to individually inquire of each of the

22    jurors whether the announced verdict represents that

23    individual juror's verdict.

24         Go ahead.

25         THE CLERK:  Ladies and gentlemen of the jury,

1    listen to your verdict as it stands recorded.  You say

2    you find the defendant, Daniel Carpenter, in Criminal

3    Action 04-10029, guilty as to Counts 1 through 19.

4            Juror 1, is that your verdict?

5            JUROR NO. 1:  Yes.

6            THE CLERK:  Juror 2, is that your verdict?

7            JUROR NO. 2:  Yes.

8            THE CLERK:  Juror 3, is that your verdict?

9            JUROR NO. 3:  Yes.

10           THE CLERK:  Juror 5, is that your verdict?

11           JUROR NO. 5:  Yes.

12           THE CLERK:  Juror 6, is that your verdict?

13           JUROR NO. 6:  Yes.

14           THE CLERK:  Juror 7, is that your verdict?

15           JUROR NO. 7:  Yes.

16           THE CLERK:  Juror 8, is that your verdict?

17           JUROR NO. 8:  Yes.

18           THE JUROR:  Juror 9, is that your verdict?

19           JUROR NO. 9:  Yes.

20           THE CLERK:  Juror 10, is that your verdict?

21           JUROR NO. 10:  Yes.

22           THE CLERK:  Juror 12, is that your verdict?

23           JUROR NO. 12:  Yes.

24           THE CLERK:  I'm going by --

25           THE COURT:  Yeah.

1          THE CLERK:  Juror 13, is that your verdict?

2          JUROR NO. 13:  Yes.

3          THE CLERK:  And Juror 14, is that your verdict?

4          JUROR NO. 14:  Yes.

5          THE CLERK:  Jury polled, your Honor.

6          THE COURT:  All right.  The poll confirms the

7     verdict.

8          So as I say, jurors, your service is at an end

9     and you are now discharged.  If you would withdraw to

10    the jury room, I'll be in in just a few moments to say a

11    formal good-by before you leave.

12         THE CLERK:  All rise for the jury.

13         (Jury out at 4:49 p.m.)

14         THE COURT:  All right.  In light of the jury

15    verdict, we'll set a date for sentencing.

16         THE CLERK:  Let's see what we've got here.

17    Tuesday, September 23rd, at three o'clock for

18    sentencing.

19         MR. MITCHELL:  Two issues, your Honor:  The

20    government is not asking for custody.  There are two

21    motions that were filed last night.  One, as I

22    understood it, is essentially just a written

23    memorialization of what Mr. Pappalardo argued yesterday

24    on a Rule 29 motion.  I assume -- it sounded like you

25    had denied that motion and have not reserved it, so I

PDF created with pdfFactory trial version www.pdffactory.com

1    assume a response is not required.

2        With respect to the motion for a mistrial, the

3    argument on that today you said you reserved.  Do you

4    expect a written response from the government on that?

5        THE COURT:  I'll certainly give you an

6    opportunity to do that if that's what you'd like.

7        MR. MITCHELL:  I --

8        THE COURT:  I hadn't thought about it.

9        MR. MITCHELL:  I don't know if you needed more

10   than what was said --

11       THE COURT:  I mean, it's up to you.  If you want

12   time to submit a written response, I'll give you some

13   time to do that.  Because of all that's been going on, I

14   haven't really thought too much about it.  So if you

15   would like, what would you think would be an appropriate

16   time?

17       MR. MITCHELL:  The usual time under the rules,

18   two weeks.

19       THE COURT:  That's a lot, I think.  I mean, I

20   know it's kind of a trial motion; it's not the usual --

21   all right.  Fine.  I guess that's fine.

22       MR. MITCHELL:  Yeah.  I mean, I'm not sure what

23   the prejudice would be to the defendant.

24       THE COURT:  I guess nothing changes.  So that's

25   fine.  And I don't know whether there would be a reply

PDF created with pdfFactory trial version www.pdffactory.com

1    or whatnot.  And depending on what I see in the papers

2    that are filed, we may or may not have further hearing

3    on it.

4         MR. MITCHELL:  Thank you.

5         THE COURT:  Did you have something or were you

6    just getting ready to leave?

7         All right.  We've set the date for the next

8    appearance.  Existing conditions of release are

9    confirmed and will continue through the sentencing date.

10        All right.  We'll be in recess.

11        THE CLERK:  All rise.

12        Court is in recess.

13        (The proceedings adjourned at 4:51 p.m.)

14                  - - - - - - - - - - - -

15

16                    CERTIFICATION

17        We certify that the foregoing is a correct

18   transcript of the record of proceedings in the

19   above-entitled matter to the best of our skill and

20   ability.

21   /s/Debra M. Joyce
     Debra M. Joyce, RMR, CRR          Date
22   Official Court Reporter

23

24   /s/Marcia G. Patrisso
     Marcia G. Patrisso, RPR, CRR       Date
25   Official Court Reporter