UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.               ) | CRIMINAL NO. 04-10029-GAO |
| ) | |
| DANIEL E. CARPENTER,   ) | |
| Defendant   ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S
MOTION FOR DECLARATION OF MISTRIAL**

The United States hereby responds to Defendant Daniel Carpenter's ("Carpenter") motion for a mistrial (the "Motion"). Relying on Napue v. State of Illinois, 360 U.S. 264 (1959), Carpenter argues that this Court should grant a mistrial because Gerald Levine ("Levine"), a witness called by the United States, falsely denied on cross-examination that he had communicated with David Patterson ("Patterson"), an attorney who represented an exchangor doing business with Benistar Property Exchange Trust Company ("Benistar") in 1998.

**Introduction**

The Court should deny Carpenter's request for a mistrial. As set forth in more detail below, Carpenter's reliance on Napue under the circumstances presented in this case is misplaced. Case law in this Circuit has made clear that Napue is a rule requiring the government to disclose impeachment material or other information that undermines the credibility of its witnesses and forbidding the government from relying on evidence it knows to be false. See United States v. McGovern, 499 F.2d 1140 (1st Cir. 1974). The United States fully met these obligations in this case. The United States properly disclosed to Carpenter ahead of time information tending to impeach Levine on the issue of whether he had communicated with Patterson. Carpenter used that information in abundance to impeach Levine on cross-

examination immediately after Levine denied during his cross-examination that he had communications with Patterson. The United States never elicited or relied on any false evidence in its case against Carpenter; indeed, the United States also itself elicited during the direct examination of Patterson evidence that conflicted with Levine's testimony. The United States also did not rely on Levine's testimony or comment on his credibility during its closing argument. And, when the Court asked Carpenter about taking corrective action after Carpenter had claimed a violation of Napue, Carpenter declined the Court's offer. On these facts, there is no basis for the Court to order a mistrial under Napue.

## Facts

On June 10, 2008, Levine testified as a witness called by the United States. [Tr. II, 7-57-151].[1] Levine had been a broker at Merrill Lynch who, from October 1998 through September 2000, had responsibility for servicing Carpenter's brokerage accounts, including the Benistar Accounts in which Carpenter traded the victim/exchangor funds in options. Before he testified on June 10, 2008, Levine had given numerous statements, both written and oral, about his dealings with Carpenter and the Benistar Accounts.

One of the topics covered in Levine's earlier statements was whether he had communicated, either orally or in writing, with Patterson. Certain documents from Patterson's files showed that Patterson had communicated directly with Levine. [See Exs. 142, 342, 402, 408, 418]. Patterson also testified on earlier occasions, including the first trial in this matter, that

---

[1] References to the Trial Transcript in this re-trial are "[Tr. II, (day)-(page), (lines)]." reference to the Trial Transcript from the first trial are "[Tr. I, (day)-(page)]." Reference to Exhibits marked in this trial are "[Ex. (number)]." References to hearings are "[(Date) Hearing at (page), (lines)]." References to the Motion are "[Motion at (page) or (Exhibit)]."

he had spoken directly with Levine during a conference call Carpenter had set up in October 1998. [Tr. I, 9-86-87]. When asked about these conversations at a May 18, 2004 hearing in one of the civil matters, Levine had initially said that they had not occurred. [See Cahaly et al. v. Benistar, et al., No. 02-00116, May 18, 2004 Hearing (the "May 18, 2004 Hearing"), at 27, ll. 14-17 (attached at Exhibit A)]. Immediately after that answer, however, Levine testified that he could not remember the communications. [Id. at 27, ll. 17-18 ("Q. Do you deny speaking with Mr. Patterson at all on October 21 or 22, 1998? A. I have no recollection.")]. And right after that testimony, Levine, in response to a question posed by the Court, clarified that his testimony about the Patterson conversation was a failure of recollection, not a denial. [Id. at 29, ll. 9-14 ("THE COURT: Okay. Hold on. Those are different things though. Denying it means it didn't happen. No recollection means I don't recollect. Which is it? A. I'm sorry, Your Honor. I have no recollection of ever having this conversation.")].

