**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____  )
                                 )
UNITED STATES OF AMERICA )
                                 )
                                 )
v.                               )        **CRIMINAL NO. 04-10029-GAO**
                                 )
                                 )        **ORAL ARGUMENT REQUESTED**
DANIEL E. CARPENTER        )
_____  )

**DEFENDANT DANIEL E. CARPENTER'S (CORRECTED) MEMORANDUM OF
LAW IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
PURSUANT TO FED. R. CRIM. P. 29(c) (AFTER JURY VERDICT) AND IN THE
ALTERNATIVE FOR NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33(a)**

       Defendant Daniel E. Carpenter ("Mr. Carpenter") respectfully moves, pursuant to

Fed. R. Crim. P. 29(c), after the jury's verdict for a judgment of acquittal and, in the

alternative, in the interest of justice for a new trial under Fed. R. Crim. P. 33(a).  The

grounds for this motion may be summarized under the following three categories:  first,

that the government has presented insufficient evidence to prove beyond a reasonable

doubt the elements of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343 as to each

of the nineteen counts; second, that the government's misconduct at trial and in its

closing has unduly and unfairly prejudiced the defendant, tainting the jury's verdict; and

third, the erroneous and prejudicial rulings on issues of evidence.

**I.**      **INTRODUCTION**

       Following a two and one-half week trial, the jury convicted Mr. Carpenter on all

nineteen counts of mail and wire fraud in approximately two hours.  The jury convicted

Mr. Carpenter on these nineteen separate counts, contrary to the weight of evidence, and

in the direct wake of the improper and irreparably unfairly prejudicial closing and rebuttal arguments of the government.

The jury commenced deliberations at 2:35 p.m. (Tr. 13-142), and returned its verdict at 4:41 p.m. (Id.) The jury received the exhibits in the case no earlier than 3:00 p.m. It is unknown to defense counsel whether, and if so at what time, the jury received a written copy of this Court's charging instructions. Assuming two hours of possible deliberation time, it is difficult to see how the evidence relevant to nineteen separate counts, with distinct findings necessary as to each (e.g., the defendant's intent on the particular date relevant to a specific count, as opposed to at some other point), possibly could have been the subject of meaningful deliberations by a rational jury. The speed of the jury's return underscores the obvious: despite the weight of the evidence in Mr. Carpenter's favor on good faith, the jury was tainted by the government's misconduct including, but not limited to, arguing facts not in evidence and appeals to emotion. Specifically, the government's willful conduct in arguing on rebuttal that Mr. Carpenter had committed fraud:

> If you recall those Nationwide agreements, you remember what was stripped out of them so that people wouldn't see: "Government bond," "money market" and so forth. He deleted them. He got rid of those portions of the agreements. So all a person would be left with was "invest" and not think twice about it. That's fraud.

(Tr. 13-111)

While the Court made an effort to address this with the jury, by instructing that there was no evidence before them as to how the Nationwide and Benistar Property Exchange Trust Company, Inc. ("Benistar") agreements came to be different, "and so that would not be an appropriate thing for you to take into consideration" (Tr. 13-120), that

caution was shown to be insufficient: the jury obviously determined that this initial "fraud" at the outset of the enterprise, with Benistar's first customer, whether in fact done by Mr. Carpenter or his "mouthpiece," Paley, was all that was necessary to convict Mr. Carpenter on all counts, obviating the need for consideration of the elements of the offense as to each count. Most critically, as discussed below, the Court's limiting instruction did not address the pernicious and prejudicial premise the government advanced: that the revision of the form was itself a fraudulent act. From this, a guilty verdict wrongly, but inexorably, followed.

In these circumstances, the Court should set aside the verdict and enter a judgment of acquittal on all counts or, in the alternative, grant a new trial. "When brief jury deliberation is coupled with a verdict that is contrary to the great weight of the evidence … the district court has an affirmative duty to set aside the verdict." Kearns v. Keystone Shipping Company, 863 F.2d 177, 182 (1st Cir. 1988).

## II.     ARGUMENT

### A.     THE GOVERNING STANDARDS

#### 1.     Legal Principles Governing a Motion for Judgment of Acquittal Under Fed. R. Crim. P. Rule 29

In considering a Rule 29 motion, the Court is required to "view all of the evidence in the light most favorable in determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Stark, 499 F.3d 72, 79 (1st Cir. 2007). The scope of the trial court's review is "over the totality of the evidence, both direct and circumstantial: [taking a] hard look at the record and reject[ing] those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." United States v. Czubinski, 106 F.3d 1069, 1073

(1st Cir. 1997) (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)) (internal quotations omitted).  "This function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable doubt."  United States v. Woodward, 149 F.3d 46, 56-57 (1st Cir. 1998) (quoting Spinney, 65 F.3d at 234).  A motion for judgment of acquittal must be granted on grounds of insufficiency "'where an equal or nearly equal theory of guilt [ ] and a theory of innocence is supported by the evidence viewed in the light most favorable to the verdict.'"  "In such cases, a reasonable jury must necessarily entertain reasonable doubt."  Woodward, 149 F.3d at 57 (internal quotations and citations omitted).

## 2. Legal Principles Governing a Motion for New Trial Under Fed. R. Crim. P. Rule 33(a)

The grant of a new trial is appropriate whenever "the interest of justice so requires," Fed. R. Crim. P. 33(a), and is within the discretion of the court:  "A district court's disposition of a Rule 33 motion for a new trial in a criminal case is ordinarily a 'judgment call.'"  United States v. Connolly, 504 F.3d 206, 211 (1st Cir. 2007) (quoting United States v. Maldonado-Rivera, 489 F.3d 60, 65 (1st Cir. 2007)).  A grant of a new trial  "may be triggered by a myriad of circumstances.  Rule 33 wisely does not attempt to characterize those circumstances so as to limit a trial judge's authority to rule on a timely motion for a new trial."  United States v. Carpenter, 494 F.3d 13, 29 (1st Cir. 2007) (Lynch, J., concurring).

For the reasons articulated below, absent Mr. Carpenter's acquittal under Fed. R. Crim. P. 29(c), the interest of justice requires the grant of a new trial in this matter.

**B.    THE GOVERNMENT HAS FAILED TO PROVE BEYOND A
REASONABLE DOUBT EACH ELEMENT OF MAIL AND WIRE
FRAUD AS TO EACH COUNT**

In order to sustain a charge of mail and wire fraud pursuant to 18 U.S.C. §§ 1341
and 1343 the government must prove: (1) that there was a scheme or artifice to defraud or
to obtain money or property by materially false and fraudulent pretenses, representations
or promises, as alleged in the Indictment; (2) that the defendant knowingly and willfully
participated in the scheme with specific intent to defraud and with specific intent to
deceive; and (3) that in execution of that scheme, the defendant used or caused the use of
interstate and foreign wire communications.[1]  As summarized in Carpenter, 494 F.3d at
16, Mr. Carpenter was charged "with having devised a scheme to defraud the Exchangors
by representing that their money would be invested prudently … while he intended to
pursue an investment strategy at odds with such representations."  The government's
theory was that Mr. Carpenter knew the escrow agreements, exchange agreements,
exchange fee agreements, account selection forms and marketing materials (collectively
"the Exchange Agreements") used by Benistar contained representations to the
Exchangors "that their funds …would be held safely in escrow accounts from which they
would not move except to be reinvested in qualifying property or to be returned to the
exchangors, and further that Carpenter knew these assurances were either false or
materially incomplete.  More particularly, the government theorized that Mr. Carpenter
knew that the exchangors were not being advised that, contrary to the assurances in the
documents, he intended to use their funds to invest in the options market," United States

---

[1] See  Carpenter v. United States, 484 U.S. 19, 25 n.6 (1987) ("mail and wire fraud statutes share the same
language in relevant part" and are therefore subject to the same analysis); United States v. McGauley, 279
F.3d 62, 67 (1st  Cir. 2002).

v. Carpenter, 405 F. Supp. 2d 85, 93 (D. Mass. 2005), or that he was sustaining

substantial losses in the options market.

    The government attempted to prove intent to defraud and to deceive largely based

upon the same theory used at the first trial. It presented the Exchange Agreements, the

investing Exchangors and the testimony of Martin Paley. In addition, it:

> focused on the incongruity between the nature of a § 1031 property
> exchange (a transaction structured to avoid capital gains while allowing
> investors to use the proceeds of one property sale to purchase a
> replacement property within a short period of time) and the aggressive
> nature of Carpenter's investment behavior. It contended that this
> incongruity demonstrated Carpenter's intent to mislead [the Exchangors]
> into depositing their real estate proceeds with a supposedly safe
> intermediary so that he could leverage the funds into substantial profits for
> himself through risky options trading.

Carpenter, 494 F.3d at 17. At this trial, as it had in the first, to prove this part of their

"agenda," the government sought to introduce "extensive evidence regarding Carpenter's

investment behavior, relying chiefly on testimony from his brokers at Merrill Lynch and

PaineWebber." Id. As explained by the government:

> during the course of the scheme he is short of funds; he has obligations to
> Exchangors that far exceed the money he had available … the fact that he
> is continuing to trade in the investments … and is compounding his losses
> … is relevant both to showing that there were … material representations
> made to the Exchangors … and to establish his state of mind that he was
> misleading these people … There's the options trading which is causing
> the deficiency, but that has to be measured against the obligations he has
> at the time he is incurring those losses."

(Tr. 4-20 to 21) (emphasis added) It is this last point, the temporal component -- "at the

time he is incurring those losses" -- from which the government most improperly strayed

in its by-any-means-necessary pursuit of a conviction.

    As this Court instructed at trial, good faith is an absolute defense to the charge of

wire fraud or mail fraud because it negates specific intent to defraud.

> Good faith on the part of the defendant is a complete defense to a charge of wire fraud or mail fraud, because if a defendant acted in good faith, he necessarily lacked the specific intent to defraud … .  A person acts in good faith if the person acts on the basis of a belief or opinion honestly held, though the belief or opinion may turn out to have been, in fact, wrong.  An honest belief in the truth of statements or representations is inconsistent with a specific intent to defraud. … [I]t is the responsibility of the government to prove beyond a reasonable doubt that the defendant did not act in good faith.

(Tr. 13-33 to 34)  See also United States v. Goodspeed, 977 F.2d 566, 1992 WL 302242, *2 (1st Cir. 1992) (per curiam) (unpublished) (defendant's good faith theory of defense was sufficiently conveyed to the jury with instructions that "the jury could not find [the defendant] guilty of embezzlement if he had acted 'mistakenly … with a good faith belief' that he had a right to use plan assets when he withdrew funds from the plan").

Moreover, it is well established, that "[u]nder the mail and wire fraud statutes, even false representations or statements or omissions of material facts, do not amount to fraud unless done with fraudulent intent.  However misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith.  An honest belief in the truth of the representations made by a defendant or caused to be made by a defendant is a good defense, however inaccurate a statement may turn out to be."  2 L. Sand et al. Modern Federal Jury Instructions -- Criminal, Instruction No. 44-5 and Comment at 44-34 (2007); United States v. Alkins, 941 F.2d 541, 549 (2d Cir. 1991) (specifically approving the definition of "good faith" as "an honest belief in the truth of the representations … however inaccurate a statement may turn out to be"); United States v. Rossomando, 144 F.3d 197, 200-03 (2d Cir. 1998) (in mail fraud prosecution, court's instruction on good faith defense which stated that defendant's belief that no loss would ultimately result would not excuse fraudulent actions, warranted reversal because of risk that jury could have convicted without finding that he intended to harm the victim).

1.    **The Government Has Failed to Prove a Material Fraud Arising from "Risky Options" Trading**

Each of the government's 19 counts charge that representations made to potential Exchangors were rendered false because Mr. Carpenter engaged in risky "options trading." As it repeatedly alleged in the Superseding Indictment and argued at trial, the government contended that the scheme to defraud consisted of representations to potential Exchangors that their funds would be "safe," while, in fact, Mr. Carpenter engaged in "aggressive, high risk trading in the options market." Under the government's theory of the case, the "fact" misrepresented or not disclosed resulting in the fraud was that "Carpenter did not hold the funds safe in the accounts into which they had been wired [but] [i]nstead, he used the funds to trade in the options market." Superseding Indictment, ¶¶ 25, 28.

Despite its charges, the government did not present any evidence that any allegedly false statements (or omissions) were materially false. As the Court charged the jury, "[a] statement or representation is material if it is one that has a natural tendency to influence or is capable of influencing a decision of the person to whom it is addressed." (Tr. 13-32) See Neder v. United States, 527 U.S. 1, 16 (1999). The government, however, made no showing that any "risky options" trading would have been material to a potential Exchangor. It simply adduced no evidence to quantify any options trades or losses due to options trades. As a result, the government failed to prove that any undisclosed options trading could have rendered any relevant statements materially false or misleading. See (Tr. 4-20 to 25) (government's acknowledgement that trading in options investments is relevant to showing materiality of alleged misrepresentations).

The testimony of government agent and summary witness Thomas Zappala succinctly captured the prosecution's failure to establish the materiality of any alleged false statement. Zappala admitted that, in compiling "trading losses" from the data on the Merrill Lynch and PaineWebber account statements, he did not identify losses arising from options trading or distinguish options-related losses from those due to other transactions or activity in the accounts, such as losses accruing from common stocks and bond funds. Indeed, the government never asked Zappala, to differentiate losses due to options trading from losses due to traditional stock investments. (Tr. 13-65)

The only evidence offered by the government to show an actual record of Mr. Carpenter's investing activity at Merrill Lynch and PaineWebber were the respective account statements. The government, however, did not ask any of its witnesses to explain the contents of those records or to identify where and how, if at all, those records evidenced the amount or volume of "risky options" investing. It used neither the statements themselves, nor any other source, to elicit testimony to measure any options trading or options related losses, whether in dollars, as a percentage of overall account activity, or by any other measurement.[2] Further, because it presented no baseline

---

[2] The monthly account statements, presented in each brokers' idiosyncratic style, demonstrably do not speak for themselves, but present an extensive array of data and information in a variety of sometime overlapping categories with no explanation of the characteristics or definitions of the categories themselves. Moreover, Merrill Lynch and PaineWebber used different terminology or the same terminology to describe different classes of transactions or amounts. Even Zappala acknowledged that in preparing Ex. 206, a summary of trading losses, he presented Merrill Lynch and PaineWebber loss figures as measurements of the same activity when, in fact, Merrill Lynch's numbers reflected realized losses but PaineWebber's reflected both realized and unrealized losses. (Tr. 10-59: 2-21)

Even if the cryptic information contained in the account statements could be decoded to reveal some measure of amount or volume of "risky trades," the jury could not find beyond a reasonable doubt that "risky" options activity in the accounts rendered any statements or omissions materially misleading by speculating about the meaning or significance of data in the account statements. As noted, the government presented no testimony concerning the account statements relative to whether or to what extent they documented any "risky options" trading. It should further be noted that the jury deliberated just around an hour and a half after receiving the several boxes of exhibits introduced in this case. It would be a nonpareil

evidence of any amount or volume of "risky options" trading, the government necessarily

failed to present any evidence respecting the degree or extent of any "risky options"

investing relative to the amounts of money deposited by any single Exchangor -- or all

Exchangors collectively.  And, perhaps most telling, the government's witnesses from

Merrill Lynch and PaineWebber were never asked, and did not testify, about: <u>one</u>, the

amount or volume of trading in "risky options" (if any); or <u>two</u>, any amount in losses

attributable to any such trading (if any).  Instead, over the objection of the defense both

prior to trial and prior to their testimony, these witnesses were generally permitted to

testify about Mr. Carpenter's "risky trading strategy" and losses.

