UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIMINAL NO. 04-10029-GAO |
| DANIEL E. CARPENTER | ) ) ) | |

**DEFENDANT'S SUPPLEMENTAL MOTION FOR JUDGMENT OF ACQUITTAL**

Defendant Daniel E. Carpenter respectfully submits this supplemental motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29(c). A judgment of acquittal is warranted for the additional reasons that: (1) Mr. Carpenter was not given fair warning, in violation of the Due Process Clause, that investing Exchangors' funds in stock options (or anything else, for that matter) on behalf of Benistar Property Exchange Trust Co., Inc. ("BPETCO") was fraudulent or criminal; (2) the government failed to allege, let alone prove, that Mr. Carpenter had a legal duty to disclose that he was investing Exchangors' funds in stock options; (3) the government violated the Double Jeopardy Clause by relitigating an issue of ultimate fact in the second trial (*i.e.*, that BPETCO president Martin L. Paley ("Paley") was Mr. Carpenter's agent) that had previously been resolved in Mr. Carpenter's favor in the first trial; and (4) there was a gaping void in the government's proof regarding causation.[1]

**I.    LEGAL STANDARD.**

In addition to the well-known standards for granting a Rule 29 motion, see United States v. Stark, 499 F.3d 72, 79 (1st Cir. 2007); United States v. Czubinski, 106 F.3d 1069, 1073 (1st Cir. 1997) (reversing district court's denial of Rule 29 motion in wire fraud case), "where an

---

[1] Various counts in the superseding indictment ("indictment") suffer from a lack of subject matter jurisdiction, improper venue, and other fatal defects as described in Mr. Carpenter's motion filed pursuant to Fed. R. Crim. P. 29(a), Dkt. #284, which is expressly incorporated herein by reference.

1

equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury *must necessarily entertain* a reasonable doubt." United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995) (citations and quotations omitted) (emphasis in original).  Although juries have significant value to the administration of justice, "juries do not have carte blanche." United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995).  After scrutinizing the record evidence in this case in the context of the applicable law, this Court necessarily must conclude "that it does not have the legitimate discretion to allow the jury to decide this case because the evidence presented is not sufficient." United States v. Pappathanasi, 383 F. Supp. 2d 289, 291 (D. Mass. 2005) (granting Rule 29 motion).

The government has alleged a case of "fraudulent inducement" against Mr. Carpenter alone, without showing any interaction by Mr. Carpenter with any of the Exchangors, and without any allegation, let alone proof, of a conspiracy or an agency relationship with Paley—the only person who had any contact with the Exchangors.  Not only is the government's case here "simply too thin," United States v. Carucci, 364 F.3d 339, 347 (1st Cir. 2004) (granting judgment of acquittal), the evidence of a crime here is nonexistent.

## II.     ARGUMENT.

### A.      A Mere Breach of Contract Does Not Constitute a Scheme to Defraud Under the Mail or Wire Fraud Statutes.

Because it is undisputed that Mr. Carpenter had no contact with the Exchangors by which he could have "induced" them to sign contracts with BPETCO, all that the government proved at trial is that BPETCO breached its contracts with the Exchangors by failing in January 2001 to successfully complete certain of their property exchanges under 26 U.S.C. § 1031. However, "the [mail fraud] statute does not reject all business practices that do not fulfill

2

expectations, nor does it taint every breach of a business contract." United States v. Kreimer, 609 F.2d 126, 128 (5th Cir. 1980). "Nor does a breach of contract in itself constitute a scheme to defraud." McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir. 1990). "Conduct which is wrongful in the civil context is not necessarily 'wrongful' within the meaning of the [mail and wire fraud] statutes." United States v. Miller, 997 F.2d 1010, 1019 (2d Cir. 1993) (citation omitted). Moreover, it has been adjudged that BPETCO's breach of those contracts (by virtue of suffering $9 million in investment losses in December 2000/January 2001) was caused by the intervening misconduct of PaineWebber, resulting in an arbitration award and judgment in BPETCO's favor against PaineWebber in the amount of $12.5 million. Tr.9:107-08 (Rock).[2]

