UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

)
UNITED STATES OF AMERICA     )
)
    v.     )     CRIMINAL NO. 04-10029-GAO
)
DANIEL E. CARPENTER     )
)

---

**DEFENDANT'S SUPPLEMENTAL MOTION FOR A NEW TRIAL**

Defendant Daniel E. Carpenter respectfully moves, pursuant to Fed. R. Crim. P. 33(a), to set aside the jury verdict and grant a new trial in the interest of justice for the additional reasons that: (1) the jury should have been instructed on venue; (2) the admission of the testimony of Joseph Iantosca and Linda Jokinen violated the hearsay rule as well as Mr. Carpenter's rights under the Confrontation Clause of the Sixth Amendment; and (3) the government's evidence and argument resulted in a constructive amendment and/or material variance with respect to the superseding indictment ("indictment").

**ARGUMENT**

**THE VERDICT SHOULD BE SET ASIDE AND A NEW TRIAL GRANTED**

**A.**     **Legal Standard**

A new trial is appropriate where the Court "finds that the verdict is contrary to the weight of the evidence" and where "the court believes a miscarriage of justice may have occurred." United States v. Smart, 501 F.3d 862, 865 (8th Cir. 2007) (quotations omitted). See also United States v. Andrade, 94 F.3d 9, 14 (1st Cir. 1996) (same). "A district court's power to order a new trial is greater than its

power to grant a motion for acquittal." United States v. Montilla-Rivera, 115 F.3d 1060, 1064 (1st Cir. 1997). "Motions for a new trial are directed to the discretion of the trial court. In considering such a motion, the court has broad power to weigh the evidence and assess the credibility of . . . the witnesses who testified at trial." United States v. Rothrock, 806 F.2d 318, 321 (1st Cir. 1986) (affirming grant of new trial even though judgment of acquittal was reversed). Even though granting the motion could result in a *third* trial in this case, the requirements for a new trial are persuasively satisfied.

**B.     The Jury Should Have Been Instructed on Venue.**

Prior to the second trial, Mr. Carpenter moved unsuccessfully to dismiss Count 4 for "an obvious lack of venue." Dkt. #277. Furthermore, in light of this Court's earlier decision regarding venue, see United States v. Carpenter, 405 F. Supp. 2d 85, 88-91 (D. Mass. 2005), Mr. Carpenter limited his proposed jury instruction on venue (Dkt. #276; Instr. #24) to the wire fraud counts (Counts 1-14).

During the second trial, Mr. Carpenter stipulated that venue was proper in the District of Massachusetts as to the five mail fraud counts (Counts 15-19) and two of the wire fraud counts (Counts 3 and 14). Dkt. #280. Mr. Carpenter, however, generally placed venue in issue during the second trial. See Tr.10:38 (AUSA Mitchell confirming Mr. Carpenter has "put [venue] in as an issue.").[1] See also Carpenter, 405 F. Supp. 2d at 88 ("Carpenter has persistently maintained an

---

[1] For example, Mr. Carpenter's counsel asked the following question of an Exchangor:
Q: And the monies that were referred to on direct examination, those monies were sent by you from New Hampshire to a Merrill Lynch account in Pennsylvania, is that right?
A: That's correct.
Tr.6:59 (Bellemore). [Citations to the trial transcript reflect the day and page number.]

objection to venue in this District."). Further confirmation that Mr. Carpenter placed venue in issue is that the government was forced to introduce into evidence several venue exhibits through its summary fact witness (Zappala) in an attempt to carry its burden of proving venue as to each count. Tr.10:39 (Zappala); Exs. 214-19, 221-26. See also United States v. Salinas, 373 F.3d 161, 163-64 (1st Cir. 2004) ("the government must prove by a preponderance of the evidence that venue is proper *as to each individual count* . . . The criminal law does not recognize the concept of supplemental venue.") (emphasis added).

Mr. Carpenter agreed to the venue stipulation only because of this Court's earlier decision on the matter and the Court's announcement prior to the opening statements that it would adhere to its earlier decision and *not* submit the issue of venue to the jury. Tr.1:182, 183 (The Court). Had the Court expressed a different inclination, either prior to or during the second trial, then Mr. Carpenter obviously would not have agreed to the stipulation or limited his proposed jury instruction just to the wire fraud counts. Thus, in the interest of justice and notwithstanding the stipulation and the proposed instruction, a new trial should be granted as to *all* counts of the indictment.[2]

During the charging conference, the Court reconfirmed that it was not "inclined" to instruct the jury on venue. Tr.12:163, 164 (The Court). Interestingly, the *government* specifically requested, as part of a "belt and suspenders" approach,

---

[2] Had the jury been properly instructed on venue, it could have decided to acquit Mr. Carpenter on *all* counts solely on venue—even if it found the existence of a fraudulent scheme—because there is no conspiracy charge and it is undisputed that all of Mr. Carpenter's conduct occurred in the District of Connecticut and/or the Southern District of New York.

