**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                        ) | CRIMINAL NO. 04-10029-GAO |
| ) | |
| DANIEL E. CARPENTER,       ) | |
| ) | |
| Defendant.            ) | |
| ) | |

**DEFENDANT DANIEL E. CARPENTER'S REPLY MEMORANDUM IN SUPPORT OF**
**MOTION FOR DECLARATION OF MISTRIAL**

In an effort to obtain the conviction of defendant Daniel E. Carpenter at any cost, the

government made a strategic decision to violate Mr. Carpenter's constitutional rights in violation

of the Due Process Clause of the Fifth Amendment, by knowingly sponsoring, using, and failing

to correct the patently false and perjurious testimony of key Merrill Lynch witness Gerald Levine

("Levine").  The government's knowing use and exploitation of Levine's false and perjured

testimony violates over 70 years of Supreme Court precedent in this area.  See Mooney v.

Holohan, 294 U.S. 103 (1935) (per curiam); Napue v. Illinois, 360 U.S. 264 (1959); Giglio v.

United States, 405 U.S. 150, 154 (1972).  Viewed in conjunction with other egregious

prosecutorial misconduct in this case,[1] and the fact that this is the second time in which

prosecutorial misconduct has polluted the trial of this case, once a mistrial is declared, the

superseding indictment should be dismissed with prejudice.

---

[1] See, e.g., Defendant's (Corrected) Motion In Support Of Its Motion For Judgment Of Acquittal Pursuant To Fed.
R. Crim. P. 29 (c) And, In The Alternative, For A New Trial Pursuant To Fed. R. Crim. P. 33(a), filed 7/3/2008,

I.      **INTRODUCTION**

A.      **Constitutional Background**

Over 70 years ago, the Supreme Court held in <u>Mooney</u> that "the presentation of

testimony known to be perjured" is "inconsistent with the rudimentary demands of justice" and

thus violates Due Process, a term said to embody "the fundamental conceptions of justice which

lie at the base of our civil and political institutions."  <u>Mooney</u>, 294 U.S. at 112.  Over the years,

the Court has built on and repeatedly cited <u>Mooney</u> as authoritative.  Thus, in <u>Pyle v. Kansas</u>,

317 U.S. 213, 215-16 (1942), the Supreme Court held that allegations that a prosecutor's

knowing use of perjured testimony and suppressed evidence stated a Due Process violation.

Fifteen years later, applying the general principles laid down in <u>Mooney</u> and <u>Pyle</u>, the Supreme

Court granted a habeas petition, holding that a prosecutor must not only refrain from soliciting

perjured testimony but must also correct testimony known to be perjured.  <u>Alcorta v. Texas</u>, 355

U.S. 28, 30-31 (1957).  That principle was reaffirmed in <u>Napue</u>, and applied where the

prosecutor "did nothing to correct" a witness's testimony that created a false and misleading

impression (though not necessarily a perjured one), that the witness had received no promise of

consideration in return for his testimony.  <u>Mooney</u>, <u>Pyle</u>, and <u>Napue</u> were followed by and

formed the basis of the Supreme Court's holding in <u>Giglio v. United States</u>, 405 U.S. 150, 153-

54 (1972), that the prosecution's chief witness' uncorrected false testimony (undisclosed to the

defendant), that he had received no promises for prosecutorial leniency in exchange for his

testimony, violated Due Process and required a new trial.

The Supreme Court has emphasized that it is not just the defendant's rights that are at

stake when a prosecutor violates these principles.  In <u>United States v. Agurs</u>, 427 U.S. 97 (1976),

the Court recognized that presenting false testimony "involve[s] a corruption of the truth-seeking

function of the trial process." <u>Id.</u> at 107.  In <u>California v. Trombetta</u>, 467 U.S. 479 (1984), the

Supreme Court also recognized that a prosecutor has a "constitutional obligation to report" to

both the defendant and "to the trial court whenever government witnesses lie under oath." <u>Id.</u> at

485.  <u>See</u>, <u>e.g.</u>, <u>Mesarosh v. United States</u>, 352 U.S. 1 (1956) (reversing convictions based on

Solicitor General's motion and statements that government witness had committed perjury in

other proceedings).  The importance of prosecutorial veracity as a core value encompassed

within the Due Process Clause is also demonstrated in the Supreme Court's decisions holding

that a prosecutor's improper argument can violate the Due Process rights of a defendant.  <u>See</u>

<u>Miller v. Pate</u>, 386 U.S. 1 (1967) (finding that a deliberate misrepresentation of truth to a jury is

a violation of Due Process).

     Collectively, the "false testimony" and "improper argument" decisions of the Supreme

Court set a clear rule: a prosecutor's failure to correct false testimony creates an unacceptably

high risk to the integrity of the judicial process.  The remedy for such conduct was established in

<u>Mooney</u> and has been reiterated by the Supreme Court and the First Circuit several times.

Where the prosecution's case includes the knowing use of false and perjured testimony, reversal

is required "if there is any reasonable likelihood that the false testimony could have affected the

judgment of the jury." <u>United States v. Mangual-Garcia</u>, 505 F.3d 1, 9-10 (1st Cir. 2007)

(<u>quoting</u> <u>Giglio</u>, 405 U.S. at 154); <u>see also</u> <u>Agurs</u>, 427 U.S. at 103; <u>Kyles v. Whitley</u>, 514 U.S.

419, 433 n.7 (1995).

    **B.**    **Due Process Background**

     The Due Process Clause guarantees every defendant the right to a fair trial.  <u>Turner v.</u>

<u>Louisiana</u>, 379 U.S. 466, 471-72 (1965).  The Supreme Court has also emphasized that "because

the prosecutor is in a peculiar and very definite sense the servant of the law, the twofold aim of

which is that guilt shall not escape or innocence suffer . . . it is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate method to bring about one." Berger v. United States, 295 U.S. 78, 88 (1935); Stirone v. United States, 361 U.S. 212 (1960). The Constitution's "overriding concern [is] with the justice of the finding of guilt." Agurs, 427 U.S. at 112. The standard that this Court must apply in evaluating the prosecution's knowing use of perjured testimony has been set forth in a series of Supreme Court cases, culminating in United States v. Bagley, 473 U.S. 667 (1985). As the Court in Bagley succinctly stated:

> The rule that a conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict derives from Napue v. Illinois, 360 U.S. at 271, 79 S.Ct. at 1178. . . . [T]here [is] little, if any, difference between a rule formulated, as in Napue, in terms of "'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction,'" and a rule "'requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"

473 U.S. at 679 n.9 (quoting Chapman v. California, 386 U.S. 18, 24, (1967)); see also United States v. Kattar, 840 F.2d 118, 128 (1st Cir. 1988) (quoting Agurs 427 U.S. at 103 and Bagley, 473 U.S. at 680) (applying "a strict standard of materiality" in making the determination of whether "there is any reasonable likelihood that false testimony could have effected the judgment of the jury"). See also Agurs, 427 U.S. at 110, n.17 ("The principle is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused.") (quotations and citations omitted); cf. Schneble v. Florida, 405 U.S. 427, 432 (1972) (standard of harmless beyond a reasonable doubt required to determine if Constitutional error requires reversal of conviction).

The knowing use of perjured testimony implicates important Due Process interests, and therefore a "materiality" standard equivalent to the constitutional "harmless error beyond a reasonable doubt" rule applies.  Bagley, 473 U.S. at 679-80, and n.9.  As stated in Agurs, a prosecutor's failure to comply with a specific discovery request as in Brady v. Maryland, 373 U.S. 83 (1963), while constituting prosecutorial misconduct, is not as egregious as the knowing use of perjured testimony or false evidence, which is "a corruption of the truth-seeking function of the trial process."  427 U.S. at 104.

There is a fundamental difference between refusing to disclose information to the defense and presenting false evidence to the judge and jury.  But it is an equally fundamental principle of the adversary system **that neither side** may knowingly present false evidence to the court.  "The principle that [the government] may not knowingly use false evidence, including false testimony, to obtain a tainted conviction" is "implicit in any concept of ordered liberty."  Napue, 360 U.S. at 269.  In Napue's predecessor, Mooney, the Supreme Court explained:

> [D]ue process cannot be deemed to be satisfied if [the government] has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.  Such a contrivance by [the government] to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.

Mooney, 294 U.S. at 112.

It is for this reason that the result of a trial in which the government knowingly used perjured testimony will not be allowed to stand unless the government can show, beyond a reasonable doubt, that the perjury was "harmless" or immaterial.  Bagley, 473 U.S. at 679-80 and n.9.  Again, as the Supreme Court stated in Agurs, "[i]n th[e]se cases, the Court has applied a strict standard of materiality . . . because they involve a corruption of the truth-seeking function

of the trial process." 427 U.S. at 104. Such a strict standard serves several important interests.

It maintains public confidence in "[t]he untainted administration of justice." Mesarosh, 352 U.S.

at 14 (citation omitted). "The administration of justice must not only be above reproach, it must

be above the suspicion of reproach." Kyle v. United States, 297 F.2d 507, 514 (2d Cir. 1961)

(citation and quotation omitted); see Napue, 360 U.S. at 269-70. As one commentator has stated:

> Perjury or the possibility of perjury strikes at the heart of the
> judicial system in its role as finder of truth. When the prosecutor
> involves himself in perjury he lends official sanction to the fraud.
> The court must combat this threat to its own dignity and to the
> dignity of the criminal system or risk the possibility that the
> community will lose faith in the entire criminal process. Thus [a
> strict standard of materiality] provide[s] protection for the court
> and the legal system as well as for the defendant.

Note, *The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant*, 74 Yale L. J.

136, 138 (1964). The strict standard of materiality also helps deter prosecutors from using false

testimony by making it clear that their tactics, if discovered, will not bring them any advantage.

### C.    Factual Background

As discussed more fully below, the application of the standard discussed above warrants

"automatic reversal." United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991). Levine's

testimony was a critical component of the government's case, and arguably the most important

witness to Mr. Carpenter's defense, as Mr. Carpenter's sole interaction with any Exchangor or

Exchangor's adviser was with Patterson in October 1998. Levine's false and perjured testimony

regarding key issues tainted all of his testimony which, in turn, polluted the entire trial and the

judgment of the jury. See United States v. LaPage, 231 F.3d 488, 491 (9th Cir. 2000) (vacating

conviction where, unlike here, "in his rebuttal closing argument, the prosecutor conceded that

[the government's witness] had lied.").[2]  The government made a strategic decision to call Levine, whom the government knew—based on substantial documentary evidence and prior sworn testimony by himself and others—would commit perjury despite the government's previous knowledge of his false testimony, which went to the heart of Mr. Carpenter's Good Faith defense.

