# EXHIBIT I

Benistar5-19-04.txt

```
 1              COMMONWEALTH OF MASSACHUSETTS
 2     SUFFOLK ss        SUPERIOR COURT DEPARTMENT
                         OF THE TRIAL COURT
 3                       CIVIL ACTION 02-00116
 4     ****************************************************
       CAHALY, ET AL. PLAINTIFF,
 5
       v.
 6
       BENISTAR PROPERTY EXHANGE TRUST ET AL. DEFENDANTS
 7
       ****************************************************
 8
 9                        HEARING
10                 TRANSCRIPT OF PROCEEDINGS
11
                              BEFORE: Botsford, J.
12                            DATE:   May 19, 2004
13
14     APPEARANCES --
15
16                    Kathleen M. Rael
17                   Official Court Reporter
18
19
20
21
22
23
24
```

```
 1
 2                        INDEX
 3                                                 PAGE
```

Page 1

GOV 26247

Benistar5-19-04.txt

18   THE COURT: Mr. Zelle.
19   MR. ZELLE: Mr. Paley, please.
20   THE CLERK: Please raise your right hand.
21        MARTIN PALEY,
22   (after having been first duly sworn, was
23   examined and testified as follows:)
24   DIRECT EXAMINATION

0  120

1   BY MR. ZELLE:
2   Q   Can you state your full name, Mr. Paley?
3   A   Martin Paley.
4   Q   You've testified in connection with -- with the
5       proceedings against Benistar by the plaintiffs in
6       the past. Since that time, have you been given
7       immunity from criminal liability?
8   A   No, I have not.
9   Q   You've spoken with the U.S. Attorney, is that
10      right?
11  A   Yes, I have.
12  Q   And in those discussions, was there any agreement
13      whatsoever with respect to your continuing
14      exposure for criminal liability?
15  A   No.
16  Q   Do you understand -- strike that.
17      There has been a settlement entered into with
18      the plaintiffs by you, is that right, Mr. Paley?
19  A   Yes.
20  Q   And do you understand that the settlement
21      agreement will be void if any material
22      misrepresentation -- if there's any material

Page 99

GOV 26248

Benistar5-19-04.txt

19  MR. GREENBERG: Objection, Your Honor.
20  THE COURT: Sustained.
21  Q  All right. Let me ask you this way. What did you
22     do to determine the specific investment that was
23     being done with the funds?
24  A  I didn't do anything.

D 126

1  Q  Why not?
2  A  I was doing what I was good at doing, and I left
3     Dan to do what he was good at doing.
4     MR. ZELLE: What we've marked as Exhibit 32A,
5     Your Honor, is Mr. Paley's affidavit with the
6     attachments.
7     THE COURT: Okay.
8     MR. ZELLE: I'll offer that.
9     THE COURT: What's 32A? Is that what you
10    said?
11    MR. ZELLE: It's 32A, yeah --
12    MR. SNYDER: I'm sorry. It's 32A?
13    THE COURT: Well, 32 was yesterday the
14    affidavit without the attachments, and this is 32A
15    with the attachments.
16    MR. SNYDER: Okay.
17    MR. ATTORNEY: Excuse me, Your Honor. Are
18    you sure you didn't mark it? I thought you were
19    going to hold off marking it until we got two.
20    MR. ZELLE: I think that's probably right,
21    because Mr. Snyder said he was going to be marking
22    some exhibits so...
23    So this is not -- I'm sorry. Did you agree
24    to mark this 32A, John, or not?

