UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER, | ) | |
| Defendant | ) | |

**UNITED STATES' CONSOLIDATED OPPOSITION
TO DEFENDANT'S SUPPLEMENTAL MOTIONS
FOR JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL**

The United States hereby opposes Defendant Daniel Carpenter's ("Carpenter" or "Defendant") Supplemental Motion for Judgment of Acquittal (the "Supplemental Motion"), Supplemental Rule 29(a) Motion for Partial Judgment of Acquittal ("Partial Acquittal Motion"), and Supplemental Motion for New Trial ("New Trial Motion"). In these various "Supplemental" motions, Carpenter raises multiple arguments for acquittal and new trial over and above what appears in his 67-page Motion for Judgment of Acquittal and New Trial. For the reasons that follow, this Court should deny all three motions.

### I. The Supplemental Motion (Docket No. 311)

In the Supplemental Motion, Carpenter challenges the sufficiency of the evidence and makes various Constitutional challenges to the verdict. As the United States discusses below, ample evidence supported the jury's conclusion that Carpenter's conduct violated both the mail and the wire fraud statutes. Carpenter's various additional arguments that the conviction violates the Due Process Clause, the Double Jeopardy Clause, and the "Principle of Concurrence" are without merit.

### A. The Mail and Wire Fraud Statutes Apply To Carpenter's Conduct

Carpenter first asks for acquittal on the ground that the evidence was insufficient to show that he committed mail and wire fraud. Specifically, he argues that the evidence at trial showed nothing other than a "mere breach of contract" that did not violate the mail and wire fraud statutes. [SM at 2].[1] Carpenter faces an imposing standard in challenging his conviction on this basis. See United States v. Vasquez-Botat, 2008 WL 2673181 *18 (July 9, 2008) ("Our central task in evaluating the sufficiency of the evidence is to determine whether a rational factfinder could have found each element of the crime in question beyond a reasonable doubt . . . looking at the record as a whole and resolving all questions of credibility and reasonable inferences in favor of the verdict.") (internal citation and quotation omitted). Carpenter falls well short of meeting this standard.

Carpenter makes two assertions in support of his claim that the evidence showed a "mere breach of contract" that did not violate the mail and wire fraud statutes: 1) that the United States *only* proved that Benistar Property Exchange Trust Company ("Benistar") breached its contracts with the exchangors by failing in January 2001 to complete successfully certain of their property exchanges, and 2) that it has been "adjudged" that the breach of contract "was caused by the intervening misconduct of PaineWebber." [SM at 2-3]. Neither of these assertions has merit.

---

[1] References to Carpenter's Supplemental Memorandum are "[SM at (page)]." References to Carpenter's Partial Acquittal Motion are "[PAM at (page)]". References to Carpenter's New Trial Motion are "[NTM at (page)]." References to the trial transcript are "[Tr. (day)-(page)]." References to Trial Exhibits are "[Ex. (number)]." References to docket entries are "[Dkt. (number)]." References to the 2005 trial are "[2005 Tr. (day)-(page)]."

Carpenter cannot credibly assert that the United States proved nothing more than that the exchangors did not get paid in January 2001. Indeed, most of the evidence in this case focused on Carpenter's fraudulent conduct *before* January 2001. That evidence, which focused on conduct up to December 14, 2000, amply showed that Carpenter intentionally engaged in a scheme to defraud and obtain money by false and fraudulent pretenses and that both the mails and the wires were used in furtherance of that scheme. As set forth in the closing argument, the evidence showed that Carpenter knew what service Benistar held itself out to provide for the exchangors; that he knew what the marketing materials said; that he knew what the contracts, especially the escrow agreements, said; that he knew that the documents did not disclose anywhere the true risks he was running, and intended to run, with the exchangors' money; that he knew that the contracts and marketing materials said nothing about Paley's and Carpenter's side deal to split what they hoped to be $1 million in excess profits generated by putting the exchangors' funds at risk in the options market; and that Carpenter knew that Benistar' obligations to exchangors in the fall of 2000 far exceeded the funds it had to meet those obligations. On this record, a rational factfinder could find that Carpenter obtained money under false and fraudulent pretenses with the specific intent to defraud.

