UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION FOR ACQUITTAL
AND ALTERNATIVELY FOR A NEW TRIAL**

The United States hereby opposes defendant Daniel E. Carpenter's Motion for Judgment of Acquittal Pursuant to Fed.R.Crim.P. 29(c) (After Jury Verdict) and in the Alternative for New Trial Pursuant to Fed.R. Crim.P. 33(a) ("Def. Mot."). The Court should reject Carpenter's motion because (1) the evidence was sufficient for a rational jury to return verdicts of guilty beyond a reasonable doubt; (2) the government committed no misconduct; and (3) the Court properly overruled the defendant's objections concerning "loss" evidence, the "Arbitration Award," "agency" statements, and alleged opinion evidence.

**ARGUMENT**

**I.    THE JURY'S FINDINGS OF GUILT WERE BASED ON SUFFICIENT EVIDENCE**.

Carpenter's principal argument is that he is entitled to an acquittal because evidence of his guilt was insufficient. This argument should be rejected because it does not satisfy the strict standard for acquittal under Rule 29(a). See United States v. Callipari, 368 F.3d 22, 43 (1st Cir. 2004). Specifically, viewed in a light most favorable to the government and the verdict, sufficient evidence existed for a rational jury to find beyond a reasonable doubt each of the

essential elements of wire and mail fraud:  (a) a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses; (b) Carpenter's knowing and willful participation in the scheme (and lack of good faith); and (c) the use of interstate wire communications or mailings in furtherance of the scheme.  See 18 U.S.C. §§ 1341, 1343.

The jury had ample reason to conclude that the defendant obtained the exchangors' money based on assurances he knew to be fraudulent.  The government introduced abundant evidence establishing that clients were induced to entrust substantial sums of money to Benistar Property Exchange Trust Company, Inc. based on material, false representations in Benistar's promotional materials and exchange documents that the company would hold the money securely in escrow for no more than 180 days and return it in full when the client was ready to purchase a replacement property.  See, e.g., Gov. Exs. 1-6, 10-13, 18 (Benistar promotional materials and exchange documents).  These written materials assured the exchangors that Benistar was what its name, "Benistar Property Exchange Trust Company," implied: a safe place for a property owner to park the proceeds of a sale of real estate for the *sole* purpose of completing a like-kind exchange of real estate in keeping with IRS regulations.  Among other assurances consistent with this purpose, the materials represented that:

- Benistar was an "intermediary" in the property exchange, Gov. Exs. 1 and 10;

- In selecting an intermediary, an exchangor "should ask about the security of your funds," Gov. Ex. 1, Slide 14;

- Benistar "has a longstanding reputation for trustworthiness, and is part of Benistar, LTD, the largest 419 administrator in the nation," Gov. Ex. 2;

- "Escrow accounts are restricted to paying out funds only for a subsequent closing, or to return funds to the original property owner," Gov. Ex. 2;

- Benistar "is a recognized leader in facilitating these exchanges with minimum

2

exposure for the property owner," Gov. Ex. 2;

- A property exchange "enables the owner of a business or investment property to retain 100% of the equity of the sold property," Gov. Ex. 3;

- In selecting a "qualified intermediary," you should ask about "what assurances you will have to assure that your funds and your exchange status will be protected;" Gov. Ex. 6, at 5.

- Benistar was bonded; Gov. Ex. 7;

- The exchangor's money would be held in an "escrow," Gov. Ex. 11;

- The accounts would bear either 3% or 6% interest, Gov. Exs. 10-13; and

- Benistar would transmit the funds "to one of only two places at the Exchangor's written direction," either to the client direct or to the escrow account for the closing on the replacement property.  Gov. Ex. 10, ¶ 2(b).

The materials make no mention of risk or the possibility that the funds could be lost.  Nor was there any indication whatsoever that the money would be traded in stock options.  To top it off, the exchangors were required to pay a fee, Gov. Ex. 10, which itself suggested that the only thing exchangors bargained for was an escrow service, not the risk of having all their money lost for a three or six percent return on their money.

Carpenter was fully aware that these promises and representations were being made to the exchangors.  Indeed, the evidence that Carpenter knew and approved of the written materials presented to the exchangors was indeed indisputable.  Benistar's Newton office manager Linda Jokinen testified that "everything had to be approved by him before going out of the office."  Tr. 4:55.  Carpenter's personal secretary, Jackie Spielman Mahanah, testified that executed exchange documents would be forwarded in the ordinary course of business to the Connecticut office, and that she would notify Carpenter when they arrived.  Tr. 9:12. Martin Paley confirmed that Carpenter reviewed and edited the materials that Paley had used at his previous employer,

Nationwide Property Exchange. Tr. 10:129, 11:14-15. Attorney David Patterson testified in detail about his discussions with Carpenter over the terms of the agreements. Tr. 12:33-41. Internal Benistar documents further demonstrated the extent to which Carpenter exercised control over the company's operations. In particular, in a memorandum to Paley just after Benistar was formed, Carpenter set forth in detail the procedure by which exchanges were to take place, including the processing of agreements through the Connecticut office, stating bluntly that no changes in procedures were to be made "**WITHOUT THE <u>PRIOR APPROVAL</u> OF DANIEL CARPENTER**." Gov. Ex. 179 (emphasis in the original). As if that was not clear enough, in an attached letter, he added, "I want to continue having everything come through the Simsbury office." Gov. Ex. 179.

At the same time the exchangors were being assured that their money would be secure and returned to them, Carpenter was trading exchangor money in high risk stock options, the purpose of which was to achieve a windfall for himself. <u>See</u> Tr. 6:101-107; 8:140-143; Gov. Ex. 184. Carpenter well knew that this type of trading entailed a degree of risk that was completely at odds with the representations made by Benistar to the exchangors. Carpenter was a sophisticated investor who, by his own admission, traded the exchangors' money aggressively and speculatively. <u>See</u> Gov. Exs. 164A, 165; Tr. 8:30, 35, 112-113. He was warned repeatedly about the riskiness of options trading. The applications he completed to open his trading accounts at Merrill Lynch and Paine Webber warned him in detail that stock options trading carried risk of substantial loss. <u>See</u> Gov. Exs. 145-146, 165-167. On numerous occasions, his brokers reminded him about these risks, and recommended that he trade more conservatively, yet he persisted. Tr. 6:105; 8: 39-40, 126,127.

