UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
v. ) CRIMINAL NO. 04-10029-GAO
)
DANIEL E. CARPENTER )

**DEFENDANT'S REPLY IN FURTHER SUPPORT OF**
**SUPPLEMENTAL MOTION FOR A NEW TRIAL**

Defendant Daniel E. Carpenter respectfully seeks leave to file this reply in further support of his supplemental motion for a new trial.

**A.   Venue Instruction Was Not Waived or Forfeited.**

The government asserts that Mr. Carpenter waived or forfeited his right to seek a venue instruction because he did not continue to press the issue *ad nauseam* after the Court had previously ruled on several occasions that it was "not inclined" to give the instruction. Tr. 1:182-83; 12:163-64. This is a strange argument, because it was the *government* (in addition to Mr. Carpenter) that requested a venue instruction. Tr. 12:63 (AUSA MITCHELL: "I'd suggest . . . to submit [venue] to the jury."). Because "Carpenter has persistently maintained an objection to venue in this District," United States v. Carpenter, 405 F. Supp. 2d 85, 88 (D. Mass. 2005), his requests for a venue instruction in *both* trials, and the Court's numerous rulings on the issue, the government is clearly and conclusively incorrect when it contends that Mr. Carpenter has somehow waived or forfeited his

valuable constitutional right to have a jury decide whether he was tried in the district where the offense was committed.

"Venue is a question of fact ordinarily decided by a jury." United States v. Kelly, 2008 WL 2972731, *2 (10th Cir. Aug. 5, 2008). "It is a constitutional consideration and an element of every crime." Id. "Specifically, the U.S. Constitution, in Article III, Section 2, Clause 3, requires that the trial of any crime be held in the state in which the crime was committed, and the Sixth Amendment guarantees trial by a jury of the state and district in which the crime was committed. The Federal Rules of Criminal Procedure also address venue, providing for prosecution in the district where the offense occurred, unless a statute or other permissive procedure allows for another venue. *See* Fed. R. Crim. P. 18." Id. See also United States v. Gaudin, 515 U.S. 506, 522-23 (1995) ("The Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged."); United States v. Cabrales, 524 U.S. 1, 6 (1998) ("The Constitution twice safeguards the defendant's venue right.").

Literally, from the inception of this case 4 ½ years ago through and including the present, Mr. Carpenter has aggressively challenged venue in this district. Mr. Pappalardo's statement that he was "content with the charge," Tr. 13:140, obviously must be considered in light of the procedural posture of the case after two trials in which venue was strenuously litigated and the Court's prior rulings that it would not give a venue instruction. *See*, *e.g.*, Dkt. 27 (motion to

dismiss entire indictment for lack of venue); Dkt. 66 (motion to transfer venue); Dkt. 83, 84 (pretrial motions *in limine* to exclude evidence (or dismiss) 13 of the 14 wire fraud counts for lack of venue); Dkt. 130 (trial motion *in limine* to preclude new government witnesses and exhibits called specifically to prove venue with respect to all 14 wire fraud counts); July 2005 Tr. 9:140 (THE COURT: "I recognize that venue remains an issue in the case."); July 2005 Tr. Charging Conf. at 6 (defendant requesting venue instruction on all counts); Dkt. 142 (Rule 29(a) motion on 12 of 14 wire fraud counts for lack of venue); July 2005 Tr. 10:94-11:26 (venue witness testimony); Dkt. 148 (THE COURT: "[T]he question whether venue has been properly established for any of the counts in the indictment is a question to be determined by the court, not the jury."); Dkt. 158 (Rule 33 motion on venue instruction); Dkt. 160 (Rule 29(c) motion on substantive venue issue); Carpenter, 405 F. Supp. 2d at 88-91 (Court explaining basis for not giving venue instruction); Dkt. 223 (second motion to transfer venue); Dkt. 227 (motion to dismiss Count 4 for lack of venue); Tr. 10:38 (AUSA Mitchell confirming that Mr. Carpenter has "put [venue] in as an issue."); Exhs. 214-19, 221-26 (government venue exhibits); Tr. 1:182-83; 12:163-64 (Court confirming that it would not give venue instruction). In light of this voluminous record regarding venue, Mr. Carpenter clearly did not waive or forfeit his request that the jury be instructed on venue.

