UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————
                                          )
UNITED STATES OF AMERICA        )
                                          )
        v.                                )        CRIMINAL NO. 04-10029-GAO
                                          )
DANIEL E. CARPENTER              )
———————————————————————)

## DEFENDANT'S REPLY IN FURTHER SUPPORT OF SUPPLEMENTAL MOTION FOR JUDGMENT OF ACQUITTAL

Defendant Daniel E. Carpenter ("Carpenter") respectfully seeks leave to file this reply in further support of his supplemental motion for judgment of acquittal.

The government has obtained a "free ride" these past 4 ½ years because: (1) its definition of the purported scheme to defraud has been a moving target; (2) it has yet to specify **exactly** the affirmative misrepresentations that it claims Carpenter made to the Exchangors; and (3) it has failed to offer a legally sufficient basis to support its contention that Carpenter can be held criminally liable for omissions, nondisclosures and half-truths absent a duty to disclose. For these and other reasons, a judgment of acquittal is warranted.

### A.      No "Scheme to Defraud" Has Been Proven.

Because neither the mail nor wire fraud statutes define a "scheme to defraud," the government can at any time literally create a "scheme to defraud" out of any standard business arrangement that, even without fraud, turns sour. Here, the government has stretched the mail and wire fraud statutes far beyond their breaking point to create a "scheme to defraud" where none exists. After more than seven years of investigation, 4 ½ years since indictment, *two* jury trials, and a government appeal to the First Circuit, the case against Carpenter has boiled down simply to investing in "risky" stock options and losing $9 million. There was no fraud and no

scheme to defraud.  Since "the gravamen of the offense is the scheme to defraud," <u>Bridge v.</u>

<u>Phoenix Bond & Indemnity Co.</u>, 128 S. Ct. 2131, 2138 (2008), no scheme means no crime.

Because there is no crime here, the government's definition of the "scheme" has gone

through numerous transformations over the past 4 ½ years.  In fact, a cursory review shows at

least *seven* separate and distinct incarnations of the "scheme"—all illusory and none proven.

In February 2004, the Grand Jury charged the "First Scheme" as inducing the Exchangors

to send "funds to BPE based on false written and oral assurances that the money would be

protected and held safe, that BPE would not transfer the funds without the client's written

authorization, and that BPE would return the funds in full."  Indictment ¶ 27 (Dkt. 1).  After

Carpenter moved to dismiss the indictment because, *inter alia*, it failed to allege "materiality"

(Dkt. 13) in accordance with <u>Neder v. United States</u>, 527 U.S. 1 (1999), in September 2004 the

Grand Jury amended the indictment to charge the "Second Scheme" of inducing the Exchangors

to send "funds to BPE based on **material**, false written and oral assurances that the money would

be protected and held safe . . ." Superseding Indictment ¶ 27 (Dkt. 34) (emphasis added).[1]

Then, after a further challenge to the sufficiency of the indictment, the government

admitted that whether Carpenter's investment strategy "subsequently resulted in gains or losses is

**irrelevant**."  Dkt. 29 at 6 (emphasis added).  The government is irrevocably bound by this

admission.  <u>United States v. Kattar</u>, 840 F.2d 118, 130-31 (1st Cir. 1988) ("[T]he federal

government is a party-opponent of the defendant in criminal cases" and is bound by admissions

made in its pleadings pursuant to FRE 801(d)(2)) (citation omitted).  During both trials, however,

the government ignored its binding admission as well as countless admonitions by the Court, and

instead focused exclusively (in the "Fourth Scheme") on the "irrelevant" issue of loss —without

---

[1]  The Grand Jury charged $9 million in losses.  Superseding Indictment ¶ 58.  The government's false, misleading and prejudicial closing argument grossly overstated the losses at $15 million.  Tr. 13:43.

any reliance on the alleged misrepresentations. Suffice it to say, according to the government, the only type of stock option investment there is would be "highly risky" and/or "naked."

During the first trial, the government failed to introduce **any** evidence of oral or written misrepresentations. It also "disavowed a theory of Carpenter's culpability based on his having aided or abetted Paley." United States v. Carpenter, 405 F. Supp. 2d 88, 95 n.6 (D. Mass. 2005). Instead, the government's evidence focused on a "Fourth Scheme" of omissions, non-disclosures and half-truths (*i.e.*, that the Exchangors were not "informed" that their money would be invested in stock options, despite the fact that the agreements clearly allowed BPE to invest in any securities offered through Merrill Lynch and PaineWebber). Although the indictment clearly fails to charge an "omissions" scheme, the government's case was saved by the Court's definition of a "Fifth Scheme" as "the 'omission' to clarify the half-truths that the defendant directed toward the exchangors," and "obtaining control of the exchangors' money by false pretenses." Id. at 92, 93. However, this formulation misses several ingredients: (1) there was no evidence that Carpenter "directed" any "half-truths" to the Exchangors; (2) the government did not offer any evidence of false pretenses or misrepresentations upon which the Exchangors could have possibly relied because Paley made no oral representations and the documents contain no written misrepresentations; (3) nothing in the BPE written materials (exchange agreements and marketing materials) has been proven to be false; and (4) since Carpenter had no contact or communication with the Exchangors, he cannot be charged with knowledge as to what the Exchangors believed was important or "material" to their decision to utilize BPE's services.

