**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____  )
                                   )
UNITED STATES OF AMERICA )
                                   )
                                   )
v.                                 )          **CRIMINAL NO. 04-10029-GAO**
                                   )
                                   )          **ORAL ARGUMENT REQUESTED**
DANIEL E. CARPENTER        )
_____  )

**DEFENDANT DANIEL E. CARPENTER'S REPLY TO GOVERNMENT'S**
**OPPOSITION TO DEFENDANT'S MOTION FOR ACQUITTAL AND**
**ALTERNATIVELY FOR A NEW TRIAL**

Defendant Daniel E. Carpenter ("Mr. Carpenter") respectfully submits this reply to the

government's opposition ("Government's Opposition") to his Motion for Judgment of Acquittal

Pursuant to Fed. R. Cr. P. 29(c) and in the Alternative For A New Trial Pursuant to Fed. R. Crim.

P. 33(a) ("Motion For Acquittal").  The arguments set forth in the Government's Opposition are

incomplete and misleading, and fail to address some of the most critical points of the Motion for

Acquittal.

In addition, it has recently come to the attention of defense counsel that, in contravention

of its discovery obligations, the government failed to turn over exculpatory evidence to Mr.

Carpenter, representing not simply the latest in a string of prosecutorial misconduct as set forth

in the Motion for Acquittal, but independent grounds for acquittal or a new trial.  Specifically,

the government did not turn over a new complaint filed by the Exchangors against Merrill Lynch

alone in Suffolk Superior Court in February 2008, accusing Merrill Lynch of violating M.G.L. c.

93A, as well as committing fraud, and malicious defense.  This evidence goes to the heart of Mr.

Carpenter's defense, and at the bare minimum would have been powerful impeachment and bias

evidence against the Merrill Lynch witnesses, and, even more critically, nearly all of the

Exchangor witnesses.  Therefore, this Court should grant Mr. Carpenter a judgment of acquittal,

or alternatively order a new trial.

I.      **THE GOVERNMENT'S ARGUMENTS CONCERNING REPRESENTATIONS ALLEGEDLY MADE BY THE EXCHANGE DOCUMENTS ARE NOT <u>SUPPORTED BY A CLEAR READING OF THE DOCUMENTS</u>**

The Government's Opposition begins by asserting that the jury had "ample reason" to

conclude that Mr. Carpenter obtained the Exchangors' funds based on assurances he knew to be

fraudulent.  Gov't. Opp. at 2-3.  In support of this argument, the government sets forth a series of

phrases from, or paraphrases of, the agreements signed by, and promotional materials shown to,

the Exchangors (collectively, the "Exchange Documents"), which the government contends

assured the Exchangors that Benistar was offering "a safe place for a property owner to park the

proceeds of a sale of real estate for the *sole* purpose of completing a like-kind exchange of real

estate in keeping with IRS regulations."  Id. at 2.  Putting aside the government's incorrect

argument, addressed *infra* at Section II, that Section 1031 assures a safe investment vehicle, the

examples provided by the government do <u>not</u> give assurances to the Exchangors of their funds'

safety.[1]  At best, the phrases: (1) state noncontroversial facts (Benistar was an "intermediary";

Benistar was bonded; the Exchangor's money would be held in an "escrow" -- as defined by the

Exchange Documents); (2) contain standard business puffery ("longstanding reputation for

trustworthiness, and is part of Benistar, LTD, the largest 419 administrator in the nation") or (3)

invite the Exchangors to <u>ask questions</u> concerning the security of their funds (an Exchangor

"should ask about the security of [his or her] funds"; you should ask about "what assurances you

---

[1]  Furthermore, the government's contention that Benistar's name --"Benistar Property Exchange Trust Company" -- implied to Exchangors that their funds would be safe is flatly contradicted by the testimony of its own witness, Mitchell Rock.  On cross examination, Mr. Rock insisted that Benistar's name was <u>not</u> a good indicator of its business.  Tr. 9-25 to 26.

will have to assure that your funds and your exchange status will be protected"). As made clear in the Motion for Acquittal, the only evidence on this third point, in the form of testimony by both Martin Paley and David Patterson, is that, in his interactions with Exchangors and their representatives, Mr. Carpenter was always entirely open and honest with inquiries concerning the investment of funds. See, e.g., Tr. 11-81 (Paley testified that he provided Mr. Levine's name and telephone number when Exchangors asked for a Merrill Lynch contact person); Tr. 11-97 (Paley never said anything to an Exchangor that was not true); Tr. 12-37 to 38, 12-56 to 67 (Patterson testified about his conversations with Mr. Levine and Mr. Carpenter concerning the investment of his funds; specifically he testified that Mr. Carpenter, without specific prompting, conferenced Mr. Levine into a telephone call to explain the mechanics of the account cards, and the three men additionally discussed the fact that funds belonged to the Exchangors). The remaining phrases, unlike the contorted meaning the government strains to place upon them, on their face imply to the Exchangors some level of risk to their funds. For example, the phrase that Benistar "is a recognized leader in facilitating these exchanges with minimum exposure for the property owner" does not suggest that there is no exposure to the Exchangor. Similarly, the fact that the Exchange Documents stated that the accounts would bear either 3% or 6% interest necessarily presumes a risk, as an investment would have to be undertaken to achieve such a return, and the government's own witnesses acknowledge that all investments have risk. See, e.g., Tr. 3-81 (Eliot Snider acknowledged that investment accounts have risk). Finally, as to the comments relating to the limitation on the funds being transferred or reserved to paying out for the subsequent closing, presumably such comments are meant to be at odds with Benistar's conduct of transferring funds between the main and sub accounts. As set forth in more detail below, this cannot serve as a material misstatement, and cannot be the basis of a wire or mail fraud charge.

Importantly, there was no evidence at trial that any of the Exchangors read, let alone specifically relied upon, the statements cited by the government -- thereby demonstrating a fatal weakness in the government's theory with respect to materiality. In addition, it is incorrect to assert that merely "parking the proceeds of a sale of real estate" was the "sole" purpose the Exchangors had when they entered into an agreement with Benistar. The Exchangors also bargained for an investment of their funds, so as to earn a 3% or a 6% return on their money. If "parking" their funds truly was their only purpose, then they could have selected any number of 1031 qualified intermediaries who did not have an investment component as part of their services. As for the government's final contention, that paying a fee suggested that Exchangors were merely "bargain[ing] for . . . an escrow service," it is entirely unclear why the fact that Benistar charged a fee would in any way foreclose investment of the Exchangors' funds, and why charging a fee could possibly be considered a fraudulent inducement of the Exchangors. It is clear, and was clear to the Exchangors as they entered into agreements with Benistar, that the modest fees paid to Benistar could not have possibly covered the amount of interest Exchangors selected as part of their agreement. Even the Exchangor with the smallest exchange, Brian Fitzgerald, who invested $97,369, could not have expected his fee to cover his return. He selected a 3% per annum return, which is $2,921.07, some $400 more than the $2,500 he paid as a fee. <u>See</u> Tr. 5-9 to 10. This disparity is even greater with the rest of the Exchangors. For example, Eliot Snider invested $3,237,190 and selected a 6% per annum return, which is $194,231.40, or $190,231.40 more than his $4,000 exchange fee. <u>See</u> Tr. 3-30. Of course, as per the requirements of Section 1031, these Exchangors were only allowed to leave their money with intermediaries for a maximum of 180 days, and so they could not expect to receive the return of one who invested for a full year.

**A.     The Government's Repeated Characterization of Mr. Carpenter's Trading Strategy As "Risky" Was Impermissible And, In Any Event, Not Reliable Evidence With Respect To The Determination Of Fraudulent Inducement**

While the government has labored consistently to characterize Mr. Carpenter's trading strategy as "risky," as addressed later in this Reply, it has not satisfied its burden to establish how much of his trading was in the form of "risky" options.  The government juxtaposes the purported representations as to the safety of the Exchangors' funds with the alleged risky trading strategy employed by Mr. Carpenter, arguing that this defeats any claim he might have of good faith.  Gov't. Opp. at 4-5.  While on a plain reading the Exchange Documents do <u>not</u> make representations of safety, even assuming, *arguendo*, that they did, simply labeling Mr. Carpenter's investment strategy as "risky" does not satisfy the government's burden of showing <u>how</u> Mr. Carpenter fraudulently induced the Exchangors.  Without demonstrating the extent of Mr. Carpenter's trading that was of the high-risk options variety, the government has done little more than to show, on one hand, that Benistar invited Exchangors to ask questions concerning the security of their funds, and on the other hand, that some undefined portion of Benistar's portfolio was made up of stock options (naked or otherwise).  This does not, and cannot, amount to sufficient evidence to disprove Mr. Carpenter's good faith, and the government has failed to carry its burden by failure of proof.

