UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                      )
UNITED STATES OF AMERICA       )
                                      )
        v.                            )        CRIMINAL NO. 04-10029-GAO
                                      )
DANIEL E. CARPENTER            )
_____)

### DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE INVOLVING THE FEDERAL TRADE COMMISSION

Defendant Daniel E. Carpenter ("Carpenter") respectfully moves, pursuant to Fed. R. Crim. P. 33(b)(1), to set aside the jury verdict and grant a new trial in the interest of justice based on the August 2008 **unanimous** decision by the Federal Trade Commission ("FTC") **not** to adopt regulations imposing restrictions on the kinds of investments that § 1031 qualified intermediaries can make with client funds. The FTC's recent decision constitutes material, and likely dispositive, evidence that Carpenter did not engage in "deceptive" acts or practices by investing the § 1031 client funds held by Benistar Property Exchange Trust Co., Inc. ("BPE") in stock options and/or failing to inform the clients of his investment choice.

## I.    **Legal Standard.**

The First Circuit employs a four-part test to evaluate a motion for a new trial based on newly discovered evidence. The defendant must establish that "the evidence was: (i) unknown or unavailable at the time of trial; (ii) despite due

diligence; (iii) material; and (iv) likely to result in an acquittal upon retrial."

United States v. Falú-González, 205 F.3d 436, 442 (1st Cir. 2000) (quoting

United States v. Montilla-Rivera, 115 F.3d 1060, 1064-65 (1st Cir. 1997)).  "If any

of the four factors . . . are lacking, then a Rule 33 motion must be denied."

United States v. Natanel, 938 F.2d 302, 313 (1st Cir. 1991).  In this case, all four

factors are easily satisfied.

## II.    **The FTC's Recent Decision Warrants a New Trial**.

In August 2007, the Federation of Exchange Accomodators ("FEA"), a

national trade association representing § 1031 qualified intermediaries,

petitioned the FTC to adopt regulations that would, *inter alia*, require a § 1031

qualified intermediary "to act as a custodian of exchange funds and *invest in a*

*manner that provides sufficient liquidity and preserves the principal of the*

*exchange funds*."  FEA Press Release at 2 (Aug. 6, 2007) (a copy of which is

attached as **Exhibit 1**).  A year later, in August 2008, the FTC voted

unanimously to deny the FEA's petition which would have, if adopted, imposed

restrictions on the kinds of investments that § 1031 qualified intermediaries

(such as BPE) could make with client funds.  See FTC letter dated August 18,

2008 (a copy of which is attached as **Exhibit 2**).[1]

In denying the FEA's petition to adopt regulations, the FTC relied on

several factors.  Critically, the FTC denied the petition even after examples were

---

[1]  The FTC's decision was announced in a press release dated August 26, 2008 (a copy of which is attached as **Exhibit 3**).

identified "where individuals have stolen exchange funds or improperly used customer assets to fund unsuccessful personal investments or business ventures." Exh. 2 at 2.  It is important to note that it is undisputed that no such conduct occurred in this case.  Carpenter merely invested client funds in what the government describes as "risky" stock options at Merrill Lynch and later at PaineWebber, and did not embezzle, steal, or misappropriate a single dime of client funds.[2]   In December 2000, PaineWebber mishandled BPE's accounts, which resulted in the loss of approximately $9 million of the funds of seven BPE clients.  However, Carpenter paid the clients whose funds were lost $12.5 million by assigning to them BPE's arbitration judgment against PaineWebber.[3]

The overall basis for the FTC's decision is summarized as follows:

> Notwithstanding the significant losses that some consumers have sustained, the Commission concluded that the proposed rule is not likely to reduce the harm, that the potential costs of the rulemaking and proposed registration process would outweigh the likely benefits of the proposed remedy, and that the overall incidence of the problem practices does not warrant a rulemaking proceeding.  It therefore determined that a rulemaking proceeding would not be in the public interest at this time.

