UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
"SUPPLEMENTAL MEMORANDUM" CONCERNING NEW EVIDENCE**

The government hereby submits this response to the "Supplemental Memorandum in Support of Defendant Daniel E. Carpenter's Motion for Declaration of Mistrial and His Motion for Acquittal and in the Alternative for a New Trial and Request for an Expedited Hearing" (Docket Number 355) ("Supplemental Memorandum" or "Supp. Memo").  In his Supplemental Memorandum, Carpenter argues that the Court should dismiss the case or, alternatively, grant him a new trial based on evidence recently disclosed in the related civil litigation involving Merrill Lynch.  The new evidence includes both documents and deposition testimony which, according to Carpenter, substantively negates his guilt and demonstrates that certain government witnesses perjured themselves.  Although the civil litigation is ongoing, Carpenter asserts that the Court now has before it sufficient evidence to undo his guilty verdicts.

For the reasons set forth below, the Court should treat the Supplemental Memorandum as a motion for new trial based on newly discovered evidence.  The Court should reject the motion because Carpenter fails to meet the First Circuit's test for a new trial based on newly discovered evidence, as the evidence is not material to his guilt or innocence, nor would it have resulted in an acquittal had it been available to him before trial.

**I.      CARPENTER'S SUPPLEMENTAL MEMORANDUM SHOULD BE TREATED AS A MOTION FOR NEW TRIAL PURSUANT TO FED.R.CRIM. 33 BASED ON NEWLY DISCOVERED EVIDENCE.**

It is necessary first to be clear about what exactly Carpenter has filed.  Although he seeks relief based on evidence that surfaced after the second trial, he has styled his pleading not as a motion for new trial based on newly discovered evidence, but as a "Supplemental Memorandum" that purports to support his pending post-trial motions, namely his motion for acquittal or a new trial pursuant to Rules 29(c) and 33(a) (Docket Number  308), and his motion for dismissal based on an alleged *Napue* violation (Docket Number 283).

Characterizing his pleading as a "Supplemental Memorandum" serves only to confuse the legal analysis of the new evidence.  The issue of whether the new evidence warrants a new trial under Rule 33 bears no relation to the issues in the pending post-trial motions.  Carpenter's arguments concerning the new evidence do not "supplement" his motion for acquittal because Rule 29(c) permits acquittal based only on the evidence presented to the jury, without regard to new evidence. *United States v. Orrego-Martinez*, 575 F.3d 1, 8 (1st Cir. July 30, 2009) (noting that Rule 29(c) motions are "confined to evidence presented at trial." (citations omitted)).  Carpenter also cannot lump the new evidence onto his pending arguments for new trial pursuant to Rule 33(a).  As the First Circuit has held, the tests to be applied to new trial motions based on events at trial, and those based on new evidence, are different.  *United States v. Conley*, 249 F.3d 38, 46 (1st Cir. 2001) (holding that the "highly discretionary" interests-of-justice standard under Rule 33 does not apply to new evidence motions).

Nor does the new evidence "supplement" Carpenter's pending *Napue* motion.  That motion seeks dismissal based on an allegation that the government knowingly sponsored the

false testimony of former Merrill Lynch broker Gerald Levine.  The new evidence concerning

Levine consists of an email and a letter that purportedly show that Levine was aware that

Carpenter was trading other people's money.  This evidence may be relevant to Carpenter's

*Napue* argument *only* insofar as it may show the falsity of Levine's trial testimony concerning

his knowledge of the nature of Carpenter's business.  Carpenter also asserts, however, that there

is no dispute over the falsity of Levine's testimony on this point. *See* Supp. Memo at 27.  And as

the government previously has pointed out, Levine's denial of knowledge about Carpenter's

business was impeached at trial by evidence offered by *both* parties.  *See* Docket Number 306 at

3-4.  Thus, the new evidence cannot be said to add anything to Carpenter's *Napue* motion.

Carpenter offers no authority to support the notion that the new evidence should be

considered as part of his pending motions.  Indeed, if it is not a new trial motion based on newly

discovered evidence, but actually concerns events at trial, the Supplemental Motion would be

untimely as it would violate the seven-day post-verdict deadline in Rule 33(b)(2).  Carpenter also

fails to offer any support for his claim that the discovery of new evidence may warrant the

remedy of dismissal, as opposed to new trial.  He invokes Rule 33, but the rule offers only a new

trial as a remedy.

Accordingly, to avoid the confusion Carpenter's Supplemental Memorandum threatens to

create, the government hereby treats the pleading as a free standing motion for new trial pursuant

to Rule 33 based on newly discovered evidence.

