UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER | ) | |

## DEFENDANT'S STATUS REPORT

Defendant Daniel E. Carpenter submits this Status Report to apprise the Court of recent decisions in the underlying civil case by Judge Neel of the Suffolk Superior Court. These decisions, particularly regarding the perjured testimony of Merrill Lynch broker Gerald Levine, contain findings that support the pending motions for mistrial, new trial and acquittal in this case.

Judge Neel's first decision relates to the Exchangors' direct lawsuit against Merrill Lynch in which they sought upwards of $400 million in damages arising from their initial $8.6 million loss for which Mr. Carpenter and BPETCO have already paid them $15.3 million. *Cahaly v. Benistar Property Exchange Trust Co., Inc.*, 2011 WL 255190 (Mass. Super. Jan. 11, 2011). The Exchangors sought this large amount of damages even though none of them had accounts at Merrill Lynch when the money was lost at PaineWebber. As a result of this decision, the Exchangors are now slated to receive an **additional** $19.4 million from Merrill Lynch on top of the $15.3 million that they have already received from Mr. Carpenter and BPETCO — for a total payout of almost $35 million on their initial $8.6 million investment!

Judge Neel's second decision relates to the Exchangors' motion for sanctions against Merrill Lynch and its attorneys Bingham McCutchen in which they sought $120 million in sanctions for Merrill's and Bingham's withholding of vital documents and the presentation of false testimony. *Cahaly v. Benistar Property Exchange Trust Co., Inc.*, 2011 WL 255290 (Mass. Super. Jan. 11, 2011).

1

Levine's 2008 trial testimony was critical to the government's case in several key respects. First, Levine adamantly denied that he ever communicated with or spoke to Attorney David Patterson when the BPETCO accounts were opened at Merrill Lynch in October 1998. Tr. 7:99 (Levine: "I'm saying I had no conversation with a David Patterson."); Tr. 7:109 (Q: "Isn't it true, sir, that you were on a phone call with Dan Carpenter and David Patterson?" Levine: "No." Q: "It's not true?" Levine: "It's not true."). Second, Levine was just as adamant that he had no idea that Mr. Carpenter and BPETCO were investing client funds as part of a property exchange business. Tr. 7:120-21 (Q: "Isn't it true - - sir, isn't it true, that you knew from October of 1998 that Dan Carpenter was engaged in a property exchange business?" Levine: "No." Q: "Where he was using clients' funds and investing clients' funds?" Levine: "No."). And third, Levine vehemently denied receiving the BPETCO agreements from Patterson showing that the money going into the accounts belonged to Patterson's client. Tr. 7:118, 119 (Q: "You didn't receive the contracts that Mr. Patterson sent by fax?" Levine: "No." Q: "You didn't receive the exchangor agreement? You received nothing that was contained in that cover letter?" Levine: "Nothing." Q: "You never received it?" Levine: "No.").

However, based on evidence that was disclosed by Merrill Lynch for the first time in 2009, Judge Neel recently found that Levine in fact **did** speak to Patterson in October 1998, that Levine **did** receive the BPETCO agreements that Patterson sent him, and that Levine **knew** all along that the funds in the BPETCO accounts belonged to third parties:

> Levine testified that he does not recall speaking with Patterson, and he denies that he ever understood that the Benistar accounts contained third-party escrow funds. **The Court finds that Levine did speak with Patterson, received the documents which Patterson sent him immediately thereafter, [and] understood that the Benistar accounts contained third-party escrow funds**.

*Cahaly*, 2011 WL 255190, at *6 (emphasis added).  This Court can take judicial notice of these findings and hold that Levine committed perjury in this Court on a material issue.  *See* Fed. R. Evid. 201(b); *White v. Gittens*, 121 F.3d 803, 805 n.1 (1st Cir. 1997) ("we may take judicial notice of published state court dispositions of cases.").[1]

Levine's testimony on these points was critical because he was responsible for opening the BPETCO accounts and had the primary interaction with Mr. Carpenter.  Tr. 7:59 (Q: "What role, if any, did you have in opening the accounts?"  Levine: "I prepared the opening-account forms by asking Dan certain specific questions as to the type of accounts he wanted to open.").  By convincing the jury that Mr. Carpenter misled Levine regarding the source of the funds in the accounts, it was easy for the government to convince the jury that he also misled the Exchangors regarding how the funds were being invested — even without presenting evidence of oral or written misrepresentations.  Once the jury learned that $8.6 million of the Exchangors' money had been invested in "risky" stock options and had been lost (without also learning that Mr. Carpenter had already paid back $15.3 million), the result was virtually pre-ordained (which likely explains the jury returning a guilty verdict in little over an hour after a three-week trial).

Furthermore, the government knew, should have known, or at least suspected that Levine would commit perjury on these critical issues.  Tr. 13:15 (The Court: "Does the government believe Mr. Levine's testimony?"  AUSA Pirozzolo: "As to the issue of whether or not he received that call?  The most charitable way I can put it is that he has a failure of recollection so complete that he believes, **but I do not think that his testimony is credible, your Honor, as to that point.**") (emphasis added).  The government certainly suspected that Levine would commit

---

[1]  Although Judge Neel's decisions contain dicta that there was "improper" and "aggressive, high-risk uncovered option trading" in the BPETCO accounts, *Cahaly*, 2011 WL 255190, at *1, this Court has consistently ruled that how the money was traded after being obtained is irrelevant to the charged offenses.  *See*, *e.g.*, *United States v. Carpenter*, 405 F. Supp. 2d 85, 93-94 (D. Mass. 2005).  Moreover, the government failed to prove that the trading involved "uncovered" or "naked" options.

perjury regarding his interactions with Patterson based on the way the government framed its questions — asking Levine whether he could "recall" communicating with Patterson or receiving the documents. Tr. 7:75 (AUSA Pirozzolo: "[D]o you **recall** communicating with a man named David Patterson?" AUSA Pirozzolo: "Do you **recall** receiving any faxes or other information from a Mr. David Patterson?") (emphasis added).

Judge Neel also found that "[o]n October 21, 1998, attorney David Patterson, **at Carpenter's suggestion**, called Levine about the Benistar account at Merrill. He told Levine that his client's escrow money was to be placed in an account in Benistar's name for the purpose of completing a § 1031 exchange." *Cahaly*, 2011 WL 255190, at *5 (emphasis added). If Mr. Carpenter harbored any criminal intent to obtain client funds by false pretenses, he certainly would not have been open and transparent with Patterson and Levine when the BPETCO accounts were first opened at Merrill Lynch, and he certainly would not have put together a client's attorney (Patterson) with the lead broker at Merrill Lynch handling all of BPETCO's option investments (Levine) if that was where the "fraud" was to take place or if he wanted to keep the fact that he would be investing property exchange funds in options a "secret." If Mr. Carpenter made a mistake in his choice of investments, that is not a crime. The documents on their face do not prevent Mr. Carpenter from investing in options, but even if they did, that would normally be expected to result in a civil lawsuit, not a criminal indictment.

Judge Neel's decisions complete the *Napue* circuit, *see Napue v. Illinois*, 360 U.S. 264 (1959), because the government put on a witness that they knew, should have known, or at least suspected would lie about a critical issue, and then did nothing to correct the perjured testimony. Judge Neel found that Merrill Lynch knew of the "Patterson-Levine" conflicting testimony as early as 2002 — especially with respect to the documents referred to as the "Malia file"

4

(showing that other Merrill Lynch employees such as options compliance specialist Martin Malia knew that BPETCO was investing client funds). *Cahaly*, 2011 WL 255290, at Part V. Why the government did not recognize this testimonial conflict after the first trial in 2005 is anyone's guess, but by the 2008 retrial the government could not have possibly failed to realize the inherent conflict between Patterson's and Levine's testimony. The government knew, should have known, or at least suspected that Levine was lying and that he would commit perjury on the witness stand to maintain his decade-old cover story, and once Levine lied the government refused to correct his testimony as required by *Napue*.

The First Circuit has held that a verdict knowingly obtained by perjured testimony must be set aside:

> **But when a prosecutor knowingly uses perjured testimony, "a conviction . . . is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."**

*Perkins v. Russo*, 586 F.3d 115, 119 (1st Cir. 2009) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Mastracchio v. Vose*, 274 F.3d 590, 601 (1st Cir. 2001); and *Gilday v. Callahan*, 59 F.3d 257, 267 (1st Cir. 1995)) (emphasis added). *See also United States v. Quinn*, 537 F. Supp. 2d 99, 122 (D. D.C. 2008) (granting new trial because "the Court is unable to conclude that Quinn received a fair trial and a verdict worthy of confidence"). Judge Stahl's dissent in *Perkins* is particularly telling in regard to Mr. Carpenter's claim that his Due Process rights generally have been violated as a result of Levine's perjury and the government's (at least) tacit acceptance of it:

> The majority dismisses the relevance of what I see as the most important question in this case – **whether the prosecutor knew or should have known of Martin's apparent perjury.** *Agurs*, 427 U.S. at 103, 96 S. Ct. 2392. I would remand for a factual finding on precisely that issue.

*Perkins*, 586 F.3d at 121 (Stahl, J., dissenting) (emphasis added).

Judge Neel's opinions also reinforce the three major themes that have been reiterated by Mr. Carpenter throughout the past decade of continuous investigation, indictment and prosecution of this case. First, no crime was committed. This has always been a civil dispute that should have (and has) been handled by the civil courts. *See United States v. Goyal*, 2010 WL 5028896, at *9 (9th Cir. Dec. 10, 2010) (Kozinski, J., concurring) ("This is just one of a string of recent cases in which courts have found that federal prosecutors overreached by trying to stretch criminal law beyond its proper bounds."). Second, other than lose money, Mr. Carpenter did nothing wrong. There was no theft, no oral or written misrepresentations, and no obtaining money by false pretenses because at the outset Mr. Carpenter told Levine (and caused Patterson to tell Levine as well) that he was investing client funds generated from property exchanges. And third, Levine committed perjury and made false statements to government agents and, if not for him lying consistently that he did not receive the Patterson materials and never talked with Patterson, then we would probably not even be here today because the government likely would not have indicted this case in the first place.

Finally, not only did Judge Neel find that several other Merrill Lynch employees besides Levine also knew that BPETCO was a property exchange company investing client funds, *see*, *e.g.*, *Cahaly*, 2011 WL 255190, at *8 (service manager Nancy Sawyer "developed the understanding that 'it was clients' money in the account,' and that Benistar was buying and selling properties on behalf of those clients"), but Judge Neel also found that "after September 20, 2000, [administrative manager Thomas] Rasmussen and [branch manager Hassan] Tabbah, managing agents of Merrill, **knew the nature of Benistar's business as reflected on Benistar's website**." *Id.* at *14 (emphasis added).

This finding is in stark contrast to Rasmussen's 2008 trial testimony regarding his understanding of a particularly important statement appearing in Mr. Carpenter's September 22, 2000 letter to Merrill Lynch complaining about the trading restrictions (Ex. 157), in which Mr. Carpenter states that BPETCO has chosen Merrill as a "depository for our clients."  Tr. 8:50 (AUSA Pirozzolo: "What is that in reference to?" Rasmussen: "As far as I was concerned, his Benistar relationships.").

Based on these new developments, Mr. Carpenter respectfully requests that the Court grant his motion for mistrial and dismiss the underlying indictment with prejudice at this time, and rule on the other motions at the Court's convenience.

Dated:  February 3, 2011

>Respectfully submitted,
>DANIEL E. CARPENTER,
>By his attorneys,
>
>/s/ *Jack E. Robinson*
>Jack E. Robinson (BBO # 559683)
>**ROBINSON LAW OFFICES**
>300 First Stamford Place, Suite 201
>Stamford, CT 06902
>(203) 425-4500

**CERTIFICATE OF SERVICE**

I hereby certify that on the date hereof a true and accurate copy of the foregoing was served on all notice parties through the Court's CM/ECF system.

>/s/ *Jack E. Robinson*
>Jack E. Robinson