UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 04-10029-GAO

UNITED STATES OF AMERICA

v.

DANIEL E. CARPENTER,
Defendant.

OPINION AND ORDER
September 1, 2011

O'TOOLE, D.J.

The defendant, Daniel E. Carpenter, was, for the second time, tried before a jury on a Superseding Indictment that alleged fourteen counts of wire fraud in violation of 18 U.S.C. § 1343 and five counts of mail fraud in violation of 18 U.S.C. § 1341. Following his first trial and conviction in July 2005, this Court granted the defendant's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 on the basis of several prejudicial inflammatory remarks made by the government during its closing argument. United States v. Carpenter, 405 F. Supp. 2d 85, 101-03 (D. Mass. 2005). That order was affirmed on appeal, United States v. Carpenter, 494 F.3d 13, 24 (1st Cir. 2007), and subsequently the defendant was re-tried. After a very brief period of deliberation, the second jury found the defendant guilty on all counts. He then moved again for a judgment of acquittal or in the alternative for a new trial.

For the reasons discussed below, the evidence was sufficient to sustain a conviction on all counts, and therefore the defendant is not entitled to a judgment of acquittal. However, because there is a very substantial possibility that the jury's verdict was based on a theory of the case that

was not sufficient to support a conviction on any count, the interest of justice requires that the defendant's conviction be vacated and a new trial be ordered.

## I.    General Background

The defendant was the Chairman of Benistar, Ltd., a corporation headquartered in Simsbury, Connecticut. Benistar Property Exchange Trust Company, Inc. was a Benistar subsidiary located in Newton, Massachusetts. Martin Paley was its President. Because the corporate formalities are not significant for the issues at hand, these entities will both be referred to as "Benistar." The defendant and Paley formed the subsidiary to serve as a qualified intermediary in property exchanges performed pursuant to Section 1031 of the Internal Revenue Code. See 26 U.S.C. § 1031.

The functions necessary to Benistar's property exchange business were divided between the Newton office and the Simsbury office. Paley and the Newton office handled the marketing of Benistar's property exchange services to potential exchangors, as well as the logistical details of arranging the property exchange transactions. The defendant and the Simsbury office then handled the exchange funds, once obtained. These funds were placed in accounts at Merrill Lynch and, later, at PaineWebber, through which the defendant invested in securities, including stock options.

A property exchange, also known as a "like kind exchange," allows the seller of property—in this case, real estate—to defer the payment of capital gains tax when that property is exchanged for property of like kind—here, another piece of real estate. See id. § 1031(a)(1). When properly completed, this exchange allows the exchangor to delay recognizing a gain on the property sold. See id. The tax basis of the relinquished property carries forward to the replacement

property, and the recognition of a gain and payment of the attendant capital gains tax are thereby delayed until occasioned by some future event. See id. § 1031(d).

For the replacement property to qualify as "like kind" it must be identified within forty-five days and be purchased within one hundred and eighty days of the sale of the relinquished property. See id. § 1031(a)(3). The exchangor also must not receive the proceeds from the sale of the relinquished property, either actually or constructively, during the prescribed period. See 26 C.F.R. § 1.1031(k)-1(a). A qualified intermediary can be used to hold the sale proceeds in the interim, preventing the exchangor's receipt of the funds. See id. § 1.1031(k)-1(g)(4). The tax provisions contain no requirement or restriction as to how the qualified intermediary is to hold the proceeds, and, so far as the tax code is concerned, the intermediary may invest the proceeds or not in ways that it may see fit. The attributes of the relationship between the qualified intermediary and the exchangor are generally set by their private agreement.

## II. The Superseding Indictment

The Superseding Indictment charged the defendant with fourteen counts of wire fraud in violation of 18 U.S.C. § 1343 and five counts of mail fraud in violation of 18 U.S.C. § 1341. These statutes proscribe substantially the same conduct, the difference generally being in the use of either the mails or interstate wire communications. To convict the defendant of mail or wire fraud, the government had to prove beyond a reasonable doubt the defendant's knowing and willful participation in a scheme to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations, or promises as to a material matter or matters, with the specific intent to defraud, and the use of the mails or interstate wire communications in furtherance

3

of the scheme. See United States v. Woodward, 149 F.3d 46, 54 (1st Cir. 1998) (quoting United States v. Sawyer, 85 F.3d 713, 723 (1st Cir. 1996)).

Generally, the government alleged in the Superseding Indictment, and argued to the jury, that although Benistar represented to seven exchangors that their exchange funds would be held safely and securely in an interest-bearing account, instead the defendant was investing the exchange funds in risky stock options. It was a necessary part of the government's case to argue that the defendant specifically intended to obtain the exchangors' money by making false representations. The government's theory was that the defendant specifically intended to obtain the exchange funds on the basis of representations to the exchangors that the exchange funds would not be subjected to any risk and would simply be "parked" in an escrow account, when he knew that these representations were false because his investment strategy was in fact extremely risky.

Each of the nineteen counts of mail or wire fraud alleged represents an instance when funds were obtained by Benistar for a property exchange transaction between August 8, 2000 and December 14, 2000 with one of seven exchangors: Bellemore Associates, Joseph Iantosca, Byron Darling, Eliot Snider, Gail Cahaly, Brian Fitzgerald, and Jeffrey Johnston. Most of the exchangors entered into more than one transaction during this period, hence the nineteen counts.

## III. Summary of Pertinent Evidence

### A. Representations

When soliciting potential exchangors, Paley routinely presented them with Benistar's standard marketing materials (the "marketing materials"). When Paley's marketing pitch proved successful, he presented the exchangors with the agreements necessary to effectuate the property exchange (the "exchange documents") and executed them on behalf of Benistar. The marketing

4

materials and exchange documents, and the allegedly false representations contained therein, were crucial pieces of evidence in the government's case against the defendant. Although the defendant was never directly involved in presenting these documents to the exchangors, the government connected these documents to him by evidence that he reviewed and approved all of the documents used by Paley, had authored some parts of them, and therefore had knowledge of and authorized the representations being made to the exchangors. An examination of the content of these documents is important.

1. The Marketing Materials

a. *PowerPoint Presentation Slides*

Paley prepared a PowerPoint presentation entitled "Benistar Presents: 1031 Tax-Deferred Property Exchanges," which explained the mechanics of a § 1031 exchange, its tax advantages, and the role of a qualified intermediary. It also provided guidance in choosing an intermediary and suggested why Benistar should be an exchangor's choice:

- Your selected qualified intermediary should have a lot of experience with exchanges. They should have an exemplary reputation among real estate and legal professionals. Examine their track record, and be sure to check references.

- Because unexpected details can have major ramifications, the intermediary should be able to manage the entire 1031 process, from beginning to end.

- A good benchmark for any proposed intermediary is their experience with reverse exchanges. Any firm which lacks this experience may not have what it takes to properly manage your exchange.

- Ask about the security of your funds, and find out what guarantees are offered. The intermediary should be bonded, and carry Errors & Omissions insurance coverage.

- This is a place where quality is imperative! Do not select an intermediary on the basis of price alone.

- With more than $100MM in exchanges successfully completed since 1995, Benistar has the experience you need in a qualified intermediary.

- Benistar can manage your exchange from start to finish, because we know the entire process.

- Benistar routinely handles reverse exchanges.

- Merrill Lynch Private Bank is used for all our escrow accounts. This provides 3% – 6% interest on the escrow. Funds transfer is accomplished in a state-of-the-art environment, utilizing electronic wire transfers for security and timeliness.

(Trial Ex. 1 at 14-15.) These slides were shown or provided in paper form to Eliot Snider, (id.; Trial Tr. 2:113-114), Brian Fitzgerald, (Trial Ex. 59; Trial Tr. 4:119-124), an advisor to Bellemore Associates, (Trial Tr. 6:19), Jeffrey Johnston, (Trial Ex. 119; Trial Tr. 12:96-97), and Joseph Iantosca's attorney, (Trial Ex. 75; Trial Tr. 5:51-52). There was no evidence at trial that these slides were provided to Byron Darling or Gail Cahaly.

### b.      *Frequently Asked Questions About 1031 Property Exchange*

Paley provided to exchangors a document entitled "Frequently Asked Questions About 1031 Property Exchanges," which provided brief answers to such questions as "Why can't I just do this myself?," "Can't my attorney act as my Qualified Intermediary?," "My attorney or accountant isn't familiar with 1031. What can I do?," "Why shouldn't I use a title company to do my exchange?," "Will a Property Exchange flag me as Audit Bait?," "What type of property can I use as a replacement?," and "What if I cannot complete the exchange, or if the value of the replacement property falls short of the requirements?" (Trial Ex. 2 at 19-20.) It also answered the question, "What will the intermediary do with my money?":

> One important factor to consider in your selection of an intermediary is how they will handle your money. BENISTAR Property Exchange has a long-standing reputation for trustworthiness, and is part of BENISTAR LTD, the largest 419 trust plan administrator in the nation.

6

Benistar has accounts with major banking and investment firms, such as Merrill Lynch. As required under the Safe Harbor provisions for exchanges, these accounts are under our sole control. Escrow accounts are restricted to paying out funds only for a subsequent closing, or to return funds to the original property owner. Written request is required for any disbursements.

(Id. at 20.) Paley provided this document to Eliot Snider, (Trial Ex. 2; Trial Tr. 2-114), the advisor to Bellemore Associates, (Trial Ex. 26), Brian Fitzgerald, (Trial Tr. 4:127), Joseph Iantosca's attorney, (Trial Ex. 76), and Jeffrey Johnston, (Trial Ex. 118). There was no evidence at trial that this document was provided to Byron Darling.

Gail Cahaly was provided with a different version entitled "IRC §1031 Property Exchanges: Frequently Asked Questions." (Trial Ex. 37.) This document similarly provided brief answers to questions such as "Why Can't I Do This Myself?," "How is BENISTAR Property Exchange Different from a Title Company Intermediary?," "Is Exchanging an 'Audit Trigger'?," "Can I Buy Any Type [sic] Investment Property as a Replacement?," "What If My Attorney or Accountant Is Not Familiar with Exchanges?," "Why Can't My Attorney or Accountant Act as My Qualified Intermediary?," "Where is Nationwide Property Exchange? Who is BENISTAR Property Exchange?," and "What If I Cannot Complete an Exchange, or Fall Short of the Required Amount of Replacement Value?" (Id. at 1-2.) It posed the question "Can I Trust BENISTAR Property Exchange with My Money?" to which it gave the answer:

First, understand that BENISTAR Property Exchange is a part of BENISTAR, LTD., the largest 419 Welfare Benefit Plan Administrator in the country. Next, take a look at the steps we take:
- We have set up accounts with major banking and investment firms - accounts under our sole control, as required for these exchanges (We must take possession of the sale proceeds to satisfy the "Safe Harbor" rules outlined in §1031.)
- Our accounts are restricted to paying out funds only for a subsequent closing, or to return funds to the original property owner.
- None of our personnel have access to your account to withdraw money.

7

(Id. at 1.) There was no evidence at trial that this document was provided to any other exchangor than Gail Cahaly.

### c. 1031 Property Exchange: An Overview

A one-page document entitled "1031 Property Exchange: An Overview" explained the various circumstances under which one could benefit from a § 1031 exchange. It explained the benefits of a § 1031 exchange in summary form, and stated that "BENISTAR, Property Exchange Trust Company has a proved [sic] track record in all forms of property exchange. . . . Our solid experience and depth of knowledge makes BENISTAR the premier choice as qualified intermediary . . . ." (Trial Ex. 3.) This was provided to Eliot Snider, (id.), the advisor to Bellemore Associates, (Trial Ex. 24), Joseph Iantosca's attorney, (Trial Ex. 79), and Jeffrey Johnston, (Trial Ex. 120). There was no evidence at trial that it was provided to Byron Darling, Gail Cahaly, or Brian Fitzgerald.

### d. 1031 Property Exchange: Legal Authority

Paley provided some of the exchangors a document entitled "1031 Property Exchange: Legal Authority," which contained a list of cases it suggested provided legal authority for the exchanges, and a brief explanation of the relevant IRS Code provisions and regulations. (See Trial Ex. 4.) This document was provided to Eliot Snider, (id.), Brian Fitzgerald, (Trial Ex. 62), Joseph Iantosca's attorney, (Trial Ex. 77), and Jeffrey Johnston, (Trial Ex. 122). There was no evidence that this document was provided to the other exchangors.

### e. Identifying a 1031 Exchange Opportunity

Some of the exchangors were given a document entitled "Identifying a 1031 Exchange Opportunity," which gave examples of various scenarios in which one might want to use a § 1031 property exchange. (See Trial Ex. 5.) This was provided to Eliot Snider, (id.), the advisor to

8

Bellemore Associates, (Trial Ex. 25), Brian Fitzgerald, (Trial Ex. 63), Joseph Iantosca's attorney, (Trial Ex. 78), and Jeffrey Johnston, (Trial Ex. 121). There was no evidence at trial that it was given to Byron Darling and Gail Cahaly.

### f. New England Real Estate Journal Article

Copies of an article entitled, "These are the ABCs of Tax Deferred Exchanges," which was written by Paley and published in the New England Journal of Real Estate, were provided to some of the exchangors. This article explained what a property exchange was, why one would consider doing an exchange, the different types of exchanges that are possible, the rules surrounding an exchange, and the mechanics of an exchange. (See Trial Ex. 6.) In the final section, entitled "Selecting an Exchange Facilitator," the article stated:

> Ask about the security of your funds, and what assurances you will have to assure that your funds and your exchange status will be protected.
> Safeguarding your exchange should translate directly to your personal peace of mind. A good rule of thumb is to evaluate an intermediary primarily based upon their interest in your exchange – not your exchange fee, your closing fee, or an associated title insurance premium.

(Id. at 29.) This article was provided to Eliot Snider, (id.), the advisor to Bellemore Associates, (Trial Ex. 27), Brian Fitzgerald, (Trial Ex. 61), and Joseph Iantosca's attorney, (Trial Ex. 80). There was no evidence at trial that the article was given to Byron Darling, Gail Cahaly, or Jeffrey Johnston.

### 2. Exchange Documents

### a. Exchange Agreement

Evidence was presented at trial that, other than Gail Cahaly, each exchangor was given, and signed, a document entitled "Exchange Agreement." During the period in which Benistar placed the exchange funds in accounts at Merrill Lynch, Elliot Snider, Bellemore Associates,

9

Byron Darling, and Joseph Iantosca signed substantially identical versions of the Exchange Agreement. (See Trial Exs. 10, 29A, 52, 84A.) Paley testified that paragraph ten was authored by the defendant. (Trial Tr. 11:14-15.) In the Merrill Lynch version of the Exchange Agreement, that paragraph stated:

> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the Relinquished Property shall be held and invested with Merrill Lynch Private Client Group in either 3% per annum in a Merrill Lynch Ready Asset Money Market account, or 6% per annum in a Merrill Lynch investment account. This latter account cannot be liquidated for 30 days whereas, the Ready Asset Money Market account can be liquidated at any time upon 48 hours written notice during the next business day. Said investment account shall be in the name of Intermediary and shall require the signature of an authorized officer of Intermediary to permit the withdrawal of any portion thereof. By the terms hereof, Intermediary shall only be required to participate in the withdrawal of funds when instructed by Exchangor and only when the instructions involve the acquisition of the replacement property of the disposition of said proceeds by Intermediary to Exchangor pursuant to the terms of paragraph 2(c) above.

(Trial Exs. 10 ¶ 10,[1] 29A ¶ 10, 52 ¶ 10, 84A ¶ 10.)

After the accounts were moved to PaineWebber, paragraph ten of the Exchange Agreement read:

> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the Relinquished Property shall be held and invested with PaineWebber at either 3% per annum, or 6% per annum in a PaineWebber account. This latter account cannot be liquidated for 30 days whereas, the former account can be liquidated at any time upon 48 hours written notice during the next business day. Said investment account shall be in the name of Intermediary and shall require the signature of an authorized officer of Intermediary to permit the withdrawal of any portion thereof. By the terms hereof, Intermediary shall only be required to participate in the withdrawal of funds when instructed by Exchangor and only when the instructions involve the acquisition of the replacement property of the disposition of said proceeds by Intermediary to Exchangor pursuant to the terms of paragraph 2 (c) above.

---

[1] Paragraph ten of the Exchange Agreement, signed by Eliot Snider, continued "or as otherwise provided in paragraph 2 (c)," which was removed from the later documents. (Compare Trial Ex. 10 ¶ 10, with Trial Exs. 29 ¶ 10, 52 ¶ 10, 84 ¶ 10.)

(Trial Exs. 66 ¶ 10, 90 ¶ 10, 95 ¶ 10, 100 ¶ 10, 105 ¶ 10, 123 ¶ 10.) The PaineWebber version of the Exchange Agreement was signed by Brian Fitzgerald, Joseph Iantosca, and Jeffrey Johnston. (Trial Exs. 66, 90, 95, 100, 105, 123.)

*b.    Escrow Agreement*

Similarly, the evidence at trial established that, other than Gail Cahaly, all of the exchangors signed a document entitled "Escrow Agreement." Paley testified that this document was authored by the defendant. (Trial Tr. 11:14-17.) The Merrill Lynch version of the Escrow Agreement, signed by Eliot Snider, Bellemore Associates, Byron Darling, and Joseph Iantosca, contained the following relevant provisions:

1.    BENISTAR shall open an Escrow Custodial Account under BENISTAR's name at Merrill Lynch for the Exchangor's benefit;

2.    BENISTAR shall have full control over the Exchangor's funds to invest as the Exchangor directs in either the 3% Ready Asset Money Market Fund or the 6% Investment Account;

3.    Only upon the Exchangor's written direction and authorization shall the funds leave the BENISTAR account. Upon the written direction of the Exchangor shall the funds be released and then the funds shall be delivered to one of only two places at the Exchangor's written direction:

   a.    Directly to the Exchangor's account; or
   b.    Directly to the Escrow account for the closing on the Replacement Property to be purchased pursuant to the Exchange Agreement.

(Trial Exs. 11, 29B, 51, 84B.)

The PaineWebber version of the Escrow Agreement was signed by Brian Fitzgerald, Joseph Iantosca, and Jeffrey Johnston, and stated:

1.    BENISTAR shall open an Escrow Custodial Account under BENISTAR's name at PaineWebber for the Exchangor's benefit;

2.  BENISTAR shall have full control over the Exchangor's funds to invest as the Exchangor directs in either the 3% or the 6% Account;

3.  Only upon the Exchangor's written direction and authorization shall the funds leave the BENISTAR account. Upon the written direction of the Exchangor shall the funds be released and then the funds shall be delivered to one of only two places at the Exchangor's written direction:

    a.  Directly to the Exchangor's account; or
    b.  Directly to the Escrow account for the closing on the Replacement Property to be purchased pursuant to the Exchange Agreement.

(Trial Exs. 67, 96, 101, 106, 124.) There was no evidence introduced at trial that Gail Cahaly signed or was given an Escrow Agreement.

### c.  *Exchange Fee Agreement*

Most of the exchangors also signed a document entitled "Exchange Fee Agreement." Eliot Snider and Brian Fitzgerald signed the Merrill Lynch version of the Exchange Fee Agreement, which stated:

> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the Relinquished Property shall be held and invested at Merrill Lynch at the direction and through the financial institutions of Intermediary. Interest accruing in said account will accrue to the benefit of Exchangor. Said investment account shall be in the name of Intermediary and shall require the signature of an authorized officer of Intermediary to permit the withdrawal of any portion thereof. . . .
> . . . .
> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the relinquished property shall be held and invested with Merrill Lynch Private Client Group in either a 3% per annum account or 6% per annum account, with interest accruing as of the third day after receipt. The 6% per annum account can not be liquidated without written thirty (30) days notice, whereas the 3% account can be liquidated by 72 hours written notice. The 6% per annum account will generate 3% interest for the final 30 days after notification.

(Trial Exs. 12, 68.)

The PaineWebber version of the Exchange Fee Agreement was signed by Gail Cahaly and Jeffrey Johnston. It similarly stated:

> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the relinquished property shall be held and invested at PaineWebber in the discretion and through financial institutions of Intermediary. Interest accruing in said account will accrue to the benefit of Exchangor. Said investment account shall be in the name of Intermediary and shall require the signature of an authorized officer of Intermediary to permit the withdrawal of any portion thereof. . . .
>
> . . . .
>
> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the relinquished property shall be held and invested with PaineWebber in either a 3% per annum account or 6% per annum account. The 6% per annum account can not be liquidated without written thirty (30) days notice, whereas the 3% account can be liquidated by 72 hours written notice.

(Trial Exs. 40, 125.) There was no evidence at trial as to an Exchange Fee Agreement signed by Bellemore Associates or Byron Darling.[2]

### d. Account Selection Form

With the exception of Gail Cahaly, a document entitled "Account Selection Form" was presented as having been filled out and signed by each exchangor. The Merrill Lynch version of this form was signed by Eliot Snider, Albert Bellemore, Byron Darling, and Joseph Iantosca. (Trial Exs. 13, 29C, 84C, 89.) On the Account Selection Form, each exchangor indicated a choice of either a "(3% per Annum) Merrill Lynch Ready Asset Money Market Account" or a "(6% per Annum) Merrill Lynch Investment Account." (See Trial Exs. 13, 29C, 84C, 89.) The PaineWebber version of this form was signed by Brian Fitzgerald, Joseph Iantosca, and Jeffrey Johnston. (Trial Exs. 69, 92, 97, 102, 107, 126.) It similarly asked the exchangors to mark their choice between a

---

[2] There was no evidence at trial that Joseph Iantosca signed an Exchange Fee Agreement for any of the charged exchanges, although the defense introduced into evidence a similar Exchange Fee Agreement signed by Iantosca in February 2000, pertaining to a previous property exchange not at issue in the trial. (See Trial Ex. 252.)

"(3% per annum) Account" and a "(6% per Annum) Account." (Trial Exs. 69, 92, 97, 102, 107, 126.)

### 3. Paley's Oral Representations

There was also some evidence about Paley's oral statements to exchangors. Byron Darling testified that Paley told him "that they were honorable people, he repeated that several times, and the money would be perfectly safe." (Trial Tr. 3:104; see also id. at 3:107, 124.) Joseph Iantosca's testimony from the first trial was read into evidence, and included his testimony that Paley told him "give the money and his people can double the money from whatever we have done." (Id. 6:10.) Paley, however, testified that the defendant never authorized him to say anything other than what was in the written agreements. (Id. 11:95.) The government did not rely on these statements in its opening statement or closing argument, and instead focused on the representations contained in the documents as well as the context of a § 1031 exchange.

### B. Carpenter's Trading

When the exchangors sold a property, the proceeds from the sale were wired or mailed to Merrill Lynch and, later, to PaineWebber, for deposit into an account maintained by Benistar. At each institution, the exchange funds were transferred into a trading account from which they were invested by the defendant.

The defendant's trading included investing in stock options, most of which constituted selling a particular kind of stock option known as a "put." The buyer of a put acquires an option to sell a stock at an agreed-upon exercise price. For this right, the put buyer pays a premium to the put seller, or "writer," who then becomes obligated to purchase that stock for the agreed-upon price at the put buyer's direction (i.e., to have the stock "put" to him). If the stock's market value remains above the exercise price, the holder of the put option will not exercise it, and when the option

14

expires, the put seller retains the premium. If the stock's market value dips below the exercise price, the holder of the put option would likely exercise it, thus requiring the put seller to purchase the stock at a price greater than its market value, or to instead simply pay the difference without acquiring the stock. Accordingly, the seller of put options hopes that the particular stock will maintain or increase its price, but stands to lose money if the stock price declines.

The defendant's trading strategy was successful for a time, but as the stock market began to decline in March 2000, his losses began to mount. In mid-September 2000, Merrill Lynch notified the defendant that he would no longer be able to open any new option positions. The defendant then moved his accounts to PaineWebber, where he continued similar trading and sustained increasing losses. On December 19, 2000, PaineWebber notified the defendant that his trading privileges were discontinued.

Some evidence of the defendant's trading loss was admitted at trial. This evidence was not directly relevant to crimes charged. The crimes alleged in the Superseding Indictment—each count alleged a particular instance of use of the mails or wires to execute a scheme to defraud—were complete upon Benistar's having obtained the exchangor's funds in response to Benistar's solicitation and advertising. In each count, the relevant wire or mail transaction alleged was either the transfer of the exchangor's funds to Benistar's custody as intermediary or a related ancillary communication. When the exchangors sent the funds to Benistar, the "obtaining money or property by means of false or fraudulent pretenses, representations, or promises" condemned by the relevant statutes (18 U.S.C. §§ 1341, 1343) had been accomplished. The subsequent risky trading by Carpenter was evidence of the falsity of the prior representations, but it was not itself the *actus reus*. Indeed, on the government's theory, the defendant would not be saved from criminal liability even if his trading strategy had proved lavishly successful if the original

15

representations about how the exchange funds would be held were shown to have been false and intended to induce the exchangors to enter into the transaction. The evidence of loss was admitted for the rather limited purpose of showing that the defendant knew that his investment strategy was resulting in substantial losses. The government's theory was that the defendant knew the content of the marketing materials and exchange documents were being given to exchangors and therefore knew that it was represented to the exchangors that their funds would be held safely in designated Merrill Lynch or PaineWebber accounts. The evidence of the trading loss therefore tended to show the defendant's knowledge that these representations were false, from which his specific intent to defraud could be inferred.

## IV.    Jury Deliberations

The trial transcript reflects that the jury recessed to the jury room to deliberate following the Court's instructions at 2:35 p.m. (Trial Tr. 13:142.) At 4:41 p.m. the jury re-entered the courtroom and delivered its verdict, finding the defendant guilty on all nineteen counts. (Id.) Thus, the maximum amount of time that the jury could have been deliberating was slightly more than two hours.[3]

## V.    Motion for a Judgment of Acquittal or a New Trial

The defendant has moved for a judgment of acquittal pursuant to Federal Rule of Criminal

---

[3] The defendant contends that the jury received the many documentary exhibits from the trial no earlier than 3:00 p.m., an assertion which the government has not disputed. (See Def. Daniel E. Carpenter's Mem. of Law in Supp. of Mot. for J. of Acquittal Pursuant to Fed. R. Crim. P. 29(c) (After Jury Verdict) and in the Alternative for New Trial Pursuant to Fed. R. Crim. P. 33(a) at 2 [hereinafter Def.'s Mem.].) As a practical matter, there also would have been time elapsed between when the jury actually agreed on a verdict and notified the court officer of that fact and when all parties had been assembled in the courtroom for the announcement of the verdict. Accordingly, a reasonable estimate would be that the jury actually spent less than two hours deliberating.

Procedure 29(c) and, in the alternative, for a new trial in the interest of justice under Federal Rule of Criminal Procedure 33(a).

### A.    Sufficiency of the Evidence

The defendant argues that the government presented insufficient evidence to prove beyond a reasonable doubt the elements of mail and wire fraud as to each count alleged in the Superseding Indictment.

A district court's "power to set aside a jury verdict [is] very circumscribed." United States v. Rothrock, 806 F.2d 318, 320 (1st Cir. 1986). Rule 29 of the Federal Rules of Criminal Procedure requires that a judgment be entered acquitting the defendant "of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. In considering whether the evidence at trial was sufficient, the Court must view all of the evidence in the light most favorable to the verdict. United States v. Duclos, 214 F.3d 27, 32 (1st Cir. 2000). In doing so, the Court takes into account all reasonable inferences that could be drawn from the evidence and resolves credibility disputes in favor of the verdict. Id. The defendant must show that "no rational jury could have found him guilty beyond a reasonable doubt." United States v. Scharon, 187 F.3d 17, 21 (1st Cir. 1999). If the evidence equally or nearly equally supports a theory of guilt and a theory of innocence, then "'a reasonable jury must necessarily entertain reasonable doubt,'" and the evidence is therefore insufficient to sustain a conviction. Woodward, 149 F.3d at 57 (quoting United States v. Adjujar, 49 F.3d 16, 20 (1st Cir. 1995)).

The evidence at trial was sufficient to sustain the conviction as to all counts charged in the Superseding Indictment. A rational jury could have concluded, based on the evidence, that the defendant knew that Paley was soliciting exchangors for Benistar using the marketing materials and exchange documents; that he knew of and approved the contents of those documents; that he

17

intended that a material false representation made in those documents would induce the exchangors to enter into a property exchange transaction using Benistar as their qualified intermediary; and that a reasonably foreseeable consequence of the scheme to defraud was the use of the mails or interstate wire communications.

More specifically, there was evidence that each exchangor was given one or more documents that the jury could have found contained false representations that the exchange funds would be placed in a specifically identified account at Merrill Lynch or PaineWebber. On the basis of such representations, the exchangors would have been justified in inferring that it was Merrill Lynch or PaineWebber, and not Benistar, who would be supervising the investment and paying the stipulated rate of interest. For example, Paley's PowerPoint presentation stated that "Merrill Lynch Private Bank is used for all our escrow accounts. This provides 3% - 6% interest on the escrow." (Trial Ex. 1 at 15.) The Merrill Lynch version of the Exchange Agreement stated that the exchange funds "shall be held and invested with Merrill Lynch Private Client Group in either 3% per annum in a Merrill Lynch Ready Asset Money Market Account, or 6% per annum in a Merrill Lynch investment account." (Trial Ex. 10 ¶ 10.) The PaineWebber version stated that the exchange funds "shall be held and invested with PaineWebber at either 3% per annum, or 6% per annum in a PaineWebber account." (Trial Ex. 66 ¶ 10.) The Escrow Agreement stated that Benistar "shall open an Escrow Custodial Account under BENISTAR's name" at either Merrill Lynch or PaineWebber, respectively. (Trial Exs. 11, 67.) The Merrill Lynch version stated that Benistar "shall have full control over the Exchangor's funds to invest as the Exchangor directs in either the 3% Ready Asset Money Market Fund or the 6% Investment Account." (Trial Ex. 11.) The PaineWebber version similarly stated that the funds would be invested in "either the 3% or the 6% Account." (Trial Ex. 67.) The Exchange Fee Agreements stated that the exchange funds would

be "held and invested with Merrill Lynch Private Client Group in either a 3% per annum account or 6% per annum account" or "with PaineWebber in either a 3% per annum account or 6% per annum account." (Trial Exs. 12, 40.) The Account Selection Form asked exchangors to choose between a "(3% per Annum) Merrill Lynch Ready Asset Money Market Account" and a "(6% per Annum) Merrill Lynch Investment Account," and later between a "(3% per Annum) Account" and a "(6% per Annum) Account." (Trial Exs. 13, 69.)

The jury could easily have found such representations to have been material. It is surely understandable that exchangors could be reassured that their funds would be held in stable-sounding accounts at large, established financial institutions, rather than left in the custody of Benistar, a newly introduced and relatively unknown entity. The jury further could have found that the defendant had the requisite specific intent to defraud the exchangors—that he specifically intended for Benistar to obtain their money by false pretenses. His specific intent to defraud could be inferred from his knowledge of the representations made in the documents combined with his knowledge of what he was actually doing with the exchange funds. The jury could have determined instead that the defendant intended to obtain the exchange funds on the basis of the representation that Merrill Lynch or PaineWebber would be investing the exchange funds and promising to pay interest, when in fact he knew that Benistar was the one doing so, and that his aggressive investment strategy made this distinction an even more important one.

The defendant argues that he is entitled to a judgment of acquittal because the government failed to disprove his good faith. The concepts of good faith and the specific intent to defraud are opposite sides of the same coin. See United States v. Mueffelman, 470 F.3d 33, 36 (1st Cir. 2006) (specific intent to defraud "excludes false statements honestly believed to be true and promises or predictions made in good faith"); United States v. Dockray, 943 F.2d 152, 156 (1st Cir. 1991);

19

Carpenter, 405 F. Supp. 2d at 93. If the defendant held an honest belief in the truth of the representations, then he necessarily lacked the specific intent to defraud that must be proven to convict him. Good faith is therefore a complete defense to the charges of mail and wire fraud, and, once raised, must be disproved by the government beyond a reasonable doubt. See Dockray, 943 F.3d at 156; Carpenter, 405 F. Supp. 2d at 93.

The defendant offers several reasons why he believes the government failed to sustain its burden of disproving his good faith, but none of them is persuasive. He argues that the evidence established his honest belief that under the terms of the exchange documents he had unfettered discretion to invest the funds as he wished. The Court rejected this same argument following the defendant's first trial, and rejects it again for the same reasons. See Carpenter, 405 F. Supp. 2d at 93-94. The defendant's intent to deceive the exchangors would not necessarily be negated by an honest belief that, as a purely contractual matter, he had unlimited discretion to invest the funds. For example, it would not be necessarily inconsistent for the defendant to have intended the marketing and exchange documents to mislead the exchangors while at the same time providing him with investment discretion as a matter of contract law. The defendant also points to evidence that he believed in his trading strategy. This is neither relevant nor remarkable. The government did not have to prove that the defendant intended to harm the exchangors by losing their money, and it was not disputed that the defendant wanted the scheme to succeed. Indeed, the defendant's desire to successfully invest the exchange funds so as to enrich himself was a central part of the government's theory. See infra pp. 28-30.

The defendant further contends that the government failed to disprove his good faith because the defendant "believed in good faith that he had made no misrepresentations to the investing Exchangors, and did not cause any representations other than those in the Agreements to

be made to the Exchangors," and "therefore had a good faith belief that the Exchangors were never misled by him or caused to be misled by him into believing that their funds would be 'safe' or 'secure' from investment loss." (Def.'s Mem. 11.) This is, of course, only the defendant's interpretation of the evidence. As already discussed, there was sufficient evidence for the jury to find that he intended to obtain the exchange funds on the basis of representations he knew to be false or misleading.

The defendant cites evidence at trial that tended to support his good faith argument. (See Def.'s Mem. 19, 24-28, 35-38.) For example, there was evidence that the defendant was forthright in answering questions posed to him by David Patterson, an attorney representing an exchangor in an earlier (uncharged) transaction, and that he put Patterson directly in touch with Benistar's primary broker at Merrill Lynch. Although the defendant was never asked how the funds would be invested, his willingness to answer other questions and to put Patterson in touch with Merrill Lynch where he ostensibly could have learned the details of Benistar's trading were circumstantial evidence of his good faith. This, and other similar circumstantial evidence, could have supported, but did not require, an inference that the defendant acted in good faith and lacked the specific intent to defraud. But the jury could have determined that any inference raised by this evidence was disproved by the other evidence from which the defendant's specific intent to defraud could be inferred.

Lastly, the defendant points out that part of the government's theory was that the shortfall in the Benistar accounts caused by the trading losses was probative of the defendant's specific intent to defraud. The government suggested that because the defendant obtained the exchange funds despite knowing that he had lost substantial amounts, he was, by extension, aware that it was becoming increasingly less likely that Benistar would be able to make good on its obligations to

the new exchangors. This, in turn, would make crucial whether that obligation was Benistar's or the much larger financial institutions. The defendant argues, however, that the government never introduced evidence that the defendant was aware of any specific shortfall at the precise time the funds were obtained from each exchangor.

As the government points out in its opposition to the defendant's motion, the defendant overstates the importance of this evidence. (See Gov't's Opp'n to Def.'s Mot. for Acquittal and Alternatively for a New Trial 10.) It was relevant only as circumstantial evidence of the defendant's specific intent to defraud. The defendant's knowledge of a shortfall was probative of his more general knowledge that his trading strategy subjected the funds to substantial risk. Ample other evidence established that the defendant understood his own trading strategy. There was sufficient evidence to sustain a conviction on all counts without any evidence of trading losses or the defendant's awareness of those losses and the resulting shortfall.[4]

The government presented evidence sufficient to sustain each count of conviction for mail or wire fraud. The defendant is therefore not entitled to a judgment of acquittal under Rule 29.

B.    New Trial

The defendant alternatively seeks an order granting a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. That rule provides that a court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Here, the interest of justice does require a new trial—again—because the government encouraged the jury to convict based upon

---

[4] Furthermore, the government introduced sufficient evidence to use the defendant's awareness of a shortfall for its limited purpose. There was evidence that quantified the losses at various points during the relevant time period. There was evidence that quantified Benistar's obligations to exchangors at other points in time during that period. And there was evidence from which a jury could infer that the defendant was generally aware of both.

impermissible reasons in addition to its proper theory that would support a conviction of mail or wire fraud.

The interest of justice requires a new trial where there has been improper comment and argument by the government and the improper comments have so "poisoned the well" that the trial's outcome was likely adversely affected. United States v. Azubike, 504 F.3d 30, 38-39 (1st Cir. 2007); Carpenter, 494 F.3d at 22-23. In making the latter assessment, factors to be considered include the extent of the improper remarks, the context, the likely effect of any curative instructions, and the weight of the evidence against the defendant. Carpenter, 494 F.3d at 23; see also Azubike, 504 F.3d at 39.

Previously, this Court ruled after Carpenter's first conviction that confidence in that verdict was undermined by the prosecution's repeated use of gambling references and metaphors to the degree that a new trial was necessary. Carpenter, 405 F. Supp. 2d at 103. In the second trial, the prosecution stayed away from the gambling references,[5] but in their place repeatedly called to the jury's attention the high profits Carpenter hoped to make using the exchangors' money. In addition, the prosecutors repeatedly mischaracterized the contents of the marketing materials and exchange documents. In doing so, they suggested that Carpenter had violated obligations to the exchangors that neither the documents nor applicable legal principles imposed on him. The cumulative effect of these tactics in a case where the evidence of mail or wire fraud was ample but not overwhelming was to taint the integrity of the verdict. The possibility that the verdict was the product in substantial part of improper argument is especially concerning in light of the short

---

[5] For the most part, that is. The government still insisted on eliciting testimony from its witness Gerald Levine that Carpenter referred to himself as a "riverboat gambler." (Trial Tr. 7:77.) Levine's testimony in other respects was perjurious in this Court's judgment, and the government knew it. (See id. 13:15.)

period of time the jury spent deliberating.[6]

1.    Representations of Safety and Security

The government stated on numerous occasions that Benistar had represented to the exchangors that their money would be safe and secure. In particular, in its closing argument, the government said that the defendant "took in millions of dollars in real estate exchangors' money based on false and fraudulent pretenses that Benistar would protect the security and safety of the exchangors' money," (Trial Tr. 13:41-42), and that "[t]he marketing documents . . . emphasized the safety and security of the money," (id. 13:45). It argued that "[t]he representations that the money is going to be held for the exchangors' benefit and that it will be held safe and secure is false because he can't meet the obligations that he owes to other exchangors." (Id. 13:61.)

This was an overstatement of the evidence. There were no explicit representations of safety and security in the marketing materials or the exchange documents.[7] Rather, this was actually an inference that the government believed should be drawn from other, less direct statements in those documents, such as reference to the Merrill Lynch and PaineWebber accounts. Instead of arguing

---

[6] The defendant has made additional arguments in support of his contention that a new trial must be granted because of what he describes as government misconduct, none of which I find persuasive to the extent they go beyond the reasons discussed in this Opinion and Order. (See Def.'s Mem. 38-52.) The defendant also takes issue with a number of the Court's rulings on evidence during the trial, (see id. at 52-66), which I continue to adhere to. I also consider the defendant's argument based on Brady v. Maryland, 373 U.S. 83 (1979), regarding a civil complaint that was raised in his reply brief, (see Def. Daniel E. Carpenter's Reply to the Gov't's Opp'n to Def.'s Mot. for Acquittal and Alternatively for a New Trial 16-25), to have been resolved in light of the government's response and defense counsel's statement at the hearing on the present motions that he accepts the government's representation that it was not aware of the complaint. (See Mot. Hr'g Tr. 106, Dec. 3, 2008.)

[7] The defendant would only be responsible for Paley's oral statements to the extent they were consistent with the documents he approved, see United States v. Ranney, 719 F.2d 1183, 1187 n.7 (1st Cir. 1983), so the focus still has to be on the documents. Furthermore, because the jury found the defendant guilty as to all counts, and not only the ones as to which Paley had made oral representations, Paley's statements are of minimal significance.

to the jurors why they should draw the inference, the government characterized the assurances as if they had been expressly made. In some contexts, this might seem a matter of small significance, but the difference between an explicit promise by the defendant of safety and security, on the one hand, and an inference by the jury of the existence of such a promise from more oblique references, on the other, is potentially very important in a case where the principal defense argument was the absence of specific intent to defraud. Moreover, a proper argument that explicitly asked the jury to infer a representation of safety and security from language in the documents, such as the language that urged exchangors to "[a]sk about the security of your funds"[8] or that referred to the Merrill Lynch accounts as "escrow accounts," (see Trial Ex. 1 at 14-15.), may have encouraged the jury to carefully examine the marketing materials and exchange documents in detail. The critical questions for the jury to determine were whether the documents were false or misleading and, if so, whether the defendant intended them to be so and thus intended to deceive the exchangors. The manner in which the government referred to representations of safety and security encouraged the jury to bypass most of the first inquiry: if the jury started from the premise that the documents actually made explicit representations as the government claimed, it would be easy then to conclude they were intentionally false.

2.      Reliance on Assumptions and Generalities

In support of its contention that Benistar had promised the exchangors safety and security, the government placed undue reliance on assumptions about what the inherent attributes of a § 1031 property exchange or an escrow account must necessarily be. This encouraged the jury to

---

[8] Interestingly, there was no evidence that any of the exchangors, nor any attorney, accountant, or advisor interacting with Benistar on their behalf, ever asked where exactly the funds would end up, nor what Benistar's interest in the exchange was.

convict based on those assumptions rather than on a careful consideration of the exchange documents which set forth the attributes of each particular exchange as agreed upon between each exchangor and Benistar. The government argued that since the only purpose of a § 1031 exchange was to defer the payment of a tax, there was implicit in the transaction itself a representation that the funds would simply be "parked" and not be subject to any risk whatsoever. In its closing argument, the government stated that the defendant "knew that the exchangors had come to Benistar for one reason: to engage in a property exchange, not to engage in options trading. . . . Benistar was supposed to be -- at all times supposed to be a temporary parking place for their money until they identified a replacement property for purchase." (Trial Tr. 13:44.) The government further argued that "[r]isking all of the funds to be held in short term for real estate purposes is simply inconsistent with the business Carpenter represented Benistar Property Exchange Trust Company to be," and that the defendant knew that the exchangors "were led to believe that Benistar would act in a way that was consistent with the overriding purpose of the exchange, a secure and safe place to park the money until the exchange was complete." (Id. 13:45.)

Similarly, the government theorized that the use of the word "escrow" amounted to a representation that the funds would be held in a particular way. The government even attempted to elicit testimony from Eliot Snider and David Eaton as to the typical attributes of an escrow account, but the defendant's objections were sustained. (See id. 3:18, 6:22.)

The implication throughout was that by using the titles "Escrow Account" and "Escrow Agreement" Benistar had effectively represented to the exchangors that the exchange funds would be "parked" and not invested. This played upon a common general understanding of the word "escrow," but the actual documents established specific terms for the escrow accounts that the exchangors and Benistar contracted for. Those attributes included the payment of interest on the

26

exchange funds, which necessarily meant the funds would have to be invested, whether by Benistar or one of the brokerage houses.

The problem stems from the imprecise way that people sometimes speak about money and bank accounts. It is common to say that there are X dollars in one's account. This is a manner of description that sacrifices accuracy for convenience. It has a tendency to create the false impression that the bank holds each person's money in some sort of safety deposit box, where perhaps once a month a teller makes the rounds depositing a few dollar bills into each box as interest. In reality, the number of dollars in an account simply quantifies the amount that the bank promises to pay the account holder. It is easy to forget that the very reason a bank is willing and able to pay interest on the account is that it is taking the money and putting it to other uses. The exchangors, all relatively sophisticated in business, must all have expected that their funds would be invested during the period they were in Benistar's custody. Indeed, they were given the choice between a lower return (three percent) and a higher (six percent). It was an obvious inference that the latter would be invested more aggressively than the former. In any event, the funds were not "parked" in the sense that they would not be invested at all.

In giving these general assumptions about escrow accounts undue emphasis, the government invited the jury to ignore the Court's instruction that the tax code placed no limitations or restrictions on how a qualified intermediary may invest the exchange funds, and further, that in the absence of a promise not to invest the proceeds in a certain way, no general statutory authority imposed limits on how they may be invested. The government essentially intimated that common sense dictated that the exchange funds could not be invested in stock options, regardless of what

the documents said.[9] In fact, it was *not* a violation of the escrow agreements to invest the exchange funds in any particular way; the documents gave Benistar complete discretion as to that judgment. The government's argument thus invited the jury to focus on the wrong question: whether the defendant violated supposedly restrictive terms of an escrow agreement, rather than whether he induced the Benistar-exchangor relationship by false or fraudulent pretenses, representations, or promises.

### 3. References to Carpenter's Greed

More important than the government's glib overcharacterization of the nature and contents of the documents described above, however, was the prosecution's repeated invitation to the jury to be outraged at the defendant's desire and attempt to profit from Benistar's investment of the exchangors' funds. The government emphasized the defendant's selfish motive to make a fortune investing the exchange funds while only paying the exchangors a three or six percent return.

In particular, the government stated in its opening that if the defendant's scheme "had kept

---

[9] For example, in its closing argument, the government referred to the trial testimony by Iantosca's attorney, Marjorie Adams, to counter the defendant's argument that the exchange documents provided Benistar with full discretion to invest the exchange funds. The government stated:

> The discretion language didn't authorize Benistar to do whatever it wanted with the money so long as it could conceivably be characterized as an investment. As Marjorie Adams testified -- you may recall that she said that Benistar couldn't take the money and go buy a building with it. A building is an investment, but they couldn't go do that.

(Id. 13:54.) As a practical matter, this type of investment may have been outside the bounds of common sense if there were not other funds available to satisfy obligations to exchangors. But there was no legal reason why the exchange funds could not be invested in a building unless a reason was provided by the agreements between Benistar and the exchangors.

The government's argument might have been a good one had Congress or some regulatory authority restricted the manner in which a qualified intermediary could hold the funds. If that were the case, then simply offering to act as a qualified intermediary in a § 1031 exchange could be considered to be a representation that the money would be held according to those restrictions. But in the complete absence of any statutory or regulatory restrictions, no such representation can be implied.

up, he would have made a fortune while still paying the people who entrusted their money to him three or six percent," (Trial Tr. 2:80), and that "[w]hat he was after was an opportunity to strike it rich in the options market without any risk to his own personal funds and while paying the people whose money he was trading a measly three or six percent," (id. 2:83). In closing, the government repeated this argument that the defendant "decided to take the exchangors' money and give them a measly 3 or 6 percent while using that money to speculate, to make a killing for himself in the options market." (Id. 13:70.)

The government specifically highlighted as one aspect of the fraud, aside from "the way in which the exchangors were misled as to the true risks Carpenter was taking with their funds," that "Mr. Carpenter was secretly using the funds to enrich himself and Mr. Paley." (Id. 13:55-56.) In support of this point the government referred to a letter sent by the defendant to Paley explaining why the options trading strategy was necessary for them to profit. In the letter, he said that they could have earned a return of two to three percent per month, which would have amounted to over a million dollars of profits to be split between them. (Id. 13:56.) The government stated that "Mr. Carpenter, while he was paying the exchangors a flat, capped rate of 3 percent or 6 percent, was actually using their money, and intended to use their money, to enrich himself and Mr. Paley." (Id.)

Like the gambling metaphors used by the government in the defendant's first trial, these arguments encouraged the jury to convict Carpenter for a reason unrelated to the wire and mail fraud charges, namely, that he was trying to reap a benefit for himself by investing the exchangors' funds. The government chastised him for acting selfishly. Whatever moral judgment might be made about the defendant's trading behavior, that trading was not expressly foreclosed by the parties' agreements or otherwise and therefore was not itself unlawful. The agreements with the

29

exchangors purported to give Benistar discretion over the investment of the exchange funds while in Benistar's custody. (E.g., Trial Exs. 11, 29B, 51, 67, 84B, 96, 101, 106, 124 (Escrow Agreements giving Benistar "full control" over the exchangors' funds); see also Trial Exs. 2 ("[T]hese accounts are under [Benistar's] sole control."), 37 ("We have set up accounts . . . under our sole control . . . .").)

The government's focus on the disparity between the defendant's intended profits and the "measly" return to the exchangors was thus doubly wrong. It was not an accurate depiction of the contracts between Benistar and the exchangors, and it was not relevant to the defendant's intent to defraud at the most relevant time—when the contracts were entered into. Nevertheless, the argument that the defendant was trying to make lots of money for himself by misusing the exchangors' funds had a significant potential to inflame the passions of the jury.

This argument about the defendant's greed dovetailed with the argument, at least implied by the government, that Benistar breached its promise to the exchangors to deposit the funds into the interest-bearing accounts at Merrill Lynch or PaineWebber. Such a breach alone could not be the basis for criminal liability on the charges set forth in the indictment, and the government did not suggest otherwise. But it is easy, especially for lay jurors, to miss the significant difference between a failure to live up to a promise after it has been made and a fraudulent intent in making the promise never to live up to it. The latter would be the basis for a finding of specific intent to defraud; the former would not be. The government's approach in emphasizing the defendant's intent to profit, instead of his intent to deceive, very likely supported and encouraged any confusion the jury might have had between the two.

> 4.     The Speedy Jury Deliberations

A jury is not required to deliberate for any specific amount of time before reaching a

verdict. The speed of the jury's deliberations certainly could not be an independent factor justifying the grant of a new trial motion. However, the brevity of the deliberations in this case raises a serious concern that the jury was led into adopting a global theme that allowed it to resolve all nineteen counts in a short time. There were no doubt some parts of the evidence that applied with equal force to each of the counts. But each count also required consideration of evidence specific to that count. For example, different exchangors were exposed to different Benistar marketing materials and signed different exchange documents. Some exchangors entered into the transactions in the Merrill Lynch era, and some in the PaineWebber era.[10] Most exchangors chose a three percent interest account, but some chose a six percent account. The most dramatic example of the variation among exchangors is the case of exchangor Gail Cahaly (Count 15). There was no evidence that she saw any marketing materials other than Paley's "Frequently Asked Questions," whereas others had received the PowerPoint slides, Paley's articles, and other materials. Similarly, there was no evidence that Cahaly signed either an Exchange Agreement or Escrow Agreement with Benistar, while an Exchange Fee Agreement signed by her was in evidence. To consider and decide the significance, if any, of these variations—especially deciding what representation in what documents influenced the particular exchangor—would have required considering the issues at least exchangor by exchangor. If the twelve jurors had spent an equal amount of time on the transactions of each of the seven exchangors over the roughly two hours they spent deliberating, they would have spent a little more than fifteen minutes on each. It is possible that a diligent and efficient jury could have given adequate consideration to the matters in that time, but the possibility is too palpable to ignore that the jury instead took a more generalized view in response

[10] One thing the government faulted Carpenter for was omitting to tell exchangors that he had been "kicked out" of Merrill Lynch. Obviously, that factor could only be relevant to the contention that subsequent PaineWebber era exchangors were deceived by the omission.

to the government's meta-narrative of Benistar's breaches of promises of safety and security driven by the defendant's greed.

As in the first trial, the government focused too much on what the defendant did with the exchangors' money, rather than how he obtained it from them. Evidence of his risky trading strategy was certainly relevant to whether he had the specific intent to defraud the exchangors and mislead them into entering the exchange transactions. Even so, however, its probative force likely varied from transaction to transaction. If knowledge of trading losses tended to highlight to the defendant the contrast between the "safety" being assured to a potential exchangor and the reality of the actual risk, and thus serve to support an inference of willful deception on his part, the force of the inference was stronger in December than it was in August because the losses were so much greater and more sustained.

It is possible the jury carefully focused on the proper questions and thoroughly examined the evidence in its variations with respect to each of the exchange transactions. If so, the verdict would be soundly based. It is also possible, however, that the government's repeated emphasis on the defendant's having broken his promises to the exchangors in order to enhance his own wealth by using their money distracted the jury from their proper inquiry and led them to render a quick verdict that was not based on the necessary conclusions about fraud, most especially specific intent to defraud. Reluctantly, this Court concludes that the government's arguments "poisoned the well" to the extent that the verdict was likely affected. It must be set aside.

## VI.    Conclusion

Because the evidence at trial, viewed in the light most favorable to the verdict was sufficient to sustain a conviction for each count of mail and wire fraud alleged in the Superseding Indictment, the defendant is not entitled to a judgment of acquittal. However, for the reasons set

forth above, because there is a strong likelihood that the jury rendered its verdict on the basis of inappropriate and insufficient grounds that cannot sustain the convictions, the interest of justice requires that the defendant's conviction as to each count be set aside and a new trial ordered. Accordingly, the defendant's motion (dkt. no. 308) is DENIED to the extent it seeks a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) and GRANTED to the extent it seeks a new trial pursuant to Federal Rule of Criminal Procedure 33(a).

The Defendant's Supplemental Motion for Judgment of Acquittal (dkt. no. 311), the Supplemental Motion for a New Trial (dkt. no. 312), the Defendant's Motion for a New Trial Based on Newly Discovered Evidence Involving the Federal Trade Commission (dkt. no. 324) and the Defendant's Motion for a New Trial Based on Newly Discovered Evidence Regarding Iantosca's "Availability" (dkt. no. 333) are DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge