UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES OF AMERICA        )
                                )
                                )
v.                              )          CRIMINAL NO. 04-10029-GAO
                                )
                                )
DANIEL E. CARPENTER             )
_____)

**MOTION FOR RECONSIDERATION OF DEFENDANT'S
SUPPLEMENTAL MOTION FOR A NEW TRIAL**

On July 3, 2008, defendant Daniel E. Carpenter filed his Supplemental Motion for a New

Trial (Doc. 312). In that motion, Carpenter argued, *inter alia*, that the government's evidence and

argument at the second trial of this case resulted in a constructive amendment of the indictment in

violation of the Fifth Amendment to the United States Constitution or, alternatively, at minimum,

a material variance which denied him the fair notice of the charges against him guaranteed by the

Sixth Amendment to the United States Constitution. The motion was denied by the Court without

discussion on September 1, 2011. Doc. 377 at 33.

Now that the First Circuit has rendered its opinion in the government's appeal, *United States

v. Carpenter*, ___ F.3d ___, 2013 WL 6153701 (1st Cir. November 25, 2013), the mandate has

issued, and this Court once again has jurisdiction of the matter, Carpenter asks that the Court

reconsider its denial of that portion of his Supplemental Motion for a New Trial which related to the

government's constructive amendment of the indictment based on subsequent developments in the

case which convincingly demonstrate the government's switch from the mail/wire fraud predicated

on affirmative false statements charged in the indictment to mail/wire fraud predicated primarily, if

not entirely, on omissions and nondisclosure. The government's briefs on its appeal of the Court's order granting Carpenter a new trial, as well as its oral argument before the First Circuit, relied on an omissions/nondisclosures theory of mail/wire fraud (a theory that was adopted by the First Circuit in its opinion), providing new – and potent – evidence in support of the constructive amendment and material variance arguments advanced in Carpenter's motion. The variance here was manifestly prejudicial to Carpenter as it denied him the fair notice of the charges against him guaranteed by the Sixth Amendment, *see, e.g., Russell v. United States*, 369 U.S. 749 (1962), and raises the very real spectre that the jury may have convicted him on a legally insufficient ground, requiring reversal under *Yates v. United States*, 354 U.S. 298 (1957).

A district court may grant a motion for reconsideration "if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust." *United States v. Cintron*, 724 F.3d 32, 36 n.5 (1st Cir. 2013). *See United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009). "[W]hen reconsideration of an earlier ruling is requested, the district court should place great emphasis on the 'interests of justice.'" *United States v. Roberts*, 978 F.2d 17, 21 (1st Cir. 1992). *See United States v. Siciliano*, 578 F.3d 61, 72 (1st Cir. 2009)("When faced with a motion for reconsideration, district courts should apply an interests-of-justice test"). "This is so . . . because such requests for reconsideration rely, in the last analysis, on the trial court's inherent power to afford relief from interlocutory decisions 'as justice requires.'" *Roberts*, 978 F.2d at 21. Given the new evidence presented in this motion, the interests of justice favor reconsideration of this Court's September 1, 2011, decision of the issues and the granting of a new trial. This was truly a case in which, in violation of Carpenter's rights under the Fifth and Sixth Amendments, the

government "shift[ed] its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal." *Russell v. United States*, 369 U.S. 749, 768 (1962).

## I.    WHAT THE INDICTMENT CHARGED.

The indictment in this case unquestionably charged mail/wire fraud predicated on the theory that BPETCO fraudulently induced exchangors to use its services through the use of affirmative false statements:

- "BPE gave written and oral assurances to its clients that BPE would hold their money safe and return the principal to them, in full, for use in closing on the purchase of replacement property." Superseding Indictment (Doc. 34) at 5.

- "The promotional materials that BPE used to solicit clients contained representations concerning the security and safety of all funds transmitted to Benistar." *Id.*

- "Clients were induced to wire funds to BPE based on material, false written and oral assurances that the money would be protected and held safe, that BPE would not transfer the funds without the client's written authorization, and that BPE would return the funds in full, either to be disbursed for the client's use in closing on the purchase of replacement property or to be returned to the client if no replacement property transaction was to occur." *Id.* at 8.

- "Carpenter knew the foregoing representations were being made to BPE's clients. Contrary to these representations, however, Carpenter did not hold the funds safe in the accounts into which they had been wired. Instead, he used the funds to trade in the options market . . . ." *Id.*

- "During the period from April through December, 2004, Carpenter sustained substantial losses from his options trading. Notwithstanding these losses, BPE continued, with Carpenter's knowledge, to solicit and induce clients to entrust funds to BPE based on material, false representations regarding the manner in which the funds would be treated and held." *Id.* at 8-9.

- "BPE continued, with Carpenter's knowledge, to solicit and induce clients to entrust funds to BPE based on material, false representations that the money would be protected and held safe, that BPE would not transfer the funds without the client's written authorization, and that BPE would return the funds in full, either to be disbursed for the client's use in closing on the purchase of replacement property or to be returned to the client if no replacement property transaction was to occur." *Id.*

at 11.

- The Cahalys "were provided assurances concerning the safety of their funds, including Powerpoint slides and a document titled *IRC §1031 Property Exchanges: Frequently Asked Questions* stating that they could trust BPE with their money, that their funds would be held in a segregated account and would be paid out only for a subsequent closing or to be returned to them, and that no BPE personnel would have access to their account to withdraw money." *Id.* at 16.

- Snider "was provided assurances concerning the safety of his company's funds, including Powerpoint slides and a document entitled *Frequently Asked Questions About 1031 Property Exchange* stating that BPE had a long-standing reputation for trustworthiness and that his funds would be held in an escrow account and would be paid out only for a subsequent closing or to be returned to the company." *Id.* at 17. *See id.* at 18 (same as to Iantosca); *id.* at 20-21 (same as to Johnston); *id.* at 24-25 (same as to Fitzgerald).

- Snider "executed an Escrow Agreement and an Exchange Agreement with BPE containing the representations set forth in paragraphs 22 and 23, above, concerning the manner in which his company's funds were to be held by BPE." *Id. See id.* at 18 (same as to Iantosca); *id.* at 21 (same as to Johnston); *id.* at 22 (same as to Darling); *id.* at 23 (same as to Bellemore); *id.* at 25 (same as to Fitzgerald).

- "Carpenter's use of client funds in connection with his options trading was directly contrary to the representations given to BPE clients to induce them to retain BPE. As set forth in paragraphs 17-24, above, those representations included assurances that client funds would be held safe and secure; that the funds would not be transferred without the client's written authorization; and even then, that the funds would be disbursed only for the purpose of closing on the replacement property or to be returned directly to the client." *Id.* at 26.

- "Carpenter was aware of the foregoing representations." *Id.*

- "BPE continued, with Carpenter's knowledge and throughout the period that Carpenter was losing substantial sums at Merrill Lynch and at Paine Webber, to solicit and induce clients to entrust funds to BPE based on material, false representations concerning the manner in which their money would be held and treated." *Id.* at 26-27.

In a pleading filed prior to the first trial, the government resoundingly – and absolutely unequivocally

– confirmed that the indictment, as it manifestly appeared to do on its face, charged Carpenter with

4

mail/wire fraud based upon affirmative false representations. The government's roughly
contemporaneous descriptions of the offenses with which the grand jury had charged Carpenter
included:

- "Specifically, the indictment charges Carpenter with having engaged in a fraudulent
  interstate scheme . . . pursuant to which clients were induced to entrust millions of
  dollars to Carpenter's company based on false representations that the money would
  be safely held in escrow and returned to them in full." Doc. 18 at 1.

- "The charges in the indictment revolve around false representations made to induce
  clients to retain and escrow funds with Carpenter's company." *Id.* at 2.

- "BPE gave written and oral assurances that BPE would hold their money safe and
  return the principal to them, in full, for using in closing on the purchase of
  replacement property." *Id.* at 2-3.

- "The indictment sets forth in detail the specific assurances that were given to clients."
  *Id.* at 3.

- "Carpenter was aware of the representations that were being made to induce clients
  to retain and escrow their funds with his company." *Id.* at 3.

- "BPE continued, with Carpenter's knowledge, to solicit and induce clients to entrust
  funds to the company based on false representations that the money would be held
  safely in escrow, and Carpenter continued, without his clients' knowledge and
  authorization, to take and use those funds to finance his high risk trading 'strategy.'"
  *Id.* at 4.

- "All of the clients were induced to retain BPE and to entrust their money to the
  company based on explicit representations and assurances that they received
  concerning the safety of their funds and the manner in which the money would be
  held." *Id.* at 5.

- [A]s charged in the indictment,  Carpenter engaged in a scheme pursuant to which
  . . . clients were induced to entrust their funds to Carpenter's company (BPE) based
  on false representations that the funds would be held safely in escrow; that the funds
  would not be transferred without the client's written authorization; and that the funds
  would be disbursed only for the purpose of closing on the purchase of replacement
  property or to be returned directly to the client." *Id.* at 5-6. *See id.* at 13 (same).

- "The foregoing summarizes the gravamen of the charges set forth in the indictment."

*Id.* at 6.

- "Carpenter was indicted on fraud charges stemming from his intentional misappropriation of client funds that were entrusted to Carpenter's company based on false representations of safety and security." *Id.*

- "Paragraphs 25 through 29 of the indictment set forth a comprehensive overview of the scheme. They charge Carpenter with having engaged in a scheme pursuant to which: (a) clients were induced to entrust substantial sums of money to BPE based on false representations that their funds would be held safely in escrow; (b) contrary to those representations, Carpenter misappropriated (i.e., took) the money without his clients' knowledge or authorization and used it to finance high risk options trading, the purpose of which was to achieve substantial financial gain for himself; and (c) notwithstanding significant trading losses, Carpenter continued to solicit, gamble with, and lose ever-increasing amounts of escrow funds that BPE had promised to hold safe . . . ." *Id.* at 7-8.

- "The indictment contains a thorough explication of each facet of the . . . scheme [including] the specific (false) representations that were made to clients to induce them to entrust their funds to Carpenter's company." *Id.* at 8.

- As to specific clients, " the indictment sets forth detailed Allegations concerning the clients' individual transactions, including the false representations that were made to them, the monies they transmitted in reliance on those representations, and the funds that Carpenter misappropriated and lost." *Id.*

- "The indictment alleges a scheme pursuant to which Carpenter wilfully misappropriated funds obtained through false representations and promises, gambled those funds in the options market, and lost $9 million of the money." *Id.* at 14.

There could hardly be a more ringing affirmation that what the grand jury charged was a mail/wire fraud scheme predicated on affirmative false representations.[1]

---

[1] It became clear through the evolution of this case that, although the indictment referenced both oral and written false statements, the government's theory of prosecution was not premised on oral misrepresentations because Carpenter did not meet with any of the exchangors before they executed their agreements with BPETCO, and Paley, who did meet with them, was not authorized to make any statements beyond the scope of the written materials. Instead, as discussed further in the text, the government's evolving theory reflected a transition from one based exclusively on alleged false written statements to one based primarily, if not exclusively, on omissions.

## II.     THE GOVERNMENT'S SUBSTITUTION OF AN OMISSIONS THEORY OF CRIMINALITY FOR THE OFFENSE CHARGED BY THE GRAND JURY.

By the time of the second trial, however, as Carpenter argued in his Supplemental Motion for a New Trial, the government had abandoned any pretense of trying Carpenter based upon the affirmative false representation scheme charged in the indictment, instead substituting for the theory charged by the grand jury a theory of mail/wire fraud predicated on Carpenter's nondisclosure of his investment strategy. Since this Court denied the motion, additional statements by the government, made in the course of its appeal to the First Circuit, confirm that impermissible shift in theory and the validity of the arguments advanced in Carpenter's motion.

In its brief on appeal, the government focused on omissions, such as Carpenter's failure to disclose that he would be investing the exchangors' funds in stock options, among other omissions, as well as on its contention that the documents were misleading, stating, for example:

- "The documents omitted critical information about Carpenter's risky investment strategy . . . ." Government's Opening Brief, *United States v. Carpenter*, No.11-2131, at 3-4.

- Carpenter used exchangors' money "to trade in high-risk stock options" "without telling them." *Id.* at 4.

- "[N]one of the documents disclosed that the exchange funds could be invested in stock options, or that returns from such investments would accrue to Benistar's or Carpenter's – rather than the exchangors' – benefit." *Id.* at 9.

- "Patterson testified that the agreements' failure to disclose that Carpenter intended to trade in stock options was material . . . ." *Id.* at 10.

- "Carpenter's good faith was belied by his failure to disclose his intent to use the exchangors' money to generate significant profits for himself." *Id.* at 17.

- "Also evincing Carpenter's fraudulent intent, the government argued, was Carpenter's failure to disclose that he had been 'kicked out of' Merrill Lynch for sustaining heavy trading losses in the options market . . . ." *Id.* at 18.

- Noting government's rebuttal argument that Carpenter "was using the money in a way that he had not disclosed to the exchangors, and he had lulled them into a different kind of belief than what he would actually do with the money." *Id.* at 20-21.

- Noting the "lack of disclosure about how Carpenter actually intended to exercise his 'discretion' to 'invest' the funds . . . ." *Id.* at 25.

- Carpenter "continued to take in millions of dollars from new exchangors without revealing what he was actually doing with their money." *Id.* at 25-26.

- "[T]he representations in the marketing materials and agreements were . . . false and misleading because of what they did not say – that Carpenter intended to use the funds to trade aggressively in risky stock options . . . ." *Id.* at 41.

- The documents "omitted highly material information as to what Carpenter was 'investing' in and how he was exercising his 'discretion.'" *Id.* at 47-48.

The government's reply brief continued and solidified the omissions theme:

- '[T]hat Carpenter defrauded the exchangors by failing to disclose his true intentions at the time he took the exchangors' money" was "central to the government's theory of the case." Government's Reply Brief, *United States v. Carpenter*, No.11-2131, at 5.

- The government "appropriately drew the jury's attention to the contrast between the low rates of return the contacts promised to the exchangors and the outsized profits Carpenter intended to gain for himself by subjecting the exchange funds to risks that he did not disclose." *Id.* at 9.

- "[A] key aspect of the government's theory was that Carpenter's desire to generate profits for himself above and beyond the fee he was paid to hold and invest the exchangors' money supplied a motive for his failure to disclose his true intentions." *Id.*

- "there was ample evidence of Carpenter's undisclosed profit motive." *Id.*

- "Carpenter's objection . . . focused on the government's comments about his failure to disclose his trading strategy . . . ." *Id.* at 15.

- "Carpenter knew, but did not disclose to the exchangors, that he had pursued and intended to continue to pursue an extremely risky investment strategy." *Id.* at 21.

8

- "Carpenter also knew he had sustained heavy losses as a result of his undisclosed risky investment strategy . . . ." *Id.*

At oral argument before the First Circuit, the government focused on the *context* in which the exchangors' entrusted their money to BPETCO, *i.e.*, the nature and requirements of a §1031 property exchange, while it was Carpenter who focused on the contracts themselves, the very reverse of what would have been the case had the government still been pursuing a false statements theory. The government's oral argument underscores the reality that by the time of the second trial and appeal, this was no longer a written false statements case but had instead morphed into an omissions case. This is especially true in light of the fact that Carpenter himself made no oral representations, nor did he authorize anyone to make any representations at all apart from what was contained in the written agreements and marketing materials.

The government's switch in theory is reflected in the opinion of the First Circuit, which adopted the government's theory in analyzing the issues before it:

- "Had there been full disclosure, especially after Carpenter knew his risky investment strategy had failed, the exchangors would never have made the investments to begin with or maintained them with Benistar." *Carpenter*, 2013 WL 6153701 at *8.

- The government "sought to show that Carpenter had misrepresented his approach by pursuing a riskier investment strategy than exchangors would have expected from the representations made and the nature of their purposes in entering exchange contracts." *Id.* at *7.

- Carpenter "knew his strategy differed from their expectations and he deliberately failed to correct or prevent those expectations." *Id.*

- "Carpenter knew not a single document advised exchangors that he was taking the risks he did with their money and knew that if the exchangors had been so advised, they never would have contracted with Benistar." *Id.* at *6.

- "The charges were based in part on the theory that Carpenter intended to deceive the exchangors as shown by his continuing to make the same representations to them

about the handling of their money even after he knew of his investment strategy's failures." *Id.* at *3.

Thus, the government's shift from the mail/wire fraud offense with which the grand jury charged Carpenter – one predicated upon the alleged affirmative representations specifically set forth in the indictment – to one in which Carpenter's silence on the matter of his investment strategy was central to the scheme's asserted criminality.

## III. THE GOVERNMENT'S SHIFT IN THEORY OF CRIMINALITY CONSTITUTED A CONSTRUCTIVE AMENDMENT OF THE INDICTMENT.

"A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." *United States v. Celestin*, 612 F.3d 14, 24 (1st Cir. 2010). *See, e.g., United States v. Davis*, 717 F.3d 28, 34 (1st Cir. 2013). "[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *United States v. Rodriguez-Rodriguez*, 663 F.3d 53, 58 (1st Cir. 2012), *quoting Stirone v. United States*, 361 U.S. 212, 217 (1960). Constructive amendments are considered prejudicial *per se*, and when they occur the conviction must be reversed. *See, e.g., Davis*, 717 F.3d at 34; *Celestin*, 612 F.3d at 24; *United States v. Portela*, 167 F.3d 687, 701 (1st Cir. 1999); *United States v. Dunn*, 758 F.2d 30, 35 (1st Cir. 1985). "To do otherwise would fail 'to preserve the defendant's Fifth Amendment right to indictment by grand jury, to prevent re-prosecution for the same offense in violation of the Sixth Amendment, and to protect the defendant's Sixth Amendment right to be informed of the charges against him.'" *Rodriguez-Rodriguez*, 663 F.3d at 58, *quoting United States v. Brandao*, 539 F.3d 44, 57 (1st Cir. 2008).

The seminal constructive amendment case is *Stirone v. United States*, 361 U.S. 212 (1960), in which the Supreme Court reversed the conviction of a defendant whose indictment charged him

10

under the Hobbs Act with interference with interstate shipments of sand but who was convicted after

the government's evidence and the court's instructions permitted the jury to find him guilty if it

found that he had interfered with interstate shipment of steel. In so doing, the Court stated:

> [The] variation here destroyed the defendant's substantial right to tried only on
> charges presented in an indictment returned by a grand jury. Deprivation of such a
> basic right is far too serious to be treated as nothing more than a variance and then
> dismissed as harmless error. . . .

*Id.* at 218.

The critical lesson of *Stirone* for this case is that, when the government particularizes in the

indictment an essential element of the offense, it must prove that the offense was committed in that

manner, and no other:

> [W]hen only one particular kind of commerce is charged to have been burdened a
> conviction must rest on that charge and not another, even though it be assumed that
> under an indictment drawn in general terms a conviction might rest upon a showing
> that one kind of commerce or another had been burdened. The right to have the grand
> jury make the charge on its own judgment is a substantial right which cannot be taken
> away with or without court amendment.

*Stirone*, 361 U.S. at 218-19.[2] Here, the scheme to defraud is an essential element of both mail and

---

[2] *See, e.g., United States v.   Milstein*, 401 F.3d 53, 65 (2d Cir. 2005)(conviction reversed
where indictment charged distributing misbranded drugs based on repackaging, but government
theory at trial also allowed conviction based on labeling drugs sterile when they were not); *United
States v.  Dipentino*, 242 F.3d  1090, 1094-95 (9th Cir. 2001)(conviction reversed where indictment
charged violation of specified work-practice standard but instructions permitted conviction based
upon violation of a different work-practice standard as well); *United States v.  Pigee*, 197 F.3d 879,
887 (7th Cir. 1999)(conviction reversed where indictment charged defendant with knowingly making
a building she owned available for the storage of cocaine, but instructions permitted conviction based
upon making building available for manufacturing, storing, distributing, or using cocaine); *United
States v.  Nuñez*, 180 F.3d 227, 231-32 (5th Cir. 1999)(conviction reversed where indictment charged
resisting arrest by use of dangerous weapon, but instructions permitted conviction based on other
means of resisting arrest); *United States v.  Randall*, 171 F.3d 195, 208 (4th Cir. 1999)(conviction
reversed where indictment charged use and carrying of firearm in relation to distribution of narcotics,
but evidence showed use and carrying in relation to possession with intent to distribute); *United
States v.  Willoughby*, 27 F.3d 263, 266 (7th Cir. 1994)(same); *United States v.  Leichtnam*, 948 F.2d

wire fraud. *See, e.g., United States v. Pimental*, 380 F.3d 575, 584 (1st Cir. 2004); *United States v. Adkinson*, 135 F.3d 1363, 1378 (11th Cir. 1998). The government chose to define the charged scheme to defraud as one predicated upon affirmative false statements. The government's having done so, Carpenter cannot, consistently with the  Fifth Amendment grand jury clause, stand convicted based on any other fraudulent scheme. As the Second Circuit has warned:

> In light of the current broad range of conduct covered by the federal fraud statutes, it is critical that courts vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury. In order to avoid amending the indictment in violation of the Fifth Amendment, the government in fraud cases should think through the nature of the crime it wishes to allege and then spell out the offense in a carefully drafted indictment, instead of confronting the defendant with its theory of criminality for the first time at trial.

*United States v. Mollica*, 849 F.2d 723, 730 (2d Cir. 1988)(indictment charged conspiracy to defraud by impeding collection of income taxes; conviction reversed because instructions created "substantial risk" that the jury may have believed that they could convict defendants of a conspiracy to defraud which did not involve income taxes). *See, e.g.,  United States v. Syme*, 276 F.3d 131, 155-56 (3d Cir. 2002)(reversing conviction where instructions permitted conviction on theory of fraud not charged in the indictment); *United States v. Santa-Manzano*, 842 F.2d 1, 2-3 (1st Cir. 1988)(reversing conviction because  government "did not prove the scheme it charged, and it did not

---

370, 374-76, 379-81 (7th Cir. 1991)(conviction reversed where indictment charged using and carrying a specific firearm but instructions permitted conviction based on using and carrying *a* firearm); *United States v. Weissman*, 899 F.2d 1111, 1115 (11th Cir. 1990)(conviction reversed where indictment charged that RICO enterprise was DeCavalcante family, but instructions permitted conviction based on any enterprise); *United States v. Adams*, 778 F.2d 1117, 1125 (5th Cir. 1985)(conviction reversed where indictment charged purchasing firearm using licence in false name, but instructions permitted conviction based on use of license with false name or address); *United States v. Zingaro*, 858 F.2d 94, 96-97, 103 (2d Cir. 1988)(conviction reversed where indictment charged loansharking in conjunction with gaming at Yonkers social clubs, but government argued jury could convict based on unrelated loan).

charge the scheme it proved");*United States v. Smolar*, 557 F.2d 13, 18-19 (1st Cir. 1977)(reversing

convictions where instructions materially altered theory of fraud charged in indictment).

   At the second trial of this case, the government's evidence and arguments so fundamentally

altered the offense for which Carpenter was on trial as to amount to a constructive amendment of the

indictment in violation of the Fifth Amendment. No longer was the case against Carpenter limited,

as the indictment was, to proof that the BPETCO documents affirmatively made false

representations. Instead, it was expanded to include, in addition, one dependent upon *omissions* by

Carpenter with respect to his investment strategy and history as a central component of the

government's fraud theory.

> [T]he government's change in position during the trial can be sufficient to work a
> constructive amendment of the indictment even where the court does not formally alter the
> elements of the offense in the jury charge. The only question . . . is whether the government
> changed its theory during trial so as to urge the jury to convict on a basis broader than that
> charged in the indictment.

*United States v. Doucet*, 994 F.2d 169, 172  (5th Cir. 1993). *See, e.g., United States v. Milstein*, 401

F.3d 53, 65 (2d Cir. 2005); *United States v.  Choy*, 309 F.3d 602, 607 (9th Cir. 2002); *United States*

*v.  Shipsey*, 190 F.3d 1081, 1086 (9th Cir. 1999); *United States v. Zingaro*, 858 F.2d 94, 96-97, 103

(2d Cir. 1988). It did so here. Because the very real possibility exists that Carpenter was convicted

of mail/wire fraud offenses based on a scheme to defraud other than that charged in the indictment,

there was a constructive amendment of the indictment in violation of the  Fifth Amendment.[3]

---

   [3] *See, e.g., Choy*, 309 F.3d at 607 (conviction reversed where indictment charged direct
bribery but government argued theory of indirect bribery); *Shipsey*, 190 F.3d at 1086-87 (indictment
charged scheme to defraud by false pretenses; conviction reversed because prosecution's argument
and court's instructions told jury it could convict based upon wrongful taking of monies); *United
States v.  Lawton*, 995 F.2d 290, 292-93 (D.C.Cir. 1993)(indictment charged defendant with
embezzling funds from union local; conviction reversed because instructions told jury defendant
could be convicted if he embezzled from either local or international union); *Doucet*, 994 F.2d at

"Under *Stirone* . . . , the mere possibility that the conviction rests upon an offense not charged by the grand jury is sufficient to call for reversal of the conviction." *Dunn*, 758 F.2d at 36. *See, e.g., Stirone*, 361 U.S. at 217 (conviction reversed because it could not "be said with certainty that with a new basis for conviction added, Stirone was convicted solely on the charge made in the indictment the grand jury returned"); *United States v. Pigee*, 197 F.3d 879, 887 (7th Cir. 1999)(case remanded with instructions to dismiss count where Court "ha[d] no way of knowing" whether jury convicted based on use charged or on another use); *Shipsey*, 190 F.3d at 1087 (constructive amendment found where there was "real likelihood" that jury convicted defendant of a scheme to defraud other than that charged); *United States v. Lawton*, 995 F.2d 290, 294 (D.C.Cir. 1993)(conviction reversed where there was "distinct possibility" that jury convicted defendant of embezzlement from a different entity than that charged); *United States v. Weissman*, 899 F.2d 1111, 1116 (11th Cir. 1990)(conviction reversed where jury "may well have convicted" defendants of membership in enterprise different than that charged); *United States v. Adams*, 778 F.2d 1117, 1124 (5th Cir. 1985)(conviction reversed where uncharged identification falsity "might have been the basis of the conviction").

For these purposes, it is irrelevant that the jury could have convicted the defendant based on the offense charged, as well as on the uncharged basis. *See, e.g., Shipsey*, 190 F.3d at 1086; *United States v. Floresca*, 38 F.3d 706, 711 (4th Cir. 1994). Accordingly, the fact that this Court concluded that the evidence was sufficient to support Carpenter's conviction on a false statements theory,

---

170, 172-73 (conviction reversed where indictment charged possession of an unregistered firearm modified to fire as a machine gun, but government argued to jury that possession of the disassembled components sufficed for conviction); *United States v. Chandler*, 858 F.2d 254, 257-58 (5th Cir. 1988)(conviction reversed where instructions permitted conviction based on different false entries than those charged in indictment).

Opinion and Order, September 1, 2011 (Doc. 377) at 17-22, does not detract from the force of Carpenter's argument that the government's focus at the second trial on Carpenter's omissions to disclose created an appreciable risk that the jury convicted Carpenter based on a mail/wire fraud theory not charged by the grand jury. Indeed, such a basis for conviction would readily explain the jury's inexplicably quick deliberations, *see id.* at 30-32, as reliance on an omissions theory of fraud by the jury would have obviated the need for a careful count-by-count assessment of the representations made to each exchangor.

## IV.   AT MINIMUM, THERE WAS A PREJUDICIAL VARIANCE BETWEEN INDICTMENT AND PROOF.

A variance occurs "when the charging terms remain unchanged but when the facts at trial are different from those alleged in the indictment." *United States v. Rodriguez-Rodriguez*, 663 F.3d 53, 58 (1st Cir. 2011), *quoting United States v. Fornia-Castillo*, 408 F.3d 52, 66 (1st Cir. 2005). A variance requires reversal of a conviction when it "affect[ed] the defendant's substantial rights." *United States v. Diaz-Arias*, 717 F.3d 1, 20 (1st Cir. 2013), *i.e.*, "cause[d] unfair prejudice." *United States v. Dellosantos*, 649 F.3d 109, 116 (1st Cir. 2011).   A variance affects the defendant's substantial rights where he "receive[d] inadequate notice of the charge against him and thus [was] taken by surprise at trial." *Dellosantos*, 649 F.3d at 125, *quoting United States v. Wihbey*, 75 F.3d 761, 774 (1st Cir. 1996). Among the most fundamental guarantees of the Sixth Amendment is the defendant's right to fair notice of the charges against which he must defend. *See, e.g., Russell v. United States*, 369 U.S. 749, 763-64 (1962).   That fundamental right was transgressed here by the government's shift of its theory of criminality to include one predicated on omissions, against which Carpenter had no notice that he should prepare to defend.  The indictment in this case charged a

15

scheme to defraud predicated on affirmative false statements and *only* on affirmatively false statements. The indictment provided Carpenter with no notice that, in addition to fraud charges based on alleged affirmatively false statements, he would also be required to defend at the second trial against fraud charges based on his omissions to disclose his trading strategy and history. That shift had critical ramifications for the fairness of Carpenter's trial.

Critically, the government's reliance on an omissions theory at trial created the real likelihood that Carpenter was convicted based on a theory of mail/wire fraud which was neither charged nor properly submitted to the jury for its consideration. Silence provides a permissible basis for a finding of criminal fraud *only* where there was an independent duty to disclose. *See, e.g., United States v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012); *United States v. Cassiere*, 4 F.3d 1006, 1022 (1st Cir. 1993); *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984), *rev'd on other grounds*, 473 U.S. 207 (1985). Here, such a duty was neither charged nor proven, and the jury was not instructed that it could not convict Carpenter based on omissions unless it found that he had an independent duty to disclose the withheld information.[4] In addition, the jury was also not instructed on another essential element of fraud under an omissions theory, namely, that Carpenter knew he had a duty to disclose. *See Cassiere*, 4 F.3d at 1022 (First Circuit approved the following instruction: "A failure to disclose a material fact may also constitute a false or fraudulent misrepresentation if, one, the person was under a general professional or a specific contractual duty to make such a disclosure; and, two, the person actually knew such disclosure ought to be made; and,

---

[4] Perhaps the most common circumstance which gives rise to a duty to disclose is the existence of a fiduciary relationship between the parties. The qualified intermediary for a tax-free exchange cannot, however, as a matter of law have a fiduciary relationship with the exchangor; the qualified intermediary cannot be an exchangor's attorney, accountant, broker, investment banker, or the like. *See* 26 C.F.R. §1.1031(k)-1k(2).

three, the person failed to make such disclosure with the specific intent to defraud"). Given the government's heavy emphasis on Carpenter's failure to disclose that he was investing exchangors' money in stock options, the jury may well have rested its quick decision to convict Carpenter on all counts on a legally non-viable omissions theory.

Where, as here, "a jury has been presented with several bases for conviction, one of which is legally erroneous, and it is impossible to tell which ground the jury convicted upon, the conviction cannot stand." *United States v. Sawyer*, 85 F.3d 713, 730-31 (1st Cir. 1996). *See, e.g., Yates v. United States*, 354 U.S. 298, 312 (1957)("In . . . circumstances [where a legally invalid theory has been submitted to the jury] we think the proper rule to be applied is that which requires a verdict to be set aside where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected"); *United States v. Fernandez*, 722 F.3d 1, 33 (1st Cir. 2013). Under *Yates*, reversal is required unless it can be conclusively found that the jury's verdicts in fact rested upon a legally and factually adequate ground. It cannot be so said here.

Thus, the variance which occurred in this case was fatally prejudicial to Carpenter. Not only may the jury have based its verdicts on an impermissible ground, but the First Circuit assessed the propriety of the government's final arguments through the lens of an omissions theory, adding to the prejudice to Carpenter. Because the variance affected Carpenter's substantial rights, a new trial should be ordered.

## CONCLUSION

For all the foregoing reasons, this Motion for Reconsideration of Defendant's Supplemental

Motion for a New Trial should be granted.

## LOCAL RULE 7.1 CERTIFICATION

The defendant tried today to reach the United States to confer, but did not make contact (likely because of the holiday season), though the defendant does not expect the Government would consent to the relief requested herein.


Respectfully Submitted,                    Respectfully Submitted,
Daniel E. Carpenter,                        Daniel E. Carpenter,
By His Attorney,                            By His Attorney,



**/s/ Robert M. Goldstein**                 **/s/ Martin G. Weinberg**
Robert M. Goldstein, Esq.                   Martin G. Weinberg, Esq.
Mass. Bar No. 630584                        Mass. Bar No. 51948
20 Park Plaza, Suite 1000                   20 Park Plaza, Suite 1000
Boston, MA 02116                            Boston, MA  02116
 (617) 742-9015                             (617) 227-3700
**rmg@goldstein-lawfirm.com**               **owlmgw@att.net**



Dated: December 30, 2013

## CERTIFICATE OF SERVICE

I, Robert M. Goldstein, hereby certify that on December 30, 2013, this document has been served, via electronic filing, upon Jack Pirozzolo, Assistant United States Attorney, John Joseph Moakley Federal Courthouse, One Courthouse Way, Suite 9200, Boston, MA, 02210.



**/s/ Robert M. Goldstein**
Robert M. Goldstein