UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,     )
                              )
        Plaintiff,            )
                              )    Criminal Action
v.                            )    No. 04-10029-GAO
                              )
DANIEL E. CARPENTER,          )
                              )
        Defendant.            )
                              )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**STATUS CONFERENCE**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, January 28, 2014
2:07 p.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Jack W. Pirozzolo, Assistant U.S. Attorney
 3        John Joseph Moakley Federal Courthouse
          Suite 9200
 4        Boston, Massachusetts  02210
          On Behalf of the Government
 5
          MARTIN G. WEINBERG, PC
 6        By: Martin G. Weinberg, Esq.
              Robert M. Goldstein, Esq.
 7        20 Park Plaza, Suite 1000
          Boston, Massachusetts  02116
 8        On Behalf of the Defendant

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                    P R O C E E D I N G S
 2           THE CLERK:  All rise.
 3           (The Court enters the courtroom at 2:07 p.m.)
 4           THE CLERK:  The United States District Court for the
 5   District of Massachusetts.  Court is in session.  Be seated.
 6           For a status conference, the case of United States
 7   versus Daniel Carpenter, 04-10029.  Would counsel identify
 8   yourselves for the record, please.
 9           MR. PIROZZOLO:  Good afternoon, your Honor.  Jack
10   Pirozzolo for the government.
11           MR. WEINBERG:  Good afternoon, your Honor.  Mark
12   Weinberg with Rob Goldstein for defendant, Dan Carpenter, who
13   is in the first row with his family.
14           THE COURT:  Okay.  I want to first address the pending
15   motions and then we'll set a sentencing date, okay?  So I don't
16   know if you have a preference.
17           MR. WEINBERG:  If your Honor please, I would start
18   with the -- what I think is the pivotal motion, which is the
19   motion that seeks for your Honor to dismiss the indictment
20   because of the passage of nine years and 51 weeks since
21   Mr. Carpenter was arraigned in the first of February 2004.  And
22   it has a corollary component that when you add approximately
23   three years for the investigation, this case has dominated his
24   life for 13 years, or about one-third of his adult life.
25           And the argument for speedy trial, or speedy
</pre>

1    sentencing, comes from the majority of circuits which have

2    applied the Sixth Amendment to sentencing.  The government's

3    position is, No, it's a due process issue, using the Second

4    Circuit, which is the outlying circuit, when compared to the

5    other circuits that have addressed what is the standard for

6    determining when there's been sufficient prejudice to warrant a

7    conclusion of sentencing and a dismissal of the indictment.

8         The First Circuit has assumed that the *Barker v.*

9    *Wingo*, the traditional Sixth Amendment test, applies.  The

10   Supreme Court had dicta in the *Pollard* case to that effect.

11   But there has not been a square opinion by the circuit saying

12   whether it's speedy trial or due process that governs the

13   analysis.  In the Second Circuit there was one case, *United*

14   *States versus Ray*, where three judges found that the sentence

15   15 years after the end of the trial -- the government had not

16   moved for sentencing in an expedited fashion, said it was

17   exceptional, they precluded any additional sentence.  Judge

18   Leval said, "It's a labeling issue.  It's the same analysis:

19   What's the passage of time; what's the degree of prejudice?"

20        Here I would contend that ten years, although not 15,

21   is an exceptional period of time for an accusation to remain in

22   the current status of a citizen not knowing whether he's going

23   to be sentenced, and at various times how he's going to be

24   sentenced, that it has had a dramatic and irrevocable effect on

25   his life.  It's been dominating his mental life.  It's been

1    affecting his physical life.  It's been dominating his

2    reputational life.

3         Today we submitted to the Court a psychiatric report

4    under seal that was filed a short time ago -- I provided

5    Mr. Pirozzolo a copy this morning, that documents from the

6    forensic perspective, you know, what it does to someone like

7    Mr. Carpenter who grew up poor, who cherished his reputation,

8    who gave great philanthropy to his school, who was investigated

9    for losing the funds, and for the BPETCO 1031 case starting in

10   2001, indicted in '04, tried in '05.  As a result of what the

11   Court properly determined to be improper government arguments,

12   it went up on appeal.  We're now in 2008.  2008 there's a

13   second trial.  And then through five years it reaches the Court

14   of Appeals' reversal of this year.

15        What's important is that it was the defendant alone

16   who at various times filed requests -- requests with the court

17   for status conferences, requests that notified the Court of

18   what it was doing to Mr. Carpenter in terms of turning into a

19   nightmare his life due to the pendency.  The First Circuit --

20   twice Mr. Goldstein filed requests of the First Circuit to send

21   the case back to your Honor so you could weigh the Sixth

22   Amendment issue, which had otherwise been jurisdictionally

23   transferred from the district court to the Court of Appeals.

24   They took two years to resolve the Carpenter appeal.

25        The government, during this five-year period, since

1    trial of 2008 until the Court of Appeals' decision in late '13,

2    did absolutely nothing to expedite the decision-making by the

3    judiciary.  And it's the government's duty.  Case after case,

4    including the Second Circuit, say it's not the defendant's duty

5    to expedite his sentencing, it's not the defendant's duty to

6    get himself prosecuted; it's the government's duty to make sure

7    that the purposes and virtues and values of speedy trial are

8    vindicated.

9         And with all due respect, the government sat silent

10    during the years when it was under consideration by this Court,

11    even though Mr. Goldstein twice asked in a respectful way.

12    It's very hard for a defendant to ask a judge, deliberating on

13    significant issues, to hurry.  Mr. Goldstein did, and again, at

14    the First Circuit for two years, asked the First Circuit to

15    remand to the district court so we could deal with the issues

16    that are now before you.

17         The four-part test is well known.  Period of delay:

18    Ten years certainly more than satisfies that threshold factor

19    of the *Barker v. Wingo* issue before the Court.  The requests:

20    Mr. Carpenter has notified the system and the Court what this

21    was doing to his life.  In fact, in 2008 when we were dealing

22    with a presentence report following the second conviction,

23    Mr. Carpenter told probation much of which is in the --

24    Dr. Shouten's report, he told probation that this was a

25    nightmare.  That he was in a state of siege.  That he couldn't

1   sleep.  That his mental and physical, you know, capacities were

2   getting overwhelmed by the uncertainty and pendency and sheer

3   duration of the ordeal of being an accused who hadn't yet had

4   finality in terms of the criminal justice system.

5          In terms of the report that we submitted under seal,

6   your Honor --

7          THE COURT:  Which I will note for the record I have

8   read.

9          MR. WEINBERG:  Thank you, your Honor.

10          Judge, I'm not going to reread what your Honor has

11   read other than to say that it talks about I think -- the

12   Supreme Court once said we can presume in the *Strunk* case that

13   somebody who is pending a charge suffers the anxiety, suffers

14   the mental anguish of being an accused.  You know, it talks

15   about Mr. Carpenter, that there's an intensification of that

16   anxiety, of that difficulty.

17          And in terms of -- he talks about sleeplessness, he

18   talks about ruminations, he talks about weight gain, he talks

19   about the obsessional quality of waking up in the middle of the

20   night, thinking about the government coming after him.  And I

21   think that to some extent part of that is just being a

22   defendant, but a greater part of it is being a defendant for

23   ten years and being a target for 13 years.

24          Like I said, this is one-third of his adult life.  It

25   has dominated his life from January 2001 until the late fall of

1    2013.  And I think that prejudice is the kind of prejudice

2    that, in combination with the sheer length of time, with the

3    requests for judicial responsiveness, with the reasons being,

4    in part, attributable to the government -- apart from the first

5    trial it would have, in an ironic way, been better for

6    Mr. Carpenter to have been sentenced in 2005 and have had some

7    finality, whatever the sentence imposed at that time, than to

8    be back in front of the Court in 2014, nine years later.

9              People have a right, a constitutional right, I

10   contend, to have finality, to have -- one part of their life is

11   dominated by the conduct -- this conduct occurred in the year

12   2000.  We're here 14 years later, Judge.  He's been punished in

13   collateral ways, not by formal sentence, but I think when you

14   read what he said to probation in 2008 when he certainly had no

15   motive to think about establishing prejudice on a speedy trial

16   issue, he said that his life has been characterized since the

17   inception of this case as being in a state of siege which has

18   resulted in poor sleeping and eating habits, the occurrence of

19   several panic attacks, dark days, his livelihood attacked.

20             Everything he thought he was building up, you know, as

21   a life of somebody who had come from a poor background and

22   established themselves, and that he went to a private school,

23   largely, you know, through donations, and it was the proudest

24   thing of his life to be able to give back to his school.  And

25   as the probation report will reflect, he has been very

```
 1    charitable.
 2              He talked about his life for eight years being a
 3    living hell, that at times he believed that, you know, going to
 4    sleep wouldn't be the worst thing, although he no longer has
 5    the kind of thoughts that he had in 2008.
 6              But I ask the Court as a matter of constitutional law
 7    to dismiss this case and to preclude sentencing.  Ten years is
 8    simply too long.
 9              We've also provided the Court with a reconsideration
10    of the Court's prior decision under the Speedy Trial Act to
11    make sure that that issue is preserved.  The Court decided it,
12    there's a split in the circuits, and I felt duty-bound to raise
13    it again.
14              But the pivotal issue before Court today is the speedy
15    trial issue.  I don't know whether the Court --
16              THE COURT:  I'm not sure I understand your
17    split-in-the-circuits argument.  In other words, the rule, as I
18    understand it, in the First Circuit is the clock is reset under
19    the statutory language with the issuance of the mandate.  And I
20    think that's what we calculated.
21              MR. WEINBERG:  Yes.  It's actually the --
22              THE COURT:  There's a debate as to whether it's the
23    issuance -- among some courts as to whether it's the issuance
24    of the mandate or the receipt by the circuit court of the
25    mandate, but we use the earlier date, and under the earlier
```

1   date the 70 days hadn't expired.

2       MR. WEINBERG:  Right.  And there's no question that if

3   the Speedy Trial Act is properly applied and its application

4   was to begin with the mandate, it's less than 70 days.

5       The "split in the circuits" comes from the courts that

6   were not -- to 3161(e) which would be a trigger of a new date

7   for a new trial.  They look at the interlocutory appeal

8   tolling, an ongoing running of the clock.  So if the clock

9   reached 20 days, interlocutory appeal filed.  The government

10  spent some time between your Honor's order of the new trial and

11  the filing of the notice of appeal.  When you add those days

12  onto the days after the mandate returned, you exceed by the

13  government's agreement 70 days.  And that's the conflict of

14  circuits.  The Ninth Circuit would restart a running clock and

15  look to the interlocutory appeal as a tolling or as an

16  exception to the running of the clock, whereas the Court's

17  decision was to look and set a separate subsection of this very

18  complicated Speedy Trial Act.

19      And that was the basis of your Honor's decision, that

20  it started at zero when the mandate was returned, and it ran to

21  about 56 before the next 70.  That's the tolling under the

22  statute.  That was the status conference when the defense

23  lawyers asked your Honor for a trial date out into the late

24  spring, and your Honor granted them that request through April,

25  and later made findings in the interest of justice that were

 1    orally thought about in November, but formally made later in

 2    the year.

 3            The split in the circuits, Judge, is not about when

 4    the clock restarts; the split in the circuits -- and we gave

 5    your Honor the *Pitner* case from the Ninth Circuit -- is which

 6    subsection the Speedy Trial Act governs which determines

 7    whether it's a restart or whether it goes to zero, whether it

 8    continues.

 9            Does your Honor want to hear from the government on

10    the speedy trial --

11            THE COURT:  Yeah, why don't we do it that way and then

12    we'll take the other...

13            MR. WEINBERG:  Thank you, sir.

14            MR. PIROZZOLO:  So I'll just address the

15    constitutional issue first.  And I've had a chance to look at

16    the motion that was filed on Sunday that relates to the

17    calculation of the Speedy Trial Act, the split in the circuits

18    that we just talked about.  So I'll talk about the

19    constitutional issue first.

20            I think it's really important to unpack exactly what

21    the analysis needs to be here for purposes of the

22    constitutional analysis.  Addressing the Sixth Circuit issue,

23    as Mr. Weinberg has properly represented, it is the

24    government's position that under the *Ray* case, the Sixth

25    Amendment does not apply in this context to a claimed delay in

1    sentencing.

2         The claim before the Court now in this current motion

3    is a claimed delay in sentencing.  The *Ray* case canvassed the

4    various circuits that had looked at the issue, and had

5    concluded that it was -- that the circuits who have decided

6    otherwise misread the *Power* decision -- the Supreme Court's

7    *Power* decision.  *Ray* is correctly -- a correct analysis of the

8    Sixth Amendment speedy trial application to sentencing, in the

9    government's opinion.

10        I want to just suggest why this matters, though.  You

11   shift pretty quickly over into the Fifth Amendment issue, which

12   I'll address in a moment.  As you know, in the *Ray* case the

13   court did grant relief to the defendant for -- under a Fifth

14   Amendment analysis, but it matters in terms of the remedy.

15        If there is a Sixth Amendment violation, the remedy is

16   dismissal; if there's a Fifth Amendment violation, that is not

17   the required remedy.  And as the *Ray* case pointed out, or have

18   held, the remedy for that defendant was the modification of the

19   sentence.

20        So the correct analysis, in the government's opinion,

21   is that Sixth Amendment doesn't apply to this particular claim,

22   which is really premised on the sentencing, and then moved to a

23   Fifth Amendment analysis as to whether or not there has been

24   unreasonable delay and prejudice.

25        But I will address the Sixth Amendment -- if the Court

1  wants I can address the Sixth Amendment analysis briefly as

2  well.  First of all -- so if you pass the first prong and say

3  that we now are going to look at the other three factors, you

4  have the reasons for the delay.  Here, I think as we set out in

5  our papers, it's really important to unpack the various phases

6  of this case.  And two of the phases are the first appeal and

7  the second appeal -- the first and second interlocutory appeal.

8         And the *Loud Hawk* case, which is cited in the papers,

9  a Supreme Court case, quite clearly says that those periods of

10 delay are reasonable, are not a basis for finding a

11 constitutional violation.  The only basis for finding a

12 constitutional violation with respect to maybe one of them

13 would be if it were clearly frivolous or tangential, if it was

14 done for some form of frivolous or tangential reason by the

15 government.

16        And that is not the case.  The first appeal, as the

17 Court knows, resulted in three separate opinions from the First

18 Circuit, including one dissent.  It was a very closely

19 contested matter.  It was not even a remotely frivolous appeal.

20 And since it was a new trial order, it's not tangential either.

21 It went to the heart of the outcome of the prosecution.

22        The second appeal was a successful appeal for the

23 government, and, therefore, that period of delay also should

24 not be weighed at all against the government with respect to

25 the Speedy Trial Act.

1              The other period of delay that the government

2    addressed in the papers is the three-year period from the time

3    of the conclusion of the trial through the Court's September 1,

4    2011, order, which is a period of a little over three years.

5    And the cases that analyze that kind of delay look to see what

6    was the docket like for the Court.  Was the defendant filing a

7    large number of motions which required the Court to take time

8    to consider the motions?

9              And as we set forth in our papers, there were a series

10   of additional motions that had been filed and pending during

11   that period of time, and that's not including the supplemental

12   memoranda, the supplemental surreplies, the replies to

13   responses that -- the letters that were sent to the Court, all

14   of which were filed by the defendant.  And under those

15   circumstances it is not appropriate to weigh that as a

16   constitutional violation given that it was the defendant's

17   advocacy for his position that required the Court to pay

18   attention to that, and, therefore, caused the delay.

19              So for the reason for the delay, that reason which is

20   really the most important one, you have no frivolous motions by

21   the government, no improper conduct -- affirmative conduct by

22   the government, and you have conduct by the defendant asserting

23   the defendant's rights, which the defendant has every right to

24   do, but can't then turn around and say, "Well, my right -- my

25   constitutional right to a speedy trial has been violated under

1 those circumstances."

2     The assertions of the right, as we point out here,

3 were made by the defendant largely -- and as is his right to

4 do, but largely as tactical decisions in an attempt to get the

5 case dismissed rather than genuinely trying to push forward the

6 sentencing date or the trial date.  In fact, the record -- the

7 docket shows that at least in the first -- before the first

8 trial there were a number of requests by the defendant to delay

9 the trial.

10     And then finally on prejudice, I just want to briefly

11 say that the analysis under *Barker* has the Court weigh three

12 separate -- there are three separate components to the

13 prejudice, two of which do not apply.  There isn't even an

14 attempt by the defendant here to show that they would apply.

15 So there's been no pretrial incarceration, and there is no

16 showing, none, of any effect that the delay had on the ability

17 of the defendant to advocate for a particular sentence one way

18 or the other.  There's been no prejudice in that sense.

19     The only component, the only sole component, is the

20 issue related to anxiety.  And I had a chance to take a look at

21 the filing that was made under seal earlier today.  And that

22 type of psychological strain is common in virtually every

23 white-collar case.  It is not uncommon in any criminal case.

24 And that is not -- it's not appropriate to have that be the

25 sole basis upon which the Court can conclude that there's been

1   a constitutional violation.

2        Some of the other things that were put in the

3   pleading, not in the letter that was submitted today, things

4   like coaching a girl's soccer team, not having -- having a name

5   of a field being pulled off of the field, are -- there's no

6   cases that show that that's the type of level of distress or

7   anxiety that would rise to really the extreme remedy here of a

8   constitutional violation.

9        On the Fifth Amendment analysis I do want to point out

10  a couple of things.  A lot of the delay issues that I just

11  talked about apply here.  There was not an unreasonable delay

12  here because the delay is attributed to two interlocutory

13  appeals and a period of time in which there was a series of

14  motions before the Court along with multiple, multiple filings

15  that had been made by the defendant supplementing those

16  motions.

17       On the issue of prejudice, the issue of prejudice, at

18  least as I read the cases, is slightly different than it is in

19  the Sixth Amendment context.  It really has to show -- the

20  prejudice prong at least in the cases that I've seen -- and I'd

21  actually cite -- I did actually provide these to Mr. Weinberg

22  before the hearing.  There's a recent -- it was decided about

23  ten days ago.  It is not precedential, but I think it's

24  potentially helpful in terms of seeing how the *Ray* prejudice

25  standard has been applied.  It's 2014 Westlaw 151762.  I have a

1    copy for the Court if it would like it.  It's *United States*

2    *versus Kurti*.

3        And it was a delay of seven years, with five years of

4    unexcused delay, in a sentencing.  And the Court rejected a

5    claim under *Ray* on the ground in part that the defendant

6    couldn't show any prejudice to his ability to advocate for a

7    certain sentence one way or another.  There was a specific

8    reference that "The defendant fails to advance any compelling

9    argument as to how his present-day inability to question a

10    former attorney" -- which would have been a piece of

11    evidence -- "has caused him any prejudice," and there was no

12    prejudice to the outcome of the sentence.

13        That's the type of prejudice that I think in the Fifth

14    Amendment context the Court needs to focus on.  And, in fact,

15    that's -- if you look at the *Ray* case, that's exactly what they

16    were looking at.  They were looking at whether it would

17    interrupt her rehabilitation in a way that would have been

18    grossly unfair to her.  She had been out of jail for -- or she

19    had been out on release for 15 years and was applying for a

20    job, and interrupting that would have undermined her

21    rehabilitation and would not have been -- it would have

22    prejudiced her ability to advocate for a particular sentence.

23        On the Speedy Trial Act filing that was made on Sunday

24    night -- if you'd just bear with me.  I want to make sure I get

25    my papers on that -- I think the statutory reference -- the

1    government addressed this back in -- I believe it was February

2    of 2008 in a filing.  Yes.  And the Fifth Circuit case is

3    cited, hold that -- the Fifth Circuit case is cited.  It's

4    *United States versus Kington*, 875 F.2d 1091, which resets the

5    clock following an appeal.

6         And I would just point out that the plain language of

7    the statute says that "The trial shall" -- excuse me.  "If the

8    defendant is to be tried again following a declaration by the

9    trial judge of a mistrial or following an order of such judge

10   for a new trial, the trial shall commence within 70 days from

11   the date the action occasioning the trial becomes final."  And

12   it becomes final at the issuance of a mandate.

13        At this point there's no reason -- or it's not -- we

14   would submit the Court has already ruled on this, and there

15   isn't any new information that has been provided at this point

16   that would -- that, in the government's view, it would be

17   appropriate for the Court to revisit that ruling at this time.

18        Does the Court have any questions for the government

19   on this?

20             THE COURT:  Not on that.  No, thank you.

21             MR. PIROZZOLO:  All right.  Thank you.

22             THE COURT:  Mr. Weinberg?

23             MR. WEINBERG:  May I briefly reply, your Honor --

24             THE COURT:  Go ahead.

25             MR. WEINBERG:  -- and then focus on the remaining

1    issues?

2            THE COURT:  Yes.

3            MR. WEINBERG:  First is the government seemingly

4    believes that Mr. Carpenter -- there's some inconsistency

5    between Mr. Carpenter's litigation positions and his

6    entitlement to a ruling on a Sixth Amendment violation.

7            Even if you were to assume arguendo that the reasons

8    for delay were neutral, that they weren't attributable to

9    government bad faith -- we have not made that argument, but we

10   have made an argument there were errors in Trial 1 that led to

11   a three-year delay between Trial 1 and Trial 2, and led

12   inexorably to the later delays.  Had they not made legal delays

13   during Trial 1, we would have had sentencing in 2005.

14           But the issue is not the government's bad faith.  It's

15   not even their misconduct.  It's the weighing of four

16   interlocking variables under the *Barker* test.  No one of them

17   governs, if you assume the reasons for delay are neutral, and I

18   assert they're not.  I believe the reasons weigh on the

19   government, and weigh largely -- because of what Justice

20   Marshall said in the 5-4 decision.  This is the dissenting

21   position of *Loud Hawk,* which is the government's case.

22           He said, "Courts as well as prosecutors must

23   necessarily work to promote those interests if they are to have

24   any vitality.  Because it is the government as a whole -

25   including the courts - that bear responsibility, and that a

1    prosecutor's good faith cannot suffice the discharge of that

2    responsibility."

3            Mr. Pirozzolo could have been in good faith from '08

4    to '13, but he did nothing to expedite decision-making.  He

5    didn't ask for a status conference.  He didn't join with

6    Mr. Goldstein in asking for a status conference, Docket 373 and

7    '5 before the Court.  When we moved the First Circuit to remand

8    so that your Honor could decide speedy trial, the government

9    was silent.  Its appellate advocate asked for two continuances

10   in their briefing.  That's understandable.  People ask for

11   continuances.  But not in the context of the case that was in

12   its ninth year since the trial at the time of the request for

13   the continuances.

14           So their silence in the context of this case to me

15   means that that one of four variables weighs against the

16   government, and it weighs against them that they did nothing to

17   expedite this case.  The prejudice component weighs heavily in

18   Mr. Carpenter's favor.  He's not like the defendants in the

19   Second Circuit case, that is the unreported decision, who,

20   according to the court, did nothing to prove substantial

21   prejudice.  He's far more like the *Ray* case where Mr. Carpenter

22   has provided a record of prejudice, a record of what he said to

23   probation five years ago when there was no litigation on his

24   mind.  He was just being candid about what at that point a much

25   lesser delay had done.

1          He's provided the Court with hard proof that there's

2     been demonstrable, actual prejudice to him through the delay.

3     Ten years is longer than many of the other cases.  And we

4     ask -- we do believe, your Honor, that we have more than met

5     the four variables under *Barker v. Wingo*.  And that is the

6     majority rule, to apply the Sixth Amendment.  The First Circuit

7     has said, We assume it applies to sentencing although,

8     candidly, they have not been confronted directly with the case.

9          In the *U.S. v. Ray* Judge Leval in Footnote 7 said it's

10    labeling.  It's the same issue of weighing prejudice versus

11    length of delay and harm.  Whether it's due process or speedy

12    trial, Judge Leval didn't write a dissenting opinion because he

13    concurred in the opinion of *Ray* which vacated the sentence.

14         Yes, due process allows a sentence that's been imposed

15    to be vacated, whereas a speedy trial requires a dismissal of

16    the indictment.  Both of those clauses apply to this very

17    unique, very extraordinary case of Mr. Carpenter.  We ask your

18    Honor to dismiss the case.

19         THE COURT:  Okay.  I will reserve the constitutional

20    motion.  The motion under the Speedy Trial Act and Rule 48 is

21    denied.

22         MR. WEINBERG:  Okay.

23         THE COURT:  Now, do you want to move with respect to

24    the supplemental new trial motion?

25         MR. WEINBERG:  Thank you, Judge.  There are two other

1     issues that remain.  One is -- results from the motion to

2     reconsider that we filed on December 30 addressing what we

3     argue is a constructive amendment of the indictment, and the

4     second, and again interfacing motion, is one that was filed but

5     not ruled on in the context of your Honor's September 1, 2011,

6     rulings denying the seven-day new trial motion, the

7     interest-of-justice motion challenging the trial on Rule 33

8     grounds.  Your Honor granted it on summation, denied it on

9     other grounds, including on the ground that Mr. Levine had

10    committed perjury.

11         Later, before that ruling but after those filings,

12    there was another new trial motion directed to newly discovered

13    evidence that was not available in '08 that was generated by

14    the parallel civil proceedings that were ongoing involving

15    Merrill Lynch.  And if I can start there.  It's Docket 355, is

16    the specific motion, and then there was government opposition

17    at 357 and a reply at 359.  And it's that motion that we ask

18    the Court to order a new trial.

19         It is not just, as Mr. Carpenter learned from

20    examining the civil pleadings, Mr. Levine, having come before

21    his jury and committed perjury, perjury that the government

22    expected that he would commit when he denied any conversation

23    or any contact or any communication with Mr. Patterson in 1998.

24    We now know that Merrill Lynch had additional witnesses that

25    were aware in 2000 that there were Benistar funds that were

1    being traded through their accounts through the end of

2    September '00 when the accounts got transferred to PaineWebber

3    were third-party funds.  And in the context of Docket 355, your

4    Honor has been provided with a deposition by Nancy Sawyer,

5    who's an upper management person there who I believe was

6    testifying as a 30(b)(6) witness.

7          And Nancy Sawyer said as a result of conversations

8    with Dan Carpenter, she knew that these were not his funds he

9    was trading; they were third-party funds.  And that was an

10   important issue because if Carpenter was transparent with

11   Merrill Lynch and explained to Merrill Lynch that he was

12   trading 1031 money or third-party money or monies that were

13   allegedly escrowed, then a jury could infer that he, Carpenter,

14   believed that he was permitted to do that; that he was not

15   committing a scheme to defraud by investing monies that he knew

16   that he had criminal mens rea and he shouldn't be investing, or

17   shouldn't be investing without disclosure.

18         And Nancy Sawyer said she spoke to Carpenter.  "What

19   did you learn from Carpenter?"  And this is in her deposition.

20   "My understanding of the Benistar business, it bought and sold

21   properties on behalf of clients."

22         "Did you understand Levine had the same understanding

23   of the business?

24         "Yes, I did."

25         She later testified that "I was never under the

1    impression it was Dan Carpenter's money.  I believed they were

2    holding it on behalf of their clients."

3           And that became an important issue.  That was the

4    Patterson v. Levine issue.  "Did Levine know it was

5    third-party money?

6           "No, I didn't.  I never spoke to anyone.  I was never

7    told that."

8           And here you have Nancy Sawyer, who's examining the

9    Merrill Lynch files, speaking to Carpenter and coming to the

10   same conclusion that supported Mr. Patterson's testimony.

11          There's additional documents that were provided

12   through the litigation, and the civil litigation that was

13   presented as newly discovered evidence.  There were faxes

14   between different people at Merrill Lynch of the Benistar

15   website which said openly, "This is a 1031 property exchange

16   business."  And it went from a man named Malia, who was

17   investigating, and it went to Rasmussen, who was a witness

18   before the Court, and it went from Rasmussen -- and it was

19   plausible it went to Stern, who was working as a subordinate

20   under Rasmussen.

21          There was a third document where another gentleman at

22   Merrill Lynch named Tassan [sic], I think -- I don't remember

23   his exact name -- sent out a request for information about

24   third-party money in a request to others within this same

25   trading room.

1          I mean, the net result of this aggregate evidence is

2     that Merrill Lynch came before this Court, this jury, Levine

3     lied to them.  Stern, if he didn't lie, was grossly mistaken.

4     Rasmussen, the same.  I'm not here to indict Merrill Lynch or

5     to make allegations of conspiracies to obstruct justice because

6     we're not here arguing that this is a *Brady* issue; we're here

7     arguing that this is a Rule 33, newly discovered evidence

8     issue, that Mr. Carpenter was denied a fair trial because a

9     group of witnesses got on the witness stand, looked this jury

10    in the eye and said, "We did not know that the Carpenter money

11    that was being traded came from third parties."

12          Why is this important besides just the Levine perjury

13    issue?  It's because as we go through time, the government's

14    theory of prosecution has evolved from a theory that basically

15    was an affirmative misrepresentation theory -- the documents

16    lied.  They promised safety.  They promised 3 or 6 percent --

17    to a half-truth theory which your Honor instructed the jury --

18    and it's been your Honor's instruction and belief -- and you

19    denied Rule 29s despite litigation saying half-truths are

20    within false statements in terms of mail fraud law.

21          And it's gone to material omissions.  It's gone to a

22    failure to disclose to the exchangers that Mr. Carpenter was

23    going to invest their money to generate their 3 and 6 percent

24    and generate a profit for Benistar.  We have a

25    failure-to-disclose case that's not based just on the

affirmative misrepresentations.  You need a duty to disclose.
And you need the knowledge of duty to disclose.  And that was a
theory that wasn't charged and wasn't constructed, because the
government charged and the government's instructions that were
requested were half truths/affirmative misrepresentations.
That's the constructive amendment argument.

The Merrill Lynch argument is:  The more important is
the failure to disclose issue, the more important it was that
Carpenter disclosed this not just to the broker Levine, but to
the Merrill Lynch people; that he disclosed it on his website
which went to Merrill Lynch, and they knew it; that he
disclosed it to Ms. Sawyer when she was asking Carpenter about
his business; that he was open; that he was transparent, which
is one step away from he didn't believe he was doing anything
wrong.  He was in good faith.  There was no covertness.  He
wasn't lying to Merrill Lynch, as the Merrill Lynch witnesses
suggested or testified, saying, "I'm engaged in risky trading.
This is my money.  I'm worth 30 million," was the Merrill Lynch
testimony, suggesting to a jury that they believed Carpenter
was trading his own money.  Why was it in their interest to
suggest that?  Because they would have distanced themselves
from the lawsuits of the exchangers who were suing not only
Carpenter, but PaineWebber and Merrill Lynch.

Since this case, Merrill Lynch gave them roughly 30
million.  PaineWebber, we know, gave them roughly 13 million.

1   They've been repaid in multiples of what they lost in 2000 and

2   2001.

3        But for new trial purposes, how helpful it would have

4   been to Carpenter's representation to a jury that I didn't have

5   criminal intent.  I didn't intend to deceive.  I believed I was

6   in good faith.  I believed the contracts permitted me to trade.

7   And I was open, not only with one lawyer, Mr. Patterson, but

8   with Merrill Lynch in terms of letting them know what the

9   source of the funds were.

10       He was denied that testimony not because of the

11  government, not because there was a suppression of evidence,

12  because Merrill Lynch denied him -- for their own monetary

13  purposes denied him that evidence that was consistent with good

14  faith and inconsistent with an intent to deceive.

15       That's the Rule 33 pending before your Honor.  The

16  documents are before your Honor.  There's pendencies before

17  your Honor.  You have the Sawyer deposition, and you have the

18  hard documents that show back in 2000 -- not in 2009, but back

19  before they came to court in '05, before they came to court in

20  '08, that back in September and October of 2000 they knew

21  exactly what funds he was trading, and they either refused to

22  remember it or testified, as your Honor found they did so

23  perjuriously.

24       Just for a second, to get back to constructive

25  amendment, the Court in its decision denying the new trial

motion relied on affirmative misrepresentations.  It relied on
the promises of safety, the promises of 3 percent, 6 percent,
has always been the basis of the Court's upholding of the
sufficiency of evidence against Rule 29 issues, that this was
as indicted, as instructed, an affirmative misrepresentation
case.

What I have provided in the motion to reconsider is
the government's statements to the Court of Appeals.  And I
quote them at pages 7 and 8.  And the heart, the soul of their
evidence position given to the Court of Appeals was featuring
the words "failure to disclose."  "Carpenter defrauded the
exchangers by failing to disclose his true intentions."  And
it's over and over and over again.  I provided, you know, maybe
ten or 12 excerpts from their two appellate briefs.

"A failure to disclose" is more than a half truth.
These are not failures to disclose in the contracts.  This is
an overall generic free-floating omission theory, a theory that
Carpenter had some duty to either speak to the exchangers, at
least in the fall of 2000, because the Court knows he never
spoke to any of them before they signed contracts.  He only
spoke to several of them after the money was lost, that the one
lawyer or representative of any of the 126 exchangers that ever
asked Carpenter, "How are you going to make the 6 percent or 3
percent and still make a profit," he said, "Go call Levine at
Merrill Lynch."  That's Mr. Patterson's summarizing, obviously.

1          None of the other exchangers ever asked Mr. Carpenter,

2     "How are you going to make the money?"  None of their lawyers,

3     financial advisors asked him.  There's no lies here.  In other

4     words, there's no oral lies by Carpenter; there's no oral

5     misrepresentations.  The documents did not say "Carpenter

6     intends to invest the money through options."

7          But the way the government argued this case to the

8     First Circuit is as an omission case, a failure to disclose

9     case.  And that's the basis for our asking the Court to

10    reconsider and grant a new trial, or dismiss the case based on

11    a constructive amendment of the indictment, which in two

12    paragraphs talked about failure to disclose.

13         But the thrust of that lengthy indictment was lies.

14    That's the basis that your Honor upheld the convictions.

15    That's the only basis that should have gone to the Court of

16    Appeals.

17         THE COURT:  Mr. Pirozzolo?

18         MR. PIROZZOLO:  Thank you, your Honor.  I'm going to

19    address the Merrill Lynch supplemental filing first and then

20    the constructive amendment issue second.

21         On the Merrill Lynch -- what I'll call broadly the

22    Merrill Lynch issue, I want to -- I actually want to focus the

23    Court in on precisely where we are procedurally with that

24    motion, because I think it's getting a little bit lost.

25         That motion -- there's no motion.  The issue that is

before the Court was raised in a supplemental memorandum in support of the mistrial, Rule 29 and Rule 33 motions that had been filed, and the Court -- and that the Court has already ruled upon.  So they were not filed or styled as separate motions before the Court.  So if you look at Number 355 -- Docket No. 355 -- you will see it is simply a supplemental memorandum in support of those motions.

Of course the Court would know, but presumably the Court had those in front of it when it ruled on the motions in its September 1 ruling denying the mistrial -- the two rulings: One denying the mistrial motion and the other denying the Rule 29 and granting in part on different grounds the Rule 33 motion.

So there is no new motion so far as I can tell in the docket for the Court to rule on right now.  And I think the reason for that is, as I -- is that if you look at that filing, it is, in fact, not framed as a new trial motion at all.  It does not even attempt to apply the relevant legal principles that apply to the new trial motion in this context under *U.S. versus Wright*.  So -- and the reason for that is, as I will explain, is that there was no basis -- they could not meet that test.

So the *Wright* test, which requires four things -- that the newly discovered evidence was known or unavailable to the defendant; that the defendant was diligent in attempting to

1    unearth the evidence; that the evidence was materially and not

2    merely impeaching or cumulative; and, four, likely to bring

3    about an acquittal.  So those are the four things.  And the

4    defendant has to reach each and every one of those in order to

5    get relief in the context if this is styled as a Rule 33 motion

6    which, incidentally, it was not.

7              And if you look at the filings, both the original

8    supplemental memorandum and the reply, there's no effort at any

9    time in those motions -- in those documents to analyze it in

10   accordance with the *Wright* standard -- "*Wright*," W-R-I-G-H-T,

11   which is the name of the case, 625 F.2d 1017.  And there's --

12   in our papers there's also a separate *Connolly* case which was

13   cited as well, which applies the *Wright* standard.

14             So analyzing it under *Wright*, the -- there are

15   basically three pieces of evidence that are provided -- well,

16   let me just be clear.  The Court doesn't need to get to *Wright*

17   because it was really never submitted as a new trial motion at

18   all.  And in that context, it's the government's position that

19   it is waived.  There's no -- they didn't even attempt to

20   establish the standard and, therefore, the Court can just on

21   that basis just deny the requested relief.

22             But if the Court proceeds to the merits of the

23   analysis, there are three pieces of -- there are three pieces

24   of evidence.

25             THE COURT:  Let me just pause on the procedural

1   question.  It was a supplemental memorandum to then-pending

2   combination 2933 motion?

3           MR. PIROZZOLO:  Yes.

4           THE COURT:  My recollection, not having reread the

5   opinion recently, is that those issues were not expressly

6   addressed in the order denying Rule 29 and granting a new

7   trial.

8           MR. PIROZZOLO:  That is true.  I actually just looked

9   at it this morning.

10          THE COURT:  Is it proper to consider -- because they

11  were pending and part of the arguments in support of those

12  motions, does the disposition of the motions imply -- without

13  recognizing them as a basis for relief, imply the denial on

14  those grounds?

15          MR. PIROZZOLO:  Yes.  Yes.

16          THE COURT:  I would think so.  So post-judgment those

17  issues would be live for appeal?

18          MR. PIROZZOLO:  Yes.  Yes.  I think that's right.

19          THE COURT:  Even if not explicitly addressed in the

20  ruling?

21          MR. PIROZZOLO:  Correct.  Assuming that -- I want to

22  think through whether there was a timing issue here because

23  there's a certain limited amount of time to bring certain

24  things to the attention of the Court.  I just can't remember

25  whether that would be in time.

1            But in any event, whatever those issues are, if they

2    were ruled upon in the judgment, it would be ripe for appeal on

3    the direct appeal following sentencing, setting aside the

4    merits and the procedural -- all of that.  Right.  And there's

5    no concession on the government's part if it's procedurally

6    correct in the way it was presented to the Court.  Okay.

7            So turning to the merits, and applying the *Wright*

8    standard, the W-R-I-G-H-T standard, there are three pieces of

9    evidence that are basically presented to the Court in the

10   supplemental memorandum.  The first has to do with testimony of

11   Ms. Sawyer from Merrill Lynch.  That fails the *Wright* test in

12   terms of the threshold inquiry because that evidence was a

13   conversation between Mr. Carpenter and Ms. Sawyer.  He knew

14   about it.  She was on the witness list for Mr. Carpenter at

15   various times.  And, therefore, it was not --

16           THE COURT:  Which witness list, here or in the state

17   courts?

18           MR. PIROZZOLO:  Let me check my filings, but I believe

19   it was witness list here.  But let me check on that.  If you

20   would just bear with me.

21           THE COURT:  Well, that's just a detail.  I don't --

22           MR. PIROZZOLO:  Okay.  I just don't want to -- I want

23   to get it right.

24           But I'm actually not sure that would be material.  If

25   the defendant knew and understood that -- if he had the

1    conversation with Ms. Sawyer, he knew enough to put her on a

2    witness list in the civil case before this motion is filed,

3    right, then it would qualify as not something newly discovered

4    by the defendant.  But that would be a matter of record.  So

5    whatever the witness list is in this case, it is.

6            I do believe that there was a reference to Ms. Sawyer,

7    however, in a letter that was provided to the government in

8    2003, and that conversation was referenced in a letter well in

9    advance of even the first trial.  So -- and I believe it was

10   actually submitted in connection with the defendant's

11   supplemental memorandum.  I'm just finding the exhibit here.

12           Yeah.  So Exhibit 7 of the government's opposition,

13   the response to defendant's supplemental memorandum.  It's

14   Document 357.  There's an October 6, 2003, letter from

15   Mr. Pappalardo to Michael Pineault that describes -- or that

16   represents that Mr. Carpenter described to Mr. Levine,

17   Mr. Stern, Mr. Rasmussen and Nancy Sawyer.

18           THE COURT:  I see it.

19           MR. PIROZZOLO:  So on that ground alone it's not a

20   basis to establish a grounds for a new trial.

21           Unless the Court has more questions about Sawyer,

22   about that issue, about how it fits into the *Wright* standard I

23   can -- for purposes of time I can move to the other two pieces

24   of evidence.  I do want to make sure that to the extent you

25   have questions about that, that I get an opportunity to address

1  them.

2         THE COURT:  Okay.

3         MR. PIROZZOLO:  So the other component -- the second

4  component, broadly speaking, are three documents that are dated

5  September 20th, September 28th and October 2nd, 2000, from

6  Merrill Lynch.  This is the other component of newly discovered

7  evidence which is communications internally to Merrill Lynch

8  about observations of the Benistar website and communications

9  about what that -- what the relevance of that website is and a

10  representation from -- or excuse me -- a letter from Mr. Stern

11  discussing and describing his relationship with Mr. Carpenter.

12         It's really important to focus on the timing of these.

13  This is -- Merrill Lynch made the decision to restrict/block

14  the trading of Mr. Carpenter's account on September 20th.

15  There is an exhibit that was entered into evidence.

16  Mr. Rasmussen -- there's an internal memo, a copy of which I

17  have here.  But in any event, September 20.  So it's the same

18  day.

19         So the relevant actions at Merrill Lynch, they're

20  documented by these -- by these communications, occur at the

21  very, very end of the Merrill Lynch relationship with

22  Mr. Carpenter.  And so these documents at most establish that

23  Mr. -- that some people at Merrill Lynch, once they found out

24  what -- what at least one of them found out was Benistar's

25  business, decided it was inappropriate for Mr. Carpenter to be

1  trading in the way that he was trading.  It's actually

2  inculpatory of Mr. Carpenter; it's not exculpatory of

3  Mr. Carpenter.  And on that basis also is not a ground for any

4  trial.

5      It's -- that series of communications is, at most,

6  communications that might be impeaching of Mr. Stern who did

7  testify that he was unaware of Benistar's business, but it

8  establishes his knowledge of that business, at most.  And at

9  the very, very end of the -- at the very, very end of the

10 relationship.  And that was not particularly material to the

11 body of the testimony of Mr. Stern.  And in any event, it's

12 impeaching.  And if it's impeaching, that's not a basis under

13 the *Wright* standard to establish a remedy of a new trial.  It's

14 also not likely to bring about an acquittal.  That's actually

15 true of all three categories.

16      As we said in our papers, the issue of what -- and as

17 was stated in the closing argument, the issue of what Merrill

18 Lynch did or did not know at that time is not the central

19 relevant fact for purposes of Mr. Carpenter's liability under

20 the mail and wire fraud statutes.  There is no evidence that

21 was presented here that Mr. Carpenter notified any of the

22 people who were exchanging the properties, as charged in the

23 indictment, as to what he was, in fact, really doing with the

24 money.  So on the -- and that's true as to all three

25 categories.

1          Now, as to the fourth category -- excuse me.  As to

2    the third category, the Rasmussen and Malia testimony, I just

3    would refer you to pages 15 and 19 of the government's response

4    to this.  And if you look at it, there's actually -- there's a

5    claimed inconsistency of Mr. Rasmussen's testimony.

6          The government provided in Exhibit 5 the testimony in

7    context of Mr. Rasmussen.  And it doesn't appear to be -- it's

8    really not clear at all there is any, in fact, inconsistency.

9    The testimony referenced in the documents here is testimony

10   that Mr. Rasmussen is giving about an SEC and NASD filing.  And

11   in general terms, it's discussing information that Merrill

12   Lynch provided to the NASD and the SEC.  It does not, in

13   context, appear to be bearing -- have bearing on

14   Mr. Rasmussen's testimony with respect to -- at trial.

15         And so there's a snippet that's taken out.  And as we

16   describe in the opposition, there's a snippet that's taken out.

17   But if you look at it in context, it doesn't appear to be any

18   admission at all by Mr. Rasmussen that he testified in any way

19   incorrectly or falsely at the criminal trial.

20         And to the context -- I mean to the contrary, on -- if

21   you look at pages 182 and 183 of Exhibit 5, which is the

22   deposition testimony, Mr. Rasmussen was very clear.  He

23   said -- he was asked whether he was covering anything up, and

24   he said, "I think it's a joke because I've never done anything

25   wrong.  I've worked hard in this company," and so on.  "I'm not

1   trying to cover anything up.  And you're suggesting I'm trying

2   to cover something up, and that's just absolutely ridiculous to

3   me.  Absolutely ridiculous."

4          There is no inconsistency when you parse through

5   these -- the deposition with respect to Rasmussen's testimony.

6   What is left is some speculation that people must have known,

7   okay?  But then I circle back to the *Wright* standard.  And what

8   all of this is, again, is at most impeaching testimony.  It is,

9   in fact, cumulative of various parts of testimony that already

10  were provided.

11         The Patterson testimony, which was introduced at

12  trial, showed that -- showed that Mr. Levine knew what the

13  Benistar property exchange -- where the money was coming from.

14  I think that's a fair inference from the Patterson testimony.

15  And so this would just be additional cumulative information

16  about that -- about that point.  And again, it doesn't go, and

17  doesn't -- the introduction of this evidence wouldn't in any

18  way lead towards the likelihood of an acquittal which, again,

19  is the fourth prong of the *Wright* test that the defendant would

20  be required to meet.  And frankly, since the defendant didn't

21  even attempt to show how it went -- goes to the *Wright*

22  standard, how it meets the *Wright* standard, there isn't a basis

23  now for the Court to revisit that.

24         On the constructive amendment point -- does the Court

25  have any questions for me on --

1           THE COURT:  No.  No.

2           MR. PIROZZOLO:  So on the constructive amendment

3   point, I think that there are a number of places within the

4   indictment -- within the superseding indictment -- we cite them

5   in the pleadings, it is not -- the argument -- the constructive

6   amendment argument, really, the fundamental premise of that

7   argument is that the indictment did not allege a half-truths or

8   omissions theory, that what was not said to the exchangers --

9   that it did not allege that what was not said to the exchangers

10  was part of the fraud.

11          But the superseding indictment in various places could

12  not have been more clear that the allegations of

13  Mr. Carpenter's fraud included both what was said and what was

14  not said.  And just by way of example, Paragraph 41 of the

15  superseding indictment, it says, "Carpenter did not notify or

16  direct BPE personnel to notify current or prospective clients

17  that he was using client funds in this fashion" -- "in this

18  fashion" meaning stock options -- "or that he was sustaining

19  substantial losses in the market."

20          Paragraph 49:  With respect to the trading at

21  PaineWebber.  Mr. Carpenter, quote, "did not notify or direct

22  BPE personnel to notify current or prospective clients that he

23  was using client funds in this fashion or that he was

24  sustaining substantial losses in the market."

25          The charging language itself amply covers both an

1      affirmative misrepresentation and the half-truths and omissions

2      theory.  And as you found, your Honor, and concluded in your

3      first *Carpenter* opinion -- in fact, the indictment and the

4      evidence at trial amply included the claimed -- the half-truths

5      or omissions theory.

6              And I would just quote from your first *Carpenter*

7      opinion.  "The fraudulent scheme alleged in the indictment

8      included the," quote, "omission," closed quote, "to clarify the

9      half-truths that the defendant directed toward the exchangers.

10     The theory is well within the scope of the indictment, and

11     proof of such omissions was neither a variance nor a new

12     theory.  There was no constructive amendment of the

13     indictment."

14             This is the exact same document that we're talking

15     about, the superseding indictment.  It was the same one that

16     was analyzed in that first opinion.  It includes that theory.

17             And the claim that there was somehow some shift in the

18     First Circuit, from the government's point of view, there was

19     no shift.  Plus, the claim here is that it's somehow new

20     evidence?  It's not evidence.  The arguments that were

21     presented to the First Circuit and the First Circuit's opinion

22     isn't some newly discovered evidence that would permit a claim

23     that there's been some kind of constructive amendment entitling

24     either a new trial or a dismissal.

25             I want to make sure I've addressed the Court's

1    concerns here.  Is there any additional questions?

2              THE COURT:  No.

3              MR. PIROZZOLO:  Okay.

4              THE COURT:  Briefly, Mr. Weinberg.

5              MR. WEINBERG:  Just very briefly.  The first is when

6    your Honor in your September 1, '11, order denying a new trial

7    motion, and the order right before this docket entry, you

8    denied the mistrial motion.

9              THE COURT:  Right.

10             MR. WEINBERG:  Listed at the very last paragraph of

11   your lengthy order are the various motions that were being

12   denied.

13             I do understand that there's a, perhaps regrettable,

14   lack of clarity in the title of 355, which is deemed the

15   supplemental memo in support of a variety of motions, but when

16   you look at the content, it's clearly focused on newly

17   discovered evidence.  When you read the government's response,

18   which is 357, it's the government that says this should be

19   deemed a motion for a new trial based on newly discovered

20   evidence.  Of course, newly discovered evidence cannot be used

21   to challenge the fairness of a prior trial.  That's the

22   seven-day rule, interests of justice.  Newly discovered

23   evidence, the defendant has three years from verdict to bring

24   new evidence, discovered after the fact, to the attention of

25   the trial court under the *Wright* standard, a different standard

1    than the seven-day standard.

2            And so I would contend that this is not within the

3    ambit of the Court's September 1 order, that it remains a

4    viable volition.  And because there's some lack of clarity, the

5    government asked for it to be treated as newly discovered

6    evidence motion.  The defendant, on 359, came back and said,

7    "We want it considered for different mistrial purposes, for

8    perjury," but then dealt with it in 359 as a materiality issue

9    and went through the newly discovered evidence.  So I do think

10   it's alive.

11           In terms of the *Wright* standard, this is not just

12   impeaching evidence; this is affirmative evidence of

13   circumstantial evidence of Carpenter's good faith.  All

14   evidence that goes to someone's internal mental processes is,

15   to some extent, circumstantial.  It's out of his mouth.  It's

16   what he's telling people.  It's what he's advising people to

17   see.

18           In terms of Miss Sawyer, yes, Carpenter knew the

19   existence of Ms. Sawyer and knew that he spoke to her, but he

20   also knew of the existence of Mr. Levine and Mr. Stern, who he

21   spoke to.  And it's certainly not implausible that

22   Mr. Carpenter, sitting through a trial and watching every

23   Merrill Lynch witness come forward, and in either Levine's case

24   commit perjury, or in Stern and Rasmussen's case make

25   inaccurate statements as to what the conversations were,

1   assumed that was going to be the corporate position of a

2   brokerage house that had deep monetary interests in pretending

3   that they didn't know that these were escrowed or 1031 or

4   third-party real estate funds.  And so I don't think that you

5   can eliminate Ms. Sawyer just because Carpenter knew of her

6   existence given the context of this trial.

7           The other documents were not impeaching documents.

8   They could have been used as refreshing documents.  Rasmussen,

9   in fact, what he originally testified to at his trial, looked

10  at a letter from Carpenter that talked about other people's

11  money and said he -- or other relationships, and he said, "I

12  thought Carpenter was referring to other Benistar

13  relationships; not to other people's money.  And Carpenter's

14  words were, quote, 'depository for our clients.'"  That Merrill

15  Lynch was a depository for our clients.

16          And that was in his criminal trial testimony when he

17  was confronted a year later with this set of newly discovered

18  evidence that shows faxes and emails from the Merrill Lynch

19  depository that was not provided to Mr. Carpenter in time for

20  his use at even the second trial, he said -- the question was,

21  "The word 'client,' that's what I'm focusing on, not

22  'depository.'"  And Rasmussen said, "Depository for our

23  clients.  Okay."

24          And the question was, "Whatever you thought it meant

25  at the time, you didn't think it meant other Benistar

1    companies, correct?"  And he said, "Correct."  In other words,

2    these documents were not just to contradict; they would have

3    been used to refresh.

4         And there was a relative shot that the Merrill Lynch

5    witnesses, if they had their documents in front of them, would

6    have told this jury the truth, which is that Carpenter never

7    concealed from them that this was third-party money.  And that,

8    of course, would have been helpful, exculpatory evidence that

9    it was not in his head to run a covert conspiracy of silence,

10   which, again, goes to the constructive amendment issue.  That's

11   before the Court in document 349 at pages 10 through 13.

12        In terms of the constructive amendment document, the

13   Court -- there is a supplemental -- there is the superseding

14   indictment.  The vast majority of paragraphs in the superseding

15   indictment deal with affirmative misrepresentations.  There are

16   instructions that your Honor instructed the 2008 jury, and they

17   instructed on affirmative lies and they instructed on

18   half-truths.  There was no instruction on the separate theory

19   of liability that deals with omissions.

20        At *U.S. versus Cassiere* at 4 F.3d says, "An omission

21   theory of fraud needs to establish a duty to disclose and a

22   mens rea as to the duty to disclose," and those were not

23   elements put to this jury.

24        The point is --

25        THE COURT:  My recollection is my instructions

1   included a caution about finding a duty to disclose in the

2   absence of statements.  That is just from memory.

3          MR. WEINBERG:  Yeah.

4          THE COURT:  That I wanted to caution against the

5   thought that an arm's-length contracting party had a duty to

6   speak when nothing had been half said.

7          MR. WEINBERG:  Yeah.

8          THE COURT:  So I think -- I think my recollection is

9   those issues were --

10          MR. WEINBERG:  I'd have to go back to -- it's Volume

11   13, and I don't have it with me.

12          THE COURT:  Okay.  I think that came up in both

13   trials, frankly, because I was concerned about that, applying a

14   duty to an obligation, an independent obligation, as a

15   fiduciary might have to make statements that an arm's-length

16   contracting party might be interested in but was not entitled

17   to have.  And so I -- my recollection is that the matter was

18   always couched in half-truth language.

19          MR. WEINBERG:  And with your Honor's permission, I

20   will go back to Volume 13, reread the first set of instructions

21   and report by letter, because I don't recall that.  And there's

22   so much here it's possible, but my recollection is there was

23   the affirmative misrepresentations.  Your Honor instructed part

24   of that definition was half-truths.  But this case on a

25   continuum went from lies about safety and about 3 percent to

1   half-truths into a failure-to-disclose theory.

2          And in the context of this case, where Carpenter

3   wasn't having dialogue with the exchangers, that really put on

4   him an obligation to go out and tell them, at least at a

5   certain point in time, "I'm losing money.  You need to know how

6   I'm making money."  And that, to me, is a theory of failure to

7   disclose, that on the continuum is an omission theory which

8   requires a finding of duty to disclose and requires the jury to

9   find a mens rea about the duty.

10          And if I'm wrong and your Honor did instruct them,

11   then that would certainly knock the legs out of that argument,

12   and then it would be a sufficiency argument.  But absent

13   informing them of those other two elements that are unique to

14   the omission theory but not unique to the false statement

15   theory, I would persist in contending, your Honor, that this

16   was a constructive amendment and that your Honor should rectify

17   it with a new trial.

18          THE COURT:  All right.  So I'll reserve the matters.

19   I think that's all the motion matters.

20          Now, I do want to set a sentencing date provisionally,

21   obviously, until the motions are resolved.  But I want to be

22   aware of the direction and the mandate.

23          The date I have looked at our calendar, what date is

24   convenient for us, would be the afternoon of February 26th, two

25   o'clock.  And I hope to have a prompt resolution of the

```
 1 | motions.
 2 |         MR. WEINBERG:  Judge, before we leave, may I present
 3 | as exhibits in furtherance of the prejudice argument, under
 4 | seal, the paragraph from the '08 PSR that talks about
 5 | Carpenter's mental and emotional health, and two letters that
 6 | Mr. Goldstein wrote to the First Circuit that I'm not sure are
 7 | contained in the record before your Honor.
 8 |         THE COURT:  Any objection?
 9 |         MR. PIROZZOLO:  None.  No objection.
10 |         THE COURT:  All right.  You want all three of those
11 | matters under seal?
12 |         MR. WEINBERG:  No.  The two letters to the First
13 | Circuit would be just --
14 |         THE COURT:  They would be in the docket anyway.
15 | Right.  Yeah.
16 |         MR. WEINBERG:  The PSR, since it's the doctor's --
17 |         THE COURT:  Because it's a PSR, I guess.  Right.
18 |         MR. WEINBERG:  -- letter, would be under seal.
19 |         Thank you, sir.
20 |         THE COURT:  All right.  Fine.  Thank you.
21 |         We'll take a short recess.
22 |         THE CLERK:  All rise.  The Court will take a short
23 | recess.
24 |         (The Court exits the courtroom and the proceedings
25 | adjourned at 3:20 p.m.)
```

```
1                    C E R T I F I C A T E

2

3            I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 04-10029-GAO,

8    United States of America v. Daniel E. Carpenter.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  2/10/14
13

14

15

16

17

18

19

20

21

22

23

24

25
```