**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**UNITED STATES' SUPPLEMENTAL SENTENCING MEMORANDUM**

Pursuant to this Court's procedural order (Dkt. 286), the United States submits this Supplemental Sentencing Memorandum, which incorporates and supplements the United States' original Sentencing Memorandum (Dkt. 190) submitted on December 14, 2005 and attached hereto as Exhibit 1.

**Sentencing Recommendation**

For the reasons that follow, the United States recommends a sentence of imprisonment of 60 months, a fine of $75,000, a period of supervised release of 3 years, a mandatory special assessment of $1,900, restitution of $9,029,184.61, and forfeiture in the amount of $14,053,715.52.   The United States' recommended sentence is within the applicable sentencing guidelines range as calculated by the United States and is otherwise appropriate and reasonable under the sentencing factors set forth in 18 U.S.C. § 3553(a).

**Proposed Findings of Fact**

After two trials and two appeals, the record setting forth Carpenter's offense conduct is well developed and, at this point, should not be the subject of much serious dispute.   The February 11, 2014 version of the Probation Office's Presentence Report (PSR) updates and summarizes the

1

offense conduct, and includes much of the evidence presented at the 2005 and 2008 trials.   *See*

PSR ¶¶ 8-57.   The First Circuit also summarized the evidence at the 2008 trial in its recent

opinion, *United States v. Carpenter*, 736 F.3d 619, 622-24 (1st Cir. 2013).   Those descriptions of

the offense conduct provide the basic factual framework for applying the sentencing guidelines

and many of the sentencing factors set forth under 18 U.S.C. § 3553(a).   The Court should adopt

those facts for purposes of sentencing.

      The United States also reasserts here the five principal factual points it made in its original

Sentencing Memorandum.   *See* Exhibit 1 at 2-8.   Although written in response to Carpenter's

first set of objections to the PSR, those points are just as salient following Carpenter's second trial

and the multiple additional objections to the PSR he submitted in 2008.[1]   As the United States

pointed out it its original Sentencing Memorandum, Carpenter is fully culpable for the criminal

conduct of which he now stands convicted; his actions caused losses of over $9 million, as well as

other emotional and psychological harm to the victims not cured simply by the return of money by

third parties; he has shown no remorse or acceptance of responsibility for his actions; he still has

not provided a full accounting of his financial condition (*see* PSR ¶150); and, as discussed in more

detail below in connection with the United States' discussion of the sentencing factors under

§ 3553(a), the dishonesty he has exhibited in perpetrating this fraud is no aberration.   Indeed, as to

this last point, Carpenter is currently under federal indictment in the District of Connecticut for an

---

[1]   As was the case with his 2005 objections, Carpenter's 2008 objections essentially present his competing legal theory of the case and his own self-serving characterization of the evidence, including his state of mind when he was committing his fraud.   *See, for example,* PSR at pp. 89-106 (where in multiple places Carpenter argues that he is not guilty of the offense); *id.* at p. 103 ("The government has failed to prove a 'scheme to defraud' because there was no fraud, no specific intent to defraud, no fraudulent misrepresentations, no fraudulent or misleading omissions, and no crime.").   The jury, of course, rejected Carpenter's view of the evidence, finding him guilty on all counts, a finding that this Court upheld.

alleged insurance fraud scheme he committed while on pretrial release in this matter.   *See* PSR

¶ 118.

<u>**Legal Disputes**</u>

The Defendant's February 19, 2014 letter to the Court sets forth the principal areas of

disagreement between the parties.   Carpenter claims that the PSR has not properly applied certain

guidelines enhancements.   He asks that the Court depart from the guidelines range on a variety of

grounds.   He also contests restitution.   As discussed in more detail below, none of Carpenter's

guidelines or departure arguments have merit.   On the question of restitution, the United States

agrees that some modification of the restitution figures set forth in the PSR is appropriate, but

disagrees with Carpenter's position that the Court should decline to order the payment of any

restitution.   The United States also notes that forfeiture applies to this case, and, for reasons

discussed below, the Court should issue an order of forfeiture of approximately $14 million.

**A.   Sentencing Guidelines**

**1.   The United States' calculation of the guidelines.**

The applicable advisory guidelines manual, which was the manual in effect at the time of

the offense, is the November 2000 edition.   Application of this manual results in the following

advisory guidelines calculation:

| | | |
|---|---|---|
| Base Offense Level | 6 | U.S.S.G. § 2F1.1(a) |
| Increase for Loss of More Than $5 Million and Less Than $10 Million | 14 | U.S.S.G. § 2F1.1(b)(1)(O) |
| More Than Minimal Planning | 2 | U.S.S.G. § 2F1.1(b)(2) |

| | | |
|---|---|---|
| Abuse of Position of Trust | 2 | U.S.S.G. § 3B1.3 |
| FINAL OFFENSE LEVEL | 24 | |
| Guidelines Sentencing Range | 51-63 months at C.H. I | |
| Restitution | $9,029,184.61 | U.S.S.G. § 5E1.1 |
| Applicable Fine | $10,000 to $100,000 | U.S.S.G. § 5E1.2. |

Probation agrees with the above guidelines calculations, with the exception of the restitution amount, where there is a discrepancy between the calculations in the PSR and the United States' current calculations based on recent information provided by the victims.   *See* PSR ¶¶ 54, 101-13, and 172; *see also*, Letter from Thomas W. Evans to Jack W. Pirozzolo dated February 20, 2014, attached hereto as Exhibit 2.

      **2.  Loss.**

      Carpenter argues in his objections to the PSR that, if the loss under U.S.S.G. § 2F1.1(b)(1) is calculated at the time of sentencing, then the loss amount is zero because the victims have been repaid through a settlement with UBS PaineWebber.   *See* PSR at p. 107 (Objection 9). Carpenter's position is untenable.   Courts have consistently held that the loss calculation under the fraud guideline is to be determined as of the time the crime was committed, without regard to the ultimate loss to the victim.   *See United States v. Walker*, 234 F.3d 780, 782-784 (1st Cir. 2000) (in embezzlement case, the losses were the amounts unlawfully withdrawn by the defendant without regard to actual or intended repayments; "the loss calculation under the fraud guideline

4

should be determined in reference to the loss at the completion of the crime, rendering the

defendant's intention to repay and the actual harm ultimately suffered by the victim irrelevant");

*United States v. Mau*, 45 F.3d 212, 215-16 (7th Cir. 1995) (rejecting argument in check kiting case

that the court should consider net detriment to victim when calculating loss).   Accordingly,

defendants are not entitled to deduct from the loss calculation repayments to victims after

detection of the fraud.   *See, for example, United States v. Burridge,* 191 F.3d 1297, 1301 (10th Cir.

1999) (qualified intermediary convicted of wire fraud; funds recovered by victims from defendant

in civil suit did not offset intended loss "because that money was not returned through [the

defendant's] voluntary actions, but rather through action by the victims subsequent to the

discovery of the fraud."); *United States v. Janusz*, 135 F.3d 1319, 1324 (10th Cir. 1998) (wire fraud

case; "[t]he fact that the victims have been able to recover part of their loss after the discovery of

the fraud does not diminish [the defendant's] culpability and responsibility for purposes of

sentencing.").

    This case law is fatal to Carpenter's repeated protestations that the guidelines "loss" in this

case is zero.   As charged in the Superseding Indictment and as proved at trial, Carpenter

improperly obtained millions of dollars from the victims, eventually losing over $9 million of

victim funds before his fraud was detected.   Under a straightforward application of the relevant

case law, the loss amount is between $5 million and $10 million and the 14-level enhancement

pursuant to § 2F1.1(b)(1)(O) is appropriate.[2]

---

[2]   As the United States discussed in more detail in its original Sentencing Memorandum, *see* Exhibit 1 at 9-10, the $9
million Carpenter fraudulently obtained and lost through his unauthorized trading is a loss directly tied to his own
offense conduct and is not properly characterized as a "consequential" or other form of loss such that it should be
excluded from the loss calculation under § 2F1.1(b)(1).

### 3.   More Than Minimal Planning.

The United States discussed the application of the two-level enhancement under § 2F1.1(b)(2)(A) ("more than minimal planning") in its original Sentencing Memorandum.   *See* Exhibit 1 at 10-11.   As the United States pointed out in that memorandum, Carpenter's conduct involved repeated acts over an extended period of time pursuant to a long-running scheme to defraud.   It falls well within the scope of § 2F1.1(b)(2)(A).   In addition, because Carpenter's scheme involved more than one victim, the two level enhancement is appropriate under the alternate provision, § 2F1.1(b)(2)(B), which applies the enhancement to a scheme to defraud more than one victim.

### 4.   Abuse of a Position of Trust.

The United States also addressed the application of § 3B1.3 (the two level enhancement for abuse of a position of trust) in its original Sentencing Memorandum.   *See* Exhibit 1 at 11-12. The United States incorporates those arguments here.   Carpenter, however, continues to oppose the application of this enhancement.   In his 2008 objections to the PSR, Carpenter argues that the abuse of trust enhancement cannot apply to him not only because his relationship to the victims was a purely commercial one but that, in addition, the IRS rules applicable to qualified intermediaries prohibited him from being a fiduciary or "occupying a position of trust" with the victims.   *See* PSR at pp. 109-11.   The IRS rules, in Carpenter's view, foreclose application of this enhancement.

The problem with Carpenter's argument is that the abuse of a position of trust enhancement is not limited to defendants who were in a fiduciary relationship with the victims.   A formal fiduciary relationship is not necessary.   Indeed, the Tenth Circuit has held that a qualified intermediary, although not formally a fiduciary, does hold a position of trust for purposes of

§ 3B1.3.   *See Burridge*, 191 F.3d at 1297.   In *Burridge*, the defendant was a qualified

intermediary convicted of wire fraud in connection with misuse of client funds provided to him as

part of § 1031 exchange transactions.   The district court imposed a two-level enhancement under

§ 3B1.3 and the defendant argued on appeal that the enhancement was improper because he could

not hold a formal fiduciary relationship with his clients under the relevant IRS rules.   *Id.* at 1305.

The Tenth Circuit rejected the argument, stating that the application of the enhancement "does not

hinge on whether [the defendant] is technically a fiduciary for purposes of agency law."   *Id.*

According to the Tenth Circuit, the defendant's clients placed their money with him because of his

established institutional role in implementing § 1031 exchange transactions and the requirement

created by the Internal Revenue Code that individuals involved in tax free exchanges use a

qualified intermediary to facilitate the tax benefit.   *Id.*   This institutional role of the defendant --

which was a de facto creation of the tax code -- allowed the defendant to conceal the fraud, which,

in turn, justified the application of the enhancement.   *Id.*   The Court should adopt the *Burridge*

reasoning here and apply the two-level enhancement to Carpenter.

### B.   Carpenter's Departure Arguments

Carpenter has requested a departure from the guidelines on multiple grounds.   The United

States addressed the departure arguments in its original Sentencing Memorandum.   *See* Exhibit 1

at 13-24. The United States relies on those arguments, but does not repeat them here.   In sum, and

as discussed in more detail in the United States' Sentencing Memorandum, Carpenter is not

entitled to a departure on any of the grounds he has asserted because (a) the offense conduct does

not fall outside the "heartland" of the guidelines; (b) the loss amount does not overstate the

seriousness of the offense; (c) Carpenter's civic contributions are a disfavored grounds for a

departure and are not otherwise exceptional; (d) no departure is warranted based on Carpenter's

claim that his business and its employees will be harmed; (e) the United States' decision not to charge Martin Paley is not a proper basis for a departure; (f) Carpenter cannot show the type of family circumstances that warrant a departure; and (g) Carpenter is not otherwise entitled to a departure based on the totality of the circumstances.

### C.   Restitution

Restitution in the full amount of each victim's loss is mandatory in this case.   *See* 18 U.S.C. §§ 3663A and 3664(f)(1)(A).   In this case, the PSR calculated the restitution figure at $9,040,686.   *See* PSR ¶ 172; *see also* PSR ¶ 54 (breaking out the loss by each victim).   While the United States agrees with the restitution methodology in the PSR, the restitution numbers need to be adjusted in two ways:   (a) to reflect recent information the United States received regarding the victims' losses and (b) to reflect compensation the victims received from third parties.

On February 20, 2014, the attorneys for the victims provided the United States with the following loss figures for the victims, which, while similar to the numbers appearing in the PSR, are not identical.   *See* Exhibit 2.   According to the attorneys for the victims, the loss amounts are as follows:

| Victim | Loss |
|---|---|
| G.C. | $992,230 |
| B.A., LLC | $444,659.65 |
| M.L., Co. | $3,237,190 |
| J.I. | $3,428,141 |
| J. J. | $541,930 |
| B.D. | $307,665.35 |

| Victim | Loss |
|--------|------|
| B.F. | $97,368.61 |
| **Total** | **$9,049,184.61** |

This total loss number differs from the PSR loss amount by about $9,000.[3]   It appears that

Carpenter paid $20,000 as part of a settlement with B.D. and B.F.   *See* Exhibit 2, n.1.

Accordingly, the Court should order restitution in the amount of **$9,029,184.61**.

In fashioning a restitution order in a case involving more than one victim, the Court can set

a payment schedule for each victim based on the type and amount of loss, as well as the economic

circumstances of the victim.   *See* 18 U.S.C. § 3664(i).   In addition, if a third party has paid

compensation to the victim for the loss, that third party is entitled to a restitution amount up to the

amount it paid the victims, so long as any restitution obligations to victims not fully compensated

is paid first.   *See* 18 U.S.C. §§ 3664(j)(1).   In this case, all of the victims, except for two -- B.D.

and B.F. -- received full compensation for their losses from a third party.   *See* Exhibit 2.   B.D.

and B.F. received only partial compensation.   Specifically, B.D. recovered $63,333.33 of his loss,

leaving a restitution balance of $244,332.02; and B.F. recovered $31,666.67, leaving a restitution

balance of $65,701.94.

Once B.D. and B.F. are paid, the remaining balance -- **$8,719,150.65** -- should be paid to

third parties who provided compensation to the victims.   In this case, the compensation paid to the

victims came from UBS PaineWebber and Merrill Lynch.   *See* Exhibit 2.   As a result, each entity

may have a basis to request some portion of the $8,719,150.65.   The original PSR assumed that

---

[3]  Because the number remains between $5 million and $10 million, this adjustment to the loss calculation has no
bearing on the loss enhancement under U.S.S.G. § 2F1.1(b)(1).

UBS PaineWebber would receive the remaining balance in light of UBS PaineWebber's approximately $12 million payment to certain of the victims in 2008.  *See* PSR ¶ 172.   UBS PaineWebber, however, recently informed the United States that Merrill Lynch made an $8.5 million contribution payment to UBS PaineWebber to offset part of that settlement.   The United States has been informed by counsel for Merrill Lynch that representatives of Merrill Lynch and UBS PaineWebber will consult with one another and then report to the United States the respective positions Merrill Lynch and UBS PaineWebber will take with respect to the remaining restitution balance.   The United States will update the Court once it receives that information.[4]

### D.   Forfeiture

The United States, in the Superseding Indictment, provided notice that it would seek forfeiture of the property, real or personal, that constitutes, or is derived from, proceeds traceable to the offenses charged in Counts 1-2, 5-6, and 8-19.   Accordingly, the United States requests that the Court impose forfeiture against the Defendant for $14,053,715.52 in the form of a personal money judgment, as that is the sum of money that the Defendant derived from the commission of the offenses charged in Counts 1-2, 5-6, and 8-19.   *See* Fed. R. Crim. P. 32.2, 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853(p).

The United States anticipates that Carpenter will claim that forfeiture does not apply to him because he lost money and therefore has no "proceeds" to forfeit.   Yet the question of whether the defendant has retained the proceeds or lost them through personal expenditures, investments, or

---

[4] The United States has also been informed that Merrill Lynch entered into a settlement agreement earlier this month with a Carpenter-related entity in litigation pending in Connecticut.  *See also* Exhibit 2.   If the Court wishes, the United States can supply it with the details of the settlement, including the details of any funds paid by the parties to the agreement.   Apparently, the funds paid pursuant to that settlement are being held by counsel for Carpenter and his related entities; and they are currently the subject of various competing civil claims from judgment creditors, including the victims here.   *See* Exhibit 2.   Because none of that money has yet been paid to any of the victims here, it should not factor into the calculation of Carpenter's restitution obligations at this time.

otherwise, is irrelevant to the determination of the proper forfeiture amount.   *See United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006) ("the Government need not prove that the defendant actually has the forfeited proceeds in his possession at the time of conviction").   In *Hall*, the First Circuit cited with approval the Seventh Circuit's discussion of this issue in *United States v. Ginsburg*, 773 F.2d 798 (7th Cir. 1985), a racketeering case.   In *Ginsburg*, the Seventh Circuit explained:

> [a defendant] who dissipates profits or proceeds of his racketeering activity on wine, women, and song has profited from organized crime to the same extent as if he had put the money in his bank account. Every dollar that the racketeer derives from illicit activities and then spends on such items as food, entertainment, college tuition, and charity, is a dollar that should not have been available for him to spend for those purposes. In order to truly separate the racketeer from his dishonest gains, therefore, the statute requires him to forfeit to the United States the total amount of the proceeds of his racketeering activity, regardless of whether the specific dollars received from that activity are still in his possession.

*Id.* at 802; *see also United States v. Misla-Aldarondo*, 478 F.3d 52, 73-74 (1st Cir. 2007) ("If the Government has proven that there was at one point an amount of cash that was directly traceable to the offense, and that thus would be forfeitable [], that is sufficient for a court to issue a money judgment, for which the defendant will be fully liable whether or not he still has the original corpus of tainted funds—indeed, whether or not he has any funds at all") (following *Hall*); *United States v. Grose*, 461 Fed.Appx. 786, 806-07 (10th Cir. 2012) (Upholding forfeiture in the form of a personal money judgment and holding that the defendant's "decision to place his gains in an ill-advised investment does not excuse him from the forfeiture of $1 million.").[5]   Accordingly, the full amount of the proceeds charged in Counts 1-2, 5-6 and 8-19 is subject to forfeiture.

---

[5]  It is the United States' position that this case involved "illegal services" or "unlawful activities," and accordingly, proceeds are defined as "property of any kind obtained directly or indirectly, as a result of the commission of the offense … and is not limited to the net gain or profit realized from the offense."   18 U.S.C. § 981(a)(2)(A); s*ee also United States v. Kahale*, 2010 WL 3851987 *31-32 (E.D.N.Y. September 27, 2010) (applying 18 U.S.C. § 981(a)(2)(A) in an investment fraud scheme and holding that forfeiture is based on the amount the defendant

### Section 3553(a) Factors

As discussed in more detail below, the United States' recommended sentence is also an appropriate sentence under the sentencing factors of 18 U.S.C. § 3553(a) and is one that the Court should impose under the circumstances of this case.   The United States focuses here on four of the most significant sentencing factors justifying its recommendation.

**A.   The Nature and Circumstances of the Offense and the Characteristics of the Defendant**

The United States' recommendation appropriately takes into consideration the nature and circumstances of the offense and the characteristics of the defendant.   *See* 18 U.S.C. § 3553(a). At its core, Carpenter's offense was a simple fraud, one that he committed for the most common and banal of motives: to enrich himself.   The victims entrusted their money to Carpenter's company to hold in escrow so that they could complete § 1031 tax free exchange transactions.   At no time did Carpenter, or anyone acting on Carpenter's behalf, tell the victims how Carpenter was actually going to use their money.   Had they been told the truth, they never would have given Carpenter's company the money.   Through his fraud, Carpenter obtained control over staggering sums of money -- millions and millions of dollars -- which he used for basically two purposes: (a) to speculate in the options market for his own personal benefit and (b) to perpetuate the fraud.

Despite his efforts to characterize his crime as one of opportunity and "spur of the moment" impulse, *see* PSR at pp. 108-09, Carpenter's crime was, in fact, one of careful deliberation and extended duration.   One need look no further than his pattern of conduct over the

---

obtained from the victims, not on victims' net losses); *United States v. Sigillito*, 899 F. Supp.2d 850, 864-65 (E.D. Mo. 2012) (liability not limited to gain in fraudulent loan scheme).   Should the Court determine that this case involves "lawful services that are sold or provided in an illegal manner," then the appropriate forfeiture amount is $8,090,463.95, which represents the $14,053,715.52 paid to the Defendant, minus payments made by the Defendant to victims in the amount of $5,963,251.57 (*i.e.*, direct costs as asserted by the Defendant).   *See* 18 U.S.C. § 981(a)(2)(B) ("claimant shall have the burden of proof with respect to the issue of direct costs").

many months leading up to December 2000 and his October 30, 2000 letter to Martin Paley (Tr. Ex. 184), to see that his decision to put the victims' money at grave risk was part of a business plan of his choosing.   Indeed, at so many points in this episode, Carpenter had opportunities to make choices that could have either eliminated or mitigated the harm to the victims in this case.   He could have disclosed to them his intentions to use the money for speculative trading; he chose not to.   He could have shifted his trading strategy away from options trading to a more, in his words "prudent" approach; he chose not to.   He could have stopped trading altogether when Merrill Lynch blocked his options trading; he chose not to.   He could have stopped taking in more victim money after he had sustained millions of dollars in losses; he chose not to.   In the end, whatever personal character traits led Carpenter to make these terrible choices -- hubris, greed, optimism, hopefulness, confidence -- matters little.   What matters is that he made these choices, on multiple occasions, over a lengthy period of time, without due regard to the consequences they had for others, which were enormous.

Taking into account nature and circumstances of this case and the characteristics of the defendant, particularly the series of choices he made, the United States' recommended sentence is not only reasonable, but appropriate.   The conduct here properly calls for the United States' recommended period of incarceration of five years.

### B.   The Need to Reflect the Seriousness of the Offense and To Promote Respect for the Law

While the nature and circumstances of this case call for a sentence that reflects the seriousness of the conduct, there is another feature of this case that justifies the sentence the United States seeks.   Specifically, there is a particularly acute need in this case to impose a sentence that promotes respect for the law.   Although Carpenter claims that he has accepted responsibility for

his actions, he has done nothing of the sort.   Throughout the lengthy proceedings in this case,

Carpenter has consistently refused to acknowledge that he committed any wrongdoing at all, and

he has exhibited no remorse for his actions.   Worse, he denigrates the victims in this matter as

merely "purported" victims (PSR at p. 106), and instead paints himself as the true victim: the

victim of an unjust and unfair prosecution, the victim of an overly harsh sentencing guidelines

regime, the victim of the "historic demise of the NASDAQ market" caused by the Bush-Gore

political stalemate (PSR pp. 57), *etc.*.   By any objective measure, Carpenter has shown utter

contempt for the laws applicable to his conduct.   The sentence the United States recommends here

appropriately reflects the seriousness of the offense and, if imposed, will promote respect for the

laws applicable to Carpenter's conduct.

### C.   The Need for General and Specific Deterrence

Little need be said here about the need for the sentence to send a general deterrent message.

A fraud case involving millions of dollars calls for meaningful prison time.   Anything else sends

precisely the wrong deterrent message, since those who might want to replicate Carpenter's

scheme might decide that the potential payoff of speculating in the options market with innocent

victims' money is worth the risk of prosecution.

More needs to be said here about specific deterrence, and the need for a sentence that will

protect the public from further crimes of the defendant.   Carpenter poses a considerable risk of

re-offending.   As the United States has previously pointed out to the Court, he is currently under

indictment in the District of Connecticut for an alleged insurance fraud scheme he engineered

while on pretrial release in this matter.   *See United States v. Daniel Carpenter, et al.*, Cr. No.

3:13CR226 (RNC) (D.Ct. Dec. 12, 2013), attached hereto as Exhibit 3.   He is also currently the

subject of a separate federal investigation in the District of Wisconsin for criminal tax violations.

Carpenter also appears to have engaged in dishonest and fraudulent conduct in a civil dispute over the proceeds of a $30 million life insurance policy.   *See Universitas Education, LLC v. Nova Group et al.,* 11 Civ. 1590 (LTS) (HBP) & 11 Civ. 8726 (LTS) (HBP) (Dkt. No. 340 (11-1590) (Memorandum Opinion and Order, November 20, 2013) attached hereto as Exhibit 4. In that matter, the district court judge found that Carpenter engaged in multiple fraudulent acts in connection with the life insurance proceeds and that he also provided false testimony to the court. *See* Exhibit 4.[6]   The district court's Memorandum and Order provides an ample description of Carpenter's (and his wife's) conduct in that matter.   The United States leaves it to the Court to draw its own conclusions as to the breadth and depth of the dishonesty documented in that matter. But by any measure, the matter not only reflects poorly on Carpenter, but it provides additional evidence of the risks he poses to others while out on the street.

In short, Carpenter's conduct while on pretrial release makes it entirely reasonable to infer that he poses a considerable risk to members of the public who might have the misfortune of doing business with one of his multiple business entities.   Incarceration for a meaningful period of time, as the United States recommends, is appropriate in order to protect the public from Carpenter.

### D.   The Need to Avoid Unwarranted Disparities Among Similarly Situated Defendants

The United States' recommended sentence also takes into account the need to avoid unwarranted disparities among similarly situated defendants.   The United States has been able to locate two reported decisions in which qualified intermediaries were convicted of fraud, *United States v. Burridge*, 191 F.3d 1297 (10th Cir. 1999) and *United States v. Okun*, 453 Fed.Appx. 364 (4th Cir. 2011).   In *Burridge*, the defendant was a qualified intermediary who used portions of

---

[6] That same court has also issued an injunction enjoining Carpenter from transferring assets and an order finding Carpenter in contempt of an order to produce documents.   *See* Exhibits 5 and 6.

victims' funds to repay closing proceeds from other real estate transactions and to pay for personal expenses.  *See Burridge*, 191 F.3d at 1300.   He was sentenced to 33 months imprisonment.  *Id.* at 1301.   The loss in that case was $134,000, a fraction of the losses involved in this case. Although the defendant was in a higher criminal history category (IV), he also accepted responsibility for his actions.  *Id.* at 1301.   In *Okun*, the defendant was a qualified intermediary who wired client funds from the client accounts to both his personal bank account and the bank account of a related real estate investment company.  *See Okun*, 453 Fed.Appx. at 367.   He was sentenced to 100 years, which was a departure downward from a guidelines sentence of 400 years. *Id.* at 367.   The loss in that case was $125 million, although, like Carpenter, the defendant had a criminal history category of I.  *Id.* at 373.   Using *Okun* as a comparison and taking into account the lower loss figure here ($9 million instead of $125 million), a roughly proportionate sentence here to the *Okun* sentence would be 7 years (9/125 or .072 of 100 years), slightly higher than the United States' recommendation.

The current sentencing guidelines manual also provides a somewhat useful measure of the reasonableness of the United States' recommendation.   While the United States does not argue here that the current guidelines apply to Carpenter, they do provide some orientation in assessing how other defendants similarly situated to Carpenter might be treated.   Under the current version of the guidelines, Carpenter's total offense level would be 28, which would advise a period of incarceration of between 78 and 97 months, eighteen months higher than the United States' recommendation.[7]

---

[7] The total offense level of 28 consists of the following calculations pursuant to the November 2013 guidelines manual: base offense level of 6 (U.S.S.G. § 2B1.1(a)), plus 20 levels for a loss of over $7 million but less than $20 million (U.S.S.G. § 2B1.1(b)(1)(K)), plus 2 levels for abuse of a position of trust (U.S.S.G. § 3B1.3).

When viewed in light of (a) other cases and (b) the current guidelines, the United States'

recommended imprisonment term of 5 years is not only reasonable, but it is, if anything, a little

below a term that would be in line with the treatment of other similarly situated defendants.

Accordingly, the Court should adopt the United States' recommended sentence.

### Conclusion

For all of the foregoing reasons, the Court should impose the United States' recommended

sentence.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:
**/s/ Jack W. Pirozzolo**
JACK W. PIROZZOLO
First Assistant U.S. Attorney
U.S. Attorney's Office
U.S. Courthouse, Suite 9200
1 Courthouse Way
Boston, MA 02210
617-748-3189

Date: February 21, 2014

## CERTIFICATE OF SERVICE

      I, Jack W. Pirozzolo, hereby certify that on February 21, 2014 I served a copy of the foregoing on counsel for the defendant via electronic filing.

                                        **/s/ Jack W. Pirozzolo**
                                           Jack W. Pirozzolo