UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA   )

             )

      v.         )     CRIMINAL NO. 04-10029-GAO

             )

DANIEL E. CARPENTER     )

_____)

### DEFENDANT DANIEL E. CARPENTER'S MOTION FOR BAIL PENDING APPEAL AND INCORPORATED MEMORANDUM OF LAW

Now comes the Defendant, Daniel E. Carpenter and respectfully moves, pursuant to 18 U.S.C. §3143(b), that this Honorable Court order that he be released on bail pending his appeal to the United States Court of Appeals for the First Circuit. As addressed herein, Mr. Carpenter amply satisfies the §3143(b) standards for release on bail pending appeal: there is clear and convincing evidence that, if released pending appeal, he is not likely to flee or pose a danger to any person or the community, and his appeal, which is not filed for purposes of delay, will raise substantial questions of law or fact which, if determined favorably to him on appeal, will likely result in reversal of all his convictions or an order for a new trial on all counts.  In short, the following issues, at minimum, warrant bail pending appeal, which requires only a finding that *if* a "substantial question" is decided favorably it is likely to result in reversal, and is *not* "contingent on a finding by the district court that it is likely to be reversed," *United States v. Bayko*, 774 F.2d 516, 522-23 (1st Cir. 1985):

1. There was a violation of the Speedy Trial Act, a point the government concedes if the First Circuit should agree with those circuits that have already ruled that the clock does not reset (*i.e.*, go back to zero) upon the return of mandate, but instead resumes;

2. Mr. Carpenter's constitutional rights to a speedy trial and sentencing, as secured by the Fifth and Sixth Amendments, was violated;

1

3. The indictment does not provide constitutionally sufficient notice, and was so broad it improperly permitted the government to proceed at trial on a new theory, resulting in a constructive amendment and/or prejudicial variance;

4. The jury was improperly permitted to convict Mr. Carpenter based on a theory of fraud by omissions, yet the jury was never instructed regarding an omission theory of criminality;

5. The evidence was legally insufficient and a judgment of acquittal should have entered pursuant to Fed.R.Crim.P. 29; and

6. A mistrial or new trial should have been granted because the broker witnesses testified falsely and concealed substantive proof that Mr. Carpenter was open and forthright with Merrill Lynch, which denied Mr. Carpenter affirmative evidence supporting his good faith defense, all of which fatally compromised the trial, rendered it unfair, and undermines confidence in the verdict.

## I.     THE STANDARDS GOVERNING BAIL PENDING APPEAL.

Under 18 U.S.C. §3143(b)(1)(B), a court considering a defendant's request for bail pending appeal must make three determinations: (1) whether there is clear and convincing evidence that, if released pending appeal, the defendant is not likely to flee or pose a danger to any person or the community; (2) whether "the appeal raise[s] a substantial question of law or fact" and (3) whether, "if the substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed." *Bayko*, 774 F.2d at 522. A "substantial question" is "a 'close' question or one that very well could be decided the other way." *Id.* at 523. Whether or not the defendant's appeal presents a "close" question is to be decided on a case-by-case basis. *Id.* "[L]ikely to result in reversal or an order for a new trial" requires "that the claimed error not be harmless or unprejudicial." *Id.* The "likely to result" standard is to be applied "flexibly." *United States v. Colon-Munoz*, 292 F.3d 18, 20 (1st Cir. 2002). *See United States v. Powell*, 761 F.2d 1227, 1233 (8th Cir.1985)(in deciding the second part of the standard, the court "must assume

that the substantial question presented will go the other way on appeal and then assess the impact of such assumed error on the conviction").

The First Circuit has stressed that bail pending appeal is *not* "contingent on a finding by the district court that it is likely to be reversed." *Bayko*, 774 F.2d at 523. *See, e.g., United States v. Grenberg*, 772 F.2d 340, 341 (7th Cir. 1985)(district court does not have to find that it is more likely to be reversed than affirmed); *Powell*, 761 F.2d at 1232 ("a judge considering the question of bail pending appeal need not hold . . . that he or she has probably made a mistake"); *United States v. Miller*, 753 F.2d 19, 23 (3d Cir.1985)("The federal courts are not to be put in the position of 'bookmakers' who trade on the probability of ultimate outcome"); *United States v. DeSimone*, 424 F.Supp.2d 344, 345 (D.R.I. 2006)(district court is not required to conclude that it is likely to be reversed).

> Thus, in determining whether there is a substantial question, a court must keep in mind that it is not being asked to reverse its position on issues decided at trial, nor is it being asked to grant a new trial. It must decide only that a significant issue exists that merits appellate review and that the issue is critical enough to the defendant's conviction that a contrary appellate ruling would warrant a reversal.

*United States v. Hicks*, 611 F.Supp. 497, 499 (S.D. Fla. 1985).  This Court has already concluded that the evidence against Mr. Carpenter, while adequate to survive sufficiency challenges, was not so overwhelming that the jury's decision might have gone the other way if not for the government's improper closing arguments.

## II.      THERE IS CLEAR AND CONVINCING EVIDENCE THAT MR. CARPENTER IS NOT LIKELY TO FLEE OR POSE A DANGER TO ANY PERSON OR THE COMMUNITY.

Mr. Carpenter presents neither a risk of flight nor a risk of danger to the community if he is permitted to remain on bail pending appeal to the First Circuit.  The Court is well versed in the procedural and factual history here.  Mr. Carpenter's ties to the community and his family have

been well-documented by the defendant, including most recently within his sentencing memoranda. Rather than repeat those facts here, Mr. Carpenter respectfully incorporates his sentencing memoranda, and the exhibits submitted in support thereof, as evidence that he does not present a risk of flight or a risk of danger to the community. As this Court has observed, Mr. Carpenter is prone to "*fight*" not flight. Indeed, if Mr. Carpenter did not flee in the 38-month period from June 30, 2008 to September 1, 2011, after the second guilty verdict and while the Court considered his post-verdict motions, and did not flee prior to his sentencing hearing in this matter after his conviction had been reinstated and at a time when he was aware that the government would be recommending a five year term of imprisonment, then there is zero chance that Mr. Carpenter is a flight risk now. Indeed, much of the standard for release pending appeal is the same standard that applies to the Court's decision to permit Mr. Carpenter to self-report in this matter.

Mr. Carpenter has at all times complied with the conditions of release imposed in this case, and has done so for the more than a decade that this matter has been pending. This Court recognized his unique history of compliance (which included his appearing at two trials) when it allowed a motion in February 2012 to return his passport to enable him to travel, at the Court's discretion, internationally, finding that "[s]ince surrendering his passport in February 2004, Carpenter has fully complied with all the requirements set by Pretrial Services." Dkt. 386. While Mr. Carpenter ultimately did not travel, but instead remained here to care for his parents, the fact that Mr. Carpenter did not re-apply for a passport is further evidence of his having no intention to flee.

The return of the indictment in the District of Connecticut does not negatively alter this analysis. Mr. Carpenter steadfastly maintains his innocence in that matter. He has been granted

pretrial release in that matter as well, further demonstrating that, in the eyes of another court (admittedly under different burdens of proof but focused on the very same underlying issues) he does not present a risk of flight or danger to the community in either this case or the Connecticut matter.  Indeed, if anything, the Connecticut release order cements a finding that Mr. Carpenter will comply with conditions of release here because in that matter Mr. Carpenter's wife and daughter posted their homes to secure Mr. Carpenter's compliance with all conditions of release in that matter – his wife of 32 year's residence was owned and resided in by her parents, and his only daughter's residence is where she is beginning her marital life.  Hence, Mr. Carpenter understands that he must comply with the conditions of release at the peril of his wife and daughter losing their homes.  The PSR and the incorporated sentencing memoranda fully reflect Mr. Carpenter's devotion to his family.  The facts of this case themselves do not reflect that Mr. Carpenter is one to cavalierly disrespect obligations; Mr. Carpenter handled over $100 million of cash successfully performing 119 out of 126 BPETCO property exchanges and did not "misappropriate" or steal a single dime for himself; rather, when the NASDAQ suffered its historical collapse in April-December of 2000 Mr. Carpenter invested over $2,000,000 of his own funds to try to sustain his business model and fulfill his contracts with BPETCO's Exchangors.

Mr. Carpenter is not a danger to the community: the Connecticut matter concerns events that largely occurred between January 2007 and June 2008, and the government's theory of proof in Connecticut is subject to doubt. The subject matter of the Connecticut indictment is whether certain insurance companies (which themselves made millions in premiums) were defrauded by applications that did not set out that the insurance policies were being purchased as investment

vehicles.   The applications in question were submitted more than 5 years ago and are not indicative of a current danger to the community.

Lastly, it is vitally important that Mr. Carpenter remain at liberty during the appellate period so that he can assist his Connecticut attorney in preparing to defend that matter, which involves over 1 million pages of documentary materials, many seized from either the residence or businesses of the defendant, *i.e.* he has the special knowledge essential to pretrial review and preparation of this document-intense case.   *See* Letter of Richard Brown, Esq., attached hereto as Exhibit 1.   Moreover, if he is incarcerated, Mr. Carpenter understands that he will be held in some local jail, either in Central Falls, Rhode Island, or in the Hartford area, given his pending indictment, which would result in Mr. Carpenter serving his sentence in a substantially more difficult environment, as contrasted with a Federal prison camp.   Mr. Carpenter also understands he will incur additional penalties should he fail to appear as required in both this case and concomitantly in Connecticut.   These facts undeniably provide additional reasons that should assure the Court that Mr. Carpenter will comply with any conditions of release imposed here and that release is appropriate upon a finding that "substantial" issues exist in this matter.

To the extent the Court has any concerns regarding either factor, Mr. Carpenter will readily agree to any reasonable and/or necessary proposed conditions, which could include the posting of the same family homes posted in Connecticut, and/or a condition that he not engage in insurance or investment related businesses as a condition of bail if the Court has any concerns regarding his commitment to conform his conduct to the law.

### III.   THERE ARE NUMEROUS SUBSTANTIAL ISSUES WARRANTING BAIL PENDING APPEAL.

1. <u>There was a violation of the Speedy Trial Act, a point the government concedes if the First Circuit should agree with those circuits that have already ruled that the clock does not reset (*i.e.*, go back to zero) upon the return of mandate, but instead resumes upon return of mandate.</u>

Mr. Carpenter has moved to dismiss the indictment in this case for violation of the Speedy Trial Act for a number of reasons. *See, e.g*., Dkt. Entries 79, 229, 239, 388, 415 and 426. A critical issue bearing upon several of Mr. Carpenter's motions is whether the Speedy Trial clock resets to zero upon the return of an appellate mandate, or whether it merely *resumes* counting from its last known position. *The government concedes that if the clock resumes, which is the position taken by several circuits, see United States v. Pinter, 307 F.3d 1178, 1185 (9ᵗʰ Cir. 2002); United States v. Rivera, 844 F.2d 916, 919 (2d Cir. 1988), rather than resets, there would* **be at least 71 non-excludable days** *prior to the scheduling conference on November 26, 2007, see Dkt. 230, and thus a violation of the Speedy Trial Act, which will necessarily result in a reversal of the verdict returned in this case and/or a dismissal of the Indictment.* While the Court, in its Order dated April 8, 2008, impliedly held that the clock resets rather than resumes (applying §3161(e) rather than §3161(h)(1)(C)), certainly this pivotal issue warrants bail pending appeal, particularly considering the government's concession that a violation of the Speedy Trial Act has occurred under the legal test applied by the Ninth and Second Circuits.

All parties agree that 58 days expired from the Speedy Trial Act between the issuance of the First Circuit mandate affirming the first new trial order (September 28, 2007) and the status conference on November 26, 2007. Given that baseline, Mr. Carpenter has argued that the Speedy Trial Act has been violated, at the very least, in the following respects:

a.     Even excluding the time period after the November 26, 2007 status

conference, the government identified additional non-excludable time that

results in a violation of the Speedy Trial Act if the clock resumes, rather

than resets, as two circuits have held.  *According to the government*, 13

days lapsed off the Speedy Trial clock between the Court's order of a new

trial on December 15, 2005 (Dkt. 192) and December 29, 2005, when Mr.

Carpenter filed his motion for reconsideration of the denial of his motion

for judgment of acquittal (Dkt. 194).  When one adds the 13 days to the 58

days that expired between the issuance of the First Circuit mandate

(September 28, 2007) and the November 26, 2007, status conference (and

further assuming that the Speedy Trial clock does not reset upon issuance

of the mandate, but simply resumes/restarts), it becomes clear that the

Speedy Trial Act has been violated.[1]

b.     The first trial concluded on July 27, 2005.  As of that date, 38 days had

expired from the Speedy Trial clock.  If that time is included in the

calculus, the Speedy Trial clock surpassed 70 days on October 30, 2007,

*i.e.* midway between the mandate upholding the Court's new trial order and

the November 26, 2007 status conference.  *See* Dkt. 229.

c.     Assuming the Speedy Trial clock reset to zero after the government's first

interlocutory appeal, and thus *excluding* the 38 days that elapsed prior to

the first trial, there was still a violation of the Speedy Trial Act prior to the

---

[1] There is also an argument that 25 days expired between the Court's order of a new trial on December 15, 2005 and the next tolling event (the government's filing of a notice of appeal on January 9, 2006), rather than merely 13 days, which produces another argument why the Speedy Trial Act was violated.  *See, e.g.*, Dkt. 230 at pp.5-6

second trial.  Again, 58 days expired from the clock between the issuance

of the mandate on September 28, 2007 and the November 26, 2007 status

conference.  On that date, the Court granted a continuance to May 5, 2008,

but *without* making any oral or written on-the-record findings as required

by 18 U.S.C. §3161(h)(8)(A) or *Zedner v. United States*, 126 S. Ct. 1976

(2006). The lack of explicit on-the-record findings had the effect of *not*

tolling the STA clock.  Mr. Carpenter then filed a motion to transfer venue

on December 17, 2007 (Dkt. 223), thereby stopping the STA clock, *see* 18

U.S.C. § 3161(h)(1)(F), 80 days after any alleged "fresh clock" had begun

to run.

d.   Additionally, Mr. Carpenter will argue that, pursuant to *U.S. v. Dessesaure*,

556 F.3d 83 (1st Cir. 2009), *Bloate v. U.S.*, 559 U.S. 196 (2010), *U.S. v.*

*Tinklenberg*, 131 S.Ct. 2007 (2011), and *U.S. v. Huete-Sandoval*, 668 F.3d

1 (1st Cir. 2011), the Speedy Trial Act was violated in part because the

Clock kept running on September 1, 2011 (the date the Court ordered a

new trial) until the government filed its second interlocutory appeal on

September 29, 2011, thus stopping the STA Clock once again, and

resulting in an additional 28 days expiring from the clock.  When combined

with the 58 days that all parties agree were non-excludable, this results in

yet another violation of the Speedy Trial Act.[2]

---

[2] In addition to the foregoing, there are additional arguments in support of an STA violation.  The Court has listed a number of filings made by Mr. Carpenter in its Order of February 21, 2014. Assuming *arguendo* that the STA Clock did stop under 18 U.S.C. §3161(h)(1)(H) for each of those filings, it would only stop for 30 days and then resume, which would produce another series of violations of the STA thus generating several additional periods of non-excludable

For all of the foregoing reasons, Mr. Carpenter respectfully submits that the Speedy Trial issues warrant bail pending appeal, *particularly given that the government has agreed (Dkt. 230) there exists a split in circuits and, if the Judges of other appellate courts were correct and the tolling but not resetting provisions of the STA are applicable, then more than 70 days elapsed* and at minimum Mr. Carpenter is entitled to a dismissal of the indictment without prejudice. The split in circuits demonstrates that reasonable judges disagree regarding the proper application of the STA to circumstances where new trial motions are allowed and then appealed, thus the STA issue is, standing alone, the type of substantial issue that warrants bail pending appeal.

2.   Mr. Carpenter's constitutional rights to a speedy trial and sentencing, as secured by the Fifth and Sixth Amendments, was violated.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. "If the government violates this constitutional right, the criminal charges must be dismissed." *United States v. Dowdell*, 595 F.3d 50, 60 (1st Cir.2010), *citing Strunk v. United States*, 412 U.S. 434, 439-40 (1973). Unlike a Speedy Trial Act violation, dismissal with prejudice is the only remedy when a violation of a defendant's constitutional right to a speedy trial has occurred; the Sixth Amendment's speedy trial protection, unlike other constitutional guarantees such as the right to an impartial jury or fair notice of charges, cannot be remedied by a new trial because this constitutional protection is explicitly designed to limit the uncertainty and anxiety that accompanies a criminal prosecution. *See, e.g., United States v. Young*, 657 F.3d 408, 413 (6th Cir.2011) ("We agree with Young that the proper remedy for a violation of a defendant's constitutional speedy-trial rights is dismissal of the indictment with prejudice"); *United States v. Elmardoudi*, 501 F.3d 935, 943, n.7 (8th

---

delay which would, like the others detailed above, exceed the 70 day imperative for trial or retrial. *See Henderson v. U.S.*, 476 U.S. 321, 328-29 (1986).

Cir.2007) ("It is generally agreed that [Strunk] means dismissal with prejudice" and "government does not dispute that dismissal with prejudice is the only remedy for a Sixth Amendment speedy trial violation").  To determine whether there exists a violation of the Sixth Amendment right to speedy trial emanating from the various delays that aggregated to over 10 years between indictment and sentencing, the Court applies the familiar four-part balancing test established in *Barker v. Wingo*, 407 U.S. 514 (1972), which requires a weighing of: "(1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant resulting from the delay." *Dowdell*, 595 F.3d at 60, *citing Barker v. Wingo*, 407 U.S. at 530; *Nelson-Rodriguez*, 319 F.3d at 60 (analyzing claim that a delayed sentence violated the defendant's right to a speedy trial under the four factors set out in *Barker*).

The Fifth Amendment due process rights also protect against irrepressible delay in trial court proceedings, as Mr. Carpenter has previously argued. U.S. Const. amend. V. ("No person shall . . . be deprived of life, liberty, or property, without due process of law"). "A defendant maintains a right to due process in a criminal proceeding until the entry of final judgment. This right guarantees not only that the required process will be afforded, but that it will be afforded without 'oppressive delay.'" *United States v. Sanders*, 452 F.3d 572, 577 (6th Cir. 2006), *citing United States v. Lovasco*, 431 U.S. 783, 789 (1977). Delays caused by criminal appeals also "can rise to the level of a due process violation." *United States v. Pratt*, 645 F.2d 89, 91 (1st Cir. 1981) (listing cases involving appellate delays of two and three years). When the pre-indictment delays are added to the post-indictment delays, the 10-year delay before sentencing extends to almost 13 full years.

Mr. Carpenter has addressed at length the reasons why dismissal is required under *Barker* and the Fifth and Sixth Amendments, and he incorporates and relies upon the points and

authorities addressed in his prior pleadings, *see, e.g.*, Dkt. 387-88, 391, 406-07, 413, to respectfully submit that bail pending appeal is warranted on this issue as well.  Certainly, the present case presents rather unique circumstances: (1) two lengthy trials, the first of which was rendered moot because of improper government trial conduct, which not only denied Mr. Carpenter jury deliberations free from taint, but also from seeking a full appeal of events transpiring during his first trial, (2) two government appeals of the Court's decisions, (3) a defendant who has regularly asserted his innocence and right to a speedy trial, (4) a government that sat on its hands for approximately three years – filing no motions that requested the expediting of the decision-making in contrast to the defendant's requests - while the Court was forced to wrestle with a motion for new trial based on improper government conduct during a second trial, and (5) a government that sat on its hands yet again during the most recent lengthy appeal, which took over two years (much of it between the government's Notice of Appeal and the scheduling of oral argument), as contrasted with Mr. Carpenter, who alone attempted to push the First Circuit to address the appeal, despite the fact it is the government with the statutory mandate to diligently pursue its appeal, *see* 18 U.S.C. §3731 (government appeal "shall be diligently prosecuted").  Of course, it is not the defendant's duty, nor that of his attorney, to see that he is speedily prosecuted and sentenced.  *See Barker*, 407 U.S. at 527 ("A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process").  Indeed, even the Second Circuit in *United States v. Ray*, 578 F.3d 184 (2d Cir. 2009), held, in joining a multitude of other circuits, that "a defendant does not bear the burden of seeking her own sentencing," a position the government did not contest in that matter.  *Ray*, 578 F.3d at 190-91 (discussing Sixth and Ninth Circuit positions as well), *citing United States v. Sanders*, 452 F.3d 572, 581 (6th Cir.2006) ("defendant does not have a duty to

petition the court for resentencing; the onus falls on the government"); *United States v. Martinez*, 837 F.2d 861, 866 (9th Cir.1988) ("just as a defendant has no duty to bring himself to trial, he has no affirmative duty to aid in the execution of his sentence").[3]

Also included within the relevant issues here, Mr. Carpenter has argued that the Sixth Amendment right to a speedy trial includes a right to a speedy sentencing.  Many courts have assumed or held that the Sixth Amendment prohibits unnecessary delay prior to final judgment. *See Pollard v. United States*, 352 U.S. 354, 361 (1957) (assuming without deciding that the sentence is part of the trial for purposes of the Sixth Amendment); *United States v. Nelson-Rodriguez*, 319 F.3d 12, 60 (1st Cir.2003) ("we assume for the purposes of this appeal that the right to a speedy trial extends to sentencing").  The Fifth, Tenth and Eleventh Circuits have recognized the right to speedy sentencing.  *See, e.g., United States v. Abou-Kassem*, 78 F.3d 161, 167 & n.25 (5th Cir.1996); *United States v. Peters*, 349 F.3d 842, 850 & n.34 (5th Cir.2003); *United States v. Yehling*, 456 F.3d 1236, 1243 (10th Cir.2006) ("[t]he Sixth Amendment guarantees all criminal defendants the right to a speedy trial; we have applied this right from arrest through sentencing"); *United States v. Miter*, 2011 WL 5420855, *1 (11th Cir.2011) (noting that the Eleventh Circuit has "recognized that the constitutional speedy trial right applies to sentencing"); *see Juarez-Casares v. United States*, 496 F.2d 190, 192 (5th Cir.1974) (holding that "the imposition of sentence is part of the trial for the purposes of the Sixth Amendment speedy trial guarantee"). The D.C. Circuit counts the Sixth Circuit as having so held, *see United*

---

[3] As Mr. Carpenter has previously detailed, during the pendency of the government's second appeal, it was Mr. Carpenter alone who pressed the First Circuit to expedite his appeal. *See, e.g., United States v. Carpenter,* First Circuit Case No. 11-2133, Dkt. Entries Dated July 3, 2012 (Letter Requesting Status) and November 21, 2012 (same); *United States v. Carpenter*, First Circuit Case No. 11-2131, Dkt. Entry Dated May 22, 2012 (Motion to Remand). All the while, the government made no attempts to expedite the appellate process, despite its statutory mandate to diligently pursue its appeal, *see* 18 U.S.C. §3731 (government appeal "shall be diligently prosecuted").

*States v. Gibson*, 353 F.3d 21, 27 (D.C.Cir.2003), and the First Circuit has identified the D.C.

Circuit as having held the Speedy Trial right applies to sentencing. *See Nelson-Rodriguez*, 319

F.3d at 60 (*citing United States v. Yelverton*, 197 F.3d 531, 535-39 (D.C.Cir.1999)).

Lastly, the prejudice suffered by Mr. Carpenter and his family as a result of this endless

litigation has been amply demonstrated to the Court.  Not only has Mr. Carpenter suffered

immeasurable anguish, anxiety and public obloquy, he has suffered physically as well.  To

establish prejudice, Mr. Carpenter submitted to the Court not only the poignant letters of family

and friends, but also the letter of Dr. Schouten.  While there were multiple filings between 2008

and 2011, which the Court cited as contributing to the delay in resolving Mr. Carpenter's motion

for new trial in its recent order denying Mr. Carpenter's motion to dismiss, *see* Dkt. 431 at p.4,

they were largely occasioned by the evolving reality that Mr. Carpenter's right to a fair trial had

been compromised for Merrill Lynch's monetary purposes and that multiple witnesses employed

by Merrill Lynch in fact had given demonstrably and now admittedly false testimony on a matter

central to Mr. Carpenter's defense:  his good faith and openness with his brokers that he was

trading funds that came from §1031 Exchangors.

While the defendant respects the Court's Sixth Amendment analysis at Dkt 431, the

unrebutted proof of more than ordinary suffering due to the passage of time from February 2004

through his sentencing at the end of February 2014 constitutes a substantial issue of whether Mr.

Carpenter's constitutional rights were violated, particularly when one also considers the more

than 3 year pre-indictment investigatory time period.  For all of these reasons, and those

previously asserted to the Court, Mr. Carpenter respectfully submits the violation of his Fifth and

Sixth Amendment rights to a speedy trial and sentencing is an issue warranting bail pending

appeal.

3. The indictment does not provide constitutionally sufficient notice, and was so broad it improperly permitted the government to proceed at trial on a new theory, resulting in a constructive amendment and/or prejudicial variance.

a. *The indictment does not provide constitutionally sufficient notice.*

To comply with the protections of the Fifth and Sixth Amendments, an indictment must contain sufficiently specific facts to provide the defendant "with reasonable certainty, of the nature of the accusation against him" so that he knows "what he must be prepared to meet." *Russell v. United States*, 369 U.S. 749, 765-66 (1962) (internal quotations and citations omitted). In addition, the indictment must be framed to "ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (internal citations and quotations omitted).  Here, as previously argued by Mr. Carpenter, the indictment fails to provide sufficient notice regarding the crime charged. As Mr. Carpenter argued at the outset of this prosecution, in seeking the dismissal of the indictment:

> Throughout the indictment, the government's underlying theory of fraud zig-zags from one point to the next without presenting any definite conclusion. Nowhere in the indictment does the government allege "where" and "when" the alleged crime was committed. That is essential because the *actus reus* must be done with the requisite *mens rea*. . . This fundamental flaw renders the indictment unconstitutionally vague because it allows the government to change its theory of the case in order to fit the evidence ultimately adduced at trial.

Dkt. 14 at p.13.  As detailed below, Mr. Carpenter's concern expressed at the outset of this case ultimately occurred.  Moreover, nowhere are any facts alleged that show Mr. Carpenter made a false statement to anyone, that he had a willful and specific intent to defraud anyone, or that he had the necessary *mens rea* or knowledge that he was breaking the law as of the time (the spring and winter of 2000) where alone the alleged *actus reus* could have occurred.

b.     *The government constructively amended the indictment.*

The government constructively amended the indictment by its proof at trial. After an

indictment has been returned, "its charges may not be broadened through amendment except by

the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215-16 (1960). "A constructive

amendment occurs when the charging terms of the indictment are altered, either literally or in

effect, by prosecution or court after the grand jury has last passed upon them."  *United States v.*

*Celestin*, 612 F.3d 14, 24 (1st Cir. 2010).  Constructive amendments are considered prejudicial

*per se*, and when they occur the conviction must be reversed.  *See, e.g., United States v. Davis*,

717 F.3d 28, 34 (1st Cir. 2013). *Celestin*, 612 F.3d at 24; *United States v. Portela*, 167 F.3d 687,

701 (1st Cir. 1999); *United States v. Dunn*, 758 F.2d 30, 35 (1st Cir. 1985). "To do otherwise

would fail 'to preserve the defendant's Fifth Amendment right to indictment by grand jury, to

prevent re-prosecution for the same offense in violation of the Sixth Amendment, and to protect

the defendant's Sixth Amendment right to be informed of the charges against him.'" *Rodriguez-*

*Rodriguez*, 663 F.3d at 58, *quoting United States v. Brandao*, 539 F.3d 44, 57 (1st Cir. 2008).

The indictment in this case unquestionably charged mail/wire fraud predicated on the

theory that BPETCO fraudulently induced Exchangors to use its services through the use of

affirmative written and oral misrepresentations, or *at most* a theory of half-truths.  *See, e.g*.,

Superseding Indictment (Dkt. 34) at 5 ("BPE gave written and oral assurances to its clients that

BPE would hold their money safe and return the principal to them, in full, for use in closing on

the purchase of replacement property"); *Id*. ("The promotional materials that BPE used to solicit

clients contained representations concerning the security and safety of all funds transmitted to

Benistar"); *Id*. at 8 ("Clients were induced to wire funds to BPE based on material, false written

and oral assurances that the money would be protected and held safe, that BPE would not

transfer the funds without the client's written authorization, and that BPE would return the funds

in full, either to be disbursed for the client's use in closing on the purchase of replacement

property or to be returned to the client if no replacement property transaction was to occur); *see*

*also* Dkt. 404 (detailing additional paragraphs within Superseding Indictment).[4]   Indeed,

consider the Court's own observation regarding the charges in the Indictment, as outlined in its

September 2011 decision granting a new trial in this matter:

> Generally, the government alleged in the Superseding Indictment, and argued to the jury, that although Benistar represented to seven exchangers that their exchange funds would be held safely and securely in an interest-bearing account, instead the defendant was investing the exchange funds in risky stock options.  It was a necessary part of the government's case to argue that the defendant specifically intended to obtain the Exchangors' money by making false representations.  The government's theory was that the defendant specifically intended to obtain the exchange funds on the basis of representations to the Exchangors that the exchange funds would not be subjected to any risk and would simply be "parked" in an escrow account, when he knew that these representations were false because his investment strategy was in fact extremely risky.

Dkt. 377 at p.4.

By the time of the second trial, however, the government had abandoned any pretense of

trying Mr. Carpenter based upon the affirmative false representation scheme charged in the

indictment, instead relying on the mid-ground of the failure to clarify half-truths in the written

documents which contained no affirmative lies, or, as argued below, on a pure omissions theory.

*cf. Carpenter*, 405 F. Supp. 2d at 92 (court holding that "the fraudulent scheme alleged in the

indictment included the 'omission' to clarify the half-truths that the defendant directed toward

the Exchangors").  Given that Mr. Carpenter never spoke to any of the 126 Exchangor clients

before they executed agreements and wired funds, the essence of the prosecution theory required

that Mr. Carpenter either assume the duty to make oral statements outside the exchange

documents or amend the documents themselves to supplement the accurate but incomplete

---

[4] It should be noted there was only one slide in the Martin Paley PowerPoint presentation that mentioned safety, and Mr. Carpenter had nothing to do with the marketing materials.

statements contained therein.  The defense claims, and will contend on appeal, that this theory of prosecution transitioned to a theory predicated upon Mr. Carpenter's nondisclosure of his investment strategy—*i.e.*, a theory of omissions.  *See, e.g.*, Tr.11:64-65 (Paley).

In the government's most recent appeal, it cemented its reliance upon the omissions/nondisclosures theory of mail/wire fraud (a theory that was adopted by the First Circuit in its opinion), providing new – and potent – evidence in support of the constructive amendment advanced by Mr. Carpenter.  In its brief on appeal, the government focused on omissions, such as Carpenter's failure to disclose that he would be investing the Exchangors' funds in stock options, among other omissions, as well as on its contention that the documents were misleading.  *See, e.g.* Govt. Opening Brief, *United States v. Carpenter*, No. 11-2131, at 3-4 ("The documents omitted critical information about Carpenter's risky investment strategy . . . ."); *Id*. at 4 (Carpenter used Exchangors' money "to trade in high-risk stock options" "without telling them"); *Id*. at 9 ("[N]one of the documents disclosed that the exchange funds could be invested in stock options, or that returns from such investments would accrue to Benistar's or Carpenter's – rather than the Exchangors' – benefit"); *see also* Dkt. 404 (detailing additional statements). At oral argument before the First Circuit, the government focused on the context in which the Exchangors' entrusted their money to BPETCO, *i.e.*, the nature and requirements of a §1031 property exchange, while it was Carpenter who focused on the contracts themselves, the very reverse of what would have been the case had the government still been pursuing a false statements theory given that on the facts of this case any false statements must have been found in the written documents that led to the exchanges in question. The government's oral argument underscores the reality that by the time of the second trial and appeal, this was no longer a written false statements case but had instead morphed into an omissions case.

The government's switch in theory is also reflected in the opinion of the First Circuit, which adopted the government's theory in analyzing the issues before it.  *See, e.g. United States v. Carpenter*, 736 F.3d 619, 629 (1st Cir.2013) ("Had there been full disclosure, especially after Carpenter knew his risky investment strategy had failed, the Exchangors would never have made the investments to begin with or maintained them with Benistar"); *Id*. at 628 (The government "sought to show that Carpenter had misrepresented his approach by pursuing a riskier investment strategy than Exchangors would have expected from the representations made and the nature of their purposes in entering exchange contracts"); *see also* Dkt. 404 (detailing additional statements); Dkt. 431 (Court denying motion to reconsider dismissal for constructive amendment) ("The 'omissions' that the defendant complains of deal with the government's contention that the defendant failed to inform the Exchangors that he was using their funds that were represented to be in "escrow" accounts to actively trade in options for his own profit. The affirmative representations that the funds were deposited in accounts maintained at Merrill Lynch and later PaineWebber were true as far as they went, but what they omitted made them misleading. Arguing that the defendant omitted material information necessary to make the affirmative statements not misleading did not transform the case from one of affirmative misrepresentations to a case of misrepresentations solely by reason of omission").

The critical lesson of *Stirone* for this case is that, when the government particularizes in the indictment an essential element, it must prove that the offense was committed in that manner, and no other:

> [W]hen only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that one kind of commerce or another had been burdened. The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment.

*Stirone*, 361 U.S. at 218-19.[5]  Without having a contractual or fiduciary duty to disclose, the

failure to disclose is not a crime, whether such failure is described as an "omission," as the

defendant contends is appropriate given the arguments cited above, or even as a "half-truth," *i.e.*

a truthful written statement that is incomplete thus requiring a further written statement that was

allegedly omitted in this case.  In *United States v. Cassiere*, 4 F.3d 1006, 1022 (1st Cir. 1993),

the Court quoted the following instruction by the district court: "**[I]t is not a crime** simply to be

careless or sloppy in discharging your duties as an attorney or as an appraiser. That may be

malpractice, but **it's not a crime**." (Emphasis added).  The court went on to observe that "'[i]t is

well settled that breach of a fiduciary duty, standing alone, **does not** constitute mail fraud.'" *Id.,*

*quoting United States v. Greenleaf,* 692 F.2d 182, 188 (1st Cir.1982), *cert. denied,* 460 U.S.

1069 (1983) (emphasis added).

 Here, the scheme to defraud is an essential element of both mail and wire fraud. *See, e.g.,*

*United States v. Pimental*, 380 F.3d 575, 584 (1st Cir. 2004); *United States v. Adkinson*, 135 F.3d

1363, 1378 (11th Cir. 1998). The government chose to define the charged scheme to defraud as

---

[5] *See, e.g., United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005)(conviction reversed where indictment charged distributing misbranded drugs based on repackaging, but government theory at trial also allowed conviction based on labeling drugs sterile when they were not); *United States v. Dipentino*, 242 F.3d 1090, 1094-95 (9th Cir. 2001)(conviction reversed where indictment charged violation of specified work-practice standard but instructions permitted conviction based upon violation of a different work-practice standard as well); *United States v. Pigee*, 197 F.3d 879, 887 (7th Cir. 1999)(conviction reversed where indictment charged defendant with knowingly making a building she owned available for the storage of cocaine, but instructions permitted conviction based upon making building available for manufacturing, storing, distributing, or using cocaine); *United States v. Nuñez*, 180 F.3d 227, 231-32 (5th Cir. 1999)(conviction reversed where indictment charged resisting arrest by use of dangerous weapon, but instructions permitted conviction based on other means of resisting arrest); *United States v. Randall*, 171 F.3d 195, 208 (4th Cir. 1999)(conviction reversed where indictment charged use and carrying of firearm in relation to distribution of narcotics, but evidence showed use and carrying in relation to possession with intent to distribute); *United States v. Willoughby*, 27 F.3d 263, 266 (7th Cir. 1994)(same).

one predicated upon affirmative false statements. The government having done so, Mr. Carpenter

cannot, consistently with the Fifth Amendment grand jury clause, stand convicted based on any

other fraudulent scheme, yet the defendant respectfully submits that is precisely what occurred in

this case.  For this reason, bail pending appeal is warranted here.

        c.     *At minimum, there was a prejudicial variance between indictment and proof.*

A material variance occurs "when the charging terms remain unchanged but when the

facts proved at trial are different from those alleged in the indictment."  *United States v. Fisher*, 3

F.3d 456, 462 (1st Cir. 1993). "Variance is grounds for reversal only if it affected the defendant's

'substantial rights'—*i.e.*, the rights to have sufficient knowledge of the charge against him in

order to prepare an effective defense and avoid surprise at trial, and to prevent a second

prosecution for the same offense." *United States v. DeCicco*, 439 F.3d 36, 43 (1st Cir. 2006)

(citation omitted).

Mr. Carpenter's fundamental right to fair notice was transgressed here by the

government's shift of its theory of criminality to include one predicated on omissions, against

which Carpenter had no notice that he should prepare to defend. The variance here was

manifestly prejudicial to Carpenter as it denied him the fair notice of the charges against him

guaranteed by the Sixth Amendment, *see, e.g., Russell v. United States*, 369 U.S. 749 (1962), and

raises the very real spectre that the jury may have convicted him on a legally insufficient ground,

requiring reversal under *Yates v. United States*, 354 U.S. 298 (1957).  Where, as here, "a jury has

been presented with several bases for conviction, one of which is legally erroneous, and it is

impossible to tell which ground the jury convicted upon, the conviction cannot stand." *United

States v. Sawyer*, 85 F.3d 713, 730-31 (1st Cir. 1996); *United States v. Fernandez*, 722 F.3d 1, 33

(1st Cir. 2013). Under *Yates*, reversal is required unless it can be conclusively found that the

jury's verdicts in fact rested upon a legally and factually adequate ground.  It cannot be so said here.  Given this compelling issue, bail pending appeal is warranted.

    4.   <u>The jury was never instructed regarding an omission theory of criminality</u>.

    Certainly, even if the government could properly proceed on an omission theory of proof, the jury should have received appropriate instructions on the issue.  Silence provides a permissible basis for a finding of criminal fraud only where there was an independent duty to disclose.  *See, e.g., United States v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012); *United States v. Cassiere*, 4 F.3d 1006, 1022 (1st Cir. 1993); *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984), rev'd on other grounds, 473 U.S. 207 (1985).  Here, such a duty was neither charged nor proven, and the jury was not instructed that it could not convict Carpenter based on omissions unless it found that he had an independent duty to disclose the withheld information. In addition, the jury was also not instructed on another essential element of fraud under an omissions theory, namely, that Carpenter knew he had a duty to disclose.  *See Cassiere*, 4 F.3d at 1022 (First Circuit approving an instruction). For this reason alone, bail pending appeal is warranted.

    5.   <u>A mistrial or new trial should have been granted because the Merrill Lynch witnesses testified falsely and Merrill Lynch concealed substantive proof that Mr. Carpenter was open and forthright with the brokerage house, all of which denied Mr. Carpenter affirmative evidence supporting his good faith defense</u>.

    The misconduct on the part of the Merrill Lynch witnesses in this case, whose testimony constituted a significant part of the government's prosecution in this matter, warranted either a mistrial or a new trial (whether pursuant to the "interests of justice" prong of Rule 33 or the "newly discovered evidence" standard), and this too warrants bail pending appeal.

A.      *The misconduct.*

During trial in this case, witnesses from Merrill Lynch called by the government testified falsely regarding the scope of their knowledge of BPETCO's business, and Merrill Lynch wrongfully concealed and/or suppressed substantial documentary proof bearing directly upon Mr. Carpenter's defense in this case—*i.e.*, that he never possessed an intent to defraud and/or at all times acted in good faith.  In short, documents unearthed after the second trial directly contradicted the testimony of Merrill Lynch witnesses given in both criminal trials as to *what* Merrill Lynch knew and *when* Merrill Lynch knew it, with respect to Mr. Carpenter investing other peoples' money as part of §1031 property exchanges.

On February 27, 2009, new counsel for Merrill Lynch (in their civil litigation) Dickstein Shapiro wrote a letter to the Clerk for the Business Litigation Session in the Massachusetts Suffolk Superior Court, revealing that "on Wednesday counsel found files in the possession of Merrill Lynch that contain documents related to Benistar Property Exchange Trust Co., Inc. [("BPETCO")]."  On March 3, 2009, counsel for Mr. Carpenter sent a letter to the government requesting that they immediately review the "newly found" files referenced in the Dickstein Shapiro letter, and provide all documents to which Mr. Carpenter is entitled in the federal criminal matter.  On March 16, 2009, Dickstein Shapiro sent another letter to the Suffolk Superior Court clerk that allegedly contained "all non-privileged documents" in the recently-discovered files.  Dickstein Shapiro's letter states that "[a]lthough some of the documents now produced are newly identified (*i.e.*, documents that were not found through document collection efforts in response to plaintiffs' initial discovery requests), others had been collected previously, but were not produced."  Merrill Lynch's review also "identified additional documents, including emails, that were not previously produced, and those documents were delivered to counsel for

plaintiffs on March 14, 2009." On March 18, 2009, the government turned over approximately

670 pages of documents received from plaintiffs' counsel to Mr. Carpenter's counsel. *See* Dkt.

343 at p.7. Since, then, roughly 5,000 pages of "newly discovered" materials have been received

by the defendant, and the Exchangors conducted more than a dozen depositions of Merrill Lynch

witnesses. *See* Dkt. 349 at p.2.

The gestalt of these materials, unknown to and unknowable by Mr. Carpenter prior to

trial, including documentary proof from Merrill Lynch's own internal files, clearly show that

Merrill Lynch witnesses had actual knowledge that the business of BPETCO was to hold and

invest other people's money, Mr. Carpenter was open and transparent with Merrill Lynch from

the inception of their relationship regarding BPETCO and its business, that Merrill Lynch

witnesses committed perjury during trial, and that Merrill Lynch and its law firms engaged in a

massive cover-up and fraud on the Court.

The clarity of the suppressed materials cannot be reasonably disputed. Even the

Exchangors have accused Merrill Lynch witnesses of committing perjury and Merrill Lynch and

its attorneys of committing an egregious fraud upon the Court through a pervasive cover-up:

> These "newly identified" documents show that Merrill Lynch personnel conspired to
> cover up the key evidence, and that Merrill Lynch witnesses Gerald Levine, Gary Stern,
> Thomas Rasmussen, Hassan Tabbah and Kevin Duffy repeatedly perjured themselves to
> hide their knowledge from the Court. In short, over the past eight years, Merrill Lynch
> has obstructed justice . . .

*Plaintiffs' Emergency Motion To Compel Merrill Lynch To Produce Its Accounts Of What Its*

*Brokers Knew About Benistar Trading With Other Peoples' Money*, Cahaly v. Benistar Property

Exchange Trust Co., No. 01-0116, Suffolk Sup. Ct. (Mar. 24, 2009). It is a rare case indeed

when the government's own "victims" accuse the government's other principal witnesses of

committing perjury and engaging in a fraud on the Court. Indeed, in the civil trial between the

Exchangors and Merrill Lynch that began on June 2, 2009 in Suffolk Superior Court, Merrill

Lynch **conceded** that Merrill Lynch broker Gerald Levine had contact and communications with Attorney David Patterson in October 1998 when the BPETCO accounts were first opened at Merrill Lynch. Of course, Levine adamantly denied having *any* such contacts and communications during his testimony in the June 2008 retrial in this case, thus creating a conflict of testimony with David Patterson and the uncertainty as to whether the jury credited Levine's knowingly false testimony to the detriment of Mr. Carpenter. The new evidence would not only have significantly bolstered Patterson's testimony, it would have not only impeached the integrity of Stern and Rasmussen's testimony, it would, most pivotally, have provided affirmative, substantive and irrefutable proof that Carpenter was transparent with his brokers – thus proving he did not believe trading with his client's funds was illegal or even improper. It should be noted that the **civil** litigation between all of the parties, including the Exchangors' $120 million lawsuit against Bingham McCutcheon and Attorney Snyder, is still ongoing to this very day.

     B.    *The legal issues*.

First, Mr. Carpenter will contend on appeal that the misconduct by the Merrill Lynch witnesses warranted a mistrial in this case. The Court has already concluded that the government knew Levine's testimony was perjurious in certain respects. *See* Dkt. 377, at p.23, n.5 ("Levine's testimony in other respects was perjurious in this Court's judgment, and the government knew it"). "It is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269. "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id*. Such convictions must be set aside where "there is any reasonable likelihood that the false testimony could have

affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). The government's obligation to correct false evidence is no less necessary when the evidence is introduced during cross-examination.  *See United States v. Mangual-Garcia*, 505 F.3d 1, 10 (2007) (finding *Napue* violation when Government allowed false testimony to go in uncorrected during cross examination but finding claim waived where defendant failed to present the information regarding the falsity to the jury).

The government had at least two options in response to Mr. Levine's false testimony. At the moment in which Mr. Levine denied having any conversation with Mr. Patterson, the government could have requested a bench conference to work out "how to inform the jury that the testimony is false." *See LaPage*, 231 F.3d at 492. Or, the government could have attempted to correct the false testimony during its redirect of Mr. Levine.  *Kattar*, 840 F.2d at 128 (noting that the prosecutor "should have made an attempt to correct [the witness'] testimony...during subsequent redirect examination"). Doing neither was not an option.  *See* Tr. at 7- 151 ("No questions"). Although the First Circuit determined the violation was mooted by successful cross-examination, *Carpenter*, 436 F.3d at 630-31, the Court did not have before it the new evidence demonstrating not just that Levine lied but that it was incontestable that Carpenter was open and truthful regarding the source of his funds with Merrill Lynch.

Second, Mr. Carpenter will argue that the misconduct by the Merrill Lynch witnesses warranted a new trial "in the interests of justice," and the Court therefore should have ordered a new trial pursuant to Rule 33(b)(2). *See United States v. Andrade*, 94 F.3d 9, 14 (1st Cir. 1996) (a new trial warranted in the interests of justice where conviction constitutes a miscarriage of justice).  Under this prong of Rule 33, a new trial in the 'interests of justice' may be granted liberally on a motion made 'within [14] days' after the verdict…." *United States v. Conley,* 323

F.3d 7, 10 (1st Cir.2003), *quoting* Fed.R.Crim.P. 33. A motion for new trial based on the "interests of justice" is warranted "where there would be a miscarriage of justice or where the evidence preponderates heavily against the verdict." *United States v. Andrade*, 94 F.3d 9, 14 (1st Cir.1996) (quotations omitted). Alternatively, Mr. Carpenter will argue that the newly discovered documents warranted a new trial pursuant to Rule 33(b)(1). *See United States v. Mathur*, 624 F.3d 498, 503 (1st Cir.2010) ("To gain a new trial based on newly discovered evidence, a defendant normally must pass a four-part test: he must show that (i) the evidence in question was unknown or unavailable to him at the time of trial; (ii) his failure to learn of it did not result from a lack of due diligence on his part; (iii) the evidence is material; and (iv) the evidence, if available upon retrial, would likely bring about an acquittal"); *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir.1980); *Agurs*, 427 U.S. at 103.

The import of the undisclosed Merrill Lynch materials cannot seriously be disputed. Had the newly discovered documents been available to Carpenter in June 2008, he could have proven to the jury that he had no intent to defraud the Exchangors given that he told Merrill Lynch from the beginning of the relationship in October 1998 that he was investing other peoples' money as part of consummating property exchanges for clients—a fact that both Stern and Levine vehemently denied at trial:

> Q:    Isn't it a fact, sir, that you and Mr. Levine knew full well Mr. Carpenter was trading with third-party funds?
>
> A:    Definitely not.

June 10, 2008 Trial Tr. at 24-25 (Stern).

** *

> Q:    Isn't it true - - sir, isn't it true, that you knew from October of 1998 that Dan Carpenter was engaged in a property exchange business?
>
> A:    No.

> Q:     Where he was using clients' funds and investing clients' funds?
>
> A:     No.

*Id*. at 120-21 (Levine).

These materials are not simply impeachment evidence.  Instead, the documents would have been used as substantive, affirmative evidence of Mr. Carpenter's good faith and absence of an intent to defraud.  It bears repeating how adamant Levine was in denying **ever** having any conversation(s) with Patterson:

> Q:     Now let's move ahead to October 22nd of 1998, ten days after Mr. Carpenter signed these forms. At that point in time, sir, isn't it true that you did have a telephone conversation with an attorney by the name of David Patterson?
>
> A:     No.
>
> Q:     You had no conversation with Mr. Patterson?
>
> A:     No.
>
> Q:     Are you saying that unequivocally or because you don't remember a conversation, sir?
>
> A:     I'm saying I had no conversation with a David Patterson.
>
> Q:     At any time?
>
> A:     At any time.

June 10, 2008 Trial Tr. at 98-99 (Levine).

** *

> Q:     It's also your testimony, sir - - and you're just as sure - - that you never had a conversation with Mr. Patterson?
>
> A:     Yes.

*Id*. at 120 (Levine).  This testimony is nothing short of outrageous.  More outrageous, in its opening statement to the jury in June 2009 in the new civil trial of the Exchangors' claims against Merrill Lynch, Merrill's attorney stated:

**It is true** that at the time that Levine is opening these accounts, that a man named David Patterson, who you will hear from, called Merrill Lynch about a client he was representing who was doing a 1031 exchange, and he will tell you **that he did his best to explain to Gerry Levine what the client's situation is**, and Gerry Levine, in fact, sent him a fax.

June 4, 2009 Trial Tr. at 48 in <u>Cahaly v. Merrill Lynch</u> (Suffolk Super. Ct.) (emphasis added).

Merrill Lynch's admission of what Levine has vehemently denied—that Patterson spoke to Levine at BPETCO's inception in October 1998 about the nature of BPETCO's business and the fact that the money in the BPETCO accounts belonged to third parties (such as Patterson's client Jane Carey)—is not surprising, given the newly disclosed documents.

Moreover, the false testimony was not limited to Stern or Levine.  On April 21, 2009, Thomas Rasmussen, Merrill Lynch's Chief Compliance Officer, gave a deposition in anticipation of the ongoing trial of the Exchangors' claims against Merrill Lynch. During his seven-hour deposition, Rasmussen admitted that much of his testimony in Carpenter's June 2008 retrial was false. For example:

> Q:     Okay. So the testimony on pages 44 - - on - - I guess [June 11, 2008] page 44, lines 4 and 5, may not be accurate, is that correct, in the criminal case?
>
> A:     It may not be.

April 21, 2009 Rasmussen Depo. Tr. at 254 (regarding time and circumstances under which he and Levine informed Carpenter that the BPETCO accounts were being closed).

\* \* \*

> Q:     [S]o it's not entirely accurate when you told the FBI that you did not take notes during your last two phone conversations with Mr. Carpenter, correct?
>
> A:     Correct.

*Id.* at 281 (regarding the "newly discovered" evidence that Rasmussen actually did take notes of his last two conversations with Carpenter when the BPETCO accounts were shut down in September 2000).

** *

> Q:     Okay, so you had actually received that call - - that letter from Dan Carpenter
>        before making the call to Dan Carpenter with Kevin Duffy; isn't that correct?
>
> A:     Yes.
>
> Q:     Okay. Not after, right?
>
> A:     Did I say after?
>
> Q:     In the testimony [June 11, 2008 at 45] you said after.
>
> A:     No, I definitely received it before.

*Id*. at 295 (regarding discussions and communications with Carpenter on September 22, 2000).

The extent of Rasmussen's and Merrill Lynch's providing false testimony in civil and criminal trials and making false statements to federal agencies regarding the extent and timing of their knowledge that Carpenter was investing client funds in the BPETCO accounts is summarized by the following exchange between **Rasmussen and the Exchangors' lawyer**:

> Q:     You agree that the - - Merrill Lynch sent a letter to the SEC that had facts in it
>        that were incorrect, correct?
>
> A:     Correct.
>
> Q:     And you agree that they sent a response to the NASD that was incorrect, right?
>
> A:     Correct.
>
> Q:     And you agree that you testified to facts that turn out not to be true, correct?
>
> A:     Correct.
>
> Q:     Have you or your lawyer gotten in touch with the courts in Massachusetts, the
>        civil and criminal courts you testified in, to let them know that you now believe
>        what you testified to was false?
>
> A:     No.
>
> Q:     Have you made any effort to contact either of those courts?
>
> A:     I have not.
>
> Q:     Do you understand that in the criminal trials a man's freedom was at stake?

A:      Yes.

Q:      But you haven't bothered to go back to the courts?

A:      No, I have not.

Q:      Do you plan to?

A:      I guess so, yes.

*Id.* at 183-85.

Merrill Lynch has always maintained, and its witnesses testified at trial, that Carpenter's September 22, 2000 letter to Rasmussen, in which he states "We have chosen Merrill as our depository **for our clients** so we cannot move the funds elsewhere," Exh. 157 (emphasis added), was understood by everyone at Merrill to reference Carpenter's other companies rather than third parties. For example:

Q:      Mr. Rasmussen, there's a reference there to a depository for our clients. Do you see that?

A:      Yes.

Q:      Did you discuss that issue with Mr. Carpenter?

A:      I did not.

Q:      What is that in reference to?

A:      As far as I was concerned, his Benistar relationships.

June 11, 2008 Trial Tr. at 50 (Rasmussen). However, in his post-criminal trial deposition, Rasmussen gave contradictory testimony on this vital point:

Q:      The word "client," that's what I'm focusing on, not depository.

A:      Okay. "Depository for our clients." Okay.

Q:      Whatever you thought it meant at that time, you didn't think it meant other Benistar companies, right?

A:      Correct.

April 21, 2009 Rasmussen Depo. Tr. at 210.

Lastly, in a letter dated December 6, 2000, which is two months *after* the BPETCO accounts were transferred to PaineWebber, Levine invited Carpenter to return to Merrill Lynch and trade stock options ***in the same "risky" technology stocks*** that Levine and Stern, during their trial testimony, excoriated Carpenter for investing in.  In this letter, Levine even provides Carpenter with investment advice on particular options trades.  *Id.*  Had this document been available to Carpenter at trial, he could have exposed Merrill Lynch and its witnesses as being liars and hypocrites, falsely testifying that Carpenter's trading in "risky" stock options was contrary to what Merrill Lynch wanted him to do—yet inviting Carpenter and Benistar "to open an options trading account" and pushing him to invest in the same "risky" technology stocks that supposedly led Merrill Lynch to close down the BPETCO accounts in the first place. With this single exhibit, Carpenter could have argued to the jury that Merrill Lynch's alleged concerns about Carpenter's options trading were entirely illusory and contrived, and made up to deceive the jury, the government, and the Court. Carpenter also would have been able to refute the government's argument that Merrill Lynch kicked him out because of "risky" options trading and large losses, given that two months later he was welcomed back with open arms to engage in the exact same "risky" options trading.

These "newly discovered" documents show that Merrill Lynch in general, and Rasmussen, Stern and Levine in particular, knew full well from the inception of the BPETCO accounts in October 1998 that Carpenter was investing client funds in the BPETCO accounts, and directly contradicts their prior testimony that the first they learned that the BPETCO accounts contained client funds in January 2001, when Mitchell Rock of PaineWebber informed Stern of this fact. Mr. Carpenter respectfully submits these materials constitute compelling affirmative, substantive evidence that Carpenter could not have had the specific intent to defraud

since the last thing in the world he would do, if he wanted to defraud an Exchangor, would be to put an Exchangor's attorney (Patterson) directly in contact with Merrill Lynch.   Whether Mr. Carpenter put Mr. Patterson, who represented the first Exchangor, in direct contact with Mr. Levine, who managed the Exchangors' funds at Merrill Lynch, and whether the detailed conversation between the two took place regarding the fact that these were third party funds which needed to be held in escrow as a result of a §1031 exchange, are critical facts regarding Mr. Carpenter's good faith defense.[6]

At trial, the government placed great emphasis on Merrill Lynch's long-standing contention that Merrill Lynch did not know Mr. Carpenter was investing other peoples' money until it received Mr. Carpenter's September 22, 2000 letter to Rasmussen complaining about Merrill Lynch's decision to prevent BPETCO from opening any new options positions. A critical aspect of Mr. Carpenter's defense was his good faith belief that he was under no restrictions as to how the Exchangors' funds were to be invested, which could be established by the fact that he at all times acted in good faith, in an open, professional, transparent, and above-board manner with Merrill Lynch and PaineWebber.   Direct documentary proof now exists that Merrill Lynch had *actual knowledge* from the inception of the BPETCO accounts that Mr. Carpenter was investing other peoples' money as part of §1031 property exchanges, and that all of Merrill Lynch's employees gave false testimony on this key issue.[7]   The suppressed evidence constitutes

---

[6] Likewise, had these materials been produced, Mr. Carpenter also could have called Malia, Tabbah, Nancy Sawyer (who said she knew the funds were from third parties based on conversations she had with Carpenter) and Kevin Duffy (Merrill Lynch's in-house counsel) as witnesses for the defendant's case-in-chief.

[7] It is also rational to infer that Stern would have told his "best friend" at PaineWebber (Mitchell Rock) about the nature of BPETCO's business and that the funds being invested belonged to BPETCO's clients, meaning that PaineWebber's witnesses very likely also gave false testimony on this vital point.  It has already been noted that Mitch Rock had approximately 13,000,000 reasons to lie in this matter.

affirmative, substantive evidence of Mr. Carpenter's good faith and lack of intent to defraud, and

Mr. Carpenter respectfully submits that the gestalt of the evidence warranted either a mistrial or a

new trial.  *See United States v. Dockray*, 943 F.2d 152, 155 (1st Cir. 1991) ("[G]ood faith is an

absolute defense to a charge of mail or wire fraud."); *United States v. Callipari*, 368 F.3d 22, 33

(1st Cir. 2004), vacated on other grounds, 543 U.S. 1098 (2005) ("Good faith is a complete

defense and it is the government's burden to disprove it beyond a reasonable doubt.").

      For the foregoing reasons, Mr. Carpenter respectfully submits that bail pending appeal

is appropriate.

      6.  <u>The evidence was legally insufficient and a judgment of acquittal should have entered</u>
<u>pursuant to Fed.R.Crim.P. 29</u>.

      Mr. Carpenter has never had the opportunity to challenge the sufficiency of the

government's evidence at the appellate level.  While this Court has sustained the sufficiency of

the evidence, *see* Dkt. 377 at pp.17-22, it has observed that "the case was not so strong that" the

verdict was not fatally prejudiced by the government's improper argument during the first trial,

and that while the jury would have been warranted in concluding beyond a reasonable doubt that

Carpenter acted with intent to defraud, "a contrary conclusion also would have been rationally

possible on the evidence."  More recently, in allowing a new trial for a second time, the Court

observed that the evidence was "ample but not overwhelming."  Dkt. 377 at p.23.  Mr. Carpenter

has submitted lengthy memoranda addressing the insufficiency of the government's trial

evidence, and he relies upon and incorporates the points and authorities discussed therein.  *See,*

*e.g.*, Dkt. 160, 178, 199, 310, 311, 321, 322, 355, and 360.  Mr. Carpenter does wish, however, to

highlight a few of the compelling arguments.

      First, despite its charges, the government did not present sufficient evidence that any

allegedly false statements were materially false.  As the Court charged the jury, "[a] statement or

representation is material if it is one that has a natural tendency to influence or is capable of influencing a decision of the person to whom it is addressed." Tr. 13-32; *Neder v. United States*, 527 U.S. 1, 16 (1999). The government, however, made no showing that there were material false statements as contrasted to suggestions about "safety" in some of Paley's presentations that triggered, in the Court's opinions, the duty to be more complete at least at such a time when stock market losses created a risk to the alleged "safety," which is mentioned nowhere in the contracts that all have the standard merger and integration clauses preventing outside words from coming into the contract. Given that the same options strategy was pursued for years while Carpenter fulfilled his clients' expectations of the return of principal plus 3 or 6% profit, the duty to supplement written agreements – which no one alleged was required in 1998, 1999, or early 2000 – or the duty to initiate oral communications with Exchangors Carpenter never met – is a duty (a) not imposed by the Indictment, (b) not required by the statute (§1031) or its regulations, (c) not required by the contracts themselves, and (d) not even the subject of any instruction to the jury, *supra*. Finally, the notion that Carpenter had a duty to make his Exchangors aware of his mounting investment losses as an essential element of the reconstructed scheme to defraud is such a novel concept in the context of a financial industry that regularly engages in complex trades (think AIG or Citibank or Lehman Brothers) that it catalyzes a substantial issue for appeal.

Second, the government failed to prove both a specific intent to defraud and to disprove Mr. Carpenter's good faith, including his good faith belief that under the terms of the Exchange Agreements he had unfettered discretion to invest the funds as he saw fit. Mr. Carpenter's good faith belief in this respect is relevant both because he had that belief at the time the funds were obtained from the Exchangors and because the government seeks to prove his intent to defraud by and through this very trading strategy. Moreover, the evidence demonstrated Mr. Carpenter's

good faith that he had made no affirmative misrepresentations to the investing Exchangors, and believed in good faith that the Exchangors were never misled by him or caused to be misled by him into believing their funds would be "safe" or "secure" from investment loss (particularly given that many of the Exchangors selected the 6% option which would require that the principal was invested to generate the interest during most of the period of time addressed by the Indictment). Lastly, Mr. Carpenter had a good faith belief that his trading strategy, which he had successfully utilized in the past on many prior exchanges, was rational, supported by market analysts, and would continue to succeed and result in successful completion of the outstanding exchanges.

Third, the government has failed to establish causation. The Court has previously ruled that "[o]n the evidence, any acts by [Carpenter] that preceded any given mailing or wire transmission (and therefore could have caused the transmission) were confined to setting up of the Benistar Property Exchange Trust business with Paley." Dkt. 192 at p.13. The indictment in this case charges a scheme to defraud from August 2000 to December 2000. Whether the Court believes or disbelieves that Mr. Carpenter's conduct in 1998 regarding the formation of BPETCO was proper or improper, *see* Dkt. 192 at 13-14, the grand jury determination to limit the ambit of criminality to August through December 2000 necessarily precludes reliance on conduct preceding the charged scheme to defraud to satisfy the essential elements of causation. "Criminal liability is normally based upon the concurrence of two factors, 'an evil meaning mind [and] an evil-doing hand ....'" *United States v. Bailey*, 444 U.S. 394, 402 (1980), *quoting Morissette v. United States*, 342 U.S. 246, 250-51 (1952). This basic axiom of criminal law, known as the Principle of Concurrence, mandates that the *actus reus* and *mens rea* must concur in time. Yet, there was a void of evidence regarding this point. The government can point to no

act of Mr. Carpenter that resulted in any of the 19 charged mailings and wires being sent.  Prior

to the mailings and wires at issue, Mr. Carpenter did not meet with the Exchangors, did not sell

to the Exchangors, did not communicate with the Exchangors, and did not even know the

identities of the Exchangors.  In fact, certain of the Exchangors did not know that Mr. Carpenter

even existed.  The Exchangors' only contact with BPE was through Paley and/or Jokinen, no

conspiracy was charged, and the aiding and abetting theory was disavowed by the prosecution at

trial.  Mr. Carpenter respectfully submits that there exists a gaping hole in the prosecution's

proof that Mr. Carpenter is liable for any of the charged mailings and wires, an acquittal was

warranted, and this issue too warrants bail pending appeal.

Fourth, the government failed to prove that Mr. Carpenter possessed a culpable *mens rea*

when the pertinent exchange agreements were executed by the Exchangors.  As the Court noted

in the decision denying Mr. Carpenter's motion for judgment of acquittal, "[t]o convict the

defendant of mail or wire fraud, the government had to prove beyond a reasonable doubt the

defendant's knowing and willful participation in a scheme to defraud, or to obtain money or

property by false or fraudulent pretenses, representations, or promises as to a material matter or

matters, with the specific intent to defraud, and the use of the mails or interest wire

communications in furtherance of the scheme."  Dkt. 377 at 3-4.  There was simply no evidence,

not even from David Patterson, that Mr. Carpenter said or did anything that evinced a deceptive,

false, or fraudulent *mens rea*, particularly not during the time frame charged within the

indictment.  Even Paley testified that Mr. Carpenter did not authorize Paley to tell the

Exchangors anything contrary to what was contained in the written materials, which the Court

has already characterized as being literally truthful.

Fifth, even if the Indictment can be construed as charging a fraudulent scheme by half-

truths, as the Court has previously ruled, *see* Dkt. 431 at 8-9, a scheme premised upon Mr. Carpenter's apparent failure to notify current or prospective clients that he was trading in options or that he was sustaining substantial losses is insufficient as a matter of law here because the government offered insufficient evidence to demonstrate that Mr. Carpenter had some affirmative, legal duty to supplement the contracts, which were literally truthful, either orally or in writing.  Only a person with some fiduciary relationship or legal duty can be held responsible for such half-truths or omissions, and the government failed to establish a factual premise for the jury to conclude any such duty existed here or that Mr. Carpenter knew of such a duty if, *arguendo*, one existed.[8]  As noted *supra*, silence provides a permissible basis for a finding of criminal fraud only where there was an independent duty to disclose.  *See, e.g., Steffen*, 687 F.3d at 1116; *Cassiere*, 4 F.3d at 1022.  While the failure to instruct regarding the legal duty constitutes legal error, the government's failure to offer sufficient factual evidence to support the existence of such a duty warranted a judgment of acquittal here, and it also constitutes a legal issue warranting bail pending appeal, whether the predicate for a conviction is described as a pure omission (as contended by the defense) or as a failure to supplement written agreements that are accurate but incomplete, *i.e*., that include "half-truths," as found by this Honorable Court.

## IV.    CONCLUSION

For all the foregoing reasons, this Court should permit Mr. Carpenter to remain free on bail pending resolution of his appeal in the First Circuit.

---

[8] The defendant has argued *supra* that the failure to instruct regarding the legal duty also constitutes a legal error warranting bail pending appeal.

Respectfully Submitted,                    Respectfully Submitted,
Daniel E. Carpenter,                       Daniel E. Carpenter,
By His Attorney,                           By His Attorney,


**/s/ Robert M. Goldstein**                **/s/ Martin G. Weinberg**
Robert M. Goldstein, Esq.                  Martin G. Weinberg, Esq.
Mass. Bar No. 630584                       Mass. Bar No. 51948
20 Park Plaza, Suite 1000                  20 Park Plaza, Suite 1000
Boston, MA 02116                           Boston, MA  02116
 (617) 742-9015                            (617) 227-3700
rmg@goldstein-lawfirm.com                  owlmgw@att.net


Dated: March 19, 2014

## CERTIFICATE OF SERVICE

        I, Robert M. Goldstein, hereby certify that on March 19, 2014, this document has been served, via electronic filing, upon Assistant U.S. Attorneys Mary B. Murrane and Kelly Begg Lawrence.
.

                        **/s/ Robert M. Goldstein**
                        Robert M. Goldstein