| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER | ) | |

## DEFENDANT DANIEL E. CARPENTER'S RESPONSE IN OPPOSITION TO UNITED STATES' SUPPLEMENTAL BRIEF IN SUPPORT OF ENTRY OF MONEY JUDGMENT IN THE AMOUNT OF $14,053,715.52

For the reasons addressed in this Response, the Court should reject the government's claim to a $14,053,715.52 forfeiture (or to forfeiture in any amount). Under 18 U.S.C. §981(a)(2)(B), the definition of proceeds applicable to this case, *see* Section II, *infra*, forfeiture may permissibly be ordered against Mr. Carpenter only to the extent that he "acquired [money] through the illegal transactions resulting in the forfeiture." Because Mr. Carpenter never acquired any of the Exchangors' funds which were paid to BPETCO, there are no "proceeds" subject to forfeiture. *See* Section I, *infra*. Even assuming *arguendo* that forfeiture is authorized under the applicable statute, a $14 million forfeiture (or even a $9 million forfeiture) is grossly disproportionate and would deprive Mr. Carpenter of his livelihood and would thus violate the Excessive Fines Clause of the Eighth Amendment. *See* Section III, *infra*. Finally, the forfeiture issue cannot be decided through judicial fact-finding but must instead be submitted to a jury. *See* Section IV, *infra*.[1]

---

[1] In addition, Mr. Carpenter continues to contend that his right to speedy sentencing has been violated in this case, and that argument would encompass the forfeiture portion of the sentencing proceedings.

## I. THERE IS NO STATUTORY AUTHORIZATION FOR THE MONEY JUDGMENT SOUGHT BY THE GOVERNMENT.

The government first seeks to impress upon the Court that forfeiture is mandatory. Gvt. Supp. Brief at 2. And so it is, *but only "[w]hen the government has met the requirements for criminal forfeiture." United States v. Newman*, 659 F.3d 1235, 1240 (9th Cir. 2011)(emphasis added).[2] *See, e.g., United States v. Monsanto*, 491 U.S. 600, 607 (1989)("forfeiture [is] mandatory *in cases where the statute applie[s]*" (emphasis added)). Forfeiture is not mandatory simply because Mr. Carpenter has been convicted of mail/wire fraud; it only becomes mandatory if the government establishes that the property in question – here, the government's claim to $14,053,715.52 – was, depending upon which provision the Court finds applicable, "obtained directly or indirectly" by Mr. Carpenter "as the result of the commission of the offense giving rise to forfeiture . . . ," 18 U.S.C. §981(a)(2)(A), or "acquired through the illegal transactions resulting in the forfeiture," 18 U.S.C. §981((a)(2)(B).[3] Other than in the context of his Eighth Amendment argument, *see* Section III, *infra*, Mr. Carpenter has not suggested that the Court has the discretion to decline to order forfeiture or to reduce the amount of the forfeiture once the government has established its statutory entitlement to forfeiture in a particular amount. What he *does* contend is that the government has not done so here under either §981(a)(2)(A) or §981(a)(2)(B)..

The cases on which the government relies in its supplemental submission do not support its position that it is entitled to a forfeiture money judgment in the amount of $14,053,715.52. The

---

[2] In *Newman*, which the government discusses at some length, Gvt. Supp. Brief at 2, the defendant committed two bank robberies in which he stole a total of $5,102, but the district court did not order forfeiture in any amount. *Newman* represents a case involving quintessentially forfeitable proceeds of the defendant's bank robbery offenses, and, as such, is of limited, if any, relevance to the issues before the Court in this case.

[3] The government contends that the applicable provision is §981(a)(2)(A), while Mr. Carpenter contends it is §981(a)(2)(B) which applies. *See* Section II, *infra*.

defendant in *United States v. Aguasvivas-Castillo*, 668 F.3d 7 (1st Cir. 2012), Gvt. Supp. Brief at 3, 4, did not challenge the forfeiture either on the ground that the money went to his company and not to him or that he had subsequently lost the money; he raised only Eighth Amendment challenges unrelated to these issues. *See id.* at 16. Moreover, the forfeiture at issue in *Aguasvivas-Castillo* was a money laundering forfeiture under 18 U.S.C. §1956(b)(1)(A), in which the amount required to be forfeited is "the value of the property, funds, or monetary instruments involved in the transaction," an amount which includes commingled funds and therefore explains the $20 million amount of the forfeiture ordered. *Id.* Nothing in *Aguasvivas-Castillo* supports the forfeiture which the government seeks under the very different circumstances of this case.[4] In *United States v. Misla-Aldarondo*, 478 F.3d 52 (1st Cir. 2007), the defendant, then the Speaker of the Puerto Rico House of Representatives, was paid $147,400 to facilitate the purchase of a hospital. Thus, unlike this case, the money went directly into the defendant's pockets, and he therefore did at one time have traceable proceeds of the offense in his possession. The dispute at issue on appeal was not primarily the amount of the forfeiture but instead whether the government could enforce the forfeiture money judgment it had obtained. *See id.* at 72-76. There is a crucial distinction between a case such as *Misla-Aldarondo* in which the defendant possessed proceeds of the offense but no longer, for whatever reason, has the proceeds of the offense in his possession and this case, in which Mr. Carpenter *never* obtained even

---

[4] Aguasvivas–Castillo was the president, owner, and sole shareholder of companies which owned supermarkets authorized to accept EBT-debit cards from food stamp recipients; he owned and operated three stores at which food stamp participants could use their EBT-debit cards to obtain food and cash and "exercised control over the three stores' finances, cash flows, and employment decisions. He also exercised at least some managerial control over store operations and received regular reports from the stores' managers as to sales, deposits, and other financial operations in the three stores." *Id.* at 10. Aguasvivas–Castillo also "intermingled and concealed the fraudulent food stamp proceeds within the total sum of $28 million in these accounts, in order to shield the fraud" and "regularly withdrew cash from these accounts to operate the cash-intensive food stamp fraud/money laundering venture." *Id.* at 11.

a penny of the Exchangors' funds.[5] In arguing to the contrary, the government mischaracterizes Mr.

Carpenter's argument. He is not contending that the government is not entitled to forfeiture because

he lost the Exchangors' money through investments rather than spending them on "wine, women,

and song," Gvt. Supp. Brief at 6, but that he never acquired the proceeds – the Exchangors' money

– in any sense that would properly subject him personally to a forfeiture money judgment.[6]

In *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), Gvt. Supp. Brief at 4-5, the Court

upheld the forfeiture based on its conclusion that "there [was] sufficient evidence to conclude that

the entirety of Berkeley's revenues are proceeds that resulted, whether directly or indirectly, from

---

[5] Other cases on which the government relies are similarly inapposite. In *United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006), Gvt. Supp. Brief at 5, the defendant was a drug dealer who had in various ways spent or dissipated the proceeds of his drug activities. *See id.* at 59. In holding that forfeiture money judgments were permissible, the Court stated that "permitting a money judgment, as part of a forfeiture order, prevents a drug dealer from ridding himself of his ill-gotten gains to avoid the forfeiture sanction." *Id. United States v. Casey*, 444 F.3d 1071 (9th Cir. 2006), also involved the imposition of a forfeiture money judgment in the amount of drug proceeds of which the defendant had had possession. Similarly, in *United States v. Ginsburg*, 773 F.2d 798 (7th Cir. 1985), on which both *Hall* and *Casey* rely, the Court stated: "Every dollar that the racketeer derives from illicit activities and then spends on such items as food, entertainment, college tuition, and charity, is a dollar that should not have been available for him to spend for those purposes. In order to truly separate the racketeer from his dishonest gains, therefore, the statute requires him to forfeit to the United States the total amount of the proceeds of his racketeering activity, regardless of whether the specific dollars received from that activity are still in his possession." *Id.* at 802. The *sine qua non* of this theory is the defendant's possession of criminal proceeds at some point, which is said to justify punishing him by requiring him to forfeit the amount of the proceeds to the government even if already spent, as the defendant had had the benefit of those funds for his personal purposes and thus forfeiture would strip him of his entitlement to those funds. This theory fails in this case because Mr. Carpenter never had any "ill-gotten gains" in his possession.

[6] In this context as well, the cases on which the government relies do not support its forfeiture claim. In *United States v. Grose*, 461 Fed. Appx. 786, 806-07 (10th Cir. 2012), Gvt. Supp. Brief at 6, the defendant stole $1 million from his employer which he then invested in a company which went bankrupt. Once again, this is a case in which the proceeds of the offense were in the defendant's possession and then were spent or lost. In *United States v. McGinty*, 610 F.3d 1242 (10th Cir. 2010), the defendant, a bank vice-president, converted bank funds to his own personal use and thus had personal possession of the proceeds of the offense. In *United States v. Crumpler*, 229 Fed. Appx. 832 (11th Cir. 2007), the defendant fraudulently acquired stock options and bonuses which accrued to him personally and of which he reaped the benefit.

unlawful activity." *Id.* at 332. The defendant did not challenge whether a forfeiture judgment could be entered against him personally based on his company's revenues, and thus the Court did not consider the issue. In any event, a challenge such as that mounted here could not have been made in *Warshak*, as the defendant was the 100% owner of Berkeley and personally reaped tens of millions of dollars in proceeds. *See United States v. Contents of Nationwide Life Ins. Annuity Account*, 2009 WL 961223 (S.D.Ohio April 8, 2009).

In *United States v. Farkas*, 2011 WL 5101752 (E.D. Va. Oct. 26, 2011), *aff'd* 474 Fed. Appx. 349 (4th Cir. 2012), Gvt. Supp. Brief at 5, the defendant, again quite unlike this case, had access to the proceeds of the fraudulent loans and used them for his own personal purposes – to pay down a huge personal financial obligation to his company, to purchase a private jet, and generally to support an extravagant lifestyle. *See id.* at *4-*6. The district court found the forfeiture proper because the "continued existence" of defendant's company "depended on the defendant's fraud, *and the money he pulled out of the company to support his extravagant lifestyle was available to him only because of the fraud.*" *Id.* at *5 (emphasis added). The nexus requirement was satisfied, the court continued, "by tracing defendant's fraud to the continued viability of *TBW to defendant's access to the funds sought to be forfeited*, demonstrating that he obtained such funds indirectly as a result of his crime." *Id.* at *6 (emphasis added). Here, that last link in the nexus chain is entirely absent: *Carpenter did not have access to the funds sought to be forfeited for his personal use but only insofar as he directed how those funds were to be invested to generate the interest rates promised the Exchangors. See United States v. Bailey*, 926 F.Supp.2d 739, 767 (W.D.N.C. 2013)("The facts of *Farkas* are clearly distinguishable from the present case. In *Farkas*, the funds that were forfeited were corporately held funds *that were available to the defendant*, i.e., the company's earnings" (emphasis

added)).[7]

Moreover, it does not appear that the First Circuit has ever applied the sort of expansive "but for" nexus test applied in *Farkas* in the context of §981 or §982 forfeitures.[8] The only forfeiture context in which the First Circuit has approved a "but for" standard is RICO forfeitures under 18 U.S.C. §1963(a)(1), which mandates the forfeiture of "any interest the person has acquired or maintained in violation of section 1962." Under this test,

> "(a)(1) forfeitures are limited to property interests that would not have been acquired or maintained but for the defendant's racketeering activities. . . . . [D]efendants' racketeering activities must be shown to be "a cause in fact of the acquisition or maintenance of these interests or some portion of them." *This "but for" test is a proportionality rule of forfeiture. Such a rule is applied because . . . proceeds or profits constitute property interests outside the enterprise and thus are only forfeitable to the extent they are actually tainted by unlawful activities.*

*United States v. Angiulo*, 897 F.2d 1169, 1213 (1st Cir. 1990)(emphasis added). This standard cannot be so readily transported outside the RICO forfeiture context as the *Farkas* court did.[9] Section

---

[7] There is nothing "conservative" about the forfeiture sought by the government. *See* Gvt. Supp. Brief at 5, 9. For the reasons discussed in the text, *supra*, nothing in *Aguasvivas-Castillo*, *Warshak*, or *Farkas* would authorize the government to seek forfeiture of the entirety of all exchangors' funds paid to BPETCO. They do not even authorize the forfeiture which the government does seek. On this point the government also cites *United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014), but *Lyons* was a RICO forfeiture case, subject to very different forfeiture provisions. In a RICO forfeiture, the defendant is required to forfeit an amount equal to the entire gross proceeds of the RICO enterprise which were reasonably foreseeable to him. *See United States v. Lyons*, 870 F.Supp.2d 281, 290-91 (D.Mass. 2012). Thus, the forfeiture ordered in *Lyons* has no bearing upon whether forfeiture is statutorily authorized in this case or, if so, the appropriate amount of that forfeiture.

[8] The government states, at page 3 of its supplemental brief that in determining the proceeds of an offense the court must "first . . . appl[y] the 'but for' test to determine gross proceeds." That statement is unsupported by citation of authority, and, as discussed in the text, *supra*, the defendant's research reveals none in the First Circuit.

[9] The two circuit court cases on which the Fourth Circuit *Farkas* decision relied – *United States v. Horak*, 833 F.2d 1235, 1242-43 (7th Cir.1987), and *United States v. DeFries*, 129 F.3d 1293, 1313 (D.C.Cir.1997) – were both §1963(a)(1) RICO forfeiture cases.

1963(a)(1) is, as the First Circuit noted, a causal standard meant to *limit* the scope of (a)(1) forfeitures to that percentage of the property which actually constituted proceeds of the RICO offense. Here, the government is seeking to use "but for" causation to dramatically *expand* the concept of §981(a)(1)(C) forfeitures far beyond the scope of any of the cases which it has cited – presumably the best it could find – and far beyond the scope of any cases which defendant's research has revealed.

Here, the monies which the government has identified as the forfeitable proceeds of the offense are the monies entrusted to BPETCO by certain Exchangors. *See* Gvt. Supp. Brief at 4. As the Court is aware, none of that money came to Mr. Carpenter. As §1031 funds, they were being held by BPETCO for return to the Exchangors with the chosen accrual of interest; Mr. Carpenter had no right to access them for his personal use, nor did he ever do so. There has never been any allegation that Mr. Carpenter took or obtained any of the Exchangors' money or that he owned or spent any of that money. The offense alleged here involved misrepresentations regarding how BPETCO would invest the money to generate the promised interest, not a fraud through which Mr. Carpenter generated monies which inured to his personal benefit or to which he had, and exercised, access for his personal benefit. In cases like *Farkas* and others, the fact that the business would not have continued to exist if not for the fraud is relevant only to the extent that the continuation of the business allowed the defendant to personally reap further proceeds of the ongoing fraud.

Unlike restitution which addresses the losses to the victims, forfeiture "is a form of punishment designed to divest the criminal defendant of the profits of the illegal activity for which he has been convicted." *United States v. Ferrario-Pozzi*, 368 F.3d 5, 8 (1st Cir. 2004)(internal quotation marks omitted). *See, e.g., United States v. Joseph*, ___F.3d ___, 2014 WL 658057 at *3 (11th Cir. Feb. 21, 2014)("While restitution seeks to make victims whole by reimbursing them for

their losses, forfeiture is meant to punish the defendant by transferring his ill-gotten gains to the United States Department of Justice"); *United States v. Contorinis,* 692 F.3d 136, 147 (2d Cir. 2012)("forfeiture is calculated based on a defendant's gains"); *United States v. Innarelli*, 524 F.3d 286, 293 n.7 (1st Cir. 2008)("unlike forfeiture, the purpose of restitution is not to disgorge from the defendant the property he gained at the victim's expense"); *United States v. Read*, 710 F.3d 219, 231 (5th Cir. 2012)("While restitution represents a victim's loss from the defendant's offense, forfeiture represents the defendant's gain from the offense"). The forfeiture statutes do not contemplate punishing a defendant to the tune of many millions of dollars (or any amount for that matter) based on funds generated by the offense to which the defendant never had access for his personal use.

In *Contorinis*, a case involving forfeiture under §981(a)(2)(B), the Second Circuit considered whether the defendant could be required to forfeit monies which had been obtained through his insider trading by the fund by which he was employed. The question turned on whether the defendant had "acquired" the money within the meaning of §981(a)(2)(B). Noting that "forfeiture" is a word "generally associated with a person's losing an entitlement as a penalty for certain conduct" and that the defendant had never been entitled to the funds, 692 F.3d at 146, the Court found it "difficult to square the statute with the forfeiture order" because the proceeds sought by the government "were 'acquired' by the Fund over which appellant lacks control." *Id.* "While property need not be personally or directly in the possession of the defendant, his assignees, or his co-conspirators in order to be subject to forfeiture, *the property must have, at some point, been under the defendant's control* or the control of his co-conspirators in order to be considered 'acquired' by him." *Id.* at 147. Because "extending the scope of a forfeiture to include proceeds that have never been acquired either by a defendant or his joint actors would be at odds with the broadly accepted principle that forfeiture is calculated based on a defendant's gains," *id.* at 147, the Court reversed the forfeiture judgment

because "the district court erred in ordering appellant to forfeit funds that were never possessed or controlled by himself or others acting in concert with him." *Id.* at 148.[10] *See United States v. Torres*, 703 F.3d 194, 201-02 (2d Cir. 2012)("Because the profits subject to the challenged forfeiture order were earned by and paid to the employer fund, not Contorinis, and because Contorinis did not control disbursements of the fund's profits, those total profits did not represent his own unlawful gain");*United States v. St. Pierre*, 809 F.Supp.2d 538, 545 (E.D.La. 2011)("[A]lthough his criminal actions produced the contract revenues, portions of those proceeds were diverted to his business partners before they ever could have been acquired by him. Accordingly, on these facts it is unreasonable and inconsistent with the purpose of forfeiture to require St. Pierre to forfeit funds which he neither directly or indirectly acquired"); *see also United States v. Goffer*, 529 Fed.Appx. 17, 20 (2d Cir. 2013)(government conceded that forfeiture order was erroneous under *Contorinis* because the amount included gains realized by the defendant's employer). By the same token here, the funds which the government asks the Court to regard as "proceeds" were "acquired" by BPETCO, not Mr. Carpenter, who had no power or authority to assert dominion and control over the Exchangors' funds for his personal gain or any entitlement to them. Because Mr. Carpenter never "acquired" the Exchangors' money, forfeiture is not permitted under §981(a)(2)(B).

At no point in the government's supplemental filing does the government address this critical issue of whether Mr. Carpenter actually "acquired," §981(a)(2)(B), or "obtained," §981(a)(2)(A), the Exchangors' funds which it has labeled proceeds of the offense. Here, the funds at issue were not

---

[10] In explaining the "in concert" theory of forfeiture, the Court stated: "The extension of forfeiture to proceeds received by actors in concert with a defendant may be deemed to be based on the view that the proceeds of a crime jointly committed are within the possessory rights of each concerted actor, i.e. are 'acquired' jointly by them and distributed according to a joint decision." *Id.* at 147. There were no such joint actors in this case who had control over the funds and could effect their distribution for personal gain.

BPETCO corporate funds but instead remained the property of the Exchangors which Mr. Carpenter invested; they were not taken by the company as profits but were instead held for the benefit of the Exchangors. Mr. Carpenter could not and did not access or use any of them for his personal benefit. Even if Mr. Carpenter controlled BPETCO's profits or other corporate assets, he did not obtain the Exchangors' funds held in BPETCO's §1031 investment accounts, either directly or indirectly. Those funds are not, accordingly, subject to forfeiture under §981(a)(2)(A), even if that provision were to be applied.

Alternately, and at minimum, both §981(a)(2)(A) and §981(a)(2)(B) are grievously ambiguous as to whether criminal forfeiture may be imposed upon a defendant like Mr. Carpenter who never personally obtained or acquired any portion of the funds which the government seeks to forfeit, and the rule of lenity dictates that the ambiguity be resolved in favor of Mr. Carpenter. *See United States v. Godin*, 534 F.3d 1, 51, 60-61 (1st Cir. 2008).

## II. SECTION 981(a)(2)(B) PROVIDES THE DEFINITION OF PROCEEDS APPLICABLE TO THIS CASE.[11]

The government first argues that §981(a)(2)(A) must necessarily be applicable because mail and wire fraud are "specified unlawful activities" and thus automatically "unlawful activities" within the plain language of §981(a)(2)(A). *See* Gvt. Supp. Brief at 7. The Second Circuit rejected this very argument for cogent and persuasive reasons in *United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012):

The government's reading renders § 981(a)(2)(B) essentially meaningless. Almost every

---

[11] Whether §981(a)(2)(A) or §981(a)(2)(B) applies in this case affects not just the question of gross vs. net proceeds, as the government frames the issue, *see* Gvt. Supp. Brief at 6, but also the standard to be applied in determining whether the defendant derived proceeds from his illegal conduct. *See Torres*, 703 F.3d at 201 & n.10 (discussing the distinction between the §981(a)(2)(A) "obtained directly or indirectly" standard and the §981(a)(2)(B) "amount of money acquired" standard.

predicate crime listed in § 981(a)(1)(C) is also a "specified unlawful activity" listed in §1956(c)(7). If every "specified unlawful activity" is subject to gross forfeiture under §981(a)(2)(A), there would be only a handful of statutes involving counterfeiting, forgery, explosive materials, and fraudulent identification documents that would fall under the auspices of § 981(a)(2)(B). That interpretation would also lead to peculiar results. Some cases involving lawful goods or lawful services would be subject to forfeiture under §981(a)(2)(B) while other cases involving lawful goods or lawful services, by virtue of constituting a "specified unlawful activity," would be subject to gross forfeiture under §981(a)(2)(A).

*Id.* at 137. Because securities trading is not generally unlawful, but the securities were sold through

illegal bribery and "frontrunning," the Court concluded that §981(a)(2)(B) was the applicable

proceeds provision. *See Contorinis*, 692 F.3d at 145 n.3 (§981(a)(1)(B) applied to insider trading).[12]

The Tenth Circuit reached a similar conclusion in *United States v. Nacchio*, 573 F.3d 1062

(10th Cir. 2009):

> While mail fraud and wire fraud are "specified unlawful activities" under sections 1956(e)(7)(A) and 1961(1)(D), this Court disagrees with the *All Funds* reading of the statutes at issue. If Congress had meant "specified unlawful activity," a defined term in the money laundering statute, it would have used that precise term—as it did in section 981(a)(1)(C)—instead of the looser term "unlawful activities" used in section 981(a)(2)(A). Moreover, the *All Funds* reading of the statutes would render section 981(a)(2)(B) nugatory because almost every predicate crime listed in section 981(a)(1)(C) is also a "specified unlawful activity" listed in section 1956(c)(7), leaving only a handful of statutes involving counterfeiting, forgery, explosive materials, and fraudulent identification documents as possible candidates for the definition of "proceeds" given in section 981(a)(2)(B). Sections 981(a)(2)(A) and 981(a)(2)(B) should be read together, and both sections must have meaning.

---

[12] The government relies on *United States v. Schlesinger*, 261 Fed. Appx. 355 (2d Cir. 2008), an unpublished opinion. Gvt. Supp. Brief at 7. To the extent that *Schlesinger* suggests that mail fraud is automatically encompassed in §981(a)(2)(A) because it is "specified unlawful activity," the decision can no longer be regarded as good law after *Mahaffy* and *Contorinis*. In *United States v. Kelley*, 305 Fed.Appx. 705, 710 (2d Cir. 2009), another unpublished opinion, the Court employed the §981(a)(1)(A) definition of proceeds without discussion; automatic application of §981(a)(1)(A) to securities fraud cases is also inconsistent with *Mahaffy* and *Contorinis*, and *Kelley* cannot, therefore, provide support for the government's position. In *United States v. Kahale*, 2010 WL 3851987 (E.D.N.Y. Sept. 27, 2010), the offense was essentially a Ponzi scheme involving fraudulent solicitation of investments in a mining company. *See id.* at *1. It does not support application of §981(a)(2)(A) to the very different circumstances of this case.

*United States v. Kalish*, No. 06 Cr. 656(RPP), 2009 WL 130215, at \*7 (S.D.N.Y. Jan. 13, 2009) (alteration in original) . . . .

While Mr. Nacchio's offense of insider trading falls within "specified unlawful activities" pursuant to § 981(a)(1)(C), we similarly conclude that this fact does not automatically render it an "unlawful activity" under § 981(a)(2)(A). Congress "would have used that precise term" (i.e., "specified unlawful activities") in both provisions if it had meant for the two provisions to be coterminous in terms of the covered offenses. *Kalish*, 2009 WL 130215, at \*7; see also 1 Smith, Forfeiture Cases, supra, ¶ 5.03[2], at 5–62 ("The term 'unlawful activities' in section 981(a)(2)(A) was meant to cover inherently unlawful activities such as robbery that are not captured by the words 'illegal goods' and 'illegal services.' "). Therefore, . . . insider trading does not by virtue of being a "specified unlawful activit[y]" constitute an "unlawful activity" such that only § 981(a)(2)(A) applies . . . .

*Id.* at 1088-89. *See, e.g., United States v. Hollnagel*, 2013 WL 5348317 at \*2 (N.D. Ill. Sept. 24, 2013)(applying §981(a)(2)(B) because "Defendant's fraudulent financing scheme was not an inherently unlawful activity, but rather involved lawful goods or services sold or provided in an illegal manner"); *United States v. Executive Recycling, Inc*., 953 F.Supp.2d 1138, 1158 (D.Colo. 2013)(applying §981(a)(2)(B) because "[t]he predicate act underlying Defendants' convictions – electronics recycling – is not inherently unlawful" and "[w]hat made Defendants' actions unlawful was the manner in which Defendants did business, i.e., by misrepresenting to customers where and how their electronic materials would be handled and failing to obtain the required export documentation"); *United States v. Butler*, 2013 WL 2298184 at \*2 (E.D.Va. May 24, 2013)(parties agreed that §981(a)(2)(B) was applicable in mail fraud case); *United States v. St. Pierre*, 809 F.Supp.2d 538, 543 (E.D.La. 2011)(§981(a)(2)(B) applied because "[i]nformation technology work is a lawful service and crime cameras are lawful goods, but the contracts for that work or those cameras were obtained through illegal bribes and kickbacks").

Here, like these cases, BPETCO's provision of §1031 intermediary services constituted the provision of "lawful services" within the meaning of §981(a)(2)(B). BPETCO completed 119 straight exchanges for its Exchangors and failed only as to the last seven when Paine Webber closed

the account and swept the funds in January, 2001. This was not an "unlawful activity" within the meaning of §981(a)(2)(A) but was instead, according to the government's theory at trial, a lawful service provided in an unlawful manner, *i.e.*, by making representations regarding the safety of the Exchangors' funds which, in the government's view, were inconsistent with Mr. Carpenter's investment strategy. Accordingly, §981(a)(2)(B) applies, and forfeiture can be ordered only to the extent that Mr. Carpenter "acquired [money] through the illegal transactions resulting in the forfeiture." Because Mr. Carpenter personally acquired no money – only BPETCO did – the statute does not authorize forfeiture in any amount.

To the extent to which there could be said to be any ambiguity regarding whether §981(a)(2)(A) or §981(a)(2)(B) applies here, the rule of lenity compels the application of §981(a)(2)(B). *See United States v. Kalish*, 2009 WL130215 (S.D.N.Y. Jan. 13, 2009).

## III. A $14 MILLION (OR $9 MILLION) FORFEITURE JUDGMENT WOULD VIOLATE THE EXCESSIVE FINES CLAUSE OF THE EIGHTH AMENDMENT.

### A. A $9 Million or $14 Million Forfeiture Would Be Grossly Disproportionate.

Forfeitures are subject to the Eighth Amendment's excessive fines clause "if they constitute punishment for an offense." *United States v. Heldeman*, 402 F.3d 220, 223 (1st Cir. 2005), *quoting United States v. Bajakajian*, 524 U.S. 321, 328 (1998). Where forfeiture is "imposed at the culmination of a criminal proceeding and requires conviction of an underlying felony," it constitutes punishment for the offense. *Heldeman*, 402 F.3d at 223, *quoting Bajakajian*, 534 U.S. at 328. *See, e.g., United States v. v. Jose*, 499 F.3d 105, 111 (1st Cir. 2007). "A criminal forfeiture is unconstitutional under the Excessive Fines Clause if it is 'grossly disproportional to the gravity of the defendant's offense.'" *United States v. Levesque*, 546 F.3d 78, 83 (1st Cir. 2008), *quoting Bajakajian*, 524 U.S. at 337. *See, e.g.*, *Jose*, 499 F.3d at 111; *Heldeman*, 402 F.3d at 223.To

determine whether a forfeiture is grossly disproportional, a court should consider: "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." *Heldeman*, 402 F.3d at 223.

The government first argues, relying on cases from the Fifth and Tenth Circuits, that forfeiture of proceeds can never violate the Eighth Amendment, Gvt. Supp. Brief at 9,[13] but such an argument is flatly contrary to the law of the First Circuit. *See United States v. Lyons*, 870 F.Supp.2d 281, 292 (D.Mass. 2012)("While there is disagreement among the federal appellate courts regarding when the forfeiture of criminal proceeds triggers the Eighth Amendment's protections, in the First Circuit, *all* forfeitures are subject to the Eighth Amendment's protections 'if they constitute punishment for an offense,'" *quoting Heldeman*, 402 F.3d at 223 (emphasis added)).[14] Thus, the Court should proceed to perform the proportionality analysis prescribed by *Bajakajian* and *Heldeman*.

As to the first *Heldeman* factor, Carpenter continues to contend that he does not "fall[] into

---

[13] Both *Betancourt* and *United States v. One Parcel of Real Property Known as 16614 Cayuga Road*, on which the government relies, were drug cases subject to different forfeiture provisions.

[14] The government also relies on *United States v. Candelaria-Silva*, 166 F.3d 19 (1st Cir. 1999), and *United States v. Reiner*, 397 F.Supp.2d 101 (D.Me. 2005). Gvt. Supp. Brief at 9. In the former case, the defendant was a member of a drug conspiracy; in the latter, he was a money launderer. Mr. Carpenter was neither and cannot be equated with one. Eighth Amendment disproportionality analysis is necessarily case-specific and must be assessed according to the facts and circumstances of each particular case. In *Candelaria-Silva*, contrary to the impression created by the government's brief, the defendant did not challenge the money judgment on Eighth Amendment grounds but only the forfeiture of real property as a substitute asset. 166 F.3d at 44-45. In *Reiner*, the defendant was a member of a money laundering conspiracy who was ordered to forfeit an amount equal to the total sum involved in the money laundering conspiracy. Notably, in discussing the *Heldeman* factors, the district court noted that the amount of the forfeiture ordered was "well under" the maximum fine authorized for violations of 18 U.S.C. §1957. 397 F.Supp.2d at 114. Such was not the case here. *See* page 16, *infra*.

the class of persons at whom the criminal statute was principally directed" and that he is innocent of the offenses of which he was convicted. However, he recognizes that the Court will be making its forfeiture decision based upon his having been convicted of mail and wire fraud. However, Mr. Carpenter's conduct falls well outside the heartland of mail and wire fraud because he did not personally obtain, receive, or possess any of the Exchangors' funds which were lost because of his investment strategy and negative market forces and because it was his intent not to take the Exchangors' funds for his own benefit but to invest them in order to return them to the Exchangors with interest and with a profit for his company – a profit that would only be realized if his investments were successful. He never intended to lose his clients' money. He did return funds, plus the agreed-upon interest, to 119 of 126 clients. He only lost funds due to the historic collapse of the NASDAQ in 2000. He never took any funds from the seven Exchangors, but rather invested more than $2 million of his own money to prevent any losses to the Exchangors. In addition, the BPETCO exchange documents were created prior to the enactment of CAFRA, *i.e.*, at a time when there was no criminal forfeiture available as punishment in mail or wire fraud cases. With the enactment of CAFRA, Mr. Carpenter's exposure to criminal punishment increased dramatically, yet the conduct on which his conviction was based did not involve any misrepresentations after the enactment of CAFRA, but only failures to disclose.

Moreover, under the unusual circumstances of this case, the Court should look not just to whether Mr. Carpenter falls within the class of persons at whom the mail and wire fraud were principally directed but also whether he falls within the class of person at whom the forfeiture statutes were principally directed. As discussed in the preceding sections, he is not, as he never at any time obtained or acquired any of the amount of the funds which the government seeks to forfeit.

The second *Heldeman* factor presents a particularly compelling basis for a finding of gross

disproportionality. The maximum statutory fine for mail and wire fraud violations is $250,000 per count, for a total of $4,750,000. *See* PSR ¶165. The $14,053,715.52 forfeiture sought by the government is almost *three times* the statutory maximum fine. When the top of the Guidelines fine range of $100,000 is considered, the disparity becomes astronomical, for the government's proposed forfeiture is *140 times* the highest fine called for by the Guidelines. *See United States v. Beras*, 183 F.3d 22, 29 n.5 (noting that *Bajakajian* "suggests that the maximum penalties provided under the Guidelines should be given greater weight than the statute because the guidelines take into account the culpability of the individual defendant").[15]

As for the harm caused by Mr. Carpenter's conduct, BPETCO was a legitimate business which successfully completed 119 straight exchanges; it failed to do so only as to a final seven. While, with respect to those last exchanges, the Exchangors were unable to complete the exchanges, they have, through civil litigation, been paid more than three times their losses by Paine Webber and Merrill Lynch.

### B.      A $9 or $14 Million Forfeiture Would Deprive Mr. Carpenter of his Livelihood.

In addition to the *Heldeman* factors, the Court should also consider "whether forfeiture would deprive the defendant of his livelihood." *United States v. Levesque*, 546 F.3d at 83. In *Levesque*, the First Circuit explained the legal history underlying this Eighth Amendment command:

The Supreme Court has made it clear that the notion that a forfeiture should not be so great

---

[15] In *Aguasvivas-Castillo*, on which the government relies, Gvt. Supp. Brief at 9, the forfeiture at issue was one for money laundering, in which context the statute prescribes a penalty of "the value of the property, funds, or monetary instruments involved in the transaction," 18 U.S.C. §1956(b)(1)(A), which includes commingled funds. Thus, the amount of the forfeiture was exactly the amount specified in the statute. See 688 F.3d at 17. The only proportionality argument considered by the First Circuit in *Lyons* was the defendants' argument that the amount of their forfeitures was disproportionate to forfeiture orders imposed on others. Nothing in either *Aguasvivas-Castillo* or *Lyons* supports the constitutional validity of the imposition of a $14 million forfeiture on Mr. Carpenter.

as to deprive a wrongdoer of his or her livelihood is deeply rooted in the history of the Eighth Amendment. *Bajakajian*, 524 U.S. at 335 . . . *Bajakajian* described that history. The Excessive Fines Clause was taken verbatim from the English Bill of Rights of 1689; "[t]hat document's prohibition against excessive fines was a reaction to the abuses of the King's judges during the reigns of the Stuarts." *Id.* . . . *Specifically*, these judges were accused of subverting the requirement, under Magna Charta, that "amercements (the medieval predecessors of fines) should be proportioned to the offense and that they should not deprive a wrongdoer of his livelihood." *Id.* The King's judges imposed "ruinous fines on wrongdoers and critics of the Crown." . . . . As these fines became more excessive, "some opponents of the King"– including several who would later help draft the 1689 Bill of Rights – "were forced to remain in prison because they could not pay the huge monetary penalties that had been assessed.". . . .

The provision of the Magna Charta which was subverted by these abuses stated that:

> A Free-man shall not be amerced for a small fault, but after the manner of the fault; and for a great fault after the greatness thereof, *saving to him his contenement*; (2) and a Merchant likewise, *saving to him his merchandise*; (3) and any other's villain than ours shall be likewise amerced, *saving his wainage.*

Magna Charta, 9 Hen. III, ch. 14 (1225), 1 Stat. at Large 6-7 (1762 ed.) (emphases added).

> "[T]he great object" of this provision was that "[i]n no case could the offender be pushed absolutely to the wall: his means of livelihood must be saved to him." W. McKechnie, Magna Carta 287 (2d ed.1914); . . . . Accordingly, under Magna Charta, after "the amount of an amercement was initially set by the court," "[a] group of the amerced party's peers would then be assembled to reduce the amercement in accordance with the party's ability to pay." . . . This limitation inhered regardless of the relationship between the amercement and the gravity of the offense. Massey*, supra*, at 1260 n. 154.

> This history . . . indicates that a court should consider a defendant's argument that a forfeiture is excessive under the Eighth Amendment when it effectively would deprive the defendant of his or her livelihood. Such ruinous monetary punishments are exactly the sort that motivated the 1689 Bill of Rights and, consequently, the Excessive Fines Clause.

*Id.* at 83-84. "This question is separate from the three-part test for gross disproportionality and may require factual findings beyond those previously made by the district court." *Id.* at 85. *See, e.g.,. Jose*, 499 F.3d at 113.

The imposition of a $14 million forfeiture would render it impossible for Mr. Carpenter to earn a living after he is released from the sentence imposed by the Court. It would entirely cripple

any prospect of financial and personal rehabilitation.

## IV. THE FORFEITURE NEXUS AND AMOUNT MUST BE DECIDED BY A JURY RATHER THAN BEING THE SUBJECT OF JUDICIAL FACT-FINDING.

In *Southern Union Co. v. United States*, ___U.S.___, 132 S.Ct. 2344 (2012), the Supreme Court extended the principle that the "Sixth Amendment reserves to juries the determination of any fact, other than the fact of a prior conviction, that increases a criminal defendant's maximum potential sentence," *id.* at 2348, *citing Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington,* 542 U.S. 296 (2004), to the context of criminal fines. Noting that "while judges may exercise discretion in sentencing, they may not "'inflic[t] punishment that the jury's verdict alone does not allow,'" *Southern Union*, 132 S.Ct. at 2350, *quoting Blakely*, 542 U.S. at 304, the Court reasoned:

> While the punishments at stake in those cases were imprisonment or a death sentence, we see no principled basis under *Apprendi* for treating criminal fines differently. *Apprendi* 's "core concern" is to reserve to the jury "the determination of facts that warrant punishment for a specific statutory offense." *Ice,* 555 U.S. at 170 . . . . That concern applies whether the sentence is a criminal fine or imprisonment or death. Criminal fines, like these other forms of punishment, are penalties inflicted by the sovereign for the commission of offenses. Fines were by far the most common form of noncapital punishment in colonial America. They are frequently imposed today, especially upon organizational defendants who cannot be imprisoned. And the amount of a fine, like the maximum term of imprisonment or eligibility for the death penalty, is often calculated by reference to particular facts. Sometimes, as here, the fact is the duration of a statutory violation; under other statutes it is the amount of the defendant's gain or the victim's loss, or some other factor. In all such cases, requiring juries to find beyond a reasonable doubt facts that determine the fine's maximum amount is necessary to implement *Apprendi* 's "animating principle": the "preservation of the jury's historic role as a bulwark between the State and the accused at the trial for an alleged offense." *Ice,* 555 U.S. at 168 . . . . In stating *Apprendi* 's rule, we have never distinguished one form of punishment from another. Instead, our decisions broadly prohibit judicial factfinding that increases maximum criminal "sentence[s]," "penalties," or "punishment [s]"—terms that each undeniably embrace fines. *E.g., Blakely,* 542 U.S. at 304 . . . ; *Apprendi,* 530 U.S. at 490 . . .; *Ring,* 536 U.S. at 589 . . . .

*Southern Union*, 132 S.Ct. at 2350-51. The Court expressly rejected the government's argument that fines are categorically less onerous than physical punishment and do not implicate the Core concerns

of *Apprendi* and its progeny:

> [N]ot all fines are insubstantial, and not all offenses punishable by fines are petty. . . . And, where the defendant is an individual, a large fine may "engender 'a significant infringement of personal freedom.' " *Blanton,* 489 U.S. at 542 . . . (quoting *Frank v. United States,* 395 U.S. 147, 151 (1969)); see also 18 U.S.C. § 3572(a)(2) (requiring court to consider "the burden that the fine will impose upon the defendant" in determining whether to impose a fine and in what amount).

> The Government thus asks the wrong question by comparing the severity of criminal fines to that of other punishments. So far as *Apprendi* is concerned, the relevant question is the significance of the fine from the perspective of the Sixth Amendment's jury trial guarantee. Where a fine is substantial enough to trigger that right, *Apprendi* applies in full. As we said in *Cunningham,* "Asking whether a defendant's basic jury-trial right is preserved, though some facts essential to punishment are reserved for determination by the judge, ... is the *very* inquiry *Apprendi* 's 'bright-line rule' was designed to exclude." 549 U.S., at 291 . . .

*Id.* at 2351-52.

This same reasoning applies equally to forfeitures. Forfeitures can run into the millions and millions of dollars and can be far more personally devastating to defendants than a term of incarceration, potentially leaving them with financial burdens which will burden their existence for the rest of their lives. While the Supreme Court held in *Libretti v. United States*, 516 U.S. 29 (1995), that the Sixth Amendment does not require that forfeiture issues be tried to a jury, *Libretti* is predicated on the now-outmoded dichotomy between elements of the offense and sentencing issues which *Apprendi* and subsequent cases invalidated. *See id.* at 49 ("our analysis of the nature of criminal forfeiture as an aspect of sentencing compels the conclusion that the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection"). In the post-*Apprendi* universe, of course, many decisions which were formerly considered only "aspects of sentencing" now fall within the parameters of the Sixth Amendment jury trial right and must be submitted to the jury for its determination.

It is true that the First Circuit has stated that it is bound by *Libretti* even in the wake of

*Apprendi* and *United States v. Booker,* 543 U.S. 220 (2005). *See, e.g., United States v. Saccoccia*, 564 F.3d 502, 507 (1st Cir. 2009); *United States v. Ortiz-Cintron*, 461 F.3d 78, 82 (1st Cir. 2006).

In *Saccoccia*, the First Circuit expressed its belief that it was unlikely that *Booker* would lead the Supreme Court to reconsider *Libretti* because "Booker's primary concern was with imprisonment being set or expanded . . . ." 564 F.3d at 507. However, *Southern Union* makes it clear that the Sixth Amendment jury trial right extends beyond physical punishment to include monetary penalties. Forfeiture is just as much punishment as is the imposition of a fine and can in many cases – the present case being a prime example – exceed the fine imposed by many orders of magnitude. While there is no statutory maximum forfeiture amount, the imposition of this crippling punishment is dependent upon judicial factfinding – such as the nexus between the property and the offense, whether a particular sum is "proceeds" of the offense, and the like – which should place it squarely within the ambit of the Sixth Amendment jury trial guarantee.[16] Accordingly, no forfeiture of this magnitude may be imposed without a jury trial.

## CONCLUSION

For all the foregoing reasons, this Court should not enter a forfeiture judgment in this case.

---

[16] The circuits which have considered the issue of whether there is a Sixth Amendment right to jury trial as to forfeiture in the wake of *Southern Union* have rejected the argument based on the fact that the Supreme Court has not overruled *Libretti* and that there is no statutory maximum on forfeitures. *See United States v. Wilkes*, ___ F.3d ___, 2014 WL 928256 at *7  (9th Cir. March 10, 2014); *United States v. Simpson*, 741 F.3d 539, 559-60 (5th Cir.  2014);*United States v. Phillips*, 704 F.3d 754, 769-71  (9th Cir. 2012).

Respectfully submitted,
By His Attorneys,

**/s/ Robert M. Goldstein**

Robert M. Goldstein, Esq.

Mass. Bar No. 630584

20 Park Plaza, Suite 1000

Boston, MA 02116

 (617) 742-9015

rmg@goldstein-lawfirm.com

**/s/ Martin G. Weinberg**

Martin G. Weinberg, Esq.

Mass. Bar No. 51948

20 Park Plaza, Suite 1000

Boston, MA  02116

(617) 227-3700

owlmgw@att.net

Dated: April 1, 2014

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on April 1, 2014, this document has been served, via electronic filing, upon Assistant U.S. Attorneys Mary B. Murrane and Kelly Begg Lawrence.

**/s/ Martin G. Weinberg**

Martin G. Weinberg