UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
UNITED STATES OF AMERICA      )
                                            )
         v.                                 )         CRIMINAL NO. 04-10029-GAO
                                            )
DANIEL E. CARPENTER             )
_____)

**Daniel Carpenter's Reply Memorandum
In Support of Motion for Bail Pending Appeal**

Daniel Carpenter ("Mr. Carpenter") files this memorandum to reply to several arguments posited by the government in opposition to Mr. Carpenter's motion for bail pending appeal. Obviously, there are significant issues at stake.  *See Johnson v. United States,* 218 F.2d 578, 580 (9th Cir. 1954) ("After all is said and done, the unjust deprivation, for a single hour of one man's liberty, creates a debt that can never be repaid"); *see also Hudson v. Parker*, 156 U.S. 277, 285 (1895) ("[A] person accused of crime shall not, until he has been finally adjudged guilty in the court of last resort, be absolutely compelled to undergo imprisonment . . . ."). Despite its best efforts, the government has failed to marshal any compelling arguments, as the facts and circumstances of this unique litigation unquestionably present several "substantial" legal and factual issues that warrant bail pending appeal.[1]

---

[1] Mr. Carpenter continues to rely upon all arguments advanced in his original pleading, and addresses herein only those issues that warrant a response.  In particular, while no response is required herein (in part given the breadth and detail of prior submissions to the Court on these respective issues), Mr. Carpenter continues to assert that the speedy trial constitutional issues, the government's pursuit of an omissions theory of proof, and the Rule 29 issues individually and collectively warrant bail pending appeal.  Each undoubtedly presents a substantial question of law and/or fact that, if determined favorably to Mr. Carpenter, is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed.

I.    <u>There is no uncontrollable risk of flight or danger to the community</u>.

The government argues that, despite *fourteen years* of responsibly standing his ground to legally challenge the criminal allegations (first during the pre-indictment stage, and since February 2004 as an indicted individual), *now ten years* of compliance with the Court's order for pretrial release, and the posting not only of his wife's primary residence but his daughter's as well as security for his compliance with conditions of release in the District of Connecticut, Mr. Carpenter now presents a flight risk because the prospect of jail is now "real" and not "hypothetical." Govt. Opp. at 2-3. The argument profoundly misconstrues what it is like to be a citizen charged with a federal crime. There is nothing "hypothetical" about the experience. Every day is spent worrying about the "real" and very often certain prospect of incarceration. *See, e.g.*, U.S. Attorneys' Annual Statistical Report, Fiscal Year 2010 (citing 93 percent conviction rate and 81 percent of defendants receive a prison sentence). The percentage of prison time is likely much higher in a wire fraud prosecution involving allegations of loss exceeding $9 million. In short, the actual imposition of the sentence is not a "material change in circumstances," as the government contends, given that Mr. Carpenter twice appeared for trials, then appeared in the District of Connecticut for arraignment, and then appeared before the Court knowing the government was seeking a five (5) year sentence. Nor is the length of the sentence so severe that Mr. Carpenter would be willing to forfeit his wife's home and his daughter's home, to sever ties with the community he so cherishes and all of his loved ones in it, only to spend a miserable life on the run, constantly looking over his shoulder, in some hypothetical country that would accept him without a passport or other valid travel documents. In the

circumstances of this case, with the track record demonstrated to date, that scenario, with all due respect, is simply not plausible.

*United States v. Kenney*, 603 F.Supp. 936, 939 (D.Me 1985), where the defendant faced a *10 year* sentence for a drug conviction, is critically dissimilar to the instant case. There, the court cited the defendant's belief that he would prevail at trial. Here, Mr. Carpenter was convicted after the first trial, so he understood the real risk of being convicted at a second trial. Moreover, after his first conviction, Mr. Carpenter did not flee. Indeed, since the time the Court sentenced him, Mr. Carpenter has not fled, of course, but remains here preparing for his appeal, which further undercuts the government's reliance on *Kenney*, where the defendant's bail was revoked at sentencing, which explains that court's discussion of the changed circumstances in *that* case. *See Kenney*, 603 F.Supp. at 938-39 (also noting the defendant was unemployed, divorced, facing a second trial presenting the risk of an additional 15 year sentence, his co-defendant was a fugitive, and the defendant failed to offer any evidence to support his arguments and instead relied only upon representations of counsel). Importantly, when the Court authorized the return of his passport, Mr. Carpenter never reacquired the passport, surely something he would have done had flight been even a distant thought in his mind, which it was not.

*United States v. Colon Berrios*, 791 F.2d 211 (1st Cir. 1986), also cited by the government and also issued in the shadows of passage of the Bail Reform Act in 1984, concerns a defendant who received a 12 year sentence, who *was facing two state murder charges*, and who was remanded at sentencing, and it contains only a one sentence opinion by the majority: "In view of the substantial sentence received by appellant, and the pendency of serious charges against him in the courts of the Commonwealth of Puerto Rico, we are not disposed to disagree with the

district court that appellant has failed to meet his burden of demonstrating by clear and convincing evidence that he is not likely to flee. The renewed motion for conditional release pending appeal is denied." *Id.* at 211. The opinion contains no analysis of the relevant statutory factors, no application of fact to law, and therefore offers little insight or precedential value. There is, however, a lengthy and persuasive dissenting opinion by Judge Torruella, wherein he concludes that the defendant should have been released pending appeal, despite the 12 year sentence and the two pending state murder charges, given, *inter alia*, the defendant's ties to his family and community, that bail was granted in the state murder case, and his pretrial compliance with conditions of release.

Lastly, neither the indictment pending in Connecticut (involving insurance policies issued between January 2007 and June 2008) nor the *civil* dispute in New York quantitatively alters the analysis.[2]   The Court in Connecticut has granted bail in that matter, so it has already determined that Mr. Carpenter's release does not present any uncontrollable risk to the community.   *Cf. Colon Berrios*, 791 F.2d at 214 (Torruella, J., dissenting) (rejecting argument that pending state charges meant the defendant should be detained pending appeal; "[o]bviously, the judicial officer of the court at which [the state murder] charges are pending thought that Colón-Berríos was not a risk worth requiring a substantial bond; $2,500.00 was enough to guarantee appellant's appearance at trial. Thus, I do not believe we should read in pending state charges a greater risk than that perceived by the Puerto Rican courts where appellant is in fact charged"). The civil dispute is just that—a civil dispute (involving the death of an insured in June 2008), and it should

---

[2] The defendant disputes there exists any "looming threat" of indictment in Wisconsin, and the government offers no evidence to support such an accusation, other than to cite a prior submission (which again offered no evidentiary support for the assertion).   *See* Govt. Opp. at 3. Indeed, the government highlighted the alleged Wisconsin investigation *four years ago* in opposing Mr. Carpenter's request for the return of his passport, arguing there then existed a risk of flight. *See* Dkt. 365 at 1.  The Court should wholly disregard the allegation.

not prevent release in this matter. To whatever extent the Court has any concerns regarding business opportunities, Mr. Carpenter will agree to any conditions that restrict or prohibit his engaging in certain business, financial, or insurance disciplines, though he respectfully submits such restrictions are not warranted or necessary here. *Cf. Sellers v. United States*, 89 S.Ct. 36, 38 (1968) (must be "kind of danger that so jeopardizes the public" that it can only be prevented by incarceration).

II.   The Speedy Trial Act issues alone warrant bail pending appeal.

While the government now argues that it never conceded that "the STA was violated in any respect," and that it has opposed all of Mr. Carpenter's motions to dismiss, Govt. Opp. at 5, in a prior pleading the government actually identified its own violation and suggested the more "prudent" course at that point was to actually dismiss the indictment, precisely to avoid the situation that presently exists—*i.e*., the risk of reversal by the First Circuit. *See* Dkt. 230 at 1 ("Although this argument is demonstrably off-the-mark, the government notes that, for an entirely separate reason, there may have been an STA violation."); *Id*. at 1 ("If the STA clock was not reset, and if there was no other pending motion that would toll the STA clock, there could be a violation of the STA, as seventy-one non-excludable days may have elapsed."); *Id*. at 2 ("Although the government believes that the most reasonable reading of Section 3161(e) is that the Court of Appeals issuance of its mandate in this case reset the STA clock, if the Court adopts this position and is wrong, yet another retrial might follow. *To avoid this outcome, the government believes that it would be prudent to dismiss the case without prejudice*.") (emphasis added); March 16, 2008 Transcript (attached as Exhibit 1 to Government Opposition) at 17

(government noting "the apparent risk of a third trial because of uncertainty of the law in this area").[3]

The proper construction of the Speedy Trial Act in the particular circumstance presented here is surely "a 'close' question or one that very well could be decided the other way," *United States v. Bayko*, 774 F.2d 516, 523 (1st Cir. 1985)*,* and, if decided in Carpenter's favor, would automatically result in, at minimum, a new trial on all counts or, if the indictment is dismissed with prejudice, in the dismissal of all charges against Carpenter.  *See* 18 U.S.C. §3162(a)(2)("If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment *shall be dismissed* on motion of the defendant" (emphasis added)); *United States v. Barnes*, 159 F.3d 4, 9 (1st Cir. 1998)("The sanction for failure to adhere to this time limit is severe – the indictment is dismissed on motion of the defendant.").  In arguing that the "reset" vs. "resumes" issue "does not present a substantial question," Govt. Opp. at 5-6, the government submits that neither *United States v. Pitner*, 307 F.3d 1178 (9th Cir. 2002), nor *United States v. Rivera*, 844 F.2d 916 (2d Cir. 1988), addressed the question here, nor are they controlling authority in this circuit, Govt. Opp. at 7-8.  While they may not be controlling, they are certainly persuasive and pertinent and illustrative of how two panels of appellate judges decided an issue directly applicable to the matter in dispute here.

In *Pitner*, the defendant had taken an interlocutory appeal from the denial of his motion to dismiss on double jeopardy grounds. After that appeal was dismissed, proceedings resumed in the district court, with both the district court and the parties "labor[ing] under a misconception regarding the effect of Pitner's interlocutory appeal on the calculation of his Speedy Trial Act

---

[3] Although the government wrote those words in 2008, circumstances have not changed: the Court of Appeals for the First Circuit has still not decided the issue.

deadline" and "assum[ing] that, at the conclusion of the appeal, a new 70-day period began." *Id.* at 1182. This was wrong, the court continued, because "[t]he effect of this interlocutory appeal was to *interrupt,* not to restart, the running of the 70-day clock." *Id.* (emphasis in original). The misconception below arose, the court stated, from a misinterpretation of §3161(e) to apply to interlocutory appeals and thus to start a new 70-day period, based on the erroneous belief that "the appellate decision itself is the 'action occasioning the retrial,' so that it starts a new 70-day period." *Id.* at 1183. The court rejected this interpretation:

> We cannot agree that § 3161(e) permits the Speedy Trial clock to restart upon the decision of an interlocutory appeal following a mistrial. An interpretation of § 3161(e) that restarted the clock after an appeal would be quite correct when the appeal overturned a judgment of conviction entered by the trial court; the appellate decision then would have caused a retrial when none would have otherwise occurred. *But in the present circumstances, when a retrial was already ordered and the interlocutory appeal sought merely to abort it, the 'action occasioning the retrial' was the mistrial order, as we and the Second and Fourth Circuits have ruled.*

*Id.* (emphasis added). *See United States v. Ginyard*, 572 F.Supp.2d 30, 36 (D.D.C. 2008)("An interlocutory appeal interrupts, but does not restart the running of the clock," *citing Pitner*).

The Second Circuit had earlier reached the same conclusion in *United States v. Rivera*, 844 F.2d 916 (2d Cir. 1988), labeling "defendants' concession that the 'action occasioning the retrial' was this court's affirmance of the district court's denial of their double jeopardy motions" inaccurate because "the 'action occasioning the retrial' was the district court's grant of the mistrial motion . . . ." *Id.* at 919. The court continued:

> In a case where the *appellate court* orders a new trial after conviction, it is the appeal that constitutes "the action occasioning the retrial", and the 70-day period begins to run, according to § 3161(e), on the date the appeal becomes final. In the situation at hand, however, an interlocutory appeal *after the district court had declared a mistrial*, the 70-day period had already started to run anew when the mistrial was declared, and the *speedy trial clock resumed* on the date the exclusion allowed for an interlocutory appeal, §3161(h)(1)(E), ended, *i.e.*, when the appeal became final.

*Id.* (emphasis added). *See United States v. Staton*, 1996 WL 465841 at *6 (4th Cir. 1996)("The parties agree that the period of delay resulting from the interlocutory appeal is excludable under § 3161(h)(1)[(C)]").[4]

In *United States v. Dessesaure*, 527 F.Supp.2d 193 (D.Mass. 2007), Judge Gertner found the government's speedy trial calculation erroneous because "[t]he government only included days between the Court of Appeals mandate . . . and the filing of defendant's *pro se* request for an appointment of counsel . . . ." *Id.* at 196. The correct calculation, Judge Gertner ruled, would have included "the non-excludable days that accrued prior to the government's appeal," *because time attributable to an interlocutory appeal "is excluded from the STA calculation . . . , but the clock is not reset to day one."* *Id* (emphasis added).[5]

The interpretation is consistent with the language and purposes of the STA, notwithstanding the government's argument to the contrary. An interlocutory appeal, by definition, interrupts *ongoing* criminal proceedings.   Congress surely was aware that interlocutory appeals by the government often follow new trial grants by the district court, yet in enacting §3161(h)(1)(C), it did not add "except as provided in §3161(e)." Instead, Congress plainly provided that the time attributable to *all* interlocutory appeals was excludable time under

---

[4] In *United States v. Kington*, 875 F.2d 1091 (5th Cir. 1989), a case cited by the government and on which the district court relied in rejecting Mr. Carpenter's speedy trial claim, Doc. 242 at 3, the court reached the opposite conclusion, but that case is distinguishable on its facts. In *Kington*, the district court granted the defendant's suppression motion after the jury was empanelled and declared a mistrial for the specific purpose of permitting the government to appeal that ruling. *See id.* at 1107. The court concluded that "[w]here, as here, the mistrial is declared for the very purpose of permitting the appeal, it is more reasonable to regard disposition of the appeal, rather than declaration of the mistrial, as the event occasioning retrial" because "[t]here is no doubt when the mistrial is declared that the defendants will be retried, if at all, only following the appeal." *Id.* at 1109. Here, in sharp contrast, there is no question that the "event occasioning retrial" was the district court's new trial order. Interestingly, the *Kington* Court cited to *United States v. Crooks*, 804 F.2d 1441 (9th Cir. 1986), in which the Ninth Circuit stated: "Section 3161(e) is not literally applicable to interlocutory appeals; it refers to appeals requiring a retrial. Interlocutory appeals interrupt the seventy day period; **they do not start it running**." *Id.* at 1145 (emphasis added). It is far from clear that the Fifth Circuit would have reached the same conclusion in a case with a different procedural background, such as this one.
[5] Judge Gertner dismissed the indictment with prejudice. On appeal, the First Court reversed, concluding that the indictment should have been dismissed without prejudice without clearly resolving the issue raised herein.

the STA, *i.e.*, time subtracted from an ongoing speedy trial clock. The structure of §3161(e) bears out his conclusion. The first sentence of §3161(e) provides: "If the defendant is to be tried again following a declaration by the trial judge of a mistrial or following an order of such judge for a new trial, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final." In such a case, the "action occasioning the retrial" was the Court's December 15, 2005, order granting the defendant a new trial, and that order was "final" as of December 15, 2005.  Accordingly, a new speedy trial clock began to run on December 16, 2005. In the next sentence, §3161(e) provides: "If the defendant is to be tried again following an appeal or a collateral attack, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final . . . ." In such cases, the "action occasioning the retrial" is the appellate opinion ordering the retrial, which becomes final upon the issuance of the appellate mandate. These two sentences plainly refer to two different actions – the first to action by the district court and the second to action by an appellate court.

Here, the Court construed "becomes final" in the first sentence of §3161(e) to mean the issuance of the appellate mandate, concluding that to do otherwise would render "becomes final" superfluous. Doc. 242 at 3-5. A substantial close question exists as to whether "final" means different things depending upon the actor occasioning the retrial. Where the actor is the district court, "final" refers to the finality of the new trial order itself, the date of which may differ depending upon the circumstances.  For example, a new trial order may be pronounced orally in open court, but it is not "final" until entered on the docket; as another example, where the government files a motion for reconsideration of the new trial order, that order would not become "final" until the district court denied the government's motion.

A substantial issue also exists as to whether the Court's analysis suffers from the inconsistency of its construction with the all-encompassing language of §3161(h)(1)(C), which provides that delay attributable to interlocutory appeals is *excludable*. The defendant also respectfully submits it is inconsistent with the purpose of the STA, which is "to implement the Sixth Amendment's right to a speedy trial, . . . a right designed to limit the time during which criminal charges are hanging over a person's head unresolved." *United States v. Janik*, 723 F.2d 537, 542 (7th Cir. 1983). *See, e.g., United States v. Saltzman*, 984 F.2d 990, 994 (10th Cir. 1993)("The dual purpose of the Speedy Trial Act is to protect a defendant's constitutional right to a speedy indictment and trial, and to serve the public interest in bringing prompt criminal proceedings."). Under the Court's interpretation, the government is able to circumvent the time constraints of the STA by taking an interlocutory appeal of a new trial order and thereby wipe out the entirety of the non-excludable days which had already accumulated, regardless of how many or how close the speedy trial deadline,[6] a result Congress surely did not intend, as evidenced by the existence of §3161(h)(1)(C).

Under the analysis adopted by the Second and Ninth Circuits, which Mr. Carpenter will contend on appeal is the correct one, Mr. Carpenter would be entitled to a dismissal of the indictment against him for violation of the STA.  His appeal will clearly, therefore, raise a substantial question of law or fact which, if decided in his favor, would result in the dismissal of all counts against him. This is surely "a 'close' question or one that very well could be decided the other way," *Bayko*, 774 F.2d at 523, and bail pending appeal is warranted based on this issue alone.

---

[6] The government has 30 days after the entry of the order to file a notice of appeal. Fed. R. App. P. 4(b)(1)(B)(i), potentially generating as many as 30 additional non-excludable days if there are no intervening events which stop the speedy trial clock.

Indeed, while the government tries to diminish the substantiality of this issue, it is already on record essentially conceding its substantiality and (as detailed below) identifying the matter as potentially a "close call" for the Court.  During the March 26, 2008, hearing, the transcript for which the government submitted as Exhibit A in support of its opposition, there was considerable discussion regarding the government's position on Mr. Carpenter's motion to dismiss, at which time the following exchange occurred:

GOVT:           What we're saying is if you think there's a violation, *your Honor, it may make -- if it's a close call for you, your Honor, highlighting the fact that, you know, one might want to consider the risk of a third trial*. We don't think there's a violation here. The government's position is that --

THE COURT:    Well --

GOVT:           *At a minimum. I know there's some ambiguity*. We're not asking -- for the record, we are not asking the Court dismiss; *we're suggesting that if the Court thinks it's a close call, then one possible route to take is to dismiss without prejudice, given the apparent risk of a third trial because of uncertainty of the law in this area*.

March 26, 2008 Transcript at 16-17 (emphasis added).  Later, government counsel acknowledged his belief a split of circuits existed, adding the following:

And it's *on that issue in which there is evidently a split in the circuits, and that's why we highlighted it. There was nothing in the First Circuit that answered the question in any way. The other circuits, the Ninth Circuit in particular, said, no, the provision that applies is the provision that deals with interlocutory appeals*.

March 26, 2008 Transcript at 24 (emphasis added).  Surely, this is a close and substantial issue that if resolved in the defendant's favor would result in dismissal and that it, alone, warrants bail pending appeal.

Second, the government's argument that Mr. Carpenter's petition for *certiorari* to the Supreme Court remedies the "reset/resumes" issue is not persuasive.  There was absolutely no

delay occasioned by the petition, which does not stop a district court from proceeding absent the granting of a stay, pursuant to Rule 23 of the Rules of the United States Supreme Court, which are rarely granted.  Surely, absent the government appeal, there would have been a new trial regardless of Mr. Carpenter's petition, which as a general matter are granted in less than one percent of the cases, are obviously discretionary, and are not a statutory right.  Indeed, pursuant to First Circuit Local Rule 41, petitions for *certiorari* no longer stay criminal cases following the affirmance of a conviction simply upon request, but instead only upon "a showing, or an independent finding by the court, of probable cause to believe that a petition would not be frivolous, or filed merely for delay."  *See* First Circuit Local Rule 41 ("Whereas an increasingly large percentage of unsuccessful petitions for *certiorari* have been filed in this circuit in criminal cases in recent years, in the interests of minimizing unnecessary delay in the administration of justice mandate will not be stayed hereafter in criminal cases following the affirmance of a conviction simply upon request. On the contrary, mandate will issue and bail will be revoked at such  time as the court shall order except upon a showing, or an independent finding by the court, of probable cause to believe that a petition would not be frivolous, or filed merely for delay.").

*United States v. Tinklenberg*, 131 S.Ct. 2007 (2011), relied upon by the government, Govt. Opp. at 9, does not stand for the proposition that *certiorari* petitions have the capacity to delay a trial absent a stay, which was not sought or ordered here.  Indeed, in *Tinklenberg*, the Court explicitly addressed §3161(h)(1)(D), which addresses pretrial motions, not Supreme Court petitions.  *See* 18 U.S.C. §3161(H)(1)(D) (excluding "*delay resulting from* any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion") (emphasis added); *Tinklenberg*, 131 S.Ct. at 2013-14 ("But when

12

read in context and in light of the statute's structure and purpose, we think it clear that Congress intended *subparagraph (D)* to apply automatically.") (emphasis added).  It likewise is not clear that the rationale employed in *Tinklenberg*, which focused on "common" pretrial occurrences, applies to petitions for *certiorari*, which are anything but common.  For example, the Court observed that "several considerations, which, taken together, convince us that the subparagraphs that specifically list *common* pretrial occurrences apply automatically in the way we have just described." *Tinklenberg*, 131 S.Ct. at 2013-14; *Id*. at 2015-16 (discussing legislative history, Court noting that the pertinent Senate Report described provisions of §3161(h)(1) "as referring to 'specific and *recurring* periods of time *often found in criminal cases*,' and characterized them as 'automatically excludable delay'") (emphasis added).  Again, there is nothing common about petitions for *certiorari*, and, the defendant respectfully submits, it is far from certain that *Tinklenberg* has resolved the issue in the manner advanced by the government here.  *Cf. United States v. Scalf*, 760 F.2d 1057, 1059 (10th Cir. 1985) ("An application to seek certiorari or a decision to make such application has no effect on the finality of an appellate decision unless the mandate of the court is stayed or withdrawn in connection with such an event. Furthermore, the time consumed in making a decision whether to seek certiorari is not an excludable period of delay recognized by Section 3161(h), and a continuance granted for such purpose is likewise not excludable delay.") (internal citations omitted); *United States v. Hessman*, 493 F.3d 977, 981 (8th Cir. 2007) (*citing Scalf*).

Moreover, once again (in this case as to whether the petition for *certiorari* "stops the clock") the government has already conceded the substantiality of the issue.  During the March 26, 2008 hearing, in addressing the impact of the Supreme Court petition upon the speedy trial

issue, government counsel repeatedly referred to the unprecedented nature of the issue. *See* March 26, 2008 Transcript at 10 ("We wondered about the same question, your Honor, and we couldn't come up with an answer in any case that was suggestive in answer to the Court's question."); *Id.* at 11 ("[T]here aren't any cases that spell this out. And again, we're sort of left with a similar issue, and that is, we're operating in unchartered waters here."); *Id.* at 16 ("I mean, I don't -- it's not clear to me – it's not clear to me that the Court has jurisdiction over the case until the Supreme Court says we're done.").

Third, the government is wrong to contend that Mr. Carpenter's argument regarding the lack of "on the record" findings at the November 26, 2007 status conference is "without merit." Govt. Opp. at 10. On November 26, 2007, the district court set a trial date of May 5, 2008, but it did so without making the oral or written on-the-record findings required to exclude the time as a §3161(h)(7)(A) (then §3161(h)(8)(A)) "ends of justice" continuance. *See, e.g.*, March 26, 2008 Transcript at 18 (Court: "I think it's unmistakable I did not make on the record then detailed findings."). Nothing was said at the status conference about the STA until the very end, when government counsel said, "Your Honor, the Speedy Trial Act?" Tr. 11/26/07 at 11. The Court merely responded, "Yeah. We will exclude the time." *Id.* This was the full extent of the STA discussion and analysis.[7]

18 U.S.C. §3161(h)(7)(A) provides that no delay resulting from a continuance granted by the court under that subsection "shall be excludable . . . unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." *See, e.g., Zedner v. United States*, 547 U.S. 489, 506-07 (2006)(holding Speedy

---

[7] While the relevant docket entry, entered the following day, states that "[a]ll time between 11/26/07 and 5/5/08 is excluded in the interests of justice," no findings were made on the record.

Trial Act violated where district court failed to make such findings); *United States v. Huete-Sandoval*, 668 F.3d 1, 3, 5 (1st Cir. 2011)(same).  Ends-of-justice continuances "should not be granted cavalierly." *United States v. Barnes*, 251 F.3d 251, 256 (1st Cir. 2001). To ensure that the district court has "seriously weigh[ed] the benefits of granting the continuance against the strong public and private interests served by speedy trials," *United States v. Bryant*, 523 F.3d 349, 361 (D.C.Cir. 2008), and that ends-of-justice continuances are not used more widely than Congress intended, *see United States v. Keith*, 42 F.3d 234, 238 (4th Cir.1994),

> the record, which includes the oral and written statements of both the district court and the moving party, must contain an explanation of why the mere occurrence of the event identified by the party as necessitating the continuance results in the need for additional time. . . . A record consisting only of short, conclusory statements lacking in detail is insufficient. For example it is insufficient to merely state that counsel is new and thus needs more time to adequately prepare for trial or that counsel or witnesses will be out of town in the weeks preceding the trial and therefore more time is required to prepare for trial . . . Simply identifying an event, and adding the conclusory statement that the event requires more time for counsel to prepare, is not enough.

*United States v. Toombs*, 574 F.3d 1262, 1271-72 (10th Cir.2009).

Although the Supreme Court indicated in *Zedner* that the district court's findings could be entered on the record as late as the time at which it ruled on the defendant's motion to dismiss on speedy trial grounds, it emphasized that the findings must have been "*made*, if only in the judge's mind, *before* granting the continuance." 547 U.S. at 506-07 (emphasis added). *See, e.g., Larson*, 627 F.3d at 1204 ("These findings may be entered on the record after the fact, but they may not be *made* after the fact" (emphasis in original)); *United States v. Crawford*, 982 F.2d 199, 204 (6th Cir. 1993) ("[T]he reasons stated must be the actual reasons that motivated the court at the time the continuance was granted."); *Keith*, 42 F.3d at 237 (district court may not grant ends-of-justice continuance *nunc pro tunc*). It must be "clear from the record that the court conducted

the mandatory balancing contemporaneously with the granting of the continuance." *United States v. Henry*, 538 F.3d 300, 304 (4th Cir. 2008). *See, e.g., Toombs*, 574 F.3d at 1269 ("[T]he record must clearly establish [that] the district court considered the proper factors at the time such a continuance was granted"); *see also Bryant*, 523 F.3d at 361 (invalidating ends-of-justice continuance where there was nothing in the record to indicate that the district court had considered the speedy trial rights of the defendant and of the public).

Here, while the Court did make oral remarks at the time of the hearing on defendant's speedy trial motion, those remarks did not more than identify the event which led to the continuance, *see Toombs*, 574 F.3d at 1271-72, and do not demonstrate that the Court actually conducted the necessary balancing *at the time it ordered the continuance. See* Tr. 3/26/08 at 21-22, 25.   Nor does the Court's written order demonstrate the requisite contemporaneous balancing. *See* Order, April 8, 2008 (Doc. 242) at 1-3.  Indeed, the fact that the government had to remind the Court of the STA at the very end of the hearing and the cursory, off-hand remark by the Court in response excluding the time strongly suggests that the Court was not thinking about STA considerations at all during the hearing which led to the continuance.  Thus, there is a very compelling argument that the  November 26, 2007, continuance did not stop the speedy trial clock, which kept running for another 22 days until the filing of a motion by Mr. Carpenter on December 17, 2007.  Thus, even assuming *arguendo* that the speedy trial clock reset to zero after the issuance of this Court's mandate in the government's interlocutory appeal, non-excludable days had mounted to 80 prior to the filing of Mr. Carpenter's motion, there having been 58 non-

16

excludable days prior to the November 26, 2007, status conference. The STA was, accordingly, violated for this reason as well.[8]

III.    The Merrill Lynch evidence.

Mr. Carpenter respectfully submits that the false testimony of the Merrill Lynch witnesses in this case, and Merrill Lynch's suppression of highly probative documentary evidence, cannot fairly be characterized as "collateral to the issue of his guilt or cumulative of evidence presented at trial, or both," as the government submits.  Govt. Opp. at 17.  Indeed, the government reliance on Mr. Carpenter's "vigorous[]" use of Mr. Patterson's testimony at trial, Govt. Opp. at 17, strongly misses the point.  The key point here is that the false testimony by the Merrill Lynch witnesses, and Merrill Lynch's suppression of affirmative evidence, cast into doubt a critical point that should have been indisputable: Mr. Carpenter was open and forthright with Mr. Patterson and, as important, not just broker Levine but with an array of personnel at Merrill Lynch, from the inception of their relationship.

As set forth in his principal pleading, the documents unearthed after the second trial directly contradicted the testimony of Merrill Lynch witnesses given in both criminal trials as to *what* Merrill Lynch knew and *when* Merrill Lynch knew it, with respect to Mr. Carpenter investing other peoples' money as part of §1031 property exchanges.  The gestalt of the materials, unknown to and unknowable by Mr. Carpenter prior to trial, clearly show that Merrill Lynch witnesses had actual knowledge that the business of BPETCO was to hold and invest other people's money, that Mr. Carpenter was open and transparent with Merrill Lynch from the inception of their relationship regarding BPETCO and its business, that Merrill Lynch witnesses

---

[8]  The discrete violations addressed herein are obviously independent of the additional speedy trial violations identified by Mr. Carpenter in all of his prior pleadings, including within his principal memorandum in support of bail pending appeal, which include periods of time spanning from 2008 to 2011.

committed perjury during trial, and that Merrill Lynch and its law firms engaged in a massive cover-up and fraud on the Court.

The unearthed documents are not cumulative of other evidence.  They would have been used as substantive, affirmative evidence of Mr. Carpenter's good faith *with Merrill Lynch*, as contrasted with Mr. Patterson, and they would have provided an unshakeable foundation to argue there existed an absence of an intent to defraud with the Exchangors, with whom Mr. Carpenter never communicated, given his openness, candor, and transparency with multiple Merrill Lynch employees, with whom he did communicate, and with whom he told the absolute truth regarding the source of funds that he was investing.  These materials simply cannot fairly be termed "cumulative" or identified as merely "impeachment" evidence.  Compounding the error, at trial, the government placed great emphasis on Merrill Lynch's long-standing contention that Merrill Lynch did not know Mr. Carpenter was investing other peoples' money until it received Mr. Carpenter's September 22, 2000 letter to Rasmussen complaining about Merrill Lynch's decision to prevent BPETCO from opening any new options positions.  The suppressed evidence constitutes affirmative, substantive evidence of Mr. Carpenter's good faith and lack of intent to defraud, and Mr. Carpenter respectfully submits this too is an issue warranting bail on appeal.

IV.    Conclusion.

There is a real asymmetry that persists in this case.  The government has twice been afforded to appeal its claims of error, yet Mr. Carpenter has to date been precluded the opportunity to appeal any of his substantial issues, and twice been denied the ability to appeal the sufficiency of evidence issues.  Mr. Carpenter now finally has the opportunity to raise every appellate issue he believes meritorious, including but not limited to those addressed in this

pleading and his principal memorandum in support of bail pending appeal. For all of the

foregoing reasons, as well as those in his original pleading, Mr. Carpenter respectfully submits

that bail pending appeal is warranted and appropriate here.

Respectfully Submitted,                     Respectfully Submitted,
Daniel E. Carpenter,                        Daniel E. Carpenter,
By His Attorney,                            By His Attorney,

**/s/ Robert M. Goldstein**                 **/s/ Martin G. Weinberg**
Robert M. Goldstein, Esq.                   Martin G. Weinberg, Esq.
Mass. Bar No. 630584                        Mass. Bar No. 51948
20 Park Plaza, Suite 1000                   20 Park Plaza, Suite 1000
Boston, MA 02116                            Boston, MA  02116
 (617) 742-9015                             (617) 227-3700
rmg@goldstein-lawfirm.com                   owlmgw@att.net

Dated: April 11, 2014

## CERTIFICATE OF SERVICE

     I, Robert M. Goldstein, hereby certify that on April 11, 2014, this document has been
served, via electronic filing, upon Assistant U.S. Attorneys Mary B. Murrane and Kelly Begg
Lawrence.

**/s/ Robert M. Goldstein**
Robert M. Goldstein