UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER | ) | |

## MOTION TO VACATE CONVICTION AND REDUCE SENTENCE

### PRELIMINARY STATEMENT

I, Daniel E. Carpenter, (hereinafter "Petitioner", "Mr. Carpenter", "I" or "me"), submit this Memorandum in support of my Petition to Vacate my conviction and/or Reduce my sentence pursuant to 28 U.S.C. §2255. Not only was I an innocent man who was the victim of egregious prosecutorial misconduct in not just one but two trials, I was also the victim of malicious and vindictive prosecutions in other states caused by the US Attorney's Office in Boston, and the victim of ineffective and incompetent counsel that abandoned me in favor of the real villain in this saga, Merrill Lynch. In my second trial in 2008 and throughout the inexplicable delay from December 3, 2008 to September 1, 2011, that the First Circuit apologized for at the end of its November 2013 opinion, when my second new trial order was granted for egregious prosecutorial misconduct, I also became the victim of what can only be called both "incompetent" and "ineffective" assistance of counsel that led the First Circuit to overturn my New Trial Order in November 2013, and that caused this Court to comment that my counsel's "right hand did not know what the left hand was doing." If my ineffective counsel had only objected to the AUSA's closing comments of "THAT'S FRAUD", then I would be a free man to this day.

Similarly, upon discovering just before the hearing on Dec 3, 2008 that the Exchangors had filed their own lawsuit in February of 2008 against Merrill Lynch that not only does not mention my name, it contradicts the government's entire theory of the case against me (that because I hid the nature of BPETCO's source of third-party funds from Merrill, I may have deceived the Exchangors as well), the government should have lived up to their *Brady-Giglio-Bagley* obligations and requested a new trial for me, and my previous counsel, Greenberg Traurig, should have demanded a new trial pursuant to Rule 33 at my post trial brief hearing on Dec 3 2008.

Both prior to and after my trial in June of 2008, and throughout 2009, 2010 and 2011, I was effectively abandoned by my counsel at the time, Greenberg Traurig, and left on my own to provide over 30,000 pages of documents to the government and to the Court to show that not only did the Merrill witnesses lie, so, too, did the Exchangors and the attorneys for both Merrill and the Exchangors, who sat behind the prosecutors for each and every day of my three week trial. Does the Court really believe that neither the attorneys for Merrill nor the attorneys for the Exchangors ever mentioned the Iantosca February 2008 lawsuit that Attorney Zelle tried to keep buried so that I would not find out about it by using Iantosca's name instead of Cahaly's? What about the new FBI 302 Reports done by the government just before trial? Didn't everyone lie on those 302 Reports as well? If the government truly had no knowledge of the February 2008 lawsuit in June of 2008 despite me signing over my arbitration victory against PaineWebber to the Exchangors at the behest of Greenberg Traurig in June of 2008 just before the trial was to begin, then they certainly had an obligation under *Brady-Giglio-Bagley* to find out about it in December of 2008 when asked about it at the hearing. The fact that Greenberg Traurig did not investigate it is a classic "ineffective assistance of counsel" complaint that will be discussed

below. The fact that the government never investigated the Exchangors' February 2007 lawsuit or the Merrill witnesses' collective perjury is a classic Due Process and *Brady-Giglio-Bagley* violation after the famous senator Ted Stevens case, *United States v. Stevens*, 593 F.Supp.2d 177 (D.C. Jan. 16, 2009).

But even more damaging to me was the fact that Greenberg Traurig effectively "dropped" and abandoned me gradually over time as they picked up more and more work from Merrill Lynch, which clearly caused a conflict that was both detrimental and prejudicial to me. Because of this abandonment and betrayal, Greenberg Traurig never followed up on the February 2008 Iantosca lawsuit matter or the Merrill Lynch perjury issues during the inexplicable delay from December 3, 2008 to Sept 1, 2011 when my new trial order was granted, because they knew that they would have to directly confront their new big paying client, Merrill Lynch, to defend me. That is why Greenberg Traurig did not file a protective Rule 33 Motion on my behalf based on newly discovered evidence during this time period which is yet another classic example of "ineffective counsel" that prejudiced me, and demands that my conviction be vacated on that basis alone. In fact, I did not receive a copy of the February 2008 Iantosca lawsuit until April 2009 when a friend sent it to me. Even more remarkable is that the government had no interest in following up on the Iantosca lawsuit or the volumes of evidence showing that all of the Merrill Lynch witnesses lied, not just Stern, Levine and Rasmussen but all of the Merrill Lynch witnesses that gave FBI 302 reports that were read into evidence by FBI Agent Caldwell during my Grand Jury hearing as if it was first party non-hearsay gospel truth. Instead, every one of the FBI reports read to the Grand Jury was not just hearsay, but absolutely a pack of lies. Instead of investigating the truth, the government's consistent response to all of this exculpatory evidence in my favor proving my good faith and negating any specific intent that I was out to defraud anyone

was that the evidence was merely "cumulative" or was just relevant to the Exchangors or Merrill's internal business discussions.

To the contrary, the February 2008 lawsuit brought in the name of *Iantosca v. Merrill*, despite the fact that Iantosca was in a nursing home and was *non compos mentis*, clearly states that BPETCO and its officers were totally open and forthright with Merrill on the source of the funding, thereby proving my good faith and that I had no "specific intent" to defraud anyone whether it be Merrill Lynch or the Exchangors. As the Court itself said at my sentencing, "Mr. Carpenter always intended to pay back the money." And, in fact, I did pay it all back and more in June of 2008 before the second trial began. This fact was wrongfully kept from the jurors by the government. Moreover, the government knew by 2009 that all of their broker witnesses committed perjury; not just Mitch Rock, "who had $13 million reasons to lie," or Lori Enright who the Court paused to explain her rights against self-incrimination, or even Martin Paley whose testimony was so incredible at the first trial in 2005, the Court felt obliged to spend several pages detailing Paley's perjury. But, in 2009 and 2010, an avalanche of new evidence came out showing not just that Levine lied (and the government knew it), but Stern and even Rasmussen, Merrill's compliance manager, lied as well. Moreover, the government had over 30,000 pages of evidence and countless depositions showing that everyone at Merrill lied except Nancy Sawyer, the business manager of the Merrill Lynch office that the FBI and the government never interviewed, despite my repeated requests to do so.

Throughout 2009, 2010, and 2011, my attorneys submitted various documents to both the government and the Court, and I was told by my ineffective counsel that either the government would drop the charges or agree to a new trial under Rule 33 because of the massive perjury in this case. See, e.g., Dkt. 352. But, the one thing that my incompetent counsel did not do was file

a Rule 33 motion on a protective basis from June 2008 to June 2011 concerning the Iantosca February 2008 lawsuit or the Merrill Lynch perjury, leaving me exposed to the very thing that happened here with the overturning of my New Trial Order. The Merrill perjury has infected the entire course of the investigation, the Grand Jury, the indictment, the trial, and the appeals in this case. I was unaware, but have since discovered that Merrill officials lied to the SEC in three separate investigations concerning BPETCO. On June 14, 2014, the Massachusetts Appellate Court concluded that Merrill's attorneys had worked in a concerted effort to suborn perjury, destroy evidence, and refuse to turn over critical evidence that would have hurt Merrill and exonerated me. *See Cahaly v. BPETCO*, No. 12–P–956 (Mass. App. 2014). But, because my ineffective and deficient counsel did not do a Rule 33 Motion to protect me, I am currently sitting in prison awaiting the outcome of my various appeals, and none of the perjurors in my case have been prosecuted.

The pernicious perjury of Paley, the Exchangors and Merrill's brokers not only infected the trial, it infected the Grand Jury proceedings as well. Even a cursory glance at my Grand Jury transcripts show that there was effectively only one witness, FBI Special Agent Caldwell, who did nothing but recite from the FBI 302 Reports the lies that Paley and the Merrill personnel told him. Not only was this "hearsay" testimony, the government vouched for the credibility and reliability of it as if Stern, Levine, Rasmussen, and Hassan Tabbah (Merrill's manager) were testifying through Agent Caldwell, it was all a pack of lies. And, when one Grand Juror asked questions about what Paley knew and what the brokers knew, AUSA Pineault cleverly directed them away from the truth that I was perfectly open and transparent with everyone I talked to at Merrill, and with Paley as well. While "hearsay" evidence is permissible in Grand Jury proceedings, perjury, deception, and outright lies and second hand reporting are not.

There is no question that I have *Brady-Giglio-Bagley* claims that would rival the prosecutorial misconduct depicted in Sidney Powell's recent book <u>Licensed to Lie</u>, but the First Circuit also has a longstanding history and policy that convictions based on the use of perjured testimony cannot be allowed to stand. *See, e.g., United States v. Maldonado-Rivera*, 489 F.3d 60 (1st Cir. 2007) ("the government was guilty of the knowing use of perjured testimony"). As this Court is well aware, this First Circuit tradition is based on well-established Supreme Court precedent that a **conviction** obtained through the prosecutions **knowing use of perjury, deception, and outright lies** cannot stand. *See, e.g., Mooney v. Holohan*, 294 U.S. 103, 112 (1935), *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Finally, because everything about this case from beginning to end was rotten to the core, I will challenge the indictment pursuant to Rule 12(b)(3)(B) as I am allowed to do under the Federal Rules of Criminal Procedure under a separate motion. And, because the Court knows that I have consistently argued that Venue was not appropriate in this case from the beginning, I wish to bring to the Court's attention the Third Circuit's recent decision in *United States v. Auernheimer*, Crim. No. 11-cr-470 (SDW) (3d Cir. April 11, 2014). Because of the nature of 28 U.S.C. §2255 proceedings, that any issue I do not bring up now will forever be forfeited, and there is so much wrong with this case, I beg the Court's indulgence and apologize in advance, because this will be a very long and comprehensive memorandum in many sections analyzing in detail the many violations of my Constitutional rights that deprived me of my rights to Due Process, and a Speedy and Fair Trial, with the effective assistance of counsel.

But, suffice it to say, it is my fervent hope that the Court will see that both the Exchangors and the Merrill witnesses lied and deceived the Court as well as the government prosecutors to preserve their own selfish interests to a judicial jackpot of over $50 million on an

$8 Million investment at the expense of my freedom, and that the government prosecutors presented both sets of perjurers as trust worthy witnesses that they vouched for and then protected them from prosecution for their perjurious testimony that is undisputable now; and that I was the victim of gross "ineffective assistance of counsel" due to Greenberg Traurig's lack of investigation, research or even objections to the outrageous government misconduct that should shock the conscience of this Court; and based on these indisputable facts, grant my §2255 Petition to vacate my conviction and dismiss the indictment against me, or at the very least commute my sentence to time served and eliminate any fines, forfeitures, and restitution against me due to the severe prosecutorial misconduct against me that deprived me of Due Process and a fair trial free of the taint of perjury.

## I.    JURISDICTION

Title 28, United States Code, Section 2255 permits a person in custody under sentence of a court established by an Act of Congress to move the court which imposed sentence to vacate, set aside, or correct the sentence on the grounds that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.  28 U.S.C. §2255.

On February 26, 2014, I was sentenced to 36 months incarceration by this Court.  I am presently in the custody of the Bureau of Prisons at USP Canaan in Waymart, Pennsylvania.  I have steadfastly proclaimed my innocence of any wrongdoing in this matter, have consistently objected to venue being proper in Massachusetts, have always believed that this Court lacks jurisdiction to try me for mail and wire fraud, and have always felt that I was a victim of both egregious prosecutorial misconduct and malicious prosecutorial vindictiveness.  Now, pursuant to 28 U.S.C. §2255, I seek to have my conviction and sentence vacated due to the ineffective assistance of counsel as well as the other above-listed issues since that ineffectiveness and incompetence was pointed out so graphically and in great detail by the First Circuit in overturning my second New Trial Order in November of 2013, and by this Court in ruling on the newly-discovered Merrill Lynch evidence in May of last year.  Because of my incarceration and pending appeal made to the Supreme Court, this Court has jurisdiction to hear this timely-made motion.

Additionally, the First Circuit has repeatedly held that fact-specific ineffective assistance of counsel claims, such as those detailed herein, should be raised in habeas proceedings, not direct appeal:

> "The rule in this circuit is that a fact-specific claim of ineffective legal assistance cannot be raised initially on direct review of a criminal conviction, but must originally be presented to the district court." *United States v. Hunnewell*, 891 F.2d 955, 956 (1st Cir. 1989). This practice exists largely to allow for full development of the record needed to "place the adequacy of a defendant's representation into proper perspective." *United States v. Natanel*, 938 F.2d 302 (1st Cir. 1991).

*United States v. Osorio-Pena*, 247 F.3d 14, 19-20 (1st Cir. 2001); *see also United States v. Leahy*, 473 F.3d 401, 410 (1st Cir. 2007) (noting that court has "'held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court'"), *quoting United States v. Mala*, 7 F.3d 1058, 1063 (1st Cir. 1993). As such, the claims made herein are properly made to this Court in the first instance, and because I am currently incarcerated at this time, pursuant to 28 U.S.C. §2255, this Court has jurisdiction to hear this timely-made Motion to Vacate my Conviction and Sentence, or at the very least, to reduce my sentence to a year and a day because there was no actual loss in this case and as the Court mentioned at my sentencing hearing, there never was any intended loss, so Your Honor should order my immediate release from prison based on the time that I have already served.

## II. MY CONVICTION MUST BE VACATED AND THE INDICTMENT MUST BE DISMISSED AS MASSACHUSETTS WAS NOT THE PROPER VENUE FOR ANY OF THE COUNTS

As this Court stated in its decision from my first trial: "Mr. Carpenter has persistently maintained an objection to venue in this District." *United States v. Carpenter*, 405 F. Supp. 2d 85, 88 (D. Mass. 2005). It is guaranteed by the Constitution that a criminal defendant has the right to be tried in an appropriate venue. The importance of this right to the Founders is emphasized by the fact that it is mentioned in the Declaration of Independence as a complaint and not once, but twice, in the text of the Constitution. *See* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed ...."); *id.* amend. VI (requiring trial of a criminal case "by an impartial jury of the State and district wherein the crime shall have been committed"). Congress has further entrenched these norms by an explicit directive that limits a criminal prosecution to "a district in which the offense was committed." Fed.R.Crim.P. 18. This rule "echoes the constitutional commands." *United States v. Cabrales,* 524 U.S. 1, 6 (1998). The result is meant to be a safety net for the defendant, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum as has happened to me not once, but twice.

In the instant matter, venue with the Massachusetts District Court was improper as I was not a resident of Massachusetts, had never visited Massachusetts in the past 10 years (with the exception of required court appearances), and the government has alleged no overt acts by me with any connection to the State of Massachusetts in the Indictment. Because it is indisputable that I did not perform any "essential conduct element" of the crime charged and alleged in the Indictment in the district of Massachusetts, my conviction must be reversed and vacated and a

judgment of acquittal be issued to me on all charges. *See United States v. Auernheimer*, Crim.
No. 11-cr-470 (SDW) (3d Cir. April 11, 2014).

As explained in *Auernheimer*, these constitutional provisions manifest a strong
constitutional policy disfavoring trials removed from the situs of the alleged criminal activity.
As explained by the First Circuit:

> Venue in a criminal case is not an arcane technicality. It involves matters that touch
> closely the fair administration of criminal justice and public confidence in it…The result
> is a safety net, which ensures that a criminal defendant cannot be tried in a distant,
> remote, or unfriendly forum solely at the prosecutor's whim.

*United States v. Salinas*, 373 F.3d 161, 162, 164 (1st Cir. 2004). Under the standard set in
*Cabrales, Salinas*, and *Aurenheimer*, I committed no act in Massachusetts, so it is clear that I
committed no crime triable in a Massachusetts court. If "non-disclosure" was the problem, that
conduct or lack of conduct was in Connecticut. If trading options or losing money was the
"crime," then that happened in the Southern District of New York. Moreover, there was **zero**
evidence adduced at trial showing any conduct of mine that actually "caused" the mailings or
wires, and it is clear that all of these mailings and wires were non-fraudulent and not in
furtherance of any scheme to defraud.

It is guaranteed by the Constitution that a criminal defendant's right to proper venue is
protected in two places: Article III, and the Sixth Amendment. *United States v. Anderson*, 328
U.S. 699, 703 (1946) ("[T]he *locus delicti* must be determined from the nature of the crime
alleged and the location of the act or acts constituting it."). These Congressional and
Constitutional protections are meant to provide a safety net, which ensures that a criminal
defendant cannot be tried in a distant, remote, or unfriendly forum (*see United States v. Salinas*,
373 F.3d 161, 164 (1st Cir. 2004)).

In a criminal case, "venue must be narrowly construed." *United States v. Jefferson*, 674 F.3d 332, 365 (4th Cir. 2012). "Venue...is an element...which must be proved...by a preponderance of the evidence." *United States v. Miller*, 111 F.3d 747, 749-50 (10th Cir. 1997). Hence, all of the counts in this case should be dismissed for lack of proper venue, because I had nothing to do with inducing any the Exchangors to work with Paley or BPETCO. As with a lack of subject matter jurisdiction, improper venue requires dismissal of the indictment or a judgment of acquittal. *See United States v. Strain*, 396 F.3d 689 (5th Cir. 2005), *reh'g denied*, 407 F.3d 379, 380 (5th Cir. 2005) (remanding for entry of judgment of acquittal due to the government's failure to prove venue and stating that such failure "does not entitle the government to a second chance at prosecution"). Not only must the government prove venue by a preponderance of the evidence at trial, *see Salinas* at 163, but the government must also allege sufficient facts in the Indictment to establish proper venue *ab initio*.

A defendant in a criminal case has a constitutional right to be tried in a proper venue. *Johnson*, 323 U.S. at 275 (noting that two constitutional provisions, Article III, §2, cl. 3 and the Sixth Amendment both provide a right to trial in the state where the crime is committed); *United States v. Uribe*, 890 F.2d 554, 558 (1st Cir. 1989); *see also* Fed. R. Crim. P. 18. The government bears the burden of proof on the issue of venue. *United States v. Lanoue*, 137 F.3d 656, 661 (1st Cir. 1998). "[I]t is readily apparent that venue requirements promote both fairness and public confidence in the criminal justice system." *Johnson*, 323 U.S. at 276. Venue must be determined by the nature of the crime alleged, by analyzing the actual conduct of the defendant constituting the offense and the location of the criminal act. *Scott*, 270 F.3d at 35. More than a *de minimis* connection to the district is required. *Uribe*, 890 F.2d at 559.

The alleged facts in this matter are very similar to those presented in *Salinas*, in that any alleged conduct or omissions by me occurred outside of Massachusetts. The defendant in *Salinas* was prosecuted for passport fraud not in New York, where the defendant applied for the passport at the post office, but in New Hampshire, where the fraud was discovered by the Passport Office. The Court dismissed the indictment for lack of venue finding that all of the criminal conduct, the elements of the offense, occurred in New York. *Id.* at 165-170. Similarly, in this case, there was simply no justification for laying venue in Massachusetts as all the alleged conduct by me occurred in Connecticut or the Southern District of New York. Rightly or wrongly, anything that I did or did not do, I did only in Connecticut, and the Indictment does not contradict this fact.

When an indictment charges a defendant with multiple counts, "venue must be proper with respect to each count." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989). *See also Travis v. United States*, 364 U.S. 631, 635 (1961) ("Where Congress is not explicit, the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it") (internal quotation marks omitted). Moreover, that the Supreme Court has construed a necessary connection between venue and the conduct elements of an offense. In general, this connection means that a **criminal defendant's own actions will determine where venue can be laid**. Expanding venue for mail and wire fraud in the way that the government has done in the Indictment would unhinge this connection and give the government unlimited control of determining where someone can be tried. I had **nothing** to do with causing any of the mailings or wires, nor were they foreseeable to me because I had no idea who Paley was talking to. Under the government's idea of venue, I could have been tried in Alaska, Florida, or California if Paley had friends or relatives there that did a property exchange

between August and December 2000. That is not how venue is determined in the First Circuit or any other circuit. For that reason alone, my conviction must be overturned and vacated and a judgment of acquittal entered as to all counts.

This matter should also be dismissed in consideration of the traditional Constitutional venue requirements. The Sixth Amendment to the United States Constitution provides that: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." U.S. Cont. amend. VI. Furthermore, Fed. R. Crim. P. Rule 18 states that unless a statute or the rules of procedure themselves permit otherwise, the government must prosecute an offense in the district where the offense was committed.

"Venue is proper only where the acts constituting the offense – the crime's 'essential conduct elements' – took place." *United States v. Tzolov*, 642 F.3d 214, 218 (2d Cir. 2011)(dismissing fraud claim brought in the EDNY instead of the SDNY, literally one subway stop away in New York). *See also United States v. Brennan*, 183 F.3d 139, 147 (2d Cir. 1999) (holding that "prosecution under the mail fraud statute is permissible only in those districts in which a proscribed act occurs"), and *Salinas*, where the defendant's indictment was dismissed due to improper venue because illegal activity occurred in New York, but was only discovered in New Hampshire. The Second Circuit, where I should have been tried, if I was tried at all, has enumerated four factors used to determine whether venue is constitutionally permissible: (1) the site of the defendant's acts; (2) the elements and nature of the crime; (3) the locus of the effect of the criminal conduct; and (4) the suitability of the district for accurate fact finding. *United States*

14

*v. Reed*, 773 F.2d 447, 481 (2d Cir. 1985); *see also United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989).

In *United States v. Bezmalinovic*, 962 F. Supp. 435 (S.D.N.Y. 1997), the court dismissed a bank fraud charge for lack of venue. The indictment charged a scheme to defraud Manufacturers Hanover Trust ("MHT") by obtaining a mortgage using a false application. Bezmalinovic allegedly prepared a false application in the Eastern District of New York ("EDNY"), submitted the application to MHT in the EDNY, more commonly known as Brooklyn, received proceeds via checks drawn on an account in the EDNY, and then deposited those checks into my account in the EDNY.

Very similar to my case, the government argued that venue was proper in the SDNY because, after the checks were deposited into a Chemical Bank account in the EDNY, the checks were sent to a processing center in Manhattan where each check was credited to Bezmalinovic's account, and each check was then forwarded to a clearing house in Manhattan. Finally, the checks were sent to MHT's processing center in Manhattan, where they were debited from MHT's closing account.

However, the court in *Bezmalinovic* did not agree with the government's determination of venue and held that the ministerial processing of the checks in Manhattan did not provide a sufficient constitutional basis for venue in the SDNY. The court further noted that the "only acts alleged to have occurred in the [SDNY] are the ministerial actions taken by MHT and Chemical Bank in the process of crediting defendant's account." *Id.* at 437. In addition, the court stated that the indictment did "not allege[] that those acts were intended or foreseen by defendant." *Id.* The court concluded that the ministerial acts of debiting and crediting accounts as alleged in the indictment did not constitute "substantial contacts" within the SDNY sufficient for venue to be

constitutionally permissible. *Id.* at 441. Moreover, in *United States v. Novak*, 443 F.3d 150 (2d Cir. 2006), another case of just one subway stop away, the defendant challenged jurisdiction in the EDNY when the evidence showed (and the government agreed) that the alleged offenses actually took place in the SDNY.  If Brooklyn is a "distant, remote, and unfriendly forum" from New York City, imagine how I feel as a Connecticut Yankee trapped in a Boston court. *Salinas* at 164.

### III.   MY CONVICION MUST BE VACATED DUE TO INEFFECIVE ASSISTANCE OF COUNSEL

"Ineffective assistance under *Strickland* is deficient performance by counsel resulting in prejudice, with performance being measured against an 'objective standard of reasonableness,' 'under prevailing professional norms.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005); *Strickland v. Washington*, 466 U.S. 668 (1984).   Prejudice occurs when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.   Counsel has a duty to investigate the facts of the case and learn the law of the case.   *Correale v. United States*, 479 F.2d 944 (1st Cir. 1973).   As detailed below, Greenberg Traurig did neither; leaving me defenseless and abandoned.   It is by now well-established that counsel's failure to conduct an adequate investigation into potential defenses can constitute ineffective assistance of counsel.   *See, also, Murchu v. United States*, 926 F.2d 50 (1st Cir. 1991).

Under *Strickland*, the Court "first determine[s] whether counsel's representation 'fell below an objective standard of reasonableness.'" *Padilla*, 130 S. Ct. 1473, 1480 (2010), *quoting Strickland*, 466 U.S. at 2052.   The Court then asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.   The *Padilla* Court set forth the "first prong" analysis as follows:

> The first prong – constitutionally deficiency – is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." We long have recognized that "[p]revailing norms of practice as reflected in American Bar Association standards and the like…are guides to determining what is reasonable…." Although they are "only guides," and not "inexorable commands," these standards may be valuable measures of the prevailing professional norms of effective representation, especially as

these standards have been adapted to deal with the intersection of modern criminal prosecutions and immigration law.

*Padilla*, 130 S.Ct. at 1482 (internal citations omitted).

In discharging constitutionally effective assistance of counsel, defense counsel has an obligation to conduct a reasonable investigation into the government's allegations. While "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste," *Rompilla*, 545 U.S. at 383, counsel clearly has a constitutional duty "to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary." *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1406-07, --- U.S. --- (2011) (emphasis in original).

In *Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005), the defendant challenged a state court conviction based on ineffective assistance of counsel, in particular defense counsel's failure to adequately investigate a "not arson" defense. The First Circuit concluded that counsel's failure to reasonably investigate a "not arson" defense constituted ineffective assistance, given "the importance of challenging the state's arson case to Dugas's defense, the unfulfilled promise to the jury to do so, the crucial role of the arson evidence to the state's case, [trial counsel] Raimo's lack of knowledge and experience in arson investigation and arson cases, and Raimo's initial awareness of problems with the state's case." *Dugas*, 428 F.3d at 331 (holding these circumstances, taken together "demonstrate the inescapable need for expert consultation in this case"). In reaching its decision, the First Circuit "emphasize[d] that the question is not whether Raimo should have presented a 'not arson' defense. Instead, we focus on whether the investigation supporting his pursuit of the defense was itself reasonable." *Dugas*, 428 F.3d at 328, *comparing Wiggins v. Smith*, 539 U.S. 510, 523 (2003) ("[O]ur principal concern…is not whether counsel should have presented a mitigation case. Rather, we focus on whether the

investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*.") (emphasis in original).

In *United States v. Santiago*, 474 F.Supp. 2d 209 (D.Mass. 2007), Judge Ponsor vacated a state court conviction the government identified in support of an enhancement per 21 U.S.C. §851, ruling "counsel's decision not to subpoena or even interview crucial, available alibi witnesses" constituted constitutionally ineffective assistance of counsel. *Santiago*, 474 F.Supp. 2d at 213. In *Santiago*, it was determined that the defendant was not in the area of a drug transaction until minutes before the arrest occurred, and the defendant thus could not have been the person observed by police conducting drug deals for an hour or so before the arrest occurred. Judge Ponsor observed that counsel in *Santiago* "abandoned [his] investigation" of crucial evidence "after having acquired only rudimentary knowledge," *Santiago*, 474 F.2d at 213, *quoting Dugas*, and held that "[b]ecause Counsel's investigation of the circumstances surrounding Defendant's arrest was neither thorough nor reasonable, "the presumption of sound trial strategy founders in this case on the rocks of ignorance." *Santiago*, 474 F.Supp.2d at 213, *quoting White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005); *citing Stewart v. Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2006) (finding "no strategic purpose in failing to investigate…a potential favorable witness"); *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) ("Failure to conduct any pretrial investigation is objectively unreasonable.").

While both the government's two briefs and the First Circuit's devastating opinion reversing my second New Trial Order give numerous and ample descriptions and examples of Greenberg Traurig's deficiencies and Ineffectiveness of Counsel and overall gross incompetence in defending me at trial and handling my overall defense, I wish to remind the Court that the Supreme Court has ruled that Constitutionally, Ineffective Assistance of Counsel can consist of

merely a "single error on the part of defense counsel" if it is sufficiently egregious. See *Murray v Carrier*, 477 U.S. 478, 496 (1986).

Therefore, before I list the litany of errors that both the government and the First Circuit pointed out in agonizing detail, and to a certain extent, this Court did as well; I wish to point out just three issues that EACH mandate this Court granting my §2255 Petition and vacating my conviction, separate and apart from all of the other errors of Greenberg Traurig to be mentioned below that cumulatively more than mandate the reversal of my conviction:

1. Failure to discover, investigate or even get a copy of the February 2008 Iantosca lawsuit by the Exchangors before my trial in June of 2008, as that lawsuit would have gutted the government's entire case, exonerated me, and provided ample *Brady*, *Giglio*, and *Bagley* information to cross-examine the Exchangors and point out their perjury at trial. A copy of the February 2008 lawsuit is attached here as an Exhibit One;

2. Failure to immediately and forcefully object to AUSA Mitchell's "THAT'S FRAUD" comment during closing.

3. Failure to agree with the government's invitation to file a Rule 33 New Trial Motion based on newly discovered evidence that has a three year limit on it after the government suggested doing so in Dkt. No. 359. Greenberg Traurig had an obligation to file a protective Rule 33 motion during the time period from 2009-2011 and they failed to do so, primarily because of their conflict of interest with their new-found client Merrill Lynch. This is classic egregious Ineffective Assistance of Counsel that shows both deficient performance by counsel and terrible prejudice to me that warrants a reversal of my conviction on that basis alone if for no other reason. The Supreme Court says that "prejudice" in such a case involving a "conflict of interest" is presumed. See e.g., *Glasser v. United States*, 315 U.S. 60, 72 (1942) and *Holloway v.*

*Arkansas*, 435 U.S. 475, 484 (1978). See also *Chapman v. California*, 386 U.S. 18, 23 (1967)

that "claims of ineffectiveness assistance of counsel" are never to be treated as harmless error.

During that same period of 2009 - 2011, the reason Greenberg Traurig did not file the

protective Rule 33 motion based on the pervasive Exchangor and Merrill perjury and effectively

abandoned me as a client, was because they took on more and more work from Merrill Lynch.

This betrayal and abandonment of a client due to a conflict of interest is also a classic example of

Ineffective Assistance of Counsel that requires a reversal of my conviction.  Additionally, the

government briefs in their appeal outline in great detail other Greenberg Traurig failings such as

their failure to object to:

  1. The instructions on half-truths versus the 50 shades of malice described in *United*

  *States v. Gray*, No. 13-1909 (1st Cir. 2015);

  2.  Evidence of Paley's marketing materials, which I had nothing to do with and there was

  no proof anyone read those materials adduced at trial;

  3.  All three grounds that this Court relied upon to grant me a new trial in the first place;

  4.  The continual references to "wealthy man", "risky" investments, cavalier attitude,

  incited the jury's hate and distrust of Wall Street during the financial downturn of 2008;

  5.  Bogus warnings of risk by the brokers;

  6.  Other prosecutorial misconduct in closing statements in addition to "THAT'S

  FRAUD" comment.

I also want to point out the prejudicial error to me in that Greenberg Traurig did not object to the

following specific items, though I demanded that they do so:

  1. No venue instruction to Jury;

  2. No objection on Venue issue despite my commitment to the issue;

21

3. No request for "duty to disclose" instruction or even more important a "knowledge" of a duty to disclose instruction;

4. Government focus on my "greed" and derogatory statements made about me in perjurious hearsay statements which are obviously very prejudicial to me.

5. They should have asked for a Bill of Particulars to identify the allegedly false misrepresentation that I made.

6. They should have done a motion to dismiss due to a violation of the STA based on the December 2011 decision in *Huete-Sandoval*.

There are clearly other things that in hindsight that Greenberg Traurig should have done, such as allowing me to testify as I begged my attorneys to do, but because everyone was anxious to have the trial over they were confident that the jury would acquit me because the government had not made its case. Obviously both of those judgments were incorrect and prejudicial to me.

While it is clear from the First Circuit's November 2013 opinion and several opinions of this Court that I satisfied both prongs of *Strickland* because Greenberg Traurig's conduct was both ineffective and prejudicial to me as the proceedings would have certainly turned out differently had they merely objected to the egregious prosecutorial misconduct in my case, and Greenberg Traurig also betrayed and abandoned me in favor of its new-found client Merrill Lynch; I now need to satisfy only the first prong of *Strickland* because prejudice is presumed in the case of a conflict of interest. See, e.g., *Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980), *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978), and *Glasser v. United States*, 315 U.S. 60, 72 (1942). Clearly, Greenberg Traurig's slipshod performance and lack of objections was unprofessional and hurt me dramatically so that the proceedings certainly would have turned out better for me but for their blatant malpractice. Since they had a serious conflict of interest in

defending both Merrill Lynch and me at the same time, unbeknownst to me, I now only need to show deficient performance on behalf of Greenberg Traurig, and both the First Circuit opinions and this Court's opinions are substantial proof and ample evidence of Greenberg Traurig's ineffective assistance of counsel.

For all of the above reasons, it is clear that I was a victim of Ineffective Assistance of Counsel and was severely prejudiced by it, so that my §2255 Petition should be granted and my conviction must be vacated.

## IV.    MY CONVICTION SHOULD BE VACATED DUE TO GRAND JURY MISCONDUCT

Even a cursory glance at the Grand Jury minutes for my original indictment exposes that the perjury on the part of the Merrill Lynch employees, Martin Paley, and even the Exchangors themselves, infected the Grand Jury proceedings in this case thereby depriving me of my Due Process rights under the Constitution, and the protection from indictment that the Grand Jury process is meant to provide. My Grand Jury was neither fair nor unbiased. There was only one witness, and that was Special Agent John D. Caldwell of the FBI, who not only repeated outright lies and misrepresentations as if they were the gospel truth, he spoke as an expert and as an authority on investment and business matters that he was clearly not an expert on. AUSA Pineault did a marvelous job of steering questioning Grand Jurors away from the truth and kept everyone entertained as over a dozen pages have the word "laughter" after comments made by AUSA Pineault or Agent Caldwell. While hearsay may be permissible in a Grand Jury setting, passing off lies and perjury and misstatements of secondhand comments as authoritative first hand comments is not. For the abuses and prosecutorial misconduct in the Grand Jury proceedings in this case, my conviction should be vacated and the unlawful Indictment against me dismissed with prejudice.

Throughout Agent Caldwell's testimony on January 14, 2004 and again in reviewing the original indictment on February 4, 2004, there are numerous spots where Agent Caldwell is asked what Merrill thought or the Exchangors' thought or what did Paley know at the time. His answers in this regard were absolutely false and prejudicial to me, because even the government, and especially AUSA Pineault, knew of both Merrill's and Paley's involvement in BPETCO in January and February of 2004. They also knew that Agent Caldwell's answers were categorically false, but they did nothing to correct the hearsay spewing forth from and knowing

falsehoods told by Agent Caldwell to the Grand Jury. In addition, the Exchangors are never called Exchangors or Investors; they are only referred to as "victims" who lost large sums of money because I invested in "naked" stock options, all of which was categorically untrue.

No one presented the facts that BPETCO successfully completed 119 out of 126 property exchanges or that I handled over $100 million and did not "misappropriate" even a single dollar for myself, despite what the indictment says. Instead, AUSA Pineault and Agent Caldwell paint a picture that money was sent into one account (the Money-In and Money-Out Account), and then I illegally moved the money to the Investment Account where I lost all of the money. Agent Caldwell states that I did not have the right to do that despite ALL of the Exchange Agreements saying that BPETCO could invest the money any way it saw fit, including investing in stocks, securities, and yes, even stock options. Agent Caldwell also goes on to say that both BPETCO and I had a "fiduciary" duty to protect the Exchangors' money, which is not only completely untrue, but is a gross misstatement of the laws under IRC Section 1031 which, as the Court knows, absolutely prohibits a fiduciary relationship between the Exchangor and a Qualified Intermediary. Worst of all, AUSA Pineault deceptively hid the litigation between Merrill Lynch, the Exchangors, and me, that had already resulted in judgements against Merrill Lynch at that time.

There are over two dozen major examples of prosecutorial misconduct in my Grand Jury minutes, each one capable of leading this Court to believe I was unfairly prejudiced and requiring this Court to reverse my conviction and dismiss the Indictment. For the sake of brevity, however, I will focus on the misstatements made by Agent Caldwell that the Court knows now are clearly untrue and demonstrably false, because they are repeating the lies of Gary Stern, Tom Rasmussen, and of course, Gerry Levine's tried and "false" favorites: Riverboat

Gambler, irrational Exuberance, what is a million dollars amongst friends, and that they always thought it was my personal money and not third-party funds. For example, one astute Juror asks Agent Caldwell if all of this talk is not just self-serving to Merrill Lynch and that Merrill is just trying to pass off their responsibility for the funds onto me, so he asked in January of 2004 if there is any litigation between Merrill and me. See Jan. 14 2004 Transcript at p. 52:

Juror: Is there a legal battle going on between these two?

AUSA Pineault: Are you aware of any lawsuit between Carpenter as a plaintiff and Merrill as a defendant?

Agent Caldwell: I am not.

Again, this is in January 2004, and AUSA Pineault knows for a fact that litigation involving BPETCO, Merrill Lynch, and me started in January of 2001 and is still going on to this very day in 2015. But, in January of 2004, Martin Paley and David Patterson gave affidavits talking about their involvement with Merrill Lynch, which had been sued by BPETCO and the Exchangors in 2001 and was found liable in December 2002. AUSA Pineault should have also known about the litigation because of the files, 54 boxes, and all the Court filings that were given to him by my counsel in Three Volumes of binders in October and November of 2003. Similarly, on page 55 Agent Caldwell refers to me as a "loose cannon" and on page 54, when asked about Merrill's fiduciary responsibility, he answered: "All investment companies have a fiduciary responsibility", obviously inferring that I and BPETCO had a fiduciary duty as well.

Agent Caldwell treats BPETCO and me as if it were a Ponzi scheme and focuses on the money being lost, and that the Exchagnors never got their money back. See, e.g., p.32. Also see p. 33, where when asked what Merrill Lynch had to say, Agent Caldwell responds: "They said that they did not know that these were third-party funds and they thought that they were Carpenter's funds." Agent Caldwell refers to Gerry Levine as a "supervisor" at Merrill Lynch

(p.42). On p.44, Agent Caldwell says Mr. Levine has given sworn testimony about the following derogatory things regarding me:

"Mr. Carpenter's trading was risky." (p.44)

"What's a million or so among friends?" (p.44)

"Mr. Carpenter displayed irrational exuberance." (p.48)

"Mr. Carpenter had the mentality of a Riverboat Gambler." (p.49)

As if Agent Caldwell repeating the lies of Paley, Levine, Stern, Rasmussen, and Mitch Rock like they were the gospel truth, and vouching for their hearsay as if it was a first-hand account rather than a secondhand hearsay account at best was not bad enough, AUSA Pineault got into the act and began testifying to the Grand Jury on page 55. AUSA Pineault stereotypes the Exchangors not as sophisticated businessmen, but rather as "granny's money" that must be kept safe as opposed to me, who portrayed myself as a "big boy" that could handle the risks and losses of trading with my own money. This is classic prosecutorial misconduct.

Then, both AUSA Pineault and Agent Caldwell describe the nature of an escrow account on page 61 and they both make it clear that I had no right to move the money from the "Money In-Money Out" account to the Investment Account, which is not just untrue in terms of the BPETCO Exchange Agreements but the nature of the Property Exchange industry as a whole. Instead, AUSA Pineault and Agent Caldwell make it appear to the Grand Jurors that the crime was moving the money from the Escrow Account to the Investment Account. And, when the Grand Jurors ask if Merrill or PaineWebber knew if this was third party funds, Agent Caldwell gives yet another absolutely false answer: "I don't know anything to the contrary, but the people at PaineWebber and Merrill Lynch both say that they thought the funds were in fact funds that belonged to Daniel Carpenter and his businesses." p.63.

27

This, of course, is untrue and is belied by the fact that Agent Caldwell says on page 79 in response to a Juror asking if the reason for Merrill shutting me down was because of the losses or because they found out it was "escrow" money, that "they told me they shut me down in their testimony because I was taking undue risk with MY OWN MONEY, and they didn't want me as a client anymore because my investment strategies were wild and speculative." p.79. As the Court is well aware, everyone now knows that Martin Malia of Merrill Lynch gave the order to shut down the BPETCO account when they allegedly realized that they could be sued by the Exchangors because of the losses sustained in the BPETCO account, and that Gary Stern handed me off to his best friend Mitch Rock, and the rest is history. Merrill Lynch was only worried about being sued and had no concern for my welfare or me losing my own money.

Agent Caldwell states that he does not know if Martin Paley knew what was going on, despite this being January – February 2004 and not January 2001. Agent Caldwell and AUSA Pineault either knew about the SEC investigations of Merrill and accepted their lies, or they ignored the investigations. They could not possibly ignore the civil litigation, so Agent Caldwell and AUSA Pineault deceived and misled the Grand Jurors about that. Moreover, when one astute Grand Juror asks about the Cahaly transaction with Marty Paley, which is out and out tax fraud because Cahaly had already received the funds from the sale, the Grand Juror asks: "Mr. Carpenter thought that couldn't be done." AUSA Pineault then steers the Grand Jury away from the truth of the Cahaly-Paley fraud by saying: "I am not sure what the question is there." Once again, this caused laughter from the Grand Jury. See page 96.

Finally, Agent Caldwell said that he interviewed all of the "victims" several times and they all lost their money and did not get it back, nor did they give me permission to transfer their money from the safe escrow account into the risky option trading account. See p.109.

Obviously, with that negative spin on things supported by the lies all sworn to by Paley, Stern, Levine, Rasmussen, and Rock, as well as the greedy Exchangors, it is amazing that I was not crucified or burned at the stake. My conviction should be reversed and my Indictment dismissed for this flagrant prosecutorial misconduct and abuse involving the Grand Jury.

## V.   THE RULE OF LENITY MANDATES VACATING MY CONVICTION

The Rule of Lenity dictates that criminal liability not be imposed for otherwise legal acts done in the ordinary course of business. As the First Circuit stated after my second trial, "[t]he federal mail fraud statute . . . is built upon a single, archaic 204-word sentence which . . . has undergone repeated periods of rapid expansion and contraction." *United States v. Urciuoli*, 513 F.3d 290, 293 (1st Cir. 2008). During the period referenced in the Indictment, October 1998 through January 2001, there was no federal or state statute, no federal or state regulation, no federal or state revenue ruling or advisory opinion, and no federal or state judicial decision, which prevented a qualified intermediary from investing §1031 funds in stock options. No one told me ever that I was doing something wrong; certainly no one at Merrill or PaineWebber, but then Levine said he never would have opened accounts if he knew it was "other people's money," which we now know to be indisputably false and perjurious in all respects.

Moreover, the privately-negotiated arm's-length agreements between BPETCO and the Exchangors, where the Exchangors were all represented by professional advisors, did not prohibit investments in stock options, or any other investments, "risky" or "safe." There is no possible way that I could have known in 1998-2000 (or at any time for that matter) that the government eight years after-the-fact would seek to brand me a criminal for doing something that neither a statute, nor any construction thereof, nor any case, had ever before held was unlawful or improper in any way. See *United States v. Emmons*, 410 U.S. 396, 411 (1973) ("this being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity."); *United States v. Santos*, 128 S. Ct. 2020, 2025 (2008) ("The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.").

Because the government did not provide me with fair warning in 1998-2000 that

investing §1031 funds in stock options was somehow fraudulent or criminal, when such

investments were clearly allowed by the terms of privately-negotiated arm's-length contracts

between sophisticated private parties, the government cannot now seek to brand me a criminal in

2014 and 2015 without violating the Due Process Clause.  Consequently, my 2255 petition

should be granted in all respects and my conviction vacated.

Applying the mail and wire fraud statutes to the facts of this case violates the Rule of

Lenity as well as the Due Process Clause of the Fifth Amendment because the government at no

time provided fair warning to me or anyone else that investing §1031 funds in stock options or

equities, as expressly allowed by arm's-length contracts negotiated with Exchangors who had

professional advisors, could somehow be considered fraudulent or illegal.

In *McBoyle v. United States*, 283 U.S. 25 (1931), Justice Oliver Wendell Holmes

emphasized the fair notice rationale inherent in the Due Process Clause.  Such notice must be

provided even if defendants did not actually read the United States Code or the Federal Register

(which would not have helped in this case in any event because no regulations govern how a

qualified intermediary may invest the funds):

> Although it is not likely that a criminal will carefully consider the text of the law before
> he murders or steals, it is reasonable that a fair warning should be given to the world in
> language that the common world will understand, of what the law intends to do if a
> certain line is passed. **To make the warning fair, so far as possible the line should be
> clear.**

*McBoyle* at 27 (emphasis added).  The Supreme Court reiterated this point fifty years later.  See

*United States v. Bass*, 404 U.S. 336, 348 (1971).  The need for fair warning is especially acute in

the context of criminal statutes like mail and wire fraud that mandate the imposition of severe

penal sanctions for the ordinary use of the mails and wires in the ordinary course of otherwise

legal and non-fraudulent business activities. In my case, there was no "bright-line" warning of any kind.

"The criminal law should not be a series of traps for the unwary." *United States v. Hussein*, 351 F.3d 9, 13 (1st Cir. 2003). To that end, the Due Process Clause demands that criminal statutes describe each particular offense with sufficient definiteness to "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *United States v. Harriss*, 347 U.S. 612, 617 (1954). "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Id.*; *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005):

> "We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress . . . and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *citing McBoyle*.

The First Circuit in *United States v. Yefsky*, 994 F.2d 885 (1st Cir. 1993) went on to say that "finding count of indictment charging defendant with conspiracy to commit engineering fraud by mails did not provide adequate notice and was therefore defective because it did not specify false pretenses used." "There are three related manifestations of the fair warning requirement." *United States v. Lanier*, 520 U.S. 259, 266 (1997). The two that are applicable here are the rule of lenity and the unforeseeably expansive interpretation doctrine:

> [T]he canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct covered . . due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. *Id.*

"Under the rule of lenity, grievous ambiguity in a penal statute is resolved in the defendant's favor." *United States v. Councilman*, 418 F.3d 67, 83 (1st Cir. 2005). The unforeseeably expansive interpretation doctrine "principally bars unforeseeable and retroactive

judicial expansion of narrow and precise statutory language." *Councilman*, 418 F.3d at 84 (quotations and citations omitted). "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 267. Here, the government has provided no fair warning that investing §1031 funds in stock options constitutes a crime. The Rule of Lenity and the vagueness doctrine are "devices worked out by the courts to keep the principle of legality in good repair"; *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926) (stating that enforcement of overly vague criminal statutes "violates the first essential of due process of law"). Lenity's underlying principles necessarily inform the interpretation of penal statutes, and they promote consistency and fairness in the application of the criminal law.

Developed in the common law courts in the seventeenth and eighteenth centuries to limit the harshness of English criminal law, the Rule of Lenity was adopted by the Supreme Court in 1820 in Chief Justice Marshall's oft-cited decision in *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (acknowledging that the rule of lenity reflects "the tenderness of the law for the rights of individuals"). The Rule was endorsed a century later by Justice Holmes in *McBoyle*, and the Supreme Court has consistently acknowledged its validity ever since. See, e.g., *United States v. Granderson*, 511 U.S. 39, 54 (1994); *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 (1992); *Taylor v. United States*, 495 U.S. 575, 596 (1990); *McNally v. United States*, 483 U.S. 350, 359-60 (1987), as recognized in *Cleveland v. United States*, 531 U.S. 12 (2000); *Dowling v. United States*, 473 U.S. 207, 213-14 (1985); *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 284-85 (1978); *Rewis v. United States*, 401 U.S. 808, 812 (1971); *Ladner v. United States*, 358 U.S. 169, 177-78 (1958); *Bell v. United States*, 349 U.S. 81, 83 (1955); *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952).

The Rule of Lenity is founded on "two policies that have long been part of our tradition": (i) provision of notice to the public, and (ii) separation of powers between the legislature and judiciary. *Bass*, 404 U.S. at 348. As the Supreme Court explained:

> [The rule of lenity] reflects not merely a convenient maxim of statutory construction. Rather, it is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited. *Dunn v. United States*, 442 U.S. 100, 112 (1979).

The Rule of Lenity also serves as a key mechanism in preserving the separation of powers between Congress and the Judiciary. The Supreme Court elaborated upon this principle in *Bass*. "[A]s we have recently reaffirmed, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Bass*, 404 U.S. at 347 (citing *Rewis*, 401 U.S. at 812); *Ladner v. United States*, 358 U.S. 169, 177 (1958); *Bell v. United States*, 349 U.S. 81 (1955)). The Supreme Court went on to state:

> [B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies "the instinctive distastes against men languishing in prison unless the lawmaker has clearly said they should." *Bass*, 404 U.S. at 348. Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant. More importantly, before the government can deprive a citizen of his liberty for conducting himself in the ordinary course of business and doing normally noncriminal acts in the ordinary course of business, it must be clear that Congress defined those specific acts to be criminal.

Modern cases recognize that the rule of strict construction—now known as the Rule of Lenity—has three fundamental purposes: "to promote fair notice to those subject to the criminal laws, to minimize the risk of selective or arbitrary enforcement, and to maintain the proper balance between Congress, prosecutors, and courts." *United States v. Kozminski*, 487 U.S. 931, 952 (1988). Each of these purposes is essential to the proper functioning of the criminal justice system. The first purpose is to ensure fair notice. Warning must be given "to the world in language that the common world will understand." *Bass*, 404 U.S. at 348 (quoting *McBoyle*, 283

34

U.S. at 27). And although it is typically fictitious to assume that wrongdoers read statutes, fair notice is nevertheless "required in any system of law." *R.L.C.*, 503 U.S. at 309 (Scalia, J., concurring). Indeed, fair notice is closely tied to the principle of legality itself.

Two ramifications stem from the need for fair notice. First, a premium is put on the commonsense meaning of a statute. See, e.g., *McBoyle*, 283 U.S. at 27. It is inherently unfair to impose on "the common world" a statutory interpretation that is overly obscure or clever. Second, a premium is put on the text itself. Judges should not rely on extratextual considerations to construe an unclear criminal statute against a defendant. "Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text." *Crandon v. United States*, 494 U.S. 152, 160 (1990). The rule of lenity "preclude[s] our resolution of [an] ambiguity against petitioner on the basis of general declarations of policy in the statute and legislative history." *Hughey v. United States*, 495 U.S. 411, 422 (1990).

Lenity's second purpose is to preserve the separation of powers. See *Bass*, 404 U.S. at 348. "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *Id.* "This policy embodies the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id.* (citation omitted). "It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think, perhaps along with some Members of Congress, is the preferred result . . . This admonition takes on a particular importance when the Court construes criminal laws." *United States v. Granderson*, 511 U.S. 39, 68-69 (1994) (Kennedy, J., concurring) (citations omitted).

Lenity prevents the imposition of punishments that are not clearly authorized by Congress, the only branch of government competent to establish criminal penalties.

Lenity's third purpose is to avoid arbitrariness and inconsistency in the enforcement of criminal statutes. See *Kozminski*, 487 U.S. at 952. The rule of lenity responds to this need by "fostering uniformity in the interpretation of criminal statutes." *Bryan v. United States*, 524 U.S. 184, 205 (1998) (Scalia, J., dissenting). It fosters uniformity because, in each case of criminal statutory interpretation, it requires courts to examine the text for ambiguity and to resolve any such ambiguity in the same direction. Faithfully applied, the rule of lenity prevents the government from punishing individuals based on an innovative or ambiguous reading of the criminal code as was clearly done here in my case, where even at this late date there has been no proof of any misrepresentations, false statements, and certainly no material misrepresentations in the signed agreements. Because I had no fair warning that anything that I did was illegal, and no one at Merrill or PaineWebber told me anything that I was doing was illegal, Your Honor should grant my 2255 Petition and  vacate my conviction because there never was any "bright line" that I crossed knowingly violating the law.

## VI.    THERE WAS NO INTENDED OR ACTUAL LOSS IN THIS CASE

I also respectfully implore the Court to grant the 2255 petition based on both Supreme Court and other appellate court precedents where the amount of loss caused by the stock market crash took me from a Guideline Level Sentence of 6-10 and probation, up to Level of 24 (14 just for the amount of loss), and the Court's imposed sentence of 36 months. This is unfair for at least two reasons.

First, the Court knows full well that before the start of my second trial, the Exchangors had been paid back over $12.5 million by me and BPETCO. Therefore, as an undisputed matter of law and fact, the Exchangors had no loss due to fraud as of May 2008. The government petitioned the Court to keep the knowledge of the payback from the jury, and even as early as Docket 29, the government claimed whether my trading strategy resulted in gains or losses was "irrelevant." Now the reason I must be incarcerated is simply because of the bad luck of the historic Market crash of April-December 2000. Now that it has taken the NASDAQ 15 years to get back to the 5000 level of the year 2000, that gives testimony to the fact that the NASDAQ crash of December 2000 is still the worst in U.S. history. Therefore, the market losses should not cause me to stay in prison when, had the market been better, I would have had probation or no losses at all. See Trial Exhibit 284 showing $14 million gain in January 2001 had not PaineWebber swept the accounts.

Second, in several cases from around the country, various appellate courts have recognized the unfairness of using the amount of loss to determine jail time based on the Supreme Court's decision in *Dura Pharmecuticals v. Broudo*, 544 U.S. 336 (2005). Particularly on point is *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007), where Rutkoske's conviction was upheld for securities fraud, but his sentence was vacated because most of his "loss" was

caused by the cataclysmic decline of the stock market, just as was true with me. Moreover, where Mr. Rutkoske did not have more than three appellate arguments, I have more than a dozen meritorious arguments to overturn and vacate my conviction, much less reduce my sentence.

In fact, in *United States v. Pike*, 473 F.3d 1053, 1057-58 (9th Cir. 2007), the Ninth Circuit found it to be plain error to apply heightened standard to a 5-level adjustment for loss without first considering the "totality of circumstances." *See, also, Rutkoske*, 506 F.3d at 180 ("a fraud disclosed just as the dot-com bubble burst might cause most, but not necessarily all, of the decline in previously high-flying technology stocks"); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (where "loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established").

The fact that the seven exchangors lost over $8 million clearly overstates my culpability in this case. The Guidelines, even pre-*Booker*, require a downward departure when conduct that is the basis of the conviction fails to match the heartland model for the fraud guideline. "The notion in the fraud guideline that the loss table may under- or overstate the seriousness of the offense is little more than another way of saying that departure from the loss table may be warranted for good cause." *United States v. Brennick*, 134 F.3d 10, 15 (1st Cir.1998) (court remands for findings but adopts general principle that a defendant who never intended to permanently steal the government's money can be sentenced differently than someone who did in a tax fraud case). See also *United States v. Monaco*, 23 F.3d 793 (3d Cir. 1994) (explaining that loss overstates seriousness where defendant had no intent to steal).

Moreover, in this case, it cannot seriously be argued that the loss was caused by extraneous forces. My investments in stock options generated sufficient funds to repay 119 of

126 exchangors their entire principal and either 3% or 6% interest. After more than one year of operation, BPETCO's investments generated a net profit of over $600,000, which remained in the corporate accounts, as opposed to merely being taken by me as profit. Clearly, the losses of 2000 resulted from a combination of economic and political forces far beyond my control and, in fact, beyond the predictions or foreseeability of most of the financial world's most prominent and respected experts and advisors. See *United States v. Gregorio*, 956 F.2d 341 (1st Cir. 1992) (holding that downward departure is appropriate where degree of loss was caused by downturn in economy).

It is worth noting that there is no statute, regulation, case law or contractual provision that precluded BPETCO from investing exchangor funds in stock options. Clearly, I had good reason to believe that my conduct was not only legal, but in full compliance with BPETCO's agreements, as Mr. Paley, the avowed §1031 expert, never suggested to me that investing the funds in stock options was illegal or improper; indeed, Paley endorsed the business concept even though it is now clear that Paley knew from the beginning about the investment in stock options and the possibility of losses. Recently, in response to a favorable settlement of investor lawsuits against Merrill Lynch, a Merrill Lynch executive was quoted in the Wall Street Journal as saying that investor losses in 2000 were caused by the worst bear market in two generations; not poor research. The fallout from the stock market calamity of 2000 is still reverberating, and has only now reached its high of 5000 again. See *United States v. Maldonado-Montalvo*, 356 F.3d 65, 69 (1st Cir. 2003) (Guidelines "permit a downward departure where the total loss calculation overstates the seriousness of the offense", and "such a loss overstatement may occur where, inter alia, any portion of the total loss sustained by the victim is a consequence of factors extraneous to the defendant s criminal conduct ") (emphasis added); *United States v. Rostoff*, 53 F.3d 398,

39

405 (1st Cir. 1995) (Judge Zobel departed in part because "economic forces not under the control of, or precipitated by, the defendants, especially the sudden, unforeseen collapse of the New England real estate market   a collapse that decimated the demand for residential condominiums increased the magnitude of the losses."). Only seven Exchangors out of 126 failed to successfully complete their §1031 exchanges due to the largest NASDAQ market decline in history. Consequently, the harm caused to the Exchangors was the product of the market as much as if not more than any acts by myself. See *United States v. White Buffalo*, 10 F.3d 575 (8th Cir. 1993) (discussing §5K2.11 and the "lesser harm" doctrine, resulting in a sentence of three years' probation, rather than guidelines sentence of 18-24 months).

My PSR mentions the famous *United States v. Olis*, 429 F.3d 540, 547 (5th Cir. 2005). See also the analysis of the district court considering the sentencing of Brocade Communications' CEO Gregory Reyes in *United States v. Reyes, et al.*, CR 06-556-CRB (N.D. Cal.)(CR 737, Order Re: Sentencing dated November 27, 2007 ("Reyes Order")). Moreover, a recent case from the Sixth Circuit focuses on the Sentencing Guidelines under U.S.S.G. §2B1.1 that the sentences for economic offenses should be based on the "actual" or "intended" loss; whichever is greater. *See United States v. Snelling*, No. 12-4288 (6th Cir. 2014). Since even the Court stated at sentencing that I always intended to pay back the money and, in fact, did pay it back or contractually settled with **all** of the Exchangors, the intended loss must be zero. And, since it is indisputable that I paid back the Exchangors an amount equal to their principal lost, plus interest and attorney's fees, the "actual" loss in this case was zero as well. Therefore, it was clearly erroneous for the Court to base my sentence on the $8.6 million loss that took me up 16 levels from a sentence of probation to a sentence of 36 months.

In this case, the losses were caused by reasons other than my actions i.e., the stock market collapse of 2000. Clearly, I pursued investment strategies geared towards making money, not losing money. Moreover, as articulated in my motion for new trial based on newly discovered evidence, $2.9 million of the loss suffered in this case was attributable to trading decisions by PaineWebber after they terminated my trading privileges, as they closed out my positions. Certainly, comparing the $8 million market loss with an investor doing everything in his power to make money is not equitable to the paradigm of a $8 million loss where a malevolent defrauder simply converts investor funds to his own pocket or his own personal benefit, yet the Guidelines make no distinction between the two.

Moreover, in Snelling's case, he took in $8.9 million from investors, but paid $3.6 million back to other investors in his "hedge fund" or "Ponzi scheme," depending on your point of view. The court in *Snelling* stated that the paying back to other investors must necessarily reduce his Guideline sentence from 121 to 151 months down to 97 months. Therefore, since the calculation of loss under the Sentencing Guidelines must take into account the amount of money that was actually paid back to **other** investors, it is indisputable that I paid back to other investors, including the Exchangors, well over $14 million in the year 2000 alone, thereby reducing my loss under the U.S.S.G. §2B1.1 to zero. Please see the calculations done for the Forfeitures aspect of this case showing that I paid back the Exchangors many times more than what was lost under the analysis in *Snelling*. That being the case, at the very least, my sentence should be commuted to time served and my probation time eradicated, if my conviction is not vacated entirely.

The government suggests in its opposition to my Motion for Reconsideration of this Court's forfeiture order that somehow the numbers submitted in Defense Exhibits #258 and #259

are not legitimate representations of the amounts paid back to the Exchangors as amounts that would reduce the amount that I could possibly owe in forfeitures simply because they were not submitted as trial exhibits. In fact, as can be seen from the attached Exhibits to this brief, Defense Exhibits #258 and #259 match up with Government Exhibit 189 from the 2008 Trial and Government Exhibit 169 (and others) from the 2005 Trial.

Significantly, all of these numbers and spreadsheets can be traced back to documents provided to the government on multiple occasions, including documents with Government Bates Stamp numbers on them provided to AUSA Pineault in a letter from Attorney Jeffrey Denner, who represented Martin Paley and who hired a private detective, Dick Anagnost, to independently verify the amounts paid back to the Exchangors, which I totaled to be over $45 million. See Exhibit Two. Attached to the Government's Denner-Pineault memo are emails between Jackie Spielman and Linda Jokinen (now deceased), who did the client amount spreadsheets for BPETCO. These emails match exactly the same emails contained in Government Exhibit 189 from the 2008 Trial and Government Exhibit 169 from the 2005 Trial. These spreadsheets were done by Ms. Jokinen and Ms. Spielman in the ordinary course of business. I did not prepare any of these original source spreadsheets. Most importantly, the list of original source payments to the Exchangors from Merrill Lynch and then PaineWebber in the latter half of 2000 and early 2001 totals more than $19 million, thus no restitution and forfeitures are appropriate in this case, and my sentence should be commuted to time served if not vacated altogether.

Once again, I would respectfully suggest that the analysis in *United States v. Hollnagel*, No. 1:10-cr-00195 (N.D. Ill. Sept. 24, 2013), is analogous to this case because it was determined that all of the repayments made to the investors (here, the Exchangors) legitimately reduced the

42

amount in forfeitures owed by the defendant. Just as there were no "profits" or forfeitures in *Hollnagel*, so, too, there should be no forfeitures assessed in this case because there were no profits and money was expended to pay back the Exchangors. Moreover, I would respectfully remind the Court that the BPETCO investigation began in January of 2001 when the government subpoenaed all of the records of BPETCO from Mr. Paley in Boston, me in Simsbury, and, of course, PaineWebber who complied with the government subpoenas, as well as Merrill Lynch who did not cooperate with the government subpoenas as was recently established by the Massachusetts Appellate Court in *Cahaly v. Benistar Property Exchange Trust Co.,* 2014 WL 2523192 (Mass. App. June 6, 2014). But, suffice it to say, AUSA Pineault and the government were given numerous copies of all of the wires and checks sent to the Exchangors because I wanted to prove that I was open and up front with Merrill, so that each of the Merrill wire transfer forms has the word "CLIENT" listed prominently at the top of each page. See Exhibit Three. Just the Merrill payments from July 31, 2000 to October 20, 2000 when the accounts were moved to PaineWebber, total over $6 million. See Exhibit Four. When this is added to the checks and wires from PaineWebber, the total amount paid back to the Exchangors is over $19 million.

Finally, I would like to respectfully submit to the Court that forfeitures are not appropriate for this case because the forfeitures section was struck from the Indictment after the first trial in 2005. Please see Dkt. No. 155. Moreover, the law that created forfeitures in "White-Collar" cases was not passed until September of 2000, and the "marketing material" that was allegedly deemed "fraudulent" in this case was not created by me but rather created by Marty Paley in 1996 even before I met the man or became involved in the property exchange business. The procedure for forfeitures is very clear, the Court is to retain the same jury that decides guilt

or innocence, and that was not done in this case. Furthermore, there was no discussion of forfeitures after either trial in 2005 or 2008, nor can the government make the "forfeitures section" magically reappear in 2014 after it was struck from the Indictment nine years earlier in 2005. In a similar vein, the government said at the beginning of this case in Dkt. No. 29 that this case was not about the losses sustained. It now appears that is exactly what the case is all about. For that reason, that the case is all about "losses" rather than "profits" as the cases like *Hollnagel* focus upon when considering forfeitures, I would respectfully suggest that this case does not meet the standard for forfeitures as described in the First Circuit's decision in *United States v. Heldeman*, 402 F.3d 200, 223 (1st Cir. 2005):

> (1) Whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant.

Just using the *Heldeman* three-part test, it is clear that this is an onerous "fine" 140 times what the real fine was and totally disproportionate to my culpability. The Exchangors have already been paid back many times over their losses, and I can show BPETCO paying out $45 million in costs and expenses, and, of course, there are no illicit "profits" or proceeds in this case. A forfeiture of over $14 million rather than a fine of $100,000, as well as $300,000 in restitution is grossly disproportionate to the gravity of the offense under *Heldeman* and *United States v. Bajakajian*, 524 U.S. 321 (1998). The holding in *Bajakajian* has been codified and extended to all civil forfeiture cases by 18 U.S.C. §983(g). For all of the above reasons, my conviction should be vacated or at the very least my sentence commuted to time served and all fines, restitution, forfeitures, and supervised release eliminated.

## VII.   CRIMINAL LIABILITY FOR OMISSIONS AND HALF-TRUTHS CANNOT EXIST ABSENT A DUTY TO DISCLOSE

"Absent a duty to disclose, silence is not fraudulent or 'misleading'...." *United States v. Schiff*, 602 F.3d 152, 162 (3d Cir. 2010), *citing Basic, Inc. v. Levinson*, 485 U.S. 224, 239 (1988). "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235 (1980). "The proposition that silence, absent a duty to disclose, cannot be actionably misleading, is a fixture in federal securities law." *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1202 (1st Cir. 1996). "A failure to disclose material information is actionable only when the defendant had an affirmative duty to disclose these facts." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 178 (2d Cir. 2001). "An act cannot be deceptive...where the actor has no duty to disclose." *Regents of Univ., Cal. v. Credit Suisse First Boston*, 482 F.3d 372, 386 (5th Cir. 2007). "For omissions to constitute securities fraud, a defendant must have had a duty to disclose material facts." *Muller-Paisner v. TheAA*, 446 F. Supp. 2d 221, 228 (S.D.N.Y. 2006).

The indictment charges that the Exchangors "were induced to wire funds to BPE based on material, false written and oral assurances that the money would be protected and held safe." Indictment ¶ 27.  At trial, however, there was no evidence of oral or written affirmative misrepresentations as alleged in the indictment, but instead evidence only that I failed to inform the Exchangors (either orally or in writing) how I was investing the funds.  Even assuming that the evidence at trial, viewed in the light most favorable to the verdict, established (as in the first trial) that there was an "omission" to clarify the half-truths regarding the types of investments that BPE would utilize, see *Carpenter*, 405 F. Supp. 2d at 92, the indictment does not allege and the government did not adduce any evidence at trial that I had a legal duty to disclose how I was investing the funds.  "A defendant's failure to disclose information, without more, cannot make

out a violation of the mail and wire fraud statutes." *Sanchez v. Triple-S Management, Corp.*, 492 F.3d 1, 10 (1st Cir. 2007). By relying entirely on an "omissions" or "nondisclosure" theory of liability, but failing to allege and prove a duty to disclose, the government failed to meet its burden of proof as to an essential element of the crimes charged as a matter of law. More recently the Third Circuit in *United States v. Schiff*, 602 F.3d 152 (3d Cir. 2010) discussed the duty to correct in a criminal securities fraud action, citing its earlier decision in *Burlington*. The court stated that "[t]he duty to correct arises when 'a company makes a historical statement that, at the time made, the company believes to be true, but as revealed by subsequently discovered information actually was not.'" *Id.* at 170 (emphasis in original) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1431 (3d Cir. 1997) (noting that the duty "can also apply to a certain narrow set of forward-looking statements"). It emphasized that "[t]he key for this duty to exist is a triggering factual event after the statement is made." *Id.* Because the government could not identify such a triggering event, the court rejected the argument that defendants had any duty to update. The court also noted that "[s]cholars have commented that if a duty to correct or update is triggered, it should be corrected in a timely fashion and preferably by using the same medium through which the initial error was disseminated, which in this case would have been a follow-up analyst call." *Id.* at 171.

The issue of liability for omissions and half-truths appears most often in the context of securities fraud, where defendants are charged with nondisclosure of material facts and such nondisclosure is deemed to constitute half-truths or otherwise be misleading, fraudulent or deceptive. This is essentially the government's theory in this case, that through my nondisclosure of the fact that I was investing the Exchangors' funds in stock options, I engaged in misleading, deceptive and fraudulent behavior constituting a scheme to defraud. The

government made it very clear throughout the trial and in its closing and rebuttal arguments that

it sought to convict me under a nondisclosure or omissions theory of fraud.  AUSA Mitchell's

questioning of Paley sums up the government's entire theory of the case:

Q:  Did any of the materials that you gave to the prospective exchangors say anything about stock options?

A:  No.

Q:  Did you tell any of the exchangors what your boss was doing with the money, sir?

A:  No.

Q:  Did you tell Gail Cahaly or Ron Cahaly about stock options?

A:  No.

Q:  Did you tell Joe Iantosca about stock options?

A:  No.

Q:  How about Eliot Snider?

A:  No.

Q:  How about Byron Darling?

A:  No.

Q:  What about Brian Fitzgerald, did you tell him?

A:  No.

Q:  Did anything in those documents say anything about stock options?

A:  No, they did not.

Q:  So did these people have any idea that their money would be put in stock options? [objection sustained.]

Q:  Mr. Paley, isn't that fraud? [objection sustained]

Q:  Mr. Paley, was it wrong not to tell Gail Cahaly that your boss was trading in stock options? [objection sustained] Tr.11:64-65, 116 (AUSA Mitchell).

The government hammered away on its overarching theme of nondisclosure, omissions,

and concealment in its closing and rebuttal arguments as well:

AUSA Pirozzolo: You just heard the Court tell you that false and fraudulent pretenses encompasses not only direct statements that are false in their entirety but also statements of half-truths that are misleading because of what they omit . . . Under these circumstances, in this context the term "invest" in the various documents was misleading because it omitted the highly material information as to how that money was going to be invested.

Tr.13:54-55 (emphasis added).

\*        \*        \*

AUSA Pirozzolo: Under these circumstances, Mr. Carpenter was not acting at all in good faith by taking in the money from Mr. Snider, Mr. Fitzgerald, Mr. Iantosca, Mr. Darling, Mrs. Cahaly, Mr. Bellemore or Mr. Johnston without telling them what Mr. Carpenter was actually doing with the money and what they were exposed to.

Tr.13:62 (emphasis added).

\*        \*        \*

AUSA Mitchell:  Mr. Pirozzolo noted in this way the word "invest" is a half-truth, and it is a half-truth because what is omitted from the description is significant . . . The defendant gave [the Exchangors] no reason to believe that there was anything else afoot.  There was no description, no notice at all that Mr. Carpenter was about to - - that Mr. Carpenter was using exchangor money in the options market.

Tr.13:111-12.

\*        \*        \*

AUSA Mitchell:  Who didn't know?  Who didn't know about the options strategy?  All the people you heard from who signed these contracts, the furthest thing from their mind, as the defendant well knew, was that Mr. Carpenter was trading the money in the options market.  Mr. Carpenter told nobody.  There was not any indication whatsoever, not a whiff of "options" in any of those documents.  That's not open - - that is not open, that is - - that's not full disclosure in the slightest way.

Tr.13:113-14 (emphasis added).

\*        \*        \*

AUSA Mitchell:  [W]hile Mr. Carpenter was, unbeknownst to them, not any disclosure whatsoever, trading the money in the options market.
Tr.13:116 (emphasis added).

There can be no doubt that the government's entire case was based on omissions, nondisclosure, concealment, and related half-truths, all of which were argued to have been misleading and, therefore, fraudulent. This theory is similar to allegations in securities fraud cases under § 10(b) and Rule 10b-5 of the Securities Exchange Act that a defendant failed to disclose material facts necessary to make "statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. Ch. II § 240.10b-5. However, at no time did the government allege, and there is not a scintilla of evidence proving, that I had a legal duty to disclose how I was investing the Exchangors' funds. Consequently, I cannot be held criminally liable for omissions, nondisclosure, concealment, or half-truths because the universal rule is that "[s]ilence, absent a duty to disclose, is not misleading." *S.E.C. v. Durgarian*, 477 F. Supp. 2d 342, 349 (D. Mass. 2007).

The same rule also applies with respect to fraud under the common law, upon which the mail and wire fraud statutes are predicated. See *Neder v. United States*, 527 U.S. 1, 22 (1999). "A failure to disclose a material fact may also constitute a false or fraudulent misrepresentation if . . . [there exists] a specific contractual duty to make such a disclosure." *United States v. Cassiere*, 4 F.3d 1006, 1022 (1st Cir. 1993) (wire fraud). I cannot be held criminally liable for failing to disclose, either orally or in the guise of half-truths contained in written materials, that I was investing the Exchangors' funds in stock options absent a duty to make such a disclosure. Yet, liability for nondisclosure, omissions, and concealment is precisely what the government elicited at trial and argued to the jury.

The rationale for the rule that liability for nondisclosure of material facts can arise only if there is a duty to speak stems from the concern that "corporations might otherwise face potential second-guessing in a subsequent disclosure suit." *City of Monroe Employees v. Bridgestone*, 399

F.3d 651, 669 (6th Cir. 2005) (quotations and citation omitted). This is essentially what has

occurred here. BPETCO completed 119 successful property exchanges, but only the handful of

those exchanges that were unsuccessful at the end were charged by the government as

fraudulent. The government elicited testimony from all of the Exchangors and their

representatives that, had they been told that BPETCO would be investing their funds in stock

options, they would not have done business with BPETCO. See, e.g., Tr.3:122 (Darling). The

government now seeks to second-guess me, eight years (now 15 years) after-the-fact, as to the

wisdom of my investment strategy by claiming that failing to disclose that investment strategy

was misleading and fraudulent, without alleging (let alone proving) that I had a legal duty to

speak about or disclose my investment strategy. Because I was under no express or implied duty

to disclose my investment strategy, the express terms of the agreements giving BPETCO

unfettered "discretion" to "invest" the funds are not magically transformed into misleading half-

truths simply because the Exchangors were not told, and did not even ask, how their funds were

being invested.

As in securities fraud cases, in the context of concealment of material information from

the federal government in 18 U.S.C. §1001 prosecutions, it is generally held that a duty of

disclosure "does not arise out of thin air." *United States v. Dollar*, 25 F. Supp. 2d 1320, 1326

(N.D. Ala. 1998). It must arise, instead, from a specific request for information, grounded in "a

statute, government regulation, or form." *United States v. Calhoun*, 97 F.3d 518, 526 (11th Cir.

1996); *accord United States v. herwin*, 654 F.2d 671, 679 (10th Cir. 1981) (reversing

concealment convictions under Section 1001 because the government did not identify a statute or

regulation that required the disclosure of the required information). Moreover, under elemental

due process principles, the duty to disclose must be clearly expressed. "[T]he touchstone [of due

process] is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 267. The defendant must therefore have a fair warning that he is under a duty to disclose specific information before he may be convicted. See *United States v. Larson*, 796 F.2d 244, 247 (8th Cir. 1986) (holding defendant's "due process rights were violated when criminal sanctions were imposed against him because he had **no fair warning** that his conduct was illegal.").

In this case, 26 U.S.C. §1031 provides no requirement that a qualified intermediary disclose the manner in which it invests its clients' funds. Nor can any such requirement be limned from 26 C.F.R. § 1.1031(k)-1. The only "forms" in this case, the various written agreements between BPETCO and the Exchangors, contain no requirements or references to the manner in which the funds would be held and invested (other than an Exchangor's receipt of 3% or 6% based upon his/her selection). Nor has any federal or state court opined on the issue. Instead, the government, especially in its closing, predicated my putative duty to disclose on a loose amalgam of hortatory "common sense" principles, none of which establish a duty at all, much less with sufficient specificity to satisfy due process in a criminal case. "If the government wish to impose a duty on [§ 1031 qualified intermediaries to disclose the manner of their investments], let it require so in plain language. It should not attempt to impose such a duty by implication, expecting that the courts will stretch statutory construction past the breaking point to accommodate the government's interpretation." *United States v. Anzalone*, 766 F.2d 676, 682 (1st Cir. 1985). See also *United States v. Safavian*, 2008 WL 2415911, *5 (D.C. Cir. June 17, 2008) ("there must be a legal duty to disclose in order for there to be a concealment offense in violation of § 1001(a)(1), yet the government failed to identify a legal disclosure duty except by reference to vague standards of conduct for government employees.").

Making this case far worse than the typical concealment issue in a §1001 prosecution is the undisputed fact that neither Paley, nor BPETCO, nor I, were ever asked to make any disclosures regarding the kinds of investments that would be utilized—even by Attorney David Patterson, Tr.12:81 (Patterson)—the only Exchangor or Exchangor's representative with whom I communicated prior to the Exchangor signing the agreements with BPETCO.   None of the Exchangors or their representatives testified that they asked Paley how the funds were being invested, and Paley specifically testified that he never told them how the funds were being invested (much less Carpenter, who they did not even know).  Needless to say, no request was ever made of me to disclose my investment strategy.  See *United States v. Woodward*, 469 U.S. 105, 108 (1985) (per curiam) (holding defendant has no duty to disclose information about which he is never asked).  Not even in Marjorie Adams' alleged July 2000 telephone call with me did she ask how (or whether) the funds were being invested.

The government's theory of the crime essentially requires, without administrative rulemaking by any federal agency, that §1031 qualified intermediaries provide investment disclosures to clients who do not request them, and to suffer criminal liability merely for not expressly stating in an arm's-length contract the types of investments that can be made with client funds.  Perhaps these are worthy objectives by which the Treasury Department or the Federal Trade Commission might seek to regulate the §1031 industry in the future, but no such regulations existed in the 1998-2000 period and no such regulations exist today.  The government cannot resort to the criminal law to engage in ex post facto economic regulation.

Specificity in this area is particularly required when the government seeks to prosecute a nondisclosure case under the mail and wire fraud statutes because "[t]he federal mail fraud statute . . . is built upon a single, archaic 204-word sentence which . . . has undergone repeated

periods of rapid expansion and contraction." *United States v. Urciuoli*, 513 F.3d 290, 293 (1st Cir. 2008). It is one thing to charge a defendant with making affirmative misrepresentations and then to introduce evidence only of omissions, but it is an entirely different matter to convict a defendant of omissions and half-truths (silence) without proving that he had a legal duty to speak. The government cannot be allowed to exploit the ambiguity inherent in the mail and wire fraud statutes to convict a defendant of silence when no proof was offered that I had an explicit or implicit duty to speak.

Because of the government's failure to allege, let alone prove beyond a reasonable doubt, that I had a legal duty to disclose my investment strategy (i.e., options investing), I cannot be held criminally liable for failing to satisfy a non-existent duty of disclosure. To allow liability in this case would violate my rights under the Due Process Clause. Therefore, my 2255 petition should be granted, my conviction vacated, and my indictment dismissed.

## VIII. AT MINIMUM THERE WAS A PREJUDICIAL VARIANCE OF THE INDICTMENT

I successfully completed 119 out of 126 property exchanges and handled over $100 million in accounts without taking a penny for myself. I did not induce anyone, fraudulently or otherwise, to give their money to BPETCO, nor did I "misappropriate" any funds as claimed by the Superseding Indictment in Paragraph 25. Superseding Indictment (Doc. 34) at 25. The five exchangors who lost $8.6 million in December 2000, in what is still the worst market crash of all time, have now received more than $50 million in damages, including over $15 million from me and BPETCO.

The variance here, if not fully a constructive amendment to the Indictment, was manifestly prejudicial to me as it denied me the fair notice of the charges against me guaranteed by the Sixth Amendment, *see, e.g., Russell v. United States*, 369 U.S. 749 (1962), and raises the very real specter that the jury may have convicted me on a legally insufficient ground, requiring reversal under *Yates v. United States*, 354 U.S. 298 (1957).

Among the most fundamental guarantees of the Fifth and Sixth Amendments is the defendant's right to fair notice of the charges against which he must defend. *See, e.g., Russell v. United States*, 369 U.S. 749, 763-64 (1962), and that fundamental right was transgressed here by the government's shift of its theory of criminality to include one predicated on omissions, against which I had no notice that I should prepare to defend. The government's reliance on an omissions theory created the real likelihood that I was convicted based on a theory of mail/wire fraud which was neither charged nor properly submitted to the jury for its consideration. The Court rejected my constructive amendment and variance arguments, concluding that the omissions theory was encompassed within the allegations of the Indictment, despite the fact that nowhere to be found in the allegations of the Indictment are the words "half-truths," "omissions,"

"duty," or "fiduciary." While I contend that this Court's decision was erroneous, to the extent that the Court's analysis supports the denial of my motions, it underscores the gravity of the prejudice to me from being prosecuted on a theory regarding which the jury was not instructed and appears nowhere in the Indictment.

If an omissions theory was properly charged in the Indictment, which it clearly was not, then two essential elements of fraud by omission were completely omitted from the instructions to the jury, to my deep prejudice. Additionally, if an omissions theory was not properly charged in the indictment, the government's repeated emphasis on an omissions theory constituted a constructive amendment of the indictment or, at minimum, prejudicial variance. See Dkt. 312, 404. "A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." *United States v. Celestin*, 612 F.3d 14, 24 (1st Cir. 2010). "[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *United States v. Rodriguez-Rodriguez*, 663 F.3d 53, 58 (1st Cir. 2012), *quoting Stirone v. United States*, 361 U.S. 212, 217 (1960). Alternatively, the shift in theory constituted a prejudicial variance, which occurs "when the charging terms remain unchanged but when the facts at trial are different from those alleged in the indictment." *Rodriguez-Rodriguez*, 663 F.3d at 58, *quoting United States v. Fornia-Castillo*, 408 F.3d 52, 66 (1st Cir. 2005).

A variance requires reversal of a conviction when it "affect[ed] the defendant's substantial rights." *United States v. Diaz-Arias*, 717 F.3d 1, 20 (1st Cir. 2013), i.e., "cause[d] unfair prejudice." *United States v. Dellosantos*, 649 F.3d 109, 116 (1st Cir. 2011). A variance affects the defendant's substantial rights where he "receive[d] inadequate notice of the charge against him and thus [was] taken by surprise at trial." *Dellosantos*, 649 F.3d at 125, *quoting*

*United States v. Wihbey*, 75 F.3d 761, 774 (1st Cir. 1996). The indictment in this case charged a scheme to defraud predicated on affirmative written and oral false statements and only on affirmatively false statements. The indictment provided me with no notice that, in addition to fraud charge based on alleged affirmatively false statements, I would also be required to defend at the second trial on a fraud charged based on my omissions to disclose my strategy and its history. That shift had critical ramifications for the fairness of my trial. At this late date the government has not produced even a single false statement and actual material misrepresentations made by me to anyone.

While Paley, Levine, Stern, Rusmussen, Rock, and even the Exchangor witnesses all constituted outright perjury at both of my trials, it is me that is sitting in prison, and I am the only person that has not told a lie or made a misrepresentation during this 15 year period, and that includes the government prosecutors. Critically, the government's reliance on an omissions theory at trial creates the real likelihood that I was convicted based on a theory of mail/wire fraud which was neither charged nor properly submitted to the jury for its consideration. Silence provides a permissible basis for a finding of criminal fraud only where there was an independent duty to disclose. *See, e.g., United States v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012); *United States v. Cassiere*, 4 F.3d 1006, 1022 (1st Cir. 1993); *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984), *rev'd on other grounds*, 473 U.S. 207 (1985). Here, such a duty was neither charged nor proven, and the jury was not instructed that it could not convict me based on omissions unless it found that I had an independent duty to disclose the withheld information. In addition, the jury was also not instructed on another essential element of fraud under an omissions theory, namely, that I knew I had a duty to disclose. *See Cassiere*, 4 F.3d at 1022 (First Circuit approved the following instruction: "A failure to disclose a material fact may also

constitute a false or fraudulent misrepresentation if, one, the person was under a general professional or a specific contractual duty to make such a disclosure; and, two, the person actually knew such disclosure ought to be made; and, three, the person failed to make such disclosure with the specific intent to defraud"). Given the government's heavy emphasis on my failure to disclose that I was investing exchangors' money in stock options, the jury may well have rested its quick decision to convict me on all counts on a legally non-viable omissions theory.

Where, as here, "a jury has been presented with several bases for conviction, one of which is legally erroneous, and it is impossible to tell which ground the jury convicted upon, the conviction cannot stand." *United States v. Sawyer*, 85 F.3d 713, 730-31 (1st Cir. 1996). *See, e.g., Yates*, 354 U.S. at 312("In . . . circumstances [where a legally invalid theory has been submitted to the jury] we think the proper rule to be applied is that which requires a verdict to be set aside where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected"); *United States v. Fernandez*, 722 F.3d 1, 33 (1st Cir. 2013). Under *Yates*, reversal is required unless it can be conclusively found that the jury's verdicts in fact rested upon a legally and factually adequate ground. It cannot be so said here.

Thus, the variance which occurred in this case was fatally prejudicial to me. Not only may the jury have based its verdicts on an impermissible ground, but the First Circuit assessed the propriety of the government's final arguments through the lens of an omissions theory, adding to the prejudice to me. Because the variance affected my substantial rights, a new trial should be ordered. Now that this Court once again has jurisdiction of the matter through this §2255 Motion to Vacate my conviction, I ask that the Court reconsider its denial of that portion of my Supplemental Motion for a New Trial which related to the government's constructive

amendment of the indictment based on subsequent developments in the case which convincingly demonstrate the government's complete switch from the mail/wire fraud predicated on affirmative false statements charged in the indictment to mail/wire fraud predicated primarily if not entirely on omissions and nondisclosure.

The government's briefs on its appeal of the Court's order granting me a new trial, as well as its oral argument before the First Circuit, relied exclusively on an omissions/nondisclosures theory of mail/wire fraud (a theory that was adopted by the First Circuit in its opinion), providing new and potent evidence in support of the constructive amendment and material variance arguments advanced in my motion. However, as this Court knows better than anyone, I was originally indicted on the charge of making orally and written false representations. After Professor Dershowitz pointed out to the Court that those allegedly false "representations" needed to be "material" in accordance with the Supreme Court's ruling in *Neder v. United States*, 527 U.S. 1 (1999), the government then issued a new superseding indictment in September 2004 that added the word "material" to the words "false representation" in seven paragraphs. Yet, at this late date, there is no oral false statement attributed to me because I never met with any of the Exchangors. Moreover, I never sent anything in writing to the Exchangors, and even if the government could prove that any of the Exchangors saw Mr. Paley's PowerPoint presentation upon which the government relies, the intervening Supreme Court cases of *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), and *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), would certainly illustrate that there was no fraud at all in this case, much less material false representations that would rise to the level of a specific intent to defraud as required for a federal indictment under the mail and wire fraud statutes.

## IX.    THE GOVERNMENT FAILED TO DISPROVE MY GOOD FAITH AT TRIAL

The theory of fraud set forth in the indictment was that I defrauded seven real estate

investors (the "Exchangors") who had entered into agreements with Boston Property Exchange

Trust Co., Inc. ("BPETCO") to hold monies to be used in 26 U.S.C. §1031 property exchanges

through false written or oral misrepresentations about the safety and security of the deposited

funds which, in the government's view, were inconsistent with the investment strategies pursued

by me with Exchangors' funds, and which, with the collapse of the stock market in 2000,

resulted in substantial losses. I contended at all times that no false representations were made,

that I had acted in complete good faith in the belief that I was authorized by the written

agreements with the Exchangors to invest the deposited funds at my discretion, and there was

never any allegation, much less proof, that I ever took, or intended to take, so much as a penny of

funds which the Exchangors entrusted to BPETCO, it being at all times my intent to return the

funds to the Exchangors to complete their exchanges, along with the promised interest. In fact,

BPETCO paid the Exchangors back nearly $15MM on their $8MM loss before the second trial

began in June of 2008. At this late date, neither the government nor this Court has told me

exactly what did I say or write that was a knowingly false written or oral misrepresentation.  For

that reason alone this Honorable Court should grant my 2255 Petition.

The case was a close one, as this Court recognized in describing the evidence as

sufficient, "but not overwhelming." The fairness of the trial, and the jury's ability to fairly

consider my central good faith defense were fatally compromised by a conspiracy by Merrill

Lynch, its attorneys, led by john Snyder of Bingham who attended every day of my hearings in

both of my trials and sat behind the government prosecutors as if he worked in their office, and

its three employee-witnesses to withhold exculpatory documents and testify falsely at my trial in

a concerted campaign to protect their own economic interests at the expense of my fundamental right to a fair trial. Only after my trial did the new documents come to light in civil litigation against Merrill Lynch and additional evidence become available through the depositions of Merrill Lynch witnesses in those civil proceedings. The newly-available evidence is both powerfully impeaching of the false testimony of all three Merrill Lynch witnesses and, more importantly, provides considerable substantive support for my good faith defense. This pattern of concerted deception by Merrill Lynch and its witnesses also makes this case an unusual one and one in which, if the indictment is not dismissed on speedy trial grounds and if my convictions are not reversed for insufficiency of evidence, a new trial is required in the interest of justice so that I may have an opportunity to present my defenses in a trial process without the taint of prosecutorial misconduct, and the pernicious perjury and false and misleading testimony of the broker witnesses, Exchangors, and Paley.

After trial, I filed a post-trial motion for judgment of acquittal or, alternatively, a new trial. After a delay of almost three years, this Court denied the motion for judgment of acquittal, *United States v. Carpenter*, 808 F.Supp.2d 366, 377-80 (D.Mass. 2011), finding the evidence sufficient, "but not overwhelming," *id.* at 380, but again granted a new trial based upon improprieties in the government's closing arguments. *Id.* at 380-86. The First Circuit reversed my new trial order based on Greenberg Traurig's ineffective conduct and their acceptance of the government's case as one of omissions. *United States v. Carpenter*, 736 F.3d 619 (1st Cir. 2013). One of the central foci of my new trial motion was extensive newly-discovered evidence that the Merrill Lynch witnesses – Stern, Levine, and Rasmussen – lied at trial when they testified that they did not know the nature of BPETCO's business or that the funds being invested were third-party funds and that their testimony suggesting that I had actively misled them as to these matters

was untrue, matters striking to the heart of my primary defense, that I at all times acted in good faith. This false testimony, well-illustrated by the supporting documents submitted to this Court, substantially and prejudicially compromised the fairness of my trial and the reliability of the jury's verdict, yet this Court never actually addressed these critical issues.

Newly-available evidence which emerged after the conclusion of my second trial demonstrates that Merrill Lynch and its three employee-witnesses engaged in a concerted cover-up to protect their own interests which included concealing documents exculpatory to me and testifying falsely at my trial. That false testimony fatally compromised my right to a fair trial, as the false testimony of the Merrill Lynch witnesses went to the heart of my good faith defense. With the new evidence, which is both impeaching and substantive, a jury would probably reach a very different result and find that the government had not disproven my good faith – a complete defense to mail/wire fraud charges – beyond a reasonable doubt. A new trial should be ordered in the interests of justice.

The theory of fraud on which the government relied at trial rested on my omissions to inform the Exchangors that I was investing their funds in stock options and had begun to incur substantial losses. A defendant cannot be convicted on an omissions theory of fraud unless the government proves beyond a reasonable doubt that he had an independent duty to disclose the information and that he knew that he had such a duty, which the evidence in this case did not suffice to prove. Moreover, the jury was not instructed regarding the requisites for conviction on an omissions theory of fraud.

A central component of the government's case was the testimony of three witnesses who had worked with me at Merrill Lynch – Stern, Levine, and Rasmussen – who collectively testified that they were unaware of the nature of BPETCO's §1031 exchange business and

unaware that the funds that were being invested were third-party funds, and suggested that the information provided by me when I opened the accounts misled them into believing that the funds were my own. The February 2008 Iantosca lawsuit which emerged as new evidence during civil litigation against Merrill Lynch by certain of the Exchangors now proves what I was unable to prove at trial: it conclusively demonstrates that these witnesses conspired to testify falsely at my trial to shield themselves and Merrill Lynch from allegations of wrongdoing and that, from the outset, I was open and transparent with Merrill Lynch about the nature of BPETCO's business and the source of the funds which would be invested. As the evidence stood at trial, the Merrill Lynch witnesses provided the jury with substantial reason to discredit that defense, which I was at that time powerless to counteract, on the theory that, if I really believed that my investments were proper, I would not have led Merrill Lynch to believe that it was my own money I was investing and would have fully disclosed the nature of BPETCO's business and the fact that the funds it handled were the escrowed funds of §1031 exchanges. The new evidence, however, convincingly demonstrates that Merrill Lynch knew from the outset that I was investing clients' funds and that I did not mislead those with whom I dealt at Merrill Lynch – a reality which would powerfully support my ultimate factual defense that I believed in good faith that I had the discretion to invest the §1031 funds and that I did not conceal from either my brokers or BPETCO's clients my intention to thus generate the interest promised to the Exchangors and BPETCO's expected profits.

Two of the major thrusts of the government's examination of the Merrill Lynch witnesses were to elicit evidence which would lead the jury to believe that I actively concealed from Merrill Lynch the nature of BPETCO's business and the funds being invested and evidence that my investment strategy was so risky, and my losses so great, that Merrill Lynch felt compelled to

cut off my trading. In fact, the new evidence convincingly shows, I was open and transparent

with Merrill Lynch from the outset, and Stern, Levine, and Rasmussen, along with everyone else

at Merrill knew that BPETCO was a §1031 intermediary which held and invested clients' funds,

and the Merrill Lynch compliance chief ordered that the account be closed to further trading not

because of my investment strategy or my losses but because Merrill Lynch feared liability to the

clients whose funds had been invested. The testimony of the Merrill Lynch witnesses at trial

seriously – and manifestly unfairly – undermined my defense that I believed in good faith that I

could invest the Exchangors' funds as I did. If I believed that my actions were proper, jurors no

doubt asked themselves, why did I conceal from Merrill Lynch that I was investing third party

funds? The truth is that I did not.  The Massachusetts Appellate Court's findings against

Merrill's attorneys Bingham McCutcheon and Bingham attorney John Snyder warrant a new trial

for me on that basis alone.

The testimony of the Merrill witnesses regarding the riskiness of my trading strategy,

which the new evidence would have substantially undercut, manifestly prejudiced me in the eyes

of the jury, painting a misleading picture, in which all three Merrill witnesses were complicit, of

a man pursuing a reckless investment strategy to enrich myself, heedless of the risk at which I

was placing BPETCO's clients' funds, conduct which the jury would no doubt have considered

inconsistent with my good faith defense.  A new trial – one which eliminated the fundamental

unfairness introduced into this trial by Merrill's suppression of evidence and the false testimony

of its witnesses – would paint a considerably more nuanced picture, one which a rational jury

could find consistent with a good faith belief by me that I was permitted to invest the

Exchangors' money as I did. Indeed, given the newly-revealed issues with Levine's testimony, in

addition to the perjury which the government already knew about, the government may well not

have called Levine as a witness at all and could well not do so at a new trial, thereby eliminating testimony such as Levine's "riverboat gambler" reference which can only have severely prejudiced my good faith defense. As it was, the government got in all of Levine's derogatory statements about me in the closing arguments by attributing them to Rasmussen and Stern.

Good faith is a complete defense to wire and mail fraud charges, and the government bears the burden to disprove good faith beyond a reasonable doubt. *See, e.g., United States v. Callipari*, 368 F.3d 22, 33 (1st Cir. 2004), *vacated on other grounds*, 543 U.S. 1098 (2005); *United States v. Dockray*, 943 F.2d 152, 155 (1st Cir. 1991), and this Court so instructed the jury in this case. In ruling on my acquittal motion, this Court stated that the Patterson evidence "and other similar circumstantial evidence, could have supported an inference that the defendant acted in good faith and lacked the specific intent to defraud. But the jury could have determined that any inference raised by this evidence was disproved by the other evidence from which the defendant's specific intent to defraud could be inferred." Much of that evidence from which the jury might have inferred a specific intent to defraud rested on the false and misleading testimony of the Merrill witnesses. The concerted pattern of false and/or fundamentally misleading testimony by the Merrill witnesses regarding both the history of my relationship with Merrill and what I did and did not tell them regarding BPETCO and its funds was seriously detrimental to the jury's fair consideration of the central component of my defense, my good faith belief in the propriety of my investments. With the new evidence, which is both impeaching and substantive, a jury would probably reach a very different result and find that the government had not disproven my good faith beyond a reasonable doubt. A new trial without the fundamental unfairness caused by Merrill's obstruction of justice should be ordered in the interests of justice.

Furthermore, in *Sanchez v. Triple-S Management Corp.*, 492 F.3d 1 (2007), the plaintiffs

in a civil RICO case tried to change the mail and wire fraud claims from one of

"misrepresentations" to a claim of "omissions," as the government tries to do in this case.  In

*Triple-S*, the First Circuit upheld the dismissal of the plaintiffs' claims as well as its decision in

*Bonilla v. Volvo Car Corp.*, 150 F.3d 62 (1998), that there is no "legal, professional or

contractual duty," nor even a "general obligation" to disclose any negative information without a

legal duty to disclose.  The First Circuit went on to reaffirm its decision in *Bonilla* that

"[w]hether or not this would bring business in the United States to a standstill might be debated;

but it is a change, if it is ever to be made, that should be undertaken by legislatures and not by

courts....[and], if the disclosure was omitted in good faith, there was no fraud. *United States v.*

*Dockray*, 943 F.2d 152, 155 (1st Cir.1991) (holding that good faith is an "absolute defense" to

mail and wire fraud)."  With these thoughts in mind, the First Circuit in *Triple-S* also went on to

state:

> A defendant's failure to disclose information, without more, cannot make out a violation
> of the mail and wire fraud statutes....We nevertheless observed that "[i]t would be a truly
> revolutionary change to make a criminal out of every salesman (assuming the use of the
> mails or telephone) who did not take the initiative to reveal negative information about
> the product and who—a jury might find—secretly harbored in his heart the hope that the
> buyer would never ask."

Therefore, one need only replace the names in *Triple-S*, and the cases parallel exactly:

> The [government] do[es] not say whether [I] ha[d] a duty to disclose "the actual manner
> in which the [funds] were [invested]" or, if so, what the source of that duty is; they do not
> say whether the defendant "fail[ed] to disclose" or "conceal[ed]" this information with
> the intent to deceive the plaintiffs. Instead, they proceed on the assumption that
> nondisclosure alone can support mail and wire fraud claims. As we have discussed, that is
> not the law, in this circuit or elsewhere. *Id.* at 11. (emphasis added).

In addition, the evidence adduced at trial did not suffice to prove that, even if such a new legal

duty of disclosure arose in 2000, that I knew that I had such a new duty which did not exist in

1998-99. The evidence did not prove that I had the required *mens rea* for conviction on an omissions theory. *See Cassiere*, 4 F.3d at 1022. The offense of fraud requires both a deceptive act and the knowledge that the act is deceptive. Also with an omissions case there must be a claim in the indictment that I had a duty to disclose and knew that I had a duty to disclose. Those words do not exist in the Indictment nor were they proven or even discussed at trial. *Cassiere,* 4 F.3d at 1011.

Because the Government never discussed my Good Faith during the trial, much less disproved it as required for a guilty verdict, this Court should grant my §2255 Petition, vacate my conviction and order a judgment of acquittal in my favor.

**X.    MY CONVICTION MUST BE VACATED AND THE INDICTMENT DISMISSED DUE TO EGREGIOUS PROSECUTORIAL MISCONDUCT AND VIOLATION OF THE DOUBLE JEOPARDY CLAUSE OF 18 U.S.C. §3731**

The Supreme Court has stated that prosecutors "must always be faithful to [the] overriding interest that 'justice shall be done,'" and "the 'twofold aim'" of the law, which is that "guilt shall not escape nor innocence suffer.'" *Berger v. United States*, 295 U.S. 78, 88 (1935). The Court has also stated that:

> "[d]ue process is violated where the state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by [the government] to procure the conviction and imprisonment of a defendant is inconsistent with the rudimentary demands of justice." *Mooney v. Holohan*, 55 S. Ct. 340, 342 (1935).

Furthermore, the Double Jeopardy Clause bars retrial where "bad-faith conduct by judge or prosecutor threatens the harassment of an accused by successive prosecutions." *United States v. Dinitz*, 96 S. Ct. 1075, 1081 (1976) (internal citations omitted).

Clearly in my case the prosecutors have abandoned their duty in *Berger* and their obligations under *Napue*, and they have reversed Blackstone's proportion and find that it is better to put 10 innocent men in prison lest one guilty one escape. "The underlying idea [of the Double Jeopardy Clause], one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity as well as enhancing the possibility that even though innocent he may be found guilty." *Green v. United States*, 78 S. Ct. 221, 223 (1957). Fundamentally, then, the Double Jeopardy Clause protects the defendant's Constitutional interest in being tried in a

single, fair proceeding before the original tribunal–the right to be free from multiple trials caused by willful prosecutorial misconduct. When the prosecution perverts that proceeding through deliberate acts of misconduct to avoid certain acquittal, the Double Jeopardy Clause bars any further attempt to harass that defendant, and forbids subjecting him to the indignity, expense, anxiety, and humiliation of another trial. *Id.*

To violate the Double Jeopardy Clause the prosecutorial conduct must have resulted from "intent on the part of the prosecutor to subvert the protections afforded by [that] Clause." *Oregon v. Kennedy*, 102 S. Ct. 2083, 2089 (1982); *see United States v. Dollar*, 25 F. Supp. 2d 1320, 1332 (N.D. Ala. 1998) (unlawfully withheld *Brady* material, which material directly contradicted witness testimony, coupled with outrageous government conduct, required dismissal with prejudice). In *Kennedy*, the Supreme Court held that if the prosecutor goads the defense into moving for a mistrial, and the mistrial is granted, the Double Jeopardy Clause bars a retrial. *Kennedy* at 2089-90. Such misconduct or overreaching, intended to subvert a defendant's right to be free of harassment from multiple trials, is a Double Jeopardy violation.

In *United States v. Singleterry*, 683 F.2d 122, 123-24 (5th Cir. 1982), the Fifth Circuit recognized the possibility that prosecutorial misconduct may present a bar to retrial in situations beyond those considered in *Kennedy*. Indeed, a number of federal courts have extended the logic of *Kennedy* to apply the "Double Jeopardy Clause to protect a defendant from retrial in some other circumstances where prosecutorial misconduct is undertaken with the intention of denying the defendant an opportunity to win an acquittal." *United States v. Wallach*, 979 F.2d 912, 916 (2d Cir. 1992), *cert. denied*, 113 S. Ct. 2414 (1993). In *Wallach*, the Second Circuit explained that the Double Jeopardy Clause bars retrial where "misconduct of the prosecutor is undertaken not simply to prevent an acquittal, but to prevent an acquittal

that the prosecutor believed at the time was likely to occur in the absence of his misconduct." *Id. See United States v. Catton*, 130 F.3d 805, 806-7 (7th Cir. 1997) (citing *Wallach*, and discussing possibility of Double Jeopardy Clause as bar to calculated prosecutorial misconduct); *Jacob v. Clarke*, 52 F.3d 178, 181-82 (8th Cir. 1995) (same); *United States v. Gary*, 74 F.3d 304, 314-15 (1st Cir. 1996) (following *Wallach*); *see United States v. Morrison*, 101 S. Ct. 665 (1981) ("pattern of recurring violations" may warrant imposition of extreme remedy of dismissal "in order to deter further lawlessness"); *United States v. Russell*, 93 S. Ct. 1637 (1973) (acknowledging possibility of "situation in which the conduct of law enforcement agencies is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction"); *United States v. Singer*, 758 F.2d 228, 239 n. 15 (8th Cir. 1986) (collecting cases). *See also Lockhart v. Nelson*, 109 S. Ct. 285, 288 n.2 (1988) (bad faith by the prosecutor in the submission and reliance on false (deceptive) evidence may preclude retrial under force of Double Jeopardy Clause); *United States v. Tateo*, 84 S. Ct. 1587, 1590 n.3 (1964) (Double Jeopardy may bar retrial where prosecutorial misconduct is motivated by a "fear that the jury was likely to acquit the accused."); *and see Mooney*, 55 S. Ct. at 342.

Many jurisdictions have also extended the logic of *Kennedy* to situations where prosecutorial misconduct is intended to subvert the defendant's Double Jeopardy rights. *State v. Kennedy*, 666 P.2d 1316, 1326 (Or. 1983) (Double Jeopardy bars retrial "when improper official conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal"); *State v. White*, 354 S.E. 2d 324, 329 (N.C. App. 1987) ("In our view, the better reasoned arguments support the broader test that includes

bad faith overreaching or harassment aimed at prejudicing the defendant's chances for an acquittal."), *aff'd*, 369 S.E. 2d 813 (N.C. 1988); *People v. Dawson*, 397 N.W. 2d 277, 282 (Mich. App. 1986) (Double Jeopardy bars retrial where prosecutor engages in misconduct calculated to avoid acquittal), *aff'd*, 427 N.W. 2d 886 (Mich. 1988); *Pool v. Superior Court*, 677 P. 2d 261, 271-72 (Ariz. 1984) (same; cited by *Dawson*); *see also Ex Parte Masonheimer*, 220 S.W. 3d 494, 507 (Tex. Crim. App. 2007) (extending *Kennedy* to instances where prosecutor knowingly commits misconduct to thwart an acquittal); *People v. Batts*, 68 P. 3d 357, 375-81 (Cal. 2003) (approving *Wallach*; analyzing cases and secondary sources), *cert. denied*, 124 S. Ct. 1432 (2004).

The government prosecutors failed in their most fundamental duties. They abused the power of the sovereign, the trust of the people, and the Constitution and laws they swore to uphold and defend. The government egregiously failed to meet its constitutional obligations under *Brady* and *Giglio*. It repeatedly misrepresented to the court that all documents had been disclosed prior to trial and that I committed fraud and continuously allowed admitted perjurious testimony during its closing arguments. This is prosecutorial misconduct in its highest form; conduct in flagrant disregard of the United States Constitution; and conduct which should be deterred by the strongest sanction available. Under these facts, the court should use its discretion in characterizing these actions as flagrant prosecutorial misconduct justifying dismissal. The court should also use its discretion in determining that a retrial — the only lesser remedy ever proposed by the government — would substantially prejudice the defendant.

When the court first indicated that it was inclined to grant a new trial, it noted that it was concerned that any lesser sanction would be like endorsing the AUSA's conduct.   The

government's tactics on appeal have only reinforced the conclusion that it still has failed to grasp the severity of the prosecutorial misconduct involved here, as well as the importance of its constitutionally imposed obligations. Accordingly, this Court should reverse my conviction, and dismiss the indictment in its entirety. Or, as a lesser remedy, this Court should grant me my new trial due to the newly-discovered evidence and allow me my first fair trial in the last 15 years without the taint of prosecutorial misconduct and the pernicious perjury of all of the broker witnesses, the Exchangors, and Paley.

## XI.   MY CONVICTION AND SENTENCE MUST BE OVERTURNED, AND THE INDICTMENT DISMISSED DUE TO EGREGIOUS PROSECUTORIAL VINDICTIVENESS

There can be no doubt that I was indicted in Connecticut on December 13, 2013, because my **second** new trial order had been surprisingly overturned in late November. I have been fighting the government for 14 years in Boston over the loss of $8 million in the stock market crash of December 2000. My alleged victims in Boston have now recovered over $50 million in lawsuits brought by me against PaineWebber and Merrill Lynch; the real villains here. Surprisingly, the AUSA at my sentencing spent more time talking about a "pending" indictment that after **five** years has never materialized in the district of Wisconsin and the new indictment in Connecticut, which is based on alleged activity that all happened prior to my second trial in 2008, rather than pointing out ANY false statement made by me to anyone. Could it be there really is no fraud in the Boston case, and only egregious prosecutorial misconduct that was written about in the September 22, 2010 edition of USA Today and malicious prosecutorial vindictiveness that is discussed below?

Additionally, my offices have been raided by the federal government not just once, but twice. The first raid occurred on April 20, 2010 by the IRS-CID and then on May 26, 2011 by

the DOL concerning its investigation of the Charter Oak Trust, which is a welfare benefit plan that insured all of 84 people. In the raid of April 20, 2010, the government took over 320 large boxes of documents, and of that material unlawfully taken, 40 of the boxes involved the Charter Oak Trust. Despite being ordered by Judge Cavello to return all of the boxes after copying was completed, only 4 boxes of the 322 have been returned to the respective businesses now five years after the raid. The government is still holding custody over those boxes at Halloran & Sage, despite repeated requests to release the boxes. The government even allowed the Exchangors' counsel to rummage through Grand Jury documents and the boxes at Halloran & Sage, despite that being against the law to allow private parties to see documents seized by the government as part of a Grand Jury investigation subpoena. But, the Boston AUSAs have been working hand in glove with both the attorneys for the Exchangors and the attorneys for Merrill Lynch for this entire 14 year time period, much to the detriment of my Constitutional rights to a fair trial and Due Process.

The second unlawful search and seizure of May 26, 2011 was purportedly all about an investigation of the Charter Oak Trust and 17 different locations were raided, including offices in Stamford, Connecticut and once again my beautiful and prestigious office building at 100 Grist Mill Road in Simsbury, Connecticut. My office is set in a beautiful office park in a peaceful, bucolic setting that was once the world headquarters for the Ensign-Bickford company. Federal agents raided the offices in Simsbury and Stamford and stayed there until 4:00 a.m. the next day. I have now sued the federal agents and the government in two separate actions under the Honorable Stefan Underhill. As Judge Underhill commented at a recent hearing on the subject: "there were three times as many federal agents with weapons and Kevlar vests at Grist Mill Road than there was at the raid that took out Osama bin Laden."

As my counsel in Connecticut goes through the "millions of documents" in that case, one thing becomes clear: federal agents interviewed over 70 witnesses in the summer of 2011, and none of those witnesses from Texas to California even heard of me. These people who allegedly lied on their insurance applications were not indicted. The brokers that signed and submitted the allegedly false insurance applications were not indicted. Only I am being brought to trial, when it is beyond peradventure that I did not speak to any of the insureds, help them fill out an application, sign the application, or submit the application. If the application is false, it is not because of me or my company Grist Mill Capital, LLC that provided the funding for the policies owned by the Charter Oak Trust. Everyone involved believes that the Connecticut indictment is payback for fighting the government for 14 years in Boston and now suing the government and federal agents involved for not one but two unlawful commando raids on my office building. And, even a cursory glance at IRC Section 7608 shows that the IRS agents are not allowed to brandish weapons during a search and seizure unless Alcohol, Guns, or Drugs are involved. For all IRS investigations, subpoenas are to be served in the "least intrusive means possible," except when the government is trying to take revenge on me.

Now that the government is "piling on" with yet another indictment with even more bizarre claims, as if the government is trying to criminalize innocent every-day movements of money, which is not a crime without it "**knowingly**" being the proceeds of some **Specified Unlawful Activity** or crime, the question to be answered is why? All of these applications were signed and submitted before my second trial in Boston in 2008. The government conducted all of their interviews in July of 2011. Why was there no indictment in 2011? Could it be that I was found to be the victim of egregious prosecutorial misconduct for a second time as I was granted my second new trial order on September 1, 2011? The government had a choice: try me again in

70 days, or put in the placeholder appeal they filed on September 27, 2011. They did not diligently prosecute their appeal as required under 18 U.S.C. §3731, but since there were all sorts of allegations of bad conduct swirling around me, it was easy to avoid the fact that everyone lied at my second trial and the government knew it. But, to no avail, even if the Merrill brokers lied, that was still "harmless error" and my attorneys did a "great job" in cross-examining all of the lying witnesses. But, a great cross-examination cannot purge the taint of perjury, nor does it absolve the government of its obligations under *Napue*.

So to review, the government raids my offices in 2010 and 2011, conducts over 70 interviews in the summer of 2011 but waits until December 13, 2013 to indict me for mail and wire fraud based on insurance applications that were all filled out before June 2008, when I did not fill out any application paid for by the Charter Oak Trust and if I knew the policies were fraudulent, I would know they would have zero value in the marketplace because the policies could be rescinded by the carrier or voided as a contract in some states for up to six years. Thus, the government's theory of a crime makes no sense, even assuming *arguendo* it was a crime to begin with.

What does make sense is that the government was out to get me for fighting the government in Boston for 14 years, and then having the audacity to sue the government not once, but twice. But after conducting all of those investigations in July of 2011 of people that never heard of me, they had to pause when I won my second new trial order. Then, while conducting their costly investigation for yet another three years, they saw their opportunity when my new trial order was overturned on November 25, 2013. Coincidence, we think not. This is a classic case of prosecutorial misconduct and vindictive prosecution as happened to James Tobin with

prosecutions in Massachusetts and then New Hampshire. I have been hit by adjacent state prosecutions in Massachusetts and Connecticut.

It has been over ten years since I was indicted in Boston for making oral and written misrepresentations concerning the BPETCO 1031 property exchange debacle. Despite the evidence adduced in not one but two trials that shows I successfully completed 119 out of 126 tax-qualified property exchanges and over $100 million in transactions without any misappropriation of money for myself, the government has pursued me for mail and wire fraud despite the fact that my trading strategy might have been successful, and that at this late date, no one has pointed to or alleged even a single false statement – written or oral – that can be attributed to me. Without any type of falsehood, there can be no fraud. Without a "knowing" scheme to defraud, there is no federal crime of mail and wire fraud. There was no evidence of scienter, mens rea, or a specific intent to defraud (no such words can be found anywhere in the Indictment), and my so-called alleged "victims" have now made over $50 million from their $8 million investment in the BPETCO property exchange transaction.

Moreover, there is no "federal issue" here that Attorney General Eric Holder says is a necessary factor in his May 19, 2010 Memorandum to America's AUSA's on deciding whether or not to prosecute. See Exhibit Five. It obviously has not appeared in either of my two trials in this Court. It is indisputable that Martin Paley had **all** contact with the Exchangors and I had none. Paley settled his $19 million judgment with the Exchangors for $150,000 and gave up his Fifth Amendment protection to testify about his conversations with Merrill Lynch broker Jerry Levine, so there is another witness that says Merrill knew the source of the BPETCO funds from the beginning. Now that volumes and volumes of new evidence have come out since my second trial showing that Merrill Lynch knew from the outset that the BPETCO funds were client funds

and not my money, and that I was totally transparent in all of my dealings, it is only government vindictiveness that keeps this prosecution going.

I have clearly been the victim of both actual vindictive prosecution and the appearance of prosecutorial vindictiveness. Nowhere in the original indictment does it mention that I met with, spoke to, or communicated with any of the Exchangors. The superseding indictment (the "Indictment") only came about after Professor Alan Dershowitz exposed the deficiencies of the original indictment that the allegedly false – oral and written – misrepresentations lacked the word "material" as required by *Neder v. United States*, 527 U.S. 1 (1999), so the government added the word "material" to seven paragraphs in September 2004. But, no one else was ever indicted in this case, and it is beyond cavil that I did nothing in Massachusetts. There is not even a single allegation of causation in Massachusetts, much less the doctrine applied by the Supreme Court in *Morissette v. United States*, 342 U.S. 246 (1952), that a crime must be "constituted only from concurrence of an evil-meaning mind with an evil-doing hand." *Id.* at 251. The *actus reus* must be combined with the *mens rea* for there to be a crime. In this case, both the "evil act" and the "evil intent" are missing. Nowhere is there any *mens rea* in the Indictment or the "specific intent" to harm someone's property interests or take their money under false pretenses. I only ran my office in Connecticut and invested BPETCO's money with Merrill Lynch and PaineWebber in Manhattan. Thus, the only thing that we are left with is that for ten years the government has carried out a program of prosecutorial vindictiveness against me and has abrogated my rights to a fair trial every step of the way. For that reason alone, my conviction and sentence must be vacated, and my Indictment must be dismissed.

## A.    LEGAL STANDARD

"A vindictive prosecution—one in which the prosecutor seeks to punish the defendant for exercising a protected statutory or constitutional right—violates a defendant's Fifth Amendment right to due process." *United States v. Jenkins*, 537 F.3d 1, 3 (1st Cir. 2008).  A defendant may establish a vindictive prosecution either (1) by producing evidence of actual vindictiveness or (2) by demonstrating circumstances that reveal a sufficient likelihood of vindictiveness to warrant a presumption of vindictiveness. *United States v. Marrapese,* 826 F.2d 145, 147 (1st Cir. 1987) (citing *Goodwin,* 457 U.S. at 376). If a defendant raises a presumption of vindictiveness, the prosecutor may rebut the presumption by showing objective reasons for its charges.  Indeed, courts have long abided the "uncontroversial principle" that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (*quoting Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)).

While finding no actual due process violation in the plea-bargaining threats of *Bordenkircher,* the Supreme Court distinguished its decisions in *North Carolina v. Pearce,* 395 U.S. 711, 725 (1969) (applying a presumption of vindictiveness where the trial judge, on retrial, imposed a more severe sentence upon the defendant who successfully attacked his initial conviction on appeal) and *Blackledge v. Perry,* 417 U.S. 21, 28 (1974) (applying a presumption of vindictiveness where the prosecutor reindicted -- on a felony charge -- a defendant originally convicted of a misdemeanor after the defendant successfully exercised his right to appeal the misdemeanor charge). The Court stressed that, in *Pearce* and *Perry,* it was dealing with the state's unilateral imposition of a penalty upon a defendant who had **exercised a legal right to appeal his original conviction**, "a situation very different from the give-and-take negotiation

common in plea bargaining between the prosecution and defense." *Bordenkircher,* 434 U.S. at 363 (internal quotation marks and citation omitted). There was no "plea-agreement" in my case, but there definitely was an agreement to review the newly-discovered Merrill Lynch evidence coming in and either agree to give me a new trial or to dismiss the charges altogether. See Agreement of June 26, 2009, Dkt. 352, attached as Exhibit Six.

Thus, a defendant may be penalized for violating the law, but not punished for exercising his rights to seek an appeal. *See Goodwin,* 457 U.S. at 372. "A defendant may establish a vindictive prosecution either (1) by producing evidence of actual vindictiveness or (2) by demonstrating circumstances that reveal a sufficient likelihood of vindictiveness to warrant a presumption of vindictiveness." *Jenkins,* 537 F.3d at 3. Although I provided an extensive list of both actual and presumptive vindictiveness, I wish to emphasize the latter. Once raised, the government must rebut a presumption of vindictiveness "by showing objective reasons for its charges," such as the discovery of new evidence. *Id.; see also United States v. Lanoue,* 137 F.3d 656, 665 (1st Cir. 1998). Obviously in this case, the discovery of "new evidence" favors my claims of prosecutorial vindictiveness rather than giving the government help in its rebuttal of the prosecutorial vindictiveness claim.

## B.   EXAMPLES OF ACTUAL AND PRESUMPTIVE VINDICTIVENESS

Therefore, the incidents and examples of vindictive prosecution or at least the facts that show a case of "presumptive" vindictive prosecution can be summed up as follows:

1. Despite providing the government with three volumes of documents that Merrill knew the BPETCO money was client funds, the government indicts only me.

2. The government makes a deal with Jeff Denner – Mr. Paley's attorney – that Mr. Paley will not be prosecuted so he can stop taking the Fifth and testify against Merrill Lynch on behalf of the Exchangors in January 2004.

3. Mr. Paley clearly perjures himself at my first trial and the government totally ignores this Court's rendition of how Paley perjured himself.

4. I, against all odds, am victorious against PaineWebber in BPETCO's arbitration victory of December 15, 2005.

5. In June 2008, I assign the almost $15 million arbitration award plus interest over to the Exchangors before my second trial begins. Incredibly, instead of dropping all charges against me, the government does several "motions-in-limine" to prevent the jury from ever hearing that the Exchangors have been paid back nearly double on their $8 million loss.

6. Even more incredible is the fact that the government maintained in the most recent Pre-Sentencing Report (PSR) that I should be paying back Byron Darling and Brian Fitzgerald even though they were paid back before the **civil** trials began in this matter. But the most incredible claim made by the government is that I should pay back any money to PaineWebber (now known as UBS), much less the $8,636,650 that PaineWebber has been reimbursed by Merrill Lynch – see the last page of the PSR dated February 11, 2014. This one addition demonstrates not only prosecutorial vindictiveness, but maliciousness as well, if not outright "shock the conscience" prosecutorial misconduct on the part of the government.

7. Beginning in 2009 and throughout 2010 and 2011, the government received over 30,000 pages of documents showing that the Merrill Lynch witnesses interviewed by the FBI on 302 Reports and that testified in both of my trials: Levine, Stern, and Rasmussen, all lied. Merrill knew from the inception that the BPETCO funds were other peoples' money, and they lied about that fact and did not turn over documents early on to the SEC, to the Exchangors, or to any of the attorneys on the Carpenter defense team. As the Court stated in its September 1, 2011 Order granting me a new trial: "Levine perjured himself, and the government knew it."

8. The government also ignored its promise in the Joint Status Report filed as Dkt. 352 that, depending on the newly-discovered evidence from Merrill, the government would either dismiss all charges or agree to give me a new trial. This was in the summer of 2009.

9. Voluminous filings followed thereafter, and Merrill Lynch was hit with a $34 million judgment from Judge Neel, followed by other orders from Judge Roach for legal fees and consequential damages payable to the Exchangors. All told, the Exchangors have **now** been paid over $50 million by me and Merrill Lynch on their $8 million investment in BPETCO.

10. When this Court's order came down on September 1, 2011 granting a new trial for me, the government had a decision to make: either retry me in 70 days or file the "placeholder" appeal that they filed on September 29, 2011. This is after filing an appeal on January 9, 2006 after learning of my arbitration victory of December 15,

2005 and knowing full well that the prosecutorial misconduct of Carpenter Two was even more egregious than the misconduct of Carpenter One.

11. During the two year pendency of the appeal, the prosecution asked for and received not one, but two extensions of time despite the requirement of 18 U.S.C. §3731 to prosecute all appeals diligently. The government also asked for and received two extensions of time on my second appeal to the Supreme Court.

12. Because of the three year interim between the June 2008 trial and the September 2011 new trial order, I several times wished to have the Court hear my Speedy Trial and Sixth Amendment violation arguments. Just as in *United States v. Trueber*, 238 F.3d 79 (2001), I asked for a remand from the First Circuit to hear my motions, but the government actively opposed those motions, and the First Circuit ultimately denied my motion to remand despite the fact that Trueber was successful in getting his case remanded back to the district court in the space of two weeks' time. *See Trueber* at 96.

13. There is no other case in the history of the First Circuit that I could find that ends with the apology at the end of the First Circuit's reversal of my new trial granted under the "interest of justice" standard:

> "We also regret that it took three years for the district court to rule on the motion for new trial."

See *United States v. Carpenter*, No. 11-2131 at *27 (1st Cir. Nov. 25, 2013).

14. The government has wasted 14 years of my life prosecuting me for a non-crime. Now that the Exchangors have been paid back their investment by a multiple of 500%, with interest and attorneys' fees, there is not even a breach of contract case here. The only apparent motive for the government to change from a theory of oral and written misrepresentations to a case of half-truths to a case of full blown omissions is that the government wants to preserve its ill-gotten jury verdict rather than see justice be done, despite their sworn oath and the famous admonition "to do justice" from *Berger v. United States*, 295 U.S. 78 (1935).

15. The government will trample over my constitutional rights to a fair trial, due process, and several violations of the Sixth Amendment just because I refuse to let go of my right to appeal or to seek justice.

16. The government on its own should join with me on a new trial motion, but they won't because they know that Stern and Rasmussen, as well as Levine, committed perjury so they don't dare put any broker including Mitch (13,000,000 reasons to lie) Rock on the stand for fear of violating their duty under *Napue v. Illinois*, 360 U.S. 264 (1959). Without the brokers, there will be no derogatory comments about me as a "Riverboat Gambler" or "watching grass grow" or "paint dry." The government

knows it will not be able to keep me off the witness stand, and the jury will learn that the Exchangors have made over $50 million on their $8 million loss.

17. The government also fears that they will now be forced to choose between what was charged in the Indictment – knowingly false misrepresentations – and their new theory of the case that I had a duty to tell the Exchangors about my choice of investments or the fact that I was losing money. An appeal of a constructively amended indictment is the ultimate form of vindictive prosecution.

18. The government also knows that I did not send out or cause to be sent out any of the mailings and wires as Mr. Paley handled all of the business parts of BPETCO, and if Paley lied to the Exchangors, it would be a state fraud rather than a federal fraud. And clearly none of the mailings or wires were in the "furtherance of the scheme to defraud" because there was no scheme to defraud, there was no false statement by me, and I had no duty to disclose anything. The government knows all of this, so the continued prosecution of me is a clear-cut case of both "actual" and "perceived" vindictive prosecution in violation of my Fifth Amendment rights to Due Process and a Fair Trial.

## C.   A PRESUMPTION OF PROSECUTORIAL VINDICTIVENESS AGAINST ME EXISTS

In short, my decade-long diary of abuse at the hands of the government presents the quintessential appearance of vindictiveness. Indeed, the sequence of events alone might well justify a presumption of vindictiveness; since courts view quite skeptically the government's decision to file more severe charges following a defendant's successful appeal of his conviction. *See, e.g., Blackledge v. Perry*, 417 U.S. 21, 28-29 (1974); *United States v. Cooper*, 461 F.3d 850, 856 (7th Cir. 2006); *United States v. Rosenthal*, No. CR 02-0053, 2007 WL 801647, at *2 (N.D. Cal. Mar. 14, 2007); *cf. Aviles-Sierra*, 576 F. Supp. 2d at 239 n.2 (distinguishing the filing of additional charges during pre-trial plea negotiations or after a mistrial). But here there was even more. Starting in 2009 and ending in December 2012 with a huge payout to the Exchangors, Merrill Lynch provided over 30,000 pages of exculpatory evidence that the government effectively ignored while it constructively amended its Indictment and kept me in a state of appellate Purgatory.

First, the government has not identified any newly discovered evidence that might justify its charging decisions. Compare *Lanoue*, 137 F.3d at 665, with *United States v. Wood*, 36 F.3d 945, 947 (10th Cir. 1994), and *United States v. Cafiero*, 292 F. Supp. 2d 242, 247-48 (D. Mass. 2003). It possesses the same evidence today as 10 years ago, and could have readily brought omission charges before superseding indictment, or, most importantly, my appeal. *See United States v. Jenkins*, 504 F.3d 694, 700 (9th Cir. 2007); *Lovett v. Butterworth*, 610 F.2d 1002, 1007 (1st Cir. 1979). Instead, it chose to wait until its arguments of 2013, over five years after the trial to raise the "omissions" argument. The new Merrill evidence helps me, it does not help the government.

Moreover, courts must assess the likelihood of prosecutorial vindictiveness with the doctrine's "prophylactic" purposes in mind. *See Jenkins*, 504 F.3d at 700. The vindictive prosecution doctrine seeks not only to alleviate the accused's apprehension of persecution but also to prevent the chilling of "the exercise of legal rights by other defendants who must make their choices under similar circumstances in the future." *Id.* (citation and internal punctuation omitted); *see also North Carolina v. Pearce*, 395 U.S. 711, 724 (1969); *Lovett*, 610 F.2d at 1006-07. And the potential for future chill surely exists when the government - in fact, some of the very same prosecutors - responds to a thwarted, judicially criticized initial prosecution by filing more severe charges that could have been brought years ago. In sum, a reasonable observer might well perceive the instant prosecution as the government's punitive attempt at mere "self-vindication" of the original indictment and trial of me. *United States v. Falcon*, 347 F.3d 1000, 1004 (7th Cir. 2003) (citation and internal punctuation omitted); *see also Rosenthal*, 2007 WL 801647, at *3.

82

In conclusion, I have presented both concrete examples and circumstances—including sequence, the absence of any new factual developments, and exposure to more severe charges—that "reveal a sufficient likelihood of vindictiveness to warrant a presumption of vindictiveness." *Jenkins*, 537 F.3d at 3.

## D.    THE TOBIN CASE REQUIRES DISMISSAL OF MY INDICTMENT

The several trials of James Tobin mirror exactly the Kafkaesque nightmare that I have been subjected to by the government's obvious malice towards me and their prosecutorial vindictiveness to secure a "win" at whatever cost. Mr. Tobin appealed his conviction, challenging a jury instruction and the sufficiency of the evidence. On March 21, 2007, the First Circuit agreed that the challenged instruction was overbroad and prejudicial, vacated the conviction, and remanded to allow the district court to address a question of statutory interpretation. *See United States v. Tobin*, 480 F.3d 53, 58, 62 (1st Cir. 2007). Eleven months later, the district court concluded that 47 U.S.C. §223(a)(1)(D) demands "a specific purpose to cause emotional upset," and, finding that the government could not satisfy this requirement, entered a judgment of acquittal on the remanded charges. *United States v. Tobin*, 545 F. Supp. 2d 189, 193 (D.N.H. 2008).

While the First Circuit was reviewing Mr. Tobin's appeal of the New Hampshire prosecution, the same government moved forward with a new indictment against Mr. Tobin in Maine based on the same set of facts. The District Court in Maine dismissed the case for prosecutorial vindictiveness not as severe as in my prosecution, but the government even appealed that to the same First Circuit as Mr. Tobin's other appeals. Whereas Mr. Tobin was sentenced to 10 months and a $10,000 fine, the First Circuit found that, just like me, there was no

proof that Mr. Tobin had the requisite "evil intent" to commit the crime, which in Tobin's case was jamming the phones of a political campaign.

Just as I protected my rights by taking an appeal, so, too, did Mr. Tobin.  The result for Mr. Tobin was brand new charges in a different state, just as I have been indicted in Connecticut on events that actually **all occurred** before my second trial in June of 2008.  Forget that all of the new charges are time-barred; the new Connecticut indictment did not happen until the government successfully overturned my grant of a new trial at the end of November 2013.  There is no question that the AUSA's in Connecticut and Massachusetts have been discussing my case for the better part of three years.  This collusion between the Massachusetts and Connecticut AUSA's is only the tip of the prosecutorial vindictiveness iceberg.

In fact, at my sentencing hearing, the government spent a great deal of the time talking about a four year old threat of indictment for tax evasion from Wisconsin that never materialized, a civil lawsuit involving a life insurance policy taken out by a person in 2007 that died in May 2008, the Connecticut indictment that involves life insurance policies taken out by a welfare benefit trust between 2006 and 2008, and threats made by one of my attorneys during a back-and-forth with the Exchangors' greedy and duplicitous lawyers in the civil case with the Exchangors, who have enjoyed a $50 million judicial jackpot at my expense.

Similar to the government creating new charges against Mr. Tobin based on the same events; the government attorneys have totally restructured a new indictment that scarcely resembles the original indictment in my case.  Therefore, the government's arguments that my crime was defrauding insurance carriers and money-laundering is **exactly** the same change in the nature of the crime that resulted in Mr. Tobin's dismissal of his indictment.  Whereas my ordeal has been longer and more arduous than Mr. Tobin's ordeal, I respectfully request that my §2255

Petition be granted, my conviction be overturned, and my Indictment be dismissed on the same basis as Mr. Tobin's for egregious prosecutorial vindictiveness.

**E.    THE GOVERNMENT'S ACTUAL VINDICTIVENESS IS PROVEN BY HOW IT HANDLED THE MERRILL LYNCH EVIDENCE**

Attached as Exhibit Six is the Joint Report Concerning Merrill Lynch Evidence filed over five years ago with the Court on June 26, 2009, as Docket Entry 352. That status report was meant to inform the Court that there were literally thousands of new documents streaming into the government's offices from Merrill Lynch's new attorneys that showed that not only had Levine lied, but also Stern, Rasmussen, Hassan Tabbah, as well as a dozen other Merrill executives. They all lied to protect Merrill from an $8 million judgment.

From the outset of this case, the government had stated that if I could show that Merrill knew from the beginning that the BPETCO funds were client funds, then I would not be indicted. Despite me repaying the Exchangors $15 million, almost double what they had lost in BPETCO, the government proceeded with the second trial in June 2008. The government filed several motions-in-limine just to keep out the knowledge that the Exchangors had been repaid all $8 million they had lost and more. Regardless that BPETCO won its arbitration against PaineWebber in December 2005, the government has me "owing" PaineWebber $8 million in its Pre-Sentencing Report as "restitution," despite the fact that PaineWebber caused the problem by sweeping the BPETCO accounts in early January 2001.

Then, as if to add insult to injury, not only has the government been derelict in its duties under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *United States v. Bagley*, 473 U.S. 667, 682 (1985), the government has not reported to anyone that Merrill paid PaineWebber back the $8 million that it was out and neglected to report to anyone that Merrill had paid over $30 million to the Exchangors to settle the judgment that the

Exchangors had against Merrill. None of this has been reported by the government to me or to the Court as required by *Brady, Giglio*, and *Bagley*, but the government has me owing restitution to PaineWebber? Even after they should know that Merrill paid PaineWebber back in full years ago? This is in addition to ignoring and not investigating the February 2008 Iantosca lawsuit discussed above.

Rather than going after Mr. Paley for his perjury in Carpenter One, or after Levine for his glaring perjury in Carpenter Two, or reporting to the Court that the Exchangors have been paid over $50 million on their $8 million loss, or acknowledging that Merrill covered PaineWebber's expenses, the government chose not to live up to their agreement of June 26, 2009 that upon "the government's review of the evidence, the parties will report whether the government agrees that a **new trial** or **dismissal of the charges** is appropriate in light of the new evidence. See Dkt. No. 352.

That agreement was signed by AUSA Pirozzolo. Instead of living up to the terms of that agreement, the government decided instead to ignore its continuing obligations under *Brady*, *Giglio*, and *Bagley*, and totally abandon its responsibilities as to false testimony under *Napue*. The government also decided to ignore the evidence provided in the two previous cases and create a new theory of the crime based on "omissions" and a failure to disclose. And when did they decide to breach their agreement of June 26, 2009 and fabricate a brand new prosecution out of "omissions"? It was more than two years later when this Court granted my new trial motion.

The government had a choice during September 2011: it could either live up to the agreement of June 26, 2009, or bring me to trial in 70 days or file the flimsy and baseless appeal that it filed in violation of 18 U.S.C. §3731, where it created out of whole cloth an imaginary duty that I, who had never met with or communicated with any of the Exchangors, was now

committing fraud based on what I **did not tell** the Exchangors. This is the ultimate proof of the government's **actual** vindictiveness against me, because not only did the government violate its agreement with me, it had to violate my Fifth and Sixth Amendment rights to do it; just so that the government could constructively amend the Indictment to keep me in jeopardy and preserve their unjustifiable guilty verdict.

The government's vindictiveness is not just "presumptive," it is "actual," it is malicious and it is a vicious reality for me and my family. The government, the Court and even I know the law of the First Circuit well. Without having a contractual or fiduciary duty to disclose, the failure to disclose is not a crime. In *United States v. Cassiere*, 4 F.3d 1006, 1022 (1st Cir. 1993), the Court in regards to the duty to disclose stated:

> **[I]t is not a crime** simply to be careless or sloppy in discharging your duties....That may be malpractice, but **it's not a crime**.
>
> It is well settled that breach of a fiduciary duty, standing alone, **does not** constitute mail fraud." *United States v. Greenleaf*, 692 F.2d 182, 188 (1st Cir.1982), *cert. denied*, 460 U.S. 1069 (1983).

(Emphasis added). The Court went on to say that "evidence showing negligence or mistake is not enough." *Id.* at 1024.

Therefore, based on the law of the First Circuit as stated above in *Triple S*, *Bonilla* and *Cassiere*, and the fact that the government had an obligation to either agree to a new trial for me based on the newly disclosed Merrill evidence or to dismiss the charges altogether, I respectfully ask this Court to vacate my conviction and sentence and dismiss the Indictment.

## F. THE GOVERNMENT CANNOT REBUT ITS VINDICTIVENESS

To rebut adequately a presumption of vindictiveness, the government must demonstrate "objective reasons for its charges." *Id.*; *see also Goodwin*, 457 U.S. at 376 n.8 (requiring "objective evidence justifying the prosecutor's action."); *Rosenthal*, 2007 WL 801647, at *2

(characterizing burden as "heavy").  here, those reasons do not include several that the government routinely invokes, such as newly discovered evidence or intervening criminal activity.  *See Lanoue*, 137 F.3d at 665; *Aviles-Sierra*, 576 F. Supp. 2d at 239; *Lovett*, 610 F.2d at 1006 n.10.  The government does not and cannot cite any material change in the law of omissions.  *See United States v. Marrapese*, 826 F.2d 145, 149 (1st Cir. 1987); *United States v. Ward*, 182 Fed. Appx. 779, 788 (10th Cir. 2006).  Nor does the government claim to have communicated to me its intent to pursue omissions charges until it filed its Appeal.  *See Rosenthal*, 2007 WL 801647, at *4.  In fact, it never notified me of any such possibility.

This will not do.  The aforementioned "legal infirmities" - previously identified by me and thus hardly "unforeseen" - were diagnosed by the First Circuit only because I exercised my right to appeal; the government's explanation justifies nothing.  A loss on appeal may occasion the consideration of new charges, but it cannot justify the government's decision to bring those charges.  To rebut a presumption of vindictiveness, the government must offer more.  *See Lovett*, 610 F.2d at 1006 (suggesting that the government must offer "new facts unrelated to the appeal").

In some cases, the government's decision to bring new charges might be perceived as less vindictive when its initial loss is attributable to a new construction of a statute.  But these circumstances do not warrant such a perception.  Moreover, to rigidly interpret the doctrine of vindictive prosecution more narrowly when a defendant has successfully appealed on novel as opposed to well-established grounds would discourage defendants from advancing novel arguments on appeal.

In conclusion, the government has failed to satisfy its burden of identifying objective facts that dispel the appearance of vindictiveness.  To be sure, courts must tread lightly when

assessing prosecutorial charging decisions. "Whether to prosecute and what charge to file or

bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *United*

*States v. Batchelder*, 442 U.S. 114, 124 (1979). These decisions are necessarily informed by

sensitive judgments about dangerousness, deterrence, and enforcement priorities, which courts

ought not readily second-guess. See *United States v. Stokes*, 124 F.3d 39, 45 (1st Cir. 1997).

Moreover, too expansive an application of the vindictive prosecution doctrine might create

perverse incentives for prosecutors to bring all plausible charges initially, lest they lose the

opportunity to pursue them. This result would hardly redound to the benefit of defendants.

That said, the vindictive prosecution doctrine imposes critical "constitutional limits" upon the

exercise of prosecutorial discretion. *Lovett*, 610 F.2d at 1005 (*quoting Bordenkircher*, 434 U.S.

at 365). Those limits protect all current and future criminal defendants, including those whose

conduct may be properly described as "insidious" or "thoroughly bad." *Tobin*, 545 F. Supp. 2d

at 194; *Tobin*, 552 F.3d at 34. And by filing even more severe charges against me in

Connecticut, the government exceeded those limits here. Above all else, I was granted not one

but two new trial orders based on egregious prosecutorial misconduct, and instead of retrying me

within 70 days of this Court's new trial orders, they instead chose to file two frivolous appeals

that were not diligently prosecuted in either case under 18 U.S.C. §3731. The fact that the

government had to change its theory of the case in the second appeal, confirms both its

misconduct and its vindictiveness.

Therefore, for the above-stated reasons, the Court should vacate my conviction and

sentence and dismiss my Indictment immediately for egregious prosecutorial misconduct and

malicious prosecutorial vindictiveness.