# EXHIBIT 1



**COMMONWEALTH OF MASSACHUSETTS**

SUFFOLK, SS.

**SUPERIOR COURT
CONSOLIDATED CIVIL ACTION
NOS. 01-0116-BLS2; 01-299-BLS2;
01-0330-BLS2; 01-0581-BLS2; 01-3433-
BLS2; 01-4305-BLS2; 01-00075 (Norfolk
County)**

**GAIL A. CAHALY, et al.,**

v.

**BENISTAR PROPERTY EXCHANGE TRUST
COMPANY, INC., et al.**

## MEMORANDUM OF FINDINGS AND RULINGS
## ON SANCTIONS REMAND

These consolidated actions represent litigation which is now a decade and one-half old.

Most recently, I held an evidentiary hearing on remand of the issue of sanctions against

the law firm of Bingham McCutchen LLP (Bingham), for a decision made by Bingham partner

John R. Snyder (Snyder) in 2002, to withhold from production in discovery in the underlying

litigation a group of documents on the basis of the work product doctrine.  A retired justice of

this court, Stephen E. Neel, had previously held an eight-day evidentiary hearing on the same

sanctions question back in 2010.  Judge Neel issued a detailed memorandum of Findings and

Rulings dated January 11, 2011 (the First Sanctions Decision).

Plaintiffs appealed the First Sanctions Decision, and in June, 2014, the Appeals Court

vacated that portion of Judge Neel's final judgment which had entered judgment for Bingham on

plaintiffs' motion for sanctions.  The Appeals Court held Bingham "lacked an adequate basis,

under the guise of the work product doctrine, for its decisions to withhold information that

Merrill employees had viewed certain Benistar Web pages describing its business as an

1

intermediary for third-party funds and then to present a defense claiming that no Merrill employee had viewed the very same Web pages." Cahaly v. Benistar Property Exchange Trust Company, Inc., 85 Mass. App. Ct. 418, 419 (2014).[1] The Appeals Court further ruled that certain issues remained requiring resolution by a fact finder, and remanded the matter to this session for further proceedings consistent with its opinion. Id., at 428-429.

**For all of the reasons discussed in this Memorandum, I find and rule that Snyder's conduct is not sanctionable. Were it sanctionable, I find the only actual loss Plaintiffs could have sustained as a proximate result of Snyder's conduct is the amount of interim uncompensated attorneys' fees accrued, which Plaintiffs themselves estimate to be $750,000.**

## LEGAL STANDARD AND SCOPE OF REVIEW

The Appeals Court decision identified "two important qualifications to the work product doctrine that bear directly on the facts of this case and were absent from [Judge Neel's] analysis" -- the concept of a party's substantial need for the material sought in discovery; and the distinction between fact and opinion work product for purposes of protection from disclosure.

---

[1]     The sanctions decision by the Appeals Court was the latest in a long series of reported and unreported decisions in these matters which form the foundation on which I write. Then Superior Court Judge Botsford presided over the first trial between the primary parties (Bingham was not an intervenor at that time) in 2002, and issued a memorandum of decision on the post-trial motion of defendant Merrill Lynch for judgment notwithstanding the verdict, in February, 2003. 2003 Mass. Super. LEXIS 143 (February 25, 2003). Judge Botsford later granted the plaintiffs a new trial based on newly-discovered evidence unrelated to Bingham and the documents at issue in these sanctions proceedings. 85 Mass. App. Ct. at 420 n. 6. That decision was affirmed by both the Appeals Court, 68 Mass. App. Ct. 668, 673-676 (2007)(describing the import of the "Paley" and "Patterson" evidence sources and potential), and the Supreme Judicial Court Cahaly v. Benistar Property Exch. Trust Co., 451 Mass. 343 (2008). Neel, J. (ret.) presided over the re-trial in 2009, which also resulted in a jury verdict for plaintiffs. In addition to the First Sanctions Decision referenced throughout the present Memorandum, Judge Neel issued a memorandum and order for judgment on plaintiffs' claims for punitive and consequential damages, following a bench trial on those issues. 2011 Mass. Super. LEXIS 8 (January 11, 2011). Finally, a different judge of the Superior Court heard a separate action entitled Cahaly v. Boston Property Exchange Trust Company, et al., Suffolk Superior Court, Civil Action No. 2014-00530-D, brought to reach and apply settlement funds. Memorandum of Decision and Order of February 24, 2015 (Locke, J.). That action has recently been resolved. Civil Action No. 2014-00530-D Docket, at Papers 82-84.

85 Mass. App. Ct. at 425, citing Commissioner of Rev. v. Comcast Corp., 453 Mass. 293, 314

(2009). The court concluded that based on these two qualifications, Snyder lacked an adequate

basis in law to support his decision to withhold certain facts reflected within the so-called Malia

file, namely that Malia visited the section 1031 pages on the Benistar Web site on September 20,

2000, and then sent those pages by fax to Rasmussen. Id., at 426. It went on to state:

> "We are also of the view that Snyder's persistence in pursuing a defense that included
> Merrill's lack of knowledge of the nature of Benistar's business and the section 1031
> Web site pages calls into question his good faith. Accordingly the judge's ultimate
> finding that Snyder acted reasonably and in good faith in withholding critical documents
> as work product must be reassessed in light of the legal principles we have set out here.
> Nevertheless, reasonableness and good faith are determinations we leave to the fact
> finder, who is in a better position to assess the credibility of witnesses and to weigh the
> evidence, in the context of the applicable law."

Id., at 428. The Appeals Court decision then briefly addressed potential authority for imposition

of the sanctions the plaintiffs seek – the inherent power of the trial court; Mass. R. Civ.P. 11; and

Mass.R.Civ.P. 37 – but again deferred to the proceedings on remand to determine whether

sanctions are warranted on any such grounds. Id., at 428-29.

The Appeals Court decision relied primarily on Comcast, decided in March, 2009, and

McCarthy v. Slade Assocs., 463 Mass. 181 (2012), decided August, 2012, as the clearest and

most recent articulations of Massachusetts work product doctrine. The parties do not now

attempt to dispute that substantial need, and the distinction between fact and opinion work

product,[2] should explicitly factor into a court's decision about Snyder's actions and state of

mind. Rather, they each cite various authorities which they believe shed light on the components

Snyder should have been considering in 2002 when he assessed the Malia file, and the Merrill

---

[2]     The burden is on the withholding party to demonstrate the type of work product involved, and
ordinary or fact work product receives "far less protection" than opinion work product. Fact work product may be
ordered upon a showing that the party seeking discovery has substantial need of the material and that it is unable
without undue hardship to obtain the substantial equivalent of the material by other means. That showing becomes
the burden of the requesting party, that is, the burden shifts. Comcast, 453 Mass. at 314-315.

witnesses' responses to that file.  Bingham Proposed Rulings at paras. 18-38; Plaintiffs'
Proposed Rulings of Law at pages 4-9.

### Sanctions Law

In their briefing before me both pre- and post-Sanctions Hearing the parties have also
understandably focused on the possible standards for imposing sanctions under Massachusetts
law in 2002, when the file at issue was withheld.  These standards incorporate factual
determinations about the actor's (in this case, Snyder's) state of mind at the time of the alleged
violation.  I summarize those authorities briefly here to frame the factual discussion.

The imposition of sanctions under Mass.R.Civ. P. 11(a) is based on a subjective standard.
It requires that the attorney in question engage in a "wilful violation." Van Christo Advertising,
Inc., v. M/A-COM/LCS, 426 Mass. 410, 412 (1998).  Thus sanctions do not lie if the attorney
demonstrates he held a subjective good faith belief that a pleading in question was supported by
both fact and law. Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 651 (2010),
citing Van Christo, 426 Mass. at 417.  Rather, there must be evidence that an attorney
"deliberately ignored the law and facts" concerning his alleged violation. Id., at 651.  "'[W]ilful
ignorance' of facts and law which would have been known had the attorney simply not
consciously disregarded them" is not excused under our Rule 11(a). Van Christo, 426 Mass. at
416-417.

As the Appeals Court noted in this case, Rule 11 sanctions do not exist to punish counsel
for a "genuine, professional judgment" that turns out to be wrong. Cahaly, 85 Mass. App. Ct. at
429.  This is because to find an absence of good faith, a court must find an intent "to secure
tactical advantage by hampering the opposing party's presentation of its case, in violation of the
rules of the court and of professional conduct." Id., citing Munshani v. Signal Lake Venture

4

Fund II, PL, 60 Mass. App. Ct. 714, 720 (2004)(fraud on the court through scheme to fabricate email, as well as an affidavit filed with the court, followed by a campaign to hide the fabrications); Van Christo, 426 Mass. at 416 ("Good faith includes, among other things, an absence of design to defraud or to seek an unconscionable advantage."); Psy-Ed. Corp v. Klein, 62 Mass. App. Ct. 110, 113 (2004)("The position advanced by the attorney need not ultimately be established to be correct, or even reasonable, for the attorney to be protected from Rule 11(a) sanctions.").

It is up to a trial judge to decide whether to credit an attorney's profession of good faith. Cahaly, 85 Mass. App. Ct. at 429; Psy-Ed. Corp., 62 Mass. App. Ct. at 114, quoting Van Christo, 426 Mass. at 418. This exercise "is expected to avoid using the wisdom of hindsight and should test the [actor's] conduct by inquiring what was reasonable to believe at the time the pleading, motion or other paper was submitted." Millennium Equity Holdings, 456 Mass. at 651, quoting Van Christo, 426 Mass. at 418-419.

The standard for a court's exercise of its inherent sanctioning authority is not dissimilar. A court's inherent sanctioning powers should be exercised with restraint and discretion, which argues for a standard aimed at deliberate conduct. Sommer v. Maharaj, 451 Mass. 615, 621-622 (2008). However, this power is broad enough to enable a court to ensure the fair administration of justice. Wong v. Luu, 472 Mass. 208, 215-220 (2015), citing Avery v. Steele, 414 Mass. 450, 457 (1993)(bad faith alone too vague a standard; limited to those cases where the imposition of sanctions is necessary to preserve the court's authority to accomplish justice; court should exercise restraint and discretion regarding whether to impose sanction and its severity). This power is not limited to instances of behavior that are technically defined as fraud on the court. Munshani, 60 Mass. App. Ct. at 721. Likewise, sanctions for discovery violations in

Massachusetts are governed by Mass. R. Civ. P. 37(d), which requires a finding that the party

"willfully fail[ed]" to comply with the requirements of the discovery rules. Keene v. Brigham

and Women's Hospital, 439 Mass. 223, 235-236 (2003)(discussing remedy of default judgment

for spoliation of records; extreme sanction to be predicated on a finding of wilfulness or bad

faith); Cf., Fletcher v. Dorchester Mut. Ins. Co., 437 Mass. 544, at 550-551 (2002)(sanctions in

litigation must be addressed to the precise unfairness that would otherwise result).  "The purpose

of sanctions is designed not only to punish but also to compensate the aggrieved litigant for the

actual loss incurred by the misconduct of the offending party."  Avelino-Wright v. Wright, 51

Mass. App. Ct. 1, 5 (2001).[3]

## Pre- and Post-Hearing Rulings on Scope of Remand

The parties filed numerous pleadings prior to and following the Sanctions Hearing on

remand, advocating their respective positions on the scope and the procedure required.  Docket,

at Papers 619-34.

### Issues to be Determined on Remand

As a preliminary matter, the parties to this sanctions proceeding (all of the remaining

Plaintiffs and Bingham) could not agree on either the factual or the legal issues to be determined

on remand.  Pursuant to my order, plaintiffs filed a motion setting out their position, duly

opposed by Bingham.  By way of a color-coded copy of the First Sanctions Decision, plaintiffs

proposed findings and rulings within that Decision which they maintained the Appeals Court had

"vacated," along with highlighted excerpts from the Appeals Court decision as support for their

position.  Docket, at Paper 628.

---

[3]     Plaintiffs have also suggested that G.L. c. 93A and G.L. c. 231, section 6F provide "insight" to determine sanctions in this case.  I respectfully disagree, and have not considered these statutes or the common law interpreting them here.

Exercising the discretion accorded the trial court by the Appeals Court decision, 85 Mass. App. Ct. at 430, n. 16, I determined to consider certain identified factual findings made by Judge Neel which I believe went to Snyder's state of mind during the relevant timeframes, but not others which I believe did not do so. I also agreed to hear additional testimony on the "two important qualifications to the work product doctrine" identified by the Appeals Court, id., and declined to hear evidence on matters listed in Judge Neel's opinion as "Rulings of Law." Rather, I ordered that any issues of law which the parties wished me to consider were to be included in their Joint PreTrial Memorandum. Docket at Paper 628, endorsement of 4/15/2015.

<u>Other Evidentiary Rulings</u>

Second, Bingham filed an Omnibus Motion in Limine seeking exclusion from the hearing of four categories of material. Docket, Paper 629. Pursuant to the Omnibus Motion, the testimony of one non-party witness proffered with respect to the effect of Bingham's actions on settlement was excluded; the testimony of a party witness on a similar topic was admitted. That portion of the motion which sought to exclude more generally evidence of damages allegedly caused to the plaintiffs by Snyder's actions was denied; and the portion of the Motion seeking to exclude two letters between NASD and Merrill Lynch was taken <u>de bene</u>. Id., at endorsement of 4/23/2015. Following hearing the two letters were admitted for whatever probative value they may hold as to Snyder's state of mind during the period 2002-2003. Id., at endorsement of 5/6/2015.

<u>Scope of this Record</u>

Third, given the discretion articulated by the Appeals Court decision, it was of some concern to this court that the parties acknowledge the record (beyond our in-court evidentiary hearing proceedings) on which this decision on remand was to be based. Unfortunately the

parties were yet again unable fully to agree. I am grateful for their Revised Stipulation of [334]

Facts, and for the forty-four (44) agreed upon hearing exhibits. However, significantly post

hearing and beyond the deadlines set by the court, plaintiffs offered a series of additional exhibits

or record designations, most of which have since been opposed by Bingham.[4] I am therefore

required to consider and to rule upon these "supplemental" proffers by the plaintiffs.

     First, Bingham challenges inclusion in this record of testimony from the 2010 sanctions

hearing before Judge Neel not previously designated. The four witnesses involved are fact

witnesses Snyder, Pash, and Bevilacqua, and plaintiffs' expert witness, Professor Moore. I see

no possible prejudice to Bingham in my consideration of these materials. Judge Neel considered

them in arriving at his findings and rulings. The Appeals Court undoubtedly had access to them

in its work on the appellate record. And, Bingham has always had access to them in preparation

for this remand proceeding.

     The content of the 2010 testimony is perforce undisputed. Snyder's prior testimony is

both relevant and material to his state of mind. And, to whatever extent Mr. Renehan's and

Professor Moore's testimony may be viewed as that of "dueling" experts, the court benefits from

their perspectives to flesh out the history of the controversy.[5] The 2010 testimony designations

are admissible.

     There is no dispute the 2002 trial designations are admissible. With respect to the 2009

trial designations, I agree with Bingham that the bulk of that (additional) material is irrelevant.

My reading of the First Sanctions Decision suggests Judge Neel considered all of the relevant

material from the 2009 trial in the first hearing, and nothing in the Appeals Court decision

---

[4]    The last post-hearing filing by the parties in this matter is dated July 23, 2015.

[5]    I am certain I have seen at least portions of Professor Moore's testimony before, and believe one or the other party submitted it during pre-hearing work in this sanctions proceeding.

counsels to the contrary.  To the limited extent certain testimony or documents have been

admitted here as a result of the scope of the remand, but were not considered by Judge Neel in

2010, those rulings speak for themselves.  Should I deem a particular piece of 2009 trial evidence

probative on any question the Appeals Court ruled was to be addressed on remand, I will so

indicate.  Otherwise, the 2009 trial materials not offered by the parties prior to or during the

May, 2015 evidentiary hearing are excluded.

     Likewise with respect to the bulk of the depositions taken in 2009 and 2010.  Of course

prior statements of witnesses under oath which I find go to Snyder's state of mind generally, or

specifically to impeach his good faith in the judgments he made about work product, are

probative.  However, the vast majority of this portion of the supplemental material offered by

plaintiffs does not fall into this category.  Rather, it is at best duplicative of the 2002 material,

and/or constitutes circumstantial evidence from which plaintiffs urge me to draw a long series of

inferences and speculations.  This I respectfully decline to do.  Moreover, Bingham's point is

well taken that it did not move to intervene in the case until March, 2010.  Docket, Paper 539.

Thus, Bingham was not present to represent its interests as a party in any discovery taken before

that time.  To the extent I rely on any of this material for my decision, I will explicitly so state.

Otherwise, the depositions taken in 2009 and 2010 are not part of the record before me on this

remand.

     I have carefully reviewed the 38 additional exhibits plaintiffs have proffered post hearing.

The vast majority of these were disclosed to Bingham pre-hearing, or are duplicative of materials

that were. I have considered Bingham's objections to these exhibits[6] and find them unpersuasive. The additional exhibits proffered by plaintiffs are admitted

## PRELIMINARY FINDINGS OF MATERIAL FACT

All of the below-enumerated Findings of Fact represent findings by the court, including but not limited to determinations of the credibility, weight, and probative value of the evidence adduced at hearing before me May 4-7, 2015, and reasonable inferences drawn from that evidence, as well as stipulations by the parties, and the prior record and judicial opinions identified. The Preliminary Findings focus on each set of decisions made by Snyder (and identified by the Appeals Court) which plaintiffs argue are sanctionable.

### Merrill Lynch Retains Bingham in Connection with Benistar Litigation (June 2001)

For purposes of these preliminary historical facts I concur with Judge Neel's findings contained at pages 3-4 of the First Sanctions Decision, including his findings that Stern, Levine, Rasmussen and Tabbah "each told Snyder that he did not know that the money in Benistar's accounts belonged to third parties; that on September 20, 2000, trading in the account was restricted to closing positions only, because of Benistar's trading strategy and losses rather than any concern about the presence of third-party money in the accounts; and that he had not visited the section 1031 pages of the Benistar website." More specifically, I find as follows based on the hearing before me:

### Snyder's Interviews of Merrill Employees (July 2001–February 2002)

1.      Between July 13, 2001 and February 4, 2002, Snyder interviewed key employees at Merrill's Fifth Avenue branch in New York which handled the Benistar accounts: Gary Stern

---

[6]      Contained in Bingham McCutchen's Statement Regarding the Scope of the Record, filed July 15, 2015.

and Gerald Levine, who were brokers and Daniel Carpenter's primary contacts; Thomas

Rasmussen, the administrative manager; and Hassan Tabbah, the branch manager. Snyder also

spoke with Jennifer Waddington, a member of the surveillance group within the compliance

department. Sanctions Hr'g Tr. vol. 1, 19:13-20:3, 22:4-23:6, 54:4-15; Ex. R-1005 at

Bingham/FH 00059-62 (July 13, 2001 conversation with Stern), 00045-46 (August 9, 2001

conversation with Levine), 00063-64 (October 16, 2001 conversation with Stern), 00093-94

(November 1, 2001 conversation with Tabbah), 00101-102 (November 8, 2001 conversation

with Waddington), 00095-96 (February 4, 2002 conversation with Tabbah), 00047-53 (February

4, 2002 conversation with Levine); Ex. R-1006 at Bingham/FH 00959 (November 5, 2001

conversation with Rasmussen).

      2.      Merrill's in-house legal department as led by Pash on the Benistar matter played a

more active role than that of many clients Snyder had worked with. Sanctions Hr'g Tr. vol. 1,

87:5-88:17. Snyder's interviews of Merrill employees were arranged by Pash. Snyder would not

call an employee himself unless Pash had previously alerted the employee, and identified who

Snyder was and what his purpose would be. Pash also personally participated in many of the

interviews. Id., Hr'g Tr. vol. 1, 88:4-17.

      3.      Before January 2002, when the first group of plaintiffs was permitted to bring

damages claims against Merrill, Snyder interviewed Stern, Levine, Rasmussen, and Waddington.

Ex. R-A; RSF ¶ 16. All consistently gave the same explanation for why Merrill had restricted

Benistar's trading, that is, that Benistar had suffered losses due to its unsuccessful trading

strategy and Carpenter refused to change his strategy. Sanctions Hr'g Tr. vol. 1, 23:19-22,

24:11-25:15. Stern was deposed in October and November 2001, and gave the same explanation

under oath. Id., at 25:17-24; Ex. R-A. Snyder spoke with Tabbah in February 2002, when there

were damages claims pending against Merrill. Tabbah told Snyder that the account was

restricted because of Benistar's losses and Carpenter's refusal to change his strategy, and when

Tabbah and Levine were deposed later in February each gave this same explanation for

restricting Benistar's trading. Sanctions Hr'g Tr. vol. 1, 23:19-22, 24:11-25:24.

4.     Stern, Levine, Tabbah, Rasmussen, and Waddington all told Snyder that they

understood in 2000 that the money in Benistar's account belonged to Carpenter or one of

Carpenter's companies, and were not aware that the account contained third-party money. Id., at

26:8-27:1; Ex. R-1005 at Bingham/FH 00059 (Stern believed money in Benistar account

belonged to Benistar), 00045-46 (Levine believed the funds to be "strictly corporate money"),

00049 (Levine believed funds to belong to Carpenter), 00102 (Waddington saw no indication of

third-party money).

**Responses to Written Discovery (June 2002)**

For purposes of these foundational facts surrounding Snyder's role in Merrill's responses

to discovery, I concur with Judge Neel's findings contained at page 6 of the First Sanctions

Decision, including the foundational finding that Snyder's "investigation lead him to believe"

"that Moya's involvement was after the fact and not sufficiently informed to constitute either a

statement of, or the fact of, the requisite 'knowledge' on Merrill's behalf." I reserve the question

of good faith for discussion below. More specifically, I find as follows based on the hearing

before me:

5.     The Iantosca plaintiffs had moved to amend their complaint and add damages

claims against Merrill in August 2001. Sanctions Hr'g Tr. vol. 1, 118:20-119:1. At that point,

the deadline for discovery was already set for November 30, 2001. Id., at 119:2-13. While their

motion to amend was pending, the Iantosca plaintiffs served interrogatories and document

requests on Merrill. Id., at 119:18-120:7. Merrill objected to this written discovery because it was not yet a party. Id., at 19:23-120:7. In January 2002, Judge Botsford allowed the Iantosca plaintiffs' motion to amend their complaint to add damages claims against Merrill. Id., at 120:7-11. Merrill continued to oppose discovery on the ground that it should not have to respond unless it had the opportunity to propound discovery of its own. Id., at 120:19-121:12. On March 25, 2002, the court ordered Merrill to respond to written discovery only if the Iantosca plaintiffs reciprocated. Id., at 122:7-123:17.

6. Additional plaintiffs subsequently sought to bring damages claims against Merrill. Massachusetts Lumber Company brought a separate action against Merrill, and others sought to intervene in the separate action, and to consolidate their new claims with the pending Iantosca claims, for which a trial date had already been set. Sanctions Hr'g Tr. vol. 1, 123:19-124:7. To obtain the advantage of this accelerated trial date, Massachusetts Lumber agreed not to seek further discovery, and to abide by all prior orders, providing its claims against Merrill were consolidated with the prior-filed actions bringing claims against Benistar and related entities. Id., at vol. 1, 125:21-126:11.

7. Merrill asserted general objections to the production of documents and information that was protected by attorney-client privilege or the work product doctrine in its responses to the Iantosca plaintiffs' written discovery. Ex. R-2110, R-2112.

8. Document Request No. 9 asked for documents concerning visits by Merrill personnel to the Benistar website. Sanctions Hr'g Tr. vol. 1, 136:1-3; Ex. R-2112 at 6. Merrill served its responses on June 12, 2002 and objected to Request No. 9 as ambiguous, overly broad, and unduly burdensome, but stated, subject to its specific and general objections, that it had

13

already produced all non-privileged responsive documents. Id., vol. 1, 136:4-10; Ex. R-2112 at 6.

9.      By this representation with respect to non-privileged responsive documents Snyder was referring to a handwritten note Tabbah had taken during a phone call with Carpenter. This produced note referred to the fact that Benistar had a website. Sanctions Hr'g. Tr. vol. 1 136:16-137:11.

10.     It was Snyder's practice in 2002 to state such general objections in responses to written discovery. To his knowledge and experience, other attorneys followed the same practice. Sanctions Hr'g Tr. vol. 1, 135:13-21.

11.     When Snyder initially made the general objections in this case, he did not have particular documents in mind that had been withheld, but believed the document request was broad enough to encompass any documents concerning a visit he or any member of the Merrill in-house legal team might have made to the Benistar website, and that any documents concerning those visits would be privileged, work product, or both. Sanctions Hr'g Tr. vol. 1, 137:12-138:4.

12.     Like the document requests, the Iantosca plaintiffs' interrogatories requested information concerning website visits by Merrill employees. Merrill served its answers on June 13, 2002, and in answering the interrogatory concerning website visits referred to its general objections, which included any production of information protected by privilege or the work product doctrine. Sanctions Hr'g Tr. vol. 1, 138:22-139:16; Ex. R-2110 at 1, 6-7.

13.     Merrill's answers identified Martin Malia as a person with knowledge of the reasons for restricting or stopping trading in the Benistar accounts. Ex. R-2110 at 15.

14

14.     On June 14, 2002, the Iantosca plaintiffs filed an emergency motion to compel Merrill to produce (1) policy and procedure manuals, (2) documents concerning visits to the Benistar website, (3) documents concerning Merrill's investigation of employee conduct in connection with the Benistar accounts, and (4) the personnel files of Stern and Levine.  Sanctions Hr'g Tr. vol. 1, 140:10-141:3; Ex. R-1203.

15.     On June 19, 2002, the Court granted the motion to compel and ordered Merrill to produce, among other things, all documents concerning visits to the website.  Hr'g Tr. vol. 1, 141:6-142:7.  Because the motion was granted without Merrill having had an opportunity to file an opposition, however, Merrill moved for reconsideration.  Merrill argued in part in its motion for reconsideration that any "non-privileged documents" concerning visits to the website had been produced.  Id., 144:2-18, 146:5-14; Ex. R-1048.  Merrill also stated that it "continue[d] to search for non-privileged responsive documents" and would produce any that it found, subject to its general and specific objections.  Id., at 149:13-20; Ex. R-1048.

16.     At the time of the motion for reconsideration, Snyder understood Merrill to be conducting a forensic search of the computers of Stern, Levine, Tabbah, and Rasmussen. Sanctions Hr'g Tr. vol. 1, 149:21-150:4.

17.     On June 21, 2002, the Court allowed Merrill's motion for reconsideration in part, stating that the request for documents concerning visits to the website had been complied with. Id., at 151:2-21; Ex. R-1852.

## Discovery and Analysis of the Malia File (July 12, 2002–July 15, 2002)

With respect to discovery of the Malia file, I concur with Judge Neel's findings contained at pages 2-3 of the First Sanctions Decision, including the finding that "the Benistar website did not inform Malia on September 20, 2000 that Carpenter's options trading constituted a breach of

15

Benistar's duty to its section 1031 clients." More specifically, I find as follows based on the hearing before me:

18.     On July 12, 2002, during a conversation with Pash, Snyder first learned that Malia had a file containing documents relating to Benistar. Sanctions Hr'g Tr. vol. 1, 10:10-17, 17:6-14; Ex. R-1005 at Bingham/FH 00030-34. Pash told Snyder he had located Malia's file and that he would send the file to Snyder. Sanctions Hr'g Tr. vol. 1, 9:23-24, 15:17-20.

19.     Malia was an options compliance specialist in Merrill's compliance department, which was part of Merrill's Office of General Counsel. Id., at 17:6-14, 18:10-16.

20.     Malia's name was already known to both Snyder and to plaintiffs. Snyder had previously heard of Malia from Waddington, who also worked in Merrill's compliance department. Waddington told Snyder Malia was involved in restricting trading in the Benistar account, and Snyder and Merrill had disclosed Malia's name by identifying Malia in the answer to interrogatory as a person with knowledge about the reasons for the decision to restrict trading in the Benistar account. Id., at 16:1-17:1; Ex. R-2110 at 15.

21.     Snyder received the Malia file on July 15, 2002. Sanctions Hr'g Tr. vol. 1, 15:21-24. He reviewed the documents the same day and made notes of questions to ask Malia. Id., vol. 1, 29:1-5; Ex. R-1006 at Bingham/FH 02764-65.

22.     As of July 2002, damages claims against Merrill were set for trial in late August, and motions were pending: motions by plaintiffs to add claims against Merrill and consolidate those claims with the prior-filed action; and a motion by Merrill for summary judgment on the claims brought by the Ianatosca plaintiffs. Sanctions Hr'g Tr. vol. 1, 89:12-90:9.

23.     Snyder and Merrill were also still engaged in efforts to collect any additional documents that were responsive to discovery requests. Sanctions Hr'g Tr. vol. 1, 13:23.

Snyder's primary purpose in reviewing the Malia file was to determine whether any material contained there should be produced in response to written discovery in the case. <u>Id.</u>, vol. 1, 29:18-24.

24.    During his initial review, Snyder noticed the following, to which he has twice testified, which prompted him to consider whether the documents were privileged or work product:

- The file contained a confidential to counsel memorandum that Snyder thought could be a privileged attorney-client communication. Sanctions Hr'g Tr. vol. 1, 30:1-11; Ex. R-1779 at Bingham/FH 01632;

- Many of the documents in the file were unrelated to the analysis of options trading, as Snyder understood that job to be from his own prior experience, raising the possibility that they could be work product. <u>Id.</u>, vol. 1, 17:6-18:9, 30:1-11;

- Several documents appeared to Snyder to have been created after Merrill had restricted trading in the Benistar account and informed Benistar of its decision. <u>Id.</u>, vol. 1, 30:12-31:6; Ex. R-1779 at Bingham/FH 01617-18, 01624-26, 01628-45, 01665-67. For example, there were three sets of printouts of pages from the Benistar website. Sanctions Hr'g vol. 1, 42:4-44:9. Two of those sets had dates after September 20, 2000, that is, after the day Merrill imposed the restriction. Ex. R-1779 at Bingham/FH 01624-26, 01665-67. The third was dated September 20, 2000, but the face of the document did not confirm whether it was printed before or after the decision to restrict trading. Ex. R-1779 at Bingham/FH 01659-61, 01669-75; and

- The file contained a letter from Carpenter to Merrill, dated September 22, 2000, objecting to the restrictions on the Benistar account, seeking "restitution," and stating

17

that Benistar would "hold Merrill legally responsible for those lost profits." Ex. R-1779 at Bingham/FH 01644-45. Snyder understood this letter to be a threat of litigation by Carpenter. Sanctions Hr'g Tr. vol. 1, 31:14-32:1, 33:5-34:24, 36:4-17.

25.     As he reviewed the Malia file, Snyder made notes of questions he wanted to ask Malia. Snyder called Malia on July 15, 2002, the same day he received the file. Sanctions Hr'g Tr. vol. 1, 49:13-52:22; Ex. R-1006 at Bingham/FH 02764-65.

26.     In their telephone call, Malia gave Snyder at least two different accounts of the details concerning his role in restricting trading in the account. First, Malia told Snyder that the account had losses of around $3 million, and Malia determined that the trading strategy was not working and Merrill ought to stop the trading. Sanctions Hr'g Tr. vol. 1, 53:7-55:11; Ex. R-1005 at Bingham/FH 00009. Then, Malia told Snyder that he had performed an Internet search before determining trading should be restricted, and had seen the 1031 page on Benistar's website and had become "suspicious of embezzlement." Id., vol. 1, 55:12-56:8; Ex. R-1005 at Bingham/FH 00009-10. Malia then returned to his first-expressed concern that the trading strategy was not working, telling Snyder that Merrill could not let clients commit financial suicide. Malia referenced a prior memorandum from Levine stated that Carpenter had compared himself to a riverboat gambler. Id., vol. 1, 57:3-23; Ex. R-1005 at Bingham/FH 00010.

27.     In this July 15, 2002 interview, Malia told Snyder that if he knew there had been embezzlement (i.e., if he had known about the misuse of third-party funds) he would have reported Benistar or Carpenter to the authorities. Id., vol. 1, 56:12-19; Ex. R-1005 at Bingham/FH 00012.

28.     Snyder asked Malia whether he worked with attorneys at the time the Benistar account was restricted. Sanctions Hr'g Tr. vol. 1, 57:24-58:7; see also Ex. R-1006 at

Bingham/FH 02764. Malia explained that he reported to a lawyer, Dennis Pape, who was responsible for at least Malia's portion of the compliance department. Hr'g Tr. vol. 1, 58:8-59:4. In addition, Malia told Snyder Malia he had referred the matter to Merrill's litigation group after seeing the September 22 letter from Carpenter, at which point Kevin Duffy, an in-house lawyer at Merrill, got involved in the matter. Sanctions Hr'g Tr. vol. 1, 59:5-17; *see also* Ex. R-1005 at Bingham/FH 00010.

29.    Snyder does not recall asking Malia specifically whether he was acting in anticipation of litigation when he created or collected the documents in the Malia file. Snyder did ask questions about why Malia had done so. Hr'g Tr. vol. 1, 72:24-73:21. Malia expressed to Snyder on July 15, 2002 that Malia had a concern that shutting down the Benistar account would "come back to bite us." Snyder did not ask Malia specific and direct questions at that time about the fax to Rasmussen with the pages of the Benistar website which were contained in the Malia file. Sanctions Hearing Tr. vol. 1, 60:8-19; Ex. R-1005 at Bingham/FH 00011.

30.    Snyder also interviewed Modesto Moya, another person in Merrill's compliance department whose name was in the Malia file, on July 15, 2002. Moya told Snyder Moya had told Malia that, if the Benistar account was an escrow account, then Benistar was losing other people's money, but Moya did not say when he made that statement to Malia. Hr'g Tr. vol. 1, 67:23-68:10; Ex. R-1005 at Bingham/FH 00013. In that regard, Snyder noted that the only document in Malia's file mentioning Moya was an email dated after the account had been transferred in January, 2001, and referring to an inquiry by PaineWebber about Benistar. Hr'g Tr. vol. 1, 62:1-6; Ex. R-1779 at Bingham/FH 01629. Snyder spoke with Moya a second time a week later. Moya told Snyder he did not have a file on the Benistar account, and if he ever had

19

any documents on the matter he would have given them to Malia. Hr'g Tr. vol. 1, 70:4-15; Ex.
R-1005 at Bingham/FH 00013.

**The Pending Summary Judgment Motion (May 2002–July 2002)[7]**

31.   Merrill had served a motion for summary judgment on the Iantosca plaintiffs on
May 22, 2002, before Snyder saw the Malia file.  Sanctions Hr'g Tr. vol. 1, 126:12-20; Ex. R-
1106. The memorandum in support of that motion stated, "At no time prior to the transfer of the
accounts did any employee at Merrill Lynch learn that the funds in the Benistar accounts were
being held by Benistar as a third party intermediary for real estate transactions or that those funds
were Benistar client escrowed funds." 85 Mass. App. Ct. at 422-23; Ex. R-1106 at 4.

32.   Judge Botsford decided the motion on July 29, 2002, granting it in part and
denying it in part.  Sanctions Hr'g Tr. vol. 1, 128:20-129:6.  Snyder does not recall giving any
consideration to amending the quoted statement in the summary judgment brief between
receiving the Malia file on July 15, 2002 and the court's decision on July 29, 2002, or thereafter.
Id., at 129:7-13.

33.   Snyder testified that during this period he believed the statement in the brief was and
remained accurate.  Id., at 129:14-133:20.  Snyder also believed the Malia file did not contradict
that statement.  In Snyder's view the web pages Malia visited described the nature of Benistar's
business, but did not describe the source of the funds in the Benistar accounts at Merrill, and
were not inconsistent with Benistar's having its own investment account, with its own funds.  Id.,
at 129:21-130:6, 132:2-14.

---

[7]      Judge Neel did not address the summary judgment pleadings in the First Sanctions Decision.

**The Decision to Withhold the Malia File (July 2002–September 2002)**

With respect to the decision to withhold the Malia file, I concur generally with Judge Neel's findings contained on page 4 of the First Sanction Decision, including the information on which Snyder based his conclusions as of July 23, 2002. More specifically, I find as follows based on the hearing before me.

34.     After interviewing Malia and Moya, Snyder spoke again with Pash at Pash's request on July 23, 2002, to update Pash on what Snyder had learned, and to explain Snyder's thinking about the Malia file. Sanctions Hr'g Tr. vol. 1, 70:16-71:15; 88:19-89:5.

35.     Pash told Snyder Malia's job position came under the umbrella of Merrill's Office of the General Counsel ("OGC"), that some of Malia's job functions were directed by attorneys, and that Malia, like others in the compliance department, could take action in anticipation of litigation and was in fact expected to do so. Id., at 71:16-72:17; Ex. R-1005 at Bingham/FH 00035.

36.     In their July 23, 2002 telephone conversation, Pash told Snyder that Pash had concluded the Malia file was protected work product, and that the October 2, 2000 confidential to counsel memorandum was a privileged attorney-client communication. Hr'g Tr. vol. 1, 73:22-74:6; Ex. R-1005 at Bingham/FH 00035. Snyder agreed with Pash. Id., at 74:7-11.

**Malia as a Potential Trial Witness**

37.     Between July, 2002 and September, 2002, Snyder and Pash had conversations concerning what to do with the Malia file if Merrill were to call Malia as a witness at the upcoming trial to help explain options trading and Benistar's options strategy to the jury. Sanctions Hr'g Tr. vol. 1, 99:11-100:9, 101:5-9, 101:24-102:7. Together Snyder and Pash determined that if Merrill were to call Malia as a witness, Merrill would produce the Malia file

and waive any privilege or work product protection in order to avoid issues about the subjects

and documents upon which Malia could testify.  Hr'g Tr. vol. 1, 102:8-19.

38.     Snyder met with Pash, Joseph Hanczor (who was succeeding Pash on the case and

became Snyder's primary OGC contact) and two more senior members of Merrill's OGC on

September 13, 2002, to help Merrill assess the risk that the litigation presented.  Sanders Hr'g Tr.

vol. 1, 91:8-93:23.  Snyder's agenda for the meeting included Malia's website visit and whether

the documents in the Malia file were privileged or work product.  Id., vol. 1, 95:4-19; Ex. R-

1005 at Bingham/FH 00103.  Although Snyder and Pash had previously concluded the Malia file

was protected by the work product doctrine, Snyder wanted to raise the issue at the meeting to

get input from other members of the OGC as to whether it was indeed work product and, if so,

whether Merrill would nonetheless produce the file if Malia was going to be called as a witness.

Id.

39.     On September 13, 2002, after the meeting of the legal team, Snyder and Hanczor

met with Malia.  Sanctions Hr'g Tr. vol. 1, 98:6-99:2, 105:24-106:17.

40.     Malia again explained the sequence of events on September 20, 2000 relating to

the restriction of trading in the Benistar accounts.  Hr'g Tr. vol. 1, 107:2-7.  Malia told Snyder

that Malia made a phone call to tell Rasmussen that Benistar's strategy was not working and

trading would have to be stopped.  Hr'g Tr. vol. 1, 107:8-23; Ex. R-1005 at Bingham/FH 00014.

Malia said it was after this decision that he performed an Internet search and visited the Benistar

website.  Hr'g Tr. vol. 1, 107:24-108:14; Ex. R-1005 at Bingham/FH 00014.

41.     The documentary evidence available to Snyder at that time arguably supported

this sequence of events.  Sanctions Hr'g Tr. vol. 4, 68:19-22, 69:24-70:11.  Malia sent his email

to Rasmussen stating that there be "no further opening option transactions entered for this

22

[Benistar] account" at 10:34 AM on September 20, 2000. Ex. R-1779 at Bingham/FH 01627. A memo from Levine stated that he told Carpenter of the restriction at 10:42 AM. Hr'g Tr. vol. 4, 69:24-70:11. Malia sent his fax to Rasmussen with pages of the Benistar website at 11:03 AM. Ex. R-1779 at Bingham/FH 01662.

42.    In the September 13, 2002 meeting, Malia also told Snyder that Moya's involvement came after the account had been restricted. Sanctions Hr'g Tr. vol. 1, 108:20-109:6; Ex. R-1005 at Bingham/FH 00014. In Snyder's view based on this sequence, Moya's purported opinion that the Benistar account could be losing other people's money would not have influenced the decision to restrict trading. Id., Hr'g Tr. vol. 1, 67:23-68:10, 108:20-109:6.

43.    After his meetings on September 13, 2002, Snyder continued to believe the Malia file could be withheld from production as protected work product, and understood he had agreement from the Merrill legal team on this position. Hr'g Tr. vol. 1, 109:11-20. And, although Snyder and the Merrill attorneys were still undecided on whether to call Malia as a witness, Snyder understood Merrill would produce the Malia file if Malia testified. Hr'g Tr. vol. 1, 110:12-19; vol. 2, 14:18-15:6.

**Pre-trial Preparation and Supplemental Filings (September 2002- November 2002)[8]**

44.    On September 25, 2002, the parties filed a First Revised Joint Pretrial Memorandum. Hr'g Tr. vol. 2, 9:4-6; Ex. R-1107. Snyder and Bingham associate Machua Millett prepared the sections of the joint memorandum that stated Merrill's position. Sanctions Hr'g Tr. vol. 2, 8:16-9:3, May 5, 2015.

45.    The joint memorandum contained a section in which Merrill presented its summary of what it expected the evidence to show at trial. Hr'g Tr. vol. 2, 9:7-10:2. In that

---

[8]    Judge Neel did not address this topic in the First Sanctions Decision.

23

section, Merrill stated: "At no time prior to the transfer of the Benistar accounts from Merrill Lynch to PaineWebber did any employee at Merrill Lynch learn that the funds in the accounts were being held by Benistar as a third-party intermediary for real estate transactions or that those funds were Benistar client escrow funds." 85 Mass. App. Ct. at 423; Ex. R-1107 at 5-8.

46.     In September 2002, plaintiff Massachusetts Lumber moved to compel the depositions of certain Merrill witnesses, including Malia. Sanctions Hr'g Tr. vol. 2, 12:14-17.

47.     By that time, Massachusetts Lumber's separate complaint bringing damages claims against Merrill, and in which other plaintiffs had intervened, had been consolidated with the prior-filed actions against Benistar and scheduled for the same November trial date. Id., vol. 1, 123:19-124:7. Merrill opposed the motion to compel on the ground that Massachusetts Lumber had agreed to abide by the primary scheduling order, including the November 2001 discovery deadline, if its claims against Merrill were consolidated. Merrill took the position that Massachusetts Lumber's effort to take new depositions contravened that agreement. Sanctions Hr'g Tr. vol. 1, 125:21-126:11; Ex. R-1848.

48.     Judge Botsford denied the motion as untimely, and plaintiffs did not depose Malia or other additional Merrill witnesses. Sanctions Hr'g Tr. vol. 2, 14:14-17; Ex. R-1849.

49.     Snyder considered supplementing Merrill's interrogatory responses during Fall, 2002. Snyder directed Millett to draft supplemental answers to interrogatories, and on October 16, 2002 Millett sent Snyder Millett's draft. Hr'g Tr. vol. 2, 15:7-16:8; Ex. R-1030.

50.     The draft Millett sent Snyder was in its preliminary stages, contained errors, and was not ready to be signed and served. Sanctions Hr'g Tr. vol. 2, 16:9-13. The draft had not been reviewed or edited by Snyder or Hanczor. Nor had Snyder yet discussed with Malia the

24

additional information the draft would potentially add concerning Malia, as was Snyder's practice. Id., vol. 2, 16:14-17:13.

51.     The draft stated, "Mr. Malia visited the Benistar.com website on his own accord." Sanctions Hr'g Tr. vol. 2, 17:14-20; Ex. R-1030 at BINGHAM 000182. A different draft stated that Malia visited the website "out of curiosity." Ex. R-1227 at Bingham/FH 01053. Snyder testified that both formulations were consistent with Snyder's view that Malia visited the website out of concern that Carpenter and Benistar might sue Merrill. Sanctions Hr'g Tr. vol. 2, 18:7-19:11.

52.     Snyder and Merrill ultimately made the decision not to call Malia as a witness. Hr'g Tr. vol. 2, 30:4-10. The trial team decided other witnesses could explain the options trading, and sought to minimize the number of witnesses to attempt to conclude the trial in the time allotted by the court. Sanctions Hr'g Tr. vol. 2, 30:11-31:4.

53.     Since Malia was not called as a witness, Snyder and Merrill did not waive the work product protection, did not supplement the interrogatory responses, and continued to withhold the Malia file and information. Sanctions Hr'g Tr. vol. 2, 31:7-13.

**2002 Trial**

For purposes of the facts surrounding decisions made at trial, I generally concur with Judge Neel's findings contained at page 6 of the First Sanctions Decision, with the exception of the finding that Snyder did not knowingly elicit false testimony from Merrill witnesses, because I reserve conclusions in this remand decision on Snyder's state of mind for discussion below. More specifically, I find as follows based on the hearing before me.

54.     Snyder met with Stern, Levine, Tabbah, and Rasmussen to prepare them for their testimony at trial and, in each instance, decided not to show them documents from the Malia file

in order to avoid waiving the privilege or work product protection, should those materials prove to have refreshed the witness's recollection. Sanctions Hr'g Tr. vol. 2, 31:14-34:15.

55.     Snyder did show each of Stern, Levine, Tabbah, and Rasmussen a copy of the section 1031 page of the Benistar website, because plaintiffs had disclosed it as a trial exhibit, so Snyder expected plaintiffs' trial counsel to examine them about it. Sanctions Hr'g Tr. vol. 2, 34:16-35:9. Each witness again told Snyder he had never seen the page. Id., vol. 2, 35:10-19.

56.     In preparing Rasmussen, Snyder asked Rasmussen whether he had ever received a copy of the 1031 page from anyone, and in particular whether he recalled receiving a fax from Malia concerning the website. Rasmussen told Snyder that he had no recollection of that. Id., vol. 2, 35:20-36:6.

57.     At the 2002 trial, Tabbah testified he did not know the money in the account belonged to third parties. He also testified that the trading in the account was restricted to closing positions only because of Benistar's trading strategy and losses, not because of any concern about the presence of third-party money in the account. RSF ¶ 157; Ex. R-1158.05 at 179:18-22.

58.     Levine likewise testified he did not know the money in the account belonged to third parties, and did not learn that Benistar acted as an intermediary or escrow agent until January 2001, after the accounts had left Merrill. Levine testified Carpenter told him that the account contained corporate money and Carpenter's own assets. Levine further testified he had not visited the § 1031 page of the Benistar website during the time the Benistar accounts were at Merrill. Levine also testified to concern with Carpenter's risky trading strategy and his efforts to get Carpenter to change his strategy. RSF ¶ 172; Ex. R-1158.07 at 114:21-115:6;132:13-133:3;138:8-139:17.

59.     Stern testified at trial he did not know the money in the account belonged to third parties, and did not learn that Benistar acted as an intermediary or escrow agent until he had a conversation with Mitchell Rock at PaineWebber in January 2001, after the accounts had left Merrill. Ex. R-1158.08 at 168:23-169:3, 172:9-21. Stern did not know what an intermediary account was, or what a 1031 exchange was, until 2001. Ex. R-1158.08 at 171:16-18, 176:6-13. Stern testified to his own concern with Carpenter's risky trading strategy and his efforts to get Carpenter to change his strategy. Ex. R-1158.08 at 188:14-191:17.

60.     Snyder asked Rasmussen at the 2002 trial whether he knew in 2000 that Benistar acted as third-party intermediary or escrow agent holding other people's money, and Rasmussen testified that he did not. Rasmussen also testified at trial that he had never visited the Benistar website before the accounts were transferred, and never thought to do so. Rasmussen further testified the account was restricted to closing transactions because Carpenter's aggressive trading strategy was generating too many losses. 85 Mass. App. Ct. at 423; Ex. R-1158.11 at 24:7-25:11; 41:9-13; Ex. R-1158.11; Sanctions Hr'g vol. 2, 39:1-8.

61.     Snyder has since testified he lacked any knowledge that Rasmussen's testimony on this point was false. To the contrary, Snyder believed this testimony was true, and therefore did not think he had any obligation to correct it. Sanctions Hr'g vol. 2, 39:22-40:1, 40:5-6.

62.     In his closing argument at trial, Snyder stated: "The Merrill Lynch people did not know that they were knowingly assisting and did not know that the funds belonged to third parties, and they did not knowingly assist Carpenter in wrongdoing." 85 Mass. App. Ct. at 423; Ex. R-1158.12 at 112:21-24.

63.     Snyder has since testified that, by the "[t]he Merrill Lynch people," he was referring to the trial witnesses named in the preceding sentence of his closing:

> Rather, as the Court will soon instruct you, the standard by which the actions of Mr. Levine, Mr. Rasmussen, Mr. Stern must be judged and the determination you must make with respect to the claims against Merrill Lynch is whether they actually knew the money in the BENISTAR accounts belonged to persons other than BENISTAR or Carpenter, whether they actually knew the actions Carpenter took with respect to those funds that were wrongful, and whether they knowingly assisted Carpenter in taking those wrongful actions.

Ex. R-1158.12 at 112:10-20; Sanctions Hr'g, vol. 2, 42:10-43:4.

64.    Snyder further stated, in closing, "All these witnesses have said they did not know what a 1031 exchange was at the time. There was no reason for them to say, oh, there's what we want, a 1031 exchange and to go to that button, or to think even, that 1031 exchange was some sort of an indication that something was amiss." 85 Mass. App. Ct. at 423; Ex. R-1158.12 at 124:18-23.

65.    Snyder later stated in a brief, and testified, that his reference to "[a]ll these witnesses" referred to Merrill's employee witnesses at the trial: Stern, Levine, Rasmussen, Tabbah, and Duffy. Sanctions Hr'g, vol. 2, 44:8-13; Ex. R-1115 at 9.

### Post-Trial Pleadings (December 2002-2008)[9]

66.    Plaintiffs won a jury verdict for $8.6 million in the 2002 Trial. Sanctions Hr'g, vol. 2, 44:14-20. Merrill filed a motion for judgment notwithstanding the verdict. The motion was restricted to the evidence at trial and the law, as Snyder understood it must be. Id., vol. 2, 48:20-49:5.

67.    The primary argument in Merrill's brief was that Plaintiffs had not presented sufficient evidence of Merrill's actual knowledge of Benistar's wrongdoing, nor of Merrill's substantial assistance in that wrongdoing. Sanctions Hr'g vol. 2, 44:21-45:8, 46:11-47:17. First, Merrill stated: "Plaintiffs, however did not present even a scintilla of evidence that Merrill

---

[9]    Judge Neel did not address these post-trial pleadings in the First Sanctions Decision.

Lynch, even if it knew that Daniel Carpenter was trading with third party funds, knew that such trading constituted conversion or breach of duty.  In fact it is undisputed that Merrill Lynch never had any knowledge of the agreements between the Plaintiffs and Benistar." Merrill's brief went on to state that, on the subject of knowledge, "Plaintiffs have failed even to present sufficient evidence to support a reasonable inference that Merrill Lynch knew that the Benistar accounts contained third party funds." 85 Mass. App. Ct. at 423; Ex. R-1115 at 7-8.

68.    Snyder testified he believed this statement was true and reflected the state of evidence at trial.  Sanctions Hr'g vol. 2, 47:21-48:7.  Snyder testified that, even had the Malia file been admitted, he believed the statement would still be true, because Malia had told Snyder that after viewing the website he did not know the Benistar accounts contained third-party funds. Id., vol. 2, 48:8-19.  Judge Botsford granted the JNOV in February, 2003, ultimately resulting in the 2009 trial.

69.    As the case was appealed to the Appeals Court and then the Supreme Judicial Court, Snyder continued to make arguments substantially identical to those made in the trial court. Sanctions Hr'g vol. 2, 49:6-14.  Snyder testified he made these arguments on appeal because appellate argument was limited to the record, and the arguments were consistent with the evidence in the record.  Snyder further testified he believed these arguments were not contradicted by any evidence, including the contents of the Malia file. Id., vol. 2, 49:15-23.

### Merrill's Letters to NASD (February-March 2003)

As discussed above, unlike Judge Neel, I admitted as evidence in the hearing before me two letters with which Snyder was involved on behalf of Merrill in 2003, for whatever additional probative value they might shed on his state of mind in 2002-2003.  With respect to these letters, I find as follows:

29

70.     Snyder assisted Merrill in responding to a request from the NASD for information and documents concerning the Benistar accounts. Sanctions Hr'g vol. 2, 113:4-8, 113:16-114:5. Although he remembers participating in the response, Snyder does not recall who wrote what language in the letter Merrill sent to the NASD in February, 2003, prior to the court's decision on the JNOV. Id., vol. 2, 119:6-19. Snyder reviewed at least one draft of the letter, but perhaps not the final version. Id., 19:21-23.

71.     The letter stated that no Merrill employee had learned the funds in the accounts were being held by Benistar as a third-party intermediary or as escrowed funds, and that Merrill had located no documentation indicating that anyone at Merrill knew so. Snyder testified this continued to be his understanding as of February and March of 2003. Id., vol. 2, 123:3-9, 124:13-125:1; Ex. R-1022 at 5.[10]

72.     In Snyder's view, no Merrill employee had "learned" or "knew" that the Benistar accounts contained third-party money, even if the Malia file contained some documents indicating that Benistar acted as a third-party intermediary. Merrill did not invoke the work product doctrine in this letter, and the signatory of the letter was unaware of the Malia file. Id., vol. 2, 125:4-10.

## Discovery of Additional Branch File Documents (2009)[11]

73.     On February 25, 2009, prior to the 2009 trial, Snyder learned that additional documents had been discovered in the Merrill Lynch Fifth Avenue branch. Sanctions Hr'g Tr. vol. 4, 73:15:19.

---

[10]     The second letter is dated after the court's February 23, 2003 decision on the JNOV, and sets forth the basis for that decision in some detail. Ex. R-1023.

[11]     Judge Neel found that Snyder acted in good faith in 2009 following discovery of the branch file. First Sanctions Decision at page 7. I reserve conclusions in this remand decision on Snyder's state of mind for discussion below.

74.     Snyder testified that between the grant of the motion for judgment notwithstanding the verdict in February 2003, and February 2009, he had no occasion to think about Malia or the Malia file. Id., 81:12-23.

75.     In February, 2009, Merrill and its then new lead counsel in the litigation, Dickstein Shapiro, asked Bingham to take on a number of tasks simultaneously.  First, Dickstein Shapiro wanted Bingham to review its own files to see if those files contained any of the newly-discovered documents.  Second, counsel wanted Bingham to prepare an historical summary of the discovery and motion practice in the case.  Third, Dickstein Shapiro wanted Bingham to participate in re-interviewing Merrill witnesses regarding the events reflected in the newly-discovered documents.  Fourth, counsel wanted a review of prior pleadings and testimony concerning anything reflected in the documents.  And fifth, counsel sought a comparison of the copy of the branch file that Merrill had given Snyder in 2001, the "original" branch file that Merrill had given Snyder in 2002, and the 2009 branch file that had just been discovered. Id., vol. 4, 73:24-76:2.

76.     Snyder worked on these tasks requested by Dickstein Shapiro from Thursday, February 26 through at least Monday, March 2, 2009. Id., vol. 4, 73:24-76:2.

77.     On Monday, March 2 or Tuesday, March 3, Snyder found the Malia file Pash sent him in July 2002, including a copy of the fax from Malia to Rasmussen with the Benistar web pages. Sanctions Hearing vol. 4, 76:9-24.  Snyder's locating that document refreshed his memory of the events which had occurred seven years before, concerning:  receiving the Malia file from Pash; the series of interviews investigating the documents it contained; and the decision to withhold it on the basis of the work product doctrine. Id., vol. 4, 77:1-12.

31

78.     By March 3, 2009, Snyder had informed Dickstein Shapiro and Merrill's in-house lawyer that he had found the Malia file and that it had been withheld in 2002 as work product and privileged. Id., vol. 4, 77:13-81:7. Snyder recalls speaking with Robert Higgins of Dickstein Shapiro and John Bevilacqua, in-house counsel at Merrill, about the file and associated events. Id., vol. 4, 77:13-78:5. Snyder's notes reflect a March 3, 2009 conversation with Bevilacqua and Ralph Cursio, a more senior member of Merrill's legal department, in which Snyder explained that no privilege logs had been created in 2002 to reflect documents withheld from production. Sanctions Hr'g Tr. vol. 4, 79:20-80:24; Ex. R-1006 at Bingham/FH 03353.

79.     Snyder testified before me that, when he re-reviewed the September 20, 2000 fax coversheet from Malia to Rasmussen (including website pages) in 2009, he understood its potential significance to the case.[12] Nonetheless, Snyder's memory remained that Rasmussen consistently told Snyder he did not remember receiving those materials. Sanctions Hr'g, vol. 3 at 42:18-43:18.

## Plaintiffs' Alleged Losses and Recoveries to Date

80.     Plaintiffs originally alleged they lost $8.6 million in investments held by Benistar. They received $12,487 million in settlement with Paine Webber in mid-2008, an amount which equaled their original loss plus interest. Sanctions Hr'g, Tr. Vol. 4, 113:21-23-114:10; 124:15-24. Plaintiffs have also received $113,543.76 from a Benistar bank account, and $150,000 from settlement with Martin Paley. 2011 Mass. Super. LEXIS 8, at 47-48.

81.     Following the 2009 jury trial, judgment entered in favor of Plaintiffs and against Merrill for compensatory and consequential damages of approximately $9.7 million, plus statutory interest, less the pro rata amount that each plaintiff had received from the Paine Webber

---

[12]     Plaintiffs have their own interpretation of this significance (see, e.g., Plaintiffs' Proposed Findings at para. 257), which Snyder does not necessarily share.

settlement. Plaintiffs were also awarded attorneys' fees of $8.015 million, and costs of more than half a million dollars. They obtained an additional $3.725 million from other related sources, for a total recovery of close to $39 million plus attorneys' fees. Id., at 49-40.

82.    Plaintiff Jeffrey M. Johnston testified at the Sanctions Hearing before me. He candidly stated that he lost approximately $540,000 because of Benistar, and recovered approximately $1.6 million, including attorneys' fees.[13] Mr. Johnston also credibly testified that he was "panicked, upset, and angry" when he first learned his investment funds had been lost by Benistar, and that he dutifully followed all of the early (2002) court and mediation proceedings, attempting to assess his ongoing litigation risk, and to determine what a fair settlement of his claim might be.

83.    Mr. Johnston further testified that he was "disillusioned" by the JNOV process, but continued to fund the appeal "with some hope." When all of the withheld material (including the Patterson documents not at issue here) came to light, he again became angry, due to all of the wasted time. Ultimately he was satisfied that he received "what we were asking for." Sanctions Hr'g Tr. Vol. 4, 125:15-21.

84.    Plaintiffs offered no other evidence before me of actual loss proximately caused to them by Snyder's conduct, beyond their estimate of $750,000 incurred in attorneys' fees since Judge Neel's award in 2011. Plaintiffs' Proposed Findings of Fact, at page 69, note 13.

## FINDINGS AND RULINGS ON THE REASONABLENESS AND GOOD FAITH OF SNYDER'S DECISIONS

On the central issue on remand with respect to Snyder's state of mind, I find and rule as follows. With the exceptions noted, I find Snyder's testimony before me to have been credible.

---

[13]    Judge Neel entered judgment in favor of Merrill Lynch with respect to Mr. Johnston's claim for consequential damages, but allocated to him $541,930 of the compensatory damages award in the case, before consideration of the PaineWebber settlement. 2011 Mass. Super. LEXIS 8 at *75-76.

## Evidence of Snyder's State of Mind

85.    In July 2002, Snyder understood that any material developed in anticipation of litigation by a representative of a party could be protected by the work product doctrine, and that the representative did not have to be a lawyer.  Sanctions Hr'g Tr. vol. 1, 76:19-77:8.

86.    Snyder's understanding of the work product doctrine had developed over the course of two decades of legal practice, in addition to his law school education and his one-year judicial clerkship with the late Hon. Robert Zampano of the United States District Court of Connecticut in New Haven.  Id., vol. 1, 11:20-12:8, 77:15-19.  Snyder received training at Bingham on propounding and responding to discovery requests, and had made work product decisions in many cases prior to this one.  Id., vol. 1, 77:20-78:8.

87.    Snyder based his conclusion that the 2002 Malia file was work product on the following factors:

   a.  Malia's actions in collecting and creating the documents in the Malia file went beyond what Snyder understood was the function of an options specialist.  In his role as an options specialist, Malia analyzed the trades and the trading strategy of the account and concluded that the strategy was failing and needed to stop.  The documents in the Malia file reflected certain actions by Malia after he had completed that analysis and concluded that the account should be restricted, for example, requesting a confidential to counsel memo and printing pages of the Benistar website on multiple days.  Sanctions Hr'g Tr. vol. 1, 74:12-22, 75:8-13; Ex. R-1779 at Bingham/FH 01617-18, 01624-26, 01628-45, 01659-01661, 01665-67;

34

   b. Malia worked within the OGC, reported to attorneys, and was expected to take action in anticipation of litigation when appropriate to protect Merrill's interest. Sanctions Hr'g Tr. vol. 1, 75:14-76:3;

   c. Malia expected that litigation could result from Merrill's decision to restrict trading in an account that had incurred substantial losses. Id., vol. 1, 74:23-75:7; Ex. R-1005 at Bingham/FH 00011; and

   d. Carpenter's September 22 letter, which Snyder understood to threaten litigation, was in Malia's file and Malia said he had referred the matter to the litigation group in the OGC when the letter was sent to him. Hr'g Tr. vol. 1, 76:4-13; Ex. R-1779 at Bingham/FH 01644-45.

88.    Snyder did not do any legal research regarding the work product doctrine, or assign anyone else to do such research. Sanctions Hr'g, vol. 1, 110:20-111:17. Snyder believed he understood the work product doctrine, and that whether it applied in this instance was primarily a factual rather than a legal question. For that reason, he spent the time described above on the factual investigation. Id., vol. 1, 110:20-111:17.

89.    Snyder understood that work product protection could be overcome if the party seeking the material showed it had a substantial need for the material, and it would be substantially more burdensome to obtain it by other means. Hr'g Tr. vol. 1, 77:9-14.

90.    However, Snyder did not actively consider whether these Plaintiffs might have "substantial need" for the materials in the Malia file. Snyder understood in 2002 that it was the burden of the party seeking discovery to raise and to prove substantial need, usually in the context of a motion to compel; to Snyder's understanding the producing (or withholding) party

did not have to perform that analysis when it made the decision to withhold documents.  Hr'g Tr.
vol. 1, 78:12-24.

91.     Bingham did not produce a privilege log on behalf of Merrill.  As far as Snyder is
aware, no party to the case produced a privilege log in 2002.  Id., vol. 1, 80:12-81:14.

**Snyder's Legal Obligations in 2002**

92.     As of 2002, Massachusetts state courts did not require the automatic generation
of privilege logs when a party withheld documents as protected work product.  Sanctions
Hearing vol. 1, 79:1-19; Ex. R-2104.  The 2008 amendment to Mass.R.Civ.P. 26 required that
privileged logs be prepared for all documents withheld by a party on a claim of privilege.  Mass.
R. Civ. P. 26(b)(5).  Thus no such log was required as a matter of law prior to the 2002 trial, but
was required prior to the 2009 trial.

93.     During the 2002 trial, at a bench conference to discuss the production of
documents, Snyder offered to produce a privilege log, as long as this production was
reciprocated by the other parties.  Id., vol. 1, 79:20-80:11, 82:9-12; Ex. R-1158.09.  Snyder
intended that any privilege logs that would be exchanged during the trial would encompass all
documents withheld by any party.  Id., Hr'g Tr. vol. 1, 83:18-84:15.  Snyder thought privilege
logs might help the parties resolve their numerous discovery disputes.  Id., vol. 1, 83:18-84:15.
Judge Botsford declined to order the parties to produce privilege logs at that time.  Id., vol. 1,
80:6-7.

94.     Bingham has argued that, as of 2002 "published Massachusetts opinions" did not
expressly articulate the distinction between fact and opinion work product now clearly set out in
Comcast.  Bingham Proposed Findings and Rulings at paras 27-51.  However, I note the
following language in the Appeals Court decision on remand: "It has long been held that

36

'[w]here relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had.'" 85 Mass. App. Ct. at 425. Plaintiffs allege here that the "hidden" documents included, "without limitation, the September 20, 2000 1031 Exchange webpage printout, the fax coversheet to Rasmussen, and Malia's September 20, 2000 email to numerous Merrill Lynch employees directing the BPETCO [Benistar] account be restricted." Plaintiffs' Proposed Findings of Fact at para. 282.

95.     The SJC stated as follows in 2009 with respect to the burdens of the respective parties on work product:  If the withholding party meets its burden by establishing that the document was prepared in anticipation of litigation, "the burden shifts to [the requesting party] to demonstrate a substantial need ... and that she cannot obtain the substantial equivalent of [the document] without undue hardship." Comcast Corp., 85 Mass. App. Ct. at 315.

**Expert Opinion on Snyder's Conduct**

96.     According to the expert testimony of Richard Renehan presented in the First Sanctions Hearing, and resubmitted by transcript before me, the work Snyder did to assess and to determine whether the Malia file was protected by the work product doctrine (multiple consultations with in-house counsel and with "the players") represented the kind of inquiry that a competent lawyer should undertake. Ex. R-2003 at 69:3-71:22. In Renehan's view, Snyder "was making a judgment call, the kind of things that lawyers, trial lawyers, do all the time." Id., at 70:11-13.

97.     Renehan also testified that the approach a trial lawyer takes when preparing a witness, including the approach to using documents to refresh the witness's recollection, is largely a matter of personal style and preference, subject to the obligation not knowingly to

present false evidence. Ex. R-2003 at 81:21-82:24. In Renehan's opinion it was reasonable for

Snyder to consider that the use in trial preparation of work product or privileged material might

waive the work product and attorney-client protection for those documents. Ex. R-2003 at

108:14-109:17. In other words, in Renehan's opinion, Snyder had a legitimate concern that

showing the Malia file to Rasmussen, Stern, Levine, and Tabbah would result in a waiver.

Hr'g Tr. vol. 2, 31:14-34:15.[14]

98.    Likewise, Renehan opined that Snyder's closing argument to the jury was

appropriate, because, "you are free, in my judgment, at any time to make an argument, a

legitimate argument, based on the evidence, that's what an advocate does." The "major"

exception is if a lawyer "has actual knowledge that something that went before that tribunal if he

has actual knowledge based on solid facts was fraudulent [then] he has a duty to bring that to the

attention of the court." Ex. R-2003 at 75: 8-17; 76: 15-24.

99.    Professor Moore, in contrast, opined Snyder "did not have . . . a colorable

basis . . . to raise work product." She faulted him for not asking Malia specific and direct

questions about the fax to Rasmussen, on the ground that "the state of mind of Mr. Malia on

September 20th is what is critical. You can consider post-September 20th events as reflecting

back on what his state of mind was." 2010 Transcript at 217: 12-18; 246: 5-12. Contrary to

Renehan, Moore opined that Snyder's investigation with Pash and Malia "was at a very, very

minimal level." Id., at 210-211: 16-4; 215-216: 16-4. I am not persuaded by this portion of

Professor Moore's opinion.

---

[14]    Mr. Renehan did not address the supplemental interrogatory response controversy in his 2010 testimony. Mr. Renehan appropriately did not offer an opinion on whether Snyder's invocation of the work product doctrine was "correct," recognizing that to be a legal determination. 2010 Transcript at 7-81. Likewise, Judge Neel at footnote 11 of the First Sanctions Decision, made "no ruling as to whether the work product determination was correct."

100.    Professor Moore also discussed, however, the underlying rationale for the distinction between fact and opinion work product. As testified by Professor Moore, the non-opinion fact "hidden" in the Malia file was that potentially one or more "Merrill people" visited the Benistar website, including the section 1031 pages, during the relevant time period of September, 2000. 2010 Transcript, at 184: 5-19. This portion of her opinion is more compelling and in keeping with my understanding of the state of Massachusetts law in 2002 when Snyder was making his judgments.

101.    Snyder acknowledged in the Sanctions Hearing before me that the fact that Malia went to the website, and the fact that Malia may have had thoughts about Benistar's business while he was there, could be distinguishable. Snyder admitted he did not analyze these two acts (the visit and the thought process) differently at the time of his work product determination in 2002, because he believed Malia's very act of going to the website itself reflected a protected thought process. Snyder also admits the visit to the website "could have had a bearing" on other evidence that was admitted at trial. Sanctions Hearing Testimony.

**Ultimate Findings**

102.    I find Snyder reasonably believed Rasmussen's testimony was true, and that the Malia file, even though it contained a fax indicating that Malia sent Rasmussen a copy of the 1031 page on September 20, 2000, did not undermine the reasonableness of Snyder's belief. Hr'g Tr. vol. 2, 37:18-38:24. The basis for Snyder's belief was threefold. First, Rasmussen had consistently told Snyder that he had no recollection of seeing the website page. Second, the file maintained at the Fifth Avenue branch (where Rasmussen worked, and where Snyder expected that fax would be if Rasmussen had received it) as reviewed by Snyder in 2002, did not contain a "received" copy of Malia's fax. Third, in September 2000, when the fax was sent, Rasmussen

was in the process of moving to a new position in New Jersey and was spending only part of his

time in the Fifth Avenue office. Hr'g Tr. vol. 2, 37:18-38:24.

103.     As discussed above, I find Snyder did not "hide" Malia as a player in the

sequence of events leading to restriction of the Benistar accounts. To the contrary, Merrill's

2002 responses to interrogatories identified Malia as a person with knowledge of the reasons for

the restrictions.

104.     I find Snyder made the statements in the pre-trial Memorandum in good faith,

based on his conversations with Merrill witnesses and their expected testimony. Hr'g Tr. vol. 2,

10:20-12:13. The Merrill witnesses Snyder expected he would call—Stern, Levine, Rasmussen,

Tabbah, and Duffy—consistently told Snyder they had not known, prior to the transfer of the

accounts, that the accounts held third-party money. In fact, they believed the money was

Benistar's or Carpenter's; and Snyder reasonably expected them to testify to that effect. Hr'g Tr.

vol. 2, 11:19-12:13, 26:4-28:11, 29:2-24. Even if Merrill had called Malia, neither his testimony

during the relevant time period in 2002, nor the presence of Malia file itself would have

undermined Snyder's belief. This is because at the time of the 2002 trial Malia did not possess,

and the Malia file did not reflect, actual knowledge that the Benistar accounts held third-party

money, but at best only a suspicion that they might have done so. Hr'g Tr. vol. 2, 11:19-12:13.

105.     I find Snyder and Merrill acted on a good faith basis in relying on the work

product doctrine to withhold the fact of Malia's September 20, 2000 visit to the Benistar website

from Merrill's answer to interrogatory no. 7. Hr'g Tr. vol. 2, 7:3-8:6. Snyder understood the

work product doctrine could protect both facts and opinions, and credibly believed at the time

that the particular fact that Malia visited the Benistar website would tend to reveal Malia's

40

thoughts and mental impressions regarding his concern that Carpenter and Benistar could "come back to bite" Merrill. Hr'g Tr. vol. 2, 7:19-8:6; Ex. R-1005 at Bingham/FH 00011.

106. I disagree with Plaintiffs' contention that there was "no evidence" that "Malia subjectively believed that litigation was a real possibility and that the prospect of litigation was the reason he created or obtained the documents." Plaintiffs' Proposed Rulings of Law, at page 4. To the contrary, I credit Snyder's testimony that Malia expressed these very sentiments to Snyder in more than one of their interviews together.

107. Nor does the evidence before me support Plaintiffs' proposition that: "It is also undisputed that Malia's reaction to seeing the website was not to refer the matter to Merrill Lynch's litigation department, but rather to contact Rasmussen to instruct him to restrict the account." Plaintiffs' Proposed Rulings of Law at page 5. Again, I credit Snyder's testimony that Malia's interviews with Snyder (and the Malia file) supported the reasonable belief that Malia did not visit the website until after he instructed Rasmussen to restrict the account.

108. In short, I find on the record before me that Bingham's characterization of the facts is more accurate; Malia presented "competing narratives" about his thoughts and actions during the relevant time period. I agree with Judge Neel's findings in this regard, that is, "that while Malia's accounts of the sequence of events was not consistent in his conversations with Snyder, he consistently stated to Snyder that his decision to restrict trading in Benistar's account was based on Benistar's losses and trading strategy." First Sanctions Decision at page 6. [15]

109. I find Snyder took reasonable and good faith steps to arrive at his work product judgments, as reflected in his testimony, his notes, and Renehan's expert opinion. Hr'g Tr. vol. 1, 29:1-76:18; Ex. R-2003 at 69:3-71:22. Once this die was cast, it was reasonable for Snyder to

---

[15] It is nonetheless undisputed Malia testified in 2009 that he restricted the account in part because of a concern that Benistar was trading other people's money. Bingham's Proposed Findings at para. 144.

express arguments orally and in pleadings which were consistent with his view of the admissible evidence at trial.

110.   In this regard, I have particularly considered this aspect of the remand decision: "We are also of the view that Snyder's persistence in pursuing a defense that included Merrill's lack of knowledge of the nature of Benistar's business and the section 1031 Web site pages calls into question his good faith." 85 Mass. App.Ct. at 428.[16] Based on the record before me, I am of a different view about the defense.

111.   As I understand and credit Snyder's testimony before me, Bingham's defense was based on the underlying substantive law of actual knowledge. It turns out (apparently, courtesy of the so-called Patterson documents and resulting evidence that emerged in the 2009 trial) that Mr. Levine possessed actual knowledge, both of the nature of Benistar's business and of Benistar's fiduciary agreements with its clients. But, Snyder had nothing whatsoever to do with the existence or emergence of the Patterson documents, and I find he had no reason, based on his own good faith investigation of the Malia file in 2002, to doubt that Levine was telling Merrill's lawyers the truth at that time.

112.   As pointed out by both trial judges in this case, there is no direct evidence in this fifteen-year record that any Merrill employee other than Levine possessed this actual (dual) knowledge necessary to establish Merrill's liability as a matter of law. The only evidence as to Malia is that, sometime between the morning of September 20, 2000, and January, 2001 when the account was transferred, Malia formed a suspicion that Benistar could have been misusing client funds.

---

[16]   See also, Plaintiffs' Proposed Rulings of Law, at page 11, referencing "five things [Bingham knew] were **not true**" but which it "tried to persuade the jury to believe." (emphasis in original). I decline to adopt these items as either findings of fact or rulings of law.

113.   To the extent Snyder argued in connection with the first trial that there were no suspicions at Merrill in this regard whatsoever prior to January, 2001, he overstated his case. But, to the extent Snyder used words like "learn," "knowingly," and "actually knew" in his advocacy, I find he was making a legitimate defense argument on behalf of his client, based on the facts and the law as he knew them to be at the time.

114.   I find no evidence that Snyder "lied" to Merrill or then co-counsel Dickstein Shapiro in 2009 when the "new branch file" issue was first raised. While I do not credit Snyder's testimony that he had "no occasion to think about Malia or the Malia file" in the intervening years (2003-2009) -- given what appears to have been his ongoing, albeit sporadic, involvement in related litigation matters for Merrill -- I do credit and believe that Snyder would have had no reason to recall all of this detail, and the specific bases for his work product judgments, absent refreshment by the file materials. Critical though Snyder's challenged decisions may appear in retrospect, they are indeed the sorts of judgment calls busy litigators and trial lawyers make all the time. I therefore find no basis in the record for Snyder to have remembered these details without significant refreshment, and credit the process he describes for having done so.

115.   I find no evidence on this record of a design by Snyder to defraud or to seek an unconscionable advantage in the litigation. Instead, I find Snyder took reasonable and appropriate steps to arrive at a good faith professional judgment, which he then consistently carried through the pre-trial, trial, and post-trial stages of the litigation.

## SANCTIONS DISCUSSION

As discussed above, all of the possible standards for imposing sanctions under Massachusetts law for conduct undertaken in 2002 are based on an analysis of counsel's

subjective state of mind, requiring that an attorney have engaged in a willful violation, rather

than a good faith belief that a course of conduct was supported by both fact and law.  While

willful ignorance is not excused, we do not punish counsel for a genuine professional judgment

that turns out to be wrong.  For all of the reasons contained in this Memorandum, I find that is

what happened here.  A genuine professional judgment made by Snyder in 2002 was determined

in 2014 to have been wrong.  This means I am not required to address sanction considerations,

but do so nonetheless in an abundance of caution.

### Importance of the Malia File/Effect of Work Product Decision

#### Importance of File

The parties in their pre and post-hearing filings take diametrically opposed views on the

importance of the Malia documents to the underlying litigation, each projecting back in time to

what would or would not have happened had the file been produced (or otherwise disclosed by a

privilege log) in 2002.  They may have been inspired to do so in part by the following portion of

the Appeals Court's decision on remand:

> "Plainly, whether Merrill employees had visited the Benistar Web site,
> and what knowledge they gleaned therefrom, were significant points of contention
> in the parties' dispute. . . .  Its [Malia's visit to the website] disclosure would have
> revealed facts that would have contradicted the observations of the trial judge, this court,
> and the Supreme Judicial Court, in their respective rulings, that evidence of Merrill's
> knowledge of the nature of Benistar's business was lacking in the 2002 trial."

85 Mass. App. Ct. at 426-428 (footnotes excluded).

These sanction proceedings must be consistent with the Appeals Court decision on

remand, and I read that decision as holding that:  "Substantial need is shown where, as here, the

work product at issue is central to the parties' substantive claims."  85 Mass. App. Ct. at 425

(emphasis supplied).  Other circumstances in which work product or otherwise protected

material is discoverable include "putting the issue in play," or "at issue waiver." Id., at 426

(significant points of contention in the parties' dispute); Ward v. Peabody, 380 Mass. 805, 817-

818 (1980)(activities of counsel at issue); McCarthy v. Slade Assocs., 463 Mass. 181, 195

(2012)(putting state of knowledge in play).  These concepts all support the importance of the

Malia file to this litigation.

     Thus, Bingham's argument that the Malia file was "not critical to plaintiffs' case" fails.

Likewise, Bingham's concession – to the effect that which Merrill people saw which pages of the

Benistar website, and when, might be "an issue" – albeit not the single issue in the case, is an

unpersuasive understatement.  In contrast, plaintiffs' characterization of the multiple inferences

that would have flowed from possession of the Malia file in 2002 is overstated, for the following

reasons.

     Effects of Decision to Withhold the File

     First, the observations of the Appeals Court, cited in footnote thirteen of the decision on

remand, are taken from its 2007 Cahaly opinion, which discussed that portion of Judge

Botsford's JNOV decision addressing the "actual knowledge" standard governing plaintiffs'

claims against Merrill.  Cahaly, 68 Mass. App. Ct. at 671 ("The judge found scant evidence that

Merrill Lynch had actual knowledge that Benistar was using funds belonging to third parties, and

no evidence that Merrill Lynch had actual knowledge that any restrictions attached to those

funds.").  That "actual knowledge" standard is indisputably law of this case.  Cahaly, 451 Mass.

at 356-57 ("The indirect, circumstantial evidence amassed at trial may suggest that Merrill Lynch

knew the nature of Benistar Trust's business.  But it does not erase the evidentiary lacunae

between Merrill Lynch's knowledge of Benistar Trust's services and knowledge that Benistar

Trust was violating its fiduciary agreements to clients and converting client funds by trading in

the Benistar Trust corporate account."). Evidence that someone in Malia's position at some point "suspected" underlying fraud is not sufficient, because it does not support a reasonable inference of actual knowledge. Id.

Likewise law of the case is the ruling that evidence of a visit to the website was not material to the issue of whether Benistar had entered into escrow agreements with its clients, and the terms of those agreements. 2003 Mass. Super. LEXIS 143 at *26. Judge Neel ruled that "while the Benistar website pages which Malia viewed (and other Malia documents) provided circumstantial evidence at the 2009 retrial that was not available to the jury at the 2002 trial, they are not direct evidence of actual knowledge as defined by the Supreme Judicial Court in Cahaly, and even combined with other circumstantial evidence, do not satisfy the 'crucial' evidentiary requirement set forth in Cahaly." First Sanctions Decision, at page 9.

Third, while I have carefully considered all of plaintiffs' submissions and arguments with respect to the effect on the litigation of Snyder's conduct and judgments, I find much of their approach to be unsupported by the record, internally inconsistent, and insufficiently precise about these prior judicial determinations in the case.

For example, I accept for purposes of argument that "Plaintiffs' discovery efforts in 2002 would have led to more evidence of Merrill Lynch's knowledge of and participation in BPETCO's breach of fiduciary duty and conversion than was the [sic] obtained through the discovery Plaintiffs eventually took in 2009." Plaintiff's Proposed Findings of Fact, at p. 76. I do not see how it can now be argued that the Malia file – while by no means dispositive -- would not have provided another potential link in the chain of circumstantial evidence from which plaintiffs could have attempted to build permissible inferences. 85 Mass. App. Ct. at 428 ("It would likely have led the plaintiffs to the existence of other relevant facts and would have

been useful in cross-examining the Merrill witnesses."). That in turn would have (and did) lead to the admissibility of the Benistar website pages which Malia viewed providing additional circumstantial evidence at the 2009 retrial that was not available in the 2002 trial. However, I cannot accept the multiple pages of speculation offered by plaintiffs regarding Malia's (and Rasmussen's) "likely testimony if he testified in 2002." Plaintiffs' Proposed Findings of Fact, at paras. 297-308.

At Plaintiffs' Proposed Findings of Fact, para. 265, they state: "It is impossible to reconstruct what would have happened if Bingham had not acted without legal justification in withholding critical evidence." I agree with the first five words of this sentence, that is, it is impossible to reconstruct. Notwithstanding that impossibility, plaintiffs continually within that same pleading make reconstructive pronouncements. At their Proposed Findings of Fact, para. 37, plaintiffs state: "But for Bingham's willful, knowing and unfair and deceptive conduct, this court would not have granted Merrill Lynch's motion for judgment notwithstanding the verdict in 2003." Similarly, at Plaintiffs' Proposed Findings of Fact, para.

287 it is stated: "Since the documents concealed by Bingham would have been produced more than a year after Merrill Lynch was obligated to produce them, this Court would likely have rejected Merrill Lynch's argument that it was too late for plaintiffs to seek additional discovery based on Merrrill Lynch's seriously delinquent production and the significance of the documents produced." I find no evidence on this record to support either of these speculations.

Perhaps the piece de resistance is this: "Because it is impossible to know whether plaintiffs and Merrill Lynch would have reached a settlement agreement in 2002, Bingham's misconduct may have been the sole basis for the past thirteen years of litigation in this case. Bingham certainly caused the expenditure of substantial resources of the parties and the

Commonwealth which could have been far better spent." Plaintiffs' Proposed Rulings of Law at

page 21 (emphasis supplied). I daresay no seasoned trial or appellate judge who has touched this

case could agree that all of the now fifteen years of litigation is to be blamed solely on the

conduct of Bingham, and I respectfully decline to so find or rule.

**Plaintiffs' Losses**

I am of course sympathetic to the notion that plaintiffs may have been subjected

unnecessarily to particular litigation risks as a result of Snyder's decisions to withhold the Malia

file. Nonetheless, the difficulties with this argument are at least threefold. First, the record is

clear that none of the risks identified by the Plaintiffs in their sanctions pleadings actually came

to pass.[17] Second, plaintiffs acknowledge, as they must, that "they did eventually recover sums

more substantial than Merrill Lynch would have offered in 2002 even if the additional evidence

had been produced to plaintiffs at that time." Plaintiffs' Proposed Findings of Fact, at page 72,

note 16. And third, as described above, the argument persists in glossing over the multiple

inferences which would have been necessary for plaintiffs to arrive at proof of the "actual

knowledge" standard first articulated by Judge Botsford in her 2003 JNOV opinion, and affirmed

by our appellate courts.[18]

---

[17]    These alleged risks are referenced at various points throughout plaintiffs' pleadings, but perhaps most directly and succinctly at Proposed Finding of Fact para. 268 (risk of losing their claims on summary judgment; risk of settling unfairly low prior to the 2002 trial; loss of an "opportunity to settle for the fair value of their claims in 2002"; the risk of a jury verdict for Merrill in 2002; the granting of the JNOV in 2003; and the risks associated with the new trial process beginning in 2004.)

[18]    In their pre-hearing filings plaintiffs sketched out three theories of loss. The first was that the judgment entered by Judge Neel in 2009 accounted for the $12.5M plaintiffs recovered in 2008 as assignees of Benistar, whereas a hypothetical judgment entered in 2002 or 2003 would not have been so reduced. A second, related theory is that this "set off" should have/could have been applied to a punitive damages award, rather than the compensatory damages award. Plaintiffs also argued a court "would likely have awarded a very substantial punitive damages award" in 2002 had plaintiffs had access to additional evidence. Lastly, they suggest that, but for Snyder's work product judgment, the litigation would have ended long ago. Docket, at Paper 632. I am unable to accept any of these theories, finding as I do that they are pure speculation, unsupported by anything in the record before me.

48

For all of these reasons, Plaintiffs have not demonstrated actual effect or uncompensated loss to them incurred by Bingham's conduct.  Thus, even had I found Snyder's work product decision constituted willful misconduct and intentional violation of law for litigation advantage, the penalty on this record would be limited to -- at most -- whatever uncompensated attorneys' fees plaintiffs have incurred since Judge Neel's decisions in 2011.

## CONCLUSION

**For all of the reasons contained in this Memorandum, and the principles set out in the Appeals Court's remand decision in this matter, I find and rule that Snyder acted reasonably and in subjective good faith with respect to each of his challenged judgments and actions in the underlying litigation, and that accordingly no sanctions are warranted against Snyder or Bingham for Snyder's conduct.**


**SO ORDERED.**

Dated:  April 12, 2016

Christine M. Roach