FILED
IN CLERKS OFFICE

2017 NOV 27 PM 1: 20

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
v. ) Crim. No. 04-10029-GAO
)
DANIEL E. CARPENTER )

**DEFENDANT'S RENEWED MOTION FOR RECONSIDERATION OF
THIS COURT'S FORFEITURE ORDER AND ITS DENIAL OF MR. CARPENTER'S
RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL BASED ON
THE DECISIONS IN *HONEYCUTT, COUNTRYWIDE, BERROA,* AND *TAVARES*
(ORAL ARGUMENT REQUESTED)**

## I.    Preliminary Statement

As the Court is well aware, Mr. Carpenter has a number of motions currently pending

before the Court to vacate his conviction, including his 2255 Petition filed in May 2015 (Doc.

496), and various motions for either a new trial pursuant to Rule 33 (Doc. 545), or to reconsider

the Court's previous judgments (Doc. 502).  But, after the Court issued its forfeiture order (Doc.

471), Mr. Carpenter promptly filed a Motion for Reconsideration of the Court's Order (Doc.

477), and Attorney Weinberg has dutifully followed up with the First Circuit for the last three

years that no action has been taken by the Court on that pending Motion for Reconsideration.

In keeping this Court and the First Circuit abreast of changes in the law of forfeitures,

Attorney Weinberg filed a supplement to the Motion of Reconsideration on July 31, 2017 (Doc.

552) based on the Supreme Court's recent decision in *Honeycutt v. United States*, 137 S.Ct. 1626

(2017), where Mr. Carpenter specifically reserved the right to file a separate motion for

reconsideration to vacate his conviction based on the fact that the Supreme Court in *Honeycutt*

clearly defines the word "obtain" as "to come into the possession of…to procure or gain."

*Honeycutt* at 1632.  As the Court knows, the word "obtain" is central to the crimes of mail and

wire fraud as the purpose of the scheme to defraud must be to use material deceptions in order to

**obtain** the victim's money or property. In denying Mr. Carpenter's Rule 29 Motion for a

Judgment of Acquittal, the Court stated the following:

> To convict the defendant of mail or wire fraud, the government had to prove beyond a reasonable doubt the defendant's knowing and willful participation in a scheme to defraud...to **obtain** money or property by means of false or fraudulent pretenses, representations, or promises...with the specific intent to defraud, and the use of the mails or interstate wire communications in furtherance of the scheme. *See United States v. Woodward*, 149 F.3d 46, 54 (1st Cir. 1998) (quoting *United States v. Sawyer*, 85 F.3d 713, 723 (1st Cir. 1996)).... The government's theory was that the defendant specifically intended to **obtain** the exchange funds on the basis of representations to the exchangors that the exchange funds would not be subjected to any risk and would simply be "parked" in an escrow account, when he knew that these representations were false because his investment strategy was in fact extremely risky. *United States v. Carpenter*, 808 F. Supp. 2d 366, 368-69 (Doc. Mass. 2011) (emphasis added).

As the Court itself laid out the requirements of the Mail and Wire Fraud statutes in

*United States v. Sawyer*, 85 F.3d 713 (1st Cir.1996) and *United States v. Woodward*, 149 F.3d 46

(1st Cir. 1998), it was up to the government to prove the following elements beyond a reasonable

doubt in order to show that Mr. Carpenter **knowingly** and **willfully** participated in a scheme to

defraud the BPETCO Exchangors by:

1. Using the mails or wires **in furtherance** of
2. A deceitful scheme to
3. **Obtain**
4. The Exchangors' Money or Property. *See Woodward* at 54, *quoting Sawyer* at 723.

Mr. Carpenter respectfully urges the Court to consider the Supreme Court's decisions in

*Honeycutt* and *Sekhar v. United States*, 133 S.Ct. 270 (2013) for the proposition that the

definition of the word **obtain** means that Mr. Carpenter personally acquired and took possession

of the Exchangors' money for his benefit or gain. As the Court knows well, that did not happen

in this case as Mr. Carpenter always intended that the Exchangors be paid back, and in fact they

were paid back with full interest before his Second Trial in 2008 with the proceeds of his $15

million Arbitration victory over PaineWebber. Therefore, based on the Supreme Court's

definition of the word "obtain," there was no Mail or Wire Fraud in this case.

Similarly, the First Circuit recently reversed and vacated the mail fraud convictions based on five Puerto Rico medical students lying on their applications and the Majority in that case worried that "under the government's theory, any false statement in an application...could constitute a federal crime." *See United States v. Berroa*, 856 F.3d 141, 150 (1st Cir. 2017), relying upon and discussing the Supreme Court's decision in *Loughrin v. United States*, 134 S.Ct. 2384 (2014) and the theory of causation and "by means of" as it applies to mail fraud, even though *Loughrin* was a bank fraud case. As the Court knows, at this late date, the government has failed to attribute even one oral or written misrepresentation to Mr. Carpenter. Not only did Mr. Carpenter have no intent to deceive, he did not lie to anyone about anything, and based on the First Circuit's new standard announced in *Berroa*, Mr. Carpenter should never have been indicted, much less convicted. Furthermore, the First Circuit's decision in *United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016) makes clear that there were no mailings and wires "**in furtherance**" of any scheme to defraud in Mr. Carpenter's case because the Second Circuit's decision in *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016) based on several famous First Circuit decisions, demonstrates why there was absolutely no "scheme to defraud" to begin with in this matter. Moreover, other recent notable decisions such as *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) and *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016) among others, also limit the over-extension of the Mail and Wire Fraud statutes in this case.

The government did not oppose Mr. Carpenter's filing this new supplemental Motion for Reconsideration (see Doc. 553), and therefore in the interests of the Court's time, if the Court grants this Motion, many of Mr. Carpenter's other Motions will become moot and the interests of justice will be served. Once the Court schedules a hearing for oral argument on this matter, Mr. Carpenter will retain counsel to appear before the Court.

## II.     This Court has the Inherent Authority to Consider & Grant this Motion

Although "motions for reconsideration in criminal cases are not specifically authorized either by statute or by rule," *United States v. Ortiz*, 741 F.3d 288, 292 n.2 (1st Cir. 2014), "[a] district court may grant a motion for reconsideration if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust." *United States v. Cintron*, 724 F.3d 32, 36 n.5 (1st Cir. 2013). *See, also, United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009) (same).   Mr. Carpenter respectfully suggests that this Motion for Reconsideration involves all of these factors.

"[W]hen reconsideration of an earlier ruling is requested, the district court should place great emphasis on the 'interests of justice.'" *United States v. Roberts*, 978 F.2d 12, 21 (1st Cir. 1992). "This is so . . . because such requests for reconsideration rely, in the last analysis, on the trial court's inherent power to afford relief from interlocutory decisions 'as justice requires.'" *Id.* "When faced with a motion for reconsideration, district courts should apply an interests-of-justice test." *United States v. Siciliano*, 578 F.3d 61, 72 (1st Cir. 2009).   *Honeycutt* and *Countrywide* constitute intervening changes in the law, and it would be in the interests of justice to acquit Mr. Carpenter when his conduct clearly did not rise to the level of mail or wire fraud—even if such acquittal occurs after Mr. Carpenter has finished serving his supervised release.[1]

Additionally, Federal Rule of Criminal Procedure 57(b), which is entitled "Procedure When There Is No Controlling Law", provides in part that "[a] judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district." Fed.R.Crim.P. 57(b). "Where the Rules of Criminal Procedure do not speak specifically to a

---

[1] For example, an acquittal would make Mr. Carpenter eligible to apply for reinstatement of his law and insurance licenses.

matter, a court conducting a criminal case is permitted to draw from and mirror a practice that is sanctioned by the Federal Rules of Civil Procedure." *United States v. Morrison,* 521 F.Supp.2d 246, 252 (S.D.N.Y. 2007), *quoting United States v. James,* 2007 WL 914242, at *3 (E.D.N.Y. 2007). "Thus, when deciding motions for reconsideration in criminal matters, courts in this district have resolved such motions according to the same principles that apply in the civil context." *James* at *3. *See, also, United States v. Fiorelli,* 337 F.3d 282, 286 (3d Cir. 2003) ("motions for reconsideration may be filed in criminal cases"); and *United States v. Clark,* 984 F.2d 31, 33-34 (2d Cir. 1993).

Furthermore, even though it has been six years since the Court's ruling on Mr. Carpenter's Rule 29 Judgment of Acquittal being challenged was issued, this motion is still timely. "To the extent that such motions are viable at all, they rely on the traditional and virtually unquestioned practice of district courts exercising their inherent authority to revisit their own orders." *Ortiz,* 741 F.3d at 292, n.2 (*citing United States v. Dieter,* 429 U.S. 6, 8 n.3 (1976) (*per curiam*) (internal quotation marks omitted)). Courts generally use the standard for the granting of motions to reconsider in civil cases. *United States v. Healy,* 376 U.S. 75, 78-79 (1984) ("We have recently recognized the appropriateness of petitions for rehearing . . . in criminal cases . . . . The practice of the Court has been to treat such petitions as having the same effect . . . as do similar petitions in civil cases . . .").

The civil analog to this Motion for Reconsideration is a motion for relief from judgment or order under Fed.R.Civ.P. 60(b)(6) ("the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (6) any other reason that justifies relief."). Although six years may have elapsed since this Court's order denying Mr. Carpenter's motion for a judgment of acquittal, the Supreme Court's decisions in *Honeycutt* and *Sekhar* as well as the First Circuit's recent decisions in *Berroa* limiting the application of the

mail and wire fraud statutes and in *Tavares* defining the "in furtherance" element of Mail and Wire Fraud, along with the Second Circuit's decision in *Countrywide* based on major First Circuit cases constitute intervening changes in the controlling law that goes to the very basis of the order being challenged. *See, e.g., Schwartz v. United States*, 129 F.R.D. 117, 120-21 (D. Md. 1990) (rule 60(b)(6) motion filed six years after order being challenged was timely due to intervening narrowing of the mail fraud statute enunciated in *McNally v. United States*, 483 U.S. 350 (1987)). *See, also,* the First Circuit's decision in *United States v. Rosa-Ortiz*, 348 F.3d 33 (1st Cir. 2003) *citing United States v. Peter*, 310 F.3d 709, 715 (11th Cir. 2002) ("When a court without jurisdiction convicts and sentences a defendant the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force.").

Absent a meaningful and substantive review of this matter, manifest injustice will occur because the intervening change in the interpretation of the controlling law goes to the very basis of Mr. Carpenter's convictions, which are fatally undermined in light of the dramatic changes to governing law nationally as well as in the First Circuit (*see, e.g., Berroa* and *Tavares*, clarifying which mailings are truly **being used in furtherance** of a scheme to defraud). Accordingly, "extraordinary circumstances" exist to warrant reconsideration of this Court's September 1, 2011 order denying Mr. Carpenter's motion for judgment of acquittal. *See Pichardo v. Ashcroft*, 374 F.3d 46, 52 (2d Cir. 2004) (reversing district's court's denial of alien's post-judgment motion for reconsideration, granting habeas relief, and reversing deportation order based on an intervening change in law).

Therefore, Mr. Carpenter hereby respectfully renews his motion for reconsideration of this Court's Forfeiture Order and the Court's September 1, 2011 order denying Mr. Carpenter's motion for a Judgment of Acquittal. *See United States v. Carpenter*, 808 F. Supp. 2d 366, 379-

80 (D. Mass. 2011). As the result of several intervening changes in the controlling law, specifically the Supreme Court's decisions in *Honeycutt, Sekhar,* and *Skilling v. United States,* 561 U.S. 358 (2010) discussing the "mirror image" theory of fraud, as well as the Seventh Circuit's decision in *United States v. Weimert,* 819 F.3d 351 (7th Cir. 2016) and the Eleventh Circuit's decision in *United States v. Takhalov,* 827 F.3d 1307 (11th Cir. 2016), both of which clarify and define the limits of Mail and Wire Fraud in a business context, and the Second Circuit's recent decision in *Countrywide* declaring that an intentional breach of contract is not fraudulent, Mr. Carpenter's conduct clearly did not rise to the level of mail or wire fraud. Similarly, the First Circuit's own decisions in *Tavares* dealing with what is meant by "**in furtherance**" and *Berroa* to define the **use of,** clearly shows the government did not prove the necessary elements of mail and wire fraud in Mr. Carpenter's case based on this major intervening change in the controlling law of Mail and Wire Fraud. As a result, Mr. Carpenter is entitled to a judgment of acquittal as to all 19 counts of the superseding indictment.[2]

---

[2] Mr. Carpenter began serving his 36-month sentence on June 20, 2014 (Doc. 476), was released in January 2017, and is now subject to an additional 36 months of supervised release. (Doc. 438). He filed numerous motions during his incarceration on a *pro se* basis: e.g., (i) the "Habeas Motions" seeking habeas and related relief from his convictions (Docs. 492, 496, 499, 502, 503, 505, 541 and 545); (ii) and the various Motions for Reconsideration and Rule 33 (e.g. Docs. 477, 545, and 552), (the Habeas Motions and the Reconsideration Motions are collectively referred to as the "*Pro Se* Motions"). It is respectfully requested that as a matter of judicial economy the Court consider and hear oral argument on this Motion for Reconsideration first—which, if granted, would render all of the *Pro Se* motions moot. Also, the Exchangors have settled all of their differences with Mr. Carpenter and have filed a satisfaction of judgment in the Massachusetts state court civil case from which this prosecution arose, after having received nearly $50 million in cash settlements and other payments on account of their original $8 million loss. Therefore, the Court should vacate all of the Forfeitures, Fines, and Restitution in this case as the Exchangors were paid back in full plus interest by the time of Mr. Carpenter's Second Trial, and the rest of the $50 million has resulted in a huge judicial windfall for all of the seven Exchangors.

### III.    The *Countrywide* Decision Supports Mr. Carpenter's Judgment of Acquittal

As discussed in greater detail below, in addition to the Supreme Court's decisions in *Honeycutt, Sekhar,* and *Skilling*, the Second Circuit in *Countrywide* reversed the judgment of the district court imposing civil penalties under the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. §1833a ("FIRREA"), following a jury trial in which the defendants were found to have violated the mail and wire fraud statutes.   18 U.S.C. §§1341, 1343. Critically, the *Countrywide* opinion - which relies heavily on major First Circuit precedents - greatly curtails the extent to which violations of the mail and wire fraud statutes may be proven where there is a contract between the parties. As this Court is well aware, Mr. Carpenter's mail and wire fraud convictions were based on the detailed contracts between BPETCO and the Exchangors.  Suffice it to say, if there was no "mail and wire fraud" in *Countrywide*, which caused billions of dollars in losses to US Taxpayers, then clearly there was no fraud in BPETCO, where the Exchangors received almost $50 million based on their $8 million of losses.

In *Countrywide*, the Second Circuit held that the government failed to present sufficient evidence to prove the defendants had committed mail and wire fraud by intentionally selling defective residential mortgage loans in violation of contractual representations to the government-sponsored enterprises Federal National Mortgage Association ("Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie"). Accordingly, it held that the government was required to prove that Countrywide either made the contractual guarantees regarding future loan quality with the contemporaneous intent not to perform, or later made other misrepresentations not contained in the contracts as to which fraudulent intent could be found.

This Court has already determined and stated several times on the record, that at the time the Exchangors entered into the contracts with BPETCO, Mr. Carpenter had the

8

contemporaneous intent to successfully perform all of the exchanges. *See Carpenter*, 808 F. Supp. 2d at 378 ("it was not disputed that the defendant wanted the scheme to succeed."); Doc. 438 at p. 16 (The Court [at sentencing]: "This is a unique case I think. . . . This was not a fraud that took money from someone intending never to return it. It was actually part of the business plan that it be returned at some point.").

The government offered no evidence whatsoever that Mr. Carpenter **never intended** to complete all of the exchanges, only that his allegedly "risky" stock option investments were racking up millions of dollars of losses while the stock market plunged in 2000 and BPETCO was still signing up new Exchangors. In fact, as to Mr. Carpenter's "intent," just the opposite is true. Mr. Carpenter completed 119 of 126 exchanges and settled two more before the civil trials in this case began, and he also invested two million dollars of his own company's money in late October 2000 in the face of a rapidly-declining market to aid in completing exchanges that were then coming due and to shore up BPETCO's accounts at PaineWebber. (Tr. 10:49-51; Ex. 205.). The NASDAQ stock market crash of 2000 is still the largest in United States history, and it has taken 17 years to get back to the levels of 2000. Other than Mr. Carpenter, no one else has been prosecuted for losing money trading during the stock market crashes of 2000 or 2008. In fact, the Court can "Google" stock option trading and watch hundreds of videos on YouTube showing that option trading is far safer and far more profitable than the normal investment in equities. Mr. Carpenter's stock option trading occurred before either YouTube or Facebook (or even Google) were in existence. Several of Mr. Carpenter's favorite stocks figure prominently in the news today, including his favorites Qualcomm, Broadcom, Intel, Cisco, and Amazon. Mr. Carpenter, unlike the Massachusetts and Connecticut pension plans, never invested in the likes of Enron. (See, e.g., attached as Exhibit One, articles on the billion dollar losses endured by the Massachusetts Employees' Pension Plan).

9

The *Countrywide* court also observed that the only representations alleged to be false were the contractual guarantees of future mortgage quality and the government did not prove, or even attempt to prove, that Countrywide did not intend to perform its promise at the time it executed the contracts. The same reasoning applies here. The only representations alleged to be false were the alleged contractual guarantees that the funds would be held "safe" or kept in a particular account at either Merrill Lynch or PaineWebber. The government did not prove, or even attempt to prove, that Mr. Carpenter did not intend to perform the exchanges at the time that BPETCO and the Exchangors executed the contracts.

Because the government failed to offer any proof that the contractual representations at issue were made with the "contemporaneous intent not to perform," the *Countrywide* court concluded that the government failed to prove the predicate violations of the mail and wire fraud statutes necessary to sustain an award of civil penalties under FIRREA, and remanded the case with instructions to enter judgment for the defendants. In this case, the government likewise failed to offer any proof that the contractual representations at issue were made with Mr. Carpenter's "contemporaneous intent not to perform" the exchanges. As a result, the government failed to prove that Mr. Carpenter committed mail or wire fraud at the time the Exchangors were induced to give their money to BPETCO — which is the time at which the alleged offenses occurred. *See Carpenter*, 808 F. Supp. 2d at 375 ("The crimes alleged in the Superseding Indictment . . . were complete upon [BPETCO]'s having obtained the Exchangors' funds in response to [BPETCO]'s solicitation and advertising."). Once again, Mr. Carpenter never personally "obtained" money or property from the Exchangors under *Honeycutt* and *Sekhar*, nor did he intend to default on the exchanges or "defraud" anyone under *Countrywide* and the "mirror image theory" of fraud in *Skilling*.

For the reasons discussed below, *Countrywide*, which relies heavily on First Circuit precedent, warrants reconsideration of this Court's September 1, 2011 order denying Mr. Carpenter's motion for a Judgment of Acquittal. Upon reconsideration, the motion should be granted and a Judgment of Acquittal entered as to all 19 counts of the superseding indictment. In the alternative, the Court can grant Mr. Carpenter's 2255 Petition based on the fact that, under the Supreme Court's decisions in *Honeycutt, Sekhar,* and *Skilling*, the Second Circuit's decision in *Countrywide*, and the First Circuit's recent decision on the **in furtherance** requirement of mail fraud in *Tavares*, this Court clearly lacked jurisdiction as there was no "federal mail and wire fraud" in this case to properly invoke this Court's jurisdiction, thereby making Mr. Carpenter's conviction a nullity. *See, e.g., Rosa-Ortiz* at 36, *citing Peter* at 715: "When a court without jurisdiction convicts and sentences a defendant the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force."

## II. The *Countrywide* Decision Based on First Circuit Precedent Warrants that Mr. Carpenter's Motion be Granted

### A. Background

Early during the financial crisis, the Securities and Exchange Commission brought suit against the three most senior executives of Countrywide, alleging that the company, at their behest, had falsely assured investors that it was primarily a prime quality mortgage lender, when in fact, Countrywide was making riskier and riskier mortgage loans. The case was settled without the executives admitting or denying the allegations, and no one went to jail despite a multi-billion dollar fraud because the government chose not to bring any criminal charges. But in 2012, a "whistleblower" named Edward O'Donnell, a former Countrywide vice president, filed a *qui tam* action alleging that another Countrywide program, known as the "High Speed Swim Lane" (or "HSSL" or "Hustle"), was the vehicle by which Countrywide had perpetrated a subsequent mail and wire fraud scheme from August 2007 to May 2008.

Eventually, the government took charge of the case and added claims under FIRREA, which imposes civil penalties for violations of the mail and wire fraud statutes "affecting a federally insured financial institution." 12 U.S.C. §1833a(c)(2). It was proved, as the jury found, that Countrywide and one of its officers (Rebecca Mairone) had engaged in an intentional mail and wire fraud scheme to misrepresent the quality of the mortgages that it processed through the Hustle program and sold to Fannie Mae and Freddie Mac. As a result, the jury found Countrywide and Mairone civilly liable under FIRREA as the result of the government having proved violations of the mail and wire fraud statutes by a preponderance of the evidence.[3]

The essential "crime" found by the jury in *Countrywide* was a mail and wire fraud scheme to induce Fannie and Freddie to purchase risky mortgage loans originated through the Hustle program by misrepresenting that the loans were of higher quality than they actually were.[4] The Hustle program implemented this scheme by transferring primary responsibility for approving loans from quality-focused underwriters to volume-focused loan specialists, eliminating quality-control, and reducing the turn-around time for loan funding from 45 days to 15 days.

The court observed that the financial motive for the fraud was that the *Countrywide* defendants "managed to unload a vast portfolio of risky assets on unwitting buyers and were thereby able to reduce the risk on their own balance sheet at a crucial moment in time." *Countrywide*, 33 F. Supp. 3d at 501, n.9. The court also noted that "if the victims had known

---

[3]  Of course, the government's burden with respect to Mr. Carpenter was to prove that he committed all of the elements of mail and wire fraud **beyond a reasonable doubt**.

[4]  This is virtually identical to the government alleging here that the scheme was Mr. Carpenter "inducing" the Exchangors to give BPETCO their money by misrepresenting in the contracts that the funds would be held "safe" and, presumably, would not be invested in risky stock options. Significantly, the words "safe" or "safely" or "safety" are nowhere to be found in the BPETCO contracts.

that the defendants were lying to them about the quality of the loans produced by the HSSL process, they would never have purchased any of the loans so generated, or parted with any of their money." *Id.* at 502.[5]

This is exactly like Mr. Carpenter's case. Much as the government's eliciting testimony and arguing to the jury that if the Exchangors had known that they were being misled (either explicitly in the contracts or implicitly by virtue of the inherent nature of a property exchange whereby the funds need to be "parked") about the quality and safety of the investments, they would have never contracted with BPETCO to perform the property exchanges "or parted with any of their money." This, of course, also means it was in reality a case of "nondisclosure" which *Skilling* says is "outside the bounds" of the federal fraud statutes. *Skilling v. United States*, 561 U.S. 358, 410 (2010). The unanimous decision in *Skilling* also describes the "mirror image of fraud" doctrine, whereby "the victim's loss of money or property suppl[ies] the defendant's gain," *Skilling* at 400.

In an email not admitted at trial, a Countrywide executive admitted to lying to Freddie "to conceal the awful quality" of certain loans. *Countrywide* at 503, n.11. In stark contrast, even the government conceded that neither Mr. Carpenter nor BPETCO's president Martin L. Paley ("Paley") made **any** oral misrepresentations or verbally lied to the Exchangors. (Tr. 12:11.). Similarly, a significant part of the government's evidence and argument focused on [Mr. Carpenter's] being "kicked out" of Merrill Lynch because he was acting like a "riverboat gambler" and incurring even larger losses, and then "doubling down" on his risky investment

---

[5] Much as the government's eliciting testimony and arguing to the jury that if the Exchangors had known that they were being misled (either explicitly in the contracts or implicitly by virtue of the inherent nature of a property exchange whereby the funds need to be "parked") about the quality and safety of the investments, they would have never contracted with BPETCO to perform the property exchanges "or parted with any of their money."

strategy and losing even more money at PaineWebber. On appeal, the Countrywide defendants argued that the evidence at trial showed at most an "intentional breach of contract" *i.e.*, that they sold mortgages they knew were not of the quality promised in their contracts, and that was insufficient as a matter of law to constitute mail and wire fraud. The Second Circuit agreed, concluding that the evidence failed to demonstrate the contemporaneous fraudulent intent necessary to prove a scheme to defraud through contractual promises. The Court in Mr. Carpenter's case eloquently shaped the issue in exactly the same way:

> But it is easy, especially for lay jurors, to miss the significant difference **between a failure to live up to a promise after it has been made** and a fraudulent intent in making the promise never to live up to it. The latter would be the basis for a finding of specific intent to defraud; **the former would not be**. *Carpenter*, 808 F. Supp. 2d at 384 (emphasis added).

This statement by the Court alone warrants reconsideration of Mr. Carpenter's Judgment of Acquittal motion based on *Honeycutt, Skilling*, and *Countrywide*. The Second Circuit in *Countrywide* further noted that "[t]his question, not an unusual one at common law, poses a novel issue in the context of the federal fraud statutes before us. Supreme Court precedent instructs us to apply the common-law understanding of fraud principles to these statutes, absent inconsistency with their text."** *Countrywide* at 656 (emphasis added). The Second Circuit then embarked upon an analysis of the common law's treatment of fraud claims based upon breaches of contract.

The defendants in *Countrywide* argued that, because the only representations involved in the case were contained within contracts with Fannie Mae and Freddie Mac, to demonstrate fraud rather than a simple breach of contract under the common law and federal statutes, the government had to prove that defendants **never intended to perform those contracts**—*i.e.*, at the time of contract execution, defendants knew and intended that they would not perform their future obligations thereunder. *Id.* at 656-57. Similarly here, because the only representations

14

involved in the case were contained within the Exchange Agreements with the Exchangors, to demonstrate fraud rather than a mere breach of contract under the common law and federal statutes the issue is whether the government had to prove that Mr. Carpenter never intended to perform those exchange agreements, *i.e.*, at the time of contract execution, did Mr. Carpenter purposefully intend to not successfully complete the property exchanges. Hopefully the Court, as well as the government, recognizes that Mr. Carpenter successfully completed 119 out of 126 property exchanges and his alleged victims have received almost $50 million on their $8 million in losses, and that civil litigation against other parties continues to this day, but Mr. Carpenter and the Exchangors have settled all of their disputes. For that reason alone, the Court should vacate all Forfeitures, Fines, and Restitution in this case, as the Exchangors were all paid back in 2008, and since then have enjoyed a huge windfall.

The *Countrywide* court calculated the total penalty against Bank of America (Countrywide's parent) at almost $3 billion but, after applying one mitigating factor urged by the defendants, settled on a penalty of $1.27 billion. Although Bank of America on behalf of Countrywide made additional arguments for even further mitigation of the penalty, the court rejected those arguments because the evidence proved convincingly that the defendants were fully prepared to jettison reasonable steps to assure loan quality in favor of volume, speed, and profits—and **even lied to** executives at Fannie and Freddie. Even when Countrywide's own internal quality reports evidenced rapidly deteriorating loan quality, "the defendants shunted critics and criticisms aside, doubled down on their risky behavior, and applied ever more pressure on loan specialists to ignore loan quality concerns." *Id.* at 503. No one has ever accused Mr. Carpenter of such deceitful conduct as exhibited in *Countrywide*, not even the government, and certainly not the Exchangors. See, e.g., the Exchangors' Lawsuit against

Merrill Lynch attached as Exhibit Two here, as well as in Mr. Carpenter's 2255 Petition Reply Brief (See Doc. 531 Exhibit One).

### B. The Analysis in *Countrywide* Proves Mr. Carpenter's Innocence

The Second Circuit in *Countrywide* posited the central issue as whether a party who enters into a contract with another party intended to perform at the time of contracting but then intentionally failed to perform (which is an intentional breach of contract), as opposed to a contracting party who never intended to perform at the outset (which is fraud). *Id.* at 656. Once again, the Court in this case showed the mistake Mr. Carpenter's jury made and shaped the issue almost exactly the same way as the Second Circuit did in *Countrywide* when it stated:

> But it is easy, especially for lay jurors, to miss the significant difference **between a failure to live up to a promise after it has been made** and a fraudulent intent in making the promise never to live up to it. The latter would be the basis for a finding of specific intent to defraud; **the former would not be**. *Carpenter*, 808 F. Supp. 2d at 384 (emphasis added).

Just as in *Countrywide*, because the only representations involved in this case were contained within the Exchange Agreements with the Exchangors, to demonstrate fraud rather than a mere breach of contract under the common law and federal statutes the issue is whether the government had to prove that Mr. Carpenter never intended to perform those exchange agreements, *i.e.*, at the time of contract execution, **did Mr. Carpenter purposefully intend to not successfully complete** the property exchanges? The Second Circuit posed the question as follows: "what is required to prove a scheme to defraud when alleged misrepresentations concerning future performance are contained within a contract?" *Id.* at 658.[6]

---

[6] Even assuming, *arguendo*, that the BPETCO marketing materials were also part of the written communications provided to the Exchangors along with the exchange agreements, they did not offer any "safety" or "security" and the contractual agreements themselves had a merger and integration clause. "The government's theory was that the defendant knew the content of the marketing materials and exchange documents were being given to Exchangors and therefore knew that it was represented to the Exchangors that their funds would be held safely in designated Merrill Lynch or PaineWebber accounts." *Carpenter*, 808 F. Supp. 2d at 376.

The Second Circuit, after reviewing the Supreme Court precedent contained in *Durland v. United States*, 161 U.S. 306 (1896) and related cases, found no difficulty in holding that "[w]hat fraud in these instances turns on, however, is *when* the representations were made and the intent of the promisor *at that time*. . . . where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim." *Countrywide* at 658 (emphasis in original). The Second Circuit noted that this view has been long-held, citing (among other cases) on more than one occasion *McEvoy Travel v. Heritage Travel*, 904 F.2d 786, 791-92 (1st Cir. 1990), for the proposition that "the common law requires proof—other than the fact of breach—that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation." *Countrywide* at 660.

The Second Circuit then summarized its holding as follows: "a contractual promise can **only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution**. Absent such proof, a subsequent breach of that promise— even where willful and intentional—cannot in itself transform the promise into a fraud." *Id.* at 662 (emphasis added). Put another way:

> Accordingly, we deem the common law's contemporaneous fraudulent intent principle incorporated into the federal mail and wire fraud statutes. Applying these principles to a fraud claim based on the breach of a contractual promise, we conclude that the proper time for identifying fraudulent intent is contemporaneous with the making of the promise, not when a victim relies on the promise or is injured by it. *Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation. Id.* (emphasis added).

The Second Circuit's decision in *Countrywide* also clarified that even in contracts having dates of future performance, "the promisor's *intent* to perform on that promise is fixed as of contract execution." *Id.* at 665 (emphasis in original). Accordingly, the jury in *Countrywide* had no legally sufficient basis on which to conclude that the misrepresentations alleged were made with "contemporaneous fraudulent intent." *Id.* at 667. Because the mail and wire fraud statutes require such proof, consistent with the common law, the Second Circuit held that the government had not proven the prerequisite violation under the mail and wire fraud statutes necessary to

---

However, "[t]here were no explicit representations of safety and security in the marketing materials or the exchange documents," *id.* at 381, and the designated accounts at each brokerage firm were considered to be a single "linked" account at each firm. (Tr. 7:36, 9:42.).

sustain an award of penalties under FIRREA. Simply put, if there was no fraud in *Countrywide*, then clearly there was no fraud in Mr. Carpenter's case.

Therefore, the application of *Countrywide* to Mr. Carpenter's case is straightforward and warrants an order from this Court to vacate his conviction and grant a Judgment of Acquittal on all counts. The penultimate issue at both of Mr. Carpenter's trials was whether any ***written*** misrepresentations were made to the Exchangors to induce them to give their money to BPETCO under false pretenses for the purpose of conducting property exchanges. The government conceded this was the **only issue** in Mr. Carpenter's case:

> The Court: The offense that's alleged is the **obtaining** of the exchange proceeds by false pretenses.... If you can show that the defendant specifically intended Exchangors, like Mr. Snider, to be fooled into giving money under false statements about security, you have the offense. *But that's the offense, the giving of the money.*
>
> AUSA: Right.

(Tr. 3:42-43) (emphasis added).

> The Court: Let me ask, ...is the government relying on things that Paley said that were different [from the documents]?
>
> AUSA: No.

(Tr. 12:11.)

The only way the Exchangors actually "gave" money to BPETCO was through the various contractual exchange agreements. Thus, it was the **obtaining** of the Exchangors' funds pursuant to these contracts, and any misrepresentations contained therein (express or implied), which constituted the alleged offenses of mail and wire fraud. Each Exchangor signed at least one of the exchange agreements. *Carpenter*, 808 F. Supp. 2d at 372-75. While the Paley marketing materials may have prodded the Exchangors into doing business with BPETCO (which is the general aim of all marketing materials), it was only through the Exchange Agreement Contracts that the Exchangors actually gave their money to BPETCO—which was the offense. Once again, there was no evidence adduced at either trial that any Exchangor actually read the Paley marketing materials or saw the Paley PowerPoint presentation, much less

relied upon the Paley materials to invest in the BPETCO property exchange. It was not until the government's second appeal of Mr. Carpenter's second New Trial Order that the issue of one particular slide in the Paley PowerPoint presentation came up. Compare that one Paley slide to the slide presentation in the First Circuit's decision in *Flannery v. SEC*, 810 F.3d 1 (1st Cir. 2015). Mr. Carpenter did not have anything to do with Paley's PowerPoint Presentation or the slide telling people to ask their Intermediary about safety, but the Exchange Agreements had a merger and integration clause that specifically barred any outside-the-contract promises. There is no mention in the exchange agreement documents themselves of "safety" and "security." In fact, the exchange agreements provide for BPETCO to invest in anything, and even Judge Botsford in her 2002 decision stated the Exchangors had to realize that the fund had to invest in equities because there was no "safe" investment that guaranteed a 6% investment return.

Because there were no misrepresentations found in the exchange agreements, and any of the alleged misrepresentations needed to be in those agreements, it follows that any and all alleged misrepresentations, if any, must also have been made at the time the exchange agreements were executed. But, the government offered no evidence whatsoever at either of Mr. Carpenter's two trials that Mr. Carpenter "intentionally" breached the agreement as the *Countrywide* defendants did, and the government did not even attempt to prove, that Mr. Carpenter "never intended to perform" the property exchanges at the time the exchange agreements were executed.

Therefore, Mr. Carpenter's only contractual breach comes from the fact that while he obviously did not intend to lose $9 million in the stock market, he allegedly placed the Exchangors' funds at "risk" by investing in stock options whereby they could more easily be lost. But, once again, as the Court itself said: "This is a unique case I think. . . . This was not a fraud that took money from someone intending never to return it. It was actually part of the

business plan that it be returned at some point....it was an objective, of course, to make money and not to lose it."). *See* Doc. 438 at p. 16.

Moreover, trading in stock options is a legitimate investment strategy and not fraudulent in any way and is, in fact, less "risky" than many other types of equity investing, or even some bonds for that matter. But, a mere breach of contract, even if "intentional" does not constitute mail and wire fraud. As the Court surely realizes from the *Countrywide* debacle, Mr. Carpenter could have lost the same $9 million by investing in FNMA preferred stock, or even lost more as the Massachusetts Employees' Pension Plan did in 2001 by investing in companies like Enron and WorldCom and then another $13 Billion loss in 2008. (See articles on Shannon O'Brien and Timothy Cahill attached as Exhibit One).

As stated earlier, evidence of Mr. Carpenter's good faith and actual intent to perform and complete the property exchanges is the fact that Mr. Carpenter invested two million dollars of his own company's money in late October 2000 to bolster BPETCO's accounts at PaineWebber and to aid in completing exchanges that were then coming due. (Tr. 10:49-51; Ex. 205.) Critically, not a single penny of the two million dollars was withdrawn from the PaineWebber accounts even when the ship was going down, unlike the famous Bear Stearns traders (*see United States v. Cioffi*, No. 08-cr-00415 (E.D.N.Y. Nov. 10, 2009)) that took their money out when the market started to tank in 2008 and yet were still acquitted. In Mr. Carpenter's case, it was all "either paid to Exchangors or was invested or traded." (Tr. 10:50.) Mr. Carpenter deposited the money into BPETCO's accounts at PaineWebber on October 27, 2000. (Tr. 10:49.) BPETCO provided property exchange services to Exchangors other than those listed in the superseding indictment and, presumably, these funds were used to complete their exchanges that were then coming due as well as shore up the PaineWebber accounts. Notwithstanding this evidence in Mr. Carpenter's favor, it was the government's burden to prove beyond a reasonable doubt that Mr. Carpenter, at

the time the exchange agreements were signed and the promise to complete the exchanges was made, had no intention to ever complete the exchanges. This, the government failed to do.

The government did not prove and did not even attempt to prove, that at the time the exchange agreements were executed Mr. Carpenter never intended to perform BPETCO's promise of successfully completing the property exchanges. Nor did the government prove that Mr. Carpenter (or Paley) made any later misrepresentations, *i.e.*, ones not contained in the contracts, to which fraudulent intent could be found. As the Court itself observed:

> "Interestingly, there was no evidence that any of the Exchangors, nor any attorney, accountant, or advisor interacting with [BPETCO] on their behalf, ever asked where exactly the funds would end up, nor what [BPETCO]'s interest in the exchange was. Consequently, there was no opportunity for Carpenter or Paley to make any later misrepresentations in this regard, even if they were so inclined." *Carpenter*, 808 F.Supp.2d at 381.

Clearly Mr. Carpenter fully intended for BPETCO to complete each and every exchange at the time the exchange agreements were executed. Thus, while Mr. Carpenter and BPETCO's post-execution conduct may have constituted a breach of contract, it did not rise to the level of mail and wire fraud. The government never argued—much less proved at trial—that the contractual representations at issue were executed with contemporaneous intent never to perform as required by *Countrywide, McEvoy Travel,* and *Sanchez v. Triple-S*, 492 F.3d 1 (1st Cir. 2007) and the trial record contains no evidence that Mr. Carpenter had any fraudulent intent in the contract negotiation or execution. In fact, as the Court found, "[t]his is a unique case I think. . . . This was not a fraud that took money from someone intending never to return it. It was actually part of the business plan that it be returned at some point." Dkt. 438 at p. 16. This statement by the Court in light of *Countrywide* and in light of *Skilling*'s "mirror image of fraud" doctrine supports granting the Motion to Reconsider and vacating Mr. Carpenter's conviction.

Perhaps the best evidence of Mr. Carpenter's contemporaneous intent to successfully perform the exchanges is the fact that some of these same Exchangors had completed other

successful exchanges with BPETCO. *See, e.g.*, Tr. 3:106 (Byron Darling: "[previous exchange] was a satisfactorily arranged exchange."). Even more relevant to Mr. Carpenter's contemporaneous intent to perform is that some of these same Exchangors successfully completed exchanges during the time period alleged in the superseding indictment. Tr. 4:151 (Q: "For the exchange in the amount of $400,000, was that money returned?" A: [Brian Fitzgerald] "Yes, it was."); Tr. 5:111 (Q: "Now, Mr. Iantosca had successful 1031 exchanges using [BPETCO]; isn't that right?" A: [Marjorie Adams] "Yes." Q: "Okay. . . . did he have a successful exchange using [BPETCO] prior to August?" A: "He sold the Plymouth land August 10, 2000."). So, rather than proving that Mr. Carpenter never intended to perform the exchanges at the time the exchange agreements were executed, the government's own evidence shows that he not only intended to but actually did perform the contracts with these same Exchangors during the time period in question. "Instead, the government's proof shows only post-contractual intentional breach of the representations. Accordingly, the jury had no legally sufficient basis on which to conclude that the misrepresentations alleged were made with contemporaneous fraudulent intent." *Countrywide* at 667.

The contractual promise to perform the exchanges contained in the exchange agreements can only support a claim for fraud upon proof that Mr. Carpenter had the fraudulent intent not to perform the promise at the time of contract execution. Because no such proof exists (then or now), a subsequent breach of that promise after the Stock Market crash—even where perhaps willful and "intentional" (*e.g.*, "intentionally" investing the Exchangors' funds in "risky" stock options and thereby losing the money so that BPETCO lacked the funds to complete the exchanges)—cannot in itself transform an unfulfilled promise into a fraud. Because the mail and wire fraud statutes require proof, consistent with the common law, that at the time the exchange agreements were executed Mr. Carpenter never intended to perform the property exchanges, and

no such proof was introduced at trial, the government failed to prove beyond a reasonable doubt that Mr. Carpenter committed mail and wire fraud arising from BPETCO's failure to complete the property exchanges charged in the superseding indictment.

In fact, Exhibit 268 from Mr. Carpenter's trial (attached here as Exhibit Three) shows that had PaineWebber not unlawfully suspended BPETCO's trading privileges and swept the BPETCO accounts in early January 2001, his option trades would have been up $15 million rather than down $9 million after Federal Reserve Chairman Alan Greenspan announced the Emergency Rate Cut on January 3, 2001. Mr. Carpenter obviously had no idea that the disputed election of 2000 would come down to a "coin-toss" Supreme Court decision, but in retrospect this is merely evidence of his bad luck, poor judgment, bad investment decisions, and a lack of foresight as to what the market would do as a result of the disputed election and interest rates. But, it is absolutely not evidence of fraudulent intent or criminal *mens rea* as required under the Supreme Court's decision in *Skilling*, or the history of the federal fraud statutes as described in *Countrywide* and based on the First Circuit's own decisions in *McEvoy Travel* and *Sanchez v. Triple-S. See, also,* the recent decisions in *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), where given the evidence adduced by the government at trial, the Seventh Circuit's analogy and analysis in reversing Weimert's conviction is directly on point in Mr. Carpenter's case where he did not lie to anyone or misrepresent anything:

> To take a simple example based on price, suppose a seller is willing to accept $28,000 for a new car listed for sale at $32,000. A buyer is actually willing to pay $32,000, but he first offers $28,000. When that offer is rejected and the seller demands $32,000, the buyer responds: "I won't pay more than $29,000." The seller replies: "I'll take $31,000 but not a penny less." After another round of offers and demands, each one falsely labeled "my final offer," the parties ultimately agree on a price of $30,000. Each side has gained from deliberately false misrepresentations about its negotiating position. Each has affected the other side's decisions. If the transaction involves interstate wires, has each committed wire fraud, each defrauding the other of $2,000? Of course not. But why not?

> The . . . answer is that negotiating parties, and certainly the sophisticated businessmen in this case, do not expect complete candor about negotiating positions, as distinct from

facts and promises of future behavior. Deception about negotiating positions—about reserve prices and other terms and their relative importance—should not be considered material for purposes of mail and wire fraud statutes. *Weimert* at 357-58.

("**Weimert's dealings in selling Chandler Creek were sharp and self-interested, but they did not amount to wire fraud**. . . . [A]ll terms of the deal were on the table. IDI might have been able to secure a better deal if it had known the underlying priorities of prospective buyers and Weimert, but that is . . . a matter for the corporate boardroom and civil law, not a federal criminal trial."). *Weimert* at 370 (emphasis added).

Similarly, in the "Parable of the Deceitful Neighbor" in the Eleventh Circuit's decision in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), the court explained two scenarios to show the difference between a "scheme to deceive" which is not illegal and its criminal cousin, the "scheme to defraud" which clearly did not exist in Mr. Carpenter's case. In the first, a man calls his neighbor saying that his child is very ill, and the neighbor responds by rushing over to see if she can help. The man asks her to give him change for a dollar, which the helpful neighbor gladly gives him. She later learns that the neighbor's child was not sick at all. The second scenario is identical to the first, except that now the Deceitful Neighbor gives the woman a counterfeit dollar in exchange for the four quarters. The Eleventh Circuit explained that the first scenario is not wire fraud, but the second one is, despite the fact that the woman would not have rushed over in the first scenario had she known that the child was not really sick. As the Eleventh Circuit explains the law of Mail and Wire Fraud in the other circuits:

> The Second Circuit has interpreted the wire-fraud statute in precisely this way. Their cases have "drawn a fine line between schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *see also United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim [that] affect[s] the very nature of the bargain itself. Such harm is apparent where there exists a discrepancy

between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.") (internal quotation marks omitted); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970) ("[W]e conclude that the defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception."). Moreover, the Second Circuit's interpretation of the wire-fraud statute is not a parochial interpretation of an ambiguous provision of federal law. Their interpretation follows as a matter of logic from Congress's decision to use the phrase "scheme to defraud" rather than "scheme" or "scheme to deceive." We therefore adopt that interpretation as our own. A jury cannot convict a defendant of wire fraud, then, based on "misrepresentations amounting only to a deceit." *Shellef*, 507 F.3d at 108. Thus, even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims "received exactly what they paid for." *Takhalov* at 1314-15, citing *Shellef*, 507 F.3d at 108.

## IV.    *Honeycutt* and *Countrywide* Both Mandate Mr. Carpenter's Acquittal

The application of *Honeycutt* and *Countrywide* to this case is straightforward and warrants Mr. Carpenter's acquittal on all 19 counts of the superseding indictment. The penultimate issue at Mr. Carpenter's trial was whether *written* misrepresentations were made to the Exchangors **in the contracts** to induce them to give their money to BPETCO under false pretenses for the purpose of conducting property exchanges. The only way the Exchangors actually gave money to BPETCO was through the contracts and exchange agreements the Exchangors signed.[7] Thus, it was the "obtaining" of the Exchangors' funds pursuant to these contracts, and any written misrepresentations contained therein, which constituted the offenses of mail and wire fraud, because there is no dispute that Mr. Carpenter did not talk to anyone and

---

[7]  Each Exchangor signed at least one of the Exchange Agreements. *Carpenter*, 808 F. Supp. 2d at 372-75. While the Paley marketing materials may have prodded the Exchangors into doing business with BPETCO (which is the general aim of all marketing materials), it was solely through the Exchange Agreements and via those contracts that the Exchangors actually gave their money to BPETCO—which was the offense.

Paley did not represent anything outside of the contracts.[8]  Unlike the defendants in *Countrywide*, the Court knows that Mr. Carpenter had every intention to pay the Exchangors' money back, and he actually did before the Second Trial began.

Because any and all of the "alleged" misrepresentations must have been contained in the Exchange Agreements themselves and not the Paley PowerPoint Presentation, and any and all alleged misrepresentations had to have been made at the time the Exchange Agreements were executed, according to *Countrywide* and *Skilling*, there was no mail or wire fraud in this case, and according to *Honeycutt* and *Sekhar*, Mr. Carpenter did not have the intent to **obtain** anything.  While perhaps there was some evidence adduced at trial that Mr. Carpenter "intentionally" breached the exchange agreements by failing successfully to complete the exchanges, the government offered no evidence whatsoever, and did not even attempt to prove as required by *Countrywide*, that Mr. Carpenter never intended to perform the property exchanges at the time the exchange agreements were executed.  Therefore, under the Supreme Court's definition of "**obtain**", Mr. Carpenter never personally obtained anything, nor did he deceive anyone to "obtain" the victim's money or property.  BPETCO had a debt and a contract to repay, but at no time did Mr. Carpenter "**obtain**" anything for himself according to *Honeycutt*.

Similarly, under *Countrywide*, as stated earlier, evidence of Mr. Carpenter's actual intent to perform the property exchanges is the fact that he invested two million dollars of his own company's money in late October 2000 to bolster BPETCO's accounts at PaineWebber and to aid in completing exchanges that were then coming due. (Tr. 10:49-51; Ex. 205.).  Critically, not a single penny of that two million dollars was withdrawn from the PaineWebber accounts.  It

---

[8]  The Court: Let me ask, . . . is the government relying on things that Paley said that were different [from the documents]?
AUSA:      No.
(Tr. 12:11.)

was all "either paid to Exchangors or was invested or traded." (Tr. 10:50.)[9]

Notwithstanding this evidence in Mr. Carpenter's favor, and based on the Second Circuit's decision in *Countrywide*, the government had the burden to prove beyond a reasonable doubt that Mr. Carpenter, at the time the exchange agreements were signed and the promise to complete the exchange was made, had no intent whatsoever to complete the exchange. This, the government clearly failed to do at two different trials. Mr. Carpenter would like to respectfully suggest to the Court that, had the *Honeycutt* and *Sekhar* definition of the word "obtain" been available in September 2011, the Court probably would have ruled a different way. But, based on the Second Circuit's decision in *Countrywide*, and the absence of any proof that Mr. Carpenter had no intent to perform the contract, the Second Circuit's decision in *Countrywide* based on major First Circuit decisions like *McEvoy Travel* and *Sanchez v. Triple-S* requires the Court to reconsider and vacate Mr. Carpenter's conviction and enter a Judgment of Acquittal in its place.

It is well-settled that a breach of contract does not constitute mail and wire fraud. **Every circuit** to consider the matter has concluded that "**[f]raud requires much more than simply not following through on contractual or other promises**." *Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1007 (7th Cir. 2004) (emphasis added); *see, e.g., McEvoy Travel v. Heritage Travel*, 904 F.2d 786, 791 (1st Cir. 1990) ("[N]or does a breach of contract in itself constitute a scheme to defraud."); *United States v. Chandler*, 388 F.3d 796, 803 (11th Cir. 2004) ("The government agreed that breach of contract does not support a mail fraud conviction."); *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980) ("[T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business

---

[9] Mr. Carpenter deposited the money into BPETCO's accounts at PaineWebber on October 27, 2000. (Tr. 10:49.) BPETCO provided property exchange services to Exchangors other than those listed in the superseding indictment and, presumably, these funds were used to complete their exchanges that were then coming due as well as shore up the PaineWebber accounts.

contract."); *see also United States v. Vinyard*, 266 F.3d 320, 327 (4th Cir. 2001); *Johnson Enters v. Fpl Group*, 162 F.3d1290, 1318-19 (11th Cir. 1998); *United States v. Cochran*, 109 F.3d 660, 667 (10th Cir. 1997); *Kehr Packages v. Fidelcor, Inc.*, 926 F.2d 1406, 1417 (3d Cir. 1991).

"Absent such proof, a subsequent breach of that promise – even where willful and intentional – cannot in itself transform the promise into a fraud." *Countrywide* at 662. The Second Circuit also relied on *McEvoy Travel* at 791-92 for the proposition that "the common law requires proof—other than the fact of breach—that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation." *See, also, Countrywide* at 660, *quoting Sanchez v. Triple-S*, 492 F.3d 1, 11 (1st Cir. 2007):

> A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes. *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000)....We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who—a jury might find—secretly harbored in his heart the hope that the buyer would never ask."

Therefore, based on *Countrywide, Sanchez v. Triple-S*, and *McEvoy Travel*, Mr. Carpenter is entitled to Reconsideration and an Acquittal. So, rather than proving that Mr. Carpenter never intended to perform the exchanges at the time the exchange agreements were executed, the government's own evidence shows that Mr. Carpenter not only intended to but actually did perform the contracts with these same Exchangors during the time period in question. "Instead, the government's proof shows only post-contractual intentional breach of the representations. Accordingly, the jury had no legally sufficient basis on which to conclude that the misrepresentations alleged were made with contemporaneous fraudulent intent." *Countrywide*, 822 F.3d at 667.[10]

---

[10] In fact, as the Court observed, even in the face of a Stock Market decline, Mr. Carpenter still believed he could complete the exchanges. "Indeed, testimony indicated that, in the fourth quarter of 1999, Mr. Carpenter was 'up' roughly $800,000.00, providing Mr. Carpenter with

## VI.    Summary

The government charged this case in 2004 as one where Mr. Carpenter somehow "promised" safety and security through Paley's marketing materials that Paley created in 1997 with his previous exchange intermediary, but none of the BPETCO Exchange Agreements or the BPETCO marketing materials made any such promises. Nor were there any oral promises of safety and security made by Paley or Mr. Carpenter. Instead, rather than focusing on the necessary contemporaneous intent to not perform at the time the contract was signed, the government's evidence at trial proved only that Mr. Carpenter was a "riverboat gambler" whose investment style was "risky" and whose investment performance was unsatisfactory, thereby resulting in the Exchangors losing $8.6 million. Based on *Sekhar's* and *Honeycutt's* definition of the word "obtain" and the decisions in *Countrywide, Takhalov,* and most recently *Weimert,* this business failure cannot possibly be a "scheme to defraud" by any stretch of the definition. Critically, the government adduced no evidence that Mr. Carpenter "never intended to perform" the exchanges at the time the contracts were executed. Therefore, based on *Countrywide citing McEvoy Travel* and *Sanchez v. Triple-S,* there was no mail or wire fraud here.

Similarly, based on the First Circuit's recent limitation of the expansiveness of the Mail and Wire Fraud Statutes in *Berroa* citing the Supreme Court's decision in *Loughrin* for the theory of causation "by the use of" being a limiting factor in Mail Fraud as well as Bank Fraud,

---

slightly more than $600,000.00 in profit." *Carpenter,* 494 F.3d at 16, n.1. In light of his investment success in the fourth quarter of 1998 and 1999, Mr. Carpenter had a reasonable expectation that history would repeat itself and he would be "up" again in the fourth quarter of 2000—thereby allowing BPETCO to complete the exchanges Mr. Carpenter had intended it to perform. *See* Doc. 438 at p. 16 (The Court: "[The investment strategy] apparently worked for quite a while which may have over-stoked Mr. Carpenter's confidence that it could keep working."). While this ultimately did not happen, no evidence exists that Mr. Carpenter did not *want* it to happen. Mr. Carpenter expected his investments to again be successful in the fourth quarter of 2000, or he would not have invested two million dollars of his own company's money to shore up the PaineWebber accounts on October 27, 2000. Once again, it is all about what Mr. Carpenter intended, and he intended to complete all of the exchanges and to pay back the money.

obviously, as the Court knows, Mr. Carpenter **did not cause** any of the mailings or wires in this case pursuant to *Berroa* as he had absolutely no contact or communication with the Exchangors. In fact, the only Exchangor attorney that Mr. Carpenter did talk to, David Patterson, he put directly in touch with Gerry Levine at Merrill Lynch. Therefore, unlike the defendants in *Berroa*, Mr. Carpenter did not lie to anyone or **cause** any use of the mails or wires **to be used** in the furtherance of any scheme to defraud, because there was no scheme to defraud here.

Similarly, as in *Tavares*, the charged mailings and wire transmissions were **not in furtherance of** any fraud and occurred after the contracts were executed and after any intent never to perform must have been manifested, thereby rendering the mail and wire transmissions not "**in furtherance of**" the charged mail and wire fraud scheme. *See Tavares* at 52:

> Even assuming that there was a "scheme to defraud," the government did not present substantial evidence of a mailing "in furtherance of" such a scheme. *Hebshie*, 549 F.3d at 35-36. The government points to form rejection letters that OCP staff mailed to unsuccessful applicants, typically after the final candidates were selected, to satisfy the mailing requirement. These mailings fulfilled a requirement in the Manual that "[a]pplicants who are not selected for appointment must be notified in writing that they have not been selected." n.10: "Some of the rejection letters were mailed before Judge Mulligan approved the person eventually hired. The defendants contend that all letters were nevertheless mailed after the scheme reached its fruition, while the government asserts that the scheme was not complete until Judge Mulligan gave his final approval. Regardless of the exact timing of the mailings, there is no evidence that the letters were material to the consummation of the defendants' scheme. *See Kann*, 323 U.S. at 94 ("It was immaterial to [the defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank.")."

## VII.   Relief Requested

Considering the Supreme Court's definition of the word **obtain** in both *Honeycutt* and *Sekhar*, and the First Circuit's recent decisions in *Berroa* and *Tavares* explaining the limitations of the words "by the use of" and "in furtherance of" in the Mail and Wire Fraud statutes, Mr. Carpenter respectfully suggests that there was no crime here and he never should have been indicted in the first place.   But, because *Countrywide* found no violation of the mail and wire fraud statutes using a preponderance of the evidence standard in a case with many similarities to this one but involving a multi-billion dollar fraud against the American taxpayers, Mr. Carpenter hereby moves this Court to reconsider its September 1, 2011 order and, upon reconsideration, vacate his conviction and grant Mr. Carpenter's motion for a Judgment of Acquittal on all 19 counts of the superseding indictment.


## ORAL ARGUMENT REQUESTED

Mr. Carpenter respectfully requests oral argument on this Motion at the Court's earliest convenience, as a favorable decision here will clear up a significant portion of the Court's Docket pertaining to Mr. Carpenter.   Upon notice from the Court, Mr. Carpenter will retain counsel to argue the case in front of this Court.


/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro-se*
18 Pond Side Lane
West Simsbury, CT 06092

# EXHIBIT
# ONE

**ARTICLES ON SHANNON O'BRIEN**
**AND TIMOTHY CAHILL**

## SouthCoastTODAY

# State employees' pension fund loses over $1 billion in value

**By THE ASSOCIATED PRESS**
Posted Aug 9, 2002 at 12:01 AM
Updated Jan 12, 2011 at 3:58 PM

BOSTON -- The value of the Massachusetts public employees' pension fund fell more than $1 billion in the first six months of 2002 to $27.3 billion, state Treasurer Shannon O'Brien's office said yesterday.

The 3.75 percent half-year drop is part of a 6.5 percent fall in value since July 1, 2001. In all, the fund has lost $4 billion since it peaked at over $31 billion during the high-tech bubble of the late 1990s.

But a spokesman for O'Brien, who as treasurer oversees the pension fund, said the Dow Jones industrial average, the Nasdaq and other indices have done far worse over the same period.

"It's very important to remember that this is not a short-term fund," said spokesman Jon Tapper. "Over the long term, the record of the fund has been strong."

Over the 12 months ending July 1, 2002, the Dow Jones Industrial Average fell 13 percent and the Nasdaq Composite Index fell 35 percent.

In the three years ending June 30, the pension fund increased in value by 0.5 percent, Tapper said. It rose 6.08 percent over the previous five years and 10.55 percent over 10 years, he said.

O'Brien is chairwoman of the nine-member board that oversees the state's pension fund, which invests the pensions of state employees and teachers.

The pension fund has drawn attention in recent months as it lost nearly $50 million in shares of Enron and WorldCom, two of the corporate giants embroiled in accounting scandals.

O'Brien and Attorney General Tom Reilly have disagreed over how aggressively Massachusetts should pursue a lawsuit against Enron to recoup some of the losses, but the two have agreed on a plan to pursue the next case, said Ann Donlan, a Reilly spokeswoman.

This story appeared on Page A3 of The Standard-Times on August 9, 2002.



### SIGN UP FOR DAILY E-MAIL
Wake up to the day's top news, delivered to your inbox

**MOST POPULAR STORIES**



# boston.com

Local Search   Site Search

[       ]   GO

HOME | TODAY'S GLOBE | NEWS | BUSINESS | SPORTS | LIFESTYLE | A&E | THINGS TO DO | TRAVEL | CARS | JOBS | HOMES

Technology   Healthcare   Markets   Personal finance   Columnists

HOME / BUSINESS          The Boston Globe

ADVERTISEMENT

## Bay State's pension fund loses nearly $13 billion

By Todd Wallack and Matt Viser
Globe Staff / July 29, 2009

Email | Print | Reprints | | ShareThis          Text size — +

The Massachusetts public pension fund had its worst performance ever in its modern history in the fiscal year that ended June 30, which could become a political issue for Treasurer Timothy P. Cahill, who is contemplating running for governor.

In large part because of steep declines in both US and foreign stock markets last summer, the fund lost 23.6 percent, or nearly $13 billion.

Massachusetts is accustomed to having one of the best public pension funds in the nation. But it fell to the bottom quarter of all major funds, based on one-year results. It was the first time that's happened in 15 years, said Michael Travaglini, executive director of the Massachusetts Public Reserves Investment Management Board.

Cahill, who chairs the pension board, which determines how money is invested, has hinted he will run as an independent and challenge Democratic Governor Deval Patrick's handling of the state's finances and the economy. In a recent poll commissioned by The Boston Globe, 23 percent of respondents said they thought Cahill would do a better job on the economy, compared with 21 percent for Patrick.

The pension fund's recent performance, however, could undermine Cahill's efforts to claim the fiscal high ground.

"People want the pension fund to be a nonpartisan, nonpolitical issue, and they want it managed so it does at least as well as the rest of the market," said David King, a lecturer in public policy at Harvard University's Kennedy School of Government. "To the extent that during his tenure the pension fund has yielded returns better than others, he'll be rewarded. If not, people are not going to look upon him very favorably."

The $37.8 billion fund administers benefits for hundreds of thousands of state and local government employees and retirees. At the start of 2009, the State Retirement System had 71.6 cents for every $1 it owes to current and future retirees, compared to 89.4 cents in January 2008, according to the Massachusetts Public Employee Retirement Administration Commission. The benefits employees and retirees have already earned are guaranteed, so they should not be affected by the investment losses. But the state could be forced to increase contributions to make up the shortfall.

Most public pension funds lost slightly less than Massachusetts' fund, Travaglini said. The Rhode Island and New Jersey state funds each fell 19 percent in the last fiscal year.

It was a bad year for all investors, Cahill said yesterday. "To have avoided the worst stock market crash, I mean Warren Buffett didn't avoid it."

### LOCAL BUSINESS NEWS ON TWITTER

Waiting for twitter.com to feed in the latest...

FOLLOW GLOBEBIZ ON TWITTER
Follow other Boston.com Tweets | What is Twitter?

### MOST E-MAILED »

1. Report: Warrant Issued for Roggie's Bar Owner
2. Map of Greater Boston Farmers Markets
3. Boston Pops Concert Move Keeps the Beach Boys, Ditches Joey McIntyre
4. We Tried Out Those New Solar Benches
5. New England's top outdoor water parks
6. Drink of the Week: Mojito Italiano
7. Lawmakers pass compounding pharmacy oversight bill

FOLLOW THIS LIST ON TWITTER: @BOSTONPOPULAR

# EXHIBIT TWO

*IANTOSCA V. MERRILL*
LAWSUIT

# COMMONWEALTH OF MASSACHUSETTS
## BUSINESS LITIGATION SESSION

SUFFOLK, ss.                                    SUPERIOR COURT DEPARTMENT

JOSEPH IANTOSCA, Individually and as Trustee )
of the Faxon Heights Apartments Realty Trust and )
Fern Realty Trust, BELRIDGE CORPORATION, )
GAIL A. CAHALY, JEFFREY M. JOHNSTON, )
BELLEMORE ASSOCIATES, LLC, and )
MASSACHUSETTS LUMBER COMPANY, INC. )
    Plaintiffs, )
     )
     )
v. )
     )
     )
MERRILL LYNCH PIERCE FENNER & )
SMITH, INC., )
    Defendant. )

CIVIL ACTION NO.

08-0775-D

## COMPLAINT AND JURY DEMAND

### PARTIES

1.    Joseph Iantosca is a natural person and a resident of the Commonwealth of Massachusetts. Mr. Iantosca brings this action individually and as trustee of plaintiffs Faxon Heights Apartments Realty Trust and Fern Realty Trust.

2.    Belridge Corporation is a Massachusetts Corporation with a principal place of business in Weymouth, Massachusetts. Mr. Iantosca is the President and sole shareholder of Belridge.

3.    Gail A. Cahaly is an individual residing in Westwood, Massachusetts.

4.    *Jeffrey M. Johnston is an individual residing in Boston, Massachusetts.*

4.    Jeffrey M. Johnston is an individual residing in Boston, Massachusetts.

5.    Bellemore Associates, LLC is a limited liability company organized under the laws of New Hampshire.

6.    Massachusetts Lumber Company, Inc. is a Massachusetts corporation with its principal place of business in Cambridge, Massachusetts.

7.     Merrill Lynch Pierce Fenner & Smith, Inc. ("Merrll Lynch") is a Delaware corporation with a usual place of business at 125 High Street in Boston Massachusetts.

## FACTS

8.     By letter dated January 16, 2008, the plaintiffs presented Merrill Lynch with a written demand for relief in accordance with Massachusetts General Laws Chapter 93A, § 9 (3).

9.     Merrill Lynch did not respond with a reasonable offer within 30 days.

10.     Merrill Lynch opened and operated brokerage accounts for Benistar Property Exchange Trust Company, Inc.

11.     As its name suggests, Benistar Property Exchange Trust Company, Inc. held money in trust for its clients.  Specifically, Benistar Property Exchange Trust Company, Inc. had Escrow Agreements with its clients, including plaintiffs, under which it agreed to hold its clients funds in escrow.

12.     Gerald Levine, one of the Merrill Lynch brokers who opened and managed the accounts for Benistar Property Exchange Trust Company, Inc. was informed by the President of Benistar and by an attorney for one of Benistar's clients that the funds in Benistar's accounts at Merrill Lynch belonged to Benistar's clients and were escrow funds that had to be returned on demand to Benistar's clients.

13.     The Merrill Lynch brokers who opened and managed the accounts for Benistar Property Exchange Trust Company, Inc. were informed in writing that the funds in Benistar's accounts at Merrill Lynch belonged to Benistar's clients and were escrow funds that had to be returned on demand to Benistars clients.

14.     The documents provided to Merrill Lynch included the Escrow Agreement used by Benistar to establish its contractual and fiduciary duties with its clients.

2

15. The documents provided to Merrill Lynch included the Exchange Agreement that described in detail Benistar's contractual and fiduciary duties as an intermediary in accordance with Section 1031 of the Internal Revenue Code.

16. As described in the Escrow and Exchange documents that were provided to Merrill Lynch, and as described to Gerald Levine in the conversations he had with Benistar's president and the attorney for one of Benistar's clients, Benistar served as an intermediary for Section 1031 transactions.

17. Section 1031 of the Internal Revenue Code entitles taxpayers to defer capital gains taxes on the appreciation of commercial real estate by using the proceeds of a sale of such real estate to purchase like-kind property.

18. The documents provided to Merrill Lynch explained that Benistar Property Exchange Trust Company held in escrow for its clients the proceeds of real estate sales made by its clients and that Benistar agreed to hold these funds in escrow pending its clients' need for those funds to acquire replacement property.

19. Despite their knowledge that the money in the Benistar accounts belonged to Benistar's clients and was to be held in escrow, the Merrill Lynch brokers approved the Benistar accounts for highly speculative option trading.

20. Benistar lost millions through the option trading and, despite demands by plaintiffs, failed to return approximately $8.7 million to plaintiffs.

21. In 2001, plaintiffs sued Benistar and served a third party subpoena on Merrill Lynch seeking all documents relating to the Benistar accounts.

22. Merrill Lynch did not produce the Benistar Escrow and Exchange Agreements or the correspondence between its broker and the attorney for one of Benistar's clients.

3

23.     Later in 2001, Merrill Lynch was added as a party in this Massachusetts litigation and plaintiffs served discovery requests on Merrill Lynch seeking all information and all documents relating to the Benistar accounts.

24.     Merrill Lynch did not produce the Benistar Escrow and Exchange Agreements or the correspondence between its broker and the attorney for one of Benistar's clients, nor did it identify these documents and communications.

25.     Merrill Lynch lied about its involvement with the Benistar accounts and destroyed, concealed and/or failed to produce the documents evidencing its participation with Benistar in the misuse of Benistar's clients' funds.

26.     Plaintiffs discovered the documents evidencing Merrill Lynch's participation with Benistar in the misuse of its clients' funds after Merrill Lynch's brokers testified under oath that they had no knowledge that the Benistar accounts contained other people's money.

27.     Despite the testimony by Merrill Lynch's brokers denying their knowledge of and participation with Benistar in the misuse of Benistar's clients' funds, a jury found Merrill Lynch liable for colluding with Benistar and found that Merrill had violated New York and Connecticut consumer protection statutes.

28.     A judgment entered on that verdict prior to the award of damages based on Merrill Lynch's violation of the New York and Connecticut consumer protection statutes. The present judgment has a value of more than $26,000,000.

29.     Merrill Lynch has persisted in its denial of liability despite the discovery by plaintiffs of the documents that Merrill Lynch destroyed, concealed and/or failed to produce and despite its own knowledge that the testimony provided at trial by its brokers was perjurious.

4

30.     Merrill has pursued litigation in an attempt to harass plaintiffs, to impose financial costs and emotional distress on the plaintiffs and to extort plaintiffs to settle for less then they are owed.

31.     As a result of the unfair and deceptive conduct described above, plaintiffs have suffered damages in the form of the attorneys' fees, the loss of use of money, tax liabilities, accountants' fees and emotional distress.

32.     Merrill's Lynch's Board of Director's has adopted *Merrill Lynch's Code of Ethics for Financial Professionals* and which states: "All financial professionals must . . .[e]ngage in and promote honest and ethical conduct . . . [and] act in good faith, responsibly, with due care, competence, prudence and diligence, without misrepresenting material facts or allowing one's independent judgment or decisions to be subordinated."

### COUNT I – UNFAIR AND DECEPTIVE ACTS PROHIBITED BY G.L. c. 93A

33.     Plaintiffs restate the allegations set forth in paragraphs 1-32 above and incorporate them by reference as though fully set forth herein.

34.     Merrill Lynch has willfully and knowingly engaged in unfair and deceptive conduct in violation of G.L. c. 93A.

35.     Plaintiffs have been injured by Merrill Lynch's willful and knowing engaged in unfair and deceptive conduct in violation of G.L. c. 93A.

36.     Plaintiffs are entitled to compensatory damages, punitive damages and attorneys fees based on Merrill Lynch's willful and knowing unfair and deceptive conduct.

### COUNT II – FRAUD

37.     Plaintiffs restate the allegations set forth in paragraphs 1-36 above and incorporate them by reference as though fully set forth herein.

5

38. Merrill Lynch's willfully and knowingly engaging in unfair and deceptive conduct constitutes fraud.

39. Plaintiffs have been injured by Merrill Lynch's fraudulent conduct.

40. Plaintiffs are entitled to recover from Merrill Lynch the damages caused by Merrill Lynch's fraudulent conduct.

## COUNT III – MALICIOUS DEFENSE

41. Plaintiffs restate the allegations set forth in paragraphs 1-40 above and incorporate them by reference as though fully set forth herein.

42. In support of Merrill Lynch's defense to plaintiffs' claims based on its collusion with Benistar in the improper use of plaintiffs' escrow funds, Merrill Lynch created false material evidence and gave false testimony advancing such evidence.

43. Plaintiffs have been injured by Merrill Lynch's malicious defense.

44. Plaintiffs are entitled to recover from Merrill Lynch the damages caused by Merrill Lynch's malicious defense.

WHEREFORE, plaintiffs demand judgment against Merrill Lynch in an amount sufficient to compensate them for the injuries caused by Merrill Lynch, for punitive damages in the amount of three times the amount of the judgment on all claims arising out of the same and underlying transactions or occurrences, for costs and attorneys fees, and for all other relief the court may deem appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

6

JOSEPH IANTOSCA, Individually and as Trustee
of the Faxon Heights Apartments Realty Trust and
Fern Realty Trust, BELRIDGE CORPORATION,
GAIL A. CAHALY, JEFFREY M. JOHNSTON,
BELLEMORE ASSOCIATES, LLC, and
MASSACHUSETTS LUMBER COMPANY, INC.

By their attorneys,

_____
Anthony R. Zelle, BBO No. 548141
**ZELLE MCDONOUGH LLP**
Four Longfellow Place, 35th Floor
Boston, MA 02114
Tel: (617) 742-6520
Fax: (617) 973-1562

William C. Nystrom, BBO No. 559656
Colleen C. Cook, BBO No. 636359
**NYSTROM BECKMAN & PARIS LLP**
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100

7

# EXHIBIT THREE

## EXHIBIT 268 FROM MR. CARPENTER'S TRIAL

Options

DEFENDANT'S EXHIBIT 268

ALL-STATE LEGAL®

## Daily Summary (With Unchanged Positions Starting 12/21/2000)

| | Portfolio Performance Measures | | | | | Position, Risk and Expiration | | | |
|---|---|---|---|---|---|---|---|---|---|
| e | Commissions | Profit/Loss | P/L+Comm. | Transactions | Trans.+Comm. | $ESP | Theta | Gamma | ExpDays |
| Jan 1999 | -$14,802 | $77,371 | $62,569 | $77,371 | $62,569 | $648,540 | $2,244 | -$27,336 | 14.77 |
| 1/4/1999 | -$600 | $13,540 | $12,940 | $8,936 | $8,336 | $163,255 | $1,541 | -$23,249 | 9.93 |
| 1/5/1999 | -$700 | $26,733 | $26,033 | $56,437 | $55,737 | $444,709 | $3,570 | -$44,611 | 9.69 |
| 1/6/1999 | -$850 | $24,668 | $23,817 | -$4,876 | -$5,726 | $216,509 | $1,876 | -$37,243 | 9.29 |
| 1/7/1999 | -$800 | -$4,640 | -$5,440 | -$8,498 | -$9,298 | $168,182 | $1,164 | -$30,598 | 8.69 |
| 1/8/1999 | -$300 | $1,231 | $931 | -$4,124 | -$4,424 | $170,862 | $1,030 | -$30,261 | 10.00 |
| 1/11/1999 | -$300 | $9,688 | $9,388 | $6,313 | $6,013 | $149,585 | $990 | -$32,601 | 6.63 |
| 1/12/1999 | -$1,400 | $12,921 | $11,520 | $81,625 | $80,225 | $512,396 | $4,702 | -$53,323 | 11.56 |
| 1/13/1999 | -$700 | -$52,159 | -$52,860 | $75,999 | $75,299 | $1,503,753 | $7,481 | -$77,386 | 3.56 |
| 1/14/1999 | -$950 | -$53,692 | -$54,642 | -$240,175 | -$241,125 | $1,257,466 | $4,550 | -$53,748 | 1.62 |
| 1/15/1999 | -$300 | $6,223 | $5,923 | $141,500 | $141,800 | $1,231,452 | -$37 | $214 | 1.01 |
| 1/19/1999 | -$3,801 | $95,104 | $91,303 | $225,815 | $222,014 | $1,045,773 | $2,779 | -$15,894 | 31.00 |
| 1/20/1999 | -$800 | -$34,934 | -$35,734 | -$199,000 | -$199,800 | $635,615 | $1,744 | -$13,284 | 30.00 |
| 1/21/1999 | -$400 | -$59,179 | -$59,579 | -$167,875 | -$168,275 | $878,041 | $1,702 | -$12,538 | 29.00 |
| 1/22/1999 | -$500 | $12,916 | $12,416 | $154,643 | $154,143 | $777,503 | $1,465 | -$11,032 | 28.00 |
| 1/25/1999 | -$300 | $29,868 | $29,568 | $7,750 | $7,450 | $942,781 | $1,676 | -$11,227 | 25.00 |
| 1/26/1999 | -$700 | $29,831 | $29,131 | $23,873 | $23,173 | $1,064,929 | $2,121 | -$24,318 | 24.00 |
| 1/27/1999 | -$200 | -$15,795 | -$15,995 | $271,500 | $271,300 | $737,877 | $2,150 | -$25,694 | 23.00 |
| 1/28/1999 | -$1,000 | $51,248 | $50,248 | -$28,562 | -$29,562 | $274,157 | $1,325 | -$13,362 | 22.00 |
| 1/29/1999 | -$200 | $5,901 | $5,701 | -$15,250 | -$15,450 | $147,409 | $816 | -$9,227 | 21.00 |
| Feb 1999 | -$5,730 | $37,189 | $31,459 | $37,189 | $31,459 | $390,600 | $1,307 | -$15,260 | 10.11 |
| 2/1/1999 | -$200 | -$16,829 | -$17,029 | -$4,874 | -$5,074 | $238,435 | $693 | -$10,595 | 18.00 |
| 2/4/1999 | -$300 | -$38,041 | -$38,341 | $2,751 | $2,451 | $282,066 | $270 | -$3,846 | 15.00 |
| 5/1999 | -$300 | -$2,907 | -$3,207 | $34,750 | $34,450 | $462,564 | $1,322 | -$8,419 | 14.00 |
| 2/8/1999 | $0 | -$15,863 | -$15,863 | $0 | $0 | $524,271 | $1,431 | -$10,739 | 11.00 |
| 2/9/1999 | -$400 | -$34,360 | -$34,760 | $23,500 | $23,100 | $970,035 | $1,875 | -$21,945 | 10.00 |
| 2/12/1999 | -$400 | $65,868 | $65,468 | -$58,687 | -$59,087 | $670,937 | $2,597 | -$28,804 | 7.00 |
| 2/16/1999 | -$700 | $7,572 | $6,872 | -$69,125 | -$69,825 | $205,930 | $1,327 | -$11,610 | 3.00 |
| 2/18/1999 | -$600 | -$2,864 | -$3,464 | $18,000 | $17,400 | $721,207 | $4,192 | -$63,565 | 1.00 |
| 2/19/1999 | -$400 | $18,813 | $18,413 | $38,000 | $37,600 | $755,814 | $660 | -$8,023 | 7.36 |
| 2/22/1999 | -$1,200 | $41,552 | $40,352 | $15,188 | $13,988 | $211,239 | $1,068 | -$10,014 | 25.00 |
| 2/23/1999 | -$400 | $1,692 | $1,292 | $9,063 | $8,663 | -$8,577 | $1,295 | -$18,771 | 24.00 |
| 2/24/1999 | -$830 | $6,784 | $5,954 | -$27,712 | -$28,542 | $22,399 | $126 | -$1,011 | 23.00 |
| 2/26/1999 | $0 | $621 | $621 | $0 | $0 | $21,481 | $132 | -$1,042 | 21.00 |
| Mar 1999 | -$6,771 | $80,825 | $74,054 | $80,825 | $74,054 | $353,858 | $2,635 | -$23,760 | 15.86 |
| 3/2/1999 | -$900 | $1,246 | $346 | $37,470 | $36,570 | $367,400 | $1,212 | -$25,312 | 17.00 |
| 3/3/1999 | -$200 | $725 | $525 | -$5,000 | -$5,200 | $308,801 | $951 | -$19,908 | 16.00 |
| 3/4/1999 | -$270 | $8,433 | $8,163 | -$16,275 | -$16,545 | $125,471 | $524 | -$11,189 | 15.00 |
| 3/8/1999 | -$400 | $2,983 | $2,583 | -$5,050 | -$5,450 | $25,586 | $122 | -$3,332 | 11.00 |
| 3/10/1999 | -$100 | $1,616 | $1,516 | $3,250 | $3,150 | $88,036 | $335 | -$9,283 | 9.00 |
| 3/11/1999 | -$600 | -$8,656 | -$9,256 | $17,800 | $17,200 | $297,958 | $2,228 | -$22,605 | 8.00 |
| 3/12/1999 | -$800 | -$29,526 | -$30,326 | $52,230 | $51,430 | $635,823 | $5,028 | -$37,585 | 13.13 |
| 3/15/1999 | -$200 | $32,200 | $32,000 | $2,225 | $2,025 | $383,200 | $6,384 | -$45,790 | 8.96 |
| 3/16/1999 | -$100 | $18,808 | $18,708 | -$2,500 | -$2,600 | $309,195 | $7,431 | -$36,842 | 9.65 |
| 3/17/1999 | -$100 | -$10,829 | -$10,929 | $26,500 | $26,600 | $465,728 | $7,367 | -$43,123 | 8.36 |
| 3/22/1999 | -$800 | -$63,017 | -$63,817 | $21,870 | $21,070 | $257,806 | $606 | -$13,657 | 25.00 |
| 3/23/1999 | -$300 | -$14,937 | -$15,237 | $17,120 | $16,820 | $292,532 | $1,199 | -$18,173 | 23.71 |
| 1/1999 | -$500 | -$10,816 | -$11,316 | -$183,000 | -$183,500 | $589,606 | $1,866 | -$22,060 | 22.76 |
| 25/1999 | -$400 | $30,798 | $30,398 | $131,250 | $130,850 | $553,452 | $2,485 | -$28,069 | 21.67 |
| 3/26/1999 | -$600 | $2,670 | $2,070 | -$122,180 | -$122,780 | $594,601 | $2,397 | -$25,926 | 20.72 |

Options

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 12/15/2000 | -$1,633 | -$398,615 | -$400,248 | $278,500 | $276,868 | $11,672,886 | -$995 | $7,719 | 15.95 |
| 12/18/2000 | -$26,045 | -$232,487 | -$258,531 | -$1,344,488 | -$1,318,444 | $10,258,931 | -$7,473 | $15,030 | 36.88 |
| 12/19/2000 | -$822 | -$1,250,556 | -$1,251,377 | -$31,004 | -$31,826 | $8,992,991 | -$2,716 | $23,201 | 35.66 |
| 12/20/2000 | $2,260 | $648,723 | $650,983 | $25,769 | $23,509 | $7,907,205 | -$7,384 | $46,898 | 34.27 |
| 12/21/2000 | -$405 | -$737,423 | -$737,827 | $36,000 | $35,596 | $6,462,656 | -$10,001 | $68,863 | 33.49 |
| 12/22/2000 | $0 | $302,880 | $302,880 | $0 | $0 | $7,086,103 | -$7,259 | $46,643 | 33.17 |
| 12/26/2000 | $0 | -$138,505 | -$138,505 | $0 | $0 | $7,053,115 | -$10,443 | $63,702 | 29.01 |
| 12/27/2000 | $0 | $760,459 | $760,459 | $0 | $0 | $8,418,227 | -$7,176 | $42,455 | 27.60 |
| 1/2/2001 | $0 | -$8,466,498 | -$8,466,498 | $0 | $0 | $5,841,607 | -$15,753 | $100,186 | 21.73 |
| 1/3/2001 | $0 | $2,102,659 | $2,102,659 | $0 | $0 | $10,042,804 | -$6,078 | $39,172 | 20.11 |
| 1/4/2001 | $0 | -$926,577 | -$926,577 | $0 | $0 | $8,602,273 | -$14,935 | $75,416 | 19.47 |
| 1/5/2001 | $0 | -$735,738 | -$735,738 | $0 | $0 | $7,064,108 | -$19,105 | $99,790 | 18.71 |
| 1/8/2001 | $0 | $407,228 | $407,228 | $0 | $0 | $8,231,175 | -$21,690 | $101,883 | 15.53 |
| 1/9/2001 | $0 | -$269,587 | -$269,587 | $0 | $0 | $7,680,409 | -$22,694 | $109,714 | 14.95 |
| 1/10/2001 | $0 | $523,229 | $523,229 | $0 | $0 | $9,187,331 | -$21,784 | $93,027 | 13.50 |
| 1/11/2001 | $0 | $566,294 | $566,294 | $0 | $0 | $10,413,884 | -$17,282 | $67,217 | 12.42 |
| 1/12/2001 | $0 | $70,174 | $70,174 | $0 | $0 | $10,786,651 | -$17,053 | $82,191 | 11.07 |
| 1/15/2001 | $0 | -$25,100 | -$25,100 | $0 | $0 | $11,138,140 | -$22,020 | $73,869 | 7.91 |
| 1/16/2001 | $0 | -$430,438 | -$430,438 | $0 | $0 | $10,463,443 | -$28,325 | $98,220 | 6.76 |
| 1/17/2001 | $0 | $1,310,883 | $1,310,883 | $0 | $0 | $13,158,500 | $11,961 | $40,267 | 5.43 |
| 1/18/2001 | $0 | $1,340,381 | $1,340,381 | $0 | $0 | $14,932,188 | $5,456 | -$610 | 4.43 |
| 1/19/2001 | $0 | $158,428 | $158,428 | $0 | $0 | $15,080,252 | $2,300 | $11,576 | 13.54 |