UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DANIEL E. CARPENTER )
)
v. )  CRIMINAL NO. 04-cr-10029-GAO
)
UNITED STATES OF AMERICA )

## MR. CARPENTER'S RENEWED MOTION FOR SUMMARY JUDGMENT TO VACATE HIS CONVICTION PURSUANT TO 28 U.S.C. §2255

NOW COMES the Defendant, Daniel E. Carpenter, to respectfully renew his motion for summary judgment for the Court to grant his Petition pursuant to 28 U.S.C. §2255 to vacate his conviction and dismiss the Indictment against him because this Court lacked jurisdiction.

Mr. Carpenter filed his original Petition pursuant 28 U.S.C. §2255 on May 18, 2015 (see Doc. 496), and filed a Motion for Summary Judgment on July 31, 2015 (see Doc. 505), which the government opposed and Mr. Carpenter filed his reply brief on February 16, 2016 (Doc. 531). As of this date, the Court has not ruled on several substantive motions to vacate Mr. Carpenter's conviction under §2255, Rule 33 of the Federal Rules of Criminal Procedure, and several motions for reconsideration pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. This Renewed Motion for Summary Judgment incorporates by reference all of the issues raised in Mr. Carpenter's original Motion for Summary Judgment and his 2255 Petition.

Because Mr. Carpenter had asked the Court for an evidentiary hearing and oral argument on his 2255 Petition and because he is no longer incarcerated, Mr. Carpenter would ask the Court to set a hearing date that is convenient for the Court's schedule. Once the Court grants a hearing date for this Renewed Motion for Summary Judgment, Mr. Carpenter will retain local counsel to argue his 2255 Petition and the other motions to vacate his conviction before the Court.

1

## PRELIMINARY STATEMENT

There was no federal fraud in this case, because neither of the indictments in this case properly invoked the Court's federal jurisdiction by alleging actual criminal conduct or the violation of a federal statute, and since the Court lacked jurisdiction, Mr. Carpenter's conviction is void as a matter of law. For example, as the First Circuit explained in *United States v. Rosa-Ortiz*, 348 F.3d 33 (1st Cir. 2003):

> As this Court has explained, "a federal court has jurisdiction to try criminal cases only when the information or indictment alleges a violation of a valid federal law." *See United States v. Saade*, 652 F.2d 1126, 1134 (1st Cir. 1981). A federal court similarly lacks jurisdiction to enter a judgment of conviction when the indictment charges no offense under federal law whatsoever. ("[A] district court is without jurisdiction to accept a guilty plea to a non-offense."). *Rosa-Ortiz* at 36, *citing* the Eleventh Circuit in *United States v. Peter*, 310 F.3d 709, 713 (11th Cir. 2002): (The district court had no jurisdiction to accept a plea to conduct that does not constitute mail fraud, and the doctrine of procedural default therefore does not bar Peter's present challenge....When a court without jurisdiction convicts and sentences a defendant the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force. *Peter* at 713-15, *citing United States v. Morgan*, 346 U.S. 502 (1954)).

> Because jurisdictional challenges to an indictment may be raised at any time, Fed.R.Crim.P. 12(b)(3)(B), including for the first time on appeal, *United States v. Mojica-Baez*, 229 F.3d 292, 309 (1 Cir. 2000), Rosa-Ortiz's guilty plea did not waive his right to argue that he has been imprisoned for conduct that Congress did not proscribe in the crime charged. *Rosa-Ortiz* at 36.

Significantly, on July 21, 2011, Charles Doyle told Congress that the government must be able to prove the following five elements before someone is indicted, much less proven guilty beyond a reasonable doubt at trial:

1. the use of either mail or wire communications **in the foreseeable furtherance**
2. of a scheme to defraud
3. involving a **material deception**
4. with the **intent to deprive** another of
5. either property or honest services.

See excerpts from Charles Doyle's CRS Report R41931, *Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law* attached as Exhibit One. Mr. Carpenter wishes to

respectfully suggest to the Court that the government failed in two trials to prove **any** of these five elements beyond a reasonable doubt, whereas to secure a conviction, the government must prove **all** of the elements beyond a reasonable doubt.

Perhaps the easiest element to knock out for the benefit of the Court's analysis of the flaws in Mr. Carpenter's conviction for a non-crime that he did not commit is the "**use of the mails and wires**" in furtherance of the alleged scheme to defraud as the First Circuit recently discussed in *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017), relying upon and discussing the Supreme Court's decision in *Loughrin v. United States*, 134 S.Ct. 2384 (2014). As the Court knows well by now, Mr. Carpenter did not have any contact whatsoever with the Exchangors, the alleged victims in this case who have now recouped a judicial windfall of nearly $50 million on $8 million of losses. Mr. Carpenter did not talk to any of the Exchangors or lie to them in any way, shape, or form. The Court also realizes that none of the mailings and wires in the Indictment relied upon for the government's case were caused by Mr. Carpenter as discussed in *Berroa* limiting "the use of the mails and wires," nor were they done at his behest or for his benefit. Additionally, Mr. Carpenter did not even know the identity of the Exchangors until he would be notified by Marty Paley or Linda Jokinen that the Exchangor was withdrawing his or her money to reinvest in a new property somewhere. Even then, Mr. Carpenter had no contact with any of the Exchangors.

Furthermore, the First Circuit's recent decision in *United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016), involving a truly fraudulent scheme where the convictions were thrown out because the mailings in that case, i.e. the rejection letters sent out to non-successful applicants, were **not in furtherance of the fraudulent scheme** to hire certain other people. Therefore, based on *Tavares*, there is no way the conviction in Mr. Carpenter's case can possibly stand,

because of the gaping void in causation of the mailings and wires under *Berroa* and the failure of

the government to show that any of the mailings and wires were **in furtherance** of any fraud as

defined by *Tavares citing Kann* and *Maze*, that had nothing whatsoever to do with the alleged

scheme to defraud. In fact, as Judge Kayatta of the First Circuit describes the Carpenter case in a

"nutshell", there was no crime here as a matter of law:

> In a nutshell, [Carpenter] **told clients** he would **hold their money** in **escrow accounts**
> for which the client would pay a fixed fee and which would **cautiously** generate returns
> of either three or six percent; then (**unbeknownst to his clients**) he invested the money in
> high-risk, high-return stock options, hoping to generate excess returns to keep for
> himself. His option trading fared poorly, and he lost nine million dollars in client funds.
> At trial, he argued unsuccessfully that he never promised that the client funds would be
> safe, and that he did not intend to defraud his clients when **he failed to disclose** his real
> strategy of using their money to make risky investments to see if he could hit a home run
> for himself. *United States v. Carpenter*, 781 F.3d 599, 603 (1st Cir. 2015) (emphasis
> added).

Despite all of the obvious errors in Judge Kayatta's "nutshell" description (e.g. Mr.

Carpenter did not **tell** anyone anything in this case and there were extensive contractual

agreements so all of the Exchangors were bound by a contract with a merger and integration

clause), the immediate problem with Judge Kayatta's description of the scheme to defraud in Mr.

Carpenter's case is that it fails to describe a crime anywhere in the United States after the

Supreme Court's unanimous decision in *Skilling v. United States*, 561 U.S. 358 (2010). For

example, *Skilling* describes the classic "mirror image of fraud" doctrine, where "the victim's loss

of money or property supplied the defendant's gain, with one the mirror image of the other." *See*

*Skilling* at 400, *citing United States v. Starr*, 816 F.2d 94, 98-99 (2d Cir. 1987). Additionally,

*Skilling* points to the fact that the nondisclosure of terms of the contract is outside the bounds of

fraud. *See Skilling* at 410. The most famous recent case involving an "intentional" breach of

contract and nondisclosure not being fraud in a contract setting is, of course, *United States v.*

*Countrywide*, 822 F.3d 650 (2d Cir. 2016), where the Second Circuit relied on not one but two

cases from the First Circuit: *McEvoy Travel v. Heritage Travel*, 904 F.2d 786 (1st Cir. 1990) for

the proposition that "the common law requires proof—other than the fact of breach—that, at the

time a contractual promise was made, the promisor had no intent ever to perform the obligation",

*Countrywide* at 658; and *Sanchez v. Triple-S*, 492 F.3d 1 (1st Cir. 2007):

> A defendant's failure to disclose information, without more, cannot make out a violation
> of the mail and wire fraud statutes. *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir.
> 2000)....We nevertheless observed that "[i]t would be a truly revolutionary change to
> make a criminal out of every salesman (assuming the use of the mails or telephone) who
> did not take the initiative to reveal negative information about the product and who—a
> jury might find—secretly harbored in his heart the hope that the buyer would never ask.".
> *Countrywide* at 660, *quoting Sanchez* at 11.

Therefore, Judge Kayatta's criticism of Mr. Carpenter's conduct fails to state a crime not

only in the First Circuit, but apparently anywhere in America after the Second Circuit's decision

in *Countrywide*, the Eleventh Circuit's decision in *United States v. Takhalov*, 827 F.3d 1307

(11th Cir. 2016), or even the more famous decision from the Seventh Circuit in *United States v.*

*Weimert*, 819 F.3d 351 (7th Cir. 2016). Significantly, both *Countrywide* and *Weimert* involved

contracts between sophisticated business people. Suffice it to say, if there was no mail or wire

fraud in *Countrywide*, which cost American taxpayers Billions of dollars, it is difficult to see

how there is any fraud in Mr. Carpenter's case where, under the terms of all of the Exchange

Agreements, BPETCO had the unfettered right to invest in anything it chose to invest in,

including stock options. Contrary to the negativity in the First Circuit's Opinion, none of Mr.

Carpenter's trades were "naked", and a simple search on Google will show the Court that Mr.

Carpenter's stock option investing is far safer and even "prudent" versus just buying stocks.

Even the civil court judge, Judge Botsford, stated that the investment had to be in some sort of

equities to earn a 6% return. Other than Mr. Carpenter, no investment manager in America has

been indicted for losing money in the stock market crashes of 2000 and 2008.

Similarly, in the famous case of *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), the Seventh Circuit reversed Weimert's conviction involving his lies to his employer, the bank, and his future partner – the buyer of the property – based on the fact that the mail and wire fraud statutes had been stretched "far beyond where they should go." *Id.* at 355. The Seventh Circuit further stated:

> In commercial negotiations, it is not unusual for parties to conceal from others their true goals, values, priorities, or reserve prices in a proposed transaction. When we look closely at the evidence, the only ways in which Weimert misled anyone concerned such negotiating positions. He led the successful buyer to believe the seller wanted him to have a piece of the deal. He led the seller to believe the buyer insisted he had a piece of the deal. All the actual terms of the deal, however, were fully disclosed and subject to negotiation. There is no evidence that Weimert misled anyone about any material facts or about promises of future actions. *Weimert* at 354.

The Seventh Circuit then stated that negotiating parties "do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior." *Id.* at 358. Thus, the Seventh Circuit held that "deception about negotiating positions – about reserve prices and other terms and their relative importance – should not be considered material for purposes of mail and wire fraud statements." *Id.* The mail and wire fraud statutes do not cover all behavior which strays from the ideal." *Id.* at 357. Once again, Mr. Carpenter did not lie to anyone here, while Weimert's lies to both parties cost them millions under the "mirror image" of fraud, and benefitted his pockets.

Finally, in a recent decision vacating a wire fraud conviction, the Eleventh Circuit gives a detailed historical analysis of the Second Circuit's interpretation of the wire fraud statute and adopts the Second Circuit's interpretation of what constitutes a "scheme to defraud" as opposed to a "scheme to deceive", so as to satisfy that requirement under the Federal mail and wire fraud statutes. *See United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). To explain the difference between a "scheme to defraud" which is illegal under the wire fraud statute, and a

"scheme to deceive" which may be morally wrong but is not conduct prohibited by the mail and wire fraud statutes, the Eleventh Circuit uses what might be called the "Parable of the Deceitful Neighbor." The court considers two scenarios. In the first, a man calls his neighbor saying that his child is very ill, and the neighbor responds by rushing over to see if she can help. The man asks her to give him change for a dollar, which the helpful neighbor gladly gives him. She later learns that the neighbor's child was not sick at all. The second scenario is identical to the first, except that now the Deceitful Neighbor gives the woman a counterfeit dollar in exchange for the four quarters. The Eleventh Circuit explains that the first scenario is not wire fraud, but the second one is, despite the fact that the woman would not have rushed over in the first scenario had she known that the child was not really sick.

For a non-criminal "scheme to deceive" to become a criminal "scheme to defraud", there must be an intent to harm the victim – actual concrete harm (*see United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998)) – and the harm must be **tangible harm**, see the Second Circuit's recent decision in *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017), discussing the concept of **tangible harm** and that deceit is not enough, there must be an **intent** on the part of the defendant to harm his victims. Even the Court, in sentencing Mr. Carpenter, acknowledged that Mr. Carpenter always intended to pay the money back to the Exchangors.

> "This is a unique case I think. . . . This was not a fraud that took money from someone intending never to return it. It was actually part of the business plan that it be returned at some point.... In light of his investment success in the fourth quarter of 1999, Carpenter had a reasonable expectation that history would repeat itself and he would be "up" again in the fourth quarter of 2000—thereby allowing BPETCO to complete the exchanges Carpenter had fully intended it to perform." *see* Doc. 438 at 16.

> "[I]t was not disputed that the defendant wanted the scheme to succeed." *See Carpenter*, 808 F. Supp. 2d at 378.

"Indeed, testimony indicated that, in the fourth quarter of 1999, Carpenter was 'up' roughly $800,000.00, providing Carpenter with slightly more than $600,000.00 in profit." *Carpenter*, 494 F.3d at 16, n.1.

To the Court's credit, Mr. Carpenter through litigation, which is still ongoing, has paid the Exchangors almost $50 million on losses of only $8 million, thereby living up to his bargain. In fact, the Exchangors received their entire deposits back, plus interest, before the start of Mr. Carpenter's Second Trial in 2008 from Mr. Carpenter's arbitration victory over PaineWebber, and the Exchangors have settled all claims against Mr. Carpenter and his affiliated entities, and have granted him a full general release as to all civil claims in this case. For that reason alone, the Court should vacate all forfeitures, fines, and restitution in this case because the civil debts have been paid in full and there was no crime here, and therefore the Court lacked jurisdiction to impose any of these penalties against Mr. Carpenter in the first place.

Again, there was no crime here, no deceit, and certainly no intent to harm anyone. Without a "scheme to defraud" there was no "federal" fraud, and therefore the Court lacked jurisdiction to try Mr. Carpenter or to pass judgment over him. *See, e.g., Peter* at 713-15, *citing United States v. Morgan*, 346 U.S. 502 (1954):

> The district court had no jurisdiction to accept a plea to conduct that does not constitute mail fraud, and the doctrine of procedural default therefore does not bar Peter's present challenge....When a court without jurisdiction convicts and sentences a defendant the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force.

## I.    SUMMARY JUDGMENT STANDARD

"Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitle to a judgment as a matter of law." F.R.C.P. 56(c). "Once the moving party...makes this showing, the party bearing the ultimate burden of proof...cannot rest on mere allegations, but must proffer sufficient competent evidence upon which a rational trier of fact could find in its favor." *Wyner v. North Am. Specialty Ins. Co.*, 78 F.3d 752, 754 (1st Cir. 1996).

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party carries its burden, the burden shifts to the nonmoving party to demonstrate, with regard to each issue on which it has the burden of proof, that a trier of fact could reasonably find in its favor. See *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997). At this stage, the nonmoving party "may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he or she bears the ultimate burden of proof at trial. *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). *International*

*Assn. of Machinists and Aerospace Workers v. Winship Green Nursing Center*, 103 F.3d 196, 199-200 (1st Cir. 1996).

After two trials, several appeals, and dozens of post-trial motions, the facts of this 20 year old case are clearly not in dispute. The only issue in dispute here is the over-extension of the Mail and Wire Fraud statutes to indict, falsely try, and then convict an innocent man of conduct that was not criminal prior to 1999-2001 or after the year 2016 according to both the First and Second Circuits. In this case, there is no genuine issue of material fact and, therefore, Mr. Carpenter is entitled to judgment as a matter of law on his 2255 Petition and his conviction must be vacated because this Court lacked jurisdiction not just to sentence him, but to even try him in the first place as there was no federal crime here based on recent Supreme Court and First Circuit decisions.

In terms of the interests of justice, Mr. Carpenter was indicted in a foreign venue for a non-crime that he did not commit, and then he was falsely tried twice on the basis of perjured testimony that the government knew to be false. Since the government did not respond to Mr. Carpenter's original Motion for Summary Judgment on a timely basis (see Doc. 505 filed on July 31, 2015), all of Mr. Carpenter's undisputed Statement of Facts have now become irrefutable. Even without this in his favor, Mr. Carpenter is entitled to Summary Judgment in his favor on his 2255 Petition because he is both **actually** and **factually** innocent of all of the charges in this case.

## II.   MR. CARPENTER IS FACTUALLY INNOCENT OF ALL CHARGES IN BOTH INDICTMENTS

Any objections that the government might have procedurally to the constitutional violations that Mr. Carpenter has raised in his 2255 Petition and his Motion for Summary Judgment are trumped by the "actual innocence" gateway of *Schlup v. Delo*, 513 U.S. 298 (1995).  *See McQuiggen v. Perkins*, 133 S.Ct. 1924, 1931 (2013), *quoting House v. Bell*, 547 U.S. 518 (2006).  Mr. Carpenter also qualifies under the "fundamental miscarriage of justice exception," but contrary to the government's opposition, none of Mr. Carpenter's constitutional rights have been waived.  Mr. Carpenter is also aware that for the purposes of the *Schlup v. Delo* innocence gateway, "**actual** innocence" means "**factual** innocence" as explained in *Bousley v. United States*, 523 U.S. 614, 623 (1998).

Based on the description of the crime of mail and wire fraud in Charles Doyle's Report to Congress (see Exhibit One), as well as the Supreme Court's description of the "mirror image of fraud" in *Skilling* and recent definitions of the word "**obtain**" in *Honeycutt v. United States*, 137 S.Ct. 1626 (2017) and *Sekhar v. United States*, 133 S.Ct. 270 (2013), there clearly was no mail **or** wire fraud in this case.  But, if that was not enough, after the decisions in *Weimert, Takhalov,* and *Countrywide* (based on *McEvoy Travel* and *Sanchez v. Triple-S*), if there was no mail and wire fraud in *Countrywide*, there was absolutely no federal fraud committed by Mr. Carpenter in any of the BPETCO transactions.  Mr. Carpenter is both **actually** and **factually** innocent of all charges in both indictments, and therefore the Court should grant this Motion, grant Mr. Carpenter's 2255 Petition, vacate his conviction, and dismiss the defective indictment in his case.

## III. THIS COURT LACKED JURISDICTION AS A MATTER OF LAW

Federal courts are courts of limited jurisdiction, and not all frauds rise to the level of conduct falling within the federal mail and wire fraud statutes or involve the United States of America in such a way that would invoke federal jurisdiction. "Jurisdiction **cannot be assumed** by a district court nor conferred by agreement of parties, but it is incumbent upon [the US Attorney] to allege in clear terms, the necessary facts showing jurisdiction which must be proved by convincing evidence." *Harris v. American Legion*, 162 F. Supp. 700 (1958), *see also McNutt v. General Motors Acceptance*, 298 U.S. 178 (1936). If a court lacked jurisdiction, any judgment that it made is null and void as a matter of law:

> When a court without jurisdiction convicts and sentences a defendant the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force. *Peter* at 713-15, *citing United States v. Morgan*, 346 U.S. 502 (1954).

Just because two juries were unlawfully persuaded by the government's egregious prosecutorial misconduct does not make the defective Superseding Indictment valid. The government tacitly admitted the original indictment was defective because it lacked the word "material" as required by *Neder v. United States*, 119 S.Ct. 1827 (1999). Mr. Carpenter successfully completed 119 out of 126 property exchanges and the government's own forensic auditor testified at both trials that Mr. Carpenter handled over $100,000,000 and did not take a penny for himself. Instead, when the market turned ugly in the Fall of 2000, Mr. Carpenter invested $2.4 Million of his company's money to bolster BPETCO's finances, which was also lost in the market tsunami. Even the Court said at Mr. Carpenter's sentencing that he "always intended to repay the money" and he, in fact, did pay the Exchangors back almost $15 Million before his Second Trial began in 2008. Therefore, there was no "intent to deceive" here and no "scheme to defraud" anyone to **obtain** their money or property.

As this Court knows well, not all frauds are "federal" frauds that rise to the level necessary to be prosecuted in a federal court. Certainly if the multi-billion dollar fraud in *Countrywide* did not involve "mail and wire fraud," there was no "federal" fraud in BPETCO either. *Countrywide* is based largely on two decisions from the First Circuit; *McEvoy* and *Sanchez v. Triple-S.* In *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir. 1990), the First Circuit noted that not every use of the mails in furtherance of a scheme to defraud another of property would be mail fraud. For example, a breach of contract in itself would not constitute mail fraud. *Id.* Nor would the mere breach of a fiduciary duty constitute a violation of the fraud statutes. *United States v. Greenleaf*, 692 F.2d 182, 188 (1st Cir. 1982). The First Circuit has stated that the scheme "must be intended to deceive another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct." *McEvoy* at 791. There was no such conduct in this case, and certainly not by Mr. Carpenter.

Mr. Carpenter respectfully suggests that this Court did not have jurisdiction over him especially after the First Circuit's recent decisions in *Berroa* and especially *Tavares*, which discusses what is meant by the term **in furtherance** citing *Kann* and *Maze* in its decision:

> The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Schmuck v. United States*, 489 U.S. 705, 710 (1989) (*quoting Kann v. United States*, 323 U.S. 88, 95 (1944)). "[T]he mailing must be 'for the purpose of executing the scheme, as the statute requires.'" *Tavares* at 403, *quoting United States v. Maze*, 414 U.S. 395, 400 (1974) (*quoting Kann* at 94).

Because the federal mail and wire fraud statutes do not purport to reach **all frauds**, but only those "limited instances in which the use of the mails is a part of the execution of the fraud, leaving **all other** cases to be dealt with by appropriate state law." *Kann v. United States*, 323 U.S. 88 (1944) (emphasis added). *See also United States v. Maze*, 414 U.S. 395 (1974), and *Parr v. United States*, 363 U.S. 370 (1960). In this case, the government's indictment not only fails to

address all five critical elements of mail and wire fraud, it appears that every single count in the Indictment involves an email, letter, or wire involving Mr. Carpenter that came **after** the Exchangors had already decided to use BPETCO (NKA Boston Property Exchange Transfer Company, Inc.). All of these counts in the Indictment relate to acts occurring after the fraud had come to its full fruition. If the alleged fraud was now a crime of omission in not telling the Exchangors that Mr. Carpenter was losing money or was trading in stock options, then none of the mailings and wires in this case satisfy the "in furtherance" requirement under *Tavares*. None of them.

In *Maze*, the Supreme Court reversed the mail fraud conviction, concluding that the success of Maze's scheme did not depend in any way on the mailings at issue, focusing on "the more difficult question [of] whether [the] mailings were sufficiently closely related to [Maze's] scheme to bring his conduct within the statute." *Maze*, 414 U.S. at 399, 402. Here, as in *Maze*, the success of the alleged scheme clearly did not depend in any way on the use of mails or wires by Mr. Carpenter, as the alleged uses all occurred **after** the alleged fraud was **complete**.

All of the counts of the Superseding Indictment list mailings and wires that have nothing to do with the alleged omissions. ("Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this. . . ."). *Maze, supra* at 405 (footnote omitted); *see also Tavares, citing United States v. Hebshie,* 549 F.3d 30, 35 (1st Cir. 2008) ("The statute does not reach all mailings resulting from a fraudulent scheme, but only those which are in **furtherance of the scheme**."). (Emphasis added.) Accordingly, the federal mail and wire fraud statutes have not been properly invoked in this case, and this Court lacked jurisdiction to convict and sentence Mr. Carpenter, and therefore, his conviction should be vacated and the Superseding Indictment must be dismissed.

After *Countrywide*, it is well-settled that a breach of contract does not constitute mail and wire fraud even if the breach is intentional. **Every circuit** to consider the matter has concluded that "**[f]raud requires much more than simply not following through on contractual or other promises.**" *See Countrywide* at 660, *citing Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1007 (7th Cir. 2004) (emphasis added); *see, e.g., McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir. 1990) ("[N]or does a breach of contract in itself constitute a scheme to defraud."); *United States v. Chandler*, 388 F.3d 796, 803 (11th Cir. 2004) ("The government agreed that breach of contract does not support a mail fraud conviction."); *United States v. Kreimer*, 609 F.2d126, 128 (5th Cir. 1980) ("[T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract."); *see also United States v. Vinyard*, 266 F.3d 320, 327 (4th Cir. 2001); *Johnson Enters v. Fpl Group*, 162 F.3d1290, 1318-19 (11th Cir. 1998); *United States v. Cochran*, 109 F.3d 660, 667 (10th Cir. 1997); *Kehr Packages v. Fidelcor, Inc.*, 926 F.2d 1406, 1417 (3d Cir. 1991).

The Government's mail and wire fraud allegations, on their face, squarely conflict with this line of authority, and the Government's post-trial allegations that Mr. Carpenter somehow committed fraud by failing to disclose his investment strategy of trading in stock options (none of which were "naked" contrary to the spurious allegations made in the civil case by the Exchangors) is nothing more than a semantic trick designed to evade the holdings of all of the cases cited above including *McEvoy*. If the failure to disclose a breach of contract constituted fraud, then nearly every breach of contract would constitute mail and wire fraud. That is precisely the result that the above cases foreclose, and what the First Circuit spoke out against in *Berroa* at 150 ("under the government's theory, any false statement in an application...could constitute a federal crime.").

To prosecute mail and wire fraud cases arising out of contractual relationships, "much more" than a mere undisclosed breach is required. At a minimum, fraud "requires a showing of deception **at the time the promise is made**." *Countrywide* at 660, *citing Corley* at 1007 and *McEvoy Travel* at 791. (emphasis added). In this case, the Government made no such allegations in either indictment and offered no such proof at either trial. In fact, to the contrary, the language of the Superseding Indictment suggests that the alleged breach and deceptions did not take place until at least the end of 2000, more than two years into the engagement of 126 contracts, of which 119 were successfully completed. How many "fraudulent" businesses have a 95% successful completion rate? Where is the fraudulent scheme here? Only Gail Cahaly came to BPETCO for the first time in November of 2000 and she had her own agreement drafted by her attorney husband. Moreover, at this late date, the Government has not provided even one example of **Mr. Carpenter personally** making an oral or written fraudulent misrepresentation, much less a fraudulent **material** misrepresentation (unlike Weimert in *Weimert*) as required by *Neder v. United States*, 527 U.S. 1 (1999).[1] There was never a failure to make an exchange until after January 2001, and that was caused by the external event of the greatest Stock Market crash in U.S. History.

The Government also failed to show (much less prove) that Mr. Carpenter actually intended to cause "tangible economic harm" to the Exchangors. *See United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017) *citing United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994). But once again, in this case, the Government made no such allegations in either indictment or at either trial. Critically, the Superseding Indictment makes no allegation that Mr. Carpenter failed

---

[1] The only difference between the original indictment and the superseding indictment was that the Government added the word "material" to the word "misrepresentation" in seven different paragraphs after Professor Alan Dershowitz pointed out the obvious flaws in the original indictment at a hearing on a motion to dismiss the original indictment in September 2004. The Government made the "material" changes to the Indictment the day after the hearing on the motion to dismiss the original indictment.

to perform the work called for under the contract. Other than the breach of contract allegations, the Superseding Indictment makes absolutely no allegation of actual or intended "tangible economic harm" to the Exchangors. There is no mention at all of Mr. Carpenter's "specific intent" to harm, deceive, cheat, or steal anything from anyone. Indeed, what is apparent is that this entire dispute has worked to the economic benefit of the Exchangors, as they have used Mr. Carpenter's alleged failure to honor the contract as a rationale for a seemingly endless pursuit of judicial jackpots against Merrill Lynch, Bingham McCutchen, and PaineWebber in addition to the $15 million that Mr. Carpenter and BPETCO paid them on an $8 million loss before Mr. Carpenter's second trial began in 2008.

Even assuming *arguendo* that an undisclosed investment risk or breach of contract could possibly be tantamount to fraud, it could not possibly constitute fraud in this case, where the underlying contractual provisions favor Mr. Carpenter's position. The mail and wire fraud charges in this case rest, at their core, on an allegation of an undisclosed investment risk and a breach of contract claim. Even as a general matter, such a theory would be dubious and would certainly not rise to the level necessary to be a "federal" fraud or a "criminal" offense in 2000 or 2004, but certainly not in 2017 after *Countrywide, Weimert, Tavares,* and *Berroa.* Furthermore, what if Mr. Carpenter had not had the account swept by PaineWebber in early January 2001? If not for PaineWebber, Mr. Carpenter would have been up $15 million instead of down $9 million in January 2001 after the Greenspan Emergency Rate Cut. See Exhibit Two, Exhibit 268 from the First Trial.

If this were a case for **civil fraud**, there is no doubt that this very same Court would dismiss the action based on *Bell Atlantic v. Twombly,* 127 S. Ct. 1955 (2007), and *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009), and chastise the Exchangors (and the Government) for failure to

plead fraud with the particularity required under Fed.R.Civ.P. 9(b). Because the Government has not alleged any scheme to defraud, much less the particularity required (the "who", "what", "where", and "when" of fraud), this Indictment is woefully inadequate even as a basis for **civil** fraud much less criminal fraud. As the Seventh Circuit held in *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993), "[b]oth the 'scheme or artifice to defraud' clause and the 'obtaining money or property' clause…contemplate a transfer of some kind." *Id.* at 1227. *See, also, Honeycutt* at 1632 and *Sekhar* at 2125. In Mr. Carpenter's case there was no "deceitful scheme" or any fraudulent material misrepresentations, but more importantly, there are **none** specifically alleged in the Indictment. And as the Seventh Circuit points out, just because there were losses in a "deceitful scheme," that does not satisfy the statutory requirements of mail and wire fraud. *See Weimert* at 357.

Moreover, the mailings relied upon by the Government, none of which originated with Mr. Carpenter or were **caused by him** as described in *Berroa*, occurred after the alleged "scheme" was complete and did nothing to further the scheme as required by *Tavares*. Illustrative of this point is a recent decision by Judge Jed Rakoff (who is praised by the First Circuit in *Berroa*), sitting by designation in the Ninth Circuit, where the defendant defrauded his own company through phony billing and caused the payments for the fake bills sent to a woman friend, who bought him an expensive watch that she then sent to him. The gift of the watch had nothing to do with the fraud, yet it was that mailing, after the fraud was accomplished (the money was in her hands already from the fake billing), on which the government relied. The Ninth Circuit reversed the defendant's mail fraud conviction, concluding that the success of the alleged scheme did not depend in any way on the use of the mails. *See, e.g., United States v. Phillips*, 704 F.3d 754, 763 (9th Cir. 2012).

None of the wires in this case were "steps in the plot" to mask or hide anything, and by the time the money was sent; the alleged fraud had been completed. The Government's problem with Mr. Carpenter is that he engaged in allegedly "risky" option trading that was supposedly not disclosed to the Exchangors. Mr. Carpenter could have lost the money just as easily in auction rate municipal bonds as LandAmerica did, losing over $400 Million of clients' funds, none of which was recovered unlike the judicial jackpot the Exchangors have enjoyed here at Mr. Carpenter's expense. More importantly, no one was charged with fraud in the LandAmerica debacle, which also involved tax-deferred property exchange transactions under IRC Section 1031. *See LandAmerica Financial Group, et. al.*, 08-bk-35994 (E.D. Va. 2011).

As said before concerning the conduct in *Countrywide*, if there was no criminal fraud alleged in the loss of $400 million without any recovery in the property-exchange *LandAmerica* case, then clearly there was no mail or wire fraud involving Mr. Carpenter and BPETCO. Because neither of the two defective indictments sufficiently alleged conduct that was clearly criminal or in violation of a federal statute, this Court lacked jurisdiction to try Mr. Carpenter's case and should now vacate his conviction as it was secured in violation of multiple sections of the Constitution.

## IV. MR. CARPENTER'S CONVICTION MUST BE VACATED AND THE INDICTMENT MUST BE DISMISSED AS MASSACHUSETTS WAS NOT THE PROPER VENUE FOR ANY OF THE COUNTS

Venue with the Massachusetts District Court was improper as Mr. Carpenter was not a resident of Massachusetts, had never visited Massachusetts on business in the past 20 years (with the exception of required court appearances), and the government alleged no overt acts by Mr. Carpenter with any connection to the State of Massachusetts in either Indictment. Because it is indisputable that Mr. Carpenter did not perform any "essential conduct element" of the crime charged and alleged in the Indictment in the district of Massachusetts, his conviction must be reversed and vacated and the Superseding Indictment must be dismissed. *See, e.g., United States v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014).

Just as the Second Circuit's decision in *Countrywide* was based on the First Circuit's decisions in *McEvoy Travel* and *Sanchez v. Triple-S*, the Third Circuit's decision in *Auernheimer* was based largely on the First Circuit's decision in *United States v. Salinas*, 373 F.3d 161 (1st Cir. 2004). As explained in *Auernheimer*, these constitutional provisions manifest a strong constitutional policy disfavoring trials removed from the situs of the alleged criminal activity. As explained by the First Circuit:

> Venue in a criminal case is not an arcane technicality. It involves matters that touch closely the fair administration of criminal justice and public confidence in it...The result is a safety net, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum solely at the prosecutor's whim. *Salinas* at 162, 164

Under the standards set forth in *Salinas* and *Auernheimer*, Mr. Carpenter committed no act in Massachusetts, so it is clear that he committed no crime triable in a Massachusetts court. If "non-disclosure" or a "breach of contract" was the problem, that conduct or lack of conduct was in Connecticut. If trading options or losing money was the "crime," then that happened in the Southern District of New York. Moreover, there was **zero** evidence adduced at trial showing

any personal conduct of Mr. Carpenter's that actually "caused" the mailings or wires, and it is clear that all of these mailings and wires were non-fraudulent and not in furtherance of any scheme to defraud. *See, also, United States v. Anderson*, 328 U.S. 699, 703 (1946) ("[T]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it."). These Congressional and Constitutional protections are meant to provide a safety net, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum. *See Salinas* at 164. As the Court is well aware, Mr. Carpenter felt that Boston was all three – distant, remote, and unfriendly – for both trials.

As this Court stated in its decision from his first trial: "Mr. Carpenter has persistently maintained an objection to venue in this District." *United States v. Carpenter*, 405 F. Supp. 2d 85, 88 (D. Mass. 2005). It is guaranteed by the Constitution that a criminal defendant has the right to be tried in an appropriate venue. The importance of this right to the Founders is emphasized by the fact that it is mentioned in the Declaration of Independence as a complaint and not once, but twice, in the text of the Constitution. *See* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed ...."); *id.* amend. VI (requiring trial of a criminal case "by an impartial jury of the State and district wherein the crime shall have been committed"). Congress has further entrenched these norms by an explicit directive that limits a criminal prosecution to "a district in which the offense was committed." Fed.R.Crim.P. 18. This rule "echoes the constitutional commands." *United States v. Cabrales,* 524 U.S. 1, 6 (1998). The result is meant to be a safety net for the defendant, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum as has happened to Mr. Carpenter not once, but twice.

In a criminal case, "venue must be narrowly construed." *United States v. Jefferson*, 674 F.3d 332, 365 (4th Cir. 2012). "Venue...is an element...which must be proved...by a preponderance of the evidence." *United States v. Miller*, 111 F.3d 747, 749-50 (10th Cir. 1997). There was no evidence presented in this case showing Venue to be proper. All of the counts in this case should be dismissed for lack of proper venue, because Mr. Carpenter had nothing to do with inducing any of the Exchangors to work with Paley or BPETCO. As with a lack of subject matter jurisdiction, improper venue requires dismissal of the indictment or a judgment of acquittal. *See United States v. Strain*, 396 F.3d 689 (5th Cir. 2005), *reh'g denied*, 407 F.3d 379, 380 (5th Cir. 2005) (remanding for entry of judgment of acquittal due to the government's failure to prove venue and stating that such failure "does not entitle the government to a second chance at prosecution"). Not only must the government prove venue by a preponderance of the evidence at trial, *see Salinas* at 163, but the government must also allege sufficient facts in the Indictment to establish proper venue *ab initio*. This the government did not do. Instead, the government merely alleged at trial that certain wire transfers went through the Federal Reserve Bank in Boston. No other evidence of Venue was presented at either trial.

The alleged facts in this matter are very similar to those presented in *Salinas*, in that any alleged conduct or omissions by Mr. Carpenter occurred outside of Massachusetts. The defendant in *Salinas* was prosecuted for passport fraud not in New York, where the defendant applied for the passport at the post office, but in New Hampshire, where the fraud was discovered by the Passport Office. The Court dismissed the indictment for lack of venue finding that all of the criminal conduct, the elements of the offense, occurred in New York. *Id.* at 165-170. Similarly, in this case, there was simply no justification for laying venue in Massachusetts as all the alleged conduct by Mr. Carpenter occurred in Connecticut or the Southern District of

New York. While Paley and the Exchangors might have been in Massachusetts, Mr. Carpenter did absolutely **nothing** in Massachusetts. Rightly or wrongly, anything that Mr. Carpenter did or did not do, he did only in Connecticut, and the Superseding Indictment (and the evidence adduced at trial) does not contradict this fact. *See, e.g., United States v. Quirke*, 2012 WL 4369304 (D.R.I. 2012) dismissing the indictment for improper venue for conduct allegedly done in Massachusetts that was brought before a Federal District Court in Rhode Island:

> "[S]ince the alleged false statement was made in Massachusetts and not in Rhode Island, proper venue lies only in the District of Massachusetts where the crime was allegedly committed." *Quirke* at *1.

When an indictment charges a defendant with multiple counts, "venue must be proper with respect to each count." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989). *See, also, Travis v. United States*, 364 U.S. 631, 635 (1961) ("Where Congress is not explicit, the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it") (internal quotation marks omitted). Moreover, that the Supreme Court has construed a necessary connection between venue and the conduct elements of an offense. In general, this connection means that a **criminal defendant's own actions will determine where venue can be laid**. Expanding venue for mail and wire fraud in the way that the government has done in the Indictment would unhinge this connection and give the government unlimited control of determining where someone can be tried. Mr. Carpenter had **nothing** to do with causing any of the mailings or wires, nor were they foreseeable to him because he had no idea who Paley was talking to. Under the government's idea of venue, Mr. Carpenter could have been tried in Alaska, Florida, or California if Paley had friends or relatives there that did a property exchange between August and December 2000. That is not how venue

is determined in the First Circuit or any other circuit. For that reason alone, Mr. Carpenter's conviction must be overturned and vacated and a judgment of acquittal entered as to all counts.

"Venue is proper only where the acts constituting the offense – the crime's 'essential conduct elements' – took place." *United States v. Tzolov*, 642 F.3d 214, 218 (2d Cir. 2011)(dismissing fraud claim brought in the EDNY instead of the SDNY, literally one subway stop away in New York). *See, also, United States v. Brennan*, 183 F.3d 139, 147 (2d Cir. 1999) (holding that "prosecution under the mail fraud statute is permissible only in those districts in which a proscribed act occurs"), and *Salinas*, where the defendant's indictment was dismissed due to improper venue because illegal activity occurred in New York, but was only discovered in New Hampshire. The Second Circuit, where Mr. Carpenter should have been tried, if he was tried at all, has enumerated four factors used to determine whether venue is constitutionally permissible: (1) the site of the defendant's acts; (2) the elements and nature of the crime; (3) the locus of the effect of the criminal conduct; and (4) the suitability of the district for accurate fact finding. *United States v. Reed*, 773 F.2d 447, 481 (2d Cir. 1985); *see also Beech-Nut* at 1188.

In *United States v. Bezmalinovic*, 962 F. Supp. 435 (S.D.N.Y. 1997), the court dismissed a bank fraud charge for lack of venue. The indictment charged a scheme to defraud Manufacturers Hanover Trust ("MHT") by obtaining a mortgage using a false application. Bezmalinovic allegedly prepared a false application in the Eastern District of New York ("EDNY"), submitted the application to MHT in the EDNY, more commonly known as Brooklyn, received proceeds via checks drawn on an account in the EDNY, and then deposited those checks into my account in the EDNY. Very similar to my case, the government argued that venue was proper in the SDNY because, after the checks were deposited into a Chemical Bank account in the EDNY, the checks were sent to a processing center in Manhattan where

each check was credited to Bezmalinovic's account, and each check was then forwarded to a clearing house in Manhattan. Finally, the checks were sent to MHT's processing center in Manhattan, where they were debited from MHT's closing account.

However, the court in *Bezmalinovic* did not agree with the government's determination of venue and held that the ministerial processing of the checks in Manhattan did not provide a sufficient constitutional basis for venue in the SDNY. The court further noted that the "only acts alleged to have occurred in the [SDNY] are the ministerial actions taken by MHT and Chemical Bank in the process of crediting defendant's account." *Id.* at 437. In addition, the court stated that the indictment did "not allege[] that those acts were intended or foreseen by defendant." *Id.* The court concluded that the ministerial acts of debiting and crediting accounts as alleged in the indictment did not constitute "substantial contacts" within the SDNY sufficient for venue to be constitutionally permissible. *Id.* at 441. Moreover, in *United States v. Novak*, 443 F.3d 150 (2d Cir. 2006), another case of just one subway stop away, the defendant challenged jurisdiction in the EDNY when the evidence showed (and the government agreed) that the alleged offenses actually took place in the SDNY. If Brooklyn is a "distant, remote, and unfriendly forum" from New York City, imagine how Mr. Carpenter must feel as a "Connecticut Yankee" trapped in a Boston court for this entire century. *Salinas* at 164.

## V.    RELIEF REQUESTED

Based on the dozen or more constitutional violations detailed in Mr. Carpenter's original 2255 Petition (Doc. 496), his amended 2255 Petition (Doc. 503), and his original Motion for Summary Judgment (Doc. 505), Mr. Carpenter respectfully moves this Court to grant this Motion for Summary Judgment, grant his 2255 Petition, and vacate his conviction in the interests of justice.   Mr. Carpenter also respectfully moves the Court to schedule a hearing for oral argument convenient for the Court, as soon as possible, and if at all possible, before the Christmas and New Year Holidays.   Once the Court establishes a date for Oral Argument, Mr. Carpenter will retain local counsel to argue on his behalf.

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro-se*
18 Pond Side Lane
West Simsbury, CT 06092

## ORAL ARGUMENT REQUESTED

# EXHIBIT
# ONE

## CHARLES DOYLE
## CRS REPORT TO CONGRESS



**Congressional
Research
Service**

# Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law

Charles Doyle
Senior Specialist in American Public Law

July 21, 2011

Congressional Research Service

7-5700

www.crs.gov

R41931

**CRS Report for Congress**
*Prepared for Members and Committees of Congress*

# Introduction

The federal mail and wire fraud statutes outlaw schemes to defraud that involve the use of mail or wire communications. Both condemn fraudulent conduct that may also come within the reach of other federal criminal statutes. Both may serve as racketeering and money laundering predicate offenses. Both are punishable by imprisonment for not more than 20 years; for not more than 30 years, if the victim is a financial institution or the offense is committed in the context of major disaster or emergency. Both entitle their victims to restitution. Both may result in the forfeiture of property.

# Elements

The mail and wire fraud statutes are essentially the same, except for the medium associated with the offense — the mail in the case of mail fraud and wire communication in the case of wire fraud. As a consequence, the interpretation of one is ordinarily considered to apply to the other. In construction of the terms within the two, the courts will frequently abbreviate or adjust their statement of the elements of a violation to focus on the questions at issue before them. As treatment of the individual elements makes clear, however, there seems little dispute that conviction requires the government to prove:

1. the use of either mail or wire communications in the foreseeable furtherance

2. of a scheme to defraud

3. involving a material deception

4. with the intent to deprive another of

5. either property or honest services.

**Use of Mail or Wire Communications:** The wire fraud statute applies to anyone who transmits or causes to be transmitted by wire, radio, or television communication in interstate or foreign commerce any writings for the purpose executing a scheme or artifice. The mail fraud statute is similarly worded and applies to anyone who for the purpose of executing a scheme or artifice causes use of the mails.

The statutes require that a mailing or wire communication be in furtherance of a scheme to defraud. It need not be an essential element of the scheme, as long as it is incident to an essential element of the scheme. A qualifying mailing or communication, standing alone, may be routine, innocent or even self-defeating, because the relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive. The element may also be satisfied by mailings or communications designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect.

A defendant need not personally have mailed or wired a communication; it is enough that he caused a mailing or transmission of a wire communication in the sense that the mailing or transmission was the reasonable foreseeable consequence of his intended scheme.

**Scheme to Defraud:** The mail and wire fraud statutes both prohibit, in pertinent part, any scheme or artifice to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, or deprive another of the right to honest services by such means. From the beginning, Congress intended to reach a wide range of schemes to defraud, and has expanded the concept whenever doubts arose. It added the second prong – obtaining money or property by false pretenses, representations, or promises – after defendants had suggested that the term "scheme to defraud" covered false pretenses concerning present conditions but not representations or promises of future conditions. More recently, it added Section 1346 to make it clear the term "scheme to defraud" encompassed schemes to defraud another of the right to honest services. Even before that adornment, the words were understood to refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.

The statutes condemn schemes to defraud—both the successful and the unsuccessful. Nevertheless, there may be some question whether the statutes reach those schemes designed to deceive the gullible though they could not ensnare the reasonably prudent. It is not uncommon for the courts to declare that to demonstrate a scheme to defraud the government needs to show that the defendant's communications were reasonably calculated to deceive persons of ordinary prudence and comprehension. One court considered these statements no more than an identification of a point at which the government has satisfied its burden in a particular case, without addressing whether a lesser quantum of evidence might suffice in other cases. In any event, the question may be more clearly present in the context of the defendant's intent and the materiality of deception, matters discussed below.

**Materiality:** Neither the mail nor the wire fraud statute include a reference to materiality. Yet materiality is an element of each offense, because at the time of the statutes' enactment, the word "defraud" was understood to require a misrepresentation or concealment of a material fact. A statement is material for mail or wire fraud purposes only if it has the natural tendency to influence or be capable of influencing the person to whom it was addressed.

**Intent:** Under both statutes, intent to defraud requires a willful act by the defendant with the intent to deceive or cheat, usually, but not necessarily, for the purpose of getting financial gain for one's self or causing financial loss to another. A defendant has a complete defense if he believes the deceptive statements or promises to be true or otherwise acts in good faith. A defendant has no such defense, however, if he blinds himself to the truth. Nor is it a defense if he intends to deceive but feels his victim will ultimately profit or be unharmed.

**Money, Property, or Honest Services:** The mail and wire fraud statutes speak of schemes to defraud or to obtain money or property. They clearly protect against deprivations of tangible property. Their protection of intangibles has not always been as clear. They do protect intangible *property* rights, although they do not apply to certain intangible rights in property that have no value in the hands of the victim of a scheme.

Some time ago, the Supreme Court held in *McNally v. United States* that the protection does not extend to "the intangible right of the citizenry to good government." Soon after *McNally*, Congress enlarged the mail and wire fraud statute coverage to include the intangible right to honest services, by defining the term "scheme or artifice to defraud" to include[s] a scheme or artifice to deprive another of the intangible right to honest services. Lest the expanded definition be found unconstitutionally vague, the Court in *Skilling v. United States* limited its application to cases of bribery or kickbacks.

# EXHIBIT
# TWO

**TRIAL EXHIBIT 268**

Options

DEFENDANT'S EXHIBIT
ALL-STATE LEGAL®
268

## Daily Summary (With Unchanged Positions Starting 12/21/2000)

| | Portfolio Performance Measures | | | | | Position, Risk and Expiration | | | |
|---|---|---|---|---|---|---|---|---|---|
| [illegible] | Commissions | Profit/Loss | P/L + Comm. | Transactions | Trans + Comm. | $ESP | Theta | Gamma | ExpDays |
| Jan 1999 | -$14,802 | $77,371 | $62,569 | $77,371 | $62,569 | $648,540 | $2,244 | -$27,336 | 14.77 |
| 1/4/1999 | -$600 | $13,540 | $12,940 | $8,936 | $8,336 | $163,255 | $1,541 | -$23,249 | 9.93 |
| 1/5/1999 | -$700 | $26,733 | $26,033 | $56,437 | $55,737 | $444,709 | $3,570 | -$44,611 | 9.69 |
| 1/6/1999 | -$850 | $24,668 | $23,817 | -$4,876 | -$5,726 | $216,509 | $1,876 | -$37,243 | 9.29 |
| 1/7/1999 | -$800 | -$4,640 | -$5,440 | -$8,498 | -$9,298 | $168,182 | $1,164 | -$30,598 | 8.69 |
| 1/8/1999 | -$300 | $1,231 | $931 | -$4,124 | -$4,424 | $170,862 | $1,030 | -$30,261 | 10.00 |
| 1/11/1999 | -$300 | $9,688 | $9,388 | $6,313 | $6,013 | $149,585 | $990 | -$32,601 | 6.63 |
| 1/12/1999 | -$1,400 | $12,921 | $11,520 | $81,625 | $80,225 | $512,396 | $4,702 | -$53,323 | 11.56 |
| 1/13/1999 | -$700 | -$52,159 | -$52,860 | $75,999 | $75,299 | $1,503,753 | $7,481 | -$77,386 | 3.56 |
| 1/14/1999 | -$950 | -$53,692 | -$54,642 | -$240,175 | -$241,125 | $1,257,466 | $4,550 | -$53,748 | 1.62 |
| 1/15/1999 | -$300 | $6,223 | $5,923 | -$141,500 | -$141,800 | $1,231,452 | $37 | $214 | 1.01 |
| 1/19/1999 | -$3,801 | $95,104 | $91,303 | $225,815 | $222,014 | $1,045,773 | $2,779 | -$15,894 | 31.00 |
| 1/20/1999 | -$800 | -$34,934 | -$35,734 | -$199,000 | -$199,800 | $635,615 | $1,744 | -$13,284 | 30.00 |
| 1/21/1999 | -$400 | -$59,179 | -$59,579 | -$167,875 | -$168,275 | $878,041 | $1,702 | -$12,538 | 29.00 |
| 1/22/1999 | -$500 | $12,916 | $12,416 | $154,643 | $154,143 | $777,503 | $1,465 | -$11,032 | 28.00 |
| 1/25/1999 | -$300 | $29,868 | $29,568 | $7,750 | $7,450 | $942,781 | $1,676 | -$11,227 | 25.00 |
| 1/26/1999 | -$700 | $29,831 | $29,131 | $23,873 | $23,173 | $1,064,929 | $2,121 | -$24,318 | 24.00 |
| 1/27/1999 | -$200 | -$15,795 | -$15,995 | $271,500 | $271,300 | $737,877 | $2,150 | -$25,694 | 23.00 |
| 1/28/1999 | -$1,000 | $51,248 | $50,248 | -$28,562 | -$29,562 | $274,157 | $1,325 | -$13,362 | 22.00 |
| 1/29/1999 | -$200 | $5,901 | $5,701 | -$15,250 | -$15,450 | $147,409 | $816 | -$9,227 | 21.00 |
| Feb 1999 | -$5,730 | $37,189 | $31,459 | $37,189 | $31,459 | $390,600 | $1,307 | -$15,260 | 10.11 |
| 2/1/1999 | -$200 | -$16,829 | -$17,029 | -$4,874 | -$5,074 | $238,435 | $693 | -$10,595 | 18.00 |
| 2/4/1999 | -$300 | -$38,041 | -$38,341 | $2,751 | $2,451 | $282,066 | $270 | -$3,846 | 15.00 |
| [illegible]5/1999 | -$300 | -$2,907 | -$3,207 | $34,750 | $34,450 | $462,564 | $1,322 | -$8,419 | 14.00 |
| 2/8/1999 | $0 | -$15,863 | -$15,863 | $0 | $0 | $524,271 | $1,431 | -$10,739 | 11.00 |
| 2/9/1999 | -$400 | -$34,360 | -$34,760 | $23,500 | $23,100 | $970,035 | $1,875 | -$21,945 | 10.00 |
| 2/12/1999 | -$400 | $65,868 | $65,468 | -$58,687 | -$59,087 | $670,937 | $2,597 | -$28,804 | 7.00 |
| 2/16/1999 | -$700 | $7,572 | $6,872 | -$69,125 | -$69,825 | $205,930 | $1,327 | -$11,610 | 3.00 |
| 2/18/1999 | -$600 | -$2,864 | -$3,464 | $18,000 | $17,400 | $721,207 | $4,192 | -$63,565 | 1.00 |
| 2/19/1999 | -$400 | $18,813 | $18,413 | $38,000 | $37,600 | $755,814 | $660 | -$8,023 | 7.36 |
| 2/22/1999 | -$1,200 | $41,552 | $40,352 | $15,188 | $13,988 | $211,239 | $1,068 | -$10,014 | 25.00 |
| 2/23/1999 | -$400 | $1,692 | $1,292 | $9,063 | $8,663 | -$8,577 | $1,295 | -$18,771 | 24.00 |
| 2/24/1999 | -$830 | $6,784 | $5,954 | -$27,712 | -$28,542 | $22,399 | $126 | -$1,011 | 23.00 |
| 2/26/1999 | $0 | $621 | $621 | $0 | $0 | $21,481 | $132 | -$1,042 | 21.00 |
| Mar 1999 | -$6,771 | $80,825 | $74,054 | $80,825 | $74,054 | $353,858 | $2,635 | -$23,760 | 15.86 |
| 3/2/1999 | -$900 | $1,246 | $346 | $37,470 | $36,570 | $367,400 | $1,212 | -$25,312 | 17.00 |
| 3/3/1999 | -$200 | $725 | $525 | -$5,000 | -$5,200 | $308,801 | $951 | -$19,908 | 16.00 |
| 3/4/1999 | -$270 | $8,433 | $8,163 | -$16,275 | -$16,545 | $125,471 | $524 | -$11,189 | 15.00 |
| 3/8/1999 | -$400 | $2,983 | $2,583 | -$5,050 | -$5,450 | $25,586 | $122 | -$3,332 | 11.00 |
| 3/10/1999 | -$100 | $1,616 | $1,516 | $3,250 | $3,150 | $88,036 | $335 | -$9,283 | 9.00 |
| 3/11/1999 | -$600 | -$8,656 | -$9,256 | $17,800 | $17,200 | $297,958 | $2,228 | -$22,605 | 8.00 |
| 3/12/1999 | -$800 | -$29,526 | -$30,326 | $52,230 | $51,430 | $635,823 | $5,028 | -$37,585 | 13.13 |
| 3/15/1999 | -$200 | $32,200 | $32,000 | $2,225 | $2,025 | $383,200 | $6,384 | -$45,790 | 8.96 |
| 3/16/1999 | -$100 | $18,808 | $18,708 | -$2,500 | -$2,600 | $309,195 | $7,431 | -$36,842 | 9.65 |
| 3/17/1999 | -$100 | -$10,829 | -$10,929 | -$26,500 | -$26,600 | $465,728 | $7,367 | -$43,123 | 8.36 |
| 3/22/1999 | -$800 | -$63,017 | -$63,817 | $21,870 | $21,070 | $257,806 | $606 | -$13,657 | 25.00 |
| 3/23/1999 | -$300 | -$14,937 | -$15,237 | $17,120 | $16,820 | $292,532 | $1,199 | -$18,173 | 23.71 |
| [illegible]4/1999 | -$500 | -$10,816 | -$11,316 | -$183,000 | -$183,500 | $589,606 | $1,866 | -$22,060 | 22.76 |
| [illegible]25/1999 | -$400 | $30,798 | $30,398 | $131,250 | $130,850 | $553,452 | $2,485 | -$28,069 | 21.67 |
| 3/26/1999 | -$600 | $2,670 | $2,070 | -$122,180 | -$122,780 | $594,601 | $2,397 | -$25,926 | 20.72 |

Options

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 12/15/2000 | -$1,633 | -$398,615 | -$400,248 | $278,500 | $276,868 | $11,672,886 | -$995 | $7,719 | 15.95 |
| 12/18/2000 | -$26,045 | -$232,487 | -$258,531 | $1,344,488 | $1,318,444 | $10,258,931 | $7,473 | $15,030 | 36.88 |
| 12/19/2000 | -$822 | -$1,250,556 | -$1,251,377 | -$31,004 | -$31,826 | $8,992,991 | -$2,716 | $23,201 | 35.66 |
| [illegible]/20/2000 | -$2,260 | -$648,723 | -$650,983 | $25,769 | -$23,509 | $7,907,205 | -$7,384 | $46,898 | 34.27 |
| [illegible]2/21/2000 | -$405 | -$737,423 | -$737,827 | $36,000 | $35,596 | $6,462,656 | -$10,001 | $68,863 | 33.49 |
| 12/22/2000 | $0 | $302,880 | $302,880 | $0 | $0 | $7,086,103 | -$7,259 | $46,643 | 33.17 |
| 12/26/2000 | $0 | -$138,505 | -$138,505 | $0 | $0 | $7,053,115 | -$10,443 | $63,702 | 29.01 |
| 12/27/2000 | $0 | $760,459 | $760,459 | $0 | $0 | $8,418,227 | $7,176 | $42,455 | 27.60 |
| 1/2/2001 | $0 | -$8,466,498 | -$8,466,498 | $0 | $0 | $5,841,607 | -$15,753 | $100,186 | 21.73 |
| 1/3/2001 | $0 | $2,102,659 | $2,102,659 | $0 | $0 | $10,042,804 | $6,078 | $39,172 | 20.11 |
| 1/4/2001 | $0 | -$926,577 | -$926,577 | $0 | $0 | $8,602,273 | -$14,935 | $75,416 | 19.47 |
| 1/5/2001 | $0 | -$735,738 | -$735,738 | $0 | $0 | $7,064,108 | -$19,105 | $99,790 | 18.71 |
| 1/8/2001 | $0 | $407,228 | $407,228 | $0 | $0 | $8,231,175 | -$21,690 | $101,883 | 15.53 |
| 1/9/2001 | $0 | -$269,587 | -$269,587 | $0 | $0 | $7,680,409 | -$22,694 | $109,714 | 14.95 |
| 1/10/2001 | $0 | $523,229 | $523,229 | $0 | $0 | $9,187,331 | -$21,784 | $93,027 | 13.50 |
| 1/11/2001 | $0 | $566,294 | $566,294 | $0 | $0 | $10,413,884 | -$17,282 | $67,217 | 12.42 |
| 1/12/2001 | $0 | $70,174 | $70,174 | $0 | $0 | $10,786,651 | -$17,053 | $62,191 | 11.07 |
| 1/15/2001 | $0 | $25,100 | $25,100 | $0 | $0 | $11,138,140 | -$22,020 | $73,869 | 7.91 |
| 1/16/2001 | $0 | -$430,438 | -$430,438 | $0 | $0 | $10,463,443 | -$28,325 | $98,220 | 6.76 |
| 1/17/2001 | $0 | $1,310,883 | $1,310,883 | $0 | $0 | $13,158,500 | $11,961 | $40,267 | 5.43 |
| 1/18/2001 | $0 | $1,340,381 | $1,340,381 | $0 | $0 | $14,932,188 | $5,456 | -$610 | 4.43 |
| 1/19/2001 | $0 | $158,428 | $158,428 | $0 | $0 | $15,080,252 | $2,300 | $11,576 | 3.54 |