UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2017 DEC 21  AM 11: 36

DANIEL E. CARPENTER )

v. )

UNITED STATES OF AMERICA )

U.S. DISTRICT COURT
DISTRICT OF MASS.

CRIMINAL NO. 04-cr-10029-GAO

**MR. CARPENTER'S MOTION TO VACATE HIS CONVICTION AND DISMISS HIS INDICTMENT FOR MULTIPLE VIOLATIONS OF *BRADY, JENCKS, BAGLEY, GIGLIO*, AND *NAPUE*, AND THE KNOWING USE OF PERJURY AND FALSE EVIDENCE BY THE GOVERNMENT AT HIS SECOND TRIAL**

### I.    PRELIMINARY STATEMENT

The First Circuit has had a longstanding history and policy that convictions based on the use of perjured testimony cannot be allowed to stand.  *See, e.g., United States v. Maldonado-Rivera*, 489 F.3d 60 (1st Cir. 2007) ("the government was guilty of the knowing use of perjured testimony"):

> [T]he *Brady* error rule applies because the government was guilty of the knowing use of perjured testimony.  Legally, this claim has its roots in a line of Supreme Court decisions holding that a conviction obtained through the prosecution's knowing use of perjured testimony cannot stand. *See, e.g., Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935).  This case law is potentially significant to the standard applicable to the adjudication of the defendant's new trial motion because we have held that "the *Brady* error rule should apply to claims of knowing use of perjured testimony." *Maldonado-Rivera* at 67-68, *citing González–González at 21*.

Yet, in Mr. Carpenter's case, the Court clearly pointed out that the government's main witness, Gerry Levine from Merrill Lynch, committed outright perjury, and the government knew it:

> "Levine's testimony in other respects was perjurious in this Court's judgment, *and the government knew it*." *See United States v. Carpenter*, 808 F.Supp.2d 366, 389 n.5 (D.Mass.2011), Doc. 377 (emphasis in the Court's original statement).

Despite the Court pointing out Levine's obvious and persistent perjury, and the government's failure to correct any of those lies **in front of the jury** as is their duty under *Napue*

and *Giglio v. United States,* 405 U.S. 150 (1972), the First Circuit felt the error here was harmless because Mr. Carpenter's attorney did such a great job on Levine's cross-examination that the jury must have known Levine lied:

> Carpenter consequently was able to and did cross-examine the lying witness "vigorously." The district court therefore determined that a mistrial was not warranted on this basis. On appeal, Carpenter has not identified any reasonable likelihood that the jury's verdict in this case was impacted by the false testimony in light of his vigorous cross-examination. That ends this attack. *United States v. Carpenter,* 736 F.3d 619, 631 (1st Cir. 2013)

However, that is not the correct legal standard for an error under *Brady-Giglio* in the First Circuit or anywhere else, and a "vigorous" cross-examination is not a substitute for truthful testimony, and certainly is not the remedy required by the Supreme Court in *Napue* and *Giglio*. Nor does a "vigorous" cross-examination alleviate the government's burden, obligation, and legal duty to bring to the jury's attention that their witness, Levine, lied, especially in the face of David Patterson's testimony that it was Mr. Carpenter who set up the conference call between Attorney Patterson and Mr. Levine to discuss the development of the future escrow account documentation for Attorney Patterson's client, who was the first Exchangor. Levine testified that he was not on that call, and that he did not receive any of the documents that Attorney Patterson and Mr. Carpenter sent him. Even Marty Paley testified that he spoke with Levine several times. Most importantly, though, Mitch Rock testified that Levine set up the decisive conference call and was on the call where Mr. Carpenter was "handed-off" from Merrill Lynch to PaineWebber, yet Mr. Levine recalled none of these phone calls. The Court even asked Mr. Levine to consider if it was a question of not remembering or not actually being on the call, and Mr. Levine was adamant that he was not any of these phone calls, despite the contrary testimony of other witnesses.

The reason that this perjury by Levine is so important is that, contrary to Judge Kayatta's "nutshell" description, Mr. Carpenter never lied to anyone, nor did he know anything about the Exchangors until they wanted their money out. Mr. Carpenter did not "deceive" anyone, nor did he make any written or oral misrepresentations to anyone as charged in the Indictment. Instead, the lies of the Merrill Lynch witnesses hurt Mr. Carpenter's Good Faith defense as in "If he would lie to Merrill, he could certainly lie to the Exchangors." As it turns out, he did not lie to anyone as can be seen from a lawsuit against Merrill filed not by Gail Cahaly, but by Joe Iantosca in February 2008, before Mr. Carpenter's second trial. See *Iantosca v. Merrill* lawsuit attached as Exhibit One. In that lawsuit, it clearly states that Mr. Carpenter and Mr. Paley told Merrill that the funds were third-party funds for a qualified property exchange under IRC Section 1031. Mr. Carpenter should have been provided with a copy of that lawsuit by the government, but did not learn of its existence until the middle of 2009.

Iantosca also filed lawsuits against Mr. Carpenter's affiliates in June and September of 2008, but was somehow "too sick" to testify at Mr. Carpenter's trial in June of 2008, so all of the Iantosca prejudicial statements from the first trial were allowed to come in to the second trial, but without the benefit of Mr. Carpenter being allowed to ask Mr. Iantosca if he had received all of his money back plus interest. The government even did a Motion in Limine to keep this truth away from the jury and out of Mr. Carpenter's second trial. Not only is this a flagrant violation of the Confrontation Clause under *Crawford v. Washington*, 541 U.S. 36 (2004), this is the type of prosecutorial vindictiveness that infected both of Mr. Carpenter's trials and now requires a vacating of Mr. Carpenter's conviction and a dismissal of his indictment because he was deprived of his liberty without Due Process, a Fair Trial, or even the "fundamental fairness" required of the government that justice be done under *Berger* v. *United States*, 295 U.S. 78

3

(1935). *See, also, United States v. Cameron*, 669 F.3d 621 (1st Cir. 2012) (First Circuit vacating conviction based on inadvertent violation of Confrontation Clause).

In fact, it was not until May of 2016 – two years after Mr. Carpenter had been in prison for a "non-crime" that he did not commit – that Judge Roach published her revealing opinion in *Cahaly v. Merrill Lynch*, No. 01-0116-BLS2 (Suff. Sup. Court April 12, 2016) in the *Cahaly* litigation that is still ongoing (albeit Mr. Carpenter and BPETCO have settled all claims with the Exchangors), which showed that not only did Levine lie, all of the Merrill government witnesses lied, including Rasmussen, Stern, Hassan Tabbah, and Kevin Duffy, **and the government knew it**. Judge Roach also discussed statements and letters sent by Merrill witnesses and attorneys that were sent to the government agencies but never given to Mr. Carpenter or the defense. This now brings up a clear *Jencks* Act violation as well as *Brady-Giglio-Bagley* and *Napue* violations for all of the Merrill witnesses statements to the SEC and NASD that were never turned over to Mr. Carpenter or either of his defense teams. Not only is this a clear violation of the law, it is another example of the prosecutorial misconduct and vindictiveness that Mr. Carpenter faced in this case. Judge Roach's Opinion makes clear that everyone at Merrill including their attorneys, and specifically Stern and Rasmussen as well as Levine, lied to Mr. Carpenter's Jury, the Court, the SEC, the NASD, FBI Agent Caldwell, and therefore by reference also lied to the Grand Jury in Mr. Carpenter's case because all FBI Agent Caldwell did as the only witness in front of the Grand Jury was repeat all of the lies he had been told by Merrill's representatives. Based on Judge Roach's Opinion (excerpts attached as Exhibit Two), this Court must vacate Mr. Carpenter's conviction because **ALL** of the Merrill witnesses lied, and **the government knew it**.

What Judge Roach's 2016 Opinion also makes clear is that Merrill Lynch set out to blame Mr. Carpenter for not telling Merrill that the money belonged to the Third-Party

Exchangors. Merrill even concocted experimental mock trials where they changed their stories to get just the right vote from a potential jury. As it was, the civil jury did not buy the Merrill lies, but Judge Botsford granted Merrill a JNOV in 2003 that was later overturned and resulted in more than a decade of ongoing litigation that has resulted in $50 million going to the Exchangors from settlements from Merrill and PaineWebber based on the litigation brought by Mr. Carpenter and BPETCO against PaineWebber and Merrill. However, despite the lies told by Merrill executives and their attorneys, and perhaps because of the Exchangors' huge windfall in this case, Judge Roach refused to blame or penalize Attorney Snyder or Bingham-McCutchen for the 16-year ongoing saga that still continues to this day on appeal:

> Because it is impossible to know whether plaintiffs and Merrill Lynch would have reached a settlement agreement in 2002, Bingham's misconduct may have been the sole basis for the past thirteen years of litigation in this case. Bingham certainly caused the expenditure of substantial resources of the parties and the Commonwealth which could have been far better spent." Plaintiffs' Proposed Rulings of Law at page 21 (emphasis supplied). I daresay no seasoned trial or appellate judge who has touched this case could agree that all of the now fifteen years of litigation is to be blamed solely on the conduct of Bingham, and I respectfully decline to so find or rule. *Judge Roach Op.* at *47-48.

Unfortunately, this Due Process nightmare continues to linger for Mr. Carpenter 17 years later, despite the fact that the Exchangors have netted $50 million on their $8 million loss from the year 2000, and Bingham-McCutchen is gone, Merrill Lynch was bought, PaineWebber was bought, and even Merrill's new law firm Dickstein Shapiro went out of business in 2016, thereby leaving Mr. Carpenter as the only survivor of the BPETCO debacle, and two trials that were infected by perjury, prosecutorial misconduct, and fundamental unfairness. Because most of the government witnesses lied at Mr. Carpenter's second trial including Paley, Mitch Rock, Rasmussen, Stern, and Levine and the *"government knew it,"* Mr. Crpenter respectfully asks the Court to vacate his conviction under *Brady-Jencks* and *Giglio-Napue,* and to dismiss his Indictment based on the government's pernicious prosecutorial misconduct in this case.

## II.  MR. CARPENTER'S CONVICTION MUST BE VACATED AND HIS INDICTMENT DISMISSED IN THE INTERESTS OF JUSTICE DUE TO THE GOVERNMENT'S KNOWING USE OF PERJURY AND FALSE EVIDENCE

There is a mountain of newly-discovered evidence from the Exchangors' lawsuit against Merrill Lynch and Bingham McCutchen that has appeared since my second trial of 2008. The newly-discovered lies and material *Brady-Giglio-Bagley* evidence continues to accumulate even at this late date. The "cumulative weight" of this newly-discovered evidence should have produced a new trial under the defendant-friendly "*Kyles* and *Strickler*" standard. *See, e.g.,* the First Circuit's opinion in *United States v. Flores-Rivera*, 56 F.3d 319 (1st Cir. 1995), where the First Circuit makes clear that:

> "If the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged," a motion for judgment of acquittal must be granted. This is so because . . . where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury *must necessarily entertain* a reasonable doubt." *Flores-Rivera* at 323 (emphasis in original).

It has been discovered in the ongoing civil cases that Levine was not the only person to lie; Stern and Rasmussen also lied, and Judge Roach based her 50-page decision on the fact Martin Malia downloaded the BPETCO information from the website and faxed it to Rasmussen, but then lied and changed the story when talking to Snyder, Merrill Lynch's attorney at the time. *See, e.g., Judge Roach Opinion* attached as Exhibit Two. Everyone at Merrill knew that the BPETCO money was "third-party" client funds and they not only lied to Snyder and Bingham, Stern and Rasmussen lied to the Court, the SEC, the NASD, FBI Agent Caldwell, and therefore they also lied to the Grand Jury and the Jury in both of Mr. Carpenter's trials as well. The Court already wrote about Paley's and Mitch Rock's lies. Now it is clear that Stern, Rasmussen, and Hassan Tabbah, Merrill's office manager, also lied to the FBI and Merrill's own lawyer Snyder, as did Martin Malia, the Merrill Compliance Director who was the unknown villain in this case.

6

*See, e.g.,* Exhibit Two Judge Roach Op. at 40, Paragraph 105, regarding "[Malia's] concern that Carpenter and Benistar could come back to bite Merrill." See, also, Footnote 15: "It is nonetheless undisputed that Malia testified in 2009 that he restricted the account in part because of a concern that Benistar was trading other people's money." Based on all these lies, clearly known by the government at both trials, Mr. Carpenter's conviction cannot be allowed to stand in the interests of justice, and his indictment must be dismissed for egregious government misconduct.

Thanks to Judge Roach's 2016 Opinion, Mr. Carpenter now knows about the multiple SEC and NASD investigations that were not disclosed to either of his defense teams by the government, and Attorney Snyder lied in those investigations as well because, allegedly, he was lied to by all of the brokers and executives at Merrill. Mr. Carpenter has requested but has not received both the SEC reports, and the two letters sent to the NASD that Judge Roach is holding back and has not published with her decision. Clearly this is and would have been newly-discovered and **material** *Brady-Giglio-Bagley* information to his case that neither the Court, nor anyone else including Mr. Carpenter or his counsel, knew about these investigations and Attorney Snyder's letters, until Judge Roach's Opinion of 2016. Mr. Carpenter and BPETCO were not sued by the NASD or indicted by the SEC, despite several intensive investigations that he knew nothing of or participated in. If a government investigation (that Mr. Carpenter and Merrill must have passed) does not constitute *Brady-Giglio-Bagley* material, what does? Compare this to the SEC's ongoing attacks against the hedge fund manager Guy Gentile that were just recently dismissed by a Federal Court in New Jersey. *See SEC v. Gentile*, 2017 WL 6371301 (D.NJ. 2017) (Dismissal of pecuniary forfeiture claim against penny-stock fraudster because the SEC Claim was outside the five year statute of limitations).

Attorney Snyder also knew about the February 2008 *Iantosca* lawsuit, the SEC investigations, the NASD investigations, the Malia file, and the David Patterson information that came out when Dickstein Shapiro took over in 2009. Snyder as counsel for Merrill Lynch, and separate counsel for the Exchangors, sat directly behind the prosecution at both of Mr. Carpenter's trials, and unbelievably did not mention any of this information to the ~~prosecution~~ *defense* , including the newly-discovered *Iantosca* lawsuit against Merrill Lynch of February 2008 which Mr. Carpenter did not even hear about until April of 2009. Perhaps the prosecution did not think that they had a duty under *Brady* and *Jencks* to share this exculpatory information with Mr. Carpenter. Clearly the Supreme Court disagrees with that decision, based on its recent decision in *Turner v. United States*, 137 S.Ct. 1885 (2017):

> The Government does not contest petitioners' claim that the withheld evidence was "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler* v. *Greene*, 527 U.S. 263, 281–82 (1999). Neither does the Government contest petitioners' claim that it "suppressed" the evidence, "either willfully or inadvertently." *Id.* at 282. It does, as it must, concede that the *Brady* rule's "'overriding concern [is] with the justice of the finding of guilt,'" *United States* v. *Bagley*, 473 U.S. 667, 678 (1985) (quoting *United States* v. *Agurs*, 427 U.S. 97, 112 (1976)), and that the Government's "'interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done,'" *Kyles* v. *Whitley*, 514 U.S. 419, 439 (1995) (quoting *Berger* v. *United States*, 295 U.S. 78, 88 (1935)). Consistent with these principles, the Government assured the Court at oral argument that subsequent to petitioners' trial, it has adopted a "**generous policy of discovery**" in criminal cases under which it discloses any "information that a defendant might wish to use." Tr. of Oral Arg. 47–48. As we have recognized, and as the Government agrees, *id.*, "[t]his is as it should be." *Kyles, supra,* at 439 (explaining that a "'prudent prosecutor['s]'" better course is to take care to disclose any evidence favorable to the defendant (quoting *Agurs, supra,* at 108)). *Turner* at 1893, *citing Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (emphasis added).

Assuming *arguendo*, even if Attorney Snyder purposefully hid all of the Merrill lies from the government, his knowledge is still imputed to the government because Snyder was there for each and every 302 Report used against Mr. Carpenter in his Grand Jury hearing and sat behind the government every day of his 2008 trial. Moreover, the knowledge of the SEC and NASD

investigations of Merrill concerning BPETCO are clearly *Brady* materials attributable to the government that should have been turned over to the defense, but were not.  This failure alone of the government to turn over vital material information warranted a new trial in 2013 and now warrants the vacating of Mr. Carpenter's conviction and the dismissal of his indictment.

**III.   JUDGE ROACH'S OPINION GIVES CLEAR AND CONVINCING EVIDENCE THAT THE GOVERNMENT KNEW ALL ALONG THAT ALL OF THE MERRILL LYNCH WITNESSES WERE KNOWINGLY OFFERING PERJURED TESTIMONY**

It has long been established by the First Circuit that they will not allow the use of perjured testimony or knowingly-false evidence to be used by the government to convict someone. *See, e.g.,* this statement from a *Bivens* action in *Drumgold v. Callahan,* 707 F.3d 28 (1st Cir. 2013):

> ("[D]ue process ... cannot be deemed to be satisfied ... if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured."); *Pyle,* 317 U.S. at 215–16 ("Petitioner's papers are inexpertly drawn, but they do set forth allegations that his imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him."); *Napue v. Illinois,* 360 U.S. 264, 269 (1959) (recognizing "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction"); *Limone,* 372 F.3d at 45 ("[T]hose charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit."); *Haley,* 657 F.3d at 49 ("Deliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant's due process rights."). Compare *Brady,* 373 U.S. at 87 (specifying that the due process right recognized in that case applies "irrespective of the good faith or bad faith of the prosecution"). *Drumgold* at 61.

It is also the established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution. *See, e.g., Mooney v. Holohan,* 55 S.Ct. 340 (1935).  As the Supreme Court stated in its unanimous decision in *Giglio*: "It has long been established that the prosecutor's deliberate deception of a court and jurors by

the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972). See, also, a case mentioned several times in the government's previous reply briefs, *Banks v. Dretke*, 540 U.S. 668 (2004): "A conviction based on testimony known by the prosecutor to be perjurious is a denial of due process."

The First Circuit has also made it clear that the knowing use of perjured testimony is also considered to be a serious *Brady* violation, and requires the order of a new trial. See *United States v. Gonzalez-Gonzalez*, 258 F.3d 16, 21 (1st Cir. 2001), *citing Strickler v. Green*, 527 U.S. 263, 280-81 (1999). In *Drumgold*, above, the First Circuit described *Mooney*'s core premise as "well-settled" in the First Circuit citing to *Coggins v. O'Brien*, 188 F.2d 130, 138 (1st Cir. 1951), and citing the Supreme Court's unanimous decision in *Napue v. Illinois*, 360 U.S. 264, 269 (1959), that was also cited by the Supreme Court's unanimous decision in *Giglio*. The First Circuit goes on in citing *Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004), *citing Miller v. Pate*, 386 U.S. 1 (1967): "In 1967, the very year the crimes took place, Justice Stewart, writing for a unanimous court stated 'More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. There has been no deviation from that established principle.'" *Miller* at 7. *See, also, Ouimette v. Moran*, 942 F.2d 1 (1st Cir. 1991), where the First Circuit vacated defendant's conviction because the government withheld evidence of defendant's partner's criminal background).

As the Court will recall, Mr. Carpenter submitted over 30,000 pages showing that all of the Merrill witnesses lied, including excerpts from Merrill Lynch's General Counsel Bevilacqua's deposition and the 2010 Dickstein Shapiro depositions, where Bevilacqua stated that he was very disappointed in the conduct of certain individuals at Merrill, and he recognized that they had all lied at Mr. Carpenter's trials. In his 2010 deposition, General Counsel

Bevilacqua testified that he was "dismayed" at the "inconsistencies" between the recently produced documents and the trial testimony of Rasmussen, Stern, and Levine.

Judge Roach also refers to Merrill's General Counsel Bevilacqua, as well as other Merrill executives' testimony that it was clear to them that a number of people at Merrill had been lying for many years, participating in the Snyder and Bingham lies and cover-up of lies, as well as the destruction and spoliation of evidence. This Court, as well as the First Circuit, was supposed to take into consideration "the cumulative impact of all of the newly-discovered evidence." See *Kyles* at 420. As the Supreme Court has described, the government's conduct in this case clearly warranted a new trial as the case was "infested with constitutional errors." *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995). *See, also, Wearry v. Cain*, 136 S.Ct. 1002 (2016), where only **one** *Brady* violation took a convict off of death row and required a new trial:

> "[T]he suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady, supra*, at 87. *See also Giglio* (clarifying that the rule stated in *Brady* applies to evidence **undermining witness credibility**). "Evidence qualifies as material when there is "**any reasonable likelihood**" it could have affected the verdict. *Giglio v. United States*, 405 U.S. 150 (1972) (*quoting Napue v. Illinois*, 360 U.S. 264, 271 (1959)). To prevail on his *Brady* claim, Wearry need not show that he "more likely than not" would have been acquitted had the new evidence been admitted. *Smith v. Cain*, 132 S.Ct. 627, 629–631 (2012). He must show only that the new evidence is sufficient to "**undermine confidence**" in the verdict. *Ibid.*" *Wearry* at 1006 (emphasis added) (internal quotation marks omitted).

Now Mr. Carpenter seeks the delayed justice of having his conviction vacated, his indictment dismissed, and his good name restored based on the government's egregious violation of his constitutional rights in the knowing use of evidence they knew to be false and outright perjury that they heard twice in two trials in 2005 and 2008. Sad, but true, had Mr. Carpenter had Judge Roach's Opinion in 2013 instead of May 2016 (see Doc. 545), Mr. Carpenter's life would have been totally different.

Clearly Judge Roach's Opinion shows that Attorney Snyder coached the Merrill witnesses to lie, and because of their repeated lies in the civil forum, they had to continue repeating those lies in Mr. Carpenter's criminal trials in 2005 and 2008, and the government worked in concert with Attorney Snyder to suborn knowing perjury in both of his trials as well as the civil litigation with the Exchangors after 2008.  The government attorneys had frequent and repeated meetings with Attorney Snyder as if Attorney Snyder was, in reality, AUSA Snyder.  But nowhere was Mr. Carpenter harmed more than in his Grand Jury, where there was just one witness, FBI Agent Caldwell, who literally quoted perjurious hearsay evidence from witnesses that AUSA Pineault had to know were lying, because Mr. Carpenter's Grand Jury hearing was in January of 2004, three years after the start of the civil litigation with Merrill, the multiple SEC and NASD investigations, and after a judgment had already been entered against Merrill Lynch as well as BPETCO in November of 2002, and there had already been several performances by Attorney Snyder in front of civil juries where he lied straight-faced to the jurors in closing arguments, saying that no one at Merrill Lynch had any knowledge that the BPETCO funds were third-party funds, and did not in fact belong to Mr. Carpenter. *See, e.g.,* Exhibit Two *Judge Roach Op.* at 27-28, Paragraphs 61-65. In 2016, for the very first time, everyone now knew that all of the Merrill witnesses knew that the BPETCO funds were third-party funds, and they all lied and perpetuated the lie for 16 years just to save themselves some money in a civil lawsuit at the cost of an innocent man's freedom.  As the Court stated boldly with italicized emphasis: "Levine's testimony in other respects was perjurious in this Court's judgment, *and the government knew it.*" *See* Doc. 377 at 23, n.5 (emphasis in the Court's original statement).  The reason this is important is because: "Interestingly, there was no evidence that any of the exchangors, nor any attorney, accountant, or advisor interacting with [BPETCO] on their behalf,

ever asked where exactly the funds would end up, nor what Benistar's interest in the exchange was." *Carpenter*, 808 F.Supp.2d at 391 n.8.

If Mr. Carpenter had available Judge Roach's Opinion in May of 2013 instead of May of 2016, the First Circuit never would have overturned Mr. Carpenter's Second New Trial Order and Mr. Carpenter probably would not have been indicted two weeks later in Connecticut for another non-crime that he did not commit. Therefore, it is Mr. Carpenter's hope that now armed with Judge Roach's Opinion, the Court will immediately vacate Mr. Carpenter's conviction in the interests of justice based on the overwhelming weight of this **new and cumulative** *Brady-Giglio-Bagley-Napue* and *Strickler-Kyles* evidence discovered within three years of this Court's finding of his guilt in February of 2014 because the government knowingly used false evidence and the perjured evidence of several witnesses to obtain the unconstitutional conviction of an innocent man.

## IV.   IN ADDITION TO THE *GIGLIO-NAPUE* VIOLATIONS, BOTH TYPES OF *BRADY* VIOLATIONS EXIST IN THIS CASE AND REQUIRE THE VACATING OF MR. CARPENTER'S CONVICTION

As the First Circuit has stated, there are in reality "two types" of *Brady* violations. Since the notorious Senator Ted Stevens prosecutorial misconduct came to light after Mr. Carpenter's 2008 trial, there are many examples of prosecutorial misconduct in Mr. Carpenter's case that are far worse than anything that happened in Senator Stevens' unfortunate case. But, as the First Circuit stated in *United States v. Acosta-Colon*, 741 F.3d 179 (1st Cir. 2013):

> Broadly speaking, there are two types of *Brady* violations. *See, e.g., United States v. González–González*, 258 F.3d 16 (1st Cir. 2001). The first occurs when the undisclosed evidence shows that prosecutors knowingly used perjured testimony or allowed false testimony to go uncorrected. *See, e.g., United States v. Agurs*, 427 U.S. 97, 103–04 (1976); *Giglio*, 405 U.S. at 153. For this violation, undisclosed evidence is material "if there is any **reasonable likelihood** that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103. The other type of *Brady* violation occurs when prosecutors suppress evidence favorable to the defense, even if the evidence does

not involve false testimony. *Id.* at 104. For this violation, evidence is material "if there is a **reasonable probability** that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The "**reasonable likelihood**" and "**reasonable probability**" standards are synonymous. *Acosta-Colon* at 195, *citing González-González* at 21-22 (emphasis added).

Both forms of *Brady* violations are readily apparent in this case and the First Circuit used the wrong standard to overturn Mr. Carpenter's Second New Trial Order. This is especially true if one considers that Mr. Carpenter is the only person to have been granted two new trial orders and that in September 2011, he was an innocent man once again, and he stayed innocent until the First Circuit overturned his Second New Trial Order two years later on the basis that his attorneys did such a "vigorous" cross-examination of the persistent perjurer Levine, that the jury must have known that Levine lied. Not only is that the wrong standard for *Brady, Giglio*, and *Napue*, it does not alleviate the government's obligation to "jump up" and tell the jury that the government's witness lied. In this case, the government only admitted to the Court in a December 3, 2008 hearing that Levine lied. There was no mention – ever or at any time – that all of the other Merrill witnesses lied. Nor did anyone, including the Court, tell the Jury that all of the government witnesses lied. The First Circuit used the wrong standard to review Levine's perjury, and they did not consider that all of the other Merrill witnesses lied as well.

Mr. Carpenter's entire case has been one long litany of prosecutorial misconduct. Yet, rather than attempt to correct any of the Constitutional or Due Process violations in his case, the First Circuit continues to understate the government misconduct and ignore the truth and avoid making any decisions critical of the government. If the conviction in *Flores-Rivera* was overturned at the same time Mr. Carpenter's conviction was affirmed because the government failed to turn over Delgado's "toilet paper" notes, please compare that to Rasmussen, Stern, and

Levine committing perjury with not just the government's knowledge, but with the government's blessing. *See United States v. Flores-Rivera*, 787 F.3d 1 (1st Cir. 2015):

> In analyzing whether there was a *Brady* violation, we evaluate the strength of the impeachment evidence and the effect of its suppression in the context of the entire record to determine its materiality. The import of withholding evidence is heightened where the evidence is highly impeaching *or* when the witness' testimony is uncorroborated and essential to the conviction.... We must grant a new trial if, after assessing the significance of the non-disclosed evidence in the context of trial, the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Flores-Rivera* at 17-18, *citing Avilés–Colón* at 19, and *Strickler* at 290 (emphasis in original).

The government also knew about the February 2008 *Iantosca v. Merrill Lynch* lawsuit that totally exonerates Mr. Carpenter and shows that he was innocent of these spurious accusations. *See Iantosca* Lawsuit attached as Exhibit One. If that is not *Brady-Jencks-Giglio-Bagley* information, then nothing is in the First Circuit. While the First Circuit played with puns in overturning Nancy Gray's conviction with the "50 Shades of Malice" described in *United States v. Gray*, No. 13-1909 (1st Cir. 2015), where was the search for criminal *mens rea* in Mr. Carpenter's case that the First Circuit required most recently in *United States v. Berroa*, 856 F.3d 141, 150 (1st Cir. 2017) ("under the government's theory, any false statement in an application...could constitute a federal crime."). In Mr. Carpenter's case, there was no "evil act" or "evil mind" and he did not lie to anyone at any time, and the words "specific intent to defraud" are nowhere to be found in his indictment or his trial transcript, and at this late date the government has still not pointed to even one written or oral misrepresentation on his part.

That, of course, inexorably leads to the Second Circuit's decision last year in *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016), which is based largely on famous First Circuit precedents including *McEvoy Travel v. Heritage Travel*, 904 F.2d 786 (1st Cir. 1990) and *Sanchez v. Triple-S*, 492 F.3d 1 (1st Cir. 2007), both of which have been cited numerous times in

Mr. Carpenter's briefs to this Court over the past 14 years. As the Second Circuit stated in

*Countrywide*:

> As we noted above, deception is the core of fraud and the key distinction between fraud and a contractual breach. *See, e.g.*, *McEvoy Travel*, 904 F.2d at 791–92; *Kreimer*, 609 F.2d at 128. The law of these cases is perfectly consistent with our holding today that **fraudulent intent must be found at the time of the allegedly fraudulent conduct**... In sum, a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution. Absent such proof, a subsequent breach of that promise—even where willful and intentional—cannot in itself transform the promise into a fraud. Far from being an arcane limitation, the principle of contemporaneous intent is, like materiality, one without which "the common law could not have conceived of 'fraud.'" *Countrywide* at 661-62, *citing Neder* at 22.

The Second Circuit also stated the following in *Countrywide* after analyzing the entire

history of federal mail and wire fraud since *Durland v. United States*, 161 U.S. 306 (1896):

> "[w]hat fraud in these instances turns on, however, **is *when* the representations were made and the intent of the promisor *at that time*.** . . . where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim." *Countrywide*, 822 F.3d at 658 (emphasis in original).

Significantly, this Court echoed these very same sentiments in its decision in this case:

> But it is easy, especially for lay jurors, to miss the **significant difference between a failure to live up to a promise after it has been made and a fraudulent intent in making the promise never to live up to it.** The latter would be the basis for a finding of specific intent to defraud; the former would not be. *Carpenter*, 808 F. Supp. 2d at 384.

And, at Mr. Carpenter's sentencing, this Court also stated the following:

> This is a unique case I think. . . . This was not a fraud that took money from someone intending never to return it. It was actually part of the business plan that it be returned at some point. Dkt. 438 at p. 16.

Therefore, based on the Second Circuit's recent decision in *Countrywide* as well as other

major fraud cases across the country and in the First Circuit, and the above statements made by

the Court, Mr. Carpenter believes it is perfectly clear that in completing almost all of the 126

property exchanges, he certainly intended to honor all of the 126 agreements. There was no

fraud here, much less "federal" fraud, which is why Mr. Carpenter is challenging the jurisdiction of the federal court in other motions under the old Rule 12(b)(3)(B) before it changed in December of 2014. This language has been interpreted to encompass such defenses even if first raised by a defendant on appeal or by a court of appeals *sua sponte. See, e. g., United States v. Saade*, 652 F.2d 1126, 1133 (1st Cir. 1981). *See, also, United States v. Rosa-Ortiz*, 348 F.3d 33, 36 (1st Cir. 2003) ("jurisdictional challenges to an indictment may be raised at any time, Fed. R. Crim. P. 12(b)(3)(B)....*United States v. Mojica-Baez*, 229 F.3d 292, 309 (1st Cir. 2000)").

To aid the Court in seeing that there was no federal fraud in this case, and that the significant prejudice caused by the multiple *Brady-Giglio-Bagley-Napue* violations require the vacating of his conviction, Mr. Carpenter offers the following decisions, all of which are following his second trial of 2008:

**Honeycutt v. United States, 137 S.Ct. 1626 (2017):**

"Neither the dictionary definition nor the common usage of the word "obtain" supports the conclusion that an individual "obtains" property that was acquired by someone else." – *6.

**United States v. Berroa, 856 F.3d 141 (1st Cir. 2017):**

"under the government's theory, any false statement in an application...could constitute a federal crime." – 150.

**United States v. Finazzo, 850 F.3d 94 (2d Cir. 2017):**

"not every non-disclosure or misrepresentation that could affect someone's decision of how to use his or her assets is sufficient to support a mail or wire fraud conviction. The fraudulent scheme must implicate tangible economic harm." – 111, *citing United States v. Mittelstaedt*, 31 F.3d 1208, 1216-17 (2d Cir. 1994).

**United States v. Tavares, 844 F.3d 46 (1st Cir. 2016):**

Even assuming that there was a "scheme to defraud," the government did not present substantial evidence of a mailing "in furtherance of" such a scheme. *Hebshie*, 549 F.3d at 35-36. The government points to form rejection letters that OCP staff mailed to unsuccessful applicants, typically after the final candidates were selected, to satisfy the

mailing requirement. The defendants contend that all letters were nevertheless mailed after the scheme reached its fruition. Regardless of the exact timing of the mailings, there is no evidence that the letters were material to the consummation of the defendants' scheme. *See Kann*, 323 U.S. at 94: "**It was immaterial to [the defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank.**" – 59.

*United States v. Countrywide*, **822 F.3d 650 (2d Cir. 2016):**

**A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes.** *Sanchez v. Triple-S*, 492 F.3d 1, 11 (1st Cir. 2007)....We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who—a jury might find—secretly harbored in his heart the hope that the buyer would never ask." – 660.

*United States v. Weimert*, **819 F.3d 351 (7th Cir. 2016):**

"In commercial negotiations, it is not unusual for parties to conceal from others their true goals, values, priorities, or reserve prices in a proposed transaction. When we look closely at the evidence, the only ways in which Weimert misled anyone concerned such negotiating positions. He led the successful buyer to believe the seller wanted him to have a piece of the deal. He led the seller to believe the buyer insisted he had a piece of the deal. All the actual terms of the deal, however, were fully disclosed and subject to negotiation. There is no evidence that Weimert misled anyone about any material facts or about promises of future actions." – 354.

"**The mail and wire fraud statutes do not cover all behavior which strays from the ideal.**" – 357. "**[W]e know of no other case in which a court has found that deceptive statements about negotiating positions amounted to a scheme to defraud under the mail or wire fraud statutes.**" – 358.

*United States v. Takhalov*, **827 F.3d 1307 (11th Cir. 2016):**

The Second Circuit has interpreted the wire-fraud statute in precisely this way. Their cases have "drawn a fine line between schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid — which do not violate the mail or wire fraud statutes — and schemes that depend for their completion on a misrepresentation of an essential element of the bargain — which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). *see also United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim [that] affect[s] the very nature of the bargain itself. Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and

the actual benefits which the defendant delivered, or intended to deliver.") (internal quotation marks omitted); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970) ("**[W]e conclude that the defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception.**"). – 1314.

*United States v. Binday*, 804 F.3d 558 (2d Cir. 2015):

"**It is not sufficient, however, to show merely that the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations**. The "right to control one's assets" does not render every transaction induced by deceit actionable under the mail and wire fraud statutes. Thus, we have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain." – 570.

*Sekhar v. United States*, 133 S.Ct. 270 (2013):

"Obtaining property requires . . . the acquisition of property" – *4-5.

*Skilling v. United States*, 561 U.S. 358 (2010):

"the victim's loss of money or property suppl[ying] the defendant's gain," – 400.

"ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." – 410.

Significantly, all of these cases were decided long after the alleged conduct in this case, from October 1998 to December 2000, and even after Mr. Carpenter's second trial in 2008, and his Second New Trial Order of September 2011. Respectfully, the First Circuit used the wrong standard for *Brady*, the wrong standard for *Giglio*, and certainly the wrong standard for *Napue* and did not analyze any other witnesses' testimony other than Levine's. Based on this simple fact alone, this Court should grant Mr. Carpenter's motion to vacate his conviction and dismiss his indictment.

## CONCLUSION

Mr. Carpenter respectfully renews his various motions to vacate his conviction and dismiss his Indictment due to the multiple serious violations of his constitutional rights by the government over this 14 year period. Mr. Carpenter can find no case in the First Circuit or elsewhere that matches the number or the magnitude of the constitutional violations that occurred in his case to deprive him of Due Process, Fundamental Fairness, or the Fair Trial that the Constitution guarantees to everyone. Because Mr. Carpenter has already served his sentence, the only remedy left in the interests of justice is to vacate his conviction and dismiss his Indictment.


## ORAL ARGUMENT REQUESTED

Mr. Carpenter respectfully requests oral argument on this Motion at the Court's earliest convenience, as a favorable decision here will clear up a significant portion of the Court's Docket pertaining to Mr. Carpenter. Upon notice from the Court, Mr. Carpenter will retain counsel to argue the case in front of this Court.


Respectfully Submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro-se*
18 Pond Side Lane
West Simsbury, CT 06092

# EXHIBIT ONE

## *IANTOSCA V. MERRILL* LAWSUIT

# COMMONWEALTH OF MASSACHUSETTS
## BUSINESS LITIGATION SESSION

SUFFOLK, ss.                                    SUPERIOR COURT DEPARTMENT

| | |
|---|---|
| JOSEPH IANTOSCA, Individually and as Trustee of the Faxon Heights Apartments Realty Trust and Fern Realty Trust, BELRIDGE CORPORATION, GAIL A. CAHALY, JEFFREY M. JOHNSTON, BELLEMORE ASSOCIATES, LLC, and MASSACHUSETTS LUMBER COMPANY, INC. Plaintiffs, v. MERRILL LYNCH PIERCE FENNER & SMITH, INC., Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

08-0775-D

CIVIL ACTION NO.

## COMPLAINT AND JURY DEMAND

### PARTIES

1.     Joseph Iantosca is a natural person and a resident of the Commonwealth of Massachusetts. Mr. Iantosca brings this action individually and as trustee of plaintiffs Faxon Heights Apartments Realty Trust and Fern Realty Trust.

2.     Belridge Corporation is a Massachusetts Corporation with a principal place of business in Weymouth, Massachusetts. Mr. Iantosca is the President and sole shareholder of Belridge.

3.     Gail A. Cahaly is an individual residing in Westwood, Massachusetts.

4.     *Jeffrey M. Johnston is an individual residing in Boston, Massachusetts.*

4.     Jeffrey M. Johnston is an individual residing in Boston, Massachusetts.

5.     Bellemore Associates, LLC is a limited liability company organized under the laws of New Hampshire.

6.     Massachusetts Lumber Company, Inc. is a Massachusetts corporation with its principal place of business in Cambridge, Massachusetts.

7.     Merrill Lynch Pierce Fenner & Smith, Inc. ("Merrll Lynch") is a Delaware corporation with a usual place of business at 125 High Street in Boston Massachusetts.

## FACTS

8.     By letter dated January 16, 2008, the plaintiffs presented Merrill Lynch with a written demand for relief in accordance with Massachusetts General Laws Chapter 93A, § 9 (3).

9.     Merrill Lynch did not respond with a reasonable offer within 30 days.

10.     Merrill Lynch opened and operated brokerage accounts for Benistar Property Exchange Trust Company, Inc.

11.     As its name suggests, Benistar Property Exchange Trust Company, Inc. held money in trust for its clients.  Specifically, Benistar Property Exchange Trust Company, Inc. had Escrow Agreements with its clients, including plaintiffs, under which it agreed to hold its clients funds in escrow.

12.     Gerald Levine, one of the Merrill Lynch brokers who opened and managed the accounts for Benistar Property Exchange Trust Company, Inc. was informed by the President of Benistar and by an attorney for one of Benistar's clients that the funds in Benistar's accounts at Merrill Lynch belonged to Benistar's clients and were escrow funds that had to be returned on demand to Benistar's clients.

13.     The Merrill Lynch brokers who opened and managed the accounts for Benistar Property Exchange Trust Company, Inc. were informed in writing that the funds in Benistar's accounts at Merrill Lynch belonged to Benistar's clients and were escrow funds that had to be returned on demand to Benistars clients.

14.     The documents provided to Merrill Lynch included the Escrow Agreement used by Benistar to establish its contractual and fiduciary duties with its clients.

2

15.     The documents provided to Merrill Lynch included the Exchange Agreement that described in detail Benistar's contractual and fiduciary duties as an intermediary in accordance with Section 1031 of the Internal Revenue Code.

16.     As described in the Escrow and Exchange documents that were provided to Merrill Lynch, and as described to Gerald Levine in the conversations he had with Benistar's president and the attorney for one of Benistar's clients, Benistar served as an intermediary for Section 1031 transactions.

17.     Section 1031 of the Internal Revenue Code entitles taxpayers to defer capital gains taxes on the appreciation of commercial real estate by using the proceeds of a sale of such real estate to purchase like-kind property.

18.     The documents provided to Merrill Lynch explained that Benistar Property Exchange Trust Company held in escrow for its clients the proceeds of real estate sales made by its clients and that Benistar agreed to hold these funds in escrow pending its clients' need for those funds to acquire replacement property.

19.     Despite their knowledge that the money in the Benistar accounts belonged to Benistar's clients and was to be held in escrow, the Merrill Lynch brokers approved the Benistar accounts for highly speculative option trading.

20.     Benistar lost millions through the option trading and, despite demands by plaintiffs, failed to return approximately $8.7 million to plaintiffs.

21.     In 2001, plaintiffs sued Benistar and served a third party subpoena on Merrill Lynch seeking all documents relating to the Benistar accounts.

22.     Merrill Lynch did not produce the Benistar Escrow and Exchange Agreements or the correspondence between its broker and the attorney for one of Benistar's clients.

3

23.    Later in 2001, Merrill Lynch was added as a party in this Massachusetts litigation and plaintiffs served discovery requests on Merrill Lynch seeking all information and all documents relating to the Benistar accounts.

24.    Merrill Lynch did not produce the Benistar Escrow and Exchange Agreements or the correspondence between its broker and the attorney for one of Benistar's clients, nor did it identify these documents and communications.

25.    Merrill Lynch lied about its involvement with the Benistar accounts and destroyed, concealed and/or failed to produce the documents evidencing its participation with Benistar in the misuse of Benistar's clients' funds.

26.    Plaintiffs discovered the documents evidencing Merrill Lynch's participation with Benistar in the misuse of its clients' funds after Merrill Lynch's brokers testified under oath that they had no knowledge that the Benistar accounts contained other people's money.

27.    Despite the testimony by Merrill Lynch's brokers denying their knowledge of and participation with Benistar in the misuse of Benistar's clients' funds, a jury found Merrill Lynch liable for colluding with Benistar and found that Merrill had violated New York and Connecticut consumer protection statutes.

28.    A judgment entered on that verdict prior to the award of damages based on Merrill Lynch's violation of the New York and Connecticut consumer protection statutes. The present judgment has a value of more than $26,000,000.

29.    Merrill Lynch has persisted in its denial of liability despite the discovery by plaintiffs of the documents that Merrill Lynch destroyed, concealed and/or failed to produce and despite its own knowledge that the testimony provided at trial by its brokers was perjurious.

30.     Merrill has pursued litigation in an attempt to harass plaintiffs, to impose financial costs and emotional distress on the plaintiffs and to extort plaintiffs to settle for less then they are owed.

31.     As a result of the unfair and deceptive conduct described above, plaintiffs have suffered damages in the form of the attorneys' fees, the loss of use of money, tax liabilities, accountants' fees and emotional distress.

32.     Merrill's Lynch's Board of Director's has adopted *Merrill Lynch's Code of Ethics for Financial Professionals* and which states: "All financial professionals must . . .[e]ngage in and promote honest and ethical conduct . . . [and] act in good faith, responsibly, with due care, competence, prudence and diligence, without misrepresenting material facts or allowing one's independent judgment or decisions to be subordinated."

### COUNT I – UNFAIR AND DECEPTIVE ACTS PROHIBITED BY G.L. c. 93A

33.     Plaintiffs restate the allegations set forth in paragraphs 1-32 above and incorporate them by reference as though fully set forth herein.

34.     Merrill Lynch has willfully and knowingly engaged in unfair and deceptive conduct in violation of G.L. c. 93A.

35.     Plaintiffs have been injured by Merrill Lynch's willful and knowing engaged in unfair and deceptive conduct in violation of G.L. c. 93A.

36.     Plaintiffs are entitled to compensatory damages, punitive damages and attorneys fees based on Merrill Lynch's willful and knowing unfair and deceptive conduct.

### COUNT II - FRAUD

37.     Plaintiffs restate the allegations set forth in paragraphs 1-36 above and incorporate them by reference as though fully set forth herein.

38.     Merrill Lynch's willfully and knowingly engaging in unfair and deceptive conduct constitutes fraud.

39.     Plaintiffs have been injured by Merrill Lynch's fraudulent conduct.

40.     Plaintiffs are entitled to recover from Merrill Lynch the damages caused by Merrill Lynch's fraudulent conduct.

### COUNT III – MALICIOUS DEFENSE

41.     Plaintiffs restate the allegations set forth in paragraphs 1-40 above and incorporate them by reference as though fully set forth herein.

42.     In support of Merrill Lynch's defense to plaintiffs' claims based on its collusion with Benistar in the improper use of plaintiffs' escrow funds, Merrill Lynch created false material evidence and gave false testimony advancing such evidence.

43.     Plaintiffs have been injured by Merrill Lynch's malicious defense.

44.     Plaintiffs are entitled to recover from Merrill Lynch the damages caused by Merrill Lynch's malicious defense.

WHEREFORE, plaintiffs demand judgment against Merrill Lynch in an amount sufficient to compensate them for the injuries caused by Merrill Lynch, for punitive damages in the amount of three times the amount of the judgment on all claims arising out of the same and underlying transactions or occurrences, for costs and attorneys fees, and for all other relief the court may deem appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

JOSEPH IANTOSCA, Individually and as Trustee
of the Faxon Heights Apartments Realty Trust and
Fern Realty Trust, BELRIDGE CORPORATION,
GAIL A. CAHALY, JEFFREY M. JOHNSTON,
BELLEMORE ASSOCIATES, LLC, and
MASSACHUSETTS LUMBER COMPANY, INC.

By their attorneys,

Anthony R. Zelle, BBO No. 548141
**ZELLE MCDONOUGH LLP**
Four Longfellow Place, 35th Floor
Boston, MA 02114
Tel:  (617) 742-6520
Fax:  (617) 973-1562

William C. Nystrom, BBO No. 559656
Colleen C. Cook, BBO No. 636359
**NYSTROM BECKMAN & PARIS LLP**
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100

7

# EXHIBIT TWO

## JUDGE ROACH 2016 OPINION



636

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT
CONSOLIDATED CIVIL ACTION
NOS. 01-0116-BLS2; 01-299-BLS2;
01-0330-BLS2; 01-0581-BLS2; 01-3433-
BLS2; 01-4305-BLS2; 01-00075 (Norfolk
County)

GAIL A. CAHALY, et al.,

v.

BENISTAR PROPERTY EXCHANGE TRUST
COMPANY, INC., et al.

## MEMORANDUM OF FINDINGS AND RULINGS
## ON SANCTIONS REMAND

These consolidated actions represent litigation which is now a decade and one-half old.

Most recently, I held an evidentiary hearing on remand of the issue of sanctions against the law firm of Bingham McCutchen LLP (Bingham), for a decision made by Bingham partner John R. Snyder (Snyder) in 2002, to withhold from production in discovery in the underlying litigation a group of documents on the basis of the work product doctrine. A retired justice of this court, Stephen E. Neel, had previously held an eight-day evidentiary hearing on the same sanctions question back in 2010. Judge Neel issued a detailed memorandum of Findings and Rulings dated January 11, 2011 (the First Sanctions Decision).

Plaintiffs appealed the First Sanctions Decision, and in June, 2014, the Appeals Court vacated that portion of Judge Neel's final judgment which had entered judgment for Bingham on plaintiffs' motion for sanctions. The Appeals Court held Bingham "lacked an adequate basis, under the guise of the work product doctrine, for its decisions to withhold information that Merrill employees had viewed certain Benistar Web pages describing its business as an

1

intermediary for third-party funds and then to present a defense claiming that no Merrill

employee had viewed the very same Web pages." Cahaly v. Benistar Property Exchange Trust

Company, Inc., 85 Mass. App. Ct. 418, 419 (2014).[1]  The Appeals Court further ruled that

certain issues remained requiring resolution by a fact finder, and remanded the matter to this

session for further proceedings consistent with its opinion. Id., at 428-429.

**For all of the reasons discussed in this Memorandum, I find and rule that Snyder's**

**conduct is not sanctionable.  Were it sanctionable, I find the only actual loss Plaintiffs could**

**have sustained as a proximate result of Snyder's conduct is the amount of interim**

**uncompensated attorneys' fees accrued, which Plaintiffs themselves estimate to be**

**$750,000.**

### LEGAL STANDARD AND SCOPE OF REVIEW

The Appeals Court decision identified "two important qualifications to the work product

doctrine that bear directly on the facts of this case and were absent from [Judge Neel's] analysis"

-- the concept of a party's substantial need for the material sought in discovery; and the

distinction between fact and opinion work product for purposes of protection from disclosure.

---

[1]    The sanctions decision by the Appeals Court was the latest in a long series of reported and
unreported decisions in these matters which form the foundation on which I write. Then Superior Court Judge
Botsford presided over the first trial between the primary parties (Bingham was not an intervenor at that time) in
2002, and issued a memorandum of decision on the post-trial motion of defendant Merrill Lynch for judgment
notwithstanding the verdict, in February, 2003. 2003 Mass. Super. LEXIS 143 (February 25, 2003).  Judge
Botsford later granted the plaintiffs a new trial based on newly-discovered evidence unrelated to Bingham and the
documents at issue in these sanctions proceedings. 85 Mass. App. Ct. at 420 n. 6. That decision was affirmed by
both the Appeals Court, 68 Mass. App. Ct. 668, 673-676 (2007)(describing the import of the "Paley" and
"Patterson" evidence sources and potential), and the Supreme Judicial Court Cahaly v. Benistar Property Exch.
Trust Co., 451 Mass. 343 (2008). Neel, J. (ret.) presided over the re-trial in 2009, which also resulted in a jury
verdict for plaintiffs. In addition to the First Sanctions Decision referenced throughout the present Memorandum,
Judge Neel issued a memorandum and order for judgment on plaintiffs' claims for punitive and consequential
damages, following a bench trial on those issues. 2011 Mass. Super. LEXIS 8 (January 11, 2011). Finally, a
different judge of the Superior Court heard a separate action entitled Cahaly v. Boston Property Exchange Trust
Company, et al., Suffolk Superior Court, Civil Action No. 2014-00530-D, brought to reach and apply settlement
funds. Memorandum of Decision and Order of February 24, 2015 (Locke, J.). That action has recently been
resolved. Civil Action No. 2014-00530-D Docket, at Papers 82-84.

85 Mass. App. Ct. at 425, citing <u>Commissioner of Rev. v. Comcast Corp.</u>, 453 Mass. 293, 314

(2009). The court concluded that based on these two qualifications, Snyder lacked an adequate

basis in law to support his decision to withhold certain facts reflected within the so-called Malia

file, namely that Malia visited the section 1031 pages on the Benistar Web site on September 20,

2000, and then sent those pages by fax to Rasmussen. <u>Id.</u>, at 426. It went on to state:

> "We are also of the view that Snyder's persistence in pursuing a defense that included
> Merrill's lack of knowledge of the nature of Benistar's business and the section 1031
> Web site pages calls into question his good faith. Accordingly the judge's ultimate
> finding that Snyder acted reasonably and in good faith in withholding critical documents
> as work product must be reassessed in light of the legal principles we have set out here.
> Nevertheless, reasonableness and good faith are determinations we leave to the fact
> finder, who is in a better position to assess the credibility of witnesses and to weigh the
> evidence, in the context of the applicable law."

<u>Id.</u>, at 428. The Appeals Court decision then briefly addressed potential authority for imposition

of the sanctions the plaintiffs seek – the inherent power of the trial court; Mass. R. Civ.P. 11; and

Mass.R.Civ.P. 37 – but again deferred to the proceedings on remand to determine whether

sanctions are warranted on any such grounds. <u>Id.</u>, at 428-29.

The Appeals Court decision relied primarily on <u>Comcast</u>, decided in March, 2009, and

<u>McCarthy v. Slade Assocs.</u>, 463 Mass. 181 (2012), decided August, 2012, as the clearest and

most recent articulations of Massachusetts work product doctrine. The parties do not now

attempt to dispute that substantial need, and the distinction between fact and opinion work

product,[2] should explicitly factor into a court's decision about Snyder's actions and state of

mind. Rather, they each cite various authorities which they believe shed light on the components

Snyder should have been considering in 2002 when he assessed the Malia file, and the Merrill

---

[2]     The burden is on the withholding party to demonstrate the type of work product involved, and
ordinary or fact work product receives "far less protection" than opinion work product. Fact work product may be
ordered upon a showing that the party seeking discovery has substantial need of the material and that it is unable
without undue hardship to obtain the substantial equivalent of the material by other means. That showing becomes
the burden of the requesting party, that is, the burden shifts. <u>Comcast</u>, 453 Mass. at 314-315.

3

Add. 12

Exercising the discretion accorded the trial court by the Appeals Court decision, 85 Mass. App. Ct. at 430, n. 16, I determined to consider certain identified factual findings made by Judge Neel which I believe went to Snyder's state of mind during the relevant timeframes, but not others which I believe did not do so. I also agreed to hear additional testimony on the "two important qualifications to the work product doctrine" identified by the Appeals Court, id., and declined to hear evidence on matters listed in Judge Neel's opinion as "Rulings of Law." Rather, I ordered that any issues of law which the parties wished me to consider were to be included in their Joint PreTrial Memorandum. Docket at Paper 628, endorsement of 4/15/2015.

Other Evidentiary Rulings

Second, Bingham filed an Omnibus Motion in Limine seeking exclusion from the hearing of four categories of material. Docket, Paper 629. Pursuant to the Omnibus Motion, the testimony of one non-party witness proffered with respect to the effect of Bingham's actions on settlement was excluded; the testimony of a party witness on a similar topic was admitted. That portion of the motion which sought to exclude more generally evidence of damages allegedly caused to the plaintiffs by Snyder's actions was denied; and the portion of the Motion seeking to exclude two letters between NASD and Merrill Lynch was taken de bene. Id., at endorsement of 4/23/2015. Following hearing the two letters were admitted for whatever probative value they may hold as to Snyder's state of mind during the period 2002-2003. Id., at endorsement of 5/6/2015.

Scope of this Record

Third, given the discretion articulated by the Appeals Court decision, it was of some concern to this court that the parties acknowledge the record (beyond our in-court evidentiary hearing proceedings) on which this decision on remand was to be based. Unfortunately the

7

that were. I have considered Bingham's objections to these exhibits[6] and find them

unpersuasive. The additional exhibits proffered by plaintiffs are admitted

## PRELIMINARY FINDINGS OF MATERIAL FACT

All of the below-enumerated Findings of Fact represent findings by the court, including

but not limited to determinations of the credibility, weight, and probative value of the evidence

adduced at hearing before me May 4-7, 2015, and reasonable inferences drawn from that

evidence, as well as stipulations by the parties, and the prior record and judicial opinions

identified. The Preliminary Findings focus on each set of decisions made by Snyder (and

identified by the Appeals Court) which plaintiffs argue are sanctionable.

### Merrill Lynch Retains Bingham in Connection with Benistar Litigation (June 2001)

For purposes of these preliminary historical facts I concur with Judge Neel's findings

contained at pages 3-4 of the First Sanctions Decision, including his findings that Stern, Levine,

Rasmussen and Tabbah "each told Snyder that he did not know that the money in Benistar's

accounts belonged to third parties; that on September 20, 2000, trading in the account was

restricted to closing positions only, because of Benistar's trading strategy and losses rather than

any concern about the presence of third-party money in the accounts; and that he had not visited

the section 1031 pages of the Benistar website." More specifically, I find as follows based on

the hearing before me:

### Snyder's Interviews of Merrill Employees (July 2001–February 2002)

1.      Between July 13, 2001 and February 4, 2002, Snyder interviewed key employees

at Merrill's Fifth Avenue branch in New York which handled the Benistar accounts: Gary Stern

---

[6]      Contained in Bingham McCutchen's Statement Regarding the Scope of the Record, filed July 15,
2015.

and Gerald Levine, who were brokers and Daniel Carpenter's primary contacts; Thomas

Rasmussen, the administrative manager; and Hassan Tabbah, the branch manager.  Snyder also

spoke with Jennifer Waddington, a member of the surveillance group within the compliance

department.  Sanctions Hr'g Tr. vol. 1, 19:13-20:3, 22:4-23:6, 54:4-15; Ex. R-1005 at

Bingham/FH 00059-62 (July 13, 2001 conversation with Stern), 00045-46 (August 9, 2001

conversation with Levine), 00063-64 (October 16, 2001 conversation with Stern), 00093-94

(November 1, 2001 conversation with Tabbah), 00101-102 (November 8, 2001 conversation

with Waddington), 00095-96 (February 4, 2002 conversation with Tabbah), 00047-53 (February

4, 2002 conversation with Levine); Ex. R-1006 at Bingham/FH 00959 (November 5, 2001

conversation with Rasmussen).

    2.      Merrill's in-house legal department as led by Pash on the Benistar matter played a

more active role than that of many clients Snyder had worked with.  Sanctions Hr'g Tr. vol. 1,

87:5-88:17.  Snyder's interviews of Merrill employees were arranged by Pash.  Snyder would not

call an employee himself unless Pash had previously alerted the employee, and identified who

Snyder was and what his purpose would be.  Pash also personally participated in many of the

interviews.  Id., Hr'g Tr. vol. 1, 88:4-17.

    3.      Before January 2002, when the first group of plaintiffs was permitted to bring

damages claims against Merrill, Snyder interviewed Stern, Levine, Rasmussen, and Waddington.

Ex. R-A; RSF ¶ 16.  All consistently gave the same explanation for why Merrill had restricted

Benistar's trading, that is, that Benistar had suffered losses due to its unsuccessful trading

strategy and Carpenter refused to change his strategy.  Sanctions Hr'g Tr. vol. 1, 23:19-22,

24:11-25:15.  Stern was deposed in October and November 2001, and gave the same explanation

under oath.  Id., at 25:17-24; Ex. R-A.  Snyder spoke with Tabbah in February 2002, when there

were damages claims pending against Merrill. Tabbah told Snyder that the account was

restricted because of Benistar's losses and Carpenter's refusal to change his strategy, and when

Tabbah and Levine were deposed later in February each gave this same explanation for

restricting Benistar's trading. Sanctions Hr'g Tr. vol. 1, 23:19-22, 24:11-25:24.

4.      Stern, Levine, Tabbah, Rasmussen, and Waddington all told Snyder that they

understood in 2000 that the money in Benistar's account belonged to Carpenter or one of

Carpenter's companies, and were not aware that the account contained third-party money. Id., at

26:8-27:1; Ex. R-1005 at Bingham/FH 00059 (Stern believed money in Benistar account

belonged to Benistar), 00045-46 (Levine believed the funds to be "strictly corporate money"),

00049 (Levine believed funds to belong to Carpenter), 00102 (Waddington saw no indication of

third-party money).

**Responses to Written Discovery (June 2002)**

For purposes of these foundational facts surrounding Snyder's role in Merrill's responses

to discovery, I concur with Judge Neel's findings contained at page 6 of the First Sanctions

Decision, including the foundational finding that Snyder's "investigation lead him to believe"

"that Moya's involvement was after the fact and not sufficiently informed to constitute either a

statement of, or the fact of, the requisite 'knowledge' on Merrill's behalf." I reserve the question

of good faith for discussion below. More specifically, I find as follows based on the hearing

before me:

5.      The Iantosca plaintiffs had moved to amend their complaint and add damages

claims against Merrill in August 2001. Sanctions Hr'g Tr. vol. 1, 118:20-119:1. At that point,

the deadline for discovery was already set for November 30, 2001. Id., at 119:2-13. While their

motion to amend was pending, the Iantosca plaintiffs served interrogatories and document

in order to avoid waiving the privilege or work product protection, should those materials prove to have refreshed the witness's recollection. Sanctions Hr'g Tr. vol. 2, 31:14-34:15.

55.    Snyder did show each of Stern, Levine, Tabbah, and Rasmussen a copy of the section 1031 page of the Benistar website, because plaintiffs had disclosed it as a trial exhibit, so Snyder expected plaintiffs' trial counsel to examine them about it. Sanctions Hr'g Tr. vol. 2, 34:16-35:9. Each witness again told Snyder he had never seen the page. Id., vol. 2, 35:10-19.

56.    In preparing Rasmussen, Snyder asked Rasmussen whether he had ever received a copy of the 1031 page from anyone, and in particular whether he recalled receiving a fax from Malia concerning the website. Rasmussen told Snyder that he had no recollection of that. Id., vol. 2, 35:20-36:6.

57.    At the 2002 trial, Tabbah testified he did not know the money in the account belonged to third parties. He also testified that the trading in the account was restricted to closing positions only because of Benistar's trading strategy and losses, not because of any concern about the presence of third-party money in the account. RSF ¶ 157; Ex. R-1158.05 at 179:18-22.

58.    Levine likewise testified he did not know the money in the account belonged to third parties, and did not learn that Benistar acted as an intermediary or escrow agent until January 2001, after the accounts had left Merrill. Levine testified Carpenter told him that the account contained corporate money and Carpenter's own assets. Levine further testified he had not visited the § 1031 page of the Benistar website during the time the Benistar accounts were at Merrill. Levine also testified to concern with Carpenter's risky trading strategy and his efforts to get Carpenter to change his strategy. RSF ¶ 172; Ex. R-1158.07 at 114:21-115:6;132:13-133:3;138:8-139:17.

59.     Stern testified at trial he did not know the money in the account belonged to third parties, and did not learn that Benistar acted as an intermediary or escrow agent until he had a conversation with Mitchell Rock at PaineWebber in January 2001, after the accounts had left Merrill. Ex. R-1158.08 at 168:23-169:3, 172:9-21. Stern did not know what an intermediary account was, or what a 1031 exchange was, until 2001. Ex. R-1158.08 at 171:16-18, 176:6-13. Stern testified to his own concern with Carpenter's risky trading strategy and his efforts to get Carpenter to change his strategy. Ex. R-1158.08 at 188:14-191:17.

60.     Snyder asked Rasmussen at the 2002 trial whether he knew in 2000 that Benistar acted as third-party intermediary or escrow agent holding other people's money, and Rasmussen testified that he did not. Rasmussen also testified at trial that he had never visited the Benistar website before the accounts were transferred, and never thought to do so. Rasmussen further testified the account was restricted to closing transactions because Carpenter's aggressive trading strategy was generating too many losses. 85 Mass. App. Ct. at 423; Ex. R-1158.11 at 24:7-25:11; 41:9-13; Ex. R-1158.11; Sanctions Hr'g vol. 2, 39:1-8.

61.     Snyder has since testified he lacked any knowledge that Rasmussen's testimony on this point was false. To the contrary, Snyder believed this testimony was true, and therefore did not think he had any obligation to correct it. Sanctions Hr'g vol. 2, 39:22-40:1, 40:5-6.

62.     In his closing argument at trial, Snyder stated: "The Merrill Lynch people did not know that they were knowingly assisting and did not know that the funds belonged to third parties, and they did not knowingly assist Carpenter in wrongdoing." 85 Mass. App. Ct. at 423; Ex. R-1158.12 at 112:21-24.

63.     Snyder has since testified that, by the "[t]he Merrill Lynch people," he was referring to the trial witnesses named in the preceding sentence of his closing:

> Rather, as the Court will soon instruct you, the standard by which the actions of
> Mr. Levine, Mr. Rasmussen, Mr. Stern must be judged and the determination you
> must make with respect to the claims against Merrill Lynch is whether they
> actually knew the money in the BENISTAR accounts belonged to persons other
> than BENISTAR or Carpenter, whether they actually knew the actions Carpenter
> took with respect to those funds that were wrongful, and whether they knowingly
> assisted Carpenter in taking those wrongful actions.

Ex. R-1158.12 at 112:10-20; Sanctions Hr'g, vol. 2, 42:10-43:4.

64.     Snyder further stated, in closing, "All these witnesses have said they did not know

what a 1031 exchange was at the time. There was no reason for them to say, oh, there's what

we want, a 1031 exchange and to go to that button, or to think even, that 1031 exchange was

some sort of an indication that something was amiss." 85 Mass. App. Ct. at 423; Ex. R-1158.12

at 124:18-23.

65.     Snyder later stated in a brief, and testified, that his reference to "[a]ll these

witnesses" referred to Merrill's employee witnesses at the trial: Stern, Levine, Rasmussen,

Tabbah, and Duffy. Sanctions Hr'g, vol. 2, 44:8-13; Ex. R-1115 at 9.

**Post-Trial Pleadings (December 2002-2008)[9]**

66.     Plaintiffs won a jury verdict for $8.6 million in the 2002 Trial. Sanctions Hr'g,

vol. 2, 44:14-20. Merrill filed a motion for judgment notwithstanding the verdict. The motion

was restricted to the evidence at trial and the law, as Snyder understood it must be. Id., vol. 2,

48:20-49:5.

67.     The primary argument in Merrill's brief was that Plaintiffs had not presented

sufficient evidence of Merrill's actual knowledge of Benistar's wrongdoing, nor of Merrill's

substantial assistance in that wrongdoing. Sanctions Hr'g vol. 2, 44:21-45:8, 46:11-47:17. First,

Merrill stated: "Plaintiffs, however did not present even a scintilla of evidence that Merrill

---

[9]     Judge Neel did not address these post-trial pleadings in the First Sanctions Decision.

Lynch, even if it knew that Daniel Carpenter was trading with third party funds, knew that such trading constituted conversion or breach of duty. In fact it is undisputed that Merrill Lynch never had any knowledge of the agreements between the Plaintiffs and Benistar." Merrill's brief went on to state that, on the subject of knowledge, "Plaintiffs have failed even to present sufficient evidence to support a reasonable inference that Merrill Lynch knew that the Benistar accounts contained third party funds." 85 Mass. App. Ct. at 423; Ex. R-1115 at 7-8.

68.     Snyder testified he believed this statement was true and reflected the state of evidence at trial. Sanctions Hr'g vol. 2, 47:21-48:7. Snyder testified that, even had the Malia file been admitted, he believed the statement would still be true, because Malia had told Snyder that after viewing the website he did not know the Benistar accounts contained third-party funds. Id., vol. 2, 48:8-19. Judge Botsford granted the JNOV in February, 2003, ultimately resulting in the 2009 trial.

69.     As the case was appealed to the Appeals Court and then the Supreme Judicial Court, Snyder continued to make arguments substantially identical to those made in the trial court. Sanctions Hr'g vol. 2, 49:6-14. Snyder testified he made these arguments on appeal because appellate argument was limited to the record, and the arguments were consistent with the evidence in the record. Snyder further testified he believed these arguments were not contradicted by any evidence, including the contents of the Malia file. Id., vol. 2, 49:15-23.

**Merrill's Letters to NASD (February-March 2003)**

As discussed above, unlike Judge Neel, I admitted as evidence in the hearing before me two letters with which Snyder was involved on behalf of Merrill in 2003, for whatever additional probative value they might shed on his state of mind in 2002-2003. With respect to these letters, I find as follows:

29

70.    Snyder assisted Merrill in responding to a request from the NASD for information and documents concerning the Benistar accounts. Sanctions Hr'g vol. 2, 113:4-8, 113:16-114:5. Although he remembers participating in the response, Snyder does not recall who wrote what language in the letter Merrill sent to the NASD in February, 2003, prior to the court's decision on the JNOV. Id., vol. 2, 119:6-19. Snyder reviewed at least one draft of the letter, but perhaps not the final version. Id., 19:21-23.

71.    The letter stated that no Merrill employee had learned the funds in the accounts were being held by Benistar as a third-party intermediary or as escrowed funds, and that Merrill had located no documentation indicating that anyone at Merrill knew so. Snyder testified this continued to be his understanding as of February and March of 2003. Id., vol. 2, 123:3-9, 124:13-125:1; Ex. R-1022 at 5.[10]

72.    In Snyder's view, no Merrill employee had "learned" or "knew" that the Benistar accounts contained third-party money, even if the Malia file contained some documents indicating that Benistar acted as a third-party intermediary. Merrill did not invoke the work product doctrine in this letter, and the signatory of the letter was unaware of the Malia file. Id., vol. 2, 125:4-10.

**Discovery of Additional Branch File Documents (2009)[11]**

73.    On February 25, 2009, prior to the 2009 trial, Snyder learned that additional documents had been discovered in the Merrill Lynch Fifth Avenue branch. Sanctions Hr'g Tr. vol. 4, 73:15:19.

---

[10]    The second letter is dated after the court's February 23, 2003 decision on the JNOV, and sets forth the basis for that decision in some detail. Ex. R-1023.

[11]    Judge Neel found that Snyder acted in good faith in 2009 following discovery of the branch file. First Sanctions Decision at page 7. I reserve conclusions in this remand decision on Snyder's state of mind for discussion below.

30

78.     By March 3, 2009, Snyder had informed Dickstein Shapiro and Merrill's in-house

lawyer that he had found the Malia file and that it had been withheld in 2002 as work product

and privileged. Id., vol. 4, 77:13-81:7. Snyder recalls speaking with Robert Higgins of

Dickstein Shapiro and John Bevilacqua, in-house counsel at Merrill, about the file and associated

events. Id., vol. 4, 77:13-78:5. Snyder's notes reflect a March 3, 2009 conversation with

Bevilacqua and Ralph Cursio, a more senior member of Merrill's legal department, in which

Snyder explained that no privilege logs had been created in 2002 to reflect documents withheld

from production. Sanctions Hr'g Tr. vol. 4, 79:20-80:24; Ex. R-1006 at Bingham/FH 03353.

79.     Snyder testified before me that, when he re-reviewed the September 20, 2000 fax

coversheet from Malia to Rasmussen (including website pages) in 2009, he understood its

potential significance to the case.[12] Nonetheless, Snyder's memory remained that Rasmussen

consistently told Snyder he did not remember receiving those materials. Sanctions Hr'g, vol. 3 at

42:18-43:18.

**Plaintiffs' Alleged Losses and Recoveries to Date**

80.     Plaintiffs originally alleged they lost $8.6 million in investments held by Benistar.

They received $12,487 million in settlement with Paine Webber in mid-2008, an amount which

equaled their original loss plus interest. Sanctions Hr'g, Tr. Vol. 4, 113:21-23-114:10; 124:15-

24. Plaintiffs have also received $113,543.76 from a Benistar bank account, and $150,000 from

settlement with Martin Paley. 2011 Mass. Super. LEXIS 8, at 47-48.

81.     Following the 2009 jury trial, judgment entered in favor of Plaintiffs and against

Merrill for compensatory and consequential damages of approximately $9.7 million, plus

statutory interest, less the pro rata amount that each plaintiff had received from the Paine Webber

---

[12]     Plaintiffs have their own interpretation of this significance (see, e.g., Plaintiffs' Proposed Findings
at para. 257), which Snyder does not necessarily share.

100.   Professor Moore also discussed, however, the underlying rationale for the distinction between fact and opinion work product. As testified by Professor Moore, the non-opinion fact "hidden" in the Malia file was that potentially one or more "Merrill people" visited the Benistar website, including the section 1031 pages, during the relevant time period of September, 2000. 2010 Transcript, at 184: 5-19. This portion of her opinion is more compelling and in keeping with my understanding of the state of Massachusetts law in 2002 when Snyder was making his judgments.

101.   Snyder acknowledged in the Sanctions Hearing before me that the fact that Malia went to the website, and the fact that Malia may have had thoughts about Benistar's business while he was there, could be distinguishable. Snyder admitted he did not analyze these two acts (the visit and the thought process) differently at the time of his work product determination in 2002, because he believed Malia's very act of going to the website itself reflected a protected thought process. Snyder also admits the visit to the website "could have had a bearing" on other evidence that was admitted at trial. Sanctions Hearing Testimony.

**Ultimate Findings**

102.   I find Snyder reasonably believed Rasmussen's testimony was true, and that the Malia file, even though it contained a fax indicating that Malia sent Rasmussen a copy of the 1031 page on September 20, 2000, did not undermine the reasonableness of Snyder's belief. Hr'g Tr. vol. 2, 37:18-38:24. The basis for Snyder's belief was threefold. First, Rasmussen had consistently told Snyder that he had no recollection of seeing the website page. Second, the file maintained at the Fifth Avenue branch (where Rasmussen worked, and where Snyder expected that fax would be if Rasmussen had received it) as reviewed by Snyder in 2002, did not contain a "received" copy of Malia's fax. Third, in September 2000, when the fax was sent, Rasmussen

39

was in the process of moving to a new position in New Jersey and was spending only part of his time in the Fifth Avenue office. Hr'g Tr. vol. 2, 37:18-38:24.

103.    As discussed above, I find Snyder did not "hide" Malia as a player in the sequence of events leading to restriction of the Benistar accounts. To the contrary, Merrill's 2002 responses to interrogatories identified Malia as a person with knowledge of the reasons for the restrictions.

104.    I find Snyder made the statements in the pre-trial Memorandum in good faith, based on his conversations with Merrill witnesses and their expected testimony. Hr'g Tr. vol. 2, 10:20-12:13. The Merrill witnesses Snyder expected he would call—Stern, Levine, Rasmussen, Tabbah, and Duffy—consistently told Snyder they had not known, prior to the transfer of the accounts, that the accounts held third-party money. In fact, they believed the money was Benistar's or Carpenter's; and Snyder reasonably expected them to testify to that effect. Hr'g Tr. vol. 2, 11:19-12:13, 26:4-28:11, 29:2-24. Even if Merrill had called Malia, neither his testimony during the relevant time period in 2002, nor the presence of Malia file itself would have undermined Snyder's belief. This is because at the time of the 2002 trial Malia did not possess, and the Malia file did not reflect, actual knowledge that the Benistar accounts held third-party money, but at best only a suspicion that they might have done so. Hr'g Tr. vol. 2, 11:19-12:13.

105.    I find Snyder and Merrill acted on a good faith basis in relying on the work product doctrine to withhold the fact of Malia's September 20, 2000 visit to the Benistar website from Merrill's answer to interrogatory no. 7. Hr'g Tr. vol. 2, 7:3-8:6. Snyder understood the work product doctrine could protect both facts and opinions, and credibly believed at the time that the particular fact that Malia visited the Benistar website would tend to reveal Malia's

thoughts and mental impressions regarding his concern that Carpenter and Benistar could "come back to bite" Merrill. Hr'g Tr. vol. 2, 7:19-8:6; Ex. R-1005 at Bingham/FH 00011.

106.   I disagree with Plaintiffs' contention that there was "no evidence" that "Malia subjectively believed that litigation was a real possibility and that the prospect of litigation was the reason he created or obtained the documents." Plaintiffs' Proposed Rulings of Law, at page 4. To the contrary, I credit Snyder's testimony that Malia expressed these very sentiments to Snyder in more than one of their interviews together.

107.   Nor does the evidence before me support Plaintiffs' proposition that: "It is also undisputed that Malia's reaction to seeing the website was not to refer the matter to Merrill Lynch's litigation department, but rather to contact Rasmussen to instruct him to restrict the account." Plaintiffs' Proposed Rulings of Law at page 5. Again, I credit Snyder's testimony that Malia's interviews with Snyder (and the Malia file) supported the reasonable belief that Malia did not visit the website until after he instructed Rasmussen to restrict the account.

108.   In short, I find on the record before me that Bingham's characterization of the facts is more accurate; Malia presented "competing narratives" about his thoughts and actions during the relevant time period. I agree with Judge Neel's findings in this regard, that is, "that while Malia's accounts of the sequence of events was not consistent in his conversations with Snyder, he consistently stated to Snyder that his decision to restrict trading in Benistar's account was based on Benistar's losses and trading strategy." First Sanctions Decision at page 6. [15]

109.   I find Snyder took reasonable and good faith steps to arrive at his work product judgments, as reflected in his testimony, his notes, and Renehan's expert opinion. Hr'g Tr. vol. 1, 29:1-76:18; Ex. R-2003 at 69:3-71:22. Once this die was cast, it was reasonable for Snyder to

---

[15]   It is nonetheless undisputed Malia testified in 2009 that he restricted the account in part because of a concern that Benistar was trading other people's money. Bingham's Proposed Findings at para. 144.

41

been useful in cross-examining the Merrill witnesses."). That in turn would have (and did) lead

to the admissibility of the Benistar website pages which Malia viewed providing additional

circumstantial evidence at the 2009 retrial that was not available in the 2002 trial. However, I

cannot accept the multiple pages of speculation offered by plaintiffs regarding Malia's (and

Rasmussen's) "likely testimony if he testified in 2002." Plaintiffs' Proposed Findings of Fact, at

paras. 297-308.

At Plaintiffs' Proposed Findings of Fact, para. 265, they state: "It is impossible to

reconstruct what would have happened if Bingham had not acted without legal justification in

withholding critical evidence." I agree with the first five words of this sentence, that is, it is

impossible to reconstruct. Notwithstanding that impossibility, plaintiffs continually within that

same pleading make reconstructive pronouncements. At their Proposed Findings of Fact, para.

37, plaintiffs state: "But for Bingham's willful, knowing and unfair and deceptive conduct, this

court would not have granted Merrill Lynch's motion for judgment notwithstanding the verdict

in 2003." Similarly, at Plaintiffs' Proposed Findings of Fact, para.

287 it is stated: "Since the documents concealed by Bingham would have been produced

more than a year after Merrill Lynch was obligated to produce them, this Court would likely

have rejected Merrill Lynch's argument that it was too late for plaintiffs to seek additional

discovery based on Merrrill Lynch's seriously delinquent production and the significance of the

documents produced." I find no evidence on this record to support either of these speculations.

Perhaps the piece de resistance is this: "Because it is impossible to know whether

plaintiffs and Merrill Lynch would have reached a settlement agreement in 2002, Bingham's

misconduct may have been the sole basis for the past thirteen years of litigation in this case.

Bingham certainly caused the expenditure of substantial resources of the parties and the

47

Commonwealth which could have been far better spent." Plaintiffs' Proposed Rulings of Law at page 21 (emphasis supplied). I daresay no seasoned trial or appellate judge who has touched this case could agree that all of the now fifteen years of litigation is to be blamed solely on the conduct of Bingham, and I respectfully decline to so find or rule.

## Plaintiffs' Losses

I am of course sympathetic to the notion that plaintiffs may have been subjected unnecessarily to particular litigation risks as a result of Snyder's decisions to withhold the Malia file. Nonetheless, the difficulties with this argument are at least threefold. First, the record is clear that none of the risks identified by the Plaintiffs in their sanctions pleadings actually came to pass.[17] Second, plaintiffs acknowledge, as they must, that "they did eventually recover sums more substantial than Merrill Lynch would have offered in 2002 even if the additional evidence had been produced to plaintiffs at that time." Plaintiffs' Proposed Findings of Fact, at page 72, note 16. And third, as described above, the argument persists in glossing over the multiple inferences which would have been necessary for plaintiffs to arrive at proof of the "actual knowledge" standard first articulated by Judge Botsford in her 2003 JNOV opinion, and affirmed by our appellate courts.[18]

---

[17] These alleged risks are referenced at various points throughout plaintiffs' pleadings, but perhaps most directly and succinctly at Proposed Finding of Fact para. 268 (risk of losing their claims on summary judgment; risk of settling unfairly low prior to the 2002 trial; loss of an "opportunity to settle for the fair value of their claims in 2002"; the risk of a jury verdict for Merrill in 2002; the granting of the JNOV in 2003; and the risks associated with the new trial process beginning in 2004.)

[18] In their pre-hearing filings plaintiffs sketched out three theories of loss. The first was that the judgment entered by Judge Neel in 2009 accounted for the $12.5M plaintiffs recovered in 2008 as assignees of Benistar, whereas a hypothetical judgment entered in 2002 or 2003 would not have been so reduced. A second, related theory is that this "set off" should have/could have been applied to a punitive damages award, rather than the compensatory damages award. Plaintiffs also argued a court "would likely have awarded a very substantial punitive damages award" in 2002 had plaintiffs had access to additional evidence. Lastly, they suggest that, but for Snyder's work product judgment, the litigation would have ended long ago. Docket, at Paper 632. I am unable to accept any of these theories, finding as I do that they are pure speculation, unsupported by anything in the record before me.

48