# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL E. CARPENTER ) <br> Petitioner, ) <br> v. ) <br> ) <br> UNITED STATES OF AMERICA ) <br> Respondent. ) | CRIMINAL NO. 04-10029-GAO |

## EMERGENCY MOTION PETITION FOR A WRIT OF CORAM NOBIS

NOW COMES THE PETITIONER, Daniel E. Carpenter (hereinafter Petitioner, Mr. Carpenter, Defendant, I, and Me), to respectfully beseech this Court to issue a Writ of Coram Nobis to vacate his 2014 conviction based on alleged criminal conduct from 1998-2000. The Emergency nature of this Petition is the fact that Mr. Carpenter is to be sentenced in Connecticut on June 27, 2018 for unrelated alleged criminal conduct between 2007 and 2009. Despite the fact that he is innocent of both alleged crimes, he is now facing sentencing based on a Criminal History of II unless this Honorable Court vacates his prior conviction in this Court. Unlike the recent coram nobis decisions by the First Circuit in *United States v. Williams*, 858 F.3d 708 (1st Cir. 2017) and *United States v. Castro-Taveras*, 841 F.3d 34 (1st Cir. 2017), along with the famous decision in *United States v. George*, 676 F.3d 249 (1st Cir. 2012), Mr. Carpenter did not plead guilty nor does he need to explain why he did not seek prior relief as his previously-filed 2255 Petition has been pending with this Court for three years since May of 2015. There are also a dozen other motions since 2014 that are pending with this Court, which Mr. Carpenter incorporates by reference:

| 477 | Motion for Reconsideration re Order on Motion for Forfeiture | 6/3/2014 |
|---|---|---|
| 496 | Motion to Vacate (2255) | 5/18/2015 |
| 499 | Motion to Amend Judgment & Commitment Order | 6/1/2015 |
| 502 | Motion for Reconsideration | 6/15/2015 |

1

| 503 | Motion to Amend 2255 | 7/6/2015 |
|---|---|---|
| 505 | Motion for Summary Judgment as to Daniel E. Carpenter. | 7/31/2015 |
| 541 | Motion for Reconsideration re [500] Order on Motion to Dismiss as to Daniel E. Carpenter. | 4/1/2016 |
| 545 | Motion for New Trial Pursuant to Rule 33. | 5/20/2016 |
| 556 | Renewed MFR of Forfeiture Order & Rule 29 Denial | 11/27/2017 |
| 555/557 | Renewed Motion for Summary Judgment Pursuant to 2255 | 11/27/2017 |
| 559/560 | Motion to Dismiss Due Process & STA Violations | 12/14/2017 |
| 561 | Motion to Vacate Pursuant to Brady, Jencks, Bagley, Giglio, and Napue, and the use of Perjury and False Evidence | 12/21/2017 |

## PRELIMINARY STATEMENT

In *Castro-Taveras*, the First Circuit reversed the District Court's denial of a writ of coram nobis and concluded that the petitioner in that case had satisfied the three requirements necessary for the extraordinary relief of coram nobis citing *George* that a petitioner must "1) explain h[is] failure to seek relief from judgment earlier, 2) demonstrate continuing collateral consequences from the conviction, and 3) prove that the error is fundamental to the validity of the judgment." *George* at 252-53. In a similar case involving the potential deportation or citizenship rights of the petitioner in *Williams*, the First Circuit ruled that a claim of Ineffective Assistance of Counsel was clearly a "rock upon which a petitioner can build her coram nobis church." *Williams* at 3, *citing Castro-Taveras* at 36–37, 52–53.

In Mr. Carpenter's case, he has of number of "rock-solid" pillars upon which to build his "coram nobis church" including claims of Lack of Jurisdiction, Improper Venue, Constructive Amendment of the Indictment, Due Process Delay, *Brady-Giglio-Bagley-Napue* claims, and Speedy Trial constitutional violations along with more serious Ineffective Assistance of Counsel claims than those which resulted in the petitioner in *Castro-Taveras* getting his writ of coram nobis granted. Suffice it to say, if the claim of Ineffective Assistance of Counsel in *Castro-Taveras* was of the most "fundamental character...such as to render the proceeding itself irregular and invalid..." *Williams* at 4, *quoting Murray v. United States*, 704 F.3d 23, 28 (1st Cir.

2013) and *citing United States v. Mayer*, 235 U.S. 55, 69 (1914), then Mr. Carpenter has more than enough proof that his 18 year-long ordeal is filled with a dozen constitutional and fundamental errors, any one of which is capable of rendering his conviction irregular and invalid.

## ARGUMENT

### I.   MR. CARPENTER IS ENTITLED TO CORAM NOBIS RELIEF

Pursuant to the All Writs Act, 28 U.S.C. §1651(a), a district court is authorized to grant the common law writ of error coram nobis. ("The Supreme Court and all courts established by an Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions agreeable to the usages and principles of law."); *United States v. Morgan*, 346 U.S. 502, 511 (1954) (holding that the enactment of 28 U.S.C. §2255 did not supersede the availability of writ of coram nobis). The writ is available as a "remedy of last resort for petitioners who are no longer in custody pursuant to a criminal conviction and therefore cannot pursue direct review or collateral relief by means of a writ of habeas corpus." *Fleming v. United States*, 146 F.3d 88, 89-90 (2d Cir. 1998). The writ is issued "to correct errors of fact unknown to the court at the time of the judgment, without fault of the defendant, which, if known, would probably have prevented the judgment." *Morgan* at 516.

In deciding whether to grant the writ, courts have used a three-part test: a petitioner must 1) explain his failure to seek relief from judgment earlier; 2) demonstrate continuing collateral consequences from the conviction; and 3) prove that the error is fundamental to the validity of the judgment. *See United States v. Sawyer (Sawyer II)*, 239 F.3d 31, 38 (1st Cir. 2001); *United States v. Barrett*, 178 F.3d 34, 56, n. 20 (1st Cir. 1999); *United States v. Hager*, 993 F.2d 4, 5 (1st Cir. 1993); *see also United States v. Mandanici*, 205 F.3d 519, 524 (2d Cir. 2000).   In *Sawyer II*, the court assumed, without deciding, that coram nobis was available to vacate a

criminal conviction premised upon a fundamental error of law. *Sawyer II* at 38.   In citing Sir

Thomas More's famous speech from Robert Bolt, "A Man For All Seasons" Act II, 89 that "[t]he

law is a causeway upon which, so long as he keeps to it, a citizen may walk safely" *United States*

*v. Brown*, 79 F.3d 1550, 1562 (11th Cir. 1996), the Eleventh Circuit observed that "the idea that

practical jokes are federal felonies would make a joke of the Supreme Court's assurance that

§1341 does not cover the waterfront of deceit." *Id.*

> "To be free of tyranny in a free country, the causeway's edges must be clearly marked.
> The exercise of federal government power to criminalize conduct and thereby to coerce
> and to deprive persons, by government action, of their liberty, reputation and property
> must be watched carefully in a country that values the liberties of its private citizens.
> Never can we allow federal prosecutors to make up the law as they go along." *Id.*

Mr. Carpenter is entitled to the benefit of that construction inasmuch as it involves the

meaning of a criminal statute enacted by Congress. *Bousley v. United States*, 523 U.S. 614, 620

(1998). "[D]ecisions of [the Supreme Court] holding that a substantive federal criminal statute

does not reach certain conduct, like decisions placing conduct 'beyond the power of the criminal

lawmaking authority to proscribe,' (citations omitted) necessarily carry a significant risk that a

defendant stands convicted of 'an act that the law does not make criminal.'" *Id.* "A judicial

construction of a statute is an authoritative statement of what the statute meant before as well as

after the decision of the case giving rise to that construction." *Rivers v. Roadway Express, Inc.*,

511 U.S. 298, 312-13 (1994).

It is indisputable that the government did not allege in the Indictment or offer any

evidence at trial that the Petitioner in this case committed any crime. Petitioner's conviction and

punishment were "for an act the law does not make criminal." *See Skilling v. United States*, 561

U.S. 358 (2010), finding that nondisclosure was outside the bounds of the fraud statutes and for

there to be fraud, "the victim's loss of money or property suppl[ied] the defendant's gain," *Id.* at

400. "[N]o other misconduct falls within §1346's province." There can be no doubt that such a circumstance inherently results in a complete miscarriage of justice..." *Davis v. United States*, 417 U.S. 333, 346-47 (1974). "[A] district court is without jurisdiction to accept a guilty plea to a 'non-offense.'" *United States v. Rosa-Ortiz*, 348 F.3d 33, 36 (1st Cir. 2003), *citing United States v. Peter*, 310 F.3d 709, 713 (11th Cir. 2002).

As mentioned above, unlike the defendants in *Williams, Castro-Taveras,* and *George*, Mr. Carpenter did not plead guilty and went to trial twice, both times having jury verdicts overturned for egregious prosecutorial misconduct. Also unlike the defendants in *Williams* and *Castro-Taveras*, Mr. Carpenter did not need to explain any delay in bringing his claim (*Williams*) or professing his innocence (*Castro-Taveras*). As this Court knows all too well, Mr. Carpenter has been persistently looking to dismiss these allegations since he was indicted in February of 2004 with a superseding indictment of September 2004, and he has professed his innocence since Day One.

Therefore, Mr. Carpenter has the same civil infirmities of not being able to vote or serve on a jury or possess a handgun as most criminal defendants, but Mr. Carpenter also lost his Passport, his ability to travel, his law license and his insurance license, which will be restored once this unlawful conviction is vacated. Additionally, unlike the defendants in *Williams, Castro-Taveras,* and *George*, Mr. Carpenter did not lie to or deceive anyone yet received a 36-month sentence, whereas Williams, Castro-Taveras, and George all received probation. Furthermore, Mr. Carpenter was saddled with unlawful restitutions and forfeitures under the Supreme Court's decisions in *United States v. Bajakajian*, 524 U.S. 321 (1998), and most recently in *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).

To add insult to injury, despite the fact that Mr. Carpenter was never a resident of Massachusetts nor did he ever receive income in Massachusetts, the State of Massachusetts taxed Mr. Carpenter on the $8 million lost and the $14 million of forfeitures as if he had received the income rather than losing the money in the stock market.   Even to this very day Mr. Carpenter receives harassing phone calls from the Massachusetts Department of Revenue looking for nearly $2 million because of this Court's Judgment.    Therefore, Mr. Carpenter respectfully submits to the Court that he is personally suffering from more "significant collateral consequences from the judgment being challenged" than anyone in the history of the First Circuit, bar none. *See Williams* at 10, *citing Murray* at 29.

As such, Mr. Carpenter is that rare candidate that clearly qualifies for the "extraordinary balm of *coram nobis* relief" that *Castro-Taveras* received. *See United States v. Castro-Taveras*, No. 02-cr-00266 (SEC) at *14 (D.P.R. August 15, 2017).

## II.    MR. CARPENTER WAS A VICTIM OF INEFFECIVE ASSISTANCE OF COUNSEL

In *Castro-Taveras*, the First Circuit vacated the district court's denial of the writ of coram nobis and remanded the case to determine if Castro-Taveras could prove the two well-known prongs of *Strickland v. Washington*, 466 U.S. 668 (1984): substandard performance by counsel and prejudice to the defendant, based on the new rule established by the Supreme Court in *Padilla v. Kentucky*, 559 U.S. 356 (2010). *See Castro-Taveras* at 42, 54. In *Castro-Taveras*, the mistake made by counsel was that he did not inform Castro-Taveras of the possible negative implications of his pleading guilty on his immigration status and the fact that he could be deported. "Ineffective assistance under *Strickland* is deficient performance by counsel resulting in prejudice, with performance being measured against an 'objective standard of reasonableness,' 'under prevailing professional norms.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). Prejudice occurs when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

Under *Strickland*, the court "first determine[s] whether counsel's representation 'fell below an objective standard of reasonableness.'" *Padilla* at 358, *quoting Strickland* at 688. The court then asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694. The *Padilla* Court set forth the "first prong" analysis as follows:

> The first prong – constitutionally deficiency – is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." We long have recognized that "[p]revailing norms of practice as reflected in American Bar Association standards and the like…are guides to determining what is reasonable…." Although they are "only guides," and not "inexorable commands," these standards may be valuable measures of the prevailing professional norms of effective representation, especially as

these standards have been adapted to deal with the intersection of modern criminal prosecutions and immigration law. *Padilla* at 1482.

In discharging constitutionally effective assistance of counsel, defense counsel has an obligation to conduct a reasonable investigation into the government's allegations. While "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste," *Rompilla* at 383, counsel clearly has a constitutional duty "to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary." *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011). Counsel has a duty to investigate the facts of the case and learn the law of the case. *Correale v. United States*, 479 F.2d 944 (1st Cir. 1973). As detailed below, Greenberg Traurig did neither; leaving me defenseless and abandoned. It is by now well-established that counsel's failure to conduct an adequate investigation into potential defenses can constitute ineffective assistance of counsel. *See, also, Murchu v. United States*, 926 F.2d 50 (1st Cir. 1991).

In *Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005), the defendant challenged a state court conviction based on ineffective assistance of counsel, in particular defense counsel's failure to adequately investigate a "not arson" defense. The First Circuit concluded that counsel's failure to reasonably investigate a "not arson" defense constituted ineffective assistance, given "the importance of challenging the state's arson case to Dugas's defense, the unfulfilled promise to the jury to do so, the crucial role of the arson evidence to the state's case, [trial counsel] Raimo's lack of knowledge and experience in arson investigation and arson cases, and Raimo's initial awareness of problems with the state's case." *Dugas* at 331 (holding these circumstances, taken together "demonstrate the inescapable need for expert consultation in this case"). In reaching its decision, the First Circuit "emphasize[d] that the question is not whether Raimo should have presented a 'not arson' defense. Instead, we focus on whether the investigation supporting his

8

pursuit of the defense was itself reasonable." *Dugas* at 328, *comparing Wiggins v. Smith*, 539 U.S. 510, 523 (2003) ("[O]ur principal concern…is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*.") (emphasis in original).

Similarly, in *United States v. Santiago*, 474 F.Supp.2d 209 (D.Mass. 2007), Judge Ponsor vacated a state court conviction the government identified in support of an enhancement per 21 U.S.C. §851, ruling "counsel's decision not to subpoena or even interview crucial, available alibi witnesses" constituted constitutionally ineffective assistance of counsel. *Santiago* at 213. In *Santiago*, it was determined that the defendant was not in the area of a drug transaction until minutes before the arrest occurred, and the defendant thus could not have been the person observed by police conducting drug deals for an hour or so before the arrest occurred. Judge Ponsor observed that counsel in *Santiago* "abandoned [his] investigation" of crucial evidence "after having acquired only rudimentary knowledge," *Santiago* at 213 *quoting Dugas*, and held that "[b]ecause Counsel's investigation of the circumstances surrounding Defendant's arrest was neither thorough nor reasonable, "the presumption of sound trial strategy founders in this case on the rocks of ignorance." *Santiago* at 213, *quoting White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005); *citing Stewart v. Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2006) (finding "no strategic purpose in failing to investigate…a potential favorable witness"); *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) ("Failure to conduct pretrial investigation is objectively unreasonable.").

While the government's two briefs in appealing Mr. Carpenter's Second New Trial Order and the First Circuit's devastating opinion reversing his Second New Trial Order give numerous and ample descriptions and examples of Greenberg Traurig's deficiencies and Ineffectiveness of

Counsel and overall gross incompetence in defending me at my second trial and handling my overall defense, the Court is well aware that the Supreme Court has ruled that constitutional Ineffective Assistance of Counsel can consist of merely a "single error on the part of defense counsel" if it is sufficiently egregious. *See Murray v Carrier*, 477 U.S. 478, 496 (1986). Therefore, rather than relist and recite the litany of errors that both the government and the First Circuit pointed out in agonizing detail, and to a certain extent, this Court did as well; Mr. Carpenter wishes to point out just three specific issues where EACH would require this Court granting his Petition for a Writ of Coram Nobis and vacating his conviction, separate and apart from all of the other errors of Greenberg Traurig to be mentioned in his §2255 Petition and other filings with this Court:

1. Failure to discover, investigate or even get a copy of the February 2008 Iantosca lawsuit by the Exchangors before his trial in June of 2008, as that lawsuit would have gutted the government's entire case, exonerated him, and provided ample *Brady, Giglio, Bagley,* and *Napue* information to cross-examine the Exchangors and point out their perjury at trial, as well as the perjury of the Merrill brokers.  A copy of the February 2008 lawsuit is attached here as an Exhibit One;

2. Failure to immediately and forcefully object to AUSA Mitchell's "THAT'S FRAUD" comment during closing.  The First Circuit concluded that because Mr. Carpenter's attorneys did not object to that, they needed to review under the "plain error" rather than the "*de novo*" standard of review.

3. Failure to agree with the government's invitation to file a Rule 33 New Trial Motion based on newly discovered evidence that has a three year limit on it after the government suggested doing so in Dkt. No. 359.  Greenberg Traurig had an obligation to file a protective

Rule 33 motion during the time period from 2009-2011 and they failed to do so, primarily because of their conflict of interest with their new-found client Merrill Lynch. This is classic egregious Ineffective Assistance of Counsel that shows both deficient performance by counsel and terrible prejudice to Mr. Carpenter that warrants a vacating of his conviction on that basis alone if for no other reason. The Supreme Court has held that **"prejudice" in such a case involving a "conflict of interest" is presumed**. *See e.g., Glasser v. United States*, 315 U.S. 60, 72 (1942) and *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978). *See, also, Chapman v. California*, 386 U.S. 18, 23 (1967) that "claims of ineffectiveness assistance of counsel" are never to be treated as harmless error.

During that same period of 2009-2011, the reason Greenberg Traurig did not file the protective Rule 33 motion based on the pervasive Exchangor and Merrill perjury and effectively abandoned Mr. Carpenter as a client, was because they took on more and more work from Merrill Lynch. This betrayal and abandonment of a client due to a conflict of interest is also a classic example of Ineffective Assistance of Counsel that requires a reversal of his conviction. Additionally, the government briefs in their appeal describe in great detail other Greenberg Traurig failings such as their failure to object to:

1. The instructions on half-truths versus the "50 shades of malice" described in *United States v. Gray*, No. 13-1909 (1st Cir. 2015);

2. Evidence of Paley's marketing materials, which Mr. Carpenter had nothing to do with and there was no proof anyone read those materials adduced at trial;

3. All three grounds that this Court relied upon to grant a new trial in the first place;

4. The continual references to "wealthy man", "risky" investments, cavalier attitude, incited the jury's hate and distrust of Wall Street during the financial downturn of 2008;

5. Bogus warnings of risk by the brokers;

6. Other prosecutorial misconduct in closing statements in addition to "THAT'S FRAUD" comment.

Mr. Carpenter also wishes to point out the cumulative prejudicial error in his trial that Greenberg Traurig did not object to the following specific items, though he demanded they do so:

1. No venue instruction to Jury;

2. No objection on Venue issue despite Mr. Carpenter's commitment to the issue;

3. No request for "duty to disclose" instruction or even more important a "knowledge" of a duty to disclose instruction;

4. Government focus on "greed" and derogatory statements made about Mr. Carpenter in perjurious hearsay statements which were obviously very prejudicial to him.

5. They should have asked for a Bill of Particulars to identify the allegedly false misrepresentations that Mr. Carpenter actually made, as opposed to the Paley Marketing Materials.

6. They should have done a motion to dismiss due to a violation of the Speedy Trial Act based on the December 2011 decision in *United States v. Huete-Sandoval*, 668 F.3d 1 (1st Cir. 2011), which was based on the Supreme Court's decision in *Bloate v. United States*, 559 U.S. 196 (2010).

The *Huete-Sandoval* decision in December 2011 came after Mr. Carpenter's second grant of a new trial order in September 2011, but it was clear by that time that Greenberg Traurig had picked up Merrill Lynch as a major client in 2010 that they had effectively abandoned Mr. Carpenter by September 2011. There are clearly other things that in hindsight that Greenberg Traurig should have done, such as allowing him to testify as he begged my attorneys to do, but

because everyone was anxious to have the trial over they were confident that the jury would acquit him because the government had not made its case.  Obviously both of those judgments were incorrect and prejudicial to Mr. Carpenter.

While it is clear from the First Circuit's November 2013 opinion and several opinions of this Court that Mr. Carpenter clearly satisfies both prongs of *Strickland* because Greenberg Traurig's conduct was both ineffective and prejudicial to Mr. Carpenter as the proceedings would have certainly turned out differently had they merely objected to the egregious prosecutorial misconduct in this case, Greenberg Traurig also betrayed and abandoned him in favor of its new-found client Merrill Lynch; he now need only satisfy the first prong of *Strickland* because prejudice is presumed in the case of a conflict of interest or abandonment by an attorney.  *See, e.g., Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980), *Holloway* at 484, and *Glasser* at 72. Clearly, Greenberg Traurig's slipshod performance and lack of objections was unprofessional and hurt Mr. Carpenter and his family dramatically so that the proceedings certainly would have turned out better for him but for their blatant malpractice.  Since they had a serious conflict of interest in defending both Merrill Lynch and Mr. Carpenter at the same time, he now only needs to show deficient performance on behalf of Greenberg Traurig, and both the First Circuit opinions and this Court's opinions are substantial proof and ample evidence of Greenberg Traurig's ineffective assistance of counsel.

For all of the above reasons, it is clear that Mr. Carpenter was a far more serious victim of Ineffective Assistance of Counsel than the defendant in *Castro-Taveras* and was severely prejudiced by it, so that his Petition for a Writ of Coram Nobis should be granted and his conviction vacated.

### III.   MR. CARPENTER'S CONVICTION MUST BE VACATED BECAUSE THIS COURT LACKED JURISDICTION

The Supreme Court redefined the meaning of fraud in 2010 with its decision in *Skilling v. United States*, 561 U.S. 358 (2010), finding that nondisclosure was outside the bounds of the fraud statutes and for there to be fraud, "the victim's loss of money or property suppl[ied] the defendant's gain," *Id.* at 400.   While Mr. Carpenter was indicted on a theory of affirmative "material" misrepresentations[1], that theory was never proven at trial, and his previous motions are all based on the government's constructive amendment of the Indictment to resemble a "scheme of nondisclosure" that *Skilling* held was "outside the bounds" of the fraud statutes. *Id.* at 410.   Moreover, following the decision in *Skilling*, in his highly regarded report to Congress on mail and wire fraud dated July 21, 2011, Charles Doyle of the Congressional Research Service, stated that the elements of mail and wire fraud that must be alleged and proven by the government beyond a reasonable doubt are that the defendant(s):

(1)   Used either mail or wire communications **in the foreseeable furtherance,**
(2)   of a scheme to defraud,
(3)   involving a material deception,
(4)   with the intent to deprive another of,
(5)   either property or honest services.

*See* excerpt from the report to Congress on the elements of mail and wire fraud by the Congressional Research Service, CRS Report R41931, *Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law*, by Charles Doyle, July 21, 2011, attached as Exhibit Two. This fact alone renders Mr. Carpenter's conviction "fundamentally" defective, especially when considering the Supreme Court's recent decisions on the necessary requirement of *mens rea* and

---

[1] The only difference between the original indictment and the superseding indictment was that the Government added the word "material" to the word "misrepresentation" in seven different paragraphs after Professor Alan Dershowitz pointed out the obvious flaws in the original indictment at a hearing on a motion to dismiss the original indictment in September 2004.  The Government made the "material" changes to the Indictment the day after the hearing on the motion to dismiss the original indictment.

criminal intent as in *Elonis v. United States*, 135 S.Ct. 2001 (2015), and the knowledge that one is committing a crime in *Yates v. United States*, 135 S.Ct. 1074 (2015), *Bond v. United States*, 134 S.Ct. 2077 (2014), and *McDonnell v. United States*, 136 S.Ct. 2355 (2016). Just reciting the basic elements of mail and wire fraud are not enough; the government must allege specific facts that comprise a crime, and without the criminal intent to harm someone and without the knowledge that one is breaking the law, there is no crime. Failure to properly allege each and every one of the elements listed above with sufficient facts renders an indictment facially invalid. "Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *United States v. Russell*, 369 U.S. 749, 764 (1962).

Moreover, as the Supreme Court summarized in *Elonis* by citing cases like *Liparota v. United States*, 471 U.S. 419 (1985) and *Morissette v. United States*, 342 U.S. 246 (1952), for there to be a crime in American Jurisprudence, an evil act must be concurrent with an evil mind. "Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand," quoting Justice Holmes' famous observation that "[e]ven a dog distinguishes between being stumbled over and being kicked." *Id.* at 251-52. Federal courts are courts of limited jurisdiction, and not all frauds rise to the level of conduct falling within the federal mail and wire fraud statutes or involve the United States of America in such a way that would invoke federal jurisdiction. *See United States v. Rosa-Ortiz*, 348 F.3d 33 (1st Cir. 2003):

> "As this Court has explained, "a federal court has jurisdiction to try criminal cases only when the information or indictment alleges a violation of a valid federal law." *See United States v. Saade*, 652 F.2d 1126, 1134 (1st Cir. 1981). A federal court similarly lacks jurisdiction to enter a judgment of conviction when the indictment charges no offense under federal law whatsoever. ("[A] district court is without jurisdiction to accept a guilty plea to a non-offense."). *United States v. Peter*, 310 F.3d 709, 713 (11th Cir. 2002): (The district court had no jurisdiction to accept a plea to conduct that does not constitute mail fraud, and the doctrine of procedural default therefore does not bar Peter's

present challenge....When a court without jurisdiction convicts and sentences a defendant the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force." *Rosa-Ortiz* at 36 *citing Peter* at 713-15, *citing United States v. Morgan*, 346 U.S. 502 (1954)).

In *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir. 1990), the First Circuit noted that not every use of the mails in furtherance of a scheme to defraud another of property would be mail fraud. For example, a breach of contract in itself would not constitute mail fraud. *Id.* Nor would the mere breach of a fiduciary duty. *United States v. Greenleaf*, 692 F.2d 182, 188 (1st Cir. 1982). The First Circuit has stated that the scheme "must be intended to deceive another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct." *McEvoy* at 791.

Respectfully, this Court did not have jurisdiction over Mr. Carpenter because the federal mail and wire fraud statutes do not purport to reach **all frauds**, but only those "limited instances in which the use of the mails is a part of the execution of the fraud, leaving **all other** cases to be dealt with by appropriate state law." See the First Circuit's decision in *United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016), *citing Kann v. United States*, 323 U.S. 88, 95 (1944) and *United States v. Maze*, 414 U.S. 395 (1974) (emphasis added). In this case, the government not only failed to address all five critical elements of mail and wire fraud, every single count involved an email, letter, or wire involving BPETCO that came **after** the Exchangors already decided to use BPETCO for their property. All of these counts related to acts occurring after the alleged fraud had come to its full fruition. If the alleged fraud was now a crime of omission in not telling the Exchangors that Mr. Carpenter was losing money or was trading in stock options, then none of the mailings and wires in this case satisfy the "in furtherance" requirement. None of them.

*Tavares* involved a truly fraudulent scheme where the convictions were thrown out because the mailings in that case, i.e. the rejection letters sent out to non-successful applicants,

were **not in furtherance of the fraudulent scheme** to hire certain other people.  Therefore, based on *Tavares*, there is no way the conviction in Mr. Carpenter's case can possibly stand because of the gaping void in causation of the mailings and wires and the failure of the government to show that any of the mailings and wires were **in furtherance** of any fraud:

> "The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Schmuck v. United States*, 489 U.S. 705, 710 (1989) (*quoting Kann* at 95). "[T]he mailing must be 'for the purpose of executing the scheme, as the statute requires.'" *Maze* at 400 (*quoting Kann* at 94). A mailing furthers a fraudulent scheme if it is, inter alia, "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *Tavares* at 58.

In *Maze*, the Supreme Court reversed the mail fraud conviction, concluding that the success of Maze's scheme did not depend in any way on the mailings at issue, focusing on "the more difficult question [of] whether [the] mailings were sufficiently closely related to [Maze's] scheme to bring his conduct within the statute." *Maze* at 399, 402.  Here, as in *Maze*, the success of the alleged scheme clearly did not depend in any way on the use of mails or wires by Mr. Carpenter, as the alleged uses all occurred **after** the alleged fraud was **complete**.  Just as in *Tavares*, all of the counts charged against Mr. Carpenter listed mailings and wires that had nothing to do with the alleged omissions.  ("Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this. . . .").  *Maze* at 405; *see also Tavares* at 58 ("The statute does not reach all mailings resulting from a fraudulent scheme, but only those which are in **furtherance of the scheme**.").  (Emphasis added.)  Accordingly, the federal mail and wire fraud statutes were not properly invoked in this case, and this Court lacked jurisdiction to proceed any further.

Moreover, it is well-settled that a breach of contract, as in this case, does not constitute mail and wire fraud. **Every circuit** to consider the matter has concluded that "**[f]raud requires much more than simply not following through on contractual or other promises**." *Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1007 (7th Cir. 2004) (emphasis added); *see, e.g., McEvoy Travel* at 791 ("[N]or does a breach of contract in itself constitute a scheme to defraud."); *United States v. Chandler*, 388 F.3d 796, 803 (11th Cir. 2004) ("The government agreed that breach of contract does not support a mail fraud conviction."); *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980) ("[T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract."); *see also United States v. Vinyard*, 266 F.3d 320, 327 (4th Cir. 2001); *Johnson Enters v. Fpl Group*, 162 F.3d 1290, 1318-19 (11th Cir. 1998); *United States v. Cochran*, 109 F.3d 660, 667 (10th Cir. 1997); *Kehr Packages v. Fidelcor, Inc.*, 926 F.2d 1406, 1417 (3d Cir. 1991).

The Second Circuit's recent decision in *United States v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016) ("*Countrywide*") totally eviscerates not only the government's theory of culpability in Mr. Carpenter's case, but also the legal reasoning behind the jury instructions for mail and wire fraud. The bedrock of these elements is the "scheme to defraud," which further requires proof that the defendant had the knowledge that he was breaking the law and the criminal *mens rea* or specific intent in contemplating harm to the victim by making a misrepresentation of a material fact. *See Neder v. United States*, 527 U.S. 1, 25 (1999). Yet, the scope and interpretation of the term "scheme to defraud" has, according to the Second Circuit, bewildered the courts for decades. "The exact contours of what kinds of conduct constitute a "scheme to defraud" have been the subject of some judicial discussion." *Countrywide* at 657.

In *Countrywide*, Bank of America and Countrywide were found liable in a multi-billion dollar fraud under the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. §1833a ("FIRREA"), and everyone knows mortgage brokers at Countrywide lied from the top executives on down, but no one was criminally indicted unlike in Mr. Carpenter's case. But, if a mortgage applicant lies about his wealth on a mortgage application or the value of his property and then receives $400,000 in a cash mortgage that he defaults on after making only a few payments (as happened in thousands of cases in *Countrywide*) then the mortgage applicant really has "stolen" or defrauded the bank out of $400,000. There is truly real "money or property" "obtained" from the bank by "trickery or deceit." Suffice it to say, if there was no criminal mail or wire fraud at Countrywide in 2008, there was no mail and wire fraud at BPETCO in 1999.

The Second Circuit posited the central issue in *Countrywide* as what is fraud in a contract and illustrates the fundamental difference between a mere breach of contract as in Mr. Carpenter's case and a fraud: the intention of the breaching party to perform at the time of entering into the agreement, as opposed to a contracting party who never intended to perform at the outset (which is fraud). *Id.* at 656. The Second Circuit noted that "[t]his question, not an unusual one at common law, poses a novel issue in the context of the federal fraud statutes before us. Supreme Court precedent instructs us to apply the common-law understanding of fraud principles to these statutes, absent inconsistency with their text." *Countrywide* at 656. The Second Circuit's observation that the issue is "novel" satisfies the requirement that a motion for a writ of coram nobis may be based on an intervening change in the law. The Second Circuit then embarked upon an analysis of the common law's treatment of fraud claims based upon breaches of contract, citing several famous First Circuit cases in its analysis of the history of mail and wire fraud.

In *Countrywide,* the Second Circuit evaluated "what is required to prove a scheme to defraud when alleged misrepresentations concerning future performance are contained within a contract?" *Countrywide* at 658. The court concluded that a "scheme to defraud" requires proof of the intent not to perform the contract at the time of its execution where the alleged misrepresentation was contained in the agreement itself. *Id.* at 662. Where there is not an intent not to perform one's obligations under the contract at the time of executing the same. A subsequent breach of the contract, even if willful and malicious, is not tortious and does not constitute fraud for purposes of the mail or wire fraud statutes. The legal standard in *Countrywide* was only by a "preponderance of the evidence", whereas in Mr. Carpenter's case it was beyond a reasonable doubt. Moreover, Mr. Carpenter successfully completed 119 of the 126 BPETCO property exchanges, while Countrywide was a multibillion-dollar disaster requiring a government bailout.

Analyzing the history of the mail and wire fraud statutes and citing *Durland v. United States,* 161 U.S. 306, 313 (1896), the Second Circuit buttressed its point: a "scheme to defraud" requires "intent and purpose." *Countrywide* at 662. Moreover, the scheme must be "designed to *induce* reliance on a known misrepresentation." *Id.* In other words, the proponent of the representation must know that they are lying or intentionally omitting necessary information. Accordingly, courts look to the individual's intent at the time the representation is made and not when the counterparty relied on or was injured by it. "Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation." *Id.*

The Second Circuit further emphasized **that regardless of how serious, intentional, or malicious the breach, it is not fraudulent, absent that intention not to perform on the promise when it was made.** *Id.* at 661 (emphasis added). To hold to the contrary, the court

explained, would vitiate the common law's tolerance and encouragement of "efficient breaches." *Id.* In other words, common law gave parties to a contract two choices: either comply with the obligations of a contract or breach it and answer in damages. Therefore, the Second Circuit held that breaches of contract do not constitute a "scheme to defraud" under the mail and wire fraud statutes, absent a fraudulent intent at the time the contract is made or later fraudulent misrepresentations. *Id.* at 661–62.

The Second Circuit, after reviewing the Supreme Court precedent contained in *Durland* and related cases, along with the history of the Common Law and the fraud statutes, found no difficulty in holding that "[w]hat fraud in these instances turns on, however, is *when* the representations were made and the intent of the promisor *at that time*. . . . where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim." *Countrywide* at 658 (emphasis in original). The Second Circuit also relied on and cited on more than one occasion the case of *McEvoy Travel*, for the proposition that "the common law requires proof—other than the fact of breach—that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation." *Countrywide* at 660. The Second Circuit also quotes the First Circuit in *Sanchez v. Triple-S*, 492 F.3d 1, 11 (1st Cir. 2007) in saying:

> A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes. *See, e.g., Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065, (11th Cir. 2007); *United States v. Gray*, 405 F.3d 227, 235–36 (4th Cir. 2005); *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000)....We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who—a jury might find—secretly harbored in his heart the hope that the buyer would never ask."

Thus, to sustain the verdict, the government needed to prove that a promise was made which Countrywide *never* intended to fulfill. *Id.* at 658–59. As the Second Circuit explained, a contractual breach alone is not fraud, because a breach of contract is not an affirmative misrepresentation or omission to the counterparty. *Id.* Therefore, evidence of a subsequent breach or breaches of contract alone cannot support a fraud claim. Fraud requires proof of deception, which is absent from a breach of contract. *Id.* at 660. The Second Circuit parsed the distinction between intentional subsequent breach and fraud this way: if a purchaser forms the intent not to pay for goods after title passes to him, he is liable for an intentional breach of contract, not fraud. Fraud cannot be proven merely by showing a broken promise to pay. To find otherwise, the court explained, would contravene the fundamental common law requirement of contemporaneity between the representation and fraudulent intent. *Id.* at 660–61.

The Second Circuit then summarized its holding as follows: "a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution." Absent such proof, a subsequent breach of that promise—even where willful and intentional—cannot in itself transform the promise into a fraud:

> Accordingly, we deem the common law's contemporaneous fraudulent intent principle incorporated into the federal mail and wire fraud statutes. Applying these principles to a fraud claim based on the breach of a contractual promise, we conclude that the proper time for identifying fraudulent intent is contemporaneous with the making of the promise, not when a victim relies on the promise or is injured by it. *Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation. Id.* at 662 (emphasis added).

Similarly, in the famous case of *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), the Seventh Circuit reversed Weimert's conviction despite his major material lies to his employer, the bank, and his future partner – the buyer of the property – based on the fact that the

mail and wire fraud statutes had been stretched "far beyond where they should go." *Id.* at 355. The Seventh Circuit further stated:

> In commercial negotiations, it is not unusual for parties to conceal from others their true goals, values, priorities, or reserve prices in a proposed transaction. When we look closely at the evidence, the only ways in which Weimert misled anyone concerned such negotiating positions. He led the successful buyer to believe the seller wanted him to have a piece of the deal. He led the seller to believe the buyer insisted he had a piece of the deal. All the actual terms of the deal, however, were fully disclosed and subject to negotiation. There is no evidence that Weimert misled anyone about any material facts or about promises of future actions. *Weimert* at 354.

The Seventh Circuit then stated that negotiating parties "do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior." *Id.* at 358. Thus, the Seventh Circuit held that "deception about negotiating positions – about reserve prices and other terms and their relative importance – should not be considered material for purposes of mail and wire fraud statements." *Id.* The mail and wire fraud statutes do not cover all behavior which strays from the ideal." *Id.* at 357. Once again, Mr. Carpenter did not lie to anyone here, while Weimert's lies to both parties cost them millions under the "mirror image" of fraud in *Skilling*, and benefitted Weimert's pockets.

Finally, in a recent decision vacating a wire fraud conviction, the Eleventh Circuit gives a detailed historical analysis of the Second Circuit's interpretation of the wire fraud statute and adopts the Second Circuit's interpretation of what constitutes a "scheme to defraud" as opposed to a "scheme to deceive", so as to satisfy that requirement under the Federal mail and wire fraud statutes. *See United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). To explain the difference between a "scheme to defraud" which is illegal under the wire fraud statute, and a "scheme to deceive" which may be morally wrong but is not conduct prohibited by the mail and wire fraud statutes, the Eleventh Circuit uses what might be called the "Parable of the Deceitful Neighbor." The court considers two scenarios. In the first, a man calls his neighbor saying that

his child is very ill, and the neighbor responds by rushing over to see if she can help. The man asks her to give him change for a dollar, which the helpful neighbor gladly gives him. She later learns that the neighbor's child was not sick at all. The second scenario is identical to the first, except that now the Deceitful Neighbor gives the woman a counterfeit dollar in exchange for the four quarters. The Eleventh Circuit explains that the first scenario is not wire fraud, but the second one is, despite the fact that the woman would not have rushed over in the first scenario had she known that the child was not really sick.

To prosecute mail and wire fraud cases arising out of contractual relationships, "much more" than a mere undisclosed breach is required. *Corley* at 1007. At a minimum, fraud "requires a showing of deception **at the time the promise is made**." *Id.* (emphasis added). In this case, the government has made no such allegation. In fact, to the contrary, the language of the indictment suggests that the alleged breach and deceptions did not take place until at least the end of 2000, more than two years into the engagement of 126 contracts, of which 119 were successfully completed. How many "fraudulent" businesses have a 95% successful completion rate? Where is the fraudulent scheme here? Only Gail Cahaly came to BPETCO in November of 2000 and she had her own agreement drafted by her attorney husband. Moreover, at this late date, the government has not provided even one example of Mr. Carpenter making an oral or written fraudulent misrepresentation, much less a fraudulent **material** misrepresentation as required by *Neder*. There was never a failure to make an exchange until after January 2001.

To establish federal mail and wire fraud, The government must also show that the defendant actually intended to cause economic harm to the other contracting party. *See United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017) *citing United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994). But once again, in this case, the government has made no such allegations.

24

Critically, the Indictment makes no allegation that Mr. Carpenter failed to perform the work called for under the contract. Other than the breach of contract allegations, the Indictment makes absolutely no allegation of actual or intended economic harm to the Exchangors. There is no mention at all of his "specific intent" to harm, deceive, cheat, or steal anything from anyone.

None of the wires were "steps in the plot" to mask or hide anything, and by the time the money was sent; the alleged fraud had been completed. The government's problem with Mr. Carpenter is that he engaged in allegedly "risky" option trading that was supposedly not disclosed to the Exchangors. Mr. Carpenter could have lost the money just as easily in auction rate municipal bonds as LandAmerica did, losing over $400 Million of clients' funds, none of which was recovered unlike the judicial jackpot the Exchangors have enjoyed here at his expense. A mere deprivation does not suffice for a mail fraud charge. The court stated that "...losses that occur even as the byproduct of a deceitful scheme do not satisfy the statutory requirement" of mail and wire fraud. *United States v. Walters*, 997 F.2d 1219, 1227 (7th Cir. 1993). Ultimately, to support its mail and wire fraud charges, the government has simply alleged an undisclosed investment risk and a breach of contract claim.

The reason the Court did not have jurisdiction is because just like in *Rosa-Ortiz*, the alleged conduct did not establish a federal crime. In *Rosa-Ortiz*, the indictment charged the defendant with conspiring to violate Section 751(a) by assisting in the escape of his co-defendant, who was in federal custody on a federal material witness warrant. The defendant pleaded guilty to that charge and appealed, arguing that his conduct was not within the crime charged. The First Circuit agreed, finding that Section 751(a), which by its terms proscribes escapes of those in federal custody "by virtue of an arrest on a charge of felony, or conviction of any offense," does not apply to the escape of one taken into federal custody on a material witness

warrant. The First Circuit explained, "[t]he plain text of [Section 751(a)] does not support the indictment in this case, and 'due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.'" *Id.* at 42 (quoting *United States v. Lanier*, 520 U.S. 259, 266 (1997)). In the case of my Indictment, the government has pleaded nothing more than a simple breach of contract claim, and it did not even do *that* well. But a breach of contract claim does not describe the prohibited conduct needed for an indictment charging mail and wire fraud. *See McEvoy Travel.*

The Second Circuit reached a similar conclusion in *United States v. Pacione*, 738 F.2d 567, 573 (2d Cir. 1984), where the defendant moved to dismiss those counts of an indictment that charged him with violating the extortionate credit statute, 18 U.S.C. §891 *et seq.*, by threatening to record a mortgage and a deed. Although the indictment tracked the language of the statute, the defense argued, and Judge Knapp agreed, that the threat of non-violent conduct it alleged as a factual basis for that statutory violation "was not what congress meant to prohibit in the extortionate credit statute." *Id.* at 569. Rejecting the government's appeal, the Second Circuit affirmed that dismissal because its analysis of the statute revealed that, as Judge Knapp had concluded, the defendant's activities as alleged in the indictment were beyond the limits of that statute. *Id.* at 572.

As these cases make clear, an indictment that merely tracks the language of a charged statute and alleges vague criminality **but alleges no facts that actually violate the statute it charges** cannot be sustained. The fatal flaw in such indictments is not that they fail to allege the charge with sufficient specificity, but rather that the facts they allege make clear that the charge

cannot be maintained and no actual federal crime has been committed, as is clear in my case.  As

the Eleventh Circuit explained in *Peter,* cited by the First Circuit in *Rosa-Ortiz*:

> The problem is not that the Government's case left unanswered a question as to whether its evidence would encompass a particular fact or element.  Rather, it is that the Government affirmatively alleged a specific course of conduct that is outside the reach of the mail fraud statute.  Peter's innocence of the charged offense appears from the very allegations made in the superseding information, not from the omission of an allegation requisite to liability. *Peter* at 715.

That is precisely the problem in this case.  Each count of the Indictment that charges Carpenter

with an alleged federal crime merely parrots the language of the mail and wire fraud statute

without any details.   But none of the counts allege facts that would bring Mr. Carpenter's

conduct within the meaning of the charged statutes under any circumstances.  For example, none

of the mailings or wires were done by Mr. Carpenter or even contemplated by Mr. Carpenter or

his staff.   None of the mailings and wires were done in **furtherance** of a scheme to defraud –

because there is no description of what the scheme to defraud was, and the word "furtherance" is

nowhere to be found in the Indictment – anywhere.

Not all frauds are federal frauds – and only a select set of frauds reach the level required

for a mail and wire fraud prosecution.  Specifically, in the instant case, the government has failed

to allege all five elements necessary to invoke this Court's jurisdiction to prosecute a mail and

wire fraud case.  There is not a single sentence in the entire Indictment that even mentions the

"specific intent" necessary to indict someone for mail and wire fraud.  Similarly, the words

"knowingly" and "willfully" are nowhere to be found in the Indictment.  Therefore, based on the

fact that both indictments in this case failed to allege a federal crime, the Court lacked

jurisdiction and that is an error of "fundamental" proportions requiring the granting of this

Petition for a Writ of Coram Nobis.

## IV.   THE WRIT OF CORAM NOBIS SHOULD ISSUE AS MASSACHUSETTS WAS NOT THE PROPER VENUE FOR ANY OF THE COUNTS

As this Court stated in its decision from Petitioner's first trial: "Mr. Carpenter has persistently maintained an objection to venue in this District." *United States v. Carpenter*, 405 F. Supp. 2d 85, 88 (D. Mass. 2005).  It is guaranteed by the Constitution that a criminal defendant has the right to be tried in an appropriate venue. The importance of this right to the Founders is emphasized by the fact that it is mentioned in the Declaration of Independence as a complaint and not once, but twice, in the text of the Constitution. *See* U.S. Const. art. III, §2, cl. 3 ("The Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed ...."); *id.* amend. VI (requiring trial of a criminal case "by an impartial jury of the State and district wherein the crime shall have been committed"). Congress has further entrenched these norms by an explicit directive that limits a criminal prosecution to "a district in which the offense was committed." Fed.R.Crim.P. 18. This rule "echoes the constitutional commands." *United States v. Cabrales,* 524 U.S. 1, 6 (1998). The result is meant to be a safety net for the defendant, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum as has happened to Mr. Carpenter not once, but twice.

In the instant matter, venue with the Massachusetts District Court was improper as Mr. Carpenter never was a resident of Massachusetts, nor had he visited Massachusetts in the past 10 years (with the exception of required court appearances), and the government has alleged no overt acts by Mr. Carpenter with any connection to the State of Massachusetts in the Indictment. Because it is indisputable that he did not perform any "essential conduct element" of the crime charged and alleged in the Indictment in the district of Massachusetts, his conviction must be vacated. *See United States v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014).   As explained in

*Auernheimer*, these constitutional provisions manifest a strong constitutional policy disfavoring trials removed from the situs of the alleged criminal activity.  As explained by the First Circuit:

> Venue in a criminal case is not an arcane technicality.  It involves matters that touch closely the fair administration of criminal justice and public confidence in it...The result is a safety net, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum solely at the prosecutor's whim.

*United States v. Salinas*, 373 F.3d 161, 162, 164 (1st Cir. 2004).  Under the standard set in *Cabrales, Salinas,* and *Aurenheimer*, Mr. Carpenter committed no "essential" act in Massachusetts, so it is clear that he committed no crime triable in a Massachusetts court.  If "non-disclosure" was the problem, that conduct or lack of conduct happened in Connecticut.  If trading options or losing money was the "crime," then that happened in the Southern District of New York.  Moreover, there was **zero** evidence adduced at trial showing any conduct of Mr. Carpenter's that actually "caused" the mailings or wires, and it is clear that all of these mailings and wires were non-fraudulent and not in furtherance of any scheme to defraud. *See Tavares* at 58. *See, also, United States v. Anderson*, 328 U.S. 699, 703 (1946) ("[T]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it."), and *Salinas* at 164.

Moreover, in a criminal case, "venue must be narrowly construed." *United States v. Jefferson*, 674 F.3d 332, 365 (4th Cir. 2012).  "Venue...is an element...which must be proved...by a preponderance of the evidence." *United States v. Miller*, 111 F.3d 747, 749-50 (10th Cir. 1997).  Hence, all of the counts in this case lack proper venue, because no evidence was adduced at trial showing Mr. Carpenter inducing any the Exchangors to work with Paley or BPETCO.  As with a lack of subject matter jurisdiction, improper venue requires dismissal of the indictment or a judgment of acquittal. *See United States v. Strain*, 396 F.3d 689 (5th Cir. 2005), *reh'g denied*, 407 F.3d 379, 380 (5th Cir. 2005) (remanding for entry of judgment of acquittal

due to the government's failure to prove venue and stating that such failure "does not entitle the government to a second chance at prosecution"). Not only must the government prove venue by a preponderance of the evidence at trial, *see Salinas* at 163, but the government must also allege sufficient facts in the Indictment to establish proper venue *ab initio*. In this case, the government did neither.

A defendant in a criminal case has a constitutional right to be tried in a proper venue. *Johnson*, 323 U.S. at 275 (noting that two constitutional provisions, Article III, §2, cl. 3 and the Sixth Amendment both provide a right to trial in the state where the crime is committed); *United States v. Uribe*, 890 F.2d 554, 558 (1st Cir. 1989); *see also* Fed. R. Crim. P. 18. The government bears the burden of proof on the issue of venue. *United States v. Lanoue*, 137 F.3d 656, 661 (1st Cir. 1998). "[I]t is readily apparent that venue requirements promote both fairness and public confidence in the criminal justice system." *Johnson*, 323 U.S. at 276. Venue must be determined by the nature of the crime alleged, by analyzing the actual conduct of the defendant constituting the offense and the location of the criminal act. *Scott*, 270 F.3d at 35. More than a *de minimis* connection to the district is required. *Uribe*, 890 F.2d at 559.

The alleged facts in this matter are very similar to those presented in *Salinas* and *Auernheimer*, in that any alleged conduct or omissions by Mr. Carpenter occurred outside of Massachusetts. The defendant in *Salinas* was prosecuted for passport fraud not in New York, where the defendant applied for the passport at the post office, but in New Hampshire, where the fraud was discovered by the Passport Office. The Court dismissed the indictment for lack of venue finding that all of the criminal conduct, the elements of the offense, occurred in New York. *Id.* at 165-170. Similarly, in this case, there was simply no justification for laying venue in Massachusetts as all the alleged conduct by Mr. Carpenter occurred in Connecticut or the

Southern District of New York.  Rightly or wrongly, anything that he did or did not do, he did only in Connecticut or the Southern District of New York, and the Indictment does not contradict this fact.

When an indictment charges a defendant with multiple counts, "venue must be proper with respect to each count." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989). *See also Travis v. United States*, 364 U.S. 631, 635 (1961) ("Where Congress is not explicit, the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it") (internal quotation marks omitted).  Moreover, that the Supreme Court has construed a necessary connection between venue and the conduct elements of an offense. In general, this connection means that a **criminal defendant's own actions will determine where venue can be laid**. Expanding venue for mail and wire fraud in the way that the government has done in the Indictment would unhinge this connection and give the government unlimited control of determining where someone can be tried.  Based on the First Circuit's decision in *Tavares*, Mr. Carpenter had **nothing** to do with causing any of the mailings or wires, nor were they foreseeable to him because he had no idea who Paley was talking to. Under the government's idea of venue, Mr. Carpenter could have been tried in Alaska, Florida, or California if Paley had friends or relatives there that did a property exchange between August and December 2000.  That is not how venue is determined in the First Circuit or any other circuit.  For that reason alone, Mr. Carpenter's conviction must be overturned and vacated and a judgment of acquittal entered as to all counts.

The Writ of Coram Nobis should also be granted in consideration of the traditional Constitutional venue requirements.  The Sixth Amendment to the United States Constitution provides that: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and

public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." U.S. Cont. amend. VI. Furthermore, F.R.C.P. Rule 18 states that unless a statute or the rules of procedure themselves permit otherwise, the government must prosecute an offense in the district where the offense was committed.

"Venue is proper only where the acts constituting the offense – the crime's 'essential conduct elements' – took place." *United States v. Tzolov*, 642 F.3d 214, 218 (2d Cir. 2011)(dismissing fraud claim brought in the EDNY instead of the SDNY, literally one subway stop away in New York). *See also United States v. Brennan*, 183 F.3d 139, 147 (2d Cir. 1999) (holding that "prosecution under the mail fraud statute is permissible only in those districts in which a proscribed act occurs"), and *Salinas*, where the defendant's indictment was dismissed due to improper venue because illegal activity occurred in New York, but was only discovered in New Hampshire.   The Second Circuit, where Mr. Carpenter should have been tried, if he was tried at all, has enumerated four factors used to determine whether venue is constitutionally permissible: (1) the site of the defendant's acts; (2) the elements and nature of the crime; (3) the locus of the effect of the criminal conduct; and (4) the suitability of the district for accurate fact finding. *United States v. Reed*, 773 F.2d 447, 481 (2d Cir. 1985); *see also United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989).

In *United States v. Bezmalinovic*, 962 F. Supp. 435 (S.D.N.Y. 1997), the court dismissed a bank fraud charge for lack of venue.   The indictment charged a scheme to defraud Manufacturers Hanover Trust ("MHT") by obtaining a mortgage using a false application. Bezmalinovic allegedly prepared a false application in the Eastern District of New York ("EDNY"), submitted the application to MHT in the EDNY, more commonly known as

Brooklyn, received proceeds via checks drawn on an account in the EDNY, and then deposited those checks into my account in the EDNY.

Very similar to this case, the government argued that venue was proper in the SDNY because, after the checks were deposited into a Chemical Bank account in the EDNY, the checks were sent to a processing center in Manhattan where each check was credited to Bezmalinovic's account, and each check was then forwarded to a clearing house in Manhattan. Finally, the checks were sent to MHT's processing center in Manhattan, where they were debited from MHT's closing account.

However, the court in *Bezmalinovic* did not agree with the government's determination of venue and held that the ministerial processing of the checks in Manhattan did not provide a sufficient constitutional basis for venue in the SDNY. The court further noted that the "only acts alleged to have occurred in the [SDNY] are the ministerial actions taken by MHT and Chemical Bank in the process of crediting defendant's account." *Id.* at 437. In addition, the court stated that the indictment did "not allege[] that those acts were intended or foreseen by defendant." *Id.* The court concluded that the ministerial acts of debiting and crediting accounts as alleged in the indictment did not constitute "substantial contacts" within the SDNY sufficient for venue to be constitutionally permissible. *Id.* at 441. Moreover, in *United States v. Novak*, 443 F.3d 150 (2d Cir. 2006), another case of just one subway stop away, the defendant challenged jurisdiction in the EDNY when the evidence showed (and the government agreed) that the alleged offenses actually took place in the SDNY. If Brooklyn is a "distant, remote, and unfriendly forum" from New York City, imagine how Mr. Carpenter feels as a "Connecticut Yankee" prosecuted not once but twice in a Boston court. *Salinas* at 164. Just as the Founders in Boston felt that London was a distant, remote, and unfriendly forum, so, too, did Mr. Carpenter feel about Boston. In

fact, if Mr. Carpenter had a choice, he clearly would have picked London over Boston. But, based on the government's allegations in the Indictment, Mr. Carpenter's **only** conduct happened in the District of Connecticut or the Southern District of New York and therefore, the errors in this case constitute the most "fundamental character" and the Writ of Coram Nobis should be issued by this Court and Mr. Carpenter's unlawful conviction vacated as soon as humanly possible to prevent further injury to him and his family.

**V.    THE PETITION FOR THE WRIT OF CORAM NOBIS SHOULD BE GRANTED DUE TO THE NUMEROUS VIOLATIONS OF BRADY, JENCKS, GIGLIO, AND NAPUE, AND THE KNOWING USE OF PERJURY BY THE GOVERNMENT AT TRIAL**

In May of 2016 – two years after Mr. Carpenter had been in prison for a "non-crime" that he did not commit – Judge Roach published her revealing opinion in *Cahaly v. Merrill Lynch*, No. 01-0116-BLS2 (Suff. Sup. Court April 12, 2016) in the *Cahaly* litigation that is still ongoing (albeit Mr. Carpenter and BPETCO have settled all claims with the Exchangors and the Exchangors have netted over $50 million based on their $8 million loss), which showed that not only did Levine lie, all of the Merrill government witnesses lied, including Rasmussen, Stern, Hassan Tabbah, and Kevin Duffy, **and the government knew it**. Judge Roach also discussed statements and letters sent by Merrill witnesses and attorneys that were sent to the government agencies but never given to Mr. Carpenter or the defense. This now brings up a clear *Jencks* Act violation as well as *Brady-Giglio-Bagley* and *Napue* violations for all of the Merrill witnesses statements to the SEC and NASD that were never turned over to Mr. Carpenter or either of his defense teams. Not only is this a clear violation of the law, it is another example of the prosecutorial misconduct and vindictiveness that Mr. Carpenter faced in this case. Judge Roach's Opinion makes clear that everyone at Merrill including their attorneys, and specifically Stern and Rasmussen as well as Levine, lied to Mr. Carpenter's Jury, the Court, the SEC, the NASD, FBI Agent Caldwell, and therefore by reference also lied to the Grand Jury in Mr. Carpenter's case because all FBI Agent Caldwell did as the only witness in front of the Grand Jury was repeat all of the lies he had been told by Merrill's representatives. Based on Judge Roach's Opinion, this Court must vacate Mr. Carpenter's conviction because **ALL** of the Merrill witnesses lied, and **the government knew it**.

What Judge Roach's 2016 Opinion also makes clear is that Merrill Lynch set out to blame Mr. Carpenter for not telling Merrill that the money belonged to the Third-Party Exchangors. Merrill even concocted experimental mock trials where they changed their stories to get just the right vote from a potential jury. As it was, the civil jury did not buy the Merrill lies, but Judge Botsford granted Merrill a JNOV in 2003 that was later overturned and resulted in more than a decade of ongoing litigation that has resulted in $50 million going to the Exchangors from settlements from Merrill and PaineWebber based on the litigation brought by Mr. Carpenter and BPETCO against PaineWebber and Merrill. However, despite the lies told by Merrill executives and their attorneys, and perhaps because of the Exchangors' huge windfall in this case, Judge Roach refused to blame or penalize Attorney Snyder or Bingham-McCutchen for the 16-year ongoing saga that still continues to this day on appeal:

> Because it is impossible to know whether plaintiffs and Merrill Lynch would have reached a settlement agreement in 2002, Bingham's misconduct may have been the sole basis for the past thirteen years of litigation in this case. Bingham certainly caused the expenditure of substantial resources of the parties and the Commonwealth which could have been far better spent." Plaintiffs' Proposed Rulings of Law at page 21 (emphasis supplied). I daresay no seasoned trial or appellate judge who has touched this case could agree that all of the now fifteen years of litigation is to be blamed solely on the conduct of Bingham, and I respectfully decline to so find or rule. *Judge Roach Op.* at \*47-48.

Unfortunately, this Due Process nightmare continues to linger for Mr. Carpenter 18 years later, despite the fact that the Exchangors have netted $50 million on their $8 million loss from the year 2000, and Bingham-McCutchen is gone, Merrill Lynch was bought, PaineWebber was bought, and even Merrill's new law firm Dickstein Shapiro went out of business in 2016, thereby leaving Mr. Carpenter as the only survivor of the BPETCO debacle, and two trials that were infected by perjury, prosecutorial misconduct, and fundamental unfairness. Because most of the government witnesses lied at Mr. Carpenter's second trial including Paley, Mitch Rock, Rasmussen, Stern, and Levine and the *"government knew it,"* Mr. Carpenter respectfully asks the

Court to vacate his conviction under *Brady-Jencks* and *Giglio-Napue*, and to grant this Petition for a Writ of Coram Nobis based on the government's pernicious prosecutorial misconduct in this case.

As discussed above, Mr. Carpenter was abandoned by his attorneys Greenberg Traurig so they could represent Merrill Lynch in various litigation. That left Mr. Carpenter to submit huge volumes of newly-discovered evidence that all the brokers lied and the government knew it. Judge Roach's Opinion in *Cahaly* makes that clear. Attorney Snyder also knew about the February 2008 *Iantosca* lawsuit, the SEC investigations, the NASD investigations, the Malia file, and the David Patterson information that came out when Dickstein Shapiro took over in 2009. Snyder as counsel for Merrill Lynch, and separate counsel for the Exchangors, sat directly behind the prosecution at both of Mr. Carpenter's trials, and unbelievably did not mention any of this information to the prosecution, including the newly-discovered *Iantosca* lawsuit against Merrill Lynch of February 2008 which Mr. Carpenter did not even hear about until April of 2009. Perhaps the prosecution did not think that they had a duty under *Brady* and *Jencks* to share this exculpatory information with Mr. Carpenter. Clearly the Supreme Court disagrees with that decision, based on its recent decision in *Turner v. United States*, 137 S.Ct. 1885 (2017):

> The Government does not contest petitioners' claim that the withheld evidence was "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler* v. *Greene*, 527 U.S. 263, 281–82 (1999). Neither does the Government contest petitioners' claim that it "suppressed" the evidence, "either willfully or inadvertently." *Id.* at 282. It does, as it must, concede that the *Brady* rule's "'overriding concern [is] with the justice of the finding of guilt,'" *United States* v. *Bagley*, 473 U.S. 667, 678 (1985) (quoting *United States* v. *Agurs*, 427 U.S. 97, 112 (1976)), and that the Government's "'interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done,'" *Kyles* v. *Whitley*, 514 U.S. 419, 439 (1995) (quoting *Berger* v. *United States*, 295 U.S. 78, 88 (1935)). Consistent with these principles, the Government assured the Court at oral argument that subsequent to petitioners' trial, it has adopted a "**generous policy of discovery**" in criminal cases under which it discloses any "information that a defendant might wish to use." Tr. of Oral Arg. 47–48. As we have recognized, and as the Government agrees, *id.*, "[t]his is as it should be." *Kyles, supra,* at 439 (explaining that a

"'prudent prosecutor['s]'" better course is to take care to disclose any evidence favorable to the defendant (quoting *Agurs, supra,* at 108)). *Turner* at 1893, *citing Cone v. Bell,* 556 U.S. 449, 469-70 (2009) (emphasis added).

Assuming *arguendo,* even if Attorney Snyder purposefully hid all of the Merrill lies from the government, his knowledge is still imputed to the government because Snyder was there for each and every 302 Report used against Mr. Carpenter in his Grand Jury hearing and sat behind the government every day of his 2008 trial.   Moreover, the knowledge of the SEC and NASD investigations of Merrill concerning BPETCO are clearly *Brady* materials attributable to the government that should have been turned over to the defense, but were not.   This failure alone of the government to turn over vital material information warranted a new trial in 2013 and now warrants the vacating of Mr. Carpenter's conviction and the dismissal of his indictment.

It has long been established by the First Circuit that they will not allow the use of perjured testimony or knowingly-false evidence to be used by the government to convict someone.   *See, e.g.,* this statement from a *Bivens* action in *Drumgold v. Callahan,* 707 F.3d 28 (1st Cir. 2013):

> ("[D]ue process ... cannot be deemed to be satisfied ... if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured."); *Pyle,* 317 U.S. at 215–16 ("Petitioner's papers are inexpertly drawn, but they do set forth allegations that his imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him."); *Napue v. Illinois,* 360 U.S. 264, 269 (1959) (recognizing "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction"); *Limone,* 372 F.3d at 45 ("[T]hose charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit."); *Haley,* 657 F.3d at 49 ("Deliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant's due process rights."). Compare *Brady,* 373 U.S. at 87 (specifying that the due process right recognized in that case applies "irrespective of the good faith or bad faith of the prosecution"). *Drumgold* at 61.

It is also the established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution. *See, e.g., Mooney v. Holohan,* 55 S.Ct. 340 (1935). As the Supreme Court stated in its unanimous decision in *Giglio*: "It has long been established that the prosecutor's deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States,* 405 U.S. 150, 153 (1972). See, also, a case mentioned several times in the government's previous reply briefs, *Banks v. Dretke,* 540 U.S. 668 (2004): "A conviction based on testimony known by the prosecutor to be perjurious is a denial of due process."

The First Circuit has also made it clear that the knowing use of perjured testimony is also considered to be a serious *Brady* violation, and requires the order of a new trial. See *United States v. Gonzalez-Gonzalez,* 258 F.3d 16, 21 (1st Cir. 2001), *citing Strickler v. Green,* 527 U.S. 263, 280-81 (1999). In *Drumgold,* above, the First Circuit described *Mooney*'s core premise as "well-settled" in the First Circuit citing to *Coggins v. O'Brien,* 188 F.2d 130, 138 (1st Cir. 1951), and citing the Supreme Court's unanimous decision in *Napue v. Illinois,* 360 U.S. 264, 269 (1959), that was also cited by the Supreme Court's unanimous decision in *Giglio*. The First Circuit goes on in citing *Limone v. Condon,* 372 F.3d 39 (1st Cir. 2004), *citing Miller v. Pate,* 386 U.S. 1 (1967): "In 1967, the very year the crimes took place, Justice Stewart, writing for a unanimous court stated 'More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. There has been no deviation from that established principle.'" *Miller* at 7. *See, also, Ouimette v. Moran,* 942 F.2d 1 (1st Cir. 1991), where the First Circuit vacated defendant's conviction because the government withheld evidence of defendant's partner's criminal background).

As the Court will recall, Mr. Carpenter submitted over 30,000 pages showing that all of the Merrill witnesses lied, including excerpts from Merrill Lynch's General Counsel Bevilacqua's deposition and the 2010 Dickstein Shapiro depositions, where Bevilacqua stated that he was very disappointed in the conduct of certain individuals at Merrill, and he recognized that they had all lied at Mr. Carpenter's trials.   In his 2010 deposition, General Counsel Bevilacqua testified that he was "dismayed" at the "inconsistencies" between the recently produced documents and the trial testimony of Rasmussen, Stern, and Levine.

Judge Roach also refers to Merrill's General Counsel Bevilacqua, as well as other Merrill executives' testimony that it was clear to them that a number of people at Merrill had been lying for many years, participating in the Snyder and Bingham lies and cover-up of lies, as well as the destruction and spoliation of evidence.  This Court, as well as the First Circuit, was supposed to take into consideration "the cumulative impact of all of the newly-discovered evidence."  See *Kyles* at 420.  As the Supreme Court has described, the government's conduct in this case clearly warranted a new trial as the case was "infested with constitutional errors." *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995).  *See, also, Wearry v. Cain*, 136 S.Ct. 1002 (2016), where only **one** *Brady* violation took a convict off of death row and required a new trial:

> "[T]he suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady, supra*, at 87.  *See also Giglio* (clarifying that the rule stated in *Brady* applies to evidence **undermining witness credibility**).  "Evidence qualifies as material when there is "**any reasonable likelihood**" it could have affected the verdict. *Giglio v. United States*, 405 U.S. 150 (1972) (*quoting Napue v. Illinois*, 360 U.S. 264, 271 (1959)).  To prevail on his *Brady* claim, Wearry need not show that he "more likely than not" would have been acquitted had the new evidence been admitted. *Smith v. Cain*, 132 S.Ct. 627, 629–631 (2012).  He must show only that the new evidence is sufficient to "**undermine confidence**" in the verdict. *Ibid.*" *Wearry* at 1006 (emphasis added) (internal quotation marks omitted).

Now Mr. Carpenter seeks the delayed justice of having his conviction vacated, his indictment dismissed, and his good name restored based on the government's egregious violation of his constitutional rights in the knowing use of evidence they knew to be false and outright perjury that they heard twice in two trials in 2005 and 2008. Sad, but true, had Mr. Carpenter had Judge Roach's Opinion in 2013 instead of May 2016 (see Doc. 545), Mr. Carpenter's life would have been totally different.

Clearly Judge Roach's Opinion shows that Attorney Snyder coached the Merrill witnesses to lie, and because of their repeated lies in the civil forum, they had to continue repeating those lies in Mr. Carpenter's criminal trials in 2005 and 2008, and the government worked in concert with Attorney Snyder to suborn knowing perjury in both of his trials as well as the civil litigation with the Exchangors after 2008. The government attorneys had frequent and repeated meetings with Attorney Snyder as if Attorney Snyder was, in reality, AUSA Snyder. But nowhere was Mr. Carpenter harmed more than in his Grand Jury, where there was just one witness, FBI Agent Caldwell, who literally quoted perjurious hearsay evidence from witnesses that AUSA Pineault had to know were lying, because Mr. Carpenter's Grand Jury hearing was in January of 2004, three years after the start of the civil litigation with Merrill, the multiple SEC and NASD investigations, and after a judgment had already been entered against Merrill Lynch as well as BPETCO in November of 2002, and there had already been several performances by Attorney Snyder in front of civil juries where he lied straight-faced to the jurors in closing arguments, saying that no one at Merrill Lynch had any knowledge that the BPETCO funds were third-party funds, and did not in fact belong to Mr. Carpenter. In 2016, for the very first time, everyone now knew that all of the Merrill witnesses knew that the BPETCO funds were third-party funds, and they all lied and perpetuated the lie for 16 years just to save themselves some

money in a civil lawsuit at the cost of an innocent man's freedom.  As the Court stated boldly

with italicized emphasis: "Levine's testimony in other respects was perjurious in this Court's

judgment, *and the government knew it.*" *See* Doc. 377 at 23, n.5 (emphasis in the Court's original

statement).  The reason this is important is because: "Interestingly, there was no evidence that

any of the exchangors, nor any attorney, accountant, or advisor interacting with [BPETCO] on

their behalf, ever asked where exactly the funds would end up, nor what Benistar's interest in the

exchange was." *Carpenter*, 808 F.Supp.2d at 391 n.8.

If Mr. Carpenter had available Judge Roach's Opinion in May of 2013 instead of May of

2016, the First Circuit never would have overturned Mr. Carpenter's Second New Trial Order

and Mr. Carpenter probably would not have been indicted two weeks later in Connecticut for

another non-crime that he did not commit. Therefore, it is Mr. Carpenter's hope that now armed

with Judge Roach's Opinion, the Court will immediately grant this Petition for a Writ of Coram

Nobis, and vacate Mr. Carpenter's conviction in the interests of justice based on the

overwhelming weight of this **new and cumulative** *Brady-Giglio-Bagley-Napue* and *Strickler-*

*Kyles* evidence discovered within three years of this Court's finding of his guilt in February of

2014 because the government knowingly used false evidence and the perjured evidence of

several witnesses to obtain the unconstitutional conviction of an innocent man.  In addition to the

*Giglio-Napue* violations, both types of *Brady* violations exist in this case and require the

vacating of Mr. Carpenter's conviction.

As the First Circuit has stated, there are in reality "two types" of *Brady* violations.  Since

the notorious Senator Ted Stevens prosecutorial misconduct came to light after Mr. Carpenter's

2008 trial, there are many examples of prosecutorial misconduct in Mr. Carpenter's case that are

far worse than anything that happened in Senator Stevens' unfortunate case. But, as the First

Circuit stated in *United States v. Acosta-Colon*, 741 F.3d 179 (1st Cir. 2013):

> Broadly speaking, there are two types of *Brady* violations. *See, e.g., United States v. González–González*, 258 F.3d 16 (1st Cir. 2001). The first occurs when the undisclosed evidence shows that prosecutors knowingly used perjured testimony or allowed false testimony to go uncorrected. *See, e.g., United States v. Agurs*, 427 U.S. 97, 103–04 (1976); *Giglio*, 405 U.S. at 153. For this violation, undisclosed evidence is material "if there is any **reasonable likelihood** that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103. The other type of *Brady* violation occurs when prosecutors suppress evidence favorable to the defense, even if the evidence does not involve false testimony. *Id.* at 104. For this violation, evidence is material "if there is a **reasonable probability** that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The "**reasonable likelihood**" and "**reasonable probability**" standards are synonymous. *Acosta-Colon* at 195, *citing González-González* at 21-22 (emphasis added).

Both forms of *Brady* violations are readily apparent in this case and the First Circuit used

the wrong standard to overturn Mr. Carpenter's Second New Trial Order. This is especially true

if one considers that Mr. Carpenter is the only person to have been granted two new trial orders

and that in September 2011, he was an innocent man once again, and he stayed innocent until the

First Circuit overturned his Second New Trial Order two years later on the basis that his

attorneys did such a "vigorous" cross-examination of the persistent perjurer Levine, that the jury

must have known that Levine lied. Despite this Court pointing out Levine's obvious and

persistent perjury, and the government's failure to correct any of those lies **in front of the jury**

as is their duty under *Napue* and *Giglio v. United States,* 405 U.S. 150 (1972), the First Circuit

felt the error here was harmless because Mr. Carpenter's attorney did such a great job on

Levine's cross-examination that the jury must have known Levine lied:

> Carpenter consequently was able to and did cross-examine the lying witness "vigorously." The district court therefore determined that a mistrial was not warranted on this basis. On appeal, Carpenter has not identified any reasonable likelihood that the jury's verdict in this case was impacted by the false testimony in light of his vigorous cross-examination. That ends this attack. *United States v. Carpenter*, 736 F.3d 619, 631 (1st Cir. 2013).

However, that is not the correct legal standard for an error under *Brady-Giglio* in the First Circuit or anywhere else, and a "vigorous" cross-examination is not a substitute for truthful testimony, and certainly is not the remedy required by the Supreme Court in *Napue* and *Giglio*. Nor does a "vigorous" cross-examination alleviate the government's burden, obligation, and legal duty to bring to the jury's attention that their witness, Levine, lied, especially in the face of David Patterson's testimony that it was Mr. Carpenter who set up the conference call between Attorney Patterson and Mr. Levine to discuss the development of the future escrow account documentation for Attorney Patterson's client, who was the first Exchangor. Levine testified that he was not on that call, and that he did not receive any of the documents that Attorney Patterson and Mr. Carpenter sent him. Even Marty Paley testified that he spoke with Levine several times. Most importantly, though, Mitch Rock testified that Levine set up the decisive conference call and was on the call where Mr. Carpenter was "handed-off" from Merrill Lynch to PaineWebber, yet Mr. Levine recalled none of these phone calls. The Court even asked Mr. Levine to consider if it was a question of not remembering or not actually being on the call, and Mr. Levine was adamant that he was not any of these phone calls, despite the contrary testimony of other witnesses.

The reason that this perjury by Levine and the other brokers is so important is that, contrary to Judge Kayatta's "nutshell" description, Mr. Carpenter never lied to anyone, nor did he know anything about the Exchangors until they wanted their money out. Mr. Carpenter did not "deceive" anyone, nor did he make any written or oral misrepresentations to anyone as charged in the Indictment. Instead, the lies of the Merrill Lynch witnesses hurt Mr. Carpenter's Good Faith defense as in "If he would lie to Merrill, he could certainly lie to the Exchangors." As it turns out, he did not lie to anyone as can be seen from a lawsuit against Merrill filed not by

Gail Cahaly, but by Joe Iantosca in February 2008, before Mr. Carpenter's second trial. See *Iantosca v. Merrill* lawsuit attached as Exhibit One. In that lawsuit, it clearly states that Mr. Carpenter and Mr. Paley told Merrill that the funds were third-party funds for a qualified property exchange under IRC Section 1031. Mr. Carpenter should have been provided with a copy of that lawsuit by the government, but did not learn of its existence until the middle of 2009.

Iantosca also filed lawsuits against Mr. Carpenter's affiliates in June and September of 2008, but was somehow "too sick" to testify at Mr. Carpenter's trial in June of 2008, so all of the Iantosca prejudicial statements from the first trial were allowed to come in to the second trial, but without the benefit of Mr. Carpenter being allowed to ask Mr. Iantosca if he had received all of his money back plus interest. The government even did a Motion in Limine to keep this truth away from the jury and out of Mr. Carpenter's second trial. Not only is this a flagrant violation of the Confrontation Clause under *Crawford v. Washington*, 541 U.S. 36 (2004), this is the type of prosecutorial vindictiveness that infected both of Mr. Carpenter's trials and now requires a vacating of Mr. Carpenter's conviction and a dismissal of his indictment because he was deprived of his liberty without Due Process, a Fair Trial, or even the "fundamental fairness" required of the government that justice be done under *Berger* v. *United States*, 295 U.S. 78 (1935). *See, also, United States v. Cameron*, 669 F.3d 621 (1st Cir. 2012) (First Circuit vacating conviction based on inadvertent violation of Confrontation Clause).

Not only did the First Circuit use the wrong standard for *Brady, Giglio,* and *Napue*, it does not alleviate the government's obligation to "jump up" and tell the jury that the govenrment's witness lied. In this case, the government only admitted to the Court in a December 3, 2008 hearing that Levine lied. There was no mention – ever or at any time – that

all of the other Merrill witnesses lied.  Nor did anyone, including the Court, tell the Jury that all of the government witnesses lied.  The First Circuit used the wrong standard to review Levine's perjury, and they did not consider in November of 2013 that all of the other Merrill witnesses lied as well.

Mr. Carpenter's entire case has been one long litany of prosecutorial misconduct.  Yet, rather than attempt to correct any of the Constitutional or Due Process violations in his case, the First Circuit continues to understate the government misconduct and ignore the truth and avoid making any decisions critical of the government.  If the conviction in *Flores-Rivera* was overturned at the same time Mr. Carpenter's conviction was affirmed because the government failed to turn over Delgado's "toilet paper" notes, please compare that to Rasmussen, Stern, and Levine committing perjury with not just the government's knowledge, but with the government's blessing.  *See United States v. Flores-Rivera*, 787 F.3d 1 (1st Cir. 2015):

> In analyzing whether there was a *Brady* violation, we evaluate the strength of the impeachment evidence and the effect of its suppression in the context of the entire record to determine its materiality. The import of withholding evidence is heightened where the evidence is highly impeaching *or* when the witness' testimony is uncorroborated and essential to the conviction.... We must grant a new trial if, after assessing the significance of the non-disclosed evidence in the context of trial, the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Flores-Rivera* at 17-18, *citing Avilés–Colón* at 19, and *Strickler* at 290 (emphasis in original).

The government also knew about the February 2008 *Iantosca v. Merrill Lynch* lawsuit that totally exonerates Mr. Carpenter and shows that he was innocent of these spurious accusations.  *See Iantosca* Lawsuit attached as Exhibit One.  If that is not *Brady-Jencks-Giglio-Bagley* information, then nothing is in the First Circuit.  While the First Circuit played with puns in overturning Nancy Gray's conviction with the "50 Shades of Malice" described in *United States v. Gray*, No. 13-1909 (1st Cir. 2015), where was the search for criminal *mens rea* in Mr.

Carpenter's case that the First Circuit required most recently in *United States v. Berroa*, 856 F.3d 141, 150 (1st Cir. 2017) ("under the government's theory, any false statement in an application...could constitute a federal crime."). In Mr. Carpenter's case, there was no "evil act" or "evil mind" and he did not lie to anyone at any time, and the words "specific intent to defraud" are nowhere to be found in his indictment or his trial transcript, and at this late date the government has still not pointed to even one written or oral misrepresentation on his part.

## VI.   THE DUE PROCESS DELAY IN THIS CASE REQUIRES THE GRANTING OF A WRIT OF CORAM NOBIS

Mr. Carpenter is the rare defendant that not only qualifies for the dismissal of his indictment under the Speedy Trial Act, but also qualifies for the dismissal of his indictment under the Fifth Amendment for Due Process Delay (see *Betterman v. Montana*, 136 S.Ct. 1609 (2016)) and the Speedy Trial Clause of the Sixth Amendment. *See, e.g., United States v. Pennick*, 2016 WL 4089192 (W.D.N.Y. 2016). "Although unusual, it is possible for a delay that does not violate the [Speedy Trial Act] to run afoul of the Sixth Amendment's guarantee of a speedy trial." *See United States v. Green*, 2018 WL 786185 (W.D.N.Y. 2018), *citing Pennick*, 2016 WL 4089192 at *2, *aff'd* 713 Fed.Appx. 33 (2d Cir. 2017). The standard for both constitutional Speedy Trial Clause violations and Due Process Clause delay violations is *Barker v. Wingo*, 407 U.S. 514 (1972), and as the Second Circuit noted in *Pennick*, above, that the defendant in *Barker* was only detained for a mere five months while awaiting trial, it has now been over 17 years since the Government began investigating Mr. Carpenter for conduct in 1999 and 2000. This is what the unanimous Supreme Court had to say about the dismissal of the indictment of a convicted murderer in *Moore v. Arizona*, 414 U.S. 25 (1973) after only a 26 month delay:

> Moreover, prejudice to a defendant caused by delay in bringing him to trial is not

confined to the possible prejudice to his defense in those proceedings. Inordinate delay, wholly aside from possible prejudice to a defense on the merits, may seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty. *Moore* at 27, *citing United States v. Marion*, 404 U.S. 307, 320-21 (1971).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. "If the government violates this constitutional right, the criminal charges must be dismissed." *United States v. Dowdell*, 595 F.3d 50, 60 (1st Cir. 2010), *citing Strunk v. United States*, 412 U.S. 434, 439-40 (1973). The speedy trial guarantee of the Sixth Amendment encompasses more than simply ensuring a speedy "trial." Rather, it was designed by the Framers, in part, "to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, ***and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges***." *United States v. Loud Hawk*, 474 U.S. 302, 311 (1986) (emphasis added), *quoting United States v. MacDonald*, 456 U.S. 1, 8 (1982). *See, also, United States v. Ewell*, 383 U.S. 116, 120 (1966) (Sixth Amendment guarantee of a speedy trial "is an important safeguard," *to **minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay** will impair the ability of an accused to defend himself*.") (emphasis added).

Mr. Carpenter's Petition for a Writ of Coram Nobis should be granted and the "new" law since his trial under *Bloate v. United States*, 559 U.S. 196 (2010), *United States v. Tinklenberg*, 131 S.Ct. 2007 (2011), and *United States v. Huete-Sandoval*, 668 F.3d 1 (1st Cir. 2011), as well as the fact that all four elements of the *Barker* test weigh in Mr. Carpenter's favor in this case. As the Supreme Court stated in *Barker*:

"[I]nordinate delay between public charge and trial, ... wholly aside from possible prejudice to a defense on the merits, may 'seriously interfere with the defendant's liberty, whether he is free on bail or not, and ... may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.'" *Barker* at 537.

Since this Court should dismiss the Indictment based on *Barker v. Wingo* as well as *United States v. Irizarry-Colon,* 848 F.3d 61 (1st Cir. 2017), Mr. Carpenter respectfully submits the case from the Second Circuit - *United States v. Montecalvo*, 861 F. Supp. 2d 110, 120 (E.D.N.Y. 2012) cited by the court in *United States v. Fawster*, 2013 WL 4047120 (D.R.I. 2013) – for the proposition of "presumptive" prejudice that:

"The longer the delay, the greater the presumptive or actual prejudice to the defendant, in terms of his ability to prepare for trial or the restrictions on his liberty ... whether he is free on bail or not, [the delay] may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. *United States v. Taylor,* 487 U.S. 326, 340 (1988)." *Fawster* at *4.

It is indeed interesting, if not ironic, that the most recent and most significant Speedy Trial and Due Process delay cases in the First Circuit both mention Mr. Carpenter's appeal, *United States v. Carpenter*, 781 F.3d 599 (1st Cir. 2015). See Judge Zobel's decision in *United States v. Handa*, 266 F.Supp.3d 443 (D. Mass. 2017) and the First Circuit's decision of February 2017 in *Irizarry-Colon* that eventually led to the dismissal of his indictment in the District of Puerto Rico in August of 2017 because of a Due Process delay that was not as long as Mr. Carpenter's Due Process delay. *See United States v. Irizarry-Colon*, 268 F.Supp.3d 324 (D.P.R. 2017). Simply put, based on the Supreme Court's decision in *Bloate* and *Tinklenberg*, as expressed by the First Circuit in *Huete-Sandoval*, it was clearly erroneous for this Court to not grant the dismissal of Mr. Carpenter's indictment based on the delay of 24 days from December 15, 2005 until January 9, 2006 when the government appealed Mr. Carpenter's first New Trial Order. When added to the 58 days that all parties agree were not excluded, that amounts to 82

49

days; a clear violation when compared to *Bloate* and *Huete-Sandoval* which were not as long. Additionally, when the Second New Trial Order was granted, that created yet another 28-day delay between September 1, 2011 and September 29, 2011, when the government appealed yet again. Moreover, in trying to excuse away its inexcusable conduct, the government has never mentioned or explained away the District of Massachusetts' own "Plan for Prompt Disposition of Criminal Cases" and its requirement of dismissal of the indictment if the rules are not followed pursuant to Rule 48(b). *See* Section 7, page 28.

That said, for the purposes of this Petition for a Writ of Coram Nobis, Mr. Carpenter wants to focus on the *Barker v. Wingo* Speedy Trial delay as discussed in *Handa*, and the *Barker v. Wingo* Due Process delay as discussed in *Irizarry-Colon* to show that his case is more deserving of dismissal than both of those, especially when considering Justice Sotomayor's Opinion in *Betterman*. Mr. Carpenter would like to respectfully point out to the Court that when the pre-indictment delay is added to the three-year delay between both trials, Mr. Carpenter's Speedy Trial delay now exceeds the delay in *Handa*, and unlike Mr. Handa who was living in India and traveling to Europe, Mr. Carpenter was reporting to Pre-Trial Services weekly and monthly for 10 years between 2004 and 2014. The delay in *Handa* that led to the dismissal of his indictment with prejudice was only six years from indictment to his arrest. The delay between the granting of Mr. Carpenter's First New Trial Order in December of 2005 to the First Circuit's ruling on his Second New Trial Order at the end of November 2013 was a long, agonizing, eight years of anxiety and public obloquy, almost all of which was the government's fault.

Similarly, Mr. Carpenter's Due Process delay from 2000-2018 has *Irizarry-Colon* beat and the defendant in *Irizarry-Colon* had several indictments dismissed on Speedy Trial grounds,

unlike Mr. Carpenter who had to go through trial twice and suffered the ultimate penalty of being incarcerated for three years for a non-crime that he did not commit, and considering this Court had no jurisdiction to try the case much less sentence him to an overly-long sentence. Because jurisdiction was lacking, Mr. Carpenter's conviction should be vacated in the interests of justice. But, if the Court does not agree with that analysis, the Writ should still be granted and Mr. Carpenter's conviction vacated based on the analysis done in *Handa* and *Irizarry-Colon*, both of which cite to *United States v. Carpenter* for the *Barker v. Wingo* factors:

(1) Length of the Delay: The delay from the end of the Second Trial in June 2008 to the First Circuit's reinstatement of the guilty verdict was 65 months. Had the First Circuit affirmed the Second New Trial Order, the third Carpenter Trial would have started within 70-90 days, making the total delay between trials 68 months.

(2) Reason for the Delay: Virtually the entire delay belongs to the Court and the government, which means the government is responsible. But, when the entire timeframe is viewed as is required by *Irizarry-Colon*, the government did two appeals of New Trial Orders causing delays of over four years just for the appeals, and the second appeal clearly violated the "Double-Jeopardy provision" of Section 3731.

(3) Defendant's Assertion of His Right: As the Court is well aware from earlier filings, Mr. Carpenter is the record holder for Speedy Trial motions in the First Circuit beginning in 2005 with Dkt. #79, dated June 13, 2005. No one else is even close in the number of filings for violations of the Speedy Trial Act and the Speedy Trial Clause.

(4) Prejudice to the Defendant: Certainly Mr. Carpenter's suffering and the suffering of his family transcends that of the defendants in *Handa, Irizarry-Colon, Barker, Marion, Moore,*

and *Taylor*.  Both this Court and the First Circuit have acknowledged the palpable prejudice in this case to Mr. Carpenter

Significantly, however, the length of the delay in this case should establish "presumptive" prejudice.  *See, e.g., United States v. Ferreira*, 665 F.2d 701, 707 (6th Cir. 2011), where the Sixth Circuit observed that in a prior decision, *Dixon v. White*, 210 Fed. Appx. 498 (6th Cir. 2007), a three-and-a-half-year delay necessitates a finding of presumptive prejudice and is in keeping with decisions from two of our sister circuits."  *See United States v. Erenas-Luna*, 560 F.3d 772, 780 (8th Cir. 2009) (Eighth Circuit applying *Doggett* and concluding that a three-year delay between indictment and arraignment caused by "the serious negligence of the government" was excessive enough to trigger a presumption of prejudice); *United States v. Ingram*, 446 F.3d 1332, 1339 (11th Cir. 2006) (Eleventh Circuit holding that a two-year, post-indictment delay caused by egregious government negligence allowed the court to presume prejudice in the fourth *Barker* prong).  Mr. Carpenter's case is exactly like the delay in *Dixon* (because all of these Speedy Trial cases deal with guns and drugs or other serious crimes), where the Sixth Circuit correctly reversed the lower court's judgment due to a three-year delay in the case being mostly attributable to the government.  As the Sixth Circuit stated:

> This case is materially indistinguishable from *Doggett* with respect to the four relevant speedy-trial inquiries, namely "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for the delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Id.* at 651.  First, although the three-and-a-half-year delay in this case is less than the eight-and-a-half-year delay in *Doggett*, it is still uncommonly long.  Second, as in *Doggett,* the state is more to blame for the delay.  Third, Dixon, like Doggett, raised his right to a speedy trial, and, fourth, like Doggett, **could not show actual prejudice from the delay**.  *Dixon* at 502 (emphasis added).

Mr. Carpenter has shown multiple times that the delay in his case has "cross[ed] the threshold dividing ordinary from 'presumptively prejudicial' delay."  *Girts v. Yanai*, 600 F.3d

576, 588 (6th Cir. 2010) (*quoting Doggett* at 651–52). It is clear that the governmental delays in this case have been motivated by prosecutorial misconduct, bad faith, vindictiveness, or an attempt to seek a tactical advantage, which should weigh heavily against the government. *United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006). There is no denying that 'substantial prejudice' to Mr. Carpenter and his family has resulted from the delay, and prejudice "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect," of which there are three: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker* at 532. The possibility that the defense will be impaired is "the most serious" of these interests. *Id.* "[E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett* at 655. Where the delay has been caused by negligence, "our toleration of such negligence varies inversely with its protractedness." *Doggett* at 657.

The delay from the end of the first trial to the second trial was three years, and the delay from the end of the second trial to the issuance of the Second New Trial Order was over three years. In *United States v. Giambrone*, 920 F.2d 176 (2d Cir. 1990), a notorious drug dealer had his indictment dismissed with prejudice for a delay of only 90 days. In *Erenas-Luna*, the Eighth Circuit applied *Doggett* and concluded that a three-year delay between indictment and arraignment caused by "the serious negligence of the government" was excessive enough to trigger a presumption of prejudice. *Erenas-Luna* at 780. Likewise, in *Ingram*, the Eleventh Circuit held that a two-year, post-indictment delay caused by egregious government negligence allowed the court to presume "conclusive" (presumptive) prejudice in the fourth *Barker* prong. *Ingram* at 1339. As stated in *Barker*, the effect delay has on a defendant's ability to mount a

defense is "the most serious" of the interests protected by the right, as "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker* at 532. Therefore, *Ferreira, Dixon, Erenas-Luna, Ingram, Doggett*, and the policy behind the original right to a Speedy Trial all support a conclusion that both the negligence that the government committed and the significant length of the eight-year delay warrant the granting of this Petition for a Writ of Coram Nobis.  Mr. Carpenter has suffered all of the things that the Founders worried about in adopting the Fifth and Sixth Amendments of the Constitution.

## CONCLUSION

Therefore, Mr. Carpenter respectfully renews his various motions to vacate his conviction and dismiss his Indictment due to the multiple serious violations of his constitutional rights by the government over this 18 year period.  Mr. Carpenter can find no case in the First Circuit or elsewhere that matches the number or the magnitude of the constitutional violations that occurred in his case to deprive him of Due Process, Fundamental Fairness, or the Fair Trial that the Constitution guarantees to everyone.  Because Mr. Carpenter has already served his sentence, the only remedy left in the interests of justice is to grant this Petition for a Writ of Coram Nobis due to these egregious violations of the most fundamental character, and to vacate his conviction.

Respectfully submitted,

/s/Daniel E. Carpenter

Daniel E. Carpenter
Petitioner *pro se*
18 Pond Side Lane
West Simsbury, CT 06092

54