# EXHIBIT ONE

*IANTOSCA V. MERRILL*
LAWSUIT

# COMMONWEALTH OF MASSACHUSETTS
# BUSINESS LITIGATION SESSION

SUFFOLK, ss.                                            SUPERIOR COURT DEPARTMENT

| | |
|---|---|
| JOSEPH IANTOSCA, Individually and as Trustee of the Faxon Heights Apartments Realty Trust and Fern Realty Trust, BELRIDGE CORPORATION, GAIL A. CAHALY, JEFFREY M. JOHNSTON, BELLEMORE ASSOCIATES, LLC, and MASSACHUSETTS LUMBER COMPANY, INC. Plaintiffs, v. MERRILL LYNCH PIERCE FENNER & SMITH, INC., Defendant. | CIVIL ACTION NO. 08-0775-D |

## COMPLAINT AND JURY DEMAND

### PARTIES

1. Joseph Iantosca is a natural person and a resident of the Commonwealth of Massachusetts. Mr. Iantosca brings this action individually and as trustee of plaintiffs Faxon Heights Apartments Realty Trust and Fern Realty Trust.

2. Belridge Corporation is a Massachusetts Corporation with a principal place of business in Weymouth, Massachusetts. Mr. Iantosca is the President and sole shareholder of Belridge.

3. Gail A. Cahaly is an individual residing in Westwood, Massachusetts.

4. Jeffrey M. Johnston is an individual residing in Boston, Massachusetts.

4. Jeffrey M. Johnston is an individual residing in Boston, Massachusetts.

5. Bellemore Associates, LLC is a limited liability company organized under the laws of New Hampshire.

6. Massachusetts Lumber Company, Inc. is a Massachusetts corporation with its principal place of business in Cambridge, Massachusetts.

7. Merrill Lynch Pierce Fenner & Smith, Inc. ("Merrll Lynch") is a Delaware corporation with a usual place of business at 125 High Street in Boston Massachusetts.

## FACTS

8. By letter dated January 16, 2008, the plaintiffs presented Merrill Lynch with a written demand for relief in accordance with Massachusetts General Laws Chapter 93A, § 9 (3).

9. Merrill Lynch did not respond with a reasonable offer within 30 days.

10. Merrill Lynch opened and operated brokerage accounts for Benistar Property Exchange Trust Company, Inc.

11. As its name suggests, Benistar Property Exchange Trust Company, Inc. held money in trust for its clients. Specifically, Benistar Property Exchange Trust Company, Inc. had Escrow Agreements with its clients, including plaintiffs, under which it agreed to hold its clients funds in escrow.

12. Gerald Levine, one of the Merrill Lynch brokers who opened and managed the accounts for Benistar Property Exchange Trust Company, Inc. was informed by the President of Benistar and by an attorney for one of Benistar's clients that the funds in Benistar's accounts at Merrill Lynch belonged to Benistar's clients and were escrow funds that had to be returned on demand to Benistar's clients.

13. The Merrill Lynch brokers who opened and managed the accounts for Benistar Property Exchange Trust Company, Inc. were informed in writing that the funds in Benistar's accounts at Merrill Lynch belonged to Benistar's clients and were escrow funds that had to be returned on demand to Benistars clients.

14. The documents provided to Merrill Lynch included the Escrow Agreement used by Benistar to establish its contractual and fiduciary duties with its clients.

2

15. The documents provided to Merrill Lynch included the Exchange Agreement that described in detail Benistar's contractual and fiduciary duties as an intermediary in accordance with Section 1031 of the Internal Revenue Code.

16. As described in the Escrow and Exchange documents that were provided to Merrill Lynch, and as described to Gerald Levine in the conversations he had with Benistar's president and the attorney for one of Benistar's clients, Benistar served as an intermediary for Section 1031 transactions.

17. Section 1031 of the Internal Revenue Code entitles taxpayers to defer capital gains taxes on the appreciation of commercial real estate by using the proceeds of a sale of such real estate to purchase like-kind property.

18. The documents provided to Merrill Lynch explained that Benistar Property Exchange Trust Company held in escrow for its clients the proceeds of real estate sales made by its clients and that Benistar agreed to hold these funds in escrow pending its clients' need for those funds to acquire replacement property.

19. Despite their knowledge that the money in the Benistar accounts belonged to Benistar's clients and was to be held in escrow, the Merrill Lynch brokers approved the Benistar accounts for highly speculative option trading.

20. Benistar lost millions through the option trading and, despite demands by plaintiffs, failed to return approximately $8.7 million to plaintiffs.

21. In 2001, plaintiffs sued Benistar and served a third party subpoena on Merrill Lynch seeking all documents relating to the Benistar accounts.

22. Merrill Lynch did not produce the Benistar Escrow and Exchange Agreements or the correspondence between its broker and the attorney for one of Benistar's clients.

23. Later in 2001, Merrill Lynch was added as a party in this Massachusetts litigation and plaintiffs served discovery requests on Merrill Lynch seeking all information and all documents relating to the Benistar accounts.

24. Merrill Lynch did not produce the Benistar Escrow and Exchange Agreements or the correspondence between its broker and the attorney for one of Benistar's clients, nor did it identify these documents and communications.

25. Merrill Lynch lied about its involvement with the Benistar accounts and destroyed, concealed and/or failed to produce the documents evidencing its participation with Benistar in the misuse of Benistar's clients' funds.

26. Plaintiffs discovered the documents evidencing Merrill Lynch's participation with Benistar in the misuse of its clients' funds after Merrill Lynch's brokers testified under oath that they had no knowledge that the Benistar accounts contained other people's money.

27. Despite the testimony by Merrill Lynch's brokers denying their knowledge of and participation with Benistar in the misuse of Benistar's clients' funds, a jury found Merrill Lynch liable for colluding with Benistar and found that Merrill had violated New York and Connecticut consumer protection statutes.

28. A judgment entered on that verdict prior to the award of damages based on Merrill Lynch's violation of the New York and Connecticut consumer protection statutes. The present judgment has a value of more than $26,000,000.

29. Merrill Lynch has persisted in its denial of liability despite the discovery by plaintiffs of the documents that Merrill Lynch destroyed, concealed and/or failed to produce and despite its own knowledge that the testimony provided at trial by its brokers was perjurious.

30. Merrill has pursued litigation in an attempt to harass plaintiffs, to impose financial costs and emotional distress on the plaintiffs and to extort plaintiffs to settle for less then they are owed.

31. As a result of the unfair and deceptive conduct described above, plaintiffs have suffered damages in the form of the attorneys' fees, the loss of use of money, tax liabilities, accountants' fees and emotional distress.

32. Merrill's Lynch's Board of Director's has adopted *Merrill Lynch's Code of Ethics for Financial Professionals* and which states: "All financial professionals must . . .[e]ngage in and promote honest and ethical conduct . . . [and] act in good faith, responsibly, with due care, competence, prudence and diligence, without misrepresenting material facts or allowing one's independent judgment or decisions to be subordinated."

## COUNT I – UNFAIR AND DECEPTIVE ACTS PROHIBITED BY G.L. c. 93A

33. Plaintiffs restate the allegations set forth in paragraphs 1-32 above and incorporate them by reference as though fully set forth herein.

34. Merrill Lynch has willfully and knowingly engaged in unfair and deceptive conduct in violation of G.L. c. 93A.

35. Plaintiffs have been injured by Merrill Lynch's willful and knowing engaged in unfair and deceptive conduct in violation of G.L. c. 93A.

36. Plaintiffs are entitled to compensatory damages, punitive damages and attorneys fees based on Merrill Lynch's willful and knowing unfair and deceptive conduct.

## COUNT II - FRAUD

37. Plaintiffs restate the allegations set forth in paragraphs 1-36 above and incorporate them by reference as though fully set forth herein.

5

38. Merrill Lynch's willfully and knowingly engaging in unfair and deceptive conduct constitutes fraud.

39. Plaintiffs have been injured by Merrill Lynch's fraudulent conduct.

40. Plaintiffs are entitled to recover from Merrill Lynch the damages caused by Merrill Lynch's fraudulent conduct.

## COUNT III – MALICIOUS DEFENSE

41. Plaintiffs restate the allegations set forth in paragraphs 1-40 above and incorporate them by reference as though fully set forth herein.

42. In support of Merrill Lynch's defense to plaintiffs' claims based on its collusion with Benistar in the improper use of plaintiffs' escrow funds, Merrill Lynch created false material evidence and gave false testimony advancing such evidence.

43. Plaintiffs have been injured by Merrill Lynch's malicious defense.

44. Plaintiffs are entitled to recover from Merrill Lynch the damages caused by Merrill Lynch's malicious defense.

**WHEREFORE**, plaintiffs demand judgment against Merrill Lynch in an amount sufficient to compensate them for the injuries caused by Merrill Lynch, for punitive damages in the amount of three times the amount of the judgment on all claims arising out of the same and underlying transactions or occurrences, for costs and attorneys fees, and for all other relief the court may deem appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

JOSEPH IANTOSCA, Individually and as Trustee
of the Faxon Heights Apartments Realty Trust and
Fern Realty Trust, BELRIDGE CORPORATION,
GAIL A. CAHALY, JEFFREY M. JOHNSTON,
BELLEMORE ASSOCIATES, LLC, and
MASSACHUSETTS LUMBER COMPANY, INC.

By their attorneys,

*/s/ Anthony R. Zelle*

Anthony R. Zelle, BBO No. 548141
**ZELLE MCDONOUGH LLP**
Four Longfellow Place, 35th Floor
Boston, MA 02114
Tel: (617) 742-6520
Fax: (617) 973-1562

William C. Nystrom, BBO No. 559656
Colleen C. Cook, BBO No. 636359
**NYSTROM BECKMAN & PARIS LLP**
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100

# EXHIBIT TWO



# Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law

Charles Doyle
Senior Specialist in American Public Law

July 21, 2011

Congressional Research Service
7-5700
www.crs.gov
R41931

CRS Report for Congress
Prepared for Members and Committees of Congress

# Introduction

The federal mail and wire fraud statutes outlaw schemes to defraud that involve the use of mail or wire communications. Both condemn fraudulent conduct that may also come within the reach of other federal criminal statutes. Both may serve as racketeering and money laundering predicate offenses. Both are punishable by imprisonment for not more than 20 years; for not more than 30 years, if the victim is a financial institution or the offense is committed in the context of major disaster or emergency. Both entitle their victims to restitution. Both may result in the forfeiture of property.

# Elements

The mail and wire fraud statutes are essentially the same, except for the medium associated with the offense – the mail in the case of mail fraud and wire communication in the case of wire fraud. As a consequence, the interpretation of one is ordinarily considered to apply to the other. In construction of the terms within the two, the courts will frequently abbreviate or adjust their statement of the elements of a violation to focus on the questions at issue before them. As treatment of the individual elements makes clear, however, there seems little dispute that conviction requires the government to prove:

1. the use of either mail or wire communications in the foreseeable furtherance
2. of a scheme to defraud
3. involving a material deception
4. with the intent to deprive another of
5. either property or honest services.

**Use of Mail or Wire Communications:** The wire fraud statute applies to anyone who transmits or causes to be transmitted by wire, radio, or television communication in interstate or foreign commerce any writings for the purpose executing a scheme or artifice. The mail fraud statute is similarly worded and applies to anyone who for the purpose of executing a scheme or artifice causes use of the mails.

The statutes require that a mailing or wire communication be in furtherance of a scheme to defraud. It need not be an essential element of the scheme, as long as it is incident to an essential element of the scheme. A qualifying mailing or communication, standing alone, may be routine, innocent or even self-defeating, because the relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive. The element may also be satisfied by mailings or communications designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect.

A defendant need not personally have mailed or wired a communication; it is enough that he caused a mailing or transmission of a wire communication in the sense that the mailing or transmission was the reasonable foreseeable consequence of his intended scheme.

**Scheme to Defraud**: The mail and wire fraud statutes both prohibit, in pertinent part, any scheme or artifice to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, or deprive another of the right to honest services by such means. From the beginning, Congress intended to reach a wide range of schemes to defraud, and has expanded the concept whenever doubts arose. It added the second prong – obtaining money or property by false pretenses, representations, or promises – after defendants had suggested that the term "scheme to defraud" covered false pretenses concerning present conditions but not representations or promises of future conditions. More recently, it added Section 1346 to make it clear the term "scheme to defraud" encompassed schemes to defraud another of the right to honest services. Even before that adornment, the words were understood to refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.

The statutes condemn schemes to defraud—both the successful and the unsuccessful. Nevertheless, there may be some question whether the statutes reach those schemes designed to deceive the gullible though they could not ensnare the reasonably prudent. It is not uncommon for the courts to declare that to demonstrate a scheme to defraud the government needs to show that the defendant's communications were reasonably calculated to deceive persons of ordinary prudence and comprehension. One court considered these statements no more than an identification of a point at which the government has satisfied its burden in a particular case, without addressing whether a lesser quantum of evidence might suffice in other cases. In any event, the question may be more clearly present in the context of the defendant's intent and the materiality of deception, matters discussed below.

**Materiality**: Neither the mail nor the wire fraud statute include a reference to materiality. Yet materiality is an element of each offense, because at the time of the statutes' enactment, the word "defraud" was understood to require a misrepresentation or concealment of a material fact. A statement is material for mail or wire fraud purposes only if it has the natural tendency to influence or be capable of influencing the person to whom it was addressed.

**Intent**: Under both statutes, intent to defraud requires a willful act by the defendant with the intent to deceive or cheat, usually, but not necessarily, for the purpose of getting financial gain for one's self or causing financial loss to another. A defendant has a complete defense if he believes the deceptive statements or promises to be true or otherwise acts in good faith. A defendant has no such defense, however, if he blinds himself to the truth. Nor is it a defense if he intends to deceive but feels his victim will ultimately profit or be unharmed.

**Money, Property, or Honest Services**: The mail and wire fraud statutes speak of schemes to defraud or to obtain money or property. They clearly protect against deprivations of tangible property. Their protection of intangibles has not always been as clear. They do protect intangible *property* rights, although they do not apply to certain intangible rights in property that have no value in the hands of the victim of a scheme.

Some time ago, the Supreme Court held in *McNally v. United States* that the protection does not extend to "the intangible right of the citizenry to good government." Soon after *McNally*, Congress enlarged the mail and wire fraud statute coverage to include the intangible right to honest services, by defining the term "scheme or artifice to defraud" to include[s] a scheme or artifice to deprive another of the intangible right to honest services. Lest the expanded definition be found unconstitutionally vague, the Court in *Skilling v. United States* limited its application to cases of bribery or kickbacks.