## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DANIEL E. CARPENTER | ) | |
| Petitioner, | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| Respondent. | ) | |

## REPLY IN FAVOR OF GRANTING A WRIT OF CORAM NOBIS
## TO VACATE MR. CARPENTER'S CONVICTION

In what can only be seen as putting procedure over justice, the Government in its

Opposition to Mr. Carpenter's Petition for a Writ of Coram Nobis (see Doc. 563 "Govt. Opp.")

makes the incredible claim that a person that is on Supervised Release is not allowed to protect

their constitutional rights by securing a Writ of Coram Nobis. The Government suggests that

Mr. Carpenter should avail himself of a second 2255, which of course Mr. Carpenter cannot do

without first seeking a Certificate of Appealability from the First Circuit to get permission to

submit a second or successive writ of habeas corpus. Even more ridiculous is the fact that there

is no limit on the number of filings for a writ of coram nobis, whereas AEDPA effectively limits

2255 petitions to one per customer. So, if anything, according to the Government, the only

problem with Mr. Carpenter's Petition for a Writ of Coram Nobis is that it is being filed 18

months too early. Therefore, to appease the Government's meritless and baseless opposition to

his Petition for a Writ of Coram Nobis, Mr. Carpenter has filed a motion to be released from the

remainder of his time on Supervised Release. (See Doc. 564). Since that is the only objection

that the Government makes to the numerous constitutional violations of a fundamental nature in

this case, the Court should grant Mr. Carpenter's Motions to vacate his conviction.

1

The only reason Mr. Carpenter did not file a Writ of Coram Nobis earlier, is that he fully anticipated the Court would have granted his 2255 by now, which has been pending for over three years, and there are other motions still pending that go back over four years. Mr. Carpenter's sentencing in an unrelated Connecticut case is scheduled for next week (June 27, 2018), and he will be greatly prejudiced if he is sentenced on the basis of Criminal History II instead of Criminal History I. Therefore, according to the Government, the only thing left for Mr. Carpenter to do is to file a Writ of Mandamus to have the First Circuit order this Court to rule on all of these pending motions. Mr. Carpenter has decided instead to use the Writ of Coram Nobis to give this Court one more opportunity to remedy the terrible injustice and the overall grievous miscarriage of justice in this 18-year nightmare that Mr. Carpenter has suffered at the hands of an over-zealous and bureaucratic Government that has sought to punish him for what now everyone understands is a non-crime that he did not commit. Not even Kafka can describe the existential nightmare of an unfeeling Government that seeks to make sure that all of the innocent are punished, lest one guilty man escape justice. Mr. Carpenter has described in great detail all of the constitutional violations that he has endured, and the Government insists on continuing to violate the Constitution by putting form over substance, and procedure over the rule of law. The Government has raised no legal or substantive objections to Mr. Carpenter's Coram Nobis Petition, so this Court should grant Mr. Carpenter's Motion to terminate his supervised released (Doc. 564) and then issue the Writ of Coram Nobis to vacate his conviction.

The Supreme Court has defined the term "miscarriage of justice" as encompassing those 'extraordinary instances when a ***constitutional violation*** probably has caused the conviction of one innocent of a crime.'" *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). Seemingly, the ends of

justice would be served by granting such an extraordinary relief as requested in this *coram nobis*.

Just as in *United States v. Castro-Taveras*, 841 F.3d 34 (1st Cir. 2017), where the defendant built

his *coram nobis* "church" upon the single "rock" of Ineffective Assistance of Counsel (*id.* at 36-

37, 52-53), Mr. Carpenter has in his case numerous constitutional "pillars" on which to build his

*coram nobis* "cathedral", not the least of which is the ineffective assistance of his attorneys, lack

of jurisdiction by this Court, improper Venue, extraordinary Due Process delay, and the

Constructive Amendment of his Indictment, which led to the conviction of an innocent man for a

non-crime that he did not commit.

The Government also continues to ignore that there are a dozen other motions since 2014

that are still pending with this Court, which Mr. Carpenter incorporates by reference:

| 477 | Motion for Reconsideration re Order on Motion for Forfeiture | 6/3/2014 |
|---|---|---|
| 496 | Motion to Vacate (2255) | 5/18/2015 |
| 499 | Motion to Amend Judgment & Commitment Order | 6/1/2015 |
| 502 | Motion for Reconsideration | 6/15/2015 |
| 503 | Motion to Amend 2255 | 7/6/2015 |
| 505 | Motion for Summary Judgment as to Daniel E. Carpenter. | 7/31/2015 |
| 541 | Motion for Reconsideration re [500] Order on Motion to Dismiss as to Daniel E. Carpenter. | 4/1/2016 |
| 545 | Motion for New Trial Pursuant to Rule 33. | 5/20/2016 |
| 556 | Renewed MFR of Forfeiture Order & Rule 29 Denial | 11/27/2017 |
| 555/557 | Renewed Motion for Summary Judgment Pursuant to 2255 | 11/27/2017 |
| 559/560 | Motion to Dismiss Due Process & STA Violations | 12/14/2017 |
| 561 | Motion to Vacate Pursuant to Brady, Jencks, Bagley, Giglio, and Napue, and the use of Perjury and False Evidence | 12/21/2017 |

The only reason Mr. Carpenter continues to go over the same old ground is because the

constitutional violations in this case have not become better with age, they have become more

bitter, more caustic, and have poisoned any vestige of Fundamental Fairness or Due Process in

this case.

I.    **IT IS CLEAR FROM THE GOVERNMENT'S APPEAL BRIEFS IN THIS CASE AND THE FIRST CIRCUIT'S OPINION THAT MR. CARPENTER'S INDICTMENT WAS CONSTRUCTIVELY AMENDED**

By the time of Mr. Carpenter's second trial, the Government had abandoned any pretense of trying Mr. Carpenter based upon a scheme of knowingly false misrepresentations charged in the indictment. Instead they radically changed the theory of the case from a scheme to deceive involving affirmative misrepresentations to one predicated on Mr. Carpenter's "nondisclosure" of his investment strategy. Since this Court denied all of those previous motions, additional statements by the Government, in the course of its appeal to the First Circuit, confirm that an impermissible shift in the theory occurred, causing a Constructive Amendment which is a *per se* constitutional violation requiring vacatur of Mr. Carpenter's conviction.

For example, in its original brief on appeal, the Government focused on omissions, such as Carpenter's failure to disclose that he would be investing the Exchangors' funds in stock options, among other omissions, that constituted "nondisclosure" that the Supreme Court stated in *Skilling v. United States*, 561 U.S. 358 (2010) was outside the bounds of the fraud statutes, for example:

- "The documents omitted critical information about Carpenter's risky investment strategy . . . ." Government's Opening Brief, *United States v. Carpenter*, No.11-2131, at 3-4.

- Carpenter used exchangors' money "to trade in high-risk stock options" "without telling them." *Id.* at 4.

- "[N]one of the documents disclosed that the exchange funds could be invested in stock options, or that returns from such investments would accrue to Benistar's or Carpenter's – rather than the exchangors' – benefit." *Id.* at 9.

- "Patterson testified that the agreements' failure to disclose that Carpenter intended to trade in stock options was material . . . ." *Id.* at 10.

- "Carpenter's good faith was belied by his failure to disclose his intent to use the exchangors' money to generate significant profits for himself."

- "Also evincing Carpenter's fraudulent intent, the government argued, was Carpenter's failure to disclose that he had been 'kicked out of' Merrill Lynch for sustaining heavy trading losses in the options market . . . ." *Id.* at 18.

- Noting government's rebuttal argument that Carpenter was using the money in a way that he had not disclosed to the exchangors, and he had lulled them into a different kind of belief than what he would actually do with the money." *Id.* at 20-21.

- Noting the "lack of disclosure about how Carpenter actually intended to exercise his 'discretion' to 'invest' the funds . . . ." *Id.* at 25.

- Carpenter "continued to take in millions of dollars from new exchangors without revealing what he was actually doing with their money." *Id.* at 25-26.

- "[T]he representations in the marketing materials and agreements were . . . false and misleading because of what they did not say – that Carpenter intended to use the funds to trade aggressively in risky stock options . . . ." *Id.* at 41.

- The documents "omitted highly material information as to what Carpenter was 'investing' in and how he was exercising his 'discretion.'" *Id.* at 47-48.

The Government's reply brief continued and solidified the "omissions" and nondisclosure theme:

- '[T]hat Carpenter defrauded the exchangors by failing to disclose his true intentions at the time he took the exchangors' money" was "central to the government's theory of the case." Government's Reply Brief, *United States v. Carpenter*, No.11-2131, at 5.

- The government "appropriately drew the jury's attention to the contrast between the low rates of return the contacts promised to the exchangors and the outsized profits Carpenter intended to gain for himself by subjecting the exchange funds to risks that he did not disclose." *Id.* at 9.

- "[A] key aspect of the government's theory was that Carpenter's desire to generate profits for himself above and beyond the fee he was paid to hold and invest the exchangors' money supplied a motive for his failure to disclose his true intentions." *Id.*

- "there was ample evidence of Carpenter's undisclosed profit motive." *Id.*

- "Carpenter's objection . . . focused on the government's comments about his failure to disclose his trading strategy . . . ." *Id.* at 15.

- "Carpenter knew, but did not disclose to the exchangors, that he had pursued and intended to continue to pursue an extremely risky investment strategy." *Id.* at 21.

- "Carpenter also knew he had sustained heavy losses as a result of his undisclosed risky investment strategy . . . ." *Id.*

Additionally, at oral argument before the First Circuit, the Government focused on the *context* in which the Exchangors entrusted their money to BPETCO, *i.e.*, the nature and requirements of a §1031 property exchange, while it was Mr. Carpenter who focused on the contracts themselves, the very reverse of what would have been the case had the government still been pursuing a false statements theory. The Government's oral argument underscores the reality that by the time of the second trial and appeal, this was no longer a case about written false statements but had instead transformed into an "omissions" case of nondisclosure, which several Supreme Court cases have determined are not covered by the Mail and Wire Fraud Statutes. This is especially true in light of the fact that Mr. Carpenter himself made no oral representations, nor did he authorize anyone to make any representations at all apart from what was contained in the written agreements and marketing materials.

The Government's Constructive Amendment of the Indictment is reflected in the Opinion of the First Circuit, which adopted the Government's theory in analyzing the issues before it:

- "Had there been full disclosure, especially after Carpenter knew his risky investment strategy had failed, the exchangors would never have made the investments to begin with or maintained them with Benistar." *Carpenter*, 2013 WL 6153701 at *8.

- The government "sought to show that Carpenter had misrepresented his approach by pursuing a riskier investment strategy than exchangors would have expected from the representations made and the nature of their purposes in entering exchange contracts." *Id.* at *7.

- Carpenter "knew his strategy differed from their expectations and he deliberately failed to correct or prevent those expectations." *Id.*

6

- "Carpenter knew not a single document advised exchangors that he was taking the risks he did with their money and knew that if the exchangors had been so advised, they never would have contracted with Benistar." *Id.* at *6.

- "The charges were based in part on the theory that Carpenter intended to deceive the exchangors as shown by his continuing to make the same representations to them about the handling of their money even after he knew of his investment strategy's failures." *Id.* at *3.

Thus, the mail/wire fraud offense with which the grand jury charged Mr. Carpenter – one predicated upon alleged affirmative misrepresentations specifically set forth in the indictment – to one in which Mr. Carpenter's silence on the matter of his investment strategy was central to the scheme's asserted criminality. Critically, the Government's reliance on an omissions theory at trial creates the real likelihood that Mr. Carpenter was convicted based on a theory of mail/wire fraud which was neither charged nor properly submitted to the jury for its consideration, especially based on *Skilling* at 400 and 420. Given the Government's heavy emphasis on Mr. Carpenter's failure to disclose that he was investing Exchangors' money in stock options, the jury may well have rested its quick decision to convict Mr. Carpenter on all counts on a legally non-viable omissions theory.

After Professor Dershowitz pointed out to the Court that those allegedly false "representations" needed to be "material" in accordance with the Supreme Court's ruling in *Neder v. United States*, 527 U.S. 1 (1999), the Government then issued a new superseding indictment in September 2004 that added the word "material" to the words "false representation" in seven paragraphs. Yet, at this late date, there is no oral or written false statement attributed to Mr. Carpenter because he never met with any of the Exchangors. Moreover, Mr. Carpenter never sent anything in writing to the Exchangors, and even if the Government could prove that any of the Exchangors saw Mr. Paley's PowerPoint presentation upon which the Government relies, the

intervening Supreme Court cases of *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), and *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), would certainly illustrate that there was no fraud at all in this case, much less material false representations that would rise to the level of a specific intent to defraud as required for a federal indictment under the mail and wire fraud statutes.

Mr. Carpenter successfully completed 119 out of 126 property exchanges and handled over $100 million in accounts without taking a penny for himself. Mr. Carpenter did not induce anyone, fraudulently or otherwise, to give their money to BPETCO, nor did he "misappropriate" any funds as claimed by the Superseding Indictment in Paragraph 25. The five Exchangors who lost $8.6 million in December 2000 in what is still the worst stock market crash of all time, have now received more than $46 million in damages from Mr. Carpenter's litigation against PaineWebber and Merrill Lynch. The variance here, if not a full Constructive Amendment to the Indictment, was manifestly prejudicial to Mr. Carpenter as it denied him the fair notice of the charges against him guaranteed by the Sixth Amendment, *see, e.g., Russell v. United States*, 369 U.S. 749 (1962), and raises the very real specter that the jury may have convicted him on a legally insufficient ground, requiring reversal under *Yates v. United States*, 135 S.Ct. 1074 (2015) and other Supreme Court cases. This was truly a case in which, in violation of Mr. Carpenter's rights under the Fifth and Sixth Amendments, the government "shift[ed] its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal." *Russell* at 768.

8

## II.   RECENT DECISIONS OF THE FIRST CIRCUIT PROVE THERE WAS NO JURISDICTION IN THIS CASE

Respectfully, this Court did not have jurisdiction over Mr. Carpenter because the federal mail and wire fraud statutes do not purport to reach **all frauds**, but only those "limited instances in which the use of the mails is a part of the execution of the fraud, leaving **all other** cases to be dealt with by appropriate state law." See the First Circuit's decision in *United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016), *citing Kann v. United States*, 323 U.S. 88, 95 (1944) and *United States v. Maze*, 414 U.S. 395 (1974) (emphasis added). In this case, the government not only failed to address all five critical elements of mail and wire fraud, every single count involved an email, letter, or wire involving BPETCO that came **after** the Exchangors already decided to use BPETCO for their property exchanges. All of these counts related to acts occurring after the alleged fraud had come to its full fruition. If the alleged fraud was now a crime of omission or nondisclosure in not telling the Exchangors that Mr. Carpenter was losing money or was trading in stock options, then none of the mailings and wires in this case satisfy the "in furtherance" requirement. None of them.

*Tavares* involved a truly fraudulent scheme where the convictions were thrown out because the mailings in that case, i.e. the rejection letters sent out to non-successful applicants, were **not in furtherance of the fraudulent scheme** to hire certain other people. Therefore, based on *Tavares*, there is no way the conviction in Mr. Carpenter's case can possibly stand because of the gaping void in causation of the mailings and wires and the failure of the government to show that any of the mailings and wires were **in furtherance** of any fraud:

> "The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Schmuck v. United States*, 489 U.S.

705, 710 (1989). "[T]he mailing must be 'for the purpose of executing the scheme, as the statute requires.'" *Maze* at 400. A mailing furthers a fraudulent scheme if it is, inter alia, "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *Tavares* at 58.

Similarly, the Second Circuit's decision in *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016), which is based on several notable First Circuit decisions, totally eviscerates not only the government's theory of culpability in Mr. Carpenter's case, but also the legal reasoning behind the jury instructions for mail and wire fraud.  The bedrock of these elements is the "scheme to defraud," which further requires proof that the defendant had the knowledge that he was breaking the law and the criminal *mens rea* or specific intent in contemplating harm to the victim by making a misrepresentation of a material fact, *see Neder v. United States*, 527 U.S. 1, 25 (1999), and intended not to follow through with the contract at its inception, which clearly did not happen here since Mr. Carpenter completed 119 out of 125 property exchanges.  The Second Circuit in its decision primarily relied on and cited on more than one occasion the case of *McEvoy Travel v. Heritage Travel*, 904 F.2d 786, 791-92 (1st Cir. 1990), for the proposition that "the common law requires proof—other than the fact of breach—that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation." *Countrywide* at 660. The Second Circuit also quotes the First Circuit in *Sanchez v. Triple-S*, 492 F.3d 1, 11 (1st Cir. 2007) in saying:

> A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes. *See, e.g., Am. United Life v. Martinez*, 480 F.3d 1043, 1065, (11th Cir. 2007); *United States v. Gray*, 405 F.3d 227, 235–36 (4th Cir. 2005); *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000)....We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who—a jury might find—secretly harbored in his heart the hope that the buyer would never ask."

Thus, to sustain the verdict, the government needed to prove that a promise was made which [Mr. Carpenter] *never intended to fulfill. Id.* at 658–59 (emphasis added). As the Second Circuit explained, a contractual breach alone is not fraud, because a breach of contract is not an affirmative misrepresentation or omission to the counterparty. *Id.* The First Circuit reached a similar conclusion as to physicians lying on a medical exam application in *United States v. Berroa*, 856 F.3d 141, 150 (1st Cir. 2017), where the First Circuit echoed Mr. Carpenter's argument all along that "under the government's theory, any false statement in an application…could constitute a federal crime." In Mr. Carpenter's case, it is indisputable that he did not lie to anyone, about anything, at any time.

## III.   THE FIRST CIRCUIT'S ANALYSIS OF THE *BARKER v. WINGO* FACTORS FAVOR THE GRANTING OF THE WRIT OF CORAM NOBIS

In suggesting that Mr. Carpenter is just repeating old claims, the Government misses the point. The Speedy Trial and Due Process delay claims in this case have not gotten better over time, but have clearly gotten worse, requiring the vacating of Mr. Carpenter's conviction. Indeed, if one were to compare the *Barker v. Wingo*, 407 U.S. 514 (1972) analysis done by this Court in its February 2014 ruling with the First Circuit's decision in 2015, it becomes clear that the Court should have granted the dismissal of Mr. Carpenter's Indictment sometime between 2008 and 2014. With or without prejudice is not an issue any longer. The Government misses the point that, while Mr. Carpenter is stating that he remains a victim of both the Speedy Trial Act violations and violations of the Speedy Trial Clause of the Constitution in this case, he is now coming before this Court stating that he has longest Due Process delay in American judicial history, and certainly in the First Circuit by comparing Mr. Carpenter to the defendant in *United*

*States v. Irizarry-Colon*, 848 F.3d 61 (1st Cir. 2017) who had his indictment dismissed with prejudice in 2017, and the defendant in *Betterman v. Montana*, 136 S. Ct. 1609 (2016) who pled guilty to his crimes and only had a sentencing delay of 14 months instead of 14 years as in Mr. Carpenter's case.   So, while this Court and the First Circuit blame Mr. Carpenter for all the filings between 2009 and 2011 as negating the 38 month delay, citing *United States v. Loud Hawk*, 474 U.S. 302 (1986), under a Due Process analysis, Mr. Carpenter is entitled to a dismissal of his Indictment because of the 96 months attributable to the Government from December 2005 to November 2013, which exceeds the famous cases of *Doggett v. United States*, 505 U.S. 647 (1992), *United States v. Marion*, 404 U.S. 307 (1971), *Moore v. Arizona*, 414 U.S. 25 (1973), and even the case cited by the First Circuit of *Loud Hawk*.

Whereas the First Circuit agreed with this Court on the first two prongs, that the delay was more than a year and most of the fault here was the Government or the three-year delay by the Court, and both this Court and the First Circuit acknowledged that the prejudice to the defendant under the Fourth *Barker* Factor favored Mr. Carpenter, this Court considered Mr. Carpenter's record of asserting his right to be "spotty", but the First Circuit disagreed with this Court and stated the following:

> Thus, in our view, the district court's conclusion that Carpenter's assertion of the right had been "spotty at best," Carpenter, 2014 WL 691659 at *4, **is not quite accurate,** at least in the time period from late 2009 to 2011, when his undecided motion was pending.
> Of course, on June 17, 2010, Carpenter informed the court that the whole case might go away, and that the court might not need to decide the post-trial motions. It is reasonable to think that a busy trial judge, so informed, might attend to other matters rather than re-engaging with a voluminous set of motions. Nevertheless, this does not significantly detract from the fact that **during the period of unwarranted delay, Carpenter otherwise steadily pressed the district court for action.** *United States v. Carpenter,* 781 F.3d 599, 614 (1st Cir. 2015) (emphasis added).

Therefore, if one were to combine the First Circuit's *Barker* analysis with this Court, it is

clear error that the Court did not dismiss on the basis of STA violations or Speedy Trial Clause violations in this case. But Mr. Carpenter repeats those claims, not to show the error by this Court, which is what a Writ of Coram Nobis is all about, but to emphasize the Due Process delay violation that Mr. Carpenter's attorneys never raised until argument before the First Circuit. Mr. Carpenter makes two points: first, no one in the judicial history of the First Circuit has done as many motions and letters asserting his rights to a speedy trial than Mr. Carpenter, beginning with a motion prior to his first trial (see e.g. Dkt. No. 79), and continuing with the motions prior to his second trial (see e.g., Dkt. Nos. 229, 239, 241, 244), and letters during the inexplicable three-year delay. As it stands, Mr. Carpenter has more motions concerning Speedy Trial than *Bloate v. United States*, 559 U.S. 196 (2010), *United States v. Tinklenberg*, 131 S. Ct. 2007 (2011), and *United States v. Huete-Sandoval*, 668 F.3d 1 (1st Cir. 2011) combined. While the First Circuit stated that the 21-month "unwarranted" delay in this case was not prejudicial because it was due to negligence on the part of this Court, the fact is that negligence is no excuse because "[r]easonable diligence" demands "serious effort[s]." *See Doggett* at 652, 656.

The second point Mr. Carpenter wishes to make is now that *Irizarry-Colon* is the law of the First Circuit and has resulted in dismissals of indictments in *United States v. Handa* and *United States v. Reina-del-Rosario*, the First Circuit has now adopted the principle of presumptive prejudice after a period of time so that the defendant does not need to prove the palpable prejudice that clearly exists in Mr. Carpenter's case. So, if the Carpenter case had come after *Irizarry-Colon*, the outcome in *Carpenter* would have been entirely different on a Speedy Trial basis. Moreover, however, Mr. Carpenter's Coram Nobis claim is based on the incredible Due Process delay in this case that both this Court and the First Circuit commented on in their

rulings in Mr. Carpenter's case. Both this Court and the First Circuit apologized for the delay, but did not honor Mr. Carpenter's constitutional rights or recognize the Due Process delay under the Fifth Amendment and the Speedy Trial delay under the Sixth Amendment, which leads to the Ineffective Assistance of Counsel violation under the Sixth Amendment that Mr. Carpenter is highlighting in his Petition for a Writ of Coram Nobis.

Therefore, as Justice Sotomayor stated in the fourteen month delay in *Betterman v. Montana*, the appropriate analysis for post-trial delay as was clearly apparent in this case, should be the same *Barker* factors. That is why Mr. Carpenter is recirculating the same arguments of the past, because the analysis of a Due Process Clause delay is now the same as a Speedy Trial Clause delay. So once again, the Government is willfully blind to the massive Due Process violations in Mr. Carpenter's case, which is longer than *Doggett, Loud Hawk, Marion,* and *Moore* combined. Mr. Carpenter should be entitled to having this Court correct its original error, that is why this Writ of Coram Nobis is appropriate.

## CONCLUSION

For the reasons detailed above, Mr. Carpenter respectfully asks this Court to grant his Motion to terminate his Supervised Release (Doc. 564) and then grant his Petition for a Writ of Coram Nobis to vacate his conviction (Doc. 562) based on the constitutional violations in this case and errors of a fundamental nature.

Respectfully Submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro-se*
18 Pond Side Lane
West Simsbury, CT 06092