## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DANIEL E. CARPENTER )
Petitioner, )
v. )        CRIMINAL NO. 04-10029-GAO
)
UNITED STATES OF AMERICA )
Respondent. )

## MR. CARPENTER'S REPLY BRIEF IN SUPPORT OF
## TERMINATION OF HIS SUPERVISED RELEASE

There are so many mistakes in the law and facts of this case in the Government's

Opposition Brief (Doc. 566, "Gov. Opp.") that it is difficult to know where to begin. But, on

Page 2 of its brief, the Government suggests that my alleged criminal conduct between 2007 and

2008 "was a direct violation of his release conditions in this case." Gov. Opp. at 2. This

patently absurd statement by the Government highlights the Kafkaesque Due Process nightmare

that Mr. Carpenter and his family have had to live through for the past 18 years.

### PRELIMINARY STATEMENT

Just to refresh the Government's memory, Mr. Carpenter won his first New Trial Order in

December 2005 and then won his Second New Trial Order in September 2011 after more than a

three-year delay from his second trial in 2008. However, under the law, Mr. Carpenter was

totally innocent until the First Circuit overturned this Court's 2011 New Trial Order on

November 28, 2013, and only then was Mr. Carpenter indicted two weeks later for alleged

suspiciously criminal conduct occurring between 2007 and 2009. Needless to say, Mr. Carpenter

has not been sentenced in that case yet, so that means under the law, he has not been convicted.

The whole purpose of the Writ of Coram Nobis was to get this Court to rule on Mr. Carpenter's

2255 Petition and several other motions to vacate his Boston conviction, which have been pending for more than three years. If Mr. Carpenter is successful in his 2255 Petition or his Writ of Coram Nobis, then he will be at a Criminal History I rather than II.

More importantly, when Mr. Carpenter was sentenced by this Court in February 2014, there was not a single mention of any lie or misrepresentation that Mr. Carpenter ever told the Exchangors. Instead, there was a lot of talk about Judge Swain's $30 million sanction against Mr. Carpenter in New York that was later vacated and overturned by the Second Circuit, the "looming" indictment from the Eastern District of Wisconsin that was dropped in 2016 (see Exhibit One Sentencing Transcript), and of course the Government's own indictment in Connecticut in December of 2013 because Mr. Carpenter had the temerity to sue the IRS and the DOL for their unlawful commando raids on Mr. Carpenter's office. Those lawsuits are still active in two different courts in Connecticut. Just as Mr. Carpenter won two Rule 33's in this Court, the Government would be wrong to count him out in having Judge Chatigny reconsider his June 6, 2016 verdict in Connecticut, but that is not the point of this filing.

This Court needs to vacate Mr. Carpenter's Boston conviction for all of the reasons detailed in both his 2255 Petition and the Writ of Coram Nobis. The Government believes incorrectly that one cannot file a Writ of Coram Nobis until one is off supervised release, which prompted this motion to terminate the period of supervised release. Whereas Mr. Carpenter was over-sentenced by 12 months because of the extraneous and unrelated claims made by the Government in February of 2014, they now raise those very same specious claims of criminal conduct from 2007-2009 to deny the termination of Mr. Carpenter's supervised release. But,

supervised release is meant to help the defendant who has served his time, to help him get back on his feet and re-enter Society; not to punish him further.

In fact, the combination of this Court's 36-month sentence where the regional and national average was 24 months (see Exhibit One), with the actions of the prosecutors in Connecticut to delay Mr. Carpenter's trial, caused him to lose the 12 months of Halfway House and Home Confinement that all prisoners (except Mr. Carpenter) are guaranteed under the Second Chance Act and 18 U.S.C. §3624(c). Therefore, the Probation Office in Connecticut has already acknowledged in Mr. Carpenter's Pre-Sentence Report (PSR) that he has a time credit of 16 months for over-serving the sentence for the Boston conviction. But, if this Court vacates his Boston conviction, Mr. Carpenter's eligible credit for time served goes up to 36 months.

## I.     THE PURPOSE OF SUPERVISED RELEASE

This brings us back to the purpose of supervised release. Congress intended supervised release to be "curative" rehabilitation for the released felon to reintegrate back into Society, not extra punishment to be added onto a sentence. Since courts already punish defendants with prison sentences, Congress instructed judges to consider only non-punitive factors under §3553 when considering the conditions for supervised release. *See, e.g., United States v. Kappes*, 782 F.3d 828, 836 (7th Cir. 2015) ("Supervised release was not intended to be imposed for the purposes of punishment or incapacitation, since those purposes will have been served to the extent necessary by the term of imprisonment."), and *United States v. Murray*, 692 F.3d 273, 280 (3d Cir. 2012) (noting that the omission of §3553(a)(2)(A) "reinforces the idea that the primary purpose of supervised release is to facilitate the reentry of offenders into their communities, rather than to inflict punishment").

The obvious Due Process dilemma that Mr. Carpenter is facing here is that he was sentenced in 2014 for allegedly criminal conduct occurring between 1998 and 2000.  Now in 2018 he is facing sentencing again for alleged criminal conduct between 2007 and 2009.  There is no other case like this in the annals of the First Circuit, or any other Circuit for that matter.  If the Court reviews the factors for Mr. Carpenter as an individual under 18 U.S.C. §3553, as the Court is obligated to do, then it becomes clear that Mr. Carpenter has been under this Court's purview for over 14 years since he was first indicted in February 2004.  This fact alone should warrant this Court granting him relief now because he was over-sentenced for the alleged "omissions" and nondisclosure in the documents Marty Paley put together in 1998 based on new allegations of criminal conduct between 2007 and 2009. Now the Government wishes to bring up these very same issues to penalize him again, ten years after his alleged conduct in the Connecticut case where the insurance carrier "victims" received over $100 million in premiums and Mr. Carpenter's company lost over $70 million.  Unlike the Boston case, no insurance carrier victims showed up looking for restitution from Mr. Carpenter or the Charter Oak Trust.

This brings us full circle to the absurd notion that Mr. Carpenter should not have his supervised release terminated because he has not paid his $100,000 fine or his restitution. Obviously, both the Fine and Restitution go away if Mr. Carpenter's conviction is vacated, but the Court should take notice that the Government's exhibit shows Mr. Carpenter dutifully paying his restitution at $50 per month.   But, nowhere does the Government mention that the Exchangors have received over $50 million for their $8 million loss in 2001 in Mr. Carpenter's and BPETCO's victories over PaineWebber and Merrill Lynch.   All of the Exchangors have given Mr. Carpenter a full settlement and release, which is attached as Exhibit Two.

## II.    THE CONNECTICUT CASE MAY YET BE RESOLVED IN MR. CARPENTER'S FAVOR

When Judge Chatigny wrote his Verdict on June 6, 2016, he did not have the benefit of the Second Circuit's scholarly decision discussing the history of the Mail and Wire Fraud Statutes in *United States v. Countrywide,* 822 F.3d 650 (2d Cir. 2016), the Eleventh Circuit's description and adoption of Second Circuit law in *United States v. Takhalov,* 827 F.3d 1307 (11th Cir. 2016), the now-famous Seventh Circuit decision defining Mail and Wire Fraud between sophisticated parties in negotiating a contract in *United States v. Weimert,* 819 F.3d 351 (7th Cir. 2016), the First Circuit's decision in *United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016) defining the limits of the Mail and Wire Fraud Statutes, or the First Circuit's decision in *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017).  He also did not have the benefit of *United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) ("*Litvak II*"), which led him to recently (June 2018) grant a Rule 33 New Trial for Michael Gramins, who was the co-defendant of Ross Shapiro in the famous securities fraud case of *United States v. Shapiro*, No. 15-cr-155.  On the same day that *Litvak II* was issued by the Second Circuit, the jury acquitted David Demos for the similar charge of lying to his clients on Wall Street.  *See United States v. Demos*, No. 16-cr-220. Therefore, there is a good argument to be made that lies done in contracts or commercial transactions are not enough to trigger the Mail and Wire Fraud Statutes.

These cases are all important because the allegations in Mr. Carpenter's December 2013 Indictment are that he was the leader of a scheme to defraud numerous insurance companies by inducing them to issue so-called "STOLI" (Stranger-Originated Life Insurance) policies.  It is not disputed that Mr. Carpenter did not fill out, sign, or send in any of the applications for the entity involved, the Charter Oak Trust, nor was he the Trustee or the Insurance Trustee of the Charter

5

Oak Trust.  His only involvement in this affair was that his company Grist Mill Capital funded the policies that were purchased by the Charter Oak Trust.  The evidence produced at Mr. Carpenter's bench trial (obviously after two negative experiences with prosecutorial misconduct in Boston, Mr. Carpenter did not want any of the jurors to see him brought to trial in handcuffs and shackles each day from the Wyatt Detention Center), showed without a doubt that the carriers were paid over $100 million for the alleged STOLI policies, and at the end of the day, Mr. Carpenter's company Grist Mill Capital lost over $74 million.  These sums have been audited several times by both the IRS in audits and Mr. Carpenter's accountants.  Therefore, after the Second Circuit's decision in *Countrywide*, where there was a massive fraud involving billions of dollars of worthless mortgages purchased by Fannie Mae, it is difficult to see how there can be any fraud in the Charter Oak Trust which paid millions of dollars to the insurance carriers who were the alleged "victims" in the Connecticut case.  As this Court knows, the now-famous *Countrywide* decision by the Second Circuit was largely based on two seminal cases from the First Circuit: *McEvoy Travel v. Heritage Travel,* 904 F.2d 786, 791-92 (1st Cir. 1990) ("the common law requires proof--other than the fact of breach-that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation.") *Countrywide* at 660, and *Sanchez* v. *Triple-S,* 492 F.3d 1, 11 (1st Cir. 2007), stating:

> A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes. *See, e.g., United States* v. *Autuori,* 212 F.3d 105, 118 (2d Cir.2000)....We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who-a jury might find-secretly harbored in his heart the hope that the buyer would never ask."

Additionally, Judge Chatigny did not have the benefit of two other recent landmark cases from the First Circuit limiting the mail and wire fraud statutes, requiring that the mailings and wires be in furtherance of the fraud. *See United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016) (in reversing RICO and mail fraud convictions and ordering the entry of judgments of acquittal) held that while "[t]he 'in furtherance' requirement is to be broadly read and applied," *id.* at 58, the requirement "places an important limitation on federal authority." *Id.* (citing *Kann v. United States,* 323 U.S. 88, 95 (1944)). Furthermore, Judge Chatigny did not have the benefit of the First Circuit's overturning the convictions of several doctors who lied on their exam applications. *See Berroa*, where the First Circuit echoed Mr. Carpenter's argument all along that "under the government's theory, any false statement in an application…could constitute a federal crime." *Id.* at 150.

Significantly, neither Mr. Carpenter nor Judge Chatigny had the benefit of the now-famous Seventh Circuit decision in *Weimert*, where Weimert, a banker negotiating a deal to sell a property owned by his employer, a major bank, not only lied to his current employer the bank, but also lied to his future "partner" the real estate company and pocketed millions of dollars that he took from both his employer and his future partner. In vacating Weimert's conviction, the Seventh Circuit made the following comments limiting the scope of the Mail and Wire Fraud statutes:

> Buyers and sellers negotiate prices and other terms. To state the obvious, they will often try to mislead the other party about the prices and terms they are willing to accept. Such deceptions are not criminal.
>
> To take a simple example based on price, suppose a seller is willing to accept $28,000 for a new car listed for sale at $32,000. A buyer is actually willing to pay $32,000, but he first offers $28,000. When that offer is rejected and the seller demands $32,000, the buyer responds: "I won't pay more than $29,000." The seller replies: "I'll take $31,000

but not a penny less." After another round of offers and demands, each one falsely labeled "my final offer," the parties ultimately agree on a price of $30,000. Each side has gained from deliberately false misrepresentations about its negotiating position. Each has affected the other side's decisions. If the transaction involves interstate wires, has each committed wire fraud, each defrauding the other of $2,000? Of course not. But why not? The…answer is that negotiating parties, and certainly the sophisticated businessmen in this case, do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior. Deception about negotiating positions—about reserve prices and other terms and their relative importance—should not be considered material for purposes of mail and wire fraud statutes. *Weimert* at 357-58.

In commercial negotiations, it is not unusual for parties to conceal from others their true goals, values, priorities, or reserve prices in a proposed transaction. When we look closely at the evidence, the only ways in which Weimert misled anyone concerned such negotiating positions. He led the successful buyer to believe the seller wanted him to have a piece of the deal. He led the seller to believe the buyer insisted he had a piece of the deal. All the actual terms of the deal, however, were fully disclosed and subject to negotiation. There is no evidence that Weimert misled anyone about any material facts or about promises of future actions. *Id.* at 354.

The mail and wire fraud statutes do not cover all behavior which strays from the ideal….[W]e know of no other case in which a court has found that deceptive statements about negotiating positions amounted to a scheme to defraud under the mail or wire fraud statutes. *Id.* at 357-58.

In the end, the Seventh Circuit determined that Weimert's dealings in selling the Chandler Creek property were "sharp and self-interested, but they did not amount to wire fraud….[A]ll terms of the deal were on the table. IDI might have been able to secure a better deal if it had known the underlying priorities of prospective buyers and Weimert, but that is . . . a matter for the corporate boardroom and civil law, not a federal criminal trial." *Id.* at 370.

In the same vein, Judge Chatigny did not have the detailed opinion from the Eleventh Circuit in *Takhalov*, describing and thereby adopting the law of the Second Circuit as to what is required for there to be a violation of the Mail and Wire Fraud Statutes. Deceit is not enough; there must be an actual intent to harm the victim of the deceit. To explain this fine but vital distinction in the law, the Eleventh Circuit uses what might be called the "Parable of the

Deceitful Neighbor" to explain its position.  The Eleventh Circuit depicted two scenarios. In the first, a man calls his neighbor saying that his child is very ill, and the neighbor responds by rushing over to see if she can help. The man asks her to give him change for a dollar, which the helpful neighbor gladly gives him. She later learns that the neighbor's child was not sick at all. The second scenario is identical to the first, except that now the Deceitful Neighbor gives the helpful neighbor a counterfeit dollar in exchange for the four quarters. The Eleventh Circuit explains that the first scenario is not wire fraud, but the second one is, despite the fact that the helpful neighbor would not have rushed over in the first scenario had she known that the child was not really sick.

Most recently, the Second Circuit has made it abundantly clear that not only must there be more than deceit in a Mail and Wire Fraud case based on the Right to Control Theory of Fraud, there must also be "intended" demonstrable "tangible economic harm" to the victim before somebody can be held accountable under the Mail and Wire Fraud Statutes. *See United States v. Finazzo,* 850 F.3d 94 (2d Cir. 2017), *citing United States v. Mittelstaedt,* 31 F.3d 1208 (2d Cir. 1994).   In *Finazzo*, the Second Circuit uses its own parable to teach its lessons concerning the Mail and Wire Fraud Statutes by stating that if an apparel company did not wish to be involved with overseas child labor, and a supplier lied about their non-involvement in child labor, that would be deceit but it would not impact the bargain, which would be based on the quality, the amount, and the cost of the goods.  So, unless the lie or the deceit was meant to cause "tangible economic harm" to the alleged victim, it is doubtful that the Mail and Wire Fraud Statutes would apply according to the Second Circuit.  This is particularly true in the accusations in Mr. Carpenter's case, because no one disputes that the STOLI policies have been profitable to

the carriers, and that it is Mr. Carpenter's company that lost money because of the lies of the carriers' own brokers. More importantly, it is an ancient maxim of insurance law that the "knowledge of the agent is the knowledge of the carrier." *See, e.g., Stipcich v. Metropolitan Life,* 277 U.S. 311 (1928).

Most recently, however, in Connecticut Judge Chatigny granted Michael Gramins's motion for a new trial pursuant to Rule 33 based on *Litvak II*, and he mentions *United States v. Demos* in his decision, who was acquitted of all charges on the same day that *Litvak II* was issued by the Second Circuit. The interesting timing and coincidence of this is that it was exactly two years after Judge Chatigny's decision regarding Mr. Carpenter in Juné of 2016. Not only does Judge Chatigny discuss the materiality element, but his rulings in the *Shapiro* case were cited by the defense in *Demos*. Attached as Exhibit Three is Judge Chatigny's ruling in *Shapiro*, that was cited to the judge in *Demos* by the defendant's attorney. There are a number of good quotes from Judge Chatigny in *Shapiro* used in *Demos* applicable to Mr. Carpenter's case, but perhaps the most significant are the following:

> "I don't think you can be convicted under the Constitution unless you had a sufficiently culpable state of mind such that you made a conscious choice to cross an important line and expose yourself to potential imprisonment....The Supreme Court has recognized that when a challenged action or course of conduct is a technical violation of the law as opposed to morally reprehensible it becomes more important to make it clear to the jury that the government has a burden to prove that the defendant knew his conduct was unlawful. Why? Because we don't want to be exposing people to conviction and incarceration if they didn't know that this is what they were risking."

> To establish that a defendant 'willfully violat[ed]' the antistructuring law, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).... As a general matter, when used in the criminal context, a "willful" act is one undertaken with a "bad purpose." In other words, in order to establish a "willful" violation of a statute, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191 (1998).

10

"As the Government concedes, lying in arms-length commercial transactions is not always illegal. It depends on the particular facts and circumstances. *See Regent Office* at 1179 (lies that are "repugnant to standards of business morality" may nevertheless be insufficient to support a criminal conviction for fraud). Prior to the indictment in Litvak, the conduct at issue appears to have been widespread in the RMBS market. Cooperating witnesses in this case testified that they didn't realize the conduct was illegal. After a series of trials involving five defendants charged with essentially the very same conduct, only Mr. Gramins currently stands convicted on any count in any of the indictments. It is possible the jury convicted him on the conspiracy count, and hung or acquitted as to all other counts in the indictment, only because it was persuaded that he continued to engage in the conduct notwithstanding the Litvak indictment. Others who engaged in this conduct have been the subject of civil enforcement proceedings or no enforcement proceedings at all. It is fair for the defendants to wonder what distinguishes their conduct from that of others who have been spared indictment."

"I would rather risk error on the side of lenity than the other way." *See* Transcript from *Demos* citing Judge Chatigny in *Shapiro* attached as Exhibit Three.

But, based on the major precedent from Supreme Court cases as well as *Weimert, Countrywide, Takhalov,* and *Finazzo*, if Mr. Carpenter is to be someday sentenced, there are obviously a number of Due Process violations in his Connecticut case that mirror and even surpass the Due Process and Speedy Trial violations in the Boston case. Obviously, these will be issues for the Second Circuit, but Mr. Carpenter wishes to point out the sentences that have been given in other STOLI cases, both in New York and California that dwarf the alleged STOLI fraud in the Charter Oak Trust case. Most significant is that Mr. Carpenter, when he is sentenced, will have the benefit of Sentencing Guidelines Amendments 791, 792, and 794. But, even without those, virtually all of the people sentenced in STOLI fraud cases have received a sentence of one year or less, or even probation as was done in the First Circuit case of *United States v. Prosperi,* 686 F.3d 32 (1st Cir. 2012), involving major fraud surrounding the "Big Dig" where the defendants received probation instead of the eight years suggested by the Sentencing Guidelines or the three years Mr. Carpenter received. Therefore, Mr. Carpenter respectfully asks

11

this Court to review the possible sentences out there that have already been delivered for STOLI

fraud to negate the Government's claim that Mr. Carpenter has committed some heinous crime

of the century that should deprive him of the early termination of his supervised release.  In fact,

if his conduct was a crime, it was a victimless crime with no intended loss under *United States v.*

*Manatau*, 647 F.3d 1048 (10th Cir. 2011), and no actual loss under *Finazzo*.

 For example, former Attorney General Loretta Lynch prosecuted Chaim Lebovits and

Moses Neuman for an alleged $500 million STOLI fraud (see Exhibit Four), but actually made a

sentencing recommendation of Probation for Mr. Lebovits, who was the alleged ringleader of the

$500 million fraud, yet the Government decided that the actual loss to the carriers was only

$70,000-$120,000 (see Exhibit Five), and a recommendation of only a year and a day for Mr.

Neuman. Similarly, a California judge sentenced Jeffery Keller, who was the ringleader of an

even larger STOLI fraud, to 90-days and $1 million in restitution even though he was paid $3.8

million in STOLI commissions. See Exhibit Six. His partner, Stuart Steinfeld, was sentenced to

60 days with no restitution and a small $10,000 fine.  See Exhibit Seven.  The Keller-Steinfeld

STOLI fraud was much larger than the Lebovits-Neuman STOLI fraud, which at $500 million

was much larger than all of the policies in the Charter Oak Trust combined.

 Therefore, it should not be surprising that in affirming the conviction of David Quatrella,

the Second Circuit found his three year sentence to be reasonable and yet, attorney Quatrella pled

guilty to not only lying to the insurance carriers but lying to his partners and his investors, who

in his case became the victims under the MVRA (*United States v. Quatrella*, 722 Fed.Appx.

64 (2d Cir. 2018)).  This is to be contrasted with Mr. Carpenter, who was not the agent or broker

that lied on the application, but rather was the so-called "Funder" or the "Investor" that was

determined to be the victim in *Quatrella*.  As with all of the cases above, David Quatrella's guilty plea and the Second Circuit's decision were all after Judge Chatigny's June 2016 decision. Significantly, in the Second Circuit docket, there was a copy of a <u>Wall Street Journal</u> article from November 2008 attached as Exhibit Eight that shows that the STOLI or Life Settlement business had come to an end by the Summer of 2008, with the collapse of Bear Stearns in March 2008 and the bankruptcy of Lehman Brothers in September 2008.

 Needless to say, Mr. Carpenter's second trial in Boston was in June 2008, and happened between those two dramatic events in a terrible year for the American economy, so he has the dubious distinction of being the only person in America indicted for losing money in the Stock Market collapse of 2000 and again for fraud in the Great Recession of 2008.  No investment bankers were charged for losing client money in 2000, nor were the trustees of the Massachusetts or Connecticut pension plans charged for losing billions of dollars in the Stock Market crashes of 2000 or 2008, and as we now know, no one from Countrywide, AIG, or even Goldman Sachs was indicted for the massive fraud that led to the collapse of the American economy ten years ago in 2008.  Only Mr. Carpenter stands accused of losing money in the Stock Market in 2000 and defrauding insurance companies in 2008 by arranging to pay them over $100 million in premiums.

 Moreover, just as the Exchangors have made $50 million on their $8 million loss, so too have the insurance carriers made over $100 million on the premiums paid by Mr. Carpenter's company and others, thereby having no actual loss, despite paying reinsured death benefits as late as this year, when Judge Chatigny's own Verdict states on page 21 that the carriers could have rescinded the policies at any time and kept the premiums paid if the policies were actually

13

STOLI policies.  Obviously, the carriers' actions in Mr. Carpenter's case seem to be drowning out the Government's shrill screams that Mr. Carpenter committed some kind of crime with the Charter Oak Trust, and Judge Chatigny's own decisions in *Shapiro* and *Gramins* seem to support Mr. Carpenter's Due Process claims that he should not be punished if he did not know that he was breaking the law in 2000 or in 2008.  Certainly there was no "bright line" that he crossed, because life insurance policies are still being bought and sold, and the carriers continue to collect premium and pay death claims on the allegedly fraudulent Charter Oak Trust policies to this day.

Therefore, based on the fact that most "White Collar" criminal offenders, especially the ones who plead guilty, are released after serving half of their supervised release, and July 26, 2018 marks Mr. Carpenter's halfway point, and in the past 20 years from 1998-2018 he has been accused of only doing two bad things – both of which he vigorously disputes – it is therefore fitting that this Court grant this Motion to Terminate Mr. Carpenter's Supervised Release and then proceed to examine his Petition for a Writ of Coram Nobis to vacate his conviction.

## CONCLUSION

For the reasons detailed above, Mr. Carpenter respectfully asks this Court to grant his Motion to Terminate his Supervised Release (Doc. 564) and then grant his Petition for a Writ of Coram Nobis to vacate his conviction (Doc. 562) based on the constitutional violations in this case and errors of a fundamental nature.

Respectfully Submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro-se*
18 Pond Side Lane
West Simsbury, CT 06092