# EXHIBIT
# ONE

1          UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
2

3    * * * * * * * * * * * * * *
     UNITED STATES OF AMERICA      *
                                   *
4              vs.                 *        CRIMINAL ACTION
                                   *        No. 04-10029-GAO
5    DANIEL E. CARPENTER           *
                                   *
6    * * * * * * * * * * * * * *

7         BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                 UNITED STATES DISTRICT JUDGE
8                      **SENTENCING**

9    A P P E A R A N C E S

10            UNITED STATES ATTORNEY'S OFFICE
              1 Courthouse Way, Suite 9200
11            Boston, Massachusetts 02210
              for the United States
12            By:  Jack W. Pirozzolo, AUSA

13
              MARTIN G. WEINBERG, PC
14            20 Park Plaza, Suite 1000
              Boston, Massachusetts 02116
15            for the defendant
              By:  Martin G. Weinberg, Esq.
16                 Robert M. Goldstein, Esq.

17

18
                                   Courtroom No. 9
19                                 John J. Moakley Courthouse
                                   1 Courthouse Way
20                                 Boston, Massachusetts 02210
                                   February 26, 2014
21                                 2:00 p.m.

22

23            CAROL LYNN SCOTT, CSR, RMR
                 Official Court Reporter
24            One Courthouse Way, Suite 7204
              Boston, Massachusetts 02210
25                 (617) 330-1377

```
 1    time.  This was avoidable.  And as you just heard, as I just

 2    mentioned, there is lots of bad judgment proof, he's

 3    judgment proof, he's judgment proof.  This loss has been

 4    paid here but not a lot has been paid by Mr. Carpenter.

 5    That's the record in this case.

 6            And one of the fundamental tenets of criminal law

 7    is that when you're dealing with a judgment-proof person is

 8    to deal with that.  You have an incarcerative sentence so

 9    there is a cost, so there is a price to be paid for taking

10    people's money, for defrauding people, even if they can't

11    get their money back from that person.

12            That's why, among other things, in order to show

13    just punishment for this offense the five-year sentence is

14    appropriate.

15            I am going to turn now to the issue of deterrence.

16    The Court has in the sentencing papers and elsewhere in the

17    record, during the ten years that Mr. Carpenter has been on

18    pretrial release in this matter it's not as if he has, it's

19    not as if the evidence shows that he his tried the straight

20    and narrow.

21            In addition to the crime that is documented with

22    respect to the unique (ph.) type civil litigation in

23    connection with this case, Mr. Carpenter now stands indicted

24    in the District of Connecticut for an insurance fraud scam.

25    He is currently under investigation for tax offenses in the
```

1    District of Wisconsin.  And his treatment and behavior in

2    connection with this case in terms of his utter lack of

3    accepting any responsibility is in full display in the civil

4    case, the *Universitas* case that the government also

5    submitted to the Court.

6         And the facts of that case, while civil, are

7    appalling.  There is, there are repeated instances of

8    evading orders of the Court.  Contempt.  He's been held in

9    contempt in that matter.  There is 30 million dollar

10   proceeds of a life insurance policy that he has done

11   everything in his power to make sure doesn't get paid to the

12   policyholder.  And the Court has not only found that he's

13   done that, engaged in fraudulent conveyance after fraudulent

14   conveyance, but that when asked about it in that matter, he

15   testified deceitfully.

16        Usually in the white collar context we talk about

17   general deterrence and don't talk a whole lot about specific

18   deterrence but specific deterrence matters in this case.  No

19   reasonable construction, no reasonable view of the series of

20   events over the last few years can suggest anything other

21   than that Mr. Carpenter is, in fact, a threat.

22        And it's beyond the scope of this argument for

23   purposes of sentencing to assess what relevance in terms of

24   his pretrial release status and bail status will be based on

25   those indictments but the fact remains he is a threat to the

1          For 2012 -- and it is not necessary to go through

2     all, I will just give you the 2012.  2012, interestingly the

3     median sentence for fraud nationally was 24 months.  The

4     median sentence for fraud within the First Circuit for 2012

5     was 24 months.  The median sentence in Massachusetts, the

6     number of cases said to be 61 for fraud in 2012, was 24

7     months.

8          You can overstate the significance of that datum

9     but I will say that it is roughly in the range if you went

10    back five years for each of those samples, national, First

11    Circuit, Massachusetts, the range is somewhere from 18 to

12    high thirties generally.

13         So if I consider how to make a sentence that avoids

14    unwarranted disparities, I think I have to do it to some

15    degree in the light of those purported statistics.

16    Interestingly the next offense on the table is for

17    embezzlement and those figures are consistently, they are

18    lower by the way.

19         Now, what I don't know in the table is what the

20    amounts were that might drive the *Guidelines* or what other

21    factors might drive the *Guidelines*.  But I do see that the

22    range in practice for fraud sentences is somewhere in the

23    two-to three-year range basically.

24         So my conclusion is that that is an appropriate

25    guide here to determine whether a sentence somewhere in that

1    range is sufficient and not greater than necessary to

2    accomplish the goals of sentencing.  And taking all the

3    factors into account, I conclude that a 36-month sentence is

4    an appropriate one in this case, followed by three years of

5    supervised release.

6            The guideline range for a fine is from $10,000 to

7    $100,000.  I actually think $100,000 is the better figure

8    than recommended by the government.  It has been my view

9    that in crimes where greed may have been a motivating

10   factor, taking money is a good way of punishing someone.

11   And so I think a fine at the high end of the range is

12   appropriate.

13           I will also order restitution in the amount that

14   has previously been stated by Mr. Pirozzolo for

15   Mr. Darling's estate and for Mr. Fitzgerald as noted.  I

16   decline to make a restitution order in favor of Merrill

17   Lynch or Paine Webber.

18           So those are the elements, and there will be a

19   forfeiture order entered ordering proceeds, if any, of the

20   offense to be forfeited and we will have a further

21   proceeding to determine that.  As to that, I would suggest

22   perhaps counsel might confer on a schedule by which we might

23   do that.

24           So, Mr. Carpenter, if you would stand, please.

25

```
1              Daniel Carpenter, on your conviction of these

2     offenses and pursuant to the Sentencing Reform Act of 1984,

3     it is the judgment of the Court that you be and hereby are

4     committed to the custody of the Bureau of Prisons to be

5     imprisoned for a term of 36 months.  This consists of equal

6     terms of 36 months on each of the counts of conviction, all

7     to be served concurrently.

8              Upon your release from imprisonment you shall be

9     placed on supervised release for a term of three years and

10    that consists of equal terms of three years on each of the

11    counts, all to be run concurrently.

12             Within 72 hours of your release from the custody of

13    the Bureau of Prisons, you shall report in person to the

14    district to which you have been released.

15             It is further ordered that you make restitution to

16    the estate of Byron Darling in the sum of $244,332.02 and to

17    the -- I am sorry.  Do I have that backwards?

18             Okay, yes.  And to Brian Fitzgerald in the sum of

19    $65,701.94 for a total of $310,033.96.

20             Any payment that is made that is not a payment in

21    full shall be made -- shall be divided proportionately among

22    the recipients as their interests may appear until the full

23    amount has been paid.

24             The restitution is either to be paid immediately or

25    according to a repayment schedule that can be agreed to
```

1    between you and the Probation Office and approved by the

2    Court or, if no agreement can be established, by the Court.

3    Payments of restitution are to be made to the Clerk of this

4    Court for transfer to the appropriate person.

5            You shall notify the United States Attorney for

6    this district within 30 days of any change of mailing or

7    residential address that occurs while any portion of the

8    restitution remains unpaid.  Restitution -- I believe that

9    the Bureau Program covers restitution as well fines?

10           **THE PROBATION OFFICER:**  Yes, Your Honor.

11           **THE COURT:**  Yes.  The Bureau Of Prisons

12   Financial -- the Inmate Financial Responsibility Program

13   will begin the process of immediately collecting payments.

14           In addition you are fined the sum of $100,000 as a

15   penalty for this offense.

16           While you are on supervised release you shall

17   comply with all the standard conditions that pertain to that

18   status.  Those conditions are set forth in the *United States*

19   *Sentencing Guidelines* at Section 5D1.3C and they are now

20   incorporated by reference but they will be set forth in

21   detail in the judgment.

22           In addition to those standard conditions you shall

23   comply with the following conditions of supervised release:

24           You shall not commit another federal, state or

25   local crime.

# EXHIBIT TWO

### Release and Settlement Agreement

AGREEMENT dated as of December 16, 2015, by and among Gail A. Cahaly, Joseph J. Iantosca and David Iantosca individually and as trustees of Faxon Heights Apartments and Fern Realty Trust on behalf of Joseph Iantosca (deceased), Belridge Corporation, Jeffrey M. Johnston, Bellemore Associates, LLC and Massachusetts Lumber Company, Inc. (collectively "The Cahaly Plaintiffs") and Daniel Carpenter, Molly Carpenter, Boston Property Exchange Transfer Company, Inc., f/n/a Benistar Property Exchange Trust Company, Benistar Admin. Services, Inc., Carpenter Financial Group, Benistar Ltd., Benistar Employer Services Trust Corporation, and U.S. Property Exchange (collectively "BPETCO").

WHEREAS, the parties to this Agreement (the "Parties") are all of the parties to an action styled *Cahaly, et al v. Boston Property Exchange Trust Company, et al, Civil Action No. SUCV2014-cv-00530-D (the "Litigation");* and

WHEREAS, the Parties have agreed to settle the Litigation on the terms set forth below.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

1.      BPETCO agrees to release any claim on the $2.85 million of escrowed funds currently held by the Court in the Litigation, (the "Escrowed Funds") and to authorize the Court to pay the Escrowed Funds to counsel for the Cahaly Plaintiffs.

2.      Universitas Education, LLC ("Universitas") has also agreed to release any claim on the Escrowed Funds and to authorize the Court to pay the Escrowed Funds to counsel for the Cahaly Plaintiffs.

3.      The Cahaly Plaintiffs agree that their counsel shall hold the Escrowed Funds in escrow until all documents relating to the settlement of this matter have been duly signed, delivered, and filed with the Court, as required by this Agreement. All documents must be signed by the Parties by December 23, 2015 for this Agreement to be valid.

4.      The Parties agree to instruct their counsel to sign and file with the Court a stipulation of dismissal of the Litigation in the form attached hereto as Exhibit A (the "Stipulation of Dismissal").

5.      The Cahaly Plaintiffs agree that $900,000 of the Escrowed Funds shall be paid by counsel for the Cahaly Plaintiffs to Universitas, through its counsel.

6.      BPETCO agrees to pay the Cahaly Plaintiffs, through their counsel, the sum of one hundred and twenty-five thousand dollars ($125,000).

7.     The Cahaly Plaintiffs agree to deliver a satisfaction of the Amended Judgment dated November 18, 2004, in *Cahaly, et al v. Benistar Property Exchange Trust Co., Inc., et al, Civil Action No., SUCV2001-cv-0116-BLS2* (the "Original Cahaly Action") acknowledging that the Amended Judgment is fully satisfied as to all judgment debtors (the Satisfaction of Judgment) in the form attached hereto as Exhibit B.

8.     The parties agree to the following mutual releases:

a.     Each of Gail Cahaly, Jeffrey M. Johnston, Bellemore Associates LLC, Massachusetts Lumber Company Inc., Joseph Iantosca, and Belridge Corporation, for themselves, their representatives, managers, members, trustees, beneficiaries, successors and assigns and all other persons for whom they are authorized to so act, each and any of them, and anyone acting in concert with them (collectively, the "**Iantosca Releasing Parties**"), do hereby remise, release and forever discharge Daniel Carpenter, Molly Carpenter, Boston Property Exchange Transfer Company, Inc., Benistar Admin. Services, Inc., Carpenter Financial Group, Benistar Ltd., Benistar Employer Services Trust Corporation, and U.S. Property Exchange and their representatives, managers, directors, officers, affiliates, predecessors, partners, servants, agents, consultants, employees, pledgees, nominees, insurers, accountants, attorneys, successors and assigns and each and every one of them, (collectively, the "**Benistar Released Parties**"), and Universitas of and from any and all manner of actions, causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, claims and demands whatsoever, whether in law in equity, known or unknown, anticipated or unanticipated, discovered or undiscovered, past or present, of any nature whatsoever.

b.     Daniel Carpenter, Molly Carpenter, Benistar Property Exchange Trust Company, Inc., Benistar Admin. Services, Inc., Carpenter Financial Group, Benistar Ltd., Benistar Employer Services Trust Corporation, and U.S. Property Exchange, for themselves and for their representatives, managers, members, partners, successors, assigns and all other persons for whom they are authorized to so act, each and every one of them, and anyone acting in concert with them (collectively, "**Benistar Releasing Parties**"), do hereby remise, release and forever discharge each of Gail Cahaly, Jeffrey M. Johnston, Bellemore Associates LLC, Massachusetts Lumber Company Inc., Joseph Iantosca, and Belridge Corporation, and their respective representatives, directors, officers, subsidiaries, affiliates, corporate predecessors, partners, servants, agents, consultants, pledgees, nominees, insurers, accountants, attorneys, successors and assigns, and each and every one of them, and anyone acting in concert with them (collectively, the "**Iantosca Released Parties**"), of and from any and all manner of actions, causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, claims and demands whatsoever, whether in law in equity, known or unknown, anticipated or unanticipated, discovered or undiscovered, past or present, of any nature whatsoever.

9.     Once counsel for each of the Parties certifies that their clients have agreed to the terms of this Agreement, the Parties shall file the Stipulation of Dismissal and shall request the Court to release the Escrowed Funds. All Escrowed Funds released by the Court shall be held in escrow by Zelle, McDonough & Cohen, LLP pending delivery to

counsel for BPETCO of the Satisfaction of Judgment and copies of this Agreement executed by all Parties.

10.    Once the Satisfaction of Judgment and copies of this Agreement executed by all Parties have been received by counsel for BPETCO, counsel shall immediately wire the $125,000 settlement proceeds to Zelle, McDonough & Cohen, LLP.

11.    Counsel for BPETCO shall not file the Satisfaction of Judgment with the Court until he has delivered to counsel for the Cahaly Plaintiffs copies of this Agreement executed by all of the BPETCO parties and has wired the $125,000 settlement proceeds to Zelle, McDonough & Cohen, LLP.

12.    The Cahaly Plaintiffs acknowledge the sufficiency of the Consideration (defined as the payments described above, together with all the promises, agreements, and representations set forth in this Agreement including the releases by the Cahaly Plaintiffs and dismissal of the Lawsuit with prejudice) by signing this Agreement. The payments described above are not an admission of liability or a concession on the part of any party as to the truth of any of the allegations, made by any party in the Lawsuit and may not be so construed. All parties acknowledge the highly disputed nature of their claims and causes of action in the Lawsuit.

13.    The Cahaly Plaintiffs and BPETCO each covenant and promise never to institute a claim relating to or arising out of their dealings, transactions or any other involvement with the other, including any alleged entitlement under any law or regulation with any state or federal court or agency. The Cahaly Plaintiffs and BPETCO further each covenant and promise never to sue each other concerning their dealings, transactions or any other involvement that any or all of the Cahaly Plaintiffs may have had with the BPETCO Parties. Each of the Cahaly Plaintiffs and BPETCO agrees that if any of them violates this covenant not to sue they will pay all costs and expenses of defending against the suit incurred by the other party, including all attorneys' fees and expenses.

14.    The Cahaly Plaintiffs and BPETCO hereby expressly waive any and all rights they, or anyone claiming by, through, or under them, may have against the other under any legal or equitable principle or theory in connection with the facts and circumstances alleged in or in any way related to the Litigation. The Cahaly Plaintiffs also acknowledge that they fully release the BPETCO Parties for the payment of any outstanding past, present and future fees, penalties, interest, liabilities and/or expenses related to the Litigation, and any tax liabilities.

15.    Each party shall pay their own costs, expenses and attorneys' fees incurred in connection with the Lawsuit.

16.    By signing this Agreement, each party makes the following representations with respect to themselves and each entity for which they are signing:

a.    The party is correctly described in this Agreement;

b.      The party is legally competent;

c.      The signatory to this Agreement for any entity is a duly authorized representative of that entity for which he or she is signing this Agreement;

d.      This Agreement is fully and forever binding on the parties their heirs, successors, assigns and partners and shareholders, as applicable;

e.      The party fully understands that this is a full, complete, and final release, and that the Consideration paid under this Agreement is all the money that is to be paid by or on behalf of the BPETCO Parties to the Cahaly Plaintiffs as a result of the matters made the basis of the Lawsuit. The Cahaly Plaintiffs will not seek any further money or other recovery from the BPETCO Parties for claims asserted, or that could have been asserted, in the Lawsuit;

f.      No promise or representation of any kind regarding the subject matter of this Agreement has been made to the parties or to anyone acting for the parties, except as is expressly stated in this Agreement;

g.      The Party has not assigned, pledged, or in any other manner sold or transferred any right, title, interest, or claim that arises out of the Lawsuit, or this Agreement, except to their counsel;

h.      This Agreement was fully explained to the party by its/his/her own Counsel before the party signed the Agreement. The party represents that it/he/she has read and understands this Agreement, and has had the advice of attorneys and other professionals of its/his/her own selection with regard to the legal consequences of this Agreement. Before executing this Agreement, the party had, with the advice of its/his/her counsel, fully informed themselves of its terms, contents, conditions, and effect and no promise or representation of any kind has been expressed or implied to the party.

i..     The party understands, after consultation with its/his/her counsel, how the consideration is being paid by, how the consideration is being allocated as among and between each party and each party agrees with such allocation and believes that it is fair and reasonable. The party has consulted with its/his/her attorneys, who have fully explained to the party's satisfaction the terms of this Agreement, including disclosure of the existence and nature of all of the claims involved in this settlement, and the nature and extent of the participation of each person or entity in the settlement. The party enters this Agreement freely, by its/his/her own choice, and judgment, and without duress or other influence;

j.      Each Party recognizes that the recitations contained in this Agreement are contractual and not a mere recital; and

k.      Each Party further represents that it/he/she are not relying on the advice of the other Parties or their representatives, consultants, or attorneys, on any matters, including but not limited to the legal and income tax consequences of this Agreement, the

investment of funds or how the Consideration being paid is allocated among and between the Parties. Each Party has relied solely and completely upon their own judgment, and the advice of its/his/her counsel in making this Agreement.

     17.    All Parties declare and represent that they are choosing to execute this Agreement under their own free will and are not under any duress or coercion.

     18.    All Parties represent that they have been afforded the opportunity, before signing and agreeing to this Agreement, to seek legal advice regarding the terms and conditions of this Agreement and have done so.

     19.    The financial terms of this Agreement shall be kept CONFIDENTIAL. The Parties and their counsel agree not to discuss or disclose, directly or indirectly, either publicly or privately the financial terms and conditions of this Agreement and the negotiations in connection herewith, including any consideration paid hereunder (the "Confidential Material"), for any purposes other than the enforcement of the terms and conditions contained herein, or as required by court order or rule, or as necessary to obtain legal or accounting advice or fulfill some legal duty. Notwithstanding this provision, the Parties permit disclosure of the Agreement to the other Parties in this Litigation as required by the Federal Rules of Civil Procedure, if so requested by any other Parties.

     20.    This Agreement has been prepared by the joint efforts of the respective attorneys for the Parties. In the unlikely event of an ambiguity in this Agreement, the Parties agree that the Agreement shall be construed in an even-handed manner as to give effect to the purpose of this Agreement, and that there shall be no presumption that the Agreement should be construed against one Party or another.

     21.    If any provision of this Agreement is later held to be invalid or unenforceable for any reason, such provision shall not affect the validity or enforceability of the remaining provisions of this Agreement.

     22.    The Parties agree that this Agreement constitutes the entire agreement between them and that a facsimile, electronic, Xerox or photostatic copy shall have the same force and effect as an original. This Agreement may be executed in multiple counterparts, each of which are to be considered originals and of equal dignity, but all of which shall constitute one and the same Agreement.

4823-2459-6268.1

WHEREFORE, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**Daniel Carpenter**

_____
Daniel Carpenter

**Molly Carpenter**

_____
Molly Carpenter

Attorneys for:
**Gail Cahaly, Jeffrey M. Johnston, Bellemore Associates, LLC, Massachusetts Lumber Company, Inc., Joseph Iantosca, and David Iantosca individually and as trustees of Faxon Heights Apartments and Fern Realty Trust on behalf of Joseph Iantosca (deceased), and Belridge Corporation,**

By: _____
Anthony R. Zelle, Esq.
Thomas W. Evans, Esq.
Zelle McDonough & Cohen LLP
101 Federal Street, 14th Floor
Boston, MA 02110

# EXHIBIT THREE

## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

## UNITED STATES OF AMERICA : No. 3:16-CR-220 (AWT)

## v.

## DAVID DEMOS,

**April 29, 2018**

### DEFENDANT'S RESPONSE TO THE COURT'S JURY CHARGE

I.  **TO BE CRIMINALLY CULPABLE A DEFENDANT MUST ACT TO DO SOMETHING THAT IS "UNLAWFUL" NOT JUST "WRONGFUL" AS THE COURT PROPOSES**

On April 10, 2018 the Court detailed the third element of the offense of securities

fraud upon which the Defense relied during the trial.

> The third element of the offense of securities fraud is that the defendant acted willfully, knowingly, and with intent to defraud. To act "knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently, and not because of ignorance, mistake, accident or carelessness. To act "willfully" means to act with the intent to do something the law forbids, that is, with a bad purpose to disobey or disregard the law. To act with intent to defraud means to act with specific intent to deceive, i.e. deliberately using deception to induce another to act to his detriment; the defendant's conduct must have been the product of his conscious objective rather than the product of mistake.

Nowhere in the Court's instruction was the Defense put on notice the Court would

expand its definition to now include the following language:

> The Government does not have to prove that the defendant knew he was violating
> any particular law, but it must prove he intentionally understood an act he knew
> was *wrongful.*

. (emphasis added).

This addition is highly prejudicial and inconstant with precent from the Supreme
Court of the United States.   In addition, the defense opend with a definition of
"willfulness" and a written slide of that definition and articulated by the Court.  Indeed,
the Court approved the Defense opening statement slide that was published to the jury.
Had the defense been aware the Court would eschew the original willfulness instruction
and  include an act the Defendant knew was wrongful, the defense trial strategy would
have been significantly different. With this revised definition, the Defense anticipates that
the Government will argue that Cantor Employee handbooks representing employment
policies  and  procedures  and  Financial  Industry  Regulatory  Authority  ("FINRA")
regulations prove that Mr. Demos knew his conduct was "wrongful" thereby meeting
their burden to establish Mr. Demos's intent to violate the law. However, centuries of
traditions and the common law confirm that is is incorrect to equate wrongful conduct
with unlawful conduct.  The former exists in the domain of civil torts, while the later
belongs in the province of the criminal law.

Presumably, the Court's proposed willfulness standard as to wrongful conduct is
derived from the factually dissimilar *United States v. Kaiser*.  It cannot establish criminal
liability in the context of this case and must be rejected by this Court. 609 F.3d 556 (2d
Cir. 2010).

This instruction was specifically rejected by Judge Chatigny in *Shapiro* because
of the factual dissimilarity between *Kaiser* and the *Litvak-Shapiro* RMBS securities fraud

2

prosecutions. In *Kaiser*, the defendant falsified SEC filings to manipulate share prices in connection with a tender offer. *See United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010). Even if the *Kaiser* defendant was unaware of the specific regulation he violated, there was no question that the defendant knew his conduct was illegal. In *Shaprio*, as here, it is not at all clear that defendants alleged misstatements were material to any of the underlying transactions and, as Judge Chatigny observed, many market participants did not realize this conduct could be criminal. *See United States v. Shapiro*, 3:15-CR-155 (RNC), Tr. Transcript, Vol. XIII, 2616-2618, **Exhibit A** at 2. ("I don't think you can be convicted under the Constitution unless you had a sufficiently culpable state of mind such that you made a conscious choice to cross an important line and expose yourself to potential imprisonment.").

In rejecting the *Kaiser* willfulness standard, Judge Chatigny in Shapiro further opined:

The Supreme Court has recognized that when a challenged action or course of conduct is a technical violation of the law as opposed to morally reprehensible it becomes more important to make it clear to the jury that the government has a burden to prove that the defendant knew his conduct was unlawful. Why? Because we don't want to be exposing people to conviction and incarceration if they didn't know that this is what they were risking.**Exhibit A** at 3.

When construing the statutory meaning of willfulness, the Supreme Court expressly considers whether the defendant knew his conduct was *illegal*, not merely wrongful. In *Ratzlaf v. United States,* a federal prosecution of a banking regulation, the

3

Supreme Court interpreted "willfulness" to mean knowledge of illegality: "[w]e hold that the 'willfulness' requirement mandates something more. To establish that a defendant 'willfully violat[ed]' the antistructuring law, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." 510 U.S. 135, 137 (1994).

In construing the meaning of willfulness in federal firearms law, the Supreme Court offered the following analysis:

> The word "willfully" is sometimes said to be "a word of many meanings" whose construction is often dependent on the context in which it appears…. Most obviously it differentiates between deliberate and unwitting conduct, but in the criminal law it also typically refers to a culpable state of mind…. [A] variety of phrases have been used to describe that concept. As a general matter, when used in the criminal context, a "willful" act is one undertaken with a "bad purpose." In other words, in order to establish a "willful" violation of a statute, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful."



*Bryan v. United States*, 524 U.S. 184, 191 (1998) (internal citations omitted).

## II.    II. IMPORTANCE AND MATERIALITY ARE NOT SYNONYMOUS

The Defendant requested in his proposed jury instructions the following language in Section e under Securities Fraud-Second Element that the court did not adopt.

> While importance is undoubtedly a necessary element of materiality, importance and materiality are not synonymous.

4

*Judge Chatigny in Shapiro*

1    legislative history of the relevant statutes, it's not

2    helpful.

3              So we have a problem, and for me the question

4    becomes, what is fair and reasonable in the circumstances.

5              The government has no obligation to prove that a

6    defendant knew he was violating Rule 10(b)(5), but I don't

7    think you can be convicted under the Constitution unless

8    you had a sufficiently culpable state of mind such that

9    you made a conscious choice to cross an important line and

10   expose yourself to potential imprisonment.

11             If the defendants are convicted in this case,

12   I'm sure the government's going to be asking me to

13   incarcerate them for years.

14             So in that context, given the state of the law,

15   I've struggled to figure out what to say.

16             I don't think the Second Circuit case law

17   requires the government to prove that the defendants knew

18   their conduct was unlawful, but at the same time, I don't

19   think it can be the case that they can be convicted, even

20   if they didn't realize their conduct was not unlawful.

21             Some of the cases cited by the defendants are in

22   the securities area, and in those cases, the court said,

23   indeed the government had a burden of proving that the

24   defendants knew their conduct was unlawful.

25             The Supreme Court has recognized that when a

1  challenged action or course of conduct is a technical

2  violation of the law as opposed to morally reprehensible,

3  it becomes more important to make it clear to the jury

4  that the government has a burden to prove that the

5  defendant knew his conduct was unlawful.

6          Why?

7          Because we don't want to be exposing people to

8  conviction and incarceration if they didn't know that this

9  is what they were risking.

10          So it's a problem, and I'm trying to do what I

11  can in the circumstances of this particular case to

12  address the parties' legitimate needs and concerns, and

13  I'm going to go with what I have.  I would rather risk

14  error on the side of lenity than the other way.

15          With regard to the next request, I think that's

16  already been dealt with.  I'm going to grant that request

17  and delete that transition sentence.

18          With regard to the last request in the

19  defendants' letter, uncalled witnesses, I don't think I

20  need to do that this minute, and I don't want to keep the

21  jury waiting any longer.

22          Bear in mind, the instructions I'm giving the

23  jury now take me through what is now, for me, closing

24  arguments on page 42.  The uncalled witnesses instruction

25  won't be given at this time.

# EXHIBIT FOUR

**BREAKING NEWS**   **Feds wiretapped Cohen's calls to the White House**   ◯

METRO

# $500M 'insure-scam' ring nailed

By Philip Messing                                                    February 24, 2011 | 5:00am

Greedy life-insurance agents took out huge policies on penniless seniors, and then asked them to fake illnesses so they'd seem more likely to die, as part of a $500 million scam, investigators said yesterday.

The fraudsters sought to cheat not only the insurance companies, from whom they reaped huge commissions, but also investors looking to buy the policies on the secondary market, postal inspectors said in mail-fraud charges filed against eight defendants in Brooklyn federal court.

Chaim Mayer Lebovits, of Liberty Planning, in Monsey, NY, facilitated the purchase of policies on behalf of the elderly "straw buyers," according to the complaint.

He and seven other defendants were released on bail yesterday.

*Recommended by*                                                         |

# EXHIBIT FIVE



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AHT:TRP
F. #2012R01923

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 9, 2015

By ECF

The Honorable Sterling Johnson, Jr.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  United States v. Chaim Lebovits
> Criminal Docket No. 11-134 (SJ)

Dear Judge Johnson:

The government respectfully submits this letter in connection with the defendant's sentencing, which is scheduled for April 13, 2015. While the Presentence Investigation Report ("PSR") indicates that the Guidelines range of imprisonment applicable to the defendant is 41 to 51 months, the government respectfully argues that, in accordance with the plea agreement entered into by the parties, the Court should find the applicable Guidelines range to be 12 to 18 months. Further, pursuant to the plea agreement entered into by the parties, the government recommends that the defendant be sentenced to a term of probation pursuant to Fed. R. Crim. P. 11(c)(1)(B).

## I.    Background

The charges against the defendant arose from his involvement in a scheme to fraudulently induce insurance companies to issue policies with high death benefits to elderly insureds and later sell those policies for a profit, which occurred on or about and between January 2007 and May 2010. See Pre-Sentence Investigation Report ("PSR") ¶ 11. Many of the fraudulent policies were submitted through Liberty Planning, Inc., an insurance agency located in Monsey, New York, of which the defendant was the Vice-President and Managing General Agent. PSR ¶ 4. The defendant had authority to disburse funds from Liberty Planning's bank accounts, as well as the bank accounts of several other related entities which he controlled, including CSL Properties, LLC; CSL Properties II, LLC; CSL Properties III, LLC; and the Rocklyn Group, Ltd. (collectively, "the Lebovits Related Companies"). Id.

Insurance companies do not ordinarily sell policies where the benefits payable upon the death of the insured are in excess of the amount needed to serve the specified

purpose of the policy. PSR ¶ 9. Under New York State law, only the insured, a close family relative or an individual with an insurable interest can purchase life insurance policy on an insured's life. PSR ¶ 14.   In furtherance of the instant conspiracy, applications were submitted to insurance companies through Liberty Planning and other agencies which contained false statements that not only induced those companies to issue the policies but also to charge lower premiums than would otherwise apply.  PSR ¶ 12.  The false statements on the insurance applications included  (1) the insureds had large net worths and annual incomes, above their true net worths and incomes; (2) the insureds did not intend to resell the policies on the secondary market for life insurance; (3) the insureds intended to pay the premiums themselves with their own money; (4) the insureds had not been compensated or  promised compensation for applying for the policies; (5) the insureds did not obtain, and would not hold the policies for others who were investing in the insureds' life; and (6) the purpose of the insurance policies was "estate planning," "estate liquidity," "estate conservation" or some equivalent description.  Id. However, each of these statements was false.  To incentivize the elderly insureds to go along with the scheme, the conspirators paid cash and promised other financial incentives to them in exchange for the insureds submitting false applications. PSR ¶ 12.

Co-conspirators Moses Neuman, Yudah Neuman and Leo Fekete recruited elderly "straw insureds" who applied for life insurance primarily through Liberty Planning via insurance applications in which their net worths and incomes were inflated.  PSR ¶ 32. The Neumans also recruited and compensated Edward Grodsky, an accountant, who participated in the scheme by recruiting elderly straw insureds and assisting them in the application process by purporting to verify their inflated net worth and income information. PSR ¶¶ 32 and 36.   Many of the policies listed Avigdor Gutwein, a life insurance agent affiliated with Liberty Planning, as the insurance agent.  Gutwein knowingly submitted the fraudulent applications which contained false information to the insurance companies. PSR ¶¶ 32 and 34.   Leo Fekete recruited one elderly insured into the scheme and facilitated the filing of a fraudulent application which contained inflated net worth and income.  Fekete's wife, a licensed New York State insurance agent affiliated with Liberty Planning, received a commission on this policy. PSR ¶ 39.

It was also part of the scheme that the conspirators engaged in financial transactions designed to falsely convince the insurance companies that the straw insureds were paying the premiums on the policies, when in fact the policies were funded by third party investors, including the defendant. PSR ¶¶ 14, 32 and 34.  In order to conceal the source of the funds deposited into the insureds' trust accounts, the conspirators caused money to be exchanged among and between themselves, Liberty Planning, the Lebovits Related Companies and companies affiliated with the Neumans. PSR ¶ 14.  The premium payments were either paid directly into individual trust bank accounts set up in the insured's names, or funneled through different accounts before being paid to the individual trust accounts, which in turn, paid the insurance companies.  Specifically, the defendant invested $1.9 million into two insurance policies issued to elderly insured Arnold Cohen.  The defendant deposited money for the premium payments directly into Cohen's individual trust account, and the trust account was used to pay the insurance company directly. Id.

After the insurance companies issued the policies to the insureds, the conspirators created false records and made false statements indicating that the elderly insureds had poorer health than they actually had. PSR ¶ 15. This was done to cause the projected life expectancies of the insured to be lowered, which would, as a result, fraudulently inflate the resale prices that prospective purchases would be willing to pay for the straw buyer's life insurance policies on the secondary life insurance market. Id. To that end, the elderly insureds were directed by the conspirators to visit doctors and lie about health problems.

The conspirators stood to profit from the scheme through: 1) the death benefits they would collect if the insureds died before the periods of contestability expired; 2) the commission that Liberty Planning, other general insurance agencies, Gutwein and other other insurance agents who participated in the scheme would receive from the premiums paid; and 3) the profits that the conspirators could make by reselling the policies on the secondary market once the periods of contestability expired. PSR ¶ 16. While the defendant intended to realize a profit on the fraudulent insurance policies, the defendant most likely lost more money than he gained on his investment in the Cohen policies. PSR ¶ 30.

In or about 2009, after an investigation by ING uncovered numerous fraudulent applications submitted through Liberty Planning, ING filed civil actions seeking to rescind life insurance policies submitted by Liberty Planning. In addition, other insurance companies that did business with Liberty Planning terminated their contracts with Gutwein and other agents affiliated with Liberty Planning after learning of the fraudulent insurance applications. Following an investigation led by the U.S. Postal Inspection Service, on or about February 23, 2011, agents arrested the defendant, Gutwein, Fekete, Grodsky and the Neumans.

On September 8, 2014, the defendant pleaded guilty to Count One of a superseding indictment charging him with conspiring to defraud insurance companies, via mail and wire fraud, in violation of 18 U.S.C. § 1349. In the plea agreement, the government agreed to recommend a sentence of probation pursuant to Fed. R. Crim. P. 11(c)(1)(B).

## II.    Defendant's Guidelines Calculations

The Department of Probation's Presentence Investigation Report calculates the defendant's United States Sentencing Guidelines range to be 41 to 51 months based on a total offense level of 22 and a Criminal History Category of I. PSR ¶¶ 58, 90. The PSR provides enhancements for loss amount and a two-point enhancement for the defendant's role in the offense not contemplated in the parties' plea agreement. The government respectfully argues that, in accordance with the plea agreement entered into by the parties, the Court should find the applicable Guidelines range to be 12 to 18 months, based on a total offense level of 13 and a Criminal History Category of I.

3

A.     Loss Amount

The PSR includes a 16-level enhancement corresponding to a loss amount of more than $1,000,000 but less than $2,500,000. PSR ¶ 49.   The PSR's calculation of loss is based on commission payments in excess of $1,000,000 obtained by Liberty Planning and Avigdor Gutwein over the course of the conspiracy. Id.   However, the government has no evidence of the defendant's personal involvement in the conspiracy other than his investment in two insurance policies, nor is it clear from the government's evidence that the total amount of the commission payments obtained during the course of the entire conspiracy were foreseeable to the defendant.

Further, consistent with the government's position as to the loss amount attributable to the other co-defendants in this case, the government believes that a more accurate assessment of the loss amount corresponds to the lapse rate assessed by the insurance companies.   Insurance companies issue and price policies based on a calculated lapse rate. A lapse rate is the rate at which insured individuals allow their policies to expire because the amount of premiums they have already paid has exceeded or soon will exceed the amount they can collect should the death of the insured occur. Here, because the premiums were actually being paid by third-parties investors who counted on the pay-out of the policy as a return on their investment, they had no intention of letting the policies lapse. As a result, the insurance companies' lapse rate was based on falsely-provided information which caused them to charge lower premiums than they otherwise would have with respect to the policies at issue.   However, attempting to determine what the correct premiums should have been and over what period of time the proper premiums would have been paid to the insurance companies are difficult endeavors.

As a result, based on the evidence available to the parties at the time of the defendant's guilty plea, and in accordance with U.S.S.G. § 2B1.1, App. Note (3)(c), a reasonable estimate of the loss suffered by the insurance companies that is attributable to the defendant was more than $70,000 but less than $120,000 and a corresponding 8-point enhancement is appropriate. U.S.S.G. § 2B1.1(b)(1)(E).

B.     Abuse of Position of Trust

The PSR also includes a two-point enhancement for abuse of trust since the defendant was a licensed insurance agent, per Guideline 3B1.3. The government has no evidence that the defendant personally submitted any insurance applications to the insurance companies. In addition, the government agrees with defense counsel's contention that although the policies were submitted by Liberty Planning, of which the defendant is a principal, the insurance companies conducted independent verification of the policies prior to authorization. Accordingly, the government stands by the Guidelines calculation set forth in the plea agreement entered into by the parties.

4

III.   **Conclusion**

        For the reasons set forth above, the government respectfully recommends a sentence of probation pursuant to Fed. R. Crim. P. 11(c)(1)(B), and restitution pursuant to 18 U.S.C. § 3663A, be ordered in this case, as it would be sufficient but not be greater than necessary, to carry out the goals of sentencing set forth in 18 U.S.C. § 3553(a).

        Respectfully submitted,

        LORETTA E. LYNCH
        United States Attorney

By:    /s/ *Tanisha Payne*
        Tanisha R. Payne
        Peter Baldwin
        Assistant U.S. Attorneys
        (718) 254-6358/6236

cc:    Clerk of the Court (SJ (by ECF)
        Nathaniel Z. Marmur, Esq. (by ECF and Email)
        USPO Michelle Espinoza, U.S. Department of Probation

# EXHIBIT
# SIX

AO 245B (CASDRev. 08/13) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT FILED

## SOUTHERN DISTRICT OF CALIFORNIA 17 AUG 28 AM II: 46

UNITED STATES OF AMERICA
**V.**
JEFFREY B. KELLER (1)

**AMENDED JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number:   13CR0424-JLS

DEPUTY

Michael L. Lipman
Defendant's Attorney

**REGISTRATION NO.**   37395298

☒ Correction of Sentence for Clerial Mistake (Fed. R. Crim. P. 36)

☒ pleaded guilty to count(s)   1 of the Superseding Information

☐ was found guilty on count(s)

after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| Title & Section | Nature of Offense | Count Number(s) |
|---|---|---|
| 18 USC 371 | Conspiracy to commit mail fraud and wire fraud and to defraud the United States | 1 |

The defendant is sentenced as provided in pages 2 through _____5_____ of this judgment.
The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ Count(s)   (remaining counts)   are   dismissed on the motion of the United States.

☒ Assessment : $100.00 imposed

☒ No fine   ☒ Forfeiture pursuant to order filed   2/26/2014   , included herein.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

July 28, 2017
Date of Imposition of Sentence

HON. JANIS L. SAMMARTINO
UNITED STATES DISTRICT JUDGE

13CR0424-JLS

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

---

| | | |
|---|---|---|
| DEFENDANT: | JEFFREY B. KELLER (1) | Judgment - Page **2** of **5** |
| CASE NUMBER: | 13CR0424-JLS | |

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of:
**Three (3) months**

☐  Sentence imposed pursuant to Title 8 USC Section 1326(b).

☒  The court makes the following recommendations to the Bureau of Prisons:

    1.  Incarceration at FCC Lompoc to accommodate family visits.

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____ A.M.     on _____

    ☐  as notified by the United States Marshal.

☒  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☒  on or before **September 15, 2017 before 12:00 PM**

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By _____

DEPUTY UNITED STATES MARSHAL

13CR0424-JLS

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | JEFFREY B. KELLER (1) | Judgment - Page 5 of 5 |
| CASE NUMBER: | 13CR0424-JLS | |

## RESTITUTION

The defendant shall pay restitution in the amount of **$1,000,000.00** unto the United States of America.

Pay restitution in the amount of **$1,000,000.00** to the Internal Revenue Service through the Clerk, U.S. District Court. Payment of restitution shall be forthwith. During any period of incarceration the defendant shall pay restitution through the Inmate Financial Responsibility Program at the rate of 50% of the defendant's income, or $25.00 per quarter, whichever is greater. The defendant shall pay the restitution during his supervised release at the rate of $500.00 per month. These payment schedules do not foreclose the United States from exercising all legal actions, remedies, and process available to it to collect the restitution judgment.

Until restitution has been paid, the defendant shall notify the Clerk of the Court and the United States Attorney's Office of any change in the defendant's mailing or residence address, no later than thirty (30) days after the change occurs.

The Court has determined that the defendant does have the ability to pay interest. It is ordered that interest is not waived.

**Victim's Address:**
IRS – RACS
Attn: Mail Stop 6261, Restitution
333 W. Pershing Avenue
Kansas City, MO 64108

# EXHIBIT
# SEVEN

AO 245B (CASDRev. 08/13) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

14 APR -3 AM 9: 01

UNITED STATES OF AMERICA

**V.**

STUART STEINFELD (2)

### AMENDED JUDGMENT IN A CRIMINAL CASE
(For Offenses Committed On or After November 1, 1987)

Case Number:   13CR0424-JLS

EUGENE G. IREDALE

Defendant's Attorney

**REGISTRATION NO.**      38337298

☒ Correction of Sentence for Clerial Mistake (Fed. R. Crim. P. 36)

☒ pleaded guilty to count(s)      One of the Indictment

☐ was found guilty on count(s)

after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| Title & Section | Nature of Offense | Count Number(s) |
|---|---|---|
| 18 USC 371 | Conspiracy | 1 |

The defendant is sentenced as provided in pages 2 through _____5_____ of this judgment.
The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ Count(s)   (Remaining Counts)            are        dismissed on the motion of the United States.

☒ Assessment : $100.00 imposed

☐ No fine        ☐ Forfeiture pursuant to order filed                                    , included herein.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

March 7, 2014
Date of Imposition of Sentence

HON. JANIS L. SAMMARTINO
UNITED STATES DISTRICT JUDGE

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | STUART STEINFELD (2) | Judgment - Page 2 of 5 |
| CASE NUMBER: | 13CR0424-JLS | |

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of:
**Sixty (60) Days**

☐  Sentence imposed pursuant to Title 8 USC Section 1326(b).

☐  The court makes the following recommendations to the Bureau of Prisons:

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____ A.M.    on _____

    ☐  as notified by the United States Marshal.

☒  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☒  on or before **April 18, 2014**

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

_____

By _____

DEPUTY UNITED STATES MARSHAL

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | STUART STEINFELD (2) | Judgment - Page 5 of 5 |
| CASE NUMBER: | 13CR0424-JLS | |

## FINE

The defendant shall pay a fine in the amount of **$20,000.00** unto the United States of America.

This sum shall be paid by May 1, 2014 through the Clerk, U.S. District Court.

13CR0424-JLS

# EXHIBIT
# EIGHT

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

See a sample reprint in PDF format.          Order a reprint of this article now

## THE WALL STREET JOURNAL.
WSJ.com

NOVEMBER 13, 2008

# Source of Cash for Seniors Is Drying Up

By ANNE TERGESEN

Older adults turning to the "life settlement" industry to help them through tough times are finding that this popular source of quick cash is getting harder to tap.

Life settlements, in which people sell their life-insurance policies to investors in exchange for a lump-sum payment, were a $12.2 billion business in 2007, according to Conning Research & Consulting Inc. in Hartford, Conn. Despite regulators' concerns about the industry's high fees, opaque nature and aggressive sales practices, that figure is more than triple the amount of just three years earlier. The growth, in part, reflects the fact that retirements have been stretching longer -- and nest eggs shrinking faster -- than many retirees ever imagined.

More recently, however, fallout from the credit crisis, coupled with a critical change in September in how sales of life-insurance policies are priced, means that several buyers of such policies -- who make their money by pocketing the death benefit when the initial policyholder dies -- have either pulled out of the market or scaled back their purchases. The buyers that remain are, in many cases, offering lower prices. And that is cutting off a source of cash for the growing numbers of older adults who rely on such sales to shore up shaky finances.

"Several seniors we've transacted with lately have suffered tremendous losses in their retirement savings and seen substantial equity value in their homes wiped away," says Mark Goode, chief executive of the Peninsula Group in Washington, which buys life-insurance policies for institutional investors. "Many sellers simply need the cash. Their question today is: 'How quickly can we close?'"

The increasingly common answer: not very soon, if at all. Richard Hess of Lancaster, Pa., recently approached Milestone Managers & Providers in Manheim, Pa., about selling his $100,000 policy to raise "a little extra money." The 66-year-old was told he had missed his window of opportunity.

"Six months ago we might have had a buyer," says Kristian Armstrong, chief executive of Milestone, which specializes in buying policies with death benefits

under $1 million. "But as it stands now, 66-year-olds are typically not going to get anything."

## Big Investors Flee

Capital to purchase life-insurance policies is less plentiful than it was just a few months ago. Hit by the credit crunch, some big investors in life settlements, including hedge funds such as London-based BlueCrest Capital Management, have dropped out of the market or are limiting their purchases, industry observers say. Mr. Goode at the Peninsula Group estimates that "the number of active funders has been reduced by half over the past 12 to 18 months."

At National Financial Partners, a nationwide network of advisers specializing in life insurance, executive benefits and financial planning, commissions and fees from life settlements fell 28% in the first nine months of the year. BlueCrest didn't return a call for comment.

But the credit crunch isn't the only problem. In mid-September, a set of life-expectancy tables many investors use to help determine the prices they're willing to pay for policies were revised by one of the major firms that calculates them, 21st Services in Minneapolis. The tables now indicate policyholders are likely to live longer -- an average of about 20% longer for men and 15% for women -- than previously expected. (The exact change varies by age, gender, smoking status, and health.)

This means investors are likely to have to wait longer to collect those benefits. They're also likely to have to pay additional premiums -- an extra expense that's driving down the amount they're willing to pay for new policies.

Regulators have long expressed concerns about the life-settlement industry. While a cash windfall may be appealing, hidden costs -- including high fees and potential tax liabilities -- can substantially erode what policyholders receive from these deals.

Life-settlement brokers often pocket the lesser of 6% of a policy's face value or 30% of the gross sale price. While heirs who inherit life-insurance benefits pay no income tax on their payouts, those who sell their policies are subject to income tax on at least some of their gains. (The rest may qualify for capital-gains tax treatment. But because the Internal Revenue Service has yet to issue a ruling on the tax treatment of life settlements, this "remains uncertain," says Stephan Leimberg of newsletter publisher Leimberg Information Services.)

There are other risks, too. Those who sell a policy only to later decide they need additional insurance may find they've used up all of the coverage a carrier will sell them. And because the market isn't generally transparent, it's often hard for

those who sell policies to know whether they're getting a good price.

Still, with a life settlement, policyholders can typically net more than is available by surrendering a policy to the insurer for a lump-sum payment. Before selling, you should consult a financial planner, an accountant, or an attorney. Alternatively, if your policy has cash value and you prefer to keep it -- or can't find a buyer -- there may be ways to borrow against it or withdraw funds from it.

To get access to more cash, you can ask your insurer to scale back the death benefit. "By restructuring the policy, you may be able to draw out any cash that's no longer needed to support the coverage," says Gary Cotter, a certified financial planner at Cotter Financial in Sun City Center, Fla. But there are caveats. Under some circumstances, loans or withdrawals can trigger tax bills, Mr. Cotter says. Moreover, if you deplete your policy's cash value, your coverage will lapse. Ask your insurer to project the impact of a withdrawal or loan, he advises.

In some situations, you may even fare better than you would with a life settlement. Under New York Life Insurance Co.'s Access Plus program, for example, clients of the insurer who are 65 or older and meet certain health requirements may be able to borrow more than a policy's cash value. Borrowers must repay the principal and interest from their policies' death benefits. Those with a terminal illness, meanwhile, may be eligible to receive the policy's entire death benefit. They will typically owe ordinary income tax on the gains from such a payment, known as an "accelerated death benefit," Mr. Cotter says.

While the funding drought may reverse when the credit crunch recedes, industry insiders say the higher life-expectancy estimates are likely to continue to weigh on prices. "Due to the revisions in the tables, it's hard for buyers to even assess what a policy is worth," says Jonathan Forster, a partner at law firm Greenberg Traurig, which has represented investors in these transactions.

## Renegotiating Deals

This has left cash-strapped seniors at the mercy of yet another market beset by falling prices. Brokers say many deals negotiated this summer have since fallen through, only to be resurrected at lower prices.

Larry Rybka, president and CEO of Akron, Ohio, brokerage firm Valmark Securities, says investors canceled 12 of the 18 contracts his firm was closing at the time the life-expectancy tables were revised. Mr. Rybka says his brokers were ultimately able to secure deals -- at much lower prices -- for nine of the 12 transactions.

One of those clients recently negotiated the sale of a policy for 60% less than he was offered last summer, when he first shopped the policy to investors. Although

Case 1:04-cr-10029-GAO   Document 568-1   Filed 07/17/18   Page 43 of 100

Source of Cash for Seniors Is Drying Up - WSJ.com                    Page 4 of 4
        Case 3:17-cr-00003-AWT   Document 24-4   Filed 04/27/17   Page 4 of 4

reluctant to sell, the client -- a man whose business is now on the rocks -- can no longer afford to pay the premiums, Mr. Rybka adds.

Skip Santori, a financial planner at Santori & Peters in Monroeville, Pa., represents an 82-year-old woman who has been trying to sell two $750,000 policies since August. Two years ago, when Mr. Santori handled the sale of an identical policy for the same client, she received $145,000. This time, the winning bid came in at $120,000 per policy. But when the life-expectancy tables were revised, that deal fell though.

While a new buyer recently offered $83,000 for each policy, this company, too, has pulled the offers, Mr. Santori says. "They said their liquidity froze up."

**Write to** Anne Tergesen at anne.tergesen@wsj.com

Copyright 2008 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit
www.djreprints.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DANIEL E. CARPENTER | ) | |
| Petitioner, | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| Respondent. | ) | |

## MR. CARPENTER'S REPLY BRIEF IN SUPPORT OF
## TERMINATION OF HIS SUPERVISED RELEASE

There are so many mistakes in the law and facts of this case in the Government's

Opposition Brief (Doc. 566, "Gov. Opp.") that it is difficult to know where to begin.   But, on

Page 2 of its brief, the Government suggests that my alleged criminal conduct between 2007 and

2008 "was a direct violation of his release conditions in this case."   Gov. Opp. at 2.   This

patently absurd statement by the Government highlights the Kafkaesque Due Process nightmare

that Mr. Carpenter and his family have had to live through for the past 18 years.

### PRELIMINARY STATEMENT

Just to refresh the Government's memory, Mr. Carpenter won his first New Trial Order in

December 2005 and then won his Second New Trial Order in September 2011 after more than a

three-year delay from his second trial in 2008.   However, under the law, Mr. Carpenter was

totally innocent until the First Circuit overturned this Court's 2011 New Trial Order on

November 28, 2013, and only then was Mr. Carpenter indicted two weeks later for alleged

suspiciously criminal conduct occurring between 2007 and 2009.   Needless to say, Mr. Carpenter

has not been sentenced in that case yet, so that means under the law, he has not been convicted.

The whole purpose of the Writ of Coram Nobis was to get this Court to rule on Mr. Carpenter's

1

2255 Petition and several other motions to vacate his Boston conviction, which have been pending for more than three years.  If Mr. Carpenter is successful in his 2255 Petition or his Writ of Coram Nobis, then he will be at a Criminal History I rather than II.

More importantly, when Mr. Carpenter was sentenced by this Court in February 2014, there was not a single mention of any lie or misrepresentation that Mr. Carpenter ever told the Exchangors.  Instead, there was a lot of talk about Judge Swain's $30 million sanction against Mr. Carpenter in New York that was later vacated and overturned by the Second Circuit, the "looming" indictment from the Eastern District of Wisconsin that was dropped in 2016 (see Exhibit One Sentencing Transcript), and of course the Government's own indictment in Connecticut in December of 2013 because Mr. Carpenter had the temerity to sue the IRS and the DOL for their unlawful commando raids on Mr. Carpenter's office.  Those lawsuits are still active in two different courts in Connecticut.  Just as Mr. Carpenter won two Rule 33's in this Court, the Government would be wrong to count him out in having Judge Chatigny reconsider his June 6, 2016 verdict in Connecticut, but that is not the point of this filing.

This Court needs to vacate Mr. Carpenter's Boston conviction for all of the reasons detailed in both his 2255 Petition and the Writ of Coram Nobis.  The Government believes incorrectly that one cannot file a Writ of Coram Nobis until one is off supervised release, which prompted this motion to terminate the period of supervised release.  Whereas Mr. Carpenter was over-sentenced by 12 months because of the extraneous and unrelated claims made by the Government in February of 2014, they now raise those very same specious claims of criminal conduct from 2007-2009 to deny the termination of Mr. Carpenter's supervised release.  But,

supervised release is meant to help the defendant who has served his time, to help him get back on his feet and re-enter Society; not to punish him further.

In fact, the combination of this Court's 36-month sentence where the regional and national average was 24 months (see Exhibit One), with the actions of the prosecutors in Connecticut to delay Mr. Carpenter's trial, caused him to lose the 12 months of Halfway House and Home Confinement that all prisoners (except Mr. Carpenter) are guaranteed under the Second Chance Act and 18 U.S.C. §3624(c). Therefore, the Probation Office in Connecticut has already acknowledged in Mr. Carpenter's Pre-Sentence Report (PSR) that he has a time credit of 16 months for over-serving the sentence for the Boston conviction. But, if this Court vacates his Boston conviction, Mr. Carpenter's eligible credit for time served goes up to 36 months.

## I.   THE PURPOSE OF SUPERVISED RELEASE

This brings us back to the purpose of supervised release. Congress intended supervised release to be "curative" rehabilitation for the released felon to reintegrate back into Society, not extra punishment to be added onto a sentence. Since courts already punish defendants with prison sentences, Congress instructed judges to consider only non-punitive factors under §3553 when considering the conditions for supervised release. *See, e.g., United States v. Kappes*, 782 F.3d 828, 836 (7th Cir. 2015) ("Supervised release was not intended to be imposed for the purposes of punishment or incapacitation, since those purposes will have been served to the extent necessary by the term of imprisonment."), and *United States v. Murray*, 692 F.3d 273, 280 (3d Cir. 2012) (noting that the omission of §3553(a)(2)(A) "reinforces the idea that the primary purpose of supervised release is to facilitate the reentry of offenders into their communities, rather than to inflict punishment").

3

The obvious Due Process dilemma that Mr. Carpenter is facing here is that he was sentenced in 2014 for allegedly criminal conduct occurring between 1998 and 2000. Now in 2018 he is facing sentencing again for alleged criminal conduct between 2007 and 2009. There is no other case like this in the annals of the First Circuit, or any other Circuit for that matter. If the Court reviews the factors for Mr. Carpenter as an individual under 18 U.S.C. §3553, as the Court is obligated to do, then it becomes clear that Mr. Carpenter has been under this Court's purview for over 14 years since he was first indicted in February 2004. This fact alone should warrant this Court granting him relief now because he was over-sentenced for the alleged "omissions" and nondisclosure in the documents Marty Paley put together in 1998 based on new allegations of criminal conduct between 2007 and 2009. Now the Government wishes to bring up these very same issues to penalize him again, ten years after his alleged conduct in the Connecticut case where the insurance carrier "victims" received over $100 million in premiums and Mr. Carpenter's company lost over $70 million. Unlike the Boston case, no insurance carrier victims showed up looking for restitution from Mr. Carpenter or the Charter Oak Trust.

This brings us full circle to the absurd notion that Mr. Carpenter should not have his supervised release terminated because he has not paid his $100,000 fine or his restitution. Obviously, both the Fine and Restitution go away if Mr. Carpenter's conviction is vacated, but the Court should take notice that the Government's exhibit shows Mr. Carpenter dutifully paying his restitution at $50 per month. But, nowhere does the Government mention that the Exchangors have received over $50 million for their $8 million loss in 2001 in Mr. Carpenter's and BPETCO's victories over PaineWebber and Merrill Lynch. All of the Exchangors have given Mr. Carpenter a full settlement and release, which is attached as Exhibit Two.

4

## II.   THE CONNECTICUT CASE MAY YET BE RESOLVED IN MR. CARPENTER'S FAVOR

When Judge Chatigny wrote his Verdict on June 6, 2016, he did not have the benefit of the Second Circuit's scholarly decision discussing the history of the Mail and Wire Fraud Statutes in *United States v. Countrywide,* 822 F.3d 650 (2d Cir. 2016), the Eleventh Circuit's description and adoption of Second Circuit law in *United States v. Takhalov,* 827 F.3d 1307 (11th Cir. 2016), the now-famous Seventh Circuit decision defining Mail and Wire Fraud between sophisticated parties in negotiating a contract in *United States v. Weimert,* 819 F.3d 351 (7th Cir. 2016), the First Circuit's decision in *United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016) defining the limits of the Mail and Wire Fraud Statutes, or the First Circuit's decision in *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017).  He also did not have the benefit of *United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) ("*Litvak II*"), which led him to recently (June 2018) grant a Rule 33 New Trial for Michael Gramins, who was the co-defendant of Ross Shapiro in the famous securities fraud case of *United States v. Shapiro*, No. 15-cr-155.  On the same day that *Litvak II* was issued by the Second Circuit, the jury acquitted David Demos for the similar charge of lying to his clients on Wall Street.  *See United States v. Demos*, No. 16-cr-220. Therefore, there is a good argument to be made that lies done in contracts or commercial transactions are not enough to trigger the Mail and Wire Fraud Statutes.

These cases are all important because the allegations in Mr. Carpenter's December 2013 Indictment are that he was the leader of a scheme to defraud numerous insurance companies by inducing them to issue so-called "STOLI" (Stranger-Originated Life Insurance) policies.  It is not disputed that Mr. Carpenter did not fill out, sign, or send in any of the applications for the entity involved, the Charter Oak Trust, nor was he the Trustee or the Insurance Trustee of the Charter

5

Oak Trust. His only involvement in this affair was that his company Grist Mill Capital funded the policies that were purchased by the Charter Oak Trust. The evidence produced at Mr. Carpenter's bench trial (obviously after two negative experiences with prosecutorial misconduct in Boston, Mr. Carpenter did not want any of the jurors to see him brought to trial in handcuffs and shackles each day from the Wyatt Detention Center), showed without a doubt that the carriers were paid over $100 million for the alleged STOLI policies, and at the end of the day, Mr. Carpenter's company Grist Mill Capital lost over $74 million. These sums have been audited several times by both the IRS in audits and Mr. Carpenter's accountants. Therefore, after the Second Circuit's decision in *Countrywide*, where there was a massive fraud involving billions of dollars of worthless mortgages purchased by Fannie Mae, it is difficult to see how there can be any fraud in the Charter Oak Trust which paid millions of dollars to the insurance carriers who were the alleged "victims" in the Connecticut case. As this Court knows, the now-famous *Countrywide* decision by the Second Circuit was largely based on two seminal cases from the First Circuit: *McEvoy Travel v. Heritage Travel,* 904 F.2d 786, 791-92 (1st Cir. 1990) ("the common law requires proof--other than the fact of breach-that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation.") *Countrywide* at 660, and *Sanchez* v. *Triple-S,* 492 F.3d 1, 11 (1st Cir. 2007), stating:

> A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes. *See, e.g., United States* v. *Autuori,* 212 F.3d 105, 118 (2d Cir.2000)....We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who-a jury might find-secretly harbored in his heart the hope that the buyer would never ask."

6

Additionally, Judge Chatigny did not have the benefit of two other recent landmark cases from the First Circuit limiting the mail and wire fraud statutes, requiring that the mailings and wires be in furtherance of the fraud. *See United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016) (in reversing RICO and mail fraud convictions and ordering the entry of judgments of acquittal) held that while "[t]he 'in furtherance' requirement is to be broadly read and applied," *id.* at 58, the requirement "places an important limitation on federal authority." *Id.* (citing *Kann v. United States,* 323 U.S. 88, 95 (1944)).  Furthermore, Judge Chatigny did not have the benefit of the First Circuit's overturning the convictions of several doctors who lied on their exam applications. *See Berroa*, where the First Circuit echoed Mr. Carpenter's argument all along that "under the government's theory, any false statement in an application…could constitute a federal crime." *Id.* at 150.

Significantly, neither Mr. Carpenter nor Judge Chatigny had the benefit of the now-famous Seventh Circuit decision in *Weimert*, where Weimert, a banker negotiating a deal to sell a property owned by his employer, a major bank, not only lied to his current employer the bank, but also lied to his future "partner" the real estate company and pocketed millions of dollars that he took from both his employer and his future partner.  In vacating Weimert's conviction, the Seventh Circuit made the following comments limiting the scope of the Mail and Wire Fraud statutes:

> Buyers and sellers negotiate prices and other terms.  To state the obvious, they will often try to mislead the other party about the prices and terms they are willing to accept.  Such deceptions are not criminal.
>
> To take a simple example based on price, suppose a seller is willing to accept $28,000 for a new car listed for sale at $32,000.  A buyer is actually willing to pay $32,000, but he first offers $28,000.  When that offer is rejected and the seller demands $32,000, the buyer responds: "I won't pay more than $29,000."  The seller replies: "I'll take $31,000

but not a penny less." After another round of offers and demands, each one falsely labeled "my final offer," the parties ultimately agree on a price of $30,000. Each side has gained from deliberately false misrepresentations about its negotiating position. Each has affected the other side's decisions. If the transaction involves interstate wires, has each committed wire fraud, each defrauding the other of $2,000? Of course not. But why not? The…answer is that negotiating parties, and certainly the sophisticated businessmen in this case, do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior. Deception about negotiating positions—about reserve prices and other terms and their relative importance—should not be considered material for purposes of mail and wire fraud statutes. *Weimert* at 357-58.

In commercial negotiations, it is not unusual for parties to conceal from others their true goals, values, priorities, or reserve prices in a proposed transaction. When we look closely at the evidence, the only ways in which Weimert misled anyone concerned such negotiating positions. He led the successful buyer to believe the seller wanted him to have a piece of the deal. He led the seller to believe the buyer insisted he had a piece of the deal. All the actual terms of the deal, however, were fully disclosed and subject to negotiation. There is no evidence that Weimert misled anyone about any material facts or about promises of future actions. *Id.* at 354.

The mail and wire fraud statutes do not cover all behavior which strays from the ideal….[W]e know of no other case in which a court has found that deceptive statements about negotiating positions amounted to a scheme to defraud under the mail or wire fraud statutes. *Id.* at 357-58.

In the end, the Seventh Circuit determined that Weimert's dealings in selling the Chandler Creek property were "sharp and self-interested, but they did not amount to wire fraud....[A]ll terms of the deal were on the table. IDI might have been able to secure a better deal if it had known the underlying priorities of prospective buyers and Weimert, but that is . . . a matter for the corporate boardroom and civil law, not a federal criminal trial." *Id.* at 370.

In the same vein, Judge Chatigny did not have the detailed opinion from the Eleventh Circuit in *Takhalov*, describing and thereby adopting the law of the Second Circuit as to what is required for there to be a violation of the Mail and Wire Fraud Statutes. Deceit is not enough; there must be an actual intent to harm the victim of the deceit. To explain this fine but vital distinction in the law, the Eleventh Circuit uses what might be called the "Parable of the

8

Deceitful Neighbor" to explain its position.  The Eleventh Circuit depicted two scenarios.  In the first, a man calls his neighbor saying that his child is very ill, and the neighbor responds by rushing over to see if she can help.  The man asks her to give him change for a dollar, which the helpful neighbor gladly gives him.  She later learns that the neighbor's child was not sick at all.  The second scenario is identical to the first, except that now the Deceitful Neighbor gives the helpful neighbor a counterfeit dollar in exchange for the four quarters.  The Eleventh Circuit explains that the first scenario is not wire fraud, but the second one is, despite the fact that the helpful neighbor would not have rushed over in the first scenario had she known that the child was not really sick.

Most recently, the Second Circuit has made it abundantly clear that not only must there be more than deceit in a Mail and Wire Fraud case based on the Right to Control Theory of Fraud, there must also be "intended" demonstrable "tangible economic harm" to the victim before somebody can be held accountable under the Mail and Wire Fraud Statutes.  *See United States v. Finazzo,* 850 F.3d 94 (2d Cir. 2017), *citing United States v. Mittelstaedt,* 31 F.3d 1208 (2d Cir. 1994).  In *Finazzo*, the Second Circuit uses its own parable to teach its lessons concerning the Mail and Wire Fraud Statutes by stating that if an apparel company did not wish to be involved with overseas child labor, and a supplier lied about their non-involvement in child labor, that would be deceit but it would not impact the bargain, which would be based on the quality, the amount, and the cost of the goods.  So, unless the lie or the deceit was meant to cause "tangible economic harm" to the alleged victim, it is doubtful that the Mail and Wire Fraud Statutes would apply according to the Second Circuit.  This is particularly true in the accusations in Mr. Carpenter's case, because no one disputes that the STOLI policies have been profitable to

the carriers, and that it is Mr. Carpenter's company that lost money because of the lies of the carriers' own brokers.   More importantly, it is an ancient maxim of insurance law that the "knowledge of the agent is the knowledge of the carrier."   *See, e.g., Stipcich v. Metropolitan Life,* 277 U.S. 311 (1928).

Most recently, however, in Connecticut Judge Chatigny granted Michael Gramins's motion for a new trial pursuant to Rule 33 based on *Litvak II*, and he mentions *United States v. Demos* in his decision, who was acquitted of all charges on the same day that *Litvak II* was issued by the Second Circuit.   The interesting timing and coincidence of this is that it was exactly two years after Judge Chatigny's decision regarding Mr. Carpenter in June of 2016.   Not only does Judge Chatigny discuss the materiality element, but his rulings in the *Shapiro* case were cited by the defense in *Demos*.   Attached as Exhibit Three is Judge Chatigny's ruling in *Shapiro*, that was cited to the judge in *Demos* by the defendant's attorney.   There are a number of good quotes from Judge Chatigny in *Shapiro* used in *Demos* applicable to Mr. Carpenter's case, but perhaps the most significant are the following:

> "I don't think you can be convicted under the Constitution unless you had a sufficiently culpable state of mind such that you made a conscious choice to cross an important line and expose yourself to potential imprisonment....The Supreme Court has recognized that when a challenged action or course of conduct is a technical violation of the law as opposed to morally reprehensible it becomes more important to make it clear to the jury that the government has a burden to prove that the defendant knew his conduct was unlawful. Why? Because we don't want to be exposing people to conviction and incarceration if they didn't know that this is what they were risking."

> To establish that a defendant 'willfully violat[ed]' the antistructuring law, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).... As a general matter, when used in the criminal context, a "willful" act is one undertaken with a "bad purpose." In other words, in order to establish a "willful" violation of a statute, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191 (1998).

10

"As the Government concedes, lying in arms-length commercial transactions is not always illegal. It depends on the particular facts and circumstances. *See Regent Office* at 1179 (lies that are "repugnant to standards of business morality" may nevertheless be insufficient to support a criminal conviction for fraud). Prior to the indictment in Litvak, the conduct at issue appears to have been widespread in the RMBS market. Cooperating witnesses in this case testified that they didn't realize the conduct was illegal. After a series of trials involving five defendants charged with essentially the very same conduct, only Mr. Gramins currently stands convicted on any count in any of the indictments. It is possible the jury convicted him on the conspiracy count, and hung or acquitted as to all other counts in the indictment, only because it was persuaded that he continued to engage in the conduct notwithstanding the Litvak indictment. Others who engaged in this conduct have been the subject of civil enforcement proceedings or no enforcement proceedings at all. It is fair for the defendants to wonder what distinguishes their conduct from that of others who have been spared indictment."

"I would rather risk error on the side of lenity than the other way." *See* Transcript from *Demos* citing Judge Chatigny in *Shapiro* attached as Exhibit Three.

But, based on the major precedent from Supreme Court cases as well as *Weimert, Countrywide, Takhalov,* and *Finazzo,* if Mr. Carpenter is to be someday sentenced, there are obviously a number of Due Process violations in his Connecticut case that mirror and even surpass the Due Process and Speedy Trial violations in the Boston case. Obviously, these will be issues for the Second Circuit, but Mr. Carpenter wishes to point out the sentences that have been given in other STOLI cases, both in New York and California that dwarf the alleged STOLI fraud in the Charter Oak Trust case. Most significant is that Mr. Carpenter, when he is sentenced, will have the benefit of Sentencing Guidelines Amendments 791, 792, and 794. But, even without those, virtually all of the people sentenced in STOLI fraud cases have received a sentence of one year or less, or even probation as was done in the First Circuit case of *United States v. Prosperi,* 686 F.3d 32 (1st Cir. 2012), involving major fraud surrounding the "Big Dig" where the defendants received probation instead of the eight years suggested by the Sentencing Guidelines or the three years Mr. Carpenter received. Therefore, Mr. Carpenter respectfully asks

11

this Court to review the possible sentences out there that have already been delivered for STOLI fraud to negate the Government's claim that Mr. Carpenter has committed some heinous crime of the century that should deprive him of the early termination of his supervised release.  In fact, if his conduct was a crime, it was a victimless crime with no intended loss under *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011), and no actual loss under *Finazzo*.

For example, former Attorney General Loretta Lynch prosecuted Chaim Lebovits and Moses Neuman for an alleged $500 million STOLI fraud (see Exhibit Four), but actually made a sentencing recommendation of Probation for Mr. Lebovits, who was the alleged ringleader of the $500 million fraud, yet the Government decided that the actual loss to the carriers was only $70,000-$120,000 (see Exhibit Five), and a recommendation of only a year and a day for Mr. Neuman. Similarly, a California judge sentenced Jeffery Keller, who was the ringleader of an even larger STOLI fraud, to 90-days and $1 million in restitution even though he was paid $3.8 million in STOLI commissions. See Exhibit Six. His partner, Stuart Steinfeld, was sentenced to 60 days with no restitution and a small $10,000 fine.  See Exhibit Seven.  The Keller-Steinfeld STOLI fraud was much larger than the Lebovits-Neuman STOLI fraud, which at $500 million was much larger than all of the policies in the Charter Oak Trust combined.

Therefore, it should not be surprising that in affirming the conviction of David Quatrella, the Second Circuit found his three year sentence to be reasonable and yet, attorney Quatrella pled guilty to not only lying to the insurance carriers but lying to his partners and his investors, who in his case became the victims under the MVRA (*United States v. Quatrella*, 722 Fed.Appx. 64 (2d Cir. 2018)).  This is to be contrasted with Mr. Carpenter, who was not the agent or broker that lied on the application, but rather was the so-called "Funder" or the "Investor" that was

determined to be the victim in *Quatrella*.  As with all of the cases above, David Quatrella's guilty plea and the Second Circuit's decision were all after Judge Chatigny's June 2016 decision. Significantly, in the Second Circuit docket, there was a copy of a Wall Street Journal article from November 2008 attached as Exhibit Eight that shows that the STOLI or Life Settlement business had come to an end by the Summer of 2008, with the collapse of Bear Stearns in March 2008 and the bankruptcy of Lehman Brothers in September 2008.

Needless to say, Mr. Carpenter's second trial in Boston was in June 2008, and happened between those two dramatic events in a terrible year for the American economy, so he has the dubious distinction of being the only person in America indicted for losing money in the Stock Market collapse of 2000 and again for fraud in the Great Recession of 2008.  No investment bankers were charged for losing client money in 2000, nor were the trustees of the Massachusetts or Connecticut pension plans charged for losing billions of dollars in the Stock Market crashes of 2000 or 2008, and as we now know, no one from Countrywide, AIG, or even Goldman Sachs was indicted for the massive fraud that led to the collapse of the American economy ten years ago in 2008.  Only Mr. Carpenter stands accused of losing money in the Stock Market in 2000 and defrauding insurance companies in 2008 by arranging to pay them over $100 million in premiums.

Moreover, just as the Exchangors have made $50 million on their $8 million loss, so too have the insurance carriers made over $100 million on the premiums paid by Mr. Carpenter's company and others, thereby having no actual loss, despite paying reinsured death benefits as late as this year, when Judge Chatigny's own Verdict states on page 21 that the carriers could have rescinded the policies at any time and kept the premiums paid if the policies were actually

13

STOLI policies. Obviously, the carriers' actions in Mr. Carpenter's case seem to be drowning out the Government's shrill screams that Mr. Carpenter committed some kind of crime with the Charter Oak Trust, and Judge Chatigny's own decisions in *Shapiro* and *Gramins* seem to support Mr. Carpenter's Due Process claims that he should not be punished if he did not know that he was breaking the law in 2000 or in 2008. Certainly there was no "bright line" that he crossed, because life insurance policies are still being bought and sold, and the carriers continue to collect premium and pay death claims on the allegedly fraudulent Charter Oak Trust policies to this day.

Therefore, based on the fact that most "White Collar" criminal offenders, especially the ones who plead guilty, are released after serving half of their supervised release, and July 26, 2018 marks Mr. Carpenter's halfway point, and in the past 20 years from 1998-2018 he has been accused of only doing two bad things – both of which he vigorously disputes – it is therefore fitting that this Court grant this Motion to Terminate Mr. Carpenter's Supervised Release and then proceed to examine his Petition for a Writ of Coram Nobis to vacate his conviction.

## CONCLUSION

For the reasons detailed above, Mr. Carpenter respectfully asks this Court to grant his Motion to Terminate his Supervised Release (Doc. 564) and then grant his Petition for a Writ of Coram Nobis to vacate his conviction (Doc. 562) based on the constitutional violations in this case and errors of a fundamental nature.

Respectfully Submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro-se*
18 Pond Side Lane
West Simsbury, CT 06092

14

# EXHIBIT
# ONE

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

       * * * * * * * * * * * * * *
3      UNITED STATES OF AMERICA      *
                                     *
4              vs.                   *         CRIMINAL ACTION
                                     *         No. 04-10029-GAO
5      DANIEL E. CARPENTER           *
                                     *
6      * * * * * * * * * * * * * *

7            BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                    UNITED STATES DISTRICT JUDGE
8                            **SENTENCING**

9      A P P E A R A N C E S

10             UNITED STATES ATTORNEY'S OFFICE
               1 Courthouse Way, Suite 9200
11             Boston, Massachusetts 02210
               for the United States
12             By:  Jack W. Pirozzolo, AUSA

13
               MARTIN G. WEINBERG, PC
14             20 Park Plaza, Suite 1000
               Boston, Massachusetts 02116
15             for the defendant
               By:  Martin G. Weinberg, Esq.
16                  Robert M. Goldstein, Esq.

17

18
                               Courtroom No. 9
19                             John J. Moakley Courthouse
                               1 Courthouse Way
20                             Boston, Massachusetts 02210
                               February 26, 2014
21                             2:00 p.m.

22

23             CAROL LYNN SCOTT, CSR, RMR
                  Official Court Reporter
24             One Courthouse Way, Suite 7204
                Boston, Massachusetts 02210
25                    (617) 330-1377

```
 1    time.  This was avoidable.  And as you just heard, as I just

 2    mentioned, there is lots of bad judgment proof, he's

 3    judgment proof, he's judgment proof.  This loss has been

 4    paid here but not a lot has been paid by Mr. Carpenter.

 5    That's the record in this case.

 6              And one of the fundamental tenets of criminal law

 7    is that when you're dealing with a judgment-proof person is

 8    to deal with that.  You have an incarcerative sentence so

 9    there is a cost, so there is a price to be paid for taking

10    people's money, for defrauding people, even if they can't

11    get their money back from that person.

12              That's why, among other things, in order to show

13    just punishment for this offense the five-year sentence is

14    appropriate.

15              I am going to turn now to the issue of deterrence.

16    The Court has in the sentencing papers and elsewhere in the

17    record, during the ten years that Mr. Carpenter has been on

18    pretrial release in this matter it's not as if he has, it's

19    not as if the evidence shows that he his tried the straight

20    and narrow.

21              In addition to the crime that is documented with

22    respect to the unique (ph.) type civil litigation in

23    connection with this case, Mr. Carpenter now stands indicted

24    in the District of Connecticut for an insurance fraud scam.

25    He is currently under investigation for tax offenses in the
```

1     District of Wisconsin.  And his treatment and behavior in

2     connection with this case in terms of his utter lack of

3     accepting any responsibility is in full display in the civil

4     case, the *Universitas* case that the government also

5     submitted to the Court.

6            And the facts of that case, while civil, are

7     appalling.  There is, there are repeated instances of

8     evading orders of the Court.  Contempt.  He's been held in

9     contempt in that matter.  There is 30 million dollar

10    proceeds of a life insurance policy that he has done

11    everything in his power to make sure doesn't get paid to the

12    policyholder.  And the Court has not only found that he's

13    done that, engaged in fraudulent conveyance after fraudulent

14    conveyance, but that when asked about it in that matter, he

15    testified deceitfully.

16           Usually in the white collar context we talk about

17    general deterrence and don't talk a whole lot about specific

18    deterrence but specific deterrence matters in this case.  No

19    reasonable construction, no reasonable view of the series of

20    events over the last few years can suggest anything other

21    than that Mr. Carpenter is, in fact, a threat.

22           And it's beyond the scope of this argument for

23    purposes of sentencing to assess what relevance in terms of

24    his pretrial release status and bail status will be based on

25    those indictments but the fact remains he is a threat to the

1          For 2012 -- and it is not necessary to go through

2     all, I will just give you the 2012.  2012, interestingly the

3     median sentence for fraud nationally was 24 months.  The

4     median sentence for fraud within the First Circuit for 2012

5     was 24 months.  The median sentence in Massachusetts, the

6     number of cases said to be 61 for fraud in 2012, was 24

7     months.

8          You can overstate the significance of that datum

9     but I will say that it is roughly in the range if you went

10    back five years for each of those samples, national, First

11    Circuit, Massachusetts, the range is somewhere from 18 to

12    high thirties generally.

13         So if I consider how to make a sentence that avoids

14    unwarranted disparities, I think I have to do it to some

15    degree in the light of those purported statistics.

16    Interestingly the next offense on the table is for

17    embezzlement and those figures are consistently, they are

18    lower by the way.

19         Now, what I don't know in the table is what the

20    amounts were that might drive the *Guidelines* or what other

21    factors might drive the *Guidelines*.  But I do see that the

22    range in practice for fraud sentences is somewhere in the

23    two-to three-year range basically.

24         So my conclusion is that that is an appropriate

25    guide here to determine whether a sentence somewhere in that

1   range is sufficient and not greater than necessary to

2   accomplish the goals of sentencing.  And taking all the

3   factors into account, I conclude that a 36-month sentence is

4   an appropriate one in this case, followed by three years of

5   supervised release.

6          The guideline range for a fine is from $10,000 to

7   $100,000.  I actually think $100,000 is the better figure

8   than recommended by the government.  It has been my view

9   that in crimes where greed may have been a motivating

10  factor, taking money is a good way of punishing someone.

11  And so I think a fine at the high end of the range is

12  appropriate.

13         I will also order restitution in the amount that

14  has previously been stated by Mr. Pirozzolo for

15  Mr. Darling's estate and for Mr. Fitzgerald as noted.  I

16  decline to make a restitution order in favor of Merrill

17  Lynch or Paine Webber.

18         So those are the elements, and there will be a

19  forfeiture order entered ordering proceeds, if any, of the

20  offense to be forfeited and we will have a further

21  proceeding to determine that.  As to that, I would suggest

22  perhaps counsel might confer on a schedule by which we might

23  do that.

24         So, Mr. Carpenter, if you would stand, please.

25

1          Daniel Carpenter, on your conviction of these

2    offenses and pursuant to the Sentencing Reform Act of 1984,

3    it is the judgment of the Court that you be and hereby are

4    committed to the custody of the Bureau of Prisons to be

5    imprisoned for a term of 36 months.  This consists of equal

6    terms of 36 months on each of the counts of conviction, all

7    to be served concurrently.

8          Upon your release from imprisonment you shall be

9    placed on supervised release for a term of three years and

10   that consists of equal terms of three years on each of the

11   counts, all to be run concurrently.

12         Within 72 hours of your release from the custody of

13   the Bureau of Prisons, you shall report in person to the

14   district to which you have been released.

15         It is further ordered that you make restitution to

16   the estate of Byron Darling in the sum of $244,332.02 and to

17   the -- I am sorry.  Do I have that backwards?

18         Okay, yes.  And to Brian Fitzgerald in the sum of

19   $65,701.94 for a total of $310,033.96.

20         Any payment that is made that is not a payment in

21   full shall be made -- shall be divided proportionately among

22   the recipients as their interests may appear until the full

23   amount has been paid.

24         The restitution is either to be paid immediately or

25   according to a repayment schedule that can be agreed to

1    between you and the Probation Office and approved by the

2    Court or, if no agreement can be established, by the Court.

3    Payments of restitution are to be made to the Clerk of this

4    Court for transfer to the appropriate person.

5            You shall notify the United States Attorney for

6    this district within 30 days of any change of mailing or

7    residential address that occurs while any portion of the

8    restitution remains unpaid.  Restitution -- I believe that

9    the Bureau Program covers restitution as well fines?

10           **THE PROBATION OFFICER:**  Yes, Your Honor.

11           **THE COURT:**  Yes.  The Bureau Of Prisons

12   Financial -- the Inmate Financial Responsibility Program

13   will begin the process of immediately collecting payments.

14           In addition you are fined the sum of $100,000 as a

15   penalty for this offense.

16           While you are on supervised release you shall

17   comply with all the standard conditions that pertain to that

18   status.  Those conditions are set forth in the *United States*

19   *Sentencing Guidelines* at Section 5D1.3C and they are now

20   incorporated by reference but they will be set forth in

21   detail in the judgment.

22           In addition to those standard conditions you shall

23   comply with the following conditions of supervised release:

24           You shall not commit another federal, state or

25   local crime.

# EXHIBIT TWO

## Release and Settlement Agreement

AGREEMENT dated as of December 16, 2015, by and among Gail A. Cahaly, Joseph J. Iantosca and David Iantosca individually and as trustees of Faxon Heights Apartments and Fern Realty Trust on behalf of Joseph Iantosca (deceased), Belridge Corporation, Jeffrey M. Johnston, Bellemore Associates, LLC and Massachusetts Lumber Company, Inc. (collectively "The Cahaly Plaintiffs") and Daniel Carpenter, Molly Carpenter, Boston Property Exchange Transfer Company, Inc., f/n/a Benistar Property Exchange Trust Company, Benistar Admin. Services, Inc., Carpenter Financial Group, Benistar Ltd., Benistar Employer Services Trust Corporation, and U.S. Property Exchange (collectively "BPETCO").

WHEREAS, the parties to this Agreement (the "Parties") are all of the parties to an action styled *Cahaly, et al v. Boston Property Exchange Trust Company, et al, Civil Action No. SUCV2014-cv-00530-D (the "Litigation");* and

WHEREAS, the Parties have agreed to settle the Litigation on the terms set forth below.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

   1.   BPETCO agrees to release any claim on the $2.85 million of escrowed funds currently held by the Court in the Litigation, (the "Escrowed Funds") and to authorize the Court to pay the Escrowed Funds to counsel for the Cahaly Plaintiffs.

   2.   Universitas Education, LLC ("Universitas") has also agreed to release any claim on the Escrowed Funds and to authorize the Court to pay the Escrowed Funds to counsel for the Cahaly Plaintiffs.

   3.   The Cahaly Plaintiffs agree that their counsel shall hold the Escrowed Funds in escrow until all documents relating to the settlement of this matter have been duly signed, delivered, and filed with the Court, as required by this Agreement. All documents must be signed by the Parties by December 23, 2015 for this Agreement to be valid.

   4.   The Parties agree to instruct their counsel to sign and file with the Court a stipulation of dismissal of the Litigation in the form attached hereto as Exhibit A (the "Stipulation of Dismissal").

   5.   The Cahaly Plaintiffs agree that $900,000 of the Escrowed Funds shall be paid by counsel for the Cahaly Plaintiffs to Universitas, through its counsel.

   6.   BPETCO agrees to pay the Cahaly Plaintiffs, through their counsel, the sum of one hundred and twenty-five thousand dollars ($125,000).

7.      The Cahaly Plaintiffs agree to deliver  a satisfaction of the Amended Judgment dated November 18, 2004, in *Cahaly, et al v. Benistar Property Exchange Trust Co., Inc., et al, Civil Action No., SUCV2001-cv-0116-BLS2* (the "Original Cahaly Action") acknowledging that the Amended Judgment is fully satisfied as to all judgment debtors (the Satisfaction of Judgment) in the form attached hereto as Exhibit B.

8.      The parties agree to the following mutual releases:

a.      Each of Gail Cahaly, Jeffrey M. Johnston, Bellemore Associates LLC, Massachusetts Lumber Company Inc., Joseph Iantosca, and Belridge Corporation, for themselves, their representatives, managers, members, trustees, beneficiaries, successors and assigns and all other persons for whom they are authorized to so act, each and any of them, and anyone acting in concert with them (collectively, the "**Iantosca Releasing Parties**"), do hereby remise, release and forever discharge Daniel Carpenter, Molly Carpenter, Boston Property Exchange Transfer Company, Inc., Benistar Admin. Services, Inc., Carpenter Financial Group, Benistar Ltd., Benistar Employer Services Trust Corporation, and U.S. Property Exchange and their representatives, managers, directors, officers, affiliates, predecessors, partners, servants, agents, consultants, employees, pledgees, nominees, insurers, accountants, attorneys, successors and assigns and each and every one of them, (collectively, the "**Benistar Released Parties**"), and Universitas of and from any and all manner of actions, causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, claims and demands whatsoever, whether in law in equity, known or unknown, anticipated or unanticipated, discovered or undiscovered, past or present, of any nature whatsoever.

b.      Daniel Carpenter, Molly Carpenter, Benistar Property Exchange Trust Company, Inc., Benistar Admin. Services, Inc., Carpenter Financial Group, Benistar Ltd., Benistar Employer Services Trust Corporation, and U.S. Property Exchange, for themselves and for their representatives, managers, members, partners, successors, assigns and all other persons for whom they are authorized to so act, each and every one of them, and anyone acting in concert with them (collectively, "**Benistar Releasing Parties**"), do hereby remise, release and forever discharge each of Gail Cahaly, Jeffrey M. Johnston, Bellemore Associates LLC, Massachusetts Lumber Company Inc., Joseph Iantosca, and Belridge Corporation, and their respective representatives, directors, officers, subsidiaries, affiliates, corporate predecessors, partners, servants, agents, consultants, pledgees, nominees, insurers, accountants, attorneys, successors and assigns, and each and every one of them, and anyone acting in concert with them (collectively, the "**Iantosca Released Parties**"), of and from any and all manner of actions, causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, claims and demands whatsoever, whether in law in equity, known or unknown, anticipated or unanticipated, discovered or undiscovered, past or present, of any nature whatsoever.

9.      Once counsel for each of the Parties certifies that their clients have agreed to the terms of this Agreement, the Parties shall file the Stipulation of Dismissal and shall request the Court to release the Escrowed Funds. All Escrowed Funds released by the Court shall be held in escrow by Zelle, McDonough & Cohen, LLP pending delivery to

counsel for BPETCO of the Satisfaction of Judgment and copies of this Agreement executed by all Parties.

10.     Once the Satisfaction of Judgment and copies of this Agreement executed by all Parties have been received by counsel for BPETCO, counsel shall immediately wire the $125,000 settlement proceeds to Zelle, McDonough & Cohen, LLP.

11.     Counsel for BPETCO shall not file the Satisfaction of Judgment with the Court until he has delivered to counsel for the Cahaly Plaintiffs copies of this Agreement executed by all of the BPETCO parties and has wired the $125,000 settlement proceeds to Zelle, McDonough & Cohen, LLP.

12.     The Cahaly Plaintiffs acknowledge the sufficiency of the Consideration (defined as the payments described above, together with all the promises, agreements, and representations set forth in this Agreement including the releases by the Cahaly Plaintiffs and dismissal of the Lawsuit with prejudice) by signing this Agreement. The payments described above are not an admission of liability or a concession on the part of any party as to the truth of any of the allegations, made by any party in the Lawsuit and may not be so construed. All parties acknowledge the highly disputed nature of their claims and causes of action in the Lawsuit.

13.     The Cahaly Plaintiffs and BPETCO each covenant and promise never to institute a claim relating to or arising out of their dealings, transactions or any other involvement with the other, including any alleged entitlement under any law or regulation with any state or federal court or agency. The Cahaly Plaintiffs and BPETCO further each covenant and promise never to sue each other concerning their dealings, transactions or any other involvement that any or all of the Cahaly Plaintiffs may have had with the BPETCO Parties. Each of the Cahaly Plaintiffs and BPETCO agrees that if any of them violates this covenant not to sue they will pay all costs and expenses of defending against the suit incurred by the other party, including all attorneys' fees and expenses.

14.   The Cahaly Plaintiffs and BPETCO hereby expressly waive any and all rights they, or anyone claiming by, through, or under them, may have against the other under any legal or equitable principle or theory in connection with the facts and circumstances alleged in or in any way related to the Litigation. The Cahaly Plaintiffs also acknowledge that they fully release the BPETCO Parties for the payment of any outstanding past, present and future fees, penalties, interest, liabilities and/or expenses related to the Litigation, and any tax liabilities.

15.     Each party shall pay their own costs, expenses and attorneys' fees incurred in connection with the Lawsuit.

16.     By signing this Agreement, each party makes the following representations with respect to themselves and each entity for which they are signing:

a.     The party is correctly described in this Agreement;

b.      The party is legally competent;

c.      The signatory to this Agreement for any entity is a duly authorized representative of that entity for which he or she is signing this Agreement;

d.      This Agreement is fully and forever binding on the parties their heirs, successors, assigns and partners and shareholders, as applicable;

e.      The party fully understands that this is a full, complete, and final release, and that the Consideration paid under this Agreement is all the money that is to be paid by or on behalf of the BPETCO Parties to the Cahaly Plaintiffs as a result of the matters made the basis of the Lawsuit. The Cahaly Plaintiffs will not seek any further money or other recovery from the BPETCO Parties for claims asserted, or that could have been asserted, in the Lawsuit;

f.      No promise or representation of any kind regarding the subject matter of this Agreement has been made to the parties or to anyone acting for the parties, except as is expressly stated in this Agreement;

g.      The Party has not assigned, pledged, or in any other manner sold or transferred any right, title, interest, or claim that arises out of the Lawsuit, or this Agreement, except to their counsel;

h.      This Agreement was fully explained to the party by its/his/her own Counsel before the party signed the Agreement. The party represents that it/he/she has read and understands this Agreement, and has had the advice of attorneys and other professionals of its/his/her own selection with regard to the legal consequences of this Agreement. Before executing this Agreement, the party had, with the advice of its/his/her counsel, fully informed themselves of its terms, contents, conditions, and effect and no promise or representation of any kind has been expressed or implied to the party.

i.      The party understands, after consultation with its/his/her counsel, how the consideration is being paid by, how the consideration is being allocated as among and between each party and each party agrees with such allocation and believes that it is fair and reasonable. The party has consulted with its/his/her attorneys, who have fully explained to the party's satisfaction the terms of this Agreement, including disclosure of the existence and nature of all of the claims involved in this settlement, and the nature and extent of the participation of each person or entity in the settlement. The party enters this Agreement freely, by its/his/her own choice, and judgment, and without duress or other influence;

j.      Each Party recognizes that the recitations contained in this Agreement are contractual and not a mere recital; and

k.      Each Party further represents that it/he/she are not relying on the advice of the other Parties or their representatives, consultants, or attorneys, on any matters, including but not limited to the legal and income tax consequences of this Agreement, the

investment of funds or how the Consideration being paid is allocated among and between the Parties. Each Party has relied solely and completely upon their own judgment, and the advice of its/his/her counsel in making this Agreement.

17.    All Parties declare and represent that they are choosing to execute this Agreement under their own free will and are not under any duress or coercion.

18.    All Parties represent that they have been afforded the opportunity, before signing and agreeing to this Agreement, to seek legal advice regarding the terms and conditions of this Agreement and have done so.

19.    The financial terms of this Agreement shall be kept CONFIDENTIAL. The Parties and their counsel agree not to discuss or disclose, directly or indirectly, either publicly or privately the financial terms and conditions of this Agreement and the negotiations in connection herewith, including any consideration paid hereunder (the "Confidential Material"), for any purposes other than the enforcement of the terms and conditions contained herein, or as required by court order or rule, or as necessary to obtain legal or accounting advice or fulfill some legal duty.   Notwithstanding this provision, the Parties permit disclosure of the Agreement to the other Parties in this Litigation as required by the Federal Rules of Civil Procedure, if so requested by any other Parties.

20.    This Agreement has been prepared by the joint efforts of the respective attorneys for the Parties.  In the unlikely event of an ambiguity in this Agreement, the Parties agree that the Agreement shall be construed in an even-handed manner as to give effect to the purpose of this Agreement, and that there shall be no presumption that the Agreement should be construed against one Party or another.

21.    If any provision of this Agreement is later held to be invalid or unenforceable for any reason, such provision shall not affect the validity or enforceability of the remaining provisions of this Agreement.

22.    The Parties agree that this Agreement constitutes the entire agreement between them and that a facsimile, electronic, Xerox or photostatic copy shall have the same force and effect as an original.  This Agreement may be executed in multiple counterparts, each of which are to be considered originals and of equal dignity, but all of which shall constitute one and the same Agreement.

WHEREFORE, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**Daniel Carpenter**

_____

Daniel Carpenter

**Molly Carpenter**

_____

Molly Carpenter

Attorneys for:

**Gail Cahaly, Jeffrey M. Johnston, Bellemore Associates, LLC, Massachusetts Lumber Company, Inc., Joseph Iantosca, and David Iantosca individually and as trustees of Faxon Heights Apartments and Fern Realty Trust on behalf of Joseph Iantosca (deceased), and Belridge Corporation,**

By: _____

Anthony R. Zelle, Esq.
Thomas W. Evans, Esq.
Zelle McDonough & Cohen LLP
101 Federal Street, 14th Floor
Boston, MA 02110

# EXHIBIT THREE

## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

## UNITED STATES OF AMERICA : No. 3:16-CR-220 (AWT)

v.

## DAVID DEMOS,

April 29, 2018

### DEFENDANT'S RESPONSE TO THE COURT'S JURY CHARGE

I.  **TO BE CRIMINALLY CULPABLE A DEFENDANT MUST ACT TO DO SOMETHING THAT IS "UNLAWFUL" NOT JUST "WRONGFUL" AS THE COURT PROPOSES**

On April 10, 2018 the Court detailed the third element of the offense of securities

fraud upon which the Defense relied during the trial.

> The third element of the offense of securities fraud is that the defendant acted willfully, knowingly, and with intent to defraud. To act "knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently, and not because of ignorance, mistake, accident or carelessness. To act "willfully" means to act with the intent to do something the law forbids, that is, with a bad purpose to disobey or disregard the law. To act with intent to defraud means to act with specific intent to deceive, i.e. deliberately using deception to induce another to act to his detriment; the defendant's conduct must have been the product of his conscious objective rather than the product of mistake.

Nowhere in the Court's instruction was the Defense put on notice the Court would

expand its definition to now include the following language:

> The Government does not have to prove that the defendant knew he was violating
> any particular law, but it must prove he intentionally understood an act he knew
> was **wrongful.**

(emphasis added).

This addition is highly prejudicial and inconstant with precent from the Supreme Court of the United States.   In addition, the defense opend with a definition of "willfulness" and a written slide of that definition and articulated by the Court.   Indeed, the Court approved the Defense opening statement slide that was published to the jury. Had the defense been aware the Court would eschew the original willfulness instruction and  include an act the Defendant knew was wrongful, the defense trial strategy would have been significantly different. With this revised definition, the Defense anticipates that the Government will argue that Cantor Employee handbooks representing employment policies and procedures and Financial Industry Regulatory Authority ("FINRA") regulations prove that Mr. Demos knew his conduct was "wrongful" thereby meeting their burden to establish Mr. Demos's intent to violate the law. However, centuries of traditions and the common law confirm that is is incorrect to equate wrongful conduct with unlawful conduct.  The former exists in the domain of civil torts, while the later belongs in the province of the criminal law.

Presumably, the Court's proposed willfulness standard as to wrongful conduct is derived from the factually dissimilar *United States v. Kaiser*.  It cannot establish criminal liability in the context of this case and must be rejected by this Court. 609 F.3d 556 (2d Cir. 2010).

This instruction was specifically rejected by Judge Chatigny in *Shapiro* because of the factual dissimilarity between *Kaiser* and the *Litvak-Shapiro* RMBS securities fraud

2

prosecutions. In *Kaiser*, the defendant falsified SEC filings to manipulate share prices in connection with a tender offer. *See United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010). Even if the *Kaiser* defendant was unaware of the specific regulation he violated, there was no question that the defendant knew his conduct was illegal. In *Shaprio*, as here, it is not at all clear that defendants alleged misstatements were material to any of the underlying transactions and, as Judge Chatigny observed, many market participants did not realize this conduct could be criminal. *See United States v. Shapiro*, 3:15-CR-155 (RNC), Tr. Transcript, Vol. XIII, 2616-2618, **Exhibit A** at 2. ("I don't think you can be convicted under the Constitution unless you had a sufficiently culpable state of mind such that you made a conscious choice to cross an important line and expose yourself to potential imprisonment.").

In rejecting the *Kaiser* willfulness standard, Judge Chatigny in Shapiro further opined:

The Supreme Court has recognized that when a challenged action or course of conduct is a technical violation of the law as opposed to morally reprehensible it becomes more important to make it clear to the jury that the government has a burden to prove that the defendant knew his conduct was unlawful. Why? Because we don't want to be exposing people to conviction and incarceration if they didn't know that this is what they were risking.**Exhibit A** at 3.

When construing the statutory meaning of willfulness, the Supreme Court expressly considers whether the defendant knew his conduct was *illegal*, not merely wrongful. In *Ratzlaf v. United States,* a federal prosecution of a banking regulation, the

3

Supreme Court interpreted "willfulness" to mean knowledge of illegality: "[w]e hold that the 'willfulness' requirement mandates something more. To establish that a defendant 'willfully violat[ed]' the antistructuring law, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." 510 U.S. 135, 137 (1994).



In construing the meaning of willfulness in federal firearms law, the Supreme Court offered the following analysis:

> The word "willfully" is sometimes said to be "a word of many meanings" whose construction is often dependent on the context in which it appears.... Most obviously it differentiates between deliberate and unwitting conduct, but in the criminal law it also typically refers to a culpable state of mind.... [A] variety of phrases have been used to describe that concept. As a general matter, when used in the criminal context, a "willful" act is one undertaken with a "bad purpose." In other words, in order to establish a "willful" violation of a statute, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful."

*Bryan v. United States*, 524 U.S. 184, 191 (1998) (internal citations omitted).

## II.    II. IMPORTANCE AND MATERIALITY ARE NOT SYNONYMOUS

The Defendant requested in his proposed jury instructions the following language in Section e under Securities Fraud-Second Element that the court did not adopt.

> While importance is undoubtedly a necessary element of materiality, importance and materiality are not synonymous.

4

*Judge Chatigny in Shapiro*

1    legislative history of the relevant statutes, it's not

2    helpful.

3            So we have a problem, and for me the question

4    becomes, what is fair and reasonable in the circumstances.

5            The government has no obligation to prove that a

6    defendant knew he was violating Rule 10(b)(5), but I don't

7    think you can be convicted under the Constitution unless

8    you had a sufficiently culpable state of mind such that

9    you made a conscious choice to cross an important line and

10   expose yourself to potential imprisonment.

11           If the defendants are convicted in this case,

12   I'm sure the government's going to be asking me to

13   incarcerate them for years.

14           So in that context, given the state of the law,

15   I've struggled to figure out what to say.

16           I don't think the Second Circuit case law

17   requires the government to prove that the defendants knew

18   their conduct was unlawful, but at the same time, I don't

19   think it can be the case that they can be convicted, even

20   if they didn't realize their conduct was not unlawful.

21           Some of the cases cited by the defendants are in

22   the securities area, and in those cases, the court said,

23   indeed the government had a burden of proving that the

24   defendants knew their conduct was unlawful.

25           The Supreme Court has recognized that when a

1    challenged action or course of conduct is a technical

2    violation of the law as opposed to morally reprehensible,

3    it becomes more important to make it clear to the jury

4    that the government has a burden to prove that the

5    defendant knew his conduct was unlawful.

6            Why?

7            Because we don't want to be exposing people to

8    conviction and incarceration if they didn't know that this

9    is what they were risking.

10           So it's a problem, and I'm trying to do what I

11   can in the circumstances of this particular case to

12   address the parties' legitimate needs and concerns, and

13   I'm going to go with what I have.  I would rather risk

14   error on the side of lenity than the other way.

15           With regard to the next request, I think that's

16   already been dealt with.  I'm going to grant that request

17   and delete that transition sentence.

18           With regard to the last request in the

19   defendants' letter, uncalled witnesses, I don't think I

20   need to do that this minute, and I don't want to keep the

21   jury waiting any longer.

22           Bear in mind, the instructions I'm giving the

23   jury now take me through what is now, for me, closing

24   arguments on page 42.  The uncalled witnesses instruction

25   won't be given at this time.

# EXHIBIT
# FOUR

BREAKING NEWS      **Feds wiretapped Cohen's calls to the White House**                                    ◯

METRO

# $500M 'insure-scam' ring nailed

By Philip Messing                                                                    February 24, 2011 | 5:00am

Greedy life-insurance agents took out huge policies on penniless seniors, and then asked them to fake illnesses so they'd seem more likely to die, as part of a $500 million scam, investigators said yesterday.

The fraudsters sought to cheat not only the insurance companies, from whom they reaped huge commissions, but also investors looking to buy the policies on the secondary market, postal inspectors said in mail-fraud charges filed against eight defendants in Brooklyn federal court.

Chaim Mayer Lebovits, of Liberty Planning, in Monsey, NY, facilitated the purchase of policies on behalf of the elderly "straw buyers," according to the complaint.

He and seven other defendants were released on bail yesterday.

*Recommended by*                        |

# EXHIBIT
# FIVE



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AHT:TRP
F. #2012R01923

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 9, 2015

By ECF

The Honorable Sterling Johnson, Jr.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    United States v. Chaim Lebovits
               Criminal Docket No. 11-134 (SJ)

Dear Judge Johnson:

       The government respectfully submits this letter in connection with the
defendant's sentencing, which is scheduled for April 13, 2015.  While the Presentence
Investigation Report ("PSR") indicates that the Guidelines range of imprisonment applicable
to the defendant is 41 to 51 months, the government respectfully argues that, in accordance
with the plea agreement entered into by the parties, the Court should find the applicable
Guidelines range to be 12 to 18 months.  Further, pursuant to the plea agreement entered into
by the parties, the government recommends that the defendant be sentenced to a term of
probation pursuant to Fed. R. Crim. P. 11(c)(1)(B).

I.     **Background**

       The charges against the defendant arose from his involvement in a scheme to
fraudulently induce insurance companies to issue policies with high death benefits to elderly
insureds and later sell those policies for a profit, which occurred on or about and between
January 2007 and May 2010.  See Pre-Sentence Investigation Report ("PSR") ¶ 11.  Many of
the fraudulent policies were submitted through Liberty Planning, Inc., an insurance agency
located in Monsey, New York, of which the defendant was the Vice-President and Managing
General Agent.  PSR ¶ 4.  The defendant had authority to disburse funds from Liberty
Planning's bank accounts, as well as the bank accounts of several other related entities which
he controlled, including CSL Properties, LLC; CSL Properties II, LLC; CSL Properties III,
LLC; and the Rocklyn Group, Ltd. (collectively, "the Lebovits Related Companies").  Id.

       Insurance companies do not ordinarily sell policies where the benefits payable
upon the death of the insured are in excess of the amount needed to serve the specified

purpose of the policy. PSR ¶ 9. Under New York State law, only the insured, a close family relative or an individual with an insurable interest can purchase life insurance policy on an insured's life. PSR ¶ 14. In furtherance of the instant conspiracy, applications were submitted to insurance companies through Liberty Planning and other agencies which contained false statements that not only induced those companies to issue the policies but also to charge lower premiums than would otherwise apply. PSR ¶ 12. The false statements on the insurance applications included (1) the insureds had large net worths and annual incomes, above their true net worths and incomes; (2) the insureds did not intend to resell the policies on the secondary market for life insurance; (3) the insureds intended to pay the premiums themselves with their own money; (4) the insureds had not been compensated or promised compensation for applying for the policies; (5) the insureds did not obtain, and would not hold the policies for others who were investing in the insureds' life; and (6) the purpose of the insurance policies was "estate planning," "estate conservation" or some equivalent description. Id. However, each of these statements was false. To incentivize the elderly insureds to go along with the scheme, the conspirators paid cash and promised other financial incentives to them in exchange for the insureds submitting false applications. PSR ¶ 12.

Co-conspirators Moses Neuman, Yudah Neuman and Leo Fekete recruited elderly "straw insureds" who applied for life insurance primarily through Liberty Planning via insurance applications in which their net worths and incomes were inflated. PSR ¶ 32. The Neumans also recruited and compensated Edward Grodsky, an accountant, who participated in the scheme by recruiting elderly straw insureds and assisting them in the application process by purporting to verify their inflated net worth and income information. PSR ¶¶ 32 and 36. Many of the policies listed Avigdor Gutwein, a life insurance agent affiliated with Liberty Planning, as the insurance agent. Gutwein knowingly submitted the fraudulent applications which contained false information to the insurance companies. PSR ¶¶ 32 and 34. Leo Fekete recruited one elderly insured into the scheme and facilitated the filing of a fraudulent application which contained inflated net worth and income. Fekete's wife, a licensed New York State insurance agent affiliated with Liberty Planning, received a commission on this policy. PSR ¶ 39.

It was also part of the scheme that the conspirators engaged in financial transactions designed to falsely convince the insurance companies that the straw insureds were paying the premiums on the policies, when in fact the policies were funded by third party investors, including the defendant. PSR ¶¶ 14, 32 and 34. In order to conceal the source of the funds deposited into the insureds' trust accounts, the conspirators caused money to be exchanged among and between themselves, Liberty Planning, the Lebovits Related Companies and companies affiliated with the Neumans. PSR ¶ 14. The premium payments were either paid directly into individual trust bank accounts set up in the insured's names, or funneled through different accounts before being paid to the individual trust accounts, which in turn, paid the insurance companies. Specifically, the defendant invested $1.9 million into two insurance policies issued to elderly insured Arnold Cohen. The defendant deposited money for the premium payments directly into Cohen's individual trust account, and the trust account was used to pay the insurance company directly. Id.

2

After the insurance companies issued the policies to the insureds, the conspirators created false records and made false statements indicating that the elderly insureds had poorer health than they actually had. PSR ¶ 15.  This was done to cause the projected life expectancies of the insured to be lowered, which would, as a result, fraudulently inflate the resale prices that prospective purchases would be willing to pay for the straw buyer's life insurance policies on the secondary life insurance market. Id. To that end, the elderly insureds were directed by the conspirators to visit doctors and lie about health problems.

The conspirators stood to profit from the scheme through: 1) the death benefits they would collect if the insureds died before the periods of contestability expired; 2) the commission that Liberty Planning, other general insurance agencies, Gutwein and other other insurance agents who participated in the scheme would receive from the premiums paid; and 3) the profits that the conspirators could make by reselling the policies on the secondary market once the periods of contestability expired. PSR ¶ 16.  While the defendant intended to realize a profit on the fraudulent insurance policies, the defendant most likely lost more money than he gained on his investment in the Cohen policies. PSR ¶ 30.

In or about 2009, after an investigation by ING uncovered numerous fraudulent applications submitted through Liberty Planning, ING filed civil actions seeking to rescind life insurance policies submitted by Liberty Planning.  In addition, other insurance companies that did business with Liberty Planning terminated their contracts with Gutwein and other agents affiliated with Liberty Planning after learning of the fraudulent insurance applications.  Following an investigation led by the U.S. Postal Inspection Service, on or about February 23, 2011, agents arrested the defendant, Gutwein, Fekete, Grodsky and the Neumans.

On September 8, 2014, the defendant pleaded guilty to Count One of a superseding indictment charging him with conspiring to defraud insurance companies, via mail and wire fraud, in violation of 18 U.S.C. § 1349.  In the plea agreement, the government agreed to recommend a sentence of probation pursuant to Fed. R. Crim. P. 11(c)(1)(B).

## II.    Defendant's Guidelines Calculations

The Department of Probation's Presentence Investigation Report calculates the defendant's United States Sentencing Guidelines range to be 41 to 51 months based on a total offense level of 22 and a Criminal History Category of I.  PSR ¶¶ 58, 90.  The PSR provides enhancements for loss amount and a two-point enhancement for the defendant's role in the offense not contemplated in the parties' plea agreement.  The government respectfully argues that, in accordance with the plea agreement entered into by the parties, the Court should find the applicable Guidelines range to be 12 to 18 months, based on a total offense level of 13 and a Criminal History Category of I.

3

A.     Loss Amount

The PSR includes a 16-level enhancement corresponding to a loss amount of more than $1,000,000 but less than $2,500,000. PSR ¶ 49.   The PSR's calculation of loss is based on commission payments in excess of $1,000,000 obtained by Liberty Planning and Avigdor Gutwein over the course of the conspiracy. Id.   However, the government has no evidence of the defendant's personal involvement in the conspiracy other than his investment in two insurance policies, nor is it clear from the government's evidence that the total amount of the commission payments obtained during the course of the entire conspiracy were foreseeable to the defendant.

Further, consistent with the government's position as to the loss amount attributable to the other co-defendants in this case, the government believes that a more accurate assessment of the loss amount corresponds to the lapse rate assessed by the insurance companies.   Insurance companies issue and price policies based on a calculated lapse rate. A lapse rate is the rate at which insured individuals allow their policies to expire because the amount of premiums they have already paid has exceeded or soon will exceed the amount they can collect should the death of the insured occur.   Here, because the premiums were actually being paid by third-parties investors who counted on the pay-out of the policy as a return on their investment, they had no intention of letting the policies lapse.   As a result, the insurance companies' lapse rate was based on falsely-provided information which caused them to charge lower premiums than they otherwise would have with respect to the policies at issue.   However, attempting to determine what the correct premiums should have been and over what period of time the proper premiums would have been paid to the insurance companies are difficult endeavors.

As a result, based on the evidence available to the parties at the time of the defendant's guilty plea, and in accordance with U.S.S.G. § 2B1.1, App. Note (3)(c), a reasonable estimate of the loss suffered by the insurance companies that is attributable to the defendant was more than $70,000 but less than $120,000 and a corresponding 8-point enhancement is appropriate. U.S.S.G. § 2B1.1(b)(1)(E).

B.     Abuse of Position of Trust

The PSR also includes a two-point enhancement for abuse of trust since the defendant was a licensed insurance agent, per Guideline 3B1.3. The government has no evidence that the defendant personally submitted any insurance applications to the insurance companies.  In addition, the government agrees with defense counsel's contention that although the policies were submitted by Liberty Planning, of which the defendant is a principal, the insurance companies conducted independent verification of the policies prior to authorization.  Accordingly, the government stands by the Guidelines calculation set forth in the plea agreement entered into by the parties.

4

III.   **Conclusion**

For the reasons set forth above, the government respectfully recommends a sentence of probation pursuant to Fed. R. Crim. P. 11(c)(1)(B), and restitution pursuant to 18 U.S.C. § 3663A, be ordered in this case, as it would be sufficient but not be greater than necessary, to carry out the goals of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:    /s/ *Tanisha Payne*
Tanisha R. Payne
Peter Baldwin
Assistant U.S. Attorneys
(718) 254-6358/6236

cc:    Clerk of the Court (SJ (by ECF)
Nathaniel Z. Marmur, Esq. (by ECF and Email)
USPO Michelle Espinoza, U.S. Department of Probation

# EXHIBIT SIX

AO 245B (CASDRev. 08/13) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT FILED

## SOUTHERN DISTRICT OF CALIFORNIA 17 AUG 28 AM 11: 46

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**V.**<br>JEFFREY B. KELLER (1) | **AMENDED JUDGMENT IN A CRIMINAL CASE**<br>(For Offenses Committed On or After November 1, 1987)<br><br>Case Number:   13CR0424-JLS          DEPUTY |

Michael L. Lipman
_Defendant's Attorney_

**REGISTRATION NO.**     37395298

☒ Correction of Sentence for Clerial Mistake (Fed. R. Crim. P. 36)

☒ pleaded guilty to count(s)     1 of the Superseding Information

☐ was found guilty on count(s) _____

after a plea of not guilty.
Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| **Title & Section** | **Nature of Offense** | **Count Number(s)** |
|---|---|---|
| 18 USC 371 | Conspiracy to commit mail fraud and wire fraud and to defraud the United States | 1 |

The defendant is sentenced as provided in pages 2 through _____5_____ of this judgment.
The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☒ Count(s) (remaining counts) _____ are     dismissed on the motion of the United States.

☒ Assessment : $100.00 imposed
–

☒ No fine          ☒ Forfeiture pursuant to order filed     2/26/2014          , included herein.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

July 28, 2017
Date of Imposition of Sentence

HON. JANIS L. SAMMARTINO
UNITED STATES DISTRICT JUDGE

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | JEFFREY B. KELLER (1) | Judgment - Page **2** of **5** |
| CASE NUMBER: | 13CR0424-JLS | |

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of:
**Three (3) months**

☐     Sentence imposed pursuant to Title 8 USC Section 1326(b).

☒     The court makes the following recommendations to the Bureau of Prisons:

        1.   Incarceration at FCC Lompoc to accommodate family visits.

☐     The defendant is remanded to the custody of the United States Marshal.

☐     The defendant shall surrender to the United States Marshal for this district:

        ☐   at _____ A.M.      on _____

        ☐   as notified by the United States Marshal.

☒     The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

        ☒   on or before **September 15, 2017 before 12:00 PM**

        ☐   as notified by the United States Marshal.

        ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

     Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

                            _____

                                    UNITED STATES MARSHAL

                  By _____

                               DEPUTY UNITED STATES MARSHAL

13CR0424-JLS

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| DEFENDANT: | JEFFREY B. KELLER (1) | Judgment - Page 5 of 5 |
| CASE NUMBER: | 13CR0424-JLS | |

## RESTITUTION

The defendant shall pay restitution in the amount of   **$1,000,000.00**   unto the United States of America.

Pay restitution in the amount of **$1,000,000.00** to the Internal Revenue Service through the Clerk, U.S. District Court. Payment of restitution shall be forthwith. During any period of incarceration the defendant shall pay restitution through the Inmate Financial Responsibility Program at the rate of 50% of the defendant's income, or $25.00 per quarter, whichever is greater. The defendant shall pay the restitution during his supervised release at the rate of $500.00 per month. These payment schedules do not foreclose the United States from exercising all legal actions, remedies, and process available to it to collect the restitution judgment.

Until restitution has been paid, the defendant shall notify the Clerk of the Court and the United States Attorney's Office of any change in the defendant's mailing or residence address, no later than thirty (30) days after the change occurs.

The Court has determined that the defendant does have the ability to pay interest. It is ordered that interest is not waived.

**Victim's Address:**
 IRS – RACS
Attn: Mail Stop 6261, Restitution
333 W. Pershing Avenue
Kansas City, MO 64108

# EXHIBIT SEVEN

AO 245B (CASDRev. 08/13) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

14 APR -3 AM 9: 01

UNITED STATES OF AMERICA

**V.**

STUART STEINFELD (2)

**AMENDED JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number:   13CR0424-JLS

EUGENE G. IREDALE

Defendant's Attorney

**REGISTRATION NO.**   38337298

☒ Correction of Sentence for Clerial Mistake (Fed. R. Crim. P. 36)

☒ pleaded guilty to count(s)   One of the Indictment

☐ was found guilty on count(s) _____

after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| Title & Section | Nature of Offense | Count Number(s) |
|---|---|---|
| 18 USC 371 | Conspiracy | 1 |

The defendant is sentenced as provided in pages 2 through ___5___ of this judgment.
The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☒ Count(s)   (Remaining Counts)   are   dismissed on the motion of the United States.

☒ Assessment : $100.00 imposed

☐ No fine   ☐ Forfeiture pursuant to order filed _____ , included herein.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

March 7, 2014
Date of Imposition of Sentence

HON. JANIS L. SAMMARTINO
UNITED STATES DISTRICT JUDGE

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| DEFENDANT: | STUART STEINFELD (2) | Judgment - Page 2 of 5 |
|---|---|---|
| CASE NUMBER: | 13CR0424-JLS | |

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of:
**Sixty (60) Days**

☐   Sentence imposed pursuant to Title 8 USC Section 1326(b).

☐   The court makes the following recommendations to the Bureau of Prisons:

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

     ☐   at _____ A.M.     on _____

     ☐   as notified by the United States Marshal.

☒   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     ☒   on or before **April 18, 2014**

     ☐   as notified by the United States Marshal.

     ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

13CR0424-JLS

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | STUART STEINFELD (2) | Judgment - Page **5** of **5** |
| CASE NUMBER: | 13CR0424-JLS | |

# FINE

The defendant shall pay a fine in the amount of **$20,000.00** unto the United States of America.

This sum shall be paid by May 1, 2014 through the Clerk, U.S. District Court.

13CR0424-JLS

# EXHIBIT EIGHT

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com.

See a sample reprint in PDF format.          Order a reprint of this article now

## THE WALL STREET JOURNAL.
WSJ.com

NOVEMBER 13, 2008

# Source of Cash for Seniors Is Drying Up

By ANNE TERGESEN

Older adults turning to the "life settlement" industry to help them through tough times are finding that this popular source of quick cash is getting harder to tap.

Life settlements, in which people sell their life-insurance policies to investors in exchange for a lump-sum payment, were a $12.2 billion business in 2007, according to Conning Research & Consulting Inc. in Hartford, Conn. Despite regulators' concerns about the industry's high fees, opaque nature and aggressive sales practices, that figure is more than triple the amount of just three years earlier. The growth, in part, reflects the fact that retirements have been stretching longer -- and nest eggs shrinking faster -- than many retirees ever imagined.

More recently, however, fallout from the credit crisis, coupled with a critical change in September in how sales of life-insurance policies are priced, means that several buyers of such policies -- who make their money by pocketing the death benefit when the initial policyholder dies -- have either pulled out of the market or scaled back their purchases. The buyers that remain are, in many cases, offering lower prices. And that is cutting off a source of cash for the growing numbers of older adults who rely on such sales to shore up shaky finances.

"Several seniors we've transacted with lately have suffered tremendous losses in their retirement savings and seen substantial equity value in their homes wiped away," says Mark Goode, chief executive of the Peninsula Group in Washington, which buys life-insurance policies for institutional investors. "Many sellers simply need the cash. Their question today is: 'How quickly can we close?'"

The increasingly common answer: not very soon, if at all. Richard Hess of Lancaster, Pa., recently approached Milestone Managers & Providers in Manheim, Pa., about selling his $100,000 policy to raise "a little extra money." The 66-year-old was told he had missed his window of opportunity.

"Six months ago we might have had a buyer," says Kristian Armstrong, chief executive of Milestone, which specializes in buying policies with death benefits

under $1 million. "But as it stands now, 66-year-olds are typically not going to get anything."

### Big Investors Flee

Capital to purchase life-insurance policies is less plentiful than it was just a few months ago. Hit by the credit crunch, some big investors in life settlements, including hedge funds such as London-based BlueCrest Capital Management, have dropped out of the market or are limiting their purchases, industry observers say. Mr. Goode at the Peninsula Group estimates that "the number of active funders has been reduced by half over the past 12 to 18 months."

At National Financial Partners, a nationwide network of advisers specializing in life insurance, executive benefits and financial planning, commissions and fees from life settlements fell 28% in the first nine months of the year. BlueCrest didn't return a call for comment.

But the credit crunch isn't the only problem. In mid-September, a set of life-expectancy tables many investors use to help determine the prices they're willing to pay for policies were revised by one of the major firms that calculates them, 21st Services in Minneapolis. The tables now indicate policyholders are likely to live longer -- an average of about 20% longer for men and 15% for women -- than previously expected. (The exact change varies by age, gender, smoking status, and health.)

This means investors are likely to have to wait longer to collect those benefits. They're also likely to have to pay additional premiums -- an extra expense that's driving down the amount they're willing to pay for new policies.

Regulators have long expressed concerns about the life-settlement industry. While a cash windfall may be appealing, hidden costs -- including high fees and potential tax liabilities -- can substantially erode what policyholders receive from these deals.

Life-settlement brokers often pocket the lesser of 6% of a policy's face value or 30% of the gross sale price. While heirs who inherit life-insurance benefits pay no income tax on their payouts, those who sell their policies are subject to income tax on at least some of their gains. (The rest may qualify for capital-gains tax treatment. But because the Internal Revenue Service has yet to issue a ruling on the tax treatment of life settlements, this "remains uncertain," says Stephan Leimberg of newsletter publisher Leimberg Information Services.)

There are other risks, too. Those who sell a policy only to later decide they need additional insurance may find they've used up all of the coverage a carrier will sell them. And because the market isn't generally transparent, it's often hard for

Case 1:04-cr-10029-GAO    Document 568-1    Filed 07/17/18    Page 99 of 100

Source of Cash for Seniors Is Drying Up - WSJ.com                    Page 3 of 4
Case 3:17-cr-00003-AWT    Document 24-4    Filed 04/27/17    Page 3 of 4

those who sell policies to know whether they're getting a good price.

Still, with a life settlement, policyholders can typically net more than is available
by surrendering a policy to the insurer for a lump-sum payment. Before selling,
you should consult a financial planner, an accountant, or an attorney.
Alternatively, if your policy has cash value and you prefer to keep it -- or can't
find a buyer -- there may be ways to borrow against it or withdraw funds from it.

To get access to more cash, you can ask your insurer to scale back the death
benefit. "By restructuring the policy, you may be able to draw out any cash that's
no longer needed to support the coverage," says Gary Cotter, a certified financial
planner at Cotter Financial in Sun City Center, Fla. But there are caveats. Under
some circumstances, loans or withdrawals can trigger tax bills, Mr. Cotter says.
Moreover, if you deplete your policy's cash value, your coverage will lapse. Ask
your insurer to project the impact of a withdrawal or loan, he advises.

In some situations, you may even fare better than you would with a life
settlement. Under New York Life Insurance Co.'s Access Plus program, for
example, clients of the insurer who are 65 or older and meet certain health
requirements may be able to borrow more than a policy's cash value. Borrowers
must repay the principal and interest from their policies' death benefits. Those
with a terminal illness, meanwhile, may be eligible to receive the policy's entire
death benefit. They will typically owe ordinary income tax on the gains from such
a payment, known as an "accelerated death benefit," Mr. Cotter says.

While the funding drought may reverse when the credit crunch recedes, industry
insiders say the higher life-expectancy estimates are likely to continue to weigh
on prices. "Due to the revisions in the tables, it's hard for buyers to even assess
what a policy is worth," says Jonathan Forster, a partner at law firm Greenberg
Traurig, which has represented investors in these transactions.

## Renegotiating Deals

This has left cash-strapped seniors at the mercy of yet another market beset by
falling prices. Brokers say many deals negotiated this summer have since fallen
through, only to be resurrected at lower prices.

Larry Rybka, president and CEO of Akron, Ohio, brokerage firm Valmark
Securities, says investors canceled 12 of the 18 contracts his firm was closing at
the time the life-expectancy tables were revised. Mr. Rybka says his brokers were
ultimately able to secure deals -- at much lower prices -- for nine of the 12
transactions.

One of those clients recently negotiated the sale of a policy for 60% less than he
was offered last summer, when he first shopped the policy to investors. Although

Case 1:04-cr-10029-GAO   Document 568-1   Filed 07/17/18   Page 100 of 100

Source of Cash for Seniors Is Drying Up - WSJ.com                                    Page 4 of 4
Case 3:17-cr-00003-AWT   Document 24-4   Filed 04/27/17   Page 4 of 4

reluctant to sell, the client — a man whose business is now on the rocks -- can no
longer afford to pay the premiums, Mr. Rybka adds.

Skip Santori, a financial planner at Santori & Peters in Monroeville, Pa.,
represents an 82-year-old woman who has been trying to sell two $750,000
policies since August. Two years ago, when Mr. Santori handled the sale of an
identical policy for the same client, she received $145,000. This time, the
winning bid came in at $120,000 per policy. But when the life-expectancy tables
were revised, that deal fell though.

While a new buyer recently offered $83,000 for each policy, this company, too,
has pulled the offers, Mr. Santori says. "They said their liquidity froze up."

**Write to** Anne Tergesen at anne.tergesen@wsj.com

Copyright 2008 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber
Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-
800-843-0008 or visit
www.djreprints.com