# United States Court of Appeals
## For the First Circuit

No. 14-1641

UNITED STATES OF AMERICA,

Appellee,

v.

DANIEL E. CARPENTER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Stahl, and Lipez,
Circuit Judges.

Kimberly Homan for appellant.
Kirby A. Heller, Attorney, U.S. Department of Justice, with
whom Andrew E. Lelling, United States Attorney, Brian A.
Benczkowski, Assistant Attorney General, and Matthew S. Miner,
Deputy Assistant Attorney General, were on brief for appellee.

October 18, 2019

LYNCH, **Circuit Judge**.  Daniel Carpenter's conviction for nineteen counts of mail and wire fraud in 2008 was affirmed by this court in 2013.  United States v. Carpenter, 736 F.3d 619 (1st Cir. 2013) (Carpenter II).  He now challenges on several grounds a forfeiture order entered against him on May 23, 2014 by the district court in the amount of $14,053,715.52.  This is the sum he obtained from only six of his investor/exchangor clients through his fraudulent scheme.

He initially argues that the district court lacked what he calls "subject matter jurisdiction" to enter the forfeiture order when it did.  He then argues that the forfeiture order of over $14 million must be vacated because: (1) he never "acquired" the funds to be forfeited, as required by 18 U.S.C. § 981(a)(2)(B); (2) the amount forfeited violates the Excessive Fines Clause of the Eighth Amendment; and (3) the imposition of the forfeiture order by the district court violated his right to a jury trial under the Sixth Amendment.

He argues it is unfair to make him forfeit a much larger sum than he gained and/or than his clients lost.  In doing so, he loses sight of the fact that the purpose of forfeiture is not merely restitution or disgorgement of ill-gotten gains.  It is also to "deter future illegality."  Kaley v. United States, 571 U.S. 320, 323 (2014).  There would be no effective deterrence if the sums forfeited were no greater than the sums he gained through

his scheme. Forfeitures must have a greater bite than that in order to deter future illegality by Carpenter and by others.

I.

A.   Carpenter's Role at Benistar

The factual basis for Carpenter's convictions for mail and wire fraud is set forth in Carpenter II, and we describe here only that evidence most pertinent to the forfeiture issue.

In 1998, Carpenter and his business partner, Martin Paley, founded Benistar, which performed property exchanges under § 1031 of the Internal Revenue Code, 26 U.S.C. § 1031(a)(1). In order to gain tax benefits in a property exchange business, clients entrust funds from property sales to an "intermediary" company, which invests the funds until the client purchases replacement property. See id. Carpenter was the chairman of such an "intermediary" company, Benistar. He worked out of Benistar's Simsbury, Connecticut office, which was responsible for handling client funds. Carpenter and a single employee who reported to him conducted Benistar's § 1031 exchange business from Simsbury.

Carpenter opened accounts at Merrill Lynch in which he deposited client funds. Carpenter used one of the accounts, the "B01" account, for depositing client funds, and used the other, the "B10" account, primarily for trading. He opened the accounts under Benistar's corporate name and listed himself as the sole signatory on the accounts.

When checks and wire transfers were sent to Benistar, the employee who reported to Carpenter deposited the funds at Merrill Lynch (and later, PaineWebber). Carpenter had sole authority to invest these funds, once deposited, as he chose. Acting in the name of Benistar, Carpenter routinely moved funds from the B01 account to the B10 account. He did so to pursue aggressive option trading strategies with clients' money, contrary to representations made to these clients. These trades exposed the funds to risk of significant losses, contradicting the promises Benistar made about the security of exchangor funds in its marketing materials.

In June 1999, Carpenter confirmed to his partner Paley that he "want[ed] to continue having everything come through the Simsbury office." Carpenter's letter listed procedures and stated that "[a]t no time are any procedures to be changed by any staff of the Benistar Property Exchange without the prior approval of Daniel Carpenter."

At first, Carpenter's strategy made money, even after paying exchangors their promised 3% or 6% return. In consequence, he made money in his role at Benistar. But by September 2000, Carpenter had lost about $4 million of the clients' money and Merrill Lynch prohibited him from opening any new options positions. These losses were hidden from existing clients. Further, Benistar continued to take on new clients. In the fall

of 2000, Carpenter transferred funds to PaineWebber and again listed himself as the point person for the accounts. He continued his risky trading, and the trades continued to lose money. By 2001, Carpenter had lost about $9 million.

His conviction established that Carpenter, through his knowing use of marketing materials, had induced clients to invest in his Benistar endeavor. The superseding indictment alleged that six of these clients invested $14,053,715.52.[1]

B. <u>Procedural History of the Forfeiture Order</u>

On February 26, 2014, following this court's affirmance of Carpenter's conviction after his second trial, the district court sentenced Carpenter to thirty-six months' imprisonment. The district court also ordered Carpenter to pay restitution in the amount of $310,033.96, which represented the outstanding balance owed to two exchangors.[2] The sentencing judgment stated that "[t]he defendant shall forfeit [his] interest in the following

---

[1] This figure represents the amount committed to Benistar by investors as charged in sixteen of the nineteen counts. These counts charged offenses that occurred after the effective date of the Civil Asset Forfeiture Reform Act (CAFRA). There were seven total exchangors whose losses formed the basis of the indictment against Carpenter but only six of them were defrauded after the passage of CAFRA, so the forfeiture amount is based only on the funds sent to Benistar by those six individuals.

[2] This restitution order was separate from the forfeiture order at issue here. Carpenter asserts that he has paid the restitution order. Through civil litigation before entry of the restitution order, the other five exchangors were eventually able to recoup their losses.

property to the United States," and specified, "[i]f there are any proceeds, they are to be forfeited. The court to scheduled [sic] a hearing to determine the amount to be forfeited." That order did not set the amount to be forfeited. Carpenter filed a notice of appeal on March 17, 2014.

On May 23, 2014, the district court ordered that Carpenter forfeit $14,053,715.52, pursuant to 18 U.S.C. § 981 and 28 U.S.C. § 2461(c). Carpenter then filed a supplemental notice of appeal on June 5, 2014 from the May 23 forfeiture order. In 2015, this court affirmed Carpenter's sentence in United States v. Carpenter, 781 F.3d 599 (1st Cir. 2015) (Carpenter III), and rejected his speedy trial challenges to his conviction. Id. at 608-18. The Carpenter III court did not reach the May 23 forfeiture order because "both parties . . . agree[d] that the forfeiture order [was] not properly before [the] court." Id. at 623. Carpenter's appeal from the May 23 forfeiture order was docketed as a separate appeal from the appeal decided in Carpenter III.

The present case concerns Carpenter's June 5, 2014 appeal after entry of the May 23, 2014 forfeiture order, which set the amount of the forfeiture at $14,053,715.52.

II.

A.    The District Court's Authority to Enter the Forfeiture Order

         Carpenter first argues that "the district court lacked subject-matter jurisdiction to enter the forfeiture order" because he filed his notice of appeal from the district court's February 26, 2014 sentencing judgment on March 17, 2014, before the court entered the order setting the amount of the forfeiture.  His theory is that the filing of this earlier notice of appeal divested the district court of jurisdiction to enter the May 23 forfeiture order.

         Carpenter's use of the term "subject matter jurisdiction" is a misnomer here.  There was no impediment to the district court's authority to determine the amount of the forfeiture on May 23.

         Carpenter relies on the appellate divestiture rule as articulated in Griggs v. Provident Consumer Discount Co., 459 U.S. 56 (1982), where the Supreme Court stated that "[t]he filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  Id. at 58.  That precise language has been subjected to later clarification by the Court.  Recently, the Court has emphasized that "[o]nly Congress may determine a lower federal court's subject-matter jurisdiction," Hamer v.

- 7 -

Neighborhood Hous. Servs. of Chi., 138 S. Ct. 13, 17 (2017)
(quoting Kontrick v. Ryan, 540 U.S. 443, 452 (2004)), and noted
that the Court in the past was "'less than meticulous' in [its]
use of the term 'jurisdictional.'" Id. at 21 (quoting Kontrick,
540 U.S. at 454). In Hamer, the Court determined that a thirty-
day limitation on extensions of time to file a notice of appeal
was not jurisdictional because it was "absent from the U.S. Code."
Id.

This circuit has recognized that the filing of a notice
of appeal does not divest the district court of all authority.
The "divestiture rule" is similarly not "jurisdictional." See
United States v. Rodríguez-Rosado, 909 F.3d 472, 477 (1st Cir.
2018) ("[B]ecause the judge-made divestiture rule isn't based on
a statute, it's not a hard-and-fast jurisdictional rule." (citing
Kontrick, 540 U.S. at 452-53)). Rather, the divestiture rule "is
rooted in concerns of judicial economy, crafted by courts to avoid
the confusion and inefficiency that would inevitably result if two
courts at the same time handled the same issues in the same case."
Id. at 477-78. Application of the rule is not mandatory and
efficiency concerns are central to determining whether we should
apply it here. Id. at 478.

The rule does not apply here. There is no issue of
potential shared jurisdiction here because the Carpenter III court

expressly declined to reach the May 23 forfeiture order for the reasons stated earlier.

Carpenter argues that United States v. George, 841 F.3d 55 (1st Cir. 2016) (George I), decided before Hamer and Rodríguez-Rosado, governs his case and requires that we vacate the forfeiture order and remand to the district court. The George I case is easily distinguished. In George I, the district court sentenced the defendant after conviction of embezzlement and entered the judgment on July 30, 2015. Id. at 61, 70. The George I court noted that this "judgment did not contain any dispositive provision with respect to forfeiture." Id. at 70. The defendant appealed the next day. Id. Two months later, the district court amended the very sentencing judgment which had been appealed so that it "for the first time included an order of forfeiture." Id. The George I court concluded that the district court lacked authority under the divestiture rule to enter the forfeiture order because "there was no forfeiture order included in the original judgment, merely an allusion to the possibility that forfeiture might be ordered at some unspecified future date." Id. at 72.

In contrast, here the district court's original judgment stated "[i]f there are any proceeds, they are to be forfeited" and stated that a hearing would be scheduled "to determine the amount to be forfeited." Forfeiture was a certainty; the only question

was the amount.  We need not consider whether <u>George I</u> has been affected by <u>Hamer</u>.  <u>George I</u> is plainly distinguishable.

Further, there is no point to a remand.  The district court would almost certainly enter the same forfeiture order.  The district court has already considered and rejected Carpenter's argument that he did not "acquire" the funds in its May 23, 2014 order, and later denied Carpenter's motion for reconsideration of that order because his arguments "merely reexamine[d] issues already decided."

B.   <u>Merits-Based Challenges to the Forfeiture Order</u>

We address in turn each of Carpenter's three arguments outlined above.

1.   <u>Challenges to the District Court's Application of 18 U.S.C. § 981</u>

Carpenter argues that the district court erred in ordering forfeiture because, he says, he never "acquired" the funds as required by § 981(a)(2)(B) and so they are not proceeds.  The question before us is whether the sum ordered forfeited, of over $14 million, is in error.  We review this preserved challenge to the district court's legal conclusions de novo and the district court's subsidiary factual findings for clear error.  <u>United States</u> v. <u>George</u>, 886 F.3d 31, 39 (1st Cir. 2018) (<u>George II</u>).[3]

---

[3]     By incorporation, the provisions of 18 U.S.C. § 981(a)(1)(C) govern forfeiture following the conviction here.  The section applies to "any offense constituting 'specified

Under § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" mail or wire fraud is subject to forfeiture to the United States.  18 U.S.C. § 981(a)(1)(C).  The standards for determining "proceeds" vary depending on whether the forfeiture falls under § 981(a)(2)(A) or § 981(a)(2)(B).

Section 981(a)(2)(A) applies to "cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes" and defines "proceeds" as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to the forfeiture, and any property traceable thereto."  Id. § 981(a)(2)(A) (emphasis added).

In contrast, § 981(a)(2)(B) governs "cases involving lawful goods or lawful services that are sold or provided in an illegal manner."  Id. § 981(a)(2)(B).  Under this section, "proceeds" means "the amount of money acquired through the illegal

---

unlawful activity' (as defined in section 1956(c)(7) of this title)."  18 U.S.C. § 981(a)(1).  Specified unlawful activity under § 1956(c)(7) includes "any act or activity constituting an offense listed in section 1961(1) of this title," 18 U.S.C. § 1956(c)(7), which includes mail and wire fraud, id. § 1961(1).  Next, 28 U.S.C. § 2461 makes § 981, this civil forfeiture provision, applicable in criminal cases and "authorizes criminal forfeiture of the proceeds of any offense for which there is no specific statutory basis for criminal forfeiture as long as civil forfeiture is permitted for that offense."  United States v. Cox, 851 F.3d 113, 128 n.14 (1st Cir. 2017).  Section 2461(c) makes forfeiture mandatory for conviction of mail or wire fraud.  28 U.S.C. § 2461(c).

transactions resulting in the forfeiture, less the direct costs
incurred in providing the goods or services." Id. (emphasis
added).

The district court's forfeiture order determined,
contrary to the position of the prosecution, that the statutory
provision governing Carpenter's case was 18 U.S.C. § 981(a)(2)(B).
The district court reasoned that as a textual matter, although
"[m]ail and wire fraud might arguably be called 'unlawful
activities'" under § 981(a)(2)(A), that section explicitly
mentions "telemarketing and health care fraud schemes."
Specifically listing these two fraud schemes "would be unnecessary
. . . if the generic term 'unlawful activities' had been intended
to be broad enough to encompass fraud schemes." Further, the
district court concluded that "lawful services" being "provided in
an illegal manner" was a more "apt" description for running a
§ 1031 intermediary through mail and wire fraud.

There was no error in the district court's choice to use
§ 981(a)(2)(B). In George II, we explained that to fall under
§ 981(a)(2)(B), "the crime must involve a good or service that
could, hypothetically, be provided in a lawful manner," while
activities falling under § 981(a)(2)(A) are "inherently unlawful."
George II, 886 F.3d at 40. There, we determined that the
defendant's crime, embezzling funds from a federally funded
organization, "[could not] be done lawfully" and so fell under

§ 981(a)(2)(A).  Id. (quoting United States v. Boudova, 853 F.3d 76, 80 (2d Cir. 2017)).

By contrast, Carpenter's conviction arose out of how he solicited customers for and made misrepresentations about his § 1031 intermediary company.  Advertising and running such a business are not "inherently unlawful" activities; rather, Benistar provided what could have been a "legal service," but which Carpenter operated in an illegal manner by misrepresenting to exchangors how their funds would be invested and investing contrary to those representations.

The reasoning applied by other circuits by analogy to insider trading cases supports our conclusion.  In United States v. Mahaffy, 693 F.3d 113 (2d Cir. 2012), the defendants were convicted of conspiring to commit securities fraud.  Id. at 119. The court concluded that § 981(a)(2)(B) applied because "[t]rading those securities, as a general matter, [was] not unlawful" and "any illegality occurred when the defendants bought and sold securities as part of a scheme involving illegal bribery and frontrunning."  Id. at 138; see also United States v. Nacchio, 573 F.3d 1062, 1090 (10th Cir. 2009) ("[T]rading, by itself, would not have been an unlawful activity.  Rather, the illegality inhered in his selling securities ('lawful goods') in an unlawful manner, i.e., 'on the basis of material, nonpublic information.'").

We turn to Carpenter's argument that he never "acquired" the exchangors' money.[4]   The district court concluded that Carpenter "acquired" the exchangors' funds because he "exercised control" over the funds "not only by causing Benistar to be the nominal custodian of the funds for purposes of the tax law but also by himself using the funds in his options trading." Carpenter challenges this conclusion on two bases.   First, he says "'[a]cquire' carries with it the connotation of ownership: something that one obtains as one's own," and he did not "own" the exchangors' funds.   In the alternative, Carpenter argues that he did not "acquire" the funds because he lacked the necessary control over the exchangors' money, under the reasoning of another circuit in United States v. Contorinis, 692 F.3d 136 (2d Cir. 2012). Neither argument is convincing.

Carpenter reasons that "acquire" must mean "ownership" for three reasons.   He first points to the language in § 981(a)(2)(A) that subjects to forfeiture any property obtained "directly or indirectly" as a result of the offense.   Section 981(a)(2)(B) omits this phrase, and Carpenter concludes that this shows Congress's intent to limit forfeiture under § 981(a)(2)(B) to "direct proceeds, i.e., money directly acquired by the

---

[4]   We have no need to reach the government's alternative argument that the result would be the same even if § 981(a)(2)(A) were applicable.

defendant."  Further, Carpenter says that because § 981(a)(2)(A)
uses the term "obtained" while § 981(a)(2)(B) uses the word
"acquired," this difference "must mean something."  Finally,
relying on selective dictionary definitions, Carpenter argues that
"acquire" means to "obtain[] as one's own."  At the most, he argues
"the monies at issue were entrusted to [Benistar]" and "remained
the property of the exchangors which Carpenter invested to produce
the rate of return they had chosen."

    We start with the use of the word "acquired" in the text
of § 981(a)(2)(B).  The plain meaning of the word "acquire," at
both the time of enactment of this statute in 2000 and now, does
not, contrary to Carpenter's argument, carry a "connotation of
ownership."  See, e.g., Acquire, Black's Law Dictionary (10th ed.
2014) (defining "acquire" as "[t]o gain possession or control of;
to get or obtain"); Acquire, Black's Law Dictionary (7th ed. 1999)
(same);     Acquire,     Oxford     English     Dictionary,
www.oed.com/view/Entry/1731 (defining "acquire" as "to gain
possession of through skill or effort; to obtain . . . in a careful,
concerted, often gradual manner"); Acquire, Merriam Webster,
http://merriam-webster.com/dictionary/acquire (defining "acquire"
as "to get as one's own; to come into possession or control of
often by unspecified means").

    Further, in Huddleston v. United States, 415 U.S. 814
(1974), the Supreme Court assessed the meaning of "acquire" in a

similar statute, 18 U.S.C. § 922(a)(6).  Relying on a dictionary
which defined "acquire" as "to come into possession, control, or
power of disposal of," the Court stated that this definition had
"no intimation . . . that title or ownership would be necessary
for possession, or control, or disposal power."  Id. at 820
(quoting Webster's New International Dictionary (3d ed. 1966,
unabridged)).

We see no reason to vary from that dictionary plain
meaning, nor to do so by resort to a judicially interpretive guide,
which is not needed or appropriate here.  See Sebelius v. Auburn
Reg'l Med. Ctr., 568 U.S. 145, 156 (2013) (stating that the general
rule that the use of different language in a statute can indicate
that different meanings were intended is an "interpretive guide"
that is "'no more than [a] rul[e] of thumb' that can tip the scales
when a statute could be read in multiple ways" (quoting Conn. Nat'l
Bank v. Germain, 503 U.S. 249, 253 (1992))).  Although
§ 981(a)(2)(A) uses the word "obtained" and includes the phrase
"directly or indirectly" while § 981(a)(2)(B) uses the word
"acquired" and omits this phrase, it does not follow that "acquire"
must mean ownership.[5]

---

[5]     In the alternative, Carpenter invokes the rule of lenity
to argue that § 981(a)(2)(B) is "grievously ambiguous" as applied
to Carpenter because he "never personally acquired any portion of
the funds he has been ordered to forfeit."  The rule of lenity
"applies only if, 'after considering text, structure, history and
purpose, there remains a grievous ambiguity or uncertainty in the

Rather, we hold that the definition of "acquired" in
§ 981(a)(2)(B), is met, at the least, where the property was at
some point under the defendant's control. Both the plain meaning
of the word "acquire" and the Supreme Court's analysis in
Huddleston support this view.[6] Whether or not Carpenter owned the
funds invested by clients, he certainly controlled them. See also
Contorinis, 692 F.3d at 147.

The district court correctly found on this record that
Carpenter acquired the exchangors' funds because the funds were
"under [his] control." Id. Carpenter opened the accounts at
Merrill Lynch (and later, PaineWebber) and listed himself as the
sole signatory. When checks or wires arrived at Benistar, they
were deposited in the accounts he created. The deposits were made
by an employee who reported to Carpenter. From there, Carpenter

---

statute such that the Court must simply guess as to what Congress
intended.'" United States v. Musso, 914 F.3d 26, 32 n.3 (1st Cir.
2019) (quoting Abramski v. United States, 573 U.S. 169, 188 n.10
(2014)). The meaning of "acquire" is not grievously ambiguous, so
the rule does not apply.

[6] Carpenter's reliance on the Supreme Court's decision in
Honeycutt v. United States, 137 S. Ct. 1626 (2017), is mistaken.
Honeycutt held that a co-conspirator cannot be required to forfeit
property under 21 U.S.C. § 853(a)(1) based on principles of joint
and several liability among co-conspirators if he never "actually
acquired [the property] as the result of the crime." Id. at 1635.
Carpenter makes no argument based on joint and several liability.
Further, Honeycutt provides no support for the view that "acquire"
means ownership. Honeycutt in fact undercuts Carpenter's view
that "obtain" and "acquire" must have different meanings because
it relied on dictionaries that defined "obtain" by using the words
"acquire" or "acquisition." Id. at 1632.

exercised complete authority over how the funds would be invested.
Carpenter moved the funds to the trading account and pursued
aggressive trading strategies.  He personally communicated with
employees at Merrill Lynch, and later PaineWebber, to execute his
chosen trades.  Carpenter sought to ensure his control going
forward by instructing his business partner in June 1999 that
"everything" should go through the Simsbury office and that no
procedure could be changed without his personal approval.
Carpenter plainly had control over the exchangors' funds.

Carpenter next argues that he did not "have 'control' of
the exchangors' funds" under his reading of the Second Circuit
opinion in Contorinis because he did not have "control over the
distribution of profits."  Contorinis does not apply.[7]

The premise of the argument is itself wrong.  Forfeiture
orders go beyond disgorgement of profits.  They "help to ensure

---

[7]    In Contorinis, the defendant was convicted of insider
trading and conspiracy to commit securities fraud after he
purchased and sold stock on behalf of his employer based on insider
information.  Contorinis, 692 F.3d at 139.  The Second Circuit
determined that the amount ordered to be forfeited by the district
court -- the total amount of profits made by the defendant's
employer -- was incorrect because "the 'proceeds' . . . were
'acquired' by the Fund over which appellant lacks control."  Id.
at 146.  In contrast to the Contorinis defendant, "who was an
employee and small equity owner" and "made investment decisions
but did not control disbursement of profits," id. at 138, 145,
Carpenter was a founder of Benistar and he controlled how exchangor
funds would be invested and could have distributed profits above
the 3% or 6% owed to the exchangors, if there had been any profits.

that crime does not pay: [t]hey at once punish wrongdoing, deter future illegality, and 'lessen the economic power' of criminal enterprises." Kaley, 571 U.S. at 323 (quoting Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 630 (1989)).

Carpenter's final argument is that the amount of the forfeiture should be reduced by the sum that Carpenter returned to the exchangors because the returned funds "were part of the direct costs of providing [Benistar's] services." Even if these could be counted as "direct costs," Carpenter has the burden to prove direct costs. 18 U.S.C. § 981(a)(2)(B). He now asserts that the district court erred when it concluded that he had failed to offer any evidence of direct costs. But "[a]rguments not 'spell[ed] out . . . squarely and distinctly' in the district court are waived." T G Plastics Trading Co. v. Toray Plastics (Am.), Inc., 775 F.3d 31, 39 (1st Cir. 2014) (quoting United States v. Samboy, 433 F.3d 154, 161 (1st Cir. 2005)). Carpenter never argued to the district court that the forfeiture order should be reduced by the direct costs of operating Benistar or that the sums returned to investors were direct costs, so he has waived this argument.

Even if Carpenter were given the benefit of plain error review, we see no error. Other than making a single statement at sentencing that $9 million was the appropriate amount of forfeiture, Carpenter did not provide any evidence that would connect the payments he made to the exchangors to the counts upon

which the forfeiture order was based or to show they were direct
costs.

    2.  Eighth Amendment Challenge

        Carpenter argues that the forfeiture order violated the
Excessive Fines Clause of the Eighth Amendment.  Not so.  A
forfeiture order violates the Eighth Amendment "only if it is
'grossly disproportional to the gravity of the defendant's
offense.'"  United States v. Heldeman, 402 F.3d 220, 223 (1st Cir.
2005) (quoting United States v. Bajakajian, 524 U.S. 321, 336-37
(1998)).  Because Carpenter raised the disproportionality argument
in the district court, our review "is de novo with due deference
given to any factual findings made by the district court."  United
States v. Aguasvivas-Castillo, 668 F.3d 7, 16 (1st Cir. 2012).

        We conclude there was no disproportion under the three-
factored test this circuit applies to determine if a forfeiture
order is grossly disproportional: "(1) whether the defendant falls
into the class of persons at whom the criminal statute was
principally directed; (2) other penalties authorized by the
legislature (or the Sentencing Commission); and (3) the harm caused
by the defendant."  Heldeman, 402 F.3d at 223.

        As to the first factor, Carpenter is plainly within the
class of persons targeted by the mail and wire fraud statutes.
Carpenter fraudulently represented to the exchangors how their

money would be invested to induce them to use his company and then used their money to make risky investments.

As to the second factor, the penalties authorized were similar; § 3571(d) authorizes a fine of "not more than the greater of twice the gross gain or twice the gross loss" from an offense if anyone derives pecuniary gain, or someone other than the defendant suffers pecuniary loss. 18 U.S.C. § 3571(d). Here, even if we accept Carpenter's figure that the exchangors lost $9 million, the maximum fine authorized was twice this amount or $18 million. We give great weight to this statutory judgment by Congress. "[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature." Bajakajian, 524 U.S. at 336; United States v. Jose, 499 F.3d 105, 111 (1st Cir. 2007). The forfeiture amount is lower.[8]

_____

[8]     In a footnote in United States v. Beras, 183 F.3d 22 (1st Cir. 1999), this court stated that "Bajakajian . . . suggests that the maximum penalties provided under the Guidelines should be given greater weight than the statute because the Guidelines take into consideration the culpability of the individual defendant." Id. at 29 n.5. Here, it is true that the Guidelines authorize a maximum fine of $100,000 for Carpenter's offense. U.S.S.G. § 5E1.2(c)(3). But the Guidelines also state that the Sentencing Commission "envision[ed] that for most defendants, the maximum of the guideline fine range . . . will be at least twice the amount of gain or loss resulting from the offense." Id. cmt. n.4. Where that is not the case, the Guidelines state that "an upward departure from the fine guideline may be warranted." Id. Given that the Commission foresaw the situation, like Carpenter's, where twice the loss caused by the offense is an amount far greater than the authorized fine under the Guidelines and stated that upward

Finally, Carpenter's criminal conduct caused significant harm. Contrary to his assertions, how Carpenter ran Benistar was hardly legitimate. We reject his argument that no harm was done. Exchangors were forced to sue civilly to recoup their losses and to testify in the criminal proceedings.

3. Sixth Amendment Challenge

Carpenter's final argument is that a jury was required to set the amount of the forfeiture.[9] The short answer is that the Supreme Court's decision in Libretti v. United States, 516 U.S. 29 (1995), holds that the Sixth Amendment does not require that the facts underlying a criminal forfeiture be found by a jury. Id. at 49 ("[O]ur analysis of the nature of criminal forfeiture as an aspect of sentencing compels the conclusion that the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection."). We held in United States v. Ortiz-Cintrón, 461 F.3d 78, 82 (1st Cir. 2006), that we are bound by that holding in Libretti. We are not free to override Supreme Court precedent.

Affirmed.

---

departures may be warranted, the statutory scheme is a better guide to whether the forfeiture order is excessive.

[9] Carpenter relies on Apprendi v. New Jersey, 530 U.S. 466 (2000), Southern Union Co. v. United States, 567 U.S. 343 (2012), and Alleyne v. United States, 570 U.S. 99 (2013).