UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL E. CARPENTER<br>Petitioner,<br>v.<br><br>UNITED STATES OF AMERICA<br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CRIMINAL NO. 04-10029-GAO

FILED
IN CLERKS OFFICE
2021 JAN 26 AM 10: 56
U.S. DISTRICT COURT
DISTRICT OF MASS.

**MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR A WRIT OF
AUDITA QUERELA TO SET ASIDE PETITIONER'S CONVICTION**

NOW COMES the Petitioner, Daniel E. Carpenter, to ask this Court to issue a Writ of

Audita Querela or, in the alternative, a Writ of Coram Nobis in order to vacate and set aside his

conviction pursuant to the All Writs Act of 28 U.S.C. §1651.

**PRELIMINARY STATEMENT**

Perhaps the best description of the difference between the ancient Writ of Audita Querela

and the similarly ancient Writ of Coram Nobis is to be found in the Honorable Judge Richard

Mazzone's decision in *United States v. Khalaf*, 116 F. Supp. 2d 210 (D. Mass. 1999), where the

Court stated that:

> The Writ of Coram Nobis is an unusual legal vehicle that courts will use to set aside a
> criminal judgment only "under circumstances compelling such action to achieve
> justice." *See Morgan* at 511. According to the First Circuit, those circumstances include
> (1) an explanation of why a coram nobis Petitioner did not earlier seek relief from the
> judgment, (2) a showing that the Petitioner continues to suffer significant collateral
> consequences from the judgment, and (3) a demonstration that an error of the most
> fundamental character relevant to the plea decision occurred. *Hager v. U.S.*, 993 F.2d 4
> (1st Cir.1993). The Writ of Audita Querela [on the other hand] "constitutes the initial
> process in an action brought by a judgment defendant to obtain relief against the
> consequences of the judgment on account of some matter of defense or discharge arising
> since its rendition and which could not be taken advantage of otherwise." Black's Law
> Dictionary 120 (5th ed.1979). The Writ of Audita Querela does not provide a purely
> equitable basis for relief independent of any legal defect in the underlying judgment.
> *Holder* at 3. Thus, the writ will not issue in the absence of a legal objection to a criminal

2

conviction. Moreover, the First Circuit has also said that this writ will not issue unless that legal objection has arisen subsequent to a conviction, and which is not redressable pursuant to another post-conviction remedy. *Id.* at 5.

In *United States v. Holder*, 936 F.2d 1 (1st Cir. 1991), the First Circuit basically said that a Writ of Audita Querela would still be eligible in a criminal case depending on the right facts. Petitioner submits that he has grounds for not only a Writ of Coram Nobis because the underlying indictment was infirm at best and fatally flawed for failure to describe a crime, but Petitioner also has a strong case for a Writ of Audita Querela based on a dozen Supreme Court and First Circuit cases since his second trial in 2008, including the following landmark cases: *Skilling v. United States*, 561 U.S. 358 (2010), *Elonis v. United States*, 135 S.Ct. 2001 (2015), *McFadden v. United States*, 135 S.Ct. 2298 (2015), *McDonnell v. United States*, 136 S.Ct. 2355 (2016), *Sessions v. Dimaya*, 138 S.Ct. 1204 (2018), and *Marinello v. United States*, 138 S.Ct. 1101 (2018), as well as *United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016), *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017), and *United States v. Bravo-Fernandez*, 913 F.3d 244 (1st Cir. 2019). All of these cases offer conclusive evidence that the prosecution and conviction of Petitioner was fraught with constitutional errors from indictment to sentencing.

A defendant may seek relief under the All Writs Act, 28 U.S.C. §1651, which "fill[ed] the interstices of the federal post-conviction remedial framework." *See Bravo-Diaz* at 997 n.2 (9th Cir. 2002). *See, also, Yasui v. United States*, 772 F.2d 1496, 1498 (9th Cir. 1985) (the writ of error coram nobis "fills a void in the availability of post-conviction remedies in federal criminal cases."). In particular, courts have recognized that the Writs of Coram Nobis and Audita Querela may provide relief for persons who have grounds to challenge the validity of their conviction but, because they are not yet in custody or are no longer in custody, are not eligible for relief pursuant to §2255. "[T]he *coram nobis* writ allows a court to vacate its

3

judgments for errors of fact...in those cases where the errors [are] of the most fundamental character, that is, such as rendered the proceeding itself invalid." *United States v. Mayer,* 235 U.S. 55, 69 (1914).

Similarly, "[t]he Writ of Audita Querela is an ancient common law writ ...of a most remedial nature, and invented lest in any case there should be an oppressive defect of justice, where a party who has a good defence is too late in making it in the ordinary forms of law." *Cummings v. United States,* 2014 WL 3388559, *1 (S.D.N.Y. July 11, 2014), citing *Humphreys v. Leggett,* 50 U.S. 297, 313 (1850). "A Writ of Audita Querela is an extraordinary remedy under the All Writs Act, 28 U.S.C. §1651(a), and is generally limited to cases where the absence of any avenue of collateral attack would raise serious constitutional questions about the laws limiting those avenues." *Persico v. United States,* 418 F. App'x 24, 25 (2d Cir. 2011). It is "available where there is a legal, as contrasted with an equitable, objection to a conviction that has arisen subsequent to the conviction and that is not redressable pursuant to another post-conviction remedy." *United States v. LaPlante,* 57 F.3d 252, 253 (2d Cir. 1995). *Pena v. United States,* 2020 WL 183216, at *2 (S.D.N.Y. Jan. 13, 2020). The Writ of Audita Querela "provides relief from the consequences of a conviction when a defense or discharge arises subsequent to entry of the final judgment. The defense or discharge must be a legal defect in the conviction, or in the sentence which taints the conviction." *See, e.g., United States v. Crowell,* 374 F.3d 790, 794-95 (9th Cir. 2004).

Moreover, just as the First Circuit's decision in *Rosa-Ortiz* was based on the Eleventh Circuit's decision in *United States v. Peter,* 310 F.3d 709 (11th Cir. 2002), which was based on the Supreme Court's decision in *Cleveland v. United States,* 531 U.S. 12 (2000), Petitioner asks this Court to look at the holdings above to establish that there was no federal fraud or federal crime in this case based on the Supreme Court's statement that "[N]ondisclosure is outside the bounds of

4

the fraud statutes," *Skilling* at 400; and, as in *Tavares*, there were no mailings or wires in this case **"in furtherance"** of any fraud. Also, in any type of fraud, "the fraudster's gain should be the mirror image of the victim's loss." *Skilling* at 410. Therefore, the unanimous holding in *Skilling* renders Petitioner's indictment, prosecution, and conviction unconstitutional and void as a matter of law. Just as *Cleveland* negated the indictment, prosecution, and guilty plea in *Peter*, so too does the Supreme Court's unanimous decision in *Skilling* and the First Circuit's decisions in *Tavares* and *Bravo-Fernandez* render the prosecution and conviction of Petitioner fundamentally unfair and unconstitutional.

As this Court knows, unlike the defendants in *Peter* and *Rosa-Ortiz*, Petitioner did not plead guilty, yet the First and Eleventh Circuits had no problem overturning both convictions in the interest of justice. Similarly, the Second Circuit overturned the conviction in *United States v. Aleynikov*, 676 F.3d (2d Cir. 2012) based on the challenge to the validity of the jurisdiction of the court under Rule 12(b)(3)(B), as the Eleventh Circuit did in *United States v. Izurieta*, 710 F.3d 1176 (11th Cir. 2013). Significantly, *Aleynikov, Izurieta,* and *Rosa-Ortiz* were all subsequent to the decision in *United States v. Cotton*, 535 U.S. 625 (2002), so clearly the Government's argument that it is too late for Petitioner to challenge the subject matter jurisdiction of the Court cannot hold up. Because Petitioner's two indictments were in 2004, a decade before a minor change in Rule 12(b)(3)(B) in December 2014, it is clear that Petitioner has access to this Court again pursuant to the old Rule 12(b)(3)(B) since both of the indictments and the subsequent conviction in February of 2014 (after having Rule 33 New Trial Orders approved in both 2005 and 2011) occurred prior to the change to Rule 12(b)(3)(B) in December 2014.

As the First Circuit has recently agreed to hear Petitioner's appeal of this Court's decision of February 20, 2019, and now that Petitioner has two appeals open challenging this Court's

decision, the case is not final for the purposes of the old Rule 12(b)(3)(B). Therefore, this petition is submitted on a timely basis to respectfully request that this Court utilize the venerable Writ of Audita Querela because, as Judge Mazzone clearly stated in *United States v. Khalaf*, 116 F. Supp. 2d 210 (D.Mass. 1999), if the Court was to determine that the indictment, trial, and conviction of Petitioner in 2008 were all proper, then this Court could still grant a Writ of Audita Querela by pointing to the Supreme Court's post-trial decisions in *Skilling, Elonis, Yates v. United States*, 574 U.S. 528 (2015), *Sessions v. Dimaya, Marinello*, and most recently *United States v. Davis*, 139 S.Ct. 2319 (2019) citing Justice Gorsuch's decision from the original *Davis* in 2017.

As this Court knows better than anyone, at no time did the Government show any mailing or wire that was "in furtherance of the scheme to defraud" by Petitioner. Moreover, as the Court is also aware, at no time did Petitioner have the criminal *mens rea* to keep the money for himself. The Court has seen many exhibits of the detailed accounting of the Property Exchange funds. In fact, as the Court knows, based on Exhibit 268, had PaineWebber not swept the funds from the account, Petitioner would have been up $15 million instead of down $9 million in January 2001. If this Court had the First Circuit's decision in *Tavares* prior to the sentencing in 2014, or the First Circuit had issued *Tavares* before Petitioner's appeal in 2015, there may have been a different result. Certainly, had *Tavares* been available in 2011 or if Petitioner's attorneys had provided the Court with a copy of *Skilling* in 2011 rather than abandoning him in favor of taking on Merrill Lynch as a client, the history of Petitioner's case would probably have been totally different. Therefore, a Writ of Audita Querela is particularly appropriate based on the facts of this case.

Furthermore, after *Tavares* in 2016, the First Circuit went on to say in *United States v. Berroa*, 856 F.3d 141, 150 (1st Cir. 2017) in reversing the mail and wire fraud convictions of doctors that lied on applications, that "under the government's theory, any false statement in an

6

application...could constitute a federal crime." Clearly, with the decisions in *Tavares* and *Berroa*, the First Circuit has gone a long way to limit the scope and scale of the mail and wire fraud statutes just as *Skilling* did. But, unlike the defendants in *Tavares* and *Berroa*, the Petitioner in this case has not lied to anyone about anything at any time. Similarly, in 2019 in *Bravo-Fernandez*, the First Circuit vacated the conviction because the Government failed to prove just one minor jurisdictional element of the indictment under 18 U.S.C. §666. In Petitioner's case, the Government has failed to prove all five elements of Mail and Wire Fraud, so his conviction should be set aside as well.

As this Court realizes, Petitioner also stands ready to challenge the terrible Due Process delays in this case that far exceed the recent rulings in *Betterman v. Montana*, 136 S.Ct. 1609 (2016) and *United States v. Irizarry-Colon*, 848 F.3d 61 (1st Cir. 2017), and the Speedy Trial cases in *United States v. Handa*, 266 F.Supp.3d 443 (D.Mass. 2017) and *United States v. Huete-Sandoval*, 668 F.3d 1 (1st Cir. 2011). And, as is also well-known by the Court, Petitioner has been challenging Venue since day one and citing *United States v. Cabrales*, 524 U.S. 1 (1998), so that if Missouri was not the right place to try drug-dealer Vicki Cabrales for money-laundering even though it was her home state because she committed the money-laundering crime in Florida; so too was it a fundamental error to charge Petitioner for the crime of Mail and Wire Fraud in Massachusetts even though he never left his office in Connecticut, and if the option trading was the crime, that occurred in the Southern District of New York. But, the purpose of this Motion is to point out the fundamental errors in both the indictment and the prosecution of the case that should prove that Petitioner never received the "fair warning" that the Supreme Court has said is "essential" in *Marinello,* and that before someone can be prosecuted, a person must know they are breaking the law and crossing that "bright line" as stated in *Arthur Andersen v. United States*, 544 U.S. 696 (2005):

7

"Fair warning should be…in language the common world will understand, of what the law intends to do if a certain line is passed. *McBoyle v United States*, 283 U.S. 25, 27 (1931)."

Clearly there was no intended crime here, and no criminal *mens rea* and absolutely no criminal scienter. Therefore, Petitioner did not receive the required Fair Warning of *Marinello* that he was crossing any bright line or what the penalty would be once that bright line was crossed. This Court knows better than anyone that Petitioner never intended to defraud the Exchangors and that the Exchangors have been paid back almost $50 million in Petitioner's legal victories over PaineWebber and Merrill Lynch on their $8 million losses in the stock market crash of 2000. Even the Court noted that: "He always intended to pay the money back." The election turmoil and the NASDAQ stock market crash of 2000 – which is still the greatest crash in history – caused the losses at issue, and Petitioner is still very sorry for those losses. But, now that the Exchangors have been paid back, and they have settled, released, and even forgiven Petitioner; Petitioner's conviction should be stricken using the venerable ancient writs that are still recognized under the criminal law. Finally, Petitioner is leaving it to the Court to decide that, if the Court had been presented *Skilling* in 2011 or *Bravo-Fernandez* in February of 2019, it might have ruled differently on all of Petitioner's motions. Additionally, Petitioner respectfully asks the Court to re-examine the lack of subject matter jurisdiction under the old Rule 12(b)(3)(B) because, unlike the defendants in *Peter and Rosa-Ortiz*, Petitioner did not do the acts he was accused of and never pleaded guilty to those actions at any point. Therefore, this Court should set aside Petitioner's conviction under the old rules of subject matter jurisdiction that are still applicable to him.

The Court knows that Petitioner still suffers from the effects of his conviction, including Restitution, Forfeitures, and the loss of his law license; and obviously Petitioner has consistently challenged the validity of his conviction since day one, so he clearly requires all three requirements

of *United States v. Hager*, 993 F.2d 4 (1st Cir. 1993). If the Court finds there was an error in the indictment or at trial, then it should issue the Writ of Coram Nobis because clearly there were errors (of the most fundamental character) of a constitutional basis. If the Court feels the trial in 2008, the indictment, and the jurisdiction of the Court were all fine, then Petitioner respectfully submits that based on the Supreme Court's decisions and the First Circuit's decisions since 2008, Petitioner lacked fair warning that anything he did was criminal and would put him in jail for 36 months with forfeitures of over $14 million and therefore, the issuance of a Writ of Audita Querela is appropriate. There are a number of constitutional issues here, and the Court should be able to agree with Petitioner that he did not receive a fair trial because all of the Government's witnesses lied, not just Gerry Levine, and the Government knew it. And, because the Court has granted two New Trial Orders in the past and knowing what it knows now from *Skilling, Tavares, Bravo-Fernandez,* and *Marinello,* this Court should be comfortable issuing a Writ of Audita Querela to set aside Petitioner's conviction or, in the alternative, issue a Writ of Coram Nobis, or to dismiss the indictment pursuant to the old version of Rule 12(b)(3)(B). Petitioner respectfully places his faith in the Court to make the right decision as what law to apply to achieve justice based on the clear-cut facts of this case.

## I.  THIS COURT LACKED SUBJECT MATTER JURISDICTION

Last month in the last week of 2020, the First Circuit vacated the conviction of a person who pleaded guilty because the court may not have had jurisdiction and the indictment did not give the exact elements of the crime. This was considered Plain Error. In *United States v. Guzman-Merced*, 2020 WL 7585176 (1st Cir. 2020), the First Circuit found there was plain error and reversed the 924(c) convictions of two convicted felons based on the Supreme Court decision in *Rehaif v. United States*, 139 S.Ct. 2191 (2019). Petitioner has clearly satisfied the standards of Plain Error under the First Circuit as stated in *United States v. Lara,* 970 F.3d 68, 84 (1st Cir. 2020) *citing United States v. Rosa-Ortiz*, 348 F.3d 33, 36 (1st Cir. 2003):

> "[a] federal court lacks jurisdiction to enter a judgment of conviction when the indictment charges no offense under federal law. These challenges raise a number of questions about the application of the plain error standard of review, which provides that a clear or obvious error should be corrected if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 138 S.Ct. 1897, 1905 (2018) *(quoting Molina-Martinez v. United States*, 136 S.Ct. 1338, 1343 (2016)).

The Supreme Court has made it clear that subject matter jurisdiction can be challenged any time, even after a judgment had been rendered. *See Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514 (2006). As the First Circuit determined in *United States v. Bravo-Fernandez*, 913 F.3d 244 (1st Cir. 2019), which has not been going on as long as this case, the Government failed to allege and prove at trial an essential jurisdictional element of the crime so the conviction had to be set aside and the indictment had to be dismissed. Petitioner submits to this Court that, based on the First Circuit's decisions in *Bravo-Fernandez, Tavares, Berroa* and especially the Supreme Court's decision in *Skilling,* this Court lacked subject matter jurisdiction because Petitioner's indictment lacked all five essential elements of the Mail and Wire Fraud statutes, and therefore the Petitioner's conviction should be set aside based on *United States v. Rosa-Ortiz*, 348 F.3d 33 (1st Cir. 2003)

which was based on *United States v. Peter*, 310 F.3d 709 (11th Cir. 2002), which in turn was based on the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000). The reason the Court did not have jurisdiction is because just like in *Rosa-Ortiz*, the alleged conduct in the indictment did not establish a federal crime. In *Rosa-Ortiz*, the indictment charged the defendant with conspiring to violate Section 751(a) by assisting in the escape of his co-defendant who was in federal custody on a federal material witness warrant. The defendant pleaded guilty to that charge and appealed, arguing that his conduct was not within the crime charged. Furthermore, it is black-letter law that a defective indictment does not invoke the jurisdiction of the federal courts and any decision by a district court that lacks jurisdiction is a nullity and is void as a matter of law.

In this Petition, Petitioner raises several separate arguments. First, this Court lacked jurisdiction because just as in *Peter*, the law of mail and wire fraud was changed by the Supreme Court's decision in *Cleveland*, and just as the defendant in *United States v. Guzman-Merced*, 2020 WL 7585176 (1st Cir. 2020) benefited from the Supreme Court's decision in *Rehaif v. United States*, 139 S.Ct. 2191 (2019), the Petitioner in this case respectfully asserts that the Supreme Court's unanimous decision in *Skilling* changed forever the requirements of mail and wire fraud because "[N]ondisclosure is outside the bounds of the fraud statutes." *Id.* at 400. Additionally, based on the First Circuit's decision in *Tavares,* since none of the mailings in that case were **in furtherance** of any crime, clearly there could be no mail or wire fraud in Petitioner's case, and since the indictment failed to properly state all of the elements of a federal crime, it was therefore constitutionally and fatally defective.

This Court also lacked jurisdiction pursuant to Fed.R.Crim.P. 12(b)(3)(B) because the Indictment failed to allege all of the facts necessary to constitute a federal offense, and because the Indictment failed to charge Mail and Wire Fraud with the particularity needed to invoke this

11

Court's jurisdiction. This is plain error under the standards set by the Supreme Court in its decision in *Rosales-Mireles v. United States,* 138 S.Ct. 1897 (2018) *citing Molina-Martinez v. United States*, 136 S.Ct. 1338 (2016). In this case, Petitioner's Indictment was woefully inadequate as to all five elements that must be sufficiently alleged. Since both of Petitioner's indictments were in 2004, they must be considered under the old Rule 12(b)(3)(B) prior to the change in December 2014. Therefore, Petitioner has the right to challenge the jurisdiction of this Court, and it should not be held against him that this case is 20 years old. Petitioner's challenge to jurisdiction is still timely and meritorious. Therefore, the indictment was either constructively amended or failed to state a federal crime at all and thus, the indictment must be dismissed and a Writ of Audita Querela should issue. Significantly, in issuing the appropriate Writ, the Court must take notice of the fact that there was never a failure to make an exchange until after January 2001 when PaineWebber swept all the funds from the BPETCO account. As the Court knows, failure to complete an agreement does not constitute fraud.

Third, unlike the lying physicians in *Berroa*, Petitioner never lied to any of the Exchangors about anything at any time, and in fact had no communication whatsoever with any of the Exchangors, so there was no lie, deception, or scheme to defraud. Finally, as the Government failed to prove only one essential element charged in *Bravo-Fernandez*, Petitioner respectfully submits that the Government failed to prove all five of the essential elements of Mail and Wire Fraud in this case, and therefore Petitioner's conviction should be set aside. With that in mind, Petitioner respectfully asks the Court to grant a Writ of Audita Querela, a Writ of Coram Nobis, or a dismissal of the indictment pursuant to the old Rule 12(b)(3)(B) prior to December 2014 as the indictment was fatally deficient and failed to state a crime just as the indictment in *Peter* did where the conviction was vacated under a Writ of Coram Nobis.

In his highly regarded report to Congress on mail and wire fraud dated July 21, 2011, Charles Doyle of the Congressional Research Service, states that all five of the elements of mail and wire fraud that must be alleged in an indictment and **proven beyond a reasonable doubt** before someone can be convicted:

(1)     Used either mail or wire communications **in the foreseeable furtherance,**
(2)     of a **scheme to defraud,**
(3)     involving a **material** deception,
(4)     with the **intent to deprive** another of,
(5)     either **property** or honest services.

*See* Congressional Research Service, CRS Report R41931, *Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law,* by Charles Doyle, July 21, 2011. Failure to properly allege each and every one of these elements with sufficient facts renders an indictment facially invalid and does not properly invoke the jurisdiction of the federal courts. "Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *United States v. Russell,* 369 U.S. 749, 764 (1962). Suffice it to say, the Government did not prove **any of these five elements** at Petitioner's trial, much less proving **all five** beyond a reasonable doubt as Charles Doyle's 2011 Report to Congress says it is required to do. Therefore, as with the defendants in *Bravo-Fernandez,* Petitioner's conviction should be set aside.

Petitioner's Indictment is also devoid of any *specific* intent to defraud, or the required "tangible economic harm." In fact, the words *"mens rea,"* "scienter," and even the "specific intent to defraud" are nowhere to be found in the Indictment, even though those words are required by the US Attorney's Manual. *See USAM Chapter 9-43.000, Criminal Resource Manual at 948.* As the Eleventh Circuit explained in dismissing the indictment and vacating the conviction in *Peter*:

The problem is not that the Government's case left unanswered a question as to whether its evidence would encompass a particular fact or element. Rather, it is that the Government affirmatively alleged a specific course of conduct that is outside the reach of the mail fraud statute. Peter's innocence of the charged offense appears from the very allegations made in the superseding information, not from the omission of an allegation requisite to liability. *Peter* at 715.

That is precisely the problem with the Indictment in Petitioner's case. Each count of the Indictment that charges Petitioner with an alleged federal crime merely parrots the language of the Mail and Wire Fraud statute without any details of what makes Petitioner's **own personal** conduct criminal, there was no conspiracy charged in this case, so it is only the personal conduct of Petitioner that is at issue. More importantly, none of the counts allege facts that would bring Petitioner's conduct within the meaning of the Mail and Wire Fraud statutes under any circumstances after *Skilling* and *Tavares*. As the First Circuit stated in *Rosa-Ortiz*, "a federal court has jurisdiction to try criminal cases only when the information or indictment alleges a violation of a valid federal law. *United States v. Saade*, 652 F.2d 1126, 1134 (1st Cir. 1981)." A federal court similarly lacks jurisdiction to enter a judgment of conviction when the indictment charges no offense under federal law whatsoever. *See Peter, citing United States v. Morgan*, 346 U.S. 502 (1954), where the Eleventh Circuit made it unequivocally clear that:

> "**When a court without jurisdiction convicts and sentences a defendant, the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force.**" *Peter* at 715.

That is precisely the problem in this case. Each count of the Indictment that charged Petitioner with an alleged federal crime in 2004 merely parroted the language of the Mail and Wire Fraud statutes without any details of how Petitioner's conduct was criminal. None of the counts alleged facts that would bring Petitioner's conduct within the meaning of the charged statutes at the time, and certainly not under any circumstances after *Skilling, Tavares*, and *Bravo-Fernandez*.

For example, none of the mailings or wires were done or caused by Petitioner, and none of the mailings and wires were done in *furtherance* of a scheme to defraud. Only a select set of frauds reach the level required for a Mail and Wire Fraud prosecution. Specifically, in this case, the government failed to allege all five elements necessary to invoke this Court's jurisdiction.

Just as the First Circuit determined in 2019 that the original indictment in *Bravo-Fernandez* failed to allege and the government failed to prove at trial only one of the essential jurisdictional elements under 18 U.S.C. §666, so too does the Petitioner want to point out to the Court that the indictment of 2004 was missing all of the jurisdictional elements necessary for mail and wire fraud according to Charles Doyle, including the fact that there was no mention of intent, *mens rea*, or scienter anywhere in the indictment or at both trials. Moreover, the Government failed to prove any of the elements, much less all five elements at trial. Petitioner, therefore respectfully asks this Court to review the case not in the lens of December 2005, but rather through the lens of the First Circuit and Supreme Court cases in 2021. Furthermore, as the First Circuit stated in *United States v. Valdes-Ayaya*, 900 F.3d 20 (1st Cir. 2018):

> That leaves the fourth prong of plain error review-whether the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." The Supreme Court has recently made this an easy decision for us. In *Rosales-Mireles*, the Court held that, "[i]n the ordinary case, the failure to correct a [plain error] that affects a defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings." *Id.* at 43.

Just as the Writ of Coram Nobis in *Peter* was based on the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000) that changed the rules of mail and wire fraud, so too did the Supreme Court's unanimous decision in *Skilling* further change the rules of mail and wire fraud in 2010. Since this Court's decision on most of these major issues was written in December 2005, Petitioner would like to respectfully request that this Court review the

constitutionally defective indictment of 2004 through the lens of recent Supreme Court and First Circuit cases rather than the Court's view of law in December 2005 when the last major detailed analysis of this case was written.

As these recent cases like *Tavares* and *Bravo-Fernandez* make clear, an indictment that merely tracks the language of a charged statute and alleges vague criminality *but alleges no facts that actually violate the statute it charges* cannot be sustained. Therefore, based on the fact that both indictments in this case failed to allege a federal crime, the Court lacked jurisdiction which is an error of "fundamental" proportions requiring the granting of this Petition for a Writ of Audita Querela or to dismiss the Indictment for a lack of jurisdiction for failure to describe a federal crime pursuant to Rule 12(b)(3)(B) prior to December 2014.

## II.    PETITIONER'S CONVICTION MUST BE SET ASIDE BASED ON *SKILLING*

As Judge Kayatta summed up Petitioner's alleged crime for the First Circuit:

> In a nutshell, Petitioner told clients he would hold their money in escrow accounts for which the client would pay a fixed fee and which would cautiously generate returns of either three or six percent; then (unbeknownst to his clients) he invested the money in high-risk, high-return stock options, hoping to generate excess returns to keep for himself. His option trading fared poorly, and he lost nine million dollars in client funds. At trial, he argued unsuccessfully that he never promised that the client funds would be safe, and that he did not intend to defraud his clients when he failed to disclose his real strategy of using their money to make risky investments to see if he could hit a home run for himself. *United States v. Carpenter*, 781 F.3d 599, 603 (1st Cir. 2015).

Despite all of the obvious errors in Judge Kayatta's "nutshell" description (e.g. Petitioner did not *tell* anyone anything in this case and there were extensive contractual agreements so all of the Exchangors were bound by a contract with a merger and integration clause), the immediate problem with Judge Kayatta's description of the scheme to defraud in Petitioner's case is that it fails to describe a crime anywhere in the United States after the Supreme Court's unanimous decision in *Skilling v. United States*, 561 U.S. 358 (2010). For example, *Skilling* describes the

16

classic "mirror image of fraud" doctrine, where "the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other." *Skilling* at 400. Additionally, *Skilling* points to the fact that "[N]ondisclosure is outside the bounds of the fraud statutes." *Skilling* at 410.

The most famous recent case involving an "intentional" breach of contract and nondisclosure not being fraud in a contract setting is, of course, *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016), where the Second Circuit relied on not one but two cases from the First Circuit: *McEvoy Travel v. Heritage Travel*, 904 F.2d 786 (1st Cir. 1990), for the proposition that "the common law requires proof—other than the fact of breach—that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation." *Countrywide* at 658; *Sanchez v. Triple-S*, 492 F.3d 1 (1st Cir. 2007):

> A defendant's failure to disclose information, without more, cannot make out a violation of the Mail and Wire Fraud statutes. *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000)....We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who—a jury might find—secretly harbored in his heart the hope that the buyer would never ask." *Countrywide* at 660, *quoting Sanchez* at 11.

Therefore, Judge Kayatta's description of Petitioner's conduct fails to state a crime not only in the First Circuit, but apparently anywhere in America after the Second Circuit's decision in *Countrywide*, the Eleventh Circuit's decision in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), or even the more famous decision from the Seventh Circuit in *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016). Significantly, both *Countrywide* and *Weimert* involved contracts between sophisticated business people. To establish federal Mail and Wire Fraud, the government must also show that the defendant actually intended to cause economic harm to the other contracting party. *See United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017) *citing United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994). But once again, in this case, the government has made

17

no such allegations. Critically, the Indictment makes no allegation that Petitioner failed to perform the work called for under the contract. Other than the breach of contract allegations, the Indictment makes absolutely no allegation of actual or intended economic harm to the Exchangors.

The Second Circuit's decision in *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016) not only eviscerates the government's theory of culpability in Petitioner's case, it also nullifies the legal reasoning behind the jury instructions for Mail and Wire Fraud. The bedrock of these elements is the "scheme to defraud" which requires proof that the defendant had the knowledge that he was breaking the law and the criminal *mens rea* or specific intent in contemplating harm to the victim by making a misrepresentation of a material fact. *See Neder v. United States*, 527 U.S. 1, 25 (1999). Yet, the scope and interpretation of the term "scheme to defraud" has, according to the Second Circuit, bewildered the courts for decades. "The exact contours of what kinds of conduct constitute a "scheme to defraud" have been the subject of some judicial discussion." *Countrywide* at 657. In *Countrywide*, everyone knew the mortgage brokers at Countrywide lied from the top executives on down, but no one was criminally indicted unlike in Petitioner's case. But, if a mortgage applicant lies about his wealth on a mortgage application for a cash mortgage that he defaults on after making only a few payments, then there is truly real "money or property" "obtained" from the bank by "trickery or deceit." Suffice it to say, if there was no criminal mail or wire fraud at Countrywide in 2008, there was no Mail and Wire Fraud at BPETCO in 1999.

The Second Circuit posited the central issue in *Countrywide* as what is fraud in a contract and illustrates the fundamental difference between a mere breach of contract as in Petitioner's case and a fraud: the intention of the breaching party to perform at the time of entering into the agreement, as opposed to a contracting party who never intended to perform at the outset (which is fraud). *Id.* at 656. The Second Circuit's observation that the issue is "novel" satisfies the

18

requirement that a motion for a Writ of Coram Nobis may be based on an intervening change in the law. The Second Circuit then embarked upon an analysis of the common law's treatment of fraud claims based upon breaches of contract, citing several famous First Circuit cases in its analysis of the history of Mail and Wire Fraud.

The Second Circuit then summarized its holding as follows: "a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution." Absent such proof, a subsequent breach of that promise - even where willful and intentional - cannot in itself transform the promise into a fraud:

> Accordingly, we deem the common law's contemporaneous fraudulent intent principle incorporated into the federal Mail and Wire Fraud statutes. Applying these principles to a fraud claim based on the breach of a contractual promise, we conclude that the proper time for identifying fraudulent intent is contemporaneous with the making of the promise, not when a victim relies on the promise or is injured by it. *Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation. Id.* at 662 (emphasis added).

Analyzing the history of the Mail and Wire Fraud statutes and citing *Durland v. United States*, 161 U.S. 306, 313 (1896), the Second Circuit buttressed its point: a "scheme to defraud" requires "intent and purpose." *Countrywide* at 662. Moreover, the scheme must be "designed to *induce* reliance on a known misrepresentation." *Id.* In other words, the proponent of the representation must know that they are lying or intentionally omitting necessary information. Accordingly, courts look to the individual's intent at the time the representation is made and not when the counterparty relied on or was injured by it. "Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation." *Id.*

The Second Circuit further emphasized that "regardless of how serious, intentional, or malicious the breach, *it is not fraudulent, absent that intention not to perform on the promise when it was made." Id.* at 661 (emphasis added). To hold to the contrary, the court explained, would

vitiate the common law's tolerance and encouragement of "efficient breaches." *Id.* In other words, common law gave parties to a contract two choices: either comply with the obligations of a contract or breach it and answer in damages. Therefore, the Second Circuit held that breaches of contract do not constitute a "scheme to defraud" under the Mail and Wire Fraud statutes, absent a fraudulent intent at the time the contract is made or later fraudulent misrepresentations. *Id.* at 661-62.

The Second Circuit, after reviewing the Supreme Court precedent contained in *Durland* and related cases, found that "[w]hat fraud in these instances turns on, however, is *when* the representations were made and the intent of the promisor *at that time*." *Countrywide* at 658. The Court also relied on and cited on more than one occasion the case of *McEvoy Travel*, for the proposition that "the common law requires proof-other than the fact of breach-that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation." *Countrywide* at 660.

Suffice it to say, if there was no mail or wire fraud in *Countrywide* which cost American taxpayers Billions of dollars, it is difficult to see how there is any fraud in Petitioner's case where, under the terms of all of the Exchange Agreements, BPETCO had the unfettered right to invest in anything it chose to invest in, including stock options. Contrary to the negativity in the First Circuit's Opinion, none of Petitioner's trades were "naked," and a simple search on Google will show the Court that Petitioner's stock option investing is far safer and even more "prudent" than just buying stocks. Even Judge Botsford stated that the investment had to be in some sort of equities to earn a 6% return. Other than Petitioner, no investment manager in America has been indicted for losing money in the stock market crash of 2000. Similarly, in the now famous case of *Weimert*, the Seventh Circuit reversed Weimert's conviction despite his outright lies to his employer, the bank, and his future partner – the buyer of the property – based on the fact that the Mail and Wire

Fraud statutes had been stretched "far beyond where they should go." *Id.* at 355. The Seventh Circuit further stated:

> In commercial negotiations, it is not unusual for parties to conceal from others their true goals, values, priorities, or reserve prices in a proposed transaction. When we look closely at the evidence, the only ways in which Weimert misled anyone concerned such negotiating positions. He led the successful buyer to believe the seller wanted him to have a piece of the deal. He led the seller to believe the buyer insisted he had a piece of the deal. All the actual terms of the deal, however, were fully disclosed and subject to negotiation. There is no evidence that Weimert misled anyone about any material facts or about promises of future actions. *Weimert* at 354.

The Seventh Circuit went on to state in *Weimert* that negotiating parties "do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior." *Id.* at 358. Thus, the Seventh Circuit held that "deception about negotiating positions – about reserve prices and other terms and their relative importance – should not be considered material for purposes of Mail and Wire Fraud statements." *Id.* The Mail and Wire Fraud statutes do not cover all behavior which strays from the ideal." *Id.* at 357. Once again, Petitioner did not lie to anyone here, while Mr. Weimert's lies to both parties cost them millions under the "mirror image" of fraud, and benefitted his own pockets at the expense of his employer and the purchaser of the property.

Finally, in another post-trial landmark decision vacating a famous wire fraud conviction (see, e.g., the television show <u>American Greed</u>), the Eleventh Circuit gives a detailed historical analysis of the Mail and Wire Fraud statutes and adopts the Second Circuit's interpretation of what constitutes a "scheme to defraud" as opposed to a "scheme to deceive," so as to satisfy that requirement under the Federal Mail and Wire Fraud statutes. *See United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). To explain the difference between a "scheme to defraud" which is illegal under the wire fraud statute, and a "scheme to deceive" which may be morally wrong but is

not conduct prohibited by the Mail and Wire Fraud statutes, the Eleventh Circuit uses what might be called the "Parable of the Deceitful Neighbor."

The Court considers two scenarios. In the first, a man calls his neighbor saying that his child is very ill, and the neighbor responds by rushing over to see if she can help. The man asks her to give him change for a dollar, which the helpful neighbor gladly gives him. She later learns that the neighbor's child was not sick at all. The second scenario is identical to the first, except that now the Deceitful Neighbor gives the woman a counterfeit dollar in exchange for the four quarters. The Eleventh Circuit explains that the first scenario is not wire fraud, but the second one is, despite the fact that the woman would not have rushed over in the first scenario had she known that the child was not really sick.

The First Circuit came to the same conclusion in both *Tavares* and *Berroa*. In *Tavares*, the mails were used to send out letters to the people who were not chosen for the jobs so that it was not in furtherance of any fraud. Similarly, in *Berroa*, the First Circuit concluded that all the doctors had lied on their applications, but that not all lies and deceptions can be prosecuted for mail and wire fraud in stating that "under the government's theory, any false statement in an application...could constitute a federal crime." To prosecute Mail and Wire Fraud cases arising out of contractual relationships, "much more" than a mere undisclosed breach is required. *See Triple-S* at 11. At a minimum, fraud "requires a showing of deception *at the time the promise is made.*" *Id.* (emphasis added). In this case, the government has made no such allegation. In fact, to the contrary, the language of the indictment suggests that the alleged breach and deceptions did not take place until at least the end of 2000, more than two years into the engagement of 126 contracts, of which 119 were successfully completed. How many "fraudulent" businesses have a

95% successful completion rate? Where is the fraudulent scheme here? Only Gail Cahaly came to

BPETCO in late 2000 and she had her own agreement drafted by her own attorney.

Moreover, at this late date, the government has not provided even one example of Petitioner

making an oral or written fraudulent misrepresentation, much less a fraudulent *material*

misrepresentation as required by *Neder*, or an outright fraudulent misrepresentation (as opposed

to nondisclosure) as required by *Skilling*. Since these crucial elements were missing from both the

indictments and Petitioner's two trials, Petitioner's conviction must be set aside and indictments

dismissed based on the First Circuit's decision in *Bravo-Fernandez* in 2019:

> Among the elements of §666, the government was required to establish that the entity Martínez represented as an agent, in this case the Commonwealth of Puerto Rico, received at least $10,000 in federal "benefits" within the meaning of that statute. The government did not meet this burden. Accordingly, we must reverse defendants' convictions for federal program bribery.

> Under the government's approach, the jurisdictional element in many federal criminal cases could be satisfied by similar reliance on jurors' extra-record knowledge. For example, one could claim that any juror would know that all banks are engaged in, or at least affect, interstate commerce, or that a bank is likely FDIC insured. Yet, the failure to offer any actual proof of these relatively obvious jurisdictional facts has repeatedly proved fatal to criminal prosecutions. *See United States v. Leslie*, 103 F.3d 1093, 1102-3 (2d Cir. 1997) (reversing conviction because government "did not provide even the slenderest of threads" upon which to hang the interstate commerce jurisdictional element); *United States v. Sliker*, 751 F.2d 477, 484 (2d Cir. 1984) (affirming conviction based on oral testimony of FDIC-insured status, but warning the government of failure to "ask the simple question that would avoid the need for judicial consideration of what should be a non-problem"); *see also United States v. Davis*, 726 F.3d 357, 366-7 (2d Cir. 2013) (holding that the government had failed to meet its burden by assuming that a federal installation on federal land automatically came within federal jurisdiction, but affirming after taking judicial notice of the fact at the government's behest)

> For the reasons explained above, we conclude that the government failed to establish an essential element of the crime it charged defendants with. We need not go further and hereby reverse Bravo's and Martínez's §666 convictions. We direct the district court to enter a judgment of acquittal on both charges. *Bravo-Fernandez* at 244, 250-51.

Additionally, this Court in December of 2005 did not have the benefit of several other recent cases from the First Circuit limiting the mail and wire fraud statutes, requiring that the mailings and wires be in furtherance of the fraud. As sovereigns, states have "the prerogative to regulate the permissible scope of interactions between state officials and their constituents," and the Supreme Court has warned against interpreting federal laws "in a manner that ... involves the Federal Government in setting standards of good government for local and state officials." *See, e.g., United States v. Tavares*, 844 F.3d 46, 54 (1st Cir. 2016) *(quoting McDonnell v. United States*, 136 S.Ct. 2355, 2373 (2016)). In *Tavares*, the First Circuit reversed the RICO and mail fraud convictions and ordered the entry of judgments of acquittal, holding that while "[t]he 'in furtherance' requirement is to be broadly read and applied," *id.* at 58, the requirement "places an important limitation on federal authority." *Id.* (citing *Kann v. United States*, 323 U.S. 88 (1944)):

> Even assuming that there was a "scheme to defraud," the government did not present substantial evidence of a mailing "in furtherance of" such a scheme. *Hebshie* at 35-36. The government points to form rejection letters that OCP staff mailed to unsuccessful applicants, typically after the final candidates were selected, to satisfy the mailing requirement. The defendants contend that all letters were nevertheless mailed after the scheme reached its fruition. Regardless of the exact timing of the mailings, there is no evidence that the letters were material to the consummation of the defendants' scheme. *See Kann* at 94: "It was immaterial to [the defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. ("Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this."). *Maze* at 405." *Tavares* at 59.

Because the federal mail and wire fraud statutes do not purport to reach all frauds, but only those "limited instances in which the use of the mails is a part of the execution of the fraud, leaving *all other* cases to be dealt with by appropriate state law." *Kann* at 95 (emphasis added). *See also United States v. Maze*, 414 U.S. 395 (1974). In this case, the Indictment not only failed to address all five critical elements of mail and wire fraud, it appears that every single count in the Indictment

relates to acts occurring after the alleged fraud had come to its full fruition. If the alleged fraud was a crime of omission in not telling the Exchangors that Petitioner was losing money or was trading in stock options, then none of the mailings and wires in this case satisfy the "in furtherance" requirement. None of them.

In *Maze*, the Supreme Court reversed the mail fraud conviction, concluding that the success of Maze's scheme did not depend in any way on the mailings at issue, focusing on "the more difficult question of whether the mailings were sufficiently closely related enough to bring his conduct within the statute." *Maze* at 399, 402. Here, the success of the alleged scheme clearly did not depend in any way on the use of mails or wires by Petitioner, as he not only never corresponded or met with any of the Exchangors at any time, but he also never signed or sent in any of the mailings or wires. All of the counts of the Superseding Indictment listed mailings and wires that have nothing to do with the alleged omissions. ("Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this..."). *Maze* at 405. Accordingly, the federal mail and wire fraud statutes were never properly invoked in this case, and this Court lacked jurisdiction to proceed any further.

None of the wires were "steps in the plot" to mask or hide anything, and by the time the money was sent; the alleged fraud had been completed. The government's problem with Petitioner is that he engaged in allegedly "risky" option trading that was supposedly not disclosed to the Exchangors. Petitioner could have lost the money just as easily in auction rate municipal bonds as LandAmerica did, but a mere deprivation does not suffice for a mail fraud charge. As the Seventh Circuit stated in *Weimert* that "losses that occur even as the byproduct of a deceitful scheme do not satisfy the statutory requirement" of Mail and Wire Fraud. *See Weimert citing United States v. Walters*, 997 F.2d 1219, 1227 (7th Cir. 1993). Ultimately, to support its Mail and Wire Fraud

charges, the government simply alleged an undisclosed investment risk and a breach of contract claim, which after *Skilling* is certainly not enough to allege a crime that supports jurisdiction of a federal court, much less a conviction.

## III.   VENUE WAS IMPROPER IN THE DISTRICT OF MASSACHUSETTS

Just as with Jurisdiction, Venue was clearly not proper in this case, and this constitutes Plain Error. A defendant in a criminal case has a constitutional right to be tried in a proper venue. *United States v. Johnson*, 323 U.S. 273, 275 (1944) (noting that two constitutional provisions, Article III, §2, cl. 3 and the Sixth Amendment both provide a right to trial in the state where the crime is committed); *United States v. Uribe*, 890 F.2d 554, 558 (1st Cir. 1989); *see also* Fed. R. Crim. P. 18. The government bears the burden of proof on the issue of venue. *United States v. Lanoue*, 137 F.3d 656, 661 (1st Cir. 1998). "[I]t is readily apparent that venue requirements promote both fairness and public confidence in the criminal justice system." *Johnson* at 276. Venue must be determined by the nature of the crime alleged, **by analyzing the actual conduct of the defendant constituting the offense and the location of the criminal acts.** *United States v. Scott*, 270 F.3d 30, 35 (1st Cir. 2001). More than a *de minimis* connection to the district is required. *United States v. Uribe*, 890 F.2d 554, 559 (1st Cir. 1989). *See United States v. Anderson*, 328 U.S. 699, 703 (1946) "[t]he locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it." These congressional and constitutional protections are meant to provide **"a safety net, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum** solely at the prosecutor's whim." *United States v. Salinas*, 373 F.3d 161, 164 (1st Cir. 2004). Moreover, after *Skilling*, the nondisclosure of option trading could not possibly be the alleged crime that established proper venue, because none of that happened in Massachusetts.

As this Court stated in its decision from Petitioner's first trial: "Petitioner has persistently maintained an objection to venue in this District." *United States v. Carpenter*, 405 F.Supp.2d 85, 88 (D.Mass. 2005). It is guaranteed by the Constitution that a criminal defendant has the right to be tried in an appropriate venue. The importance of this right to the Founders is emphasized by the fact that it is mentioned in the Declaration of Independence as a complaint and not once, but twice, in the text of the Constitution. *See* U.S. Const. art. III, §2, cl. 3 ("The Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed ...."); *id.* amend. VI (requiring trial of a criminal case "by an impartial jury of the State and district wherein the crime shall have been committed"). Congress has further entrenched these norms by an explicit directive that limits a criminal prosecution to "a district in which the offense was committed." Fed.R.Crim.P. 18. This rule "echoes the constitutional commands." *United States v. Cabrales,* 524 U.S. 1, 6 (1998). Under *Salinas,* the result is meant to be a safety net for the defendant, ensuring that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum as has happened to Petitioner not once, but twice. As Judge Lipez recently articulated in his dissent in *United States v. Seward,* 967 F.3d 57 (1st Cir. 2020), **it is solely the actions of the Defendant himself** that establishes proper venue for a criminal prosecution:

> "I agree with my colleagues on the legal framework for our venue analysis. As acknowledged by the majority, and reaffirmed repeatedly by the Supreme Court, *"the locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Anderson* at 703; *United States v. Rodriguez-Moreno,* 526 U.S. 275, 279 (1999); *Cabrales* at 6-7. We part ways, however, on the application of this principle to 18 U.S.C. §2250. In my view, based on a close examination of the text and structure of the statute, its placement in a comprehensive legislative scheme, and the Supreme Court's precedents, the interstate-travel element is not part of the nature of the crime. Rather, the nature of the crime defined by §2250 is the failure to register or update a registration, such that venue is proper only where that failure occurs. Accordingly, I would vacate Seward's conviction and hold that venue for prosecuting Seward was not proper in Massachusetts." *Id.* at 68.

In Petitioner's case, Venue in the District of Massachusetts was clearly improper as Petitioner never was a resident of Massachusetts, nor did he have anything to do with Massachusetts until the court proceedings in this case began, and the government alleged no overt acts by Petitioner with any connection to the State of Massachusetts in the Indictment. Because it is indisputable that he did not perform any "essential conduct element" of the crime charged and alleged in the Indictment in the district of Massachusetts, his conviction must be vacated. *See, e.g., United States v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014). As explained by the Third Circuit in *Auernheimer* (citing the First Circuit in *Salinas*), these constitutional provisions manifest a strong constitutional policy disfavoring trials removed from the situs of the Defendant's alleged criminal activity. As explained by the Third Circuit:

> The Supreme Court has repeatedly made clear that the constitutional limitations on venue are extraordinarily important. "[Q]uestions of venue are more than matters of mere procedure. They raise deep issues of public policy in the light of which legislation must be construed." *Travis v. United States,* 364 U.S. 631, 634 (1961). "The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores,* 356 U.S. 405, 407 (1958); *accord United States v. Passodelis,* 615 F.2d 975, 977 (3d Cir. 1980). The founders were so concerned with the location of a criminal trial that they placed the venue requirement, which is "principally a protection for the defendant," *Cabrales* at 9, in the Constitution in two places. *See* U.S. Const. art. III, § 2, cl. 3 and amend. VI. They did so for good reason. A defendant who has been convicted "in a distant, remote, or unfriendly forum solely at the prosecutor's whim," *Salinas* at 164, has had his substantial rights compromised. *See Auernheimer* at 540, *citing Salinas* at 162, 164.

Moreover, in a criminal case, "venue must be narrowly construed." *United States v. Jefferson*, 674 F.3d 332, 365 (4th Cir. 2012). Additionally, "Venue…is an element…which must be proved…by a preponderance of the evidence." *Auernheimer citing Salinas* at 163. All of the counts in the Indictment in this case lacked proper venue because **zero** evidence whatsoever was adduced at trial showing Petitioner inducing any of the Exchangors to work with Paley or BPETCO, or showing any conduct of Petitioner's that actually "caused" the mailings or wires, and

it is clear that all of these mailings and wires were non-fraudulent and not "in furtherance of any scheme" to defraud. *See Tavares* at 58. Furthermore, after *Skilling*, "Nondisclosure is outside the bounds of the fraud statutes." *Skilling at* 410. Therefore, there was **zero** evidence whatsoever of any mailings or wires in furtherance of any scheme to defraud that properly established Venue in the District of Massachusetts. *See Salinas* at 164.

Under the standard set in *Cabrales, Salinas,* and *Auernheimer,* Petitioner committed no "essential" act in Massachusetts, so it is clear that he committed no triable crime in a Massachusetts court. If "non-disclosure" of option trading was the alleged crime, that conduct or lack of conduct happened in Connecticut. If trading options or losing money was the "crime," then that happened in the Southern District of New York. As with a lack of subject matter jurisdiction, this is not "harmless error," and therefore improper venue requires dismissal of the indictment and setting aside of the Judgment in this case. *See, e.g., United States v. Strain,* 396 F.3d 689 (5th Cir. 2005) (remanding for entry of judgment of acquittal due to the government's failure to prove venue and stating that such failure "does not entitle the government to a second chance at prosecution."). Not only must the government prove venue by a preponderance of the evidence at trial, *see Salinas* at 163, but it must also allege sufficient facts in the Indictment to establish proper venue *ab initio.* This the government did not do. Therefore, because Petitioner did not raise this issue on appeal, he realizes that he must satisfy the Plain Error standard of *Rosales-Mireles,* which he clearly does because improper Venue can never be harmless error. *See Auernheimer* at 540.

The alleged facts in this matter are very similar to the facts presented in *Salinas,* in that any alleged conduct or omissions by Petitioner occurred outside of Massachusetts. In *Salinas,* the defendant was prosecuted for passport fraud in New Hampshire where the fraud was discovered by the Passport Office, rather than in New York, where the defendant applied for the passport. The

Court dismissed the indictment for lack of venue finding that all of the criminal conduct - the elements of the offense - occurred in New York. *Id.* at 165-70. Similarly, in this case, there was simply no justification for laying venue in Massachusetts as all of the alleged conduct by Petitioner occurred in Connecticut or New York. Rightly or wrongly, anything that he did or did not do, he did only in Connecticut or New York, and the Indictment does not contradict these facts. If the Court replaced Petitioner's name with "*Salinas*" and "Passport" with "Option Trading," then Petitioner is entitled to the same treatment as the defendant in *Salinas*.

The Second Circuit has also determined that when an indictment charges a defendant with multiple counts as in this case, "venue must be proper with respect to each count." *Beech-Nut* at 1188. *See, also, Travis v. United States*, 364 U.S. 631, 635 (1961) ("Where Congress is not explicit, the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it"). In declining the government's invitation to improperly expand the constitutional limits on venue, the Second Circuit, after parsing the "essential conduct element" analysis of *Cabrales* and *Rodriguez-Moreno*, held: "While a scheme to defraud is certainly one of three essential elements of mail fraud, it is not an *essential* conduct element." *Ramirez* at 144 (emphasis in original). Consequently, "we conclude that having devised or intending to devise a scheme or artifice to defraud, while an essential element, *is not an essential conduct element for purposes of establishing venue.*" *Id.* at 145 (emphasis in original). Otherwise, the Second Circuit warned, "a defendant who devised a scheme to defraud while driving across the country could be prosecuted in virtually any venue through which he passed." *Id.*

This Court should further consider granting this Motion as a Writ of Coram Nobis, because that Writ may be granted in consideration of the traditional Constitutional Venue requirements. Improper Venue can never be viewed as "harmless error." *See Auernheimer* at 540, *citing Travis*

and *Salinas*. The Sixth Amendment to the Constitution provides that: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." U.S. Cont. amend. VI. Furthermore, F.R.C.P. Rule 18 states that unless a statute or the rules of procedure themselves permit otherwise, the government must prosecute an offense in the district where the offense was committed. However, there are several major post-trial decisions that would support this Court issuing a Writ of Audita Querela. With this in mind, and based on the First Circuit's decision in *Tavares*, Petitioner had **nothing** to do with "causing" any of the mailings or wires, nor were they foreseeable to him as he had no idea who Paley was talking to at any given time. Furthermore, based on *Tavares*, none of the alleged mailings and wires were "in furtherance" of any scheme to defraud.

Moreover, "the Supreme Court has forged a connection between venue and conduct elements." *See, e.g., Rodriguez-Moreno* at 279. In general, this connection means that a **criminal defendant's own actions will determine where venue can be laid**. *See Salinas* at 169. Under the Government's idea of venue, Petitioner could have been tried in Alaska, Florida, or California if Paley had friends or relatives there that did a property exchange between August and December 2000, but that is not how venue is determined in the First Circuit or any other circuit. Expanding venue for Mail and Wire Fraud in the way that the government has done in this case would unhinge this connection and give the government unlimited control of determining where someone can be tried. The determination of venue must be tied to the substantive definition of the crime, otherwise it would offend the First Circuit's bedrock cornerstone that "[t]he venue requirement is designed to prevent a criminal defendant from having to defend himself in a place that has no meaningful connection to the offense with which he is charged." *United States v. Santiago*, 83 F.3d 20, 24 (1st

31

Cir. 1996). For that reason alone, Petitioner's conviction should be set aside and a Writ of Coram Nobis entered as to all counts.

Several famous cases from the Second Circuit are instructive on this point. For instance, "Venue is proper only where the acts constituting the offense–the crime's essential conduct elements–took place." *See, e.g., United States v. Tzolov*, 642 F.3d 214, 218 (2d Cir. 2011) (dismissing fraud claim brought in the EDNY instead of the SDNY, literally one subway stop away in New York). *See, also, United States v. Brennan*, 183 F.3d 139, 147 (2d Cir. 1999) (holding that "prosecution under the mail fraud statute is permissible only in those districts in which a proscribed act occurs"). The Second Circuit, where Petitioner should have been tried if he was tried at all, has enumerated four factors used to determine whether venue is constitutionally permissible: (1) the site of the defendant's own acts; (2) the elements and nature of the crime; (3) the locus of the effect of the criminal conduct; and (4) the suitability of the district for accurate fact finding. *United States v. Reed*, 773 F.2d 447, 481 (2d Cir. 1985); *see also Beech-Nut* at 1188.

Similarly, in *United States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005), Dr. Angela Vitug and her co-defendant, Attorney Silverio Ramirez, were charged with "a variety of offenses stemming from their efforts to obtain fraudulent visas for Ramirez's clients." *Id.* at 136. The indictment, filed in the Southern District of New York (which encompasses Manhattan), alleged Vitug and Ramirez falsely represented to the Immigration and Naturalization Service (INS) and the Department of Labor (DOL) that Vitug's medical practice would employ Ramirez's clients in order for those clients to obtain visas to enter and/or remain in the United States. To consummate this scheme, Vitug and Ramirez completed and mailed various forms to the INS and DOL on behalf of Ramirez's clients. Vitug's medical practice was located in New Jersey and Ramirez's office was located in Manhattan. Vitug signed some INS forms in New Jersey that were mailed to an INS

branch in Vermont. Attached to these INS forms were DOL forms Vitug previously signed in New Jersey and mailed to the DOL office in Manhattan. *Id.* at 137. Other forms were filed with the DOL in New Jersey, which were later forwarded to the DOL office in Manhattan. *Id.* at 138. The Second Circuit also rejected the government's invitation "to extend the reasoning of *Rodriguez-Moreno*" based on the critical difference between the mail fraud statute and the charged offense of kidnapping in *Rodriguez-Moreno*. *Id.* at 146. As a result, the Second Circuit reversed Vitug's conviction on this mail fraud count for improper venue because the mailing at issue was sent from New Jersey to Vermont, and the preliminary mailing to the DOL in Manhattan "was a separate event that occurred prior to the charged offense and in preparation for it." *Id.*

This analysis by the Second Circuit in *Ramirez* is crucial to Petitioner's Petition for a Writ of Audita Querela regarding Venue, because this Court did exactly the opposite of what the Second Circuit did in *Ramirez* by ignoring *Cabrales,* which was directly on point, and instead acknowledging the holding in *Rodriguez-Moreno* where a kidnapper took his victim through several states. Respectfully, Petitioner did not kidnap or kill anyone, and the defendant in *Cabrales* could not possibly be more on point because she lived in Missouri, but committed her money-laundering crime in Florida. Once again, it is not disputed that Petitioner did not cause any mailings or wires in furtherance of any fraud, and anything that Petitioner did that might have been illegal was personally done in Connecticut or in the Southern District of New York. Therefore, this Court should grant the relief requested based on *Skilling, Tavares, Auernheimer,* and *Salinas.*

Furthermore, in *United States v. Bezmalinovic*, 962 F. Supp. 435 (S.D.N.Y. 1997), the district court dismissed a bank fraud charge for improper venue. The indictment charged a scheme to defraud Manufacturers Hanover Trust ("MHT") by obtaining a mortgage using a false application. Bezmalinovic allegedly prepared a false application in the Eastern District of New

33

York ("EDNY"), more commonly known as Brooklyn, submitted the application to MHT in the EDNY, received proceeds via checks drawn on an account in the EDNY, and then deposited those checks into his account in the EDNY. Very similar to Petitioner's case, the government argued that venue was proper in the SDNY because, after the checks were deposited into a Chemical Bank account in the EDNY, they were then sent to a processing center in Manhattan where each check was credited to Bezmalinovic's account and each check was then forwarded to a clearing house in Manhattan. Finally, the checks were sent to MHT's processing center in Manhattan, where they were debited from MHT's closing account. In Petitioner's case, there was no mailing or wire that Petitioner caused to be made or received in the District of Massachusetts, and there was absolutely no mailing or wire "in furtherance" of any scheme to defraud.

However, the Second Circuit in *Bezmalinovic* did not agree with the government's determination of venue and held that the ministerial processing of the checks in Manhattan did not provide a sufficient constitutional basis for Venue in the SDNY. The Second Circuit further noted that the "only acts alleged to have occurred in the [SDNY] are the ministerial actions taken by MHT and Chemical Bank in the process of crediting defendant's account." *Id.* at 437. In addition, the Second Circuit stated that the indictment did "not allege[] that those acts were intended or foreseen by defendant." *Id.* It therefore concluded that the ministerial acts of debiting and crediting accounts as alleged in the indictment did not constitute "substantial contacts" within the SDNY sufficient for venue to be constitutionally permissible. *Id.* at 441.

Moreover, in *United States v. Novak*, 443 F.3d 150 (2d Cir. 2006), another case of just one subway stop away, the defendant challenged venue and jurisdiction in the EDNY when the evidence showed (and the government agreed) that the alleged offenses actually took place in the SDNY. If Brooklyn was a "distant, remote, and unfriendly forum" from New York City, imagine

how Petitioner must feel as a Connecticut Yankee trapped in a Boston court. *Salinas* at 164. Just

as the Founders felt that London was a distant, remote, and unfriendly forum, so, too, did Petitioner

feel about Boston. But, based on the allegations in the Indictment, Petitioner's **only conduct**

happened in Connecticut or New York and therefore Venue in Massachusetts was improper, and

the errors in this case constitute "errors of the fundamental character" and either a Writ of Coram

Nobis or Audita Querela should be issued by this Court to correct the Plain Error in this case.

## IV. THE INDICTMENT WAS UNTIMELY AND DID NOT PROVIDE CONSTITUTIONAL FAIR WARNING

The Supreme Court's decisions in *Kokesh v. S.E.C.*, 137 S.Ct. 1635 (2017) and *Gabelli v.*

*S.E.C.*, 568 U.S. 442 (2014) are dispositive of this case because any fraudulent BPETCO contracts

were drafted by Martin Paley in 1997 or 1998 at the latest. In *Kokesh*, Justice Sotomayor wrote for

a unanimous Supreme Court, where it was determined that §2462 established a 5-year limitations

period for "an action, suit or proceeding for the enforcement of any civil fine, penalty, or

forfeiture." *See Kokesh* at 1638, *quoting Gabelli* at 454. In fact, Chief Justice Roberts further

explained the absolute nature of the Statute of Limitations in criminal cases for any type of criminal

penalties as follows: "[T]he Statute of Limitations, the five year clock for 28 U.S.C. §2462, begins

to tick when a defendant's allegedly fraudulent conduct occurs." *Gabelli* at 448.

Since Petitioner's allegedly fraudulent conduct could only be in 1998 when Petitioner met

Mr. Paley who drafted the Exchangor Agreements, the September 2004 Indictment was barred by

the Statute of Limitations. See 18 U.S.C. §3582. The Supreme Court's decisions in *Gabelli* and

*Kokesh* explained the absolute nature of the Statute of Limitations in criminal cases for any type

of criminal penalties and are dispositive of this case. Chief Justice Roberts went on to say in

*Gabelli*: "Statutes of limitations se[t] a fixed date when exposure to the specified Government

enforcement efforts en[d]." Such limits are "vital to the welfare of society" and rest on the principle that "even wrongdoers are entitled to assume that their sins may be forgotten." *Gabelli* at 448-49, *citing Wilson v. Garcia*, 471 U.S. 261, 271 (1985).

Clearly, if Petitioner had "Fair Warning" that he faced three years in prison and forfeitures of $14 million just from losing money in the stock market, there is no question that he would never have involved himself with Marty Paley or Merrill Lynch in the BPETCO debacle. Moreover, the Government has never answered the simple question as to what could have Petitioner invested in, lost all of the investor funds like in the LandAmerica case, or the OptionsSellers.com case, and yet not have been indicted? Therefore, Petitioner is in this predicament not because of his own conduct or omissions, but rather because the indictments of 2004 failed to state a crime under federal law or give Petitioner the "Fair Warning" as required by the Supreme Court in *Marinello* and several other cases since Petitioner's second trial in 2008.

The Supreme Court made clear the concept of "Fair Warning" is a fundamental protection for all defendants accused of a crime. The Supreme Court's decision in *Marinello v. United States*, 138 S.Ct. 1101 (2018) provides that a defendant must know that what he is doing is crossing a line into "illegal conduct," as well as the **punishment he will receive** if that bright line is passed:

> "We wrote that we have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress and out of concern that a fair warning should be given to the world in language that the common world will understand, *of what the law intends to do if a certain line is passed. McBoyle v. United States*, 283 U.S. 25, 27 (1931)." *Marinello* at 1106 (emphasis added).

The use of Justice Oliver Wendell Holmes' description of knowing what Society will do to you when the "bright line" of the law is crossed is particularly appropriate for this case where 20 years later, Petitioner is still making the case that what he did was not criminal at all. For example, the defendant in *McBoyle* literally stole an airplane but was charged under the

Automobile Act as if he had stolen a car. In this case, Petitioner was accused of Mail and Wire Fraud for losing $8 million of client funds during the NASDAQ Stock Market Crash of 2000, but at this late date there is not a single exhibit showing that Petitioner lied to anyone about anything at any time or had the evil intent to steal anyone's money, harm anyone, or that he *caused* any mailing or wire *in furtherance* of any fraud. So, whereas the defendant in *McBoyle* really did steal a plane and the defendant in *Marinello* really did commit tax evasion, Petitioner did not do any act that he was accused of, nor could he reasonably believe that any of his conduct was criminal or would put him in prison for three years. All of these "Fair Warning" cases happened after Petitioner's second trial 2008, and none of these "Fair Warning" issues were raised by Petitioner's attorneys on appeal.

Similarly, the defendants in *Rosa-Ortiz* and *Peter* (not to mention the defendant in *United States v. Guzman-Merced,* 2020 WL 7585176 (1st Cir. 2020) (from December 2020) actually did the act they pleaded guilty to, but it turned out not to be a federal crime and their convictions were vacated. Now, with *Marinello*, it is "Constitutionally" clear that not only do you need to know you are breaking the law, you must also know that you will be punished for your conduct, and you must also know the penalty for breaking the law as well. Perhaps the best analogy the Supreme Court uses in *Marinello* is that every American couple pays their babysitter in cash. Neither the parents nor the babysitter report that to the IRS as taxable income. Clearly, that could be considered a violation of the tax laws, but no one would seriously believe the babysitter would be sentenced to 36 months for accepting cash "under the table" for doing her job. Similarly, no one could expect that Petitioner could possibly expect that he would be sentenced to 36 months for losing money in the stock market, especially when one considers that had PaineWebber not stripped the accounts, Petitioner could have been up $15 million in January of 2001 rather than being down $9 million

37

in December of 2000 after the contested election of November 2000. Once again, Petitioner is a much better example that *Peter, Rosa-Ortiz, Marinello,* and *Guzman-Merced* combined.

As the Supreme Court teaches us in *Morissette v. United States,* 342 U.S. 246 (1952), for there to be a crime, an evil act must be concurrent with an evil mind. "Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand," quoting Justice Holmes' famous observation that "[e]ven a dog distinguishes between being stumbled over and being kicked." *Id.* at 251-52. In *Elonis v. United States,* 135 S.Ct. 2001 (2015), Chief Justice Roberts confirmed that the cornerstone of American Jurisprudence is that a person should not be deemed criminally responsible for mere negligence. Chief Justice Roberts further stated that the government must allege and prove that the person had the necessary criminal intent or criminal *mens rea* before conduct could be considered criminal, and that this principle of criminal justice in America is "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. *Morissette* at 250." Similarly, as was stated by Justice Gorsuch in *United States v. Manatau,* 647 F.3d 1048 (10th Cir. 2011):

> "[t]he contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil....*Morissette* at 250. The simple fact is intent and knowledge are different things, different as a matter of their plain meaning, different in their treatment in modern American criminal law. And the sentencing commission chose here to invoke the former term, not the latter....The guidelines' definition of "intended loss" makes no mention of knowledge or some lesser *mens rea* standard." *Manatau* at 1051.

Also, in *United States v. United States Gypsum,* 438 U.S. 422 (1978), the clear-cut requirement of *mens rea* for a crime is firmly embedded in the American System of Justice. As the Supreme Court has observed, "[t]he existence of a *mens rea* is the rule of, rather than the exception

to, the principles of American criminal jurisprudence." *Id.* at 436. "Thus, to meet the statute's *mens rea* requirement, a defendant must consciously behave in a way the statute prohibits." *Id.* at 445. Therefore, something more is required than the doing of the act proscribed by the statute. *United States v. Balint*, 258 U.S. 250 (1922). In *Liparota v. United States*, 471 U.S. 419 (1985), the Supreme Court "rejected that interpretation of the statute, because it would have criminalized a broad range of apparently innocent conduct and swept in individuals who had no knowledge of the facts that made their conduct blameworthy." *Elonis* at 2010, *citing Liparota* at 426.

Petitioner never received the "fair warning" that the Supreme Court said was "essential" in *Marinello,* and that before someone can be prosecuted they must know they are breaking the law and crossing that "bright line" as stated in *Arthur Andersen v. United States,* 544 U.S. 696 (2005):

> "Fair warning should be...in language the common world will understand, of what the law intends to do if a certain line is passed. *McBoyle* at 27."

Clearly the Court realizes that there was no intended crime here, and no criminal *mens rea* and absolutely no criminal scienter. This Court knows better than anyone that Petitioner never intended to defraud the Exchangors and that the Exchangors have been paid back almost $50 million in Petitioner's legal victories over PaineWebber and Merrill Lynch on their $8 million losses in the stock market crash of 2000. Even the Court noted that: "He always intended to pay the money back." Furthermore, Petitioner did not *cause* any of the mailings or wires in this case, and none of the mailings or wires were done in the furtherance of any fraud as required by *Tavares*, because there was no scheme to defraud based on *Skilling*. Petitioner's conviction should therefore be set aside because there were no facts alleged in the indictment or proven at trial that showed the "concurrence of an evil-meaning mind at the same time an evil act is committed" to be considered

a crime as determined by the Supreme Court in *Morissette* and as reiterated most recently in *Elonis* and *Marinello*.

## V. THE DUE PROCESS VIOLATIONS IN THIS CASE ARE EXTRAORDINARY

*All* of the errors in this case are constitutional and structural errors and clearly amount to one large Due Process Clause violation, requiring the vacating of Petitioner's conviction. Despite pointing out Levine's obvious and persistent perjury, and the Government's failure to correct any of those lies *in front of the jury* as is their duty, the error here was considered "harmless" because Petitioner's attorney did such a "great job" on the cross-examination that the jury must have known Levine lied:

> Carpenter consequently was able to and did cross-examine the lying witness "vigorously." The district court therefore determined that a mistrial was not warranted on this basis. On appeal, Carpenter has not identified any reasonable likelihood that the jury's verdict in this case was impacted by the false testimony in light of his vigorous cross-examination. That ends this attack. *United States v. Carpenter*, 736 F.3d 619, 631 (1st Cir. 2013).

However, that is not the correct legal standard for an error under *Brady-Giglio-Napue* in this Circuit or anywhere else, and a "vigorous" cross-examination is not a substitute for truthful testimony and certainly is not the remedy required by the Supreme Court in *Napue* and *Giglio*. Nor does a "vigorous" cross-examination alleviate the Government's burden, obligation, and legal duty to bring to the jury's attention that their witness, Levine, lied. Respectfully, this Court should grant Petitioner a Writ of Audita Querela or a Writ of Coram Nobis, or in the alternative, vacate Petitioner's conviction because "Levine's testimony [as well as eight other brokers and managers from Merrill Lynch] was perjurious in this Court's judgment, *and the Government knew it*." *See United States v. Carpenter*, 808 F.Supp.2d 366, 389 n.5 (D.Mass. 2011), Doc. 377 (emphasis in original). It has long been established by the First Circuit that they will not allow the use of perjured

testimony or knowingly-false evidence to be used by the government to convict someone. *See, e.g., Drumgold v. Callahan*, 707 F.3d 28 (1st Cir. 2013):

> ("[D]ue process ... cannot be deemed to be satisfied ... if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured."); *Pyle* at 215-16 ("Petitioner's papers are inexpertly drawn, but they do set forth allegations that his imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him."); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (recognizing "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction"); *Limone* at 45 ("[T]hose charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit."); *Haley* at 49 ("Deliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant's due process rights."). Compare *Brady* at 87 (specifying that the due process right recognized in that case applies "irrespective of the good faith or bad faith of the prosecution"). *Drumgold* at 61.

It is also the established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution. *See, e.g., Mooney v. Holohan*, 55 S.Ct. 340 (1935). As the Supreme Court stated in its unanimous decision in *Giglio*: "It has long been established that the prosecutor's deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972). *See, also, Banks v. Dretke*, 540 U.S. 668 (2004): "A conviction based on testimony known by the prosecutor to be perjurious is a denial of due process." The First Circuit has also made it clear that the knowing use of perjured testimony is also considered to be a serious *Brady* violation, and requires the order of a new trial. See *United States v. Gonzalez-Gonzalez*, 258 F.3d 16, 21 (1st Cir. 2001), *citing Strickler v. Green*, 527 U.S. 263, 280-81 (1999).

In *Drumgold*, the First Circuit described *Mooney*'s core premise as "well-settled" in the First Circuit citing to *Coggins v. O'Brien*, 188 F.2d 130, 138 (1st Cir. 1951) and the Supreme

Court's unanimous decision in *Napue v. Illinois*, 360 U.S. 264, 269 (1959) that was also cited by

the Supreme Court's unanimous decision in *Giglio*. The First Circuit goes on in citing *Limone v.*

*Condon*, 372 F.3d 39 (1st Cir. 2004), *citing Miller v. Pate*, 386 U.S. 1 (1967): "In 1967, the very

year the crimes took place, Justice Stewart, writing for a unanimous court stated More than 30

years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal

conviction obtained by the knowing use of false evidence. There has been no deviation from that

established principle." *Miller* at 7. *See, also, Ouimette v. Moran*, 942 F.2d 1 (1st Cir. 1991), where

the First Circuit vacated defendant's conviction because the government withheld evidence of

defendant's partner's criminal background).

Judge Roach, in her 2016 Opinion, also refers to Merrill's general counsel Bevilacqua, as

well as other Merrill executives' testimony that it was clear to them that a number of people at

Merrill had been lying for many years, participating in the Snyder and Bingham lies and cover-up

of lies, as well as the destruction and spoliation of evidence. As the Supreme Court has described,

the government's conduct in this case clearly warranted a new trial as the case was "infested with

constitutional errors." *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995). *See, also, Wearry v. Cain*,

136 S.Ct. 1002 (2016), where only **one** *Brady* violation took a convict off of death row and required

a new trial:

> "[T]he suppression by the prosecution of evidence favorable to an accused violates due
> process where the evidence is material either to guilt or to punishment, irrespective of the
> good faith or bad faith of the prosecution." *Brady* at 87. *See also Giglio* (clarifying that the
> rule stated in *Brady* applies to evidence **undermining witness credibility**). "Evidence
> qualifies as material when there is **"any reasonable likelihood"** it could have affected the
> verdict. *Giglio v. United States*, 405 U.S. 150 (1972) (*quoting Napue v. Illinois*, 360 U.S.
> 264, 271 (1959)). To prevail on his *Brady* claim, Wearry need not show that he "more
> likely than not" would have been acquitted had the new evidence been admitted. *Smith v.*
> *Cain*, 132 S.Ct. 627, 629-31 (2012). He must show only that the new evidence is sufficient
> to **"undermine confidence"** in the verdict. *Ibid.*" *Wearry* at 1006 (emphasis added).

Now Petitioner seeks the delayed justice of having his conviction set aside through a Writ of Coram Nobis or a Writ of Audita Querela, and having his indictment dismissed, and his good name restored based on the Government's egregious violations of his constitutional rights in the knowing use of evidence they knew to be false and outright perjury that they heard twice in two trials in 2005 and 2008. Sad, but true, if Petitioner had Judge Roach's Opinion in February of 2014 at sentencing instead of May 2016 (See Doc. 545), Petitioner's life would have been totally different. Clearly Judge Roach's Opinion shows that Attorney Snyder coached the Merrill witnesses to lie, and because of their repeated lies in the civil forum, they had to continue repeating those lies in Petitioner's criminal trials in 2005 and 2008, and the Government worked in concert with Attorney Snyder to suborn knowing perjury in both of his trials as well as the civil litigation with the Exchangors after 2008.

Attorney Snyder also knew about the February 2008 *Iantosca* lawsuit, the SEC investigations, the NASD investigations, the Malia file, and the David Patterson information that came out when Dickstein Shapiro took over in 2009. Snyder as counsel for Merrill Lynch, and separate counsel for the Exchangors, sat directly behind the prosecution at both of Petitioner's trials, and unbelievably did not mention any of this information to the prosecution, including the newly-discovered *Iantosca* lawsuit against Merrill Lynch of February 2008 which Petitioner did not even hear about until April of 2009. Perhaps the prosecution did not think that they had a duty under *Brady* and *Jencks* to share this exculpatory information with Petitioner. Clearly the Supreme Court disagrees with that decision, based on its recent decision in *Turner v. United States*, 137 S.Ct. 1885 (2017):

> The Government does not contest petitioners' claim that the withheld evidence was "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler* at 281-82. Neither does the Government contest petitioners' claim that it

"suppressed" the evidence, "either willfully or inadvertently." *Id.* at 282. It does, as it must, concede that the *Brady* rules "overriding concern [is] with the justice of the finding of guilt," *United States* v. *Bagley*, 473 U.S. 667, 678 (1985) (quoting *United States* v. *Agurs*, 427 U.S. 97, 112 (1976)), and that the Government's "interest…in a criminal prosecution is not that it shall win a case, but that justice shall be done," *Kyles* v. *Whitley*, 514 U.S. 419, 439 (1995) (quoting *Berger* v. *United States*, 295 U.S. 78, 88 (1935)). Consistent with these principles, the Government assured the Court at oral argument that subsequent to petitioners' trial, it has adopted a **"generous policy of discovery"** in criminal cases under which it discloses any "information that a defendant might wish to use." As we have recognized, and as the Government agrees, *id.*, "[t]his is as it should be." *Kyles* at 439 (explaining that a "prudent prosecutor['s]" better course is to take care to disclose any evidence favorable to the defendant (quoting *Agurs* at 108)). *Turner* at 1893, *citing Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (emphasis added).

Assuming, *arguendo*, that even if Attorney Snyder purposefully hid all of the Merrill lies from the Government, his knowledge is still imputed to the Government because Snyder was there for each and every 302 Report used against Petitioner in his Grand Jury hearing and sat behind the Government every day of his 2008 trial. Moreover, the knowledge of the SEC and NASD investigations of Merrill concerning BPETCO are clearly *Brady* materials attributable to the Government that should have been turned over to the defense, but were not. This failure alone of the Government to turn over vital material information warranted a new trial in 2013 and now warrants the vacating of Petitioner's conviction by issuing a Writ of Audita Querela.

The simple fact that Judge Roach's 2016 opinion mentions several SEC investigations that Petitioner must have passed and the Government did not turn over that *Brady-Giglio-Jencks* evidence, demands that a Writ of Audita Querela should issue pursuant to the Supreme Court's decision in *Turner* at 1893, *citing Cone* at 469-70. See, once again, the quote from *Turner* above. Just as important to Petitioner is the fact that the Court knows there was only one witness at Petitioner's Grand Jury, and that was an FBI Agent who just repeated all of the lies that were told to him by the brokers at Merrill Lynch. This, too, is a separate reason to issue a Writ of Coram Nobis or a Writ of Audita Querela to set aside Petitioner's conviction.

There is no other case in any circuit in this country that can match the Due Process delays in this case. Petitioner asks this Court to focus on the extraordinary Due Process delays in this case pursuant to the *Barker* factors as suggested by Justice Sotomayor in her concurrence in *Betterman v. Montana*, 136 S.Ct. 1609 (2016). Viewing Petitioner's now 20 year-long "Kafkaesque" odyssey with the vision provided by *Betterman*, his preindictment delay of four years was longer than the delay in *Marion*, the inexplicable delay from June 2008 to September 2011 was longer than the delay in *Moore*, and now his total Due Process delay is more than double the seven year delays of *United States v. Loud Hawk*, 474 U.S. 302 (1986) and *Doggett*. Now that the Supreme Court has clearly laid out the rules of Due Process in *Betterman*, this Court cannot again ignore the clear violation of Petitioner's Constitutional rights.

Petitioner respectfully asserts that there was no fraud in this case as a matter of law, nor did he have the "Fair Warning" in his indictment that is the cornerstone of American jurisprudence. But even assuming, *arguendo*, that Petitioner did something wrong or illegal, he certainly did not receive a fair trial in either of his two trials in 2005 and 2008. Because of the pre-indictment delay between January of 2001 and September of 2004, and the post-trial Due Process delay between sentencing of almost six years and the total Due Process delay of 15 years, it is Petitioner who should have the landmark case for both violations of the Due Process Clause under *United States v. Lovasco*, 431 U.S. 782 (1977) and *United States v. Marion*, 404 U.S. 307 (1971). In fact, it is significant that the delay of 39 months from Petitioner's trial in 2008 through September 2011 - when this Court granted Petitioner's second new trial order - was longer than the delay for convicted murderer Rocky Moore. *See, e.g., Moore v. Arizona*, 414 U.S. 25 (1973):

> Moreover, prejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings. Inordinate delay, "wholly aside from possible prejudice to a defense on the merits, may `seriously interfere with the

defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.' These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty." *Moore* at 27, *citing Marion* at 320-21.

The delay in this case also exceeds that of *United States v. Handa*, 892 F.3d 95 (1st Cir. 2018) and *United States v. Irizarry-Colon*, 848 F.3d 61 (1st Cir. 2017) combined, so that Petitioner's conviction and indictment should be vacated. Ironically, those two seminal cases in the First Circuit both cite Petitioner's case. *See Handa* at 101, *citing United States v. Carpenter*, 781 F.3d 599, 610 (1st Cir. 2015) ("[d]elay of around one year is considered presumptively prejudicial, and the presumption that delay prejudices the defendant intensifies over time."), and *Irizarry-Colon* at 68 (same). The Speedy Trial violations in this case are also not a close call as there was no reason for the delay from June 2008 to May 2015, nor was there any balancing tests done in the interests of justice. *See United States v. Zedner*, 547 U.S. 489, 507 (2006).

Moreover, the *Barker* factors that Justice Sotomayor stated in *Betterman*, and the seven year delay between Petitioner's second trial in June 2008 and the First Circuit's decision in May 2015 (ignoring fundamental legal principles of not only the First Circuit but the Supreme Court as well), mandates that Petitioner's indictment and conviction be vacated. There were no reasons placed on the docket as required by §3161(h)(7) and the Supreme Court's decision in *Bloate v. United States*, 559 U.S. 196 (2010). Thus, the extraordinary delay in Petitioner's case is far longer than any delay in *United States v. Dezeler*, 81 F.3d 86 (8th Cir. 1996) (delay of only one day); *United States v. Huete-Sandoval*, 668 F.3d 1 (1st Cir. 2011) (delay of only 16 days), and *Bloate* and *United States v. Tinklenberg*, 131 S.Ct. 2007 (2011) (delays of only 9 days). As the Supreme Court has explained, "The relevant provisions of the Act are unequivocal," and "[t]he sanction for

a violation of the Act is dismissal." *Zedner* at 507, 509. If "the trial does not begin on time, the indictment or information must be dismissed." *Id.* at 508. At this point, all of the Exchangors have been paid back many times their original losses, almost $50 million on an $8 million loss in the great NASDAQ stock market crash of 20 years ago.

Petitioner hereby requests that this Honorable Court do the same calculation that was done for *Irizarry-Colon* and arrive at the same conclusion and grant a Writ of Audita Querela or a Writ of Coram Nobis, thereby setting aside Petitioner's conviction and dismissing his indictment with prejudice for violations of the Speedy Trial clause. Unlike the defendant in *Handa*, Petitioner has lived in the same house in Connecticut and has been under Government investigation or supervision for the past 20 years since he lost the Exchangors' money in the NASDAQ Stock Market Crash of 2000. Petitioner would also like to emphasize the Third Circuit opinion in *United States v. Velazquez*, 749 F.3d 161 (3d Cir. 2014) written by Judge Lipez of First Circuit fame, where he reviews the six year delay in bringing Mr. Velazquez, a notorious drug dealer and dangerous criminal, to trial. Mr. Velazquez was either evading justice (the government's view) or was just a transient individual (Third Circuit's view) when he was arrested in California and shipped back to Philadelphia on an old arrest warrant. Meanwhile, Petitioner was dutifully checking in with pre-trial services for the 14 years leading up to his sentencing, including the three-year delay from 2008 until his new trial order was overturned in 2013.

Mr. Velazquez pled guilty while preserving his Speedy Trial claim and was sentenced to 87 months. In vacating his conviction and sentence for violations of the Speedy Trial Clause, Judge Lipez discussed the second of the *Barker* factors: who is responsible for the delay, which is the "flag that all litigants seek to capture," *Loud Hawk* at 315. Judge Lipez refers to *Doggett*, which

describes the range of the government effort to pursue an accused as extending from "reasonable diligence" to "bad-faith" delay. *Doggett* at 656. In the next paragraph, Judge Lipez writes:

> "Negligence over a sufficiently long period can establish a general presumption that the defendant's ability to present a defense is impaired, meaning that a defendant can prevail on his claim despite not having shown specific prejudice. *See Doggett* at 658 (finding a Speedy Trial violation based on general prejudice where government's negligence led to six-year delay). This general presumption applies because "impairment of one's defense is the most difficult form of Speedy Trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown." *Id.* at 655 (*quoting Barker* at 532). "Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett* at 655.

In other words, **Judge Lipez describes exactly what happened in this case**; the theory of "presumptive prejudice" because of the extended delay of over three years. "[T]o trigger a Speedy Trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Doggett* at 651-52. Delays exceeding one year are generally found to be "presumptively prejudicial." *Doggett* at 652 n.1. If, after the threshold inquiry is satisfied and the second and third factor are considered, all three of these factors weigh heavily against the government, the defendant need not show actual prejudice (the fourth factor) to succeed in showing a violation of his right to a Speedy Trial. *Doggett* at 647.

Petitioner's conviction, unlike anyone else, was dismissed three years after his trial. But, the Government decided to violate the double jeopardy clause of 18 U.S.C. §3731 that prevents the government from doing an appeal, and that took another two years. Petitioner's family has also suffered through this ordeal not only by numerous lost business opportunities and banks severing ties with them, but simply through the personal pain of watching their loved one suffer while incarcerated and through relentless litigation by the government. *United States v. Ferreira*, 665 F.2d 701 (6th Cir. 2011), *Dixon v. White*, 210 Fed. Appx. 498 (6th Cir. 2007), *United States v.*

*Erenas-Luna*, 560 F.3d 772 (8th Cir. 2009), *United States v. Ingram*, 446 F.3d 1332 (11th Cir. 2006), and the policy behind Speedy Trial rights support a conclusion that both the negligence that the government committed and the significant length of the delay warrant dismissal of the indictment with prejudice. Finally, in the period of investigation and indictment from January 2001 to sentencing in 2014, Carpenter was always in Connecticut and unlike the defendant in *Handa* who was traveling in India and England, Petitioner was always checking in throughout the entire time. For that reason alone, this Court should grant the Writ of Audita Querela.

## CONCLUSION

For the reasons above, Petitioner respectfully requests that this Court should grant the Petitioner a Writ of Audita Querela or a Writ of Coram Nobis; or, in the alternative, to set aside his conviction and/or dismiss the indictment pursuant to Rule 12(b)(3)(B), and any other relief this Court deems proper.

Respectfully submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092