# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DANIEL E. CARPENTER**<br>**Petitioner,**<br>**v.**<br><br>**UNITED STATES OF AMERICA**<br>**Respondent.** | )<br>)<br>)<br><br>)<br>)<br>) |

**CRIMINAL NO. 04-10029-GAO**

### TO THE HON. JUDGE GEORGE A. O'TOOLE, MAY IT PLEASE THE COURT:

NOW COMES THE PETITIONER, Daniel E. Carpenter, pursuant to Rule 60(b)(6) to Vacate his

Judgment and Conviction of 2014 as a matter of law pursuant to the Supreme Court's recent decision

in *Smith v. United States*, 143 S. Ct. 1594 (2023) because Petitioner's trial was held in an improper

venue and before a jury drawn from the wrong district, and to also dismiss the defective Indictment

of September 2004 pursuant to the First Circuit's recent decision in *United States v. Abdelaziz*, 68

F.4th 1 (1st Cir. 2023). Therefore, since Venue was improper in this case and the jury for both trials

should have been drawn from the District of Connecticut pursuant to the Vicinage Clause and the

Petitioner's conviction of 2014 is void as a matter of law under *Abdelaziz*, it should now be vacated

by this Honorable Court.

Respectfully submitted,
/s/ Daniel Carpenter
Daniel Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092

**IMMEDIATE RULING OR ORDER TO SHOW CAUSE REQUESTED**

## PRELIMINARY STATEMENT

The Supreme Court's recent decision in *Smith v. United States*, 143 S. Ct. 1594 (2023) is a triple win for the Petitioner. Not only does *Smith* mandate that Petitioner's conviction must be vacated for violation of the Venue Clause of the Constitution, it must be also vacated for violation of the Vicinage Clause, which the Supreme Court decided for the first time. In addition, the Supreme Court in *Smith* stated that the only exception to the new trial rule for violations of the Venue or Vicinage Clauses, is for a violation of the Speedy Trial Clause, which Petitioner respectfully suggests he is the record holder for not just the First Circuit – but nationally as well, and in this Brief Petitioner provides the Court with ample evidence to vacate Petitioner's conviction and to dismiss the defective Indictment of 2004 for violations of the Speedy Trial Act and the Speedy Trial Clause. The Vicinage Clause violation is a case of first impression that would allow this Court to use its inherent powers to vacate Petitioner's conviction without consulting the Government.

Rule 60(b)(6) permits this Court *sua sponte* to vacate Petitioner's Judgment and Conviction and to dismiss his defective Indictment of 20 years ago solely in the "interests of justice". There is no need to ask the Government's opinion on the subject or to even give the Government notice. This Court has available an unlimited reservoir of equity to do justice pursuant to Rule 60(b)(6) – and there is no requirement to consult with the Government about this Court's unfettered ability to change its mind.

The Court knows that if consulted – the Government AUSA Quinlivan would say that Venue has been argued "*ad nauseum*" in Petitioner's case. It has not even been analyzed since Your Honor's December 2005 New Trial Order which Petitioner will respectfully ask the Court to review in light of the Supreme Court's recent unanimous 9-0 decision in *Timothy Smith v. United States*, 143 S. Ct. 1594 (June 15, 2023). AUSA Wright would say that Rule 60(b)(6) is not available in criminal cases.

However, Westlaw is a beautiful thing and allows Petitioner the ability to check the veracity – or lack thereof – of comments made by Government AUSAs. Similarly, AUSA Wright's statement that Rule 60(b) is only for civil cases ignores Justice Sotomayor's brilliant dissertation in *Kemp* citing the now famous *Buck v. Davis* case discussed below. As the Court knows, Petitioner lost $8,000,000 in client funds in the NASDAQ Dot.Com Stock Market Crash of 2000, but was able to pay the Exchangors back $50,000,000 ($14,000,000 before his second trial in 2008) through his legal victories over PaineWebber and Merrill Lynch. PaineWebber was purchased by UBS and Merrill Lynch was purchased by Bank of America, but Petitioner is still here and nothing has been done to eliminate the forfeiture part of his Judgement despite another unanimous Supreme Court decision in *Timbs v. Indiana*, 139 S. Ct. 682, 690–91 (2019) Petitioner's Wife dutifully pays $50 per month – every month – and had $60,000 in tax refunds unlawfully seized from her because she was married to a felon.

Rather than explain about three decades of injustice and egregious prosecutorial misconduct, Petitioner would respectfully request that this Court read its comments on Venue from the December 2005 New Trial Order (on Westlaw perhaps?) and compare that analysis to the analyses by the Supreme Court in *Smith*. The Constitution requires that Petitioner's conviction must be vacated for improper Venue and a clear violation of the Vicinage Clause – which the Supreme Court says was raised for the first time. Westlaw has no cases involving "Carpenter" and the "Vicinage Clause" anywhere, so this is truly a matter of first impression.

Petitioner's case for improper Venue and improper Vicinage is much stronger than the Defendant's case in *Smith*, because the Defendant in *Smith* really did steal computer secrets from a server in the Central District of Florida rather than the Northern District of Florida from his home in Alabama. In Petitioner's case, he never did what the Government accused him of in the defective

3

Indictment of 2004, and now we know in 2023 that what the Government accused him of was not actually a crime based on the First Circuit's recent decision in the "Varsity Blues" John Wilson case of *Abdelaziz* and the Supreme Court's decision in *Ciminelli* which both mention the Supreme Court's 9-0 unanimous decision in *Skilling* from 2010. Now that the case – *Skilling* – and "Nondisclosure being outside the bounds of the fraud statutes" has been mentioned once or twice over the years since Petitioner's attorneys at Greenberg Traurig abandoned him to defend Merrill Lynch Brokers for "Nondisclosure" like in *Tambone*, S.E.C. v. Tambone, 597 F.3d 436, 448 (1st Cir. 2010).

Petitioner won judgments against both PaineWebber ($14,000,000) and Merrill Lynch ($35,000,000) that were all turned over to the Exchangors who settled with Petitioner in 2015 (while he was in prison for a non-crime that he did not commit). That is why Petitioner is applying to this Court to ask for the extraordinary relief that is available pursuant to Rule 60(b)(6) to achieve justice at long last.

Finally, Petitioner would be remiss if he did not point out that the two famous judges of the First Circuit that were on the landmark decision in *Abdelaziz*, Judge Lynch and Judge Lipez, were also on the not so famous but still excellent decision in *United States v. Carpenter* from 2007. Coincidentally, Judge Lipez wrote the opinion in *Carpenter* while Judge Lynch wrote the concurring opinion, and as the Court knows the opinion in *Carpenter* has been cited many times – not just for the egregious prosecutorial misconduct, but for Speedy Trial cases as well.

For that reason, Petitioner respectfully asks this Court to grant relief *sua sponte* without unnecessary input from the Government AUSAs who add nothing but additional injustice to the equation. Please review Your Honor's December 2005 Opinion on Venue through the new lens of *Smith* in 2023, and review the Indictment of 2004 submitted with Petitioner's Rule 60(b)(4) Motion to Dismiss for Lack of Jurisdiction (which is hereby incorporated by reference) in the light of Judge

4

Lynch's description of *Sadler* and *Bruchausen* which are also mentioned in the Supreme Court's 9-0 unanimous opinion in *Ciminelli*, as is *Chiarella* – about silence without a duty to disclose:

> When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235, 100 S. Ct. 1108, 1118, 63 L. Ed. 2d 348 (1980).

It is indeed ironic that the First Circuit decided in 2010 that the Defendant in *Tambone* had no duty to disclose, but for some reason Petitioner did despite *Chiarella*:

> "The key precedent is *Chiarella v. United States*, 445 U.S. 222, (1980). It instructs that a party's nondisclosure of information to another is actionable under Rule 10b–5 only when there is an *independent* duty to disclose the information arising from "a fiduciary or other similar relation of trust and confidence" between the parties. *Id.* at 228, . As the Fourth Circuit explained, "the duty to disclose material facts arises only when there is some basis outside the securities laws, such as state law, for finding a fiduciary or other confidential relationship." *Fortson v. Winstead, McGuire, Sechrest & Minick*, 961 F.2d 469, 472 (4th Cir.1992); Adopting the SEC's implied statement theory would pave the way for suits against securities professionals for nondisclosure of material information without the required showing of a fiduciary relationship. Fidelity to that requirement demands that we reject the SEC's notion that a breach of a duty to investigate, without more, is a breach of a duty to disclose (and, thus, should be treated as a primary violation under Rule 10b–5(b)). The SEC labors to depict its implied statement theory as firmly rooted in both case law and longstanding administrative interpretation. This depiction is inaccurate." *S.E.C. v. Tambone*, 597 F.3d 436, 448 (1st Cir. 2010)

Suffice it to say, Petitioner has been effectively under Government "supervision" for about 20 years for a non-crime of "Nondisclosure" that he clearly did not commit based on the law of 2023. He has been released – and in some cases forgiven – by his alleged "victims" of the year 2000 Stock Market Crash, and he has been defending himself for ten years. It is time for this Court to "clean the slate" and relieve Petitioner of his 20-year burden pursuant to the "unlimited reservoir" of Rule 60(b)(6).

## I.   LEGAL STANDARD

Rule 60(b)(6) provides, in relevant part, that a "court may relieve a party or its legal representative from a final judgment, order, or proceeding for...: (6) any...reason that justifies relief." Rule 60(b)(6). Furthermore, Rule 60(b)(6) "constitutes a grand reservoir of equitable power to do justice in a particular case; *Matarese v. Lefevre*, 801 F.2d 98, 106 (2d Cir. 1986) *citing United States v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1977))," and "is designed to balance the sanctity of final judgments and the command that justice be done in light of all the facts." *Paddington v. Bouchard*, 34 F.3d 1132, 1144 (2d Cir. 1994). It has often been noted that Rule 60(b)(6) confers broad discretion upon the trial court to grant relief when appropriate to accomplish justice. A District Court's discretion is "especially broad under subdivision (6)." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 670 (2d Cir. 1977). All Circuits have long recognized that a Rule 60(b)(6) Motion is appropriate in both criminal and civil cases. *See, e.g., United States v. Becker*, 502 F.3d 122 (2d Cir. 2007), and *Buck v. Davis*, 137 S. Ct. 759 (2017).

A District Court has the authority to vacate its own judgment *sua sponte* under Rule 60(b)(6). *See, e.g., Fort Knox Music, Inc. v. Baptiste*, 257 F.3d 108, 111 (2d Cir. 2001); *Matter of Perras*, 2010 WL 11627295, at *6 (E.D.N.Y. Nov. 3, 2010); *Economist's Advocate, LLC v. Cognitive Arts Corp.*, 2004 WL 728874, at *11 (S.D.N.Y. Apr. 6, 2004). The rule, which permits a court to "relieve a party ... from a final judgment" for "any ... reason that justifies relief," Rule 60(b)(6), "confers broad discretion ... to grant relief when appropriate to accomplish justice." *Matter of Perras*, 2010 WL 11627295, at *6 (quoting *United Airlines, Inc. v. Brien*, 588 F.3d 158, 176 (2d Cir. 2009)). Relief is appropriate "where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship, and should be liberally construed when substantial justice will thus be served." *Id.* (*quoting United Airlines* at 176. Courts have relied

6

on Rule 60(b)(6) to *sua sponte* vacate a denial of habeas and reopen the proceeding. *See, e.g., Cobb v. United States*, 2019 WL 2607002, at *2 (E.D.N.Y. Jan. 11, 2019). *See, also, Walker v. Conway*, 2007 WL 2027911, at *1 (N.D.N.Y. July 11, 2007); *Cole v. United States*, 2003 WL 21909758, at *1 (E.D.N.Y. July 30, 2003).

A motion for reconsideration pursuant to Rule 60(b)(6) also serves a valuable function where the court "*has patently misunderstood a party*," or…" has made an error not of reasoning but of apprehension." *Caisse Nationale v. CBI*, 90 F.3d 1264, 1269-70 (7th Cir. 1996). A court may also "reconsider an earlier decision when it is confronted with an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Becker* at 127, *quoting United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000). All three of these factors are amply present in this case. "[W]hen reconsideration of an earlier ruling is requested; the District Court should place great emphasis on the interests of justice." *United States v. Siciliano*, 578 F.3d 61, 72 (1st Cir. 2009) ("When faced with a motion for reconsideration, District Courts should apply an interests-of-justice test"). "This is so…because such requests for reconsideration rely, in the last analysis, on the trial court's inherent power to afford relief from decisions as justice requires." Alternatively, the Court can also amend a judgment pursuant to Rule 60(b)(6) – the catch-all provision of Rule 60(b) – which "allows courts to vacate judgments whenever necessary to accomplish justice…." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (*citing Liljeberg* at 863).

Moreover, most Courts have long recognized the "inherent equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984). It seems beyond peradventure that those inherent powers of the court must include a judge's power to change his mind and/or correct his own decisions when, as in this case, they are clearly based on the government's many misrepresentations of the law and/or the facts of

7

any given situation. The intervening change in controlling law and the "extraordinary circumstances" that the Supreme Court listed in *Buck* are all present in this case, and warrant reconsideration by this Court of its Judgment and Verdict of February 2014.

In fact, the First Circuit has stated "Rule 60(b) empowers courts to relieve a party from a final judgment on various grounds, including "any other reason justifying relief. Fed. R. Civ. P. 60(b)(6), and recently cited the Tenth Circuit, [the First Circuit has] referred to Rule 60(b)(6) as a district court's 'residual reservoir of equitable power to grant discretionary relief' -- allowing it to relieve a party from a final judgment where such relief is appropriate to accomplish justice." *Pais v. Kijakazi*, 52 F.4th 486 (1st Cir. 2022). "Like the Tenth Circuit, we have referred to Rule 60(b)(6) as a district court's "residual reservoir of equitable power to grant discretionary relief" -- allowing it "to relieve a party from a final judgment where such relief is appropriate to accomplish justice[.]" *Paul Revere Variable Annuity Ins. Co. v. Zang,* 248 F.3d 1, 5 (1st Cir. 2001). *Pais v. Kijakazi*, 52 F.4th 486, 491–92 (1st Cir. 2022).

"This is the 'catch-all' provision, appropriate only when none of the first five sections pertain." *Ahmed v. Rosenblatt*, 118 F.3d 886, 891 n.9 (1st Cir. 1997). "To balance the competing policies of finality of judgments and resolving litigation on the merits, courts considering motions under Rule 60(b)(6) ordinarily examine four factors: (1) the motion's timeliness, (2) whether exceptional circumstances justify extraordinary relief, (3) whether the movant can show a potentially meritorious claim or defense, which, if proven, could bring . . . success at trial, and (4) the likelihood of unfair prejudice to the opposing party." *Bouret-Echevarria v. Caribbean Aviation Maint. Corp.*, 784 F.3d 37, 43 (1st Cir. 2015)). There is, however, "no ironclad rule requiring an in-depth, multi-factored analysis in every case. **Sometimes one factor predominates to such an extent that it inexorably dictates the result**." *Ungar v. PLO*, 599 F.3d 79, 86 (1st Cir. 2010)).

The Government has argued in this case that Rule 60(b)(4) and Rule 60(b)(6) do not apply to criminal cases, however the Supreme Court overturned the death sentence of a convicted killer based on the Fifth Circuit's failure to correct the district court, which in the Supreme Court's words had "abused its discretion in denying Buck's Rule 60(b)(6) motion." *See Buck v. Davis*, 137 S.Ct. 759, 778 (2017). See also the Supreme Court's decision in *Kemp*, referring to *Buck*, went on to describe the type of extraordinary circumstances that would warrant a court granting a Rule 60(b)(6) motion including: "the risk of injustice to the parties" and "the risk of undermining the public's confidence in the judicial process." "Such concerns are precisely among those we have identified as supporting relief under Rule 60(b)(6).":

> "Buck brought his Rule 60(b) motion under the Rule's catchall category, subdivision (b)(6), which permits a court to reopen a judgment for "any other reason that justifies relief. Rule 60(b) vests wide discretion in courts, but we have held that relief under Rule 60(b)(6) is available only in extraordinary circumstances. In determining whether extraordinary circumstances are present, a court may consider a wide range of factors. These may include, in an appropriate case, the risk of injustice to the partie. and the risk of undermining the public's confidence in the judicial process.
>
> In the circumstances of this case, the District Court abused its discretion in denying Buck's Rule 60(b)(6) motion. The District Court's conclusion that Buck ha[d] failed to demonstrate that this case presents extraordinary circumstances rested in large measure on its determination that the introduction of any mention of race—though ill advised at best and repugnant at worst—played only a de minimis  role in the proceeding. The Fifth Circuit, for its part, failed even to mention the racial evidence in concluding that Buck's claim was "at least unremarkable as far as [ineffective assistance] claims go. But our holding on prejudice makes clear that Buck may have been sentenced to death in part because of his race. As an initial matter, this is a disturbing departure from a basic premise of our criminal justice system: **Our law punishes people for what they do, not who they are. Dispensing punishment on the basis of an immutable characteristic flatly contravenes this guiding principle. As petitioner correctly puts it, it stretches credulity to characterize Mr. Buck's ineffective assistance of counsel claim as run-of-the-mill."**
> *Buck v. Davis*, 137 S. Ct. 759, 777–78, 197 L. Ed. 2d 1 (2017)

A motion for reconsideration pursuant to Rule 60(b)(6) also serves a valuable function where the court "**has patently misunderstood a party**," or…"has made an error not of reasoning but of

apprehension" (i.e. there was no scheme to defraud the Exchangors here and they have received $50,000,000 on their loss of $8,000,000, Mrs. Cahaly has received $9,000,000 on her $1,000,000 of Property Exchange Proceeeds). *Caisse Nationale v. CBI*, 90 F.3d 1264, 1269-70 (7th Cir. 1996). A court may also "reconsider an earlier decision when it is confronted with an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *See United States v. Becker* at 127, *quoting United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000). Both are criminal cases. All three of these factors are amply present in this case. "[W]hen reconsideration of an earlier ruling is requested, the District Court should place great emphasis on the 'interests of justice.'" *See, also, United States v. Siciliano*, 578 F.3d 61, 72 (1st Cir. 2009)("When faced with a motion for reconsideration, district courts should apply an interests-of-justice test"). "This is so...because such requests for reconsideration rely, in the last analysis, on the trial court's inherent power to afford relief from decisions as justice requires." Again, alternatively, the Court can also amend a judgment pursuant to Rule 60(b)(6); and Subsection (b)(6)—the catch-all provision of Rule 60(b)—"allows courts to vacate judgments whenever necessary to accomplish justice...." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (*citing Liljeberg* at 863).

Moreover, most courts have long recognized the "inherent equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984). It seems beyond peradventure that those inherent powers of the Court must include a judge's power to change his mind and/or correct his own decisions when, as in this case, they are clearly based on the government's many misrepresentations of the law and/or the facts of any given situation. Absent a meaningful and substantive review of this matter, manifest injustice will occur to Petitioner because the Court's Verdict of February 2014 has been critically undermined by the decisions in *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), *United States*

10

*v. Countrywide*, 822 F.3d 650 (2d Cir. 2016), and in light of the Eleventh Circuit's decision in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) describing the history of the law of the Second Circuit as to Mail and Wire Fraud which the Eleventh Circuit adopted as its own in July 2016. Moreover, the Second Circuit's decision in *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017) suggests, there is no crime here as the words required by the Second Circuit's decision in *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994), that is the intent to cause "tangible economic harm" to the victim are nowhere to be found in Petitioner's Indictment or the Court's February 2014 Judgment. Now with the Supreme Court's decision in *Ciminelli* and the First Circuit's decision in *Abdelaziz*, it is time to vacate Petitioner's conviction. A court should "reconsider an earlier decision when it is confronted with an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *e.g. Buck* and *Becker* at 127, *quoting Tenzer* at 39.

Suffice it to say, Petitioner respectfully asks this Court to reconsider, review, and vacate its Judgment of 2014 and the Indictment of 2004 based on First Circuit and Supreme Court decisions of 2023. Moreover, if there was no criminal Mail and Wire Fraud in the multi-billion dollar government bailout of *Countrywide* because there was a contract involved, and if there was no property rights infringed upon in *Abdelaziz* and *Ciminelli*, then clearly there were no "property" rights infringed upon here, no duty to disclose ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak", *Chiarella v. United States*, 445 U.S. 222, 235, 100 S. Ct. 1108, 1118, 63 L. Ed. 2d 348 (1980)), and no mailings or wires in furtherance of the fraud (*Kelly, Tavares*, and *Skilling)*.

## II.     THE SUPREME COURT'S RECENT DECISION IN *SMITH v. UNITED STATES*, 143 S. CT. 1594 (2023) MANDATES RELIEF IN THIS CASE AND REQUIRES A NEW TRIAL FOR THE PETITIONER

The Supreme Court's recent decision in *Smith v. United States,* 143 S. Ct. 1594 (2023), holds

that the Constitution requires the vacating of a defendant's conviction following a trial in an improper

venue or conducted before a jury drawn from the wrong district. Obviously, this Court knows that

Petitioner committed no crime at all, no crime was alleged in the defective indictment, and none of

the five requested elements were proven at either trial, but whether Petitioner did or "did not do" –

he was always in Connecticut.

Assuming *arguendo* that Petitioner did anything wrong much less criminal, he did it in his

office in Connecticut or with Merill Lynch in New York. As the Court knows well, Petitioner never

met with or talked to the Exchangors at all – and no conspiracy was alleged in the case, so only

Petitioner's own acts could create Venue. Contrary to AUSA Quinlivan's suggestions that Venue

has been debated in this case "ad nauseum" it has not been discussed since 2005 and certainly not in

the light of the Supreme Court's decision in *Smith* which was held as to Venue:

> "Remedies for constitutional violations in criminal trials, we have explained, "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364, (1981). When a conviction is obtained in a proceeding marred by harmful trial error, "the accused has a strong interest in obtaining a fair readjudication of his guilt," and society "maintains a valid concern for insuring that the guilty are punished." *Burks v. United States*, 437 U.S. 1, 15. Therefore, the appropriate remedy for prejudicial trial error, in almost all circumstances, is simply the award of a retrial, not a judgment barring reprosecution. We have recognized one exception to this general rule: violations of the Speedy Trial Clause, which we have described as "generically different" from "any" other criminal right in the Constitution, *Barker v. Wingo*, 407 U.S. 514, 519, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), preclude retrial. **In all other circumstances, we have found that retrial is the strongest appropriate remedy, and we have applied this rule to every other Clause of the Sixth Amendment except for the Vicinage Clause (which we now address along with the Venue Clause).** Against this backdrop, we are asked to consider whether violations of the Venue and Vicinage Clauses are exceptions to the retrial rule. Text and precedent provide no basis for that result.

We start with the Venue Clause, which concerns the place where a trial must be held. That Clause mandates that the "Trial of all Crimes ... shall be held in the State where the ... Crimes shall have been committed." Art. III, § 2, cl. 3. Nothing about the language that frames this requirement suggests that a new trial in the proper venue is not an adequate remedy for its violation." *Smith v. United States*, 143 S. Ct. 1594, 1601–02 (2023).

**"That Clause guarantees "the right to ... an impartial jury of the State and district wherein the crime shall have been committed." Amdt. 6. The coverage of this Clause "reinforce[s]" the coverage of the Venue Clause because, in protecting the right to a jury drawn from the place where a crime occurred, it functionally prescribes the place where a trial must be held. . But the Vicinage** Clause differs from the Venue Clause in two ways: it concerns jury composition, not the place where a trial may be held, and it narrows the place where trial is permissible by specifying that a jury must be drawn from **"the State *and district* wherein the crime shall have been committed."** Amdt. 6 (emphasis in original). Nothing about these differences dictates a remedy that is broader than the one awarded when the Venue Clause is violated. The vicinage right is only one aspect of the jury-trial rights protected by the Sixth Amendment, and we have repeatedly acknowledged that retrials are the appropriate remedy for violations of other jury-trial rights." *Smith v. United States*, 143 S. Ct. 1594, 1603–04 (2023)

As a good example of this, the District Court examined Venue between Washington D.C and a Maryland suburb:

In *United States v. Gamble*, the D.C. Circuit Court held that "[u]nder D.C. Circuit precedent and because the alleged essential conduct elements all occurred in Maryland, the Court agrees that venue is improper here for Count III. *See, e.g., Cabrales*, 524 U.S. at 8–10 (affirming Eighth Circuit's finding that counts alleging money laundering to cover up alleged drug trafficking scheme should have been dismissed for improper venue because essential conduct elements underlying money laundering all occurred in Florida, even though drug trafficking conspiracy was in Missouri); *Auernheimer*, 748 F.3d at 533–36 (finding that venue was improper on conspiracy and identity fraud counts because essential conduct elements did not occur in district in which trial was held); *United States v. Foy*, 641 F.3d 455, 467–68 (10th Cir. 2011) (*citing United States v. Kwong-Wah*, 924 F.2d 298, 302 (D.C. Cir. 1991)) (finding that venue was improper for attempt charge because there was "absolutely no evidence" that defendant had committed any act in that district, even where defendant had received calls from alleged co-conspirator from that district); *United States v. Ramirez*, 420 F.3d 134, 140 (2d Cir. 2005) (finding that venue was improper for false statement count because underlying essential conduct elements occurred in other districts). Accordingly, the Court dismisses without prejudice Count III.    *United States v. Gamble*, No. CR 19-348 (CKK), 2020 WL 3605829, at *5 (D.D.C. July 2, 2020), adhered to on denial of reconsideration, No. CR 19-348 (CKK), 2020 WL 5062938 (D.D.C. Aug. 27, 2020).

13

It is guaranteed by the Constitution that a criminal defendant has the right to be tried by the proper jury in the correct Vicinage as well as in the appropriate Venue as the Supreme Court pointed out in *Smith*. The importance of this right to the Founders is emphasized by the fact that it is mentioned in the Declaration of Independence as a complaint and not once, but twice, in the text of the Constitution. *See* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed ...."); *id.* amend. VI (requiring trial of a criminal case "by an impartial jury of the State and district wherein the crime shall have been committed"). Congress has further entrenched these norms by an explicit directive that limits a criminal prosecution to "a district in which the offense was committed." Fed.R.Crim.P. 18. This rule "echoes the constitutional commands." *United States v. Cabrales,* 524 U.S. 1, 6 (1998). The result is meant to be a safety net for the defendant, which ensures that a criminal defendant cannot be tried in "a distant, remote, or unfriendly forum" as has happened to Petitioner not once, but twice. Seen in this light, it is readily apparent that venue requirements promote both fairness and public confidence in the criminal justice system. *United States v. Johnson,* 323 U.S. 273, 276 (1944). Because it is now indisputable that Petitioner did not perform any "essential conduct element" of the crime charged and alleged in the Indictment in the district of Massachusetts, Petitioner's conviction must be vacated. *See e.g., United States v. Auernheimer*, Crim. No. 11-cr-470 (SDW) (3d Cir. April 11, 2014).

As explained in *Auernheimer*, citing the First Circuit in *Salinas,* these constitutional provisions manifest a strong constitutional policy disfavoring trials removed from the situs of the alleged criminal activity:

> Venue in a criminal case is not an arcane technicality.  It involves matters that touch closely the fair administration of criminal justice and public confidence in it…The result is a safety net, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum solely at the prosecutor's whim. *United States v. Salinas*, 373 F.3d 161, 162, 164 (1st Cir. 2004).

14

Under the standard set in *Cabrales*, *Salinas*, and *Aurenheimer*, Petitioner committed no act in Massachusetts, so it is clear that he committed no crime triable in a Massachusetts court by a Massachusetts jury. If "non-disclosure" was the problem, that conduct or lack of conduct was in Connecticut. If trading options or losing money was the "crime," then that happened in the Southern District of New York. Moreover, there was **zero** conduct of Petitioner that actually "caused" the mailings or wires, and it is clear that all of these mailings and wires were non-fraudulent and not "in furtherance" of any scheme to defraud.

When an indictment charges a defendant with multiple counts, "Venue must be proper with respect to each count." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989). *See also Travis v. United States*, 364 U.S. 631, 635 (1961) ("Where Congress is not explicit, the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it") (internal quotation marks omitted). As with a lack of subject matter jurisdiction, improper venue requires dismissal of the indictment or a judgment of acquittal. *See United States v. Strain*, 396 F.3d 689 (5th Cir. 2005), *reh'g denied*, 407 F.3d 379, 380 (5th Cir. 2005) (remanding for entry of judgment of acquittal due to the government's failure to prove venue and stating that such failure "does not entitle the government to a second chance at prosecution"). Not only must the government prove venue by a preponderance of the evidence at trial, *see Salinas* at 163, but the government must also allege sufficient facts in the Indictment to establish proper Venue *ab initio*.

Moreover, that the Supreme Court has construed a necessary connection between Venue and the conduct elements of an offense. In general, this connection means that a **criminal defendant's own actions will determine where venue can be laid**. Expanding Venue for mail and wire fraud in the way that the government has done in the Indictment would unhinge this connection and give the

government unlimited control of determining where someone can be tried.  Petitioner had **nothing** to do with causing any of the mailings or wires, nor were they foreseeable to him because he had no idea who Paley was talking to.  Under the Government's idea of Venue, Petitioner could have been tried in Alaska, Florida, or California if Paley had friends or relatives there that did a property exchange between August and December 2000.  That is not how Venue is determined in the First Circuit or any other circuit.  For that reason alone, Petitioner's conviction must be vacated. But now with the Supreme Court's decision in *Smith* as to Venue, Vicinage, and Speedy Trial – there is no need to order a new trial because of the multiple violations of the Speedy Trial Clause in this case.

"Venue is proper only where the acts constituting the offense–the crime's essential conduct elements–took place." *United States v. Tzolov*, 642 F.3d 214, 218 (2d Cir. 2011) (dismissing fraud claim brought in the EDNY instead of the SDNY, literally one subway stop away in New York). *See also United States v. Brennan*, 183 F.3d 139, 147 (2d Cir. 1999) (holding that "prosecution under the mail fraud statute is permissible only in those districts in which a proscribed act occurs"), and *Salinas*, where the defendant's indictment was dismissed due to improper venue because illegal activity occurred in New York, but was only discovered in New Hampshire.

Just as the Founders in Boston felt that London was a distant, remote, and unfriendly forum, so, too, did Petitioner feel about Boston. But, based on the Government's allegations in the Indictment, Petitioner's **only** conduct happened in the District of Connecticut or the Southern District of New York and therefore, the errors in this case constitute the most "fundamental character" and the Writ vacating Petitioner's Conviction should be issued by this Court pursuant to 28 U.S.C. 2243 *sua sponte* pursuant to Rule 60(b)(6).

Just as with Jurisdiction, Venue was clearly not proper in this case, and this constitutes Plain Error. A defendant in a criminal case has a constitutional right to be tried in a proper venue. *United*

16

*States v. Johnson,* 323 U.S. 273, 275 (1944) (noting that two constitutional provisions, Article III, §2, cl. 3 and the Sixth Amendment both provide a right to trial in the state where the crime is committed); *United States v. Uribe,* 890 F.2d 554, 558 (1st Cir. 1989); *see also* Fed. R. Crim. P. 18. The government bears the burden of proof on the issue of venue. *United States v. Lanoue,* 137 F.3d 656, 661 (1st Cir. 1998). "[I]t is readily apparent that venue requirements promote both fairness and public confidence in the criminal justice system." *Johnson* at 276. Venue must be determined by the nature of the crime alleged, **by analyzing the actual conduct of the defendant constituting the offense and the location of the criminal acts**. *United States v. Scott,* 270 F.3d 30, 35 (1st Cir. 2001). More than a *de minimis* connection to the district is required. *Uribe* at 559. *See United States v. Anderson*, 328 U.S. 699, 703 (1946) "[t]he locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it." These congressional and constitutional protections are meant to provide "**a safety net, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum** solely at the prosecutor's whim." *United States v. Salinas*, 373 F.3d 161, 164 (1st Cir. 2004). Moreover, after *Skilling,* the nondisclosure of option trading could not possibly be the alleged crime that established proper venue, because none of that happened in Massachusetts.

As this Court stated in its decision from Petitioner's first trial: "Petitioner has persistently maintained an objection to venue in this District." *United States v. Carpenter*, 405 F.Supp.2d 85, 88 (D.Mass. 2005). As the Supreme Court recently discussed in *Smith* and as the Third Circuit described in *Auernheimer*, quoting the First Circuit in *Salinas*, it is guaranteed by the Constitution that a criminal defendant has the right to be tried in an appropriate venue. The importance of this right to the Founders is emphasized by the fact that it is mentioned in the Declaration of Independence as a complaint and not once, but twice, in the text of the Constitution. *See* U.S. Const.

17

art. III, §2, cl. 3 ("The Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed" ); *id.* amend. VI (requiring trial of a criminal case "by an impartial jury of the State and district wherein the crime shall have been committed"). Congress has further entrenched these norms by anexplicit directive that limits a criminal prosecution to "a district in which the offense was committed." Fed.R.Crim.P. 18. This rule "echoes the constitutional commands." *United States v. Cabrales,* 524 U.S. 1, 6 (1998). Under *Salinas,* the result is meant to be a safety net for the defendant, ensuring that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum as has happened to Petitioner not once, but twice. As Judge Lipez recently articulated in his dissent in *United States v. Seward,* 967 F.3d 57 (1st Cir. 2020), **it is solely the actions of the Defendant himself** that establishes proper venue for a criminal prosecution:

> "I agree with my colleagues on the legal framework for our venue analysis. As acknowledged by the majority, and reaffirmed repeatedly by the Supreme Court, *"the locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Anderson* at 703; *United States v. Rodriguez-Moreno,* 526 U.S. 275, 279 (1999); *Cabrales* at 6-7. We part ways, however, on the application of this principle to 18 U.S.C. §2250. In my view, based on a close examination of the text and structure of the statute, its placement in a comprehensive legislative scheme, and the Supreme Court's precedents, the interstate-travel element is not part of the nature of the crime. **Rather, the nature of the crime defined by §2250 is the failure to register or update a registration, such that venue is proper only where that failure occurs. Accordingly, I would vacate Seward's conviction and hold that venue for prosecuting Seward was not proper in Massachusetts."** *Id.* at 68 (emphasis added).

In Petitioner's case, Venue in the District of Massachusetts was clearly improper as Petitioner never was a resident of Massachusetts, nor did he have anything to do with Massachusetts until the court proceedings in this case began, and the government alleged no overt acts by Petitioner with any connection to the State of Massachusetts in the Indictment. Because it is indisputable that he did not perform any "essential conduct element" of the crime charged and alleged in the Indictment in the district of Massachusetts, his conviction must be vacated. *See, e.g., United States*

18

*v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014). As explained by the Third Circuit in *Auernheimer* (citing the First Circuit in *Salinas*), these constitutional provisions manifest a strong constitutional policy disfavoring trials removed from the situs of the Defendant's alleged criminal activity. As explained by the Third Circuit:

> "The Supreme Court has repeatedly made clear that the constitutional limitations on venue are extraordinarily important. "[Q]uestions of venue are more than matters of mere procedure. They raise deep issues of public policy in the light of which legislation must be construed." *Travis v. United States,* 364 U.S. 631, 634 (1961). "The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores,* 356 U.S. 405, 407 (1958); *accord United States v. Passodelis,* 615 F.2d 975, 977 (3d Cir. 1980). The founders were so concerned with the location of a criminal trial that they placed the venue requirement, which is "principally a protection for the defendant," *Cabrales* at 9, in the Constitution in two places. *See* U.S. Const. art. III, § 2, cl. 3 and amend. VI. They did so for good reason. A defendant who has been convicted "in a distant, remote, or unfriendly forum solely at the prosecutor's whim,"" *Salinas* at 164, has had his substantial rights compromised. *See Auernheimer* at 540, *citing Salinas* at 162, 164.

Moreover, in a criminal case, "venue must be narrowly construed." *United States v. Jefferson,* 674 F.3d 332, 365 (4th Cir. 2012). Additionally, "Venue...is an element...which must be proved...by a preponderance of the evidence." *Auernheimer citing Salinas* at 163. All of the counts in the Indictment in this case lacked proper venue because **zero** evidence whatsoever was adduced at trial showing Petitioner inducing any of the Exchangors to work with Paley or BPETCO, or showing any conduct of Petitioner's that actually "caused" the mailings or wires, and it is clear that all of these mailings and wires were non-fraudulent and not "in furtherance of any scheme" to defraud. *See Tavares* at 58. Furthermore, after *Skilling*, "Nondisclosure is outside the bounds of the fraud statutes." *Skilling at* 410. Therefore, there was **zero** evidence whatsoever of any mailings or wires in furtherance of any scheme to defraud that properly established Venue in the District of Massachusetts. *See Salinas* at 164.

Under the standard set in *Cabrales*, *Salinas*, and *Auernheimer*, Petitioner committed no "essential" act in Massachusetts, so it is clear that he committed no triable crime in a Massachusetts court. If "non-disclosure" of option trading was the alleged crime, that conduct or lack of conduct happened in Connecticut. If trading options or losing money was the "crime," then that happened in the Southern District of New York. As with a lack of subject matter jurisdiction, this is not "harmless error," and therefore improper venue requires dismissal of the indictment and setting aside of the Judgment in this case. *See, e.g., United States v. Strain*, 396 F.3d 689 (5th Cir. 2005) (remanding for entry of judgment of acquittal due to the government's failure to prove venue and stating that such failure "does not entitle the government to a second chance at prosecution."). Not only must the government prove venue by a preponderance of the evidence at trial, *see Salinas* at 163, but it must also allege sufficient facts in the Indictment to establish proper venue *ab initio*. This the government did not do.

The alleged facts in this matter are very similar to the facts presented in *Salinas*, in that any alleged conduct or omissions by Petitioner occurred outside of Massachusetts. In *Salinas,* the defendant was prosecuted for passport fraud in New Hampshire where the fraud was discovered by the Passport Office, rather than in New York, where the defendant applied for the passport. The Court dismissed the indictment for lack of venue finding that all of the elements of the offense occurred in New York. *Id.* at 165-70. Similarly, in this case, there was simply no justification for laying venue in Massachusetts as all of the alleged conduct by Petitioner occurred in Connecticut or New York. Rightly or wrongly, anything that Petitioner did or did not do, he did only in Connecticut or New York, and the Indictment of 2004 does not contradict that fact. If this Court were to replace Petitioner's name with "*Salinas*" and "Passport" with "Option Trading," then Petitioner is entitled to the same relief received as the defendants in *Salinas* and *Auernheimer*.

### III.   THE FIRST CIRCUIT'S DECISION IN *ABDELAZIZ* REQUIRES RECONSIDERATION OF THE VERDICT PURSUANT TO RULE 60(b)(6)

In *United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023) the Government charged the Defendants with conspiring with other parents to commit "honest services" fraud and "property" fraud, two types of Mail and Wire fraud. Defendants were convicted on all counts. The First Circuit vacated in part, holding (1) the "honest services" theory is invalid as a matter of law under *Skilling v. United States*, 561 U.S. 358 (2010); and (2) the Government failed to prove that Defendants agreed to join an overarching conspiracy charged in the indictment and that this variance prejudiced Defendants. The First Circuit also limited the scope of what constitutes "property" for the Fraud Statutes:

> Even when Congress amended the fraud statutes to cover some intangible rights, it did not stretch the statute to cover the right to accurate information before making an otherwise fair exchange. Before 1987, "numerous [courts had] interpreted the [fraud] statute broadly [to] affirm[] convictions involving schemes to defraud" victims of all kinds of intangible rights, including a right to privacy and honest elections. Id. at 250. The Supreme Court stopped this expanding universe of intangible-right protections, limiting the fraud statutes' scope to rights that sounded in property. *See Carpenter*, 484 U.S. at 25; *McNally*, 483 U.S. at 360. Congress responded to *Carpenter* and *McNally* in 1988, but its response was limited. Instead of reinstating the universe of previously protected intangible rights, it embraced just one of them: "the intangible right of honest services," which protects citizens from public-official corruption. 18 U.S.C. § 1346. Congress's reverberating silence about other intangible interests tells us all we need to know.

As the First Circuit also opined in *Abdelaziz*, describing *Sadler* and *Bruchhausen*:

> "The proposed test is also incompatible with multiple circuit decisions holding that various intangible interests that are both exclusive and valuable fall outside the scope of §§ 1341 and 1343. For example, the government's theory conflicts with the Sixth Circuit's decision in *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014). There, the government charged one of the defendants, Nancy Sadler, with wire fraud in connection with the purchase of controlled substances. *See id.* at 588-89. The prosecution did not dispute that Sadler paid full price for the pills at issue; instead, to satisfy the property requirement, it argued that Sadler had lied to the sellers about the patients to whom she would distribute the pills, "depriv[ing] the [sellers] of ... a right to accurate information before selling the pills." The court rejected this argument, reasoning that "the ethereal right to accurate information" did not qualify as a property

right, in part because it did not "amount[ ] to an interest that 'has long been recognized as property.' " (*quoting Cleveland*, 531 U.S. at 23, 121 S.Ct. 365); *accord United States v. Yates*, 16 F.4th 256, 265 (9th Cir. 2021). The government's proposed test would call for the opposite result, since a party's purported right to accurate information before engaging in a transaction would presumably both have economic value for and belong exclusively to that party. *See also United States v. Bruchhausen*, 977 F.2d 464, 467-68 (9th Cir. 1992) (declining to recognize as property a seller's right to control "the destination of [its] products after sale," even though such a right would, by hypothesis, be exclusive to the seller and potentially economically valuable)."

"The government's highly general argument would criminalize a wide swath of conduct. Under the government's broad understanding of property applied to admissions slots as a class, embellishments in a kindergarten application could constitute property fraud proscribed by federal law. Cleveland explained that it "reject[ed] the Government's theories of property rights not simply because they stray[ed] from traditional concepts of property," but also "because [they] invite[d the Court] to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." 531 U.S. at 24, cf. Yates, 16 F.4th at 265 (rejecting property theory that "would transform all deception into fraud").Further, as the Court stated in Cleveland: [T]o the extent that the word "property" is ambiguous as placed in [the mail and wire fraud statutes], we have instructed that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." This interpretive guide is especially appropriate in construing [the mail and wire fraud statutes] because ... mail [and wire] fraud [are] predicate offense[s] under RICO .... In deciding what is "property" [in this context], we think "it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite."" 531 U.S. at 25, *United States v. Abdelaziz*, No. 22-1129, 2023 WL 3335870, at *23 (1st Cir. May 10, 2023).

It should be noted that at the same time the First Circuit limited the definition of "property" rights in *Abdelaziz*, the Supreme Court did the same thing in *Ciminelli* and both cases refer to *Skilling* which is dispositive of Peitioner's case because Government accused Petitioner of "Nondisclosure" that he was trading options and losing money. *Ciminelli* and *Abdelaziz* both cite *Skilling* for limiting the Fraud Statutes that "Nondisclosure is outside the bounds of the fraud statutes." Skilling at 420.

## IV.    DUE PROCESS REQUIRES VACATING THIS COURT'S JUDGMENT

From the earliest days of the Constitution, and until the middle of the twentieth century, habeas relief was limited to claims that the court lacked "jurisdiction". *See, e.g., McCleskey v. Zant*, 499 U.S. 467, 468 (1991). The understanding of a court lacking "jurisdiction" at the time of the Founding Fathers encompassed claims that an individual was detained for conduct that was not actually criminal under the applicable law.

Thus, the Framers understood that courts lacked jurisdiction to convict an individual for conduct that (in retrospect, of course, upon review) was not, by statute, a crime. *See Ex parte Yarbrough*, 110 U.S. 651, 654 (1884). ("If the law which defines the offence and prescribes its punishment is void, the court was without jurisdiction, and the prisoners must be discharged."); *Ex parte Siebold*, 100 U.S. 371, 375 (1879) (holding a "party imprisoned under a sentence of a United States court, upon conviction of a crime created by and indictable under an unconstitutional act of Congress, may be discharged from imprisonment by this court on habeas corpus" because there was no authority to indict and try the defendant for a crime is "illegal and void, and cannot be a legal cause of imprisonment"); *cf. Ex parte Page*, 49 Mo. 291, 294 (1872) (granting habeas to a person sentenced to ten years under statute that allowed maximum sentence of seven years because the "judgment of the court in passing sentence was illegal" and "absolutely void" and thus exceed[ed] the jurisdiction of the court and [was not] the exercise of an authority prescribed by law").

*Bousley v. United States*, 523 U.S. 614 (1998), totally supports Petitioner's constitutional entitlement to reconsideration and review by this Court. There, Bousley pleaded guilty to "using" a firearm in violation of 18 U.S.C. § 924(c)(1), on the ground that guns in his "bedroom were in close proximity to drugs and were readily accessible". 523 U.S. at 617. Five years later, the Supreme Court interpreted Section 924(c)(1)'s "use" prong more restrictively, requiring a showing of "active

employment of the firearm", not merely "storing a weapon near drugs". *Id.* Bousley sought collateral relief under 28 U.S.C. § 2255, alleging that his plea was unintelligent because he was misinformed about the elements of a Section 924(c)(1) offense. The Supreme Court agreed. And while it held that Bousley had procedurally defaulted that claim by failing to raise it on direct review, that default did not bar relief insofar as petitioner could "establish actual innocence." 523 U.S. at 623. As the Supreme Court famously explained:

> "[D]ecisions of this Court holding that a substantive federal criminal statute does not reach certain conduct, like decisions placing conduct beyond the power of the criminal law-making authority to proscribe, necessarily carry a significant risk that a Defendant stands convicted of an act that the law does not make criminal … Accordingly, it would be inconsistent with the doctrinal underpinnings of habeas review to preclude petitioner from relying on [an intervening decision] in support of his claim that his guilty plea was constitutionally invalid." *Id.* At 620-21 (internal citations and quotation marks omitted).

In short, the Supreme Court relied on constitutional concerns to allow the defendant in *Bousley* to advance his claim where the Supreme Court's recent interpretation of a criminal statute created "a significant risk that a defendant stands convicted of an act that the law does not make criminal". *Id.* At 620 (internal quotation marks omitted). Similar constitutional concerns favor this Court reconsidering and vacating the Petitioner's conviction because nothing he did was "criminal" or in violation of any law in the past and certainly not now with the Supreme Court's recent decisions.

The Due Process Clause also prohibits continued imprisonment for conduct that "a criminal statute, as properly interpreted, does not prohibit". *Fiore v. White*, 531 U.S. 255, 228 (2001) (per curiam). Like Petitioner here, the defendant in *Fiore* was convicted of violating a statute that was later interpreted to clarify that an element of the crime has a narrower meaning than the meaning understood at the time the defendant was convicted. The Supreme Court deemed it "clear" that Due Process forbade Fiore's "conviction and continued incarceration" for conduct that a criminal statute, "as properly interpreted, does not prohibit". *Id.; see also Bunkley v. Florida*, 538 U.S. 835, 840 (2003)

("It has long been established by this Court that the 'Due Process Clause . . . forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt.'" (quoting *Fiore*, 531 U.S. at 228-29)). As the Supreme Court previously explained, [t]here can be no room for doubt" that sustaining "conviction and punishment . . . for an act that the law does not make criminal "inherently results in a complete miscarriage of justice." *Davis v. United States*, 417 U.S. 333, 346-47 (1974).

For similar reasons, punishing Petitioner for conduct that Congress did not make criminal also violates the Separation of Powers under the Constitution. "[U]nder our federal system it is only Congress, and not the courts, which can make conduct criminal". *Bousley*, 523 U.S. at 620-21; *see also United States v. Lanier*, 520 U.S. 259, 267-68, n.6 (1997); *United States v. Hudson*, 11 U.S. 32 (7 Cranch) (1812). Therefore, where the Supreme Court construes a federal criminal statute, detaining individuals under contrary readings of the statute exceeds the District Court's constitutionally granted authority. Such is the case under the facts this Court must assume here. Petitioner is currently being punished not because *Congress* authorized his punishment, but because *a federal court* erroneously construed the statute to criminalize conduct Congress did not in fact make a crime and which now everyone knows is not, in fact, criminal conduct.

The Supreme Court's direction that substantive interpretations narrowing criminal statutes apply retroactively on collateral review further supports the notion that the Constitution precludes punishing individuals under statutes that do not in fact criminalize their conduct – regardless of when it is actually determined what is and is not criminal conduct. In *Mackey v. United States*, 401 U.S. 667, 675 (1971), Justice Harlan articulated a view of retroactivity for cases on collateral review, later adopted in *Teague v. Lane*, 489 U.S. 288 (1989), that finality interests should yield when a conviction is attacked on the grounds, as is it here, that the "conduct [is] beyond the power of the criminal law-

making authority to proscribe". *Id.* at 310; *see Mackey*, 401 U.S. at 692-93 (Harlan, J., opinion concurring in judgments in part). Because **"[a] conviction or sentence imposed in violation of a substantive rule is not just erroneous but contrary to law and, as a result, void . . . a court has no authority to leave in place a conviction or sentence that violates a substantive rule, regardless of whether the conviction or sentence became final before the rule was announced."** *Montgomery v. Louisiana*, 577 U.S. 190, 203 (2016).

Accordingly, both the Due Process Clause and the Separation of Powers supports the common-sense proposition that the Constitution does not permit the continued punishment of an individual whose conduct was not actually a crime.

Moreover, punishing someone for conduct that is not actually a crime would also violate the Eighth Amendment. Punishment is "cruel and unusual" U.S. Const. amend. VIII, when it is "grossly disproportionate and excessive punishment for the crime". *Solem v. Helm*, 463 U.S. 277, 288 (1983). That being so, it must also violate the Eighth Amendment to inflict punishment for no crime at all, as was done in this case by this Court. **Serving "[e]ven one day in prison would be a cruel and unusual punishment for the 'crime of' something that the law does not punish.** *See Robinson v. California*, 370 U.S. 660, 667 (1962).

## V.   PETITIONER'S SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL HAS BEEN VIOLATED.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. "If the government violates this constitutional right, the criminal charges must be dismissed." *United States v. Dowdell*, 595 F.3d 50, 60 (1st Cir.2010), *citing Strunk v. United States*, 412 U.S. 434, 439-40 (1973). The speedy trial guarantee of the Sixth Amendment encompasses more than simply ensuring a speedy "trial." Rather, it was designed by the Framers, in part, "to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, *and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.*" *United States v. Loud Hawk*, 474 U.S. 302, 311 (1986) (emphasis added), *quoting United States v. MacDonald*, 456 U.S. 1, 8 (1982).[1]

Petitioner contends that his Sixth Amendment right to a speedy trial has been violated in the rather unique circumstances presented here: (1) there are at least six, and perhaps as many as nine separate violations of the Speedy Trial Act ("STA") in the two-decade-long Carpenter ordeal; (2) there have been two lengthy trials, both of which were tainted and rendered moot because of egregious prosecutorial misconduct, which not only denied Petitioner's right to a fair trial and jury deliberations free from taint, but also from seeking a full appeal of events transpiring during his first trial; (3) along with two excessively delayed government interlocutory appeals of the District Court's decisions; (4) combined with a defendant who has regularly asserted his innocence as well as his rights to a fair and speedy trial; (5) a government that sat on its hands for approximately three years

---

[1] *See also United States v. Ewell*, 383 U.S. 116, 120 (1966) (Sixth Amendment guarantee of a speedy trial "is an important safeguard," *to minimize anxiety and concern accompanying public accusation* and to limit the possibilities that long delay *will impair the ability of an accused to defend himself*") (emphasis added).

while this Court was forced to wrestle with a motion for new trial based on improper government conduct and the obvious perjury of not one, but several government witnesses during a second trial; and (6) with a government that sat on its hands yet again during the most recent lengthy appeal, as contrasted with Petitioner, who alone attempted to push the First Circuit to address the appeal, despite the fact it is the government with the statutory mandate to diligently pursue its appeal, *see* 18 U.S.C. §3731 (government appeal "shall be diligently prosecuted").

In short, Petitioner can point to several violations of non-excludable time on the STA Clock as well as an eight-year gap from December 15, 2005 when he received his first new trial order due to prosecutorial misconduct, to November 2013 when his second new trial order was overturned by the First Circuit. This Court did not have the benefit of the Supreme Court's decisions in *Bloate v. United States*, 559 U.S. 196 (2010), *United States v. Tinklenberg*, 131 S. Ct. 2007 (2011), and *United States v. Huete-Sandoval*, 668 F.3d 1 (1st Cir. 2011), in 2005 when it turned down Petitioner's first of many Speedy Trial motions. But clearly there were numerous STA Clock violations during the 10 years between 2004-2014 as well as Sixth Amendment Speedy Trial and Speedy Sentencing issues, along with Due Process violations under the Fifth Amendment. Petitioner will detail several distinct violations below, but only one is necessary to have his Indictment dismissed with prejudice.

The first Speedy Trial Act violation happened before the first trial even began. On Feb. 4, 2004, now almost 20 years ago, the original indictment was returned (Dkt. No. 1), and Petitioner was arraigned on Feb. 24, 2004. The superseding indictment (the "Indictment") was returned on Sep. 24, 2004 (Dkt. No. 34), and Petitioner was arraigned again on Oct. 7, 2004. Trial began less than a year later, on July 11, 2005, and concluded on July 27, 2005. (Dkt. No. 149). On June 30, 2005, just prior to the first trial, the Court denied (without analysis) Petitioner's motion to dismiss the Indictment on STA grounds. (Dkt. No. 79.) The basis for this motion was that by the time the parties

filed joint motions for a trial continuance and for excludable delay on Nov. 17, 2004 (Dkt. Nos. 45, 46); a total of **75 days** had already elapsed on the STA clock as a result of errors committed by former Magistrate Judge Cohen.

In Dkt. No. 96, the government concedes that there were as many as 35 non-excludable days gone on the STA Clock.  There are several large gaps the government assumes are excludable without having had the benefit of *Zedner* or *Bloate*.  "[T]he government agrees that 13 days had elapsed off the clock as of the status conference that took place before Magistrate Judge Cohen on July 8, 2004."  (Dkt. No. 96 at 1-2.)    After that July 8, 2004 status conference, Magistrate Judge Cohen unsuccessfully attempted *three times* to enter electronically an order excluding time through Sep. 10, 2004.  (Dkt. Nos. 24, 25, 26.)  The order that was eventually entered was a legal nullity because none of the three versions (which are all alike) were signed by a judicial officer.  *See United States v. Schiavo*, 504 F.2d 1 (3d Cir. 1974) (failure to reduce an oral order to written form and enter it on the court's docket renders an order null and void).  Because Magistrate Judge Cohen failed to sign any of the orders for excludable delay, those orders did not stop the STA clock.  As a result, the STA clock continued to run unabated until Petitioner filed a supplemental motion to dismiss for lack of venue on Aug. 20, 2004.  (Dkt. No. 27.)  By that time, however, 53 days had run off the STA clock.

However, nothing happened to "stop the clock" from August 20 to October 22 according to *Zedner, Bloate, Tinklenberg,* and *Huete-Sandoval*.  Even if we give the government 30 days under (*Henderson v. United States*, 476 U.S. 321 (1986)) 18 U.S.C. § 3161(h)(1)(H) for a pretrial motion, that is over 80 days of non-excludable time on the STA Clock.  The government also concedes that "12 additional days elapsed," *id.*, from Oct. 22 to Nov. 2, 2004 – meaning that a total of over 95 days had elapsed as of Nov. 2, 2004.  The STA clock stopped the next day, Nov. 3, 2004, because both parties filed procedural motions on that date (Dkt. Nos. 42, 43), but the Court granted both motions

shortly thereafter on Nov. 5, 2004.  As a result, the government concedes that a total of at least 10 additional days ran off the STA clock (Dkt. No. 96 at 3) before the parties filed their joint motions for continuance and excludable delay on Nov. 17, 2004.  Consequently, a total of over **105** non-excludable days ran off the STA clock prior to the clock being stopped in November 2004 through the beginning of the first trial in June 2005, meaning that the Indictment should have been dismissed prior to the first trial.  Moreover, there was nothing put on the record in the "interests of justice" for November 2004 through June 2005.  The District Court's denial of Petitioner's Motion to Dismiss the Indictment for violations of the Speedy Trial Act was clearly erroneous, but the Court did not have the benefit of the Supreme Court's decisions in *Zedner, Bloate, Tinklenberg,* and *Huete-Sandoval,* or the District of Massachusetts' *Plan for the Prompt Disposition of Criminal Cases* published in January of 2009.  *See* for example, page 28 Section 7(a) DISMISSAL. The fact that Petitioner received a new trial order of Dec. 15, 2005 does not wipe out this STA Clock violation.

The fifth and sixth STA Clock violations came after the Court's first new trial order was entered on Dec. 15, 2005 (Dkt. No. 192), where the government filed its interlocutory appeal on Jan. 9, 2006.  (Dkt. No. 195.)  The First Circuit affirmed the new trial order and issued its mandate to that effect on Sep. 28, 2007.  Thus, the government's first interlocutory appeal caused another 22 months of delay − for a total of 44 months since indictment, with most of that delay attributable to the government's bad acts.

But, more importantly, there is no disputing that 24 days had run off the new STA Clock starting on Dec. 15, 2005.  Based upon a review of the non-excludable time pursuant to the Speedy Trial Act, and using the government's own admissions and calculations—at least **82** non-excludable days ran off the STA clock prior to the second trial (24 days between December 15, 2005 and January 9, 2006, plus 58 days between September 27 and November 26).  Moreover, because of the Supreme

Court's decision in *Zedner*, there is now clearly a sixth violation following the status conference of November 26, 2007, which never put an "interests of justice" finding on the record as required by *Zedner*, so the STA clock kept on running and did not stop at November 26. *See, also, Tinklenberg, Huete-Sandoval*, and most importantly *Bloate*; decisions that have occurred since Petitioner's trial in 2008, all of which require this Court to reverse and vacate Petitioner's conviction and dismiss the Indictment for violations of the Speedy Trial Act. Because more than 70 non-excludable days have elapsed several times on several different occasions, there should be no discretion involved and the Indictment **must** be dismissed. *See* 18 U.S.C. § 3162(a)(2) ("the information or indictment **shall** be dismissed on motion of the defendant.") (emphasis added).

The STA Clock violations in this case are *not* a close call, but the STA violation of between Dec. 15, 2005 (New Trial Order) and Jan. 9, 2006 (government interlocutory appeal) of 24 days, when added to the 58 days between Sep. 27 and Nov. 26, 2006 results in **a clear violation** based on the statute and relevant case law. However, whether the period is 71 days as the government concedes (see Dkt. No. 230), or at least 82 days as Petitioner maintains, ***any*** STA violation requires dismissal. *See United States v. Dezeler*, 81 F.3d 86 (8th Cir. 1996) (dismissing due to 71 days). *See, also, Huete-Sandoval*, where the indictment was dismissed for just **one** STA violation of only 16 days.

Finally, in regard to the undeniable and inexplicable three-year delay between December 3, 2008 and September 1, 2011, this Court on Page 4 of its February 21, 2014 Opinion, lists a number of separate filings made by Petitioner in his defense during that time period as if any of them stopped the STA Clock. Assuming *arguendo* that the STA Clock did stop under 18 U.S.C. §3161(h)(1)(H) for each of those filings, it would only stop for 30 days and then resume. *See Henderson v. U.S.*, 476 U.S. 321, 328-29 (1986). However, there is a gap of five months or 150 **non-excludable** days

31

between the Memorandum of January 13, 2010 (Dkt. No. 360) and the Letter Regarding Recent Developments on June 17, 2010 (Dkt. No. 371). That is one entire violation of the Speedy Trial Act right there.

Also during that same time period, Petitioner filed several letters with the Court. In particular, on June 17, 2010, Petitioner's prior counsel filed a letter with the Court regarding recent developments involving the massive amounts of newly discovered evidence related to Merrill Lynch's fraud on the Court and the perjury of the three Merrill witnesses at both of Petitioner's trials (Dkt. No. 370), and on Jan. 6, 2011, Petitioner filed a letter noticing supplemental authority. (Dkt. No. 372.) In this letter, Petitioner also noted the angst he had been forced to live with during ten years of government investigation and prosecution, and once again requested that the Court grant his post-trial motions. On Feb. 3, 2011, Petitioner filed a status report, updating the Court regarding matters he believed supported his pending motions. (Dkt. No. 374). On July 14, 2011, Petitioner filed a request for status conference and notice of supplemental authority (Dkt. No. 375), in which he noted that it had been three long years since the conclusion of the second trial (which ended in June 2008), that every day had been punishment, and it had been more than seven years since indictment. (Dkt. No. 375 at 8.) Petitioner also noted that the emotional and psychological toll imposed upon a citizen charged with federal crimes is incalculable, even in the ordinary case, much less one that has consumed a decade of the defendant's life. *Id.* None of these letters or status reports would have stopped the STA Clock or have been considered excludable time under any STA Clock or Speedy Trial calculation.

And, if nothing else, even the government must agree that when one adds the non-excludable time of 28 days between September 1st and 29th 2011 to the 58 days between September 27 and November 26, 2007 (which even the government and the District Court agree is non-excludable),

there is yet another STA violation of at least 86 days requiring the dismissal of the Indictment and the vacating and reversing of Petitioner's conviction. Clearly, had the First Circuit affirmed Petitioner's new trial order, all would agree that the STA clock would have been reset and started ticking anew on September 1, 2011. Since the First Circuit decision rendered the new trial order a nullity, there is no way to avoid the additional 28 days of non-excludable time.

Moreover, none of these "letters" or "notices of supplemental authority" would stop the STA Clock under *Zedner, Bloate, Tinklenberg,* or *Huete-Sandoval*. Similarly, there is a six-month (180 day) gap between the June 17, 2010 Letter of Recent Developments (Dkt. No. 371) and the January 6, 2011 Notice of Supplemental Authorities (Dkt. No. 373) to constitute yet another violation of the Speedy Trial Act. Furthermore, there is nothing that stops the Speedy Trial Clock in the June 17, 2010 Letter or the January 6, 2011 Notice or the February 3, 2011 Status Report (Dkt. No. 374). Therefore, there is either one long STA Clock violation between December 3, 2008 and September 29, 2011 when the government filed its interlocutory appeal, or there are a number of shorter violations of the Speedy Trial Act, not to mention the Sixth Amendment right to a "speedy sentencing" as described in *Pollard v. United States*, 352 U.S. 354 (1957), and *United States v. Nelson-Rodriguez*, 319 F.3d 12, 87 (1st Cir.2003)("the right to a speedy trial extends to sentencing"), and Fed. R. Crim. P. 32(b). All of the factors listed in the now familiar *Barker* test, which determines whether dismissal of the Indictment is with or without prejudice militate heavily in favor of the dismissal of Mr. Carpenter's Indictment *with* prejudice. *See* 18 U.S.C. § 3162(a)(2).

The Indictment **must be** dismissed due to the new law created since Petitioner's second trial by *Zedner, Bloate, Tinklenberg,* and *Huete-Sandoval,* as well as the fact that all four points of the *Barker* test favor Petitioner. As the Supreme Court stated in *Barker v. Wingo*, 407 U.S. 514, 537 (1972):

"[I]nordinate delay between public charge and trial, ... wholly aside from possible prejudice to a defense on the merits, may 'seriously interfere with the defendant's liberty, whether he is free on bail or not, and ... may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.'"

Courts must balance the four factors to determine whether a delay violated the Sixth Amendment. (1) the "[l]ength of the delay"; (2) "the reason for the delay"; (3) "the defendant's assertion of his right"; and (4) "prejudice to the defendant." *Barker*, 407 U.S. at 530. A delay of one year or more crosses the threshold and triggers analysis of the remaining *Barker* factors, but no one factor is determinative; rather, they are related factors which must be considered together with such other circumstances as may be relevant. In Petitioner's case, all four factors point to a dismissal of the Indictment with prejudice.

First, the "length of delay" in this case from Indictment to Sentencing was ten years, so the first factor favors Petitioner. Second, the "reason for the delay" for over eight years had been the government's unwarranted appeals as well as this Court's three-year delay which is attributed to the government. Therefore, the second factor favors Petitioner. Third, Petitioner had submitted no less than six separate motions laying out the various speedy trial violations that have occurred in this case since it began, so the third factor obviously favors Petitioner. No defendant since the STA was passed has filed as many STA motions as Petitioner. Fourth, and most importantly, not only has this 20 year nightmare resulted in the worst forms of prejudice against Petitioner in not only lost business opportunities and public obloquy, but also by separate litigations being poisoned against him due to a presumption of guilt and "negative inferences," but his family has suffered through this ordeal not only by the enormous cost of defending Petitioner and the loss of clients due to negative publicity, as well as banks severing ties with them, but simply through the personal pain of watching their loved one suffer through endless and relentless litigation by a government that will finance and support the

34

banks that almost destroyed the economy to the tune of hundreds of billions of dollars, but will not let go a man who has never been shown a single false statement that he made to cause these so-called "crimes," and who has paid back the investors' losses by more than five times over.

The eight-year government-caused delay from December 15, 2005 to November 2013, or even just the delay from December 3, 2008 to September 29, 2011 should be enough for the prejudice under *Doggett v. United States*, 505 U.S. 647 (1992), for a delay of more than three years. For example, in *United States v. Ferreira*, 665 F.2d 701, 707 (6th Cir. 2011), the Sixth Circuit observed that in a prior decision, *Dixon v. White*, 210 Fed. Appx. 498, 499 (6th Cir. 2007), the court held that a three-and-a-half-year delay necessitates a finding of presumptive prejudice and is in keeping with decisions from two of our sister circuits." *See United States v. Erenas-Luna*, 560 F.3d 772, 780 (8th Cir. 2009) (Eighth Circuit applying *Doggett* and concluding that a three-year delay between indictment and arraignment caused by "the serious negligence of the government" was excessive enough to trigger a presumption of prejudice); *United States v. Ingram*, 446 F.3d 1332, 1339 (11th Cir. 2006) (Eleventh Circuit holding that a two-year, post-indictment delay caused by egregious government negligence allowed the court to presume prejudice in the fourth *Barker* prong). Mr. Carpenter's case is exactly like the delay in *Dixon* (because all of these Speedy Trial cases deal with guns and drugs or other serious crimes), where the Sixth Circuit correctly reversed the lower court's judgment due to a three-year delay in the case being mostly attributable to the government. As the Sixth Circuit stated:

> "This case is materially indistinguishable from *Doggett* with respect to the four relevant speedy-trial inquiries, namely "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for the delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Id.* at 651. First, although the three-and-a-half-year delay in this case is less than the eight-and-a-half-year delay in *Doggett,* it is still uncommonly long. Second, as in *Doggett,* the state is more to blame for the delay. Third, Dixon, like Doggett, raised

his right to a speedy trial, and, fourth, like Doggett, could not show actual prejudice from the delay." *Dixon,* 210 Fed. Appx. 498 at 502.

In Petitioner's case, the delay has been at least over five years, and closer to an eight-year delay, and Petitioner has suffered extreme actual prejudice from the delays to the tune of two new criminal investigations, a new indictment, and numerous civil litigations where the present case is mentioned throughout the proceedings and filings in order to poison the well in the various courts in New York and Connecticut against him. Just as in *Dixon,* "the state failed to protect [Carpenter]'s known desire to have a speedy trial after [Carpenter] raised his speedy trial rights on [six or more] separate occasions. Thus, while the government in *Doggett* was unaware of a[ny] speedy trial demand, the [government] in this case knew about [Carpenter]'s desire to prove his innocence at trial, yet failed to secure his right to a speedy trial." *Id.* at 502. Therefore, because this case is materially indistinguishable from *Doggett,* this Court engaged in an unreasonable application of United State Supreme Court precedent when it held that the delay in this case did not violate Petitioner's right to a Speedy Trial.

Petitioner has shown multiple times that the delay in his case has "cross[ed] the threshold dividing ordinary from 'presumptively prejudicial' delay." *Girts v. Yanai,* 600 F.3d 576, 588 (6th Cir. 2010) (*quoting Doggett v. United States,* 505 U.S. 647, 651–52 (1992)). It is clear that the governmental delays in this case have been motivated by prosecutorial misconduct, bad faith, vindictiveness, or an attempt to seek a tactical advantage, which should weigh heavily against the government. *United States v. Robinson,* 455 F.3d 602, 607 (6th Cir. 2006). There is no denying that 'substantial prejudice' has resulted from the delay. Prejudice "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect," of which there are three: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker,* 407 U.S. at 532.

36

The possibility that the defense will be impaired is "the most serious" of these interests. *Id.* "[E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett*, 505 U.S. at 655. Where the delay has been caused by negligence, "our toleration of such negligence varies inversely with its protractedness." *Doggett*, 505 U.S. at 657. In Petitioner's case, the three-year delay from the second trial in June 2005 to the new trial order in September 2011 compromised his ability to file for a new trial under Rule 33 for newly-discovered evidence.

In *United States v. Erenas-Luna*, the Eighth Circuit applied *Doggett* and concluded that a three-year delay between indictment and arraignment caused by "the serious negligence of the government" was excessive enough to trigger a presumption of prejudice. 560 F.3d 772, 780 (8th Cir. 2009). Likewise, in *United States v. Ingram*, the Eleventh Circuit held that a two-year, post-indictment delay caused by egregious government negligence allowed the court to presume "conclusive" prejudice in the fourth *Barker* prong. 446 F.3d 1332, 1339 (11th Cir. 2006). Therefore, *Ferreira, Dixon, Erenas-Luna, Ingram, Doggett*, and the policy behind the original right to a Speedy Trial all support a conclusion that both the negligence that the government committed and the significant length of the eight-year delay warrant dismissal of the Indictment with prejudice. As stated in *Barker*, the effect delay has on a defendant's ability to mount a defense is "the most serious" of the interests protected by the right, as "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." 407 U.S. at 532.

In light of the Supreme Court's admonition not to condone "prolonged and unjustifiable delays," *id.*, this Court should conclude that the district court erred by not presuming prejudice in the fourth *Barker* prong. The other three *Barker* prongs clearly favor Petitioner, so that his Indictment should be dismissed forthwith with prejudice in the interests of justice based on the Supreme Court's

recent comments in *Smith*.

The prejudice suffered by Petitioner and his family as a result of this endless litigation defies adequate description. Indeed, while the Court is undoubtedly familiar with the procedural history of this matter, the Court may not be so familiar with the immeasurable anguish, anxiety and public obloquy that accompany litigation of this nature. For almost 20 years now, a man who believes in his legal and factual innocence with every fiber of his being has been forced to endure not one trial, but two trials; not one appeal, but several appeals. The entire time, his life has been on hold, his future uncertain, and every day burdened by the constant anxiety of being under government supervision. For all of the following reasons, Petitioner respectfully submits that his conviction needs to be vacated, and his Indictment should be dismissed <u>with</u> prejudice to any new trial.

Furthermore, there is no other case in any circuit in this Country that can match the Due Process delays in this case. Petitioner asks this Court to focus on the extraordinary Due Process delays in this case pursuant to the Barker factors as suggested by Justice Sotomayor in her Opinion in *Betterman v. Montana*, 136 S.Ct. 1609 (2016). Viewing Petitioner's now 20 year-long "Kafkaesque" odyssey with the vision provided by *Betterman*, his preindictment delay of four years was longer than the delay in *Marion*, the inexplicable delay from June 2008 to September 2011 was longer than the delay in *Moore*, and now his total Due Process delay is more than double the seven-year delays of *United States v. Loud Hawk*, 474 U.S. 302 (1986) and *Doggett*. Now that the Supreme Court has clearly laid out the rules of Due Process in *Betterman*, this Court cannot ignore the clear violation of Petitioner's Constitutional rights.

Petitioner respectfully asserts that there was no fraud in this case as a matter of law, nor did he have the "Fair Warning" in his indictment that is the cornerstone of American jurisprudence. But even assuming, arguendo, that Petitioner did something wrong or illegal, he certainly did not

38

commit that act in the District of Massachusetts and did not receive a fair trial in either of his two trials in 2005 and 2008. Because of the pre-indictment delay between January of 2001 and September of 2004, and the post-trial Due Process delay between sentencing of almost six years and the total Due Process delay of 20 years, it is Petitioner who should have the landmark case for both violations of the Due Process Clause under *United States v. Lovasco*, 431 U.S. 782 (1977) and *United States v. Marion*, 404 U.S. 307 (1971). In fact, it is significant that the delay of 39 months from Petitioner's trial in 2008 through September 2011 - when this Court granted Petitioner's second new trial order - was longer than the delay for convicted murderer Rocky Moore. *See, e.g., Moore v. Arizona*, 414 U.S. 25 (1973):

> "Moreover, prejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings. Inordinate delay, "wholly aside from possible prejudice to a defense on the merits, may `seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.' These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty.""
> *Moore* at 27, citing *Marion* at 320-21.

The delay in this case also exceeds that of *United States v. Handa*, 892 F.3d 95 (1st Cir. 2018) and *United States v. Irizarry-Colon*, 848 F.3d 61 (1st Cir. 2017) combined, so that Petitioner's conviction and indictment should be vacated. Ironically, those two seminal cases in the First Circuit both cite Petitioner's case. *See Handa* at 101, citing *United States v. Carpenter*, 781 F.3d 599, 610 (1st Cir. 2015) ("[d]elay of around one year is considered presumptively prejudicial, and the presumption that delay prejudices the defendant intensifies over time."), and *Irizarry- Colon* at 68 (same). The Speedy Trial violations in this case are also not a close call as there was no reason for the delay from June 2008 to May 2015, nor was there any balancing tests done in the interests of justice. See *United States v. Zedner*, 547 U.S. 489, 507 (2008).

39

Moreover, the Barker factors that Justice Sotomayor stated in *Betterman*, and the seven-year delay between Petitioner's second trial in June 2008 and the First Circuit's decision in May 2015 (ignoring fundamental legal principles of not only the First Circuit but the Supreme Court as well), mandates that Petitioner's indictment and conviction be vacated. There were no reasons placed on the docket as required by §3161(h)(7) and the Supreme Court's decision in *Bloate v. United States*, 559 U.S. 196 (2010). Thus, the extraordinary delay in Petitioner's case is far longer than any delay in *United States v. Dezeler*, 81 F.3d 86 (8th Cir. 1996) (delay of only one day); *United States v. Huete-Sandoval*, 668 F.3d 1 (1st Cir. 2011) (delay of only 16 days), and *Bloate and United States v. Tinklenberg*, 131 S.Ct. 2007 (2011) (delays of only 9 days). As the Supreme Court has explained, "The relevant provisions of the Act are unequivocal," and "[t]he sanction for a violation of the Act is dismissal." *Zedner* at 507, 509. If "the trial does not begin on time, the indictment or information must be dismissed." Id. at 508. At this point, all of the Exchangors have been paid back many times their original losses, almost $50 million on an $8 million loss in the great NASDAQ stock market crash of 20 years ago.

Petitioner hereby requests that this Honorable Court do the same calculation that was done for the defendant in *Irizarry-Colon* and arrive at the same conclusion and grant this Petition, thereby setting aside Petitioner's conviction and dismissing his indictment with prejudice for violations of the Speedy Trial Clause. Unlike the defendant in *Handa*, Petitioner has lived in the same house in Connecticut and has been under Government investigation or supervision for the past 20 years since he lost the Exchangors' money in the NASDAQ Stock Market Crash of 2000. Petitioner would also like to emphasize the Third Circuit opinion in *United States v. Velazquez*, 749 F.3d 161 (3d Cir. 2014) written by Judge Lipez of First Circuit fame, where he reviews the six-year delay in bringing Velazquez, a notorious drug dealer and dangerous criminal, to trial. Velazquez was either evading

justice (the government's view) or was just a transient individual (Third Circuit's view) when he was arrested in California and shipped back to Philadelphia on an old arrest warrant. Meanwhile, Petitioner was dutifully checking in with pre-trial services for the 14 years leading up to his sentencing, including the five-year delay from 2008 until his new trial order was overturned in 2013.

Velazquez pled guilty while preserving his Speedy Trial claim and was sentenced to 87 months. In vacating his conviction and sentence for violations of the Speedy Trial Clause, Judge Lipez discussed the second of the Barker factors: who is responsible for the delay, which is the "flag that all litigants seek to capture," *Loud Hawk* at 315:

> "Negligence over a sufficiently long period can establish a general presumption that the defendant's ability to present a defense is impaired, meaning that a defendant can prevail on his claim despite not having shown specific prejudice. This general presumption applies because impairment of one's defense is the most difficult form of Speedy Trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown. Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett* at 655.

In other words, Judge Lipez describes exactly what happened in this case; the theory of "presumptive prejudice" because of the number of extensive delays in this case. Unlike any of these other defendant's, Petitioner's conviction, unlike anyone else, was dismissed three years after his second trial in 2008. But the Government decided to violate the "Double Jeopardy" clause of 18 U.S.C. §3731 that prevents the government from doing an appeal, and that took another two years. Petitioner's family has also suffered through this ordeal not only by numerous lost business opportunities and banks severing ties with them, but simply through the personal pain of watching their loved one suffer while incarcerated and through relentless litigation by the government. *United States v. Ferreira*, 665 F.2d 701 (6th Cir. 2011), *Dixon v. White*, 210 Fed. Appx. 498 (6th Cir. 2007), *United States v. Erenas-Luna*, 560 F.3d 772 (8th Cir. 2009), *United States v. Ingram*, 446 F.3d 1332 (11th Cir. 2006), and the policy behind Speedy Trial rights support a conclusion that both

41

the negligence that the Government exhibited and the significant length in the several separate delays warrant the dismissal of the Indictment in this case with prejudice as well as vacating Petitioner's conviction. This Court must vacate Petitioner's conviction due to Improper Venue and violation of the Vicinage Clause, but unlike the Defendant in *Smith*, the violations of Speedy Trial Clause in Petitioner's case would bar a second trial.

## VI.    RELIEF REQUESTED

### RELIEF SOUGHT

Petitioner respectfully requests that the Court grant the instant Petition and issue an order: (i) vacating and setting aside the Order of Forfeiture and Petitioner's 2014 conviction for mail and wire fraud in its entirety; (ii) expunging and sealing all records of the foregoing indictment and conviction; (iii) ordering the Government to return all funds paid to the Government on behalf of Petitioner in this case; and (iv) granting such other and further relief as this Court deems just, equitable, and proper.

### EXPEDITED RELIEF

Petitioner's conviction continues to prevent him from practicing law as an attorney, or acting as an insurance agent or working on any ERISA Employee Benefit Plan. This has caused and continues to cause significant financial instability to his family. In addition, it would be better for Society to restore Petitioner's law license so that he may help other individuals who are still in prison and not able to afford legal counsel to help them prepare the necessary legal documents to secure their release. Petitioner helped to secure the early release of over 120 inmates pursuant to the First Step Act and the CARES Act during his period of incarceration. Accordingly, to the extent possible and practicable, Petitioner most respectfully requests that his Petition be treated on an expedited basis as the Due Process delays in this case have been extraordinary to date and far exceed any other case in the history of the First Circuit.

### EXPUNGEMENT

After a conviction is invalidated "district courts possess ancillary jurisdiction to expunge criminal records. That jurisdiction flows out of the congressional grant of jurisdiction to hear cases involving offenses against the United States pursuant to 18 U.S.C. § 3231." *See, e.g., United States*

*v. Sumner,* 226 F.3d 1005, 1014 (9th Cir. 2000). Here, in the event the Court grants this Petition and invalidates Petitioner's conviction, Petitioner respectfully requests that this Court order the record of the conviction to be expunged and sealed. As discussed, *supra,* Petitioner's conviction is invalid as a matter of law and was premised on erroneous applications of the law that were never valid. Accordingly, Petitioner has demonstrated appropriate, extraordinary, and unusual circumstances to warrant the relief of expungement and the return of all funds paid to the Government over the past seven years.

## VII.   CONCLUSION

As Petitioner committed no criminal conduct in the District of Massachusetts, Venue was improper in this case and the Vicinage Clause was clearly violated in both trials requiring this Court to vacate Petitioner's conviction based on the Supreme Court's recent decision in *Smith*.

Moreover, based on the Supreme Court vacating the convictions in *Ciminelli* based on the demise of the "Right to Control Theory of Fraud", and as explained by the First Circuit in *Abdelaziz,* which is intervening law that establishes that Petitioner's conduct was at no time criminal, Petitioner respectfully moves this Court to reconsider and vacate its February 2014 Judgment as to all counts pursuant to Rule 60(b)(6).

Respectfully Submitted:


/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092
