## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **DANIEL E. CARPENTER**<br>**Petitioner,** | ) | |
| | ) | |
| | ) | **PETITION FOR WRIT OF** |
| **v.** | ) | **AUDITA QUERELA** |
| | ) | |
| **UNITED STATES OF AMERICA**<br>**Respondent.** | ) | **APRIL 3, 2024** |

<u>**TO THE HONORABLE DOUGLAS P. WHITLOCK, MAY IT PLEASE THE COURT:**</u>

NOW COMES THE PETITIONER, DANIEL E. CARPENTER, PETITIONER-CARPENTER, to respectfully request that this Honorable Court grants this Petition for a Writ of Audita Querela to vacate Petitioner's conviction pursuant to this Court's vacating the conviction and dismissing the indictment in *United States v. El Naddaf,* 662 F. Supp. 3d 108, 137–38 (D. Mass. 2023), and the Supreme Court's clear directive in *Smith v. United States,* 143 S. Ct. 1594, 1604–06, (2023). Clearly the Vicinage Clause of the Constitution was violated in both of Petitioner's trials in 2005 and 2008. Moreover, the Supreme Court also made clear in *Smith* that the Speedy Trial violations in this case would be the reason to not permit a third trial in Petitioner's case. Based on recent opinions by the Supreme Court and the First Circuit, there was no crime committed in Petitioner's case. (See e.g., *Ciminelli v. United States,* 143 S. Ct. 1121, (2023) and *United States v. Abdelaziz,* 68 F.4th, (1st Cir. 2023)). Therefore, **no crime in Massachusetts** means that the jury pool should not have been drawn from Massachusetts, regardless. This was a clear Constitutional violation.

Any criminal case should have been brought in the District of Connecticut as required by the Constitution and by the Supreme Court's clear directive in *Smith v. United States* (dealing with a computer being in the wrong District of Florida). There will not be a third trial in Connecticut, however, because the Speedy Trial Clause violations in this case are the longest and worst violations of the Speedy Trial Clause in the history of this Nation, not just for the First Circuit where *United States v. Carpenter*, 781 F. 3d 599 (1st Cir. 2015) is mentioned in every single Speedy Trial case including this Court's decision in *U.S. v. El Nadaff*, but for the entire Country.

Therefore, Petitioner respectfully requests this Court grant this Petition and issue a Writ of Audita Querela to vacate his conviction based on the obvious and conspicuous Constitutional violations in this case. Petitioner will, of course, point out that Judge Lipez and Judge Lynch of *United States v. Abdelaziz* in 2023 were also the authors of *United States v. Carpenter* in 2007 (See ECF 220).

Respectfully Submitted,

*/s/ Daniel E. Carpenter*
Daniel E. Carpenter
Petitioner, *pro se*
18 Pondside Lane
West Simsbury, CT. 06092

**NO ORAL ARGUMENT REQUESTED**

## PRELIMINARY STATEMENT

Any Federal Judge can grant the ancient Writ of Audita Querela when it appears that the conviction of a defendant may be legally flawed. See, for example, Judge Mazzone granting the Writ of Audita Querela for Mohammed Mutie Khalaf in 1999 even though he pleaded guilty to a drug charge in 1984 and had served his sentence. *United States v. Khalaf*, 116 F. Supp. 2d 210, 217 (D. Mass. 1999) (The writ of Audita Querela "constitutes the initial process in an action brought by a judgment defendant to obtain relief against the consequences of the judgment on account of some matter of defense or discharge arising since its rendition and which could not be taken advantage of otherwise." Black's Law Dictionary 120 (5th ed.1979)).

In *Khalaf*, the issue was not the fundamental errors found in Petitioner-Carpenter's case like the Speedy Trial Clause, the Vicinage Clause, the Venue Clause, the Due Process Clause, or even the egregious prosecutorial misconduct that caused both jury verdicts to be vacated. Instead, it was merely that Khalaf's attorney did not tell him he might be deported because he was a resident citizen of Jordan and he had committed a crime in the United States.

Respectfully, the only "legal" analysis that the First Circuit did well in Petitioner-Carpenter's case was to describe the "Living Hell" that Carpenter endured since his indictment in February 2004 for losing client funds in the NASDAQ Dot.com Stock Market Crash of 2000. Despite the fact that Carpenter's clients received $50,000,000 for their $8,000,000 in losses thanks to Carpenter's legal victories over PaineWebber and Merrill Lynch, the First Circuit has turned down each and every one of Petitioner-Carpenter's appeals.

While the First Circuit did apologize to Carpenter for the undue delay in Petitioner's case, which is not just the worst delay in First Circuit history – it is by far the longest and worst of any Circuit in the Country, but it is only THIS COURT that said an apology is not good enough and

granted the dismissal of the defendant's indictment in *United States v. El Nadaff*, No. CR 13-10289-2-DPW, 2023 WL 2541555 (D. Mass. Mar. 16, 2023), stating that the violation of the Speedy Trial Clause of the Constitution is more "enervating" and deserves more than a simple apology:

> Here, each of the four *Barker* factors in varying degrees weighs in favor of finding a violation of Mr. El Naddaf's Sixth Amendment right to a speedy trial. Together, they overcome the hurdles *Doggett* identified for a defendant to surmount in establishing a speedy trial claim. **It is inadequate to leave matters in this case with the observation that "the delay was unfortunate, [but] it did not impair the defense, create any undue pressure, or result in any period of incarceration." *Carpenter*, 781 F.3d at 615. The delay here did something more enervating; it deprived the defendant of his fundamental constitutional right to a speedy and public trial. Accordingly, I will grant Mr. El Naddaf's motion to dismiss the indictment for violation of his Sixth Amendment right to a speedy trial.** *United States v. El Naddaf*, No. CR 13-10289-2-DPW, 2023 WL 2541555, at *24 (D. Mass. Mar. 16, 2023).

Therefore, Petitioner-Carpenter respectfully asks this Honorable Court to issue the ancient, venerable Writ of Audita Querela or a Writ of Coram Nobis. Because of the obvious fundamental errors in this case, based on the historic Speedy Trial Clause and Speedy Trial Act violations or because of the Supreme Court's recent ruling in *Smith v. United States* deciding the Vicinage Clause for the first time and for the comments made about the Venue Clause that make it clear that Venue was certainly not proper in Massachusetts. Moreover, based on the Supreme Court's decision in *Xiulu Ruan* and the First Circuit's recent decision in *Abdelaziz*, Jurisdiction was not found in Massachusetts either. Ironically, the Judges in *Abdelaziz*, Judge Lipez and Judge Lynch, ruled for Petitioner-Carpenter in the Government's Appeal in 2007.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITIONER'S
PETITION FOR A WRIT OF AUDITA QUERELA AND TO VACATE PETITIONER'S
CONVICTION FOR VIOLATIONS OF THE CONSTITUTION**

## I.     SOMETHING MORE ENERVATING THAN HELL

Justice in the First Circuit should not come down to which Judge you draw. Recently,

several different Judges in Boston have granted a "guilty" person's Motion to Dismiss his

indictment for violations of the Speedy Trial Clause of the Constitution for delays of a mere four

years, citing Petitioner's case (as most Speedy Trial cases do), *United States v. Carpenter*, 781 F.

3d 599 (1ˢᵗ Cir. 2015). This is particularly significant as the First Circuit in *United States v.*

*Carpenter* describes very well the "Living Hell" that Petitioner has suffered at the hands of the

Government for the past 20 years, and an "apology" is just not good enough for a clear violation

of the Constitution yet again in this case:

> **Carpenter's argument instead focuses on the anxiety he suffered throughout the
> proceedings. His brief, supported by record materials, describes a "living hell" of
> lost business opportunities, financial stress, sleeplessness, panic attacks, and the like.**
> He points, however, to no opportunities that would not have been lost as well in the wake
> of a speedier conviction. And while anxiety about the outcome of post-conviction
> motions and appeals is no doubt real, anxiety is a normal part of the pendency of criminal
> charges. It therefore becomes a sign of prejudice only when "undue pressures" exist.
> **While Carpenter argues convincingly that he has suffered great stress throughout
> the proceedings, he does not demonstrate why his anxiety was greater than that
> suffered by many other defendants, other than that it continued longer. While it
> may be possible that post-conviction delay could result in prejudice by shifting the
> time period in which a defendant serves his sentence, Carpenter makes no such
> argument here.** In sum, while the length of delay causes us to presume some prejudice,
> we find nothing in this record to establish that Carpenter suffered a type of prejudice that
> would take on added weight in our assessment of the constitutionality of that delay.
> While the travel of the case as a whole was remarkable, its length arose almost entirely
> because the district court exercised (and exceeded in one instance) its discretion in
> granting Carpenter relief from verdicts against him. In the end, we have an unjustified
> delay of roughly twenty-one months, which occurred after a guilty verdict was returned
> and without any meaningful fault of the government. **While the delay was unfortunate,
> it did not impair the defense, create any undue pressure, or result in any period of
> incarceration.** *United States v. Carpenter*, 781 F.3d 599, 614–15 (1st Cir. 2015).

At the risk of having the government claim once more that Petitioner is simply "repackaging" again – Rocky Moore (another convicted killer like Duane Buck) had his conviction vacated by the Supreme Court for a delay of only 28 months, which happens to be shorter than Petitioner's "Speedy Trial Delay" from June 2008 – September 2011:

> "Inordinate delay, wholly aside from possible prejudice to a defense on the merits, may seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . **may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.**" *Moore* at 27, *citing United States v. Marion*, 404 U.S. 307, 320-21 (1971).

Once again, Petitioner respectfully suggests that he is the "One Innocent Person" out of 100 that Ben Franklin was warning us all to protect – and was a three-decade victim (perhaps even "poster-child") of "Public Obloquy" because of the Government's actions and the First Circuit's "inaction" in Petitioner's case. As Your Honor stated in *El Nadaff*:

> Length of delay analysis requires a "double enquiry," *Doggett* v. *United States*, **505 U.S. 647, 651-52, (1992)**, because it is both a "**triggering mechanism for the rest of the [speedy trial] analysis, and *a* factor in that analysis,**" *Handa*, **892 F.3d at 101 (quoting *United States* v. *Carpenter*, 781 F.3d 599, 609 (1st Cir. 2015)).** To establish at the outset that a speedy trial inquiry is necessary, "a defendant must allege that the time between accusation — whether by arrest or indictment — and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay." *Handa*, 892 F.3d at 101 quoting *United States* v. *Irizarry-Colón*, 848 F.3d 61, 68 (1st Cir. 2017)). **The First Circuit has held that a "[d]elay of around one year is considered presumptively prejudicial, and the presumption that delay prejudices the defendant 'intensifies over time.'" *Carpenter*, 781 F.3d at 610 (quoting *Doggett*, 505 U.S. at 652, 112 S. Ct. 2686).** For *Barker* factor one purposes, the delay period is calculated using the date that the defendant is "indicted, arrested, or otherwise officially accused" as its start date. **It is inadequate to leave matters in this case with the observation that "the delay was unfortunate, [but] it did not impair the defense, create any undue pressure, or result in any period of incarceration." *Carpenter*, 781 F.3d at 615. The delay here did something more enervating; it deprived the defendant of his fundamental constitutional right to a speedy and public trial.** *United States v. El Naddaf*, No. CR 13-10289-2-DPW, 2023 WL 2541555, at *24 (D. Mass. Mar. 16, 2023).

Your Honor goes on to make a number of points citing *United States v. Carpenter:*

Here, each of the four *Barker* factors in varying degrees weighs in favor of finding a violation of Mr. El Naddaf's Sixth Amendment right to a speedy trial. Together, they overcome the hurdles *Doggett* identified for a defendant to surmount in establishing a

speedy trial claim. **It is inadequate to leave matters in this case with the observation that "the delay was unfortunate, [but] it did not impair the defense, create any undue pressure, or result in any period of incarceration."** *Carpenter*, **781 F.3d at 615. The delay here did something more enervating; it deprived the defendant of his fundamental constitutional right to a speedy and public trial.**
Having conducted a full four factor *Barker* analysis as directed by *Doggett* and governing First Circuit law shaped by the Supreme Court's modern cautious, step-by-step and ad hoc approach to addressing constitutional speedy trial claims, I am not unaware of the tensions created by the interests at play. That constitutional protections are principally directed at securing for an accused the right to a speedy and public trial. That constitutional provision also serves to secure for the community a speedy and public resolution of criminal charges. **Yet the decision to move the case to trial deprives the defendant of the right to avoid trial altogether when his speedy trial rights have been breached.** In addressing the issues in this case, I was impelled by the conclusion that a meaningful balancing test here required such a trial. **With the benefit of the full record it created, I am satisfied that Mr. El Naddaf has been deprived of his constitutional speedy trial rights and that this deprivation provides an alternative ground for a judgment terminating this case.** *United States v. El Naddaf,* No. CR 13-10289-2-DPW, 2023 WL 2541555, at *24 (D. Mass. Mar. 16, 2023).

In *Doggett* v. *United States*, the Supreme Court twice cited a law review article as instructive, H. Richard Uviller, Barker v. Wingo: *Speedy Trial Gets a Fast Shuffle*, 72 Colum. L. Rev. 1376 (1972). *See Doggett* v. *United States*, 505 U.S. 647, 652 n.1 & 658 n.4, 112 S. Ct. 2686, 120 L.Ed.2d 520 (1992). There, Professor Uviller explored, *inter alia*, the "[r]ealistic[ ]" application of prejudice in the *Barker* analysis, explaining that "prejudice lies beyond the capacity of either side to prove or disprove, except in the rare instance where a known defense witness of known competence actually disappears or reports a recent impairment of memory, and no prior testimony from him is available." Uviller, *supra*, at 1394-95. **As a result, "the shift of burden actually permits the presumption of prejudice to prevail on the issue," though "[t]he establishment of [presumptive] prejudice ... does not end the inquiry; it merely focuses attention on other elements wherein impropriety or justification may be more meaningfully discerned."** *Id.* at 1395.

Your Honor then describes Judge Lipez's famous Opinion in *Velazquez* for the Third

Circuit which Petitioner-Carpenter actually mentioned to the First Circuit in 2014:

Judge Lipez, a First Circuit judge sitting by designation on the Third Circuit "note[d] that, in citing the ... [Uviller] passage for support, the *Doggett* Court was keenly aware of the practical difficulties for the prosecution in making such a rebuttal." *United States* v. *Velazquez*, 749 F.3d 161, 185 n.23 (3d Cir. 2014). **In fact, "[t]he [Supreme] Court [in *Doggett*] thus indicated that the government faces a high, and potentially insurmountable, hurdle in seeking to disprove general prejudice where the period of delay is extraordinarily long."** *Id.* at 185. **Although I have concluded Mr. El Naddaf did not establish specific prejudice, I conclude the government has failed to rebut**

7

**the inherent prejudice of a nearly five-year delay, during which no steps were taken to make Mr. El Naddaf aware of the charges against him.**
**I further note that in sitting by designation on the Third Circuit, Judge Lipez deployed a somewhat different standard of review formulation from the one applied by the First Circuit, which has "repeatedly reviewed district court rulings for abuse of discretion,"** *United States* v. *Carpenter*, **781 F.3d 599, 607 (1st Cir. 2015). This formulation "varies from that used in most other circuits," including the Third Circuit in** *Velazquez*, **"which review such claims de novo, albeit while applying clear error review to the district court's factual findings."** *Id.* **The different formulations do not appear to be material for purposes of my own responsibilities for nisi prius analysis in this case.** *United States v. El Naddaf*, No. CR 13-10289-2-DPW, 2023 WL 2541555, at \*23 (D. Mass. Mar. 16, 2023).

Your Honor also does an excellent review of the protections guaranteed by the Sixth

Amendment – none of which have protected Petitioner:

The Sixth Amendment protects a defendant's right to a prompt resolution of criminal charges against him by providing "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial ...." U.S. Const. amend VI. The right to a speedy trial "is one of the most basic rights preserved by our Constitution." *Klopfer* v. *North Carolina*, 386 U.S. 213, 226, 87 S. Ct. 988, 18 L.Ed.2d 1 (1967). **This fundamental constitutional protection recognizes "the general concern that all accused persons be treated according to decent and fair procedures."** *Barker* v. *Wingo*, 407 U.S. 514, 519, (1972). As the Supreme Court has explained, the Sixth Amendment speedy trial right is "generically different from any of the other rights enshrined in the Constitution for the protection of the accused." The Sixth Amendment implicitly recognizes that pretrial delays "might result in witness unavailability and fading memories, which may prejudice both defendants and prosecutors." (But the constitutional right to a speedy trial must also be read to "promote the interests of rehabilitation, minimize the amount of time potentially dangerous individuals are free on bond, prevent oppressive pretrial incarceration, **minimize anxiety and concern of the accused, and shorten the disruption of life caused by arrest and the presence of unresolved criminal charges."** *Id.* In determining whether a defendant's Sixth Amendment right to a speedy trial has been violated, I am directed to engage in an "ad hoc" balancing test involving the following factors set out by the Supreme Court in *Barker*: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. at 530, 92 S. Ct. 2182. The First Circuit cautioned some thirty years ago that "[t]hese factors cannot be plugged into a formula that operates with scientific precision. Rather they must be considered on a case-by-case basis 'together with such other circumstances as may be relevant.'" *United States v. El Naddaf*, No. CR 13-10289-2-DPW, 2023 WL 2541555, at \*15–16 (D. Mass. Mar. 16, 2023).

Furthermore, there is no other case in any circuit in this Country that can match the Due

Process delays in this case. Petitioner asks this Court to focus on the extraordinary Due Process

delays in this case pursuant to the Barker factors as suggested by Justice Sotomayor in her Opinion in *Betterman v. Montana*, 136 S.Ct. 1609 (2016). Viewing Petitioner's now 20 year-long "Kafkaesque" odyssey with the vision provided by *Betterman*, his preindictment delay of four years was longer than the delay in *Marion*, the inexplicable delay from June 2008 to September 2011 was longer than the delay in *Moore*, and now his total Due Process delay is more than double the seven-year delays of *United States v. Loud Hawk*, 474 U.S. 302 (1986) and *Doggett*. Now that the Supreme Court has clearly laid out the rules of Due Process in *Betterman*, this Court cannot ignore the clear violation of Petitioner's Constitutional rights.

      Petitioner respectfully asserts that there was no fraud in this case as a matter of law, nor did he have the "Fair Warning" in his indictment which is the cornerstone of American jurisprudence. But even assuming, arguendo, that Petitioner did something wrong or illegal, he certainly did not receive a fair trial in either of his two trials in 2005 and 2008. Because of the pre-indictment delay between January of 2001 and September of 2004, and the post-trial Due Process delay between sentencing of almost six years and the total Due Process delay of 15 years, it is Petitioner who should have the landmark case for both violations of the Due Process Clause under *United States v. Lovasco*, 431 U.S. 782 (1977) and *United States v. Marion*, 404 U.S. 307 (1971). In fact, it is significant that the delay of 39 months from Petitioner's trial in 2008 through September 2011 - when Judge O'Toole granted Petitioner's second new trial order - was longer than the delay for convicted murderer Rocky Moore. *See, e.g., Moore v. Arizona*, 414 U.S. 25 (1973):

> Moreover, prejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings. Inordinate delay, "wholly aside from possible prejudice to a defense on the merits, may `seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.' These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either

be incarcerated pending trial or on bail subject to substantial restrictions on his liberty." *Moore* at 27, citing *Marion* at 320-21.

The delay in this case also exceeds that of *United States v. Handa*, 892 F.3d 95 (1st Cir. 2018) and *United States v. Irizarry-Colon*, 848 F.3d 61 (1st Cir. 2017) combined, so that Petitioner's conviction and indictment should be vacated. Ironically, those two seminal cases in the First Circuit both cite Petitioner's case. *See Handa* at 101, citing *United States v. Carpenter*, 781 F.3d 599, 610 (1st Cir. 2015) ("[d]elay of around one year is considered presumptively prejudicial, and the presumption that delay prejudices the defendant intensifies over time."), and *Irizarry-Colon* at 68 (same). The Speedy Trial violations in this case are also not a close call as there was no reason for the delay from June 2008 to May 2015, nor was there any balancing tests done in the interests of justice. See *United States v. Zedner*, 547 U.S. 489, 507 (2008). Starting in 2005, Petitioner-Carpenter had six different Speedy Trial Act motions all denied for clearly erroneous reasons.

Moreover, the Barker factors that Justice Sotomayor stated in *Betterman*, and the seven-year delay between Petitioner's second trial in June 2008 and the First Circuit's decision in May 2015 (ignoring fundamental legal principles of not only the First Circuit but the Supreme Court as well), mandates that Petitioner's indictment and conviction be vacated. There were no reasons placed on the docket as required by §3161(h)(7) and the Supreme Court's decision in *Bloate v. United States*, 559 U.S. 196 (2010). Thus, the extraordinary delay in Petitioner's case is far longer than any delay in *United States v. Dezeler*, 81 F.3d 86 (8th Cir. 1996) (delay of only one day); *United States v. Huete-Sandoval*, 668 F.3d 1 (1st Cir. 2011) (delay of only 16 days), and *Bloate and United States v. Tinklenberg*, 131 S.Ct. 2007 (2011) (delays of only 9 days). As the Supreme Court has explained, "The relevant provisions of the Act are unequivocal," and "[t]he sanction for a violation of the Act is dismissal." *Zedner* at 507, 509. If "the trial does not begin on time, the

10

indictment or information must be dismissed." Id. at 508. At this point, all of the Exchangors have been paid back many times their original losses, almost $50 million on an $8 million loss in the great NASDAQ stock market crash of 20 years ago. The Exchangors received $14,000,000 before Petitioner's Second Trial in 2008 and fully released Petitioner in 2015, yet the First Circuit did not even void the Forfeitures Order against Petitioner.

Petitioner hereby requests that this Honorable Court do the same calculation that was done for the defendant in *Irizarry-Colon* and arrive at the same conclusion and grant the Writ, thereby setting aside Petitioner's conviction and dismissing his indictment with prejudice for violations of the Speedy Trial Clause. Unlike the defendant in *Handa*, Petitioner has lived in the same house in Connecticut and has been under Government investigation or supervision for the past 20 years since he lost the Exchangors' money in the NASDAQ Stock Market Crash of 2000. Petitioner would also like to emphasize the Third Circuit opinion in *United States v. Velazquez*, 749 F.3d 161 (3d Cir. 2014) written by Judge Lipez of First Circuit fame, where he reviews the six-year delay in bringing Velazquez, a notorious drug dealer and dangerous criminal, to trial. Velazquez was either evading justice (the government's view) or was just a transient individual (Third Circuit's view) when he was arrested in California and shipped back to Philadelphia on an old arrest warrant.

Meanwhile, Petitioner was dutifully checking in with pre-trial services for the 14 years leading up to his sentencing, including the five-year delay from 2008 until his new trial order was overturned in 2013. Velazquez pled guilty while preserving his Speedy Trial claim and was sentenced to 87 months. In vacating his conviction and sentence for violations of the Speedy Trial Clause, Judge Lipez discussed the second of the Barker factors: who is responsible for the delay, which is the "flag that all litigants seek to capture," *Loud Hawk* at 315:

> "Negligence over a sufficiently long period can establish a general presumption that the defendant's ability to present a defense is impaired, meaning that a defendant

can prevail on his claim despite not having shown specific prejudice. This general presumption applies because impairment of one's defense is the most difficult form of Speedy Trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown. Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett* at 655.

In other words, Judge Lipez describes exactly what happened in this case; the theory of "presumptive prejudice" because of the number of extensive delays in this case. Unlike any of these other defendant's, Petitioner's conviction, unlike anyone else, was dismissed three years after his second trial in 2008. But the Government decided to violate the "Double Jeopardy" clause of 18 U.S.C. §3731 that prevents the government from doing an appeal, and that took another two years. Petitioner's family has also suffered through this ordeal not only by numerous lost business opportunities and banks severing ties with them, but simply through the personal pain of watching their loved one suffer while incarcerated and through relentless litigation by the government. *United States v. Ferreira*, 665 F.2d 701 (6th Cir. 2011), *Dixon v. White*, 210 Fed. Appx. 498 (6th Cir. 2007), *United States v. Erenas-Luna*, 560 F.3d 772 (8th Cir. 2009), *United States v. Ingram*, 446 F.3d 1332 (11th Cir. 2006), and the policy behind Speedy Trial rights support a conclusion that both the negligence that the Government exhibited and the significant length in the several separate delays warrant the dismissal of the Indictment in this case with prejudice as well as vacating Petitioner's conviction.

## II.     THE SUPREME COURT'S DECISION IN *SMITH v. UNITED STATES* REQUIRES THIS COURT TO VACATE PETITIONER'S CONVICTION FOR VIOLATIONS OF THE VICINAGE CLAUSE

Respectfully, by listening to the Government, the First Circuit has committed Manifest Plain Error that will clearly be pointed out on appeal to the Supreme Court if not the First Circuit by Judge Lipez and Judge Lynch; and therefore Petitioner-Carpenter respectfully asks this Court

to grant this Petition of Audita Querela. See the Supreme Court's decision in *Rosales-Mireles v. United States,* 138 S. Ct. 1897 (2018) citing *Molina-Martinez v. United States*, 136 S. Ct. 1338 (2016), for the definition of Plain Error.

Furthermore, virtually all Constitutional scholars cite Benjamin Franklin's Maxim "That it is better to let 100 Guilty Persons escape rather than One Innocent Person suffer" – as the source and support for most of the "guaranteed" Constitutional protections for criminal defendants written into the Constitution and the Bill of Rights:

> That it is better 100 guilty Persons should escape, than that one innocent Person should suffer, is a Maxim that has been long & generally approv'd, never that I know of controverted. Even the sanguinary Author of the *Thoughts* agrees to it page 163, adding well, that "the very Thought of *injured* Innocence, and much more that of *suffering* Innocence, must awaken all our tenderest and most compassionate Feelings, and at the same time raise our highest Indignation against the Instruments of it.

> This principle had been most recently enunciated by Sir William Blackstone in his *Commentaries on the Laws of England* (4th ed.; 4 vols., Dublin, 1771), iv 352: "all presumptive evidence of felony should be admitted cautiously: for the law holds, that it is better that ten guilty persons escape, than that one innocent suffer."
> Letter from Benjamin Franklin to Benjamin Vaughan, March 14, 1785, courtesy of The National Archives.

Respectfully, Petitioner suggests to Your Honor that for the past 20 years he has played the role of the "One Innocent Person" that Benjamin Franklin warned we should not let suffer. But even assuming *arguendo* that Petitioner was "guilty as sin" as the Government still suggests – whatever Petitioner did or failed to do – he did in Connecticut. And this is what the Supreme Court said recently in 2023 describing the history of the Vicinage Clause, which requires this Court to vacate Petitioner's conviction and forever end the Government's bogus claims of "repackaging" the dozen major constitutional violations in this case:

> There is no question that the founding generation enthusiastically embraced the vicinage right and wielded it "as a political argument of the Revolution." Prior to the Revolution, Parliament enacted measures to circumvent local trials before colonial juries, most notably by authorizing trials in England for both British soldiers charged with murdering colonists

and colonists accused of treason. The Continental Congress and colonial legislatures forcefully objected to trials in England before loyalist juries, characterizing the practice as an affront to the existing "common law of England, and more especially to the great and inestimable privilege of being tried by ... peers of the vicinage." The Declaration of Independence also denounced these laws, under which, it said, British soldiers were "protect[ed] ... by a mock Trial" and colonists were "transport[ed] ... beyond the Seas to be tried for pretended offences." As States declared independence, most incorporated some form of a venue or vicinage clause in their governing documents, but none of these provisions specified a particular remedy for violations. The common-law vicinage right, both as a jury requirement and as a proxy for venue, remained prominent during debates over the ratification of the Constitution. As originally proposed, the Constitution contained only the Venue Clause, which, as noted, says nothing about jury composition. Appealing to "ancient common law," Anti-Federalists objected to this omission. Federalists responded that Congress could secure the vicinage right by statute, analogizing to common law, where "the preservation of this right [was] in the hands of Parliament." After the ratification of the Constitution, Congress yielded in part to the Anti-Federalists' argument and included a vicinage right in the Sixth Amendment. James Madison's initial draft of the Amendment required a jury "of the vicinage," 1 Annals of Cong. 435 (1789), **but Congress amended that language so that it guaranteed a jury from the State of the crime and from any smaller judicial districts that Congress chose to create.** This history tells us two important things about the way in which the Constitution dealt with the common-law vicinage right. First, the right was highly prized by the founding generation, and this right undoubtedly inspired the Venue and Vicinage Clauses. Second, although the Clauses depart in some respects from the common law—most notably by providing new specifications about the place where a crime may be tried—there is no meaningful evidence that the Constitution altered the remedy prescribed by common law for violations of the vicinage right. *Smith v. United States*, 143 S. Ct. 1594, 1604–06, (2023).

## III.    THE MASSACHUSETTS COURT LACKED SUBJECT MATTER JURISDICTION

Recently, the First Circuit vacated the conviction of a person who pleaded guilty because the District Court may not have had jurisdiction and the indictment did not specify the exact elements of the crime. This was considered Plain Error. In *United States v. Guzman-Merced*, 2020 WL 7585176 (1st Cir. 2020), the First Circuit found there was Plain Error and reversed the 924(c) convictions of two convicted felons based on the Supreme Court's decision in *Rehaif v. United States*, 139 S.Ct. 2191 (2019). Petitioner has clearly satisfied the standards of Plain Error as stated

14

in *United States v. Lara,* 970 F.3d 68, 84 (1st Cir. 2020) *citing United States v. Rosa- Ortiz,* 348 F.3d 33, 36 (1st Cir. 2003):

> "[a] federal court lacks jurisdiction to enter a judgment of conviction when the indictment charges no offense under federal law. These challenges raise a number of questions about the application of the plain error standard of review, which provides that a clear or obvious error should be corrected if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States,* 138 S.Ct. 1897, 1905 (2018) (*quoting Molina-Martinez v. United States,* 136 S.Ct. 1338, 1343 (2016)).

The Supreme Court has made it clear that subject matter jurisdiction can be challenged any time, even after a judgment had been rendered. *See Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514 (2006). As the First Circuit determined in *United States v. Bravo-Fernandez,* 913 F.3d 244 (1st Cir. 2019), which has not been going on as long as the Petitioner's case, the Government failed to allege and prove at trial an essential jurisdictional element of the crime so the conviction had to be set aside and the indictment had to be dismissed.

Petitioner submits to this Court that, based on the First Circuit's decisions in *Bravo-Fernandez, Tavares, United States v. Berroa,* 856 F.3d 141 (1st Cir. 2017) and especially the Supreme Court's decision in *Skilling,* the District Court in Boston lacked subject matter jurisdiction because Petitioner's indictment lacked all five essential elements of the Mail and Wire Fraud statutes, and therefore the Petitioner's conviction should be set aside based on *United States v. Aleynikov,* 676 F.3d 71 (2d Cir 2012), which in turn was based largely upon the First Circuit's decision in *United States v. Rosa-Ortiz,* 348 F.3d 33 (1st Cir. 2003), which was based on *United States v. Peter,* 310 F.3d 709 (11th Cir. 2002), which in turn was based on the Supreme Court's decision in *Cleveland v. United States,* 531 U.S. 12 (2000), **which was also the basis** for the Supreme Court's recent unanimous decision in *Kelly v. United States.*

The reason the District Court in Boston did not have jurisdiction is because just like in *Aleynikov,* and *Rosa-Ortiz,* the alleged conduct described in the Indictment did not establish a

15

federal crime. In *Rosa-Ortiz*, the indictment charged the defendant with conspiring to violate Section 751(a) by assisting in the escape of his co- defendant who was in federal custody on a federal material witness warrant. The defendant pleaded guilty to that charge and appealed, arguing that his conduct was not within the crime charged. Furthermore, it is black-letter law that a defective indictment does not invoke the jurisdiction of the federal courts and any decision by a District court that lacks jurisdiction is a nullity and is void as a matter of law.

In this Petition, Petitioner raises several separate arguments. First, the District Court in Boston lacked jurisdiction because just as in *Peter*, the law of mail and wire fraud was changed by the Supreme Court's decisions in *Cleveland, Skilling, Kelly*, and *Ciminelli*; and just as the defendant in *United States v. Guzman-Merced*, 2020 WL 7585176 (1st Cir. 2020) benefited from the Supreme Court's decision in *Rehaif v. United States*, 139 S.Ct. 2191 (2019), the Petitioner respectfully asserts that the Supreme Court's unanimous decisions in *Kelly* - and certainly in *Skilling* - changed forever the requirements of mail and wire fraud because:

"[N]ondisclosure is outside the bounds of the fraud statutes." *Skilling* at 400.

Additionally, based on the First Circuit's decision in *Tavares*, since none of the mailings in that case were in furtherance of any crime, clearly there could be no mail or wire fraud in Petitioner's case, and since the indictment failed to properly state all of the elements of a federal crime, it was therefore constitutionally and fatally defective.

The District Court also lacked jurisdiction pursuant to Fed.R.Crim.P. 12(b)(3)(B) because the Indictment of 2004 failed to allege all of the facts necessary to constitute a federal offense, and because the Indictment failed to charge Mail and Wire Fraud with the particularity needed to invoke the Court's jurisdiction, this was plain error under the standards set by the Supreme Court in its decision in *Rosales-Mireles v. United States,* 138 S.Ct. 1897 (2018) *citing Molina-Martinez*

*v. United States*, 136 S.Ct. 1338 (2016). In this case, Petitioner's Indictment was woefully inadequate as to all five elements that must be sufficiently alleged to establish a federal crime. Since both of Petitioner's indictments were in 2004, they must be considered under the old Rule 12(b)(3)(B) prior to the change in December 2014. Petitioner's challenge to jurisdiction is still timely and meritorious.

Therefore, the Indictment was either constructively amended or failed to state a federal crime at all and thus, the Indictment must be dismissed and a 2243 Writ must be issued to vacate Petitioner's conviction. Significantly, in issuing the appropriate Writ, the Court should take notice of the fact there was never a failure to make an exchange until after January 2001 when PaineWebber swept all the funds from the BPETCO account, and as this Court knows well, failure to complete an agreement does not constitute fraud.

Similarly, in the "Bridgegate" case of *Kelly v. United States*, the Supreme Court made it clear that the intent to acquire someone else's property using deceit must be at the core of the charged criminal act:

> But that property must play more than some bit part in a scheme: It must be an "object of the fraud." Or put differently, a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme. Without that rule, as Judge Easterbrook has elaborated, even a practical joke could be a federal felony. See *United States v. Walters*, 997 F.2d 1219, 1224 (CA7 1993). His example goes: "A [e-mails] B an invitation to a surprise party for their mutual friend C. B drives his car to the place named in the invitation," thus expending the cost of gasoline. "But there is no party; the address is a vacant lot; B is the butt of a joke." Wire fraud? No. And for the reason Judge Easterbrook gave: "[T]he victim's loss must be an objective of the [deceitful] scheme rather than a byproduct of it." *Id.*, at 1226.

In his highly regarded report to Congress on mail and wire fraud dated July 21, 2011, Charles Doyle of the Congressional Research Service, states that all five of the elements of mail and wire fraud that must be alleged in an indictment and **proven beyond a reasonable doubt** before someone can be convicted:

17

(1)     Used either mail or wire communications **in the foreseeable furtherance**,

(2)     of a **scheme to defraud**,

(3)     involving a **material** deception,

(4)     with the **intent to deprive** another of,

(5)     either **property** or honest services.

See Congressional Research Service, CRS Report R41931, *Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law*, by Charles Doyle, July 21, 2011.

Failure to properly allege each and every one of these elements with sufficient facts renders an indictment facially invalid and does not properly invoke the jurisdiction of the federal courts. "Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *United States v. Russell*, 369 U.S. 749, 764 (1962). Suffice it to say, the Government did not prove **any of these five elements** at Petitioner's trial, much less proving **all five** beyond a reasonable doubt as Charles Doyle's 2011 Report to Congress says it is required to do.

Therefore, as with the defendants in *Bravo-Fernandez*, Petitioner's conviction should be set aside. Petitioner's Indictment is also devoid of any *specific* intent to defraud, or the required "tangible economic harm." In fact, the words "*mens rea*," "scienter," and even the "specific intent to defraud" are nowhere to be found in the Indictment, even though those words are required by the US Attorney's Manual. *See USAM Chapter 9-43.000, Criminal Resource Manual at 948* and by Justice Breyer in his unanimous decision in *Ruan*. As the Eleventh Circuit explained in dismissing the indictment and vacating the conviction in *Peter*:

> The problem is not that the Government's case left unanswered a question whether its evidence would encompass a particular fact or element. But that the Government affirmatively alleged specific conduct that is outside the reach of the mail fraud statute. Peter's innocence of the charged offense appears from the very allegations made in the

18

superseding information, not from the omission of allegations requisite to liability. *Peter* at 715.

That is precisely the problem with the Indictment in Petitioner's case. Each count of the Indictment that charges Petitioner with an alleged federal crime merely parrots the language of the Mail and Wire Fraud statute without any details of what makes Petitioner's **own personal** conduct criminal, there was no conspiracy charged in this case, so it is only the personal conduct of Petitioner that is at issue. More importantly, none of the counts allege facts that would bring Petitioner's conduct within the meaning of the Mail and Wire Fraud statutes under any circumstances after *Skilling* and *Tavares*. As the First Circuit stated in *Rosa-Ortiz*, "a federal court has jurisdiction to try criminal cases only when the information or indictment alleges a violation of a valid federal law. *United States v. Saade*, 652 F.2d 1126, 1134 (1st Cir. 1981)." A federal court similarly lacks jurisdiction to enter a judgment of conviction when the indictment charges no offense under federal law whatsoever. *See Peter, citing United States v. Morgan*, 346 U.S. 502 (1954), where the Eleventh Circuit made it unequivocally clear that:

> **"When a court without jurisdiction convicts and sentences a defendant, the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force."** *Peter* at 715.

Significantly, none of the mailings or wires were done or caused by Petitioner, and none of the mailings and wires were done in *furtherance* of a scheme to defraud. Only a select set of frauds reach the level required for a Mail and Wire Fraud prosecution. Specifically, in this case, the Government failed to allege all five elements necessary to invoke a federal court's jurisdiction. For example, the words "in furtherance" are nowhere to be found in Petitioner's 2004 Indictment.

Just as the First Circuit determined in 2019 that the original indictment in *Bravo-Fernandez* failed to allege and the government failed to prove only one of the essential jurisdictional elements under 18 U.S.C. §666, so too does the Petitioner want to point out to this Court that the indictment

19

of 2004 was missing all of the jurisdictional elements necessary for Mail and Wire fraud according to Charles Doyle, including the fact that there was no mention of intent, *mens rea*, or scienter anywhere in the indictment or at both trials. Moreover, the Government failed to prove any of those elements, much less all five elements at two trials. Petitioner, therefore respectfully asks this Court to review the case not in the lens of the Law as it existed in December 2005, but rather through the lens of the Second Circuit, First Circuit, and Supreme Court cases in 2023. For example, as the First Circuit stated in *United States v. Valdes-Ayaya*, 900 F.3d 20 (1st Cir. 2018):

> **That leaves the fourth prong of plain error review-whether the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." The Supreme Court has recently made this an easy decision for us. In *Rosales-Mireles*, the Court held that, "[i]n the ordinary case, the failure to correct a [plain error] that affects a defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings." *Id.* at 43.**

Therefore, just as the Writ of Coram Nobis in *Peter* led to the win in *Kelly*, "Bridgegate" was based on the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000) that changed the rules of Mail and Wire Fraud, so too did the Supreme Court's unanimous decision in *Ciminelli* further forever change the rules of Mail and Wire Fraud in 2023. Since the District Court's decision in Boston on most of these major issues was written in December 2005, Petitioner would like to respectfully request that this Court review the constitutionally defective Indictment of 2004 based on the Law as it exists in 2023 as with the Supreme Court's decisions in *Ruan* and most recently in *Ciminelli* and *Percoco* defining what is required for a proper indictment to invoke the jurisdiction of the Federal Court and what constitutes "property" under the Fraud Statutes. A challenge to the district court's jurisdiction to hear a given case can never be waived or forfeited. *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006). Certain constitutional challenges asserting a "right not to be hauled into court" cannot be waived even through a guilty plea. *Blackledge v. Perry*, 417 U.S. 21, 31 (1974).

Because Petitioner's Indictment of 2004 clearly fails to state a crime against the United States or shows how any conduct of Petitioner violated a federal statute and does not reasonably allege the facts necessary to invoke the jurisdiction of the District Court in Boston, Petitioner's judgment and conviction must be overturned because the District Court lacked jurisdiction. This jurisdictional defect cannot be waived or ignored. See e.g, *United States v. Morgan*, 346 U.S. 502 (1954), a case involving a Writ of Coram Nobis where someone challenged the jurisdiction of the court even after serving his sentence, citing *United States v. Mayer*, 235 U.S. 55 (1914), that this type of "jurisdictional error" has been historically recognized as the most "fundamental" of all fundamental errors. In fact, a judgment by a district court that lacks jurisdiction is null and void as a matter of law. See *United States v. Peter*, 310 F.3d 709 (11th Cir. 2002):

> "When a court without jurisdiction convicts and sentences a defendant, the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force." *Peter* at 715, citing *Morgan* at 509 n.15.

The Supreme Court in *Morgan* went on to say that the law recognizes that there must be a vehicle to correct errors "of the most fundamental character, that is, such as rendered the proceeding itself irregular and invalid." *Morgan* at 509, *quoting United States v. Mayer*, 235 U.S. 55, 69 (1914).

Such jurisdictional errors can never be waived, and if a court lacks jurisdiction, the case must be dismissed. See *Louisville & Nashville Railroad v. Motley*, 211 U.S. 149, 152 (1908) (ordering case dismissed for lack of jurisdiction despite absence of objection from either party). "Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *Russell*, 369 U.S. at 764. Accordingly, the District Court in Boston lacked jurisdiction to proceed any further because the Petitioner's Indictment does not even sufficiently allege a breach

of contract, much less any crime, much less the Federal crime of Mail and Wire Fraud. Not all frauds rise to the level of Federal Mail and Wire fraud. *See, e.g., McEvoy Travel v. Heritage Travel,* 904 F.2d 786 (1990).

In 2012, the Second Circuit used Rule 12(b)(3)(B) to overturn the famous conviction of the Goldman Sachs programmer Sergei Aleynikov, who like Petitioner, went to trial, was found guilty, and had his guilty verdict overturned pursuant to Rule 12(b)(3)(B) and the lack of jurisdiction established by his indictment, and unfortunately like Petitioner had to endure his own legal odyssey. But the Second Circuit's decision in *Aleynikov* is based largely on the First Circuit's decision in *Rosa-Ortiz*, which is primarily based on the Eleventh Circuit's decision in *Peter*, which came **after** *Cotton*, the Government's Favorite case to quote and spends a great deal of time explaining why the ruling in *Cotton* has nothing at all to do with the facts of the Petitioner's case. In fact, the ruling by the Eleventh Circuit in *Peter* is directly on point to Petitioner's Rule 12(b)(3)(B) claim in Boston because it involves a mail fraud claim and once again - unlike Petitioner - *Peter* pled guilty. It is significant for Petitioner's 12(b)(3)B claim that *Peter, Rosa-Ortiz,* and *Aleynikov,* are all decided after *Cotton,* and *Peter* does an excellent job in explaining why the Government's prosecution of Petitioner in Boston was unconstitutional in all respects and why the Petitioner's Indictment should be dismissed just as was done in *Peter,* and *Cleveland,* and *Kelly.* The type of claim that exists in the Petitioner's case has been historically recognized as the most "fundamental" of all fundamental errors and that is what is referred to as "jurisdictional error."

In fact, the Petitioner's previously filed 2255 Petition is an example of a motion based on challenging the fundamental error knows as "jurisdictional" error. A Writ of Habeas Corpus "has long been available to attack convictions and sentences entered by a court without jurisdiction."

22

*United States v. Addonizio*, 442 U.S. 178, 185 (1975). Since the First Circuit's decision is based largely on *Peter*, and both *Rosa-Ortiz* and *Peter* are subsequent to *Cotton* and both mention and distinguish *Cotton*, and since the court in *Peter* based its decision largely on an old Fifth Circuit case *United States v. Meacham*, 626 F.2d 503 (5th Cir. 1980) that a federal court is without jurisdiction to accept even a guilty plea for a "non-offense" or when the indictment, like in the Petitioner's case, fails to state a federal offense, this Court should grant my 2243 Petition.

In addition, the Notice Clause of the Sixth Amendment requires that a criminal defendant must be informed of the actual nature and the cause of the accusations against him. An indictment that merely tracks the language of a statute and alleges vague criminality **but alleges no facts that actually violate the statute it charges** cannot be sustained. See, *U.S. v. Simmons*, 96 U.S. 360, 362 (1878):

> "...the accused must be apprised by the indictment, with reasonable certainty, of the nature of the accusation against him, to the end that he may prepare his defense.... An indictment not so framed is defective, although it may follow the language of the statute."

"Real notice of the true nature of the charge...is the first and most universally recognized requirement of Due Process." *Smith v. O'Grady*, 312 U.S. 329, 334 (1941). "Fair warning should be...in language the common world will understand, of what the law intends to do if a certain line is passed." *Arthur Andersen v. U.S.*, 544 U.S. 696 (2005) citing *McBoyle v U.S.*, 283 U.S. 25, 27 (1931). "The office of the indictment demands specific facts of what conduct by the accused constitutes a crime, and that conduct must be correlated with what is prohibited by the statute and what is the very core of criminality." *Russell v. United States*, 369 U.S. 749, 764 (1962). Far from informing Petitioner of the nature of the accusation, Petitioner's Indictment left the prosecution free to roam at large; to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal. See *Russell* at 768. Petitioner's Indictment must also be

dismissed because it fails to allege any "**knowledge**" on Petitioner's part that he was **willfully** participating in a scheme to defraud or that he knew that any of his conduct was actually breaking the law. In *Pettibone v. U.S.*, 148 U.S. 197 (1893), the defendants were charged with encouraging mine workers to disobey an injunction, and the Supreme Court, in reversing their conviction, stated:

> It seems clear that an indictment against a person…must charge a knowledge or notice, on the part of the accused….Unless that fact exists, the statutory offense cannot be committed…and without such knowledge or notice, the evil intent is lacking. *Id.* at 206.

This requirement of a direct and explicit allegation of knowledge of breaking the law or knowledge that a law was broken in an indictment was reiterated by the Supreme Court 50 years later in *Direct Sales v. U.S.*, 319 U.S. 703 (1943), where the Court reaffirmed *Pettibone*:

> Without the knowledge, the intent cannot exist….Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal….This, because charges…are not to be made out by piling inference on inference, thus fashioning…a dragnet to draw in all substantive crimes. *Direct Sales* at 711.

See, also, Chief Justice John Roberts' opinion in *Elonis* citing *Staples*:

> "[A] defendant must have knowledge of 'the facts that make his conduct fit the definition of the offense.'" *Staples*, 511 U.S. at 608.

To date, however, the Government has not alleged or proven even one false written or oral statement made by Petitioner; and reviewing marketing materials cannot possibly be a crime if deliberate misrepresentations in a mutual fund prospectus are not criminal. *See, e.g.,* the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), stating that inaccuracies in a mutual fund prospectus did not give rise to a crime. See, also, *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008). Once again, these dispositive Supreme Court Cases just like *Skilling* were decided in the 2008-2011 interim

24

period between Petitioner's last trial in 2008 and Judge O'Toole's Second New Trial Order in 2011.

Furthermore, something more than a breach of contract or even "deceit" is required to make a case for mail and wire fraud. See, e.g., *U.S. v. Shellef*, 507 F.3d 82, 107-109 (2d Cir. 2007), citing *Starr* and *Regent Office* among other cases. The government must show that the defendant actually contemplated "concrete harm" to his victims. See *United States v. Rossomando*, 144 F.3d 197, 201 n.4 (2d Cir. 1998). Also, silence is not a crime, unless there is a duty to speak. See <u>*Backman v. Polaroid Corp., 910 F. 2d 10,*</u> 13 (1st Cir. 1990), citing *Chiarella v. U.S.,* 445 U.S. 222 (1980), where the Supreme Court clearly states: "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Id.* at 235. It is axiomatic that statutes creating and defining crimes cannot be extended by intendment, and that no act, however wrongful, can be punished under such a statute unless clearly within its terms. "There can be no constructive offences, and before a man can be punished, his case must be plainly and unmistakably within the statute." *U.S. v. Lacher*, 134 U.S. 624 (1890).

But in Petitioner's case the government has punished an innocent man for unspecific "otherwise innocent conduct" that Petitioner did not cause and could not possibly foresee at the time to be criminal. See *U.S. v. Cleveland*, 531 U.S. 12 (2000) as quoted in *Kelly* and *Marinello*.

From the earliest days of the Constitution, and until the middle of the twentieth century, habeas relief was limited to claims that the court lacked "jurisdiction". *See, e.g., McCleskey v. Zant*, 499 U.S. 467, 468 (1991). The understanding of a court lacking "jurisdiction" at the time of the Founding Fathers encompassed claims that an individual was detained for conduct that was not actually criminal under the applicable law.

Thus, the Framers understood that courts lacked jurisdiction to convict an individual for conduct that (in retrospect, of course, upon review) was not, by statute, a crime. *See Ex parte Yarbrough*, 110 U.S. 651, 654 (1884). ("If the law which defines the offence and prescribes its punishment is void, the court was without jurisdiction, and the prisoners must be discharged."); *Ex parte Siebold*, 100 U.S. 371, 375 (1879) (holding a "party imprisoned under a sentence of a United States court, upon conviction of a crime created by and indictable under an unconstitutional act of Congress, may be discharged from imprisonment by this court on habeas corpus" because there was no authority to indict and try the defendant for a crime is "illegal and void, and cannot be a legal cause of imprisonment"); *cf. Ex parte Page*, 49 Mo. 291, 294 (1872) (granting habeas to a person sentenced to ten years under statute that allowed maximum sentence of seven years because the "judgment of the court in passing sentence was illegal" and "absolutely void" and thus exceed[ed] the jurisdiction of the court and [was not] the exercise of an authority prescribed by law").

*Bousley v. United States*, 523 U.S. 614 (1998), totally supports Petitioner's constitutional entitlement to reconsideration and review by this Court. There, Bousley pleaded guilty to "using" a firearm in violation of 18 U.S.C. § 924(c)(1), on the ground that guns in his "bedroom were in close proximity to drugs and were readily accessible". 523 U.S. at 617. Five years later, the Supreme Court interpreted Section 924(c)(1)'s "use" prong more restrictively, requiring a showing of "active employment of the firearm", not merely "storing a weapon near drugs". *Id.* Bousley sought collateral relief under 28 U.S.C. § 2255, alleging that his plea was unintelligent because he was misinformed about the elements of a Section 924(c)(1) offense. The Supreme Court agreed. And while it held that Bousley had procedurally defaulted that claim by failing to raise it on direct

review, that default did not bar relief insofar as petitioner could "establish actual innocence." 523 U.S. at 623. As the Supreme Court famously explained:

> "[D]ecisions of this Court holding that a substantive federal Criminal statute does not reach certain conduct, like decisions placing conduct beyond the power of the criminal law-making authority to proscribe, necessarily carry a significant risk that a Defendant stands convicted of an act that the law does not make criminal ... Accordingly, it would be inconsistent with the doctrinal underpinnings of habeas review to preclude petitioner from relying on [an intervening decision] in support of his claim that his guilty plea was constitutionally invalid."

In short, the Supreme Court relied on constitutional concerns to allow the defendant in *Bousley* to advance his claim where the Supreme Court's recent interpretation of a criminal statute created "a significant risk that a defendant stands convicted of an act that the law does not make criminal". *Id.* At 620 (internal quotation marks omitted). Similar constitutional concerns favor this Court reconsidering and vacating the Petitioner's conviction because nothing he did was "criminal" or in violation of any law in the past and certainly **not** with the Supreme Court's recent decisions.

The Due Process Clause also prohibits continued imprisonment for conduct that "a criminal statute, as properly interpreted, does not prohibit". *Fiore v. White*, 531 U.S. 255, 228 (2001) (per curiam). Like Petitioner here, the defendant in *Fiore* was convicted of violating a statute that was later interpreted to clarify that an element of the crime has a narrower meaning than the meaning understood at the time the defendant was convicted. The Supreme Court deemed it "clear" that Due Process forbade Fiore's "conviction and continued incarceration" for conduct that a criminal statute, "as properly interpreted, does not prohibit". *Id.; see also Bunkley v. Florida*, 538 U.S. 835, 840 (2003) ("It has long been established by this Court that the 'Due Process Clause . . . forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt.'" (quoting *Fiore*, 531 U.S. at 228-29)). As the Supreme Court previously explained, [t]here

can be no room for doubt" that sustaining "conviction and punishment . . . for an act that the law does not make criminal "inherently results in a complete miscarriage of justice." *Davis v. United States*, 417 U.S. 333, 346-47 (1974).

For similar reasons, punishing Petitioner for conduct that Congress did not make criminal also violates the Separation of Powers under the Constitution. "[U]nder our federal system it is only Congress, and not the courts, which can make conduct criminal". *Bousley*, 523 U.S. at 620-21; *see also United States v. Lanier*, 520 U.S. 259, 267-68, n.6 (1997); *United States v. Hudson*, 11 U.S. 32 (7 Cranch) (1812). Therefore, where the Supreme Court construes a federal criminal statute, detaining individuals under contrary readings of the statute exceeds the District Court's constitutionally granted authority. Such is the case under the facts this Court must assume here. Petitioner is currently being punished not because *Congress* authorized his punishment, but because *a federal court* erroneously construed the statute to criminalize conduct Congress did not in fact make a crime and which now everyone knows is not, in fact, criminal conduct.

The Supreme Court's direction that substantive interpretations narrowing criminal statutes apply retroactively on collateral review further supports the notion that the Constitution precludes punishing individuals under statutes that do not in fact criminalize their conduct – regardless of when it is actually determined what is and is not criminal conduct. In *Mackey v. United States*, 401 U.S. 667, 675 (1971), Justice Harlan articulated a view of retroactivity for cases on collateral review, later adopted in *Teague v. Lane*, 489 U.S. 288 (1989), that finality interests should yield when a conviction is attacked on the grounds, as is it here, that the "conduct [is] beyond the power of the criminal law-making authority to proscribe". *Id.* at 310; *see Mackey*, 401 U.S. at 692-93 (Harlan, J., opinion concurring in judgments in part). Because **"[a] conviction or sentence imposed in violation of a substantive rule is not just erroneous but contrary to law and, as a**

result, void . . . a court has no authority to leave in place a conviction or sentence that violates a substantive rule, regardless of whether the conviction or sentence became final before the rule was announced." *Montgomery v. Louisiana*, 577 U.S. 190, 203 (2016).

Accordingly, both the Due Process Clause and the Separation of Powers supports the common-sense proposition that the Constitution does not permit the continued punishment of an individual whose conduct was not actually a crime.

Moreover, punishing someone for conduct that is not actually a crime would also violate the Eighth Amendment. Punishment is "cruel and unusual" U.S. Const. amend. VIII, when it is "grossly disproportionate and excessive punishment for the crime". *Solem v. Helm*, 463 U.S. 277, 288 (1983). That being so, it must also violate the Eighth Amendment to inflict punishment for no crime at all, as was done in this case by this Court. **Serving "[e]ven one day in prison would be a cruel and unusual punishment for the 'crime of' something that the law does not punish.** *See Robinson v. California*, 370 U.S. 660, 667 (1962).

## IV.  THE SUPREME COURT'S UNANIMOUS DECISION IN *XIULU RUAN* IS ALSO DISPOSITIVE IN THIS CASE

On June 30, 2022 the Supreme Court granted Certiorari in four different Writs attacking the Second Circuit's "Right to Control Theory" of Fraud. The decisions were announced on Friday July 1st and the Petitioners were released from prison the next day on a Saturday. Petitioner has respectfully asked for the immediate issuance of the Writ as was done in *Ex Parte Merryman*, 17 F. Cas. 144 (1861)—in two days during the Civil War.

Prior to that on June 27, 2022 the Supreme Court vacated the conviction of a doctor, who thought he was writing legal prescriptions, with Justice Breyer writing for a 9-0 unanimous Supreme Court in *Ruan*:

First as a general matter, our criminal law seeks to punish the "vicious will." *Morissette v. United States*, 342 U.S. 246, (1952); With few exceptions, "wrongdoing must be conscious to be criminal." *Elonis v. United States*, 575 U.S. 723, 734, (2015) (quoting *Morissette*, 342 U.S. at 252, 72 S.Ct. 240). Indeed, we have said that consciousness of wrongdoing is a principle "as universal and persistent in mature systems of [criminal] law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil."

Consequently, when we interpret criminal statutes, we normally "start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state." *Rehaif v. United States*, 588 U. S. ——, ——, 139 S.Ct. 2191, 2195, (2019). We have referred to this culpable mental state as "scienter," which means the degree of knowledge necessary to make a person criminally responsible for his or her acts. *Morissette*, 342 U.S. at 250–252, 72 (1952)

Applying the presumption of scienter, we have read into criminal statutes that are "silent on the required mental state"—meaning statutes that contain no *mens rea* provision whatsoever—" that *mens rea* which is necessary to separate wrongful conduct from "otherwise innocent conduct." *Elonis*, 575 U.S. at 736, 135 S.Ct. 2001. Unsurprisingly, given the meaning of scienter, the *mens rea* we have read into such statutes is often that of knowledge or intent. *See, e.g., Staples v. United States*, 511 U.S. 600, 619, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); *United States v. United States Gypsum Co.*, 438 U.S. 422, 444–446, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978).

And when a statute is not silent as to *mens rea* but instead "includes a general scienter provision," "the presumption applies with equal or greater force" to the scope of that provision. *Rehaif*, 588 U. S., at ——, 139 S.Ct., at 2195 (emphasis added). We have accordingly held that a word such as "knowingly" modifies not only the words directly following it, but also those other statutory terms that "separate wrongful from innocent acts." Id., at ——, 139 S.Ct., at 2197; see, e.g., ibid.; *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72, 115 S.Ct. 464 (1994); *Liparota v. United States*, 471 U.S. 419, 426, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). Applying § 841's "knowingly or intentionally" *mens rea* to the authorization clause thus "helps advance the purpose of scienter, for it helps to separate wrongful from innocent acts." *Rehaif*, 588 U. S., at ——, 139 S.Ct., at 2197; see also *X-Citement Video*, 513 U.S. at 72–73, 115 S.Ct. 464.

Rather, § 841 imposes severe penalties upon those who violate it, including life imprisonment and fines up to $1 million. See § 841(b)(1)(C); see generally § 841(b). **Such severe penalties counsel in favor of a strong scienter requirement. See *Staples*, 511 U.S. at 618–619, 114 S.Ct. 1793 (noting that "a severe penalty is a further factor tending to suggest that ... the usual presumption that a**

**defendant must know the facts that make his conduct illegal should apply");**
***United States Gypsum*, 438 U.S. at 442, n. 18, 98 S.Ct. 2864.**

Analogous precedent reinforces our conclusion. In *Liparota*, we interpreted a statute penalizing anyone who " 'knowingly uses [food stamps] in any manner not authorized by' " statute. 471 U.S. at 420, 105 S.Ct. 2084. We held that "knowingly" modified both the "use" of food stamps element and the element that the use be "not authorized." *Id.*, at 423, 433, 105 S.Ct. 2084. We applied "knowingly" to the authorization language even though Congress had not "explicitly and unambiguously" indicated that it should so apply. *Id.*, at 426, 105 S.Ct. 2084. But if knowingly did not modify the fact of nonauthorization, we explained, the statute "would ... criminalize a broad range of apparently innocent conduct." *Ibid.*

Similarly, in *X-Citement Video*, we interpreted a statute penalizing anyone who " 'knowingly transports' " or " 'knowingly receives' " videos " 'involv[ing] the use of a minor engaging in sexually explicit conduct.' " 513 U.S. at 68, 115 S.Ct. 464. **We held that "knowingly" applied not only to the element of transporting or receiving videos but also to the elemental fact that the videos involve "the use of a minor."** *Id.*, at 66, 115 S.Ct. 464. We recognized that this was not "the most grammatical reading of the statute." *Id.*, at 70, 115 S.Ct. 464. But, we explained, "the age of the performers is the crucial element separating legal innocence from wrongful conduct," for possessing sexually explicit videos involving nonminors is protected First Amendment activity. *Id.*, at 72–73, 115 S.Ct. 464.

Finally, in *Rehaif*, we interpreted a statutory scheme in which one statutory subsection provided penalties for anyone who "knowingly violates" a separate subsection. This latter subsection made it "unlawful" for people with certain statuses (i.e., being a felon or being in the country unlawfully) to possess a gun. *Ibid.* We held that the first subsection's "knowingly" language applied to the status element in the second subsection. To convict under the statute, then, the Government had to prove that a defendant knew he had one of the listed statuses. Ibid. "Without knowledge of that status," we reasoned, "the defendant may well lack the intent needed to make his behavior wrongful," because "[a]ssuming compliance with ordinary licensing requirements, the possession of a gun can be entirely innocent." *Ruan v. United States*, No. 20-1410, 2022 WL 2295024, at 5-6 (U.S. June 27, 2022).

As Your Honor can clearly see—none of the requirements concerning scienter, *mens rea*, or "knowingly" violating a statute, that Justice Breyer speaks of as constitutionally required can be found in Petitioner's Original Indictment of February 2004 or his Superseding Indictment of September 2004.

## V.    THE WRIT SHOULD ISSUE AS MASSACHUSETTS WAS NOT THE PROPER VENUE FOR ANY OF THE COUNTS

Just as with the Vicinage Clause in *Smith*, Venue was also not appropriate in that case, and the Defendant in *Smith* at least did something in Florida. In Petitioner-Carpenter's case, since there was no Federal Crime committed at all there was no Federal Crime committed in the District of Massachusetts. As Judge O'Toole stated in his decision from Petitioner's first trial: "Mr. Carpenter has persistently maintained an objection to venue in this District." *United States v. Carpenter*, 405 F. Supp. 2d 85, 88 (D. Mass. 2005). It is guaranteed by the Constitution that a criminal defendant has the right to be tried in an appropriate venue. The importance of this right to the Founders is emphasized by the fact that it is mentioned in the Declaration of Independence as a complaint  and not once, but twice, in the text of the Constitution. *See* U.S. Const. art. III, §2, cl. 3 ("The Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed...."); *id.* amend. VI (requiring trial of a criminal case "by an impartial jury of the State and district wherein the crime shall have been committed"). Congress has further entrenched these norms by an explicit directive that limits a criminal prosecution to "a district in which the offense was committed." Fed.R.Crim.P.18. This rule "echoes the constitutional commands." *United States v. Cabrales,* 524 U.S. 1, 6 (1998). The result is meant to be a safety net for the defendant, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum as has happened to Petitioner not once, but twice.

In this case, Venue with the Massachusetts District Court was improper as Petitioner never was a resident of Massachusetts, nor had he visited Massachusetts in the past 25 years (with the exception of required court appearances), and the Government alleged no overt acts by Petitioner with any connection to the District of Massachusetts in the Indictment.  Because it is indisputable that he did not perform any "essential conduct element" of the crime charged and alleged in the

32

Indictment in the district of Massachusetts, his conviction must be vacated. *See United States v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014). As explained in *Auernheimer*, these constitutional provisions manifest a strong constitutional policy disfavoring trials removed from the situs of the alleged criminal activity. As explained by the First Circuit:

> Venue in a criminal case is not an arcane technicality. It involves matters that touch closely the fair administration of criminal justice and public confidence in it…The result is a safety net, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum solely at the prosecutor's whim. *United States v. Salinas*, 373 F.3d 161, 162, 164 (1st Cir. 2004).

Under the standard set in *Cabrales, Salinas*, and *Auernheimer*, Mr. Carpenter committed no "essential" act in Massachusetts, so it is clear that he committed no crime triable in a Massachusetts court. If "non-disclosure" was the problem, that conduct or lack of conduct happened in Connecticut. If trading options or losing money was the "crime," then that happened in the Southern District of New York. Moreover, there was **zero** evidence adduced at trial showing any conduct of Petitioner that actually "caused" the mailings or wires, and it is clear that all of these mailings and wires were non-fraudulent and not in furtherance of any scheme to defraud. *See Tavares* at 58. *See, also, United States v. Anderson*, 328 U.S. 699, 703 (1946) ("[T]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it."), and *Salinas* at 164.

Moreover, in a criminal case, "venue must be narrowly construed." *United States v. Jefferson*, 674 F.3d 332, 365 (4th Cir. 2012). "Venue…is an element…which must be proved…by a preponderance of the evidence." *United States v. Miller*, 111 F.3d 747, 749-50 (10th Cir. 1997). Hence, all of the counts in this case lack proper venue, because no evidence was adduced at trial showing Petitioner inducing any of the Exchangors to work with Paley or BPETCO. As with a lack of subject matter jurisdiction, improper venue requires dismissal of the

indictment or a judgment of acquittal. *See United States v. Strain*, 396 F.3d 689 (5th Cir. 2005) (remanding for entry of judgment of acquittal due to the government's failure to prove venue and stating that such failure "does not entitle the government to a second chance at prosecution"). Not only must the government prove venue by a preponderance of the evidence at trial, *see Salinas* at 163, but the government must also allege sufficient facts in the Indictment to establish proper venue *ab initio*. In this case, the Government did neither.

A defendant in a criminal case has a constitutional right to be tried in a proper venue. *Johnson* at 275 (noting that two constitutional provisions, Article III, §2, cl. 3 and the Sixth Amendment both provide a right to trial in the state where the crime is committed); *United States v. Uribe*, 890 F.2d 554, 558 (1st Cir. 1989); *see also* Fed. R. Crim. P. 18. The government bears the burden of proof on the issue of venue. *United States v. Lanoue*, 137 F.3d 656, 661 (1st Cir. 1998). "[I]t is readily apparent that venue requirements promote both fairness and public confidence in the criminal justice system." *Johnson* at 276. Venue must be determined by the nature of the crime alleged, by analyzing the actual conduct of the defendant constituting the offense and the location of the criminal act. *Scott* at 35. More than a *de minimis* connection to the district is required. *Uribe* at 559.

The alleged facts in this matter are very similar to those presented in *Salinas* and *Auernheimer*, in that any alleged conduct or omissions by Petitioner occurred outside of Massachusetts. The defendant in *Salinas* was prosecuted for passport fraud not in New York, where the defendant applied for the passport at the post office, but in New Hampshire, where the fraud was discovered by the Passport Office. The First Circuit dismissed the indictment for lack of venue finding that all of the criminal conduct, the elements of the offense, occurred in New York. *Id.* at 165-70. Similarly, in this case, there was simply no justification for laying venue in

Massachusetts as all the alleged conduct by Petitioner occurred in Connecticut or the Southern District of New York. Rightly or wrongly, anything that he did or did not do, he did only in Connecticut or the Southern District of New York, and the Indictment does not contradict this fact.

When an indictment charges a defendant with multiple counts, "venue must be proper with respect to each count." *United States v. Beech-Nut*, 871 F.2d 1181, 1188 (2d Cir. 1989). *See also Travis v. United States*, 364 U.S. 631, 635 (1961) ("Where Congress is not explicit, the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it").

Moreover, that the Supreme Court has construed a necessary connection between venue and the conduct elements of an offense. In general, this connection means that a **criminal defendant's own actions will determine where venue can be laid**. Expanding venue for mail and wire fraud in the way that the government has done in the Indictment would  unhinge this connection and give the government unlimited control of determining where someone can be tried. Based on the First Circuit's decision in *Tavares*, Petitioner had **nothing** to do with causing any of the mailings or wires, nor were they foreseeable to him because he had no idea who Paley was talking to. Under the Government's idea of venue, Petitioner could have been tried in Alaska, Florida, or California if Paley had friends or relatives there that did a property exchange between August and December 2000. That is not how Venue is determined in the First Circuit or any other Circuit.

The Court should further consider granting this Motion expeditiously, because that Writ may be granted in consideration of the traditional Constitutional Venue requirements.  The Sixth Amendment to the Constitution provides that: "In all criminal prosecutions, the accused shall

enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." U.S. Cont. amend. VI. Furthermore, F.R.C.P. Rule 18 states that unless a statute or the rules of procedure themselves permit otherwise, the government must prosecute an offense in the district where the offense was committed.

"Venue is proper only where the acts constituting the offense–the crime's essential conduct elements–took place." *United States v. Tzolov*, 642 F.3d 214, 218 (2d Cir. 2011) (dismissing fraud claim brought in the EDNY instead of the SDNY, literally one subway stop away in New York). *See also United States v. Brennan*, 183 F.3d 139, 147 (2d Cir. 1999) (holding that "prosecution under the mail fraud statute is permissible only in those districts in which a proscribed act occurs"), and *Salinas*, where the defendant's indictment was dismissed due to improper venue because illegal activity occurred in New York, but was only discovered in New Hampshire.

Just as the Founders in Boston felt that London was a distant, remote, and unfriendly forum, so, too, did Petitioner feel about Boston. But, based on the Government's allegations in the Indictment, Petitioner's **only** conduct happened in the District of Connecticut or the Southern District of New York and therefore, the errors in this case constitute the most "fundamental character" and the Writ vacating Petitioner's Conviction should be issued by this Court.

Just as with Jurisdiction, Venue was clearly not proper in this case, and this constitutes Plain Error. A defendant in a criminal case has a constitutional right to be tried in a proper venue. *United States v. Johnson,* 323 U.S. 273, 275 (1944) (noting that two constitutional provisions, Article III, §2, cl. 3 and the Sixth Amendment both provide a right to trial in the state where the crime is committed); *United States v. Uribe*, 890 F.2d 554, 558 (1st Cir. 1989); *see also* Fed. R.

Crim. P. 18. The government bears the burden of proof on the issue of venue. *United States v. Lanoue*, 137 F.3d 656, 661 (1st Cir. 1998). "[I]t is readily apparent that venue requirements promote both fairness and public confidence in the criminal justice system." *Johnson* at 276. Venue must be determined by the nature of the crime alleged, **by analyzing the actual conduct of the defendant constituting the offense and the location of the criminal acts**. *United States v. Scott,* 270 F.3d 30, 35 (1st Cir. 2001). More than a *de minimis* connection to the district is required. *Uribe* at 559. *See United States v. Anderson*, 328 U.S. 699, 703 (1946) "[t]he locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it." These congressional and constitutional protections are meant to provide "**a safety net, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum** solely at the prosecutor's whim." *United States v. Salinas*, 373 F.3d 161, 164 (1st Cir. 2004). Moreover, after *Skilling*, the nondisclosure of option trading could not possibly be the alleged crime that established proper venue, because none of that happened in Massachusetts.

As the District Court stated in its decision from Petitioner's first trial: "Petitioner has persistently maintained an objection to venue in this District." *United States v. Carpenter*, 405 F.Supp.2d 85, 88 (D.Mass. 2005). Venue has not been discussed since 2005, because both jury verdicts were vacated due to egregious prosecutorial misconduct. It is guaranteed by the Constitution that a criminal defendant has the right to be tried in an appropriate venue. The importance of this right to the Founders is emphasized by the fact that it is mentioned in the Declaration of Independence as a complaint and not once, but twice, in the text of the Constitution. *See* U.S. Const. art. III, §2, cl. 3 ("The Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed"); *id.* amend. VI (requiring trial of a criminal case "by

an impartial jury of the State and district wherein the crime shall have been committed"). Congress has further entrenched these norms by an explicit directive that limits a criminal prosecution to "a district in which the offense was committed." Fed.R.Crim.P. 18. This rule "echoes the constitutional commands." *United States v. Cabrales,* 524 U.S. 1, 6 (1998). Under *Salinas,* the result is meant to be a safety net for the defendant, ensuring that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum as has happened to Petitioner not once, but twice. As Judge Lipez recently articulated in his dissent in *United States v. Seward,* 967 F.3d 57 (1st Cir. 2020), **it is solely the actions of the Defendant himself** that establishes proper venue for a criminal prosecution:

> "I agree with my colleagues on the legal framework for our venue analysis. As acknowledged by the majority, and reaffirmed repeatedly by the Supreme Court, "*the locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Anderson* at 703; *United States v. Rodriguez-Moreno,* 526 U.S. 275, 279 (1999); *Cabrales* at 6-7. We part ways, however, on the application of this principle to 18 U.S.C. §2250. In my view, based on a close examination of the text and structure of the statute, its placement in a comprehensive legislative scheme, and the Supreme Court's precedents, the interstate-travel element is not part of the nature of the crime. **Rather, the nature of the crime defined by §2250 is the failure to register or update a registration, such that venue is proper only where that failure occurs. Accordingly, I would vacate Seward's conviction and hold that venue for prosecuting Seward was not proper in Massachusetts.**" *Id.* at 68 (emphasis added).

In Petitioner's case, Venue in the District of Massachusetts was clearly improper as Petitioner never was a resident of Massachusetts, nor did he have anything to do with Massachusetts until the court proceedings in this case began, and the government alleged no overt acts by Petitioner with any connection to the State of Massachusetts in the Indictment. Because it is indisputable that he did not perform any "essential conduct element" of the crime charged and alleged in the Indictment in the district of Massachusetts, his conviction must be vacated. *See, e.g., United States v. Auernheimer,* 748 F.3d 525 (3d Cir. 2014). As explained by the Third Circuit

in *Auernheimer* (citing the First Circuit in *Salinas*), these constitutional provisions manifest a strong constitutional policy disfavoring trials removed from the situs of the Defendant's alleged criminal activity. As explained by the Third Circuit:

> The Supreme Court has repeatedly made clear that the constitutional limitations on venue are extraordinarily important. "[Q]uestions of venue are more than matters of mere procedure. They raise deep issues of public policy in the light of which legislation must be construed." *Travis v. United States,* 364 U.S. 631, 634 (1961). "The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores,* 356 U.S. 405, 407 (1958); *accord United States v. Passodelis,* 615 F.2d 975, 977 (3d Cir. 1980). The founders were so concerned with the location of a criminal trial that they placed the venue requirement, which is "principally a protection for the defendant," *Cabrales* at 9, in the Constitution in two places. *See* U.S. Const. art. III, § 2, cl. 3 and amend. VI. They did so for good reason. A defendant who has been convicted "in a distant, remote, or unfriendly forum solely at the prosecutor's whim," *Salinas* at 164, has had his substantial rights compromised. *See Auernheimer* at 540, *citing Salinas* at 162, 164.

Moreover, in a criminal case, "venue must be narrowly construed." *United States v. Jefferson*, 674 F.3d 332, 365 (4th Cir. 2012). Additionally, "Venue...is an element...which must be proved...by a preponderance of the evidence." *Auernheimer citing Salinas* at 163. All of the counts in the Indictment in this case lacked proper venue because **zero** evidence whatsoever was adduced at trial showing Petitioner inducing any of the Exchangors to work with Paley or BPETCO, or showing any conduct of Petitioner's that actually "caused" the mailings or wires, and it is clear that all of these mailings and wires were non-fraudulent and not "in furtherance of any scheme" to defraud. *See Tavares* at 58. Furthermore, after *Skilling*, "Nondisclosure is outside the bounds of the fraud statutes." *Skilling at* 410. Therefore, there was **zero** evidence whatsoever of any mailings or wires in furtherance of any scheme to defraud that properly established Venue in the District of Massachusetts. *See Salinas* at 164.

Under the standard set in *Cabrales, Salinas,* and *Auernheimer,* Petitioner committed no

"essential" act in Massachusetts, so it is clear that he committed no triable crime in a Massachusetts court. If "non-disclosure" of option trading was the alleged crime, that conduct or lack of conduct happened in Connecticut. If trading options or losing money was the "crime," then that happened in the Southern District of New York. As with a lack of subject matter jurisdiction, this is not "harmless error," and therefore improper venue requires dismissal of the indictment and setting aside of the Judgment in this case. *See, e.g., United States v. Strain*, 396 F.3d 689 (5th Cir. 2005) (remanding for entry of judgment of acquittal due to the government's failure to prove venue and stating that such failure "does not entitle the government to a second chance at prosecution."). Not only must the government prove venue by a preponderance of the evidence at trial, *see Salinas* at 163, but it must also allege sufficient facts in the Indictment to establish proper venue *ab initio*. This the government did not do. Therefore, because Petitioner did not raise this issue on appeal, he realizes that he must satisfy the Plain Error standard of *Rosales-Mireles,* which he clearly does because improper Venue can never be harmless error. *See Auernheimer* at 540.

The alleged facts in this matter are very similar to the facts presented in *Salinas*, in that any alleged conduct or omissions by Petitioner occurred outside of Massachusetts. In *Salinas,* the defendant was prosecuted for passport fraud in New Hampshire where the fraud was discovered by the Passport Office, rather than in New York, where the defendant applied for the passport. The Court dismissed the indictment for lack of venue finding that all of the criminal conduct - the elements of the offense - occurred in New York. *Id.* at 165-70. Similarly, in this case, there was simply no justification for laying venue in Massachusetts as all of the alleged conduct by Petitioner occurred in Connecticut or New York. Rightly or wrongly, anything that Petitioner did or did not do, he did only in Connecticut or New York, and the Indictment of 20004 does not contradict that fact. If this Court were to replace Petitioner's name with *"Salinas"* and "Passport"

with "Option Trading," then Petitioner is entitled to the same relief received as the defendants in *Salinas* and *Auernheimer*.

## VI.   THE INDICTMENT WAS UNTIMELY AND DID NOT PROVIDE CONSTITUTIONAL FAIR WARNING

The Supreme Court's decisions in *Kokesh v. S.E.C.,* 137 S.Ct. 1635 (2017) and *Gabelli v. S.E.C.,* 568 U.S. 442 (2014) are also dispositive of this case because any fraudulent BPETCO contracts were drafted by Martin Paley in 1997 or 1998 at the latest. In *Kokesh*, Justice Sotomayor wrote for a unanimous Supreme Court, where it was determined that §2462 established a 5-year limitations period for "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture." *See Kokesh* at 1638, *quoting Gabelli* at 454. In fact, Chief Justice Roberts further explained the absolute nature of the Statute of Limitations in criminal cases for any type of criminal penalties as follows: "[T]he Statute of Limitations, the five-year clock for 28 U.S.C. §2462, begins to tick when a defendant's allegedly fraudulent conduct occurs." *Gabelli* at 448.

Since Petitioner's allegedly fraudulent conduct could only be in 1998 when Petitioner met Mr. Paley who drafted the Exchangor Agreements, the September 2004 Indictment was barred by the Statute of Limitations. *See* 18 U.S.C. §3582. The Supreme Court's decisions in *Gabelli* and *Kokesh* explained the absolute nature of the Statute of Limitations in criminal cases for any type of criminal penalties and are dispositive of this case. Chief Justice Roberts went on to say in *Gabelli*: "Statutes of limitations set a fixed date when exposure to the specified Government enforcement efforts end." Such limits are "vital to the welfare of society" and rest on the principle that "even wrongdoers are entitled to assume that their sins may be forgotten." *Gabelli* at 448-49, *citing Wilson v. Garcia*, 471 U.S. 261, 271 (1985).

Clearly, if Petitioner had "Fair Warning" that he faced three years in prison and forfeitures of $14 million just from losing money in the stock market, there is no question that he would never

41

have involved himself with Marty Paley or Merrill Lynch in the BPETCO debacle. Moreover, the

Government has never answered the simple question as to what could have Petitioner invested in,

lost all of the investor funds like in the *LandAmerica* case, or the *OptionsSellers.com* case, and yet

not have been indicted? Therefore, Petitioner is in this predicament not because of his own conduct

or omissions, but rather because the indictments of 2004 failed to state a crime under federal law or

give Petitioner the "Fair Warning" as required by the Supreme Court in *Marinello* and several

other cases since Petitioner's second trial in 2008. The Supreme Court made clear the concept of

"Fair Warning" is a fundamental protection for all defendants accused of a crime. The Supreme

Court's decision in *Marinello v. United States*, 138 S.Ct. 1101 (2018) provides that a defendant

must know that what he is doing is crossing a line into "illegal conduct," as well as the

**punishment he will receive** if that bright line is passed:

> "We wrote that we have traditionally exercised restraint in assessing the reach of
> a federal criminal statute, both out of deference to the prerogatives of Congress
> and out of concern that a fair warning should be given to the world in language
> that the common world will understand, ***of what the law intends to do if a certain
> line is passed.*** *McBoyle v. United States*, 283 U.S. 25, 27 (1931)." *Marinello* at
> 1106 (emphasis added).

The use of Justice Oliver Wendell Holmes' description of knowing what Society will do

to you when the "bright line" of the law is crossed is particularly appropriate for this case where

20 years later, Petitioner is still making the case that what he did was not criminal at all. For

example, the defendant in *McBoyle* literally stole an airplane but was charged under the

Automobile Act as if he had stolen a car. In this case, Petitioner was accused of Mail and Wire

Fraud for losing $8 million of client funds during the NASDAQ Stock Market Crash of 2000, but

at this late date there is not a single exhibit showing that Petitioner lied to anyone about anything

at any time or had the evil intent to steal anyone's money, harm anyone, or that he *caused* any

mailing or wire *in furtherance* of any fraud. So, whereas the defendant in *McBoyle* really did

steal a plane and the defendant in *Marinello* really did commit tax evasion, Petitioner did not do any act that he was accused of, nor could he reasonably believe that any of his conduct was criminal or would put him in prison for three years. All of these "Fair Warning" cases happened after Petitioner's second trial 2008, and none of these "Fair Warning" issues were raised by Petitioner's attorneys on appeal.

Similarly, the defendants in *Rosa-Ortiz* and *Peter* (not to mention the defendant in *United States v. Guzman-Merced*, 2020 WL 7585176 (1st Cir. 2020) (from December 2020) actually did the act they pleaded guilty to, but it turned out not to be a federal crime and their convictions were vacated. Now, with *Marinello*, it is "Constitutionally" clear that not only do you need to know you are breaking the law, you must also know that you will be punished for your conduct, and you must also know the penalty for breaking the law as well. Perhaps the best analogy the Supreme Court uses in *Marinello* is that every American couple pays their babysitter in cash. Neither the parents nor the babysitter report that to the IRS as taxable income. Clearly, that could be considered a violation of the tax laws, but no one would seriously believe the babysitter would be sentenced to 36 months for accepting cash "under the table" for doing her job. Similarly, no one could expect that Petitioner could possibly expect that he would be sentenced to 36 months for losing money in the stock market, especially when one considers that had PaineWebber not stripped the accounts, Petitioner could have been up $15 million in January of 2001 rather than being down $9 million in December of 2000 after the contested election of November 2000.

Once again, Petitioner is a much better example than *Peter, Rosa-Ortiz, Marinello,* and *Guzman-Merced* combined. As the Supreme Court teaches us in *Morissette v. United States*, 342 U.S. 246 (1952), for there to be a crime, an evil act must be concurrent with an evil mind. "Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind

with an evil-doing hand," quoting Justice Holmes' famous observation that "[e]ven a dog distinguishes between being stumbled over and being kicked." *Id.* at 251-52. In *Elonis v. United States,* 135 S.Ct. 2001 (2015), Chief Justice Roberts confirmed that the cornerstone of American Jurisprudence is that a person should not be deemed criminally responsible for mere negligence.

Chief Justice Roberts further stated that the government must allege and prove that the person had the necessary criminal intent or criminal *mens rea* before conduct could be considered criminal, and that this principle of criminal justice in America is "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. *Morissette* at 250." Similarly, as was stated by Justice Gorsuch in *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011):

> "[t]he contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. *Morissette* at 250. The simple fact is intent and knowledge are different things, different as a matter of their plain meaning, different in their treatment in modern American criminal law. And the sentencing commission chose here to invoke the former term, not the latter. The guidelines' definition of "intended loss" makes no mention of knowledge or some lesser *mens rea* standard." *Manatau* at 1051.

Also, in *United States* v. *United States Gypsum,* 438 U.S. 422 (1978), the clear-cut requirement of *mens rea* for a crime is firmly embedded in the American System of Justice. As the Supreme Court has observed, "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of American criminal jurisprudence." *Id.* at 436. "Thus, to meet the statute's *mens rea* requirement, a defendant must consciously behave in a way the statute prohibits." *Id.* at 445. Therefore, something more is required than the doing of the act proscribed by the statute. *United States v. Balint*, 258 U.S. 250 (1922).

In *Liparota v. United States*, 471 U.S. 419 (1985), the Supreme Court "rejected that

interpretation of the statute, because it would have criminalized a broad range of apparently innocent conduct and swept in individuals who had no knowledge of the facts that made their conduct blameworthy." *Elonis* at 2010, *citing Liparota* at 426. Petitioner never received the "fair warning" that the Supreme Court said was "essential" in *Marinello,* and that before someone can be prosecuted they must know they are breaking the law and crossing that "bright line" as stated in *Arthur Andersen v. United States,* 544 U.S. 696 (2005):

> "Fair warning should be...in language the common world will understand, of what the law intends to do if a certain line is passed. *McBoyle* at 27."

Clearly the Court realizes that there was no intended crime here, and no criminal *mens rea* and absolutely no criminal scienter. This Court knows better than anyone that Petitioner never intended to defraud the Exchangors and that the Exchangors have been paid back almost $50 million in Petitioner's legal victories over PaineWebber and Merrill Lynch on their $8 million losses in the stock market crash of 2000. **Even the District Court noted that: "He always intended to pay the money back."** Furthermore, Petitioner did not *cause* any of the mailings or wires in this case, and none of the mailings or wires were done in the furtherance of any fraud as required by *Tavares*, because there was no scheme to defraud based on *Skilling*. Petitioner's conviction should therefore be set aside because there were no facts alleged in the indictment or proven at trial that showed the "concurrence of an evil-meaning mind at the same time an evil act is committed" to be considered.

## VII.    THE DUE PROCESS VIOLATIONS IN THIS CASE ARE EXTRAORDINARY

All of the errors in this case are constitutional and structural errors and clearly amount to one large Due Process Clause violation, requiring the vacating of Petitioner's conviction. It is also the established law of the United States that a conviction obtained through testimony the

prosecutor knows to be false is repugnant to the Constitution. *See, e.g., Mooney v. Holohan*, 55 S.Ct. 340 (1935). As the Supreme Court stated in its unanimous decision in *Giglio*: "It has long been established that the prosecutor's deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972). *See, also, Banks v. Dretke*, 540 U.S. 668 (2004): "A conviction based on testimony known by the prosecutor to be perjurious is a denial of due process."

The First Circuit has also made it clear that the knowing use of perjured testimony is also considered to be a serious Brady violation and requires the order of a new trial. *See United States v. Gonzalez- Gonzalez*, 258 F.3d 16, 21 (1st Cir. 2001), *citing Strickler v. Green*, 527 U.S. 263, 280-81 (1999).

In *Drumgold*, the First Circuit described Mooney's core premise as "well-settled" in the First Circuit citing to *Coggins v. O'Brien*, 188 F.2d 130, 138 (1st Cir. 1951) and the Supreme Court's unanimous decision in *Napue v. Illinois*, 360 U.S. 264, 269 (1959) that was also cited by the Supreme Court's unanimous decision in Giglio. The First Circuit goes on in citing *Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004), *citing Miller v. Pate*, 386 U.S. 1 (1967): "In 1967, the very year the crimes took place, Justice Stewart, writing for a unanimous court stated More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. There has been no deviation from that established principle." *Miller* at 7. *See, also, Ouimette v. Moran*, 942 F.2d 1 (1st Cir. 1991), where the First Circuit vacated defendant's conviction because the government withheld evidence of defendant's partner's criminal background).

Judge Roach, in her 2016 Opinion in the BPETCO civil litigation against Merrill Lynch, also refers to Merrill's General Counsel Bevilacqua, as well as other Merrill executives' testimony

that it was clear to them that a number of people at Merrill had been lying for many years, participating in the Snyder and Bingham lies and cover-up of lies, as well as the destruction and spoliation of evidence. As the Supreme Court has described, the Government's conduct in this case clearly warranted a new trial as the case was "infested with constitutional errors." *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995). *See, also, Wearry v. Cain*, 136 S.Ct. 1002 (2016), where only one *Brady* violation took a convict off of death row and required a new trial:

> "[T]he suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* at 87. *See also Giglio* (clarifying that the rule stated in *Brady* applies to evidence undermining witness credibility). "Evidence qualifies as material when there is "any reasonable likelihood" it could have affected the verdict. *Giglio* at 150 (*quoting Napue* at 271). To prevail on his *Brady* claim, Wearry need not show that he "more likely than not" would have been acquitted had the new evidence been admitted. *Smith v. Cain*, 132 S.Ct. 627, 629-31 (2012). He must show only that the new evidence is sufficient to "undermine confidence" in the verdict. *Ibid." Wearry* at 1006 (emphasis added).

Now Petitioner seeks the delayed justice of having his conviction set aside by this Court in issuing a Writ of Audita Querela, and having his indictment dismissed, and his good name restored based on the Government's egregious violations of his constitutional rights in the knowing use of evidence they knew to be false and outright perjury that they heard twice in two trials in 2005 and 2008. Sad, but true, if Petitioner had Judge Roach's Opinion in February of 2014, at sentencing instead of May 2016 (See Doc. 545), Petitioner's life would have been totally different. Clearly Judge Roach's Opinion shows that Attorney Snyder coached the Merrill witnesses to lie, and because of their repeated lies in the civil forum, they had to continue repeating those lies in Petitioner's criminal trials in 2005 and 2008, and the Government worked in concert with Merrill Lynch's Attorney Snyder to suborn knowing perjury in both of his trials as well as the civil litigation with the Exchangors after 2008.

Attorney Snyder also knew about the February 2008 Iantosca lawsuit, the SEC

investigations, the NASD investigations, the Malia file, and the David Patterson information that came out when Dickstein Shapiro took over in 2009. Snyder as counsel for Merrill Lynch, and separate counsel for the Exchangors, sat directly behind the prosecution at both of Petitioner's trials, and unbelievably did not mention any of this information to the prosecution, including the newly-discovered Iantosca lawsuit against Merrill Lynch of February 2008 which Petitioner did not even hear about until April of 2009. Perhaps the prosecution did not think that they had a duty under *Brady* and *Jencks* to share this exculpatory information with Petitioner. Clearly the Supreme Court disagrees with that decision, based on its definitive decision in *Turner v. United States*, 137 S.Ct. 1885 (2017):

> The Government does not contest petitioners' claim that the withheld evidence was "favorable to the accused, either because it is exculpatory, or because it is impeaching." Strickler at 281-82. Neither does the Government contest petitioners' claim that it "suppressed" the evidence, "either willfully or inadvertently." Id. at 282. It does, as it must, concede that the Brady rules "overriding concern [is] with the justice of the finding of guilt," *United States v. Bagley*, 473 U.S. 667, 678 (1985) (*quoting United States v. Agurs*, 427 U.S. 97, 112 (1976)), and that the Government's "interest...in a criminal prosecution is not that it shall win a case, but that justice shall be done," *Kyles v. Whitley*, 514 U.S. 419, 439 (1995) (*quoting Berger v. United States*, 295 U.S. 78, 88 (1935)). Consistent with these principles, the Government assured the Court at oral argument that subsequent to petitioners' trial, it has adopted a "generous policy of discovery" in criminal cases under which it discloses any "information that a defendant might wish to use." As we have recognized, and as the Government agrees, id., "[t]his is as it should be." *Kyles* at 439 (explaining that a "prudent prosecutor['s]" better course is to take care to disclose any evidence favorable to the defendant (*quoting Agurs* at 108)). *Turner* at 1893, *citing Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (emphasis added).

Assuming, arguendo, that even if Attorney Snyder purposefully hid all of the Merrill lies from the Government, his knowledge is still imputed to the Government because Snyder was there for each and every 302 Report used against Petitioner in his Grand Jury hearing and sat behind the Government every day of his 2008 trial. Moreover, the knowledge of the SEC and NASD investigations of Merrill concerning BPETCO are clearly *Brady* materials attributable to the

Government that should have been turned over to the defense, but were not. This failure alone of the Government to turn over vital material information warranted a new trial in 2013 and now warrants the vacating of Petitioner's conviction by issuing the Writ.

The simple fact that Judge Roach's 2016 opinion mentions several SEC investigations that Petitioner must have passed and the Government did not turn over that *Brady-Giglio-Jencks* evidence, demands that a Writ of Audita Querela should issue pursuant to the Supreme Court's decision in Turner at 1893, citing Cone at 469-70. See, once again, the quote from *Turner* above. Just as important to Petitioner is the fact that the Court knows there was only one witness at Petitioner's Grand Jury, and that was an FBI Agent who just repeated all of the lies that were told to him by the brokers at Merrill Lynch. This, too, is a separate reason to issue the Writ to set aside Petitioner's conviction.

## CONCLUSION

While the First Circuit did apologize to Petitioner for all of the delays in this case, it is Your Honor who established that an apology is not good enough for any violation of the Constitution. Petitioner's conviction should be vacated for any one of a dozen fundamental errors and violations of the Constitution, but the Writ of Audita Querela is the appropriate vehicle because there was no crime here – and if there was a crime here it was not committed by the Petitioner in the District of Massachusetts. So, the Vicinage Clause of the Constitution was violated, and the Supreme Court did not rule on that until 2023. Therefore, Petitioner respectfully requests that this Court uses its inherent power to vacate Petitioner's conviction and issue the Writ without further delay after 20 years of injustice and constitutional violations.

Respectfully Submitted,

*/s/ Daniel E. Carpenter*
Daniel E. Carpenter
Petitioner, *pro se*
18 Pondside Lane
West Simsbury, CT 06092