Prior to trial, the United States had provided to Carpenter documents from Patterson's files evidencing that such communications between Patterson and Levine had, in fact, occurred. The United States also put one such document on its exhibit list. [See Ex. 142]. The United States also put Patterson on its witness list. Carpenter also had in his possession additional documents evidencing that Patterson and Levine had communicated. [See Exs. 342, 343, 402, 408, 418].

On his direct examination on June 10, 2008, in response to two questions from the United States, Levine said that he could not recall conversations or communications with Patterson. [Tr. II, 7-75, ll. 5-11]. On cross-examination, Levine then denied that such communications had occurred. [Tr. II, 7-98, ll. 16-25; 7-99, ll. 1-4]. Carpenter's counsel then proceeded to introduce

3

a series of exhibits (including documents appearing on both the United States' and Carpenter's exhibit lists) evidencing that such communications had, in fact, occurred. [See Tr. II, 7-99-7-123]. Of a cross-examination that took up approximately 60 pages of transcript, 24 of those pages, over one-third of the entire cross, was spent impeaching Levine on this issue. During the course of the cross, the parties and the Court specifically discussed at a side bar the fact that the parties anticipated that Patterson would be called and that additional extrinsic evidence impeaching Levine on this issue was anticipated. [See Tr. II, 7-103-105].

On June 17, 2008, the United States called Patterson as a witness. On his direct examination, the United States asked Patterson about his conversations and written communications with Levine. [Tr. II, 12-37, ll. 15-25, 12-38, ll. 1-22]. The United States also introduced a letter Patterson sent to Levine enclosing certain Escrow and Exchange Agreements. [Ex. 142; Tr. II. 12-43, ll. 18-25, 12-44-46]. On cross-examination of Patterson, Carpenter's counsel elicited additional testimony impeaching Levine further on the question of whether he had communicated with Patterson. [Tr. II, 12-56-73]. Carpenter then made an oral request at the close of Patterson's testimony for the Court to declare a mistrial based on Napue and United States v. Mangual-Garcia, 505 F.3d 1 (1st Cir. 2007). [Tr. II, 12-86-89].

Later that day, shortly after Patterson's testimony, the United States and Carpenter rested. Carpenter then filed his written motion for a mistrial based on Napue. The next day, June 18, 2008, shortly before closing argument, the Court asked for a response from the United States, stating that it wanted to see whether it was necessary for the Court to take any corrective action before the jury was instructed or before closing arguments were to begin. [Tr. II, 13-12, ll. 10-12]. Following a brief recess, the Court asked the United States how it planned to refer to

4

Levine in the closing and the United States informed the Court that it was going to make a very limited reference to Levine. [Tr. II, 13-14. ll. 9-24]. In response to the Court's question as to whether it would ask the jury during its closing to credit Levine's testimony, the United States said it would not. [Tr. II, 13-15, ll. 5-7].

Following that exchange, Carpenter continued to ask for a mistrial and rejected the Court's invitation to take corrective action. Specifically, after the Court said to Carpenter that "correction could still be possible," [Tr. II, 13-18, ll. 21-22], Carpenter explicitly rejected such remedies as redacting Levine's testimony and instructing the jury that it could consider none of Levine's testimony. [See Tr. II, 13-18, ll. 23-25; 13-19, ll. 1-4; 13-20, ll. 15-25; 13-21, ll. 1-13].

The Court then reserved on the motion and proceeded to instructions and closings. During its closing, the United States made no reference to Levine other than the limited reference it had earlier represented to the Court it would make. [Tr. 11, 13-69, ll. 17-20]. Carpenter's counsel, during his closing, commented on Levine and Levine's lack of credibility based on the Patterson communications. [Tr. II, 13-87; 13-89, 13-91-94]. During the rebuttal, the United States responded to Carpenter's counsel's reference to Levine. [Tr. II, 13-113 ("Mr. Pappalardo wants you to focus on the fact that Jerry Levine was sent letters; that Jerry Levine was put in a position to know what was going on. Does that mean he was operating in an open way? No it doesn't.")]. Carpenter objected to the reference to Levine in the rebuttal, stating that "any mention of Levine, given what is in play at the moment, is inappropriate." [Tr. II, 13-117, ll. 7-9]. On that point, the Court stated: "I don't think it changes the mix at all." [Tr. II, 13-119, ll. 19-20].

## Analysis

"The government violates due process when it obtains a conviction by soliciting or failing to correct false evidence." United States v. Casas, 425 F.3d 23, 45 (1st Cir. 2005) (citing Napue). The principal obligation Napue places on the United States is to disclose evidence in its possession that impeaches or undermines the credibility of its witnesses. See United States v. McGovern, 499 F.2d 1140, 1143 (1st Cir. 1974). As the First Circuit stated in McGovern:

> Napue forbids knowing reliance upon false evidence, including false evidence, bearing upon credibility. But the government is not forbidden to call witnesses whose reliability in one or many particulars is imperfect or even suspect. Its obligations are to make a clean breast of any evidence it has which may contradict such witnesses or undermine their credibility, and not to rest its case upon testimony which it believes to be incorrect.

499 F.2d at 1143; see also United States v. Doherty, 867 F.2d 47, 70 (1st Cir. 1989). As is evident from the Circuit's language in McGovern, Napue does not stand for the proposition that a defendant is entitled to a new trial or a mistrial whenever a prosecution witness is impeached at trial or gives a version of events that conflicts with another witness. See also Doherty, 867 F.2d at 70 ("Neither Napue nor any other decision prohibits a prosecutor from calling witnesses who will present conflicting stories."). "[C]onflicts are a matter to be explored on cross-examination [] and the credibility of each account is for the jury to determine." Casas, 425 F.3d at 45. Under this case law, this Court should deny Carpenter's motion for a mistrial for several reasons.

First, the United States fully met its disclosure obligations under Napue. As McGovern and Doherty provide, Napue sets forth principally a rule of disclosure. See McGovern, 499 F.2d at 1143; Doherty, 867 F.2d at 70. "In Napue, the unfairness of the government's conduct stemmed from a two-step process: first, the failure to disclose the exculpatory evidence of a plea bargain with the prosecution; and, second, the exploitation of that failure by the presentation of

evidence or testimony, the falsity of which would have been obvious but for the nondisclosure." United States v. Crockett, 435 F.3d 1305, 1317 (10th Cir. 2006). Here, all of the impeachment evidence relating to Levine's communications with Patterson not only was known to the defendant, but some of it even was on the United States' and Carpenter's own exhibit lists. As the record amply demonstrates, Carpenter was well equipped to use that information to impeach Levine the moment he testified on cross-examination that the communications had not occurred. Under such circumstances, Napue is inapposite. See id. at 1318 ("In the instant case [] the Defendant had the plea agreement to use when cross-examining [the witness]. The government had disclosed this impeachment evidence and hence Napue is inapposite.").[2]

Second, Carpenter used the information in his possession to conduct a vigorous cross-examination of Levine on the question of his communications with Patterson. Napue addresses situations in which false testimony (upon which the government relies) goes uncorrected; it is not supposed to be a basis to interfere with the jury's role in weighing credibility. See Casas, 425 F.3d at 45; United States v. Carpenter, 405 F.Supp.2d 85, 101 (D. Mass. 2005) (rejecting claim of Napue violation because defendant's counsel was aware of witness' inconsistencies and was able expose them "with some emphasis" on cross-examination.).

---

[2] In Crockett, the Tenth Circuit not only held that the district court did not abuse its discretion when it denied a motion for a mistrial, but also held that the district court appropriately refused the defendant's request for an instruction that the witness had testified falsely. Id.; cf. also United States v. Decker, 543 F.2d 1102, 1105 (5th Cir. 1976) (rejecting Napue argument where government disclosed impeachment information after witness left the stand, but while still subject to recall) (citing cases); United States v. Smith, 40 F.3d 386 (5th Cir. 1994) (per curiam) (unpublished) ("the government fulfilled its constitutional disclosure duty by revealing the memoranda in time for appellants to recall [the witness] for cross-examination.").

Over one-third of Carpenter's cross-examination of Levine was spent impeaching Levine after he denied that he had communicated with Patterson. During the cross-examination, Carpenter's counsel showed Levine faxes, letters and phone records evidencing communications with Patterson. Given the vigorous cross-examination of Levine on the question of whether he had communicated with Patterson, Carpenter cannot reasonably say that Levine's denial that the communication occurred had any bearing on the outcome of the case. See Decker, 543 F.2d at 1105 ("[I]n view of the fact that [the plea agreement] was fully disclosed to the jury and the subject of extensive cross-examination, any error would in our opinion be harmless."); see also United States v. O'Keefe, 128 F.3d 885, 896 (5th Cir. 1997) (noting that the vigorous and effective use of impeachment evidence on cross-examination as a basis to reject claim of Napue violation) (also citing United States v. Brand, 80 F.3d 560, 565-66 (1st Cir. 1996) (no Napue violation where cooperating witness was sufficiently impeached on cross-examination on issue of why he decided to plead guilty)); United States v. Grosz, 76 F.3d 1318, 1328 (5th Cir. 1996) (rejecting argument for reversal based on alleged false testimony of witness where defendant introduced a document and elicited testimony from another witness that refuted witness' testimony).

Third, the United States did not solicit or rely on any false testimony from Levine. In this case, the only testimony Carpenter alleges to be false occurred on cross-examination of Levine. While this fact is not, by itself, dispositive of the Napue issue, it is relevant and weighs against a finding that Napue was violated. See McGovern, 499 F.2d at 1143 ("the government was not responsible for [the witness'] lapses on cross-examination nor for the defense's use or non-use of the correct information earlier disclosed."); Carpenter, 485 F. Supp.2d at 101 (noting

as relevant to finding of no Napue violation the fact that the alleged false statements of witness were not sponsored by the prosecutor, but elicited on cross-examination); cf. also Doherty, 867 F.2d at 70 (holding that no Napue violation occurred and noting that "the prosecutor did not even elicit any of [the challenged] testimony."); see also O'Keefe, 128 F.3d at 896 (rejecting Napue claim in part because any "falsehoods . . . occurred as a result of the defense's cross-examination, not from testimony elicited by the prosecution."); United States v. Adabayo, 985 F.2d 1333, 1341-42 (weighing as relevant the fact that the false testimony was elicited during cross-examination.).[3]

Fourth, the United States presented to the jury the corrective testimony from Patterson that impeached Levine on the question of whether Levine and Patterson communicated. In this regard, the United States acted in accord with the First Circuit's direction in McGovern and Doherty. Specifically, it disclosed the evidence that conflicted with Levine's cross-examination testimony and put Patterson's version of events before the jury as part of its case-in-chief. See McGovern, 499 F.2d at 1143 (Noting as a basis for why no Napue violation occurred that "other evidence contrary to [the witness'] testimony was introduced by the government."); Doherty, 867 at 70 (citing McGovern) ("Napue does not forbid calling witnesses whose reliability is suspect, but only obligates the government to disclose any evidence which contradicts such

---

[3] To the extent Carpenter suggests here that the United States was forbidden from calling Levine at all because the United States may have been on notice from Levine's prior statements regarding Patterson that he might give false testimony in this case about the Patterson communications, Carpenter is seriously overreaching. Indeed, the Seventh Circuit rejected precisely such an argument in Adebayo. See 985 F.2d at 1342 ("[Defendant] reasons that because [the witness] lied at his own trial (about his knowledge [that packets contained heroin]), he was discredited as a witness and should not have been permitted to testify against [the Defendant]. Such an argument is wasted on an appellate court.").

witnesses or undermines their credibility."). The corrective testimony from Patterson – elicited by the United States and again by Carpenter during the cross-examination of Patterson – cured any due process issue under Napue that might have existed had Levine's testimony stood alone.

Fifth, the United States did not use any of Levine's testimony in its closing argument. Here, the United States did not rely in any way on Levine's testimony in articulating the evidence showing Carpenter's guilt during its closing.[4] Nor did the United States ask the jury to credit Levine's testimony over Patterson's or to credit Levine's testimony in any way. It only said: "whatever Mr. Levine may have known about what Mr. Carpenter was up to, it is irrelevant to what Mr. Carpenter did after he went to Merrill Lynch and went to Paine Webber." [Tr. II, 13-69, ll. 17-20]. Neither this statement, which the United States cleared with the Court before making it during closing, nor the statement in rebuttal, which the Court said did not "change[] the mix at all" [Tr. II, 13-119, ll. 19-20], put into issue Levine's credibility or ask the jury to credit Levine in any way.[5]

In fact, the United States' case against Carpenter did not rest or rely on whether Levine had communicated with Patterson or on whether Levine recalled, denied or admitted communicating with Patterson. What Levine knew about the source of the funds – while

---

[4] The United States did not even refer to Levine's testimony that Carpenter had described himself as a "riverboat gambler." That testimony was never impeached, and for good reason: Levine recorded that conversation in a contemporaneous memorandum he sent to Merrill Lynch management. [See Ex. 154].

[5] The situation here is thus ever farther away from the situation posed in United States v. Mangual-Garcia, 505 F.3d 1 (1st Cir. 2007) upon which Carpenter relies. In Mangual-Garcia, the prosecutor explicitly commented on the credibility of the witness who has testified falsely that he was facing prosecution for his role. Id. at 9. And even there, the First Circuit said the prosecutor's comment in closing was not improper. Id.

perhaps relevant to the questions of Merrill Lynch's culpability – did not affect Carpenter's culpability. And it was totally irrelevant to what happened after September 2000 when Carpenter moved to PaineWebber and continued to take in funds from the exchangors.

Finally, Carpenter declined the Court's offer to take corrective action. As the First Circuit recognized in Mangual-Garcia, a defendant cannot consciously avoid having a correction made before the trier of fact and then later complain that he was denied due process. See 505 F.3d at 10 ("Although there is some division within the circuits on this issue, we agree with the majority of circuits that 'absent unusual circumstances, the right of a defendant to disclosure by the prosecutor is deemed waived if defense counsel with actual knowledge of the [false testimony] chooses not to present such information to the jury.'" (quoting United States v. Iverson, 648 F.2d 737, 739 (D.C. Cir. 1981))). Even if there had been a violation of Napue (which there was not), the issue was apparent at trial in time for the Court to address the jury and take a variety of corrective steps – such as providing a curative instruction, striking Levine's testimony, cautioning the jury not to consider Levine's testimony in any way, etc. Such action could also have occurred within a day of when Patterson had testified and when his testimony was fresh in the jury's mind.[6] Carpenter explicitly declined the Court's invitation to take such

---

[6] In light of Mangual-Garcia, Carpenter cannot now argue that taking corrective action could only have occurred immediately after Levine's testimony. Given that Carpenter was aware of the impeaching evidence when he was questioning Levine and represented to the Court that he expected further impeachment of Levine during Patterson's testimony, it was clearly Carpenter's choice not to ask for a correction at the close of Levine's testimony. Having made that choice, he cannot complain that the timing of the proposed correction – one day after Patterson's testimony – came too late. Cf. Mangual-Garcia, 505 F.3d at 10-11 ("When the defendant knows about the false testimony and fails to bring it to the jury or court's attention, the assumption is that he did so for strategic reasons, and the defendant will not be allowed to question his own strategic choices on appeal.").

corrective action. Having declined the Court's offer to take corrective action, he has no basis to claim that he is entitled to a mistrial based on a violation of Napue.

### Conclusion

For all of these reasons, the Court should deny Carpenter's motion for a mistrial.

                Respectfully submitted,

                MICHAEL J. SULLIVAN
                United States Attorney

By:

                **/s/ Jack W. Pirozzolo**
                JONATHAN F. MITCHELL
                JACK W. PIROZZOLO
                Assistant U.S. Attorneys
                U.S. Attorney's Office
                U.S. Courthouse, Suite 9200
                1 Courthouse Way
                Boston, MA 02210

Date: July 2, 2008

### CERTIFICATE OF SERVICE

I, Jack W. Pirozzolo, hereby certify that on July 2, 2008 I served a copy of the foregoing by electronic filing on counsel for the defendant.

                **/s/ Jack W. Pirozzolo**
                JACK W. PIROZZOLO
                Assistant U.S. Attorney