Mr. Carpenter does not maintain that the government necessarily was required to

establish "risky options" trading in a specific minimum amount in order to prove the

materiality of any alleged misstatement.  In this case, however, the government presented

<u>no evidence of any amount</u> of any such trading.  The jury was not entitled to guess that

the nature or extent of options trading in the account would have had a natural tendency

to influence or was capable of influencing a decision of the Exchangors.  Accordingly,

because the evidence was insufficient to establish the element of materiality, the court

should enter a judgment of acquittal on all counts of the indictment.

### 2.    The Government Has Failed To Prove Beyond a Reasonable Doubt That Mr. Carpenter Did Not Act in Good Faith

The government must prove both a specific intent to defraud and a specific intent

to deceive, and it has failed to meet its burden here by a considerable margin.  <u>First</u>, there

is substantial, if not overwhelming, evidence that Mr. Carpenter believed in good faith

that under the terms of the Exchange Agreements he had unfettered discretion to invest

---

legal fiction to suppose that the jury reviewed the several hundred pages of account statement exhibits, accurately interpreted the data, and then reached a non-speculative conclusion on materiality.

the funds as he saw fit.  Mr. Carpenter's good faith belief in this respect is relevant both because he had that belief at the time the funds were obtained from the investing Exchangors and because the government seeks to prove his intent to defraud by and through this very trading strategy.  See Goodspeed, 977 F.2d 566, 1992 WL 302242, *2 (where defendant was charged with embezzlement from an employee benefit plan his defense was that he had acted "mistakenly … with a good faith belief" that he had a right to use plan assets when he withdrew funds from the plan" and the jury was appropriately instructed on this defense).  Second, he believed in good faith that he had made no misrepresentations to the investing Exchangors, and did not cause any representations other than those in the Agreements to be made to the Exchangors.  Third, he therefore had a good faith belief that the Exchangors were never misled by him or caused to be misled by him into believing their funds would be "safe" or "secure" from investment loss.  Fourth, he had a good faith belief that his trading strategy, which he had successfully utilized in the past on many prior exchanges, was rational, supported by market analysts, and would continue to succeed and result in successful completion of the outstanding exchanges.

> **a.    The Written Exchange Agreements and Testimony
> From the Investing Exchangors**

In essence, the Exchange Agreements placed no restrictions on how the funds would be managed in order to produce the 3% and the 6% return selected by the investing Exchangors and state that Benistar shall have full control over and full discretion to invest the funds.  In addition, each of the investing Exchangors testified that they: were represented by either or both attorneys and accountants who reviewed the Exchange Agreements; had no contact with and never met Mr. Carpenter prior to contracting;

understood that Benistar was investing the money but never asked in what fashion; understood there was no limitation on investment vehicles selected so long as they received their 3% and 6%; knew that Benistar had full discretion; and chose Benistar because of a personal relationship or business connection that they, their lawyer, or their accountant had with Paley, or had referred them to Paley, and that it was Paley who induced them to provide their money to Benistar.

### (i)     The Exchange Documents

The very language of the various documents entered into between the investing Exchangors and Benistar make clear Mr. Carpenter's full disclosure of material facts and his good faith conduct.

The Exchange Agreements provide for Benistar's investment of Exchangors' funds, recommend that they consult with tax professionals and legal counsel, and make clear that any prior written or oral representations made to the Exchangors are superseded, and the entirety of the agreement is expressed in the Exchange Agreement.

Critically, and contrary to the incessant mischaracterizations of the government, nowhere in the Exchange Agreements is there any statement that invested proceeds are held "safe" or "secure" by Benistar so as to not be subject to potential investment loss.[3]

In the Exchange Agreements, paragraph 10 of the agreement provides:

> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the Relinquished Property shall be held and invested with Merrill Lynch Private Client Group in either 3% per annum in a Merrill Lynch Ready Asset Money Market account, or 6% per annum in a Merrill Lynch investment account[4]. . . . Said investment account shall be in the name of Intermediary and shall require the

---

[3]  Moreover, the marketing materials that the government presented throughout the trial do not make represntations of safety or security, but rather pose rhetorical questions concerning the 1031 process.
[4]  In the PaineWebber Era, this language read "shall be held and invested with PaineWebber at either 3% per annum, or 6% per annum in a PaineWebber account."  Ex. 95

> signature of an authorized officer of Intermediary to permit the withdrawal
> of any portion thereof.

Ex. 10 (emphasis added).  As noted by Zappala, <u>none</u> of the Exchangors involved in this

case selected a 3% Merrill Lynch Ready Asset Money Market account (Tr. 13-49), it

simply has no relevance here, so that reference cannot be deemed to have fraudulently

induced any Exchangors.  This language places the investing Exchangors on clear notice

that their funds would be invested, and there is no evidence to negate Mr. Carpenter's

good faith in investing their funds under these documents.

Similarly, the Escrow Agreements entered into between the investing Exchangors

and Benistar made clear that the Exchangors' money would be invested, and did not limit

the permissible vehicles for investment.  The Escrow Agreement during the Merrill

Lynch era stated, in relevant part, "<u>BENISTAR shall have full control over the

Exchangor's funds to invest</u> as the Exchangor directs in either the 3% Ready Asset

Money Market Fund or the 6% Investment Account."  Ex. 11 (emphasis added).[5]  Mr.

Carpenter's good faith in investing the Exchangors' funds in accordance with his

judgment and experience is reinforced by these documents, and the government has

provided no evidence to disprove his good faith in light of such language.

Finally, the Exchange Fee Agreement signed by each of the Exchangors further

evidences the fact that Benistar would invest the funds in its discretion.  The agreements

during the Merrill Lynch era provided that, "Exchangor and Intermediary expressly agree

that any cash proceeds received from the disposition of the Relinquished Property <u>shall

---

[5]  In the PaineWebber era, the relevant language "<u>BENISTAR shall have full control over the Exchangor's funds to invest</u> as the Exchangor directs in either the 3% or 6% account."  Ex. 96 (emphasis added).

be held and invested at Merrill Lynch at the discretion and through financial institutions of Intermediary." Ex. 12 (emphasis added).[6]

In sum, these documents provided clear notice to the investing Exchangors and their advisors that the choice of investment vehicles which Benistar could utilize in investing their funds was a matter of Benistar's discretion.

### (ii)    The Investing Exchangors' Testimony

The investing Exchangors testified as follows: **Eliot Snider** testified that he is a sophisticated and experienced businessman (Tr. 2-109 to 110; Tr. 3-50). In deciding to retain Benistar, Snider spoke to Paley by phone then met two or three times in person in the summer of 2000, where Paley presented promotional materials to him. (Tr. 2-112; Tr. 2-112; Exs. 1-6) Snider acknowledged that Mr. Carpenter's name does not appear in any of the promotional materials (Tr. 3-92), and that he did not meet with him, or even know he existed, prior to engaging Benistar. (Tr. 3-92 to 93)

As to any purported inducement of Snider by Paley, Snider testified that he selected Benistar because he was very favorably disposed towards Paley because of his familiarity with Paley's family. (Tr. 3-72 to 73) He further claimed that there was "nothing in particular" that Paley said to him that made him select Benistar, "just everything in general." (Tr. 3-70)

Following his meetings and calls with Paley, Snider understood that his funds would be held and invested at Merrill Lynch, and that Benistar had the discretion to invest the funds. (Tr. 3-68) He further knew that the six percent account he elected was an investment account, (Tr. 3-77) and acknowledged that the Exchange Agreement he

---

[6] In the PaineWebber era, the reference to Merrill Lynch was changed to PaineWebber, but the rest of the relevant language remained the same. Ex. 25

signed does not specify the kind or nature of the investment Benistar would engage in to give him a six percent return.  (Tr. 3-80)  He knew investment accounts had risks when he signed the Exchange Agreement (Tr. 3-81), and elected to grant Benistar the complete discretion to invest his funds (Tr. 3-85 to 86).  Thus, Snider's testimony, in sum, is that relied upon his familiarity with Paley's family, and not any putative inducement.

**Byron Darling** testified that prior to engaging Benistar, he had spoken only by telephone with Linda Jokinen and Paley, (Tr. 3-102 to 103) and he never spoke with, met, or had any contact with Mr. Carpenter.  (Tr. 3-128 to 129)  Moreover, there is no evidence that Darling ever saw any promotional materials relating to Benistar prior to entering into his exchange.  Although Darling claimed that he had a conversation with Paley before both his first and second exchange, the latter being at issue in this case, concerning the safety of his funds, he acknowledged that he had testified in October of 2001 that he did not recall Paley saying anything else about the nature of property exchanges at any point after his initial conversation with Paley in December 1999.[7]  (Tr. 4-127 to 128)  Moreover, despite Darling's claim that Paley told him that his money would be "perfectly safe," Paley testified that he never represented to any Exchangor that their money would be safe or secure.  (Tr. 11-86 to 87)

**Brian Fitzgerald** testified that together with his accountant, he met with Paley in March 2000.  (Tr. 4-155 to 156)  Fitzgerald, at the time he contracted with Benstar, did not know that Mr. Carpenter existed.  (Tr. 5-31)

Before signing the exchange documents, he had his accountant and attorney review the documents.  (Tr. 5-28 to 29)  Fitzgerald understood that the integration clause

---

[7]  This prior inconsistent statement is not hearsay and is admissible for the truth of the matter pursuant to Fed. R. Evid. 801(d)(1).

of the Exchange Agreement superseded any representations made to him by Paley in March 2000. (Tr. 5-18 to 19; Ex. 69) He testified that when he signed the exchange documents in the fall of 2000, he knew that Benistar would invest his funds at their financial institutions at their discretion, and that it had full control to invest his funds. (Tr. 5-8 to 9; 5-23 to 24) He additionally testified that the account selection form he signed, selecting a three percent account, referred merely to a "three percent account" and not a "money market account." (Tr. 5-11 to 13; Ex. 69)

He also testified that the only restriction in his mind as to the nature of Benistar's investment of the funds was Section 1031 of the tax code, and that he himself did not place any limitation on Benistar's investment. (Tr. 5-26 to 27; Tr. 5-31) As this Court is aware, there is no limitation on vehicles of investment provided for in Section 1031.

The reading of **Joseph Iantosca's** testimony from the first criminal trial offered almost no evidence concerning the elements of the crimes of which Mr. Carpenter is accused. Iantosca testified that he met Paley, signed an Exchange Agreement, and gave Benistar one million dollars. (Tr. 6-10 to 12) He also testified that Paley told him that "his people can double the money from whatever we have done." (Tr. 6-10) This hearsay testimony should not be admissible against Mr. Carpenter because (1) the government has failed to establish an agency relationship between Paley and Mr. Carpenter,[8] and (2) even to the extent the Court finds an agency relationship between Mr.

---

[8]  The failure of the government to prove Paley's agency relationship with Mr. Carpenter, and the Court's failure to properly rule on this issue are discussed in Section E, infra.

Carpenter and Paley as to the documents presented to Iantosca, nowhere on any of the documents is the suggestion made that an Exchangors' monies could be doubled.[9]

Iantosca's attorney, **Marjorie Adams**, testified that she and Iantosca met with Paley in early 2000.  (Tr. 5-50)  Adams had two conversations with Mr. Carpenter, only one of which was in the year 2000, and is not relevant to this case (it related to the mechanics of a reverse exchange).  (Tr. 5-79 to 80)

Adams acknowledged that she never asked Mr. Carpenter in 2000 if Iantosca's funds were going to be invested.  (Tr. 5-89 to 90)  Iantosca entered into a § 1031 exchange before he and Adams met Paley.  (Tr. 5-103 to 104)  Adams acknowledged that the exchange agreements did not define the phrase "investment account," (Tr. 5-129)  and that during the first criminal trial, she answered that there was no limitation as to how funds would be invested other than the fact Iantosca was scheduled to get either three or six percent depending on the rate he chose[10]  (Tr. 5-130 to 131)

**Albert Bellemore** testified he never met or spoke with Paley, Mr. Carpenter, or anyone from Benistar prior to entering into his exchange.  (Tr. 6-51)  Instead, David Eaton, who ran a real estate asset management company, testified that he sought out a qualified intermediary on behalf of Bellemore's company.  (Tr. 6-13 to 16)

**David Eaton** testified that he met Paley in June of 2000, but never spoke with or met Mr. Carpenter.  (Tr. 6-18; 6-24; 6-28)  Eaton listened to Paley's representations, "checked him out with someone who had completed a 1031 exchange," told Bellemore about the merits of a § 1031 transaction, and the fee structure.  (Tr. 6-40)

---

[9]  This was highly prejudicial and not at all probative:  it suggested to the jury either that the fraud was even greater than the government told them (double your money), or that Mr. Carpenter and his putative mouthpiece preyed upon the cognitively infirm.

[10]  This prior inconsistent statement is not hearsay and is admissible for the truth of the matter pursuant to Fed. Rule Evid. 801(d)(1).

Bellemore testified that he never asked anyone at Benistar to explain any of the language in the exchange documents.  (Tr. 6-58)  He and Eaton testified that it was their understanding that Benistar would have full control over Bellemore's funds.  (Tr. 6-60; 6-42)  Eaton, who explained Paley's representations to Bellemore, knew that Bellemore's money would be in an investment account and invested by Benistar.  (Tr. 6-45)

There is no evidence that **Gail Cahaly** received any promotional materials from Paley other than Ex. 37, a two page document setting forth "Frequently Asked Questions" concerning 1031 exchanges, which makes no representations as to the safety of funds, but rather to the "Safe Harbor" for tax deferral purposes which, as the Court is aware, has nothing to do with safety of investments.  She met with Paley only one time, acknowledged that she had previously testified that that meeting lasted less than ten minutes, and had no meetings with Mr. Carpenter in 2000.  (Tr. 10-101; 103 to 106)  The only document Cahaly signed in connection with her exchange with Benistar was an Exchange Fee Agreement.  (Tr. 10-96 to 99; Ex. 40)  She further acknowledged that in  a 2001 deposition she answered that she knew her money was going to be invested in PaineWebber in the discretion and through financial institutions of Benistar.  (Tr. 10-108 to 109)  There is no evidence of fraudulent inducement, as Cahaly was on notice as to the full discretion Benistar had to invest her funds.

**Jeffrey Johnston** testified that he met with Paley, who did not tell him anything that differed from the documents presented.  (Tr. 12-101)  Johnston was represented by counsel (Tr. 12-102), and acknowledged that his attorney had referred him to Paley and Benistar as a § 1031 intermediary.  (Tr. 12-108 to 109)  He never spoke with Mr. Carpenter in 2000.  (Tr. 12-107)  Critically, Johnston acknowledged that at the time of

contracting, he knew that the proceeds of his § 1031 exchange were being invested by

Benistar in securities of some type (Tr. 12-115), and that he understood that under the

Exchange Agreement, so long as he earned the contracted for 6% return on his funds,

Benistar in its discretion could select the investment vehicles.  (Tr. 12-116)

> **b.     26 U.S.C. § 1031 Places No Restrictions on Investments
> in Which a Qualified Intermediary May Place Funds**

Mr. Carpenter's good faith must also be evaluated in light of the federal statute

and regulations concerning § 1031 exchanges.  Neither the statute, 26 U.S.C. § 1031, nor

the regulations, IRS Reg. § 1.1031(k)-1(g)(4), contain any requirement or restriction as to

how the proceeds may be invested while the qualified intermediary has legal title to the

funds.  Also, under IRS Reg. § 1.1031(k)-1(g), the term "Safe Harbor" means a safe

harbor from taxes for purposes of deferring tax on a capital gain, so long as a person

causes the proceeds of the sale to be transferred to and held by a qualified intermediary.

It does not mean that the proceeds will be safely invested.

> **c.     Mr. Carpenter's Good Faith Belief in His Trading
> Strategy**

There is conclusive evidence that Mr. Carpenter had a good faith belief in his

trading strategy, which he had successfully utilized for nearly two years and which had

resulted in over 100 successful prior exchanges, that it was rational and supported by

market analysts, and that it would continue to succeed and result in successful completion

of the outstanding exchanges.  The testimony of Gary Stern, the broker who led the

Stern/Levine group at Merrill Lynch, and Thomas Rasmussen, the administrative

manager who supervised Stern and the trading activity, is conclusive on this point.

Stern testified that Mr. Carpenter was very knowledgeable in securities, options in particular, and understood the risks. (Tr. 6-109 to 110) In addition to working with Merrill Lynch brokers, Mr. Carpenter also worked with his brother, an investment advisor and analyst. (Tr. 6-110; 6-123) Stern and Levine were in daily contact with him, sometimes multiple times a day, to discuss his selected positions and analyze the various strike options; many of these calls lasted over an hour. (Tr. 6-123; 7-29 to 30)

Rasmussen testified that he and Mr. Carpenter on more than one occasion discussed that his trading strategy had made money and generated profits over certain time frames and that Mr. Carpenter had a complete belief in his strategy and that it would continue to make money in the future. (Tr. 8-66; 8-77) Rasmussen had no concerns about the Benistar account in April 1999 during the time Mr. Carpenter employed this strategy. (Tr. 8-57 to 58) Notwithstanding the fact that Mr. Carpenter did not follow all of Stern's investment advice -- which was to diversify and put less in technology stocks -- as of December 31, 1999 Mr. Carpenter had invested a majority of the portfolio in technology stocks and had a made a gain of over $608,000 *(net of several hundred thousand dollars in commissions)* as a result of his trading strategy in a volatile market. (Tr. 6-117 to 118) In fact, in November and December 1999, after a loss of approximately $373,000 Mr. Carpenter's trading strategy resulted in a gain of $1 million while his portfolio remained heavily weighted in technology stocks. (Tr. 6-119) This successful trend continued into the beginning of 2000 when Mr. Carpenter made $800,000. (Tr. 6-124) Even after the active account review in May 2000 when the Benistar account (along with other Merrill Lynch clients) suffered a loss of $1,168,782 as a result of a collapse in the NASDAQ, in the next two months -- June and July 2000 ---

the Benistar accounts were again profitable as a result of Mr. Carpenter's trading

strategy.  (Tr. 8-70; 8-76 to 77)  Rasmussen testified that Mr. Carpenter's trading strategy

was rational because he had a strategy which had been profitable at various times over

the investing relationship.  (Tr. 8-65)  Stern testified that Mr. Carpenter's trading strategy

was bullish, optimistic, aggressive and it had  "proved that he was able to make money in

some years, and  … [it] was not irrational."  (Tr. 6-129)

Rasmussen testified that Merrill Lynch's chief investment analyst was publicly

advocating stocks in the Wall Street Journal in 2000, during this very volatile year for

technology stocks.  (Tr. 8-54; 8-58)  In 1999-2000 there were significantly competing

views held by market analysts, including Merrill Lynch market analysts, as to whether

the market, though volatile, represented a good buying opportunity.  (Tr. 6-132 to 133)

There was also a difference or opinion in the Rasmussen/Stern/Levine group (the "Stern

group") as to whether the market would rebound.  (Tr. 6-133 to 134)  There was a

divergence in views on this subject on a day-to-day basis within the Stern group with

some "slightly more in favor" of Mr. Carpenter's optimistic bullish position.  (Tr. 6-132

to 135)

Mr. Carpenter's good faith belief in his trading strategy is also reflected in the fact

that for the entire time he traded with Merrill Lynch, he never failed to meet a margin

call.  (Tr. 7-53)  It is also corroborated by Rasmussen, who testified that he did not

suggest that the Benistar account be closed, and had no plans to shut it down.  (Tr. 8-71)

If it had not been for the input of  the head of Merrill Lynch's options compliance

department, Mr. Malia, Rasmussen would not have taken action on Mr. Carpenter's

account.  (Tr. 8-72)  Mr. Malia himself did not express concerns about Mr. Carpenter's

trading strategy, itself -- only that it was not working in September 2000.  (Tr. 8-71)

Contrary to the government's characterization of Mr. Carpenter's trading strategy

as "risky," it did not involve totally uncovered call writing; rather the predominant

strategy used in the majority of Mr. Carpenter's trades actually limited the liability or

exposure.  (Tr. 8-81; 8-83)  The exposure was limited on the "naked" calls by, for

example, selling a put at 25 and then buying a put at 20 so that the spread was only 5 (and

not 25).  (Tr. 8-81)  Once Mr. Carpenter made the second trade, the first put was no

longer "naked." (Tr. 8-83)   In fact, Mr. Carpenter's options trading strategy was at least

in part induced by Merrill Lynch and the Stern group.  Early in the relationship, Stern had

provided Mr. Carpenter with marketing materials from Merrill Lynch, including a

booklet entitled "Money Making Options Strategy," which "induced [Mr. Carpenter] to

deal with options" and encouraged clients of Merrill Lynch to use an options strategy to

make money or improve the portfolio performance.  (Tr. 6-111; 6-113)  The marketing

materials also advocated that "naked put writing" be considered as part of an options

strategy.  (Tr. 7-9).

Even though Merrill Lynch made the decision to stop Mr. Carpenter from putting

on new option positions, Stern recommended to Mr. Carpenter that his very good friend,

Mitchell Rock at PaineWebber, take over the account. (Tr. 6-130)

Mr. Carpenter's belief in his trading strategy is clearly recorded in the September

22, 2000 letter he wrote to Rasmussen asking that Merrill Lynch revisit its decision and

permit him to continue to trade in options.  (Ex. 157; Tr. 8-46; 8-74 to 79)  Among other

things, Mr. Carpenter noted: that the technology stocks he was trading in were, in

general, those which were being advocated by Merrill Lynch's chief trader (Tr. 8-75); that he was perfectly positioned to recapture his losses on the rebound of the market as he had in November and December 1999 (Tr. 8-75 to 77); and that he was contemplating a lawsuit against Merrill Lynch for lost profits, as the action requiring him to stop opening option positions happened without warning.  (Tr. 8-79)

Mr. Carpenter's good faith belief in his investment of the Exchangors' funds, and in the ultimate efficacy of his investment strategy, is further evidenced by the testimony of Rock.  At the outset, the very fact that Mr. Carpenter had been referred to PaineWebber by Merrill Lynch's Stern evidences Mr. Carpenter's good faith belief that his trading of investor funds generally and his trading strategy specifically was not in any way improper:  if it were otherwise, surely Merrill Lynch would not have referred him to PaineWebber, and Stern, specifically, would not have recommended Mr. Carpenter to his friend, Rock.  While it was clear that Merrill Lynch's option trading compliance unit may have had an issue with protecting Merrill Lynch's financial exposure, Merrill Lynch's assistance in transferring Mr. Carpenter to PaineWebber so that he could continue his trading strategy evidences that the investment house had no concerns as to the legality or propriety of Mr. Carpenter's actions.  Indeed, Rock testified on direct examination that when the Benistar account was transferred from to PaineWebber, he in part relied upon the fact that Mr. Carpenter was "a client of Merrill Lynch in good standing."  (Tr. 8-102)

Further, the fact that Merrill Lynch communicated to PaineWebber its desire to maintain some relationship with Mr. Carpenter, even after terminating his ability to open new option positions, and referring him to PaineWebber further supports the view that

nothing that Merrill Lynch did vis-à-vis the Benistar accounts and option trading

reflected negatively on the propriety or legality of Mr. Carpenter's conduct.  (Tr. 9-17)

> ### d.    The Open and Obvious Manner with Which Mr. Carpenter Conducted Himself with Merrill Lynch and Paine Webber Evidences His Good Faith

The open and obvious manner with which Mr. Carpenter conducted himself in his

interactions with PaineWebber and Merrill Lynch further evidences his good faith.

Indeed, Mr. Carpenter's very use of Merrill Lynch and PaineWebber is itself evidence of

his good faith.  If Mr. Carpenter had been acting in bad faith, with a fraudulent intent, he

could have easily worked through "E*Trade" or some other online trading service

without inviting scrutiny, as Rock acknowledged.  (Tr. 8-114)

Another aspect of Mr. Carpenter's being forthcoming about the source of the

investment funds, is the fact that all of his requests for wire transfers to the accounts of

the agents for the investing Exchangors which he sent to Merrill Lynch were not secret

but rather sent for all to see and these in and of themselves showed that the source of the

funds were third party or clients' funds.  (Tr. 6-24)  Numerous of these requests for wire

transfers from Mr. Carpenter clearly referenced client names and authorized the transfer

of funds from the Benistar account at Merrill Lynch to deposit moneys into various

accounts denoted as  "clients accounts," "clients funds," "clients fund accounts," "clients

fund real estate accounts," "real estate trust accounts," "client's accounts," "client trust

account," "escrow account" or "real estate escrow account."  (Tr. 7-17 to 23; Def. Ex.

352.)  Stern testified that he now realizes that these authorizations for wire transfers from

Mr. Carpenter indicated that these funds were third party funds but that he did not come

to that conclusion at the time even though the requests were faxed to the Stern group's

fax machine and even though he saw these requests come in.  (Tr. 7-12; 7-19; 7-23 to 24) Stern testified that he did not read the body of the one page wire transfer authorization forms because "it wasn't [his] job."  (Tr. 7-53)

That Mr. Carpenter acted openly and in good faith is also powerfully evidenced by the fact that he had monies wired out of the PaineWebber account directly for use in the investing Exchangors' property exchange transactions.  These wires out of the PaineWebber account clearly identified the recipients variously as client accounts, IOLTA accounts, and so forth.  See, e.g., Gov.'s Ex. 169 (collecting wire transfer requests) and Tr. 9-45 to 9-57, passim (Rock's testimony concerning the wire transfer). Multiple people at PaineWebber had to review and approve a requested wire transfer before money was wired out.  (Tr. 9-45)

Had Mr. Carpenter been acting in bad faith, he could have taken steps to hide from Merrill Lynch and PaineWebber the nature of these wires by, for example, wiring moneys first to some other account under one of his other company's names, from where they then could be disbursed.  That Mr. Carpenter did not engage in any such furtive conduct, that he instead acted in an open manner, powerfully evidences his good faith.

Mr. Carpenter's good faith belief in his investment strategy during the critical time period with PaineWebber has been repeatedly documented by the evidence, and nowhere contradicted.  Rock testified that when they started their trading relationship in mid-October 2000, "Dan [Mr. Carpenter] was convinced that the outcome of the [presidential] election was going to be very favorable to his style of investing, and that his expectation was that these stocks were going to go much, much higher."  (Tr. 8-141)

e.     **The Open and Obvious Manner with Which Mr. Carpenter Addressed Concerns Raised by Counsel for an Investing Exchangor, Placing Him in Contact with Merrill Lynch, Powerfully Evidences His Good Faith**

The open and obvious manner with which Mr. Carpenter conducted himself from the very beginning of the relationship with Merrill Lynch and the investing Exchangors in October 1998 is substantial evidence of Mr. Carpenter's good faith.

Highly probative of that good faith is the fact that in the lone instance in which he was in communication with an investing Exchangor's agent (Attorney David Patterson) during the course of contracting, Mr. Carpenter was not only open and forthcoming in his actions and made no misrepresentations, but also established direct communications between Patterson and Merrill Lynch.  During those communications with lead Merrill Lynch broker Levine, Patterson told Levine specifically that the Benistar funds were clients' § 1031 exchange funds and that they needed to be placed in an escrow account.

More specifically, Patterson testified as follows.  He represented Benistar's first investor, Jane Carey, in the fall of 1998 and had been referred to Paley by his client's accountant.  (Tr. 12-15 to 16; 12-50)  The three men met together on October 13, 1998.  (Tr. 12-16)  Patterson testified that he learned in the course of  his communications with Paley that Benistar had not as of yet performed any property exchanges (Tr. 12-21; 12-53 to 54), and was moving into the business with Paley, who was experienced in the industry.  (Tr. 12-52 to 53)

Patterson had concerns and questions in connection with this contemplated transaction with Benistar, and a specific concern was the manner in which the Merrill Lynch account was being set-up.  (Tr. 12-34 to 35; 12-57)

Paley referred Patterson to Mr. Carpenter for any questions on the documentation (Tr. 12-53), and on October 21, 1998, the day before the closing of Carey's transaction, he spoke with Mr. Carpenter.  (Tr. 12-50)  Patterson testified that during this call, Mr. Carpenter conferenced in Levine of Merrill Lynch to address his concerns.  (Tr. 12-37 to 38; 12-58 to 59)  Mr. Carpenter in essence stated that he did not know the details of the accounts, and that Merrill Lynch could better explain the matter.  (Tr. 12-37 to 38; 12-58)  The call with Levine and Mr. Carpenter lasted about a half hour (Tr. 12-56; 12-60), and Patterson attested to his billing records, which indicate a teleconference with Merrill Lynch and Benistar.  See Ex. 402.

Patterson also testified with respect to the details of the teleconference with Mr. Carpenter and Levine.  (Tr. 12-59 to 61)  During the conversation he gave Levine a summary of the § 1031 transaction, and made clear to him that the money was his client's funds, but that, because of the rules of a § 1031 exchange, neither Patterson's nor his client's name could appear on the account.  (Tr. 12-59 to 60)  By the end of the conversation, it was his impression that Levine understood that Benistar was holding the money for the benefit of his client.  (Tr. 12-60)

Additional communications with Levine followed over the next two days.  First, on October 22, 1998, Patterson spoke with Levine for approximately 10.5 minutes.  (Tr. 12-62 to 64; Ex. 402)  He had called Levine because he wanted to see the Merrill Lynch account forms that were to be used for Carey's funds.  (Tr. 12-64)  On October 23, 1998, Patterson faxed and mailed Ex. 142 to Levine, a cover letter and the documents related to Carey's § 1031 exchange (the Escrow Agreement, the Exchange Agreement, the Account Selection Form and Wire Transfer Instruction).  (Tr. 12-67 to 69)

Patterson's testimony establishes that Mr. Carpenter acted in good faith by demonstrating that from the very outset that he was open with the investors who made inquiry of him, and further was fully forthcoming with Merrill Lynch as to the sources of the investment funds. That Mr. Carpenter was fully transparent in his dealings with the only agent of an Exchangor with whom he dealt and with Merrill Lynch is of tremendous significance in negating any suggestion that his conduct was furtive or that he had any specific intent to defraud or specific intent to deceive.

**f.    The Transfers Between Master and Sub-Accounts Do Not Support an Inference of Bad Faith**

To the extent that the government claims that there were "transfers" between the Merrill Lynch master account (B10) and sub account (B01) accounts which would have been precluded by the Exchange Agreements, this cannot be viewed as evidence of specific intent to defraud or specific intent to deceive. The master account and sub account were under the same relationship. To even be eligible for a sub account, the master and sub account had to have the same taxpayer identification number. (Tr. 7-35 to 36) These were related accounts and part of a complete service Merrill Lynch offered called the Working Capital Management Account ("WCMA"), the main feature of which was the linked and integrated nature of the accounts (Tr. 7-36; 7-38 to 39) At most this is an immaterial, mechanical "transfer" which existed because of the way in which the account was set up by Merrill Lynch and cannot be said to have violated the Exchange Agreements or support an inference of bad faith.

**g.    The Government Presented No Evidence that Mr. Carpenter Knew of Any Shortfall at the Time of the Investments**

The government's theory was that Mr. Carpenter committed wire fraud because Exchangors were induced, by means of false statements, to deposit money with Benistar at a time when Mr. Carpenter knew that the value of the Merrill Lynch and Paine Webber accounts were insufficient to meet existing obligations to Exchangors.    As it asserted in its opening argument, its mail and wire fraud charges were based on an alleged "scheme" in which Carpenter "is short of funds; <u>he has obligations to exchangors that far exceed the money he had available</u> .... There's the options trading which is causing the deficiency; but that has to be measured against the obligations he has <u>at the time</u> he is incurring those losses."  (Tr. 2-4) (emphasis added)  It argued that the alleged mail and wire "fraud" occurred, as to any particular Exchangor, because "Mr. Carpenter continued to accept money from the exchangors <u>at the same time as</u> suffering significant losses -- that made it impossible for him to repay the exchangors if they exercised what was their right in the contract, which was to have their money returned."  (Tr. 10-31) (emphasis added)  The government kept up this argument during its closing, when it told the jury:

> Benistar was facing a hole of $5 million.  Mr. Carpenter knew that. Actually knew that.  And this is <u>at a time</u> when he was taking money from exchangors like Ms. Cahaly, which is November 2000;  Mr. Johnson, who is also November of 2000;  Mr. Iantosca, late November-early December of 2000;  Mr. Fitzgerald, Halloween of 2000. He is aware that he doesn't have enough money to meet the obligations.  The representations that the money is going to be held for the exchangors' benefit and that it will be held safe and secure is false because he can't meet the obligations that he owes to other exchangors.

(Tr. 13-61) (emphasis added))    Thus, the nexus between a "shortfall" and Exchangors' investment decisions was the basis for the government's charge that Mr. Carpenter acted with the state of mind necessary to support conviction for wire and mail fraud.

Notwithstanding its argument, the government presented <u>no evidence</u> that, at the time of any investment decision and transfer of funds, Benistar's undistributed exchange deposits <u>in fact exceeded</u> the value of its exchange-dedicated accounts. Instead, it treated the crimes alleged in the separate charges as an indistinct mass, introducing evidence that, at most, reflected shortfalls at random points in time during the period between the first and the last exchanges. It introduced no evidence, however, that any such shortfall condition existed at the critical moment when the alleged crimes occurred -- when any of the Exchangors were induced to commit to, and did, invest.[11] *A fortiori*, the government's evidence failed to establish that Mr. Carpenter acted with intent to defraud.

At trial, with immaterial exceptions, the government's only evidence of the dollar value of the account assets at any point in time were the respective monthly account statements for Merrill Lynch accounts B01 and B10, and Paine Webber accounts 33 and 34.[12] The statements provide opening and closing net asset values or "balances" -- that is, the net aggregate dollar value of all assets (cash and securities) in the account on the last day of each month, calculated on the basis of the closing market prices of the portfolio securities on that day. The statements do not purport to show the net aggregate dollar values of the accounts for days during the month other than the final day. Nor did the government present evidence or even argue that account values on interim days during the months that coincided with any exchangors' investment decision were derivable from the statements -- or from any other source. On the contrary, as Zappala

---

[11]  The table at Ex. A, attached hereto, shows for each count the date the Exchangor executed an exchange agreement, the date funds were wired or mailed, and whether the government presented evidence of "shortfall" on such dates.

[12]  Rasmussen testified that an "active account review" letter he wrote to Mr. Carpenter on August 29, 2000 identified month and year to date losses in the account as of August 4, 2000, and a "margin debit balance" as of August 28, 2000. This testimony did not disclose the value of the account as of those dates. In any event, no Exchangor executed an agreement or transferred finds on either date.

testified, speaking specifically in regard to the PaineWebber statement for December 2000, he "was not able to calculate the gain or loss on -- in the interim period during the month, I simply took the month end balance as November 30, or the last change in value." (Tr. 10-25.)[13]

Because it lacked evidence to show the relationship between exchange obligations and account values at the time any Exchangor entered agreements to invest and transferred the funds, the government attempted to gloss over this void by offering Ex. 207C, a chalk prepared by Zappala. The chalk purported to show at August 31, 2000 and November 30, 2000 a negative variance between Benistar's "1031 Obligations" and the "Account Balances." Mr. Carpenter objected on the ground that 207C was irrelevant and misleading because it was not probative of his state of mind at the times that the contracts were entered. The Court sustained the objection, finding that the government had not presented evidence to suggest that Mr. Carpenter in fact made or even would have made such a comparison, and that the chalk "doesn't have a proper use." (Tr. 10-31 to 10-35.)

In closing argument, however, the government ignored the Court's evidentiary ruling and presented to the jury the virtual equivalent of the prejudicial chalk. The government used Ex. 189, various spreadsheets purporting to show Benistar § 1031 funds received (and the apparent source for Zappala's chalk), to identify the cumulative undistributed amounts as of two dates: August 31, 2000; and November 22, 2000. (Tr. 13-59 to 13-61) The government then compared those amounts with the Merrill Lynch and PaineWebber account balances of August 31, 2000 and November 30, 2000; observed that the latter numbers were less than the former; and argued that Mr. Carpenter

---

[13] Zappala answered specifically in response to the question why his chart, Govt. Ex. 206B, did not reflect any data for December 14, 2000, the date of Iantosca's last transfer alleged in Count XIX.

"is aware that he doesn't have enough money to meet the obligations" at the "time he was taking money from exchangors."  (Tr. 13-61)

As noted, the Court ruled this argument had no proper purpose and lacked relevance.  Aside from the impertinence of the government's argument, moreover, its proof of a "shortfall" on August 31, 2000, did not coincide with any events relevant to the counts of the Indictment.  See Ex. A.  Likewise, although Iantosca executed an exchange agreement on November 30, 2000, the comparison between the obligation as of November 22, 2000 and the account value eight days later on November 30, 2000 does not evidence any "shortfall" on November 30, 2000 and, in any event, provides no evidence relating to December 1, 2000, the date Iantosca transferred funds.

The government, moreover, cannot argue that the jury may reasonably infer from the evidence that a "shortfall" existed at the time the Exchangors executed agreements and transferred their funds.  A jury cannot find proof of an essential element beyond a reasonable doubt on the basis of such speculation.  United States v. Cappozi, 486 F.3d 711 (1st Cir. 2003) ("We take a hard look at the record and "'reject only those evidentiary interpretations and illations that are unreasonable, unsupportable, or overly speculative'") (quoting Spinney, 65 F.3d at 234).  Indeed, the government's evidence eviscerates any contention that its "shortfall" evidence was "close enough" to the critical dates to have permitted the jury reasonably to draw such inferences. Rock testified that "[t]he account would fluctuate significantly from day to day…"  (Tr. 8-143) (emphasis added)  Further, Merrill Lynch representatives testified that the Benistar trading account contained "volatile high tech" stocks.  (Stern, Tr. 6-106; Levine, Tr. 7-69)

In view of the government's failure to establish any "shortfall" at any of the critical times alleged in the Superseding Indictment, moreover, no reasonable jury could possibly have found beyond a reasonable doubt that Mr. Carpenter <u>knew</u> of any such shortfall at the time any Exchangor agreed to invest or actually transferred funds.  Indeed, if anything, the government's evidence on Mr. Carpenter's state of mind was even weaker.  The government presented no evidence that Mr. Carpenter had foreknowledge of any Exchangor's intent to execute an exchange agreement or intent to transfer funds pursuant to such agreements.  Moreover, there was no testimony or documentary evidence to suggest that he had ever been given or saw any specific spreadsheets in Ex. 189, the government's primary record evidence of Benistar's exchange fund liabilities. Indeed, the government's shortfall argument specifically focused on liabilities reflected on Ex. 189 as of August 31, 2000 and November 22, 2000.[14]   There was no evidence to remotely suggest that Mr. Carpenter had ever seen these records, or knew the amounts of the liabilities on or about those dates.   As a result, the government manifestly failed to prove that Mr. Carpenter had any intent to defraud.

The government, moreover, exacerbated its failure to adduce evidence of intent with the irrelevant and prejudicial "shortfall" evidence it did introduce.  A "shortfall" circumstance arising <u>after</u> an Exchangor's investment decision could not possibly be

---

[14]   Referring to the entirety of Ex. 189, a collection of § 1031 obligation spreadsheets covering a two year period, the government asserted in closing argument that "Jackie Mahannah testified that Mr. Carpenter was aware of this spreadsheet, she provided it to him when he asked for it…."  (Tr. 13-59)  Counsel then specifically referred the jury to the 1031 obligation spreadsheets as of August 30, 2000 and November 22, 2000, which he then used to argue that Mr. Carpenter "knew" Benistar "was facing a hole" of $2.3 million on August 31 and "$5 million" on November 30.  (Tr. 13-60 to 61)  At trial, however, the government never showed Ms. Mahannah either Government's 189 or the spreadsheets for August 31, 2000 and November 22, 2000.  It did not elicit any testimony from her in regard to those dates.   Instead, Mahannah testified only that she recognized the spreadsheet attached to Ex. 184B, which is dated December 20, 2000, and that Mr. Carpenter "occasionally" asked for spreadsheets of the same type.  (Tr. 9-123 to 126)

relevant to an alleged "scheme" to defraud that Exchangor.  As a matter of logic,
evidence of a *post hoc* "shortfall" could have no bearing on Mr. Carpenter's earlier state
of mind.  The government, however, specifically exploited "shortfall" evidence in this
improper *post hoc* fashion.  Indeed, in its closing argument, the government asserted that
the "next thing that Mr. Carpenter did that was fraudulent comes in August, September,
October, November and December; and that is, during that period of time he knew
[Benistar] did not have enough money to meet its obligations to the exchangors."  (Tr.
13-58)  It then argued that the evidence showed a shortfall <u>as of</u> August 31, 2000 of $4.2
million and, later, <u>as of</u> somewhere around the end of November 2000, "was facing a $5
million hole."  (Tr 13-56)[15]   Insofar as the jury was exposed to this evidence with respect
to any of the exchangors who signed contracts before some date in late November, such
evidence manifestly was irrelevant, confusing and highly prejudicial.[16]

The *post hoc* use of such evidence, moreover, necessarily renders it prejudicial
and improper in relation to Mr. Carpenter's state of mind subsequent to the "shortfall."
By arguing that "shortfall" evidence inculpated Mr. Carpenter in pre-"shortfall"
Exchangor investor exchanges, the government in effect manufactured evidence of prior
bad acts for the jury to consider in relation to the one post-shortfall investor--Iantosca.
The government must not be permitted to bootstrap evidence of prior bad acts in this
manner.  At most, the government's "shortfall" argumentation and evidence suggests

---

[15] The government's "$5 million hole" shortfall argument was prejudicial and improper for the distinct
reason that it was not based on evidence.  The government purported to compare Benistar obligations as of
November 22 with the PaineWebber account value some eight days later.  (Tr. 13-61)  Counsel's deduction
of a "$5 million hole" from the two inapposite measurement dates was grossly misleading.

[16] In closing argument, immediately after referring to the sometime at the end of November "$5 million
hole," the government asserted that "Mr. Carpenter … [a]ctually knew that … at the time he is talking
money from exchangors like" Cahaly, Johnston, Iantosca and Fitzgerald, <u>all of whom</u> (except Iantosca)
invested during the month of November before the time of the "hole" allegedly existed.  (Tr. 13-61)

<u>depositor losses</u>, which the Court had at various times excluded or limited as being of slight relevance and unfairly prejudicial to the determination of criminal liability.

In light of the government's failure of proof of intent to defraud, judgment of acquittal must enter for Mr. Carpenter on all counts of the Superseding Indictment.

### h.    The Government's Central Witness Testified Repeatedly As To Mr. Carpenter's Good Faith Conduct With Respect To The Exchangors

Under the government's theory of Mr. Carpenter's fraudulent inducement of the Exchangors, the focus must be on the relevant time period of when the Exchangors entered into their agreements, and the representations made to those Exchangors prior to that time.  Ultimately, as the government's central witness, Paley, testified, there was a bright line division of labor at Benistar between himself and Mr. Carpenter, with Mr. Carpenter handling investments, and Paley handling marketing and solicitation.  (Tr. 11-89 to 91)[17]  Paley acknowledged that it was he who explained the exchange documents to the Exchangors, and signed the agreements on behalf of Benistar.[18]  (Tr. 11-91 to 92)  As such, most, if not all, allegations of fraudulent inducement of Exchangors appear to relate to Paley (under the government's theory that Paley was Mr. Carpenter's agent), and there is ample evidence of Paley's proper conduct and Mr. Carpenter's good faith.

As stated by Paley, he received no promises, inducements or rewards from the government and he did not do anything wrong in connection with his dealings with the Exchangors.  (Tr. 11-115)  He testified that there is nothing that he ever said to an

---

[17]  This is further underscored by the fact that Mr. Carpenter never obtained a single client for Benistar Property Exchange Trust Company, and so cannot be seen to have "induced" any Exchangor to enter into agreements.  (Tr. 11-91)

[18]  Paley testified that Mr. Carpenter only met with one Exchangor's representative in the entire lifetime of Benistar Property Exchange Trust Co., and that was Patterson in October of 1998.  (Tr. 11-88 to 89)  As made clear by Patterson's testimony, his interaction with Mr. Carpenter provides ample additional evidence of Mr. Carpenter's openness and good faith.

Exchangor that was not true.  (Tr. 11-98)  He did not make any oral representations that

were inconsistent with any of the written agreements, nor was he ever told by Mr.

Carpenter to do so.  (Tr. 11-94 to 95)  In fact, Paley testified, Mr. Carpenter never told

him to say <u>anything</u>.  (Tr. 11-98)  He never said to any of the Exchangors or their

representatives that their money would be safe or secure, or that their would be no risk of

loss.  (Tr. 11-86 to 87)  He also testified that references made to "safe harbor" on

Benistar promotional materials had nothing to do with the "safety" of funds, and instead

dealt with the fact that a qualified intermediary must gain control of the funds in order for

the Exchangor to qualify for tax deferment.  (Tr. 11-87 to 88)  He testified that he was

never asked, nor did he ever provide any details, as to how the Exchangors' funds would

be invested.  (Tr. 11-95)  He did tell Exchangors that their monies would be pooled and

co-mingled, and that there was no distinction between client A's money and client B's

money.  (Tr. 11-95 to 96)  He further testified that there was no legal requirement under

Section 1031 to segregate Exchangors' funds, nor are there limitations under Section

1031 as to standards of investment of Exchangors' funds.  (Tr. 11-97; Tr. 11-100 to 101)

Paley acknowledged that there was no limitation to the nature of the investments

of Exchangors' funds provided for in paragraph 10 of the Exchange Agreement (Tr. 11-

102), the Escrow Agreements (Tr. 11-104), or the Exchange Fee Agreement.  (Tr. 11-106

to 107)  Paley acknowledged that in contrast the agreement he used while at Nationwide

provided specific vehicles in which funds could be invested.  (Tr. 11-107 to 109; Ex. 390)

In clear demonstration of Mr. Carpenter's openness and good faith belief in the

appropriateness of his investment of Exchangors' funds, Paley testified that Mr.

Carpenter requested that he speak with Levine at Merrill Lynch, which he in fact did.

(Tr. 11-74 to 76)  Paley testified that he described Benistar's business to Levine  (Tr. 11-75 to 76), told him that Benistar was a qualified intermediary for individuals (Tr. 11-76), that Benistar's clients' money would be wired to Merrill Lynch with their name and other information on the wire (Tr. 11-77), that he would send him copies of the standard Benistar Exchange Agreements (Tr. 11-79), explained the nature of § 1031 property exchanges (Tr. 11-77 to 78), and told Levine to contact a Merrill Lynch employee that had worked with Mr. Paley's prior § 1031 exchange company, Nationwide, so to have a idea on how to properly set up the accounts for Benistar.  (Tr. 11-78)  He also sent Levine a copy of the standard fee agreement.  (Tr. 11-80)  Critically, Paley provided Merrill Lynch's contact information to Exchangors when requested.  (Tr. 11-81)  As Paley testified, he took steps to deal with Merrill Lynch to make sure they understood what the property exchange business was about and the fact that they were holding money in escrow.  (Tr. 11-82)

        i.      **Mr. Carpenter's Investment of Millions of Dollars of His Own Company's Money into the Investing Exchangors' Account Powerfully Evidences His Good Faith**

People embarked upon a course of committing fraud do not tend to invest their own money in the allegedly fraudulent scheme, but that is exactly what Mr. Carpenter did here.[19]  As testified to by Zappala, on October 27, 2000, the heart of the relevant time period, Mr. Carpenter transferred $2 million from the account of Benistar Employers Services Trust Company ("BESTCO"), one of his companies, into the Benistar PaineWebber account.  (Tr. 10-49 to 51)  Zappala confirmed that the funds sent to the

---

[19] Conversely, people committing fraud tend to take for themselves the money of others:  Mr. Carpenter did nothing of the sort, instead putting his own money in for the benefit of others.  There is no evidence, or even a suggestion, that Mr. Carpenter diverted any of the investing Exchangors' funds for his own personal benefit.

PaineWebber account did not come from any Exchangor, and were not removed from the account.  (Id.)  Similarly, Zappala testified that Mr. Carpenter, through his company Carpenter Financial, loaned $400,000 to BESTCO, to be placed in Benistar's B01 account at Merrill Lynch.  (Tr. 10-68 to 69).  Zappala also testified that two additional transfers of funds into Benistar's B01 account, in the amounts of $120,000 and $400,000, were never removed from the B01 account, and acknowledged that Mr. Carpenter, or an entity controlled by him, rather than an Exchangor, was the source of the funds.  (Id.; Tr. 10-20).  Mr. Carpenter's confidence in the business model of Benistar, as well as his good faith belief in his trading strategy specifically, is powerfully evidenced by his own personal investment in the company's accounts at Merrill Lynch and later PaineWebber.

C.     **THE GOVERNMENT'S MISCONDUCT**

The government's misconduct most clearly manifests in three forms: first, its having put forth the testimony of Levine which it at all relevant times -- more than four years before it offered it at this trial, in fact -- knew to be untrue, and which it did not correct; second, it's improper questioning of witnesses eliciting or seeking to elicit impermissible, excluded and/or unfairly prejudicial testimony, and third, its improper argument at closing.

1.     **The Perjurious Levine Testimony**

The "riverboat gambler" was one of the aspects of Levine's testimony the government wanted to have in evidence, and it got it in.[20]  This sarcastic, self-deprecatory

---

[20]  Asked by the government what Mr. Carpenter said to him following Mr. Carpenter's trading losses in 2000, Levine testified that, "He said that he had the mentality of a riverboat gambler in doing some of the

characterization, shorn from context, and converted into an inflammatory admission, was the basis for the government's mounting, in a somewhat more subtle fashion, the same inflammatory and unfairly prejudicial argument it presented in the first trial: that the jury should convict Mr. Carpenter on the basis of his high risk "options strategy," rather than on the alleged offense conduct of misrepresentations.

As is set forth more fully in Mr. Carpenter's Motion for Declaration of Mistrial, filed during the course of trial, as well as Mr. Carpenter's to-be-filed reply memorandum to the government's Response to Defendant's Motion For Declaration of Mistrial, the government flagrantly violated Napue v. Illinois and Mr. Carpenter's Due Process rights by knowingly using, and failing to correct, the false testimony of Levine.  Levine, when asked on direct examination whether he "recalled" communicating with, or receiving faxes from Patterson (Benistar's first client's attorney), replied that he did not.  (Tr. 7-75) On cross-examination, Levine denied: having a conference call with Patterson, receiving documents on October 23, 1998, even hearing the name Patterson, and knowing that Mr. Carpenter was engaged in a property exchange business and investing clients' funds.  (Tr. 7-98 to 102, 109 to 110, & 120)

The government was aware of the falsity of Levine's testimony since at least 2004, long before Mr. Carpenter's trial, as it was in possession of a plethora of evidence, including prior testimony by Patterson and Paley, as well as Patterson's phone records, which demonstrated clearly that, contrary to Levine's testimony, Mr. Carpenter put Patterson in touch with Levine, and that there was a conversation between himself, Mr. Carpenter and Patterson.  It is similarly clear from Patterson's testimony and records that

---

trades, in trying to quickly recoup by going larger and larger contracts and positions to recoup the losses that he was sustaining."  (Tr. 7-77)

Levine was aware of precisely business in which Benistar was engaged and that Mr. Carpenter was trading in options with clients' funds, and that Patterson sent Levine the exchange documents.  In fact, the government conceded during argument before the Court that it "did not think that [Levine's] testimony is credible . . . as to [whether or not he received a telephone call from Patterson]."  (Tr. 13-15)  The fact that Mr. Carpenter put Patterson and Paley in direct contact with Levine, and that Levine knew the funds were third party funds to be held in escrow and never told Mr. Carpenter that he could not trade with those funds, goes directly to Mr. Carpenter's good faith intent, and was central to his defense.

Moreover, and perhaps most importantly, it is impossible to know if, not being apprised by the government that Levine lied, the jury credited all of Levine's testimony and believed that Carpenter had <u>not</u> put Patterson and Paley in direct contact with Levine. Whether Carpenter put Patterson, who represented the very first Exchangor, and Paley in <u>direct contact</u> with Levine, who managed the Exchangors' funds at Merrill Lynch, and whether the detailed conversations and faxed exchange documents took place in October, 1998 regarding the fact that these were third party funds which needed to be held in escrow as a result of a § 1031 exchange, are critical facts and go to the heart of the issue of Carpenter's state of mind when he opened the accounts at Merrill Lynch, and his good faith defense.  That Carpenter voluntarily initiated and facilitated the communications between Levine and Patterson (and between Levine and Paley) is proof that he in good faith believed <u>inter alia</u> that he had unfettered discretion to invest the Exchangors funds, as well as proof that he was never told by Levine, or anyone else, that he could not do so, and that he never hid from anyone that he was engaged in options trading.  Such conduct

is not consistent with the requisite intent to defraud, and thus strongly supports Carpenter's good faith defense.

It was improper for the government to allow such evidence to go in uncorrected. "[A] conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment" and "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue v. Illinois, 360 U.S. 264, 269 (1959). The government was under an obligation not to "convict, but to see that, so far as possible, truth emerges." Giles v. Maryland, 38 U.S. 66, 98 (1967) (Fortas, J. concurring).

The government's failure to correct Levine's false testimony, or indeed take any corrective measures, which was in direct violation of applicable law under Napue, 360 U.S. 264 and United States v. Mangual-Garcia, 505 F.3d 1 (1st Cir. 2007), materially harmed Mr. Carpenter's defense and violated his due process rights.  There is a reasonable likelihood that Levine's uncorrected false testimony could have affected the judgment of the jury, as it related to critical facts at the outset of Benistar's business.  The government's improper conduct (which is particularly egregious, given that it faced Napue issues of varying magnitudes in connection with Paley's testimony in the first trial (Tr. 8-45 to 46, 82 to 83, 86 to 94; 9-5), and Iantosca's testimony in the second trial (Tr. 4-10 to 15)), was not, as it claims, waived by Mr. Carpenter's counsel, who merely noted that any corrective measure taken by the Court nearly a week after Levine's testimony, short of declaring a mistrial, would be inadequate.  (Tr. 13-18 to 19)

## 2.     **The Improper Questioning**

The trial transcripts are replete with instances in which the government, knowing full well the inappropriateness of its line of questioning, nevertheless proceeded. Notwithstanding the Court's admonition to the parties concerning the limited relevance, and questionable admissibility, of evidence of loss and unsuccessful exchanges, the government's improper questioning of many of its witnesses sought to elicit such evidence.  See, e.g., **Snider** (Tr. 3-47) (asked if he completed his property exchange; objection sustained); **Jokinen** (Tr. 4-111) (testified that at some point Benistar went out of business); **Fitzgerald** (Tr. 4-150 to 151) (over objection testified that $100,000 held by Benistar was not transferred to the designated third party); **Adams** (Tr. 5-83 to 84) (over objection testified that in January 2001, Mr. Carpenter called her, told her he wanted to delay Iantosca's exchange because he had a run on the bank, and said that the money was not there at that point), (Tr. 5-142) (asked if all of Iantosca's money was disbursed back to him; objection sustained); **Levine** (Tr. 7-91) (testifying to monthly short-term capital loss of $1,770,973.06 and year to date loss of $4,000,283.69); **Rock** (9-108 to 109) (testifying that PaineWebber brought an end to Mr. Carpenter's trading on December 19 through a telephone call in which they told Mr. Carpenter that he had losses of $5 million, and when the account was shut on December 19 he had total losses of $7 million; the government also asked how much money was lost in the accounts by the end of 2000, but Mr. Carpenter's objection was sustained);[21] **Zappala** (10-72 to 73) (testifying about

---

[21]  This conversation occurred in mid-December 2000, almost three weeks after the last exchanges charged in the indictment were entered into by Iantosca (November 30, 2000).  Exs. 90, 95, 100, 105.  Furthermore, the December 2000 and January 2001 PaineWebber statements were excluded from Exs 168, 169A-F, and 170.  (Tr. 9-5 to 6)  Thus, only the PaineWebber statements from October and November 2000 were admitted.  This is further support for the contention that the testimony regarding the December telephone call was not only irrelevant, but highly prejudicial.

his summary chart of trading losses, by month and by year, of up to $6.3 million), (Tr. 10-74) (asked if there were any unsuccessful exchanges after December 14, 2000; objection sustained); **Patterson** (Tr. 12-39) (asked whether Mr. Carpenter or Levine told him his client's money would be invested in stock options, and whether there was any mention of stock options in their conversation, in three straight questions to which all of the defense's objections were sustained)[22]; Paley (Tr. 11-65) (without seeking leave to treat its own witness as hostile, asked if the Exchange Documents said anything about stock options, to which he answered no; asked if the Exchangors had any idea their money would be put in stock options, and "[I]sn't that fraud?"; objections sustained).

### 3.    Improper Arguments in Opening, Closing and Rebuttal

#### a.    The Opening

On the first day of trial, the Court issued "a provisional ruling for the opening statements" (Tr. 1-156), stating that "we'll focus on the elements of the offense and what might have been known at that time or could have been believed in good faith." (Tr. 1-158)  As a result, the government was expressly precluded from mentioning "the trading losses, the Merrill Lynch, PaineWebber trading losses." (Id.)  Notwithstanding this clear directive, the government proceeded to emphasize loss in its opening statement in direct contravention of the Court's order.

Pertinent statements from the government's opening (AUSA Mitchell) that violated the Court's order are as follows:

---

[22]  This direct examination of the counsel for an investing Exchangor not named in the Superseding Indictment, which Exchangor had a completely successful exchange with the contracted-for return on investment, is used by the government as a vehicle for improperly focusing the jury on the issue of trading strategy (options).  The questioning also inappropriately leads the jury to understand that there was some affirmative obligation on the part of Mr. Carpenter to report on the specifics of his investment strategy to Patterson, when the issue which he had in fact raised with Mr. Carpenter related to the particulars of the account set-up and signatures.

His downward spiral in the stock options market lasted until the last group of people who entrusted their money to him, all $9 million of it, got a letter that said to them, bluntly, please be advised that we are not able to return your funds to you at this time . . . For this, ladies and gentlemen, Dan Carpenter stands before you today accused of mail and wire fraud.  (Tr. 2-74)[23]

. . . .

I mentioned to you this last group of people who found out that their money wasn't there.  (Tr. 2-76)

. . . .

When the market stopped soaring in the year 2000, his losses mounted, first in the thousands, and then in the millions.  (Tr. 2-80)

. . . .

When the exchangors called Benistar for the return of their money so that they could complete their property exchange, because they needed their money to complete these exchanges, Carpenter could no longer hide the fact that the money, which was supposed to be parked in a safe place, wasn't there.  (Tr. 2-82)

. . . .

The money wasn't tied up here; it wasn't there anymore.  The fact is, Carpenter had taken the money and used it all up in the options market.  (Tr. 2-84)

These statements are not only incorrect and misleading, but they clearly violate the Court's order that the government could not "characteriz[e] it as a loss or the exchangors learned that their money had been lost."  (Tr. 1-165)  The government's opening so infected the jury that Mr. Carpenter was severely prejudiced literally from the trial's inception.  This assertion is not based on mere speculation, surmise, or conjecture, but actual fact because a juror had to be excused the next day when, in the Court's words, "it had suddenly dawned on her that she and her husband had lost $10,000 in a real estate scam - - I think she used the word."  (Tr. 3-4)  It was reported to the Court that the juror had made a disparaging comment to the court security officer about Mr. Carpenter, referring to him as "the sleaze who was on trial."  (Tr. 3-5)  Later at sidebar, with Mr. Carpenter present, the juror repeated her derogatory comment, stating: "I just felt like the guy's a sleazebag, is how I felt."  (Tr. 3-8) (emphasis added).

---

[23]  The letter to which the government referred was never admitted into evidence.

The juror, who was excused for cause, also stated: "I lost $10,000; these people lost millions of dollars." (Tr. 3-7) Clearly, at this early stage of the proceedings, the only way this juror (and presumably the rest of the jurors) could have learned about millions of dollars in losses is by virtue of the government's improper opening statement. As the Court observed that the juror's knowledge was necessarily based on the fact that "she heard the openings." (Tr. 3-9) The prejudice to Mr. Carpenter was palpable, and clearly infected the entire trial. A new trial is warranted on this basis alone. However, the government's reference to and reliance on loss only became worse during the presentation of its case (as described in Section D, infra) and its closing.

b.    The Closing

The government's closing argument amplified many of the improper themes that it had presented throughout the trial, specifically, investor losses and risky options trading strategy. In doing so, the government knowingly mischaracterized facts such as stating that Mr. Carpenter had been "kicked out" of Merrill Lynch (Tr. 13-57:7-8), when in fact, as the government well knew from the unchallenged and uncontradicted testimony of its own witnesses, that Merrill Lynch had only limited Mr. Carpenter's ability to open option positions. The government, however, knowingly distorted this into the prejudicial and inaccurate characterization of Mr. Carpenter's having been "kicked out," with the intention of inflaming the jury.

The government does not stop, however, with merely distorting the truth by mischaracterizing the termination of Mr. Carpenter's option trading rights at Merrill Lynch as his having been kicked out. Rather, the government took the extraordinary step

of then taking its prejudicial and inflammatory mischaracterization and contending his

having been "kicked out" by Merrill Lynch gave rise to some uncharged fraud:

> The second thing that Mr. Carpenter did that was fraudulent in addition to
> the two things that I've already talked about . . . is that when he was
> kicked out of Merrill Lynch in September of 2000, he didn't tell any of the
> exchangors why that had happened.  He knew that being kicked out of
> Merrill Lynch was material, and was material to the exchangors' money.

(Tr. 13-57)  Thusly the government misrepresents a restriction on opening new option

positions in his trading in a specific account into Mr. Carpenter's having been "kicked

out" of Merrill Lynch, and then even more egregiously tries to bootstrap its distortion

into what it misleadingly and prejudicially calls a fraudulent failure to disclose by Mr.

Carpenter.  This is not legitimate argument, but false and misleading distortion intended

to inflame and confuse the jury.

The government also improperly called upon the jury to credit the opinion

testimony two of witnesses, both lawyers, for what amounts to highly prejudicial "expert"

opinion on issues of law central to this case:

> You heard Mr. Patterson yesterday.  Nothing in those agreements
> authorized Benistar to do whatever it wanted with the money.  The
> question of discretion was a requirement of the IRS code to qualify so his
> clients, so the exchangors, could qualify for the exchange.  . . . .
>
> The discretion language didn't authorize Benistar to do whatever it wanted
> with the money so long as it could conceivably be characterized as an
> investment.  As Marjorie Adams testified -- you may recall that she said
> that Benistar couldn't take the money and go buy a building with it.  A
> building is an investment, but they couldn't do that.

(Tr. 13-54:8-12 & 16 to 22)  This not only is improper and in violation of Fed. R. Evid.

702, it also is factually and legally incorrect.  There is nowhere any restriction on

investment, including the purchase of real estate; rather, it is the issue of liquidity that

likely would render such an investment impractical.  But the point remains:  the

government asked the jury to credit the opinions of two its lawyer witnesses for purposes of construing contractual provisions at the very heart of this prosecution.  This was improper, and highly prejudicial.

The government also improperly and inaccurately characterizes Paley as Mr. Carpenter's "mouthpiece."  (Tr. 13-46; 13-68)  This is especially inappropriate, given that Paley testified on cross-examination that Mr. Carpenter never authorized him to say anything outside of the written documents (Tr. 11-98), and in fact, Mr. Carpenter never told him to say anything whatsoever.  (Tr. 11-98)

Further, the government argued in closing that the Exchangors who had testified at trial turned over "approximately $15 million."  (Tr. 13-43)  While this may or may not be accurate, so far as it goes, in context it is plain what the government's object was in introducing this previously unmentioned figure.  While the Superseding Indictment alleges losses of approximately $9 million, the government was anxious to counter the $12.5 million figure associated with the PaineWebber settlement.  This was an improper effort to influence the jury by misdirection, and prejudicial to Mr. Carpenter.

The government, in addition, improperly argued that the Benistar rates of return, 3% or 6%, were put forth "to lead these people into believing that this was a conservative, safe place to park their money."  (Tr. 13-48)  This is preceded by the government's calling to the attention of the jury the fact that, as of the date of the Merrill Lynch account statement, Ex. 148D, the Treasury Bill rate was 6.2%.  This was highly misleading, and not supported by facts in evidence, as the rates for T-bills was not shown for the entire relevant period, and certainly not at the time the interest rates were set out in the Exchange Agreements in 1998.  In addition, the T-bills are 90 day or more

investments, and insufficiently liquid for purposes of investment in the context of § 1031

exchange proceeds.  This was a deceptive and misleading argument, not supported by

facts in evidence, and unfairly prejudicial to Mr. Carpenter.

c.    <u>Rebuttal</u>

The government's most egregious instance of improper argument occurred here,

with the intentional arguing of facts not in evidence to assert that Mr. Carpenter had

committed fraud at the very outset:

> If you recall those Nationwide agreements, you remember what was
> stripped out of them so that people wouldn't see:  "Government bond,"
> "money market" and so forth.  He deleted them.  He got rid of those
> portions of the agreements.  So all a person would be left with was
> "invest" and not think twice about it.  That's fraud.

(Tr. 13-111)

Prosecutorial misconduct encompasses "an assertion to the jury of a fact, either by

way of argument or by an assumption in a question, [without] evidence of that fact."

<u>United States v. Azubike</u>, 504 F.3d 30, 42 (1st Cir. 2007) (quoting Charles Alan Wright,

Nancy J. King & Susan R. Klein, <u>Federal Practice & Procedure</u> § 555 (3d ed. 2007)).

The question is "whether [the] prosecutorial misconduct has 'so poisoned the well' that a

new trial is required."  <u>United States v. Manning</u>, 23 F.3d 570, 574 (1st Cir. 1994)

(citations omitted).  It has:

> In assessing whether improper statements during closing argument require
> a new trial, we examine (1) whether the prosecutor's conduct was isolated
> and/or deliberate;  (2) whether the trial court gave a strong and explicit
> cautionary instruction; and (3) whether it is likely that any prejudice
> surviving the judge's instruction could have affected the outcome of the
> case.

<u>United States. v. Lowe</u>, 145 F.3d 45, 50 (1st Cir. 1998) (citations omitted).

Considering these points in turn, it is beyond question that the action was deliberate and intentional. At sidebar, the prosecutor called the facts introduced during rebuttal "bare inference" and "fair inference" when confronted by the Court with the absence of the proffered facts from evidence. (Tr. 13-117 to 118) There was no contrition.

In terms of remediation, this Court delivered a limiting instruction. (Tr. 13-120) Generally, "a strong, explicit and thorough curative instruction to disregard improper comments by the prosecutor is sufficient to cure any prejudice from prosecutorial misconduct." United States v. Riccio, No. 07-2604, 2008 WL 2420736, at *4 (1st Cir. June 17, 2008) (citations omitted). However, even a targeted limiting instruction may fail to eliminate prejudicial effect where it is unclear or deemed ineffective. Azubike, 504 F.3d at 42 ("[T]he jury instructions given could neither undo the error nor mitigate its prejudicial effects under these egregious circumstances."). The Court's precise limiting instruction, in full, reads:

> THE COURT: Jurors, let me just address one comment that was made by Mr. Mitchell in rebuttal. He made reference to -- he was trying to make a point that there was a difference between the provisions in the Nationwide form agreement and a subsequent Benistar, [sic] and it made reference to the fact that Mr. Carpenter had been responsible for changing that language.
>
> There is no evidence that Mr. Carpenter was responsible for changing the agreement. You have evidence of two different agreements, but there's no evidence of how they came to be different, and so that would not be an appropriate thing for you to take into consideration.

(Tr. 13-120)

This instruction, while tailored to the statement, is neither strong, explicit, nor thorough, as it implicitly endorses the government's underlying point: that the fact that the Benistar agreement differed from the Nationwide agreement in specifying permissible

investment vehicles itself is a fraud.  It follows that either Mr. Carpenter or his

"mouthpiece" Paley altered the agreement, and it matters not a whit whether it was one or

the other, because Mr. Carpenter was the "boss" and nothing happened without his

approval.  And so, the government was able to argue, there was fraud by Mr. Carpenter at

the founding of the Benistar business, and this initial fraud, embodied in the Exchange

Agreement, carried forward to every one of the investing Exchangors[24] in the criminal

trial.  Because, the government told them, "That's fraud," the jury was at liberty to act as

it did:  not deliberate as to the applicable facts and law on each count as entailing a

potential fraud, but to merely rely on this contract revision.

The prejudice surviving the limiting instruction self-evidently affected the

outcome of the case.  The totality of the circumstances are considered in to determining if

improper statements during closing argument affected the trial's outcome.  United States

v. Levy-Cordero, 67 F.3d 1002, 1008 (1st Cir. 1995).  Several factors are considered:

First, the impact of the prosecutor's improper use of facts not in evidence is weighed

against the strength of the government's overall case.  Even if there exists sufficient

evidence to convict a defendant, a jury may still be determined to have been prejudiced

by prosecutorial misconduct.  Azubike, 504 F.3d at 41 ("[T]he fact that there was

sufficient evidence to convict does not mean that the jury would have convicted absent

the prosecutor's improper remarks.").

In examples of "close cases" without overwhelming evidence of a defendant's

guilt, the First Circuit has found juries more susceptible to prejudice from prosecutorial

misconduct.  Id. at 41, n.12 ("Where the circumstantial evidence against [the defendant]

is close the prosecutor's argument [is] powerful.").  As this Court has acknowledged, this

---

[24] Of course, it does not: for example, Cahaly did enter into Exchange Agreement.

is not a strong case for the government.  See Carpenter, F. Supp. 2d at 102-103 (noting that acquittal "would have been rationally possible on the evidence").

What is more, the First Circuit has held that misstated testimony by the prosecution of a "crucial point" could not be remedied through limiting instructions from the Court.  Azubike, 504 F.3d at 41-42 (citing Watson, 171 F.3d at 702).  Closing arguments are given additional weight as a prejudicial factor on the jury because of their timing during a trial.  Prejudicial statements made during closing argument "militate in favor of reversal" because they are "the last words spoken to the jury by the trial attorneys." Azubike, 504 F.3d at 41-42 (quoting Manning, 23 F.3d at 575); accord Mooney, 315 F.3d at 60 ("the last words the jury hears have significant potential to cause prejudice"); United States v. Auch, 187 F.3d 125, 132 (1st Cir. 1999) ("the government's rebuttal . . . , as the last words that the jury heard from the trial attorneys, had great potential to cause prejudice").

Here the facts not in evidence were argued on rebuttal to constitute fraud. This improper argument went directly to the central issue of the case: Mr. Carpenter was charged with mail and wire fraud on the basis of fraudulently inducing Exchangors by way of the very document the government asserted he, in an act constituting fraud, modified.  A more crucial point than this, at a more critical time in the proceedings -- rebuttal -- is simply unimaginable.

Finally, the jury's deliberations were extremely short.  After a thirteen-day trial on nineteen counts alleging complex financial fraud, the jury deliberated for less than two hours to a guilty verdict on all counts.  By comparison, during the first trial on the same charges, but where more inculpatory evidence was admitted against Mr. Carpenter, the

jury deliberated for six hours. The improper remarks by the prosecutor on rebuttal were

fresh in the minds of the jurors during their brief deliberations. The ability to decide guilt

on each count in so brief a time demonstrates that the impact any prejudicial remarks by

the government had on jurors was not remedied by the Court's limiting instruction.

"When brief jury deliberation is coupled with a verdict that is contrary to the great weight

of the evidence . . . it creates a situation where the district court has an affirmative duty to

set aside the verdict." Kearns, 863 F.2d at 182.[25] A new trial, in the interest of justice, is

necessary due to the government's improper conduct and its poisoning of the well.

D.     **THE ERRONEOUS AND PREJUDICIAL INCLUSION OF EVIDENCE OF INVESTING EXCHANGOR LOSSES AND PRECLUSION OF EVIDENCE OF REPAYMENTS TO INVESTING EXCHANGORS**

Prior to openings, the Court addressed the subject of the admissibility of evidence

concerning, on one hand, the investing Exchangors' losses, and, on the other, the

repayment of the investing Exchangors by virtue of the arbitration award (the

"Arbitration Award") following the Exchangors' prevailing in an arbitration originally

brought by Benistar against PaineWebber, and the enforcement of that award of over $12

million by a New York court (the "PaineWebber Settlement"). With an eye towards

setting the ground rules for the admissibility of such evidence at trial, and acknowledging

that "the time line is . . . a significant determining factor as to what's admissible or not

admissible for each side[,]" (Tr. 1-151 to 152), the Court drew the parties' attention to

each offense's "temporal focal point" (being the time when the individual Exchangor

---

[25] Even if any of the foregoing instances of improper prosecutorial conduct viewed alone is found to be insufficient grounds for a new trial, the Court should consider the improper rebuttal argument as part of a "cumulative effect" creating prejudice against a defendant. Mooney, 315 F.3d at 61 ("We acknowledge that several incidents of prosecutorial misconduct, none of which individually would require reversal, taken together may have a cumulative effect that warrants a mistrial." (citing United States v. Wihbey, 75 F.3d 761, 773 (1st Cir. 1996))).

entered into his or her § 1031 exchange), and suggested to the parties that "[f]or the legal analysis, it's a pointed period in time." (Tr. 1-157) Significantly, in appearing to reject both the government's request to admit evidence of the investing Exchangors' losses, and Mr. Carpenter's evidence concerning their repayment, the Court stated that for the openings, the parties should focus on what might have been known, or could be believed in good faith, at the time the agreements were entered, and not "past the commission of the crimes." (Tr. 1-158)

Nevertheless, despite the Court's statement, the government's improper references to the investing Exchangors' losses began in its opening. In the course of that statement, AUSA Mitchell made reference to letters the investing Exchangors after the relevant time period cut off of December 14, 2000, indicating that their funds were not available, as well as telephone calls investing Exchangors made to Benistar on the same subject. Starting with this statement, there can be no doubt but that the jury believed that all of the investing Exchangors permanently lost , collectively, $9 million:

> His downward spiral in the stock options market lasted until the last group of people who entrusted their money to him, all $9 million of it, got a letter that said to them, bluntly, Please be advised that we are not able to return your funds to you at this time.
> . . . .
> When the exchangors called Benistar for the return of their money so that they could complete their property exchange, because they needed their money to complete these exchanges, Carpenter could no longer hide the fact that the money, which was supposed to be parked in a safe place, wasn't there)

Tr. T. 2-74; 82) (emphasis added).

The improper references to the loss of the Exchangors' funds continued with the first witness, Snider. Early into Snider's direct examination, at sidebar, counsel for Mr. Carpenter objected to evidence of Snider's loss, arguing it was irrelevant, a position with

which the Court agreed.  The Court, accepted the defendant's argument, and set forth the

time frame for relevant evidence in the case:

>MR. PAPPALARDO: . . . . The Court said it was going to make a ruling as
>the trial proceeded with respect to the issue of loss.  And our view is very
>plain:  If he starts getting into the issue of loss, then we can examine and
>we can introduce evidence on what that loss was.  And we take the
>position, . . .that loss, number one, is not an element of this crime; number
>two, . . . to the extent that the government seeks to introduce loss on the
>issue of state of mind on Dan Carpenter back in September of 2000, we
>should be permitted under any rule that I can think of to explain that and
>to show that, number one, today there won't be a loss -- or there's
>anticipated that there won't be a loss because there's been a judgment that
>will more than satisfy this; and, number two, . . . <u>either it is relevant to the
>issue of intent or it is not</u>. . . .

>THE COURT:     <u>I don't think it is at this point.</u>

>MR. PAPPALARDO: Fine.

>MR. MITCHELL:     It's relevant to what we're doing here, your Honor.
>The point is:  He did not complete the exchange.  None of these people
>completed their exchange.

>THE COURT:     The offense that's alleged is the obtaining of the
>exchange proceeds by false pretenses.  You put some of that evidence in
>this morning, I presume, about what the evidence was regarding the
>security of the funds.  If you can show that the defendant specifically
>intended exchangors, like Mr. Snider, to be fooled into giving money
>under false statements about security, you have the offense.  But <u>that's the
>offense, the giving of the money.</u>

>MR. MITCHELL:     Right.  But what I'm saying is, again, it's part of --
>this is consistent with a number of the Court's rulings at the first trial.  It's
>relevant to show the elements of the offense.  If the jury is led to believe
>that he completed his exchange, your Honor, that begs the question of --

>THE COURT:     More relevant would be if you wanted to show that
>somebody else before -- if you tie the representations to the defendant,
>before the representations were made to Snider, the defendant already
>knew that somebody else's had failed, and therefore, when the renewed
>representations were made in September 2000 to Snider, there was guilty
>knowledge on the part of the defendant which could support an inference
>of specific intent.  <u>But his subsequent loss has nothing to do with the
>crime.  The crime was completed when Snider entrusted the money based</u>

<u>on false representations and used the mails.  That's when the crime was committed.</u>

MR. MITCHELL:        I understand that.

THE COURT:        <u>And so it doesn't affect, good or bad -- Snider's experience works out or doesn't work out -- doesn't affect whether at the time he paid the money it was obtained by fraud.</u>

(Tr. 3-41 to 43) (emphasis added).  This exchange is critical for two reasons.  First, the Court, agreed that the loss of Snider's funds was not relevant.  Second, the Court emphasized the time at which he was allegedly induced to enter into a § 1031 exchange is the operative time frame.  The Court's statement that "subsequent loss has nothing to do with the crime" could not possibly be clearer.

However, under cross-examination, Snider, in a non-responsive outburst, made it clear to the jury that he had lost all of the money he had invested with Benistar, when he testified "No investment account I've ever heard of contemplates losing $3 million in 90 days on puts, calls, and options. . . ."  (Tr. 3-80 to 81)  The striking of this answer, while the appropriate measure, cannot credibly be thought to have erased from the mind of the jury what it heard concerning losses, particularly in view of the government's opening statement, and the further references to loss made by the government throughout trial.  The Court should have taken this into consideration when it considered whether to admit evidence of the Arbitration Award as independently relevant to Mr. Carpenter's good faith intent.

Snider, on re-direct, again went beyond the scope of the question put to him, and again left the jury with the clear impression that he had lost all of his funds.  The government, following up on its improper references in its opening to the letters sent to the investing Exchangors' outside of the relevant time period and relating to the

unavailability of their funds, sought to question Snider on the basis of the letter, to which

he testified that it began "We regret" and was dated January 17, 2001. (Tr. 3-96)

Clearly, the date of receipt of this letter puts it well beyond any time period relevant in

determining whether or not Mr. Carpenter fraudulently induced Snider to enter into a §

1031 exchange. As a result, the only purpose of the government's reference to the letter

was to again suggest loss to the jury, which Snider aided by impermissibly reading the

opening.[26]

   During the direct examination of Fitzgerald, the government again delved into a

time period irrelevant to the elements of the crimes of which Mr. Carpenter was accused.

Once again, the purpose of the government's questioning was to demonstrate the

investing Exchangors' losses to the jury, as it asked Fitzgerald if $100,000 that he

transferred to Benistar was transferred to a third party, pursuant to his exchange, and he

answered that it was not. (Tr. 4-150 to 151) It is unclear why the Court, just one day

after expressly stating that loss was irrelevant to the determination of whether Mr.

Carpenter committed mail and wire fraud, allowed in this irrelevant and highly

prejudicial evidence of Fitzgerald's loss.[27] Nevertheless, by this point, the jury had heard

repeated references to the investing Exchangors' inability to complete exchanges, as well

as to the losses they suffered. Under the framework set forth by the Court, this evidence

---

[26] The government again referenced the letter during Bellemore's testimony, specifically asking him if he had received Ex 35, a letter dated January 17, 2001. The only purpose to such a line of question was to suggest Bellemore's loss, a misimpression that was never corrected due to the preclusion of the evidence of repayment.

[27] Although the Court, during a sidebar directly following the conclusion of Fitzgerald's direct examination, stated that, "the evidence of the incomplete exchange transactions is . . . sort of the unfolding of events," and that "[i]t is a part of the big picture of the government's prosecution that in December certain events occurred and certain obligations weren't able to be met and so on" (Tr. 4-153 to 154), this reasoning is wholly at odds with the statement made by the Court during the course of Snider's testimony that: "[I]t doesn't affect, good or bad -- Snider's experience works out or doesn't work out -- doesn't affect whether at the time he paid the money it was obtained by fraud." (Tr. 3-43)

should not have been admitted, and to the extent it was, the Court should have allowed Mr. Carpenter to introduce evidence of Fitzgerald's repayment.

At sidebar following Fitzgerald's direct, the Court rejected the defense request to introduce evidence of a settlement entered into between Benistar and Fitzgerald, in which Fitzgerald was repaid most of his losses.  In response to the defense's assertion that the evidence of the settlement was admissible to correct the misimpression left with the jury that this loss to Fitzgerald was permanent, the Court, without articulating its rationale, declined to allow evidence of the settlement to be introduced.  (Tr. 4-152 to 153)

On the eighth day of Mr. Carpenter's trial, the Court discussed with the parties the admissibility of the Arbitration Award and the subsequent enforcement of that award by a New York court.  The defense requested leave to introduce evidence of these events, not only as bias evidence against Rock of PaineWebber, but also as substantive evidence relating to the causation of losses, and the recompense of the investing Exchangors.  (Tr. 8-160 to 174)  The Court stated that it would review the documents and the brief filed by the defendant on the subject of their admissibility, and would discuss the matter the following morning.  (Tr. 8-174)

Prior to the start of testimony on the ninth day of trial, the Court ruled that reference to the Arbitration Award was permissible during the cross-examination of. Rock, but only for the purpose of demonstrating his bias.  (Tr. 9-7)  In this ruling, the Court precluded Mr. Carpenter from introducing the document memorializing the Arbitration Award into evidence.  (Id.)  Following the ruling, the defense again raised the issue of the independent admissibility of the Arbitration Award, as well as the motions

Mr. Carpenter had filed on the subject, but the Court did not entertain argument on the subject at that time.  (Tr. 9-10 to 13)

In addition, on re-direct examination, the government asked Zappala whether Benistar had any unsuccessful exchanges after December 14, 2000, knowing full well that the Court had ruled that losses sustained after this point were irrelevant.  (Tr. 10-74) The government, in asking such a question, was similarly aware that there were no successful exchanges past that date, and the only potential reason to inquire of Zappala was to elicit highly prejudicial and testimony of, in the Court's own words, "at best marginal" relevance.  (Tr. 10-86 to 87)  The government's nearly instantaneous withdrawal of the question following Mr. Carpenter's counsel's objection, as well as comments it made at sidebar following the question,[28] strongly suggest a form of gamesmanship or "tit for tat" which is entirely impermissible and unnecessary given the clear ground rules for the inadmissibility of evidence following December 14, 2000.

Shortly after this improper questioning by the government the Court again denied Mr. Carpenter's request to admit evidence concerning the Arbitration Award against PaineWebber, as well as the enforcement of that Award by a Massachusetts Superior Court.  The Court rejected the admissibility of the repayment as substantive evidence, and though its admissibility as a remedial measure was a "closer question," it declined to allow the evidence in because it would "simply invite retaliation" and further claims for remediation under Fed. R. Evid. 403, and because "the balance where we are is as good

---

[28]  The government in defending the withdrawn, and clearly inappropriate, question, suggested that Mr. Pappalardo's question to Zappala on cross-examination as to whether there were any unsuccessful exchanges prior to December 14, 2000 "opened the door" to his question.  (Tr. 10-82)  Most tellingly, the government suggested to the Court that the question was appropriate due to some perceived cumulative effect of Mr. Carpenter's counsel's questioning of various witnesses.  (Tr. 10-84)  This argument was meritless and belies the improper motivation behind the government's prejudicial and misleading question.

as we're going to get." (Tr. 10-85 - 86) This ruling foreclosed any chance Mr. Carpenter

had of introducing relevant evidence concerning repayment of the Exchangors, evidence

that Mr. Carpenter's counsel had repeatedly argued was substantively admissible as

relevant to his good faith intent, and which, in any case, was essential to offset the

significant amount of improper and unfairly prejudicial evidence concerning the losses

incurred by the Exchangors.

    Taken in concert with the persistent evidence of trading losses introduced through

Stern,[29] Levine,[30] Rasmussen,[31] Rock,[32] and Zappala,[33] as well as the government's

closing argument[34] (evidence which this Court, in its opinion overturning the jury's guilty

verdict in Mr. Carpenter's first trial, described as being admissible for "a rather limited

---

[29] See, e.g., Tr. 6-102 (June 8, 2008) ("[T]owards the end of the relationship, in 2000 or so, [Mr. Carpenter] started to lose a lot of money."); Ex. 152; Tr. 7-46 to 47 (June 9, 2008) ("At the close of business on May 12, 2000, your account had an unrealized loss of $535,762, and in 2000, a realized loss of $1,168,782."); Ex. 153; id. at 49-50 ("At the close of business of August 4, 2000, your account had an unrealized loss of $87,392, and in 2000, a realized loss of $1,957,852.").

[30] See, e.g., Tr. 7-76 ("I believe that at the beginning of 2000 and for the first month or two, he was up about $200,000, and then, as the technology market rapidly turned, he experienced a loss, a net position loss of over a million dollars."); id. at 85 ("[D]uring [May 2000 through September 2000], [Mr. Carpenter] was losing more and more money . . . .").

[31] See, e.g., Tr. 8-37 to 38 (June 11, 2008) (testifying as to a realized loss of $1,168,782, and an unrealized loss of $535,762 in the Benistar account as of April 2000); id. at 86 to 87 (testifying as to approximately $1.9 million dollars of losses in the Benistar account as of August 2000).

[32] See, e.g., Tr. T. 8-143 (June 11, 2008) ("The [Benistar] account would fluctuate significantly from day to day, but the over all -- [Mr. Carpenter] lost money every week -- every month that we traded."); id. at 156: to 157 ("The call started out by summarizing the losses in the account and the exposure that he currently had to the markets at the time. When we told Dan that the losses were $5 million through that morning, he was somewhat surprised.").

[33] See, e.g., Tr. 10-22 (June 13, 2008) (testifying to monthly loss in May 2000 of $1,156,618.48, year to date loss of $2,453,828.42, and realized cumulative loss in September of $4,000,283.69); id. at 24 to 25 (testifying as to change in value of -$2,860,897 in November 2000, and monthly loss that month of $2,352,463.91); id. at 73 (testifying as to total calculated loss between Merrill Lynch and PaineWebber accounts of $6.3 million).

[34] See, e.g., Tr. 13-43 (June 18, 2008) ("Mr. Carpenter's ever-escalating losses during 2000 are also a matter of record . . . .); id. at 64 ("Does it sound like good faith for Mr. Carpenter to say to Mr. Rasmussen, when he loses over a million dollars in May of 2000, what's one and a half million dollars amongst friends?"); id. at 64:22-25 ("Is it good faith for Mr. Carpenter, after Merrill Lynch shuts him down, to go right over to PaineWebber and lose another $2.3 million by the end of November . . . ?"); id. at 65 ("But the facts here show that Mr. Carpenter was losing money hand over fist . . . .").

purpose" and having "the tendency to lead the jury away from the charges in the

indictment by inviting them to blame Carpenter . . . because he lost the [E]xchangors'

money, rather than he had committed mail or wire fraud." Carpenter, 405 F.Supp.2d at

102), the jury was consistently left with the incorrect impression that the Exchangors

permanently lost their funds.  By failing to correct the jury's misimpression by precluding

Mr. Carpenter from introducing evidence of the Arbitration Award as substantive

evidence of his good faith intent, or evidence of Mr. Carpenter's repayment to Exchangor

in January 2001, the Court allowed the cumulative impact of the government's improper

references to go unabated.  This was an incorrect decision, which materially hindered the

defense, and resulted in unfair prejudice to Mr. Carpenter.

### E.    THE ERRONEOUS AND PREJUDICIAL INCLUSION OF EVIDENCE OF STATEMENTS MADE BY MR. PALEY AS AGAINST MR. CARPENTER IN THE ABSENCE OF THE FINDING OF AN AGENCY RELATIONSHIP

At the conclusion of the eleventh day of the trial, the defense, noting that the

Court had allowed in, *de bene*, testimony from the investing Exchangors and their

representatives concerning what Mr. Paley said to them, argued that the state of the

evidence presented by the government was insufficient to establish an agency

relationship between Mr. Paley and Mr. Carpenter, and thus such evidence should be

deemed inadmissible.  (Tr. 11-134 to 135)  The defense requested, as a result, that the

Court strike the Exchangors' and their representatives' testimony on that subject (id.), but

the Court refused, indicating however that it might "be appropriate . . . [to give] an

instruction to the jury on how to use such evidence; that is, they should use it only if they

believe that Mr. Paley was authorized to bind Mr. Carpenter."  (Id. at 135)  The Court

noted that the agency determination wasn't "necessarily principal and agency law," and

stated that "this is in the context of a scheme to defraud, as alleged in the indictment, if that's what the jurors find, they might find co-participants in a scheme, if they find one, to be acting with authorization on each other's behalf." (Id. at 135)  The Court conceded that Mr. Carpenter's concern was "not illegitimate," but stated that "it's cured by an instruction to the jury and the appropriate instructions to the jury." (Id. at 135 to 136)

At the beginning of the twelfth day of the trial the defense again raised the issue of the failure of the government to satisfy the requirements for proving an agency relationship between Paley and Mr. Carpenter, and so any oral representations made by Paley should not be admitted against Mr. Carpenter. (Tr. 12-5 to 13)  Specifically, the defense cited, and provided to the Court, the case of United States v. Ranney, 719 F. 2d 1183, 1187 n.7 (1st Cir. 1983), which requires that, in agency relationships, in order to use hearsay statements against the defendant, the government must prove the declarant was expressly or implied authorized or ratified by the defendant. (Id. at 5 to 6)  Mr. Carpenter's counsel pointed out that the only evidence as to Paley being authorized by Mr. Carpenter to make particular statements came from Paley's cross-examination, where he admitted that Mr. Carpenter never authorized him to say anything outside of the written documents (id. at 6), and in fact, Mr. Carpenter never told him to say anything whatsoever. (Id.)

Following argument, the Court suggested that the matter could be resolved at a later time, and remarked that it did not view this issue as posing much of a controversy, since the government was simply seeking to introduce statements consistent with the documents through Paley hearsay. (Id. at 10)  In other words, the Court's view was that "it doesn't appear that the government is relying on oral representations by Paley but

rather on the documents." (Id.) Despite this view, and its indication that it would give an instruction to the jury on how to use hearsay testimony of Mr. Paley, the Court gave no such instruction. This failure to appropriately instruct the jury is damaging for a number of reasons: (1) testimony of such statements allegedly made by Paley was inadmissible hearsay, because the government failed to prove the authorization of Paley by Mr. Carpenter as required by Ranney, an issue which the Court never ruled on; (2) the government did rely on such testimony in its case; and (3) some of this inadmissible hearsay was indeed inconsistent with the written documents. See, e.g., **Darling**, (Tr. 3-104) ("I was particularly concerned about the safety . . . of the money, and [Paley] told me that they were honorable people, he repeated that several times, and the money would be perfectly safe."); (id. at 107) (regarding his second exchange, Darling testified that Paley told him that Benistar was honorable, "and that the money would be perfectly safe."); id. at 124 ("he assured me my money would be safe and that they were honorable men."); **Fitzgerald**, (Tr. 4-120 to 121) (describing what he discussed with Paley at the meeting regarding the safety of his money); **Iantosca**, (Tr. 6-10) ("[Paley] said . . . give the money and his people can double the money from whatever we have done"); **Cahaly**, (Tr. 10-101) ("I made a copy of the check and then handed it to Martin [Paley], and I said, kiddingly, "Martin, I hope my money's going to be safe.").  This failure to strike the hearsay testimony concerning Paley, or at the very least give a limiting instruction to the jury as to how to treat such evidence, was severely damaging to Mr. Carpenter's case, and improper under the governing law of the First Circuit. See Ranney.

F.    THE IMPROPER AND UNFAIRLY PREJUDICIAL ADMISSION
      OF EVIDENCE FOCUSING ON "RISKY" INVESTMENTS

As this Court noted in its opinion overturning the jury's verdict in the first trial

and ordering a new trial, "The object of the scheme to defraud was obtaining control of

the exchangors' money by false pretenses; the fraud was not, as the defendant has himself

repeatedly emphasized, the pursuit of an incautious investment strategy. The scheme's

object was achieved when the money was obtained, before it was invested." Carpenter,

405 F. Supp. at 93 (emphasis added) (also adding that such evidence was admitted for a

"rather limited purpose"). Indeed, during the final pre-trial conference in this matter, the

Court again conceded that during the first trial there was some "leakage of lay opinion

either unexpected or unpoliced" as to Mr. Carpenter's trading strategy, and promised to

"keep a sharper eye on that . . . ." (Tr. 29 to 30)

However, even before any Merrill Lynch or PaineWebber witnesses took the

stand, such leakage began, in the form of improper evidence from Exchangors concerning

their opinion regarding options trading. See, e.g., **Snider**, (Tr. 3-95) (testifying that

options trading by Benistar would be the "furthest thing from [his] mind that [he] could

think of"); **Darling**, (Tr. 3-122 to 123) (testifying that he would have "[a]bsolutely not"

have given his money to Benistar had he known the funds were being invested in stock

options, because he "considered stock options . . . very risky . . . .").

Immediately before the first witness from Merrill Lynch, Stern, took the stand,

Mr. Carpenter's counsel requested and received a sidebar to again discuss the issue of

inappropriate and inadmissible lay testimony concerning Mr. Carpenter's trading

strategy. (Tr. 7-70 to 73) Upon Mr. Carpenter's objection to the inadmissibility of such

testimony under Fed. R. Evid. 702, the Court asked the government what it sought to

elicit through the Merrill Lynch witnesses, to which AUSA Pirozzolo responded that he was not going to have these witnesses give expert opinions as to the riskiness of Mr. Carpenter's trading but sought to admit, "communications to Mr. Carpenter from Merrill Lynch . . . telling him about the riskiness of his strategy, [because] those communications . . . are relevant to his intent at the time of the offense…."  (Tr. 3-70 to 71)

Nevertheless, what followed from Stern, Levine and Rock was a toxic stream of improper, opinion testimony as to the riskiness of Mr. Carpenter's trading strategy, and options trading in general.  This testimony was not, as the government asserted, always limited to specific communications between the brokers and Mr. Carpenter, and should not have been permitted, as its impact was hugely prejudicial to Mr. Carpenter's case. See, e.g., **Stern** (Tr. 6-102) (when asked what he said to Mr. Carpenter concerning his trading, instead testified to his own characterization of Mr. Carpenter's trading strategy as "writing uncovered puts on . . . a lot of stocks that were more volatile and basically one-dimensional in terms of technology stocks he favored as opposed to diversifying and doing lots of different categories . . . ."); (id. at 107) (describing the differences between Mr. Carpenter's trading strategy at the early and later stages, as at the later stage, "he was basically even more in technology stocks and writing options even deeper in the money and going to the very limits of the amount of money he could put on -- he could borrow or go on margin."); (id.) (asserting, without being tied to any communications to Mr. Carpenter, that Mr. Carpenter's strategy became less and less successful over time, and "in fact, [it was] not very successful at all towards the end of the relationship"); (Tr. 7-41 to 42) (when asked what Mr. Carpenter did, rather than follow his advice, testified that "he sold puts on just technology stocks, not stocks that he would potentially own because

he never really did own most of those stocks.  He would buy back the option positions at a loss, typically, before he owned those underlying stocks").

The same was true for **Levine**, who was permitted to testify, not constrained to his specific communications with Mr. Carpenter, but rather about his negative characterizations of Mr. Carpenter's trading strategy.  See, e.g., (Tr. 7-70 (permitted to testify that Mr. Carpenter's predominant trading strategy was to "sell uncovered puts, take in as much premium as he could, and hope that the underlying stocks would go up");[35] (id. at 75-77) (rather than confining his testimony to communications with Mr. Carpenter, testified that he declined to go into a "more conservative . . . writing strategy with greater diversification," and characterized Mr. Carpenter as, towards the end of the relationship, "having negative balances in his account . . . [while] the market was eroding rapidly, and he had not adjusted his strategy accordingly");  (id. at 84 to 85) (testified that from May to September 2000, Mr. Carpenter, "was losing more and more money and still sticking, stubbornly, to his strategy").

This pattern continued with the testimony of **Rock**, who once again criticized, and portrayed Mr. Carpenter's trading strategy in a very negative light, without limiting his testimony to specific communications.  See, e.g. (id. at 98) (over objection permitted to criticize Mr. Carpenter's investment objective of earning money by testifying "most of our clients have already created a lot of money for them[selves] already, and they come to us to preserve their capital. . . . Most people don't come to us with the goal of making a lot of money, quote/unquote"); (id. at 99 to 100) (in non-responsive answer to question

---

[35] This characterization of Mr. Carpenter as essentially blindly guessing as to the direction of particular stocks, is not only untrue, but highly inflammatory, prejudicial and utterly unnecessary for the government's case, in light of the judge's admonition during the pre-trial conference that the alleged crime was contained in the obtaining of Exchangors' money, not in any imprudent trading strategy.

whether Mr. Carpenter said anything to him regarding his relationship with Merrill Lynch, testified "because Dan was a very aggressive investor, the way the account was introduced to me was that he was taking up so much time and his trading was so aggressive that Merrill didn't want to work with him anymore. . . .").  Rock testified extensively about Mr. Carpenter's trading strategy, including: expanding on the characterization of Mr. Carpenter's puts as "uncovered" (id. at 140), claiming that there was an agreement with Mr. Carpenter that he must temper his risk (id. at 141), that Mr. Carpenter's "original positions . . . were aggressive" (id.), that he had "an extremely aggressive portfolio" of which PaineWebber tried to "temper the risk" (id.), that Mr. Carpenter was "making a bilateral directional bet," in which, if he bet wrong he would "lose money on both sides" (id. at 141 to 142), and that Mr. Carpenter was trading in a particular industry sector, namely Internet stocks (id. at 142).

This was all improper testimony, not connected to communications between Mr. Carpenter and Stern, Levine, or Rock, and introduced by the government for the purpose of disparaging Mr. Carpenter's trading strategy, which was only admissible in the first instance for "a rather limited purpose."  This testimony alone went far beyond the limitations of the Court's guidelines, and moreover was of marginal relevance, highly prejudicial, and inappropriate lay opinion testimony.  It should not have been permitted, and its prejudicial impact upon Mr. Carpenter -- as in the first trial -- was dispositive.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, defendant Daniel E. Carpenter respectfully requests that the Court, pursuant to Fed. R. Crim. P. 29(c), enter a judgment

of acquittal after the jury's verdict or, in the alternative, and in the interest of justice,

order a new trial under Fed. R. Crim. P. 33(a).

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), Mr. Carpenter requests oral argument on this

motion.

**RESPECTFULLY SUBMITTED:**
DANIEL E. CARPENTER,
Defendant,
By his attorney:

/s/ A. John Pappalardo
A. John Pappalardo (BBO # 338760)
GREENBERG TRAURIG, LLP
One International Place, 20th Floor
Boston, MA 02110
(617) 310-6000
(617) 310-6001 (fax)

## Certificate of Service

I hereby certify that on this 3rd day of July, 2008, I served on counsel of record in
the foregoing matter a copy of this submission by means of the ECF system.

/s/  A. John Pappalardo
A. John Pappalardo