"A breach of contract does not amount to mail fraud. Failure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract." United States v. D'Amato, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994). Here, the government adduced no evidence that Mr. Carpenter never intended to honor BPETCO's contracts with the Exchangors. In fact, he caused BPETCO to honor contracts with over 100 Exchangors involving over $100 million in total funds invested. Tr.11:100 (Paley); Exs. 147-48 (Merrill Lynch statements); Exs. 168-70 (PaineWebber statements). In D'Amato, as here, the prosecution obtained a conviction of a professional based on alleged misrepresentations in providing services for the benefit of a corporation. D'Amato, 39 F.3d at 1252-56. There, as here, the professional was prosecuted under the mail fraud statute with respect to his dealings with another private, sophisticated party. Id. There, as here, the alleged victim had sufficient, although allegedly incomplete, knowledge about the defendant's activities. Id. And there, as

---

[2] Mr. Carpenter caused PaineWebber to pay the $12.5 million directly to the Exchangors. Ex. 415A (marked). [Citations to the trial transcript reflect the day and page number.]

3

here, the disastrous impact on the professional's career caused by the criminal proceedings was grossly disproportionate to the contractual injury. The Second Circuit unanimously reversed the conviction and entered a judgment of acquittal because, *inter alia*, "[t]o infer fraudulent intent from mere nonperformance, therefore, would eviscerate the distinction between breach of contract and fraud." Id. at 1261 n.8. Justice Oliver Wendell Holmes, Jr., observed that every party to a contract is legally entitled to interpret and breach it, with contractual damages being the sole remedy. Oliver Wendell Holmes, Jr., The Path of the Law, 10 Harv. L. Rev. 457, 462 (1897). The breach of contract here, and the payment of damages, does not rise to a scheme to defraud.

**B.      Mr. Carpenter Was Not Given Adequate Notice or Fair Warning that His Conduct Was Proscribed in Violation of the Due Process Clause.**

Constitutional substantive due process requires that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." United States v. Harriss, 347 U.S. 612, 617 (1954). See also Kolender v. Lawson, 461 U.S. 352 (1983); Lanzetta v. New Jersey, 306 U.S. 451 (1939). At this late date, the government has failed to state with particularity what act of Mr. Carpenter's alone (as opposed to Paley) was a crime. Investing in stock options, losing money (especially when a third-party is the cause of the loss), or failure to repay a debt—without more—is not a crime. The unwarranted expansion of the mail and wire fraud statutes to the private contractual relationships in this case, where the government has inferred fraudulent intent from mere nonperformance, has eviscerated the distinction between breach of contract and fraud—precisely the harm the Second Circuit sought to avoid in D'Amato—in violation of the Fifth Amendment's Due Process Clause.

The Supreme Court emphasized the importance of this limitation:

4

> Although the [due process] doctrine focuses both on actual notice to citizens and arbitrary enforcement, [the Court has] recognized that the more important aspect of the doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.

Kolender, 461 U.S. at 357-58 (citations and quotations omitted). Imprecise laws—or the imprecise application of laws—give rise to "arbitrary and erratic arrests and convictions." Papachristou v. City of Jacksonville, 405 U.S. 156, 162 (1972). Both the actual notice and the fair warning requirements of the Due Process Clause were violated in this case. Mr. Carpenter could not have possibly known or imagined in October 1998 or in the August-December 2000 period that investing § 1031 funds in stock options, based on his interpretation of language in arm's-length agreements reviewed and approved by professionals on both sides, or being involved in the property exchange business as a qualified intermediary and successfully completing 119 of 126 exchanges, could somehow constitute a violation of the mail and wire fraud statutes. Such application of the mail and wire fraud statutes, which is wholly unprecedented, constitutes a complete lack of the requisite actual notice or fair warning that a "line" was crossed by Mr. Carpenter either when he formed BPETCO with Paley in October 1998, or invested in options throughout BPETCO's existence.

The guilty verdict here, if not set aside, would open a virtual Pandora's box of unlimited mail and wire fraud prosecutions for any *unintentional* breach of a commercial contract between private parties involving the use of the mails or wires. Such expansion of the mail and wire fraud statutes is not permitted by the Due Process Clause, which precludes the use of general statutory provisions in order to criminalize minor breaches of contractual provisions.

5

See United States v. Bass, 404 U.S. 336, 347-50 (1971). In Bass, the Supreme Court emphasized the principle that "fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed" and that "legislatures and not courts should define criminal activity." Id. at 348 (quoting McBoyle v. United States, 283 U.S. 25, 27 (1931) (Holmes, J.)).

Congress may have constitutional authority to extend the application of the mail and wire fraud statutes to govern civil disputes between private parties involving mere nonperformance of a contract, but it has yet to do so, and this Court should not allow the government to usurp the role of Congress in this fashion. "Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a statute broader than that clearly warranted by the text." Ratzlaf v. United States, 510 U.S. 135, 148 (1994) (quoting Crandon v. United States, 495 U.S. 152, 160 (1990)). The guilty verdict in this case violates all of these fundamental principles of due process. As the D.C. Circuit recently stated:

> [C]ases in this circuit and others have found a duty to disclose material facts on the basis of specific requirements for disclosure of specific information. There is good reason for demanding such specificity: to comply with Fifth Amendment due process, the defendant must have fair notice . . . of what conduct is forbidden . . . [T]his 'fair warning' requirement prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendants' actions were criminal.

United States v. Safavian, 2008 WL 2415911, *6 (D.C. Cir. June 17, 2008) (quotations and citations omitted). Applying the mail and wire fraud statutes to the facts of this case violates the Due Process Clause because the government did not provide fair warning to Mr. Carpenter that investing § 1031 funds in stock options or equities, as expressly allowed by arm's-length

6

contracts negotiated with Exchangors who had professional advisors, could somehow be considered fraudulent or illegal.

In <u>McBoyle v. United States</u>, 283 U.S. 25 (1931), Justice Holmes emphasized the fair notice rationale inherent in the Due Process Clause. Such notice must be provided even if defendants did not actually read the United States Code or the Federal Register (which would not have helped in this case in any event because no regulations govern how a qualified intermediary may invest the funds):

> Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.

<u>Id.</u> at 27. The Supreme Court reiterated this point fifty years later. <u>See</u> <u>Bass</u>, 404 U.S. at 348. The need for fair warning is especially acute in the context of criminal statutes like mail and wire fraud that mandate the imposition of severe penal sanctions for the ordinary use of the mails and wires in the ordinary course of otherwise legal and non-fraudulent business activities.

"The criminal law should not be a series of traps for the unwary." <u>United States v. Hussein</u>, 351 F.3d 9, 13 (1st Cir. 2003). To that end, the Due Process Clause demands that criminal statutes describe each particular offense with sufficient definiteness to "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." <u>Harriss</u>, 347 U.S. at 617. "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." <u>Id.</u> <u>See also</u> <u>Arthur Andersen LLP v. United States</u>, 544 U.S. 696, 703 (2005) ("We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress . . . and out of concern that a fair warning should be given to the world

in language that the common world will understand, of what the law intends to do if a certain line is passed.") (citing McBoyle); United States v. Yefsky, 994 F.2d 885 (1st Cir. 1993) (finding count of indictment charging defendant with conspiracy to commit engineering fraud by mails did not provide adequate notice and was therefore defective because it did not specify false pretenses used).

"There are three related manifestations of the fair warning requirement." United States v. Lanier, 520 U.S. 259, 266 (1997). The two that are applicable here are the Rule of Lenity and the unforeseeably expansive interpretation doctrine:

> [T]he canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct covered . . due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.

Id. "Under the rule of lenity, grievous ambiguity in a penal statute is resolved in the defendant's favor." United States v. Councilman, 418 F.3d 67, 83 (1st Cir. 2005). The unforeseeably expansive interpretation doctrine "principally bars unforeseeable and retroactive judicial expansion of narrow and precise statutory language." Councilman, 418 F.3d at 84 (quotations and citations omitted). "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Lanier, 520 U.S. at 267. Here, the government has provided no fair warning that investing § 1031 funds in stock options is criminal.

C.  **The Rule of Lenity Dictates that Criminal Liability Not be Imposed for Otherwise Legal Acts Done in the Ordinary Course of Business.**

The Rule of Lenity is "almost as old as the common law itself." Antonin Scalia, The Tanner Lectures on Human Values at Princeton University, Common-Law Courts in a Civil-

8

Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws (Mar. 8-9, 1995). Developed in the common law courts in the seventeenth and eighteenth centuries to limit the harshness of English criminal law, the Rule was adopted by the Supreme Court in 1820 in Chief Justice Marshall's oft-cited decision in United States v. Wiltberger, 18 U.S. (5 Wheat.) 76, 95 (1820) (acknowledging that the rule of lenity reflects "the tenderness of the law for the rights of individuals"). The Rule was endorsed a century later by Justice Holmes in McBoyle, and the Supreme Court has consistently acknowledged its validity ever since. See, e.g., United States v. Granderson, 511 U.S. 39, 54 (1994).

    **1.**    **The Rule of Lenity Ensures that Citizens Receive Fair Warning Before Facing Penal Sanctions and that the Separation of Powers is Preserved.**

The Rule of Lenity is founded on "two policies that have long been part of our tradition": (i) provision of notice to the public, and (ii) separation of powers between the legislature and judiciary. Bass, 404 U.S. at 348. As the Supreme Court explained:

> [The rule of lenity] reflects not merely a convenient maxim of statutory construction. Rather, it is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited.

Dunn v. United States, 442 U.S. 100, 112 (1979). The Supreme Court elaborated upon this principle in Bass. "[A]s we have recently reaffirmed, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." Bass, 404 U.S. at 347 (citing Rewis v. United States, 401 U.S. 808, 812 (1971); Ladner v. United States, 358 U.S. 169, 177 (1958); Bell v. United States, 349 U.S. 81 (1955)). The Supreme Court went on to state:

> [B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies "the instinctive distastes against men languishing in prison unless the lawmaker has clearly said they should."

Bass, 404 U.S. at 348 (quoting H. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, in Benchmarks 196, 209 (1967)). Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant. More importantly, before the government can deprive a citizen of his liberty for conducting himself in the ordinary course of business and doing normally non-criminal acts in the ordinary course of business, it must be clear that Congress defined those specific acts to be criminal.

The Rule of Lenity has been called "venerable" because of its age and the respect it commands. See United States v. R.L.C., 503 U.S. 291, 305 (Scalia, J., concurring). Blackstone commented on the vigorous role the Rule played in limiting criminal punishment in sixteenth- and seventeenth-century English courts. William Blackstone, 2 Commentaries *88. He described the rule as one of strict construction: "Penal statutes must be construed strictly." Id. Lenity's underlying principles necessarily inform the interpretation of penal statutes, and they promote consistency and fairness in the application of the criminal law.

    **2.**    **The Rule of Lenity as Applied Here Mandates Acquittal.**

As the First Circuit has recently ruled, "[t]he federal mail fraud statute…is built upon a single, archaic 204-word sentence which…has undergone repeated periods of rapid expansion and contraction." United States v. Urciuoli, 513 F.3d 290, 293 (1st Cir. 2008). During the period referenced in the indictment (October 1998 through January 2001), there was no federal or state statute, no federal or state regulation, no federal or state revenue ruling or advisory opinion, and no federal or state judicial decision, which prevented a qualified intermediary from

investing § 1031 funds in stock options. Since that time, only one state has enacted a statute regulating qualified intermediaries or "exchange accommodators" (Nevada), and Nevada's statute was enacted only in 2007 to require that each qualified intermediary or exchange accommodator "shall invest money related to a tax-deferred exchange of property in investments which meet the reasonable standards that are applicable to persons acting as fiduciaries in this State." Nev. Rev. Stat. § 645G.300(2) (2008).[3]

Moreover, the privately-negotiated arm's-length agreements between BPETCO and the Exchangors, where the Exchangors were all represented by professional advisors, do not prohibit investments in stock options.[4] There is no possible way that Mr. Carpenter could have known in 1998-2000 that the government eight years after-the-fact would seek to brand him a criminal for doing something that neither a statute, nor any construction thereof, nor any case, had ever before held was unlawful or improper in any way, shape, or form. See United States v. Emmons, 410 U.S. 396, 411 (1973) ("this being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity."); United States v. Santos, 128 S. Ct. 2020, 2025 (2008) ("The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.").

---

[3] Nev. Rev. Stat. § 163.275(1) (2008) allows Nevada fiduciaries to invest in "stocks, common or preferred, bonds, debentures, notes, mortgages or other securities in or outside the United States," as well as in "any real or personal property." Id. Furthermore, Nev. Rev. Stat. § 163.280 (2008) allows fiduciaries to make investments "without diversification." Id. Merrill Lynch broker Gerald Levine criticized Mr. Carpenter's investment strategy as not being "diversified." Tr.5:71 (Levine). In 2007 and early 2008, the Federation of Exchange Accomodators, a national trade organization representing § 1031 qualified intermediaries, petitioned the federal government to adopt nationwide federal regulations governing the § 1031 industry—so far without success. See http://www.1031.org. Thus, even to this day, the § 1031 industry remains completely unregulated in 49 states and at the federal level. However, in the 1998-2000 period relevant to the indictment, **no regulation existed anywhere on this issue**.

[4] The BPETCO agreements were literally negotiated at arm's-length, as some Exchangors actually made hand-written changes to the form agreements. See Ex. 40 (Cahaly modifying fees and rates); Exs. 29(A-C) (Bellemore changing governing law to that of New Hampshire).

11

Because the government did not provide Mr. Carpenter with fair warning in 1998-2000 that investing § 1031 funds in stock options was somehow fraudulent or criminal, when such investments were clearly allowed by the terms of privately-negotiated arm's-length contracts between sophisticated private parties, the government cannot now seek to brand Mr. Carpenter a criminal in 2008 without violating the Due Process Clause. Consequently, a judgment of acquittal on all counts of the indictment is warranted.[5]

### D. **Liability for Omissions and Half-Truths Cannot Exist Absent a Duty to Disclose.**

The indictment charges that the Exchangors "were induced to wire funds to BPE based on material, false written and oral assurances that the money would be protected and held safe." Indictment ¶ 27. At trial, however, there was no evidence of oral (Paley did not say anything different from the documents) or written (nowhere does any document promise "safety") affirmative misrepresentations as alleged in the indictment. Rather, there was evidence only that Mr. Carpenter *failed to inform* the Exchangors how he was investing the funds. Even assuming that the evidence at trial, viewed in the light most favorable to the verdict, established (as in the first trial) that there was an "omission" to clarify the half-truths regarding the types of investments that BPETCO would utilize, see United States v. Carpenter, 405 F. Supp. 2d 85, 92 (D. Mass. 2005), the indictment does not allege and the government did not prove that Mr. Carpenter had a **legal duty to disclose** how he was investing the funds. "A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes." Sanchez v. Triple-S Management, Corp., 492 F.3d 1, 10 (1st Cir.), cert. denied, 128 S. Ct. 806 (2007). By relying entirely on an "omissions" or "nondisclosure" theory of liability,

---

[5] Mr. Carpenter's investing $2 million of his own money into BPETCO (Ex. 212B) "when the going got tough" stands in stark contrast to the defendants in the recent Bear Stearns hedge fund case allegedly withdrawing $2 million of their own money as the funds collapsed. See Kate Kelly, *Two Ex-Managers At Bear Indicted Over Hedge Funds*, Wall St. J., Jun. 20, 2008, at C1.

but failing to allege and prove a duty to disclose, the government failed to meet its burden of proof as to an essential element of the crimes charged as a matter of law. Consequently, a judgment of acquittal on all counts of the indictment must be entered.

The government's entire case was based on omissions, nondisclosure, concealment, and related half-truths, all of which were argued to have been misleading and, therefore, fraudulent. This theory is similar to allegations in securities fraud cases under § 10(b) and Rule 10b-5 of the Securities Exchange Act that a defendant failed to disclose material facts necessary to make "statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. Ch. II § 240.10b-5. However, at no time did the government allege, and there is not a scintilla of evidence proving, that Mr. Carpenter had a legal duty to disclose how he was investing the Exchangors' funds. Consequently, he cannot be held criminally liable for omissions, nondisclosure, concealment, or half-truths. "Silence, absent a duty to disclose, is not misleading." S.E.C. v. Durgarian, 477 F. Supp. 2d 342, 349 (D. Mass. 2007) (citations omitted). See also Chiarella v. United States, 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."); Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1202 (1st Cir. 1996) ("The proposition that silence, absent a duty to disclose, cannot be actionably misleading, is a fixture in federal securities law."); Regents of Univ., Cal. v. Credit Suisse First Boston, 482 F.3d 372, 386 (5th Cir. 2007) ("An act cannot be deceptive within the meaning of § 10(b) where the actor has no duty to disclose."). The same rule also applies with respect to fraud under the common law, upon which the mail and wire fraud statutes are predicated. See Neder v. United States, 527 U.S. 1, 22 (1999). "A failure to disclose a material fact may also

constitute a false or fraudulent misrepresentation if . . . [there exists] a specific contractual duty to make such a disclosure." United States v. Cassiere, 4 F.3d 1006, 1022 (1st Cir. 1993) (wire fraud).

A duty of disclosure "does not arise out of thin air." United States v. Dollar, 25 F. Supp. 2d 1320, 1326 (N.D. Ala. 1998). It must arise, instead, from a specific request for information, grounded in "a statute, government regulation, or form." United States v. Calhoun, 97 F.3d 518, 526 (11th Cir. 1996). Moreover, under fundamental due process principles, a defendant must have fair warning that he is under a duty to disclose specific information before he may be convicted of a crime for failing to do so. See United States v. Larson, 796 F.2d 244, 247 (8th Cir. 1986) (holding defendant's "due process rights were violated when criminal sanctions were imposed against him because he had no fair warning that his conduct was illegal.").

"If the government wishes to impose a duty on [§ 1031 qualified intermediaries to disclose the manner of their investments], let it require so in plain language. It should not attempt to impose such a duty by implication, expecting that the courts will stretch statutory construction past the breaking point to accommodate the government's interpretation." United States v. Anzalone, 766 F.2d 676, 682 (1st Cir. 1985). See also United States v. Safavian, 2008 WL 2415911, *5 (D.C. Cir. Jun. 17, 2008) ("there must be a legal duty to disclose in order for there to be a concealment offense in violation of § 1001(a)(1), yet the government failed to identify a legal disclosure duty except by reference to vague standards of conduct for government employees.").[6]

---

[6] Marjorie Adams went out of her way to opine that "Benistar can't go, you know, buy an office building and say, Joe's going to get three percent. It has to be in an account." Tr.5:129 (Adams). The government latched onto this improper lay opinion testimony in violation of Fed. R. Evid. 701 by arguing that "[a]s Marjorie Adams testified - - you may recall that she said that Benistar couldn't take the money and go buy a building with it. A building is an

Because Mr. Carpenter was under no duty to disclose his investment strategy, the express terms of the agreements giving BPETCO unfettered "discretion" to "invest" the funds are not magically transformed into misleading half-truths simply because the Exchangors were not told, *and did not even ask*, how their funds were being invested. See Tr.11:95 (Paley was "never asked by any of the exchangors specifically how their funds were going to be invested."); United States v. Woodward, 469 U.S. 105, 108 (1985) (per curiam) (holding defendant has no duty to disclose information about which he is never asked). Because of the government's failure to allege, let alone prove beyond a reasonable doubt, that Mr. Carpenter had a legal duty to disclose his investment strategy, he cannot be held criminally liable for failing to satisfy a non-existent duty of disclosure.

### E.  Acquittal is Mandated Under the Double Jeopardy Clause.

Prior to the second trial, Mr. Carpenter filed a motion to dismiss the indictment based on double jeopardy grounds, Dkt. #275, which was denied. Dkt. #302. Based on the government's evidence and arguments in the second trial, however, Mr. Carpenter's rights under the Double Jeopardy Clause have clearly been violated. After jeopardy attached in the first trial, and after the close of all the evidence, the Court determined that the evidence was insufficient to find that Paley was Mr. Carpenter's agent. 7/25/05 Tr. Charging Conf. at 45.[7]

---

investment, but they couldn't go do that." Tr.13:54 (AUSA Pirozzolo closing). Both characterizations are incorrect as well as improper and misleading. There is no prohibition against BPETCO acquiring real estate with Exchangor funds—in fact, that is precisely what a "reverse exchange" entails—which was the subject of the alleged July 2000 telephone conversation that Adams claims she had with Mr. Carpenter. Tr.5:80 (Adams). In a reverse exchange, which Adams described as "when you purchase the new property first," id., BPETCO would hold title to the "new" property (*i.e.*, a building) while waiting for Iantosca to sell the "old" property. Adams is clearly misinformed, and certainly not a § 1031 expert as the government claimed her to be in its improper and prejudicial closing argument. Furthermore, BPETCO could have easily purchased shares of REITs (real estate investment trusts) in the securities accounts at both brokerage firms.

[7] THE COURT: "I don't think there is enough, even the evidence of general supervision or decision-making, is enough to connect any statement by Mr. Paley . . . with Mr. Carpenter." Id.

15

Thus, Mr. Carpenter received the functional equivalent of an acquittal on this key issue in the first trial. See Richardson v. United States, 468 U.S. 317, 325 n.5 (1984) ("a trial court's finding of insufficient evidence also is the equivalent of an acquittal."); Serfass v. United States, 420 U.S. 377, 392 (1975) ("The word [acquittal] has no talismanic quality for purposes of the Double Jeopardy Clause.").

In the second trial, however, the government's evidence and argument placed a heavy emphasis on proving that Paley was acting throughout as Mr. Carpenter's agent, even though the Court had previously ruled in the first trial there was insufficient evidence of agency. Since the indictment did not charge a conspiracy, the only way for the government to link any of the charged criminal conduct in the case to Mr. Carpenter was by proving that Paley was acting as Mr. Carpenter's agent. Although Paley was obviously acting as BPETCO's agent, Mr. Carpenter had already prevailed on the issue of whether Paley was acting as *Mr. Carpenter's* agent. Thus, a guilty verdict predicated on the jury's implicit finding in the second trial that Paley was acting as Mr. Carpenter's agent violates Mr. Carpenter's rights under the Double Jeopardy Clause.

> THE COURT: The question is: Why are statements attributed to Paley attributable to the defendant?
>
> AUSA MITCHELL: *He was acting as an agent, for one thing*.
>
> THE COURT: What will the evidence of that be?
>
> AUSA MITCHELL: He worked for Benistar, he answered directly to Dan Carpenter in conducting a 1031 property exchange business, and so, I mean - - that alone establishes that he was - - *he was an agent of Dan Carpenter*. It is that simple.

Tr.2:106-07 (emphasis added).[8]

---

[8] BPETCO manager Linda Jokinen testified that "Benistar was the parent company" of BPETCO. Tr.4:40 (Jokinen). However, a parent-subsidiary relationship between two corporations, by itself, does not make an officer of a subsidiary the agent of an officer of the parent. Nor does the mere fact that Paley was president and Mr. Carpenter was chairman of BPETCO, Tr.10:115 (Paley), make one the agent of the other. In fact, in the first trial,

*       *       *

> AUSA PIROZZOLO (closing argument): Mr. Paley played a direct role in this case as the evidence shows. As he testified, *he was Mr. Carpenter's mouthpiece* for - - to the exchangors; he is the one who - - *he is the one who spoke to the exchangors on Mr. Carpenter's behalf* . . . he went on and took these people's money telling them the same things *Mr. Carpenter authorized him to say* without telling them what was actually going on.

Tr.13:68 (emphasis added).[9] Because Mr. Carpenter had already prevailed on this issue in the first trial, such a result clearly violates the collateral estoppel and res judicata prongs of the Double Jeopardy Clause.

"Collateral estopppel, in the criminal context, is one part of the Fifth Amendment's guarantee against double jeopardy." United States v. Benkahla, 2008 WL 2486741, *4 (4th Cir. Jun. 23, 2008). "[T]he rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. . . . The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." Ashe v. Swenson, 397 U.S. 436, 444 (1970) (quotation omitted). The inquiry must focus on whether "certain facts were necessarily determined in the first trial" that "constituted ultimate issues" in the second. United States v. Yearwood, 518 F.3d 220, 229 (4th Cir. 2008) (quotation omitted).

The Court already determined in the first trial that the evidence was insufficient to prove that Paley was acting as Mr. Carpenter's agent. Under the doctrine of collateral estoppel, an acquittal is required because the only way the government was able to obtain a guilty verdict in the second trial was to prove and argue that Paley was Mr. Carpenter's agent or "mouthpiece."

---

Jokinen testified that she did **not** consider Mr. Carpenter "to be [her] boss," and that Paley treated "BPETCO as if it was his own company." July 2005 Tr.3:60 (Jokinen).

[9] The evidence directly contravenes this argument, as Paley testified that Mr. Carpenter did not direct him (Paley) to say *anything* to the Exchangors. Tr.11:98 (Paley).

See, e.g., Tr.13:46 (AUSA Pirozzolo). The "issue of ultimate fact," *i.e.*, whether Paley was acting as Mr. Carpenter's agent, was resolved in the first trial and then reopened in the second. Both trials involved an "identical issue" that was "necessarily adjudicated" in Mr. Carpenter's favor in the first. The conclusion is unavoidable that the collateral estoppel prong of the Double Jeopardy Clause mandates a judgment of acquittal.

The Double Jeopardy Clause also embodies the doctrine of res judicata "Where a criminal charge has been adjudicated upon by a court having jurisdiction to hear and determine it, that adjudication . . . is final as to the matter so adjudicated upon, and may be pleaded in bar to any subsequent prosecution for the same offense." United States v. Oppenheimer, 242 U.S. 85, 88 (1916); see also Sealfon v. United States, 332 U.S. 575, 578 (1948) ("res judicata may be a defense in a second prosecution. That doctrine applies to criminal as well as civil proceedings."). In Sealfon, the Supreme Court held that the defendant's acquittal on a charge of conspiracy to defraud precluded a subsequent prosecution for aiding and abetting the same fraud. Id. at 580. "The earlier verdict precludes a later conviction of the substantive offense. The basic facts in each trial were identical." Id. The Court concluded that the first jury's acquittal on the conspiracy count could only have been based on a finding that the alleged illegal agreement did not exist. The Court thus determined that Sealfon's conviction on the substantive charge depended upon a fact necessarily adjudicated in his favor at the first trial and, therefore, reversed his conviction because the "basic facts in each trial were identical." Id. at 580. The same situation exists here with respect to the government's assertion that Paley was Mr. Carpenter's agent. Because Mr. Carpenter had earlier prevailed on this claim in the first trial, he cannot be subject to a second prosecution that seeks to establish the same claim. See

United States v. DeAngelo, 138 F.2d 466, 468 (3d Cir. 1943) ("a prior judgment of acquittal on related matters has been said to be conclusive as to all that the judgment determined.").

F.      **There is a Gaping Void in the Government's Proof as to Causation.**

The government sought to prove the existence of a scheme to defraud primarily through the testimony of, and documents introduced through, David Patterson. All of such testimony and documents related to acts of Mr. Carpenter which occurred at BPETCO's inception in October 1998. Tr.12:13-85 (Patterson); Exs. 62, 135-36, 138-43, 333. However, the grand jury decided to limit the ambit of criminality (*i.e.*, the period in which Mr. Carpenter harbored the specific intent to defraud) to the period of August-December 2000. This is a fatal defect in the government's proof (more like a gaping void), because a crime cannot occur if its actus reus (*i.e.,* setting up BPETCO and/or speaking with Patterson) occurred two years before the defendant is alleged to have formed the mens rea to commit the crime. Had the government charged a conspiracy between Mr. Carpenter and Paley, then this gaping void in causation could have been bridged. The government's failure to do so, however, constitutes a fatal defect from which its case cannot recover.

The suggestion that a defendant can commit a criminal act at one point in time and then, two years later, have the requisite mental state for that earlier act also violates the basic axiom of criminal law known as the Principle of Concurrence. This principle mandates that the actus reus (evil act) and the mens rea (evil mind) concur simultaneously. See Paul H. Robinson, Criminal Law § 4.1 at 217 (1997) (concurrence requirement "means that the required culpability as to the element must exist at the time of the conduct constituting the offense."); United States v. Bailey, 444 U.S. 394, 402 (1980) ("Criminal liability is normally based upon the concurrence of two factors, 'an evil-meaning mind [and] an evil-doing hand.'") (quotations

19

omitted); <u>Dixon v. United States</u>, 548 U.S. 1, 6-7 (2006) (same).  Relying upon acts committed two years before the grand jury alleged Mr. Carpenter had the specific intent to defraud clearly violates the Principle of Concurrence.[10]

## IV.     CONCLUSION.

In light of the foregoing, this Court should enter a judgment of acquittal as to all counts of the indictment or, alternatively, as to 15 of the 19 counts.

                             RESPECTFULLY SUBMITTED,
                             DANIEL E. CARPENTER,
                             By his attorney,


                             <u>/s/ Jack E. Robinson</u>
                             Jack E. Robinson
                             (BBO #559683)
                             2187 Atlantic Street, Suite 905
                             Stamford, CT 06902
                             (203) 425-4500

Dated:  July 3, 2008


## CERTIFICATE OF SERVICE

I hereby certify that on the date hereof this document was filed through the Court's CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).


                             <u>/s/ Jack E. Robinson</u>
                             Jack E. Robinson

---

[10] Concurrence and causation have temporal limits, as Justice Scalia noted in his concurrence in <u>Holmes v. Sec. Investor Protection Corp.</u>, 503 U.S. 258, 287 (1992) (Scalia, J., concurring) ("'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith."). <u>See also</u> <u>United States v. Maali</u>, 358 F. Supp. 2d 1154, 1159-60 n.3 (M.D. Fla. 2005) ("For want of a nail the shoe was lost.  For want of a shoe the horse was lost.  For want of a horse the rider was lost.  For want of a rider the battle was lost.  For want of a battle the kingdom was lost.  And all for the want of a horseshoe nail.").

20