"to submit [venue] to the jury." Tr.12:163 (AUSA Mitchell). Thus, both the defendant and the government are on record requesting that the jury be instructed on venue. However, keeping with its earlier decisions, the Court declined to do so. Tr.13:26-41, 120-42 (The Court). Although, as in the first trial, the Court determined that venue was an issue for the Court to decide rather than the jury, Tr.10:36; 12:164 (The Court), Mr. Carpenter respectfully submits that the weight of authority suggests a different result. Consequently, a new trial is warranted.

All of the circuits that have considered the issue have held, based on one formulation or another, that the jury must be instructed on venue when the defendant requests an instruction and places venue in issue—as occurred here. See United States v. Grammatikos, 633 F.2d 1013, 1022 (2d Cir. 1980);[3] United States v. Perez, 280 F.3d 318, 327 (3d Cir. 2002); United States v. Ebersole, 411 F.3d 517, 526 n.10 (4th Cir. 2005); United States v. Winship, 724 F.2d 1116, 1125-27 (5th Cir. 1984); United States v. Massa, 686 F.2d 526, 530-31 (7th Cir. 1982); United States v. Moeckly, 769 F.2d 453, 461 (8th Cir. 1985); United States v. Casch, 448 F.3d 1115, 1117 (9th Cir. 2006) ("In a jury trial, it is not for the court to determine that venue exists, and it is error for the court to decline to give the instruction."); United States v. Miller, 111 F.3d 747, 753-54 (10th Cir. 1997); United States v. Haire, 371 F.3d 833, 840 (D.C. Cir. 2004), vacated on other grounds, 543 U.S. 1109 (2005). The Supreme Court has recently declined an invitation to speak on the matter. See United States v. Muhammad, 502 F.3d 646,

---

[3] The Second Circuit has had a recent opportunity to revisit this issue, but declined to do so. See United States v. Rommy, 506 F.3d 108, 119 n.5 (2d Cir. 2007), cert. denied, 128 S. Ct. 1681 (2008).

656 (7th Cir. 2007), <u>cert. denied</u>, 128 S. Ct. 1104 (2008) ("we agree with our sister circuits that, in a case such as this one, the best practice would have been to give a venue instruction."). The clear weight of authority is that, under one formulation or another, when a defendant requests a jury instruction on venue and places venue in issue, the instruction should be given.[4] Consequently, a new trial on *all* counts of the indictment is warranted for lack of a venue instruction.

**C.    Admission of Jokinen and Iantosca Testimony Violated the Hearsay Rule and the Confrontation Clause.**

The government filed a motion *in limine* to admit the prior trial testimony of Linda Jokinen and Joseph Iantosca. Dkt. #249. Mr. Carpenter filed written objections based on hearsay and Confrontation Clause grounds. Dkt. #257, #279. The government's motion was ultimately granted. Tr.2:56; Tr.3:12 (The Court). As a result, the government was allowed to read into the record, in front of the jury, certain testimony of these witnesses (subject to specific objections) and introduce numerous exhibits through Jokinen. Tr.4:36-116 (Jokinen); Tr.6:4-12 (Iantosca).

Mr. Carpenter conceded that both witnesses were unavailable to testify at the second trial due to death (Jokinen) or mental illness (Iantosca). FRE 804(a)(4). Thus, the sole issue for hearsay purposes is whether Mr. Carpenter had "an opportunity and similar motive" to develop their prior testimony. FRE 804(b)(1). Based on the evidence admitted in the second trial and the changed circumstances,

---

[4] Since this Court's 2005 opinion on the issue, no court has cited the opinion in support of a similar finding. However, it is still true that "the question of whether a judge or jury should resolve the venue issue remains open, at least in this Circuit [and the Sixth and Eleventh Circuits]." <u>Carpenter</u>, 405 F. Supp. 2d at 90.

Mr. Carpenter would have employed a different theory of cross-examination pursuant to a dissimilar motive than existed at the first trial in July 2005. Thus, <u>all</u> of the testimony of Jokinen and Iantosca should have been excluded as not falling within a hearsay exception.

"For purposes of Rule 804(b)(1), we focus narrowly on a party's motive and opportunity to develop particular testimony on a particular issue. The party against whom the prior testimony is offered must have had a *similar*, not necessarily an *identical*, motive to develop the adverse testimony in the prior proceeding." <u>United States v. Bartelho</u>, 129 F.3d 663, 671 (1st Cir. 1997) (quotations and citation omitted) (emphasis in original). The "similar motive" inquiry "requires scrutiny of the factual and procedural context of each proceeding to determine both the issue in dispute and the intensity of interest in developing the particular issue by the party against whom the disputed testimony is offered." <u>Id.</u> at 672.

As Mr. Carpenter's opposition to the government's motion *in limine* set forth, the witnesses' prior testimony occurred during the first trial in July 2005. However, in December 2005, BPETCO was awarded $12.5 million in an arbitration proceeding against PaineWebber. That award was affirmed and a judgment was entered in BPETCO's favor in New York state court in April 2007. In April 2008, PaineWebber agreed to abandon its appeal of the judgment and, pursuant to a settlement agreement and related documents executed by Mr. Carpenter, he forced PaineWebber to pay the $12.5 million directly to the Exchgangors. In light of

these subsequent events, Mr. Carpenter's motive and ability to effectively cross-examine the witnesses in June 2008 was substantially different than it had been three years prior in July 2005. At the first trial, Mr. Carpenter had no other party upon whom he could credibly place the blame for the Exchangors' losses. However, by the time of the second trial, not only could he lay the blame where it truly belonged—squarely at the feet of PaineWebber—but he could also develop the testimony that the Exchangors in general, and Iantosca in particular, had been made whole (and then some) on their $9 million in losses.

Mr. Carpenter's inability to inquire regarding the repayment of the funds is a critical factor, in light of how all of the government's "loss" evidence impermissibly leaked into the second trial. For example, the government ended its Iantosca testimony as follows:

> AUSA MITCHELL: Do you remember how much money you gave Benistar?
>
> IANTOSCA (as read): The amount, I don't remember; it must have been in the millions of dollars.
>
> AUSA MITCHELL: The millions of dollars.
>
> IANTOSCA (as read): Yes.

Tr.6:11-12 (Iantosca). Obviously, had Iantosca been available at the second trial, Mr. Carpenter had a strong motive to inquire as to the issue of full repayment of the "millions of dollars" Iantosca "gave Benistar." This is a motive that is substantially and materially different from the motive and opportunity that existed in July 2005, when neither the PaineWebber award nor the repayment had yet materialized.

For similar reasons, Mr. Carpenter did not have the same opportunity and motive in the first trial to cross-examine Jokinen regarding the PaineWebber award and the repayment of the Exchangors' funds as he did in the second trial. However, there are additional reasons why the opportunity and motive were substantially different in June 2008 than in July 2005 with respect to Jokinen. In the first trial, the government did not attempt, and in fact abandoned, its efforts to prove that Paley was acting as Mr. Carpenter's agent. See Carpenter, 405 F. Supp. 2d at 95 n.6 ("His conviction rests on his own acts, not on Paley's attributed to him."). In the second trial, however, the government's entire case was predicated on establishing that Paley was in fact acting as Mr. Carpenter's agent (*i.e.*, "mouthpiece") and under his direction. This was a critical area which merited further cross-examination in light of the evidence and the government's theory in the second trial.

For example, when the government asked Jokinen at trial who owned and controlled BPETCO, she answered (or implied) that Mr. Carpenter did. Tr.4:39-40 (Jokinen). However, in Jokinen's March 30, 2001 civil deposition ("Jokinen Dep."), which was taken just two months after the events at issue in this case, she bristled when it was merely suggested that Mr. Carpenter was her boss:

Q: Did you understand what Daniel Carpenter's role was at the company?

A: Benistar Property Exchange. As far as I knew, he handled, he just handled the escrow accounts. He didn't process exchanges.

Q: *And did you understand that he was your boss?*

A: *He was not my boss . . . I worked for Martin Paley.*

Jokinen Dep. at 19 (emphasis added).  Given the government's new theory at the

second trial that Paley was Mr. Carpenter's agent, Mr. Carpenter had a much

different motive this time around to impeach Jokinen's testimony on this issue if

she had been available.

Another example of a different motive is that during Jokinen's prior trial

testimony, she suggested Mr. Carpenter had substantial authority over BPETCO's

operations:

> AUSA PIROZZOLO:  During the time that you worked at Benistar Property
> Exchange, did Mr. Carpenter have final approval authority over the
> operations at Benistar Property Exchange?
>
> JOKINEN (as read):  Yes.
>
> AUSA PIROZZOLO:  Was his authority greater or less than that of Marty
> Paley?
>
> JOKINEN (as read):  Greater.

Tr.4:47-48 (Jokinen).  However, in 2001, Jokinen gave a much different description

of Mr. Carpenter's role at BPETCO:

> Q:  Did Daniel Carpenter do work for Benistar Property Exchange?
>
> A:  All he did was handle the money and as far as the escrow account.
>
> Q:  Was it your understanding that he was serving in this role as an
> employee of the company?
>
> A:  No.
>
> Q:  Why would he handle the money for a company he didn't work for?
>
> A:  It was a business relationship.
>
> Q:  What company did Daniel Carpenter work for?

A:  I don't know.

Jokinen Dep. at 20-21.  At the second trial, Mr. Carpenter would have had a

completely different motive to cross-examine Jokinen on the issue of who really

ran BPETCO's operations.[5]

Another example is prior testimony regarding the source of BPETCO's

agreements.  Jokinen's testimony (as read) at trial states that she obtained

BPETCO's agreements "[f]rom Daniel Carpenter."  Tr.4:60 (Jokinen).  In 2001,

however, Jokinen testified that she obtained the agreements from Nationwide's

president Thomas Bottenberg:

> Q:  Who created the exchange documents?
>
> A:  Are you asking about the Benistar Property Exchange documents?  We were given a set of documents to revise for our use from Tom Bottenberg.

Jokinen Dep. at 42.

*        *        *

> Q:  Do you know how Benistar Property came to obtain this form of exchange agreement?
>
> A:  Yes.
>
> Q:  How?
>
> A:  Tom Bottenberg sent us boilerplate documents and we revised them to suit Benistar Property Exchange.

---

[5] Similarly, Jokinen's trial testimony gave the impression that she had numerous discussions and substantive interactions with Mr. Carpenter regarding documents, communications, and procedures.  See, e.g., Tr.4:100 (Jokinen) ("Q: To whom did you send this particular fax?  A: To Daniel Carpenter.").  In 2001, however, she testified that she would speak to Mr. Carpenter "[n]ot very" often, Jokinen Dep. at 18, and "we rarely had occasion to have a conversation ourselves" on business or personal matters.  Id. at 135.

> Q: Okay. So this is similar to the exchange agreement that was utilized with Nationwide?
>
> A: Yes.

Jokinen Dep. at 155. Obviously, Mr. Carpenter would have had a completely different motive to develop this testimony at the second trial.

An even more critical example is that Paley testified at the second trial that he did *not* use an escrow agreement at Nationwide, but that BPETCO *did* use an escrow agreement because "Dan Carpenter thought it was a good idea," and that he (Carpenter) actually "wrote" the escrow agreement. Tr.11:15-16 (Paley).[6] In 2001, however, Jokinen testified that the escrow agreement **came from Nationwide**:

> Q: Directing your attention to the next document, the escrow agreement is the, is your testimony the same with regard to the escrow agreement, that it was a document that was forwarded by Mr. Bottenberg that was modified to suit Benistar Property?
>
> A: Yes.

Jokinen Dep. at 155-56.

Because at the second trial Mr. Carpenter clearly had a much greater "intensity of interest in developing the particular issue[s]," Bartelho, 129 F.3d at 672, the prejudicial admission of the Jokinen and Iantosca testimony as exceptions to the hearsay rule warrants a new trial.

Aside from the evidentiary problem, admission of the Jokinen and Iantosca testimony violated Mr. Carpenter's rights under the Confrontation Clause of the

---

[6] Throughout its closing argument, the government placed substantial emphasis on the "evidence" that Mr. Carpenter was responsible for creating the escrow agreement. See, e.g., Tr.13:52 (AUSA Pirozzolo: "He didn't put any of these [option] warnings into the Escrow Agreement.").

Sixth Amendment, as delineated in <u>Crawford v. Washington</u>, 541 U.S. 36, 42

(2004) (holding that the Confrontation Clause prohibits the admission of out-of-

court statements that are testimonial in nature unless the declarant is unavailable

and the defendant had a prior opportunity to cross-examine the declarant

concerning the statements).  As described above, the changed facts, circumstances,

opportunity, and motive from the first trial did not give Mr. Carpenter the right to

effective cross-examination.  Thus, <u>Crawford</u> applies barring the testimony under

the Confrontation Clause.

**D.    Government's Evidence and Argument Resulted in a Constructive Amendment and/or Material Variance.**

The indictment alleged that the Exchangors were fraudulently induced to

utilize the services of Benistar Property Exchange Trust Co., Inc. ("BPETCO") as a

qualified intermediary by *affirmative* written and oral misrepresentations.

Indictment ¶ 27.  At trial, however, instead of evidence of misrepresentations

(written or oral), the government offered evidence and argument only of *omissions*,

related *half-truths*, and *nondisclosure* (*i.e.*, failing to inform the Exchangors that

their funds would be invested in stock options).  <u>See</u>, <u>e.g.</u>, Tr.13:112 (AUSA

Mitchell rebuttal: "There was no description, no notice at all that he was about to -

- that he was using exchangor money in the options market.").  Aside from the

government's failure to prove that Mr. Carpenter had a legal duty to disclose how

he was investing the funds (requiring a judgment of acquittal), the indictment has

been constructively amended and/or a material variance between the indictment

and proof affecting Mr. Carpenter's substantial rights has occurred, because the

indictment does not contain the "full-scale" omissions/nondisclosure theory of liability proved and argued by the government at trial.  Thus, a new trial is warranted.

The Presentment Clause of the Fifth Amendment provides that "[n]o person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S. Const. amend. V.  Accordingly, "after an indictment has been returned[,] its charges may not be broadened through amendment except by the grand jury itself."  Stirone v. United States, 361 U.S. 212, 215-16 (1960).  "An indictment has been constructively amended in violation of the Presentment Clause when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them."  United States v. Fornia-Castillo, 408 F.3d 52, 66 (1st Cir. 2005).  "Constructive amendment is a *per se* violation of the Fifth Amendment." United States v. Milstein, 401 F.3d 53, 65 (2d Cir. 2005).  "Any broadening of the possible bases for conviction from that which appeared in the indictment is fatal." United States v. Leichtman, 948 F.2d 370, 377 (7th Cir. 1991).  A material variance occurs, on the other hand, "when the charging terms remain unchanged but when the facts proved at trial are different from those alleged in the indictment."  United States v. Fisher, 3 F.3d 456, 462 (1st Cir. 1993).  "A constructive amendment is considered prejudicial *per se* and grounds for reversal of a conviction.  Variance is grounds for reversal only if it affected the defendant's 'substantial rights'—*i.e.*, the rights to have sufficient knowledge of the charge

against him in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense." United States v. DeCicco, 439 F.3d 36, 43 (1st Cir. 2006) (citation omitted).

The Court rejected Mr. Carpenter's argument on this issue after the first trial because it held that "the fraudulent scheme alleged in the indictment included the 'omission' to clarify the half-truths that the defendant directed toward the exchangors." Carpenter, 405 F. Supp. 2d at 92.  However, during the second trial, concealment of material facts and omissions regarding half-truths gave way to full-scale omissions equal to silence. See, e.g., Tr.11:64-65 (Paley).  Moreover, there was no evidence offered that Mr. Carpenter had a legal duty to disclose how he was investing the funds.  If the government wanted to prove a full-scale omissions case, it should have charged one.  Instead, it charged an affirmative misrepresentation and half-truth case, found during trial that there were no affirmative misrepresentations or half-truths (either in the BPETCO written materials or in Paley's oral statements to the Exchangors), and instead shifted to a full-scale omissions (i.e., silence) case, without alleging in the indictment that Mr. Carpenter had a duty to speak regarding his investment strategy. See United States v. Yefsky, 994 F.2d 885, 893 (1st Cir. 1993) (holding mail fraud count did not provide adequate notice and was therefore defective because it did not specify false pretenses used); United States v. Cassiere, 4 F.3d 1006, 1022 (1st Cir. 1993) (holding silence can constitute fraud only where there is a duty to disclose).

"The government alleged it . . . and it must be charged with proving it." United States v. Cancelliere, 69 F.3d 1116, 1122 (11th Cir. 1995). Here, the government alleged it, found that it could not be proved, and then shifted to something which could be proved. This is impermissible and constitutes a constructive amendment and/or a material variance affecting substantial rights warranting a new trial. See United States v. Russell, 369 U.S. 749, 766 (1962) ("A cryptic form of indictment in cases of this kind requires the defendant to go to trial with the chief issue undefined. It enables his conviction to rest on one point and the affirmance of the conviction to rest on another. It gives the prosecution free hand on appeal to fill in the gaps of proof by surmise or conjecture.").

## CONCLUSION

For the foregoing reasons, Mr. Carpenter's motion for a new trial on all counts of the indictment should be granted.

RESPECTFULLY SUBMITTED,
DANIEL E. CARPENTER,
By his attorney,


*/s/ Jack E. Robinson*
Jack E. Robinson
(BBO #559683)
2187 Atlantic Street, Suite 905
Stamford, CT 06902
(203) 425-4500

Dated: July 3, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date hereof this document was filed through the Court's CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).


*/s/ Jack E. Robinson*
Jack E. Robinson