Levine lied about substantive facts, concerning telephone calls Levine said he never had, and concerning the faxed and mailed escrow and exchange agreements which Levine said he never received, all of which go to the heart of Mr. Carpenter's Good Faith defense.[3]

Instead of committing perjury, if Levine had simply admitted to the three telephone calls that he swore never occurred: (1) the Carpenter three-way conference call with Patterson; (2) the Patterson call to Levine; and (3) the Paley call to Levine and the exchange documents he received; then that would have established a rock-solid Good Faith defense.  But rather than tell the truth, Levine testified to self-serving and disparaging characterizations of Mr. Carpenter's trading, and statements allegedly made by Mr. Carpenter.

Levine was a key government witness providing testimony crucial to the government's case, and his false and perjured testimony calls into question the veracity of all of his testimony—including the incriminating and highly prejudicial statements allegedly made to him by Mr. Carpenter, two of which only Levine recounted.  As succinctly stated by the Ninth Circuit:

---

[2]  "Where the prosecutor knows that his witness has lied, he has a constitutional duty to correct the false impression of the facts.  Many prosecutors, when this occurs, interrupt their own questioning, and work out in a bench conference with the judge and defense counsel how to inform the jury immediately that the testimony is false."  Id. at 492.  Unfortunately, the prosecutors here did not take such remedial measures.

[3]  The communications involved, *inter alia*, three telephone calls: (1) the October 21, 1998 three-way Carpenter/Patterson/Levine conference call confirmed by Patterson; (2) the October 22, 1998 Patterson/Levine call confirmed by Patterson; and (3) the October 13, 1998 Paley/Levine call confirmed by Paley.  Patterson also faxed certain documents to Levine.

> All perjury pollutes a trial, making it hard for the jury to see the truth.
> No lawyer, whether prosecutor or defense counsel, . . . may knowingly
> present lies to a jury and sit idly by while opposing counsel struggles to
> contain this pollution of the trial.

LaPage, 231 F.3d at 492.  Levine is also a witness who had an obvious motive to lie, as his

conduct is at the center of the new civil trial between the Exchangors and Merrill Lynch.

In fact, the government ultimately conceded on Day 13 of the trial that Levine was not

credible as to whether he received the Carpenter/Patterson/Levine telephone call.  Calling

Levine to testify, when the government knew he would lie if asked about the communications.

but needed his testimony on the prejudicial statements Carpenter allegedly made to him, and

then calling Patterson to testify about those same communications, was a strategic decision by the

government which invited Levine's false and perjured testimony.  See ABA STANDARDS FOR

CRIMINAL JUSTICE, PROSECUTION FUNCTION § 3-1.2(c) and commentary thereto ("The duty of the

prosecutor is to seek justice not to merely convict."  "[I]t is fundamental that the prosecutor's

obligation is to protect the innocent, as well as to convict the guilty, to guard the rights of the

accused, as well as to enforce the rights of the public.").  As a consequence of the government's

indisputable misconduct, declaration of a mistrial should be "virtually automatic."  See Wallach,

935 F.2d at 456.

## II.     SUPPLEMENTAL FACTS

### A.     What the Government Knew Prior to Calling Levine to Testify As its Witness in the Federal Criminal Trial

Before the second trial in this case began in June 2008, the government had in its

possession the sworn testimony of Levine, Attorney David Patterson ("Patterson"), and Benistar

Property Exchange Trust Co., Inc. ("BPETCO") president Martin L. Paley ("Paley"), which was

provided at the May 2004 evidentiary hearing in the related state court civil case in which the

Exchangors were subsequently granted a new trial on their claims against Merrill Lynch.  See

<u>Cahaly v. Benistar Property Exchange Trust Co., Inc.</u>, 2004 WL 5031628 (Mass. Super. Ct Sep. 24, 2004) (the "<u>Cahaly</u> evidentiary hearing"). The key evidence at the <u>Cahaly</u> evidentiary hearing which resulted in the Exchangors obtaining a new trial against Merrill Lynch was provided by Patterson. The Patterson evidence was, in sum, that: (1) he had, in fact, communicated by telephone in a conference call initiated by Carpenter with Levine at Merrill Lynch; (2) he explained "to Levine, in a telephone conversation, both the nature of a § 1031 exchange and the fact that Patterson's client's funds would be held in escrow at Merrill Lynch in the Benistar account" and; (3) he had sent Levine the escrow and exchange documents. See also <u>Cahaly v. Benistar Property Exchange Trust Co., Inc.</u>, 451 Mass. 343, 362-366 and notes 45, 47 (May 8, 2008) (affirming allowance of Exchangors' motion for new trial against Merrill Lynch).[4]

At the <u>Cahaly</u> evidentiary hearing, Patterson testified that on or about October 21, 1998, he had a telephone call with Carpenter during which Carpenter conferenced in Levine. <u>Cahaly</u> Evid. Hrg. 5/19/04 at 16, 20-21.[5] Patterson had wanted to "make sure that there be a clear understanding that the funds be put in the proper kind of account with the proper signatories on the account . . . to make sure specifically that Merrill Lynch understood that these were escrow funds, and that they have a general understanding of how this transaction was meant to work." <u>Id.</u> at 20-21. During the course of a telephone call with Carpenter about "how the account would work at Merrill Lynch . . . how [it] was going to be set up, who the signatories were . . . and about the changes [Patterson] had made to the draft exchange agreement and escrow agreement," <u>id.</u> at 16, Carpenter told Patterson "he was not that familiar with all the specifics of

---

[4]  The Supreme Judicial Court noted that the trial court "found the Patterson evidence credible and persuasive." <u>Id.</u> at 819.

[5]  Patterson's testimony at the Cahaly evidentiary hearing was consistent with paragraphs 10 and 11 of his affidavit which was also an exhibit at that hearing. <u>See</u> **Exhibit B** to Def. Mot. for Mistrial filed 6/17/08 (the "Mistrial Motion"). Dkt. #283.

the Merrill Lynch account" and that "the only person who can answer this is Gerry Levine. Let

me get him on the line." Id. at 22-23.  Patterson testified that Carpenter got Levine on the

conference call:

> I was introduced to Levine.  Right away Dan said, look this is someone
> who has a client . . . who wants to find out the specifics about how the
> Merrill Lynch account is going to be set up. Gerry, you are the guy who
> can explain that to him. So at that point I described -- it was clear to me
> that Mr. Levine did not understand about the 1031 transaction, how they
> worked. ... I think I made it clear to him that these were my client's
> funds, and that it was critically important that my client's name -- neither
> my client's name nor my name appear on the account, because if that
> were to happen, were the IRS to audit ... you would lose the
> intermediary protection that makes a 1031 transaction go through.

Id. at 24.  Patterson explained to Levine the basic aspects of a 1031 exchange including the fact

that the funds are held by BPETCO, which was a qualified intermediary, for a period not to

exceed 180 days and then the funds are transferred out to purchase a replacement property.  Id.

Patterson believed he used the term escrow in describing it.  Id.

On October 22, 1998, Patterson called Levine again and in response he received a fax

from Levine which consisted of a cover sheet with a handwritten note from Levine and an

attached authorization form.  Id. at 16-17.  See **Exhibit G** to Mistrial Motion.[6]  On October 23,

1998, Patterson sent Levine a cover letter, copy of the escrow and exchange agreements (signed

by Carpenter), the account selection form and wiring instructions.  Id. at 17-18.  See **Exhibit H**

to Mistrial Motion.  These documents were faxed to Levine at Merrill Lynch and the original

was sent to Levine by mail.  Id.  Patterson's telephone records corroborated the October 22, 1998

telephone call, and Patterson faxed the escrow and exchange agreements to Levine on October

23, 1998.  See **Exhibit F** to Mistrial Motion.

---

[6] This document was Exhibit E to the Patterson Affidavit filed in the Cahaly evidentiary hearing.

Paley, who had invoked his Fifth Amendment privilege against self-incrimination at the civil trial, Cahaly, 451 Mass. at 368, subsequently testified at the Cahaly evidentiary hearing that he, too, had telephoned Levine.  Paley had come forward after he heard Levine's testimony in the Cahaly civil trial, i.e., that Levine had never heard of, or spoken to, Paley.  Paley notified his attorney, because "I did speak to Gerry Levine and I did instruct him as to what was going on in the account, and that needs -- that record needs to be stated."  Cahaly Evid. Hrg. 5/19/04 Tr. at 127-130.  See **Exhibit I**, attached hereo.[7]  In a telephone call with Levine in October 1998, Paley told Levine, among other things, that he was given his (Levine's) name by Carpenter, that BPETCO was in the business of tax deferred property exchanges for clients, that BPETCO would be holding clients' money, that the clients' money would need to be returned upon demand within 180 days of the exchange, and in any case available immediately, and that the money had to be held in escrow.  Id. at 132-33.  Paley corrected Levine's mistaken view of 1031 exchanges as "swaps," and explained the basic mechanics of the exchange to Levine.  Id.  Levine said that he understood the essential facts and nature of the Benistar property exchange business.  Id. at 138.[8]  After the telephone call, Levine "was well aware of what an exchange was and what Merrill Lynch's role would be."  Id. at 127, 128; see also Cahaly, 451 Mass. at 368 (holding that because Patterson's evidence alone was sufficient to warrant allowing the motion for post trial relief, Court need not reach the question of whether Paley evidence alone would justify new trial).

At the Cahaly evidentiary hearing, Levine denied having spoken with Patterson and Carpenter on October 21, 1998.  See Levine testimony at Cahaly Evid. Hrg Tr. 5/18/04 at 32, attached as **Exhibit C** to Mistrial Motion.  In response to further questioning of "Do you deny

---

[7] **Exhibit I-L** attached hereto follow **Exhibits A-H** attached to Def. Mot. For Mistrial, filed 6/17/2008.
[8] Paley, making reference to his February 2004 affidavit filed in the civil case, testified that his conversation with Levine occurred on or about October 13, 1998.  Id. at 131.

speaking with Mr. Patterson at all on October 21 or October 22, 1998?" and "Do you deny speaking with him?" Levine then said, "I have no recollection." Id.  Levine also denied speaking with Paley.  See Cahaly Evid. Hrg Tr. 5/18/04 at 60-61, attached hereto as **Exhibit J.**    After further questioning by the Judge, Levine said "I  have no recollection of ever having this conversation." Id. at 35.  At Levine's deposition, less than a year after the events, Levine denied having "any discussion with Mr. Carpenter at any time in which he informed [Levine] that Benistar had chosen Merrill as its depository for client funds" and denied that he had "any understanding that any of the funds that were deposited in the Benistar Property accounts at Merrill included client escrow funds." See Levine Dep. 2/6/02 at 166, 182 attached hereto as **Exhibit K**.  He also denied  ever learning "of an individual associated with Benistar Property Exchange Trust … named Martin Paley" or knowing that Paley was the president. Id. at 95, 151.

### B.    The Testimony of Government Witnesses Levine, Patterson and Paley in the Federal Criminal Trial

#### 1.    Levine's Testimony in the Federal Criminal Trial

On the seventh day of the second criminal trial, the government called Levine to testify. On direct examination, the government asked Levine whether he "recalled" communicating with or receiving faxes from Patterson, and Levine said, "No." Tr. 7:75.[9]  The government's direct examination of Levine focused on Carpenter's: opening of the Merrill Lynch accounts, id. at 59, 61, 65; his risky and aggressive trading strategy and his failure to follow Levine's more conservative recommendations, id. at 70-72, 76, 84; the heavy losses Carpenter sustained as a result of his trading strategy and the margin calls he had to meet, id. at 76, 79, 84-85; the

---

[9]  AUSA:  Mr. Levine, during the course of your business relationship with Mr. Carpenter, do you recall communicating with a man named David Patterson?
LEVINE:  No.
AUSA:  Do you recall receiving any faxes or other information from a Mr. David Patterson?
LEVINE:  No.  Id.

warnings Levine gave Carpenter about his trading strategy generally, id. at 76-77; and the risks noted in the Standard Option Agreement regarding options trading. Id. at 65; Exh. 145. The government also elicited from Levine that his only role in handling the Benistar accounts was "in executing the orders that were unsolicited that were placed by Dan Carpenter," id. at 68, and that Carpenter's predominant strategy was to "sell uncovered puts, take in as much premium as he could, and hope that the underlying stocks would go up." Id. at 68, 70.

In addition, the government's direct examination of Levine also focused on the incriminating statements Carpenter allegedly made to Levine including that Carpenter refused to follow Levine's recommendations as to trading strategy because it was "like watching paint dry or watching grass grow." Tr.7: 71. Critically, the government called Levine to testify that in May 2000, when Carpenter was sustaining heavy losses and purportedly rejecting Levine's investment advice, Carpenter had said to him that he (Carpenter) "had the mentality of a riverboat gambler in doing some of the trades, in trying to quickly recoup by going larger and larger contracts and positions to recoup the losses he was sustaining." Tr. 7: 77.

On cross-examination, Levine denied: (1) having the three-way conference call with Patterson and Carpenter described in paragraphs 10 and 11 of the Patterson Affidavit, as well as every specific aspect of the telephone call; (2) receiving the October 23, 1998 documents from Patterson containing the escrow and exchange agreements, account selection form and wiring instructions which Patterson had sent to him by fax and mail; and (3) ever hearing the name Patterson. Tr.7: 98-102, 109-110, 120. Levine denied knowledge at the time that BPETCO was engaged in property exchanges and was investing client's funds. Tr.7:120. He also denied ever having a conversation with Paley in October 1998, and that Paley had explained to him BPETCO's

business as an intermediary for 1031 exchanges and that the funds in the BPETCO accounts at Merrill Lynch were third-party funds.  Tr.7: 121-128.

During cross-examination, the government objected to defense counsel's use of the Patterson Affidavit, in which he recounted his communications with Levine to impeach Levine. Tr.7: 99-101.

### 2.    Paley's Testimony in the Federal Criminal Trial

On direct examination, Paley testified in sum, that it was at Carpenter's suggestion that he (Paley) called and spoke with Levine at Merrill Lynch, explained 1031 property exchanges to Levine, and that after the conversation Levine had a "rudimentary understanding" of what BPETCO was doing and that clients' money would be coming in and out of the account. Tr.11: 27-29.

On cross-examination, Paley testified that he spoke with Levine by telephone in September or early October of 1998, the same time the BPETCO accounts were being opened at Merrill Lynch.  Tr.11: 74.  Paley told Levine that he was the president of BPETCO, described its business and informed him that BPETCO was a qualified intermediary which held funds in escrow on behalf of clients pending their purchase of like-kind property.  Tr.11: 75-76.  Paley also told Levine that BPETCO's clients' money would be wired to Merrill Lynch with the clients' name and other information on it, and that when the clients needed their money, BPETCO would send Merrill Lynch an authorization form to wire the money.  Tr.11: 76-77. Paley stressed to Levine that the clients' money could not be held up following such a request, and the ability for the money to be moved quickly was important.  Tr.11: 76.

During this telephone call, Paley corrected Levine's misperceptions about 1031 exchanges as "swaps" and explained the nature of the transactions in some detail.  Tr.11:77.

He told Levine that it was possible that he (Levine) would receive calls directly from

BPETCO's clients or their representatives and that it was important for him to be able to

respond to such calls. Tr.11: 78. He also told Levine he would send him copies of the

standard BPETCO agreements and in fact sent Levine the standard exchange fee agreement.

Tr.11: 79-80. Levine told him that he understood the nature of BPETCO's business. Tr.11:

79. There was no doubt in Paley's mind that he spoke with Levine. Tr.11: 82. During cross-

examination of Levine, the government objected to defense counsel's use of the Paley

Affidavit, in which he recounted his telephone call with Levine. Tr.11: 123-125.

### 3.    Patterson's Testimony in the Federal Criminal Trial

On Day 12 of the trial, five days after Levine's testimony, the government called

Patterson to show Carpenter's intent to defraud. Pre-Trial Conference Hrg. 5/22/08 Tr. 13-15. In

response to the defendant's motion *in limine* to exclude Patterson's testimony, the government

argued:

> [T]he testimony of David Patterson puts knowledge of those document
> directly into the defendant's head, and it is . . . directly relevant -- highly
> probative of intent; and secondly, it also puts . . . him on notice that
> security of funds was important to people engaging in 1031 exchanges.
> The principal reason is the first reason: It establishes that the defendant
> was well familiar with the exchange documents . . . [I]t's highly
> probative; it directly connects the defendant with the exchange
> documents. Those are the documents that induced people to give his
> business money.

Id. at 14-15.

To accomplish this objective, the government called Patterson on direct examination to

testify about Patterson's call with Carpenter and the ensuing conference call in which Carpenter

conferenced in Levine. Patterson testified that following his conversation with Paley

concerning 1031 exchanges, he received a fax from Paley with Carpenter's telephone number,

stating that "the fastest way to do due diligence was to speak with" Carpenter. Tr.12:25; Exh.

333.  Patterson spoke with Carpenter by telephone concerning changes to the exchange documents; he wanted to obtain information concerning "exactly where the funds would be held and how the account would be set up."  Tr.12:33-34.  He discussed with Carpenter that his client, Jane Carey, could not have control of the funds from her exchange.  Tr.12:35.  Carpenter told him that the funds "were going to be held in Benistar's accounts at Merrill Lynch" but, as Carpenter was not entirely sure how the account cards at Merrill Lynch would work, he got Levine on the line in a conference call so Levine could explain this to Patterson.  Tr.12:34-35, 37-38.  On this three-way conference call, Patterson told Levine that the funds were being held in escrow, that while Ms. Carey's name would not be on the account, they were being held for her benefit, and must go back to her within 180 days to buy replacement property.  Tr.12: 38.  Based on this conversation, Patterson believed that Levine understood Ms. Carey's 1031 exchange.  Tr.12: 38.  On October 23, 1998, Patterson faxed and mailed to Levine a copy of the fully executed escrow and exchange agreements, account selection form and wiring instructions.  Tr.12: 43-44; Exh. 142.

On cross-examination, Patterson explained further that Carpenter had gotten Levine on the line because Carpenter did not know the "exact mechanics" of how the clients' accounts would be set up, and Carpenter believed Levine could explain it to Patterson.  Tr.12: 58.  There was "no question" that Patterson had a conversation with Levine.  Tr.12: 59.  It was important to him to explain to Levine the major elements of a 1031 exchange and he gave a general summary to Levine and he made it very clear to Levine that the money was Ms. Carey's, not BPETCO's.  Tr.12: 59-60.  By the end of the conversation, he believed that Levine understood that BPETCO was holding his client's money. Tr.12: 59-60. Following the conference call, Patterson got Levine's direct telephone number because he wanted to make sure he had the best

contact with the person setting up and managing BPETCO's accounts and that person was Levine. Tr.12: 61.

Patterson had a second telephone conversation with Levine on October 22, 1998 lasting about ten minutes; he wanted to see the Merrill Lynch account forms that were to be used for Ms. Carey's benefit.  Tr.12:63-64.  In response, Levine said that he would send him a copy of the actual account signatory forms, and faxed him a Merrill Lynch authorization form.  Tr.12: 64; Exh. 408.  Patterson confirmed that on October 23, 1998, he sent the escrow and exchange agreements, account selection form and wiring instructions to Levine, by both fax and mail. Tr.12: 68-70.[10]

### C.    Carpenter's Motion for Mistrial

After Patterson's testimony, Mr. Carpenter timely moved for a mistrial pursuant to Napue and United States v. Mangual-Garcia, 505 F.3d 1, 9-10 (1st Cir. 2007), on the grounds that the government had knowingly sponsored, used, and failed to correct Levine's false and perjured testimony.  Tr.12: 86.  The next day, before closing arguments, the Court heard further argument on the motion for mistrial.  Tr.13: 12-21.  Before argument, the Court specifically stated "I want to consider whether anything needs to be done before the jury - or as the jury is instructed." Tr.13: 12.  The Court took a recess to give the government time to consider the defendant's written motion for a mistrial, which had been filed the previous evening.  Id.  After the recess, the government responded, in sum, that Mangual-Garcia did not apply to these circumstances and that there was no prejudice to the defendant.  Tr.13: 12-15.  In response to the Court asking the government what it intended to say in closing argument about Levine's testimony, the

---

[10]  Patterson's telephone bill was admitted on cross-examination and reflects a call to Levine's Merrill Lynch number on October 22, 1998, and a transmission to Levine's fax number the next day.  Tr.12:63-64, 70; Exh. 402.

government stated, "we were going to say nothing about the riverboat gambler comment."

Tr.13: 14.  In addition, the government stated:

> We're going to focus on the fact that Merrill Lynch and Paine Webber may have played a role in this, generally not distinguishing between Mr. Levine, Mr. Stern, Mr. Rasmussen and Mr. Rock. And then I intend to say whatever role Mr. Levine may have known about what Mr. Carpenter was up to is not relevant to what Mr. Carpenter did after Merrill Lynch threw him out and he went to PaineWebber.... Now there are two other brokers that testified for Merrill Lynch, and there's testimony from them that I do intend to address in closing. But their testimony is not at issue by this motion or affected by Levine's testimony.

Tr.13: 15.  In response to the Court's question as to whether the government intended "to ask the jury to credit Mr. Levine's testimony?" the government answered, "No."  Tr.13: 15.

Next the Court asked:

> THE COURT: Does the government believe Mr. Levine's testimony?
>
> AUSA: As to the issue of whether or not he received that call? The most charitable way I can put it is that he has a failure of recollection so complete that he believes, <u>but I do not think that his testimony is credible, your Honor as to that point</u>.

Tr.13: 15 (emphasis added).  The government never responded to the Court's question of whether anything needed to be done before the jury -- or as the jury is instructed.

In response to the Court's suggestion that "correction could still be possible," defense counsel disagreed stating, "You cannot cure what is before this jury now.  If . . . the [Court] instructed the jury not to listen to Levine or that you can't consider anything he said . . . the harm was still done."  Tr.13: 18-19.  Counsel argued that "there is no way that you can at this point in time cure that testimony before the jury."  Tr.13: 20.

The defense argued, *inter alia*, that the government had known what Levine was going to say since 2004, and had invited the false testimony, that under <u>Napue</u>, the government had

"an affirmative duty to correct" the false testimony, Tr.13: 18, which it had failed to do.  Tr.13: 15-20.  The defense also argued that even if the Court struck Levine's testimony and instructed the jury not to consider anything Levine said, that the prejudice to Mr. Carpenter was incurable because central to the defense was "Mr. Carpenter's state of mind when he set up the accounts at Merrill Lynch."  That is, "Mr. Carpenter takes steps to ensure that Mr. Levine knew they are dealing with clients' funds; two, knows what property exchange is all about" and "knows that . . . the money has to be quickly available for such exchanges and Mr. Levine denied it."  Tr.13: 18.

Ultimately, the government never offered or suggested any corrective action nor did the Court require any as a result of Levine's false and perjured testimony.

### D.     The Government's Closing and Rebuttal Arguments

In the government's closing argument with respect to Merrill Lynch and Paine Webber, the government stated, "whatever their role in this episode three things remain very true: First, Merrill Lynch and Paine Webber are not on trial here; Mr. Carpenter and Mr. Carpenter alone, is, and nothing they did or failed to do diminishes in any way Mr. Carpenter's responsibility and culpability for his own actions."  Tr.13: 69.

In rebuttal, the government argued "Mr. Carpenter wants -- Mr. Pappalardo wants you to focus on the fact that Jerry Levine was sent letters; that Jerry Levine was put in a position to know what was going on. Does that mean he was operating this in an open way? No it does not." Tr.13: 113.  The defense objected to this reference to Levine in rebuttal because of the pending motion for mistrial and the fact that when the Court asked how the government was going to deal with Levine's testimony in closing, the government failed to inform the Court that it intended to

make this argument.  Tr.13: 117.  The Court stated, "I don't think that changes the mix at all."
Tr.13: 119.

### III.    ARGUMENT

### A.    The Mistrial Motion Should be Granted Because the Government Violated <u>Napue</u> and Dan Carpenter's Fifth Amendment Rights

In response to Carpenter's motion for mistrial, the government argues that <u>Napue</u> only
applies in "situations in which there is information that is within the possession of the
government but not the defendant" and where the evidence is uncorrected.  Tr. 13: 13-14.  The
government now supplements this theory claiming that "the principal obligation <u>Napue</u> places on
United States is to disclose evidence in its possession that impeaches or undermines the
credibility of its witnesses."  Gov. Mem. at 6.[11]  The government also claims that so long as the
defense was able to cross examine Levine "about [his] credibility" and because "the government
elicited on direct examination of Patterson the corrected information," that this sufficed to
"correct" the false testimony.  Tr. 13: 13-14; Gov. Mem. at 7-8.  Next it claims that it "did not
solicit or rely on any false testimony from Levine," Gov. Mem. at 8, 10.  The government also
claims that because defense counsel "was able to argue … to the jury about Mr. Levine's
credibility," that there was no prejudice to Carpenter.  <u>Id</u>. at 14.  Finally, it posits that the defense
"has no basis to claim he is entitled to a mistrial based a violation of <u>Napue</u>" because it "declined

---

[11] While the government's primary argument is that <u>Napue</u> is inapposite so long as it fulfilled its disclosure
obligations, it has not shown that it has in fact fulfilled those obligations by providing all relevant documents and
information.  Rather, the government states that it "had provided to Carpenter documents from Patterson's files
evidencing that such communications between Patterson and Levine had in fact occurred" and notes that with
respect to other relevant documents that they were in the defendant's possession.  Gov. Mem. at 3.  A preliminary
search of  defendant's files reveal that the Patterson Affidavit (Def. Exh. 342) was **not** produced by the government
and only portions of the exhibits thereto were produced.  Also, the October 23, 1998 14 page fax from Patterson to
Levine containing the escrow and exchange documents, account selection form etc. (Def. Exh. 418) was **not**
produced by the government.  With respect to Def. Exh. 418 only the cover letter from Patterson to Levine and the
fax cover sheet to Paley, not Levine were found (GOV22170-22171).  It appears the government did **not**, therefore,
disclose documents consistent with its <u>Giglio/Brady</u> obligations.

the court's offer to take corrective action." Gov. Mem. at 11. These arguments are not only totally incorrect, they are inconsistent with <u>Napue</u> and its progeny.[12] Moreover, in none of these claims, and nowhere in its memorandum, does the government address or take into consideration that it conceded that it did not find the testimony of one of its principal witnesses credible. Indeed, this fact is conspicuously absent from the rendition of facts in its memorandum. <u>See</u> Gov. Mem. at 2-5.

Contrary to the government's argument, it matters not one bit whether the false testimony is "solicited" by the government or elicited on cross examination by the defense.[13] This is clear from the explicit language of <u>Napue</u>:

> It is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment [citations omitted]. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

360 U.S. at 269. It is also clear from <u>Mangual-Garcia</u>, 505 F.3d at 10, in which the First Circuit found a <u>Napue</u> violation where the government allowed false testimony during cross examination to go uncorrected.

"Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware

---

[12] The government is well aware of its obligations under <u>Napue</u>. In fact, prior to Levine's testimony, the government improperly sought to admit false testimony from Joseph Iantosca's transcript from the first trial in which Iantosca stated that he had received "nothing" back from the millions he had given to Benistar. Tr. 4: 12-13. The government sought to admit this testimony despite the fact that the government knew that Iantosca had received $1.3 million. Tr. 4: 10-12. The defense objected to this testimony and the Court had to ask specific questions of the government to confirm that the proffered testimony was incorrect. It admonished the government that it could not elicit testimony that it knew was untrue and barred the government from introducing it. <u>Id.</u> at 13-15 (The Court: "If you knew that he was going to say 'Nothing' if you asked him on the stand, and you knew that was not true, that would not be proper … . That … is the <u>Napue</u> case. AUSA: We remember that your Honor.").

[13] In fact here, as discussed <u>infra</u>, it is submitted that the government did solicit the false testimony from Levine. To the extent that the government cite cases, such as <u>United States v. Adebayo</u>, 985 F.2d 1333, 1341-42 (7th Cir. 1993), which rely on the fact that the false testimony was elicited on cross-examination rather than on direct, that is a distinction without a difference under <u>Napue</u>. Also, in <u>Adebayo</u>, the court held that the government did not "have any reason to believe . . . that [the witness] would perjure himself during cross examination."

of the perjury." <u>Wallach</u>, 935 F.2d at 456. "A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." <u>Agurs</u>, 427 U.S. at 103. In reaching the ultimate determination of whether there is any likelihood that the false testimony could have affected the jury, the First Circuit has held that the standard applied for materiality is a "stringent one" in that "false testimony should be considered material `unless failure to disclose it would be harmless beyond a reasonable doubt.'" <u>Kattar</u>, 840 F.2d at 128 (<u>quoting United States v. Bagley</u>, 473 U.S. 667, 680 (1985)); <u>Green v. United States</u>, 313 F.2d 6, 8 n.3 (1st Cir. 1963) ("due process not only requires a prosecuting officer to refrain from offering false testimony but also requires him to correct testimony which he knows to be false . . . this rule does not cease to apply merely because the false testimony only goes to the credibility of the witness").

Indeed, the Second Circuit has held that "if it is established that the government knowingly permitted the introduction of false testimony, reversal is 'virtually automatic.'" <u>Wallach</u>, 935 F.2d at 456. That the Government may have only been negligent with respect to its failure to correct false testimony is not an excuse. <u>See</u> <u>Giglio</u>, 405 U.S. at 154 (failure to disclose existence of agreement between government witness, "whether by negligence or design . . . is the responsibility of the prosecutor").

Also, contrary to the government's assertion, <u>Napue</u> is not restricted to circumstances in which the government alone knows that the testimony is false or when the government fails to disclose impeachment material under <u>Brady</u> and <u>Giglio</u>. The government's obligations under <u>Napue</u> are separate and distinct from those under <u>Brady</u> and <u>Giglio</u>. This is apparent from <u>Napue</u> itself, which nowhere discusses whether the information that a promise had been made to the witness had been disclosed to the defense. Even assuming, *arguendo*, there had

not been such a disclosure, nowhere does Napue even suggest that failure to disclose was a

ground for, or factor in, its holding.  Rather, Napue turns upon the simple facts that the

government's witness lied, the government knew it, and the government failed to correct it:

> It is of no consequence that the falsehood bore on the witness' credibility rather
> than directly upon defendant's guilt. A lie is a lie, no matter what its subject,
> and, if it is in any way relevant to the case, the [prosecutor] has the
> responsibility and duty to correct what he knows is false and to elicit the truth.

Napue, 360 U.S. at 269-70 (citation and quotation omitted).

That Napue is a related but separate doctrine from Brady/Giglio is also clear from the

most recent First Circuit case addressing a Napue violation.  In Mangual-Garcia, the prosecutor

made disclosure to defense counsel which satisfied the government's obligations under

Brady/Giglio in that, prior to the witness's testimony, the government informed defense counsel

and the court that the government had no intention of prosecuting the witness.  Mangual-Garcia,

505 F.3d at 9-10.  However, during cross-examination in which defense counsel explored the

witness' motive for cooperating, the witness lied and said he could be put in jail.  Id.

Notwithstanding the government's disclosure, the First Circuit held that there was a Napue

violation because the government knew the witness lied and failed to correct the false testimony.

Id.[14]  See also Jenkins v. Artuz, 294 F.3d 284, 294 (2d Cir. 2002) (affirming grant of writ of

habeas corpus where prosecutor informed court and defense counsel of plea agreement with

witness but then allowed witness' denial of existence of plea agreement to go uncorrected);

United States v. Iverson, 648 F.2d 737, 738-39 (D.C. Cir. 1981) (rejecting as "unduly restrictive"

the Government's assertion that Napue is limited "to situations in which defense counsel was

unaware of plea agreements made with the prosecution witnesses.").

---

[14]  The First Circuit ultimately deemed the Napue claim had been waived due to counsel's decision not to raise it in
the trial court.  Id. at 10.

The government's reliance upon United States v. Casas, 425 F.3d 23, 45-46 (1st Cir. 2005); United States v. Doherty, 867 F.2d 47, 70 (1st Cir. 1989), and United States v. McGovern, 499 F.2d 1140, 1143 (1st Cir. 1974), that Napue is simply a disclosure rule, or for the general proposition that Napue does not preclude the government from presenting witnesses "whose reliability in one or many particulars is imperfect or even suspect," id. at 1143, is misplaced. The government has completely failed to address the facts of those cases, which are readily distinguishable from the instant case and, more importantly, completely failed to reconcile those cases with Mangual-Garcia. The most crucial fact distinguishing these cases is that each defendant fell "far short of showing that the witnesses in question perjured themselves much less that the government knowingly allowed them to do so." See, e.g., Casas, 425 F.3d at 45. In Casas, the defendant "frame[d] his argument in terms of the government's failure to corroborate the witnesses' claims, rather than the knowing presentation of false testimony." Id. n.28 (defendant claimed that airline's document retention procedure would have required destruction of manifest which an agent testified he obtained but the government no longer had; an agent testified that an investigator told him that a dive team had searched a site and the investigator testified to the contrary; a cooperating witness testified that the defendant had participated in a drug transaction but did not inform investigators of this when debriefed). Similarly, in Doherty, the Court held, *inter alia*, that "[t]he record provides no reason to believe that the prosecutor knew one or another of the witnesses was lying," or that defendants "had failed to show they were prejudiced by this testimony." In McGovern, the court found that "the government here presented what, insofar as we know, was the correct version." Id. (government's "rambling, unresponsive" witness, whose cross examination filled 800 pages, id. at 1141, mistakenly testified on re-cross that the sheets of counterfeit bills were stored in a cellar

and turned over to an agent, but "when the exhibit was offered the prosecutor told the court and opposing counsel that an agent had purchased the sheets from two men." Id. at 1143). Thus, all three cases, unlike the present case, lacked the *sine qua non* of a Napue violation—*i.e.*, the prosecution knowingly allowing false testimony to go uncorrected. It is clear that the First Circuit has not subscribed to the restrictive theory that Napue is "inapposite" so long as impeachment evidence is disclosed.[15]

Nor, contrary to the government's assertion, is a Napue violation cured or deemed "corrected" simply because defense counsel attempts to demonstrate the falsity of the testimony at trial through cross-examination. Napue, 360 U.S. at 269-70. In Napue itself, the Court quoted from a portion of the cross examination of the witness who had lied about having been promised consideration by the prosecutor. Napue, 360 U.S. at 269. In that cross-examination, defense counsel was able to elicit from the witness that a Public Defender had said that he was going to try and get something done for him but he could not promise him anything. Id. at 269. In response to this, the Court held that the cross-examination did not "correct" the perjured testimony and held "we do not believe that the fact that the jury was apprised of other grounds

---

[15] The government relies on cases from the Fifth and Tenth Circuits for the proposition that Napue is inapposite where the government has disclosed impeachment evidence. First, here it is not at all certain that the government satisfied that obligation. See supra at footnote 15. Second, this emphatically is not the law in the First Circuit. Third, the cases are distinguishable or have no precedential value. For example, in United States v. Decker, 543 F.2d 1102, 1105 (5th Cir. 1977), the Court's finding that there was no Napue violation was based on its holding that not only had the government had "fulfilled its duty of disclosure" by voluntarily informing the defense of the false testimony of two witnesses, it also disclosed the "true circumstances" at a time when the defense could have, but did, not recall the witnesses. Id. Here, the government never voluntarily informed the defense or the jury of the "true circumstances" of the Levine/Patterson telephone call which Carpenter initiated. It was not until six days after Levine's testimony, a motion for mistrial and the Court's pointed inquiry of the government that it finally conceded that Levine's testimony was not credible. In United States v. O'Keefe, 435 F.3d 1305, 1317 (10th Cir. 2006), the Tenth Circuit's decision that there was no Napue violation was based on both that "[t]here has been no showing of deliberate false testimony"; rather, that the witness was "confused about her obligation to testify" and that the government had disclosed the impeachment evidence.

United States v. Smith, 40 F.3d 386 (5th Cir. 1994) (Per Curiam) (Unpublished) has never been cited or relied upon and is of no precedential value in this Circuit. There, the Court did not even perform the analysis required under Napue of whether there was a reasonable likelihood that the false testimony could have affected the judgment of the jury. Id.

for believing that the witness . . . may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one."  Id; see also Wallach, 935 F.2d at 455-59 (citing Napue, 360 U.S. at 269) (reversing conviction where prosecution witness committed perjury which both government and defense counsel knew of and explored the falsity of the witness' testimony on direct and cross examination); United States v. LaPage, 231 F.3d 488, 492 (9th Cir. 2000) (reversing conviction and ordering new trial where prosecutor failed to correct witness' false testimony despite defense counsel's attempt to impeach the witness: "the government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false"); Jackson v. Brown, 513 F.3d 1057 (9th Cir. 2008) (affirming grant of habeas relief due to numerous Napue and Brady violations).  Cf. United States v. Brand, 80 F.3d 560, 565 (1st Cir. 1996) (no Napue violation where on cross-examination witness ultimately told the truth).  The cases cited by the government do not change this analysis -- they either depend on an overly restrictive reading of the dictates of Napue which do not comport with the prevailing law in the First or Second Circuits as set forth in Mangual-Garcia and Wallach, and/or involve crucial distinguishing facts which the government ignores.[16]  None of the cases cited by the government address the

---

[16] For example, in O'Keefe, 128 F.3d at 894, the Fifth Circuit held that whether the false testimony is material hinges upon whether the perjured testimony "occurs as part of the prosecution's case" and that "when the defense elicits the alleged perjury on cross-examination, no material falsehood has occurred because the government has not itself knowingly presented false testimony."  Id. at 894.  This, of course, is not the law in the First or Second Circuits.  See Mangual-Garcia, 505 F.3d at 10 (Napue violation where government allowed false testimony elicited during cross-examination to go uncorrected); Wallach, supra.  Nor is it the law in the First or Second Circuits that "vigorous cross examination," Gov. Mem at 8, can cure a Napue violation.  Cf O'Keefe, 128 F.3d at 896.  Moreover, in O'Keefe, the Court relied upon the "concessions" made by the witness on cross-examination, the strong cautionary statement in jury instructions through which "the jury knew that [the witness] had lied …" in holding there was no Napue violation.  Id. at 896.  Where in the First Circuit knowingly permitting and failing to correct false testimony on cross-examination is a Napue violation, where there were no concessions by Levine on cross-examination and there were no cautionary instructions, O'Keefe does nothing to alter the analysis.  United States v. Grosz, 76 F. 3d 1318, 1328 (5th Cir. 1996) is distinguishable.  There, the Court found in the first instance that the Napue claim failed "because the record contains insufficient evidence to prove that the government elicited … testimony [that a check was altered] knowing it to be false."  Id. at 1327.  Next, it found that the defendant "conclusively refuted [the witness' ] testimony by the introduction of the microfiche copy of the check" which

circumstance, as here, in which the government actually conceded that the testimony of one of its main witnesses was not credible, six days after that witness testified.

That a violation is not deemed "cured" or "corrected" by the fact that the defense knew of or tried to correct the false testimony, is because it is the <u>government's</u> affirmative and constitutional duty to correct the false testimony, not the duty of defense counsel or the court.[17] A prosecutor "has a special duty commensurate with a prosecutor's unique power, to assure that defendants receive fair trials," and when the government knows that its witness has lied, it "has a constitutional obligation to correct the false impression of the facts." <u>LaPage</u>, 231 F.3d at 492. "The State's obligation is not to convict, but to see that, so far as possible, truth emerges. This is also the ultimate statement of its responsibility to provide a fair trial under the Due Process Clause . . . ." <u>Giles v. Maryland</u>, 386 U.S. 66, 98 (1967) (Fortas, J., concurring).

The government's assertion that it "corrected" the false testimony by putting Patterson on to testify (Gov. Mem. at 9-10) falls wide of the mark. <u>See</u> <u>Kattar</u>, 840 F. 2d 118 (holding that the government should not have elicited the false testimony "given that the government itself contended elsewhere that the truth was contrary to this false testimony"). This does not constitute the "correction" required by <u>Napue</u>, and as ultimately conceded by the government that Levine was lying. A concession before the jury by the government when Levine testified is vastly different than the government simply putting forth two versions of an event through two of its witnesses which is ultimately left to the jury to determine credibility. The jury should have been told **by the government that its witness was lying at the time Levine lied**. This is

---

showed it was not altered" <u>Id</u>. at 1328. Thus, in <u>Grosz</u>, the knowing presentation of false testimony was not present as it is here.

[17] A prosecutor is not to misrepresent facts to the court, ABA <u>Standards for Criminal Justice</u>, <u>Prosecution Function</u> § 3-2.8 (1992), and is to seek the withdrawal of false evidence upon its discovery. <u>See</u> ABA <u>Standards for Criminal Justice</u>, <u>Prosecution Function</u> S § 3-5.6(a) (1992) ("A prosecutor should not knowingly offer false evidence, whether by documents, tangible evidence, or the testimony of witnesses, or fail to seek withdrawal thereof upon discovery of its falsity.").

crucial to the jury's estimate of truthfulness and reliability of the witness.  As the Court stated in

Napue, 360 U.S. at 269, after its clear pronouncement that a conviction must fall if obtained

through the use of false evidence "when the State, although not soliciting false evidence, allows

it to go uncorrected when it appears":

> The jury's estimate of the truthfulness and reliability of a given
> witness may well be determinative of guilt or innocence, and it is
> upon such subtle factors as the possible interest of a witness in
> testifying falsely that a defendant's life or liberty may depend.

Id.   If this is true of a lie involving credibility only -- whether or not the witness had a deal with

the government -- it is even more true when the lie involves substantive facts in the case.  A

witness' false testimony "calls into question the veracity of the rest of his statements." Wallach,

935 F.2d at 458.

The Court should reject the government's assertion that it "corrected" Levine's testimony

when it called Patterson and asked him about his interactions with Levine as nothing but *post hoc*

justification.  The government called Levine on Day Seven of the trial.  It took no steps to correct

Levine's false testimony on Days Seven, Eight, Nine, Ten, or Eleven.  By the time Patterson

testified, the damage had been done; the jury had been left for five days to think about Levine's

testimony as to his interactions with Carpenter—including Levine's testimony concerning

Carpenter's alleged refusal to follow Levine's advice and Carpenter's alleged "river boat

gambler" and "watching grass grow" comments.  It was critically important that the jury be

apprised of Levine's false testimony by the government *the day he testified*; calling Patterson on

the twelfth day of trial did not constitute "correction."  See LaPage, 231 F.3d at 492 (rejecting

argument that concession in prosecutor's closing argument that witness had testified falsely was

sufficient correction of witness' testimony).  It is clear that the government called Patterson not

to correct Levine's testimony, but rather to show Carpenter's knowledge and intent.  On the one

hand, the government called Levine to testify that he could not recall any conversations with Patterson to show that Carpenter did not act in good faith, while on the other hand the government called Patterson to testify that the conversations with Levine did take place to show that Carpenter had the required specific intent to defraud.[18]

The government's argument that, because the defendant "declined the court's offer to take corrective action he has no basis to claim that he is entitled to a mistrial under Napue," is entirely baseless. Gov. Mem. at 11-12. First, at trial the government certainly did not suggest any of the "variety of corrective steps" such as a curative instruction, or striking Levine's testimony, or cautioning the jury not to consider Levine's testimony, it now assures could have cured the Napue violation. In fact, it argued that Napue and Mangual-Garcia did not even apply here. Second, it is the government's duty, not the court's or defendant's, to correct the false testimony from its witness at the time the false testimony occurs. Third, the defense attempted to bring the false testimony to the jury's attention on cross-examination of Levine and again with its timely motion for mistrial at the conclusion of Patterson's testimony. The government does not cite to one case for the proposition that a Napue claim can only be raised at the time of the false testimony itself, and not at the time of the testimony of the government's second witness, at which time the falsity of the first witness' testimony is manifest. The government's citation to Mangual-Garcia, 505 F.3d at 10-11, does not support their claim because there, the false testimony was never brought to the attention of the jury or court and defendant was attempting to raise the Napue issue for the first time on appeal.

---

[18]  At the moment Levine testified that he absolutely denied having any conversation with Patterson and Carpenter, the government could have requested a bench conference to work out "how to inform the jury that the testimony is false." See LaPage, 231 F.3d at 492. Or, the government could have corrected the false testimony during its redirect of Levine. Kattar, 840 F.2d at 128 (noting that the prosecutor "should have made an attempt to correct [the witness'] testimony . . . during subsequent redirect examination"). Or, the government could have told the jury that, as it later conceded to this Court, that Levine's testimony was not credible. Napue 360 U.S. at 269. The government did none of these things. Tr.7:51.

1.    **The Government Violated Carpenter's Due Process Rights By Failing to Correct What It Knew or Should have Known was False Testimony And By Soliciting That False or Misleading Testimony**

There can be no doubt that the government knew Levine falsely testified that he never spoke with, or received the escrow and exchange documents from, Patterson, that he never spoke with Paley, and that he did not know that BPETCO was holding third-party funds.

That the government knew Levine's testimony on these crucial topics was false is apparent first and foremost from the government's concession. Six days after Levine falsely testified, when questioned specifically by the Court out of the jury's presence, "Does the government believe Mr. Levine's testimony?", the government conceded that at least a portion of Levine's testimony was false and "did not think that his testimony is credible as to [whether or not he received that call from Patterson.]" Tr. 13: 16. Second, the government's knowledge is apparent from Patterson's testimony—who had no real interest in the outcome of this trial and whose client successfully completed a 1031 exchange with BPETCO—which flatly contradicted Levine with respect to both the telephone calls with Levine and the fact that Patterson sent the exchange documents to Levine. Third, the government's knowledge is apparent from the fact that it has had in its possession since 2004, the Levine/Patterson/Paley testimony from the Cahaly evidentiary hearing.

Patterson's testimony in 2004 was entirely consistent with and corroborated by all of the following which was in the government's possession prior to this trial: (a) Patterson's Affidavit dated March 9, 2004 attached as **Exhibit B** to Mistrial Motion; (b) Patterson's detailed statement to the FBI on April 4, 2004 set forth in the Patterson FBI 302, attached as **Exhibit E** to Mistrial Motion; (c) un-rebutted documentary evidence, in the government's possession since 2004, including Patterson's telephone bill showing that on October 22, 1998 he called Levine at Merrill

Lynch and that in response, less than fifteen minutes later, Levine faxed a handwritten memo signed "Jerry" attaching Merrill Lynch's authorization form to Patterson. See Exh. 402 (Patterson telephone bill, attached as **Exhibit F** to Mistrial Motion) and Exh. 408 (Levine fax to Patterson, attached as **Exhibit G** to Mistrial Motion); and (d) the decision of the Supreme Judicial Court in Cahaly, allowing the Exchangors' motion for a new trial against Merrill Lynch based solely on the newly-discovered Patterson evidence, in which the court noted that the trial court had found the Patterson evidence credible and persuasive. Id. at 365.

Additionally, the government did in fact solicit false or misleading testimony when it asked Levine if he "recalled" communicating with or receiving faxes from Patterson and Levine said, "No." Prior to this criminal trial -- four years prior -- the government also had Patterson's, Paley's and Levine's testimony at the Cahaly evidentiary hearing which clearly informed the government that Levine was either going to deny the calls and faxes occurred or say he did not recall, and that the former response was a lie and the latter response was, at best, intentionally misleading. That the government knew that Levine would lie if asked directly if he ever spoke with Patterson, is demonstrated by the above un-rebutted evidence and by the government's question to Levine on direct. This was nothing but a "conscious attempt to avoid the obvious" -- that Levine's responses to any further questioning would result in false testimony. Knowing that Levine had previously denied the call and knowing all of the independent corroborating evidence that the call in fact occurred, the government's question, and the answer it elicited, was misleading. This is similar to the prosecutor's conduct which was found improper in Jenkins, 294 F.3d at 293-94. There, in affirming the issuance of a writ of habeas corpus based on a Napue violation, the prosecutor had informed the court and defense counsel that the witness had entered into a plea agreement, but on cross examination the witness denied having any plea

agreement.  Id.  On re-direct, rather than asking the witness specifically about the plea

agreement, the prosecutor only asked whether the witness had made any deals with her

personally and the witness said "no."  Id. at 294.  The Court held that the "testimony was

probably true but surely misleading," and faulted the prosecutor for failing to follow up by

eliciting truthful testimony.  Id. at 294.  Thus, the government's claim that it did not solicit the

false testimony, to be charitable, is not entirely accurate.  See Jenkins, 294 F.3d at 295 ("we have

further noted the heightened opportunity for prejudice where the prosecutor, by action or

inaction, is complicit in the untruthful testimony." (citations omitted).  Nor should it escape

notice that the government objected to defense counsel's efforts to impeach Levine with the

Patterson and Paley Affidavits from the Cahaly evidentiary hearing.

    What must also be factored into the Napue analysis with respect to the question of the

government's knowledge of the false testimony is that here, while long in possession of this

information, the government still decided to make the strategic decision to call both Levine and

Patterson.  Levine's testimony as the primary broker and the person who had the most contact

with Carpenter was substantial and indeed crucial to the government's case.  The government

also made the decision that it needed Patterson to testify to the very information Levine was

denying in an effort to show Carpenter's knowledge and intent.  In fact, it viewed Patterson's

testimony regarding his telephone conference with Carpenter and Levine and the escrow and

exchange documents Patterson sent to Levine as "highly probative."  Pre-Trial Conf. Hrg.

5/22/08, Tr. 14.  It was critical to the government's case because Patterson was the only

Exchangor, or agent of an Exchangor, who had actually dealt with Carpenter and who, as the

government stated, "puts knowledge of those documents directly into the defendant's head."  Id.

**Automatic reversal is warranted** where, as here, the government knew of the false testimony, made a strategic decision to use it, sat silently by for six days until, and upon questioning by the Court, it conceded that Levine's testimony was not credible and made absolutely no effort to correct it before the jury as required by Napue.  See Napue, 360 U.S. at 269; Wallach, 935 F.2d at 456.  None of the cases the government relies upon, including those in the First Circuit (Casas, Doherty or McGovern), involve the knowing use of false testimony such as that here.  Because "the government knew [of the false testimony], the government invited it, the government orchestrated it," Tr.13:18,[19] a mistrial is required.

There is more than a reasonable likelihood that the false testimony could have affected the judgment of the jury, see Mangual-Garcia, 505 F.3d at 10; Wallach, 935 F.3d at 456-57, and the false testimony is material because it cannot be shown that it was harmless beyond a reasonable doubt.  Kattar, 840 F.2d at 128; LaPage, 231 F.3d at 492.  The false testimony, the importance of the witness' testimony in context of the evidence and the defense theory, and the failure of the government to correct the false testimony, are all considered.  See e.g., Kattar, 840 F.2d at 128; Wallach, 935 F.2d at 456-57.  A number of cases in which Napue violations have resulted in reversals only involve the potential bias or credibility of a witness (Giglio, Napue, Wallach, Jenkins) or the witness' willingness to lie on the stand and the importance of the witness' testimony to the government's case.  See United States v. Milikowsky, 896 F. Supp. 1285, 1299 (D. Conn. 1994) (collecting cases).  Just as those cases required reversal, the facts here demand a mistrial for similar reasons.  It is important to note at the outset that the false

---

[19] This is not a matter of mere "conflict of testimony among witnesses." See Doherty, 867 F.2d at 70 (no Napue violation where a mere conflict of testimony among witnesses, which testimony was not elicited from the government, where there was no evidence that the government knew which witness was lying and where appellants had not shown they were prejudiced by the witnesses' testimony).  Nor is this a case of "mere inconsistencies between two versions of a witness' testimony." See United States v. Pagan-Santini, 451 F.3d 258, 265 (1st Cir. 2006) (no Napue violation where there was no evidence of knowing use by the government of false testimony and where there were "mere inconsistencies" between two version's of a witness' testimony).

testimony here concerned <u>substantive</u> <u>facts</u> which go to the heart of the defense: not simply a witness' credibility or simply that a witness lied about entering into a deal with the government, or lied about a wholly collateral matter not involving the substantive facts.  See <u>Wallach</u>, 935 F.2d at 456-57.  Whether Carpenter put Patterson, who represented the first Exchangor, and Paley in <u>direct contact</u> with Levine, who managed the Exchangors' funds at Merrill Lynch, and whether the detailed conversations and faxed escrow and exchange documents took place in October 1998 regarding the fact that these were third party funds which needed to be held in escrow as a result of a § 1031 exchange, are all critical facts that go to the heart of the issue of Carpenter's state of mind and good faith.  These substantive facts are a fundamental component of both Carpenter's good faith defense and the government's burden to prove he lacked good faith beyond a reasonable doubt.  That Carpenter voluntarily initiated and facilitated the communications between Levine and Patterson (and between Levine and Paley) is proof that Carpenter in good faith believed <u>inter alia</u>: that he had unfettered discretion to invest the Exchangors funds, and was never told by Levine, or anyone else, he could not do so;[20] and that he never hid from the Exchangors, their representatives, or Merrill Lynch that he was engaged in options trading at Merrill Lynch with those third-party funds.  In his mind he had done his due diligence to facilitate openness between the investors and the primary broker at Merrill Lynch. Such conduct is not that of a man who had the requisite intent to defraud, and thus strongly supports Carpenter's good faith defense.

Moreover, Levine not only lied about these substantive facts -- he was also the key government witness in a case of which this Court has previously stated that an acquittal "would have been rationally possible on the evidence."  <u>United States v. Carpenter</u>, 405 F. Supp.2d 85,

---

[20] This is particularly important because there is no evidence that anyone ever told Mr. Carpenter that he could not trade third party funds in the BPETCO accounts.

102-03 (D. Mass. 2005). As the primary broker on the BPETCO accounts, Levine testified to

Carpenter's opening of the Merrill Lynch accounts, his "risky" and aggressive trading strategy

and failure to follow Levine's more conservative recommendations, the heavy losses Carpenter

sustained as a result of his trading strategy, the warnings Levine gave Carpenter about his trading

strategy generally and the risks Levine informed Carpenter of with respect to options trading in

particular. Levine also testified that all he did was execute Carpenter's directives. One of the

inferences the jury could have drawn from Levine's testimony, and an inference the government

sought the jury to draw, was that all of the losses were sustained as a result of Carpenter's

allegedly "risky" options trading strategy. Indeed, that is what the government argued in its

opening, Tr.2: 4 ("There's the options trading which is causing the deficiency") and what is

alleged in the Superseding Indictment. See Superseding Indictment at ¶¶ 25, 26, 28, 29. The

truthfulness or accuracy of this testimony is in question.

The inference was not substantiated by the government's summary witness Thomas

Zappala. Zappala admitted, when asked on cross-examination, how much of the losses could be

attributed to options, that he did not know and testified that he was never asked to differentiate

between losses due to option trading or losses due to traditional stock investments. Tr.10: 64-

65.[21] Moreover, Levine's testimony that he unsuccessfully urged Carpenter to diversify his

portfolio beyond technology stocks, Tr.7: 71; 75-76, and the inference that this too was reckless

and improper of Carpenter, was contradicted by the acknowledgment on cross-examination by

Merrill Lynch's Thomas Rasmussen that during the same period, Merrill Lynch's chief

investment strategist, was publicly advocating such technology stocks. Tr. 8: 53-54; 56-58.

---

[21] See Defendant's (Corrected) Memorandum in Support of Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P. Rule 29 c) and, in the Alternative, for New Trial Pursuant to Fed. R. Crim. P. 33(a) filed 7/3/08.

Levine's testimony was also crucial to the government because he testified to incriminating statements Carpenter allegedly made to him, including that Carpenter refused to follow Levine's recommendations because it was "like watching paint dry or watching grass grow," and that in May 2000 when Carpenter was sustaining heavy losses and purportedly rejecting Levine's advice, that Carpenter had said that he "had the mentality of a riverboat gambler. . . ."[22]

Another inference the jury could have drawn from Levine's testimony was that as part of the alleged scheme, Carpenter surreptitiously engaged in trading third party funds at Merrill Lynch, see e.g., Superseding Indictment ¶¶ 31, 39, 40, 41, and that conversely, he never informed Levine that the funds were third party funds from § 1031 exchanges which were to be held in escrow, that he never put Patterson or Paley in contact with Levine for the same purpose, and he never took any steps to ensure that clients knew they could call Levine if they wished. Thus, Levine's false testimony was tainted "evidence" from which the jury could infer consciousness of guilt and that Carpenter had the intent to defraud and engaged in the alleged scheme, as opposed to the rock-solid Good Faith defense mentioned above. Even when the false testimony only affects the credibility of the witness, a circumstance far less material than when it affects the substantive facts of the case as here, Napue confirms that even then "[t]he jury's

---

[22] Levine's testimony was not cumulative of Merrill Lynch's Gary Stern's testimony. Levine provided testimony that no other witness could provide. It was Levine, not Stern, who communicated with Carpenter concerning the opening of Benistar accounts with Merrill Lynch and it was Levine, not Stern, who had daily communications with Carpenter about his trades and trading strategy. See Stern testimony Tr. 7: 39-40 ("whatever conversations for account opening was [sic] with my associate, Jerry,"; "Jerry Levine was responsible for opening up the accounts.") Levine was the "the primary broker" for the Benistar accounts at Merrill Lynch. Cahaly Evid.Hrg. 5/18/04 Tr. at 24-25, attached hereto as **Exhibit K**. As the primary broker, only Levine provided testimony concerning: his daily calls with Carpenter, Tr. 7: 69 (Stern only spoke with Carpenter on a weekly basis and sometimes not at all during the week, id. at 6: 101); the process by which Carpenter chose the stocks in which to trade, id. at 69-70; the alleged "unsolicited" nature of Carpenter's trades, id.; Levine's alleged advice that Carpenter should engage in covered calls, id. at 71; the information Levine provided to Carpenter, on a daily basis, concerning the cash positions resulting from the previous day's trades, id. at 74; Levine's conversations with Carpenter about the margin calls, id. at 77-78; and the highly prejudicial "river boat gambler" and "watching grass grow" statements Carpenter allegedly made to Levine. Id. at 77.

estimate of truthfulness and reliability may well be determinative of guilt or innocence."  Napue, 360 U.S. at 269; Wallach,  935 F.2d at 458 ("The taint of the false testimony is not erased because of his untruthfulness affects only his credibility as a witness.").  Had this jury been apprised of the fact that Levine had testified falsely about his communications with Patterson, there is certainly a reasonable likelihood that it would have discredited the entirety of Levine's testimony and, in so doing, determined that the government  failed to prove that Carpenter did not act in good faith.  As the Second Circuit stated in Wallach:

> Had it been brought to the attention of the jury that [the witness] was lying . . . *his entire testimony may have been rejected by the jury*.  It was one thing for the jury to learn that [the witness] has a history of improprieties; it would have been an entirely different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie…[B]ecause we are convinced that the government should have known that [the witness] was committing perjury, all convictions must be reversed.

Wallach, 935 F.2d at 457 (emphasis added).  Here too, Levine's false testimony "calls into question the veracity of the rest of his statements."  Id. at 458.  Because the government never corrected the false testimony and the jury was never instructed with respect to Levine's credibility or that his false testimony called into question his entire testimony, the jury deliberated having no actual knowledge that a key government witness had testified committed perjury.

Perhaps most importantly, it is impossible to know if, not having been apprised by the government that Levine lied, the jury credited all of Levine's testimony and believed that Carpenter had not put Patterson and Paley in direct contact with Levine.

Levine's false testimony as to substantive and critical events in the case is far more egregious and material than the false testimony in Wallach, 935 F.2d at 455-56, in which the witness lied on a collateral issue which only went to the witness' credibility but which resulted in

a reversal of the conviction.  It is also more egregious and material than the false testimony in

Napue and Mangual-Garcia in which the witnesses lied only about whether they had a deal with

the government but the convictions were reversed.[23]  The prejudicial nature of Levine's false

testimony was compounded because this was the only time Carpenter ever had any contact with

an investor or an investor's representative.  In addition, the government failed to correct that

false testimony before the jury and, instead of providing the Court with possible curative

instructions as the Court suggested, argued that Napue and Mangual-Garcia were not even

applicable.  Ultimately, the Court did not give any instructions regarding Levine's false

testimony.  While the defense argued that no instruction could cure the violation, that did not

absolve the government of its duty to correct Levine's false testimony.  Instead, in its closing

argument, it stated that "Merrill Lynch and PaineWebber are not on trial here; Mr. Carpenter …

alone is, and nothing they did or failed to do in any way diminishes Mr. Carpenter's

responsibility and culpability for his own actions."  Tr.13:69.  In fact, a crucial part of the

defense was that what Merrill Lynch did or did not do or lied about (in the person of Levine)

does in fact diminish Carpenter's criminal culpability as it is a critical aspect of his good faith

defense in believing that he was permitted to trade in third party funds.

Inexplicably, after the government had told the Court the limited argument it would make

with respect to Levine, in rebuttal the government argued "Mr. Carpenter wants -- Mr.

Pappalardo wants you to focus on the fact that Jerry Levine was sent letters; that Jerry Levine

was put in a position to know what was going on.  Does that mean he was operating this in an

open way?  No it does not."  Tr.13:113.  From this, the jury could have inferred that Levine did

not in fact have the detailed conversation with Carpenter and Patterson or that Levine had not

---

[23] The false testimony here is also more egregious than the circumstances in Casas, Doherty and McGovern in which the defendants failed to prove that the testimony was "false" in the first instance or amounted to anything more than inconsistencies between witness for which there was not sufficient evidence to show which version was true.

received the escrow or exchange agreements which were the same documents used for all the Exchangors. This could have had no effect but to compound the false Levine testimony and to guarantee a reasonable likelihood that it could have affected the judgment of the jury.

Because there is a reasonable likelihood that the false testimony could have affected the judgment of the jury, see Mangual-Garcia, 505 F.3d at 10; Wallach, 935 F.2d at 456-57, and the government cannot show that the false testimony is harmless beyond a reasonable doubt, Bagley, 473 U.S. at 679 n.9; Kattar, 840 F.2d at 128, a mistrial must be declared. Because of the egregious nature of the prosecutorial misconduct here, the case should be dismissed with prejudice.

## IV.    THE DOUBLE JEOPARDY CLAUSE BARS RETRIAL OF MR. CARPENTER

Mr. Carpenter has now suffered through not one, but two trials permeated with prosecutorial misconduct and government-sponsored perjury. The only thing that is apparent after two trials is that no crime of any sort was committed—only a civil breach of contract—and the prosecution's key witnesses (*i.e.*, Levine and Rock) literally had "millions" of reasons to lie. As for Mr. Carpenter, despite winning a $12.5 million arbitration award and judgment against PaineWebber and then **voluntarily** signing over the award to the Exchangors to make them whole, his good name, reputation, and business have been irreparably tarnished. His career as one of America's leading estate planning authorities is effectively over because of the zeal of federal prosecutors who ignored their oaths and engaged in egregious prosecutorial misconduct simply to convict an innocent man.[24]

---

[24] As former U.S. Secretary of Labor Raymond Donovan, the only cabinet secretary to be indicted while in office, said after he was finally exonerated of baseless criminal charges: "Which office do I go to to get my reputation back?"

In their zeal to convict Mr. Carpenter at all costs, the prosecutors knowingly and willfully sponsored and used Levine's patently false and perjured testimony, and this caused Mr. Carpenter severe prejudice.  See United States v. Maldonado-Rivera, 489 F.3d 60, 67 (1st Cir. 2007) ("a conviction obtained through the prosecution's knowing use of perjured testimony cannot stand.") (citing Napue).  Not only were the prosecutors' actions willful and were intended to (and did) cripple the defense, but they deprived Mr. Carpenter of his Constitutional rights to Due Process and a Fair Trial.[25]

In Mooney v. Holohan, 294 U.S. 103 (1935) (per curiam), the Supreme Court explained that due process:

> is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty *through a deliberate deception of court and jury by the presentation of testimony known to be perjured*.

Id. at 112 (emphasis added).  The following term, the Supreme Court reaffirmed the idea that the Due Process Clause forbids convictions predicated on deliberate deceptions.  See Brown v. Mississippi, 297 U.S. 278, 286 (1936).  Six years later, the Supreme Court needed only a single paragraph and a citation to Mooney to buttress its conclusion that "allegations that [the petitioner's] imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him . . . sufficiently charge a deprivation of rights guaranteed by the Federal Constitution."  Pyle v. Kansas, 317 U.S. 213, 216 (1942).  Given these precedents,

---

[25]  This Constitutional violation is also a violation of professional ethics.  *See American Bar Association's Standards for Criminal Justice* § 3-5.6(a) (3d ed. 1996) ("A prosecutor should not knowingly offer false evidence, whether by documents, tangible evidence, or the testimony of witnesses, or fail to seek withdrawal thereof upon discovery of its falsity.").

it is not surprising that, as early as 1951, the First Circuit described <u>Mooney</u>'s core premise as "well-settled." <u>Coggins v. O'Brien</u>, 188 F.2d 130, 138 (1st Cir. 1951).

Should this Court grant Mr. Carpenter's Motion for Mistrial, a dismissal *with prejudice* is the appropriate remedy, as a third trial of Mr. Carpenter, following the government's <u>Napue</u> violation and other assorted misconduct,[26] would violate the Double Jeopardy Clause. "The underlying idea [of the Double Jeopardy Clause], one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity as well as enhancing the possibility that even though innocent he may be found guilty." <u>Green v. United States</u>, 355 U.S. 184, 187-88 (1957). Fundamentally, the Double Jeopardy Clause protects the defendant's Constitutional interest in being tried in a single, fair proceeding before the original tribunal—the right to be free from multiple trials caused by willful prosecutorial misconduct. When the prosecution perverts that proceeding through deliberate acts of misconduct to avoid certain acquittal, the Double Jeopardy Clause bars any further attempt to harass that defendant, and forbids subjecting him to the indignity, expense, anxiety, and humiliation of another trial. <u>Id.</u>

To violate the Double Jeopardy Clause, the prosecutorial misconduct must have resulted from "intent on the part of the prosecutor to subvert the protections afforded by [that] Clause." <u>Oregon v. Kennedy</u>, 456 U.S. 667, 675-76 (1982).[27] In <u>Kennedy</u>, the Supreme Court held that if the prosecutor "goads" the defense into moving for a mistrial, and the mistrial is granted, the

---

[26] As discussed in detail in Defendant's (Corrected) Motion In Support Of Its Motion For Judgment Of Acquittal Pursuant To Fed. R. Crim. P. 29 (c) And, In The Alternative, For A New Trial Pursuant To Fed. R. Crim. P. 33(a), filed 7/3/2008.

[27] The First Circuit examined <u>Kennedy</u> as recently as today. <u>See United States v. Aviles-Sierra</u>, No. 07-2006 (Jul 11. 2008, 1st Cir.)

Double Jeopardy Clause bars a retrial.  Id.  Such misconduct or overreaching, intended to subvert a defendant's right to be free of harassment from multiple trials, is a Double Jeopardy violation.

In United States v. Singleterry, 683 F.2d 122, 123-24 (5th Cir. 1982), the Fifth Circuit recognized the possibility that prosecutorial misconduct may present a bar to retrial in situations beyond those considered in Kennedy.  Indeed, a number of federal courts have explored extending the logic of Kennedy to apply the "Double Jeopardy Clause to protect a defendant from retrial in some other circumstances where prosecutorial misconduct is undertaken with the intention of denying the defendant an opportunity to win an acquittal."  United States v. Wallach, 979 F.2d 912, 916 (2d Cir. 1992) ("Wallach II").  In Wallach II, the Second Circuit explained that the Double Jeopardy Clause bars retrial where "misconduct of the prosecutor is undertaken not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct."  Id.[28]  Critically, Wallach II, in rejecting the defendant's argument that retrial was barred by the Double Jeopardy principles of Kennedy, found that the defendant's case did not present evidence of "deliberate misconduct." 979 F.2d at 917.  The circumstances before this Court are starkly different, and the retrial of this case is barred as a result.

By knowingly sponsoring and relying upon Levine's false and perjured testimony, which the government knew was false prior to its introduction, in addition to the other instances of egregious prosecutorial misconduct in this case, the prosecution not only demonstrated bad faith,

---

[28]  See also United States v. Gary, 74 F.3d 304, 314-15 (1st Cir. 1996) (following Wallach); United States v. Catton, 130 F.3d 805, 806-7 (7th Cir. 1997) (citing Wallach, and discussing possibility of Double Jeopardy Clause as bar to calculated prosecutorial misconduct); Jacob v. Clarke, 52 F.3d 178, 181-82 (8th Cir. 1995) (same); United States v. Morrison, 449 U.S. 361, 365 n.2 (1981) ("pattern of recurring violations" may warrant imposition of extreme remedy of dismissal "in order to deter further lawlessness"); United States v. Tateo, 377 U.S. 463, 468 n.3 (1964) (holding Double Jeopardy may bar retrial where prosecutorial misconduct is motivated by a "fear that the jury was likely to acquit the accused."); United States v. Russell, 411 U.S. 423, 431-32 (1973) (acknowledging possibility of "situation in which the conduct of law enforcement agencies is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction").

but consciously disregarded the substantial risk that a reversal would result (after having already been chastised for improper conduct in the first trial).  The conclusion is inescapable that the prosecutors carefully, deliberately, willfully, knowingly, and intentionally sponsored and introduced false and perjured testimony, and the only reason for doing so was to avoid an outright acquittal.[29]  This misconduct is exactly of the type that should preclude the prosecution from making a *third* attempt.  Thus, the Double Jeopardy Clause bars a *third* trial in this case.

The misconduct in this case is exactly the type that should preclude the prosecution from making a *third* attempt.  To quote Judge Wyzanski, "a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators."  United States ex. rel. Williams v. Twomey, 510 F.2d 634, 640 (7th Cir. 1975).  Stripped of his armor of the truth, Mr. Carpenter was, indeed, sacrificed to the government's gladiators, who then publicly exalted in their triumph that Mr. Carpenter "had lost over $9 million in client money,"[30] without also stating that the Exchangors had since been made whole on their losses—due to the efforts of Mr. Carpenter.

## V.    CONCLUSION

For the forgoing reasons, the defendant Daniel E. Carpenter respectfully requests that the Superseding Indictment be dismissed with prejudice or, in the alternative, that this motion for a mistrial be granted.

---

[29]  One of the government's theories to disprove beyond a reasonable doubt that Mr. Carpenter acted in good faith was to show that Mr. Carpenter somehow hid the real nature of BPETCO's business from Levine, or the nature of the investments from Patterson, when the Merrill Lynch accounts were opened in October 1998.  The absence of Levine's false and perjured testimony dismantles the government's theory of criminality.  Conversely, if Levine told the truth and admitted to all three telephone calls, then he would establish Carpenter's Good Faith defense beyond any doubt.

[30]  See Press Release, U.S. Dept. of Justice, *Benestar* (sic) *Chairman Convicted of Fraud* (Jun. 19, 2008).

**REQUEST FOR ORAL ARGUMENT**

Mr. Carpenter hereby requests oral argument with respect to this motion.

**RESPECTFULLY SUBMITTED:**
DANIEL E. CARPENTER, Defendant,

By his attorney:

/s/ A. John Pappalardo
A. John Pappalardo (BBO # 338760)
GREENBERG TRAURIG, LLP
One International Place, 20th Floor
Boston, MA 02110
(617) 310-6000
(617) 310-6001 (fax)

**<u>Certificate of Service</u>**

I hereby certify that on this 11th day of July, 2008, I served on counsel of record in the foregoing matter Daniel E. Carpenter's Reply Memorandum in Support of Motion for Mistrial, by means of the ECF system.

/s/ A. John Pappalardo
A. John Pappalardo

BOS 46,369,694v8 7-11-08