Page 104

GOV 26253

Benistar5-19-04.txt

D 127

```
 1            THE COURT: It's Mr. Greenberg who doesn't
 2   have the attachments.
 3            MR. GREENBERG: I want to see if we have an
 4   objection. That's all.
 5            THE COURT: But you have them. I know you
 6   have them.
 7            MR. SNYDER: That's why I thought it was
 8   already in.
 9            MR. GREENBERG: Your Honor, I object to these
10   attachments.
11            THE COURT: Can I see them? Well, let me say
12   this, Mr. Snyder, do you object to them?
13            MR. SNYDER: No, Your Honor.
14            THE COURT: Okay. For -- for present
15   purposes, I'm only going to admit them against
16   Merill Lynch. We'll deal with it otherwise.
17            MR. ZELLE: That's fine.
18            THE COURT: Okay.
19   Q   I'm going to show you the affidavit, Mr. Paley,
20       that you signed, is that right?
21   A   Yes.
22   Q   What led to your providing this affidavit, for the
23       Court?
```

D 128
```
24   A   That I realized I had spoken to Mr. Levine and he

 1       was well aware of what an exchange was and what
 2       Merill Lynch's role would be.
 3   Q   All right. When you say you realized, you heard
```

Page 105

GOV 26254

Benistar5-19-04.txt

```
 4        Mr. Levine testify at the trial of this case,
 5   didn't you?
 6   A   I did.
 7   Q   And what did you do when you heard him testify
 8       that he had never heard of Martin Paley and never
 9       spoken to Martin Palely?
10   A   I notified my attorney to say that I had.
11   Q   What did you tell him?
12   A   I said that I had.
13         THE COURT: Are we having waiver here,
14   because before we go any further.
15         MR. SNYDER: Looks like it.
16         MR. GREENBERG: My understanding is this
17   witness waived everything, including all Fifth
18   Amendment rights.
19         THE COURT: I know the Fifth Amendment. But
20   I'm talking attorney-client now.
21         MR. GREENBERG: Sounds like --
22         MR. GARFINKLE: He has -- he's talking about
23   one conversation. I don't read that as a blanket
24   waiver of the entire attorney-client privilege.
```

D  129

```
 1   If so, I'll instruct him not to answer.
 2         THE COURT: Well, I'm not sure it's confined
 3   to that conversation.
 4         MR. GARFINKLE: Then I'll instruct him not to
 5   respond to any conversation he had with me.
 6         MR. SNYDER: Well, Your Honor, I think if --
 7   if we're proceeding in that fashion, that
 8   testimony needs to be stricken --
 9         THE COURT: Right. I understand.
```

Page 106

Benistar5-19-04.txt

```
10          MR. SNYDER: -- that otherwise it is a waiver
11     as to all matters under --
12          THE COURT: Well, I'm -- I'm striking it.
13   Q  Mr. Paley, why didn't you come forward with this
14      testimony after hearing Mr. Levine's testimony at
15      trial?
16   A  As I was still in jeopardy of being pursued on the
17      criminal case.
18   Q  You are still in jeopardy today, aren't you?
19   A  I am.
20   Q  But you're coming forward. Can you tell the Court
21      why you're coming forward today?
22   A  Because I did speak to Gerry Levine and I did
23      instruct him as to what was going on in the
24      account, and that that needs -- that record needs
```

0  130

```
1       to be stated.
2    Q  Now, your agreement to provide this affidavit to
3       the Court was not entirely altruistic. It was
4       contingent on a settlement agreement, right?
5    A  Yes, it was.
6          MR. ZELLE: Let me mark then, Your Honor, the
7       settlement agreement. Are we on 40?
8          THE COURT: Yes, we are.
9          (Exhibit 40, Document, marked.)
10   Q  Let me show you what's been marked as Exhibit 40.
11      Mr. Paley, direct your attention to the last page,
12      is that your signature page?
13   A  Yes.
14   Q  And included with that exhibit are signatures
```

Page 107

Benistar5-19-04.txt

15    pages for all of the plaintiffs except
16    Mr. Iantoska; is that right?
17  A  Yes.
18  Q  And you understand that that settlement agreement
19    is contingent upon the veracity of the
20    representations in your affidavit, correct?
21  A  Correct.
22  Q  In reaching the settlement agreement, and you met
23    with your attorney and myself and Mr. Nystrom,
24    Mr. O'Brien and Ms. Cook, is that right?

0  131

1  A  Yes.
2  Q  And we discussed what would be included in your
3    affidavit, correct?
4  A  It was discussed. Yes.
5  Q  Okay. And after the meeting, the affidavit was
6    drafted, right?
7  A  Yes.
8  Q  And in the affidavit, you described your telephone
9    conversation with Mr. Levine, is that right?
10 A  Yes.
11 Q  Do you have a clear recollection -- well, let me
12    direct your attention to the affidavit. Can you
13    identify for the Court the specific paragraphs
14    that recount that -- that discussion?
15        THE COURT: Try 11 through 15.
16        THE WITNESS: Thank you.
17        THE COURT: Twelve through fifteen.
18        THE WITNESS: Mine goes up to six. Oh, you
19    meant the paragraph?
20        THE COURT: Yes.

Page 108

GOV 26257

Benistar5-19-04.txt

```
21            THE WITNESS: I'm sorry. Sorry.
22            THE COURT: Starting at the bottom of page
23       four.
24            THE WITNESS: Yes. Thank you. Sorry. Okay.
```
D 132

```
1        I'm there.
2    Q   Okay. What -- just again so it's clear on the
3        record, which are the paragraphs that were
4        conversations you had with Mr. Levine?
5    A   It's paragraph twelve on page four.
6            THE COURT: It keeps going.
7    A   And keeps going.
8    Q   Do you have a clear recollection of that
9        conversation as you sit here today?
10   A   Yes.
11   Q   Tell us -- tell the Court, please, in as much
12       detail as you can recall, the substance of your
13       conversation with Mr. Levine.
14   A   We explained pleasantries. I explained who I was,
15       that we were -- I was given his name by Dan
16       Carpenter; that we were in the business or
17       starting the business of doing tax deferred
18       property exchange for clients, we're be holding
19       clients' money. He had -- I asked him if he never
20       knew about an exchange, and he made some vague
21       reference to, those are what they call swaps. And
22       that's incorrect. And so I corrected him to what
23       the new -- excuse me -- what the current nature of
24       exchanges were, that clients would be -- we'd be
```
D 133

Page 109

GOV 26258

Benistar5-19-04.txt

1      holding clients' money subject to Section 1031 of
2      the Internal Revenue Code, and then be returning
3      it to them when they requested up until 180 days.
4 Q Did you tell him that the money had to be held in
5      escrow?
6 A Yes.
7 Q Did you tell him that Benistar properties served
8      as an intermediary?
9 A I did.
10      MR. SNYDER: Objection, Your Honor, to the
11      leading here.
12      THE COURT: Okay. Fair enough.
13 Q Okay. Did you tell him about the manner in which
14      the funds or the type of account in which the
15      funds should be held?
16 A I said escrow account to make sure that the money
17      was available for the clients when they needed it.
18 Q And what did you explain to him in terms of
19      availability?
20 A It had to be available immediately, within --
21      well, in our case within 48 hours, but that's
22      pretty immediate.
23 Q Was there any discussion about the escrow
24      agreements or exchange agreements that Benistar

134

1      property had with its clients?
2 A No. There was no mention of those agreements.
3 Q Did you make any effort to locate your telephone
4      records to identify a call to Merill Lynch?
5 A Yes, I did.

Page 110

GOV 26259

Benistar5-19-04.txt

6  Q  And let me just back up. When did this
7     conversation take place with Mr. Levine?
8  A  October of 1998.
9  Q  Okay.
10      THE COURT: I just want to ask you something,
11 Mr. Paley. You said that money had to be
12 available -- you said you said to Mr. Levine that
13 the money had to be available within 48 hours; is
14 that right?
15      THE WITNESS: The way we had termed our
16 agreements, yes.
17      THE COURT: But if the money was put into a
18 6 percent account, the -- the account selection
19 form says it has to be available within 30 days.
20      THE WITNESS: That's correct. They were
21 saying this on the -- the more immediate side.
22      THE COURT: Did you explain to him that there
23 were two types of accounts.
24      THE WITNESS: No. Not at that time.

0  135

1  Q  You only had that one account?
2  A  Well, it was only one time, that's right.
3  Q  Well, what -- going back to your efforts to locate
4     telephone records, describe what you did.
5  A  I went to my telephone records. I attempted to
6     locate the time of -- of calling Mr. Levine. I
7     have act database that has telephone numbers in
8     it, and attempted to determine when exactly I'd
9     spoken to Mr. Levine.
10 Q  Let me back up. Why did you call Mr. Levine at

Page 111

GOV 26260

```
                        Benistar5-19-04.txt
11                 Merill Lynch?
12      A    Dan Carpenter told me to.
13      Q    What did he tell you specifically with respect to
14           calling Mr. Levine?
15      A    To talk to -- to Mr. Levine because he had
16           knowledge of Dan and Dan's investment activities,
17           it would be a way to introduce myself to
18           Mr. Levine. And that it would be a good idea for
19           me to know who the account rep would be on the
20           account.
21      Q    Did you tell him who you were?
22      A    Did I tell Levine who I was?
23      Q    Mr. Levine who you were?
24      A    Yes. Yes.
```

D  136

```
1       Q    And did you tell him that you were the president
2            of Benistar Property Exchange?
3       A    I did.
4       Q    Did you tell him about the --
5            THE COURT: No leading.
6       Q    Strike that. What did you tell Mr. Levine about
7            your experience with property exchanges?
8       A    I had said that I had done them since June of
9            1995; that they -- I've also said that in the
10           former association with Nationwide that we all --
11           that Nationwide had also used Merill Lynch in
12           their office in California. And I gave them the
13           name of an account executive there that I knew the
14           name of, and suggested that he, meaning Levine,
15           speak to the account rep in California,
16           Mr. Warthen, about how the accounts could be set
                              Page 112
```

Benistar5-19-04.txt

```
17           up at Merill Lynch from -- from Merill Lynch's
18           point of view.
19    Q      Did Mr. Levine say anything to you with respect to
20           his knowledge of property exchanges?
21    A      He had mentioned again about the common
22           misconception of -- of swap. In other words, that
23           I would swap for somebody else's property
24           directly, which is not -- not the case. And I
```

0   137

```
1            took pains to correct him on that.
2     Q      Specifically what did you say to Mr. Levine to
3            correct his misconception about properties
4            exchange?
5     A      Specifically that there is no direct swap of -- of
6            property from, you know, person A to person B,
7            that the relinquished property, the property sold,
8            proceeds can be deposited with intermediary held,
9            and then that exchange -- the exchange could be
10           completed by the -- by the person selling the
11           property, by buying a property to replace anywhere
12           in the country of any kind.
13    Q      What did you explain to Mr. Levine about the
14           mechanics of the transfer of funds?
15    A      Just generally that money would go in, and.
16    Q      How would it go in?
17    A      Well, okay. Would be wire transferred in
18           generally. That's how the vast majority of our
19           transactions went. They were wired. And that
20           generally, and again, the vast majority of the
21           money when it's taken out of the account to
```

Page 113

GOV 26262

Benistar5-19-04.txt

22   complete the exchange, was also sent by wire to a
23   closing.
24 Q   What specifically did you tell Mr. Levine about

D 138

1    Benistar property's obligations as an escrow
2    agent?
3 A   That the money had to be held ready for it to be
4    transferred on a very short notice, if -- if
5    designated by the client.
6 Q   Did Mr. Levine say anything during the conference
7    to indicate to you that he understood the
8    essential facts and nature of the Benistar
9    property exchange business?
10 A   Yes. He had assented to what I said. He seemed
11   to -- to -- say he understood.
12 Q   Did anything Mr. Levine say indicate to you that
13   he understood --
14        THE COURT: Well, let's find out what he
15   said.
16 Q   Okay. What did Mr. Levine say to you to indicate
17   that he understood?
18 A   After our conversation, he said something like, I
19   got it, or I understand, or, you know, thank you
20   for calling. I, you know, I understand what we're
21   doing here. And the conversation ended.
22 Q   Did Mr. Levine say -- or strike that. What did
23   Mr. -- I guess I'll lay a foundation. Did
24   Mr. Levine say anything to you?

D 139

1        THE COURT: Before you lay the foundation,
         Page 114

GOV 26263