Carpenter's second assertion – that the evidence established that PaineWebber's "intervening misconduct" caused the "breach of contract" – suffers from a variety of deficiencies. First, Carpenter's characterization of what occurred at the arbitration is untrue. Nowhere does the arbitration award state that PaineWebber committed "intervening misconduct" or that Carpenter did not commit fraud. Indeed, as the United States pointed out in its pretrial filings, the arbitration record shows that PaineWebber's liability was premised on the notion that

Carpenter *had* committed fraud. [See Dkt. 250]. Second, the Court admitted the evidence of the award and settlement solely to impeach Mitchell Rock's testimony. Having heard that evidence, it was well within the province of the jury to weigh Rock's credibility with regard to Carpenter's role and conclude that Carpenter committed fraud. See United States v. Calderon, 77 F.3d 6, 10 (1st Cir. 1996) ("Credibility determinations are uniquely within the jury's province, and we defer to the jury's verdict if the evidence can support varying inferences.").

Third, the evidence of what Carpenter calls PaineWebber's "intervening misconduct" bears on the issue of the exchangors' lost funds. It does not bear on the question of whether Carpenter obtained money from the exchangors on the basis of false or fraudulent pretenses. According to Rock, PaineWebber did not stop Carpenter's trading until December 19, 2000, five days after the last wire transfer charged in the indictment. [Tr. 8-156]. Whatever PaineWebber may have done to stop Carpenter's options trading on or about December 19, 2000, does not nullify the evidence of Carpenter's fraudulent conduct before then. A rational factfinder properly could conclude that Carpenter committed fraud when he obtained the exchangors' money on each of the occasions charged as counts in the indictment, regardless of whether Carpenter (as he suggested during his cross-examination of Rock) would have made back the money.[2]

---

[2] The case upon which Carpenter relies, United States v. D'Amato, 39 F.3d 1249 (2nd Cir. 1994), bears little resemblance to this case. In D'Amato, the Second Circuit held that there was insufficient evidence of intent to support a mail fraud conviction against a lawyer who had been hired by a corporation to perform lobbying efforts for the corporation. Id. at 1259-61. The government had sought to convict the lawyer on the ground that the lawyer had defrauded the corporation by disguising his services through another lawyer at his firm and failing to prepare certain reports for which the corporation was purportedly paying him. Id. The evidence, however, was that an agent of the corporation who appeared to have appropriate authority to speak for the corporation had instructed him to disguise his involvement and not to prepare the

### B.   There Is No Due Process Violation

Carpenter claims he did not have adequate notice that his conduct violated the mail and wire fraud statutes. Specifically, Carpenter complains that application of the mail and wire fraud statutes to him would violate the Due Process Clause because it opens the door for prosecution of "*unintentional* breach of a commercial contract." [SM at 5 (emphasis in original)]. This argument ignores both the indictment and the jury's verdict. Carpenter was charged with and convicted of obtaining money by means of false and fraudulent pretenses with *the specific intent to deceive*. This fact seriously undermines Carpenter's protest that he was not given fair warning that his conduct was criminal. See, for example, United States v. Bohonus, 628 F.2d 1167, 1174 (9th Cir. 1980) ("A specific intent requirement does not necessarily validate a criminal statute against all vagueness challenges. It does, however, eliminate the objection that the statute punishes the accused for an offense of which he was unaware." (citing cases)). The record here reveals little that is novel about the application of the mail and wire fraud statutes to Carpenter. His conduct of intentionally taking the exchangors' money under the false pretense that it would be kept safe and secure while intentionally using that money to engage in self dealing options trading fits comfortably within the mail and wire fraud statute, as well as notions of common law fraud.[3]   There is no violation of the Due Process Clause here.

---

reports. Id.  Here, none of the exchangors, or anyone acting on behalf of the exchangors, instructed Carpenter to put their money into the options market. Indeed, the evidence is overwhelming that the exchangors never knew the money was going into options.

[3] Carpenter's conduct was fraud under Massachusetts law, as both the Massachusetts Appeals Court and the Supreme Judicial Court held. See Cahaly v. Benistar Property Exchange Trust Co., 68 Mass. App. Ct. 668, 670-71 & 680-81 (2007) ("Finally, the Benistar defendants claim that Daniel Carpenter could not have made false representations to the plaintiffs because, as the plaintiffs testified, they had not met, spoken to, or communicated in writing with him. The

### C. The Rule Of Lenity Does Not Apply Here

In a variant of his Due Process argument, Carpenter argues that he must be acquitted under the Rule of Lenity. [SM 8-12]. The Rule of Lenity is a rule of statutory construction only applicable to ambiguous statutes. The mail and wire fraud statutes are not ambiguous. See United States v. Luongo, 11 F.3d 7, 9 (1st Cir. 1993) (rule of lenity did not apply to wire fraud statute because "wire fraud statute is unambiguous"). There is nothing ambiguous about the application of the mail and wire fraud statutes to Carpenter. Although Carpenter suggests he is only being prosecuted for putting the exchangors' money in stock options [SM 10-11], that is not an accurate description of his crime. See United States v. Carpenter, 405 F. Supp.2d 85, 93 (D. Mass. 2005) ("The object of the scheme to defraud was obtaining control of the exchangors' money by false pretenses; the fraud was not, as the defendant has himself repeatedly emphasized, the pursuit of an incautious investment strategy."). The indictment did not charge Carpenter with mail and wire fraud solely because he put the funds into stock options. The indictment charged Carpenter with obtaining money from the exchangors under false and fraudulent pretenses with the specific intent to deceive. [See, for example, Dkt. 34 ¶¶ 27,41,49]. The mail and wire fraud statutes are not ambiguous in their application to such conduct.

---

jury's finding of misrepresentation is supported by ample evidence in the record that Daniel Carpenter was responsible for promotional material and was intimately involved in Benistar's communications with clients, including the agreements themselves, which represented that funds would be placed in three- and six-percent money market accounts and repaid upon request. His direct personal contact with the plaintiffs was not a requirement for a finding of misrepresentation in this case, and we decline to disturb the jury verdict."); Cahaly v. Benistar Property Exchange Trust Co., 451 Mass. 343, 369 (2008) (affirming jury verdict against Carpenter).

### D.    Carpenter Can Properly Be Held Accountable For Half-Truths

Carpenter argues that the government failed to prove that he had a legal duty to disclose how he was investing the funds and that he is entitled to acquittal on that basis. [SM at 12]. He is wrong. "It requires no extended discussion of authority to demonstrate that omissions or concealment of material information can constitute fraud . . . under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation." United States v. Keplinger, 776 F.2d 678, 697 (7th Cir. 1985) (citing cases) (also rejecting notion that a fiduciary duty is required). That is why misleading half-truths or misleading partial statements fall within the scope of the mail and wire fraud statutes. See First Circuit Pattern Jury Instructions, 4.12 (mail fraud) (1998); see also Carpenter, 405 F.Supp.2d at 92.[4] The evidence at trial amply established that statements in both the Benistar marketing materials and Benistar agreements with the exchangors contained materially misleading statements because of the information that was omitted. This includes such statements in the escrow agreement that the funds would be "invested" (without disclosing that the "investment" was options), that the funds would be held in 3% and 6% accounts (without disclosing that the funds would be transferred between accounts to facilitate Carpenter's options strategy and would be put at enormous risk); and that the funds would be held for the exchangors' benefit (without disclosing that Carpenter would be self-dealing with the funds). It also includes the various representations about the

---

[4] Carpenter cites United States v. Anzalone, 766 F.2d 676, 682 (1st Cir. 1985) as if it addressed 1031 exchange transactions. [SM at 14 (purporting to quote from Anzalone: "If the government wishes to impose a duty on [§ 1031 qualified intermediaries to disclose the manner of their investment], let it require so in plain language."]. Anzalone, however, involved application of the Currency Transaction Reporting Act, 31 U.S.C. § 5311 et seq. in the context of a structured transaction. It had nothing to do with § 1031 exchanges.

security of the funds which intentionally omitted a) the risk disclosures Carpenter agreed to when setting up his trading accounts with Merrill Lynch and PaineWebber, b) the fact that Benistar had insufficient funds on hand to meet Benistar's obligations to the exchangors, and c) that Carpenter had been shut down from opening new options positions at Merrill Lynch because he was incurring too much risk. The evidence of fraudulent and misleading half-truths was sufficient.[5]

### E.    There Is No Double Jeopardy Problem Here

The Double Jeopardy Clause does not bar Carpenter's conviction. The First Circuit has already held that the Double Jeopardy Clause does not bar Carpenter's retrial. See United States v. Carpenter, 494 F.3d 13, 26 (1st Cir. 2007) (holding that Carpenter did not have a "viable double jeopardy claim"). In Carpenter, the First Circuit noted that this Court had granted a new trial because of legal error and that, under such circumstances, "the concept of continuing jeopardy rules out a double jeopardy claim based on purported insufficiency of evidence at the first trial." Id. This forecloses Carpenter's Double Jeopardy argument here.

Notwithstanding the First Circuit's direction on this, Carpenter continues to assert that the Court acquitted him in the first trial on an issue (Paley's agency relationship to Carpenter)

---

[5] The case was not limited to omissions. The indictment alleged and the evidence at trial showed affirmative misrepresentations. [See, e.g., Dkt. 34 at ¶¶ 41, 49; Tr. 13-56-57 (closing argument discussing actual falsity of representations in escrow agreement)]. The documents given to the exchangors touted Benistar's trustworthiness, promised to hold client funds for their benefit in escrow in short-term, fixed interest accounts, stated that Benistar would not transfer the money out of the account without the exchangors' written authorization, and committed to return the funds, in full, either to be disbursed for the client's use in closing on the purchase of replacement property or to be returned to the client if no replacement property transaction was to occur. The evidence was sufficient to allow a rational jury to conclude that these representations were affirmatively false.

that he says was necessary to the verdict in this case. [SM 15-16]. Carpenter is wrong on the law. A partial ruling is not an acquittal for double jeopardy purposes. See United States v. Pacheco, 434 F.3d 106, 114-115 (1st Cir. 2006) (rejecting concept that a partial directed verdict created a double jeopardy bar). He is also wrong on the facts. In support of his claim that the Court found at the first trial insufficient evidence "that Paley was Mr. Carpenter's agent," [SM at 15], Carpenter refers to a statement the Court made during the charge conference of the first trial. [SM at 15, n.7]. Carpenter mischaracterizes that statement. In the referenced statement the Court was addressing the question of whether the government would be permitted to argue that Carpenter was responsible for any statements Palely made that were different from what was in the written materials. The Court said that the statements chargeable to Carpenter were those in the written materials and not any statements from Paley that were different from what Carpenter had approved:

> The COURT: In other words there is evidence from this jury to find that Mr. Carpenter reviewed and, therefore, implicitly approved the language in the written instruments and including the promotional materials. But I don't think there is enough, even the evidence of general supervision and decision-making, is enough to connect any statement by Mr. Paley *that is different from what has – from what language it could be concluded he had approved, connection any such statement* with Mr. Carpenter. [2005 Tr. 7/25/05 at 45 (italics supplied)].[6]

This is not a finding, as Carpenter now argues, that "Carpenter had prevailed on the issue of whether Paley was acting as *Mr. Carpenter's* agent." [SM at 15 (emphasis in original)]. To the contrary, in the language quoted above, the Court stated that the evidence was sufficient to find

---

[6] Carpenter omits the italicized portion of the statement from his reference. [See SM at 15,n.7].

that Carpenter had authorized Paley to communicate the language in the written instruments, including the promotional materials. In the second trial, the evidence on this issue was presented the same way: Carpenter was responsible for the continued communication of the written materials to the exchangors. No Double Jeopardy issue of any kind exists here.

### F.     Carpenter's Causation Argument Is Without Merit

Carpenter argues that a "gaping void" exists between the evidence of Carpenter's "actus reus" and "mens rea." [SM 19-20]. Carpenter says the only proof of any acts by Carpenter is dated from 1998, while the indictment limited the crime to the August 2000 through December 2000 time frame. [SM 19]. This Court already rejected a similar argument in its order on the motion for a new trial. See Carpenter, 405 F.Supp.2d at 95 ("Though Carpenter may not have acted as directly as Paley did to solicit exchangors or to execute the transaction documents with them, his participation in the creation of Benistar Property Exchange Trust Company was more than just an isolated historical event with no ongoing effect. To the contrary, having joined with Paley initially to devise the fraudulent scheme, Carpenter remained a participant in it. Paley's acts in furtherance of the scheme produced the funds which Carpenter used to conduct his trading."). The Court should reject this argument now.

Contrary to Carpenter's contentions, the scheme charged was not limited to the period August 2000 to December 2000. Although the indictment does not list the precise date as marking the commencement of the scheme, it alleges in detail the false and fraudulent pretenses and representations that induced clients to entrust their escrow funds to Carpenter's company as well as the undisclosed self dealing trading in high risk options that violated those representations. Those representations were contained in documents that dated as far back as the

10

formation of Benistar in 1998 and continued through at least December 2000.  [See, e.g., Exs. 90-93, 100-103, 105-108, 140, 141].  That the charged mailings and wires occurred between August 2000 and December 2000 does not mean that the scheme was limited to that time frame.  Benistar's pledge to hold client funds in a fixed interest escrow account was just as false and misleading in the fall of 1998, when Carpenter opened the options trading account at Merrill Lynch, as it was in the latter part of 2000 when he continued to trade in options through PaineWebber after having been shut down at Merrill Lynch.  It does not matter that the earlier clients – such as David Patterson's client – escaped without loss of funds.  They were still fraudulently induced to entrust their money to Carpenter's company.

Also, the evidence shows that Carpenter's participation in the scheme did not begin and end in 1998 with his participation in creating the written materials and discussions with Patterson.  Carpenter knew that the false and misleading documents remained in use through the end of 2000 and that clients continued to wire and mail funds to Benistar in reliance on those documents.  Carpenter was the chairman and exercised approval authority over all operational procedures.  [See Exs. 178, 179].  Even minor changes to documents went to Carpenter for review.  Linda Jokinen testified that after Merrill Lynch terminated Carpenter's options trading privileges, Carpenter made revisions to the documents to reflect the transfer of accounts to PaineWebber.  [Tr.4-103-105; Exs. 182A &B].  Those edits were sent to Carpenter "because Daniel had to have final word on all documents." [Tr. 4-105, ll. 4-5].  Similarly, Jackie Mahannah testified that copies of the exchange documents were sent to Carpenter's Connecticut office in connection with each closing and that she advised Carpenter of the receipt of incoming funds.  [See e.g., Tr. 9-120, 122-123, 127, 128].  Carpenter also made several admissions in his

"Personal and Confidential" memorandum to Paley in October 2000 that showed his ongoing, active involvement in the scheme as well as his criminal intent. [See Ex. 184].

## II. Partial Acquittal Motion (Docket No. 284)

In this filing, Carpenter raises a variety of different challenges to the verdict based on subject matter jurisdiction, sufficiency of the evidence, and venue. None of them have merit.

### A. Subject Matter Jurisdiction

Carpenter challenges the subject matter jurisdiction on one wire fraud count (Count 13) and two mail fraud counts (Counts 15 and 19). On the wire fraud count, Carpenter argues that the evidence was insufficient to show that interstate wires were used in connection with Count 13, which was a $17,000 wire from Brian Fitzgerald's law firm in Milford, Massachusetts to the Benistar PaineWebber account in New York. Carpenter stipulated that this wire was initiated in Massachusetts, cleared through the Federal Reserve Bank in Boston, Massachusetts and terminated in New York. [See Dkt. 280 (Stipulation on Venue); Ex. 216 (Federal Reserve Records)]. There was a sufficient basis for the jury to infer that interstate wires were used in this transaction.

On the mail fraud counts, Carpenter claims that the mailings in Count 15 and 19 occurred after the scheme reached fruition. Count 15 and Count 19 are each mailings in which Benistar in Newton, Massachusetts sent checks to Benistar in Connecticut for deposit into the PaineWebber client funds account ("the '34 Account"). Count 15 relates to a check for $2,412,230 that Paley received from Gail Cahaly and then mailed to Benistar in Connecticut in November 2000. [See Ex. 41]. Count 19 relates to a $300,000 check related to Joseph Iantosca that was mailed from Benistar in Newton to Benistar in Connecticut in December 2000. [See Ex. 111]. Carpenter's

logic is that once the checks were delivered to Newton, Massachusetts the scheme had reached fruition and therefore the subsequent mailings to Connecticut were not in furtherance of the fraud. [PAM at 4-5]. Carpenter's logic is flawed. "There is no requirement that the mailings precede the fraud." United States v. Slevin, 106 F.3d 1086, 1089 (2nd Cir. 1996). As long as the mailings are incidental to an essential part of the scheme, the mailings meet the statutory requirement. Id. Here, the scheme involved obtaining the exchangors' funds by false pretenses. Mailing the checks from the branch office in Newton, Massachusetts to Connecticut so they could be deposited into the '34 Account was incident to the scheme to obtain the money from the exchangors because, among other things, once the Connecticut office received the checks, Jackie Mahannah deposited the checks so the proceeds would be credited to the '34 Account. [See, Ex. 112 (deposit ticket)].

### B.   Fraudulent Inducement

Carpenter argues that the court should enter a judgment of acquittal on counts involving exchangors who engaged in successful exchanges with Benistar. [PAM 6-9]. On this basis Carpenter asks for dismissal of all counts related to Byron Darling (Counts 1 and 2) and Joseph Iantosca (Counts 7-11 and 19). [PAM 7-8]. Carpenter asserts that under such circumstances, the exchangors must have engaged Benistar because of the prior successful exchanges and not because of the fraudulent and misleading representations in the written documents they received. [PAM 7-8]. This is a materiality argument – a classic jury question, see Neder v. United States, 527 U.S. 1, 25 (1999) – that relies on Carpenter's one-sided characterization of the evidence. It is not a basis for an acquittal. On the record before it, the jury could rationally conclude that the false and misleading representations in the agreements Darling and Iantosca signed at the time of

each of the transactions were material. The fact that Darling and Iantosca had engaged in successful exchanges before the transactions set forth in Counts 1-2, 7-11 and 19, does not mean that the false and misleading representations in the escrow and exchange agreements they signed were immaterial to them at the time they turned over their money.[7]

Similarly, Carpenter argues that Count 14 must be dismissed because it related to $400,000 that Brian Fitzgerald received back. Here, Carpenter simply mischaracterizes the charges and the theory presented to the jury. As the Court emphasized, the theory of fraudulent inducement put to the jury did not depend on whether the exchangors lost money. [See Tr. 13-36, 13-40 (Jury Instructions)]. Benistar's various undertakings in the marketing materials and agreements were fraudulent even to those exchangors who escaped the fraud without losing their funds.

### C. Venue

Carpenter again raises the issue of venue on Counts 1, 2 and 4-13. This Court considered and rejected the challenge to venue on these counts in its order on the motion for new trial, see Carpenter, 405 F. Supp.2d at 91, and should do so again now. The wires Carpenter now challenges were either "begun" or "continued" in Massachusetts. See 18 U.S.C. § 3237(a) (venue proper "in any district in which such offense was begun, continued or completed."). At trial, Carpenter stipulated that the wires in those counts either were initiated in or passed through

---

[7] To the extent Carpenter is defending his conduct on the ground that Darling and Iantosca did not rely on the representations, the Supreme Court has made clear that reliance is not an element of the mail and wire fraud statutes. Id. at 524-25 ("The common-law requirements of "justifiable reliance" and "damages," for example, plainly have no place in the federal fraud statutes.").

Massachusetts and terminated in either Pennsylvania or New York.[8] He also agreed to admission of records, including wire records from the Federal Reserve showing that all of the wires Carpenter now challenges passed through Massachusetts.[9] Thus, the wires now challenged were either begun or continued in Massachusetts. Venue was proper.

### III. New Trial Motion (Docket No. 312)

In this additional "Supplemental" motion, Carpenter asks for a new trial on three grounds: a) the lack of a jury instruction on venue, b) the reading of portions of Linda Jokinen's and Joseph Iantosca's testimony, and c) a claimed constructive amendment to the indictment. None of these issues provides a basis for a new trial.

#### A. Venue Instruction

Carpenter requests that the Court grant a new trial on all counts on the ground that the Court did not instruct the jury on venue. The Court rejected this argument in the first trial. See Carpenter, 405 F.Supp.2d at 88-91 (rejecting argument that the question of venue needed to be put to the jury because there was no genuine disputable factual issue upon which the resolution of the venue issue depended). The Court should reject this argument again. In fact, Carpenter's claim for a new trial on this basis is even weaker here than it was in the first trial, for a couple of

---

[8] Carpenter purports to quote from ¶ 2 of the stipulation as saying that the counts "involve wire transfers from bank wire rooms located outside of Massachusetts to either Pennsylvania (Merrill Lynch) or New York (PaineWebber)." [PAM at 10]. The stipulation does not say that. It says: "The wires alleged in Counts 1-2 and 5-13 were initiated in Massachusetts." [Dkt. 280, ¶2].

[9] Carpenter now says that the Federal Reserve records are not "probative" of whether they actually "physically 'passed through'" Massachusetts or were accounting entries. [PAM at 11]. That is not a reasonable position. The Federal Reserve records are clearly probative on that point, and provide a reasonable basis for a factfinder to conclude that the wires passed through Massachusetts.

reasons. First, Carpenter did not request a venue instruction on all counts, so he is not entitled to a new trial on all counts based on venue. Second, and more fundamentally, Carpenter did not object to the charge on the ground that it did not instruct on venue. In fact, Carpenter had no objections to the charge. [Tr. 13-147 (MR.PAPPALARDO: "Your Honor, I'm content with the charge.")]. Having stated he was content with the charge, Carpenter cannot now complain about it. See United States v. Mendoza-Acevedo, 950 F.2d 1, 4 (1st Cir 1991) ("It has long been established in this circuit that failure to renew objections after the charge constitutes waiver of any claim of error."); see also United States v. Bishop, 453 F.3d 30, 33 (1st Cir. 2006) ("After concluding that appellant had not produced enough evidence to support his affirmative defense of necessity, the court refused to give a requested instruction. This issue, however, is forfeited, for appellant failed to renew his request after the court had delivered its instructions, and there was unquestionably no plain error."). This was not plain error. No new trial is warranted on this issue.

      **B.**    **The Jokinen and Iantosca Testimony**

Carpenter argues that the admission of any of Jokinen's or Iantosca's testimony from the first trial violated Fed. R. Evid. 804(b)(1). Because both Jokinen and Iantosca were unavailable for the second trial in this matter, their testimony fell within the scope of Rule 804(d)(1), which permits introduction of prior testimony of an unavailable witness "if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed. R. Evid. 804(b)(1). In this case, the issues were identical; the parties were identical; and Carpenter had the same motive to develop the evidence and attack the credibility of each witness. Significantly, both Jokinen's and Iantosca's

testimony had been offered against Carpenter in the first trial of this same matter. The advisory committee notes recognize that this is the strongest basis for admission of testimony in a second proceeding. See Fed. R. Evid. 804(b)(1), 1972 Advisory Committee Notes ("If the party against whom now offered is the one against whom the testimony was offered previously, no unfairness is apparent in requiring him to accept his own prior conduct of cross-examination or decision not to cross-examine. Only demeanor has been lost, and that is inherent in the situation.").

Carpenter argues he did not have a similar motive in the first trial in examining Iantosca because the arbitration award against PaineWebber had not occurred. According to Carpenter, this affected his motive to cross-examine Iantosca on two grounds: 1) because at the first trial he could not blame PaineWebber, whereas at the second trial he could, and 2) because at the second trial he could develop the testimony that Iantosca had been made whole. [NTM at 7]. Neither of these reasons provide a basis to exclude the testimony. On the first point, Iantosca was not in a position to testify about PaineWebber's dealings with Carpenter, and so whatever blame Carpenter wished to lay at the feet of PaineWebber could not be done through Iantosca's testimony. On the second point, the Court ruled (for various reasons) that the question of whether Iantosca might recover from PaineWebber in a separate civil suit was not admissible. Even if it had been admissible, Carpenter did not need to cross-examine Iantosca to establish that point.

As for Jokinen, Carpenter says he did not have a similar motive to cross-examine her for two reasons: 1) because the PaineWebber arbitration award had not yet occurred, and 2) because he had a different motive to probe Jokinen at the first trial on the issue of "who really ran [Benistar's] operations." [NTM at 10]. As is the case with Iantosca's testimony, neither reason

provides a basis to exclude the testimony. The PaineWebber arbitration award has even less bearing on Jokinen's testimony than it did on Iantosca's. Carpenter does not even attempt to proffer a basis for how the PaineWebber arbitration award affected his motive to cross-examine Jokinen at the first trial (let alone provide a coherent basis for why that matters). As to the issue of who really ran Benistar, Carpenter also articulates no coherent explanation as to why it deprived him of a "similar motive" to cross-examine Jokinen. Carpenter appears to be saying now that he would have made more of an issue of Paley's role in the organization at the last trial. But even a cursory review of the 2005 trial record, including the cross-examination of Jokinen, shows that Carpenter made Paley's role a significant issue in the first trial. [See, for example, 2005 Tr. 3-60-66, 89 (Jokinen cross-examination)].[10] In any event, Carpenter's "motive" to focus on Paley as the person running Benistar did not change between the last trial and this trial. Perhaps Carpenter's tactics changed, but that is not a valid basis to exclude the testimony. See United States v. Zurosky, 614 F.2d 779, 793 (1st Cir. 1979) ("lots of times people as a tactical matter don't ask certain questions, but that doesn't say you don't have the opportunity within the meaning of 804(b)(1)").

Because the admission of the Jokinen and Iantosca testimony fell well within Rule 804(b)(1), Carpenter's reference to Crawford v. Washington, 541 U.S. 36 (2004) is inapt. As Crawford recognizes, no Confrontation Clause issues arises where the declarant is unavailable and the defendant had a prior opportunity to cross examine the witness. Id. at 68 ("Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law

---

[10] Carpenter opted not to read any of Jokinen's cross-examination in this trial. [Tr. 4-116 (MR. GREENBERG: "Your honor, we're not going to read anything.")].

required: unavailability and a prior opportunity for cross-examination."); see also United States v.

Avants, 367 F.3d 433, 445 (5th Cir. 2004) ("Crawford did not alter the rule that evidence within

the firmly rooted hearsay exception expressed in Rule 804(b)(1) satisfies the Confrontation

Clause.").

      C.      **Constructive Amendment/Variance**

Carpenter also claims that there was a constructive amendment and material variance at

trial because the United States presented "evidence and argument only of *omissions*, related half-

*truths*, and *nondisclosure*." [NTM at 12 (emphasis in original)].[11]  The Court considered and

rejected this same argument in its order on the new trial.  See Carpenter, 405 F. Supp.2d at 92.

The Court said:

> [T]he fraudulent scheme alleged in the indictment included the "omission" to
> clarify the half-truths that the defendant directed toward the exchangors.  The
> theory is well within the scope of the indictment, and proof of such "omissions"
> was neither a variance nor a new theory.  There was no constructive amendment of
> the indictment.

This same reasoning applies here.

---

    [11]  This is a misrepresentation of what the United States argued.  The United States argued that there were affirmative misrepresentations as well.  [See, for example, Tr. 13-56-57 ("[T]he agreements explicitly state that the funds were being held for the exchangors' benefit.  That makes those statements in those agreements actually false."].

**Conclusion**

For these reasons, the Court should deny Carpenters' Supplemental Motion (Dkt. 311), Partial Acquittal Motion (Dkt. 284), and New Trial Motion (Dkt. 312).

                    Respectfully submitted,

                    MICHAEL J. SULLIVAN
                    United States Attorney

By:

                    **/s/ Jack W. Pirozzolo**
                    JONATHAN F. MITCHELL
                    JACK W. PIROZZOLO
                    Assistant U.S. Attorneys
                    U.S. Attorney's Office
                    U.S. Courthouse, Suite 9200
                    1 Courthouse Way
                    Boston, MA 02210

Date: July 31, 2008

**CERTIFICATE OF SERVICE**

I, Jack W. Pirozzolo, hereby certify that on July 31, 2008 I served a copy of the foregoing by electronic filing on counsel for the defendant.

                    **/s/ Jack W. Pirozzolo**
                    JACK W. PIROZZOLO
                    Assistant U.S. Attorney