4

Furthermore, Carpenter's trading losses made crystal clear to him that his use of the exchangors' funds carried a risk of loss that could not conceivably be reconciled with the assurances of security in the exchange materials. Before the first of the exchangors named in the indictment gave his money to Benistar, Carpenter had already lost approximately $2 million. Tr. 10:23. The losses from his options trading continued to mount thereafter, until Merrill Lynch terminated his trading privileges. Tr. 8:51. Despite what should have been a wake up call for Carpenter, he simply moved his money to Paine Webber, where, despite agreeing up front to tone down the riskiness of his trading strategy, he immediately continued to speculate in the options market. Tr. 8:96. Approximately two-thirds of the money from the exchangors named in the indictment arrived at Benistar after Merrill Lynch had cut him off. Tr. 10:71. In light of these dramatic developments, there was no question that Carpenter knew that the promises of security his company had made to the exchangors were fraudulent, yet he continued to operate the business in the same fashion so that he could swindle more and more real estate investors into giving Benistar their money. Because the evidence further established the use of both wire communications and mailings in connection with the scheme, see Gov. Exs. 16-17, 29, 111, 130 and 226 (copies of mailings and chart summarizing wire transfers), a rational jury could, and did, find that there was sufficient evidence to establish Carpenter's guilt beyond a reasonable doubt.

Despite this overwhelming evidence, Carpenter maintains that no rational jury could have found that (1) his omission to disclose his options trading to the exchangors was material; and (2) he acted in good faith. Both of these arguments are deficient in several respects, and the Court should accordingly reject them.

A.    **What Benistar Did Not Tell the Exchangors About Carpenter's Trading Was Material to Their Decisions to Entrust Benistar With Their Money.**

Carpenter contends that the government failed to prove that the representations made to the exchangors were material because the government presented insufficient evidence of the amount of money Carpenter traded in stock options.  See Def. Mot. at 9-11.  The government must of course prove the false representations and half-truths that induced the exchangors were material, that is, that they had a "natural tendency to influence or [were] capable of influencing" their decision to entrust their funds with Benistar.  See Neder v. United States, 527 U.S. 1, 16 (1999).  Carpenter's contention in essence is that the government failed to prove that he was trading in options in an amount that would have mattered to the exchangors in deciding whether to do business with Benistar.

This argument should fail for several reasons.  First, Carpenter is wrong on the facts.  His claim that the government put on "no evidence" concerning the extent of his options trading ignores the testimony of his brokers, each of whom described Carpenter's trading strategy in detail.  When asked about the kinds of trades Carpenter was making, Gary Stern from Merrill Lynch testified that Carpenter was "writing uncovered puts on . . . a lot of stock that were more volatile" and borrowing on "margin."  Tr. 6:102, 107.  Mitchell Rock likewise stated that at Paine Webber, Carpenter traded in "uncovered puts," and made "bilateral directional bets." Tr. 8:140-142.  Moreover, Carpenter's brokerage account statements support this testimony.  Gov. Exs. 148, 168.  Although Carpenter protests that the brokers were not asked to parse the statements, the statements themselves were in evidence, and they indicate on their face that throughout the relevant period, Carpenter was losing money in the options market.  Gov. Exs. 148, 168.  Based on these statements alone, a rational jury could conclude that Carpenter traded

in options to a degree that would have been important for prospective exchangors to know.[1]  See United States v. Reyes, 2007 WL 2288120, *2 (N.D. Cal. 2007) (questions of materiality "ordinarily are for the jury to decide").

Second, Carpenter defines materiality too narrowly.  As the exchangors testified, in selecting an intermediary, it was important to them that the intermediary hold their money safely and return it to them so that they could complete their property exchanges.  Tr. 2:131; 3:104, 6:51.  For this reason, in addition to the fact that he was trading options, other information never revealed by Carpenter would have been important to them.  For instance, he did not disclose the fact that he had lost millions of dollars of exchangor funds – regardless of how much of the losses were attributable to options trading – before the exchangors named in the indictment did business with him, or that he continued to lose money thereafter.  Nor did he disclose the fact that his trading was so risky as to cause Merrill Lynch, which was earning commissions on his trades, to halt his options trading.  Nor did he tell them that he had moved millions of exchangor funds out of the deposit account into his trading account, in direct contravention of the exchange agreements.  A rational jury could have concluded that such information would have been material to the individuals who entrusted their money to Benistar based on assurances that their funds would be held securely in a short term escrow account.

---

[1] Contrary to Carpenter's contention that the statements were difficult to understand, see Def. Mot. at 10, n. 2, they made crystal clear that Carpenter was trading in stock options. Moreover, the Court should disregard Carpenter's invitation to speculate about precisely which materials the jury reviewed or discussed during its deliberations. See id.

**B.**    **The Jury's Rejection of Carpenter's Good Faith Arguments Was Supported by Sufficient Evidence.**

For largely the same reasons, sufficient evidence existed to support the jury's rejection of Carpenter's defense that he acted in "good faith." See Def. Motion at 10. As this Court observed, "good faith is essentially the opposite of an intent to defraud." United States v. Carpenter, 405 F. Supp. 2d 85, 93 (D.Mass. 2005), citing United States v. Dockray, 943 F.2d 152, 155 (1st Cir. 1991). Nevertheless, Carpenter offers a set of specific reasons why a jury could not rationally have concluded that he lacked good faith. Each of these arguments should be rejected.

First, Carpenter grounded his defense primarily on a professed "good faith" belief that he had unfettered discretion to "invest" Benistar's client funds however he saw fit, no matter how speculative or risky the "investment." See Def. Mot 11-19. This argument was undercut by a substantial amount of evidence. Among other deficiencies, the argument flew squarely in the face of the core purpose of 1031 exchanges, as communicated to Benistar's clients and as embodied in all of the documents they received, which was to place real estate funds in a secure, short term escrow account so that they could be returned, in full, to purchase replacement property. Given this countervailing evidence, it was within the jury's province to reject Carpenter's protestations of "good faith" and conclude, instead, that he had intentionally engaged in a scheme to defraud.

Second, Carpenter claims that he did not cause misrepresentations to be made to the exchangors. Def. Mot. at 11-19. This argument is undercut by the simple fact that Carpenter set up the business, reviewed and approved the exchange materials, and allowed the business to continue using these materials knowing they were fraudulent. As the prime mover of the

scheme, Carpenter caused it to begin and continue.  See Carpenter, 405 F. Supp.2d at 94.

Third, Carpenter insists that he acted in good faith because he had a "complete belief" in his trading strategy, emphasizing his experience in trading securities and his claimed reliance on the supposedly rosy predictions of certain market analysts during the relevant time period.  See Def. Mot. at 19-24.  Similarly, later in his brief, Carpenter insists that the fact that he transferred his own money into the exchangors' account evinces his good faith.  Def. Mot. at 37-38.  The Court's instructions, however, render these points irrelevant.  Specifically, the Court instructed the jury that hoping that events will turn out favorably is not the equivalent of good faith:

> [I]t is not necessary for the government to prove that Carpenter had the specific intent to cause injury or financial loss to the exchangors.  If it is proved that he intended to deceive them for the purpose of inducing or persuading them to enter into the transaction, the absence of a specific intention to cause them loss is of no consequence.

Tr. 13:37; see United States v. Brennan, 832 F. Supp. 435, 439-440 (D. Mass. 1991), aff'd 994 F.2d 918 (1993) ("No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for those involved will excuse fraudulent actions or false representations to obtain money").

What matters, rather, is whether he intended to induce the exchangors to part with their money by means of false or fraudulent pretenses, representations and promises. Carpenter, 405 F. Supp. 2d at 102.  As the government has stated in previous pleadings, at its core, Carpenter's conduct is hardly different from that of a bank teller who takes the bank's money to a casino fully believing that his night's winnings will enable him to return all the money to the bank and have some left over for himself.  Even if the teller returns from the casino flush with cash and pays the bank back in full, the teller would have a committed a crime just the same by having

9

converted the funds to his own use without authorization. Carpenter likewise may have operated under the delusion that, despite his mounting losses, he would reap a windfall by continuing to trade the exchangors' money in options, but his crime had to do with how he obtained the funds. For this reason, Carpenter's professed faith in his trading strategy does not support his good faith defense.

Fourth, Carpenter's claim that he operated in an "open and obvious" way, Def. Mot. at 24-28, should be rejected for the simple reason that he was not the least bit "open and obvious" with the people to whom it mattered most: the exchangors. As Carpenter was aware, Benistar informed none of the exchangors that their money would be traded in options or that there was a risk that their money would be lost. Nothing in the promotional materials or the exchange documents offered them the slightest hint of risk. From their perspective, the suggestion that he was "open and obvious" would be absurd.

Fifth, Carpenter maintains that because the government failed to prove that Carpenter knew there was a shortfall between the money in his trading account and his obligations to the exchangors at the precise moments when Benistar induced exchangors to part with their money, "*a fortiori*" the government failed to prove that Carpenter acted with an intent to defraud. Def. Mot. at 28-35. This argument both overstates and understates the import of the government's "shortfall" evidence. This evidence was not, as Carpenter asserts, "the basis" of the government's case. Def. Mot. at 29. As set forth above, there was ample reason for a jury to conclude, apart from any evidence of a shortfall in the trading accounts, that Carpenter knew that Benistar's assurances to the exchangors were false and misleading. Most of all, Carpenter was aware that his risky trading strategy was antithetical to the core tenet of his business: that

Benistar would hold a client's money for a short period while the client completed a real estate transaction.  As set forth above, everything in the promotional materials and exchange documents reaffirmed the notion that the money would be returned in full to the exchangors.  At the same time, Carpenter knew, for all the reasons outlined above, that the money was being put at substantial risk of loss.  Even in the absence of evidence of a shortfall in Benistar's accounts, a rational jury could have concluded that defendant acted with an intent to defraud.

Nevertheless, evidence that there was a shortfall, and that Carpenter knew about it, was substantial and powerful.  For starters, there is no question that Carpenter was aware of his mounting losses in the second half of 2000.  Among other evidence, Jackie Mahannah testified that she observed him "daily" monitoring his stocks, Tr. 9:136, which, during the relevant period, were plummeting in value.  Gov. Ex. 148, 168.  His brokers spoke to him on nearly a daily basis, and repeatedly implored him to reduce the riskiness of his trades as these losses were building.

At the same time, Carpenter was directly privy to the amount of funds Benistar owed to exchangors.  Mahannah testified that each time she received new funds, she would notify Carpenter.  Tr. 9:123.  At Carpenter's direction, she tracked Benistar's outstanding obligations on spread sheets.  Tr. 9:126; Gov. Ex. 184B.  When compared to Benistar's account balances during the second half of 2000, as summarized in the chalk marked Government Exhibit 204, it becomes clear that the Benistar was in a deficit position, and would be unable make good on his obligations to the exchangors if all at once they asked for their money back.  By the end of August 2000, Benistar had approximately $2 million less than what it owed to the exchangors.  Compare Gov. Exs. 189 and 204.  By the end of November, the gap had grown to approximately

$5 million. Id.

Carpenter contends that there is no direct evidence that he was shown these figures, and that the figures themselves are unreliable because the dates on the spreadsheets Benistar used to track exchangor deposits, see Government Exhibit 189, and Carpenter's brokerage account statements, do not precisely coincide. Def. Mot. at 31. Therefore, as his argument goes, the government did not prove that Carpenter was aware of the shortfall. This argument is put to rest, however, by Government 184, which is a memorandum from Carpenter to Paley in October 2000 in which Carpenter acknowledges the shortfall. In the memo, Carpenter specifically discusses the possibility of "bankruptcy" and that he "is committed to getting us back in the black." See Gov. Ex. 184. These are not the words of a business owner – and a preternaturally controlling one at that – who is unaware that he is running a large deficit. He awareness could hardly be clearer.

Carpenter further contends that the government did not prove whether Carpenter was running a deficit at the precise moment when each exchangor gave his money to Benistar. See Def. Mot. at 30. Even if the "shortfall" evidence was as crucial as Carpenter contends, a rational jury could have convicted him based on the existence of a significant short fall throughout the period in which the exchangors were induced to give up their money, that is, in the second half of 2000. It would have been reasonable to infer that Carpenter's concern about bankruptcy did not materialize overnight, as Carpenter's losses grew steadily during the last two quarters of 2000. Tr. 10:22-24. A rational jury could infer from this evidence that at each point the exchangors gave their money to Benistar, Carpenter knew that there was a substantial risk that the money would be lost, reflecting consequently that Benistar's promises of security to the

exchangors were misleading.[2]

In summary, for the reasons set forth above, a rational jury could have rejected each of Carpenter's good faith arguments.

## II.   CARPENTER'S ALLEGATIONS OF GOVERNMENT MISCONDUCT ARE WITHOUT MERIT.

Carpenter next contends that the government engaged in prosecutorial misconduct in that it supposedly failed to correct the testimony of Merrill Lynch broker Jerry Levine, asked improper questions, and made improper comments in its opening and closings. Def. Mot. at 38-52. In order to establish that a new trial is warranted as a result of alleged prosecutorial misconduct, a defendant must establish first that there was prosecutorial misconduct. In the context of this case, it would be "misconduct for a prosecutor to make an assertion to the jury of a fact, either by way of argument or by an assumption in a question, unless there is evidence of the fact." United States v. Azubike, 504 F.3d 30, 38 (1st Cir. 2007). If there was misconduct, the defendant then must establish that "the prosecutor's misconduct 'so poisoned the well' that the trial's outcome was likely affected." United States v. Joyner, 191 F.3d 47, 54 (1st Cir. 2007). In determining whether the misconduct "so poisoned the well," courts in this Circuit apply a three part test: (1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether it is likely that any

---

[2] Carpenter also contends that the Court should credit the statement of Martin Paley, whom Carpenter characterizes as the government's "central witness" in the case, that he said nothing "untrue" to any exchangor and that he did "nothing wrong." Def. Mot. at 35. Because Rule 29(a) requires Courts to analyze trial evidence "in a light most favorable to the government," United States v. Stark, 499 F.3d 72, 79 (1st Cir. 2007), the Court should reject this argument, as a rational jury could have rejected these and other self-serving statements by Paley as not credible.

prejudice surviving the instruction could have affected the outcome of the case.  See United States v. Cormier, 468 F.3d 63, 73 (1st Cir. 2006).

The Court should reject the defendant's argument as a grasp at straw, because the government did not commit misconduct, much less "poison the well."

A.     **For the Reasons Set Forth in a Separate Filing, the Government Committed No Misconduct in Connection with the Testimony of Jerry Levine.**

Carpenter reiterates his argument that the government was obligated to correct the testimony of Jerry Levine, who the defendant claims perjured himself at trial.  See Def. Mot. at 42. The defendant recently submitted lengthy briefing on this issue in a separate motion and reply.  See Docket Numbers 283, 314.  The government fully addresses this argument in its opposition to the defendant's motion.  See Docket Number 306.  For the reasons set forth in the government's opposition, which the government incorporates herein by reference, the government committed no misconduct in connection with the testimony of Jerry Levine, nor can Carpenter claim the testimony prejudiced him in any way.

B.     **To the Extent that There Were Sustained Objections to the Government's Questions, None of Questions Amounted to Misconduct.**

Carpenter next contends that the government engaged in misconduct in asking certain questions that he claims were prejudicial on the ground that they sought to elicit testimony concerning "loss," despite "the Court's admonition to the parties concerning the limited relevance and questionable admissibility."  See Def. Mot. at 42.[3]  A quick perusal of these

---

[3] Carpenter also claims that questions asked of David Patterson and Martin Paley, which did not have to do with loss, were improper.  Def. Mot. At 43.  The objections were sustained not because the questions introduced or suggested any prejudicial information.  The Paley question, although intended to impeach a witness whose credibility at the last trial was highly suspect, was ruled out of bounds because it was leading and argumentative.  Tr. 11:65.  The Patterson

allegedly improper questions reveals that the government did not violate any court order, and to the extent that any questions were arguably "on the fence" of admissibility concerning loss, they were in response to cross examination that fairly could be characterized as having "opened the door" for redirect examination on the same issue. In any event, Carpenter does not articulate how he was prejudiced by any of the government's questions.

Carpenter's argument about loss conflates the two types of "losses" that were the subject of discussion at trial. Some of the questions to which he objects concerned the "losses" in Carpenter's trading accounts. See id. (questions put to Levine, Rock and Zappala). Such questions were clearly relevant to show Carpenter's awareness that the funds were not being used consistent with the assurances of security that Benistar made to the exchangors. The only one of these questions to which the Court sustained Carpenter's objection was a question on redirect to Mitchell Rock about Carpenter's total losses through the end of 2000. Def. Mot. at 42, citing Tr: 9:108-109. As undersigned counsel noted at sidebar immediately after the question was asked, the question was prompted by door-opening questions by defense counsel on cross examination – one of many instances where a door was opened to excluded evidence on cross examination. Tr. 9:110. Specifically, despite Carpenter's objections to evidence about the eventual crash of Benistar's accounts, his defense counsel zeroed in on an interest rate cut on January 3, 2001 that supposedly sparked a market rally that, as the defense insisted, would have enabled Carpenter to recover his losses. Tr. 9:102-106. The government's logical follow-up, though ultimately disallowed, was hardly inappropriate. Tr. 9:108-109.

---

questions were barred because they were leading, as well as cumulative as there already had been testimony about what statements had been made by Carpenter to Patterson.

Carpenter's objections to the remaining questions, which concern, loosely, the "losses" suffered by the exchangors, are equally thin.  <u>See</u> Def. Mot. at 42 (questions to Snider, Jokinen, Fitzgerald, Adams and Zappala).  Carpenter's general objection to them is that they allude indirectly to the losses incurred by the exchangors.  Some of these questions again were on redirect and were in response to door-opening questions.  <u>See</u> 5:142-143 (the government's redirect question and the side bar that followed); Tr. 10-74 (Zappala redirect question in response to door opening question on cross examination).  The question to Linda Jokinen had to do with whether Benistar was out of business, a completely innocuous fact.  The remaining questions Carpenter complains about were allowed over objection (Fitzgerald, Tr. 4-150-151 and Adams, Tr. 5-83 to 84).  For this reason alone, the asking of those questions does not constitute misconduct.

### C.    <u>There Was No Misconduct in the Opening, Closing or Rebuttal.</u>

Carpenter's next argument is that the government committed misconduct by making improper references in its opening, closing and rebuttal.

#### 1.    **The Opening Did Not Run Afoul of the Court's Admonition Concerning the Exchangors' Funds**.

Carpenter contends that the government "emphasized loss in its opening statement in direct contravention of the Court's order," and cites in support of his argument a series of excerpts from the opening that he claims crossed the line.[4]  The Court should reject this

---

[4] Carpenter also claims that the statements were "incorrect and misleading," Def. Mot. at 44, without articulating (because he can't) how the statements were untrue.

16

argument out of hand.[5]

The government's opening statement was consistent with the Court's ruling.  To put matters in context, during hearings the previous day, the Court heard argument from both parties concerning the admissibility of an award of $12 million against Paine Webber in a parallel arbitration matter, which Carpenter claimed would make the exchangors whole.  Tr. 1:163-165. Defense counsel insisted that the arbitration award was relevant to show that the exchangors were ultimately repaid, and that if the government were able to state in its opening that the exchangors "lost" $9 million, it would be misleading to the extent the use of the word suggested that they were never repaid.[6]  The government responded that the arbitration award was not relevant to any fact in issue, and its introduction of the arbitration award would mislead the jury into believing that Paine Webber was exclusively at fault.  The Court responded that "characterizing it as a loss or exchangors learned that their money had been lost adds a commentary to facts.  I think the raw facts are where we should stay."  Tr. 1:165.  This was consistent with the Court's observation that the issue of exchangor losses was:

> really a question of emphasis. It's not an in-or-out kind of thing; its taken as a whole: Where is the center of gravity of the argument.

See Pretrial Conference, May 22, 2008, at 32. The Court added that the problem at the first trial was the over-emphasis of the loss of exchangor funds.  Id.

The government's opening was fully consistent with these directives.  At every turn in

---

[5] Although Carpenter lodged certain objections to the opening, that the government over-emphasized loss was not one of them.  Tr. 2:99.

[6] The government notes that defense counsel made this argument even though the exchangors had not actually received the award.  Tr. 2:98.

the opening, the government grounded its narrative in what the defendant knew during the period charged in the indictment. Tr. 2:73-85. To describe what happened to the exchangors' money, the government did not say that the money was "lost" or otherwise suggest that the exchangors remain permanently deprived of their funds. Instead, to complete the narrative of events, the government stated instead that when the time came for the exchangors to complete their exchanges, the money "wasn't there," a term which, unlike the word "lost," does not convey permanent deprivation. Tr. 2:74, 76, 82, 84.

Carpenter's instant motion implies that the government could not even say that. Def. Mot. at 43-44. In other words, the Court's directive meant that the government was prohibited from making any reference to the fact that Benistar could not complete their exchanges because Carpenter had lost it in the options market. This argument is premised on an unsupportably narrow view of relevance. As the Court noted, the fact that the exchangors did not complete their transactions was relevant to show the "unfolding of events" and that it "is a part of big picture of the government's prosecution that in December certain events occurred and certain obligations weren't able to be met and so on." Tr. 4:153-154. Without knowing that the exchangors did not complete their property exchanges, the jury would have been left with the misleading impression that nothing out of the ordinary happened, that the seven exchangors completed their exchanges just like all of Benistar's other exchangors. To leave the jury totally hanging about what later happened would have invited speculation and sent the trial down the wrong track.

Defense counsel evidently had the same understanding of the Court's directives. Not only did he confirm in his opening that the money was lost, but that it was the fault of Paine

Webber. Tr. 2:87-88. He also claimed that Carpenter had breached his contracts with the exchangors. Tr. 2:88. And he noted that Carpenter in fact had been found civilly liable. Tr. 2:96. Given these assertions concerning the loss of funds, the defendant cannot credibly contend that the government was prohibited from stating at all in its opening that the exchangors' money was no longer available to complete their exchanges.

### 2.    The Government's Closing Contained No Improper References.

Carpenter alleges that the government mischaracterized certain facts in its closing. Def. Mot. at 45. Each of these allegedly improper references, however, was grounded in the evidence.        Carpenter complains first that it was inaccurate for the government to state that he had been "kicked out" of Merrill Lynch.[7] Def. Mot. at 45. There was direct evidence, however, to support the fact that Carpenter's departure from Merrill Lynch was involuntary. In October 2000, Merrill Lynch's compliance officer, Tom Rasmussen, told Carpenter that he had to close out his options positions. Tr. 8:42-43. This decision followed months of warnings by Merrill Lynch that Carpenter must reduce the risk in his trading accounts. Carpenter himself equated this decision to being effectively "kicked out;" according the Rasmussen, Carpenter "felt that, you know, we were *shutting him down*." Tr. 8:44. A few days later, Carpenter called Merrill Lynch and continued to protest, this time heatedly, asking, "how come we were *shutting him down*?" Tr. 8:45. Carpenter claimed that Merrill Lynch was "*preventing him* from getting back in the market." Tr. 8:45. He later threatened to sue Merrill Lynch for its decision. Tr. 8:46. The term "kicked out" precisely describes what Carpenter believed had happened to him: that Merrill Lynch forced him to leave. Though colorful, the term is hardly inflammatory or

---

[7] Carpenter did not object to this comment. Tr. 13:70-73.

prejudicial.  See United States v. Felton, 417 F.3d 97, 103 (1st Cir. 2005) (no error in referring to defendant as a "terrorist" where comment was a fair characterization of the evidence).

The same goes for Carpenter's argument about the reference to Martin Paley as Carpenter's "mouthpiece." Def. Mot. at 47.  This was entirely appropriate, in that, as Carpenter pointed out throughout the trial, it was Paley that made the representations to the exchangors, not Carpenter. "Mouthpiece" was an accurate characterization of Paley's role, and not the least bit inflammatory.

Nor did the government improperly credit, as Carpenter alleges, David Patterson or Marjorie Adams with providing "expert" opinion. Def. Mot. at 46-47.  The government did not refer to them as "experts" or suggest in any way that the jury should give greater weight to their testimony by virtue of their status as attorneys.  Rather, the government accurately summarized their testimony in its closing.  Tr. 13:54.[8]

Carpenter also complains about the government's reference to evidence concerning prevailing Treasury Bill rates, claiming that it was prejudicial for the government to rely on the T-Bill rate at the end of October 2000, and yet not show the prevailing rates at other points in time. Def. Mot. at 47-48.  It is hard to understand the purported problem here.  The government accurately summarized the evidence; government counsel specifically cited Gov. Ex. 148D, which indicated that the T-Bill rate in October 2000 was 6.2%.  Tr. 13:47-48.  This was relevant of course to show that the six percent rate offered by Benistar may have implied to a reasonable person that Benistar was holding exchangor funds in conservative investment vehicles such as

---

[8] Carpenter's argument is really about Patterson's and Adams's underlying testimony, which defense counsel elicited on cross examination.  Tr. 12:81; 5:129.

government bonds.  The government's reliance on this evidence was not the least bit misleading, much less prejudicial.  That the government did not present more evidence about T-Bills is an argument about sufficiency, which Carpenter was free to make to the jury.[9]

        For these reasons, there was no misconduct in the closing.

### 3.    Carpenter Was Not Prejudiced By Comments in the Rebuttal.

        Carpenter claims that "the government's most egregious instance of improper argument" was a comment that Carpenter had stricken language concerning investment vehicles from the exchange documents used by Benistar's predecessor, Nationwide Property Exchange, Benistar adopted as its own.  Def. Mot. at 48-52.  Carpenter contends that there was no evidence that he altered these provisions.  At side bar after the rebuttal, the Court stated that the comment was "overstating the evidence."  Tr. 13:118.  Although the government respectfully maintains that the comment was grounded in the evidence,[10] even assuming, arguendo, that it was not, Carpenter

_____

        [9] It is equally hard to fathom Carpenter's grievance about references to the exchangors' having turned over "approximately $15 million" to Benistar.  Def. Mot. at 47, citing Tr. 13:43. To be clear, the reference accurately reflected the evidence.  Tr. 10:15; Gov. Ex. 208.  Nor was the comment conceivably prejudicial; the case, after all, was about how the exchangors were induced to give their money to Benistar.

        [10] That Carpenter edited out the references to conservative investment vehicles from the Nationwide agreements can be readily inferred from the evidence.  In the four agreements Benistar ordinary issued to exchangors, the language about the accounts in which the exchangors funds would be held appears in four places: Paragraph 10 of the exchange agreement, Paragraph 2 the escrow agreement, the one page exchange fee agreement, and the one page account selection form.  See e.g. Gov. Exs. 10-13.  Each of these provisions essentially state that the funds will held in either three percent or six percent accounts.  During his direct examination, Paley was asked about the changes Carpenter made to three of these provisions, and Paley testified that in each instance, Carpenter authored the language.  Tr. 11:31 (exchange agreement); Tr. 11:14, 16 (escrow agreement); Tr. 11:17 (account selection form).
        The only one of the four provisions that Paley was not asked about was the exchange fee agreement (for no other reason than to avoid not belaboring the point about how the documents came into being).  Gov. Ex. 12.  Nationwide's version of this document contained the language

did not suffer prejudice because it was not deliberate, the Court made a strong and clear

cautionary instruction to the jury, the evidence of guilt was strong, and the point underlying the

comment was not an important one.  See Joyner, 191 F.3d at 54 (setting forth the three-part test

for prejudice).

        **a.**        **The Government Did Not Deliberately Misstate the Evidence.**

Carpenter cannot satisfy the first prong of the First Circuit's test for prejudice because the

government did not deliberately misstate the evidence.  Even if the Court concludes that the

allegedly improper comment could not fairly be inferred from the evidence, given the undisputed

evidence of Carpenter's absolute control over the affairs of the business and his editing of every

other exchange document, a reasonable difference of opinion about properly-drawn inferences or

a failure of on-the-spot recollection of the nuances of the evidence, would have been

understandable under the circumstances.  See United States v. Riccio, 529 F.3d 40, 45 (1ˢᵗ Cir.

2008) ("understandable misrecollection" of testimony not prejudicial).  Moreover, the comment

was made only once and was brief in nature. See United States v. Joyner, 191 F.3d 47, 54 (1ˢᵗ

---

about conservative investments that is the subject of the allegedly improper rebuttal comment.
Def. Ex. 390.  On cross examination, defense counsel highlighted the difference between the two
versions of the exchange fee agreement, but did not ask (nor did the government in redirect) who
made the changes.

       In light of this testimony, however, it is difficult to imagine that Carpenter would author
the investment language in Benistar's exchange agreement, escrow agreement, and account
selection form, but did not add the exact same language to the exchange fee agreement, too.  Nor
is it realistic to think that Carpenter ignored that document when Paley presented it to him, and
that Paley on his own edited it.  The testimony of David Patterson reveals that Carpenter worked
on the Nationwide documents, as Paley directed Patterson to Carpenter to discuss the agreements
right after Patterson received the Nationwide agreement from Paley.  Given that Carpenter
reviewed the exchange materials and everything else that left Benistar's office space, Tr. 4:55
(Jokinen testimony), it is highly unlikely that Paley instead amended the document on his own.

Cir. 1999) (holding that comments made "only twice" were "isolated");  Riccio, 529 F.3d at 45 (noting that brevity of the comment was a mitigating factor).

Furthermore, the point undersigned counsel was attempting to make about edits to the exchange fee agreement was not central to the defense.  See Joyner, 191 F.3d at 54 (giving weight to the fact that misstated evidence not "particularly probative").  Carpenter's chief defense was that Benistar's exchange documents on their face were not misleading.  Because there was no dispute that Carpenter ratified the documents, the issue of what changes were made to precursor documents did not itself matter (except to show Carpenter's familiarity with the final product, not the changes themselves).  In this way, Carpenter's claim that the comment made any difference at all after the Court issued its instruction is without merit.

For all these reasons, there is no suggestion in the record that undersigned counsel was deliberately attempting to mislead the jury.[11]

> ### b.  The Court's Admonition to the Jury Put to Rest Any Conceivable Prejudice.

As the First Circuit has stated, "a strong, explicit and thorough instruction to disregard improper comments by the prosecutor is sufficient to cure any prejudice from prosecutorial misconduct."  United States v. Mangual-Garcia, 505 F.3d 1, 7 (1st Cir. September 28, 2007).

---

[11] It also should be noted that undersigned counsel was in fact proactive about avoiding improper comments.  For instance, undersigned counsel asked the court, not once but twice, for its guidance about what comments were appropriate in the goverment's opening.  Pretrial Conference, May 22, 2008, at 30; Tr. 1:163.  Undersigned counsel also halted his examination of Mitchell Rock without prompting to inquire about whether the Court had concerns about certain loss evidence that undersigned counsel was about to elicit.  Tr. 8:128-129.  In addition, during the side bar conference after the rebuttal, undersigned counsel agreed to the extraordinary remedy of having defense counsel give a "sur-rebuttal" argument.  Tr. 13:119.  All of these steps, the government submits, belie any suggestion that undersigned counsel ever attempted to mislead the jury.

That is exactly what the Court did here. At sidebar, the Court asked defense counsel what he wanted the Court to do to address the comment, and defense counsel responded that "I would like you to state that [the] statement is not accurate and it's not supported by the evidence in this case and you can't consider that." Tr. 13:118-119. The Court granted defense counsel's request, instructing the jury:

> There is no evidence that Mr. Carpenter was responsible for changing the agreement. You have evidence of two different agreements, but there's no evidence of how they came to be different, and so that would not be an appropriate thing for you to take into consideration.

This was a clear and direct admonition, and it is exactly what defense counsel asked for.[12] It is exactly the sort of instruction that the First Circuit has required to cure an improper comment. Riccio, 529 F.3d at 40; see also United States v. Cormier, 468 F.3d 63, 74 (1st Cir. 2006) (instructing jury to disregard improper comments); Joyner, 191 F.3d at 53-54 (instructing jury that statements of counsel are not evidence and that the jurors' recollection controls).[13] Because the Court's cautionary instruction was clear and direct, and precisely what the defendant asked for, the defendant credibly claim prejudice.

---

[12] Carpenter's argument that the cautionary instruction "implicitly endorses" the alleged improper comment is without merit. Def. Mot. at 49. First, it should be noted that Carpenter did not object to this instruction, Tr: 13:140, nor does he suggest now what the Court should have said. More to the point, however, the instruction did not invite the jury to draw any conclusions about the differences in the Nationwide and Benistar agreements.

[13] Carpenter's apparent reliance on United States v. Azubike, 504 F.3d 30, 42 (1st Cir. September 21, 2007) is far from the mark. Def. Mot. at 50. In Azubike, in the midst of the court's curative instruction, the prosecutor interrupted the court and reasserted the disputed facts, prompting the court to abandon its instruction. Id. (reversing and noting that "this would have been quite a different case if the district court had corrected the error in the prosecutor's statement").

c.    **No conceivable prejudice would have survived the cautionary instruction.**

Even if, <u>arguendo</u>, the Court's instruction did not completely negate the allegedly improper comment, there cannot conceivably be any prejudice to Carpenter because for the reasons set forth in the opening section of this Opposition, the evidence against Carpenter was overwhelming.

In summary, the defendant was not prejudiced by any comments made by the government.

## III.    THE DEFENDANT'S ARGUMENTS THAT THE COURT RULED INCORRECTLY ON CERTAIN EVIDENCE SHOULD BE REJECTED.

Carpenter claims that he is entitled to a new trial because the Court ruled incorrectly on the admission or exclusion of certain evidence. The Court should reject each of his arguments.

### A.    The Court Correctly Excluded the Arbitration Award as Substantive Evidence.

Carpenter contends that the Court should not have let in evidence of the exchangors' losses, and that having let in some of this evidence, it should have admitted the exchangors' arbitration award against Paine Webber ("Arbitration Award") supposedly to balance the loss evidence. Def. Mot. at 52.

To the limited extent that the Court allowed in evidence of loss, it was relevant to the case. As the Court recognized, the fact that the exchangors did not complete their exchanges was part of the "unfolding of events." Tr. 4:153. Indeed, one could not tell the story of the case in the most neutral fashion without reference to the fact that the exchangors did not receive their money. Evidence of loss also was relevant because Carpenter put loss in issue in his opening statement. Indeed, what happened to the exchangors' money was prominently featured in

defense counsel's narrative.  Among other things, defense counsel stated that:

- That Carpenter experienced substantial losses in the last two weeks of December, Tr. 2:87;

- That if Paine Webber had not forced him to liquidate his positions, he would have benefitted from the January 2001 market rally and as a result Benistar would been "better situated to meet of all of its contractual obligations," Tr. 2:87-88;

- In January 2001, seven investors did not have their money returned to them, Tr. 2:88;

- Benistar breached it contracts to its investors, Tr. 2:88; and

- Carpenter had been found civilly responsible for breaching the contract, Tr. 2:96.

Carpenter decided that at the start, he would make the case about how he was the victim of a souring stock market, never intending to defraud anyone.  Because Carpenter himself made loss relevant, he has no basis now to claim that no evidence of exchangor loss should have been admitted.[14]

Nevertheless, the Court struck a balance between the use of relevant loss evidence and the need to avoid having the jury's focus diverted from the conduct that caused the exchangors to give their money to Benistar.  As the Court stated before trial, the loss issue was a "question of emphasis.  It is not an in-or-out kind of thing."  Pretrial Conference, May 22, 2008, at 32.  With this balance in mind, the Court ultimately kept out the bulk of the government's evidence, including the enormous losses in the Paine Webber accounts in December 2000.  Gov. Exh. 168. As part of this balance, however, the Court properly excluded the Arbitration Award as substantive evidence on the ground that it was irrelevant and prejudicial.  Indeed, under

---

[14] Nor should he complain now about references to the government's opening, see Def. Mot. at 53, to which he made no such objection.  Tr. 2:99.

Fed.R.Evid. 401, the fact that a third party determined, years after the events at issue, that Paine

Webber was civilly liable to the exchangors does not make it more or less likely that Carpenter

caused false and misleading statements to be made to the exchangors for the purpose of

obtaining money from them, or that he acted in good faith.  See United States v. Sindona, 636

F.2d 792, 801 (2d Cir. 1980) (in a wire fraud case, repayment by third party not relevant).  Nor

are the facts underlying the award relevant.  That Paine Webber may have been negligent in

opening an account for someone it should have known was operating *ultra vires* does not make it

any more or less likely that Carpenter was committing wire or mail fraud.  This would be true

even if Paine Webber had intentionally conspired with Carpenter.  See United States v. Roti, 484

F.3d 934, 935 (7th Cir. 2007) ("That two people cooperate to swindle a third does not excuse

either of the schemers.").

As the Court recognized, the greater danger posed by the award's introduction was its

potential to mislead the jury.  In the absence of a complete explanation of the civil matter, the

introduction of the Arbitration Award would suggest to the jury that fault lay exclusively with

Paine Webber, not Carpenter.  This would have been a gross distortion of the facts, as the award

was premised on the notion that Carpenter had committed fraud, and that Paine Webber did not

do enough to stop him.  See Docket 259, Tab D.  Thus, for good reason, the Court excluded the

Arbitration Award.

Another reason why Carpenter cannot claim prejudice was that, practically speaking, he

got what he wanted.  Although the Court allowed the introduction of the Arbitration Award

against Paine Webber only for the purpose of impeaching the lone Paine Webber witness,

Mitchell Rock, defense counsel effectively introduced the evidence substantively – despite the

Court's order.  In his cross-examination of Rock, defense counsel elicited from him that three arbitrators found Paine Webber liable to the tune over $12 million.  Tr. 9:106-108.  Defense counsel made no attempt to inquire, as he was required, whether the award affected Rock's ability to be truthful.  Tr. 9:106-108.  The fact of the finding against Paine Webber, along with the award amount, thus came in like any other piece of substantive evidence.[15]

Defense counsel took it a step further in the cross examination of exchangor Gail Cahaly, who was the lead defendant in the Massachusetts civil matter in which Carpenter, his wife, Paley, Benistar, Paine Webber, and Merrill Lynch were named as defendants.  The Court's order allowing impeachment based on the parallel civil matters did not extend to Cahaly.  Despite this, purporting to refresh Cahaly's recollection about her testimony in deposition in Massachusetts civil case, defense counsel asked her whether she brought "civil proceedings against Merrill Lynch and Paine Webber," not mentioning any of the other defendants in that matter.  This comment conveyed loudly, clearly and completely *inaccurately* that Merrill Lynch and Paine Webber, not Carpenter, were the ones ultimately at fault.

For all these reasons, the defendant's claim that he was prejudiced by the balance the Court struck on loss evidence is without merit.

**B.      Carpenter Suffered No Prejudice From the Admission of Statements by Paley.**

Carpenter argues again that he was prejudiced by the admission of testimony by certain exchangors about oral statements made to them by Paley.  Def. Mot. at 60-61.  Carpenter

---

[15] On redirect, in a transparent pretext to remind the jury about the Arbitration Award and end the examination on a high note, defense counsel finally inquired whether the award affected Rock's testimony.  Tr. 9:116.

maintains that any statements that were inconsistent with the exchanges were beyond the scope of Paley's agency authority and therefore should not be attributed to Carpenter.  On this ground, Carpenter alleges that the Court erred in not instructing the jury that the testimony about Paley's statements was inadmissible.[16]

Carpenter's argument is deficient in two respects.  First, Paley was in fact Carpenter's agent for purposes of Rule 801(d)(2)(D).  As the record amply demonstrates, Paley worked for Carpenter and was authorized by him to present the promotional materials and exchange documents to prospective exchangors.  According to the testimony of Paley and Jokinen, statements in these materials were ratified by Carpenter.  Tr. 11:14-17; 4:55.  To the extent that Paley made oral representations consistent with these documents, such statements would be admissible against Carpenter under Rule 801(d)(2)(D).  See United States v. Ranney, 719 F.23d 1183, 1187 n. 7 (1st Cir. 1983).

Second, and more to the point, Carpenter suffered no prejudice because the statements at issue, see Def. Mot. at 62, apart from being highly generalized, are consistent with the exchange materials.  Exchangor Byron Darling's testimony that Paley said that Benistar was "honorable" echoed the representation in Benistar's promotional materials that the company had a "longstanding reputation for trustworthiness."  Gov. Ex. 2.  Paley's statements to Darling and Fitzgerald about the "safety" of their money likewise was consistent with the thrust of the exchange materials; that is, that the money would be held for a short period while the exchangor completed the purchase of his replacement property.  It was also consistent with particular representations in the promotional materials, such as "ask about the security of your funds"

---

[16] Here, again, Carpenter failed to object to the Court's instructions.  Tr. 13:147.

(Gov. Exs. 1 and 5), that the company was bonded, and that money would be placed in escrow.[17]

Even if, for the sake of argument, Paley's oral statements to the exchangors were inconsistent with the exchange materials, Carpenter still cannot claim they prejudiced him because they constituted a drop in the bucket of representations made to the exchangors in the written materials, all of which were ratified by Carpenter.[18]

## C.    The Testimony About Carpenter's Trading Activity Was Not Opinion Testimony.

Finally, Carpenter's contends that the Court admitted a substantial amount of opinion evidence about the nature of Carpenter's trades. Def. Mot. at 63. In support of his argument, he lists several excerpts from the testimony of his brokers that he contends is the sort of opinion evidence that before trial the Court expressed a desire to keep out. Def. Mot. at 64. He also contends that the testimony of two of the exchangors, Eliot Snider and Byron Darling, included improper opinion about stock options.

Carpenter does not seem to contend that a description of Carpenter's trading activity was irrelevant. Indeed, what Carpenter did with the exchangor's money was centrally relevant to whether the representations Benistar made to the exchangors were false or misleading. On this basis, the Court properly allowed testimony describing the nature of his trades by the people who were actually performing the trades on his behalf. Because the world of stock options lies

---

[17] The last two statements by Paley, to Iantosca and Cahaly, are inconsequential for different reasons. Def. Mot. at 62. The excerpt of Iantosca' testimony is of no consequence because it is unintelligible. The Cahaly testimony is irrelevant to Carpenter's agency argument because it refers to a statement by Cahaly, not by Paley.

[18] Carpenter's assertion that the government relied on these statement is inaccurate, as the government cited none of them in its opening or closings.

beyond the experience of most people, it was necessary to allow the brokers to provide sufficient detail about his trading activity so that the jury could determine whether, as alleged in the indictment, it was inconsistent with the representations to the exchangors.  A group of lay people would not have been able to make sense of the testimony if all the brokers were allowed to say about the millions of dollars of securities Carpenter traded was that "he traded in calls and puts."

The broker testimony that Carpenter contends was opinion evidence was instead factually based descriptions of Carpenter's trading activity.  Def. Mot. 64-65.  To take the first allegedly improper statement as an example, Def. Mot. 64, as Gary Stern described Carpenter's trading activity as involving the "writing uncovered puts on . . . a lot of stocks that were more volatile and basically one-dimensional in terms of technology stocks he favored as opposed to diversifying and doing lots of different categories . . . ," was an entirely appropriate description of what Carpenter was doing with the exchangors' money at a relevant point in time.  No where in that answer or in the others in Carpenter's list of "toxic" testimony, is there any expression of opinion about Carpenters trades.  Def. Mot. at 64-66.  The one conceivable exception is the excerpted testimony of Mitchell Rock in which he characterizes Carpenter's trading as "aggressive."  Carpenter cannot credibility claim prejudice from this testimony because he acknowledged in the account opening forms for Paine Webber that he was an "aggressive/speculative trader."  Gov. Exs. 164A, 165.

As for the supposed "opinion" evidence by Snider and Darling, Def. Mot. at 63, Carpenter suffered no prejudice.  Defense counsel opened the door to the Snider testimony that he now characterizes as prejudicial.  Although the Court had kept out of testimony about the exchangors' states of mind, defense counsel nevertheless asked Snider, "What other components

31

entered your mind other than the meeting [with Paley] and these materials?"  Tr. 3:61.  With

Snider's state of mind now at issue, the government asked on redirect the logical follow up

question, "Did it enter your mind that your money would be traded in stock options?"  To this

question, Snider replied with the answer Carpenter now contends is opinion evidence.  Even if

there was any prejudice at all, it was caused by Carpenter.  Moreover, Darling's testimony about

his view that stock options were "very risky" is hardly prejudicial.  It is unlikely that a jury

would give special credit to this answer, coming from a 92 year old witness who struggled

through his testimony whom the jury would not mistake for an expert in stock options.

## CONCLUSION

For the foregoing reasons, the United States requests that Carpenter's motion for

acquittal and alternatively for new trial be denied.

<div style="margin-left:40%">

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

</div>

By:

<div style="margin-left:40%">

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
JACK W. PIROZZOLO
Assistant U.S. Attorneys

</div>

**<u>Certificate of Service</u>**

I hereby certify that on this 31[th] day of July, 2008, I served on counsel of record in the foregoing matter the Government's Opposition to Defendant's Motion for Acquittal and Alternatively For a New Trial.

<div align="right">

<u>/s/ Jonathan F. Mitchell  </u>
Jonathan F. Mitchell

</div>