Given the unique procedural posture of this case, there was no need for Mr. Pappalardo, after the charge, to renew *yet again* Mr. Carpenter's request for a venue instruction, particularly since the Court had already made it abundantly

clear on the record several times that it would not give one. "A party need not properly object if doing so would be a 'pointless formality.'" United States v. Kessi, 868 F.2d 1097, 1102 (1989) (citation omitted). As the Ninth Circuit has recently explained:

> [W]e recognize a sole exception to the requirement of a formal, timely, and distinctly stated objection when a proper objection would be a pointless formality. A proper objection would be a pointless formality if: (1) throughout the trial the party argued the disputed matter with the court; (2) it is clear from the record that the court knew the party's grounds for disagreement with the instruction; and (3) the party proposed an alternate instruction.

United States v. Fuller, 2008 WL 2651413, *2 n.2 (9th Cir. Jul. 8, 2008) (citations and quotations omitted). See also United States v. Carpenter, 494 F.3d 13, 18-19 (1st Cir. 2007) (no waiver on similar grounds regarding government's closing).

Here, (1) Mr. Carpenter has disputed venue and sought a venue instruction from the inception of this case; (2) the record is abundantly clear that the Court understood and acknowledged on several occasions Mr. Carpenter's disagreement with the Court's decision not to give the instruction; and (3) Mr. Carpenter proposed alternate instructions. Dkt. 141, 276. Consequently, not only has there been no waiver or forfeiture, but the lack of a venue instruction is subject to *de novo* (rather than plain error) review. Given the history of this case regarding venue, and the current state of the law regarding venue instructions (where all circuits that have addressed the issue require the instruction, but the First Circuit has yet to address the issue), "[c]ounsel, though, can hardly be faulted for not objecting . . . given the law at the time." United States v. Collins, 60 F.3d 4, 7 (1st

Cir. 1995). See also United States v. Marder, 48 F.3d 564, 571 (1st Cir. 1995) ("Because of the uncertainty as to whether defense counsel had explicitly approved the instruction and in light of the conflicting decisions of this circuit, we decline to find a waiver here.").

Mr. Carpenter limited his proposed venue instruction in the second trial (Dkt. 276) to the wire fraud counts *only* because of the Court's prior decision regarding venue in the first trial. At the beginning of the second trial, the Court confirmed that it deemed its venue ruling in the first trial controlling in the second trial. Tr. 2:184 (THE COURT: "I think I may already have done that [decide the venue issue] in the prior order."). Thus, for purposes of preserving his right to seek a venue instruction, Mr. Carpenter's filings in the first trial are sufficient to preserve the issue in the second trial **as to all counts**. See Kelly, 2008 WL 2972731 at *3-4 (finding defendant preserved venue challenge on grounds similar to those present here).

Finally, because the government's opposition does not offer any legal argument contradicting Mr. Carpenter's assertion regarding the state of the law on giving venue instructions (*i.e.*, that all of the circuits to have addressed the issue require the instruction), the government itself has waived or forfeited any argument on the merits regarding this issue. See id. at *7, n.7 ("In [United States v. Miller, 111 F.3d 747 (10th Cir. 1997)], we adopt[ed] the rule that failure to instruct on venue, *when requested*, is reversible error unless it is beyond a reasonable doubt that the jury's guilty verdict on the charged offense necessarily

incorporates a finding of proper venue.") (emphasis in original).  The government cannot possibly meet this standard, because it is undisputed that all of Mr. Carpenter's actions occurred in the District of Connecticut and/or the Southern District of New York and none of his actions occurred in the District of Massachusetts, unlike in Kelly where the Tenth Circuit took judicial notice of the undisputed fact that all of Kelly's actions occurred only in the District of Utah.  Id. at *6.  Thus, the instant case is exactly like Cabrales, where the money laundering counts brought in Missouri (where the cocaine sales occurred) were dismissed for lack of venue because "[t]he laundering alleged in the indictment occurred entirely in Florida."  Cabrales, 524 U.S. at 3.[1]

## B. Government Has Failed to Prove that Jokinen/Iantosca Testimony is Admissible Under FRE 804(b)(1).

The sole issue under FRE 804(b)(1) regarding the admissibility of the Jokinen and Iantosca hearsay testimony from the first trial is whether Mr. Carpenter had a "substantially similar" opportunity and motive to develop the challenged testimony in light of the changed circumstances inherent in the second trial.  See United States v. Bartelho, 129 F.3d 663, 671 (1st Cir. 1997).  Because the government is the proponent of this hearsay evidence, the government bears the "burden to prove each element of the exception [it] invoked."  United States v.

---

[1] In fact, the government's continued failure to apply Cabrales betrays its misunderstanding of the venue requirement.  Cabrales is a 9-0 Supreme Court decision from 1998, the same year BPE started.  If "selling cocaine in Missouri" is replaced with "1031 property exchange business in Massachusetts," and "money laundering in Florida" is replaced with "investing in stock options in New York," then the result is similar to the instant case with a 9-0 Supreme Court decision favoring Mr. Carpenter's position on venue over that of the government.

6

Omar, 104 F.3d 519, 522 (1st Cir. 1997). The government has failed to carry its burden here.

The government asserts that the issues and parties were identical in both trials. While the parties were the same, the ultimate issues about which the hearsay declarants would have been asked to testify in the second trial were completely different. Furthermore, the real question is whether the *opportunity and motive* for cross-examination were different. This is where the government seriously stumbles. Mr. Carpenter had a substantially different opportunity and motive in the second trial regarding the scope of cross-examination in light of: (1) the existence of the PaineWebber arbitration award and the pretrial payment to the Exchangors of $12.5 million; (2) the Exchangors in general and Iantosca in particular thereby suffering no loss; and (3) the quantum shift in the government's theory of the case regarding Mr. Carpenter's role at BPE from the first trial, where the government did not seek to prove that Paley was Mr. Carpenter's agent, to the second trial—where the government's entire case was predicated on showing that Paley *was* acting as Mr. Carpenter's agent (*i.e.*, "mouthpiece" or "front man"). See, e.g., Tr. 2:84 (AUSA MITCHELL: "He also had a front man, a person named Martin Paley, who I mentioned earlier, who ran the Newton office.").

In the first trial, the Court ruled that Mr. Carpenter's "conviction rests on his own acts, not on Paley's attributed to him." Carpenter, 405 F. Supp. 2d at 95, n.6. In the second trial, however, the government made it clear that its

overarching theory was that Mr. Carpenter was criminally liable *solely* by virtue of the acts of Paley—his purported agent:

> THE COURT: The question is: Why are statements attributed to Paley attributable to the defendant?
>
> AUSA MITCHELL: He was acting as an agent, for one thing.
>
> THE COURT: What will the evidence of that be?
>
> AUSA MITCHELL: He worked for Benistar, he answered directly to Dan Carpenter in conducting a 1031 property exchange business, and so, I mean - - that alone establishes that he was - - he was an agent of Dan Carpenter. It is that simple. *Linda Jokinen will establish - - the reading of her testimony will establish the same thing.*

Tr. 2:106-07 (emphasis added).

The government's statement shows why Mr. Carpenter's opportunity and motive for cross-examination of Jokinen was completely different in the second trial than in the first. At the first trial, since the government did not seek to prove that Paley was acting as Mr. Carpenter's agent, there was no reason or motive for Mr. Carpenter to cross-examine her on that issue. In the second trial, however, when the government shifted its entire theory of the case to prove that Paley *was* acting as Mr. Carpenter's agent, obviously the opportunity to cross-examine Jokinen on this vital issue no longer existed.

The evidence showed that Paley and Jokinen operated their own little "fiefdom" out of Paley's home in Newton, Massachusetts. Tr. 4:39 (Jokinen testifying that BPE was based "in Marty's home."). In fact, there is no record evidence that Jokinen ever spoke to or communicated with Mr. Carpenter. Rather, all of Jokinen's communications with "Connecticut" were with "at first [Janet]

8

May, and then Jackie Spielman [n/k/a Mahannah]." Tr.4:70. The government's suggestion that Mr. Carpenter was somehow Jokinen's "boss" must have her spinning in her grave, because in Jokinen's 2001 civil deposition she bristled any time it was merely suggested that she worked for anyone other than Paley, who was her first cousin. Tr. 4:38. Jokinen testified that she "did the bookkeeping; I had client contacts; I followed through on exchanges." Tr. 4:38. It was Jokinen and Paley who were in charge of all documents and all client matters. The 1999 standard operating procedures memoranda (Exhs. 178, 179), on which the government places much importance to show that Mr. Carpenter "ran the show," were effectively countermanded by Paley and Jokinen because "[o]ver time it evolved that I [Jokinen] handled most of the paperwork," Tr. 4:50, which was in direct contravention of the supposedly inviolate standard operating procedures outlined in Exhibits 178 and 179. Jokinen even prepared her own spreadsheets (Exhs. 113, 186, 187) rather than rely on the spreadsheets prepared by Benistar-CT employees. Exh. 189. The division of labor between Benistar-CT and BPE-Newton was clear. Jokinen "handled most of the paperwork . . . [t]he exchange documents," Tr. 4:50-51, while Benistar-CT employees "handled the cash." Tr. 4:51. Jokinen made changes to Paley's Powerpoint presentation on a regular basis *without* seeking Mr. Carpenter's input or approval. Tr. 4:52-53. She even testified that "I made the revisions," Tr. 4:103, to the exchange documents to reflect the change from Merrill Lynch to PaineWebber.

Now that Jokinen is dead and the government must prove a criminal act by Mr. Carpenter (and not by Paley), the government is desperate to find an agency relationship between and among Jokinen, Paley and Mr. Carpenter that clearly does not exist. That Jokinen and Paley were agents of BPE does not make them agents of Mr. Carpenter. In fact, absent a conspiracy or aiding and abetting (neither of which exist here), an officer of a corporation cannot be held criminally liable for the acts of another officer of the same corporation. See United States v. Schlei, 122 F.3d 944, 972 (11th Cir. 1997). It is as if the government realizes for the first time, after over seven years of investigation, that Paley & Jokinen *alone* had all of the relevant contact with the Exchangors and their advisors, and that Mr. Carpenter's only "crime" appears to be losing money by investing in stock options (losses for which PaineWebber was ultimately held responsible). Jokinen's hearsay testimony cannot be used to create out of thin air an agency relationship where none exists as a matter of law. This explains why Mr. Carpenter's rights under the Confrontation Clause have been egregiously violated by the admission of Jokinen's outdated hearsay testimony. Thus, under both the Rule and the Confrontation Clause, a new trial is required.

As for Iantosca, it does not matter, as the government contends, whether he was in a position to testify about PaineWebber's dealings with Mr. Carpenter. The motive for cross-examination of Iantosca would be to show that he suffered no loss, not to inquire whether he was aware of the specifics regarding BPE's arbitration claims against PaineWebber (which, obviously, he wasn't). As it currently stands,

the jury in the second trial heard only that Iantosca "gave Benistar . . . millions of dollars." Tr. 6:11-12. If Mr. Carpenter had the opportunity to cross-examine Iantosca anew, the jury also would have learned that Iantosca received back his "millions of dollars." Obviously, Mr. Carpenter did not have the opportunity at the first trial to make this inquiry, since the PaineWebber award had not yet come to fruition.[2]

This is not a case, unlike in most situations implicating FRE 804(b)(1), where the Court must determine whether the defendant had a sufficient opportunity to challenge the *credibility* of the declarant at the first trial. See, e.g., United States v. Garcia, 117 F. App'x 162, 164 (2d Cir. 2004) ("After carefully reviewing the vigorous cross-examination of [declarant] conducted at the first trial . . . we conclude that this prior cross-examination sufficiently allowed the jury at the second trial to evaluate the truth of [declarant's] testimony."). Here, Mr. Carpenter's opportunity and motive to cross-examine Jokinen and Iantosca have little to do with credibility *per se*. Rather, the purpose would be to establish Mr. Carpenter's innocence. The government has finally admitted what Mr. Carpenter and his attorneys have long suspected, that there would be no crime if there had been no loss. See, e.g., Tr. 3:44 (AUSA MITCHELL: **"I mean, if [Snider] had completed his exchange, we wouldn't be here today."**) (emphasis added). Thus, in order to show that no crime was committed, Mr. Carpenter had a strong

---

[2] The first trial occurred in July 2005, but the PaineWebber arbitration award in favor of BPE was not issued until December 2005. The transaction by which Mr. Carpenter forced PaineWebber to pay the entire $12.5 million to the Exchangors (including Iantosca) was consummated in May 2008.

11

motive to prove that Iantosca suffered no loss—an opportunity and motive that simply did not exist at the first trial in July 2005. Similarly, the government placed the responsibility for creating the escrow agreement in Mr. Carpenter's lap. See, e.g., Tr. 13:52 (AUSA PIROZZOLO: "He didn't put any of those [option] warnings into the Escrow Agreement."). However, Jokinen testified at her 2001 civil deposition that Nationwide president Tom Bottenberg created the escrow agreement—not Mr. Carpenter. Given the government's new theory at the second trial, Mr. Carpenter clearly had a totally different motive to cross-examine Jokinen and Iantosca if the opportunity had presented itself.

For example, in United States v. Taplin, 954 F.2d 1256 (6th Cir. 1992), the Sixth Circuit found reversible error in the admission under FRE 804(b)(1) of a co-conspirator's suppression hearing testimony, because the defendant's motive in discrediting the co-conspirator at the suppression hearing on defendant's expectation of privacy in a vehicle search by police was substantially different than the defendant's motive at trial in establishing his innocence. "A dissimilar motive defeats the 804(b)(1) claim." Id. at 1259. In United States v. Preciado, 336 F.3d 739 (8th Cir. 2003), statements made by a drug co-conspirator during his plea hearing were inadmissible under FRE 804(b)(1), where the government's motive at the plea hearing "was to ensure that the plea was knowing, voluntary, and intelligent and that there was an adequate factual basis to accept it—it had no need or motive to develop testimony about [defendant]." Id. at 746. See also Bartelho, 129 F.3d at 672 (affirming the exclusion of prior testimony under

12

804(b)(1) because "the government's motive at each proceeding, viewed in context, was actually quite different."). Viewed in context, Mr. Carpenter's opportunity and motive regarding cross-examination of Iantosca and Jokinen were completely different from the first trial to the second trial.

Finally, Mr. Carpenter's dissimilar opportunity and motive to develop the Iantosca and Jokinen testimony is not, as the government suggests, simply a matter of changing "tactics."  Rather, the lines of questioning that Mr. Carpenter was unable to pursue with both witnesses goes to the very heart of establishing his innocence—whether it had to do with Iantosca suffering no loss, Jokinen testifying who really ran BPE's operations, or Jokinen contradicting the trial testimony of both Paley and herself by admitting at her 2001 civil deposition that Nationwide's Tom Bottenberg created the escrow agreement rather than Mr. Carpenter.

Because the government has failed to carry its burden of proving that the Jokinen and Iantosca hearsay testimony satisfy the exceptions under FRE 804(b)(1), the testimony and related exhibits introduced thereby are inadmissible and should have been excluded both under the Rule and the Confrontation Clause.[3]  Consequently, a new trial is required.[4]

---

[3] Without the exhibits admitted into evidence through Jokinen's hearsay testimony, even the government would be forced to admit there would be insufficient evidence to convict.  That is why a new trial is required even if *only* Jokinen's hearsay testimony should have been excluded, because exclusion of the testimony necessarily results in the exclusion of the exhibits admitted through such testimony.  See Exhs. 15, 29, 54, 70, 82-83, 110, 111, 113, 178-79, 181, 182A-B, 186-87, 189, 189B-C.

[4] The government's highly inflammatory and prejudicial reliance on argument and evidence regarding loss, in direct violation of the Court's orders, provides a separate basis for a new trial as well as a substantially different motive for cross-examination under FRE 804(b)(1).

A.  **Opening Statement**

Prior to the opening statements in the second trial, the government requested a clarification regarding how it should "characterize loss" so that the government "doesn't run afoul of the Court's order," Tr. 1:163 (AUSA Mitchell), by which evidence of loss was excluded.  The Court issued "a provisional ruling for the opening statements," Tr. 2:156, stating that "we'll focus on the elements of the offense and what might have been known at that time or could have been believed in good faith." Tr. 2:158.  As a result, the government was expressly precluded from mentioning "the trading losses, the Merrill Lynch, PaineWebber trading losses."  Id.  Notwithstanding this clear directive, the government (AUSA Mitchell) proceeded to emphasize loss in its opening statement:

1)  "His downward spiral in the stock options market lasted until the last group of people who entrusted their money to him, all $9 million of it, got a letter that said to them, bluntly, please be advised that we are not able to return your funds to you at this time.  For this, ladies and gentlemen, Dan Carpenter stands before you today accused of mail and wire fraud."  Tr. 2:74 [*The letter was never admitted into evidence.*]

2)  "I mentioned to you this last group of people who found out that their money wasn't there."  Tr. 2:76.

3)  "When the market stopped soaring in the year 2000, his losses mounted, first in the thousands, and then in the millions."  Tr. 2:80.

4)  "When the exchangors called Benistar for the return of their money so that they could complete their property exchange, because they needed their money to complete these exchanges, Carpenter could no longer hide the fact that the money, which was supposed to be parked in a safe place, wasn't there."  Tr. 2:82.

5)  "The money wasn't tied up here; it wasn't there anymore.  The fact is, Carpenter had taken the money and used it all up in the options market."  Tr. 2:84.

These statements are not only incorrect and misleading, but they clearly violate the Court's order that the government could not "characteriz[e] it as a loss or the exchangors learned that their money had been lost."  Tr. 1:165 (The Court).

B.  **Evidence**

After the opening statements, and before the issue of loss was addressed with the government's first witness (Eliot Snider), the Court transformed its earlier provisional ruling into a permanent ruling that evidence of loss was not relevant to the offenses charged and, therefore, was inadmissible:

> THE COURT:  The offense that's alleged is the obtaining of the exchangor proceeds by false pretenses . . . But that's the offense, the giving of money. . . *[Snider's] subsequent loss has nothing to do with the crime*.  The crime was completed when Snider entrusted the money based on false representations and used the mails.  That's when the crime was committed.

Tr. 3:42, 43 (emphasis added).  The government confirmed that it "understood" the Court's ruling.  Tr. 3:43 (AUSA Mitchell).  Notwithstanding the government's representation to the Court that it

14

"understood," the government continued to flagrantly emphasize evidence of loss in direct contravention of the Court's order:

**(1)     Snider**

AUSA MITCHELL:  Did you complete your property exchange?  Tr. 3:47.  [*Objection sustained.*]

**(2)     Jokinen**

AUSA PIROZZOLO:  At some point did Benistar Property Exchange go out of business?
JOKINEN:  Yes.  Tr. 4:111.

**(3)     Fitzgerald**

AUSA PIROZZOLO:  At some point in time did you ask for your money to be returned?  [*Objection overruled.*]
FITZGERALD:  I did.
AUSA PIROZZOLO:  Did the $100,000 get transferred to the third party?
FITZGERALD:  No, that did not.  Tr. 4:150-51.

**(4)     Adams**

AUSA MITCHELL:  What did [Mr. Carpenter] tell you?  [*Objection overruled.*]
ADAMS:  Mr. Carpenter told me that he had just met with Joe [Iantosca] - - that everything was okay . . he wanted to ask Mr. Iantosca to delay some upcoming purchases because they had a run on the bank . . . if Joe just delayed his closing for a few days, the money would be there for Joe's closing.
AUSA MITCHELL:  Did he say - - so did he say that the money wasn't there at that point? [*Objection overruled.*]
ADAMS:  Yes.  Tr. 5:83-84.
AUSA MITCHELL:  Was all of Mr. Iantosca's money disbursed back to him?  Tr. 5:142.  [*Objection sustained.*]

**(5)     Levine**

AUSA PIROZZOLO:  Can you read out the line that says, "short term"?
LEVINE:  "This month short-term capital loss" - - because it's in parenthesis - - "of $1,770,973.06."
AUSA PIROZZOLO:  What's the year-to-date number?
LEVINE:  That's a loss figure, because of parenthesis, of $4,000,283.69.  Tr. 7:91 [*Exh. 148D (Merrill Lynch statement) admitted over objection.*]

**(6)     Rock**

AUSA MITCHELL:  At some point did PaineWebber bring an end to Mr. Carpenter's trading?
ROCK:  Yes.
AUSA MITCHELL:  When was that?
ROCK:  December - - the middle of December.  December 19th [2000], I believe.
AUSA MITCHELL:  Okay.  And how was that communicated to him?
ROCK:  Through a phone call.
AUSA MITCHELL:  What was said to him?

ROCK: The call started out by summarizing the losses in the account and the exposure that he currently had to the markets at the time. When we told Dan that the losses were $5 million through that morning, he was somewhat surprised. Tr. 8:156-57. [*Objection sustained.*] [*This conversation occurred in mid-December 2000, almost three weeks after the last exchanges charged in the indictment were entered into by Iantosca (November 30, 2000). See Exhs. 90, 95, 100, 105.*]
AUSA MITCHELL: When you shut down the account - - when PaineWebber shut down the account in December of 2000, as of December 19th do you recall the amount of money that had been lost by then?
ROCK: That['s] $7 million.
AUSA MITCHELL: Okay. And by the time the - - the end of the year, how much money was lost in his accounts? Tr. 9:109. [*Objection sustained.*] [*At the ensuing sidebar, the government acknowledged it had gone too far by stating: "I know you want to cabin the issue of loss, your Honor." Tr. 9:111 (AUSA Mitchell). The Court responded: "We've already diverted too much from the main issues." Tr. 9:113.*]

### (7) **Zappala**

AUSA PIROZZOLO: And the realized loss for Merrill Lynch was how much?
ZAPPALA: $4,000,283.69.
AUSA PIROZZOLO: And you were shown a document that showed a realized loss as of November from PaineWebber of approximately $2.3 million?
ZAPPALA: Yes.
AUSA PIROZZOLO: If you add those together, what's the total realized loss?
ZAPPALA: That would be approximately $6.3 million.
AUSA PIROZZOLO: As of that date?
ZAPPALA: Through November 2000. For the year. Tr. 10:72-73.
AUSA PIROZZOLO: Were there unsuccessful exchanges after December 14th? Tr. 10:74. [*Objection sustained.*]

As in the first trial, all of this evidence regarding loss "had the tendency to lead the jury away from the charges in the indictment by inviting them to blame Carpenter because he [incurred losses], rather than because he had committed mail or wire fraud." Carpenter, 405 F. Supp. 2d at 102.

### C.    **Closing Argument**

However, the government's presentation of loss evidence pales in comparison to the government's almost exclusive focus on loss during its closing argument. The government's closing (AUSA Pirozzolo) started off mentioning loss at the very beginning and continued right until the end, as the following (just partial) excerpts show:

1) "Mr. Carpenter's ever-escalating losses during 2000 are also a matter of record." Tr. 13:43.

2) "What he is doing is taking new exchangors' money to cure the problem that he created with the other exchangors' money. Under no conceivable construction of the term "invest" or "discretion" is it fair to say that the exchange - - that he was entitled to use exchangors' money to get out of this hole." Tr. 13:62.

3) "Is it good faith for Mr. Carpenter, after Merrill Lynch shuts him down, to go right over to PaineWebber and lose another $2.3 million by the end of November, two months?" Tr. 13:64.

16

C. **The Indictment Was Constructively Amended Because it Failed to Charge Omissions, Nondisclosures and Half-Truths.**

The indictment alleged only that Mr. Carpenter made written and oral *affirmative misrepresentations* that were materially false. Indictment ¶ 27. As in the first trial, "[t]here was no evidence at trial that Carpenter personally made any oral misrepresentations, so the focus was on the written statements that the indictment alleged were materially false." Carpenter, 405 F. Supp. 2d at 92. However, the government proffered evidence at the second trial involving *only omissions, nondisclosures and half-truths*. Although the Court previously rejected Mr. Carpenter's argument that this constituted a constructive amendment or material variance because "the fraudulent scheme alleged in the indictment included the 'omission' to clarify the half-truths that the defendant directed toward the exchangors," id., the Court should reconsider its prior ruling because liability for omissions, nondisclosures and half-truths can arise only if there is a legal duty to disclose. See Sanchez v. Triple-S Mgmt. Corp., 492 F.3d 1, 10 (1st Cir.), cert. denied, 128 S. Ct. 806 (2007) ("A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes."). Because the indictment does not allege that Mr. Carpenter had a legal duty to disclose that he was investing Exchangors' funds in stock options, the

---

4) "But the facts here show that Mr. Carpenter was losing money hand over fist." Tr. 13:65.

A new trial is required due to the government's persistent, prejudicial, and inflammatory reference to loss in direct violation of the Court's orders. Even worse than in *Carpenter I*, where the government used at least 18 references to "gambling," see Carpenter, 405 F. Supp. 2d at 101, in *Carpenter II* the government's references to "loss" exceed 25 instances. All of this loss evidence and argument also provided Mr. Carpenter with a substantially different motive to cross-examine under FRE 804(b)(1).

17

government's proof at trial that he failed to make such disclosures is paradigmatic of a constructive amendment.

"A constructive amendment is considered prejudicial per se and grounds for reversal of a conviction." United States v. Bucci, 525 F.3d 116, 131 (1st Cir. 2008) (citations omitted). "A primary objective of the rule against constructive amendment of indictments is to ensure defendants have notice of the charges they must defend against." United States v. Dwyer, 490 F.3d 81, 84 (1st Cir. 2007) (quotations and citation omitted). Here, it cannot be said that Mr. Carpenter received sufficient notice in the superseding indictment of the charges upon which the government would ultimately seek to convict him (*i.e.*, omissions), especially since the government sought to convict Mr. Carpenter merely for the acts of others (*i.e.*, Paley). Where there is no conspiracy charge, the government has previously abandoned its aiding and abetting theory, and there is no evidence of Mr. Carpenter *himself* making any affirmative misrepresentations to the Exchangors or their advisors, Due Process does not allow the government to charge Mr. Carpenter only with speaking falsely (*i.e.*, affirmative misrepresentations), and then convict him only for failing to speak (*i.e.*, omissions). "When the facts proved at trial differ from those alleged in the indictment, the indictment has been constructively amended." United States v. Pierre, 484 F.3d 75, 82 (1st Cir. 2007).

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Carpenter a new trial as to all counts of the superseding indictment.

>RESPECTFULLY SUBMITTED,
>DANIEL E. CARPENTER,
>By his attorney,
>
>
>*/s/ Jack E. Robinson*
>Jack E. Robinson
>(BBO #559683)
>2187 Atlantic Street, Suite 905
>Stamford, CT 06902
>(203) 425-4500

Dated: August 8, 2008

## CERTIFICATE OF SERVICE

    I hereby certify that on the date hereof this document was filed through the Court's CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).

>*/s/ Jack E. Robinson*
>Jack E. Robinson