During the government's interlocutory appeal, the First Circuit identified yet a "Sixth Scheme" that is completely different from the others:

> Carpenter was charged with having devised and implemented a scheme to defraud investors by representing that their money would be invested **prudently** in conformity with the property exchange requirements of the Internal Revenue Code while he intended to pursue an investment strategy at odds with such representations.

United States v. Carpenter, 494 F.3d 13, 16 (1st Cir. 2007) (emphasis added).  While an interesting theory, it has several fatal flaws.  First, nowhere does the indictment allege that the Exchangors were told (orally or in writing) that their funds would be invested "prudently"—the indictment alleges only that the Exchangors were told that their funds "would be protected and held safe."  Superseding Indictment ¶ 27.  The terms "prudent" and "safe" are not synonymous, so the First Circuit's description of the alleged scheme is materially different from what the Grand Jury charged.[2]  Second, the Internal Revenue Code does not provide any requirements or guidance on how an intermediary may invest client funds, so even if there had been a representation that the investments would be "prudent" (which there wasn't), such a representation would not have been in contravention of a statutory or regulatory "requirement" because none exists.[3]  Third, even if representations regarding "prudent" investments existed (which they don't), the government failed to offer any proof that stock options are not "prudent" investments.  Fourth, and most critically, this Court has already considered and rejected any theory based on the alleged lack of "prudence."  See July 2005 Tr. 4:145 (THE COURT: "**Why does prudence matter?**") (emphasis added).  The First Circuit's definition of the "scheme" is not only totally at odds with that relied upon by the Grand Jury and the government, but is based on a

---

[2]  The requirement under the Massachusetts Prudent Investor Act that a trustee manage trust assets "as a prudent investor would," Mass. Gen. Laws c. 203C, § 3(a), applies only to **trustees managing trust assets**.  Mass. Gen. Laws c. 203C, § 2(a).  By definition, a qualified intermediary cannot be a trustee of an exchangor because that would imply a fiduciary relationship, which is expressly forbidden as a matter of federal law.  See 26 C.F.R. § 1.1031(k)-1(k)(2) (disqualifying as an intermediary anyone in a fiduciary relationship with the exchangor).

[3]  The Internal Revenue Code does not even mention qualified intermediaries.  See 26 U.S.C. § 1031.  Assuming the First Circuit was referring to the § 1031 *regulations* issued by the Treasury Department, they are also silent on how an intermediary can invest exchange proceeds.  See 26 C.F.R. § 1-1031(k)-1.

theory already rejected by this Court (the rejection of which was not challenged by the government).[4]

After the second trial, the government offered yet a "Seventh Scheme." The government's latest argument is that BPE was a fraudulent enterprise from inception in October 1998, and that the vast majority of BPE's clients "escaped the fraud without losing their funds," Dkt. 315 at 14, is irrelevant. Under this theory, BPE was a fraudulent scheme from the get-go simply because it did not disclose to its clients (whether satisfied or not) that their funds could possibly be lost (in stock options or otherwise). Dkt. 317 at 3 ("The materials make no mention of risk or the possibility that the funds could be lost."). Defining the scheme in terms of "loss," however, runs afoul of the Court's repeated warnings as well as the government's admission prior to the first trial that whether Carpenter's investment strategy "subsequently resulted in gains or losses is **irrelevant**." Dkt. 29 at 6 (emphasis added). See also Tr. 3:44 (AUSA MITCHELL: "I mean, if [Snider] had completed his exchange, we wouldn't be here today."). If loss is irrelevant, then it is also irrelevant that the Exchangors were not told beforehand that their funds could be lost. Certainly, the government did not allege, much less prove, that Carpenter intended to "lose" the money. Once again, recent events have proven that "riskless" investments can be the riskiest of them all. The most staid and stable of investments can turn deadly. Bear Stearns was brought down by home mortgages, and UBS PaineWebber and Merrill Lynch are being investigated for selling "Auction-rate" municipal bonds.

The government has failed to prove a "scheme to defraud" because there was no fraud, no specific intent to defraud, no fraudulent misrepresentations, no fraudulent or misleading

---

[4] The Court previously identified other problems with the "prudence" theory. See July 2005 Tr. 4:150 (THE COURT: "I've been getting the impression that the government's case is a little bit more bright-line."). In other words, if the money "had been all placed in IBM stock and it had plummeted, as I think it did, and there were big losses," id., then there would be no "crime."

omissions, and no crime.  As a result, the government's definition of the "scheme" has been a continuously moving target.  After seven different permutations over 4 ½ years, the government still cannot settle on precisely *what* the scheme entails.  If the true nature of the "scheme" is, as AUSA Mitchell recently explained, simply the failure of BPE to meet its contractual obligations to seven clients, then there is no "scheme" because "breach of contract itself [does not] constitute a scheme to defraud."  Sanchez v. Triple-S Management Corp., 492 F.3d 1, 12 (1st Cir.), cert. denied, 128 S. Ct. 806 (2007) (citations and quotations omitted).  The concept that a mere breach of contract does not constitute a scheme to defraud is confirmed by a long line of First Circuit cases beginning with McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir. 1990), and was confirmed by the jury instructions given by the Court in *both* trials.

**B.    No Evidence of  Affirmative Misrepresentations**.

The government's 4 ½-year "free ride" also includes its failure to specify **exactly** the affirmative misrepresentations that it claims were made by Carpenter.[5]  None of the statements identified by the government amount to misrepresentations or were proven by the government to have been false or fraudulent, a necessary predicate to liability under the mail and wire fraud statutes.  See Dkt. 315 at 8 n.5; Dkt. 317 at 2-3.  The government must now be called to task, because it failed to prove **any** affirmative misrepresentations by anyone, let alone by Carpenter.[6]

---

[5]  Had the Exchangors brought a civil RICO action against Carpenter, it would have been summarily dismissed for failure to plead fraud with particularity under Fed. R. Civ. P. 9(b).

[6]  For example, even if the documents "touted Benistar's trustworthiness," Dkt. 315 at 8 n.5 (although there is no document in evidence that states BPE is "trustworthy"), such a statement would only be common marketplace "puffery," which is not actionable under the mail and wire fraud statutes.  See Baron v. Smith, 285 F. Supp. 2d 96, 106 (D. Mass. 2003), aff'd, 380 F.3d 49 (1st Cir. 2004) (statements were "the kinds of optimistic statements that the market would easily recognize as nothing more than a kind of self-directed corporate puffery.").  None of the remaining representations identified by the government are false, fraudulent or misleading.  See, e.g., Dkt. 317 at 3 (government stating that "Benistar was bonded" constituted a misrepresentation, even though the undisputed evidence showed that BPE was, in fact, bonded with Travelers in the amount of $5 million (see Exh. 7)).

"There was no evidence at [either] trial that Carpenter personally made any oral misrepresentations, so the focus was on the written statements that the indictment alleged were materially false." Carpenter, 405 F. Supp. 2d at 92. However, the government cannot point to a single written statement in evidence that qualifies as an affirmative misrepresentation. The indictment alleged only two affirmative misrepresentations, neither of which were proved at trial. The first alleged misrepresentation is that clients were induced to send funds to BPE "based on material, false written and oral assurances that the money would be *protected and held safe*." Superseding Indictment ¶ 27 (emphasis added). The government concedes that no oral misrepresentations were made (either by Paley or Carpenter), so the government must point to a document—any document—admitted into evidence where BPE expressly states that the funds will be "protected and held safe." **No such document exists and no such statement was made**.

The only documents in evidence that even remotely refer to the issues of "protection" and "safety" are Exhibit 1, slide 14 of Paley's Powerpoint presentation, and Exhibit 6, page 5 of Paley's § 1031 article (written while he was with Nationwide and dealing with its president Thomas Bottenberg). Neither document contains any affirmative statements, but rather *suggestions* as to what questions prospective clients should ask of *any* § 1031 intermediary:

- "*Ask* about the security of your funds, and find out what guarantees are offered." Exh. 1, slide 14 (emphasis added).

- "*Ask* about the security of your funds, and what assurance you will have to assure that your funds and your exchange status will be protected." Exh. 6, page 5 (emphasis added).[7]

These statements only suggest that prospective clients "ask" about the security of their funds. Nowhere does BPE *guarantee* the safety, security or protection of the funds. Nor, more

---

[7] Since Paley's article (Exh. 6) was published in July 1998, which was *before* he formed BPE with Carpenter in October 1998, even if the statement constituted a misrepresentation (which it doesn't), the statement can in no way be attributed to Carpenter.

importantly, is there any evidence that any Exchangor or Exchangor's advisor ever asked about the "safety" or "security" of the funds. If no Exchangor asked about "safety" or "security," then obviously such issues were not sufficiently important or "material" to warrant inquiry, notwithstanding the Exchangors' trial testimony eight years after-the-fact. See Tr. 2:131 (Snider); 3:104 (Darling); 6:51 (Bellemore).

The second alleged affirmative misrepresentation is "that BPE would not transfer the funds without the client's written authorization, and that BPE would return the funds in full." Superseding Indictment ¶ 27. No evidence exists that the Exchangors' funds were ever transferred anywhere but back to the Exchangor or to a seller of the replacement property as agreed. Ordinary, customary and daily transfers between BPE's dual accounts at Merrill Lynch (the "B-01" and the "B-10" accounts) and PaineWebber (the "33" and the "34" accounts) do not make the representation about prohibited transfers false, primarily because Merrill Lynch broker Gary Stern and PaineWebber broker Mitchell Rock both testified that the dual accounts at each firm were linked and, therefore, were considered to be one and the same account. Tr. 8:106 (Rock stating that the "33" and "34" accounts were "the same account."); Tr. 7:36 (Stern confirming that the "B-01" and the "B-10" accounts "are linked together."). At both firms, one account was for money transfers (the "money in-money out" account) and the other was for investments. Tr. 8:104 (ROCK: "[Carpenter] said he likes to have the accounts split in two parts so that the trading and the cash flows were separate."). Both accounts at each firm comprised an integrated unitary account, both accounts were in BPE's name, and neither account was in Carpenter's name. The exchange agreements clearly mention "accounts" and "institutions" (plural) as well as "sole" discretion. Nor is there any evidence of any transfer of funds from BPE to Carpenter. The government's allegations of "misappropriation," therefore, are demonstrably false. Nor can the representation that BPE would return the funds in full be considered false,

since BPE did ultimately return all of the Exchangors' funds in full (and then some) by virtue of paying BPE's $12.5 million arbitration award against PaineWebber directly to the Exchangors.

## C.    No Duty to Disclose Investment Strategy.

The total lack of proof regarding affirmative misrepresentations leaves only omissions, nondisclosures and half-truths (even though the indictment only charged fraud by affirmative written and oral misrepresentations) as a potential basis for criminal liability.  However, the government necessarily concedes that it has not alleged, let alone proven, that Carpenter had a legal duty to disclose that he was investing in "risky" stock options.  Absent such a duty, Carpenter cannot, as a matter of law, be held liable for omissions, nondisclosures and half-truths.[8]

### 1.    The Seventh Circuit Cases Cited by the Government are Inapposite.

The only statement missing from the written materials is, as the government contends, that the "materials make no mention of risk or the possibility that the funds could be lost."  Dkt. 317 at 3.  To supports its omissions theory, the government is forced to rely on cases from the Seventh Circuit, thereby ignoring the well-settled First Circuit decisions in United States v. Yefsky, 994 F.2d 885 (1st Cir. 1993), McEvoy Travel, and United States v. Cassiere, 4 F.3d 1006 (1st Cir. 1993), all of which are contained in the U.S. Attorney's Criminal Resource Manual but are conspicuously absent from the government's briefs.

---

[8]  Investing in stock options was not supposed to have been the issue at trial, though the government made it so.  Had Carpenter invested and lost the funds in "Auction-rate" securities issued by municipalities through Merrill Lynch and UBS PaineWebber rather than stock options, apparently no "crime" would have been committed, even if they proved to be more "risky" and less "prudent" than options.  See L. Rappaport & R. Smith, *UBS to Pay $19 Billion as Auction Mess Hits Wall Street*, Wall St. J., Aug. 9, 2008, at A1 ("UBS, Merrill Lynch and Citigroup have committed to taking back a total of more than $36 billion of the instruments."); J. Stewart, *Auction-Rate Securities and the Ugly Truth*, Wall St. J., Aug. 14, 2008, at D3 ("Auction-rate securities were sold by nearly all the big firms as a slightly higher-yielding, but safe, alternative to money-market funds.  They proved anything but when the auction markets froze in February, stranding thousands of investors with more than $300 billion in illiquid holdings.").

Not only were omissions not charged in the indictment, but the government neither alleged nor proved that Carpenter had a legal duty to disclose how he was investing the funds. While the government cites a Seventh Circuit case in support of its omissions theory (Dkt. 315 at 7), the Seventh Circuit itself has since limited the viability of the omissions theory of mail and wire fraud.  "The mere failure to disclose information will not always constitute fraud, but an omission *accompanied by acts of concealment or affirmative misrepresentations* can constitute fraud."  United States v. Stephens, 421 F.3d 503, 507 (7th Cir. 2005).  Even this formulation, however, does not benefit the government, because there is no evidence of any concealment by Carpenter and no evidence of affirmative misrepresentations by anyone.  Critically, in Stephens the Seventh Circuit used the auxiliary verb "can" to identify the possibility that an omission *may* constitute mail or wire fraud, instead of the imperative command verb "shall," because omissions alone can hardly ever serve as the predicate for mail or wire fraud offenses.

Furthermore, the government's reliance on United States v. Keplinger, 776 F.2d 678 (7th Cir. 1985), is equally misplaced, if not desperate.  See Dkt. 315 at 7.  Aside from the fact that Keplinger is not binding in the First Circuit, a cursory review of the case reveals that the defendant's convictions for mail fraud were actually predicated on *a series of material written affirmative misrepresentations, fabrications and falsifications* of important scientific studies, id. at 684, and not, as the government suggests here, for omitting information where there is no duty to disclose.  While the Seventh Circuit in Keplinger did discuss the possibility of an omission constituting fraud under the mail fraud statute (absent a duty to disclose), it did so *in dicta* and only in response to the defendants' "wholly unpersuasive argument" that the jury might have found them guilty on the basis of "omissions" in the report.  Id. at 697.  In fact, all of the acts for which the defendants were charged and convicted were affirmative, deliberate, and material written misrepresentations that were executed in order to defraud the drug study's sponsor and

eventually the public.[9]  *Not reporting any of the toxic effects* of a drug might be an example of a fraudulent "omission," but when the defendants deliberately manipulated data and communicated statistics that were either completely fabricated or known to be untrue, those "omissions" became fraudulent and criminal affirmative written misrepresentations actionable under the mail fraud statute.  Moreover, the court in <u>Keplinger</u> *did not allow* the jury to consider a particular omission charged in connection with a count of violating 18 U.S.C. §1001 (prohibiting false statements) "because the government had shown **no legal duty to disclose** the information omitted from the report."  <u>Id.</u> at 697, n.8 (emphasis added).  The government's reliance on <u>Keplinger</u> to show criminal liability for omissions here, when defendants in that case were convicted for *a series of written material affirmative frauds, fabrications and falsifications*, is completely inapposite to the instant case and betrays the government's desperation regarding its flawed "half-truth" theory.[10]

Moreover, the government's brief does nothing to distinguish the governing principle in various First Circuit cases that "[n]or does a breach of contract in itself constitute a scheme to defraud."  <u>McEvoy Travel Bureau, Inc.</u>, 904 F.2d at 791.  In fact, the Seventh Circuit is in line with the First Circuit on this issue:

> [M]ail fraud requires a showing of specific intent to defraud. This in turn requires a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another…**The fact that Rosewood subsequently broke a promise is not evidence that it never intended to keep the promise when made. At most this is evidence of breach of contract, not fraud**. Fraud requires much more than simply not following through on contractual or other promises. It requires a showing of deception at the time

---

[9]  It is difficult to imagine a more heinous instance of mail fraud, where human lives were endangered, compared to the instant case where the Exchangors did not suffer any physical injury or financial loss.

[10]  "There is a Yiddish proverb that defines a half-truth as a whole lie."  <u>United States v. Sloan</u>, 492 F.3d 884, 891 n.2 (7th Cir. 2007).  The government has offered no proof that Carpenter lied about anything or misrepresented anything to anybody, and it likewise cannot prove the existence of any half-truths. <u>Compare</u> D. Mangan, *Edwards Scandal's New Tryst*, N.Y. Post, Aug. 13, 2008, at 11 ("'The most shocking thing was watching him on TV [last week] giving these half-truths, these half-baked answers.").

the promise is made. A subsequent breach, although consistent with deceptive intent is not in and of itself evidence of such an intent.

Corley v. Rosewood Care Center, Inc., 388 F.3d 990, 1007 (7th. Cir. 2004) (citations omitted) (emphasis added).  Furthermore, as the Seventh Circuit's distinguished jurist Chief  Judge Easterbrook has stated: "Breach of contract is not fraud, and a series of broken promises therefore is not a pattern of fraud . . . But how can one have mail fraud without fraud?  The word 'fraud' in the mail-fraud statute means deliberate, material misrepresentations . . . No fraud, no mail fraud." Perlman v. Zell, 185 F.3d 850, 853-54 (7th Cir. 1999).

### 2.      **Mere Omissions Do Not Constitute Mail/Wire Fraud in the First Circuit**.

Even worse for the government, however, is that the First Circuit takes a much dimmer view than the Seventh Circuit of the concept that mail and wire fraud can exist based on omissions or half-truths absent a legal duty to disclose.  The First Circuit has described the concept "in which conduct alone, in context, can amount to a misrepresentation" as a "shadowy area."  Bonilla v. Volvo Car Corp., 150 F.3d 62, 70 (1st Cir. 1998).  "A mail or wire fraud conviction usually cannot result from a failure to disclose unless the defendant was *aware* of its duty to disclose."  Id. at 75 (emphasis in original).  See also United States v. Cassiere, 4 F.3d 1006, 1022 (1st Cir. 1993) ("the person actually knew such disclosure ought to be made").  Carpenter had no statutory, regulatory, legal, equitable, or contractual duty to disclose how he was investing the funds or that there was a risk of loss, and the government offered no evidence to the contrary.  Nor did the government offer any evidence that if such a duty did somehow exist (it didn't), that Carpenter was aware of it.  "Under these circumstances, an inference of deliberate deception by [Carpenter] would be impossible to sustain even if we agreed that [he] had such a legal duty—a point on which we are at the very least doubtful."  Bonilla, 150 F.3d at 70.

The final fatal flaw in the government's case is that the First Circuit has recently shut the door on the "omissions" theory of liability. "A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes." Sanchez, 492 F.3d at 10. "It would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who—a jury might find—harbored in his heart the hope that the buyer would never ask." Id. (quoting Bonilla, 150 F.3d at 70). In Sanchez, the First Circuit thoroughly rejected this theory of liability under the mail and wire fraud statutes on grounds identical to those here:

> [T]he plaintiffs make no effort to explain how their theory even states a claim predicated on mail and wire fraud. They do not say whether the defendants have a duty to disclose "the actual manner in which the payment requests were processed" or, if so, what the source of that duty is; they do not say whether the defendants "fail[ed] to disclose" or "conceal[ed]" this information with the intent to deceive the plaintiffs. Instead, they proceed on the assumption that nondisclosure alone can support mail and wire fraud claims. **As we have discussed, that is not the law, in this circuit or elsewhere**.

Id. at 11 (emphasis added).

"[S]imple nondisclosure does not mail or wire fraud make." Id. at 11-12. Yet, that is the *only* evidence the government has introduced in this case after *two* trials—that Carpenter simply failed to disclose to the Exchangors that he was investing their funds in "risky" stock options. See Dkt. 315 at 5, n.2 ("Indeed, the evidence is overwhelming that the exchangors never knew the money was going into options."). But this is clearly insufficient evidence for a conviction. There were no affirmative misrepresentations. **Nor was there any concealment because nobody ever asked Paley (let alone Carpenter) how the funds were being invested**. Even Marjorie Adams, who claimed to have had two telephone conversations with Carpenter, never asked him if or how the money was going to be invested. Tr. 5:88. "The government has identified no way in which

[Carpenter] communicated anything to his customers, let alone anything false. Rather, viewing the evidence in the light most favorable to the government, the government undertook to prove no more than garden variety conversion"—and it failed even in that endeavor. United States v. Finnerty, 2008 WL 2778830, *5 (2d Cir. Jul. 18, 2008) (affirming grant of judgment of acquittal in securities fraud case based on lack of deceptive conduct).[11]

Evidence only of omissions, nondisclosures and half-truths, absent a duty to disclose, is insufficient. Rather, "there must be some proof of manipulation or a false statement, breach of a duty to disclose, or deceptive communicative conduct." Id. at *6. None of these exist here. Absent a duty to disclose, Carpenter cannot be held criminally liable for omissions, nondisclosures and half-truths. See United States v. Safavian, 528 F.3d 957, 965 (D.C. Cir. 2008) ("We therefore conclude that Safavian had no legal duty to disclose and that his concealment convictions cannot stand.").[12]

**D.    Carpenter Lacked Fair Warning.**

While the mail and wire fraud statutes may contain unambiguous language on their face, they can be applied in ambiguous and unconstitutional ways. "The criminal law should not be a series of traps for the unwary." United States v. Hussein, 351 F.3d 9, 13 (1st Cir. 2003). "The underlying principle is that no man shall be held criminally responsible for conduct which he

---

[11]  There was no conversion because even the government conceded that BPE had the right and obligation to exercise sole possession, custody and control over the funds. See 26 C.F.R. § 1.1031(k)-1(a); Tr. 2:76.

[12]  In Sanchez, the First Circuit reiterated that "breach of contract itself [does not] constitute a scheme to defraud." Sanchez, 492 F.3d at 12 (quoting McEvoy Travel Bureau, Inc., 904 F.2d at 791). The jury instructions follow this mandate as well. All the government proved was that BPE failed to satisfy its contractual obligations to the seven Exchangors listed in the indictment. Even if a breach of contract could somehow constitute mail and wire fraud (which it can't), PaineWebber's supervening misconduct caused the losses in this case, as the NASD arbitration panel found. Regardless of its underlying reasons, the arbitration award was in favor of BPE and against PaineWebber in the amount of $12.5 million. The Court should take judicial notice of this fact under FRE 201. Doing so absolves Carpenter of harboring any fraudulent intent since, as the government has conceded, the "crime" here was simply the loss. If PaineWebber caused the loss—as found by the arbitrators—then Carpenter did not commit the "crime."

could not reasonably understand to be proscribed." Id. (citation omitted). Under no circumstances could Carpenter have reasonably understood that investing § 1031 funds in stock options would, four years after-the-fact, be deemed fraudulent or criminal—particularly when the privately-negotiated, arm's-length agreements between BPE and the Exchangors, where the Exchangors were all represented by professional advisors, *do not prohibit investments in stock options*.

The government seeks to create a scheme to defraud *solely* out of Carpenter's failing to disclose to the Exchangors that he was investing their money in "risky" stock options. The government takes issue with this characterization, claiming that the crime was "intentionally taking the exchangors' money under the false pretense that it would be *kept safe and secure* while intentionally using that money to engage in self dealing options trading." Dkt. 315 at 5 (emphasis added).[13] However, nowhere and at no time did BPE or Paley (let alone Carpenter) represent orally or in writing that the funds "would be kept safe and secure." See Tr. 11:86-87 (Paley).

Its avenue to a proper conviction foreclosed on this point, the government desperately grasps at straws and seeks to obtain a conviction **without** (1) proof of affirmative misrepresentations—written or oral; (2) the existence of a duty to disclose; (3) a conspiracy charge or evidence of aiding and abetting; and (4) evidence that Jokinen and Paley were Carpenter's agents. As described by Judge DeMoss in a similar context involving honest services mail and wire fraud under 18 U.S.C. § 1346 in an Enron prosecution:

---

[13] While the government refers several times to "self dealing options trading," it is well aware that there is no evidence whatsoever of "self dealing" by Carpenter—*i.e.*, that he personally profited from BPE's investments. The undisputed evidence is that Carpenter did not pocket a penny for himself personally and, instead, invested and *lost over $2.5 million of his own funds* in BPE—a far cry from "self dealing." See Tr. 10:66-70 (Zappala).

> [T]he application of [the mail and wire fraud statutes] to the facts presented in this case is particularly problematic for several reasons, the combination of which poses an even greater harm to future business relationships and transactions than would any one of the problems alone . . . The cumulative effect of a vague criminal statute, a broad conception of [agency], and an unprincipled theory of harm that connects the ultimate demise of [BPE] to a single transaction is a very real threat, of potentially dramatic proportion, to legitimate and lawful business relationships and the negotiations necessary to the creation of such relationships.

United States v. Brown, 459 F.3d 509, 534, 535 (5th Cir. 2006), cert. denied, 127 S. Ct. 2249 (2007) (DeMoss, J., concurring in part and dissenting in part). To allow a conviction in this case on these facts would pose an even greater harm to future business relationships and transactions (not only in the § 1031 industry but generally in any financial services business) than even Judge DeMoss feared.[14]

### E.    Double Jeopardy Clause Was Violated.

The government is simply incorrect when it claims that a partial ruling on the sufficiency of the evidence cannot create a double jeopardy bar. See Dkt. 315 at 9. "[W]hat constitutes an 'acquittal' is not to be controlled by the form of the judge's action. Rather, we must determine whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." United States v. Martin Linen Supply Co., 430 U.S. 564, 571 (1977). Whatever label the government seeks to affix to the Court's ruling (with the government's express assent) in the first trial that Paley was not Carpenter's agent, see 7/25/05 Tr. Charging Conf. at 31-32, that ruling is sufficient for double jeopardy purposes because it involved a resolution of certain facts (i.e., the existence of an agency

---

[14] The government's desperate attempts to save the irrational verdict in this case have reached new lows, as shown by the government's reliance on findings in the related *civil* case to support the verdict in a *criminal* case. See Dkt. 315 at 5, n.3. The government must introduce legally sufficient evidence *in this case*—not in a civil case involving a lower burden of proof and different parties, where Carpenter did not appear, defend, or introduce any evidence. See Cahaly v. Benistar Property Exchange Trust Co., Inc., 885 N.E.2d 800, 808 n.13 (Mass. 2008) ("[Daniel] Carpenter and Molly Carpenter did not appear at trial."). By comparison, in another related case in which Carpenter *did appear and defend*, he prevailed. See Cahaly v. Benistar Property Exchange Trust Co., Inc., 842 A.2d 264 (Conn. 2004).

relationship) that "constituted ultimate issues" in the second trial.  <u>United States v. Yearwood</u>, 518 F.3d 220, 229 (4th Cir. 2008).

Nor did Carpenter "mischaracterize" the resolution of the ultimate issue regarding agency. In the first trial, the government specifically assented to the jury *not* being instructed on aiding and abetting.  <u>See</u> <u>Carpenter</u>, 405 F. Supp. 2d at 95 n.6 ("although the indictment contains a reference to 18 U.S.C. § 2, during trial the government disavowed a theory of Carpenter's culpability based on his having aided or abetted Paley.").  This necessarily means that there was insufficient evidence of aiding and abetting (*i.e.*, agency) in the first trial. Consistent with this result, there was no jury instruction on aiding and abetting in the second trial.  Thus, Carpenter received an "acquittal" on the aiding and abetting and agency allegations in the first trial.[15] Because "the two trials involved an 'identical' issue 'necessarily adjudicated' in the first," <u>United States v. Benkahla</u>, 530 F.3d 300, 307 (4th Cir. 2008), double jeopardy bars the second trial.  The case here for a double jeopardy bar is stronger than in <u>Ashe v. Swenson</u>, 397 U.S. 436 (1970).

**F.    To Prove Causation, the Government Extends the Scheme's Duration.**

The government now contends that "the scheme charged was not limited to the period August 2000 to December 2000" as charged in the indictment, Dkt. 315 at 10, but instead really "dated as far back as the formation of Benistar in 1998."  <u>Id.</u> at 10-11.  This is an amazing statement, and shows the desperate levels to which the government will sink to defend the verdict.

This argument is foreclosed for reasons too numerous and obvious to delineate here, not the least of which is that the indictment makes no reference to any period earlier than February 2000.  Superseding Indictment ¶ 39.  For the government even to make such an argument constitutes a "per se" prejudicial constructive amendment of the superseding indictment.  <u>See</u>

---

[15]  The Court's official docket in this case reflects this, as the aiding and abetting charges are listed under "Terminated Counts."  <u>See</u> Dkt. at p. 3.

United States v. Bucci, 525 F.3d 116, 131 (1st Cir. 2008).  Nothing can save the government from this error, which is greater than the constructive amendment found unconstitutional in Stirone v. United States, 361 U.S. 212 (1960) (changing the offense from involving "sand" to "steel").

The Court previously rejected Carpenter's causation argument because it found that "having joined with Paley initially to devise the fraudulent scheme, Carpenter remained a participant in it."  Carpenter, 405 F. Supp. 2d at 95.  Based on the evidence in the second trial, the Court should reconsider this ruling and find the evidence insufficient to sustain the verdict.  The government cannot rely on principles of conspiracy in a case where there is no conspiracy charge, aiding and abetting, or agency.  The government is limited to proving acts **by Carpenter alone and nobody else** in order to obtain a conviction—which on the evidence it cannot do because Carpenter had no interaction with any of the Exchangors.  See id. at 95, n.6 (Carpenter's "conviction rests on his own acts, not on Paley's attributed to him.").  Because there was no conspiracy, aiding and abetting, or agency, the government was unable to prove causation.

**G.      Subject Matter Jurisdiction Is Lacking as to Counts 13, 15 and 19.**

The government was required to prove *beyond a reasonable doubt* that the wire transmission in Count 13 "actually crossed state lines."  United States v. Phillips, 376 F. Supp. 2d 6, 9 (D. Mass. 2005).  The government failed to meet this burden because the ambiguous nature of Exh. 214 (wire transfer from "FLEET NYC" to "BK OF NYC") precludes the government from proving *beyond a reasonable doubt* that the wire transmission in Count 13 "actually crossed state lines."  Because there was no trial testimony explaining the details of this wire transfer, the *only* evidence offered by the government was the venue stipulation.  Dkt. 280.  But this is of no aid because when the stipulation and Exhibit 214 are considered together, the required standard has not been met.  The stipulation provides only that the wire in Count 13 was "initiated in" and "cleared through" Massachusetts.  Dkt. 280, ¶¶ 2-3.  Absent more of an explanation of these

terms, it is unclear whether the wire itself traveled in interstate commerce because Exhibit 214 indicates that the wire originated and terminated in New York. Since jurisdiction must be proved **beyond a reasonable doubt**, while venue can be proved just by a **preponderance of the evidence**, the lower standard of proof inherent in the venue stipulation is legally insufficient.

There is no jurisdiction as to Counts 15 and 19 because both mailings occurred *after* the "scheme" had reached fruition (*i.e.*, after BPE had obtained the funds). *Post*-scheme mailings can qualify under the mail fraud statute only if they are "lulling" communications intended "to keep the scheme in operation by preserving a needed business relationship between a fraud victim and the defendant." United States v. Slevin, 106 F.3d 1086, 1089 (2d Cir. 1996). The post-scheme mailings in Counts 15 and 19 were obviously not "lulling" communications because they were sent from BPE-Newton to Benistar-CT, rather than to or from an Exchangor. "A mailing cannot be said to be in furtherance of a scheme to defraud when it occurs **after** the scheme has reached fruition." United States v. Altman, 48 F.3d 96, 103 (2d Cir. 1995) (emphasis added).

**H.     No Fraudulent Inducement as to Counts 1-2, 7-11, and 19.**

The government concedes that the transfers in Counts 1-2, 7-11, and 19 occurred without the Exchangors receiving further written materials to "induce" them to utilize BPE's services, Dkt. 315 at 13, but asserts this is a "materiality argument—a classic jury question." Because materiality is an element of mail and wire fraud, it must be proved beyond a reasonable doubt. The government's failure to do so warrants a judgment of acquittal—a decision that is clearly not "a classic jury question." Since Count 14 involved an exchange in which no loss resulted, there can be no "crime" because the government has conceded that the "crime" *was* the loss. Tr. 3:44.

**I.     Government Has Failed to Prove Venue as to Counts 1-2 and 4-13.**

"Actions which are merely preparatory or prior to the crime are not probative in determining venue." United States v. Georgacarakos, 988 F.2d 1289, 1293 (1st Cir. 1993). The

venue stipulation (Dkt. 280) deals primarily with the location of acts which are merely preparatory or prior to the transmission of the actual wire transfers charged in the indictment (*i.e.*, where the wires were "initiated," Dkt. 280, ¶ 2).  The government cannot create venue in Massachusetts by relying on a Massachusetts-based payor requesting that his financial institution (*i.e.*, Fidelity) process a wire transfer of funds from "CHASE NYC" to "MELLON PIT."  Exh. 217.  That a wire transfer "cleared" through the Boston Fed (Dkt. 280, ¶ 3) only means that an electronic accounting entry was made there.  The venue stipulation does not address whether the actual wire transfer itself physically "passed through" the Boston Fed.  The government has failed to prove by a preponderance of the evidence that venue is proper as to Counts 1-2 and 4-13.

## CONCLUSION

Based on the foregoing, Carpenter's motions for judgment of acquittal should be granted.

RESPECTFULLY SUBMITTED,
DANIEL E. CARPENTER,
By his attorney,


*/s/ Jack E. Robinson*
Jack E. Robinson
(BBO #559683)
2187 Atlantic Street, Suite 905
Stamford, CT 06902
(203) 425-4500

Dated:  August 14, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on the date hereof this document was filed through the Court's CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).


*/s/ Jack E. Robinson*
Jack E. Robinson