What is more, there was evidence in the form of testimony by the government's witness Thomas Rasmussen (the then-administrative manger of Merrill Lynch), that Mr. Carpenter's trading was not nearly as risky as the government suggests with their summary of the testimony of Mr. Carpenter's brokers (Gary Stern and Mitchell Rock).  <u>See</u> Tr. 10-65 (Mr. Rasmussen testified that Mr. Carpenter had a trading strategy which was rational and had been profitable for him at various times); Tr. 10-70 to 71 (Mr. Rasmussen was not planning to shut down the

Benistar account, absent the advice of Mr. Malia -- Merrill Lynch's head of option compliance);

Tr. 10-81 to 83 (on the majority of Mr. Carpenter's trades, he was not truly engaging in "naked"

puts, because he limited his exposure by buying another put, thereby covering the position,

hedging the spread and limiting the risk).[2]

>    **B.    The Government Has Not Met Its Burden With Respect To Proving The**
>    **Materiality Of Mr. Carpenter's Alleged Non-Disclosure To Exchangors**
>    **Concerning His Trading Practices**

For similar reasons, the government's arguments relating to the materiality of the

representations made to the Exchangors in connection with stock option trading are unavailing.

Gov't. Opp. at 6.  As stated by the Supreme Court of the United States, in holding that

materiality is an element of mail and wire fraud:

> The Restatement instructs that a matter is material if: (a) a reasonable man would
> attach importance to its existence or nonexistence in determining his choice of
> action in the transaction in question; or (b) the maker of the representation knows
> or has reason to know that its recipient regards or is likely to regard the matter as
> important in determining his choice of action, although a reasonable man would
> not so regard it.

Neder v. United States, 527 U.S. 1, 22 n.7 (1999) (quoting Restatement (Second) of Torts § 538

(1977)); see also United States v. Blastos, 258 F.3d 25, 28-29 (1st Cir. 2001) (in mail and wire

fraud cases, a representation is material if it has a natural tendency to, or is capable of, influence

the decision of the audience to which it is addressed).  The government cites the testimony of

Stern and Rock concerning their views of his trading, suggesting that such testimony constituted

evidence of the extent of Mr. Carpenter's options trading.  It does not.  The government

presented absolutely no quantification of the extent of Mr. Carpenter's trading in supposedly

---

[2]  In the course of its discussion of "dramatic developments" relating to Benistar during the relevant time period (Gov't. Opp. at 5), the government suggests that particular facts put Mr. Carpenter on clear notice that his trading carried an inappropriately high level of risk when compared to the representations made to Exchangors concerning their funds.  The government, citing Tr. 10-71, contends that "[a]pproximately two-thirds of the money from the [E]xchangors named in the indictment arrived at Benistar after Merrill Lynch had cut him off."  This assertion is unsupported by the government's citation to the record, which contains testimony about the percentage of the Exchangors' money which was invested at 3 percent as opposed to 6 percent.

"risky" stock options, and therefore failed to demonstrate the materiality of Mr. Carpenter's alleged misrepresentations. The citation to Messrs. Stern and Rock's testimony merely reiterates the brokers' own inaccurate (as demonstrated by Mr. Rasmussen's testimony, referenced above) characterization of Mr. Carpenter's trading as "uncovered" and "bets." This testimony does nothing to explain to what extent Mr. Carpenter's trading constituted, and to what extent Benistar's losses stemmed from, such "risky" options trading.

Recognizing the vulnerability arising from its failure to present any meaningful, particularized evidence on this point, the government complains that its witnesses should not have been required to "parse their statements" because they were not asked to do so. It is entirely disingenuous for the government to assert that it was not required to be specific on a critical issue in the determination of whether or not Mr. Carpenter fraudulently induced the Exchangors, and then in the next sentence to claim that at any rate the overbroad, factually incorrect, and biased testimony of Messrs. Stern and Rock satisfies that burden. Because the government failed to offer any proof on this point, it is dismissive of this argument. Moreover, it entirely misses the crux of the matter when it claims that some suggestion that Mr. Carpenter at particular times was losing money in the options market is sufficient to establish that the Exchangors would want to know Mr. Carpenter was investing in options. The government emphatically did not demonstrate how much of Mr. Carpenter's trading and losses were a result of options trading, and has thus failed to meet its burden in proving materiality.[3]

---

[3] Finally, the government suggests that the complex and lengthy account statements from Merrill Lynch and PaineWebber are "crystal clear." If this is the case, it is all the more confounding that Thomas Zapalla did not quantify the trading and losses resulting from the trading of "risky" options. In any event, the government undermines this leap of logic when it later asserts that "A group of lay people would not have been able to make sense of the testimony if all the brokers were allowed to say about the millions of dollars of securities Carpenter traded was that 'he traded in calls and puts.'" Gov't. Opp. at 31. The government asks the Court to believe that the jury cannot understand the description of "calls and puts," but insists that the jury not only could understand the account statements, but examined them in a meaningful way in a shockingly short period of time before rendering a verdict. As set forth in his Motion for Acquittal, and made clear by the record, at most the jury deliberated for two

Next, the government claims that the Exchangors testified that it was important to them that their money was held safely. Gov't. Opp. at 7. The government seeks to substantiate this assertion by citation to the testimony of three Exchangors (Eliot Snider, Byron Darling, and Albert Bellemore) and is silent as to the remaining four (Brian Fitzgerald, Joseph Iantosca, Gail Cahaly, and Jeffrey Johnston). Mr. Snider's testimony, that the security of his funds was important to him, immediately followed the government's request that Mr. Snider read the portion of Exhibit 1 <u>inviting</u> potential Exchangors to "[a]sk about the security of your funds, and find out what guarantees are offered." Tr. 2-130. There was no evidence whatsoever concerning questions Mr. Snider asked Mr. Carpenter, Mr. Paley, or anybody at Benistar about the safety of his funds, let alone any evidence of false or misleading answers to such questions. Thus, the Court is left with the self-serving testimony of Mr. Snider that a particular aspect of the exchange was important to him but no evidence that there were any specific representations or <u>fraudulent inducement</u> on the point of security of funds with respect to his exchange.[4] Similarly, in support of this argument, the government cites the testimony of Mr. Darling, the same individual whose testimony it later invites the Court to disregard by describing him as a "92 year old witness who struggled through his testimony" and to whom the "jury was unlikely to give special credit."[5]

---

hours, and had the exhibits before them for barely over an hour and a half. <u>See</u> Motion for Acquittal at 1-2; Tr. at 13-142. This "moving target" approach to what the Court is expected to believe with respect to the jury at various times of the trial is not unlike the government's conveniently selective approach to crediting and later discrediting the testimony of its own witnesses (<u>see</u> n.5, <i>infra</i>).

[4] It is telling that the government did not follow up by asking Exchangors if they had asked specific questions about security, and what they were told in response. In comparison, Mr. Paley, testified that he never made any promises of safety or security to the Exchangors concerning their funds. <u>See</u> Tr. 11-86 to 87.

[5] The government, in its Opposition, demonstrates a curious pattern of denigrating its own witnesses. At various times, it invites the Court to disregard the testimony of Mr. Paley (Gov't. Opp. at 13 n. 2, alluding to "these and other self-serving statements by Paley"), Mr. Iantosca (Gov't. Opp. at 30 fn. 17, describing testimony as "unintelligible"), and Mr. Darling (Gov't. Opp. at 32). Unfortunately, these consistent caveats smack of the pattern of gamesmanship and misconduct referenced in Section II.C of Mr. Carpenter's Motion For Acquittal. At best, the government's urging of the Court to credit only the helpful testimony of these witnesses should draw the Court's attention even closer to the irksome testimony the government now seeks to simply gloss over.

Gov't. Opp. at 32.  Mr. Darling testified that Martin Paley told him that his money "would be perfectly safe."  Tr. 3-104.  Even putting aside the government's own concerns regarding the weight that should be afforded Mr. Darling's testimony, the contention that Mr. Paley made representations about the safety of the funds is directly contradicted by Paley's own testimony. See, e.g., Tr. 11-86 to 87 (Mr. Paley testified that he never told any of the Exchangors or their representatives that their money would be safe or secure, or that there would be no risk of loss); Tr. 11-95 (same).  Additionally, as set forth in more detail below, to the extent that Paley did make express representations about the safety of Mr. Darling's funds, those comments should not be used against Mr. Carpenter due to (1) the government's deficiency in proof in establishing an agency relationship between Mr. Carpenter and Mr. Paley, and (2) the fact that a representation of safety is inconsistent with the language of the Exchange Documents, and therefore, even if an agency relationship was found as to the Documents, a comment by Paley that the money would be "perfectly safe" cannot be admissible against Mr. Carpenter.

While the government argued to the Court that the alleged representations by Paley that it introduced were consistent with the Exchange Documents (see Tr. 12-9 to 12), this assertion, as made clear in Section IV.B, *infra*, is manifestly not true.  Finally, the government cites the testimony of Albert Bellemore, purportedly to show that the security of his funds was important to him.  However, Mr. Bellemore's testimony clearly references the fact that Benistar could not transfer the funds without his written approval.  Tr. 6-51.  As previously argued in Mr. Carpenter's Motion For Acquittal, the transfer between linked accounts as part of Benistar's Section 1031 business was a transfer to a sub-account, which cannot be considered to be a material difference from what was represented to Exchangors.  See Motion for Acquittal at 28 (the two accounts were "master and sub" accounts which were related, linked and integrated,

meaning transfers between the two were immaterial and mechanical, and existed merely due to the way Merrill Lynch set up the accounts).  Thus, the government's broad pronouncement regarding the state of the evidence with respect to materiality is supported by three statements of weak probative value and is directly rebutted by the testimony of Martin Paley, who testified that he never told Exchangors their money would be safe or secure.

Moreover, the government now suggests that other alleged omissions (concerning Carpenter's alleged loss of "millions of dollars of [E]xchangors funds -- regardless of how much was attributed to options trading -- before the [E]xchangors named in the indictment did business with him . . . " as well as the alleged movement of the funds "out of the deposit account into [Mr. Carpenter's] trading account") by Mr. Carpenter could suffice to prove that he fraudulently induced the Exchangors to invest their funds.  Gov't. Opp. at 7.  There is simply no evidence relating to the materiality of any of these omissions.  In addition, the government's characterization of Mr. Carpenter's moving "millions of [E]xchangor funds out of the deposit account into his trading account" as "in direct contravention of the exchange agreements," is not only an outrageous mischaracterization of the nature of the accounts, but also ignores the clear language of the Exchange Documents, the testimony of the brokers who the government called as witnesses, and the nature of the sub and master accounts.  See, e.g., Motion for Acquittal at 28 (funds moving between the sub and master accounts constituted immaterial, mechanical transfers); Tr. 7-35 to 36 (master and sub accounts at Merrill Lynch were under the same relationship and linked together); Tr. 3-82 (testimony of Mr. Snider, acknowledging that Escrow Agreement stated that the Exchangor will be depositing with Benistar an amount of funds to be deposited in the Benistar accounts," emphasizing the plural form); Tr. 5-21 (Mr. Fitzgerald acknowledging same).

## II.    THE GOVERNMENT'S ARGUMENTS CONCERNING GOOD FAITH IGNORE CRITICAL EVIDENCE AND ARGUMENTS

The government attempts to rebut the arguments made by Mr. Carpenter in his Motion for Acquittal concerning his good faith, but in doing so fails to address critical points.  See Gov't. Opp at 8-13.

First, with respect to Mr. Carpenter's good faith belief that he had unfettered discretion to invest the Exchangors' funds, the government entirely ignores the clear language of the Exchange Documents set forth in the Motion for Acquittal, which lends abundant support to such a belief.  See Motion for Acquittal at 12-14.  Moreover, the government rests its entire argument on its own definition of the "core purpose of [Section] 1031 exchanges," that is, "to place real estate in a secure, short term escrow account so that they could be returned, in full, to purchase replacement property."  Gov't. Opp. at 8.  This characterization is in direct contravention of the evidence at trial (and noted by the Court during jury instructions) that Section 1031 places no limitation on the investment vehicles that an intermediary may use.  See Tr. 13-38 (concerning Section 1031, the Court instructed the jury that, "[t]he tax code provisions themselves contain no requirement or restriction as to how the intermediary is to hold the proceeds.  Specifically, for the purposes of the tax code, there is no limitation on how the proceeds may be invested while they're being held by the intermediary.  Insofar as the tax code is concerned, an intermediary may invest the proceeds or not in ways it may see fit."); see also Motion for Acquittal at 19 (neither 26 U.S.C. § 1031, nor its relevant regulations put any restrictions on investment, and further that "safe harbor" does not reference safety of funds, but rather the possession of the funds by a qualified intermediary in order to defer a taxable event).  Therefore, the government has vastly overstated its suggestion that the utilization of a particular investment vehicle, by definition, is contrary to the purpose of Section 1031.  Mr. Carpenter's good faith belief was

informed by the language of the Exchange Documents and the parameters of Section 1031.  The

government has presented no evidence or argument to suggest that such a belief was not

supported.

The government relies on its characterization of Mr. Carpenter as the "prime mover" of

the scheme to attack Mr. Carpenter's argument that he did not make any misrepresentations to

the Exchangors.  Gov't. Opp. at 8-9.  This argument does not address the critical point that the

government failed to establish an agency relationship between Mr. Carpenter and Paley.  As

argued later in this Reply, see infra at Section IV.B, at best the government could argue that Mr.

Carpenter caused representations consistent with the Exchange Documents to be made.  But, as

argued above, these representations were made in good faith, and did not amount to assurances

of the security of Exchangors' funds.  Merely labeling Mr. Carpenter the "prime mover" does not

satisfy the government's burden in tying him to particular alleged misrepresentations made to

Exchangors.  Moreover, this argument rests on the assertion that Mr. Carpenter "set up the

[Benistar] business," a premise which is not supported by the record.  The government attempts

to bolster its case against Mr. Carpenter by overstating his involvement with the Benistar

business, which, after all, was in many ways a continuation of Mr. Paley's former work with

Nationwide.  Mr. Carpenter without question was a critical part of Benistar investment

operations, but the government is completely unjustified in insisting that he set up the Benistar's

property exchange business because it is undisputed that Mr. Carpenter (unlike Mr. Paley) had

no prior experience with Section 1031.

Next, the government weakly attempts to attack Mr. Carpenter's clear good faith belief in

his trading strategy.  To do so, the government devalues the definition of "good faith" by

misconstruing the Court's instruction to the jury.  The portion of the instructions cited by the

government (Gov't. Opp. at 9), does not stand for the proposition that "hoping that events will turn out favorably is not the equivalent of good faith," and in any event the Court's most direct commentary on the matter occurred elsewhere in the instructions.  See Tr. 13-33 to 34 (jury instruction from Court: "A person acts in good faith if the person acts on the basis of a belief or opinion honestly held, though the belief or opinion may turn out to have been, in fact wrong.  An honest belief in the truth of statement or representations is inconsistent with an intent to defraud."); see also United States v. Alkins, 925 F.2d 541, 550 (2d Cir. 1998) (Approving instruction given by trial court to jury that "even false representations or statements or omissions of material facts do not amount to a fraud unless done with fraudulent intent.  However misleading or deceptive a plan may be, still it is not fraudulent if it was devised or carried out in good faith.  An honest belief in the truth of the representations made by a defendant is a good defense, however inaccurate the statement may turn out to be.").[6]

    The government's belittling of Mr. Carpenter's complete good faith belief in his trading strategy, informed by expert advice and projections from top financial analysts, and evidenced by, among other things, his investment of his own funds, as mere "hope" is not supported by the evidence.  To the contrary, the evidence clearly demonstrated that Mr. Carpenter always believed in his right to engage in trading with the Exchangors' funds (as envisioned by the Exchange Documents), and specifically believed in his strategy with respect to these funds.  While history may have shown that belief to have been incorrect (and even this characterization is questionable, as the acts of Merrill Lynch and PaineWebber had a major part in causing the

---

[6]  See also 2 L. Sand, Modern Federal Jury Instructions -- Criminal, Instruction 44-5 at 44-28 ("Under the mail fraud statute, even false representations or statements, or omissions of material facts, do not amount to a fraud unless done with fraudulent intent.  However misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith.  An honest belief in the truth of the representations made by a defendant is a good defense, however inaccurate the statements turn out to be.").

Exchangors' losses), there is no evidence that it was ever held in anything but good faith.[7]

As part of this argument, the government returns, once again, to its inapt analogy of the bank teller taking the bank's money to the casino. The government's continued use of a gambling motif is alarming, considering the fact that it was chastised by this Court following the first trial for "[c]ondemning [Mr. Carpenter] for 'gambling'" because it "was an appeal to instincts of moral disapprobation. . . ." United States v. Carpenter, 405 F. Supp. 2d 85, 102 (D. Mass. 2005). Beyond the government's unfortunate choice of words, the hypothetical is at once both wholly inapt and deeply revealing of the government's mind set. Unlike the teller in the government's analogy, Benistar had both legal title to the funds (as required under Section 1031) and full discretion to invest these funds, as permitted under the Exchange Documents. Of course, the very inaptness of the scenario posited by the government serves to only underscore, despite its lip service to the Court's clear direction that the crime alleged is fraudulent inducement, its fixation on the manner in which the funds were used once they were obtained ("risky options trading"), as opposed to any coherent articulation, supported by the evidence, of the purported fraudulent inducement. This specious, backwards calculus -- money was lost, so there must have been a crime -- is at the heart of both the government's hypothetical and this misguided prosecution.

Furthermore, the government's discussion of Mr. Carpenter's argument concerning his open and obvious conduct towards the Exchangors (Gov't. Opp. at 10), entirely neglects to address perhaps the most probative evidence on that subject: Mr. Carpenter's interactions with David Patterson. As set forth in the Motion for Acquittal, Mr. Carpenter's oral communications with Mr. Patterson, the only representative of any Exchangor with whom he was in direct contact

---

[7] For example, recent events reported in the business press have called into question the "safety" of mortgage-backed securities, auction-rate municipal bonds, and other supposedly "safe" investments.

and with whom we was open and obvious in his conduct, epitomized transparency.  <u>See</u> Motion for Acquittal at 26-28.  There was no evidence that Mr. Carpenter ever answered dishonestly any questions the Exchangors put to him.  To the contrary, the evidence on the subject demonstrates that in his only relevant contact with an Exchangor's representative, Mr. Patterson, he was entirely open, including placing Mr. Patterson in direct communication with the individuals handling the accounts at Merrill Lynch.

Finally, the government makes a tepid effort to argue first that it proved that Mr. Carpenter knew of a specific shortfall of obligations to Exchangors compared to funds on hand at Benistar at the specific time each Exchangor named in the indictment entered into his or her agreement; and second that such evidence is unnecessary.   The weakness of the government's case on this critical point is made clear by the paltry evidence it miscasts as conclusive on the point of Mr. Carpenter's knowledge of specific shortfalls at specific times.  Mr. Carpenter's Motion for Acquittal sets forth an argument concerning why Ms. Mahannah's testimony is not probative on this critical question of Mr. Carpenter's knowledge (<u>see</u> Motion for Acquittal at 33 and footnote 14), to which the government has offered no argument in opposition.  Similarly, the fact that Mr. Carpenter's "brokers spoke to him on nearly a daily basis" is not probative of Mr. Carpenter's knowledge of shortfalls at the critical time period.  Thus, the government has effectively admitted that it has not carried its burden with respect to this point, and instead resorts to a fall back position -- rationalizing that a jury could have convicted Mr. Carpenter based on the existence of a significant short fall throughout the second half of 2000.  Gov't. Opp. at 12.  This is inadequate evidence, and the government has failed to meet its burden of proof.

III.  **THE GOVERNMENT'S MISCONDUCT THROUGHOUT THIS CASE, INCLUDING THE MOST RECENTLY DISCOVERED DISCOVERY VIOLATION, IS WELL-DOCUMENTED, CONSIDERABLE, AND WARRANTS A JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE A NEW TRIAL**

A.  **The Government's Failure To Produce The Exchangors New Complaint Against Merrill Lynch Was In Violation Of Its Obligations Under Giglio/Brady and Warrants A New Trial**

Within the past month (and after the second trial ended on June 18, 2008), Mr. Carpenter has learned that on February 15, 2008, despite: (1) having obtained a judgment against Mr. Carpenter and Benistar; (2) Mr. Carpenter causing the Exchangors to receive $12.5 million by virtue of Benistar's Arbitration Award against PaineWebber; and (3) the pending new trial secured against Merrill Lynch, Joseph Iantosca, Gail Cahaly, Jeffrey Johnston, and corporations controlled by Albert Bellemore and Eliot Snider, together filed a complaint in Suffolk Superior Court against Merrill Lynch only (the "New Complaint") alleging, *inter alia*, that Merrill Lynch, and Merrill Lynch alone, defrauded them of their investments in Benistar.  See Iantosca v. Merrill Lynch, Civil Action No. 08-775-D, attached hereto as Exhibit A.

In the New Complaint, the Exchangors allege, in a mirror image of Mr. Carpenter's defense at the criminal re-trial, that Mr. Paley and Mr. Patterson[8] told Gerald Levine, the Merrill Lynch broker on the Benistar account, that the money in the accounts belonged to Benistar clients and was to be held in an escrow account, and that despite this knowledge the brokers approved the Benistar accounts "for highly speculative option trading."  See Ex. A, New Complaint at ¶¶ 12-20.  The New Complaint further alleges that Mr. Levine was given documents and told during conversations with Messrs. Paley and Patterson that Benistar was an intermediary for Section 1031 exchanges and that the company was holding funds in escrow for its clients.  Id. at 12-16.  It adds, *inter alia*, that "Merrill Lynch lied about its involvement with

---

[8]  Neither Mr. Paley nor Mr. Patterson is referenced by name in the New Complaint.

the Benistar accounts and destroyed, concealed or failed to produce the documents evidencing its

participation with Benistar in misuse of Benistar's clients' funds . . . . and that Merrill "has

persisted in its denial of liability despite the discovery by plaintiffs of the documents that Merrill

destroyed, concealed and/or failed to produce and despite its own knowledge that the testimony

provided at trial was perjurious." Id. at 25, 29 (emphasis added).

The New Complaint does not include Mr. Carpenter or Benistar as defendants, and

nowhere in the complaint do the plaintiffs make any allegations against Mr. Carpenter, by name

or otherwise. Thus, just four months before they testified against Mr. Carpenter in the criminal

re-trial, blaming solely him for their losses, these same Exchangors filed the New Complaint,

blaming Merrill Lynch alone for fraud. The government's failure to turn over this exculpatory

evidence to Mr. Carpenter was a violation of his due process rights, and warrants a new trial.[9]

Pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, the prosecution has an

affirmative duty to disclose favorable evidence known to it, even without a specific request by

the defense. See also Kyles v. Whitley, 514 U.S. 419, 432-33 (1995). This obligation includes

impeachment evidence. Giglio v. United States, 405 U.S. 150 (1972). See also Local Rule

116.2(B)(1) (defining exculpatory material as, "Information that would tend directly to negate

the defendant's guilt concerning any count in the indictment or information."). As a result, the

government was under a clear and unambiguous obligation to disclose the New Complaint to Mr.

Carpenter. The government's suppression of evidence is a violation of a defendant's due process

rights. Kyles, 514 U.S. at 432-33.

---

[9] Mr. Carpenter expressly reserves the right to file, at a later date, a motion for a new trial on the basis of the New Complaint constituting newly discovered evidence -- an independent ground for the granting of a new trial. A motion for a new trial based upon newly discovered evidence may be filed within three years after the verdict. Fed. R. Crim. P. 33(b)(1).

The First Circuit has recently set forth the framework for analyzing when a <u>Brady</u>

violation is material, and therefore warrants a new trial:

> [T]o establish the materiality of a <u>Brady</u> violation, the defendant need only
> demonstrate that there was a reasonable probability of a different outcome, which
> is shown when the government's evidentiary suppression undermines confidence
> in the outcome of the trial. . . . The question is not whether the defendant would
> more likely than not would have received a different verdict with the evidence,
> but whether in its absence he received a fair trial, understood as a trial resulting in
> a verdict worthy of confidence.

<u>See</u> <u>United States v. Aviles-Colon</u>, 2008 WL 2930115, at *12-13 (1st Cir. Jul. 31, 2008) (internal

citation and quotation marks omitted) ("[T]he district court's refusal to grant a new trial on the

basis of the <u>Brady</u> violation cannot stand in any event.  As we shall explain, the [withheld] DEA

reports, or evidence developed on the basis of the DEA reports, could have been important for

impeachment purposes.").

As stated in <u>United States v. Connolly</u>, 504 F.3 206, 212 (1st Cir. 2007), to make out a

<u>Brady</u> violation a defendant must show that (1) the suppressed evidence in question was

favorable to him; (2) the evidence was either willfully or inadvertently suppressed by the

government; and (3) prejudice resulted from its suppression.  <u>Id.</u> (citing <u>Strickler v. Greene</u>, 527

U.S. 263, 281-82 (1999)).  The requisite prejudice to warrant a new trial on the basis of a <u>Brady</u>

violation is found where there is a "reasonable probability that, had the evidence been disclosed

to the defense, the result of the proceeding would have been different."  <u>Id.</u> at 213 (quoting

<u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)).  A "reasonable probability" means a

"probability sufficient to undermine confidence in the outcome."  <u>Bagley</u>, 473 U.S. 667, 682

(1985) (quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984)).

In fact, the Ninth Circuit has recently upheld the dismissal of an indictment with

prejudice, under arguably less egregious circumstances than the panoply of misconduct described

herein, in the Motion for Acquittal, and in the mistrial motion. United States v. Chapman, 524 F.3d 1073, 1079, 1084, 1085 (9th Cir. 2008) (dismissal of indictment on the grounds of "outrageous government conduct," where government acted with "reckless disregard for the prosecution's Constitutional obligations" in late disclosing 650 pages of Brady/Giglio material during trial, including plea agreements and other information relating to government witnesses, was not an abuse of discretion). Critically, Chapman involved the failure to disclose "material documents relevant to impeachment of witnesses who had already testified." Id. at 1085.

      1.    The New Complaint Constitutes Evidence Favorable To Mr. Carpenter

There is little question that the New Complaint is Giglio/Brady material. The New Complaint could be used for impeachment by demonstrating bias and lack of credibility of the Merrill Lynch witnesses. Similarly, the New Complaint could be used as impeachment material against the Exchangors, including confronting them with the fact that they have filed a lawsuit endorsing Mr. Carpenter's theory of defense of good faith. For all of these reasons, and because the New Complaint would clearly "tend to negate the defendant's guilt," the government was obligated under Brady and its progeny to produce the New Complaint to Mr. Carpenter.

If the New Complaint had been provided to the defense prior to the criminal re-trial, it could have been thus utilized on cross-examination of no less than seven of the government's witnesses -- not merely against the Merrill Lynch witnesses (Messrs. Stern, Levine, and Rasmussen), but also against the Exchangors who brought the New Complaint and were available at trial (Ms. Cahaly, and Messrs. Johnston, Bellemore and Snider).

Additionally, in asserting that Merrill Lynch was aware of the nature of Benistar's Section 1031 business, and the fact that the funds Benistar was trading with belonged to Exchangors, the New Complaint represents evidence directly supporting Mr. Carpenter's

primary defense -- that he acted openly and honestly and in good faith with respect to the Exchangors and Merrill Lynch, and that he was never given any reason to believe that his trading activity was in any way improper or warranted any further disclosures to Merrill Lynch or the Exchangors.  The New Complaint represents an endorsement of Mr. Carpenter's steadfast version of the events relating to communications with Mr. Levine and Merrill Lynch, embodied in Mr. Carpenter's good faith defense.  Thus, by and through the New Complaint, Messrs. Snider, Bellemore, Iantosca, Johnston, and Ms. Cahaly, join Messrs. Paley and Patterson (in total, seven of the government's own witnesses) in calling into question the government's theory of prosecution, negating any intent on the part of Mr. Carpenter to defraud the Exchangors, and establishing a rock solid good faith defense.

The New Complaint would "tend to negate" Mr. Carpenter's guilt, as it represents further evidence of, and additional opportunity to impeach witnesses concerning, Mr. Carpenter's primary theory of defense -- that his actions with respect to the Exchangors and Merrill Lynch were always in good faith, and the responsibility for the loss of the Exchangors' funds lies with Merrill Lynch and PaineWebber, not Mr. Carpenter.

2.    The Government Suppressed The New Complaint

In the more than four years since Mr. Carpenter was originally indicted, the government has been aware of the civil litigation pursued against Mr. Carpenter, Benistar, Merrill Lynch, and PaineWebber in various venues by the Exchangors.  The government's familiarity with this myriad litigation is demonstrated, for example, by the fax AUSA Jonathan Mitchell sent undersigned counsel on May 12, 2008 (attached hereto as Exhibit B), stating that the government did not "have any Jencks material that it has not previously disclosed to defense counsel, with the exception of certain transcripts from the New York arbitration hearing."  It defies credulity

that the government, having met repeatedly over a period of years, including in the time approaching Mr. Carpenter's criminal re-trial, with Eliot Snider, Byron Darling, Brian Fitzgerald, Joseph Iantosca, Albert Bellemore, Gail Cahaly, Jeffrey Johnston, Gary Stern, Gerald Levine, and Thomas Rasmussen, was not aware of the New Complaint and the fact that the Exchangors were pursuing new claims against Merrill Lynch.  This conclusion is further reinforced by the fact that Merrill Lynch's lawyer, John L. Snyder of the law firm Bingham McCutchen, who was also aware of the New Complaint at the time of the criminal re-trial,[10] attended every day of the Merrill Lynch witnesses' testimony, and presumably met with the government when his clients were prepared by the government for their appearances (including after February 2008, when the New Complaint was filed).

In addition, Anthony Zelle, the lawyer who signed the New Complaint on behalf of the Exchangors, was listed on the government's witness list, and, like Mr. Snyder, has presumably had repeated dealings with the government during the course of this matter, including in the months after the New Complaint was filed.[11]  To the extent that the government met with the plaintiffs in the New Complaint, as well as Messrs. Stern, Levine, and Rasmussen (formerly and currently of Merrill Lynch and almost certainly aware of the action), and attorneys Zelle and Snyder (representing the opposing parties in the New Complaint as counsel of record) between February and June of 2008, it is inconceivable that the government did not ask about any pending litigation related to the criminal case.[12]  Combined with the government's action in

---

[10]  This conclusion is cemented by the fact that Mr. Snyder is the counsel of record for Merrill Lynch in connection with the New Complaint.

[11]  The government's failure to call Mr. Zelle to testify at trial is unsurprising in light of the New Complaint, filed on the eve of Mr. Carpenter's criminal re-trial, which advances a theory of liability for the Exchangors' losses wholly at odds with the government's prosecution.

[12]  Also noteworthy is the fact that while the New Complaint, in its civil action cover sheet, does not list any related cases, co-counsel for the plaintiffs, John E. O'Brien, in a letter to the Suffolk Superior Court, referred to the case as

providing certain transcripts and depositions in connection with civil litigation involving the Exchangors and Merrill Lynch, Mr. Carpenter acted reasonably in assuming that the government had provided <u>all</u> such information.  See <u>United States v. Payne</u>, 63 F.3d 1200, 1209 (2d Cir. 1995) (where prosecution had turned over publically available court documents, the defendant could reasonably assume that the government was not in possession of any more court filings containing exculpatory or impeachment material).  Of course, in light of the discovery of the New Complaint, that assumption has been proven to be incorrect, and the government's failure to produce the New Complaint to Mr. Carpenter has resulted in a violation of his due process rights under <u>Giglio</u>/<u>Brady</u>, and warrants the granting of a new trial.

3.     <u>The Failure To Turn Over The New Complaint Undermines Confidence In The Jury's Verdict</u>

Mr. Carpenter's defense throughout the case focused on his good faith, most powerfully evidenced by his openness with respect to the only Exchangor's representative he dealt with prior to 2000, Mr. Patterson, and the proactive steps he took to put Mr. Patterson in touch with Mr. Levine and make clear the logistics of Benistar's Section 1031 business, as well as the fact that the funds belonged to the Exchangors.  Mr. Carpenter should not have been found criminally liable, as he lacked the requisite intent to commit a crime.  Specifically, by way of the allegations of the New Complaint, the Exchangors adopt the version of events set forth by Mr. Carpenter during the *first and second* trials: that Gerald Levine and Merrill Lynch <u>did</u> know about the nature of Benistar's business and the funds it handled for Exchangors.  The New Complaint further validates Mr. Carpenter's good faith belief in what he did with respect to the Exchangors and the trading of their funds, as it chronicles his interactions with Messrs. Levine and

---

related to the pending action against Mr. Carpenter and Benistar.  <u>See</u> Ex C, attached hereto  This letter, dated July 23, 2008, was the first time Mr. Carpenter and his attorneys had any reason to suspect that the Exchangors pursued a separate and new action against Merrill Lynch.

Patterson. This evidence strongly undercuts the government's theory of fraud based on material misrepresentations or omissions.

The importance, relevance, and potential use of the New Complaint is multi-faceted, and with it Mr. Carpenter would have had an additional and extremely powerful piece of evidence with which to bolster his defense and impeach the key witnesses against him. The New Complaint would have firmly established Mr. Carpenter's good faith defense that he always intended to complete the exchanges or return to the Exchangors any funds that were outstanding in the Section 1031 process. Furthermore, the New Complaint makes it clear that he never intended to "lose" the Exchangors' funds or "misappropriate" or "embezzle" any funds.

First, the New Complaint, as even a superficial reading reveals, mirrors Mr. Carpenter's defense at trial -- that, in sum, Merrill Lynch knew that Benistar was trading with Exchangors' funds from the very beginning of the relationship in the Fall of 1998, and knew the nature of Benistar's business, and yet did not prevent Mr. Carpenter from engaging in such conduct or otherwise suggest or place him on notice that his conduct was impermissible or improper. The New Complaint could have been used to further cross-examine Mr. Levine in his numerous denials of communications with Messrs. Patterson and Paley relating to the nature of Benistar and its funds on account at Merrill Lynch.

Next, the New Complaint could have been used to cross-examine the Exchangors who are named as plaintiffs, and inquiries could have been made as to why Mr. Carpenter was neither named as defendant nor mentioned in the body of the New Complaint, and why they pursued a fraud action solely against Merrill Lynch. This is a critical use to which the undisclosed material could have been put, and one which standing alone gives rise to a probability sufficient to lose confidence in the trial's outcome.

Moreover, with respect to Joseph Iantosca, the New Complaint could have served as a basis to exclude his testimony entirely. Even though the government was able to successfully argue[13] that he was unavailable to testify at the criminal re-trial because of his mental incompetency, Mr. Iantosca, not his guardian, is named as plaintiff in the New Complaint, filed merely four months prior to the start of the criminal re-trial. See Mass. R. Civ. P. 17(b) ("The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action."). By reading Mr. Iantosca's testimony from the first trial, Mr. Carpenter was clearly deprived of an opportunity to cross-examine him on the subject of the New Complaint. Federal Rule of Evidence 804(b)(1) provides that, if the declarant is "unavailable," as defined by 804(a), the following is not excluded by the hearsay rule: "Testimony given as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." In order for testimony to be admitted under FRE 804(b)(1), "the proponent must satisfy both requirements of the rule: unavailability and similar motive and opportunity to develop the challenged testimony." United States v. Bartelho, 129 F.3d 663, 670 (1st Cir. 1997) (citing United States v. Salerno, 505 U.S. 317, 321 (1992)). There is no question that at the first trial, Mr. Carpenter did not have the similar opportunity or motive to do inquire about the allegations contained in the New Complaint, which was filed in February 2008, and as a result Mr. Iantosca's former testimony should have been excluded.

The New Complaint also points out the critical unfairness of the prosecution of Mr. Carpenter. As Mr. Stern testified, Merrill Lynch policies did not permit companies to trade in

---

[13] Mr. Carpenter vehemently opposed this use of Mr. Iantosca's prior testimony in his Opposition to the Government's *Motion in Limine* to Permit Introduction of Prior Trial Testimony of Linda Jokinen and Joseph Iantosca.

other people's money.  Tr. 7-54.  Thus, had Mr. Levine not acted in the negligent and fraudulent manner in which he is accused by the Exchangors in the New Complaint (consistent with Mr. Carpenter's defense), the Benistar accounts investing Exchangors' funds could not have been opened (id.), and therefore no losses could have been incurred.  In other words, Mr. Levine's conduct in permitting Mr. Carpenter to trade third-party funds did not alert Mr. Carpenter that his conduct was in any way improper.  It cannot be gainsaid that Mr. Levine's actions in the Fall of 1998 were in fact the but for cause of the Exchangors' losses.

Finally, the New Complaint further amplifies the impropriety of the government allowing Mr. Levine's false testimony -- his denials, *inter alia*, that he knew about the nature of Benistar's business and the fact that the money was escrowed Exchangors' funds -- to go uncorrected.  In sum, besides Mr. Carpenter, now Mr. Paley, Mr. Patterson Mr. Snider, Mr. Iantosca, Mr. Bellemore, Mr. Johnston, Ms. Cahaly, and Mr. Zelle, no less than eight of the witnesses listed by the government before trial, have advocated the position, either through testimony or court filings, that Merrill Lynch, and Mr. Levine specifically, knew from day one that Benistar was holding Exchangors' funds, as well as the nature of Benistar's Section 1031 business.

Put plainly, Mr. Carpenter was deprived of an important piece of evidence that would support his primary defense as well as impeach multiple witnesses called by the government. This deprivation has undermined the credibility of the outcome of Mr. Carpenter's criminal re-trial, and a new trial must be ordered.

**B.     The Government's Failure To Address The False Testimony Of Gerald Levine, Apart From Whether Or Not Such Conduct Merits A Declaration Of A Mistrial, Supports Mr. Carpenter's Motion For An Acquittal Or A Mistrial**

Even assuming, *arguendo*, that the government's sponsoring of Mr. Levine's false testimony does not warrant a declaration of a mistrial, it is a separate and distinct inquiry to

determine if the government's conduct with respect to Mr. Levine, when viewed together with the government's other illustrated misconduct, is sufficient to merit a judgment of acquittal or a new trial. In other words, the standards set forth under Napue and its progeny, as discussed in Mr. Carpenter's filings relating to his Motion for Mistrial, are different than the standards for a new trial or acquittal.

Put yet another way, it is entirely reasonable to conclude that even if the improper conduct of the government in connection with Mr. Levine's testimony alone does not warrant a mistrial under Napue, it was still part of a pattern of prosecutorial misconduct that makes an acquittal or a new trial necessary. As stated in United States v. Azubike, 504 F.3d 30, 38 (1st Cir. 2007), the test to determine whether the government's misconduct "so poisoned the well" that the trial's outcome was likely affected, involves three prongs: "(1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; (3) whether it is likely that any prejudice surviving the instruction could have affected the outcome of the case." The government's conduct in connection with Mr. Levine further demonstrates the clear pattern of deliberate and extensive misconduct, which, for the most part, was left uncommented upon by the Court and was highly prejudicial to Mr. Carpenter. Specifically with respect to the government's failure to correct Mr. Levine's false testimony, the prejudice resulting was clear: the government polluted Mr. Carpenter's case with known perjurious testimony, and its failure to correct the false testimony materially impaired the key portion of Mr. Carpenter's defense -- his good faith conduct in being open with Exchangors and Merrill Lynch. Thus, even if the Levine episode is not an independent ground for a declaration of mistrial, taken together with the improper conduct of the government with respect

to its questioning of witnesses, opening, closing and rebuttal, and now its recently uncovered Giglio/ Brady violation, this pattern of conduct must result in a new trial.

### C. The Government's Insistence That Particular Improper Questions Were Merited Due To Perceived "Door-Opening Questions" Is Unsupported By The Record And Further Evidences An Inappropriate Pattern Of Gamesmanship

In addressing Mr. Carpenter's arguments concerning inappropriate questioning of witnesses, the government makes the stunning assertion that "Carpenter does not articulate how he was prejudiced by any of the government's questions." Gov't. Opp. at 15. To the extent the Motion For Acquittal was unclear, the reason why such questions should not have been asked was explained by the Court in granting Mr. Carpenter a new trial following the first trial in this matter: too much time was spent concerning losses to the Exchangors, and this had the effect of diverting the jury's attention away from the elements of the alleged crimes of mail and wire fraud. See Carpenter, 405 F. Supp. 2d at 102 ("The real problem is that the references [to Carpenter's "risky" trading strategy and losses], in addition to being persistently pejorative, had the tendency to lead the jury away from the charges in the indictment by inviting them to blame Carpenter because he was a gambler, or because he lost the [E]xchangors' money, rather than because he had committed mail or wire fraud.").

Indeed, the government clearly recognizes this concern of the Court, as it cites to the pre-trial conference in which the Court "added that the problem at the first trial was the over-emphasis of loss of [E]xchangor funds." Gov't. Opp. at 17. Additionally, the Court was even more explicit during the course of the re-trial in noting that such evidence was of limited, if any, relevance. See, e.g., Tr. 3-41 to 43. The government's cavalier response that such questions were nevertheless permissible due to some perceived "door-opening questions" on the part of defense counsel is a wholly inadequate response to the pattern of improper questions set forth in

the Motion for Acquittal.  The government was well aware of the extraordinary prejudicial and

irrelevant nature of these questions, as made clear by the Court, and yet rather than provide a

substantive, independent justification for such questions, it resorts to the excuse of "they did it

first."  The record clearly reflects a pattern of inappropriate questions by the government, the

majority of which were wholly unrelated to any inquiry by defense counsel.[14]

It was additionally improper of the government to take it upon itself to determine that the

"door" had been "opened" and it could begin questioning witnesses concerning losses due to the

problems posed by Fed. R. Evid. 403.  Even presuming that loss has any minimal probative value

to the determination of whether the government met its burden of proof of establishing all of the

elements of mail and wire fraud beyond a reasonable doubt, the highly prejudicial impact of the

greater than $9 million total loss figure (and the various Exchangors' amounts comprising it)

could only divert the jury's attention and cause them to react emotionally and negatively towards

Mr. Carpenter.  This risk of extreme prejudice substantially outweighs any minor probative value

of the evidence (especially when Mr. Carpenter was prevented from introducing into evidence

the repayment to the Exchangors of $12.5 million), and as the Court has consistently stated,

"loss" is not an element of the crimes Mr. Carpenter is accused of committing.

**D.**     **The Government's Opposition, Like The Court's Attempted Curative Instruction, Overlooks The Most Prejudicial And Inappropriate Portion Of The Rebuttal Argument**

The government attempts to convince the Court that its improper comments during

rebuttal argument were the result of a "reasonable difference of opinion" or "a failure of on-the-

---

[14]  For example, the government's description of the question and answer read from Linda Jokinen's transcript from the first trial, concerning Benistar going out of business, as "completely innocuous" could not be more inaccurate.  First, the question called for evidence beyond the relevant time period, as defined by the Court.  Second this question and answer could only lead the jury to believe that all of the Exchangors had lost their money--precisely the impact the Court sought to avoid when defining the relevant time frame for the case and excluding evidence of loss in the first place.

spot recollection of the nuances of the evidence," but neither of these *post hoc* justifications come close to explaining its inappropriate, factually unsupported, and uncorrected description of Mr. Carpenter's alleged revising of the Nationwide Exchange Fee Agreement as constituting an act of <u>fraud</u>. This legal conclusion, as well as the Court's failure to instruct the jury that such a conclusion was incorrect and that it should not credit such a conclusion, was the critically prejudicial portion of the objectionable rebuttal. Both the government and the Court missed this point -- the Court made no correction relating to the prosecution's assertion that "That's fraud."[15] Unfortunately, as set forth in the Motion for Acquittal (<u>see</u> 48-52), the Court's failure to correct the jury's resulting misunderstanding of what constituted "fraud," amounted to an endorsement of this assertion, and as the last word from the government to the jury prior to its deliberations had a devastating prejudicial effect on Mr. Carpenter's case. Labeling something "fraud" following an unsupported trail of inferences rejected by the Court is not "a failure of memory" and reasonable minds cannot differ as to whether the prosecution was entitled to make such statements. It was not, and the Court's failure to correct it merits an acquittal, or in the alternative a new trial.

**IV.     THE COURT ABUSED ITS DISCRETION IN SEVERAL EVIDENTIARY <u>RULINGS</u>**

> **A.     The Court's Allowance Of Loss Evidence And Preclusion Of The Use Of The Arbitration Award As Substantive Evidence Was An Abuse Of Discretion**

It is abundantly clear, as a result of the government, in a moment of candor, disclosing its role as a collection agency, that loss was at the center of its theory of prosecution. <u>See</u> Tr. 3-43 to 44 (AUSA Mitchell told the Court during side bar that "[I]f [the Exchangors] had completed [their] exchange[s], we wouldn't be here today[,]" clearly demonstrating the government's fixation with loss, as opposed to alleged fraudulent inducement). The Court's oscillating

---

[15]  Defense counsel clearly objected to this statement.  Tr. 13-116.

positions with respect to the admissibility of loss, and its steadfast refusal to allow Mr. Carpenter

to offer substantive proof that the Exchangors' losses (1) were caused by a third party (*i.e.*

PaineWebber) and (2) were repaid in full, was an abuse of discretion and prejudicial to Mr.

Carpenter's case.

The government suggests that isolated references in undersigned counsel's opening

statement to unsuccessful exchanges opened the door to the admission of loss (Gov't. Opp. at

26), and further argues that the Court properly deemed the failure of Benistar to complete these

exchanges part of the "unfolding of events" of the case.  Id. at 25.  The government is incorrect,

and the Court abused its discretion with respect to its approach on loss and repayment evidence.

First, defense counsel included the references to loss and failed exchanges in his opening

statement as a result of the Court's rulings in the pre-trial conference and the first day of trial.

See Pretrial Conference, May 22, 2008, at 31-32; Tr. 1-156 to 165.  With the understanding that

loss was going to be admissible (albeit in a limited manner), defense counsel had little choice but

to discuss the issue in his opening.  However, as discussed below, the contours of the Court's

ruling with respect to loss soon shifted.  The argument set forth by the prosecution fails to

address the Court's most direct discussion of the subject, on the third day of the trial during the

testimony of Mr. Snider, and similarly fails to give justification as to why the Court, without

explanation, suddenly abandoned the hitherto clear course of viewing the evidence of loss as

irrelevant to the elements of the charged crimes.

As set forth in the Motion for Acquittal, a day after the opening statement by undersigned

counsel which the government now contends opened the door for the admission of loss evidence,

the Court stated, unequivocally, with respect to Mr. Snider: "[H]is subsequent loss has nothing to

do with the crime.  The crime was completed when Snider entrusted the money based on false

representations and used the mails. . . . And so it doesn't affect, good or bad -- Snider's experience works out or it doesn't work out -- doesn't affect whether at the time he paid the money it was obtained by fraud." Tr. 3-41 to 43. Clearly, at this point, the Court had not accepted the government's contention that Mr. Carpenter's opening had put loss and uncompleted exchanges at issue in this case. In fact, the Court's own language leaves no doubt but that it had reached precisely the opposite conclusion. However, the clarity of this position makes the Court's sudden reversal in position as to unsuccessful exchanges (on day four, beginning with the testimony of Brian Fitzgerald), all the more confounding and improper -- it was clearly an abuse of discretion for the Court to reverse its position without justification, explanation, or notice.

Similarly, the government's contention that, with respect to the admission of the Arbitration Award, "[Mr. Carpenter] got what he wanted" (Gov't. Opp. at 27), misconstrues both the trial record and the arguments set forth in the Motion for Acquittal. Pointing to defense counsel's use of the Arbitration Award, as approved, for impeachment and bias evidence, the government argues that the information concerning the Award "thus came in like any other piece of substantive evidence." Gov't. Opp. at 28. This argument neglects to consider the fact that the Court expressly rejected the admission of the Arbitration Award as substantive evidence. <u>See</u> Motion for Acquittal at 58-59. Regardless of how the government seeks to construe the proper and approved questioning of witnesses using the Arbitration Award as impeachment and bias evidence, the Court made plain its position that it was satisfied with the "balance" of the evidence -- permitting the defense to use the Arbitration Award <u>only</u> as impeachment and/or bias evidence and not as substantive evidence. Tr. 10-85 to 86.

Furthermore, the government's argument that Mr. Carpenter "got what he wanted" with respect to the Arbitration Award ignores the position set forth by Mr. Carpenter in the Motion for Acquittal (see 52-60), explaining precisely why the Award should have come in as substantive evidence, and why, in light of all of the improper loss evidence introduced by the government, the Court's ruling to the contrary resulted in significant prejudice to Mr. Carpenter. That the government was displeased with the wording of questions during defense counsel's use of the Arbitration Award to impeach and demonstrate bias does not convert its limited use into full admission as substantive evidence.

The government's reliance upon United States v. Sindona, 636 F.2d 792 (2d Cir. 1980), for the proposition that repayment of the Exchangors "does not make it more or less likely that [Mr.] Carpenter caused false and misleading statements to be made to the [E]xchangors for the purpose of obtaining money from them, or that he acted in good faith" (Gov't. Opp. at 27) is contrary to the case law from across the nation,[16] and Sindona is itself distinguishable. There, the Second Circuit found that the trial court had not abused its discretion in excluding evidence of loss in the first instance, because as a matter of law it held that "loss to the victim need not be shown in order to prove a violation [and t]hus, an absence of loss to Franklin is irrelevant." Id. at

---

[16]  As set forth in the defendant's Motion In Limine to Prohibit Admission Of Testimony Or Argument That Exchangors Have Suffered Monetary Loss, at 9-11, see, e.g., Anderson v. United States, 369 F.2d 11, 15 (8th Cir. 1996) ("permissibly indicative of . . . intent is the absence of any effort on [defendant's] part to rectify the wrongs suffered by victims of the . . . scheme"); United States v. Zehrbach, 98 Fed. Appx. 211, 218 (4th Cir. 2004) (in mail fraud prosecutions evidence that defendant refused to make good on victim's losses is relevant to show the defendant's specific intent to defraud); United States v. Van Dyke, 605 F.2d 220, 22 (6th Cir. 1979) (considering as relevant evidence concerning intent in a mail fraud case, the fact that defendant received complaints concerning the alleged scheme and did not respond); United States v. Ethridge, 948 F.2d 1215, 1217 (11th Cir. 1991) ("If [the insurance company] had lost money, the government would likely have introduced that fact as evidence of intent to defraud. In our opinion, the Ethridges are equally entitled to argue that the fact that [the insurance company] did not suffer a loss related to their intent, and present evidence to support that argument. . . . The jury, armed with all relevant evidence could then ultimately decide this issue."); United States v. Clearly, 565 F.2d 43, 47-48 (2d Cir. 1977) (in context of bank fraud, the matter of repayments was ruled to be relevant to element of intent); United States v. Southers, 583 F.2d 1302, 1307 (5th Cir. 1978) (although the lower district court denied defendant's request for a jury instruction concerning restitution's relevance to intent, it did permit him to present testimony regarding his intent to repay, as well as the repayment).

800. While loss need not be shown, in the instant case the government proceeded under a theory that loss is relevant to the intent of the defendant and succeeded in having evidence of loss admitted at trial (even though the government previously admitted that loss was irrelevant). See Docket Entry 29 at 6 ("Whether Carpenter's fraudulent scheme (and his speculative options trading) subsequently resulted in gains or losses is irrelvant."). In such an event, "a defendant is entitled to present proof that the victim did not suffer a loss as evidence of a lack of intent." See 2 L. Sand et al. Modern Federal Jury Instructions -- Criminal, Comment to Instruction 44-5 at pp. 44-33 (collecting cases). Indeed, loss was the sine qua non of the prosecution. Mr. Carpenter's case is also very different from Sindona in terms of the theory of defense. In Sindona the only defense was that the defendant "had repaid [the money] involved and, therefore, these transactions were legitimate loans with no fraud or illegality involved." Sindona, 636 F.2d at 786. Here, Mr. Carpenter's defense was that he did not have the intent to defraud the Exchangors. Sindona is also distinguishable factually. There, the evidence sought to be admitted was that of a settlement, not a contested arbitration award after a full arbitration proceeding, as happened here. The Sindona Court emphasized that the trial court had received testimony which unequivocally showed that Interbanca was "destined to lose as between the FDIC and Interbanca and, therefore, Interbanca settled." Id. at 801. Sindona's suit to compel repayment came only after a regulatory agency, the FDIC, had brought suit against him whereas here, Mr. Carpenter brought the action against PaineWebber before he was indicted. Id.

     Finally, to the extent that the government endorses the Court's decision not to admit the evidence of the Arbitration Award substantively due to concern that it would mislead the jury, Mr. Carpenter reiterates his argument that it was an abuse of discretion for the Court not to allow

the evidence in and give a limiting instruction with respect to the use for which the jury could consider the evidence.

> **B.**   **The Admission Of Mr. Paley's Statements Against Mr. Carpenter Without Requiring The Government To Meet The Burden Of <u>United States v. Ranney</u> Was An Abuse Of Discretion And Prejudiced Mr. Carpenter By Improperly Attributing Alleged Misrepresentations To Him**

In light of the government's failure to meet its burden of demonstrating an agency relationship between Mr. Paley and Mr. Carpenter under the relevant First Circuit authority of <u>United States v. Ranney</u>, 719 F.2d 1183, 1187 n.7 (1st Cir. 1983), it was an abuse of discretion for the Court to admit statements of Mr. Paley against Mr. Carpenter.  The government's conclusory statement that "[Mr.] Paley worked for [Mr.] Carpenter and was authorized by him to present the promotional materials and exchange documents to prospective [E]xchangors" (Gov't. Opp. at 29), is supported in the government's brief merely by two citations relating to Mr. Carpenter's purported ratification of statements in the Exchange Documents.  This evidence is insufficient to meet the burden of <u>Ranney</u> for several reasons.  First, as argued in the Motion for Acquittal, Mr. Paley testified that Mr. Carpenter never told him to say <u>anything</u> whatsoever.[17] Second, the government's argument fails to address another possibility as to the role of Mr. Paley: that he was the agent of Benistar, not Mr. Carpenter.

The government also argues that Mr. Carpenter suffered no prejudice when Mr. Paley's statements were admitted against him, both because the statements were supposedly "highly generalized," and also because they were consistent with the exchange materials.  It is here that the stark difference between what the government articulates its case to be, and the evidence in

---

[17]  The government's silence on this particular point is noteworthy.  While it argues elsewhere in its opposition that the Court should disregard the testimony of Mr. Paley that the government considers "self-serving" (Gov't. Opp. at 13), it is hard to imagine how this particular testimony-- in which Paley asserts that he acted alone with respect to his statements to Exchangors --could possibly be characterized as self-serving.  Mr. Paley's testimony, therefore, must be viewed as highly probative on the question of any alleged agency relationship between himself and Mr. Carpenter.

support of that theory, is clearest. The government contends that the alleged statements of Paley

to the Exchangors are the same as the Exchange Documents, and offers the argument that the

"thrust" of the materials was safety. It attempts to bolster this claim by putting forth the phrase

"ask about the security of your funds" as a key example of "particular representations in the

promotional materials." To repeat the argument set forth above, an invitation to ask questions

relating to security is <u>not</u> a representation.[18] Perhaps a follow-up question, inquiring of

Exchangors what questions they asked Mr. Paley and what they were told with respect to the

security of their funds <u>might</u> constitute representations, but the government did not ask a single

question on this subject. The government's silence on this critical issue is significant, and

demonstrates the failure of the government to carry its burden of proof.

A manifest injustice has been done to Mr. Carpenter. For the past four years the

government has sought to prosecute him for alleged "representations" of security or safety that

were no such thing, for supposedly making these representations through Mr. Paley, although all

the evidence proves that no such authorization existed, and for "losing" the Exchangors money

through nebulously identified and arbitrarily labeled "risky" investments. Today, it is clear that

the government on one hand has failed to carry its burden on the most critical issues of

materiality and lack of good faith and on the other has engaged in a consistent course of highly

prejudicial misconduct, including, but not limited to persistently prejudicial and improper

questions, improper arguments to the jury, the knowing sponsorship of false testimony, and the

suppression of exculpatory evidence that indicates that even the "victims" of Mr. Carpenter's

conduct solely blame Merrill Lynch for their now recompensed "loss." This was compounded

by the fact that Mr. Carpenter was prevented by the Court, upon the urging of the government,

---

[18]  Black's Law Dictionary defines "representation" as "Any conduct capable of being turned into a statement of fact. . . . Statement of fact made to induce another to enter into contract." An invitation to ask questions is not, and cannot be turned into, a statement of substantive fact.

from presenting critical evidence of the full repayment to the Exchangors to offset the government's prejudicial use of evidence concerning loss.  In short, Mr. Carpenter was not given a level playing field, and as a consequence justice has not been done in this case.  An acquittal, or at the very least a new trial, must be ordered.

## CONCLUSION

WHEREFORE, for the foregoing reasons, defendant Daniel E. Carpenter respectfully requests that the Court, pursuant to Fed. R. Crim. P. 29(c), enter a judgment of acquittal after the jury's verdict or, in the alternative, and in the interest of justice, order a new trial under Fed. R. Crim. P. 33(a).

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), Mr. Carpenter requests oral argument on this motion.

**RESPECTFULLY SUBMITTED:**
DANIEL E. CARPENTER, Defendant,
By his attorney:

/s/ A. John Pappalardo
A. John Pappalardo (BBO # 338760)
GREENBERG TRAURIG, LLP
One International Place, 20th Floor
Boston, MA 02110
(617) 310-6000
(617) 310-6001 (fax)

## Certificate of Service

I hereby certify that on this 15th day of August, 2008, I served on counsel of record in the foregoing matter a copy of this submission by means of the ECF system.

/s/  A. John Pappalardo
A. John Pappalardo