---

[2]  In fact, Carpenter invested and lost over $2.4 million of his own funds in BPE.

[3]  As agreed among Carpenter, BPE and the clients, in June 2008 PaineWebber wired $12,487,000.00 directly to the clients.  On September 19, 2008, at a hearing in the related civil case brought by the clients, Merrill Lynch's attorney stated that Merrill Lynch and PaineWebber are in negotiations to share that payment between themselves.  Moreover, in February 2008 (and unbeknownst to Carpenter and his attorneys prior to the June 2008 retrial), the clients filed a new lawsuit solely against Merrill Lynch that does not blame the losses on Carpenter or BPE.

Exh. 3.  Thus, after surveying the landscape of the unregulated § 1031 industry for an entire year, the FTC decided not to adopt regulations restricting how intermediaries could invest client funds.[4]

**A.     <u>Unknown and Unavailable</u>.**

The new evidence, which came into existence in August 2008, was obviously both unknown and unavailable at the time of the June 2008 retrial.

**B.     <u>Due Diligence</u>.**

Just as obvious is the fact that no amount of due diligence could have unearthed the new evidence, since it did not exist at the time of the June 2008 retrial.

**C.     <u>Material</u>.**

"New evidence is material if it has the potential to alter the outcome of the lawsuit under the applicable legal tenets."   <u>United States v. Hernandez-Rodriguez</u>, 443 F.3d 138, 145 (1st Cir. 2006) (quotations and citations omitted). The government's theory of the case at trial was that Carpenter invested client funds in "risky" stock options, that he should not have done so because § 1031 funds are supposed to be kept "safe," and that Carpenter "deceived" the clients into using BPE's services by failing to inform them that he would be investing their supposedly "safe" § 1031 funds in "risky" stock options.

---

[4] Consequently, the § 1031 industry remains unregulated at the federal level, and only one State—Nevada—has (just recently) enacted laws on the state level.  *See* Nev. Rev. Stat. Ann. § 645G.300(2) (2008) (requiring § 1031 qualified intermediaries to "invest money related to a tax-deferred exchange of property in investments which meet the reasonable standards that are applicable to persons acting as fiduciaries in this State.").

The government's theory of the case was clearly manifested in the government's opening and closing arguments, to wit:

> [BPE] told these people that their money would be secure and kept in escrow accounts earning either three percent or six percent interest. Unbeknownst to them, however, the defendant took the money and traded it in the high-flying stock options market, putting it all at grave risk . . . For this, ladies and gentlemen, Dan Carpenter stands before you today accused of mail and wire fraud.

Tr. 2:74 (government opening). Similarly:

> Mr. Carpenter put the exchangors' money into options knowing full well that not a single exchangor agreed, or was even told, that Mr. Carpenter would be risking their money for that purpose. He did this knowing full well - - knowing full well - - that not a single document anywhere warned the exchangors that he would be taking such risks with their money; he did this knowing full well that none of the exchangors would ever have turned over their money had they known the whole truth about how he intended to use their money. By doing this[,] Mr. Carpenter, that man, committed fraud.

Tr. 13:42 (government closing).

In light of the government's theory at trial and its arguments, evidence that the FTC, a well-known federal consumer watchdog agency, decided (after a year-long inquiry) that it was *not* in the public interest to adopt regulations limiting how § 1031 funds can be invested, would not only be highly material to Carpenter's defense, but likely dispositive of the entire case. The FTC's decision that it is not in the public interest to restrict how § 1031 intermediaries can invest client funds destroys the government's theory that Carpenter deceived the

clients by failing to inform them how he was investing their funds. <u>See</u> Tr. 13:108 (government rebuttal: "This is what he knew while he was trading their money in a way that hadn't been disclosed to them."). Because the new evidence clearly has the "potential to alter the outcome of the lawsuit," <u>Hernandez-Rodriguez</u>, 443 F.3d at 145, it satisfies the materiality requirement.[5]

### D.     Likely Acquittal.

The new evidence is also "likely to result in an acquittal upon retrial." <u>Falú-González</u>, 205 F.3d at 442 (quoting <u>Montilla-Rivera</u>, 115 F.3d at 1064-65). The FTC Act declares as unlawful "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). The Act also empowers the FTC to adopt "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 57a(a)(1). A strong argument can be made on a motion for judgment of acquittal that, since the FTC decided not to restrict how § 1031 funds can be invested, Carpenter's actions in investing client funds in "risky" stock options and failing to inform the clients of that fact were—as determined by a federal agency—not "deceptive." The Court instructed the jury that a scheme to defraud "means to deprive another of something of value by means of deception or cheating." Tr. 13:32. If a federal agency has determined that there is no need to restrict how § 1031 funds

---

[5] Although the Court instructed the jury that "for the purposes of the tax code, there is no limitation on how the proceeds may be invested while they're held by the intermediary," Tr. 13:38, the new evidence is not cumulative of the Court's instruction because a statute's silence on the issue carries far less evidentiary weight for a jury than a federal agency's express decision *not* to adopt regulations in the public interest.

are invested, then Carpenter's failure to inform the clients how the funds were invested cannot—by definition—be deceptive.  If there is no deceptive conduct, then there can be no scheme to defraud.  And absent a scheme to defraud, there can be no mail or wire fraud.

Furthermore, the Court would be required to take judicial notice of the new evidence and "instruct the jury that it may, but is not required to, accept as conclusive" such evidence.  Fed. R. Evid. 201(g).  If the jury accepted the new evidence as conclusive, and there is no reason to expect otherwise, the new evidence "would greatly undermine the [mail and wire fraud] charges against [Carpenter]."  <u>Hernandez-Rodriguez</u>, 443 F.3d at 146.  The government premised its entire case on Carpenter's investing in "risky" stock options and failing to inform the clients of that fact.  A jury could very easily conclude that if the FTC saw no need to regulate how § 1031 funds could be invested, then investing in stock options and failing to inform the clients of such investments must not be deceptive, let alone criminal.  Very simply, with this new evidence the government's entire case unravels.

Yet another basis for a likely acquittal, in light of the new evidence and the government's theory of the case, is the recent turmoil in the global financial markets resulting in the worst financial crisis since the Great Depression.  The definition of "safe" investments has, since the June 2008 retrial, changed dramatically.  Many investments that in June 2008 could be considered by the jury as "safe" are now considered anything but, to wit:

- Auction-rate securities, supposedly "safe" municipal bonds, have plunged in value to the point where Wall Street firms (including Merrill Lynch and PaineWebber) have been forced to buy back around $70 billion of the now worthless securities. See S. Anand & J. Levitz, *Auction-Rate Bailouts Bypass Some Investors*, Wall St. J. at D1 (Sep. 4, 2008) ("Auction-rate securities are . . . typically issued by municipalities . . . and until the market froze, they were widely peddled to the public as safe investments.").

- The Treasury Department's bailout and recapitalization of collapsing home mortgage giants Fannie Mae and Freddie Mac, involving over $5 trillion of supposedly "safe" home mortgages, resulted in many commercial banks, which invested in the supposedly "safe" preferred stock of the two mortgage giants, suffering huge losses on those investments. See M. Gordon, *Webster & Sovereign Hurt by Takeover of Fannie & Freddie*, Hartford Courant at B1 (Sep. 10, 2008) ("The preferred shares of Fannie and Freddie, which banks of all sizes long considered to be safe investments that paid substantial dividends, are now virtually worthless.").

- On June 2, 2008, the day the retrial began, shares of 158-year-old Lehman Brothers were trading at just under $30 per share. On June 4, Merrill Lynch's analyst upgraded Lehman shares and said "the company looked like a good buy." L. Story, *Courting Lehman*, N.Y. Times at B5 (Jun. 13, 2008). Lehman shares are now worthless and the company is in liquidation.

- In June 2008, AIG—the world's largest insurance company—was rated "A+ (Superior)" by A.M. Best Co.[6] Earlier this month, the federal government was forced to grant an emergency $85 billion bridge loan to AIG at 12% interest, and in return take an 80% equity stake in the ailing insurer, in order to avoid an immediate and catastrophic global financial collapse.

---

[6] A.M. Best defines this rating to mean "secure." See http://www.ambest.com/ratings/ guide.asp. The government argued in closing that BPE was "a secure and safe place to park the money until the exchange was completed." Tr. 13:45.

- Merrill Lynch, the world's largest and supposedly strongest brokerage firm, was forced to sell itself to Bank of America in a $50 billion shotgun marriage in order to avoid suffering the same fate as Lehman Brothers.

- Two large money market funds, supposedly one of the "safest" forms of investments, had to close to investors and actually lost money. See D. Gullapalli, *Investors Flee Money Funds & Moving Cash to Safer Spots*, Wall St. J. at C1 (Sep. 19, 2008) ("Investors pulled more cash out of money-market funds, prompting a second large fund to close to investors, amid concern that these onetime safe harbors are now too risky."); *The Week That Changed American Capitalism*, Wall St. J. at A5 (Sep. 20, 2008) ("Shares of Reserve Primary Fund—billed as a super-safe money-market fund—fall below $1 a share due to Lehman exposure."); S. Anand, *At Reserve, Some Cash is Still Hard to Pull Out*, Wall St. J. at C1 (Sep. 29, 2008) ("The Reserve debacle is the latest instance in which investors have had trouble exiting from investments pitched as cashlike.").[7]

- Severe liquidity problems forced the venerable Wall Street firms of Goldman Sachs and Morgan Stanley to abandon "high flying" investment banking and become heavily regulated (and supposedly "safe") bank holding companies.

- Earlier this month, a "[s]tampede into one-month Treasury bills sends yields into negative territory: Jittery investors are offering to pay the government to put their cash into a safe haven." *The Week That Changed American Capitalism*, Wall St. J. at A5 (Sep. 20, 2008).[8]

---

[7] The government suggested to the jury that money market funds were a "safer" investment than stock options, arguing that Carpenter "knew that money markets were paying 4.8 percent." Tr. 13:47.

[8] The government also suggested to the jury that Treasury Bills were a better investment for BPE than stock options, arguing "that six percent was about what a Treasury bill was paying." Tr. 13:47-48. However, as set forth in **Exhibit 4**, within the past decade T-Bill rates exceeded 5% only once and for a very short duration—as it turns out, for a brief period during the summer of 2000. Since that time, T-Bill rates have not exceeded 5%, let alone the 6% level that was the minimum necessary for BPE to earn so that it could afford to pay its clients 6% interest.

- On September 19, the federal government agreed to temporarily insure the safety of the $3.4 trillion held in supposedly safe money market funds.  <u>See</u> D. Gullapalli & A. Anand, *Bailout of Money Funds Seems to Staunch Outflow*, <u>Wall St. J.</u> at A2 (Sep. 20, 2008).[9]

- In addition to the recent federal seizures of IndyMac Bank and Washington Mutual, America's 4th largest bank—Wachovia—was forced over this past weekend to submit to a $2 billion government-engineered takeover by Citigroup.  <u>See</u> D. Enrich & M. Karnitschnig, *Citi, U.S. Rescue Wachovia*, <u>Wall St. J.</u> at A1 (Sep. 30, 2008) ("Citigroup Inc. acquired most of Wachovia Corp. for nearly $2 billion in a government-engineered takeover that shows how quickly once-mighty U.S. banks are succumbing to a growing mountain of bad mortgages and other loans.").[10]

- The government's $700 billion bailout of banks holding once "safe," but now toxic, mortgage-backed securities was rejected by the House of Representatives, and the Dow Jones Industrial Average suffered its biggest one-day point drop in history.  <u>See</u> *Defiant House Rejects Huge Bailout; Stocks Plunge; Next Step is Uncertain*, <u>N.Y. Times</u> at A1 (Sep. 30, 2008).[11]

Because the "safety" of BPE's investments was such an important part of the government's case, these recent historic events in the financial markets underscore the importance of the new evidence from the FTC.  The definition of a

---

[9]  Instead of "risky" stock options, what would the government's position be if Carpenter had invested in "safe" money market funds that ultimately went bust?

[10]  At the time of the June 2008 retrial, Wachovia was America's 4th largest bank, had over 120,000 employees, and its common shares—which are now worthless—were selling at roughly $20.  <u>See</u> D. Fitzpatrick & D. Gullapalli, *Storm of Fear Enveloped Wachovia*, <u>Wall St. J.</u> at A7 (Sep. 30, 2008).  Carpenter could have lost the clients' funds just as easily by buying Wachovia shares at $20 (or even "safer" preferred shares) and riding them all the way down to $0—without disclosing to the clients that he was investing in "risky" Wachovia shares.

[11]  As bad as current times are, they pale in comparison to the market rout that engulfed Carpenter and other investors in late 2000.  While the NASDAQ is down approximately 22% so far in 2008, the NASDAQ dropped over 45% in 2000.

"safe" investment has obviously changed substantially since the jury had the occasion to consider the term in June 2008. Today, compared to other supposedly "safe" investments that recently went bust, stock options no longer seem as "risky" or "high-flying" as the government described them to the jury at the June 2008 retrial. At a new trial (the third in this case), Carpenter will be able to introduce the FTC's decision, presented in light of recent historic financial events, to show the jury that (i) *every* investment (including T-Bills and money market funds) is "risky," and (ii) a federal agency determined in August 2008, in the midst of the financial crisis, that requiring a § 1031 intermediary to invest client funds in a certain manner would not be "in the public interest." These two arguments in tandem are fatal to the government's case.[12]

"In considering the motion for a new trial, we must carefully consider the strength of the government's case in light of the new evidence." Hernandez-Rodriguez, 443 F.3d at 147. This Court found after the first trial that the government's case was not "strong" and that an acquittal "would have been rationally possible on the evidence." United States v. Carpenter, 405 F. Supp.2d 85, 103 (D. Mass. 2005). The government's evidence in the second trial was even weaker, especially in light of the PaineWebber judgment and the government's decision not to call several witnesses who testified in the first trial. At the third trial, in light of the new FTC evidence and the recent global financial meltdown,

---

[12] Massachusetts State Treasurer Timothy Cahill will be called as a witness to explain his recent statement that "[t]here is risk involved in any type of investment." TV interview with Timothy Cahill, Mass. State Treasurer, *NewsNight with Jim Braude*, NECN (Sep. 16, 2008).

there is a substantial "likelihood of acquittal upon retrial." Hernandez-Rodriguez, 443 F.3d at 147. See also United States v. Garland, 991 F.2d 328, 335 (6th Cir. 1993) (judicially noticed foreign judgment "is dramatic and probative newly discovered evidence that goes to the issue of Garland's intent to defraud.").

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Carpenter a new trial based on the newly discovered FTC evidence.

RESPECTFULLY SUBMITTED,
DANIEL E. CARPENTER,
By his attorney,


*/s/ Jack E. Robinson*
Jack E. Robinson
(BBO #559683)
2187 Atlantic Street, Suite 905
Stamford, CT 06902
(203) 425-4500


Dated:  September 30, 2008


## CERTIFICATE OF SERVICE

I hereby certify that on the date hereof this document was filed through the Court's CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).


*/s/ Jack E. Robinson*
Jack E. Robinson