## II.   UNDER FIRST CIRCUIT LAW, THE NEWLY DISCOVERED EVIDENCE DOES NOT WARRANT A NEW TRIAL.

In his Supplemental Memorandum, Carpenter cites three sets of newly produced evidence as warranting a new trial:[1]

(1)    The recent civil deposition testimony of Nancy Sawyer, a Merrill Lynch employee who had direct conversations with Carpenter during the relevant time period (Exhibit 1, attached hereto), *see* Supp. Memo at 9-10;

(2)    Three documents that were created after Merrill Lynch terminated Carpenter's option trading privileges: (i) a fax from Merrill Lynch compliance officer Martin Malia to administrative manger Thomas Rasmussen on September 20, 2000 (Exhibit 2); (ii) an email from Merrill Lynch branch manager Hassan Tabbah to Rasmussen dated September 28, 2000 (Exhibit 3); and (iii) an internal letter dated October 2, 2000 authored by Merrill Lynch brokers Gary Stern and Gerald Levine (Exhibit 4), *see* Supp. Memo at 10-11; and

(3)    The recent civil deposition testimony of Rasmussen (Exhibit 5) and Merrill Lynch compliance officer Martin Malia  (Exhibit 6), *see* Supp. Memo at 18-24.

Carpenter contends that the evidence either tends directly to negate his guilt, or demonstrates that certain government witnesses testified falsely, and that as a result, he is entitled to a new trial.  For the reasons set forth below, however, the new evidence does not, either standing alone or collectively, come close to satisfying the First Circuit's stringent test for a new trial based on newly discovered evidence.

### A.    TO DECLARE A NEW TRIAL, THE COURT MUST FIND THAT THE EVIDENCE WAS PREVIOUSLY UNKNOWN, MATERIAL BUT NOT COLLATERAL OR CUMULATIVE, AND LIKELY TO RESULT IN AN ACQUITTAL.

A criminal defendant seeking a new trial under Rule 33 on the basis of newly discovered evidence must show: (1) the evidence was unknown or unavailable to the defendant at the time

---

[1] Although the enumerated pieces of new evidence are attached to Carpenter's Supplemental Memorandum, for ease of reference, they are also attached hereto.

of trial; (2) that the defendant was duly diligent in attempting to unearth it; (3) that the newly discovered evidence was material, and not merely impeaching or cumulative; and (4) that its availability is likely to bring about an acquittal upon retrial.  *United States v. Connolly*, 504 F.3d 206, 212 (1st Cir. 2007); *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980).  Every one these factors (known collectively as the "*Wright*" test) must be satisfied, and failure to establish any one of them will defeat the motion.  *United States v. Gonzalez-Gonsalez*, 258 F.3d 16, 20 (1st Cir. 2001).

"Motions for a new trial based on newly discovered evidence are granted only with great caution in the most extraordinary circumstances."  *United States v. DiPaolo*, 835 F.2d 46, 49 (2d Cir. 1987) (citations and internal quotation marks omitted).  That is because the defendant must show an "*actual probability*" that the new evidence, had it been available at trial, would have led to an acquittal.  *United States v. Colon-Munoz*, 318 F.3d 348, 358 (1st Cir. 2000); *United States v. Sepulveda*, 15 F.2d 1216, 1220 (1st Cir. 1993).  Even if the evidence demonstrates that a government witness committed perjury, the evidence is to be analyzed under this standard just like any other evidence.  *United States v. Huddleston*, 194 F.3d 214, 221 (1st Cir. 1999); *United States v. Stewart*, 433 F.3d 273, 295 (2d Cir. 2006) ("[E]ven where newly discovered evidence indicates perjury, motions for new trials should be granted only with great caution and in the most extraordinary circumstances.").  Moreover, the *Wright* test "categorically discounts 'merely impeaching' evidence as immaterial."  *Connolly*, 504 F.3d at 213 (quoting *Wright*, 625 F.2d at 1019).  "Merely impeaching" evidence includes evidence that is cumulative of other witness impeachment evidence offered at trial, *United States v. Hahn*, 17 F.3d 502, 510 (1st Cir. 1994), as well as impeachment evidence that is collateral to the issue of the defendant's guilt.  *See*

*Connolly*, 504 F.3d at 216 (noting that Frank Salemme's alleged recantation of certain portions

of his trial testimony was merely impeaching because the recantation gave no indication that

John Connolly was innocent).

Although the First Circuit and other circuits apply a less stringent test in cases involving

*Brady* violations, *see Colon-Munoz*, 318 F.3d at 358, Carpenter does not allege a *Brady* violation

here.  In any event, where a new trial motion is based on evidence withheld, even wrongfully, by

a third-party, the more demanding *Wright* test applies.  *United States v. Jocelyn*, 206 F.3d 144,

151 (1st Cir. 2000) (holding that the wrongful withholding of documents by corporate entity at

center of case not attributable to the prosecution, and therefore not subject to *Brady* analysis);

*see also United States v. Redcorn*, 528 F.3d 727, 744 (10th Cir. 2008) (holding that *Brady* test

does not apply to evidence discovered in the possession of a state agency after trial).

## B.   THE "NEW" EVIDENCE PROFFERED BY CARPENTER DOES NOT SATISFY THE *WRIGHT* TEST.

The "new" evidence touted by Carpenter does not meet the *Wright* test, because it is not

material to the defendant's guilt or innocence, would not change the result of the trial, and, in the

case of Nancy Sawyer's testimony, was not unknown to Carpenter prior to trial.

### 1.   Testimony of Nancy Sawyer

The centerpiece of Carpenter's new trial argument is the recent deposition testimony of

Merrill Lynch employee Nancy Sawyer, who served as a "service manager" in the same office as

certain of the Merrill Lynch employees called by the government at trial.  *See* Supp. Memo. at 9-

10.  At her deposition, Sawyer testified in essence that she spoke to Carpenter on several

occasions, and as a result, became aware that the money in the Benistar accounts belonged to

third parties involved in certain real estate transactions.  *Id.* at 9.  She also testified that it

appeared that Merrill Lynch broker Gerald Levine had the same understanding.  *Id.*  Carpenter

contends that this evidence establishes his lack of criminal intent, inasmuch as he purportedly

was "at all times open with Merrill Lynch regarding both the nature of BPETCO'S property

exchange business, as well as the nature of the funds with which he traded."  *Id.* at 9-10.

Although Carpenter does not even begin to address how Sawyer's testimony may satisfy the

*Wright* test, the testimony fails the test for several reasons.

        **a.**    **Carpenter and His Attorneys Were Aware of Sawyer's Likely Testimony Long Before Trial and Still Chose Not to Call Her as a Witness.**

Carpenter's arguments concerning Sawyer's testimony about her conversations with

Carpenter should be summarily rejected on the ground that it is not "new" evidence.  The reason

is simple: having spoken directly to Sawyer, Carpenter cannot now claim that he was unaware of

those conversations.  As the First Circuit repeatedly has held, conversations involving the

defendant "cannot be said to be 'newly discovered evidence' unknown or unavailable to the

defendant."  *United States v. Lenz*, 577 F.3d 377, 381 (1st Cir. August 14, 2009); *see also United

States v. Falu-Gonsalez*, 205 F.3d 436, 443 (1st Cir. 2000) (same); *United States v. Deluca*, 137

F.3d 24, 40 (1st Cir. 1998) ("since [the defendant] participated in these conversations he must

have known long before trial that the 'exculpatory' testimony these witnesses could provide

would be essential to respond to the evidence against him . . . .").

Not only was Carpenter aware of Sawyer's participation in conversations with him, so

were his attorneys – not just before trial, but before Carpenter was *indicted*.  In a letter to

government counsel on October 6, 2003, Carpenter's attorney made substantially the same

arguments about the import of Sawyer's likely testimony that he makes today.  *See* Letter from

John Pappalardo to Michael Pineault, attached as Exhibit 7.  At the top of the second page of the

letter, defense counsel states that Sawyer and others were present for communications with Carpenter concerning his property exchange business, and argues that the communications reflect Carpenter's good faith.  In light of this argument, it was not surprising that Sawyer was listed on Carpenter's witness list before each of his criminal trials.  *See* Docket Numbers 112 and 270.  Nevertheless, Carpenter did not call Sawyer as a witness at either trial.

Having known about Sawyer and made the tactical decision not to present her to the jury, Carpenter may not now claim that her testimony is "new."  *See United States v. Garcia-Alvarez*, 541 F.3d 8, 18 (1st Cir. 2008) ("Rule 33 does not give counsel a second opportunity to rectify a faulty trial strategy."); *United States v. Ortiz*, 23 F.3d 21, 27 (1st Cir. 1994)(holding that where a defendant does not seek to call a known witness at trial, the defendant has not exercised due diligence under *Wright*).  Sawyer's testimony thus fails the first element of the *Wright* test.

### b.       Sawyer's Testimony Does Not Raise an "Actual Probability" of Acquittal, and It is Cumulative of Evidence Presented at Trial.

Even if it were new, Sawyer's testimony would not raise an "actual probability" that Carpenter otherwise would have been acquitted, as the testimony does not tend to exculpate him. As the government argued both to the jury and in its responses to Carpenter's initial round of post-trial motions, evidence that Carpenter spoke to Merrill Lynch employees about the nature of his property exchange business is not probative of the ultimate issue in the case: whether Carpenter intended to defraud the exchangors.  After all, that an individual does not seek to cover up his fraud from everyone says little about whether he intended to defraud.  Rather, what principally mattered was what Carpenter, through his agents, said and did not say to the exchangors.  As Carpenter knew, the exchangors were being led to believe that their money would be held securely in escrow.  If relevant at all, testimony concerning Carpenter's

statements to Nancy Sawyer and others at Merrill Lynch are barely probative of his state of mind.

Moreover, Carpenter's conversations with Sawyer still would leave the fact that Carpenter made no disclosures about his business to representatives of Paine Weber, where he traded the exchangors' funds after leaving Merrill Lynch.  Carpenter traded at Paine Webber in the same fashion as he had at Merrill Lynch, knowing that the same representations were being made to the exchangors concerning what Benestar would do with their money.  Thus, even if, hypothetically speaking, Sawyer's testimony about Carpenter's "disclosures" likely would lead to Carpenter's acquittal on the wire and mail fraud counts associated Carpenter's Merrill Lynch transactions, it would have no effect on the Paine Webber counts.

In a similar vein, the Sawyer testimony was not material to Carpenter's defense because it is cumulative of similar evidence presented at trial.  The Sawyer testimony added little to what the jury heard and, by virtue of their guilty verdicts, rejected.  The jury was well aware that Carpenter disclosed information about the nature of his business to Merrill Lynch.  The evidence included exhibits used by the defense to impeach Gerald Levine, as well as wire transfer documents sent to Merrill Lynch that reflected the names of certain of the exchangors.  It also included the testimony of David Patterson, an attorney of one of the exchangors, from whom the *government* elicited that at Carpenter's suggestion, Patterson discussed the nature of the property exchange directly with Levine.  The jury had the opportunity to consider this evidence, and ultimately rejected it.

Sawyer's testimony is even less probative than what the jury heard from Patterson.  Although Sawyer testified in her deposition that Carpenter told her that the funds he traded came

from a property exchange business, she did not testify that she knew precisely what representations Carpenter's company made to its exchangors to convince them to part with their money. Under Carpenter's theory of the case, that would have been more compelling. But that is what the jury heard from Patterson, to whom Carpenter disclosed not only the nature of his business, but also the specific representations he made to at least one exchangor to obtain her money. Thus, Sawyer's testimony would add nothing to what was already before the jury. Where new evidence simply adds to the sum total of evidence presented to the jury, but is not qualitatively different, it is cumulative. *See Jocelyn,* 206 F.3d at 160.

What makes Sawyer's testimony particularly cumulative is the fact that the government did not dispute that Carpenter made Merrill Lynch aware of the nature of his business. Neither in its opening or its closings did the government assert that the Merrill Lynch was unaware. Rather, the government maintained that Carpenter's "disclosures" to Merrill Lynch did not matter. *See* Trial Transcript 13:69, 112-113. As evidence that would support a point not disputed by the government, Sawyer's testimony is by definition cumulative, and therefore not material.[2]

### 2.       The Malia Fax, the Tabbah Email and the October 2, 2000 Letter

Carpenter also touts three documents recently produced by Merrill Lynch that were generated in the days after Merrill Lynch terminated Carpenter's options trading privileges on September 20, 2000. The first is a fax dated September 20, 2009 from compliance officer Martin Malia to administrative manager Thomas Rasmussen (a government witness), stating simply "as

---

[2] Inasmuch as Carpenter suggests that Sawyer's testimony demonstrates the falsity of Gerald Levine's testimony concerning his knowledge of Carpenter's business, Sawyer's testimony is cumulative for the same reasons.

we discussed," and attaching pages from Benistar's website.  *See* Exhibit 2.  In his recent

deposition, Malia placed this email in context.  *See* Exhibit 6.  He explained that on September

20, 2000, he had inquired of Rasmussen about Carpenter's "highly speculative options trading"

and told Rasmussen to "downgrade" the account to permit only less risky trading.  Supp. Memo

at 21-22.  Malia then went to Benistar's website to conduct more due diligence on Carpenter and

discovered that Benistar was in the property exchange business.  *See id.*  He surmised that the

funds Carpenter was trading through Merrill Lynch had come from third-party real estate

transactions, and promptly emailed Rasmussen, ordering him to terminate Carpenter's options

trading privileges. *See id.*  He then faxed a copy of the website to Rasmussen.  *See id.*

    The second document is an email dated September 28, 2000, from Rasmussen to broker

Gary Stern and two other Merrill Lynch employees, forwarding an email from branch manager

Hassan Tabbah, in which Tabbah reported that compliance officer Malia was looking to

document what Carpenter's Merrill Lynch brokers, namely Stern and Gerald Levine, knew

concerning the fact that Carpenter had been trading third party funds:

> Tom,
> Marty Malia is looking for a letter from the FC [financial consultant, or broker]
> confidential to counsel re the FC's knowledge about the client managing other
> people's money and fax it to him.

*See* Exhibit 3 and Supp. Memo 10-11.

    The third document is a letter dated October 2, 2000 from Stern and Levine, which was

addressed "To Whom it May Concern."  This evidently was the letter Malia was looking for.

Referring to Carpenter, Stern and Levine state in the letter that they "were under the assumption

that the money he has been investing has been his own."  *See* Exhibit 4 and Supp. Memo at 11-

12.

Carpenter contends that these three documents establish (1) that Merrill Lynch knew that Carpenter was trading third party funds, and (2) that Merrill Lynch witnesses, specifically Stern, testified falsely, and that a new trial is appropriate on either ground. *See* Supp. Memo. at 10. For the following reasons, the documents fail to satisfy the *Wright* test either as substantive or impeachment evidence.

### a.      As Substantive Evidence, the Documents Are Cumulative, if Relevant at All.

Carpenter's argument concerning the substantive import of the documents suffers from several infirmities. For starters, that Merrill Lynch was aware that Carpenter traded third-party funds is utterly irrelevant to whether *Carpenter* had the requisite state of mind to violate the mail and wire fraud statutes. That a third-party is a knowing bystander to a fraud (assuming that could be shown here) does not negate the criminal intent of the person actually committing the fraud. *See United States v. Poulson*, 568 F. Supp.2d 885, 926 (S.D. Ohio 2008) ("whatever responsibility third parties may bear for failing to detect the fraud or furthering its end, does not diminish Dieker's culpability . . . ."); *c.f. United States v. Joselyn*, 206 F.3d at 155 n.10 (noting that knowledge of fraud by corporate supervisor does not negate the defendant's intent to defraud his company). It is altogether commonplace in prosecutions for fraud offenses for there to be witnesses who were aware of the fraud, but did not participate in it. While one may ascribe moral culpability to the knowing bystander for his inaction, the perpetrator is no less guilty. Although Merrill Lynch's knowledge of Carpenter's fraud may be relevant in the civil trial against *Merrill Lynch*, it has no bearing on Carpenter's state of mind in this case.

Carpenter of course could make the same argument he made with respect to Nancy Sawyer's deposition testimony; that is, the documents reflect Carpenter's disclosures concerning

his business that evince a general good faith openness.  Even assuming that the fact of his

disclosures were probative of good faith – and for reasons articulated above concerning the

Sawyer testimony, they are not – the three documents add nothing to the evidence that was

already before the jury.  The documents concern internal communications among Merrill Lynch

employees, not with Carpenter.  Inasmuch as Carpenter could claim that the documents reflect

that he disclosed the information about his business on his website, the evidence is cumulative,

as the content of the website was admitted at trial (Government Exhibit 185).

The timing of the creation of the documents also makes them substantively irrelevant.

All of three documents were created *after* Merrill Lynch terminated Carpenter's options trading

privileges on September 20, 2000.  If, theoretically, Merrill Lynch's knowledge of the actual

source of Carpenter funds were relevant to show, for instance, Merrill Lynch's condonation of

Carpenter's trades (assuming that could somehow be relevant), its knowledge would not matter

if the information came to Merrill Lynch after the trading stopped.  That is all the documents

show.  Moreover, the documents relate to a period after the date of the latest wiring to Merrill

Lynch charged in the indictment.  *See* Superseding Indictment (Docket Number 34), Count 6.  If

under Carpenter's theory of the case, the crime of wire fraud is complete upon the transmission

of the wire in furtherance of the charged scheme, the documents relate to events that took place

after the offenses associated with the Merrill Lynch counts were complete, and are therefore

immaterial to Carpenter's guilt on those counts.[3]  Furthermore, it bears re-emphasis that like

---

[3] In fact, rather than exculpate Carpenter, the documents actually inculpate him.
Specifically, the October 2, 2000 letter from Stern and Levine confirms, contrary to Carpenter's
protestations at trial, that against his brokers' advice, Carpenter was "using heavy margin and
naked writing and buying of options."

Sawyer's testimony, none of the three documents indicate anything about what Carpenter disclosed to Paine Webber.

Therefore, as substantive evidence, the three documents are immaterial, and do not raise an "actual probability" that Carpenter would have been acquitted had they been available to him before trial.

> **b.      The Malia Email and the October 2, 2000 Letter Are Merely Impeaching of Gary Stern.**

Carpenter argues that the newly discovered documents demonstrate that testimony of the Merrill Lynch broker Gary Stern was false in several respects. *See* Supp. Memo at 11-12. First, they allegedly show that Stern testified falsely at the close of his cross examination when he denied knowledge of Carpenter's true business as of "September 2000." *Id.* at 11-12, 15-17 (quoting relevant testimony). Carpenter's contention is that the recently-produced email from Rasmussen to Stern on September 28, 2000 demonstrates that Stern knew the true nature of Carpenter's business in *September*. *Id.* at 11. He adds that the wording of the October 2, 2000 letter adds credence to this evidence in that the letter implies that Stern was aware at some unspecified point that Carpenter was trading third-party funds. *Id.* Lastly, Carpenter further alleges that the September 20, 2000 fax from Malia to Rasmussen, attaching Benistar's website, establishes that Stern lied when he denied that he visited Benistar's website. *Id.* at 12. Even though Stern was not a party to the fax, Carpenter asserts that "it is simply not credible that Rasmussen did not share Mr. Stern the fax copy of Benistar website." *Id.*

Under the *Wright* test, new evidence that contradicts a witness' testimony, but does not relate to the defendant's guilt or innocence is "merely impeaching," and therefore immaterial. *See Connolly,* 504 F.3d at 216 (holding that even if new evidence demonstrated that witness lied,

it was immaterial because the matter was collateral to the defendant's guilt); *United States v. Rodriguez*, 738 F.2d 13, 17-18 (1st Cir. 1984) (holding evidence that merely contradicts another witness' testimony is impeaching, and therefore not material).  Any knowledge about Carpenter's business gleaned by Stern from the September 28, 2000 email, or whether he visited Benistar's website at any point, is collateral to Carpenter's guilt or innocence.  As stated above, Merrill Lynch's knowledge about Carpenter's business at any point in time had no bearing on Carpenter's intent.  The email is particularly collateral because Stern received it on September 28, 2000, eight days after Merrill Lynch terminated Carpenter's options trading.  To the degree that the information in the email contradicts Stern's testimony about not having any knowledge about Carpenter's business in "September 2000," it is "merely impeaching."  Moreover, the evidence would not have changed the verdict had it been available to Carpenter.  It is hard to conceive that a jury would have been moved had it known that Stern was put on notice about Carpenter's true business as of the last two days of September, that is, a week after Merrill Lynch shut down Carpenter.

### 3.     Rasmussen and Malia Depositions

Carpenter lastly contends that the testimony provided by Rasmussen and Malia in recent civil depositions demonstrates that Rasmussen's trial testimony was false.  *See* Supp. Memo at 18-26.  Here, too, Carpenter's arguments lack merit not only because the evidence concerns collateral issues, but also because it is not clear upon closer review that the deposition testimony is actually inconsistent with Rasmussen's trial testimony.

As with his arguments concerning Stern's testimony, Carpenter focuses on the same irrelevant question of whether Merrill Lynch knew that Carpenter was trading third party funds.

He first asserts that Rasmussen's new deposition testimony demonstrates that his trial testimony was misleading concerning his interpretation of a September 22, 2000 letter he received from Carpenter discussing his "clients," as well as whether Rasmussen viewed Benistar's website two days earlier.  *See* Supp. Memo at 18-20.  As before, Carpenter offers no reason to support the notion that evidence of Merrill Lynch's knowledge was relevant to show Carpenter's intent.  Nor does he explain why events that took place after (or at least simultaneously with) Merrill Lynch's decision to terminate his options trading privileges were probative of his good faith. Notably, the September 22, 2000 letter he cites was itself before the jury as Government Exhibit 157.  Insofar as the letter explicitly states that "[w]e have chosen Merrill as our depository for our clients," the jury was aware that Carpenter made a "disclosure" about his business in the days after the company terminated his options trading.  Thus Carpenter has failed to demonstrate that any alleged inconsistency Rasmussen's testimony concerns something more than a collateral and cumulative matter, much less a point so weighty as to cast doubt on the verdict.

Carpenter's remaining arguments concerning the alleged inconsistencies between Rasmussen's deposition and trial testimony involve the same immaterial issues.  Moreover, the testimony does not appear actually inconsistent.  On pages 22 and 23 of his Supplemental Memorandum, Carpenter quotes a passage from Rasmussen's trial testimony which, according to Carpenter, is "incomplete, false and misleading" because Rasmussen does not mention in his conversations with Malia on September 20, 2000, that Malia informed him about Benistar's website.  *See* Supp. Memo at 23-24.  The allegedly offending passage in Rasmussen's trial testimony consists entirely of a series of leading questions by defense counsel and invariably affirmative responses.  *See* Exhibit 5 at 166.  At no point was Rasmussen asked a non-leading

question that would have allowed him to describe his conversations with Malia.  It is unremarkable that a trial attorney would ask a series of yes-or-no questions on cross-examination to make a specific point, as Carpenter's counsel was doing here, but one would hardly expect a full elaboration from the witness concerning the subject matter.  A witness after all is expected to answer a yes-or-no question with either a "yes" or "no."  Furthermore, had Rasmussen been asked about his second conversation with Malia on September 20, the testimony would have been decidedly *unfavorable* to Carpenter.  In other words, if his responses mirrored Malia's deposition testimony, the jury would have heard that Merrill Lynch management shut Carpenter down immediately upon surmising that the money he was trading in options came from a real estate escrow.  *See* Supp. Memo at 21-22.

In his final salvo, Carpenter insinuates that in his deposition, Rasmussen admitted that he gave false testimony at trial.  *See* Supp. Memo at 24-26.  Specifically, in another series of yes-or-no questions, Rasmussen seemingly agrees that false statements were made to authorities by Merrill Lynch and that he himself testified falsely at the second criminal trial:

> Q:     You agree that the – Merrill Lynch sent a letter to the SEC that had facts in it that were incorrect, correct?
>
> A:     Correct.
>
> Q:     And you agree that they sent a response to the NASD that was incorrect, right?
>
> A:     Correct.
>
> Q:     And you agree that you testified to facts that turn out not to be true, correct?
>
> A:     Correct.

*See* Supp. Memo at 24-25.  The examining attorney goes on to suggest that Rasmussen had a duty to report to the court the purportedly inaccurate testimony.  *Id.* at 25.

17

Carpenter characterizes this series of questions and answers as a "remarkable exchange," but he does not explain why it is so.  *Id.* at 26.  Although Carpenter invites the Court to infer that Rasmussen admitted that he lied on the witness stand in the criminal case, the deposition transcript, the relevant passage of which is attached hereto as Exhibit 5,[4] tells a different story. Earlier in his deposition, Rasmussen was examined about his knowledge of the subject of the first two "remarkable" questions-and-answers quoted above, concerning Merrill Lynch's submissions to the SEC and the NASD.  *See* Exhibit 5, at 141-42, 147-48.  In both instances, the questions concerned matters of which Rasmussen was *unaware* prior to the submissions to the SEC and NASD.  *Id.*  In other words, the testimony does not indicate at all that Rasmussen knowingly submitted false information to the SEC or the NASD.

As for Rasmussen's affirmative response to the question, "And you agree that you testified to facts that turn out not to be true, correct?," it is not clear what testimony Rasmussen was referring to.  The government has read the transcript and cannot glean whether Rasmussen is referring to the SEC and NASD submissions or something else.  For whatever reason, Carpenter does not begin to explain the reference.  In any case, Rasmussen did not admit to testifying falsely.  The question literally asked him whether he "testified to facts that *turn out* not to be not true," not whether he testified to things he knew not to be true at the time of his testimony. Indeed, Rasmussen emphatically asserted earlier in his testimony that he never has testified falsely.  Referring to the examining attorney's insinuation that he had covered up information, Rasmussen stated:

---

[4] The page references to this exhibit are the page numbers at the bottom of the page.

> I think it's a joke, because I've never done anything wrong. I have worked hard
> in this company and so on. I'm not trying to cover anything up. And you're
> suggesting that I'm trying to cover anything up, and that's just absolutely
> ridiculous to me, absolutely ridiculous.

Exhibit 5 at 182-183.

In short, Carpenter has shown no inconsistency in Rasmussen's testimony, much less an admission of false testimony. Thus Rasmussen's deposition testimony, as well as Malia's, is cumulative evidence under *Wright*.

## C.     CONCLUSION

Carpenter's motion for new trial, which he has styled as a "Supplemental Memorandum" to his earlier post-trial motions, should be rejected. Carpenter has failed to invoke, much less satisfy, the stringent test under *Wright* for new trial motions. The "new" evidence he touts is, in every instance, collateral to the issue of his guilt or cumulative of evidence presented at trial, or both. And he does not establish that any of the evidence is so weighty as to create an "actual probability" that the verdict would have been different had the evidence been available to him before trial.

III.   **CARPENTER'S INSINUATION THAT THE GOVERNMENT HAS NOT ACTED PROMPTLY ON POST-TRIAL MATTERS IS INACCURATE.**

As a postscript to the government's argument on the merits, it is necessary to set the record straight concerning Carpenter's misleading insinuation that the government has not acted promptly in dealing with post-trial developments. *See* Supp. Memo at 2-8. The long-and-short of it is that the government has given Carpenter a fair opportunity to develop his arguments concerning the new Merrill Lynch documents.[5]

Since the defendant announced in March that Merrill Lynch had uncovered "explosive" new documents that would exonerate him, *see* Docket Number 343 at 1, the government has not impeded, and indeed has facilitated, his ability to present his arguments for a new trial both to the government and the Court.  To the extent that the government received Merrill Lynch documents that were not already in Carpenter's hands, it immediately produced them to him. *See* Docket Number 348 at 2.  Moreover, the government did not object to the defendant's request to serve Merrill Lynch with a document subpoena pursuant to Rule 17(c).  *See* Docket Number 345 at 3.  When Carpenter asked to meet with the prosecutors assigned to the case concerning the import of the new evidence, the prosecutors met with them.  At the June 11, 2009 meeting at the U.S. Attorney's Office, defense counsel asked the prosecutors to dismiss the case, without having submitted a memorandum to support their arguments and knowing that line AUSAs are not authorized to dismiss a case without the prior approval of the United States Attorney. Nevertheless, the prosecutors suggested that in order for them to appreciate the evidence, it

---

[5] The government will spare the Court a tit-for-tat inclusion of all the correspondence between the parties since the new evidence was uncovered, but if the Court wishes to see the letters, the government would promptly provide them.

would be helpful if the defense team articulated its arguments in a memorandum, and then have a follow up meeting with the prosecutors to discuss it.  In addition, without defense counsel's asking, the undersigned AUSA later arranged to include managers in the U.S. Attorney's Office to participate in the meeting.

The defense team submitted its memorandum to the government on September 1, 2009, over two months after the first meeting.  At defense counsel's request, the follow-up meeting was postponed, and was rescheduled for September 29.  At that meeting, defense counsel made a presentation to the assigned prosecutors, as well as their supervisors.  The government attorneys asked various questions about Carpenter's arguments, without expressing an opinion about whether a new trial would be appropriate. *See* Exhibit 8, Letter of Paul Levenson to John Pappalardo, dated October 9, 2009.  They also asked for further explanation of the reasons why defense counsel believed that Stern and Rasmussen testified falsely, as in the government's view, Carpenter's memorandum did not make those points clear.  *Id.*  Carpenter's attorneys thus produced another memorandum the following week, purporting to identify perjurious testimony. *Id.*  The government told Carpenter's attorneys that they would need time to review the material and to *confirm* that the government had received everything produced by Merrill Lynch.  *Id.* Carpenter decided not to allow the process, which began at his request, to play itself out.  *See* Letter of Paul G. Levinson to John Pappalardo, dated October 30, 2009, attached as Exhibit 9, hereto.  Evidently prompted by the loss of a business opportunity as a result of the pendency of his criminal case, *see* Supp. Memo n.1, Carpenter decided to bring the matter before the Court by filing his Supplemental Memorandum which, as explained above, is really a motion for new trial.

It is certainly Carpenter's right to seek relief based on the discovery of new evidence irrespective of the government's review of the material.  But the suggestion that the government has not acted promptly on the matter is simply inaccurate, and fits a long pattern of hollow accusations of prosecutorial misconduct in this case.  As it stands now, the government has confirmed that Carpenter has received all of the evidence recently produced by Merrill Lynch, except for a production made by Merrill Lynch to the exchangors on November 4, 2009, which is reportedly being sent to Carpenter today.  *See* Exhibits 10 and 11 (letters between the undersigned prosecutor and counsel for Merrill Lynch).  According to Merrill Lynch's counsel, the liability phase of the trial is now complete, but there remains a damages phase and a sanctions phase, along with a new complaint recently filed by two exchangors (Fitzgerald and Darling) who were not part of the current suit.  *Id.*  Merrill Lynch confirms that Carpenter will receive any new discovery generated in these matters in its possession.  *See* Exhibits 10 and 11.  Under Rule 33(b)(1), Carpenter will have up to three years after the verdict in this case to file a motion for new trial in the event that any evidence generated from further proceedings warrants it.  As it has stated repeatedly, the government remains open to evaluating any new evidence Carpenter might have to present.  For the reasons stated above, however, Carpenter has failed to establish that the new evidence on which he relies in his Supplemental Memorandum entitles him to a new trial.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:

/s/ Jonathan F. Mitchell
JONATHAN. F. MITCHELL
JACK W. PIROZZOLO
Assistant U.S. Attorneys

22

## **Certificate of Service**

I hereby certify that on this 12th day of November, 2009, I served on counsel of record in the foregoing matter the Government's Response to Defendant's "Supplemental Memorandum" Concerning "New" Evidence, by means of the ECF system.

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell